## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, by Attorney General KATHLEEN G. KANE, | CIVIL ACTION NO. _____ |
| Plaintiff, | |
| v. | |
| THINK FINANCE, INC., TC LOAN SERVICE, LLC, ELEVATE CREDIT, INC., FINANCIAL U, LLC, KENNETH E. REES, WILLIAM WEINSTEIN, WEINSTEIN, PINSON AND RILEY, PS, CERASTES, LLC, NATIONAL CREDIT ADJUSTERS, LLC, SELLING SOURCE, LLC and PARTNERWEEKLY, LLC, d/b/a MONEYMUTUAL.COM , and other JOHN DOE persons or entities, | |
| Defendants. | |

### NOTICE OF REMOVAL

Defendants Think Finance, Inc., TC Loan Service, LLC, and Financial U, LLC, hereby remove this civil action from the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1441.

In further support of this Notice of Removal, Defendants state as follows:

### PROCEDURAL HISTORY

1.     On November 13, 2014, the Commonwealth of Pennsylvania, acting through its Attorney General, the Honorable Kathleen G. Kane, filed this action in the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, Case No. 141101359.

2.     On November 20, 2014, the Attorney General served the Complaint and Summons on Defendants Think Finance, Inc., and TC Loan Service, LLC. True and correct copies of the Complaint, with exhibits, and Summons are attached hereto as Exhibit A. On December 15, 2014, counsel for Financial U, LLC, accepted service on its behalf. A true and

1

sf-3482425

correct copy of the signed Acceptance of Service is attached hereto as Exhibit B.

3.      Exhibits A-B constitute all of the process, pleadings, and orders served on Think Finance, Inc., TC Loan Service, LLC, and Financial U, LLC, in this case, and are attached hereto pursuant to 28 U.S.C. § 1446(a).

## TIMELINESS OF REMOVAL

4.      Defendants' removal notice is timely under 28 U.S.C. § 1446(b) because it is filed within thirty (30) days after service of the Summons and Complaint upon Defendants Think Finance, Inc., and TC Loan Service, LLC, on November 20, 2014.

## VENUE

5.      The Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, is located within the Eastern District of Pennsylvania. 28 U.S.C. § 118(a). This Notice of Removal is therefore properly filed in this Court pursuant to 28 U.S.C. § 1441(a).

## BASIS FOR REMOVAL JURISDICTION

**I.      The Allegations.**

6.      The Complaint challenges Defendants Think Finance, Inc. ("Think Finance"), TC Loan Service, LLC ("TC Loan Service"), Elevate Credit, Inc., Financial U, LLC, and Kenneth Rees' (collectively, the "Think Finance Defendants") provision of services to a bank and three Native American tribes who offered loans and cash advances over the internet. According to the Complaint, the bank and the tribes were only "nominal" lenders, (Compl. ¶¶ 32, 45), and the Think Defendants associated with them in order "[t]o evade licensure, *usury* and consumer protection laws" regulating payday loans offered to Pennsylvania consumers, (*id.* ¶ 2 (emphasis added)).

7.      The Complaint alleges a two-part "scheme." Under the "first phase," Defendants Think Finance,[1] TC Loan Service, and Rees allegedly utilized a so-called "rent-a-bank" model, in which they partnered with First Bank of Delaware ("FBD"), a bank insulated from state

---

[1] Prior to 2010, Think Finance was known as ThinkCash, Inc. (Compl. ¶ 30.)

regulation, to serve as "nominal lender," while they served as "the *de facto*, non-bank lender" that in actuality "marketed, funded and collected the loan and performed other lender functions." (*Id.* ¶ 32.) This partnership allowed Think Finance "to offer high-rate 'installment loans' as the supposed servicing agent of the bank." (*Id.* ¶ 36.) According to the Complaint, the "rent-a-bank scheme" continued in spite of a Federal Deposit Insurance Corporation ("FDIC") cease and desist order until 2011. (*Id.* ¶¶ 37-40.)

