# Exhibit A

KATHLEEN G. KANE
*Attorney General*

JAMES A. DONAHUE III
*Executive Deputy Attorney General*
*Public Protection Division*

SAVERIO P. MIRARCHI
*Deputy Attorney General*
PA Attorney I.D. #88616
Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
21 South 12th Street, 2nd Floor
Philadelphia, Pennsylvania 19107
Phone: (215) 560-2414
Fax: (215) 560-2494
Email: smirarchi@attorneygeneral.gov

Special Counsel:
IRV ACKELSBERG
PA Attorney I.D. #23813
Howard I. Langer
John J. Grogan
Edward A. Diver
Peter Leckman
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, Pennsylvania 19103
Phone: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com

**THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

_____

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **November Term, 2014** |
| **by Attorney General** | : | |
| **KATHLEEN G. KANE** | : | **No.** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | |
| | : | |

Case ID: 141101359

**THINK FINANCE, INC., TC LOAN SERVICE, LLC,** :
**ELEVATE CREDIT, INC., FINANCIAL U, LLC and** :
**KENNETH E. REES** :
**4150 International Plaza, Suite 400** :
**Fort Worth, Texas 76109-4819** :
                                                                          :
**WILLIAM WEINSTEIN, WEINSTEIN, PINSON** :
**AND RILEY, PS and CERASTES, LLC** :
**2001 Western Avenue, Suite 430** :
**Seattle, Washington 98121-3132** :
                                                                          :
**NATIONAL CREDIT ADJUSTERS, LLC** :
**327 W. 4th Avenue** :
**Hutchinson, Kansas 67501** :
                                                                          :
**SELLING SOURCE, LLC and PARTNERWEEKLY,** :
**LLC, d/b/a MONEYMUTUAL.COM** :
**325 E. Warm Springs Road** :
**Las Vegas, Nevada  89119-4238** :
                                                                          :
                            **-and-** :
                                                                          :
**other JOHN DOE persons or entities** :

<u>**NOTICE TO DEFEND**</u>

        YOU HAVE BEEN SUED IN COURT.  IF YOU WISH TO DEFEND AGAINST THE
CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN
TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY
ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND
FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE
CLAIMS SET FORTH AGAINST YOU.  YOU ARE WARNED THAT IF YOU FAIL TO DO
SO THE CASE MAY PROCEED WITHOUT YOU, AND A JUDGMENT MAY BE
ENTERED AGAINST YOU WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED
IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE
PLAINTIFF.  YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS
IMPORTANT TO YOU.

        **YOU SHOULD TAKE THIS NOTICE TO YOUR LAWYER AT ONCE.  IF YOU
DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE(S) SET FORTH
BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT
HIRING A LAWYER.**

        **IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE
ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY**

**OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, PA 19107
Telephone: (215) 238-1701

## AVISO

Le han demandado a usted en la corte. Si usted quiere defen derse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias, de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacio. Ademas, la corte puede decider a favor del demandante y require que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
SERVICIO DE REFERENCIA INFORMACION LEGAL
One Reading Center
Filadelphia, Pennsylvania 19107
Telefono: (215) 238-1701

Case ID: 141101359

KATHLEEN G. KANE
*Attorney General*

JAMES A. DONAHUE III
*Executive Deputy Attorney General*
*Public Protection Division*

SAVERIO P. MIRARCHI
*Deputy Attorney General*
PA Attorney I.D. #88616
Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
21 South 12th Street, 2nd Floor
Philadelphia, Pennsylvania 19107
Phone: (215) 560-2414
Fax: (215) 560-2494
Email: smirarchi@attorneygeneral.gov

Special Counsel:
IRV ACKELSBERG
PA Attorney I.D. #23813
Howard I. Langer
John J. Grogan
Edward A. Diver
Peter Leckman
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Phone: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com

**THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **November Term, 2014** |
| **by Attorney General** | : | |
| **KATHLEEN G. KANE** | : | **No.** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | |
| | : | |

Case ID: 141101359

THINK FINANCE, INC., TC LOAN SERVICE, LLC,   :
ELEVATE CREDIT, INC., FINANCIAL U, LLC and   :
KENNETH E. REES   :
4150 International Plaza, Suite 400   :
Fort Worth, Texas 76109-4819   :
   :
WILLIAM WEINSTEIN, WEINSTEIN, PINSON   :
AND RILEY, PS and CERASTES, LLC   :
2001 Western Avenue, Suite 430   :
Seattle, Washington 98121-3132   :
   :
NATIONAL CREDIT ADJUSTERS, LLC   :
327 W. 4th Avenue   :
Hutchinson, Kansas 67501   :
   :
SELLING SOURCE, LLC and PARTNERWEEKLY,   :
LLC, d/b/a MONEYMUTUAL.COM   :
325 E. Warm Springs Road   :
Las Vegas, Nevada  89119-4238   :
   :
             -and-   :
   :
other JOHN DOE persons or entities   :
   :
             Defendants   :

## COMPLAINT

The Commonwealth of Pennsylvania, by its Attorney General, the Honorable Kathleen

G. Kane, brings this Complaint against Think Finance, Inc., TC Loan Service, LLC, Elevate

Credit, Inc., Financial U, LLC, Kenneth E. Rees, William Weinstein, Weinstein, Pinson & Riley,

PS, Cerastes, LLC, National Credit Adjusters, LLC, Selling Source, LLC and PartnerWeekly,

LLC, d/b/a MoneyMutual.com, and other John Doe persons and entities (collectively

"Defendants"), pursuant to the Pennsylvania Corrupt Organizations Act, 18 Pa. C.S.A. § 911, *et*

*seq*. (hereinafter "PA COA"); for  violations of the Unfair Trade Practices and Consumer

Protection Law, 73 P.S. § 201-1, *et seq*. (hereinafter "Consumer Protection Law"), to restrain

unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful

2

Case ID: 141101359

by Section 201-3 of the Consumer Protection Law; and for violations of the Pennsylvania Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1, *et seq*. (hereinafter "FCEUA") and alleges as follows:

## I.  INTRODUCTION

1.     Defendants illegally solicit, arrange, fund, purchase, service and/or collect loans and cash advances made to Pennsylvania citizens over the Internet. These loans and cash advances charge well in excess of the usury ceiling established by Pennsylvania law. Defendants also engage in various forms of unfair or deceptive conduct related to that business activity.

2.     To evade licensure, usury and consumer protection laws, Defendants Think Finance, Inc., TC Loan Service, LLC, Elevate Credit, Inc., Financial U, LLC and Kenneth Rees (hereinafter "the Think Finance Defendants") have used affiliations with a rogue bank and Native American tribes as vehicles for this illegal activity. Knowing that banks and tribal corporations have insulation from state jurisdiction under the doctrines of federal bank preemption and tribal sovereign immunity, the Think Finance Defendants have, as an alternative to making the loans in their own name, structured, participated in, and operated this scheme in which they act as providers of contracted "services" to the bank and the tribes, and, through such devices, have profited from illegal loans that flout Pennsylvania law, using deliberate deceptions targeting Pennsylvania consumers.

3.     Also involved in this scheme are various debt buyers and debt collectors, including, but not limited to, Defendants William Weinstein, Weinstein, Pinson and Riley, PS and Cerastes, LLC (hereinafter collectively, "the Weinstein Defendants") and National Credit Adjusters, LLC, who are actively collecting or attempting to collect illegal loans made through this scheme to Pennsylvania residents.

3

Case ID: 141101359

4.      Also currently or formerly involved in the illegal lending scheme are the affiliated marketing companies, Selling Source, LLC and PartnerWeekly, LLC, d/b/a MoneyMutual.com (hereinafter collectively, the Selling Source Defendants), which generate leads over the Internet for high-rate lenders and, upon information and belief,  have made referrals of Pennsylvania residents to the scheme for a commission.

5.      In this action, the Commonwealth, through its Attorney General, asserts and exercises its enforcement authority and power under the following Pennsylvania statutes:  (a) the Corrupt Organizations Act, 18 Pa. C.S.A.  § 911; (b) the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*; and (c) the Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1.

6.      The Bureau of Consumer Protection of the Office of the Attorney General and the Pennsylvania Department of Banking and Securities (hereinafter "the Banking Department") have received numerous complaints from consumers harmed by the scheme alleged herein. Among the consumers victimized by the Defendants are Pennsylvania citizens at or above the age of 60. The Commonwealth believes there are numerous consumers who have been harmed due to the methods, acts and practices alleged herein.

7.      The public interest is served by seeking before this Honorable court a permanent injunction to restrain the methods, acts and practices alleged, including restitution and disgorgement of all income and monies Defendants have derived from these methods, acts and practices, as well as civil penalties, and investigative and litigation costs, including but not limited to attorney's fees.

## II.  THE PARTIES

Case ID: 141101359

8.      Plaintiff is the Commonwealth of Pennsylvania, appearing through its Attorney General, the Honorable Kathleen G. Kane, with offices at 21 South 12th Street, 2nd Floor, Philadelphia, Pennsylvania 19107 and at Strawberry Square, 15th Floor, Harrisburg, Pennsylvania 17120.

9.      Article 4, § 4.1 of the Pennsylvania Constitution designates the Attorney General as "the chief law officer of the Commonwealth." *See also* 71 P.S. § 732-204(c) (directing the Attorney General, as a general matter, to represent the Commonwealth in all civil actions brought by the Commonwealth).

10.     The Attorney General is, by statute, expressly designated as the Commonwealth agency authorized to enforce the following two statutes and to seek injunctive and other appropriate relief to restrain conduct prohibited by such statutes: PA COA, 18 Pa. C.S.A. § 911(e) and the Consumer Protection Law, 73 P.S. § 201-4.

11.     Defendant Think Finance, Inc. is a Delaware corporation headquartered at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. It formerly had the name ThinkCash, Inc. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

12.     Defendant TC Loan Service, LLC is a Delaware limited liability company located at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is registered with the Pennsylvania Department of State Corporation Bureau as a Pennsylvania limited liability company. It is registered with the Pennsylvania Department of Banking as a foreign limited liability company, which during the period 12/29/2010 to 2/1/2012, was doing business in Pennsylvania as a "credit services" licensee, from the website www.thinkcash.com.

5

Case ID: 141101359

13.     Defendant Elevate Credit, Inc. is a Delaware corporation located at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

14.     Defendant Financial U, LLC is a Delaware limited liability company with offices at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

15.     Defendant Kenneth E. Rees is an individual residing in Texas who, until the business restructuring described below, was the President and Chief Executive Officer of Think Finance, Inc. He is currently the Chief Executive Officer of Elevate Credit, Inc. and, upon information and belief, retains a controlling interest and operational role in Think Finance. He personally has designed and directed the business activity described herein.

16.     Defendant William Weinstein is an attorney, debt buyer and debt collector who, upon information and belief, resides in Washington State and is the principal of a Washington law firm, Defendant Weinstein, Pinson and Riley, PS, that specializes in debt collection, with principal offices at 2001 Western Avenue, Suite 400, Seattle, Washington 98121. These defendants are not registered with the Pennsylvania Department of State Corporation Bureau.

17.     Located at the same Seattle address as Defendant Weinstein's law firm are other corporate entities controlled by Weinstein. These entities purchase large portfolios of bad debt and function as the client of Weinstein's law firm. One such entity is Defendant Cerastes, Inc., a Delaware corporation. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau. (hereinafter Weinstein; Weinstein, Pinson and Riley, PS; and Cerastes will be collectively referred to as "the Weinstein Defendants.")

Case ID: 141101359

18.     Cerastes has purchased illegal usurious loans made to Pennsylvania residents, either from the Think Finance Defendants, and/or from the tribal entities affiliated with the Think Finance Defendants or from other nominal entities designated by the scheme to hold the loans, or is the successor to another Weinstein corporation or limited liability company that purchased the debt, and has been engaging in debt collection activity pertaining to such loans. At Defendant Weinstein's direction, his law firm, Defendant Weinstein, Pinson and Riley have been engaged in collection activity directed against Pennsylvania residents regarding such loans.

19.     Defendant National Credit Adjusters, LLC (hereinafter "NCA") is a Kansas limited liability company located at 327 W. 4th Street, Hutchinson, Kansas 67501. NCA has either purchased illegal usurious loans made to Pennsylvania residents from the Think Finance Defendants and/or from the tribal entities affiliated with the Think Finance Defendants or from other nominal entities designated by the scheme to hold the loans, or is the successor to another corporation or limited liability company that purchased the debt, and has been engaging in debt collection activity pertaining to such loans. This defendant is registered with the Pennsylvania Department of State Corporation Bureau as a foreign limited liability company located in Kansas.

20.     Defendant Selling Source, LLC, is a Delaware limited liability company, based in Las Vegas, Nevada. It is a holding company that owns other legal entities engaged in marketing over the Internet. One of those entities is PartnerWeekly, LLC, a Nevada limited liability company, which is located at 325 E. Warm Springs Road, Las Vegas, Nevada 89119. PartnerWeekly, LLC generates leads for sale to lenders including the Think Finance Defendants and/or their tribal lender affiliates. These defendants are not registered with the Pennsylvania Department of State Corporation Bureau, nor is the fictitious name "Money Mutual" registered.

7

Case ID: 141101359

21.     Defendants John Doe include the various other non-tribal persons or entities that, in concert with and/or at the direction of the Think Finance Defendants, have participated in the funding, origination, collection or marketing of loans made in the name of "ThinkCash", "Plain Green," "Great Plains Lending" and "MobiLoans." Such persons or entities include, but are not limited to: the lessee of a Philadelphia postal box that is designated to receive payments relating to loans made in the name of Plain Green or Great Plains Lending; entities that Think Finance has located or arranged to provide the lending capital used to make loans to Pennsylvania residents or to funnel such lending capital to the tribal entities; additional entities that Think Finance has located or arranged to purchase and/or collect unpaid balances purportedly owed by Pennsylvania borrowers; and those entities that are involved in processing payments that are electronically debited from the bank accounts of Pennsylvania consumers. Plaintiff does not yet know the identity of these persons or entities but does intend to add them as party-defendants as their identities become known.

## III.  JURISDICTION AND VENUE

22.     This Court has jurisdiction to hear this matter pursuant to 42 Pa. C.S.A. § 931 which grants this Court "unlimited original jurisdiction of all actions and proceedings."

23.     This Court has personal jurisdiction over Defendants pursuant to 42 Pa. C.S.A. § 5322 in that Defendants (a) are transacting business in this Commonwealth, as defined by 42 Pa. C.S.A. § 5322(a)(1), (b) are causing harm to Pennsylvania citizens by acts occurring outside the Commonwealth, 42 Pa. C.S.A. § 5322(a)(4), or (c) have maintained the most minimum contact with this Commonwealth allowed under the United States Constitution, 42 Pa. C.S.A. § 5322(b).

8

Case ID: 141101359

24.     Venue is appropriate in this Court because harmed consumers reside in this county. Pa. R. Civ. P. 1006(a). Moreover, various instrumentalities of the scheme have been located in Philadelphia, making this a county in which "a transaction or occurrence took place out of which the cause of action arose." *Id*. The operational center of First Bank of Delaware, a key partner in the scheme, was located in a Philadelphia office building. Currently, the postal box designated for receipt of payments on loans made in the name of Plain Green and Great Plains Lending is located in Philadelphia.

## IV.  THE FACTS OF THE CASE

### a.  Pennsylvania Restrictions on High-Rate Lending over the Internet

25.     Under Section 201 of the Loan Interest and Protection Law (hereinafter "LIPL"), 41 P.S. § 201, the maximum lawful rate of interest for the loan and use of money in amounts less than $50,000 is six percent per year.

26.     The six-percent interest cap applies to all consumer lenders except those lenders who are licensed under the Consumer Discount Company Act (hereinafter "CDCA"), 7 P.S. §§ 6201-6219, and who make loans in accordance with the limitations and requirements of that statute. *See Pa. Dept. of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752 (Pa. 2008). This cap applies to all credit-related charges, however labeled, and applies to credit lines as well as fixed-amount loans. *Id*.

27.     As of February 1, 2009, the usury restrictions imposed by LIPL and the CDCA apply to loans made to Pennsylvania citizens over the Internet. *Cash America Net of Nevada, LLC v. Com., Dept. of Banking*, 8 A.3d 282 (Pa. 2010) (upholding 2008 Banking Dept. official interpretation that went into effect February 1, 2009).

9

28.     Thus, as of February 1, 2009, "payday lending"—the "consumer lending practice in which a lender offers consumers high-rate, short-term loans secured by either a post-dated check or a debit authorization from a bank," *id.*, 8 A.3d at 284—has been illegal in Pennsylvania, whether done through storefronts or over the Internet.

29.     The Think Finance Defendants are not licensed under the CDCA, and thus they are prohibited from making and collecting on any consumer loans to Pennsylvania citizens that charge interest at rates in excess of six percent.

**b.  Phase One of the Scheme:  Rent-A-Bank**

30.     Prior to a 2010 corporate name change, Defendant Think Finance, Inc. was known as ThinkCash, Inc.

31.     ThinkCash, Inc. was formed by Defendant Rees in or around 2001 as a payday lender that operated over the Internet rather than through "bricks and mortar" payday lending stores, making short-term loans at effective annual rates in excess of 200 or 300 percent. Early on, Defendant Rees, using various affiliated companies, offered two payday loan products, one called "PaydayOne" and one called "ThinkCash." Upon information and belief, Defendant Rees and other Think Finance Defendants offered "PaydayOne" loans in states where payday lending was legal and designed an equivalent "ThinkCash" loan product for use in states, like Pennsylvania, where payday lending was not legal.

32.     Because they could not target or contract with Pennsylvania consumers directly for the usurious and illegal loans, Defendants Think Finance (then "ThinkCash"), TC Loan Service, LLC and Rees, utilized a lending model known in the money lending industry as "rent-a-bank" to do so indirectly. Under this model, a payday lender legally prohibited from making loans in a particular jurisdiction would evade those legal restrictions by partnering with an out-

10

of-state bank that, for a fee, would act as the nominal lender while the *de facto*, non-bank lender marketed, funded and collected the loan and performed other lender functions. Because banks are insulated from state examination and regulation by virtue of federal bank pre-emption doctrines, many payday lenders were, for a period of time, able to use these "rent-a-bank" arrangements to evade enforcement in states where, like Pennsylvania, payday lending is illegal under state law.

33.     Beginning in 2005, the Federal Deposit and Insurance Corporation. (hereinafter "FDIC") began to limit its regulated banks with regard to their "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005.

34.     As a result of that policy announcement by the FDIC, most banks that were engaged in rent-a-bank partnerships with payday lenders terminated those relationships. Thus, all of the storefront payday lending that had been conducted in Pennsylvania through the use of these bank partnerships ceased and those stores closed.

35.     However, one FDIC-regulated bank, First Bank of Delaware (hereinafter "FBD"), operating mainly from an office building in Center City Philadelphia, developed a niche specialty in providing banking services to payday lenders and other merchants involved in illegal activity to circumvent the law of Pennsylvania and other jurisdictions.

36.     One of the payday lenders that established a relationship with this rogue bank was Defendant TC Loan Service, LLC, d/b/a "ThinkCash." Through its version of the rent-a-bank model, ThinkCash and FBD developed a relationship that enabled ThinkCash to offer high-rate "installment loans" as the supposed servicing agent of the bank, representing itself on its website as "ThinkCash by First Bank of Delaware."

11

37.     In October, 2008, however, the FDIC initiated an enforcement action against FBD that, among other things, resulted in an administrative order to cease and desist the bank's "lending programs offered, marketed, administered, processed and/or serviced by third-parties," including, specifically, the bank's agreement with "TC Loan Service, LLC d/b/a ThinkCash." *See In the Matter of First Bank of Delaware*, FDIC-07-256b and FDIC-07-257k (June 10, 2008 Notice of Charges for an Order to Cease and Desist and Oct. 3, 2008 Stipulation and Consent to the Issuance of An Order to Cease and Desist, the latter of which a copy is attached hereto as Exhibit A).

38.     At the time of this cease and desist order, the Pennsylvania Banking Department had already issued its official interpretation clarifying that it would begin enforcing state usury restrictions against payday lenders transacting business with Pennsylvania borrowers over the Internet, giving the industry until February 1, 2009 to end all such activity.

39.     In willful and deliberate disregard of the FDIC cease and desist order and the Banking Department announcement, FBD and the Think Finance Defendants continued operating their rent-a-bank scheme and, specifically, continued to make their illegal loans to Pennsylvania consumers. Attached as Exhibit B is a July, 2010 computer screenshot of a marketing email directed to a consumer by a lender calling itself "ThinkCash by First Bank of Delaware," with a "Customer Support" mailing address in Philadelphia.

40.     The Think Finance Defendants continued loan-related activity through its relationship with FBD until sometime in 2011. While continuing this illegal activity through the FBD relationship, the Think Finance Defendants began at the same time to plan for a transition to a whole new mechanism for this activity. This plan included, among other things, (a) the 2010 corporate name change of ThinkCash, Inc. to Think Finance, Inc.; and (b) a structural shift from a "rent-a-bank" model to the "rent-a-tribe" model described below.

12

Case ID: 141101359

41.     With its arrangement with FBD facing the continuing threat of regulatory and other law enforcement pressure, the Think Finance Defendants pursued various alternative strategies for recharacterizing or restructuring its illegal usury business in Pennsylvania. On December 29, 2010, shortly before it ceased making loans to Pennsylvania consumers under its "ThinkCash" label, Defendant TC Loan Service, LLC obtained a Pennsylvania license as a "credit services organization," pursuant to the Credit Services Act, 73 P.S. § 2181, *et seq.*

42.     In registering itself as such an entity, Defendant TC Loan Service, LLC represented itself to the Banking Department as:

> A person who, with respect to the extension of credit by others, sells, provides or performs or represents that he or she can or will sell, provide or perform any of the following services in return for the payment of money or other valuable consideration:
> > (i) Improving a buyer's credit record, history or rating.
> > (ii) Obtaining an extension of credit for a buyer.
> > (iii) Providing advice or assistance to a buyer with regard to either subparagraph (i) or (ii).

73 P.S. § 2182. Upon information and belief, Defendant did not conduct any business in Pennsylvania as a "credit services organization," and, instead, elected to continue the scheme involving illegal, usurious loans in Pennsylvania via the rent-a-tribe structure described below.

43.     FBD is no longer in business. On October 23, 2012, its shareholders voted to dissolve the bank and on November 12, 2012 the United States Department of Justice announced a settlement resulting, *inter alia*, in the bank's payment of a $15 million civil penalty. *See United States v. First Bank of Delaware*, No. 12-6500-HB (E.D. Pa.). The FDIC sold all of the bank's assets to a Pennsylvania-based bank, but, upon information and belief, these assets did not include any of the ThinkCash loans, over which the Think Finance Defendants continued to exercise ownership and control.

13

Case ID: 141101359

c. **Phase Two of the Scheme:  Rent-A-Tribe**

44.     Despite the loss of their partnership with FBD, the Think Finance Defendants created a new mechanism to continue the usury scheme, turning to a model that Internet payday lenders in the United States had developed as a lucrative substitute for the rent-a-bank model. Under this new model, known in the money lending industry as "rent-a tribe," the payday lender would try to take advantage of the similar immunity from state enforcement enjoyed by Native American tribes through business relationships with a tribe that could enable the payday lender to construct a tribal façade for its usurious loan products.

45.     Upon information and belief, the strategy of the Think Finance Defendants was to identify a tribal partner willing to play a function similar to the role played by FBD in the ThinkCash arrangement, with the tribe performing the role of nominal lender but with Think Finance earning significant revenues generated by the lending activity, denominated as fees or charges for services provided to the tribal entity.

46.     Think Finance also desired, through such arrangement with such tribal entity or entities to continue to exploit the existing ThinkCash customer base to generate future loans and to create a structure that produced revenues for itself equivalent to or greater than those earned from its in-house credit products like PaydayOne loans.

