## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | Civil Action |
| by Attorney General | : | |
| KATHLEEN G. KANE, | : | No. 14-7139-JCJ |
| **Plaintiff** | : | |
| vs. | : | |
| | : | |
| THINK FINANCE, INC., TC LOAN SERVICE, LLC, | : | |
| PAYDAY ONE, LLC, TAILWIND MARKETING, LLC, | : | |
| TC DECISION SCIENCES, LLC, FINANCIAL U, LLC: | | |
| and KENNETH E. REES, | : | |
| | | |
| NATIONAL CREDIT ADJUSTERS, LLC, | : | |
| | : | |
| SELLING SOURCE, LLC and PARTNERWEEKLY, | : | |
| LLC, d/b/a MONEYMUTUAL.COM | : | |
| | : | |
| -and- | : | |
| | : | |
| other JOHN DOE persons or entities, | : | |
| **Defendants** | : | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

KATHLEEN G. KANE
*Attorney General*

JAMES A. DONAHUE III
*Executive Deputy Attorney General*
*Public Protection Division*

SAVERIO P. MIRARCHI
*Deputy Attorney General*
PA Attorney I.D. #88616

Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
21 South 12th Street, 2nd Floor
Philadelphia, Pennsylvania 19107
Phone: (215) 560-2414
Fax: (215) 560-2494
Email: smirarchi@attorneygeneral.gov

Special Counsel:
IRV ACKELSBERG
PA Attorney I.D. #23813
Howard I. Langer
John J. Grogan
Edward A. Diver
Peter Leckman

LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Phone: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com

*Table of Contents*

I.      Introduction ............................................................................................................1

II.     The Parties ...........................................................................................................3

III.    Jurisdiction and Venue..........................................................................................6

IV.     The Facts of the Case ............................................................................................7

        a.   Pennsylvania Restrictions on High-Rate Lending over the Internet......................7

        b.   Phase One of the Scheme:  Rent-a-Bank ................................................................8

        c.   Phase Two of the Scheme: Rent-a-Tribe ................................................................11

        d.   Other Participants in the Think Finance Scheme and the Ongoing Harms to
             Pennsylvania Consumers ....................................................................................20

V.      Claims for Relief....................................................................................................24

        Count One (Pa. Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(1))...........  24

        Count Two (Pa. Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(3))....... ... 26

        Count Three (Pa. Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(4))…….. 28

        Count Four (State Law Debt-Collection Violations)……………………………29

        Count Five (State Law Deceptive Practices)……………………………………33

        Count Six (Dodd-Frank Act)……………………………………………………36

VI.     Prayer for Relief.....................................................................................................38

# I.  INTRODUCTION

1.      Defendants illegally solicit, arrange, fund, purchase, service and/or collect loans and cash advances made to Pennsylvania citizens over the Internet. These loans and cash advances charge well in excess of the usury ceiling established by Pennsylvania law, which reflects the Commonwealth's fundamental policy against predatory consumer lending practices. Defendants also engage in various forms of unfair, deceptive and abusive conduct related to that business activity.

2.      To evade licensure, usury and consumer protection laws, Defendants Think Finance, Inc., TC Loan Service, LLC, PayDay One, LLC, Tailwind Marketing, LLC, TC Decision Sciences, LLC, Financial U, LLC and Kenneth Rees (hereinafter "the Think Finance Defendants") are using affiliations with Native American tribes—as they did, previously, with a rogue bank—as vehicles for this illegal activity. The Think Finance Defendants have, as an alternative to making the loans in their own name, designed, participated in, and operated a lending and collection scheme in which they disguise themselves as mere service providers—initially to the bank and now to the tribes—in order to cloak their business activity with whatever protections from state law the bank or tribes might enjoy. Through such devices, they have profited from illegal and abusive loans that flout Pennsylvania and federal law, using deliberate deceptions and abusive practices to target and take advantage of Pennsylvania consumers.

3.      Also involved in this scheme are various debt buyers and debt collectors, including, but not limited to, Defendant National Credit Adjusters, LLC, which has actively collected or attempted to collect these illegal and abusive loans.

4.      Also currently or formerly involved in the scheme are the affiliated marketing companies, Selling Source, LLC and PartnerWeekly, LLC, d/b/a MoneyMutual.com (hereinafter

collectively, the Selling Source Defendants), which generate leads over the Internet for high-rate

lenders and, upon information and belief,  have made referrals of Pennsylvania residents to this

scheme, and extracted fees for those referrals.

5.      In this action, the Commonwealth, through its Attorney General, asserts and

exercises its enforcement powers and authority under the following state and federal statutes:

(a) the Corrupt Organizations Act (hereafter "the COA"), 18 Pa. C.S.A.  § 911; (b) the Unfair

Trade Practices and Consumer Protection Law (hereafter "the UTPCPL"), 73 P.S. § 201-1, *et

seq.*; (c) the Fair Credit Extension Uniformity Act (hereafter "the FCEUA"), 73 P.S. § 2270.1,

and (d) the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (hereafter

"the Dodd-Frank Act"), 12 U.S.C. § 5552(a).

6.      The Bureau of Consumer Protection of the Office of the Attorney General and the

Pennsylvania Department of Banking and Securities (hereinafter "the Banking Department")

have received numerous complaints from consumers harmed by the scheme alleged herein.

Among the consumers victimized by the Defendants are Pennsylvania citizens at or above the

age of 60. The Commonwealth believes there are numerous consumers who have been harmed

due to the methods, acts and practices alleged herein.

7.      The public interest is served by seeking before this Honorable Court a permanent

injunction to restrain the methods, acts and practices alleged, including restitution and

disgorgement of all income and monies Defendants have derived from these methods, acts and

practices, as well as civil penalties, and investigative and litigation costs, including but not

limited to attorney's fees.

## II.  THE PARTIES

8.      Plaintiff is the Commonwealth of Pennsylvania, appearing through its Attorney General, the Honorable Kathleen G. Kane, with offices at 21 South 12th Street, 2nd Floor, Philadelphia, Pennsylvania 19107 and at Strawberry Square, 15th Floor, Harrisburg, Pennsylvania 17120.

9.      Article 4, § 4.1 of the Pennsylvania Constitution designates the Attorney General as "the chief law officer of the Commonwealth." *See also* 71 P.S. § 732-204(c) (directing the Attorney General, as a general matter, to represent the Commonwealth in all civil actions brought by the Commonwealth).

10.     The Attorney General is, by statute, expressly designated as the Commonwealth agency authorized to enforce the following two statutes and to seek injunctive and other appropriate relief to restrain conduct prohibited by such statutes: PA COA, 18 Pa. C.S.A. § 911(e) and the Consumer Protection Law, 73 P.S. § 201-4.

11.     The Dodd-Frank Act, which prohibits "unfair, deceptive or abusive acts or practices" by any person engaged in the business of consumer financial services, 12 U.S.C. § 5531, explicitly delegates to state attorneys general the authority to bring federal civil enforcement actions in order to enforce the Act and to secure remedies provided therein. 12 U.S.C. § 5552(a)(1). This provision is subject to a requirement that an attorney general provide prior notice to the Consumer Financial Protection Bureau (CFPB) in accordance with that agency's regulation. The Commonwealth has provided such notice to the CFPB.

12.     Defendant Think Finance, Inc. is a Delaware corporation headquartered at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. It formerly had the name ThinkCash,

Inc. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

13.     Defendant TC Loan Service, LLC is a Delaware limited liability company located at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is registered with the Pennsylvania Department of State Corporation Bureau as a Pennsylvania limited liability company. It was registered with the Pennsylvania Department of Banking as a foreign limited liability company, which, during the period 12/29/2010 to 2/1/2012, was doing business in Pennsylvania as a "credit services" licensee, from the website www.thinkcash.com.

14.     Defendant PayDay One, LLC is a Delaware limited liability company located at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

15.     Defendant Tailwind Marketing, LLC is a Delaware limited liability company located at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

16.     Defendant TC Decision Sciences, LLC is a Delaware limited liability company located at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

17.     Defendant Financial U, LLC is a Delaware limited liability company with offices at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. This defendant is not registered with the Pennsylvania Department of State Corporation Bureau.

