# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, by Attorney General KATHLEEN G. KANE<br><br>*Plaintiff*,<br><br>v.<br><br>THINK FINANCE, INC., et al.,<br><br>*Defendants*. | CIVIL ACTION<br><br>NO. 14-cv-07139-JCJ |

## MEMORANDUM OF LAW IN SUPPORT OF THE THINK DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Ira Neil Richards (PA I.D. No. 50879)
Stephen A. Fogdall (PA I.D. No. 87444)
Arleigh P. Helfer III (PA I.D. No. 84427)
Shannon L.C. Ammon (PA I.D. No. 318939)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market St., Suite 3600
Philadelphia, PA 19103
(215) 751-2503
Email: irichards@schnader.com

James R. McGuire (*Pro hac vice*)
Angela E. Kleine (*Pro hac vice*)
Elizabeth Balassone (*Pro hac vice*)
Lauren Wroblewski (*Pro hac vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
(415) 268-7000
Email: jmcguire@mofo.com

Walter W. Cohen (PA I.D. 12097)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
200 Locust Street, Suite 400
Harrisburg, PA 17101-1508
(717) 234-9730
Email: walter.cohen@obermayer.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

BACKGROUND ............................................................................................................ 2

    A.    The Think Finance Defendants' Partnerships with Lenders ................................ 2

        1.    FBD Partnership .................................................................................. 2

        2.    The Tribal Lender Partnerships ........................................................... 3

    B.    Regulation of Small Dollar Lenders in Pennsylvania ........................................ 4

        1.    Before July 2009, Pennsylvania Allowed Small-Dollar
               Lending at Any Rate ............................................................................ 5

        2.    After December 2012, Pennsylvania Allows Tribal Lending
               at Any Rate ......................................................................................... 6

I.    THE ATTORNEY GENERAL FAILS TO ALLEGE A PLAUSIBLE
    CLAIM AS TO THE THINK DEFENDANTS .......................................................... 9

II.    THE FAC FAILS TO SATISFY BASIC PLEADING REQUIREMENTS .................... 17

III.    FEDERAL LAW PREEMPTS ALL CAUSES OF ACTION
    CHALLENGING THE INTEREST RATE ON FIRST BANK OF
    DELAWARE'S LOANS .......................................................................................... 20

    A.    Section 521 Expressly Preempts the Causes of Action Based on the
        FBD's Loans .................................................................................................... 20

    B.    The Attorney General's "Rent-A-Bank" Allegations Do Not Avoid
        Preemption's Application Here ......................................................................... 21

IV.    THE ATTORNEY GENERAL HAS FAILED TO STATE A CLAIM
    UNDER THE COA ................................................................................................ 23

    A.    The Attorney General Cannot Allege any "Racketeering Activity"
        Because the Interest Rates Here Were Authorized by Law .............................. 24

    B.    Each of the COA Claims Fails for Additional Independent Reasons ................ 25

        1.    Count One:  No Enterprise and No Investment Injury ........................ 25

        2.    Count Two:  No Enterprise and No Participation ................................. 27

        3.    Count Three:  No Substantive Violation and No Agreement ............... 29

        4.    The Attorney General Cannot Obtain the Disgorgement
               Remedy She Seeks .............................................................................. 30

V.    THE FAC's DEBT COLLECTION CLAIM  FAILS BECAUSE THE
    THINK DEFENDANTS DID NOT COLLECT ANY UNLAWFUL
    DEBT ................................................................................................................... 31

    A.    The Attorney General Fails to Allege that the Think Defendants
        Collected any "Debt" ....................................................................................... 32

    B.    The Interest Rates at Issue Are Authorized by the Agreements
        Creating the Alleged Debt and Are Permitted by Law ..................................... 32

i

VI.    THE ATTORNEY GENERAL HAS NOT STATED A CLAIM UNDER
THE UTPCPL FOR AN INJUNCTION OR MONETARY DAMAGES ...................... 33

     A.    The Attorney General Has Not Pleaded a Plausible Claim for
Injunctive Relief Under the UTCPL ................................................................. 34

     B.    Because the Attorney General Has Not Stated A Claim for an
Injunction, She Has Not Stated a Claim for Damages ......................................... 37

     C.    The Attorney General Has Failed To Plead Sufficient Facts
Showing That She Is Entitled To Recover Damages for any Person
Under UTPCPL Section 201-4.1 ......................................................................... 38

     D.    The UTPCPL Claim Also Fails Because the FAC Does Not Allege
Facts That Show that the Think Defendants Engaged in Deceptive
Acts or Practices ................................................................................................ 40

     E.    The Attorney General Has Failed To Meet the Heightened
UTPCPL Pleading Requirements for Claims Involving Internet
Service Providers ................................................................................................ 42

VII.    THE DODD-FRANK ACT CLAIMS FAIL AS A MATTER OF LAW ........................ 44

     A.    The Attorney General Fails To Plausibly Plead Any Unfair,
Deceptive, or Abusive Act .................................................................................. 44

         1.    The EFTA Claim Is Baseless ................................................................. 44

         2.    The "Personal Information" Claim Does Not Make Sense ...................... 46

         3.    The Unsupported "Unreasonable Advantage" Claims All
Fail .......................................................................................................... 47

     B.    The "Common Enterprise" Theory Does Not Save the UDAAP
Claims ................................................................................................................ 48

CONCLUSION ................................................................................................................... 50

**Page(s)**

**Cases**

*16630 Southfield Ltd. Partnership v. Flagstar Bank, FSB,*
    727 F.3d 502 (6th Cir. 2013) ............................................................15, 17

*Advanced Oral Techs., LLC v. Nutrex Research, Inc.,*
    Civ. No. 10-5303, 2011 U.S. Dist. LEXIS 28625 (D.N.J. Mar. 21, 2011)............15

*American Dental Ass'n v. Cigna Corp.,*
    605 F.3d 1283 (11th Cir. 2010) ................................................................17

*Argueta v. U.S. Immigration & Customs Enforcement,*
    643 F.3d 60 (3d Cir. 2011)...............................................................10, 11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...............................................................10, 16, 19

*Barnes v. DiTech.Com,*
    No. 03-CV-6471, 2005 U.S. Dist. LEXIS 6760 (E.D. Pa. Apr. 19, 2005) ............12

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................... 9-10, 18, 19, 30

*Belmont v. MB Inv. Partners,*
    708 F.3d 470 (3d Cir. 2013)........................................................................40

*Bennett v. Eastern Building & Loan Ass'n of Syracuse, N.Y.,*
    35 A. 684 (Pa. 1896) .................................................................5, 41

*Bistrian v. Levi,*
    696 F.3d 352 (3d Cir. 2012)........................................................................10

*Building Indus. Fund v. Local Union No. 3, Int'l Brotherhood of Elec. Workers,*
    992 F. Supp. 162 (E.D.N.Y. 1996) ......................................................27

*Carpenters Health & Welfare Fund of Philadelphia v. Kia Enters. Inc.,*
    No. 09-116, 2009 U.S. Dist. LEXIS 61320 (E.D. Pa. July 15, 2009)....................10

*Cash Am. Net of Nevada, LLC v. Commonwealth of Pennsylvania, Dep't of Banking,*
    978 A.2d 1028 (Pa. Commw. Ct. 2009) ...............................................5-6

*Cash Am. Net of Nevada, LLC v. Commonwealth of Pennsylvania, Dep't of Banking,*

8 A.3d 282 (Pa. 2010) ...................................................................................24

*Cohen v. Daddona*,
  No. 95-4110, 1996 U.S. Dist. LEXIS 14837 (E.D. Pa. Oct. 1, 1996) ............26, 27

*Commonwealth v. Burns*,
  663 A.2d 308 (Pa. Commw. Ct. 1995) ................................................34

*Commonwealth v. Peoples Benefit Servs.*,
  895 A.2d 683 (Pa. Commw. Ct. 2006) ................................................39

*Commonwealth v. Reichenbach*,
  41 A.3d 168 (Pa. Commw. Ct. 2012) ..................................................38

*Commonwealth v. TAP Pharm. Prods.*,
  36 A.3d 1197 (Pa. Commw. Ct. 2011) ................................................34

*Commonwealth of Pennsylvania v. Traitz*,
  597 A.2d 1129 (Pa. 1991) ...............................................................26

*Copperweld v. Independence Tube Corp.*,
  467 U.S. 752 (1984)........................................................................29

*Defazio v. Wallis*,
  500 F. Supp. 2d 197 (E.D.N.Y. 2007) ................................................28

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ...........................................................16

*Falat v. County of Hunterdon*,
  No. 12-6804, 2013 U.S. Dist. LEXIS 37398 (D.N.J. Mar. 19, 2015).....................19

*F.T.C. v. PayDay Fin. LLC*,
  989 F. Supp. 2d 799 (D.S.D. 2013), ..................................................49

*Glover v. Std. Fed. Bank*,
  283 F.3d 953 (8th Cir. 2002) ...........................................................14

*Greenwood Trust Co. v. Massachusetts*,
  971 F.2d 818 (1st Cir. 1992)...........................................................20, 21

*Grewal v. Cuneo*,
  No. 13-cv-6836, 2015 U.S. Dist. LEXIS 87755 (S.D.N.Y. Jul. 7, 2015).................26

*Holloway v. Bristol Meyers Corp.*,
485 F.2d 986 (D.C. Cir. 1973) ............................................................ 48-49

*Hvostal v. Am. Idea Mgmt. Corp.*,
No. Civ. A. 91-1724, 1992 U.S. Dist. LEXIS 18775 (W.D. Pa. Mar. 23, 1992) ....................49

*Hudson v. Ace Cash Express, Inc.*,
No. IP 01-1336-C H/S, 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. May 30, 2002) ................22

*In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*,
Civ. A. No. 05-md-1712, 2013 U.S. Dist. LEXIS 96449 (E.D. Pa. July 10, 2013) ..............38

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ...........................................................17

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005) ............................................................20

*Ingris v. Borough of Caldwell*,
No. CIV.A. 14-855, 2015 U.S. Dist. LEXIS 74255 (D.N.J. June 9, 2015) ...........................19

*Japhet v. Francis E. Parker Mem. Home, Inc.*,
No. 14-1206, 2014 U.S. Dist. LEXIS 105134 (D.N.J. July 31, 2014) ..............................18-19

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
926 F.2d 1406 (3d Cir. 1991) ...........................................................27

*Kern v. Lehigh Valley Hosp., Inc.*,
108 A.3d 1281 (Pa. Super. Ct. 2015) ...............................................39-40

*Koch v. SEC*,
No. 14-1134, ___ F.3d __, 2015 U.S. App. LEXIS 12077 (D.C. Cir. July 11, 2015) .............49

*Krispin v. May Dep't Stores Co.*,
218 F.3d 919 (8th Cir. 2000) ...........................................................22

*Lance v. Weltman, Weinberg & Reis Co.*,
No. 11-1254, 2012 U.S. Dist. LEXIS 190112 (E.D. Pa. Jun. 8, 2012) ...................................32

*Lightning Lube v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) ..............................................................29

*Lovick v. Ritemoney Ltd.*,
378 F.3d 433 (5th Cir. 2004) ..........................................................24, 25

*Malt Bevs. Distribs. Ass'n v. Pa. Liquor Control Bd.*,
974 A.2d 1144 (Pa. 2009) ..............................................................34

*Marquette Nat'l. Bank v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978)..........................................................................20

*Mega Concrete, Inc. v. Smith*,
2011 U.S. Dist. LEXIS 30789 (E.D. Pa. Mar. 24, 2011)..........................28

*Munoz v. Pipestone Fin., LLC*,
513 F. Supp. 2d 1076 (D. Minn. 2007)....................................................22

*Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*,
No. 05-281, 2011 U.S. Dist. LEXIS 16446 (E.D. Pa. Feb. 17, 2011) ...................33

*New Mexico ex rel. King v. Capital One Bank*,
980 F. Supp. 2d 1314 (D.N.M. 2013) ................................................. 8-9

*Northview Motors, Inc. v. Commonwealth*,
562 A.2d 977 (Pa. Commw. Ct. 1989) ....................................................38

*Olvera v. Blitt & Gaines, P.C.*,
431 F.3d 285 (7th Cir. 2005) ................................................................33

*Pa. Dep't of Banking v. NCAS of Del., LLC*,
995 A.2d 422 (Pa. Commw. Ct. 2010) ....................................................31

*Paslowski v. Standard Mortgage Corp. of Ga.*,
129 F. Supp. 2d 793 (W.D. Pa. 2000)......................................................14

*People's Build., Loan & Sav. Ass'n v. Berlin*,
50 A. 308 (Pa. 1901) ............................................................................5

*Peterson v. Commonwealth*,
2012 Pa. Commw. Unpub. LEXIS 832, 56 A.3d 709 (Pa. Commw. Ct. 2012) ...................35

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008)..................................................................18

*Phipps v. F.D.I.C.*,
417 F.3d 1006 (8th Cir. 2005) ..............................................................22

*Pollice v. National Tax Funding, L.P.*,
225 F.3d 379 (3d Cir. 2000)..................................................................33

*Sallie Mae v. Riley*,
112 F. Supp. 2d 38 (D.D.C. 2000).........................................................14

*Sawyer v. Bill Me Later, Inc.*,
23 F. Supp. 3d 1359 (D. Utah 2014)..............................................13, 20, 22, 23

*Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*,
 955 F. Supp. 2d 452 (E.D. Pa. 2013) ..................................................................39

*Stewart v. Evans*,
 No. 3:CV-09-1428, 2009 U.S. Dist. LEXIS 75969 (M.D. Pa. Aug. 25, 2009) ......................19

*The Knit With v. Knitting Fever, Inc.*,
 Civ. A. No. 08-4221, 2011 U.S. Dist. LEXIS 34233 (E.D. Pa. Mar. 30, 2011)....................29

*Thomas v. Cendant Mortgage*,
 Civ. A. No. 03-1672, 2004 U.S. Dist. LEXIS 23081 (E.D. Pa. Nov. 15, 2004)....................13

*Todd v. Weltman, Weinberg & Reis, Co.*,
 348 F. Supp. 2d 903 (S.D. Ohio 2004) ..................................................................33

*United States v. Philip Morris USA Inc.*,
 396 F.3d 1190 (D.C. Cir. 2005)..........................................................................30

