**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA, by :
Attorney General KATHLEEN G. KANE, :
                                   :
          Plaintiff,               :    CIVIL ACTION
                                   :
     v.                            :
                                   :    NO. 14-cv-7139
THINK FINANCE, INC., et al.,       :
                                   :
                                   :
          Defendants.              :


**MEMORANDUM**

Joyner, J.                              January 14, 2016

        Before the Court are Defendants' Motions to Dismiss (Doc. Nos.
67, 68, 69, 70, 71, 73), Plaintiff's Response in Opposition thereto
(Doc. No. 75), and Defendants' Replies in Further Support thereof
(Doc. Nos. 81, 82, 83, 84). For the reasons below, the Motions to
Dismiss are DENIED in part, and GRANTED in part. An Order follows.

**I. Factual and Procedural Background**

        This action concerns high-interest rate, short-term loans made
to Pennsylvania citizens over the Internet. The Plaintiff, the
Office of the Attorney General ("OAG"), alleges that the Defendants
Think Finance, Inc.; TC Loan Service, LLC; Tailwind Marketing, LLC;
TC Decision Sciences, LLC; Financial U, LLC (hereinafter "Think

Defendants")[1] and Kenneth Rees violated Pennsylvania and federal laws prohibiting usurious and otherwise illegal lending practices. FAC ¶ 2. The OAG also alleges that various debt buyers and collectors, including Defendant National Credit Adjusters, LLC ("NCA"), and affiliated marketing companies, Defendants Selling Source, LLC and PartnerWeekly, LLC, participated in this scheme by referring Pennsylvania residents to the Think Defendants' products and by collecting or attempting to collect these loans. FAC ¶¶ 3, 4. These loans allegedly violated the Loan Interest and Protection Law ("LIPL"), which limits the rate of interest for loans under $50,000 issued by unlicensed lenders to six percent per year. FAC ¶¶ 25, 26; 41 P.S. § 201(a). The OAG alleges that the Defendants partnered with an out-of-state bank and with Native American tribes, in schemes known colloquially as "rent-a-bank" and "rent-a-tribe."

In the alleged "rent-a-bank" scheme, the Think Defendants and Mr. Rees partnered with First Bank of Delaware ("FBD"), an out-of-state bank. FAC ¶¶ 33, 37. FBD acted as the nominal lender while the non-bank entity was the de facto lender – marketing, funding, and collecting the loan. Id. This partnership took advantage of

---

[1] The Plaintiff refers to these five entities plus Kenneth Rees as the "Think Finance Defendants." These five refer to themselves as the "Think Defendants" and Mr. Rees has retained separate counsel and filed separate pleadings from them, so we will use "Think Defendants" to refer to only these five to avoid confusion.

federal bank preemption doctrines to insulate the Defendants from state regulations. FAC ¶ 34.

The OAG alleges that the "rent-a-tribe" scheme similarly avoided state laws by issuing loans in partnership with Native American tribes. FAC ¶¶ 43, 46. In this alleged scheme the tribe acts as the nominal lender and the Defendants benefit from the tribe's immunity. FAC ¶ 43. The Think Defendants and Mr. Rees provide services, including education, marketing, technology, funding, and collection. FAC ¶¶ 47-50. The Defendants maintain that they are merely service providers and as such have violated no laws. The OAG alleges that the Think Defendants and Mr. Rees are themselves the de facto lenders and that their partnership with the tribes, as the partnership with FBD previously, is meant to provide cover as the Defendants violate Pennsylvania and federal law. FAC ¶ 43.

The FAC alleges the Think Defendants and Mr. Rees partnered with three tribes: Chippewa Cree, Otoe-Missouria, and Tunica-Biloxi. FAC ¶¶ 46, 53, 60, 63. As evidence that Think Finance is the true lender in this scheme, the OAG points to the "take-it-or-leave-it" terms of the partnership with Chippewa Cree, which details, among other things, the name of the tribal entity that will issue the loans, the limits of the amount and interest rates

3

of the loans themselves, and the percentage the tribe would receive on each loan. FAC ¶¶ 53, 54. The contract with Otoe-Missouria contains similar provisions. FAC ¶ 62. Think Finance (previously known as ThinkCash) customers visiting the Think Cash website were directed to the Chippewa Cree's LLC's website, the FAQ page of which promised the customers would receive "the same" service as previously provided by Think Finance. FAC ¶ 56. The OAG notes that the loans provided by the tribal companies are similar to those provided directly by the Think Defendants in states where such loans are legal. FAC ¶¶ 70, 71. The Think Defendants and Mr. Rees allegedly transferred their portfolio of customers and loan balances, as well as their pre-existing customer database, over to Plain Green, one of the tribal lending enterprises. FAC ¶ 55. Additionally, Think Finance has listed the tribal websites as its own products. FAC ¶ 72. The Defendants made most of the revenue from these loans. FAC ¶ 44. The loan agreements all include provisions indicating the loans will be governed by tribal law. FAC ¶¶ 59, 61, 68.

The OAG acknowledges that the tribal lenders stopped accepting loans from new Pennsylvania consumers sometime in mid-2013. FAC ¶ 77. Collection on pre-existing loans, however, continues, and preexisting costumers have been able to apply for new loans. FAC ¶¶

4

78, 79. Additionally, the OAG alleges that the loan companies continue to take personal information from prospective new lenders from Pennsylvania. FAC ¶ 80.

The Plaintiff filed this action on November 13, 2014 in the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania. Doc. No. 1-1. On December 17, 2014, various Defendants removed the case to the United States District Court for the Eastern District of Pennsylvania. Doc. No. 1. On March 11, 2015, Plaintiff filed a motion to remand to state court. Doc. No. 42. This Court denied the Plaintiff's motion on May 28, 2015. Doc. No. 53.

On July 6, 2015, Plaintiff filed her First Amended Complaint ("FAC"). Doc. No. 57. In it, the OAG alleges various violations of state and federal law by the Defendants:

1) Count One: Violations of Corrupt Organizations Act ("COA"), 18 Pa. C.S.A. § 911(b)(1), by the Think Defendants and Mr. Rees.

2) Count Two: Violations of COA, 18 Pa. C.S.A. § 911(b)(3), by the Think Defendants and Mr. Rees.

3) Count Three: Violations of COA, 18 Pa. C.S.A. § 911(b)(4), by all Defendants.

4) Count Four: Violations of the Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1, by the Think Defendants, Mr.

5

Rees, and NCA.

5) Count Five: Violations of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq., by all Defendants.

6) Count Six: Violations of the Dodd-Frank Act, 12 U.S.C. § 5536(a)(1)(B), by the Think Defendants and Mr. Rees.

On August 28, 2015 Defendants filed seven different motions to dismiss. Doc. Nos. 67-73. Since then, claims against Defendant PayDay One have been dismissed, so PayDay One's Motion to Dismiss was denied as moot. Doc. No. 80. The remaining motions are:

1) Motion to Dismiss for Failure to Join Indispensable Parties, filed by the Think Defendants. Doc. No. 67.

2) Motion to Dismiss for Lack of Capacity to Sue and Failure to State a Claim, filed by the Think Defendants. Doc. No. 68.

3) Motion to Dismiss for Lack of Personal Jurisdiction, filed by Partnerweekly, LLC and Selling Source, LLC. Doc No. 69.

4) Motion to Dismiss for Failure to State a Claim, filed by the Think Defendants. Doc. No. 70.

5) Motion to Dismiss for Failure to State a Claim, filed by NCA. Doc. No. 71.

6) Motion to Dismiss for Failure to State a Claim, filed by Kenneth E. Rees. Doc. No. 73.

6

Plaintiff filed a joint response in opposition to the various motions to dismiss on October 9, 2015. Doc. No. 75. Defendants filed four separate replies on October 23, 2015. Doc. No. 81-84. We will address the various motions to dismiss.

## II. Jurisdiction

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331. It has supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims.

## III. Legal Issues

### A. Whether the Tribes are Indispensable Under Rule 19

Federal Rule 12(b)(7) allows for a party to move to dismiss a case for failure to join a party under Rule 19. Fed. R. Civ. P. 12(b)(7). Defendants argue that the tribes and tribal lending enterprises[2] are indispensable parties under Rule 19. To decide this motion, we first look to whether the parties are considered "necessary" or "required" under Rule 19(a).[3] Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007). If they

---

[2] The OAG does not contest that the tribal lending enterprises are "arms of the tribe" and are accordingly entitled to sovereign immunity. We assume for purposes of deciding this motion that the tribal lending enterprises are entitled to the same immunity as the tribes. We refer to "tribes" throughout this memorandum to refer to the tribal lending enterprises.

[3] "Necessary" is the older term, no longer in the Rule but still widely used. "Required" is the current term. Both terms can be misleading; a party might be found "required" or "necessary" but not "indispensable," and so the suit may proceed without them. See E.E.O.C. v. Peabody W. Coal Co., 400 F.3d 774, 779 (9th Cir. 2005) (noting a better term may be "desirable").

are, then we look to whether it is feasible that they be joined. If
not, we turn to Rule 19(b) and evaluate whether the court should
"in equity and good conscience," dismiss the action or proceed with
the existing parties. Fed. R. Civ. P. 19(b). The Court need not
turn to Rule 19(b) if it determines the absent parties are not
required under Rule 19(a). See Abel v. Am. Art Analog, Inc., 838
F.2d 691, 695 (3d Cir. 1988).

Rule 19(a)(1) provides:

(a) Persons Required to Be Joined if Feasible.
(1)  Required  Party.  A  person  who  is  subject  to  service  of
process  and  whose  joinder  will  not  deprive  the  court  of
subject-matter jurisdiction must be joined as a party if:
(A) in that person's absence, the court cannot accord complete
relief among existing parties; or
(B) that person claims an interest relating to the subject of
the action and is so situated that disposing of the action in
the person's absence may:
(i)  as  a  practical  matter  impair  or  impede  the  person's
ability to protect the interest; or
(ii) leave an existing party subject to a substantial risk of
incurring  double,  multiple,  or  otherwise  inconsistent
obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). The 19(a) inquiry "is not a matter of per
se rules; instead it is determined on a case-by-case basis." Cont'l
Cas. Co. v. Diversified Indus., Inc., 884 F.Supp. 937, 943 n.2
(E.D. Pa. 1995) (internal citations omitted). The Defendants argue
the tribes are required parties under both prongs of Rule 19(a)(1).
We will address each in turn.

## 1. Complete Relief Among Existing Parties

Under Rule 19(a)(1), "we ask first whether complete relief can be accorded to the parties to the action in the absence of the joined party." Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 405 (3d Cir. 1993) (citing Fed. R. Civ. P. 19(a)(1)). This inquiry is limited to whether the court "can grant complete relief to the persons already parties to the action. The effect a decision may have on an absent party is not material." Id. (internal citations omitted). Rule 19(a)(1) "stresses the desirability of joining those parties in whose absence the court would be obliged to grant partial or 'hollow' rather than complete relief to the parties before the court." Gen. Refractories Co., 500 F.3d at 315 (internal quotations omitted) (citing Fed. R. Civ. P. 19 advisory committee's notes).

The Defendants point to two cases to support their claim that we cannot accord complete relief among existing parties. In Hotvela, the plaintiffs, members of the Hopi Tribe in the Village of Hotevilla,[4] sought to enjoin construction of a wastewater treatment facility. Village of Hotvela Traditional Elders v. Indian Health Services, 1 F.Supp.2d 1022, 1024 (D. Ariz. 1997). A

_____

[4] The case title refers to the village Hotvela but the body of the case refers to the village of Hotevilla.

Memorandum of Understanding between the defendant, Indian Health Services, and the Hopi Tribe allowed the tribe to construct the facility, and the tribe was engaged in construction at the time of the suit. Id. at 1025. The court found that the injunctive relief sought by the plaintiffs would not offer them full relief because the non-party tribe would not be barred from constructing on the site. Id. at 1026.

