# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA**<br>**by Attorney General JOSH SHAPIRO,** | : | Civil Action |
| | : | |
| **Plaintiff** | : | **No. 14-7139-JCJ** |
| | : | |
| **vs.** | : | |
| | : | |
| **THINK FINANCE, INC., TC LOAN SERVICE, LLC,**<br>**TAILWIND MARKETING, LLC, TC DECISION**<br>**SCIENCES, LLC, FINANCIAL U, LLC and**<br>**KENNETH E. REES,** | : | |
| | : | |
| | : | |
| | : | |
| **VICTORY PARK CAPITAL ADVISORS, LLC,**<br>**VICTORY PARK MANAGEMENT, LLC,**<br>**GPL SERVICING, LTD., GPL SERVICING AGENT,**<br>**LLC, GPL SERVICING TRUST, GPL SERVICING**<br>**TRUST II, VPC/TF TRUST I, and VICTORY PARK**<br>**CREDIT OPPORTUNITIES MASTER FUND, LTD.,** | : | |
| | : | |
| | : | |
| **-and-** | : | |
| | : | |
| **NATIONAL CREDIT ADJUSTERS, LLC,** | : | |
| | : | |
| **Defendants** | : | |


## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION AS TO ALL CLAIMS, AND, WITH RESPECT TO CERTAIN CLAIMS, FOR FAILURE TO STATE A CLAIM

Defendants Victory Park Capital Advisors, LLC ("VPCA"), Victory Park Management,

LLC ("VPM"), GPL Servicing Agent, LLC (collectively, the "Victory Park Defendants"),[1] GPL

Servicing, Ltd., and GPL Servicing Trust, GPL Servicing Trust II, and VPC/TF Trust I[2]

---

[1] Victory Park Credit Opportunities Master Fund, Ltd. has also been named in this suit but it has not been served. All of the shareholders in this Cayman Islands exempted company were redeemed in July 2012. The entity was dissolved in December 2013. (Exhibit A, Declaration of Scott Zemnick "Zemnick Decl." ¶ 9.)

[2] Each of these trusts were terminated and dissolved (the "Dissolved Trusts").

(collectively, "GPLS") respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure ("Federal Rules") and, with respect to certain claims, Rule 12(b)(6).

## BACKGROUND

As the Court is aware, this case involves purportedly usurious lending by certain Native American tribes to Pennsylvania consumers over the internet.[3]  Although the consumer loans that are the subject of this litigation were made by the Tribes, and none of the defendants were a party to those loans, Plaintiff has alleged from the beginning of this litigation—before the Victory Park Defendants and GPLS were named—that the Think Finance Defendants[4] are liable here as a result of the various services provided by the Think Defendants to these tribal lenders, including providing "customer leads, the technology platform, investors who fund the loans, and/or the payment-processing and collection mechanisms".  (SAC ¶ 54.)

In the Second Amended Complaint ("SAC"), Plaintiff attempts to expand the reach of Pennsylvania law far beyond the territorial limits of the state by adding the Victory Park Defendants and GPLS, which have never had any connection to Pennsylvania.[5]  VPCA, through investment funds, supplied commercial funding to GPLS, and GPLS purchased participation interests from the out-of-state tribal lending institutions that had business relationships with Think Finance.  Unlike the other defendants, neither the Victory Park Defendants nor GPLS are alleged to have been involved in the marketing, originating or collecting of any consumer loans.

---

[3] The Native American tribes include the Chippewa Cree Tribe of Rocky Boy Montana, the Otoe-Missouria Tribe of Indians in Oklahoma, and the Tunica-Biloxi Tribe of Louisiana (collectively, the "Tribes").

[4] Think Finance, Inc. ("Think Finance"), TC Loan Service, LLC, Tailwind Marketing, LLC, TC Decision Sciences, LLC, Financial U, LLC and Kenneth Rees ("Rees").

[5] The Dissolved Trusts are merely statutory trusts that were dissolved in January and February 2013.

Further, the Victory Park Defendants and GPLS never transacted with or loaned money to any Tribes' borrowers in Pennsylvania, collected money from Pennsylvania borrowers, or assisted the Tribes or Think Finance in the management or marketing of any of the lending programs. Instead, the Victory Park Defendants transacted business with GPLS, and GPLS transacted business with the Tribes. These were commercial transactions, not consumer loans, and were negotiated and performed wholly outside Pennsylvania. Simply put, they have no connection to the state. As such, the Court does not have personal jurisdiction over any of these newly added defendants.[6]

### A. VPCA.

VPCA is an investment management firm organized in Delaware with headquarters in Chicago, Illinois. (SAC ¶ 16; Zemnick Decl. ¶ 3.) VPCA does not maintain offices in Pennsylvania, and none of VPCA's partners or employees reside in Pennsylvania. (*Id.*)

Plaintiff does not allege that any of the transactions by the Victory Park Defendants or GPLS occurred in or was directed at Pennsylvania, because they were not. (Zemnick Decl. ¶¶ 3-13, 17-19.) Rather, those transactions were negotiated and executed entirely outside of Pennsylvania, and none of these relationships were governed by Pennsylvania law. (*Id.*)

---

[6] Plaintiff's claims against the Victory Park Defendants and GPLS in the SAC focus almost exclusively on the tribal loan programs that were associated with Think Finance, which were negotiated and executed entirely outside the state. With respect to loans issued by First Bank of Delaware ("FBD"), a Delaware-chartered bank, in connection with an earlier Think Finance lending program, Plaintiff concedes that GPLS purchased participation interests in those loans long after that program was developed and just months before it ended. Plaintiff does not allege that any of the newly added defendants were involved in the development of that program or that they conducted any of the business of the "ThinkCash" loan program (or that they did so in Pennsylvania). (*See* SAC ¶¶ 89-90 (alleging only that VPCA formed an investment fund to hold participation interests in ThinkCash loans and entered into an administrative agreement with TC Administrative Services, LLC to manage those interests).) As a result, it remains unclear whether the Plaintiff is actually seeking recovery from the newly added defendants with respect to the FBD loans, or whether mention in the SAC of the short-lived involvement of that program was intended merely to provide background. To the extent Plaintiff asserts a claim against the Victory Park Defendants and GPLS relating to the FBD loans, these defendants challenge personal jurisdiction with respect to those loans as well, and, out of an abundance of caution, move to dismiss any such claims pursuant to Rule 12(b)(6) as set forth in Part II.

