```
                                                                    1
              UNITED STATES BANKRUPTCY COURT
               NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION


IN RE:                              .  Case No.
                                    .  17-33964-11
                                    .
THINK FINANCE, LLC,                 .  Dallas, Texas
                                    .
DEBTOR                              .  Wed., October 25, 2017
. . . . . . . . . . . . . . . .




                  Hearing on First Day Motions






         BEFORE THE HONORABLE HARLIN DeWAYNE HALE
              UNITED STATES BANKRUPTCY JUDGE










 Proceedings recorded by electronic sound recording;
 transcript produced by transcription service.
```

APPEARANCES:

| | |
|---|---|
| Counsel for Think<br>Finance, LLC: | MR. GREGORY GETTY HESSE<br>Hunton & Williams<br>1445 Ross Ave., Suite 3700<br>Dallas, TX  75202-2799 |
| | and |
| | MR. TYLER BROWN<br>MR. JASON HARBOUR<br>Hunton & Williams<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219 |
| Counsel for Victory Park<br>Capital Advisors and<br>Victory Park Management: | MS. PATRICIA TOMASCO<br>Jackson Walker LLP<br>1401 McKinney St., Suite 1900<br>Houston, TX  77010 |
| | and |
| | MR. ADAM PAUL, MS. ANNA ROTMAN, MR. JUSTIN BERNBROCK<br>Kirkland & Ellis, LLP<br>300 North LaSalle<br>Chicago, IL 60654 |
| Counsel for the United<br>States Trustee: | MS. LISA LAMBERT<br>MR. STEPHEN McKITT<br>Office of The U.S. Trustee<br>Earle Cabell Federal Building<br>1100 Commerce Street, Room 976<br>Dallas, TX  75242 |
| Electronic Court<br>Reporter: | MS. NICOLE WHITTINGTON_____<br>U.S. Bankruptcy Court<br>1100 Commerce St.<br>Dallas, Texas 75242 |
| Transcription Service: | MS. DIANE LANCASTER<br>6728 Kirkwood Rd.<br>Fort Worth, TX  76116<br>(817) 845-4139 |

1  <u>DALLAS, TEXAS, WEDNESDAY, OCTOBER 25, 2017, 2:11 P.M.</u>

2  THE COURT: I'll take appearances in Think
3  Finance, first in the courtroom, and I think we may
4  have one person by CourtCall.

5  MR. HESSE: Good afternoon, Your Honor. Greg
6  Hesse, and I have my partners Tyler Brown and Jason
7  Harbour on behalf of Hunton & Williams, on behalf of
8  the debtors.

9  MS. TOMASCO: Good afternoon, Your Honor.
10  Patty Tomasco on behalf of Victory Park Capital
11  Advisors and Victory Park Management. Both are LLCs.
12  I think I introduced to the Court on the phone
13  yesterday some people from Kirkland & Ellis who are
14  also counsel for Victory Park, Adam Paul, Anna Rotman,
15  and Justin Bernbrock. We filed pro hac vices for a
16  variety of people this afternoon. I don't think the
17  Court has had a chance to review those, but if they
18  could appear. Ms. Rotman is admitted in the Northern
19  District.

20  THE COURT: They can appear this afternoon.
21  MS. TOMASCO: Thank you.
22  MS. LAMBERT: May it please the Court, Judge
23  Hale, my name is Lisa Lambert. With me today is
24  Stephen McKitt. We represent the United States
25  Trustee, William Neary.

1  THE COURT: Welcome. Does anyone wish to make
2  an appearance by CourtCall?
3  OPERATOR: Your Honor, we do have counsel
4  dialed in. This is the CourtCall operator. However,
5  they are on listen-only mode.
6  THE COURT: Right. I will note for the
7  lawyers that we have several members of the press also
8  on listen only on CourtCall. You may proceed.
9  MR. HESSE: Good afternoon again, Your Honor.
10  Greg Hesse on behalf of the debtors, Think Finance,
11  LLC, Think Finance SPV, LLC, Financial U, LLC, Tailwind
12  Marketing, LLC, TC Administrative Services, LLC, TC
13  Decision Sciences, LLC, and TC Loan Services, LLC.
14  First of all I'd like to thank Your Honor and your
15  staff for your courtesies that have been extended to us
16  over the last couple of days in order to get here today
17  on our first day hearings. We truly appreciate the
18  help that y'all have provided to us.
19  Prior to the hearing I had provided binders of
20  first day motions and orders. I just wanted to make
21  sure that those were provided to you. And at this
22  point we'd like to take up the matters on the agenda.
23  The first two matters are our pro hac vice motions, as
24  I mentioned in the announcements, that I have in here.
25  In here, two of my partners, Tyler Brown and Jason

Harbour.  Both Mr. Brown and Mr. Harbour are members in good standing of the Bar of the Commonwealth of Virginia.  Mr. Harbour is also a member of the State Bar of Delaware.  We filed yesterday motions to appear pro hac vice for both Mr. Brown and Mr. Harbour.  Last time I looked, I don't think orders have been entered.  I would request that the Court authorize Mr. Brown and Mr. Harbour to appear before the Court today.

