**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, by Attorney General JOSH SHAPIRO, | : : : | |
| Plaintiff, | : : | CIVIL ACTION |
| v. | : : | No. 14-cv-7139 |
| THINK FINANCE, INC., et al., | : : | |
| Defendants. | : | |


## MEMORANDUM

Joyner, J.                                                    January 26, 2018

Before the Court are Defendants Victory Park Capital Advisors, LLC, Victory Park Management, LLC, GPL Servicing Agent, LLC, GPL Servicing, Ltd., GPL Servicing Trust, GPL Servicing Trust II, and VPC/TF Trust I's (collectively, the "movants") Motion to Dismiss (Doc. No. 192), Plaintiff's Response in Opposition thereto (Doc. No. 194), and the movants' Reply in Support thereof (Doc. No. 198). For the following reasons, the Motion to Dismiss is DENIED IN PART and GRANTED IN PART.

## I.    Factual and Procedural Background[1]

This action concerns high-interest rate, short-term loans made to Pennsylvania residents over the Internet.  The Plaintiff, the Office of the Attorney General ("OAG"), alleges that Defendants Think Finance, Inc. ("Think Finance"), TC Loan Service, LLC, Tailwind Marketing, LLC, TC Decision Sciences, LLC, Financial U, LLC, and Think Finance's President and CEO, Kenneth Rees (collectively, the "Think Finance Defendants"), violated Pennsylvania and federal laws prohibiting usurious and otherwise illegal lending practices.  Second Amended Complaint ("SAC") ¶ 2 (Doc. No. 205).

In its Second Amended Complaint, the OAG names as co-defendants Victory Park Capital Advisors, LLC ("VPCA"), Victory Park Management, LLC ("VPM"), GPL Servicing Agent, LLC, GPL Servicing Ltd., GPL Servicing Trust, GPL Servicing Trust II, and VPC/TF Trust I.[2]  In Counts I and II, the OAG alleges that the

_____

[1] Unless otherwise noted, the following facts are taken from Plaintiff's Second Amended Complaint ("SAC").  (Doc. No. 149-2).  With respect to the movants' argument for dismissal under Fed. R. Civ. P. 12(b)(6), these allegations are generally taken as true.  See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  As discussed below, with respect to the movants' argument for dismissal under Fed. R. Civ. P. 12(b)(2), the Plaintiff must make a prima facie case for personal jurisdiction, supporting jurisdictional facts through sworn affidavits or other competent evidence.  Patterson v. FBI, 891 F.2d 595, 604 (3d Cir. 1990) (internal quotation marks omitted).

[2] In their Motion to Dismiss, VPCA, VPM, and GPLS Servicing Agent, LLC refer and treat themselves as a single entity, the "Victory Park Defendants." In the same Motion, GPL Servicing, Ltd., GPL Servicing Trust, GPL Servicing Trust II, and VPC/TF Trust I refer to and treat themselves as a single entity, "GPLS." Defs.' Mem. at 1-2 (Doc. No. 192-2).  The Court will adopt the movants' categorizations and will consider each Defendant interchangeable with its group, as both parties have done throughout their filings.  This treatment is understandable given the corporate structure attested to by VPCA's General

Think Finance Defendants and VPCA are liable for violating Pennsylvania's Corrupt Organizations Act ("COA") for their conduct relating to the payday lending schemes at issue.[3]  In Count III, the OAG alleges that all Defendants are liable for conspiring to violate the COA under 18 Pa. C.S.A. Section 911(b)(4).

In response to the OAG's Second Amended Complaint, the Victory Park Defendants and GPLS filed a Motion to Dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## A.    The Alleged Scheme

The OAG alleges that the Defendants designed, implemented, and profited from a consumer lending scheme to circumvent the usury laws of states, such as Pennsylvania, that prohibit such lending activity.  OAG Mem. at 3 (Doc. No. 194).

Pennsylvania's Loan Interest and Protection Law ("LIPL") prohibits lenders who are not licensed under the Consumer Discount Company Act ("CDCA") from charging an interest rate in excess of

---

(*footnote continued*)

Counsel, whereby VPCA essentially controls and manages each of the affiliated entities included in "Victory Park Defendants" and "GPLS." See Zemnick Decl. ¶¶ 1, 4 (noting VPCA wholly owns VPM), 5 (noting VPM wholly owns GPL Servicing Agent, LLC, which was created to serve as a special purpose entity to serve as a director of GPLS), 6-8 (noting GPLS was the sole beneficiary of VPC/TF Trust I, VPC/TF Trust II, and GPL Servicing Trust II before they were terminated) (Doc. No. 192-3).

