LANGER GROGAN & DIVER P.C.
ATTORNEYS AT LAW
1717 ARCH STREET
SUITE 4020
PHILADELPHIA, PA 19103
PHONE: 215-320-5660
FAX: 215-320-5703

HOWARD LANGER
JOHN J. GROGAN*
EDWARD A. DIVER
IRV ACKELSBERG
PETER LECKMAN†

*ALSO ADMITTED IN NEW JERSEY
†ALSO ADMITTED IN CALIFORNIA

IRV ACKELSBERG
DIRECT DIAL (215) 320-5701
iackelsberg@langergrogan.com

June 18, 2018

**HAND-DELIVERED and via ECF**

Hon. J. Curtis Joyner
United States District Court
Room 17614, U.S. Courthouse
601 Market Street
Philadelphia, PA 19103

   **Re:** *Commonwealth of Pa. v. Think Finance, Inc., et al.*
      **Civil Action No. 14-cv-07139**

Dear Judge Joyner:

  We write to respond in opposition to the request by defendant Think Finance, Inc. for an order compelling Rule 30(b)(6) testimony from the Commonwealth of Pennsylvania. The Commonwealth has justifiably refused to produce a witness that can testify about Pennsylvania state loan programs. Such testimony would cause the Commonwealth undue burden and would be irrelevant to any issue before the Court in this matter. The Commonwealth has also justifiably refused, pursuant to the work-product doctrine, to produce its own attorneys for examination by the defendants concerning their interviews with witnesses the defendants will themselves be deposing. As for defendant's demand to examine those attorneys concerning their confidential communications with other law enforcement and regulatory agencies, such communications are protected by the deliberative process and law enforcement investigative privileges, under the common interest doctrine.

  **Background**

  In March 2018 the Office of Attorney General (OAG) was served with three separate Rule 30(b)(6) deposition notices directed to the Commonwealth of

Pennsylvania, by, respectively, Think Finance, Kenneth Rees and Victory Park Capital. The Commonwealth objected to each of those notices. Through OAG and its outside counsel, the Commonwealth conducted meet-and-confer discussions with each of these three sets of defendants. Not satisfied with OAG's response to its notice, Think Finance submitted its request for an order compelling testimony on June 6, 2018.

As set forth in the June 6 letter, Think Finance's request is directed to the following three topics included in the 30(b)(6) notice:

- Topic One: "The Commonwealth's inclusion of choice-of-law provisions in loan contracts entered into by the Commonwealth since 2010 where the Commonwealth was the lender, and whether those provisions always, sometimes or never require the Commonwealth's own laws to apply to the contract. This includes any such contracts that concern programs for loans funded in full or in part, or sponsored, by the Commonwealth, including loan programs for students, veterans, state employees, low income persons, and whether those provisions always, sometimes or never require the Commonwealth's own laws to apply to the contract."

- Topic Two: "The Commonwealth's use of investors and/or service-providers for purposes of operating any loan programs funded in full or in part, or sponsored, by the Commonwealth, including loan programs for students, veterans, state employees, low income persons."

- Topic Seven: "All interactions, correspondence, communications or documents exchanged, or cooperation, between the Commonwealth or any of its lawyers, and . . .

    iv. any current or former employees or officers of Plain Green, LLC, Great Plains Lending, LLC, or Mobiloans, LLC . . .;

    . . .

    vii. the United States of America, Department of Justice, Consumer Financial Protection Bureau, Federal Trade Commission, or any other federal regulator (collectively, "the Federal Regulators") regarding the Defendants and/or the loans at issue in this Litigation, either as it pertains to this Litigation or any actual or potential litigation, enforcement action, or investigation by the Federal Regulators; [or]

viii. regulators of other states, including the attorneys general of other states, regarding the Defendants and/or the loans at issue in this Litigation, either as it pertains to this Litigation or any actual or potential litigation, enforcement action or investigation by any of the state's regulator."

