# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PA, by | : | CIVIL ACTION |
| Attorney General JOSH SHAPIRO, | : | |
| | : | |
| *Plaintiff,* | : | NO. 14-cv-07139-JCJ |
| | : | |
| v. | : | |
| | : | **CONFIDENTIAL** |
| THINK FINANCE, INC., et al. | : | **Filed Under Seal Pursuant to** |
| | : | **Confidentiality and Protective Order** |
| *Defendants.* | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS KENNETH REES AND NATIONAL CREDIT ADJUSTERS, LLC

JOSH SHAPIRO
Attorney General

SARAH A. E. FRASCH
Chief Deputy Attorney General

JOHN ABEL
Senior Deputy Attorney General

SAVERIO P. MIRARCHI
Senior Deputy Attorney General

Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
1600 Arch St., Ste 300
Philadelphia, Pennsylvania 19103
Phone: (215) 560-2414
smirarchi@attorneygeneral.gov

IRV ACKELSBERG
John J. Grogan
Howard I. Langer
Edward A. Diver
Peter Leckman
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Phone: (215) 320-5660
Email: iackelsberg@langergrogan.com
*Special Counsel to the Commonwealth*

**UNSEALED**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION & PROCEDURAL HISTORY .................................................................. 1

FACTS OF THE CASE.......................................................................................................... 5

   I.     The Earlier Bank Model that Rees Used to Circumvent State Law ......................... 5

   II.    Rees's Decision to Transition to a Tribal Model, His Search for Tribes
          and His Embrace of the Deception of Tribal Sovereign Immunity ......................... 7

   III.   The Dominance of Think Finance over the Lending Enterprises ........................... 11

   IV.   A Concern for "Optics" ......................................................................................... 13

   V.    TF's Predominant Economic Stake.......................................................................... 15

   VI.   Avoiding High-Risk States ..................................................................................... 17

   VII.  The Regulatory Crackdown Triggering Rees's Abandonment of the
          Tribal Model and His Spinoff of a New Company .................................................. 18

   VIII. NCA's Involvement as a Purchaser and Collector of the Illegal Debt .................. 24

ARGUMENT......................................................................................................................... 26

   I.     Summary Judgment Standard .................................................................................. 26

   II.    The Loans Offered by the Think Finance Lending Enterprise Were Illegal
          as a Matter of Law.................................................................................................. 28

   III.   Defendant Kenneth Rees Violated the Pennsylvania COA § 911(b)(3)
          Through His Direction of the Scheme (SAC Count Two) ...................................... 31

        A.  The Legal Principles Regarding the Commonwealth's COA Claims
            Are Well-Settled ............................................................................................ 31

        B.  TF's Ongoing Collection Activity on High-Rate Consumer Loans
            Constituted a Pattern of Racketeering Activity Under the
            Pennsylvania COA......................................................................................... 32

        C.  Think Finance, Inc. and Its Three Tribal Lending Associations-in-Fact
            Were Enterprises Engaged in a Pattern of Racketeering Activity ................... 34

        D.  Defendant Kenneth Rees Conducted Think Finance's Racketeering
            Activities........................................................................................................ 35

   IV.   Defendant Kenneth Rees Violated the Pennsylvania COA § 911(b)(4)
          (SAC Count Three)................................................................................................ 42

UNSEALED

V.   The Consumer Contracts' Choice-of-Law Provisions Do Not Apply in This Action................................................................................. 43

    A.   The Choice of Law Provisions Contained in the Lending Contracts at Issue Here Are Void as the Attorney General Cannot be Bound by Contractual Choice of Law Provisions ............................................... 44

    B.   The Choice of Law Provision Are Void Because They Prospectively Waive Federal Rights.............................................................................. 45

    C.   The Choice of Law Clauses Also Fail Because They Violate Pennsylvania's Fundamental Public Policy Against Usurious Lending ......... 55

    D.   The Choice of Law Provisions Are Void Because the Tribal Entities They Favor are Not in Fact the True Lenders in the Loan Transactions.......... 62

VI.  Defendant Rees's Deceptive Conduct Violated Pennsylvania Consumer Protection Law (SAC Count Five) ................................................................ 67

VII. Defendant NCA "Conspired" with the Tribal Racketeering Enterprises and Is a "Creditor" that Violated the FCEUA through Its Collection of Illegal Debt ................................................................................... 71

    A.   NCA's Knowing Assistance to the Scheme COA § 911(b)(4) ........................... 71

    B.   NCA's Collection of Unlawful Debt, in Violation of the FCEUA.................... 72

    CONCLUSION ......................................................................................................... 74

UNSEALED

# TABLE OF AUTHORITIES

## Cases

*Am. Exp. Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)..................................................................................... 46

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................ 26, 27

*Azrielli v. Cohen Law Offices*,
  21 F.3d 512 (2d Cir. 1994)............................................................................ 37

*Banek Inc. v. Yogurt Ventures U.S.A., Inc.*,
  6 F.3d 357 (6th Cir. 1993)............................................................................ 45

*BankWest Inc. v. Baker*,
  324 F. Supp. 2d 1333 (N.D. Ga. 2004) ....................................................... 64

*Boyle v. United States*,
  556 U.S. 938 (2009)...................................................................................... 35

*Carlino v. Whitpain Investors*,
  453 A.2d 1385 (Pa. 1982)............................................................................. 44

*Cash Am. Net of Nevada, LLC v. Com.*,
  978 A.2d 1028 (Pa. Commw. 2009) ............................................................ 29

*CFPB v. CashCall*,
  Civ. No. 15-7522, 2016 WL 4820635 (C.D. Cal. Aug. 21, 2016)................ *passim*

*CashCall, Inc. v. Morrisey*,
  Civ. No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) ................... 65

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001)...................................................................................... 36

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................... 27

*Commonwealth of Pennsylvania v. Think Fin., Inc.*,
  2016 WL 183289 (Jan. 14, 2016)............................................................ *passim*

*Commonwealth of Pennsylvania v. Think Fin., Inc.*,
  2018 WL 637656 (Jan. 31, 2018)................................................................... 4

*Commonwealth ex rel. Creamer v. Monumental Prop., Inc.*,
  329 A.2d 812 (Pa. 1974)............................................................................... 68

*Commonwealth ex rel. Zimmerman v. Nickel*,
  26 Pa. D. & C.3d 115 (Pa. Com. Pl. 1983) ................................................. 67

*Commonwealth v. Brady*,
  368 A.2d 699 (Pa. 1977)............................................................................... 31

*Commonwealth v. Cassidy*,
  620 A.2d 9 (Pa. Super. 1993) ...................................................................... 32

UNSEALED

*Commonwealth v. Dellisanti,*
876 A.2d 366 (Pa. 2005)......................................................................... 37

*Commonwealth v. Donahue,*
630 A.2d 1238 (Pa. Super. 1993) ............................................... 31, 34, 37

*Commonwealth v. Piner,*
2015 WL 7575681 (Pa. Super. 2015)................................................... 37

*Dillon v. BMO Harris Bank, N.A.,*
856 F.3d 330 (4th Cir. 2017) ....................................................... *passim*

*Easter v. American W. Fin.,*
381 F.3d 948 (9th Cir. 2004) ............................................................... 64

*Eisen v. Venulum Ltd.,*
244 F. Supp. 3d 324 (W.D.N.Y. 2017)............................................... 46

*Exxon Mobil Corp. v. Drennen,*
452 S.W.3d 319 (Tex. 2014) .............................................................. 58

*Flowers v. EZPawn Okla., Inc.,*
307 F. Supp. 2d 1191 (N.D. Okla. 2004) ........................................... 64

*General Electric, Co. v. Jackson,*
595 F. Supp. 2d 8 (D.D.C. 2009) ...................................................... 28

*Gingras v. Rosette,*
No. 5:15-CV-101, 2016 WL 2932163 (D. Vt. May 18, 2016) ................ 46, 48, 49

*Goleta Nat'l Bank v. Lingerfelt,*
211 F. Supp. 2d 711 (E.D.N.C. 2002) ............................................... 64

*H.J., Inc. v. Northwestern Bell Telephone Co.,*
492 U.S. 229 (1989).......................................................................... 33

*Havoco of Am., Ltd. v. Shell Oil Co.,*
626 F.2d 549 (7th Cir. 1980) ............................................................. 72

*Hayes v. Delbert Servs., Corp.,*
811 F.3d 666 (4th Cir. 2016) .......................................................*passim*

*In re Grigsby,*
127 B.R. 759 (E.D. Pa. 1991) ............................................................. 29

*Inetianbor v. Cash Call, Inc.,*
13-60066, 2015 WL 11438192 (S.D. Fla. Dec. 8, 2015)....................... 8, 57

*Jaguar Cars, Inc., v. Royal Oaks Motor Co., Inc.,*
46 F.3d 258 (3d Cir. 1995) ................................................................. 36

*Kaneff v. Delaware Title Loans, Inc.,*
587 F.3d 616 (3d Cir. 2009) ..................................................... 55, 56, 61

*Kaucher v. County of Bucks,*
455 F.3d 418 (3d Cir. 2006) ............................................................... 27

*Koltonuk v. Borough of Laureldale,*
443 F. Supp. 2d 685 (E.D. Pa. 2006) ................................................. 27

iv

**UNSEALED**

*Lyon v. Caterpillar, Inc.*,
    194 F.R.D. 206 (E.D. Pa. 2000) ...................................................................... 61

*MacDonald v. Cash Call, Inc.*,
    Civ. No. 16–2781, 2017 WL 1536427 (D.N.J. Apr. 28, 2017) ............................ 8, 46, 57, 61

*Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*,
    439 U.S. 299 (1978) ...................................................................................... 6

*Matsushita Elec. Indus., Ltd. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................................................... 27

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*,
    62 F.3d 967 (7th Cir. 1995) ........................................................................... 37

*Meade v. Avant of Colo., LLC*,
    307 F. Supp. 3d 1134 (D. Colo. 2018) ........................................................... 64

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ...................................................................................... 46

*Moll v. Lafferty*,
    153 A. 557 (Pa. 1931) .................................................................................... 30

*Nicini v. Morra*,
    212 F.3d 798 (3d Cir. 2000) ........................................................................... 27

*Olwine v. Torrens*,
    344 A.2d 665 (Pa. Super. Ct. 1975) ................................................................ 30

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*,
    769 F.3d 105 (2d Cir. 2014) ................................................................... 23, 58, 60

*Parnell v. CashCall, Inc.*,
    181 F. Supp. 3d 1025 (N.D. Ga. 2016) ........................................................... 46

*Pennsylvania Department of Banking v. NCAS of Delaware* ("NCAS I")
    948 A.2d 752 (Pa. 2008) ........................................................................ *passim*

*Pennsylvania Department of Banking v. NCAS of Delaware, LLC* ("NCAS II")
    995 A.2d 422 (Pa. Commw. Ct. 2010) ...................................................... 70, 71

*People ex rel. Owen v. Miami Nation Enterprises*,
    386 P.3d 357 (Cal. 2016) ............................................................................... 64

*Pollice v. Nat'l Tax Funding, L.P.*,
    225 F.3d 379 (3d Cir. 2000) ........................................................................... 73

*People rel. Spitzer v. County Bank of Rehoboth Beach, Del.*,
    846 N.Y.S.2d 436 (App. Div. 2007) ................................................................ 64

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ............................................................................ 36, 37, 38

*Rideout v. CashCall, Inc.*,
    No. 16-cv-02817, 2018 WL 1220565 (D. Nev. Mar. 8, 2018) ............................ 46

*Robertson v. Allied Signal, Inc.*,
    914 F.2d 360 (3d Cir. 1990) ........................................................................... 27

**UNSEALED**

*Ryan v. Delbert Services Corp.,*
    No. 5:15-cv-5044, 2016 WL 4702352 (E.D. Pa. Sept. 8, 2016)................................. 8, 46, 47

*Salinas v. United States,*
    522 U.S. 52 (1997).......................................................................................................... 42, 43

*Sedima, S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985)............................................................................................................... 32

*Simpson v. Penn Discount Corp.,*
    5 A.2d 796 (Pa. 1939) ......................................................................................................... 30

*Smith v. Berg,*
    247 F. 3d 532 (3d Cir. 2011) ........................................................................................ 42, 43, 72

*Smith v. Western Sky Financial,*
    168 F. Supp. 3d 778 (E.D. Pa. 2016) .......................................................................... 8, 46, 47, 55

*State ex rel. Cooper v. Western Sky Financial,*
    No. 13-CVS-16487, 2015 WL 5091229 (N.C. Super. Aug. 27, 2015) ............................... 61

*Stone St. Servs., Inc. v. Daniels,*
    No. 00–1904, 2000 WL 1909373 (E.D. Pa. Dec. 29, 2000) ................................................. 61

*Thomas v. First Nat'l Bank of Scranton,*
    101 A.2d 910 (Pa. 1954)...................................................................................................... 30

*Thompson v. Prettyman,*
    79 A. 874 (Pa. 1911) ........................................................................................................... 29

*Titus v. ZestFinance, Inc.,*
    No. 18-5373, 2018 WL 5084844 (W.D. Wash. Oct. 18, 2018) ........................................... 46

*Tuttle v. Equifax Check,*
    190 F.3d 9 (2d Cir.1999) .................................................................................................... 73

*U.S. v. Boria,*
    592 F.3d 476 (3d. Cir. 2010) .............................................................................................. 43

*United States v. Riccobene,*
    709 F.2d 214 (3d Cir. 1983) ............................................................................................... 34

*United States v. Turkette,*
    452 U.S. 576 (1981)....................................................................................................... 31, 34

*Washington v. Confederated Tribes of Colville Indian Reservation,*
    447 U.S. 134 (1980) ............................................................................................................ 58

*Western Sky Financial, LLC v. State ex rel. Olens,*
    793 S.E.2d 357 (Ga. 2016) ................................................................................................. 61

*Wetzel v. Tucker,*
    139 F.3d 380 (3d Cir. 1998) ............................................................................................... 27

**UNSEALED**

**Statutes**

18 Pa.C.S. § 911 ..................................................................... *passim*

7 P.S. §§ 6201–6219 ................................................................ 28, 29

41 P.S. §§ 101–605 .................................................................. 28

41 P.S. § 201 ........................................................................... 28

41 P.S. § 408 ........................................................................... 29, 44

41 P.S. § 506 ........................................................................... 70

73 P.S. § 201 ........................................................................... *passim*

73 P.S. § 2270 ......................................................................... 3, 72, 73, 74

11 U.S.C. § 362 ....................................................................... 4

12 U.S.C. § 1831d .................................................................... 6

12 U.S.C. § 5552 ..................................................................... 4

15 U.S.C. § 1692 ..................................................................... 72, 73

18 U.S.C. § 1961 *et seq* ........................................................... *passim*

UNSEALED

## INTRODUCTION & PROCEDURAL HISTORY

As the President, CEO and Board Chairman of Think Finance, Inc. ("TF"), Kenneth E. Rees operated and managed a consumer lending business that intentionally and systematically violated Pennsylvania law. The loans this business made to Pennsylvania citizens charged rates averaging more than 200% APR, when the limit for unsecured, unlicensed loans under Pennsylvania law is 6%. Rees helped to construct this usury scheme with the specific intention of evading the law of states like Pennsylvania that prohibited this activity. Rees oversaw the implementation and operation of the scheme, and then, as the risk of regulatory enforcement grew, he led efforts to restructure the scheme in order to extend its life. Later, as that risk continued to grow, he invested the profits and the expertise gained from the illicit business into a new, "clean" company which he took public as its CEO.

