# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PA, by | : | CIVIL ACTION |
| Attorney General JOSH SHAPIRO, | : | |
| | : | |
| *Plaintiff,* | : | NO. 14-cv-07139-JCJ |
| | : | |
| v. | : | |
| | : | **CONFIDENTIAL** |
| THINK FINANCE, INC., et al. | : | **Filed Under Seal Pursuant to** |
| | : | **Confidentiality and Protective Order** |
| *Defendants.* | : | |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS KENNETH REES AND NATIONAL CREDIT ADJUSTERS, LLC [1]

---

[1] The discovery record on which this Statement of Undisputed Facts is based consists primarily of documents produced in discovery by the various parties and deposition testimony. Most of the document production was electronically stored information. Documents produced by the Think Finance Defendants have the Bates-prefix "TF-PA." Those produced by the Victory Park Capital Defendants have the prefix "GPLP." Those produced by the Pennsylvania Attorney General have the prefix "PAOAG." Those produced by Kenneth Rees have the prefix "REES." Those produced by National Credit Adjusters have the prefix "NCA_PA." Documents have also been produced by various third-parties with prefixes "Haynes," "INTERCEPT," "Intercept_PA-Think," and "Wildstein." For ease of reference, Plaintiff has compiled an Appendix accompanying this filing containing all of the cited transcripts and documents.  Citations in this Statement will be made to the page and line numbers of deposition transcripts; to the exhibit number of marked deposition exhibits; and to the Bates number of the first page of any additional discovery document, followed by the citation to the Appendix ("App."). Pin cites will be made to internal pagination when possible, to Bates numbers when not, and always to the Appendix. The Declaration of Irv Ackelsberg, filed with the Motion for Summary Judgment, contains further details as to how the Appendix was compiled.

UNSEALED

# TABLE OF CONTENTS

I.  Defendant Kenneth Rees Participated in the Design of "Tribal" Lending
    Enterprises in a Scheme to Evade State Usury Laws ...................................... 3

    A.  History of Think Finance, Inc. and Its U.S. Product Lines ................................. 3

    B.  History of TF's Activity in Pennsylvania ........................................... 10

    C.  The Precursor to TF's Tribal Lending Products: The "ThinkCash"
        Venture with First Bank of Delaware ................................................... 13

    D.  TF's Transition from a Bank-Originating Model for Its "Indirect" Loan
        Program to the Tribal Model ................................................... 23

    E.  The Contracts underlying TF's Three Tribal Product Enterprises ................... 35

    F.  The Purported Non-Applicability of State and Federal Law Disclosed
        in the Loan Agreements ............................................................... 49

II. Under Defendant Rees' Direction, Think Finance Operated the "Tribal"
    Lending Enterprises, Received Most of the Revenues Generated by Them,
    and Assumed Virtually All of the Economic Risk ...................................... 56

    A.  TF Conducted All the Marketing Activity for the Enterprises ......................... 56

    B.  TF's Technology Platform Performed the Loan Approvals ............................. 58

    C.  TF's Role in the Funding of the Loans ................................................. 60

    D.  TF Administered All the Accounting and Cash Management,
        Including the Collections from Consumer Bank Accounts ............................. 63

    E.  TF Decided in Which States the Enterprises Would Operate, Based on a
        State-by-State Evaluation of the Risk of Enforcement Action .......................... 68

    F.  TF's Dominant Economic Interest in the Enterprises ......................... 72

III. After Initially Taking Steps to Fortify TF's Model from Regulatory Challenge,
    Defendant Rees Changed Course, Abandoning Both the Tribal Model and TF,
    and Fled into the New Spin-Off Company, Taking with Him His Top
    Personnel and TF's Technology ...................................................... 76

IV. The Role of Defendant National Credit Adjusters, LLC in the Tribal Lending
    Enterprise ........................................................................... 89

UNSEALED

# I. Defendant Kenneth Rees Participated in the Design of "Tribal" Lending Enterprises in a Scheme to Evade State Usury Laws

## A. History of Think Finance, Inc. and Its U.S. Product Lines

1.    Think Finance, Inc. ("TF"), a company that "develops, markets, and manages online credit products," was founded in 2001, with the name PayDay One Holdings, LLC.[2] It was based in Fort Worth, Texas.[3]

2.    PayDay One Holdings changed its name to ThinkCash, Inc. in 2007 and then to Think Finance, Inc. in 2010.[4]

3.    Defendant Kenneth E. Rees joined TF as President in 2004, and was named Chief Executive Officer ("CEO") a year or two later.[5] By 2007, he was also Chairman of the Board of TF.[6]

4.    At the time Rees joined TF, and up to the 2007 name change to "Think Cash," TF was a direct lender of short-term payday loans offered over the Internet.[7]

---

[2] TF-PA-735160, Think Finance, Inc., KPMG Opinion on the U.S. Federal Tax Consequences of the Spin-Off of Elevate Credit, Inc., May 1, 2014, at 1, 1 n.1 (App. 2765).

[3] *Id.* at 1 n.2 (App. 2765).

[4] *Id.* at 1 n.1 (App. 2765).

[5] Deposition of Kenneth E. Rees 19:25-20:8, 26:21-27:5 ("Rees Dep.") (App. 0025, 0027).

[6] *Id.* at 27:17-21 (App. 0027).

[7] Deposition of Chris Lutes 23:2-13 ("Lutes Dep.") (App. 0173) (former CFO explaining that, as of end of 2006, all of Company's revenues were from "the payday loan products"); Rees Dep. 21:12-25 (App. 0026) (explaining that TF "started as online payday loan company"); Deposition of Michelle Nguyen 19:14-20:22 ("Nguyen Dep.") (App. 0509) (product director explaining that when she arrived in 2006 she was responsible for three payday loan products offered on different websites, PayDay One, PayDay Okay, and PayDay Select); *see also* Rees Dep. 259:19-260:23 (App. 0085) (discussing multiple payday loan sites run by TF in its capacity as a direct lender early on)

UNSEALED

5.     Rees was interested, from the time he joined TF, to take it public through the issuance of an IPO.[8] Rees believed that the expansion of TF's product base was key to getting the support needed for an IPO.[9]

6.     Beginning in 2007, the TF's business consisted of two separate product lines, its PayDay One program in which TF functioned as the direct lender and separate, "indirect" loan programs wherein a third-party, bank functioned as the ostensible lender and TF functioned as a service provider to that separate lender. Defendant Rees described this distinction between TF's "direct" and "indirect" products as follows: "Some of the products are originated directly by Think Finance and some are originated by third party lenders who license the use of the company's technology platform, proprietary underwriting models and multi-channel marketing capabilities."[10]

---

[8] Rees Dep. 53:10-54:5 (App. 0034) (testifying that "from when I joined the business" the Company was "optimistic" about a public offering being possible as a "liquidity event"). *See also* testimony of the CFO, Chris Lutes, that, for him, the opportunity to take a company public was a key motivating factor in his decision to join the Company in 2007. Lutes Dep. 21:9-22:10 (App. 0073).

[9] TF-PA-476958, Memo from Ken Rees to Think Finance Board Members, September 16, 2010, at 4 (App. 2427) (explaining that the Company's expanded product base under its new corporate brand, "Banking for the Rest of Us," will be "a key factor in how we differentiate ourselves from Alternative Financial Service Providers (ie payday lenders) as we prepare to go public").

[10] Exhibit P-274, TF-PA-683403, Think Finance Business Plan, April 2013, at 1 (App. 1473). According to the metadata accompanying this document, its author and custodian was Defendant Rees. *See* Rees Dep. 46:19-48:12 (App. 0032). Think Finance also produced a January 2013 version of this Business Plan, also authored by Rees, at TF-PA-670668, Think Finance Business Plan, January 2013 (App. 2617).  For Defendant Rees's acknowledgment of his use of the terms "direct" and "indirect" products, see Rees Dep. 66:22-67:10 (App. 0037).

UNSEALED

7.      The company referred to its "indirect" products as its Service Provider Model.[11]

8.      In a published interview in 2012, Defendant Rees explained that TF had moved away from direct lending products because "byzantine state laws" made them unprofitable.[12]

9.      TF's technology platform, which it used in both its "direct" and "indirect" product lines included, a "decision engine" that rendered automatic decisions regarding loan applications made online; a "payment module" that powered the collection of ACH payments from borrower bank accounts through a technology interface with outside payment processors; a loan management module that provided an accounting platform to track daily accruals and customer payments; a communication module that could generate email and text communications with customers; and a "customer relationship management" module used to run customer service and collection operations.[13]

---

[11] Deposition of Stephen Smith ("Smith Dep.") 21:3-22:18 (App. 0556).
[12] TF-PA-400679, Emails forwarding "Payday Lenders Using Indian Tribes to Evade Laws Draw Scrutiny" by Carter Dougherty at Bloomberg, June 4, 2012 (App. 2306).
[13] Rees Dep. 99:8-111:1 (App. 0045-0048) (discussing Exhibit P-274, TF-PA-683403, Think Finance Business Plan, April 2013, at 7 (App. 1479).

UNSEALED

10.     In September 2007, TF submitted a September 2007 Loan Broker Registration Application to the Pennsylvania Department of Banking[14] where it described the ThinkCash product as a new loan program "being offered by TC Loan Service, LLC dba ThinkCash," which was identified as the marketing and servicing arm of PayDay One.[15]  According to the program description included with the application, "TC Loan Service . . . will provide all marketing and servicing for the program and the lender will be one or more state banks. Currently, we are working with First Bank of Delaware, a Delaware state bank, regulated by the FDIC (the 'Lender')."[16]

11.     While TF believed it could eventually deliver the ThinkCash product to consumers through multiple banks, First Bank of Delaware ("FBD") was the only bank partner the Company ever could find for ThinkCash.[17]

12.     ThinkCash loans were priced at 324% APR for first time borrowers, with a lower rate for returning customers. TF targeted an overall, average APR of 263% for the ThinkCash program.[18]

---

[14] Exhibit P-101, PAOAG-0000207, Loan Broker Registration Application, September 6, 2007 (App. 0969).

[15] *Id.* at Attachment 2 ("ThinkCash Program Overview") (App. 0982).

[16] *Id.*

[17] Deposition of Jason Harvison 42:5-43:8 ("Harvison Dep.") (App. 0416). Harvison was the Chief Product Officer who reported to Defendant Rees.  *Id*. at 19:13-20:12 (App. 0410).

[18] *See* Exhibit P-119, TF-PA-670117, Board of Directors Meeting, April 15, 2011, at TF-PA-670181 (App. 1090).

UNSEALED

13.     Starting in 2011, after First Bank of Delaware withdrew from the ThinkCash program, the Company redesigned its indirect products to be originated by Native American tribal entities. TF had three such indirect products: Plain Green, Great Plains Lending, and MobiLoans. The average APRs for these products were 250-260% for Plain Green,[19] 375-380% for Great Plains,[20] and 390% for Mobiloans.[21]

14.     All of TF's "direct" products were originated under state law, meaning that there would be an authorizing or licensing statute under which the product would be offered in a particular state.[22]  In contrast, the "indirect" products like ThinkCash were offered in states where the direct products were not legal.[23]

15.     TF used the term "regulatory diversification" to refer to its business strategy of operating in as many states as possible, either through direct or indirect products.[24]

16.     An August 2011 TF presentation entitled "Investor Themes" touts the company's "regulatory diversification strategy and lists "our products" as including

---

[19] TF-PA-410032, Email from Angela McQuein to Andrew Eckstein, July 5, 2012, at TF-PA-410033-34 (App. 2312-2313).
[20] *Id.*
[21] Exhibit P-274, TF-PA-683403, Think Finance Business Plan, April 2013, at 5 (App. 1477); Rees Dep. 62:4-24 (App. 0036).
[22] Rees Dep. 113:2-17 (App. 0049).
[23] *Id*. at 113:18-114:13 (App. 0049).
[24] *Id.* at 112:12-115:2 (App. 0048-0049).

UNSEALED

both the Payday One direct product as well as the three tribal products, Plain Green, Great Plains Lending and Mobiloans.[25]

17. Prior to the launch of the ThinkCash product in 2007, TF generated annual revenues of $86 million from its direct, payday loan products.[26] In October 2012, after a year of operations for its tribal lending products, TF had revenues of $250 million and was projecting revenues of $475 million for 2012,[27] "2/3 of total revenues" being from the tribal lending products.[28] By 2013, TF was generating revenue at an annual rate of $800 million, of which more than $700 million was from the three tribal products.[29]

18. In the Spring of 2013, TF discontinued its original PayDay One product, replacing it with a state-licensed version of its installment loan product, called "Rise."[30] Defendant Rees reported to the Think Finance board members that he expected this

---

[25] TF-PA-098387, Investor Themes Slide Show, August 2011, at 5 (App. 2147); *see also* TF-PA-337026, Loan Products: ThinkFinance Product History 101 (App. 2238-2260); TF-PA-001675, Great Plains Lending Meeting, Jan. 12, 2011, at 3 (App. 1913) (noting that "product diversification minimizes regulatory risk").

[26] Lutes Dep. 23:8-13 (App. 0073).

[27] TF-PA-437372, Company Overview Slides, October 2012, at 6 (App. 2356).

[28] *Id.* at 18 (App. 2368).

[29] *See* Exhibit P-399, TF-PA-759909, Q1 2013 Executive Team Offsite Direction and Focus, March 28, 2013, at 3 (App. 1619) (slide entitled "However, We Are Not Adhering to Our Diversification Strategy"). General Counsel Sarah Cutrona confirmed that this presentation was prepared by Defendant Rees for discussion with top management. Deposition of Sarah Cutrona 69:23-75:24 ("Cutrona Dep.") (App. 0533-0534).

[30] TF-PA-475235, Memorandum from Ken Rees to Think Finance Board Members, April 18, 2013, at 2 (App. 2420).

UNSEALED

new product to become the Company's "flagship product," and have "great economics" because "there is no third party partner to capture part of the margin."[31]

19.     By the end of 2013, Defendant Rees reported to the Board that the Company was evaluating an organizational change referred to as "Project Exclaim" that "would spin off several products…to separate the tribal and non-tribal business," by leaving the tribal products in the legacy company and creating a new company to hold the non-tribal products such as Rise. [32]

20.     At the time of the spinoff of Elevate, TF had roughly 500 employees, in contrast to the roughly 15 employees it had when its only product was PayDay One.[33]

21.     On, May 1, 2014, various assets and products of TF were transferred to a new company named Elevate Credit, Inc.[34] As the result of an IPO, Elevate Credit, Inc. is now a public company, with many of the former executives of TF now in comparable positions at Elevate, including CEO Ken Rees, CFO Chris Lutes, COO Jason Harvison and GC Sarah Cutrona.[35]

---

[31] *Id.*

[32] TF-PA-724033, Memorandum from Ken Rees to Think Finance Board Members, December 11, 2013, at 3 (App. 2762).

[33] Harvison Dep. 33:9-25 (App. 0414).

[34] Amendment No. 4 to SEC S-1 Registration Statement, Elevate Credit, Inc., filed on January 30, 2017 (App. 3055), full text available at https://www.sec.gov/Archives/edgar/data/1651094/000119312517023390/d310075ds1a.htm (section titled "Selected historical consolidated financial data").

[35] *Id.* (App. 3049) (section titled "Management").

UNSEALED

### B. History of TF's Activity in Pennsylvania

22.     Under Section 201 of the Pennsylvania Loan Interest and Protection Law ("LIPL"), 41 P.S. § 201, the maximum lawful rate of interest for the loan and use of money in amounts less than $50,000 is six percent per year.

23.     The six-percent interest cap applies to all consumer lenders except those lenders who are licensed under the Consumer Discount Company Act (hereinafter "CDCA"), 7 P.S. §§ 6201-6219, and who make loans in accordance with the limitations and requirements of that statute. *See Pa. Dept. of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752 (Pa. 2008). This cap applies to all credit-related charges, however labeled, and applies to credit lines as well as fixed-amount loans. *Id.*

24.     On July 26, 2008, the Pennsylvania Department of Banking issued a notice rescinding an earlier administrative interpretation of the CDCA and announcing that, as of February 1, 2009, the CDCA licensing requirement applicable to small-loan consumer lending (which under the earlier interpretation only applied to lending occurring in storefronts within Pennsylvania) would apply to lending to Pennsylvania consumers conducted over the Internet.[36]

25.     TF initially made loans in Pennsylvania directly through its PayDay One product.  However, due to the regulatory change in Pennsylvania noted above that extended the state's longstanding prohibition against high-rate consumer lending to

---

[36] 38 Pa. Bulletin 30, at 3986-87 (July 26, 2008) (App. 3067-3068).

UNSEALED

Internet lenders, the Company ceased offering PayDay One loans to Pennsylvania consumers and concentrated, instead, on offering indirect loans to Pennsylvanians. This was explained in a 2009 memo from TF's General Counsel to the company:

> A Pennsylvania state appellate court ruled on Friday that Internet payday lenders and other out-of-state companies must obtain Pennsylvania license before they make consumer loans to Pennsylvania residents. . . . As a result of this ruling, PayDay One will no longer originate loans in Pennsylvania and is evaluating its options on how to provide the consumers of Pennsylvania other alternatives.  Both the First Bank of Delaware/Think Cash product and the Urban Trust Bank/Elastic product are viable alternatives to payday loans and we anticipate we will be filling the gap with these products. Our diversification strategy is indeed paying off![37]

26.     On September 25, 2009, the Pennsylvania Banking Department sent a certified letter addressed to ThinkCash, Inc. in Fort Worth, summarizing the results of the court decision referenced in the Cutrona email, and advising the company that "continuing to engage" in unlicensed, online lending "could result in enforcement action against you."[38]

27.     At her deposition, Ms. Cutrona confirmed receiving that letter but testified that she interpreted it as only applying to the PayDay One product, not the

---

[37] Exhibit P-405, REES_0000011, Email from Sarah Cutrona to PDO-Corporate, July 14, 2009 (App. 1637); *see* Cutrona Dep. 137:8-139:2 (App. 0540) (introducing email).
[38] Exhibit P-373, Letter from Pennsylvania Department of Banking to ThinkCash, September 25, 2009 (App. 1611).

UNSEALED

ThinkCash product.[39]  She also confirmed that TF did in fact continue to market

ThinkCash loans to Pennsylvanians.[40]

28.     The Pennsylvania court ruling referenced in Cutrona's email involved the

unsuccessful challenge brought by TF's competitor, Cash America, trading as CashNet

USA, to the Commonwealth's policy change regarding Internet lending.  *See Cash

America Net of Nevada, LLC, v. Com., Dept. of Banking*, 978 A.2d 1028 (Pa. Cmwlth. 2009),

*aff'd*, 8 A.3d 282 (Pa. 2010).  After that decision, TF began purchasing leads from

CashNet and other Internet lenders exiting Pennsylvania for the purpose of marketing

ThinkCash loans to those consumers.[41]

29.     After tribal lending entities replaced First Bank of Delaware as the

ostensible lender, TF continued to target Pennsylvania borrowers with significant

success, as Pennsylvania was one of its highest volume states for its three tribal

programs during the 2011-2014 time period.[42]

---

[39] Cutrona Dep. 167:4-169:20 (App. 0547-0548).
[40] *Id.* at 141:1-17 (App. 0541).
[41] Exhibit P-111, TF-PA-724002, Memo from Ken Rees to Think Finance Board Members, April 15, 2009, at 2 (App. 1068-2); Harvison Dep. 69:21-72:10 (App. 0418) (confirming that TF did in fact purchase leads from CashNetUSA).
[42] Exhibit P-146, TF-PA-325436, Product and Operations Overview, November 7, 2012, at 29-30 (App. 1343-1344) (as of Sept. 30, 2012, Pennsylvania represents the third highest state by outstanding principal for both the two installment loans—i.e., Plain Green and Great Plains Lending—and for the MobiLoans line-of-credit); TF-PA-038019, Plain Green Reporting Update, December 1, 2014, at TF-PA-038042 (App. 2081-2082) (Pennsylvania third highest state).