        8.     Plaintiff alleges that under the "second phase" of the "scheme," the Think Finance Defendants adopted a so-called "rent-a-tribe" model, in which they relied on three Native American tribes to perform the role of "nominal lender" originally held by FBD. (*Id.* ¶ 45.) The loan agreements used by two of the tribes contained a provision stating that the borrower "consent[ed] to the sole subject matter and personal jurisdiction" of the lending tribe and "further agree[d] that no other state or federal law or regulation" applies to the loan agreement, its enforcement, or interpretation. (*See id.* ¶¶ 57, 59; *id.* Ex. D (Plain Green Loan Agreement), Ex. E (Great Plains Lending Agreement).) The third tribe's agreement contained similar provisions. (*See id.* ¶ 67; *id.* Ex. F at XVI. Transfer of Rights; Maintenance of Register ("[T]his agreement shall remain exclusively subject to the laws and courts of the Tribe. As an integral component of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal courts for the purposes of this Agreement."), XVIII. Governing Law (stating that the agreement is governed by tribal law, the Indian Commerce Clause, and other applicable federal law).

        9.     Whether through the alleged rent-a-bank or rent-a-tribe model, the core of Plaintiff's allegations are that the interest charged on the loans made to Pennsylvania consumers under the Think Finance Defendants' scheme was usurious and in violation of section 201 of Pennsylvania's Loan Interest and Protection Law, 41 P.S. § 201. (*See, e.g.*, Compl. ¶¶ 1, 31-32, 44, 48.) Indeed, Plaintiff variously describes the loans as "illegal" and "usurious." (*See id.* ¶ 2 (alleging that the loans at issue are "illegal loans that flout Pennsylvania law"), ¶ 3 ("illegal loans made through this scheme to Pennsylvania residents"), ¶ 18 ("illegal usurious loans"), ¶ 19 (same), ¶ 39 ("illegal loans"), ¶ 42 ("illegal, usurious loans"), ¶ 44 (describing Tribal loans as

"usurious loan products").)  Each of Plaintiff's five claims turn, at least in part, on this alleged charging of illegal interest.  Plaintiff's first three claims for violations of Pennsylvania's Corrupt Organizations Act, 18 Pa. C.S.A. § 911, are premised on the underlying "racketeering activity" of collecting interest at a rate that exceeds 25% per year.  (Compl. ¶¶ 93, 97, 106, 113.) Plaintiff's fourth claim, for violation of the Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1 *et seq.*, is predicated upon Defendants' collection of interest in excess of the limits created by Pennsylvania's usury law, whether as debt collectors or creditors.  (Compl. ¶¶ 122-24.)  Finally, under Plaintiff's fifth claim, Defendants are alleged to have violated the Consumer Protection Law, 73 P.S. § 201-1 *et seq.*, "because the credit offered is unlawful in Pennsylvania." (Compl. ¶ 132.)

## II.      Federal Question Jurisdiction

10.      This is a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and is one that may be removed to this Court pursuant to the provisions of 28 U.S.C. § 1446.

11.      Federal question jurisdiction exists when an action presents a claim "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Under the well-pleaded complaint rule, a claim ordinarily arises under federal law only when a federal question is presented on the face of the complaint.  *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  There are, however, at least two exceptions to the well-pleaded complaint rule: the complete preemption doctrine and the substantial federal question doctrine.  Both of those exceptions apply in this case.

### A.      Complete Preemption

12.      The Complaint can be removed because it falls under the "complete preemption" exception to the well-pleaded complaint rule.  The complete preemption doctrine allows for the removal of cases in which the "pre-emptive force of [federal law] is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'"  *Caterpillar*, 482 U.S. at 393 (citation omitted).

13.    The Complaint includes claims that are subject to federal question jurisdiction because the Complaint challenges the amount of interest that FBD charged for loans, and state-law challenges to the amount of interest charged by a state-chartered, federally insured bank are completely preempted and arise under federal law.

14.    FBD was a federally insured, state-chartered bank existing under the laws of Delaware. (*See* Compl. ¶ 35; *id.* Ex. A at p. 1, p. 2 ¶ 4; Declaration of Ira N. Richards ("Richards Decl.") Ex. A (FDIC, Demographic Information, First Bank of Delaware).)[2]  As such, it was subject to the provisions of § 521 of the Depository Institution Deregulation and Monetary Control Act ("DIDA"), 12 U.S.C. § 1831d.  "DIDA creates a federal remedy in favor of borrowers who are charged rates in excess of the limit established in § 521(a)." *Hill v. Chem. Bank*, 799 F. Supp. 948, 951 (D. Minn. 1992).