47.     The Think Finance Defendants established business relationships with three separate Native American tribes. These tribal  entities and the lending websites they operate in conjunction with Think Finance are:

> a.  The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana (hereinafter "Chippewa Cree Tribe") and its lending website, www.plaingreen.com (hereinafter "Plain Green");

Case ID: 141101359

b.  The Otoe-Missouria Tribe of Indians, located in Red Rock, Oklahoma (hereinafter "Otoe-Missouria Tribe") and its lending website, www.greatplainslending.com (hereinafter "Great Plains Lending"); and

c.  The Tunica-Biloxi Tribe of Louisiana (hereinafter "Tunica-Biloxi Tribe") and its website, www.mobiloans.com (hereinafter "MobiLoans").

48.     Under the rent-a-tribe version of the Think Finance usury scheme, the loans are made in the name of lender affiliated with one of these tribes, but, upon information and belief, the Think Finance Defendants provide the infrastructure to market, fund, underwrite and collect the loans, providing some or all of the following: customer leads, a technology platform, investors who fund the loans, and/or the payment-processing and collection mechanisms used to obtain payments from consumers. Defendants earn significant revenues from the scheme through providing such services to the three tribal entities.

49.     Upon information and belief, the Think Finance Defendants created "Financial U" as a mechanism intended to justify the extraction of additional revenues from the scheme, disguised as payments for services provided. Each of the three websites, supposedly associated with separate Native American tribes that have no relationship to each other, offer the identical "educational" videos and tools as a service made available to loan borrowers, purportedly provided by "Financial U."

50.     Upon information and belief, the Think Finance Defendants charge the tribes for the use of this "Financial U" material, in amounts in excess of any actual value provided to the tribes or their customers through such material, and through this subterfuge, the Think Finance Defendants conceal the nature and extent of their participation in or direction of the scheme, and the extent to which the revenues generated by these three supposedly unrelated websites actually flow to the Think Finance Defendants rather than the three tribes that sponsor the respective websites.

15

51.     In a 2012 interview appearing in a Dallas on-line feature on "Dallas Entrepreneurs of the Year 2012," Defendant Rees bragged that despite losing a "bank client" in 2010— presumably referring to his rent-a-bank relationship with FBD—that had been the source of more than half of the annual revenue for Think Finance, the company managed to increase revenue by 15% in 2011 and projected a 50% increase in 2012 through its "new direction," namely, providing a so-called "technology platform to Native American tribes with lending businesses." *See* http://www.dmagazine.com/Home/D_CEO/2012/July_August/Ernst_and_Young_Dallas_Entrepreneurs_of_the_Year_2012_07.aspx.

52.     The first of the Think Finance partnerships was the "Plain Green" label. It began approximately in March, 2011, when the Chippewa Cree Tribe changed an existing tribal payday loan business into one designed and supported by Think Finance.

53.     Among the benefits Defendants used to induce the Chippewa Cree Tribe into this partnership was Defendants' existing portfolio of customers and existing loan balances from the ThinkCash-FBD period. As part of its arrangement with the tribe, the Think Finance Defendants transferred the existing ThinkCash loans and the ThinkCash customer database to the new "Plain Green" entity.

54.     Think Finance designed the web platform used by Plain Green so that existing ThinkCash customers visiting the ThinkCash website at www.thinkcash.com would be routed automatically to the Plain Green site, www.plaingreenloans.com, where they would be recognized as an existing customer and able to log into their account and, if they wished, could obtain new loans. Attached as Exhibit C is a printout of what a ThinkCash customer, visiting the site www.thinkcash.com would have seen in June, 2011, including (a) a "Welcome Back" greeting containing the logos of both ThinkCash and Plain Green, and an automatic link to the

16

Case ID: 141101359

Plain Green site, (b) an "FAQ" page that explained how Plain Green was now available to offer

"the same prompt, friendly customer service," and loans up to $2,500, "using the same email

address and password you used for your ThinkCash account," and (c) the Plain Green loan

application page to which the returning ThinkCash customer would be automatically routed.

55.     In fact, Pennsylvania consumers who had obtained usurious loans from the

ThinkCash site returned for more money and obtained loans, at equivalent or higher cost, from

"Plain Green."

56.     Attached as Exhibit D is a redacted loan agreement between a Pennsylvania

consumer and Plain Green, created over the Internet during May, 2012, on the Plain Green

website developed and managed by Think Finance.  The loan is for $1,200, payable over a

period of approximately 14 months, at an Annual Percentage Rate of 279.22%.  These terms are

those that appear under the "Loan Cost and Terms" page on the Plain Green website,

http://www.plaingreenloans.com/loan-cost-and-terms.

57.     The sample Plain Green loan agreement is on a form contract that contains the

following provision in a paragraph beginning, **This Loan Agreement ("the Agreement") is**

**subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe of the**

**Rocky Boy's Indian Reservation, Montana ("Chippewa Cree")**:

> By executing this Agreement, you hereby acknowledge and consent to be bound
> to the terms of this Agreement, consent to the sole subject matter and personal
> jurisdiction of the Chippewa Cree Tribal Court, and further agree that no other
> state or federal law or regulation shall apply to this Agreement, its enforcement or
> interpretation.

58.     Sometime after establishing its relationship with the Chippewa Cree Tribe, Think

Finance established a similar relationship with the Otoe-Missouria Tribe, calling the lender

created by this second relationship "Great Plains Lending." Attached as Exhibit E is a redacted

Case ID: 141101359

loan agreement between a Pennsylvania consumer and Great Plains Lending, created over the Internet during July, 2012, on a website developed and managed by Think Finance. The loan is for $600, payable over a period of approximately seven months, at an Annual Percentage Rate of 448.77%. These terms are those that appear under the "Loan Cost and Terms" page on the Great Plains Lending website, https://www.greatplainslending.com/loan-cost-and-terms.

59.     The sample Great Plains Lending loan agreement is on a form contract that contains the following provision in a paragraph beginning, **This Loan Agreement ("the Agreement") is subject solely to the exclusive laws and jurisdiction of the Otoe-Missouria Tribe of Indians, a federally recognized Indian tribe**:

> By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the Otoe-Missouria Tribe of Indians Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.

60.     The form contracts used by Plain Green and Great Plains Lending are nearly identical, because, upon information and belief, the Think Finance Defendants and/or their agents participated in drafting them.

61.     Upon information and belief, numerous Pennsylvania consumers entered into such loan contracts with these two tribal entities affiliated with Think Finance.

62.     Defendant's third "tribal" relationship is with the Tunica-Biloxi Tribe, the nominal lender behind the credit product "MobiLoans" and the website www.mobiloans.com. Described on the website as "Fast cash for people on the go," this product differs from the other two in that instead of offering consumers loans at specific amounts, it offers an ongoing "line of credit." However, despite this difference, the Moiloans product is designed to generate fees and charges equivalent to those generated by Plain Green or Great Plains Lending loans.

18

Case ID: 141101359

63.     According to the MobiLoans website, "[o]ne of the best features of the MobiLoans line of credit is simple, easy-to-understand pricing." This pricing includes fees that are charged in two ways. First, there are upfront fees, including a "cash advance" fee of $3 per $20 received for advances up to $500, and $2 per $20 for larger advances. The upfront fee is charged at the front end, as soon as the cash proceeds are transferred into the consumer's account. Second, as consumers repay the credit over time, a "Fixed Finance Charge" is added to the loan balance which, according to the website, is "calculated on a tiered level based upon the unpaid balance."

64.     Consumers with open MobiLoans balances are billed every two weeks, and invited to pay a "minimum payment" that is calculated in accordance with a standard formula. The MobiLoans website provides illustrations of the amount of fees and charges generated by such "minimum payment" repayments. *See* http://www.MobiLoans.com/What-It-Costs. One such illustration is for a MobiLoans cash advance of $1,000, repaid in accordance with that "minimum payment" formula, where consumer will make 20 bi-weekly payments totaling $2,265, meaning that $1,265 in fees or charges would be collected.  Expressed as an Annual Percentage Rate, repayment of a $1,000 debt in accordance with that schedule would be the equivalent of an APR of approximately 246%.

65.     Under Pennsylvania usury restrictions, it does not matter how credit-related fees or charges for small-balance "lines of credit" are named or calculated; if in the aggregate such fees or charges cost consumers the equivalent of interest rates that would be illegal, those fees and charges are illegal. *See* 7 P.S. § 6203; *Pa. Dept. of Banking v. NCAS of Delaware, LLC*. Using the illustrated cash advance and repayment schedule in the prior paragraph, a 6% rate

19

Case ID: 141101359

would allow for collection of fees and charges of about $53.33, meaning that the excess,

$1,211.67, would be illegal fees and charges.

66.     Attached as Exhibit F is a redacted account statement, received by a

Pennsylvania consumer from MobiLoans in August, 2013, on an account that the consumer

opened sometime in 2012 on the MobiLoans website developed and managed by the Think

Finance Defendants, along with a form "MobiLoans Credit Agreement and Terms and

Conditions" that was made available to her at the time she obtained her initial cash advance of

$500.

67.     The "MobiLoans Credit Agreement and Terms and Conditions," which the

website developed and managed by the Think Finance Defendants provides to "approved"

customers, contains the following emphasized language at the beginning of the 10 pages of text:

> MobiLoans, LLC is an entity owned and operated by the Tunica-Biloxi tribe of
> Louisiana, the credit issued to you and information provided under this agreement
> by MobiLoans is done so solely under the provisions of laws of the Tunica-Biloxi
> tribe of Louisiana and applicable federal law.

In a section of the form agreement entitled "Governing Law," consumers are informed that

"Neither this Agreement nor the Lender is subject to the laws of any State of the United States."

68.     During the operation of both stages of the Think Finance usury scheme, the

company continued to provide equivalent loan and credit-line products directly to consumers,

without the use of a bank or a tribal partner/intermediary, in states where such consumer lending

is legal. At the same time it was offering the "ThinkCash" product to Pennsylvania borrowers,

using FBD as the façade to shield it from potential state law enforcement authorities, the Think

Finance Defendants also maintained a separate, but equivalent payday lending product and

website named "PaydayOne."

Case ID: 141101359

69.     Similarly, during the period they have been operating the three tribal lending sites, the Think Finance Defendants have also been directly selling similar products, using separate labels sold from separate websites. *See*, *e.g.*, the high-rate "Rise" loans available at www.risecredit.com.  They designed the Rise website to recognize the state where the inquiring consumer is located. Over a banner including a photo of Rocky and the Philadelphia skyline, visitors from computers in Pennsylvania receive the following message when arriving at the site: "We're currently unable to serve you in PENNSYLVANIA but please check back with us in the near future." Attached as Exhibit G is a copy of that website homepage.

70.     Think Finance publicly lists the three tribal websites as its own products, along with the labels it markets and sells itself directly to the public. Attached as Exhibit H-1 is a list of "Think Finance Products" that appeared on the company's LinkedIn page as of July 19, 2013, including Payday One, Plain Green, Great Plains Lending and MobiLoans. Attached as Exhibit H-2 is a list containing these same four labels, under the heading "Products powered by the Think Finance Platform," appearing on the company's United Kingdom site.

71.     On or about May 1, 2014, Think Finance split itself into two companies. It placed into the new company, Defendant Elevate Credit, Inc., the loan products it markets directly in its own name in jurisdictions where such high-cost lending is legal, such as the "Rise" loans discussed above. The original company, Think Finance, Inc., now focuses entirely on what it describes as the provision of services to third-party lenders.

72.     Upon information and belief, business equity or other assets attributable to the pre-existing company's illegal activities directed against Pennsylvania consumers may have been transferred to the new company, Elevate Credit, Inc.

Case ID: 141101359

73.     Upon information and belief, significant revenues generated by the above-described scheme were and continue to be extracted from Pennsylvania consumers.

### d. Other Participants in the Think Finance Scheme and Ongoing Harms to Pennsylvania Consumers

74.     Usurious loans and/or "cash advances" made to Pennsylvania consumers in the name of Plain Green, Great Plains Lending or MobiLoans have been funded by an investor or investors supplied by the Think Finance Defendants, which investors continue to fund loans and cash advances to Pennsylvania consumers.

75.     Payments by Pennsylvania consumers on Plain Green and Great Plains Lending loans and on MobiLoans credit lines were and continue to be processed electronically and directly debited from the consumers' bank accounts by the same bank. Upon information and belief, the Think Finance Defendants arranged the banking relationship or arranged a relationship with a payment processor that found the bank.

76.     Each of the three separate websites direct consumers to send their payments to postal boxes in the same Philadelphia postal office.

77.     Upon information and belief, the Think Finance Defendants have participated in the sale or transfer of loan balances supposedly owed by Pennsylvania consumers to Plain Green, Great Plains Lending or MobiLoans to various debt buyers, including the Weinstein Defendants and Defendant National Credit Adjusters.

78.     Upon information and belief, the three tribal lenders affiliated with the Think Finance Defendants stopped accepting loans from new Pennsylvania consumers sometime in mid-2013. However, Pennsylvania consumers are still being injured by the scheme in at least several ways.

Case ID: 141101359

79.    First, Pennsylvania consumers are facing ongoing collection of consumer debt owed nominally to Plain Green, Great Plains Lending or MobiLoans. For example:

        a.    On January 29, 2014, the Weinstein Defendants filed a proof of claim in the bankruptcy case of a Pennsylvania consumer for the balance owing on a loan issued by Plain Green, LLC.

        b.    During the period 2012-2014, Plaintiff has received numerous complaints from consumers about abusive collection activity by debt collectors, including Defendant National Credit Adjusters, regarding debts originated by Plain Green, Great Plains Lending or MobiLoans.

80.    Second, even though not accepting applications from new Pennsylvania customers, upon information and belief, the three websites continue to make new loans or cash advances, all of which are illegal under Pennsylvania law, to existing Pennsylvania customers who need only log-in to their accounts, update their personal information already appearing on the screen, and request a new loan or advance. By way of example, on June 24, 2014, Plain Green made a $600 loan to a Pennsylvania customer known to the Plaintiff, which customer used his email address and existing password to obtain the loan. During the period July 1, 2014 to September 16, 2014, Plain Green collected full repayment of this loan from this customer's Pennsylvania bank account, in accordance with the usury scheme described above.

81.    Third, even though the three websites are not presently accepting applications from new Pennsylvania consumers, unlike Defendants' "Rise" website, these websites do not block access from Pennsylvania consumers. On the contrary, it is only after Pennsylvania consumers visiting any of those sites transmit their personal information—including social security number, driver license and bank account information—that the site informs them that, as Pennsylvania residents, they cannot obtain credit.

82.    Personal information about a consumer—particularly where it includes social security numbers and bank account information—is a highly valuable commodity known in the

Case ID: 141101359

lead generation trade as a "full data lead." Full Data Leads are used by fraudulent telemarketers, internet lenders, and other entities engaged in illegal activity injurious to consumers.

83.    Defendants have no legitimate business purpose in extracting such highly personal information from consumers to whom they know they cannot legally provide their usurious credit products.

84.    Upon information and belief, the Think Finance Defendants are nonetheless collecting this personal information in order to store it for future use and/or to sell it to others (or to enable their tribal partners to sell it to others). For example, the Privacy Policy on the MobiLoans website expressly states that MobiLoans shares personal information with "Non-Affiliates" and does so "as soon as the same day that you apply for a line of credit."

85.    Besides being able to access and obtain loans from direct visits to the Plain Green, Great Plains Lending and MobiLoans websites, Pennsylvania consumers are also lured or directed to these sites by direct mail. By way of example, attached as Exhibit I is a copy of direct mail solicitation a Pennsylvania consumer received from Great Plains Lending around September, 2012.

86.    Another referral source to the various Think Finance-affiliated websites has been MoneyMutual.com, a payday loan "lead generator" owned by the Selling Source Defendants. Consumers are lured to the site by television advertising featuring television personality Montel Williams, whose image is also featured on the website, under the banner, "Instant Approval, Get Cash Fast."

87.    The Selling Source Defendants were expressly named in the FDIC's October 2008 cease and desist order as one of the business partnerships that FBD was required to terminate. *See* Exhibit C to the FDIC Order (Exhibit A hereto).

24

Case ID: 141101359

88.     As a result of a February 2011 Consent Agreement and Order between the Selling Source Defendants and the Banking Department, the Selling Source Defendants agreed and were ordered to block access to their websites to Pennsylvania consumers and to cease targeting any internet lending advertisements to Pennsylvania consumers. *Commonwealth of Pennsylvania Dept. of Banking v. Selling Source, L.L.C. d/b/a Money Mutual*, Dkt. No. 100286 (ENF-C&D) (Pa. Banking Dept.). Attached as Exhibit J is a copy of the Consent Agreement and Order.

89.     The Selling Source Defendants deliberately violated the Consent Agreement and Order.  At least until July, 2013, they were continuing to sell leads involving Pennsylvania borrowers to Plain Green. This arrangement included a web link from the MoneyMutual site to the Plain Green site, inviting Pennsylvania consumers "to take advantage of an opportunity with our partner Plain Green Loans for your short-term financial needs," by simply clicking a button to transfer to the loan application page of the Plain Green site. Attached as Exhibit K is a screenshot from the MoneyMutual site, taken on July 16, 2013, illustrating the direct connection between a visit to the site from a computer in Pennsylvania and the Plain Green site.

90.     The Selling Source Defendants designed their MoneyMutual website to give consumers visiting the site the impression that any personal information they provide when applying for a loan is kept "private" and "secure." However, in contrast to such representations and assurances, Defendants' Privacy Policy, available on the site through a small-print link at the bottom of the website, reveals that Defendants, in fact, "reserve the right to share, rent, sell or otherwise disclose your information with/to third parties," including, among others, "e-mail marketers; wireless service providers and telemarketers."

91.     Upon information and belief, the Selling Source Defendants have, in fact, derived income from selling the information of Pennsylvania consumers to such third parties.

25

## V.  CLAIMS FOR RELIEF

### *COUNT ONE*
### *(Against the Think Finance Defendants)*
### *(Violations of Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(1))*

92.     Plaintiff realleges and incorporates by this reference all prior paragraphs of this Complaint.

93.     Under PA COA, 18 Pa. C.S.A. § 911, "racketeering activity" includes the collection of any money on account of a debt which arose as the result of the lending of money at a rate of interest exceeding 25% per annum. 18 Pa. C.S.A. § 911(h)(1)(iv). The above-described scheme constitutes "racketeering activity" in that the consumer credit offered and collected by the arrangements known as ThinkCash, Plain Green, Great Plains Lending and MobiLoans is at an effective rate far exceeding 25% per annum.

94.     Under 18 Pa. C.S.A. § 911(b)(1), it is unlawful for any person who has received income derived, directly or indirectly, from a pattern of "racketeering activity" in which such person participated as a principal, to use or invest, directly or indirectly, any part of such income in the operation of any "enterprise."

95.     This language was adopted from the federal RICO statute, 18 U.S.C. § 1962(a). "Principal" is not defined in PA COA. Under federal law, a "principal" includes anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission." 18 U.S.C. § 2.

96.     PA COA defines an "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and government entities." 18 Pa. C.S.A. § 911(h)(3).

Case ID: 141101359

97.     On multiple occasions as detailed above, the Think Finance Defendants participated as a principal in the racketeering activity described above in that they aided, abetted, counseled, commanded, induced or procured the usurious and illegal lending described above.

98.     The Think Finance Defendants derived income from such racketeering activity and used or invested that income in the operation of an "enterprise," as defined by 18 Pa. C.S.A. § 911(h)(3), such enterprises being, among others, ThinkCash, Inc., TC Loan Service, LLC, Think Finance, Inc., Elevated Credit, Inc. and Financial U, LLC.

99.     Upon information and belief, this income includes not only what Defendants have derived directly from loans made in the name of ThinkCash, Plain Green, Great Plains Lending and MobiLoans Pennsylvania borrowers, but also from their possible trafficking in the personal information obtained through the websites from Pennsylvania borrowers who are not offered loans.

100.    Through their above-described acquisition, use and investment of funds acquired from a usury scheme, the Think Finance Defendants violated and are continuing to violate 18 Pa. C.S.A. § 911(b)(1).

101.    Plaintiff is expressly authorized to enforce PA COA, 18 Pa. C.S.A. § 911(e), by seeking an appropriate order preventing and restraining any violations, 18 Pa. C.S.A. § 911(d).

102.    A violation of PA COA "shall be deemed to continue so long as the person who committed the violation continues to receive any benefit from the violation." 18 Pa. C.S.A. § 911(c).  Accordingly, in addition to enjoining Defendants from any future acquisition, use and investment of funds acquired from this or any similar usury scheme targeting Pennsylvania consumers, any equitable relief ordered against Defendants should also include, and Plaintiff therefore demands, an order divesting and disgorging all income or monies obtained, directly or

Case ID: 141101359

indirectly, from activity related to ThinkCash, Plain Green, Great Plains Lending or MobiLoans

loans or cash advances, or from any services provided in connection with such loans or cash

advances, attributable to Pennsylvania consumers, and invalidating any beneficial interest related

to existing loans to Pennsylvania consumers.

### COUNT TWO
#### (Against Think Finance Defendants)
#### (Violations of Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(3))

103.    Plaintiff realleges and incorporates by this reference all prior paragraphs of this

Complaint.

104.    Under 18 Pa. C.S.A. § 911(b)(3), it is unlawful for any person "employed by or

associated with" an "enterprise" to conduct or participate, directly or indirectly, in the

enterprise's affairs, through a pattern of racketeering activity.

105.    The above-described "rent-a-bank" arrangement between TC Loan Service, LLC

and FBD and the "rent-a-tribe" arrangements between the Think Finance Defendants and their

affiliated  lenders, Plain Green, Great Plains Lending and MobiLoans, are each association-in-

fact enterprises engaged in commerce within the definition of an "enterprise" in 18 Pa. C.S.A. §

911(h)(3).

106.    The Think Finance Defendants are associated with those association-in-fact

enterprises and participate directly in the affairs of those enterprises through a pattern of

racketeering activity, namely, the usury scheme described above, in which, on multiple

occasions, the enterprise has collected money on account of a debt which arose as the result of

the lending of money at a rate of interest exceeding 25% per annum. The role of the Think

Finance Defendants in these enterprises is multi-faceted, including, but not limited to, some or

all of the following: (a) designing, providing and managing the web technology that powers each

28

Case ID: 141101359

of the three tribal lending operations; (b) arranging for the provision of lending capital to each of
the three nominal tribal lenders; (c) providing customer databases and leads and other marketing
assistance; (d) arranging payment processing services; (e) collecting unpaid loans and arranging
the sale of uncollected debt to debt buyers; (f) arranging for the sale of consumer personal
information obtained through the various websites and/or (g) coordinating and managing the
enterprises.

107.    Also playing distinct roles in the associations-in-fact are:

a.  Various investors in the loans and cash advances made by the associations-in-fact
    to Pennsylvania consumers and/or those who provide lending capital for such
    loans and who, in exchange, earn a significant rate of return on those investments;

b.  The payment processors and banks that arrange the electronic transfers from the
    bank accounts of Pennsylvania consumers to the accounts controlled by the
    association-in-fact;

c.  The person or persons who control the payment postal boxes in Philadelphia;

d.  Various debt buyers and/or debt collectors involved in collecting delinquent
    balances supposedly owed to the association-in-fact by Pennsylvania consumers,
    including the Weinstein Defendants and Defendant National Credit Adjusters;

e.  The Selling Source Defendants, and, possibly, other lead generators who receive
    or received commissions or referral fees for referring Pennsylvania consumers to
    the association in fact or who purchase or purchased personal information about
    Pennsylvania consumers from the associations-in-fact.

108.    Through their above-described participation in and conduct of the enterprises, the
Think Finance Defendants have violated and are continuing to violate 18 Pa. C.S.A. § 911(b)(3).