18.     Defendant Kenneth E. Rees is an individual residing in Texas who, until the business restructuring described below, was the President and Chief Executive Officer of Think Finance, Inc. Following the restructuring, he served as Chairman of the Board. According to the

records of the Texas Secretary of State, he is the sole registered member of Tailwind Marketing, LLC and TC Decision Sciences, LLC, under the misspelled name Ken Bees. He participated in designing and directing the business activity described herein.

19.     Defendant National Credit Adjusters, LLC (hereinafter "NCA") is a Kansas limited liability company located at 327 W. 4th Street, Hutchinson, Kansas 67501. NCA has either purchased illegal usurious loans made to Pennsylvania residents from the Think Finance Defendants and/or from the tribal entities affiliated with the Think Finance Defendants or from other entities designated by the scheme to hold the loans, or is the successor to another corporation or limited liability company that purchased the debt, and has been engaging in debt collection activity pertaining to such loans. This defendant is registered with the Pennsylvania Department of State Corporation Bureau as a foreign limited liability company located in Kansas.

20.     Defendant Selling Source, LLC, is a Delaware limited liability company, based in Las Vegas, Nevada. It is a holding company that owns other legal entities engaged in marketing over the Internet. One of those entities is PartnerWeekly, LLC, a Nevada limited liability company, which is located at 325 E. Warm Springs Road, Las Vegas, Nevada 89119. PartnerWeekly, LLC generates leads for sale to lenders including the Think Finance Defendants and/or their tribal lender affiliates. These defendants are not registered with the Pennsylvania Department of State Corporation Bureau, nor is the fictitious name "Money Mutual" registered.

21.     Defendants John Doe include the various other non-tribal persons or entities that, in concert with and/or at the direction of the Think Finance Defendants, have participated in the funding, origination, collection or marketing of loans made in the name of  "ThinkCash", "Plain Green," "Great Plains Lending" and "MobiLoans." Such persons or entities include, but are not

limited to: the lessee of a Philadelphia postal box that is designated to receive mail payments relating to loans made in the name of Plain Green or Great Plains Lending; the investor/owners of the legal entity that holds title to loans originated by the scheme; entities that Think Finance has located or arranged to provide the lending capital used to make loans to Pennsylvania residents or to funnel such lending capital to the tribal entities; additional entities that Think Finance has located or arranged to purchase and/or collect unpaid balances purportedly owed by Pennsylvania borrowers; and those entities that are involved in processing payments that are electronically debited from the bank accounts of Pennsylvania consumers. The Commonwealth does not yet know the identity of these persons or entities but reserves the right to add them as party-defendants as their identities become known.

### III. JURISDICTION AND VENUE

22.     This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331 in that (a) this Court has already ruled that Count Five under the Pennsylvania UTPCPL raises substantial federal questions under the federal common law pertaining to the scope of Native American tribal sovereignty, and (b) Count Six arises under the Dodd-Frank Act, which granted jurisdiction to the district courts over civil enforcement actions brought by state attorneys general. *See* 12 U.S.C. § 5552(a)(1).

23.     This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

24.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this District, or alternatively, because the Defendants reside in Pennsylvania within the meaning of 28 U.S.C. § 1391(c).

## IV.  THE FACTS OF THE CASE

### a.  Pennsylvania Restrictions on High-Rate Lending over the Internet

25.     Under Section 201 of the Loan Interest and Protection Law (hereinafter "LIPL"), 41 P.S. § 201, the maximum lawful rate of interest for the loan and use of money in amounts less than $50,000 is six percent per year.

26.     The six-percent interest cap applies to all consumer lenders except those lenders who are licensed under the Consumer Discount Company Act (hereinafter "CDCA"), 7 P.S. §§ 6201-6219, and who make loans in accordance with the limitations and requirements of that statute. *See Pa. Dept. of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752 (Pa. 2008). This cap applies to all credit-related charges, however labeled, and applies to credit lines as well as fixed-amount loans. *Id*.

27.     On July 26, 2008, the Pennsylvania Department of Banking issued a notice rescinding an earlier administrative interpretation of the CDCA and announcing that, as of February 1, 2009, the CDCA licensing requirement applicable to small-loan consumer lending (which under the earlier interpretation only applied to lending occurring in storefronts within Pennsylvania) would apply to lending to Pennsylvania consumers conducted over the Internet. (A copy of the interpretative letter is attached hereto as Exhibit A.)

28.     On-line lenders sought unsuccessfully to enjoin this administrative ruling from going into effect, but the Pennsylvania courts upheld the position of the Department of Banking. *See Cash America Net of Nevada, LLC v. Com., Dept. of Banking*, 8 A.3d 282 (Pa. 2010).

29.     Thus, as of February 1, 2009, "payday lending"—the "consumer lending practice in which a lender offers consumers high-rate, short-term loans secured by either a post-dated

check or a debit authorization from a bank," *id*., 8 A.3d at 284—has been illegal in Pennsylvania, whether done through storefronts or over the Internet.

30.　　None of the Defendants are licensed under the CDCA, and thus they are prohibited from making or collecting on any consumer loans to Pennsylvania citizens that charge interest at rates in excess of six percent.

**b. Phase One of the Scheme: Rent-A-Bank**

31.　　Prior to a 2010 corporate name change, Defendant Think Finance, Inc. was known as ThinkCash, Inc.

32.　　ThinkCash, Inc. was formed in or around 2001 as a payday lender that operated over the Internet rather than through "bricks and mortar" payday lending stores, making short-term loans at effective annual rates in excess of 200 or 300 percent. During the early years of the scheme, the Think Finance Defendants extended payday loans to Pennsylvania consumers through their "PayDay One" and "Think Cash" websites, at www.PaydayOne.com and www.ThinkCash.com.

33.　　Prior to the 2008 change of policy by the Pennsylvania Banking Department regarding online payday lending, the Think Finance Defendants were also participating in a lending model known colloquially as "rent-a-bank." Under this model, a payday lender who was by law prohibited from making loans in a particular state would attempt to evade those legal restrictions by partnering with an out-of-state bank that, for a fee, would act as the nominal lender while the *de facto*, non-bank lender marketed, funded and collected the loan and performed other lender functions.

34.　　Because banks are insulated from state examination and regulation by virtue of federal bank pre-emption doctrines, many payday lenders were, for a period of time, able to

operate openly from Pennsylvania storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like Pennsylvania, payday lending is illegal under state law. However, beginning in 2005, the Federal Deposit and Insurance Corporation (hereinafter "FDIC") began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005.

35.     As a result of that 2005 policy announcement by the FDIC, most banks that were engaged in rent-a-bank partnerships with payday lenders terminated those relationships. One effect of the policy change was that, by 2006, all of the storefront payday lending that had been conducted in Pennsylvania through the use of these bank partnerships ceased and those stores closed.

36.     At least one FDIC-regulated bank, however, First Bank of Delaware (hereinafter "FBD"), operating from an office building in Center City Philadelphia, developed a specialty in providing banking services to payday lenders and other merchants involved in illegal activity to circumvent the law of Pennsylvania and other jurisdictions.

37.     The Think Finance Defendants established a contractual relationship with FBD, whereby the bank would, for a fee, serve as the nominal lender, while Defendants would continue to perform most lender functions and would earn most of the revenue generated by this lending activity. Defendants used service contracts between the bank and various Think Finance affiliates in order to disguise the flow of revenue to themselves. For example, upon information and belief, Defendant Tailwind Marketing, LLC received fees to market the loans and Defendant TC Decision Sciences, LLC received fees for, among other things, website and other technological services. Upon further information and belief, Defendant TC Loan Service, LLC

also collected fees for additional "services" provided and/or acquired an interest in the loans that were originated in the name of FBD.

38.     The continued viability of this "rent-a-bank" scheme was threatened, however, as a result of FDIC enforcement proceedings against FBD. In October, 2008, the FDIC issued an Order to Cease and Desist against FBD, finding, among other things, that the bank was operating payday loan programs "offered, marketed, administered, processed serviced and/or collected by third parties"—naming, specifically, Defendant TC Loan Service, LLC—without proper oversight and supervision by the bank. *See In the Matter of First Bank of Delaware*, FDIC-07-256b and FDIC-07-257k.