**Statutes, Regulations, and Court Rules**

STATUTES

12 U.S.C. § 25b.................................................................................................. 8

12 U.S.C. § 85.................................................................................................. 20

12 U.S.C. § 1831d..........................................................................................20, 21

12 U.S.C. § 5536..........................................................................................2, 48

12 U.S.C. § 5563.............................................................................................. 49

12 U.S.C. § 5564.............................................................................................. 49

15 U.S.C. § 45.................................................................................................. 48

15 U.S.C. § 56.................................................................................................. 48

15 U.S.C. § 1681.............................................................................................. 14

15 U.S.C. § 1692........................................................................................14, 32

15 U.S.C. § 1693k............................................................................................ 44

18 U.S.C. § 1962................................................................................25, 26, 27, 29

1 Pa. C.S. § 1902 .................................................................................... 35

1 Pa. C.S. § 1903 .................................................................................... 34

1 Pa. C.S. § 1926 .................................................................................... 35

7 P.S. § 303 ..................................................................................... 7, 24

7 P.S. § 309 ........................................................................................ 7

7 P.S. § 6203 ...................................................................................... 6

7 P.S. § 6211 ...................................................................................... 5

7 P.S. § 6212 ...................................................................................... 5

7 P.S. § 6213 ...................................................................................... 5

7 P.S. § 6217 ................................................................................... 5, 9

15 Pa. C.S. § 4121 ................................................................................ 42

15 Pa. C.S. § 4122 ................................................................................ 42

18 Pa. C.S. § 911 ........................................... 2, 24, 25, 26, 27, 29, 30

41 P.S. § 201 ...................................................................................... 5

41 P.S. § 604 ................................................................................... 6, 9

71 P.S. § 733-506 ................................................... 6, 7, 8, 9, 24, 41

72 P.S. § 7201 ................................................................................... 34

73 P.S. § 201-1 ................................................................................... 2

73 P.S. § 201-2 ....................................................................... 34, 37, 42

73 P.S. § 201-3 ................................................................................. 43

73 P.S. § 201-4 ................................................................................. 34

73 P.S. § 201-4.1 ......................................................................... 37, 38

73 P.S. § 2270.1 ................................................................................. 2

73 P.S. § 2270.3 ............................................................................... 32

73 P.S. § 2270.4 ............................................................................... 31

73 P.S. § 2270.5 ..................................................................................................... 31

Del. Code Ann. tit. 5, § 963 ................................................................................. 21

### REGULATIONS

12 C.F.R. § 1005 ............................................................................................ 44, 45

12 C.F.R. Pt. 1005, Supp. I ................................................................................ 45

12 C.F.R. § 1024 ................................................................................................. 13

12 C.F.R. § 1026.2 .............................................................................................. 13

12 C.F.R. Part 1026, Supp. I .............................................................................. 13

### RULES

Fed. R. Civ. P. Rule 12(b)(6) ............................................................................... 9


**Other Authorities**

Letter from Glenn E. Moyer, Secretary of Banking and Securities, to Pennsylvania
  Banks (Nov. 14, 2012) ..................................................................................7, 8

80 Fed. Register 9 (Jan. 14, 2015) ......................................................................8

124 Cong. Rec. 25733 (1978) (statement of Rep. Wylie) ............................45

CFPB Consumer Laws and Regulations EFTA, EFTA 35 (Oct. 2013) ......45

CFPB Examination Procedures, Short Term, Small Dollar Lending, 45
  Procedures 10 (Sept. 2013) ...........................................................................45

CFPB Outline of Proposals (Mar. 26, 2015) .................................................48

Press Release, CFPB Considers Proposal to End Payday Debt Traps (Mar. 26, 2015) ...............48

The Think Defendants have shown in their accompanying motions pursuant to Rules 17 and 19 of the Federal Rules of Civil Procedure that the Attorney General's case cannot get out of the starting gate.[1] But even if it could, the Attorney General still stumbles and falls flat. Both as a matter of pleading and as a matter of substance, the First Amended Complaint ("FAC") does not allege any plausible claim against the Think Defendants.

- Each count in the FAC depends on "information and belief" speculation and self-serving conclusions, not on facts. As a result, the FAC does not distinguish the Think Defendants' service provider relationship with their lender clients from any other business relationships in the financial services sector. And, tellingly, the Attorney General concedes that the lender on all of the challenged loans was either a federally insured, state chartered bank, or a federally recognized Native American tribe but incorrectly concludes that the Think Defendants violated state and federal lending laws.

- The Attorney General's ham-handed reliance on a "fundamental policy" relating to small loan interest rates fundamentally misunderstands Pennsylvania law. Until July 2009, there is no question that out of state lenders were not restricted by Pennsylvania law in the rates they could charge via Internet lending. Later, through amendments to the Banking Code effective at the end of 2012, the General Assembly rejected the application of a 6% interest rate ceiling to out of state "foreign financial institutions" including Native American tribes.

- The claims under the Corrupt Organizations Act (Counts I-III) fail for a number of reasons, including a failure to allege facts sufficient to meet the essential elements of the claims and because the interest rates charged by the lenders were "otherwise allowed by law."

- The claims under Fair Credit Extension Uniformity Act (Count IV) and the Unfair Trade Practice and Consumer Protection Law (Count V) fail because, among other things, the Attorney General does not plausibly allege continuing conduct giving her a right to seek an injunction or damages, or that any lending took place without full disclosure in signed contracts.

- The Dodd-Frank Act claim fails because neither the case law nor the alleged conclusory facts lead to a claim under that Act.

As a result of all the incurable problems in the FAC, this case must be dismissed under Fed. R. Civ. P. Rule 12(b)(6).

---

[1] The Think Defendants' motion under Federal Rule 17 demonstrates the Attorney General's lack of authority under Pennsylvania law to maintain this action. The motion under Federal Rule 19 demonstrates that the Attorney General has failed to join indispensable parties.

# BACKGROUND

On July 6, 2015, the Attorney General filed her FAC against Think Finance, Inc., TC Loan Service, LLC, Tailwind Marketing, LLC, TC Decision Sciences, LLC, and Financial U, LLC ("Think Defendants"). (FAC ¶ 2.) The FAC alleges claims against the Think Defendants for violations of the Corrupt Organizations Act ("COA"), 18 Pa. C.S.A. §§ 911(b)(1), 911(b)(3), and 911(b)(4); the Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. §§ 2270.1, *et seq.*, and Unfair Trade Practices and Consumer Protection ("UTPCPL"), 73 P.S. §§ 201-1, *et seq.*; and the Dodd-Frank Act, 12 U.S.C. § 5536(a)(1)(B). (*Id*. ¶¶ 91-153.)

## A. The Think Finance Defendants' Partnerships with Lenders

The crux of the Attorney General's FAC is that the Think Defendants created and participated in a two-part "scheme" involving a federally regulated bank and Native American tribes supposedly to evade federal and Pennsylvania law.

### 1. FBD Partnership

As to the first part of the alleged scheme, the Attorney General contends that, because the Think Defendants were unable to offer short-term loans to Pennsylvania consumers directly, they partnered with First Bank of Delaware ("FBD"). (*See* FAC ¶¶ 36-37.) The Attorney General alleges that FBD acted as the nominal lender, while the Think Defendants were the *de facto* lender. (*See id*. ¶¶ 33, 37.) The Think Defendants also allegedly provided numerous services to FBD, including marketing and technological services. (*Id*. ¶ 37.) According to the Attorney General, the Think Defendants used the contracts for those services to disguise the flow of revenue from the lending activity to the Think Defendants. (*Id*.) As explained in opposition to the Attorney General's motion to remand (*see* Docket Item 42 at 10-11), the Attorney General misconstrues the import of the FDIC's order and thus falsely asserts that Think Defendants' relationship with FBD allegedly dissolved after the bank was subject to FDIC enforcement proceedings and the Pennsylvania Department of Banking limited Internet lending. (*Id*. ¶¶ 38-39.)

## 2.     The Tribal Lender Partnerships

For the second part of the alleged scheme, the Attorney General alleges that the Think Defendants turned to a "rent-a-tribe" model.  (*See* FAC ¶ 42.)  The FAC contends that the Think Defendants found Native American tribal partners that played a "nominal lender" role similar to the role FBD supposedly played in the first part of the alleged scheme.  (*See id*. ¶¶ 43-44.)  The Think Defendants established business relationships with three Native American Tribes:  the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana, the Otoe-Missouria Tribe of Indians, and the Tunica-Biloxi Tribe of Louisiana.  (*See id*. ¶ 46.)

A lender affiliated with each of the Tribes makes the loans, which are then transferred to a non-tribal entity.  (FAC ¶ 47.)  According to the Attorney General, the Think Defendants "provide the infrastructure to market, fund, underwrite and collect the loans, providing the following: customer leads, the technology platform, investors who fund the loans, and/or the payment-processing and collection mechanisms used to obtain payments from consumers."  (*Id*. ¶ 47; *see id*. ¶¶ 48, 105.)  They allegedly also operate a lending website for each of the Tribes.  (*See id*. ¶ 46.)  In this way, the Attorney General alleges, the Think Defendants "extract most of the profits as payment for 'services' provided to the [Tribal] lender, are able to hide behind a tribal façade, and to claim the vicarious benefit of whatever legal immunities the tribe enjoys."  (*Id*. ¶ 43.)

The Attorney General alleges that the Think Defendants first approached the Chippewa Cree Tribe, "which was already engaged in a small-scale consumer lending venture of its own," with a proposal in March 2011.  (*Id*. ¶ 53.)  A term sheet from the proposal is Exhibit D to the FAC. The Attorney General alleges it memorializes the parties' agreement related to aspects of the loan program, including, for example, that the Tribe will adopt a finance code and "provide for the licensing of an arm of the tribe to engage in consumer lending."  (FAC Ex. D at 1.)  The lender licensed by the Chippewa Cree Tribe to make loans to consumers pursuant to the Tribe's consumer finance code is called Plain Green.

The terms of the loan agreements between Plain Green and its customers can be found on the "Loan Cost and Terms" page of the Plain Green website, www.plaingreenloans.com. (*See* FAC ¶ 58.) Those terms include a provision in the loan agreement that states that the "Loan Agreement . . . is subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana." (*Id.* ¶ 59.) Further, the provision states that those executing the agreement "hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the Chippewa Cree Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation." (*Id.*)

The Attorney General alleges that the Think Defendants established a similar relationship with the Otoe-Missouria Tribe, with the lender involved in their relationship called "Great Plains Lending." (*See* FAC ¶ 60.) The Attorney General also alleges a relationship between the Think Defendants and the Tunica-Biloxi Tribe, with the lender involved in their relationship called "MobiLoans." (*See id.* ¶ 63.) According to the FAC, the websites for these Tribal lenders had terms and conditions identical to the terms of the Plain Green program, such that the parties to such loans agreed to the application of Tribal law. (*See id.* ¶¶ 61, 68.)

## B. Regulation of Small Dollar Lenders in Pennsylvania

Although the Attorney General contends that the loans she challenges are contrary to Pennsylvania's public policy, Pennsylvania's regulation of small-dollar lending has evolved over the past several years. Significantly, the Attorney General ignores that Pennsylvania has now explicitly sanctioned the very loans the FAC challenges.[2]

---

[2] Defendants do not concede that Pennsylvania could ever apply to any of the loans at issue. The point that defendants are making here is that even assuming Pennsylvania law could apply, there was a very limited window of time in which the Commonwealth did not explicitly permit the lending practices its Attorney General now challenges.

1. **Before July 2009, Pennsylvania Allowed Small-Dollar Lending at Any Rate**

Under Pennsylvania's Loan Interest Protection Law ("LIPL"), 41 P.S. § 201, unlicensed lenders generally can, as a matter of state law, charge no more than 6% interest on nonmortgage consumer loans under $50,000. Originally, the Department of Banking (the "Department") adopted the position that the LIPL's interest-rate cap did not apply to nondepository entities that offered loans online and had no physical presence in Pennsylvania. (FAC Ex. A.) Such lenders, the Department explained, could lend at an interest rate greater than 6% without first obtaining a license under the Consumer Discount Company Act ("CDCA"), 7 P.S. §§ 6211, 6212.[3] (FAC Ex. A.)

This position was consistent with long-standing Pennsylvania Supreme Court case law holding that loans subject to other state's laws were not subject to Pennsylvania interest-rate restrictions. *See, e.g.*, *Bennett v. Eastern Building & Loan Ass'n of Syracuse, N.Y.*, 35 A. 684 (Pa. 1896); *see also People's Build., Loan & Sav. Ass'n v. Berlin*, 50 A. 308 (Pa. 1901). As the Supreme Court stated unequivocally in *Bennett*, "[t]he fact that [a borrower] lived in Pennsylvania, and negotiated [the loan] there . . . is not of the slightest significance," where the loan was made by a lender in another state permitting a higher interest rate. 35 A. at 685; *see also id.* ("[T]he mere fact that [a] loan was made to a citizen of Pennsylvania cannot justify an inference that it was done with an intent to evade the laws of Pennsylvania.").

On July 26, 2008, the Department altered course. (FAC ¶ 27.) It issued a notice (the "Notice"), which stated that the Department would require nondepository lenders to be licensed under the CDCA if they wanted to continue to issue small-balance consumer loans at a rate of more than 6% via the Internet. (*Id.*) Although the Department originally stated that licenses would be required by February 1, 2009 (*id.*), a court challenge delayed the implementation date of this requirement until July 10, 2009. *See Cash Am. Net of Nevada, LLC v. Commonwealth of*

---

[3] The CDCA authorizes the Department to license a category of in-state small-balance consumer lenders that are permitted to charge an interest rate of 9.5% per year, plus a specified service charge, or 24% per year, on loans of $25,000 or less. 7 P.S. §§ 6213.E, 6217.1.

*Pennsylvania, Dep't of Banking*, 978 A.2d 1028, 1032 (Pa. Commw. Ct. 2009). Until July 10, 2009, then, Pennsylvania law did not limit the amount of interest that could be charged on small-balance consumer loans made over the Internet.

Notwithstanding the Department's Notice, the CDCA remained subject to a significant built-in exemption. The statute prohibits any person from making or brokering a loan "in this Commonwealth" of $25,000 or less without a license under the CDCA *only if* the "interest, discount, bonus, fees, fines, commissions, charges, or other considerations" in connection with the loan "aggregate in excess of the interest that the lender *would otherwise be permitted by law to charge* if not licensed under [the CDCA]." 7 P.S. § 6203.A (emphasis added). The LIPL similarly provides that where another law authorizes a higher interest rate, its 6% cap does not apply: "If any maximum lawful rate of interest provided for in [the LIPL] is inconsistent with the provision of any other act establishing, permitting or removing a maximum interest rate . . . then the provision of such other act shall prevail." 41 P.S. § 604.

Ignoring that both the CDCA and the LIPL, by their express terms, provided that their interest rate caps are automatically overridden by any other law authorizing a higher rate, the Attorney General wrongly asserts that "as of February 1, 2009, 'payday lending' . . . has been illegal in Pennsylvania, whether done through storefronts or over the Internet." (FAC ¶ 29.) Contrary to this suggestion, nothing in the Department's Notice prohibits, or could prohibit, an out-of-state small-balance consumer lender from making a loan to a Pennsylvania resident in excess of the interest-rate limit in either the LIPL or the CDCA where that lender "is otherwise permitted by law" to do so. 7 P.S. § 6203.A. In fact, as next shown, as a matter of Pennsylvania statutory law, the Tribal lenders here are indeed "otherwise permitted by law" to make loans bearing interest in excess of the limits in the LIPL and the CDCA.