In Chehalis, several tribes and tribe members sought a declaration that they (the plaintiffs) had equal rights in the Quinault Indian Reservation. Confederate Tribes of Chehalis Indian Reservation v. Lujan, 928 F.2d 1496, 1498 (9th Cir. 1991). The court found that the plaintiffs could not be granted complete relief without joining the Quinault Nation because the Quinault Nation would continue to exercise "sovereign powers and management responsibilities over the reservation." Id.

In both Hotleva and Chehalis, the actions of the non-party would preclude the relief sought. In contrast, here the relief sought by the Plaintiffs does not require the non-party tribes to do or refrain from doing anything. For example, the Plaintiff seeks disgorgement of the money earned by the Defendants only, not the money the tribes have earned, through the alleged scheme. FAC p. 40. The Plaintiff is not seeking a declaration that the contracts

themselves are illegal, but rather a declaration that the Defendants' conduct violates a number of state and federal laws.[5] FAC p. 39. The Chippewa Cree were engaged in consumer lending prior to their partnership with Think Finance and, since the tribes are not bound by the outcome of this case, they would be permitted to continue that business. The tribes continuing their business (without the services of the Defendants) would in no way limit the relief the Plaintiffs seek. See Dillon v. BMO Harris Bank, N.A., 16 F.Supp.3d 605, 615 (M.D.N.C. 2014) ("[J]udgment ... will not prohibit the lenders from lending money or from relying on other mechanisms to collect on their loans."). The relief the OAG seeks is thus not "hollow." The tribes are not required under Rule 19(a)(1)(a).

## 2. Claimed Interests

The Defendants argue that the tribes are also necessary because they claim interests "relating to the subject of the action" and are "so situated that disposing of the action" in their absence may "as a practical matter impair or impede" their ability

---

[5] The Defendants allege that the Plaintiffs do seek a declaration that the contracts between the tribes and the consumers are illegal. The Plaintiff notes that under Dodd-Frank the Court can construct a number of different remedies, and includes in that list the invalidation of the loans. FAC ¶ 152. The Plaintiffs, however, do not specifically request that remedy in their prayer for relief. FAC pp. 39-40.

to protect those interests. Fed. R. Civ. P. 19(a)(1)(B)(i). The Defendants indicate that the tribes claim contractual, economic, and sovereign interests in this litigation. We will address each in turn, then we will look to whether these interests "may as a practical matter" be impaired or impeded by disposing of this case in their absence.

**a. Contractual Interest**

Throughout the FAC, the OAG characterizes the loans as illegal and usurious under both federal and Pennsylvania law. The loans contain a clause indicating that they are subject solely to tribal law. As this Court indicated in its order denying the OAG's motion to remand to state court, the validity of this clause is necessarily raised by the Commonwealth's cause of action. Doc. 53 at 1 n.1.

While the validity of the clause is at issue, this action is not one for a breach of contract. Defendants cite several cases in which the contractual interests are more closely implicated by the cause of action than they are here. Rashid, for example, was a breach of contract case. Rashid, 957 F. Supp. 70, 71 (E.D. Pa. 1997). In finding an unnamed party necessary under Rule 19, this Court emphasized both the importance of the absent party being an executor of the contract as well as the suit being a claim for

breach of that same contract. Id. at 74. Similarly, Fluent and McClendon, both involve terms of leases and the outcome of the litigation would specifically invalidate or enforce those contracts. Fluent v. Salamanca Indian Lease Authority, 928 F.2d 542, 547 (2d Cir. 1991) (concerning the constitutionality of the statute authorizing lease agreement in which tribe is a party); McClendon v. U.S., 885 F.2d 627, 633 (9th Cir. 1989) (seeking to enforce terms of a lease to which tribe is a party). Finally, Defendants cite an unpublished N.D.N.Y. case finding that a tribal party to a contract is a necessary party to an action seeking declaration that the contract is invalid. U.S., ex rel. Hill v. Coulter, No. 98-CV-111(FJS)(GLS), 1998 WL 460239, at *1 (N.D.N.Y. July 31, 1998).

The matter at hand does not involve a breach of contract or the direct invalidation of any contracts to which the tribes are a party. Even if we were to find in favor of the Commonwealth, the contracts between the Pennsylvania citizens and the tribal enterprises would remain valid. Nevertheless, the issue is whether the tribes claim an interest, not whether they have one. See Cassidy v. U.S., 875 F.Supp. 1438, 1444 (E.D. Wa. 1994) ("Although the Plaintiffs' focus in this case is on the United States rather than the Tribes, it is clear that this case will turn on, among other

13

things, the interpretation of section 835d and the Agreement.").

Here, the validity of the contracts is centrally related to the claims against the Defendants. Therefore, we conclude that the tribes do claim a contractual interest in this litigation.

**b. Economic Interest**

The Defendants argue that the tribes claim a significant economic interest in this action. While various circuits have recognized economic interests as sufficient for Rule 19(a) purposes, the Third Circuit has not. In <u>Treesdale</u>, the Third Circuit noted that the interests claimed must be "legally protected" and "not merely a financial interest." <u>Liberty Mut. Ins. Co. v. Treesdale, Inc.</u>, 419 F.3d 216, 230 (3d Cir. 2005). While lower courts in this Circuit have disagreed about whether <u>Treesdale</u> continues to apply to Rule 19(a), we are persuaded by our sister court in <u>Cardenas</u>'s thorough analysis and conclusion that <u>Treesdale</u> still offers the best indication of how the Third Circuit would rule on this issue.[6] <u>Hartford Casualty Ins. Co. v. Cardenas</u>, 292 F.R.D. 235, 240 (E.D. Pa. 2013). Therefore, we find the claimed economic interests of the tribes are insufficient under Rule 19(a).

**c. Sovereign Interest**

---

[6] The statement in <u>Treesdale</u> was dicta, so not binding on this court.

The Defendants argue that the tribes' sovereign interests may be affected by this litigation. In support of this view Defendants cite two cases, neither of which involve Rule 19, in which courts have recognized that Tribes have sovereign interests. Doc. No. 67-1 at 13-14 (citing Seneca-Cayuga Tribe of Okla. v. Okla. ex rel. Thompson, 874 F.2d 709, 716 (10th Cir. 1989); Cal. v. Cabazon Band of Mission Indians, 480 U.S. 202, 216 (1987)). In Seneca-Cayuga, Oklahoma was attempting to enjoin a casino's operation. Seneca-Cayuga, 874 F.2d at 710. In Cabazon, California had attempted to regulate the operation of bingo games on reservations. Cabazon, 480 U.S. at 216 (1987).

Central to the sovereignty interests in both cases is that the tribal activities at issue took place on tribal land. The Supreme Court has noted that the sovereignty that Indian tribes retain is of a "unique and limited character. It centers on the land held by the tribe and on the tribal members within the reservation. Plains Comm. Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327 (2008) (internal quotation and citation omitted). The Supreme Court has recognized, however, that a tribe "may regulate, through taxation, licensing or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other

15

arrangements." <u>Montana v. U.S.</u>, 450 U.S. 544, 565 (1981). In other words, "laws and regulations may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions." <u>Plains Comm. Bank</u>, 554 U.S. at 337. "Even then the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control international relations." <u>Id.</u>

The claimed sovereignty interests stem from the loan agreements between the consumers and the tribes. This still requires "nonmember conduct inside the reservation that implicates the tribe's sovereign interest." <u>Id.</u> at 329. In this case, it appears the bulk of activities at issue did not take place on tribal land. See <u>Otoe-Missouria Tribe of Indians v. New York State Dept. of Fin. Services</u>, 769 F.3d 105, 115 (finding that the district court did not err in finding that online loan agreements New York residents entered into from within New York did not occur on tribal land for purposes of a preliminary injunction). Additionally, there is no indication that the loans were issued to members of the tribes.

The tribes may claim, however, that the actions that led to issuing these loans took place on tribal grounds. See <u>Otoe-Missouria</u>, 769 F.3d at 115 (noting that the tribes in that case had made such an argument). Therefore, the tribes claim sovereign

16

interests related to conduct on tribal land. We are obliged to recognize these interests without deciding on the merits of those claims. Accordingly, we conclude that the tribes claim sovereign interests in this case.

### d. Practically Impaired or Impeded

Having established that the tribes claim contractual and sovereign interests in this litigation, we turn to whether this litigation may <u>as a practical matter</u> impact those interests. The Third Circuit has noted that "as a practical matter" has a limiting as well as an expanding function: "The fact that the absent person may be affected by the judgment does not of itself require his joinder if his interests are fully represented by parties present." <u>Owens-Illinois, Inc. v. LakeShore Land Co., Inc.</u>, 610 F.2d 1185, 1191 (3d Cir. 1979). The OAG argues that "[t]his principle applies with no less force when a Native American tribe is the absent party." Doc. No. 75 at 29. Defendants do not argue with the general principle in <u>Owens-Illinois</u>, but rather they argue that tribal interests can only be adequately represented by the United States due to the "special relationship between the federal government and the Indian nations" and that this operates as an exception. Doc. No. 82 at 6 (quoting <u>Conn. ex rel. Blumenthal v. Babbitt</u>, 899 F.Supp.80, 83 (D.Conn. 1995)). Because  the United States is not the named

17

party here, this exception does not apply, they argue, and the Defendants cannot adequately represent the interests of the tribes.

The Defendants are correct that the special relationship between the United States and Native tribes is a factor courts consider when determining whether the United States adequately represents a tribe's interests. See, e.g., Alto v. Black, 738 F.3d 1111, 1128 (9th Cir. 2013). But Defendants are not correct that the United States is the only party that can stand in for a tribe. See Salt River Project Agr. Imp & Power Dist. v. Lee, 672 F.3d 1176, 1180 (9th Cir. 2012) (finding tribal officials can adequately represent the tribe's interests); Vann v. U.S. Dept of Interior, 701 F.3d 927, 929-30 (D.C. Cir. 2012) (same); see also Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 359-360 (2d Cir. 2000) (finding that when a tribe is a joint tortfeasor it is not indispensable under Rule 19).

The Third Circuit has not weighed in on the degree to which the interests of the named party must align with the absent party. The First Circuit indicates that there should be something close to a "perfect identity of interests." Tell v. Trs. of Dartmouth Coll., 145 F.3d 417, 419 (1st Cir. 1998). The Ninth Circuit employs a three-factor test. See Shermoen v. U.S., 982 F.2d 1312, 1318 (9th Cir. 1992). The Sixth Circuit has indicated that the inquiry is best

18

located under the 19(b) analysis, and not under 19(a) at all. <u>Glancy v. Taubman Centers, Inc.</u>, 373 F.3d 656, 669-670 (6th Cir. 2004). The D.C. Circuit finds that the inquiry belongs under both prongs of Rule 19. <u>Kickapoo Tribe of Indians v. Babbitt</u>, 43 F.3d 1491, 1497 n.9 (D.C. Cir. 1995).

The Third Circuit has indicated that the necessity of a non-party under Rule 19(a) may hinge on whether a party can sufficiently represent that person's interests such that it does not impair them as a practical matter, so we consider it here. <u>Owens-Illinois</u>, 610 F.2d at 1191. We find the Commonwealth's argument that the tribes are akin to joint tortfeasors, and therefore not necessary to be joined, persuasive. <u>See</u> <u>Lomando v. U.S.</u>, 667 F.3d 363, 384 (3d Cir. 2011) (citing several cases that indicate joint tortfeasors are not required to be joined under Rule 19). This action is not for a breach of contract, but rather for claims that "arise under statutory schemes analogous to tort law." <u>Dillon</u>, 16 F.Supp.3d at 612-13. Because the lenders "are at most joint tortfeasors or co-conspirators," they are not necessary parties under Rule 19. <u>Id.</u> at 613.

The Defendants' argument that <u>Dillon</u> is inapplicable because the OAG seeks injunctive relief has no bearing on this issue. In <u>Dillon</u>, the court found it was necessary for the plaintiff to drop

19

the claim for injunctive relief because the injunctive relief sought would have directly impacted the non-party lenders. Id. at 614. Here, the injunctive relief sought only impacts the named Defendants. As in Dillon, the tribes are free to continue making loans even if the Court finds against the Defendants.