**B.     GPLS.**

GPLS is a Cayman Islands company that Plaintiff claims "VPCA established to hold ownership interests in the loans at issue in this matter." (SAC ¶¶ 20, 94.) This misleading allegation suggests that tribal loans were assigned to GPLS—which they were not. GPLS was a party to participation agreements with the Tribes,[7] which gave GPLS the option to purchase participation interests in a portion of the loans that the Tribes originated. (Zemnick Decl. ¶ 11.) The Tribes' sale of participation interests in a portion of their loans created only a contractual relationship between the Tribes and GPLS. (*Id.* ¶ 14.) GPLS does not identify or interact with borrowers, fund or underwrite any particular loans, receive or process payments from consumers, or collect on any loans issued by the Tribes. (*Id.* ¶ 16.) The Tribes' sale to GPLS of participation interests in their loans occurs exclusively between the Montana, Oklahoma and Louisiana Tribes and GPLS, well outside Pennsylvania's borders. (*Id.* ¶ 11.) GPLS does not become a party to the loans made by the Tribes.

Like the Victory Park Defendants, GPLS has no presence in the Commonwealth of Pennsylvania and does not do business in the state. (*Id.* ¶¶ 10-12.) GPLS does not have any offices or property in Pennsylvania, and none of GPLS's investors reside in Pennsylvania. (*Id.* ¶ 10.) GPLS's contracts with the Tribes are not governed by Pennsylvania law. (*Id.* ¶ 11.) GPLS has no relationship or contact with any of the Tribes' borrowers. (*Id.* ¶¶ 14, 16-17.)

**C.     Investment Entities.**

Plaintiff attempts to treat the "Victory Park Defendants" and GPLS as a single entity to mask the fact that these distinct corporate defendants have no meaningful connection to the

---

[7] As discussed below, in a participation agreement, the participating party only has a right to a share of the income stream and has no legal relationship or rights against the borrower. *See First Nat'l Bank v. Continental III, Nat'l Bank & Trust Co.*, 933 F.2d 466 (7th Cir. 1991).

Commonwealth of Pennsylvania. Neither the Victory Park Defendants nor GPLS have any offices, employees or business in Pennsylvania.

With respect to the Dissolved Trusts, Plaintiff pleads only that these entities were Delaware statutory trusts established by VPCA for the purpose of holding investment interests in the loans at issue for the benefit of GPLS. (*See* SAC ¶¶ 22-24.) In other words, they were special purpose entities that (like the Victory Park Defendants and GPLS) never participated in the marketing, origination or collection of consumer loans in any state, let alone Pennsylvania. Moreover, each of these trusts has been terminated and dissolved since February 2013. (Zemnick Decl. ¶¶ 6-8.)

Plaintiff alleges that VPM, a Delaware limited liability company headquartered in Chicago, "served as an administrative and collateral agent or trustee of one or more of the Victory Park funds or trusts that hold or held ownership interests in the loans at issue in this matter." (SAC ¶¶ 19, 90.) Plaintiff alleges that GPL Servicing Agent, LLC is a "wholly owned affiliate of Victory Park" which has served as a "collateral agent" of GPLS. (SAC ¶ 21.) VPM and GPLS Servicing Agent, LLC have or had no offices or business in the Commonwealth of Pennsylvania. (Zemnick Decl. ¶¶ 4-5.)

### D. Procedural History.

On May 2, 2017, Plaintiff filed the SAC to add the Victory Park Defendants and GPLS. (Dkt. No. 157.) The SAC alleges three counts against VPCA and one count against the Victory Park Defendants and GPLS. Each of these counts alleges a violation of state law under Pennsylvania's Corrupt Organizations Act ("COA"). Count One alleges that VPCA engaged in a pattern of "racketeering activity," namely the collection of an unlawful debt. (SAC ¶ 121.) Specifically, Plaintiff alleges that in 2010, VPCA joined the alleged racketeering activity by "agreeing to assume the role as the primary funder of ThinkCash loans and then providing at

least $90 million of lending capital to Think Finance's tribal lending ventures."  (SAC ¶ 127.)

Plaintiff does not allege, however, that VPCA ever originated or collected on any unlawful loans.

Instead, Plaintiff contends that VPCA's activities rendered it a "principal" in the alleged

racketeering activity (*i.e*., collection of an unlawful debt), and that VPCA used the proceeds of

that activity to fund GPLS.  (SAC ¶¶ 127-28.)

Count Two alleges that VPCA was a person "employed by or associated with" the tribal

loan programs, and that VPCA participated in those programs' affairs "through a pattern of

racketeering activity."  (SAC ¶¶ 132-42; 18 Pa. C.S.A. § 911(b)(3).)  In support of this

allegation, Plaintiff argues that VPCA directed the alleged racketeering enterprises' affairs by

"determining the volume of lending by the 'tribal' entities based on its assessment of its own risk

tolerance," and by marketing the investment to potential investors in GPLS.  (SAC ¶¶ 93, 137.)

Count Three alleges that the Victory Park Defendants and GPLS conspired to violate the

COA "by agreeing to facilitate—and profiting from—lending activity that was illegal in

Pennsylvania."  (SAC ¶ 146; 18 Pa. C.S.A. § 911(b)(4).)

<u>**ARGUMENT**</u>

**I.**  **THE COURT SHOULD DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT BECAUSE
THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE VICTORY PARK
DEFENDANTS OR GPLS.**

**A.**  **Legal Standard.**

A district court may exercise personal jurisdiction over a non-resident defendant only "to

the extent permissible under the law of the state where the district court sits."  *N. Penn. Gas Co.*

*v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir. 1990).  Because Pennsylvania

authorizes jurisdiction coextensive with due process under the U.S. Constitution, 42 Pa. Const.

Stat. § 5322(b), the Court must inquire whether each defendant has sufficient "minimum

contacts" with Pennsylvania and, if so, whether the exercise of jurisdiction would comport with

"traditional notions of fair play and substantial justice." *Scott v. Lackey*, 587 F. App'x 712, 716 (3d Cir. 2014) (*quoting Remnick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001)).

A court may only exercise general jurisdiction when "the foreign corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (internal quotations and alterations omitted). Only in the most "exceptional case" might a "corporation's operations in a forum other than its formal place of incorporation or principal place of business . . . be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n.19.

Specific personal jurisdiction over a non-resident depends on "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). For the exercise of jurisdiction to be consistent with due process, the "defendant's suit-related conduct must create a substantial connection with the forum [s]tate." *Id.* That "relationship must 'arise out of the contacts the defendant *himself* creates.'" *Id.* at 1123 (emphasis in original); *see also Falcone v. Mediterranean Shipping Co.*, No. CIV.A. 01-3918, 2002 WL 32348270, at *1 (E.D. Pa. Apr. 3, 2002) ("Specific jurisdiction requires that Defendant's business with Pennsylvania residents result from purposeful activity to avail itself of the benefits of the state.").