THE COURT:  They may appear today, and I'll try to sign all the orders sometime today.

MR. HESSE:  Okay, thank you.  Additionally, Your Honor, the third matter under the agenda is the request for emergency consideration of the first day matters.  Assuming that we're here, I hope that the Court would enter the order approving the emergency motions.

THE COURT:  I'm not going to deny that, Mr. Hesse.

MR. HESSE:  Very good.  Thank you, Your Honor.  And with that, Your Honor, I will now turn the podium over to Mr. Brown, who will present the administrative motions.

MR. BROWN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. BROWN:  Tyler Brown of Hunton & Williams.

1  Your Honor, I would like to introduce the Court to a
2  few of the management members of the debtors who are in
3  the courtroom, some of whom have filed declarations in
4  the case. On the right-hand side here in the front
5  row, that is Mr. Barney Briggs, who filed the first day
6  declaration. He is the CFO of the debtor companies.
7  On the second row is Martin Wong. He is the CEO of the
8  debtor companies. Mr. Tom Graber beside him is general
9  counsel. And you're familiar with Mr. Albergotti from
10 Haynes and Boone. He represents the parent company and
11 some non-debtor affiliates. We recently made sure that
12 those companies had good counsel to provide them with
13 the guidance they need in a case like this. So we're
14 glad to have him on board as well.
15         Your Honor, these debtors are singularly
16 focused on returning as much to the creditors as they
17 can, maximizing these estates, and we believe the
18 creditors in this case actually will be paid in full.
19 We are of the belief that the claims that are facing
20 the company in the way of litigation claims are
21 meritless, and that we will actually prevail on those
22 claims; that the claim that you've heard about that
23 belongs to Victory Park Capital actually will not be an
24 allowed claim in this case, and that we at the end of
25 the day will actually be able to return money fully to

1  creditors and actually may come out of this case
2  solvent with equity staying intact.
3       I'd like to walk you through a little bit.  I
4  know you've probably read a lot of papers already, and
5  I'd like to walk you through a little bit through an
6  opening statement that's all based on the declarations,
7  the verified complaint that's already in the record to
8  tell you a little bit about how we got here.  And there
9  is significant paper on file, and I think probably as a
10 result of some actions yesterday, you better understand
11 where we're coming from a little bit and why we had to
12 effectively file considerable pleadings to set out for
13 the Court really what the dilemma is and why we're
14 here.
15      We believe, Your Honor, that this is a bit of
16 an unusual case, and you probably already know that.
17 We are not debtors who are struggling in a failing
18 business.  These are not like the retail cases where
19 the market's changed, you know, we're being left
20 behind.  This isn't a company with too much secured
21 debt on it that we can't service.  That's not what this
22 is about.  This is all about illiquidity.  Our money is
23 currently tied up and our money is being spent to
24 address legal actions that we think are legally
25 deficient.

1  Two primary reasons we are here is the Victory
2  Park situation. An investment firm has seized the
3  debtor's cash and its income flow, and it's alleged
4  that it's done that as a secured creditor, holding
5  property of the estate, and to hold it for purposes of
6  contingent indemnity claims, claims that may never come
7  due and indemnities that may never apply. That's our
8  cash. We can't operate without our cash. We've worked
9  the best we can prepetition to try to come to an
10 agreement. We've exhausted those efforts, and we saw
11 the end of our liquidity on the horizon. We had to
12 come get relief. We had to seek relief from -- we had
13 to seek the automatic stay to give us some help.
14      The second is these lawsuits I mentioned. We
15 are parties to lawsuits in four states. We believe
16 those lawsuits miscomprehend the facts. I think our
17 pleadings in this case have laid out those facts a
18 little better than perhaps the plaintiffs in those
19 cases have understood to this point. But there are
20 mounting defense costs, having our lawyers in various
21 states defend these claims at a time when our money is
22 tied up. So, the debtors want to take advantage of the
23 turnover and cash collateral provisions of the
24 Bankruptcy Code to regain access to our cash and to our
25 future income. We want to obtain the protections of