[3]  Specifically, in Count I, the OAG alleges that the Think Finance Defendants and VPCA violated 18 Pa. C.S.A. Section 911(b)(1).  In Count II, the OAG alleges that the Think Finance Defendants and VPCA violated 18 Pa. C.S.A. Section 911(b)(3).

six-percent per year on a loan amount less than $50,000. SAC ¶¶ 32-33; 41 P.S. § 201(a). Since February 1, 2009, LIPL's yearly six percent interest rate limitation has been applied to resident and non-resident lenders issuing loans in Pennsylvania, whether done through storefronts or over the Internet. 38 Pa. Bull. 3986 (July 26, 2008); Cash America Net of Nev., LLC v. Com., Dept. Of Banking, 8 A.3d 282, 293-96 (Pa. 2010). The Defendants are not licensed under the CDCA and are therefore prohibited from making or collecting on any consumer loans in excess of six percent per year. SAC ¶ 37.

To circumvent the LIPL, the Defendants partnered with an out-of-state bank and later with Native American tribes, in schemes colloquially known as "rent-a-bank" and "rent-a-tribe." In the alleged "rent-a-bank" scheme, the Think Finance Defendants partnered with the First Bank of Delaware ("FBD"), an out-of-state bank, sometime in the mid-2000s. Id. ¶¶ 40, 44. In this scheme, FBD would act as the nominal lender while the Think Finance Defendants were the defacto lender in charge of marketing, funding, and collecting the loans. Id. Because FBD was regulated by the Federal Deposit and Insurance Corporation ("FDIC"), federal bank preemption doctrines provided FBD with immunity from state regulations such as the LIPL. Id. ¶ 41.

The OAG claims that VPCA "agreed to join and support the Think Finance Defendants' illegal-lending scheme" around 2010. SAC ¶¶

88-89. VPCA did so by making "an initial commitment of at least $90 million to be used in funding [the] loans" in exchange for a fixed 20 percent return on investment, guaranteed by the Think Finance Defendants. Id. ¶¶ 88-90. VPCA formed VPC/TF Fund I, Ltd. and VPC/TF Fund II, Ltd., which were later folded into or renamed as GPLS, for the purpose of purchasing "participation interests" in the loans originated by FBD. Id. ¶¶ 89, 94. As the holder of participation interests, these entities would have a right to the payments that FBD received on the loans, without fully assuming or outright purchasing the loans from FBD.

The OAG alleges that the Defendants began devising a tribal lending scheme in the face of mounting regulatory pressure against their "rent-a-bank" scheme. Id. ¶¶ 45-49. Similar to the "rent-a-bank" scheme, the "rent-a-tribe" scheme was designed to avoid state usury laws by issuing payday loans in partnership with Native American tribes. Id. ¶¶ 50-52. The tribal entity would act as the nominal lender and the Defendants, the defacto lender, would avoid state regulation under the cloak of the tribe's sovereign immunity. Id. ¶ 50.

Like in the "rent-a-bank" scheme, GPLS operated as a special purpose vehicle under VPCA's control that would collect the revenue from the participation interests, pay the loan program's operating expenses, pay a fixed rate of return to VPCA and its other investors, and distribute the remaining revenue to Think Finance.

<u>Id.</u> ¶ 95.

According to the OAG, "VPCA actively participated in the design and direction of the scheme, including the development and maintenance of the finance and contractual structures used to (a) fund the consumer loan operation, (b) direct the flow of dollars and the accounting for that flow and (c) erect the facade of tribal control." <u>Id.</u> ¶ 93. Indeed, VPCA began its participation in the scheme before the Think Finance Defendants had reached an agreement with a tribal partner. <u>Id.</u> ¶ 92.