**Legal Discussion**

A. **The Commonwealth Does Not Have to Produce a Witness Who Can Testify to Details Concerning Pennsylvania State Loan Programs as This Topic Has No Relevance to Counterbalance the Significant Burdens It Would Impose**

Discovery requests must be "relevant to [the requesting party's] claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). When moving to compel discovery, the requesting party bears the initial burden of establishing the relevance of the information sought. *Morrison v. Phila. Hous. Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001). The burden then shifts to the party resisting disclosure to show that "the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 383 (E.D. Pa. 2013) (citing *McConnell v. Canadian Pac. Realty Co.*, 280 F.R.D. 188, 193 (M.D. Pa. 2011) ). "However, when a request for discovery is overly broad on its face or when relevancy is not readily apparent, the party seeking the discovery has the burden to show the relevancy of the request." *Cunningham v. Standard Fire Ins. Co.*, 2008 WL 2902621 at *1 (D.Colo.). See *Marook v. State Farm Mut. Auto. Ins. Co.*, 259 F.R.D. 388, 394–95 (N.D. Iowa 2009). This is such a case.

In this action, the Pennsylvania Attorney General is asserting his statutory powers to combat racketeering and unfair and deceptive practices in the consumer marketplace. He is seeking to recoup, at a minimum, the more than $100 million in illegal interest and fees collected by the Defendants,[1] who, the Commonwealth alleges,

---

[1] According to discovery responses by Think Finance, the scheme collected approximately $127 million in interest and fees from Pennsylvania consumers—of which approximately $17 million was collected during the earlier "rent-a-bank" enterprise with First Bank of Delaware—and an equivalent amount in repaid principal. The Pennsylvania Corrupt Organizations Act, 18 Pa. C.S.A. § 911 does not distinguish between interest or principal if the underlying loan is illegal

devised a scheme in which they paid three tribal entities to serve as nominal lenders in an effort to cloak themselves vicariously with the tribes' sovereign immunity from state law enforcement. The Commonwealth alleges that the choice-of-law provisions in loan agreements claiming that tribal, not state law, govern its online loan products are sham, as are the defendants' characterizations of themselves as mere service providers. In fact, among other things, 99% of the loan interests have been on Think Finance's balance sheets, Think Finance bore all the risk of loss, and Think Finance (with its co-conspirator, Victory Park Capital) designed and controlled virtually every aspect of the loan program.[2]

In Topics One and Two, Defendants are demanding that the Commonwealth produce a witness to describe Pennsylvania's own state loan programs, with regard to the choice-of-law provisions used in the loan agreements for such programs and the Commonwealth's use of third-party investors and service providers. These details concerning Pennsylvania state loan programs bear no relation whatsoever to the truth or falsity of the Commonwealth's allegations against Defendant and its co-conspirators. As set forth in the attached Affidavit of Sarah A. E. Frasch, the Deputy Attorney General who directs the Bureau of Consumer Protection ("BCP" or "Bureau") within the Office of the Attorney General ("OAG"), "this case is about the Defendants' loan programs, not the Commonwealth's." Frasch Affidavit, ¶ 29. Moreover, as affirmed by Dep. Attorney General Frasch, there are over 65 Pennsylvania agencies and departments a number so high that "it would require several days of concentrated work" just to identify what state loan programs exist, let alone to assemble loan

---

and imposes interest rates in excess of 25%. *See* 18 Pa. C.S.A. § 911(h) (defining "racketeering activity" as including "[t]he collection of *any money* . . . in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum or the equivalent rate for a longer or shorter period, where not otherwise authorized by law") (emphasis added). Here the loans made by the challenged scheme *averaged* 250% APR.

[2] To date, after the production of more than a million documents and the deposition of Think Finance and Victory Park executives, there is no evidence that the tribes drafted loan agreements and insisted on the inclusion of tribal choice-of-law provisions. On the contrary, the evidence is that Think Finance was seeking to continue its pre-existing "ThinkCash" loan program when it approached the Chippewa Cree tribe in Montana, substituting the tribe for the earlier nominal lender, First Bank of Delaware. Think Finance essentially came to the tribe with a fully designed loan program that was making loans online just weeks after the tribe was first approached.

agreements, investigate how those programs function and prepare an appropriate witness for examination. *Id*. at ¶ 28. Given the extraordinary burden that this request would impose, it lacks proportionality as well as relevance.