Rees's scheme rested on the fundamental deception that tribal, not state, law governed the lending activity generated by the scheme, because the loans were originated in the name of tribal businesses associated with Native American tribes. However, the tribes only retained a 1% interest in the loans, with the remaining 99% interest ending up on the books of TF as the company's asset. Putting up no money and assuming no economic risk, the tribal entities were paid a percentage fee from the loan revenue for the tribal veneer they provided.

1

UNSEALED

Even though Rees characterized TF as a mere "service provider" to tribal lending companies, he and his executive team knew from the beginning that this scheme presented substantial legal risk. They openly acknowledged the possibility that an aggressive state attorney general could make the case that TF, not the tribal companies, was the "true lender." To manage that risk, Rees and his lawyers assessed the likelihood of regulatory enforcement, state-by-state, and chose to operate in Pennsylvania based on a determination that an enforcement action by Pennsylvania authorities represented a "low to moderate" risk of occurring.

From April 2011 through the end of 2014, this scheme generated more than $1.5 billion in interest revenue from consumer loan repayments, much of which was generated in states, like Pennsylvania, where such lending is illegal. Most of this revenue ended up in the coffers of Rees's company, TF, and his private equity ally, Victory Park Capital, which raised substantial investment capital to support the illegal business venture and helped TF design the financial structure comprising the three tribal lending enterprises. During this four-year period, these enterprises together collected $192 million from Pennsylvania consumers.

Rees did not invent the use of tribal façades for illegal payday lending schemes. Other so-called "service providers" for tribal lenders that used the same lawyer and payment processor as Rees were recently convicted and imprisoned under RICO prosecutions in this District. *See* Statement of Undisputed Facts ("SUF") ¶¶ 131-134.

UNSEALED

What is unique, however, to the Rees version of the tribal lending sham is the degree of detail and sophistication used by a major corporation and a financial institution, and their army of lawyers, to attempt to bolster the "service provider" pretense with the contractual and operational complexities present here.

This action was originally filed in Pennsylvania state court on November 13, 2014, by the Attorney General of the Commonwealth of Pennsylvania to enjoin the illegal, usurious lending scheme being carried out by the Defendants, and among other relief, to obtain restitution for the thousands of Pennsylvania consumers who have been victimized. Ex. A to Doc. 1. The case was removed to federal court on December 17, 2014, and this Court denied the Commonwealth's motion to remand on May 28, 2015. Doc. 53. The Commonwealth alleged that the Defendants while profiting from illegal loans made to Pennsylvania consumers, violated the Pennsylvania Corrupt Organizations Act ("COA"), 18 Pa. C.S. § 911 (Counts One through Three), the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.1 *et seq.* (Count Four), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201 *et seq.* (Count Five). Besides naming Rees as a Defendant, the Commonwealth also named TF and its various subsidiaries, as well as a debt-buyer named National Credit Adjuster, LLC ("NCA"), that acquired millions of dollars in loan balances charged off by the three tribal lending enterprises and ended up illegally collecting $4.4 million in payments from Pennsylvania consumers.

3

UNSEALED

The Commonwealth amended the complaint twice, first to add a federal claim—Count Six—under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), 12 U.S.C. § 5552(a)(1), First Amended Complaint, Doc. 57, and then, following limited discovery, to add several "Victory Park Capital Defendants," Second Amended Complaint, Doc. 160 (sealed); Doc. No. 205 (unsealed). This Court denied multiple motions to dismiss the First Amended Complaint. Doc. Nos. 93, 94, 115; *Com. of Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289 (Jan. 14, 2016). It also denied in part a later motion to dismiss by the Victory Park Defendants. Doc. 214, 215; 2018 WL 637656 (Jan. 31, 2018).

While discovery was proceeding, Think Finance, Inc. and its subsidiary entities filed a Chapter 11 bankruptcy petition in the Northern District of Texas on October 23, 2017. No. 17-33964-HDH. This Court denied the subsequent motion to transfer venue to the Northern District of Texas on April 5, 2018. Doc. Nos. 228, 229. By order dated December 15, 2017, the Bankruptcy Court granted the Commonwealth's motion confirming that this action is not stayed, pursuant to 11 U.S.C. § 362. *In re Think Finance, Inc.*, No. 17-33964-HDH (Doc. 201).

This Motion for Partial Summary Judgment is directed to two of the Defendants, Rees and NCA. As to Rees, the Commonwealth is a seeking a liability determination only, as to Counts Two, Three and Five. As to NCA, the Commonwealth is seeking a

4

liability determination as to Count Three, and as to Count Four a judgment enjoining further violations of Pennsylvania law and $4.4 million in restitution.[1]

**FACTS OF THE CASE[2]**

## I. The Earlier Bank Model that Rees Used to Circumvent State Law

Think Finance, Inc., the company Defendant Rees captained for a decade as its President, Chief Operating Officer and Chairman of the Board, was in the business of online payday lending. SUF ¶¶ 1-4. When he first joined the company, it was making loans in Pennsylvania, because, at the time, Pennsylvania regulators were not exercising jurisdiction over lenders operating exclusively over the Internet without a physical presence in the state. But in 2009, this policy changed, and TF was warned by the Pennsylvania Banking Department to cease targeting Pennsylvania consumers. SUF ¶¶ 22-26.

TF did stop offering loans directly in Pennsylvania, but it continued offering an "indirect" loan product named "ThinkCash"—an installment loan product that charged consumers an average APR of 263%—that TF was operating as the supposed "service provider" to First Bank of Delaware ("FBD"). SUF ¶¶ 6-12. This "indirect" product

---

[1] Although the Second Amended Complaint also covers the earlier "Bank Model" period, this motion for partial summary judgment only covers the second stage of the scheme, *i.e.*, the "Tribal Model" period.

[2] This is a summary of the more detailed Statement of Undisputed Facts ("SUF") which the Commonwealth is filing with this motion. For brevity's sake, the Commonwealth will, where possible, reference paragraphs in the SUF, rather than the documents, declarations or deposition testimony which are included in the Appendix and pincited in the SUF.

5

**UNSEALED**

operated on the same TF technology platform that powered the "direct" payday loan product that TF was operating in states where it could so do legally. SUF ¶ 9. The use of a bank was based on the special statutory powers of national and state banks to preempt state usury rate caps.[3] Rees and his executive team referred to this strategy of offering "direct" products in states that allowed payday loans, while using "indirect" products in states like Pennsylvania, as "regulatory diversification." SUF ¶¶ 14-16.

Despite the characterization of TF's role in the ThinkCash program as being a mere service provider to FBD, the contractual structure of the product shows the opposite was true. Under these agreements, TF ended up with 90-99% of the loans on its own books and FBD received a fee based on the percentage of revenue generated by the program. *See* SUF ¶¶ 31-60. Thus, rather than TF providing services to a bank lender, the transaction could be more accurately characterized as the bank providing TF the service of renting its bank status to enable TF to operate a loan business it could not legally conduct in its own name.

_____

[3] In *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299 (1978), the Supreme Court, interpreting the National Bank Act, gave national banks the ability to export the interest rates permitted in their home state across state lines, and preempt the law of the borrower's home state. State chartered depository institutions obtained the same most favored lender status when Congress enacted § 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (codified at 12 U.S.C. § 1831d). This allowed FBD to lend to borrowers in any state and charge the interest rates that are authorized in Delaware—which are unlimited.

UNSEALED

Defendant Rees signed all the agreements forming the ThinkCash enterprise, as the President/CEO of the various TF subsidiaries named as parties in those agreements. SUF ¶¶ 32, 48-51. And, when TF's competitors pulled out of Pennsylvania in 2009 due to the change in state regulatory policy, Rees saw this as an opportunity to expand its ThinkCash portfolio, and TF started buying leads from those competitors. SUF ¶ 28.

## II. Rees's Decision to Transition to a Tribal Model, His Search for Tribes and His Embrace of the Deception of Tribal Sovereign Immunity

Rees took charge of the company's search for another bank to replace FBD as the nominal lender in its installment loan program, when, under pressure from the FDIC, FBD withdrew from the enterprise. SUF ¶ 62. When Rees could not find another bank, he began a search for a Native American tribe willing to play that role. SUF ¶¶ 64-67. Besides personally participating in that search, he also took charge of formulating the false and deceptive "sovereign immunity" façade. In a 2013 "Business Plan," Rees articulated the supposed rationale for legitimizing the scheme through the use of a tribally owned entity as the originator of the loans:

> In much the same way that the National Bank Act allows banks to export the rate of their products across states, Native American tribal sovereignty gives tribes the ability to operate businesses off the reservation without adhering to state regulation (although all Federal regulations must be followed).

SUF ¶ 68.

But Rees knew this was not true. TF produced in discovery an extensive "White Paper" prepared by the firm Patton Boggs. (TF had to produce the white paper because

7

Rees had shared it with a large investor in TF's tribal lending program.) In this White Paper, TF's counsel states explicitly that the insulation from state enforcement actions enjoyed by sovereign tribes does not mean that tribes can ignore state law with regard to business activities conducted outside sovereign land, and that "the applicability of a law, even if unenforceable against a tribe or certain wholly-owned tribal business entities, may be of consequence to non-tribal service providers or vendors." SUF ¶ 199. Effectively, therefore, Rees was advised by his own lawyers that (a) he and his company could not vicariously benefit from a tribe's insulation from state enforcement actions and (b) that tribal sovereign immunity did *not* permit tribal entities to export usurious rates into Pennsylvania.[4]

The urgency of Rees's decision nonetheless to switch to a so-called Tribal Model was driven by his appetite for loan revenue, whether legal or not. At the point of FBD's

---

[4] In developing its tribal model, TF consulted Claudia Callaway, an attorney who also helped develop the tribal lending models used by CashCall, Charles Hallinan, and Adrian Rubin. SUF ¶ 134. Hallinan and Rubin were both criminally convicted in the Eastern District of Pennsylvania for frauds related to their role in the lending schemes. *See United States v. Charles M. Hallinan*, No. 2:16-cr-00130-ER, Doc. 87 (E.D. Pa.) (Indictment, Doc. 1, Mar. 31, 2016; Judgment, Doc. 505, July 6, 2018); *United States v. Rubin*, No. 2:15-cr-238 (E.D. Pa.) (Information, Doc. 1, June 9, 2015; Judgment, Doc. 31, Aug. 8, 2018). CashCall and its nominally tribal partner Western Sky Financial have been the subject of numerous civil suits that have successfully challenged consumer loans made pursuant to the program. *See, e.g., MacDonald v. Cash Call, Inc.*, Civ. No. 16–2781, 2017 WL 1536427 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *see also CFPB v. CashCall*, Civ. No. 15-7522, 2016 WL 4820635 (C.D. Cal. Aug. 21, 2016); *Inetianbor v. Cash Call, Inc.*, 13-60066, 2015 WL 11438192 (S.D. Fla. Dec. 8, 2015). This includes two cases in the Eastern District of Pennsylvania. *See Ryan v. Delbert Services Corp.*, No. 5:15-cv-5044, 2016 WL 4702352 (E.D. Pa. Sept. 8, 2016); *Smith v. Western Sky Financial, LLC*, 168 F. Supp. 3d 778 (E.D. Pa. 2016).

UNSEALED

exit, TF revenues from the ThinkCash "indirect" product accounted for 60% of total revenue. SUF ¶ 63. Rees himself explained that the company's strategic emphasis on "indirect" products was because "byzantine state laws" made it unprofitable for an online lender to rely solely on "direct" products. SUF ¶ 8.

Even before a tribe had been identified, Rees reported to his board on the "Great Plains Financial" program his marketing and technology personnel had come up with a new, "tribal" version of the ThinkCash product, including completed mock-ups of a lending website. *See* SUF ¶¶ 66, 70, 74. At the same time, he and his CFO, Chris Lutes, were working with Victory Park Capital ("VPC")—the private equity funder that, in the final months of the ThinkCash program, had joined the venture, SUF ¶¶ 56-60—to create a new, Cayman Islands-based investment fund, GPL Servicing, Ltd. ("GPLS"), to buy participation interests from the anticipated "Great Plains Lending" tribal lending entity. SUF ¶¶ 69-72. When the search for a tribe began, Rees himself identified and met with individuals connected to two potential tribal partners. SUF ¶ 76.

After the Otoe-Missouria Tribe in Oklahoma initially agreed to work with TF, buy the "Great Plains Lending" website URL from TF for $100 and register that trademark, Rees excitedly reported to the other executives, "Gentlemen -- Start your engines!!!" SUF ¶ 84. But as negotiations with that tribe stalled and Rees's team located a new tribe willing to jump in and be TF's first tribal partner, SUF ¶¶ 85-95, it was Rees

9

UNSEALED

who personally decided that the new product would be called "Plain Green," a different name his marketing people had come up with. SUF ¶ 96.

In TF's sales pitch to tribes, TF touted its "turnkey" platform for a 360% APR loan product that could be "up and running 90 days from signed contracts," with TF essentially performing all the key lender functions, including a "fully automated loan process;" "a diversified product portfolio" of installment loans, open-end credit and traditional payday loans; a "marketing machine" that could generate "100,000 applications monthly;" and "access to third party capital" up to $150 million. SUF ¶¶ 79-82. The company assured the tribes that their lack of experience in the lending business and their lack of any capital would not be an impediment because "[u]sing Think Finance technology and services, tribes can generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." SUF ¶ 79.

Ultimately, TF closed deals with three separate tribes and launched a lending operation for each of them: Plain Green, associated with the Chippewa Cree in Montana, which offered installment loans charging an averaging of 250-260% APR; Great Plains Lending, associated with the Otoe-Missouria in Oklahoma, which offered installment loans charging an average of 375-380% APR; and MobiLoans, associated with the Tunica-Biloxi of Louisiana, which offered a line of credit charging an average of 390% APR. SUF ¶ 13.

10

UNSEALED

### III.    The Dominance of Think Finance over the Lending Enterprises

The loan agreements used by the three tribal lending enterprises employed the same or similar consumer disclosures about what law governed the agreements. Both the Plain Green ("PG") and Great Plains Lending ("GPL") installment loan agreements state from the beginning, "This Loan Agreement (the "Agreement") is subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana" (for PG), or the Otoe-Missouria Tribe (for GPL). SUF ¶ 139. Loan agreements for all three contained "Governing Law" provisions that, in addition to restating the applicability of tribal law, represent that "[n]either this Agreement nor the Lender is subject to the laws of any State of the United States." SUF ¶¶ 140-141. All three agreements also contain "transfer of rights" clauses that maintain that choice of law and venue would remain exclusively tribal even in the event participation interests in the loan is transferred to GPLS. SUF ¶ 143. And all three include mandatory arbitration provisions that ensure the exclusive application of tribal law and, in the case of judicial review or opting out of arbitration, only tribal court jurisdiction would be available. SUF ¶ 144.