**UNSEALED**

30.     From 2009 through 2014, TF collected from Pennsylvania consumers approximately $37 million in payments on account of ThinkCash loans and $192 million in payments on account of the three TF tribal loan programs.[43]

### C. The Precursor to TF's Tribal Lending Products: The "ThinkCash" Venture with First Bank of Delaware

31.     The initial contractual structure for the ThinkCash program of TF using First Bank of Delaware ("FBD") was comprised of the following three agreements, all dated January 23, 2007:

   a. A Marketing and Servicing Agreement between FBD and TC Loan Service, LLC, a TF subsidiary;[44]

   b. A Master Participation Agreement between FBD and a different TF subsidiary, TC Financial, LLC;[45] and

   c. A Guaranty Agreement between TF (PayDay One Holdings, Inc) and FBD.[46]

32.      The individual who signed each of these agreements for the TF entities was Defendant Rees.

---

[43] Think Finance Defendants' Response to Plaintiff's First Set of Interrogatories, Nos. 3 and 4, March 17, 2017 (App. 0002-0006).

[44] Exhibit P-102, TF-PA-000845, Marketing and Servicing Agreement (FBD), January 23, 2007 (App. 0985).

[45] Exhibit P-406, TF-PA-000876, Master Participation Agreement (FBD), January 23, 2007 (App. 1647).

[46] Exhibit P-102, TF-PA-000840, Guaranty (FBD), January 23, 2007 (attached at end of P-102) (App. 1016).

UNSEALED

33.     Under the Marketing and Servicing Agreement, TF agreed to market the

ThinkCash loans (using a license from FBD to use the bank's name and trademarks), to

take applications for such loans from consumers and to service the loans including

collection, accounting, remittance and settlement on such loans. In return, the TF entity

was to be paid $100 per funded loan.[47]

34.     Under the Master Participation Agreement, the TF entity TC Financial

contracted to purchase a 99% "participation interest" in each ThinkCash loan made on a

daily basis, meaning that at the end of the day on which the loan was originated in the

name of FBD, TF owned a 99% beneficial interest in the loan, thereby entitling TF to

99% of the revenues generated by the loan. [48]

35.     TF also agreed to pay a "monthly participation fee" to FBD of $100/loan

plus a percentage of the revenue generated by TF on its 99% participation interest.[49]

---

[47] Exhibit P-102, TF-PA-000845, Marketing and Servicing Agreement (FBD), January 23, 2007 (App. 0985).
[48]  Exhibit P-406, TF-PA-000876, Master Participation Agreement (FBD), January 23, 2007 (App. 1647). A "participation interest" was defined as an "undivided equitable ownership interest in the economic and beneficial interest in the Participated Loans." *Id.* at 3 (App. 1649). The daily transfer of the 99% interest to TC Financial is discussed at Section 2.2. *Id.* at 4-5 (App. 1650-1651).
[49] *Id*. at 5 (Section 2.3) (App. 1651).

UNSEALED

36.     The Master Participation Agreement also required the TF entity to maintain a reserve account at FBD that it "owned and funded" from which new loans were made.[50]

37.     Under the Guaranty Agreement, TF unconditionally guaranteed the obligations of its subsidiaries under the Marketing and Servicing Agreement and the Master Participation Agreement including payment of all fees owed to FBD.[51]

38.     In September 2007, the Master Participation Agreement was amended to reduce the percentage of the participation interest immediately sold to TF to 90%, thereby leaving FBD with 10% retained interest. However, TF also agreed to reimburse FBD for the amount of any principal losses or charge-offs that exceeded 25% of the bank's Retained Interest.[52]

39.     After the launch of the ThinkCash program pursuant to these contracts, the TF balance sheet included (a) outstanding PayDay One loans and (b) the participation interests in the ThinkCash loans purchased from FBD.[53]

40.     On October 3, 2008, FBD entered into a Stipulation and Consent to the Issuance of Order to Cease and Desist ("Cease and Desist Consent") with its regulator,

---

[50] *Id.* at 24-25 (Section 20.1) (App. 1670-1671).

[51] Exhibit P-102, TF-PA-000840, Guaranty (FBD), January 23, 2007, at 1 (attached at end of P-102) (App. 1016).

[52] Exhibit P-104, TF-PA-000989, Amendment to Master Participation Agreement (FBD), September 27, 2007 (App. 1021).

[53] Lutes Dep. 34:2-19 (App. 0176).

**UNSEALED**

the Federal Deposit and Insurance Corp. ("FDIC").[54] This action arose out of an FDIC

examination into possible "unsafe or unsound banking practices and violations of law

and/or regulations in connection with the operation and oversight of [FBD's] National

Consumer Products Division, including the lending programs offered, marketed,

administered, processed and/or serviced by third parties pursuant to the agreements

specified in Exhibits "A" and "B" attached."[55] One of the lending programs listed in the

attached Exhibit "A" was the ThinkCash program.[56]

       41.     The Cease and Desist Consent also states that some of the bank's third-

party lending programs "exhibit the characteristics of a 'Rent-a-BIN' . . . arrangement."[57]

       42.     As a result of the FDIC action, FBD and TF restructured the ThinkCash

program in a number of ways.  First, TF created two new subsidiaries, Tailwind

Marketing, LLC and TC Decision Sciences, LLC that would replace TC Loan Service as

---

[54] Exhibit P-9, TF-PA-684341, FDIC Stipulation and Consent to the Issuance of an Order to Cease and Desist, October 3, 2008 (App. 0661).

[55] *Id*. at ¶ 5 (App. 0662)

[56] Exhibit A to the Cease and Desist Consent lists 17 programs including the following one listed as No. 9: "Marketing and Servicing Agreement dated as of January 23, 2007 between TC Loan Service, LLC d/b/a ThinkCash and First Bank of Delaware and the Master Participation Agreement dated as of January 23, 2007 between TC Financial, LLC and First Bank of Delaware." (App. 0668). Sarah Cutrona, TF's General Counsel, recalled the FDIC not being "comfortable with Think Finance doing collections and customer service on behalf of the bank." Cutrona Dep. 143:11-18 (App. 0541).

[57] Exhibit P-9, TF-PA-684341, FDIC Stipulation and Consent to the Issuance of an Order to Cease and Desist, October 3, 2008, at ¶ 9 (App. 0664).  "Rent-a-BIN" stands for "Rent a Bank Identification Number." *See* Risk Management Examination Manual for Credit Card Activities (March 2007), FDIC – Division of Supervision and Consumer Protection – Chapter XIV, available at https://www.fdic.gov/regulations/examinations/credit_card/.

UNSEALED

the entity providing services to FBD.[58]  Second, rather than TF purchasing the

participation interests, a "special purpose vehicle" ("SPV") was created to be the

purchaser, using funds raised from outside investors.[59]

43.     The name of the SPV was Universal Finance II, LLC (also known as "the

Universal Fund"). Its structure and its relationship to TF and FBD within the ThinkCash

program is described in an Amended and Restated Private Placement Memorandum

("PPM").[60]

44.     According to the PPM, the Fund was formed for the purpose of acquiring

90% participation interests "in certain short term unsecured consumer loans originated

by [FBD]," and offered investors a return of 17%.[61] The loans charged borrowers rates

between 85% and 334%, depending on the amount borrowed.[62]

45.     According to the PPM, the owner and managing member of the Universal

Fund was an individual named Mark Wildstein.[63]  Wildstein is the brother of Harris

Wildstein,[64] one of the FBD directors that signed the FDIC Cease and Desist Consent.[65]

---

[58] Lutes Dep. 52:2-53:4 (App. 0180-0181).

[59] *Id.* at 35:1-36:17 (App. 0176).

[60] Exhibit P-1, Wildstein0025, Universal Finance II, LLC Amended and Restated Private
Placement Memorandum, April 3, 2009 (App. 0626).

[61] *Id*. at 17 (App. 0642).

[62] *Id*. at 20 (App. 0645).

[63] *Id*. at 18 (App. 0643).

[64] Deposition of Mark Wildstein 15:8-18 ("Wildstein Dep.") (App. 0500).

[65] Exhibit P-9, TF-PA-684341, FDIC Stipulation and Consent to the Issuance of an Order to Cease
and Desist, October 3, 2008, at 7 (App. 0667). (signature page). Wildstein testified that, as the
brother of a director and a customer of the bank, FBD considered him a "trusted person" who

UNSEALED

46.     Once the Universal Fund became the purchaser of the participation

interests in the ThinkCash loans, the contractual structure of the program consisted of

the following agreements:

      a.  A Marketing Agreement between the TF entity Tailwind Marketing, LLC and FBD; [66]

      b.  A Software and License Support Agreement between the TF entity TC Decision Sciences, LLC and FBD; [67]

      c.  A Master Participation Agreement between the Universal Fund and FBD; [68]

      d.  An Administrative Agency Agreement between the TF entity TC Administrative Services, LLC and the Universal Fund; [69] and

      e.  A Guaranty between TF and the Universal Fund. [70]

47.     These various TF subsidiary entities—Tailwind Marketing, LLC, TC

Decision Sciences, LLC, and TC Administrative Services—had no separate employees or

---

could play this role of being the sole member of the Universal Fund. Wildstein Dep. 15:8-23 (App. 0500).

[66] Exhibit P-105, TF-PA-000723, Marketing Agreement (FBD), October 1, 2008 (App. 1026). This agreement was amended in March 2009. *See* Exhibit P-107, TF-PA-623377, Amendment Number One to the Marketing Agreement (App. 1067).

[67] Exhibit P-106, TF-PA-000745, Software License & Support Agreement (FBD), October 22, 2008 (App. 1052).

[68] TF-PA-623546, Master Participation Agreement (UF II – FBD), March 19, 2009 (App. 2534).

[69] TF-PA-002386, Amended and Restated Administrative Agency Agreement, April 3, 2009 (App. 1931).

[70] TF-PA-002378, Guaranty, March 19, 2009 (App. 1923).

UNSEALED

work location. The tasks performed in the name of these subsidiaries were performed by TF employees.[71]

48.  Under the Marketing Agreement, Tailwind would market the loans, with FBD's license to use its name and trademark, for a per-loan fee of $100. Defendant Rees signed the agreement as the CEO of Tailwind Marketing, LLC.[72]

49.  Under the Software and License Support Agreement, TC Decision Sciences, LLC, FBD agreed to license software to process the loan applications and manage the collections for a $30/loan fee.[73] Defendant Rees signed the agreement as the CEO of TC Decision Sciences, LLC.[74]

50.  Under the Master Participation Agreement, the Universal Fund acquired the right to purchase 90% participation interests in the loans made on a daily basis, and agreed to reimburse FBD for its costs, including the marketing and technology fees the bank owed to the TF entities, to protect the bank from losses on its 10% retained interest

---

[71] Deposition of Linda Callnin 29:9-31:1 ("Callnin Dep.") (App. 0449); Smith Dep. 46:4-47:16 (App. 0559) ("Internally, we just referred to everybody as Think.").
[72] The signature pages of Exhibit P-105 are at TF-PA-000740 (original) (App. 1043), TF-PA-000761 (first amendment) (App. 1050), TF-PA-000762 (second amendment) (App. 1051).
[73] Exhibit P-106, TF-PA-000745, Software License & Support Agreement (FBD), October 22, 2008, at 10 (App. 1061). The software was defined as "the Licensor's automated consumer loan decision making and processing software application" which included "an internet-based Installment Loan Platform (ILP) that permits the collection, verification, evaluation, funding and servicing of installment loans." *Id.* at 9 (App. 1060).
[74] *Id.* (signature page at 13) (App. 1063).

**UNSEALED**

in the loans, and to pay the bank a percentage of the revenue earned by the Fund on its 90% interest.[75]

51.     The Administrative Agency Agreement, combined with the Guaranty, was a new feature of the structure. TF guaranteed the 17% return to the Universal Fund investors and also agreed to repurchase the Fund's interest in any loans that defaulted, in return for TF receiving all the residual net income as an "administrative fee."[76] Defendant Rees signed the Administrative Agency Agreement as the President of TC Administrative Services, LLC,[77] and signed the Guaranty as the President of Think Cash, Inc.[78]

52.     Mark Wildstein explained that, under the Administrative Agency Agreement, the TF entity managed the Universal Fund, including the funding of a reserve account to purchase the participation interests, the payment of all amounts owed to FBD, and the payments to investors.[79]

---

[75] TF-PA-623546, Master Participation Agreement (UF II – FBD), March 19, 2009, at TF-PA-623549 (App. 2537-2538) (sales of participation interests), TF-PA-623586 (App. 2574) (participation interest defined), TF-PA-623587 (App. 2575) (bank fees stated).
[76] Lutes Dep. 64:2-67:13 (App. 0183-0184).
[77]  TF-PA-002386, Amended and Restated Administrative Agency Agreement, April 3, 2009 (signature page at 18) (App. 1948).
[78] TF-PA-002378, Guaranty, March 19, 2009 (signature page at 8) (App. 1930).
[79] Wildstein Dep. 75:20-78:22 (App. 0503)

UNSEALED

53.     TF was also an investor in the Universal Fund and, therefore, the 17% return on investment provided by the Fund on the portion of shares in the Universal Fund that it owned was an additional source of revenue for the Company.[80]

54.     In summary, under the ThinkCash program as it was structured during the period that the participation interests were purchased by the Universal Fund, TF marketed the loans to customers (Marketing Agreement); used its technology platform to run the automated loan decisioning software and manage the collection process (Software and License Support Agreement); and managed the accounting and fund transfers involved in the participation purchases made by the Universal Fund and to make payments to investors (Administrative Agency Agreement).

55.     In return, TF received revenues from the following sources:

   a.   The per-loan marketing fee from the Marketing Agreement;

   b.   The per-loan technology fee from the Software and License Support Agreement);

   c.   The return earned on its own investment in the Universal Fund as provided in the PPM; and

   d.   All of the income that remained, denominated as its administrative fee, as provided in the Administrative Agency Agreement.[81]

56.     In order to provide additional capital for the rapidly expanding volume of ThinkCash loans, TF contracted with Defendant Victory Park Capital ("VPC") to "come

---

[80] Lutes Dep. 67:24-68:13 (App. 0184).
[81] TF CFO Lutes confirmed these separate sources of revenue. *Id.* at 70:9-73:7 (App. 0185-0186).

UNSEALED

in and supplement with additional capital on top…of the existing investors" of the Universal Fund.[82]

57.     In its deal with TF, VPC was given an exclusive right to use up to $90 million to purchase participation interests in TF products, including interests in both ThinkCash and PayDay One loans.[83]

58.     The structure of TF's "new deal" with VPC was presented in a July 9, 2010 "Universal Fund Investor Update PPM Amendment" presentation.[84] The original Universal Fund investors had to accept the new arrangement with VPC on a take it or leave it basis.[85]

59.     Under the new arrangement, Universal Fund continued to purchase the participation interests from FBD but would then turn around and resell them to a VPC fund.[86]

---

[82] Lutes Dep. 88:7-89:15 (App. 0189-0190).
[83] Exhibit P-305, GPLP00448749 at GPLP00448752, VPC Investment Committee Memorandum ("ICM"), July 28, 2010 (App. 1541). In this ICM, VPC described TF as "a lender of unsecured short-term cash advances and installment loans to individuals primarily through the Internet" that "currently offers three products: payday loans (PayDay One), installment loans (ThinkCash) and open-ended lines of credit (Elastic)." *Id.*  At the time of VPC's entry, TF offered PayDay One loans in 29 states and ThinkCash loans in 43 states. *Id.*
[84] Exhibit P-21, TF-PA-001995, Universal Fund Investor Update PPM Amendment, July 9, 2010 (App. 0672).
[85] *Id.* at 6 (App. 0677) ("The new deal structure will require amendments to the existing PPM. . . "[I]nvestors who do not sign the consent to the amended PPM or are uncomfortable with the terms of the deal will be redeemed immediately.")
[86] Lutes Dep. 90:11-91:13 (App. 0190).

UNSEALED

60.     A new Administrative Agency Agreement and Guaranty and Security Agreement was executed and retained most of the features of the pre-existing structure, except that the investment return to VPC which was guaranteed by TF was increased to 20%.[87]

61.     By February 28, 2011, with the "bank model" installment loan program originally called "ThinkCash" evolving into a "tribal model", VPC's investment commitment to TF increased from $90 to $150mm,[88] and then, in October 2012, once all three tribal products were launched, VPC committed an additional $150 million.[89]

## D. TF's Transition from a Bank-Originating Model for Its "Indirect" Loan Program to the Tribal Model

62.     In October 2010, the FDIC directed FBD to withdraw from the ThinkCash program.[90] According to Defendant Rees's report to TF's executive team, the federal agency cited the "absurd logic" that the rates charged to ThinkCash customers were "abusive."[91]

---

[87] TF-PA-003901, Administrative Agency Agreement (Universal Fund), July 28, 2010 (App. 1949) ("Fixed Return" of 20.0% detailed at 3, (App. 1951)); TF-PA-011864, Guaranty and Security Agreement, July 28, 2010 (App. 1986).

[88] Exhibit P-305, GPLP00448749 at GPLP00448767, VPC ICM, February 28, 2011 (App. 1556).

[89] Exhibit P-305, GPLP00448749 at GPLP00448781, VPC ICM, October 18, 2012 (App. 1570); *see also* Deposition of Thomas Welch ("Welch Dep.") 74:8-77:11 (App. 0606-0607).

[90] *See* Exhibit P-119, TF-PA-670117, Board of Directors Meeting, April 15, 2011, at TF-PA-670175 (App. 1084) (timeline detailing transition from FBD to tribal operation).

[91] Exhibit P-116, TF-PA-671969, Leadership Team Session Slides, October 24, 2010, at 2 (App. 1070). According to the testimony of Jason Harvison, the presentation in which this report is contained was prepared for TF's executive team by Defendant Rees. Harvison Dep. 86:4-16 (App. 0422).

**UNSEALED**

63.     At the time, the ThinkCash product represented 60% of TF's total

revenues.[92]

64.     TF under Rees recognized that the loss of the relationship with FBD

represented a serious risk to the ThinkCash revenue stream and planned to replace FBD

as the originating lender of its installment loan product.[93]

65.     As of October 15, 2010, TF had contacted over 80 banks without finding

one willing to take the place of FBD.[94]

66.     On November 17, 2010, Rees proposed to the TF Board that "we . . .

migrate the balances [of the ThinkCash portfolio] to another lender that will be able to

lend in 48 states (all except SD and WV). Assuming things go as anticipated, we may be

able to not only migrate any lost revenue, but actually increase our growth next year."[95]

Rees called this plan "Great Plains Financial."[96]

67.     In November 2010, TF began its search for a potential tribal lending entity

willing to function as the originating lender for its "Great Plains Financial" concept.[97]

---

[92] Exhibit P-116, TF-PA-671969, Leadership Team Session Slides, October 24, 2010, at 3 (App. 1071).
[93] Exhibit P-118, TF-PA-476861, Memorandum from Ken Rees to Think Finance Board Members, November 17, 2010, at 2 (App. 1080).
[94] TF-PA-671850, Bank Update Slides, October 15, 2010 (App. 2693).
[95] Exhibit P-118, TF-PA-476861, Memorandum from Ken Rees to Think Finance Board Members, November 17, 2010, at 2 (App. 1080).
[96] *Id.* at 1. (App. 1079).
[97] Exhibit P-119, TF-PA-670117, Board of Directors Meeting, April 15, 2011, at TF-PA-670175 (App. 1084) (describing the corporate activity that month as "Decision to Support Tribal Lending. Tribe Search begins.")