15.    In *Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003), the Supreme Court held that §§ 85 and 86 of the National Bank Act ("NBA") completely preempt state law usury claims against national banks.  539 U.S. at 11 ("Because §§ 85 and 86 provide the exclusive cause of action for [usury] . . . claims, there is, in short, no such thing as a state-law claim of usury against a national bank. . . . This cause of action against national banks only arises under federal law and could, therefore, be removed under § 1441.").  Explaining that § 521 contains an express preemption clause and "incorporates verbatim the language of § 85 of the NBA," the Third Circuit followed *Beneficial National Bank* in holding that § 521 of DIDA "completely preempts any state law attempting to limit the amount of interest and fees a federally insured-state chartered bank can charge." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 295 (3d Cir. 2005)

---

[2] In determining whether a complaint includes any claims that are completely preempted, a "court may 'look beyond the face of the complaint to determine whether a plaintiff has artfully pleaded his suit so as to couch a federal claim in terms of state law.'" *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 274 (3d Cir. 2001) (quoting *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1488 (7th Cir. 1996); *see Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 399-402 (3d Cir. 2004) (considering evidence extrinsic to the complaint to determine whether complete preemption applied and created federal jurisdiction); *Palmer v. Kraft Foods Global, Inc.*, No. 13-6260, 2014 U.S. Dist. LEXIS 10700, at *9-15 (E.D. Pa. Jan. 29, 2014) (same).

sf-3482425

("*In re Community Bank*"); *cf. Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 824, 827 (1st Cir. 1992) (noting that parallel provisions of DIDA and the NBA should be read *in pari materia* and holding that § 521 expressly preempts state laws regulating interest).

16.     To analyze whether complete preemption arose from the allegations before it, the Court of Appeals focused on whether the complaint "alleged state law claims of unlawful interest by a nationally or state chartered bank." *In re Cmty. Bank*, 418 F.3d at 296.  It declined to find such claims in the complaint before it because (1) the complaint did not assert any claims against a national or state-chartered federally insured bank, and (2) the complaint did not assert any usury claims against any party under state law.  *Id.*  Here, neither of these reasons applies to bar the conclusion that complete preemption arises.

17.     As in *In re Community Bank*, the Complaint does not directly assert claims against a bank, but it nonetheless alleges state law claims of unlawful interest by FBD.  *See id.* The Third Circuit explained that the complaint before it asserted no claims that challenged a bank's interest rate because the loans at issue were made by a non-depository institution, and then bought by another non-bank in the secondary market.  *Id.* at 296-97.  In contrast, the Complaint attacks the interest rate charged on loans *made by* FBD.

18.     The Complaint concedes that under the first phase of the Think Finance Defendants' alleged "scheme," FBD made the loans issued to Pennsylvania consumers.  (*See* Compl. ¶ 36.)  Plaintiff also makes the vague and conclusory allegation that FBD was used by the Think Finance Defendants as a "nominal" lender to evade state usury laws, without explaining what that means or offering any factual support.  (*Id.* ¶ 32.)  Plaintiff alleges that in 2008, the FDIC ordered FBD to cease its "'lending programs offered, marketed, administered, processed and/or serviced by third-parties,' specifically the bank's agreement with 'TC Loan Service, LLC d/b/a ThinkCash.'"  (*Id.* ¶ 37 (internal citation omitted).)

19.     However, the documents attached to the Complaint and referenced within it demonstrate that this allegation is simply wrong.  The documents show that the FDIC ordered FBD to terminate only "*certain* third-party lending programs and third-party providers that

exhibit the characteristics of a 'Rent-a-BIN' or 'Rent-a-ICA' arrangement," and specifically permitted FBD to continue doing business with other entities, including those at issue here. (*See id.* Ex. A. at p. 4 ¶ 9 (emphasis added), *id.* at Ex. C to Ex. A ¶¶ 16, 18.) The Complaint references the FDIC's cease and desist order, (Compl. ¶ 37), but does not attach it, (*see* Richards Decl. Ex. B). That order explains that the "Rent-a-BIN" or "Rent-a-ICA" arrangements it prohibits are those detailed in the FDIC's *Credit Card Activities Manual*, (*id.* at 4), which explains that a "Rent-a-BIN" or "Rent-a-ICA" arrangement is one in which a bank allows a third party to conduct credit card activities with or through one of the bank's BINs or ICAs, which are numbers issued by a card association, such as Visa or MasterCard, to identify the bank for various processes, (Richards Decl. Ex. C at 120 & n.8). The bank receives a "rental" fee in exchange for allowing the entity to use its BIN or ICA. (*Id.* at 120.) Essentially, the bank is either renting its right to offer credit cards that have the applicable card association's label logo or allowing the third party to use its BIN or ICA to acquire merchants and settle their credit card transactions. (*Id.*; *id.* Ex. D at 180.)