109.    Plaintiff is expressly authorized to enforce the Corrupt Organizations Act, 18 Pa.
C.S.A. § 911(e), by seeking an appropriate order preventing and restraining any violations, 18
Pa. C.S.A. § 911(d).

110.    A violation of the PA COA statute "shall be deemed to continue so long as the
person who committed the violation continues to receive any benefit from the violation." 18 Pa.

29

Case ID: 141101359

C.S.A. § 911(c). Accordingly, in addition to enjoining Defendants from any future participation in or conduct of this or any similar usury scheme targeting Pennsylvania consumers, any equitable relief ordered against Defendants should also include, and Plaintiff therefore demands, an order divesting and disgorging all income or monies obtained, directly or indirectly, from activity related to ThinkCash, Plain Green, Great Plains Lending or MobiLoans loans or cash advances, or from any services provided in connection with such loans or cash advances, attributable to Pennsylvania consumers, and invalidating any beneficial interest related to existing loans to Pennsylvania consumers.

### COUNT THREE
### (Against All Defendants)
### (Violations of Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(4))

111.    Plaintiff realleges and incorporates by this reference all prior paragraphs of this Complaint.

112.    Under 18 Pa. C.S.A. § 911(b)(4), it is unlawful for any person "to conspire to violate" §§ 911(b)(1) or (b)(3).

113.    The Think Finance Defendants conspired to violate 18 Pa. C.S.A. §§ 911(b)(1) and/or (b)(3), in violation of 18 Pa. C.S.A. § 911(b)(4), by entering into the above described rent-a-bank and rent-a-tribe arrangements and facilitating—and profiting from—lending activity that they know is illegal in Pennsylvania.

114.    The Selling Source Defendants conspired with the Think Finance Defendants and others, with knowledge of the scheme's purpose and intent, to provide customer leads to the said schemes, conspired to violate 18 Pa. C.S.A. § 911(b)(1) and (3), in violation of 18 Pa. C.S.A. § 911(b)(4).

Case ID: 141101359

115.    The Weinstein Defendants and Defendant National Credit Adjusters conspired with the Think Finance Defendants and others, with knowledge of the scheme's purpose and intent, to violate 18 Pa. C.S.A. § 911(b)(1) and (3), in violation of 18 Pa. C.S.A. § 911(b)(4), by purchasing and/or collecting usurious loans made to Pennsylvania consumers by the various lending schemes.

116.    Plaintiff is expressly authorized to enforce the Corrupt Organizations Act, 18 Pa. C.S.A. § 911(e), by seeking an appropriate order preventing and restraining any violations, 18 Pa. C.S.A. § 911(d).

117.    A violation of the PA COA statute "shall be deemed to continue so long as the person who committed the violation continues to receive any benefit from the violation." 18 Pa. C.S.A. § 911(c).  Accordingly, in addition to enjoining Defendants from any future agreements to provide services to this or any similar usury scheme targeting Pennsylvania consumers, any equitable relief ordered against Defendants should also include, and Plaintiff therefore demands, an order divesting and disgorging all income or monies obtained, directly or indirectly, from activity related to ThinkCash, Plain Green, Great Plains Lending or MobilLoans loans or cash advances, or from any services provided in connection with such loans or cash advances, attributable to Pennsylvania consumers, and invalidating any beneficial interest related to existing loans to Pennsylvania consumers.

### COUNT FOUR
### (Against Think Finance, Weinstein and NCA Defendants)
### (Violations of FCEUA and the Consumer Protection Law for Collecting Illegal Interest)

118.    Plaintiff realleges and incorporates by this reference all prior paragraphs of this Complaint.

31

Case ID: 141101359

119.     The Weinstein Defendants and Defendant National Credit Adjusters are persons conducting business within this Commonwealth, acting on behalf of Plain Green, Great Plains Lending and MobiLoans or their successors in interest, and engaging or aiding directly or indirectly in collecting debts owed or allegedly owed to such creditors. Therefore, Defendants are each a "debt collector" within the meaning of the Fair Credit Extension Uniformity Act, ("FCEUA"), 73 P.S. § 2270.1.

120.     To the extent that any Think Finance Defendant is itself engaged in collection activity regarding consumer debt supposedly owed by Pennsylvania consumers to ThinkCash, Plain Green, Great Plains Lending or MobiLoans, it, too, is a "debt collector" within the meaning of the Fair Credit Extension Uniformity Act, ("FCEUA"), 73 P.S. § 2270.1.

121.     Under the FCEUA, any debt collector that violates any provision of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., by that act, commits "an unfair or deceptive act or practice" under Pennsylvania law. 73 P.S. § 2270.4(a).

122.     Under the FDCPA, 15 U.S.C. § 1692f(1), a debt collector that collects or attempts to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation)" that is prohibited by state law thereby commits an "unfair or unconscionable" act prohibited by the FDCPA.  *See Pollice v. National Tax Funding, LP*, 225 F.3d 379, 406-07 (3d Cir. 2000). Accordingly, as provided by 73 P.S. § 2270.4(a), these acts unlawful under the FDCPA also constitute "unfair or deceptive acts or practices" prohibited by the FCEUA.

123.     As debt collectors collecting or attempting to collect on loans or advances that are unlawful in Pennsylvania, Defendants have violated and are violating the FCEUA,  73 P.S. § 2270.4(a), every time they collect any interest, fee or charge from a Pennsylvania consumer in excess of the six-percent ceiling established by LIPL.

32

124.    Even if viewed as the "creditor" rather than a "debt collector," the FCEUA prohibits each of the Defendants from collecting interest prohibited by state law. *See* 73 P.S. § 2270.4(b)(6)(i). Thus, whether determined to be engaging in this collection activity as a "debt collector" or "creditor," each of the Defendants are liable for violations of the Consumer Protection Law, 73 P.S. § 201-1 et seq. *See* FCEUA, 73 P.S. § 2270.5(a).

125.    The Plaintiff is empowered by 73 P.S. § 201-4 to bring an equitable action to enjoin Defendants' above-described debt-collection practices prohibited by the FCEUA and the UTPCPL, and, as a component of such equitable relief, can obtain an appropriate order of restitution, ordering Defendants to "restore to any person in interest" any money acquired by means of such prohibited practices. 73 P.S. § 201-4.1.

126.    The above-described debt-collection violations having been and continuing to be willful, in so far as they are the result of a deliberate scheme to circumvent this and other state's usury laws, being conceived, organized and directed by Defendants, Plaintiff also requests, besides an appropriate order of restitution to benefit the injured Pennsylvania consumers, civil penalties for the benefit of the Commonwealth, in the amount of $1,000 per violation—and, in the case of consumers sixty years of age or older, $3,000 per violation—pursuant to 73 P.S. § 201-8(b).

127.    Some of the debt buyers engaged in this illegal activity, including Defendant National Credit Adjusters, have aggravated their willful and illegal collection of usurious debts through abusive collection practices, including false representations that there will be law enforcement action taken in Pennsylvania against the consumer debtors, threatening legal action to collect debts on loan amounts that are illegal in Pennsylvania, falsely representing that debts incurred on loan amounts that are illegal in Pennsylvania can be collected, contacting consumers

33

Case ID: 141101359

at their place of employment and repeated, harassing telephone calls, which practices are themselves violations of the FDCPA and FCEUA. These additional violations constitute an additional aggravating factor warranting civil penalties against such parties.

**COUNT FIVE**
**(Against All Defendants)**
**(Additional Violations of the Consumer Protection Law for Misrepresentation and Deception)**

128.    Plaintiff realleges and incorporates by this reference all prior paragraphs of this Complaint.

129.    The Think Finance Defendants have designed and are operating so-called "technology platforms" that offer to Pennsylvania consumers illegal usurious loans and credit lines represented falsely as being purely the product of the lawful exercise of tribal sovereignty and being subject to no state law.

130.    Such representations are false, misleading or confusing in that (a) they obfuscate the central role played by the Think Finance Defendants in the usury scheme, (b) the loans and credit lines are illegal in Pennsylvania and (c) the legal status of the tribes does not transform illegal products into legal ones under Pennsylvania law.

131.    These false, misleading or confusing representations about the characteristics of the so-called tribal loans are unfair and deceptive acts or practices prohibited by 73 P.S. § 201-2(4)(v) and constitute fraudulent or deceptive conduct which creates a likelihood of consumer confusion or misunderstanding, prohibited by 73 P.S. § 201-2(4)(xxi). *See Pa. Dept. of Banking v. NCAS of Delaware, LLC*, 995 A.2d 422, 442-45 (Pa. Commwlth. 2010).

132.    Further, Defendants' above-described "rent-a-tribe" scheme is in itself an unfair or deceptive practice because the credit offered is unlawful in Pennsylvania; because they misrepresent the extent to which such credit is actually offered by "another;" and because they

34

Case ID: 141101359

have created a likelihood of confusion or misunderstanding as to the source, sponsorship and approval of these credit products, in violation of 73 P.S. § 201-2(4)(i), (ii), (v) and (xxi).

133.    With regard to cash advances made pursuant to MobiLoan credit lines, the Think Finance Defendants' representation that debts incurred by consumers are repaid at an "Annual Percentage Rate of 0%," is, for Pennsylvania borrowers, a misleading representation of the actual cost of using this product, as interpreted by Pennsylvania law. By representing this as "0%" credit, Defendants are systematically representing that MobiLoan credit lines have characteristics and ingredients they do not have, in violation of 73 P.S. § 201-2(4)(v), and are engaging in deceptive conduct which creates a likelihood of consumer confusion or misunderstanding, in violation of 73 P.S. § 201-2(4)(xxi) .

134.    In  making such false representations in the course of engaging in any collection activity regarding such extensions of credit, Defendants also are violating 15 U.S.C. § 1692e(2)(A) and 73 P.S. §2270.4(a) (if Defendants are "debt collectors"), or 73 P.S. § 2270.4(b)(5)(ii) (if Defendants are "creditors").

135.    Each of the "tribal" websites developed and operated by the Think Finance Defendants have been designed to obtain personal information from Pennsylvania residents— including their social security, driver license and bank account numbers—before informing them that loans are not presently being offered to Pennsylvania residents.

136.    By obtaining the personal information of Pennsylvania consumers, through the pretense of offering loans they have no intention of making, Defendants are:

> a.  Causing likelihood of confusion or of misunderstanding as to the source of goods or services, in violation of 73 P.S. § 201-2(4)(ii);
>
> b.  Advertising goods or services with intent not to sell them as advertised, 73 P.S. § 201-2(4)(ix);

35

Case ID: 141101359

      c.   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

137.    The Selling Source Defendants have also engaged in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, in violation of 73 P.S. § 201-2(4)(xxi), by obtaining the personal information of Pennsylvania consumers for resale to third parties while representing to those consumers that their information will be "private" and "secure."

138.    Defendants failed to register Think Finance, Inc., Financial U, LLC, Cerastes, LLC, Selling Source, LLC and PartnerWeekly, LLC as foreign or domestic business corporations with the Pennsylvania Department of State Corporations Bureau in accordance with the requirements of the Business Corporation Law, 15 Pa.C.S. § 1101, *et seq*.

139.    Defendants failed to register the names "Financial U" and "MoneyMutual" with the Pennsylvania Department of State Corporations Bureau in accordance with the Fictitious Names Act, 54 Pa.C.S. § 301, *et seq*.

140.    By conducting business in Pennsylvania without such mandatory registration, Defendants committed unfair and deceptive acts or practices prohibited by Section 201-3 of the Consumer Protection Law by, among other things:

    (a)   Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services, in violation of 73 P.S. § 201-2(4)(ii);

    (b)   Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another, in violation of 73 P.S. § 201-2(4)(iii);

    (c)   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have, in violation of 73 P.S. § 201-2(4)(v); and

Case ID: 141101359

     (d)    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, in violation of 73 P.S. § 201-2(4)(xxi).

141.    Plaintiff is authorized to seek injunctive relief enjoining such unfair and deceptive practices by 73 P.S. § 201-4.

142.    Pursuant to 73 P.S. § 201-4.1 Plaintiff is also authorized to seek an order directing that Defendants restore to Pennsylvania consumers any money acquired by means of such unfair and deceptive practices.

143.    In addition, pursuant to 73 P.S. § 201-8(b), Plaintiff is also authorized to seek a finding that  Defendants' violations were willful and, in the event such a finding is made, to seek civil penalties of $1,000 per violation, increased to $3,000 per violation for violations committed against consumers 60 years or older,

## VI.  PRAYER FOR RELIEF

**WHEREFORE,** the Commonwealth of Pennsylvania respectfully requests that this Honorable Court issue an Order:

A.    Declaring Defendants' conduct as described herein above to be in violation of the PA COA; the Consumer Protection Law; and the FCEUA;

B.    Permanently enjoining Defendants and all other persons acting on their behalf, directly or indirectly, from violating the PA COA; the Consumer Protection Law; and the FCEUA and any amendments thereto, including placing reasonable restrictions on Defendants' future activities or investments and ordering Defendants to divest themselves of any interest, direct or indirect, in enterprises, as authorized by 18 Pa. C.S § 911(d)(1);

Case ID: 141101359

C.      Directing Defendants to make full restitution pursuant to Section 201-4.1 of the Consumer Protection Law to all consumers who have suffered losses as a result of the acts and practices alleged in this complaint and any other acts or practices which violate the PA COA; the Consumer Protection Law; and the FCEUA;

D.      Directing the Defendants to disgorge and forfeit all profits they have derived as a result of their violation of the PA COA and the Consumer Protection Law, as set forth in this Complaint;

E.      Directing Defendants to pay to the Commonwealth civil penalties of One Thousand and 00/100 Dollars ($1,000.00) for each instance of a violation of the Consumer Protection Law, and Three Thousand and 00/100 Dollars ($3,000.00) for each instance of a violation of the Consumer Protection Law involving consumers aged sixty (60) or older as victims;

F.      Requiring Defendants to pay the Commonwealth's investigative and litigation costs in this matter;

G.      Invalidating any beneficial interest in existing consumer debt purported to be owed by Pennsylvania consumers;

H.      In the event Defendants have issued any reports to credit bureaus regarding obligations they claim to be owed by Pennsylvania consumers, directing Defendants to notify credit bureaus to remove all such references to ThinkCash, First Bank of Delaware, Plain Green, Great Plains Lending or MobiLoans; and

I.      Granting such other general, equitable and/or further relief as the Court deems just and proper.

Case ID: 141101359

Respectfully submitted,


KATHLEEN G. KANE
Attorney General


JAMES A. DONAHUE III
Executive Deputy Attorney General
Public Protection Division


Date: **11-13-14**

By: _____

SAVERIO P. MIRARCHI
Deputy Attorney General
PA Attorney I.D. #88616
Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
21 South 12th Street, 2nd Floor
Philadelphia, Pennsylvania 19107
Phone: (215) 560-2414
Fax: (215) 560-2494
Email: smirarchi@attorneygeneral.gov


Date: **11-13-2014**

By: _____

IRV ACKELSBERG
PA Attorney I.D. #23813
Howard I. Langer
John J. Grogan
Edward A. Diver
Peter Leckman
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Phone: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com
*Special Counsel to the Commonwealth*

39

Case ID: 141101359

## VERIFICATION

I, John D. Gaskill, hereby state that I am an Agent with the Pennsylvania Office of Attorney General, Bureau of Consumer Protection, Philadelphia Regional Office and am authorized to make this verification on behalf of the Plaintiff in the within action.  I hereby verify that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge or information and belief.  I understand that the statements made therein are made subject to the penalties of 18 Pa. C.S. §4904 relating to unsworn falsifications to authorities.

Date: 11/13/14

JOHN D. GASKILL
*Consumer Protection Agent*

Case ID: 141101359



Filed and Attested by
PROTHONOTARY
13 NOV 2014 08:51 am
J. OSTROWSKI

# EXHIBIT A

Case ID: 141101359

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | ) STIPULATION AND CONSENT |
| | ) TO THE ISSUANCE OF AN |
| FIRST BANK OF DELAWARE | ) ORDER TO CEASE AND DESIST, |
| WILMINGTON, DELAWARE | ) ORDER FOR RESTITUTION, AND |
| | ) ORDER TO PAY |
| | ) |
| (INSURED STATE NONMEMBER BANK) | ) |
| | ) FDIC-07-256b |
| | ) FDIC-07-257k |
| | ) |

Subject to the acceptance of this STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, AND ORDER TO PAY (CONSENT AGREEMENT) by the Federal Deposit Insurance Corporation (FDIC), it is hereby stipulated and agreed by and between a representative of the Legal Division of the FDIC and First Bank of Delaware, Wilmington, Delaware (Respondent) as follows:

1.   The  Respondent has received a NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING (collectively, NOTICE) issued by the FDIC on June 10, 2008 detailing the violations of law and/or regulations and unsafe or unsound banking practices alleged to have been committed by the Respondent for which an ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, AND ORDER TO PAY (ORDER) may issue against the Respondent pursuant to sections 8(b) and 8(i)(2) of the Federal Deposit Insurance Act (Act), 12 U.S.C. §§ 1818(b) and 1818(i)(2).

2.   Respondent has been further advised of its right to a

Case ID: 141101359

hearing on the charges under sections 8(b) and 8(i)(2) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i)(2), and the FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308.

3.    The Respondent is represented by counsel.

4.    The Respondent admits that the FDIC is the appropriate Federal banking agency to maintain this enforcement action pursuant to section 3(q)(3) of the Act, 12 U.S.C. § 1813(q)(3), and that the FDIC has jurisdiction over it and the subject matter of this proceeding.

5.    The FDIC has reason to believe that the Respondent engaged in unsafe or unsound banking practices and violations of law and/or regulations in connection with the operation and oversight of the Respondent's National Consumer Products Division, including, but not limited to, the lending programs offered, marketed, administered, processed and/or serviced by third-parties pursuant to the agreements set forth in Exhibits "A" and "B" attached hereto.  Specifically, the FDIC has reason to believe the Respondent engaged in violations of:

(a)    section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (Section 5);

(b)    section 205.10 of Regulation E of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 205.10;

(c)    the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.*;

(d)    Part 332 of the FDIC Rules and Regulations, 12 C.F.R. Part 332, implementing the consumer privacy safeguards of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*;

-2-

Case ID: 141101359

(e)   the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* and Regulation B of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 202 *et seq.*;

(f)   the E-Sign Act, 15 U.S.C. §§ 7001 *et seq.*; and

(g)   the CAN-SPAM Act of 2003, 15 U.S.C. §§ 7701 *et seq.*

6.    In the interest of compromise and settlement, the Respondent, solely for the purpose of this proceeding pursuant to sections 8(b) and 8(i)(2) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i)(2), and without admitting or denying any of the unsafe or unsound banking practices or violations of law or regulations as set forth in paragraph 5 of this CONSENT AGREEMENT, hereby consents and agrees to the issuance of the ORDER by the FDIC, and further consents and agrees to pay a civil money penalty in the amount of $304,000 to the Treasury of the United States pursuant to the provisions of section 8(i)(2) of the Act, 12 U.S.C § 1818(i)(2).

7.    The Respondent further agrees to pay the civil money penalty assessed by delivering to the FDIC a certified check payable to the Treasury of the United States in the amount of $304,000 upon execution of this CONSENT AGREEMENT. Upon issuance of the ORDER by the FDIC, the FDIC shall remit the certified check to the Treasury of the United States.

8.    In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, Respondent agrees not to seek or accept indemnification for the civil money penalty assessed and paid in this matter.

-3-

Case ID: 141101359

9.    Paragraph I of the ORDER provides that the Respondent shall terminate certain third-party lending programs and third-party providers that exhibit the characteristics of a "Rent-a-BIN" or "Rent-a-ICA" arrangement. Exhibit "C" attached hereto lists certain third parties that provide services directly to the Respondent. The FDIC and Respondent hereby agree that these third-parties are not subject to the termination provision set forth in paragraph I of the ORDER.

10.   The Respondent further stipulates and agrees that such ORDER will be deemed to be an order which has become final under the Act, and that such ORDER shall become effective upon its issuance by the FDIC and fully enforceable by the FDIC pursuant to the provisions of the Act subject only to the conditions of paragraphs 11 and 12 of this CONSENT AGREEMENT.

11.   In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, it is agreed that no action will be taken by the FDIC against the Respondent to enforce the ORDER in the United States District Court unless the Respondent, its affiliates, their successors or assigns, or their respective directors, officers, employees, and agents, has violated or is about to violate any provision of such ORDER.

12.   (a)    In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, and except for any claims against any of the CompuCredit Parties, as hereinafter defined, this will be a release by the FDIC of the Respondent, its affiliates, their successors and assigns, and their respective directors, officers, employees, and agents (collectively, the Bank Parties) with

-4-

Case ID: 141101359

respect to the violations of Section 5 identified by the FDIC arising out of or related to the Tribute Little Rock, Imagine Little Rock, Purpose Advantage, and Embrace credit card programs or relating in any manner to the FDIC's Report of Examination dated April 25, 2007 and/or the FDIC's Compliance Report of Examination as of April 6, 2006 and related investigations, in each case to the effective date of the ORDER (Release Violations). The CompuCredit Parties shall mean CompuCredit Corporation, Atlanta, Georgia (CompuCredit), its officers, directors, employees, subsidiaries, successors and assigns, and any party having a contract with CompuCredit or providing services to or for the benefit of CompuCredit, with the exception of any of the Bank Parties. In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, except for any actions against any of the CompuCredit Parties, it is agreed that the FDIC shall not initiate any further legal action, except an action to enforce the terms of the ORDER, against any of the Bank Parties based on the Release Violations. Neither this CONSENT AGREEMENT nor the ORDER, if issued, shall constitute a release of any of the CompuCredit Parties.

(b) Except as provided herein, the Respondent agrees and acknowledges that the terms and provisions of this CONSENT AGREEMENT and the acceptance by the FDIC of this CONSENT AGREEMENT and the issuance of the ORDER shall not in any way bar, estop or otherwise prevent the FDIC from taking any other action against any of the Bank Parties, or any of the Respondent's current or former institution-affiliated parties.

-5-

Case ID: 141101359

(c)   The FDIC expressly reserves all rights against the CompuCredit Parties.  Nothing in this CONSENT AGREEMENT or the ORDER shall require the FDIC or any other party to reduce, compromise, or otherwise limit any claims against any of the CompuCredit Parties.

(d)   Nothing in this CONSENT AGREEMENT or the ORDER shall require the FDIC or any other party to reduce, compromise, or otherwise limit any claims because of any contractual or other commitments of the Bank to indemnify, defend, or hold harmless any of the CompuCredit Parties.

13.   The FDIC and the Respondent agree that entering into this CONSENT AGREEMENT shall not constitute an admission of liability by the Respondent for the transactions and practices that form the basis of the ORDER.

14.   The Respondent hereby agrees and acknowledges that the terms and provisions of this CONSENT AGREEMENT and the acceptance by the FDIC of this CONSENT AGREEMENT and the issuance of the ORDER shall not bar, estop or otherwise prevent any other federal or state agency or department from taking any action against any of the Bank Parties, or any of the Respondent's current or former institution-affiliated parties. Except as expressly provided herein, the Respondent reserves all of its rights with respect to the assertion of any claims, in any form, by any individual, or federal or state agency, department or entity.

15.   The Respondent hereby waives:

(a)   all defenses and counterclaims of any kind to the NOTICE and in this proceeding;

-6-

Case ID: 141101359

(b)   a public hearing for the purpose of taking evidence on such alleged charges;

(c)   the filing of proposed findings of fact and conclusions of law;

(d)   the issuance of a recommended decision by an administrative law judge;

(e)   the filing of exceptions and briefs with respect to such recommended decision; and

(f)   judicial review of the ORDER as provided by section 8(h) of the Act, 12 U.S.C. § 1818(h), or any other challenge to the validity of the ORDER.

Dated this _3d_ day of October, 2008.