39.     By the time the cease and desist orders were issued, the Pennsylvania Banking Department had already banned unlicensed lenders from making high-rate loans to Pennsylvania consumers over the Internet, effective February 1, 2009.  Notwithstanding the actions of the FDIC and the Banking Department, FBD and the Think Finance Defendants, continued making and collecting loans involving Pennsylvania consumers beyond February 1, 2009.  Attached hereto as Exhibit B is a July, 2010 marketing email directed to a Pennsylvania consumer by a lender calling itself "ThinkCash by First Bank of Delaware," with a "Customer Support" mailing address in Philadelphia.

40.     At the same time they were engaged in illegal payday lending through the ThinkCash-FBD arrangement, the Think Finance Defendants also continued to make direct loans to Pennsylvania consumers through their affiliate, Defendant PayDay One, LLC. Attached hereto as Exhibit C are a series of emails sent to a Pennsylvania consumer during the period February 2009 to December 2010 by "the PayDay One Team," offering a payday loan, attempting to

collect a $1,045 balance, and informing the consumer that the loan had been sold for collection to defendant National Credit Adjusters, LLC.

41.     FBD is no longer in business. On October 23, 2012, its shareholders voted to dissolve the bank. On November 12, 2012 the United States Department of Justice announced a settlement with FBD, resulting, *inter alia*, in the bank's payment of a $15 million civil penalty. *See United States v. First Bank of Delaware*, No. 12-6500-HB (E.D. Pa.). The FDIC sold all of the bank's assets to a Pennsylvania-based bank, but these assets did not include any of the ThinkCash loans, over which the Think Finance Defendants continued to exercise ownership and control.

### c.  Phase Two of the Scheme:  Rent-A-Tribe

42.     While they were still using the rent-a-bank structure facilitated by FBD, the Think Finance Defendants began to explore alternative vehicles for conducting their illegal activity in Pennsylvania and the other states that prohibited their high-rate products. During the period 2010-2011, they developed a new mechanism to continue the scheme, using agreements with Native American tribes rather than banks.

43.     Under this model, known colloquially as "rent-a tribe," the payday lender contracts with a Native American tribe to originate loans in the name of the tribe, with the tribe acting as the nominal lender. The tribe does not retain ownership of the loans; instead, the tribe transfers ownership to a non-tribal entity. In return, the tribe receives a small share of the profits generated (with respect to at least one of the tribes, less than 5%), while the Think Finance defendants, who extract most of the profits as payment for "services" provided to the lender, are able to hide behind a tribal façade, and to claim the vicarious benefit of whatever legal immunities the tribe enjoys.

44.     The Think Finance Defendants identified tribal partners willing to play the nominal lender function described above—similar to the role played by FBD in the ThinkCash arrangement—with Think Finance earning most of the revenues generated by the lending activity, denominated as fees or charges for services provided to the tribal lender. These arrangements with the tribal partners allowed Think Finance to exploit the existing ThinkCash customer base by enabling the restructured scheme to continue to collect from and make new loans to those existing customers.

45.     According to a 2012 interview Defendant Rees gave the Bloomberg Business service, he described Think Finance's business strategy as shifting away from direct lending, described by him as being made complicated by "byzantine state laws," towards partnering with Native American tribes that "don't have to look to each state's lending laws." *See* Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," BloombergBusiness, *available at* http://www.bloomberg.com/news/articles/2012-06-04/payday-lenders-and-indian-tribes-evading-laws-draw-scrutiny-1-.

46.     Ultimately, the Think Finance Defendants established business relationships with at least three separate Native American tribes. These tribal  entities and the websites operated by the Think Finance Defendants in association with the tribes are:

 a.  The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana (hereinafter "Chippewa Cree Tribe") and its lending website, www.plaingreen.com (hereinafter "Plain Green");

 b.  The Otoe-Missouria Tribe of Indians, located in Red Rock, Oklahoma (hereinafter "Otoe-Missouria Tribe") and its lending website, www.greatplainslending.com (hereinafter "Great Plains Lending"); and

 c.  The Tunica-Biloxi Tribe of Louisiana (hereinafter "Tunica-Biloxi Tribe") and its website, www.mobiloans.com (hereinafter "MobiLoans").

47.     Under the scheme, the loans are made in the name of a lender affiliated with one of these tribes, but the Think Finance Defendants provide the infrastructure to market, fund, underwrite and collect the loans, providing the following:  customer leads, the technology platform, investors who fund the loans, and/or the payment-processing and collection mechanisms used to obtain payments from consumers. Once made, the loans are transferred to a non-tribal entity in which, upon information and belief, the Think Finance Defendants have an interest or affiliation, including GPL Servicing, Ltd., a Cayman Islands company.

48.     The Think Finance Defendants segment their participation in the scheme into different "services" provided by different Think Finance affiliates. For example, upon information and belief, through Defendant Tailwind Marketing, LLC, they charge the tribe per-loan fees for designated marketing services, while also charging servicing and technology fees, through Defendant TC Decision Sciences, LLC. This segmentation disguises the extent of the Think Finance involvement.

49.     Upon information and belief, the Think Finance Defendants created "Financial U" as a mechanism to extract additional revenues from the scheme, disguised as payments for "educational" services provided to the borrowers. Each of the three websites, supposedly associated with separate Native American tribes that have no relationship to each other, offer the identical "educational" videos and tools as a service made available to loan borrowers, purportedly provided by "Financial U."

50.     Upon information and belief, the Think Finance Defendants charge the tribes for the use of this "Financial U" material, in amounts in excess of any actual value provided to the tribes or their customers through such material, and through this subterfuge, the Think Finance Defendants conceal the nature and extent of their participation in or direction of the scheme, and

13

the extent to which the revenues generated by these three supposedly unrelated websites actually flow to the Think Finance Defendants rather than the three tribes that sponsor the respective websites.

51.     Thus, lending activity that is designed to appear to be business conducted by Native American tribes is, in actuality, a complex scheme driven by non-tribal entities that extract most of the generated revenue. Much of the revenue is disguised as fees for services provided by the Think Finance Defendants, and even the net earnings, after these "services" are paid for, are, for the most part, diverted to the non-tribal purchasers of the loans.

52.     In a 2012 interview appearing in a Dallas on-line feature on "Dallas Entrepreneurs of the Year 2012," Defendant Rees bragged that despite losing a "bank client" in 2010—presumably referring to the rent-a-bank relationship with FBD—that had been the source of more than half of the annual revenue for Think Finance, the company managed to increase revenue by 15% in 2011 and projected a 50% increase in 2012 through its "new direction," namely, providing a so-called "technology platform to Native American tribes with lending businesses." *See* http://www.dmagazine.com/Home/D_CEO/2012/July_August/Ernst_and_Young_Dallas_Entrepreneurs_of_the_Year_2012_07.aspx.

53.     The first of the Think Finance partnerships was with the Chippewa Cree Tribe. It began approximately in March, 2011, when, upon information and belief, Think Finance approached the Tribe, which was already engaged in a small-scale consumer lending venture of its own, with a take-it-or-leave it proposal. The proposal, contained in a written term sheet dated March 11, 2011 (a copy of which is attached as Exhibit D), provided, among other things, that Think Finance "will license its software to the Tribe pursuant to a software license agreement acceptable to the parties," and will also provide "risk management, application processing,

14

underwriting assistance, payment processing, and ongoing customer service support" and "access channels for consumer loans on the Tribe's behalf."

54.    Think Finance's term sheet defined many characteristics of what would thereafter become the Plain Green product, including even the name "Plain Green" itself, and it required the Tribe to establish various professional affiliations specified by Think Finance. Among the conditions set by Think Finance were the following:

   a.   The Tribe would establish a tribal entity named Plain Green, LLC, "or an entity with some other agreed upon name," to function as a lender;

   b.   The loans offered would be "an installment loan with a maximum amount of $2,500," with terms of two months to two years, and interest rates between "60% and 360%;"

   c.   The lending capital would be provided by an entity named Haynes Investments, Inc.;

   d.   99% of the loans made would be sold to GPLS Servicing, Ltd. (hereinafter "GPLS"), with GPLS, paying the Tribe "4.5% of cash revenue received on account of the loans" purchased by GPLS; and

   e.   The Tribe was given two weeks to, among other things, create the tribal limited liability company, revise tribal laws to legitimize the defined lending program, and set up bank accounts and ACH processing, and was required to hire two law firms that Think Finance selected and agreed to share in paying.