### 2. After December 2012, Pennsylvania Allows Tribal Lending at Any Rate

In 2012, the General Assembly passed a Banking Law Modernization Package ("BLMP"), which included a new section of the Banking and Securities Code implementing the

Dodd-Frank Act. *See* 71 P.S. § 733-506. As the Secretary of the Banking Department explained in a letter to Pennsylvania banking institutions, "[t]he overall goal of the Banking Law Modernization Package was to update, simplify and modernize the banking laws of the Commonwealth," and to make clear "that Pennsylvania is 'open for business' by reducing regulatory burden where possible and appropriate." November 14, 2012 letter from Secretary Glenn Moyer ("Secretary's Letter") at 1.[4]

The BLMP effected two relevant changes. First, the BLMP removed any interest-rate restrictions on Pennsylvania state-chartered banks. Although neither the LIPL's nor the CDCA's interest-rate caps apply to Pennsylvania state-chartered banks, Section 309 of the Banking Code of 1965 contained its own 6% interest-rate cap for such banks. *See* 7 P.S. § 309(a). The BLMP eliminated the interest rate cap in Section 309 and granted such banks the power to make loans at any rate or any terms "permitted for any other financial institution or any other lender" regulated by any supervisory authority. 7 P.S. § 303(b)(i). As the Secretary of Banking explained, by virtue of these amendments, the "***interest rate and fee restrictions regarding lending activity by Pennsylvania state-chartered banks and savings banks have been removed***[.]" Secretary's Letter at 2 (emphasis added).

Second, the BLMP granted parity to "foreign financial institutions," so that these institutions are likewise free of all interest-rate restrictions to the same extent as Pennsylvania state-chartered banks. *See* 71 P.S. § 733-506(J). The BMLP defines a "foreign financial institution" as "[a] person licensed, registered or regulated by a ***state*** other than the Commonwealth or a foreign country that provides financial services to or for the benefit of persons in this Commonwealth." 71 P.S. § 733-506(K) (emphasis added). A "state" is defined to include "any federally recognized Indian tribe[.]" *Id*. Each of the three Tribes identified in

---

[4] The Secretary's Letter is available for viewing and downloading at
http://www.dobs.pa.gov/Documents/Secretary%20Letters/Banks/11.14.12%20Secretary_s%20Letter%20Re_%20Banking%20Law%20Modernization%20Package.pdf (last visited Aug. 28, 2015).

the FAC is federally recognized, and has "licensed, registered, or regulat[es]" their Tribal lending businesses. *See* 80 Fed. Register 9 at 1943-1946 (Jan. 14, 2015).

The Attorney General's own allegations in the FAC qualify the Tribes she identifies as "foreign financial institutions." She alleges that they are arms of the Tribe, licensed under Tribal law. (*See* FAC ¶¶ 43, 53, 58, 59, 60, 61, 68.) Also, she alleges throughout the FAC that loans were made to Pennsylvania consumers. (*See, e.g.*, *id*. ¶¶ 1, 2, 32, 40, 69.)

The BLMP provides that "[c]onsumer financial laws of this Commonwealth applicable to the activities of foreign financial institutions . . . shall apply to foreign financial institutions and their subsidiaries ***only to the extent those laws apply to State-chartered banks and savings associations and their subsidiaries***." 71 P.S. § 733-506(J) (emphasis added). Under this amendment, "financial institutions and their subsidiaries doing business in Pennsylvania . . . are subject to state and local laws and regulations only to the same extent as such laws and regulations apply to Pennsylvania state-chartered institutions." Secretary's Letter at 4. This "ensure[s] that *all* financial institutions doing business in the Commonwealth are subject to a uniform set of laws, regulations and standards." *Id*. at 4 (emphasis added).

Although the BLMP does not define "[c]onsumer financial laws," that phrase is used in 71 P.S. § 733-506(I) in connection with Section 1044 of the Dodd-Frank Act, codified at 12 U.S.C. § 25b. In Dodd-Frank, a "[s]tate consumer financial law" is defined to mean "a [s]tate law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2).

Both the LIPL and the CDCA are "[s]tate consumer financial laws" under this definition. Neither the LIPL nor the CDCA "directly or indirectly discriminate[s] against national banks," and each "directly and specifically regulates the manner, content, or terms and conditions" of a "financial transaction . . . with respect to a consumer" "as may be authorized for national banks to engage in." *See, e.g.*, *New Mexico ex rel. King v. Capital One Bank*, 980 F. Supp. 2d 1314,

1332 (D.N.M. 2013) (state unfair practices act was a "state consumer financial law"). Moreover, neither the LIPL nor the CDCA applies to Pennsylvania state-chartered banks. *See* 41 P.S. § 604 (to the extent the LIPL's interest rate cap is "inconsistent with" any other act "removing a maximum interest rate," the "other act shall prevail"); 7 P.S. § 6217 (the CDCA does not apply to any entity otherwise licensed by the Secretary of Banking).

As the LIPL and the CDCA do not apply to state-chartered banks, they no longer apply to "foreign financial institutions" either. 71 P.S. § 733-506(J). The Tribal lenders, as foreign financial institutions, are thus not subject to the LIPL's interest rate cap, nor are they required to be licensed under the CDCA.[5] After December 24, 2012, which is the effective date of the BLMP amendments, then, Pennsylvania law does not limit the amount of interest that can be charged on loans made by those lenders. Moreover, under those amendments, even the Think Defendants could make loans to Pennsylvania borrowers at interest rates exceeding the LIPL cap without a CDCA license if they are "licensed, registered, or regulated" by a federally recognized Native American tribe.

## ARGUMENT

## I.  THE ATTORNEY GENERAL FAILS TO ALLEGE A PLAUSIBLE CLAIM AS TO THE THINK DEFENDANTS

The Attorney General's core theory—that the relationships between the lenders and the Think Defendants were nothing more than a conspiracy to evade Pennsylvania usury law—does not demonstrate a plausible claim for relief. The facts pleaded instead lead to a more mundane conclusion, entirely consistent with lawful conduct: the Think Defendants' provision of services to FBD and the Tribes is explained by the usual relationship between a lender and its service providers.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts demonstrating a plausible claim for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556

---

[5] Again, this is not to suggest that Pennsylvania *could* apply its law to the Tribal lenders. The point is that Pennsylvania has eliminated the conflict that the Attorney General has manufactured by this lawsuit.

(2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In analyzing the complaint, a court is required to first "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). The remaining factual allegations must "provide the grounds of [the] entitle[ment] to relief," and this "requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted).

Although the "'plausibility' standard does not require probability, . . . it does demand more than a sheer possibility that the defendant acted unlawfully. Therefore, a complaint pleading facts that are merely consistent with liability is insufficient." *Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 72-73 (3d Cir. 2011); *see Carpenters Health & Welfare Fund of Philadelphia v. Kia Enters. Inc.*, No. 09-116, 2009 U.S. Dist. LEXIS 61320, at *4 (E.D. Pa. July 15, 2009) ("[A]llegations [that] are 'not only compatible with, but more likely explained by,' lawful behavior . . . cannot 'plausibly suggest' actionable wrongdoing.") (quoting *Iqbal*, 556 U.S. at 679).

Factual allegations that are consistent with, and better explained by, lawful conduct fail to state a plausible claim. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Thus, in *Twombly*, a conspiracy to restrain trade was not plausible because the companies' "parallel conduct" was readily explained by natural market forces. *Twombly*, 550 U.S. at 569. And in *Iqbal*, allegations that government officials detained thousands of Arab Muslim men did not plausibly establish discrimination in light of the "more likely explanation[]" that a lawful policy directing the arrest and detention of individuals connected to the September 11 attacks would have a disparate impact on Arab Muslims. *Iqbal*, 556 U.S. at 681-82. As the Supreme Court explained in both cases, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

To assess plausibility, a court must first "peel away" conclusory statements and rhetoric. *Bistrian*, 696 F.3d at 365. Here, this requires scrubbing the FAC of the self-serving sinister gloss

the Attorney General has applied to it. The Attorney General alleges that the Think Defendants "are using affiliations" with tribes and FBD—a "rogue bank"—to "evade licensure, usury and consumer protection laws." (FAC ¶ 2.) Instead of making loans in their own name, the Attorney General alleges, the Think Defendants have "designed, participated in, and operated a lending and collection scheme in which they disguise themselves as mere service providers . . . ." (*Id.*; *see also id.* ¶ 33 (alleging "rent-a-bank" lending model), ¶ 43 (same for "rent-a-tribe").) According to her, the Think Defendants' provision of services to FBD and the Tribes shows that lending activity purportedly conducted by FBD and the Tribes "is, in actuality, a complex scheme driven by [non-bank and] non-tribal entities that extract[s] most of the generated revenue." (*Id.* ¶ 51; *see id.* ¶ 37.) As a result, she asserts that the loans made to Pennsylvania consumers are "usurious" and "illegal." (*See, e.g.*, *id.* ¶¶ 74, 79.) These "allegations" are "no more than conclusions" and rhetorical embellishments that the Attorney General has added. *Argueta*, 643 F.3d at 74. Under the required analysis for a motion to dismiss, such allegations must be set aside in the Court's consideration of the Attorney General's FAC. *See id.*

A court must next consider whether the remaining factual allegations state a claim. The thrust of the Attorney General's allegations as to the Think Defendants are that FBD paid fees to Tailwind Marketing, LLC for marketing services and to TC Decision Sciences, LLC for providing a website and other technological services. (*Id.* ¶ 37.) The Tribes are likewise alleged to have paid "the Think . . . Defendants" to "provide the infrastructure to market, fund, underwrite and collect the loans, providing the following: customer leads, the technology platform, investors who fund the loans, and/or the payment-processing and collection mechanisms used to obtain payments from consumers." (*Id.* ¶ 47; *see id.* ¶¶ 48, 105.) As to FBD and the Tribal lenders, the Attorney General concedes that FBD originally served as the lender (Compl. ¶ 36; FAC ¶ 38), and that now the Tribal lenders are the entities that "accept[]" and "ma[k]e" the loans, and thus that borrowers owe the borrowed money to the Tribal lenders, and not to Think Finance (*see* FAC ¶¶ 47, 75-79).

These remaining allegations show that when the Attorney General's labels and conclusions are set aside, the FAC alleges that FBD and the Tribal lenders are the lenders of the challenged loans and that the Think Defendants are mere service providers. The Attorney General's claims—all of which are predicated on the *Think Defendants* lending at illegal rates— thus are not plausible. The Attorney General's claims are also implausible because her allegations of the Think Defendants' provision of services demonstrate nothing more than that the Think Defendants engaged in perfectly lawful acts. Supplying marketing services or a designing or hosting a website are routine commercial activities, not intrinsically culpable conduct. The Think Defendants merely provided to FBD, and now provide to the Tribes, certain services that many other lenders routinely outsource.

For example, the term sheet that the Attorney General attaches to the FAC, far from demonstrating unlawful conduct, simply confirms that the relationship between Think Finance and the Chippewa Cree Tribe was a traditional and lawful commercial agreement. (*See* FAC Ex. D.) Contrary to the Attorney General's "information and belief" characterization of the term sheet as a "take-it-or-leave it proposal" (FAC ¶ 53), with "conditions set by Think Finance" (*id*. ¶ 54), the term sheet reveals nothing more than a standard, arms-length business transaction. The term sheet sets out the parameters for a formal agreement between the two parties in which Think Finance provides services to the Tribe and the Tribe undertakes various obligations in return. (*Id*.) Indeed, the term sheet even requires counsel to be provided to the Tribe to assist in further formalizing the Tribe's relationship with Think. (*Id*.)

The market for consumer financial services is filled with additional examples in which various aspects of a transaction are performed by different parties who specialize in providing that particular function. That is simply how the industry (like many other industries) works. For example, various government sponsored entities ("GSEs") provide a robust secondary market for the purchase of consumer residential mortgage loans from mortgage lenders. In *Barnes v. DiTech.Com*, No. 03-CV-6471, 2005 U.S. Dist. LEXIS 6760, at *17 (E.D. Pa. Apr. 19, 2005), the court discusses the process under which Fannie Mae works closely with mortgage lenders

that sell it loans. To this end, Fannie Mae licenses mortgage lenders an "automated desktop underwriting tool ('DU'), which allows a lender to enter information about the consumer obtained from other sources, such as the consumer's . . . consumer reports." *Id*. Based on that information, DU provides an assessment of whether the loan would meet Fannie Mae's eligibility requirements for purchase. *See id*. If so, the lender generally makes the loan and Fannie Mae purchases it. *See id*. Although the GSE provides underwriting and other technical services at the front end of the mortgage origination process, and then purchases the loan following loan closing, the GSE is not the lender and is not obligated to make the various disclosures that federal laws require the lender to make.[6] *See id*.; 12 C.F.R. § 1026.2(a)(17); 12 C.F.R. Part 1026, Supp. I, at ¶ 2(a)(17)(i)-2 ("Regulation Z") (pertaining to assignees); *see also*, *e.g.*, *Thomas v. Cendant Mortgage*, Civ. A. No. 03-1672, 2004 U.S. Dist. LEXIS 23081, at *13-*14 (E.D. Pa. Nov. 15, 2004).

In *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1360-61 (D. Utah 2014), the plaintiff challenged an agreement between two banks and a third party to provide financing for consumer purchases in which the banks funded the loans, held the receivables for two days, and then sold them to the same third party, which also facilitated the loans for the banks. Although the plaintiff, like the Attorney General here, derided the parties' arrangement as a "rent-a-charter agreement," *id*. at 1362 n.2, the court concluded that it more closely resembled legitimate credit card programs supervised by the FDIC, *id*. at 1367. The FDIC explains that in such programs a third party will generally solicit prospective credit card customers and provide approved applicants with a credit card. FDIC Credit Card Activities Manual, Ch. XIV. The bank may hold or securitize the receivables, but the third party often holds them. *Id*. In addition to solicitation, underwriting, and administration of the program, the third party may also provide

---

[6] *See also* 12 C.F.R. § 1024, App. B, Ill. 5; § 1024.2(b), § 1024.5(b)(7) (a correspondent lender receives loan applications from consumers, underwrites the loans in accordance with the requirements and pre-set pricing of the mortgage lender, funds the loans by drawing on a line of credit for which it is liable, and closes the loans in its own name, yet are still considered the "lender" under certain statutes when promptly after closing, the loans and their servicing rights are sold to the mortgage lender pursuant to the parties' pre-existing agreements and standards).

such services as collections, customer service, and processing. *Id.* ("[T]he bank sheds itself of a majority of the day-to-day operational duties associated with operating the program in most cases."). As the *Sawyer* court rightly recognized, a bank's shifting of services to third parties is contemplated by the FDIC and is not illegal merely because a plaintiff characterizes it as such.