Defendants argue that Kermanshah v. Kermanshah, No. 08-CV-409 (BSJ/AJP), 2010 U.S. Dist. LEXIS 45896 (S.D.N.Y. May 11, 2010), tells us that parties to a contract underlying a tort claim are always necessary parties under Rule 19. The facts in that case are substantially different from the facts here. Kermanshah involves a plaintiff asserting ownership interests in corporate assets. Rather than make a factual analogy, the Defendants use this unpublished, out-of-circuit case to stand for the rule that all parties to a contract are required when it underlies a tort action. We are not persuaded. We find Dillon, with facts substantially similar to the facts here, to be more persuasive.

In addition, we find that the interests of the Defendants substantially align with the tribes. The Defendants have the same interest as the tribes in proving the legality of the loan contracts because the legality of the loans is central to this cause of action. Therefore, we find that the tribes, while claiming contractual and sovereignty interests in this litigation, are not

"as a practical matter" impaired or impeded in these interests. Accordingly, we find they are not necessary parties under Rule 19(a).[7]

## B. Whether the OAG Lacks Capacity to Sue

The Defendants argue that the FAC should be dismissed with prejudice because the OAG lacks capacity to bring this case. Under Rule 17(b)(3), capacity to sue or be sued is determined by the laws of the state where a federal court is located. Fed. R. Civ. P. 17(b)(3). Although Rule 12 does not explicitly provide for dismissal based on Rule 17, courts have allowed it. See, e.g., Klebanow v. New York Produce Exchange, 344 F.2d 294, 296 n.1 (2d Cir. 1965). A motion under Rule 12(b)(6) may be granted "if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that

---

[7] Having not found the tribes necessary under Rule 19(a), we are not required to analyze whether they are indispensable under Rule 19(b). We note, however, that the Defendants are not correct that if the tribes were found necessary under Rule 19(a) the case would need to be dismissed because the tribes enjoy sovereign immunity. There is nothing in "the text of the rule nor any of the Advisory Committee's notes [that suggests any] special treatment should be accorded immune sovereigns who are absent parties." Katherine Florey, Making Sovereigns Indispensable: Pimentel and the Evolution of Rule 19, 58 UCLA L. Rev. 667, 682 (2011). Although some circuits have found sovereign immunity to be a compelling factor that alters the Rule 19(b) analysis, the Third Circuit has not. We note instead the repeated emphasis on the flexible nature of Rule 19(b). See, e.g., Rashid v. Kite, 957 F.Supp. 70, 74 (E.D. Pa. 1997) ("We have substantial discretion as we engage in this balancing of interests."). Here, where it is possible to shape the relief to protect the tribes, where the Plaintiff would have no other relief if the case were to be dismissed, and where the Defendants' interests are substantially aligned with the tribes' interests, it appears the action would be able to proceed among the existing parties without the tribes in equity and good conscience had we found the tribes to be necessary parties under Rule 19(a).

plaintiff's claims lack facial plausibility." <u>Warren Gen. Hosp. v. Amgen Inc.,</u> 643 F.3d 77, 84 (3d Cir. 2011) (citing <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555-56 (2007)).

The Defendants argue that the OAG does not have authority to bring this case because 71 P.S. § 733-506(F) granted exclusive enforcement rights for claims involving financial and banking activities of enumerated entities to the Department of Banking and Securities ("DOB"). Section F of 71 P.S. § 733-506 reads as follows:

> F. Nothing in this section may prevent an agency of this Commonwealth, or political subdivision, from engaging in a civil investigation, administrative enforcement action, examination, information collection or any other administrative proceeding or commencing civil proceedings before a court of competent jurisdiction to determine compliance with or enforce a statute of this Commonwealth, a regulation or order of a Commonwealth agency, an ordinance or resolution of a political subdivision or a Federal law or regulation, to the extent authorized by Federal law, not relating to or incidental to the banking or financial activities, operations or condition of an institution, credit union, licensee, national bank, Federal savings association or foreign financial institution and not otherwise preempted by Federal law, but prior to doing so, the agency or political subdivision shall give notice and consult with the department. To the extent the department determines that such actions may affect the banking or financial activities, operations or condition, including safety and soundness, of any institution, credit union, licensee, national bank, Federal savings association, foreign financial institution or a subsidiary of the foregoing; or interfere with the regulation of such entities by the department, Federal regulatory agencies or regulatory agencies of other states, the department shall have sole and exclusive jurisdiction to initiate or participate in administrative proceedings, or to request that the Attorney General initiate or participate in judicial proceedings, to

enforce such laws or to determine that such proceedings are not in the public interest.

71 P.S. § 733-506. According to the Think Defendants, because this cause of action deals with financial activities of foreign financial institutions and licensees, and the DOB has not requested the OAG initiate judicial proceedings, this cause of action exceeds the OAG's authority.

The Supreme Court of Pennsylvania has not yet interpreted this statute, so we are tasked with predicting how they would. The statute is not clear.[8] We turn to the Secretary's Letter for guidance.[9] The Secretary indicates this section preserves the right of the OAG to "initiate civil actions ... against financial institutions doing business in Pennsylvania ... ." Secretary's Letter at 3. Financial institutions include "foreign financial institutions," which the Defendants maintain include the tribal lending enterprises, and "licensees." The Defendants argue that

_____

[8] For example, it is unclear who is to determine that the action is "not relating to or incidental to the banking or financial activities ... " in the first place, prior to the DOB determining that it *does* affect such activities. It is also unclear whether this statute applies to all civil actions against any entity because the statute does not expressly state that they must be brought against one of the enumerated entities. It also refers to an "extent" to which the DOB determines these actions affect banking or financial activities, suggesting it is a matter of degree, which contradicts the binary "sole and exclusive jurisdiction."

[9] Letter from Glenn E. Moyer, Secretary of Department of Banking and Securities, to Pennsylvania Banks (Nov. 14, 2012) ("Secretary's Letter"), available at: http://www.dobs.pa.gov/Documents/Secretary%20Letters/Banks/11.14.12%20Secretary_s%20Letter%20Re_%20Banking%20Law%20Modernization%20Package.pdf.

23

"licensees" include the Think Defendants. Because this cause of action is not against the tribes, we are only concerned with whether the Defendants fall under the definition of "licensee" for purposes of this statute.

The Banking Code defines "licensee" as a "corporation, person or any other type of business entity required to be licensed by, registered with or partially exempt from being licensed by the Department of Banking and Securities under any law of this Commonwealth administered by the Department of Banking and Securities." 71 P.S. § 733-2. The Defendants argue that because the Think Defendants are "required to be licensed" (and are not) they fall under this provision. We disagree. Section F of 71 P.S. § 733-506 was meant to protect the DOB's authority over entities it regulates. The Secretary notes it requires the OAG to provide notice and consult with the DOB when it initiates actions against financial institutions "doing business in Pennsylvania." We do not believe this was meant to apply to institutions illegally doing business, but rather to those that are licensed with the DOB. The Defendants cannot use their illegal status to provide cover from suit.

The Pennsylvania Constitution empowers the OAG to bring civil actions only when given express statutory authority. Pa. Const. Art. IV § 4.1. Each statute that is the base for the claims in this case

24

grants enforcement authority to the OAG's Office. 18 Pa.C.S.A. §
911(e)(1); 73 P.S. § 201-4; 12 U.S.C. § 5552(a)(1). The Defendants'
misreading of this statute leads them to the erroneous conclusion
that Section F implicitly repealed the OAG's enforcement powers in
all the state laws claims brought in this action. Therefore, they
argue, the OAG can only bring cases on behalf of the DOB. Because
the DOB has no authority to bring the state law claims here, they
argue, they must be dismissed.

The statute at issue is titled "Implementation of the Consumer
Financial Protection Act of 2010" which suggests a more limited
purpose than a grand restructuring of state financial regulation.
See 1 Pa.C.S.A. § 1924 ("The title ... of a statute may be
considered in the construction thereof."). The Supreme Court of
Pennsylvania has noted "repeals by implication are not favored and
will not be permitted if there is any other reasonable construction,
and ... a law is not repealed by a later enactment if the two may
be operative without repugnance to each other." Consumer Ed. and
Protective Ass'n v. Schwartz, 432 A.2d 173, 180 n.17 (Pa. 1981).
Other laws repealed by this statute were done so explicitly. See
Doc. No. 78 at 7. Section B of 71 P.S. § 733-506 expressly
authorizes the OAG to initiate proceedings to enforce the Dodd-Frank
Act. Additionally, the LIPL specifically provides the OAG an

enforcement role. 41 P.S. § 506(a). Rules of statutory construction "direct that every statute shall be construed, if possible, to give effect to all of its provisions." Hearst Television, Inc. v. Norris, 54 A.3d 23, 31-32 (Pa. 2012) (internal quotation omitted).

We maintain that Section F refers only to a subsection of claims in which the DOB (not the Defendants) determine that the financial and banking activities of the entities they regulate may be implicated. Because this cause of action is not against entities regulated by the DOB, and the OAG has statutory authority to act, the OAG has capacity to bring this suit. Accordingly, we deny the Defendants' Motion to Dismiss for Lack of Capacity to Sue.[10]

## C. Failure to State a Claim

A party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering such a motion, a district court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140, 142 (3d Cir. 2002) (quoting Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

---

[10] The Defendants appear to concede that the OAG has the requisite permission for the claim under Dodd-Frank. Doc. No. 82 at 10.

its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citation omitted). "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" will not suffice. <u>Id.</u> (citation omitted). Rather, a plaintiff must allege some facts to raise the allegation above the level of mere speculation. <u>Great W. Mining & Mineral Co. v. Fox Rothschild LLP</u>, 615 F.3d 159, 176 (3d Cir. 2010) (citing <u>Twombly</u>, 550 U.S. at 555). Although a plaintiff is entitled to all reasonable inferences from the facts alleged, a plaintiff's legal conclusions are not entitled to deference, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).

**1. Plausibility of Claims**

The Think Defendants claim the OAG's "core theory – that the relationships between the lenders and the Think Defendants were nothing more than a conspiracy to evade Pennsylvania usury law – does not demonstrate a plausible claim for relief." Doc. No. 70-1 at 9. The Defendants argue that the OAG offers only conclusory statements in support of this alleged conspiracy. Further, the Defendants argue that the factual allegations are better explained

by lawful conduct – that they lawfully provided services to the tribal lending enterprises.

The OAG agrees that the actions undertaken by the Think Defendants are not "intrinsically culpable." See Doc. No. 70-1 at 12; Doc. No. 75 at 51. The OAG argues that the knowledge and intent of the Defendants, however, renders this otherwise lawful activity illegal. Throughout the FAC, the Plaintiff alleges the Defendants' intent to evade Pennsylvania law as the motivation for partnering with Native American tribes and the FBD. FAC ¶¶ 33, 34, 37, 42, 43, 45, 48, 50, 51. While Defendants correctly note that allegations of intent and knowledge are legal conclusions, the OAG has pled facts that support a reasonable inference of Defendants' intent to commit illegal activity.

According to the facts pleaded in the FAC, the Defendants directly provided consumer loans over the Internet at annual rates "in excess of 200 or 300 percent" to citizens of Pennsylvania before a policy change declared such loans illegal. FAC ¶ 32. Once they were no longer able to issue loans directly, Defendants partnered with FBD and the Tribes, both of which issued loans with interest rates that exceeded the lawful amount in Pennsylvania. FAC ¶¶ 37, 42. The OAG offered a direct statement from Defendant Rees indicating that the partnership with the tribes was to avoid state

usury laws. FAC ¶ 45. The segmentation of services and the high rate
of payment that the Defendants received for these services provide
additional circumstantial evidence supporting the conclusion that
the Think Defendants are the true lenders here. FAC ¶¶ 48-50.
Similarly, although conditions on a term sheet are typical of legal
business transactions, here they indicate a level of control over
the loans that supports the inference that the Think Defendants are
the true lenders. FAC ¶¶ 53-54.