Finally, "[e]ach defendant's contacts with the forum State must be assessed individually." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (emphasis in original); *Capitol Ins. Co. v. Dvorak*, No. 10-CV-1195, 2010 WL 4289864, at *3 (E.D. Pa. Oct. 29, 2010) (Joyner J.) ("[T]he due process standard must be applied to each defendant separately.") (internal quotations omitted). "[A] defendant's relationship with a . . . third party standing alone is an insufficient basis for jurisdiction." *Walden*, 134 S. Ct. at 1123; *see, e.g.*, *Bristol-Meyers Squibb*

*Co. v. Sup. Ct. of Cal., San Fran. Cty.*, 137 S. Ct 1773, 1783 (2017) ("[T]hat BMS contracted with a California distributor is not enough to establish personal jurisdiction in the [s]tate.").

Once a defendant raises the defense of lack of personal jurisdiction, "the burden shifts to plaintiff to demonstrate facts that establish personal jurisdiction." *Cumberland Truck Equip. Co. v. Detroit Diesel Corp.*, 401 F. Supp. 2d 415, 418 (E.D. Pa. 2005). The plaintiff must satisfy its burden of "establishing, through sworn declarations or other competent evidence, that personal jurisdiction can be exercised." *Scott*, 587 F. App'x at 716 (citing *Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros.*, 983 F.2d 551, 554 (3d Cir. 1993)). "At no point may a plaintiff rely on the bare pleadings to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction . . . . Once the motion is made, plaintiff must respond with actual proofs, not mere allegations." *Patters v. Fed. Bur. of Invest.*, 893 F.2d 595, 604 (3d Cir. 1990) (quotations omitted).

### B. The Victory Park Defendants and GPLS Are Not Subject to General Personal Jurisdiction in Pennsylvania.

Plaintiff has not and cannot establish that any of the Victory Park Defendants or GPLS have sufficient contacts with Pennsylvania to subject them to general jurisdiction. Notably, none of the defendants are incorporated in or licensed to do business in Pennsylvania. (SAC ¶¶ 18-25; Zemnick Decl. ¶¶ 3-13, 17-19.) VPCA, for example, is an investment management firm organized in Delaware and headquartered in Chicago, Illinois. (SAC ¶ 16; Zemnick Decl. ¶ 3.) None of VPCA's partners or employees reside in Pennsylvania. (Zemnick Decl. ¶ 3.) GPLS is a Cayman Island company with no physical presence in the United States, let alone Pennsylvania. (SAC ¶ 18; Zemnick Decl. ¶¶ 10, 12.) The SAC is also devoid of any allegations that these defendants purchase supplies, file income tax returns or maintain property in the state. As the attached declaration demonstrates, these entities operate exclusively outside of Pennsylvania and

are, therefore, not subject to general personal jurisdiction in Pennsylvania. (Zemnick Decl. ¶¶ 3-13, 17-19); *Daimler*, 134 S. Ct. at 760–61.

**C.     The Victory Park Defendants and GPLS Are Not Subject to Specific Jurisdiction.**

Plaintiff cannot establish specific jurisdiction over any of the Victory Park Defendants or GPLS because they do not have any contact with Pennsylvania related to Plaintiff's allegations. All of the activities that supposedly connect these defendants to this action are alleged to have occurred outside of Pennsylvania. In particular, GPLS's purchased participation interests in a portion of tribal loans after the loans were issued was negotiated and executed wholly outside of Pennsylvania through a series of contracts that have no connection to Pennsylvania and, indeed, are not governed by its laws. (SAC ¶ 54; Zemnick Decl. ¶ 11.) GPLS's purchases of participation interests and payments from the Tribes on those interests occurred (exclusively between GPLS and Tribes) either in the Cayman Islands or the states in which the Tribes are located—namely, Montana, Oklahoma and Missouri. Neither the purchase of the participation interests nor the payment thereon occurred in Pennsylvania. (SAC ¶¶ 54, 96-97; Zemnick Decl. ¶ 11.)

Likewise, VPCA's alleged agreements with Think Finance to guarantee and create security for GPLS's participation interests were again negotiated and executed entirely outside of Pennsylvania between VPCA in Chicago, and the Think Finance Defendants in Texas. (SAC ¶ 96; Zemnick Decl. ¶ 19.) Those contracts are also not governed by Pennsylvania law. (Zemnick Decl. ¶ 19.)

The only connection between the parties, Pennsylvania and Tribal lending is the mere fact that the Tribes that sold participation interests to GPLS happened to market and originate loans over the internet to consumers that included residents of Pennsylvania. (SAC ¶¶ 49, 65-

67.)  That fact, however, says nothing about the Victory Park Defendants' or GPLS's own connections to Pennsylvania and does not establish that they purposefully availed themselves of the privilege to conduct business in Pennsylvania.  *See BP Chemicals Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000) ("[The] purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts") (citations and internal quotations omitted).

Neither GPLS nor the Victory Park Defendants ever originated, serviced or collected on any tribal loans in Pennsylvania (or anywhere else for that matter).  (Zemnick Decl. ¶¶ 14, 16.) None of their agreements with the Tribes or the Think Defendants was negotiated or performed in Pennsylvania, nor did they contemplate Pennsylvania as a possible forum for litigating disputes arising from those relationships.  (*Id.*)

Further, even if Pennsylvania consumers might be able to trace the funding of their loans to GPLS and then to the Victory Park Defendants (through other distinct, corporate entities) or trace their payments through the Tribes to GPLS, neither is sufficient contact with the forum for purposes of due process.  *See, e.g.*, *First Nat'l Bank of Penn. v. Transamerica Life Ins. Co*., No. 14-1007, 2016 WL 520965, at *9 (W.D. Pa. Feb. 10, 2016) ("It is clear that . . . JPMC's acceptance of money from Commonwealth General under the EAA that JPMC knew was ultimately traceable to FNB in Pennsylvania did not create the necessary minimum contacts with Pennsylvania.") (applying *Walden*).  These entities have no relationship with these borrowers and the mere receipt of money that might be attributable to them is not sufficient to show that either GPLS or the Victory Park Defendants directed any intentional conduct at them.  *See Walden*, 134 S. Ct. at 1123 (the "unilateral activity" of third parties is not sufficient to establish personal jurisdiction over an out-of-state defendant).