1  the automatic stay against the use of our cash, and the
2  breathing spell that comes with it with respect to
3  litigation.  Then we want to implement, Your Honor, a
4  claims process in this court.  We want to effectively
5  channel these claims and any outstanding claims that
6  may not have been brought into one forum so we can deal
7  with these, have the Court address these theories, and
8  we can decide whether or not these are legitimate
9  claims or not.  But we can't continue with the
10 significant burden of the defense costs, particularly
11 at a time when our money is tied up.
12       As I said at the outset, we believe the
13 debtors are solvent, and we believe when we work
14 through this process we'll be able to propose a Chapter
15 11 plan for these debtors, which will return equity.
16 And if we can't get to that point and we find ourselves
17 with insufficient assets and income to pay those claims
18 in full, then we'll have a process where we commit the
19 assets of this company to the legitimate creditors and
20 we'll use that process to wind up the business.
21       The debtors, Your Honor, were founded in 2001.
22 This isn't a recently created, overnight, fly-by-the-
23 seat-of-the-pants company.  This is a company that's
24 been around.  It developed significant technology;
25 software platforms that allow their lender clients to

market, underwrite, originate, identify opportunities for those lender clients to make loans. And that's been its business for a very long time. It has had a lender business at one point. This debtor is no longer, and hasn't been for several years, a consumer lender. They are merely a fintech, a financial technology firm providing services to lender clients. That's what they do.

Now, the story here of how we got to this point really starts in 2011, when Think Finance and its predecessor entities were looking for additional financial investments, sell the company, and they were approached by Victory Park Management. There were discussions about doing some sort of financial transactions together, and Victory Park brought to the debtors the idea of investing in loan participations of loans that would be created by Native American tribes. These tribal lenders, or these sovereign tribe-created lenders, would generate loans and they would do so in part using the technology of our clients. Our clients provided services to lots of lenders and this was one of their client bases. But Victory Park brought the idea of creating a new entity, this entity called GPLS, and that entity would buy loan participations, and Victory Park as well as Think would buy shares in that

1 entity, GPLS.

2 And as a result of their discussions Victory Park demanded that Think Finance buy approximately 25 percent of the interest in GPLS. They would buy the rest with their various funds that they manage, as well as some other family and friend investors, but they would essentially have the lion's share of the interest. And that process was put in place. They created GPLS as a Cayman Islands entity. They then orchestrated a loan participation program. That process started and it ran fairly happily, I guess, as business partners, if you will, not technically partners, but they both were investors in GPLS for about six years. And there were healthy returns earned and GPLS not only got a fixed return -- I'm sorry, the investors in GPLS not only got a fixed return on their money, but at the end of the loan participation program, the parties were entitled to get their invested capital back.

Well, in 2016 Victory Park decided they wanted to end the loan participation program at the end of its term, which was to run out naturally March 31st, 2017. And in order to pay back the investors, the parties decided they needed to stop reinvesting money and let then the money flow into GPLS, build the cash to pay

back the stockholders. Victory Park was paid back every dollar it and its investors were owed, fully redeemed, completely, by May 31, 2017. The only party that wasn't redeemed was the debtor entity, Think Finance SPV, one of the debtors in this case. So, as a result of those transactions, Think SPV as the 100 percent equity owner of this entity called GPLS, it is entitled to absolutely every dollar that comes into that entity.

And what has happened is, after Victory Park got redeemed, then they shut off the valve. They refused to allow my clients to get paid their fixed return. They refused to allow the additional money that was collected and invested capital come back, and they refused to pay administrative agent fees to one of the debtor clients, TC Administrative Services. That's the agent that actually does the work to collect from the tribal lenders the monies that are owed to GPLS, deposits to GPLS, determines how much GPLS owes to various creditors, orchestrates the payment. They're the parties that create the money, they're entitled to an agent fee, they shut that off as well. So our clients lost all income sources coming from the GPLS investment, just as soon or shortly after Victory Park got their money.

1  Now, why did they do it? They did it, as I
2  mentioned earlier, because they have these contingent
3  indemnity claims. They have been sued, Victory Park
4  has been sued in one of our cases, the Pennsylvania
5  case. GPLS is also a defendant in several of these
6  cases as well. And the best we can determine, based on
7  their statements, is they were nervous about whether or
8  not there were going to be adequate funds available to
9  pay a contingent indemnity claim eventually if they had
10 liability and if they had incurred fees that were
11 reimbursable and indemnifiable. They wanted to have a
12 pot of money sitting there for an indefinite period of
13 time to have as their collateral, to have as their
14 security. Well, that, of course, starved our clients.
15 We made repeated demands for our money. They
16 understood this was going to drive us into bankruptcy,
17 and at the end of the day, I think we all now concluded
18 that's where they wanted us to be.
19 So here we are, and we are here at a place
20 where we need the protection of the automatic stay.
21 Our clients yesterday were surprised they didn't have
22 the benefit of the automatic stay. Property of the
23 debtors sitting in the hands of an alleged secured
24 creditor was taken out of the estate yesterday. So, we
25 need the help of this Court to not only restore the