Importantly, "VPCA itself determined the volume of lending by the 'tribal' entities based on its assessment of its own risk tolerance." <u>Id.</u> ¶ 93. The OAG alleges that VPCA closely monitored the regulatory landscape in relation to this scheme. <u>Id.</u> ¶ 110. For example, in 2013, when banks began expressing concern that federal regulation prohibited them from processing ACH payments from loan customers that held accounts at the banks, VPCA placed restrictions on the scheme's loan origination practices. <u>Id.</u> ¶¶ 110-11.

The regulatory pressure continued to increase in 2013 when one of the tribal lenders challenged New York's attempt to regulate online-lending operations based on tribal reservations. <u>Id.</u> ¶ 112. Following the district court's decision to reject the tribe's sovereign immunity argument, <u>id.</u> (citing <u>Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.</u>, 974 F. Supp. 2d 353

(S.D.N.Y. 2013)), Think Finance's CFO noted how decisive the court's opinion was to VPCA: "The tribe's appeal of the NY ruling will be heard in early Dec[.] so there won't be any change in the [new loan] strategy until that appeal is ruled on. If the ruling is as bad as the first one, then GPLS will probably stop purchasing all loans and the tribal portfolios will go into wind down. If the tribe wins, they may decide to start purchasing more loans." Id. ¶ 113. Later that year, the Second Circuit ultimately affirmed the district court's decision. Id. ¶ 114 (citing Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105 (2d Cir. 2014)).

In response to the foregoing regulatory pressure, Defendants began winding down the tribal lending scheme and stopped accepting loans from Pennsylvania borrowers. Id. ¶ 116. While Defendants stopped issuing loans to Pennsylvania residents in 2013, Defendants continued servicing existing loans into 2014 when the OAG initiated this action. Id. ¶¶ 117-19.

## II. Personal Jurisdiction

Rule 12(b)(2) allows a defendant to assert a motion to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Once challenged, the plaintiff "bears the burden of establishing the court's personal jurisdiction over the moving defendants." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

If the court does not hold an evidentiary hearing on the motion, as here, "the plaintiff need only establish a prima facie case of personal jurisdiction." Id. The plaintiff must sustain its prima facie case for personal jurisdiction through a preponderance of the evidence. Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992). While the Court must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff, id. at 142 n.1, "the plaintiff must sustain its burden . . . through sworn affidavits or other competent evidence." Patterson v. FBI, 893 F.2d 595, 604 (3d Cir. 1990) (internal quotation marks omitted).

Federal courts may assert personal jurisdiction over non-resident defendants "to the extent permissible under the law of the state where the district court sits." Pennzoil Prods. Co. v. Colelli & Ass's, Inc., 149 F.3d 197, 200 (3d Cir. 1998) (internal quotation marks omitted). Pennsylvania's long-arm statute "permits Pennsylvania courts to exercise personal jurisdiction over nonresident defendants 'to the constitutional limits of the Due Process Clause of the Fourteenth Amendment.'" Id. (quoting Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1220, 1221 (3d Cir. 1992)). "A district court's exercise of personal jurisdiction pursuant to Pennsylvania's long-arm statute is therefore valid as long as it is constitutional." Id. (citing Farino, 960 F.2d at 1221).

Of course, jurisdiction may be general or specific in nature. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systemic' as to render them essentially at home in the forum State." Id. General jurisdiction empowers a state to assert jurisdiction over nonresidents "regardless of whether the subject matter of the cause of action has any connection to the forum." Farino, 960 F.2d at 1221.

The OAG does not attempt to establish that the Victory Park Defendants and GPLS had "continuous and substantial" contact with Pennsylvania to justify general jurisdiction. The OAG does not challenge certain averments in the affidavit offered by VPCA's General Counsel, Mr. Zemnick, in support of the Motion to Dismiss. Zemnick Decl. (Doc. No. 192-3). Specifically, the OAG did not challenge Mr. Zemnick's assertion that the Victory Park Defendants are Delaware limited liability companies headquartered in Chicago, Illinois, and "[do] not maintain any offices, bank accounts, PO boxes, telephone listings or real property in Pennsylvania." Zemnick Decl. ¶¶ 3-5. As for GPLS, Mr. Zemnick asserts that it "is a Cayman Island exempted company" that lacks those same contacts with Pennsylvania as the Victory Park Defendants. Id. ¶ 10-12.

Rather than challenge these facts, the OAG focuses its argument on specific jurisdiction.