   B. **Given the Protections of the Work-Product Doctrine, the Commonwealth Should Not Have to Produce Its Attorneys for Deposition by Defendant Concerning Their Interviews with Former Officers or Employees of Plain Green When Defendant Is Taking the Deposition of Those Former Same Officers or Employees**

There is no basis to compel the Commonwealth's attorneys to be deposed regarding their interviews of former employees of one of the tribal entities associated with the Think Finance lending scheme. The very case relied upon by the Think Finance Defendants, *In Re Linerboard Antitrust Litigation*, 237 F.R.D. 373, 380 (E.D. Pa. 2006) makes this clear. *Linerboard* plainly states, "an attorney' recollection of witness interviews constitutes opinion work product." 237 F.R.D. at 386 (*citing United States v. Urban Health Network, Inc.*, 1993 WL 12811, at *3 (E.D.Pa. Jan.19, 1993) ("There can be no doubt that notes prepared by an attorney or his agent of oral interviews with witnesses are core work product ...."); *see also Bloch v. Smithkline Beckman Corp.*, 1987 WL 9279, at *2 (E.D.Pa. Apr.9, 1987) (concluding that memorandum based on recollection of oral interview constituted opinion work product). *Linerboard* further holds that where other witnesses are available for deposition, the "availability of witnesses undermined the necessity for the government to 'invade an attorney's file,'" 237 F.R.D. at 387 (*quoting In re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir. 1979)).

Here, with the cooperation of the Commonwealth, three of the four persons interviewed by the Commonwealth's attorneys and designated as a potential Commonwealth witness are set to be deposed by Defendants on June 18th and 19th, with the fourth likely to occur as soon as the witness obtains counsel. *See* Frasch Affidavit at ¶¶ 24-25. The Think Finance Defendants are free to inquire into the substance of the conversations between those witnesses and the Commonwealth attorneys. There is no reason to compel the Commonwealth's attorneys to testify about these same interviews. Their recollections of those interviews are unquestionably protected work product.[3]

---

[3] Think Finance's citation to Judge Davis' opinion in *Buckley v. Clifford Chance LLP*, No. 06-cv-1003, 2008 WL 11365192, at *1 (E.D. Pa. June 25, 2008) does not say anything different. There, a party sought to compel the deposition of a corporate representative under Fed. R. Civ. P. 30(b)(6) although it had already deposed other witnesses (whose testimony did not bind the corporation) on the same topic. The moving party however, as Judge Davis recognized, wanted to establish, on the record, the position of the corporation itself as to the issues. For that reason,

**C. The Important Public Policy Concerns Underlying the Deliberative Process/ Law Enforcement Privileges Under the Common Interest Doctrine Should Protect the Commonwealth from Having to Disclose Its Ongoing, Confidential Communications with Other Law Enforcement Agencies Concerning the Challenged Loan Scheme**

Although not devoting much attention to it in their letter, the Think Finance Defendants also seek to depose a 30(b)(6) witness from the Commonwealth about OAG's communications with other law enforcement agencies. It is important to note that the Commonwealth has produced or will produce non-privileged documents related to the Think Finance loan scheme that it obtained from any of these agencies.[4] Not satisfied with this production, the Think Finance Defendants seek to question the Commonwealth *attorneys* about their communications with the *attorneys* of the CFPB and other state attorneys general. There is no basis for this application and it treads on exceedingly important and dangerous ground.

The Commonwealth has asserted a number of well-established privileges, including the deliberative process privilege and the law enforcement investigative privilege under the common interest doctrine, as well as the attorney work product doctrine, all of which hold firmly that the Think Finance Defendants are not entitled to invade the Commonwealth's communications with other law enforcement entities.

*Common Interest Doctrine*

Under the common-interest doctrine, those communications which are otherwise protected by work product or other applicable privilege, are not waived when shared with parties that hold a common legal interest. "The purpose of the work product

---

the 30(b)(6) deposition was proper. According to Think Finance, what they seek here is testimony as to the facts discussed in the interviews not to establish the Commonwealth's position on a certain issue.