The same contractual structure was used to form each of these tribal lending enterprises:

- marketing, licensing and/or servicing contracts between a TF subsidiary and the tribal lending entity which provided for specified services, at a per-loan fee, paid by the tribal entity;

11

UNSEALED

- a participation agreement between the tribal entity and GPLS through which GPLS purchased a 99% interest in the loans originated, and agreed to pay a percentage of revenue earned on the 99%-interest to the tribe as a "fee;"

- an Administrative Agency Agreement common to all three enterprises, through which a TF entity managed all the cash flows, paid all expenses incurred by the tribal entities, made fixed return payments to GPLS investors, and repurchased all loans in default, and then retained all net revenue as its own "administrative agent fee;" and

- a Guaranty and Security Agreement through which TF provided a guaranty to VPC as to the obligations of all the TF subsidiaries, secured by all of its corporate assets.

SUF ¶¶ 102-110, 116, 117. In addition, TF agreed to purchase shares in the GPLS fund.

SUF ¶ 160. Defendant Rees signed the agreements with VPC and most of the

agreements with the tribal entities. SUF ¶¶ 108, 110, 118.

With regard to Plain Green, TF put up the money used to fund the loans in the

first instance and to fund the 1% stake retained by the tribal entity. Rather than doing

this directly, however, it loaned the money to an intermediary, Haynes Investments,

which, in turn loaned the money to the tribal entity. SUF ¶ 119. TF also guaranteed any

payments owed to various, critical third-party vendors, including the payment

processor conducting the ACH transfers in and out of consumer bank accounts, SUF ¶¶

12

121-124,[5] and the collection companies that did most of the call-center work. SUF ¶¶ 135-136.

TF designed and operated all of the marketing activity underlying the three tribal enterprises. SUF ¶¶ 145-149. It used its proprietary technology to make the actual loan decisions, described by VPC as an "approval process {that] is fully automated and gives the customer a loan decision within seconds." SUF ¶¶ 150-158. Its Finance Department employees managed all of the cash flow through its access to the tribal and GPLS accounts, SUF ¶¶ 165-174, and delivered cash reports for the three tribal enterprises on a daily basis to Rees. SUF ¶ 175.

## IV.     A Concern for "Optics"

Various features of TF's operational design functioned merely to lend support for the "service provider" artifice. For example, to create an appearance of tribal involvement in the individual lending decisions, TF created a computer interface that gave tribal employees the apparent opportunity to decide that particular loans approved automatically by TF's "decision engine" should not be funded, but this function did not work on the MobiLoans platform and was ignored by Plain Green. SUF ¶ 159. Another example is the monthly invoicing for marketing and servicing fees

---

[5] The ACH providers and banks used by TF to collect payments from consumers later in the scheme dispensed with the use of tribal contracts guaranteed by TF and required TF itself to be their contractual counterparty. *See* SUF ¶¶ 129-130.

UNSEALED

conducted by the TF Finance Department. Although there were invoices backing up the existence of the per-loan fees the three tribal entities were supposedly paying TF for its marketing and technology services, a simultaneous invoice for a GPLS reimbursement of these fees was also prepared, so that the tribal entities never actually had to pay anything. SUF ¶¶ 176-177.

The TF executive team focused explicitly on the "optics," as opposed to the reality, of the "tribal" aspect of the lending enterprises. In 2012 communications among TF executives and the three tribal lending entities, TF articulated the following "concerns" regarding the tribal model:

- Concern that although tribes have sovereign immunity, service providers (eg us) may have potential liability
- States may claim that the loans are illegal (even if tribal lenders have sovereign protections)
- States may claim that the tribe is not the 'true lender'
- Recent cases have suggested potential liability.

SUF ¶ 201. Among the company's suggested responses to these concerns—which it characterized as "aiding and abetting" and "true lender" concerns—were suggested program changes to "Improve optics," such as "no automatic end of day funding—require daily tribal" and "eliminate guarantees to vendors from TF." SUF ¶¶ 201-202. Similarly, in a PowerPoint presentation Rees prepared for an off-site executive meeting on March 28, 2013, he stressed the need to "Reduce Tribal Risks" through a "restructure" that, among other things, would "improve deal optics." SUF ¶¶ 204-205.

14

UNSEALED

One component of the tribal "restructure" Rees suggested was to redesign the tribal share from being a percentage of GPLS revenue to a 51% share of "profit." But in a communication explaining that proposed change to Richard Levy, the owner of VPC, Rees assured Levy that the "restructure" proposal would not change the substance of the parties' relative economic stake, but "should greatly change the 'optics' of the deal." SUF ¶ 207.

## V.     TF's Predominant Economic Stake

As for that "relative economic stake" that Rees alluded to, by 2013, revenues from the tribal lending enterprises represented 89% of TF's company revenue, completely dwarfing the revenue from its direct payday lending, SUF ¶ 203, leading Rees to warn his colleagues, "we are not adhering to our diversification strategy," SUF ¶ 204. The revenue growth from the tribal products was so pronounced—referred to as a money "tsumani" by Rees, SUF ¶ 198 (footnote)—that VPC agreed to increase its initial funding commitment from $90 million to $150 million, and then doubled that commitment to $300 million. SUF ¶ 61.

During the 2011-2014 period, while Pennsylvania consumers were being targeted for Plain Green, Great Plains Lending and MobiLoans, TF's audited consolidated financial statements reflected the 99% participation interests in loans originated by those tribal entities and purchased by GPLS as being assets of TF. This was due to Generally Accepted Accounting Principles ("GAAP") that required TF to classify GPLS

15

UNSEALED

as its own "variable interest entity" ("VIE") because, quoting TF's auditors, TF "has both (1) the power to direct the activities of [the separate entity] that most significantly impact the entity's economic performance and (2) the obligation to absorb losses of the entity that could potentially be significant to the . . . entity." As a result of that classification, the auditors concluded, the "consolidated financial statements include the accounts of [GPLS], including the participated loan balances and the notes payable balance." SUF ¶¶ 191-193.

TF's financial records regarding its tribal lending operation from its inception in 2011 to December 31, 2014 indicate that the tribal lending operation generated $1.507 billion in revenue. SUF ¶ 194. That revenue was disbursed as follows:

a. $14.59 million was disbursed among the tribes reflecting the income generated by their 1% retained interest in program loans.

b. $303.71 million was nominally disbursed to the tribes as reimbursement for operating expenses. Of that, at least $261.78 million was concurrently wired from the tribal accounts to TF in payment for those same services, as noted above. The remaining $41.93 million covered other operating expenses of the tribes, primarily payments made to outside vendors, who were selected by TF and paid by TF through TF-controlled tribal accounts, including lead generators, ACH processors, and collections centers.

c. $41.12 million was disbursed as operating expenses directly incurred by GPLS.

d. $110.05 million was disbursed to VPC and its investors as interest on its shares held in GPLS.

e. $31.91 million was disbursed to TF as interest on its shares held in GPLS.

f. $62.76 million was disbursed among the three tribes as "Profit-sharing Fees" that reflected the "Service Fees" established in the respective Participation Agreements.

UNSEALED

g. $955.72 million was disbursed to TF as "Admin Agency Fees," which was the residual of all GPLS program income after all expenses had been removed, pursuant to the terms of the Administrative Agency Agreement between the TF entity and GPLS.

*Id*. In sum, TF received $955.72 million as Admin Agency Fees, at least $261.78 million for lending-related service fees nominally paid to the tribal entities, and $31.91 million as return on its own investment in GPLS, for a total of $1.249 billion. VPC and its investors received $110.05 million, so that together, VPC and TF received $1.359 billion of the total $1.507 billion in revenue, or 90.18%. The tribal entities, for their part, received $77.35 million, or 5.13%. SUF ¶ 195.

## VI.    Avoiding High-Risk States

Among the operational decisions that TF controlled was the determination in which states to operate the "tribal" programs. During its earlier venture with FBD, TF and FBD decided which states to operate in. For example, TF decided to avoid the state of West Virginia because regulators had convinced a state court to halt a similar bank model, lending program after the court determined that the so-called "service provider" for the bank was a "true lender." SUF ¶ 179. With the advent of the tribal lending model, Rees saw the opportunity to expand his penetration to every state, save West Virginia and South Dakota. SUF ¶ 180.

Two years into the tribal model, however, and with the risk of regulatory challenge increasing, TF decided, as Rees noted in his March 28, 2013 PowerPoint, to "exit high-risk states." SUF ¶ 205. Explaining how TF made the decision to categorize

17

UNSEALED

the level of risk in a particular state, Rees testified that "we had a perspective on states where there would be more litigation, more challenges." SUF ¶ 183. In order to conduct that state-by-state risk analysis, Rees's General Counsel brought in Claudia Callaway, the same regulatory counsel that TF had consulted in designing the program in the first place. SUF ¶ 181. TF's state-by-state analysis, as of July 1, 2014, was shared with VPC and, therefore, is not protected by attorney-client privilege. In it, Pennsylvania was classified as a state that could still be targeted, having a "low to moderate risk of enforcement." SUF ¶ 185. Rees's CFO explained to a third-party that the primary criteria used in making this state-by-state determination was "probably . . . the state's attorney general (litigious, negative attitude toward tribal lending, etc.)," but falsely attributed this determination to the tribal entities. SUF ¶ 186.

## VII.  The Regulatory Crackdown Triggering Rees's Abandonment of the Tribal Model and His Spinoff of a New Company

Despite Rees's confident public statements about the legality of the company's "tribal" business—for example, declaring, "Tribal lending is legal and here to stay," SUF ¶ 198 (footnotes), TF's business model was not long in attracting regulatory attention. In June 2012, TF received civil investigative demands, or CIDs, from the Consumer Finance Protection Bureau ("CFPB"). And, in early 2013, ACH processors and their banks were backing out of servicing the scheme based on pressure from the Justice Department and the FDIC. SUF ¶ 127. During this period, it was the "number one priority" of Rees's CFO to talk with potential ACH processors and banks, and he

18

UNSEALED

gave Rees "frequent updates." *Id*. Rees's reaction to the TF Board concerning this governmental pressure was that that this is a "very dangerous time for financial services industry as a whole when the primary regulatory agencies (CFPB and FDIC) are being run by activists . . . in pursuit of their anti-credit agenda." SUF ¶ 216.

Even after TF decided in early 2013 to exit eight states deemed particularly risky, SUF ¶ 182, the regulatory pressure on Rees and his Tribal Model increased further. In August 2013, New York State issued cease and desist orders to various on-line lenders, including TF's three tribal partners, triggering the filing of an action in the Southern District of New York by the Otoe-Missouria tribe. SUF ¶ 212.[6] The suit sought a preliminary injunction against the state, "alleging that the State's effort to regulate Tribal lending is an affront to Plaintiffs' inherent sovereignty and violates the Indian Commerce Clause of the United States Constitution." *Id*. Although brought in the name of the tribe, this suit was actually coordinated and financed by TF. SUF ¶ 213. In a September 2013 memo to the board, Rees reported, "we are waiting on tenterhooks to learn the outcome of the challenge against New York State." SUF ¶ 215. As a result of the New York litigation, VPC directed TF to cease making new loans to new customers. SUF ¶ 214. Rees personally intervened with the head of VPC and persuaded him to

---

[6] TF tried to get all three of the tribal entities to be plaintiffs, but only the Otoe-Missouria agreed. Footnote to SUF ¶ 213.

UNSEALED

allow TF to process new loans to returning customers, as he had to do repeatedly in the months ahead. SUF ¶ 214

At the same time that Rees and his team was responding to this regulatory pressure concerning its "tribal" products, it was also trying to grow its direct lending business. In the Spring of 2013, TF discontinued its original payday loan product, replacing it with a state-licensed version of its installment loan product, calling it "Rise." SUF ¶ 18. Defendant Rees reported to TF board members that he expected this new product to become the Company's "flagship product," and have "great economics" because "there is no third party partner to capture part of the margin." *Id*. To assist the growth of this non-tribal product, TF was able to favor Rise in the routing of new customer business. SUF ¶ 147.

On September 30, 2013, the district court in New York denied the request of the Otoe-Missouria for a preliminary injunction. SUF ¶ 217. On October 16, 2013, Rees reported this development to the board, and noted that "due to the unexpectedly negative tone of the judge's decision in the New York case GPLS has pulled back again until the appeal is resolved." SUF ¶ 218. He expressed optimism regarding an appeal, but warned "that it doesn't really matter if we have a regulatory cloud over the company while it winds its way through the courts," and further noted, "We will also need to discuss options for moving forward given the ongoing regulatory challenges related to the tribal products (and the upside from the non-tribal products)." *Id*.

UNSEALED

In a December 11, 2013 memo to the board, Rees reported increasing growth of the Rise portfolio in the 14 states covered at that time, and introduced the possibility of a new direction for the company:

> As mentioned during the previous Board meeting we are evaluating a rather draconian organizational change that we are referring to as "Project Exclaim." This would spin off several products (Rise, Sunny, and Elastic) to separate the tribal and non-tribal businesses. This will cause a fair amount of staff upheaval but is likely the right thing to do from the standpoint of potential liquidity events. I will propose the details (and discuss the implications) at the Board meeting on Friday.

SUF ¶ 219.

By January 2014, the "Project Exclaim" initiative was moving forward. On the tribal side of the business, Rees reported that the three tribes had been notified of "our plans to split the company," and that "the directors and leaders in the company are getting charged up about the work ahead and excited to be able to create a business without the regulatory overhang of the tribal business." SUF ¶ 220.

From the beginning of Rees's tenure as the leader of TF, his goal was to take the company public through an IPO. SUF ¶ 5. This goal remained paramount as a primary reason for the company split, as confirmed by CFO Chris Lutes, who described the following two reasons for the impending spin-off transaction:

1. We have always focused on having multiple products for regulatory diversification. Our tribal partners are in litigation with the state of NY

21

UNSEALED

and this could last for years. They have chosen to not aggressively grow their business while this gets resolved. Meanwhile our non-tribal products are really starting to grow. Rise [is] now our largest product and we expect to generate almost $300mm in revs this year off of non-tribal. The tribal litigation would hold up our ability to go public. Spinoff enables the new entity to go public and allows Think (tribal business) to turn in to a dividend play.

2. ACH and corporate banking issues again weighing down non-tribal business. Spin off should allow easier ACH and corporate banking access.

SUF ¶ 221.

In order to be able to accomplish the spinoff transaction, Rees personally engaged with VPC to support the transition away from the tribal model and to raise cash for the Rise product. As Tom Welch, the VPC principal in charge of the account stated, "Rise doesn't happen w/o GPLS' cooperation." SUF ¶ 220. Rees and Lutes pushed successfully for that cooperation, for example, providing concessions by VPC that allowed TF to move cash into the Rise program and getting VPC to move its own investment dollars from GPLS into Rise. SUF ¶¶ 222-223.