UNSEALED

68.     Later, in a 2013 "Business Plan," Rees explained the company's rationale

for a so-called "Tribal Model" of lending: "In much the same way that the National

Bank Act allows banks to export the rate of their products across states, Native

American tribal sovereignty gives tribes the ability to operate businesses off the

reservation without adhering to state regulation (although all Federal regulations must

be followed)."[98]

69.     At the same time that TF began the search for a tribe interested in

originating loans under the Great Plains concept, TF also was discussing with VPC the

possibility of it continuing its role in funding loans, but with a tribal partner instead of

FBD.[99]

70.     The "initial branding concept" TF came up with for the potential tribal

product was "Great Plains Lending."[100]

71.     A name for a new special purpose vehicle to purchase participation

interests in the new structure was also adopted: "Great Plains Lending Servicing, Ltd.,"

or "GPLS."[101]

---

[98] Exhibit P-274, TF-PA-683403, Think Finance Business Plan, April 2013, at 10 (App. 1482). For
Rees' authorship of this document, see Rees Dep. 46:20-51:25 (App. 0032-0033).

[99] Rees Dep. 180:3-21 (App. 0065).

[100] Lutes Dep. 112:3-19 (App. 0195) ("we had to, as marketer, come up with a potential brand
name that whatever tribe we ended up partnering with, you know, would adopt and agree to");
*see also* Harvison Dep. 96:19-22 (App. 0424)

[101] Lutes Dep. at 111:6-20 (App. 0428).

**UNSEALED**

72.     CFO Lutes authored a one-page summary of the "Flow of Funds for Ongoing Loan Originations and Sales" for the Great Plains Lending concept.[102] In it, he described how the program would begin with a $1 million deposit by GPLS into a Funding Account owned by the tribal lending entity, "GP Lending, to be used to fund new loans; that two days later a 99% participation interest in the loans would be sold at book value to GPLS, with the proceeds of the sale being used to fund new loans; that collections on the loans would be deposited into a Collections Account owned by the tribal entity from which a "revenue share" would by paid monthly to the tribal entity by GPLS; that each month a reconciliation would be performed so that per-loan fees could be paid to the TF entities Tailwind Marketing and TC Decision Sciences, and that "because of the time lags between when the reimbursements are made from GPLS and are due to the Think Finance entities, there will be no out-of-pocket cash required from GP Lending."[103]

73.     The first tribal entity TF contacted was a tribe in South Dakota.[104]

---

[102] Exhibit P-243, TF-PA-013418, Great Plains Lending: Flow of Funds for Ongoing Loan Origination and Sales (App. 1442); Lutes Dep. 109:10-25 (App. 0195).
[103] Exhibit P-243, TF-PA-013418, Great Plains Lending: Flow of Funds for Ongoing Loan Origination and Sales (App. 1442).
[104] Rees Dep. 159:7-160:1 (App. 0060); Nguyen Dep. 89:5-91:14 (App. 0512).

UNSEALED

74.     A November 2010 Company sales presentation titled "Great Plains Lending" contains mock-ups of webpages of a Great Plains Lending website;[105] touts a 3-year prior history of the ThinkCash product in which FBD was able to earn $1.5 million in monthly revenues;[106] and shows the location of Great Plains Lending Customer Support at postal box in South Dakota.[107]

75.     By January 2011, the Company had identified a different tribal entity for its Great Plains Lending concept: the Otoe Missouria Tribe in Oklahoma.[108]

76.     Defendant Rees was personally involved in the first two contacts about potential tribal partners. The first was with Butch Webb, a member of a South Dakota tribe who went on to conduct lending under the name "Western Sky" and sold those loans to CashCall.  The second was Mark Curry, an online lender that was already involved in a pre-existing tribal lending enterprise with the Otoe-Missouria Tribe in Oklahoma.[109]

---

[105] Exhibit P-120, TF-PA-013270, Great Plains Lending Slide Show, December 2010, at TF-PA-013276-81 (App. 1098-1103).
[106] *Id*. at TF-PA-013274 (App. 1096).
[107] *Id*. at TF-PA-013282 (App. 1104).
[108] Exhibit P-119, TF-PA-670117, Board of Directors Meeting, April 15, 2011, at TF-PA-670175 (App. 1084) (timeline).
[109] Rees Dep. 149:19-152:6 (App. 0058) (Curry); 159:7-161:23 (App. 0060-0061) (Webb).

**UNSEALED**

77.     Meanwhile, as Rees was searching for a suitable tribal entity, VPC was setting up the financial infrastructure for the tribal lending enterprise. On January 6, 2011, VPC created GPL Servicing, Ltd. ("GPLS").[110]

78.     GPLS was a "Cayman entity established for the purpose of purchasing participation interests in unsecured consumer loans originated from one of three Native American Indian tribes."[111]

79.     In February 2011, TF created an updated Powerpoint presentation for selling its Great Plains Lending idea to tribal prospects, titled "Emergency Cash Lending—A New Source of Tribal Revenue."[112]  In addition to images of the Great Plains Lending webpage mock-ups, the presentation included the following additional representations:

- "Think Finance has a unique turnkey solution for helping tribes enter this lucrative market;" and

- "Using Think Finance technology and services, tribes can generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss."[113]

80.     The "turnkey solution" referenced in the presentation was described as including "technology, marketing, risk management, compliance support, and access to

---

[110] GPLP00600177, Written Shareholder Resolutions, January 6, 2011 (App. 3048).
[111] TF-PA-381520, VPC Series II Slide Show, August 2012, at 4 (App. 2286).
[112] *See* Exhibit P-122, TF-PA-098567, Emergency Cash Lending – A New Source of Tribal Revenue, February 2011 (App. 1118).
[113] *Id*. at 2 (App. 1119).

**UNSEALED**

capital funding," for a loan program that could be "up and running 90 days from signed contracts."[114]

81.     This "complete technology, marketing, and risk management platform," TF represented, offered tribes willing to enter the online lending business a "fully automated loan process;" "a diversified product portfolio" of installment loans, open-end credit and traditional payday loans; a "marketing machine" that could generate "100,000 applications monthly;" and "access to third party capital" up to $150 million.[115]

82.     TF explained that the installment loan product it was proposing would start at rates of 360% APR,[116] and would be marketed to "emergency cash users – mainstream Americans," who were "65% female," with household income of "25k-50k" who primarily needed emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts."[117]

83.     TF stated that a tribe willing to sign up could generate a payday loan portfolio of $10-50 million.[118]

---

[114] *Id.* at 3 (App. 1120). As late as 2014, TF was continuing to refer to itself as the provider of a "turnkey platform" for tribal corporations. TF-PA-676476, Online Consumer Lending – A New Source of Tribal Revenue, April 24, 2014, at 17 (App. 2719).
[115] Exhibit P-122 at 5-6 (App. 1122-1123).
[116] *Id*. at 8 (App. 1125).
[117] *Id*. at 4 (App. 1121).
[118] *Id*. at 3 (App. 1120).

UNSEALED

84.     On February 24, 2011, TF received back from the Otoe-Missouria a signed "Trademark and URL Assignment Agreement," in which the tribe agreed to purchase the website address "www.greatplainslending.com" from the TF entity Tailwind Marketing for $100 with TF retaining the right to purchase back the intellectual property for the same $100.[119] In response, Defendant Rees sent out an internal e-mail message to Company personnel:  "Gentlemen -- Start your engines!!!"[120]

85.     On February 28, 2011, TF signed a Non-Disclosure Agreement ("NDA") with a different tribe, the Chippewa Cree Tribe of the Rocky Boy's Point Reservation ("CCT"), located in Montana.[121]

86.     TF was introduced to the CCT by a businessman named Steven Haynes,[122] who had supplied a casino on that reservation with slot machines.[123]

87.     Haynes heard about TF's interest in finding a tribal partner for a lending enterprise from his lawyer at Pepper Hamilton. His attorney introduced him to another Pepper lawyer named Rick Eckman "who was working with Think Finance to help them find a tribe to partner with."[124]

---

[119] Exhibit P-124, TF-PA-003273, Trademark and URL Assignment Agreement (GPL), February 24, 2011 (App. 1136) (attachment to email).
[120] *Id.* (App. 1135) (email).
[121] Exhibit P-126, TF-PA-001034, Mutual Nondisclosure Agreement (PG), February 28, 2011 (App. 1136).
[122] Deposition of Steven Haynes 54:10-56:8 ("Haynes Dep.") (App. 0576).
[123] Haynes Dep. 59:12-60:12 (App. 0577).
[124] Haynes Dep. 67:19-68:6 (App. 0579).

UNSEALED

88.     Rick Eckman had been the lawyer representing First Bank of Delaware in the ThinkCash relationship.[125]

89.     Haynes' discussions with TF were with the Chief Product Officer Jason Harvison, General Counsel Cutrona, and a board member named Steve Shaper.[126]

90.     Part of the attraction of the CCT was TF's impression that the tribe had prior lending experience with another online servicer named "Encore."[127]

91.     In an email dated February 24, 2011, Shaper offered Haynes "1.0% of the gross interest collected" on the loans for the first tribe to partner with TF.[128] Shaper explained as follows the importance to TF of this first tribal partnership: "Think Finance will be turning over a sizeable volume of loans to the new partnership early on."[129]

92.     In an earlier email on the same day, Shaper provided further information about TF's stalled negotiations with the Otoe-Missouria tribe and the urgency of the Company's desire to close a deal quickly with another tribe:

> As I explained before you got your call, Think Finance is losing a large
> amount of money each week by not being able to generate new loans.
> Before our meeting on Tuesday, we expected to have everything signed
> with our Oklahoma tribe this week and be processing new loans by
> Monday. This was easy to do since our websites have been up and
> collecting applications all along. We have simply been turning down
> every applicant and obviously want to stop doing that. The significance of

---

[125] Rees Dep. 152:21-153:12 (App. 0058-0059).
[126] Haynes Dep. 78:18-84:8 (App. 0582-0583).
[127] Harvison Dep. 122:18-124:1 (App. 0431).
[128] Exhibit P-339, Haynes0001004, Email from Steve Shaper to Steven Haynes, February 24, 2011 (App. 1580).
[129] *Id.*

**UNSEALED**

the first tribe to go up is that our existing websites will forward all inquiries to the tribe's new website plus all existing loans when (if) they extend, that tribe will take over the new loan.

I have been hoping that I could get one of your tribes up in under a week and that it would take the place of the present OK tribe. That may not be possible. A tremendous amount of work has gone on both legally getting everything in order and designing a complete website with all back-up (applications, statements, all support documents, etc.).[130]

93.     A few days before the Shaper emails, Haynes met face-to-face with Jason Harvison in Haynes's residence in Dallas.[131] At the meeting, Harvison reiterated that TF was looking to "find a tribal partner as soon as it was physically possible" because "they had a portfolio that was winding down and they didn't want to lose those clients."[132] Haynes also stressed that the tribes would not have to put up any of its own money, which was important since Haynes knew that "many tribes don't have the money to invest."[133]

94.     In his pitch to Haynes, Harvison gave him a paper copy of a shortened version of the "Emergency Cash Lending" Powerpoint, titled "Tribal Lending Introduction."[134]

---

[130] *Id.* at Haynes0001005 (App. 1581).
[131] Haynes Dep. 82:11-83:11 (App. 0583).
[132] Haynes Dep. 88:4-11 (App. 0584).
[133] Haynes Dep. 111:7-112:5 (App. 0587).
[134] Haynes Dep. 187:16-188:14 (App. 0598); Exhibit P-352, Haynes0001190, Tribal Lending Introduction PowerPoint Slides, February 2011 (App. 1591).

UNSEALED

95.     According to Haynes, following the CCT's signing of the February 28, 2011 NDA, Rick Eckman "took the reins and started generating documents and being the negotiator between the parties."[135] On March 7, 2011, Eckman circulated a draft Term Sheet involving the CCT, TF, VPC and Haynes that still used the name "Great Plains Lending" for the product to be created by the enterprise being formed.[136]

96.     On the following day, March 8, 2011, Defendant Rees informed the various people working on the documentation that "we will be changing the name" of the lending website from Great Plains Lending to Plain Green, among other reasons, due to "potential challenges [in] retrieving Great Plains Lending from the Otoe-Missouria tribe."[137] TF came up with the name "Plain Green."[138]

97.     On March 10, 2011, Rees circulated a new version of Chris Lutes' "flow of funds" description, this time showing Plain Green loans being funded in the first instance by a $1 million deposit by Haynes into a Plain Green account in First Bank of Delaware; with FBD handling the ACH processing of customer payments; and all payments into and out of Plain Green accounts at FBD.[139]

98.     On March 11, 2011 the parties executed a "Term Sheet For Think Finance-Chippewa Cree Transaction" that provided, among other things, that:

---

[135] Haynes Dep. 123:8-17 (App. 0590)
[136] Exhibit P-341, Haynes0001100, Draft Term Sheet and Cover Email, March 7, 2011 (App. 1585).
[137] Exhibit P-343, Haynes0000989, Email from Ken Rees, March 8, 2011 (App. 1588).
[138] Rees Dep. 223:20-224:23 (App. 0076).
[139] Exhibit P-347, Haynes0000477, Flow of Funds and Cover Email, March 10, 2011 (App. 1590).

UNSEALED

- The tribe would license TF's loan platform, "will adopt a finance code . . . acceptable to the parties and provide for the licensing of an arm of the tribe to engage in consumer lending," and will implement a specified installment loan program with interest rates from 60-360%;

- Haynes Investments, Inc. will provide funding to the tribe "to enable it to make each of the Loans;"

- GPLS has the right to purchase "participation interests in each Loan . . . at 100% par value;"

- GPLS will pay the tribe 4.5% and Haynes 1% of the cash revenue generated by the acquired participation interests;

- The tribe commits to establish "Plain Green, LLC," to revise its Tribal Credit Transaction Code and to hire Pepper Hamilton as its counsel.[140]

99.     On March 18, 2011, TF and the CCT executed the contracts that formed the Plain Green lending enterprise.[141]

100.     On April 13, 2011, Defendant Rees reported to the TF board, "I'm very pleased to announce . . . that Plain Green (our first tribal lending site) is online and doing fantastic business in it's first week," averaging over $1 million new loan originations per day.[142] "Despite all of the problems with the contracts (not to mention legal expense)," he continued, "I'm very pleased with the deal as it now stands. It is better for us economically than the one with First Bank of Delaware."[143]

---

[140] Exhibit P-279, Dkt. No. 57-3, Term Sheet For Think Finance-Chippewa Cree Transaction, March 11, 2011 (App. 1489).
[141] *See* contracts enumerated and described *supra* ¶ 105.
[142] Exhibit P-283, TF-PA-710229, Memo from Ken Rees to Think Finance Board Members, April 13, 2011, at 1 (App. 1494).
[143] *Id.* at 2 (App. 1495).

UNSEALED

101.    Rees also told the board that the Company's "team continues to move forward with other tribal lenders," hoping "to have a second site (Great Plains Lending) operational by the end of the quarter and third one later in the year."[144]

### E. The Contracts underlying TF's Three Tribal Product Enterprises

#### 1. The Core Agreements that Defined Roles in the Tribal Lending Enterprises

102.    Except for a few minor differences, the contractual structure of the three tribal lending enterprises were the same.[145]

103.    A VPC Investment Committee Memorandum dated February 28, 2011 described the structure of the Plain Green enterprise as follows:

> Under the new structure, Think Finance would license its marketing and underwriting platforms to Plain Green, LLC ("PG"), a business entity organized under the laws of the Chippewa-Cree Tribe of the Rocky Boy's Indian Reservation, Montana. PG would originate installment loans that are substantially similar to the ThinkCash loans ("the PG Loans"). GPL Servicing Ltd. ("GPLS"), a Cayman Islands limited partnership controlled by VPC, would have the option to purchase a 99% participation interests (sic) in the PG Loans ("the PG Participations"). GPLS contracts with Think Finance to provide administrative services for any and all PG Participations purchased. GPLS is structured to yield 20% per annum, which in addition to the PG Participations purchase price is guaranteed by Think Finance. The proposed tribal lending structure is substantially similar to the business model used by CashCall for over nine months, Think Finance's main competitor. Think Finance is utilizing the same legal counsel as Cash Call to construct the tribal lending model, Claudia

---

[144] *Id.* at 2 (App. 1495).
[145] See Exhibit P-157, TF-PA-454508, Email from Linda Rogenski to Nina Vitagliano, October 21, 2014 (App. 1367) ("The Marketing, Licensing and Participation Agreements are generally the same across the tribes.").

UNSEALED

Callaway of Katten Muchin Rosenman LLP, an expert in consumer protection and consumer finance laws.[146]

104.    The enterprise depended on GPLS purchasing loan participations; if GPLS declined to make such purchases, the loans would not be made in the first instance.[147]

105.    The transaction establishing the Plain Green enterprise consisted of the following contractual agreements that were executed by TF and CCT on March 18, 2011:

    a.  A Marketing Agreement between Plain Green, LLC ("PG") and Tailwind Marketing, LLC pursuant to which PG agrees to retain Tailwind to market loans and identify potential customers, and manage all the cash accounts, for a fee of $100 per loan made;[148]

    b.  A License and Support Agreement between PG and TC Decision Sciences, LLC ("TCDS"), pursuant to which PG hires TCDS to provide and maintain the lending technology platform, including the website and the loan decision-making software, for a "license fee" of $50/loan made, plus an hourly rate for any customization work;[149] and

    c.  A Servicing Agreement between PG and TCDS, pursuant to which TCDS manages the outsourcing of the customer service functions for a fee of $5/mo. per active account.[150]

106.    On March 18, 2011, Plain Green and GPLS signed a Participation Agreement, for the purchase by GPLS of 99% participations in the loans, and for the

---

[146] Exhibit P-305, GPLP00448749 at GPLP00448767, VPC ICM, February 28, 2011, at 2 (App. 1557).

[147] Deposition of Kenneth Rees by the Consumer Financial Protection Bureau, August 23, 2016, 61:22-62:6 ("Rees (CFPB) Dep.") (App. 0167); *see also* Welch Dep. 146:9-148:5 (App. 0612) (detailing GPLS's role as the sole purchaser of loan participations).

[148] Exhibit P-128, TF-PA-001151, Marketing Agreement (Plain Green), March 18, 2011 (App. 1147).

[149] Exhibit P-129, TF-PA-001135, License and Support Agreement (Plain Green), March 18, 2011 (App. 1164).

[150] Exhibit P-130, TF-PA-001167, Servicing Agreement (Plain Green), March 18, 2011 (App. 1180)

UNSEALED

payment of a "Service Fee" to PG by GPLS in the amount of 4.5% of monthly Cash

Revenue received by GPLS on account of its 99% interest.[151]

107.     On May 25, 2011, an equivalent set of documents forming the Great Plains

Lending enterprise were executed, including the following:

    a.  A Marketing Agreement between Great Plains Lending, LLC ("GPL")  (described as being "an entity organized under and governed by the laws of the Otoe-Missouria Tribe of Indians") and Tailwind pursuant to which GPL agrees to retain Tailwind to market loans and identify potential customers, and manage all the cash accounts, for a fee of $100 per loan made;[152]

    b.  A License and Support Agreement between GPL and TCDS, pursuant to which PG hires TCDS to provide and maintain the lending technology platform, including the website and the loan decision-making software, for a "license fee" of $50/loan made, plus an hourly rate for any customization work;[153] and

    c.  A Servicing Agreement between GPL and TCDS, pursuant to which TCDS manages the outsourcing of the customer service functions for a fee of $5/mo. per active account.[154]

108.     Defendant Rees signed the GPL documents as the CEO of Tailwind and

TCDS.