20.     By the FDIC's own view, the arrangement between FBD and the Think Finance Defendants did not have "Rent-a-BIN" or "Rent-a-ICA" characteristics. According to the allegations in the Complaint, FBD offered online loans and cash advances. (Compl. ¶¶ 1, 32, 36.) There are no allegations of any activities related to credit cards, much less that FBD received fees from the Think Finance Defendants for use of one of FBD's BINs or ICAs. More fundamentally, the FDIC order *expressly authorized* FBD to continue to do business with the Think-related entities "Marketing provider Tailwind Marketing, LLC" and "Software provider TC Decision Sciences, LLC." (*Id.* at Ex. C to Ex. A ¶¶ 16, 18.) Plaintiff's allegations that the FDIC ordered FBD and the Think Finance Defendants to terminate their arrangement, and that FBD and Think continued to operate illegally after 2008, is, therefore, flat wrong. Accordingly, there are no viable allegations in the Complaint to even suggest that FBD served as anything other than the lender in a legitimate lending program, for which the Think Finance Defendants provided ancillary services. Thus, unlike in *In re Community Bank*, Plaintiff's claims directly

challenge the interest rate of bank-made loans.

21.     Plaintiff itself has also approved the very lending program it now attacks. Plaintiff suggests that the program was not legitimate because the Think Finance Defendants "marketed, funded, and collected the loan and performed other lender functions." (Compl. ¶ 32.) It also disputes the legitimacy of the Think Finance Defendants' relationship with the tribes with allegations that the Think Finance Defendants "provide the infrastructure to market, fund, underwrite and collect the loans, providing some or all of the following: customer leads, a technology platform, investors who fund the loans, and/or the payment-processing and collection mechanisms . . . ." (*Id.* ¶¶ 48; *see also id.* ¶ 106 (Think Finance Defendants engaging in "racketeering activity" by "designing, providing and managing the web technology that powers" the tribal lending programs; providing marketing assistance; arranging for provision of capital; and arranging for sale of uncollected debt).)  These alleged activities, however, were detailed to the Commonwealth and sanctioned by it.

22.     To bring its loan program with FBD to Pennsylvania, TC Loan Service (doing business as ThinkCash) applied for a credit services loan broker license with the Pennsylvania Department of Banking in 2007.  (Declaration of Kristen M. Hensley ("Hensley Decl.") Ex. A.) As part of that application, TC Loan Service provided a fulsome description of its partnership with FBD.  It stated that TC Loan Service would be the "marketer/servicer" for the program, providing consumer marketing, application processing, ongoing customer support, and collections services.  (*Id.* at Attachment 2.)  FBD would serve as lender and provide underwriting criteria, rollbacks, funding, and payment processing.  (*Id.*)  TC Loan Service specifically noted that it had a marketing and servicing agreement with FBD and would receive a one-time fee for each new loan made by a customer.  (*Id.*)  The Department of Banking approved TC Loan Service's application and issued it a license.  (*Id.*)  As Plaintiff had earlier approved of the Think Finance Defendants' role in the lending program, its attempt to now cast that same role as illegitimate or illegal fails.  The lending program at issue in the Complaint was disclosed, reviewed, and found by Plaintiff itself to be *legitimate*.  Plaintiff's allegations to the contrary are

simply implausible.