FDIC
LEGAL DIVISION

BY:

_____
A.T. Dill, III
Assistant General Counsel

FIRST BANK OF DELAWARE
WILMINGTON, DELAWARE

BY:

_____
Harry D. Madonna, Esq.
Director

_____
William W. Batoff
Director

_____
Alonzo J. Primus, CPA
Director

_____
Lyle W. Hall Jr., CPA
Director

_____
Harris Wildstein, Esq.
Director
Comprising the Board of
  Directors of
First Bank of Delaware
Wilmington, Delaware

-7-

Case ID: 141101359

## EXHIBIT A

1. Amended and Restated Affinity Card Agreement dated as of March 13, 2006 between CompuCredit Corporation and First Bank of Delaware;

2. Amended and Restated Installment Loan Marketing and Servicing Agreement dated as of September 20, 2006 (made effective as of August 23, 2006) between Noble Consumer Lending Services, LLC and First Bank of Delaware;

3. Credit Card Marketing and Servicing Agreement dated as of August 31,2005 between First Bank of Delaware and CARDS Credit Services, LLC;

4. Credit Card Marketing Agreement dated as of February 28, 2006 by and among Continental Finance Company, LLC, Continental Sub-Prime Purchasing, LLC and First Bank of Delaware, and the Amended and Restated Receivables Purchase Agreement dated as of May 17, 2006 by and among First Bank of Delaware, Continental Finance Company, LLC, and Continental Sub-Prime Purchasing, LLC;

5. Credit Card Marketing Agreement dated as of January 18, 2007 between Accucredit Associates, LLC and First Bank of Delaware and the Receivables Purchase Agreement dated January 17, 2007 between Accucredit Associates, LLC and First Bank of Delaware;

6. Credit Card Marketing Agreement dated as of September 29, 2006 between E-Duction, Inc. and First Bank of Delaware and the Receivables Purchase Agreement dated September 29, 2006 between First Bank of Delaware and E-Duction Receivables Funding I, LLC;

7. Installment Loan Marketing and Servicing Agreement dated as of November 1, 2006 between Avante Teladvance, Inc. d/b/a Check 'n Go Online and First Bank of Delaware;

8. Consumer Loan Marketing, Origination, and Sale Agreement dated as of January 15, 2007 between CashCall, Inc. and First Bank of Delaware;

9. Marketing and Servicing Agreement dated as of January 23, 2007 between TC Loan Service, LLC d/b/a ThinkCash and First Bank of Delaware and the Master Participation Agreement dated as of January 23, 2007 between TC Financial, LLC and First Bank of Delaware;

Case ID: 141101359

10. Program Administration Agreement dated as of November 1, 2006, between First Bank of Delaware and Fortris Financial, LLC and PF Participation Funding Trust; Master Participation Agreement dated as of November 1, 2006 between First Bank of Delaware and Fortris Financial, LLC and PF Participation Funding Trust; and the Sub-Servicing Agreement dated as of November 1, 2006 between Fortris Financial, LLC and First Bank of Delaware;

11. Premium Finance Program Agreement dated as of August 23, 2006 between First Delaware Services LLC and First Bank of Delaware;

12. Processor Sponsorship and Services Agreement dated as of April 17, 2006 between Card Express, Inc. and First Bank of Delaware;

13. Processor Sponsorship and Services Agreement dated as of August 26, 2005 between TSYS Prepaid, Inc. and First Bank of Delaware;

14. Processor Sponsorship and Services Agreement dated as of April 5, 2006 between ECOM Financial Corp. and First Bank of Delaware;

15. Program Management Agreement dated July 30, 2004 between Financial Services International, Inc. and First Bank of Delaware;

16. Processor Servicing Agreement dated as of October 5, 2004 between Lynk Systems, Inc. and First Bank of Delaware;

17. Bank Sponsorship and Services Agreement dated as of January 3, 2007 between Payoneer, Inc. and First Bank of Delaware.

Case ID: 141101359

EXHIBIT B

1.   Amended and Restated Affinity Card Agreement dated
     as of March 13, 2006 between CompuCredit Corporation
     and First Bank of Delaware.

Case ID: 141101359

EXHIBIT C

 1.   Marketing provider Selling Source, Inc.

2.   Marketing provider Quasar Corporate Services, Inc.

3.   Credit and debit card processor TSYS Inc.

4.   Credit and debit card processor First Data Resources

5.   Credit and debit card processor Fidelity National Information Services

6.   Credit and debit card processor Ecommlink

7.   Credit and debit card processor I2c Inc.

8.   Customer service and collection provider First Center, LLC

9.   Customer service and collection provider Cardworks Inc.

10.   Credit scoring provider Transunion

11.   Credit scoring provider DataX

12.   Data hosting facilities provider Hosted Solutions

13.   Data hosting facilities provider Rackspace

14.   Scoring and credit analysis provider Austin Logistics

15.   Scoring and credit analysis provider Scoring Solutions

16.   Marketing provider Tailwind Marketing, LLC

17.   Technology provider Protective Draft Credit, LLC

18.   Software provider TC Decision Sciences, LLC

19.   Marketing provider Data Processing Systems, LLC

20.   Loan servicing provider Capture Resources, LLC

Case ID: 141101359

# EXHIBIT B

Case ID: 141101359

2/4/2012          Gmail - Payday Loan Information for w...

 REDACTED

# Payday Loan Information for

1 message

---

**ThinkCash <info@ourfinancialtimes.com>**       **Wed, Jul 28, 2010 at 11:37 AM**
Reply-To: info@ourfinancialtimes.com
To:   REDACTED

Can't view this email click here to view in a web browser.



You can depend on us for convenient short term loans to cover life's unexpected needs. We invite you to apply anytime. Get from $250 up to $2,500 with no paperwork*, no standing in line, and no hassle*!

Just apply at www.thinkcash.com and you can be approved in seconds, and have cash in your account as soon as the next banking day*.

**Get Started Today!**

We're here when you need us, and invite you to rejoin the thousands of customers who have received the help they need from First Bank of Delaware.

Your ThinkCash & First Bank of Delaware Teams 

support@FBDLoans.com
(866) 420-7157
M-F: 8am to 10pm ET
Sat: 9am to 5pm ET
First Bank of Delaware
Customer Support
PO Box 37727
Philadelphia, PA 19101

https://mail.google.com/mail/?ui=2&ik...     1/2

Case ID: 14T101359

# EXHIBIT C

Case ID: 141101359

9/3/2014     Online Personal Loans, Fast Cash Loans - ThinkCash

INTERNET ARCHIVE
WaybackMachine
181 captures
4 Apr 01 - 19 Jul 14

http://www.thinkcash.com/   Go

FEB **JUN** SEP   Close ✖
◄ **14** ►
2010 **2011** 2012   Help ?

## ThinkCash       plain green

### Welcome back!

As a returning customer, we have some *exciting news* to share. ThinkCash customers are now to be serviced at PlainGreenLoans.com.

Here are a few things you need to know:

1. You don't need to take any action

2. Continue to use your ThinkCash email address and password

3. From now on, just login to PlainGreenLoans.com to view your account

You will be redirected to the site in 10 seconds, or you can click below.



Who is Plain Green Loans? Why is ThinkCash no longer servicing my account? Click here to view answers to frequently asked questions.

2008-2011 ThinkCash All Rights Reserved.
[1]

Case ID: 141101359

Plain Green Loans - Frequently Asked Questions

9/3/2014


INTERNET ARCHIVE
WayBackMachine

http://www.thinkcash.com/faq/migration   Go

2 captures
12 Apr 11 - 16 Jul 11

APR   JUL   AUG
◀ 16 ▶
2010  2011  2012




### WHY IS THINKCASH NO LONGER SERVICING MY LOAN?

ThinkCash is no longer offering loans. Instead, Plain Green Loans is here to help you with the same prompt, friendly customer service you've come to expect.

### WHO IS PLAIN GREEN LOANS?

Plain Green Loans offers installment loans up to $2,500 to cover life's unexpected expenses. We service thousands of customers just like you. To learn more, visit PlainGreenLoans.com.

### WHAT DO I NEED TO DO TO ACCESS MY ACCOUNT?

It's easy - you can access your loan details by logging in to PlainGreenLoans.com using the same email address and password you used for your ThinkCash account.

### IF I STILL HAVE SOME QUESTIONS ON MY LOAN, WHO DO I CONTACT?

Plain Green Loans is here to assist you with any questions! You can email support@plaingreenloans.com or call (866) 420-7157. Customer support representatives are available Monday - Friday 8am to 10pm ET, and on Saturdays from 9am to 5pm ET.

Case ID: 141101359

Plain Green Loans – Online Personal Loans, Fast Cash Loans

9/3/2014

INTERNET ARCHIVE
WayBack Machine    242 captures    http://www.plaingreenloans.com/    Go    APR JUN AUG    Close ✕
8 Apr 11 – 3 Sep 14    2010 **28** 2012    Help ?
2011



How It Works | Loan Cost & Terms | My Account | Contact Us        been here before? login

## GET STARTED TODAY!

First Name

Last Name

E-mail Address

State       Promo Code

apply now

HOW DOES IT WORK?    WHY A PLAIN GREEN LOAN?    PLAIN GREEN LOAN vs. LATE FEES

have a question?
call 1.866.420.7157

*Our* cash loans are as easy as *123*        GET STARTED TODAY >>

    1. apply *online*
With our plain and simple online application, it's quick, secure and confidential.

    2. get an answer in *seconds**
No waiting and no guessing. We'll tell you how much you're approved for in moments.

    3. get *cash* as soon as tomorrow!
If approved, your loan funds will be deposited as early as the next business day (for transactions completed by 6 p.m. ET)*.

---

FAQs | About Us | Financial Tips | Security | Privacy | Disclosures | Site Map

2011 Plain Green Loans All Rights Reserved.
[1]

*Plain Green, LLC is a tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana, a sovereign nation located within the United States of America, and is operating within the Tribe's Reservation. Applications processed and approved before 6 p.m. ET are typically funded the next business day. In some cases, we may not be able to verify your application information and may ask you to provide certain documents. Maximum loan amount for initial loan is $1,000.00. Refer to Loan Cost & Terms for additional details. Complete disclosures of APR, fees and payment terms are provided within the Loan Agreement.

Please note: This is an expensive form of credit. Plain Green loans are designed to help you meet your short-term borrowing needs. Appropriate emergencies might be a car repair, medical care for you or your family, or travel expenses in connection with your job. This service is not intended to provide a solution for longer-term credit or other financial needs. Alternative forms of credit may be less expensive and more suitable for your financial needs. Alternative sources you could consider include: a credit card cash advance; personal loans; home equity line of credit; existing savings; or borrowing from a friend or relative.

Case ID: 141101359

# EXHIBIT D

Case ID: 141101359

THIS AGREEMENT SHALL NOT CONSTITUTE A "NEGOTIABLE INSTRUMENT"

**CONSUMER LOAN AGREEMENT**
**LOAN NUMBER:** ▮▮▮▮▮

Plain Green, LLC
93 Mack Road, Suite 600
PO Box 270
Box Elder, MT 59521

**BORROWER'S INFORMATION:**

Lender: Plain Green, LLC

**Borrower's Name:**
▮▮▮▮▮▮▮▮

Origination Date: 5/25/2012
This is the date you signed and submitted this loan agreement to the lender.

**Borrower's ID:**

Effective Date: 5/30/2012
The date you begin to pay interest on the loan.

**Borrower's Address:**
▮▮▮ Ave
▮▮▮, PA ▮▮▮

Final Payment Due Date:
7/19/2013

**Borrower's Bank and Account Number for ACH Transfers (the "Bank Account"):**
▮▮▮ ▮▮▮▮▮▮

**This Loan Agreement (the "Agreement") is subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana ("Chippewa Cree").** In this Agreement, "you" and "your" refer to the Borrower identified above. "We", "us", "our", and Lender refer to **Plain Green, LLC**, a lender authorized by the laws of the Chippewa Cree. "Loan" means this consumer installment loan. By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the Chippewa Cree Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.

TRUTH IN LENDING DISCLOSURES: The disclosures below are provided to you so that you may compare the cost of this loan to other loan products you might obtain in the United States. Our inclusion of these disclosures does not mean that we or any subsequent holder of this Agreement consent to application of state or federal law to us, to the Loan, or this Agreement.

TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 279.22% | $2,715.47 | $1,200.00 | $3,915.47 |

Your payment schedule (the "Payment Schedule") will be:

| Number of Payments | Amount of Payments | When Payments Are Due (each, a "Payment Due Date") |
|---|---|---|
| 29 | $130.53 | 6/8/2012, 6/22/2012, 7/6/2012, 7/20/2012, 8/3/2012, 8/17/2012, 8/31/2012, 9/14/2012, 9/28/2012, 10/12/2012, 10/26/2012, 11/9/2012, 11/23/2012, 12/7/2012, 12/21/2012, 1/4/2013, 1/18/2013, 2/1/2013, 2/15/2013, 3/1/2013, 3/15/2013, 3/29/2013, 4/12/2013, 4/26/2013, 5/10/2013, 5/24/2013, 6/7/2013, 6/21/2013, 7/5/2013 |
| 1 | $130.10 | 7/19/2013 |

PREPAYMENT: If you pay off the Loan early, you will not have to pay a penalty, and you may be entitled to a refund of part of the finance charge.

SECURITY INTEREST: If you have chosen the ACH Debit Authorization option, your ACH authorization is security for this loan.

See the Loan Agreement for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment penalties.

Itemization of Amount Financed:                                                  $1,200.00
Amount given to you directly:                                                    $1,200.00

**PROMISE TO PAY:** You promise to pay to the order of Lender or any registered assignee of this Agreement the principal sum of $1,200.00 plus interest from the date of this Loan at the rate of 279.9915% per year until this Loan is repaid in full. You promise to pay these amounts on the dates listed in the Payment Schedule above. You also promise to pay to us or to any subsequent holder of this Agreement any other fees provided for under this Agreement.

**PAYMENTS:** You promise to pay the amount of the Total of Payments shown above on or before the Payment Due Date. If you have chosen the ACH Debit Authorization option, you must make arrangements with us by 5:00 PM Eastern Time, on the business day prior to the Payment Due Date, so an authorized ACH entry is not initiated. If you choose to mail a payment, (i) all payments shall be mailed to PO Box 270, Box Elder, MT 59521, (ii) payment must reach this address by the Payment Due Date, and (iii) you should notify us prior to 5:00 PM Eastern Time the business day prior to Payment Due Date so an authorized ACH entry is not initiated prior to receipt of the payment. In addition, you agree that we cannot make and have not made the Loan contingent upon your obtaining any other product or service from us or anyone else. If you have chosen to receive your loan proceeds via check please mail your payments by the dates indicated within "When Payments Are Due" section of this Agreement to 93 Mack Road, Suite 600, PO Box 270, Box Elder, MT 59521.

**CALCULATION OF INTEREST AND PAYMENTS:** The interest charged hereunder is calculated using the simple interest method and has been computed upon the basis that you will pay all installments on the scheduled Payment Dates. Interest shall not be payable in advance or compounded.

**WHEN YOU BEGIN PAYING INTEREST:** You begin to pay us interest on the Loan on the date the proceeds of the Loan are deposited into your Bank Account, or, if you elect to receive Loan proceeds by check through the mail, the date we issue the check (the "Effective Date"). You will be charged interest on the unpaid amount of the Loan each day from the Effective Date until the Loan is paid in full. In calculating your payments, we have assumed you will make each payment on the day and in the amount due. If any payment is received after the payment due date, you must pay any additional interest that accrues after such date. If any payment is made before the payment due date, the interest due will be reduced. The amount of this decrease or increase in interest due will be reflected in the final payment that is due. Time is of the essence, which means that there are no grace periods for when payments must be made. If any payment is due on a day on which your bank is not open, then such payment shall be due on the next day upon which your bank is open.

**VERIFICATION:** You authorize us to verify the information you provided to us in connection with your Loan application. You give us consent to obtain information about you from a consumer reporting agency or other sources. We reserve the right to withhold funding of this Loan, at any time prior to disbursement, to allow us to verify the information you have provided to us.

**ACH AUTHORIZATION TO CREDIT BANK ACCOUNT:** Unless the proceeds of this Agreement are applied to any outstanding loan balance that you may owe to us, and you do not elect to receive the Loan proceeds by check through regular mail, you authorize us and our agents to initiate an Automated Clearing House ("ACH") credit entry to your Bank Account to disburse the proceeds of this Loan.

**ACH AUTHORIZATION TO DEBIT BANK ACCOUNT:** Unless you chose to mail to us a check or money order as payment for this Loan, you authorize us, and our agents, successors, employees, and registered assigns to withdraw

money from your Bank Account for each payment you owe us, including any returned payment charges and the total amount you owe if you do not pay us when you agreed in this Agreement. You agree we can withdraw money from your Bank Account (called an 'ACH debit entry') on each scheduled payment date shown on the Payment Schedule above. This right to withdraw money from your Bank Account will remain in full force until the earlier of the following occurs: (i) you pay us everything that you owe us under this Agreement or (ii) you tell us or the institution holding your Bank Account (the "Paying Bank") that we can no longer withdraw money from your Bank Account in enough time to let the Paying Bank or us stop taking the money out of your Bank Account. You acknowledge and agree that this ACH Authorization to Debit Bank Account inures to the benefit of Plain Green, LLC, its affiliates, agents, employees, successors, and registered assigns.

**NOTICE OF VARYING AMOUNTS:** For those customers who have chosen the ACH Debit Authorization, please note that you have the right to receive notice of all withdrawals from your Bank Account by an ACH Debit that vary in amount. However, by agreeing to let us withdraw the money from your Bank Account, you agree we only have to tell you the range of withdrawals that we can make. The range of withdrawals will be either an amount equal to your installment payment or an amount equal to the outstanding balance under the Loan (which may be greater than or less than an installment payment based upon your payment history), plus a returned payment fee as specified below. For any withdrawal outside of this specified range, we will send you a notice. Therefore, by signing this Agreement below, you are choosing to only receive notice when a withdrawal exceeds the amount in the specified range. You authorize us to vary the amount of the amount of any withdrawal as needed to repay installments due on the Loan as modified by any partial prepayments you make.

**TERMINATING ACH DEBIT AUTHORIZATION:** For those customers who have chosen the ACH Debit Authorization, the ACH debit authorization will remain in full force and effect until the earlier of the following occurs: (i) you satisfy all of your payment obligations under this Agreement or (ii) you tell us or the Paying Bank that we can no longer withdraw money from your Bank Account in enough time to let the Paying Bank or us stop taking the money out of your Bank Account. Terminating your ACH authorization does not relieve you of your obligation to pay your Loan in full.

**REMOTELY CREATED CHECK AUTHORIZATION:** If you terminate any previous ACH Debit Authorization you provided to us or we do not receive a payment by the Payment Due Date, you authorize us and our agents, successors and assigns to create and submit remotely created checks for payment to us in the amount of each payment owing under this Agreement, including any returned payment charges or other amounts owing to us upon acceleration of this Loan as a result of your Default. Your typed signature below shall constitute your authorization to us to authenticate remotely created checks, which are also known as demand drafts, telechecks, preauthorized drafts, or paper drafts. If you believe we charged your Bank Account in a manner not contemplated by this authorization, then please contact us. You authorize us to vary the amount of any preauthorized payment by remotely created check as needed to repay installments and any other payments due under this Agreement.

**PAYMENT BY CHECK OR MONEY ORDER:** You may pay each payment owing under this Agreement by check or money order.

**CHECK CONVERSION NOTIFICATION:** When you provide a check as payment, you agree we can either use information from your check to make a one-time electronic withdrawal from your Bank Account or to process the payment as a check transaction. When we use information from your check to make a withdrawal from your Bank Account, funds may be withdrawn from your Bank Account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. For questions, please call our customer service phone number: (866) 420-7157.

**PAYMENT APPLICATION:** Lender will apply your payments in the following order: (1) to any fees due, (2) to earned but unpaid interest, and (3) to principal amounts outstanding.

**SECURITY INTEREST DISCLOSURE:** To the extent that your agreement to have us withdraw money from your Bank Account is deemed a security interest under the law of the Chippewa Cree Tribe, you hereby grant to us a security interest in such withdrawal authorization using the ACH system.

**PREPAYMENT:** You may prepay all or part of the amount you owe us at any time without penalty. If you do so, you must pay the interest accrued on your Loan and all other amounts due up to the date of your payment.

**REFINANCE POLICY:** We, in our sole discretion, will determine whether your Loan may be refinanced.

**RETURNED PAYMENT FEE:** If any payment made by you on this Loan is not honored or cannot be processed for any reason, including not enough money in your Bank Account, you agree to pay us a fee of $30.00. You authorize us and our agents to make a one-time withdrawal from your Bank Account to collect this fee, if you have also selected the ACH Debit Authorization. Your financial institution may also impose a fee.

**DEFAULT:** You will have broken your promise you made to us in this Agreement (each a "Default") if: (a) you provide false or misleading information about yourself, your employment, or your financial condition prior to entering into this Agreement, (b) if you fail to make a payment by the due date or if your payment is returned to us for any reason, or (c) if you file bankruptcy or become a debtor under the Federal Bankruptcy Laws.

**CONSEQUENCES OF DEFAULT:** Should you not do the things you agreed to under this Agreement, we may, at our option, do any one or more of the following things: (a) require you to immediately pay us everything you owe us; (b) withdraw money from your Bank Account that was not available when we tried to withdraw it at an earlier time, if you have selected the ACH Debit Authorization; and (c) pursue all legally available means to collect what you owe us. In the event we declare all amounts owed under this Agreement immediately due because you did not pay us, then you further authorize us and our agents to withdraw money from your Bank Account in the full amount due under this Agreement, if you have selected the ACH Debit Authorization. By choosing any one of more of these, we do not give up our right to use another way to collect the money you owe us later. We may decide not to use any of the ways described above to get

back the money that you owe us. If so, we do not give up our right to consider what you said you would do to make payment(s) and, if you fail to make those payment(s), we will consider you to be in Default.

**CREDIT REPORTING:** We may report information about your Loan to credit bureaus. Late payments, missed payments, or other things you do may be reflected on your credit report.

**RIGHT TO CANCEL:** YOU MAY CANCEL THIS LOAN, WITHOUT COST TO YOU OR FURTHER OBLIGATION TO US, BY TELEPHONING TOLL-FREE 866-420-7157 BY 5:30 P.M. EASTERN TIME ON THE FIRST BANKING DAY AFTER THE EFFECTIVE DATE. YOU CAN CANCEL ONLY IF YOU SEND US BACK THE MONEY FROM THE LOAN WE PUT IN YOUR BANK ACCOUNT, RETURN THE LOAN PROCEEDS CHECK MAILED TO YOU OR WE ARE ABLE TO WITHDRAW THE AMOUNT OF YOUR LOAN FROM YOUR BANK ACCOUNT.

**BORROWER'S BANK CHARGES:** You will not hold us or our agents responsible for any fees you must pay as a result of any check or withdrawal request being presented at your bank in connection with this Agreement.

**TRANSFER OF RIGHTS AND MAINTENANCE OF REGISTER:** We may assign or transfer this Agreement, or any of our rights hereunder, to another person or entity without notice or consent from you. Regardless of any transfer, this Agreement shall remain exclusively subject to the laws and courts of the Chippewa-Cree Tribe. Plain Green, LLC, (the "Registrar") acting solely for this purpose as your irrevocably appointed agent, shall maintain at an office located in the United States a copy of each assignment of this Agreement delivered to it and a register (the "Register") for the recordation of the names and addresses of the original owner and assignees, and the amounts of principal and interest owing to each from time to time pursuant to the terms of this Loan. The Register may be in electronic form. The entries of the Register shall be conclusive, and you, the Registrar, the Lender and all of its assignees shall treat each person whose name is recorded in the Register pursuant to these terms as the owner of such principal and interest payments for all purposes of this Agreement, notwithstanding notice to the contrary. The name of the owner in the Register shall be available to you by written request to the Registrar at any reasonable time and from time to time upon reasonable prior notice. In addition to the foregoing, the Registrar shall include on the Register the names and addresses of those persons holding participation interests in the Loan of which it has notice. Any fees and expenses of the Registrar for its services shall be charged to the registered owner of the loan and not to you.