55.    Among the benefits the Think Finance Defendants used to induce the Chippewa Cree Tribe into this partnership was their existing portfolio of customers and loan balances from the ThinkCash-FBD period. As part of the negotiated arrangement with the tribe, the Think Finance Defendants transferred the existing ThinkCash loans and the ThinkCash customer database to the new "Plain Green" entity.

56.    Think Finance designed the web platform used by Plain Green so that existing ThinkCash customers visiting the ThinkCash website at www.thinkcash.com would be routed automatically to the Plain Green site, www.plaingreenloans.com, where they would be

recognized as an existing customer, able to log into their account and, if they wished, could obtain new loans. Attached as Exhibit E is a printout of what an actual ThinkCash customer from Pennsylvania—who was not previously a Plain Green customer—saw, when visiting the site www.thinkcash.com in June, 2011, including (a) a "Welcome Back" greeting containing the logos of both ThinkCash and Plain Green, and an automatic link to the Plain Green site, (b) an "FAQ" page that explained how Plain Green was now available to offer "the same prompt, friendly customer service," and loans up to $2,500, "using the same email address and password you used for your ThinkCash account," and (c) the Plain Green loan application page to which the returning ThinkCash customer would be automatically routed.

57.     Pennsylvania consumers who had obtained usurious loans from the ThinkCash site returned for more money and obtained loans, at equivalent or higher cost, from "Plain Green."

58.     Attached as Exhibit F is a redacted loan agreement between a Pennsylvania consumer and Plain Green, created over the Internet during May, 2012, on the Plain Green website developed and managed by Think Finance.  The loan is for $1,200, payable over a period of approximately 14 months, at an Annual Percentage Rate of 279.22%.  These terms are those that appear under the "Loan Cost and Terms" page on the Plain Green website, http://www.plaingreenloans.com/loan-cost-and-terms.

59.     The sample Plain Green loan agreement is on a form contract that contains the following provision in a paragraph beginning, **This Loan Agreement ("the Agreement") is subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana ("Chippewa Cree")**:

> By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal

16

jurisdiction of the Chippewa Cree Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.

60.     Sometime after establishing its relationship with the Chippewa Cree Tribe, Think Finance established a similar relationship with the Otoe-Missouria Tribe, creating a website named "Great Plains Lending." Attached as Exhibit G is a redacted loan agreement between a Pennsylvania consumer and Great Plains Lending, created over the Internet during July, 2012, on a website developed and managed by Think Finance. The loan is for $600, payable over a period of approximately seven months, at an Annual Percentage Rate of 448.77%. These terms are those that appear under the "Loan Cost and Terms" page on the Great Plains Lending website, https://www.greatplainslending.com/loan-cost-and-terms.

61.     The sample Great Plains Lending loan agreement is on a form contract that contains the following provision in a paragraph beginning, **This Loan Agreement ("the Agreement") is subject solely to the exclusive laws and jurisdiction of the Otoe-Missouria Tribe of Indians, a federally recognized Indian tribe**:

> By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the Otoe-Missouria Tribe of Indians Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.

62.     The form contracts used by Plain Green and Great Plains Lending are nearly identical, because, upon information and belief, the Think Finance Defendants and/or their agents participated in drafting them.

63.     Defendant's third "tribal" relationship is with the Tunica-Biloxi Tribe, the nominal lender behind the credit product "MobiLoans" and the website www.mobiloans.com. Described on the website as "Fast cash for people on the go," this product differs from the other

17

two in that instead of offering consumers loans at specific amounts, it offers an ongoing "line of credit." However, despite this difference, the Mobiloans product is designed to generate fees and charges equivalent to those generated by Plain Green or Great Plains Lending loans.

64.     According to the MobiLoans website, "[o]ne of the best features of the MobiLoans line of credit is simple, easy-to-understand pricing." This pricing includes fees that are charged in two ways. First, there are upfront fees, including a "cash advance" fee of $3 per $20 received for advances up to $500, and $2 per $20 for larger advances. The upfront fee is charged at the front end, as soon as the cash proceeds are transferred into the consumer's account. Second, as consumers repay the credit over time, a "Fixed Finance Charge" is added to the loan balance which, according to the website, is "calculated on a tiered level based upon the unpaid balance."

65.     Consumers with open MobiLoans balances are billed every two weeks, and invited to pay a "minimum payment" that is calculated in accordance with a standard formula. The MobiLoans website provides illustrations of the amount of fees and charges generated by such "minimum payment" repayments. *See* http://www.MobiLoans.com/What-It-Costs. One such illustration is for a MobiLoans cash advance of $1,000, repaid in accordance with that "minimum payment" formula, where consumer will make 20 bi-weekly payments totaling $2,265, meaning that $1,265 in fees or charges would be collected.  Expressed as an Annual Percentage Rate, repayment of a $1,000 debt in accordance with that schedule would be the equivalent of an APR of approximately 246%.

66.     Under Pennsylvania usury restrictions, it does not matter how credit-related fees or charges for small-balance "lines of credit" are named or calculated; if in the aggregate such fees or charges cost consumers the equivalent of interest rates that would be illegal, those fees

and charges are illegal. *See* 7 P.S. § 6203; *Pa. Dept. of Banking v. NCAS of Delaware, LLC*. Using the illustrated cash advance and repayment schedule in the prior paragraph, a 6% rate would allow for collection of fees and charges of about $53.33, meaning that the excess, $1,211.67, would be illegal fees and charges.

67.     Attached as Exhibit H is a redacted account statement, received by a Pennsylvania consumer from MobiLoans in August, 2013, on an account that the consumer opened sometime in 2012 on the MobiLoans website developed and managed by the Think Finance Defendants, along with a form "MobiLoans Credit Agreement and Terms and Conditions" that was made available to her at the time she obtained her initial cash advance of $500.

68.     The "MobiLoans Credit Agreement and Terms and Conditions," which the website developed and managed by the Think Finance Defendants provides to "approved" customers, contains the following emphasized language at the beginning of the 10 pages of text:

> MobiLoans, LLC is an entity owned and operated by the Tunica-Biloxi tribe of Louisiana, the credit issued to you and information provided under this agreement by MobiLoans is done so solely under the provisions of laws of the Tunica-Biloxi tribe of Louisiana and applicable federal law**.**

In a section of the form agreement entitled "Governing Law," consumers are informed that "Neither this Agreement nor the Lender is subject to the laws of any State of the United States."

69.     Numerous Pennsylvania consumers entered into the above-described consumer credit contracts with these three tribal entities affiliated with Think Finance.

70.     Throughout the period they have been operating the three tribal lending sites, the Think Finance Defendants have also been directly selling similar products, using separate labels sold from separate websites. However, consumers from Pennsylvania and other states where payday lending is illegal are not allowed to access these products.  For example, Defendants

designed their website www.risecredit.com, which offers high-rate "Rise" loans, to recognize the state where the inquiring consumer is located and to deny access to those from such states. Attached as Exhibit I is a copy of that website homepage, which includes a banner photo of Rocky and the Philadelphia skyline, but which advises visitors from computers in Pennsylvania: "We're currently unable to serve you in PENNSYLVANIA but please check back with us in the near future."

71.     In contrast, Defendants' three tribal-related websites have allowed access to those same consumers, who, using computers located in Pennsylvania, could not access www.risecredit.com.

72.     Think Finance publicly lists the three tribal websites as its own products, along with the labels it markets and sells itself directly to the public. Attached as Exhibit J is (a) a list of "Think Finance Products" that appeared on the company's LinkedIn page as of July 19, 2013, including Payday One, Plain Green, Great Plains Lending and MobiLoans and (b) a list containing these same four labels, under the heading "Products powered by the Think Finance Platform," appearing on the company's United Kingdom site.