Other examples are abundant throughout the financial services world. *See Glover v. Std. Fed. Bank*, 283 F.3d 953, 957 (8th Cir. 2002) (mortgage brokers provide origination services to mortgage lenders); *Paslowski v. Standard Mortgage Corp. of Ga.*, 129 F. Supp. 2d 793, 799 (W.D. Pa. 2000) (mortgage lenders (or the entities the lenders sell the loans to) often outsource the servicing of the loans to third parties); *Sallie Mae v. Riley*, 112 F. Supp. 2d 38, 40, 45-46 (D.D.C. 2000) (educational lender considered "lender" for purposes of anti-inducement provision even though entered into forward purchasing agreement with guarantee agency in which the agency processed the applications, performed all loan origination activity, provided lending capital, and then purchased the loan from the lender at a premium). For all types of consumer credit, lenders frequently outsource the collection process for defaulted loans to debt collectors. This is regulated by, and indeed the reasons for, the Fair Debt Collection Practices Act. *See* 15 U.S.C. §§ 1692, *et seq.* And virtually all financial services companies outsource their credit investigation function by purchasing credit reports and credit scores on prospective borrowers from consumer reporting agencies. This is regulated by, and again a driving rationale for, the Fair Credit Reporting Act. *See* 15 U.S.C. §§ 1681, *et seq.*

The Attorney General's remaining factual allegations go no further in suggesting that the FAC describes anything other than lawful conduct. First, the Attorney General attempts to cast the legitimacy of the Think Defendants' provision of services to the Tribes into doubt by suggesting that the Tribes do not have the right to lend at rates above Pennsylvania's usury cap. (*See, e.g.*, FAC ¶ 43 (alleging that the Think Defendants "are able to hide behind a tribal façade … to claim the vicarious benefit of whatever legal immunities the tribe[s] enjoy[]").) Crucially, however, there are no allegations in the FAC that it was actually unlawful for the Tribes to make

14

loans at the interest rates they did.  The Attorney General's attempt to portray the Think Defendants as service providers to an unlawful lender thus fails.

Second, the Attorney General alleges, on information and belief, that "the Think … Defendants created 'Financial U' as a mechanism to extract additional revenues from the scheme, disguised as payments for 'educational' services provided to the borrowers."  (*Id.* ¶ 49.) She contends that the amounts the Tribes were charged for use of Financial U were "in excess of any actual value provided to the Tribes or their customers."  (*Id.* ¶ 50.)

These allegations do not point to illegal behavior, but instead "are precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told us to ignore when evaluating a complaint's sufficiency."  *16630 Southfield Ltd. Partnership v. Flagstar Bank, FSB*, 727 F.3d 502, 506 (6th Cir. 2013) (setting aside allegations based upon information and belief describing incidents of disparate treatment).  For example, the Attorney General alleges no facts to support her conclusion regarding the supposed purpose of Financial U, which provides educational content on individual financial responsibility, to extract fees or its alleged value.  As a result, she cannot plausibly allege that the Think Defendants charge the Tribes more than the company's content is worth.[7]

Third, the Attorney General alleges that the Think Defendants "segment their participation in the scheme into different 'services' provided by different Think Finance affiliates," (*id.* ¶ 48), to serve as a "subterfuge" by which "the Think . . . Defendants conceal the nature and extent of their participation in or direction of the scheme."  (*Id.* ¶ 50.)  The fact that the Think Defendants provide—and receive fees for—services through several separate entities

---

[7] The Attorney General's allegations based solely on "information and belief" extend beyond her unsupported claims about Financial U.  (*See* FAC ¶¶ 4, 37, 47-50, 53, 62, 75-77, 83, 90, 98.) Nothing in those paragraphs, which are all pleaded on information and belief, salvages the complaint.  After *Twombly* and *Iqbal*, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim.  "Allegations made upon information and belief—which are little more than conjecture and wishful thinking—have little hope of salvaging an otherwise defective complaint."  *Advanced Oral Techs., LLC v. Nutrex Research, Inc*., Civ. No. 10-5303, 2011 U.S. Dist. LEXIS 28625, at *11 n.6 (D.N.J. Mar. 21, 2011).

is also perfectly consistent with lawful conduct.  Businesses often divide their operations into separate entities for a host of legitimate business reasons, and the Attorney General has not alleged facts excluding those reasons as a basis for the division of the Think Defendants here.

The normal relationship between lenders and service providers, driven by lender demand, thus provides an "obvious alternative explanation" that more likely explains the conduct alleged in the FAC than the Attorney General's assertion of a conspiracy to evade state law.  *Iqbal*, 556 U.S. at 682.  As "[a]ll of the facts [the Attorney General] h[as] presented are consistent with both [her] theory of liability and this innocent alternative . . . [the Attorney General] h[as] not met [her] burden to do '[s]omething more' to 'render [her] allegations plausible within the meaning of *Iqbal* and *Twombly*.'"  *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998-99 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1104, 1108).

Indeed, courts regularly conclude that complaints similarly predicated upon regular, lawful business activity are not plausible.  For example, the plaintiffs in *Eclectic Properties* brought RICO and RICO conspiracy claims after franchise businesses, owned by the defendants, stopped paying rent on the numerous properties the plaintiffs had purchased from the defendants. 751 F.3d at 993-95.  The plaintiffs contended that the defendants conspired to have the franchises pay inflated rents so that the properties would appear far more valuable to third parties.  *Id*. at 994.

The Ninth Circuit first explained that "[w]hen companies engage in sale-leaseback transactions that are facially legitimate, pay rent and operate legitimate businesses for years thereafter, and otherwise act as routine participants in American commerce, a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme."  *Id*. at 997-98.  In support of their claims of fraud, the plaintiffs had alleged that the properties had significantly increased in value from their true value at the time the defendants originally purchased them, but the plaintiffs could not, in turn, sell the properties at that increased value.  *See id*. at 998.  The court concluded that this and other allegations failed

to meet the required level of specificity, as they did nothing "to exclude a plausible and innocuous alternative explanation" that properties tend to increase in value over time and that the plaintiffs tried to sell the properties during a national recession. *Id*. at 998.

As in *Eclectic Properties*, the Attorney General here fails to allege facts "tending to exclude the possibility that the alternative explanation is true"; that is, that the FAC demonstrates a normal set of relationships among lenders and service providers, which the parties set up precisely for the purpose of complying with the law. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013).[8] Although the Attorney General alleges a "scheme" and "subterfuge," these mere labels and conclusions do not transform her allegations of lawful conduct into plausibly illegal conduct. The Attorney General needs facts suggesting illegality and she offers none. The FAC therefore "stops short of the line between possibility and plausibility" and should be dismissed. *Twombly*, 550 U.S. at 569.

## II. THE FAC FAILS TO SATISFY BASIC PLEADING REQUIREMENTS

The Attorney General's claims against the Think Defendants fail for other basic reasons. The FAC groups six separate corporate entities and an individual defendant into a single unit: the "Think Finance Defendants." Aside from identifying them (*id*. ¶¶ 2, 12-21), the 153-paragraph FAC does nothing to substantively distinguish the conduct of these defendants.[9] The Attorney General simply attributes every action in the FAC to "Defendants" or "the Think Finance Defendants." (*See id*. ¶¶ 1, 2, 33, 37-40, 42-44, 46-51, 53-55, 75-85, 91-153.)

---

[8] *See also American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) (concluding that plaintiffs failed to plead plausible RICO conspiracy claims where the defendants' conduct was "equally indicative of rational independent action as it is concerted, illegitimate conduct"); *16630 Southfield Ltd. Partnership*, 727 F.3d at 505 ("Where, as here, the complaint alleges facts that are merely consistent with liability . . . as opposed to facts that demonstrate discriminatory intent . . . , the existence of obvious alternative explanations simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made.").

[9] The Think Finance Defendants are never again mentioned individually in the FAC, aside from the Attorney General claiming (incorrectly) that none of them registered in the Commonwealth. (FAC ¶ 137.)

First, the FAC does not adequately allege any basis on which any Think Defendant could be held liable for acts undertaken by any other Think Defendant. The allegation that they each entered into a "scheme" with one another is the mere recitation of a legal conclusion that, if established, can operate to make one defendant liable for the acts of another. As discussed above, in the assessment of whether a complaint complies with Rule 8, such a legal conclusion is disregarded. *Twombly*, 550 U.S. at 565.

Second, Rule 8 requires the Attorney General to state her claims in a manner that apprises each defendant of the specific acts giving rise to that defendant's alleged liability. In other words, she must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citing *Twombly*, 550 U.S. at 554). The FAC fails to meet this requirement, making it impossible for each of the defendants to fairly and completely understand the claims against them.

Examples of the nonsensical and contradictory allegations against the Think Finance Defendants highlight the problem. For instance, the Attorney General claims "[a]t the same time they [the Think Finance Defendants, which include PayDay One] were engaged in illegal payday lending through the ThinkCash-FBD arrangement, the Think Finance Defendants [including PayDay One] also continued to make direct loans to Pennsylvania consumers through their affiliate, Defendant PayDay One, LLC." (FAC ¶ 40.) In other words, according to the Attorney General, PayDay One simultaneously (1) was "engaged in" the 'ThinkCash-FBD Arrangement," (2) "continued to make direct loans" through itself, and (3) was somehow an "affiliate" of itself. (*See id*.) Similarly, the Attorney General asserts that Financial U somehow created itself and then abused its own corporate form: "Upon information and belief, the Think Finance Defendants [including Financial U] created 'Financial U' as a mechanism to extract additional revenues from the scheme, disguised as payments for 'educational' services provided to the borrowers." (*Id*. ¶ 49.)

Such group pleading "undermines the notice pleading regime of Rule 8." *Japhet v. Francis E. Parker Mem. Home, Inc.*, No. 14-1206, 2014 U.S. Dist. LEXIS 105134, at *6 (D.N.J.

July 31, 2014) (citing *Twombly*, 550 U.S. at 555). In *Japhet*, the court explained that "[a]lleging that 'Defendants' undertook certain illegal acts—without more—injects an inherently speculative nature into the pleadings forcing both the Defendants and the Court to guess who did what to whom when. Such speculation is anathema to contemporary pleading standards." *Id*. at *7; *see also Stewart v. Evans*, No. 3:CV-09-1428, 2009 U.S. Dist. LEXIS 75969, at *13-*14 (M.D. Pa. Aug.§, 2009) (plaintiff's complaint fails because "***specific facts are not alleged against individual defendants***") (emphasis added); *Ingris v. Borough of Caldwell*, No. CIV.A. 14-855, 2015 U.S. Dist. LEXIS 74255, at *16 (D.N.J. June 9, 2015) ("[L]ump[ing] several defendants together without setting forth what each particular defendant is alleged to have done," constitutes "impermissibly vague group pleading."); *Falat v. County of Hunterdon*, No. 12-6804, 2013 U.S. Dist. LEXIS 37398, at *12 (D.N.J. Mar. 19, 2015) ("Plaintiffs cannot merely state that '*Defendants* did X,'—they must specifically allege which Defendants engaged in what wrongful conduct.") (emphasis in original). The claims against the Think Defendants should be dismissed for the same reasons.

Finally, even if the FAC were read to allege that each of the Think Defendants performed every act described in it (and thus to state a ***possible*** claim), it nonetheless would not state a ***plausible*** claim. As noted above, a complaint that pleads facts that are merely consistent with a defendant's liability is insufficient to satisfy Rule 8. *See Twombly*, 550 U.S. at 557. The Attorney General's sloppy treatment of the Think Defendants as a single entity results in the incongruous and ***implausible*** allegation that seven separate defendants, hand in hand, undertook each and every act attributed to the Think Defendants entity. "Judicial experience and common sense," *Iqbal*, 556 U.S. at 679, make plain that these seven Think Defendants did not, hand in hand, undertake each and every act alleged in the complaint; such a claim would not only be implausible, it would be impossible. Because the FAC states no plausible claim against the entities constituting the Think Defendants, it does not pass muster under *Iqbal*. *See id*. at 678-79; *see also Twombly*, 550 U.S. at 555.

III.  **FEDERAL LAW PREEMPTS ALL CAUSES OF ACTION CHALLENGING THE INTEREST RATE ON FIRST BANK OF DELAWARE'S LOANS**

The FAC challenges loans made to Pennsylvania consumers by FBD.  (*See* FAC ¶ 37.) The Attorney General asserts that the interest FBD charged on its loans was "illegal" and "usurious" under Pennsylvania law.  Because FBD is a federally-insured, state charted bank, federal law preempts such claims.

A.  **Section 521 Expressly Preempts the Causes of Action Based on the FBD's Loans**

Section 85 of the National Bank Act ("NBA") allows a national bank to charge interest on any loan at the rate allowed by the state where the bank is located.  12 U.S.C. § 85; *see Marquette Nat'l. Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978).  Congress enacted Section 521 of the Depository Institution Deregulation and Monetary Control Act ("DIDA"),[10] 12 U.S.C. § 1831d, to level the playing field for federally insured, state-chartered banks.  *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 827 (1st Cir. 1992).  As two such provisions should be read *in pari materia*, DIDA likewise allows state banks to export the laws governing the interest rate charged from the state where the bank is located.  *Id.*; *see Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1363 (D. Utah 2014) (holding that § 521 expressly preempts state laws regulating interest); *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 295 (3d Cir. 2005) ("[Section] 521 of DIDA completely preempts any state law attempting to limit the amount of interest and fees a federally insured-state chartered bank can charge.").  In other words, "[t]o the extent that a law or regulation enacted in the borrower's home state purposes to inhibit the bank's choice of an interest term under Section 521, DIDA expressly preempts the state law's operation."  *Greenwood Trust Co.*, 971 F.2d at 827.

Here, FBD was a federally insured, state-chartered bank existing under the laws of Delaware.  (*See* FAC ¶ 36; Declaration of Ira N. Richards in Supp. of Not. of Removal ("Richards Decl.") Ex. A (FDIC, Demographic Information, First Bank of Delaware) (Docket Item No. 1-8).)  As such, § 521 of DIDA clearly applied to FBD.

---

[10] This provision is also known as Section 27 of the Federal Deposit Insurance Act.

Each cause of action in the FAC turns, at least in part, on the alleged charging of illegal interest under Pennsylvania law. For example, the Attorney General's causes of action under the COA allege that the Think Defendants "participated as a principal in the racketeering activity described above in that they aided, abetted, counseled, commanded, induced or procured the usurious and illegal lending described above." (FAC ¶ 96; *see also id*. ¶ 105 ("the usury scheme described above"); ¶ 112 ("lending activity that they know is illegal in Pennsylvania").) The remaining causes of action include similar allegations of illegal interest. (*Id*. ¶ 126 ("loan amounts that are illegal in Pennsylvania"); ¶ 128 ("offer to Pennsylvania consumers illegal and usurious loans and credit lines"); ¶ 129 ("the loans and credit lines are illegal in Pennsylvania"); ¶ 150d ("extending credit in violation of an explicit state law prohibition against any unlicensed lending to consumers in excess of six percent interest").)

Pennsylvania law, however, cannot constrain a federally insured, state-chartered bank's choice to charge an interest rate within the parameters set by federal law. As FBD was such a bank, it was authorized as a matter of federal law to charge interest on loans made to interstate customers, like Pennsylvania residents, so long as those charges are authorized under Delaware law. *See Greenwood Trust Co.*, 971 F.2d at 827; 12 U.S.C. § 1831d. Under Delaware law, a lender may charge a borrower any agreed-upon interest rate. *See* Del. Code Ann. tit. 5, § 963. Accordingly, the interest charges on Pennsylvania consumers' loans were unambiguously allowed under Delaware law, and they were authorized as a matter of federal law under DIDA.