The Think Defendants allege that their true purpose was "to
provide services to proper institutions" and "to assist tribes
seeking new and meaningful e-commerce opportunities" and to do this
"in a way that explicitly complies with the applicable law." Doc.
No. 82 at 17. It appears that the Defendants were determined to be
involved in the business of providing high-interest rate loans to
citizens of Pennsylvania. Whether they discovered a legal loophole
that would allow them to do this free from consequence or whether
they have illegally violated Pennsylvania and federal laws (and by
partnering with entities immune from suit hoped that immunity would
provide them legal cover) is a matter this Court will have to
address.[11] At this stage, it is sufficient that the Plaintiff has

---

[11] See <u>Michigan v. Bay Mills Indian Cmty</u>, 134 S.Ct. 2024, 2052 (2014)
(Thomas, J., dissenting) ("[T]ribal immunity has also been exploited in new
areas that are often heavily regulated by States. For instance, payday lenders

alleged evidence from which the latter is a plausible inference.[12]

## 2. Group Pleading

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This is meant to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)) (alteration in the original).

The Think Defendants argue that the OAG fails to meet the Rule 8 pleading standard because they group together six individual Defendants as the "Think Defendants" without distinguishing most allegations among them. It is not group pleading *per se*, however, that violates the standard of Rule 8. See Frazier v. U.S. Bank Nat'l Ass'n, No. 11-C-8775, 2013 U.S. Dist. LEXIS 45330, at *10-12 (N.D. Ill. Mar. 29, 2013) (finding group pleading did not render a complaint deficient under Rule 8 where complaint provided fair notice of claims). Rather, it is group pleading that fails to provide defendants with fair notice of what they are being accused.

The Defendants cite several cases that involved multiple

---

... often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality.")

[12] The Pennsylvania Supreme Court has noted that "usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality." Richman v. Watkins, 376 Pa. 510, 515 (Pa. 1954).

defendants that were dismissed for failing to provide adequate notice. The pleadings in the cases the Defendants cite are distinguishable from the pleadings here in that those pleadings were more generally deficient. For example, in Japhet, the complaint was so deficient that it was "impossible for [the] Court to read the Complaint and have any idea" what an individual defendant did to make her liable for misconduct alleged. Japhet v. Francis E. Parker Mem. Home, Inc., No. 14-1206(SRC), 2014 U.S. Dist. LEXIS 105134, at *5 (D.N.J. July 31, 2014). In Stewart, several of the defendants were not named in the complaint, so it was also impossible for them to determine what they were alleged to have done. Stewart v. Evans, No. 3:CV-09-1428, 2009 U.S. Dist. LEXIS 75969, at *14 (M.D. Pa. Aug. 25, 2009).

In contrast, here each Defendant is alleged to have been involved in and/or profited from a scheme to circumvent Pennsylvania and federal laws through marketing, funding, underwriting and collecting loans, and providing various other services specified in the FAC. FAC ¶ 47; See In re Riddell Concussion Reduction Litigation, 77 F.Supp.3d 422, 431-32 (D.N.J. 2015) ("Each Defendant was involved in some manner in the creation and dissemination of the misleading marketing campaign ... and/or was involved in or profited from the sales ... ."). The individual Defendants are aware of what

31

services they provide; this puts them on notice of what services they are alleged to have illegally undertaken to advance this scheme. This is "sufficient factual detail to put Defendants on notice of the nature of the claims against them, satisfying the requirements of Rule 8." <u>Toback v. GNC Holdings, Inc.</u>, No. 13-80526-CIV-COHN/SELTZER, 2013 U.S. Dist. LEXIS 131135, *7 (S.D. Fla. Sept. 13, 2013).

Additionally, as in <u>Riddell</u>, Defendants are represented by the same counsel and jointly filed several motions to dismiss. <u>Riddell</u>, 77 F.Supp.3d at 432. Unlike in <u>Riddell</u>, the Think Defendants do not operate under a single brand name. <u>See</u> <u>id.</u> The segmentation of services into different entities, however, is part of the alleged scheme. FAC ¶ 48. We do not find that this distinction renders the Think Defendants unfairly without notice of what they are being accused.[13]

### 3. Federal Banking Law Preemption

"The doctrine of federal preemption is rooted in the Supremacy

---

[13] NCA and Mr. Rees also alleges that the complaint does not provide them with sufficient notice to satisfy Rule 8. It appears that NCA ties its legal argument to that of the Think Defendants such that if we do not dismiss the claims against the Think Defendants, we should not dismiss the claims against NCA. See Doc. No. 71 at 3. Accordingly, we deny NCA's motion to dismiss on this ground. Mr. Rees's arguments on this issue are substantially similar to the Think Defendants. Mr. Rees argues that there is a particular paucity of facts connecting him to the alleged scheme. We find that, for example, the quote connecting Mr. Rees to the strategy of partnering with tribes to "avoid byzantine state laws" (FAC ¶ 45) supports a conclusion that he played a role in constructing the scheme. Accordingly, we deny his motion based on the general lack of notice due to group pleading.

Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, which invalidates state laws that interfere with, or are contrary to, federal law." Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d 237, 242 (3d Cir. 2008) (internal quotations and citations omitted). A state law may be preempted when: 1) congress expressly states its intent to preempt state law, 2) congress's intent to preempt may be inferred because the scheme of federal regulation is comprehensive or dominant, or 3) state law conflicts with federal law. Id. at 242- 243 (internal quotations and citation omitted). The Depository Institution Deregulation and Monetary Control Act ("DIDA") allows state-chartered, federally insured banks to charge the same interest rate in any state as they are legally allowed to charge in the state in which that bank is located. 12 U.S.C. § 1831d.[14] This statute

---

[14] The relevant section of DIDA provides:
State-chartered insured depository institutions and insured branches of foreign banks.

(a) Interest rates. In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, **notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section**, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.
12 U.S.C. § 1831d(a) (emphasis added).

"completely preempts any state law attempting to limit the amount of interest and fees a federally insured-state chartered bank can charge." In re Community Bank of Northern Virginia, 418 F.3d 277, 295 (3d Cir. 2005). The statute "incorporates verbatim the language of § 85 of the [National Bank Act ('NBA')]. When Congress borrows language from one statute and incorporates it into a second statute, the language of the two acts ordinarily should be interpreted in the same way." Id. at 295-96.

For the alleged "rent-a-bank" scheme, the Defendants partnered with FBD, and the loans originated with FBD. FBD is chartered in Delaware, which allows interest on a loan of any agreed-upon rate. 5 Del.C. § 963. FBD is a federally insured, state-chartered bank under DIDA. 12 U.S.C. § 1831d. The Think Defendants and Mr. Rees argue that federal law preempts the causes of action in the Plaintiff's complaint that pertain to the partnership between the Defendants and FBD. They argue that preemption applies to any challenge of interest or fees on a bank-issued loan, even when brought against a non-bank, and that preemption rights do not disappear when a loan is assigned or transferred from the bank.

In support of this view, Defendants point to two cases that found state law claims to be preempted even when the defendants were not the banks themselves. In Sawyer, the court found that where the

bank essentially rented out its charter (in a similar "rent-a-bank" scheme to the one alleged here), the state law claims were preempted. Sawyer v. Bill Me Later, Inc., 23 F.Supp.3d 1359, 1367 (D. Utah 2014). In Hudson, this applied even when the state-chartered bank played an "insignificant" role in the loan that had been designed by the non-bank "for the sole purpose of circumventing Indiana usury law." Hudson v. ACE Cash Express, Inc., No. IP 01-1336-C H/S, 2002 WL 1205060, at *4 (S.D. Ind. May 30, 2002). The Hudson court found that to draw jurisdictional boundaries to distinguish between non-banks "renting" a bank's charter and other non-bank entities would be "uncertain and unpredictable." Id. at *6.

The Third Circuit, however, distinguishes between claims against banks and claims against non-banks for purposes of preemption. In In re Community Bank, the court found state law claims against a non-bank were not preempted by DIDA and the NBA. In re Community Bank, 418 F.3d at 296. The court found two issues to be determinative: 1) that the "complaint asserted no claims against a national or state chartered federally insured bank" and 2) "the complaint asserted no usury claims against any party under Pennsylvania law." Id. In this case, the FAC does assert Pennsylvania usury law claims. The FAC does not make any claims against the FBD.

35

We find that even though the complaint contains state usury claims, that there are no claims made against a bank is sufficient to avoid preemption. In re Community Bank spent the bulk of its analysis on the first determinative issue and the cases it cited allowed state usury laws to go forward against non-bank entities. Id. at 296-297 (citing Flowers v. EZPawn Oklahoma, Inc., 307 F.Supp.2d 1191 (N.D. Okla. 2004), Colorado v. Ace Cash Express, Inc., 188 F.Supp.2d 1282 (D. Colo. 2002)). The court's conclusion did not depend on the finding that there were no state usury claims. Additionally, In re Community Bank distinguishes Krispin, a case on which the Defendants rely, by noting that in that case "[a]lthough there were no claims against a national or state-chartered bank, the loans were issued by a national bank, which was a wholly owned subsidiary of the department store." Id. at 296-97 (citing Krispin v. May Dep't Stores Co., 218 F.3d 919 (8th Cir. 2000)). Other courts have noted that the close relationship between the bank and the store made Krispin a unique situation. Ubaldi v. SLM Corp., 852 F.Supp.2d 1190, 1200 (N.D. Cal. 2012) (highlighting the language in Krispin: "in these circumstances"); Madden v. Midland Funding, LLC, 786 F.3d 246, 253 (2d Cir. 2015) (noting that the Krispin court found the bank to be "the real party in interest").

Here, the FAC alleges the Defendants, not the bank, are the

real parties in interest and the Defendants are not closely tied to the FBD. Accordingly, we find Krispin distinguishable. That the FBD retained interest in the loans does not place this case in the category of cases like Krispin, because the Think Defendants are alleged to be the *de facto* lender. The Third Circuit precedent supports finding a distinction between banks and non-banks in determining whether these claims are preempted. Because the claims here are not against a bank, we deny Defendants' motions to dismiss on federal preemption grounds.

## 4. Corrupt Organizations Act

The first three counts of the FAC fall under the Pennsylvania anti-racketeering statute, the Corrupt Organizations Act ("COA"). 18 Pa.C.S.A. § 911(b). The language of the COA mirrors the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), except the state statute contains no interstate commerce jurisdictional element. See 18 U.S.C. § 1962. We will look to case law analyzing RICO in analyzing the COA. See Com. v. Donahue, 630 A.2d 1238, 1245 (Pa. 1993) (looking to federal courts' analysis of RICO to interpret COA). The Think Defendants and Mr. Rees make several arguments that the COA claims must be dismissed. We will address each in turn.

## a. Authorized by Law

"Racketeering activity" includes "[t]he collection of any money

... in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum ... where not otherwise authorized by law." 18 Pa.C.S.A. § 911(h)(1)(iv). The Think Defendants argue that the interest charged on the loans at issue was authorized by law, and so does not fall under this definition of "racketeering activity." They make three related claims to support this view: 1) the General Assembly ("GA") eliminated interest rate caps for Pennsylvania state-charted banks under 7 P.S. § 303(b)(I), 2) the GA extended the same protection to all foreign financial institutions under 71 P.S. § 733-506(J), and 3) the tribal lenders are foreign financial institutions. The OAG does not contest the first two claims. This issue hinges on whether the lenders here are "foreign financial institutions" under 71 P.S. § 733-506(J).

The Banking Law Modernization Package ("BLMP"), passed in 2012, removed interest rate restrictions on Pennsylvania state-chartered banks. The relevant section of the BLMP reads:

> An institution may, subject to any applicable restriction under other provisions of this act, lend money, extend credit and discount or purchase evidences of indebtedness and agreements for the payment of money at such interest, finance charge, rate or terms authorized under this section or at any interest, finance charge, rate or terms permitted for any other financial institution or any other lender regulated by any Federal or State supervisory authority on the specified class of loan.