GPLS's ownership of a participation interest in any portion of a loan originated by the Tribes to a Pennsylvania resident did not create a relationship or result in any contact with that borrower by GPLS. It is fundamental that the purchaser of a participation interest may become a creditor *of the lender*, but it assumes no relationship with the borrower. *See, e.g.*, *Cottage Savings Ass'n v. Comm'r of Internal Revenue*, 499 U.S. 554, 557 n.3 (1991) ("By exchanging merely participation interests rather than the loans themselves, each party retained its relationship with the individual obligors"). As such, the holder of a mere participation interest may "look solely . . . to the [lender] for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers." *Hibernia Nat'l Bank v. F.D.I.C.*, 733 F.2d 1403, 1407 (10th Cir. 1984); *see also Hudson v. Ace Cash Express, Inc.*, No. IP-01-1136, 2002 WL 1205060, at *5–6 (S.D. Ind. May 30, 2002) ("Goleta's sale of a participation interest to ACE neither destroyed the debtor-creditor relationship between Goleta and Hudson nor created privity between ACE and Hudson").

Absent any relationship or contact between GPLS and Pennsylvania consumers, Plaintiff cannot establish – by simply attempting to trace money to and from non-residents – that GPLS, let alone the Victory Park Defendants, "purposefully directed [their] activities at a resident of [Pennsylvania]." *Cardona v. Bledsoe*, 596 F. App'x 64, 66 (3d Cir. 2015) (quoting *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2011)); *First Nat'l Bank of Penn.*, 2016 WL 520965, at *9. Once again, "[d]ue process requires that a defendant be haled into court in a forum State based on *his own affiliation* with the State," and not based on "contacts he makes by interacting with other persons affiliated with the State." *Walden*, 134 S. Ct. at 1123 (emphasis added).

**D.    Plaintiff's Conspiracy Allegations Do Not Confer Personal Jurisdiction Over the Victory Park Defendants or GPLS.**

Plaintiff's failure to allege any suit-related contacts with Pennsylvania on the part of the Victory Park Defendants or GPLS cannot be cured by alleging a conspiracy that included lending by other parties that was allegedly illegal in Pennsylvania.  (*See* SAC ¶ 146.)[8]  As discussed below, due process prohibits the Court from imputing the contacts of the Tribes or other defendants to these defendants based on Plaintiff's "conspiracy" theory of liability.  In any event, Plaintiff's conspiracy allegations against the Victory Park Defendants and GPLS do not provide a basis for asserting personal jurisdiction over any of them because the alleged conspiratorial conduct likewise occurred exclusively outside of Pennsylvania.

**i.    *Alleged membership in a conspiracy does not provide an independent basis for asserting personal jurisdiction.***

The expansive "co-conspirator theory" of personal jurisdiction—which courts in this district have, to varying degrees, invoked in the past to impute forum contacts among co-conspirators—did not survive the Supreme Court's holding in *Walden*.

Under the co-conspirator theory, a defendant is subject to personal jurisdiction if the defendant was alleged to be a member of the conspiracy and should have been aware of the co-conspirator's conduct in furtherance of the conspiracy in the forum, regardless of its own forum contacts or its control or direction of its co-conspirators' conduct in the forum.  *See Santana Prods., Inc. v. Bobrick Washroom Equip.*, 14 F. Supp. 2d 710, 717–20 & n.8 (M.D. Pa. 1998) (discussing and questioning the proper reach of this theory); *Aluminum Bahrain B.S.C. v.*

---

[8] In past briefing before this Court, Plaintiff has argued that personal jurisdiction may be asserted over any non-forum co-conspirator, regardless of that defendant's own relationship or contacts with the forum.  *See* ECF No. 75 at 109.  The Court has not addressed these arguments; instead, it allowed personal jurisdiction to be asserted against the Selling Source Defendants based on the now-defunct "sliding scale approach" set forth in *Zippo Mfg. Co. v. Zippo Dot Com., Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).  *See* ECF No. 93 ("Jan. 14, 2016 Order"), at 75; *Bristol-Meyers*, 137 S. Ct. at 1781 (clarifying that the "sliding scale approach" did not survive *Walden*).

*Dahdaleh*, No. 08-299, 2012 WL 5305169, at *3 (W.D. Pa. Oct. 25, 2012) (collecting cases and concluding that there was a substantial difference of opinion as to the legitimacy of co-conspirator jurisdiction); *but see Roy v. Brahmbhatt*, CIV.A. 07-5082 (PGS), 2008 WL 5054096, at *8 (D.N.J. Nov. 26, 2008) (declining to recognize the conspiracy theory of personal jurisdiction because it offends both the requirement that personal jurisdiction "must be met as to *each* defendant" and "traditional notions of fair play and substantial justice").

In *Walden*, however, the Supreme Court held that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction" as "it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State." *Walden*, 134 S. Ct. at 1123, 1126; *see also Scott*, 587 F. App'x at 716 (discussing *Walden*). Recently, in *Bristol-Meyers*, the Court reaffirmed this principle, holding that a defendant's "decision to contract with a California company . . . to distribute [Plavix] *nationally*" was insufficient to establish personal jurisdiction over the defendant in California with respect to claims by non-California residents. 137 S. Ct. at 1783 (citing *Walden*).

After *Walden*, merely alleging that one co-conspirator committed acts in furtherance of the conspiracy in the forum with the knowledge of the other alleged co-conspirator does not confer jurisdiction over a foreign defendant. Such allegations do not address the requirement that "the *defendant's* actions connect him to the *forum*"; relying on the conduct of others does not suffice. *Walden*, 134 S. Ct. at 1124 (emphasis in original);[9]

---

[9] *See also* Janet C. Alexander, *Unlimited Shareholder Liability Through a Procedural Lens*, 106 Harv. L. Rev. 387, 401 n.66 (1992) (arguing that "attribution of [co-conspirators'] contacts should violate due process"); Stuart M. Riback, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction*, 84 Colum. L. Rev. 506, 526 (1984) ("[W]hile a conspirator's act in the forum might be some evidence of the coconspirator's contacts with the forum, it does not alone supply those contacts without a showing of purposeful availment").

Although the Third Circuit has not considered the viability of co-conspirator jurisdiction under Pennsylvania's long-arm statute after *Walden*, it has rejected the theory under New Jersey's identical long-arm statute. In *LaSala v. Marfin Popular Bank Public Company*, 410 F. App'x 474, 478 (3d Cir. 2011), the Third Circuit affirmed the district court's rejection of the co-conspirator theory of personal jurisdiction under New Jersey law, which, like Pennsylvania, authorizes personal jurisdiction to the full extent provided by the Due Process Clause. *See Synergy, Inc. v. Manama Textile Mills*, No. 06-4128, 2008 WL 6839038, at *13 n.6 (D.N.J. Feb. 19, 2008) ("Pennsylvania law is 'identical' to New Jersey's long-arm statute."). *LaSala* compels the same conclusion under Pennsylvania law. There is simply no basis upon which the due process rights of a non-resident defendant—under the U.S. Constitution—are greater in New Jersey than they are in Pennsylvania.[10] This Court must follow the Third Circuit's guidance in *LaSala* and reject the conspiracy theory of jurisdiction as an independent basis for asserting personal jurisdiction.