To support a finding of specific jurisdiction, due process requires the plaintiff show: (1) the defendant "purposefully directed its activities at the forum," (2) the litigation arises out of or relates to at least one of those activities, and (3) the exercise of jurisdiction "otherwise comports with fair play and substantial justice." Allaham v. Naddaf, 635 Fed. App'x 32, 39 (3d Cir. 2015) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); O'Connor v. Sandy Lane Hotel Co., 486 F.3d 312, 317 (3d Cir. 2007)). In actions akin to intentional torts, such as this one, the "proper focus of the 'minimum contacts' inquiry" is "the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 134 S. Ct. 1115, 1125 (2014) (quoting Calder v. Jones, 465 U.S. 783, 788 (1984)). Even if a defendant did not take any physical actions in the forum, the defendant's out-of-state conduct at issue in the litigation may nevertheless create a sufficient relationship between the defendant and the forum to support personal jurisdiction. Calder v. Jones, 465 U.S. at 788.

The Victory Park Defendants and GPLS argue that all of their activities underlying the OAG's claims occurred exclusively outside of Pennsylvania. Defs.' Mem. at 9 (Doc. No. 192-2). VPCA insists

that its agreements with the Think Finance Defendants to guarantee and create security for GPLS's participation interests were negotiated and executed outside of Pennsylvania.  Id.  GPLS argues that its only conduct relevant to the loans was its purchase of participation interests from the tribes, which was also negotiated and executed outside of Pennsylvania.  Id.; see Defs.' Reply at 2 (Doc. No. 198).  The movants insist that they "never originated, serviced or collected on any tribal loans in Pennsylvania (or anywhere else for that matter)." Defs.' Mem. at 10 (citing Zemnick Decl. ¶¶ 14, 16).  The movants essentially argue that it was the tribal entities, not the movants, who had contacts with Pennsylvania residents.

However, the movants fail to account for other contacts relevant in this litigation.  As noted above, specific jurisdiction is not solely based on physical presence.  Instead, specific jurisdiction is based on the "relationship among the defendant, the forum, and the litigation." Walden, 134 S. Ct. at 1121-26.  As the Third Circuit has held, "[s]pecific jurisdiction over a defendant exists when that defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.'" Miller Yacht Sales, Inc., 384 F.3d at 96 (quoting Rudzewicz, 471 U.S. at 472).

Based on the record before the Court, the OAG has established by a preponderance of the evidence that the movants have sufficient contacts with Pennsylvania to justify personal jurisdiction. As discussed below, the OAG has shown that the movants actively participated in the design, implementation, and direction of a scheme that targeted customers located in Pennsylvania with the payday loans that are the subject of this litigation. This conduct constitutes sufficient suit-related contacts with Pennsylvania to support specific jurisdiction. In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003) (holding a defendant's level of participation in a conspiracy targeting residents in a forum may satisfy the Calder effects test); see In re Aluminum Warehousing Antitrust Litig., 90 F. Supp. 3d 219, 232 (S.D.N.Y. 2015) (rejecting specific jurisdiction where plaintiff failed to show the defendant "participated in any particular meeting at which the . . . conspiracy was discussed"); id. at 233-34 (rejecting jurisdiction where plaintiff failed to show that the defendant took any "specific actions . . . in which the unlawful conspiracy was furthered in some manner").[4]

_____

[4] The parties spend a considerable amount of their briefing on the propriety of "conspiracy jurisdiction," whereby one conspirator's contacts are assigned to a co-conspirator who would otherwise lack sufficient contacts with the forum. However, the OAG has shown that the movants, on their own, took sufficient actions with respect to the scheme that availed themselves of Pennsylvania. This does not invoke conspiracy jurisdiction simply because the movants acted in accordance with other participants. Therefore, the Court need not address the merits of conspiracy jurisdiction.