[4] The Commonwealth has identified for production a Think Finance Powerpoint presentation that it obtained from a participant in the multi-state Payday Lending call, and it has produced deposition transcripts it obtained from the CFPB of various Think Finance executives. Not yet produced is a transcript of a tribal employee deposition because of an objection raised by the tribe's counsel. The Commonwealth has informed the attorney that it will produce the transcript unless a request for a protective order is initiated within ten days. Frasch Aff. at 19.

doctrine is to protect information against opposing parties, rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). If the sharing of information with a third party does not substantially increase the likelihood that the adversary will obtain the information, it remains protected by the work product privilege. *In re Raytheon Securities Litigation*, 218 F.R.D. 354, 361 (D. Mass. 2003). The *AT&T* court explained that:

> "[C]ommon interests" should not be construed as narrowly limited to co-parties. So long as transferor and transferee anticipate litigation against a common adversary on the same issue or issues, they have strong common interests in sharing the fruit of the trial preparation efforts. Moreover, with common interests on a particular issue against a common adversary, the transferee is not at all likely to disclose the work product material to the adversary. When the transfer to a party with such common interests is conducted under a guarantee of confidentiality, the case against waiver is even stronger.

*AT&T*, 642 F.2d at 1299-1300.

The court in *AT&T* further noted that "the government has the same entitlement as any other party to assistance from those sharing common interests, whatever their motive is." *Id.* at 1300. And courts have recognized government agencies have a low burden in establishing a common, adversarial interest. *See, e.g.*, *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1202 (D.C. Cir. 1991) ("A law enforcement agency may meet this standard by demonstrating that one of its lawyers prepared a document in the course of an investigation that was undertaken with litigation in mind.").

As made clear in the Frasch Aff., at ¶¶ 11-16, the Commonwealth shares with other law enforcement and governmental agencies a common interest in the enforcement of consumer protection laws across the country, and all participants in those communications have maintained confidentiality, which is the very basis of those communications. Indeed, "This could affect our participation in these exchanges of information if the substance of the communications, and the very fact that our office was participating, were subject to disclosure." *Id.* at ¶ 17.

The important policy reasons underlying the applicability of the common interest doctrine to government attorneys has even greater force in the context of

information-sharing that occurs as part of an active, multi-state/multi-agency law enforcement initiative. See, e.g., *ASARCO, LLC v. Americas Mining Corp.*, No. MS 07-6289, 2007 WL 3504774, at *8 (D. Idaho Nov. 15, 2007) ("Idaho's disclosure of documents to the Department of Justice, its ally in previous litigation against ASARCO, or to the Department's retained expert ... did not result in waiver of the work product privilege. Idaho cooperated with the Department of Justice and its experts against ASARCO at the time it shared the documents."); *SEC v. Rosenfeld*, No. 97 Civ. 1467, 1997 WL 576021, at *4 (S.D.N.Y. Sept. 16, 1997) (law enforcement privilege protected SEC witness from deposition regarding SEC possession of Ontario Securities Commission's deposition of defendant); *Nishnic v. US. Dept. of Justice*, 671 F.Supp. 771, 775 (D.D.C. 1987), *aff'd*, 828 F.2d 844 (D.C. Cir. 1987) (work product privilege not waived when DOJ shared information with Israeli government in prosecution of Nazi war criminals); *see* also Order, *State of Tennessee v. Lexington Law Firms*, No. 3:96-0344 (M.D. Tenn. Sept. 28, 1999) (Plaintiff Tennessee Office of Attorney General did not waive work product protection by sharing information with and receiving information from other state attorneys general) (copy attached hereto).

*Deliberative Process and Law Enforcement Privileges*

The Commonwealth's communications with other government agencies are further protected by the deliberative process privilege. "The deliberative process privilege permits the government to withhold information containing 'confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice.'" *In re Wilmington Trust Securities Litigation*, 2016 WL 9753979, at *4 n.6 (D. Del. Aug. 16, 2016) (quoting *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987)). "[I]n all but exceptional cases the government will not be compelled to produce interagency advisory opinions or correspondence." *Fusco ex rel. NLRB v. Richard W Kaase Baking Co.*, 205 F.Supp. 459, 464 (N.D. Ohio 1962). "[T]he ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).