Effective May 1, 2014, TF split into two companies, with Elevate Credit, Inc. taking Rise and the other "direct" products and TF keeping only the tribal products. SUF ¶ 224. As part of the split, Elevate got a copy of the "legacy" technology platform on which the Plain Green, Great Plains Lending and Rise products were supported, with no valuation being assigned to that transfer. SUF ¶ 225. Among the

UNSEALED

contracts transferred to the new company was the employment contract between Defendant Rees and TF. In his first memo to the newly created Elevate board, Rees observed that "we are learning . . . that forecasting for Rise growth is very challenging given the huge variance in loan size, APR, CPL and terms for each state." SUF ¶ 226.

On October 1, 2014, a panel of the Second Circuit unanimously affirmed the district court's denial of the tribal request for a preliminary injunction against the New York enforcement action. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).

After becoming the CEO of Elevate in May 2014, Rees remained Chairman of the Board of TF, which was, as a result of the split, doing only the tribal lending. SUF ¶ 227. At the time of his departure from that last connection to his former company, Rees provided the following confidential assessment to his successor Chairman concerning the company's tribal business and its new CEO, Martin Wong:

—Tribal deals are going sideways (MBL dysfunctional with inadequate tribal mgmt., PG trying to play hardball for greater profits, GPL ok, but mainly because another service provider has done a better job of building a relationship with them). We have only minimal daily interactions with the tribes (IMO) and haven't built an effective relationship management team that can stay close to tribal councils and lending operations and help build up key capabilities (and jobs on the reservation) for long-term success. I don't see TF mgmt. making this a top priority. Obviously Martin would disagree with my assessment.

—New tribe may just be "grass is always greener." All of things that Martin sees in the new tribe were things we also liked about the tribes we initially worked with.

UNSEALED

On October 23, 2017, TF filed a bankruptcy petition under Chapter 11 in the Northern District of Texas. Rees, on the other hand, having severed himself from the ruins of the tribal business he had built, thrived financially in his new company. According to filings submitted to the SEC by Elevate, as its CEO and Chairman, Rees received total compensation in the years 2015 to 2017 of $1.667 million (2015), $2.567 million (2016), and $5.337 million (2017). SUF ¶ 233. As for the economic consequence of the tribal lending enterprises he caused Pennsylvania consumers, $192 million was collected from them.

## VIII. NCA's Involvement as a Purchaser and Collector of the Illegal Debt

Defendant National Credit Adjusters, LLC ("NCA") is a purchaser of charged off consumer loans, which, over the last decade, has primarily consisted of charged off payday loan balances. SUF ¶¶ 234, 237. The company is based in Kansas, and uses its own call centers (in Kansas, Arizona and the nation of Jamaica) to collect on these delinquent receivables itself, and also outsources some of its collection volume to outside vendors it hires. SUF ¶¶ 234-235, 266.

Under the Administrative Agency Agreement governing the three tribal enterprises, TF was obligated to repurchase from GPLS all loan balances that became 60-days delinquent. SUF ¶ 116. NCA repurchased and collected on these Plain Green, Great Plains Lending and MobiLoans delinquent balances. SUF ¶¶ 252-258. In making these purchases, NCA had little or no direct contact with tribal entities; it dealt

24

UNSEALED

exclusively with a debt broker named Brett Horrocks, who was representing and being paid by TF. SUF ¶¶ 247-250, 252, 260. These debt sales were conducted through a largely automated process at TF. SUF ¶ 251.

NCA acknowledges that payday lending is illegal in some states, but it also concedes that, during the relevant time period, it was not conducting any due diligence regarding the legality of the payday loans it purchased for collection. SUF ¶ 244. Instead, in deciding whether to buy delinquent debt from a particular state, the previous CEO would weigh the volume represented by the state (meaning, the potential money to be made) against the risk of state enforcement. SUF ¶ 241, 243. NCA was the subject of enforcement actions brought by New York, Arkansas, Connecticut and Maryland for collecting on illegal payday loan debt, resulting in NCA having to repay consumers in those states. SUF ¶ 241-244.

When NCA onboarded a new portfolio of debt, among the data it captured was the state of residence of the consumer. SUF ¶ 268. It also stored copies of the actual, underlying loan agreements. SUF ¶ 263. In other words, NCA knew when it was purchasing a Pennsylvania loan, and had the ability to call up for inspection the loan agreement for any such Pennsylvania loan on which it was collecting.

On or about August 31, 2015, NCA began processing a "Think Product Close and Recall" for all Pennsylvania-coded accounts, based on a decision by the former CEO. SUF ¶ 268. At that time, NCA was collecting on approximately $9.5 million in Plain

UNSEALED

Green loan balances from approximately 7,000 Pennsylvania borrowers; $3.5 million in Great Plains Lending balances from 2,800 Pennsylvanians; and $5 million in Pennsylvania MobiLoan balances from 6,000 Pennsylvanians actively collecting on Pennsylvania loans purchased from the TF tribal enterprises. SUF ¶ 269. Even after this halt to collection communications, NCA continued to accept payments from Pennsylvania borrowers on account of these loans. SUF ¶ 270.

As of December 3, 2015, NCA assembled data for all Plain Green, Great Plains Lending and MobiLoans accounts that were loaded onto the NCA system from April 2013 until then, that were coded as Pennsylvania accounts, producing the following numbers: Great Plains Lending, 2,731 accounts, representing $3.531 million in balances; Plain Green, 6,695 accounts, representing $9.738 million in balances; and MobiLoans, 6,155 accounts, representing $5.225 million in balances. SUF ¶ 271. NCA collected a total of $4.4 million in payments from Pennsylvania consumers on account of Plain Green, Great Plains Lending and MobiLoans obligations. SUF ¶ 274.

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine "if the

26

UNSEALED

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Id*.

If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus., Ltd. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). If the non-moving party bears the burden of persuasion at trial, "the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (*quoting Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998). In addition, the moving party may point to the absence of evidence proffered by the non-movant to succeed on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). However, there must be more than a "mere scintilla" of evidence in support of the non-moving party's position to survive the summary judgment stage. *Anderson*, 477 U.S. at 252. "[A]n inference based on speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Koltonuk v. Borough of Laureldale*, 443 F. Supp. 2d 685, 691 (E.D. Pa. 2006) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (internal quotation

UNSEALED

omitted). Where, as here, the Court would be the trier of fact if the case were to proceed to trial, "the court is not confined to deciding questions of law, but also may . . . draw a derivative inference from undisputed subsidiary facts, even if those facts could support an inference to the contrary, so long as the inference does not depend upon an evaluation of witness credibility." *General Electric, Co. v. Jackson*, 595 F. Supp. 2d 8, 14 (D.D.C. 2009).

## II. The Loans Offered by the Think Finance Lending Enterprise Were Illegal as a Matter of Law

Pennsylvania's general usury law, the Loan Interest Protection Law ("LIPL"), Act of January 30, 1974, P.L. 13, *as amended,* 41 P.S. §§ 101–605, forbids charging more than 6% interest for an unsecured consumer loan less than $50,000. 41 P.S. § 201. A separate law, the Consumer Discount Company Act, Act of April 8, 1937, P.L. 262, *as amended,* 7 P.S. §§ 6201–6219 (the "CDCA"), authorizes some higher rate consumer lending, but only in the context of a strictly defined, licensed product that is regulated by the state Department of Banking. *See Pennsylvania Department of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752 (Pa. 2008) *("NCAS I")*. It is undisputed that TF was never licensed under the CDCA, so the general six percent rate cap in LIPL applies here.

The prohibition on usurious lending is broad:

[N]o person shall engage or continue to engage in this Commonwealth, *either as principal, employee, agent or broker*, in the business of negotiating or making loans or advances of money on credit, in the amount or value of twenty-five thousand dollars ($25,000) or less, and *charge, collect, contract for or receive* interest, discount, bonus, fees, fines, commissions, charges, or

UNSEALED

> other considerations which aggregate in excess of the interest that the
> lender would otherwise be permitted by law to charge if not licensed
> under this act on the amount actually loaned or advanced.

7 P.S. § 6203.A (emphasis added). *NCAS I,* 948 A.2d at 642. This long-standing statutory

framework reflects Pennsylvania's unequivocal, fundamental policy against usury.

*NCAS I,* 948 A.2d at 759. "It is well established that Commonwealth public policy

prohibits usurious lending, a prohibition that has been recognized for well over 100

years." *Id.; see also In re Grigsby,* 127 B.R. 759, 764 (E.D. Pa. 1991) (Pennsylvania's usury

statute reflects "the legislature's abhorrence of usurious interest rates").

Pennsylvania public policy is concerned not only with preventing and

remedying the usury that is apparent on the face of a loan but also in preventing and

remedying schemes designed to evade the law. For example, LIPL forbids any

contractual waiver of the applicability of the rate cap, 41 P.S. § 408, and the

Pennsylvania Supreme Court has specifically warned that "the methods used by

usurious lenders, often involv[e] subterfuge, to attempt to circumvent fundamental

public policy." *Cash Am. Net of Nevada, LLC v. Com.,* 978 A.2d 1028, 1038 (Pa. Commw.

2009), *aff'd sub nom. Cash Am. Net of Nevada, LLC v. Com., Dep't of Banking,* 8 A.3d 282

(Pa. 2010).

Pennsylvania courts have consistently struck down procedural obstacles that

would inhibit the return of usurious interest and fees—whether those obstacles were

created by operation of law, by agreement of the parties, or otherwise. *See Thompson v.*

29

UNSEALED

*Prettyman*, 79 A. 874, 876 (Pa. 1911) (refusing to give effect to a release that was entered into after the usurious interest had been paid.); *Simpson v. Penn Discount Corp.*, 5 A.2d 796, 798 (Pa. 1939) (refusing to apply the parole evidence rule where it would interfere with the ability to establish the usurious nature of a loan); *Moll v. Lafferty*, 153 A. 557, 559 (Pa. 1931) (public policy in favor of recovering usury can overcome the finality of judgments); *Olwine v. Torrens*, 344 A.2d 665, 668 (Pa. Super. Ct. 1975) (failure to raise usury as an affirmative defense does not constitute waiver); *cf. Thomas v. First Nat'l Bank of Scranton*, 101 A.2d 910 (Pa. 1954) (holding contractual provisions exculpating banks from liability to be unenforceable as against public policy). And the Pennsylvania Supreme Court has specifically stated that choice-of-law provisions that seek to avoid Pennsylvania law run afoul of this policy. *NCAS I*, 948 A.2d at 759 n.9.

There is no question that the loans at issue violated Pennsylvania usury law. TF's insistence throughout this case that it was only a "service provider" to the tribal LLCs does not change this legal conclusion. Even if this were true (and it is not), a "service provider" is no more free to violate Pennsylvania's usury law than is the named lender. The language in the CDCA quoted above makes clear that the applicability of the usury prohibition extends beyond the named lender in a usurious loan. It applies also to "any person" who "charges," "collects" or "receives" the usurious interest, including any "principal, employee, agent or broker" in the lending business. This language covers

30

UNSEALED

TF, even if it were true that was merely a "service provider." And as CEO of TF, the law clearly encompasses Defendant Rees.

## III. Defendant Kenneth Rees Violated the Pennsylvania COA § 911(b)(3) Through His Direction of the Scheme (SAC Count Two)

### A. The Legal Principles Regarding the Commonwealth's COA Claims Are Well-Settled

The Pennsylvania Corrupt Organizations Act empowers the Pennsylvania Attorney General "to enforce the provisions of this section" and to "institute proceedings under subsection (d)." 18 Pa.C.S. § 911(e)(1). Subsection (d) grants jurisdiction to the courts "to prevent and restrain violations of subsection (b)." 18 Pa.C.S. § 911(d)(1). Here, the Pennsylvania Attorney General brought an action in the Court of Common Pleas of Pennsylvania in order to enforce the provisions of the COA, and specifically violations of 18 Pa.C.S. § 911(b)(1),(3),(4) seeking injunctions, restitution, disgorgement other equitable relief from the court pursuant to 18 Pa.C.S. § 911(d)(1)(i). (SAC ¶¶ VI.B, E, G-I).

The Pennsylvania COA was modeled on the federal RICO statute and incorporated much of the federal act's language. *See Commonwealth v. Brady*, 368 A.2d 699, 706 n.17 (Pa. 1977). Pennsylvania courts have found judicial interpretations of the federal RICO statute to be instructive in many instances. *See, e.g., Commonwealth v. Donahue*, 630 A.2d 1238, 1245-46 (Pa. Super. 1993) (interpreting "enterprise" under COA in line with the Supreme Court's definition under RICO in *United States v. Turkette,* 452

31

UNSEALED

U.S. 576 (1981)); *Commonwealth v. Cassidy*, 620 A.2d 9, 8-11 (Pa. Super. 1993). Similarly, as this Court has already ruled, where the COA adds or subtracts from RICO's language, RICO precedent is not controlling. *Commonwealth of Pennsylvania v. Think Finance, Inc.*, Civ. No. 14-cv-7139, 2016 WL 183289, at *19 (E.D. Pa. Jan. 14, 2016) (applying language from COA not present in RICO to interpret availability of a disgorgement remedy.)

Under 18 Pa.C.S. § 911(b)(3), "It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To sustain a claim under §911(b)(3), the Commonwealth must therefore establish: (1) conduct or participation of a person; (2) in the conduct of an enterprise; (3) through a pattern; (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (as to federal RICO).

**B. TF's Ongoing Collection Activity on High-Rate Consumer Loans Constituted a Pattern of Racketeering Activity Under the Pennsylvania COA**

A "pattern of racketeering activity" is defined in 18 Pa.C.S. § 911(h)(4) as "a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this section."[7] Under RICO, this element requires a

_____

[7] *Compare* 18 U.S.C. § 1961(5): "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last

UNSEALED

relatedness among the predicate acts, that the acts share "similar purposes, results, participants, victims, or methods of commission." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989). It also requires continuity, which the Supreme Court defines as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242.

To establish "racketeering activity," the conduct of the enterprise must include "predicate acts," which are offenses enumerated in the COA statute. *See* 18 Pa.C.S. § 911(h)(1). Among the enumerated offenses, the COA includes: "The collection of any money or other property in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum or the equivalent rate for a longer or shorter period, where not otherwise authorized by law." 18 Pa.C.S. § 911(h)(1)(iv).[8] Here the unlawful lending enterprises collected some

---

of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

[8] The COA diverges from RICO in one minor respect here. Where under the COA the collection of unlawful debts is an enumerated offense under the definition of "racketeering activity," *see* 18 Pa.C.S. § 911(h)(1), which is then prohibited under the liability provisions, *see* 18 Pa.C.S. § 911(b)(1)-(4), under RICO the "collection of an unlawful debt" is an alternative to "pattern of racketeering activity" as a direct basis for liability under 18 U.S.C. § 1962(a)-(d).

33

**UNSEALED**

$192 million Pennsylvania consumers, at usurious and unlawful rates, from April 2011 through and beyond the filing of this action in November 2014. SUF ¶ 30.