109.     There also was a separate Participation Agreement executed between GPL

and GPLS, providing for the same purchase of 99% participation interests in GPL loans,

---

[151] Exhibit P-131, TF-PA-000039, Participation Agreement (Plain Green), March 18, 2011 (App. 1192) (right to 99% participation interest detailed at 6 (App. 1197)).
[152] Exhibit P-134, TF-PA-000202, Marketing Agreement (Great Plains), May 25, 2011 (App. 1245).
[153] Exhibit P-133, TF-PA-000189, License and Support Agreement (Great Plains), May 25, 2011 (App. 1232).
[154] Exhibit P-135, TF-PA-000219, Servicing Agreement (Great Plains), May 25, 2011 (App. 1261)

**UNSEALED**

and also providing for a monthly percentage Service Fee to be paid by GPLS to GPL based on Cash Revenue, but at a sliding rate from 6% to 10%, depending on loan volume.[155]

110.    On October 25, 2011, similar agreements were executed with MobiLoans, LLC ("MBL"), described as being "a limited liability company governed by the laws of the Tunica-Biloxi Tribe of Louisiana," including:

   a.  A Marketing Agreement providing for a fee to Tailwind of $100 per account opened;[156]

   b.  A License and Support Agreement providing for a fee to TCDS of $25 per account;[157] and

   c.  A Services Agreement providing for a fee to the TF entity TC Administrative Services, LLC ("TCAS") of $25 per account.[158]

   d.  A Participation Agreement providing for the same purchase of a 99% interest in consumer debt owed to MBL, with payment of a "Service Fee" to MBL of 4.0 % of Cash Revenue.[159]

---

[155] Exhibit P-136, TF-PA-244514, Participation Agreement (Great Plains), May 25, 2011 (App. 1269). *See* definition of "Service Fee," *id.* at 6 (App. 1273), which incorporates Exhibit B, *id.* at TF-PA-244545 (App. 1299).

[156] TF-PA-042786, Marketing Agreement (Mobiloans), October 4, 2011 (App. 2108) (signed by Kenneth Rees at App. 2123).

[157] TF-PA-042767, License and Support Agreement (Mobiloans), October 4, 2011 (App. 2089) (signed by Kenneth Rees at App. 2101).

[158] TF-PA-042805, Services Agreement (Mobiloans), October 30, 2011 (App. 2127) (signed by Kenneth Rees at App. 2138).

[159] TF-PA-000314, Participation Agreement (Mobiloans), October 4, 2011 (App. 1864). The MBL Participation Agreement actually states that there would be an additional entity sharing in the participation purchases with GPLS, but that third party did not exercise its option and GPLS ended up buying the full 99% participation interests from MBL. *See* GPLP00582552, Mobiloans Notice, February 29, 2012 (App. 3047).

UNSEALED

111.    The Plain Green enterprise also included a Referral Agreement, dated March 18, 2011, between TCAS and Haynes Investments, Inc., ("HII"), referencing that "HII assisted in establishing the [PG] Program . . . and will provide ongoing consulting services to TCAS in connection to the Program, and TCAS desires to compensate HII for such services," and that provides for payments to HII of "1.0% of the Cash Revenue received by GPLS during each calendar month."[160] Haynes testified that he considered this to be his finder's fee agreement and confirmed that he never provided any "ongoing" consulting services regarding Plain Green.[161]

112.    The Great Plains Lending enterprise included a similar agreement, a Consulting and Services Agreement, between TCDS, GPL and a "consultant" named Sentinel Resources, LLC.[162]  According to this agreement, Sentinel "shall be [TCDS]'and [TCDS]'s affiliates exclusive provider of guidance and authority in business dealings between [TCDS] and [GPL]," [163] and is to be the required intermediary between TCDS and the tribal entity and the provider of any accounting services to the tribe related to the GPL product.[164]

---

[160] Exhibit P-132, TF-PA-000029, Referral Agreement (Plain Green), March 18, 2011 (App. 1222).
[161] Haynes Dep. 177:1-178:19 (App. 0596); 215:12-216:3 (App. 0601). Haynes also testified that he did not recall what TCAS was and what role it was playing in the arrangement. Haynes Dep. 177:20-178:8 (App. 0596).
[162] TF-PA-001480, Consulting and Servicing Agreement (Great Plains), May 25, 2011 (App. 1898).
[163] *Id*. at 2 (App. 1899).
[164] *Id*. at TF-PA-001491, Exhibit A (App. 1909).

UNSEALED

113. The Consulting and Services Agreement provides that the tribal entity, GPL, is to pay to Sentinel undisclosed compensation for its "consulting.[165] The compensation payable to Sentinel Resources was specified in the "Flow of Funds" model that TF's CFO prepared for the original Great Plains Lending concept, in which it is stated that Sentinel Resources would receive $40% of the tribal entity's revenue share payments from GPLS.[166]

114. Defendant Rees has otherwise identified Mark Curry, an online payday lender who served as the intermediary for the Otoe-Missouria tribe with Defendant Rees, as the actual individual who provided this "consulting" role for GPL.[167]

115. Rees explained his withdrawal from the original GPL deal as uneasiness about an entity "associated with" Curry (the name of which he could not recall) "that we were contracting with as opposed to directly with the tribal lending entity."[168] The GPL arrangement was eventually structured so that the tribal entity compensated Curry directly rather than such payments being made through TF.[169]

116. In addition to the separate agreement that formed the individual three tribal lending enterprises, there was a single Administrative Agency Agreement

---

[165] *Id*. at 3 (App. 1900) (Section 2.1).
[166] Exhibit P-243, TF-PA-013418, Great Plains Lending: Flow of Funds for Ongoing Loan Origination and Sales (App. 1442) (*see* ¶ 6).
[167] Rees Dep. 149:19-151:2 (App. 0058); 195:20-196:24 (App. 0069).
[168] Rees Dep. 182:11-183:13 (App. 0066)
[169] Harvison Dep. 163:9-164:17 (App. 0434).

UNSEALED

between the TF entity TCAS and GPLS.[170] Under the agreement, and as is detailed *infra* ¶¶ 165-177, TF handled all of the money flows pertaining to the product, including the flow of funds to and from GPLS from tribal entity accounts as well as reimbursement of all program related expenses incurred by the tribal entities, and payment of the "participation fees" owed to the tribal entities.[171] TF also agreed to purchase from GPLS, at face value, the subrogation rights and repayment interests in all loans over sixty-days past due.[172] Finally, TF's compensation for its role as administrative agent of GPLS was an "administrative agent fee" set as all of the remaining, residual funds in the GPLS accounts after the payment of expenses and participation fees to the tribal entities and the agreed upon return to the GPLS investors.[173] In other words, through the administrative agent fee, TF was entitled to all the economic upside of the lending operation.

117.    Accompanying the Administrative Agency Agreement that applied collectively to the three tribal lending products, there also was a Guaranty and Security

---

[170] Exhibit P-35, TF-PA-000241, Third Amended and Restated Administrative Agency Agreement, October 4, 2011 (App. 0711).

[171] *Id.* at Section 2.2 (App. 0720-0722).

[172] *Id.* at Section 2.9 (App. 0724).

[173] *Id.* at Section 2.6(b)(i) (App. 0723) (authorizing payment of "Agent Fee"), Section 1.1 (App. 0712) (defining "Agent Fee").

41

UNSEALED

Agreement in which TF guaranteed all of the obligations of its subsidiary entities and secured that guaranty with a security interest in all of TF's assets in favor of GPLS.[174]

118.    Signing the Administrative Agency Agreements and the Guaranty and Security Agreements for TF or the TF subsidiary entities was Defendant Rees.

119.    The initial cash used to fund the Plain Green loans to consumers was provided pursuant to two Credit Agreements, both dated March 18, 2011. Under a Credit Agreement between Plain Green LLC ("PG") and Haynes Investments, Inc. ("HII"), Haynes provided a $2 million line of credit to PG, at 5% interest, "to assist [PG] with the funding of a certain installment loan program."[175] At the same time, under a Credit Agreement between HII and TF, TF provided Haynes a $2 million credit facility, at the same 5% interest, "for the funding of a certain installment loan program."[176] In other words, TF lent Haynes the money to be used to fund the loans to consumers, and Haynes, in turn, lent that same money to the tribal lending entity.[177] According to CFO Lutes, the reason for doing it this was that he was more confident of his ability to go

---

[174] TF-PA-000119, Amended and Restated Guaranty and Security Agreement, March 18, 2011 (App. 1794); GPLP215765, Second Amended and Restated Guaranty and Security Agreement, July 31, 2012 (App. 2991).
[175] Exhibit P-244, TF-PA-000491, Credit Agreement between Steven Haynes and Plain Green, March 18, 2011 (App. 1443).
[176] Exhibit P-245, TF-PA-001231, Credit Agreement between Steven Haynes and Think Finance, March 18, 2011 (App. 1456).
[177] Haynes Dep. 152:12-154-2 (App. 0592)

UNSEALED

after Haynes rather than a tribal entity in the event of nonpayment of the line of credit.[178]

120. In the two later tribal lending deals, Great Plains Lending and MobiLoans, the loans to consumers were funded using a different funding source: a reserve account established by GPLS and administered by TF in its capacity as the Administrative Agent.[179]

## 2. *Additional Agreements with Outside Service Providers*

121. TF also entered into a number of agreements with outside, third-party vendors that performed services essential to the tribal lending enterprises. One of the most important of these vendor relationships was with payment processors that, using banks they arranged, handled the electronic transfers of loan proceeds and loan payments in and out of consumer bank accounts via the ACH system. Without reliable access to the ACH network, Defendant Rees observed in a memo to the TF Board, "there is no business."[180]

122. One of the early payment processors arranged by Think Finance to process payments for the tribal lending enterprises was a North Dakota company

---

[178] Lutes Dep. 172:23-175:13 (App. 0210-0211).

[179] Lutes Dep. 184:16-186:4 (App. 0213-0214); Deposition of Linda Rogenski 99:5-100:17 ("Rogenski Dep.) (App. 0487); *see also* Exhibit P-35, TF-PA-000241, Third Amended and Restated Administrative Agency Agreement, October 4, 2011, at 10 (App. 0721) (section 2.2(j)) (obligation of Administrative Agent includes "funding and managing Reserve Accounts").

[180] TF-PA-672268, Memo from Ken Rees to Think Finance Board Members, June 18, 2013, at 2 (App. 2700); *see also* Nguyen Dep. 259:23-260:12 (App. 0523).

UNSEALED

named "Intercept." Intercept produced a May 5, 2011 application for service by Plain Green, LLC, which states that First Bank of Delaware is currently processing payments but that the bank "has decided to cease ACH processing altogether."[181] A notation on the first page of the application states "TF will provide guarantee."[182]

123.    TF did, in fact, provide Intercept with an unlimited guaranty of all amounts due to Intercept in connection with the payment processing services it provided the three tribal lending enterprises.[183]

124.    A consultant charged with analyzing TF's lending operation for VPC wrote, "My understanding from our conversation with Think resulted in a reasonable level of comfort that Intercept was completely at the direction of Think, and it is unlikely that they would do anything adverse to Think/VPC interests."[184]

---

[181] INTERCEPT00001, Plain Green ACH Application to Intercept, May 5, 2011, at 2 (App. 2923).

[182] *Id*. at 1 (App. 2922); *see also* Intercept_PA-Think-01-0001, 5-Star Risk Level Rating for Mobiloans, LLC, September 21, 2011 (App. 2915) (noting that Intercept's assessment of financial capacity "was based on financials of Think Finance"); Intercept_PA-Think-01-00160, 5-Star Risk Level Rating for Great Plains, LLC, June 29, 2012 (App. 2915-1) (assigning highest financial rating, noting that "customer is part of ThinkCash/ThinkFinance family of companies").

[183] INTERCEPT000035, Commercial Guaranty (Plain Green), May 12, 2011 (App. 29354); Intercept_PA-Think-01-00163, Commercial Guaranty (Great Plains), June 24, 2011 (App. 2919); Intercept_PA-Think-01-00075, Commercial Guaranty (Mobiloans), September 20, 2011 (App. 2916).

[184] GPLP00227447, Email from Christopher Haney (Duff & Phelps) to Tom Welch, October 9, 2012 (App. 3037).

UNSEALED

125.     Up until February 2013, Intercept handled the payment processing for both TF's "direct" product, PayDay One, and for the three tribal lending products.[185] Intercept used First Premier Bank for processing PayDay One ACH transactions, and Bay Cities Bank for the three tribal products.[186]

126.     Intercept ceased processing payments when the bank it was using to originate ACH transactions (the Originating Depository Financial Institution or "ODFI") for the TF products ceased allowing Intercept access to the ACH network.[187] The same thing happened with subsequent payment processors that Think found and then lost.[188]

127.     In 2013 there was a federal regulatory initiative called Operation Chokepoint that put pressure on banks doing ACH processing for the high-rate lending industry.[189] During this period, it was the "number one priority" of TF's CFO Lutes to talk with potential ACH processors and ODFIs, an effort concerning which he gave Defendant Rees "frequent updates."[190]

---

[185] TF-PA-237167, ACH Processor Change Timeline Spreadsheet and Cover Email, June 5, 2014 (App. 2201).
[186] *Id*.
[187] TF-PA-297015, Email from Chris Lutes to Thomas Welch, August 14, 2013 (App. 2223) (relevant information contained in Mr. Lutes's inline responses to Mr. Welch's initial email at App. 2223-2224).
[188] *Id*.
[189] Lutes Dep. 209:20-210:7 (App. 0220).
[190] *Id*. at 224:9-22 (App. 0223).

UNSEALED

128.     When Lutes reported to Rees in a June, 2013 email that the ACH providers and banks wanted to contract directly with TF rather than the tribal entities, Rees expressed concern that: "If we have to process for the tribe will the customer know the payment is for the tribal loan or will it say think finance?"[191] Lutes responded as follows:

> Customer will not know. Money is still coming from the tribe and the descriptor on the customer's bank statement won't change (will say Plain Green, Great Plains, etc). ACH providers and banks just don't like all the tribal court, sovereign immunity stuff in the agreements that the tribes insert in and would rather just deal with us.[192]

Rees responded, "Perfect."[193]

129.     Starting in September 2013, TF used a Canadian payment processor named ███████, which used the Bank of Montreal as its ODFI.[194] The agreement with ███████ was directly with TF, not with the tribal lending entities.[195]

130.     Another subsequent ACH processor, ████████████, contracted directly with TF in March 2014.[196] Defendant Rees signed the agreement with ███████ on behalf of TC Decision Sciences.[197]

---

[191] TF-PA-347438, Emails between Ken Rees and Chris Lutes, June 15, 2013 (App. 2273).
[192] Id.
[193] Id.
[194] TF-PA-237167, ACH Processor Change Timeline Spreadsheet and Cover Email, June 5, 2014 (App. 2201).
[195] TF-PA-244562, Service Agreement between ███████ and TF, September 1, 2013 (App. 2202).
[196] TF-PA-178453, ACH Processing Service Agreement, March 20, 2014 (App. 2151).
[197] TF-PA-178453, ACH Processing Service Agreement, March 20, 2014, at 11 (App. 2161).

UNSEALED

131.    On October 2, 2017, Intercept pleaded guilty in this Court to operating an illegal money transmittal business, in violation of 18 U.S.C. § 1960, from May 2008 to August 2013, regarding "processing payments for payday loan companies to and from borrowers who resided in jurisdictions that had laws effectively prohibiting payday lending." Intercept Corporation's Supplemental Sentencing Memorandum, November 13, 2018, Doc. 35, Case 2:17-cr-00491-ER (E.D. Pa.).

132.    The Intercept plea was part of a larger RICO prosecution that focused on the online payday lending empire of Charles Hallinan, who, the Government alleged, used "sham business agreements with federally-recognized Indian tribes" to create a "sovereign" front for his business in an effort to avoid state usury laws.[198]  Hallinan was convicted on multiple counts and sentenced to 14 years.[199]

133.    One of the Government's witnesses against Hallinan was, Adrian Rubin, another online lender who used arrangements with Native American tribes to evade state law and was sentenced to 37 months imprisonment.[200]

---

[198] Superceding Indictment, *U.S.A. v. Charles M. Hallinan*, et al., No. 2:16-cr-00130-ER, Doc. 87 (Dec. 1, 2016), ¶¶ 20-21. Echoing the Commonwealth's allegations in this case, the Government further alleged that "the tribes did not provide the money advanced for the payday loans, service the loans, collect on the loans, or incur any losses if the borrowers defaulted," which "functions were conducted solely by non-tribal payday lenders, such as defendant CHARLES M. HALLINAN and the Hallinan Payday Loan Companies. The tribes' sole function was to act as false fronts for the Hallinan Payday Loan Companies and assert "sovereign immunity" whenever necessary to evade the laws of the Prohibited Payday Lending States and the Regulated Payday Lending States." *Id*.
[199] Judgment in a Criminal Case, No. 2:16-cr-00130-ER, Doc. 87 (July 6, 2018).
[200] *U.S.A. v. Adrian Rubin*, No. 2:15-cr-00238-ER (E.D.Pa.).

UNSEALED

134. Claudia Callaway, the attorney who provided the regulatory advice underlying both TF and CashCall's tribal lending enterprises, also, at some time, provided regulatory advice to Hallinan and Rubin regarding their "bank model" payday lending businesses.[201]

135. Another important set of vendor relationships concerned the call centers in Pennsylvania, New York, Utah, South Carolina, and Mexico that handled customer service and collection calls for the tribal lending enterprises.[202] Included among these outsourced vendors was a Pennsylvania company named MetaSource, that handled customer service calls with Plain Green and Great Plains Lending customers, and a New York company named CMS that handled customer service calls for MobiLoans and collections for all three tribal products.[203]

---

[201] Deposition of Claudia Callaway ("Callaway Dep.") 26:17-29:6 (App. 0625-04 – 0625-05) (represented Hallinan's "bank model" payday lending "service provider"); 65:17-82:18 (Rubin) (App. 0625-06 – 0625-10).
[202] *See*, *e.g.*, Harvison Dep. 256:1-257:12; 232:6-233:21 (App. 0442-0443, 0440-0441); Deposition of Neal Humphrey 34:24-35:25 ("Humphrey Dep.) (App. 0527); Exhibit P-153, TF-PA-014425, Map of Call Centers and Table Detailing Serviced Products, July 31, 2012 (App. 1365-1366); TF-PA-400620, Email from Jason Harvison to VPC, July 31, 2012 (App. 2299) (email to which call center map was attached). For a complete list of the call center vendors, by date and tribal entity, see Defendant Think Finance's Response to Interrogatory No. 13 (App. 0007-0009).
[203] TF-PA-400620 at TF-PA-400622, Email from April Sealy to Thomas Welch, July 23, 2012 (App. 2301).

**UNSEALED**

136.     TF provided guarantees to both MetaSource and CMS on behalf of the

tribal lending entities,[204] and it managed the flow of work to these outside vendors.[205]

137.     There were also call centers on the tribal lands associated with the three

products that handled some of the volume of customer service calls.[206]

## F.   The Purported Non-Applicability of State and Federal Law Disclosed in the Loan Agreements

138.     The loan agreements that consumers entered into electronically on the

tribal entity websites were form agreements that had the same language across states.[207]

This was in contrast to the direct lending products, where the loan agreements had to

conform to the law of the particular state.[208]

139.     The initial disclosures in the installment loan agreements offered by Plain

Green and Great Plains during the time period relevant to this action specify that tribal

law applies and expressly disclaim the application of state and federal law:

---

[204] GPLP00050534, MetaSource Guaranty Agreement (Plain Green), November 9, 2012 (App. 2982); TF-PA-381374, MetaSource Guaranty Agreement (Great Plains), November 9, 2012 (App. 2276); TF-PA-398175, CMS Guaranty Agreement (Mobiloans) (App. 2290); *see also* Harvison Dep. 188:4-14 (App. 0437) (confirming that "during the early days," TF guaranteed payments owed by the tribal lending entities to these vendors "to get the partners comfortable with signing a contract with a tribal entity").

[205] Smith Dep. 252:15-255:5 (App. 0570-0571) (TF Compliance head, testifying that, of September 2014, all of the collections calls were being done by outside vendors and that a TF group headed by Gio Rodriguez was monitoring the work of these agencies).