23.     While the absence of a bank defendant in *In re Community Bank* signaled that the plaintiff's claims were not directed at a bank's exercise of its federally granted powers, such an inference has no force in this case. First, FBD's absence here does not diminish the fact that Plaintiff's Complaint, unlike the complaint in *In re Community Bank*, challenges the interest FBD charged on loans it originated. (*See* Hensley Decl. Ex. A at Attachment 2 ("Although ThinkCash is the marketer/servicer for the program, the bank is the lender.") The Eight Circuit has confirmed that where a complaint challenges a bank's interest rate, complete preemption may arise even though the bank itself is not a defendant. *See Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000). In *Krispin*, holders of a department store's credit card brought a case alleging violation of Missouri's usury laws. The court concluded that removal based upon complete preemption under the NBA was proper because even though there were no claims against a national or state-chartered bank, the loans were issued by a national bank. *Id.* It explained that even though the store purchased the bank's receivables daily, it made "sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies." *Id.* Second, it is questionable whether FBD *could* be added as a defendant—it "is no longer in business." (Compl. ¶ 43.)

24.     Courts have likewise held in the general preemption context that claims against non-bank defendants may be preempted where they interfere with the exercise of a bank's authorized powers. As one court succinctly stated, "the question here is not *whom* the [state] statute regulates, but rather, against *what activity* it regulates." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 532 (1st Cir. 2007) (citing *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 127 S. Ct. 1559, 1570 (2007)) (holding that state law claims against mall defendant that acted as agent for national bank's gift card program were preempted by the NBA because the state law indirectly prohibited the bank from exercising an allowed activity by prohibiting the mall from doing it); *see also State Farm Bank v. Reardon*, 539 F.3d 336, 349 (6th Cir. 2008) (claims based on state statute that regulated independent agents of bank against such agents were preempted under the

Home Owners' Loan Act because they had the effect of impinging on bank's exercise of federally granted powers); *Sawyer v. Bill Me Later, Inc.*, --- F. Supp. 2d ---, 2014 WL 2159044, at *4, *8 (D. Utah May 23, 2014) (where bank originated loans, state usury claims against non-bank service provider were preempted by DIDA even though plaintiff alleged that bank was not the true lender and program was intentionally structured to evade certain state usury laws). Here, the challenge to FBD's banking power is direct, as Plaintiff predicates each of its claims on violations of state laws that limit interest rates, in contradiction to FBD's power to set interest rates under federal law.

25.     In sum, under the analysis required by the Third Circuit, complete preemption arises here because the Complaint "allege[s] state law claims of unlawful interest by a nationally or state chartered bank." *In re Cmty. Bank*, 418 F.3d at 296.

**B.   Substantial Question of Federal Law**

26.     A second exception to the well-pleaded complaint rule arises where a state-law claim turns on a substantial, dispositive issue of federal law. *Franchise Tax Bd. for State of Cal. v. Constr. Laborers Vacation Trust of S. Cal.*, 463 U.S. 1, 9 (1983), *superseded by statute on other grounds*, 28 U.S.C. § 1441(e); *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 201-02 (1921). A state-law claim gives rise to federal question jurisdiction if the claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).

27.     This Court has federal question jurisdiction over Plaintiff's Complaint because it necessarily raises and actually disputes at least two substantial federal issues. The alleged misconduct underlying Plaintiff's claims is that the Think Finance Defendants made loans and cash advances for which they charged interest in excess of the limits set by Pennsylvania usury law. In particular, Plaintiff alleges that under the "second phase" of the Think Finance Defendant's alleged "scheme," it partnered with three Native American tribes to make those

sf-3482425

loans and cash advances. (Compl. ¶¶ 45, 47-48.) As with FBD, Plaintiff concedes that the tribes were the lenders in the lending program at issue. (*Id.* ¶ 48.) Plaintiff also alleges, and exhibits attached to the Complaint show, that the tribes asserted that tribal law governs the loans. (*Id.* ¶¶ 57, 59, 67; *id.* Exs. D, E, F.) To resolve Plaintiff's claims, each of which is premised on a violation of state law, the Court must decide first, whether state law governs the loans and second, whether the tribes' assertion of jurisdiction is valid.

28.     Whether the loans originated by the tribes are subject to Pennsylvania law raises a substantial and disputed federal issue. "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (citation omitted). They retain the right to "make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220 (1959). Nonetheless, "Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980). In light of these two principles, the Supreme Court has held that states may regulate tribal activities, but only in a limited manner that considers the tribe's right to self-government and Congress's power to manage tribal affairs. *Id.* at 142-43. Thus, even though Plaintiff's Complaint is premised on violations of Pennsylvania law, the Court must first resort to this federal law to determine whether such laws have any force as to the loans made by the tribes, or if they remain subject to tribal law alone.