## WAIVER OF JURY TRIAL AND ARBITRATION.

**RIGHT TO OPT OUT.** IF YOU DO NOT WISH YOUR ACCOUNT TO BE SUBJECT TO THIS AGREEMENT TO ARBITRATE, YOU MUST ADVISE US IN WRITING AT 93 MACK ROAD, SUITE 600, PO BOX 270, BOX ELDER, MT 59521 OR VIA E-MAIL AT SUPPORT@PLAINGREENLOANS.COM. YOU MUST CLEARLY PRINT OR TYPE YOUR NAME AND ACCOUNT NUMBER OR SOCIAL SECURITY NUMBER AND STATE THAT YOU REJECT ARBITRATION. YOU MUST GIVE WRITTEN NOTICE; IT IS NOT SUFFICIENT TO TELEPHONE US. WE MUST RECEIVE YOUR LETTER OR E-MAIL WITHIN SIXTY (60) DAYS AFTER THE DATE YOUR LOAN FUNDS OR YOUR REJECTION OF ARBITRATION WILL NOT BE EFFECTIVE. IN THE EVENT YOU OPT OUT OF THIS AGREEMENT TO ARBITRATE, ANY DISPUTES HEREUNDER SHALL NONETHELESS BE GOVERNED UNDER THE LAWS OF THE CHIPPEWA CREE TRIBE AND MUST BE BROUGHT WITHIN THE COURT SYSTEM THEREOF.

**PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.** Unless you exercise your right to opt-out of arbitration in the manner described above, any dispute you have with Lender or anyone else under this Agreement will be resolved by binding arbitration. Arbitration replaces the right to go to court, including the right to have a jury, to engage in discovery (except as may be provided in the arbitration rules), and to participate in a class action or similar proceeding. In arbitration, a dispute is resolved by an arbitrator instead of a judge or jury. Arbitration procedures are simpler and more limited than court procedures. Any arbitration will be limited to addressing your dispute individually and will not be part of a class-wide or consolidated arbitration proceeding.

**Agreement to Arbitrate.** You agree that any Dispute (defined below) will be resolved by arbitration in accordance with Chippewa Cree tribal law.

**Arbitration Defined.** Arbitration is a means of having an independent third party resolve a Dispute. A "Dispute" is any controversy or claim between you and Lender, its marketing agent, collection agent, any subsequent holder of this Note, or any of their respective agents, affiliates, assigns, employees, officers, managers, members or shareholders (each considered a "Holder" for purposes of this Agreement). The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, including events that occurred prior to the opening of this Account), based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought (i.e. money, injunctive relief, or declaratory relief). A Dispute includes, by way of example and without limitation, any claim arising from, related to or based upon marketing or solicitations to obtain the loan and the handling or servicing of your account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan or the Agreement to Arbitrate.

You acknowledge and agree that by entering into this Arbitration Provision:

**(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**

**(b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and**

**(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

**Choice of Arbitrator.** Any party to a Dispute, including a Holder or its related third parties, may send the other party

written notice by certified mail return receipt requested at the address appearing at the top of this Agreement of their intent to arbitrate and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association (1-800-778-7879) http://www.adr.org; JAMS (1-800-352-5267) http://www.jamsadr.com; or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Chippewa Cree Tribe or the express terms of this Agreement to Arbitrate, including the limitations on the Arbitrator below. The party receiving notice of Arbitration will respond in writing by certified mail return receipt requested within twenty (20) days. You understand that if you demand Arbitration, you must inform us of your demand and of the arbitration organization you have selected. You also understand that if you fail to notify us, then we have the right to select the arbitration organization. Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that the accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Chippewa Cree's Tribes sovereign status or immunity, or (b) to allow for the application of any law other then the law of the Chippewa Cree Tribe.

**Cost of Arbitration.** We will pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the arbitration. Except where otherwise provided by the law of the Chippewa Cree Tribe, each party will be responsible for its own attorneys' fees and other expenses. Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorneys' fees to the party who substantially prevails in the arbitration.

**Waiver of Jury Trial and Waiver of Ability to Participate in a Class Action.** YOU HEREBY AGREE THAT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL, TO HAVE A COURT DECIDE YOUR DISPUTE, AND YOU ARE WAIVING YOUR ABILITY TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, TO PARTICIPATE IN A CLASS ACTION LAWSUIT, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION, AND TO CERTAIN DISCOVERY AND OTHER PROCEDURES THAT WOULD BE AVAILABLE IN A LAWSUIT. The arbitrator has the ability to award all remedies available under the Chippewa Cree Tribe's tribal law, whether at law or in equity, to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual Disputes between the parties. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction located within the Chippewa Cree Tribe, and not by the arbitrator. If the court refuses to enforce the class-wide arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in tribal court and will be decided by a tribal court judge, sitting without a jury, under applicable court rules and procedures and may be enforced by such court through any measures or reciprocity provisions available.

**Applicable Law and Judicial Review.** THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHIPPEWA CREE TRIBE. The arbitrator will apply the laws of the Chippewa Cree Tribe and the terms of this Agreement, including the Agreement to Arbitrate. The arbitrator must apply the terms of this Agreement to Arbitrate, including without limitation the waiver of class-wide arbitration. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. If allowed by statute or applicable law, the arbitrator may award statutory damages and/or reasonable attorneys' fees and expenses. The arbitrator will make written findings and the arbitrator's award may be filed with the tribal court. The arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by the tribal court upon judicial review.

**Other Provisions.** This Agreement to Arbitrate will survive: (i) termination or changes in this Agreement, the Account, or the relationship between us concerning the Account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of my Note, or any amounts owed on my account, to any other person or entity. This Agreement to Arbitrate benefits and is binding upon you, your respective heirs, successors and assigns. It also benefits and is binding upon us, our successors and assigns, and related third parties. The Agreement to Arbitrate continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. The Agreement to Arbitrate survives any termination, amendment, expiration, or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing. If any of this Agreement to Arbitrate is held invalid, the remainder shall remain in effect.

**GOVERNING LAW.** This Agreement and the Agreement to Arbitrate are governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Chippewa Cree Tribe. We do not have a presence in Montana or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any state of the United States.

**TELEPHONE CALLS.** You hereby agree that in the event we need to contact you to discuss your account or the repayment of your Loan, we may call you at any number, including any cell phone number you have provided, and that we may leave an autodialed or prerecorded message or use other technology (including, but not limited to, SMS messaging or other text messaging) to contact or to communicate with you.

**VERIFICATION.** You authorize us to verify all of the information you have provided in obtaining approval of this Loan.

**This Agreement includes a Waiver of Jury Trial and Arbitration Provision that may be enforced by you and us.** By signing this Agreement you agree that it was filled in before you did so and that you have received a completed copy of it. **You further agree that you have read and understand all of the terms of this Agreement, including the part entitled "Waiver of Jury Trial and Arbitration Provision."**

*By electronically signing this Agreement* you certify that the information given in connection with this Agreement is true and correct. You authorize us to verify the information given in connection with this Agreement, and you give us consent to obtain information about you from a consumer reporting agency or other sources. *You acknowledge, represent and warrant that (a) you have read, understand, and agree to all of the terms and conditions of this Agreement, including the Disclosures and the Arbitration Agreement and Waiver of Jury Trial, (b) this Agreement contains all of*

00/23/2014 141101359

*the terms of the agreement between you and us and that no representations or promises other than those contained in this Agreement have been made, (c) you specifically authorize withdrawals and deposits to and from your Bank Account as described in this Agreement, if you have selected the ACH Debit Authorization, (d) you are not a debtor under any proceeding in Bankruptcy and have no intention to file a petition for relief under any chapter of the United States Bankruptcy Code, (e) this Agreement was filled in before you signed it, and (f) you have the ability to print or retain a completed copy of this Agreement. You further acknowledge that we may withhold funding of your Loan until we check to make sure all the information you gave us on your application is true and we decide whether you meet our requirements to receive the Loan.*

☒ By checking here you authorize us to verify all of the information that you have provided us, including past and/or current information. If there is any missing or erroneous information in or with your loan application regarding your Bank Account (including without limitation your bank, bank routing number, or account number), then you authorize us to verify and correct such information. You agree that your ACH Authorization is subject to our approving this Agreement.

**Please review and select one of these funding options:**

⦿ **ELECTRONIC (as soon as the next business day):** By checking here, you authorize us to effect ACH debit and credit entries for this loan, you also agree to the ACH Authorizations set forth in this Agreement. You acknowledge and agree that this ACH Authorization to Debit Bank Account inures to the benefit of Plain Green, LLC, its affiliates, agents, employees, successors, and registered assigns. Check this box if you agree to the ACH Authorizations in this Agreement.

⦾ **POSTAL MAIL (up to 7 to 10 days):** By checking here, you request Loan proceeds be distributed to you by check and delivered by regular mail through the United States Postal System. If you elect to receive your proceeds by mail, you must also make your payments by mail. You should allow 7 to 10 days for delivery of the Loan proceeds, and be aware interest begins accruing on the date Lender issues the check for the Loan proceeds.

| By: Plain Green, LLC | Your Full Name: | Type 'I Agree': I Agree | Date: 5/25/2012 |
|---|---|---|---|

Billi Anne Raining Bird-Morsette, CEO

# EXHIBIT E

Case ID: 141101359

THIS AGREEMENT SHALL NOT CONSTITUTE A "NEGOTIABLE INSTRUMENT"

**CONSUMER LOAN AGREEMENT**
**LOAN NUMBER:** ▮▮▮▮▮▮▮

Great Plains Lending, LLC
Otoe-Missouria Indian Reservation
Red Rock, OK 74651

BORROWER'S INFORMATION:

| | |
|---|---|
| **Lender: Great Plains Lending, LLC** | **Borrower's Name:** |
| **Origination Date: 7/21/2012**<br>This is the date you signed and submitted this loan agreement to the lender. | **Borrower's ID:** |
| **Effective Date: 7/24/2012**<br>The date you begin to pay interest on the loan. | **Borrower's Address:**<br>▮▮▮ Ave<br>▮▮▮▮, PA 19320 |
| **Final Payment Due Date:**<br>**1/4/2013** | **Borrower's Bank and Account Number for ACH**<br>**Transfers (the "Bank Account")** |

This Loan Agreement (the "Agreement") is subject solely to the exclusive laws and jurisdiction of the Otoe-Missouria Tribe of Indians, a federally recognized Indian Tribe. In this Agreement, "you" and "your" refer to the Borrower identified above. "We", "us", "our", and "Lender" refer to **Great Plains Lending, LLC**, a lender authorized by the laws of the Otoe-Missouria Tribe. "Loan" means this consumer installment loan. By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the Otoe-Missouria Tribe of Indians Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.

TRUTH IN LENDING DISCLOSURES:  The disclosures below are provided to you so that you may compare the cost of this loan to other loan products you might obtain in the United States. Our inclusion of these disclosures does not mean that we or any subsequent holder of this Agreement consent to application of state or federal law to us, to the loan, or this Agreement.

### TRUTH-IN-LENDING DISCLOSURES

| **ANNUAL PERCENTAGE RATE**<br>The cost of your credit as a yearly rate. | **FINANCE CHARGE**<br>The dollar amount the credit will cost you. | **Amount Financed**<br>The amount of credit provided to you or on your behalf. | **Total of Payments**<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 448.77% | $797.14 | $600.00 | $1,397.14 |

Your payment schedule (the "Payment Schedule") will be:

| Number of Payments | Amount of Payments | When Payments Are Due (each, a "Payment Due Date") |
|---|---|---|
| 11 | $116.44 | 8/3/2012, 8/17/2012, 8/31/2012, 9/14/2012, 9/28/2012, 10/12/2012, 10/26/2012, 11/9/2012, 11/23/2012, 12/7/2012, 12/21/2012 |
| 1 | $116.30 | 1/4/2013 |

PREPAYMENT:  If you pay off the Loan early, you will not have to pay a penalty, and you may be entitled to a refund of part of the finance charge.

SECURITY INTEREST:  If you have chosen the ACH Debit Authorization option, your ACH authorization is security for this loan.

See the Loan Agreement for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment penalties.

Case ID: 141101359
10/23/2012

| **Itemization of Amount Financed:** | **$600.00** |
|---|---|
| **Amount given to you directly:** | **$600.00** |

**PROMISE TO PAY:** You promise to pay to the order of Lender or any registered assignee of this Agreement the principal sum of $600.00 plus interest from the date of this Loan at the rate of 450.0085% per year until this loan is repaid in full. You promise to pay these amounts on the dates listed in the Payment Schedule above. You also promise to pay to us or to any subsequent holder of this Agreement any other fees provided for under this Agreement.

**PAYMENTS:** You promise to pay the amount of the Total of Payments shown above on or before the Payment Due Date. If you have chosen the ACH Debit Authorization option, you must make arrangements with us by 5:00 PM Eastern Time, on the business day prior to the Payment Due Date, so an authorized ACH entry is not initiated. If you choose to mail a payment, (i) all payments shall be mailed to 2274 S. 1300 East, Suite G-15 #374, Salt Lake City, UT 84106 for forwarding to and receipt and processing on the Otoe-Missouria Indian reservation, (ii) payment must reach this address by the Payment Due Date, and (iii) you should notify us prior to 5:00 PM Eastern Time the business day prior to Payment Due Date so an authorized ACH entry is not initiated prior to receipt of the payment. In addition, you agree that we cannot make and have not made the Loan contingent upon your obtaining any other product or service from us or anyone else. If you have chosen to receive your loan proceeds via check please mail your payments by the dates indicated within "When Payments Are Due" section of this agreement to 2274 S. 1300 East, Suite G-15 #374, Salt Lake City, UT 84106 for forwarding to and receipt and processing on the Otoe-Missouria Indian reservation.

**CALCULATION OF INTEREST AND PAYMENTS:** The interest charged hereunder is calculated using the simple interest method and has been computed upon the basis that you will pay all installments on the scheduled Payment Dates. Interest shall not be payable in advance or compounded.

**WHEN YOU BEGIN PAYING INTEREST:** You begin to pay us interest on the Loan on the date the proceeds of the Loan are deposited into your Bank Account, or, if you elect to receive Loan proceeds by check through the mail, the date we issue the check (the "Effective Date"). You will be charged interest on the unpaid amount of the Loan each day from the Effective Date until the Loan is paid in full. In calculating your payments, we have assumed you will make each payment on the day and in the amount due. If any payment is received after the payment due date, you must pay any additional interest that accrues after such date. If any payment is made before the payment due date, the interest due will be reduced. The amount of this decrease or increase in interest will be reflected in the final payment that is due. Time is of the essence, which means that there are no grace periods for when payments must be made. If any payment is due on a day on which your bank is not open, then such payment shall be due on the next day your bank is open.

**VERIFICATION:** You authorize us to verify the information you provided to us in connection with your Loan application. You give us consent to obtain information about you from a consumer reporting agency or other sources. We reserve the right to withhold funding of this Loan, at any time prior to disbursement, to allow us to verify the information you have provided to us.

**ACH AUTHORIZATION TO CREDIT BANK ACCOUNT:** Unless the proceeds of this Agreement are applied to any outstanding loan balance that you may owe to us, and you do not elect to receive the Loan proceeds by check through regular mail, you authorize us and our agents to initiate an Automated Clearing House ("ACH") credit entry to your Bank Account to disburse the proceeds of this Loan.

**ACH AUTHORIZATION TO DEBIT BANK ACCOUNT:** Unless you chose to mail to us a check or money order as payment for this Loan, you authorize us, and our agents, successors, employees, and registered assigns to withdraw money from your Bank Account for each payment you owe us, including any returned payment charges and the total amount you owe if you do not pay us when you agreed in this Agreement. You agree we can withdraw money from your Bank Account (called an 'ACH debit entry') on each scheduled payment date shown on the Payment Schedule above. This right to withdraw money from your Bank Account will remain in full force until the earlier of the following occurs: (i) you pay us everything that you owe us under this Agreement or (ii) you tell us or the institution holding your Bank Account (the "Paying Bank") that we can no longer withdraw money from your Bank Account in enough time to let the Paying Bank or us stop taking the money out of your Bank Account. You acknowledge and agree that this ACH Authorization to Debit Bank Account inures to the benefit of Great Plains, LLC, its affiliates, agents, employees, successors, and registered assigns.

**NOTICE OF VARYING AMOUNTS:** For those customers who have chosen the ACH Debit Authorization, please note that you have the right to receive notice of all withdrawals from your Bank Account by an ACH Debit that vary in amount. However, by agreeing to let us withdraw the money from your Bank Account, you agree we only have to tell you the range of withdrawals that we can make. The range of withdrawals will be either an amount equal to your installment payment or an amount equal to the outstanding balance under the Loan (which may be greater than or less than an installment payment based upon your payment history), plus a returned payment fee as specified below. For any withdrawal outside of this specified range, we will send you a notice. Therefore, by signing this Agreement below, you are choosing to only receive notice when a withdrawal exceeds the amount in the specified range. You authorize us to vary the amount of the amount of any withdrawal as needed to repay installments due on the Loan as modified by any partial prepayments you make.

**TERMINATING ACH DEBIT AUTHORIZATION:** For those customers who have chosen the ACH Debit Authorization, the ACH debit authorization will remain in full force and effect until the earlier of the following occurs: (i) you satisfy all of your payment obligations under this Agreement or (ii) you tell us or the Paying Bank that we can no longer withdraw money from your Bank Account in enough time to let the Paying Bank or us stop taking the money out of your Bank Account. Terminating your ACH authorization does not relieve you of your obligation to pay your Loan in full.

**REMOTELY CREATED CHECK AUTHORIZATION:** If you terminate any previous ACH Debit Authorization you provided to us or we do not receive a payment by the Payment Due Date, you authorize us and our agents, successors and assigns to create and submit remotely-created checks for payment to us in the amount of each payment owing under this Agreement, including any returned payment charges or other amounts owing to us upon acceleration of this Loan as a result of your Default. Your typed signature below shall constitute your authorization to us to authenticate remotely created checks, which are also known as demand drafts, telechecks, preauthorized drafts, or paper drafts. If you believe we charged your Bank Account in a manner not contemplated by this authorization, then please contact us. You authorize us to vary the amount of any preauthorized payment by remotely created check as needed to repay installments and any other payments due under this Agreement.

**PAYMENT BY CHECK OR MONEY ORDER:** You may pay each payment owing under this Agreement by check or money order.

Case ID: 141101359

**CHECK CONVERSION NOTIFICATION:** When you provide a check as payment, you agree we can either use information from your check to make a one-time electronic withdrawal from your Bank Account or to process the payment as a check transaction. When we use information from your check to make a withdrawal from your Bank Account, funds may be withdrawn from your Bank Account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. For questions, please call our customer service phone number: (877) 836-1506.

**PAYMENT APPLICATION:** Lender will apply your payments in the following order: (1) to any fees due, (2) to earned but unpaid interest, and (3) to principal amounts outstanding.

**SECURITY INTEREST DISCLOSURE:** To the extent that your agreement to have us withdraw money from your Bank Account is deemed a security interest under the law of the Otoe-Missouria Tribe of Indians, you hereby grant, mortgage, assign, transfer, deliver, pledge, bargain, sell and convey to us a continuing security interest in such withdrawal authorization using the ACH system.

**PREPAYMENT:** You may prepay all or part of the amount you owe us at any time without penalty. If you do so, you must pay the interest accrued on your Loan and all other amounts due up to the date of your payment.

**REFINANCE POLICY:** We, in our sole discretion, will determine whether your Loan may be refinanced.

**RETURNED PAYMENT FEE:** If any payment made by you on this Loan is not honored or cannot be processed for any reason, including not enough money in your Bank Account, you agree to pay us a fee of $30.00. You authorize us and our agents to make a one-time withdrawal from your Bank Account to collect this fee, if you have also selected the ACH Debit Authorization. Your financial institution may also impose a fee.

**DEFAULT:** You will have broken your promise you made to us in this Agreement (each, a "Default") if: (a) you provide false or misleading information about yourself, your employment or your financial condition prior to entering into this Agreement, (b) if you fail to make a payment by the due date or if your payment is returned to us for any reason, or (c) if you file bankruptcy or become a debtor under the Federal Bankruptcy Laws.

**CONSEQUENCES OF DEFAULT:** Should you not do the things you agreed to under this Agreement, we may, at our option, do any one or more of the following things: (a) require you to immediately pay us everything you owe us; (b) withdraw money from your Bank Account that was not available when we tried to withdraw it at an earlier time, if you have selected the ACH Debit Authorization; and (c) pursue all legally available means to collect what you owe us. In the event we declare all amounts owed under this Agreement immediately due because you did not pay us, then you further authorize us and our agents to withdraw money from your Bank Account in the full amount due under this Agreement, if you have selected the ACH Debit Authorization. By choosing any one of more of these, we do not give up our right to use another way to collect the money you owe us later. We may decide not to use any of the ways described above to get back the money that you owe us. If so, we do not give up our right to consider what you said you would do to make payment(s) and, if you fail to make those payment(s), we will consider you to be in Default.

**CREDIT REPORTING:** We may report information about your Loan to credit bureaus. Late payments, missed payments, or other things you do may be reflected on your credit report.

**RIGHT TO CANCEL:** YOU MAY CANCEL THIS LOAN, WITHOUT COST TO YOU OR FURTHER OBLIGATION TO US, BY TELEPHONING TOLL-FREE 877-836-1506 BY 5:30 P.M. EASTERN TIME ON THE FIRST BANKING DAY AFTER THE EFFECTIVE DATE. YOU CAN CANCEL ONLY IF YOU SEND US BACK THE MONEY FROM THE LOAN WE PUT IN YOUR BANK ACCOUNT, RETURN THE LOAN PROCEEDS CHECK MAILED TO YOU OR WE ARE ABLE TO WITHDRAW THE AMOUNT OF YOUR LOAN FROM YOUR BANK ACCOUNT.

**BORROWER'S BANK CHARGES:** You will not hold us or our agents responsible for any fees you must pay as a result of any check or withdrawal request being presented at your bank in connection with this Agreement.

**TRANSFER OF RIGHTS AND MAINTENANCE OF REGISTER:** We may assign or transfer this Agreement, or any of our rights hereunder, to another person or entity without notice or consent from you. Regardless of any transfer, this Agreement shall remain exclusively subject to the laws and courts of the Otoe-Missouria Tribe of Indians. Great Plains Lending, LLC, (the "Registrar") acting solely for this purpose as your irrevocably appointed agent, shall maintain at an office located in the United States a copy of each assignment of this Agreement delivered to it and a register (the "Register") for the recordation of the names and addresses of the original owner and assignees, and the amounts of principal and interest owing to each from time to time pursuant to the terms of this Loan. The Register may be in electronic form. The entries of the Register shall be conclusive, and you, the Registrar, the Lender and all of its assignees shall treat each person whose name is recorded in the Register pursuant to these terms as the owner of such principal and interest payments for all purposes of this Agreement, notwithstanding notice to the contrary. The name of the owner in the Register shall be available to you by written request to the Registrar at any reasonable time and from time to time upon reasonable prior notice. In addition to the foregoing, the Registrar shall include on the Register the names and addresses of those persons holding participation interests in the Loan of which it has notice. Any fees and expenses of the Registrar for its services shall be charged to the registered owner of the loan and not to you.