73.     On or about May 1, 2014, Think Finance split itself into two companies. It placed into the new company, Elevate Credit, Inc., the loan products it markets directly in its own name in jurisdictions where such high-cost lending is legal, such as the "Rise" loans discussed above. The original company, Think Finance, Inc., now focuses entirely on what it describes as the provision of services to third-party lenders.

**d.  Other Participants in the Think Finance Scheme and the Ongoing Harms to Pennsylvania Consumers**

74.     Usurious loans and/or "cash advances" made to Pennsylvania consumers in the name of Plain Green, Great Plains Lending or MobiLoans have been funded by an investor or

investors supplied by the Think Finance Defendants, which investors continue to fund loans and cash advances to Pennsylvania consumers.

75.     Upon information and belief, the majority of payments received by the scheme—whether from Plain Green, Great Plains Lending or Mobiloans transactions—are taken directly from the consumers' bank accounts via electronic debits processed through the ACH system. Because no ACH payment can occur without a bank initiating the transaction, either the Think Finance Defendants themselves, or a third party selected by them, arranged the banking relationship or arranged a relationship with a payment processor that found the bank.

76.     Upon information and belief, the Think Finance Defendants have participated in the sale or transfer of loan balances supposedly owed by Pennsylvania consumers to Plain Green, Great Plains Lending or MobiLoans to various debt buyers, including Defendant National Credit Adjusters.

77.     Upon information and belief, the three tribal lenders affiliated with the Think Finance Defendants stopped accepting loans from new Pennsylvania consumers sometime in mid-2013. However, Pennsylvania consumers are still being injured by the scheme in at least several ways.

78.     First, Pennsylvania consumers are facing ongoing collection of consumer debt owed nominally to Plain Green, Great Plains Lending or MobiLoans.  During the period 2012-2014, the Commonwealth has received numerous complaints from consumers about abusive collection activity by debt collectors, including Defendant National Credit Adjusters, regarding debts originated by Plain Green, Great Plains Lending or MobiLoans.

79.     Second, even though not accepting applications from *new* Pennsylvania customers, at least until the original filing of this action in state court, the three websites

continued to process new loans or cash advances, all of which are illegal under Pennsylvania law, to *existing* Pennsylvania customers who need only log-in to their accounts, update their personal information already appearing on the screen, and request a new loan or advance. By way of example, on June 24, 2014, Plain Green made a $600 loan to a Pennsylvania customer known to the Commonwealth, which customer used his email address and existing password to obtain the loan. During the period July 1, 2014 to September 16, 2014, Plain Green collected full repayment of this loan from this customer's Pennsylvania bank account, in accordance with the usury scheme described above.

80.    Third, even though the three websites are not presently accepting applications from new Pennsylvania consumers, unlike Defendants' "Rise" website, these websites still do not block access to Pennsylvania consumers. On the contrary, it is only after Pennsylvania consumers visiting any of those sites transmit their personal information—including social security number, driver license and bank account information—that the site informs them that, as Pennsylvania residents, they cannot obtain credit.

81.    Personal information about a consumer—particularly where it includes social security numbers and bank account information—is a highly valuable commodity known in the lead generation trade as a "full data lead." Full Data Leads are used by fraudulent telemarketers, internet lenders, and other entities engaged in illegal activity injurious to consumers.

82.    Defendants have no legitimate business purpose in extracting such highly personal information from consumers to whom they know they cannot legally provide their usurious credit products.

83.    Upon information and belief, the Think Finance Defendants are nonetheless collecting this personal information in order to store it for future use and/or to sell it to others (or

to enable their tribal partners to sell it to others). For example, the Privacy Policy on the MobiLoans website expressly states that MobiLoans shares personal information with "Non-Affiliates" and does so "as soon as the same day that you apply for a line of credit."

84.     Besides being able to access and obtain loans from direct visits to the Plain Green, Great Plains Lending and MobiLoans websites, Pennsylvania consumers are also lured or directed to these sites by direct mail. By way of example, attached as Exhibit K is a copy of direct mail solicitation a Pennsylvania consumer received from Great Plains Lending around September, 2012.

85.     Another referral source to the various Think Finance-affiliated websites has been MoneyMutual.com, a payday loan "lead generator" owned by the Selling Source Defendants. Consumers are lured to the site by television advertising featuring television personality Montel Williams, whose image is also featured on the website, under the banner, "Instant Approval, Get Cash Fast."

86.     The Selling Source Defendants were expressly named in the FDIC's October 2008 cease and desist order as one of the business partnerships that FBD was required to terminate.

87.     As a result of a February 2011 Consent Agreement and Order between the Selling Source Defendants and the Banking Department, the Selling Source Defendants agreed and were ordered to block access to their websites to Pennsylvania consumers and to cease targeting any internet lending advertisements to Pennsylvania consumers. *Commonwealth of Pennsylvania Dept. of Banking v. Selling Source, L.L.C. d/b/a Money Mutual*, Dkt. No. 100286 (ENF-C&D) (Pa. Banking Dept.). Attached as Exhibit L is a copy of the Consent Agreement and Order.

88.     The Selling Source Defendants have deliberately violated the Consent Agreement and Order. At least until July, 2013, they were continuing to sell leads involving Pennsylvania borrowers to Plain Green. This arrangement included a web link from the MoneyMutual site to the Plain Green site, inviting Pennsylvania consumers "to take advantage of an opportunity with our partner Plain Green Loans for your short-term financial needs," by simply clicking a button to transfer to the loan application page of the Plain Green site. Attached as Exhibit M is a screenshot from the MoneyMutual site, taken on July 16, 2013, illustrating the direct connection between a visit to the site from a computer in Pennsylvania and the Plain Green site.

89.     The Selling Source Defendants designed their MoneyMutual website to give consumers visiting the site the impression that any personal information they provide when applying for a loan is kept "private" and "secure." However, in contrast to such representations and assurances, Defendants' Privacy Policy, available on the site through a small-print link at the bottom of the website, reveals that Defendants, in fact, "reserve the right to share, rent, sell or otherwise disclose your information with/to third parties," including, among others, "e-mail marketers; wireless service providers and telemarketers."

90.     Upon information and belief, the Selling Source Defendants have, in fact, derived income from selling the information of Pennsylvania consumers to such third parties.

### V.  Claims for Relief

### *COUNT ONE*
### (Against the Think Finance Defendants)
### (Violations of Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(1))

91.     Plaintiff realleges and incorporates by this reference all prior paragraphs of this Complaint.

92.     Under PA COA, 18 Pa. C.S.A. § 911, "racketeering activity" includes the collection of any money on account of a debt which arose as the result of the lending of money at a rate of interest exceeding 25% per annum. 18 Pa. C.S.A. § 911(h)(1)(iv). The above-described scheme constitutes "racketeering activity" in that the consumer credit offered and collected by the arrangements known as ThinkCash, Plain Green, Great Plains Lending and MobiLoans is at an effective rate far exceeding 25% per annum.

93.     Under 18 Pa. C.S.A. § 911(b)(1), it is unlawful for any person who has received income derived, directly or indirectly, from a pattern of "racketeering activity" in which such person participated as a principal, to use or invest, directly or indirectly, any part of such income in the operation of any "enterprise."

94.     This language was adopted from the federal RICO statute, 18 U.S.C. § 1962(a). "Principal" is not defined in PA COA. Under federal law, a "principal" includes anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission." 18 U.S.C. § 2.

95.     PA COA defines an "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and government entities." 18 Pa. C.S.A. § 911(h)(3).

96.     On multiple occasions as detailed above, the Think Finance Defendants participated as a principal in the racketeering activity described above in that they aided, abetted, counseled, commanded, induced or procured the usurious and illegal lending described above.

97.     The Think Finance Defendants derived income from such racketeering activity and used or invested that income in the operation of an "enterprise," as defined by 18 Pa. C.S.A.

§ 911(h)(3), such enterprises being, among others, ThinkCash, Inc., Think Finance, Inc., Elevate Credit, Inc. and GPL Servicing, Ltd.

98.     Upon information and belief, this income includes not only what Defendants have derived directly from loans made in the name of ThinkCash, Plain Green, Great Plains Lending and MobiLoans Pennsylvania borrowers, but also from their possible trafficking in the personal information obtained through the websites from Pennsylvania borrowers who are not offered loans.