**B.** **The Attorney General's "Rent-A-Bank" Allegations Do Not Avoid Preemption's Application Here**

Seeking to plead around the application of § 521, the Attorney General alleges that FBD was the lender in name only and that the Think Defendants performed "most lender functions." (*See* FAC ¶¶ 2, 36-37.) But the Attorney General's artful pleading fails to establish that preemption does not attach to the loans the FAC concedes were made by FBD, even if FBD transferred part of its interest in those loans. Moreover, even if the Attorney General's

allegations about evasion of Pennsylvania law were credited, those allegations do not defeat the application of § 521.

First, preemption applies to the causes of action challenging the interest rate on FBD's loans to Pennsylvania consumers, despite allegations that FBD played only a minimal role in those loans. The Attorney General concedes that the loans "were originated in the name of FBD" (FAC ¶ 37), but nonetheless alleges that FBD served as a "nominal" lender, while under various service contracts, the Think Defendants "performed most lender functions" and earned "most of the revenue generated by" the lending (*id.* ¶ 37; *see id.* ¶ 33 (generally explaining the so called "rent-a-bank" model)). But even where a bank has a limited role in a lending program, courts conclude that preemption is appropriate where the claims challenge the interest or fees on a bank-issued loan. *See, e.g.*, *Sawyer*, 23 F. Supp. 3d at 1360-61, 1363 n.2, 1365 (holding that plaintiff's usury claims based on alleged "rent-a-charter agreement" between non-bank and banks were preempted by § 521 where the banks funded the loans, held the receivables for two days, and then sold them to the non-bank, who also facilitated the loans); *Hudson v. Ace Cash Express, Inc.*, No. IP 01-1336-C H/S, 2002 U.S. Dist. LEXIS 11226, at *9-*15 (S.D. Ind. May 30, 2002) (concluding that § 85 of the NBA preempted plaintiff's claims predicated upon illegal interest even though plaintiff alleged that the bank played an "insignificant" role in a lending program and the third party was required to purchase a 95% participation interest in the loans).

Second, this conclusion should not change because the Attorney General alleges that Defendant TC Loan Service, LLC may have acquired an interest in FBD's loans. (*See* FAC ¶ 37.) Courts often hold that preemption rights attaching to a loan when made do not disappear when the loan is later assigned, sold, or otherwise transferred to a non-bank defendant.[11] The

---

[11] *See, e.g.*, *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 923-24 (8th Cir. 2000) (concluding that plaintiff's claims challenging a department store's late fees on the account receivables it purchased were completely preempted by NBA because the originating entity of the credit was a bank); *Sawyer*, 23 F. Supp. 3d at 1365 (plaintiff's usury and late fee claims against non-bank who purchased receivables were preempted under § 521); *Munoz v. Pipestone Fin., LLC*, 513 F. Supp. 2d 1076, 1079 (D. Minn. 2007) (plaintiff's claims alleging illegal collection of interest against debt collector preempted by NBA because national bank originated the loan and charged the same interest rate); *see also Phipps v. F.D.I.C.*, 417 F.3d 1006, 1009, 1013 (8th Cir. 2005)

Court need not go so far here, as the FAC concedes that FBD retained the loans wholly, or at least in part.

Third, even if the Court credits the Attorney General's factually unsupported allegation that FBD has worked with the Think Defendants "[t]o evade licensure, usury and consumer protection law," preemption nonetheless applies. (FAC ¶ 2.) The *Hudson* and *Sawyer* courts rejected the argument that concerns of loans "made for the purpose of evading state usury laws" or loans where the bank "'rents' its charter to some other entity" change the preemption calculus. *Hudson*, 2002 U.S. Dist. LEXIS at *15-*16. In *Hudson*, the court reasoned that adopting that position would require it to draw uncertain and unpredictable boundaries between federal and state bank law depending on the subjective purpose of those engaged in the transaction or the level of risk accepted by the bank. *Id*. And, as the *Sawyer* court explained, concerns about the "protection of state usury laws" is an issue better addressed by Congress. *Sawyer*, 23 F. Supp. 3d at 1367 (citing *Marquette Nat'l Bank*, 439 U.S. at 319). The *Hudson* and *Sawyer* courts got it exactly right. Preemption of the Attorney General's causes of action based upon FBD's loans cannot be avoided simply because she alleges evasion of Pennsylvania law.

## IV.    THE ATTORNEY GENERAL HAS FAILED TO STATE A CLAIM UNDER THE COA

The first three counts of the FAC purport to assert claims under the COA. But as the Think Defendants have already demonstrated, the FAC is devoid of any factual allegations plausibly suggesting anything other than routine and legitimate business relationships. There is not a single allegation suggesting—plausibly or otherwise—that the Think Defendants' business relationships are the kind of organized criminal conduct that the COA addresses. Even beyond that, each of these claims fails as a matter of law.

---

(although plaintiff alleged that the defendants conspired to give the appearance of making loans through a national bank to avoid consumer protection laws, dismissing plaintiff's unlawful fees claims as preempted by the NBA because national bank originated loan).

**A.** **The Attorney General Cannot Allege any "Racketeering Activity" Because the Interest Rates Here Were Authorized by Law**

Each of the FAC's COA counts is based on the alleged collection of money to repay a loan bearing "a rate of interest exceeding 25% per annum or the equivalent rate for a longer or shorter period, where not otherwise authorized by law." 18 Pa. C.S. § 911(h)(1)(iv). This is the FAC's only alleged predicate act under the COA. *See* FAC ¶¶ 92, 105, 112. However, nowhere in the FAC does the Attorney General acknowledge the critical language: "where not otherwise authorized by law." Here, the interest charged was "authorized by law."

As explained above, federal law authorized the rates charged by FBD. As the FAC makes clear, Tribal law authorized the rates charged on the "second phase" of the alleged lending "scheme." (FAC ¶¶ 58, 59, 60, 61, 65, 68.) Moreover, the General Assembly in 2012 eliminated any interest rate caps for Pennsylvania state-charted banks, *see* 7 P.S. § 303(b)(i), and extended that protection to all foreign financial institutions. 71 P.S. § 733-506(J). *See* Section B, pages 6-9, *supra.* Each one of the Tribal lenders is a foreign financial institution under the FAC's allegations. *See id.* Therefore, these lenders simply are not subject to the interest rate caps on which the Attorney General relies.

Although the Attorney General contends that "as of February 1, 2009," offering "consumers high-rate, short-term loans" "has been illegal in Pennsylvania" (FAC ¶ 29), this allegation is, quite simply, false. While the Attorney General claims that this position was "upheld" by the Pennsylvania Supreme Court in *Cash Am. Net of Nevada, LLC v. Commonwealth of Pennsylvania, Dep't of Banking*, 8 A.3d 282 (Pa. 2010) (*see* FAC ¶ 29), that case predates the BLMP discussed above and did not survive it. In short, as of December 24, 2012, Pennsylvania law expressly authorizes foreign financial institutions to "offer[] consumers high-rate, short term loans." Thus, because the rates of interest that the Attorney General claims are usurious here are "otherwise authorized by law"—not only under federal law (the first part of the "scheme") and the Tribes' financial codes but also in Pennsylvania (the second part of the "scheme")—the Attorney General "fails to state a claim for usury. Therefore, her RICO claim also fails." *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 444 (5th Cir. 2004).

*Lovick* involved a federal RICO claim based on the "collection of unlawful debt," 18 U.S.C. § 1962(c), the analog under the federal statute of the claim the Attorney General brings here. The plaintiff obtained an automobile title loan of $2,000.00. The loan agreement recited that the interest rate on the loan was 10%, the limit under Texas law, but the borrower paid an additional $1,500.00 brokerage fee to another entity. The plaintiff, like the Attorney General here, claimed that the arrangement was a "subterfuge" because the broker "performed most of the tasks ordinarily performed by the lender," and thus the brokerage fee was simply disguised interest, making the actual interest rate on the loan usurious, contrary to what the contract itself stated. *Id*. at 437, 439, 441.[12]

The court rejected this argument. The court held that a Texas statute overruled the case law the plaintiff relied on for this "subterfuge" argument and unambiguously permitted the loan broker to charge a brokerage fee of any amount. *Id*. at 443. The plaintiff's complaint admitted that the broker had performed services in exchange for that fee. *Id*. While the court was "well aware that a $1500 fee a $2000 loan appears quite excessive," it could not "substitute [its] judgment" for the judgment of the Texas legislature. *Id*.

This Court should reach exactly the same conclusion here. The General Assembly determined in its judgment that foreign financial institutions should not be subject to Pennsylvania's consumer financial laws. That includes the LIPL and the CDCA. The Attorney General ignores the General Assembly's judgment completely.

### B.    Each of the COA Claims Fails for Additional Independent Reasons

### 1.    Count One: No Enterprise and No Investment Injury

Count One of the FAC alleges that the "Think Finance Defendants derived income from" "racketeering activity" and then "used or invested" that income in an "enterprise" in violation of 18 Pa. C.S. § 911(b)(1). This claim fails for three reasons.

___

[12] The loan agreement acknowledged that the annual percentage rate on the loan, including the brokerage fee, was approximately 131%. *Id*. at 437.

First, the Attorney General asserts generically that the "Think Finance Defendants" invested in an "enterprise," but then identifies as the supposed enterprise "ThinkCash, Inc., Think Finance, Inc., Elevate Credit, Inc., and GPL Servicing, Ltd.," "among others." (FAC ¶ 97.) To state a RICO "investment" claim, whether under the federal provision, 18 U.S.C. § 1962(a), or its mirror image in the COA, 18 Pa. C.S. § 911(b)(1), the plaintiff must identify an "enterprise" that is different from the "racketeering enterprise" that supposedly committed the racketeering activity at issue. *See, e.g.*, *Defazio v. Wallis*, 500 F. Supp. 2d 197, 208 (E.D.N.Y. 2007) ("The 'enterprise' in subsection (a) refers not to the 'racketeering enterprise,' but contemplates investment in some other, legitimate business.").[13] Yet the only "enterprise" the Attorney General identifies is the very "scheme" she claims constituted the racketeering activity at issue. (*See* FAC ¶ 92.) The Attorney General therefore has not alleged an "enterprise" adequate to state an "investment" claim under the COA or RICO.

Second, to state a COA or RICO "investment" claim against a particular defendant, that defendant must *itself* have "participated as a principal" in the racketeering activity and received income from it. 18 Pa. C.S. § 911(b)(1); 18 U.S.C. § 1962(a). Thus, the Attorney General is required to plead for each Think Defendant how that defendant participated as a principal in the "scheme" and what enterprise specifically received that defendant's income as an investment. *Grewal v. Cuneo*, No. 13-cv-6836, 2015 U.S. Dist. LEXIS 87755, at *47 (S.D.N.Y. Jul. 7, 2015) ("[A]ll RICO claims—whether premised on a violation of Section 1962(a), (b), or (c)—require a showing that *each defendant* was engaged in a 'pattern of racketeering activity.'" (emphasis added)). The Attorney General makes no attempt to do this, and instead simply lumps all of the "Think Finance Defendants" together as if they were a single "principal" receiving and investing income as a unit in an alleged pattern of activity that is spelled out with no more specificity than "[t]he above-described scheme." (FAC ¶ 92.) This is wholly insufficient. *See Cohen v. Daddona*, No. 95-4110, 1996 U.S. Dist. LEXIS 14837, at *8 (E.D. Pa. Oct. 1, 1996) (explaining

---

[13] The Pennsylvania Supreme Court has noted that the COA is "virtually identical" to RICO. *Commonwealth of Pennsylvania v. Traitz*, 597 A.2d 1129, 1133 (Pa. 1991).

that incorporating allegations into a count by reference, "or allud[ing] to them 'as set forth elsewhere,'" is insufficient to state a RICO claim).

Third, under the COA, as under RICO, "a plaintiff must allege injury specifically from the use or investment of income in the named enterprise." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir. 1991); *see also Cohen*, 1996 U.S. Dist. LEXIS 14837 at *7 (describing this as "investment injury"). The FAC contains no such allegation. Indeed, Count One contains no allegation of injury whatsoever. To the extent an unpleaded allegation of injury can be interpolated into Count One, the Attorney General's theory is at most that the "Think Finance Defendants" "derive[d] income from a pattern of racketeering activity, and then reinvest[ed] the proceeds of that activity in [their] general business operations." *Building Indus. Fund v. Local Union No. 3, Int'l Brotherhood of Elec. Workers*, 992 F. Supp. 162, 175 (E.D.N.Y. 1996). In such alleged circumstances, "it is the racketeering activity which injures the plaintiff, and not the 'investment.'" *Id*. This is insufficient to state a COA investment claim.

### 2.     Count Two:  No Enterprise and No Participation

Count Two is based on Section 911(b)(3) of the COA, 18 Pa. C.S. § 911(b)(3), which mirrors Section 1962(c) of RICO, 18 U.S.C. § 1962(c). Under this Count, the Attorney General alleges that the "Think Finance Defendants" "participated" in two "association-in-fact enterprises," which the Attorney General says are the "above-described" "arrangement[s]" between the Think Defendants and FBD and the three Native American tribes." (FAC ¶ 104.) Like Count One, Count Two is fatally flawed.

First, once again the Attorney General fails to make any concrete allegations in Count Two and instead relies on the "above-described" "arrangement[s]" to attempt to identify the enterprise in which the Think Defendants supposedly participated. As with Count One, "allud[ing] to [allegations] 'as set forth elsewhere'" is insufficient. *Cohen*, 1996 U.S. Dist. LEXIS 14837 at *8.

Second, to state a "participation" claim, whether under Section 911(b)(3) of the COA or Section 1962(c) of RICO, "the alleged 'enterprise' through which a pattern of racketeering

27

activity is conducted must be distinct from those persons who stand accused of conducting that racketeering activity." *DeFazio v. Wallis*, 500 F. Supp. 2d 197, 209 (E.D.N.Y. 2007). The Attorney General alleges no such distinct enterprise. Instead, the enterprise is the "above-described" "arrangements" with FBD and the Tribes, which is also "the usury scheme described above," which is the very alleged pattern of racketeering activity at issue. (FAC ¶ 105.)

Third, even if the Attorney General had alleged an "enterprise," which she has not, she has not alleged any "facts to support a reasonable inference that any of the [Think Defendants] engaged in activities constituting 'participation' in the affairs of the enterprise, as opposed to simply their own ostensibly legitimate business affairs." *Mega Concrete, Inc. v. Smith*, 2011 U.S. Dist. LEXIS 30789, at *30 (E.D. Pa. Mar. 24, 2011). The Attorney General alleges that "the Think . . . Defendants" participated in the enterprises by "(a) designing, providing and managing the web technology that powers each of the three tribal lending operations; (b) arranging for the provision of lending capital to each of the three nominal tribal lenders; (c) providing customer databases and leads and other marketing assistance; (d) providing application processing and underwriting assistance; (e) arranging payment processing services; (f) collecting unpaid loans and arranging the sale of uncollected debt to debt buyers; (g) arranging for the sale of consumer personal information obtained through the various websites and/or (h) coordinating and managing the enterprises." (FAC ¶ 105.)