38

7 P.S. § 303(b)(i). Pennsylvania state-chartered banks were limited to a 6% interest rate until the BLMP was enacted. See 7 P.S. § 309(a) (repealed by 2012, Oct. 24, P.L. 1336, No. 170 § 12, effective Dec. 24, 2012). The Secretary of Banking explained that the new law removed "interest rate and fee restrictions regarding lending activity by Pennsylvania state-chartered banks and savings banks." Secretary's Letter at 2.

The BLMP also granted parity to "foreign financial institutions." The relevant section reads:

> Consumer financial laws of this Commonwealth applicable to the activities of foreign financial institutions and their subsidiaries, including statutes, regulations adopted by Commonwealth agencies, orders issues by Commonwealth agencies, ordinances or resolutions enacted by political subdivisions or orders issued by political subdivisions, shall apply to foreign financial institutions and their subsidiaries, **only to the extent those laws apply to State-chartered banks and savings associations and their subsidiaries**.

71 P.S. § 733-506(J) (emphasis added).

The BLMP defines "foreign financial institutions" as "[a] person licensed, registered or regulated by a state other than the Commonwealth or a foreign country that provides financial services to or for the benefit of persons in this Commonwealth." 71 P.S. § 733-506(K). The same section defines "state" to include "any federally recognized Indian Tribe." Id. The Defendants allege that the three tribal lending enterprises that issued the loans in

question are licensed under their respective tribe's laws, so they are "foreign financial institutions" under this statute.

The OAG points to interpretive language within Section K that indicates the defined terms shall have the meanings given "except in those instances where the context clearly indicates otherwise." Id. They argue that the broad definition of "foreign financial institutions" makes sense in Sections B and F of this statute, but that the context in Section J clearly indicates the definition should be more narrowly construed. "Foreign financial institutions" in Section J, according to the OAG, should refer to financial institutions with bank charters from outside of Pennsylvania. This preserves the section's purpose to create parity among banks. See Doc. No. 75 at 68. To give it the more expansive definition advocated by the Defendants would be to give out-of-state lenders without bank charters an advantage over Pennsylvania state financial institutions that are subject to the interest rate cap in the LIPL. See Doc. No. 78 at 3.

In support of this interpretation, the Plaintiff directs us to legislative history. A bill written explicitly to legalize payday lending was introduced to the Pennsylvania House on March 14, 2012

40

and it was extensively debated.[15] Ultimately, that bill failed to come out of Senate committee. The enacted BLMP section, alleged by the Defendants to accomplish the same goal, rendered comparatively little discussion in either the House or the Senate.[16] Additionally, other payday loan legalization bills have been proposed since the BLMP was passed, suggesting that the BLMP did not have the effect argued by Defendants here. <u>See</u> Doc. No. 78 at 8.

The Defendants argue that the payday loans were essentially legalized, with none of the protections contained in the first proposed bill, with the passing of the BLMP.[17] We are not convinced. Section K explicitly allows for a different meaning of the defined terms to prevail within the statute where the context clearly

---

[15] The text of the final day of the debate may be viewed online at http://www.legis.state.pa.us/WU01/LI/HJ/2012/0/20120606.pdf#page=36 at pp. 1028-1037. Several members of the General Assembly, both those for and against the proposed bill to legalize a controlled form of payday lending, expressed dismay at the kind of lending at issue here. For example: "So we have Internet lending here. We have it happening in a way that the Secretary of Banking cannot control and cannot reach ... because they are using sovereign Native-American nations" Id. at 1029; "[I]f in fact there is rampant Internet payday predatory lending going on in the State of Pennsylvania, then I suggest we charge the Attorney General with going and doing something about it." Id. at 1031.

[16] This bill, HB 2369, passed the House unanimously. http://www.legis.state.pa.us/cfdocs/Legis/RC/Public/rc_view_action2.cfm?sess_yr=2011&sess_ind=0&rc_body=H&rc_nbr=1744. The Senate debate can be viewed here http://www.legis.state.pa.us/WU01/LI/SJ/2012/0/Sj20121017.pdf at pp. 990-991.

[17] The Defendants note that perhaps the payday loan bill did not come out of committee because it was deemed unnecessary with this bill accomplishing the same goal. While this is possible, it is not likely. The proposed bill heavily regulated payday lending, including by placing a cap on the amount a person could borrow and the percentage a lender could charge, whereas the Defendants allege that this bill legalized payday loans such as these with no regulations in place.

indicates that should be the case. In this context, we find that the General Assembly did not intend for "foreign financial institutions" in Section J to include payday lenders such as the tribal entities at issue here.[18] Accordingly, we find that the loans are not "authorized by law" such that COA would not apply.[19]

### b. Claims against Mr. Rees

Defendant Rees argues that the COA charges against him should be dismissed because they fail to state any factual allegations against him. As explained above, the facts alleged in the FAC are sufficient to put Mr. Rees on notice of what he is being accused. Mr. Rees puts much stock in the fact that he is only specifically mentioned three times in the FAC. In one instance, the OAG alleges Mr. Rees admitted that he partnered with tribes to avoid state lending laws. FAC ¶ 45. Another alleges he stated that more than

---

[18] This is further supported by the use of the word "institutions" by the Banking Secretary when referring to the statute. The Secretary states that financial institutions and their subsidiaries "are subject to state and local laws and regulations only to the same extent as such laws and regulations apply to **Pennsylvania state-chartered institutions.**" Secretary's Letter at 4 (emphasis added). Compare this to the text of the statute, which states that financial institutions and their subsidiaries are subject to state and local laws "only to the extent those laws apply to **State-chartered banks and savings associations and their subsidiaries.**" 71 P.S. § 733-506(J) (emphasis added). This suggests that "institutions" and "banks" may be commonly substituted and the meaning is derived from context.

[19] Mr. Rees also alleges these loans are "authorized by law" because they are authorized by the laws of the tribes and Delaware. Doc. No. 73 at 28-29 n.10. As we have articulated elsewhere, it is not clear that the choice of law provisions in these loan contracts would hold up as they are against a fundamental policy of the Commonwealth of Pennsylvania. At this stage of the litigation, it is sufficient that the loans at issue might be illegal under Pennsylvania law for the COA claims to survive these motions to dismiss.

half of the annual revenue for Think Finance came from its partnership with FBD. FAC ¶ 52. These two allegations support the claim that Mr. Rees "participated in designing and directing the business activity" described in the complaint. FAC ¶ 18. The claims against Mr. Rees do not rest on his prior association with the other Defendants. Rather he is alleged to have been a key player in creating and carrying out the alleged scheme. Accordingly, we deny Rees's motion to dismiss the COA charges against him based on deficient pleadings.

**c. Count One**

Count One alleges the Think Defendants and Mr. Rees "participated as a principal" in a "pattern of racketeering activity," received "income derived, directly or indirectly," from that activity, and used or invested some of that income "in the acquisition of any interest in, or the establishment or operation of, any enterprise." 18 Pa.C.S.A. § 911(b)(1).[20] The Think Defendants argue that Count One fails for three reasons: 1) there is no "enterprise" within the meaning of the statute, 2) the Think Defendants did not participate as principals, 3) there is no injury. Mr. Rees argues 1) he did not participate as a principal in a

---

[20] The equivalent federal statute is 18 U.S.C. § 1962(a).

pattern of racketeering and 2) the FAC does not allege that he derived income from these acts or invested those funds into another enterprise.

The statute defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and government entities." 18 Pa.C.S.A. § 911(h)(3). The Think Defendants argue that the "enterprises" alleged in Count One are the same as the "racketeering enterprises." Doc. No. 70-1 at 26. Under RICO, "[t]he 'enterprise' in subsection (a) refers not to the 'racketeering enterprise,' but contemplates investment in some other, legitimate business." DeFazio v. Wallis, 500 F.Supp.2d 197, 208 (E.D.N.Y. 2007). The OAG does not dispute that these must be separate entities. Instead, they note that the FAC indicates that the alleged racketeering enterprises and investment enterprises are not the same. The OAG is correct. The FAC alleges separate racketeering enterprises (FAC ¶¶ 92, 104) and investment enterprises (FAC ¶ 97). Therefore, we deny this ground for dismissal.

Pennsylvania law does not define "principal," but federal law defines it as anyone who "commits an offense against the United

44

States or aids, abets, counsels, commands, induces or procures its commission." 18 U.S.C. § 2. We find that this definition can be applied to the substantially similar state law. See <u>Lafferty v. St. Riel</u>, 495 F.3d 72, 81-82 (3d Cir. 2007) ("[T]he common canon of statutory construction [is] that similar statutes are to be construed similarly[.]"). The Think Defendants argue that they are not alleged to be principals, but they essentially re-argue their claims regarding group pleading.[21] We see no reason to come to a different conclusion when it appears there is sufficient evidence to support a reasonable inference that the Defendants fit the definition of "principal" under the COA.

Mr. Rees also argues he was not alleged to have engaged in two or more acts of racketeering that constitute a pattern. Mr. Rees argues that because he is not alleged to have himself collected any unlawful debt, he cannot be alleged to have participated as a principal in a pattern of racketeering activity. We find it is not necessary that the OAG allege Mr. Rees personally collected the

---

[21] For example, Defendants cite <u>Cohen v. Daddona</u>, No. 95-4110, 1996 U.S. Dist. LEXIS 14837, at *8 (E.D. Pa. Oct. 1, 1996) to support the view that referencing "[t]he above-described scheme" is "wholly insufficient" to state a RICO claim. Doc. No. 70-1 at 26-27. <u>Cohen</u>, much like the other cases the Defendants cite to argue insufficient pleading, dealt with a much more "threadbare" complaint than the FAC here. It mentioned over 40 defendants and plaintiffs "never aver[ed] facts to support any relationship among the transactions or the various defendants or their conduct," and the counts "do not relate to or rely upon the facts contained in the body of the complaint." <u>Cohen</u> at *2, 5-6, 8. This is not the case here.

loans because "principal" includes a wide range of activities. Mr. Rees is alleged to have "participated in designing and directing the business activity described." FAC ¶ 18. This is sufficient to find that he, for example, counseled and induced the lending scheme. Because "principal" includes those actions, we find the OAG sufficiently pled that Mr. Rees participated as a principal in a pattern of racketeering.[22] Mr. Rees's argument that he is not alleged to have derived income or invested that income similarly fails. As a principal, he need not personally have invested the income into other enterprises; it is sufficient that he is alleged to have directed the entities (FAC ¶ 18) that are alleged to have invested the income (FAC ¶ 97).

The Think Defendants argue that there is no "injury" alleged under Count One, so the claim must fail. In support of this, they cite a Third Circuit case that looked to whether a private individual bringing a RICO claim had standing. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir. 1991); See also Rose v. Bartle, 871 F.2d 331, 357 n.40 (3d Cir. 1989) ("This question can be characterized as whether the plaintiffs have standing to sue

---

[22] Mr. Rees argues that the exclusion of "conspiracy" from the definition of collection of unlawful debt indicates that a narrower definition of "principal" should be applied. See 18 Pa. C.S.A. § 911(h)(iii). We do not find this exclusion bears on the definition of "principal" in accordance with federal law.

under section 1964(c) for a violation of section 1962(a).").[23] This claim is brought by the OAG, not by "any person injured in his business or property." Accordingly, there is no need to look at actual injury in order to determine standing. The OAG is authorized to bring this claim, both under RICO and the COA. 18 U.S.C. § 1964(b); 18 Pa.C.S.A. § 911(e)(1). Further, as the OAG points out, there is no corollary to section 1964(c) under the COA.[24] We accordingly deny the Defendants' motions to dismiss Count One of the FAC.