Other courts that have considered the viability of co-conspirator jurisdiction since *Walden* have rejected it, holding that participation in a conspiracy cannot "provide a standalone basis for jurisdiction." *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015) (rejecting conspiracy jurisdiction as inconsistent with due process). Rather, these courts have held that allegations of conspiracy should not change the jurisdictional analysis; only if a defendant itself "has in fact engaged in some affirmative act directed at the

---

[10] The Pennsylvania Supreme Court has never endorsed co-conspirator jurisdiction. Instead, federal district courts in Pennsylvania have relied on a single Superior Court decision in *Temtex Products, Inc. v. Kramer*, 330 Pa. Super. 183 (1984) to support the theory. In *Temtex*, the Superior Court stated that "it has been held that personal jurisdiction over all of the participants in concerted action may be maintained where a significant part of the action took place in the forum state." *Id.* at 195 (citing federal district courts in Pennsylvania and Georgia). In that case, however, the defendants had "purposefully entered Pennsylvania to record transfers of property situated in Pennsylvania," which was the basis for the plaintiff's fraudulent conveyance claims in that case. *See id.* Thus, personal jurisdiction was proper regardless of the alleged conspiracy.

forum" may that defendant potentially be subject to jurisdiction. Otherwise, it may not. *Id.*; *see also Martin v. Eide Bailly LLP*, No. 1:15-cv-1202-WTL-DKL, 2016 WL 4496570 (S.D. Ind. Aug. 26, 2016) (considering co-conspirator jurisdiction under *Walden* and concluding that it does not comport with due process); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2015 WL 4508938, at *4 (E.D. Mich. July 24, 2015) (rejecting conspiracy jurisdiction and noting "[t]he Court has no basis for imputing the actions of one defendant to another in analyzing jurisdiction"); *Murphy v. Am. Gen. Life Ins. Co.*, No. EDCV1400486JAKSPX, 2015 WL 4379834 (C.D. Cal. July 15, 2015) (under *Walden*, conspiracy allegations are insufficient to establish personal jurisdiction); *Spivak v. Law Firm of Tripp Scott, P.A.*, No. 1:13-CV-1342, 2015 WL 1084856, at *5 (N.D. Ohio Mar. 10, 2015) (rejecting theory that "contacts of one alleged member of a civil conspiracy with the forum state may be attributed to other members of that conspiracy who have no such personal contacts"); *Hanna v. Blanchette*, No. CIV. A. H-13-3119, 2014 WL 4185816, at *5 (S.D. Tex. Aug. 21, 2014) (same).

The obvious flaw with co-conspirator jurisdiction is that it conflates the standard to impose *liability* with that necessary to assert *personal jurisdiction*. Courts have long distinguished between these standards because they are governed by different rationales. "Liability depends on the relationship between the plaintiff and the defendants and between the individual defendants," while "jurisdiction depends only upon each defendant's relationship with the forum." *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990). Unlike the attribution rules of conspiracy law, which are designed to broaden the pool of resources from which an injured plaintiff may recover,[11] the restrictions on personal jurisdiction "are a consequence of territorial

---

[11] Riback, 84 Colum. L. Rev. at 530.

limitations on the power of the respective States." *Bristol-Meyers*, 137 S. Ct. at 1780 (quotations omitted).

For this reason, the Supreme Court has for decades analyzed liability and personal jurisdiction under different standards, holding, for example, that the kind of foreseeability needed for liability to attach is not a "sufficient benchmark" for exercising personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Instead, "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

      **ii.**      *Plaintiff's allegations of conspiracy do not establish personal jurisdiction over the Victory Park Defendants or GPLS.*

Even if the conspiracy theory of personal jurisdiction survived *Walden* or *Bristol-Meyers* in some form, it cannot be applied to establish jurisdiction over any of the Victory Park Defendants or GPLS because none of these defendants' alleged conspiratorial conduct is alleged to have occurred in Pennsylvania.

The primary lesson from *Walden* and *Bristol-Meyers* is that the only relevant conduct for purposes of personal jurisdiction is the conduct giving rise to the particular defendant's liability. Here, Plaintiff attempts to hold the Victory Park Defendants and GPLS liable because they allegedly "conspired to violate [the COA] by agreeing to facilitate—and profiting from—lending activity that was illegal in Pennsylvania." (SAC ¶ 146.) None of these purported liability-creating activities, however, had any connection to or were directed at Pennsylvania.

With respect to the alleged "conspiracy," Plaintiff does not allege that any of the Victory Park Defendants or GPLS had any meetings or negotiations or made any agreements with any party (including the non-party Tribes) in Pennsylvania. The alleged "facilitation"—presumably

the Victory Park Defendants' fund to GPLS and GPLS's purchase of participation interests from the Tribes—occurred entirely outside of Pennsylvania; and was directed exclusively at the Tribes' businesses on the reservation. (Zemnick Decl. ¶¶ 11, 14.) Indeed, GPLS did not fund any particular loans to Pennsylvania consumers (it purchased a participation interest in a portfolio of loans *after* the loans were issued). And, as discussed above, it assumed no relationship with those consumers.

To the extent these defendants "profited" from their investments in the Tribes' businesses, they did not do so in Pennsylvania. Payments to GPLS were made by the Tribes, not consumers, who were the obligors to GPLS's participation interests. (*Id.* ¶ 14.) None of those transactions occurred in Pennsylvania or were governed by Pennsylvania law. (*Id.* ¶¶ 11, 14.)

Finally, that lending to or collection from Pennsylvania residents may have been a foreseeable result of the alleged financing arrangement created and executed outside the state is insufficient to establish personal jurisdiction under *Walden*. In *Walden*, Nevada plaintiffs sued an out-of-state defendant for conducting an allegedly unlawful search of the plaintiffs while they were in Georgia preparing to board a plane bound for Nevada. *Walden*, 134 S. Ct. at 1120. That the plaintiffs were Nevada residents and "suffered foreseeable harm in Nevada" was insufficient for due process purposes because the "*relevant* conduct occurred entirely in Georgi[a] . . . the mere fact that [this] conduct affected plaintiffs with connections to the forum State d[id] not suffice to authorize jurisdiction." *Id*. at 1124, 1126; *see also Asahi Metal Indus. Co. v. Sup. Ct. of Cal.*, 480 U.S. 102, 109 (1987) (even though Japanese manufacturer knew that some of its products were being used in California, it could not be haled into a California court because it did not "advertise or solicit business in California and did not create, control or employ the distribution system that brought its valves to California").