First, the OAG has shown that the movants targeted potential and existing customers located in Pennsylvania. The purpose of the "rent-a-tribe" scheme was to target customers in states, such as Pennsylvania, which otherwise would have prohibited the Defendants from offering the payday loans at issue. Pointedly, the OAG provided an email authored by Think Finance CFO, Mr. Lutes, in which he discusses why the scheme may not offer loans in certain states. Ackelsberg Decl., Ex. 13. Mr. Lutes noted that the "primary reason" products may not be offered in a state is "the state's attorney general (litigious, negative attitude toward tribal lending, etc.)." Id. In an another email exchange around the same time, Mr. Lutes sends Victory Park principal, Mr. Welsh, the scheme's "No-State List," which provides a list of the states where the scheme did not offer its loan products. Id., Ex. 12. Notably absent from the "No-State List" is Pennsylvania, where the Defendants collected on the third- to sixth-highest volume of loans. Id. ¶ 19; Id., Ex. 14. Moreover, Think Finance's answers to interrogators establish that the scheme issued about $133 million in loans to 97,000 Pennsylvania consumers, which resulted in an additional $127 million in interest and fees. Both the purpose and result of the scheme establish that its participants, including the movants, targeted customers located in Pennsylvania.

Second, the OAG has shown that the movants were early participants and helped develop the "rent-a-tribe" scheme. The OAG

presented a document authored by Think Finance CEO, Mr. Rees, that outlines the timing of the movants' participation. Ackelsberg Decl., Ex. 1. Mr. Rees notes that in July 2010, the Victory Park Defendants "provided a $100 million commitment at 20% to participate in the Universal Fund," which was used for the "rent-a-bank" scheme. Id. Mr. Rees goes on to note that "[i]n Q2 2011," after the "rent-a-bank" scheme ended in the face of regulatory pressure, "Think Finance began partnering with various tribes that originated similar installment loans under the sovereign lending model," and that "[VPCA] created the GPLS Fund to purchase loan participations from these tribes." Id.

In addition, the OAG presented a 2011 Think Finance PowerPoint entitled "Great Plains Lending Meeting," which details the scheme's planned structure. Id., Ex. 6. According to the PowerPoint, the Think Finance entities would sell leads, license the brand, and provide technology and risk management support to a tribal entity – yet to be identified – who would be the face of loan originations. Id. at 8. The loans would then be purchased by "GPL Servicing (VPC Purchasing Entity)," a reference to GPLS. Id. With the money collected on those loans, GPLS would pay a fixed return to the "VPC (Hedge Fund)," VPCA, and send the remaining "net income as [a] monthly admin fee" to "TF Admin Services," a Think Finance affiliate. Id. The Victory Park Defendants and GPLS formalized this structure with the Think Finance Defendants through a series

of service agreements and guarantees. <u>Id.</u>, Exs. 9-11. This evidence supports the conclusion that the movants were active in the design and establishment of the "rent-a-tribe" scheme, which as noted above, was purposefully directed at Pennsylvania residents.

Lastly, evidence shows that the movants were active participants with actual control over the scheme. <u>Id.</u>, Ex. 16. Not only did Victory Park fund the scheme through GPLS, but it later illustrated its control over the scheme when it forced a temporary halt to the purchase of all participation interests. <u>Id.</u> When regulatory pressure increased against the "rent-a-tribe" scheme, VPCA established a new policy that restricted the tribes to "fund[] repeat customers but not new customers." <u>Id.</u> Later, when Think Finance wanted to increase the scheme's volume of lending, it was Think Finance who sought VPCA's permission to loosen these restrictions. <u>Id.</u>

This level of engagement takes the movants from passive investors to collaborators in a scheme that targeted Pennsylvania residents. Even though this conduct occurred outside of Pennsylvania, it connects them "to the forum in a meaningful way." <u>Walden</u>, 134 S. Ct. at 1125; <u>see</u> <u>In re Magnetic Audiotape Antitrust Litig.</u>, 334 F.3d at 208. Accordingly, the Victory Park Defendants and GPLS's motion to dismiss for lack of personal jurisdiction is denied.

## III.  Failure to State a Claim

The Victory Park Defendants and GPLS move this Court to dismiss the OAG's Second Amended Complaint to the extent the OAG claims that the movants are liable under Pennsylvania's Corrupt Organizations Act ("COA") for their involvement in the "rent-a-bank" scheme.

The OAG and the movants offer two competing views of this issue.  The OAG argues "rent-a-bank" and "rent-a-tribe" were two phases of a single scheme that violated the COA.  According to the OAG, the movants are merely requesting that the Court strike allegations that connect them to the "rent-a-tribe" phase.  In contrast, the movants argue that "rent-a-bank" and "rent-a-tribe" are two independent schemes, and that the Court should dismiss Counts I, II, and III for failure to state a claim with regard to their alleged conduct in the "rent-a-bank" scheme.