OAG's ability to freely communicate with other governmental agencies, including, without limitation, those of sister states and the federal government, in order to enforce Pennsylvania laws, is an important capacity of the executive. *See* Frasch Aff. at ¶ 17. These deliberations ensure the quality and efficiency of both on-going and future state investigations and enforcement decisions. *See Redland Soccer Club, Inc. v. Dep't of the Army*, 55 F .3d 827, 854 (3d Cir. 1995) ("[W]ere agencies forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of

administrative decisions would consequently suffer."). *See* Frasch Aff. at ¶14 (noting that this inter-agency communication "promotes the efficiency and integrity of investigations and enforcement proceedings [and] constitutes a significant force-multiplier, where public agencies charged with enforcing the law, and strained always by limited resources, are able to leverage work and expertise from other jurisdictions"). The Commonwealth and other agencies are only able to engage in a frank exchange of ideas and opinions during these law enforcement discussions because the information shared is understood to be privileged and confidential by all parties involved. *Id*. at ¶¶ 15-16. Piercing this confidentiality would be a grave disservice to public policy and the ability of the Pennsylvania Office of the Attorney General and other governmental law enforcement agencies to freely share information regarding the enforcement of consumer protection laws in the future. *Id*. at ¶ 18 ("Discovery of the content of the communications between law enforcement agencies—even mere disclosure of the identities of the entities participating—would cause highly sensitive information regarding investigations to be shared with the very entities or persons under investigation, thereby impairing investigations and the prosecution of entities or persons suspected of or determined to have violated state or federal laws.").

Given the fact that these communications arose in the context of pending enforcement proceedings by the Commonwealth and the CFPB, they also implicate the law enforcement investigative privilege, which bars the disclosure of investigatory files in active proceedings as against the public interest. *See Frankenhauser v. Rizzo*, 59 F.R.D. 339, 342 (E.D. Pa. 1973) (overruled on other grounds). This privilege has been recognized broadly across the federal circuit courts. *See, e.g., Commonwealth of Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007); *Coughlin v. Lee*, 946 F.2d 1152, 1159-60 (5th Cir. 1991); *In re Dept. of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir.1988); *Black v. Sheraton Corp. of America*, 564 F.2d 531, 545-46 (D.C. Cir. 1977); *see also Shah v. Department of Justice*, 714 Fed. App'x 657, 657, 657 n.1 (9th Cir. 2017) ("[W]e assume without deciding that this privilege exists."). "The purpose of this privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dept. of Investigation of City of New York*, 856 F.2d at 484. "The government's interest in protecting investigatory files from disclosure is particularly strong when the files relate to an ongoing investigation." *Startzell v. City of Philadelphia*, No. CIV.A. 05-05287, 2006 WL 2945226, at *4 (E.D. Pa. Oct. 13, 2006) (citing *Fin. Mgmt. Prof'l Corp. v. US.*, No. 88-2272, 1989 WL 35425, at *5 (E.D. Pa. Apr. 11, 1989)).

The Think Finance Defendants are obviously aware that, in addition to defending this action, a live enforcement action by the CFPB is also pending. They are not entitled to question the Commonwealth's attorneys on the discussions that have occurred between those agencies regarding the evidence they have assembled and regarding their respective legal theories. Defendants may be curious about what other enforcement actions they might be facing from other state attorneys general—possibly revealed from mere disclosure of the participants in the multi-state calls, *see* Frasch Aff. at ¶ 18—but the law enforcement investigative privilege bars that disclosure. Clearly, compelling the testimony of Commonwealth attorneys to reveal anything about these calls to the actual subject of these law enforcement communications would be against the public interest.

The Think Finance Defendants have not met the bare minimum of their burden to show how this information is relevant to any claim or defense in this case. Lacking even this minimal showing, potential harms caused by disclosure are disproportional to any likely benefit. *See* R. Civ. P. 26(b)(5)(A)(ii) (providing that a party withholding information is only obligated to describe the nature of the documents not produced or disclosed in a manner "without revealing information itself privileged or protected").

Thank you in advance for your consideration of this matter.

    Respectfully,

    */s/ Irv Ackelsberg*
    Irv Ackelsberg

cc: All Counsel (via email)