### C. Think Finance, Inc. and Its Three Tribal Lending Associations-in-Fact Were Enterprises Engaged in a Pattern of Racketeering Activity

An "enterprise" is defined broadly in 18 Pa.C.S. § 911(h)(3), encompassing "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities."[9] Persuaded by United States Supreme Court and Third Circuit precedent as to federal RICO, Pennsylvania courts have found this element to be met by a showing "that there was an ongoing organization engaged in commerce and that the associates of the organization functioned as a continuing unit." *Commonwealth v. Donahue*, 630 A.2d 1238, 1245 (Pa. 1993) (citing *United States v. Turkette*, 452 U.S. 576 (1981) and *United States v. Riccobene*, 709 F.2d 214 (3d Cir. 1983)). An enterprise can be a single entity, like a corporation, or it can be "individuals associated in fact." *See* 18 Pa.C.S. § 911(h)(3). An "association-in-fact enterprise" must possess three attributes: (1) a purpose; (2)

---

[9] *Compare* 18 U.S.C. § 1961(4): "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The key difference in the COA is requiring an engagement in commerce—an element which is uncontested here.

UNSEALED

relationships among those associated with the enterprise; and (3) longevity sufficient to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

The Second Amended Complaint alleged the existence of several enterprises involved in the illegal conduct at issue including TF itself and three tribal lending associations in fact. *See* SAC ¶¶ 126-136. Each of these tribal lending enterprises—Plain Green, Great Plains, and Mobiloans—shared the same purpose, *i.e.*, making high-interest loans in states where TF could not do so itself. The structure of each of these associations in fact was realized by a series of contracts and agreements between and among Think Finance, Inc., the Think Finance subsidiaries, GPLS, Victory Park Capital Advisors, the Victory Park Capital investment funds, the First Bank of Delaware, the respective tribal LLCs of Plain Green, Great Plains, and Mobiloans, National Credit Adjustors, and numerous other entities providing services such as ACH processing, call centers, and debt collection. SUF ¶¶ 31-39, 42-55, 56-61, 84-85, 98-120, 121-137. These enterprises operated continuously during the relevant period as reflected in the undisputed, ongoing marketing, processing, servicing, and collecting upon usurious loans made to Pennsylvania consumers over that time. SUF ¶¶ 28-30, 165-177, 179, 189-190, 196, 245, 263, 268-272.

### D. Defendant Kenneth Rees Conducted Think Finance's Racketeering Activities

The conduct must be carried out by a "person," as defined in 18 Pa.C.S. § 911(h)(2), as "any individual or entity capable of holding a legal or beneficial interest in

UNSEALED

property." The term "conduct" requires an inquiry into whether a defendant exercised a sufficient degree of control over the enterprise necessary to ground RICO liability. One must "have some part in directing [the enterprises' s] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Plainly, as the CEO and Chairman of TF, Rees, had "some part" in the "direction" of the enterprises' affairs.

In *Reves* the Supreme Court established the "operated and managed" standard for liability for persons under § 1962(c). "In sum, we hold that 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." 507 U.S. at 185. Judge Becker, writing for the Third Circuit and applying *Reves*, found a corporate officer liable for racketeering he carried out through a business enterprise, by noting that "corporate officers/employees, such as the defendants, may properly be held liable as persons managing the affairs of their corporation as an enterprise through a pattern of racketeering activity." *Jaguar Cars, Inc., v. Royal Oaks Motor Co., Inc.*, 46 F.3d 258, 261 (3d Cir. 1995); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise,' particularly when the statute explicitly defines 'person' to include 'any individual ... capable of holding a legal or beneficial interest in property,' and defines 'enterprise' to include a 'corporation.'").

36

Pennsylvania courts have found liability to attach to persons from a broad range of connections to the enterprise that acts as a vehicle for the racketeering. This includes corporate officers and owners of corporate enterprises who direct the conduct as Defendant Rees did, down to regular, low-level operatives who are directed by upper management, and even to those that have limited dealings with the enterprise but who present particular facts to establish control. *See, e.g., Commonwealth v. Dellisanti*, 876 A.2d 366, 370 (Pa. 2005) (owner of store through which drug paraphernalia sold); *Commonwealth v. Piner*, 2015 WL 7575681 (Pa. Super. 2015) (drug dealer in drug-ring run out of a bar); *Commonwealth v. Donahue*, 630 A.2d 1238 (Pa. Super. 1993) (drug dealer who occasionally purchased his supply through the enterprise). These tiers of personal liability under the COA line up with how federal circuit courts have interpreted RICO. *See, e.g., Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994) ("An enterprise may be operated, for RICO purposes, by, *inter alia*, upper management, 'lower-rung participants in the enterprise who are under the direction of upper management,' or 'others "associated with" the enterprise who exert control over it, as for example, by bribery.'") (quoting *Reves*); *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 977 (7th Cir. 1995).

Defendant Rees's liability stems from his actions taken as the CEO of Think Finance, Inc. and its subsidiaries. In that role, he was able to direct, manage, conduct, operate, and participate in the Think Finance lending operation, which was carried out

UNSEALED

through a number of association-in-fact enterprises. Under the direction of Rees, the Think Finance entities designed the overall scheme and then performed discrete functions within the scheme to make and collect upon illegal loans. SUF ¶¶ 145-190. As CEO of TF, and of the subsidiaries, Defendant Rees knowingly designed the enterprise to evade state usury law, SUF ¶¶ 6-8, 10-16, 66-68, 138-144, 197-221, either executed personally or directed the execution of the agreements that established the enterprises, SUF ¶¶ 32, 48-49, 51, 108, 110, 118, 130, 163, 165, and knew of, participated in, and approved major decisions related to the enterprise, SUF ¶¶ 5, 8, 18-19, 28, 32, 48-49, 51, 62-101, 108, 110, 114-115, 118, 121, 127-128, 130, 145, 163-165, 175, 180, 198, 204-207, 211-220, 223, 227, 229, 231, 251. For purposes of RICO analysis under *Reves* and *Jaguar Cars*, he was an upper-level officer of corporate entities at the heart of the association-in-fact enterprises which he controlled through a pattern of racketeering, and his conduct is the quintessence of "operate and manage."

1. **Kenneth Rees Designed the Racketeering Enterprise to Evade State Usury Law by Using Tribal Entities**

The undisputed facts show that when FBD was forced by the FDIC to abandon its lending relationship with TF, SUF ¶ 62, Rees led TF to seek out other means to continue high rate consumer lending in states, like Pennsylvania, where such lending is illegal, SUF ¶¶ 62-101.

The record shows Rees overseeing TF efforts, first to try to find a replacement bank for FBD, and later, when that effort failed, to establish a tribal model and to seek

38

UNSEALED

tribes willing to participate. SUF ¶¶ 62-101. Rees explained to his Board that the reason for working with tribes was that they were like banks in that they could export their rates into states that barred high rate consumer lending. SUF ¶ 68. Rees was personally engaged in the search for tribal entities. SUF ¶¶ 66, 68, 76, 84, 101. He met with representatives of two potential tribal partners, Butch Webb and Mark Curry. SUF ¶ 76. His reports to the Board of Directors show the progress of his search for tribes. SUF ¶¶ 100-101. Under his direction, TF developed mock tribal-lending brands, websites and materials used to promote the business opportunity to tribes, promising no up-front investment of tribal money and no risk of loss. SUF ¶¶ 70-75, 79-83, 96.

### 2. Kenneth Rees, as CEO, Was the Person Who Contractually Bound TF to the Tribal Lending Enterprises

Once suitable tribal partners were found, Rees personally signed or directed the execution of the agreements that brought the tribal lending operation and the core of the association-in-fact enterprises into being. SUF ¶¶ 108, 110, 118, 130, 163, 165. Rees explained that the creation of three separate tribal enterprises was part of his strategy to avoid reliance on only one nominal lending entity. More, Rees oversaw the shift of his purchasing and funding arrangements with VPC from the bank model to the tribal model. As part of this new model, TF provided a guarantee of payment, secured by all of TF's corporate assets, to VPC's GPLS entity. SUF ¶¶ 117-118. Rees also oversaw and approved the pledge of TF capital assets to guaranty GPLS against risk arising from delinquent loans. SUF ¶¶ 117-118, 160-162. More, Rees also oversaw and approved the

39

UNSEALED

issuance of corporate guarantees to certain critical third-party service providers, like the ACH processor Intercept, as well as call center service providers, who were thereby integrated into the association-in-fact enterprises. SUF ¶¶ 123, 136.

### 3. Kenneth Rees Knew of, Was Intimately Involved in, and Finally Approved All Major Decisions Related to the Conduct of the Racketeering Enterprise

On a day to day basis, Rees oversaw and directed the TF operations managing the three tribal association-in-fact enterprises. TF employees, under Rees's direction from TF headquarters in Texas, performed the vast bulk of the work necessary to carry out the lending operation, including the marketing, funding, processing, approval, servicing and collections of loans to Pennsylvania consumers. SUF ¶¶ 165.

Once the tribal lending operation was up and running, and growing at phenomenal rates, Rees led the efforts to protect the operation from regulatory scrutiny. He oversaw and approved the efforts to hide TF's role in the lending enterprise and to deal with what TF understood to be the "true lender" threat to the business model, *i.e.*, the recognition by state or federal regulators that TF had the predominant economic interest in the lending operation, not the tribal entities. SUF ¶¶ 201-202, 204-211. In response to increasing regulatory scrutiny, Rees oversaw and approved efforts to "restructure" the lending process. SUF ¶¶ 204-211. In his own words, he explained that he was hoping to make changes in the model that would not change the economic reality but would change the "optics." SUF ¶ 207. When the model was threatened by regulatory enforcement, Rees oversaw and approved, TF's role in coordinating and

40

paying for litigation that was filed in the name of one of the tribes in an attempt to enjoin regulatory enforcement. SUF ¶¶ 212-213.

After regulatory pressure caused VPC to temporarily halt the tribal lending operation in August of 2013, Rees swung into action and personally negotiated with VPC for a restoration of some of the lending. SUF ¶ 214. He also worked to identify new ACH processors willing to work with TF and secured approval to use GPLS funds to seed ACH accounts to entice banks to work with the company. SUF ¶¶ 127-130. When he determined that the tribal operation was too exposed, he led the efforts to shift TF resources away from the tribal operation to TF's state-licensed, RISE product. SUF ¶¶ 147, 211, 218-221. He personally negotiated with VPC to obtain a number of concessions to smooth the process of winding down the tribal lending operation and to redirect resources to the RISE product. SUF ¶¶ 222-223. Ultimately, he led the process of splitting TF into two. SUF ¶ 218-224. And in May 2014, he completed that process with a formal split and the birth of the company Elevate, of which he became CEO and which he eventually took public. SUF ¶¶ 224-233.

Ken Rees, as CEO, was directly and personally involved in every major turn in the creation, operation and eventual wind down of the lending operation. He "operated and managed" the association-in-fact enterprises all of which were dedicated to the making and collection on loans that were illegal under Pennsylvania law.

UNSEALED

## IV. Defendant Kenneth Rees Violated the Pennsylvania COA § 911(b)(4) (SAC Count Three)

In addition to its claim under § 911(b)(3), the Commonwealth also alleges conspiracy claims under § 911(b)(4), which makes it "unlawful for any person to conspire to violate any of the provisions of paragraphs (1), (2) or (3) of this subsection." In contrast to a § 911(b)(3), claim, which holds responsible those actually directing the enterprise that is engaged in "racketeering activity," a § 911(b)(4) claim reaches those who conspire to further the illegal purposes engaged in a COA enterprise.

Federal RICO law is instructive regarding the reach of conspiracy liability, as the Pennsylvania courts have not had occasion to rule on it independently. "[A] defendant may be held liable for conspiracy to violate § 1962(c), if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." *Smith v. Berg*, 247 F. 3d 532, 538 (3d Cir. 2011). "The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense . . . A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. . . If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Salinas v. United States*, 522 U.S. 52, 63-64 (1997). A RICO conspiracy may be inferred from the facts and circumstances from which it arises because the acts of the participants could not be carried on "except as a result of a preconceived scheme or

UNSEALED

common understanding." *Think Finance*, 2016 WL 183289, at *18 (quoting *U.S. v. Boria*, 592 F.3d 476, 481 (3d. Cir. 2010)).

The standard for liability as a RICO conspirator is substantially less onerous than the standard for a person who "operated and managed" a RICO enterprise. *See Salinas*, 522 U.S. at 65.

As stated *supra*, the undisputed facts show that Rees "knowingly agree[d] to facilitate a scheme which include[d] the operation or management of a RICO enterprise." *Smith v. Berg*, 247 F. 3d at 538. That is, during the period 2011 and 2014, Rees knowingly facilitated a scheme to make and collect loans which were illegal under Pennsylvania law. He facilitated the marketing, processing, funding, and collection aspects of such lending activity, and undertook efforts to protect the scheme from detection, all with the intention to profit from illegal, usurious loans. Rees is plainly liable as a RICO co-conspirator.

## V. The Consumer Contracts' Choice-of-Law Provisions Do Not Apply in This Action

The choice-of-law provisions contained in the consumer lending agreements offered through the Plain Green, Great Plains, and Mobiloans products are void and unenforceable for the following independent reasons: (1) Pennsylvania law prohibits the use of contractual clauses to waive the protections of the usury statute and the Attorney General is not bound by choice-of-law provisions when acting pursuant to his police powers; (2) the choice-of-law provisions function to prospectively waive federal

43

UNSEALED

rights and therefore are unenforceable as a matter of federal law; (3) the choice-of-law provisions violate Pennsylvania's fundamental public policy against usury; and (4) the tribal entities were not the "true lenders" in the transactions and therefore provisions that favor tribal law violate public policy.

**A. The Choice of Law Provisions Contained in the Lending Contracts at Issue Here Are Void as the Attorney General Cannot be Bound by Contractual Choice of Law Provisions**

The choice-of-law provisions in the consumer lending contracts do not launder away the illegality of the loans under Pennsylvania law. Pennsylvania statutory law clearly prohibits the use of contractual clauses to waive the protections of the usury statute. 41 P.S. § 408. Furthermore, under well-established Pennsylvania law, the Attorney General, acting to enforce Pennsylvania law pursuant to his police powers cannot be bound by choice-of-law provisions. *See NCAS I*, 948 A.2d at 759 ("[T]he Department instituted this action pursuant to its police power, not only to protect consumers who had already entered into contracts with Appellant, but more broadly on behalf of the general public to enforce the policy protecting them from usurious lending. … When viewed in this light … the choice-of-law provision in Appellant's contracts cannot bind the Department in this action to enforce Pennsylvania public policy"). Parties may not contract around the "police power" of the Attorney General or other state law enforcement agencies. *Carlino v. Whitpain Investors*, 453 A.2d 1385, 1388 (Pa. 1982) ("[I]ndividuals' cannot, by contract, abridge police powers which protect the

44

**UNSEALED**

general welfare and public interest."); *see also Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 362 n.3 (6th Cir. 1993) ("Enforcement of the act's provisions by the attorney general would not be affected by a choice of law provision in a franchise contract."). Because Pennsylvania law recognizes the per se nullity of choice-of-law provisions both statutorily as to usury and with respect to Attorney General actions enforcing statutory prohibitions of usurious lending, this Court should apply these Pennsylvania choice-of-law rules in the present action as a federal court exercising jurisdiction over claims brought under state law.