[206] Exhibit P-153, TF-PA-014425, Map of Call Centers and Table Detailing Serviced Products, July 31, 2012 (App. 1365-1366).

[207] Cutrona Dep. 31:3-32:5 (App. 0530-2).

[208] Smith Dep. 23:19-24:5 (App. 0556).

**UNSEALED**

**Plain Green**

**This Loan Agreement (the "Agreement") is subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana ("Chippewa Cree").** In this Agreement, 'you' and 'your' refer to the Borrower Identified above. 'We', 'us', 'our', and 'Lender' refer to **Plain Green, LLC,** a lender authorized by the laws of the Chippewa Cree. 'Loan' means this consumer installment loan. By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the Chippewa Cree Tribal Court, and further agree that **no state or federal law or regulation shall apply to this Agreement**, its enforcement or interpretation.[209]

**Great Plains**

**This Loan Agreement (the "Agreement") is subject solely to the exclusive laws and jurisdiction of the Otoe-Missouria Tribe of Indians, a federally recognized Indian Tribe.** In this Agreement, 'you' and 'your' refer to the Borrower Identified above. 'We', 'us', 'our', and 'Lender' refer to **Great Plains Lending, LLC,** a lender authorized by the laws of the Otoe-Missouria Tribe. 'Loan' means this consumer installment loan. By executing this Agreement, you hereby acknowledge and consent to be bound to the terms of this Agreement, consent to the sole subject matter and personal jurisdiction of the Otoe-Missouria Tribe of Indians Tribal Court, and further agree that **no state or federal law or regulation shall apply to this Agreement**, its enforcement or interpretation.[210]

140.   In both the Plain Green and Mobiloans consumer loan contracts, a "Governing Law" clause was present for the entire period of the complaint that expressly disclaims the application of all state law as follows:

**Plain Green**

**GOVERNING LAW.** This Agreement and the Agreement to Arbitrate are governed by the Indian Commerce Clause of the Constitution of the

---

[209] PAOAG-0001808, Plain Green Loan Agreement, November 7, 2011 (App. 2947); *see also* GPLP00005917, Plain Green Loan Agreement, May 12, 2013 (App. 2968).

[210] PAOAG-0001766, Great Plains Loan Agreement. October 9, 2011 (App. 2937); PAOAG-0002977, Great Plains Loan Agreement, August 8, 2013 (App. 2956).

UNSEALED

United States of America and the laws of the Chippewa Cree Tribe. We do not have a presence in Montana or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of **any state** of the United States.[211]

### Mobiloans

**GOVERNING LAW.** This Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution and other applicable federal law. We do not have a presence in Louisiana or any other State of the United States of America. Neither this Agreement nor the Lender is subject to the laws of **any State** of the United States.[212]

141.     As of 2013, this same "Governing Law" provision was included in the

Great Plains loan agreement:

### Great Plains

**GOVERNING LAW.** This Agreement and the Agreement to Arbitrate are governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Otoe-Missouria Tribe of Indians. We do not have a presence in Oklahoma or any other state of the United states of America. Neither this Agreement nor the Lender is subject to the laws of **any state** of the United States.[213]

---

[211] PAOAG-0001808, Plain Green Loan Agreement, November 7, 2011 (App. 2950-2951); GPLP00005917, Plain Green Loan Agreement, May 12, 2013 (App. 2975).

[212] TF-PA-212895, Mobiloans Credit Agreement, July 5, 2012 (App. 2195); TF-PA-567143, Mobiloans Credit Agreement, June 5, 2013 (App. 2532). The original Mobiloans credit document had a single Governing Law provision that included both the Agreement and Agreement to Arbitrate, where the later versions had a distinct Governing Law provision for each element. *See* TF-PA-212882, Mobiloans Credit Agreement, September 26, 2011 (App. 2175) ("This Agreement and the Agreement to Arbitrate are governed. . .").

[213] PAOAG-0002977, Great Plains Loan Agreement, August 8, 2013 (App. 2961).

**UNSEALED**

142.     Sometime in early 2013, the final acknowledgments of both the Plain

Green and Great Plains agreements were also amended to include a provision

reiterating that tribal law applied to the exclusion of state law.

**Plain Green**
I understand, acknowledge and agree that Plain Green, LLC is a tribal
lending entity wholly owned by Chippewa Cree Tribe of Rocky Boy's
Indian Reservation, a federally recognized tribe. I further understand,
acknowledge and agree that this loan is governed by the laws of the
Chippewa Cree Tribe and is not subject to the provisions or protections of
the laws of my home state or any other state.[214]

**Great Plains**
I understand, acknowledge and agree that Great Plains Lending, LLC is a
tribal lending entity wholly owned by Otoe-Missouria Tribe of Indians, a
federally recognized tribe. I further understand, acknowledge and agree
that this loan is governed by the laws of the Otoe-Missouria Tribe of
Indians and is not subject to the provisions or protections of the laws of
my home state or any other state.[215]

143.     All these agreements contained "transfer of rights" clauses that maintain

that choice of law and venue would remain exclusively tribal even if the participation

interests would be transferred to GPLS:

**Plain Green**
**Transfer of Rights and Maintenance of Register**: . . . Regardless of any
transfer, this Agreement shall remain exclusively subject to the laws and
courts of the Chippewa-Cree Tribe.[216]

**Great Plains**
**Transfer of Rights and Maintenance of Register**: . . . Regardless of any

---

[214] GPLP00005917, Plain Green Loan Agreement, May 12, 2013 (App. 2976).

[215] PAOAG-0002977, Great Plains Loan Agreement, August 8, 2013 (App. 2962).

[216] PAOAG-0001808, Plain Green Loan Agreement, November 7, 2011 (App. 2949);
GPLP00005917, Plain Green Loan Agreement, May 12, 2013 (App. 2972).

**UNSEALED**

transfer, this Agreement shall remain exclusively subject to the laws and courts of the Otoe-Missouria Tribe of Indians.[217]

**Mobiloans**
**TRANSFER OF RIGHTS** . . . Regardless of any transfer, this Agreement shall remain exclusively subject to the laws and courts of the Tribe. As an integral component of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal courts for the purposes of this Agreement.[218]

144.    All these agreements contain arbitration provisions with several references to the exclusive applicability of tribal law and jurisdiction including the agreement to arbitrate clause, the right to opt out clause, and the applicable law and judicial review clause:

**Plain Green**
**Agreement to Arbitrate**: You agree that any dispute (defined below) will be resolved by arbitration in accordance with Chippewa Cree tribal law.

**Right to Opt Out**: . . . In the event you opt out of this agreement to arbitrate, any disputes hereunder shall nonetheless be governed under the laws of the Chippewa-Cree Tribe and must be brought within the court system thereof.

**Applicable Law and Judicial Review:** THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHIPPEWA-CREE TRIBE. The arbitrator will apply the laws of the Chippewa Cree Tribe and the terms of this Agreement,

---

[217] PAOAG-0001766, Great Plains Loan Agreement, October 9, 2011 (App. 2942); PAOAG-0002977, Great Plains Loan Agreement, August 8, 2013 (App. 2959-2960).
[218] TF-PA-212895, Mobiloans Credit Agreement, July 5, 2012 (App. 2191-2192); TF-PA-567143, Mobiloans Credit Agreement, June 5, 2013 (App. 2529); *see also* TF-PA-212882, Mobiloans Loan Agreement, September 26, 2011 (App. 2172-2173) (reading ". . . the laws and courts of the Tunica-Biloxi Tribe of Louisiana . . .").

**UNSEALED**

including the Agreement to Arbitrate. . . . The arbitrator will make written findings and the arbitrator's award may be filed with the tribal court. The arbitration award . . . may be set aside by the tribal court upon judicial review.[219]

### Great Plains

**Agreement to Arbitrate:** You agree that any dispute (defined below) will be resolved by arbitration in accordance with the law of the Otoe-Missouria Tribe of Indians."

**Right to Opt Out:** . . . In the event you opt out of this agreement to arbitrate, any disputes hereunder shall nonetheless be governed under the laws of the Otoe-Missouria Tribe of Indians and must be brought within the court system thereof."

**Applicable Law and Judicial Review:** THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE OTO-MISSOURIA TRIBE OF INDIANS. The arbitrator will apply the laws of the Otoe-Missouria Tribe of Indians and the terms of this Agreement, including the Agreement to Arbitrate. . . . The arbitrator will make written findings and the arbitrator's award may be filed with the tribal court. The arbitration award . . . may be set aside by the tribal court upon judicial review.[220]

### Mobiloans

**Agreement to Arbitrate.** You agree that any Dispute (defined below) will be resolved by arbitration in accordance with Tribal Law.

**DISPUTE RESOLUTION . . .** IN THE EVENT YOU OPT OUT OF THIS AGREEMENT TO ARBITRATE, ANY DISPUTES HEREUNDER SHALL NONETHELESS BE GOVERNED UNDER THE LAWS OF THE TUNICA-

---

[219] PAOAG-0001808, Plain Green Loan Agreement, November 7, 2011 (App. 2950); GPLP00005917, Plain Green Loan Agreement, May 12, 2013 (App. 2973-2975).

[220] PAOAG-0002977, Great Plains Loan Agreement, August 8, 2013 (App. 2960-2961). The "Applicable Law and Judicial Review" clause was added to the Great Plains arbitration section sometime in 2013. *See* PAOAG-0001766, Great Plains Loan Agreement, October 9, 2011 (App. 2941-2942).

UNSEALED

BILOXI TRIBE OF LOUISIANA AND MUST BE BROUGHT WITHIN THE COURT SYSTEM THEREOF, TO WHOSE JURISDICTION YOU IRREVOCABLY CONSENT FOR THE PURPOSES OF THIS AGREEMENT.

**CHOICE OF ARBITER . . .** Any arbitration under this Agreement may be conducted either on Tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than Tribal Law.

**WAIVER OF JURY TRIAL AND WAIVER OF ABILITY TO PARTICIPATE IN CLASS ACTION.** The arbitrator has the ability to award all remedies available under the laws of the Tunica-Biloxi Tribe of Louisiana, whether at law or in equity, to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual Disputes between the parties. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration is to be determined solely by a court of competent jurisdiction of the Tunica-Biloxi Tribe of Louisiana, and not by the arbitrator. If the court refuses to enforce the class wide arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide arbitration, the parties agree that the Dispute will proceed in Tribal court and will be decided by a Tribal court judge, sitting without a jury, under applicable court rules and procedures and may be enforced by such court through any measures or reciprocity provisions available. As an integral component of accepting this Agreement, you irrevocably consent to the jurisdiction of the Tribal courts for purposes of this Agreement.

**JUDICIAL REVIEW** The arbitrator will apply the laws of the Tunica-Biloxi Tribe of Louisiana and the terms of this Agreement, including the Agreement to Arbitrate. . . The arbitration award . . . may be set aside by the Tribal court upon judicial review.[221]

---

[221] TF-PA-212895, Mobiloans Credit Agreement, July 5, 2012 (App. 2192-2195); TF-PA-567143, Mobiloans Credit Agreement, June 5, 2013 (App. 2530-2532); *see also* TF-PA-212882, Mobiloans Loan Agreement, September 26, 2011 (App. 2173-2175) (reading ". . . the laws and courts of the Tunica-Biloxi Tribe of Louisiana . . .").

UNSEALED

GOVERNING LAW. This Arbitration Agreement is governed by the laws of the Tunica-Biloxi Tribe of Louisiana, the Indian Commerce Clause of the United States Constitution, the Federal Arbitration Act ("FAA") and the decisions of the United States Supreme Court interpreting the FAA, and any other applicable federal law. . . . Neither this agreement nor the lender is subject to the laws of any State of the United States. [222]

## II. Under Defendant Rees' Direction, Think Finance Operated the "Tribal" Lending Enterprises, Received Most of the Revenues Generated by Them, and Assumed Virtually All of the Economic Risk

### A. TF Conducted All the Marketing Activity for the Enterprises

145. TF employed multiple marketing channels to generate loan applications for the tribal lending operations, including direct mail offers, search-engine ads, and lead generation.[223] TF defined each of these different channels in its interrogatory answers.[224]

---

[222] TF-PA-212895, Mobiloans Credit Agreement, July 5, 2012 (App. 2195); TF-PA-567143, Mobiloans Credit Agreement, June 5, 2013 (App. 2531-2532); *see also* TF-PA-212882, Mobiloans Credit Agreement. September 26, 2011 (App. 2175) (using a single governing law clause to cover both the agreement and the agreement to arbitrate).

[223] Exhibit P-274, TF-PA- 683403, Think Finance Business Plan, April 2013, at 9 (App. 1481) (Rees authored description of the different marketing channels used by TF); Exhibit P-119, TF-PA-670174, Tribal Lending Update, April 15, 2011, at 66 (App. 1091); Harvison Dep. 103:16-105:3 (App. 0426-0427) (explaining differences between affiliate, paid search, direct mail and lead generation).

[224] *See* Think Finance Defendants' Response to Plaintiff's First Set of Interrogatories, No. 16, March 17, 2017 (App. 0012-0015) (Direct Marketing=providing potential customers with either pre-qualified offers or invitations to apply; Lead Generation=purchasing leads from third-party websites based on pre-set criteria and prices; Affiliate=paying third-party sites to direct potential customers to the tribal lending websites via banner ads or text links; Search Engine Marketing=ads that appear alongside the search results yielded by a search engine).

UNSEALED

146.    Through TF's simultaneous management of the marketing for all the tribal products, it was able to assign a particular marketing channel to one or more of the tribal lending websites.[225]

147.    At the same time, TF was also managing marketing campaigns for its direct loan products. For example, this provided TF with the opportunity in states where both Rise and the tribal products were offered to favor Rise in the routing of new customer business.[226]

148.    By directing the marketing for all the products, TF was able to develop each product for distinctive submarkets. For example, in the case of Great Plains Lending ("GPL"), which charged a higher interest rate than Plain Green for the installment loans offered on that site, TF branded GPL as the product "for those that needed a 'Second Chance' for a loan."[227]

149.    The role of the tribal lending entities was to approve marketing campaigns devised by TF.[228]

---

[225] Exhibit P-119, TF-PA-670174, Tribal Lending Update, April 15, 2011, at 66 (App. 1091) (Multiple Sites = Differentiation").

[226] Nguyen Dep. 141:1-25 (App. 0515) (discussing Exhibit P-179, TF-PA-521098, Tribal Vision and Roadmap Exec Offsite Slides and Cover Email, July 2013, at 9 (App. 1388)).

[227] Nguyen Dep. 162:20-165:22 (App. 0520-0521) (discussing Exhibit P-179, TF-PA-521098, Tribal Vision and Roadmap Exec Offsite Slides and Cover Email, July 2013, at 12 (App. 1391)); *see also* Rees Dep. 132:17-22 (App. 0053); Exhibit P-119, TF-PA-670174, Tribal Lending Update, April 15, 2011, at 66 (App. 1091) (slide indicating differentiation of tribal websites by marketing channel and product types).

[228] Deposition of Bobbi Jo Favel 23:7-21 ("Favel Dep.") (App. 0405); Bankruptcy Deposition of Billi Ann Raining Bird 101:5-11 ("Raining Bird Bankr. Dep.") (App. 0621).

UNSEALED

**B. TF's Technology Platform Performed the Loan Approvals**

150.    TF used the same "legacy" technology platform to power its earlier payday lending program, as well as all of its installment loan programs, including Plain Green, Great Plains Lending, and its direct product, Rise.[229] The MobiLoans line-of-credit program was powered by a different platform called "CoreCard."[230]

151.    The "risk and analytics" component of the two platforms, meaning the technology that evaluated loan applications and rendered a decision, was the same across all products, direct and indirect.[231]

152.    In making its original decision in 2010 to invest in TF's "indirect," ThinkCash program, VPC observed that TF's "approval process is fully automated and gives the customer a loan decision within seconds."[232]

153.    In 2014, during the spinoff of Elevate Credit, TF described its technology platform as follows:

> The loan management software used…is an internally developed loan software system. … [TF's] employees link multiple functions to… the softwares to make them fully operational according to [TF's] needs. For example, the softwares are linked to (i) the product's website to draw necessary information, (ii) the risk analytics software for the approval or rejection of applicants, (iii) the ACH provider network to facilitate loan

---

[229] Rees Dep. 130:22-132:12 (App. 0053).

[230] *Id.* 130:17-21 (App. 0053); Smith Dep. 175:18-176:5 (App. 0569)

[231] Rees Dep. 132:9-12 (App. 0053).

[232] Exhibit P-305, GPLP00448749 at GPLP00448752, VPC ICM, July 28, 2010, at 9 (App. 1549).

UNSEALED

disbursement and loan repayment, and (iv) the credit bureaus to enable reporting of a customer's loan status.[233]

154.    This TF software is what performed all of the customer loan approvals,[234] which would include all approvals of the loans made to Pennsylvania consumers.

155.    The lending operations, including automatic approvals, were essentially the same for all three of TF's tribal entities.[235]

156.    TF explained this similarity as follows:

…each of these products rely on substantially the same management and operational activities, know-how, and experience and the conduct of the activities associated with each of the products has been performed by officers, management and employees who are either the same persons or persons with substantially the same skill sets.[236]

157.    VPC, for its part, described the loan approval process as follows to a potential outside investor in the tribal lending program:

While the tribes are technically approving each loan, Think owns and licenses their underwriting technology to them and Think ultimately decides at what risk levels they are willing to allow. Driver here for the tribe to abide by Thinks' risk guidance is that technically Think could decide that a group of riskier loans were made to customers and Think could ultimately refuse to purchase the participations. This has never

---

[233] TF-PA-735160, Think Finance, Inc., KPMG Opinion on the U.S. Federal Tax Consequences of the Spin-Off of Elevate Credit, Inc., May 1, 2014, at 13 (App. 2777).

[234] Callnin Dep. 28:3-7 (App. 0448) (regarding TC Decision Sciences approving all loans).

[235] See Exhibit P-157, TF-PA-454508, Email from Linda Rogenski to Nina Vitagliano, October 21, 2014 (App. 1367) ("The Marketing, Licensing and Participation Agreements are generally the same across the tribes.").

[236] TF-PA-735160, Think Finance, Inc., KPMG Opinion on the U.S. Federal Tax Consequences of the Spin-Off of Elevate Credit, Inc., May 1, 2014, at 45-46 (App. 2809-2810).

UNSEALED

happened as the Tribe always looks to Think for managing the appropriate underwriting levels/borrower risk.[237]

158. The tribal entities were not permitted to see the proprietary risk scores assigned by the TF loan management software to customer applications, which determined whether an application was approved or rejected.[238]

159. Despite the fact that automated loan approvals were being performed by the TF technology platform, TF created computer interfaces with the tribal entities that, on a daily basis, would list the customers approved by the system. The purpose of this interface was to give the tribal entities the opportunity to try to block the funding of a particular loan if they wanted to, but in the case of Mobiloans this interface did not work, and in the case of Plain Green the tribal entity employees were not performing this function.[239] Whether or not the interface worked or was used, absent some affirmative act by someone at the tribal level to stop an approved loan from being funded, the loan would be funded by the TF system.[240]

**C. TF's Role in the Funding of the Loans**

160. As described above, through the Participation Agreements that GPLS had with each of the tribal lending entities, the GPLS Fund owned 99% of the value of all the loans originated by those entities. TF was itself required by VPC to hold a substantial

---

[237] GPLP00542710, Email of Thomas Welch, August 2012. (App. 3043-3044).
[238] Deposition of Kim Palermo by the Consumer Financial Protection Bureau, Vol. 1, April 7, 2016, 161:15-162:10 ("Palermo Dep.") (App. 0625).
[239] Smith Dep. 146:12-176:9 (App. 0562-0569).
[240] *Id.* 150:15-151:9 (App. 0563).