29.     Plaintiff's claims will remain unresolved, however, without the Court's decision on a second federal issue. As set forth above, the loan agreements entered into between the tribes and borrowers contain choice-of-law and forum selection provisions that assume the tribes' legal authority over the borrowers. Before Plaintiff's claims may proceed—all of which, again, assume that Pennsylvania law applies—the Court must also determine whether these provisions are valid. If they are, Plaintiff's claims fail because Pennsylvania law will be inapplicable. Whether the provisions are valid requires determining whether the provisions reflect a valid exercise of the tribes' civil jurisdiction over nonmembers, a matter of federal law.

*See U.S. ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 905 (9th Cir. 1994) ("Tribal jurisdiction over non-Indians is a question of federal law . . . .").

30.     As the Supreme Court has explained, although Indian tribes generally lack legal authority over persons who are not tribal members, there are two exceptions to that general rule. *Montana v. United States*, 450 U.S. 544, 565 (1981).  The first exception is relevant here: "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.*  In this case, the Court must evaluate whether this exception applies and allows the tribes to exercise the regulatory and judicial authority asserted by the loan contract provisions.  Plaintiff's Complaint thus also depends on this second disputed and substantial issue of federal law.

31.     This Court may entertain the claims asserted in the Complaint without disturbing any congressionally approved balance of federal and state judicial responsibilities.  That balance "as to Indian tribes is heavily weighted on the federal side," *Massachusetts v. Wampanoag Tribe of Gay Head*, No. 13-13286-FDS, 2014 WL 2998989, at *4 (D. Mass. July 1, 2014), as it has been recognized that "Indian sovereignty and the congressional goal of Indian self-government" are "important federal interests," *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216-17 (1987) (so stating in the related context of tribal gaming), *superseded by statute on other grounds as stated in Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014).

32.     Removal based on the existence of a substantial federal question is therefore warranted.  *See Grable & Sons Metal Prods.*, 545 U.S. at 313-14.

### SUPPLEMENTAL JURISDICTION UNDER 28 U.S.C. § 1367

33.     This Court should exercise supplemental jurisdiction under 28 U.S.C. § 1367 over any claims that are not independently removable.  *See* 28 U.S.C. § 1367(a).

### CONSENT AND JOINDER

34.     Defendants Elevate Credit, Inc., Kenneth E. Rees, William Weinstein, Weinstein, Pinson and Riley PS, Cerastes, LLC, National Credit Adjusters, LLC, Selling Source LLC; and

sf-3482425

PartnerWeekly, LLC d/b/a Moneymutual.com have consented to and/or joined in this notice of removal as shown by the forms that as are attached hereto as Exhibit C.  No consent is necessary as to the remaining defendants, "John Does," who are not named in the complaint and have not been served.  *Green v. Am. Online (AOL)*, 318 F.3d 465, 470 (3d Cir. 2003) ("However, the general rule that all defendants must join in a notice of removal may be disregarded where, as here, the non-joining defendants are unknown.").

**NOTICE TO STATE COURT AND PLAINTIFF**

35.    Counsel for Defendant certifies that pursuant to 28 U.S.C. § 1446(d), copies of this Notice of Removal will be filed with the Clerk of the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, and served on Plaintiff promptly.

Dated: December 17, 2014

Respectfully submitted,

Ira Neil Richards (PA I.D. No. 50879)
Stephen A. Fogdall (PA I.D. No. 87444)
Arleigh P. Helfer III (PA I.D. No. 84427)
Schnader Harrison Segal & Lewis LLP
1600 Market St., Suite 3600
Philadelphia, PA 19103
(215)751-2503
ahelfer@schnader.com

James R. McGuire (*Pro hac vice* to be filed)
Angela E. Kleine (*Pro hac vice* to be filed)
Elizabeth Balassone (*Pro hac vice* to be filed)
Lauren Wroblewski (*Pro hac vice* to be filed)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105-2482
(415) 268-7000

Attorneys for Defendants
THINK FINANCE, INC., TC LOAN
SERVICES, LLC, and FINANCIAL U, LLC

sf-3482425