**WAIVER OF JURY TRIAL AND ARBITRATION.**

**RIGHT TO OPT OUT.** IF YOU DO NOT WISH YOUR ACCOUNT TO BE SUBJECT TO THIS AGREEMENT TO ARBITRATE, YOU MUST ADVISE US IN WRITING AT 2274 S. 1300 EAST, SUITE G-15 #374, SALT LAKE CITY, UT 84106 OR VIA E-MAIL AT SUPPORT@GREATPLAINSLENDING.COM. YOU MUST CLEARLY PRINT OR TYPE YOUR NAME AND ACCOUNT NUMBER OR SOCIAL SECURITY NUMBER AND STATE THAT YOU REJECT ARBITRATION. YOU MUST GIVE WRITTEN NOTICE; IT IS NOT SUFFICIENT TO TELEPHONE US. WE MUST RECEIVE YOUR LETTER OR E-MAIL WITHIN SIXTY (60) DAYS AFTER THE DATE YOUR LOAN FUNDS OR YOUR REJECTION OF ARBITRATION WILL NOT BE EFFECTIVE. IN THE EVENT YOU OPT OUT OF THIS AGREEMENT TO ARBITRATE, ANY DISPUTES HEREUNDER SHALL NONETHELESS BE GOVERNED UNDER THE LAWS OF THE OTOE-MISSOURIA TRIBE OF INDIANS AND MUST BE BROUGHT WITHIN THE COURT SYSTEM THEREOF.

**PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.** UNLESS YOU EXERCISE YOUR RIGHT TO OPT-OUT OF ARBITRATION IN THE MANNER DESCRIBED ABOVE, ANY DISPUTE YOU HAVE WITH LENDER OR ANYONE ELSE UNDER THIS AGREEMENT

Case ID: 141101359

WILL BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO HAVE A JURY, TO ENGAGE IN DISCOVERY (EXCEPT AS MAY BE PROVIDED IN THE ARBITRATION RULES) AND TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES. ANY ARBITRATION WILL BE LIMITED TO ADDRESSING YOUR DISPUTE INDIVIDUALLY AND WILL NOT BE PART OF A CLASS-WIDE OR CONSOLIDATED ARBITRATION PROCEEDING.

**AGREEMENT TO ARBITRATE.** YOU AGREE THAT ANY DISPUTE (DEFINED BELOW) WILL BE RESOLVED BY ARBITRATION IN ACCORDANCE WITH THE LAW OF THE OTOE-MISSOURIA TRIBE OF INDIANS.

**Arbitration Defined.** Arbitration is a means of having an independent third party resolve a Dispute. A "Dispute" is any controversy or claim between you and Lender, its marketing agent, collection agent, any subsequent holder of this Note, or any of their respective agents, affiliates, assigns, employees, officers, managers, members or shareholders (each considered a "Holder" for purposes of this Agreement). The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present or future, including events that occurred prior to the opening of this Account) based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought (i.e. money, injunctive relief or declaratory relief). A Dispute includes, by way of example and without limitation, any claim arising from, related to or based upon marketing or solicitations to obtain the loan and the handling or servicing of your account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan or the Agreement to Arbitrate.

You acknowledge and agree that by entering into this Arbitration Provision:

**(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**

**(b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and**

**(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

**Choice of Arbitrator.** Any party to a Dispute, including a Holder or its related third parties, may send the other party written notice by certified mail return receipt requested at the address appearing at the top of this Agreement of their intent to arbitrate and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association (1-800-778-7879) http://www.adr.org; JAMS (1-800-352-5267) http://www.jamsadr.com; or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Otoe-Missouria Tribe or the express terms of this Agreement to Arbitrate, including the limitations on the Arbitrator below. The party receiving notice of Arbitration will respond in writing by certified mail return receipt requested within twenty (20) days. You understand that if you demand Arbitration, you must inform us of your demand and of the arbitration organization you selected. You also understand that if you fail to notify us, then we have the right to select the arbitration organization. Any arbitration under this Agreement may be conducted either on tribal land or within thirty (30) miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the sovereign status or immunity of the Otoe-Missouria Tribe of Indians, or (b) to allow for the application of any law other than the law of the Otoe-Missouria Tribe of Indians.

**Cost of Arbitration.** We will pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the arbitration. Except where otherwise provided by the law of the Otoe-Missouria Tribe of Indians, each party will be responsible for its own attorneys' fees and other expenses. Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorneys' fees to the party who substantially prevails in the arbitration.

**Waiver of Jury Trial and Waiver of Ability to Participate in a Class Action.** YOU HEREBY AGREE THAT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL, TO HAVE A COURT DECIDE YOUR DISPUTE, AND YOU ARE WAIVING YOUR ABILITY TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION, AND TO CERTAIN DISCOVERY AND OTHER PROCEDURES THAT WOULD BE AVAILABLE IN A LAWSUIT. The arbitrator has the ability to award all remedies available under the law of the Otoe-Missouria Tribe of Indians, whether at law or in equity, to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual Disputes between the parties. The validity, effect and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction located within the Otoe-Missouria Tribe of Indians, and not by the arbitrator. If the court refuses to enforce the class-wide arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in tribal court and will be decided by a tribal court judge, sitting without a jury, under applicable court rules and procedures and may be enforced by such court through any measures or reciprocity provisions available.

**Applicable Law and Judicial Review.** THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE OTOE-MISSOURIA TRIBE OF INDIANS. The arbitrator will apply the laws of the Otoe-Missouria Tribe of Indians and the terms of this Agreement, including the Agreement to Arbitrate. The arbitrator must apply the terms of this Agreement to Arbitrate, including without limitation the waiver of class-wide arbitration. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. If allowed by statute or applicable law, the arbitrator may award statutory damages and/or reasonable attorneys' fees and expenses. The arbitrator will make written findings and the arbitrator's award may be filed with the tribal court. The arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by the tribal court upon judicial review.

**Other Provisions.** This Agreement to Arbitrate will survive: (i) termination or changes in this Agreement, the Account, or the

Case ID: 141101359

relationship between us concerning the Account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of my Note, or any amounts owed on my account, to any other person or entity. This Agreement to Arbitrate benefits and is binding upon you, your respective heirs, successors and assigns. It also benefits and is binding upon us, our successors and assigns, and related third parties. The Agreement to Arbitrate continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. The Agreement to Arbitrate survives any termination, amendment, expiration, or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing. If any of this Agreement to Arbitrate is held invalid, the remainder shall remain in effect.

**GOVERNING LAW.** This Agreement and the Agreement to Arbitrate are governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Otoe-Missouria Tribe of Indians. We do not have a presence in Oklahoma or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any state of the United States.

**TELEPHONE CALLS.** You hereby agree that in the event we need to contact you to discuss your account or the repayment of your Loan, we may call you at any number, including any cell phone number you have provided, and that we may leave an autodialed or prerecorded message or use other technology (including, but not limited to, SMS messaging or other text messaging) to contact or to communicate with you.

**VERIFICATION.** You authorize us to verify all of the information you have provided in obtaining approval of this Loan.

**This Agreement includes a Waiver of Jury Trial and Arbitration Provision that may be enforced by you and us.** By signing this Agreement you agree that it was filled in before you did so and that you have received a completed copy of it. **You further agree that you have read and understand all of the terms of this Agreement, including the part entitled "Waiver of Jury Trial and Arbitration Provision."**

*By electronically signing this Agreement* you certify that the information given in connection with this Agreement is true and correct. You authorize us to verify the information given in connection with this Agreement, and you give us consent to obtain information about you from a consumer reporting agency or other sources. *You acknowledge, represent and warrant that: (a) you have read, understand, and agree to all of the terms and conditions of this Agreement, including the Disclosures and the Arbitration Agreement and Waiver of Jury Trial, (b) this Agreement contains all of the terms of the agreement between you and us and that no representations or promises other than those contained in this Agreement have been made, (c) you specifically authorize withdrawals and deposits to and from your Bank Account as described in this Agreement, if you have selected the ACH Debit Authorization, (d) you are not a debtor under any proceeding in Bankruptcy and have no intention to file a petition for relief under any chapter of the United States Bankruptcy Code, (e) this Agreement was filled in before you signed it, and (f) you have the ability to print or retain a completed copy of this Agreement. You further acknowledge that we may withhold funding of your loan until we check to make sure all the information you gave us on your application is true and we decide whether you meet our requirements to receive the Loan.*

☒ By checking here you authorize us to verify all of the information that you have provided us, including past and/or current information. If there is any missing or erroneous information in or with your loan application regarding your Bank Account (including, without limitation, your bank, bank routing number, and/or account number), then you authorize us to verify and correct such information. You agree that your ACH Authorization is subject to our approving this Agreement.

### Please review and select one of these funding options:

☉ **ELECTRONIC (as soon as the next business day):** By checking here, you authorize us to effect ACH debit and credit entries for this loan, you also agree to the ACH Authorizations set forth in this Agreement. You acknowledge and agree that this ACH Authorization to Debit Bank Account inures to the benefit of Great Plains Lending, LLC, its affiliates, agents, employees, successors, and registered assigns. Check this box if you agree to the ACH Authorizations in this Agreement.

☉ **POSTAL MAIL (up to 7 to 10 days):** By checking here, you request Loan proceeds be distributed to you by check and delivered by regular mail through the United States Postal System. If you elect to receive your proceeds by mail, you must also make your payments by mail. You should allow 7 to 10 days for delivery of the Loan proceeds, and be aware interest begins accruing on the date Lender issues the check for the Loan proceeds.

By: Great Plains Lending, LLC

| Your Full Name: | Type 'I Agree': | Date: |
|---|---|---|
| ▮▮▮▮▮▮ | I Agree | **7/21/2012** |

Case ID: 141101359
10/23/2012



Filed and Attested by
PROTHONOTARY
13 NOV 2014 09:51 am
J. OSTROWSKI

# EXHIBIT F



**MOBILOANS**

www.mobiloans.com
151 Melacon Road
Marksville, LA 71351

**Important Note:** This statement represents the activity and status of your account as of the day the statement was generated. For the most up-to-date look at your activity, please log into your account at mobiloans.com.

| Account Holder: | | Email: | |
|---|---|---|---|
| Statement Date: | 08/04/2013 | Account Number: | |
| Billing Cycle: | 07/19/2013 - 08/04/2013 | Payment Due Date: | 08/19/2013 |
| Current Balance: | $590.00 | Minimum Payment Due: | $190.00 |

**Transaction History**

| Transaction Date | Description | Deposits/Fees | Payments/Credits |
|---|---|---|---|
| 08/04/2013 | Payment - Thank you (Checking Account) | | ($90.00) |
| 08/04/2013 | Fixed Finance Charge | $65.00 | |

**Summary of Fees**

| Date | Fee Description | Amount | Fee Totals | Amount |
|---|---|---|---|---|
| 08/04/2013 | Fixed Finance Charge | $65.00 | Total fees charged this billing cycle | $65.00 |
| | | | | $510.00 |
| | | | Total fees charged 2013 | |

**Minimum Payment Due**

| Due Date | Principal | Fees/Charges | Total |
|---|---|---|---|
| 08/19/2013 | $100.00 | $90.00 | $190.00 |

**Summary**

| Previous Balance | (+) Deposits/Fees | (-) Payments/Credits | (=) New Balance |
|---|---|---|---|
| $615.00 | $65.00 | ($90.00) | $590.00 |

**Calculation of Minimum Payment Due:** *Your Minimum Payment Due is a payment of 10% of the outstanding Mobiloans Cash balance resulting from your most recent Mobiloans Cash draw plus accrued fees and fixed finance charges.*

**Automatic Payments:** *Your Mobiloans Cash comes with AutoPay. If you don't schedule or make a payment by your Payment Due Date, we will automatically deduct the minimum payment from your designated bank account on your Payment Due Date.*

**Billing Rights Summary:** *To access information on your rights to dispute transactions and how to exercise those please view the Billing Rights section of your Terms & Conditions.*

*If you think there is an error on your statement, write to Mobiloans Customer Service at: MobiLoans, LLC, 151 Melacon Road, Marksville, LA 71351 or contact us electronically at http://www.mobiloans.com.*

**View Your Agreement:** *Your entire Mobiloans Cash Agreement can be viewed by logging onto your account at www.mobiloans.com.*

Mobiloans Credit
Agreement and Terms and Conditions
Effective August 23, 2013

MOBILOANS, LLC IS AN ENTITY OWNED AND OPERATED BY THE TUNICA-BILOXI TRIBE OF LOUISIANA. THE CREDIT ISSUED TO YOU AND INFORMATION PROVIDED UNDER THIS AGREEMENT BY MOBILOANS IS DONE SO SOLELY UNDER THE PROVISIONS OF LAWS OF THE TUNICA-BILOXI TRIBE OF LOUISIANA AND APPLICABLE FEDERAL LAW.

This Mobiloans Credit Agreement and Terms and Conditions (these "Terms and Conditions" or this "Agreement") govern your Mobiloans Credit Account. In this Agreement, "you" and "your" refer to those persons who have applied for and been approved for Mobiloans Credit. "We", "us", and "our" refer to Mobiloans, LLC, a tribal lending entity wholly owned by the Tunica-Biloxi Tribe of Louisiana, a sovereign nation located within the United States of America and is operating within the Tunica-Biloxi Reservation. "Tribe" or "Tribal" refers to the Tunica-Biloxi Tribe of Louisiana. Each loan made by us hereunder is being made from the Tunica-Biloxi Reservation. **These Terms and Conditions contain an arbitration provision. Unless you act promptly to reject the arbitration provision, it will have a substantial effect on your rights in the event of a dispute.**

You should review these Terms and Conditions to fully understand how Mobiloans Credit works. If you have questions, you may contact Customer Support at 877-836-1518. You should retain a copy of these Terms and Conditions for your records.

<u>HIGH COST CREDIT DISCLOSURE</u>: MOBILOANS CREDIT IS AN EXPENSIVE FORM OF CREDIT. MOBILOANS CREDIT IS DESIGNED TO HELP CUSTOMERS MEET THEIR SHORT-TERM BORROWING NEEDS. THIS SERVICE IS NOT INTENDED TO PROVIDE A SOLUTION FOR LONGER-TERM CREDIT OR OTHER FINANCIAL NEEDS. ALTERNATIVE FORMS OF CREDIT MAY BE LESS EXPENSIVE AND MORE SUITABLE FOR YOUR FINANCIAL NEEDS.

<u>Truth-in-Lending Disclosures</u>

| Interest Rate and Finance Charges | | |
|---|---|---|
| **Annual Percentage Rate** on Mobiloans Credit advanced | **0%** | |
| Minimum Charge – Fixed Finance Charge | Each Billing Cycle you will be charged a Fixed Finance Charge of: | |
| | If your principal balance as of the last day of your prior Billing Cycle was at or below | ...your Fixed Finance Charge will be: |
| | $0 | No charge |
| | $100 | $10 |
| | $200 | $25 |
| | $300 | $35 |
| | $400 | $45 |
| | $600 | $65 |
| | $900 | $95 |
| | $1,200 | $105 |
| | $1,500 | $135 |

| Fees | |
|---|---|
| *Cash Advance Fee* | $3.00 for each $20.00 of Mobiloans Cash advanced, **for draws of up to $500** |
| | $2.00 for each $20.00 of Mobiloans Cash advanced, **for draws over $500** |

How We Will Calculate Your Balance

To calculate the balance of your Account, at the beginning of each Billing Cycle we subtract all payments and credits made to your Account. Then we will add to your existing unpaid balance the applicable Fixed Finance Charge, the amount of any Mobiloans Cash (Case ID): 141101359

, since your last Periodic Statement, and any applicable Cash Advance Fees for draws of Mobiloans Cash advanced during that Billing Cycle.

Billing Disputes: Information on your rights to dispute transactions and how to exercise those rights is provided in these Terms and Conditions.

See Section VI for further details on costs and charges and Section X and Section XV for further details on balance calculations and billing disputes.

**I. Definitions**

"Account" and "Mobiloans Credit Account" mean your Mobiloans Credit relationship established under this Agreement.

"Application" or "Mobiloans Credit Application" means each initial and supplemental credit application you submitted to Lender to in connection with establishing your Mobiloans Credit Account with Lender.

"AutoPay" means the automatic payment of the Minimum Payment Amount from your designated Demand Deposit Account.

"Billing Cycle" means the interval between the days or dates of regular periodic statements. All Pay Frequencies have two Billing Cycles per month.

"Business Day" means any day a bank in Louisiana is open for business not including weekends or bank holidays.

"Cash Advance Fee" means the nonrefundable fee charged for each draw on your Mobiloans Credit account, regardless of the time the Mobiloans Cash you receive from that draw is outstanding.

"Credit Limit" means the maximum amount you can borrow under your Mobiloans Credit Account.

"Demand Deposit Account" means a bank checking account you have identified for distribution of Mobiloans Cash and/or collection of payments due pursuant to the terms of this Agreement.

"Due Date" means the date reflected on your periodic statement on which your payment is due.

"Fixed Finance Charge" means a minimum charge, calculated on a tiered level based upon the unpaid balance in your Mobiloans Credit Account and charged to your Account each Billing Cycle that you have an unpaid balance.

"Lender" means Mobiloans, LLC, a Tribal entity wholly owned and operated by the Tunica-Biloxi Tribe of Louisiana possessing the inherent characteristics and immunities of the Tribal government.

"Minimum Payment Amount" means the minimum payment you agree to make each Billing Cycle, consisting of the Minimum Principal Amount and accrued fees and Fixed Finance Charges.

"Minimum Principal Amount" means that portion of your Minimum Payment Amount that is applied to the outstanding principal balance of your Mobiloans Credit Account.

"Mobiloans Cash" means the amount of cash you receive from a draw under your Mobiloans Credit Account.

"Mobiloans Credit" means the line of credit governed by this Agreement that allows eligible customers to receive short-term cash draws under this Agreement.

"Pay Date" means the date that you submitted in your initial or updated Mobiloans Credit Application as the date on which you are paid wages or receive other sources of income or benefits.

"Pay Frequency" means the frequency you receive your income payments which are either, weekly, bi-weekly, semi-monthly, or monthly. If your Pay Frequency is weekly, your Pay Dates are considered to be bi-weekly for determining your Billing Cycle under this Agreement. If your Pay Frequency is monthly, your Pay Dates are considered to be semi-monthly for determining your Billing Cycle under this agreement. All Pay Frequencies have two Billing Cycles and are required to remit two Minimum Payment Amounts per month.

"Periodic Statement" means the written statement issued for each Billing Cycle that describes, among other things, Mobiloans Cash transactions, accrued Fees and Finance Charges, payments made, other credits, balances that are past due, your previous balance, your new balance and your payment Due Date for that Billing Cycle.

"Tribal Law" means any law or regulation duly enacted by the Tunica-Biloxi Tribe of Louisiana, a sovereign nation located within the United States of America.

**II. Eligibility for Mobiloans Credit**

You may be eligible for Mobiloans Credit if you meet certain eligibility criteria established by us, which may change from time to time at our sole discretion. As of the date of this Agreement, the eligibility criteria are as follows:

- You have a regular source of income or benefits deposited to a qualified Demand Deposit Account;

- You are at least 18 years old (or at least 19 years old if you are a resident of Alabama or Nebraska);

Case ID: 141101359

- You meet credit underwriting standards established by the Lender;

- You have identified a qualified Demand Deposit Account on the Application;

- You authorize the Lender to initiate automated transfers from your qualified Demand Deposit Account(s) to repay amounts owed under this Agreement or you enroll for payments by mail, as described below;

- Your qualified Demand Deposit Account(s) are not frozen or subject to legal process (such as a garnishment order); and

- You are not in default of this Agreement.

### III. Establishing your Mobiloans Credit Account

Upon approval and verification by Lender of the information you submitted on your Application, your Mobiloans Credit Account will be established. Your Mobiloans Credit Account will be terminated if you do not request Mobiloans Cash for a period of 12 consecutive months. By applying for and using your Mobiloans Credit, you acknowledge that you have received a copy of this Agreement and that you understand and accept its terms and conditions. Access to Mobiloans Cash is subject to the eligibility criteria provided in this Agreement and your compliance with the terms of this Agreement.

You can obtain your current Credit Limit by: (a) logging in to your Mobiloans Account online at http://www.mobiloans.com; (b) calling Customer Support at 877-836-1518; or (c) writing Mobiloans Customer Support at Mobiloans, LLC, P.O. Box 1409, Marksville, LA 71351.

### IV. Accessing your Account and Receiving Mobiloans Cash

You may request Mobiloans Cash online at http://www.mobiloans.com. Aggregate Mobiloans Cash requests may not exceed your Credit Limit, and individual draws are limited to the availability under your Account. Proceeds deposited to a qualified Demand Deposit Account will be affected via ACH. If your request was received by 4:00 PM Central Time, your requested Mobiloans Cash may be available on the next day your financial institution holding your Demand Deposit Account is open for business. If you do not authorize electronic payments from your Demand Deposit Account and instead elect to make payments by mail, you will receive your Mobiloans Cash by check in the mail. Whether you receive your Mobiloans Cash by check or ACH, always check with your financial institution to accurately determine when the money will be available for use.

You may cancel a request for Mobiloans Cash at no cost to you by calling Customer Support at 877-836-1518 prior to 4:00 PM Central Time on the same day you made the request and, if you already received your Mobiloans Cash, you return the received Mobiloans Cash immediately as instructed by Customer Support. In the event that your draw of Mobiloans Cash will be funded by check and you desire to cancel your request, (a) if we have not mailed the check representing the Mobiloans Cash to you or (b) if you have not cashed the check representing the Mobiloans Cash, then we will cancel the check and your obligations in respect of that draw of Mobiloans Cash will be canceled.

**Draw Restrictions:** As noted above, aggregate Mobiloans Cash requests may not exceed your Credit Limit, and individual draws are limited to the availability under your Account. Additional draws may be restricted if you have not made one or more required Minimum Periodic Payments in full and on time, if we have reduced your Credit Limit as described in Section V or if your Account is not otherwise in good standing. In addition, if you have had an outstanding principal balance of Mobiloans Cash on your Account for at least 12 consecutive months, then you may not obtain additional Mobiloans Cash until you pay down the balance of your Mobiloans Credit Account to $0. Once you have brought your Account balance to $0, your ability to draw Mobiloans Cash will be reinstated. See Section VIII below for further information on this paydown requirement and the reinstatement of your ability to draw Mobiloans Cash.

### V. Credit Limit

Your Credit Limit is the maximum amount that you may borrow under your Mobiloans Credit Account. Your Credit Limit is assigned by the Lender and is between $20 and $1,500. This Credit Limit is subject to change with changes in your Demand Deposit Account status and/or underwriting eligibility. We reserve the right, at any time, and upon notice where required by Tribal Law or applicable federal law, to adjust your Credit Limit based on your use of Mobiloans Credit, your payment history with us and other factors, at the Lender's sole discretion. We may reduce your Credit Limit to $0 at any time. We reserve the right to review your credit status at any time, including after obtaining credit reports and other credit information we believe to be relevant. We may modify your Credit Limit or cancel your Account at any time based on this information.

### VI. Costs and Charges

#### Cash Advance Fee

We charge a Cash Advance Fee for each draw on your Mobiloans Credit Account, regardless of the period of time for which the Mobiloans Cash you receive from that draw is outstanding. The Cash Advance Fee is a **FINANCE CHARGE**. The Cash Advance Fee is assessed each time a draw is requested, and there is no grace period within which you may repay an advance and avoid payment of the related Cash Advance Fee. The amount of the Cash Advance Fee that will be assessed on a draw of Mobiloans Cash is as follows:

| Fees | |
|---|---|
| Cash Advance Fee | $3.00 for each $20.00 of Mobiloans Cash advanced, **for draws of up to $500** |
| | $2.00 for each $20.00 of Mobiloans Cash advanced, **for draws** |

Case ID: 141101359

| | over $500 |
|---|---|

**Interest Rate and Fixed Finance Charge**

The interest rate applied to the unpaid principal balance of Mobiloans Cash advanced under your Mobiloans Credit Account is 0%.