99.     Through their above-described acquisition, use and investment of funds acquired from a usury scheme, the Think Finance Defendants violated and are continuing to violate 18 Pa. C.S.A. § 911(b)(1).

100.     The Attorney General is expressly authorized to enforce PA COA, 18 Pa. C.S.A. § 911(e), by seeking an appropriate order preventing and restraining any violations, 18 Pa. C.S.A. § 911(d).

101.     A violation of PA COA "shall be deemed to continue so long as the person who committed the violation continues to receive any benefit from the violation." 18 Pa. C.S.A. § 911(c).  Accordingly, in addition to enjoining Defendants from any future acquisition, use and investment of funds acquired from this or any similar usury scheme targeting Pennsylvania consumers, any equitable relief ordered against Defendants should also include, and the Commonwealth therefore demands, an order divesting and disgorging all income or monies obtained, directly or indirectly, from activity related to ThinkCash, Plain Green, Great Plains Lending or MobiLoans loans or cash advances, or from any services provided in connection with such loans or cash advances, attributable to Pennsylvania consumers, and invalidating any beneficial interest related to existing loans to Pennsylvania consumers.

*COUNT TWO*
**(Against Think Finance Defendants)**
**(Violations of Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(3))**

102.    Plaintiff realleges and incorporates by this reference all prior paragraphs of this Complaint.

103.    Under 18 Pa. C.S.A. § 911(b)(3), it is unlawful for any person "employed by or associated with" an "enterprise" to conduct or participate, directly or indirectly, in the enterprise's affairs, through a pattern of racketeering activity.

104.    The above-described "rent-a-bank" arrangement between the Think Finance Defendants and FBD and the three Native American tribes involved in, respectively, Plain Green, Great Plains Lending and MobiLoans, are each association-in-fact enterprises engaged in commerce within the definition of an "enterprise" in 18 Pa. C.S.A. § 911(h)(3).

105.    The Think Finance Defendants are associated with those association-in-fact enterprises and participate directly in the affairs of those enterprises through a pattern of racketeering activity, namely, the usury scheme described above, in which, on multiple occasions, the enterprise has collected money on account of a debt which arose as the result of the lending of money at a rate of interest exceeding 25% per annum. The role of the Think Finance Defendants in these enterprises is multi-faceted, including, but not limited to, some or all of the following: (a) designing, providing and managing the web technology that powers each of the three tribal lending operations; (b) arranging for the provision of lending capital to each of the three nominal tribal lenders; (c) providing customer databases and leads and other marketing assistance; (d) providing application processing and underwriting assistance; (e) arranging payment processing services; (f) collecting unpaid loans and arranging the sale of uncollected

27

debt to debt buyers; (g) arranging for the sale of consumer personal information obtained through the various websites and/or (h) coordinating and managing the enterprises.

106.    Also playing distinct roles in the associations-in-fact are:

a.   Various investors in the loans and cash advances made by the associations-in-fact to Pennsylvania consumers and/or those who provide lending capital for such loans and who, in exchange, earn a significant rate of return on those investments;

b.   The payment processors and banks that arrange the electronic transfers from the bank accounts of Pennsylvania consumers to the accounts controlled by the association-in-fact;

c.   The person or persons who control the payment postal boxes in Philadelphia;

d.   Various debt buyers and/or debt collectors involved in collecting delinquent balances supposedly owed to the association-in-fact by Pennsylvania consumers, including Defendant National Credit Adjusters;

e.   The Selling Source Defendants, and, possibly, other lead generators who receive or received commissions or referral fees for referring Pennsylvania consumers to the association in fact or who purchase or purchased personal information about Pennsylvania consumers from the associations-in-fact.

107.    Through their above-described participation in and conduct of the enterprises, the Think Finance Defendants have violated and are continuing to violate 18 Pa. C.S.A. § 911(b)(3).

108.    The Pennsylvania Attorney General is expressly authorized to enforce the Corrupt Organizations Act, 18 Pa. C.S.A. § 911(e), by seeking an appropriate order preventing and restraining any violations, 18 Pa. C.S.A. § 911(d).

109.    A violation of the PA COA statute "shall be deemed to continue so long as the person who committed the violation continues to receive any benefit from the violation." 18 Pa. C.S.A. § 911(c).  Accordingly, in addition to enjoining Defendants from any future participation in or conduct of this or any similar usury scheme targeting Pennsylvania consumers, any equitable relief ordered against Defendants should also include, and Plaintiff therefore demands, an order divesting and disgorging all income or monies obtained, directly or indirectly, from

28

activity related to ThinkCash, Plain Green, Great Plains Lending or MobiLoans loans or cash

advances, or from any services provided in connection with such loans or cash advances,

attributable to Pennsylvania consumers, and invalidating any beneficial interest related to

existing loans to Pennsylvania consumers.

**COUNT THREE**
**(Against All Defendants)**
**(Violations of Corrupt Organizations Act, 18 Pa. C.S.A. § 911(b)(4))**

110.    The Commonwealth realleges and incorporates by this reference all prior

paragraphs of this Complaint.

111.    Under 18 Pa. C.S.A. § 911(b)(4), it is unlawful for any person "to conspire to

violate" §§ 911(b)(1) or (b)(3).

112.    The Think Finance Defendants conspired to violate 18 Pa. C.S.A. §§ 911(b)(1)

and/or (b)(3), in violation of 18 Pa. C.S.A. § 911(b)(4), by entering into the above described rent-

a-bank and rent-a-tribe arrangements and facilitating—and profiting from—lending activity that

they know is illegal in Pennsylvania.

113.    By conspiring with the Think Finance Defendants and others, with knowledge of

the scheme's purpose and intent, to provide customer leads to the said schemes, the Selling

Source Defendants conspired to violate 18 Pa. C.S.A. § 911(b)(1) and (3), in violation of 18 Pa.

C.S.A. § 911(b)(4).

114.    Defendant National Credit Adjusters, LLC conspired with the Think Finance

Defendants and others, with knowledge of the scheme's purpose and intent, to violate 18 Pa.

C.S.A. § 911(b)(1) and (3), in violation of 18 Pa. C.S.A. § 911(b)(4), by purchasing and/or

collecting usurious loans made to Pennsylvania consumers by the various lending schemes.

29

115.    The Attorney General is expressly authorized to enforce the Corrupt Organizations Act, 18 Pa. C.S.A. § 911(e), by seeking an appropriate order preventing and restraining any violations, 18 Pa. C.S.A. § 911(d).

116.    A violation of the PA COA statute "shall be deemed to continue so long as the person who committed the violation continues to receive any benefit from the violation." 18 Pa. C.S.A. § 911(c).  Accordingly, in addition to enjoining Defendants from any future agreements to provide services to this or any similar usury scheme targeting Pennsylvania consumers, any equitable relief ordered against Defendants should also include, and the Commonwealth therefore demands, an order divesting and disgorging all income or monies obtained, directly or indirectly, from activity related to ThinkCash, Plain Green, Great Plains Lending or MobilLoans loans or cash advances, or from any services provided in connection with such loans or cash advances, attributable to Pennsylvania consumers, and invalidating any beneficial interest related to existing loans to Pennsylvania consumers.

### COUNT FOUR
#### (Against the Think Finance Defendants and NCA)
#### (Violations of FCEUA and the Consumer Protection Law for Collecting Illegal Interest)

117.    The Commonwealth realleges and incorporates by this reference all prior paragraphs of this Complaint.

118.    Defendant National Credit Adjusters, LLC ("NCA") is a "debt collector" within the meaning of 73 P.S. § 2270.3 in that it is in the business of engaging or aiding directly or indirectly in collecting a debt owed or alleged to be owed a creditor or assignee of a creditor. Among the creditors on behalf of which it has collected and is collecting consumer debt are PayDay One, Plain Green, Great Plains Lending and Mobiloans.

119.     To the extent that any Think Finance Defendant is itself engaged in collection activity regarding consumer debt supposedly owed by Pennsylvania consumers to ThinkCash, PayDay One, Plain Green, Great Plains Lending or MobiLoans, it, too, is a "debt collector" within the meaning of the Fair Credit Extension Uniformity Act, ("FCEUA"), 73 P.S. § 2270.1.