Not one of these activities is, in itself, illegal, and there are no allegations of fact plausibly suggesting otherwise. Further, as already explained, there can be no dispute that, at least as of December 2012, a foreign financial institution making a loan to a Pennsylvania resident is not subject to any interest rate restriction under the LIPL or the CDCA. Because of this, there cannot be anything illegal under Pennsylvania law about "designing, providing and managing" web technology for a foreign financial institution making a loan to a Pennsylvania resident. Nor can there be anything illegal under Pennsylvania law about "arranging" for lending capital for such foreign financial institutions. Nor can there be anything illegal about providing leads or marketing assistance, or application processing and underwriting assistance, or payment

processing services, or any of the activities the Attorney General alleges supposedly represent "participation" in an illegal scheme. Far from alleging racketeering activity, the Attorney General's allegations, on their face, are perfectly consistent with legitimate services being provided to a foreign financial institution making perfectly legal loans to Pennsylvania borrowers.

### 3. Count Three: No Substantive Violation and No Agreement

Count Three alleges a supposed "conspiracy" to violate the COA under 18 Pa. C.S. § 911(b)(4), which is the mirror image of 18 U.S.C. § 1962(d) in the RICO statute. This Count is also meritless.

First, as already shown, the FAC's substantive COA claims are defective. There obviously can be no conspiracy to commit COA violations that do not exist. Thus, the FAC's conspiracy count must fail as well. *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993).

Second, even if the Attorney General had pleaded a substantive COA violation, which she has not, her conspiracy count still would fail. To begin with, the Attorney General acknowledges that many of the Think Defendants are affiliated entities, and such entities cannot conspire with one another as a matter of law. *See, e.g.*, *Copperweld v. Independence Tube Corp.*, 467 U.S. 752 (1984). Moreover, the Attorney General "must allege facts to show that each [Think Defendant] objectively manifested an agreement to participate, directly or indirectly, in the affairs of a RICO enterprise through the commission of two or more predicate acts." *The Knit With v. Knitting Fever, Inc.*, Civ. A. No. 08-4221, 2011 U.S. Dist. LEXIS 34233, at *13 (E.D. Pa. Mar. 30, 2011) (quoting *Smith v. Jones, Gregg, Creehan & Gerace, LLP*, No. 08-365, 2008 U.S. Dist. LEXIS 98530, at *7 (W.D. Pa. Dec. 5, 2008)). The FAC alleges no objective manifestation of such an agreement by any Think Defendant. Instead, the Attorney General relies on conclusory references to "above described" "arrangements." As already shown, these "arrangements" are, at the very least, consistent with perfectly lawful conduct—providing services to foreign financial institutions that are free of interest rate restrictions by the deliberate

choice of the General Assembly, or to a state-charted bank that is not subject to Pennsylvania's interest rate caps under federal law—so the Attorney General has failed to offer "allegations plausibly suggesting (not merely consistent with) [an unlawful] agreement." *Twombly*, 550 U.S. at 557.

**4. The Attorney General Cannot Obtain the Disgorgement Remedy She Seeks**

Each of the COA counts contains the same prayer for relief: because the Think Defendants supposedly are "continuing to violate" the COA, they not only should be enjoined "from any future participation" in the "usury scheme," they should be ordered to "divest[] and disgorg[e] all income or monies obtained, directly or indirectly, from activity related to ThinkCash, Plain Green, Great Plains Lending or MobilLoans," and any "beneficial interest related to existing loans to Pennsylvania consumers" should be "invalidat[ed]." (FAC ¶¶ 101, 109, 116.) This extreme relief is unavailable for many reasons.

First, since 2012, Pennsylvania's restrictions on interest rates under the LIPL and the CDCA do not apply to foreign financial institutions. The Think Defendants obviously cannot "continue to violate" rate restrictions that do not exist by providing services to such foreign financial institutions, which is all they are alleged to have done on the face of the FAC.

Second, the COA contains no hint that the sweeping disgorgement remedy the Attorney General seeks is available. The statute provides only that Pennsylvania courts may "prevent and restrain violations," including by ordering a person "to divest himself of any interest . . . in the enterprise," "imposing reasonable restrictions on the future activities or investments" of such a person, and "ordering the dissolution of the enterprise" or revoking or suspending a person's license or authority to do business in Pennsylvania, provided that "due provision" is made "for the rights of innocent persons." 18 Pa. C.S. § 911(d)(1)(i) & (ii). This language is identical to language in RICO that has been held, rightly, to be "limited to forward-looking remedies that are aimed at future violations." *United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005). By contrast, "[d]isgorgement . . . is a quintessentially backward-looking remedy

focused on remedying the effects of past conduct to restore the status quo." *Id*. Thus, just as the plain meaning of the RICO statute precludes any congressional intent to allow a disgorgement remedy, so too the General Assembly could not have intended to permit the drastic remedy the Attorney General seeks here.

Moreover, even if the COA otherwise permitted disgorgement, the remedy the Attorney General seeks ***does not*** make "due provision for the rights of innocent persons." The Attorney General does not dispute that the Tribes and Tribal lenders are, indeed, innocent persons. Nor could she, since the General Assembly determined in 2012 that foreign financial institutions should be free of all interest rate restrictions to the same extent as Pennsylvania state-chartered banks. An order prohibiting the Think Defendants from doing business with these innocent parties hardly respects their rights. To the extent the Attorney General's improper disgorgement remedy seeks to force the Tribes or Tribal lenders to return funds they lawfully received under loan contracts with Pennsylvania borrowers, or pursuant to their contracts with the Think Defendants, such a remedy likewise runs roughshod over these innocent parties' rights.

Lastly, to the extent the Attorney General's request to "invalidat[e] any beneficial interest related to existing loans to Pennsylvania consumers" is in fact a request to rescind these loans, which it appears to be, that remedy cannot be reconciled with the rights of the Tribes or Tribal lenders. It also goes far beyond the traditional remedy recognized in Pennsylvania for an allegedly usurious loan, which never "authorize[d] voiding the principal loan," but only the return of "interest specified beyond the lawful rate." *Pa. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422, 440 (Pa. Commw. Ct. 2010).

## V. THE FAC'S DEBT COLLECTION CLAIM FAILS BECAUSE THE THINK DEFENDANTS DID NOT COLLECT ANY UNLAWFUL DEBT

In Count Four , the Attorney General asserts that the Think Defendants committed a "per se" violation of the UTPCPL by violating the FCEUA, 73 P.S. § 2270.4; *see also* 73 P.S. § 2270.5(a) (providing that a violation of FCEUA "shall constitute a violation" of the UTPCPL, 73 P.S. § 201-1, *et seq*.). This claim should be dismissed for the reasons discussed below.

### A. The Attorney General Fails to Allege that the Think Defendants Collected any "Debt"

Both the FDCPA and the FCEUA address the collection of loan obligations that are *in default*. The FDCPA does this by excluding from the definition of "debt collector" any person collecting a debt on behalf of another person "which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(iii). The FCEUA on the other hand explicitly defines a "debt" as "[a]n actual or alleged *past due* obligation, claim, demand, note or other similar liability of a consumer . . . ." 73 P.S. § 2270.3 (emphasis added).

The FAC does allege that any Think Defendant collected a "debt," in the sense of a past due obligation of a consumer, on behalf of FBD or any Tribal lender. The Attorney General relies on an exhibit to the FAC stating that Think Finance would provide services to one of the Tribal lenders, Plain Green, including payment processing services (*see* FAC Ex. D), but processing payments on a loan simply is not collecting a "debt" for purposes of the FCEUA. *Cf. Lance v. Weltman, Weinberg & Reis Co.*, No. 11-1254, 2012 U.S. Dist. LEXIS 190112, at *3-*4 (E.D. Pa. Jun. 8, 2012) (claims under FCEUA and FDCPA failed where plaintiff did not clearly allege that loan was in default). Thus, the FAC's FCEUA claim fails to allege even the threshold requirement that there be some actual *debt* the defendant supposedly collected.

### B. The Interest Rates at Issue Are Authorized by the Agreements Creating the Alleged Debt and Are Permitted by Law

The FAC's FCEUA claim is also based on a mischaracterization of the FDCPA. The Attorney General claims that the FDCPA forbids collection of "any amount" that is "prohibited by state law." (FAC ¶ 121.) The FDCPA says no such thing. Instead, that statute states that a debt collector may not collect any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). The Attorney General cannot allege a violation of this provision.

To begin with, as discussed above, the interest rates the Attorney General wrongly says are illegal are "permitted by law." But even if these interest rates were not permitted by law, the Attorney General's claim would still fail because these interest rates are in every instance

"expressly authorized by the agreement creating the debt."[14]  Indeed, the loan agreements between the Tribal lenders and Pennsylvania borrowers the Attorney General attaches to the FAC all set forth clearly the annual percentage rates as required by the Truth in Lending Act, and the Attorney General makes no argument that any Pennsylvania borrower has been charged any interest or other amounts that were not authorized by a borrower's loan agreement.

In an attempt to get around the plain language of the FDCPA, the Attorney General cites *dicta* in *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 408 (3d Cir. 2000).  (*See* FAC ¶ 121.)  In *Pollice*, the Third Circuit noted that, according to an FTC staff commentary on the FDCPA, a defendant "ha[s] violated section 1692f(1) regardless of the presence of any agreement authorizing the rates of interest and penalties" if "state law specifically prohibits [the interest charges at issue]."  225 F.3d at 408.  However, the court did not decide this issue because it concluded that the interest charges were not in fact authorized in the agreements.  *Id*.  Such *dicta* is not binding on this Court.  *See, e.g.*, *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, No. 05-281, 2011 U.S. Dist. LEXIS 16446, at *29-*30 (E.D. Pa. Feb. 17, 2011).  Neither is the FTC staff commentary that the Third Circuit cited.  That commentary is entitled to no deference because the FTC's reading "is a stretch" that is contrary to "the disjunctive wording of statute."  *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288 (7th Cir. 2005); *see also Todd v. Weltman, Weinberg & Reis, Co.*, 348 F. Supp. 2d 903, 914 n.10 (S.D. Ohio 2004) (noting the "disjunctive" nature of the provision and concluding that where the charges are "expressly authorized by the agreement creating the debt" it is "not relevant" whether they are "permitted by law").

## VI.  THE ATTORNEY GENERAL HAS NOT STATED A CLAIM UNDER THE UTPCPL FOR AN INJUNCTION OR MONETARY DAMAGES

The Attorney General alleges that the Think Defendants used "deliberate deceptions . . . to target and take advantage of Pennsylvania consumers."  (FAC ¶ 2.)  Based on these allegedly "deliberate deceptions," the Attorney General claims in Count Five that, pursuant to the

---

[14] Assuming, for the sake of argument, that "debt" under the FCEUA simply means "loan."

UTPCPL, she is entitled to a broad permanent injunction, "full restitution" to consumers, and civil penalties. But apart from the Attorney General's *ipse dixit* assertions that she has a claim, her few factual allegations show that the claim is implausible.

### A. The Attorney General Has Not Pleaded a Plausible Claim for Injunctive Relief Under the UTCPL

The Attorney General seeks an order directing defendants "to disgorge and forfeit all profits" and "to pay the Commonwealth civil penalties" on the basis of allegations under the UTPCPL. (*See* FAC ¶ 7; *id*. Prayer for Relief ¶¶ A, E, F.) The Attorney General also asks for a permanent injunction pursuant to the UTPCPL. (*See id*. ¶ 140; *id*. Prayer for Relief ¶ B.) However, the Attorney General has not pleaded sufficient facts showing a plausible entitlement to either an injunction or monetary damages.

The Attorney General can only obtain a permanent injunction under the UTPCPL when "any person is ***using*** or is ***about to use*** any method, act or practice" declared unlawful by the Act. 73 P.S. § 201-4 (emphasis added). Construing the plain language of 73 P.S. § 201-4, courts have held that, in order to obtain an injunction under the UTPCPL, the Attorney General must prove: (1) that a person is ***using*** or ***about to use*** a practice declared unlawful by the UTPCPL; and (2) that such proceedings would be in the public interest. *Commonwealth v. TAP Pharm. Prods.*, 36 A.3d 1197, 1221 (Pa. Commw. Ct. 2011) (explaining that the basis for an injunction under § 201-4 is statutory and, thus, not based on common law elements); *Commonwealth v. Burns*, 663 A.2d 308, 312 (Pa. Commw. Ct. 1995). The Attorney General has not pleaded, and cannot plead, facts sufficient to satisfy these requirements.

While other statutes define the phrase "use" in the relevant statutory context, *see, e.g.*, 72 P.S. § 7201(o), "use" or "using" is not defined in the UTPCPL. *See generally* 73 P.S. § 201-2. Absent a statutory definition, the Statutory Construction Act requires that a statute's words and phrases be given their ordinary meaning. *See* 1 Pa. C. S. § 1903(a); *see Malt Bevs. Distribs. Ass'n v. Pa. Liquor Control Bd.*, 974 A.2d 1144, 1149 (Pa. 2009). "'Use' as commonly understood and defined includes 'the act of employing, using or putting into service.'"

*Peterson v. Commonwealth*, 2012 Pa. Commw. Unpub. LEXIS 832, at *10, 56 A.3d 709 (Pa.

Commw. Ct. 2012) (citing the Dictionary.com definition of "use" at

http://dictionary.reference.com/browse/use?s=t).  Thus, to sufficiently allege a claim for

injunctive relief under the UTPCPL the Attorney General must show that the Think Defendants

are presently using—or are about to employ, use, or put into service—unfair or deceptive

practices.[15]

   As an initial matter, the Attorney General's UTPCPL claim is premised on her legal

conclusion that Internet consumer lending by tribal entities to Pennsylvania residents is capped at

6%.  However, as shown above in Section B, *supra*, at pages 6-7, the Attorney General's legal

premise is wrong.  As a result of the BLMP effective in December 2012, the LIPL's 6% cap does

not apply to "foreign financial institutions" like the Tribal lenders here.  Without any interest

cap, the Attorney General cannot plausibly claim that the Think Defendants are "using or about

to use" anything that falls within the scope of the UTPCPL.  Moreover, the Attorney General

cannot plausibly claim that an injunction under the UTPCPL would be in the public interest.  The

General Assembly has determined that the public interest is served through the BLMP, which

permits foreign financial institutions to lend at rates not limited by the LIPL's cap.

   Even if there were an applicable rate cap, the Attorney General still cannot plead a

plausible claim for a permanent injunction.  The FAC nowhere alleges that the Think Defendants

are "using" or "about to use" an unfair or deceptive lending practice.  To the contrary, the FAC

alleges a lending "scheme" involving multiple phases, none of which involves allegations of

present day lending to Pennsylvania consumers, as opposed to past lending.

   The first phase of the alleged scheme supposedly involved the Think Defendants'

association with FBD.  (*See* FAC ¶¶ 31-41.)  However, the Attorney General herself pleads that

---

[15] Pursuant to the Statutory Construction Act, words used in the past or present tense shall include the future.  1 Pa. C.S. § 1902.  However, there is no basis to conclude that a present or future tense chosen in a statute should be extended to include the past tense.  On the contrary, statutes are not to be applied retroactively unless clearly and manifestly so intended by the General Assembly.  1 Pa. C.S. § 1926.