**d. Count Two**

Count Two alleges the Think Defendants and Mr. Rees are persons "employed by or associated with any enterprise" and are conducting or participating in that "enterprise's affairs through a pattern of racketeering activity." 18 Pa. C.S.A. § 911(b)(3).[25] The Think Defendants argue that this count should be dismissed because the

---

[23] "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit ... ." 18 U.S.C. § 1964(c).

[24] In their Reply, Defendants backtrack from their original argument. They point to language indicating the court has jurisdiction to "prevent and restrain" violations of the COA. This has no bearing on whether a pleading of injury is required. Neither does a case involving specific facts under the UTPCPL, which the Defendants boldly cite to support the proposition that all injunctive relief requires a showing of injury. Doc. No. 82 at 28. Even if a showing of injury were required, we find that the OAG pled injury to individual Pennsylvanians as well as to the public interest. FAC ¶¶ 6, 7.

[25] The federal version of this statute is 18 U.S.C. § 1962(c).

Plaintiff 1) alleges no distinct enterprises from the Defendants themselves and 2) alleges no conduct distinct from the persons accused of committing that conduct. Mr. Rees argues this count should be dismissed against him because there are no allegations that Rees controlled the affairs of the enterprise.

To state a claim under Section 1962(c) of RICO, "a plaintiff must allege ... the existence of two distinct entities: (1) a 'person' [who operates or manages the enterprise]; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Mega Concrete, Inc. v. Smith, No. 09-4234, 2013 WL 3716515, at *12 (E.D. Pa. July 15, 2013) (citing Cedric Kushner Promotions, Ltd. V. King, 533 U.S. 158, 161 (2001)) (internal quotations omitted) (alteration in the original); see also Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990) (noting that the same defendants cannot be named as both enterprises and defendants under Section 1962(c)).

According to the Plaintiff, the associations between the Defendants and the FBD and the three tribal lending enterprises constitute separate enterprises from the Defendants themselves. FAC ¶ 104. The Third Circuit has recognized that an "association-in-fact" enterprise can satisfy the distinctiveness requirement. U.S. v. Bergrin, 650 F.3d 257, 266 (3d Cir. 2011). The Third Circuit has

also indicated "a RICO enterprise could be 'form[ed] solely for the purpose of carrying out a pattern of racketeering acts,' and ... 'the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure[.]'" In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300, 368 (3d Cir. 2010) (quoting U.S. v. Turkette, 101 S.Ct. 2224, 2242, 2247 (1981)). An association-in-fact enterprise need have "no purpose or economic significance beyond or independent of the group's pattern of racketeering activity." Id. (internal quotation and citation omitted).

We find there are sufficient facts from which to conclude that the association between the Defendants and the tribal lending enterprises creates an association-in-fact. We also find that there is no requirement that the association-in-fact enterprise have a purpose beyond the usury scheme itself. Therefore, the Plaintiff has sufficiently pled this count. Drawing all inferences in the Plaintiff's favor, we find there is a plausible claim that the Defendants participated in a pattern of racketeering activity through the conduct of associated enterprises, and, accordingly, we deny the motion to dismiss Count Two against the Think Defendants.

Liability under 18 U.S.C. § 1962(c) requires one to "have some part in directing [the enterprises's] affairs." Reves v. Ernst &

<u>Young</u>, 507 U.S. 170, 179 (1993). As Mr. Rees accurately notes,
providing services alone is insufficient to show a person or entity
directed or controlled an enterprise. Here, however, the OAG alleges
that Mr. Rees controlled and directed the alleged enterprise as it
provided services that were the instruments of the scheme itself.
See FAC ¶¶ 47-51. Because the OAG has pled that Mr. Rees controlled
the enterprise through a pattern of racketeering, we deny the motion
to dismiss Count Two against Mr. Rees.

**e. Count Three**

The Think Defendants and Mr. Rees move to dismiss Count Three,
which alleges that all Defendants conspired to violate the COA.[26] "A
conspiracy can be proven by direct or circumstantial evidence. Its
existence can be inferred from evidence of related facts and
circumstances from which it appears, as a reasonable and logical
inference, that the activities of the participants could not have
been carried on except as a result of a preconceived scheme or
common understanding." <u>U.S. v. Boria</u>, 592 F.3d 476, 481 (3d Cir.
2010) (citation omitted).

The Think Defendants argue that the FAC fails to allege
objective manifestations of an agreement. They argue they have

---

[26] "It shall be unlawful for any person to conspire to violate any of
the provisions of paragraphs (1), (2) or (3) of this subsection." 18 Pa.C.S.A.
§ 911(b)(4). The federal version of this statute is 18 U.S.C. § 1962(d).

engaged only in lawful acts. Their argument appears to rest on the allegations that the loans issued were lawful. We find, as explained above, that there is sufficient evidence from which to conclude the loans were not lawful. There is also ample circumstantial evidence that supports the finding of a conspiracy on the part of all Defendants to engage in unlawful lending that violates the COA.

The Think Defendants allege that because they are affiliated entities, they are unable to conspire with each other as matter of law. They point to Copperweld to support this claim. Copperweld v. Independence Tube Corp., 467 U.S. 752 (1984). Copperweld, however, was an antitrust case, and its "intracorporate conspiracy doctrine ... turns on specific antitrust objectives." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 166 (2001). The Third Circuit has not decided whether the intracorporate conspiracy doctrine applies in 1962(d) cases. See State Farm Mut. Auto. Ins. Co. v. Lincow, 715 F.Supp.2d 617, 640 (E.D. Pa. 2010), aff'd, 444 Fed.Appx. 617 (3d Cir. 2011) (noting that the Third Circuit has not decided this issue and that there is a circuit split). We need not decide on this issue, however, because even if the intracorporate conspiracy doctrine did apply, the Plaintiff alleges conspiracy beyond just among affiliated entities. The FAC alleges a conspiracy among the Think Defendants, FBD, and the Tribes. Accordingly, this

ground for dismissal is denied.[27]

## f. Disgorgement under the COA

The Think Defendants and Mr. Rees allege that disgorgement is not an available remedy under the COA.[28] In support of this view, Defendants point to <u>Philip Morris</u>, which found that the language "to prevent and restrain" in 18 U.S.C. 1964(a) "indicates that the court is limited to forward-looking remedies that are aimed at future violations." <u>U.S. v. Philip Morris USA, Inc.</u>, 396 F.3d 1190, 1198 (D.C. Cir. 2005). The court found that disgorgement "is a quintessentially backward-looking remedy focused on remedying the

---

[27] Mr. Rees's argument that this claim should be dismissed is substantially similar to the Think Defendants and duplicative of arguments made elsewhere. We find there are sufficient facts pled from which it can be inferred that Mr. Rees was involved in a conspiracy to violate this statute. Accordingly, we deny his motion to dismiss Count Three.

[28] The remedies provision of the COA reads in pertinent part:
(1) The several courts of common pleas, and the Commonwealth Court, shall have jurisdiction to prevent and restrain violations of subsection (b) of this section by issuing appropriate orders, including but not limited to:
(i) ordering any person to divest himself of any interest direct or indirect, in the enterprise; imposing reasonable restrictions on the future activities or investments of any person, including but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in; and
(ii) making due provision for the rights of innocent persons, ordering the dissolution of the enterprise, ordering the denial, suspension or revocation of charters of domestic corporations, certificates of authority authorizing foreign corporations to do business within the Commonwealth of Pennsylvania, licenses, permits, or prior approval granted to any enterprise by any department or agency of the Commonwealth of Pennsylvania; or prohibiting the enterprise from engaging in any business.
18 Pa.C.S.A. § 911(d). The federal equivalent is 18 U.S.C. § 1964(a).

effects of past conduct ... ." <u>Id.</u>

There is a circuit split on whether backwards-looking relief is permitted under RICO. <u>See</u> <u>State of Indiana ex rel. Zoeller v. Pastrick</u>, 696 F.Supp.2d 970, 996 n.23 (N.D. Ind. 2010). The Third Circuit has not decided the issue. <u>U.S. v. Lane Labs-USA Inc.</u>, 427 F.3d 219, 233 (3d Cir. 2005). The Plaintiff argues that disgorgement should be allowed here because the COA, unlike RICO, indicates that a violation "shall be deemed to continue so long as the person who committed the violation continues to receive any benefit from the violation" 18 Pa.C.S.A. § 911(c). "Any benefit," they argue, is broad enough to encompass the value in a company that is "attributable to its tainted earnings in Pennsylvania." Doc. No. 75 at 78. Thus the OAG does not argue that the COA includes backward-looking remedies but instead argues that because "a violation is said to be on-going so long as a person retains the benefit of illegal gains" that disgorgement in the COA context is forward-looking.

The OAG is correct that the "any benefit" language in the COA is not included in RICO and so may merit a different analysis from RICO. We also note that the Second Circuit, while also finding the remedies for RICO violations limited to those that foreclose future violations, found that not all disgorgement claims are backward-

53

looking. <u>U.S. v. Carson</u>, 52 F.3d 1173, 1182. We find that to the extent the OAG can show that disgorgement is applicable to future harm, this remedy is properly sought under the COA.

**5. Fair Credit Extension Uniformity Act**

Count Four of the FAC alleges violations of the Federal Credit Extension Uniformity Act ("FCEUA") by NCA, the Think Defendants, and Mr. Rees. The FCEUA states "[i]t shall constitute an unfair or deceptive debt collection act or practice under this act if a debt collector violates any of the provisions of the Fair Debt Collection Practices Act (Public Law 95-109, 15 U.S.C. § 1692 et seq.)." 73 P.S. § 2270.4(a). Thus a violation of the Fair Debt Collection Practices Act ("FDCPA") is a *per se* violation of the FCEUA. Under the FDCPA, a debt collector is barred from collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

The Think Defendants make two main arguments that this count should be dismissed. They argue that they are not "debt collectors" and the FAC contains no allegations that they collected a "debt" within the meaning of the statute. They also argue that the interest rates at issue are authorized by agreement, so not proscribed by the

FDCPA.[29] Mr. Rees argues that he is not alleged to be a "debt collector" or "creditor" under the statute, so the claims against him must be dismissed.

The FDCPA's definition of "debt collector" includes a number of exclusions. Relevant here is the exclusion for "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... concerns a debt which was not in default at the time it was obtained by such person ... ." 15 U.S.C. § 1692a(6)(F). Similarly, a "debt" is defined under the FCEUA as "[a]n actual or alleged past due obligation, claim, demand, note or other similar liability of a consumer to pay money ... ." 73 P.S. § 2270.3. The Think Defendants argue that there are no allegations in the FAC that the debts collected on were in default, therefore they cannot be found to have violated the FCEUA.

The OAG does not contest that the definitions of "debt" and "debt collector" require the payments to be in default. Instead they argue that they have alleged sufficient facts to show the Defendants collected "debts" and were "debt collectors" in accordance with the statute. In <u>Lance</u>, cited by Defendants, the plaintiff was "unclear"

---

[29] The Think Defendants also argue that the debts are "authorized by law." This has been dealt with elsewhere in the memorandum so we don't find the need to address it again here.

about whether or not the debt at issue was in default. <u>Lance v. Weltman, Weinberg & Reis Co., L.P.A.</u>, No. 11-1254, 2012 U.S. Dist. LEXIS 190112, at *4 (E.D. Pa. June 8, 2012). Here the Plaintiff is not unclear. The FAC specifically references the Defendants' collecting past due and delinquent balances. FAC ¶¶ 76, 105, 106. Additionally, <u>Lance</u> dealt with a single debt in default whereas here the Defendants are alleged to have been involved in the business of collecting a large number of debts. It would be strange for *none* of those debts to be or have been in default.