The same is true here.  Even if it might have been foreseeable that Pennsylvania residents would access the Tribes' websites to obtain loans, that is not sufficient to assert personal jurisdiction over the Victory Park Defendants or GPLS, whose relevant conduct occurred exclusively outside the state and was not directed at these residents.  Instead, the acts of third parties—Pennsylvania consumers accessing another third-party's website—are the sole link to Pennsylvania.  The Supreme Court has repeatedly held that such unilateral acts of third parties cannot create personal jurisdiction over a defendant whose actions occurred outside of the state. *Walden*, 134 S. Ct. at 1123; *World-Wide Volkswagen*, 444 U.S. at 297.

## E. Exercising Personal Jurisdiction Over the Victory Park Defendants or GPLS Would Offend Traditional Notions of Fair Play and Substantial Justice.

The final inquiry in the personal jurisdiction analysis considers whether exercising jurisdiction would offend traditional notions of fair play and substantial justice.  In conducting this inquiry, the court's "primary concern" is on the burden to the non-resident defendant of proceeding in the foreign forum.  *Bristol-Meyers*, 137 S. Ct. at 1780.  In assessing that burden, the Court must consider not only "the practical problems resulting from litigating in the forum," but it must also consider "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question."  *Id.*

"[R]estrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient litigation or distant litigation.  They are a consequence of territorial limitations on the powers of the respective States.'"  *Id.* (*quoting Hanson v. Denckla*, 357 U.S. 235, 251 (1958)); *see also World-Wide Volkswagen*, 444 U.S. at 295 ("[E]ven if the forum is the most convenient forum for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.").  Considering these respective burdens on the Victory Park Defendants and GPLS against the

nominal interest of the Commonwealth in seeking relief from them in Pennsylvania, exercising personal jurisdiction would be unreasonable.

First, litigating in the Eastern District of Pennsylvania would unquestionably be a significant practical burden on GPLS and the Victory Park Defendants, which are located outside of the state and have no offices, employees, documents, facilities, or other business in Pennsylvania. (*See* Zemnick Decl. ¶¶ 3-10.) Indeed, GPLS, the only newly added defendant with any contractual relationship with the Tribes, is a foreign entity with no physical presence in the United States.

Second, the federalism considerations built into "traditional notions of fair play and substantial justice" weigh heavily against asserting personal jurisdiction in Pennsylvania. This is a case where "this federalism interest [is] . . . decisive," *Bristol-Meyers*, 137 S. Ct. at 1780, because Pennsylvania's interest in regulating investments by non-residents in non-resident tribal businesses (which are themselves self-governing sovereigns) is minimal. As an initial matter, Plaintiff's attempts to enforce a Pennsylvania statute that regulates the collection of unlawful debts against non-residents that have neither marketed, originated nor collected any debts in Pennsylvania, nor invested or received income from their investments in Pennsylvania, is so offensive that it violates the extraterritoriality principle of the Dormant Commerce Clause, which prohibits a state from "regulating commerce wholly outside that State's borders." *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989); *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982). Here, GPLS, a Cayman Islands entity, transacted only with Tribes located in other states when it purchased participation interests and received payments on them. (Zemnick Decl. ¶ 11.) Pennsylvania law simply does not govern those transactions, which occurred exclusively outside the borders of Pennsylvania. *See, e.g.*, *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N.*

*Am., Inc*., 492 F.3d 484, 490 (4th Cir. 2007) (under the extraterritoriality principle, a South Carolina statute could not be interpreted to regulate automobile sales to South Carolina residents occurring out of state); *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010) (holding that the application of Indiana's interest rate cap to title loans made and executed in Illinois violated the Dormant Commerce Clause even though the loans were made to Indiana residents).

Moreover, Plaintiff's interest in obtaining relief from the Victory Park Defendants or GPLS, in addition to the existing defendants, is dubious. The COA only authorizes the Attorney General to "prevent and restrain violations" of the COA. 18 Pa. C.S.A. § 911(d)(1)(i). The SAC, however, concedes that the offending activity ended in mid-2013. (*See* SAC ¶ 116.) Indeed, all of the funds associated with VPCA have already divested themselves of their non-management shares in GPLS, leaving Think Finance the sole remaining equity holder in GPLS. (Zemnick Decl. ¶ 20.) As a result, there is no reason to believe that recovery from the Victory Park Defendants would further any interest in "prevent[ing] or restrain[ing]" violations. (*See* SAC ¶ 130.) In fact, recovery would likely be cumulative of any recovery from the remaining defendants.

Moreover, to the extent Plaintiff is motivated by a desire to punish the Victory Park Defendants or GPLS, or to discourage others from doing the same, that interest is illegitimate. The Supreme Court has explained that "it follows from . . . principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing [their] lawful conduct in other States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996).

**II.**     **PLAINTIFF FAILS TO STATE A CLAIM AGAINST THE VICTORY PARK DEFENDANTS OR GPLS WITH RESPECT TO THE ALLEGED "RENT-A-BANK" LENDING PROGRAM.**

Although the SAC is virtually devoid of factual allegations regarding the Victory Park Defendants' or GPLS's involvement in the ThinkCash program, and indeed concedes that this purported "rent-a-bank" program began many years before VPCA had any relationship with Think Finance and that the FBD stopped originating loans around the same time or just a few months after VPCA agreed to finance the program, Plaintiff appears to assert claims against the Victory Park Defendants and GPLS with respect to that program. (*See* SAC ¶¶ 128-31, 142, 149 (listing ThinkCash among the alleged "racketeering" enterprises).) If that is the case, such claims are not sufficiently pleaded and should be dismissed pursuant to Rule 12(b)(6).[12]

**A.     The Alleged "Rent-a-Bank" Program.**

Plaintiff alleges that starting around 2001, Think Finance, then PayDay One, extended payday loans to consumers over the internet. (SAC ¶¶ 38-39.) Prior to a 2008 policy change by the Pennsylvania Banking Department regarding online payday lending, Think Finance allegedly participated in a so-called "rent-a-bank" lending model, in which it partnered with FBD, a Delaware-charted bank, to act as the "nominal lender" for the "ThinkCash" loans, while Think Finance operated as the "*de facto*, non-bank lender" and "marketed, funded and collected the loan and performed other lender functions." (SAC ¶¶ 40, 44.) Plaintiff suggests that as a result of regulatory pressure, FBD withdrew from the ThinkCash loan program and stopped originating new loans by December 2010. (SAC ¶ 92.)

Plaintiff's allegations pertaining to the Victory Park Defendants or GPLS with respect to the "ThinkCash" program are sparse. Plaintiff pleads only that, beginning at the end of July

---

[12] The Victory Park Defendants and GPLS's motion to dismiss pursuant to Federal Rule 12(b)(6) is brought in the alternative to its motion pursuant to Federal Rule 12(b)(2).