To be clear, the movants do not argue Counts I, II, and III should be dismissed with respect to their alleged behavior in the "rent-a-tribe" scheme.  The movants only insist that the OAG has failed to plead sufficient allegations relating to their behavior in the "rent-a-bank" scheme that would render them liable under 18 Pa. C.S.A. Section 911(b)(1),(3), and (4), as the OAG claims in Counts I, II, and III.

The Court finds that both parties are correct in varying degrees.  It is true that the allegations suggest that the "rent-a-

16

tribe" scheme grew out of the "rent-a-bank" scheme, and that the two are therefore connected in some sense. However, whether we call these two phases of the same scheme or two independent schemes is a distinction without a difference, at least at this stage of the litigation. At the heart of this issue is whether the movants can be held liable under the COA for their alleged conduct during the "rent-a-bank" scheme. That question is properly presented to the Court in the movants' Motion to Dismiss.

A party may move to dismiss a complaint, in full or in part, for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering such a motion, a district court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." <u>Krantz v. Prudential Invs. Fund Mgmt. LLC</u>, 305 F.3d 140, 142 (3d Cir. 2002) (quoting <u>Nami v. Fauver</u>, 82 F.3d 63, 65 (3d Cir. 1996)). While a court generally cannot consider matters outside the pleadings, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks and alteration omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556

U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citation omitted). Although a plaintiff is entitled to all reasonable inferences from the facts alleged, a plaintiff's legal conclusions are not entitled to deference, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).

In Count I, the OAG claims that the Think Finance Defendants and VPCA are liable under 18 Pa. C.S.A. Section 911(b)(1) for, among other things, their conduct in the "rent-a-bank" scheme. SAC ¶¶ 120-31. In pertinent part, this section of the COA provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity in which such person participated *as a principal*, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise . . . .

18 Pa. C.S.A. § 911(b)(1) (emphasis added).

In Count II, the OAG claims that the Think Finance Defendants and VPCA are liable under 18 Pa. C.S.A. Section 911(b)(3) for, among other things, their conduct in the "rent-a-bank" scheme. <u>Id.</u> ¶¶ 132-42. This section of the COA provides:

It shall be unlawful for any person employed by or associated with any enterprise to *conduct or participate*, directly or indirectly, *in the conduct of such enterprise's affairs* through a pattern of racketeering activity.

18 Pa. C.S.A. Section 911(b)(3)(emphasis added).

Pennsylvania's COA is modeled after the federal Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. Sections 1961-1968, and courts routinely look to RICO case law when interpreting the COA. Commonwealth v. Donahue, 630 A.2d 1238, 1245 (Pa. Super. Ct. 1993). While cases interpreting RICO are not controlling, they are instructive. Commonwealth v. Dennis, 618 A.2d 972, 607 (Pa. Super. Ct. 1992) (citing Commonwealth v. Taraschi, 475 A.2d 744 (1984)).

To incur COA liability under Section 911(b)(1), the defendant must have participated in racketeering activities as a principal.[5] To incur COA liability under Section 911(b)(3) for conducting the enterprise's affairs, the defendant must have "'participate[d] in the operation or management of the enterprise.'" Dongelewicz v. PNC

---

[5] While Pennsylvania law does not define "principal," federal law defines it as anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission." 18 U.S.C. § 2. However, under the Third Circuit's holding in Rolo v. City investing Co. Liquidating Trust, 155 F.3d 644, 657 (3d Cir. 1998), the more general 'aiding and abetting' language of 18 U.S.C. § 2 does not create a private right of action to hold a defendant liable for aiding and abetting a RICO violation. The Third Circuit noted that if Congress wanted to create aiding and abetting liability under RICO, it would have done so in the RICO statute. Id. Neither party has directed the Court's attention to, and the Court has not been able to find through its own research, any Pennsylvania court that has addressed whether a civil plaintiff may sue a "principal" under 18 Pa. C.S.A. Section 911(b)(1) for aiding and abetting an unlawful enterprise. Regardless of whether Rolo controls our interpretation of the COA, we nevertheless find the Third Circuit's analysis persuasive. We therefore hold that 18 Pa. C.S.A. Section 911(b)(1) does not create a private right of action for aiding and abetting violations of the COA.