There is no material dispute of fact that this action is brought by the Commonwealth pursuant to its police powers, *see* SAC ¶5, and as such, this action is not governed by the contractual choice of law provisions. Moreover, usury protections may not be waived by contract. Pennsylvania law applies, and these loans are illegal.

**B. The Choice of Law Provisions Are Void Because They Prospectively Waive Federal Rights**

The Court, in its Order of May 28, 2015, denying the Commonwealth's Motion for Remand, noted that the Court was exercising federal question jurisdiction as to "whether the tribes' assertions of jurisdiction over the loans and borrowers are valid." (Doc. 53, at 1 n.1). Since the Court's Order, numerous federal decisions, including two in the Eastern District of Pennsylvania, have found that tribal choice-of-law clauses in consumer loans nominally made by tribal entities are invalid as a matter of *federal* law because they prospectively waive federal rights. *See, e.g., Dillon v. BMO Harris Bank,*

45

UNSEALED

*N.A.*, 856 F.3d 330 (4th Cir. 2017) (as to loans made by Great Plains); *Hayes v. Delbert Servs., Corp.*, 811 F.3d 666 (4th Cir. 2016); *Smith v. Western Sky Financial,* 168 F.Supp.3d 778 (E.D. Pa. 2016) (J. McHugh); *Ryan v. Delbert Services Corp.*, Civ. No. 5:15-05044, 2016 WL 4702352 (E.D. Pa. Sept. 9, 2016) (J. Leeson). [10] These decisions apply the Supreme Court's prospective waiver doctrine to tribal "choice-of-forum and choice-of-law clauses [that] operate[] in tandem as a prospective waiver of a party's right to pursue statutory remedies." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-236 (2013). The choice-of-law provisions in the TF lending contracts either expressly disclaim the applicability of federal law or subject consumers to tribal forums which exclusively apply tribal law and thus "surreptitiously waive[] a potential claimant's federal rights through the guise of a choice of law clause." *Hayes*, 811 F.3d at 375.

---

[10] Numerous federal courts have *uniformly* agreed with and adopted the application of the prospective waiver doctrine as applied in *Hayes* to consumer loans made by tribal entities. *See Titus v. ZestFinance, Inc.*, No. 18-5373, 2018 WL 5084844, at *4-5 (W.D. Wash. Oct. 18, 2018); *Rideout v. CashCall, Inc.*, No. 16-cv-02817, 2018 WL 1220565, at *6 (D. Nev. Mar. 8, 2018); *MacDonald v. CashCall, Inc.*, Civ. No. 16-2781, 2017 WL 1536427 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 344-45 (W.D.N.Y. 2017); *Parnell v. CashCall, Inc.*, 181 F. Supp. 3d 1025, 1042 (N.D. Ga. 2016), *aff'd sub nom. Parnell v. W. Sky Fin., LLC*, 664 Fed. App'x 841 (11th Cir. 2016); *see also Gingras v. Rosette*, No. 5:15-CV-101, 2016 WL 2932163, at *18 (D. Vt. May 18, 2016) (citing *Hayes* and concluding that incorporation of tribal law and review of arbitration by only a tribal court "effectively insulated" defendants from claims for violating state and federal lending laws with respect to Plain Green loans).

UNSEALED

The Fourth Circuit's decision in *Hayes* is the leading case in applying the prospective waiver doctrine to payday lending agreements' use of tribal choice-of-law and arbitration provisions to find the choice-of-law provisions unenforceable as a matter of law. The *Hayes* court reasoned that "a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of federal statutes to which it is and must remain subject." *Id.* at 675. A little over a year later, the Fourth Circuit expanded on this principle in *Dillon*, holding that a loan agreement that "implicitly accomplishes" what the agreement in *Hayes* expressly stated was also unenforceable. 856 F.3d at 335. The loan agreement at issue in *Dillon* was a Great Plains loan agreement.

In the Eastern District of Pennsylvania, the decisions in *Smith* and *Ryan* applied the Fourth Circuit's reasoning in *Hayes*. With a similar set of facts, Judge McHugh in *Smith* "concluded that Native American sovereignty is not at stake in this case, and [agreed] with the Fourth Circuit (among others) that Defendants seek 'to avoid federal law and game the system.'" *Smith*, 168 F. Supp. 3d at 780. Judge Leeson, in applying *Hayes* and *Smith*, notes that "both opinions are well reasoned, and the Court adopts their reasoning here." *Ryan,* 2016 WL 4702352, at *3.

**1. Plain Green and Great Plains Contract Language**

The PG and GP loan agreements expressly disclaimed application of federal and state law: "***and further agree that no state or federal law or regulation shall apply to***

47

UNSEALED

*this Agreement, its enforcement or interpretation*." SUF ¶ 139. This is a clear prospective waiver of rights.

Language throughout the rest of the PG and GP contracts only reinforces the prospective waiver of federal rights. In addition, the agreements contained transfer clauses that stated: "this Agreement shall remain *exclusively* subject to the laws and courts of the [tribe]" (emphasis added), SUF ¶ 143. Further, the agreements contain arbitration provisions which, in multiple places, reiterate that only tribal forums and tribal law apply. SUF ¶ 144. When providing truth-in-lending disclosures required by federal law, the agreements state, "[o]ur inclusion of these disclosures does not mean that we or any subsequent holder of this Agreement consent to application of state or federal law to us, to the Loan, or this Agreement." SUF ¶ 139.[11]

The express disclaimer as to the applicability of federal law in the Plain Green and Great Plains contracts is unambiguous, and for that reason it is not necessary to fully analyze the arbitration agreement, as done below for Mobiloans, that provides the parallel procedural mechanism to evade federal law. The Fourth Circuit in *Dillon* and the District Court of Vermont in *Gingras v. Rosette* have reviewed the arbitration agreements found in the consumer loan contracts from this period of Great Plains and Plain Green, respectively, and found that they functioned to waive federal law. *See*

---

[11] For brevity sake, this language was not quoted in SUF ¶ 139. The full agreements are reproduced in the Appendix as referenced in SUF ¶ 139.

UNSEALED

*Dillon*, 856 F.3d at 335 ("The [Great Plains] arbitration agreement in this case implicitly accomplishes what the [arbitration agreement in *Hayes*] explicitly stated, namely, that the arbitrator shall not allow for the application of any law other than tribal law."); *Gingras*, 2016 WL 2932163, at *18 ("By incorporating the tribal financial law and making all arbitrations reviewable by the tribal court on both the law and the facts [in the Plain Green agreement], the defendants have effectively insulated themselves from claims that they have violated state and federal lending laws.").

### 2. Mobiloans Contract Language[12]

Although the Mobiloans contracts do not begin with an express disclaimer of all federal law like the Plain Green and Great Plain agreements, the structure of the agreement—especially through applicable law clauses in the arbitration section—"surreptitiously waives a potential claimant's federal rights through the guise of a choice of law clause." *Hayes*, 811 F.3d at 675.

At first glance, the Mobiloans agreement seems to accept that some federal law is applicable, including a heading stating that credit issued pursuant to the agreement is

---

[12] For completeness sake, the Appendix contains three different Mobiloans agreements drafted in 2011 (App. 2165-2177), 2012 (App. 2178-2198), and 2013 (App. 2522-2533). The language quoted here comes from the 2012 and 2013 loan agreements. Where the language differs with respect to the 2011 agreement is footnoted in the SUF; none of the differences are material to this analysis. The SUF quotes the Mobiloans agreements at SUF ¶¶ 140, 143-144. Not all quotes used here are fully reproduced in the SUF. For the convenience of the Court, footnotes will be provided here with full quotes from the relevant clauses being discussed. All cited references will be made to the 2012 agreement fully reproduced at App. 2178-2198. All emphases are added.

UNSEALED

done "solely under the provisions of laws of the Tunica-Biloxi Tribe of Louisiana and applicable federal law."[13] Yet additional clauses that use similar terminology make it clear that "applicable federal law" is limited to that federal law that benefits the tribal entity. In both clauses, the tribal entity explicitly denies the general applicability of federal law while availing itself of the benefits of the Federal Arbitration Act and the Indian Commerce Clause. In the "Governing Law" clause of the "Arbitration Agreement" section, the agreement notes "*such voluntary application [of the FAA] does not represent acquiescence by the Tribe of the general application of such law or any other federal law to the Tribes operation* unless such law is expressly applicable thereto."[14] Similarly, the "Governing Law" clause that governs the entire agreement states that "Mobiloans, LLC may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use *does not represent*

---

[13] "Mobiloans, LLC is an entity owned and operated by the Tunica-Biloxi Tribe of Louisiana. The credit issued to you and information provided under this agreement by Mobiloans is done so solely under the provisions of the laws of the Tunica-Biloxi Tribe of Louisiana and applicable federal law." (App. 2178).

[14] "This Arbitration Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution, the Federal Arbitration Act ("FAA") and the decisions of the United States Supreme Court interpreting the FAA, and other applicable federal law. We do not have a presence in Louisiana or any other State of the United States of America. Neither is this Agreement nor the Lender subject to the laws of any State of the United States. Although Mobiloans, LLC is voluntarily agreeing to the application of the FAA and the relevant judicial interpretations of the FAA to this Arbitration Agreement, such voluntary application does not represent acquiescence by the Tribe of the general application of such law or any other federal law to the Tribes operation unless such law is expressly applicable thereto." (App. 2195).

UNSEALED

*acquiescence of the Tribe to any federal law* unless found expressly applicable to the Tribal operations offering such services."[15] None of this language would be necessary if the agreement was meant to be subject to "applicable federal law," as noted in the heading on the first page of the agreement. And, in fact, if it was meant to permit application of federal law, then it would conflict with the dictates of the arbitration agreement section, discussed below, which mandate the arbitrator to exclusively apply the laws of the tribe and the terms of the agreement.

The Arbitration Agreement section offers the mechanism by which the agreement clearly waives any possible federal right. The "Choice of Arbitrator" clause first provides that any chosen arbitrator may apply his or her own rules of arbitration but only to the "extent those rules and procedures *do not contradict either Tribal law or the express terms of this Arbitration Agreement*."[16] The arbitrator "has the ability to award all remedies *available under the laws of the Tunica-Biloxi tribe of Louisiana*."[17]

---

[15] "This Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution and other applicable federal law. We do not have a presence in Louisiana or any other State of the United States. Mobiloans, LLC may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Tribe to any federal law unless found expressly applicable to the Tribal operations offering such services." (App. 2195).

[16] "The chosen arbitrator will utilize the rules and procedures applicable to consumer disputes of the chosen arbitration organization extent those rules and procedures do not contradict either Tribal law or the express terms of this Arbitration Agreement." (App. 2194).

[17] "The arbitrator has the ability to award all remedies available under the laws of the Tunica-Biloxi Tribe of Louisiana, whether at law or equity, to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual Disputes between the parties." (App. 2194).

UNSEALED

Only a tribal court or the arbitrator has the jurisdiction to determine the validity of the class waiver, and if the tribal court or the arbitrator refuse to enforce the class waiver, "the Dispute will proceed in Tribal court and will be decided by a Tribal court judge."[18] Furthermore, Mobiloan's agreement to conduct an arbitration within thirty miles of the consumer's residence "shall not be construed in any way . . . to allow for the application of *any law other than Tribal law*."[19] The "Judicial Review" clause reinforces the exclusive application of tribal law by the arbitrator, stating that "[t]he arbitrator will apply *the laws of the Tunica-Biloxi Tribe of Louisiana* and the terms of this Agreement, including the Arbitration Agreement."[20] Judicial review is limited to review by a Tribal court.[21] And the agreement mandates the consumer to "irrevocably consent

_____

[18] "The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction of the Tunica-Biloxi Tribe of Louisiana, and not by the arbitrator. If the court refuses to enforce the class-wide arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in Tribal court and will be decided by a Tribal court judge, sitting without a jury, under applicable court rules and procedures and may be enforced by such court through any measures or reciprocity provisions available." (App. 2194)

[19] "Any arbitration under this Agreement may be conducted either on Tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than Tribal Law." (App. 2194).

[20] "The arbitrator will apply the laws of the Tunica-Biloxi Tribe of Louisiana and the terms of this Agreement, including the Arbitration Agreement." (App. 2195).

[21] "The arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or be set aside by the Tribal court upon judicial review." (App. 2195).

UNSEALED

to the jurisdiction of the Tribal courts for purposes of this Agreement."[22] The

Arbitration Agreement section, taken seriously, would subject a consumer who wanted

to pursue federal, statutory remedies, to the exclusive jurisdiction of an arbitrator who

was limited to applying tribal law. Federal law, by these terms, does not apply.

Additionally, even if a consumer chose to "opt out" of the arbitration agreement,

"any disputes under this Agreement or related to your Mobiloans Credit Account *shall*

*nonetheless* be governed under the laws of the Tunica-Biloxi Tribe of Louisiana and

must be brought within the court system thereof."[23] Besides no mention of the

applicability of federal law, the use of "nonetheless" suggests that even prior to opting

out, only tribal law and jurisdiction applied to "any disputes under this Agreement."

Another section of the Agreement entitled "Transfer of Rights; Maintenance of

Register" creates a similar implication as to the presumption that the agreement was,

prior to the exercise of any contractual provision, exclusively under tribal law and

jurisdiction. That section states that "[r]egardless of any transfer, this Agreement *shall*

*remain exclusively* subject to the laws and courts of the Tribe. As an integral component

of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal

---

[22] "As an integral component of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal courts for purposes of this Agreement." (App. 2194).

[23] "In the event you opt out of the arbitration agreement, any disputes under this Agreement or related to your Mobiloans Credit Account shall nonetheless be governed under the laws of the Tunica-Biloxi Tribe of Louisiana and must be brought within the court system thereof, to whose jurisdiction you irrevocably consent for the purposes of this agreement." (App. 2192).

UNSEALED

courts for the purposes of this Agreement."[24] In order for the phrase "shall remain exclusively subject to the laws and courts of the Tribe," the agreement must be "exclusively" subject solely to tribal law in the first instance. The exclusivity of tribal law and tribal court jurisdiction is reinforced by the fact that the consumer's irrevocable consent to tribal court jurisdiction is repeated three times in the agreement.[25]

The Mobiloans agreement has the same effect condemned in *Dillon* in that it asserts the sole applicability of tribal law, disclaims the applicability of any state law, and mentions federal law only in a selective and self-serving manner. It creates a conundrum: the consumer's only avenues of dispute are arbitration or a tribal court, both of which have been rigged so that only tribal law and tribal law remedies apply. *See Dillon* 856 F.3d at 335 ("The arbitration agreement [makes it so] that the arbitrator shall not allow for the application of any law other than tribal law."). *Dillon* explained that the problem cannot be resolved simply by removing the offending terms from the arbitration clause: "the offending choice of law provision was not severable from the rest of the arbitration agreement, because the choice of law provision went to the 'essence" of the contract.'" *Id.* at 334-35. Like the arbitration clauses in *Hayes* and *Dillon*, in the Mobiloans agreement, "one of the animating purposes of the arbitration

---

[24] "Regardless of any transfer, this Agreement shall remain exclusively subject to the laws and courts of the Tribe. As an integral component of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal courts for the purposes of this Agreement." (App. 2191).
[25] *See supra* notes 22-24.