**UNSEALED**

portion of the investment shares in GPLS. Under the terms of the Guaranty and Security Agreements, both initially and as they were amended and revised over the course of the scheme, TF was obligated to commit 15% to 25% of GPLS's capital, in the form of shares in GPLS, as pledged collateral for VPC's investment.[241]

161.    Pursuant to these terms, from the formation of GPLS up until the present action, TF owned between 19% and 28% of the shares in GPLS, with an investment value ranging from $16 million to $76 million when GPLS was at its peak, meaning that TF funded that portion of the loans made in the name of the tribal entities.[242]

162.    Even though TF owned 19-28% of the shares in GPLS, the entire GPLS portfolio, representing 99% of all of the "tribal" loan balances, was reported by TF as a corporate asset on its audited consolidated financial.[243] This was in accordance with Generally Accepted Accounting Principles ("GAAP") that required TF to classify GPLS as a "variable interest entity" of TF because TF "has both (1) the power to direct the

---

[241] *See, e.g.*, TF-PA-000119, Amended and Restated Guaranty and Security Agreement, March 18, 2011, at 14-15, 35, 8 (App. 1807-1808, 1828, 1801) (reading ¶¶ 2. "Pledged Collateral", 6(a)(v)(A). "Covenants: Loan to Value Ratio", and 1(eee). "Loan to Value Ratio" to obligate TF to maintain a commitment of 25% of capital); GPLP00215765, Second Amended and Restated Guaranty and Security Agreement, July 31, 2012, at 18, 29, 9 (App. 3008, 3019, 2999) (reading ¶¶ 2. "Pledged Collateral", 6(a)(v)(A). "Covenants: Loan to Value Ratio", and 1(jjj). "Loan to Value Ratio" to obligate TF to maintain a commitment of 15% of capital).

[242] Based on figures calculated from P-303, GPLP00223298, GPLS Share Register, March 11, 2016 (App. 1509-1513).

[243] TF-PA-414604, Consolidated Financial Statements and Report of Independent Certified Public Accountants: Think Finance, Inc. and Subsidiaries, December 31, 2013 and 2012, at 18 n.5 (App. 2335).

UNSEALED

activities of [the separate entity] that most significantly impact the entity's economic performance and (2) the obligation to absorb losses of the entity that could potentially be significant to the . . . entity."[244]

163.     Besides this described role in the funding of the 99% portion of the loans originated by the tribal lending entities, TF also funded the 1% interest retained by Plain Green, by way of the Credit Agreement (signed by Defendant Rees) that loaned Haynes Investments $2 million in lending capital that Haynes, in turn, loaned to Plain Green.[245]

164.     Defendant Rees personally worked in concert with VPC to promote investments in the GPLS fund. This included lining up a substantial investment from a TF board member,[246] and traveling with the principals of VPC to a foreign country at the end of 2012 to persuade the sovereign wealth fund of that country to invest.[247] Among the issues that this institutional investor raised for discussion at the meeting was "the legal/regulatory issues related to high interest lending and the use of tribes."[248] Rees brought with him a presentation he authored, entitled "Company Overview,"

---

[244] *Id*. at 18 n.5 (App. 2335).
[245] *See supra* at ¶¶ 97-98, 119.
[246] TF-PA-641759, Emails between TF and VPC, August 10, 2012 (App. 2582-2583).
[247] TF-PA-310806, Email thread from November 2012 between TF and VPC executives (App. 2228-2236).  This discovery document has been redacted to conceal the name and identifying details of the institutional investor. By redacting this information in this document, the Commonwealth in no way waives any rights it may have to use this document in un-redacted form in the future in the course of this litigation. The Commonwealth is prepared to provide the Court with an un-redacted copy should the Court so desire.
[248] *Id*. at TF-PA-310810 (App. 2232).

UNSEALED

which, with regard to TF's Plain Green, Great Plains Lending and MobiLoans products,

represented that the "Regulatory Model" for these products worked because: "Tribes

[are] allowed to export rates off reservation."[249] He cited "[c]ase law from California and

Colorado Supreme courts [which] upheld sovereign right of 'arm of the tribe' to

conduct tribal lending businesses without state interference or regulation."[250]

### D. TF Administered All the Accounting and Cash Management, Including the Collections from Consumer Bank Accounts

165.    Section 2.2 of the Administrative Agency Agreement between TC

Administrative Services ("TCAS") and GPLS (which was signed on behalf of TCAS by

Defendant Rees)[251] lists the following among the services that TCAS would perform for

GPLS with regard to the three tribal lending enterprises:

- daily loan settlement reporting and accounting;

- disbursing funds for the purchase of the participation interests from a Purchasing Account it would adminster;

- depositing into a Collection Account it would administer the funds collected from consumer repayments on their loans;

- paying the Service Fee due to the tribal entities provided by the particular Participation Agreement;

---

[249] TF-PA-677353, Company Overview Slides with Transmittal Email from Ken Rees, November 30, 2012, at 9 (App. 2739).

[250] *Id*. at 17 (App. 2747).

[251] Exhibit P-35, TF-PA-000241, Third Amended and Restated Administrative Agency Agreement, October 4, 2011 (App. 0711).

**UNSEALED**

- funding and managing the Reserve Accounts used to fund the initial advances to consumer borrowers;

- paying the interest due to the GPLS investors; and

- paying all expense reimbursements.

All of these duties were performed by the Finance Department of TF in Fort Worth.[252]

166. TF personnel had authority to move money in and out of the tribal entities' bank accounts and the GPLS bank accounts. TF used the Wells Fargo "CEO" tool in order to maintain access to Plain Green accounts.[253] Great Plains Lending and MobiLoans, both provided TF with "view access" and "access to set up wires" for their accounts.[254]

167. TF's control over the tribal entities' bank accounts was explained by VPC to an investor as follows: "For PG, the tribe cannot set up wires for that account . . . but PG only has the ability to release wires. Further, in the event PG wasn't willing to release a wire Think set up, Think can go through a few administrative channels to

---

[252] Callnin Dep. 137:3-142:9 (App. 0467-0468).
[253] Rogenski Dep. 123:17-128:3 (App. 0490-0491); Exhibit P-32, "Commercial Electronic Office" Portal of Wells Fargo, available at https://www.wellsfargo.com/com/ceo (App. 0706). As Rogenski explained to VPC, when inquiring about the basis for TF's control over Plain Green accounts, "Since Think Finance is the administrator of the [Wells Fargo] CEO then we ultimately have the ability to manage the access of the accounts." GPLP00048680, Email from Linda Rogenski to Thomas Welch, November 15, 2012, at GPLP00048680-81 (App. 2980-2981).
[254] Rogenski Dep. 129:1-130:17 (App. 0492); *see also* Exhibit P-25, TF-PA-318531, Daily Cash Instructions, May 21, 2012 (App. 0678-0686) (describing tribal and GPLS bank accounts that TF personal monitored and executed wires to and form).

UNSEALED

ultimately get the funds released w/o PG approval. For the other two tribes, Think is actually the Admin on the accounts."[255]

168.    Each of the tribal entities had one bank account out of which loans were funded and a separate "collections" account.[256]

169.    To begin the process of funding new loans, TF would "determine [the] necessary amount to be wired to [the] ACH Service Provider in order to maintain minimum balance requirements (generally, the amount necessary needed to meet minimum is the amount of principal dollars funded the prior day)."[257] TF would then wire from the tribal funding accounts to the ACH processor the cash anticipated as necessary to fund the next day loan approvals .[258]

170.    At the end of each day, after TF had approved the day's portfolio of loans, TF sent a data transmission to an account associated with each tribal entity at the ACH

---

[255]  GPLP00315783, Email from Thomas Welch to James Masciello, December 11, 2012 (App. 3041); *see also* Rogenski Dep. 133:9-17 (App. 0493) (noting that Plain Green allowed TF "to release the wire without" their express approval).

[256] Callnin Dep. 54:18-55:3 (App. 0451).

[257] TF-PA-378980, Standard Operating Procedure #300-40 Daily Wire Transfers, March 21, 2012 (App. 2274) (Item 1.2); *see also* Callnin Dep. 119:7-12, 120:11-17 (App. 0462).

[258] Callnin Dep. 56:3-14 (App. 0451); TF-PA-378980, Standard Operating Procedure #300-40 Daily Wire Transfers, March 21, 2012 (App. 2274) (Item 1.3); *see also* Callnin Dep. 64:14-18 (App. 0453) (confirming that TF had to "make sure that 100% of the loan fundings was in the hands of the ACH provider").

UNSEALED

processor, in effect, instructing the payment processor to fund those loans in the approved amounts to those customers' bank accounts.[259]

171.    Correspondingly, every day, and for each tribal entity, TF sent a data transmission to the ACH processor, indicating the payment amounts to be collected from the consumers' accounts.[260]

172.    After holding the payments collected from customer's accounts for four days, to ensure that the majority of any ACH returns were processed, the ACH processor remitted the funds to the tribal entity's collection account.[261]

173.    On a daily basis, TF transferred (a) from a GPLS account it administered into the respective tribal funding account the amount needed to reflect the 99% participation purchase[262] and (b) from the tribal collection accounts to the GPLS account amounts sufficient to reflect the value of GPLS' 99% participation interests in the loan

---

[259] Callnin Dep. 56:3-57:12 (App. 0451-0452); *see also* Exhibit P-26, TF-PA-540675 at TF-PA-540678, Discussion of Daily Cash Movement and Cover Email, November 19, 2012 (App. 0691-0694) (diagramming and describing cash flows for funding and collections on loans).

[260] Callnin Dep. 57:14-58:14 (App. 0452); *see also* Exhibit P-26, TF-PA-540675 at TF-PA-540678, Discussion of Daily Cash Movement and Cover Email, November 19, 2012 (App. 0691-0694) (diagramming and describing cash flows for funding and collections on loans).

[261] Callnin Dep 56:3-58:22 (App. 0451-0452); *see also* Exhibit P-26, TF-PA-540675 at TF-PA-540678, Discussion of Daily Cash Movement and Cover Email, November 19, 2012, at "Tab-1" (App. 0692) ("Intercept holds the collected funds for 4 days to ensure that the majority of returns are processed.").

[262] Callnin Dep. 61:22-62:15 (App. 0453).

UNSEALED

payments collected out of consumer bank accounts, effectively leaving only 1% of the collections in the tribal accounts.[263]

174.     With regard to the wire transfers coming out of the tribal funding and collection accounts, TF asked the tribal entities to approve these transfers, consistent with a TF-drafted Standard Operating Procedures.  However, if the tribal entity did not provide approval in time, TF had authority to independently process the wire transfer to GPLS.[264]

175.     A daily cash activity report prepared by the TF Finance Department regarding each of the tribal lending enterprises was sent to Defendant Rees.[265]

176.     Pursuant to the Participation Agreements' terms, GPLS agreed to reimburse the tribal entities for all reasonable out-of-pocket expenses, including the various TF service fees.[266]

---

[263] Callnin Dep. 57:14-58:22 (App. 0452); 136:7-25 (App. 0466).
[264] TF-PA-378980, Standard Operating Procedure #300-40 Daily Wire Transfers, March 21, 2012 (App. 2274-2275) (Item 2.9) ("…so long as such wire transfers are in the ordinary course of business, and consistent with past practices…"); *see also* Callnin Dep. 173:9-174:11, 182:20-186:18 (App. 0476, 0478-0479) (discussing Exhibit P-38, TF-PA-096707, Draft SOP and Email Thread, January 30, 2015 (App. 0747) regarding revisions to SOP and applicability to other tribes).
[265] Callnin Dep. 133:3-16 (App. 0466); Exhibit P-34, TF-PA-684666, Email from Amy Nay to Ken Rees, October 4, 2013 (App. 0708) (example of daily cash reporting email discussed at Callnin Dep. 133:3-16 (App. 0466)).
[266] *See, e.g.,* Exhibit P-131, TF-PA-000039, Participation Agreement (Plain Green), March 18, 2011, at 10 (App. 1201) ("…including, but not limited to, expenses arising under the Credit Agreement, Marketing Agreement and License Agreement, legal and due diligence costs, direct marketing expenses, licensing expenses, actual NSF charges, service fees, credit scoring costs, identity verification costs, Teletrack fees, trademark and URL fees, and other related expenses incurred by PGI [Plain Green].").

UNSEALED

177. On a monthly basis, employees in the TF Finance Department simultaneously prepared invoices from the TF entities (Tailwind and TC Decision Sciences) to the tribes related to marketing, licensing, and servicing fees along with corresponding invoices from the tribes to GPLS seeking reimbursement in the same amounts.[267] TF employees then prepared all the wire transfers necessary to pay the offsetting invoices, including wires from the tribal accounts to TF and wires from GPLS to the tribal accounts.[268] As confirmed by the accounting operations controller for TF,[269] the effect of these offsetting invoices and wire transfers was that "in the end, the tribe wasn't actually paying anything; it was GPLS that was paying it."[270]

## E. TF Decided in Which States the Enterprises Would Operate, Based on a State-by-State Evaluation of the Risk of Enforcement Action

178. Prior to the tribal lending period, when TF was still using First Bank of Delaware as the originator of its installment loan product, TF and FBD collectively decided in which states to operate the program based on a state-by-state analysis conducted by their respective attorneys.[271]

---

[267] Callnin Dep. 76:16-88:21-13 (App. 0456-0459); *see also* Rogenski Dep. 243:8-244:7 (App. 0495); Exhibit P-27, TF-PA-325814, Email from Linda Rogenski to Matthew Govek, September 10, 2012 (App. 0695) (sending both sets of invoices to the tribe "just for your information as we will do all the cash transfers concerning the invoices.").
[268] Callnin Dep. 88:11-90:25 (App. 0459-0460).
[269] *Id*. at 10:1-5 (App. 0447).
[270] *Id*. at 154:23-155:1 (App. 0471).
[271] Cutrona Dep. 151:2-154:16 (App. 0543-0544).

**UNSEALED**

179.     TF was aware that the Attorney General of West Virginia had already challenged the similar "bank model" program of TF's competitor, Cash Call, taking the position that Cash Call, rather than its partner bank, was the "true lender" and that therefore federal bank preemption protections would not apply. Accordingly, while ThinkCash loans were offered in Pennsylvania, they were not offered in West Virginia.[272]

180.     After FBD withdrew from the ThinkCash program and TF began looking for a tribal partner to become the originating lender for its installment loan program, Defendant Rees saw this as an opportunity to expand the product's penetration into all states except West Virginia and South Dakota.[273]

181.     Two years into the tribal lending venture, however, TF decided to be more selective concerning the states where it would operate.  It brought in two lawyers—one of them Claudia Callaway, the regulatory counsel who it consulted in setting up the program originally—to conduct a state-by-state assessment of the risk of challenge by an attorney general's office.[274]

182.     At the time, none of the tribal products were being marketed in Colorado, West Virginia, and New Hampshire, plus each of the individual tribal products were

---

[272] *Id.* 155:20-161:10 (App. 0544-0546).
[273] Exhibit P-118, TF-PA-476861, Memorandum from Ken Rees to Think Finance Board Members, November 17, 2010, at 2 (App. 1080).
[274] Cutrona Dep. 94:22-97:20 (App. 0537-0538).

UNSEALED

not offered in the state where the tribal reservation was located.[275]  As a result of the risk

analysis conducted by the two attorneys, the following states were added to what TF

called its "No-State List":  Arkansas, Georgia, New York, Minnesota, Maine, Maryland,

Missouri and Illinois.[276]

183.    Regarding the role of TF in making this state-by-state decision, Rees

testified that "we had a perspective on states where there would be more litigation,

more challenges."[277]

184.    Over time, TF "no-stated" additional states. In its answers to

interrogatories, TF provided a list of the dates when the three tribal programs exited

particular states.[278]

185.    TF's state-by-state analysis, as of July 1, 2014, was shared with VPC and,

therefore, is not protected by attorney-client privilege.[279] In it, the previously "no-

stated" states were classified as "Tier 5" states with "High" or "Moderate-to-high"

---

[275] Exhibit P-388, TF-PA-267158, Email March 27, 2013 ("Final No state Lists for PG, GPL, Mobi") (App. 1615-1616).

[276] *Id.*

[277] Rees Dep. 267:22-270:1 (App. 0087-0088) (explaining that the tribes were advised by their respective counsel not to lend in their home states, but that as to the other states, the decision was "consistent" based on the work of "a consistent group of . . . attorneys").

[278] Think Finance Defendants' Response to Plaintiff's First Set of Interrogatories, No. 18, March 17, 2017 (App. 0017-0020).

[279] Exhibit P-213, GPLP00023496, State-by State Analysis, January 19, 2015 (App. 1438-1441).

UNSEALED

likelihood of enforcement.[280] Pennsylvania was classified as a "Tier 4" state, with "low to moderate risk of enforcement."[281]

186.     In an email dated November 20, 2013, responding to a question about why particular states are excluded, CFO Chris Lutes provided the following explanation to an officer of Bank of Montreal, which for a time processed ACH transactions for the tribal lending enterprises: "The below states are states where the tribes we partner with currently do not lend. They may choose not to lend in a state for variety of reasons, probably the primary one being the state's attorney general (litigious, negative attitude toward tribal lending, etc.).[282]  Despite this suggestion that the No-State list was somehow a choice made by the tribal entities, there is no evidence in the discovery record that the tribal entities participated in the "No-State" decision, let alone made it themselves.

187.     In an internal communication within VPC, in August 2013, Tom Welch, who was in charge of the TF account, reported, "Due to the current regulatory climate, Think has strategically decided to exit tribal lending in certain states (11 in total) it views as 'high-risk.'"[283]

---

[280] *Id.*, at "Page 3 of 3" (App. 1441).

[281] *Id.*

[282] Exhibit P-255, TF-PA-228363, Email from Chris Lutes to BMO, November 20, 2013 (App. 1468).

[283] GPLP00008863, Email of Thomas Welch to Matthew Coad, August 12, 2013 (App. 2977).

**UNSEALED**

188.    This action was originally filed in the Court of Common Pleas on

November 13, 2014.[284]

189.    On November 25, 2014, TF classified Pennsylvania as a "No-State,"

meaning that its technology platform would no longer accept applications for new loans

or cash advances from Pennsylvania consumers. [285]

190.    Although the "no-stating" of Pennsylvania signified the end of marketing

to new customers in November 2014, TF continued to collect on existing Pennsylvania

loans during the pendency of this case.[286]

**F.  TF's Dominant Economic Interest in the Enterprises**

191.    During the tribal period, TF's audited consolidated financial statements

reflected the 99% participation interests in loans originated by the tribal entities and

purchased by GPLS as assets of TF.[287]

---

[284] Complaint, *Commonwealth v. Think Finance, Inc.*, Case. No. 1359, November Term, 2014 (Pa. Ct. Comm. Pls., Phila. Cty. Nov. 13, 2014).

[285] Think Finance Defendants' Response to Plaintiff's First Set of Interrogatories, No. 18, March 17, 2017 (App. 0017-0020).

[286] *See* GPLP00221032, Internal VPC Email, November 13, 2015 (App. 3036) (describing the following activity in its Think Finance investment, in the context of this pending litigation: "Legacy loans in Pennsylvania continue to amortize and the portfolio has continued to decline to $1.2 million in eligible receivables outstanding . . . From a regulatory risk standpoint, Think continues to triage states accordingly on an on-going basis to help mitigate any potential future lawsuits filed by state AGs."); GPLP00043809, VPC "For Deal Slide" (App. 2979) (reporting that in 2016 TF had reduced the Pennsylvania portfolio "to less than $50,000 in principal outstanding").

[287] TF-PA-414604, Consolidated Financial Statements and Report of Independent Certified Public Accountants: Think Finance, Inc. and Subsidiaries, December 31, 2013 and 2012, at 18 n.5 (App. 2335).