A Fixed Finance Charge will be assessed at the beginning of any Billing Cycle based on the unpaid principal balance of Mobiloans Cash at the end of each prior Billing Cycle in accordance with the table below. The Fixed Finance Charge is a **FINANCE CHARGE**. Unless you pay your entire outstanding balance by the applicable Due Date specified in your Periodic Statement, there is no grace period within which you will not be charged a Fixed Finance Charge.

| Interest Rate and Finance Charges | | |
|---|---|---|
| **Annual Percentage Rate** on Mobiloans Credit advanced | **0%** | |
| **Minimum Charge – Fixed Finance Charge** | Each Billing Cycle you will be charged a Fixed Finance Charge of: | |
| | If your principal balance as of the last day of your prior Billing Cycle was at or below | ...your Fixed Finance Charge will be: |
| | $0 | No charge |
| | $100 | $10 |
| | $200 | $25 |
| | $300 | $35 |
| | $400 | $45 |
| | $600 | $65 |
| | $900 | $95 |
| | $1,200 | $105 |
| | $1,500 | $135 |

How we will calculate your balance: To calculate the balance of your Account, at the beginning of each Billing Cycle we subtract all payments and credits made to your Account. Then we will add to your existing unpaid balance the applicable Fixed Finance Charge, the amount of any Mobiloans Cash draws made since your last Periodic Statement, and any applicable Cash Advance Fees for draws of Mobiloans Cash advanced during that Billing Cycle.

Billing Disputes: Information on your rights to dispute transactions and how to exercise those rights is provided in these Terms and Conditions.

See Section X and Section XV for further details on balance calculations and billing disputes.

**VII. Your Promise to Pay**

You promise to pay the total of all outstanding Mobiloans Cash along with all accrued Fees and Finance Charges as described in this Agreement. To the extent permitted by Tribal Law or applicable federal law, you also promise to pay all costs and fees, including reasonable attorneys' fees, which we incur in collection or enforcement of the Agreement.

You agree to make the Minimum Payment Amount shown on each Periodic Statement on or before the applicable Due Date for such payment. The Minimum Payment Amount consists of the Minimum Principal Payment and accrued Fees and Finance Charges as described in this Agreement. Payments are credited to your Account effective as of the day they are received.

You may experience a delay between the date of your payment and the time you are able to take additional Mobiloans Cash while we verify that sufficient funds are available and/or we receive credit for any payments drawn on another depository institution. This action will not result in more cost to you, but it may delay the availability and/or amount of your future Mobiloans Cash.

There is no grace period for repayment.

If you fail to pay the Minimum Payment Amount on or before the applicable Due Date, an AutoPay payment will automatically be deducted by us from your Demand Deposit Account (see Section VIII below) if you have authorized the AutoPay feature. Any amount that is electronically transferred directly into the Demand Deposit Account will be eligible to be used as repayment of your outstanding Mobiloans

141101359

. Cash balances at the time of the transfer.

To minimize the amount of Finance Charges you may incur, you are encouraged to pay your Mobiloans Cash balances in full on or before the applicable Due Date. You also may make payments toward your unpaid balance at any time without penalty.

**Calculation of Minimum Principal Amount**

If the Mobiloans Cash balance is up to and including $400, the Minimum Principal Amount you are required to pay is $20, and if the Mobiloans Cash balance exceeds $400, the Minimum Principal Amount you are required to pay is equal to 5% of outstanding Mobiloans Cash balance.

**VIII. Payment Options**

**Payments in Full and Partial Payments:** You may pay your outstanding balance in full at any time. We also accept partial payments as further described in this Section VIII.

**AutoPay:** If you do not pay in full by scheduling an electronic payment to us or we do not receive a payment in full by mail prior to the Due Date, if you have enrolled in the AutoPay feature, we will process the AutoPay payment as a convenience for you. AutoPay is the automatic payment of the Minimum Payment Amount specified in the applicable Periodic Statement. If you elect to make AutoPay payments via ACH, we will debit your Demand Deposit Account for the amount of one AutoPay payment on the applicable Due Date.

**Borrower-Scheduled Electronic Payments:** You may schedule an electronic payment at any time up to the full amount of the outstanding balance of your Mobiloans Credit Account prior to the applicable Due Date. You may schedule these payments online at http://www.mobiloans.com, by calling Customer Support at 877-836-1518 or by mail. We must receive your scheduled payment request by 4:00 p.m. Central Time on the Business Day prior to the applicable Due Date. Any debit to a Demand Deposit Account will be processed via ACH and will take at least one (1) Business Day to process. Depending on the amount and timing of the early or partial payment, such payments may not reduce the Fees or Fixed Finance Charges that may accrue. See Section VI and Section VII above.

**Payments by Mail:** Extension of Mobiloans Credit is not conditioned on your repayment by electronic means of the amounts you owe Lender. You may make payments by mail, using certified check or money order payable to "Mobiloans, LLC", and any such payment must be received by 4:00 p.m. Central Time on the Business Day prior to the applicable payment Due Date. As noted in Section IV above, if you do not authorize electronic payments from your Demand Deposit Account and instead elect to make payments by mail, you will receive each draw of Mobiloans Cash by check in the mail.

**Required Paydown to $0 after 12 Months with an Outstanding Principal Balance of Mobiloans Cash:** As described in Section IV, if you have had an outstanding principal balance of Mobiloans Cash on your Mobiloans Credit Account for at least 12 consecutive months, then your ability to initiate additional draws of Mobiloans Cash will be restricted until such time as you pay down the balance of your Mobiloans Credit Account to $0. Repayment of your outstanding balance to $0 can be made by paying the Minimum Payment Amount over a maximum of 20 Billing Cycles. You can pay off the outstanding balance in full or over a shorter time frame by scheduling additional electronic payments, sending additional payments by mail, paying more than the Minimum Payment Amount or just remitting a payment in full. Once you have paid in full the outstanding balance of your Account, your ability to make draws of Mobiloans Cash up to your Credit Limit will be reinstated. Depending on the method by which you make the final payment that brings your Account balance to $0, it may take one to three Business Days to process the payment and reinstate your ability to make draws of Mobiloans Cash.

**IX. Application of Payments**

All payments received (whether electronically or otherwise) will be applied first to any accrued and unpaid Fees and Finance Charges, and then to the outstanding principal balance of your Mobiloans Credit Account.

**X. Balance Computation Method**

At the beginning of each Billing Cycle we subtract all payments and credits made to your Account. Then we will add to your existing unpaid balance the applicable Fixed Finance Charge, the amount of any Mobiloans Cash draws made since your last Periodic Statement, and any applicable Cash Advance Fees for draws of Mobiloans Cash advanced during that Billing Cycle. See Section VI above for more details about Fees and Finance Charges.

**XI. Servicing Your Account**

In connection with the servicing of your Mobiloans Credit Account, you hereby authorize us to contact you, including the use of an autodialer, text messaging (if you have opted-in to text messaging in your Application), or prerecorded message, at any phone number you have provided to us in your Application or otherwise, including mobile phone numbers, and at any address we have for you in our records or from other public and nonpublic databases we may lawfully access. Where allowed by law, we also may contact other individuals who may be able to provide updated employment, location, and contact information for you.

**XII. Default**

We may declare you to be in default of this Agreement at any time if: (a) you fail to comply with the terms of this Agreement, including your repayment obligations with respect to borrowings under your Mobiloans Credit Account; (b) we discover that any information you have provided to us is false or misleading in any material respect; (c) you have exceeded the limitations regarding the usage of your Mobiloans Credit Account as set forth in this Agreement; (d) you have not provided us with information we may request from time to time to satisfy our obligations to comply with the Bank Secrecy Act or other statutes or regulations that apply to us; or (e) anything else happens that causes us in our sole discretion to reasonably believe that the prospect of your Mobiloans Credit Account being repaid is impaired. In the event of default, we may suspend or terminate your right to access your Mobiloans Credit Account and to receive draws of Mobiloans Cash, and we may require you to repay at once the amount of all outstanding Mobiloans Cash and accrued Fees and Finance 141101359

Charges.

Upon the occurrence of any event of default, we may debit your Demand Deposit Account and apply any current or future funds available in your Demand Deposit Account(s) towards the repayment of any amounts past due and owed under this Agreement.

## XIII. Periodic Statements

Not less than once each Billing Cycle during which there is (i) one or more Mobiloans Cash transactions, (ii) a payment is received, or (iii) there is an outstanding balance owing on your Mobiloans Credit Account, we will make available to you electronically, or if you specifically request, by mail, a Periodic Statement reflecting, among other things, Mobiloans Cash transactions, accrued Fees and Finance Charges, payments made, other credits, balances that are past due, your previous balance, and your new balance. In addition, we will provide you from time to time with any other disclosures or information required by this Agreement, Tribal law and applicable federal law.

Your Periodic Statements will be generated fourteen (14) days prior to the applicable Due Date for such Billing Cycle. A notification will be emailed to the email account you have on file in your Account, and your statement will be available electronically at http://www.mobiloans.com. You may choose not to receive your statements electronically. If you choose to receive paper statements, please notify us in writing within five days of opening your Account by writing to Mobiloans Customer Support at Mobiloans, LLC, P.O. Box 1409, Marksville, LA 71351.

## XIV. Billing Rights

**YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE**

This notice contains important information about your rights and our responsibilities under Tribal law and applicable federal law.

### What To Do If You Find a Mistake on Your Periodic Statement

If you think there is an error on your Periodic Statement, write to Mobiloans Customer Support at Mobiloans, LLC, P.O. Box 1409, Marksville, LA 71351, or contact us electronically at http://www.mobiloans.com.

In your correspondence, give us the following information:

- Account information - your name and Account number;
- Dollar amount - the dollar amount of the suspected error; and
- Description of problem - if you think there is an error on your Periodic Statement, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your Periodic Statement; and
- At least 3 Business Days before an automated payment is scheduled if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing or electronically. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

### What Will Happen After We Receive Your Correspondence

When we receive your correspondence, we must do two things:

1. Within 30 days of receiving your correspondence, we must tell you that we received your correspondence. We will also tell you if we have already corrected the error.

2. Within 90 days of receiving your correspondence, we must either correct the error or explain to you why we believe the Periodic Statement is correct.

While we investigate whether or not there has been an error:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your Periodic Statement, and we may continue to charge Finance Charges on that amount in accordance with this Agreement.
- While you do not have to pay the amount in question, you are responsible for the remainder of the outstanding balance of your 141101359

Account.

- We can apply any unpaid amount against your Credit Limit.

After we finish our investigation, one of two things will happen:

1. *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.

2. *If we do not believe there was a mistake:* You will have to pay the amount in question, along with applicable Finance Charges on that amount in accordance with this Agreement. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive *our* explanation but still believe your Periodic Statement is wrong, you must write to us within 10 days telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your Periodic Statement. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your Periodic Statement is correct.

### XV. Change in Terms

We reserve the right to change the terms of this Agreement at any time with notice to you as required by Tribal Law and applicable federal law. Such changes may apply to Mobiloans Credit and any current amounts of outstanding Mobiloans Cash as well as to future Mobiloans Cash balances. By continuing to use the Mobiloans Credit service, you are accepting the change in terms, or you may decline the change in terms by no longer using Mobiloans Credit prior to the effective date of the change or by requesting that access to your Mobiloans Credit Account be discontinued. If you discontinue access, you will still be required to repay all amounts that you owe on your Mobiloans Credit Account pursuant to the continuing terms of the Agreement.

### XVI. Transfer of Rights; Maintenance of Register

We may assign or transfer this Agreement, or any of our rights hereunder, to another person or entity without notice or consent from you. Regardless of any transfer, this Agreement shall remain exclusively subject to the laws and courts of the Tribe. As an integral component of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal courts for the purposes of this Agreement. Mobiloans, LLC, (the "Registrar") acting solely for this purpose as your irrevocably appointed agent, shall maintain at an office located within the geographic boundaries of the United States a copy of each assignment of this Agreement delivered to it and a register (the "Register") for the recordation of the names and addresses of the original owner and assignees, and the amounts of the principal, interest, fees, charges and other amounts owing to each from time to time pursuant to the terms of this Agreement. The Register may be in electronic form. The entries of the Register shall be conclusive, and you, the Registrar, the Lender and all of its assignees shall treat each person whose name is recorded in the Register pursuant to these terms as the owner of such principal, interest, fees, charges and other amounts for all purposes of this Agreement and any rights hereunder, notwithstanding notice to the contrary. The name of the owner in the Register shall be available to you by written request to the Registrar at any reasonable time and from time to time upon reasonable prior notice. In addition to the foregoing, the Registrar shall include on the Register the names and addresses of those persons holding participation interests in the receivables outstanding from time to time in the Accounts of which it has notice. Any fees and expenses of the Registrar for its services shall be charged to the registered owner of the loan and not to you.

### XVII. Dispute Resolution; Arbitration

---

#### Notice of Waiver of Jury Trial and Arbitration Agreement

This Agreement includes a binding Waiver of Jury Trial and Arbitration Agreement. You may opt out of the Waiver of Jury Trial and Arbitration Agreement by following the instructions below.

RIGHT TO OPT OUT. IF YOU DO NOT WISH YOUR ACCOUNT TO BE SUBJECT TO THE FOLLOWING WAIVER OF JURY TRIAL AND ARBITRATION AGREEMENT, YOU MUST ADVISE US IN WRITING AT MOBILOANS, LLC, P.O. BOX 1409, MARKSVILLE, LA 71351 OR VIA EMAIL AT SUPPORT@MOBILOANS.COM. YOU MUST CLEARLY PRINT OR TYPE YOUR NAME AND ACCOUNT NUMBER OR SOCIAL SECURITY NUMBER AND STATE THAT YOU REJECT ARBITRATION. YOU MUST GIVE WRITTEN NOTICE; IT IS NOT SUFFICIENT TO TELEPHONE US. WE MUST RECEIVE YOUR LETTER OR E-MAIL WITHIN SIXTY (60) DAYS AFTER THE DATE YOUR MOBILOANS CREDIT ACCOUNT IS ESTABLISHED OR YOUR REJECTION OF ARBITRATION WILL NOT BE EFFECTIVE. IN THE EVENT YOU OPT OUT OF THE ARBITRATION AGREEMENT, ANY DISPUTES UNDER THIS AGREEMENT OR RELATED TO YOUR MOBILOANS CREDIT ACCOUNT SHALL NONETHELESS BE GOVERNED UNDER THE LAWS OF THE TUNICA-BILOXI TRIBE OF LOUISIANA AND MUST BE BROUGHT WITHIN THE COURT SYSTEM THEREOF, TO WHOSE JURISDICTION YOU IRREVOCABLY CONSENT FOR THE PURPOSES OF THIS AGREEMENT.

---

#### WAIVER OF JURY TRIAL AND ARBITRATION AGREEMENT

In this Waiver of Jury Trial and Arbitration Agreement (this "Arbitration Agreement"), "Tribe" or "Tribal" refers to the Tunica-Biloxi Tribe of Louisiana, a sovereign nation located within the United States of America, and "Tribal Law" means any law or regulation duly enacted by the Tunica-Biloxi Tribe of Louisiana.

**PLEASE READ THIS WAIVER OF JURY TRIAL AND ARBITRATION AGREEMENT CAREFULLY.** Unless you exercise your right to opt-out of arbitration in the manner described above, any dispute you have with Lender, its agents, operator of the website where you submitted your Application, purchaser(s) of any interest in the Agreement or your Account, or anyone else under the Agreement, will be resolved by binding arbitration. Arbitration replaces the right to go to court, including the right to have a jury, to engage in discovery (except as may be provided in the arbitration rules), and to participate in a class action or similar proceeding. In arbitration, a dispute is resolved by an arbitrator instead of a judge or jury. Arbitration procedures are simpler and more limited than court procedures. Any arbitration will be limited to addressing your dispute individually and will not be part of a class-wide or consolidated arbitration proceeding.

**Agreement to Arbitrate.** You agree that any Dispute (defined below) will be resolved by arbitration in accordance with Tribal Law.

Arbitration Defined. Arbitration is a means of having an independent third party resolve a Dispute. A "Dispute" is any controversy or claim between you and Lender, its marketing agent, collection agent, any subsequent holder of your Mobiloans Credit Account, or any of their respective agents, affiliates, assigns, employees, officers, managers, members or shareholders (each considered a "Holder" for purposes of this Agreement). The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, including events that occurred prior to the opening of your Account), based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought (i.e., money, injunctive relief, or declaratory relief). A Dispute includes, by way of example and without limitation, any claim arising from, related to or based upon marketing or solicitations to obtain the loan and the handling or servicing of your account whether such Dispute is based on a Tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan or the Arbitration Agreement.

**You acknowledge and agree that by entering into this Arbitration Agreement:**

    (a) **YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**

    (b) **YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and**

    (c) **YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

**Choice of Arbitrator.** Any party to a Dispute, including a Holder or its related third parties, may send the other party written notice by certified mail return receipt requested at the address appearing at the top of the Agreement of their intent to arbitrate and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association (1-800-778-7879) http://www.adr.org; JAMS (1-800-352-5267) http://www.jamsadr.com; or an arbitration organization agreed upon by you and the other parties to the Dispute. The chosen arbitrator will utilize the rules and procedures applicable to consumer disputes of the chosen arbitration organization, to the extent that those rules and procedures do not contradict either Tribal Law or the express terms of this Arbitration Agreement, including the limitations on the Arbitrator below. The party receiving notice of Arbitration will respond in writing by certified mail return receipt requested within twenty (20) days. You understand that if you demand Arbitration, you must inform us of your demand and of the arbitration organization you have selected. You also understand that if you fail to notify us, then we have the right to select the arbitration organization. Any arbitration under this Agreement may be conducted either on Tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than Tribal Law

**Cost of Arbitration.** We will pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the arbitration. Except where otherwise provided by Tribal Law, each party will be responsible for its own attorneys' fees and other expenses. Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorneys' fees to the party who substantially prevails in the arbitration.

**Waiver of Jury Trial and Waiver of Ability to Participate in a Class Action.** YOU HEREBY AGREE THAT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL, TO HAVE A COURT DECIDE YOUR DISPUTE, AND YOU ARE WAIVING YOUR ABILITY TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, TO PARTICIPATE IN A CLASS ACTION LAWSUIT, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION, AND TO CERTAIN DISCOVERY AND OTHER PROCEDURES THAT WOULD BE AVAILABLE IN A LAWSUIT. The arbitrator has the ability to award all remedies available under the laws of the Tunica-Biloxi Tribe of Louisiana, whether at law or in equity, to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual Disputes between the parties. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction of the Tunica-Biloxi Tribe of Louisiana, and not by the arbitrator. If the court refuses to enforce the class-wide arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in Tribal court and will be decided by a Tribal court judge, sitting without a jury, under applicable court rules and procedures and may be enforced by such court through any measures or reciprocity provisions available. As an integral component of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal courts for purposes of this Agreement.

**Judicial Review.** The arbitrator will apply the laws of the Tunica-Biloxi Tribe of Louisiana and the terms of this Agreement, including the Arbitration Agreement. The arbitrator must apply the terms of this Arbitration Agreement, including without limitation the waiver of class-wide arbitration. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. If allowed by statute or applicable law, the arbitrator may award statutory damages and/or reasonable attorneys' fees and expenses. The arbitrator will make written findings and the arbitrator's award may be filed with the Tribal court. The arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by the Tribal court upon judicial review.

**Other Provisions.** This Arbitration Agreement will survive: (i) termination or changes in this Agreement, the Account, or the relationship

Case ID: 141101359

between us concerning the Account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of my Note, or any amounts owed on my account, to any other person or entity. This Arbitration Agreement benefits and is binding upon you, your respective heirs, successors and assigns. It also benefits and is binding upon us, our successors and assigns, and related third parties. The Arbitration Agreement continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. The Arbitration Agreement survives any termination, amendment, expiration, or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing. If any of this Arbitration Agreement is held invalid, the remainder shall remain in effect.

**GOVERNING LAW.** This Arbitration Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution, the Federal Arbitration Act ("FAA") and the decisions of the United States Supreme Court interpreting the FAA, and other applicable federal law. We do not have a presence in Louisiana or any other State of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any State of the United States. Although Mobiloans, LLC is voluntarily agreeing to the application of the FAA and relevant judicial interpretations of the FAA to this Arbitration Agreement, such voluntary application does not represent acquiescence by the Tribe of the general application of such law or any other federal law to the Tribe's operations unless such law is expressly applicable thereto.

### XVIII. Governing Law

This Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution and other applicable federal law. We do not have a presence in Louisiana or any other State of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any State of the United States. Mobiloans, LLC may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Tribe to any federal law unless found expressly applicable to Tribal operations offering such services.

### XIX. Electronic Signature and Electronic Records

We are required by law to provide you with Periodic Statements and certain other disclosures and notices ("Subsequent Disclosures"). **By checking the "Sign Here" box on the Application, that action will signify your agreement that this Agreement and the Subsequent Disclosures we provide to you constitute electronic records under the Electronic Signatures in Global and National Commerce Act (15 U.S.C. Sections 7001 and following) in a manner consistent with Tribal Law and applicable federal law.**

By checking the "Sign Here" box on your Application, you agree to receive all such disclosures electronically. To access these Subsequent Disclosures, in most cases, we will provide you with such disclosures at our web site or the web sites of our vendors. By checking the box, you acknowledge that you are able to electronically access the Mobiloans website (http://www.mobiloans.com), and to electronically access and print the periodic statements and other Subsequent Disclosures we will be providing to you in connection with your Mobiloans Credit account. We will notify you of Subsequent Disclosures by email and will provide copies of any Subsequent Disclosures to you in electronic form by including them in the email, posting them on the Mobiloans website or by providing a link to them on the website. In order to access, view and retain Subsequent Disclosures in electronic form, you must have a computer with Internet access. The minimum system requirements include software that supports 128-bit security encryption and Adobe Reader® version 9.0.

Your agreement to receive disclosures and notices from us in electronic form does not mean you cannot obtain a paper copy of any such disclosure or notice. If you wish to obtain a paper copy of any document or withdraw your consent to receive Subsequent Disclosures electronically, contact us in writing at Mobiloans Customer Support, Mobiloans, LLC, P.O. Box 1409, Marksville, LA 71351. You will be charged a $5.00 fee for the provision of each paper copy. The same fee will apply to customers who withdraw their consent to receive electronic disclosures and notices.

By checking the "Sign Here" box for Electronic Delivery of Disclosures on your Application, you acknowledge receipt of the Terms and Conditions governing your Mobiloans Credit Account, that you have read and agreed to these Terms and Conditions, and that you agree to receive Subsequent Disclosures from us in electronic form.

### XX. Electronic Payment Authorization

#### Consent to Pre-Authorized Electronic Payments

By submitting the last four digits of your Social Security number in the "Sign Here" box on the Application, I hereby authorize and request Mobiloans, LLC to initiate debits to my Demand Deposit Account for my regularly scheduled AutoPay payments equal to the Minimum Payment Amount disclosed on each Periodic Statement. I further authorize Mobiloans, LLC to initiate ACH debit entries to my Demand Deposit Account for any amount of each AutoPay payment. This authority is to remain in full force and effect until Mobiloans, LLC shall have received written notification from me stating my termination in such time and in such manner as to afford Mobiloans, LLC a reasonable opportunity to act upon such notice.

I hereby acknowledge that I shall have the right to stop payment of an ACH debit entry to my designated Demand Deposit Account by providing notification to Mobiloans, LLC in such time as to afford it with a reasonable opportunity to act upon such order prior to it debiting my Demand Deposit Account as described below. After my Demand Deposit Account has been debited, I may have the right to have the amount of an erroneous debit credited to my Demand Deposit Account, respectively, by Mobiloans, LLC, provided I send written notice of such debit to Mobiloans, LLC.