120.     Under the FCEUA, any debt collector that violates any provision of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., by that act, commits "an unfair or deceptive act or practice" under Pennsylvania law. 73 P.S. § 2270.4(a).

121.     Under the FDCPA, 15 U.S.C. § 1692f(1), a debt collector that collects or attempts to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation)" that is prohibited by state law thereby commits an "unfair or unconscionable" act prohibited by the FDCPA.  *See Pollice v. National Tax Funding, LP*, 225 F.3d 379, 406-07 (3d Cir. 2000). Accordingly, as provided by 73 P.S. § 2270.4(a), these acts, which are unlawful under the FDCPA, also constitute "unfair or deceptive acts or practices" prohibited by the FCEUA.

122.     As debt collectors collecting or attempting to collect on loans or advances that are unlawful in Pennsylvania, Defendants have violated and are violating the FCEUA,  73 P.S. § 2270.4(a), every time they collect any interest, fee or charge from a Pennsylvania consumer in excess of the six-percent ceiling established by LIPL.

123.     Even if any Defendants are properly classified under the FCEUA as a "creditor" rather than a "debt collector," the FCEUA also prohibits such person from collecting interest prohibited by state law. *See* 73 P.S. § 2270.4(b)(6)(i). Thus, whether determined to be engaging in this collection activity as a "debt collector" or "creditor," any collection activity related to the

alleged usury scheme would be a violation of the UTPCPL, 73 P.S. § 201-1 et seq. *See* FCEUA, 73 P.S. § 2270.5(a).

124.    The Pennsylvania Attorney General is empowered by 73 P.S. § 201-4 to bring an equitable action to enjoin Defendants' above-described debt-collection practices prohibited by the FCEUA and the UTPCPL, and, as a component of such equitable relief, can obtain an appropriate order of restitution, ordering Defendants to "restore to any person in interest" any money acquired by means of such prohibited practices. 73 P.S. § 201-4.1.

125.    The above-described debt-collection violations having been and continuing to be willful, in so far as they are the result of a deliberate scheme to circumvent state usury laws, the Commonwealth also requests, besides an appropriate order of restitution to benefit the injured Pennsylvania consumers, civil penalties for the benefit of the Commonwealth, in the amount of $1,000 per violation—and, in the case of consumers sixty years of age or older, $3,000 per violation—pursuant to 73 P.S. § 201-8(b).

126.    Some of the debt buyers engaged in this illegal activity, including Defendant NCA, have aggravated their willful and illegal collection of usurious debts through abusive collection practices, including false representations that there will be law enforcement action taken in Pennsylvania against the consumer debtors, threatening legal action to collect debts on loan amounts that are illegal in Pennsylvania, falsely representing that debts incurred on loan amounts that are illegal in Pennsylvania can be collected, contacting consumers at their place of employment and repeated, harassing telephone calls, which practices are themselves violations of the FDCPA and FCEUA. These additional violations constitute an additional aggravating factor warranting civil penalties against NCA.

## COUNT FIVE
### (Against All Defendants)
### (Additional Violations of the Consumer Protection Law for Misrepresentation and Deception)

127.    The Commonwealth realleges and incorporates by this reference all prior paragraphs of this Complaint.

128.    The Think Finance Defendants have designed and are operating so-called "technology platforms" that offer to Pennsylvania consumers illegal usurious loans and credit lines represented falsely as being purely the product of the lawful exercise of tribal sovereignty and being subject to no state law.

129.    Such representations are false, misleading or confusing in that (a) they obfuscate the central role played by the Think Finance Defendants in the usury scheme, (b) the loans and credit lines are illegal in Pennsylvania and (c) the involvement of the tribes does not transform illegal products into legal ones.

130.    These false, misleading or confusing representations about the characteristics of the so-called tribal loans are unfair and deceptive acts or practices prohibited by 73 P.S. § 201-2(4)(v) and constitute fraudulent or deceptive conduct which creates a likelihood of consumer confusion or misunderstanding, prohibited by 73 P.S. § 201-2(4)(xxi). *See Pa. Dept. of Banking v. NCAS of Delaware, LLC*, 995 A.2d 422, 442-45 (Pa. Commwlth. 2010).

131.    Further, Defendants' above-described "rent-a-tribe" scheme is in itself an unfair or deceptive practice because the credit offered is unlawful in Pennsylvania; because they misrepresent the extent to which such credit is actually offered by "another;" and because they have created a likelihood of confusion or misunderstanding as to the source, sponsorship and approval of these credit products, in violation of 73 P.S. § 201-2(4)(i), (ii), (v) and (xxi).

33

132.    With regard to cash advances made pursuant to MobiLoan credit lines, the Think

Finance Defendants' representation that debts incurred by consumers are repaid at an "Annual

Percentage Rate of 0%," is, for Pennsylvania borrowers, a misleading representation of the actual

cost of using this product, as interpreted by Pennsylvania law. By representing this as "0%"

credit, Defendants are systematically representing that MobiLoan credit lines have characteristics

and ingredients they do not have, in violation of 73 P.S. § 201-2(4)(v), and are engaging in

deceptive conduct which creates a likelihood of consumer confusion or misunderstanding, in

violation of 73 P.S. § 201-2(4)(xxi) .

133.    By making some or all of the above-mentioned false representations in the course

of engaging in any collection activity regarding such extensions of credit, Defendants also are

violating 15 U.S.C. § 1692e(2)(A) and 73 P.S. §2270.4(a) (if Defendants are "debt collectors"),

or 73 P.S. § 2270.4(b)(5)(ii) (if Defendants are "creditors").

134.    Each of the "tribal" websites developed and operated by the Think Finance

Defendants have been designed to obtain personal information from Pennsylvania residents—

including their social security, driver license and bank account numbers—before informing them

that loans are not presently being offered to Pennsylvania residents.

135.    By obtaining the personal information of Pennsylvania consumers, through the

pretense of offering loans they have no intention of making, Defendants are:

     a.   Causing likelihood of confusion or of misunderstanding as to the source of goods
         or services, in violation of 73 P.S. § 201-2(4)(ii);

     b.   Advertising goods or services with intent not to sell them as advertised, 73 P.S. §
         201-2(4)(ix);

     c.   Engaging in any other fraudulent or deceptive conduct which creates a likelihood
         of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

136.    The Selling Source Defendants have also engaged in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, in violation of 73 P.S. § 201-2(4)(xxi), by obtaining the personal information of Pennsylvania consumers for resale to third parties while representing to those consumers that their information will be "private" and "secure."

137.    Defendants failed to register Think Finance, Inc., TC Financial, LLC, PayDay One, LLC, Tailwind Marketing, LLC, TC Decision Sciences, LLC, Financial U, LLC, Selling Source, LLC and PartnerWeekly, LLC as foreign or domestic business corporations with the Pennsylvania Department of State Corporations Bureau in accordance with the requirements of the Business Corporation Law, 15 Pa.C.S. § 1101, *et seq.*

138.    Defendants failed to register the names "Financial U" and "MoneyMutual" with the Pennsylvania Department of State Corporations Bureau in accordance with the Fictitious Names Act, 54 Pa.C.S. § 301, *et seq*.

139.    By conducting business in Pennsylvania without such mandatory registration, Defendants committed unfair and deceptive acts or practices prohibited by Section 201-3 of the Consumer Protection Law by, among other things:

   (a)   Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services, in violation of 73 P.S. § 201-2(4)(ii);

   (b)   Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another, in violation of 73 P.S. § 201-2(4)(iii);

   (c)   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have, in violation of 73 P.S. § 201-2(4)(v); and

(d)     Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, in violation of 73 P.S. § 201-2(4)(xxi).

140.    The Attorney General is authorized to seek injunctive relief enjoining such unfair and deceptive practices by 73 P.S. § 201-4.

141.    Pursuant to 73 P.S. § 201-4.1 the Attorney General is also authorized to seek an order directing that Defendants restore to Pennsylvania consumers any money acquired by means of such unfair and deceptive practices.