FBD "is no longer in business" and sold all of its assets 2012. (FAC ¶ 41.) Therefore, there can be no ongoing activity, let alone a use or threatened imminent use of any alleged deceptive practices, relating to the Think Defendants' alleged association with FBD.

The second phase of the purported scheme deals with allegedly unlawful partnerships and lending through federally-recognized Tribes. The Attorney General alleges that Pennsylvania consumers entered into loan contracts with such Tribal entities in the past; however, the FAC does not contain any factual allegations that this so-called second phase is on-going. Quite the opposite, the Attorney General admits that "the three tribal lenders affiliated with the Think . . . Defendants stopped accepting loans from new Pennsylvania consumers sometime in mid-2013." (FAC ¶ 77; *see also id*. ¶ 70 (alleging that a website "advises visitors from computers in Pennsylvania "We're currently unable to serve you . . . .").)

Recognizing she has failed to plead an actionable claim, the Attorney Generals strains in paragraphs 78-80 to cover up this deficiency. She asserts in paragraph 78 that Pennsylvania consumers face ongoing collection of consumer debt owed to the Tribal lenders. (FAC ¶ 78.) However, the allegation in paragraph 78 is that any debt collection occurred in 2012-2014 only. There are no allegations of fact that there are any collection practices currently "used or about to be used." Given the Attorney General's own characterization of the lending as "short term," it is not plausible to infer from the Attorney General's allegation of complaints ending in 2014 that there is any ongoing activity. Also, there are no facts to support the Attorney General's conclusory label that any collections during that past period were "abusive." That label is not entitled to any weight in assessing whether the Attorney General has pleaded a plausible claim.

Moreover, the Attorney General contradicts herself in trying to attribute any debt collection to the Think Defendants. The FAC does not allege that the Think Defendants conduct any collection of consumer debt. Instead, the Attorney General alleges that National Credit Adjusters, LLC (another defendant) has actively collected or attempted to collect on the loans. (FAC ¶¶ 3, 19, 40; *see also id*. ¶ 21 (alleging John Doe defendants have participated in the collection of loans).) The Attorney General states that the complaints from consumers about

36

abusive collection activity relate to "debt collectors, including Defendant National Credit Adjusters." (*Id.* ¶ 78.) Therefore, the Think Defendants are not alleged to be involved in any ongoing debt collection activities.

Paragraph 79 is of no help to the Attorney General either. Despite pleading earlier that TC Loan Services stopped doing business in Pennsylvania before the end of 2012 (FAC ¶ 13), and despite pleading that the Tribal lenders "stopped accepting loans from new Pennsylvania consumers sometime in mid-2013" (*id.* ¶ 77), the Attorney General attempts to allege ongoing practices in Pennsylvania by citing to a single loan made in June 2014 by a Tribal lender to a pre-existing customer (without citation to any exhibit or support for the allegation). (*See id.* ¶ 79.) The Attorney General alleges this single, short term loan was paid back, making it an implausible basis to support to a claim that there is any ongoing lending.

Finally, the allegation in paragraph 80 that the Tribal lenders' websites do not "block access to Pennsylvania consumers" simply does not allege that the Think Defendants are using or are about to use any unfair or deceptive practice. (*See* FAC ¶ 80.) The Attorney General's case is about lending to Pennsylvania consumers, and she admits that such lending has stopped. Her speculation that the Think Defendants are collecting data for future use is just that: speculation. There is not a single allegation of fact supporting this conclusory assertion. And there are no facts supporting the Attorney General's assertion that the mere collection of data is unlawful, particularly initial data collection to ***reject*** lending to Pennsylvania borrower. For example, collection of personal information is not an activity prohibited by the UTPCPL. *See* 73 P.S. § 201-2 (defining "unfair or deceptive acts or practices").

### B. Because the Attorney General Has Not Stated A Claim for an Injunction, She Has Not Stated a Claim for Damages

Because the Attorney General has not pleaded a plausible claim for injunctive relief under the UTPCPL, she cannot state a claim for damages either. UTPCPL Section 201-4.1 expressly conditions any monetary recovery in an action by the Attorney General on the issuance of a permanent injunction. 73 P.S. § 201-4.1. Because the Attorney General has failed to allege

any facts that the Think Defendants presently use or are about to use any unfair or deceptive practices that would warrant the issuance of a permanent injunction, she has not alleged facts to support any claim of recovery under Section 201-4.1.

    **C.    The Attorney General Has Failed To Plead Sufficient Facts Showing That She Is Entitled To Recover Damages for any Person Under UTPCPL Section 201-4.1**

Additionally, Section 201-4.1 authorizes a court to direct a defendant to restore to "any person in interest any moneys or property, real or personal, which may have been acquired by means of violation of this act." 73 P.S. § 201-4.1. Thus, Section 201-4.1 permits directed restitution to aggrieved individuals. *See, e.g.*, *Northview Motors, Inc. v. Commonwealth*, 562 A.2d 977, 980 (Pa. Commw. Ct. 1989) (ordering restitution to five individuals based on their testimony). The UTPCPL is clear that the money recoverable "belongs to the claimant individuals, not the government." *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, Civ. A. No. 05-md-1712, 2013 U.S. Dist. LEXIS 96449, at *23-24 (E.D. Pa. July 10, 2013); *see also Commonwealth v. Reichenbach*, 41 A.3d 168, 174 (Pa. Commw. Ct. 2012) (the purpose of restitution under the UTPCPL "is to return the parties as nearly as possible to their original positions where warranted by the circumstances of the transaction").

In an analogous context, Judge McLaughlin explained that under Section 201-4.1 "the money ultimately belongs to the claimant individuals, not the government. Thus, even though the restitution is sought by (and arguably in the name of) the Attorney General, the Office of Attorney General does so 'on behalf of affected consumers' who are also class members." *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 2013 U.S. Dist. LEXIS 96449 at *23-24. In *In re American Investors*, the court was interpreting the limitations of a settlement on the Attorney General's ability to recover monetary sums and concluded that the Attorney General, while permitted to seek other remedies such as an injunction or civil penalties, could not seek restitution because the class members had already agreed to a settlement with the defendants. *Id.* at *26 ("The Court will not allow the class members, or the Attorney General acting on their behalf, to demand more money from the defendants."). Thus, just as the Attorney

General's ability to recover restitution is limited to that of the individuals she represents, the

Attorney General, like any other class representative, cannot recover damages when the class

members themselves have no such entitlement.

Therefore, to recover damages under the UTPCPL, the Attorney General is required to

> show that [borrowers] justifiably relied on the defendant's
> wrongful conduct or representation and that [they] suffered harm
> as a result of that reliance. *Yocca v. Pittsburgh Steelers Sports,*
> *Inc.*, 578 Pa. 479, 501, 854 A.2d 425 (Pa. 2004). Accordingly, "a
> plaintiff alleging violations of the Consumer Protection Law must
> prove justifiable reliance." *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20,
> 46, 928 A.2d 186, 202 (Pa. 2007). Such evidence of reliance must
> go beyond "simply a causal connection between the
> misrepresentation and the harm," and a plaintiff must "show that
> he justifiably bought the product in the first place (or engaged in
> some other detrimental activity) because of the misrepresentation."
> *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 n.4 (3d Cir. 2008).

*Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 955 F. Supp. 2d 452, 460-61 (E.D. Pa.

2013).

In this case, the Attorney General has not alleged any facts to support a plausible claim

for an award of restitution for repayment to any identified aggrieved individuals. Nor has the

Attorney General pleaded justifiable reliance by the borrowers, a *sine qua non* for recovery. The

FAC makes only a general reference "to numerous complaints from consumers." However, the

Attorney General does not attach any examples of these complaints, list any identifiable

consumers who have complained, provide any specific instances of a borrower relying on an

alleged misrepresentation of the Think Defendants, or plead any facts plausibly showing that any

of the alleged actions of the Think Defendants were material to a borrower's decision to obtain a

loan. *Cf. Commonwealth v. Peoples Benefit Servs.*, 895 A.2d 683 (Pa. Commw. Ct. 2006)

(upholding a complaint alleging violations of the UTPCPL attaching five complaints from

different individuals as exhibits and including excerpts from the complaints detailing the

confusing and misleading nature of the solicitations). The failure to allege any justifiable

reliance by any individual, let alone damages attributable to such reliance, is fatal to the Attorney

General's claims for restitution under both the UTPCPL and the FCEUA. *See Kern v. Lehigh*

*Valley Hosp., Inc.*, 108 A.3d 1281, 1289-90 (Pa. Super. Ct. 2015) (holding justifiable reliance is a required part of damages claims under both the UTPCPL and FCEUA).

**D.    The UTPCPL Claim Also Fails Because the FAC Does Not Allege Facts That Show that the Think Defendants Engaged in Deceptive Acts or Practices**

The UTPCPL claim fails for the additional reason that the FAC does not allege sufficient facts to show that the Think Defendants acted deceptively, let alone with the deliberate intent that the Attorney General asserts underlies their conduct. (*See* FAC ¶ 2.) To show that the Think Defendants engaged in "deceptive conduct" sufficient to trigger liability under the UTPCPL, the Attorney General would have to plead facts sufficient to show that the Think Defendants engaged in an "act of intentionally giving a false impression or a tort arising from a false representation made knowingly or recklessly." *Belmont v. MB Inv. Partners*, 708 F.3d 470, 498 (3d Cir. 2013). The FAC contains no factual allegations that would meet this requirement. To the contrary, the FAC lacks any allegations that distinguish the Think Defendants' alleged misconduct from business relationships common in the financial services industry and from disclosures routinely made to consumers. *See* Section I, pages 12-14, *supra*.

The core allegations of Count Five are that the Think Defendants designed and operate technology platforms and websites for Tribal lenders that "offer to Pennsylvania consumers illegal usurious loans and credit lines represented falsely as being purely the product of the lawful exercise of tribal sovereignty and being subject to no state law." (FAC ¶ 128.) The Attorney General claims that these representations are false, misleading, or confusing for three reasons: 1) they allegedly obfuscate the Think Defendants' role in the purported usury scheme; 2) the loans and credit lines are purportedly illegal in Pennsylvania; and 3) the involvement of the Tribes does not make the financial products legal. (*Id*. ¶ 129.)

However, the Attorney General cites no authority that establishes that the loans and credit lines are illegal in Pennsylvania. Her core allegations depend on her own legal assertion that Pennsylvania's interest rate cap in the LIPL applies to loans made by sovereign Native American tribes. But as described in detail above, the loans were made by the Tribal lenders at rates that

are permitted under the Tribal codes and under the BLMP. *See* Section B.2, pages 6-9, *supra.*
"[T]he mere fact that [a] loan was made to a citizen of Pennsylvania [by an out of state lender at a higher interest rate] cannot justify an inference that it was done with an intent to evade the laws of Pennsylvania." *Bennett*, 35 A. at 685.

Moreover, to support a claim that the Think Defendants acted deceptively, the Attorney General would have to plead ***facts*** plausibly showing that the Think Defendants knew that providing services to tribal lenders was unlawful. There are no such facts to plead. Apart from the Attorney General's own assertions, there has been no finding that sovereign Native American tribes cannot export interest rates through Internet lending. Moreover, to the extent there is a dispute about the interest rates that the Tribal lenders can charge, that is a dispute involving the law of sovereign tribal entities. The Tribal lenders are arms of independent sovereign authorities and are "foreign financial institutions" under the BLMP.

Again, the Attorney General's own allegations belie her conclusion that the Think Defendants acted deceptively and deliberately so. The Attorney General relies on Exhibit D to her FAC, but that Exhibit shows that (1) the terms included compliance with "the federal consumer code, including the Truth in Lending Act, the Equal Credit Opportunity Act, and the Electronic Funds Transfer Act"; and (2) that the Tribal lenders were represented by counsel from Pepper Hamilton and Jones & Keller, P.C. (*See* FAC Ex. D.) Requiring compliance with federal law is not a fact that supports an inference of deceptive conduct. Representation by capable and well-known law firms with subject-matter expertise is not a fact that supports an inference of illegality. At best, the Attorney General has pleaded her disagreement with the Tribal lenders that they, as foreign financial institutions, can export rates to Pennsylvania. However, no case has ever held that a disagreement by one state, as the Tribes are defined in the Banking Code, *see* 71 P.S. § 733-506, with the Attorney General about an issue of law amounts to deception under the UTPCPL.

In addition, the Attorney General has not pleaded that any Pennsylvania consumer was actually deceived by any of the statements made by the Think Defendants. To the contrary, the

Tribal lenders made full disclosure to the Pennsylvania borrowers, as demonstrated by the loan agreements attached to the FAC. (*See* FAC ¶¶ 58, 60, & 67; *id*. Exs. F, G, & H.) The FAC further alleges that the Tribal lenders' websites collect information about Pennsylvania consumers before they are informed they are not currently eligible for loans and that doing so is a violation of the UTPCPL. However, the Attorney General has wholly failed to identify any Pennsylvania consumer who has provided such information or who purportedly has been deceived by the websites in this regard.

With regard to her contention that the Think Defendants have not registered with the Pennsylvania Department of State, her claim fails because a foreign business corporation is required to register only if it is "doing business in this Commonwealth." 15 Pa. C.S. § 4121(a). The FAC does not allege any facts to support a conclusion that the Think Defendants are "doing business" in Pennsylvania. The allegations of the FAC concern the Think Defendants' provision of services to tribal lenders outside of Pennsylvania to facilitate lending over the Internet. However, for business registration purposes, "transacting any business in interstate or foreign commerce," such as the Think Defendants are alleged to be doing here, "shall not be considered to be doing business in this Commonwealth." 15 Pa. C.S. § 4122(a)(9).

### E. The Attorney General Has Failed To Meet the Heightened UTPCPL Pleading Requirements for Claims Involving Internet Service Providers

Even assuming that the Attorney General had actually pleaded an ongoing or imminently threatened use of a deceptive practice, the FAC establishes that the Think Defendants are Internet Service Providers within the meaning of the UTPCPL. Claims against Internet Service Providers are subject to heightened pleading requirements that the Attorney General has not met.

Under the UTPCPL, an "Internet Service Provider" is any "person who furnishes a service that enables users to access content, information, electronic mail or other services offered over the Internet, and access to proprietary content, information and other services as part of a package of services offered to consumers." 73 P.S. § 201-2(1.1). The FAC makes numerous

allegations that place the Think Defendants squarely within the category of Internet Service Providers.

The FAC opens with an allegation that the Think Defendants "illegally solicit, arrange, fund, purchase, service and/or collect loans and cash advances made to Pennsylvania citizens ***over the Internet***." (FAC ¶ 1 (emphasis added).) The Think Defendants allegedly are "service providers" to the Native American Tribes. (*Id*. ¶ 2.) In part, they provide the "technology platform" the Tribes need to make loans over the Internet. (*Id*. ¶ 47.) They allegedly designed the Internet platforms that help route consumers to the Tribal lenders' websites. (*See id*. ¶ 56.) The FAC also alleges that the Think Defendants have developed and manage the tribal lenders' websites and, thereby, have played a role in facilitating the formation of credit agreements over the Internet. (*Id*. ¶¶ 60, 67 (attaching exhibits purporting to be loan and credit agreements between Pennsylvania consumers and the Tribal lenders created via websites alleged to have been designed and managed by the Think Defendants).) Further, the FAC alleges that the Think Defendants provide a package of services, including materials through Financial U. (FAC ¶¶ 47, 49.)