Mr. Rees argues he cannot be considered a "debt collector" solely based on his status as an executive and shareholder. In support of this view, he points to a Seventh Circuit case that found officers and shareholders who are not otherwise "debt collectors" cannot be held liable under the act. <u>Pettit v. Retrieval Masters Creditor Bureau, Inc.</u>, 211 F.3d 1057, 1059 (7th Cir. 2000). Mr. Rees also argued that <u>Pollice</u>, a Third Circuit case that allowed vicarious liability for "a general partner exercising control over the affairs of such a partnership" is limited to partnerships. <u>See Pollice v. Nat'l Tax Funding, L.P.</u>, 225 F.3d 379, 405 n.29 (3d Cir. 2000). Some of our sister courts have expanded the rationale in <u>Pollice</u> to apply to officers and employees of debt collectors. <u>See, e.g.</u>, <u>Piper v. Portnoff Law Assoc.</u>, 274 F.Supp.2d 681, 689 (E.D. Pa.

2003); <u>Albanese v. Portnoff Law Assoc., Ltd.</u>, 301 F.Supp.2d 389, 400 (E.D. Pa. 2004). We find that so long as the employee is alleged to have some degree of control over the affairs of the debt collecting agencies, they can be found liable under this statute. Accordingly, we deny Mr. Rees's motion to dismiss this claim.

The Think Defendants further claim that the agreements are lawful because they are agreed-upon. In support of this view, they point to the disjunctive language of the statute: collection is prohibited unless either 1) "the agreement expressly authorizes the amount" or 2) "the amount is permitted by law." <u>See</u> <u>Todd v. Weltman, Weinberg & Reis, Co., L.P.A.</u>, 348 F.Supp.2d 903, 914 n.10 (S.D. OH 2004), *aff'd*, 434 F.3d 432 (6th Cir. 2006). Defendants cite <u>Todd</u> to support their argument that we should not follow the contrary dicta in <u>Pollice</u>, 225 F.3d at 408 and that we should afford no deference to the FTC staff commentary cited within. However, <u>Todd</u> does not contradict <u>Pollice</u>. <u>Todd</u>, goes on to explain that "under the plain language of the statute" it permits "collection of both amounts expressly authorized by a loan agreement, as well as *additional* amounts as permitted by law." <u>Todd</u>, 348 F.Supp.2d at 914 n.10 (emphasis in the original). The statute is "meant to proscribe only the addition of fees, interest, and other charges that were not authorized by the debtor or the law." <u>Id.</u> (internal citation

omitted).

The Second Circuit broke down 15 U.S.C. § 1692f(1) to mean: 1) "*If state law expressly permits service charges*, a service charge may be imposed even if the contract is silent on the matter;" 2) "*If state law expressly prohibits service charges*, a service charge cannot be imposed even if the contract allows it;" 3) "*If state law neither affirmatively permits nor expressly prohibits service charges*, a service charge can be imposed only if the customer expressly agrees to it in the contract." Tuttle v. Equifax Check, 190 F.3d 9, 13 (2d Cir. 1999) (emphasis in the original). The Third Circuit favorably quoted this section of Tuttle. Pollice, 225 F.3d at 408.

Defendants' reading of the statute would permit collection of unlawful agreed-upon debts. This is not the reading supported by one of the cases Defendants themselves cite, nor is it supported by the Third Circuit's dicta or the FTC's staff commentary.[30] We find that the disjunctive language is meant to allow lawful charges added to the agreed-upon debt and not to allow *unlawful* agreed-upon debts.

---

[30] The other case Defendants cite found that the statute does allow debt collectors to collect on illegal, agreed-upon debts, because it was not meant to make "the federal statute a vehicle for enforcing state law." Olvera v. Blitt & Gaines, P.C., 431 F.3d 285, 287 (7th Cir. 2005). At least one court found this to be dicta and did not defer to its reasoning. Burch v. Midland Funding, LLC, No. 14-219, 2014 WL 4898265, at *4 (N.D. Ill. Sept. 29, 2014). We find the analysis of the Second Circuit in Tuttle to be more persuasive.

58

Because we find there is sufficient evidence from which to reasonably conclude the agreed upon debt at issue here is unlawful, we deny the motions to dismiss Count Four.

## 6. Unfair Trade Practices and Consumer Protection Law

Count Five of the FAC alleges violations by all Defendants of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). The UTPCPL makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.[31] The statute authorizes the OAG to "bring an action in the name of the Commonwealth against" a person the OAG "has reason to believe ... is using or is about to use any method, act or practice declared by section 3 ... to be unlawful ... to restrain by temporary or permanent injunction the use of such method, act or practice." 73 P.S. § 201-4. An act or a practice is deceptive or unfair if it has the "capacity or tendency

---

[31] The Plaintiff alleges the following specific "unfair methods of competition" and/or "unfair or deceptive acts or practices":
(i) Passing off goods or services as those of another;
(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
(ix) Advertising goods or services with intent not to sell them as advertised;
(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.
73 P.S. § 201-2(4).

to deceive." <u>Com. ex rel. Zimmerman v. Nickel</u>, 26 Pa. D. & C.3d 115, 120 (Pa. Com. Pl. 1983). The Pennsylvania Supreme Court has noted that the UTPCPL is to be construed liberally to effectuate its objective of protecting consumers in Pennsylvania from unfair or deceptive business practices. <u>Com., by Creamer v. Monumental Prop., Inc.</u>, 329 A.2d 812, 817 (Pa. 1974).

The Think Defendants and Mr. Rees both argue there is no alleged present or future harm, so the OAG is not entitled to injunctive relief. The Think Defendants also argue: 1) the OAG has failed to show justifiable reliance on the Defendants' conduct, 2) the Defendants have not engaged in deceptive practices, and 3) they are "internet service providers" under the statute. Mr Rees also argues that the OAG has not pled specific facts to show he violated the UTPCPL. We will address each claim in turn.

**a. Injunctive Relief**

The Think Defendants and Mr. Rees argue that the Plaintiff has not pled sufficient facts that the Defendants are "using" or "about to use" a proscribed practice under the UTPCPL. Essentially, they argue that the allegations in the FAC only pertain to past conduct and so the claim for a permanent injunction necessarily fails. The OAG does not contest that they must show present or future activity, but instead allege that they have pled sufficiently that illegal

activity is currently or likely will occur.

Although the FAC acknowledges that some aspects of the alleged scheme have ceased (in particular, that the tribal lending enterprises are no longer accepting new Pennsylvania customers), the OAG alleges that collection on existing debts continues and that existing customers may take out new loans. FAC ¶¶ 78, 79, 101, 109, 116. They further allege that these loans are presently being falsely represented as "purely the product of the lawful exercise of tribal sovereignty and being subject to no state law." FAC ¶ 128.

As already discussed, the OAG has alleged sufficient facts from which one can reasonably conclude the loans at issue are illegal under Pennsylvania law. The OAG has also alleged that the Defendants are deeply involved in all aspects of issuing, marketing, and collecting these loans and that those practices continue today and are likely to continue this involvement in the future. The OAG alleges Defendants continue to issue loans to existing customers and to collect on existing loans. We find the Plaintiff has alleged plausible facts from which one could infer the Defendants are engaged in activity that has the capacity or tendency to deceive. Accordingly, we deny the Defendants' motion to dismiss on the ground

that there is no alleged present or future harm.[32]

## b. Justifiable Reliance

The Think Defendants argue that in order to recover damages under the UTPCPL, the OAG must show the victims of the alleged misrepresentation justifiably relied on the Defendants' unlawful conduct and suffered harm as a result. Because the OAG has not alleged any facts regarding justifiable reliance on the part of the borrowers, Defendants argue, this claim must be dismissed.

The Defendants misstate the law. Justifiable reliance is required for a *private* action under the UTPCPL. Kern v. Lehigh Valley Hosp., Inc., 108 A.3d 1281, 1287-88 (Sup. Ct. of Pa. 2015). A cause of action brought by the OAG in the name of the Commonwealth is not governed by the same standard. See Weinberg v. Sun Co., Inc., 777 A.2d 442, 444-45 (Pa. 2001). The OAG instead must show she "has reason to believe" the actions are unlawful and "that proceedings would be in the public interest." 73 P.S. § 201-4. Moreover, we note that at this stage, it is not necessary to plea "the precise identity of consumers" harmed by the Defendants nor the precise harm. Com. ex rel. Corbett v. Peoples Benefit Servs., Inc., 895 A.2d 683, 689 (Pa. Commw. Ct. 2006).

---

[32] Defendants' claim that the OAG cannot state a claim for damages under the UTPCPL is contingent on the finding that they cannot state a claim for injunctive relief. Therefore, we deny this claim as well.

Because Defendants are incorrect that the OAG needs to show justifiable reliance to proceed, we deny the motion to dismiss the UTPCPL claim on this ground.

**c. Deceptive Acts or Practices**

The Defendants argue that the FAC does not allege facts that show the Think Defendants engaged in deceptive acts or practices as required by the statute. In particular, the Think Defendants argue that the OAG has not alleged facts to show that the Defendants acted intentionally.

The Defendants point to a Third Circuit opinion indicating that "deceptive conduct" under the UTPCPL requires intention. Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 498 (3d Cir. 2013). Belmont, however, specifically addresses the catchall provision of the UTPCPL, which includes "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)(xxi). The Plaintiff has alleged additional violations beyond the catchall provision. Even if intentionality were required, we find that the Plaintiff sufficiently pled it here. Intentionality can be inferred from the totality of the circumstances. See Wilson v. Parisi, 549 F.Supp.2d 637, 666 (M.D. Pa. 2008).

The Defendants try to characterize this case as one about mere

disagreement about a law. This, however, is not what the OAG alleges. The FAC alleges that the Defendants specifically approached the FBD and the tribes in order to circumvent Pennsylvania law. FAC ¶¶ 53, 60, 125. The FAC alleges that the Defendants partnered with the tribes in order to "claim vicarious benefit of whatever legal immunities the tribe enjoys." FAC ¶ 43. In other words, the Defendants partnered with the tribes in hopes the tribes' sovereign immunity would prevent these loans from ever being challenged in court.[33] The alleged deception includes the Defendants' representation to consumers that these loans are lawful. FAC ¶ 128. The Defendants' repeated assertions that the loans are legal are inapposite. For one, we have found that it is not legal for a non-depository institution to issue loans in excess of the statutory limit in Pennsylvania. For two, courts have applied Pennsylvania law when fundamental policy issues are at play. See Kaneff v. Delaware Title Loans, Inc., 587 F.3d 616, 623-24 (3d Cir. 2009) (applying Pennsylvania law instead of Delaware law to a high-interest loan contract despite the contract explicitly stating Delaware law will apply because it involved "a fundamental policy" against usury);

---

[33] Tribes have immunity from suit even with regard to commercial activity that takes place off the reservation. Michigan v. Bay Mills Indian Cmty, 134 S.Ct. 2024, 2032 (2014). This is true even if the underlying activity is in fact illegal. Id. at 2034 ("[A] State lacks the ability to sue a tribe for illegal gaming when that activity occurs off the reservation.")

Richman, 376 Pa. at 515 ("The statute against usury forms a part of the public policy of the state and cannot be evaded by any circumvention or waived by the debtor."); See also Jackson v. Payday Financial, LLC, 764 F.3d 765, 782 (7th Cir. 2014) (noting that it is the tribe's burden to establish jurisdiction over non-tribal members and that burden was not met when the individual consumers did not engage in any activities inside the tribal reservation, but rather applied for, negotiated, and executed loan documents, and paid fees, in Illinois).

The OAG has pled sufficient facts from which one could conclude the Defendants engaged in deceptive acts or practices under the UTPCPL. Accordingly, we deny this ground to dismiss.

**d. Internet Service Provider**

The UTPCPL defines "internet service provider" as "a person who furnishes a service that enables users to access content, information, electronic mail or other services offered over the Internet, and access to proprietary content, information and other services as part of a package of services offered to consumers." 73 P.S. § 201-2(1.1). The UTPCPL does not apply to an Internet service provider "who, in good faith and without knowledge of the falsity or deceptive character thereof, publishes causes to be published or takes part in the publication of such advertisement." 73 P.S. § 201-

3. The Think Defendants argue that they fit this definition because they are alleged to do various things over the Internet, including providing the technology platforms to the tribes, and conduct services related to the loans.