2010, VPCA agreed to provide funding to the program and that Think Finance guaranteed VPCA a 20 percent return. (SAC ¶ 88.) As security, VPCA allegedly formed GPLS for the purpose of holding participation interests in some portion of the FBD-originated loans. (SAC ¶ 89.) GPLS then entered an administrative agreement with TC Administrative Services, LLC ("TCAS"), a Think Finance affiliate, whereby TCAS would manage the participation interests and pay the guaranteed rate of return to GPLS. (SAC ¶ 90.) Just four months later, in December 2010, the ThinkCash program stopped originating new loans. (SAC ¶ 92.) FBD is no longer in business and was officially dissolved in October 2012. (SAC ¶ 48.)

Based upon these facts alone, Plaintiff contends in Count I that VPCA "participated as a principal" with respect to the "racketeering activity" of ThinkCash, 18 Pa. C.S.A. § 911(b)(1); in Count II, that VPCA "conducted and participated in the affairs of [the GPLS] funding enterprises," 18 Pa. C.S.A. § 911(b)(3); and in Count III, that the Victory Park Defendants and GPLS "conspired to violate [the COA], by agreeing to facilitate—and profiting from—lending activity that was illegal in Pennsylvania," 18 Pa. C.S.A. § 911(b)(4).

## I. Counts I and II fail to state a claim against VPCA under 18 Pa. C.S.A. Sections 911(b)(1) or (3) with respect to the alleged "rent-a-bank" scheme.

The SAC fails to state a claim against VPCA with respect to the ThinkCash program under either 18 Pa. C.S.A. Sections 911(b)(1) or (3). To be found liable under the COA, a defendant must either act as a "principal" with respect to the racketeering activity (*i.e.*, collect on unlawful debts) or play a part in "directing the [racketeering] enterprise's affairs." *Reyes v. Ernst & Young*, 507 U.S. 170, 179 (1993) (interpreting the Racketeering Influenced Corrupt Practices Act).[13] Absent direction of the enterprise's affairs, providing otherwise lawful services

---

[13] It is well settled that Pennsylvania's COA is modeled after the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, and that courts look to RICO case law in interpreting the

to an enterprise does not subject a defendant to COA liability. *See id.*; *see also Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003) ("Regardless of how indispensable or essential such services may have been, rendering a professional service by itself does not qualify as participation in a RICO enterprise.").

Plaintiff does not allege that VPCA collected on any ThinkCash loans. Nor does Plaintiff allege any facts to suggest that VPCA was involved in the design, creation or direction of the alleged "rent-a-bank" program or ever conducted any of its affairs. Indeed, the program had been put in place many years prior. At most, Plaintiff's allegations establish that VPCA structured a financing transaction in which GPLS supplied capital to the supposed "ThinkCash" enterprise, and Think Finance did the rest. That is not enough to state a claim.

Courts have repeatedly held that simply lending money to, or investing in, an enterprise is insufficient to establish a role in directing the enterprise's affairs. *Dongelewicz v. PNC Bank Nat'l Ass'n*, 104 F. App'x 811, 817 (3d Cir. 2004) (finding that when a bank provided financing to an alleged RICO enterprise, the bank did not conduct the affairs of the enterprise, did not directly participate in fraud or extortion, and did not violate Section 1962(d)); *Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 690 (8th Cir. 2008) (finding that providing financial assistance and investment to entity "may assist a customer engaging in racketeering activities" but does not mean investor is directing customer's affairs for purposes of RICO liability); *Renaissance Ctr. Venture v. Lozovoj*, 884 F. Supp. 1132, 1146 (E.D. Mich. 1995) ("[P]assive financing arrangements are insufficient to give rise to [RICO] liability. Because defendants . . . did not manage or direct the enterprise, they may not be liable under RICO"); *Indus. Bank of*

---

COA. *See Commonwealth v. Donahue*, 630 A.2d 1238, 1245 (Pa. Super Ct. 1993) (looking to RICO case law in interpreting the COA).

*Latvia v. Baltic Fin. Corp.*, No. 93 Civ. 9032(LLS), 1994 WL 286162, at *3 (S.D.N.Y. Jun. 27, 1994) (granting motion to dismiss RICO claim against bank because "provid[ing] banking services—even with knowledge of the fraud is not enough" to state a RICO claim).

These decisions reflect the logical conclusion that financing ordinary business operations does not demonstrate the requisite operation and control necessary for COA liability. The Third Circuit's holding in *Dongelewicz* is particularly instructive. In that case, CBG, a development company, acquired a large tract of land in Pennsylvania and developed it into a mixed residential and recreational development. *Id.* at 813–14. First Eastern Bank served as the primary source of financing for CBG, providing CBG with a multi-million dollar development loan and line of credit, which were secured by CBG's accounts receivable on notes secured by purchase money mortgages, which lot owners (the "Purchasers") provided to CBG when buying lots in the development. *Id.*

First Eastern financed 90 percent of CBG's costs, and, when mortgage payments were received from Purchasers, the funds would be wired to First Eastern as payment on the receivable line. *Id.* Eventually, CBG began to default on its loan and line of credit. First Eastern made cash infusions and loans to CBG to keep the development alive and thereby preserve its collateral. Those cash infusions ultimately failed and CBG filed for bankruptcy. *Id.* at 814.

The Purchasers then brought suit against First Eastern, alleging violations of the RICO provisions that are analogous to the COA claims asserted here. They claimed that First Eastern knowingly infused the insolvent developer with funds as a "scheme" designed to allow CBG to appear solvent to the Purchasers. *Id.* at 814. The Third Circuit rejected each of the Purchasers' RICO claims.

Applying *Reves*, the Third Circuit held that First Eastern was not liable under

Section 1962(c) because it "was merely a lender – it supplied financing for a development that failed, and then took steps to preserve its collateral." *Id.* at 818. Relying on several of its own precedents, the Third Circuit held:

> [W]e are unwilling to hold that merely because a lender requires security and approval of aspects of construction, the lender thereby takes 'control' of the project. To do so would wreak havoc on the lending industry, for any lender who reasonably wished to protect itself would be forced to run the risk of being sued for the unknown fraudulent acts of its borrowers.