Bank Nat'l Ass'n, 104 Fed. App'x 811, 817 (3d Cir. 2004) (quoting Reves v. Ernst & Young, 507 U.S. 170, 183 (1993)) (interpreting analogous RICO language).

In Dogelewicz, a development company, CBG, secured primary lending from First Eastern Bank to develop a large piece of land. Id. at 813-14. CBG secured its line of credit with First Eastern Bank with the payments it received from the individuals who purchased sub-lots in the development. Id. After CBG began to default on its line of credit, First Eastern Bank provided cash infusions to CBG to keep CBG from insolvency. Id. at 814. Once CBG filed for Chapter 11, the lot purchasers filed RICO claims against First Eastern Bank, claiming the bank participated in a scheme to conceal CBG's insolvency while knowing that CBG never intended to build the development. Id. at 814, 817. The Third Circuit upheld the trial court's dismissal of the purchasers' RICO claims, holding that the purchasers failed to plead facts that showed First Eastern Bank participated in the "operation and management" of the alleged enterprise. Id. at 817-18.

In contrast to the OAG's allegations about VPCA's conduct in the "rent-a-tribe" scheme, the OAG fails to show how VPCA could be liable under the COA for its alleged participation in the "rent-a-bank" scheme. The OAG provides plenty of allegations about VPCA's conduct in the "rent-a-tribe" scheme that, if proven true, would render VPCA liable under the COA. For example, the OAG alleges

that *after* FBD withdrew from the "rent-a-bank" scheme, "VPCA agreed to continue its involvement in the illegal-lending scheme, participating with the Think Finance Defendants in the development of the 'tribal lending' model." SAC ¶ 91. The OAG provides specific allegations regarding VPCA's participation in the "development and maintenance" of the enterprise's structure, and that "VPCA itself determined the volume of lending by the 'tribal' entities based on its assessment of its risk tolerance. Id. ¶ 93. These allegations are sufficient to show VPCA acted as a principal, and participated in the operation and management, of the "rent-a-tribe" scheme.

However, with respect to VPCA's conduct in the "rent-a-bank" scheme, the OAG only alleges that VPCA joined the scheme by being a primary investor and created GPLS to purchase participation interests from the "rented" bank. Id. ¶¶ 88-90, 127-29; see OAG Mem. at 24-25. But a defendant does not incur liability under the COA for merely funding an alleged unlawful enterprise. See Dongelewicz, 104 Fed. App'x at 117-18. Given the lack of allegations regarding VPCA's conduct in the "rent-a-bank" scheme – either as a principal or as a participant involved in the operation and management of that scheme – the OAG has failed to plead sufficient allegations that would render VPCA liable under 18 Pa. C.S.A. Section 911(b)(1) and (3).

Regarding Count III, the OAG likewise fails to allege anything more than VPCA and GPLS were merely passive investors in the "rent-a-bank" scheme. To be liable under 18 Pa. C.S.A. Section 911(b)(4) for conspiracy to violate the COA, a plaintiff must aver that: "(1) there was an agreement to commit the predicate acts of [racketeering activity], and (2) defendants had knowledge that those acts were part of a pattern of racketeering activity." Khan v. Vayn, 2014 U.S. Dist. LEXIS 17287, at *11 (E.D. Pa. Feb. 11, 2014) (interpreting analogous RICO language). Unlike the allegations of VPCA's and GPLS's conduct in the "rent-a-tribe" scheme, the OAG fails to allege specific facts regarding VPCA's and GPLS's conduct in the "rent-a-bank" scheme that would satisfy either element.

Because the OAG has failed to allege facts that would render the movants liable under 18 Pa. C.S.A. Section 911(b)(1), (3), and (4) for their conduct in the "rent-a-bank" scheme, the Court dismisses those aspects of the Second Amended Complaint.[6]

## IV. CONCLUSION

For the foregoing reasons, the movants' Motion to Dismiss is DENIED IN PART and GRANTED IN PART. An appropriate order will follow.

---

[6] For the sake of clarity, Counts I, II, and III remain pending against the movants for the conduct that was not the subject of their Motion to Dismiss, such as their involvement in the "rent-a-tribe" scheme.