UNSEALED

agreement was to ensure that [the lender] could engage in lending and collection practices free from the strictures of any federal law." *Hayes*, 811 F.3d at 676 (quoted at *Dillion*, 856 F.3d at 335).

The Mobiloans choice-of-law clause and arbitration provisions thus "manufacture a parallel universe in which state and federal law claims are avoided entirely." *Smith*, 168 F. Supp. 3d at 785. The prospective waiver doctrine prohibits such broad waivers of federal rights, making the choice-of-law and choice-of-forum provisions of the contracts unenforceable.

There is no material dispute of fact that the lending contracts at issue prospectively waive federal rights and are therefore void. Pennsylvania law applies and these loans are illegal.

### C. The Choice of Law Clauses Also Fail Because They Violate Pennsylvania's Fundamental Public Policy Against Usurious Lending

In addition to the choice of law provisions' *per se* violation of state law and their independent violation of federal law, they also fail under traditional choice of law analysis as well.

The Third Circuit has found that Pennsylvania law applies to usurious contracts made with out-of-state lenders. *Kaneff v. Delaware Title Loans, Inc.*, 587 F.3d 616, 624 (3d Cir. 2009) ("[W]e conclude that Pennsylvania's interest in the dispute, particularly its antipathy to high interest rates such as the 300.01 percent interest charged in the contract at issue, represents such a fundamental policy that we must apply

55

Pennsylvania law.").[26] The Third Circuit reached its conclusion after review of the traditional choice of law factors set forth in Section 187 of the Restatement (Second) of Conflicts of Law. Under the principles set forth in the Restatement, the choice of law provisions plainly fail and Pennsylvania law controls.

Under § 187 of the Restatement, "the law of the state chosen by the parties to govern" their agreement will apply unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflicts of Laws § 187(2). The choice-of-law provisions here fail under either of these exceptions.

---

[26] In *Kaneff*, the Third Circuit considered an auto title loan made by a Pennsylvania consumer who traveled across the state border into Delaware in order to obtain a loan that would be usurious under Pennsylvania law. 587 F.3d at 618-619. Despite the consumer having traveled over state lines to sign a contract whose repayment had to be made in Delaware, *id.* at 623, the Third Circuit still found that "Pennsylvania has a materially greater interest than Delaware," *id.* at 623. As discussed *infra*, the facts here are even more aligned with Pennsylvania's interests since the consumers never left Pennsylvania when they entered into these contracts from their home computers, and most funding and collection took place through ACH credits to and debits from Pennsylvania consumers' bank accounts.

UNSEALED

1.  **None of the Tribal Lending Entities Have a Substantial Relationship to the Transactions**

Using any of the factors suggested in the Comments to § 187(2)(a)[27] the tribal entities did not have a substantial relationship to the transactions other than to facilitate efforts to evade the law. The minimal role of the tribal entities in the TF lending operation—and the fundamental deception their presence in the lending transactions was designed to perpetrate—is detailed at length in the Statement of Facts and, in even greater detail, in the accompanying Statement of Undisputed Facts. They will not be repeated here.

Courts evaluating the relationship of tribal lending entities to the consumer contracts in similar tribal lending contacts agree. *See MacDonald v. Cash Call, Inc.*, Civ. No. 16–2781, 2017 WL 1536427, at *10 n.12 (D.N.J. April 28, 2017) *aff'd*, 883 F.3d 220 (3d Cir. 2018) (finding it, "quite evident" that the tribe's "involvement was nominal in nature, and merely intended to evade New Jersey and other states' laws"); *see also, CFPB v. CashCall*, Civ. No. 15-7522, 2016 WL 4820635, at *6-7 (C.D. Cal. Aug. 21, 2016); *Inetianbor v. Cash Call, Inc*, 13-60066, 2015 WL 11438192, at *3-4 (S.D. Fla. Dec. 8, 2015).

---

[27] *See*, Restatement (Second) of Conflict of Laws § 187, cmt. f. ("where one of the parties is domiciled or has his principal place of business," the state "where performance by one of the parties is to take place," and "the place of contracting.")

UNSEALED

Here, the undisputed evidence shows that TF solicited the relationship with the tribal entities as part of an effort to evade state usury laws—offering a "turnkey" program that allowed the tribe to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." SUF ¶¶ 79-83.[28] Participating as the nominal lender in TF's turnkey program does not create a genuine and legitimate relationship to the consumer loan transactions.

## 2. The Choice-of-Law Provisions Fail under § 187(2)(b) of the Restatement

Even if there was a substantial relationship between Pennsylvania consumers and tribal entities in remote portions of Montana, Oklahoma, and Louisiana, the choice of law provisions fail under Section 187(2)(b) of the Restatement.[29]

---

[28] Even if a chosen law does not have substantial relationship to the contract, it may be otherwise enforceable where there was a reasonable basis for the chosen law. Restatement (Second) of Conflict of Laws § 187(2). Example of a reasonable basis include when parties choose "law they know well" or where the law is "well developed." *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 325 (Tex. 2014). By contrast, a choice-of-law clause "based solely" on a "desire to shield against state usury and licensing laws" does not provide a reasonable basis for enforcing a choice-of-law provision. *CFPB v. CashCall*, 2016 WL 4820635 at *7; *see also Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 136 (1980) ("Principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, **do not authorize Indian tribes to market an exemption** from state taxation **to persons who would normally do their business elsewhere**.") (emphasis added); *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 114 (2d Cir. 2014) ("[A] tribe has no legitimate interest in selling an opportunity to evade state law."). Because the evidence shows the choice of law provisions were selected for the purpose of evading usury laws, the reasonable basis exception does not apply.

[29] According to Section 187(2)(b), where a substantial relationship exists between the chosen law and the transaction, the choice-of-law will nonetheless be unenforceable where another state:

    (1) has a more significant relationship with the parties and the transaction at issue than the chosen state does under Restatement § 188;

UNSEALED

a. <u>Pennsylvania has a more significant relationship with the parties.</u>

Pennsylvania's relationship to the loans at issue dwarfs that of the tribal entities. The loans were marketed to Pennsylvanians. SUF ¶ 189-190. The loans were finalized by the electronic acceptance of the consumer in Pennsylvania.[30] Loan funds were delivered either by check or by ACH into bank accounts of Pennsylvania consumers in Pennsylvania.[31] And payments were retrieved electronically by ACH withdrawals from consumers' Pennsylvania bank accounts.[32] No real negotiations occurred with these loans, which were approved and funded automatically, via TF's decision engine, not by any tribal employees. SUF ¶¶ 9, 152-154, 159, 170-171. All of the consumers affected by the loans at issue in this litigation lived in Pennsylvania.

The only connection to the tribal forums is the domicile of the nominal lenders. And as has already been discussed, the actual work of making, servicing and collecting

---

(2) has a materially greater interest than the chosen state does in the enforceability of a given provision; and
(3) has a fundamental policy that would be contravened by the application of the chosen state's law.

[30] See the consumer loan agreement terms regarding acceptance: Great Plains Loan Agreement at App. 2943; Plain Green Loan Agreement at App. 2976; Mobiloans Credit Agreement at App. 2196-2197.

[31] See the consumer loan agreement terms regarding payment of funds by ACH or check: Great Plains Loan Agreement at App. 2937; Plain Green Loan Agreement at App. 2968; Mobiloans Credit Agreement at App. 2182.

[32] See the consumer loan agreement terms regarding ACH authorizations: Great Plains Loan Agreement at App. 2938-2939; Plain Green Loan Agreement at App. 2969-2970; Mobiloans Credit Agreement at App. 2196-2197.

UNSEALED

on the loans was done mainly from Texas. SUF ¶165.[33] As the Second Circuit concluded, in rejecting an injunction request by the Great Plains Lending entity, in an action coordinated and financed by TF:

> Much of the commercial activity at issue takes place in New York. That is where the borrower is located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation. Even if we concluded that a loan is made where it is approved, the transaction New York seeks to regulate involves the collection as well as the extension of credit, and that collection clearly takes place in New York. The loan agreements permit the lenders to reach into the borrowers' accounts, most or all of them presumably located in New York, to effect regular, automatic wire transfers from those accounts to make periodic payments on the loans.

*Otoe-Missouria*, 769 F.3d at 115.

> b. <u>Pennsylvania has a fundamental policy that would be contravened by the application of Tribal law.</u>

As was set forth *supra* Sections II and V.A, application of the tribal law would contravene Pennsylvania's fundamental policy against usury that has been clearly established by the Pennsylvania Legislature, as enforced by the Pennsylvania Attorney

---

[33] None of the exceptions provided for in §§ 189-199 and 203 of the Restatement operate to require application of any law other than the law of Pennsylvania. Sections 195 and 203 are the only two exceptions that could apply. Section 195 does not save the choice-of-law provision because, *inter alia*, repayment of the money is to be made in Pennsylvania by electronic fund transfer (and, even if mailed, to a Pennsylvania address). Section 203 does not save the choice-of-law provision because, *inter alia*, the interest rate used in the lending agreement is greatly in excess of the rate permitted by Pennsylvania law.

UNSEALED

General and the Pennsylvania Banking Department, and has been affirmed by the Pennsylvania Supreme Court in *NCAS I,* and the Third Circuit in *Kaneff.*

    c. <u>Pennsylvania has a materially greater interest than the tribal lending entities in the application of its laws to the loan agreements.</u>

States have a strong interest in seeing their consumer protection laws be applied because "state consumer protection statutes are designed to protect residents" of their states. *Stone St. Servs., Inc. v. Daniels,* No. 00–1904, 2000 WL 1909373, at *5 (E.D. Pa. Dec. 29, 2000) (citing *Lyon v. Caterpillar, Inc.,* 194 F.R.D. 206, 216 (E.D. Pa. 2000)). This applies especially to protections against usury. *See Kaneff,* 587 F.3d at 624; *see also CFPB v. Cashcall,* 2016 WL 4820635 at *7-8 (finding sixteen states had a materially greater interest in the transaction than the tribe where the states' statutes rendered the loans void).

    The tribal entities have, at most, a general interest in the enforcement of contract terms. But that interest is "necessarily . . . present in every dispute concerning the enforcement of a choice-of-law provision." *MacDonald,* 2017 WL 1536427 at *9. Courts that have considered this balancing of material interests between tribal entities that make online loans and the states where the loans are made have held that a state's "fundamental public policy of preventing usurious lending," far outweighs the tribal entities' interest. *MacDonald,* 2017 WL 1536427, at *9-10; *see, e.g., CFPB v. CashCall,* 2016 WL 4820635, at *7-8; *Western Sky Financial, LLC v. State ex rel. Olens,* 793 S.E.2d 357, 366 (Ga. 2016); *State ex rel. Cooper v. Western Sky Financial,* No. 13-CVS-16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015).

UNSEALED

Application of traditional choice of law principles makes plain that there is no material dispute of fact that Pennsylvania law applies. These loans are illegal.

**D. The Choice of Law Provisions Are Void Because the Tribal Entities They Favor are Not in Fact the True Lenders in the Loan Transactions**

Another final reason why the choice of law provisions fail is because the tribal entities that the provisions favor are not, in fact, the true lenders in the consumer loan transactions at issue. The undisputed material facts clearly establish that TF, under the leadership and direction of Ken Rees, held the predominant economic interest in the lending operation which targeted Pennsylvanians with high-rate consumer loans issued in the name of the three tribal entities. As such, TF is the true lender.

As is set forth at length in the Statement of Undisputed Facts, TF marketed the loans; arranged for their funding; its automated loan management system approved or rejected loan applications; it arranged for 99% of the economic value of the loans to be sold to GPLS, an entity created by TF and VPC, administered by TF, and in which the tribal entities had no stake; it either provided or arranged for collections, customer service, disbursements, and all loan-operation accounting; assumed the risk of loss arising from the lending operation; carried the 99% participation interests in each of the loans on its own books; and, not surprisingly, appropriated to itself $1.249 billion of the total $1.507 billion in revenue the scheme generated.

Under any formulation of the case law to determine the true lender in a lending transaction, TF, not the tribal entities, is the true lender. TF knew this was true. Nearly

62

from the start of its lending operation, TF feared that a regulator or judge looking into the facts would conclude that TF was the true lender. SUF ¶¶ 197-211.

TF, under Rees's leadership, made it a top priority to create and then bolster the façade that TF was acting merely as service provider and that the tribal entities were the lenders. SUF ¶¶ 197-211. When that façade could no longer be maintained, Rees led the effort to redirect the cash and expertise derived from the illegal lending into a new company called Elevate, which Rees now heads, partially owns, and has taken public. SUF ¶¶ 218-233.

**1. Legal Standards to Identify the True Lender**

The fraud Rees and TF perpetrated is a common one. As a result, numerous courts have addressed it, and a substantial body of case-law now exists to test the identity of a true lender in a loan scheme. This Court, in denying Defendants various motions to dismiss, stressed the importance of focusing on the economic reality of the lending transactions. *See Commonwealth of Pennsylvania v. Think Finance, Inc.*, No. 14-CV-7139, 2016 WL 183289, at *11 (E.D. Pa. Jan. 14, 2016). Other courts agree. They also focus on the economic fundamentals.

The analysis begins with commonsense: courts will not elevate "form over substance." *See, e.g., CFPB v. CashCall*, 2016 WL 4820635, at *5 (court should look to the

63

UNSEALED

substance, not the form, of the transaction to identify the true lender).[34] Instead, courts determine which entity has the "predominant economic interest" in the lending operation.[35] The predominant economic interest analysis looks to the economic fundamentals of the transactions. For example, as the Ninth Circuit has said: "A lender is one who puts money at risk. The touchstone for decision here is whether. . . parties were placing their own money at risk at any time during the transactions." *Easter v. American W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004); *see also id.* at 959 ("[T]he party that provides the funds is the lender."). Similar basic economic questions used by courts are:

1. Which party exerts ownership and control over the loans and the loan enterprise;[36]
2. Which party has the primary burden and risk of loss from the loan transactions;[37]
3. Which party receives most of the revenue generated by the loans and enjoys any potential upside.[38]

---

[34] *See also BankWest Inc. v. Baker*, 324 F. Supp. 2d 1333 (N.D. Ga. 2004), *aff'd*, 411 F.3d 1289 (2005), *reh'g granted, opinion vacated*, 433 F.3d 1344 (11th Cir. 2005), *opinion vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006); *People ex rel. Owen v. Miami Nation Enterprises*, 386 P.3d 357, 374 (Cal. 2016).