**UNSEALED**

192.     The consolidated financial statements refer to Generally Accepted

Accounting Principles ("GAAP") as the basis for requiring TF to classify GPLS as a

"variable interest entity" under TF because TF "has both (1) the power to direct the

activities of [the separate entity] that most significantly impact the entity's economic

performance and (2) the obligation to absorb losses of the entity that could potentially

be significant to the . . . entity."[288]

193.     TF's consolidated financial statements note that GPLS was "determined to

be [a] VIE and though the Company does not hold direct ownership interests in the

entities, it qualifies as the primary beneficiary of the entities. … The consolidated

financial statements include the accounts of [GPLS], including the participated loan

balances and the notes payable balance."[289]

---

[288] TF-PA-414604, Consolidated Financial Statements and Report of Independent Certified
Public Accountants: Think Finance, Inc. and Subsidiaries, December 31, 2013 and 2012, at 18 n.5
(App. 2335).
[289] TF-PA-414604, Consolidated Financial Statements and Report of Independent Certified
Public Accountants: Think Finance, Inc. and Subsidiaries, December 31, 2013 and 2012, at 18 n.5
(App. 2335).

**UNSEALED**

194.     TF's financial records[290] regarding its tribal lending operation from its inception in 2011 to December 31, 2014 indicate that the tribal lending operation generated $1.507 billion in revenue. [291]  That revenue was disbursed by TF as follows:

a.   $14.59 million was disbursed among the tribes reflecting the income generated by their 1% retained interest in program loans.[292]

b.   $303.71 million was nominally disbursed to the tribes as reimbursement for operating expenses.[293] Of that, at least $261.78 million was concurrently wired from the tribal accounts to TF in payment for those same services, as noted above.[294] The remaining $41.93 million covered other operating expenses of the tribes, primarily payments made to outside vendors, who were selected by TF and paid by TF through TF-controlled tribal accounts, including lead generators, ACH processors, and collections centers.[295]

c.   $41.12 million was disbursed as operating expenses directly incurred by GPLS.[296]

---

[290] These figures are based upon summations of values contained in the "P&L Trend" worksheets of the following spreadsheets of the tribal and GPLS spreadsheets maintained by TF: TF-PA-447483, Plain Green Lending Financial Results December 2014 (App. 2399-2408); TF-PA-447481, Great Plains Lending Financial Results December 2014 (App. 2381-2388); TF-PA-447482, Mobiloans Lending Financial Results December 2014 (App. 2389-2398); TF-PA-455405, GPLS Financial Results December 2014 (App. 2409-2418). The summations are collected in Exhibits A and B to the Declaration of David Nagdeman ("Nagdeman Decl.").

[291] Sum of $1.492 billion from Exhibit A to Nagdeman Decl. ("Finance Charges") (representing the income from the 99% participation interests owned by GPLS) and $14.59 million from Exhibit B to Nagdeman Decl., ("Cash Finance Charges on 1% Retained").

[292] Exhibit B to Nagdeman Decl. ("Cash Finance Charges on 1% Retained").

[293] Exhibit B to Nagdeman Decl. ("Reimbursements from GPLS Fund").

[294] Exhibit A to Nagdeman Decl. (sum of "Marketing Fees," "IT Licensing Fees," and "Processing Fees"). *But see* Exhibit B to Nagdeman Decl. (where the sum of the marketing, licensing, and servicing fees accounted for on the tribal accounts totaled $271.51 million).

[295] *See, e.g.*, TF-PA-447483, "Current Month P&L" tab (App. 2391) (Mobiloans) (listing external vendors covered under "Other Reimbursable Expenses" line).

[296] Exhibit A to Nagdeman Decl. ("Operating Expenses").

UNSEALED

d. $110.05 million was disbursed to VPC and its investors as interest on its shares held in GPLS.[297]

e. $31.91 million was disbursed to TF as interest on its shares held in GPLS.[298]

f. $62.76 million was disbursed among the three tribes as "Profit-sharing Fees" that reflected the "Service Fees" mentioned in the respective Participation Agreements, noted in *supra* ¶¶ 106, 109, 110.[299]

g. $955.72 million was disbursed to TF as "Admin Agency Fees," which was the residual of all GPLS program income after all expenses had been removed, pursuant to the terms of the Administrative Agency Agreement between TCAS and GPLS noted in *supra* ¶ 116.[300]

195. In sum, TF received $955.72 million as Admin Agency Fees, at least $261.78 million for lending related service fees nominally paid to the tribal entities, and $31.91 million as return on its own investment in GPLS, for a total of $1.249 billion. VPC and its investors received $110.05 million, so that together, VPC and TF received $1.359 billion of the total $1.507 billion in revenue, or 90.18%. Whereas the tribal entities only received $77.35 million, or 5.13%.

---

[297] Exhibit A to Nagdeman Decl. ("Fixed Return Payment").
[298] Exhibit A to Nagdeman Decl. ("Interest Expense on Notes Payable to TF").
[299] Exhibit B to Nagdeman Decl. ("Profit Share for [Tribe]").
[300] Exhibit B to Nagdeman Decl. ("Admin Agency Fees (Paid)/Reimbursed").

UNSEALED

196.    The revenue derived by TF from the tribal lending operation from interest

charges paid by Pennsylvania consumers from 2011 until 2016 is as follows:[301]

| | |
|---|---|
| Through Great Plains | $15,556,193 |
| Through Plain Green | $69,202,553 |
| Through MobiLoans | $23,757,642 |
| **Total:** | **$108,516,388** |

## III.    After Initially Taking Steps to Fortify TF's Model from Regulatory Challenge, Defendant Rees Changed Course, Abandoning Both the Tribal Model and TF, and Fled into the New Spin-Off Company, Taking with Him His Top Personnel and TF's Technology

197.    From the outset of TF's tribal lending venture, there was awareness that,

as VPC put it, "[r]egulatory risk, especially for payday loan products, continues to be

the primary concern for investors in this space," and an awareness that in several states,

including Pennsylvania, these products are illegal.[302]

198.    Despite the early revenues from the tribal lending enterprises exceeding

expectations,[303] and despite Defendant Rees' confident messaging about the solidity of

---

[301] Think Finance Defendants' Response to Plaintiff's First Set of Interrogatories, Nos. 3 and 4, March 17, 2017 (App. 0002-0006).

[302] P-305, GPLP00448749 at GPLP00448767, Investment Committee Memorandum, February 28, 2011, at 13 (App. 1568).

[303] Exhibit P-283, TF-PA-710229, Rees Memo to Think Finance Board Members, April 13, 2011, at 2 (App. 1495) (describing volume of Plain Green loans during first month of operation); TF-PA-438416, Rees Memo to Think Finance Board Members, June 14, 2012, at 2 (App. 2377) (characterizing TF "tsunami" growth as being driven by Plain Green and Great Plains portfolio).

**UNSEALED**

the venture's underlying legal foundation,[304] internal communications within TF

reflected a more cautious assessment of the regulatory risk facing the tribal model.[305]

199.    TF's own counsel on Native American law cautioned the company that

the insulation from state enforcement actions enjoyed by sovereign tribes did not mean

that tribes could ignore state law with regard to business activities conducted outside

sovereign land, and that "the applicability of a law, even if unenforceable against a tribe

or certain wholly owned tribal business entities, may be of consequence to non-tribal

service providers or vendors."[306]

200.    In June 2012, the Consumer Financial Protective Bureau issued a Civil

Investigative Demand on TF.[307]

---

[304] *See, e.g.,* TF-PA 301261, Rees-Authored Fact Sheet for Media Inquiries Regarding Plain Green Loans (App. 2227) ("Tribal lending is legal and here to stay").

[305] *See, e.g.,* Exhibit P-141, TF-PA-290895, Enterprise Risk Analysis Interview Results Workbook, Harvison Tab, September 2011 (App. 1306) (Interview of Jason Harvison, Executive V. P. for Products on "regulatory/compliance" risk facing the company: "70% of company revenue is tied to the sovereign model which is a fairly new business model and subject to regulatory scrutiny.") In her interview, General Counsel Sarah Cutrona, had a similar view. Exhibit P-404, TF-PA-290895, Enterprise Risk Analysis Interview Results Workbook, Cutrona Tab, September 2011 (App. 1633) ("Reliance upon the tribal model for the ILP product could result in increased litigation exposure since this is a very gray area for case law.")

[306] Exhibit P-414, TF-PA-725617, "Tribal Sovereignty as the Foundation of Indian Nation Economic Development and the Complex Role of Federal and State Governments:  A White Paper Prepared at the Request of Think Finance," at 16-17 (App. 1776-1777) (identified by Sarah Cutrona as the "Patton-Boggs White Paper" that was shared with institutional investor, Cutrona Dep. 219:20-221-10 (App. 0551-0552)).

[307] TF-PA-641838, CFPB CID to TF, June 12, 2012 (App. 2584).

UNSEALED

201.    By the end of 2012, in its internal communications among executive and

with the three tribal lending entities, TF discussed the following "concerns" regarding

the tribal model:

- "Concern that although tribes have sovereign immunity, service providers (eg us) may have potential liability
- States may claim that the loans are illegal (even if tribal lenders have sovereign protections)
- States may claim that the tribe is not the 'true lender'
- Recent cases have suggested potential liability."[308]

202.    Included in the company's suggested responses to these concerns—which

it characterized as "aiding and abetting" and "true lender" concerns[309]--were the

following suggested changes to the program in order to "Improve optics":  "No

automatic end of day funding—require daily tribal" and "Eliminate guarantees to

vendors from TF."[310]

203.    As of 2013, TF's tribal lending model accounted for 89% of TF's overall

revenue.[311]

204.    In a PowerPoint presentation Defendant Rees prepared for an off-site

executive meeting on March 28, 2013 on the topic "Direction and Focus",[312] Rees

---

[308] Exhibit P-149, TF-PA-369516, Strengthening the Tribal Model and Program Update Slides, December 20, 2012, at 3 (App. 1356).

[309] *Id.*

[310] *Id.* at 5 (App. 1358).

[311] Exhibit P-179, TF-PA-521098, Tribal Vision and Road Map, July 2013, at 5 (App. 1384).

[312] Exhibit P-399, TF-PA-759909 (App. 1617) (discussed in Cutrona Dep. 66:13-68:10 (App. 0532)).

UNSEALED

observed that the company's heavy reliance on its tribal products meant that "We Are Not Adhering to Our Diversification Strategy,"[313] and that "Industry Opponents" were putting pressure on ACH providers and targeting "tribal service providers."[314]

205.    In this presentation, Rees described various steps the company should take in order to "Reduce Tribal Risks (Restructure)," including "increase tribal management and oversight," "reduce contractual roles for Think Finance" "improve deal optics," and "Exit high-risk states."[315] Regarding this last step, he noted that it was already "Done,"[316] referring to the No-State initiative described above.

206.    In this presentation, Rees also directed the following additional strategic "Refocus": "Accelerate growth of non-tribal business."[317]

207.    One component of the tribal "restructure" Rees had in mind was to redesign the tribal share from being a percentage of GPLS revenue to a 51% share of "profit."[318] But in a communication to Richard Levy, the owner of VPC, concerning that proposed change, Rees assured Levy that the change would not change the substance of

---

[313] *Id.* at 3 (App. 1619).
[314] *Id.* at 4 (App. 1620).
[315] *Id.* at 6 (App. 1622).
[316] *Id.* at 7 (App. 1623).
[317] *Id.* at 5 (App. 1621).
[318] TF-PA-055009, Email Jason Harvison to Ken Rees, March 7, 2013 (App. 2141) ("To reiterate what you want, you want the tribe to get 51% program share and adjust the license fees accordingly.").

**UNSEALED**

the parties' relative economic stake, but instead "should greatly change the 'optics' of the deal."[319]

208.     In a May, 2013 communication with the lawyer representing Plain Green and MobiLoans, GC Cutrona requested a change in the contractual language defining the relationship between TF and the tribal entity, so that unreimbursed expenses would be listed rather than reimbursed expenses, explaining her reasoning as follows: "I understand this is a bit backwards but we are concerned (as are the other attorneys) that the perception that expenses are reimbursed will not be helpful in a true lender challenge.[320]

209.     An April 2013 TF presentation entitled "Tribal Restructure," included a question and answer section: "Why do we need to restructure the model" and "[W]hat is the risk to the business?"  The answer to these questions was: "States may argue that the tribe is not the 'true lender' due to TF's involvement."[321]

210.     The tribal "restructure" initiative was also viewed by the TF executives as essential for their plan to take the company public with an IPO.[322]

---

[319] GPLP00058913, Email from Ken Rees to Richard Levy, March 29, 2013 (App. 2989-2990).
[320] TF-PA-398605, Email from Sarah Cutrona, May 29, 2013 (App. 2297-2298).
[321] Exhibit P-185, TF-PA-611730, Tribal Restructure Slides and Transmittal Email, April 2013, at 19 (App. 1414).
[322] TF-PA-579753, Q1 2013 Pre-IPO Investors Memo/Opinion (App. 3069).

UNSEALED

211.    In a memo to the TF board on June 18, 2013, Rees reported some progress on the strategic initiative intended to compliment the tribal "restructure," involving accelerating the growth in the company's non-tribal products, mentioning the launch of the Rise product that would take the place of the direct product, PayDay One.[323] In August, Rees further reported to the board that "we are working on making sure that we can quickly and seamlessly migrate customers from the tribal sites to applicable Rise states if needed."[324]

212.    On August 5, 2013, New York State sent cease-and-desist letters to online lenders, including Great Plain Lending, threatening "appropriate action to protect New York consumers."[325] In response, the Otoe-Missouria tribe filed suit against New York, seeking a preliminary injunction and "alleging that the State's effort to regulate Tribal lending is an affront to Plaintiffs' inherent sovereignty and violates the Indian Commerce Clause of the United States Constitution."[326]

213.    TF, through its Chief Integrity Officer, Martin Wong, coordinated that litigation that was filed in the name of the Otoe-Missouria tribe and provided financing

---

[323] TF-PA-672268, Memo from Ken Rees to Think Finance Board Members, June 18, 2013, at 1 (App. 2699).
[324] TF-PA-514535, Memo from Ken Rees to Think Finance Board Members, August 14, 2013, at 4 (App. 2435).
[325] *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).
[326] *Id.* at 357.

**UNSEALED**

for it, through contributions made to the Native American Financial Services Association.[327]

214.     On August 20, 2013, VPC notified Rees and Lutes that it was going to put a halt to all participation purchases from the tribal entities, but was persuaded by them to allow some loans to be made to some former customers.[328]

215.     In his September 18, 2013 memo to the TF board, Rees noted, "We are waiting on tenterhooks to learn the outcome of the challenge against New York State," expressed the view that "many judges are more supportive of states' rights despite hundreds of years of case law regarding tribal sovereignty," and acknowledged newly hired Martin Wong for having "jumped into the fray by leading the litigation effort."[329]

216.     In this same memo, Rees informed the Board that VPC had put a temporary halt to new tribal loans due to the "regulatory issues we've been facing."[330] He also expressed "frustration . . . at our inability to complete the tribal restructuring

---

[327] Rees Dep. 242:19-244:20 (App. 0081). The plan had been to file the action on behalf of each of TF's tribal partners, but by the time the attorneys were ready to file, only the Otoe tribe had agreed.  *See* Exhibit P-198, TF-PA-607086, Email from Martin Wong to David Bernick, August 21, 2013 (App. 1423).  Bernick's legal bill appears to have been split between TF and the MacFarlane Group, *see* Exhibit P-200, TF-PA-367337, Legal Bill and Transmittal Email (App. 1425), that being one of the organizations associated with Mark Curry, the online lender that was the intermediary between TF and the Otoe-Missouria Tribe. *See supra* ¶¶ 114-115.
[328] TF-PA-680466, Emails between Thomas Welch and Chris Lutes, August 20-21, 2013 (App. 2749-2751) (cc'ing Ken Rees and Richard Levy).
[329] TF-PA-513939, Memo from Ken Rees to Think Finance Board Members, September 18, 2013, at 1, 4 (App. 2428, 2431)
[330] *Id*. at 1-2 (App. 2428-2429).

UNSEALED

[due to] [t]he tribes . . . moving extremely slowly."[331] Summing up his view of the

regulatory situation, he observed, "It is a very dangerous time for financial services

industry as a whole when the primary regulatory agencies (CFPB and FDIC) are being

run by activists . . . in pursuit of their anti-credit agenda."[332]

217.    On September 30, 2013, the district court in New York denied the request

of the Otoe-Missouria for a preliminary injunction.[333]

218.    On October 16, 2013, Rees reported this development to the board, and

noted that "due to the unexpectedly negative tone of the judge's decision in the New

York case GPLS has pulled back again until the appeal is resolved."[334] He expressed

optimism regarding an appeal, but warned "that it doesn't really matter if we have a

regulatory cloud over the company while it winds its way through the courts," and

noted, "We will also need to discuss options for moving forward given the ongoing

regulatory challenges related to the tribal products (and the upside from the non-tribal

products)."[335] With regard to the non-tribal installment loan (Rise) that TF had recently

---

[331] *Id.* at 2 (App. 2429).

[332] *Id.* at 3 (App. 2430).

[333] *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

[334] TF-PA-711121, Memo from Ken Rees to Think Finance Board Members, October 16, 2013, at 2 (App. 2757).

[335] *Id.* at 3 (App. 2758).

UNSEALED

launched, Rees reported that "the first direct mail campaign for Rise has hit and is delivering great volumes."[336]

219.   In his December 11, 2013, memo to the TF board, Rees reported increasing growth of the Rise portfolio in the 14 states covered at that time, and introduced the possibility of a new direction for the company:

> As mentioned during the previous Board meeting we are evaluating a rather draconian organizational change that we are referring to as "Project Exclaim." This would spin off several products (Rise, Sunny, and Elastic) t separate the tribal and non-tribal businesses.  This will cause a fair amount of staff upheaval but is likely the right thing to do from the standpoint of potential liquidity events. I will propose the details (and discuss the implications) at the Board meeting on Friday.[337]

220.   By January 2014, the "Project Exclaim" initiative was moving forward, as Rees reported to the board.[338]  On the tribal side of the business, he had notified the three tribes of "our plans to split the company," and noted with approval "how Chris and his treasury team are managing the bank" and the "terrific job" that "Martin and his tribal litigation team did  . . . with the appellate hearing."[339]  At the same time, he reported that "the directors and leaders in the company are getting charged up about

---

[336] *Id.*

[337] TF-PA-724033, Memo from Ken Rees to Think Finance Board Members, December 11, 2013, at 3 (App. 2762).

[338] TF-PA-710924, Memo from Ken Rees to Think Finance Board Members, January 16, 2014 (App. 2752).

[339] *Id.* at 3 (App. 2754).

UNSEALED

the work ahead and excited to be able to create a business without the regulatory overhang of the tribal business."[340]

221. On March 13, 2014, CFO Lutes explained the following two reasons for the impending spin-off:

1. We have always focused on having multiple products for regulatory diversification. Our tribal partners are in litigation with the state of NY and this could last for years. They have chosen to not aggressively grow their business while this gets resolved. Meanwhile our non-tribal products are really starting to grow. Rise now our largest product and we expect to generate almost $300mm in revs this year off of non-tribal. The tribal litigation would hold up our ability to go public. Spinoff enables the new entity to go public and allows Think (tribal business) to turn in to a dividend play.

2. ACH and corporate banking issues again weighing down non-tribal business. Spin off should allow easier ACH and corporate banking access.[341]

222. In order to be able to accomplish the spinoff transaction envisioned by TF's "Project Exclaim" initiative, Rees personally engaged with VPC to support the transition away from the tribal model and to raise cash for the Rise product. As Tom Welch, the VPC principal in charge of the account stated, "Rise doesn't happen w/o GPLS' cooperation."[342]

---

[340] *Id*. at 4 (App. 2755).
[341] Exhibit P-267, TF-PA-210850, Email from Badr Qureshi to Chris Lutes, March 13, 2014 (App. 1471).
[342] Exhibit P-328, GPLP00016131, Email from Thomas Welch to Richard Levy, January 16, 2014 (App. 1578).