#### Right to Stop Preauthorized Payments

If you have authorized us in advance to make a one-time or recurring payment out of your Demand Deposit Account, you can stop any of these payments by calling us at 877-836-1518 or writing to us at Mobiloans Customer Support, Mobiloans, LLC, P.O. Box 1409, Marksville, LA 71351, in time for us to receive your request by 4:00 pm Central Time at least two Business Days before the applicable due date. If 41101359

you call, we may also require you to put your request in writing and send it to us within 14 days after you call.

If you order us to stop one of these payments by 4:00 pm Central Time at least two Business Days before the applicable Due Date, and we do not do so, we will be liable for your losses or damages.

**Error Resolution**

In case of errors or questions about an AutoPay or electronic payment, call us at 877-836-1518 or write to us at Mobiloans Customer Support, Mobiloans, LLC, P.O. Box 1409, Marksville, LA 71351. We must hear from you no later than 60 days after we sent the FIRST Periodic Statement on which the problem or error appeared.

- Tell us your name and account number;

- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information; and

- Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 Business Days.

We will determine whether an error occurred within 10 Business Days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your account within 10 Business Days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 Business Days, we may not credit your account.

For errors involving new Accounts (Accounts that have been open less than 45 days), we may take up to 90 days to investigate your complaint or question. For new Accounts, we may take up to 20 Business Days to credit your Account for the amount you think is in error.

We will tell you the results within 3 Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation. If you need more information about our error-resolution procedures, call us at 877-836-1518 or write to us at Mobiloans Customer Support, Mobiloans, LLC, P.O. Box 1409, Marksville, LA 71351.

**By submitting the last four digits of your Social Security number in the Terms and Conditions section of the Application you acknowledge that you are not required to consent to receive funds or repay your loan by an ACH transaction crediting or debiting to your Demand Deposit Account. If you authorize us to effect ACH debit entries to your Demand Deposit Account for this line of credit, by submitting the last four digits of your Social Security number you also agree that the Electronic Payment Authorization set forth in this agreement is to remain in full force and effect unless you terminate such authority. If you terminate such authority, you agree to provide us with another means of payment acceptable to us in our sole discretion.**

Case ID: 141101359

# EXHIBIT G

Case ID: 141101359



# HOW WE'RE DIFFERENT



## RATES
**Decrease Over Time**

Rates decrease over time with on-time payments.



**Choose Your Own**
## TERMS

With flexible payment scheduling you can choose your terms.



## FREE
**Credit Score Plus**

*RISE* is all about putting you in control. Our Credit Score Plus tracks credit activity and gives you the tools to monitor your credit. Sign up for Credit Score Plus

⚙ *RISE* TACKLES THE TOUGH QUESTIONS ABOUT CONSUMER INSTALLMENT

Case ID: 141101359

**LOANS.** <u>Read more</u>

| | | | |
|---|---|---|---|
| Know Before You Owe | Loan Cost & Terms | Credit Score Plus | |
| Why We're Different | Privacy | Security | WATCH OUR LATEST ADS  |
| *RISE* Blog | Installment Loans | Financial Terms | AND FOLLOW US ON |
| Online Loans | Cash Loans | Site Map | |

©2014 *RISE*. All Rights Reserved.

*RISE* and its affiliates offer installment loans and credit services only to residents in those states where permitted by law. To obtain a loan, you must apply online and have a valid checking account and email address. Applications processed and approved before 6 p.m. ET are typically funded the next business day. In some cases, we may not be able to verify your application information and may ask you to provide certain documents. Refer to <u>Loan Cost & Terms</u> for additional details. Complete disclosures of APR, fees and payment terms are provided within the Loan Agreement.

Important Disclosures:

Rates may decrease over time based on (i) a history of successful, on-time payments that may qualify you for larger loan amounts with lower rates and (ii) earning points that may qualify you for discounts in the *RISE* Rewards Program. The *RISE* Rewards Program is not available in every state; eligibility for the Rewards Program is subject to *RISE*'s discretion. Reduced rates and choosing your own terms vary by state.

Loan approvals and the amount of any loan for which you may be approved are subject to minimum income requirements and vary by state.

This is an expensive form of credit. *RISE* loans are designed to help you meet your borrowing needs. Appropriate emergencies might be a car repair, medical care for you or your family, or travel expenses in connection with your job. This service is not intended to provide a solution for all credit or other financial needs. Alternative forms of credit, such as a credit card cash advance, personal loan, home equity line of credit, existing savings or borrowing from a friend or relative, may be less expensive and more suitable for your financial needs. Refinancing may be available and is not automatic. Refinancing your loan will extend the term of the loan and result in additional interest charges. Late fees and non-sufficient funds/returned item fees may apply as described in your Loan Agreement. We will never charge you any "hidden fees" that are not fully disclosed in the Loan Agreement or the <u>Loan Cost & Terms</u>. If you don't make a payment on time we will attempt to contact you via one or more authorized methods. All of our collections methods will be in accordance with the guidelines of the federal Fair Debt Collection Practices Act (FDCPA). Because we may report your payment history to one or more credit bureaus, late or non-payment of your loan may negatively impact your credit rating. If you fail to repay your loan in accordance with its terms, we may place your loan with or sell your loan to a third-party collection agency or other company that acquires and/or collects delinquent consumer debt.

First time *RISE* customers typically qualify for an installment loan of $500 to $5,000 with APRs that range from 363.97% to 124.67% respectively for bi-weekly payments (though higher amounts may be available in certain states). For example, a $700 loan in Idaho repaid in 14 bi-weekly payments of $113.41 (last payment amount varies), including $887.74 of interest, has an APR of 349.02%.

The foregoing is an example only — loan amounts, loan repayment terms and applicable finance charges vary by state and are governed by your loan agreement and relevant state law. Please see <u>Loan Cost & Terms</u> for more details.

 

Case ID: 141101359

# EXHIBIT H

Case ID: 141101359

7/19/13                                          Think Finance Products & Services | LinkedIn

Linked®                                                                          Join Today · Sign In

> **Join LinkedIn to see how you are connected to Think Finance... it's free.**
> Get full access to recommendations by professionals in the LinkedIn community!
>                                              [ Join LinkedIn ]   Already a member?
>                                                                  Sign in »

# Think Finance

Overview    Careers    **Products**    Employee Insights

**th!nk**         **Welcome to Think Finance Products**                    5 Products
F I N A N C E     Twenty years after the rise of the modern Internet, the infrastructure is finally in
                  place for software to transform industries at a global scale. The cost of         4 Recommendations
                  delivering online services is a small fraction of what it was ten years ago. Two
                  billion consumers worldwide use
                  ... more

## Think Finance Products                                                  **LinkedIn Company Pages**
                                                                            Stay up-to-date on company news,
                                                                            industry trends, and job opportunities.
Filter by: All Products    Sort by: Hottest
                                                                            
                                                                            [ Find Companies ]

MOBILOANS    **Mobiloans**                                        2 recommendations
                     Mobiloans can be a great way to handle cash emergencies and
                     avoid more expensive bank fees. Once you're approved for a                
                     Mobiloans line of credit, you can request cash at any time by
                     logging into Mobiloans.com. Your line of credit will be there
                     when you need it.  Cash from your Mobiloans line of...

plain **green**      **Plain Green**                                                 Be the first to
                     At Think Finance, we're passionate about providing better        recommend
                     financial products to underbanked consumers.  We call it
                     Banking for the Rest of Us ™.  Customers in need of
                     emergency cash can apply online in minutes, get an answer in
                     seconds, and get cash as soon as the next day.  Customers
                     choose Plain...

GreatPlains Lending  **Great Plains Lending**                                        1 recommendation
                     Up to $500 on Your First Loan and even more at lower rates on
                     future loans!  We offer from $200 to $500 for your first loan, and        
                     up to $1,000 on subsequent loans. What's great? Unlike many
                     other emergency cash alternatives, as you become eligible for
                     larger future loans, you'll qualify for lower...

presta    **Presta**                                                    1 recommendation
                     Presta is the newest way to get today's hottest electronics. Get
                     the brands you want with low payments, no money down and no         
                     long-term commitment when you open a Presta Lease
                     Purchase account. It's like magic. But it's Presta!

PayDay One    **PayDay One**                                             Be the first to
                     Let's face it — everyone can use a little extra cash from time to   recommend
                     time. That's why we're here. At PayDay One, we've created a
                     better way for you to get the cash you need to pay bills, avoid
                     bounced checks, or cover unexpected expenses. Apply now
                     and you can have $100 to $1000 in your bank account...

Case ID: 141101359



Case ID: 141101359

H-2

# EXHIBIT I

Case ID: 141101359



## YOU'RE PRE-QUALIFIED!

Get **$1,000** as soon as tomorrow* with no hassle and you don't need perfect credit.

**Go to greatplainslending.com**
**Expiration date: 9/29/12**



Dear ███████

Life is unpredictable. But you can rely on the team at Great Plains Lending if the unexpected arises.

Whether it's a car repair, medical bill, or other unforeseen expense, Great Plains offers short-term installment loans that can be deposited in your account as soon as tomorrow!* We don't require perfect credit or home ownership. And, this letter verifies your pre-qualified status for a **$1,000 loan** without hassle or delay. Just visit **greatplainslending.com** and apply by **9/29/12**.

At Great Plains, we believe you should not have to deal with the threat of late fees or bounced checks. We provide competitive rates and simple terms, so you have a better alternative than a payday loan. The interest on an initial Great Plains installment loan is **up to 27% lower** than fees you'd pay on a payday loan.† Plus, as you build a successful payment record, you'll be eligible for larger loan amounts (up to $1,500!), and lower rates.** And, with Great Plains, there are no prepayment penalties.

When you need money fast, turn to Great Plains — it's quick, easy and 100% confidential. You'll get an answer in seconds, and get cash as soon as tomorrow!* Just go to **greatplainslending.com**.

Sincerely,

Your Great Plains Lending Team

P.S. Great Plains is committed to providing a great emergency cash option. Turn to us for a convenient, no-hassle lending experience. Visit us today at greatplainslending.com.



## Go to greatplainslending.com

---

**You can choose to stop receiving "prescreened" offers of credit from this and other companies by calling toll free 1-888-567-8688. See PRESCREEN & OPT-OUT NOTICE on the other side for more information about prescreened offers.**

© 2012 Great Plains Lending. All Rights Reserved.
This offer is made based on information retrieved as of June 11, 2012. Subsequent events or changes in your information, such as your moving to another state or applying for a loan from us in the interim period, may impact your eligibility for this offer. If you have any questions, please call us at 1-877-836-1506.
*Great Plains Lending, LLC is a tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians, a sovereign nation located within the United States of America, and is operating within the boundaries of the Otoe-Missouria Reservation. Applications processed and approved before 6 p.m. ET are typically funded the next business day. In some cases, we may not be able to verify your application information and may ask you to provide certain documents. Maximum loan amount for initial loan is $1,000. Refer to Loan Cost & Terms for additional details. Complete disclosures of APR, fees and payment terms are provided within the Loan Agreement. The Annual Percentage Rate (APR) for an example loan of $1,000 is 349.05% with 24 bi-weekly payments of $141.11; pricing in effect as of July 9, 2012.
**A successful payment is made on time, for the full amount due, and is not returned unpaid (i.e. for insufficient funds).
†Please see reverse side for additional information about competitor comparisons.

GRP  262488  1,000  0136996

Case ID: 141101359

GRP_PQ_0712

Please note: This is an expensive form of credit. Great Plains loans are designed to help you meet your short-term borrowing needs. Appropriate emergencies might be a car repair, medical care for you or your family, or travel expenses in connection with your job. This service is not intended to provide a solution for longer-term credit or other financial needs. Alternative forms of credit may be less expensive and more suitable for your financial needs. Alternative sources you could consider include: a credit card cash advance; personal loans; home equity line of credit; existing savings; or borrowing from a friend or relative.

†First time Great Plains Lending customers typically qualify for an installment loan of $100 to $1,000 with an APR of 349.05% to 448.78%, or 27% less than the average 611.96% APR for a payday loan. For example, a $500 loan from Great Plains at 448.78% APR would require 12 bi-weekly installment payments of $101.29. After the 12th successful payment, your loan would be paid in full. An average payday loan of $500 with an APR of 611.96% and a fourteen (14) day term would require one payment of $617.36. Average payday loan pricing is based on Texas-originated loans facilitated by Credit Service Organizations/Credit Access Businesses such as CashNet USA® (664.30%), ChecknGo® (661.75%), MyCashNow (485.45%), DiscountAdvances.com (458.25%) and Ace Cash Express® (792.05%) as of April 16, 2012.

## PRESCREEN & OPT-OUT NOTICE:
This "prescreened" offer of credit is based on information in your credit report indicating that you meet certain criteria. This offer is not guaranteed if you do not continue to meet the criteria used for this "prescreened" offer of credit or: (A) you are below the age required to create a valid contract (18 years of age or 19 years of age in Alabama and Nebraska); (B) you have moved beyond our service area or have an existing loan with us; or (C) the information you submit in connection with accepting this "prescreened" offer of credit is not complete or verifiable. If you do not want to receive prescreened offers of credit from this and other companies, call the consumer reporting agencies toll-free at 1-888-5OPT-OUT (1-888-567-8688), or visit the website at www.optoutprescreen.com; or write: TransUnion Opt-Out Request, P.O. Box 505, Woodlyn, PA 19094-0505.

Case ID: 141101359

EXHIBIT J

Case ID: 141101359

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF BANKING

FILED

2011 FEB 18  PM 3: 23

PA DEPT OF BANKING

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF BANKING, BUREAU OF COMPLIANCE, INVESTIGATION AND LICENSING, | : : : : : |
| Petitioner, | : |
| v. | : : |
| SELLING SOURCE, LLC d/b/a MONEY MUTUAL, | : : : |
| Respondent. | : : |

Docket No.: 100286 (ENF-C&D)

## CONSENT AGREEMENT AND ORDER

The Commonwealth of Pennsylvania acting through the Department of Banking ("Department") Bureau of Compliance, Investigation and Licensing ("Bureau") enters into this Consent Agreement and Order ("Order") with Selling Source, LLC and PartnerWeekly, LLC, a subsidiary of Selling Source, to resolve all issues arising from an Order issued by the Bureau on December 3, 2010, Docket No. 100286 (ENF-C&D).

In the Order, the Bureau asserts that Selling Source, LLC violated the Consumer Discount Company Act ("CDCA"), 7 P.S. §6201, et. seq. and the Loan Interest Protection Law ("LIPL"), 41 P.S. §101, et. seq. Selling Source, LLC and PartnerWeekly, LLC deny that they violated the CDCA and the LIPL as set forth in the Bureau's Order, deny that the Department has jurisdiction over their activities and admit to no wrongdoing. The parties to the above-captioned matter, in lieu of litigation, hereby stipulate that the following statements are true and correct in settlement of the above-captioned matter and, intending to be legally bound, hereby agree to the terms of this Consent Agreement and Order ("Order").

Case ID: 141101359

## BACKGROUND

1.     The Department is the Commonwealth of Pennsylvania's administrative agency authorized and empowered to administer and enforce the CDCA and LIPL.

2.     The Bureau is primarily responsible for administering and enforcing the CDCA and LIPL.

3.     Selling Source, LLC ("Selling Source"), a Delaware limited liability company with its principal place of business in Las Vegas, Nevada, is a holding company that owns other legal entities that engage in Internet marketing including technology and analytical services to customers in a wide variety of industries.

4.     One of the legal entities owned by Selling Source is PartnerWeekly, LLC ("PartnerWeekly"), a Nevada company also with its principal place of business in Las Vegas.

5.     PartnerWeekly is engaged in the business of marketing and generating Internet leads for sale to lenders (also referred to as "customers").

6.     PartnerWeekly generates leads for sale to lenders through its website located at www.moneymutual.com (the "Website").

7.     On December 3, 2010, the Bureau issued the Order against Selling Source asserting that it violated Section 3.B of the CDCA, 7 P.S. § 6203.B, and Section 201(a) of the LIPL, 41 P.S. § 201(a).

8.     Section 3.B of the CDCA provides that,

> Any person who shall hold himself out as willing or able to arrange for or negotiate such loans of twenty-five thousand dollars ($25,000), or less where the interest, discount, bonus, fees, fines, commissions or other considerations in the aggregate exceeds the interest that the lender would otherwise be permitted by law to charge or who solicits prospective borrowers of such loans . . . . . shall be deemed to be engaged in the business contemplated by this act.

7 P.S. § 6203.B.

9. Section 201(a) of the LIPL provides, in relevant part that, "the maximum lawful rate of interest for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less . . . .shall be six per cent per annum." 41 P.S. § 201(a).

10. Thus, the Department requires any person who shall "hold himself out as willing or able to arrange for" or who "solicits prospective borrowers" that are Pennsylvania residents to obtain loans that meet the parameters of the CDCA and LIPL be licensed as a consumer discount company in Pennsylvania.

11. The Bureau averred in its December 3rd Order that Selling Source engaged in unlicensed activity by assisting lenders to make payday loans to Pennsylvania residents through its marketing and internet activities; the lenders that Selling Source assisted were not licensed in Pennsylvania as consumer discount companies and charged in excess of 6% for the loans made to Pennsylvania residents.

12. Upon notice of the December 3, 2010 Order, Selling Source immediately contacted the Bureau to cooperate in its investigation and amicably resolve any open questions concerning PartnerWeekly's activities and the nature of its business.

13. Selling Source and PartnerWeekly contend that neither Selling Source nor PartnerWeekly has any significant contacts with the Commonwealth of Pennsylvania.

14. Selling Source and PartnerWeekly deny any violation of either the CDCA or the LIPL and admit no wrongdoing.

15. Selling Source and PartnerWeekly contend that there is no basis for jurisdiction over them in the Commonwealth of Pennsylvania and that the CDCA and LIPL cannot be enforced against them consistent with the requirements of the Constitution of the United States of America and the Constitution of the Commonwealth of Pennsylvania.

16.    In lieu of going to a hearing on the matter, the parties have agreed to resolve this matter amicably.

17.    By agreeing to this Order, Selling Source and its subsidiary PartnerWeekly do not admit to violating any Pennsylvania law or to any wrongdoing; rather Selling Source and PartnerWeekly seek to cooperate with the Department and, to demonstrate good faith, agree to comply with the terms set forth below.

18.    This Order resolves all issues involved in the *Commonwealth of Pennsylvania, Department of Banking, Bureau of Compliance, Investigation and Licensing v. Selling Source, LLC d/b/a Money Mutual*, Docket No. 100286 (ENF-C&D).

RELIEF

19.    Penalty. PartnerWeekly agrees to pay the Department $40,000.00 to cover, *inter alia*, the costs of the Department's investigation and commencement of this litigation. The payment shall be due and payable to the Department within 30 days of the Effective Date of this Order as defined in Paragraph 26. The payment shall be remitted by certified check or money order made payable to the Pennsylvania Department of Banking and forwarded to 17 N. Second Street, Suite 1300, Harrisburg, PA 17103.

20.    Corrective Action.

   (a)    Prohibit Advertisements to Pennsylvania Residents. PartnerWeekly will block Pennsylvania residents from accessing the Website. Furthermore, PartnerWeekly will not specifically target Pennsylvania residents in its advertisements.

   (b)    Disclaimers. PartnerWeekly will certify that the Website and print advertisements have a clear and prominent caveat that explicitly states its products are not available to Pennsylvania residents, and its television advertisements will have a clear and prominent caveat that explicitly states its products will not be available in all states.

   (c)    Letter to Customers. PartnerWeekly, by way of letter, will notify its existing customers as of the date of this Order that leads from

Case ID: 141101359

Pennsylvania residents will not be provided. Further, PartnerWeekly will notify its prospective customers that it cannot provide leads to Pennsylvania residents.

(d) Certification. PartnerWeekly will certify to the Department when letters to the existing customers pursuant to Subparagraph(c) have been sent. PartnerWeekly will disclose to the Department the number of letters sent to its customers.

## FURTHER PROVISIONS

21.    Consent and Jurisdiction. Selling Source and PartnerWeekly hereby knowingly, willingly, voluntarily and irrevocably consent to the entry of this Order, and agree that they understand all of the terms and conditions contained herein. Selling Source and PartnerWeekly take the position that they are not subject to jurisdiction in Pennsylvania and nothing in this Order shall be construed as an admission to the contrary. Selling Source and PartnerWeekly, however, acknowledge that they are subject to jurisdiction in Pennsylvania for the sole purpose of enforcing this Order, if necessary. Moreover, Selling Source and PartnerWeekly, by voluntarily entering into this Order, waive any right to hearing or appeal concerning the terms, conditions and/or penalties set forth in this Order.

22.    Publication and Release. The Department will publish this Order pursuant to its authority pursuant to its authority in Section 302.A(5) of the Department of Banking Code. 71 P.S. § 733-302.A.(5).

23.    Entire Agreement. This Order contains the whole agreement between the parties. There are no other terms, obligations, covenants, representations, statements, conditions, or otherwise, of any kind whatsoever concerning this Order. This Order may be amended in writing by mutual agreement by the parties.

24.    Binding Nature. The Department, Selling Source and PartnerWeekly intend to be and are legally bound by the terms of this Order.

25.    Counsel.  This Order is entered into by the parties upon full opportunity for legal advice from legal counsel.

26.    Effectiveness.  Selling Source and PartnerWeekly stipulate and agree that this Order shall become effective on the date that the Bureau executes the Order.

27.    Other Enforcement Action.

(a)    The Department reserves all of its rights, duties, and authority to enforce all statutes, rules and regulations under its jurisdiction against Selling Source and PartnerWeekly in the future regarding all matters not resolved by this Order.

(b)    Selling Source and PartnerWeekly acknowledges and agrees that this Order is only binding upon the Department and not any other local, state or federal agency, department or office regarding matters within this Order.

28.    Authorization.  The parties below are authorized to execute this Order and legally bind their respective parties.

29.    Counterparts. This Order may be executed in separate counterparts and by facsimile or email.

30.    Titles.  The titles used to identify the paragraphs of this document are for the convenience of reference only and do not control the interpretation of this document.

WHEREFORE, in consideration of the foregoing, including the recital paragraphs, the

Commonwealth of Pennsylvania, Department of Banking, Bureau of Compliance, Investigation

and Licensing and Selling Source, LLC and PartnerWeekly, LLC do hereby execute this Consent

Agreement and Order.

**FOR THE COMMONWEALTH OF**
**PENNSYLVANIA DEPARTMENT OF**
**BANKING, BUREAU OF COMPLIANCE,**
**INVESTIGATION AND LICENSING**

**SELLING SOURCE, LLC**
**PARTNERWEEKLY, LLC**

By:_____ _____

    Ryan Walsh, Administrator
    Bureau of Compliance, Investigation and
    Licensing
    Department of Banking

By:_____

    Frank A. Mayer, III, Esquire
    Richard P. Eckman, Esquire
    Stephen G. Harvey, Esquire
    PEPPER HAMILTON LLP
    3000 Two Logan Square
    Eighteenth & Arch Streets
    Philadelphia, PA 19103
    (215) 981-4000
    Counsel for PartnerWeekly, LLC,
    Selling Source, LLC

Dated: February 18, 2011

Dated: 2/18/2011

Case ID: 141101359

# EXHIBIT K

Case ID: 141101359

7/16/13                                   MoneyMutual® Plain Green Loans



Need Help? Call Now **800-741-3300**

# Hello, Irv!

MoneyMutual was unable to match you with a participating lender in our network due to either your state of residency or the inability to meet certain lender requirements. However, we invite you to take advantage of an opportunity with our partner Plain Green Loans for your short-term financial needs.

Please click the button below to complete the loan process with Plain Green Loans. For your safety & security, Plain Green Loans may require some information you previously provided.



*Additional disclosures apply. For more information, click "Apply Now" or visit www.plaingreenloans.com.

MoneyMutual is NOT a lender.

Case ID: 141101359