142.    In addition, pursuant to 73 P.S. § 201-8(b), the Attorney General is also authorized to seek a finding that  Defendants' violations were willful and, in the event such a finding is made, to seek civil penalties of $1,000 per violation, increased to $3,000 per violation for violations committed against consumers 60 years or older.

### COUNT SIX
### (Against the Think Finance Defendants only)
### (Violations of the Dodd-Frank Act)

143.     The Commonwealth realleges and incorporates by this reference all prior paragraphs of this Complaint.

144.    The Think Finance Defendants are engaged in offering or providing a consumer financial product or service and are, therefore, "covered persons" within the meaning of 12 U.S.C. § 5481(6).

145.    The Dodd Frank Act prohibits covered persons from engaging in any "unfair, deceptive or abusive acts or practice." 12 U.S.C. § 5536(a)(1)(B).

146.    Federal policy, enshrined in the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and its implementing Regulation E, seeks to limit creditor direct access to consumer checking accounts by prohibiting lenders from requiring consumers to repay credit

through electronic payments. 15 U.S.C § 1693k; Reg. E, 12 C.F.R. § 1005.10(e)(1). Contrary to this policy, the Think Finance Defendants designed the Plain Green, Great Plains Lending and Mobiloans websites to manipulate consumers into preauthorizing electronic repayments. They do so by offering consumers—who are, by definition, desperate for cash—the option of receiving the loan proceeds in their bank account quickly if the consumer agrees to electronic direct deposit and repayment, while conditioning the alternative option of payment by mail on the consumer agreeing to wait as long as a week for the borrowed cash.

147.    By thus inducing consumers to grant access to their checking account by offering to provide the loan proceeds by direct deposit—"as soon as tomorrow," promised on both the Plain Green and Great Plains Lending homepages—the Think Finance Defendants have committed an unfair act or practice, which produces substantial consumer harm not outweighed by any benefit to competition, and/or a deceptive act or practice, in violation of 12 U.S.C. § 5536(a)(1)(B).

148.    By inducing consumers to provide highly personal information, including social security and bank account numbers, that make them vulnerable to future improper use of that information, the Think Finance Defendants have committed an unfair act or practice, which produces substantial consumer harm not outweighed by any benefit to competition, and/or a deceptive act or practice, in violation of 12 U.S.C. § 5536(a)(1)(B).

149.    Think Finance Defendants have committed additional unfair or deceptive acts or practices, unlawful under 12 U.S.C. § 5536(a)(1)(B), for the reasons alleged in Count Five above.

150.    Think Finance Defendants have committed abusive acts or practices, as defined at 12 U.S.C. § 5531(d)(2)(A), in violation of 12 U.S.C. § 5536(a)(1)(B), by taking unreasonable advantage of (1) a lack of understanding on the part of Pennsylvania consumers regarding the

material risks, costs, or conditions of the Plain Green, Great Plains Lending or Mobiloans

products, and/or (2) the inability of such consumers to protect their interests in selecting or using

such financial products, including the following:

     a.  By taking advantage of consumers' desperation for cash in order to induce them into agreeing to ongoing pre-authorized electronic payments coming directly from their checking accounts;

     b.  By taking advantage of consumer lack of understanding regarding the actual cost of the credit;

     c.  By taking advantage of consumer lack of understanding regarding the purported legality of the credit;

     d.  By extending credit in violation of an explicit state law prohibition against any unlicensed lending to consumers in excess of six percent interest;

     e.  By inducing consumers already burdened by high-rate loan debt to repay that debt by taking out a new high-rate loan; and

     f.  By luring consumers into a cycle of debt by incentivizing  repeat borrowing, through a number of devices, including but not limited to a "rewards" program on the Mobiloans site, *see* https://www.mobiloans.com/rewards.

151. Under established interpretation of the pre-Dodd Frank prohibition of unfair or

deceptive acts or practices under the FTC Act, 15 U.S.C. § 45, where a "common enterprise"

consisting of individuals and companies uses corporate structures to circumvent the prohibition,

all such individuals and companies may be jointly and severally liable for violations. *See, e.g.,*

*F.T.C. v. PayDay Fin. LLC*, 989 F.Supp. 2d 799, 808-09 (D.S.D. 2013).  For the same reasons,

all the Think Finance Defendants participating in the above-described common enterprises

related to the Plain Green, Great Plains Lending and Mobiloans websites are liable for the above-

described abusive practices.

152. Upon finding that Defendants did commit unfair, deceptive or abusive acts or

practices within the meaning of the Dodd Frank Act, this Court is empowered to grant relief that

includes rescission or reformation of loan contracts; refund of monies paid by consumers; restitution; disgorgement or compensation for unjust enrichment; public notification regarding the violations, including the costs of notification; limits on the activities or functions of the defendants; and civil money penalties. 12 U.S.C. § 5565(a)(2).

153.    The amount of civil penalties may not exceed $5,000 per day, but in the case of reckless violations not in excess of $25,000 per day, and in the case of knowing violations of federal consumer financial law, not in excess of $1 million per day.  The above-described violations, at the very least, were reckless, and, with regard to Defendants' violation of the federal ban on lenders conditioning credit on preauthorized electronic access to the borrower's checking account, were knowing.

## VI.  Prayer for Relief

**WHEREFORE,** the Plaintiff Commonwealth of Pennsylvania respectfully requests that this Honorable Court issue an Order:

A.    Declaring Defendants' conduct as described herein above to be in violation of the PA COA; the UTPCPL; the FCEUA; and the Dodd Frank Act;

B.    Permanently enjoining Defendants and all other persons acting on their behalf, directly or indirectly, from engaging in any future violations;

C.    Placing reasonable restrictions on Defendants' future activities or investments and ordering Defendants to divest themselves of any interest, direct or indirect, in enterprises, as authorized by 18 Pa. C.S § 911(d)(1);

D.    Directing Defendants to make full restitution pursuant to Section 201-4.1 of the UTPCPL, 73 P.S.  201-4.1, and the Dodd Frank Act, 12 U.S.C. § 5565(a)(2)(C), to all consumers who have suffered losses as a result of the acts and practices alleged in this complaint and any other acts or practices proved by the Commonwealth;

39

E.      Directing the Defendants to disgorge and forfeit all profits they have derived as a result of the conduct alleged herein, as provided by the COA, and the Dodd Frank Act;

F.      Directing Defendants to pay to the Commonwealth civil penalties pursuant to the UTPCPL of not less than One Thousand and 00/100 Dollars ($1,000.00) for each instance of a violation, and Three Thousand and 00/100 Dollars ($3,000.00) for each instance of a violation of the Consumer Protection Law involving consumers aged sixty (60) or older as victims, in accordance with 73 P.S. § 201-8, and pursuant to the Dodd Frank Act of no more than $1 million per day;

G.      Requiring Defendants to finance the cost of a notice program to consumers approved by this Court, pursuant to 12 U.S.C. § 5565(a)(2)(F);

F.      Requiring Defendants to pay the Commonwealth's investigative and litigation costs in this matter;

G.      Invalidating any beneficial interest in existing consumer debt purported to be owed by Pennsylvania consumers;

H.      In the event Defendants have issued any reports to credit bureaus regarding obligations they claim to be owed by Pennsylvania consumers, directing Defendants to notify credit bureaus to remove all such references to ThinkCash, First Bank of Delaware, Plain Green, Great Plains Lending or MobiLoans; and

I.      Granting such other general, equitable and/or further relief as the Court deems just and proper.

Respectfully submitted,

KATHLEEN G. KANE
Attorney General

JAMES A. DONAHUE III
Executive Deputy Attorney General
Public Protection Division

Date: 7-2-15                      By: _____

SAVERIO P. MIRARCHI
Deputy Attorney General
PA Attorney I.D. #88616
Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
21 South 12th Street, 2nd Floor
Philadelphia, Pennsylvania 19107
Phone: (215) 560-2414
Fax: (215) 560-2494
Email: smirarchi@attorneygeneral.gov

Date: 7/2/-15                     By: _____

IRV ACKELSBERG
PA Attorney I.D. #23813
Howard J. Langer
John J. Grogan
Edward A. Diver
Peter Leckman
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Phone: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com
*Special Counsel to the Commonwealth*