The FAC therefore alleges that the Think Defendants are providing a service that enables users to access content and other services as part of a package offered to consumers over the Internet. Accordingly, the Think Defendants are Internet Service Providers within the meaning of the UTPCPL's definition of that term.

In defining what acts and practices are unlawful, the UTPCPL states: "The provisions of this act shall not apply to any . . . owner, publisher, printer, agent or employee of an Internet service provider . . . who, in good faith and without knowledge of the falsity or deceptive character thereof, publishes, causes to be published or takes part in the publication of such advertisement." 73 P.S. § 201-3. The Attorney General has made no allegation of fact that the Think Defendants, their agents, or employees acted knowingly and in bad faith.

## VII.  THE DODD-FRANK ACT CLAIMS FAIL AS A MATTER OF LAW

### A.  The Attorney General Fails To Plausibly Plead Any Unfair, Deceptive, or Abusive Act

The Attorney General asserts a new claim that "the Think Finance Defendants" collectively engaged in a laundry list "unfair, deceptive or abusive acts or practices" ("UDAAPs") in violation of the Dodd-Frank Act.  (*See* FAC ¶¶ 143-53.)  None of these claims hold water.

### 1.  The EFTA Claim Is Baseless

The Attorney General's primary argument is that the Think Defendants acted "contrary to [the] policy" of the Electronic Funds Transfer Act ("EFTA").  She appears to argue that the Tribal lenders' loan agreements with borrowers violated the "policy" of the EFTA[16] by conditioning (1) the lender's electronic payment of the funds to the borrower on (2) the borrower's agreeing to repay the money by electronic debit.  (*See* FAC ¶ 146.)  In other words, the Attorney General claims that linking electronic payment with electronic repayment violates the EFTA.  This claim fails as a matter of law.

The EFTA prohibits the "[*c*]*ompulsory* use of electronic funds transfer."  15 U.S.C. § 1693k (emphasis added).  "No person may . . . ***condition the extension of credit*** to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."  *Id.* (emphasis added); *see also* 12 C.F.R. § 1005.10(e)(1) (same in relevant part).  Here—even putting aside the fact that the "creditors" at issue are the Tribal lenders and not any Think Defendant—the loan contracts comply with the EFTA because they do not require borrowers to use electronic funds transfer ("EFT") in order to borrower money.  The agreements specifically allow borrowers to repay their loans by mail, among other means.  (*See* FAC Ex. F at 2-3, 6; Ex. G at 2, 5; Ex. H at §§ II, VIII, XV.)  Indeed, borrowers must affirmatively opt into electronic

---

[16] The Attorney General does not appear to claim that the Think Defendants actually violated the terms of the EFTA (*see* FAC ¶ 146), although she does allege in a later paragraph seeking remedies that "Defendants violat[ed] the federal ban on lenders conditioning credit on preauthorized electronic access to the borrower's checking account."  (FAC ¶ 153.) Accordingly, defendants show here that they violated neither the letter nor the "policy" of the EFTA.

payments and debits.  (*See id*.)  Because the lenders did not condition the extension of credit on payment by EFT, they did not violate the EFTA.

The loan agreements are also entirely consistent with EFTA "policy."  Congress intended this provision of the EFTA to prevent the "forced use" of electronic funds transfer.  *See* 124 Cong. Rec. 25733 (1978) (statement of Rep. Wylie).  The rules implementing the EFTA specifically contemplate that financial institutions may offer EFT, setting various requirements for entities that elect to offer EFT.  *See* 12 C.F.R. § 1005.10; *see also* CFPB Examination Procedures, Short Term, Small Dollar Lending, Procedures 10 (Sept. 2013) (advising that loan "terms requiring that the borrower agree to electronic payment," versus "offer[ing] the borrower an option to pay using a non-EFT method of payment," may violate the EFTA").[17]  As discussed above, the loan agreements here do not "force" or "require" borrowers to use electronic funds transfer.  The Attorney General has not alleged that the loan terms here violate these regulations.

Nor does the EFTA prohibit financial institutions from linking electronic payments to the consumer with electronic repayment by the consumer, as the lenders did here.  On the contrary, EFTA regulations recognize that lenders may offer—and customers may rationally choose—loan options that incentivize borrowers to enroll in automatic payment features.  For example, "[a] creditor may offer a program with a reduced annual percentage rate or other cost-related incentive for an automatic repayment feature, provided the program with the automatic payment feature is not the only loan program offered by the creditor for the type of credit involved." 12 C.F.R. Pt. 1005, Supp. I, cmmt. 10(e)(1).  Such incentives include, but are not limited to, "[m]ortgage plans calling for preauthorized biweekly payments that are debited electronically to the consumer's account and produce a lower total finance charge."  *Id*.; *see also* CFPB Consumer Laws and Regulations EFTA, EFTA 35 (Oct. 2013) ("[A] financial institution may offer a reduced APR or other cost-related incentive for an automatic payment feature as long as the

---

[17] Available at http://files.consumerfinance.gov/f/201309_cfpb_payday_manual_ revisions.pdf (last visited Aug. 28, 2015).

creditor offers other loan programs for the type of credit involved.").[18]  Thus, contrary to the Attorney General's allegations, the EFTA narrowly prohibits only "compulsory" or "forced" EFT, and it expressly allows creditors to offer EFT and to tie the use of EFT to other loan product terms.  The Attorney General's claims based on the EFTA should be dismissed.

### 2. The "Personal Information" Claim Does Not Make Sense

The Attorney General adds a one-paragraph, unsupported claim that the Think Defendants all committed UDAAPs by "inducing consumers to provide highly personal information, including social security and bank account numbers, that make them vulnerable to future improper use of that information."  (FAC ¶ 148.)  Again, there are no facts pleaded to illuminate which of the "Think … Defendants" did this or how.  *See* Section I(A)-(B), *supra*.[19] And in any event, the claim does not make sense.  The lenders obviously needed basic personal and financial information in order to underwrite and fund the loans that borrowers sought.

To the extent the Attorney General is claiming that the Think Defendants collected information in connection with loan applications that the lenders then rejected because they were no longer making loans in Pennsylvania (FAC ¶¶ 80-84), this claim fails for the reasons discussed in Section VI above.  These include (a) the "information and belief" claims that the Think Defendants are all "stor[ing] [the information] for future use and/or to sell it to others" are unfounded and inadequate as a matter of law and (b) the Attorney General fails to explain how a lender or servicer's mere "storing" of borrower application data violates any law or harms loan applicants in any way.  This UDAAP claim is based on nothing but legally and factually unsupported speculation and it should be dismissed.

---

[18] Available at http://files.consumerfinance.gov/f/201310_cfpb_updated-regulation-e-examination-procedures_including-remittances.pdf (last visited Aug. 28, 2015).

[19] To provide one example, Defendant Financial U provided free financial education to borrowers.  (*See* FAC ¶ 49.)  There are no facts alleged to support a claim that it collected or distributed personally identifying information from borrowers.

### 3. The Unsupported "Unreasonable Advantage" Claims All Fail

The Attorney General next offers a long list of vague claims that "the Think . . . Defendants" all committed "abusive acts or practices" by "taking advantage" of borrowers. She asserts that borrowers who may wish to take out a short term loan are by definition "desperate," "lack [] understanding" of "the actual cost of credit" and the "legality of the credit" offered, are incapable of understanding the "reward" programs offered, and are incapable of reading and understanding the clear and accurate disclosures that accompanied their loan applications. (*See* FAC ¶ 150.) She fails, however, to support this paternalistic rhetoric with any facts. These unsupported claims—stripped of the Attorney General's "labels" and legal conclusions—fail as a matter of law as explained in Section I, *supra*.

Moreover, the facts pleaded and incorporated into the FAC demonstrate that the loan programs the Attorney General is attacking were entirely consistent with all existing laws and regulations:

- **EFTA claims**: As discussed above, the optional EFT that the lenders offered (FAC ¶ 150(a)) was entirely legal.

- **Disclosure of loan terms**: The Attorney General makes vague and general claims about inadequate disclosure of loan terms (*id.* ¶¶ 150(b), (e)). But she does not, and cannot, show that the disclosures violated the provisions of the federal law that are actually potentially applicable here—the Truth in Lending Act ("TILA") and Regulation Z. The TILA and other disclosures are legally compliant and clearly and conspicuously disclosed on the opening pages of each loan agreements. (*See* FAC Exs. F, G, H at pp. 1-2.)[20]

- "**Legal[ity] of the credit**: As discussed in Section B, pages 4-9, *supra*, the "credit" offered (FAC ¶¶ 150(c), (d)) was in fact "legal[]" under applicable law, and claims based on alleged misrepresentations regarding which law applies to the agreements fail in any event.

- **MobiLoans programs:** The MobiLoans "rewards" program—which is the only way the Attorney General specifically claims the Think Defendants "lur[ed] consumers into a cycle of debt" (FAC ¶ 150(f))—does no such thing. On the contrary, the webpage the Attorney General cites, https://www.mobiloans.com/rewards, demonstrates the opposite. It shows that the

---

[20] The websites also include explicit warnings on the opening page that, for example, "[t[his is an expensive form of credit" "designed to help you meet your short-term borrowing needs," such as "emergencies," and recommending the use of "[a]lternative forms of credit" if possible. (FAC Ex. E at 3; *see also id.* Ex. H at 2.)

programs incentive customers to avoid a cycle of debt by rewarding "timely payment" and providing reductions in the cost of credit. (*See id.*)

More broadly, the UDAAP provisions of the Dodd-Frank Act do not say anywhere that people who are in need of short term lending cannot receive it. *See* 12 U.S.C. § 5536. There are no UDAAP rules governing short term lending: the CFPB has only recently proposed such rules. *See* Press Release, CFPB Considers Proposal to End Payday Debt Traps (Mar. 26, 2015) ("March 2015 Press Release"); CFPB Outline of Proposals (Mar. 26, 2015) ("Proposals Outline").[21] In proposing those rules, it has recognized that consumers sometimes need short-term credit. *See* March 2015 Press Release. Accordingly, it has not banned installment loan products, like those at issue here, or taken the position that offering these loans is unfair, deceptive, or abusive.

And finally, the Dodd-Frank Act claims based on Count V (FAC ¶ 149) are all without merit for the reasons discussed in Section VI above and so cannot provide a basis for the Attorney General's UDAAP claims.

In sum, when the Attorney General's labels and conclusions are stripped away, there are no facts alleged in the FAC or included in its exhibits that establish any UDAAP violation. The Dodd-Frank Act claims should therefore be dismissed.

## B.     The "Common Enterprise" Theory Does Not Save the UDAAP Claims

In recognition of the disabling group pleading inadequacies discussed above, the Attorney General has tacked on an argument that all of the Think Defendants are "jointly and severally liable" for UDAAP violations because they participated in a "common enterprise" under the FTC Act. (FAC ¶ 151.) The Attorney General does not bring an FTC Act claim, nor could she, as the FTC Act does not empower state attorneys general to enforce FTC Act claims. *See, e.g.*, 15 U.S.C. §§ 45, 56 (FTC and U.S. Attorney General are empowered to bring FTC Act claims); *Holloway v. Bristol Meyers Corp.*, 485 F.2d 986 (D.C. Cir. 1973) ("A fair reading of the

---

[21] Available at http://www.consumerfinance.gov/newsroom/cfpb-considers-proposal-to-end-payday-debt-traps/ and http://files.consumerfinance.gov/f/201503_cfpb_outline-of-the-proposals-from-small-business-review-panel.pdf, respectively (last visited Aug. 28, 2015).

statute and its legislative history evinces a plain intent by Congress to make the administrative program for enforcing the Federal Trade Commission Act an exclusive one."); *Hvostal v. Am. Idea Mgmt. Corp.*, No. Civ. A. 91-1724, 1992 U.S. Dist. LEXIS 18775, at *1 (W.D. Pa. Mar. 23, 1992).

The Dodd-Frank Act does not incorporate any such "common enterprise" liability. *See generally* 12 U.S.C. § 5563, *et seq*. Instead, on its face, it applies only to the unfair, deceptive, or abusive acts of a specific "covered person or service provider." *See id*. The case that the Attorney General cites, *F.T.C. v. PayDay Fin. LLC*, 989 F. Supp. 2d 799 (D.S.D. 2013), was brought by the FTC under the FTC Act. And it makes clear that the doctrine is specific to the FTC Act. *Id*. at 809 (describing the doctrine as one created to prevent entities from "circumvent[ing] the FTCA"). In any event, even if this were an FTC Act case, the Attorney General has not pleaded any facts that would be necessary to show a common enterprise between all of the Think Defendants, such as "common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." *See id*. (internal citation omitted). Again, all that the Attorney General has put forward is a bare legal conclusion that a "common enterprise" exists. Having failed to allege facts plausibly supporting the existence of the common enterprise factors, the Attorney General's complaint cannot survive a motion to dismiss in federal court.[22]

---

[22] The Attorney General's claims are also time-limited. First, the Dodd-Frank Act imposes a three year statute of limitations on UDAAP claims. 12 U.S.C. § 5564(g)(1). The Attorney General filed her complaint on November 13, 2014. Thus, even if her UDAAP claims otherwise survived motion to dismiss, they would be limited to alleged activity occurring on or after November 13, 2011. Separately, because the Dodd-Frank Act did not go into effect until July 21, 2011, and the UDAAP provisions do not apply retroactively, the Attorney General would not be able to bring UDAAP claims regarding acts or practices that occurred prior to that date. *See, e.g.*, *Koch v. SEC*, No. 14-1134, ___ F.3d __, 2015 U.S. App. LEXIS 12077 (D.C. Cir. July 11, 2015).

## CONCLUSION

For the foregoing reasons, the Attorney General's First Amended Complaint should be dismissed with prejudice.

s/Ira Neil Richards
Ira Neil Richards (PA I.D. No. 50879)
Stephen A. Fogdall (PA I.D. No. 87444)
Arleigh P. Helfer III (PA I.D. No. 84427)
Shannon L.C. Ammon (PA I.D. No. 318939)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market St., Suite 3600
Philadelphia, PA 19103
(215) 751-2503
irichards@schnader.com
sfogdall@schnader.com
ahelfer@schnader.com
sammon@schnader.com

James R. McGuire (Pro hac vice)
Angela E. Kleine (Pro hac vice)
Elizabeth Balassone (Pro hac vice)
Lauren Wroblewski (Pro hac vice)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
(415) 268-7000
jmcguire@mofo.com
akleine@mofo.com

Walter W. Cohen (PA I.D. 12097)
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
200 Locust Street, Suite 400
Harrisburg, PA 17101-1508
(717) 234-9730
walter.cohen@obermayer.com

*Attorneys for Defendants*
THINK FINANCE, INC., TC LOAN SERVICE,
LLC, TAILWIND MARKETING, LLC, TC
DECISION SCIENCES, LLC, AND FINANCIAL
U, LLC