The Defendants are not Internet service providers.[34] Nor are they alleged to have acted in good faith or without knowledge. We therefore deny this ground for dismissal.

**e. Claims Against Rees**

Mr. Rees alleges that the claims made against him for violations of the UTPCPL lack specificity such that they should be dismissed. In support of this view, Rees points to a number of cases in which UTPCPL claims were dismissed against individual Defendants. Some of these cases involve generally threadbare complaints, an issue we have already addressed.[35]

In <u>Parisi</u>, the Commonwealth Court of Pennsylvania found the plaintiff had not pled any specific facts to indicate the Defendant engaged in any illegal activity despite allegations that she "was a critical party to the remaining Defendants' scheme." <u>Com. v.</u>

---

[34] Statutory phrases are to be construed according to their common usage. See 1 Pa.C.S.A. § 1903(a).

[35] <u>See, e.g.</u>, <u>Pa. V. Exxon Mobil Corp.</u>, No. 1:00-1898, 2015 WL 4092326, at *5 (S.D.N.Y. July 2, 2015); <u>Kamara v. Columbia Home Loans, LLC</u>, 654 F.Supp.2d 259, 265 (E.D. Pa. 2009); <u>Garcynski v. Countrywide Home Loans, Inc.</u>, 656 F.Supp. 2d 505, 515-16 (E.D. Pa. 2009).

Parisi, 873 A.2d 3, 9 (Pa. Commw. Ct. 2005). Here, however, Rees is alleged to have directed the alleged scheme, and this is supported by specific factual allegations that indicate he approached the FBD and the tribes to evade state law. FAC ¶¶ 45, 52.

Rees also points to Andirchyn, in which this Court found that a payment processor alleged to have processed debts on illegal payday loans was not liable under the UTPCPL. Andrichyn v. TD Bank, N.A., 93 F.Supp.3d 375, 390-91. In that case, however, the plaintiff alleged the defendant processed illegal loans, not that they held those loans out to be legal or to have engaged in other illegal conduct as alleged here. The claims alleging fraudulent behavior were found to be without merit factually, not legally. Id. at 390 (finding that the claim that TD made deceptive representations in the Account Agreement fails because the alleged representation was not included in the Account Agreement). In contrast, here Mr. Rees is alleged to have designed and operated a scheme that held the loans out to be legal and subject to no state law, in violation of several provisions of the UTPCPL. We find that this claim is sufficiently and plausibly pled against Mr. Rees and accordingly we deny his motion to dismiss Count Five against him.

Having found that the Plaintiffs have sufficiently pled facts from which it is reasonable to conclude that the Defendants have

violated the UTPCPL, we accordingly deny the Defendants' motions to dismiss Count Five.

## 7. Dodd-Frank

Count Six of the FAC alleges violations of the Dodd-Frank Act by the Think Defendants and Mr. Rees. Dodd-Frank renders it unlawful for any covered person or service provider "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). A "covered person" under this statute includes "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). An act or practice is unfair under this statute if 1) it causes or is likely to cause substantial injury to consumers; 2) such injury is not reasonably avoidable by consumers; and 3) such injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(C). An act or practice is abusive if it takes "unreasonable advantage of ... the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B).

The Think Defendants argue that the OAG fails to plausibly plead any violations under this act. Their argument focuses on claims in FAC centered on particular issues: 1) EFTA, 2) personal

information, 3) unreasonable advantage, and 4) common enterprise.[36] We will address each in turn.

### a. EFTA Claim

The Think Defendants argue that the claim that they violated the policy of the Electronic Funds Transfer Act ("EFTA") lacks merit. The EFTA forbids "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k(1). The OAG alleges that the Defendants violated the policy of this statute by allowing customers "the option of receiving the loan proceeds in their bank account quickly if the consumer agrees to electronic direct deposit and repayment, while conditioning the alternative option of payment by mail on the consumer agreeing to wait as long as a week for the borrowed cash." FAC ¶ 146. This, the OAG alleges, is an unfair, deceptive, or abusive act or practice under the Act. FAC ¶¶ 147-148, 150.

The Defendants argue that this statute only addresses compulsory electronic transfer. Because the issuance of the loans are not conditioned on electronic payments, they argue, the OAG has

---

[36] Mr. Rees also argues that the Dodd-Frank claims against him should be dismissed. His arguments are either duplicative of arguments made and addressed elsewhere or sufficiently covered in the section on the common enterprise theory.

not pled a violation. We find the OAG fails to connect the Defendants' incentivizing electronic payments with a lack of understanding on the part of the consumer. It is also difficult to see how the automatic payment option is itself unfair or deceptive. In particular, the Plaintiff has not pled that the electronic payment option causes injury to consumers. The promise to provide the loans by direct deposit "as soon as tomorrow" is not itself injurious; it is reflective of the desperation of the consumer *prior* to engaging with the Defendants. Accordingly, we have not found that the Plaintiff has pled sufficient facts to state a claim under Dodd-Frank for violations of EFTA.

## b. Personal Information

The OAG alleges that the Defendants have engaged in unfair or deceptive acts or practices by "inducing consumers to provide highly personal information." FAC ¶ 148. We agree with the Think Defendants that this ground fails because the Plaintiff has not indicated how this harms consumers beyond a general allegations that it "makes them vulnerable to future improper use of that information." Accordingly, we find the Plaintiff has not pled sufficient facts to sustain this claim.

## c. Unreasonable Advantage

The OAG alleges the Defendants engaged in abusive acts or

practices by taking unreasonable advantage of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d)(2)(A); FAC ¶ 150. We agree with the Defendants that the OAG has failed to adequately show that the Defendants failed to disclose terms of the loans such that it would be considered "abusive" under the statute. However, the Plaintiff also alleges that the Defendants engaged in abusive acts or practices by taking advantage of the consumers' lack of understanding about the legality of the credit. The OAG alleges the Defendants held these loans out to be legal, thus taking unreasonable advantage of the consumer's lack of knowledge. We find that the OAG had pleaded sufficient facts for this claim to survive the motions to dismiss.

**d. Common Enterprise**

A "common enterprise" is a court-created exception to general common law principles and operates to "prevent individuals and companies from using corporate structures to circumvent the FTCA." F.T.C. v. PayDay Financial LLC, 989 F.Supp.2d 799, 808-09 (D.S.D. 2013). It allows one or more corporate entities operating together to be held jointly and severally liable for violations of the FTCA. F.T.C. v. Wyndham Worldwide Corp., Civil Action No. 13-1887(ES), 2014 WL 2812049, at *4-5 (D.N.J. June 23, 2014). The OAG argues that

71

this theory should carry over to the Dodd-Frank Act because the FTCA uses the same "unfair or deceptive acts or practices" language. FAC ¶ 151; 15 U.S.C. § 45(a)(1); <u>See also</u> <u>Lafferty</u>, 495 F.3d at 81-82 (noting that similar statutes are to be construed similarly).

The Defendants argue that the "common enterprise" exception should be limited to FTCA claims. They also argue that even if "common enterprise" liability did apply, the OAG has not pled sufficient facts to show a common enterprise exists.

We agree with the Defendants that the common enterprise theory should not be superimposed on a claim under the Dodd-Frank Act. Although the language in both statutes is similar, the FTCA limited enforcement to the FTC. Additionally, Dodd-Frank is more expansive, including abusive claims as well as unlawful and deceptive. We find that this distinguishes the two statutes such that even though both involve the public interest we do not find that an exception to the common law principle is merited here. Accordingly, we find that the common law enterprise theory does not apply to the Dodd-Frank Act and so cannot be applied against the Defendants here.

Although the Defendants have successfully argued for dismissal of several of the claims under the Dodd-Frank Act, because we find that some of the claims are sufficiently pled, we deny the motions

to dismiss Count Six.[37]

## D. Jurisdiction

Rule 12(b)(2) allows a defendant to assert a motion to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Courts reviewing a motion to dismiss a case for lack of personal jurisdiction "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

Federal courts are authorized to exercise personal jurisdiction over non-resident defendants "to the extent permissible under the law of the state where the district court sits." Pennzoil Products Co. v. Colelli & Associates, Inc., 149 F.3d 197 (3d Cir. 1998) (internal quotation and citation omitted). Pennsylvania's long-arm statute is coextensive with the due process clause of the United States Constitution. Mellon Bank (East) PSFS, National Association v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992). The due process clause permits courts to exercise personal jurisdiction over non-resident defendants who have "minimum contacts" with the forum state, such that the exercise of jurisdiction would comport with

---

[37] The Plaintiff also alleges the same "unlawful and deceptive" practices alleged under Count Five constitute a violation under Dodd-Frank. The Defendants allege these claims fall on the same grounds argued previously. Because we deny the Defendants' motions to dismiss Count Five, we also deny the motions to dismiss the same claims under Count Six.

"traditional notions of fair play and substantial justice." Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001) (internal quotation and citation omitted). A district court may exercise either general or specific jurisdiction over a defendant for purposes of personal jurisdiction. Id.[38] The burden of establishing personal jurisdiction rests with the Plaintiff. Grand Entertainment Group v. Star Media Sales, 988 F.2d 476, 482 (3d Cir. 1993).

Whether a forum may assert specific jurisdiction over a non-resident defendant depends on "the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 134 S.Ct. 1115, 1121 (2014) (internal quotation and citation omitted). "The Defendant's suit-related conduct must create a substantial connection with the forum State." Id. "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." Id.

Defendants Selling Source, LLC and Partnerweekly, LLC move to dismiss claims in the FAC directed at them because they allege the OAG has not established that this Court has specific jurisdiction over them. They allege that the accessibility and use by Pennsylvania residents of their webiste, www.moneymutual.com, does

---

[38] Plaintiff only alleges specific jurisdiction here.

not create specific jurisdiction because it is not a contact created by the Defendants themselves with the forum state. The Defendants argue that the once-seminal case Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119 (W.D. Pa. 1997), which established a sliding scale of commercial interactivity as the test for whether there is personal jurisdiction based on the operation of a website, no longer applies after Walden. We disagree. Courts have continued to apply the Zippo test after Walden. See, e.g. Harris v. Sportbike Track Gear, Civil Action No. 13-6527(JLL)(JAD), 2015 WL 5648710 (D.N.J. Sept. 24, 2015). We find the two cases to be compatible.

The Third Circuit has found a greater degree of commercial interactivity indicates "the intentional nature of the defendant's conduct vis-a-vis the forum state." Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452 (3d Cir. 2003). In Zippo, the Third Circuit noted, "the defendant had purposefully availed itself of doing business in Pennsylvania when it 'repeatedly and consciously chose to process Pennsylvania residents' applications and to assign them passwords,' knowing that the contact would result in business relationships with Pennsylvania customers." Id. (quoting Zippo, 952 F.Supp. at 1126). Therefore, under Zippo (and in the Third Circuit) "there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly

targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contact." Id. at 454.

The Defendants argue that the conduct being used to attempt to establish jurisdiction is the unilateral conduct of the consumers who visit the Defendants' website and the subsequent loan agreement with third parties, the tribal lenders. The Defendants ignore a crucial step between those two: the Defendants' taking the consumers' information and providing it to the lenders. This is more than minimal communication. In this role, they specifically arrange for Pennsylvania consumers to engage in the alleged payday loan scheme. This is sufficient contact to show that these Defendants specifically availed themselves of Pennsylvania jurisdiction.[39] Accordingly, we deny Selling Source and PartnerWeekly's Motion to Dismiss for Lack of Personal Jurisdiction.

## IV. Conclusion

For the reasons explained above, the various motions to dismiss are denied. An Order follows.

---

[39] Further, the OAG alleges that these Defendants have been knowing participants in the scheme to issue illegal loans to citizens of Pennsylvania. Thus their alleged participation goes beyond creating a website. Additionally, the OAG points to a consent order entered into by Selling Source and PartnerWeekly and the Pennsylvania Department of Banking wherein the Defendants agreed to cease targeting Pennsylvania consumers. FAC ¶ 90. The OAG alleges that these Defendants have failed to abide by this agreement.