104 F. App'x at 817 (quoting *Bhatla v. U.S. Capital Corp.*, 990 F.2d 780, 788 (3d Cir. 1993)). Critically, the court noted that while "a major creditor of a corporation can have 'substantial persuasive power' and some legal authority over management," such facts, alone, are "not equivalent to having the power to conduct or participate directly or indirectly in the conduct [or] the affairs of those corporations." *Id.* at 817–18 (quotation omitted).[14]

In *Dahlgren*, the Eighth Circuit adopted the *Dongelewicz* court's approach. There, the Eighth Circuit held that a bank that served as primary lender to a feedlot did not direct the feedlot's operations or management during the time period in which the plaintiffs allegedly were injured by the bank's purported pattern of racketeering activity. *Id.* at 690. The *Dahlgren* court reasoned that courts "must carefully distinguish between the bank conducting its own affairs as creditor, and the bank taking additional steps as an outsider to direct the operation or management of its customer, the RICO enterprise." *Id.* "A bank's financial assistance and professional services may assist a customer engaging in racketeering activities, but that alone

---

[14] With respect to the loans issued by the Tribes, Plaintiff at least attempts to plead around *Dongelewicz*, by arguing that VPCA had some role in the "design and direction of the scheme" by "determining the volume of lending by the 'tribal' entities based on its assessment of *its own risk tolerance*," and by marketing the investment to potential investors in GPLS. (SAC ¶¶ 93, 137) (emphasis added.) These allegations reflect nothing more than a benign secured financing arrangement, which the evidence will surely bear out. With respect to the FBD-originated loans, however, Plaintiff pleads no additional facts to suggest that VPCA had any role other than to supply funding (long after the program was in place), which is plainly deficient under the reasoning of *Dongelewicz*.

does not satisfy the stringent operation and management test" applicable to RICO claims. *Id.* (internal marks omitted).

VPCA's short-lived investment in the ThinkCash consumer loan program is no different. VPCA is alleged only to have provided funding to the lending program conceived of and established by Think Finance many years earlier, long before VPCA's alleged involvement. Notably, Plaintiff does not, and cannot, allege that VPCA directed the operation and management of the ThinkCash consumer loan program. Clearly, they had no hand in such activities. That VPCA negotiated a "guaranteed return" on its investment reinforces the fact that it was not exposure to the success or failure of ThinkCash, or any particular consumer loan. Indeed, VPCA's contractual relationship was divorced from the consumer lending activity. Clearly, VPCA was advancing its own interests, not the interests of any enterprise, by negotiating a guaranteed rate of return.[15] Because Plaintiff does not allege that VPCA managed or operated anyone's affairs other than its own, Counts I and II should be dismissed. *Reves*, 507 U.S. at 185.[16]

**II. Count III fails to state a "conspiracy" claim against the Victory Park Defendants or GPLS with respect to the ThinkCash lending program.**

For many of the same reasons, Plaintiff's conclusory allegations that the Victory Park Defendants were engaged in a so-called "conspiracy" to violate the COA fails as well. To plead such a cause of action, "a plaintiff must aver that: (1) there was an agreement to commit the

---

[15] Count II is also patently deficient because it alleges that VPCA is liable for conducting and participating in the affairs of the "funding enterprises," rather than the affairs of the racketeering enterprises, and otherwise fails to plead that VPCA conducted the affairs of such enterprises "through a pattern of racketeering." (SAC ¶ 139.) *See* 18 Pa. C.S.A. § 911(b)(3).

[16] The Victory Park Defendants and GPLS join all of the arguments made by the Think Defendants and Rees in support of their motions to dismiss, including, without limitation, that Plaintiff's claims relating to FBD are preempted by federal law. In light of the Court's January Order denying those motions, however, these arguments are restated for purposes of preserving those issues for appeal only.

predicate acts of [racketeering activity], and (2) defendants had knowledge that those acts were part of a pattern of racketeering activity." *Khan v. Vayn*, 2014 U.S. Dist. LEXIS 17287 (E.D. Pa. Feb. 11, 2014); *see also Tyler v. O'Neill*, 994 F. Supp. 603, 615 (E. D. Pa. 1998). Noticeably absent from the SAC is any allegation—conclusory or otherwise—that the Victory Park Defendants or GPLS knew (or even could have known at the time) of the allegedly illicit nature of the ThinkCash program at the time they invested,[17] or that they entered into an agreement with anyone to collect on unlawful loans. As the SAC concedes, VPCA is simply not in the business of making or collecting on consumer loans. Rather, VPCA is a private equity firm that manages investments in structured financing arrangements. Against this backdrop, Plaintiff's suggestion that Victory Park Defendants knowingly agreed to participate in a conspiracy to illegally collect on usurious loans in Pennsylvania—based solely upon its supplying capital to ThinkCash and obtaining security for that investment through GPLS—falls flat.

At most, Plaintiff pleads facts showing that VPCA conducted its business as usual (*i.e.*, by supplying capital to businesses, obtaining guarantees from its counterparties, and then obtain security for those investments). Such business activities are legal and appropriate and do not, as Plaintiff suggests, reflect any nefarious plan to evade Pennsylvania's usury laws. As is clear from Plaintiff's allegations, the Victory Park Defendants simply did not engage in behavior sufficient to make them either a principal with respect to the alleged racketeering activity nor did they play any part in directing the alleged ThinkCash enterprise's affairs. Accordingly, Count III should be dismissed as it pertains to the ThinkCash program.

---

[17] For FBD's loans to Pennsylvania consumers to be "unlawful" requires determining that Think Finance was the "true lender" of FBD-originated loans at the time they were originated. The possibility of that complex and novel legal conclusion was not even apparent until this Court's January Order. Accordingly, it cannot be said that the Victory Park Defendants and GPLS had knowledge of the possibility that the loans – issued by a state-chartered bank – were unlawful.

## III.    CONCLUSION.

For the foregoing reasons, the Victory Park Defendants respectfully request that the

Court grant their motion and dismiss the SAC for lack of personal jurisdiction pursuant to Rule

12(b)(2) and, alternatively, with respect to ThinkCash program claims for failure to state a claim

pursuant to Rule 12(b)(6).


Dated:  August 25, 2017

/s/ Mark J.  Levin
Mark J. Levin, Esq.
Attorney I.D. No. 26601
Elanor A. Mulhern, Esq.
Attorney I.D. No. 322185
Christopher J. Willis (Pro Hac Vice)
Daniel L. Delnero (Pro Hac Vice)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: 215.665.8500
Fax: 215.864.8999
levinmj@ballardspahr.com
mulherne@ballardspahr.com

/s/ Daniel P. Shapiro
Daniel P. Shapiro (Pro Hac Vice)
Dawn M. Canty (Pro Hac Vice)
Patrick M. Smith (Pro Hac Vice)
Matthew W. Haws (Pro Hac Vice)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Tel:     (312) 902-5200
Fax:     (312) 902-1061

*Attorneys for Victory Park Capital Advisors, LLC,
Victory Park Management, LLC, GPL Servicing,
Ltd., GPL Servicing Agent, LLC, GPL Servicing
Trust, GPL Servicing Trust II, and VPC/TF Trust I*