[35] *See, e.g., BankWest*, 324 F. Supp. 2d at 1352; *People ex rel. Spitzer v. County Bank of Rehoboth Beach*, Del., 846 N.Y.S.2d 436, 439 (App. Div. 2007); *see also Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711, 718 (E.D.N.C. 2002) (test for the factfinder is to determine whether the bank is "the true maker of the . . . loans").

[36] *See, e.g, Flowers v. EZPawn Okla., Inc.*, 307 F. Supp. 2d 1191, 1205 (N.D. Okla. 2004); *see also Think Finance, Inc.*, 2016 WL 183289, at *11.

[37] *See, e.g, Meade v. Avant of Colo., LLC,* 307 F. Supp. 3d 1134, 1147-48 (D. Colo. 2018); *CFPB v. CashCall*, 2016 WL 4820635, at *2–3.

[38] *See, e.g, Meade,* 307 F. Supp. 3d at 1147; *Think Finance*, 2016 WL 183289, at *11.

UNSEALED

However articulated, the point is straightforward: The party with the "predominant economic interest" in the transactions is the party that should be rightfully assigned the role of true lender.

## 2. TF, Not the Tribal Entities, Was the True Lender

It is not surprising that courts applying these considerations have consistently found that lending schemes involving tribal lending entities as the nominal lender do not survive true lender scrutiny.[39]

Focus on the key economic and control factors in the TF lending operation makes it clear that TF bore the predominant economic interest in the lending program not the tribal entities.

The undisputed facts –drawn largely from the contractual arrangements signed or authorized by Rees – establish that:

1. TF provided or arranged for the initial funding of the loans, SUF ¶¶ 160-164;
2. TF directed and conducted the marketing of the loan products, SUF ¶¶ 145-149;
3. TF's proprietary loan management system was used to approve or reject the loan applications for all three tribal products, SUF ¶¶ 150-159;
4. TF arranged for the sale of 99% interests in the loans from all three tribal products to be immediately purchased by GPLS, an entity TF and VPC created and which VPC controlled, and in which TF was a substantial investor, SUF ¶¶ 106, 109, 110, 161-162;
5. TF employees arranged for or conducted the loan funding, servicing and collections activity for the loan products for all three tribal entities including

---

[39] *See CFPB v. CashCall*, 2016 WL 4820635, at *2–3; *CashCall, Inc. v. Morrisey*, Civ. No. 12-1274, 2014 WL 2404300, at *15 (W. Va. May 30, 2014).

UNSEALED

providing substantial guarantees to critical third-party services providers needed to carry out the lending function, SUF ¶¶ 121-137, 160-164, 165-177;

6. Through the use of contractual guarantees both to the tribal entities and GPLS, TF assumed all of the risk associated with 99% of the loan portfolio, SUF ¶¶ 60, 117, 160-161;

7. Through the mechanism of the agency agreement and the fees associated with its role as agent for GPLS, TF was entitled to the economic upside of 99% of the loan portfolio, *i.e.*, net revenue, SUF ¶¶ 116, 192-193;

8. The participation interests associated with the loans nominally made by all three tribal entities were deemed by GAAP accounting rules to be assets of TF precisely because TF bore the risk of loss and was the primary beneficiary of the loan portfolio, SUF ¶¶ 162, 192;

9. TF received $1.249 billion of the total $1.507 billion in revenue generated by the lending operation, SUF ¶ 195;

10. From the early days of the lending operation, TF itself recognized that it was vulnerable to being determined to be the "true lender" and made extensive efforts to hide the extent of its role in the lending operation, SUF ¶¶ 197-211.

By contrast, the undisputed facts show that the tribal entities were told by TF from the beginning that they would not have to invest any of their own capital in the program, would incur no operational expense, would bear no risk, and in fact are simply putting their name onto a "turnkey" solution that would allow them to enter the consumer lending business – a somewhat complicated endeavor – in a remarkably short period. SUF ¶¶ 79-81. And in fact, TF was true to its word: the tribal entities were paid a percentage of revenue, SUF ¶¶ 106, 109, 110, had all their operational expenses, including the fees owed to TF for actually conducting the lending operation, reimbursed on a monthly basis, SUF ¶¶ 176-177, and bore no risk of loss save for the minimal risks associated with the 1% of the loans they retained. Of the total revenue from inception through December 2014, the tribal entities combined received only $77.5

66

UNSEALED

million of the $1.507 billion realized, while TF and VPC took in $1.359 billion, with TF alone receiving $1.249 billion. SUF ¶ 195.

There is no material dispute of fact that TF, not the tribal entities, bore the predominant economic interest in the loan operation and are appropriately denominated the "true lender." This was the very conclusion that Rees understood was a lethal threat to the viability of the tribal model from the beginning.

Rees cannot hide from the plain facts of TF's predominant economic interest in the tribal lending enterprises conveyed in the contractual agreements, financial statements, and business obligations TF undertook none of which can be materially disputed. The contractual choice of law provisions in favor of tribal law fail. Pennsylvania law applies. The loans are illegal.

## VI. Defendant Rees's Deceptive Conduct Violated Pennsylvania Consumer Protection Law (SAC Count Five)

In the Court's 2016 Memorandum denying the motions to dismiss, it summarized the law applicable the Attorney General's ("OAG") claim under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 *et seq.*:

> The UTPCPL makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3. The statute authorizes the OAG to "bring an action in the name of the Commonwealth against" a person the OAG "has reason to believe...is using or is about to use any method, act or practice declared by section 3...to be unlawful...to restrain by temporary or permanent injunction the use of such method, act or practice." 73 P.S. § 201-4. An act or a practice is deceptive or unfair if it has the "capacity or tendency to deceive." *Com. ex rel. Zimmerman v. Nickel*, 26 Pa. D. & C.3d

67

UNSEALED

115, 120 (Pa. Com. Pl. 1983). The Pennsylvania Supreme Court has noted that the UTPCPL is to be construed liberally to effectuate its objective of protecting consumers in Pennsylvania from unfair or deceptive business practices. *Com., by Creamer v. Monumental Prop., Inc.*, 329 A.2d 812, 817 (Pa. 1974).

*Com. of Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *21 (E.D. Pa. Jan. 14, 2016) (footnote omitted). The Court went on to sustain the sufficiency of the Commonwealth's pleaded UTPCPL claim against Defendant Rees, that he "designed and operated a scheme that held the loans out to be legal and subject to no state law." *Id*. at *24-*25. The undisputed facts now before the Court make clear that this claim has now been proved.

The UTPCPL, 73 P.S. § 201-2(4) enumerates 21 categories of "unfair and deceptive practices" that are declared unlawful in the following section, 73 P.S. § 201-3., and that are specifically relevant to the conduct of Defendant Rees, including:

> (i) Passing off goods or services as those of another;
>
> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
>
> (iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
>
> . . .
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
>
> . . .
>
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

UNSEALED

73 P.S. § 201-2(4).

It is indisputable that "it is not legal for a non-depository institution to issue loans in excess of the statutory limit in Pennsylvania." *Think Fin*, 2016 WL 183289, *23. The essence of the Commonwealth's UTPCPL claim is that Rees ran a non-depository loan business to do just that—to violate Pennsylvania interest restrictions—and that he did so employing two deliberate and systematic deceptions. First, he used Native American tribes as a front to confuse consumers about the businesses hiding behind the tribal façade and operating the illegal business, thereby "passing off services as those of another," "causing likelihood of confusion or misunderstanding as to source of services" or as to the "affiliation, connection or association with another," in violation of 73 P.S. § 201-2(4)(i), (ii) and (iii). Second, he used deliberate and systematic misrepresentations to consumers that the 200-300% APR debt they were incurring was not subject to Pennsylvania law. By falsely telling consumers that only tribal, not state, law applied to their loans, he was representing that the loans "had characteristics they did not have," and, otherwise was engaging in "deceptive conduct that created a likelihood of confusion or misunderstanding," in violation of 73 P.S. § 201-2(4)(v) and (xxii).

The Pennsylvania courts have already upheld this precise claim in a case almost identical to this one, namely, the remand decision following the Supreme Court's landmark decision in *NCAS I*. The business conduct involved in that litigation followed

UNSEALED

a very similar path, as is summarized in the Commonwealth Court's remand decision, *Pa. Dep't of Banking v. NCAS of Delaware, LLC*, 995 A.2d 422, 426 (Pa. Commw. Ct. 2010) ("*NCAS II*"). "NCAS" was the name under which Advance America, a publicly traded payday lending company, did business in Pennsylvania. Up until 2006, it was doing so, like TF did, as the "marketing, processing, and servicing agent" of an FDIC-regulated bank. *Id.* at 426–27. Like what happened here regarding the ThinkCash product, after the FDIC forced the bank to withdraw from that relationship, Advance America came up with a new product to try to stay in Pennsylvania, a "line of credit" that charged just under 6% interest, but also charged a separate monthly fee of $149.95. *Id.* The Supreme Court affirmed the Commonwealth Court's early decision, which had concluded that the fee was just "interest" posing as something else and enjoined the company from offering the product in Pennsylvania.

The remand proceeding involved the Commonwealth—at that point, represented by the Office of the Attorney General—trying to obtain restitution for consumers for the unlawful interest they had paid. Although dismissing OAG's claim for restitution under the Usury Law itself, the Commonwealth Court sustained OAG's restitution claim under the UTPCPL.[40] Among the UTPCPL allegations that the Court sustained was that

---

[40] The Court noted that the Pennsylvania legislature amended LIPL in 2008, 41 P.S. § 506(c)(3), after Advance America had left the state, to give OAG the explicit authority to seek restitution under that statute as well. *NCAS II*, 995 A.2d at 442.

UNSEALED

"Advance America 'held itself out' as a lawful lender offering a lawful credit product and as a result Advance America employed an unfair or deceptive act or practice." *Id*. at 422. That is precisely what OAG proved here, that Rees and his company held out these loans as legal, when they were not legal, with the additional deceptive element involving the use of the tribal entities and the supposedly applicable tribal law to further confuse and mislead consumers.

## VII. Defendant NCA "Conspired" with the Tribal Racketeering Enterprises and Is a "Creditor" that Violated the FCEUA through Its Collection of Illegal Debt

### A. NCA's Knowing Assistance to the Scheme Violated COA § 911(b)(4)

Under the COA conspiracy provision already summarized above, *supra* at Section IV, NCA knowingly agreed to facilitate TF's scheme. It understood that it was buying consumer debt that was illegal in Pennsylvania; indeed, it had the capacity to view on its screen the actual agreements that charged the unlawful interest rates. It also understood that, despite the fact that the loan agreements said that the lenders were tribal LLCs, it knew full well that it was getting the accounts from TF. Indeed, as a debt-buyer specializing in payday loan debt, it knew that many of its customers were using "tribal models" like TF.[41]

---

[41] In his deposition, current CEO Tyler Rempel testified that NCA bought "tribal" payday loans from other sources besides TF, including CashCall. Rempel Dep. 87:17-88:1, 248:10-12.

UNSEALED

A conspiring service provider does not have to participate directly in any substantive crimes or perform any "overt act." All that is required is (1) knowledge of the corrupt enterprise's activities and (2) an agreement to facilitate those activities. *Smith v. Berg*, 247 F. 3d 532, 538 (3d Cir. 2011). Even though the magnitude of NCA's involvement in the scheme was admittedly smaller than the command role of Rees, under RICO conspiracy principles incorporated into the COA, NCA is responsible for the entire scope of the harm perpetrated by the three enterprises. Those who conspire with a RICO enterprise are liable for all harm caused by the enterprise, even those harms caused before the conspirator joined the conspiracy. *Salinas v. United States*, 522 at 64 ([T]he supporters are as guilty as the perpetrators ... so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators."); *accord Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its conspirators").

**B.  NCA's Collection of Unlawful Debt, in Violation of the FCEUA**

The Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.1 *et seq*. is Pennsylvania's debt collection law. It is derived from the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.; *Think Fin*. 2016 WL 183289, *19, but unlike the

72

**UNSEALED**

FDCPA, the state law regulates debt collection activity conducted by both "debt collectors" and "creditors."

There are different definitions of "debt collector" under the two statutes. On the federal side, a debt collector is *either* a "business the principal purpose of which is the collection of any debts" *or* a business that collects debt "owed or due another." 15 U.S.C. § 1692(a)(6). This disjunctive language means that, for purposes of the FDCPA, a debt-buyer that is in the business of collecting debts that he owns (and therefore is not collecting debts "owed or due another") can still fall within the first definition. *Barbato v. Greystone Alliance, LLC*, __ F.3d __ , No. 18-1042 (3d Cir. slip op. Feb. 22, 2019). The state definition, on the other hand, defines a "debt collector" as "a person not a creditor" that is collecting debt "on behalf of a creditor," 73 P.S. § 2270.3, and a "creditor" is the person "to whom a debt is owed or alleged to be owed." Because NCA actually purchased the debt, and was collecting on its own behalf, it is a "creditor" rather than a "debt collector" under the FCEUA.

However, NCA is liable, the same as if it were a "debt collector," because, with regard to the conduct at issue here, the FCEUA prohibits both debt collectors and creditors from collecting illegal interest. With regard to "debt collectors," collecting illegal interest is a violation of 15 U.S.C. § 1692f(1), as interpreted by *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 407 (3d Cir. 2000) (citing with approval, *Tuttle v. Equifax Check*, 190 F.3d 9, 13 (2d Cir.1999)). Under the FCEUA, "debt collectors" as defined by

73

that statute, who violate the FDCPA, also violate the FCEUA. 73 P.S. § 2270.4(a).

"Creditors" are prohibited from the same conduct. 73 P.S. § 2270.4(b)(6).

A violation of the FCEUA is a *per se* violation of the UTPCPL, 73 P.S. § 2270.3,

which the Attorney General can enforce by way of injunction, 73 P.S. § 201-4, and, an

order providing for restitution and costs. 73 P.S. § 201-4.1. It is undisputed that NCA

collected $4.4 million in unlawful debt. Accordingly, the Commonwealth is entitled to

an injunction against further violations, and restitution of $4.4 million, plus costs.

## CONCLUSION

For all of the foregoing reasons, the Commonwealth of Pennsylvania respectfully

requests that the Court grant its Motion for Partial Summary Judgement as to the

liability of Defendant Rees with respect to Counts Two, Three, and Five. As to

Defendant NCA, the Commonwealth seeks summary judgment as to Counts Three and

Four and, as to Count Four, an injunction against further violation of illegal debt and

restitution in the amount of $4.4 million plus costs.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

SARAH A. E. FRASCH
Chief Deputy Attorney General

JOHN ABEL
Senior Deputy Attorney General

74

UNSEALED

Dated: March 8, 2019

/s/*Saverio P. Mirarchi*
SAVERIO P. MIRARCHI
Senior Deputy Attorney General

Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
1600 Arch St., Ste 300
Philadelphia, Pennsylvania 19103
Phone: (215) 560-2414
Email: smirarchi@attorneygeneral.gov

/s/*Irv Ackelsberg*
IRV ACKELSBERG
JOHN J. GROGAN
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Phone: (215) 320-5660
Email: iackelsberg@langergrogan.com
*Special Counsel to the Commonwealth*

75

UNSEALED