UNSEALED

223.    Rees and Lutes pushed successfully for that cooperation, for example, suggesting to VPC that it move its investment from GPLS to RISE, albeit at a lower rate;[343] securing VPC permission to redeem $50m of GPLS investments without a pre-payment penalty;[344] securing permission to "gross sweep" certain GPLS accounts enabling TF to take its "administrative agent fee" before it was fully earned in order to create more cash for RISE originations;[345] and, notwithstanding contractual covenants to GPLS that forbid TF from incurring debt, securing permission to incur debt for Rise from a different VPC investment vehicle.[346]

224.    Effective May 1, 2014, TF split into two companies, with Elevate Credit, Inc. taking Rise and the other "direct" products and TF keeping only the tribal products.[347]

225.    In the split, Elevate got a copy of the "legacy" technology platform on which the Plain Green, Great Plains Lending and Rise products were supported, with no valuation being assigned to that transfer.[348]

---

[343] TF-PA-244634, Email from Chris Lutes, October 2, 2013 (App. 1471).
[344] GPLP00015862, Email from Richard Levy to Ken Rees, January 14, 2014 (App. 2978).
[345] Welch Dep. 100:24-103:3 (App. 0608-0609).
[346] Welch Dep. 238:24-240:4 (App. 0616).
[347] TF-PA-564956, Separation and Distribution Agreement, May 1, 2014 (App. 2436).
[348] Lutes Dep. 274:9-277:5 (App. 0236-0237).

UNSEALED

226.    Among the contracts transferred to the new company was the employment contract between Defendant Rees and TC Loan Services, Inc.[349]

227.    While in his new position as CEO of Elevate Credit, Defendant Rees remained as the Chairman of TF's board into 2015.[350]

228.    On May 2, 2014, when he was CEO of Elevate but still the Chairman of TF, Rees personally requested the owner of VPC to allow a small increase in the volume of new tribal loans.[351]

229.    In his first memo to the newly created Elevate board, Rees observed that "we are learning . . . that forecasting for Rise growth is very challenging given the huge variance in loan size, APR, CPL and terms for each state."[352]

230.    On October 1, 2014, a panel of the Second Circuit unanimously affirmed the district court's denial of the tribal request for a preliminary injunction against the New York enforcement action. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).

231.    On May 15, 2015, after Rees had stepped down as Chairman of the TF board, he wrote to the new incoming chair with the following "offline" comments about

---

[349] TF-PA-564956, Separation and Distribution Agreement, May 1, 2014, at Schedule 1.21(d) (App. 2493).
[350] Rees Dep. 64:23-65:6 (App. 0036-0037).
[351] TF-PA-297788, Email from Richard Levy to Ken Rees, May 2, 2014 (App. 2226).
[352] TF-PA-643587, Memo from Ken Rees to Elevate Board Members, May 14, 2014, at 1 (App. 2614).

**UNSEALED**

the existing tribal business and the new CEO's plans for bringing on a new tribal

partner:

> --Tribal deals are going sideways (MBL dysfunctional with inadequate
> tribal mgmt., PG trying to play hardball for greater profits, GPL ok, but
> mainly because another service provider has done a better job of building
> a relationship with them). We have only minimal daily interactions with
> the tribes (IMO) and haven't built an effective relationship management
> team that can stay close to tribal councils and lending operations and help
> build up key capabilities (and jobs on the reservation) for long-term
> success. I don't see TF mgmt. making this a top priority. Obviously Martin
> would disagree with my assessment.
> --New tribe may just be "grass is always greener." All of things that
> Martin sees in the new tribe were things we also liked about the tribes we
> initially worked with.[353]

232.    On October 23, 2017, TF filed a bankruptcy petition under Chapter 11 in

the Northern District of Texas.[354]

233.    While the old company withered, Rees and his new company flourished.

According to filings submitted to the SEC by Elevate, as its CEO and Chairman Rees

received total compensation in the years 2015 to 2017 of $1.667 million (2015), $2.567

million (2016), and $5.337 million (2017).[355]

---

[353] REES_0000001, Email from Kenneth Rees to John Drew, May 15, 2015 (App. 2966).

[354] Petition for Bankruptcy, *In re: Think Finance, LLC*, No. 17-33964, Dkt. No. 1 (Bankr. N.D. Tex. Oct. 23, 2017).

[355] Amendment No. 6 to SEC S-1 Registration Statement, Elevate Credit, Inc., filed on March 27, 2017 (App. 3056), full text available at https://www.sec.gov/Archives/edgar/data/1651094/000119312517096406/d310075ds1a.htm (section titled "Executive compensation") (covering years 2015 and 2016); Schedule 14A Proxy Statement filed with SEC, Elevate Credit, Inc., filed on April 4, 2018 (App. 3061), full text available at https://www.sec.gov/Archives/edgar/data/1651094/000119312518107128/d470008ddef14a.htm (section titled "Executive compensation") (covering years 2016 and 2017).

UNSEALED

## IV.  The Role of Defendant National Credit Adjusters, LLC in the Tribal Lending Enterprise

234.     As stated by its current CEO, Tyler Rempel, at a deposition pursuant to Rule 30(b)(6), Federal of Civil Procedure, Defendant National Credit Adjusters, LLC ("NCA") is a purchaser of charged off consumer loans that "engage[s] in collection activity for the purpose of recovering those delinquent receivables."[356]

235.     The company is headquartered in Hutchinson, Kansas, with call centers there and in Phoenix, Arizona and Montego Bay, Jamaica.[357]

236.     It is a privately-held, privately capitalized company that was founded in 2001.[358]

237.     Over the last roughly ten years, NCA has primarily purchased and collected on what are commonly referred to as "payday loans," meaning short-term loans, including installment loans lines of credit, that typically carry triple-digit APRs.[359]

---

[356] Deposition of Lee Tyler Rempel ("Rempel Dep.") 11:18-12:6 (App. 0300).
[357] *Id.* at 15:15-16:4 (App. 0301).
[358] Exhibit P-66, TF-PA-604259, Think Finance – NCA Due Diligence Summary, 2014 (App. 0778).
[359] Rempel Dep. 12:17-21 (App. 0300).

**UNSEALED**

238. During the period relevant to this action, Tyler Rempel was NCA's Vice President of Operations and a member of the Board of Directors.[360]

239. The prior President and CEO was Brad Hochstein, who also owned 38% of the company.[361]

240. Starting around 2008, as a result of increases in the price of charged-off credit card debt, Hochstein began concentrating the company's debt acquisitions on the payday loan market.[362]

241. By 2012, as the volume of NCA's payday loan portfolio rose, there were a few states where Hochstein did not want to acquire loans, based on his weighing regulatory risk against the volume of loans at issue, meaning that he would stay away from the states where volume was not high enough to warrant the risk of regulatory challenge by a state attorney general or banking department.[363]

242. Prior to this litigation, NCA was the subject of regulatory challenges in New York, Arkansas, Connecticut and Maryland, based on allegations that the company was collecting on usurious or unlicensed loans, which challenges resulted in

---

[360] Exhibit P-65, TF-PA-405052, NCA Organizational Charts (App. 0763-0764); Exhibit P-66, TF-PA-604259, Think Finance – NCA Due Diligence Summary, 2014 (App. 0778). *See also* Rempel Dep. 17:3-18:15 (App. 0302).

[361] *Id.*

[362] Rempel Dep. 36:1-37:22 (App. 0306-0307).

[363] *Id.* at 39:7-42:14 (App. 0307-0308).

UNSEALED

the company "having to pay back consumers . . ., in most cases, what was collected above and beyond the state cap."[364]

243.    Prior to those state enforcement action, the NCA board mainly deferred to the purchasing decisions of Hochstein. In Rempel's words, "Brad really controlled not just the company, but he's the one with 30 years' experience, et cetera. Everyone really looked up to him."[365]

244.    NCA acknowledges today that "lending is not legal in all states," and that it is now paying attention to the states in which it is engaged in collection activity.[366] After Tyler Rempel became CEO in 2016, he instituted a documented, compliance-conscious, due diligence process to guide the company's purchase of debt portfolios, including a determination of the legality of collecting on the specific portfolio. In contrast, when Brad Hochstein was still running the company, there was no documented process for conducting that kind of due diligence on loan portfolios being purchased.[367]

245.    The company is still purchasing payday loans for collection but is no longer collecting on loans in Pennsylvania.[368]

---

[364] *Id.* at 31:4-32:15 (App. 0305).
[365] *Id.* at 57:15-61:10 (App. 0312-0313).
[366] *Id*. at 199:13-200:7 (App. 0347).
[367] *Id.* at 45:21-47:13 (App. 0309).
[368] *Id.* at 45:1-10 (App. 0309).

UNSEALED

246.     As is typical in the debt-buying industry, NCA commonly enters into "forward flow" agreements with lenders, which is to say, an agreement to buy specified volumes of delinquent debt, on a periodic basis, at a set price.[369]

247.     NCA's first portfolio purchase and forward flow agreement with TF occurred in October 2010.[370]

248.     The transaction between NCA and TF was brokered by an individual named Brett Horrocks, operating through his company, named SourceItOne.[371]

249.     The initial debt placement included $80 million in written off PayDay One balances and $80 million in ThinkCash balances, with an expectation of a forward flow covering future periodic purchases.[372]

250.     NCA understood that Horrocks was a debt collector that had already been working the accounts for TF and that he was also a broker who was representing, and was being paid by by, TF with regard to the debt sale transaction.[373]

251.     In his January 2011 report to the TF board, Rees discussed the debt sales to NCA as follows:

---

[369] *Id.* at 29:17-31:1 (App. 0305).
[370] P-67, NCA_PA000378, Emails between TF, Brett Horrocks, and NCA, October 21-28, 2010 (App. 0781-0782); Rempel Dep. 80:10-88:15 (App. 0317-0319) (identifying P-67 and walking through Horrocks role in brokering debt sales).
[371] *Id.*
[372] P-67, NCA_PA000378, Emails between TF, Brett Horrocks, and NCA, October 21-28, 2010 (App. 0781-0782).
[373] Rempel Dep. 84:5-88:15 (App. 0318-0319).

**UNSEALED**

The debt sale continues to exceed expectations. Not only did we bring in $2MM more than we anticipated in Q4, but we should receive an extra $1MM in January. We are automating this process on a go-forward basis and believe it could generate $250K or more in additional revenues monthly.[374]

252. By December 2011, after TF had transformed the ThinkCash program into the three tribal lending products, Horrocks continued to deliver written-off debt from TF to NCA, including both "payday" and "installment" accounts.[375]

253. The actual Loan Sale Agreement in the December 2011 transaction was between NCA and Plain Green, LLC.[376] It provided for the purchase of approximately $18 million in unpaid PG balances, at a price of 7.0%, or $1,258,434.00.[377]

254. By February 2012, NCA was also purchasing Great Plains Lending write-offs, with the price now at 7.6% of outstanding balances.[378] The GPL agreement included a forward-flow provision for the period purchase of "90-100% of all payday loan accounts reaching 120 days delinquent."[379]

---

[374] Exhibit P-123, TF-PA-411039, Memo from Ken Rees to Think Board Members, January 21, 2011, at 4 (App. 1134-4).

[375] Exhibit P-72, NCA_PA014992, Emails from Brett Horrocks to Brad Hochstein, December 12-13, 2011 (App. 0815).

[376] Exhibit P-73, NCA_PA000851, Loan Sale Agreement, Dec. 13, 2011 (App. 0817).

[377] *Id.*, Annex 1 (App. 0835).

[378] Exhibit P-78, NCA_PA0902, Loan Sale Agreement, Feb. 27, 2012 (App. 0839); Exhibit P-79, Annex I to Loan Sale Agreement of Feb. 27, 2012 (App. 0862).

[379] *Id.*

UNSEALED

255.    Over the course of the next several years, through 2014, Brett Horrocks, in his capacity as TF's broker, continued to arrange the purchase by NCA of monthly charge-offs of Plain Green and Great Plains Lending installment loan balances.[380]

256.    By February 2013, TF and Horrocks were discussing decreasing the age of the delinquency accounts being sold to NCA (down from 90 to 60 days), with a corresponding increase in price, to 8.65 % (or, 8.65 cents on the dollar).[381] They were also discussing how to get MobiLoans, which up to that time had not been agreeing to sell delinquent debt, into the arrangement with NCA.[382]

257.    By October 2013, MobiLoans had still not agreed to terms of a debt sale, with TF expressing internally and to Horrocks the urgency of getting that deal done because "[w]e have about $6-8 mm in revenue to the P&L we can recognize once MobiLoan delinquent account are sold.[383]

258.    As of November 26, 2013, the 60-day delinquent accounts of MobiLoans were included in the debt sales to NCA.[384]

---

[380] Rempel Dep. 124:8-125:2 (App. 0328-0329).
[381] Exhibit P-80, TF-PA-611481, Email from Brett Horrocks to Jason Harvison, February 27, 2013 (App. 0865); Rempel Dep. 135:1-137:10 (App. 0331-0332).
[382] Exhibit P-80, TF-PA-611481, Email from Brett Horrocks to Jason Harvison, February 27, 2013 (App. 0865).
[383] Exhibit P-83, TF-PA-610807, Email from Walt Ramsey, Oct. 2, 2013 (App. 0897).
[384] Exhibit P-84, TF-PA-565648, Line of Credit Account Sale Agreement, November 26, 2013 (App. 0902).

UNSEALED

259.     NCA also has been purchasing charged off Rise balances, originally from

TF and now from Elevate, but with regard to Rise accounts, neither Horrocks nor

anyone else is playing the role of intermediary between Think (or Elevate) and NCA.[385]

260.     Although the debt sale agreements regarding Plain Green, Great Plains

Lending and MobiLoans were, according to their documentation, between NCA and

the tribal entities, at least into 2013, NCA had no contact with the anyone from the tribal

entities; the executed agreements were received by NCA from TF's broker, Brett

Horrocks.[386]

261.     Starting in April 2013, the Loan Sale Agreements provided for a price

increase to 8.65% and included a Schedule A-1 that listed various "Compliance

Controls, Reporting Requirements, Etc.," and idenfied the "Seller's Servicer Contact" as

Gio Rodriguez of TF.[387]

262.     Shortly after this Loan Sale Agreement was executed, some

representatives of Plain Green came to NCA's office for a site visit, accompanied by Gio

---

[385] Rempel Dep. at 125:3-22 (App. 0329).
[386] *Id*. at 122:5-20 (App. 0328).
[387] Exhibit P-81, TF-PA-386399, Amended and Restated Loan Sale Agreement, April 24, 2013
(App. 0867).

**UNSEALED**

Rodriquez.[388]  This was the first time anyone at NCA had had any direct contact with anyone from Plain Green.[389] NCA never met anyone from Great Plains Lending.[390]

263.    In the "onboarding" process involved in the acquisition of the Plain Green, Great Plains Lending and MobiLoans balances, after the debt sale agreements were executed, the actual account files would be transmitted electronically to NCA via Brett Horrocks.[391] This meant that, with regard to the purchased accounts of Pennsylvania borrowers, NCA had their loan agreements stored on its system and could access them if it wanted to.[392]

264.    Starting in 2014, NCA began purchasing debt through a special purpose entity named Level Financial, LLC it created.[393]

265.    Also in 2014, NCA was producing a "monthly summary report for the Think products," meaning Plain Green, Great Plains Lending and MobiLoans accounts it had purchased.[394]

---

[388] Rempel Dep. 139:11-146:22 (App. 0332-0334).

[389] *Id*. at 146:10-14 (App. 0334).

[390] *Id*. at 147:23-148:9 (App. 0334).

[391] *Id*. at 126:23-127:1 (App. 0329).

[392] *Id*. at 133:23-134:7 (App. 0331).

[393] Exhibit P-66, TF-PA-604259, Think Finance – NCA Due Diligence Summary, 2014 (App. 0778); Rempel Dep. 75:21-77:2 (App. 0316); *see also* Exhibit P-85, TF-PA 272605, Line of Credit Account Sale (App. 0929).

[394] Exhibit P-89, TF-PA-392165, Email from NCA to TF and Brett Horrocks, May 13, 2014 (App. 0957); Rempel Dep. 181:4-182:7 (App. 0343).

UNSEALED

266.     Besides using its own call centers to engage in collection activity, NCA also outsourced some collection activity on the debt it purchased, subject to approval of those outside vendors by TF.[395]

267.     NCA included within its coding of accounts the address of the borrower so it had the capability, for example, of isolating all PG, GPL and MBL accounts from Pennsylvania, including inactive ones, and retrieving account information for any such Pennsylvania borrower, including a copy of the underlying loan agreement.[396]

268.     On or about August 31, 2015, NCA began processing a "Think Product Close and Recall" for all Pennsylvania-coded accounts, based on a decision by Brad Hochstein to "move them off the collection floor."[397]

269.     At that time, NCA was collecting on approximately $9.5 million in Plain Green loan balances from approximately 7,000 Pennsylvania borrowers; $3.5 million in Great Plains Lending balances from 2,800 Pennsylvanians; and $5 million in Pennsylvania MobiLoan balances from 6,000 Pennsylvanians.[398]

---

[395] *Id.* at 143:22-145:10 (App. 0333-0334).
[396] *Id.* at 132:6-134:7 (App. 0330-0331).
[397] *Id.* at 225:14-227:10 (App. 0354).
[398] Exhibit P-97, NCA_PA002603, Internal NCA Emails, August 31, 2015 (App. 0964); Rempel Dep. 225:14-229:9 (App. 0354-0355).

**UNSEALED**

270.     As a result of this recall of Pennsylvania accounts, collection agencies by NCA stopped contacting Pennsylvania borrowers, but they continued to accept and deposit payments made by Pennsylvania borrowers even after the August 2015 recall.[399]

271.     As of December 3, 2015, NCA assembled data for all Plain Green, Great Plains Lending and MobiLoans accounts that were loaded onto the NCA system from April 2013 until then, that were coded as Pennsylvania accounts, producing the following numbers:  Great Plains Lending, 2,731 accounts, representing $3.531 million in balances; Plain Green, 6,695 accounts, representing $9.738 million in balances; and MobiLoans, 6,155 accounts, representing $5.225 million in balances.[400]

272.     As of that date, NCA was also estimating approximately $104,000 in combined "futures,"[401] for those Pennsylvania accounts, meaning amounts that it was still expecting to receive from Pennsylvania borrowers.[402]

273.     No money changed hands between TF and NCA regarding the recalled Pennsylvania accounts.[403]

[399] Rempel Dep. 233:8-236:11 (App. 0356).
[400] Exhibit P-98, NCA_PA007264, Internal NCA Emails, December 3, 2015 (App. 0964).
[401] *Id.*
[402] Rempel Dep. 242:6-245:16 (App. 0358-0359).
[403] *Id.* at 247:9-21 (App. 0359).

UNSEALED

274. NCA collected a total of $4.4 million in payments from Pennsylvania consumers on account of Plain Green, Great Plains Lending and MobiLoans obligations.[404]

Respectfully submitted,

JOSH SHAPIRO
Attorney General

SARAH A. E. FRASCH
Chief Deputy Attorney General

JOHN ABEL
Senior Deputy Attorney General

Dated: March 8, 2019         */s/ Saverio P. Mirarchi*
SAVERIO P. MIRARCHI
Senior Deputy Attorney General

Office of Attorney General
Bureau of Consumer Protection
1600 Arch St., Ste 300
Philadelphia, Pennsylvania 19103
Phone: (215) 560-2414
Email: smirarchi@attorneygeneral.gov

*/s/ Irv Ackelsberg*
IRV ACKELSBERG
John J. Grogan
Howard I. Langer
Edward A. Diver
Peter Leckman
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Phone: (215) 320-5660

---

[404] *Id*. at 251:17-253:7 (App. 0360-0361).

UNSEALED

Email: iackelsberg@langergrogan.com
*Special Counsel to the Commonwealth*

UNSEALED