# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PA, by | : | CIVIL ACTION |
| Attorney General JOSH SHAPIRO, | : | |
| | : | |
| *Plaintiff,* | : | NO. 14-cv-07139-JCJ |
| | : | |
| v. | : | |
| | : | **CONFIDENTIAL** |
| THINK FINANCE, INC., et al. | : | **Filed Under Seal Pursuant to** |
| | : | **Confidentiality and Protective Order** |
| *Defendants.* | : | |

## APPENDIX TO THE COMMONWEALTH'S
## STATEMENT OF UNDISPUTED FACTS

### VOLUME 1: LITGATION DOCUMENTS
### APP. 0001 – APP. 0625

UNSEALED

UNSEALED

# Contents

TF Interrogatory Responses.......................................................................................App. 0001

Deposition of Ken Rees (Full Document) ..............................................................App. 0021

CFPB Deposition of Ken Rees (Excerpt) ...............................................................App. 0163

Deposition of Chris Lutes (Full Document) .........................................................App. 0168

Deposition of Lee Tyler Rempel (Full Document) .............................................App. 0298

Deposition of Bobbi Jo Favel (Excerpts) ..............................................................App. 0401

Deposition of Jason Harvison (Excerpts)..............................................................App. 0406

Deposition of Linda Callnin (Excerpts) ................................................................App. 0445

Deposition of Linda Rogenski (Excerpts) .............................................................App. 0481

Deposition of Mark Wildstein (Excerpts)..............................................................App. 0497

Deposition of Michelle Nguyen (Excerpts)...........................................................App. 0505

Deposition of Neal Humphrey (Excerpt) .............................................................App. 0525

Deposition of Sarah Cutrona (Excerpts)...............................................................App. 0529

Deposition of Stephen Smith (Excerpts)...............................................................App. 0553

Deposition of Steven Haynes (Excerpts) ..............................................................App. 0573

Deposition of Thomas Welch (Excerpts) ..............................................................App. 0603

Bankruptcy Deposition of Billi Ann Raining Bird (Excerpts)...............................App. 0618

CFPB Deposition of Kim Palermo (Excerpts) .......................................................App. 0622

Deposition of Claudia Callaway (Excerpts) ...................................................... App. 0625-01

UNSEALED

UNSEALED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | CIVIL ACTION |
| *Plaintiff,* | |
| v. | |
| THINK FINANCE, INC., et al. | |
| | NO. 14-cv-07139-JCJ |
| *Defendants.* | |

---

## THINK FINANCE DEFENDANTS' RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants Think Finance Inc., TC Loan Service, LLC, Tailwind Marketing, LLC, TC Decision Sciences, LLC, and Financial U, LLC ("Defendants") object and respond to Plaintiff Commonwealth of Pennsylvania, Office of Attorney General's ("Plaintiff") First Set of Interrogatories ("Interrogatories") as follows.

These responses are based on information available and analysis completed as of the date of this response. Further discovery, independent investigation, and analysis may lead to additional information that may add meaning to known facts, as well as establish new factual conclusions and legal contentions, all of which may lead to additions to, changes to, or variations from the information set forth herein. Accordingly, Defendants reserve the right to alter, amend, or supplement its responses as necessary. Defendants also reserve the right to amend their responses for inadvertent errors, mistakes, or admissions. In responding to all or

1

UNSEALED

Loans originated by First Bank of Delaware: $203,504

Loans originated by Plain Green: $1,744,788

Loans originated by Great Plains: $513,699

Lines of credit extended by MobiLoans: $351,859

## INTERROGATORY No. 3

For all ThinkCash installment loans made to Pennsylvania borrowers, provide the following information:

(a)     Loans originated, in dollars,

(b)     Numbers of loans originated,

(c)     Numbers of unique borrowers,

(d)     The average Annual Percentage Rate charged,

(e)     Amount of dollars still outstanding (regardless of identity of the current creditor), broken down into current, past due less than 61 days, and past due more than 60 days,

(f)     Amount of dollars collected to date from the borrowers, broken down by principal, interest and fees,

(g)     Total dollar amount of debt that was sold or transferred, broken down by Debt Buyer,

(h)     Total dollar amount of judgments obtained by Debt Buyers, broken down by Debt Buyer (regardless of the name of the judgment creditor).

## RESPONSE:

Subject to and without waiving the General Objections set forth above and the specific objections set forth herein, Defendants respond as follows:

(a) The total principal of ThinkCash installment loans lent by the First Bank of Delaware in Pennsylvania during the Relevant Time Period was $23,912,900.

10

(b) The First Bank of Delaware originated 48,327 ThinkCash installment loans in Pennsylvania during the Relevant Time Period.

(c) Defendants do not know the exact number of unique borrowers of installment loans originated by the First Bank of Delaware in the Relevant Time Period. Approximately 33,310 of the ThinkCash installment loans during this time were coded "new" First Bank of Delaware customers as opposed to "former."

(d) Defendants object to this subpart on the grounds that it requests information not maintained in the usual course of business.

(e) Defendants object to this subpart on the grounds that the term "outstanding" is vague and ambiguous. Notwithstanding this objection, none of the principal lent to Pennsylvania borrowers for ThinkCash installment loans originated by the First Bank of Delaware is outstanding.

(f) The total amount of dollars collected to date from Pennsylvania borrowers for ThinkCash installment loans originated by the First Bank of Delaware in the Relevant Time Period is $19,202,086 (principal), $18,140,682 (interest), and $392,577 (fees). These amounts do not reflect Defendants' income.

(g) Defendants object to this subpart on the grounds that it seeks information not within the custody and control of Defendants. Notwithstanding this objection, the First Bank of Delaware sold approximately $2,903,100 in ThinkCash installment loans that it had originated.

(h) Defendants are without knowledge about the information requested in subpart (h).

11

UNSEALED

## INTERROGATORY No. 4

For each of the tree Tribal Products, provide the following information regarding loans or cash advances made to Pennsylvania borrowers:

      (a)     Loans originated or cash advanced, in dollars,

      (b)     Numbers of loans or cash advances originated,

      (c)     Numbers of unique borrowers,

      (d)     The average Annual Percentage Rate (APR) charged, and, for each year during the Relevant Time Period, the number of loans that ever had an APR of (i) 60% or less, (ii) between 60% and 80%, or (iii) between 80% and 100%.

      (e)     Amount of dollars still outstanding (regardless of identity of the current creditor), broken down into current, past due less than 61 days, and past due more than 60 days,

      (f)     Amount of dollars collected to date from the borrowers, broken down by principal, interest and fees,

      (g)     Total dollar amount of debt that was sold or transferred, broken down by Debt Buyer,

      (h)     Total dollar amount of judgments obtained by Debt Buyers, broken down by Debt Buyer (regardless of the name of the judgment creditor).

**RESPONSE:**

Subject to and without waiving the General Objections set forth above and the specific objections set forth herein, Defendants respond as follows:

(a) <u>Plain Green</u> – The total principal of loans lent by Plain Green in Pennsylvania during the Relevant Time Period was $69,552,250.

<u>Great Plains</u> – The total principal of loans lent by Great Plains in Pennsylvania during the Relevant Time Period was $14,394,800.

12

<u>MobiLoans</u> – The total amount of extensions of lines of credit by MobiLoans in Pennsylvania during the Relevant Time Period was $25,101,953.

(b) <u>Plain Green</u> originated 76,278 loans in Pennsylvania during the Relevant Time Period;

<u>Great Plains</u> originated at 23,646 loans in Pennsylvania during the Relevant Time Period;

<u>MobiLoans</u> extended 25,324 lines of credit in Pennsylvania during the Relevant Time Period.

(c) <u>Plain Green</u> – Defendants do not know the exact number of unique borrowers of loans originated by Plain Green in the Relevant Time Period. Approximately 34,799 of the loans during this time were coded "new" Plain Green customers as opposed to "former."

<u>Great Plains</u> – Defendants do not know the exact number of unique borrowers of loans originated by Great Plains in the Relevant Time Period. Approximately 12,009 of the loans during this time were coded "new" Great Plains customers as opposed to "former."

<u>MobiLoans</u> – Defendants do not know the exact number of unique lines of credit extended by MobiLoans in the Relevant Time Period. Approximately 16,689 of the lines of credit extended during this time were coded "new" MobiLoans customers as opposed to "former."

(d) <u>Plain Green/Great Plains/MobiLoans</u> – Defendants object to this subpart on the grounds that it requests information not maintained in the usual course of business.

(e) Defendants object to this subpart on the grounds that the term "outstanding" is vague and ambiguous. Notwithstanding this objection, none of the principal lent to Pennsylvania borrowers for loans originated by Plain Green or Great Plains, or for extensions of lines of credit by MobiLoans is believed to be outstanding.

13

UNSEALED

(f) <u>Plain Green</u> – The total amount of dollars collected to date from Pennsylvania borrowers for loans originated by Plain Green in the Relevant Time Period is $53,491,230 (principal), $69,202,553 (interest), and $620,178 (fees).

<u>Great Plains</u> – The total amount of dollars collected to date from Pennsylvania borrowers for loans originated by Great Plains in the Relevant Time Period is $10,242,138 (principal), $15,556,193 (interest), and $179,412 (fees).

<u>MobiLoans</u> – The total amount of dollars collected to date from Pennsylvania borrowers from extensions of lines of credit by MobiLoans in the Relevant Time Period is $19,395,176 (principal), $23,757,643 (fees). Since MobiLoans offered lines of credit, there were no "interest" fees accumulated; the comparable information for the offered lines of credit is contained in the "fees" amount.

(g) Defendants object to this subpart on the grounds that it seeks information not within the custody and control of Defendants. Notwithstanding this objection, Plain Green sold approximately $1,744,788 in loans that it had originated; Great Plains sold approximately $513,699 in loans that it had originated; and MobiLoans sold approximately $351,839 in loans that it had originated.

(h) Defendants are without knowledge about the information requested in subpart (h).

**<u>INTERROGATORY No. 5</u>**

Describe the role of any members of the Chippewa Cree Tribe (including with that description, the identity of such members, the geographical location of such person while performing that role, the source of this information and the identity of the persons at Think

14

during the Relevant Time Period and were responsible for servicing consumer loans originated by Plain Green or Great Plains, or the lines of credit extended by MobiLoans. Defendants entered into a "License and Support Agreement" with each of the Tribal lenders detailing the licensing of consumer lending software. Per the agreements, the loan management platforms were fully accessible by certain Think Finance personnel; when questions arose from the Tribal lenders or investors regarding specific information, Think Finance personnel would transfer data from the loan management platforms via encrypted emails, secure FTP, or via the lender portal website.

The system servers for the loan management platforms were located at Rackspace (Chicago, Illinois); SunGard (Richardson, Texas); CyrusOne (Carrollton, Texas); and the Think Finance offices (Fort Worth, Texas; systems did not actively run from here, there were only copies of the data). From Think Finance, Larry Brandt likely would be most knowledgeable about the information in this Interrogatory.

Defendants are also in the process of preparing an additional document for an upcoming production that will be responsive to this Interrogatory. Upon production, the document will be marked TF-PA-623514.

<u>**INTERROGATORY No. 13**</u>

Provide the following information regarding customer-service personnel answering phone calls from or initiating phone calls to current or prospective installment-loan or line-of- credit customers of either of the Tribal Products, as of (i) July 1, 2011, (ii) January 1, 2012, (iii) January 1, 2013, (iv) January 1, 2014, (v) January 1, 2015: (a) the Tribal Product worked on, (b) the

UNSEALED

location of the call-center sites where they worked; (c) the number of such individuals at each of the locations; and (d) the employer(s) of such individuals.

**RESPONSE:**

In addition to and without waiving the General Objections set forth above, Defendants object to this Interrogatory on the grounds it is not limited to information relevant to a party's claims or defenses in this case and requests information not proportional to the needs of the case. Defendants also object to this Interrogatory to the extent it seeks information more readily obtained from other parties, specifically Plain Green, LLC, Great Plains Lending, LLC, and MobiLoans, LLC. Subject to and without waiving the foregoing specific and General Objections, Defendants respond as follows:

As described in Interrogatories 5, 6, and 7, each Tribal lender was responsible for, and had final authority over, the entirety of origination of consumer loans and extensions of lines of credit, including decisions regarding staffing of customer-service personnel. Defendants did not maintain comprehensive information about the customer-service personnel of each of the Tribal lending entities. Defendants, however, did maintain a running list of individuals who worked for Plain Green, LLC, Great Plains Lending, LLC, and MobiLoans, LLC to the best of their knowledge. A copy of this list, including job title and location where known, is attached as Attachment A.

Responding further, each Tribal lending entity contracted with firms that provided call center services as needed. Although Defendants did not maintain a comprehensive list of all

UNSEALED

entities that may have contracted with the Tribal lenders, the following organizations are believed to have provided customer-service support for each Tribal lending entity as detailed below.

MetaSource, LLC – provided call center services for Great Plains since July 2011, for Plain Green since April 2011, and for MobiLoans since July 2013.

First Contact, LLC (d/b/a iQor) – provided call center services for Great Plains since July 2013, for Plain Green since August 2013, and for MobiLoans since August 2013.

KM2 Solutions, LLC – provided call center services for Great Plains from July 2011 to February 2013 and for Plain Green from July 2012 to June 2014.

TeleVista, Inc. – provided call center services for Plain Green from July 2012 to June 2014 and for MobiLoans from April 2013 to June 2014.

First Center, LLC (d/b/a Capital Management Services) – provided call center services for MobiLoans from June 2012 to September 2013.

**INTERROGATORY No. 14**

With regard to your plans in 2012 to conduct an IPO for Think Finance (referenced, for example, in Document TF-PA 310635 (at page 310640)), explain the reasons that the IPO did not take place and that the company, instead, created Elevate Credit, Inc. as a separate company. Include in the explanation, an identification of all documents and analyses related to the decision whether to conduct an IPO for Think Finance.

**RESPONSE:**

In addition to and without waiving the General Objections set forth above, Defendants object to this Interrogatory on the grounds it is not limited to information relevant to a party's

UNSEALED

claims or defenses in this case and requests information not proportional to the needs of the case. Further, Defendants object to this Interrogatory on the ground that it seeks information protected by the attorney-client privilege.

**INTERROGATORY No. 15**

Identify each person (a) who served on the Think Finance board of directors during the Relevant Period (including the dates they served and any organizational affiliation), (b) on the initial board of directors of Elevate Credit, Inc., and (c) on the current board of directors of Elevate Credit, Inc.

**RESPONSE:**

In addition to and without waiving the General Objections set forth above, Defendants object to subparts (b) and (c) of this Interrogatory on the grounds that it is not limited to information relevant to a party's claims or defenses in this case, requests information not proportional to the needs of the case, and requests information more appropriately addressed to a third party. Subject to and without waiving the foregoing specific and General Objections, Defendants respond as follows:

(a) The following persons have served on the Think Finance board of directors during the Relevant Time Period:

| Name | Dates Served (during Relevant Time Period – 1/1/09-present) | Organizational Affiliation |
|---|---|---|
| Kenneth E. Rees | 1/1/09-5/15/15 | Think Finance |
| Jason Harvison | 1/1/09-8/24/15 | Think Finance |

UNSEALED

| | | |
|---|---|---|
| Mike Goguen | 1/1/09-5/1/14 | Sequoia Capital |
| John Rosenberg | 1/1/09-5/1/14 | TCV |
| Robert L. Johnson | 9/14/12-5/1/14 | None |
| Tyler Head | 5/20/15-9/21/15 | N/A |
| Bob Rees | 5/1/14-1/20/17 | Startup Capital |
| Steve Shaper | 1/1/09-present | N/A |
| Martin J. Wong | 5/1/14-present | Think Finance |
| John Drew | 5/1/14-present | TCV |
| Gary King | 3/20/15-present | N/A |
| Johnny Harvison | 8/24/15-present | 7HBF |
| Ken Keenum | 9/21/15-present | N/A |

UNSEALED

**INTERROGATORY No. 16**

Describe each of the customer acquisition channels referenced in TF-PA-041497 and 43836 (DM, LG, Affiliate, SEM, Organic, Digital), including in each description, (a) an explanation in lay terms describing how customers are routed to Think Finance products; (b) the costs associated with the channel, including the point at which the cost is incurred; (c) an identification of any business relationships regarding such channels and (d) identification of any contracts related to such business relationships.

**RESPONSE:**

In addition to and without waiving the General Objections set forth above, Defendants object to this Interrogatory on the grounds that it is not limited to information relevant to a party's claims or defenses in this case and requests information not proportional to the needs of the case. Subject to and without waiving the foregoing specific and General Objections, Defendants respond as follows:

The different customer acquisition channels referenced in TF-PA-041497 and -043836 are described below in turn:

"DM" – Direct Marketing: this channel includes direct mailing of offers to apply for loans originated by Plain Green or Great Plains, or for an extension of line of credit from MobiLoans. Think Finance prepares marketing materials and sends the materials to the Tribal lenders for review and approval. After approval from the Tribal lenders, the Direct Marketing materials are mailed to potential consumers. These Direct Marketing materials

UNSEALED

provide potential consumers with either pre-qualified offers or invitations to apply for loans or extensions of credit directly on the Tribal lenders' websites. The costs associated with the Direct Marketing channel include acquisition of potential consumer data from credit bureaus (cost incurred after final list of data approved), printing of mailing materials (cost invoiced after completion), postage (cost invoiced after completion), and logistics of the printing process (cost invoiced after completion). The Direct Marketing channel involves business relationships with credit bureaus that provide data, TransUnion, LLC, Clarity Services, Inc., printing houses that print and manage mailing logistics including Direct Marketing Solutions, Inc., and other providers of potential consumer data including Altair Data Resources, Inc. and O2 Consulting, Inc. The Direct Marketing channel relevant business relationship agreement with Direct Marketing Solutions, Inc. has been produced as TF-PA-618884.

"LG" – Lead Generator: this channel included agreements between Lead Generator entities (third party websites) and Tribal lenders to supply potential consumer leads. The Lead Generator channel directed potential consumers to Tribal lender websites using prerequisites and rules based on answers provided via loan applications completed on a given Lead Generator website. The Lead Generator channel costs included a pre-set amount per lead that the Tribal lender ultimately accepted; this cost was invoiced in bulk at the end of each monthly billing cycle to the Tribal lender. The Lead Generator channel involved business relationships between the Tribal lenders and AmOne Corp., Partner Weekly, LLC, Affiliate ROI, LLC, Credit Loan, LLC, KGM Direct, LLC, Zoom Marketing, Inc., Apex 1

UNSEALED

Lead Generators, Inc., Ccnet, AtomicLeads.com, StoreFront Lenders, LLC, and Commission Junction, Inc.

"Affiliate" – this channel is similar to the Lead Generator channel and consisted of third party websites that pre-negotiated terms with the Tribal lenders to generate potential consumer leads. The Affiliate channel directed potential consumers to Tribal lender websites via banner ads or text links on the Affiliate website; unlike the Lead Generator channel, there was no loan application data passed from the Affiliate regarding the potential consumer. The Affiliate channel costs included a pre-set amount per lead that the Tribal lender ultimately accepted; this cost was invoiced in bulk at the end of each monthly billing cycle to the Tribal lender. The Affiliate channel involved business relationships between the Tribal lenders and AmOne Corp., Partner Weekly, LLC, Affiliate ROI, LLC, Credit Loan, LLC, KGM Direct, LLC, Zoom Marketing, Inc., Apex 1 Lead Generators, Inc., Ccnet, AtomicLeads.com, StoreFront Lenders, LLC, and Commission Junction, Inc.

"SEM" – Search Engine Marketing: this channel includes ads that appear alongside standard search results when an internet user is using a search engine. The Search Engine Marketing channel directs potential consumers to Tribal lender websites when a potential consumer clicks on the ad link in the search engine results. The Search Engine Marketing channel costs include a pre-set amount per click of the Tribal lender ad on the search engine. The cost is incurred instantly, and is invoiced on a monthly basis. The Search Engine Marketing channel involves business relationships with Google, Inc. (results shown on search engine), Bing (results shown on search engine), and Camelot Communications, LTD (an

38

agency that manages bidding on specific keywords for search results). There are no contracts with particular search engines or agencies; payments to the search engines and agencies are based on actual usage.

"Organic" – this channel includes natural links to and traffic to lender websites. The Organic channel directs potential consumers to Tribal lender websites from various free website traffic hits and free search engine hits. There are no costs associated with the Organic channel. The Organic channel involves no consistent business relationships. On occasion, there have been third party technical consultants, like Vertical Nerve, Inc., used to help recommend better website coding. There are no contracts related to the Organic channel.

"Digital" – this channel includes other digital advertising methods such as banner ads aimed to attract clicks to Tribal lender websites. The Digital channel directs potential consumers to Tribal lender websites via clicking on banner ads from various third party websites; unlike the Affiliate channel, the agreements to place the ads come from a separate ad platform. The Digital channel costs include a pre-set, pay-per-click arrangement, and these costs are agreed to through specific insertion orders to different ad platforms. The Digital channel involves business relationships with Google, Inc, DoubleClick, Rocketfuel, and ClearHead Group, LLC (digital ad platforms). There are no contracts related to the Digital channel; these relationships are driven on specific orders.

UNSEALED

**INTERROGATORY No. 17**

State the book value of the investment fund known as GPL Servicing Ltd. ("GPLS") as of the following dates: July 1, 2011; December 31, 2012; December 31, 2013; December 31, 2014, and, as of those same dates, identify all investors by dollar amount and percentage, and describe any liquidity restrictions, guaranteed returns, and any differences in the rights of classes of investors.

**RESPONSE:**

In addition to and without waiving the General Objections set forth above, Defendants object to this Interrogatory on the grounds that "book value" is vague and ambiguous and is susceptible to multiple meanings. Defendants will need clarification on its intended meaning before being able to respond to this Interrogatory with accurate information. Defendants also object to this Interrogatory's request that Defendants "identify all investors . . ." on the grounds that it is not limited to information relevant to any party's claims or defenses in this case and requests information not proportional to the needs of the case. In addition, Defendants do not have the information necessary to respond to the questions about the specific investors in GPLS and their respective percentages of investments.

UNSEALED

## INTERROGATORY No. 18

For each state ever classified as "No State" on the loan platform for any of the Tribal Products, or, which was ever removed from the No State list, provide the following information for each Tribal Product: (a) the date that state was added to or removed from the "No State" list; (b) the reasons for the decision not to do business or the decision to resume doing business in that state; (c) identification of any documents pertaining to that decision and (d) identification of any persons participating in the decision.

**RESPONSE:**

In addition to and without waiving the General Objections set forth above, Defendants object to subparts (b), (c), and (d) of this Interrogatory on the grounds that Plain Green, Great Plains, and MobiLoans are a better source for this information and the individuals most knowledgeable about this subject work (or have worked) for these entities and not Defendants. Defendants, however, did maintain a list of States where the Tribal lending entities did not offer loans on an annual basis since 2013, which is offered below in response to subpart (a). Subject to and without waiving the foregoing specific and General Objections, Defendants respond as follows:

(a) **Plain Green** – The following states were included on the "No State" list for *Plain Green LLC* at the dates noted:

UNSEALED

As of June 15, 2016: Arkansas, Colorado, Connecticut, Georgia, Illinois, Maine, Maryland, Massachusetts, Minnesota, Montana, New Hampshire, New York, North Carolina, Oregon, Pennsylvania, Vermont, West Virginia

2015: Arkansas, Colorado, Connecticut, Georgia, Illinois, Maine, Maryland, Massachusetts, Minnesota, Montana, New Hampshire, New York, North Carolina, Pennsylvania, Vermont, West Virginia

2014: Arkansas (as of June 13, 2014), Colorado (as of June 13, 2014), Connecticut, Georgia (as of June 13, 2014), Illinois (as of June 13, 2014), Maine (as of June 13, 2014), Maryland (as of June 13, 2014), Massachusetts (as of March 24, 2014), Minnesota (as of June 13, 2014), Montana (as of June 13, 2014), New Hampshire (as of June 13, 2014), New York (as of June 13, 2014), North Carolina (as of June 13, 2014), Pennsylvania (as of November 25, 2014), Vermont (as of June 13, 2014), West Virginia (as of June 13, 2014)

2013: All states between August 22, 2013 and October 1, 2013 as well as Arkansas (April 5 – October 1, 2013) California (January 29 – February 22, 2013), Connecticut (January 29 – April 5, 2013), Georgia (January 29 – October 1, 2013), Illinois (April 5 – October 1, 2013), Louisiana (January 29 – February 22, 2013), Maryland (April 5 – October 1, 2013), Minnesota (April 5 – October 1, 2013), Missouri (April 5 – October 1, 2013), New York (April 5 – October 1, 2013), North Dakota (January 29 – April 5, 2013)

**Great Plains** – The following states were included on the "No State" list for ***Great Plains Lending LLC*** at the dates noted:

42

UNSEALED

As of June 15, 2016: Arkansas, Colorado, Connecticut, Georgia, Illinois, Maine, Maryland, Minnesota, New Hampshire, New York, Pennsylvania, Vermont, West Virginia

2015: Arkansas, Colorado, Georgia, Illinois, Maine, Maryland, Minnesota, New Hampshire, New York, Pennsylvania, Vermont, West Virginia

2014: Arkansas, Colorado, Georgia, Illinois, Oklahoma, Maine, Maryland, Minnesota (as of June 13, 2014), New Hampshire (as of June 13, 2014), New York, Pennsylvania (as of November 26, 2014), Vermont (as of June 13, 2014), West Virginia (as of June 13, 2014)

2013: Maryland and all states between August 22, 2013 and October 1, 2013, after which consumer loans were extended in all states except for Arkansas, Colorado, Georgia, Illinois, Oklahoma, Maine, Maryland, New York

**MobiLoans** – The following states were included on the "No State" list for *MobiLoans LLC* at the dates noted:

As of June 15, 2016: Arkansas, Colorado, Connecticut, Georgia, Illinois, Louisiana, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New York, Pennsylvania, Vermont, West Virginia

2015: Arkansas, Colorado, Connecticut (as of January 7, 20 15), Georgia, Illinois, Louisiana, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New York, Pennsylvania, Vermont, West Virginia

2014: Arkansas, Colorado, Georgia, Illinois, Louisiana, Maine, Maryland, Massachusetts (April2, 2014), Minnesota, New Hampshire, New York, Pennsylvania (as of November 25, 2014), Vermont (June 13, 2014), West Virginia

43

UNSEALED

All states between August 22, 2013 and October 1, 2013, after which consumer loans were extended in all states except for Arkansas, Colorado, Georgia, Illinois, Louisiana, Maine, Maryland, Minnesota, New Hampshire, New York, West Virginia

**INTERROGATORY No.19**

During the Relevant Period, identify which of the following persons or entities have held stock in or made loans to Think Finance, Inc., and for each, state (i) the applicable period of time, (ii) the amount of shares owned or loans made, and (iii) the amount of outstanding shares or loan balances currently: (a) Victory Park (b) Alonzo Primus, (c) Steven Haynes or Haynes Investments, (d) Ken Rees, (e) Jason Harvison or other members of the Harvison family, (f) Chris Lutes, (g) Robert L. Johnson, (h) Princeton Alternative Funding or Fintech Financial, LLC, (i) Brett Horrocks, or (j) Mark Curry.

**RESPONSE:**

In addition to and without waiving the General Objections set forth above, Defendants object to this Interrogatory on the grounds that it is not limited to information relevant to a party's claims or defenses in this case and requests information not proportional to the needs of the case. Subject to and without waiving the foregoing specific and General Objections, Defendants respond as follows:

(a) <u>Victory Park</u> – none.

(b) <u>Alonzo Primus</u> – none.

(c) <u>Steven Haynes / Haynes Investments</u> – none.

44

**UNSEALED**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
    Plaintiff, *
            *
VS.          * Civil Action
         * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants. *

*****************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
KENNETH REES
MAY 8, 2018
*****************************************************

      DEPOSITION of KENNETH REES, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and
numbered cause on the 8th day of May, 2018, from
9:08 a.m. to 5:46 p.m., before Christy R. Sievert,
CSR, RPR, in and for the State of Texas, reported by
machine shorthand, at the Fort Worth Club, 306 West
7th Street, Fort Worth, Texas 76102, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 2

1           A P P E A R A N C E S
2
3 COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4  MR IRV ACKELSBERG
   Langer, Grogan & Diver, PC
5   1717 Arch Street, Suite 4130
   Philadelphia, Pennsylvania 19103
6   Phone:  215-320-5701
   E-mail:  iackelsberg@langergrogan.com
7
   MR SAVERIO "SAM" MIRARCHI
8   Senior Deputy Attorney General
   Bureau of Consumer Protection
9   1600 Arch Street, Suite 300
   Philadelphia, Pennsylvania 19103
10  Phone:  215-560-2445
   E-mail:  smirarchi@attorneygeneral gov
11
12 COUNSEL FOR KENNETH E REES:
13  MR RICHARD L SCHEFF
   Montgomery, McCracken, Walker & Rhoads, LLP
14  123 South Broad Street
   Philadelphia, Pennsylvania 19109
15  Phone:  215-772-7502
   E-mail:  rscheff@mmwr com
16
17 COUNSEL FOR THINK FINANCE, INC :
18  MR MATTHEW S SHELDON
   Goodwin Procter, LLP
19  901 New York Avenue, NW
   Washington, D C  20001
20  Phone:  202-346-4000
   E-mail:  msheldon@goodwinprocter com
21
22
23
24
25

## Page 3

1        A P P E A R A N C E S
         (continued)
2
3 COUNSEL FOR VICTORY PARK CAPITAL:
4  MR. DANIEL P. SHAPIRO
   MR. MATTHEW W. HAWS
   Katten Muchin Rosenman, LLP
5   525 W. Monroe Street
   Chicago, Illinois 60661
6   Phone:  312-902-5622
   E-mail:  daniel.shapiro@kattenlaw.com
7        matthew.haws@kattenlaw.com
8
9 COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
10  MR. PATRICK DAUGHERTY
   Van Ness Feldman, LLP
11  1050 Thomas Jefferson Street, NW
   Seventh Floor
   Washington, D.C.
12  Phone:  202-298-1874
   E-mail:  pod@vnf.com
13
14 ALSO PRESENT:
15  GUS PHILLIPS, Videographer
16
17
18
19
20
21
22
23
24
25

## Page 4

1         I N D E X
              PAGE
2
  Appearances................................ 2-3
3
  Exhibits.................................... 5-6
4
  Proceedings................................. 7
5
  KENNETH REES:
6
    Examination by Mr. Ackelsberg.............. 8
7
8  Changes and Signature.................. 345-346
9  Reporter's Certification............... 347-348
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

WWW.KLWREPORTERS.COM

UNSEALED

App. 0021

## Page 5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 272 | How to Become a Bus Driver, Not a Bulldozer | 34 |
| Exhibit 273 | LendIt Fintech, Ken Rees | 43 |
| Exhibit 274 | Think Finance Business Plan, April 2013 TF-PA 683403 - 683418 | 46 |
| Exhibit 275 | E-mail correspondence 4-6-15, Re: GP article TF-PA 308918 - 308920 | 64 |
| Exhibit 276 | E-mail correspondence 11-30-12, Re: Presentation For ████ Investors TF-PA 677353 - 677371 | 135 |
| Exhibit 277 | IPO Roadshow Presentation Breakout #1 TF-PA 670288 - 670295 | 141 |
| Exhibit 278 | E-mail correspondence 8-26-13, Re: Encore Video TF-PA 677068 | 200 |
| Exhibit 279 | Term Sheet for Think Finance - Chippewa Cree Transaction | 208 |
| Exhibit 280 | E-mail correspondence 10-24-13, Re: BMO TF-PA 606626 - 606627 | 226 |
| Exhibit 281 | E-mail correspondence 12-13-13, Re: Selected Expense Report TF-PA 674488 - 674489 | 229 |
| Exhibit 282 | Memorandum, 2-17-11 TF-PA 710233 - 710236 | 280 |
| Exhibit 283 | Memorandum, 4-13-11 TF-PA 710229 - 710232 | 283 |

## Page 6

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 284 | Memorandum, 5-18-11 TF-PA 710237 - 710240 | 292 |
| Exhibit 285 | Memorandum, 10-19-11 TF-PA 474695 - 474698 | 298 |
| Exhibit 286 | Memorandum, 12-14-11 TF-PA 705357 - 705361 | 303 |
| Exhibit 287 | E-mail correspondence 8-9-13, Re: GPL Volume TF-PA 680605 - 680606 | 305 |
| Exhibit 288 | E-mail correspondence 9-26-13, Re: Call to Bob from Tunica-Biloxi Tribal Chairman Marshall Pierite TF-PA 258168 | 315 |
| Exhibit 289 | E-mail correspondence 4-28-13, Re: Tribal training TF-PA 191141 | 318 |
| Exhibit 290 | LinkedIn, Think Finance | 325 |
| Exhibit 291 | E-mail correspondence 7-8-13, Re: FWST mention TF-PA 310765 - 310768 | 325 |
| Exhibit 292 | Think Finance Tribal Holdings Statement TF-pA 301317 - 301320 | 330 |

## Page 7

1  THE VIDEOGRAPHER:  We are now on the
2  record for the videotaped deposition of Kenneth
3  Rees.  The time is 9:08 a.m., May 8, 2018, in the
4  matter of the Commonwealth of Pennsylvania vs. Think
5  Finance Incorporated, et al., Case No. 14-7139-JCJ,
6  being held in the United States District Court for
7  the Eastern District of Pennsylvania.
8       The court reporter is Christy Sievert.
9  The videographer is Gus Phillips.  Both are
10  representatives of Kaplan, Leaman & Wolfe Court
11  Reporting.
12       Will counsel please state their
13  appearances for the record.
14       MR. ACKELSBERG:  Irv Ackelsberg for
15  the Commonwealth of Pennsylvania.
16       MR. GROGAN:  John Grogan, also for the
17  Commonwealth.
18       MR. MIRARCHI:  Saverio Mirarchi for
19  the Commonwealth of Pennsylvania.
20       MR. DAUGHERTY:  Patrick Daugherty on
21  behalf of National Credit Adjusters.
22       MR. HAWS:  Matthew Haws on behalf of
23  the Victory Park defendants.
24       MR. SHAPIRO:  Dan Shapiro for the
25  Victory Park defendants.

## Page 8

1       MR. SHELDON:  Matt Sheldon for the
2  Think Finance defendants.
3       MR. SCHEFF:  Richard Scheff for Ken
4  Rees.
5       KENNETH REES
6  having been first duly sworn,
7       testified as follows:
8       EXAMINATION
9  BY MR. ACKELSBERG:
10  Q.  Mr. Rees, you have been deposed before?
11  A.  I have.
12  Q.  Okay.  So I'm sure you understand how this
13  works, but just to confirm that you do know the
14  ground rules, I want to just go over a few things
15  that I'm sure are familiar to you.
16       You see that there's a videographer.
17  There's also a court reporter.  The official record
18  of what happens today is the -- is going to be the
19  written transcript.  The reason I tell you that is
20  just to caution you that gestures -- verbal
21  responses -- don't register on the -- on the written
22  record, so we need -- we need verbal responses from
23  you.
24       And I'll do my best -- and the other thing
25  about the written record is that it's very hard for

UNSEALED

App. 0022

1  her when we're all talking over one another, which
2  I'm as guilty as anybody of.  So we also have to do
3  our best to try to wait until whoever is talking is
4  finished before we proceed with my question or your
5  answer.  Do you understand?
6      A.  Uh-huh, yes.
7      Q.  Okay.  See, that was -- see, it's a trick
8  question.
9          So the -- and the result of what happens
10  here is that there is this transcript, and the
11  transcript could conceivably be used in further
12  proceedings in this case.  Do you understand that?
13      A.  Yes.
14      Q.  Okay.  And you're under oath.  The oath
15  that you just got -- that you just took is -- means
16  that what happens here is the equivalent of you
17  testifying in a federal courtroom.  Do you
18  understand?
19      A.  Yes.
20      Q.  Okay.  If you don't understand the
21  question, it's perfectly fine to ask for
22  clarification.  It would be helpful if there's
23  something in the question that you don't understand,
24  to tell me what about the question you didn't
25  understand.  I'll try to do a better job.  If you

1  don't know the answer, "I don't know" is perfectly
2  fine as well.
3          Now, your lawyer will, undoubtedly, be
4  objecting for a good part of today.  But as I'm sure
5  he's told you, unless he specifically directs you
6  not to answer, you still have to answer the
7  question.  That's one difference between a
8  deposition and the courtroom, there's no judge here
9  to rule on objections.  So unless he tells you not
10  to answer, you still have to answer the question,
11  notwithstanding whatever -- there may be objections
12  all up the table, you still have to answer the
13  question.  Do you understand that?
14      A.  Yes.
15      Q.  Okay.  We will take many breaks.  If you
16  need a break outside of when the lawyers call a
17  halt, just let us know.  I would only ask you to
18  finish whatever question was pending at the time,
19  and then we can break and you can go out.
20          Lastly, is there any reason, illness,
21  hearing disorder, medication, lack of sleep,
22  concussion, anything like that, why you can't give
23  this deposition your full attention today?
24      A.  No.
25      Q.  Okay.  So the first question is, you

1  mentioned that you've been deposed before.
2      A.  Uh-huh (affirmative response).
3      Q.  Can you let -- let us know -- and I don't
4  really care about your personal life, if there have
5  been car accidents or bike accidents, or things like
6  that.  But just with regard to your professional
7  life, what -- have some of those depositions been
8  with regard to the business side of your life?
9      A.  Yes.
10      Q.  Okay.
11      A.  One was related to the CFBS CID into Think
12  Finance, and the other was related to a -- a lawsuit
13  related to a board member of ours.  So I was a
14  witness in that lawsuit.  And potentially one
15  related to employment law.  I'm not sure if that
16  really happened.
17      Q.  Now, the lawsuit, was that the Steve
18  Schafer lawsuit?
19      A.  Yes.
20      Q.  What was that lawsuit about?
21      A.  There was a dispute over compensation
22  between Steve and the -- the company that he was
23  formerly a part of.  And he -- we had attempted to
24  do a business deal with him, and for one reason or
25  another, I was a witness in that.

1      Q.  I see.  But you weren't adverse to Steven
2  Schafer?
3      A.  No, not at all.
4      Q.  He's still -- he's still on your board,
5  right?
6      A.  Yeah.
7      Q.  Okay.  And the CFPB CID investigation, when
8  were you deposed in that, how long ago?
9      A.  I don't know the year.  It was -- I'd be
10  guessing.
11      Q.  And after the deposition, did you get a
12  chance to review the transcript to make sure your --
13  that they accurately transcribed your answers to the
14  questions?
15      A.  I did not review the transcript.
16      Q.  Did -- so did you ever see a transcript?
17      A.  It was available to me, but I didn't -- I
18  had other people review it.
19      Q.  Meaning your lawyers?
20      A.  Uh-huh (affirmative response).
21      Q.  Okay.  Do you have that with you today?
22      A.  No.
23      Q.  Okay.  Did -- and you didn't -- you've
24  never reviewed that transcript?
25      A.  I don't believe so.

UNSEALED

App. 0023

1    Q.  Okay.
2        MR. ACKELSBERG:  Richard, I just --
3    just for the record, I mean, just we mentioned this
4    during the Harvison deposition, we would like copies
5    of the depositions.
6        MR. SCHEFF:  And if my recollection is
7    correct, I think that we've not been supplied with
8    an official transcript by the CFPB.  We created our
9    own.  And I think the CFPB regulations prevent us
10   from turning it over.  I'll review those, as we said
11   we would.  I always thought and, you know, I'll ask
12   you, as part of the MOU, as part of the cooperation
13   that you've had with the CFPB, I assumed you have
14   the transcripts of Harvison and Rees.
15       MR. ACKELSBERG:  All right.  Well,
16   we'll talk about it.
17       MR. SCHEFF:  Okay.
18   BY MR. ACKELSBERG:
19   Q.  I want to just go over your very impressive
20   resumé just a little bit.  I note that you graduated
21   Reed College in mathematics.  Is that right?
22   A.  That's right.
23   Q.  And the University of Chicago MBA program;
24   is that right?
25   A.  Yes.

1    Q.  So I have to ask you this, just out of
2    curiosity, how did a graduate of one of the
3    country's most prestigious liberal arts colleges and
4    MBA programs end up as an online subprime lender?
5        MR. SCHEFF:  Object to the form.
6    A.  Well, actually, I can walk you through my,
7    sort of, career.  After business school, I became a
8    management consultant working with -- first it was
9    Booz Allen Hamilton, then -- then CSC.  I did a lot
10   of work in financial services, including work for
11   Wells Fargo.
12       And, actually, the thing that got me
13   started on this was some work I did in the Wells
14   Fargo branches where we were doing some branch
15   productivity work, and the staff kept talking about
16   lobby trash and how we need to get rid of the lobby
17   trash.  And I realized it wasn't trash, it was the
18   people cashing checks that were underserved by
19   banks.
20       And it sort of signaled to me that there
21   was a vast unmet need for financial services that
22   banks were backing away from.  I was intrigued with
23   the idea of how technology could serve that.
24       So that's what led me first to the world
25   of -- of sort of online check cashing, which we --

1    there was a couple of companies in a row, including
2    the one that I started in Dallas called CashWorks
3    where I -- we helped consumers cash their checks in
4    convenience stores and grocery stores and put the
5    proceeds on -- on prepaid debit cards so they would
6    be safer for the customer.  That company was bought
7    by GE.
8        Then after that -- that company was sold,
9    I was looking for what to do next.  And one of the
10   board members of that company, CashWorks, had
11   started up a company called PayDay One.  It was the
12   company that ultimately became Think Finance.
13   And --
14   Q.  Would that be Mr. Stinson?
15   A.  That was Mr. Stinson, that's right.
16       And he had gotten the company to -- to
17   profitability.  It was in growth mode, trying to
18   decide whether he wanted to sell the company or
19   continue to grow it.  He was an older Fort Worth
20   businessman, didn't think that he wanted to
21   personally run it.  Thought I was a decent CEO
22   and -- and asked if I would first step in as the
23   president under him, and then, eventually, he sort
24   of stepped off and asked if I would take over as CEO
25   and chairman of the board.

1    Q.  Well, let me go back just a little bit to
2    the period at Wells Fargo.  What time period were
3    you there?
4    A.  So I was a management consultant from -- I
5    graduated business school in 1990.  So I would have
6    been a management consultant until about '98.  '97,
7    '98.  Then started a -- or didn't start, joined a
8    business -- and that's actually where I met Mike
9    Stinson.  He was the one who had started this.
10   Q.  That's the CashWorks, or is that --
11   A.  It's actually a precursor to CashWorks.  It
12   was originally called Mr. Payroll when I -- when I
13   joined, and then it was renamed InnoVentry.  And it
14   was -- ended up being a joint venture between Wells
15   Fargo and CashWorks, kind of a strange joint venture
16   between a bank and a -- and a pawnshop.  But with
17   the idea of using, again, technology and things like
18   facial biometrics to better serve an underserved
19   customer.
20   Q.  How does -- what does facial biometrics
21   have to do with check cashing?  I'm just curious.
22   A.  You have these sort of souped up ATMs in
23   grocery stores, and so the facial biometrics is a
24   way to identify the customer and to prevent fraud.
25   Q.  When you were a management consultant at

UNSEALED

1  Wells, what --
2      A.  And just to be clear, I was a management
3  consultant with -- with CSC and was doing a project
4  for Wells Fargo.
5      Q.  I see.  So your employer was CSC, but for
6  those roughly eight years, the project was at Wells
7  Fargo?
8      A.  No.  To be clear, I did many projects.  The
9  project that really made me think about the needs of
10 underserved Americans for financial services was
11 some work I did for Wells Fargo.  And I did --
12     Q.  And what specifically was that work that
13 you were doing for Wells Fargo?
14     A.  It was a -- the project that I was
15 referring to was a branch productivity project, how
16 to be able to serve more customers in the branches
17 with -- with lower costs.  I did a number of
18 projects for Wells Fargo, though, over the years.
19 But they were not my only client at -- at CSC.  I
20 had clients including Citibank in Singapore,
21 chemical plants in Korea, and power plants in
22 Canada.
23         So it was pretty wide ranging, but -- but
24 as I said, the -- you asked specifically how did I
25 get into this space.  It was some work I did as a

1  consultant working for Wells Fargo bank that -- that
2  really sent me down this path and gave me a sort of
3  lifelong passion about serving underserved
4  consumers.
5      Q.  So when you -- now, Mr. Stinson was the
6  owner of both CashWorks and PayDay One?
7      A.  No, sorry, the -- a little bit confusing.
8  When I left management consulting, it was to join a
9  company that Mike had started, Mike Stinson had
10 started called Mr. Payroll.  I was the COO of that
11 company.  That company ultimately failed, and I
12 started up a company called CashWorks.
13     Q.  So that -- you started it?
14     A.  I started that.  Mike was on -- I asked
15 Mike to be on my board of that company.  I -- I
16 thought he was a very good businessman.  And then,
17 as I said, after I sold CashWorks, then Mike, who
18 had started up another business called PayDay One at
19 the time, asked me if I would join PayDay One.
20     Q.  All right.  So the -- you mentioned a
21 little bit about CashWorks, that it had to do with
22 check cashing and retail establishments, right?
23     A.  Right.
24     Q.  And Mr. Payroll, what was that?  What was
25 the service that Mr. Payroll --

1      A.  Yeah, Mr. Payroll was --
2      Q.  -- tried but failed?
3      A.  Yeah, that was check cashing in,
4  essentially, souped up ATMs.  The problem with that
5  product was the ATMs were very expensive on both
6  buy -- they were $60,000 devices -- and then very
7  high servicing costs.  So the business model just
8  didn't ultimately work.
9          CashWorks was really serving the same
10 customer need of check cashing customers that wanted
11 the convenience of being in -- in grocery stores and
12 retailers as opposed to going to an establishment
13 with brick and mortar and bullet proof glass and
14 things like that.
15         The difference is we used point-of-sale
16 terminals.  So it was a lower cost.  And we funded
17 onto prepaid debit cards, so it was more -- safer
18 for consumers.  They didn't walk away from the
19 establishment with a bunch of cash in their hands,
20 they had the plastic.
21     Q.  So they would come in with, like, a
22 paycheck, and they would walk out with a prepaid
23 debit card?
24     A.  Right.
25     Q.  Okay.  Now, the company that went -- let's

1  move to PayDay One.  And you began there in what
2  year?
3      A.  2004.
4      Q.  And you joined as CEO?
5      A.  No, I joined as president.  The company had
6  been started in 2001.  I was asked to join in 2004.
7  I worked for Mike as the president, and he was the
8  CEO and chairman of the board.
9      Q.  And when was it that -- that PayDay One
10 changed its name?
11     A.  I don't remember the exact year.  I
12 would -- it was in the range of 2006 to 2008.
13     Q.  So, roughly, the time that the -- that the
14 venture with First Bank of Delaware was happening,
15 right?
16         MR. SCHEFF:  Object to the form.
17 BY MR. ACKELSBERG:
18     Q.  So, roughly, that same time period?
19         MR. SCHEFF:  Object to the form.
20     A.  I'm just trying to remember what the timing
21 was.  I -- I think that's correct.
22 BY MR. ACKELSBERG:
23     Q.  Yeah.  And so the product, the installment
24 loan product was called Think Finance, right?
25 And -- you've got to answer the question.

UNSEALED

1    MR. SCHEFF: He wasn't sure whether
2  you were finished with your question. So is
3  there --
4  BY MR. ACKELSBERG:
5    Q. The name of the product -- this is -- this
6  is a question. The name of the -- it's called
7  leading questions. So sometimes it may not sound
8  like a question, but I -- it is intended as a
9  question.
10    So the name of the product was Think --
11  ThinkCash, correct?
12    A. The name of the product was ThinkCash. The
13  reason for the -- for the change in the name of the
14  business was it -- when the company was started by
15  Mike Stinson, it was an online payday loan company.
16  It was actually a discounted payday loan using
17  technology, but it was clearly indicated by the name
18  this was a payday loan product. We had some
19  concerns with that name, so we were -- we were
20  already anticipating a different name change. But
21  Think -- ThinkCash was the product name and the
22  company name, but it was really the signal that this
23  was not a company that was about payday loans; this
24  was a company about providing access to credit in a
25  variety of different ways.

1    Q. And at that point the name changed,
2  there -- there, basically, were two products, it was
3  PayDay One and ThinkCash, right?
4    A. Right.
5    Q. Okay. And the ThinkCash product felt, in
6  your mind, as sort of closer to the direction you
7  wanted to take the company at that point; am I
8  right?
9    MR. SCHEFF: Object to the form.
10    You can answer.
11  BY MR. ACKELSBERG:
12    Q. As opposed to traditional payday loans?
13    MR. SCHEFF: Object to the form.
14    A. Yeah, we -- we felt that there was -- and
15  we were learning more about the customer needs, and
16  what was interesting to us customers were looking to
17  be able to repay their loans over longer periods of
18  time than a traditional payday loan, which is a very
19  short-term payment.
20  BY MR. ACKELSBERG:
21    Q. Usually it's two-weeks, right?
22    A. Usually -- yeah, on the next paycheck,
23  right. So we -- we were anticipating moving into
24  other forms of credit, installment loans, lines of
25  credit were all sort of anticipated pretty early

1  after I got on board and we started doing more focus
2  groups with customers.
3    But -- but to your -- to your exact point,
4  yes, the idea of ThinkCash was to move away from the
5  idea of it being a payday loan company and it being
6  a financial services company serving nonprime
7  customers.
8    Q. Then at some point, I believe -- well, I
9  think -- I think it was Chris Lutes who told us
10  this, but let me ask you: There was a point where
11  the venture capital came in and enabled you to pay
12  off Stinson and the early -- the early investors; is
13  that right?
14    MR. SCHEFF: Object to the form.
15    You can answer the question.
16    A. So when I came on board, I thought it was
17  important to have a more professional equity
18  sponsorship for the company. The company was cash
19  flow positive at the time. Typically, when venture
20  capitalists put in their money, it goes to fund
21  operations. In this case, when they put in their
22  money, it was primarily to -- to pay the founders of
23  the company, Stinson and Harvison. But they -- they
24  didn't cashout, by any stretch of the imagination,
25  but the funds that came in were really used to buy

1  parts of the ownership of Stinson and 7HBF.
2  BY MR. ACKELSBERG:
3    Q. 7HBF being the Harvison family fund, right?
4    A. That's correct.
5    Q. So when you arrived at PayDay One, was --
6  was Jason Harvison already -- already there?
7    A. He was.
8    Q. Okay. And what was his job there when you
9  arrived?
10    A. I actually don't know exactly what he was
11  working on. There was only about 20 people when I
12  joined, and oftentimes people had a number of hats.
13  But he was someone who impressed me as a -- as a
14  talented young guy, and it ended up being something
15  he took on a number of roles within the company from
16  compliance roles to operations to product
17  leadership.
18    Q. I've read some things that you've written
19  talking about the path from startup to -- to a
20  public company, which is, obviously, a very
21  impressive path. What -- in your -- in your own
22  mind, how long did the startup -- the startup phase
23  last? What was the -- I mean, I assume when you
24  were at 20 people there, that it's still in startup
25  mode. At what point, in your mind, was it something

UNSEALED

1 other than a startup?

2 A. I don't mean to be, you know, flippant in
3 the response, but I -- I feel in many ways the
4 company is still a startup. We still are constantly
5 reevaluating. When I think about what a startup
6 does, it's trying lots of things. It's focused on
7 growth. It's looking for -- for new opportunities.
8 And that's something that's been actually fairly
9 consistent in the company.

10 So it's been a company that I -- I find is
11 interesting in just how much innovation it's been
12 sort of doing from the history of the company,
13 whether even before me it was the first one to use
14 technology to have a fully automated loan
15 transaction in this space. They had already done
16 a -- a licensing deal with a third-party bank before
17 I came on board. We expanded that.

18 And so it's been sort of a constant
19 history, I think, of -- of being willing to grow and
20 try and advance. And so I don't know in my mind
21 that there is a change between startup and stable
22 because it has seemed to be that -- that type of a
23 high growth, high innovation business from -- from
24 very early on before I joined.

25 Q. Which was the -- I'm forgetting. What was

1 the bank arrangement before First Bank of Delaware?

2 A. It was before my time. It was a bank, I
3 believe, called First Bank of Las Vegas, strangely
4 not -- not in Las Vegas, you know, in New Mexico.

5 Q. Well, that's all right. First Bank of
6 Delaware wasn't much in Delaware either.

7 MR. SCHEFF: Object to the form to the
8 extent that's a question.

9 BY MR. ACKELSBERG:

10 Q. Go ahead. So. . .

11 A. And, yeah, there was a -- I don't know much
12 about the -- the transaction because before -- it
13 was before my time, but it was a -- a partnership
14 with a bank to license them technology to serve the,
15 you know, customers with credit.

16 Q. Also payday loans were at that time?

17 A. Again, I don't know for a fact whether it
18 was payday loans or installment loans. It was one
19 of those two. I don't think it was a line of credit
20 product.

21 Q. Okay. So at what point did you become CEO
22 of the company that eventually was called Think
23 Finance?

24 A. Yeah, I think it was about a year after I
25 joined. I don't know the exact date, but I think it

1 was about a year after I joined. I think Mike was
2 sort of comfortable with my management style and
3 thought that I could lead the company that he had --
4 he had established and, you know, had, justifiably,
5 a lot of pride and personal ownership in.

6 Q. And what about -- at some point, you became
7 chairman of the board as well, right?

8 A. Yes.

9 Q. And when did that happen? Could that have
10 been when the venture capital came in, like, roughly
11 when -- when Stinson was -- the Stinson debt and the
12 Harvison debt was paid off or. . .

13 MR. SCHEFF: Object to the form.

14 A. I just don't know exactly when that was.
15 I'm sorry.

16 BY MR. ACKELSBERG:

17 Q. But by the time you were entering into the
18 deal with First Bank of Delaware in 2007, you were
19 also chairman of the board at that point, right?

20 A. By 2007, I would have been chairman of the
21 board. I don't know, for instance, whether I was
22 when we got TC funding. I just don't remember that.

23 Q. Okay. Now, what about -- do you have any
24 professional -- are there any professional
25 organizations you're -- you're involved in?

1 A. I'm on the board of the Online Lenders
2 Association, and I think that's -- that's about it.

3 Q. And how long have you been associated with
4 the online lenders -- is it the association or
5 alliance?

6 A. I think it is the Online Lenders Alliance.
7 Thank you.

8 Q. Okay.

9 A. I don't know exactly when I joined. I
10 think we were asked to join, I'm going to guess, it
11 was probably '07, '08. I can't remember exactly
12 when.

13 Q. And how long have you been on the board?

14 A. It would have been since we joined as a
15 member.

16 Q. And what's the -- what's the mission of
17 OLA?

18 A. It's a trade organization for online
19 lenders to help them under- -- help both promulgate
20 best practices as well as for government affairs
21 activities.

22 Q. And are they all -- strike that.

23 All right. How would you describe your
24 leadership style?

25 MR. SCHEFF: You're talking about

7 (Pages 25 to 28)

UNSEALED

App. 0027

1   during the Think Finance period, I presume?  Because
2   I don't know whether it's changed and who knows.
3   BY MR. ACKELSBERG:
4       Q.  Yeah, that's fine.  We can -- during your
5   years --
6           MR. SCHEFF:  Confine your answers to
7   during the Think -- when you were associated with --
8   BY MR. ACKELSBERG:
9       Q.  That's all we've been talking about at the
10  moment.  So, sure, I'm happy to confine it to Think
11  Finance.
12          MR. SCHEFF:  Thank you.
13  BY MR. ACKELSBERG:
14      Q.  During your years at Think Finance, how
15  would you describe your leadership style?
16      A.  I have been asked that before, and I always
17  struggle to give an answer for it.  I've never been
18  able to articulate that.  I mean, I think what do
19  I -- what drives me as a leader is about -- we have
20  our -- our four values, and I think four values in a
21  company ultimately come from what the CEO thinks.
22          So we've always said that we want to think
23  big.  So I like innovation, and I want sort of
24  people who work for me to be driving for -- for new
25  things and trying new things.  Sort of raise the

1   bar.  So I want to see people work on incrementally
2   improving all aspects of the business.
3           Win together.  So we feel very -- very
4   strongly about the lack of functional hier- -- of
5   barriers and the lack of hierarchy in the company.
6   One of the reasons why, for instance, you know, as
7   part of my leadership style I don't just look to the
8   people below me.  I do like to listen pretty broadly
9   what's going on in the company at all levels.
10          And I think do the right thing is the
11  other thing that's part of the -- the -- are the
12  values of the company I feel very strongly about.  I
13  want to see a high level of ethics.  It's
14  something -- you know, I've been proud of the
15  company.  I think we have -- you know, instead of
16  the -- you know, the old line payday loans, we have
17  moved away from that.  We have saved customers, you
18  know, our products, $3 billion over the -- and this
19  is for the -- for the Elevate world.
20          But have really sort of held ourselves to
21  trying to do things in a better way.  So I don't
22  know if that fully answers your question, but I
23  think values of the company are a reflection of the
24  leader of the company.
25      Q.  And I do want to -- I want to follow up

1   with a little bit.  But I'm just curious, this --
2   this 3 billion figure, like, where did that come
3   from?
4           MR. SCHEFF:  Let's -- we're not
5   talking about Elevate, so let's move on.  We're not
6   talking about Elevate's business.  We're talking
7   about Think Finance, and --
8           MR. ACKELSBERG:  I didn't --
9           MR. SCHEFF:  -- he was -- he was
10  referring to Elevate.
11          MR. ACKELSBERG:  I didn't -- there was
12  no question about --
13          MR. SCHEFF:  He referred to it in his
14  answer, and that's what it is.  So let's move and
15  just focus on Think Finance.
16  BY MR. ACKELSBERG:
17      Q.  So you -- I mean, I think I saw that in --
18  that figure $3 billion saved, I mean, there are
19  documents to that from the Think period as well.
20  That's not a new concept savings, is it?
21          MR. SCHEFF:  Mr. Rees, confine your
22  answer to Think Finance, please.  Thank you.
23          MR. ACKELSBERG:  What?  I'm just
24  curious, what --
25          MR. SCHEFF:  Because this case isn't

1   about Elevate.  And, again, if you want to go talk
2   to Judge Joiner about that, I'm happy to do that,
3   but we're not talking about Elevate.  If you want to
4   talk about the spinoff, we're -- I think that's fair
5   game.  But we're not talking about Elevate's present
6   business.  We're talking about Think Finance.
7   That's what your lawsuit is about, and so that's
8   what you need to focus on.
9   BY MR. ACKELSBERG:
10      Q.  Mr. Rees, when you were at -- I mean, these
11  values that you told us about, the four values,
12  those are values that you had when you were at Think
13  Finance, right?  Can you -- right?
14      A.  Yes.
15      Q.  And they were communicated to the workers
16  at Think Finance?
17      A.  Yes.
18      Q.  Okay.  The $3 billion saved, that --
19  from -- that number was used during the Think
20  Finance period, wasn't it?
21      A.  Actually, that number wasn't used, but we
22  were through -- through the, really, latter part of
23  the Think period that I was there, we were really
24  focused on this idea of how much we saved customers
25  over payday loans.

UNSEALED

1  Q. And how do you make that calculation?
2 Whether it's 3 billion that you're quoting at
3 Elevate or some other number that you quoted
4 earlier, what -- how do you come up with that
5 number?
6  A. So the -- we used the CFPB's assessment of
7 what the average effective APR of a payday loan was
8 and then looked at the products that were originated
9 either directly by us or by partners using our
10 technology platform.  Looked at the difference
11 between the APR of those products and the
12 effective APR of payday loans, and that's how we
13 calculated them.
14  Q. And then just multiply that times the loan
15 volume?
16  A. Exactly.
17  Q. Okay.  I see.
18  You mentioned you've been asked about your
19 management style before.  Do you remember the -- the
20 interview that you did with Adam Bryant of the New
21 York Times in 2012, "How to Become a Bus Driver, Not
22 a Bulldozer"?  Do you remember that?
23  A. I do.
24  Q. Okay.  I want to show you a copy of that.
25  MR. ACKELSBERG:  Why don't we mark

1 this as Plaintiff's Exhibit 272.
2  (Exhibit No. 272 marked.)
3  A. Okay.
4 BY MR. ACKELSBERG:
5  Q. All right.  So my first question is just,
6 how in the world did you manage to get the New York
7 Times to interview you about your management style?
8  A. We had a PR team that we were working with,
9 and they were, obviously, looking for coverage of
10 the company and me as the leader and were able to
11 secure this.
12  Q. So, you know, there's reference to -- you
13 know, and this follows up for some of the things you
14 just told us about -- about trying to diminish
15 hierarchy a little bit within the -- within the
16 culture of the company, right?  And this "Cookies
17 With Ken," did that -- did that -- something like
18 that happen throughout your years with Think?
19  A. Absolutely, yes.
20  Q. And the quarterly town hall meetings?
21  A. Yes.
22  Q. And the -- so the idea was to really
23 inspire people and to -- but to also be accessible
24 to your -- to your employees?
25  A. Yeah, I mean, think the point of breaking

1 down hierarchy is to be able to listen to challenges
2 as well as to do a good job of communicating what we
3 are trying to achieve as a company.
4  Q. The title, which -- the title of the
5 article which refers to, I guess, a comment you made
6 in the -- in the interview itself about trying to
7 become more a bus driver than a bulldozer.  I take
8 it that there's -- that sometimes just from that --
9 from that description, that you've had a hard time
10 sort of not getting too involved in the details and
11 trying to look more in the big picture.  Is that --
12 is that what you're trying to communicate with this
13 bulldozer and bus driver idea?
14  MR. SCHEFF:  Object to the form.
15  You can answer the question.
16  A. You know, working for a CEO that doesn't
17 focus on building the team is ultimately, you know,
18 super frustrating for people.  And I have evolved as
19 a CEO.  I think early days, I was more -- I didn't
20 listen as much to my team, and it's something that I
21 have worked on a lot.  I've had coaches that have
22 worked on this with me.  And it's -- that's been
23 sort of the theme of trying to be a better leader is
24 to balance, you know, making sure people understand
25 what we are trying to do but also doing a better job

1 of listening and delegating and letting people run
2 their pieces of the business.
3 BY MR. ACKELSBERG:
4  Q. What about -- how would you -- we have been
5 talking about your management style, your leadership
6 style.  But what would you describe as the core
7 responsibilities of the CEO, at least -- and I'm not
8 asking for a business school answer.  I'm asking for
9 just you, Ken Rees, within the Think -- Think
10 Finance period, what did -- just in terms of your
11 work there, what were your core responsibilities?
12  A. I mean, I think, ultimately, the CEO is
13 responsible for building a team that can -- can
14 deliver the -- the growth and objectives of the
15 business, getting that team to jointly agree on a
16 direction and work effectively towards -- towards
17 achieving that direction.
18  So that's where, I think, that the bus
19 dozer -- excuse me -- the bus driver comes into
20 place, that that's -- that's -- I think the number
21 one job of any CEO is making sure you've got the
22 right people on the bus, that everybody understands
23 their -- their role, and working together, they can
24 achieve the business objectives of the business.
25  Q. Now, usually a bus driver is driving

UNSEALED

1    towards a particular -- a particular location,
2    right?  A particular direction, right?  And that's
3    part of it, too, is setting -- setting the business
4    strategy, the strategic direction of the company.
5    Would you agree with that?
6        A.  Well, I mean, certainly the CEO plays a
7    very big role in -- in establishing the direction of
8    the company.  But I think, you know, for a company
9    to align on a vision, it has to be a vision that's
10   been -- that a lot of people feel like they have
11   helped to build, and there's -- there's full
12   commitment to it.
13         And, again, I mean, that's sort of the
14   theme of the -- of this bus driver.  I think the
15   best CEOs are ones who -- who are not coming down
16   from the mountain with tablets saying, "Here's the
17   answer," but working with the team to jointly get
18   the best ideas and -- and align on -- on a vision
19   for the company in a direction that makes sense.
20         Because it doesn't make -- you know, you
21   rarely get the results you want if -- if one person
22   is saying we've got to do X but everyone else thinks
23   we've go to do Y.  I mean, I have never worked with
24   people that just blindly do what I want, as much as
25   I may like that.  It is really about coming up with

1    a -- a joint vision that people are really
2    passionate about.
3        Q.  Well, once the -- once the team has -- once
4    there's consensus on what that -- what that
5    direction is, what the strategy is, then the CEO has
6    certain -- has a certain role in terms of taking
7    that into the world, right?
8            MR. SCHEFF:  Object to the form.
9        A.  That's right.  Yes, the CEO should be
10   working with his team to make sure that -- that
11   we're doing the best job we can moving towards
12   that -- that vision.
13   BY MR. ACKELSBERG:
14       Q.  And particularly with regard to relations
15   with the board and communicating that -- that vision
16   to the board and making sure the board is aligned
17   with that vision -- with that vision, that's --
18   that's certainly a CEO responsibility, would you
19   agree?
20       A.  Yes.
21       Q.  As well as --
22       A.  Although, I would say, obviously, listening
23   to the board as well.
24       Q.  Oh, sure.
25       A.  Because the board, you know, are very

1    seasoned business people, and, ultimately, the CEO
2    does report to the board.  So it's -- it's
3    communicating and adapting as -- as need be as well.
4        Q.  And there are also -- the CEO also has --
5    and, again, I'm not talking -- talking generalities.
6    I'm talking Ken Rees as the CEO.
7        A.  Right.
8        Q.  That you also have a primary
9    responsibility -- an important responsibility with
10   regard to not only talking to board members but
11   talking to investors, right?
12           MR. SCHEFF:  Object to the form.
13         You can answer the question.
14       A.  Yeah, I mean, I think it's probably pretty
15   obvious.  You've undoubtedly looked at the board
16   memos I write.  I think it's important to be highly
17   transparent with the board in all things that are
18   working well, as well as things that aren't working
19   well, and engage them in both understanding, you
20   know -- you know, how the company is working as --
21   as well as sort of where we're -- where we're headed
22   and what the overall strategy is.
23   BY MR. ACKELSBERG:
24       Q.  And with regard to communications with --
25   with investors as opposed to board members, that

1    too, is -- the CEO has a role in that; am I right?
2            MR. SCHEFF:  Object to the form.
3         You can answer the question.
4        A.  Specifically, I'm -- so, specifically, I
5    guess I want to -- so all of the investors in the
6    company were either on the board, except for the
7    7HBF and Stinson who were not on the board.  I did
8    do a fair amount of separate interactions with Mike
9    Stinson as the founder to help him understand and
10   talk to him about the business.  I really didn't
11   spend any time updating 7HBF, even though they were
12   a meaningful investor.
13         So I just wanted to highlight, I really
14   spent my time with the board and the -- because the
15   board really represented the investors as well.  I
16   didn't -- I wouldn't say I felt that my role was --
17   was communicating to all of the investors.  It was
18   really to the board, and then I also spent some time
19   with Mike just because I thought he was a good
20   sounding board for ideas.
21   BY MR. ACKELSBERG:
22       Q.  And I understand that from the -- from the
23   earlier period.  But then there came a time as the
24   products became more and more successful that you
25   began looking for -- and maybe -- maybe "investor"

UNSEALED

App. 0030

1  is the wrong word.
2      I mean, at some point you're looking for
3  money, whether it's -- you know, whether it's equity
4  money or debt money or -- at some point, you're
5  looking for money to support growth in loan volume,
6  right?
7          MR. SCHEFF:  Object to the form.
8      You can answer the question.
9      A.  I guess "investor" in my mind is an equity
10  investor.
11  BY MR. ACKELSBERG:
12      Q.  Oh, okay.  All right.  So what would you --
13  what would you call Victory Park, for example?
14      A.  Lender.
15      Q.  Okay.  So in lender relations, the CEO
16  certainly has a role in lender relations, doesn't
17  it?
18          MR. SCHEFF:  Object to the form.
19      You can answer.
20  BY MR. ACKELSBERG:
21      Q.  You've had a role in that area?
22      A.  Yes.
23          MR. SCHEFF:  Object to the form.
24  BY MR. ACKELSBERG:
25      Q.  Okay.  Not only in maintaining relations

1  with existing lenders but also exploring other
2  options, perhaps, that might be better economically
3  for the company, right?
4          MR. SCHEFF:  Object to the form.
5      You can answer the question.
6      A.  Chris Lutes, as our CFO, was the person who
7  drove both identifying new -- new lenders and the
8  relationship management, the existing ones.  But I
9  certainly played a role as well.
10  BY MR. ACKELSBERG:
11      Q.  Was there also a role in terms of the --
12  did you also play a role in terms of the external
13  messaging of the company and the company image,
14  things like that?
15          MR. SCHEFF:  Object to the form.
16      You can answer.
17      A.  Certainly, yes.
18  BY MR. ACKELSBERG:
19      Q.  Okay.  From time to time, you -- you give
20  talks at professional conferences?
21      A.  I do.
22      Q.  One of those is call LendIt?
23      A.  Yes.
24      Q.  What is LendIt?
25      A.  LendIt is an industry conference focused on

1  technology enabled lending businesses and
2  opportunities.
3      Q.  All right.  And you've been a speaker at
4  LendIt for many years; am I right?
5      A.  I don't think I was on the first year that
6  LendIt -- or maybe in the first couple of years.
7  But for a few years now, maybe three years, I have
8  been at LendIt.
9      Q.  Let me give you another exhibit.
10          MR. ACKELSBERG:  We'll call this 273.
11          (Exhibit No. 273 marked.)
12  BY MR. ACKELSBERG:
13      Q.  So this -- I got this off the LendIt
14  website.  This is the most -- when was the last
15  LendIt conference?
16      A.  It was just a few months ago.
17      Q.  Right.  And you spoke there, right?
18      A.  Uh-huh (affirmative response).
19      Q.  What was the topic of your -- of your talk?
20      A.  I did what they called a fireside chat with
21  a reporter Ari Levy from -- I think it was C- --
22  either CBNC or MSNBC.  Must be CNBC -- talking about
23  opportunities for nonprime lending and -- and why we
24  felt the technology could help eliminate some of the
25  predatory products in the space.

1      Q.  And Exhibit 273 is a copy of the bio you
2  supplied for that -- for that conference; am I
3  right?
4      A.  I didn't supply it, but I -- I imagine that
5  our PR team did.
6      Q.  But you looked at it before it was
7  submitted, right?
8      A.  I don't -- I don't know that I did.
9      Q.  I mean, what I notice is that your years at
10  Think Finance seem to have been -- seem to have
11  disappeared.  Do you see that?
12          MR. SCHEFF:  Object to the form.
13      You can answer the question.
14      A.  So it talks about Elevate and it talks to
15  prior to Elevate, and it doesn't talk about Think
16  Finance.  But, you know, Elevate is pretty well
17  known as the spinoff from Think Finance.
18  BY MR. ACKELSBERG:
19      Q.  So according to this, you -- you know, you
20  mention -- well, you mentioned Reed College and
21  University of Chicago, right?
22      A.  For the record, I didn't mention Booz Allen
23  or -- or Mr. Payroll, nor did I mention the multiple
24  names that happened before.  So more focused on -- I
25  mean, this is bio, and keeping it short is

1  important.  I thought this was the salient parts of
2  my -- my resume'.
3      Q.  So --
4      A.  Or I mean -- go ahead.
5      Q.  You came -- you came to Think Finance as
6  the CEO in 2004 from CashWorks, right?
7          MR. SCHEFF:  Objection; misstates the
8  testimony.
9      A.  Actually, I was the president --
10 BY MR. ACKELSBERG:
11     Q.  I'm sorry, the president.
12     A.  -- of PayDay One, which then turned into
13 ThinkCash, which then turned to Think Finance.  And
14 I'm -- the simplicity of this, rather than listing
15 of a bunch of corporate names, that it seemed like
16 it was a cleaner thing for people to understand when
17 looking at a bio.
18     Q.  Okay.  Is there -- is there any reason why
19 you'd rather not talk about Think Finance --
20         MR. SCHEFF:  Object to the form.
21 BY MR. ACKELSBERG:
22     Q.  -- in a -- in a professional setting like
23 this?
24         MR. SCHEFF:  Object to the form.  The
25 witness said he's never even seen this document.

1  So -- didn't draft it.  So if that's what you're
2  referring to, I think you're misstating the
3  testimony and misleading the witness.
4  BY MR. ACKELSBERG:
5      Q.  Go ahead.
6          MR. SCHEFF:  You can answer the
7  question if you can.
8      A.  But I -- I mean -- so we went public, and
9  in the S1 it talks at length about, you know, my
10 history with Think Finance and the evolution and how
11 Elevate was a spinoff from Think Finance.  So,
12 certainly, there's been no attempt to, you know,
13 sort of expunge that from the record by any stretch
14 of the imagination just for purposes of this.  It
15 was more interesting to highlight the things that
16 were highlighted on this page.
17 BY MR. ACKELSBERG:
18     Q.  Okay.
19         MR. ACKELSBERG:  This is P-274.
20         (Exhibit No. 274 marked.)
21 BY MR. ACKELSBERG:
22     Q.  Oh, and we're going to be -- you probably
23 know this, but just to be clear, make sure you do
24 know it, you see that --
25         MR. ACKELSBERG:  Are we short any?

1  Everybody have one?
2          MR. SHAPIRO:  Yes.
3  BY MR. ACKELSBERG:
4      Q.  Do you see the numbers at the lower
5  right-hand -- underneath the exhibit sticker, do you
6  see the "TF-PA"?
7      A.  Yes.
8      Q.  Okay.  Just so you understand the
9  conventions here, "TF-PA" means it's a document
10 produced by Think Finance.  You will also see
11 probably some documents produced by other parties,
12 and when that happens, I'll explain that to you.
13         But -- so Exhibit 274 begins -- the other
14 thing -- the other convention is that in a
15 multi-page document that was produced, we used the
16 first page as a convenient way to reference the
17 whole document.  So if we reference document TF-PA
18 683403, we're referring to the discovery document
19 that starts with that Bates number.  Okay?
20         MR. SCHEFF:  Irv, is this attached to
21 an e-mail?
22         MR. ACKELSBERG:  No, I don't believe
23 it is.
24         MR. SCHEFF:  Thank you.
25 BY MR. ACKELSBERG:

1      Q.  And just for your -- and, also, just to --
2          MR. ACKELSBERG:  Thank you, Richard.
3  BY MR. ACKELSBERG:
4      Q.  Just to give the witness as much
5  information as possible, you know, I know it's a
6  little bit -- we're going to be throwing things at
7  you from the past, but -- but according to the
8  metadata that came with, this was a document that
9  was found in your folder and that you were the
10 custodian and that you were the author of the
11 document according to the -- to the metadata.  Okay?
12     A.  Thank you.
13     Q.  All right.  So in -- do you need some more
14 time to look at it?  Are you familiar with the
15 document?
16     A.  I'm not.  I can flip through it, if you
17 don't mind.
18     Q.  Sure.
19     A.  (Reviews document.)
20         Can I ask a question?  This is highlighted
21 here.  Was that highlighted --
22     Q.  I have no idea.
23     A.  -- in the draft, or was that highlighted by
24 the attorneys?
25     Q.  It's how we -- it's how we got it.  No,

UNSEALED

1   this is not --
2     A.  Okay.  This is not highlighted by you.
3     Q.  No.  I think this is --
4     A.  Because I notice that there's a mark on
5   here, too.  And I -- I assume that's -- that this
6   mark is by, I'm sorry, page 12.  Is it just my copy
7   that has the mark on it?
8        MR. SCHEFF:  It is.
9   BY MR. ACKELSBERG:
10    Q.  It may be.
11    A.  Okay.
12    Q.  Well, we can -- why don't we switch if
13   there's a mark on there.
14    A.  It's not -- it's not interrupting me.  It's
15   fine.
16    Q.  Okay.
17    A.  Thanks.
18       MR. SHELDON:  Once you're done
19   reviewing it, I actually think you should switch
20   just because -- for the sake of the record, I want
21   the deposition exhibit to be clean rather than
22   marked on.
23       MR. ACKELSBERG:  Yeah, why don't we
24   just do that.  I'll take it off that.  We'll just
25   switch the sticker.

1       THE WITNESS:  And after we go through
2   this, if I could do a restroom break, that would be
3   terrific.
4       MR. SCHEFF:  Do you want to do it now,
5   just because --
6       THE WITNESS:  I can last a little bit
7   longer, or we can break now.
8       MR. ACKELSBERG:  Well, we'll last a
9   little bit longer.  Just ask a few questions.
10      THE WITNESS:  Okay.  You know,
11   actually, now that I think about it, it's going to
12   take me a minute to read that.  Why don't I go ahead
13   and. . .
14      THE VIDEOGRAPHER:  Going off the
15   record.  The time is 10:02 a.m.
16      (Break taken, 10:02 a.m. to 10:11 a.m.)
17      THE VIDEOGRAPHER:  We are back on the
18   record.  The time is 10:11 a.m.
19   BY MR. ACKELSBERG:
20    Q.  Mr. Rees, in the -- during the break, we
21   did go into the discovery trove and found that, in
22   fact, there is an e-mail connected to this document.
23   It was an e-mail dated July 5, 2013, from you.  It
24   looks like, I guess, from one e-mail address to you
25   at thinkfinance.com and attaching a document called

1   "Think Finance Business Plan 4-1."  Do you see that?
2    A.  Yes, thank you.
3    Q.  Okay.  So having looked at the document --
4    A.  I'm sorry, I've got a couple more pages.
5    Q.  Oh, sure, sure.  Go ahead.
6    A.  Thanks.
7      (Reviews document.)
8      Thanks for that.
9    Q.  Okay.  So you still don't recognize the
10   document itself?
11    A.  No.
12    Q.  Okay.  But the information that's within
13   the document is information that you're familiar
14   with; am I right?
15    A.  Yeah, I mean, it appears to be sort of a
16   draft version.  There's a lot of gaps in it.  I
17   don't know what sort of -- the purpose or use of it
18   was, but -- but much of the material is material
19   that I would have seen from other documents.
20    Q.  Well, and -- and assuming that you were the
21   author -- the metadata says you were, I don't know.
22   But if it -- if you were the author, there --
23   these -- there's much content in here that you're
24   familiar using --
25    A.  Yes.

1    Q.  -- as other things you have written, right?
2    A.  Correct.
3       MR. SCHEFF:  Object to the form.
4   BY MR. ACKELSBERG:
5    Q.  Now, do you remember preparing business
6   plans either for the board or for investors or for
7   the executive team or for -- is this -- this is
8   within the bailiwick of what CEOs do, right?
9       MR. SCHEFF:  Object to the form.
10    A.  Specifically to this, I don't remember
11   this, other than the -- than what we did for the
12   regulatory filings when we -- when we went public.
13   I don't know that we ever sort of had an official
14   business plan that was approved by the board, per
15   se.  So I can't speak to exactly what the purpose of
16   this was.
17   BY MR. ACKELSBERG:
18    Q.  Well, at April 2013, this was -- this was
19   before -- this was sometime before the -- the idea
20   of the split occurred, right?
21       MR. SCHEFF:  Object to the form.
22      You can answer the question.
23   BY MR. ACKELSBERG:
24    Q.  That was more, like, in the summer after
25   the ACH crisis, right?

UNSEALED

1     MR. SCHEFF: Object to the form.
2     You can answer the question.
3     And lack of foundation.
4     A.  I don't know when we -- we first started
5  thinking about a spinoff.  It would have been close
6  to this time, but I don't know if it happened before
7  or after this April time frame or before or after
8  the July time that I apparently sent this to myself.
9  BY MR. ACKELSBERG:
10     Q.  But there -- there was -- I mean, there was
11  always a desire internally for an IPO, right?  I
12  mean, that was from the beginning of -- from the
13  beginning of your time arriving at the company,
14  right, or soon thereafter?
15     MR. SCHEFF: Object to the form.
16     You can answer the question.
17     A.  That was one, as they say, liquidity event
18  that we were optimistic about from when I joined the
19  business, that's correct.
20  BY MR. ACKELSBERG:
21     Q.  And is it possible that you were sketching
22  this out for a possible IPO by Think Finance itself?
23     MR. SCHEFF: Object to the form; calls
24  for speculation.
25     You can answer the question.

1     He's testified he doesn't remember the
2  document.
3     A.  So I can speak to the fact that at Think
4  Finance we did believe that Think Finance could go
5  public.  I don't know the purpose of this document.
6  BY MR. ACKELSBERG:
7     Q.  Okay.  Well, let's just look at some of
8  the -- some of the material in here.  So let's -- I
9  mean, there's things, like, the -- page 4, you see
10  there's the four values I think that you talked
11  about before.  Right?  Do you see that?
12     A.  Yes.
13     Q.  And there's reference to the town hall
14  meetings?
15     MR. SCHEFF: Where are you referring
16  to?  Page same?
17     MR. ACKELSBERG: Same page.
18  BY MR. ACKELSBERG:
19     Q.  Right?  I mean, these are -- and if you can
20  just start from the -- start from the beginning,
21  these -- the bullets, the 11 years of innovation --
22     MR. SCHEFF: What page are you on?
23     MR. ACKELSBERG: Page 1.
24     MR. SCHEFF: Thank you.
25  BY MR. ACKELSBERG:

1     Q.  I mean, 11 years of innovation, 3.5 billion
2  in credit issue, I mean, these are numbers that
3  you're familiar with, right?
4     MR. SCHEFF: Object to the form.
5     A.  There's much that I have seen in here
6  before.  It's just clearly a draft document, and I
7  don't know exactly what the purpose of it was.  But
8  I -- there was much that would have been consistent
9  with other documents we had -- we had written.
10  BY MR. ACKELSBERG:
11     Q.  Well, that you had written, right?
12     A.  Correct.
13     Q.  Okay.  And the description of the market at
14  the bottom of page -- page 1.
15     MR. SCHEFF: What about it?  Is there
16  a question?
17  BY MR. ACKELSBERG:
18     Q.  That's -- that's also consistent with
19  other -- other descriptive narratives you've written
20  with regard to the -- to the -- to the market you're
21  serving?
22     MR. SCHEFF: Object to the form.
23     You can answer the question.
24     A.  It's consistent.
25  BY MR. ACKELSBERG:

1     Q.  On page -- let's go back to page 4.  And so
2  there is -- there's a description of the U.S. credit
3  products.  Do you see that?
4     A.  Yes.
5     Q.  Okay.  And the fact that there's question
6  marks in the last -- the last box -- do you see
7  that?  I mean, that -- that indicates this might
8  have been a working document, right?
9     MR. SCHEFF: Object to the form.
10     A.  It does appear to be a working document.
11  Even the -- it says, "Financing history, company
12  values, responsible lending," and not completely
13  filled out.
14  BY MR. ACKELSBERG:
15     Q.  Right.
16     A.  So I -- yes, it does look like a work in
17  process.
18     Q.  And so it -- it goes through the U.S.
19  products at the time, and the first one is -- is
20  Lending Street.  Now, am I right, this was a
21  rebranding of PayDay One that was being talked about
22  at that time?
23     MR. SCHEFF: Object to the form.
24     A.  That is correct.  It's sort of interesting
25  that PayDay One wasn't mentioned here, because I

UNSEALED

1  don't believe we actually ever launched that brand,
2  Lending Street. I think before we launched it, we
3  ultimately changed the name to RISE, and that's
4  what the -- the PayDay One product ultimately
5  morphed into.
6  BY MR. ACKELSBERG:
7      Q.  Okay. And that was the state licensed
8  installment loan product, right?
9      A.  Yes.
10     Q.  And then there were reference to the three
11 tribal products?
12     A.  Correct.
13     Q.  Plain Green, Great Plains Lending,
14 Mobiloans, right?
15     A.  Yes.
16     Q.  And then there's another -- another product
17 called MySalaryLine. Did that ever go online?
18     A.  MySalaryLine was the product, as I recall,
19 that we bought originally from another company and
20 then rebranded as Elastic. And it ultimately became
21 that product -- that Republic Bank originated.
22     Q.  All right. And then there's -- there's a
23 bar graph on page 5 sort of showing where the
24 company's products lie within the -- within the
25 market, and this is -- you're familiar with this

1  graph, right?
2          MR. SCHEFF: Object to the form.
3      A.  Yes.
4  BY MR. ACKELSBERG:
5      Q.  If I were to tell you I've seen this
6  display or something like this display on numerous
7  decs presented to investors or the board or whoever,
8  that you were using -- you, Ken Rees, used -- have
9  used a graph like this frequently, right?
10         MR. SCHEFF: Object to the form.
11     You can answer the question.
12     A.  At this era, I -- around 2013 timeframe, I
13 had seen this and used this before it, yes.
14 BY MR. ACKELSBERG:
15     Q.  Well, when you say "have seen it," I
16 mean --
17     A.  I said I used it.
18     Q.  Did you -- did you create it?
19         MR. SCHEFF: Object to the form.
20     A.  We had a PR team, a marketing team. I
21 would have been involved in the creation of it. I
22 don't know that every single one of these line items
23 came from me. I did put it together, but I was
24 involved in the creation of it.
25 BY MR. ACKELSBERG:

1      Q.  And so let me -- let me just understand the
2  display. So you're basically trying to compare the
3  products that the company is involved in and
4  comparing it to other products in the same space,
5  market space, correct?
6      A.  Correct.
7      Q.  All right. And so you have PayDay loans,
8  which you have on the right are -- you say are
9  averaging 520 percent, right?
10     A.  That's what this say, yes.
11     Q.  Okay. And then you have late payments on
12 utility bills as a comparison of more than twice --
13 twice that, to payday loans, right?
14     A.  That's, again, what this says, yes.
15     Q.  I mean, why are you comparing payday loans
16 to late payments on utility bills?
17     A.  This chart, as I recall, was trying to
18 highlight the real world financial challenges that
19 customers who are not served by banks get into. So
20 if they need to pay an unexpected bill, this has a
21 meaningful expense to them. In this case, there was
22 a -- you know, a late payment. I -- I don't
23 remember the map on this. I'm sure the map was
24 checked.
25     But, you know, with a hundred dollar

1  utility bill, that could generate a very high
2  effective APR so that a payday loan could actually
3  be a financial option for customers versus that.
4  And then, I mean, clearly we felt that products,
5  like -- like, Plain Green and MySalaryLine could be
6  an even better option for consumers.
7      Q.  Now, a late payment on an utility bill or
8  an overdraft bill, those are one-time events, right?
9          MR. SHAPIRO: Object to form.
10     A.  Like, we were, first and foremost, looking
11 at the difference between APRs. And I think why we
12 thought this was a relevant comparison is if the
13 customer had a payment -- you know, a late payment
14 and they were able to ultimately pay that off very
15 quickly so there weren't any others, they could do
16 the same thing with the loan that they got from us
17 because there was never any prepayment penalties or
18 origination fees or anything like that on our
19 product. So we thought it was a -- it was a fair
20 comparison.
21     But, you know, the point is well taken
22 that -- that there are different terms for these
23 products, but it -- I mean, there's a reason that
24 people look to effective APR as a way to compare the
25 cost of credit.

UNSEALED

1  BY MR. ACKELSBERG:
2      Q.  Now, payday loans, you mentioned before,
3  they tend to be two-week -- two-week contracts.  But
4  they're rarely paid off after two weeks, right?
5          MR. SCHEFF:  Object to the form.
6      A.  That's -- that's true.
7  BY MR. ACKELSBERG:
8      Q.  Okay.  Now, in this grid, so you have
9  payday loans as 520 percent.  By the way, what
10  was -- what was the -- rate of PayDay One when
11  that was online?
12          MR. SCHEFF:  What -- in what time
13  period?
14          MR. ACKELSBERG:  When it was online.
15  I don't know what --
16          MR. SCHEFF:  If you know from spanning
17  that time period. . .
18      A.  It operated under different state laws, so
19  different states had -- had different -- but I -- my
20  memory is that that was capped at $14 per hundred
21  for a two-week loan.  So it was capped at
22  360 percent.
23  BY MR. ACKELSBERG:
24      Q.  Okay.  And then you have in the -- in the
25  comparison going down, I mean -- and it's moving to

1  the left of the graph, you're showing -- you're
2  trying to show less expensive options, right?
3      A.  Yes.
4      Q.  All right.  And then after payday loans,
5  you have Mobiloans line of credit, and you have that
6  as about 390 percent.  Do you see that?
7      A.  Yes.
8      Q.  And how was -- how was -- how did you come
9  up with a 390 percent effective APR for Mobiloans?
10          MR. SCHEFF:  Object to the form.  He's
11  not saying he did the calculation.  If you're
12  referring to "you" as Think Finance, then he can
13  answer that question.
14  BY MR. ACKELSBERG:
15      Q.  Go ahead, you can answer it.  How did you
16  and the PR people and the people putting together
17  this table come up with that number?
18          MR. SCHEFF:  Object to the form;
19  misstates the testimony.
20          You can answer the question.
21      A.  If you're asking specifically this table,
22  how did we come up with 390 percent, I believe that
23  was the stated effective APR of the Mobiloans line
24  of credit product at that time.
25  BY MR. ACKELSBERG:

1      Q.  And then you have, "Plain Green (first
2  loan)," and it says 240 percent.  Do you see that?
3      A.  Yes.
4      Q.  And, I mean, if -- and this, in fact,
5  was -- I mean, you would -- Think Finance would have
6  used the numbers that -- the percentages that were
7  actual, the actual -- this was the actual at this
8  time --
9      A.  I have no reason to --
10          MR. SCHEFF:  Hold on.
11          Finish your question.
12  BY MR. ACKELSBERG:
13      Q.  Do you have any reason to believe these
14  numbers are inaccurate?
15          MR. SCHEFF:  Object to the form.
16          Answer the question.
17      A.  I don't know.
18  BY MR. ACKELSBERG:
19      Q.  I notice in this grid that Great Plains
20  Lending is not there.  You didn't list them.  Do you
21  remember the -- the first loan APR for Great Plains
22  Lending?
23          MR. SCHEFF:  Object to the form to the
24  extent that the question suggests that Mr. Rees made
25  a decision to either include or not include Great

1  Plains Lending.
2          You can answer the question.
3      A.  I don't remember what the effective APR of
4  Great Plains Lending was.
5          COURT REPORTER:  I'm sorry, you don't
6  remember the effective. . .
7          THE WITNESS:  APR of Great Plains
8  Lending.
9          MR. ACKELSBERG:  This will be 275.
10          MR. SCHEFF:  Are you done with 74?
11          MR. ACKELSBERG:  No.  We'll go back to
12  that.
13          (Exhibit No. 275 marked.)
14      A.  (Reviews document.)
15  BY MR. ACKELSBERG:
16      Q.  All right.  You see this is now April 2015,
17  this e-mail.  We're looking, by the way, at
18  Exhibit 275.  It is Bates stamped TF-PA 308918.
19          So the e-mail chain, as many e-mail chains
20  work, you've got to go the back to see how it
21  works.  You know that, right?
22      A.  Yes.
23      Q.  So April 2015, at this point, you were the
24  CEO of Elevate but still the chairman of the board
25  of Think?

UNSEALED

1    A. I'm not sure exactly when I stepped off.
2  It would have been --
3    Q. About that time?
4    A. You guys would know. But probably about
5  that time I left the board, but I don't know exactly
6  when that was.
7    Q. Okay. So you -- you noticed an article
8  about -- when it says "CT," it's the Chippewa?
9  Or -- is that who you're referring to? I don't know
10 what CT is. No, it wouldn't be --
11   A. CT.
12   Q. CT, I'm sorry, the Connecticut lawsuit with
13 the Otoe-Missouria, right?
14   A. That's what it appears to be.
15   Q. Okay. So there's an article that you're
16 noticing that describes the State of Connecticut's
17 lawsuit with the Otoe-Missouria tribe, and you're
18 quoting to Michelle Nguyen the -- the description of
19 the APR's on Great Plains' loans. Do you see that?
20   A. Yes.
21   Q. Okay. And what the article said was that
22 the -- the APR is in the range of 349 percent to,
23 roughly, 449 percent. Do you see that?
24   A. Yes.
25   Q. Okay. And it looks like you were surprised

1  to see that the APRs were that high, and you asked
2  Michelle whether that was accurate. And she
3  confirmed that, in fact, those were the accurate
4  numbers, right?
5        MR. SCHEFF: Object to the form.
6        You can answer the question.
7    A. Correct.
8  BY MR. ACKELSBERG:
9    Q. Okay. So assuming this is correct, then
10 where would -- where would GPL -- going back to the
11 exhibit we were looking at before, where would GPL
12 fit?
13   A. Well, if this is correct, from 350 to 448,
14 it would have been below Quid on the low side and
15 between late fee on credit card balances and payday
16 loans on the high side.
17   Q. Okay. Now, there's a -- if you turn the
18 page, now we're on page 6, there's a section of this
19 document that's entitled, "How Think Finance Makes
20 Money." Do you see that?
21   A. Yes, I do.
22   Q. And in the first paragraph -- and I think
23 the -- there's a -- there's a distinction made
24 between direct and indirect product. That's a
25 distinction you're familiar with, right?

1    A. I think I'm making a distinction between
2  the products where Think Finance is the lender and
3  where Think Finance provides technology and services
4  to the lender.
5    Q. The latter being the indirect that would --
6    A. I don't --
7        MR. SCHEFF: Object to the form.
8    A. Actually, thank you, I didn't see the word
9  "indirect" until I just looked here. So, yes,
10 right, that appears to be correct.
11 BY MR. ACKELSBERG:
12   Q. Okay. And what this description -- so let
13 me just ask you: Is it correct that with regard to
14 products where Think Finance is the direct lender,
15 the income it receives is the finance charges that
16 consumers pay, right?
17   A. Yes.
18   Q. And in -- with regard to the direct loan
19 programs, Think Finance also directly bears the cost
20 of losses, marketing expenses and operating
21 expenses, correct?
22   A. For the direct?
23   Q. Yes.
24   A. Yes.
25   Q. Okay. And then we -- we get into the

1  indirect products. That's the next -- it looks like
2  the next paragraph. It says in those cases, and
3  using Great Plains, Plain Green and Mobiloans as
4  examples, "Think Finance receives license fees for
5  the technology and underwriting scores." Is that
6  correct?
7        MR. SCHEFF: Object to the form.
8        You can answer the question.
9  BY MR. ACKELSBERG:
10   Q. Is the information correct?
11   A. Just for the record, it also included the
12 MySalaryLine product. But, yes, the -- the Think
13 Finance receives licensing fees for technology and
14 underwriting scores and marketing revenue from the
15 lender for helping them acquire customers.
16   Q. Okay. And then -- and then it states in
17 the next paragraph that nonaffiliated investment
18 funds purchase participations in those indirect --
19 in those indirect loans, correct?
20   A. That's correct.
21   Q. And it says and that way the lenders
22 only -- you know, only need limited capital to --
23 I'm not -- I'm not giving you every word for word.
24 I'm trying to -- basically summarizing this, that
25 the lenders only need limited capital to make the

UNSEALED

 1  loans, and they can also keep the credit risk off
 2  their books, right?
 3      MR. SCHEFF:  Object to the form.
 4      A.  So I think a more broad-based assessment of
 5  why lenders would participate out the loans in this
 6  way, it's a pretty common practice for banks.  I
 7  think almost all mortgages are ultimately -- you
 8  know, a participation is sold off on the mortgages,
 9  generally, for a couple reasons.  One is the cash --
10  the actual capital that the lender has, but also in
11  the case of banks, then the -- regulations require
12  them to -- to overcapitalize loan balances.  And so
13  that's why a lot of banks push those balances to
14  third parties.
15      So it's a -- cash constraint as well as
16  the -- in the banking environment, they're
17  oftentimes forced by regulators to -- to get more
18  equity capital investments to support the growth of
19  a loan portfolio.
20  BY MR. ACKELSBERG:
21      Q.  But if we move to the tribal environment,
22  there is no such -- there really are no similar
23  regulations; am I right?
24      MR. SCHEFF:  Object to the form.
25      You can answer the question.

 1      A.  In the tribal environment, it was about the
 2  cash and capital availability of that tribe to make
 3  those loans and keep them on their books.
 4  BY MR. ACKELSBERG:
 5      Q.  But there's no regulator who's telling them
 6  how much capital they have to have or how much
 7  reserves or anything -- anything equivalent to what
 8  banks have, right?
 9      MR. SHELDON:  Object to form.
10      MR. SCHEFF:  Object to the form.
11      You can answer the question if you can.
12      A.  I don't know the tribal law in all of the
13  cases.  I'm not aware of any tribal law that forces
14  them to overcapitalize for -- for loan balances.
15  BY MR. ACKELSBERG:
16      Q.  Are you aware of any tribal law that deals
17  with any -- anything equivalent to something like --
18  well, the National Bank Act or something like that?
19      MR. SCHEFF:  Object to the form.
20      Answer the question if you can.
21      A.  You -- I think what it sounds like we're
22  specifically asking is am I aware of a tribal law
23  that requires a tribe to overcapitalize their loan
24  balances?
25  BY MR. ACKELSBERG:

 1      Q.  Well, you already answered that you're not
 2  aware of that law.  But are you aware of any -- are
 3  you aware of any tribal law in the lending arena at
 4  all?
 5      A.  Yes.
 6      MR. SCHEFF:  Like what?  Just general
 7  tribal lending law?  Is that what you're asking for?
 8      A.  Yes, there's tribal lending laws.
 9  BY MR. ACKELSBERG:
10      Q.  And what are you referring to?  The model
11  code of the -- of NAFSA, is that what you're
12  referring to?
13      A.  The tribes set up -- they have their -- I
14  can't speak to all the details, but I believe they
15  have -- it's been represented to me they have their
16  own lending statutes.
17      Q.  Who represented that to you?
18      MR. SCHEFF:  Object to the form.
19      To the extent you can answer that question
20  without revealing communications from counsel,
21  please do.  If you can't, then just advise us, and
22  we'll direct you not to answer the question.
23      A.  I don't think I can.
24      MR. SCHEFF:  Okay.  Then I direct you
25  not to answer the question.

 1  BY MR. ACKELSBERG:
 2      Q.  So other than anything you heard from
 3  your -- from an attorney, have you ever seen
 4  anything purporting to be tribal law?
 5      A.  Have I ever seen tribal law?
 6      Q.  Pertaining to the -- to consumer lending?
 7      A.  I'm sure the only tribal consumer lending
 8  statutes or representation about that would have
 9  come from counsel.
10      Q.  Okay.  Well, we'll drop that for the
11  moment.
12      Let's go back to -- let's go back to the
13  text here on page 6.  So the -- in the direct -- in
14  the direct lending context, Think Finance would
15  directly bear the cost of loss, marketing expense
16  and operating expense, right?  That's -- in the
17  direct lending context, that's how it works
18  financially, right?
19      A.  That's correct.
20      Q.  Isn't that how it worked in the indirect as
21  well?
22      MR. SCHEFF:  Object to the form.
23      You can answer the question if you can.
24      A.  So there's a difference in it.  This
25  actually states it, I think, pretty clearly.

1  There's a difference between the contractual
2  relationships and the accounting treatment.  So the
3  contractual relationships -- should I finish?
4  BY MR. ACKELSBERG:
5      Q.  Yeah.  I'm just confused.  Yeah,
6  absolutely.
7          MR. SCHEFF:  Just finish your question
8  (sic), and then he'll ask another.
9  BY MR. ACKELSBERG:
10     Q.  Yeah, yeah, absolutely, finish.
11     A.  So in the contractual relationships, as
12 it -- as it says here, we receive licensing fees for
13 the technology and underwriting scores.  And then
14 "we," meaning Think Finance, receive marketing
15 revenue from the lender to help them acquire
16 customers.
17         However, as is laid out here, and I'm
18 really just reading from it, "The investment funds,"
19 these unaffiliated investment funds that buy
20 participations, "contracted with Think Finance as
21 the administrative agent for the funds and to
22 purchase past due loans from the books of the
23 investment funds.  Because of this, for accounting
24 purposes, Think Finance typically consolidates loans
25 onto its balance sheets and recognizes finance

1  charges, losses, and operating expenses."  This is
2  an accounting treatment, not a contractual one.
3      Q.  All right.  So first of all, in terms of
4  the paragraph you just read, is that information
5  accurate?  Does it accurately describe the tribal
6  products at Think?
7          MR. SCHEFF:  As of 2013?
8          MR. ACKELSBERG:  Yeah.
9          MR. SCHEFF:  Thank you.
10     A.  At the time, I believe it did represent
11 accurately the business relationship between Think
12 and the tribes.
13 BY MR. ACKELSBERG:
14     Q.  Okay.  And am I right, that for accounting
15 purposes, the -- the loans are effectively on the
16 balance sheet of Think Finance?
17         MR. SCHEFF:  Object to the form.
18         You can answer the question.
19     A.  The difference between the contractual
20 relationship and accounting relationship is -- is
21 distinct.  And as I've said, the contractual
22 relationship, the only way that we got cash flows
23 was from the -- the licensing agreement and from the
24 technology and services -- excuse me -- the
25 marketing arrangement, the technology and services,

1  and then the administrative agent.
2          But -- so that's why, generally speaking,
3  the finance charge and -- and losses and operating
4  expenses -- see if I can say it.  I think what --
5  what I've said is -- is sort of accurate, that
6  there's a contractual relationship, and that's how
7  we generally make money.  But the accounting
8  treatment, because of the -- the guarantee to the --
9  to the investment funds we're required to recognize
10 that finance revenue on our balance sheet --
11 BY MR. ACKELSBERG:
12     Q.  All right.  Well, let's -- let's --
13     A.  -- on a P&L.
14     Q.  I'm sorry, I didn't mean to interrupt.
15     A.  Yeah, and, I'm sorry, I'm -- that I'm not
16 an accountant.  I sort of -- you may be getting to
17 the -- to the limit of my understanding of the exact
18 accounting treatment and which FASB rules require us
19 to recognize that revenue and those losses directly.
20     Q.  Well, I'm not asking -- I mean, I realize
21 you're not a CPA.  I'm not asking you for -- you
22 know, for CPA talk.  This is really more CEO talk
23 what -- I mean, the CEO certainly knows the audited
24 financial statements of his company, right?
25         MR. SCHEFF:  Object to the form.  He's

1  told you what the limits of his knowledge are.
2          And you can answer the question if you
3  can.
4  BY MR. ACKELSBERG:
5      Q.  You're familiar with the -- with the
6  financial statements of your company, right?
7          MR. SCHEFF:  You're asking whether
8  he's familiar with the financial statements of Think
9  Finance as of 2013?
10 BY MR. ACKELSBERG:
11     Q.  Go ahead, you can answer the question now.
12         MR. SCHEFF:  Which question do you
13 want him to ask?
14 BY MR. ACKELSBERG:
15     Q.  Just answer the question.
16         MR. SCHEFF:  Because he's got to
17 confine his answer to this time period, 2013.
18         So confine your answer appropriately.
19 BY MR. ACKELSBERG:
20     Q.  You're familiar with the Think Finance
21 consolidated financial statements, correct?
22     A.  In 2013, I would have reviewed the
23 consolidated statements of the company.
24     Q.  And you would have reviewed them in 2012?
25     A.  I would have reviewed them annually, yes.

UNSEALED

1     Q. Every year?

2     A. Uh-huh (affirmative response).

3     Q. Yes? You've got to say "yes."

4     A. Yes. Sorry.

5     Q. Well, I want to just probe this difference

6  between contractual and accounting. And so let's

7  just talk contractual. With regard to the tribal

8  loans, the tribes had no monetary risk; am I right?

9       MR. SCHEFF: Object to the form.

10 BY MR. ACKELSBERG:

11    Q. No risk of loss --

12      MR. SCHEFF: Object to the form.

13 BY MR. ACKELSBERG:

14    Q. -- on nonpayment of loans?

15      MR. SCHEFF: Object to the form.

16    A. Well, they retained 1 percent of the --

17 this is at -- at the time that that evolved, as I'm

18 sure you know. But at the time of the -- we're

19 talking about here, the tribes made the full loan,

20 and then at the -- the participant would have the

21 option to purchase that -- that loan from them, and

22 they could purchase up to 99 percent of that loan

23 and leave the -- the tribe with 1 percent.

24    So there's sort of two -- two inherent

25 risks that the tribe had. One was that the lender

1  would decide not to purchase those balances from

2  the -- from the -- from the tribe, in which case

3  they would have a hundred percent of the risk.

4  Otherwise, they would only have 1 percent of the --

5  of the risk. If the -- excuse me -- if the -- that

6  investor in the fund purchased the 99 percent, then

7  they would be left with the 1 percent left over.

8  BY MR. ACKELSBERG:

9    Q. But the tribes -- that initial funding

10 capital, the tribes didn't use their own money for

11 that, right?

12      MR. SCHEFF: Object to the form; lack

13 of foundation.

14    You can answer the question if you can.

15    A. I don't think that's accurate.

16 BY MR. ACKELSBERG:

17    Q. All right. Well, let's just start -- let's

18 go through the tribes. Plain Green, that capital

19 came from Steven Haynes to make the loans, right?

20    A. I don't know the details of that

21 transaction, but that's -- that's been what I've

22 been told.

23    Q. And then Think Finance gave Mr. Haynes --

24 or Haynes Investments the money to give to Plain

25 Green. You remember that, right?

1       MR. SCHEFF: Object to the form;

2  misstates prior testimony, misstates documents you

3  have marked as exhibits. Don't mislead the witness.

4  Ask an appropriate question.

5  BY MR. ACKELSBERG:

6    Q. Now you can answer.

7    A. I'm sorry, what is the question?

8    Q. I know, it's hard when your lawyers are

9  giving you -- telling you what they want you to talk

10 about.

11      MR. SCHEFF: No, we're trying to make

12 sure that you don't mislead the witness that you

13 keep doing in every single deposition.

14      MR. ACKELSBERG: Oh, I'm -- I'm

15 sure that what's --

16      MR. SCHEFF: Ask your question. Just

17 ask the question, a proper question.

18 BY MR. ACKELSBERG:

19    Q. When the -- when the relationship with

20 Plain Green began -- you certainly remember that in

21 2011, right? You remember that -- let's just take

22 question by question.

23    You remember the beginnings of that

24 relationship?

25    A. I remember the beginnings of that

1  relationship.

2    Q. Okay. And do you remember that Think

3  Finance made it clear to the Chippewa Cree that they

4  were not going to have to put up any of their own

5  money? You remember, right?

6    A. I don't remember that.

7      MR. SCHEFF: Object to the form.

8  BY MR. ACKELSBERG:

9    Q. You don't remember that?

10    A. No, I don't.

11      MR. SCHEFF: Object to the form.

12 BY MR. ACKELSBERG:

13    Q. Do you remember the term "turnkey"?

14    A. Turnkey?

15    Q. We have a turnkey solution that -- just

16 give us the word, and we'll plug it in, something

17 like that?

18      MR. SCHEFF: Object to the form;

19 misstates the exhibits. You know that,

20 Mr. Ackelsberg. Ask a proper question.

21    A. So the term "turnkey," which I do remember

22 seeing from a -- from a presentation, doesn't, in my

23 mind, and in -- of course, in fact didn't mean that

24 there was no capital requirement for -- for the

25 tribes.

UNSEALED

App. 0040

BY MR. ACKELSBERG:
1  Q.   The tribes never had to put up any of their
2  money in 2011 or 2012 or 2013 to initiate any new
3  loans by Plain Green; am I right?
4         MR. SCHEFF:  Object to the form.
5         You can answer the question if you can.
6     A.   You said just Plain Green we're talking
7  about?
8  BY MR. ACKELSBERG:
9     Q.   That's all I'm talking about right now.
10    A.   I don't know the answer to that.
11    Q.   Might it be correct that the tribes got
12 their -- that Plain Green got their money from
13 Mr. Haynes, who got the money from Think Finance?
14        MR. SCHEFF:  Objection; asked and
15 answered, calls for speculation.
16        Answer the question if you.
17        MR. ACKELSBERG:  Speculation?
18        MR. SCHEFF:  Yeah.  You started the
19 question with "might it be possible."  I mean, come
20 on, Irv, ask a proper question, will you?  I mean,
21 this is kind of ridiculous.  It's a waste of time.
22 Just ask a proper question.
23        MR. ACKELSBERG:  Are you done?
24        MR. SCHEFF:  I am.  I am.

1         MR. ACKELSBERG:  I'm enjoying it
2  immensely.
3         MR. SCHEFF:  Good.  Ask a proper
4  question.
5  BY MR. ACKELSBERG:
6     Q.   So Plain Green, can you sit here today and
7  tell us, yes, you are sure that Plain Green was
8  putting up its own money to make loans in 2011?
9         MR. SCHEFF:  Objection; misstates the
10 testimony.
11        Answer the question if you can.
12 BY MR. ACKELSBERG:
13    Q.   Can you say?
14    A.   No, I can't say that.  What I am aware of
15 was, was there was a loan to Haynes, and there was a
16 loan from Haynes to the tribe.  I don't know
17 anything more about what additional capital was put
18 up or not put up by Plain Green.  I don't believe
19 there was a similar financial transaction for either
20 of the other two tribes that Think Finance worked
21 with during that period.
22    Q.   Well, that's because Great Plains -- that's
23 because Victory Park provided for a reserve account
24 so that they could, basically, front the money to
25 Great Plains Lending and Mobiloans, right?

1         MR. SHAPIRO:  Object to form.
2         MR. SCHEFF:  Object to the form.
3  BY MR. ACKELSBERG:
4     Q.   That was the arrangement for the other two
5  tribes?
6         MR. SHAPIRO:  Same objection.
7         MR. SCHEFF:  Misstates the prior
8  testimony.  Object to the form.
9         You can answer the question if you can.
10    A.   Was that a question?
11        MR. SCHEFF:  Hard to say.
12 BY MR. ACKELSBERG:
13    Q.   How did -- how did Great Plains Lending get
14 its initial lending capital?
15    A.   I don't know.  I assume that they were
16 using their -- their capital for the program.
17    Q.   Did Great Plains Lending have any capital
18 to put into the program?
19        MR. SCHEFF:  Object to the form.
20        You can answer the question if you can.
21    A.   Well, they had another loan program already
22 in existence by the time that Great Plains came into
23 being.  So I think they did have capital as a -- as
24 a tribal organization.
25 BY MR. ACKELSBERG:

1     Q.   Sitting here today, are you not aware of a
2  GPLS reserve account that provided that upfront
3  funding?
4     A.   I don't --
5         MR. SCHEFF:  Object to the form.
6     A.   As I said, I don't know the specifics of
7  exactly all of the accounting treatments and how
8  money was moved back and forth.  That would have
9  been what -- what the CFO did primarily working with
10 VPC and the tribes, obviously.
11 BY MR. ACKELSBERG:
12    Q.   But I'm not talking about accounting.  I'm
13 talking about actual money, whether -- whether the
14 Otoe-Missouria had to put out any of their money to
15 fund the loans?
16        MR. SCHEFF:  Objection; asked and
17 answered.
18        MR. SHAPIRO:  Can you read the
19 witness's last answer -- the answer to the last
20 question, please?
21        COURT REPORTER:  "As I said, I don't
22 know the specifics of exactly all of the accounting
23 treatments and how money was moved back and forth.
24 That would have been what -- what the CFO did
25 primarily working with CFPB (sic) and the tribes,

UNSEALED

App. 0041

1  obviously."
2         MR. SCHEFF:  VPC.
3         COURT REPORTER:  Oh, VPC, okay.
4  BY MR. ACKELSBERG:
5     Q.  And then I asked you, I'm not talking about
6  accounting, I'm talking about whether the -- in
7  fact, the Otoe-Missouria put out any of their own
8  funds to originate loans.
9         MR. SHAPIRO:  But, in fairness, the
10 witness's last answer was accounting and the
11 specifics of how money was moved back and forth.  It
12 wasn't just accounting.  So he's answered your
13 question, I believe.  I just don't want to get lost
14 in the --
15        MR. ACKELSBERG:  Okay.  I understand
16 what you're -- okay.  I understand.  Thank you.
17 BY MR. ACKELSBERG:
18    Q.  So just -- and I'm not talking about
19 accounting.  I'm not.  I'm talking about just where
20 the dollars come from.  When Great Plains Lending
21 loans were funded, do you know, for a fact, that
22 tribal money was -- was the source of that funding?
23        MR. SCHEFF:  Object to the form; asked
24 and answered.
25        You can answer again, Mr. Rees.

1     You're referring to Great Plains?
2         MR. ACKELSBERG:  Yes.
3         MR. SHAPIRO:  Object to the form as
4  well.  There was a foundation issue.  There are
5  foundation issues there.
6     A.  For Great Plains, I was under the
7  assumption that Great Plains was putting at least
8  some of their own capital, you know, for the
9  program.  I can't speak to exactly how much, what
10 the structures were, but that was my understanding.
11 BY MR. ACKELSBERG:
12    Q.  And what about Mobiloans, did they have any
13 capital to -- did the Tunica-Biloxi have any capital
14 to fund -- to fund these initial cash advances?
15    A.  Tunica-Biloxi was also, from our
16 perspective, a relatively sophisticated tribe in
17 terms of how they had a number of businesses that
18 they operated.  So I would have assumed in the same
19 way that they had put at least some of their own
20 money into the loan programs.
21    Q.  You're talking about the casinos that they
22 had?
23    A.  I know they had a casino, but I was told
24 that other -- they had other businesses as well.
25    Q.  Well, none of those businesses were -- were

1  lending operations, were they?
2     A.  Tunica-Biloxi was one tribe that we worked
3  with that did not have a preexisting lending program
4  in place.
5     Q.  All right.  So a tribe that has never lent
6  money before, you're -- do you know whether they --
7  they had the capital to actually fund loans?
8         MR. SCHEFF:  Objection; asked and
9  answered.
10 BY MR. ACKELSBERG:
11    Q.  Mobiloans?
12        MR. SCHEFF:  Answer again.
13    A.  I assume that they did.  They had a -- you
14 know, we were aware of the casino business that they
15 had.  We believed they had other economic
16 development on the reservation as well.  So I
17 believe they did have the capital to fund those
18 loans.
19 BY MR. ACKELSBERG:
20    Q.  I know you believe it.  Did anyone -- did
21 you -- did anyone ever tell you that they had the
22 money to fund the loans?
23        MR. SCHEFF:  Object to the form; asked
24 and answered.
25        You can answer it again.

1     A.  I don't remember if anyone specifically
2  told me one way or the other.  Like I said, I did
3  assume that they were providing at least some of the
4  capital.  I would still assume that.
5  BY MR. ACKELSBERG:
6     Q.  And --
7     A.  I mean, actually, I --
8         MR. SCHEFF:  You've answered the
9  question.
10        THE WITNESS:  Okay.  Thank you.
11 BY MR. ACKELSBERG:
12    Q.  And once -- once the partici-- at least
13 once the 99 participation kicks in and 99 percent
14 purchase has occurred, the most that the tribe would
15 be risking would be 1 percent of the -- of the
16 balance of the loan; am I right?
17        MR. SHAPIRO:  Object to form.
18        MR. SHELDON:  Object to form.
19        MR. SCHEFF:  Object to the form;
20 misstates the prior answer.
21        You can answer again.
22    A.  If the -- investment group bought the
23 99 percent participation, they would be left with
24 1 percent, and that would be what their risk of loss
25 would be.

UNSEALED

App. 0042

1 BY MR. ACKELSBERG:
2 Q. All right. Now, as to the other
3 99 percent, that risk of loss was, basically, that
4 the -- that the lender there -- and I'm talking
5 about VPC. Right? If we're talking about the
6 99 percent.
7      MR. SHAPIRO: Object to form.
8 BY MR. ACKELSBERG:
9 Q. Right? We're talking about GPLS or --
10 A. GPLS was the entity that purchased that,
11 correct.
12 Q. Okay. Now, GPLS had no risk; am I right?
13      MR. SCHEFF: Object to the form.
14 A. That's -- that's not true.
15 BY MR. ACKELSBERG:
16 Q. Well -- all right. What was the nature of
17 GPLS's risk?
18 A. If the portfolio for some reason was
19 uncollectible and Think was unable to provide the
20 services under the administer -- administer
21 agreement to them, they would have had that loss.
22      MR. SHAPIRO: Late objection on form
23 on that question.
24 BY MR. ACKELSBERG:
25 Q. Now, the obligations that Think had towards

1 GPLS were set forth in an administrative agency
2 agreement and a guarantee and security agreement,
3 correct?
4 A. I believe that's correct.
5 Q. And you signed them as the CEO, right?
6 A. I don't know for a fact. It wouldn't be
7 surprising.
8 Q. And under those agreements, Think -- now,
9 the GPLS -- I'm sorry, strike that.
10     GPLS initially got a 20 percent return,
11 right?
12      MR. SCHEFF: Object to the form.
13 Define "initially."
14 BY MR. ACKELSBERG:
15 Q. Let's -- beginning of the tribal period is
16 20 percent guaranteed return?
17      MR. SCHEFF: Object to the form.
18 You can answer the question.
19 A. I don't remember the exact numbers.
20 BY MR. ACKELSBERG:
21 Q. Whatever --
22 A. If you -- you know, I could probably
23 stipulate that there was a range, but I don't
24 remember exact whether it was 20 percent or what the
25 exact terms were.

1 Q. And as admin- -- as GPLS -- as the
2 administrative agent for GPLS, Think
3 guaranteed that return to GPLS. That's part of the
4 guarantee, correct?
5      MR. ACKELSBERG: Object to the form.
6 A. My understanding of the guarantee agreement
7 was exactly that, that it would guarantee the return
8 if Think had sufficient resources to do that. Now,
9 of course, the risk was that they wouldn't have the
10 resources, so it's a large and growing portfolio.
11 BY MR. ACKELSBERG:
12 Q. I understand. And Think also absorbed the
13 risk of the loans going bad, right?
14      MR. SCHEFF: Object to the form.
15 A. As part of the -- the administrative agent
16 agreement, if the loans went past due, my
17 understanding, is that -- that Think would purchase
18 those off of the balance sheet of the -- of that
19 fund to -- as part of sort of how -- that was the
20 guarantee agreement, that -- that they would
21 purchase the past due loans.
22 BY MR. ACKELSBERG:
23 Q. So the risk of the loans going bad was one
24 of the risks that Think Finance assumed as part of
25 its contractual deal with Victory Park and Great --

1 and GPLS, right?
2      MR. SHELDON: Object to form. It's
3 not clear to me anymore. These questions started
4 with the discussion of the 99 percent interest, and
5 now they've morphed into loans overall. So I'm not
6 sure if either the record or the witness is clear on
7 where these questions have led.
8 BY MR. ACKELSBERG:
9 Q. You can answer. So --
10 A. I've forgotten what the question was.
11 Q. See, now you understand what -- the
12 process. I ask a question, they get you confused
13 about what the question is, and now I have to try
14 again. Now we're --
15      MR. SCHEFF: Just ask a proper
16 question and stop the chatter.
17      MR. ACKELSBERG: I should stop the
18 chatter?
19      MR. SCHEFF: Yeah.
20 BY MR. ACKELSBERG:
21 Q. So the -- Think Finance guaranteed the
22 return to the -- to the investment fund, correct?
23 A. So my understanding of the --
24 Q. Administrative.
25 A. -- of the administrative agreement is that

UNSEALED

App. 0043

1  as per that, if loans in that portfolio, that
2  99 percent that was purchased, went past due, that
3  to the extent Think had the capital to do that, they
4  would buy the -- the past due loans off of that --
5  off the books, and that if there was -- if the --
6  that fund was not achieving the target rate of
7  return, which I don't remember what that was, that
8  Think would be responsible for adding into that fund
9  to ensure that the investors got their target rate
10  of return.  That's my understanding.
11      Q.  And that was the -- that's what the
12  contracts defined between Think Finance and GPLS,
13  right?
14          MR. SHAPIRO:  Object to form.
15      A.  As I said, that's my understanding.
16  BY MR. ACKELSBERG:
17      Q.  Okay.  Now, let's move to the accounting
18  side.  And when we -- when we -- have you ever heard
19  in the accounting -- in the -- as a CEO, have you
20  ever heard the term of "substance over form"?
21      A.  I've heard that expression.
22      Q.  Okay.  And you're also familiar with
23  generally accepted -- the term "GAAP," G-A-A-P?
24      A.  I'm familiar with the term.
25      Q.  I mean, as a CEO, that's -- that's a term

1  you have to be familiar with, right?
2      A.  Yes.
3          MR. SCHEFF:  Object to the form.
4  BY MR. ACKELSBERG:
5      Q.  And one of the purposes of GAAP, or
6  generally accepted accounting principles, is that
7  the -- that the financial statements capture the
8  financial reality of the transactions or entities
9  that the accountants are looking at?
10          MR. SCHEFF:  Objection to the form.
11          Answer the question if you can.
12      A.  I think that's a misstatement of what GAAP
13  is trying to do.  There are -- I mean, I -- not
14  being an accountant, I don't know that I can get
15  into the specifics, but I think you're
16  oversimplifying what GAAP is trying to do.
17  BY MR. ACKELSBERG:
18      Q.  Okay.  But you are aware that with regard
19  to your auditors, the 99 percent interest in the
20  loans originated by each one of the three tribes
21  have appeared on the consolidated financial
22  statements as assets of Think Finance?
23          MR. SCHEFF:  Object to the form.
24          Answer the question if you can.
25      A.  And as -- as we've been discussing,

1  accounting principles require us to consolidate
2  those balances onto our balances, correct.
3  BY MR. ACKELSBERG:
4      Q.  So just to go back to my question -- and
5  we'll stay just within the realm of the accountants
6  and generally accepted accounting principles -- with
7  regard -- so am I right, then -- and I'm just
8  looking back at the description of page 6 of this
9  business plan that we're looking at, P-274, when it
10  said Think Finance, in a direct loan, bears the cost
11  of losses, marketing expenses and operating
12  expenses, right?
13      A.  Yes.
14      Q.  Now, with regard to the cost of losses, at
15  least from the account- -- in the accountant's view,
16  the indirect -- on the indirect side, Think Finance
17  is also bearing the cost of loss?
18          MR. SCHEFF:  Object to the form.
19          You can answer the question.
20  BY MR. ACKELSBERG:
21      Q.  That's the accountant's view of the world?
22          MR. SCHEFF:  Object to the form.
23          Answer the question if you can.
24      A.  I think we've been pretty clear,
25  accounting -- accounting rules require us to

1  consolidate those loans onto a balance sheet and
2  recognize finance charges also as operating
3  expenses.  That is different from the contractual
4  relationships in terms of how we serve the tribal
5  lenders and the administrative agreement with the --
6  with the third-party.
7  BY MR. ACKELSBERG:
8      Q.  Well, we haven't talked about marketing
9  expenses and operating expenses, but why -- why
10  don't we mention that.  That clearly when Think
11  Finance is the direct lender, those operating
12  expenses or marketing expenses are -- come off
13  the -- come off the revenue of -- of Think Finance,
14  right?
15          MR. SCHEFF:  Object to the form.
16          You can answer the question.
17      A.  I'm sorry, I was just distracted by the
18  noise.  Can you say that again?
19  BY MR. ACKELSBERG:
20      Q.  So with regard to marketing expenses and
21  operating expenses of a loan product that Think
22  Finance is making directly as the lender, whatever
23  operating expenses and marketing expenses are
24  attributable to that product, they came -- that's --
25  that's Think Finance's problem, right, that comes

UNSEALED

1   off of Think Finance's revenue?
2           MR. SCHEFF: Object to the form.
3     A. That's correct.
4           MR. SCHEFF: You can answer the
5   question.
6     A. That's correct.
7   BY MR. ACKELSBERG:
8     Q. Okay. And on the tribal side, at least
9   from the accountant's standpoint, isn't it also true
10   that the marketing expenses and the operating
11   expenses were essentially coming off of Think
12   Finance's --
13     A. The marketing expense --
14           MR. SCHEFF: Just wait until he
15   finishes the question.
16   BY MR. ACKELSBERG:
17     Q. Go ahead.
18           MR. SCHEFF: You haven't finished the
19   question. Ask the question, and he'll give you an
20   answer.
21   BY MR. ACKELSBERG:
22     Q. Isn't it the same, at least as far as the
23   accountants are concerned, on the indirect -- on the
24   indirect loan side?
25           MR. SCHEFF: Object to the form.

1       You can answer the question if you can.
2     A. So on marketing expenses, because they're
3   related to the marketing agreement, yes, we would
4   have recognized the marketing expenses because
5   they're directly in correlation with the -- with the
6   marketing agreement that we had.
7       There were operating expenses that we had
8   that we would have recognized, but, for instance,
9   the operating expenses, more broadly speaking,
10   related to the delivery of the product. The -- for
11   instance, the operating expenses, that if it had
12   been a direct product that we originated, like, for
13   call center support or collection support, for a
14   direct product, we would have recognized that.
15       For the indirect product, we don't have a
16   requirement to pay those expenses. But my
17   understanding -- and, again, not being an
18   accountant, my understanding is that the accounting
19   treatment would have forced us to recognize those
20   call center costs, like -- I'm not entirely certain
21   about that, but there are differences between the
22   expenses that we're required to assume as per
23   accounting treatment as per, you know, how we would
24   normally think about things as a direct lender.
25       Did my answer make any sense?

1   BY MR. ACKELSBERG:
2     Q. Moderately.
3     A. If it didn't, it's probably because I
4   don't -- I'm not an accountant. I'm trying to give
5   you the best sense of my understanding of the
6   situation. And I'm sure that Chris Lutes probably
7   did a better job explaining this than I have.
8     Q. Turn the page to page 7. We're still in
9   the same document. And there's a reference to the
10   competitive -- this is, basically, describing,
11   like -- it seems to me, like, what's special about
12   Think Finance in terms of its -- its expertise,
13   its -- its value proposition. Am I right?
14           MR. SCHEFF: Object to the form.
15     A. I agree with that statement.
16   BY MR. ACKELSBERG:
17     Q. Okay. And the way that this document
18   describes the sort of value proposition of Think
19   Finance is that it has three core platforms,
20   which -- which account for its competitive
21   advantage, its competitive value proposition, right?
22           MR. SCHEFF: Object to the form.
23     A. This is -- this page is identifying the
24   areas of the business that we've invested in to
25   serve our customers and -- and ultimately grow in

1   the market. These three areas, the marketing
2   capabilities, the risk and analytics capabilities,
3   and the platform delivery capabilities would be the
4   three that I would generally say are the top three
5   for us as a company.
6   BY MR. ACKELSBERG:
7     Q. All right. Good.
8       So could -- I just want to go through
9   these quickly just so that I understand the
10   difference between these platforms. And just so
11   we're clear, whether we're talking about a direct
12   lending product or an indirect lending product,
13   these three platforms are -- are involved in both
14   those types -- both those models of product; am I
15   right?
16           MR. SCHEFF: Object to the form.
17       You can answer the question.
18     A. Yes, for -- for the direct product, we
19   utilize all three of these platforms to deliver the
20   product. With an indirect product, we license the
21   risk and analytics platform and the product platform
22   and utilize marketing to service as the marketing
23   arm and under the marketing agreement.
24   BY MR. ACKELSBERG:
25     Q. Okay. So just starting with the product

UNSEALED

1    platform, and the -- and I'm starting that way
2    because in the way that the -- it looks like it's a
3    pyramid, and it starts from the bottom and works its
4    way up, or at least the first of the platforms
5    that's described in this document is the product
6    platform.
7            And in the narrative, it -- it describes
8    various modules that are part of the platform.  Is
9    that -- and is this information accurate, that these
10   are the modules that compose the platform?
11       A.   At this point in time, this was how we
12   tended to think about the -- the delivery platform.
13       Q.   And so the decision engine, this is the
14   actual mechanics of, like, of how the -- you know,
15   of how a loan -- a decision whether to approve or
16   reject or conditionally approve with verification,
17   that's what we're talking about with the decision
18   engine, those kind of mechanics, right?
19           MR. SCHEFF:  Object to the form.
20           You can answer the question.
21       A.   Yes.
22   BY MR. ACKELSBERG:
23       Q.   And the prefunding module, what's that
24   about?
25           MR. SCHEFF:  Object to the form.

1            You can answer the question.
2        A.   I believe this was when the -- the decision
3    engine would make the automated decisions, yes, no.
4    And if no, provide notice by the section; if, yes,
5    they provide the offer to the customer.  But there
6    was also fraud that happened between that and when
7    the loan was ultimately sort of -- excuse me --
8    fraud identification and remediation, that it
9    happened after the loan was approved and before it
10   was ultimately funded.
11   BY MR. ACKELSBERG:
12       Q.   And --
13       A.   So that's what that's referring to.
14       Q.   Okay.  And then there's a payment module
15   that is connected to the ACH processing?
16       A.   Yes.
17       Q.   Okay.  And that has to do with the
18   interface between the Think Finance and the --
19   whoever is providing the ACH services?
20       A.   Yes.
21       Q.   And it says loan management
22   accruals/statements is another module that's --
23   that's keeping track of payments by the customer?
24           MR. SCHEFF:  Object to the form.
25           You can answer the question.

1        A.   That's the accounting part of the -- of the
2    platform that managed the daily accruals and
3    tracking of all the finance charges and things like
4    that, yes.
5    BY MR. ACKELSBERG:
6        Q.   And then there's another module which deals
7    with communications with the customers by e-mail or
8    text?
9        A.   Yes.
10       Q.   And another module that deals with support
11   for the collections process?
12           MR. SCHEFF:  Object to the form.
13       A.   I believe this is referring to CRM, so
14   customer relationship management.  So it's both the
15   customer support for any inbound calls or the
16   management of ongoing collections activities.
17           MR. SCHEFF:  Irv, when you get to a
18   good break time, it's bio time.
19           MR. ACKELSBERG:  Okay.
20           MR. SCHEFF:  And it's been a little
21   more than an hour, as well.
22           MR. ACKELSBERG:  I mean, we can -- we
23   can break now and maybe do one more run until lunch,
24   that's fine.  I mean, we can -- that's fine.
25           THE VIDEOGRAPHER:  We are off the

1    record.  The time is 11:16 a.m.
2            (Break taken, 11:16 a.m. to 11:26 a.m.)
3            THE VIDEOGRAPHER:  We are back on the
4    record.  The time is 11:26 a.m.
5    BY MR. ACKELSBERG:
6        Q.   All right.  Mr. Rees, I want to move to the
7    risk and analytics platform on page 8 of the
8    document.  And this is going to need a little bit
9    more of your help in understanding this.  Now, first
10   of all, there's reference to -- so the horizontal
11   cells in the little grid under "Customer Lifecycle,"
12   do you see that?
13       A.   Yes.
14       Q.   And there's -- there's four columns:
15   Acquire, Approve, Optimize, and Collect.  So it
16   sounds like -- well, first of all, we're talking
17   about the way the data is used.  And, again, this is
18   a value proposition, the expertise of the company,
19   the way that the risk and analytics platform uses
20   big data to -- at various points of the relationship
21   with a customer.  Is that what we're talking about?
22       A.   Yes.
23       Q.   Okay.  Now, on -- in the initial column,
24   where it says "Acquire," are we talking about
25   things, like, direct mail, like, how to -- how to

Kenneth Rees

1  target direct mail campaigns?  Would that be under
2  the "Acquire"?
3      A.  I'll answer the question, but just
4  vis-a-vis this specific chart, this isn't -- my
5  recollection is this isn't entirely accurate.  I
6  think this was in -- obviously, in this draft there
7  was some semimisrepresentations, in particular, just
8  pointing to -- I -- I don't believe we used either
9  subprime bureau data or social media and alternate
10  data in the "Collect" part of this.  But -- so just
11  perspective on this chart as a whole, I don't think
12  it's completely fleshed out.  To your point, though,
13  yes, at the time -- at the time. . .
14      Q.  2013.
15      A.  I believe in 2013, we were using prime
16  bureau data for direct mail campaigns.  I think that
17  was your question.
18      Q.  And subprime bureau data?
19      A.  I don't think we were using that for direct
20  mail campaigns.
21      Q.  Okay.  So why don't -- can you explain the
22  difference between a prime bureau and a subprime
23  bureau?
24      A.  Yeah, so there's -- the way we categorize
25  them, the three -- big three bureaus:  Experian,

1  Equifax and Trans Union, are primarily serving prime
2  customers, and they're the traditional sources of,
3  like, you know -- that's what goes into a FICO score
4  and things like that.
5      The subprime bureaus, in our minds,
6  were -- and I think all these were in existence back
7  then:  Clarity, MicroBilt, Teletrack.  There's
8  FactorTrust.  There might have been a couple others.
9  Ones that had very limited data on just sort of
10  targeted niches in the -- in the credit provision.
11      So Teletrack, as an example, got most of
12  its data from brick-and-mortar payday lenders.  They
13  didn't have anything that -- that banks originate.
14  Clarity had some bank transactions but were
15  primarily online lending based.
16      Q.  And what about MicroBilt?
17      A.  I don't know what was unique about
18  MicroBilt.  I just remember they were also, in our
19  minds, subprime, sort of more nichey provider of
20  credit information.
21      Q.  And there was another one called DataX.  Do
22  you remember that one?
23      A.  DataX, yes.  I had forgotten about them.
24  Thank you.
25      Q.  That was Mr. Tucker's company, right?

1      A.  I don't -- I don't know -- I knew it was
2  related to a --
3      Q.  Or Selling Source?
4      A.  I remember it was related to Selling
5  Source.  I didn't know what relationship Tucker had
6  to either of those businesses.
7      Q.  Okay.  And then the one that was puzzling
8  to me was social media and how social media and --
9  and I've actually read some articles where you even
10  described this.  So if you could just briefly
11  explain how -- what was unique about Think Finance's
12  use of social media?
13      MR. SCHEFF:  Object to the form.  I
14  think the witness testified that they weren't using
15  social media in '13.
16      MR. ACKELSBERG:  No, no, you misheard.
17  That was with regard to collections.
18      MR. SCHEFF:  I may have.
19      MR. ACKELSBERG:  Yeah.
20  BY MR. ACKELSBERG:
21      Q.  So now we'll answer the question.
22      A.  You're correct, this is -- as I said, on --
23  I don't -- I can't -- I don't know what was the
24  intent of this.  It's not quite accurate.  The -- in
25  2013, we had been doing some limited sort of

1  testing, I would say, of the social media in the
2  approved section.  In particular, what we were
3  looking for was whether the customer had a social
4  media footprint, did they have a LinkedIn account, a
5  Facebook account.  If they didn't have any social
6  media footprint, that raised a flag, and that was a
7  potential fraud indicator.  But that's the only
8  place that I was aware that back then we used social
9  media information anywhere in the customer
10  lifecycle.
11      Q.  All right.  So, basically, just generally
12  what we're talking about is purchasing data from --
13  from a variety of third-party sources to make
14  decisions, either with regard to who the company is
15  going to approach as a potential customer, or as
16  you -- as you move across this grid, how the
17  decision engine is going to actually work and making
18  the decision whether to lend or not.  Am I right?
19      MR. SCHEFF:  Object to the form.
20  You can answer the question.
21      A.  Yeah, just specifically, so, of course, as
22  you probably know, my recollection is the data that
23  was bought was bought by the lender, typically.  So
24  in some cases, the data was actually purchased by
25  whether -- if it's a bank, the bank would have been

27 (Pages 105 to 108)

UNSEALED          App. 0047

1  buying the data directly. The tribal lender would
2  typically buy that data directly. That would go
3  into our platform, and our platform's algorithms,
4  based on the model analysis that was done by the
5  analytics team, would then, you know, sort that into
6  either scores or decision trees and come up with a
7  decision of yes or no. Hopefully, I answered that
8  question.
9  BY MR. ACKELSBERG:
10  Q. Yeah. Now, when you say the tribe would
11  buy the data, you're talking about there would, in
12  fact, be a contract between, let's say, MicroBilt or
13  Clarity and Plain Green, for example, right?
14  A. Correct.
15  Q. Okay. But when MicroBilt or Clarity would
16  deliver the actual data used by the platform, it
17  wouldn't go first to somebody at Box Elder and who
18  then has to get it to Think Finance, would it?
19  A. In -- really, we were serving as an agent
20  of the -- whether it's a tribe or a bank and -- and
21  the platform, based on the contract with the data
22  provider, would stipulate that the data provider
23  would send that information into our platform to be
24  decisioned.
25  Q. Right. So when someone, for example, went

1  on the Plain Green website to apply for a loan, the
2  data traveled from these third-party providers to
3  Think Finance pursuant to the contract that they had
4  signed with the tribe, right? That's the way it
5  worked?
6  A. It went direct to the -- to the IQ
7  technology platform that was decisioned on behalf of
8  the tribe or the bank, what have you, yes.
9  Q. Yeah. Okay. Now, in addition to this
10  third-party data that Think would purchase pursuant
11  to contracts with whoever was the named lender, did
12  Think Finance --
13  A. I'm sorry, you -- can you state that again
14  because I'm not sure I -- I heard right.
15  Q. Okay. So --
16  A. I thought you said we purchased it
17  pursuant --
18          MR. SCHEFF: He did. Misstated the
19  testimony.
20  BY MR. ACKELSBERG:
21  Q. Well, that Think Finance acquired it
22  pursuant to the contracts.
23  A. Transmitted to Think's platform pursuant to
24  the contract?
25  Q. Yes. Is that better?

1  A. Yes.
2  Q. Okay. All right. So in addition to that
3  data that's third-party data that would be
4  transmitted to the Think Finance platform, was --
5  over the course of the customer life cycle, did the
6  risk and analytics platform also have access to the
7  historic -- to the historic either application data
8  or performance data that was in-house, that's just
9  from all the years of making loans online at Think
10  Finance?
11          MR. SCHEFF: Object to the form.
12  A. I believe for fraud purposes -- I can't
13  speak to outside of that. I do believe that if
14  there was a determined fraud, that that would be a
15  database that was available to all of the lending
16  initiatives, both direct and indirect. I don't know
17  if -- if they use any -- any other internal data
18  more broadly than that.
19  BY MR. ACKELSBERG:
20  Q. But in terms of the actual approval, let's
21  say as far as the decision engine goes, did it --
22  did the platform utilize internal historic data as
23  well as the third-party data?
24  A. As I said --
25          MR. SCHEFF: Object to the form.

1  A. As I said, the only thing that I'm aware of
2  was for fraud purposes.
3  BY MR. ACKELSBERG:
4  Q. Fraud purposes. Okay.
5  A. So it was for shared fraud data across
6  the -- across the lending programs, which is not
7  unusual in this space.
8  Q. All right. Let's turn the page, page 9.
9  There's a description of the -- there's a section
10  called "Regulatory Environment." Do you see it?
11  A. Yes.
12  Q. Okay. And there -- I've seen reference on
13  a number of documents to something called
14  "regulatory diversification." That's a term that
15  you're familiar with; am I right?
16  A. We've used that term, yes.
17  Q. Okay. And so when you used that term
18  internally, what -- what did you mean by that?
19  A. Well, I mean, the business from, you know,
20  even before I joined the company was interested in
21  diversification both in terms of products and the
22  regulatory model. So to be able to serve the
23  optimal number of customers, there was direct
24  consumer products as well as -- as you -- you can
25  classify them, as written here, indirect products as

UNSEALED

1   well.
2       Q.   So the -- the direct products are generally
3   offered in states that have some form of authorizing
4   legislation that allows for those kind of products,
5   correct?
6           MR. SCHEFF:  Object to the form.
7       You can answer the question.
8       A.   All of the direct products are originated
9   under state law.  I was just verifying.  Yes, so
10  they're all originated under state law.
11  BY MR. ACKELSBERG:
12      Q.   So there would be either an authorizing
13  statute or a licensing statute, something that
14  basically says this kind of product is okay in our
15  state, right?
16      A.   Supported the -- the rate structure we felt
17  was needed to serve the customer, yes.
18      Q.   Okay.  And then the way the -- the
19  regulatory diversification works is that through the
20  so-called indirect products, Think was also able to
21  operate within states that didn't have such
22  authorizing or licensing statutes?
23          MR. SCHEFF:  Object to the form.
24          MR. SHELDON:  Object to form.
25      A.   So I -- the answer is -- I mean, I guess I

1   have to -- I'll just walk through sort of my
2   understanding of the -- of the regulatory situation.
3       The banks operated under the National Bank
4   Act, and as with credit cards, they're able to
5   originate credit across the U.S. and are not subject
6   to -- to state law.  As will be discussed, that that
7   also is the situation, at least my understanding,
8   with Native American tribes.  So the -- you know,
9   ultimately, our technology was able to serve more
10  underserved customers across the U.S. by having
11  banks and tribal lenders use our technology platform
12  than we would have been able to directly serve as a
13  state licensed lender.
14  BY MR. ACKELSBERG:
15      Q.   Now, the -- we talked about the plat- --
16  the three platforms as -- I realize we only talked
17  about two of them, but -- we didn't talk about
18  marketing, but I think we can leave that for the
19  moment.  That these three platforms are part of what
20  define the value proposition of the company of Think
21  Finance within the space of online lending, correct?
22          MR. SCHEFF:  Object to the form.
23      You can answer the question.
24      A.   We -- we certainly viewed our technology
25  platform as a strength in something we built over

1   the years, first as a -- as a direct lender and
2   then -- then as a service provider.
3   BY MR. ACKELSBERG:
4       Q.   And would I -- would I be correct in
5   stating that regulatory diversification was also
6   something that set the company apart from some of
7   its peer competitors?
8           MR. SCHEFF:  Object to the form.
9       A.   Not every lender used a diverse set of
10  products, but it was pretty common, still is.
11  BY MR. ACKELSBERG:
12      Q.   Well, let's take, for example, Cash
13  America, you know -- that's a competitor you're
14  familiar with, right?
15      A.   Yes.
16      Q.   They're based here in Fort Worth, right?
17      A.   Yeah.
18      Q.   Okay.  And they're an online lender?
19      A.   They -- well, Cash America had an online
20  lending business.
21      Q.   Okay.  And when Cash America had an online
22  lending business, it was strictly a state
23  licensed -- they -- they worked strictly within the
24  state license model; am I right?
25      A.   I don't think that's true.  I remember that

1   Cash America had bank partnerships to operate in
2   certain states.
3       Q.   Right.  But when the bank -- but when the
4   bank partnerships dried up as a result of the bank
5   regulator's involvement and companies, like
6   yourself, were moving into tribal model, Cash
7   America didn't move in that direction; am I right?
8           MR. SCHEFF:  Object to the form.
9       A.   As I said, they -- they had a regulatory
10  diversification, which is what you asked, bank and
11  nonbank, but they opted not to do any tribal
12  partnerships, that's correct.
13  BY MR. ACKELSBERG:
14      Q.   And Think Finance, in fact, at some point,
15  was purchasing leads from Cash America from those
16  states where Cash America chose not to lend in; am I
17  right?
18      A.   I'm not aware of that.
19      Q.   Okay.
20      A.   I'm not suggesting it didn't happen.  I'm
21  just not aware of that relationship.
22      Q.   Okay.  On page 12 of the document, do you
23  see the second section, "Regulatory Risk"?
24      A.   Yes.
25      Q.   And I'm particularly interested in the

29 (Pages 113 to 116)

UNSEALED

1  second paragraph there. And I'll read it to you.
2  "There is unique regulatory risk related to our
3  technology and marketing support for tribal lenders.
4  Because this lending model is relatively new and
5  because many state" -- I assume that's "states" --
6  "don't believe tribes should be allowed to operate
7  in violation of their state laws, we can expect
8  challenges to this model." Do you see that?
9      A. Yes.
10     Q. Okay. And that's -- that's an accurate
11  statement of the company's thinking back then in
12  2013?
13         MR. SCHEFF: Object to the form.
14     A. It is.
15  BY MR. ACKELSBERG:
16     Q. "Yes"?
17     A. Yes.
18     Q. Okay. And that -- that the uniqueness of
19  this risk was different than in the bank context, in
20  the bank years, right?
21         MR. SCHEFF: Object to the form.
22     A. I actually wouldn't say that. I think
23  the -- what was unique about it was that it's
24  relatively new, but I think both bank and tribal
25  were subject to challenges from states that either

1  thought they had a legal justification or, in some
2  cases, wanted to get publicity for their perspective
3  on higher interest lending.
4  BY MR. ACKELSBERG:
5      Q. So is that what you think that states
6  were -- were motivating states to challenge the
7  model, that they were looking for publicity?
8      A. I think I was --
9         MR. SCHEFF: Object to the form.
10     A. -- I was clear that I think in some cases
11  there was a legitimate view that this was a state's
12  rights, but I think, in particular with regard to
13  say, National Bank Act, which is so firmly
14  entrenched in law, the challenges to banks
15  originating credit across the U.S. seemed less based
16  on legal precedent than they do in media.
17  BY MR. ACKELSBERG:
18     Q. That -- I'm trying to understand what
19  you're saying. You're saying that when states have
20  challenged the tribe -- the tribal model lending,
21  they've done so not out of what the law is, but
22  rather -- but rather the desire for some sort of
23  publicity?
24     A. I was --
25         MR. SCHEFF: Object to the form.

1      A. I was speaking specifically to -- to banks.
2  BY MR. ACKELSBERG:
3      Q. Oh, okay.
4      A. And, like I said, the National Bank Act is
5  pretty clear, that banks do have this right, yet,
6  you know, we saw certain states challenging the
7  rights of national banks to originate credit as
8  per -- you know, it's not -- I think it's a hundred
9  years since the National Bank Act was put into
10  account.
11        So I -- you know, I -- you know, perhaps
12  it was an unfair statement on my part to assume what
13  the -- what the rationale was, but it didn't seem to
14  be, at least from our perspective, and from -- you
15  know, from our perspective based on a true belief
16  that the National Bank Act just didn't apply.
17     Q. Well, I'm --
18     A. And I would -- I'm sorry, go ahead.
19     Q. Well, let's just -- let's focus on the
20  tribal model.
21     A. Okay.
22     Q. And so I think we -- there's no -- there's
23  no statute out there like that the National Bank Act
24  that authorizes tribes to do online lending, right?
25        MR. SCHEFF: Object to the form.

1  BY MR. ACKELSBERG:
2      Q. We all know that, right?
3      A. In this case -- in this case, I was pretty
4  clear in -- in this write-up that there are states
5  who don't believe that tribes should be allowed to
6  operate, and they don't. At least from my
7  understanding back then, weren't aware of the
8  sovereign rights of tribes. And it wouldn't be
9  surprising to us, and sort of why it was in here,
10  because the, you know, sovereign rights of tribes
11  are not something that attorneys general and other
12  people in states deal with on a day-to-day basis,
13  may not have the experience. And there had really
14  been relatively recent case law about it come from
15  the California and Colorado states, that it wouldn't
16  have been surprising if -- if all states weren't
17  fully conversant in.
18     Q. And I'm hearing that there was, on your
19  part, some frustration with state policymakers not
20  appreciating the importance of the service that
21  you're providing. Am I right?
22     A. I don't know that this is suggesting --
23     Q. I'm not --
24     A. -- frustration so much as -- as the
25  recognition of the reality that there might be

UNSEALED

1    challenges to the model because of the newness and
2    the fact that, you know, tribal sovereign rights is
3    not an area of law that's particularly well-known
4    broadly, especially in states that don't have Native
5    American tribes.
6        Q.  We cited a -- forgetting offhand the --
7    whether it was an article or a company -- a company
8    blog, but something coming from you in the years
9    prior to the -- to the litigation where you
10   reference state laws being Byzantine.  Do you
11   remember that -- that reference?
12       A.  I did make a reference to that.
13       Q.  Okay.  When you described in media state
14   reaction to tribal -- the tribal lending model as
15   being Byzantine, what did you mean by that?
16       A.  I don't know that I can speak to exactly
17   what I meant.  It's -- that was a -- in fact, I
18   don't even know the context for when that was --
19   that was originally said.  It's been, I think, taken
20   out of context a number of times.  But I can't speak
21   to exactly what I was referring to.
22       Q.  Well, I guess that's why I was -- when I
23   asked you whether there was some frustration with
24   state regulatory response to tribal lending, I
25   wasn't talking specifically about document P-274.  I

1    was really just -- just interpreting what you were
2    saying and the Byzantine reference, that there was
3    some frustration that the states were not fully
4    appreciating what Think Finance was trying to do?
5        MR. SCHEFF:  Object to the form.
6       A.  I guess I wouldn't really speak to
7    frustration.  That's a nature of serving this
8    customer.  I mean, we are serving a customer that,
9    although they are two-thirds of the U.S., still
10   wasn't particularly well-known by policymakers.
11   Their needs for credit, the real-world alternatives
12   they have are not particularly well-known.  I think
13   it's just sort of a statement of fact.
14       And, again, you know, in here I was trying
15   to -- and, again, I don't know exactly what the
16   purpose of this was, but it -- to me it seems to be
17   just trying to sort of recite the realities of --
18   of, you know, the business that we were in.
19   BY MR. ACKELSBERG:
20       Q.  Now, one of -- you're familiar with an
21   argument called "true lender," right?
22       A.  I have -- have heard of that.  I believe
23   it's a not particularly well-defined largely legal
24   fiction.  That's -- you know, I'm not an attorney.
25   I know --

1       Q.  I understand.
2       A.  -- something about it, but that's about it.
3       Q.  Well, I mean, you're not an attorney.  I'm
4    certainly not asking for anything you're getting
5    from attorneys.  But you're also, you know, a very
6    smart guy who pays attention to a lot of stuff,
7    like, for example, the Colorado and California cases
8    that you mentioned.  Those are cases that you
9    studied, right, before you decided to take the
10   company down this path?  Am I right?
11        MR. SCHEFF:  Object to the form.
12       A.  I -- I read those before, as a company, we
13   ultimately decided to move down that path, yes.
14   BY MR. ACKELSBERG:
15       Q.  And you're also familiar in litigation
16   around the country, whether in the bank context or
17   the tribal context, that the argument has been made
18   saying that whatever tribes have -- well, let me
19   just -- let me just sort of paraphrase the argument.
20   So -- and just ask if you're familiar with this
21   argument.
22       That whatever it is that the tribes have
23   the ability to do, if somebody else is really doing
24   it in the tribe's name, that's different, that
25   that's -- that other person might actually be the

1    lender using the tribe as a cover for doing what
2    they can't do directly.  That's -- that's the
3    argument that -- you understand that's the true
4    lender argument, right?
5        MR. SCHEFF:  Object to the form.
6       To the extent you can answer that question
7    without disclosing communications you've had with
8    counsel, please do so.  If not, just tell us.
9       A.  And you're asking my opinion.  As I said,
10   in my awareness of that -- we stipulated that I'm
11   not an attorney -- I have read certain cases.  What
12   is striking to me, and why I do refer to the legal
13   fiction, is -- and I actually said this to the
14   CFPB -- is that the -- there seems to be different
15   definitions.  Different judges have ruled in
16   different ways.
17       There doesn't seem to be any understanding
18   of what this term actually means and whether it has
19   any real legal background.  That's from my limited
20   under- -- you know, reading of the various rules
21   that have happened and how judges seem to rule both
22   ways, some throwing out the whole concept saying,
23   oh, if a -- if a bank originated that loan, a bank
24   originated that loan; others who -- who take this
25   concept and rule in different ways around it.  So I

UNSEALED

1  don't know what it means other than it has been a
2  claim made by certain people who are trying to, you
3  know, have a lawsuit against some sort of lending
4  product.
5  BY MR. ACKELSBERG:
6      Q.  Well --
7      A.  I'm -- hopefully I answered that
8  appropriately.
9      Q.  But it's a debate -- it's a debate, as you
10  said, that you've been aware of?
11     A.  Yes.
12     Q.  Okay.  And, in fact, there have been --
13  during your time as CEO at Think Finance, there in
14  fact, were executive discussions about trying to
15  mitigate true lender risk.  You remember those
16  discussions, don't you?
17         MR. SCHEFF:  Object to the form.
18         To the extent you can answer that question
19  without disclosing communications with counsel,
20  please do so.  If you can't, let us know.
21         MR. SHELDON:  And by communications
22  with counsel, to be clear, that means both outside
23  counsel at all firms, like Mr. Scheff, but also
24  in-house counsel like Ms. Cutrona and others who are
25  employed as attorneys who you have worked with.

1      A.  It's pretty -- pretty hard for me to answer
2  something like this without referring to my
3  communications with in-house or outside counsel.
4  BY MR. ACKELSBERG:
5      Q.  Well, yeah, and I'm not -- I'm certainly
6  not asking about that.  I'm asking in your
7  communications, say, with Jason Harvison in
8  structuring -- structuring the loans, structuring
9  the programs, the relationships with the tribes, do
10  you remember discussions about mitigating true
11  lender risk?
12         MR. SCHEFF:  Object to the form.  Same
13  instruction.
14         MR. SHELDON:  And I'll just say again,
15  even if someone like Mr. Harvison was in the room,
16  if Ms. Cutrona or legal counsel were also in the
17  room and providing legal advice, then we would ask
18  you not to answer.  And if you have any questions
19  about whether or not you can answer, we are happy to
20  step outside in the hall and discuss this briefly
21  and then come back in.  Do you understand?
22         THE WITNESS:  I do.  Thank you.
23     A.  I don't think I would have been talking to
24  Jason or anybody else about, you know, anything in
25  regard to structuring a legal agreement for this

1  purpose without having counsel involved in that.
2  BY MR. ACKELSBERG:
3      Q.  Do you remember -- do you remember the
4  ongoing project called "tribalization" or "tribal
5  restructure"?  Do you remember that as a -- as a
6  subject of executive attention during this period of
7  time?
8      A.  Yeah, we had -- I heard some ongoing
9  evolution, if you will, of the -- of the tribal
10  relationship and the tribal contractual relationship
11  that we broadly based referred to as that.
12     Q.  And you remember the discussions that --
13  where you were trying to improve the optics of the
14  way that -- the way those relationships appear?
15         MR. SCHEFF:  Object to the form.
16         You can answer the question.
17     A.  Should I -- are you wanting do I -- do I
18  remember or -- I'm trying to think if there was
19  conversations that would have been without counsel,
20  and I don't know that there would have been.
21         THE WITNESS:  So I -- I -- can I
22  say --
23         MR. SCHEFF:  If -- let's talk outside.
24         MR. SHELDON:  Off record for a second.
25         THE VIDEOGRAPHER:  We are off the

1  record.  The time is 11:56 a.m.
2         (Break taken, 11:56 a.m. to 12:01 p.m.)
3         THE VIDEOGRAPHER:  We are back on the
4  record.  The time is 12:01 p.m.
5  BY MR. ACKELSBERG:
6      Q.  So before we broke, Mr. Rees, I was asking
7  you about executive discussions about improving the
8  optics in the relationship with the tribes, and then
9  you said you wanted to talk with counsel.  Can you
10  answer the question now?
11     A.  Yeah, so what I can't directly refer to is
12  sort of the -- any legal strategies in terms of how
13  that the tribal contracts and relationships were --
14  were evolved.  I'm not aware of any -- any
15  communications that happened where either in-house
16  counsel or outhouse counsel wasn't there.
17         However, the overall, what we would
18  consider strengthening of the programs by really
19  working with the tribes to help build up their staff
20  and to be ready to support what was a relatively
21  fast-growing business, that would have happened
22  with, say, Michelle and Jason without Sarah in the
23  room.  So the operational improvements, absolutely,
24  would have happened, and I do remember those.
25         MR. SHELDON:  And by Sarah, just to

UNSEALED

1  confirm, you're talking about Sarah Cutrona, general
2  counsel, correct?
3      THE WITNESS: Yes. Thank you.
4  BY MR. ACKELSBERG:
5      Q. But in -- and in the discussions with the
6  operational staff, with Michelle and Jason, for
7  example, that you do remember that -- that the --
8  that with regard to the things that you mentioned,
9  as examples, getting up staff and getting them --
10  building up competencies at the tribal level, that,
11  in part, this was to improve the optics, right? You
12  remember that -- you remember that term being used,
13  don't you?
14      MR. SCHEFF: Object to the form.
15      A. Well, as -- as I've said, the primary
16  driver of the work that was done by Michelle and
17  Jason with the tribes to continue to expand their
18  capabilities is support the rapid growth of
19  business. The primary thing was to support the fact
20  that these were rapidly growing businesses.
21  BY MR. ACKELSBERG:
22      Q. I understand that. I'm just saying --
23      A. And.
24      Q. -- do you remember the use of the term --
25      MR. SCHEFF: Let him finish his --

1  BY MR. ACKELSBERG:
2      Q. -- the use of the term "optics"?
3      MR. SCHEFF: Let him -- let him finish
4  his answer.
5      A. So my -- my memory is that the
6  communications around sort of the additional things
7  that we were trying to do with the legal
8  arrangements would have been based on interactions.
9  And I believe always had a -- one of our attorneys
10  in the room for the legal strategies for going
11  forward with the relationships. So I'm trying to
12  distinguish between the operational, which would
13  have been handled directly by me and the
14  relationship managers, strengthening those, and then
15  any -- any specific legal changes in the contractual
16  relationships. Is that distinction clear?
17      Q. Let me go back to when we were talking
18  about the three platforms before. With regard to
19  the product platforms, there was a Legacy platform
20  and then there was the CoreCard platform, right?
21      A. Yes.
22      Q. Okay. And the Legacy platform was where
23  the original PayDay One product was -- was housed,
24  right?
25      A. First started on the PayDay One product,

1  yes, that's right.
2      Q. And that's where the -- and when the
3  companies began in the installment loan business
4  first with First Bank of Delaware, again, it was the
5  Legacy platform, right?
6      A. Yes.
7      Q. And that -- and the tribe -- the tribal
8  versions of that were on the Legacy platform, right?
9  Not the -- not Mobiloans, the installment loan.
10      A. Yeah, and I -- the only reason I -- at some
11  point in time I believe that -- that the Legacy
12  program for some of the tribal products was shifted
13  to another platform provider.
14      Q. Well --
15      A. So I don't mean to be overcomplicated here,
16  but, generally speaking, though, when we launched
17  the tribal programs, those -- the installment loan
18  programs, they were on the Legacy platform. That's
19  probably what you're looking for.
20      Q. And you were mentioning before when -- when
21  RISE was first developed, when the company was
22  moving away from the state licensed payday products
23  to state licensed installment loan products, that
24  too, that product also was housed on the Legacy --
25  on the Legacy platform, right?

1      A. Again, just for clarity, there had been a
2  movement towards longer-term installment loans on
3  the PayDay One platform. The RISE was a rebranding
4  of that platform and a change in the pricing
5  structure.
6      Q. But still using the --
7      A. Still all using that platform, that's
8  correct.
9      Q. And then the risk and analytics platform,
10  that's pretty much common across products, right?
11      MR. SCHEFF: Object to the form.
12      A. I believe it is, yes.
13  BY MR. ACKELSBERG:
14      Q. And that's true of the marketing platform
15  as well, right?
16      MR. SCHEFF: Object to the form.
17      A. There wasn't a technology marketing
18  platform, per se, but the channels that were used
19  were consistent, although somewhat different,
20  between the products. For instance, I think some
21  of -- some of the marketing channels were exclusive
22  to some -- some lending operations.
23  BY MR. ACKELSBERG:
24      Q. Okay. Now, at the time of the split -- or
25  the spinoff of Elevate, the -- was -- how did you

UNSEALED

1 handle the transfer of the technological know-how
2 with regard to the Legacy platform and the risk and
3 analytics platform to the Elevate side? How did
4 that work?
5     MR. SCHEFF: Object to the form.
6     You can answer.
7     A. Yeah, my understanding was there was,
8 essentially, a copy because both the -- the direct
9 products and the licensed products were using the
10 same platform. So my understanding, I'm -- I think
11 this is correct from a technical perspective. I may
12 be missing some of the subtleties. Basically, a
13 copy was done, and each entity ended up with a copy
14 of the technology IP at the time.
15 BY MR. ACKELSBERG:
16     Q. Okay. And do you know -- you remember that
17 you had to go through an evaluation process as part
18 of the spinoff?
19     A. I remember that. Not the specifics, but I
20 do remember that Chris did some sort of an
21 evaluation. I don't know exactly what that was.
22     Q. Do you -- do you remember if the Legacy
23 platform and the risk and analytics platform were
24 ever valued as part of that transaction?
25     A. I don't know the answer to that.

1     Q. Do you remember the end of 2012, traveling
2 to ▮▮▮▮▮ with Victory Park?
3     A. Yes.
4     Q. And what was the purpose of that trip?
5     MR. SCHEFF: Irv, are you done with
6 this one?
7     MR. ACKELSBERG: Yes.
8     A. Victory Park was raising money for their
9 funds, and because we were a -- my recollection,
10 it's been a couple years, since we were a portfolio
11 company, they wanted us to come out and talk about
12 what -- what the, at the time, Think Finance product
13 was and why ▮▮▮▮▮ should be interested in
14 investing in Victory Park or -- I can't remember if
15 they invested or -- or provided debt financing to
16 Victory Park Capital. But in any event, we were
17 helping them sell ▮▮▮▮▮ as a client.
18 BY MR. ACKELSBERG:
19     Q. Basically, you were -- you were trying to
20 sell Think Finance, right?
21     MR. SCHEFF: Object to the form.
22     A. My recollection, they asked about Think
23 Finance, but I thought we were out there to help
24 with their broader relationship management with --
25 with ▮▮▮▮▮. I think that was

1 the name for the entity that we were talking to.
2     MR. ACKELSBERG: All right. So we're
3 up to, what, Document 276? 276. All right. I want
4 to show you a dec, and there's an e-mail with it.
5 Why don't we just call the -- the exhibit the e-mail
6 plus the attached dec and. . .
7     (Exhibit No. 276 marked.)
8     MR. SHAPIRO: This is all 276?
9     MR. ACKELSBERG: Yes.
10     A. (Reviews document.)
11     Okay.
12 BY MR. ACKELSBERG:
13     Q. So, Mr. Rees, before, earlier in the
14 deposition when I asked you about the
15 relationship -- the nature of the relationship
16 between Think Finance and Victory Park, you said
17 Victory Park was really more in the nature of a
18 lender than an investor in Think Finance, right?
19     MR. SHAPIRO: Objection; that's not
20 his testimony.
21 BY MR. ACKELSBERG:
22     Q. Well. . .
23     A. They were not a --
24     MR. SHAPIRO: Well, wait. It's not my
25 witness, but I would like -- I would like counsel to

1 pose a question.
2     MR. ACKELSBERG: Oh, okay. That's
3 fine.
4 BY MR. ACKELSBERG:
5     Q. Was Think -- was the relationship between
6 Think Finance and Victory Park more in the nature of
7 a -- from your standpoint, more in the nature of a
8 lender to Think Finance rather than an investor in
9 Think Finance?
10     A. They did not invest as an equity investor
11 in us, and it was more in the nature of a debt
12 facility.
13     Q. Okay. And your understanding of the trip
14 to ▮▮▮▮▮ was to try to raise more capital for
15 that lending facility; am I right?
16     MR. SCHEFF: Object to the form.
17     A. As -- I guess as I said before, I would
18 have characterized the primary thing we were doing
19 was helping Victory Park Capital with a relationship
20 that they're trying to build with ▮▮▮▮▮ that was
21 supporting -- you know, we assumed that they would
22 come into the facility that supported the growth of
23 this business as well as the growth of other
24 businesses that Victory Park Capital was -- was
25 investing in.

UNSEALED

App. 0054

BY MR. ACKELSBERG:

Q. But your presence at the meeting --

A. Or was -- was lending in.

Q. But your presence at that meeting wasn't about their other business, it was about their -- their lending to Think Finance, right?

A. Yes, I was just trying to respond to your question. So, yes, I -- I presented what I could present about, which was our -- our product and -- and assuming that ███ put money into that product, how it would function. But, like I said, I think they were trying to look for a broader relationship with ███ than just for -- for this one investment opportunity.

Q. I understand. But you weren't there for that broader relationship, you were there for -- specifically, for the -- you weren't raising money for Victory Park, in general, were you? You were --

MR. SCHEFF: Objection; asked and answered.

You can answer again.

A. I was -- I viewed that my role was to help them build their relationship and -- but, obviously, as I have been saying, I communicated about this product, the Think Finance product.

BY MR. ACKELSBERG:

Q. Well, at this point in time, you were trying to build the volume of the tribal products, right?

MR. SCHEFF: Object to the form.

A. Ensuring that there was adequate capital to support the growth of the -- of the tribal business was something that we were, you know -- you know, helping out where we could, yes.

BY MR. ACKELSBERG:

Q. In fact, there were frustrations from time to time with Victory Park that they weren't delivering capital that they had previously promised. I mean, you were relying on Victory capital coming in with the funds that you needed to put these loans on the street. Am I right?

MR. SHAPIRO: Object to form.

MR. SCHEFF: Object to the form.

A. I mean, that was the structure of -- you know, the structure of the deal was that they would be able to buy whatever participations they wanted to buy, and the product would grow either based on this purchasing entity or -- or something else coming along. And to the extent that Victory Park Capital didn't have an interest or didn't have the

capacity, then -- then that would have an understandable impact on the growth of the business.

BY MR. ACKELSBERG:

Q. Right. And so the idea behind the trip to ███ was your hope that this would increase the capacity for the product, right?

MR. SCHEFF: Object to the form.

You can answer the question.

A. We were there helping Victory Park Capital get the funding that we hoped would support the growth of this -- of this business.

BY MR. ACKELSBERG:

Q. Okay. Thank you.

And who went to -- by the way, you used the term ███. It's ███, right?

A. Yes.

Q. Standing for the ███ ███?

A. I don't know what the "C" stands for.

Q. But you understood this to be the -- basically, the investment vehicle of the government of ███, right?

A. I think they call it a sovereign wealth fund.

Q. Okay.

A. So apparently lots of -- I don't know much about this, but apparently lots of countries have their own investment arms that they invest in things around the world.

Q. And who went on that trip to ███?

A. Myself, Chris Lutes, and the person named -- I believe his name was Badr Qureshi who was -- worked for Chris in the --

Q. In the treasury department, right?

A. I think he was treasury, that's correct.

Q. And who went on the Victory Park side?

A. It's been a few years. I'm guessing, I think -- I think the answer is -- I mean, you would know. I think it was Brendan and Tom, but I'm not sure.

Q. And by Brendan, you mean Brendan Carroll?

A. Yes.

Q. By Tom, you mean Tom Welch?

A. Yes. Although, it might not have been Tom Welch at the time. I -- actually, I'm pretty certain -- certain it was Brendan. I don't know who else was there. I think there were two people.

Q. Okay. And we are looking at the dec that you presented to the folks at ███?

A. It -- at least it was a draft version of

UNSEALED

App. 0055

1  the dec that was presented at ████
2     Q.  I mean, do you see anything striking in
3  there that -- that suggests that this was -- that
4  the information you presented to ████ was different
5  than what appears in this document?
6        MR. SCHEFF:  Object to the form.
7        MR. SHELDON:  Object to form.
8  BY MR. ACKELSBERG:
9     Q.  You can answer.
10       MR. SCHEFF:  Yeah, you can answer the
11  question.
12     A.  No.
13  BY MR. ACKELSBERG:
14     Q.  Okay.  Thank you.
15       MR. SHAPIRO:  You asked for a notice
16  at 12:20.
17       MR. ACKELSBERG:  It's 12:20.  Okay.
18  Thank you.
19       Okay.  I think -- I think we'll leave that
20  document.
21       (Exhibit No. 277 marked.)
22  BY MR. ACKELSBERG:
23     Q.  Here's another one.
24     A.  So we're done with this?
25     Q.  Yeah.

1       MR. SCHEFF:  We're done with that.
2     A.  Did you want a sticker on this one?
3       MR. SCHEFF:  The sticker is on the
4  e-mail.  It's one exhibit.
5  BY MR. ACKELSBERG:
6     Q.  So I want to give you an opportunity to
7  review this document, Exhibit 277.
8     A.  Do you know what the date is on this?
9       MR. SCHEFF:  Is there an e-mail copy?
10  BY MR. ACKELSBERG:
11     Q.  Yes.  No, there's no e-mail.  I believe
12  there is -- that there is metadata, and I'm going to
13  tell you what the metadata says.  It says that
14  you're both the author and the custodian, and the
15  date on the metadata is August 8, 2011.
16     A.  Okay.  Thank you.
17     Q.  I don't -- again, I can't attest to --
18  that's how we received it.  That was -- that was
19  attached to the document that we received.  Okay?
20       MR. SCHEFF:  I'll find out if there's
21  an e-mail attached.
22       MR. ACKELSBERG:  There is?
23       MR. SCHEFF:  I don't know.
24       MR. ACKELSBERG:  I don't think there
25  is.

1       MR. SCHEFF:  There typically is.  I
2  mean, there either is or isn't.
3     A.  Is it inappropriate for me to write what
4  that date was on here so I can --
5  BY MR. ACKELSBERG:
6     Q.  No, no.  Well --
7       MR. SCHEFF:  Say it again.
8     A.  Yeah, just I'm not going to remember the
9  date.
10  BY MR. ACKELSBERG:
11     Q.  You can write on the exhibit.  That's fine.
12     A.  Thank you.  I'm sorry, what was that again,
13  August?
14     Q.  August 8, 2011.
15     A.  Thank you.
16       (Reviews document.)
17     Q.  And while you review it, I'm going to check
18  and see if there was an e-mail.
19       MR. ACKELSBERG:  It's freestanding.
20       MR. SCHEFF:  See if Dave agrees.
21       MR. ACKELSBERG:  Okay.
22     A.  Okay.  Thanks.
23  BY MR. ACKELSBERG:
24     Q.  So explain to me -- first of all, is
25  this -- is this familiar to you, either this

1  particular document or -- or it looks like documents
2  that you -- that you saw in the past or. . .
3     A.  I mean, there's components of it that are
4  familiar, but I don't -- I mean, "IPO Roadshow
5  Presentation, Breakout 1" that seems sort of odd
6  for -- for 2011.  We were talking about taking the
7  company public, and it had been something that we
8  had hoped to be able to do.  But, I mean, I don't --
9  in 2001 --
10       MR. SCHEFF:  2011.
11     A.  I mean, 2011, I don't -- I don't remember
12  that we actually did do any roadshow presentations
13  in breakout No. 1.  And so I -- I can't speak to
14  exactly what this is, but the materials in this,
15  I've seen in various other presentations, for the
16  most part.
17  BY MR. ACKELSBERG:
18     Q.  And I'm sorry for any confusion caused by
19  the date.  Again, I'm just relaying to you what
20  the -- what the metadata says.  I mean, I --
21     A.  I'm actually more reacting to the breakout
22  No. 1.
23     Q.  Yeah.
24     A.  Because breakouts, in my mind, are
25  generally for team meetings where, like, a -- we

UNSEALED

App. 0056

1  would have breakouts at town hall meetings where we
2  would work on a topic and the people would, you
3  know, present back their -- what they came up with.
4      Q. But you wouldn't be talking about an IPO at
5  a town meeting, would you?
6      A. We -- we might. And, I'm sorry, I said
7  town hall. I meant to say the quarterly business
8  reviews. Quarterly business reviews were typically
9  the -- the VP -- or directors and above in the
10  company, maybe 50 people. And we would have
11  discussed things, like, our plans for going public
12  and what we thought needed to happen in order to
13  have a successful IPO at some point in time.
14      Q. Now, at some point, you were talking to
15  investment bankers about the possibility of going
16  public, right?
17      A. Yes.
18      Q. And would you need to -- would -- forget
19  about need. Would you, in the course of those
20  discussions, have presentations where you would use
21  decs that looked like this with the -- forget about
22  breakout No. 1, but the information in here would be
23  the kind of information that you would be
24  communicating to potential backers of an IPO?
25      MR. SCHEFF: Object to the form.

1      You can answer the question.
2      A. Much of the material would be things we
3  would discuss with an investment banker. But the
4  fact that it says "Critical to achieve sexy spin on
5  risk management capabilities" makes me think we
6  probably didn't present this to a -- to an
7  investment banker.
8  BY MR. ACKELSBERG:
9      Q. Right. So this -- this was probably meant
10  for internal purposes, and then it would be -- it
11  would be tweaked if -- if it were then turned into a
12  production for a potential backer?
13      A. I don't know about tweaked, but it does
14  seem like this is for internal purposes of some
15  sort. I agree with that.
16      MR. ACKELSBERG: All right. What time
17  are we at?
18      MR. SHELDON: 27.
19      MR. ACKELSBERG: Let's just break now.
20      THE VIDEOGRAPHER: We're off the
21  record. The time is 12:27 p.m.
22      (Break taken, 12:27 p.m. to 1:13 p.m.)
23      THE VIDEOGRAPHER: We are back on the
24  record. The time is 1:13 p.m.
25  BY MR. ACKELSBERG:

1      Q. Mr. Rees, I want to move to the decision of
2  the company to pursue possible tribal partnerships
3  and the -- the origins of those three contracts.
4  And before I do, there's a number of people that
5  appear in the documents sort of connected to either
6  the decision to do tribal or one of the particular
7  tribal relationships. And I am going to go through
8  just a couple of names and ask you, one, how you
9  first connected to that person, and, two, what role,
10  if any, they played in the development of either
11  Think's decision to go tribal or to -- in one of the
12  particular relationships.
13      Okay. So the first name is a name that we
14  mentioned before, and that's Steve Haynes. How did
15  you first connect with Steven Haynes?
16      A. I actually don't know. I met him once at
17  an admiral's club in an airport for about
18  15 minutes. I think that's the only time I met him.
19  After all of this discussion, I should know all the
20  interrelationships, but I can't remember who first
21  contacted him or how we got in touch with him as a
22  company.
23      Q. And you do know that there was some role
24  that he played with regard to the funding of -- of
25  Plain Green loans, correct?

1      A. Yeah. I mean, I --
2      MR. SCHEFF: Object to the form.
3      Go ahead.
4      A. I really think of Haynes' role as the one
5  who was helping us identify potential travel
6  partners. He was somebody who was represented to us
7  as having some experience working with Native
8  American tribes before and could help us with
9  understanding how to do business in Indian country
10  in a way that we didn't.
11  BY MR. ACKELSBERG:
12      Q. And through who did you learn about Haynes'
13  ability to do that?
14      A. I don't know. He came -- he -- I -- like I
15  said, I met him, I think, once. Maybe there was
16  another time. I'm not aware of any other time. And
17  I really literally can't remember how we came into
18  contact with him.
19      Q. Okay. What about Alonzo Primus?
20      A. Oh, Alonzo. Yeah, he ran First Bank of
21  Delaware. I had actually known him as we were
22  evaluating, you know, banking relationships. I
23  mentioned we had the banking relationship before I
24  joined the company, and there was a period of time
25  where a lot of, you know, bank FinTech partnerships

UNSEALED

App. 0057

1    were happening.  We talked to him early.  It sort of
2    probably took a couple of years from when I first
3    was introduced to Alonzo to when we had a business
4    relationship at First Bank of Delaware.
5        Q.   And what role, if any, did he play in the
6    years during which Think had these relationships
7    with tribes?
8            MR. SCHEFF:  Object to the form.
9        You can answer the question.
10       A.   So for the tribes, the -- I'll tell you,
11   the only -- the relationship that I'm directly aware
12   of was he was helping us find -- I believe it was
13   potential banking relationships or ACH
14   relationships.  That's all I'm aware of.
15   BY MR. ACKELSBERG:
16       Q.   You're aware that he had a consulting
17   partnership with Steven Haynes?
18       A.   I wasn't aware of that.
19       Q.   What about Mark Curry?
20       A.   Mark Curry was on the board of the Online
21   Lenders Association.  I knew him through that.  And
22   he was actually the person who -- I don't really
23   quite know how it happened, but he somehow heard
24   that I was looking into, you know, whether it made
25   sense for us to provide technology to tribal lenders

1    like we did with banks.  And he actually introduced
2    us to the -- the Otoe-Missouria tribe in Oklahoma.
3        Q.   And what's your understanding of his
4    connection to the Otoe-Missouria tribe?
5        A.   He's a service provider to their -- one of
6    their other lending programs.  So Otoe-Missouria had
7    a -- at least one, if not more than one, tribal
8    lending program before we became introduced to them.
9    And he was the service provider to -- at least one,
10   if -- if not more, I don't know.  But at least one
11   of those programs.
12       Q.   Referring to American Web Loan?
13       A.   I think that's the name.  I'm -- I'm not
14   sure, but I think that's the name.
15       Q.   And when you say that he was a service
16   provider, are you saying that he -- your
17   understanding was that he was performing a role for
18   that other lending product similar to the kind of
19   role that Think Finance was ultimately playing with
20   regard to Great Plains Lending?
21           MR. SCHEFF:  Object to the form.
22       You can answer the question.
23       A.   I actually don't know what the contractual
24   relationship was between him and the tribe.  He
25   seemed to have a good relationship with the tribe

1    and introduced us to them, but I don't know exactly
2    what role he played.
3    BY MR. ACKELSBERG:
4        Q.   And what's your understanding of Mark
5    Curry's background with regard to, let's say, the
6    payday lending world?
7            MR. SCHEFF:  Object to the form.
8        You can answer the question.
9        A.   So he was an online lender.  Actually, I
10   don't know much about the products he offered, but
11   he was somebody that was instrumental in
12   establishing the online lender's alliance, along
13   with other people.  So he was pretty well-known in
14   the industry as sort of an early online lender, but
15   I don't -- I don't know much about his products or
16   anything other than that.
17   BY MR. ACKELSBERG:
18       Q.   He comes out of Kansas City originally,
19   right?
20       A.   Now that you say that, I think he does come
21   out of Kansas City.  I think he lives in Puerto Rico
22   now.
23       Q.   Right.
24       A.   But I think he did come out of Kansas City.
25       Q.   And Kansas City was a very active center of

1    payday lending industry; am I right?
2            MR. SCHEFF:  Object to the form.
3        A.   I -- I know there were a number of
4    businesses that started up out of Kansas City.  You
5    know, we're Texas based, so didn't have a whole lot
6    of connection up there.
7    BY MR. ACKELSBERG:
8        Q.   You have heard of Scott Tucker?
9        A.   Oh, yes.
10       Q.   And that -- it was a fairly large
11   constellation of -- of payday lending related
12   organizations connected to Scott Tucker?
13       A.   Yeah, I --
14           MR. SCHEFF:  Object to the form.
15       A.   I have no idea -- I have no reason to
16   believe that -- that Mark Curry was connected with
17   that at all.  He may be.  They were both out of
18   Kansas City.  But I can't speak to any relationships
19   between them.
20   BY MR. ACKELSBERG:
21       Q.   All right.  What about Rick Eckman, when
22   did you first connect with Rick Eckman?
23       A.   Rick Eckman, an attorney with Pepper
24   Hamilton, I believe.
25       Q.   That's correct.

UNSEALED

1    A.  I believe -- and I know for a fact that he
2  was First Bank of Delaware's attorney for a period
3  of time.  For some reason, I think he represented us
4  at one point in time, but I don't remember in which
5  connection.  And then I think he also represented
6  one -- at least one of the tribal lenders as well.
7    Q.  Might he have been the -- the one that
8  connected the company to Steven Haynes?
9         MR. SCHEFF:  Object to the form.
10  BY MR. ACKELSBERG:
11    Q.  If you remember.
12    A.  I don't remember that.  Maybe he did.
13    Q.  Okay.  What about Claudia Callaway?
14    A.  Oh, Claudia Callaway, an attorney that
15  actually had worked with PayDay One before I joined
16  the company, was -- you know, advised Mike Stinson
17  in how to set up the business.
18         MR. SHELDON:  Let me just caution the
19  witness.  Claudia Callaway, as I understand, was
20  outside counsel to Think Finance, correct?
21         THE WITNESS:  She was outside counsel
22  to Think Finance, correct.
23         MR. SHELDON:  So in answering his
24  question, please don't reveal any information that
25  Claudia communicated to you or that you communicated

1  to Claudia.  You can, obviously, answer to the
2  extent it reveals that she was outside counsel.  And
3  if he asks you about the number of times or ways you
4  communicated with her, that's okay as well.  Do you
5  understand?
6         THE WITNESS:  Okay.  Thank you.
7    A.  So she was outside counsel for initially
8  PayDay One and then remained as outside regulatory
9  counsel with the company until, I'm not sure, maybe
10  2012, 2013, something like that.
11  BY MR. ACKELSBERG:
12    Q.  And what about Ed Gehres?
13    A.  Oh, Ed Gehres.  He was outside regulatory
14  counsel.  I hope we're not going to list all the
15  regulatory counsel we used over the years --
16    Q.  There were lots.
17    A.  -- because there was a lot.  And I don't
18  remember the name of the firm that he was with, but
19  he was somebody who -- well, he was just regular
20  outside counsel for the firm, I guess.
21    Q.  Do you remember the Patton Boggs white
22  paper?
23    A.  Not in any specificity.
24    Q.  Okay.  Now, why don't -- why don't you
25  just, like, tell us briefly about the decision to

1  pursue a tribal partnership after -- we've had some
2  testimony of this before, and I'm not going to get
3  into too much detail about it, but you got -- just
4  to recount what happened, you were notified in
5  October of 2010 by First Bank of Delaware that --
6  that, basically, the FDIC had told them to stop
7  their involvement, right?
8         MR. SCHEFF:  Object to the form.
9    You can answer the question.
10    A.  That's actually not true.
11  BY MR. ACKELSBERG:
12    Q.  What's not true?
13    A.  What you just said.
14    Q.  Really?
15    A.  We were notified that the bank made their
16  own decision to exit the program, that they were
17  never told by the FDIC to exit the program.
18    Q.  Okay.  If that's your recollection, that's
19  fine.
20    A.  Well, I mean,, we -- that's -- that's
21  specifically what we have been told in writing --
22    Q.  Okay.
23    A.  -- about the -- about that situation.
24    Q.  Okay.  And so -- and then we know that
25  the Plain Green -- Plain Green was the first product

1  that went online, the first tribal product, right?
2  That was the first week of April 2011?
3    A.  I'm sorry, did you want the background
4  on --
5    Q.  Yeah, I'm just --
6    A.  You originally were asking me --
7    Q.  I'm just situating --
8         MR. SCHEFF:  Wait for his question.
9  BY MR. ACKELSBERG:
10    Q.  I'm just situating the -- the timeline.
11    A.  Thank you.
12    Q.  So in October of 2010, you're notified that
13  for whatever their reasons for leaving --
14    A.  The bank is terminating the program.
15    Q.  The bank is going to terminate the program.
16  And it's going to be effective at the end of the
17  year, at the end of 2010.  And then by April of
18  2011, there was a product online called Plain Green.
19  So we're talking about this period of time between
20  the notification from First Bank of Delaware that --
21  that they're going to terminate and the Plain Green
22  program beginning.  Okay?
23    A.  Right.
24    Q.  All right.  So first of all, how is the
25  decision made to pursue a tribal partner?

UNSEALED

1    A.  So I'll walk through the history as I
2  remember it.  We were notified by FBD that they were
3  going to be terminating the program.  The program
4  was representing a very significant part of the
5  revenue and net income of the business.
6        We assembled the executive team together
7  that weekend to look at a wide variety of things to
8  do.  Continued to grow the -- the existing nonbank
9  product, adding new ones.  We looked at
10  opportunities in the UK.  We looked at new product
11  opportunities even outside of credit.  And sort of
12  moved down a path of -- and including a tribal lend,
13  which is something we hadn't really evaluated in the
14  past.  So we took all of those potential business
15  opportunities, began looking into them.
16        We actually ended up doing all of those
17  things.  You know, we bought a company in the UK.
18  We launched a prepaid debit card.  We launched a
19  rent-to-own product.  We enhanced the direct
20  consumer product to grow that more aggressively.
21  And then -- but as we were evaluating all the
22  alternatives -- I'm sorry if I'm doing too much
23  here --
24    Q.  That's okay.
25    A.  -- but I'm hoping this provides some of

1  what you're looking for.
2        We looked at -- at sort of other tribal
3  lending businesses.  There was a couple of court
4  cases at the time that had just been decided in
5  favor of the tribes, one in California and one in
6  Colorado -- I don't know the -- you know, what names
7  those were -- that seemed to specify what it would
8  take for a tribal lending entity to have sovereign
9  immunity and to not be, you know, subject to state
10  law as per the tribal sovereignty would be.
11        We looked at other programs that were out
12  there.  And then based on that, then based on --
13  really, you know, based on sort of the evaluation of
14  that by all the parties, including the board, we
15  decided that it made sense to move forward with
16  seeing if we could come up with a suitable tribal
17  relationship where we would provide technology and
18  services to them, very similar to the way we had
19  provided technology and services to the bank.
20    Q.  And at that point in time, were other of
21  your peer organizations -- well, let's say within --
22  within the OLA, other than Mark Curry, were there
23  other peer members of OLA that were doing business
24  under the tribal model?
25        MR. SCHEFF:  Object to the form.

1    A.  I think there were.  I don't know that I
2  could name any of them, but I'm pretty sure there
3  were other entities within the Online Lenders
4  Alliance that were licensing technology to tribal
5  lenders as well.
6  BY MR. ACKELSBERG:
7    Q.  Now, the first -- my understanding is the
8  first potential partner that the company talked to
9  was Butch Webb in South Dakota.  Right?
10    A.  Yes.
11    Q.  And how did that meeting come to be?
12    A.  Actually, our -- the founder of the
13  company, Mike Stinson, had known another gentleman
14  named John Templer, who had known Butch Webb.  And
15  when -- I -- I know that was the connection.  I
16  don't know exactly how it was sort of connected up
17  that Butch Webb was involved in a tribal lending
18  organization.  I don't remember that.
19        But one thing led to another, and we -- we
20  traveled up to North Dakota -- North or South
21  Dakota.  I think it was North Dakota -- to meet with
22  him.  We ultimately couldn't get comfortable with
23  his -- his business model.  It seemed to run
24  contrary to what -- you know, what we and outside
25  counsel thought was the legally justifiable lending

1  structures and --
2        MR. SCHEFF:  Stay away from whatever
3  counsel told you.
4        THE WITNESS:  Sorry.
5    A.  But in -- in any event, we -- I mean, did
6  not like the fact that there didn't seem to be an
7  arm of the tribe in any way involved with the --
8  with the lending operation.  So it was -- he was not
9  very happy about it, but -- but we told him we
10  weren't going to do business with him.
11  BY MR. ACKELSBERG:
12    Q.  Now, did Claudia Callaway play a role in
13  that connection?
14        MR. SCHEFF:  Just answer the question
15  "yes" or "no."
16    A.  I just don't know.
17  BY MR. ACKELSBERG:
18    Q.  Do you -- do you remember if she was
19  representing Butch Webb back at that time?
20    A.  Don't know.
21    Q.  Or CashCall or. . .
22    A.  I don't know.
23    Q.  The -- did Butch Webb have a
24  relationship -- now his company was called Western
25  Sky, right?

UNSEALED

App. 0060

1    A. Yes.

2    Q. And did Western Sky have -- have a

3  relationship with CashCall at that time, or did that

4  happen when you turned him down?

5    A. I don't know. I had an operation. My

6  recollection, Western Sky was the name. I don't

7  know if at that time he already had a relationship

8  with -- with CashCall or not.

9    Q. I mean,, you do know eventually --

10    A. Yes.

11    Q. -- he did develop a relationship with

12  CashCall, right?

13    A. Yes.

14    Q. And that was one of your competitors,

15  right?

16    A. They were an online lender. I don't know

17  how much we directly competed with them. They were

18  an online lender, though.

19    Q. Okay. And then the next -- as I understand

20  it, the next tribe that you made contact with was

21  the Otoe-Missouria. Right? And that was through

22  Mark Curry?

23    A. I believe that's correct.

24    Q. And I can show this to you if you want to

25  see it, but we've seen an e-mail from you to the

1  executives, I think it's February 28th, 2011, where

2  you say something to the effect of, "Start your

3  engines," where -- where you thought it looked like

4  the Otoe-Missouria were ready to -- ready to go. Do

5  you remember that?

6       MR. SCHEFF: Object to the form.

7  BY MR. ACKELSBERG:

8    Q. I can show -- I can show you the e-mail.

9       MR. SCHEFF: Lack of foundation.

10      You can answer the question if you can.

11    A. I've seen the e-mail and --

12  BY MR. ACKELSBERG:

13    Q. Okay.

14    A. And I -- I think we believed that the

15  business relationship was going to happen.

16    Q. And, in fact, the e-mail was connected to a

17  signed agreement whereby the tribe agreed to acquire

18  the website, Plain Green, that -- that Think Finance

19  had already -- already owned in terms of the URL,

20  right? I mean,, that was the context of that,

21  correct?

22       MR. SCHEFF: Object to the form.

23      You can answer the question.

24    A. Yeah, you know, as we talked about when the

25  bank relationship was terminated, we were looking at

1  a lot of business opportunities and were -- one of

2  the biggest challenges for launching a product, we

3  launched a number of products over the years, is

4  getting an URL and getting a trademark that -- that

5  you could actually use.

6      So we had already gone and looked at a

7  whole bunch of different potential names and done

8  the trademark searches and found the URLs and bought

9  a few. So we had a handful of things that we were

10  sort of sitting on. So in order to, you know, help

11  them get live, we lice- -- well, not -- we actually

12  sold them, I think, the URL so that they could have

13  that as the basis for the product.

14  BY MR. ACKELSBERG:

15    Q. So, in other words, that -- before you

16  approached the Otoe-Missouria, you already had a

17  website called greatplainslending.com, right?

18    A. Yes.

19    Q. And --

20    A. Actually, I don't know if that's true. I

21  know that we began looking for product names and

22  URLs. Whether that was completed before we met

23  with the Otoe-Missouria, I don't know the exact

24  timing of that.

25    Q. All right. But the start your engines

1  e-mail was at the point where they -- whatever the

2  timing of your original meeting with them was, it

3  was -- it was at the point where they were saying,

4  okay, we'll -- we'll agree to this agreement to

5  assume the responsibility and ownership of that --

6  of that website, that URL, right?

7       MR. SCHEFF: Object to the form; the

8  document speaks for itself. An unmarked document

9  speaks for itself.

10    A. I'm sorry, if you can rephrase the

11  question.

12  BY MR. ACKELSBERG:

13    Q. See, that's the problem. That's the

14  problem.

15       MR. SCHEFF: Why don't you mark the

16  document. Just mark the exhibit as opposed to --

17       MR. ACKELSBERG: I'll be happy to.

18       MR. SCHEFF: -- talking about it in

19  the air.

20       MR. ACKELSBERG: That's fine, Richard.

21  I don't want to have any misunderstandings.

22       MR. SCHEFF: Good.

23  BY MR. ACKELSBERG:

24    Q. This document has already been marked

25  Exhibit 124.

UNSEALED

1    A.  Thank you.
2    Q.  It looks familiar?
3    A.  Yes.
4    Q.  Okay.  We had to do this for your lawyer.
5  He wanted too make sure you knew what we were
6  talking about.
7      MR. SCHEFF:  Just ask the question and
8  stop the chatter.
9  BY MR. ACKELSBERG:
10    Q.  So this is a signed agreement between --
11  well, in this case it was TailWind Marketing.
12  TailWind Marketing was the Think entity that
13  actually at that point in time owned the URL, right?
14    A.  That appears correct from -- from the
15  agreement.  I didn't really remember that.
16    Q.  Well, in any way case, you signed -- your
17  signed --
18    A.  Oh, your mic.
19    Q.  In any case, you signed on behalf of
20  TailWind, and it was a signature from the tribe.
21  And you expected this to be the beginning of the
22  first -- the first tribal product, correct?
23    A.  Yes.
24    Q.  Okay.  And when you said, "Start your
25  engines," it was because there already was, in fact,

1  the -- the architecture of this Great Plains Lending
2  product for which you had acquired the URL, right?
3      MR. SCHEFF:  Object to the form.
4    A.  I mean, we're ready to launch a new
5  product.  There's always excitement anytime you
6  launch a new product.
7  BY MR. ACKELSBERG:
8    Q.  No, but --
9    A.  So I was trying to convey the excitement to
10  the team that we had a new product that was about to
11  hit the ground.
12    Q.  Well, I'm sure there was excitement.  I
13  just want to confirm that at this point in time,
14  there already was a mock-up of a website.  The
15  platform had -- the proper -- the coding had already
16  begun, that this was, basically, a product that was
17  ready to go and that that was your -- when you said
18  start the engines, it was to start the engines of a
19  loan platform that was already ready to go?
20      MR. SCHEFF:  Object to the form.
21    A.  Like I said, I -- I would read this, and my
22  memory at the time was, a lot of excitement about
23  starting a new product like any other product.  And
24  I can't speak to the timing of when any -- any, you
25  know, development on a -- you know, the actual site

1  that became Great Plains Lending happened.  I don't
2  know if it happened before or after this.  You may
3  have, you know, documents that say when it happened,
4  but I don't remember.  I view this just as, hey,
5  we're -- got a new product, it's time to start
6  working on it.
7  BY MR. ACKELSBERG:
8    Q.  Okay.  Well, maybe this will refresh your
9  recollection.  Plaintiff's Exhibit 120, P-120.
10  We're looking at a dec that starts at TF-PA 13270.
11    A.  Was this connected to an e-mail?
12    Q.  Connected to an e-mail, I have no idea.
13    A.  Was this sent anywhere?  Did this come
14  from --
15    Q.  This is an exhibit -- I really don't know.
16  This is an exhibit already identified, and Richard
17  is checking.
18      MR. SCHEFF:  Yeah, I'll check.  In
19  fairness, we have an agreement, Mr. Rees, that if a
20  document like this is going to be shown and there's
21  an e-mail attached, that that e-mail will be shown
22  as well so the witness is not misled and can
23  understand the context.
24    A.  Should I look at this?
25  BY MR. ACKELSBERG:

1    Q.  Sure.
2    A.  Okay.  Thanks.
3    (Reviews document.)
4    Q.  I am looking at the production.  Appears to
5  be a freestanding document.  You're -- you're the
6  custodian.  The author, it just says "ThinkCash
7  employee."  I'm not sure what that means.  All
8  right?
9    A.  Yeah, thank you.
10    (Reviews document.)
11    Thank you.
12    Q.  Okay.  So you see this -- you've seen this
13  dec before, right?
14    A.  I don't remember it.  It wouldn't surprise
15  me if I had seen it, though.
16    Q.  Okay.  And it doesn't surprise you that --
17  that -- the date on this doesn't surprise you
18  given -- given your recollection of the timing of
19  First Bank of Delaware terminating its -- telling
20  you that come December, they're not going to do any
21  more lending and you deciding to go tribal, and --
22  and because it takes a long time to create a
23  product, your product people were already hard at
24  work trying to see what this would look like, right?
25      MR. SCHEFF:  Object to the form.

UNSEALED

App. 0062

1        You can answer if you can.
2    A.  Sure.  I mean,, as I mentioned, we were
3  evaluating a lot of different product opportunities
4  at the time, and we were definitely in full scramble
5  mode to be able to get any that were finally
6  launched up and operational as fast as possible.
7        To your early point, had we actually sort
8  of built out the website, I actually don't know from
9  this.  I mean,, a lot of things that we did were
10  just mock-ups and demo.  This -- this might have
11  been we actually built out the wire frame for the
12  website or it's just a quicky mock-up of the site
13  for purposes of marketing discussions.
14  BY MR. ACKELSBERG:
15    Q.  How long did it -- from your recollection,
16  how long would it take to actually build a platform
17  once you got the go-ahead and you had -- and you had
18  a mock-up already, you had a name, you had a
19  concept, you had --
20    A.  Assuming that there weren't any structural
21  changes to the -- to the flow over the flow that was
22  used for other products that we had in market, it
23  wasn't -- it certainly wasn't exactly cut and paste.
24  Like, you could generally put a new design on a --
25  you know, copy the -- website and put a new

1  design template on top of it for at least, you know,
2  preliminarily to a point that you could look at it.
3  Hopefully I answered.
4    Q.  Well, but I asked you in terms of time, how
5  long would that process take --
6    A.  Well, I mean, it's sort --
7    Q.  -- to go from mock-up to -- to a platform?
8    A.  So the market -- the marketing team could
9  get the mock-up done, actually, generally, just in a
10  few days.  And then putting the -- the, you know,
11  branding on top could take maybe no more than a
12  couple of weeks.  I mean, that doesn't mean it's
13  ready to go live, but at least for purposes of
14  having something to kind of click through, you could
15  do it probably in a couple of weeks.
16    Q.  Okay.  And you see that, again, it's dated
17  December 2010, that they're already -- it was in the
18  works, discussions with Victory Park by this time,
19  because there's reference to the purchaser of the
20  participation interest being GPL Servicing.  You see
21  that, right?
22    A.  Yeah, I don't know that there were
23  conversations directly with Victory Park. There may
24  well have been.  But this was a period in time that
25  we were, you know, surprised, moving pretty rapidly.

1  I would like to believe that we would have had the
2  discussions with Victory Park Capital before we
3  discussed this with a potential partner, but I can't
4  say that we absolutely did.
5    Q.  Well, it --
6    A.  And I'm sorry to interrupt.  Just to
7  respond, because this was really adapting the
8  existing financing and lending structure that had
9  been sort of adopted and -- by First Bank of
10  Delaware and reviewed by the FDIC.  So we thought
11  this was sort of a standard approach that we were
12  using.  So I -- like I said, I just can't remember
13  when we began talking to Victory Park Capital.
14  Ultimately, obviously, we did, but I just don't know
15  if it was before or after this document was
16  distributed.
17    Q.  Do you remember how the naming occurred --
18  I mean,, who named the -- the special purpose
19  vehicle GPL Servicing, or GPLS?  Where did that name
20  come from?  That came from Great Plains Lending,
21  right?  I mean,, that's what the GPL referenced,
22  wasn't it?
23    A.  You're right, it -- it was Great Plains
24  Lending.  I just can't remember the timing and who
25  came up with that.

1    Q.  It might have been Think, it might have
2  been Victory Park, you're not sure?
3        MR. SCHEFF:  Object to the form.
4        THE WITNESS:  I can answer?
5        MR. SCHEFF:  You can answer.
6    A.  I would assume one of the two.
7  BY MR. ACKELSBERG:
8    Q.  Okay.  But you don't remember the
9  discussions about -- about the creation of a new
10  special purpose vehicle and an investment fund to
11  buy the tribal -- to drive the participations from
12  the tribal --
13        MR. SHAPIRO:  Objection; compound
14  question.
15        Can you read the question back so that the
16  witness hears the question exactly?
17        COURT REPORTER:  "Okay.  But you don't
18  remember the discussions about -- about the creation
19  of a new special purpose vehicle and the investment
20  fund to buy the tribal -- to drive" --
21  BY MR. ACKELSBERG:
22    Q.  I asked you --
23        MR. SCHEFF:  Hold on.  Just wait.
24  Just wait.
25        COURT REPORTER:  "You don't remember

UNSEALED

1  the discussions about -- about the creation of a new
2  special purpose vehicle and an investment fund to
3  buy tribal" -- "tribal -- to drive the
4  participations from the tribal," and then --
5  BY MR. ACKELSBERG:
6      Q.  Well, I'll just ask you a different
7  question rather than trying to -- so as of December
8  of 2010, there -- there was a product, Think --
9  called ThinkCash that operated in partnership with
10  First Bank of Delaware, right?
11     A.  Yes.
12     Q.  Yeah.  And the participations were being
13  purchased by -- by investment funds or special
14  purpose vehicles connected to Victory Park, right?
15  That were buying the participation interests from
16  First Bank of Delaware, right?
17     A.  To answer the question, so when the, what
18  was at the time called Universal Fund -- was
19  established and was -- we were really directed by
20  the bank that that's how they wanted to structure
21  the relationship and they wanted a third-party to
22  buy those participations from the ThinkCash product,
23  it was originally a sort of friends and family of
24  the bank that were -- that were invested into that
25  Universal Fund --

1      At some point in time, Victory Park
2  Capital, you know, came in and bought participations
3  with them.  I have to assume by December 2010,
4  Victory Park Capital was involved in the
5  relationship.  I don't know exactly under what --
6  you know, there was a couple of evolutions of who
7  was investing and what the naming conventions were.
8      Q.  Okay.  So we --
9      A.  So that's -- I just want to be --
10         MR. SCHEFF:  Let him finish.
11  BY MR. ACKELSBERG:
12     Q.  So we can start -- so you remember the
13  Universal Fund at one point was--
14     A.  Universal Fund -- I think, is what it was
15  called.
16     Q.  Universal Fund -- was purchasing the
17  participations, and you said that was -- the
18  investors were mainly family and friends of the
19  bank?
20     A.  And I -- that was -- we referred to it as
21  friends and family, but it was -- it was largely
22  people that the bank had known, because the bank had
23  used this structure before.  So it was investors in
24  the bank structure were also invited, in the
25  previous one, Universal Fund I, were invited to be

1  part of the Universal Fund --.  And then it also
2  expanded.  I think there were some additional
3  investors that came in.
4      Q.  Like Think Finance?  In fact, wasn't Think
5  Finance the largest investor in Universal Fund --?
6      A.  That's not my -- that's not my memory.
7  I -- I don't know exactly the structure of who
8  was invested into --
9      Q.  And what about the family and friends of
10  Think Finance, like, your uncle, like. . .
11     A.  Oh.  Yeah, my -- my uncle did invest.  I
12  doubt it was very much money.  Wasn't much to -- to
13  invest.  But I think that was part of the friends
14  and family.  I think there was a -- maybe another
15  board member or two that were -- I think it was
16  broadly at the time if any of them wanted to invest,
17  it was sort of opened to, as we said, friends and
18  family of the company or the bank.
19     Q.  Well, when it went -- when it went from
20  Universal Fund I to Universal Fund -- --
21     A.  I wasn't involved in Universal Fund I.
22     Q.  I know that.
23     A.  Okay.
24     Q.  But the initial -- the initial seed
25  investment for Universal Fund -- was $3 million from

1  Think Finance, right?
2      A.  I didn't know that.  I mean,, I -- Chris
3  Lutes, I'm sure, could do a better job explaining
4  exactly the evolving funding structure of both
5  the -- the bank products and any tribal products
6  than I can.
7      Q.  Okay.  And then there was -- there was a
8  point in time when the Universal Fund couldn't keep
9  up with the volume that -- couldn't keep up with the
10  success of the product, right?
11         MR. SCHEFF:  Object to the form.
12     You can answer the question.
13     A.  Actually, I don't know what you're saying.
14  The Universal Fund couldn't keep up, so then it
15  wouldn't be buying participations, so it --
16  BY MR. ACKELSBERG:
17     Q.  It didn't have --
18     A.  -- stopped buying?
19     Q.  -- the capacity to support the volume that
20  Think believed it could generate from the ThinkCash
21  product?
22         MR. SCHEFF:  Object to the form.
23     You can answer the question.
24     A.  So you're -- I'm just trying to understand
25  the question.  So you're saying that there weren't

UNSEALED

1   enough investors in that and that they had to stop
2   buying participations?  Because I didn't remember
3   that they stopped buying participations.
4   BY MR. ACKELSBERG:
5      Q.   I'll ask a different question.  You
6   remember that Think Finance came in and, basically,
7   bought -- took out the Universal Fund?  Do you
8   remember that?
9         MR. SCHEFF:  I'm sorry, could you --
10       MR. SHELDON:  I think for clarity of
11  the record, I think we should say Universal Fund I
12  or --.  I realize it's another few syllables, but
13  let's just -- I think -- I would appreciate if we
14  could do that because there were doing two different
15  universal funds, and the witness has already pointed
16  it out once, and I don't want the testimony to be
17  unclear.
18       MR. ACKELSBERG:  That's fine.  Why
19  don't I just make it clear that I'm not talking at
20  all about the Universal Fund No. 1, and that anytime
21  I make reference in the next five minutes to the
22  Universal Fund, I'm talking about the Universal Fund
23  --.  Okay?
24       MR. SHELDON:  Okay.  So for -- for the
25  sake of the record, until counsel says otherwise, I

1   am going to assume all future references, and the
2   witness should as well, to Universal Fund are to
3   Universal Fund -- only and not to Universal Fund I.
4   And I would ask if you ever go back on that and you
5   want to talk about Universal Fund I, that you just
6   announce that for the record.  Thank you.
7   BY MR. ACKELSBERG:
8      Q.   Do you remember, roughly, July of 2010 that
9   Victory Park, essentially, bought up the Universal
10  Fund?  Do you remember that happening?
11      MR. SCHEFF:  Object to the form.
12      MR. SHAPIRO:  Object to form.
13      MR. SCHEFF:  Object to the form.
14     A.   Victory Park bought out.  I remember at
15  some point in time -- again, I'm -- I'm sorry, I
16  don't know the exact timing -- Victory Park became
17  an investor, and I don't know whether they came in
18  in parallel, so pari passu to any of the previous
19  investments, or that when their investment dollars
20  came in, the previous investors were repaid in that
21  transaction.  So I don't know the specifics.
22   BY MR. ACKELSBERG:
23      Q.   I'm not -- and I'm not asking you to recall
24  the details of that transaction.  But just at some
25  point, while you were still lending to the -- while

1   you were still in partnership with First Bank of
2   Delaware, First Bank of Delaware was still
3   originating the loans --
4     A.   Right.
5     Q.   -- the participations started getting
6   purchased by a Victory Park entity rather than a
7   Universal entity?
8     A.   I believe that's correct.  What I thought
9   you were suggesting was that they --
10     Q.   Don't worry --
11     A.   -- bought out the other one, which I didn't
12  think was what had happened.  I don't know the
13  specifics.  I do remember at some point in time that
14  Victory Park became an investor in Universal Fund --
15  again, my -- my understanding, and began through
16  that relationship owning the participations in that
17  entity.
18     Q.   Okay.  And then at -- so at some point
19  soon thereafter, you get word from First Bank of
20  Delaware that they're going to stop originating
21  loans, right?
22     A.   I -- I'm sorry, I don't know the specific
23  timing of when all these happened.  I can say that,
24  yes, I know that Victory Park began buying
25  participations before the -- we were notified of the

1   termination of the program by the bank.  I think
2   that's what you're asking.
3     Q.   Okay.  Right.  And so there would have --
4   there would have had to have been discussions with
5   Victory Park to let them know that -- of what the
6   bank had told you, right?
7     A.   Well, yes, we -- we notified them that the
8   program was being terminated and the loans would be
9   paying out over time.
10     Q.   Okay.  And, similarly, when you decided at
11  Think -- at Think to pursue the tribal model, to try
12  to find a partner that -- that suited your
13  requirements, whatever they were -- and we
14  haven't -- we haven't gotten there yet -- you would
15  have been in discussions with Victory Park about
16  that, right?
17     A.   At some point in time, we would have
18  discussed that we were evaluating it and given them
19  some time to think of whether they were interested
20  in evaluating that as a potential funding
21  opportunity for them.
22     Q.   And at some --
23     A.   I just don't know exactly when that
24  happened.
25     Q.   Right.  And without the specifics of the

UNSEALED

1 day, at some point, Victory Park told you that they
2 were interested, right?
3     A.  That's correct.
4     Q.  Okay.  And so whoever kind of came up with
5 the name, either it was Victory Park or Think
6 Finance, or together, the concept came up of GPLS to
7 be a -- essentially, a replacement investment fund
8 for whatever the preexisting one was with regard to
9 First Bank of Delaware?
10         MR. SHAPIRO:  Object.
11         MR. SCHEFF:  Object to the form.
12         MR. SHAPIRO:  Object to the form.  And
13 inconsistent with prior testimony, mischaracterizing
14 the testimony.
15     A.  And, again, the way I remember it, and I
16 remember it fairly discreet, there was the Universal
17 Fund that Victory Park Capital was an investor in.
18 At some point in time, the GPLS fund was established
19 and Victory Park was an investor in that fund.  I
20 don't remember with any specificity how things
21 evolved and if they did evolve.  I'm sure Chris
22 could do a better job than I could about that.
23 BY MR. ACKELSBERG:
24     Q.  Okay.  Now, the Great Plains Lending
25 labelled product didn't -- didn't happen as you

1 thought it was going to happen when you said start
2 the engines on February 28, 2011?
3         MR. SCHEFF:  Object to the form.
4     You can answer the question.
5     A.  Yes.
6 BY MR. ACKELSBERG:
7     Q.  Okay.  Instead, there was a -- there was a
8 switch to a different tribe, the Chippewa Cree in
9 Montana, correct?
10     A.  Yes.
11     Q.  Okay.  So what do you remember -- well,
12 first of all, what went wrong with the
13 Otoe-Missouria and Mark Curry, or whoever you were
14 talking with back then, or whoever --
15     A.  Yeah.
16     Q.  -- the company was talking with?
17     A.  You know, the difference between the
18 preliminary sort of deal terms that seemed to make
19 sense and the final paperwork, we just weren't
20 really happy with what we were seeing.  At a high
21 level, we thought that the -- we believed that the
22 way that we worked with the bank, which we felt was
23 very stable and a well-functioning structure, but
24 such that we had really -- you know, we were the
25 service provider for the bank, and there weren't

1 intermediaries in between.  As we saw the final
2 proposed documents coming from -- from the tribe,
3 they had the sort of management company that the
4 tribe was using --
5     Q.  MacFarlane Group?
6     A.  I don't know which entity it was.  It
7 was -- it was one that Mark Curry was associated
8 with.  I don't know if it was The MacFarlane Group
9 or anyone else.  But -- but there was a business
10 entity that we were to be contracting with as
11 opposed to directly with the tribal lending entity,
12 and we didn't think that was a smart way to do
13 business.  And the --
14     Q.  Why not --
15         MR. SCHEFF:  Let him finish the
16 answer, please.
17     A.  You know, we -- we felt we had a business
18 model that, you know, A, it worked well.  It had had
19 FDIC -- in our minds at least, an FDIC sort of stamp
20 of approval on it because it had gone through FDIC
21 examination.  We wanted to replicate that as much as
22 possible.  And having another entity where also we
23 didn't feel like we'd be working directly with
24 that -- that, you know, tribal lending entity, it
25 just didn't feel like the right relation- -- I mean,

1 we already walked away from the Butch Webb operation
2 because we didn't think that was an appropriate
3 way -- you know, we didn't think there was -- they
4 had any sovereign rights to lend at all.
5     And this, we just thought, was not the
6 kind of business relationship that would be a
7 stable, longstanding one that we wanted to be part
8 of.  So we had been continuing to talk to other
9 tribes.
10     And as you mentioned, I think it was
11 Haynes that bound the the -- -- what became the
12 Plain Green tribe, the Chippewa Cree tribe, and we
13 were sort of in parallel talking with those two --
14 two tribes.  And, ultimately, we were more
15 comfortable with the structure and the relationship
16 with the Chippewa Cree than we were with the
17 Otoe-Missouria at that time.
18 BY MR. ACKELSBERG:
19     Q.  Where did you get the impression that the
20 FDIC had approved of the structure that you had in
21 place with First Bank of Delaware?
22     A.  Well, it had gone through multiple FDIC
23 exams.
24     Q.  How do you know?
25         MR. SHELDON:  I would just caution

UNSEALED

App. 0066

1  again if anything you're going to say would be as a
2  result of being told something by counsel, you know,
3  you can state that for the record, but if it's
4  independent of that, please do testify.
5      A.  It was independent.  It was from bank --
6  bank management.
7  BY MR. ACKELSBERG:
8      Q.  Like Alonzo?
9      A.  Alonzo and Harry Madonna, the chairmen.
10  And they -- I'm sorry, I just lost my train of
11  thought.  Excuse me.
12      Yeah, so back to the -- sort of FDIC
13  oversight.  So you've probably seen that at one
14  point in time the FDIC stopped the bank from some of
15  its programs and thought that they exhibited
16  rent-a-bin characteristics.  Ours was excluded from
17  that.  And we did modify the structure of the
18  relationship with the bank, sort of looking at -- at
19  what the FDIC didn't like about the other
20  transactions.  That was actually largely what the
21  bank asked us to do.  And then -- and that's when we
22  established the Universal Fund -- for instance.
23  Yeah, Universal Fund --.  And the FDIC did -- I
24  think it was two more exams, at least one more exam
25  since that time.

1      So from our perspective, you know, the
2  bank had been told this is how we think you ought to
3  be working with service providers for credit
4  programs.  We made changes specifically based on
5  bank guidance.  And then the FDIC looked at it and
6  continued that -- that business until the bank
7  ultimately exited it.
8      So, again, from our perspective, the FDIC
9  had looked at it and thought there was an
10  appropriate relationship for a lender and a service
11  provider to have.  So that was -- that was our
12  perspective and why we wanted to heed as close to
13  that structure as possible when working with tribes.
14      Q.  Based on your conversations with Alonzo
15  Primus and Harry Madonna, did you have the
16  impression that the FDIC had been informed by them
17  that the invest- -- that the investors in the
18  Universal Fund who was buying the participations
19  were family and friends of the bank leadership?
20      A.  The FDIC, my understanding -- and this is
21  really coming from representations from Alonzo and
22  others at -- at the bank, was pretty thorough in its
23  evaluation of these programs, both the program with
24  us and previous programs that the -- that the bank
25  had had.

1      So I guess I'd be surprised if the FDIC
2  was unaware of it because they used that same
3  structure and the same -- some of the same
4  investors, at least for the previous program as well
5  as for ours, but I don't know for a fact whether the
6  FDIC didn't know that.
7      Q.  Okay.  You do know that the government
8  ultimately shutdown First Bank of Delaware, you do
9  know that, right?
10      MR. SCHEFF:  Object to the form; lack
11  of foundation.
12      A.  I will go ahead an answer the question.
13  They did shut it down, but, again, my
14  understanding is --
15  BY MR. ACKELSBERG:
16      Q.  They did or didn't?
17      A.  Oh, actually, did they shut it down?  I
18  thought the -- the bank actually sold all the
19  assets.
20      Q.  After they were sued by the justice
21  department?
22      A.  I don't know that that means they shut them
23  down.
24      MR. SCHEFF:  Object to the form; lack
25  of foundation.

1      A.  Maybe -- maybe they -- I assumed that they
2  were selling assets, there was some value to those
3  assets as an -- as an entity.
4  BY MR. ACKELSBERG:
5      Q.  By the way, the -- the loan assets with
6  regard to the ThinkCash program, at the time the
7  bank was selling off its assets, Think Finance
8  already owned all those loan assets; am I right?
9      MR. SCHEFF:  Object to the form; lack
10  of foundation.
11      A.  So when the -- at the end of the -- when
12  the bank notified us that they wanted us -- they
13  wanted to no longer continue the program, they told
14  us they would stop originating by the end of the
15  year, and they asked us to -- to buy those assets
16  off of their books.  And I don't know if --
17  actually, I --
18  BY MR. ACKELSBERG:
19      Q.  Well, there weren't any --
20      A.  I just don't know.  There -- there was a --
21  they -- you know, their -- and I'm not sure how much
22  the bank retained.  It was maybe 2 or 3 percent that
23  they had on their books after they participated out
24  the majority to the Universal Fund --.  But at some
25  point in time, as sort of the end of the program,

UNSEALED

1    they wanted to get all of those assets off their
2    books. And I don't know exactly where those ended
3    up. I don't think that Think bought those assets.
4    Maybe they did. But I thought they were ultimately
5    contributed to -- to another fund.
6        Q. The investment fund, right. But that
7    investment fund, due to those quirky accounting
8    rules back in the Universal -- Universal Fund
9    period, those loan assets were on the books of Think
10   Finance anyway, right?
11       A. I thought you asked --
12           MR. SCHEFF: Object to the form; lack
13   of foundation.
14           You can answer the question.
15       A. I thought you asked who bought the -- the
16   assets.
17   BY MR. ACKELSBERG:
18       Q. So it might --
19       A. I believe the assets were bought by the
20   investment fund, not by us.
21       Q. And then by virtue of those pesky
22   accounting rules, those -- they were actually shown
23   on the financial statements of Think Finance as
24   assets of the company?
25           MR. SCHEFF: Object to the form.

1        A. I certainly wouldn't -- you know, I
2    wouldn't characterize accounting rules as pesky. I
3    just don't think they're an accurate way to judge
4    the contractual relationships that the -- that Think
5    had with the entities that it did business with.
6    BY MR. ACKELSBERG:
7        Q. Okay. Now, did -- did Think Finance when
8    it began talking with the Chippewa Cree, did it do
9    any due diligence on Steven Haynes, the go-between?
10           MR. SCHEFF: Object to the form; lack
11   of foundation.
12       A. You know, I don't know the answer to that.
13   Oftentimes we would do background checks on people
14   we work with. That was sort of a common practice.
15   I don't know if in that case we did. I know there
16   was some -- I mean,, I expect there was some vetting
17   of him by the people that worked with him and in how
18   we came into contact, I think you said Rick Eckman,
19   sort of was the person who was kind of the person
20   that put us together.
21           And I -- I just don't know exactly what --
22   you know, how much background or due diligence was
23   done on Haynes. I mean,, because it came from an
24   attorney, there might have been a sense that he had
25   already been vetted to a certain extent. But I

1    don't know. Oftentimes we would do that.
2    BY MR. ACKELSBERG:
3        Q. And he was someone that you would -- you
4    trusted and had -- you know, he was involved in the
5    First Bank of Delaware product, right?
6            MR. SCHEFF: Object to the form.
7        A. I mean,, he was -- he was an attorney
8    with -- with a reputable law firm and seemed to have
9    a lot of experience in, you know, supporting credit
10   programs.
11   BY MR. ACKELSBERG:
12       Q. Well, but he's someone you knew and trusted
13   already, right?
14           MR. SCHEFF: Object to the form.
15   BY MR. ACKELSBERG:
16       Q. As -- as --
17       A. I mean,, so you're saying "trusted." I'm
18   sorry, there's a lot of attorneys in the room here.
19   He is an attorney. He is someone we worked with in
20   the past. I'm not sure "trusted" is the word I
21   would use for him, but he was a person who had
22   experience with us and we knew him and had worked
23   with him.
24       Q. Specifically, with regard to the
25   ThinkCash/First Bank of Delaware product, right?

1        A. Yes.
2        Q. Okay. And with regard to the Chippewa
3    Cree, it's -- you know, the tribe itself, was there
4    any due diligence done by Think with regard to the
5    tribe?
6        A. I'm sorry, which tribe are we talking
7    about?
8        Q. Chippewa Cree.
9        A. The Chippewa Cree tribe.
10       Q. The tribe that Haynes -- Eckman and Haynes
11   connected you with.
12       A. Yes, it's -- it's not easy to get a lot of
13   detailed due diligence on -- on tribal
14   organizations. You don't have all the sort of
15   filings and stuff that you have with, you know, a
16   nontribal company. But we did what we could.
17           A lot of it actually came from Haynes.
18   Haynes had worked with the Chippewa Cree before.
19   And as far as various other tribal organizations he
20   had worked with, he seemed to think they were a
21   pretty sound business partner. There was certainly
22   a real need on the reservation for business
23   development, and he felt they'd be a good partner.
24           But I think we probably -- it was hard for
25   us to do a whole lot of additional due diligence on

UNSEALED

1  the Chippewa Cree as a business partner outside of
2  what Haynes represented to us.
3     Q.  And Haynes' business relationship with the
4  tribe was in a casino business, right?
5     A.  I believe he was in a casino business with
6  them.  I don't know any more details than that.  But
7  he had worked with them and thought they were good
8  business partners.
9     Q.  Did the company -- did Think Finance do any
10  due diligence with regard to the Chippewa Cree's
11  prior experience in the lending business?
12     A.  Well, I knew that they had a lending
13  business in the past.  It was one of the things that
14  made them an attractive business partner because
15  they had already had some experience with lending.
16  I don't know anything other than the fact that they
17  had a product that they -- that they told us that
18  they were unhappy with.
19     Q.  Did you look at the product or look at its
20  track record or. . .
21     A.  I didn't personally.
22     Q.  Did anybody at Think Finance do that?
23     A.  I can't speak to that.
24     Q.  So that's not something that you, as CEO,
25  required?  That wasn't information that you needed

1  in order to make a decision whether this was a good
2  partner?
3     MR. SCHEFF:  Object to the form.
4     You can answer the question.
5     A.  I can say I didn't do that.  And I can't
6  remember now exactly what due diligence was done on
7  that tribe.  I can speak to the fact that as a team
8  we got comfortable that they would be a good
9  business partner, but I just can't speak to exactly
10  what was done and how much detail was accomplished.
11  BY MR. ACKELSBERG:
12     Q.  To the extent the Chippewa Cree had any
13  prior experience in a lending operation, that would
14  have been with the service provider being a company
15  called Encore, Encore Services, right?
16     A.  I believe that's true; although, I don't
17  know exactly what role Encore played in the previous
18  lending business that the tribe had.  I remember
19  that name in association with the business but not
20  what the role was.
21     Q.  Well, did the -- did Think Finance do any
22  due diligence with regard to --
23     A.  To Encore?
24     Q.  -- to Encore?
25     A.  Not that I'm aware of.  That -- that was

1  a -- as far as we knew, that was a former business
2  relationship.  I think it had already ended by the
3  time that we had begun discussions with the tribe.
4  I'm not certain about that, but that was my
5  recollection.
6     Q.  Hang on just for a second.
7     Now, at some point you learned that --
8  sorry.  At some point Think Finance learned that
9  Encore was, in fact, getting a percentage of the
10  take from the Plain Green product, right?
11     A.  Yes.
12     Q.  Okay.
13     A.  It's very frustrating.
14     Q.  Explain.  Why was it so frustrating?
15     A.  We didn't think they had done any value in
16  terms of helping the tribe establish a relationship
17  with us, yet they were taking what we felt was, you
18  know, economic benefits from the tribe and putting
19  them into their own pocket for no value add.
20     Q.  Well -- so make sure I understand this.  So
21  when you were talking -- let's switch tribes.  When
22  you were talking to the Otoe-Missouria, you knew
23  that there was a nontribal, call it intermediary
24  service provider, that -- that you were talking with
25  about the possible relationship.  You were talking

1  with Mark Curry about whether or not you could
2  connect with the Otoe-Missouria, right?
3     MR. SCHEFF:  Object to the form;
4  compound question.
5     You can answer whatever question you
6  choose.
7     A.  So, you know, the -- I didn't know all the
8  details of how Curry worked with the Otoe, but Curry
9  was the intermediary -- intermediary that sort of
10  found us as a potential partner for the tribe.  So
11  they had added some value add there.  And, also, we
12  knew that they were providing some level of
13  consulting to the tribal lending about how to think
14  about their economic development on the reservation.
15  Neither of those things is true of Encore.
16  BY MR. ACKELSBERG:
17     Q.  Well -- okay.  So --
18     A.  So we just saw no value in what they were
19  doing.  Whereas -- whereas, Mark Curry -- and we can
20  argue about, you know, exactly how much they got.
21  I'm not sure exactly I know what it was.  But there
22  was real value add they provided to the tribe, and
23  they should have been compensated in some fashion
24  for that.
25     Q.  But did you care whether or not the

UNSEALED

App. 0069

1    Chippewa Cree had any prior lending experience?  Was
2    that important to you?
3        A.  It was, actually.  It gave us a sense that
4    they had already evaluated the product and were
5    comfortable with it and saw the value for -- for
6    their reservation.
7        Q.  But to the extent they did, in fact, if
8    they really did have any prior lending experience,
9    it would have been with regard to some lending
10   activity associated with Encore Services, right?
11       A.  Well, I don't think you get credit for a
12   failed business opportunity that gives you an
13   understanding of the fact that there is a business
14   opportunity.  They added zero value in the
15   transaction for -- for us.  They added zero value
16   for the tribe, and yet they're an economic drain on
17   important, you know, revenue sources to the tribe.
18   So, yeah, we had a lot of problem with it.  It
19   seemed like a wildly inappropriate way to be, you
20   know, stripping wealth from the tribe is how we
21   viewed it.  I know I may be overstating that, but we
22   felt that was inappropriate at the time and we still
23   do.  Or I still do.
24       Q.  Look, I have the same impression.  I'm
25   not -- I'm not fighting that at all.

1        But that's something that you discovered
2    sort of late in the game after the Plain Green
3    product was up and running for a couple of years,
4    right?
5        A.  I don't know when we discovered it.  I
6    remember it happened after we had got the program up
7    and running.
8        Q.  Okay.  So at that point, you made the
9    determination that Encore had provided no value to
10   this transaction, what -- to this relationship, this
11   product at all?
12       MR. SCHEFF:  Which product?  Be
13   specific.
14       MR. ACKELSBERG:  Plain Green.  Plain
15   Green.
16       MR. SCHEFF:  Thank you.
17   BY MR. ACKELSBERG:
18       Q.  But I'm going back to the beginning, to
19   February, March 2011, you said it was important
20   that -- it was important to you, to the company,
21   that the Chippewa Cree had some prior lending
22   experience?
23       A.  That was a plus for them as a business
24   partner, that's correct.
25       Q.  And how did you determine that they had any

1    prior lending experience?
2        A.  Through representations of Haynes.
3        Q.  And that's it?
4        A.  Yeah.
5        Q.  Okay.  By the way, the Encore crowd, we're
6    talking about -- basically, we're talking about Las
7    Vegas gangsters, aren't we?
8        MR. SCHEFF:  Object to the form.
9        A.  I know nothing about them other than the
10   fact that I thought their business relationship with
11   the tribe was -- I had heard it was unsuccessful
12   from a lending perspective, and I thought the fact
13   that they were getting any sort of revenue share was
14   inappropriate.  I don't know anything about that --
15   that crowd of people.
16   BY MR. ACKELSBERG:
17       Q.  Well, when we're talking about Encore,
18   we're talking about Zachary Roberts and -- and --
19       A.  Don't know the name.
20       Q.  What about Marty Mazzara, you know that
21   name, right?
22       A.  I -- I don't remember that name.
23       Q.  Do you remember being sent a video by Mark
24   Curry of Marty Mazzara's collection operation in Las
25   Vegas?

1        A.  No, I don't.
2        MR. ACKELSBERG:  Okay.  What are we up
3    to?  278.
4        (Exhibit No. 278 marked.)
5        A.  Thank you.
6    BY MR. ACKELSBERG:
7        Q.  Does this -- does this refresh your
8    recollection?
9        A.  Yeah, it does.  And so I'm reading here, it
10   was in 2013, a couple years after the relationship
11   with the tribe happened.  And we were, by that
12   point in time, aware of the fact that Encore was
13   getting money as -- I guess it was a finder's fee or
14   consulter's fee or something like that.  So, you
15   know, I -- I don't know the name that you mentioned.
16   I don't think that's on here.  But there was -- I do
17   remember looking at some video, and I think it was a
18   party in their call center, and it just seemed
19   really --
20       Q.  It was pretty offensive, wasn't it?
21       A.  I don't know about offensive.  I actually
22   don't remember what was in it.  I just remember
23   thinking it was not a -- you know, obviously, it
24   wasn't an indication of a professionally run
25   business, from my perspective.

UNSEALED

1     Q.   By the way, did anyone in Think
2  Finance ever -- or did you ever come to learn that
3  this same guy, Marty Mazzara, who was also connected
4  to Encore, had at this point in time purchased
5  millions of dollars of ThinkCash and PayDay One
6  debt?
7     A.   I didn't know that.  How -- I guess I can
8  ask, how would he have done that directly?  I don't
9  remember that we --
10    Q.   All right.  Well, let's --
11    A.   Direct buying through us, I'm not aware of
12 it.
13    Q.   Well, let's talk about -- so you do know --
14 so at some point in, I think, it was 2010, you
15 decided to start selling debt.  You got a broker
16 named Brett Horrocks involved, right?
17    A.   Yes.
18    Q.   And Brett Horrocks connected you with a
19 company called NCA?
20    A.   Yes.
21    Q.   And NCA ended up buying, virtually, all the
22 debt from PayDay One, from ThinkCash, from -- from
23 the tribal products; am I right?
24    A.   I don't know how much they bought.  They
25 were a buyer.  I thought there was a few debt

1  buyers.  There were a limited number.  For some
2  reason, I remember NCA and NCB.  I think they were
3  different companies.
4     Q.   And do you remember that there were some
5  issues about the fact that NCA was selling the debt
6  to secondary purchasers?
7         MR. DAUGHERTY:  Objection to form.
8  BY MR. ACKELSBERG:
9     Q.   You do remember that problem, right?
10    A.   It was --
11        MR. DAUGHERTY:  Same objection.
12    A.   It was -- I mean, it's -- it's a very
13 common thing that happens in the -- in the business.
14 Typically, when debt buyers buy debt, if they can't
15 collect on it, they will resell it later.  We were
16 pretty new to selling debt and didn't understand
17 that this could happen.  It was in their legal right
18 to do under the contract, so we did change the
19 contract to prevent any future reselling because --
20 BY MR. ACKELSBERG:
21    Q.   Right.
22    A.   -- we thought it was important to keep
23 that -- you know, keep a close eye on any debt
24 collection.
25    Q.   No, and I saw that.  But before you did

1  sort of make those changes, that you learned that
2  the debt from ThinkCash, PayDay One, tribal, that,
3  basically, it had gotten into hands that you hadn't
4  vetted originally, right?
5     A.   Yeah, and I have no reason to believe that
6  there was anything done that was in violation of the
7  Fair Debt Collections Practices Act.  I think all of
8  the people that did buy the -- the paper were
9  licensed collectors.  But we wanted more control
10 over the customers that -- that, you know, took
11 products either from -- from our direct products or
12 from customers that were using the -- the licensed
13 products.
14    Q.   Right, but just going back to this -- to
15 this e-mail in this -- before you -- before you did
16 change the rules so that you took more control over
17 NCA's ability to resell the debt, millions of
18 dollars of PayDay One, ThinkCash and tribal loans
19 ended up in hands that you had not vetted?
20        MR. SCHEFF:  Object to the form.
21 BY MR. ACKELSBERG:
22    Q.   That's the -- that's why you changed the
23 rules, right?
24        MR. SCHEFF:  Object to the form; lack
25 of foundation.

1         You can answer the question.
2     A.   I mean, again, it's actually a pretty
3  common thing.  We were very unusual in not wanting
4  that to happen.  And also, as I said, I've got
5  absolutely no reason to believe that there was
6  anything inappropriate that was done with the paper
7  because we would have -- oftentimes, you know, if
8  there was any sort of collections problem, we would
9  hear about it, and I don't remember hearing anything
10 in particular with this.
11        But, certainly, you know, I didn't view
12 this as a particularly professionally run company,
13 and I wouldn't have wanted them to have any
14 collections rights to any -- any loans that were
15 originated using our platform.
16 BY MR. ACKELSBERG:
17    Q.   And so you didn't know until today that
18 millions of dollars of loans originated off your
19 platform were, in fact, sold to this character that
20 you thought -- that you thought should go to jail
21 based on what you saw on the -- on the video?
22        MR. SCHEFF:  Objection; lack of
23 foundation, mischaracterizes the exhibits.
24        You can answer the question.
25    A.   So, obviously, the comment, "Some people

1   should go to jail," is flip and doesn't really have
2   anything to do with any specific understanding
3   of what they're doing. And in this, I think I'm more
4   talking about still frustrated about the -- the
5   relationship they had with -- with the Rocky Boy
6   tribe, which we felt was -- you know, again, I still
7   believe that it was -- it was taking important
8   economic resources away from the tribe.
9        But, you know, yes, when we realized
10  that -- that the controls we thought were in place
11  by contractual arrangements weren't in place, we
12  acted to tighten those up so we could control it
13  more.
14  BY MR. ACKELSBERG:
15    Q. All right. So I'd like --
16    A. And -- I'm sorry -- to answer your
17  question, I wasn't aware until today that -- that
18  this specific entity had -- had ever purchased any
19  loans from us, at least I'm not aware that -- I
20  can't remember that I was aware of that.
21    Q. Okay. So just were you --
22    A. I'm sorry, is this a break time?
23       MR. SCHEFF: You need a break? You
24  got it.
25       THE VIDEOGRAPHER: We are off the

1   record. The time is 2:23 p.m.
2       (Break taken, 2:23 p.m. to 2:33 p.m.)
3       THE VIDEOGRAPHER: We are back on the
4   record. The time is 2:33 p.m.
5   BY MR. ACKELSBERG:
6    Q. Mr. Rees, were you involved in any of the
7  initial meetings with the Chippewa Cree?
8    A. The Chippewa Cree, no, I don't think so.
9    Q. Okay. But you would have vetted the term
10  sheet, though, before it was presented, right?
11       MR. SCHEFF: Object to the form.
12       You can answer.
13    A. I -- I don't know what I saw before it went
14  out. Certainly, the deal -- the proposed deal terms
15  I would have understood from Chris and Jason and
16  Michelle before they met with the tribe.
17  BY MR. ACKELSBERG:
18    Q. Okay. So I want to show you a document
19  that's been marked Plaintiff's Exhibit 127.
20    A. Thank you.
21       (Reviews document.)
22       By the way, do we -- it doesn't look like
23  this was executed. Do we know if it was?
24    Q. Would you rather see the executed one? I
25  mean, this is the one that was produced by --

1    A. I'm just asking if it was executed as -- as
2  here, or was this just a draft term sheet that was
3  used by the sides in discussions?
4    Q. Well -- so Think Finance went to the tribe
5  with proposed terms, right? I mean,, that's what --
6  that's what you-all vetted before the crew went out
7  to Montana, right?
8       MR. SCHEFF: Object to the form; lack
9  of foundation through this witness.
10       You can answer the question if you can.
11    A. Generally, there would be a, you know,
12  business objective. I -- and I don't know when,
13  this was multiple meetings in and there had been a
14  lot of discussions or was -- was very early on and
15  it was just in a sort of here's optimally some of
16  the things we're looking to achieve versus the more
17  specific. So I -- if this was -- if this was
18  executed, it would help me better understand the
19  context for it. I don't need to see the executed
20  one. I'm just asking if it was executed.
21  BY MR. ACKELSBERG:
22    Q. My understanding it was, signed by Jason
23  Harvison --
24       MR. SCHEFF: Why don't you show him
25  the executed copy? It will give context on --

1   BY MR. ACKELSBERG:
2    Q. -- John Hull.
3       MR. SCHEFF: Give him the executed
4  one.
5       MR. ACKELSBERG: We'll call this --
6  we'll call this P-279.
7       (Exhibit No. 279 marked.)
8    A. Thanks. Because I don't remember seeing
9  this specific document. Thank you.
10       Signed by Jason. Do we happen to know who
11  this -- curious as whose signature for GPLS was.
12  BY MR. ACKELSBERG:
13    Q. I haven't the faintest idea.
14    A. Okay. All right. Thank you.
15       (Reviews document.)
16       Great. Thank you.
17    Q. So you remember this document as setting
18  forth the terms that Think Finance presented to the
19  Chippewa Cree?
20    A. Like I said, I don't remember this term
21  sheet.
22    Q. I see. But you do remember -- the content
23  of the term sheet you remember, though, right?
24    A. Some of it. I mean,, there's even mention
25  of a law firm -- I don't know Jones and Keller.

UNSEALED

App. 0072

1  Maybe I -- maybe I've heard the name. I don't
2  remember them.
3     Q. Well, why don't we work through it and
4  see --
5     A. Sure.
6     Q. Why don't we work through it. So in terms
7  of the transaction, the first paragraph is pretty --
8  well, it's just obvious that's what Think Finance
9  does, right, in terms of licensing the --
10    A. Licensing, yeah, they -- the basic
11 structure of the relationship where we're licensing
12 our software and, you know, providing certain other
13 services. Let's see. Coterminous, that seems like
14 something, generally speaking, we'd -- we'd do in a
15 term sheet.
16    Q. Okay. And the second paragraph in terms of
17 requiring the tribe to adopt a finance code, that
18 was something that Think wanted the tribe to do,
19 right?
20       MR. SCHEFF: Object to the form.
21    A. I actually don't know who drove that,
22 whether it was Haynes or GPLS or Think. It does
23 make sense that the parties would review the tribal
24 law under which the lending operation was operating
25 and be comfortable that it was acceptable to all

1  parties, but I don't know who brought that term into
2  play.
3  BY MR. ACKELSBERG:
4     Q. Okay. And the third paragraph, I mean,
5  it's, basically, a description of the ThinkCash
6  product that was previously on line in -- in
7  partnership with First Bank of Delaware, right?
8       MR. SCHEFF: Object to the form.
9     A. Actually, I mean,, both products were
10 installment loan. I don't know if the terms maximum
11 amount and -- and APRs are identical or just
12 comparable.
13 BY MR. ACKELSBERG:
14    Q. But in any case, these were the terms that
15 Think Finance was comfortable with?
16    A. And, I mean, certainly, we must have been
17 comfortable because we were willing to sign the term
18 sheet. I don't know how much negotiation on exactly
19 what the structure -- whether it happened before the
20 term sheet was -- was agreed to.
21    Q. Well, I mean,, these terms weren't set by
22 the tribe, right?
23       MR. SCHEFF: Object to the form.
24    A. I'm sure that there was discussions. I
25 mean,, the tribe had a lending program before. You

1  know, I'm sure that we would have said that we
2  wouldn't want to do a payday loan product, which I
3  think the tribe had done before. But to exactly
4  whether they -- you know, we proposed exactly what
5  that product looked like and they said: Yes, that's
6  exactly what we want, or whether there was some
7  discussion. Certainly, the tribes wanted different
8  things than -- than we had exactly proposed.
9  BY MR. ACKELSBERG:
10    Q. The fact that -- the provision about
11 Haynes, you don't know where that came from, the
12 last paragraph?
13    A. "Haynes will arrange to provide funding,"
14 yeah, I don't know who -- who drove that. As -- as
15 I mentioned before, I was aware that Haynes was
16 providing some sort of funding. Actually, more
17 recently I became aware of that. But I don't know
18 who came up with terms around Haynes, whether it was
19 Haynes, the tribe or us.
20    Q. Well, I think that you also said earlier
21 that you were aware that Think Finance was providing
22 the money to Haynes to provide to the tribe?
23       MR. SCHEFF: Object to the form.
24 BY MR. ACKELSBERG:
25    Q. You do remember that, right?

1        MR. SCHEFF: Misstates the testimony.
2     You can answer the question.
3  BY MR. ACKELSBERG:
4     Q. At some point, you learned that that was --
5     A. At some point --
6        MR. SCHEFF: Object to the form.
7     A. -- I learned that we were providing debt to
8  Haynes, and I was also aware that Haynes was
9  providing debt to the tribes. I wasn't -- I didn't
10 know any sort of more of the details around that.
11 BY MR. ACKELSBERG:
12    Q. You didn't realize they were connected to
13 two things?
14    A. I -- I think the original question was more
15 specific than that and -- but I was aware that they
16 were connected, but I don't remember exactly how
17 they were connected and whether there was a complete
18 overlap or -- or something very different. I just
19 don't know exactly what his relationship with the
20 tribe was other than that he provided some form of
21 debt financing for the tribe. And I don't know
22 exactly what our relationship with Haynes was other
23 than we provided some form of debt to him, largely
24 because we had never, you know, done transactions
25 with tribes. And so providing -- you know,

UNSEALED

App. 0073

1    providing a debt to a tribe was something that we
2    didn't really understand much about.
3        Q.  All right.  And then there's references to
4    a variety of issues on the second page.
5        A.  I mean, it looks like that GPLS may, from
6    time to time, purchase participations that sounds
7    very comparable to the structure that -- that was
8    used with the First Bank of Delaware.
9        Q.  And you see that in terms of the mechanics,
10   that Haynes had to set up a fund with sufficient
11   monies to fund a day's worth of loans?  Do you see
12   that?
13       A.  I see it.  This is new to me, but I see it.
14       Q.  So this -- it sounds like before -- before
15   Jason signed this, he didn't -- he didn't talk to
16   you.  Was he just off on his own?
17          MR. SCHEFF:  Object to the form.
18        You can answer the question.
19       A.  Well, we're talking about a lot of details
20   here, and these would be details that I would expect
21   the relationship manager and the person working on
22   the products to figure out between all the parties.
23   There were a lot of parties.
24       The tribe, we had -- it looks like -- it
25   looks like we had at least two sets of counsel

1    involved, obviously, GPLS or -- or Victory Park
2    Capital, and, you know, I -- you know, there was
3    certainly aspects that I would have expected that we
4    would have driven, other aspects that we wouldn't
5    necessarily have, like, you know, the -- the
6    structure of these mechanics.  I don't know whether
7    that came from us.  It seems like it's something
8    more salient to a relationship between the Haynes
9    and the tribe than -- than us.
10   BY MR. ACKELSBERG:
11       Q.  What about the provision about revenue
12   share?  Do you see that, about the tribe getting a
13   4.5 percent revenue share, that's something that
14   probably would have been driven by Think Finance
15   rather than GPLS, right?
16          MR. SCHEFF:  Objection; calls for
17   speculation.  You can answer the question if you
18   can.
19       A.  You know, going into the negotiation, you
20   know, there was -- you know, how does -- you know,
21   he had a fair amount of leverage in negotiating the
22   deal as -- as the best he could.  I mean, every
23   negotiation has its own unique challenges.  I knew
24   that there was going to be a revenue share.
25   Obviously, that's the way it had worked with -- with

1    the bank as well.  So the basic structure would have
2    been in place.  I don't -- I don't remember sort of
3    stamping 4.5 as either the goal or the limit.  It
4    was -- that would have been the range of things that
5    he was trying to achieve.
6    BY MR. ACKELSBERG:
7       Q.  Is the "he" Jason?
8       A.  Yeah, Jason.  It would have been, you know,
9    the deal team, I recall, being Jason and Michelle.
10   Probably Sarah would have been involved.  I don't --
11   I don't know.  But, you know, these are people I
12   worked with for quite a while, so I had a lot of
13   trust in his ability to negotiate the best job they
14   could.
15       Q.  Am I right that the --
16       A.  And, again, this is -- this is just the
17   term sheet, not the final executed contract.
18       Q.  Am I right that the higher the revenue
19   share, the less money at the end of the day for
20   Think Finance?  Right?
21          MR. SCHEFF:  Object to the form.
22       A.  Higher the revenue share?  That is true.
23   BY MR. ACKELSBERG:
24       Q.  Okay.  And this revenue share of 4.5
25   percent, this was significantly less than the

1    revenue share that Think was paying First Bank of
2    Delaware; am I right?
3       A.  I don't remember what that -- what that
4    was.  From what I remember, the bank seemed --
5    excuse me -- the tribe seemed to think this was a
6    significantly better deal for them than they had
7    gotten from Encore, but I -- I can't speak to the
8    specifics of that deal either.
9       Q.  And how do you remember that?
10      A.  This was really as we learned that they had
11   an unsuccessful lending product, they told us they
12   were unhappy with the deal structure that had been
13   done at the time.  I -- I can't remember exactly
14   what they didn't like about it, but they certainly
15   felt that this was very -- and as, obviously,
16   approved to be, a great boom to the, you know,
17   economic development on the tribe and a lot of
18   income that came to the tribe from this product.
19      Q.  Now, in addition to the 4.5 percent offered
20   to the tribe, there was an additional 1 percent
21   offered to Haynes, right?
22      A.  That's what it says here, yes.
23      Q.  Well, do you remember that as part of the
24   Plain Green deal?
25      A.  I don't.

UNSEALED

1    Q. Okay.
2    A. And by the way, I don't know what became --
3    what got into the final executed contracts. This is
4    a term sheet. So you may be showing me the executed
5    contract at some point, but this is a term sheet
6    rather than an -- than an executed agreement.
7    Q. So if we wanted to know the terms of the
8    final deal, am I correct that we would -- first, we
9    would look at the contracts between Plain Green on
10   the one hand and TailWind and TC Decision Sciences
11   on the other with regard to the service provider
12   relationship? Correct?
13   A. So are you asking what the contracts are --
14   Q. Yes.
15   A. -- related --
16   Q. Well, you --
17   A. So we -- as we've said, Think was a
18   marketing and technology provider, so we had --
19   there may have been different naming structures, so
20   I apologize if it isn't quite the same. But I do
21   remember there was a marketing agreement by which we
22   would be compensated for -- I believe it was new
23   customers; although, it might have been loans
24   overall. And then there was a technology licensing
25   and servicing agreement, and we got some sort of

1    a -- of a share for that. Other contracts, there
2    was the contract for buying the participations. I
3    think that was called the participation agreement.
4    And then there was a guarantee agreement that we
5    talked about. And all of those things have
6    evolved --
7    Q. The administrative agency agreement?
8    A. I think that's right as well. As I said,
9    these things evolved a number of different times,
10   and I don't remember the naming exactly. But those
11   are, basically, the structure. And comparable to
12   the structures, as I said, that we had with First
13   Bank of Delaware.
14   Q. Now, those --
15   A. But, for instance, you mentioned that --
16   you know, this Haynes agreement, I don't know if the
17   Haynes agreement, you know, ended up being like
18   that, and that wouldn't have been anything that --
19   gosh, other than in the term sheet, I don't know why
20   we -- I don't know that I would have seen the final
21   executed agreement for that. I'm not sure that
22   anyone at Think would have seen the executed
23   agreement.
24   Q. You're talking about the referral agreement
25   where it -- I mean,, we can -- we can show that to

1    you if you want, but let's --
2    A. Because it's -- it's a -- this -- GPLS
3    shall pay a fee to Haynes, that doesn't seem like
4    something that we would be a party to.
5    Q. Oh, right. But you would -- you would
6    have -- you would have the contract?
7    A. I don't know that I would have.
8    Q. Oh, I see. Okay.
9    A. I mean, it doesn't mean I didn't, but I --
10   I don't see why there would be any reason for me to
11   have it.
12   Q. Okay. Now, that -- the service provider
13   contracts, the one regarding marketing and the
14   one regarding Decision Sciences, they -- those
15   contracts said that the tribes would be paying
16   various fees to Think Finance for the services
17   provided, right?
18   A. Right.
19   Q. But, in fact, those fees were all paid by
20   GPLS, right?
21        MR. SCHEFF: Object to the form; lack
22   of foundation.
23   A. Well, only for those -- I believe only for
24   those loans that the -- that GPLS elected to buy
25   participations in.

1    BY MR. ACKELSBERG:
2    Q. Meaning all of them?
3        MR. SCHEFF: Object to the form; lack
4    of foundation.
5    A. Well, as I said there was the -- the --
6    GPLS could always decide whether to buy the
7    participations. They had a right but not a
8    requirement to buy participations in the loans that
9    were originated by the tribe. It was probably three
10   independent parties with different -- or rights and
11   responsibilities.
12   BY MR. ACKELSBERG:
13   Q. All right. Well, so just for those loans
14   that GPLS did, in fact, buy 99 percent
15   participations in, that the --
16        MR. ACKELSBERG: Yes?
17        MR. SHAPIRO: No, I'm sorry, I
18   interrupted you. Go ahead.
19   BY MR. ACKELSBERG:
20   Q. So with regard to the loans that, in fact,
21   GPLS purchased a 99 percent interest from Plain
22   Green --
23   A. Yes.
24   Q. -- am I right that the marketing fees to
25   TailWind and the technology fees to TC Decision

UNSEALED

App. 0075

1   Sciences, that in reality, those fees were paid by
2   GPLS out of the collection revenue?
3           MR. SHAPIRO:  Object to form.
4           MR. SCHEFF:  Object to the form.
5   BY MR. ACKELSBERG:
6       Q.  You understand how that's how the program
7   worked, right?
8           MR. SHAPIRO:  Same objection.
9           MR. SCHEFF:  Object to the form.
10      A.  So my understanding is they either paid
11  99 percent of that or a hundred percent.  I don't
12  know.
13  BY MR. ACKELSBERG:
14      Q.  Okay.  Whether --
15      A.  But they certainly paid a majority of those
16  fees as part of the participation agreement.
17      Q.  Right.  And do you know why it was
18  structured such that the contracts were with the
19  tribes for those fees, but, in fact, the fees in
20  reality were paid by GPLS?
21          MR. SHAPIRO:  Object to form.
22          MR. SCHEFF:  Objection; misstates the
23  evidence.
24          MR. SHAPIRO:  Go ahead.
25          MR. SCHEFF:  You can answer the

1   question if you can.
2       A.  Why was the deal structured the way it was?
3   I mean,, this is sort what we had been first -- you
4   know, the -- the bank had, you know, urged us to
5   structure the relationship between them and us and
6   the third-party, this Universal Fund -- that they
7   had, you know, urged the establishment of.  It was a
8   structure that -- that we had been comfortable with.
9   I imagine the GPLS had been comfortable with it.
10  And so we adopted it as -- as we had done with the
11  bank.
12  BY MR. ACKELSBERG:
13      Q.  And turning to page 3, so why would Think
14  or GPLS be making it a requirement of the deal that
15  the tribe establish a company called Plain Green,
16  LLC?
17          MR. SCHEFF:  Object to the form.  The
18  witness has testified this is a term sheet, not the
19  final deal.  If you want to talk to him about the
20  final deal, show him those documents as opposed to
21  the term sheet.  It's just inappropriate.
22  BY MR. ACKELSBERG:
23      Q.  You can answer the question now that
24  Mr. Scheff has finished his speech.
25          MR. SCHEFF:  Mr. Scheff is trying to

1   make sure the witness is not misled.
2           But go ahead, answer the question.
3       A.  Well, I -- I mean,, in order to begin the
4   loan program, it has to be a bank account
5   established.  Generally, sort of best practices are
6   that the bank account that's used for originating
7   loans has the same name as the entity.  One of the
8   reasons for that is when a customer sees either
9   funds into their account or a payment out of their
10  account, they see that name on the -- on the bank
11  account so it isn't confusing.
12          So it starts out saying, you know,
13  establish Plain Green or an entity with other --
14  some other agreed upon name, and I think what
15  they're just trying to say is you should make sure
16  that the bank account has the same name as the
17  lending entity name so there's no confusion to
18  customers.
19  BY MR. ACKELSBERG:
20      Q.  Well, actually, I was really more focused
21  on the name Plain Green because, I'm assuming and
22  maybe I'm wrong, so correct me if I am wrong, that
23  your marketing team had come up with the name Plain
24  Green before the first meeting with the Chippewa
25  Cree.  Am I right?

1       A.  I just don't know the answer to that.  I
2   know that we had -- as I mentioned, there was a lot
3   of product names being thrown around and evaluated
4   by our team.  Whether that -- that final name came
5   into being before or after the initial discussions
6   with the Chippewa Cree, I mean,, the fact that this
7   is a term sheet suggested there had been previous
8   meetings with the Chippewa Cree.  It would have been
9   pretty surprising if we would have started the first
10  meeting with a term sheet.
11          So it is true, I do remember that -- that
12  Think did come up with that name along with -- I'd
13  be surprised if we didn't have a dozen other names
14  that we had come up, including crazy names, and they
15  were all things that we sort of had in a parking lot
16  for future products, whether products we directly
17  originated or products that we would do with a
18  third-party bank or a tribal lender.  So I just
19  don't know timing.
20          But if the question is did -- did Think
21  Finance come up with the name Plain Green, the
22  answer is, yes, along with a number of other product
23  names.
24      Q.  Okay.  And my -- do you know what the
25  reason was for telling the tribe that they had to

UNSEALED

App. 0076

1    hire Pepper Hamilton?
2          MR. SCHEFF:  Object to the form;
3    misstates the document.
4          You can answer the question if you can.
5    BY MR. ACKELSBERG:
6       Q.  Page 3.
7       A.  Well, it's unclear to me that this is a
8    Think, you know, specified document.  I -- I guess
9    it's -- since -- since Pepper is representing the
10   tribe, I don't know that we, you know, urged them to
11   do it or they were somebody -- I mean, it's, I think
12   as you pointed out, Haynes and the Pepper Hamilton
13   firm had a relationship.  So perhaps Pepper Hamilton
14   was recommended to the tribe by Haynes or maybe they
15   had -- I just don't know where that relationship --
16         MR. SCHEFF:  Don't guess.  If you know
17   the answer, fine.
18      A.  Sorry about that.  I just don't know in
19   this case.  And this is -- again, just a point I
20   would make is, this is a term sheet that seems to
21   have come after a number of conversations already,
22   and it seems to be attempting to represent the
23   intents of all parties, not just one party.
24         MR. ACKELSBERG:  Okay.  I am going to
25   show you another document. I show you a document --

1    I show you a document marked Exhibit P-280.
2          (Exhibit No. 280 marked.)
3    BY MR. ACKELSBERG:
4       Q.  This is an e-mail starting at TF-PA 606626.
5    It looks like you remember this e-mail.
6       A.  I --
7          MR. SHELDON:  May counsel have a few
8    minutes to read it, please?
9          MR. ACKELSBERG:  Oh, sure.
10         MR. SHELDON:  Thank you.  It will just
11   take a second.
12      A.  (Reviews document.)
13      Okay.  Thank you.
14         MR. SHELDON:  Just one more second for
15   me, please.
16         THE WITNESS:  By the way, this is from
17   Sarah.
18         MR. SCHEFF:  It's -- Think has
19   produced it.
20         THE WITNESS:  It's not privileged?
21         MR. SCHEFF:  It's Think's decision as
22   to whether or not it's privileged or not privileged.
23         THE WITNESS:  Oh, okay.
24         MR. SCHEFF:  They have options if they
25   believe it is privileged or not.

1          THE WITNESS:  Okay.
2    BY MR. ACKELSBERG:
3       Q.  And I'm not -- I'm not going to ask any
4    questions about Sarah's comments here.  This is
5    really about the dialogue between you and Mark
6    Curry.
7          MR. SHELDON:  You can proceed.  Thank
8    you for your time.
9    BY MR. ACKELSBERG:
10      Q.  So why don't you explain the context of
11   this exchange with Mark Curry.
12      A.  Sure.  This is at -- loosely speaking, in
13   that period of time where the -- what's called
14   Operation Choke Point is happening, a period of time
15   that, you know, obviously, we and certain others in
16   the industry, as well as legislators, thought it was
17   a period of regulatory overreach by banking
18   regulators to stop banks from doing business with
19   certain types of businesses.
20         And during that time, it became very hard
21   for us as a direct lender as well as -- as well as
22   tribal entities, such as in this case Great Plains
23   Lending, to -- to have stable ACH relationships,
24   which are, obviously, important for -- for the
25   business to operate.

1          And I -- I remember that we had been
2    doing -- you know, looking on behalf of the bank --
3    excuse me -- behalf of the tribe to help find them
4    other ACH providers.  And, actually, there's a
5    number of -- I don't remember the details, but I --
6    I'm trying to -- a KapCharge guy.  So I can't
7    remember what KapCharge is other than I'm pretty
8    sure they're an ACH provider.  So I think that is
9    what this is all about.
10         We had an ACH provider for Great Plains
11   loan because the tribe had two service providers to
12   them for their two different lending programs.  Mark
13   Curry who was involved with the other one said, "Can
14   you give us an introduction?"  And we were nervous
15   about making that introduction.
16         We understood Mark and the chairman's
17   perspective on it, but we were sort of trying to get
18   through a situation where we could support, first
19   and foremost, the ongoing operation of the Great
20   Plains loan portfolio and their access to an ACH
21   account, and then, secondarily, any additional
22   business opportunities that the -- that the tribe
23   had.
24      Q.  Specifically, I want to call your attention
25   to the -- to the sort of question and response here

57 (Pages 225 to 228)

UNSEALED

App. 0077

1   that -- where -- where Mark Curry is -- his concern
2   is that Think might be exiting the tribal -- the
3   tribal model altogether.  Do you see that?
4      A.  Yes.
5      Q.  Okay.  And your response to him is,
6   "Hopefully you know we're not pulling away from the
7   tribal model.  We're paying over a million dollars a
8   month in support of it."  Right?
9      A.  That's what it says.
10      Q.  Okay.  So what did you mean by that, that
11   Think Finance is paying a million dollars a month to
12   support the tribal model?
13      A.  I actually don't know.  I don't know
14   what -- what payments that's referring to.  You may
15   know specifically, but my -- you know, there was --
16   it could have been any number of things.  I don't
17   know whether it was legal activities or PR
18   activities or -- or ongoing support of the trade
19   associations or what.  You know, overall, we were
20   actively committed to supporting the -- the
21   robustness of that business line.
22      MR. ACKELSBERG:  I'll show you another
23   document marked P-281.
24      (Exhibit No. 281 marked.)
25   BY MR. ACKELSBERG:

1      Q.  Now, I think that it's possible we haven't
2   seen one of these before, documents like this in the
3   production.  But some of the documents -- you see
4   this is an e-mail with a document attached to the
5   e-mail.  And then some of the documents attached to
6   e-mail are actually Excel sheets.  And so what we've
7   been doing as a convention is -- in these
8   depositions is showing the witness first the -- what
9   we're calling the cover sheet produced in native
10   format and then -- and then a copy -- a printout of
11   the actual Excel sheet that is that native document.
12   Okay?  Do you understand what we've done here?
13      A.  Yes, I do.
14      Q.  Okay.  So we're looking here at something
15   called a "Selected Expense Report for Ken," right?
16      A.  If I -- what I --
17      Q.  You would like to explain what this is
18   or --
19      A.  Well, I don't -- I mean,, it -- just the
20   "Selected Expense Report for Ken," it's, obviously,
21   not my expenses.
22      Q.  Oh, no, I understand.
23      A.  I must have requested this from -- from
24   someone in accounting.
25      Q.  Well, and there were -- there were

1   certain -- there was a certain level of expenses
2   that were -- that you had to approve or that you
3   were as CEO monitoring?
4      A.  Yes, as CEO, I would see roll-ups of -- of
5   expenses in the monthly financials.
6      Q.  Okay.  And so -- and this selected expense
7   detail, I mean,, what we're looking at here is the
8   detail that you looked at before in your capacity as
9   CEO, right?
10      A.  Yes.
11      Q.  Okay.  So -- and the way it's broken down
12   is these are basically different vendor -- vendor
13   payments broken down into categories, right?
14      A.  Yeah.
15      Q.  Okay.  And there's a category for legal,
16   right, that adds up to close -- close to $7 million
17   for -- and we're looking at -- we're looking at,
18   basically, a 12-month period from December of 2012
19   to November 2013, right?  Do you see that?
20      A.  Yes.
21      Q.  Okay.  And it identifies $6.9 million in
22   payments to law firms or -- mostly this is -- in
23   some cases, it's to -- like, Levick is -- well, how
24   would you describe Levick?  A PR firm or --
25      A.  I think of them more as a PR firm, but it's

1   put under legal for one reason or another.
2      Q.  Okay.  Well, maybe because they were
3   involved in the lobbying stuff?
4      A.  I can't speak to why they were
5   characterized that way.  I think of them as a PR
6   firm.
7      Q.  But that's -- but that's Levick's work was,
8   was in sort of in the -- in the lobbying realm?
9      A.  As I said, I thought of them more as the
10   PR.  I think they had a lobbying practice, but I
11   don't think we hired them as a lobbyist.  In fact,
12   I'm pretty sure they -- we didn't use them as a
13   registered lobbyist.
14      Q.  So there -- so Patton Boggs is one of the
15   law firms that was providing services with regard to
16   the tribal model, right?
17      A.  Uh-huh (affirmative response).
18      Q.  Correct?
19      A.  Yes.  Yes.  Thank you.
20      Q.  Okay.  And then there's a payment to NAFSA,
21   the Native American Financial Services Association,
22   of 800,000 during that year.  That was --
23      A.  Yes.
24      Q.  -- one of -- and by the way, just going
25   back to the e-mail, we're basically looking here,

UNSEALED

1  just to bolster what you were saying to -- to Mark,
2  I mean,, that this -- basically, what we're looking
3  at here is a representation of at least some of the
4  ways that Think Finance was supporting the tribal
5  model, this real dollars, right?
6          MR. SCHEFF:  Object to the form.
7      A.  Yes, we were both contributing to the trade
8  organization, Native American Financial Services
9  organization.  There was legal expenses involved
10  with doing business with the three tribal lending
11  organizations as well as, you know, obviously, quite
12  a -- quite a variety of consulting and contracting
13  costs associated with bringing these products to
14  life.
15          Some of these I don't know, but -- but
16  generally speaking, yes, there's a lot of operating
17  expense involved in the -- the -- and I don't know
18  whether these are exclusive to -- to the tribal
19  lending programs.  It's not clear that they are.  So
20  I don't know how much is -- is, generally speaking,
21  legal consulting and contracting for the company as
22  a whole and how much was just for the tribal
23  association -- or sorry -- tribal-related -- related
24  business.  But, you know, obviously, there was
25  meaningful amounts of legal and consulting and

1  contractor expense for the company as a whole.
2  BY MR. ACKELSBERG:
3      Q.  Well, during this period of time,
4  December 2012 to November 2013, other than -- other
5  than the beginnings of the RISE product, the three
6  live products were Plain Green, Great Plains Lending
7  and Mobiloans; am I right?
8          MR. SHELDON:  Object to the form.
9          MR. SCHEFF:  Object to the form;
10  misstates the evidence.
11          You can answer the question.
12      A.  Yeah, actually, in 20- -- by the end of
13  2013, we had -- boy, there was actually a fair
14  amount that had -- that had gone on.  You know, we
15  had the press -- the product up and operational.  I
16  think that spendable product and all of the ongoing
17  sort of negotiations of trying to expand that, I
18  think there was some period of time here we had
19  launched the Elastic product in 2013.  We had
20  restructured PayDay One entirely to be RISE, and
21  there's a cost associated with that.  You know,
22  legal consulting and contractor associated with
23  that.  So -- oh, and then, of course, the UK, you
24  know, we bought that business in 2010 but we
25  relaunched the whole product in 2013.

1          So 2013 was actually a year of tremendous
2  amount of product innovation and launches.  So
3  I'm -- I would certainly not suggest that there
4  wasn't a meaningful amount of expense related to the
5  three tribal businesses, but we had an awful lot
6  going on as a company.  And so I can't speak to how
7  much of this was related to, you know, the
8  transition of the -- that the original product,
9  the -- and then, of course, the expected spinoff of
10  the business later, there's legal work related to
11  that.
12          So this was a time of tremendous amount of
13  activity as we launched three new products, were
14  preparing to go public -- excuse me -- preparing to
15  spin off, and then also thinking long-term about
16  what the prospects of the company might be.
17  BY MR. ACKELSBERG:
18      Q.  Well, just going down the list, Patton
19  Boggs, that was tribal model related, right?
20          MR. SHELDON:  Let me insert an
21  instruction and an objection here.  So what I
22  understand counsel is about to do is ask you
23  questions regarding the legal services that the
24  various law firms were providing here.  That gets
25  into a tricky area because in some of these answers

1  you may be tempted to reveal, you know,
2  communications or details of what those legal
3  services are.
4          I'll say for purposes of this line of
5  questioning, I'm okay if you -- if you indicate
6  whether these law firms, in general, provided legal
7  services related to the tribal arrangements and if
8  you indicate whether these law firms provided legal
9  services other than in relation to tribal
10  arrangements.  If you feel you need to go into any
11  more detail than that to answer any of his
12  questions, I would ask you to indicate that, and we
13  can step out in the hall and discuss that.  Do you
14  understand?
15          THE WITNESS:  Okay.
16          MR. SHELDON:  Thank you.
17  BY MR. ACKELSBERG:
18      Q.  So Patton Boggs, that was related to
19  tribal, right?
20      A.  I think they were exclusively tribal.
21      Q.  Okay.  And, of course, the Native American
22  Financial Services Association, that would be
23  exclusively tribal, right?
24      A.  Yes.
25      Q.  And Victory Park management, that --

UNSEALED

App. 0079

1    A.  Probably a mix.

2    Q.  Oh, because -- well, when did they start

3  funding RISE loans?

4    A.  I thought there was a facility that we got

5  through Victory Park from -- well before 2013.  And,

6  again, Chris would know better than I exactly what

7  the structures were.

8    Q.  Okay.  All right.  So you're not sure about

9  Victory Park.

10    A.  But I thought Victory Park was -- would

11  have been all -- and, in fact, I think they also

12  supported the growth that -- of the UK business by

13  this time.

14    Q.  Okay.  Obviously, payments to Mobiloans and

15  Plain Green were tribal related -- tribal related --

16    A.  Yes.

17    Q.  -- right?

18    A.  Right.

19    Q.  And, in fact, it's under "legal," am I

20  correct that part of the -- the agreement with both

21  of -- with all three of the tribes was that their

22  legal expenses would be reimbursed by the GPLS

23  revenue?

24    A.  I don't --

25        MR. SHAPIRO:  Object to form.

1    Go ahead.

2    A.  -- remember exactly what the structure was,

3  but this suggests that we're cutting some form of a

4  check too Mobiloans for -- for legal expenses, but I

5  can't speak to what the structure was.

6  BY MR. ACKELSBERG:

7    Q.  All right.  And then Levick, they were

8  doing work in the tribal area, right?

9    A.  I think they were exclusively tribally

10  focused.  Just give me a second.  You know, they

11  might have also been helping with broad-based PR

12  activities we were doing.  It may have been a mix.

13    Q.  Okay.  And --

14    A.  Katten would have been -- would have been

15  all aspects of the business, I believe.

16    Q.  What about Coblentz?

17    A.  In fact, definitely Katten because was, I

18  think, at this time representing Victory Park

19  Capital.  So. . .

20    Q.  So that would be coming out of the GPLS

21  revenues, right?

22    A.  No, representing all of the relationships

23  they had with us.  So setting up the facility to

24  support the RISE growth and the facility to support

25  the UK growth.

1        MR. SHAPIRO:  Let me interject here.

2  Would you -- you're moving quickly.  You know when

3  you're getting into privileged areas.  We'll try to

4  assert privilege, but I would certainly appreciate

5  it that you honor that as we're moving along.

6        MR. SHELDON:  And just for -- hold on.

7  For purposes of prior questions -- are you -- are

8  you done asking about Katten?

9        MR. ACKELSBERG:  Yes.

10        MR. SHELDON:  All right.  So set that

11  aside for now.  If he asks about Katten again, I

12  want to clarify a point, but you can move on for

13  now.

14        THE WITNESS:  I'm sorry for jumping

15  ahead so quickly in that.

16        MR. SHAPIRO:  No, it's not -- it's

17  really the witness's issue.

18  BY MR. ACKELSBERG:

19    Q.  And Coblentz?

20    A.  They were a corporate counsel for the

21  company is all from the original -- they had been

22  corporate counsel for me going back to -- to

23  CashWorks.

24    Q.  What about Hogan Lovells?

25    A.  I can't remember whether they were broader

1  based.  I don't remember what we did with Hogan.

2    Q.  Okay.  Great Plains Lending, of course,

3  that was tribal?

4    A.  Yes.

5    Q.  And other vendors, we don't know?

6    A.  Don't know.

7    Q.  You don't know what's included in that,

8  right?

9    A.  I expect it's a combination of things.

10  This looks to be -- and I'm -- you know, I'm -- just

11  looking at the list, this looks like sort of

12  comprehensive for all of the, you know, legal

13  consulting and contractors that we used across the

14  entire business, not just tribal.  So it's bound to

15  be some mix.

16    Q.  Well, and -- without going into every

17  single item here, you know, it all adds up to 15

18  million; you see that?

19    A.  Uh-huh (affirmative response).

20    Q.  And then there also was the revenue share

21  that you're paying the tribe every month, right?

22    A.  The revenue share that was paid by the --

23  by the participation agreement from GPLS to the

24  tribe, yes.

25    Q.  Well, but for every dollar that was --

UNSEALED

1   every dollar paid to the tribe for revenue share was
2   less dollars paid to TCAS as an administrative agent
3   fee, right?
4            MR. SCHEFF:  Object to form;
5   misconstruing the testimony.
6   BY MR. ACKELSBERG:
7       Q.  That's the way that the economics were set
8   up, right?
9       A.  The economics were as per the contract very
10  clear that GPLS would pay that share and that we
11  were providing a guarantee to -- to GPLS and we were
12  getting a share of the upside for that -- for that
13  loan portfolio.  But I think it's pretty clear that
14  we were not paying that to the tribe.
15      Q.  Oh, no, I understand that.  And I'm -- I
16  apologize for maybe my sloppy question.  But for
17  every dollar that was paid to the tribe by -- out of
18  GPLS revenues, that was a dollar less that would go
19  at the bottom of the waterfall to Think for the
20  administrative fee?
21      A.  The terms of the deal were that --
22  actually, let me see if I can remember.  It's been a
23  while now.  So there was a waterfall of payments
24  that came out of the GPLS fund, some to pay for --
25  for the tribe's revenue share, some to pay for some

1   tribal expenses, some to go to the investors, and
2   then sort of whatever was leftover would -- would
3   come to us per the guarantee.
4       Q.  Right.
5       A.  So that's -- that's the structure of it.
6       Q.  So -- so I think you're agreeing with what
7   I'm saying, but let me -- that under that structure,
8   if you have to pay, you know, an extra dollar to the
9   tribe, that's an extra dollar that's not going to be
10  at the bottom of the waterfall, right?
11      A.  Since we weren't paying to the tribe, if
12  GPLS had to pay those, that would mean there would
13  be less excess cash flow for us as the
14  administrative agent.  But, I mean,, to be clear, we
15  weren't paying those.  That was not our
16  responsibility.  That was something that, you know,
17  ultimately, GPLS and the -- and the tribe, you know,
18  had as part of the participation agreement.
19      Q.  When you said to Mr. Curry in 2013 that --
20  that the tribal model is costing Think Finance a
21  million dollars a month, I mean,, are we looking at
22  part of what that -- what was -- what was included
23  in that $1 million a month?
24           MR. SHAPIRO:  Object.  You misread, I
25  think in a significant way, what this document says.

1   It does not say it was costing a million dollars a
2   month.  It says we're paying over a million dollars
3   a month, and that's a really important distinction
4   here.
5            MR. ACKELSBERG:  Okay.  That's fine.
6       A.  So, I mean,, I -- to -- to we sort of -- when
7   we had the previous discussion, even before I saw
8   this, I suggested that there were, you know, costs
9   related to legal expenses, costs related to the
10  support of the Native American Financial Services
11  Association and other sort of consulting costs
12  related to -- to serving the tribal market.  So
13  there were true out-of-pocket expenses for us not
14  related to the operation of any individual tribal
15  program.
16  BY MR. ACKELSBERG:
17      Q.  Okay.  Do you remember the -- the
18  litigation that the -- the Otoe-Missouria had with
19  the State of New York?
20      A.  Yes, I do.
21      Q.  And, in fact, your -- your chief integrity
22  officer, Martin Wong, was part -- you know, part of
23  his responsibilities was to work on that litigation;
24  am I right?
25      A.  He -- he coordinated with the counsel.  I

1   think it was David Bernick who worked on that on
2   behalf of the tribes.
3       Q.  So that would be additional legal expenses
4   that -- did that come out of -- who paid -- who paid
5   those expenses?  Was that -- was that Think Finance?
6   Was that GPLS?  Was that --
7       A.  I think that was -- I think that was paid
8   by the Native American Financial Services
9   Association.  I'm not sure about exactly how that
10  was paid.  We contributed to supporting that -- that
11  legal process.  So I don't --
12      Q.  So it might have --
13      A.  Actually, I don't -- I don't remember the
14  timing of whether it was in 2013 or whatever the
15  year is, but -- but in terms of -- it doesn't look
16  like, and I don't remember this, that we were making
17  any direct contributions to that.  I think our
18  contributions were to the trade association, and the
19  trade association made the decision about how to
20  spend those with regard to the -- to the lawsuit.
21           MR. ACKELSBERG:  Okay.  Does anybody
22  need a break?  Are we okay?  Or can we keep going,
23  or what?
24           MR. SCHEFF:  How do you feel?
25           MR. ACKELSBERG:  That's a -- that's a

1  bad question.
2      MR. SCHEFF: That's the right
3  question.
4      THE WITNESS: I can keep going for a
5  while longer. Thank you.
6      MR. ACKELSBERG: All right. Okay. So
7  before, you alluded to the board -- the memos that
8  you wrote to the board of directors. I guess you
9  anticipated we were going to be looking at those,
10  and we are going to be looking at those, and I'm
11  going to move to them now. So if you'll just hang
12  with me one minute, I am going to get them.
13      So, Mr. Rees, to avoid the -- to try to
14  minimize the paper going back and forth like we have
15  been doing all day, what I have done is I've
16  assembled them in a book, which I am going to give
17  you. And we are going to identify them month by
18  month, but I thought it would be easier if -- and
19  these are all in chronological order to make things
20  more clear.
21      So what I am going to do is give you a
22  book. We are going to use this as the -- for the
23  court reporter, we'll just insert the stickers in
24  the book when we get to that page. For other
25  counsel, I've -- I didn't have the time to put them

1  in hole punch, but I do have. . .
2      MR. SCHEFF: Thank you, Irv. Are
3  these in chronological --
4      MR. ACKELSBERG: Yes.
5      MR. SCHEFF: -- order and complete?
6      MR. ACKELSBERG: No.
7      MR. SCHEFF: Okay.
8      MR. ACKELSBERG: In other words,
9  because we don't have 14 hours, we only have seven
10  hours today, I basically was somewhat selective.
11  There's a lot in there. You know, I don't know
12  whether we'll even get to them.
13      MR. SCHEFF: You can mark what you
14  want to mark. I just want to understand --
15      MR. ACKELSBERG: They're in
16  chronological order, but in some cases I skipped
17  months intentionally and sometimes I skipped months
18  because there were gaps in the production.
19      MR. SCHEFF: That's fine. I just
20  wanted to understand where you're at. That's all.
21      So are these going to be collectively
22  marked as an exhibit?
23      MR. ACKELSBERG: No, no.
24      MR. SCHEFF: Okay.
25      MR. ACKELSBERG: I think it will be

1  easier if we just go month by month.
2      MR. SCHEFF: That's fine.
3      MR. ACKELSBERG: And we've already
4  identified a few of these with, I think, Jason
5  Harvison.
6  BY MR. ACKELSBERG:
7      Q. So before we get -- we get into these, I
8  have to say they're very impressive, they're very
9  extensive. It looks like every single month that
10  there was a board meeting, you've prepared a very,
11  very detailed report to the board in the form of a
12  confidential board memo regarding the previous
13  month's performance. Right?
14      A. As I said at the beginning, I think
15  transparency with the board is important. It's
16  really smart people, and we really use them to help
17  us understand the best direction to take the company
18  and also to be just good governance over us.
19      Q. Now, the board -- as I understand it, every
20  month the board would get your memo and also would
21  get something called the board dec?
22      A. Yes.
23      Q. Right? And that's a 90 page, a hundred
24  page, a fairly large PowerPoint of just data and
25  descriptive material about the previous month?

1      A. Yes, primarily financials and various -- a
2  lot of numerical and analytical information of the
3  company.
4      Q. Okay. Now, that -- that board dec would go
5  to Victory Park every month pursuant to the -- the
6  contractual agreements between Think and Victory
7  Park, right?
8      A. I think that's true. And the only reason
9  I'm not a hundred percent certain is, you know, at
10  one point in time they actually had a representative
11  at the board meetings, and I don't remember exactly
12  when that happened. It may have happened --
13  frankly, it may have happened after Think Finance.
14  I do believe that they got -- at least at some
15  period of time they were getting board materials. I
16  don't know if it was from the beginning of our first
17  interactions with them back in -- with First Bank of
18  Delaware or sometime later.
19      Q. Do you remember when Victory Park first
20  started sending representatives to the meeting
21  itself?
22      A. I don't. And, in fact, having mentioned
23  this, I don't even know if it happened --
24      Q. Before or after the spinoff?
25      A. Before the spinoff. It may have only

UNSEALED

App. 0082

1  happened after the spinoff.
2     Q.  Right.  Because you were still chairman of
3  the board at Think after the spinoff while you were
4  CEO of Elevate?
5     A.  There was a transition period for about a
6  year that there was a sort of, you know, getting
7  the -- the spinoff.  I mean,, there's just some --
8  some shared resources as we were sort of in that
9  transition period.  I think it lasted about a year,
10  though.
11     Q.  Okay.  So my question is, you sent the
12  board dec to Victory Park every month.  Did Victory
13  Park also get the confidential memo from Ken Rees to
14  the board?
15     A.  And, again, just to clarify, I don't know
16  exactly what time -- period of time Victory Park
17  Capital got the board decs, and I don't know if they
18  saw the board memo.  I don't know why they wouldn't,
19  but I don't know that they did.
20     Q.  Maybe they did, maybe they didn't;
21  you don't know?
22     A.  I just don't know.
23     Q.  Okay.  All right.  So we are going to go
24  through some of these in order, and we're starting
25  with your report to the board, your memo to the

1  board dated September 16, 2010.  And if you'll --
2     A.  I'm sorry, December 16, 2010.  Okay.  Thank
3  you.
4     Q.  September.
5     A.  September.
6     Q.  And, actually, just --
7        MR. SCHEFF:  He doesn't have it.  You
8  never gave it to him.
9  BY MR. ACKELSBERG:
10     Q.  Oh, I'm sorry.  I never gave it to you.
11     A.  I'm sorry, July performance, September 16,
12  2010.  Thank you.
13     Q.  Okay.  And you'll see this -- this was
14  actually already used as an exhibit, I believe, at
15  Mr. Harvison's deposition.  Mr. Harvison was a board
16  member, right?
17     A.  Mr. Harvison was a board member at that
18  time, yes.
19     Q.  Representing the Harvison family interest?
20     A.  Yes.
21     Q.  Okay.  So you'll see this was previously
22  identified as P-114.  So my first question is
23  that -- so the way this is organized, it looks like
24  you first had an introductory section where you kind
25  of summarized the high points.  Then there was --

1  then you get -- you give a little bit of the actual
2  numbers.  In this case, it says "August
3  Performance."  And then you gave -- then you would
4  give a product-by-product description, and sometimes
5  you would have other matters that you would include
6  also.  Right?
7     A.  That's correct.
8     Q.  Okay.  And so one of the things I noticed in
9  every one of these reports is that you have these --
10  in the financial section, you would have revenue,
11  you had loans outstanding, you have -- you have
12  charge-offs, these -- these sorts of key metrics.
13  And you're getting these from the actual P&Ls from
14  Chris Lutes every month, right?
15     A.  Yes.
16     Q.  Okay.  And so with regard to loans
17  outstanding, that -- that particular metrics --
18  metric -- again, we're talking about September --
19  we're talking about the end of the fall -- the
20  summer and fall of 2010, at that point, it looks
21  like your products were PayDay One, ThinkCash and
22  Elastic, right?
23     A.  Let's see.  Didn't have UK.  We hadn't
24  launched -- I think those were the products.  And,
25  again, we have -- it's obvious that some we directly

1  originate and some we're servicing with our
2  technology and licensing platform.
3     Q.  And, actually, if you look ahead to page 3
4  about Elastic, it looks like there wasn't a lot of
5  activity in Elastic.  It was -- you say, "We have
6  turned off all new customer acquisition."  Do you
7  see that?
8     A.  Yes.
9     Q.  So for the most part, at this -- at this
10  point in time, the -- the summer and fall of 2010,
11  the company's business, from a financial standpoint,
12  was basically PayDay One and ThinkCash?
13     A.  I mean,, certainly the revenue -- revenues
14  coming in were primarily from those products.  But
15  as is kind of defined here under the Elastic
16  section, we are -- we are actively working on trying
17  to bring another bank live to complete what we
18  thought was a very attractive early sort of rollout
19  of the what at the time was called the Elastic
20  product.
21     So, I mean,, I think we would have, you
22  know, clearly viewed our business as -- as having a
23  direct consumer component and then two distinct --
24  it says -- you -- you defined them earlier, two
25  direct -- indirect components, one with bank

UNSEALED

1  partnerships and one with tribal partnerships.
2  Q. Well, at this point, there was no tribal
3  partnerships, though, right?
4  A. Oh, you're absolutely right. Oh, gosh,
5  I -- maybe it is later in the day. Right now, we
6  were -- we had one bank partner. We were actively
7  looking -- we had two bank partners, one where the
8  revenue had obviously dropped off. It was super
9  profitable, but we were trying to find another
10  bank -- bank partner.
11  So I guess what I'm responding to is -- I
12  don't think at this time we would have said we just
13  have PayDay One and ThinkCash. I think we still
14  thought that the Elastic product was going to
15  continue, just with a different bank partner.
16  Q. By the way, so just looking at the revenue
17  performance, the first bullet under "August
18  Performance," revenue -- I mean, we're largely
19  talking about revenues generated by, at this point
20  in time, PayDay One and ThinkCash?
21  A. I think that's right. I just don't know
22  how much revenue was still coming from the Elastic
23  product. We weren't doing new customer
24  acquisitions, but oftentimes, the earnings are
25  highest when you're not doing new customer

1  acquisitions.
2  Q. I understand, because you don't have --
3  A. Marketing costs.
4  Q. -- you don't have the expense of trying to
5  get those customers, right?
6  A. Yeah.
7  Q. Okay. Loans outstanding less than 61 days,
8  this -- this would refer to the loans outstanding in
9  the PayDay One and ThinkCash business primarily?
10  A. And the Elastic.
11  Q. All right. But -- okay. All three of
12  them, right?
13  A. Uh-huh (affirmative response).
14  Q. Okay. And then on the next page, you talk
15  about -- page 2 of the report, there's references to
16  the PayDay One portfolio and the Think- -- and then
17  in the next section, the ThinkCash portfolio. And
18  my understanding is, is that the -- the P&Ls would
19  also be broken out by product type so you would
20  actually be able to see how the -- the direct
21  product PayDay One is operating how the installment
22  loan product was operating, for example, right?
23  A. In the board dec it would have broken out
24  the performance by product, yes.
25  Q. Okay. So when we think about the ThinkCash

1  portfolio, we're talking about the performance of
2  those loans, right?
3  A. Yes.
4  Q. Okay. Now, I do want to ask one question
5  about the -- in the Elastic section on page 3, do
6  you see in the -- in the -- in the second paragraph,
7  it says, "We've been reviewing the customer
8  profitability of the product and are pleased with
9  the results. When we throw out monthly customers,"
10  then you say, "(we'll force biweekly/semimonthly
11  payments for all customers) and look at the results
12  of our champion strategy, the product is showing
13  strong margins."
14  So my question is about -- about -- do you
15  remember the decision to, basically, push all
16  customers into an every two-week payment as opposed
17  to a monthly payment?
18  A. I don't -- I don't know -- I don't remember
19  that we actually did that. I do know we talked
20  about it. The -- for one reason or another, monthly
21  customers had much higher defaults than biweekly
22  and semimonthly. I don't know if it was because of the
23  type of customer who's paid on a monthly basis
24  versus the type that has, you know, sort of
25  biweekly, semimonthly payments. But I know there

1  was a -- certainly a discussion at the time of
2  whether we just say the loan product requires either
3  a biweekly or semimonthly payment.
4  Q. Now, that wasn't -- that difference in
5  behavior, that wasn't only with regard to the
6  Elastic product, right? I mean,, you saw that --
7  you saw that across all products? Let me ask you a
8  different question.
9  Am I right that the way that the -- that
10  the ThinkCash product with First Bank of Delaware
11  was set up is that payments were made every two
12  weeks?
13  A. My recollection is payments were tied to --
14  to when the customers paid. So it would have been
15  at least biweekly and semimonthly payments. I
16  thought the product also allowed customers to select
17  a monthly, you know, payment structure. I'm not
18  certain on that, but I -- I guess I would have
19  thought they did.
20  Q. There was a default, though, like, if the
21  customer didn't -- didn't select something
22  different, it would be every two weeks, right?
23  A. Well -- and I can't speak to exactly how it
24  worked, but my -- because we sort of changed how we
25  determined that. You know, very early on, the

UNSEALED

App. 0084

1  customer would just say -- you know, would just
2  say, "How do you want to be paid?" More recently,
3  but I think it would have been at this time, we had
4  the customer give the next few pay dates for them,
5  and then we would associate the repayment schedule
6  for that loan to match with their anticipated pay
7  dates.
8      Q.  So that the ACH could be targeted for the
9  date that they actually get their paycheck in
10  their -- in their bank account, right?
11     A.  Assuming that the customer opted to pay by
12  automated ACH, yes.
13     Q.  Well, that was most customers?
14     A.  It was most customers. Customers had to --
15  had to select that.
16     Q.  Okay.
17     A.  And I know it goes without saying, but, you
18  know, these were -- since these were products where
19  we were the -- the technology and servicing
20  provider, any -- any discussions or the sort of
21  changes to the structure, and like we're talking
22  about with Elastic, would have been done in concert
23  with the -- with originator of the credit.
24     Q.  In the last section on page 4, talk about
25  the plans for a -- I guess a branding or something

1  called "Banking for the rest of us" that was a
2  slogan that ran across all your products?
3      A.  I don't know that it ran across our
4  products, but I think we were becoming aware that
5  the need that we were serving was very much a
6  mainstream need. There was more awareness of the
7  fact that -- pardon me for this -- but, you know,
8  half of Americans have barely $400 in savings,
9  two-thirds of Americans have a subprime credit
10 score.
11      So this is very much a mainstream need.
12 People didn't understand that it was a mainstream
13 need and mainstream credit product. So that sort of
14 "Banking for the rest of us," I don't know that we
15 even specifically used those words, but that was the
16 context of trying to raise visibility of the need
17 for better forms of nonprime credit and how we were
18 doing things that were helping mainstream consumers
19 have access to credit that was better than other
20 options available to them.
21      Q.  And the last sentence suggests that this --
22 this new banner, this slogan would be, you say here,
23 "A key factor in how we differentiate ourselves from
24 alternative financial service providers, that is the
25 payday lenders, as we prepare to go public." Right?

1  Do you see that?
2      A.  So it does say that. I -- just to clarify,
3  I don't know that we ever used "Banking for the rest
4  of us" in any -- actually any public facing. I
5  think it was just really, as I recall it, more of
6  our internal thinking about how do we raise the
7  visibility of these products as mainstream products.
8  In retro -- "Banking for the rest of us" is not a
9  great logo. I don't know that we did much with
10 that.
11      But, yes, we did as -- it says here, we
12 thought it was important to distinguish our products
13 from those sort of payday lenders, both in terms of
14 the structure, the pricing and the fact that they
15 don't help customers build credit. And then,
16 secondarily, we were conscious of the fact that at
17 some point in time, a liquidity event, like an IPO,
18 would be a good thing for our investors.
19      Q.  But -- so when you started with the company
20 in 2004, the main product was PayDay One, right?
21      A.  The -- the product that was live at the
22 time was PayDay One. Actually, there was -- I think
23 there was a couple of other products.
24      Q.  Like PayDay Select? PayDay Okay?
25      A.  No, I think PayDay Okay was live when I

1  joined. PayDay Select was launched afterwards. And
2  there was that bank product. I don't know what the
3  name of that was. It was before my point in time.
4      Q.  Because at one point were you -- were you
5  running, like, three payday websites at the same
6  time: PayDay One, PayDay Select and PayDay Okay?
7      A.  I think that was right. Different --
8  different channels for each one was the general
9  idea.
10      Q.  Was it more or less the same product or. . .
11      A.  They were -- actually, I can't remember. I
12 think there were pricing differences and channel
13 differences.
14      Q.  When you say --
15      A.  I think at the time, also, there was this
16 idea that because Google, in particular, for search
17 engine marketing, you were rewarded by having a
18 placement. You know, if somebody typed in "payday
19 loan," you would get a placement. But if you have
20 three products, you take up the top three
21 placements. So you're getting more of sort of the
22 customer eyeballs, and you have a better chance that
23 the customer is going to go to one of your websites.
24      Q.  I see. Okay.
25      But what -- regardless of the label,

UNSEALED

App. 0085

1  whether it was Payday One, PayDay Select, PayDay
2  Okay, I mean,, your primary business, certainly up
3  until the time that you began with First Bank of
4  Delaware, your primary business was payday loans,
5  right?
6          MR. SCHEFF:  Object to the form, and
7  misstates the testimony.
8          You can answer the question.
9      A.  As I -- as I -- as I mentioned, when I came
10  on board, I didn't know a whole lot about the
11  alternate lending products.  And what I knew about
12  PayDay One at the time and PayDay Okay was that it
13  was a discounted product versus sort of the classic
14  payday loans that were online, and they developed
15  some technology that I thought was really
16  interesting.
17          And as I mentioned, we began thinking
18  about ways to structure the product to allow
19  customers to pay it down for a longer period of time
20  and then evolving into, you know, installment loans
21  and lines of credit.
22          So that was antici- -- I can't say exactly
23  when we began -- you know, I probably can go back to
24  early board memos to see an evolution of how we
25  began to think about the product and an increasing

1  commitment to doing more than just providing credit
2  but also helping with the financial help with
3  customers at the same time.
4  BY MR. ACKELSBERG:
5      Q.  Well, I'm just curious about the connection
6  about going public and differentiating yourself from
7  the payday lenders.  Why was that important?
8          MR. SCHEFF:  Object to the form; lack
9  of foundation.
10          You can answer the question.
11      A.  I mean, we certainly had, rightly or
12  wrongly, a lot of pride in the products as being a
13  better solution for customers than -- than payday
14  loans and thought that it was important to highlight
15  that we are serving a customer that's typically
16  being served by a payday loan, but this -- that the
17  products that we either had in market or thought
18  that we would be bringing into market in the future
19  were representing a sort of new breed of more
20  responsible credit to those customers.
21          And when we were talking to the investor
22  community, we didn't want them thinking, oh, this is
23  just a payday loan.  We wanted to be able to
24  distinguish both the pricing differences, which as
25  we've highlighted we thought were significant; the

1  structural differences in that they allowed the
2  customer to pay down over time, and we thought that
3  helped prevent the cycle of debt that the consumer
4  groups were concerned about; and that, also, we were
5  doing things like reporting to credit bureaus and
6  providing -- and at this point in time, 2010, I
7  don't know what financial wellness activities we
8  had.  Probably none, frankly, other than reporting
9  to credit bureaus.
10          But there was already a sort of growing
11  view that -- that it was important to help customers
12  with financial -- I don't know exactly if we had
13  that in 2010, but that was sort of the evolution of
14  how we thought about our mission and how we thought
15  about what we were trying to do in growing the
16  business.
17  BY MR. ACKELSBERG:
18      Q.  Okay.  Why don't you turn the page to the
19  next --
20          MR. SHELDON:  Are we near time for a
21  break?
22          MR. SCHEFF:  We have been going for
23  about an hour and 15.
24          MR. ACKELSBERG:  All right.
25          THE VIDEOGRAPHER:  We are off the

1  record.  The time is 3:47 p.m.
2          (Break taken, 3:47 p.m. to 3:53 p.m.)
3          THE VIDEOGRAPHER:  We are back on the
4  record.  The time is 3:53 p.m.
5  BY MR. ACKELSBERG:
6      Q.  All right.  So we're now looking at your
7  report of November 17, 2010.  This has already been
8  marked as Plaintiff's Exhibit 118.  Okay?  And if
9  you'll look in the second paragraph, it mentions
10  that at the meeting, "We will discuss our plans for
11  moving ahead with Great Plains Financial which could
12  replace all of the lost ThinkCash revenues as well
13  as open our growth prospects in new states."  Do you
14  see that?
15      A.  Yes.
16      Q.  Okay.  And then I think on page 2 you get
17  into more detail about that.  So in the third
18  paragraph in the ThinkCash section, you say that --
19  that you're proposing to migrate the ThinkCash
20  balances to a new lender -- or another lender that
21  will be able to lend in all -- in 48 states, all
22  except South Dakota and West Virginia.  Do you see
23  that?
24      A.  Yes.
25      Q.  Okay.  Now -- so when you say "propose to

1  migrate the balances," why don't you just explain
2  what that -- what that means.
3      A.  So as the -- the ThinkCash -- at this
4  point, the ThinkCash portfolio pays down, you know,
5  they -- I'm sorry, I'll sort of just provide all the
6  background.  So the way the portfolios work, we
7  provide the marketing services to help the lender
8  originate the loan.  There's marketing costs
9  associated with that.  Then once those customers are
10  acquired, if you will, if the customers need more
11  credit over time, they typically come back to that
12  same lender.
13      And this is a customer that is a pretty
14  income constrained, doesn't have a lot of credit
15  options.  And so there is a fair amount of reuse of
16  the product by customers once they pay off their
17  first loan.  So this is referring to the customers
18  that paid off their loans, getting them a, you know,
19  new loan with a new lender and sort of optimally
20  keeping that portfolio balance as -- as high as
21  possible.
22      Q.  And that's ultimately what happened with
23  regard to -- the ThinkCash customers ultimately were
24  migrated to Plain Green rather than Great Plains
25  Lending, right?

1      A.  Yeah, you know, "migrating" is a -- is a
2  weird term because it's really more of a remarketing
3  to those customers and making them aware of that
4  loan product so they don't just go to some other
5  lender.  But, yes, ultimately the way it happened --
6  there's a few different twists and turns along the
7  way, but ultimately, the ThinkCash customers were
8  redirected -- or remarketed to -- to Plain Green
9  when that product became live.
10      Q.  Now, my understanding of the -- deal
11  documents with the First Bank of Delaware was that
12  the decision of -- that it was actually First Bank
13  of Delaware which made the decision which states
14  ThinkCash would or would not be in.  Is that your
15  recollection?
16      A.  Oh, yes.
17      Q.  Okay.  And so that's kind of what you're
18  referring to when you're saying that there's the
19  potential of expanding the product to all -- well,
20  to 48 -- to a larger number of states because you no
21  longer would be bound by what First Bank of Delaware
22  was deciding with regard to state coverage; am I
23  right?
24      A.  I'm -- actually, I don't know what the
25  state coverage of the bank was, whether it was --

1  there was a complete overlap or a -- or a change in
2  the lending structure.  But in both the cases of the
3  bank and with the tribal lenders, ultimately, the
4  originating lenders made the -- the final decision
5  on what customers -- you know, what states they
6  would originate into.
7      Q.  Even -- really?  With Plain Green and Great
8  Plains Lending, they're the ones that, when you say
9  "made that decision," I'm sure there was an approval
10  of some sort.  But in terms of actually analyzing
11  the states and figuring out where you would go or
12  where you wouldn't go, just be careful because
13  they're -- they're about ready to all jump at this
14  but you're sure -- but you said it was the tribes
15  that made that decision, right?
16      A.  I said -- I said --
17          MR. SCHEFF:  Object to the form.
18  There was a lot in your so-called question before
19  you asked the question that was incredibly
20  objectionable.  So object to the form.
21      You can answer the question.
22      A.  So I said ultimately that decision is one
23  of the originating lender.  And, I guess, the
24  example I give is I think it's the case -- and,
25  again, hopefully I'm right -- in the case of the

1  Otoe-Missouria, they didn't want to originate any
2  loans in the state of Oklahoma --
3  BY MR. ACKELSBERG:
4      Q.  And --
5      A.  -- for one reason or another.
6      Q.  Plain Green didn't want to originate any
7  loans in the state of Montana, right?
8      A.  Right.
9      Q.  And the Tunica-Biloxi didn't want to
10  generate any loans in the state of Louisiana?
11      A.  That may be correct.
12      Q.  Okay.  So other than the states in which
13  they actually resided -- by the way, do you know why
14  none of these tribes wanted to lend this -- to offer
15  these loans to other residents of their state?
16      A.  I believe that was advice they got from
17  their counsel.  I don't know the specifics of what
18  that advice was based on.
19      Q.  Okay.  But with regard to Plain Green or
20  Great Plains Lending, I mean,, for the most part, at
21  least initially, other than Louisiana, Montana and
22  Oklahoma, they were all in or not in the same list
23  of states, right?
24          MR. SCHEFF:  Object to the form.
25      A.  And so, again, to my --

67 (Pages 265 to 268)

UNSEALED

App. 0087

BY MR. ACKELSBERG:

Q. "Yes" or "no"?

A. Well, the same list of states other than those -- there may be some differences; I don't know. But, generally speaking, the decisions on which -- which states to lend into and out of were consistent, but that -- if you would let me finish my response to you, which is that the tribes make the ultimate decision, but, you know, we also helped -- I'm just wondering about -- about privilege issues.

MR. SCHEFF: Careful about that.

A. So. . .

BY MR. ACKELSBERG:

Q. You made recommendations?

A. Well, we had a perspective on states where there would be more litigation, more challenges.

Q. Okay. And that perspective would be communicated to the tribes, and then the -- and then the tribes would either agree or not agree with the -- with that perspective?

A. Yeah. I mean, there was a -- now I'm getting into the privilege, because there's -- there's sort of a consistent group of -- of attorneys that met together to decide what was the

appropriate states to go into.

MR. SCHEFF: Hold on.

THE WITNESS: Okay.

MR. SCHEFF: You can give whatever direction you want to give.

MR. SHELDON: All right. Mr. Rees, I'd ask you not to reveal anything with regard to the decision whether or not to provide services in any state for Think Finance. That would be a communication involving outside or inside counsel, you know, where there was legal advice being provided. So if your answer to the question is that a decision was made, you know, in conjunction with counsel, provide that answer but don't go any further, please.

THE WITNESS: Okay. Thank you.

BY MR. ACKELSBERG:

Q. So without telling me what the lawyers recommended, please identify the team of lawyers that were making those recommendations.

A. Well, it would have been --

MR. SCHEFF: At what time?

BY MR. ACKELSBERG:

Q. Well, let's start -- let's start at the beginning -- at the beginning in 2011 when all of

them began. Right? And then we can talk 2013.

THE WITNESS: And that's okay listing --

MR. SHELDON: You can identify the lawyers that provided Think with legal advice.

A. Think and -- and really the tribes. So it would have been the combination of the tribal attorneys, including in -- in at least in one case the -- Pepper Hamilton. It would have been people, like, Claudia Callaway with --

BY MR. ACKELSBERG:

Q. Whatever?

A. I think she was at Katten Muchin at the time. It would have been our general counsel, and it would have been the general counsel of the tribes would have been the general groups that were working together to ultimately come up with what they thought was the optimal states to -- to lend into.

Q. And what about any involvement of Victory Park?

A. Oh, I don't know. I think they would have had a perspective since they were buying participations, and they could have elected not to buy participations in certain states. I don't remember whether their counsel was directly

involved; although, they were using Katten Muchin for some of the contract work. So I don't know if they -- if they used regulatory counsel and were involved in that discussion.

MR. SCHEFF: Again, Mr. Rees, if you know the answer to a question, provide it.

THE WITNESS: Yeah.

MR. SCHEFF: If you don't, just say you don't know.

A. I just don't know the answer.

BY MR. ACKELSBERG:

Q. Well, do you remember --

THE WITNESS: I'm sorry.

MR. SCHEFF: That's all right.

BY MR. ACKELSBERG:

Q. Do you remember a lawyer named John Williams that was advising Victory Park?

A. I don't remember that name.

Q. Okay. And what about in 2013, I mean, was it the same group that would have been making any decisions about -- my understanding is that there was something called a no-state list that was generated around April of 2013. Does that jog your memory at all?

A. Well, the first question, there was

UNSEALED

App. 0088

1    certainly different attorneys by that time, as we
2    mentioned some of the attorneys that -- that Think
3    was using later by 2013.  I think that was the list
4    we were looking at.  So it was certainly more
5    expansive than the views of --
6           MR. SHELDON:  Okay.  Stop.  If you are
7    going to provide views of attorneys or in-house
8    counsel, please don't go there.
9           THE WITNESS:  Thank you.
10          MR. SHELDON:  You may disclose the
11   identities of counsel who provided advice and you
12   may disclose if they provided advice regarding the
13   tribal arrangements or not, but please, be careful
14   not to go into any views that were expressed to you
15   or by you to your attorneys.  Understood?
16          THE WITNESS:  Thank you.
17          MR. SHELDON:  Thanks.
18       A.  Do you want a list of those other
19   attorneys?
20   BY MR. ACKELSBERG:
21       Q.  Sure.
22       A.  So I believe people, like, Patton Boggs
23   were involved at that point.  And I just don't
24   remember the others.  There was -- I mean,, between
25   the trade organization attorneys, the -- the tribal

1    attorneys, our evolving attorneys at Think Finance,
2    to the extent -- to the extent that Victory Park
3    were -- attorneys were involved in those decisions,
4    there was a lot of attorneys that were working
5    together to determine the best states to -- for --
6    for the tribes to lend into.
7    BY MR. ACKELSBERG:
8        Q.  Okay.  In -- returning to the text of
9    the -- of the report we were looking at, you say
10   that, "We propose to migrate the balances to another
11   lender that will be able to lend in 48 states all
12   except to South Dakota and West Virginia."
13          Now, do you remember what was unique about
14   South Dakota and West Virginia?
15          MR. SCHEFF:  Again, to the extent you
16   can answer this question without revealing advice of
17   counsel, do so.  If you can't, just tell us.
18       A.  I do remember this, but I -- but this is --
19   this is based on counsel, the decisions about -- the
20   recommendations on South Dakota and West Virginia.
21          MR. SCHEFF:  I expect Mr. Sheldon will
22   direct you not to answer the question.
23          MR. ACKELSBERG:  That's fine.  I'll
24   just move on.
25       A.  And -- but I -- I just I wanted to

1    highlight, because I thought the last answer -- I
2    mean, -- I mean,, we're talking about October.  This
3    was very early in evaluating business opportunities.
4    So this is probably not particularly well thought
5    through.  This is sort of early views on what might
6    happen.
7    BY MR. ACKELSBERG:
8        Q.  So in the last section on page 2, it's
9    called "Regulatory," and you're talking about the --
10   the regulatory environment for banks being in
11   partnerships like -- I assume you mean like -- like
12   the relationship that you had with First Bank of
13   Delaware, that -- that that's -- those opportunities
14   have eroded because of the regulatory environment.
15   Right?
16          MR. SCHEFF:  Object to the form.
17          You can answer the question.
18   BY MR. ACKELSBERG:
19       Q.  And the next sentence, it says, "Both the
20   OTS and the FDIC have made it clear like -- like
21   innovation and are comfortable with the dramatic
22   reduction in consumer credit."
23          Now --
24          MR. SCHEFF:  Hold on.  There's no
25   question in front of you.

1           THE WITNESS:  Thank you.
2    BY MR. ACKELSBERG:
3        Q.  Do you remember making that assessment or
4    assessments like this in the past?
5        A.  It certainly was a response to the
6    frustrations.  I -- I don't remember exactly writing
7    this, but I had -- I think a lot of us did, I had a
8    lot of frustration on the -- what we saw as a
9    changing regulatory environment where following the
10   recession, regulators were really pushing banks to
11   tighten up credit quality in what we thought was not
12   serve -- underserved customers, in particular
13   subprime customers.
14          And that -- that, you know, then led to --
15   and I don't think at this time Operation Choke
16   Point was in place, but that was sort of a changing
17   regulatory environment that we felt was constraining
18   access to credit to -- to Americans and constraining
19   the ability of banks to serve that.
20       Q.  This is actually --
21       A.  I think I --
22       Q.  -- in 2010, right?
23       A.  I think in retrospect I certainly
24   overstated they don't want innovation.  I wouldn't
25   have -- I would not -- no longer stick with that.

UNSEALED

App. 0089

1    But there -- there was a period of time where the
2    OTS and the FDIC were -- and this is right after the
3    recession -- really urging banks to tighten up their
4    credit standards quite a bit.
5        Q.  Well, banks weren't really doing much in
6    this space anyway, right?
7        A.  Well, it's -- I mean, they're actually in
8    the, what was it, '07, '08 time, there was actually
9    a fair number of partnerships with -- with banks
10   and --
11       Q.  Oh, you mean like --
12       A.  -- and credit providers.
13       Q.  -- like First Bank of Delaware, like those
14   kind of partnerships?
15           MR. SCHEFF:  Object to the form.
16       A.  Like those and others.
17   BY MR. ACKELSBERG:
18       Q.  Okay.  Why don't you flip the page.  We're
19   now into January of 2011.  This is also a report
20   that we discussed -- a board memo we discussed with
21   Mr. Harvison.  So this is P-123.  If you'd turn to
22   page 2, there's a discussion of advances in risk
23   scoring.  And, I mean,, we've previously -- you
24   previously talked to us about the risk and analytics
25   platform, and this is -- you're just -- you're just

1    giving the board some information about some
2    enhancements that -- that the risk group is coming
3    up with for that platform, right?  Am I right?
4        A.  Yes.
5        Q.  Okay.  And that's -- and those
6    improvements, that -- that was -- even though it's
7    under PayDay One, it would have been after the --
8    the platform, in general, across all the products
9    using -- using the decision engine, correct?
10       A.  Not necessarily.  The risk scores were
11   oftentimes developed for the individual portfolio.
12   There was overlapping approaches, but sometimes
13   there was a -- a uniform score.  Most often the
14   scores were kind of customized within each loan
15   portfolio.
16       Q.  Okay.  Now, you also -- you see it's
17   ThinkCash/Great Plains Lending.  So this is -- this
18   is still -- and you can -- reading the text about
19   you're still happy with the Otoe-Missouria.  Do you
20   see that?
21       A.  Yes.
22       Q.  So this is January 21st.  Still, at this
23   point in time, the assumption was it was going to be
24   the Otoe-Missouria that were going to be sponsoring
25   that first tribal installment loan product, right?

1        A.  At this point in time, that's what we felt.
2        Q.  All right.
3        A.  I guess I just wanted to highlight --
4        Q.  Sure.
5        A.  -- but you sort of suggested that we were,
6    you know -- you know, at this point in time sort of
7    viewed our -- our business as PayDay One and
8    ThinkCash.  This is my recollection, I didn't see it
9    on the previous, but there was this view that we had
10   some pretty exciting other bank partnership
11   opportunities that we were, at that point in time,
12   confident about being able to close on.  First
13   Premier was one.  Later, there's -- there's other
14   banks.  So throughout this time period, we're still
15   very aggressively focused on trying to license our
16   technology to banks as well as nonbank lenders.
17       Q.  And had there been a bank willing to do
18   the -- a product like First Bank of Delaware, it
19   might have -- you might have gone in that direction
20   rather than tribal, right?
21           MR. SCHEFF:  Object to the form; calls
22   for speculation.
23           You can answer the question if you can.
24       A.  I can't say which we would have proposed,
25   which would have gone forward.  It would have

1    depended on the deal terms, I would imagine.
2            MR. ACKELSBERG:  Okay.  All right.
3    Let's turn to the next board report.  And this is
4    one that wasn't previously identified, so let's call
5    this P-282.  Let's just stick this in the book so
6    you'll have it.  Give me the book for a second.  So
7    Exhibit 282 is TF-PA 170233.
8            (Exhibit No. 282 marked.)
9    BY MR. ACKELSBERG:
10       Q.  So this is now a month later.  And
11   February 17th, 2011, and you're thanking God for
12   PayDay One.  Do you remember that?
13       A.  That's what I wrote here, yes.  I don't
14   specifically remember writing, "Thank God for PayDay
15   One."
16       Q.  Well, because at this point you're -- this
17   is -- it's already 2011.  There are no more loan
18   originations for ThinkCash, and the only -- you said
19   the only domestic product we're marketing at the
20   moment is PayDay One, right?
21       A.  You know, obviously, we had -- we had just
22   bought the UK business, which was a pretty
23   interesting opportunity.  But PayDay One, at this
24   point, was certainly the driving majority of what we
25   could see as ongoing revenue streams.

UNSEALED

1    Q.   Okay.  So in terms of ThinkCash to Great
2  Plains Lending -- now, this is now February 17th.
3  Still the assumption was you're going to be able to
4  close the deal with Mark Curry and the
5  Otoe-Missouria, right?
6         MR. SCHEFF:  Object to the form.
7    A.   As you know, we were looking to close the
8  deal with the Otoe-Missouria tribe directly.
9  BY MR. ACKELSBERG:
10   Q.   Right.  And this is now on page 2.  You
11 say, "We are scrambling to bring Great Plains
12 Lending live in February.  Although I expected
13 potential setbacks due to technical factors, the IT
14 team has done a fantastic job getting everything
15 ready ahead of plan," and they've "delivered a solid
16 platform on time."  Do you see that?
17   A.   Yes.
18   Q.   Okay.  So remember, I was asking you before
19 when we were looking at the "Gentlemen start your
20 engines e-mail," that was February 28th.  So this
21 is -- this is, you know, 11 days before that.  It
22 looks like the IT team has actually gotten the
23 platform ready to roll, you're just waiting for --
24 waiting for the final deal to materialize, right?
25        MR. SCHEFF:  Object to the form.

1    A.   As I said at the time, and I put in
2  perspective, there was an awful lot of activities
3  going on at that point.  The acquisition of the --
4  of the UK business, ongoing bank negotiations, but
5  we were very excited about the potential to bring
6  Great Plains live and -- and anticipate that that's
7  what would happen.
8  BY MR. ACKELSBERG:
9    Q.   All right.  Let's move to the next month.
10 By the way -- and I guess I should direct this to
11 Matt.
12        MR. ACKELSBERG:  We don't -- I
13 don't -- we looked for it.  I don't believe we have
14 the report that Mr. Rees presumably made to the
15 board in March of 2011 where, I think, we would have
16 had a little more information about -- about Plain
17 Green.  So I believe I've made a request earlier in
18 some e-mail or letter, but if you could check,
19 please, about whether the March 2011 report exists,
20 and if it's -- or if it's being withheld.  I mean,,
21 I. . .
22        MR. SHELDON:  I'm happy to look into
23 it for you and report back after the deposition.
24        MR. ACKELSBERG:  Thank you.
25 So let's -- let's -- we don't have March,

1  but we have your April report, and we're going to
2  identify this as P-283.  I'm putting it in my book
3  rather than yours.  It's late in the day.
4         (Exhibit No. 283 marked.)
5  BY MR. ACKELSBERG:
6    Q.   So this is, roughly, two months after the
7  last report we looked at where it all looked like it
8  was moving towards Great Plains Lending.  And not
9  only have you signed a deal --
10   A.   Actually, I think you mean -- oh, you're
11 right, Great Plains Lending.  Thank you.
12   Q.   And it looks like in the two months not
13 only have you closed a deal with a different tribe,
14 but it's already online and doing fantastic
15 business.  Do you see that?
16   A.   Yes, it looks like they're live by that
17 point, yes.
18   Q.   And the reason it's doing so well is you
19 say, "Primarily due to former customers, and we
20 haven't even marketed the old ThinkCash customers
21 yet."  Do you see that?
22   A.   Yes.
23   Q.   So at some point, an e-mail was sent to
24 ThinkCash customers advising them of the opportunity
25 to apply for loans to -- to --

1    A.   Plain Green.
2    Q.   -- to Plain Green; you remember that,
3  right?
4    A.   Yes.
5    Q.   And that would have been an e-mail that you
6  probably reviewed it before it -- before it was sent
7  out?
8    A.   Probably not.
9         MR. SCHEFF:  Object to the form.
10   A.   That's why our marketing team would have
11 made that creative decision on how to get that out.
12 I mean,, that was certainly the marketing channel
13 that was used.
14 BY MR. ACKELSBERG:
15   Q.   Now, the way it worked for ThinkCash
16 customers and later Plain Green customers is that
17 they actually had a login where they didn't even --
18 they didn't need to be invited, they needed to be --
19 they didn't need to be on the internet looking for a
20 loan; they could literally log onto their account
21 and apply for a new loan.  Am I right?
22   A.   So customers who apply for credit get an
23 account name and a password, and they use that to
24 access what's called the "my account" page of the
25 websites, like most other online lenders.  They can

UNSEALED

1   schedule payments.  They see their -- their status.
2   And then after they have repaid their loan, they can
3   go back and apply for another loan.
4       Q.  Right on that -- on that website by logging
5   in, right?
6       A.  Right.
7       Q.  Okay.  So it sounds like what you're saying
8   is that either someone did that or they called the
9   call center, and without getting any marketing at
10  all, just from their own initiatives, were -- were
11  applying for these brand new Plain Green loans?
12          MR. SCHEFF:  Object to the form.
13      A.  I don't remember exactly what was
14  happening, but I do remember that -- I can't
15  remember exactly how during this interim period
16  customers found out about -- whether there was
17  search engine marketing going on that was directing
18  customers, but I -- I expect -- I mean, it's
19  mentioned here, that when people would call the call
20  center, I expect that the call center staff would
21  say:  Hey, you may want to try this other -- this
22  other website.  There may have been some text put on
23  the -- the ThinkCash site saying you may want to
24  apply for credit at this site.  I don't know exactly
25  what was done.

1   BY MR. ACKELSBERG:
2       Q.  So just looking at -- you're now -- we're
3   both, I think, at page 2, where in the middle of the
4   second paragraph, it says, "As far as we can tell,
5   the former customers have been calling the call
6   center regularly since the end of the year to find
7   out when the product would be available."  Right?
8   Do you see that?
9       A.  Yes.
10      Q.  Okay.  What call center are we talking
11  about?  This is the one in Fort Worth, right?
12      A.  No, I expect it would have been the one
13  that was set up by -- or that the -- the call center
14  that was used by First Bank of Delaware.  They used
15  a third-party firm.
16      Q.  Which fund was that?  Was that Meta or. . .
17      A.  Probably was Meta.  I think that was the
18  firm that the bank wanted us to use.
19      Q.  And you kept using it?
20      A.  Yes, for some period of time.  I don't
21  know -- we didn't -- we ended up ultimately
22  cancelling that contract.
23      Q.  Well, even -- I mean,, in the beginning,
24  for example, Plain Green didn't even have a call
25  center; you needed to help them build one, right?  I

1   mean, you financed them -- you provided money to
2   help them build a call center, right?
3           MR. SCHEFF:  Object to the form.
4       A.  They -- they contract with a -- with a
5   third party, just like the bank did, to provide
6   customer support services and collection services.
7   In addition to that, as they became more proficient
8   and they were able to train people up and staff
9   people up, they expanded their own call centers.
10  BY MR. ACKELSBERG:
11      Q.  Well, with money supplied by -- it was a
12  loan from -- it was a credit facility agreement
13  between Think Finance and Plain Green to lend them
14  the money for the costs in building a call center.
15  You don't remember that?
16      A.  I don't.
17          MR. SCHEFF:  Object to the form.
18  BY MR. ACKELSBERG:
19      Q.  No.  Okay.
20      A.  I mean,, I'm sure that --
21          MR. SCHEFF:  You've answered the
22  question.
23          THE WITNESS:  Okay.  Thank you.
24          MR. SCHEFF:  If there's another
25  question, he can put it on the table.

1   BY MR. ACKELSBERG:
2       Q.  I think -- I think you were about to tell
3   me who would be a better source of that information.
4   So why don't --
5           MR. SCHEFF:  Why don't you just ask
6   another question.
7   BY MR. ACKELSBERG:
8       Q.  So who would be a better source of
9   information?
10      A.  Well, I think the -- you know, certainly
11  Chris Lutes, the CFO, and the relationship managers,
12  Jason and Michelle, would probably more -- know more
13  of the details.
14      Q.  Okay.  And then at the end of the
15  paragraph, "We are planning a large e-mail drop to
16  former customers."  That's what you were describing
17  before, right?
18      A.  Yes.
19      Q.  Okay.  Look at the first paragraph of the
20  "ThinkCash/Great Plains Lending/Plain Green"
21  section.  You say, "Despite all the problems with
22  the contracts, not to mention the legal expense, I'm
23  very pleased with the deal as it stands.  It is
24  better for us economically than the one with First
25  Bank of Delaware."  Do you see that?

UNSEALED

1    A.  Yes.
2    Q.  Okay.  And I just want to explore with you
3  how it was better.  Now, I alluded to this before,
4  that part of that is the amount of the revenue
5  share, right?  That's -- that might have been part
6  of how the economics were better, right?
7         MR. SCHEFF:  Object to the form; calls
8  for speculation.  Why don't you ask him a question
9  as opposed to whether something might be the case.
10  BY MR. ACKELSBERG:
11    Q.  You can answer it now.
12         MR. SCHEFF:  You can answer if you
13  can.
14  BY MR. ACKELSBERG:
15    Q.  If you remember the question.  I mean,,
16  that's the whole point, as you see.
17         MR. SCHEFF:  It's not the whole point.
18  It's to make sure you ask a question that can be
19  understood and then answered so the record is clear.
20    A.  Actually, I don't remember that there was a
21  question in that.  I apologize.
22  BY MR. ACKELSBERG:
23    Q.  Right.  Okay.  So I'm just trying to
24  explore with you the elements of the deal with Plain
25  Green as compared to First Bank of Delaware which

1  made the Plain Green deal better economically for
2  Think Finance.
3    A.  I actually -- since I'm -- unfortunately,
4  at this point in time with the years, I don't know
5  the differences in the deal structures.  I mean,
6  obviously, at a very high level that there was --
7  structurally, they were the same.  There were -- I
8  think the bank retained more balances than the tribe
9  did.  I think the bank -- and I don't even know what
10  the revenue shares were between the -- between the
11  various parties.  So, I mean,, clearly, I thought
12  there were some advantages of this structure, but I
13  can't speak to what the -- the economic advantages
14  and differences were between them.
15    Q.  Okay.  Now, who is negotiating again for
16  Plain Green in setting up these structures?
17    A.  Well, from our side, the primary sort of
18  relationship manager, if you will, was --
19  relationship managers would have been Jason and
20  Michelle.  They spent the most time with the tribe
21  getting through this.  But there was, obviously,
22  counsel and -- from -- from our side as well, as we
23  talked about, from Victory Park Capital's side.
24  And, actually, as you had pointed out, also then you
25  have the Haynes and Haynes' counsel involved in the

1  negotiations.
2    Q.  Meaning Eckman?
3    A.  I don't -- I don't know if he -- he might
4  have hired another counsel.  We -- there was some
5  reference to a -- to a law firm that I had never
6  heard of before, and maybe that was his.
7    Q.  Okay.
8    A.  But there was, obviously, a lot of -- and
9  what I'm suggesting, a lot of parties, a lot of
10  counselors involved in the negotiation.
11    Q.  Including Eckman?
12    A.  Eckman on Plain Green, I would expect that
13  he was involved in the negotiations.  I don't know
14  exactly what his role was, but he was -- he was --
15  he was an attorney involved in the discussions.
16    Q.  Well, the term sheet required Plain Green
17  to hire Pepper and said that Think Finance would pay
18  for -- for Pepper, right?
19    A.  I just don't know if he was being used for
20  negotiating the contract or just advising the -- the
21  tribal lender on how to establish their tribal
22  lending law and practices and other aspects of the
23  business.
24    Q.  Okay.
25    A.  I don't know -- I don't know if it was a

1  regulatory attorney, corporate attorney or
2  negotiating attorney, or all three.
3    Q.  Now, Eckman would have known the revenue
4  share that First Bank of Delaware had because he
5  was --
6    A.  Yes.
7    Q.  Right?  So presumably -- well, you don't --
8         MR. SCHEFF:  Let's not presume.  Let's
9  just ask a question.
10         MR. ACKELSBERG:  All right.  Let's
11  move to the next month.  And this will be 286, I'm
12  sorry, 284.  Do I have that right?  Let's see.  Let
13  me get my numbers straight.
14         MR. SCHEFF:  There's no question
15  that's pending.
16         THE WITNESS:  Thank you.
17         MR. ACKELSBERG:  Why don't you give me
18  the book, and we'll. . .
19         THE WITNESS:  Thank you.
20         MR. ACKELSBERG:  I'll get you a
21  question as soon as your lawyer gets back in his
22  seat.
23         MR. SCHEFF:  I'm in my seat.
24         (Exhibit No. 284 marked.)
25  BY MR. ACKELSBERG:

73  (Pages 289 to 292)

UNSEALED

1    Q.   So we are now looking at your report
2 May 18, 2011, Plaintiff's Exhibit 284, TF-PA 710237.
3 And, basically, you're giving a very positive
4 account of the growth of the installment loan
5 portfolio, right?
6    A.   Yes.
7    Q.   Which is called still "ThinkCash/Great
8 Plains Lending/Plain Green."  Do you see that in
9 your -- in your report?
10   A.   Yes.  It looks like from this -- and I
11 don't remember, but from this it's suggesting that
12 Plain Green was live and we believed that Great
13 Plains would be coming live, it looks like they're
14 saying hoping to go live in June.
15   Q.   So eventually you did make a deal with
16 Great Plains Lending, obviously?
17   A.   Yes.  And as we said, we had hoped to have
18 a number of tribal lenders utilizing our software.
19   Q.   Okay.  So the portfolio -- and this -- and,
20 again, the portfolio you were referring to is the
21 portfolio of customers, some of whom first became
22 customers with ThinkCash and now they're either
23 Great Plains or Plain Green, correct?
24        MR. SCHEFF:  Object to the form.
25   A.   Some of -- I'm sorry, can you just repeat

1 the question?
2 BY MR. ACKELSBERG:
3    Q.   Well, we're looking at -- the way that this
4 report is structured, you're looking at,
5 generically, the installment loan portfolio,
6 correct?
7    A.   I'm sorry, with regard to what?  I mean,
8 the -- obviously, the April performance covers the
9 -- covers the payday loan product as well as the --
10   Q.   Well, I know that.  But I'm just -- so turn
11 the page to page 2.
12   A.   Okay, this -- this section here?
13   Q.   Yes.
14   A.   Yes.
15   Q.   And when it talks about "the portfolio" in
16 this section, we're referencing the installment loan
17 portfolio, right?
18   A.   Yes.  Thank you.
19   Q.   And inclusive of the ThinkCash balances and
20 the new -- and the new tribal customers, correct?
21   A.   That's right.
22   Q.   Okay.  And so in the next paragraph we see
23 that not only is the deal better economically for
24 Think Finance than the deal with First Bank of
25 Delaware, you say that the tribe is easier to work

1 with than First Bank of Delaware was?
2        MR. SCHEFF:  Object to the form.
3 BY MR. ACKELSBERG:
4    Q.   Do you see that?
5        MR. SCHEFF:  Object to the verbiage in
6 the question.
7        You can answer -- answer the last question
8 with reference to what you have stated in this
9 exhibit.
10       THE WITNESS:  Sure.
11       MR. SHELDON:  Let me just point one
12 thing out, too, is that -- and this is partly my
13 failing -- we're dealing with documents that are,
14 you know, four pages long, single spaced, and I
15 realize now that we haven't been giving the witness
16 adequate time to -- to skim the whole document,
17 necessarily, or even, you know, counsel at times.
18 So I would just instruct if you need more time to
19 skim the entire document, to get the context or
20 anything, please do so.  And you are welcome to do
21 so either up front, or if you decide you need it for
22 any particular question, you can take as much time
23 as you need at any point to review it.  Okay?
24       THE WITNESS:  Okay.  Thank you.  And I
25 should have been doing that as well.

1    A.   I just -- if you're sort of asking about
2 this -- this context, you know, the FBD was -- had a
3 lot of changes along the way, and FBD had, I think
4 correctly as a bank partner, based on their -- the
5 guidance they got from the FDIC and their continued
6 thinking about how to structure the program, had us
7 restructure it a number of times.  So this was a
8 pretty stable product, at least in our minds and the
9 minds of -- of the tribe.
10       I mean,, candidly, it's -- it's why it was
11 a very, very attractive product because it wasn't a
12 startup product and it already had a cash flow.  So
13 it was -- as opposed to First Bank of Delaware that
14 only got sort of cash flow from the product after
15 some period of time after it ramped.  This product
16 brought cash flows to the tribe day one.  So they
17 were -- they were, obviously, pretty happy with the
18 bottom line impact to -- to the tribal economic
19 development.
20 BY MR. ACKELSBERG:
21   Q.   In the last -- in the last paragraph, you
22 say, "To provide political air cover for tribal
23 lending, we are establishing an industry
24 organization for lobbying and for internal policing
25 of lending practices."  Do you see that?

UNSEALED

1    A.  I do see it.
2    Q.  Okay.  And that references -- my
3  understanding is the early organization was called
4  NALA, N-A-L-A?
5    A.  To -- just in point of clarifying this, you
6  know, when we say "we," this is the royal we of the
7  parties involved with -- you know, us as a service
8  provider, the tribes we were servicing, their other
9  people sort of interested in the space, and we had
10  seen the benefit of what the online lending alliance
11  had been able to do from a government affairs
12  perspective and promulgating best practices, and we
13  were working with the tribes to build up an industry
14  association in the same way.
15    Q.  Okay.
16    A.  And we say actually -- in fact, it says
17  that the "industry association for lobbying and
18  internal policing of lending practices."
19    Q.  And, in fact, one of the -- and that was,
20  actually -- and Think had to support that
21  financially as well; am I right?
22    A.  Think as a vendor to the industry, like --
23  like all the other vendors that were members, there
24  was a financial contribution or membership fee.
25    Q.  Okay.

1    A.  And, actually, I think the -- the tribes
2  had a membership fee as well, I believe.
3    MR. ACKELSBERG:  Where are we on the
4  time?
5    MR. SCHEFF:  You are probably a few
6  minutes shy of six hours.
7    MR. ACKELSBERG:  Okay.  Let's -- let's
8  turn to the next one.  This is P-285.
9    (Exhibit No. 285 marked.)
10  BY MR. ACKELSBERG:
11    Q.  We're now looking at your report -- we
12  skipped a few months.  We're now --
13    A.  If I could, he's right, I should --
14    Q.  Yeah, yeah, yeah.
15    A.  -- familiarize myself.
16    Q.  I'm going to -- I'm going to give you a
17  chance to look at it.
18    A.  Thank you.
19    Q.  I'm just situating it.
20    A.  Okay.
21    Q.  We moved ahead a few months.
22    A.  Thank you.
23    Q.  This is now October 19th, your report about
24  September's performance in 2011.  And I want to give
25  you a chance to review it.

1    A.  Great.  Thank you.
2    Q.  And I should tell you that my only
3  questions are going to be about -- well, why don't
4  you just review it.  Then we'll --
5    A.  Okay.
6    Q.  Yeah, that's -- that's fine.
7    MR. SCHEFF:  Read as much of it as you
8  think you need to.
9    A.  (Reviews document.)
10    Thank you.
11    MR. SHELDON:  Just one more second.
12    Okay.  Thank you.
13  BY MR. ACKELSBERG:
14    Q.  Mr. Rees, if you could turn to page 2 of
15  this memo to the board memo, under "Great Plains
16  Lending/Plain Green," and in the second paragraph,
17  you state that, "The product and risk teams have
18  just rolled out revised underwriting rules that
19  should get our fund rates and CPL back to target
20  levels while keeping defaults at low levels."  Do
21  you see that?
22    A.  Yes.
23    Q.  Okay.  So, again, we're talking about the
24  risk and analytics platform here?
25    A.  Yes.

1    Q.  Okay.  And the way this is set up, we're
2  talking about improvements to the platform that
3  would have been applicable to both Great -- both
4  Great Plains and Plain Green would have had the
5  benefit of these -- of these improvements; am I
6  right?
7    A.  You know how the underwriting changes are
8  proposed to the tribes and they accept them.  I
9  think I -- I assume that's been discussed before.
10  So just to be -- I mean, I'm sure you know this, but
11  as we developed the improvements that we think could
12  benefit the portfolios, we put together a
13  presentation that goes to the lender, whether it's a
14  bank lender or tribal lender.  They review it, and
15  they ultimately sign off on implementing them.
16    Typically, there's a period of time where
17  the champion challenger, where you test the new
18  versus the old and make sure it's working better,
19  and then based on approval from the lender, again,
20  tribal/bank, that's then flipped as the champion
21  for -- for the product.
22    Q.  Okay.
23    A.  So I -- it's probably clear to you.  I just
24  wanted to make sure that it didn't appear as if we
25  can just roll out new underwriting rules without

UNSEALED

1  partnering with -- with the lenders.
2      Q.  No, I understand that --
3      A.  Okay.  Thank you.
4      Q.  -- you would have -- you know, that the
5  team would come up with changes, and before the
6  changes would be implemented, you would -- you would
7  have to get an approval from the particular tribe.
8  Right?
9      A.  Yes.
10         MR. SCHEFF:  Object to the form.  He's
11  answered the question.
12  BY MR. ACKELSBERG:
13      Q.  So let's move to the regulatory section.
14  "At the Online Lenders Alliance meeting last week
15  the speakers seemed in complete agreement that the
16  regulatory situation had improved for the industry.
17  The impact of the Republicans to block CFPB
18  nominations, in particular, appears to bode well for
19  the industry as a whole."
20      That -- because that, I take it, relates
21  to the -- to the concerns that the CFPB might look
22  more closely at the -- at the short-term lending; is
23  that the --
24         MR. SCHEFF:  Object to the form.
25  BY MR. ACKELSBERG:

1      Q.  I mean,, what about the CP- -- why would --
2  why would Republicans blocking the CFPB nominations
3  be a good thing for the industry?
4      A.  Well, at the time, it wasn't exactly clear
5  how the CFPB was going to be focusing their time, so
6  there was certainly a concern.  I'm a Democrat.  I
7  think that's probably known.  But the concern was
8  that some of the people that were the early staffers
9  for the CFPB were -- that the view was that they
10  were anti-credit, and there was concern that the
11  CFPB would not be a balanced regulatory agency like
12  an FTC but more of an advocacy agency that wouldn't
13  be fair and balanced.  That was the concern at the
14  time.
15      Q.  Okay.
16      A.  And there was some -- some rationale for
17  why that was a concern.
18         MR. ACKELSBERG:  All right.  Let's --
19  let's go to the report, December 14th, 2011.  Here's
20  a stick for you.
21         THE WITNESS:  Oh, thank you.
22         MR. ACKELSBERG:  We're marking TF-PA
23  705357 as Plaintiff's Exhibit -- what number do you
24  have there?
25      A.  286.

1         (Exhibit No. 286 marked.)
2      A.  (Reviews document.)
3      Okay.  I think I've got it.
4  BY MR. ACKELSBERG:
5      Q.  Turn to page 2.  Again, we're at the Great
6  Plains Lending and Plain Green discussion.  There is
7  a -- there's a discussion about APRs.  Do you see
8  that?
9      A.  Yes.
10      Q.  Okay.  So it says -- now, one of the -- one
11  of the characteristics of these products -- and I
12  think it's one of the characteristics that you're
13  most proud of -- is that the longer -- that a repeat
14  customer gets a lower APR.  Right?
15      A.  Right.
16      Q.  And it sounds -- so but the problem is as
17  the APR goes down, revenue goes down, right?
18      A.  Yes.
19         MR. SCHEFF:  Object to the form.
20  BY MR. ACKELSBERG:
21      Q.  And so it sounds like that what -- I don't
22  know whether this would be the product team or --
23  somebody is trying to find that sweet spot where you
24  can give the customer a break but maybe not so much
25  a break that we lose off on revenues.  Did I -- did

1  I just sort of summarize it more or less accurately?
2      A.  I think very much the way we thought about
3  it, that the challenge with the products, as we were
4  launching them, is we were -- we made guesses about
5  what the default rates, how they would reduce over
6  time, and made guesses as to what the APR ought to
7  be appropriate to the customer's sort of default
8  rates going down.  Maybe I should take a second to
9  explain that.
10      What we had found in the past is with a
11  customer, with each progressive payment that we got
12  from a customer, the chance of the default went down
13  and then sort of flat lined at some point over time.
14  So the -- the APR reductions that were initially
15  launched but that were predicated on a -- on an
16  understanding of what we thought that would be,
17  and -- and it was turning out that that wasn't quite
18  exactly the way we thought.  And so there was a
19  discussion of how do we tune that APR reduction
20  strategy so it more closely aligned with the
21  reduction default rates over time.  Hopefully that
22  makes sense.
23      Q.  Sure.  I want to leave the -- the board
24  memos for a moment.  We may -- we may come back to
25  them.  But I'm conscious of the time, and I want to

UNSEALED

1 just have you look at a couple of other documents.
2          MR. ACKELSBERG: 287.
3          (Exhibit No. 287 marked.)
4     A.  And we're -- we're done with these?
5 BY MR. ACKELSBERG:
6     Q.  Well, for the -- just leave it right there.
7 We may -- we may come back.
8     A.  Thank you.
9          (Reviews document.)
10         There's no intermediary e-mail from --
11 because it looks like I'm responding to myself,
12 which seems odd, but -- you're not aware of
13 anything?
14    Q.  Well, let --
15         MR. SCHEFF:  No, I think you've
16 misread it.
17         THE WITNESS:  Oh, thank you.  Thank
18 you.  I saw my name up top.  Okay.  That's from
19 Michelle saying "Exact same items."  Okay.  Thank
20 you.
21    A.  Okay.  I've got it.
22 BY MR. ACKELSBERG:
23    Q.  You've got it.  Okay.
24         So my question to you is, do you remember
25 talking -- now, when we say "Chairman Shotton,"

1 we're talking about the chairman of the
2 Otoe-Missouria tribe, correct?
3     A.  Yes.
4     Q.  Do you remember Chairman Shotton at this --
5 in this time period -- well, first let me -- let me
6 go back a minute and say, this is August of 2013.
7 This is sort of when the ACH crisis was in full
8 bloom; am I right?
9          MR. SCHEFF:  Object to the form and
10 the terminology.
11         You can answer the question.
12    A.  The company was, as the industry as a
13 whole, was struggling for access to ACH providers
14 during this time.
15 BY MR. ACKELSBERG:
16    Q.  Okay.  And as a result, you had been
17 instructed by Victory Park to shut down new
18 customers, right?  Do you remember that?
19         MR. SHAPIRO:  Objection to form;
20 misstating the record.
21 BY MR. ACKELSBERG:
22    Q.  You do remember that, don't you?
23         MR. SHAPIRO:  Same objection.
24         Read that question back, please, if you
25 would, Ms. Reporter.  I want the witness to hear it.

1          COURT REPORTER:  "And as a result, you
2 had been instructed by Victory Park to shut down new
3 customers, right?  Do you remember that?"
4     A.  There were certainly discussions with
5 Victory Park Capital about whether they would
6 purchase participations if there were lingering
7 concerns about the ability to gain access to -- to
8 ACHs.  I can't remember if they ultimately told the
9 tribe they were going to stop making purchases.  I
10 think they continued to make at least some purchase
11 of loan participations, but I don't remember the
12 specific details.  Is that close enough?
13 BY MR. ACKELSBERG:
14    Q.  Well, if they were going to stop purchasing
15 participations, that communication would have been
16 between Victory Park and Think Finance; am I right?
17         MR. SHAPIRO:  Objection to form.
18         MR. SCHEFF:  Object to the form; calls
19 for a conclusion that's not supported by the record.
20         THE WITNESS:  Should I respond?
21         MR. SCHEFF:  You can answer the
22 question, yes, of course.
23    A.  I mean, their primary requirement was to
24 notify the tribe of that.
25 BY MR. ACKELSBERG:

1     Q.  How would they do that?
2     A.  They could do it by communicating with the
3 tribe.
4     Q.  Or by communicating with Think Finance?
5     A.  Yes, they could have communicated with us.
6     Q.  Because you were the -- you were the
7 administrative agent for GPLS, and you were,
8 basically, managing all of the cash flows, right,
9 through -- through your finance department?
10         MR. SCHEFF:  Object to the form; non
11 sequitur with respect to the question.
12    A.  You can -- I mean,, Chris Lutes, I'm sure,
13 will give you a better sense of the cash flows
14 between the various entities and -- and how that
15 operated.  But Victory Park Capital could have
16 notified us or could have notified the tribe
17 correctly.
18 BY MR. ACKELSBERG:
19    Q.  Okay.  So at -- and so just to -- I'm just
20 trying to provide context for this e-mail.  So,
21 presumably, the Otoe-Missouria would have been
22 informed by either Victory Park or by -- by Think
23 Finance that -- that new customers are -- that with
24 regard to -- to future purchase of loan
25 participations, Victory Park was basically saying

UNSEALED

1  we're not going to purchase participations for new
2  customers at this --
3      A.  I don't --
4          MR. SCHEFF:  Just wait until he
5  finishes his question.
6  BY MR. ACKELSBERG:
7      Q.  -- at this point in time?
8      A.  I don't remember that.  This speaks to a
9  volume reduction --
10     Q.  Okay.
11     A.  -- due to concerns about ACH.  And, like I
12 said, I can't speak to exactly what the decisions
13 were, but I do remember the concern about ACH, and I
14 do remember a concern about whether the portfolio
15 should continue to grow while there -- this -- this
16 concern was in place.
17     Q.  All right.  So -- and thank you for the
18 correction.
19         And is it your recollection that maybe
20 earlier in August it was them slowing down the
21 volume, but at some point, there -- there was a
22 shutdown of new customers?
23         MR. SHAPIRO:  Objection to form.
24         MR. SCHEFF:  Object to the form.
25 BY MR. ACKELSBERG:

1      Q.  Am I right?
2          MR. SHAPIRO:  Wait.  Wait a minute.
3  Who's "them" in that question?
4  BY MR. ACKELSBERG:
5      Q.  At some point, Great Plains Lending, Plain
6  Green and Mobiloans stopped making loans to new
7  customers; am I right?
8      A.  I don't remember that there was a complete
9  cessation of new customer originations at any point
10 in time.  That might have been the case, but I
11 thought there was always at least some limited
12 provision of credit to new customers.  I'm sure it
13 was -- the volumes I remember at -- at least one
14 point in time were -- were constrained due to this
15 concern about the ACH.  But I don't think it was
16 ever stopped, and I -- but I don't remember the
17 details, but that's -- that's my memory.
18     Q.  And do you remember discussing during this
19 time period when volumes at least were slowing down,
20 the tribe's concern that you were pushing business
21 to RISE, you were redirecting new customers to RISE?
22 Do you remember that coming up in the conversation
23 with the Otoe-Missouria?
24     A.  I actually don't remember that.  I mean,,
25 it's -- clearly, that was -- that was something that

1  was happening here.  Whether that was the chairman
2  having that concern or whether that was just Mark
3  Curry having that concern, I -- I can't speak to it.
4      Q.  Well, I -- all right.  Putting aside
5  whether your conversations were with the chairman or
6  with Mark Curry, you do remember that the
7  Otoe-Missouria expressing their concern that Think
8  Finance was redirecting customers to the RISE
9  product rather than the tribal product?
10         MR. SCHEFF:  Objection; asked and
11 answered.
12         You can answer it again.
13     A.  Yeah, I don't remember the Otoe-Missouria
14 raising this.  I remember Mark Curry and his team
15 raising this as a concern but -- in fact, I don't
16 know that I communicated directly with -- with
17 Chairman Shotten.  I imagine that would have been
18 the relationship management team.  But I -- I
19 always -- I thought we had -- and by "we," I really
20 mean the relationship management team had a terrific
21 relationship with Chairman Shotten and the team on
22 the ground.  Mark Curry was not always such a great
23 relationship.
24 BY MR. ACKELSBERG:
25     Q.  Why is that?

1      A.  Mark is a difficult and demanding business
2  person, and, you know, this, I think, is an example
3  of that.  He's raising an issue that was just not
4  true based on speculation and sort of a contrary
5  personality.  And I -- I don't think I'm overstating
6  that.  He's -- you know, he's a very successful
7  business person, but he, in this case, thought that
8  there was something duplicitous going on that just
9  wasn't in any way correct.
10     Q.  Okay.  But it was true that there was -- at
11 the same time that you were pulling back, that --
12 that the tribal products were pulling back with
13 regard to new customers, that you were expanding the
14 RISE product?
15         MR. SCHEFF:  Object to the form.
16         You can answer.
17 BY MR. ACKELSBERG:
18     Q.  Those two things were happening at the same
19 time; am I right?
20     A.  Yes, we were continuing to -- to grow RISE
21 because that was something in our control as opposed
22 to something that -- you know, that Victory Park
23 Capital was suggesting that they had -- had -- you
24 know, that they were questioning the concerns about
25 the ACH issue.  But what he was saying was we're

UNSEALED

1 redirecting customers to RISE, which is absolutely
2 not true.
3     Q. Okay. So -- but you did mention --
4     A. I mean, -- I'm sorry, just to -- that's
5 what he was frustrated about, is not that RISE was
6 growing, but he thought we were taking customers
7 that should have rightfully been the tribes and
8 redirecting them. He was just wrong about that.
9     Q. So you mentioned that the relations with
10 Mark Curry on the Great Plains Lending side were a
11 little strained at times. How were the relations
12 with the Tunica-Biloxi?
13         MR. SCHEFF: Object to the form;
14 misstates the testimony.
15     You can answer the question.
16     A. The Tunica-Biloxi, I mean,, each -- each of
17 the tribal partners had -- you know, they were
18 different to deal with. There were certain benefits
19 of working with the Tunica-Biloxi. In particular,
20 their chairman at the time -- actually, a really
21 interesting guy and -- and interested in really
22 pushing us to drive down the rates, which I found
23 very refreshing. I think he was very much a
24 consumer advocate. So there was a lot of positives
25 with working with him. We liked the product. But

1 the -- the council, as far as I could tell, did have
2 some concerns, and so it made our interactions with
3 the tribal council sometimes -- you know, there was
4 some conflicts there.
5 BY MR. ACKELSBERG:
6     Q. So just to be -- to be clear, so -- and I
7 want to just get the personalities straight.
8     A. Yeah.
9     Q. So the Mobiloans had some staff, had -- had
10 executives. One of them was, I think, someone named
11 Kim Palermo. Do you remember Kim?
12     A. I vaguely remember Kim. I remember the
13 name. I don't know if I met her.
14     Q. But the tribal council would have been
15 Marshall? Is that -- I'm just trying to understand
16 where the problems were.
17     A. Yeah, so -- of the people we met with, we
18 had very good relationships, but there was one
19 member, her name was Brenda. I don't remember what
20 her last name is, but she was -- she was difficult
21 to deal with.
22     Q. Did she think that -- was she expressing
23 concerns that the tribe was not being treated fairly
24 by Think Finance?
25     A. She said that she thought that there was

1 risk in the program to the tribe and that she didn't
2 think the lending program made sense for the tribe.
3 The other members of the council were supportive,
4 but it led to, on occasion, you know, challenging
5 interactions because she was very negative to the
6 program and vocal on that.
7         MR. ACKELSBERG: Let's look at another
8 exhibit.
9         MR. SCHEFF: Irv, after this document,
10 let's take a little break. We have been going for a
11 little more than an hour.
12         MR. ACKELSBERG: Okay. This is 288.
13     (Exhibit No. 288 marked.)
14     A. (Reviews document.)
15     Yes.
16 BY MR. ACKELSBERG:
17     Q. So your -- I'm not sure who you're --
18 you're interacting with Michelle Curtis at RLJ
19 Companies. Do you see that?
20     A. She's Bob Johnson's assistant.
21     Q. Okay. Now, at this point -- I think at
22 this point Think Finance already acquired RJL. Am I
23 right?
24     A. No. RJL (sic) was a separate entity. RJL,
25 actually, was the -- RJL is the holding company of

1 Bob Johnson's various investments. We bought one of
2 his investment companies. I think what's became
3 MySalaryLine. I may not be getting that exactly
4 right. But Bob Johnson still had RLJ Companies. I
5 think he still does. And Michelle was the person
6 who would take -- he doesn't read his own e-mails,
7 so she would take the e-mails and print them out and
8 hand them to him.
9     Q. Okay. And -- and Bob Johnson was the one
10 that had originally connected Think Finance to the
11 Tunica-Biloxi; am I right?
12     A. Yeah, I don't remember how he had a
13 relationship with them, but he -- he did have some
14 sort of a relationship and thought that they might
15 be a good -- good partner for the program.
16     Q. Okay. And so you're saying to Michelle,
17 this is September 26, 2013, "We are near the point
18 of terminating our relationship with Tunica-Biloxi.
19 They've been extremely difficult to work with." Do
20 you see that? "If we don't complete the deal, it
21 will not be the worst thing in the world." Do you
22 see that?
23         MR. SCHEFF: Why don't you finish
24 reading the rest of the e-mail so he has got the
25 whole thing, Irv?

UNSEALED

1 BY MR. ACKELSBERG:
2    Q.   Do you see that?
3    A.   And as it says, "We are working in good
4 faith, but they are requesting acceptable changes."
5    Q.   What kind of changes were they asking?
6    A.   I actually don't remember what it was.  I
7 don't know if it was financial deal terms or
8 structural deal terms.
9    Q.   And you do remember, though, that there was
10 some strained relationships with -- as you said --
11   A.   As I mentioned, yes.
12   Q.   -- with the tribe, with the Tunica-Biloxi?
13   A.   Yeah.
14   Q.   Okay.  And what about --
15        MR. SCHEFF:  Let's take --
16        MR. ACKELSBERG:  Can I just do one
17 more, please, real quick?
18        MR. SCHEFF:  One more what?
19        MR. ACKELSBERG:  One more exhibit and
20 then --
21        MR. SCHEFF:  No.  Let's take a break.
22 We've been going more than an hour.  It's late in
23 the day.
24        MR. ACKELSBERG:  Okay.
25        THE VIDEOGRAPHER:  We are off the

1 record.  The time is 5:01 p.m.
2        (Break taken, 5:01 p.m. to 5:13 p.m.)
3        (Exhibit No. 289 marked.)
4        THE VIDEOGRAPHER:  We are back on the
5 record.  The time is 5:13 p.m.
6 BY MR. ACKELSBERG:
7    Q.   So before we get to the document -- this is
8 289.
9    A.   289.
10   Q.   Before we get to the document, just -- we
11 haven't talked about Plain Green and how the
12 relations were with Plain Green, better or -- I
13 mean,, so --
14   A.   You know, each -- each had their -- their
15 pros and cons.  I don't know that I can say better
16 or worse.  At different periods of time --
17   Q.   Was it a difficult relation --
18   A.   -- one was more strained than other ones.
19   Q.   -- or was it a strained relation?  A good
20 relation?
21   A.   I would say, generally speaking, it was a
22 very good -- good relationship.  I mean,,
23 ultimately, it ended up eroding to a point where
24 they terminated the relationship and -- and did
25 their own loan program.  And, you know, that was

1 something that they had -- they had the right to do.
2 But while I was interacting with them, I always
3 thought that they were very, very appreciative of
4 the economic benefit that the program had to
5 their -- to their tribe.
6    Q.   Do you know what happened?  I mean,, what
7 were the -- what was the deal breakers?  What -- why
8 did -- what triggered the separation?
9    A.   I really don't know.  That was really -- my
10 recollection is that was after I had exited even the
11 board of -- of Think Finance at that time.  I was --
12 I was aware that this had happened and disappointed,
13 but I don't remember the specifics.
14   Q.   You never heard any backstory about what --
15 why it fell apart?
16   A.   I mean,, it was thirdhand.  So I -- that's
17 why I didn't -- I said I don't know the specifics.
18 I had heard that the bank -- or, excuse me -- that
19 the tribe wanted a greater share of the economics
20 coming out of the business, and I had also heard
21 that there was ongoing negotiations to make that
22 happen.  I don't know exactly what led to the
23 termination of that relationship because it did seem
24 like it was based on a pretty good foundation.
25   Q.   Have you also heard that some former

1 employees of Think Finance are now working for Plain
2 Green?
3    A.   Yes.
4    Q.   And who are the ones you heard are there?
5    A.   I think the person in treasury that we
6 mentioned, Badr, I believe.
7    Q.   B-a-d-r, Badr?
8    A.   Yeah.  I think it's pronounced "butter" for
9 some reason.
10        And I think more recently one of the --
11 another people -- a person in finance.
12   Q.   Linda Callnin?
13   A.   Linda Callnin.  It was one of the Lindas.
14   Q.   L1.
15   A.   L1.  L1 had joined them.  I don't know of
16 anyone else.  There may be others, though.
17   Q.   Where's Michelle Nguyen these days?
18   A.   Michelle Nguyen is working for another
19 online lender.
20   Q.   Which one?
21   A.   I think they go by the name of either RSVP
22 or VIP.  I don't know much about them.  It was
23 just -- it was set up by a former employee of the
24 company.
25   Q.   Which employee?

UNSEALED

App. 0100

1    A.  A guy named Kevin Dahlstrom.
2    Q.  He was your marketing guy, wasn't he?
3    A.  He was the chief marketing officer,
4  correct.
5    Q.  And is that product live?
6    A.  I think it is.  I literally don't know
7  anything about the size of the portfolio, what the
8  products are, but I believe that it is live.
9    Q.  Do you -- do you know the label name, the
10  website name?
11    A.  I don't.
12    Q.  And so Kevin sort of set up a company doing
13  what Think Finance used to do, providing services to
14  tribal lenders?
15    A.  I really don't know whether he's a direct
16  lender or licenses technology in some point, whether
17  they work with banks or tribes.  I just don't know.
18    Q.  Is he based here in Fort Worth?
19    A.  I think that that operation is out of
20  Dallas.
21    Q.  Do you know what tribe they're partnered
22  with?
23    A.  I don't know that they're partnered with a
24  tribe at all.
25    Q.  Well, who's the lender?  Do you know?

1    A.  They may be a direct lender.  Actually, if
2  I had to -- you know, my understanding, because I
3  really haven't asked, I mean,, I -- it's -- well, I
4  just haven't asked.  So my thought, they were a
5  direct lender, rightly or wrongly.
6    Q.  Okay.  So if we go to the exhibit, maybe
7  you can just explain to us what's going on here.
8        MR. SCHEFF:  I'm sorry, is there a --
9    explain what's going on?
10        All right.  To the extent that you can
11  answer that question, go ahead.
12    A.  I would be glad to.
13        So this is actually something that as we
14  were, you know, watching the tribal programs evolve
15  and grow, one of the challenges was getting
16  employment on the reservation to support those --
17  those tribes.  And we thought it made more sense,
18  and certainly supported what the reservation was
19  trying to do, to have the employment for the tribal
20  lending businesses be tribal members.  It wasn't a
21  requirement.
22        They could have hired outsiders.  And,
23  obviously, as you mentioned, Plain Green did for
24  their program because there weren't tribal members
25  to support the tribal program.  But we thought it

1  only made sense as sort of part of what we thought
2  we were doing with tribes.  I mean,, I have to say,
3  it was part of what we had some pride in was
4  providing economic benefits to the tribe.
5        So what we saw, as when we were providing
6  just in skills training, it wasn't enough.  We were
7  seeing a lot of turnover in basic stuff, like,
8  showing up to work for time -- you know, on time.
9  There was a, you know, just basic sort of more --
10  you know, how you -- it's almost mindset training,
11  if you will, how to think about a job and how to
12  interact with that job was what was hard.
13        So it -- I recognize in saying it needs to
14  be more like a prison program or programs for
15  addicts sounds terrible.  What I was trying to get
16  at is the training we provide and the training we
17  support needs to be more than just the skills of the
18  job.  It needs to be more broad-based, how to be an
19  effective member of the workforce and how to
20  contribute to the growth of the business.  And we
21  hoped that would be above and beyond what happened
22  specifically with this program.
23  BY MR. ACKELSBERG:
24    Q.  And you were talking mainly about -- about
25  the call center employees, right?

1    A.  Mainly about the call center, but it would
2  have been anybody.  We, actually, at one point in
3  time were -- as actually it mentions here, we had an
4  idea that, you know, we could provide sort of a
5  program through the local college that anybody in
6  the reservation could use, and whether they were
7  ultimately hired by the tribe or just used those
8  skills to find other work or do other things on or
9  off the reservation, that was sort of part of our
10  what we think -- thought was our commitment to, you
11  know, the tribal partners that we worked with.
12    Q.  But you discovered that was sort of more
13  challenging than you thought at conception?
14    A.  Yeah, I mean, it's just a lot of work to
15  set that up.  And so we did expand -- and I don't --
16  I mean, this was something that was primarily around
17  the jobs that the -- that the tribal lender had
18  established for customer support.  I think there
19  were some -- you know, there was some accounting, I
20  think.
21        I can't speak to the full suite of jobs
22  that they -- that they had as part of the managing
23  the program, but there was, you know, definitely the
24  skills program that was managed by our training
25  staff that worked with third parties and helped

UNSEALED

1   bring them up to speed but also this idea of what
2   more can we do.
3       Q.  Now, I just want to switch topics for a
4   second.  I've noticed in some of the discovery
5   documents some tension between listing the tribal
6   products as Think Finance products or they're not
7   our products or they are our products.  Do you
8   remember that -- that -- you're nodding your head,
9   so I think you -- you remember those sort of issues
10  being discussed within the company?
11      A.  Yeah.
12       MR. ACKELSBERG:  I just want to show
13  you a document along that line.
14       (Exhibit Nos. 290 & 291 marked.)
15  BY MR. ACKELSBERG:
16      Q.  So there's 290, and here's 291.
17       MR. SCHEFF:  Is this attached to
18  anything?  This is not even --
19       MR. ACKELSBERG:  No, this is -- this
20  is from the complaint.
21       MR. SCHEFF:  Okay.  Thank you.
22      A.  So this is the LinkedIn page for Think
23  Finance.
24       MR. ACKELSBERG:  That we attached to
25  the -- this was attached to the --

1       MR. SCHEFF:  I understand.  I see it.
2   Thank you.
3       MR. ACKELSBERG:  -- to the complaint
4   in this action.
5      A.  (Reviews document.)
6      Yes.
7       MR. SHELDON:  Just one second.
8       MR. ACKELSBERG:  Sure.
9       MR. SHELDON:  It's two exhibits.  I
10  would like to read them first, please.
11       Thank you.
12  BY MR. ACKELSBERG:
13      Q.  So early on in the -- with the tribal
14  products, there were -- there were times when Think
15  would refer to the tribal products as Think Finance
16  products, agreed?
17       MR. SCHEFF:  Object to the form.
18      A.  Yes.
19  BY MR. ACKELSBERG:
20      Q.  Okay.  And then over time, the -- it
21  appears that there was a discipline sort of
22  developed within the -- in the company to stop doing
23  that; would that be fair?
24      A.  Well, there was a lot of confusion that
25  still lingers.  I'm sure you've read the S1 filing

1   when we went public, we still had to do a lot of
2   sort of, in my mind, excessive explaining about when
3   we refer to our products, our products that -- that
4   utilize our technology platform, some that we are
5   the direct originator of and some that there is a --
6   in the case of the -- of the filings, there is a
7   third-party bank that originates.  So it's just sort
8   of complicated to explain it.
9       From, you know, the internal point of
10  view, you know, we were all on the same -- you know,
11  we're -- we're doing what we can to help our
12  partners be successful, and we feel a lot of pride
13  in the way the products are serving customers.  And
14  I think we all think of them, you know, as -- as,
15  you know, the stuff we are committed to being
16  successful with.
17       But it's -- that has been the challenge,
18  as how to communicate in a crisp way the products
19  that are supported by the platform without being
20  misleading, as in this case, where the reporter
21  thought we actually operated the -- the product
22  Plain Green.
23      Q.  Well, you did operate it, didn't you?
24       MR. SCHEFF:  Object to the form.
25       MR. SHELDON:  Object to form.

1  BY MR. ACKELSBERG:
2      Q.  I'm not saying that you -- you were the
3  lender, but don't you agree, that in -- I mean, what
4  do you mean -- what do you mean that you didn't
5  operate the program?
6       MR. SCHEFF:  Object to the form.
7      A.  Well, actually, I mean, --
8  BY MR. ACKELSBERG:
9      Q.  What do you -- what do you mean?
10      A.  So, I mean, for instance, there was --
11  there was none of customer support staff.  It wasn't
12  our collection staff.  We were providing key
13  components of it, but that's very different from
14  operating all the decisions on, you know, the
15  marketing, the -- the underwriting, the -- the way
16  that the policies and procedures were followed was
17  ultimately what the tribal lenders were doing.  So I
18  think the term "we were operating Plain Green" would
19  have been misleading and -- inaccurate.
20      Q.  Okay.  One of the things that you did as --
21  as CEO was to take responsibility for some of the
22  external messaging; am I right?
23      A.  Yes.
24      Q.  I mean,, we looked, for example, at --
25  there was one board memo that we saw where you had

UNSEALED

1  an op-ed, and it was an op-ed in Fox Business
2  something-or-another --
3      A. Yes.
4      Q. -- and you shared with the board. And
5  so -- right? You remember that?
6      A. Yes.
7      Q. Okay. And so would you agree that you were
8  periodically either scoping out potential op-eds
9  or -- or constructing sort of message -- messaging
10 statements for the company with regard to the tribal
11 lending business?
12         MR. SCHEFF: Object to the form.
13     You can answer the question.
14     A. I mean,, yes, to the business of -- of
15 Elevate, as a whole.
16         MR. SCHEFF: Not as to Elevate. We're
17 talking about Think Finance.
18         THE WITNESS: Oh, gosh. Thank you.
19 BY MR. ACKELSBERG:
20     Q. That's all right. I knew you meant Think
21 Finance.
22     A. So to your -- to your question, yes, I was
23 thinking about op-eds really in a broad set of, you
24 know, topics related to the business of Think
25 Finance.

1          MR. ACKELSBERG: All right. So I am
2  going to show you a document, P-293.
3          MR. SCHEFF: P-292.
4          MR. ACKELSBERG: Oh, you're right.
5          (Exhibit No. 292 marked.)
6          MR. ACKELSBERG: For the record, I
7  believe this is a stand-alone document. The
8  metadata says that the author is Ken Rees,
9  custodian, Ken Rees, and assigns a date of
10 January 23, 2012, to this document.
11     A. (Reviews document.)
12         I'm sorry, is there -- there's no date on
13 this?
14 BY MR. ACKELSBERG:
15     Q. Yeah, I'm sorry, I said it before.
16     A. Can you tell me that?
17     Q. Sure.
18     A. Okay.
19     Q. So there's no date, obviously, on the
20 document. What the metadata --
21     A. The metadata suggests.
22     Q. -- states a date created of January 23,
23 2012.
24     A. '12. Thank you.
25         (Reviews document.)

1          Last page. Okay. Thank you.
2      Q. So this document, which you entitled
3  "Tribal Lending Holding Statement" --
4      A. I know the metadata says that -- that I
5  originated it. I actually don't remember that I
6  originate- -- I may have edited it or it may have
7  been provided to me with -- you know, it may have
8  started with something that I wrote and kept the --
9  you know, my meta tag on it. I, sort of generally
10 speaking, remember when documents like this were
11 created. But just for the record, I don't know that
12 I created this in whole cloth.
13     Q. Okay. And I appreciate that. I mean,, but
14 you -- you were involved in some fashion with
15 constructing this document or documents like it?
16     A. Yes.
17         MR. SCHEFF: Object to the form.
18 BY MR. ACKELSBERG:
19     Q. Okay. So you see, for example, in No. 3,
20 it looks like you were -- you or the group that was
21 working on this document anticipated some ambiguity
22 about whose product these labels were, right --
23         MR. SCHEFF: Object to the form.
24 BY MR. ACKELSBERG:
25     Q. -- along the lines that we were just

1  talking about?
2          MR. SCHEFF: Object to the form.
3      You can answer the question.
4      A. I'm sorry.
5  BY MR. ACKELSBERG:
6      Q. It looks like you anticipated some
7  confusion in the external world with regard to
8  whether these were Think Finance products or tribal
9  products or -- right?
10     A. Right.
11     Q. And that's what --
12         MR. SCHEFF: Object to the form.
13 BY MR. ACKELSBERG:
14     Q. And so what you're doing here is you or the
15 group that is working on this is trying to formulate
16 a way of talking about that?
17     A. Yes.
18     Q. Yeah?
19     A. Yes.
20     Q. Okay. And then No. 4, the question -- and
21 these are questions, essentially, you're asking
22 yourself. And by "you," I mean,, you and maybe the
23 group that was working on this or --
24     A. So if you --
25         MR. SCHEFF: Hold on. Can you -- let

UNSEALED

1   him ask the question.  He hasn't asked a question.
2   BY MR. ACKELSBERG:
3       Q.  You can clarify if you need some --
4           MR. SCHEFF:  Well, there's nothing to
5   clarify.  You need to ask a question.
6   BY MR. ACKELSBERG:
7       Q.  If you need -- if you need to clarify a
8   previous answer -- as I told you in the beginning, I
9   want you to give you the opportunity to do that, and
10  I think you are trying to do that before your lawyer
11  interrupted you.  So I'll give you the chance to do
12  that now.
13          MR. SCHEFF:  Were you trying to
14  clarify, or -- or what were you doing?
15          THE WITNESS:  I was trying to clarify
16  what this document was.
17          MR. SCHEFF:  Okay.  Then go ahead.
18      A.  Because I don't know if it's clear what a
19  holding statement is.
20  BY MR. ACKELSBERG:
21      Q.  Okay.  What is a holding statement?
22      A.  Our -- you know, it's sort of PR firms know
23  that a -- there could get questions, and it could be
24  an article, maybe it's a controversial article or
25  just somebody that's trying to understand about the

1   business.  And they like crisp answers so they're
2   not trying to -- when a journalist is on deadline
3   trying to communicate stuff that they don't really
4   know how to communicate, so this was an -- I don't
5   remember exactly this, but this and other things
6   have been written and evolved over the years related
7   to helping the PR team be able to sort of succinctly
8   answer questions that come their way.  So just --
9   that may be clear already, but I wanted to specify
10  what I think this document is for.
11      Q.  Well, look at -- if you look at -- let's
12  look at No. 8, "Where does the money that the tribes
13  lend come from?"  And --
14      A.  Yes.
15      Q.  So I take it your -- that the response,
16  that this one line responds to that?
17      A.  Yeah, it's not actually accurate, just for
18  the -- for the record.
19      Q.  What's not accurate?
20      A.  Well, because, in general, the -- the
21  lending -- where the money that the tribes lend
22  comes from, there's also these participation
23  agreements that help support the growth of the
24  business.
25      Q.  Right.  So this is somewhat of an

1   incomplete statement?
2       A.  Some -- some shorthand for purposes of
3   journalists asking questions.  That would have been
4   for -- obviously, this wouldn't be used for legal
5   inquiries, for instance.
6       Q.  Okay.  And what about No. 9, "Who owns the
7   loan and who assumes the credit risk, Think or
8   tribal partner?"  Your -- the answer it looks like
9   you came up with or you and the PR people came up
10  with was --
11          MR. SCHEFF:  Object to the form;
12  misstates the testimony.
13      A.  As I -- as I said, I'm not -- I'm not sure
14  if I wrote this.  But, clearly, there was a vetting
15  process that was going on that -- where the other
16  executives looked at this and said they either
17  agreed or disagreed.  And I think Chris thought that
18  there needed to be -- this needed to be enhanced.  I
19  don't know where it ended up.
20  BY MR. ACKELSBERG:
21      Q.  Well, I mean, what Chris is essentially
22  saying is that the answer that the group came up
23  with isn't -- isn't true, right?  Isn't that what
24  he's saying?
25          MR. SCHEFF:  Object to the form; the

1   document speaks for itself.  You had the opportunity
2   to ask Mr. Lutes about what he meant, and you never
3   did so.  So don't ask him to do so.
4   BY MR. ACKELSBERG:
5       Q.  So do you see where it says, "The tribes
6   originate the loans and assume the credit risk for
7   them"?  And I think we talked earlier that the bulk
8   of the credit risk is actually assumed by Think
9   Finance through its guarantee supply to GPLS.
10  Right?
11          MR. SCHEFF:  Object to the form.
12  You can answer the question.
13      A.  So if you're asking my perception on this
14  specific, I would say that the tribes originate the
15  loans is correct.  I would say that they assume the
16  credit risk on the parts of the loans that are not
17  participated out.
18  BY MR. ACKELSBERG:
19      Q.  The 1 percent?
20      A.  And -- well, and, actually, just to be
21  clear, on the loans that they originate that, for
22  one reason or another, wouldn't be participated out,
23  they would assume that in perpetuity.  And then for
24  any that are participated out, they would keep that,
25  the, in the case of the early days, 1 percent.  And

UNSEALED

1  I believe there was ongoing discussions that led to
2  the expansion of the -- of the tribe's ownership
3  levels.
4       So this was -- I think the reason why the
5  PR team probably originally wrote this is it
6  is correct, per se, but not a full response.  So I
7  think that's why Chris raised it.  I'm sorry, I'm
8  speculating.
9       Q.  Number 14, it says --
10           MR. SCHEFF:  You're objecting to your
11  own answer.
12  BY MR. ACKELSBERG:
13      Q.  Number 14 --
14      A.  Yes.
15      Q.  -- it says, "Does Think Finance help with
16  the collections process when customers default?"
17  And you say, "Other than providing the" -- you or
18  the authors answer that question, "Other than
19  providing the technology platform that is used for
20  collections, Think Finance does not provide
21  collection services."
22       Now, that's not entirely correct, is it?
23      A.  I would have said I thought it was correct.
24  So I'm maybe missing a subtlety, but I thought this
25  would be an accurate statement.

1       Q.  Well, do you remember Gio Rodriguez?  Do
2  you remember his work at monitoring the collections
3  pro- -- you had -- there were -- there were all
4  these outsourced?  Do you remember the -- there
5  was --
6           MR. SCHEFF:  What time frame,
7  Mr. Ackelsberg?  This is January '12.
8  BY MR. ACKELSBERG:
9       Q.  So do you remember -- do you remember there
10  was CMS and Buffalo?  There was Yessio.  There
11  was -- there was K2 in Honduras.  There was -- there
12  was another outsource collection agency in -- in
13  Mexico, and -- and there were Think Finance staff
14  that were assigned to monitor the performance of all
15  of these various collection call centers.  Am I
16  right?
17           MR. SCHEFF:  Object to the form.
18       Unpack that however you choose to answer
19  the question.
20           THE WITNESS:  Thank you.
21       A.  So you used a lot of names.  I know some of
22  those names.  Gio Rodriguez, I don't know what that
23  is.  You know, the collections activities and all
24  that was not something I was particularly close to.
25  But I do think this is still an accurate, "Think

1  Finance does not provide collection services."  I
2  know that we were providing sort of monitoring and
3  quality assurance or services to the tribe in sort
4  of overseeing that collections, but I don't view
5  that as collection services, per se.  I think I view
6  that as a quality.
7  BY MR. ACKELSBERG:
8       Q.  So you were overseeing --
9           MR. SCHEFF:  Irv, you're at five
10  minutes.
11  BY MR. ACKELSBERG:
12       Q.  So you were overseeing and monitoring and
13  assessing the collection services on behalf of the
14  tribes --
15       A.  Just to respond to that --
16       Q.  -- but not doing --
17           MR. SCHEFF:  Hold on.
18  BY MR. ACKELSBERG:
19       Q.  -- but not doing the collections -- but not
20  doing the collections work directly yourself; that's
21  what you're saying?
22       A.  I guess --
23           MR. SCHEFF:  Object to the form.
24       You can answer the question.
25       A.  Unpack that a little bit because you used

1  "overseeing."  I think you had a few words.  The
2  overseeing, I wouldn't say that we were overseeing.
3  I would say that we were providing monitoring
4  services to the tribe, that they had the contract
5  with the collections providers.  And, you know,
6  we -- we provided certainly advisory support to the
7  tribes, but I guess the -- I wouldn't characterize
8  it as our team was overseeing the collections
9  activities.
10  BY MR. ACKELSBERG:
11       Q.  Your team was overseeing the debt sales,
12  though, weren't they?
13           MR. SCHEFF:  Object to the form.
14       You can answer the question if you can.
15       A.  And, I'm sorry, this is not an area that I
16  have a whole lot of specificity in.  I thought there
17  was a third party that was managing the debt sales
18  for -- for all of the lending arms, including our
19  direct lending arms.
20  BY MR. ACKELSBERG:
21       Q.  You're talking about Brett Horrocks --
22       A.  Yes, I thought he --
23       Q.  -- SourceItOne?
24       A.  -- was the one who was sort of determining
25  all of the management of the debt sales.

UNSEALED

1    Q.  Didn't we just look at board reports where
2  you were talking -- or kind of bragging about the
3  automation of the debt sale process?
4         MR. SCHEFF:  Object to the form;
5  mischaracterizes the document.
6         You can answer the question if you can.
7    A.  I think actually what I was talking about
8  was the fact that we put in place requirements that
9  when the debt was sold, that it could be resold, and
10  there was ongoing monitor- -- monitoring to ensure,
11  you know, adherence to FDCPA and other customer
12  support, you know, best practices.
13  BY MR. ACKELSBERG:
14    Q.  All right.  Let's --
15    A.  So I don't -- I don't remember talking
16  about the automation of that.
17    Q.  Look at No. 15, "Some people say that
18  payday lenders are essentially renting a tribe to
19  escape state regulation.  What is your response to
20  that claim?"  And do you see your response to that?
21    A.  Yes.
22    Q.  Might the revenue share be looked at by
23  some as a rental payment to the tribe?
24         MR. SCHEFF:  Object to the form; calls
25  for speculation.  Who knows who these other people

1  are?
2         You can answer the question if you can.
3  BY MR. ACKELSBERG:
4    Q.  Like, maybe an attorney general?
5         MR. SCHEFF:  Well, then the attorney
6  general can testify to that, Irv.  Don't ask him to
7  get in the mind of the attorney general.  Ask him a
8  proper question, and he'll answer it.
9  BY MR. ACKELSBERG:
10    Q.  You can answer the question.
11         MR. SCHEFF:  Answer if you can.
12    A.  I mean, I didn't say that the -- the
13  question is can they -- you know, what's your
14  response to -- to the claim that the payday lender
15  are essentially renting a tribe?  I think the
16  response is right, we thought the tribal lenders,
17  and I -- frankly, I still do, were overseeing and
18  managing the program as appropriate for -- for
19  lenders and not dissimilar from the way that banks
20  work with third parties.  So I -- I guess I don't
21  see anything wrong with the text that's written
22  there.  I think it's accurate.
23  BY MR. ACKELSBERG:
24    Q.  Number 19, "Do tribal lending operations
25  take place on tribal land?"  Now, we know there was

1  a -- we know there was -- there was at some point
2  customer service -- well, let me -- there was never
3  a customer -- well, let's just say there were
4  customer service seats with tribal -- with tribal
5  members sitting in them at the three tribes,
6  correct?
7    A.  Correct.
8    Q.  Okay.  And, eventually, there were -- well,
9  at various points there were tribal employees --
10  employees of the -- of the tribal lending companies,
11  right?
12    A.  Yes.
13    Q.  Okay.  But the question seems to say where
14  is all the activity related to the tribal products
15  taking place, right?  That's kind of what you're --
16         MR. SCHEFF:  Hold up.
17  BY MR. ACKELSBERG:
18    Q.  Do you see that?
19         MR. SCHEFF:  Objection; the document
20  speaks for itself.
21         You can answer the question.
22         And you're at seven hours, Irv.
23         You can finish his question.
24    A.  I guess I would -- I do think the question
25  speaks for itself.

1         MR. ACKELSBERG:  Okay.  No further
2  questions.
3         MR. SHAPIRO:  Christy, Gus, and
4  questions for Ken?  No.
5         Patrick?
6         MR. DAUGHERTY:  No.
7         MR. SHAPIRO:  No questions.
8         MR. SCHEFF:  No questions?
9         MR. SHELDON:  No questions.
10         MR. SCHEFF:  No questions.
11         Thank you, Mr. Rees.
12         MR. SHELDON:  Off the record.
13         THE VIDEOGRAPHER:  We are off the
14  record.  The time is 5:46 p.m.
15         (Deposition concluded at 5:46 p.m.)
16
17
18
19
20
21
22
23
24
25

UNSEALED

## Page 345

1    CHANGES AND SIGNATURE
2    KENNETH REES  MAY 8, 2018
3    Reason Codes: (1) to clarify the record; (2) to
4    conform to the facts; (3) to correct a transcription
5    error; (4) other (please explain)
6    PAGE  LINE     CHANGE        REASON
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

## Page 346

1            SIGNATURE
2
3        I, KENNETH REES, have read the
4    foregoing deposition, or have had it read to me, and
5    hereby affix my signature that same is true and
6    correct, except as noted above.
7
8        _____
9        KENNETH REES
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 347

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
COMMONWEALTH OF PENNSYLVANIA  *
3    BY ATTORNEY GENERAL JOSH    *
     SHAPIRO,                   *
4        Plaintiff,             *
                               *
5    VS.              * Civil Action
                    * No. 14-7139-JCJ
6    THINK FINANCE, INC., et al., *
         Defendants.            *
7
         REPORTER'S CERTIFICATION
8        DEPOSITION OF KENNETH REES
           MAY 8, 2018
9
10       I, CHRISTY R. SIEVERT, CSR, RPR, in
11   and for the State of Texas, hereby certify to the
12   following:
13       That the witness, KENNETH REES, was duly
14   sworn by the officer and that the transcript of the
15   oral deposition is a true record of the testimony
16   given by the witness;
17       I further certify that the signature of
18   the deponent was requested by the deponent or a
19   party and is to be returned within 30 days from date
20   of receipt of the transcript.  If returned, the
21   attached Changes and Signature Page contains any
22   changes and the reasons therefor;
23       I further certify that I am neither
24   counsel for, related to, nor employed by any of the
25   parties or attorneys in the action in which this

## Page 348

1    proceeding was taken, and further that I am not
2    financially or otherwise interested in the outcome
3    of the action.
4        Subscribed and sworn to on this the 15th
5    day of May, 2018.
6
7
8
9        _____
         CHRISTY R. SIEVERT, CSR, RPR
         Texas CSR 8172
10       Expiration Date:  12/31/2018
         Huseby, Inc.
11       Firm No. 660
         7000 North Mopac Freeway
12       2nd Floor
         Austin, Texas  78731
13       (512) 687-0421 (tel)
14
15
16
17
18
19
20
21
22
23
24
25

87  (Pages 345 to 348)

UNSEALED

App. 0107

**A**

███████ 139:15

**a.m** 1:19 7:3
50:15,16,16,18
104:1,2,2,4
128:1,2

**ability** 123:23
148:13 203:17
215:13 276:19
307:7

**able** 17:16 22:17
29:18 34:10
35:1 60:14
112:22 113:20
114:4,9,12
138:21 144:8
169:5 254:20
262:23 264:21
274:11 279:12
281:3 287:8
297:11 334:7

**above-styled**
1:17

**absolutely** 34:19
73:6,10 128:23
171:4 204:5
253:4 313:1

**absorbed** 91:12
███ 5:10 134:2
134:13,17,25
136:14,20
137:13 139:5
139:17,22
140:5

**accept** 300:8

**acceptable**
209:25 317:4

**accepted** 93:23
94:6 95:6

**access** 21:24
111:6 228:20
258:19 276:18
284:24 306:13
307:7

**accessible** 34:23

**accidents** 11:5,5

**accomplished**
194:10

**account** 82:23
84:2 99:20
108:4,5 119:10
223:4,6,9,10
223:11,16
228:21 257:10
284:20,23,24
293:4

**account-** 95:15

**accountant**
75:16 94:14
98:18 99:4

**accountant's**
95:15,21 97:9

**accountants**
94:9 95:5
97:23

**accounting** 73:2
73:23 74:2,14
74:20 75:7,18
77:6 84:7,12
84:22 85:6,10
85:12,19 93:17
93:19 94:6
95:1,6,25,25
98:18,23 103:1
189:7,22 190:2
230:24 324:19

**accruals** 103:2

**accruals/state...**
102:22

**accurate** 66:2,3
74:5 75:5
78:15 101:9
105:5 107:24
117:10 190:3
334:17,19
337:25 338:25
342:22

**accurately** 12:13
74:5,11 304:1

**ACH** 52:25
102:15,19
149:13 227:23

**accomplished**
228:4,8,10,20
257:8,12 306:7
306:13 309:11
309:13 310:15
312:25

**achieve** 35:3
36:24 146:4
207:16 215:5

**achieving** 36:17
93:6

**ACHs** 307:8

**Ackelsberg** 2:4
4:6 7:14,14 8:9
13:2,15,18
20:17,22 21:4
22:11,20 24:2
26:9 27:16
29:3,8,13 31:8
31:11,16,23
32:9 33:25
34:4 36:3
38:13 39:23
40:21 41:11,20
41:24 42:10,18
43:10,12 44:18
45:10,21 46:4
46:17,19,21,25
47:3,22,25
48:2,3 49:9,23
50:8,19 52:4
52:17,23 53:9
53:20 54:6,17
54:18,23,25
55:10,17,25
56:14 57:6
58:4,14,25
61:1,7,14,23
62:14,25 63:12
63:18 64:9,11
64:15 66:8
67:11 68:9
69:20 70:4,15
70:25 71:9
72:1 73:4,9
74:8,13 75:11
76:4,10,14,19

77:10,13 78:8
78:16 79:5,14
79:18 80:8,12
80:20 81:1,9
81:18,24 82:1
82:5,12 83:3
83:12,25 84:11
85:4,15,17
86:2,11 87:10
87:19 88:5,11
89:1,8,15,24
90:14,20 91:11
91:22 92:8,17
92:20 93:16
94:4,17 95:3
95:20 96:7,19
97:7,16,21
99:1,16 100:6
100:24 101:22
102:11 103:5
103:19,22
104:5 107:16
107:19,20
109:9 110:20
111:19 112:3
113:11 114:14
115:3,11
116:13 117:15
118:4,17 119:2
120:1 122:19
123:14 125:5
126:4 127:2
128:5 129:4,21
130:1 132:13
132:23 133:7
134:7,18 135:2
135:9,12,21
136:2,4 137:1
138:1,10 139:3
139:12 141:8
141:13,17,22
142:5,10,22,24
143:5,10,19,21
143:23 144:17
146:8,16,19,25
148:11 149:15

151:3,17 152:7
152:20 153:10
154:11 155:11
156:9 159:6
160:11,17
162:7,12
163:14 164:12
164:17,20,23
165:9 166:7
167:7,25
169:14 172:7
172:21 173:5
174:11 176:16
177:4,18 178:7
178:22 181:23
182:6 184:18
185:7 187:15
188:4,18
189:17 190:6
191:2,11,15
194:11 196:16
198:14,17
199:16 200:2,6
202:8,20
203:21 204:16
205:14 206:5
206:17 207:21
208:1,5,12
210:3,13 211:9
211:24 212:3
212:11 214:10
215:6,23 220:1
220:12,16,19
221:5,13
222:12,22
223:19 225:5
225:24 226:3,9
227:2,9 229:22
229:25 234:2
235:17 236:17
238:6 239:9,18
241:6 243:5,16
244:21,25
245:6 246:4,6
246:8,15,23,25
247:3,6 250:9

UNSEALED

App. 0108

262:4 263:17
263:24 264:5
268:3 269:1,14
270:17,23
271:11 272:11
272:15 273:20
274:7,23 275:7
275:18 276:2
277:17 280:2,9
281:9 282:8,12
282:24 283:5
284:14 286:1
287:10,18
288:1,7 289:10
289:14,22
292:10,17,20
292:25 294:2
295:3 296:20
298:3,7,10
299:13 301:12
301:25 302:18
302:22 303:4
303:20 305:2,5
305:22 306:15
306:21 307:13
307:25 308:18
309:6,25 310:4
311:24 312:17
314:5 315:7,12
315:16 317:1
317:16,19,24
318:6 323:23
325:12,15,19
325:24 326:3,8
326:12,19
328:1,8 329:19
330:1,4,6,14
331:18,24
332:5,13 333:2
333:6,20
335:20 336:4
336:18 337:12
338:7,8 339:7
339:11,18
340:10,20
341:13 342:3,9

342:23 343:17
344:1
**acquire** 68:15
73:15 104:15
104:24 105:2
162:17
**acquired** 110:21
166:2 265:10
315:22
**acquisition**
252:6 282:3
**acquisitions**
253:24 254:1
**Act** 70:18 114:4
118:13 119:4,9
119:16,23
**acted** 205:12
**action** 1:5 326:4
347:5,25 348:3
**active** 151:25
**actively** 229:20
252:16 253:6
**activities** 28:21
103:16 229:17
229:18 238:12
263:7 282:2
338:23 340:9
**activity** 197:10
235:13 252:5
343:14
**actual** 63:7,7,7
69:10 84:13
101:14 109:16
111:20 166:25
230:11 251:1
251:13
**Adam** 33:20
**adapting** 39:3
171:7
**add** 195:19
196:11,22
**added** 196:11
197:14,15
**addicts** 323:15
**adding** 93:8

157:9
**addition** 110:9
111:2 216:19
287:7
**additional** 82:17
130:6 175:2
192:25 216:20
228:21 244:3
**address** 50:24
**adds** 231:16
240:17
**adequate** 138:6
295:16
**adherence**
341:11
█████ 137:10
139:15 140:24
141:1,4
**Adjusters** 3:8
7:21
**admin-** 91:1
**administer**
89:20,20
**administrative**
73:21 75:1
90:1 91:2,15
92:24,25 96:5
218:7 241:2,20
242:14 308:7
**admiral's**
147:17
**adopt** 209:17
**adopted** 171:9
222:10
**advance** 25:20
**advances** 86:14
277:22
**advantage** 99:21
**advantages**
290:12,13
**adverse** 12:1
**advice** 126:17
268:16,18
270:11 271:5
273:11,12
274:16

**advise** 71:21
**advised** 153:16
**advising** 272:17
283:24 291:20
**advisory** 340:6
**advocacy** 302:12
**advocate** 313:24
**affairs** 28:20
297:11
**affirmative** 11:2
12:20 43:18
77:2 232:17
240:19 254:13
**affix** 346:5
**agency** 90:1
218:7 302:11
302:12 338:12
**agent** 73:21 75:1
91:2,15 109:19
241:2 242:14
308:7
**aggressively**
157:20 279:15
**ago** 12:8 43:16
**agree** 36:15 37:5
38:19 99:15
146:15 164:4
269:20,20
328:3 329:7
**agreed** 162:17
210:20 223:14
326:16 335:17
**agreeing** 242:6
**agreement**
74:23 89:21
90:2,2 91:6,16
91:20 92:25
96:5 98:3,6
100:23 126:25
162:17 164:4
165:10,15
167:19 217:6
217:21,25
218:3,4,7,16
218:17,21,23
218:24 221:16

237:20 240:23
242:18 287:12
301:15
**agreements** 90:8
248:6 334:23
**agrees** 143:20
**ahead** 26:10
45:4 46:5
50:12 51:5
62:15 76:11
97:17 119:18
148:3 187:12
220:18 221:24
223:2 238:1
239:15 252:3
264:11 281:15
298:21 322:11
333:17
**air** 164:19
296:22
**airport** 147:17
**al** 1:6 7:5 347:6
**algorithms**
109:3
**align** 37:9,18
**aligned** 38:16
304:20
**Allen** 14:9 44:22
**alliance** 28:5,6
151:12 159:4
297:10 301:14
**allow** 261:18
**allowed** 117:6
120:5 256:16
263:1
**allows** 113:4
**alluded** 245:7
289:3
**Alonzo** 148:19
148:20 149:3
185:8,9 186:14
186:21
**alternate** 105:9
261:11
**alternative**
258:24

alternatives
122:11 157:22
altogether 229:3
ambiguity
331:21
America 115:13
115:19,21
116:1,7,15,16
American 114:8
121:5 148:8
150:12 232:21
233:8 236:21
243:10 244:8
Americans
17:10 258:8,9
276:18
amount 40:8
210:11 214:21
234:14 235:2,4
235:12 265:15
289:4
amounts 233:25
analysis 109:4
analytical 248:2
analytics 100:2
100:21 104:7
104:19 109:5
111:6 132:9
133:3,23
277:24 299:24
analyzing
267:10
announce 178:6
annually 76:25
answer 9:5 10:1
10:6,6,10,10
10:12 20:25
22:10 23:15
29:17 31:14,22
35:15 36:8
37:17 39:13
40:3 41:8,19
42:5,16 44:13
46:6 52:22
53:2,16,25
55:23 58:11

62:13,15,20
63:16 64:2
66:6 68:8
69:25 70:11,20
71:19,22,25
72:23 74:18
76:2,11,15,18
78:14 79:6
81:6,11,17
82:11 83:9,20
84:19,19 85:10
85:25 87:12,25
88:20,21 90:18
92:9 94:11,24
95:19,23 96:16
97:4,20 98:1
98:25 100:17
101:20 102:1
102:25 105:3
107:21 108:20
113:7,25
114:23 124:6
125:18 126:1
126:18,19
127:16 128:10
130:4 133:6,25
137:21 139:8
140:13 141:9
141:10 146:1
149:9 150:22
151:8 154:1
155:9 160:14
162:10,23
169:1 172:4,5
173:17 176:12
176:23 182:4
183:16 187:12
189:14 190:12
194:4 196:5
204:1,24
205:16 206:12
207:10 212:2
213:18 214:17
221:25 222:23
223:2 224:1,22
225:4,17

234:11 236:11
261:8 262:10
267:21 270:12
270:14 272:6
272:10 274:16
274:22 275:1
275:17 279:23
289:11,12
295:7,7 306:11
307:21 311:12
312:16 313:15
322:11 329:13
332:3 333:8
334:8 335:8,22
336:12 337:11
337:18 338:18
339:24 340:14
341:6 342:2,8
342:10,11
343:21
answered 71:1
81:16 84:17
85:12,24 87:9
87:24 88:8
109:7 125:7
137:20 170:3
287:21 289:19
301:11 311:11
answering
153:23
answers 12:13
29:6 30:22
235:25 334:1
anti-credit
302:10
antici- 261:22
anticipate 282:6
anticipated
22:25 245:9
257:6 331:21
332:6
anticipating
21:20 22:23
anybody 9:2
126:24 193:22
244:21 324:2,5

anymore 92:3
anytime 166:5
177:20
anyway 189:10
277:6
apart 115:6
319:15
apologize
217:20 241:16
289:21
apparently 53:8
140:1,2
appear 56:10
127:14 147:5
300:24
appearances 4:2
7:13
appeared 94:21
appears 51:15
65:14 67:10
141:5 165:14
168:4 301:18
326:21
applicable 300:3
application
111:7
apply 110:1
119:16 283:25
284:21,22
285:3,24
applying 285:11
appreciate
177:13 239:4
331:13
appreciating
120:20 122:4
appreciative
319:3
approach
108:15 171:11
approached
163:16
approaches
278:12
appropriate
79:4 184:2

186:10 270:1
304:7 342:18
appropriately
76:18 125:8
approval 111:20
183:20 267:9
300:19 301:7
approve 101:15
101:16 104:15
231:2
approved 52:14
102:9 108:2
184:20 216:16
APR 33:7,11,12
60:2,24 62:9
62:23 63:21
64:3,7 65:22
303:14,17
304:6,14,19
APR's 65:19
April 5:6 52:18
53:7 64:16,23
156:2,17
272:23 283:1
294:8
APRs 60:11
66:1 210:11
303:7
Arch 2:5,9
architecture
166:1
area 41:21 121:3
235:25 238:8
340:15
areas 99:24
100:1 239:3
arena 71:3
argue 196:20
argument
122:21 123:17
123:19,21
124:3,4
Ari 43:21
arm 100:23
160:7
arms 140:3

340:18,19
**arrange** 211:13
**arrangement**
26:1 74:25
83:4
**arrangements**
130:8 205:11
236:7,10
273:13
**arrived** 24:5,9
**arriving** 53:13
**article** 5:8 35:5
65:7,15,21
121:7 333:24
333:24
**articles** 107:9
**articulate** 29:18
**arts** 14:3
**aside** 239:11
311:4
**asked** 15:22,24
17:24 18:14,19
20:6 28:10
29:16 33:18
66:1 81:15
84:16 85:5,23
87:8,23 116:10
121:23 134:22
135:14 137:19
141:15 170:4
172:22 185:21
188:15 189:11
189:15 267:19
311:10 322:3,4
333:1
**asking** 36:8,8
62:21 70:22
71:7 75:20,21
76:7 123:4
124:9 126:6,6
128:6 156:6
178:23 180:2
207:1,20
217:13 239:8
281:18 296:1
317:5 332:21

335:3 336:13
**asks** 154:3
239:11
**aspects** 30:2
214:3,4 238:15
291:22
**assembled** 157:6
245:16
**assert** 239:4
**assessing** 339:13
**assessment** 33:6
69:4 276:3
**assessments**
276:4
**assets** 94:22
187:19 188:2,3
188:5,7,8,15
189:1,3,9,16
189:19,24
**assigned** 338:14
**assigns** 330:9
**assistant** 315:20
**associate** 257:5
**associated** 28:3
29:7 183:7
197:10 233:13
234:21,22
265:9
**association** 28:2
28:4 149:21
194:19 232:21
233:23 236:22
243:11 244:9
244:18,19
297:14,17
**associations**
229:19
**assume** 24:23
49:5 83:15
87:13 88:3,4
98:22 117:5
119:12 164:5
172:6 174:3
178:1 275:11
300:9 336:6,15
336:23

**assumed** 13:13
86:18 91:24
136:21 188:1
336:8
**assumes** 335:7
**assuming** 51:20
66:9 137:10
169:20 223:21
257:11
**assumption** 86:7
278:23 281:3
**assurance** 339:3
**ATMs** 16:22
19:4,5
**attached** 1:24
47:20 135:6
142:19,21
167:21 230:4,5
325:17,24,25
347:21
**attaching** 50:25
**attempt** 46:12
**attempted** 11:23
**attempting**
225:22
**attention** 10:23
123:6 127:6
228:24
**attest** 142:17
**attorney** 1:3 2:8
72:3 122:24
123:3 124:11
152:23 153:2
153:14 190:24
191:7,19
291:15 292:1,1
292:2 342:4,5
342:7 347:3
**attorneys** 48:24
120:11 123:5
125:25 130:9
191:18 269:25
271:8 273:1,2
273:7,15,19,25
274:1,1,3,4
347:25

**attractive**
193:14 252:18
296:11
**attributable**
96:24
**audited** 75:23
**auditors** 94:19
**August** 142:15
143:13,14
251:2 253:17
306:6 309:20
**Austin** 348:12
**author** 48:10
51:21,22
142:14 168:6
330:8
**authorizes**
119:24
**authorizing**
113:3,12,22
**authors** 337:18
**automated**
25:14 102:3
257:12
**automation**
341:3,16
**availability** 70:2
**available** 12:17
111:15 258:20
286:7
**Avenue** 2:19
**average** 33:7
**averaging** 59:9
**avoid** 245:13
**aware** 70:13,16
70:22 71:2,2,3
82:14 84:1
87:14 94:18
108:8 112:1
116:18,21
120:7 125:10
128:14 148:16
149:11,14,16
149:18 194:25
200:12 201:11
205:17,19,20

211:15,17,21
212:8,15 258:4
266:3 305:12
319:12
**awareness**
124:10 258:6
**awful** 235:5
282:2

---

**B**

**B** 5:1 6:1
**B-a-d-r** 320:7
**back** 16:1 50:17
56:1 64:11,20
66:10 72:12,12
84:8,23 85:11
95:4,8 104:3
106:6 108:8
117:11 120:7
126:21 128:3
130:17 145:3
146:23 160:19
172:15 178:4
182:14 185:12
189:8 198:18
203:14 206:3
232:25 239:22
245:14 248:17
261:23 264:3
265:11 282:23
285:3 292:21
299:19 304:24
305:7 306:6,24
312:11,12
318:4
**backer** 146:12
**backers** 145:24
**background**
124:19 151:5
156:3 190:13
190:22 265:6
**backing** 14:22
**backstory**
319:14
**bad** 91:13,23
245:1

UNSEALED

App. 0111

**Badr** 140:7
320:6,7
**bailiwick** 52:8
**balance** 35:24
73:25 74:16
75:10 88:16
91:18 96:1
265:20
**balanced** 302:11
302:13
**balances** 66:15
69:12,13 70:14
70:24 78:1
95:2,2 264:20
265:1 274:10
290:8 294:19
**bank** 16:16 18:1
20:14 25:16
26:1,1,2,3,5,14
27:18 57:21
70:18 106:14
108:25,25
109:20 110:8
114:3 116:1,3
116:4,4,10
117:19,20,24
118:13 119:4,9
119:16,23
123:16 124:23
124:23 131:4
148:20,25
149:4 153:2
155:5,15
156:14,15,20
158:19 162:25
168:19 171:9
173:10,16,20
173:24 174:19
174:22,22,24
175:18 176:5
179:1,2,19
180:1,6 181:9
182:22,25
184:21 185:5,6
185:14,18,21
186:2,5,6,19

186:22,24
187:8,18 188:7
188:12,22
191:5,25 210:7
213:8 215:1
216:1,4 218:13
222:4,11 223:4
223:6,10,16
224:18 228:2
248:17 252:17
252:25 253:6,7
253:10,10,15
256:10 257:10
260:2 261:3
266:11,12,21
266:25 267:3
275:12 277:13
279:10,17,18
282:4 286:14
286:18 287:5
288:25 289:25
290:8,9 292:4
294:24 295:1
296:4,13
300:14 319:18
327:7
**banker** 146:3,7
**bankers** 145:15
**banking** 69:16
148:22,23
149:13 227:17
258:1,14 259:3
259:8
**banks** 14:19,22
59:19 69:6,11
69:13 70:8
106:13 114:3
114:11 118:14
119:1,5,7
150:1 227:18
275:10 276:10
276:19 277:3,5
277:9 279:14
279:16 321:17
342:19
**banner** 258:22

**bar** 30:1 57:23
**barely** 258:8
**barriers** 30:5
**based** 106:15
109:4,21
115:16 118:15
119:15 127:11
130:8 138:22
152:5 158:12
158:12,13
186:4,14
204:21 240:1
268:18 274:19
296:4 300:19
312:4 319:24
321:18
**basic** 209:10
215:1 323:7,9
**basically** 22:2
59:2 68:24
82:24 89:3
99:10 108:11
113:14 133:12
134:19 139:21
155:6 166:16
177:6 199:6
203:3 210:5
218:11 231:12
231:18 232:25
233:2 246:10
252:12 255:15
293:3 308:8,25
**basis** 120:12
163:13 255:23
**Bates** 47:19
64:18
**bear** 72:15
**bearing** 95:17
**bears** 67:19
95:10
**becoming** 258:4
**began** 20:1
40:25 79:20
131:3 157:15
163:21 171:13
179:15,24

190:8 261:3,17
261:23,25
271:1
**beginning** 53:12
53:13 54:20
90:15 156:22
165:21 198:18
247:14 248:16
270:25,25
286:23 333:8
**beginnings**
79:23,25 234:5
**begins** 47:13
**begun** 166:16
195:3
**behalf** 7:21,22
110:7 165:19
228:2,3 244:2
339:13
**behavior** 256:5
**belief** 119:15
**believe** 12:25
23:8 26:3
47:22 54:4
57:1 62:22
63:13 71:14
74:10 82:18
85:13 87:17,20
90:4 102:2
103:13 105:8
105:15 111:12
111:13 117:6
120:5 122:22
130:9 131:11
132:12 140:7
142:11 149:12
152:16,24
153:1 161:23
171:1 179:8
189:19 193:5
194:16 203:5
204:5 205:7
211:20 217:22
219:23 226:25
238:15 248:14
250:14 268:16

273:22 282:13
282:17 298:2
320:6 321:8
330:7 337:1
**believed** 87:15
162:14 176:20
182:21 293:12
**benefit** 297:10
300:5,12 319:4
**benefits** 195:18
313:18 323:4
**Bernick** 244:1
**best** 8:24 9:3
28:20 37:15,18
38:11 99:5
214:22 215:13
223:5 247:17
274:5 297:12
341:12
**better** 9:25
16:18 30:21
35:23,25 42:2
60:6 99:7
110:25 176:3
181:22 207:18
216:6 237:6
258:17,19
260:22 262:13
288:3,8,24
289:3,6 290:1
294:23 300:18
308:13 318:12
318:15
**beyond** 323:21
**big** 29:23 35:11
37:7 104:20
105:25
**biggest** 163:2
**bike** 11:5
**bill** 59:20 60:1,7
60:8
**billion** 30:18
31:2,18 32:18
33:2 55:1
**bills** 59:12,16
**bio** 44:1,25

UNSEALED

45:17 103:18
**biometrics**
16:18,20,23
**bit** 13:20 16:1
18:7,21 31:1
34:15 48:6
50:6,9 104:8
251:1 277:4
339:25
**biweekly** 255:21
255:25 256:3
256:15
**biweekly/semi...**
255:10
**blindly** 37:24
**block** 301:17
**blocking** 302:2
**blog** 121:8
**bloom** 306:8
**BMO** 5:18
**board** 11:13
12:4 15:10,25
18:15 20:8
23:1,16 25:17
27:7,19,21
28:1,13 38:15
38:16,16,23,25
39:2,10,15,17
39:25 40:6,7
40:14,15,18,20
52:6,14 58:7
64:24 65:5
149:20 158:14
175:15 245:7,8
247:10,11,12
247:15,19,20
247:21 248:4
248:11,15
249:3,12,14,17
249:18,25
250:1,15,17
254:23 261:10
261:24 277:20
278:1 280:3
282:15 299:15
304:23 319:11

328:25 329:4
341:1
**Bob** 6:10 315:20
316:1,4,9
**bode** 301:18
**Boggs** 154:21
232:14 235:19
236:18 273:22
**bolster** 233:1
**book** 245:16,22
245:24 280:5,6
283:2 292:18
**books** 69:2 70:3
73:22 93:5
188:16,23
189:2,9
**boom** 216:16
**Booz** 14:9 44:22
**bottom** 55:14
101:3 241:19
242:10 296:18
**bought** 15:6
57:19 88:22
108:23,23
157:17 163:8
174:2 177:7
178:9,14
179:11 189:3
189:15,19
201:24 234:24
280:22 316:1
**bound** 184:11
240:14 266:21
**box** 56:6 109:17
**boy** 205:5
234:13
**bragging** 341:2
**branch** 14:14
17:15
**branches** 14:14
17:16
**brand** 57:1
285:11
**branding**
170:11 257:25
**break** 10:16,19

50:2,7,16,20
103:18,23
104:2 128:2
146:19,22
205:22,23
206:2 244:22
263:21 264:2
303:24,25
315:10 317:21
318:2
**breakers** 319:7
**breaking** 34:25
**breakout** 5:12
144:5,13,21
145:22
**breakouts**
144:24 145:1
**breaks** 10:15
**breed** 262:19
**Brenda** 314:19
**Brendan** 140:14
140:16,16,21
**Brett** 201:16,18
340:21
**brick** 19:13
**brick-and-mo...**
106:12
**briefly** 107:10
126:20 154:25
**bring** 252:17
281:11 282:5
325:1
**bringing** 233:13
262:18
**broad** 2:14
329:23
**broad-based**
69:4 238:11
323:18
**broader** 134:24
137:12,16
239:25
**broadly** 30:8
98:9 111:18
121:4 127:11
175:16

**broke** 128:6
**broken** 231:11
231:13 254:19
254:23
**broker** 201:15
**brought** 210:1
296:16
**Bryant** 33:20
**Buffalo** 338:10
**build** 37:11
128:19 136:20
137:23 138:3
169:16 259:15
286:25 287:2
297:13
**building** 35:17
36:13 129:10
287:14
**built** 114:25
169:8,11
**bulk** 336:7
**bulldozer** 5:3
33:22 35:7,13
**bullet** 19:13
253:17
**bullets** 54:21
**bunch** 19:19
45:15 163:7
**bureau** 2:8
105:9,16,18,22
105:23
**bureaus** 105:25
106:5 263:5,9
**bus** 5:3 33:21
35:7,13 36:18
36:19,22,25
37:14
**business** 5:5
11:8,24 14:7
16:5,8 18:18
19:7 21:14
25:23 30:2
31:6 32:6 36:2
36:8,15,24,24
37:3 39:1
40:10 51:1

52:5,14 53:19
74:11 87:14
95:9 99:24
112:19 115:20
115:22 122:18
128:21 129:19
131:3 136:23
137:5 138:7
139:2,11 145:7
145:8 148:9
149:3 153:17
157:5,14
158:23 159:23
160:10 162:15
163:1 183:9,13
183:17 184:6
186:6 190:5
192:21,22
193:1,3,4,5,8
193:11,13,14
194:9,18,19
195:1 197:12
197:13 198:23
199:10 200:25
202:13 207:12
227:18,25
228:22 229:21
233:10,24
234:24 235:10
237:12 238:15
240:14 252:11
252:22 254:9
261:2,4 263:16
275:3 279:7
280:22 282:4
283:15 291:23
310:20 312:1,7
319:20 323:20
329:1,11,14,24
334:1,24
**businesses** 43:1
86:17,24,25
107:6 129:20
136:24 152:4
158:3 227:19
235:5 322:20

UNSEALED

App. 0113

businessman 15:20 18:16
Butch 159:9,14
  159:17 160:19
  160:23 184:1
butter 320:8
buy 19:6 23:25
  73:19 93:4
  109:2,11
  138:21,22
  172:11,20
  173:3,22
  188:15 202:14
  203:8 219:24
  220:6,8,14
  271:24
buyer 201:25
buyers 202:1,14
buying 109:1
  173:15 176:15
  176:18 177:2,3
  179:24 186:18
  201:11,21
  218:2 271:22
Byzantine
  121:10,15
  122:2

———————
        C
———————
C 2:1 3:1 139:19
C- 43:21
calculated 33:13
calculation 33:1
  62:11
California
  120:15 123:7
  158:5
call 6:10 10:16
  41:13 42:22
  43:10 98:13,20
  135:5 139:23
  195:23 200:18
  208:5,6 228:24
  280:4 285:9,19
  285:19,20
  286:5,10,13,24

287:2,9,14
  323:25 324:1
  338:15
Callaway
  153:13,14,19
  160:12 271:10
called 15:2,11
  16:12 18:10,12
  18:18 20:24
  21:6 26:3,22
  43:20 50:25
  57:17 106:21
  112:10,13
  122:21 127:4
  156:18 160:24
  163:17 173:9
  173:18 174:15
  194:15 201:19
  218:3 222:15
  227:13 230:15
  247:21 252:19
  258:1 272:22
  275:9 284:24
  285:8 293:7
  297:3
calling 230:9
  286:5
Callnin 320:12
  320:13
calls 53:23 81:16
  103:15 214:16
  279:21 289:7
  307:18 341:24
campaigns
  105:1,16,20
Canada 17:22
cancelling
  286:22
candidly 296:10
capabilities
  100:2,2,3
  129:18 146:5
capacity 139:1,6
  176:19 231:8
capital 3:2 23:11
  27:10 68:22,25

69:10,18 70:2
  70:6 78:10,18
  80:24 82:17
  83:14,16,17,23
  86:8,13,13
  87:7,17 88:4
  93:3 134:16
  136:14,19,24
  138:6,13,15,25
  139:9 171:2,13
  174:2,4 181:17
  214:2 238:19
  249:17 307:5
  308:15 312:23
Capital's 290:23
capitalists 23:20
capped 61:20,21
capture 94:7
car 11:5
card 19:23
  66:15 157:18
cards 15:5 19:17
  114:4
care 11:4 196:25
career 14:7
careful 267:12
  269:12 273:13
Carroll 140:16
case 7:5 9:12
  23:21 31:25
  59:21 69:11
  78:2 120:3,3
  120:14 165:11
  165:16,19
  190:15 210:14
  225:19 227:22
  251:2 267:24
  267:25 271:8
  289:9 310:10
  312:7 327:6,20
  336:25
cases 68:2 70:13
  108:24 118:2
  118:10 123:7,8
  124:11 158:4
  231:23 246:16

267:2
cash 15:3 19:19
  23:18 69:9,15
  70:2 74:22
  86:14 115:12
  115:19,21
  116:1,6,15,16
  242:13 296:12
  296:14,16
  308:8,13
CashCall 160:21
  161:3,8,12
cashing 14:18
  14:25 16:21
  18:22 19:3,10
cashout 23:24
CashWorks
  15:2,10 16:10
  16:11,15 18:6
  18:12,17,21
  19:9 45:6
  239:23
casino 86:23
  87:14 193:4,5
casinos 86:21
categories
  231:13
categorize
  105:24
category 231:15
cause 1:18
caused 144:18
caution 8:20
  153:18 184:25
CBNC 43:22
cells 104:11
center 98:13,20
  151:25 200:18
  285:9,20,20
  286:6,10,13,25
  287:2,14
  323:25 324:1
centers 287:9
  338:15
CEO 15:21,24
  20:4,8 26:21

29:21 35:16,19
  36:7,12,21
  37:6 38:5,9,18
  39:1,4,6 40:1
  41:15 45:6
  64:24 75:22,23
  90:5 93:19,25
  125:13 193:24
  231:3,4,9
  249:4 328:21
CEOs 37:15
  52:8
certain 38:6,6
  98:20 116:2
  119:6 124:11
  125:2 140:21
  140:21 190:25
  195:4 209:12
  227:15,19
  231:1,1 248:9
  256:18 271:24
  313:18
certainly 37:6
  38:18 41:16
  42:9,17 46:12
  75:23 79:20
  114:24 123:4
  126:5 169:23
  190:1 192:21
  204:11 206:14
  210:16 211:7
  214:3 216:14
  221:15 235:3
  239:4 252:13
  256:1 261:2
  262:11 273:1,4
  276:5,23
  280:24 284:12
  288:10 302:6
  307:4 322:18
  340:6
Certification 4:9
  347:7
certify 347:11
  347:17,23
cessation 310:9

UNSEALED

CFBS 11:11
CFO 42:6 84:9
84:24 288:11
CFPB 12:7 13:8
13:9,13 84:25
124:14 301:17
301:21 302:2,5
302:9,11
CFPB's 33:6
chain 64:19
chains 64:19
chairman 6:11
15:25 20:8
27:7,19,20
64:24 249:2
305:25 306:1,4
311:1,5,17,21
313:20
chairman's
228:16
chairmen 185:9
challenge 118:6
304:3 327:17
challenged
118:20
challenger
300:17
challenges 35:1
59:18 117:8,25
118:14 121:1
163:2 214:23
269:17 322:15
challenging
119:6 315:4
324:13
champion
255:12 300:17
300:20
chance 12:12
260:22 298:17
298:25 304:12
333:11
change 21:13,20
25:21 132:4
202:18 203:16
267:1 345:6

changed 20:10
22:1 29:2 57:3
203:22 256:24
changes 4:8
130:15 169:21
186:4 203:1
257:21 296:3
300:7 301:5,6
317:4,5 345:1
347:21,22
changing 276:9
276:16
channel 260:12
284:12
channels 132:18
132:21 260:8
character
204:19
characteristics
185:16 303:11
303:12
characterize
190:2 340:7
characterized
136:18 232:5
charge 75:3
charge-offs
251:12
charges 67:15
74:1 96:2
103:3
chart 59:17
105:4,11
chat 43:20
chatter 92:16,18
165:8
check 14:25
16:21 18:22
19:3,10 143:17
167:18 238:4
282:18
checked 59:24
checking 167:17
checks 14:18
15:3 190:13
chemical 17:21

Chicago 3:5
13:23 44:21
chief 243:21
321:3
Chippewa 5:16
65:8 80:3
182:8 184:12
184:16 190:8
192:2,8,9,18
193:1,10
194:12 197:1
198:21 206:7,8
208:19 223:24
224:6,8
Choke 227:14
276:15
choose 196:6
338:18
chose 116:16
Chris 23:9 42:6
99:6 133:20
140:6,8 176:2
181:21 206:15
237:6 251:14
288:11 308:12
335:17,21
337:7
Christy 1:19 7:8
344:3 347:10
348:9
chronological
245:19 246:3
246:16
CID 11:11 12:7
cited 121:6
Citibank 17:20
City 151:18,21
151:24,25
152:4,18
Civil 1:5,23
347:5
claim 125:2
341:20 342:14
clarification
9:22
clarify 239:12

249:15 259:2
333:3,5,7,14
333:15 345:3
clarifying 297:5
clarity 106:7,14
109:13,15
132:1 177:10
classic 261:13
classify 112:25
Claudia 153:13
153:14,19,25
154:1 160:12
271:10
clean 49:21
cleaner 45:16
clear 17:2,8
46:23 80:3
92:3,6 95:24
100:11 118:10
119:5 120:4
125:22 130:16
177:19 233:19
241:10,13
242:14 245:20
275:20 289:19
300:23 302:4
314:6 333:18
334:9 336:21
clearly 21:17
55:6 60:4
72:25 96:10
252:22 290:11
304:20 310:25
335:14
click 170:14
client 17:19
134:17
clients 17:20
close 53:5
186:12 202:23
231:16,16
279:12 281:4,7
307:12 338:24
closed 283:13
closely 301:22
closer 22:6

cloth 331:12
club 1:21 147:17
CMS 338:10
CNBC 43:22
coaches 35:21
Coblentz 238:16
239:19
code 71:11
209:17
Codes 345:3
coding 166:15
collect 104:15
105:10 202:15
collection 98:13
199:24 202:24
221:2 287:6
328:12 337:21
338:12,15
339:1,5,13
collections
103:11,16
107:17 203:7
204:8,14
337:16,20
338:2,23 339:4
339:19,20
340:5,8
collectively
246:21
collectors 203:9
college 13:21
44:20 324:5
colleges 14:3
Colorado
120:15 123:7
158:6
column 104:23
columns 104:14
combination
240:9 271:7
come 19:21
29:21 31:2
33:4 62:8,17
62:22 72:9
81:20 85:20
96:12,13 109:6

UNSEALED

120:14 126:21
134:11 136:22
151:20,24
158:16 159:11
167:13 168:20
171:20 201:2
223:23 224:12
224:14,21
225:21 242:3
244:4 265:11
271:17 301:5
304:24 305:7
334:8,13
**comes** 36:19
96:25 151:18
334:22
**comfortable**
27:2 159:22
184:15 194:8
197:5 209:25
210:15,17
222:8,9 275:21
**coming** 37:15,25
97:11 121:8
138:15,24
183:2 186:21
238:20 252:14
253:22 278:2
293:13 310:22
319:20
**comment** 35:5
204:25
**comments** 227:4
**commitment**
37:12 262:1
324:10
**committed**
229:20 327:15
**common** 69:6
115:10 132:10
190:14 202:13
204:3
**Commonwealth**
1:2 2:3 7:4,15
7:17,19 347:2
**communicate**

35:12 327:18
334:3,4
**communicated**
32:15 137:24
153:25,25
154:4 269:19
308:5 311:16
**communicating**
35:2 38:15
39:3 40:17
145:24 308:2,4
**communication**
270:10 307:15
**communicatio...**
39:24 71:20
103:7 124:7
125:19,21
126:3,7 128:15
130:6 236:2
**community**
262:22
**companies** 15:1
116:5 131:3
202:3 315:19
316:2,4 343:10
**company** 11:22
15:6,8,10,11
15:12,16,18
18:9,11,11,12
18:15 19:25
20:5 21:14,15
21:22,23,24
22:7 23:5,6,18
23:18,23 24:15
24:20 25:4,9
25:10,12 26:22
27:3 29:21
30:5,9,12,15
30:23,24 34:10
34:16 35:3
37:4,8,8,19
39:20 40:6
42:3,13,13
53:13 56:11
57:19 59:3
75:24 76:6,23

100:5 104:18
106:25 108:14
112:20 114:20
115:6 121:7,7
123:10,12
131:21 134:11
144:7 145:10
147:2,22
148:24 153:8
153:16 154:9
157:17 159:8
159:13 160:24
175:18 182:16
183:3 189:24
192:16 193:9
194:14 198:20
201:19 204:12
222:15 233:21
234:1 235:6,16
239:21 247:17
248:3 259:19
306:12 315:25
320:24 321:12
325:10 326:22
329:10
**company's**
57:24 117:11
252:11
**comparable**
210:12 213:7
218:11
**compare** 59:2
60:24
**compared**
289:25
**comparing** 59:4
59:15
**comparison**
59:12 60:12,20
61:25
**compensated**
196:23 217:22
**compensation**
11:21
**competed**
161:17

**competencies**
129:10
**competitive**
99:10,20,21
**competitor**
115:13
**competitors**
115:7 161:14
**complaint**
325:20 326:3
**complete** 212:17
246:5 252:17
267:1 301:15
310:8 316:20
**completed**
163:22
**completely**
56:12 105:12
**compliance**
24:16
**complicated**
327:8
**component**
252:23
**components**
144:3 252:25
328:13
**compose** 101:10
**compound**
172:13 196:4
**comprehensive**
240:12
**conceivably**
9:11
**concept** 31:20
124:22,25
169:19 181:6
**conception**
324:13
**concern** 229:1
302:6,7,10,13
302:17 309:13
309:14,16
310:15,20
311:2,3,7,15
**concerned** 97:23

263:4
**concerns** 21:19
301:21 307:7
309:11 312:24
314:2,23
**concert** 257:22
**concluded**
344:15
**conclusion**
307:19
**concussion**
10:22
**conditionally**
101:16
**conference**
42:25 43:15
44:2
**conferences**
42:20
**confident**
279:12
**confidential**
247:12 249:13
**confine** 29:6,10
31:21 76:17,18
**confirm** 8:13
129:1 166:13
**confirmed** 66:3
**conflicts** 314:4
**conform** 345:4
**confused** 73:5
92:12
**confusing** 18:7
223:11
**confusion**
144:18 223:17
326:24 332:7
**conjunction**
270:13
**connect** 147:15
152:22 196:2
**connected** 50:22
102:15 147:5,9
152:12,16
153:8 159:16
162:16 167:11

UNSEALED

167:12 173:14
192:11 201:3
201:18 212:12
212:16,17
316:10
**Connecticut**
65:12
**Connecticut's**
65:16
**connection**
150:4 152:6
153:5 159:15
160:13 262:5
**cons** 318:15
**conscious**
259:16 304:25
**consensus** 38:4
**consider** 128:18
**consistent** 25:9
55:8,18,24
132:19 269:7
269:24
**consolidate** 95:1
96:1
**consolidated**
76:21,23 94:21
**consolidates**
73:24
**constant** 25:18
**constantly** 25:4
**constellation**
152:11
**constrained**
265:14 310:14
**constraining**
276:17,18
**constraint** 69:15
**constructing**
329:9 331:15
**consultant** 14:8
16:4,6,25 17:3
18:1
**consulter's**
200:14
**consulting** 18:8
149:16 196:13

233:12,21,25
234:22 240:13
243:11
**consumer** 2:8
72:6,7 112:24
157:20 252:23
263:3 275:22
313:24
**consumers** 15:3
18:4 19:18
60:6 67:16
258:18
**contact** 148:18
161:20 190:18
**contacted**
147:21
**contains** 347:21
**content** 51:23
208:22
**context** 72:14,17
117:19 121:18
121:20 123:16
123:17 162:20
167:23 207:19
207:25 227:10
258:16 295:19
296:2 308:20
**continue** 15:19
129:17 188:13
253:15 309:15
**continued** 3:1
6:1 157:8
186:6 296:5
307:10
**continuing**
184:8 312:20
**contract** 109:12
109:21 110:3
110:24 202:18
202:19 215:17
217:5 218:2
219:6 241:9
272:2 286:22
287:4 291:20
340:4
**contracted**

73:20
**contracting**
183:10 233:12
233:21
**contractor**
234:1,22
**contractors**
240:13
**contracts** 61:3
93:12 110:11
110:22 128:13
147:3 217:3,9
217:13 218:1
219:13,15
221:18 288:22
**contractual** 73:1
73:3,11 74:2
74:19,21 75:6
77:6,7 91:25
96:3 127:10
130:15 150:23
190:4 205:11
248:6
**contrary** 159:24
312:4
**contribute**
323:20
**contributed**
189:5 244:10
**contributing**
233:7
**contribution**
297:24
**contributions**
244:17,18
**control** 203:9,16
205:12 312:21
**controls** 205:10
**controversial**
333:24
**convenience**
15:4 19:11
**convenient**
47:16
**convention**
47:14 230:7

**conventions**
47:9 174:7
**conversant**
120:17
**conversation**
310:22
**conversations**
127:19 170:23
186:14 225:21
311:5
**convey** 166:9
**COO** 18:10
**Cookies** 34:16
**cooperation**
13:12
**coordinated**
243:25
**copies** 13:4
**copy** 33:24 44:1
49:6 133:8,13
133:13 142:9
169:25 207:25
230:10
**core** 36:6,11
99:19
**CoreCard**
130:20
**Corp** 134:25
**corporate** 45:15
239:20,22
292:1
**correct** 13:7
20:21 21:11
24:4 52:2
53:19 55:12
56:24 57:12
59:5,6 66:7,9
66:13 67:10,13
67:21 68:6,10
68:19,20 72:19
76:21 81:12
89:11 90:3,4
91:4 92:22
95:2 97:3,6
107:22 109:14
113:5 114:21

115:4 116:12
129:2 132:8
133:11 140:10
147:25 152:25
153:20,22
161:23 162:21
165:14,22
179:8 181:3
182:9 198:24
217:8,12
223:22 232:18
237:20 251:7
268:11 278:9
293:23 294:6
294:20 306:2
312:9 321:4
336:15 337:6
337:22,23
343:6,7 345:4
346:6
**correction**
309:18
**correctly** 296:4
308:17
**correlation** 98:5
**correspondence**
5:7,9,14,18,20
6:8,10,13,16
**cost** 19:16 60:25
67:19 72:15
95:10,14,17
234:21
**costing** 242:20
243:1
**costs** 17:17 19:7
98:20 233:13
243:8,9,11
254:3 265:8
287:14
**Coterminous**
209:13
**council** 139:18
314:1,3,14
315:3
**counsel** 2:3,12
2:17 3:2,8 7:12

UNSEALED

App. 0117

71:20 72:9
124:8 125:19
125:22,23,24
126:3,16 127:1
127:19 128:9
128:16,16
129:2 135:25
153:20,21
154:2,7,9,14
154:15,20
159:25 160:3
177:25 185:2
213:25 226:7
235:22 239:20
239:22 243:25
245:25 268:17
270:10,14
271:14,15,25
272:3 273:8,11
274:17,19
290:22,25
291:4 295:17
347:24
**counselors**
291:10
**countries** 140:2
**country** 123:16
148:9
**country's** 14:3
**couple** 15:1 43:6
51:4 69:9
106:8 134:10
147:8 149:2
158:3 170:12
170:15 174:6
198:3 200:10
259:23 305:1
**course** 80:23
91:9 108:21
111:5 145:19
234:23 235:9
236:21 240:2
307:22
**court** 1:1 7:6,8
7:10 8:17 64:5
84:21 85:3

158:3 172:17
172:25 245:23
307:1 347:1
**courtroom** 9:17
10:8
**cover** 124:1
230:9 296:22
**coverage** 34:9
266:22,25
**covers** 294:8,9
**CP-** 302:1
**CPA** 75:21,22
**CPL** 299:19
**crazy** 224:14
**create** 58:18
168:22
**created** 13:8
330:22 331:11
331:12
**creation** 58:21
58:24 172:9,18
173:1
**creative** 284:11
**credit** 3:8 7:21
21:24 22:24,25
26:15,19 55:2
56:2 60:25
62:5,24 66:15
69:1 106:10,20
114:4,5 118:15
119:7 122:11
157:11 186:3
191:9 197:11
257:23 258:9
258:13,17,19
259:15 261:21
262:1,20 263:5
263:9 265:11
265:14 275:22
276:11,18
277:4,12
284:22 285:24
287:12 310:12
335:7 336:6,8
336:16
**Cree** 5:16 80:3

182:8 184:12
184:16 190:8
192:3,8,9,18
193:1 194:12
197:1 198:21
206:7,8 208:19
223:25 224:6,8
**Cree's** 193:10
**crew** 207:6
**crisis** 52:25
306:7
**crisp** 327:18
334:1
**Critical** 146:4
**CRM** 103:13
**crowd** 199:5,15
**CSC** 14:9 17:3,5
17:19
**CSR** 1:20
347:10 348:9,9
**CT** 65:8,10,11
65:12
**culture** 34:16
**curiosity** 14:2
**curious** 16:21
31:1,24 208:11
262:5
**Curry** 149:19,20
152:16 158:22
161:22 182:13
183:7 196:1,8
196:8,19
199:24 227:6
227:11 228:13
229:1 242:19
281:4 311:3,6
311:14,22
313:10
**Curry's** 151:5
**Curtis** 315:18
**custodian** 48:10
142:14 168:6
330:9
**customer** 15:6
16:19,24 19:10
22:15 60:13

102:5,23
103:14,15
104:11,21
108:3,9,15
111:5 113:17
122:8,8 223:8
252:6 253:23
253:25 255:7
255:23 256:21
257:1,4,11
260:22,23
262:15 263:2
265:13 287:6
303:14,24
304:11,12
310:9 324:18
328:11 341:11
343:2,3,4
**customer's**
304:7
**customers** 17:16
19:10 22:16
23:2,7 26:15
30:17 32:24
59:19 60:3
68:15 73:16
99:25 103:7
106:2 112:23
114:10 203:10
203:12 217:23
223:18 254:5
255:9,11,16,21
256:14,16
257:13,14,14
259:15 261:19
262:3,13,20
263:11 265:9
265:10,16,17
265:23 266:3,7
267:5 276:12
276:13 283:19
283:20,24
284:16,16,22
285:16,18
286:5 288:16
293:21,22

294:20 306:18
307:3 308:23
309:2,22 310:7
310:12,21
311:8 312:13
313:1,6 327:13
337:16
**customized**
278:14
**cut** 169:23
**Cutrona** 125:24
126:16 129:1
**cutting** 238:3
**cycle** 111:5
263:3

---

### D

**D** 4:1
**D.C** 2:19 3:11
**Dahlstrom**
321:1
**daily** 103:2
**Dakota** 159:9,20
159:21,21
264:22 274:12
274:14,20
**Dallas** 15:2
321:20
**Dan** 7:24
**DANIEL** 3:3
**daniel.shapiro...**
3:6
**data** 104:17,20
105:9,10,16,18
106:9,12
108:12,22,24
109:1,2,11,16
109:21,22
110:2,10 111:3
111:3,7,8,17
111:22,23
112:5 247:24
**database** 111:15
**DataX** 106:21
106:23
**date** 26:25 142:8

UNSEALED

142:15 143:4,9
144:19 168:17
257:9 330:9,12
330:19,22
347:19 348:10
**dated** 50:23
170:16 250:1
**dates** 257:4,7
**Daugherty** 3:9
7:20,20 202:7
202:11 344:6
**Dave** 143:20
**David** 244:1
**day** 1:18 181:1
215:19 245:15
253:5 283:3
296:16 317:23
348:5
**day's** 213:11
**day-to-day**
120:12
**days** 35:19
170:10 254:7
281:21 320:17
336:25 347:19
**deadline** 334:2
**deal** 11:24 25:16
27:18 91:25
120:12 138:20
182:18 206:14
206:14 214:22
215:9 216:6,8
216:12,24
217:8 222:2,14
222:19,20
241:21 266:10
280:1 281:4,8
281:24 283:9
283:13 288:23
289:24 290:1,5
293:15 294:23
294:24 313:18
314:21 316:20
317:7,8 319:7
**dealing** 295:13
**deals** 70:16

103:6,10
**debate** 125:9,9
**debit** 15:5 19:17
19:23 157:18
**debt** 27:11,12
41:4 134:15
136:11 201:6
201:15,22,25
202:5,14,14,16
202:23 203:2,7
203:17 212:7,9
212:21,23
213:1 263:3
340:11,17,25
341:3,9
**dec** 135:4,6
140:23 141:1
167:10 168:13
247:21 248:4
249:12 254:23
**December**
168:20 170:17
173:7 174:3
231:18 234:4
250:2 302:19
**decent** 15:21
**decide** 15:18
78:1 220:6
269:25 295:21
**decided** 123:9
123:13 158:4
158:15 180:10
201:15
**deciding** 168:21
266:22
**decision** 63:25
101:13,15,17
102:2 108:17
108:18 109:6,7
111:21 147:1,6
147:11 154:25
155:16 156:25
194:1 217:10
219:14 220:25
226:21 244:19
255:15 266:12

266:13 267:4,9
267:15,22
269:9 270:8,13
278:9 284:11
**decisioned**
109:24 110:7
**decisions** 102:3
108:14 269:5
272:21 274:3
274:19 309:12
328:14
**decs** 58:7 145:21
249:17
**default** 256:20
304:5,7,12,21
337:16
**defaults** 255:21
299:20
**defendants** 1:6
7:23,25 8:2
347:6
**define** 90:13
114:20
**defined** 93:12
252:15,24
**definitely** 169:4
238:17 324:23
**definitions**
124:15
**Delaware** 20:14
26:1,6,6 27:18
131:4 148:21
149:4 155:5
156:20 168:19
171:10 173:10
173:16 179:2,2
179:20 181:9
184:21 187:8
191:5,25 210:7
213:8 216:2
218:13 248:18
256:10 261:4
266:11,13,21
275:13 277:13
279:18 286:14
288:25 289:25

292:4 294:25
295:1 296:13
**Delaware's**
153:2
**delegating** 36:1
**deliver** 36:14
100:19 109:16
**delivered** 281:15
**delivering**
138:13
**delivery** 98:10
100:3 101:12
**demanding**
312:1
**demo** 169:10
**Democrat** 302:6
**department**
140:9 187:21
308:9
**depended** 280:1
**deponent** 347:18
347:18
**deposed** 8:10
11:1 12:8
**deposition** 1:9
1:15 7:2 10:8
10:23 12:11
13:4 49:21
79:13 135:14
250:15 282:23
344:15 346:4
347:8,15
**depositions** 11:7
13:5 230:8
**Deputy** 2:8
**describe** 28:23
29:15 36:6
74:5 231:24
**described** 101:5
107:10 121:13
**describes** 65:16
99:18 101:7
**describing** 99:10
288:16
**description** 5:2
6:2 35:9 55:13

56:2 65:18
67:12 95:8
112:9 210:5
251:4
**descriptive**
55:19 247:25
**design** 169:24
170:1
**desire** 53:11
118:22
**Despite** 288:21
**detail** 155:3
194:10 231:7,8
236:11 264:17
**detailed** 192:13
247:11
**details** 35:10
71:14 78:20
178:24 193:6
196:8 212:10
213:19,20
228:5 236:2
288:13 307:12
310:17
**determination**
198:9
**determine**
198:25 274:5
**determined**
111:14 256:25
**determining**
340:24
**develop** 161:11
**developed**
131:21 261:14
278:11 300:11
326:22
**development**
87:16 147:10
166:25 192:23
196:14 216:17
296:19
**devices** 19:6
████ 5:10
134:2,13,17,25
136:14,20

UNSEALED

App. 0119

137:13 139:5
139:17,22
140:5
**dialogue** 227:5
**difference** 10:7
19:15 33:10
60:11 72:24
73:1 74:19
77:5 100:10
105:22 182:17
256:4
**differences**
98:21 260:12
260:13 262:24
263:1 269:4
290:5,14
**different** 21:20
21:25 60:22
61:18,19,19
96:3 117:19
123:24 124:14
124:15,16,25
132:19 141:4
163:7 169:3
173:6 177:5,14
182:8 202:3
211:7 212:18
217:19 218:9
220:10 228:12
231:12 253:15
256:8,22 260:7
260:8 266:6
273:1 283:13
313:18 318:16
328:13
**differentiate**
258:23
**differentiating**
262:6
**difficult** 312:1
314:20 316:19
318:17
**diligence** 190:9
190:22 192:4
192:13,25
193:10 194:6

194:22
**diminish** 34:14
**direct** 66:24
67:14,18,22
71:22,24 72:13
72:14,17 95:10
96:11 98:12,14
98:24 100:11
100:18 104:25
105:1,16,19
110:6 111:16
112:23 113:2,8
115:1 133:8
157:19 201:11
203:11 227:21
244:17 252:23
252:25 254:20
274:22 282:10
321:15 322:1,5
327:5 340:19
**directed** 173:19
**directing** 285:17
**direction** 22:6
36:16,17 37:2
37:4,7,19 38:5
116:7 247:17
270:5 279:19
**directly** 33:9
67:19 72:15
75:19 96:22
98:5 109:1,2
114:12 124:2
128:11 130:13
149:11 161:17
170:23 183:11
183:23 201:8
224:16 251:25
271:25 281:8
311:16 339:20
**directors** 145:9
245:8
**directs** 10:5
**disagreed**
335:17
**disappeared**
44:11

**disappointed**
319:12
**discipline**
326:21
**disclose** 273:10
273:12
**disclosing** 124:7
125:19
**discounted**
21:16 261:13
**discovered**
198:1,5 324:12
**discovery** 47:18
50:21 325:4
**discreet** 181:16
**discuss** 126:20
146:3 236:13
264:10
**discussed** 114:6
145:11 171:3
180:18 277:20
277:20 300:9
325:10
**discussing** 94:25
310:18
**discussion** 92:4
147:19 211:7
243:7 256:1
272:4 277:22
303:6,7 304:19
**discussions**
125:14,16
126:10 127:12
128:7 129:5
145:20 169:13
170:18 171:2
172:9,18 173:1
180:4,15 195:3
207:3,14
210:24 224:5
257:20 291:15
307:4 337:1
**disorder** 10:21
**display** 58:6,6
59:2
**dispute** 11:21

**dissimilar**
342:19
**distinct** 74:21
252:23
**distinction**
66:23,25 67:1
130:16 243:3
**distinguish**
130:12 259:12
262:24
**distracted** 96:17
**distributed**
171:16
**District** 1:1,1
7:6,7 347:1,1
**Diver** 2:4
**diverse** 115:9
**diversification**
112:14,21
113:19 115:5
116:10
**document** 45:25
47:9,15,17,17
47:18 48:8,11
48:15,19 50:22
50:25 51:3,7
51:10,13 54:2
54:5 55:6 56:8
56:10 64:14
66:19 99:9,17
101:5 104:8
116:22 121:25
135:3,10 141:5
141:20 142:7
142:19 143:16
144:1 164:8,8
164:16,24
167:20 168:3,5
168:10 171:15
206:18,21
208:9,15,17
225:3,8,25,25
226:1,12
229:23 230:4
230:11 242:25
295:16,19

299:9 303:2
305:9 315:9,14
318:7,10
325:13 326:5
330:2,7,10,11
330:20,25
331:2,15,21
333:16 334:10
336:1 341:5
343:19
**documents**
31:19 47:11
51:19 55:9
79:2 112:13
144:1 147:5
167:3 183:2
222:20 230:2,3
230:5 266:11
295:13 305:1
325:5 331:10
331:15
**doing** 14:14 17:3
17:13 23:1
25:12 35:25
38:11 79:13
107:25 123:23
124:1 136:18
157:16,22
158:23 177:14
196:19 205:3
227:18 228:2
230:7 233:10
238:8,12
245:15 253:23
253:25 258:18
262:1 263:5
277:5 283:14
283:18 295:25
321:12 323:2
326:22 327:11
328:17 332:14
333:14 339:16
339:19,20
**dollar** 59:25
240:25 241:1
241:17,18

UNSEALED

App. 0120

242:8,9
**dollars** 85:20
178:19 201:5
203:18 204:18
229:7,11 233:5
241:2 242:21
243:1,2
**domestic** 280:19
**doubt** 175:12
**dozen** 224:13
**dozer** 36:19
**draft** 46:1 48:23
51:16 55:6
105:6 140:25
207:2
**drain** 197:16
**dramatic** 275:21
**dried** 116:4
**drive** 172:11,20
173:3 313:22
**driven** 214:4,14
**driver** 5:3 33:21
35:7,13 36:19
36:25 37:14
129:16
**drives** 29:19
**driving** 29:24
36:25 280:24
**drop** 72:10
288:15
**dropped** 253:8
**drove** 42:7
209:21 211:14
**due** 73:22 91:16
91:21 93:2,4
189:7 190:9,22
192:4,13,25
193:10 194:6
194:22 281:13
283:19 309:11
310:14
**duly** 1:17 8:6
347:13
**duplicitous**
312:8

     **E**

**E** 2:1,1,12 3:1,1
4:1 5:1 6:1
**e-mail** 2:6,10,15
2:20 3:6,12 5:7
5:9,14,18,20
6:8,10,13,16
47:21 50:22,23
50:24 64:17,19
64:19 103:7
135:4,5 142:4
142:9,11,21
143:18 161:25
162:8,11,16
164:1 167:11
167:12,21,21
203:15 226:4,5
230:4,5,6
232:25 281:20
282:18 283:23
284:5 288:15
305:10 308:20
316:24
**e-mailed** 283:20
**e-mails** 316:6,7
**earlier** 33:4
40:23 135:13
211:20 252:24
282:17 309:20
336:7
**early** 22:25
23:12,12 25:24
35:19 149:1
151:14 169:7
207:14 252:18
256:25 261:24
275:3,5 297:3
302:8 326:13
336:25
**earnings** 253:24
**easier** 245:18
247:1 294:25
**Eastern** 1:1 7:7
347:1
**easy** 192:12
**Eckman** 152:21

152:22,23
190:18 192:10
291:2,11,12
292:3
**economic** 87:15
195:18 196:14
197:16 205:8
216:17 290:13
296:18 319:4
323:4
**economically**
42:2 288:24
290:1 294:23
**economics** 241:7
241:9 289:6
319:19
**Ed** 154:12,13
**edited** 331:6
**effect** 162:2
**effective** 33:7,11
33:12 60:2,24
62:9,23 64:3,6
156:16 323:19
**effectively** 36:16
74:15
**eight** 17:6
**either** 26:6 33:9
40:6 43:22
52:6 63:25
82:19 92:6
105:8 107:6
108:14 109:6
111:7 113:12
117:25 128:15
138:22 143:2
143:25 147:5
147:10 181:5
203:11 215:3
216:8 221:10
223:8 256:2
262:17 269:20
285:8 293:22
295:21 308:22
320:21 329:8
335:16
**Elastic** 57:20

234:19 251:22
252:4,5,15,19
253:14,22
254:10 255:5
256:6 257:22
**Elder** 109:17
**elected** 219:24
271:23
**elements** 289:24
**Elevate** 30:19
31:5,10 32:1,3
33:3 44:14,15
44:16 46:11
64:24 132:25
133:3 249:4
329:15,16
**Elevate's** 31:6
32:5
**eliminate** 43:24
**employed**
125:25 347:24
**employee** 168:7
320:23,25
**employees** 34:24
320:1 323:25
343:9,10
**employer** 17:5
**employment**
11:15 322:16
322:19
**enabled** 23:11
43:1
**Encore** 5:14
194:15,15,17
194:23,24
195:9 196:15
197:10 198:9
199:5,17
200:12 201:4
216:7
**ended** 16:14
24:14 133:13
157:16 189:2
195:2 201:21
203:19 218:17
286:21 318:23

335:19
**engage** 39:19
**engine** 101:13
101:18 102:3
108:17 111:21
260:17 278:9
285:17
**engines** 162:3
163:25 165:25
166:18,18
182:2 281:20
**enhanced**
157:19 335:18
**enhancements**
278:2
**enjoying** 82:1
**ensure** 93:9
341:10
**Ensuring** 138:6
**entering** 27:17
**entire** 240:14
295:19
**entirely** 98:20
105:5 234:20
337:22
**entities** 94:8
159:3 190:5
227:22 308:14
**entitled** 66:19
331:2
**entity** 89:10
133:13 135:1
138:23 158:8
165:12 179:6,7
179:17 183:6
183:10,11,22
183:24 188:3
205:18 223:7
223:13,17
315:24
**entrenched**
118:14
**environment**
69:16,21 70:1
112:10 275:10
275:14 276:9

**UNSEALED**

276:17
**Equifax** 106:1
**equity** 23:17
41:3,9 69:18
136:10
**equivalent** 9:16
70:7,17
**era** 58:12
**eroded** 275:14
**eroding** 318:23
**error** 345:5
**escape** 341:19
**especially** 121:4
**essentially** 19:4
97:11 133:8
178:9 181:7
332:21 335:21
341:18 342:15
**establish** 195:16
222:15 223:13
291:21
**established** 27:4
173:19 181:18
185:22 223:5
324:18
**establishing**
37:7 151:12
296:23
**establishment**
19:12,19 222:7
**establishments**
18:22
**et i** 1:6 7:5 347:6
**ethics** 30:13
**evaluated**
157:13 197:4
224:3
**evaluating**
148:22 157:21
169:3 180:18
180:20 275:3
**evaluation**
133:17,21
158:13 186:23
**event** 53:17
134:16 160:5

259:17
**events** 60:8
**eventually** 15:23
26:22 161:9
293:15 343:8
**everybody** 36:22
47:1
**evidence** 221:23
234:10
**evolution** 46:10
127:9 261:24
263:13
**evolutions** 174:6
**evolve** 181:21
322:14
**evolved** 35:18
77:17 128:14
181:21 218:6,9
334:6
**evolving** 176:4
261:20 274:1
**exact** 20:11 23:3
26:25 75:17
90:19,24,25
163:23 178:16
305:19
**exactly** 24:10
27:14 28:9,11
33:16 52:15
55:7 65:1,5
84:7,22 86:9
91:7 121:16,21
122:15 133:21
144:14 151:1
159:16 169:23
172:16 174:5
175:7 176:4
180:23 189:2
190:21 194:6,9
194:17 196:20
196:21 210:18
211:3,4,6,8
212:16,19,22
216:13 218:10
237:6 238:2
244:9 248:11

249:16 256:23
261:22 263:12
276:6 285:13
285:15,24
291:14 302:4
304:18 309:12
316:3 319:22
334:5
**exam** 185:24
**examination** 4:6
8:8 183:21
**example** 41:13
106:11 109:13
109:25 115:12
123:7 129:7
254:22 267:24
286:24 312:2
328:24 331:19
**examples** 68:4
129:9
**exams** 184:23
185:24
**Excel** 230:6,11
**excess** 242:13
**excessive** 327:2
**exchange** 227:11
**excited** 282:5
**excitement**
166:5,9,12,22
**exciting** 279:10
**excluded** 185:16
**exclusive** 132:21
233:18
**exclusively**
236:20,23
238:9
**excuse** 36:19
74:24 78:5
102:7 185:11
216:5 228:3
235:14 319:18
**executed** 206:23
206:24 207:1
207:18,19,20
207:25 208:3
215:17 217:3,4

217:6 218:21
218:22
**executive** 52:7
125:14 127:6
128:7 157:6
**executives** 162:1
314:10 335:16
**exhibit** 5:3,4,5,7
5:9,12,14,16
5:18,20,22,24
6:3,5,6,8,10,13
6:15,16,18
34:1,2 43:9,11
44:1 46:20
47:5,13 49:21
64:13,18 66:11
135:5,7 141:21
142:4,7 143:11
164:16,25
167:9,15,16
200:4 206:19
208:7 226:1,2
229:24 246:22
250:14 264:8
280:7,8 283:4
292:24 293:2
295:9 298:9
302:23 303:1
305:3 315:8,13
317:19 318:3
322:6 325:14
330:5
**exhibited** 185:15
**exhibits** 4:3 79:3
80:19 204:23
326:9
**existence** 83:22
106:6
**existing** 42:1,8
157:8 171:8
**exists** 282:19
**exit** 155:16,17
**exited** 186:7
319:10
**exiting** 229:2
**expand** 129:17

234:17 324:15
**expanded** 25:17
175:2 287:9
**expanding**
266:19 312:13
**expansion** 337:2
**expansive** 273:5
**expect** 117:7
190:16 213:20
240:9 274:21
285:18,20
286:12 291:12
**expected** 165:21
214:3 235:9
281:12
**expense** 5:21
59:21 72:15,16
97:13 230:15
230:20 231:6
233:17 234:1
235:4 254:4
288:22
**expenses** 67:20
67:21 74:1
75:4 95:11,12
96:3,9,9,12,12
96:20,21,23,23
97:10,11 98:2
98:4,7,9,11,16
98:22 230:21
231:1,5 233:9
237:22 238:4
242:1 243:9,13
244:3,5
**expensive** 19:5
62:2
**Experian** 105:25
106:1
**experience**
120:13 148:7
191:9,22
193:11,15
194:13 197:1,8
198:22 199:1
**expertise** 99:12
104:18
**Expiration**

UNSEALED

348:10
explain 47:12
  105:21 107:11
  143:24 195:14
  227:10 230:17
  265:1 304:9
  322:7,9 327:8
  345:5
explaining 99:7
  176:3 327:2
explore 289:2,24
exploring 42:1
expressed
  273:14
expressing
  311:7 314:22
expression
  93:21
expunge 46:13
extensive 247:9
extent 26:8
  63:24 71:19
  93:3 124:6
  125:18 138:24
  154:2 190:25
  194:12 197:7
  274:2,2,15
  322:10
external 42:12
  328:22 332:7
extra 242:8,9
extremely
  316:19
eye 202:23
eyeballs 260:22

**F**
Facebook 108:5
facial 16:18,20
  16:23
facility 136:12
  136:15,22
  237:4 238:23
  238:24 287:12
facing 259:4
fact 26:17 50:22

54:3 56:5 63:4
  66:3 80:23
  85:7,21 90:6
  109:12 116:14
  121:2,17
  122:13 125:12
  125:14 129:19
  138:11 146:4
  153:1 160:6
  162:16 165:25
  175:4 187:5
  193:16 194:7
  195:9 197:7,13
  199:10,12
  200:12 202:5
  204:19 211:10
  219:19 220:14
  220:20 221:19
  224:6 232:11
  237:11,19
  238:17 243:21
  248:22 258:7
  259:14,16
  297:16,19
  311:15 341:8
factor 258:23
factors 281:13
FactorTrust
  106:8
facts 345:4
failed 18:11 19:2
  197:12
failing 295:13
faintest 208:13
fair 32:4 40:8
  60:19 203:7
  214:21 234:13
  265:15 277:9
  302:13 326:23
fairly 25:8
  152:10 181:16
  247:24 314:23
fairness 85:9
  167:19
faith 317:4
fall 251:19,20

252:10
familiar 8:15
  48:14 51:13,24
  55:3 57:25
  66:25 76:5,8
  76:20 93:22,24
  94:1 112:15
  115:14 122:20
  123:15,20
  143:25 144:4
  165:2
familiarize
  298:15
family 24:3
  173:23 174:18
  174:21 175:9
  175:14,18
  186:19 250:19
fantastic 281:14
  283:14
far 97:22 111:21
  192:19 195:1
  286:4 314:1
Fargo 14:11,14
  16:2,15 17:4,7
  17:11,13,18
  18:1
FASB 75:18
fashion 196:23
  331:14
fast 169:6
fast-growing
  128:21
favor 158:5
FBD 157:2
  296:2,3
FDCPA 341:11
FDIC 155:6,17
  171:10 183:19
  183:19,20
  184:20,22
  185:12,14,19
  185:23 186:5,8
  186:16,20
  187:1,6 275:20
  277:2 296:5

February 162:1
  182:2 198:19
  280:11 281:2
  281:12,20
federal 1:23
  9:17
fee 66:15 200:13
  200:14 219:3
  241:3,20
  297:24 298:2
feel 25:3 30:3,12
  37:10 183:23
  183:25 236:10
  244:24 327:12
fees 60:18 68:4
  68:13 73:12
  219:16,19
  220:24,25
  221:1,16,19,19
Feldman 3:10
fell 319:15
felt 22:5,14
  40:16 43:24
  60:4 113:16
  182:22 183:17
  192:23 195:17
  197:22 205:6
  216:15 276:17
  279:1
FICO 106:3
fiction 122:24
  124:13
fighting 197:25
figure 31:2,18
  213:22
figuring 267:11
filing 326:25
filings 52:12
  192:15 327:6
filled 56:13
final 182:19
  183:1 215:17
  217:3,8 218:20
  222:19,20
  224:4 267:4
  281:24

finally 169:5
finance 1:6 2:17
  5:5,16 6:15,18
  7:5 8:2 11:12
  15:12 20:24
  26:23 29:1,11
  29:14 31:7,15
  31:22 32:6,13
  32:16,20 36:10
  44:10,16,17
  45:5,13,19
  46:10,11 47:10
  51:1 53:22
  54:4,4 62:12
  63:5 66:19
  67:2,3,14,15
  67:19 68:4,13
  72:14 73:14,20
  73:24,25 74:16
  75:3,10 76:9
  76:17,20 78:23
  80:3 81:14
  82:20 91:2,24
  92:21 93:12
  94:22 95:10,16
  96:2,11,13,22
  99:12,19
  102:18 103:3
  109:18 110:3
  110:12,21
  111:4,10
  114:21 116:14
  122:4 125:13
  134:12,20,23
  135:16,18
  136:6,8,9
  137:6,25
  150:19 153:20
  153:22 162:18
  175:4,5,10
  176:1 177:6
  181:6 188:7
  189:10,23
  190:7 193:9,22
  194:21 195:8
  201:2 207:4

209:17 210:15
211:21 214:14
215:20 219:16
224:21 229:11
233:4 242:20
244:5 248:13
270:9 274:1
287:13 290:2
291:17 294:24
307:16 308:4,9
308:23 311:8
314:24 315:22
316:10 319:11
320:1,11
321:13 325:6
325:23 326:15
329:17,21,25
332:8 336:9
337:15,20
338:13 339:1
347:6
**Finance's** 96:25
97:1,12 107:11
**financed** 287:1
**financial** 14:10
14:21 17:10
23:6 59:18
60:3 75:24
76:6,8,21
82:19 94:7,8
94:21 189:23
232:21 233:8
236:22 243:10
244:8 251:10
252:11 258:24
262:2 263:7,12
264:11 297:24
317:7
**financially**
72:18 297:21
348:2
**financials** 231:5
248:1
**financing** 56:11
134:15 171:8
212:21

**find** 25:10
142:20 149:12
180:12 228:3
253:9 286:6
303:23 324:8
**finder's** 200:13
**fine** 9:21 10:2
29:4 49:15
103:24,24
136:3 143:11
155:19 164:20
177:18 225:17
243:5 246:19
247:2 274:23
299:6
**finish** 10:18
63:11 73:3,7
73:10 129:25
130:3 174:10
183:15 269:7
316:23 343:23
**finished** 9:4 21:2
97:18 222:24
**finishes** 97:15
309:5
**Fintech** 5:4
148:25
**fireside** 43:20
**firm** 154:18,20
191:8 208:25
225:13 231:24
231:25 232:6
286:15,18
291:5 348:11
**firmly** 118:13
**firms** 125:23
231:22 232:15
235:24 236:6,8
333:22
**first** 8:6 10:25
14:8,24 15:22
20:14 25:13
26:1,3,5 27:18
34:5 43:5,6
47:16 53:4
56:19 60:10

63:1,21 66:22
74:3 101:4
104:9,16
109:17 115:1
130:25 131:4,4
131:21 143:24
147:9,13,15,20
148:20 149:2,4
152:22 153:2
155:5,25 156:1
156:2,20,24
159:7,8 165:22
165:22 168:19
171:9 173:10
173:16 179:1,2
179:19 181:9
182:12 184:21
187:8 191:5
209:7 210:7
213:8 216:1
217:8 218:12
222:3 223:24
224:9 228:18
230:8 248:16
248:17,19
250:22,24
253:17 256:10
261:3 265:17
266:11,12,21
272:25 275:12
277:13 278:25
279:12,18
286:14 288:19
288:24 289:25
292:4 293:21
294:24 295:1
296:13 306:5
326:10
**fit** 66:12
**five** 177:21
339:9
**flag** 108:6
**flat** 304:13
**fleshed** 105:12
**flip** 48:16 205:1
277:18

**flippant** 25:2
**flipped** 300:20
**Floor** 3:11
348:12
**flow** 23:19
169:21,21
242:13 296:12
296:14
**flows** 74:22
296:16 308:8
308:13
**focus** 23:1 31:15
32:8 35:17
119:19
**focused** 25:6
32:24 42:25
44:24 223:20
238:10 279:15
**focusing** 302:5
**folder** 48:9
**folks** 140:24
**follow** 30:25
**followed** 328:16
**following** 276:9
347:12
**follows** 8:7
34:13
**footprint** 108:4
108:6
**force** 255:10
**forced** 69:17
98:19
**forces** 70:13
**foregoing** 346:4
**foremost** 60:10
228:19
**forget** 145:18,21
**forgetting** 25:25
121:6
**forgotten** 92:10
106:23
**form** 14:5 20:16
20:19 22:9,13
23:14 26:7
27:13 35:14
38:8 39:12

40:2 41:7,18
41:23 42:4,15
44:12 45:20,24
52:3,9,21 53:1
53:15,23 55:4
55:22 56:9,23
58:2,10,19
60:9 61:5
62:10,18 63:15
63:23 66:5
67:7 68:7 69:3
69:24 70:9,10
70:19 71:18
72:22 74:17
75:25 77:9,12
77:15 78:12
79:1 80:7,11
80:18 81:5
83:1,2,8,19
84:5 85:23
86:3 87:23
88:17,18,19
89:7,13,22
90:12,17 91:5
91:14 92:2
93:14,20 94:3
94:10,23 95:18
95:22 96:15
97:2,25 99:14
99:22 100:16
101:19,25
102:24 103:12
107:13 108:19
111:11,25
113:3,6,23,24
114:22 115:8
116:8 117:13
117:21 118:9
118:25 119:25
122:5 123:11
124:5 125:17
126:12 127:15
129:14 132:11
132:16 133:5
134:21 136:16
138:5,17,18

UNSEALED

App. 0124

139:7 141:6,7
145:25 148:2
149:8 150:21
151:7 152:2,14
153:9 155:8
158:25 162:6
162:22 164:7
166:3,20
168:25 172:3
176:11,22
178:11,12,13
181:11,12
182:3 187:10
187:24 188:9
189:12,25
190:10 191:6
191:14 194:3
196:3 199:8
202:7 203:20
203:24 206:11
207:8 209:20
210:8,23
211:23 212:6
212:20,23
213:17 215:21
219:21 220:3
221:3,4,9,21
222:17 225:2
233:6 234:8,9
237:25 238:3
241:4 247:11
261:6 262:8
267:17,20
268:24 275:16
277:15 279:21
281:6,25 284:9
285:12 287:3
287:17 289:7
293:24 295:2
301:10,24
303:19 306:9
306:19 307:17
307:18 308:10
309:23,24
312:15 313:13
326:17 327:24

327:25 328:6
329:12 331:17
331:23 332:2
332:12 335:11
335:25 336:11
338:17 339:23
340:13 341:4
341:24
**format** 230:10
**former** 195:1
283:19 286:5
288:16 319:25
320:23
**formerly** 11:23
**forms** 22:24
258:17
**formulate**
332:15
**Fort** 1:21,22
15:19 115:16
286:11 321:18
**forth** 84:8,23
85:11 90:1
208:18 245:14
**forward** 130:11
158:15 279:25
**found** 48:9
50:21 163:8
196:10 285:16
304:10 313:22
**foundation** 53:3
78:13 86:4,5
162:9 187:11
187:25 188:10
189:13 190:11
203:25 204:23
207:9 219:22
220:4 262:9
319:24
**founder** 40:9
159:12
**founders** 23:22
**four** 29:20,20
32:11 54:10
104:14 295:14
**Fox** 329:1

**frame** 53:7
169:11 338:6
**frankly** 248:13
263:8 342:17
**fraud** 16:24
102:6,8 108:7
111:12,14
112:2,4,5
**freestanding**
143:19 168:5
**Freeway** 348:11
**frequently** 58:9
**friends** 173:23
174:18,21
175:9,13,17
186:19
**front** 82:24
275:25 295:21
**frustrated** 205:4
313:5
**frustrating**
35:18 195:13
195:14
**frustration**
120:19,24
121:23 122:3,7
276:8
**frustrations**
138:11 276:6
**FTC** 302:12
**full** 10:23 37:11
77:19 169:4
306:7 324:21
337:6
**fully** 25:14
30:22 120:17
122:3
**function** 137:11
**functional** 30:4
**fund** 23:20 24:3
78:6 84:15
86:14,14 87:7
87:17,22 91:19
92:22 93:6,8
139:24 172:10
172:20 173:2

173:18,25
174:13,14,16
174:25 175:1,5
175:20,20,21
175:25 176:8
176:14 177:7
177:11,20,22
177:22 178:2,3
178:3,5,10
179:14 181:7
181:17,18,19
185:22,23
186:18 188:24
189:5,6,7,8,20
213:10,11
222:6 241:24
286:16 299:19
**funded** 19:16
85:21 102:10
**funding** 27:22
78:9 84:3
85:22 139:10
147:24 176:4
180:20 211:13
211:16 237:3
**funds** 23:25
68:18 73:18,19
73:21,23 75:9
85:8 134:9
138:15 173:13
177:15 223:9
**further** 9:11
270:15 344:1
347:17,23
348:1
**future** 178:1
202:19 224:16
262:18 308:24
**FWST** 6:16

──────────
**G**
**G-A-A-P** 93:23
**GAAP** 93:23
94:5,12,16
**gain** 307:7
**game** 32:5 198:2

**gangsters** 199:7
**gaps** 51:16
246:18
**GE** 15:7
**Gehres** 154:12
154:13
**general** 1:3 2:8
71:6 120:11
129:1 137:18
236:6 260:8
271:14,15,16
278:8 334:20
342:4,6,7
347:3
**generalities** 39:5
**generally** 69:9
75:2,7 93:23
94:6 95:6
100:4 108:11
113:2 131:16
144:25 169:24
170:9 207:11
209:14 223:5
233:16,20
269:5 318:21
331:9
**generate** 60:1
176:20 268:10
**generated**
253:19 272:23
**generically**
294:5
**gentleman**
159:13
**Gentlemen**
281:19
**gestures** 8:20
**getting** 35:10
36:15 75:16
123:4 129:9,9
163:4,4 179:5
195:9 199:13
200:13 214:12
239:3 241:12
248:15 249:6
251:13 260:21

UNSEALED
App. 0125

265:18 269:23
281:14 285:9
290:21 316:3
322:15
**Gio** 338:1,22
**give** 10:22 29:17
42:19 43:9
48:4 78:24
80:16 97:19
99:4 142:6
207:25 208:3
228:14 238:10
245:16,21
251:1,4 257:4
267:24 270:4,5
280:6 292:17
298:16,24
303:24 308:13
333:9,11
**given** 168:18,18
180:18 347:16
**gives** 197:12
**giving** 68:23
79:9 278:1
293:3 295:15
**glad** 322:12
**glass** 19:13
**go** 8:14 10:19
13:19 16:1
26:10 32:1
37:23 45:4
46:5 50:1,12
50:21 51:5
54:4 56:1
57:17 62:15
64:11,20 72:12
72:12 76:11
78:18 95:4
97:17 100:8
109:2,17
119:18 130:17
133:17 147:7
147:11 148:3
162:4 166:17
166:19 168:21
170:7,13 178:4

187:12 204:20
205:1 220:18
221:24 223:2
235:14 236:10
238:1 241:18
242:1 247:1
248:4 249:23
258:25 260:23
261:23 266:4
267:11,12
270:1,14 273:8
273:14 285:3
293:14 302:19
306:6 320:21
322:6,11
333:17
**go-ahead** 169:17
**go-between**
190:9
**goal** 215:3
**God** 280:11,14
**goes** 23:20 56:18
106:3 111:21
257:17 300:13
303:17,17
**going** 8:18 19:12
28:10 30:9
46:22 48:6
50:11,14 61:25
66:10 80:4
91:13,23 104:8
108:15,17
130:10 142:12
143:8,17
145:11,15
147:7 154:14
155:2 156:15
156:16,21
157:3 160:10
162:15 167:20
168:20 178:1
179:20 182:1
185:1 198:18
203:14 214:19
214:24 225:24
227:3 232:24

235:6,18
239:22 240:16
242:9 244:22
245:4,9,10,11
245:12,14,16
245:17,21,22
246:21 249:23
253:14 260:23
262:6 263:22
273:7 278:23
278:24 281:3
282:3 283:1
285:17 298:16
298:16 299:3
302:5 304:8
307:9,14 309:1
312:8 315:10
317:22 322:7,9
330:2 335:15
**good** 10:4 18:16
35:2 40:19
82:3 100:7
103:18 150:25
164:22 192:23
193:7 194:1,8
247:18 259:18
302:3 314:18
316:15,15
317:3 318:19
318:22,22
319:24
**Goodwin** 2:18
**Google** 260:16
**gosh** 218:19
253:4 329:18
**gotten** 15:16
180:14 203:3
216:7 281:22
**governance**
247:18
**government**
28:20 139:21
187:7 297:11
**GP** 5:8
**GPL** 6:8 66:10
66:11 170:20

171:19,21
**GPLS** 84:2 89:9
89:10,12 90:1
90:9,10 91:1,2
91:3 92:1
93:12 171:19
181:6,18
208:11 209:22
213:5 214:1,15
219:2,20,24
220:6,14,21
221:2,20 222:9
222:14 237:22
238:20 240:23
241:10,11,18
241:24 242:12
242:17 244:6
308:7 336:9
**GPLS's** 89:17
**graduate** 14:2
**graduated** 13:20
16:5
**graph** 57:23
58:1,9 62:1
**great** 57:13
63:19,21,25
64:4,7 65:19
68:3 82:22,25
83:13,17,22
85:20 86:1,6,7
91:25 150:20
166:1 167:1
171:20,23
181:24 208:16
216:16 227:22
228:10,19
234:6 240:2
259:9 264:11
265:24 267:7
268:20 281:1
281:11 282:6
283:8,11
293:12,16,23
299:1,15 300:3
300:4 303:5
310:5 311:22

313:10
**greater** 319:19
**greatplainslen...**
163:17
**Green** 57:13
60:5 63:1 68:3
78:18,25 79:20
81:4,7,13 82:6
82:7,18 109:13
110:1 147:25
155:25,25
156:18,21
162:18 184:12
195:10 198:2
198:14,15
216:24 217:9
220:22 222:15
223:13,21,24
224:21 234:6
237:15 265:24
266:8 267:7
268:6,19
282:17 284:1,2
284:16 285:11
286:24 287:13
288:20 289:25
290:1,16
291:12,16
293:8,12,23
299:16 300:4
303:6 310:6
318:11,12
320:2 322:23
327:22 328:18
**grid** 61:8 63:19
104:11 108:16
**grocery** 15:4
16:23 19:11
**Grogan** 2:4 7:16
7:16
**ground** 8:14
166:11 311:22
**group** 88:22
183:5,8 269:24
272:20 278:2
331:20 332:15

UNSEALED

App. 0126

332:23 335:22
**groups** 23:2
263:4 271:16
**grow** 15:19
25:19 99:25
138:22 157:8
157:20 309:15
312:20 322:15
**growing** 91:10
129:20 263:10
263:15 313:6
**growth** 15:17
25:7,23 36:14
41:5 69:18
129:18 136:22
136:23 138:7
139:2,11
237:12 238:24
238:25 264:13
293:4 323:20
334:23
**guarantee** 75:8
90:2 91:4,6,7
91:20 218:4
241:11 242:3
336:9
**guaranteed**
90:16 91:3
92:21
**guess** 28:10 35:5
40:5 41:9
50:24 113:25
121:22 122:6
136:17 154:20
187:1 200:13
201:7 225:8,16
245:8 253:11
256:18 257:25
267:23 279:3
282:10 339:22
340:7 342:20
343:24
**guesses** 304:4,6
**guessing** 12:10
140:12
**guidance** 186:5

296:5
**guilty** 9:2
**Gus** 3:15 7:9
344:3
**guy** 24:14 123:6
201:3 228:6
313:21 321:1,2
**guys** 65:4

**H**

**H** 5:1 6:1
**half** 258:8
**hall** 34:20 54:13
126:20 145:1,7
236:13
**halt** 10:17
**Hamilton** 14:9
152:24 225:1
225:12,13
271:9
**hand** 217:10
316:8
**handful** 163:9
**handle** 133:1
**handled** 130:13
**hands** 19:19
203:3,19
**hang** 195:6
245:11
**happen** 27:9
34:18 116:20
145:12 161:4
162:15 181:25
182:1 202:17
204:4 208:10
275:6 282:7
319:22
**happened** 11:16
44:24 53:6
102:6,9 124:21
128:15,21,24
149:23 155:4
167:1,2,3
179:12,23
180:24 198:6
200:11 210:19

248:12,12,13
248:23 249:1
265:22 266:5
319:6,12
323:21
**happening**
20:14 149:1
178:10 227:14
285:14 311:1
312:18
**happens** 8:18
9:9,16 47:12
202:13
**happy** 29:10
32:2 126:19
160:9 164:17
182:20 278:19
282:22 296:17
**hard** 8:25 35:9
79:8 83:11
126:1 168:23
192:24 227:20
323:12
**Harry** 185:9
186:15
**Harvison** 13:4
13:14 23:23
24:3,6 27:12
126:7,15
207:23 247:5
250:15,17,19
277:21
**Harvison's**
250:15
**hats** 24:12
**Haws** 3:4 7:22
7:22
**Haynes** 78:19,23
78:24 81:14
82:15,16
147:14,15
149:17 153:8
184:11 190:9
190:23 192:10
192:10,17,18
193:2 199:2

209:22 211:11
211:13,15,18
211:19,22
212:8,8,22
213:10 214:8
216:21 218:16
218:17 219:3
225:12,14
290:25
**Haynes'** 148:4
148:12 193:3
290:25
**he'll** 73:8 97:19
342:8
**head** 325:8
**headed** 39:21
**hear** 204:9
306:25
**heard** 72:2
93:18,20,21
110:14 122:22
127:8 149:23
152:8 199:11
209:1 291:6
319:14,18,20
319:25 320:4
**hearing** 10:21
120:18 204:9
**hears** 172:16
**heed** 186:12
**held** 7:6 30:20
**help** 28:19,19
40:9 43:24
73:15 104:9
128:19 134:23
137:22 148:8
163:10 207:18
228:3 247:16
259:15 262:2
263:11 265:7
286:25 287:2
327:11 334:23
337:15
**helped** 15:3
37:11 263:3
269:10 324:25

**helpful** 9:22
**helping** 68:15
134:17 136:19
138:9 139:9
148:5 149:12
195:16 238:11
258:18 262:2
334:7
**hereto** 1:24
**hey** 167:4
285:21
**hier-** 30:4
**hierarchy** 30:5
34:15 35:1
**high** 19:7 25:23
25:23 30:13
60:1 66:1,16
182:20 250:25
265:20 290:6
**higher** 118:3
215:18,22
255:21
**highest** 253:25
**highlight** 40:13
46:15 59:18
262:14 275:1
279:3
**highlighted**
46:16 48:20,21
48:23 49:2
262:25
**highly** 39:16
**hire** 225:1
291:17
**hired** 232:11
291:4 322:22
324:7
**historic** 111:7,7
111:22
**history** 25:12,19
46:10 56:11
157:1
**hit** 166:11
**Hogan** 239:24
240:1
**hold** 63:10

UNSEALED

172:23 239:6
270:2 275:24
332:25 339:17
343:16
**holding** 315:25
331:3 333:19
333:21
**Holdings** 6:18
**hole** 246:1
**Honduras**
338:11
**honor** 239:5
**hope** 139:5
154:14
**hoped** 139:10
144:8 293:17
323:21
**hopefully** 109:7
125:7 170:3
229:6 267:25
304:21
**hoping** 157:25
293:14
**horizontal**
104:10
**Horrocks**
201:16,18
340:21
**hour** 103:21
263:23 315:11
317:22
**hours** 246:9,10
298:6 343:22
**housed** 130:23
131:24
**Hull** 208:2
**hundred** 59:25
61:20 78:3
119:8 221:11
247:23 248:9
**Huseby** 348:10

**I**
**iackelsberg@l...**
2:6
**idea** 14:23 16:17

23:4,5 32:24
34:22 35:13
48:22 52:19
139:4 152:15
167:12 208:13
260:9,16 324:4
325:1
**ideas** 37:18
40:20
**identical** 210:11
**identification**
102:8
**identified**
167:16 247:4
250:22 280:4
**identifies** 231:21
**identify** 16:24
148:5 245:17
270:19 271:4
283:2
**identifying** 42:7
99:23
**identities** 273:11
**Illinois** 3:5
**illness** 10:20
**image** 42:13
**imagination**
23:24 46:14
**imagine** 44:4
222:9 280:1
311:17
**immensely** 82:2
**immunity** 158:9
**impact** 139:2
296:18 301:17
**implemented**
301:6
**implementing**
300:15
**importance**
120:20
**important** 23:17
39:9,16 45:1
197:2,17
198:19,20
202:22 205:7

227:24 243:3
247:15 259:12
262:7,14
263:11
**impressed** 24:13
**impression**
184:19 186:16
197:24
**impressive**
13:19 24:21
247:8
**improve** 127:13
129:11
**improved**
301:16
**improvements**
128:23 278:6
300:2,5,11
**improving** 30:2
128:7
**in-house** 111:8
125:24 126:3
128:15 273:7
**inaccurate**
63:14 328:19
**inappropriate**
143:3 197:19
197:22 199:14
204:6 222:21
**inbound** 103:15
**include** 63:25,25
251:5
**included** 68:11
240:7 242:22
**including** 14:10
15:1 17:20
157:12 158:14
224:14 271:8
291:11 340:18
**inclusive** 294:19
**income** 67:15
157:5 216:18
265:14
**incomplete**
335:1
**inconsistent**

181:13
**Incorporated**
7:5
**increase** 139:5
**increasing**
261:25
**incredibly**
267:19
**incrementally**
30:1
**independent**
185:4,5 220:10
**Indian** 148:9
**indicate** 236:5,8
236:12
**indicated** 21:17
**indicates** 56:7
**indication**
200:24
**indicator** 108:7
**indirect** 66:24
67:5,9 68:1,18
68:19 72:20
95:16,16 97:23
97:24 98:15
100:12,20
111:16 112:25
113:20 252:25
**individual**
243:14 278:11
**industry** 42:25
151:14 152:1
227:16 296:23
297:13,17,22
301:16,19
302:3 306:12
**information**
48:5 51:12,13
68:10 74:4
101:9 106:20
108:9 109:23
141:4 145:22
145:23 153:24
193:25 248:2
278:1 282:16
288:3,9

**informed** 186:16
308:22
**inherent** 77:24
**initial** 78:9
83:14 86:14
104:23 175:24
175:24 206:7
224:5
**initially** 90:10
90:13 154:7
268:21 304:14
**initiate** 81:3
**initiatives**
111:16 285:10
**innovation**
25:11,23 29:23
54:21 55:1
235:2 275:21
276:24
**InnoVentry**
16:13
**inquiries** 335:5
**insert** 235:20
245:23
**inside** 270:10
**inspire** 34:23
**installment**
20:23 22:24
26:18 57:8
131:3,9,17,23
132:2 210:10
254:21 261:20
278:25 293:4
294:5,16
**instance** 1:16
27:21 30:6
98:8,11 132:20
185:22 218:15
328:10 335:5
**instruct** 295:18
**instructed**
306:17 307:2
**instruction**
126:13 235:21
**instrumental**
151:11

integrity 243:21
intended 21:8
intent 107:24
intentionally
246:17
intents 225:23
interact 323:12
interacting
315:18 319:2
interactions
40:8 130:8
248:17 314:2
315:5
interest 92:4
94:19 118:3
138:25 170:20
220:21 250:19
interested
112:20 116:25
134:13 180:19
181:2 297:9
313:21 348:2
interesting
22:16 25:11
46:15 56:24
261:16 280:23
313:21
interests 173:15
interface 102:18
interim 285:15
interject 239:1
intermediaries
183:1
intermediary
195:23 196:9,9
305:10
internal 111:17
111:22 146:10
146:14 259:6
296:24 297:18
327:9
internally 53:11
112:18
internet 284:19
interpreting
122:1

interrelations...
147:20
interrupt 75:14
171:6
interrupted
220:18 333:11
interrupting
49:14
interview 33:20
34:7 35:6
intrigued 14:22
introduced
149:3 150:1,8
151:1
introduction
228:14,15
introductory
250:24
invest 136:10
140:3 175:11
175:13,16
invest- 186:17
invested 99:24
134:15 173:24
175:8
investigation
12:7
investing 134:14
136:25 174:7
investment
68:17 73:18,19
73:23 75:9
88:22 92:22
134:25 137:14
139:17,21
140:3 145:15
146:3,7 172:10
172:19 173:2
173:13 175:25
178:19 181:7
189:6,7,20
316:2
investments
69:18 78:24
178:19 316:1
investor 40:12

40:25 41:9,10
78:6 135:18
136:8,10 175:5
178:17 179:14
181:17,19
262:21
investors 5:10
23:12 39:11,25
40:5,15,17
52:6 58:7 93:9
174:18,23
175:3 177:1
178:20 186:17
187:4 242:1
259:18
invited 174:24
174:25 284:18
involved 27:25
35:10 58:21,24
59:3 100:13
127:1 159:17
160:7 174:4
175:21 191:4
201:16 206:6
214:1 215:10
228:13 232:3
233:9,17 272:1
272:4 273:23
274:3 290:25
291:10,13,15
297:7 331:14
involvement
116:5 155:7
271:19
involving
270:10
IP 133:14
IPO 5:12 53:11
53:22 144:4
145:4,13,24
259:17
IQ 110:6
Irv 2:4 7:14
47:20 81:21
103:17 134:5
246:2 315:9

316:25 339:9
342:6 343:22
issue 55:2 86:4
239:17 312:3
312:25
issues 86:5
202:5 213:4
269:11 325:9
item 240:17
items 58:22
305:19

_____

**J**

jail 204:20 205:1
January 277:19
278:22 330:10
330:22 338:7
Jason 24:6
126:7,24
128:22 129:6
129:17 206:15
207:22 208:10
213:15 215:7,8
215:9 247:4
288:12 290:19
Jefferson 3:10
job 9:25 24:8
35:2,25 36:21
38:11 99:7
176:3 181:22
215:13 281:14
323:11,12,18
jobs 324:17,21
jog 272:23
John 7:16
159:14 208:2
272:16
Johnson 316:4,9
Johnson's
315:20 316:1
join 18:8,19 20:6
20:18
joined 16:7,13
20:4,5 24:12
25:24 26:25
27:1 28:9,14

53:18 112:20
148:24 153:15
260:1 320:15
Joiner 32:2
joint 16:14,15
38:1
jointly 36:15
37:17
Jones 208:25
JOSH 1:3 347:3
journalist 334:2
journalists
335:3
judge 10:8 32:2
190:3
judges 124:15
124:21
July 50:23 53:8
178:8 250:11
jump 267:13
jumping 239:14
June 293:14
justice 187:20
justifiable
159:25
justifiably 27:4
justification
118:1

_____

**K**

K2 338:11
Kansas 151:18
151:21,24,25
152:4,18
KapCharge
228:6,7
Kaplan 7:10
Katten 3:4
238:14,17
239:8,11
271:13 272:1
keep 69:1 70:3
79:13 176:8,9
176:14 202:22
202:23 244:22
245:4 336:24

UNSEALED

**keeping** 44:25
102:23 265:20
299:20
**Keller** 208:25
**Ken** 5:4 8:3
34:17 36:9
39:6 58:8
230:15,20
249:13 330:8,9
344:4
**Kenneth** 1:9,15
2:12 4:5 7:2
8:5 345:2
346:3,9 347:8
347:13
**kept** 14:15
286:19 331:8
**Kevin** 321:1,12
**key** 251:12
258:23 328:12
**kicks** 88:13
**Kim** 314:11,11
314:12
**kind** 16:15
81:22 101:18
113:4,14
145:23 150:18
170:14 181:4
184:6 190:19
250:24 252:15
266:17 277:14
278:14 317:5
341:2 343:15
**knew** 107:1
149:21 165:5
191:12,22
193:12 195:1
195:22 196:12
214:23 261:11
329:20
**know** 8:13 10:1
10:1,17 11:3
12:9 13:11
24:10 25:2,20
26:4,11,15,17
26:25 27:4,14

27:21 28:9
29:2 30:6,14
30:15,16,18,22
34:12,13 35:16
35:17,24 37:8
37:20 38:25
39:20,20 41:3
44:8,16,19
46:9,12,23,24
48:5,5 50:10
51:17,21 52:13
53:4,6 54:5
55:7 58:22
59:22,25 60:13
60:21 61:15,16
63:17 64:21
65:4,5,9 68:22
69:8 70:12
75:22 77:18
78:20 79:8
80:19 81:11
82:16 83:15
84:6,22 85:21
86:8,23 87:6
87:14,20 90:6
90:22 94:14
98:23 101:14
106:3,17 107:1
107:5,23
108:22 109:5
111:16 112:19
114:8 115:13
119:6,8,11,11
119:15 120:2
120:10,22
121:2,16,18
122:14,15,18
122:24,25
123:5 124:20
125:1,3,20
126:24 127:20
133:16,21,25
136:21 138:8,8
138:20 139:19
140:1,14,21
142:8,23 145:3

146:13 147:16
147:19,23
148:14,22,25
149:23,24
150:10,23
151:1,10,15
152:3,5 153:1
153:16 155:24
157:17 158:6,6
158:9,13 159:1
159:15,16,24
160:16,20,22
161:5,7,9,16
162:24 163:10
163:20,21,23
166:25,25
167:2,3,15
169:8,25 170:1
170:10,22,25
171:14 174:2,5
174:6 175:7,22
176:2,13
178:16,17,21
179:12,22,24
180:5,23
182:17,24
183:6,8,17,18
183:24 184:3
184:24 185:2
186:1 187:5,6
187:7,9,22
188:16,20,21
189:2 190:1,12
190:12,15,15
190:21,22
191:1,4,9
192:3,15 193:6
193:16 194:17
195:18 196:7,7
196:20,21
197:17,20,21
198:5 199:9,14
199:19,20
200:15,15,21
200:23 201:7
201:13,24

202:23 203:10
204:7,11,17
205:6,9 206:13
206:23 207:11
207:12 208:10
208:25 209:12
209:21 210:1
210:10,18
211:1,4,11,14
211:17 212:10
212:19,21,24
212:25 214:2,2
214:5,6,19,20
214:20,20
215:8,11,11
216:16 217:2,7
218:16,16,17
218:19,20
219:7 221:12
221:17 222:4,4
222:7 223:12
224:1,2,19,24
225:8,10,10,15
225:16,18
227:15 228:2
229:6,13,13,15
229:15,17,19
233:11,15,17
233:20,24
234:14,21,24
235:7 236:1
237:6 238:10
239:2 240:5,6
240:7,10,12,17
242:8,16,17
243:8,22
246:11,11
248:9,16,23
249:6,15,17,18
249:19,21,22
252:22 253:21
255:18,19,22
255:24,25
256:17,25
257:1,17,18
258:3,7,14

259:3,9 260:2
260:18 261:10
261:20,23
263:7,12 265:4
265:18 266:1
266:24 267:5
268:13,17
269:5,9 270:11
270:13 271:21
272:2,6,9,10
276:14 279:6,6
280:21 281:7
281:21 285:24
286:21 288:10
288:12 290:4,9
291:3,13,19,25
291:25 294:10
295:14,17
296:2 297:6,7
300:7,10 301:4
303:22 311:16
312:2,6,22,24
313:17 314:3
314:13 315:4
317:7 318:14
318:15,25
319:6,9,17,22
320:15,22
321:6,9,15,17
321:21,23,25
322:2,14 323:8
323:9,10 324:4
324:11,19,23
327:9,10,10,14
327:15 328:14
329:24 331:4,7
331:9,11
333:18,22,22
334:4 335:19
338:21,22,23
339:2 340:5
341:11,12
342:13,25
343:1
**know-how**
133:1

UNSEALED

knowledge 76:1
known 44:17
148:21 159:13
159:14 174:22
292:3 302:7
knows 29:2
75:23 341:25
Korea 17:21

**L**

L 2:13
L1 320:14,15,15
label 260:25
321:9
labelled 181:25
labels 331:22
lack 10:21 30:4
30:5 53:3
78:12 162:9
187:10,24
188:9 189:12
190:10 203:24
204:22 207:8
219:21 220:3
262:8
laid 73:17
land 342:25
Langer 2:4
large 91:10
152:10 247:24
288:15
largely 122:23
174:21 185:20
212:23 253:18
larger 266:20
largest 175:5
Las 26:3,4 199:6
199:24
lasted 249:9
Lastly 10:20
late 59:11,16,22
60:7,13 66:15
89:22 198:2
283:3 317:22
launch 166:4,6
launched 57:1,2

131:16 157:18
157:18 163:3
169:6 234:19
235:13 251:24
260:1 304:15
launches 235:2
launching 163:2
304:4
law 11:15 70:12
70:13,16,22
71:2,3,7 72:4,5
113:9,10 114:6
118:14,21
120:14 121:3
158:10 191:8
208:25 209:24
231:22 232:15
235:24 236:6,8
291:5,22
laws 61:18 71:8
117:7 121:10
lawsuit 11:12,14
11:17,18,20
32:7 65:12,17
125:3 244:20
lawyer 10:3
165:4 272:16
292:21 333:10
lawyers 10:16
12:19 79:8
270:18,19
271:5
lead 27:3
leader 29:19
30:24 34:10
35:23
leadership 24:17
28:24 29:15
30:7 36:5
186:19
leading 21:7
leads 116:15
Leaman 7:10
learn 148:12
201:2
learned 195:7,8

203:1 212:4,7
216:10
learning 22:15
leave 77:23
114:18 141:19
304:23 305:6
leaving 156:13
led 14:24 92:7
159:19 276:14
315:4 319:22
337:1
left 18:8 62:1
65:5 78:7,7
88:23
leftover 242:2
Legacy 130:19
130:22 131:5,8
131:11,18,24
131:25 133:2
133:22
legal 118:1,16
122:23 124:12
124:19 126:16
126:17,25
128:12 130:7
130:10,15
202:17 229:17
231:15 232:1
233:9,21,25
234:22 235:10
235:23 236:2,6
236:8 237:19
237:22 238:4
240:12 243:9
244:3,11
270:11 271:5
288:22 335:4
legally 159:25
legislation 113:4
legislators
227:16
legitimate
118:11
lend 108:18
116:16 157:12
184:4 264:21

268:14 269:6
271:18 274:6
274:11 287:13
334:13,21
lender 14:4
41:14,15,16
67:2,4,14
68:15 69:10
73:15 77:25
89:4 96:11,22
98:24 108:23
109:1 110:11
114:13 115:1,9
115:18 122:21
124:1,4 125:15
126:11 135:18
136:8 151:9,14
161:16,18
186:10 224:18
227:21 264:20
264:20 265:7
265:12,19
266:5 267:23
274:11 291:21
300:13,14,14
300:19 320:19
321:16,25
322:1,5 324:17
328:3 342:14
lender's 151:12
lenders 28:1,4,6
28:19 42:1,7
68:21,25 69:5
96:5 106:12
114:11 117:3
149:21,25
153:6 159:3,5
258:25 259:13
262:7 267:3,4
279:16 284:25
293:18 301:1
301:14 321:14
328:17 341:18
342:16,19
lending 43:1,23
56:12,20 57:2

57:13 63:20,22
64:1,4,8 71:3,7
71:8,16 72:6,7
72:14,17 82:25
83:13,14,17
85:20 87:1,3
100:12,12
106:15 111:15
112:6 114:21
115:20,22
117:4 118:3,20
119:24 121:14
121:24 125:3
132:22 136:15
137:3,6 150:6
150:8,18,20
151:6 152:1,11
158:3,8 159:17
159:25 160:8
166:1 167:1
168:21 171:8
171:20,24
178:25 181:24
183:11,24
193:11,12,15
194:13,18
196:13 197:1,8
197:9 198:21
199:1,12
209:24 210:25
216:11 223:17
227:23 228:12
233:10,19
234:6 240:2
261:11 265:25
267:2,8 268:20
278:17 281:2
281:12 283:8
283:11 291:22
293:16 296:23
296:25 297:10
297:18 301:22
303:6 310:5
313:10 315:2
322:20 329:11
331:3 334:21

UNSEALED

App. 0131

340:18,19
342:24 343:10
**Lending/Plain**
288:20 293:8
299:16
**LendIt** 5:4
42:22,24,25
43:4,6,8,13,15
**length** 46:9
**lent** 87:5
**let's** 19:25 31:4
31:5,14 54:7,8
56:1 72:12,12
75:12,12 77:6
78:17,17 79:21
90:15 93:17
109:12 111:20
112:8 115:12
119:19,19
127:23 146:19
151:5 158:21
177:13 195:21
201:10,13
209:13 219:1
251:23 270:24
270:24 280:3,4
280:5 282:9,25
282:25 292:8,8
292:10,12
298:7,7 301:13
302:18,19
315:7,10
317:15,21
334:11 341:14
343:3
**letter** 282:18
**letting** 36:1
**level** 30:13
129:10 182:21
196:12 231:1
290:6
**levels** 30:9
299:20,20
337:3
**leverage** 214:21
**Levick** 231:23

231:24 238:7
**Levick's** 232:7
**Levy** 43:21
**liberal** 14:3
**lice-** 163:11
**license** 26:14
68:4 100:20
115:24 279:15
**licensed** 57:7
114:13 115:23
131:22,23
133:9 203:9,12
**licenses** 321:16
**licensing** 25:16
68:13 73:12
74:23 113:13
113:22 159:4
209:9,10,11
217:24 252:2
**lie** 57:24
**life** 11:4,7,8
111:5 233:14
**lifecycle** 104:11
108:10
**lifelong** 18:3
**liked** 313:25
**limit** 75:17
215:3
**limited** 68:22,25
106:9 107:25
124:19 202:1
310:11
**limits** 76:1
**Linda** 320:12,13
**Lindas** 320:13
**line** 26:19 30:16
58:22 62:5,23
210:6 229:21
236:4 296:18
325:13 334:16
345:6
**lined** 304:13
**lines** 22:24
261:21 331:25
**lingering** 307:6
**lingers** 326:25

**LinkedIn** 6:15
108:4 325:22
**liquidity** 53:17
259:17
**list** 63:20 154:14
235:18 240:11
268:22 269:3
272:22 273:3
273:18
**listen** 30:8 35:1
35:20
**listening** 36:1
38:22
**listing** 45:14
271:3 325:5
**literally** 148:17
284:20 321:6
**litigation** 121:9
123:15 243:18
243:23 269:17
**little** 13:20 16:1
18:7,21 31:1
34:15 48:6
50:6,9 103:20
104:8,11 251:1
282:16 313:11
315:10,11
339:25
**live** 163:11
170:13 234:6
252:17 259:21
259:25 266:9
281:12 282:6
283:16 293:12
293:13,14
321:5,8
**lives** 151:21
**LLC** 222:16
**LLP** 2:13,18 3:4
3:10
**loan** 20:24 21:15
21:16,18 22:18
23:5 25:14
33:7,14 41:5
57:8 60:2,16
61:21 63:2,21

67:18 69:12,19
70:14,23 77:19
77:21,22 82:15
82:16 83:21
86:20 88:16
95:10 96:21
97:24 101:15
102:7,9,21
110:1 124:23
124:24 131:3,9
131:17,23
150:12 166:19
188:5,8 189:9
210:10 211:2
223:4 228:11
228:20 241:13
254:22 256:2
257:6 260:19
262:16,23
265:8,17,19
266:4 278:14
278:25 280:17
284:20,21
285:2,3 287:12
293:4 294:5,9
294:16 307:11
308:24 318:25
335:7
**loans** 21:23
22:12,17,24
26:16,18,18
30:16 32:25
33:12 59:7,13
59:15 61:2,9
62:4 65:19
66:16 68:19
69:1,5 70:3
73:22,24 74:15
77:8,14 78:19
81:4 82:8
84:15 85:8,21
87:7,18,22
91:13,16,21,23
92:5 93:1,4
94:20 96:1
111:9 126:8

132:2 138:16
147:25 179:3
179:21 180:8
203:18 204:14
204:18 205:19
213:11 217:23
219:24 220:8
220:13,20
223:7 237:3
251:11,16
254:7,8 255:2
261:4,14,20
262:14 265:18
268:2,7,10,15
283:25 285:11
310:6 336:6,15
336:16,21
**lobby** 14:16,16
**lobbying** 232:3
232:8,10
296:24 297:17
**lobbyist** 232:11
232:13
**local** 324:5
**location** 37:1
**log** 284:20
**logging** 285:4
**login** 284:17
**logo** 259:9
**long** 12:8 24:22
28:3,13 168:22
169:15,16
170:5 295:14
**long-term**
235:15
**longer** 22:17
50:7,9 188:13
245:5 261:19
266:21 276:25
303:13
**longer-term**
132:2
**longstanding**
184:7
**look** 30:7 35:11
48:14 54:7

UNSEALED

56:16 60:24
137:12 157:7
167:24 168:24
170:2 193:19
193:19 197:24
206:22 217:9
244:15 252:3
255:11 264:9
282:22 288:19
298:17 301:21
305:1 315:7
334:11,11,12
341:1,17
**looked** 33:8,10
39:15 44:6
51:3 67:9
145:21 157:9
157:10 158:2
158:11 162:3
163:6 186:5,9
211:5 231:8
282:13 283:7,7
328:24 335:16
341:22
**looking** 15:9
22:16 25:7
34:9 40:25
41:2,5 45:17
60:10 64:17
66:11 94:9
95:8,9 108:3
118:7 131:19
140:23 149:24
157:15 158:1
162:25 163:21
167:10 168:4
185:18 200:17
207:16 228:2
230:14 231:7
231:17,17
232:25 233:2
240:11 242:21
245:9,10 253:7
253:16 264:6
273:4 274:9
281:7,19

284:19 286:2
293:1 294:3,4
298:11
**looks** 50:24
65:25 68:1
101:2 144:1
165:2 213:5,24
213:25 226:5
240:10,11
247:9 250:23
251:20 252:4
281:22 283:12
283:16 293:10
293:13 305:11
331:20 332:6
335:8
**loosely** 227:12
**lose** 303:25
**loss** 72:15 77:11
88:24 89:3,21
97:10 113:8
**losses** 67:20 74:1
75:3,19 95:11
95:14
**lost** 85:13
185:10 264:12
**lot** 14:9 27:5
35:21 37:10
51:16 69:13
123:6 148:25
152:5 154:17
163:1 166:22
169:3,9 191:9
191:18 192:12
192:17,25
197:18 207:14
213:19,23
215:12 216:17
224:2,15
233:16 235:5
246:11 248:2
252:4 261:10
262:12 265:14
267:18 274:4
276:7,8 282:2
291:8,9,9

296:3 313:24
323:7 324:14
326:24 327:1
327:12 338:21
340:16
**lots** 25:6 140:1,2
154:16
**Louisiana**
268:10,21
**Lovells** 239:24
**low** 66:14
299:20
**lower** 17:17
19:16 47:4
303:14
**lunch** 103:23
**Lutes** 23:9 42:6
99:6 140:6
176:3 251:14
288:11 308:12
336:2

## M

**MacFarlane**
183:5,8
**machine** 1:21
**Madonna** 185:9
186:15
**mail** 104:25
105:1,16,20
**main** 259:20
**mainstream**
258:6,11,12,13
258:18 259:7
**maintaining**
41:25
**majority** 188:24
221:15 280:24
**making** 35:24
36:21 38:16
67:1 96:22
108:17 111:9
222:14 228:15
244:16 266:3
270:20 272:20
276:3 307:9

310:6
**manage** 34:6
**managed** 103:2
324:24
**management**
14:8 16:4,6,25
17:2 18:8 27:2
33:19 34:7
36:5 42:8
102:21 103:14
103:16 134:24
146:5 183:3
185:6 236:25
311:18,20
340:25
**manager** 213:21
290:18
**managers**
130:14 288:11
290:19
**managing** 308:8
324:22 340:17
342:18
**map** 59:23,23
**March** 198:19
282:15,19,25
**margins** 255:13
**mark** 33:25 49:4
49:6,7,13
149:19,20
151:4 152:16
158:22 161:22
164:15,16
182:13 183:7
196:1,19
199:23 227:5
227:11 228:12
228:16 229:1
233:1 246:13
246:14 281:4
311:2,6,14,22
312:1 313:10
**marked** 34:2
43:11 46:20
49:22 64:13
79:3 135:7

141:21 164:24
200:4 206:19
208:7 226:1,2
229:23,24
246:22 264:8
280:8 283:4
292:24 298:9
303:1 305:3
315:14 330:5
**market** 55:13,20
57:25 59:5
100:1 169:22
170:8 243:12
262:17,18
**marketing** 58:20
67:20 68:14
72:15 73:14
74:25 95:11
96:8,12,20,23
97:10,13 98:2
98:3,4,6 100:1
100:22,22,23
114:18 117:3
132:14,17,21
165:11,12
169:13 170:8
217:18,21
219:13 220:24
223:23 254:3
260:17 265:7,8
280:19 284:10
284:12 285:9
285:17 321:2,3
328:15
**marking** 302:22
**marks** 56:6
**Marshall** 6:11
314:15
**Martin** 243:22
**Marty** 199:20
199:24 201:3
**match** 257:6
**material** 51:18
51:18 54:8
146:2 247:25

UNSEALED

**materialize**
281:24
**materials**
144:14 248:15
**mathematics**
13:21
**Matt** 8:1 282:11
**matter** 7:4
**matters** 251:5
**Matthew** 2:18
3:4 7:22
**matthew.haws...**
3:7
**maximum**
210:10
**Mazzara** 199:20
201:3
**Mazzara's**
199:24
**MBA** 13:23 14:4
**McCracken**
2:13
**mean** 13:3 24:23
25:2 29:18
31:17,18 32:10
34:25 36:12
37:6,13,23
39:14 41:2
44:9,25 45:4
46:8 51:15
53:10,12 54:9
54:19 55:1,2
56:7 58:16
59:15 60:4,23
61:25 63:4,5
75:14,20,23
80:23 81:20,21
88:7 93:25
94:13 103:22
103:24 112:18
112:19 113:25
121:15 122:8
123:3 131:15
138:14,19
140:13,16,18
141:2 143:2

144:3,4,8,11
144:20 148:1
155:20 160:5
161:9 162:20
166:4 169:2,9
170:6,12,12
171:18,21
176:2 183:25
190:16,23
191:7,17
202:12 204:2
206:25 207:5
208:24 210:4,9
210:16,21,25
213:5 214:22
218:25 219:9,9
222:3 223:3
224:6 225:11
229:10 230:19
231:7 233:2
242:12,14,21
243:6 249:7
252:13,21
253:18 256:6
261:2 262:11
268:20 269:22
272:19 273:24
275:2,2,11
277:7,11,23
282:20 283:10
284:12 285:18
286:23 287:1
287:20 289:15
290:5,11 294:7
296:10 300:10
302:1 307:23
308:12 310:24
311:20 313:4
313:16 318:13
318:22 319:6
319:16 322:3
323:2 324:14
324:16 328:3,4
328:4,7,9,10
328:24 329:14
331:13 332:22

335:21 342:12
**meaning** 12:19
73:14 220:2
291:2
**meaningful**
40:12 59:21
233:25 235:4
**means** 9:15 47:9
124:18 125:1
125:22 168:7
187:22 265:2
**meant** 121:17
145:7 146:9
329:20 336:2
**mechanics**
101:14,18
213:9 214:6
**media** 105:9
107:8,8,12,15
108:1,4,6,9
118:16 121:13
**medication**
10:21
**meet** 159:21
**meeting** 137:2,4
145:5 159:11
164:2 223:24
224:10 247:10
248:20 264:10
301:14
**meetings** 34:20
54:14 144:25
145:1 206:7
207:13 224:8
248:11
**member** 11:13
28:15 175:15
250:16,17
314:19 323:19
**members** 15:10
39:10,25
158:23 297:23
315:3 322:20
322:24 343:5
**membership**
297:24 298:2

**memo** 247:12,20
249:13,18,25
277:20 299:15
299:15 328:25
**Memorandum**
5:22,24 6:3,5,6
**memory** 61:20
130:5 166:22
175:6 272:24
310:17
**memos** 39:16
245:7 261:24
304:24
**mention** 6:16
44:20,22,23
96:10 208:24
288:22 313:3
**mentioned** 11:1
13:3 18:20
33:18 44:20
56:25 61:2
123:8 129:8
147:14 148:23
169:2 184:10
200:15 211:15
218:15 224:2
248:22 261:9
261:17 273:2
285:19 313:9
317:11 320:6
322:23
**mentioning**
131:20
**mentions** 264:9
324:3
**message** 329:9
**messaging** 42:13
328:22 329:9
**met** 16:8 147:16
147:18 148:15
163:22 206:16
269:25 314:13
314:17
**meta** 286:16,17
331:9
**metadata** 48:8

48:11 51:21
142:12,13,15
144:20 330:8
330:20,21
331:4
**metric** 251:18
**metrics** 251:12
251:17
**Mexico** 26:4
338:13
**mic** 165:18
**Michelle** 65:18
66:2 128:22
129:6,16
206:16 215:9
288:12 290:20
305:19 315:18
316:5,16
320:17,18
**MicroBilt** 106:7
106:16,18
109:12,15
**middle** 286:3
**migrate** 264:19
265:1 274:10
**migrated** 265:24
**migrating** 266:1
**Mike** 16:8 18:9
18:9,14,15,17
20:7 21:15
27:1 40:8,19
153:16 159:13
**million** 175:25
229:7,11
231:16,21
240:18 242:21
242:23 243:1,2
**millions** 201:5
203:17 204:18
**mind** 22:6 24:22
24:25 25:20
41:9 48:17
80:23 144:24
327:2 342:7
**minds** 106:5,19
183:19 296:8,9

UNSEALED

mindset 323:10
minimize 245:14
minute 50:12
  245:12 306:6
  310:2
minutes 147:18
  177:21 226:8
  298:6 339:10
Mirarchi 2:7
  7:18,18
mischaracteri...
  204:23 341:5
mischaracteri...
  181:13
misconstruing
  241:5
misheard
  107:16
mislead 79:3,12
misleading 46:3
  327:20 328:19
misled 167:22
  223:1
misread 242:24
  305:16
missing 133:12
  337:24
mission 28:16
  263:14
Misstated
  110:18
misstatement
  94:12
misstates 45:7
  62:19 79:2,2
  80:19 82:9
  83:7 88:20
  212:1 221:22
  225:3 234:10
  261:7 313:14
  335:12
misstating 46:2
  306:20
misunderstan...
  164:21
mitigate 125:15

mitigating
  126:10
mix 237:1
  238:12 240:15
Mobiloans
  57:14 62:5,9
  62:23 68:3
  82:25 86:12
  87:11 131:9
  234:7 237:14
  238:4 310:6
  314:9
mock-up 166:14
  169:12,18
  170:7,9
mock-ups
  169:10
mode 15:17
  24:25 169:5
model 19:7
  71:10 109:4
  112:22 115:24
  116:6 117:4,8
  118:7,20
  119:20 121:1
  121:14 158:24
  159:23 180:11
  183:18 229:3,7
  229:12 232:16
  233:5 235:19
  242:20
models 100:14
Moderately 99:2
modify 185:17
module 101:23
  102:14,22
  103:6,10
modules 101:8
  101:10
moment 29:10
  72:11 114:19
  280:20 304:24
monetary 77:8
money 23:20,22
  41:3,4,4,5
  66:20 75:7

78:10,24 80:5
81:3,13,14
82:8,24 84:8
84:13,14,23
85:11,22 86:20
87:6,22 134:8
137:10,17
175:12 200:13
211:22 215:19
287:1,11,14
334:12,21
monies 213:11
monitor 338:14
monitor- 341:10
monitoring
  231:3 338:2
  339:2,12 340:3
  341:10
Monroe 3:5
Montana 182:9
  207:7 268:7,21
Montgomery
  2:13
month 229:8,11
  240:21 242:21
  242:23 243:2,3
  245:17,18
  247:1,1,9,20
  247:25 248:5
  249:12 251:14
  280:10 282:9
  292:11
month's 247:13
monthly 231:5
  255:9,17,20,23
  256:17
months 43:16
  246:17,17
  283:6,12
  298:12,21
Mopac 348:11
morphed 57:5
  92:5
mortar 19:13
mortgages 69:7
  69:8

motivating
  118:6
MOU 13:12
mountain 37:16
move 20:1 23:4
  31:5,14 69:21
  93:17 104:6
  108:16 116:7
  123:13 147:1
  158:15 239:12
  245:11 274:24
  282:9 292:11
  301:13
moved 30:17
  84:8,23 85:11
  157:12 298:21
movement 132:2
moving 22:23
  38:11 61:25
  116:6 131:22
  170:25 239:2,5
  264:11 283:8
msheldon@go...
  2:20
MSNBC 43:22
Muchin 3:4
  271:13 272:1
multi-page
  47:15
multiple 44:23
  184:22 207:13
multiply 33:14
MySalaryLine
  57:17,18 60:5
  68:12 316:3
  ─────────────
       N
N 2:1 3:1 4:1
N-A-L-A 297:4
NAFSA 71:11
  232:20
NALA 297:4
name 20:10 21:5
  21:6,10,12,13
  21:17,19,20,21
  21:22 22:1

57:3 123:24
135:1 140:7
147:13,13
150:13,14
154:18 159:2
161:6 169:18
171:19 181:5
194:19 199:19
199:21,22
200:15 209:1
223:7,10,14,16
223:17,21,23
224:4,12,21
260:3 272:18
284:23 305:18
314:13,19,20
320:21 321:9
321:10
named 110:11
  140:7 159:14
  171:18 201:16
  272:16 314:10
  321:1
names 44:24
  45:15 147:8
  158:6 163:7,21
  224:3,13,14,23
  338:21,22
naming 171:17
  174:7 217:19
  218:10
narrative 101:7
narratives 55:19
national 3:8
  7:21 70:18
  114:3 118:13
  119:4,7,9,16
  119:23
native 114:8
  121:4 148:7
  230:9,11
  232:21 233:8
  236:21 243:10
  244:8
nature 89:16
  122:7 135:15

UNSEALED

135:17 136:6,7
136:11
**NCA** 201:19,21
202:2,5
**NCA's** 203:17
**NCB** 202:2
**near** 263:20
316:17
**necessarily**
214:5 278:10
295:17
**need** 8:22,22
10:16 14:16,21
19:10 32:8
39:3 48:13
59:20 68:22,25
104:8 145:18
145:19 192:22
205:23 207:19
236:10 244:22
258:5,6,11,13
258:16 265:10
284:18,19
295:18,21,23
299:8 333:3,5
333:7,7
**needed** 113:17
138:15 145:12
193:25 284:18
286:25 335:18
335:18
**needs** 17:9 22:15
122:11 323:13
323:17,18
**negative** 315:5
**negotiate** 215:13
**negotiating**
214:21 290:15
291:20 292:2
**negotiation**
210:18 214:19
214:23 291:10
**negotiations**
234:17 282:4
291:1,13
319:21

**neither** 196:15
347:23
**nervous** 228:14
**Ness** 3:10
**net** 157:5
**never** 12:24
29:17 37:23
45:25 60:17
81:2 87:5
155:17 212:24
250:8,10 291:5
319:14 336:2
343:2
**new** 2:19 25:7
26:4 29:24,25
31:20 33:20
34:6 42:7,7
81:3 117:4,24
157:9,10 166:4
166:6,10,23
167:5 169:24
169:25 172:9
172:19 173:1
202:16 213:13
217:22 235:13
243:19 252:6
253:23,25
258:22 262:19
264:13,20
265:19,19
284:21 285:11
294:20,20
300:17,25
306:17 307:2
308:23 309:1
309:22 310:6,9
310:12,21
312:13
**newness** 121:1
**Nguyen** 65:18
320:17,18
**niches** 106:10
**nichey** 106:19
**no-state** 272:22
**nodding** 325:8
**noise** 96:18

**nominations**
301:18 302:2
**non** 308:10
**nonaffiliated**
68:17
**nonbank** 116:11
157:8 279:16
**nonpayment**
77:14
**nonprime** 23:6
43:23 258:17
**nontribal**
192:16 195:23
**normally** 98:24
**North** 159:20,20
159:21 348:11
**Nos** 325:14
**note** 13:20
**noted** 346:6
**notice** 44:9 49:4
63:19 102:4
141:15
**noticed** 65:7
251:8 325:4
**noticing** 65:16
**notification**
156:20
**notified** 155:4
155:15 156:12
157:2 179:25
180:7 188:12
308:16,16
**notify** 307:24
**notwithstandi...**
10:11
**November**
231:19 234:4
264:7
**number** 5:2 6:2
17:17 24:12,15
32:19,21 33:3
33:5 36:20
47:19 62:17
86:17 112:13
112:23 121:20
147:4 152:3

154:3 163:3
202:1 218:9
224:22 225:21
228:5 229:16
266:20 277:9
293:18 296:7
302:23 337:9
337:13 342:24
**numbered** 1:18
**numbers** 47:4
55:2 63:6,14
66:4 90:19
251:2 292:13
**numerical** 248:2
**numerous** 58:6
**NW** 2:19 3:10

_____
**O**

**oath** 9:14,14
**object** 14:5
20:16,19 22:9
22:13 23:14
26:7 27:13
35:14 38:8
39:12 40:2
41:7,18,23
42:4,15 44:12
45:20,24 52:3
52:9,21 53:1
53:15,23 55:4
55:22 56:9,23
58:2,10,19
60:9 61:5
62:10,18 63:15
63:23 66:5
67:7 68:7 69:3
69:24 70:9,10
70:19 71:18
72:22 74:17
75:25 77:9,12
77:15 78:12
79:1 80:7,11
80:18 81:5
83:1,2,8,19
84:5 85:23
86:3 87:23

88:17,18,19
89:7,13 90:12
90:17 91:5,14
92:2 93:14
94:3,23 95:18
95:22 96:15
97:2,25 99:14
99:22 100:16
101:19,25
102:24 103:12
107:13 108:19
111:11,25
113:6,23,24
114:22 115:8
116:8 117:13
117:21 118:9
118:25 119:25
122:5 123:11
124:5 125:17
126:12 127:15
129:14 132:11
132:16 133:5
134:21 136:16
138:5,17,18
139:7 141:6,7
145:25 148:2
149:8 150:21
151:7 152:2,14
153:9 155:8
158:25 162:6
162:22 164:7
166:3,20
168:25 172:3
176:11,22
178:11,12,13
181:10,11,12
182:3 187:10
187:24 188:9
189:12,25
190:10 191:6
191:14 194:3
196:3 199:8
203:20,24
206:11 207:8
209:20 210:8
210:23 211:23

UNSEALED

212:6 213:17
215:21 219:21
220:3 221:3,4
221:9,21
222:17 225:2
233:6 234:8,9
237:25 241:4
242:24 261:6
262:8 267:17
267:20 268:24
275:16 277:15
279:21 281:6
281:25 284:9
285:12 287:3
287:17 289:7
293:24 295:2,5
301:10,24
303:19 306:9
307:18 308:10
309:24 312:15
313:13 326:17
327:24,25
328:6 329:12
331:17,23
332:2,12
335:11,25
336:11 338:17
339:23 340:13
341:4,24
**objecting** 10:4
337:10
**objection** 45:7
81:15 82:9
83:6 84:16
87:8 89:22
94:10 135:19
137:19 172:13
202:7,11
204:22 214:16
221:8,22
235:21 306:19
306:23 307:17
309:23 311:10
343:19
**objectionable**
267:20

**objections** 10:9
10:11
**objective** 207:12
**objectives** 36:14
36:24
**obligations**
89:25
**obvious** 39:15
209:8 251:25
**obviously** 24:20
34:9 38:22
84:10 85:1
105:6 137:23
154:1 171:14
200:23 204:25
214:1,25
216:15 227:15
227:24 230:20
233:11,24
237:14 253:8
280:21 290:6
290:21 291:8
293:16 294:8
296:17 322:23
330:19 335:4
**occasion** 315:4
**occurred** 52:20
88:14 171:17
**October** 155:5
156:12 275:2
298:23
**odd** 144:5
305:12
**offensive** 200:20
200:21
**offer** 102:5
268:14
**offered** 113:3
151:10 216:19
216:21
**offhand** 121:6
**officer** 243:22
321:3 347:14
**official** 8:17
13:8 52:13
**oftentimes** 24:12

69:17 190:13
191:1 204:7
253:24 278:11
**oh** 38:24 41:12
46:22 51:5
79:14 85:3
119:3 124:23
136:2 148:20
152:9 153:14
154:13 165:18
175:11 187:17
219:5,8 226:9
226:23 230:22
234:23 237:2
241:15 250:10
253:4,4 262:22
266:16 271:21
277:11 283:10
302:21 305:17
329:18 330:4
**okay** 8:12 9:7,14
9:20 10:15,25
11:10 12:7,21
12:23 13:1,17
19:25 22:5
24:8 26:21
27:23 28:8
32:18 33:17,24
34:3 41:12,15
41:25 42:19
45:18 46:18
47:8,19 48:11
49:2,11,16
50:10 51:3,9
51:12 54:7
55:13 56:5
57:7 59:11
61:8,24 65:7
65:15,21,25
66:9,17 67:12
67:25 68:16
71:24 72:10
74:14 80:2
85:3,15,16
88:10 89:12
93:17,22 94:18

97:8 99:17
100:25 102:14
102:17 103:19
104:23 105:21
107:7 109:15
110:9,15 111:2
112:4,12,17
113:14,18
115:18,21
116:19,22
117:10,18
119:3,21
121:13 125:12
130:22 132:24
133:16 135:11
136:2,13
139:13,25
140:23 141:14
141:17,19
142:16,19
143:21,22
147:13 148:19
153:13 154:4,6
154:24 155:18
155:22,24
156:22 157:24
161:19 162:13
164:4 165:4,24
167:8 168:2,12
168:16 170:16
172:8,17 174:8
175:23 176:7
177:23,24
179:18 180:3
180:10 181:4
181:24 182:7
182:11 187:7
190:7 192:2
195:12 196:17
198:8 199:5
200:2 205:21
206:9,18
208:14 209:16
210:4 215:24
217:1 219:8,12
221:14 224:24

225:24 226:13
226:23 227:1
229:5,10
230:12,14
231:6,11,15,21
232:2,20 236:5
236:15,21
237:8,14
238:13 240:2
243:5,17
244:21,22
245:6 246:7,24
248:4 249:11
249:20,23
250:2,13,21
251:8,16 254:7
254:11,14,25
255:4 257:16
259:24,25
260:6,24 261:2
261:12 263:18
264:8,16,25
266:17 268:12
268:19 269:18
270:3,16 271:2
272:19 273:6
274:8 277:18
278:5,16 280:2
281:1,18 285:7
286:10 287:19
287:23 288:14
288:19 289:2
289:23 290:15
291:7,24
293:19 294:12
294:22 295:23
295:24 297:2
297:15,25
298:7,20 299:5
299:12,23
300:1,22 301:3
302:15 303:3
303:10 305:18
305:19,21,23
306:16 308:19
309:10 312:10

313:3 315:12
315:21 316:9
316:16 317:14
317:24 322:6
325:21 326:20
328:20 329:7
330:18 331:1
331:13,19
332:20 333:17
333:21 335:6
343:8,13 344:1
**Oklahoma**
150:2 268:2,22
**OLA** 28:17
158:22,23
**old** 30:16 283:20
300:18
**older** 15:19
**once** 38:3,3,3
49:18 88:12,12
88:13 147:16
148:15 169:17
177:16 265:9
265:16
**one-time** 60:8
**ones** 37:15 42:8
106:9 157:9
267:8 318:18
320:4
**ongoing** 103:16
127:4,8 228:19
229:18 234:16
280:25 282:4
319:21 337:1
341:10
**online** 14:4,25
21:15 28:1,4,6
28:18 57:17
61:11,14
106:15 111:9
114:21 115:18
115:19,21
119:24 149:20
151:9,12,14
156:1,18 159:3
161:16,18

261:14 283:14
284:25 297:10
301:14 320:19
**op-ed** 329:1,1
**op-eds** 329:8,23
**open** 264:13
**opened** 175:17
**operate** 113:21
116:1 117:6
120:6 227:25
327:23 328:5
**operated** 61:18
86:18 114:3
173:9 308:15
327:21
**operating** 67:20
72:16 74:1
75:3 95:11
96:2,9,11,21
96:23 97:10
98:7,9,11
209:24 233:16
254:21,22
328:14,18
**operation** 160:8
161:5 184:1
194:13 199:24
209:24 227:14
228:19 243:14
276:15 321:19
**operational**
128:23 129:6
130:12 169:6
234:15
**operations**
23:21 24:16
87:1 132:22
342:24
**opinion** 124:9
**opportunities**
25:7 43:2,23
157:10,11,15
163:1 169:3
228:22 275:3
275:13 279:11
**opportunity**

137:14 142:6
180:21 197:12
197:14 280:23
283:24 333:9
336:1
**opposed** 19:12
22:12 39:25
164:16 183:11
222:20 255:16
289:9 296:13
312:21
**opted** 116:11
257:11
**optics** 127:13
128:8 129:11
130:2
**optimal** 112:23
271:18
**optimally**
207:15 265:19
**optimistic** 53:18
**Optimize** 104:15
**option** 60:3,6
77:21
**options** 42:2
62:2 226:24
258:20 265:15
**oral** 1:9 347:15
**order** 145:12
163:10 194:1
223:3 245:19
246:5,16
249:24
**organization**
28:18 83:24
159:18 233:8,9
273:25 296:24
297:3
**organizations**
27:25 152:12
158:21 192:14
192:19 233:11
**organized**
250:23
**original** 130:23
164:2 212:14

235:8 239:21
**originally** 16:12
57:19 121:19
151:18 156:6
173:23 203:4
316:10 337:5
**originate** 85:8
106:13 114:5
119:7 252:1
265:8 267:6
268:1,6 336:6
336:14,21
**originate-** 331:6
**originated** 33:8
57:21 94:20
98:12 113:8,10
124:23,24
204:15,18
220:9 224:17
331:5
**originates** 327:7
**originating**
118:15 179:3
179:20 188:14
223:6 267:4,23
**origination**
60:18
**originations**
280:18 310:9
**originator**
257:23 327:5
**origins** 147:3
**Otoe** 196:8
**Otoe-Missouria**
65:13,17 84:14
85:7 150:2,4,6
161:21 162:4
163:16,23
182:13 184:17
195:22 196:2
243:18 268:1
278:19,24
281:5,8 306:2
308:21 310:23
311:7,13
**OTS** 275:20

277:2
**ought** 186:2
304:6
**out-of-pocket**
243:13
**outcome** 348:2
**outhouse** 128:16
**outside** 10:16
111:13 125:22
126:3,20
127:23 153:20
153:21 154:2,7
154:8,13,20
157:11 159:24
193:1 270:10
**outsiders** 322:22
**outsource**
338:12
**outsourced**
338:4
**outstanding**
251:11,17
254:7,8
**overall** 39:22
92:5 128:17
217:24 229:19
**overcapitalize**
69:12 70:14,23
**overcomplicat...**
131:15
**overdraft** 60:8
**overlap** 212:18
267:1
**overlapping**
278:12
**overreach**
227:17
**overseeing**
339:4,8,12
340:1,2,2,8,11
342:17
**oversight** 185:13
**oversimplifying**
94:16
**overstated**
276:24

UNSEALED

**overstating**
197:21 312:5
**owned** 162:19
165:13 188:8
**owner** 18:6
**ownership** 24:1
27:5 164:5
337:2
**owning** 179:16
**owns** 335:6

**P**

**P** 2:1,1 3:1,1,3
**P-114** 250:22
**P-120** 167:9
**P-123** 277:21
**P-274** 46:19
95:9 121:25
**P-279** 208:6
**P-280** 226:1
**P-281** 229:23
**P-282** 280:5
**P-283** 283:2
**P-285** 298:8
**P-292** 330:3
**P-293** 330:2
**P&L** 75:13
**P&Ls** 251:13
254:18
**p.m** 1:19 128:2,4
146:21,22,22
146:24 206:1,2
206:2,4 264:1
264:2,2,4
318:1,2,2,5
344:14,15
**page** 4:1 5:2 6:2
46:16 47:16
49:6 54:9,16
54:17,22,23
55:14,14 56:1
56:1 57:23
66:18,18 72:13
95:8 99:8,8,23
104:7 112:8,8
116:22 213:4

222:13 225:6
245:24 247:23
247:24 252:3
254:14,15
255:5 257:24
263:18 264:16
275:8 277:18
277:22 281:10
284:24 286:3
294:11,11
299:14 303:5
325:22 331:1
345:6 347:21
**pages** 51:4
295:14
**paid** 27:12 61:4
219:19 221:1
221:10,15,20
240:22 241:1,2
241:17 244:4,4
244:7,10
255:23 256:14
257:2 265:18
**Palermo** 314:11
**paper** 154:22
203:8 204:6
245:14
**paperwork**
182:19
**paragraph**
66:22 68:2,17
74:4 117:1
209:7,16 210:4
211:12 255:6
264:9,18 286:4
288:15,19
294:22 296:21
299:16
**parallel** 178:18
184:13
**paraphrase**
123:19
**pardon** 258:7
**pari** 178:18
**Park** 3:2 7:23,25
41:13 82:23

91:25 134:2,8
134:14,16
135:16,17
136:6,19,24
137:18 138:12
138:24 139:9
140:11 170:18
170:23 171:2
171:13 172:2
173:14 174:1,4
178:9,14,16
179:6,14,24
180:5,15 181:1
181:5,17,19
214:1 236:25
237:5,9,10
238:18 248:5,7
248:19 249:12
249:13,16
271:20 272:17
274:2 290:23
306:17 307:2,5
307:16 308:15
308:22,25
312:22
**parking** 224:15
**part** 10:4 11:23
13:12,12 30:7
30:11 32:22
37:3 91:3,15
91:19,24 101:8
103:1 105:10
114:19 119:12
120:19 129:11
133:17,24
144:16 157:4
175:1,13 184:7
216:23 221:16
237:20 242:18
242:22 243:22
243:22 252:9
268:20 289:4,5
323:1,3 324:9
324:22
**partici-** 88:12
**participant**

77:20
**participate** 69:5
**participated**
188:23 336:17
336:22,24
**participation**
69:8 88:13,23
170:20 173:15
218:3 221:16
240:23 242:18
334:22
**participations**
68:18 73:20
138:21 172:11
173:4,12,22
174:2,17
176:15 177:2,3
179:5,16,25
186:18 213:6
218:2 219:25
220:7,8,15
271:23,24
307:6,11,15
308:25 309:1
**particular** 37:1
37:1,2 105:7
108:2 118:12
144:1 147:6,12
204:10 251:17
260:16 276:12
295:22 301:7
301:18 313:19
**particularly**
38:14 116:25
121:3 122:10
122:12,23
204:12 275:4
338:24
**parties** 47:11
69:14 158:14
209:23 210:1
213:22,23
220:10 225:23
290:11 291:9
297:7 324:25
342:20 347:25

**partly** 295:12
**partner** 156:25
159:8 171:3
180:12 192:21
192:23 193:1
193:14 194:2,9
196:10 198:24
253:6,10,15
296:4 316:15
335:8
**partnered**
321:21,23
**partnering**
301:1
**partners** 33:9
148:6 193:8
253:7 313:17
324:11 327:12
**partnership**
26:13 149:17
155:1 173:9
179:1 210:7
253:3 279:10
**partnerships**
116:1,4,12
147:2 148:25
253:1,1 275:11
277:9,14
**parts** 24:1 45:1
336:16
**party** 200:18
219:4 225:23
287:5 340:17
347:19
**passion** 18:3
**passionate** 38:2
**passu** 178:18
**password**
284:23
**paste** 169:23
**path** 18:2 24:19
24:21 123:10
123:13 157:12
**Patrick** 3:9 7:20
344:5
**Patton** 154:21

232:14 235:18
236:18 273:22
**pawnshop** 16:16
**pay** 23:11,22
59:20 60:14
67:16 98:16
219:3 241:10
241:24,25
242:8,12 257:4
257:6,11
261:19 263:2
265:16 291:17
**paycheck** 19:22
22:22 257:9
**payday** 15:11
18:6,18,19
20:1,9 21:15
21:16,18,23
22:3,12,18
23:5 24:5
26:16,18 30:16
32:25 33:7,12
45:12 56:21,25
57:4 59:7,13
59:15 60:2
61:2,9,10 62:4
66:15 106:12
130:23,25
131:22 132:3
151:6 152:1,11
153:15 154:8
201:5,22 203:2
203:18 211:2
234:20 251:21
252:12 253:13
253:20 254:9
254:16,21
258:25 259:13
259:20,22,24
259:24,25
260:1,5,6,6,6
260:18 261:1,1
261:1,4,12,12
261:14 262:7
262:13,16,23
278:7 279:7

280:12,14,20
280:23 294:9
341:18 342:14
**paying** 180:9
216:1 219:15
229:7,11
240:21 241:14
242:11,15
243:2
**payment** 22:19
59:22 60:7,13
60:13 102:14
223:9 232:20
255:16,17
256:3,17
304:11 341:23
**payments** 59:11
59:16 102:23
229:14 231:13
231:22 237:14
241:23 255:11
255:25 256:11
256:13,15
285:1
**Payroll** 16:12
18:10,24,25
19:1 44:23
**pays** 123:6
265:4
**PC** 2:4
**peer** 115:7
158:21,23
**penalties** 60:17
**pending** 10:18
292:15
**Pennsylvania**
1:1,2 2:3,5,9
2:14 7:4,7,15
7:19 347:1,2
**people** 12:18
14:18 24:11,12
24:24 29:24
30:1,8 34:23
35:18,24 36:1
36:22 37:10,24
38:1 39:1

45:16 60:24
62:16,16
120:12 125:2
140:22 145:2
145:10 147:4
151:13 168:23
174:22 190:13
190:17 199:15
203:8 204:25
215:11 247:16
258:12 271:9
273:22 285:19
287:8,9 297:9
302:8 314:17
320:11 335:9
341:17,25
**Pepper** 152:23
225:1,9,12,13
271:9 291:17
291:18
**percent** 59:9
61:9,22 62:6,9
62:22 63:2
65:22,23 77:16
77:22,23 78:3
78:4,6,7 88:13
88:15,23,24
89:3,6 90:10
90:16,24 92:4
93:2 94:19
188:22 214:13
215:25 216:19
216:20 220:14
220:21 221:11
221:11 248:9
336:19,25
**percentage**
195:9
**percentages**
63:6
**perception**
336:13
**perfectly** 9:21
10:1
**performance**
111:8 247:13

250:11 251:3
253:17,18
254:24 255:1
294:8 298:24
338:14
**performing**
150:17
**period** 16:2,2
20:18 29:1
31:19 32:20,23
36:10 40:23
61:13,17 76:17
82:21 90:15
127:6 148:24
153:2 156:19
170:24 189:9
227:13,14,17
231:18 234:3
234:18 248:15
249:5,9,16
261:19 277:1
279:14 285:15
286:20 296:15
300:16 306:5
310:19
**periodically**
329:8
**periods** 22:17
318:16
**perpetuity**
336:23
**person** 37:21
42:6 123:25
140:6 147:9
149:22 190:19
190:19 191:21
213:21 312:2,7
316:5 320:5,11
**personal** 11:4
27:5
**personalities**
314:7
**personality**
312:5
**personally** 15:21
193:21

**perspective**
86:16 105:11
118:2 119:14
119:15 133:11
186:1,8,12
199:12 200:25
228:17 269:16
269:18,21
271:22 282:2
297:12
**Pertaining** 72:6
**pesky** 189:21
190:2
**phase** 24:22
**Philadelphia** 2:5
2:9,14
**Phillips** 3:15 7:9
**Phone** 2:6,10,15
2:20 3:6,12
**picture** 35:11
**pieces** 36:2
**Pierite** 6:11
**place** 36:20 87:4
108:8 184:21
205:10,11
215:2 276:16
309:16 341:8
342:25 343:15
**placement**
260:18,19
**placements**
260:21
**Plain** 57:13 60:5
63:1 68:3
78:18,24 79:20
81:4,7,13 82:6
82:7,18 109:13
110:1 147:25
155:25,25
156:18,21
162:18 184:12
195:10 198:2
198:14,14
216:24 217:9
220:21 222:15
223:13,21,23

UNSEALED

App. 0140

224:21 234:6
237:15 265:24
266:8 267:7
268:6,19
282:16 284:1,2
284:16 285:11
286:24 287:13
289:24 290:1
290:16 291:12
291:16 293:12
293:23 300:4
303:6 310:5
318:11,12
320:1 322:23
327:22 328:18
**Plains** 57:13
63:19,21 64:1
64:4,7 68:3
82:22,25 83:13
83:17,22 85:20
86:1,6,7
150:20 166:1
167:1 171:20
171:23 181:24
227:22 228:10
228:20 234:6
240:2 264:11
265:24 267:8
268:20 278:17
281:2,11 282:6
283:8,11
288:20 293:8
293:13,16,23
299:15 300:4
303:6 310:5
313:10
**Plains'** 65:19
**Plaintiff** 1:4,16
347:4
**Plaintiff's** 34:1
167:9 206:19
264:8 293:2
302:23
**plan** 5:6 51:1
52:14 95:9
281:15

**planning** 288:15
**plans** 52:6
145:11 257:25
264:10
**plants** 17:21,21
**plastic** 19:20
**plat-** 114:15
**platform** 33:10
100:3,21,21
101:1,6,8,10
101:12 103:2
104:7,19 109:3
109:16,21,23
110:7,23 111:4
111:6,22
114:11,25
130:19,20,22
131:5,8,13,18
131:25 132:3,4
132:7,9,14,18
133:2,3,10,23
133:23 166:15
166:19 169:16
170:7 204:15
204:19 252:2
277:25 278:3,8
281:16,23
299:24 300:2
327:4,19
337:19
**platform's** 109:3
**platforms** 99:19
100:10,13,19
101:4 114:16
114:19 130:18
130:19
**play** 42:12 149:5
160:12 210:2
**played** 42:9
147:10,24
151:2 194:17
**playing** 150:19
**plays** 37:6
**please** 7:12
31:22 71:21
84:20 124:8

125:20 153:24
183:16 185:4
226:8,15
270:15,19
273:8,13
282:19 295:20
306:24 317:17
326:10 345:5
**pleased** 255:8
288:23
**plug** 80:16
**plus** 135:6
198:23
**pocket** 195:19
**pod@vnf.com**
3:12
**point** 22:1,7
23:3,8,10
24:25 26:21
27:6,19 34:25
41:2,4 60:21
64:23 101:11
105:12 116:14
131:11 138:2
145:13,14
153:4 158:20
164:1,3 165:13
166:13 169:7
170:2 174:1,13
176:8 178:15
178:25 179:13
179:18 180:17
181:1,18
185:14 188:25
195:7,8 198:8
200:12 201:4
201:14 212:4,5
217:5 225:19
227:14 239:12
248:10 251:20
252:10 253:2
253:19 259:17
260:3,4 263:6
265:4 273:23
276:16 278:23
279:1,6,11

280:16,24
282:3 283:17
283:23 289:16
289:17 290:4
295:11,23
297:5 304:13
309:7,21 310:5
310:9,14
315:21,22
316:17 318:23
321:16 324:2
327:9 343:1
**point-of-sale**
19:15
**pointed** 177:15
225:12 290:24
**pointing** 105:8
**points** 104:20
250:25 343:9
**policies** 328:16
**policing** 296:24
297:18
**policymakers**
120:19 122:10
**political** 296:22
**portfolio** 69:19
89:18 91:10
93:1 134:10
228:20 241:13
254:16,17
255:1 265:4,20
278:11,15
293:5,19,20,21
294:5,15,17
309:14 321:7
**portfolios** 265:6
300:12
**pose** 136:1
**positive** 23:19
293:3
**positives** 313:24
**possibility**
145:15
**possible** 48:5
53:21,22 81:20
147:2 169:6

183:22 186:13
195:25 230:1
265:21
**potential** 108:7
108:15 145:24
146:12 148:5
149:13 157:14
159:8 163:7
171:3 180:20
196:10 266:19
281:13 282:5
329:8
**potentially**
11:14
**power** 17:21
**PowerPoint**
247:24
**PR** 34:8 44:5
58:20 62:16
229:17 231:24
231:25 232:5
232:10 238:11
333:22 334:7
335:9 337:5
**practice** 69:6
190:14 232:10
**practices** 28:20
203:7 223:5
291:22 296:25
297:12,18
341:12
**precedent**
118:16
**precursor** 16:11
**predatory** 43:25
**predicated**
304:15
**preexisting** 87:3
181:8
**prefunding**
101:23
**preliminarily**
170:2
**preliminary**
182:18
**Premier** 279:13

UNSEALED

**prepaid** 15:5
19:17,22
157:18
**prepare** 258:25
**prepared** 247:10
**preparing** 52:5
235:14,14
**prepayment**
60:17
**presence** 137:2
137:4
**present** 3:14
32:5 137:9
145:3 146:6
**presentation**
5:10,12 80:22
144:5 300:13
**presentations**
144:12,15
145:20
**presented** 58:7
137:8 140:24
141:1,4 206:10
208:18
**president** 15:23
20:5,7 45:9,11
**press** 234:15
**prestigious** 14:3
**presumably**
282:14 292:7
308:21
**presume** 29:1
292:8
**pretty** 17:23
22:25 30:8
39:14 44:16
69:6 72:25
95:24 115:10
119:5 120:3
126:1,1 132:10
140:20 151:13
159:2 170:25
186:22 192:21
200:20 202:16
204:2 209:7
224:9 228:7

232:12 241:13
265:13 279:10
280:22 296:8
296:17 319:24
**prevent** 13:9
16:24 202:19
263:3
**previous** 174:25
178:18,20
186:24 187:4
194:17 224:7
243:7 247:12
247:25 279:9
333:8
**previously**
138:13 210:6
250:21 277:23
277:24 280:4
**pricing** 132:4
259:14 260:12
262:24
**pride** 27:5
262:12 323:3
327:12
**primarily** 23:22
84:9,25 106:1
106:15 248:1
252:14 254:9
283:19 324:16
**primary** 39:8
129:15,19
136:18 261:2,4
290:17 307:23
**prime** 105:15,22
106:1
**Primus** 148:19
186:15
**principles** 94:6
95:1,6
**print** 316:7
**printout** 230:10
**prior** 44:15 79:2
83:7 88:20
121:9 181:13
193:11 194:13
197:1,8 198:21

199:1 239:7
**prison** 323:14
**privilege** 239:4
269:11,23
**privileged**
226:20,22,22
226:25 239:3
**pro-** 338:3
**probably** 28:11
39:14 46:22
47:11 65:4
90:22 99:3,6
108:22 131:19
146:6,9 149:2
170:15 185:13
192:24 214:14
215:10 220:9
237:1 261:23
263:8 275:4
284:6,8 286:17
288:12 298:5
300:23 302:7
337:5
**probe** 77:5
**problem** 19:4
96:25 164:13
164:14 197:18
202:9 204:8
303:16
**problems**
288:21 314:16
**Procedure** 1:23
**procedures**
328:16
**proceed** 9:4
227:7
**proceeding**
348:1
**proceedings** 4:4
9:12
**proceeds** 15:5
**process** 56:17
92:12 103:11
133:17 170:5
244:11 335:15
337:16 341:3

**processing**
102:15
**Procter** 2:18
**produced** 1:15
47:10,11,15
206:25 226:19
230:9
**product** 19:5
20:23,24 21:5
21:10,12,18,21
22:5 24:16
26:20 57:4,8
57:16,18,21
60:19 62:24
66:24 68:12
96:21,24 98:10
98:12,14,15
100:12,12,14
100:18,20,20
100:21,25
101:5 113:14
125:4 130:19
130:23,25
131:24 134:12
137:9,10,25,25
138:22 139:6
150:18 155:25
156:1,18 157:9
157:10,19,20
163:2,13,21
165:22 166:2,5
166:6,10,16,23
166:23 167:5
168:23,23
169:3 173:8,22
176:10,21
181:25 191:5
191:25 193:17
193:19 195:10
197:4 198:3,11
198:12 210:6
211:2,5 216:11
216:18 224:3
224:22 234:5
234:15,16,19
234:25 235:2,8

252:20 253:14
253:23 254:19
254:21,22,24
255:8,12 256:2
256:6,10,16
258:13 259:20
259:21 260:2
260:10 261:13
261:18,25
265:16 266:4,9
266:19 278:25
279:18 280:19
286:7 294:9
296:8,11,12,14
296:15 299:17
300:21 303:22
311:9,9 312:14
313:25 321:5
327:21 331:22
**product-by-pr...**
251:4
**production**
146:12 168:4
230:3 246:18
**productivity**
14:15 17:15
**products** 22:2
30:18 33:8,11
40:24 43:25
56:3,19 57:11
57:24 59:3,4
60:4,23 67:2
67:14 68:1
74:6 112:21,24
112:25 113:2,4
113:8,20
115:10 131:12
131:22,23
132:10,20
133:9,9 138:3
151:10,15
163:3 169:22
176:5,5 201:23
203:11,11,13
210:9 213:22
224:16,16,17

UNSEALED

App. 0142

233:13 234:6
235:13 251:21
251:24 252:14
256:7 257:18
258:2,4 259:7
259:7,12,23
260:20 261:11
262:12,17
278:8 303:11
304:3 312:12
321:8 325:6,6
325:7,7 326:14
326:15,16
327:3,3,13,18
332:8,9 343:14
**professional**
11:6 23:17
27:24,24 42:20
45:22
**professionally**
200:24 204:12
**proficient** 287:7
**profitability**
15:17 255:8
**profitable** 253:9
**program** 13:23
83:16,18,21
86:9 87:3
131:12 150:8
155:16,17
156:14,15,22
157:3,3 180:1
180:8 186:23
187:4 188:6,13
188:25 198:6
210:25 221:6
223:4 243:15
296:6 315:1,2
315:6 316:15
318:25 319:4
322:24,25
323:14,22
324:5,23,24
328:5 342:18
**programs** 14:4
67:19 86:20

112:6 126:9
128:18 131:17
131:18 150:6
150:11 158:11
185:15 186:4
186:23,24
191:10 228:12
233:19 322:14
323:14
**progressive**
304:11
**project** 17:3,6,9
17:14,15 127:4
**projects** 17:8,18
**promised**
138:14
**promulgate**
28:19
**promulgating**
297:12
**pronounced**
320:8
**proof** 19:13
**proper** 79:17
80:20 81:21,23
82:3 92:15
166:15 342:8
**propose** 264:25
274:10
**proposed** 183:2
206:14 207:5
211:4,8 279:24
300:8
**proposing**
264:19
**proposition**
99:13,18,21
104:18 114:20
**pros** 318:15
**prospects**
235:16 264:13
**Protection** 2:8
**proud** 30:14
303:13
**provide** 89:19
102:4,5 149:25

158:17 211:13
211:22 265:5,7
270:8,14 272:6
273:7 287:5
296:22 308:20
323:16 324:4
337:20 339:1
**provided** 82:23
84:2 134:15
158:19 196:22
198:9 212:20
212:23 219:17
236:6,8 270:12
271:5 273:11
273:12 287:1
331:7 340:6
**provider** 106:19
109:22,22
115:2 131:13
150:5,9,16
182:25 186:11
194:14 195:24
217:11,18
219:12 228:8
228:10 257:20
297:8
**providers** 110:2
186:3 228:4,11
258:24 277:12
306:13 340:5
**provides** 67:3
157:25
**providing** 21:24
88:3 102:19
120:21 126:17
196:12 209:12
211:16,21
212:7,9,25
213:1 232:15
235:24 241:11
262:1 263:6
321:13 323:4,5
328:12 337:17
337:19 339:2
340:3
**provision**

106:10 211:10
214:11 310:12
**provisions** 1:23
**public** 24:20
46:8 52:12
54:5 144:7
145:11,16
235:14 258:25
259:4 262:6
327:1
**publicity** 118:2
118:7,23
**Puerto** 151:21
**pulling** 229:6
312:11,12
**punch** 246:1
**purchase** 68:18
73:22 77:21,22
78:1 88:14
91:17,21
110:10 213:6
307:6,10
308:24 309:1
**purchased** 78:6
89:10 93:2
108:24 110:16
173:13 179:6
201:4 205:18
220:21
**purchaser**
170:19
**purchasers**
202:6
**purchases** 307:9
**purchasing**
108:12 116:15
138:23 174:16
307:14
**purporting** 72:4
**purpose** 51:17
52:15 54:5
55:7 122:16
127:1 134:4
171:18 172:10
172:19 173:2
173:14

**purposes** 46:14
73:24 74:15
94:5 111:12
112:2,4 146:10
146:14 169:13
170:13 236:4
239:7 335:2
**pursuant** 1:22
110:3,10,17,22
110:23 248:5
**pursue** 147:2
155:1 156:25
180:11
**push** 69:13
255:15
**pushing** 276:10
310:20 313:22
**put** 15:4 23:20
23:21 58:23
80:4 81:2
82:17,18 83:18
84:14 85:7
86:19 119:9
137:10 138:16
169:24,25
190:20 232:1
245:25 282:1
285:22 287:25
300:12 341:8
**putting** 62:16
82:8 86:7
170:10 195:18
283:2 311:4
**puzzling** 107:7
**pyramid** 101:3

**Q**

**quality** 276:11
339:3,6
**quarterly** 34:20
145:7,8
**question** 9:4,8
9:21,23,24
10:7,10,13,18
10:25 20:25
21:2,6,8,9

UNSEALED

App. 0143

23:15 26:8
30:22 31:12
34:5 35:15
39:13 40:3
41:8 42:5
44:13 46:7
48:20 52:22
53:2,16,25
55:16,23 56:5
58:11 62:13,20
63:11,16,24
64:2 66:6 68:8
69:25 70:11,20
71:19,22,25
72:23 73:7
74:18 76:2,11
76:12,15 78:14
79:4,7,16,17
79:17,22,22
80:20 81:6,17
81:20,21,23
82:4,11 83:9
83:10,20 84:20
85:13 88:9
89:23 90:18
92:10,12,13,16
94:11,24 95:4
95:19,23 96:16
97:5,15,19,19
98:1 100:17
101:20 102:1
102:25 105:3
105:17 107:21
108:20 109:8
113:7 114:23
124:6 125:18
127:16 128:10
136:1 137:8
139:8 141:11
146:1 149:9
150:22 151:8
153:24 155:9
156:8 160:14
162:10,23
164:11 165:7
172:14,15,16

173:7,17
176:12,23,25
177:5 182:4
187:12 189:14
194:4 196:4,5
204:1,24
205:17 207:10
212:2,14
213:18 214:17
222:1,23 223:2
224:20 225:4
228:25 234:11
241:16 245:1,3
249:11 250:22
255:4,14 256:8
261:8 262:10
267:18,19,21
270:12 272:6
272:25 274:16
274:22 275:17
275:25 279:23
287:22,25
288:6 289:8,15
289:18,21
292:9,14,21
294:1 295:6,7
295:22 301:11
305:24 306:11
306:24 307:22
308:11 309:5
310:3 313:15
322:11 329:13
329:22 332:3
332:20 333:1,1
333:5 336:12
337:18 338:19
339:24 340:14
341:6 342:2,8
342:10,13
343:13,21,23
343:24
**questioning**
236:5 312:24
**questions** 12:14
21:7 50:9 92:3
92:7 126:18

227:4 235:23
236:12 239:7
299:3 332:21
333:23 334:8
335:3 344:2,4
344:7,8,9,10
**quick** 317:17
**quickly** 60:15
100:9 239:2,15
**quicky** 169:12
**Quid** 66:14
**quirky** 189:7
**quite** 107:24
149:23 215:12
217:20 233:11
233:12 277:4
304:17
**quoted** 33:3
**quoting** 33:2
65:18
**Qureshi** 140:7

_____

## R

**R** 1:19 2:1 3:1
347:10 348:9
**raise** 29:25
136:14 258:16
259:6
**raised** 108:6
337:7
**raising** 134:8
137:17 311:14
311:15 312:3
**ramped** 296:15
**ran** 148:20
258:2,3
**range** 20:12
65:22 90:23
215:4
**ranging** 17:23
**rapid** 129:18
**rapidly** 129:20
170:25
**rarely** 37:21
61:4
**rate** 61:10 93:6

93:9 113:16
**rates** 299:19
304:5,8,21
313:22
**rationale** 119:13
302:16
**reacting** 144:21
**reaction** 121:14
**read** 24:18
50:12 74:4
84:18 107:9
117:1 123:12
124:11 166:21
172:15 226:8
299:7 306:24
316:6 326:10
326:25 346:3,4
**reading** 73:18
124:20 200:9
278:18 316:24
**ready** 128:20
162:4,4 166:4
166:17,19
170:13 267:13
281:15,23
**real** 59:18
124:19 192:22
196:22 233:5
317:17
**real-world**
122:11
**realities** 122:17
**reality** 94:8
120:25 221:1
221:20
**realize** 75:20
114:16 177:12
212:12 295:15
**realized** 14:17
205:9
**really** 11:4,16
17:9 18:2 19:9
21:22 23:25
30:20 32:22,23
34:22 37:25
38:1 40:10,13

40:15,18 69:22
73:18 75:22
109:19 120:13
122:1,6 123:23
128:18 135:17
148:4,17
149:22 155:14
157:13 158:13
165:15 167:15
171:7 173:19
182:20,24
186:21 197:8
200:19 205:1
213:2 216:10
223:20 227:5
239:17 243:3
247:16,16
259:5 261:15
266:2 267:7
271:6 276:10
277:3,5 311:19
313:20,21
319:9,9 321:15
322:3 329:23
334:3
**realm** 232:8
**reason** 8:19
10:20 11:24
21:13 45:18
60:23 63:9,13
89:18 131:10
152:15 153:3
202:2 203:5
204:5 219:10
224:25 232:1
248:8 255:20
268:5 283:18
320:9 336:22
337:4 345:3,6
**reasons** 30:6
69:9 156:13
223:8 347:22
**rebranded**
57:20
**rebranding**
56:21 132:3

UNSEALED

**recall** 57:18
59:17 178:23
215:9 259:5
**receipt** 347:20
**receive** 73:12,14
**received** 142:18
142:19
**receives** 67:15
68:4,13
**recession** 276:10
277:3
**recite** 122:17
**recognition**
120:25
**recognize** 51:9
75:9,19 96:2
98:19 323:13
**recognized** 98:4
98:8,14
**recognizes** 73:25
**recollection** 13:6
105:5 108:22
134:9,22
155:18 161:6
167:9 168:18
169:15 195:5
200:8 256:13
266:15 279:8
309:19 319:10
**recommendati...**
269:15 270:20
274:20
**recommended**
225:14 270:19
**record** 1:24 7:2
7:13 8:17,22
8:25 13:3
44:22 46:13
49:20 50:15,18
68:11 92:6
104:1,4 127:24
128:1,4 146:21
146:24 177:11
177:25 178:6
185:3 193:20
206:1,4 264:1

264:4 289:19
306:20 307:19
318:1,5 330:6
331:11 334:18
344:12,14
345:3 347:15
**recount** 155:4
**redirected** 266:8
**redirecting**
310:21 311:8
313:1,8
**reduce** 304:5
**reduction**
275:22 304:19
304:21 309:9
**reductions**
304:14
**Reed** 13:21
44:20
**Rees** 1:9,15 2:12
4:5 5:4 7:3 8:4
8:5,10 13:14
31:21 32:10
36:9 39:6
50:20 58:8
63:24 85:25
104:6 128:6
135:13 147:1
167:19 206:6
245:13 249:13
270:6 272:5
282:14 299:14
330:8,9 344:11
345:2 346:3,9
347:8,13
**reevaluating**
25:5
**refer** 124:12
128:11 254:8
326:15 327:3
**reference** 34:12
47:16,17 54:13
57:10 99:9
104:10 112:12
121:10,11,12
122:2 170:19

177:21 291:5
295:8
**referenced**
171:21
**references** 178:1
213:3 254:15
297:2
**referencing**
294:16
**referral** 218:24
**referred** 31:13
127:11 174:20
**referring** 17:15
31:10 46:2
47:18 54:15
62:12 65:9
71:10,12 86:1
102:13 103:13
121:21 126:2
150:12 229:14
265:17 266:18
293:20
**refers** 35:5
**reflection** 30:23
**refresh** 167:8
200:7
**refreshing**
313:23
**regard** 11:6,8
38:14 39:10,24
55:20 67:13,18
77:7 94:18
95:7,14 96:20
107:17 108:14
118:12 126:25
129:8 130:18
133:2 147:24
150:20 151:5
181:8 188:6
191:24 192:2,4
193:10 194:22
197:9 217:11
220:20 232:15
244:20 251:16
256:5 265:23
266:22 268:19

270:7 294:7
308:24 312:13
329:10 332:7
**regarding**
219:13,14
235:23 247:12
273:12
**regardless**
260:25
**register** 8:21
**registered**
232:13
**regular** 154:19
**regularly** 286:6
**regulation**
341:19
**regulations** 13:9
69:11,23
**regulator** 70:5
**regulator's**
116:5
**regulators** 69:17
227:18 276:10
**regulatory**
52:12 112:10
112:14,22
113:19 114:2
115:5 116:9,23
117:2 121:24
154:8,13,15
227:17 272:3
275:9,10,14
276:9,17 292:1
301:13,16
302:11
**reimbursed**
237:22
**reject** 101:16
**related** 11:11,12
11:13,15 98:3
98:10 107:2,4
117:2 152:11
217:15 233:23
235:4,7,10,19
236:7,18
237:15,15

243:9,9,12,14
329:24 334:6
343:14 347:24
**relates** 301:20
**relation** 236:9
318:17,19,20
**relation-** 183:25
**relations** 38:14
41:15,16,25
313:9,11
318:12
**relationship**
42:8 74:11,20
74:20,22 75:6
79:19,24 80:1
103:14 104:20
107:5 116:21
127:10,10
128:8 130:14
134:24 135:15
135:15 136:5
136:19 137:12
137:16,23
148:23 149:4
149:11 150:24
150:25 158:17
160:24 161:3,7
161:11 162:15
162:25 173:21
174:5 179:16
184:6,15
185:18 186:10
193:3 195:2,16
195:25 198:10
199:10 200:10
205:5 209:11
212:19,22
213:21 214:8
217:12 222:5
225:13,15
275:12 288:11
290:18,19
311:18,20,21
311:23 316:13
316:14,18
318:22,24

UNSEALED

App. 0145

319:23
**relationships**
73:2,3,11 96:4
126:9 127:14
128:13 130:11
130:16 147:7
147:12 148:22
149:6,13,14
152:18 190:4
227:23 238:22
314:18 317:10
**relatively** 86:16
117:4,24
120:14 128:20
**relaunched**
234:25
**relaying** 144:19
**relevant** 60:12
**relying** 138:14
**remained** 154:8
**remarketed**
266:8
**remarketing**
266:2
**remediation**
102:8
**remember** 20:11
20:20 27:22
28:11 33:19,22
52:5,10 54:1
59:23 63:21
64:3,6 78:25
79:20,21,23,25
80:2,5,6,9,13
80:21 88:1
90:19,24 93:7
106:18,22
107:4 115:25
121:11 125:15
126:10 127:3,3
127:5,12,18
128:24 129:7
129:12,12,24
133:16,19,20
133:22 134:1
134:14 143:8

144:11 147:20
148:17 153:4
153:11,12
154:18,21
157:2 159:18
160:18 162:5
165:15 167:4
168:14 171:12
171:17,24
172:8,18,25
174:12 177:2,6
177:8 178:8,10
178:14 179:13
181:15,16,20
182:11 194:6
194:18 198:6
199:22,23
200:17,22,22
201:9 202:2,4
202:9 204:9
205:20 208:8
208:17,20,22
208:23 209:2
211:25 212:16
215:2 216:3,4
216:9,13,23
217:21 218:10
224:11 226:5
228:1,5,7
238:2 239:25
240:1 241:22
243:17 244:13
244:16 248:11
248:19 255:15
255:18 260:11
271:25 272:12
272:16,18
273:24 274:13
274:18 276:3,6
280:12,14
281:18 284:2
285:13,14,15
287:15 289:15
289:20 293:11
305:24 306:4
306:18,22

307:3,8,11
309:8,13,14
310:8,13,16,18
310:22,24
311:6,13,14
314:11,12,12
314:19 316:12
317:6,9 319:13
325:8,9 329:5
331:5,10 334:5
338:1,2,4,9,9
341:15
**renamed** 16:13
**rent-a-bin**
185:16
**rent-to-own**
157:19
**rental** 341:23
**renting** 341:18
342:15
**repaid** 178:20
285:2
**repay** 22:17
**repayment**
257:5
**repeat** 293:25
303:13
**rephrase** 164:10
**replace** 264:12
**replacement**
181:7
**replicate** 183:21
**report** 5:21 39:2
230:15,20
247:11 249:25
254:15 264:7
274:9 277:19
280:3 282:14
282:19,23
283:1,7 293:1
293:9 294:4
298:11,23
302:19
**reported** 1:20
**reporter** 7:8
8:17 43:21

64:5 84:21
85:3 172:17,25
245:23 306:25
307:1 327:20
**Reporter's** 4:9
347:7
**reporting** 7:11
263:5,8
**reports** 251:9
341:1
**represent** 74:10
225:22
**representation**
72:8 233:3
**representations**
186:21 199:2
**representative**
248:10
**representatives**
7:10 248:20
**represented**
40:15 71:15,17
148:6 153:3,5
193:2
**representing**
157:4 160:19
225:9 238:18
238:22 250:19
262:19
**Republic** 57:21
**Republicans**
301:17 302:2
**reputable** 191:8
**request** 282:17
**requested**
230:23 347:18
**requesting**
317:4
**require** 69:11
75:18 95:1,25
**required** 75:9
98:22 193:25
291:16
**requirement**
80:24 98:16
220:8 222:14

307:23 322:21
**requirements**
180:13 341:8
**requires** 70:23
256:2
**requiring**
209:17
**resell** 202:15
203:17
**reselling** 202:19
**reservation**
87:16 192:22
196:14 197:6
322:16,18
324:6,9
**reserve** 82:23
84:2
**reserves** 70:7
**resided** 268:13
**residents** 268:15
**resold** 341:9
**resources** 91:8
91:10 205:8
249:8
**respect** 308:11
**respond** 137:7
171:7 307:20
339:15
**responding**
253:11 305:11
**responds** 334:16
**response** 11:2
12:20 25:3
43:18 77:2
121:24 228:25
229:5 232:17
240:19 254:13
269:8 276:5
334:15 337:6
341:19,20
342:14,16
**responses** 8:21
8:22
**responsibilities**
36:7,11 220:11
243:23

UNSEALED

App. 0146

responsibility
38:18 39:9,9
164:5 242:16
328:21
responsible
36:13 56:12
93:8 262:20
rest 258:1,14
259:3,8 316:24
restroom 50:2
restructure
127:5 296:7
restructured
234:20
result 9:9 116:4
185:2 306:16
307:1
results 37:21
255:9,11
resumé 13:20
resume' 45:2
retail 18:22
retailers 19:12
retained 77:16
188:22 290:8
retro- 259:8
retrospect
276:23
return 90:10,16
91:3,7 92:22
93:7,10
returned 347:19
347:20
returning 274:8
reuse 265:15
reveal 153:24
236:1 270:7
revealing 71:20
274:16
reveals 154:2
revenue 68:14
73:15 75:10,19
96:13 97:1
157:5 197:17
199:13 214:11
214:13,24

215:18,22,24
216:1 221:2
237:23 240:20
240:22 241:1
241:25 251:10
252:13 253:8
253:16,18,22
280:25 289:4
290:10 292:3
303:17 341:22
revenues 238:21
241:18 252:13
253:19 264:12
303:25
review 12:12,15
12:18 13:10
142:7 143:17
209:23 295:23
298:25 299:4
300:14
reviewed 12:24
76:22,24,25
171:10 284:6
reviewing 49:19
255:7
reviews 48:19
51:7 64:14
135:10 143:16
145:8,8 168:3
168:10 206:21
208:15 226:12
299:9 303:2
305:9 315:14
326:5 330:11
330:25
revised 299:18
rewarded
260:17
Rhoads 2:13
Richard 2:13
8:3 13:2 48:2
164:20 167:16
Rick 152:21,22
152:23 190:18
Rico 151:21
rid 14:16

ridiculous 81:22
right 12:5 13:15
13:21,22,24
15:15 18:20,22
18:23 19:24
20:15,24 22:3
22:4,8,21,23
23:13 24:3
26:5 27:7,19
28:23 30:10
32:13,13 34:5
34:16 36:22
37:2,2 38:7,9
39:7,11 40:1
41:6,12 42:3
43:3,4,17,17
44:3,7,21 45:6
48:13 51:14
52:1,8,20,25
53:11,14 54:11
54:19 55:3,11
56:8,15,20
57:8,14,22
58:1,9 59:7,8,9
59:13 60:8
61:4 62:2,4
64:16,21 65:13
66:4,25 67:10
67:16 69:2,23
70:8 72:16,18
74:3,14 75:12
75:24 76:6
77:8 78:11,17
78:19,25 79:21
80:5 81:4,10
82:25 87:5
88:16 89:2,5,9
89:12,16 90:5
90:11 91:13
92:1 93:13
94:1 95:7,12
96:14,25 99:13
99:21 100:7,15
101:18 104:6
106:25 108:11
108:18 109:13

109:25 110:4
110:14 111:2
112:8,15
113:15 115:14
115:16,24
116:3,7,17
117:20 119:5
119:24 120:2
120:21 122:21
123:9,10 124:4
129:11 130:20
130:24 131:1,5
131:8,25
132:10,15
134:20 135:2,3
135:18 136:15
137:6 138:4,16
139:4,6,15,22
140:9 145:16
146:9,16
151:19,23
152:1,21 155:7
156:1,23,24
159:9 160:25
161:12,15,21
162:20 163:17
163:25 164:6
165:13 166:2
168:8,13,24
170:21 171:21
171:23 173:10
173:14,16
176:1,10 179:4
179:21 180:3,6
180:16,25
181:2 183:25
187:9 188:8
189:6,10 191:5
191:13,25
193:4 194:15
195:10 196:2
197:10 198:4
199:21 201:10
201:16,23
202:9,17,21
203:4,14,23

205:15 206:10
207:5,7 208:14
208:23 209:9
209:19 210:7
210:22 211:25
213:3 214:15
215:15,18,20
216:2,21 218:8
219:5,17,18,20
220:7,13,24
221:7,17
223:25 229:8
230:15 231:9
231:13,16,19
232:16 233:5
234:7 235:19
236:19,23
237:8,17,18
238:7,8,21
239:10 240:8
240:21 241:3,8
242:4,10
243:24 245:2,6
247:13,23
248:7 249:2,23
250:16 251:6
251:14,22
253:3,4,5,21
254:5,11,12,22
255:2 256:6,9
256:22 257:10
258:25 259:20
260:7 261:5
263:24 264:6
265:25 266:23
267:15,25
268:7,8,23
270:6 271:1
272:14 275:15
276:22 277:2,6
278:3,3,25
279:2,20 280:2
280:20 281:5
281:10,24
282:9 283:11
284:3,21 285:4

UNSEALED

285:5,6 286:7
286:11,25
287:2 288:17
289:5,6,23
291:18 292:7
292:10,12
293:5 294:17
294:21 297:21
298:13 300:6
301:8 302:18
303:14,15,17
305:6 306:8,18
307:3,16 308:8
309:17 310:1,7
311:4 312:19
315:23 316:4
316:11 319:1
322:10 323:25
328:22 329:5
329:20 330:1,4
331:22 332:9
332:10 334:25
335:23 336:10
338:16 341:14
342:16 343:11
343:15
**right-hand** 47:5
**rightfully** 313:7
**rightly** 262:11
322:5
**rights** 118:12
119:7 120:8,10
121:2 184:4
204:14 220:10
**RISE** 57:3
131:21 132:3
234:5,20 237:3
238:24 310:21
310:21 311:8
312:14,20
313:1,5
**risk** 69:1 77:8,11
78:3,5 88:24
89:3,12,17
91:9,13,23
100:2,21 104:7

104:19 111:6
116:23 117:2
117:19 125:15
126:11 132:9
133:2,23 146:5
277:22,24
278:2,10
299:17,24
315:1 335:7
336:6,8,16
**risking** 88:15
**risks** 77:25
91:24
**RJL** 315:22,24
315:24,25
**RLJ** 315:18
316:4
**roadshow** 5:12
144:4,12
**Roberts** 199:18
**robustness**
229:21
**Rocky** 205:5
**Rodriguez** 338:1
338:22
**role** 36:23 37:7
38:6 40:1,16
41:16,21 42:9
42:11,12
137:22 147:9
147:23 148:4
149:5 150:17
150:19 151:2
160:12 194:17
194:20 291:14
**roles** 24:15,16
**roll** 281:23
300:25
**roll-ups** 231:4
**rolled** 299:18
**rollout** 252:18
**room** 126:15,17
128:23 130:10
191:18
**Rosenman** 3:4
**roughly** 17:6

20:13,18 27:10
65:23 178:8
283:6
**row** 15:1
**royal** 297:6
**RPR** 1:20
347:10 348:9
**rscheff@mm...**
2:15
**RSVP** 320:21
**rule** 10:9 124:21
124:25
**ruled** 124:15
**rules** 1:23 8:14
75:18 95:25
124:20 189:8
189:22 190:2
203:16,23
299:18 300:25
**run** 15:21 36:1
103:23 159:23
200:24 204:12
**running** 198:3,7
260:5

### S

**S** 2:1,18 3:1 5:1
6:1
**S1** 46:9 326:25
**safer** 15:6 19:17
**sake** 49:20
177:25
**sale** 341:3
**sales** 340:11,17
340:25
**salient** 45:1
214:8
**SAM** 2:7
**Sarah** 128:22,25
129:1 215:10
226:17
**Sarah's** 227:4
**saved** 30:17
31:18 32:18,24
**Saverio** 2:7 7:18
**savings** 31:20

258:8
**saw** 31:17 119:6
144:2 183:1
196:18 197:5
202:25 204:21
206:13 243:7
249:18 256:6,7
276:8 305:18
323:5 328:25
**saying** 37:16,22
62:11 118:19
118:19 122:2
123:18 124:22
129:22 137:24
150:16 164:3
176:13,25
191:17 223:12
233:1 242:7
257:17 266:18
285:7,23
293:14 305:19
308:25 312:25
316:16 323:13
328:2 335:22
335:24 339:21
**says** 51:21 56:11
59:14 63:2
65:8 68:2,21
73:12 102:21
104:24 113:14
142:13,13
144:20 146:4
168:6 177:25
216:22 229:9
242:25 243:2
251:2 252:24
255:7 259:11
275:19 286:4
297:16 303:10
317:3 330:8
331:4 336:5
337:9,15
**Schafer** 11:18
12:2
**schedule** 257:5
285:1

**Scheff** 2:13 8:3
8:3 13:6,17
14:5 20:16,19
21:1 22:9,13
23:14 26:7
27:13 28:25
29:6,12 31:4,9
31:13,21,25
35:14 38:8
39:12 40:2
41:7,18,23
42:4,15 44:12
45:7,20,24
46:6 47:20,24
49:8 50:4 52:3
52:9,21 53:1
53:15,23 54:15
54:22,24 55:4
55:15,22 56:9
56:23 58:2,10
58:19 61:5,12
61:16 62:10,18
63:10,15,23
64:10 66:5
67:7 68:7 69:3
69:24 70:10,19
71:6,18,24
72:22 73:7
74:7,9,17
75:25 76:7,12
76:16 77:9,12
77:15 78:12
79:1,11,16
80:7,11,18
81:5,15,19,25
82:3,9 83:2,7
83:11,19 84:5
84:16 85:2,23
87:8,12,23
88:8,19 89:13
90:12,17 91:5
91:14 92:15,19
94:3,10,23
95:18,22 96:15
97:2,4,14,18
97:25 99:14,22

UNSEALED

100:16 101:19
101:25 102:24
103:12,17,20
107:13,18
108:19 110:18
111:11,25
113:6,23
114:22 115:8
116:8 117:13
117:21 118:9
118:25 119:25
122:5 123:11
124:5 125:17
125:23 126:12
127:15,23
129:14,25
130:3 132:11
132:16 133:5
134:5,21
136:16 137:19
138:5,18 139:7
141:6,10 142:1
142:3,9,20,23
143:1,7,20
144:10 145:25
148:2 149:8
150:21 151:7
152:2,14 153:9
155:8 156:8
158:25 160:2
160:14 162:6,9
162:22 164:7
164:15,18,22
165:7 166:3,20
167:18 168:25
172:3,5,23
174:10 176:11
176:22 177:9
178:11,13
181:11 182:3
183:15 187:10
187:24 188:9
189:12,25
190:10 191:6
191:14 194:3
196:3 198:12

198:16 199:8
203:20,24
204:22 205:23
206:11 207:8
207:24 208:3
209:20 210:8
210:23 211:23
212:1,6 213:17
214:16 215:21
219:21 220:3
221:4,9,22,25
222:17,24,25
222:25 225:2
225:16 226:18
226:21,24
233:6 234:9
241:4 244:24
245:2 246:2,5
246:7,13,19,24
247:2 250:7
261:6 262:8
263:22 267:17
268:24 269:12
270:2,4,22
272:5,8,14
274:15,21
275:16,24
277:15 279:21
281:6,25 284:9
285:12 287:3
287:17,21,24
288:5 289:7,12
289:17 292:8
292:14,23
293:24 295:2,5
298:5 299:7
301:10,24
303:19 305:15
306:9 307:18
307:21 308:10
309:4,24
311:10 312:15
313:13 315:9
316:23 317:15
317:18,21
322:8 325:17

325:21 326:1
326:17 327:24
328:6 329:12
329:16 330:3
331:17,23
332:2,12,25
333:4,13,17
335:11,25
336:11 337:10
338:6,17 339:9
339:17,23
340:13 341:4
341:24 342:5
342:11 343:16
343:19 344:8
344:10
**school** 14:7 16:5
  36:8
**Sciences** 217:10
  219:14 221:1
**scoping** 329:8
**score** 106:3
  258:10 278:13
**scores** 68:5,14
  73:13 109:6
  278:10,14
**scoring** 277:23
**Scott** 152:8,12
**scramble** 169:4
**scrambling**
  281:11
**se** 52:15 132:18
  337:6 339:5
**search** 260:16
  285:17
**searches** 163:8
**seasoned** 39:1
**seat** 292:22,23
**seats** 343:4
**second** 116:23
  117:1 127:24
  195:6 209:16
  213:4 226:11
  226:14 238:10
  255:6 264:9
  280:6 286:4

299:11,16
304:8 325:4
326:7
**secondarily**
  228:21 259:16
**secondary** 202:6
**section** 66:18
  102:4 108:2
  112:9 116:23
  250:24 251:10
  252:16 254:17
  255:5 257:24
  264:18 275:8
  288:21 294:12
  294:16 301:13
**secure** 34:11
**security** 90:2
**see** 8:16 9:7,7
  12:1,16 17:5
  30:1,13 33:17
  44:11 46:24
  47:4,6,10 51:1
  54:9,11 56:3,6
  62:6 63:2
  64:16,20 65:19
  65:23 66:1,20
  67:8 75:4
  92:11 104:12
  112:10 116:23
  117:8 141:2
  143:18,20
  161:25 164:13
  168:12,24
  170:16,20
  206:24 207:19
  208:22 209:4
  209:13 213:9
  213:11,13,13
  214:12 219:8
  219:10 223:10
  229:3 230:3
  231:4,19
  240:18 241:22
  250:13,21
  251:23 252:7
  254:20 255:6

259:1 260:24
261:24 264:14
264:22 278:16
278:20 279:8
280:25 281:16
283:15,21
285:1 286:8
288:25 289:16
292:12 293:8
294:22 295:4
296:25 297:1
299:21 303:7
315:19 316:20
316:22 317:2
326:1 331:19
336:5 341:20
342:21 343:18
**seed** 175:24
**seeing** 80:22
  158:16 182:20
  208:8 323:7
**seen** 45:25 51:19
  55:5 58:5,13
  58:15 72:3,5
  112:12 144:15
  161:25 162:11
  168:12,15
  185:13 218:20
  218:22 230:2
  297:10
**sees** 223:8
**select** 256:16,21
  257:15 259:24
  260:1,6 261:1
**selected** 5:20
  230:15,20
  231:6
**selective** 246:10
**sell** 15:18 134:17
  134:20
**selling** 107:3,4
  188:2,7 201:15
  202:5,16
**semimisrepres...**
  105:7
**semimonthly**

UNSEALED

255:22,25
256:3,15
**send** 109:23
**sending** 248:20
**Senior** 2:8
**sense** 37:19
98:25 99:5
149:25 158:15
182:19 190:24
197:3 209:23
304:22 308:13
315:2 322:17
323:1
**sent** 18:2 53:8
167:13 199:23
249:11 283:23
284:6
**sentence** 258:21
275:19
**separate** 40:8
315:24
**separation**
319:8
**September**
250:1,4,5,11
251:18 316:17
**September's**
298:24
**sequitur** 308:11
**serve** 14:23
16:18 17:16
26:14 96:4
99:25 112:22
113:17 114:9
114:12 276:12
276:19
**served** 59:19
262:16
**service** 18:25
100:22 115:2
120:20 150:5,9
150:15 182:25
186:3,10
194:14 195:24
217:11 219:12
228:11 258:24

297:7 343:2,4
**services** 14:10
14:21 17:10
23:6 67:3
74:24,25 89:20
102:19 158:18
158:19 194:15
197:10 209:13
219:16 232:15
232:21 233:8
235:23 236:3,7
236:9,22
243:10 244:8
265:7 270:8
287:6,6 321:13
337:21 339:1,3
339:5,13 340:4
**servicing** 19:7
170:20 171:19
217:25 252:1
257:19 297:8
**serving** 18:3
19:9 23:6
55:21 106:1
109:19 122:7,8
243:12 258:5
262:15 327:13
**set** 71:13 90:1
115:6,9 153:17
210:21 213:10
239:10 241:7
256:11 286:13
300:1 320:23
321:12 324:15
329:23
**setbacks** 281:13
**sets** 213:25
**setting** 37:3,3
45:22 208:17
238:23 290:16
**seven** 246:9
343:22
**Seventh** 3:11
**sexy** 146:4
**Shapiro** 1:3 3:3
7:24,24 47:2

60:9 83:1,6
84:18 85:9
86:3 88:17
89:7,22 93:14
135:8,19,24
138:17 141:15
172:13 178:12
181:10,12
220:17 221:3,8
221:21,24
237:25 239:1
239:16 242:24
306:19,23
307:17 309:23
310:2 344:3,7
347:3
**share** 199:13
214:12,13,24
215:19,22,24
216:1 218:1
240:20,22
241:1,10,12,25
289:5 292:4
319:19 341:22
**shared** 112:5
249:8 329:4
**shares** 290:10
**sheet** 5:16 74:16
75:10 91:18
96:1 206:10
207:2 208:21
208:23 209:15
210:18,20
215:17 217:4,5
218:19 222:18
222:21 224:7
224:10 225:20
230:9,11
291:16
**sheets** 73:25
230:6
**Sheldon** 2:18
8:1,1 49:18
70:9 88:18
92:2 113:24
125:21 126:14

127:24 128:25
141:7 146:18
153:18,23
177:10,24
184:25 226:7
226:10,14
227:7 234:8
235:20 236:16
239:6,10
263:20 270:6
271:4 273:6,10
273:17 274:21
282:22 295:11
299:11 326:7,9
327:25 344:9
344:12
**shifted** 131:12
**short** 44:25
46:25
**short-term**
22:19 301:22
**shorthand** 1:21
335:2
**Shotten** 311:17
311:21
**Shotton** 305:25
306:4
**show** 33:24 62:2
135:4 161:24
162:8,8 206:18
207:24 218:25
222:20 225:25
225:25 226:1
229:22 325:12
330:2
**showing** 57:23
62:1 217:4
230:8 255:12
323:8
**shown** 167:20
167:21 189:22
**shut** 187:13,17
187:22 306:17
307:2
**shutdown** 187:8
309:22

**shy** 298:6
**sic** 73:8 84:25
315:24
**side** 11:8 66:14
66:16 93:18
95:16 97:8,24
133:3 140:11
290:17,22,23
313:10
**sides** 207:3
**Sievert** 1:19 7:8
347:10 348:9
**sign** 210:17
300:15
**signal** 21:22
**signaled** 14:20
**signature** 4:8
165:20 208:11
345:1 346:1,5
347:17,21
**signed** 90:5
110:4 162:17
165:10,16,17
165:19 207:22
208:10 213:15
283:9
**significant**
157:4 242:25
262:25
**significantly**
215:25 216:6
**similar** 69:22
82:19 150:18
158:18
**similarly** 180:10
**simplicity** 45:14
**Singapore** 17:20
**single** 58:22
79:13 240:17
247:9 295:14
**sit** 82:6
**site** 166:25
169:12 285:23
285:24
**sitting** 84:1
163:10 343:5

UNSEALED

situating 156:7
  156:10 298:19
situation 99:6
  114:2,7 155:23
  228:18 301:16
six 298:6
size 321:7
sketching 53:21
skills 323:6,17
  324:8,24
skim 295:16,19
skipped 246:16
  246:17 298:12
Sky 160:25
  161:2,6
sleep 10:21
slogan 258:2,22
sloppy 241:16
slowing 309:20
  310:19
smart 123:6
  183:12 247:16
smirarchi@at...
  2:10
so-called 113:20
  267:18
social 105:9
  107:8,8,12,15
  108:1,3,5,8
software 209:12
  293:18
sold 15:8 18:17
  69:8 163:12
  187:18 204:19
  341:9
solid 281:15
solution 80:15
  262:13
somebody
  109:17 123:23
  148:6 151:11
  154:19 225:11
  260:18 303:23
  333:25
something-or-...
  329:2

somewhat
  132:19 246:10
  334:25
soon 53:14
  179:19 292:21
sophisticated
  86:16
sorry 18:7 27:15
  45:11 49:6
  51:4 64:5
  65:12 75:14,15
  77:4 79:7 90:9
  96:17 110:13
  119:18 143:12
  144:18 145:6
  156:3 157:22
  160:4 164:10
  171:6 177:9
  178:15 179:22
  185:10 191:18
  192:6 195:8
  205:16,22
  220:17 225:18
  233:23 239:14
  250:2,10,11
  265:5 272:13
  292:12 293:25
  294:7 313:4
  322:8 330:12
  330:15 332:4
  337:7 340:15
sort 14:7,20,25
  15:23 16:22
  18:2 22:6,25
  25:12,18 27:2
  29:23,25 30:20
  35:10,23 37:13
  39:21 46:13
  51:15,17 52:13
  56:24 57:23
  75:5,16 77:24
  91:19 99:18
  102:7 106:9,19
  107:25 109:5
  114:1 118:22
  120:9 122:13

122:17 123:19
  125:3 128:12
  130:6 133:20
  144:5 146:15
  147:5 149:1
  151:14 157:11
  158:2,13
  159:16 163:10
  169:7 170:6
  171:9,11
  173:23 175:17
  182:18 183:3
  183:19 184:13
  185:12,18
  188:25 190:14
  190:19 192:14
  196:9 198:2
  199:13 203:1
  204:8 207:15
  211:16 212:10
  215:2 217:25
  222:3 223:5
  224:15 228:17
  228:25 232:8
  234:17 240:11
  242:2 243:6,11
  249:6,8 252:18
  255:24 256:24
  257:20 258:13
  259:13 260:21
  261:13 262:19
  263:10,13
  265:5,19
  267:10 269:24
  275:5 276:16
  279:5,6 290:17
  296:1,14 297:9
  304:1,7,13
  306:7 312:4
  316:14 321:12
  323:1,9 324:4
  324:9,12 325:9
  326:21 327:2,7
  329:9 331:9
  333:22 334:7
  339:2,3 340:24

sorts 251:12
sound 21:7
  192:21
sounding 40:20
sounds 70:21
  104:16 213:6
  213:14 285:7
  303:16,21
  323:15
souped 16:22
  19:4
source 85:22
  107:3,5 288:3
  288:8
SourceItOne
  340:23
sources 106:2
  108:13 197:17
South 2:14
  159:9,20
  264:22 274:12
  274:14,20
sovereign 120:8
  120:10 121:2
  139:23 158:8
  184:4
sovereignty
  158:10
space 17:25
  25:15 43:25
  59:4,5 112:7
  114:21 277:6
  297:9
spaced 295:14
spanning 61:16
speak 52:15
  54:3 71:14
  86:9 111:13
  121:16,20
  122:6 144:13
  152:18 166:24
  193:23 194:7,9
  216:7 232:4
  235:6 238:5
  256:23 290:13
  309:12 311:3

324:21
speaker 43:3
speakers 301:15
speaking 75:2
  98:9 119:1
  131:16 209:14
  227:12 233:16
  233:20 269:5
  318:21 331:10
speaks 164:8,9
  309:8 336:1
  343:20,25
special 99:11
  171:18 172:10
  172:19 173:2
  173:13
specific 105:4
  130:15 179:22
  198:13 205:2
  205:18 207:17
  208:9 212:15
  307:12 336:14
specifically 10:5
  17:12,24 40:4
  40:4 52:10
  62:21 70:22
  88:1 108:21
  119:1 121:25
  137:17 155:21
  186:4 191:24
  228:24 229:15
  258:15 280:14
  323:22
specificity
  154:23 181:20
  340:16
specifics 84:6,22
  85:11 94:15
  133:19 178:21
  179:13 180:25
  216:8 268:17
  319:13,17
specified 225:8
specify 158:7
  334:9
speculating

UNSEALED

337:8
**speculation**
53:24 81:16,18
214:17 279:22
289:8 312:4
341:25
**speech** 222:24
**speed** 325:1
**spend** 40:11
244:20
**spendable**
234:16
**spent** 40:14,18
290:20
**spin** 146:4
235:15
**spinoff** 32:4
44:17 46:11
53:5 132:25
133:18 235:9
248:24,25
249:1,3,7
**split** 52:20
132:24
**spoke** 43:17
**sponsoring**
278:24
**sponsorship**
23:18
**spot** 303:23
**stable** 25:21
182:23 184:7
227:23 296:8
**staff** 14:15
128:19 129:6,9
285:20 287:8
314:9 324:25
328:11,12
338:13
**staffers** 302:8
**stamp** 183:19
**stamped** 64:18
**stamping** 215:3
**stand-alone**
330:7
**standard** 171:11

**standards** 277:4
**Standing** 139:17
**standpoint** 97:9
136:7 252:11
**stands** 139:19
288:23
**start** 16:7 54:20
54:20 78:17
162:2 163:25
165:24 166:18
166:18 167:5
174:12 182:1
201:15 237:2
270:24,24
281:19
**started** 14:13
15:2,11 16:7,9
18:9,10,12,13
18:14,18 20:6
21:14 23:1
53:4 81:19
92:3 130:25
152:4 179:5
224:9 248:20
259:19 331:8
**starting** 100:25
101:1 166:23
226:4 249:24
**starts** 47:19
101:3 167:10
223:12
**startup** 24:19,22
24:22,24 25:1
25:4,5,21
296:12
**state** 1:20 7:12
57:7 61:18
65:16 110:13
113:9,10,15
114:6,13
115:22,24
117:5,7 120:19
121:10,13,24
131:22,23
158:9 185:3
243:19 266:22

266:25 268:2,7
268:10,15
270:9 299:17
341:19 347:11
**state's** 118:11
**stated** 1:24
62:23 295:8
**statement** 6:18
99:15 117:11
119:12 122:13
331:3 333:19
333:21 335:1
337:25
**statements**
75:24 76:6,8
76:21,23 94:7
94:22 189:23
329:10
**states** 1:1 7:6
61:19 68:16
72:25 113:3,21
116:2,16 117:5
117:25 118:5,6
118:19 119:6
120:4,12,15,16
121:4 122:3
264:13,21
266:13,20
267:5,11
268:12,23
269:3,6,16
270:1 271:18
271:24 274:5
274:11 330:22
347:1
**stating** 115:5
**status** 285:1
**statute** 113:13
113:13 119:23
**statutes** 71:16
72:8 113:22
**stay** 95:5 160:2
**step** 15:22
126:20 236:13
**stepped** 15:24
65:1

**Steve** 11:17,22
147:14
**Steven** 12:1
78:19 147:15
149:17 153:8
190:9
**stick** 276:25
280:5 302:20
**sticker** 47:5
49:25 142:2,3
**stickers** 245:23
**Stinson** 15:14,15
16:9 18:5,9
21:15 23:12,23
24:1 27:11,11
40:7,9 153:16
159:13
**stipulate** 90:23
109:22
**stipulated**
124:10
**stop** 92:16,17
155:6 165:8
177:1 179:20
188:14 227:18
273:6 307:9,14
326:22
**stopped** 176:18
177:3 185:14
310:6,16
**stores** 15:4,4
16:23 19:11
**straight** 292:13
314:7
**strained** 313:11
317:10 318:18
318:19
**strange** 16:15
**strangely** 26:3
**strategic** 37:4
**strategies**
128:12 130:10
**strategy** 37:4
38:5 39:22
255:12 304:20
**streams** 280:25

**street** 1:22 2:5,9
2:14 3:5,10
56:20 57:2
138:16
**strength** 114:25
**strengthening**
128:18 130:14
**stretch** 23:24
46:13
**strictly** 115:22
115:23
**strike** 28:22
90:9
**striking** 124:12
141:2
**stripping** 197:20
**strong** 255:13
**strongly** 30:4,12
**structural**
169:20 263:1
317:8
**structurally**
290:7
**structure** 113:16
132:5 138:19
138:20 171:8
173:20 174:23
174:24 175:7
176:4 182:23
184:15,20
185:17 186:13
187:3 209:11
210:19 213:7
214:6 215:1
216:12 218:11
222:5,8 238:2
238:5 242:5,7
256:17 257:21
259:14 261:18
267:2 290:12
296:6
**structured**
221:18 222:2
294:4
**structures** 86:10
160:1 217:19

UNSEALED

290:5,16
**structuring**
126:8,8,8,25
**struggle** 29:17
**struggling**
306:13
**studied** 123:9
**stuff** 123:6
192:15 232:3
323:7 327:15
334:3
**style** 27:2 28:24
29:15 30:7
33:19 34:7
36:5,6
**subject** 114:5
117:25 127:6
158:9
**submitted** 44:7
**subprime** 14:4
105:9,18,22
106:5,19 258:9
276:13
**Subscribed**
348:4
**substance** 93:20
**subtleties**
133:12
**subtlety** 337:24
**success** 176:10
**successful** 40:24
145:13 312:6
327:12,16
**succinctly** 334:7
**sued** 187:20
**sufficient** 91:8
213:10
**suggest** 235:3
**suggested** 224:7
243:8 279:5
**suggesting**
116:20 120:22
179:9 291:9
293:11 312:23
**suggests** 63:24
141:3 238:3

258:21 330:21
**suitable** 158:16
**suite** 2:5,9
324:21
**suited** 180:12
**summarize**
304:1
**summarized**
250:25
**summarizing**
68:24
**summer** 52:24
251:20 252:10
**super** 35:18
253:8
**supplied** 13:7
44:2 287:11
**supply** 44:4
336:9
**support** 41:5
69:18 98:13,13
103:10,15
117:3 128:20
129:18,19
138:7 139:10
176:19 228:18
229:8,12,18
238:24,24
243:10 287:6
297:20 322:16
322:25 323:17
324:18 328:11
334:23 340:6
341:12
**supported**
113:16 136:22
237:12 307:19
322:18 327:19
**supporting**
136:21 191:9
229:20 233:4
244:10
**supportive**
315:3
**sure** 8:12,15
10:4 11:15

12:12 21:1
29:10 35:24
36:21 38:10,16
38:24 46:23
48:18 51:5,5
59:23 65:1
72:7 77:18
79:12,15 82:7
92:6 99:6
110:14 140:15
150:14 154:9
159:2 165:5
166:12 168:1,7
169:2 172:2
176:3 181:21
188:21 191:20
195:20 196:21
209:5 210:24
211:1 218:21
223:1,15 226:9
227:12 228:8
232:12 237:8
244:9 267:9,14
273:21 279:4
287:20 289:18
295:10 300:10
300:18,24
304:23 308:12
310:12 315:17
326:8,25
330:17 335:13
**surprise** 168:14
168:16,17
**surprised** 65:25
170:25 187:1
224:13
**surprising** 90:7
120:9,16 224:9
**sweet** 303:23
**switch** 49:12,19
49:25 182:8
195:21 325:3
**sworn** 1:17 8:6
347:14 348:4
**syllables** 177:12

**T**

T 5:1 6:1
**table** 10:12
62:17,21
287:25
**tablets** 37:16
**tag** 331:9
**TailWind**
165:11,12,20
217:10 220:25
**take** 10:15 15:24
22:7 35:7
49:24 50:12
79:21 115:12
123:9 124:24
158:8 169:16
170:5,11
195:10 226:11
247:17 260:20
295:22 301:20
304:8 315:10
316:6,7 317:15
317:21 328:21
334:15 342:25
**taken** 1:17 50:16
60:21 104:2
121:19 128:2
146:22 206:2
264:2 318:2
348:1
**takes** 168:22
**talented** 24:14
**talk** 13:16 32:1,4
40:10 43:19
44:15 45:19
75:22,22 77:7
79:9 114:17
127:23 128:9
134:11 178:5
184:8 201:13
213:15 222:19
254:14 257:24
271:1
**talked** 54:10
56:21 96:8
114:15,16

149:1 159:8
162:24 218:5
255:19 277:24
290:23 318:11
336:7
**talking** 9:1,3
14:15 24:19
28:25 29:9
31:5,6,6 32:3,5
32:6 36:5 39:5
39:5,6,10,11
43:22 77:19
81:7,10 84:12
84:13 85:5,6
85:18,19 86:21
89:4,5,9
100:11 101:17
104:16,21,24
108:12 109:11
121:25 126:23
129:1 130:17
135:1 144:6
145:4,14
156:19 164:18
165:6 171:13
177:19,22
182:14,16
184:13 190:8
192:6 195:21
195:22,24,25
199:6,6,17,18
205:4 213:19
218:24 251:18
251:19 253:19
255:1 257:21
262:21 275:2,9
286:10 299:23
300:2 305:25
306:1 323:24
329:17 332:1
332:16 340:21
341:2,7,15
**talks** 42:20
44:14,14 46:9
294:15
**target** 93:6,9

UNSEALED

105:1 299:19
**targeted** 106:10
257:8
**TC** 27:22 217:10
220:25
**TCAS** 241:2
**team** 34:8 35:17
35:20 36:13,15
37:17 38:3,10
44:5 52:7
58:20,20 109:5
144:25 157:6
166:10 170:8
194:7 215:9
223:23 224:4
270:19 281:14
281:22 284:10
301:5 303:22
311:14,18,20
311:21 334:7
337:5 340:8,11
**teams** 299:17
**technical** 133:11
281:13
**technological**
133:1
**technology**
14:23 16:17
21:17 25:14
26:14 33:10
43:1,24 67:3
68:5,13 73:13
74:24,25 110:7
114:9,11,24
117:3 132:17
133:14 149:25
158:17,19
159:4 217:18
217:24 220:25
252:2 257:19
261:15 279:16
321:16 327:4
337:19
**tel** 348:13
**Teletrack** 106:7
106:11

**tell** 8:19 9:24
58:5 82:7
87:21 124:8
142:13 149:10
154:25 274:17
286:4 288:2
299:2 314:1
330:16
**telling** 70:5 79:9
168:19 224:25
270:18
**tells** 10:9
**template** 170:1
**Templer** 159:14
**tempted** 236:1
**tend** 61:3
**tended** 101:12
**tension** 325:5
**term** 5:16 80:13
80:21 93:20,23
93:24,25
112:14,16,17
124:18 129:12
129:24 130:2
139:15 206:9
207:2 208:20
208:23 209:15
210:1,17,20
215:17 217:4,5
218:19 222:18
222:21 224:7
224:10 225:20
266:2 291:16
328:18
**terminals** 19:16
**terminate**
156:15,21
**terminated**
162:25 180:8
318:24
**terminating**
156:14 157:3
168:19 316:18
**termination**
180:1 319:23
**terminology**

306:10
**terms** 36:10 38:6
42:11,12 60:22
74:3 86:17
90:25 96:4
99:12 111:20
112:21 128:12
162:19 170:4
182:18 195:16
206:14 207:5
208:18 209:6,9
209:16 210:10
210:14,21
211:18 213:9
217:7 241:21
244:15 259:13
267:10 280:1
281:1 317:7,8
**terrible** 323:15
**terrific** 50:3
311:20
**test** 300:17
**testified** 8:7 54:1
107:14 222:18
**testify** 185:4
342:6
**testifying** 9:17
**testimony** 45:8
46:3 62:19
79:2 82:10
83:8 110:19
135:20 155:2
177:16 181:13
181:14 212:1
241:5 261:7
313:14 335:12
347:15
**testing** 108:1
**Texas** 1:20,22
152:5 347:11
348:9,12
**text** 72:13 103:8
274:8 278:18
285:22 342:21
**TF-pA** 5:6,8,11
5:13,15,19,21

5:23,24 6:4,5,7
6:9,12,14,17
6:19 47:6,9,17
64:18 167:10
226:4 280:7
293:2 302:22
**thank** 28:7
29:12 31:22
47:24 48:2,12
51:2 54:24
67:8 74:9
85:16 88:10
106:24 126:22
129:3 139:13
141:14,18
142:16 143:12
143:15 154:6
156:11 165:1
168:9,11 178:6
198:16 200:5
206:20 208:9
208:14,16
226:10,13
227:7 232:19
236:16 245:5
246:2 250:2,12
270:16 273:9
273:16 276:1
280:14 282:24
283:11 287:23
292:16,19
294:18 295:24
298:18,22
299:1,10,12
301:3 302:21
305:8,17,17,19
309:17 325:21
326:2,11
329:18 330:24
331:1 338:20
344:11
**thanking** 280:11
**Thanks** 49:17
51:6,8 143:22
168:2 208:8
273:17

**theme** 35:23
37:14
**therefor** 347:22
**they'd** 192:23
**thing** 8:24 14:12
30:10,11 45:16
47:14 60:16
112:1 129:19
136:18 159:19
202:13 204:3
259:18 295:12
302:3 316:21
316:25
**things** 8:14 11:5
16:17 19:14
24:18 25:6
29:25,25 30:21
34:13 39:17,18
42:14 46:15
48:6 52:1 54:9
98:24 103:3
104:25 106:4
129:8 130:6
140:3 145:11
146:2 157:7,17
163:9 169:9
181:20 193:13
196:15 207:16
211:8 212:13
215:4 218:5,9
224:15 229:16
240:9 245:19
251:8 258:18
263:5 312:18
324:8 328:20
334:5
**think** 1:6 2:17
5:5,16 6:15,18
7:4 8:2 11:11
13:7,9 15:12
15:20 17:9
20:21,24 21:10
21:21 23:9,9
25:5,19 26:19
26:22,24,25
27:1 28:2,6,10

UNSEALED

29:1,7,10,14
29:18,20,22
30:10,15,23
31:7,15,17,19
31:22 32:4,6
32:12,16,19,23
34:18,25 35:19
36:9,9,12,18
36:20 37:8,14
39:14,16 43:5
43:21 44:10,15
44:17 45:5,13
45:19 46:2,10
46:11 47:10
49:3,19 50:11
51:1 53:22
54:3,4,10 57:2
60:11 62:12
63:5 64:25
66:19,22 67:1
67:2,3,14,19
68:4,12 69:4,7
70:21 71:23
72:14,25 73:14
73:20,24 74:6
74:11,16 75:4
76:8,17,20
78:15,23 80:2
81:14 82:20
83:23 89:19,25
90:8 91:2,8,12
91:17,24 92:21
93:3,8,12
94:12,15,22
95:10,16,24
96:10,13,21,25
97:1,11 98:24
99:12,18
101:12 102:18
105:6,11,16,19
106:6 107:11
107:14 109:18
110:3,10,12,21
111:4,9 113:20
114:18,20
115:25 116:14

117:22,24
118:5,8,10,12
119:8,22
121:19 122:4
122:12 125:13
126:23 127:18
132:20 133:10
134:12,20,22
134:25 135:16
135:18 136:5,6
136:8,9 137:6
137:11,25
139:23 140:10
140:13,13,14
140:22 141:19
141:19 142:24
146:5 147:18
148:4,15 149:6
150:13,14,19
151:20,21,24
153:3,5,20,22
159:1,21 162:1
162:14,18
163:12 165:12
172:1 173:8
174:14 175:2,4
175:4,10,13,14
175:15 176:1
176:20 177:6
177:10,11,13
179:12 180:1
180:11,11,19
181:5 183:12
184:2,3,10
185:24 186:2
188:7 189:3,3
189:9,23 190:3
190:4,7,18
192:4,20,24
193:9,22
194:21 195:2,8
195:15 196:13
197:11 200:16
200:17 201:1
201:14 202:2
203:7 205:3

206:8 207:4
208:18 209:8
209:18,22
210:15 211:3
211:21 212:14
214:14 215:20
216:1,5 217:17
218:3,8,22
219:16 222:13
223:14 224:12
224:20 225:8
225:11 226:18
228:8 229:2,11
230:1 231:25
232:5,10,11
233:4 234:16
234:18 236:20
237:11 238:9
238:18 241:13
241:19 242:6
242:20,25
244:1,5,7,7,11
246:25 247:4
247:14 248:6,8
248:13 249:3,9
251:24 252:21
253:12,13,21
254:25 257:3
258:4 259:5,22
259:25 260:7
260:12,15
261:25 264:16
267:24 270:9
271:5,6,13,21
273:2,3 274:1
276:7,15,21,23
282:15 283:10
286:3,17
287:13 288:2,2
288:10 290:2,8
290:9 291:17
294:24 296:3
297:20,22
298:1 299:8
300:9,11 302:7
303:3,12 304:2

305:15 307:10
307:16 308:4
308:22 310:15
311:7 312:2,5
313:23 314:10
314:22,24
315:2,21,22
316:2,5,10
319:11 320:1,5
320:8,10,21
321:6,13,19
323:11 324:10
324:18,20
325:6,9,22
326:14,15
327:14,14
328:18 329:17
329:20,24
332:8 333:10
334:10 335:7
335:17 336:7,8
337:4,7,15,20
338:13,25,25
339:5 340:1
341:7 342:15
342:22 343:24
347:6
**Think's** 110:23
147:11 226:21
**Think-** 254:16
**ThinkCash**
21:11,12,21
22:3,5 23:4
45:13 168:6
173:9,22
176:20 188:6
201:5,22 203:2
203:18 210:5
251:21 252:12
253:13,20
254:9,17,25
256:10 264:12
264:18,19
265:3,4,23
266:7,14 279:8
280:18 281:1

283:20,24
284:15 285:23
293:22 294:19
**ThinkCash/Fi...**
191:25
**ThinkCash/G...**
278:17 288:20
293:7
**thinkfinance.c...**
50:25
**thinking** 53:5
117:11 200:23
235:15 259:6
261:17 262:22
296:6 329:23
**thinks** 29:21
37:22
**third** 69:14
210:4 264:17
287:5 324:25
340:17 342:20
**third-party**
25:16 96:6
108:13 110:2
110:10 111:3
111:23 173:21
222:6 224:18
286:15 327:7
**thirdhand**
319:16
**Thomas** 3:10
**thorough** 186:22
**thought** 13:11
15:21 18:16
23:16 27:3
40:19 45:1
60:12,19
110:16 118:1
134:23 145:12
159:25 162:3
171:10 179:8
182:1,21 184:5
185:11,15
186:9 187:18
189:4,11,15
193:7 199:10

UNSEALED

App. 0155

199:12 201:25
202:22 204:20
204:20 205:10
227:16 232:9
237:4,10
245:18 252:18
253:14 256:16
256:19 259:12
261:15 262:14
262:17,25
263:2,14,14
271:18 275:1,4
276:11 290:11
304:2,16,18
310:11 311:19
312:7 313:6
314:25 316:14
319:3 322:4,17
322:25 323:1
324:10,13
327:21 335:17
337:23,24
340:16,22
342:16
**three** 43:7 57:10
94:20 99:19
100:1,4,4,13
100:19 105:25
105:25 114:16
114:19 130:18
147:3 220:9
233:10 234:5
235:5,13
237:21 254:11
260:5,20,20
292:2 343:5
**throw** 255:9
**throwing** 48:6
124:22
**thrown** 224:3
**tied** 256:13
**tighten** 205:12
276:11 277:3
**time** 7:3 10:18
16:2 18:19
20:13,18 22:18

23:19 26:2,13
26:16 27:17
35:9 40:11,14
40:18,23 42:19
42:19 48:14
50:15,18 53:6
53:7,8,13
56:19,22 61:12
61:17 62:24
63:8 65:3,5
74:10 76:17
77:17,18 81:22
83:22 101:11
103:18,18
104:1,4 105:13
105:13 125:13
127:7 128:1,4
131:11 132:24
133:14 134:12
138:2,11,12
140:20 145:13
146:16,21,24
147:18 148:16
148:16,24
153:3,4 156:19
158:4,20
160:19 161:3,7
165:13 166:13
166:22 167:5
168:22 169:4
170:4,18,24
173:18 174:1
175:16 176:8
178:15 179:13
180:9,17,19
181:18 184:17
185:14,25
188:6,25 195:3
197:22 200:12
201:4 205:22
206:1,4 213:6
213:6 216:13
227:8,13,14,20
234:3,18
235:12 237:13
238:18 245:25

248:10,15
249:16,16
250:18 252:10
252:19 253:12
253:20 256:1
257:3 259:17
259:22 260:3,6
260:15 261:3
261:12,19
262:3 263:2,6
263:20 264:1,4
265:11 270:22
271:14 273:1
276:15 277:1,8
278:23 279:1,6
279:11,14
281:16 282:1
286:20 290:4
290:20 295:16
295:18,22
296:15 298:4
300:16 302:4,5
302:14 304:6
304:13,21,25
306:5,14 309:7
310:10,14,19
312:11,19
313:20 318:1,5
318:16 319:11
323:8,8 324:3
326:20 338:6
344:14
**timeframe** 58:12
**timeline** 156:10
**times** 33:14,21
34:7 121:20
154:3 218:9
295:17 296:7
313:11 326:14
**timing** 20:20
163:24 164:2
166:24 168:18
171:24 178:16
179:23 224:19
244:14
**title** 35:4,4

**today** 8:18 10:4
10:23 12:21
82:6 84:1
204:17 205:17
246:10
**told** 10:5 23:9
32:11 34:14
76:1 78:22
86:23 88:2
155:6,17,21
160:3,9 180:6
181:1 185:2
186:2 188:13
193:17 216:11
307:8 333:8
**Tom** 140:14,18
140:18,19
**top** 100:4 170:1
170:11 260:20
305:18
**topic** 43:19
145:2
**topics** 325:3
329:24
**touch** 147:21
**town** 34:20
54:13 145:1,5
145:7
**track** 102:23
193:20
**tracking** 103:3
**trade** 28:18
229:18 233:7
244:18,19
273:25
**trademark**
163:4,8
**traditional**
22:12,18 106:2
**train** 185:10
287:8
**training** 6:13
323:6,10,16,16
324:24
**Trans** 106:1
**transaction** 5:17

25:15 26:12
78:21 82:19
133:24 178:21
178:24 197:15
198:10 209:7
**transactions**
94:8 106:14
185:20 212:24
**transcribed**
12:13
**transcript** 8:19
9:10,11 12:12
12:15,16,24
13:8 347:14,20
**transcription**
345:4
**transcripts**
13:14
**transfer** 133:1
**transition** 235:8
249:5,9
**transmitted**
110:23 111:4
**transparency**
247:15
**transparent**
39:17
**trash** 14:16,17
14:17
**travel** 148:5
**traveled** 110:2
159:20
**traveling** 134:1
**treasury** 140:9
140:10 320:5
**treated** 314:23
**treatment** 73:2
74:2 75:8,18
98:19,23
**treatments** 84:7
84:23
**trees** 109:6
**tremendous**
235:1,12
**tribal** 6:11,13,18
57:11 69:21

UNSEALED

App. 0156

| | | | | |
|---|---|---|---|---|
| 70:1,12,13,16 | 291:21 293:18 | 211:19,22 | 267:14 268:14 | 122:14,17 |
| 70:22 71:3,7,8 | 294:20 296:18 | 212:20,21 | 269:8,19,20 | 125:2,14 |
| 72:4,5,7 74:5 | 296:22 300:14 | 213:1,24 214:9 | 271:6,15 274:6 | 127:13,18 |
| 77:7 83:24 | 311:9 312:12 | 214:12 216:5 | 297:8,13 298:1 | 130:7,11 |
| 85:22 90:15 | 313:17 314:3 | 216:17,18,20 | 300:8 313:7 | 134:19 136:20 |
| 96:4 97:8 | 314:14 321:14 | 220:9 222:15 | 321:17 322:17 | 137:7,12 138:3 |
| 109:1 114:11 | 322:14,19,20 | 224:25 225:10 | 323:2 334:12 | 166:9 168:24 |
| 116:6,11 117:3 | 322:24,25 | 225:14 228:3 | 334:21 336:5 | 173:7 176:24 |
| 117:24 118:20 | 324:11,17 | 228:11,22 | 336:14 339:14 | 215:5 222:25 |
| 119:20 121:2 | 325:5 326:13 | 240:21,24 | 340:7 343:5 | 223:15 228:6 |
| 121:14,14,24 | 326:15 328:17 | 241:1,14,17 | **trick** 9:7 | 228:17 234:17 |
| 123:17 127:4,9 | 329:10 331:3 | 242:9,11,17 | **tricky** 235:25 | 252:16 253:9 |
| 127:10 128:13 | 332:8 335:8 | 281:8 283:13 | **tried** 19:2 | 254:4 258:16 |
| 129:10 131:7 | 342:16,24,25 | 290:8,20 | **triggered** 319:8 | 263:15 279:15 |
| 131:12,17 | 343:4,4,9,10 | 294:25 296:9 | **trip** 134:4 | 289:23 303:23 |
| 138:3,7 147:2 | 343:14 | 296:16 301:7 | 136:13 139:4 | 308:20 314:15 |
| 147:6,7,11 | **tribal-related** | 306:2 307:9,24 | 140:5 | 322:19 323:15 |
| 149:25 150:7 | 233:23 | 308:3,16 | **trove** 50:21 | 332:15 333:10 |
| 153:6 155:1 | **tribal/bank** | 314:23 315:1,2 | **true** 61:6 89:14 | 333:13,15,25 |
| 156:1,25 | 300:20 | 317:12 319:5 | 97:9 115:25 | 334:2,3 |
| 157:12 158:2,8 | **tribalization** | 319:19 321:21 | 119:15 122:21 | **Tucker** 107:5 |
| 158:10,16,24 | 127:4 | 321:24 323:4 | 124:3 125:15 | 152:8,12 |
| 159:4,17 | **tribally** 238:9 | 324:7 339:3 | 126:10 132:14 | **Tucker's** 106:25 |
| 165:22 168:21 | **tribe** 65:17 70:2 | 340:4 341:18 | 155:10,12 | **tune** 304:19 |
| 172:11,12,20 | 70:23 77:23,25 | 341:23 342:15 | 163:20 194:16 | **Tunica-Biloxi** |
| 173:3,3,4 | 78:2 82:16 | **tribe's** 123:24 | 196:15 215:22 | 6:11 86:13,15 |
| 176:5 180:11 | 86:16 87:2,5 | 241:25 310:20 | 224:11 243:13 | 87:2 268:9 |
| 183:11,24 | 88:14 109:10 | 337:2 | 248:8 312:4,10 | 313:12,16,19 |
| 192:13,19 | 109:20 110:4,8 | **tribes** 71:13 | 313:2 335:23 | 316:11,18 |
| 196:13 201:23 | 118:20 124:1 | 74:12 77:8,19 | 346:5 347:15 | 317:12 |
| 203:2,18 | 131:7 150:2,4 | 78:9,10,18 | **trust** 215:13 | **turn** 66:17 99:8 |
| 209:23 224:18 | 150:24,25 | 80:25 81:2,12 | **trusted** 191:4,12 | 112:8 263:18 |
| 227:22 229:2,3 | 160:7 161:20 | 82:20 83:5 | 191:17,20 | 277:21 280:3 |
| 229:7,12 | 162:17 165:20 | 84:10,25 94:20 | **try** 9:3,25 25:20 | 294:10 298:8 |
| 232:16 233:4 | 182:8 183:2,4 | 114:8 117:6 | 92:13 136:14 | 299:14 303:5 |
| 233:10,18,22 | 184:12,12 | 119:24 120:5,8 | 180:11 239:3 | **turned** 45:12,13 |
| 235:5,19 236:7 | 192:3,5,6,9,10 | 120:10 121:5 | 245:13 285:21 | 146:11 161:4 |
| 236:9,19,20,23 | 193:4 194:7,18 | 123:18,22 | **trying** 15:17 | 252:6 |
| 237:15,15 | 195:3,16,18 | 126:9 128:8,19 | 20:20 25:6 | **turning** 13:10 |
| 238:8 240:3,14 | 196:10,22 | 129:17 148:8 | 29:25 30:21 | 222:13 304:17 |
| 242:1,20 | 197:16,17,20 | 149:7,10 158:5 | 34:14 35:3,6 | **turnkey** 80:13 |
| 243:12,14 | 199:11 200:11 | 184:9,14 | 35:11,12,23,25 | 80:14,15,21 |
| 253:1,2 267:3 | 205:6,8 206:16 | 186:13 195:21 | 59:2,17 62:2 | **turnover** 323:7 |
| 271:7 273:13 | 207:4 209:17 | 211:7 212:9,25 | 68:24 79:11 | **turns** 266:6 |
| 273:25 278:25 | 209:18 210:22 | 219:15 221:19 | 94:13,16 99:4 | **tweaked** 146:11 |
| 279:20 291:21 | 210:25 211:3 | 237:21 244:2 | 118:18 122:4 | 146:13 |

UNSEALED

App. 0157

twice 59:12,13
twists 266:6
two 22:2 26:19
  61:4 77:24,24
  82:20 83:4
  114:17 140:22
  147:9 172:6
  175:15 177:14
  184:13,14
  185:24 212:13
  213:25 228:11
  228:12 252:23
  252:24 253:7
  256:11,22
  283:6,12
  312:18 326:9
two-thirds 122:9
  258:9
two-week 61:3,3
  61:21 255:16
two-weeks 22:21
type 25:22
  254:19 255:23
  255:24
typed 260:18
types 100:14
  227:19
typically 23:19
  73:24 108:23
  109:2 143:1
  145:8 202:14
  262:15 265:11
  300:16

_____

U

U.S 56:2,18
  114:5,10
  118:15 122:9
Uh-huh 9:6 11:2
  12:20 43:18
  77:2 232:17
  240:19 254:13
UK 157:10,17
  234:23 237:12
  238:25 251:23
  280:22 282:4

ultimate 269:9
ultimately 15:12
  18:11 19:8
  29:21 35:17
  36:12 39:1
  57:3,4,20
  60:14 69:7
  99:25 102:7,10
  114:9 123:13
  150:19 159:22
  171:14 184:14
  186:7 187:8
  189:4 242:17
  265:22,23
  266:5,7 267:3
  267:22 271:17
  286:21 300:15
  307:8 318:23
  324:7 328:17
unable 89:19
unaffiliated
  73:19
unaware 187:2
uncle 175:10,11
unclear 177:17
  225:7
uncollectible
  89:19
under- 28:19
  124:20
underneath 47:5
underserved
  14:18 16:18
  17:10 18:3
  114:10 276:12
understand 8:12
  9:5,12,18,20
  9:23,25 10:13
  35:24 40:9,22
  45:16 47:8
  59:1 85:15,16
  91:12 92:11
  100:9 118:18
  123:1 124:3
  126:21 129:22
  137:15 153:19

154:5 161:19
  167:23 176:24
  195:20 202:16
  207:18 213:2
  221:6 230:12
  230:22 235:22
  236:14 241:15
  246:14,20
  247:17,19
  254:2 258:12
  301:2 314:15
  326:1 333:25
understandable
  139:2
understanding
  39:19 75:17
  86:10 91:6,17
  92:23 93:10,15
  98:17,18 99:5
  104:9 114:2,7
  120:7 124:17
  133:7,10
  136:13 148:9
  150:3,17 151:4
  159:7 179:15
  186:20 187:14
  197:13 205:2
  207:22 221:10
  254:18 266:10
  272:21 297:3
  304:16 322:2
understands
  36:22
understood
  139:20 206:15
  228:16 273:15
  289:19
underwriting
  68:5,14 73:13
  299:18 300:7
  300:25 328:15
undoubtedly
  10:3 39:15
unexpected
  59:20
unfair 119:12

unfortunately
  290:3
unhappy 193:18
  216:12
uniform 278:13
Union 106:1
unique 106:17
  107:11 117:2
  117:23 214:23
  274:13
uniqueness
  117:18
United 1:1 7:6
  347:1
universal 173:18
  173:25 174:13
  174:14,16,25
  175:1,5,20,20
  175:21,25
  176:8,14 177:7
  177:11,15,20
  177:22,22
  178:2,3,3,5,9
  179:7,14
  181:16 185:22
  185:23 186:18
  188:24 189:8,8
  222:6
University 13:23
  44:21
unmarked 164:8
unmet 14:21
Unpack 338:18
  339:25
unsuccessful
  199:11 216:11
unusual 112:7
  204:3
updating 40:11
upfront 84:2
upside 241:12
urged 222:4,7
  225:10
urging 277:3
URL 162:19
  163:4,12 164:6

165:13 166:2
URLs 163:8,22
use 25:13 51:17
  78:10 107:12
  111:17 114:11
  129:24 130:2
  145:20 163:5
  191:21 232:12
  245:22 247:16
  284:23 286:18
  324:6
uses 104:19
usually 22:21,22
  36:25
utility 59:12,16
  60:1,7
utilize 100:19,22
  111:22 327:4
utilizing 293:18

_____

V

vaguely 314:12
value 99:13,18
  99:21 104:18
  114:20 188:2
  195:15,19
  196:11,18,22
  197:5,14,15
  198:9
valued 133:24
values 29:20,20
  30:12,23 32:11
  32:11,12 54:10
  56:12
Van 3:10
variety 21:25
  108:13 157:7
  213:4 233:12
various 101:8
  104:20 124:20
  144:15 192:19
  219:16 235:24
  248:1 290:11
  308:14 316:1
  338:15 343:9
vast 14:21

UNSEALED

**Vegas** 26:3,4
199:7,25
**vehicle** 139:21
171:19 172:10
172:19 173:2
**vehicles** 173:14
**vendor** 231:12
231:12 297:22
**vendors** 240:5
297:23
**venture** 16:14
16:15 20:14
23:11,19 27:10
**verbal** 8:20,22
**verbiage** 295:5
**verification**
101:16
**verifying** 113:9
**version** 51:16
140:25
**versions** 131:8
**versus** 60:3
207:16 255:24
261:13 300:18
**vetted** 190:25
203:4,19 206:9
207:6
**vetting** 190:16
335:14
**Victory** 3:2 7:23
7:25 41:13
82:23 91:25
134:2,8,14,16
135:16,17
136:6,19,24
137:18 138:12
138:14,24
139:9 140:11
170:18,23
171:2,13 172:2
173:14 174:1,4
178:9,14,16
179:6,14,24
180:5,15 181:1
181:5,17,19
214:1 236:25

237:5,9,10
238:18 248:5,6
248:19 249:12
249:12,16
271:19 272:17
274:2 290:23
306:17 307:2,5
307:16 308:15
308:22,25
312:22
**video** 5:14
199:23 200:17
204:21
**videographer**
3:15 7:1,9 8:16
50:14,17
103:25 104:3
127:25 128:3
146:20,23
205:25 206:3
263:25 264:3
317:25 318:4
344:13
**videotaped** 1:9
7:2
**view** 95:15,21
118:11 167:4
204:11 263:11
279:9 302:9
327:10 339:4,5
**viewed** 114:24
137:22 197:21
252:22 279:7
**views** 273:5,7,14
275:5
**violation** 117:7
203:6
**VIP** 320:22
**Virginia** 264:22
274:12,14,20
**virtually** 201:21
**virtue** 189:21
**vis-a-vis** 105:4
**visibility** 258:16
259:7
**vision** 37:9,9,18

38:1,12,15,17
38:17
**vocal** 315:6
**volume** 6:8
33:15 41:5
138:3 176:9,19
309:9,21
**volumes** 310:13
310:19
**VP** 145:9
**VPC** 84:10 85:2
85:3 89:5
**vs** 1:5 7:4 347:5

---

## W

**W** 3:4,5
**wait** 9:3 97:14
135:24 156:8
172:23,24
309:4 310:2,2
**waiting** 281:23
281:24
**walk** 14:6 19:18
19:22 114:1
157:1
**walked** 184:1
**Walker** 2:13
**want** 8:14 13:19
29:22,23 30:1
30:13,25,25
32:1,3 33:24
37:21,24 40:5
49:20 50:4
76:13 77:5
79:9 85:13
100:8 104:6
135:3 142:2,6
147:1 156:3
161:24 164:21
166:13 174:9
177:16 178:5
206:18 211:2,6
219:1 222:19
228:24 239:12
246:14,14
255:4 257:2

262:22 268:1,6
268:9 270:5
273:18 275:20
276:24 285:21
285:23 289:2
298:24 304:23
304:25 306:25
314:7 325:3,12
333:9
**wanted** 15:18,20
19:10 22:7
40:13 118:2
128:9 134:11
138:21 165:5
173:20,21
175:16 183:21
184:7 186:12
188:12,13
189:1 203:9
204:13 209:18
211:7 217:7
246:20 262:23
268:14 274:25
279:3 286:18
300:24 319:19
334:9
**wanting** 127:17
204:3
**Washington**
2:19 3:11
**wasn't** 14:17
21:1 26:6
32:20,21 56:25
85:12 121:25
122:10 128:16
132:17 137:4
149:18 169:23
169:23 171:22
175:4,12,21
193:25 200:20
200:24 205:17
212:9 235:4
252:4 256:4,5
280:4 296:11
302:4 304:17
312:9 321:2

322:20 323:6
328:11
**waste** 81:22
**watching** 322:14
**waterfall** 241:19
241:23 242:10
**way** 16:24 30:21
47:16 60:24
61:9 64:17
68:21 69:6
74:22 86:19
88:2 99:17
101:1,2,4
104:17,19
105:24 110:4
113:18 127:14
127:14 139:14
148:10 158:18
160:7 165:16
181:15 182:22
181:12 184:3
188:5 190:3
197:19 199:5
201:1 206:22
214:25 217:2
222:2 226:16
231:11 232:5
232:24 241:7
242:25 250:23
253:16 256:9
265:6 266:5,7
268:13 282:10
284:15 294:3
296:3 297:14
300:1 304:2,18
312:9 327:13
327:18 328:15
332:16 334:8
342:19
**ways** 21:25 25:3
124:16,22,25
154:3 233:4
261:18
**we'll** 13:16
43:10 49:24
50:8 64:11

UNSEALED

71:22 72:10
80:16 95:5
107:21 141:19
164:4,4 208:5
208:6 239:3
245:23 246:12
255:10 292:18
299:4
**we're** 9:1 31:4,5
31:6 32:3,4,5,6
38:11 39:21,21
46:22 47:18
48:6 64:17
66:18 70:21
75:9 77:18
79:11 81:7
89:5,9 92:14
95:9 98:22
99:8 100:11,11
101:17 104:16
104:21 108:12
135:2 141:24
142:1 146:20
152:5 154:14
156:19 166:4
167:5,10 199:5
199:6,17,18
207:16 209:11
213:19 229:6,7
230:9,14 231:7
231:17,17
232:25 233:2
238:3 239:5
243:2 249:24
251:18,19
252:1 253:18
255:1 257:21
264:6 275:2
277:18 279:14
280:19 283:1
286:2 294:3,16
295:13 298:11
298:12 299:23
300:1 302:22
303:5 305:4,4
306:1 309:1

312:25 327:11
327:11 329:16
**we've** 13:7 29:9
29:22 37:22,23
94:25 95:24
99:24 112:16
155:1 161:25
217:17 230:6
230:12 247:3
255:7 262:25
277:23 317:22
**wealth** 139:23
197:20
**Web** 150:12
**Webb** 159:9,14
159:17 160:19
160:23 184:1
**website** 43:14
110:1 162:18
163:17 164:6
166:14 169:8
169:12,25
285:4,22
321:10
**websites** 260:5
260:23 284:25
**week** 156:2
301:14
**weekend** 157:7
**weeks** 61:4
170:12,15
256:12,22
**weird** 266:2
**Welch** 140:18
140:20
**welcome** 295:20
**well-defined**
122:23
**well-functioni...**
182:23
**well-known**
121:3 122:10
122:12 151:13
**wellness** 263:7
**Wells** 14:11,13
16:2,14 17:1,4

17:6,11,13,18
18:1
**went** 19:25 46:8
52:12 91:16
93:2 109:25
110:6 139:14
140:5,11 156:1
175:19,19
182:12 206:13
207:4,6 304:12
327:1
**weren't** 12:1
60:15 107:14
120:7,16
137:15,17
138:12 160:10
169:20 176:25
182:19,25
188:19 205:11
210:21 242:11
242:15 253:23
277:5 322:24
340:12
**West** 1:21
264:22 274:12
274:14,20
**Western** 160:24
161:2,6
**white** 154:21
**wide** 17:23
157:7
**wildly** 197:19
**Williams** 272:17
**willing** 25:19
210:17 279:17
**Win** 30:3
**wire** 169:11
**withheld** 282:20
**witness** 1:16
11:14,25 45:25
46:3 48:4 50:1
50:6,10 64:7
79:3,12 88:10
92:6 107:14
126:22 127:21
129:3 135:25

153:19,21
154:6 160:4
167:22 172:4
172:16 177:15
178:2 207:9
222:18 223:1
226:16,20,23
227:1 230:8
236:15 239:14
245:4 270:3,16
271:2 272:7,13
273:9,16 276:1
287:23 292:16
292:19 295:10
295:15,24
302:21 305:17
306:25 307:20
329:18 333:15
338:20 347:13
347:16
**witness's** 84:19
85:10 239:17
**Wolfe** 7:10
**wondering**
269:10
**Wong** 243:22
**word** 41:1 67:8
68:23,23 80:16
179:19 191:20
**words** 163:15
246:8 258:15
340:1
**work** 14:10,10
14:13,15 17:11
17:12,25 19:8
29:24 30:1
36:11,16 56:16
64:20 108:17
129:16 133:4
145:2 168:24
190:14 209:3,6
232:7 235:10
238:8 243:23
265:6 272:2
294:25 316:19
321:17 323:8

324:8,14 338:2
339:20 342:20
**worked** 20:7
35:21,22 37:23
72:20 82:20
87:2 110:5
115:23 125:25
140:8 153:15
182:22 183:18
190:17 191:19
191:22 192:18
192:20 193:7
196:8 214:25
215:12 221:7
244:1 256:24
284:15 324:11
324:25
**workers** 32:15
**workforce**
323:19
**working** 14:8
18:1 24:11
34:8 35:16
36:23 37:17
38:10 39:18,18
39:20 56:8,10
84:9,25 128:19
148:7 167:6
183:23 186:3
186:13 213:21
252:16 271:16
274:4 297:13
300:18 313:19
313:25 317:3
320:1,18
331:21 332:15
332:23
**works** 8:13
64:21 72:17
101:3 113:19
170:18
**world** 14:24
30:19 34:6
38:7 59:18
95:5,21 140:4
151:6 316:21

UNSEALED

332:7
**worry** 179:10
**worse** 318:16
**worst** 316:21
**worth** 1:21,22
15:19 115:16
213:11 286:11
321:18
**wouldn't** 40:16
65:10 90:6
91:9 109:17
117:22 120:8
120:15 122:6
145:4 168:14
176:15 190:1,2
204:13 211:2
214:4 218:18
249:18 267:12
276:24 302:12
335:4 336:22
340:2,7
**write** 39:16
143:3,11
**write-up** 120:4
**writing** 155:21
276:6 280:14
**written** 8:19,21
8:25 24:18
52:1 55:9,11
55:19 112:25
334:6 342:21
**wrong** 41:1
182:12 223:22
223:22 313:8
342:21
**wrongly** 262:12
322:5
**wrote** 245:8
280:13 331:8
335:14 337:5

___

**X**

**X** 4:1 5:1 6:1
37:22

___

**Y**

**Y** 37:23
**yeah** 12:6 19:1,3
20:23 22:14,22
26:11,24 29:4
34:25 39:14
49:23 51:15
73:5,5,10,10
74:8 75:15
81:19 92:19
105:24 107:19
108:21 109:10
110:9 115:17
126:5 127:8
128:11 131:10
133:7 141:10
141:25 143:8
144:23 148:1
148:20 152:13
156:5 162:24
167:18 168:9
170:22 173:12
175:11 182:15
185:12,23
197:18 199:4
200:9 203:5
209:10 211:14
215:8 231:14
234:12 254:6
266:1 269:22
272:7 298:14
298:14,14
299:6 311:13
314:8,17
316:12 317:13
320:8 324:14
325:11 330:15
332:18 334:17
**year** 12:9 20:2
20:11 26:24
27:1 43:5 77:1
156:17 188:15
232:22 235:1
244:15 249:6,9
286:6
**years** 17:6,18
29:5,14 34:18

43:4,6,7,7 44:9
54:21 55:1
111:9 115:1
117:20 119:9
121:8 134:10
140:12 149:2,6
154:15 163:3
198:3 200:10
290:4 334:6
**Yessio** 338:10
**York** 2:19 33:21
34:6 243:19
**you-all** 207:6
**young** 24:14

___

**Z**

**Zachary** 199:18
**zero** 197:14,15

___

**0**

**07** 28:11 277:8
**08** 28:11 277:8

___

**1**

**1** 5:12 54:23
55:14 77:16,23
78:4,7 88:15
88:24 144:5,13
144:22 145:22
177:20 216:20
242:23 336:19
336:25 345:3
**1:13** 146:22,24
**10-19-11** 6:5
**10-24-13** 5:18
**10:02** 50:15,16
**10:11** 50:16,18
**1050** 3:10
**11** 54:21 55:1
281:21
**11-30-12** 5:10
**11:16** 104:1,2
**11:26** 104:2,4
**11:56** 128:1,2
**118** 264:8
**12** 49:6 116:22
330:24 338:7

**12-13-13** 5:20
**12-14-11** 6:6
**12-month**
231:18
**12/31/2018**
348:10
**12:01** 128:2,4
**12:20** 141:16,17
**12:27** 146:21,22
**120** 167:9
**123** 2:14
**124** 164:25
**127** 206:19
**13** 107:15
**13270** 167:10
**135** 5:9
**14** 61:20 246:9
337:9,13
**14-7139-JCJ** 1:5
7:5 347:5
**141** 5:12
**14th** 302:19
**15** 147:18
240:17 263:23
341:17
**15th** 348:4
**16** 250:1,2,11
**1600** 2:9
**17** 264:7
**170233** 280:7
**1717** 2:5
**17th** 280:11
281:2
**18** 293:2
**19** 342:24
**19103** 2:5,9
**19109** 2:14
**191141** 6:14
**1990** 16:5
**19th** 298:23

___

**2**

**2** 188:22 254:15
264:16 275:8
277:22 281:10
286:3 294:11

299:14 303:5
345:3
**2-17-11** 5:22
**2-3** 4:2
**2:23** 206:1,2
**2:33** 206:2,4
**20** 24:11,24
90:10,16,24
**20-** 234:12
**200** 5:14
**20001** 2:19
**2001** 20:6 144:9
**2004** 20:3,6 45:6
259:20
**2006** 20:12
**2007** 27:18,20
**2008** 20:12
**2010** 155:5
156:12,17
170:17 173:8
174:3 178:8
201:14 234:24
250:1,2,12
251:20 252:10
263:6,13 264:7
276:22
**2011** 79:21 81:3
82:8 142:15
143:14 144:6
144:10,11
156:2,18 162:1
182:2 198:19
270:25 277:19
280:11,17
282:15,19
293:2 298:24
302:19
**2012** 33:21
76:24 81:3
134:1 154:10
231:18 234:4
330:10,23
**2013** 5:6 50:23
52:18 58:12
74:7 76:9,17
76:22 81:3

**UNSEALED**

105:14,15
107:25 117:12
154:10 200:10
231:19 234:4
234:13,19,25
235:1 237:5
242:19 244:14
271:1 272:19
272:23 273:3
306:6 316:17
**2015** 64:16,23
**2018** 1:10,18 7:3
345:2 347:8
348:5
**202-298-1874**
3:12
**202-346-4000**
2:20
**208** 5:16
**215-320-5701**
2:6
**215-560-2445**
2:10
**215-772-7502**
2:15
**21st** 278:22
**226** 5:18
**229** 5:20
**23** 330:10,22
**240** 63:2
**258168** 6:12
**26** 316:17
**27** 146:18
**272** 5:3 34:1,2
**273** 5:4 43:10,11
44:1
**274** 5:5 46:20
47:13
**275** 5:7 64:9,13
64:18
**276** 5:9 135:3,3
135:7,8
**277** 5:12 141:21
142:7
**278** 5:14 200:3,4
**279** 5:16 208:7

**28** 182:2
**280** 5:18,22
226:2
**281** 5:20 229:24
**282** 5:22 280:7,8
**283** 5:24,24
283:4
**284** 6:3 292:12
292:24 293:2
**285** 6:5 298:9
**286** 6:6 292:11
302:25 303:1
**287** 6:8 305:2,3
**288** 6:10 315:12
315:13
**289** 6:13 318:3,8
318:9
**28th** 162:1
281:20
**290** 6:15 325:14
325:16
**291** 6:16 325:14
325:16
**292** 6:3,18 330:5
**298** 6:5
**2nd** 348:12

**3**

**3** 30:18 31:2,18
32:18 33:2
175:25 188:22
222:13 225:6
252:3 255:5
331:19 345:4
**3.5** 55:1
**3:47** 264:1,2
**3:53** 264:2,4
**30** 347:19
**300** 2:9
**301317** 6:19
**301320** 6:19
**303** 6:6
**305** 6:8
**306** 1:21
**308918** 5:8
64:18

**308920** 5:8
**310765** 6:17
**310768** 6:17
**312-902-5622**
3:6
**315** 6:10
**318** 6:13
**325** 6:15,16
**330** 6:18
**34** 5:3
**345-346** 4:8
**347-348** 4:9
**349** 65:22
**350** 66:13
**360** 61:22
**390** 62:6,9,22

**4**

**4** 54:9 56:1
257:24 332:20
345:5
**4-1** 51:1
**4-13-11** 5:24
**4-28-13** 6:13
**4-6-15** 5:8
**4.5** 214:13 215:3
215:24 216:19
**400** 258:8
**4130** 2:5
**43** 5:4
**448** 66:13
**449** 65:23
**46** 5:5
**474695** 6:5
**474698** 6:5
**48** 264:21
266:20 274:11

**5**

**5** 50:23 57:23
**5-18-11** 6:3
**5-6** 4:3
**5:01** 318:1,2
**5:13** 318:2,5
**5:46** 1:19 344:14
344:15

**50** 145:10
**512** 348:13
**520** 59:9 61:9
**525** 3:5

**6**

**6** 66:18 72:13
95:8
**6.9** 231:21
**60,000** 19:6
**60661** 3:5
**606626** 5:19
226:4
**606627** 5:19
**61** 254:7
**64** 5:7
**660** 348:11
**670288** 5:13
**670295** 5:13
**674488** 5:21
**674489** 5:21
**677068** 5:15
**677353** 5:11
**677371** 5:11
**680605** 6:9
**680606** 6:9
**683403** 5:6
47:18
**683418** 5:6
**687-0421** 348:13

**7**

**7** 4:4 99:8
231:16
**7-8-13** 6:16
**7000** 348:11
**705357** 6:7
302:23
**705361** 6:7
**710229** 5:24
**710232** 5:24
**710233** 5:23
**710236** 5:23
**710237** 6:4
293:2
**710240** 6:4

**74** 64:10
**76102** 1:22
**78731** 348:12
**7HBF** 24:1,3
40:7,11
**7th** 1:22

**8**

**8** 1:10 4:6 7:3
104:7 142:15
143:14 334:12
345:2 347:8
**8-26-13** 5:14
**8-9-13** 6:8
**800,000** 232:22
**8172** 348:9
**8th** 1:18

**9**

**9** 112:8 335:6
**9-26-13** 6:10
**9:08** 1:19 7:3
**90** 247:23
**901** 2:19
**97** 16:6
**98** 16:6,7
**99** 77:22 78:6
88:13,13,23
89:3,6 92:4
93:2 94:19
220:14,21
221:11

# In the Matter of:

## Think Finance

*August 23, 2016*
*Kenneth Earl Rees*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

UNSEALED

**1**

1              CONSUMER FINANCIAL PROTECTION BOARD

2

3

4   In the matter of:          )

5   THINK FINANCE              )

6          a corporation.      )

7   _____)

8

9                Tuesday, August 23, 2016

10

11              Securities and Exchange Commission

12              801 Cherry Street

13              Fort Worth, Texas

14

15          The investigational hearing testimony of

16   KENNETH EARL REES commences, pursuant to notice, at

17   9:08 a.m.

18

19

20

21

22

23

24

25

**3**

1                I N D E X
2   EXAMINATION OF KENNETH EARL REES:          PAGE
3   August 23, 2016
4   BY MR. VAUGHN                         5, 83, 86, 91,
5                                          92, 98 146,
                                          151,158, 183,
                                          190, 190, 197
6
    BY MS. BUCHKO                          82, 86, 88,
7                                          92, 97, 146,
                                          149, 151, 177,
8                                          185, 190, 194
9   CORRECTIONS MADE BY WITNESS                    232
10  SIGNATURE OF WITNESS                           233
11  REPORTER'S CERTIFICATION                       234
12  HEARING EXHIBITS                          INITIAL
                                            REFERENCE
13
    Exhibit 1 Civil Investigative Demand           9
14
    Exhibit 2 E-mail dated 2/9/2015 from
15            Kim Palermo to Brett Horrocks        18
16  Exhibit 3 E-mail dated 1/12/2015 from
              Kim Palermo to Beverly C. Rachal     20
17
    Exhibit 4 E-mail dated May 14, 2012 from
18            Ken Rees to Kelly Ann Scott          24
19  Exhibit 5 E-mail dated September 10, 20013 from
              Ken Rees to Chris Lutes             56
20
    Exhibit 6 E-mail dated July 24, 2013 from
21          Walt Ramsey to Ken Rees               74
22  Exhibit 7 E-mal dated June 10, 2013 from
              Bill Kontgis to Ken Rees            98
23
    Exhibit 8 E-mail Thread dated July 25th, 2013 110
24
    Exhibit 9 E-mail dated December 14,2012 from
25            Chris Lutes to Ken Rees             124

**2**

1   APPEARANCES:
2   ON BEHALF OF THE CONSUMER FINANCIAL PROTECTION BUREAU:
3            BENJAMIN E. VAUGHN, ESQ.
             VANESSA A. BUCHKO, ESQ.
4            Consumer Financial Protection Bureau
             1700 G Street NW
5            Washington, D.C. 20006
             202-435-7944
6            benjamin.vaughn@cfpb.gov
             vanessa.buchko@cfpb.gov
7
    ON BEHALF OF THINK FINANCE:
8
             MR. RICHARD L. SCHEFF
9            MR. DAVID F. HERMAN
             Montgomery McCracken
10           123 South Broad Street
             Avenue of the Arts
11           Philadelphia, PA, 19109
             215-772-7502
12           rscheff@mmwr.com
             dherman@mmwr.com
13
    ALSO PRESENT:
14           Ms. Sarah Fagin Cutrona, In-house Counsel
15
16
17
18
19
20
21
22
23
24
25

**4**

1                I N D E X
2   HEARING EXHIBITS                          INITIAL
                                            REFERENCE
3
    Exhibit 10 E-mail String dated
4             September 24, 2013 from Greg Hall
              to Kevin Dahlstrom                  167
5
    Exhibit 11 E-mail dated March 22, 2013 from
6             Mark Curry to Ken Rees              173
7   Exhibit 12 E-mail dated August 25, 2013 from
              Ken Rees to Chris Lutes             197
8
    Exhibit 13 E-mail dated July 09, 2013 from
9             Michelle Nguyen to Patsy Hauer,
              Angela Patterson                    206
10
    Exhibit 14 E-mail dated June 12, 2013 from
11            Jason Harvison to Ken Rees          211
12  Exhibit 15 E-mail dated March 27, 2013 from
              Scott Davis to Kevin Dahlstrom,
13            Kerry Miles                         215
14  Exhibit 16 E-mail dated September 26, 2013
              from Michelle Curtis to Ken Rees    222
15
    Exhibit 17 E-mail dated April 18, 2013 from
16            Ken Rees to Jason Harvison,
              Michelle Nguyen Chris, Lutes        226
17
              (Retained by counsel.)
18
19
20
21
22
23
24
25

---

5

```
1              P R O C E E D I N G S
2    Whereupon--
3                KENNETH EARL REES,
4    a witness, called for examination, having been first
5    duly sworn, was examined and testified as follows:
6                   EXAMINATION
7    BY MR. VAUGHN:
8        Q.  Good morning, Mr. Rees.
9        A.  Good morning.
10       Q.  Could you please state your full name for the
11   record?
12       A.  Kenneth Earl Rees.
13       Q.  Are the individuals here with you today your
14   attorneys?
15       A.  Yes, they are.
16       Q.  They're representing you personally?
17       A.  Yes.
18              MR. VAUGHN:  Counsel, could you please
19   introduce yourself?
20              MR. SCHEFF:  Yes.  Richard L. Scheff,
21   Montgomery McCracken Walker & Rhoads.
22              MR. HERMAN:  David F. Herman, Montgomery
23   McCracken Walker & Rhoads.
24              MS. CUTRONA:  Sarah Fagin Cutrona, Ken
25   Rees' personal attorney.
```

7

```
1        A.  I believe it was called PreCash.
2        Q.  Do you recall what year that was?
3        A.  I'm kind of guessing.  Maybe '09.
4        Q.  Any testimony, other than that?
5        A.  No.
6        Q.  So a few ground rule to make things as
7    efficient as possible today.  I'm sure your attorneys
8    have gone over them with you, as well.
9              You have to provide audible answers in
10   response to my questions.  If you nod or shake your
11   head, the court reporter can't take down your answer.
12             Does that make sense?
13       A.  Yes.
14       Q.  If you don't understand one of my questions,
15   please ask that I rephrase, and I'll try to ask a
16   better one.  And if you do answer my question, I'm
17   going to assume that you understood it.  Is that fair?
18       A.  Yes.
19       Q.  It's very important that we not talk over
20   each other.  When you're talking, you know, among
21   friends or in a social situation, it's very easy to
22   chat back and forth.
23             If we do that, it's hard for the court
24   reporter to take down what we're saying, and we'll
25   have a complicated record.  So I'll do my best to make
```

6

```
1              MR. VAUGHN:  My name is Benjamin Vaughn,
2    and my colleague with me is Vanessa Buchko.  We're
3    attorneys for the Consumer Financial Protection
4    Bureau.
5              This is an investigational hearing
6    governed by 12 USC 5562 in its implementing
7    regulations.  Any objections that may be properly
8    raised are limited as set forth in the regulations.
9              The stenographic recording arranged by
10   the Bureau is the only recording permitted.  No other
11   recording may be created.
12       Q.  (By Mr. Vaughn)  Mr. Rees, have you ever been
13   deposed before or offered live witness testimony?
14       A.  I have.
15       Q.  In what situations?
16       A.  It was a lawsuit against a board member.
17       Q.  A board member of Think Finance?
18       A.  A board member of Think Finance, correct.
19       Q.  In connection with his departure from the
20   company?
21       A.  No, no, no.  It was in connection with a
22   business deal we had with his previous company.
23       Q.  Which board member was that?
24       A.  Steve Shaper.
25       Q.  And what was his previous company?
```

8

```
1    sure I let you finish your answer before I ask another
2    question, and wait until I'm done with my question
3    before you begin your answer.
4              Does that make sense?
5        A.  Yes.
6        Q.  Okay.  If you need a break during the day
7    today, let us know, and we should be able to
8    accommodate it, as long as a question isn't pending.
9    But we'll take pretty regular breaks during the day
10   with an eyes towards wrapping up with you as soon as
11   possible so you can get back to your life.
12       A.  Great.  Things.
13       Q.  Given your position at Think Finance, it's
14   obviously likely that you came into information that
15   was protected by Think finance's attorney-client
16   privilege -- information, legal advice that Think's
17   attorneys gave to the company.
18             We don't want to tell us any of that
19   information today.  If I ask a question during today's
20   hearing and the basis for your answer would solely be
21   information that Think's attorneys passed on to you or
22   that was relayed to you, please tell me that, and I'll
23   ask you some kind of surrounding questions, and we'll
24   figure out if it's appropriate for you to give us the
25   answer.
```

UNSEALED

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

App. 0168

57

1      Q. And take a moment and review the e-mail.
2      A. Okay.
3      Q. Have you finished your review of the e-mail?
4      A. I did.
5      Q. Do you recall this discussion?
6      A. Not in detail.
7      Q. Do you recall something about it generally?
8      A. Yes.
9      Q. What do you recall?
10     A. I recall that there was a period that ACH
11   providers had stopped doing business with -- with
12   tribal lenders, and we had to help the tribes find an
13   ACH processor for their business.
14     Q. And what's an ACH processor?
15     A. That provides the money transfer from the --
16   from the lender into the customer's bank account, and
17   from the customer to the lender's bank account for
18   payments.
19     Q. And looking at the other individuals in the
20   e-mail, Bill -- can you pronounce the last name for
21   me?
22     A. Kontgis.
23     Q. Kontgis. I was given it yesterday and
24   couldn't remember.
25           Jason Harvison?

58

1      A. Yes.
2      Q. Chad Bradford and Badar Qureshi?
3      A. Yes.
4      Q. Who's Badar?
5      A. He worked for Chris in the -- I believe it
6    was cash -- actually I don't know what -- what his
7    role was. He worked in the finance department.
8      Q. Chad Bradford, do you recall who he is --
9      A. Chad was the chief accounting officer at the
10   time.
11     Q. Okay. So then in Chris's e-mail, he says,
12   Hi. Update on today's many meetings. Skipping to No.
13   3, confirm with VPC that since we are now above the
14   cash threshold, that we can turn on MBL formers
15   (multidraw) beginning next Monday (Tom to confirm with
16   Richard at BC -- BPC).
17         Do you see that?
18     A. Yes.
19     Q. Do you understand what he's reporting to?
20     A. I'm actually not certain. I'm -- but, I
21   mean, what I'm reading from this is that the tribes
22   were unable to make loans to former Mobiloans'
23   customers due to -- it appears that GPLS stopping the
24   purchase of those -- those loans for some period of
25   time.

59

1      Q. Was GPLS stopping the purchase of those loans
2    for some period of time because of the ACH issues, or
3    was that an independent decision?
4      A. I don't -- I don't know the -- the exact
5    reason for it.
6      Q. And the reference to MBL formers, am I
7    correct that the term MBL formers refers to a customer
8    with an existing line of credit who wants to make a
9    subsequent draw?
10     A. That appears to be correct.
11     Q. Do you have an understanding with -- in the
12   paren, Tom, to confirm with Richard at BPC. Do you
13   know who Tom is?
14     A. It would have been Tom Welch.
15     Q. And who's Tom Welch?
16     A. He was the account manager that -- that we
17   worked with at Victory Park Capital.
18     Q. And who's Richard?
19     A. Richard Levy is the head of Victory Park
20   Capital.
21     Q. And so the issue here, to your understanding,
22   is that for -- for some reason, GPLS was not buying
23   participation interests for some period of time, and
24   because of that --
25     A. Yeah.

60

1      Q. -- MBL customers who had taken out one draw
2    from their line of credit couldn't, then, take out
3    subsequent draws from their lines of credit?
4      A. Yeah. The terms of the GPLS agreement with
5    the tribes, the participation agreement, was that they
6    would have the right to buy but not the obligation so
7    they could always decide whether they wanted to
8    continue buying participations.
9          And they would typically notify the
10   tribes that there was a change in what they were
11   expecting to buy.
12     Q. Do you have -- had this happened before with
13   Mobiloans where the funding that GPLS was willing to
14   contribute to buying participation interest was
15   insufficient to allow Mobiloans customers to make
16   subsequent draws on their lines?
17     A. The funding was insignificant. See, I -- I
18   can't speak -- well, let me read this again. I'm
19   sorry. I just don't -- don't understand what the
20   "above the cash threshold is." I do know that there
21   were, I believe, multiple times, but certainly I
22   remember one time where GPLS decided to stop buying
23   participations for -- for a period of time really
24   across all of the tribal portfolio.
25           But I -- I don't know what the cash

UNSEALED

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

App. 0186

61

1    threshold refers to.  I'm sorry.
2    **Q. That's okay.**
3       **Based on how the Mobiloans product is**
4 **designed as a line of credit product, is every time**
5 **GPLS decided for some period of time not to continue**
6 **buying participation interest, does that mean that**
7 **Mobiloans' consumers could not make subsequent draws**
8 **on their lines?**
9    A. Really it -- well, it -- it -- it meant
10 really exactly that, that they wouldn't buy
11 participations from Mobiloans at that time.
12    **Q. So -- and I get what the impact of that would**
13 **be on Plain Green and Great Plains.  It would mean**
14 **that they couldn't originate individual loans if they**
15 **didn't have GPLS ready to buy the participation**
16 **interest.**
17       **But as it pertains to Mobiloans where you**
18 **have the a line of credit structure, is the effect,**
19 **then, that not only could they not originate new lines**
20 **but they wouldn't be able to permit existing customers**
21 **to make multidraws on their existing lines?**
22    A. If the -- if the tribe did not have access to
23 sufficient funding from another source, they wouldn't
24 be able to originate any more credit for the
25 customers, that's correct.

62

1    **Q. Okay.  And that would be new lines and**
2 **multidraws for Mobiloans?**
3    A. That's correct.
4    **Q. And that would be just individual new loans**
5 **for Great Plains and Great Plains?**
6    A. Correct.
7    **Q. Looking at --**
8    A. I -- there was, of course, cash flow coming
9 back to the tribes, so they -- they may have tried to
10 do some ongoing fundings, and they probably would have
11 focused on multidraws, but I -- I don't know the
12 specifics of -- of whether -- you know, this adjusted
13 multidraws stopped for at least some period of time.
14    **Q. Okay.  On line number four, Mr. Lutes writes**
15 **to you, I'm going to present VPC with a balance sheet**
16 **analysis that shows we should get 50 percent cash**
17 **credit for investment we had in GPLS.  This would**
18 **equate to about 35 million in additional cash**
19 **variability.  That would enable us to grow more**
20 **aggressively beginning 10/1.  Tom was okay with this,**
21 **assuming ACH continues to be stable.**
22       **Do you see that?**
23    A. Yes.
24    **Q. Do you have an understanding of what**
25 **Mr. Lutes is referring to with respect to the 50**

63

1 **percent cash credit for investment we've made in GPLS?**
2    A. I don't know the specifics.  I -- I do know
3 that the tribes were trying to grow very aggressively,
4 and so they would have been -- you know, the -- any
5 sort of -- any times that GPLS wouldn't buy
6 participations, that slowed down the growth of those
7 businesses.
8       As to the 50 percent cash credit, as --
9 as we discussed, Think Finance made a -- an investment
10 in -- in GPLS, and, again, I'm not sure exactly -- I
11 could -- I could speculate about what that cash credit
12 is, but -- but obviously it related to the investment
13 that Think -- that Think Finance made in GPLS.
14    **Q. Is this -- the investment that's referenced**
15 **here, that's separate from the guarantee that Think**
16 **was obligated to provide?**
17    A. I don't -- I believe the investment form- --
18 formed a collateralization for that guarantee.
19    **Q. That's all the same thing?**
20    A. I believe so.
21    **Q. Okay.  But even if you don't understand the**
22 **specifics of some of what Mr. Lutes is referring to**
23 **here, your understanding is that this is an effort by**
24 **Think Finance to get GPLS to make more cash available**
25 **to help the tribal lending businesses originate more**

64

1 **loans?**
2    A. That's correct.
3    **Q. And then No. 5, then hopefully by 11/1, we**
4 **can get them to drop the cash requirement down to 25**
5 **percent from 50 percent so we can continue to grow**
6 **aggressively in November and December.**
7       **Do you know what that means?**
8    A. I -- I don't know for certain, but I believe
9 it's in line with what we just discussed.
10    **Q. Same general idea as in No. 4 there, trying**
11 **to get GPLS to make more cash available?**
12    A. That's what it appears, yes.
13    **Q. Earlier you were giving me a tutorial on the**
14 **differences between a lending relationship and the**
15 **acquisition of a participation interest and kind of**
16 **the different characteristics of that.**
17       **What -- are you familiar with any other**
18 **businesses that use -- in the lending business that**
19 **use the acquisition of participation interest**
20 **financing model that the tribal lenders use?**
21    A. Yes.
22    **Q. Which ones can you think of?**
23    A. I should -- a large percentage of financial
24 services, mortgages originated, and then
25 participations bought.

16 (Pages 61 to 64)

UNSEALED

App. 0102

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
    Plaintiff, *
     *
VS.      * Civil Action
     * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants. *

*****************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CHRISTOPHER LUTES
MAY 3, 2018
*****************************************************

      DEPOSITION of CHRISTOPHER LUTES,
produced as a witness at the instance of the
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 3rd day of
May, 2018, from 9:03 a.m. to 5:13 p.m., before
Christy R. Sievert, CSR, RPR, in and for the State
of Texas, reported by machine shorthand, at the Fort
Worth Club, 306 West 7th Street, Fort Worth, Texas
76102, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## Page 2

1            A P P E A R A N C E S
2
3  COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4    MR IRV ACKELSBERG
      Langer, Grogan & Diver, PC
5      1717 Arch Street, Suite 4130
      Philadelphia, Pennsylvania 19103
6      Phone: 215-320-5701
      E-mail: iackelsberg@langergrogan.com
7
    MR SAVERIO "SAM" MIRARCHI
8    Senior Deputy Attorney General
      Bureau of Consumer Protection
9    1600 Arch Street, Suite 300
      Philadelphia, Pennsylvania 19103
10    Phone: 215-560-2445
      E-mail: smirarchi@attorneygeneral gov
11
12  COUNSEL FOR CHRISTOPHER LUTES:
13    MR RICHARD L SCHEFF
      Montgomery, McCracken, Walker & Rhoads, LLP
14    123 South Broad Street
      Philadelphia, Pennsylvania 19109
15    Phone: 215-772-7502
      E-mail: rscheff@mmwr com
16
17  COUNSEL FOR KENNETH E REES:
18    MR DAVID F HERMAN
      Montgomery, McCracken, Walker & Rhoads, LLP
19    123 South Broad Street
      Philadelphia, Pennsylvania 19109
20    Phone: 215-772-7502
      E-mail: dherman@mmwr com
21
22
23
24
25

## Page 3

1            A P P E A R A N C E S
              (continued)
2
3  COUNSEL FOR THINK FINANCE, INC :
4    MR MATTHEW S SHELDON
      Goodwin Procter, LLP
5    901 New York Avenue, NW
      Washington, D C 20001
6    Phone: 202-346-4000
      E-mail: msheldon@goodwinprocter com
7
8  COUNSEL FOR VICTORY PARK CAPITAL:
9    MR DANIEL P SHAPIRO
    MR MATTHEW W HAWS
10    Katten Muchin Rosenman, LLP
      525 W Monroe Street
      Chicago, Illinois 60661
11    Phone: 312-902-5622
      E-mail: daniel shapiro@kattenlaw com
12           matthew haws@kattenlaw com
13
14  COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15    MR PATRICK DAUGHERTY
      Van Ness Feldman, LLP
16    1050 Thomas Jefferson Street, NW
      Seventh Floor
17    Washington, D C
      Phone: 202-298-1874
      E-mail: pod@vnf com
18
19  ALSO PRESENT:
20    WILL RAINE, Videographer
      KEVIN BYERS
21
22
23
24
25

## Page 4

1            I N D E X
2              PAGE

3  Appearances................................. 2-3
4  Exhibits..................................... 5-7
5  Proceedings.................................. 8
6  CHRISTOPHER LUTES:
7    Examination by Mr. Ackelsberg.............. 9
8
9  Changes and Signature.................. 304-305
    Reporter's Certification............... 306-307
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNSEALED

App. 0168

## Page 5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 243 | Great Plains Lending Flow of Funds for Ongoing Loan Originations and Sales TF-PA 013418 | 109 |
| Exhibit 244 | Credit Agreement, Plain Green, LLC, and Haynes Investments, Inc TF-PA 000491 - 000503 | 169 |
| Exhibit 245 | Credit Agreement, Haynes Investments, Inc , and Think Finance, Inc TF-PA 001231 - 001242 | 171 |
| Exhibit 246 | E-mail correspondence 6-7-12, Re: Revised Structure GPLP 00151908 - 00151909 | 182 |
| Exhibit 247 | E-mail correspondence 6-19-12, Re: Haynes Amendment TF-PA 583777 - 583778 | 186 |
| Exhibit 248 | E-mail correspondence 11-15-12, Re: Fw: Revised Put Agreement for your review TF-PA 608431 - 608433 | 188 |
| Exhibit 249 | E-mail correspondence 9-11-12, Re: Haynes Loan to PGL TF-PA 582865 | 191 |
| Exhibit 250 | E-mail correspondence 1-18-13, Re: PG credit agreement TF-PA 041391 - 041392 | 198 |
| Exhibit 251 | Credit and Security Agreement TF-PA 000504 - 000529 | 200 |
| Exhibit 252 | Put Agreement TF-PA 269583 - 228385 | 200 |

## Page 7

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 263A | E-mail correspondence 10-29-13, Re: Revised Model TF-PA 575005 - 575001 | 243 |
| Exhibit 263B | VPC, Summary of Terms October 29, 2013 TF-PA 575012 - 575015 | 243 |
| Exhibit 264 | E-mail correspondence 12-14-13, Re: Monthly Reporting Package GPLP 00014578 - 00014581 | 250 |
| Exhibit 265 | E-mail correspondence 12-24-13, Re: Rise Structural Overview Chart TF-PA 674500 - 674502 | 254 |
| Exhibit 266 | E-mail correspondence 1-16-14, Re: Rise GPLP 00016130 | 255 |
| Exhibit 267 | E-mail correspondence 3-13-14, Re: Insurance Overview TF-PA 210850 | 257 |
| Exhibit 268 | E-mail correspondence 3-19-14, Re: GPLS/Split Discussion TF-PA 108729 - 108732 | 263 |
| Exhibit 269-270 | (Not marked or identified ) | |
| Exhibit 271 | E-mail correspondence 6-20-14, Re: Monthly Reporting Package GPLP 00383459 - 00383563 | 284 |

## Page 6

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 253 | Enterprise Risk Assessment Produced in Native Format TF-PA 290895 | 202 |
| Exhibit 254 | E-mail correspondence 4-18-13, Re: Final No State lists for PG, GPL, Mobi TF-PA 267158 - 267160 | 203 |
| Exhibit 255 | E-mail correspondence 11-20-13, Re: States serviced by tribes TF-PA 228363 - 228365 | 209 |
| Exhibit 256 | 7-25-13 letter from C Lutes TF-PA 041394 - 041397 | 216 |
| Exhibit 257 | E-mail correspondence 8-8-13, Re: Fw: WSJ Article GPLP 00008844 - 00008845 | 219 |
| Exhibit 258 | E-mail correspondence 8-14-13, Re: VPC TF-PA 678633 - 678635 | 221 |
| Exhibit 259 | E-mail correspondence 8-19-13, Re: Forecasts TF-PA 367418 - 367420 | 227 |
| Exhibit 260 | E-mail correspondence 8-21-13, Re: GPLS Letter TF-PA 677073 | 231 |
| Exhibit 261 | E-mail correspondence 10-10-13, Re: Fw: Mobi TF-PA 309723 - 309725 | 238 |
| Exhibit 262 | E-mail correspondence 10-7-13, Re: GPLS GPLP 00518002 | 239 |

## Page 8

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record for the video deposition of Chris Lutes. The time is 9:03 a.m. on May 3, 2018.

This is the matter of the Commonwealth of Pennsylvania, et al., vs. Think Finance, Incorporated, et al., Civil Action No. 14-7139-JCJ. This is being held in the United States District Court for the Eastern District of Pennsylvania.

The court reporter is Christy Sievert. The videographer is Will Raine. Both are representatives of Kaplan, Leaman & Wolfe Court Reporter.

And now would counsel please state your appearances for the record.

MR. ACKELSBERG: For the Commonwealth of Pennsylvania, Irv Ackelsberg. Also with me, temporarily out in the hall, is Saverio Mirarchi with the attorney general's office.

MR. SCHEFF: Irv, could you identify -- could you --

MR. ACKELSBERG: Yes. This is Kevin Byers, our consultant.

MR. SCHEFF: Thank you.

Richard Scheff for Christopher Lutes.

UNSEALED

App. 0169

1         MR. HERMAN:  David Herman for Kenneth
2  E. Rees.
3         MR. SHELDON:  Matt Sheldon for the
4  Think Finance defendants.
5         MR. SHAPIRO:  Dan Shapiro for the
6  Victory Park defendants.  And Matt Haws, who's in
7  the hall right now, will be joining us shortly.
8         MR. DAUGHERTY:  Patrick Daugherty on
9  behalf of National Credit Adjusters.
10         CHRISTOPHER LUTES
11     having been first duly sworn,
12     testified as follows:
13         EXAMINATION
14  BY MR. ACKELSBERG:
15     Q.  Good morning, Mr. Lutes.  It's very nice to
16  meet you, finally.
17     A.  Thank you.  Likewise.
18     Q.  So we have to go through, as you know, a
19  few preliminaries just to make sure that, first of
20  all, you understand the procedure and what's
21  happening here.  Have you been deposed before?
22     A.  No, I have not.
23     Q.  Okay.  So I'm sure your lawyer has gone
24  through this, but I need to do it myself.
25  Basically, the way we're going to proceed, it's a

1  series -- it's questions and answers.  I ask a
2  question, you answer as best as you can.  There may
3  be objections by your lawyer.  And I can assure you
4  there will be objections from your lawyer and maybe
5  from other lawyers.  But the way this -- the way
6  this works in a deposition as opposed to a trial is
7  that after the objections, you still have to answer
8  the question unless the -- your lawyer specifically
9  directs you not to answer the question.  And, you
10  know, I'm guessing we're not going to be doing a
11  whole lot of that today, but it's -- but there will
12  be plenty of objections.
13     And so it's important that we not talk
14  over one another.  The court reporter has to get
15  everything down.  My question, the lawyer's
16  objection, your answer, the whole thing.  But -- do
17  you understand that?
18     A.  Yeah, I do.
19     Q.  Okay.  And we are being videotaped today,
20  but the official -- the record of this deposition is
21  the written transcript that the court reporter is
22  preparing, and the reason I stress that is that
23  nonverbal responses aren't picked up.  So, you know,
24  if I say, "Is that a yes or a no," I mean --
25     A.  I shouldn't nod my head.

1     Q.  Yeah, the nods aren't going to be picked
2  up.  And if I -- and if I say, "Did you mean yes,"
3  it's not -- I'm not trying -- it's not an act of
4  disrespect.  We just have to get it onto the --
5     A.  Understood.
6     Q.  -- onto the record.
7     Right.  So nods or shrugs don't work.  We
8  need verbal.
9     If you don't know the answer, just --
10  that's fine, "I don't know."  If you don't
11  understand the question, please tell me, and I'll do
12  my best.  I might ask you, well, what about the
13  question don't you understand, but we can -- we can
14  work together to clarify the question so we can
15  get -- we can get an answer from you to a question
16  that you understand.
17     A.  Uh-huh (affirmative response).
18     Q.  Let's see.  What else haven't I covered?
19  We're going to take breaks.  This will be a long day
20  for all of us.  We'll take many breaks.  If you need
21  a break, just tell us.
22     A.  Okay.
23     Q.  And I would just ask you to finish your
24  answer to the pending question, and then we can go
25  off the record and. . .

1     A.  Got it.
2     Q.  And, finally, is there any reason, such as
3  illness, hearing disorder, medication, lack of
4  sleep, things like that, that would get in the way
5  of you giving this deposition your full attention
6  today?
7     A.  No.
8     Q.  Okay.  So we are going to go just a little
9  bit into your background, and I'm --
10     A.  Sure.
11     Q.  -- going to try to breeze through this.  My
12  understanding is that you're a CPA.  Is that right?
13     A.  Yes, I am, in the state of Arizona.
14     Q.  Okay.  And is that -- and your
15  certification is current?
16     A.  Yes, it is.
17     Q.  Okay.  And am I right that at some point,
18  you were the CEO -- the CFO, the chief financial
19  officer, for Silicon Valley Bank?
20     A.  Yes, I was.
21     Q.  And where is that located?
22     A.  That's located in Santa Clara, California.
23     Q.  And during what period of time were you
24  with the bank?
25     A.  I was with the bank from 1994 through 2001,

UNSEALED

1  and I was the CFO from 1998 through 2001.
2      Q.   And what position did you have before you
3  were the CFO?
4      A.   Before I was the CFO, I was the controller.
5      Q.   Okay.  And then you were at Think Finance
6  from 2007 until?
7      A.   The end of 2014.
8      Q.   '14.  And then you went over to Elevate?
9      A.   Yes.
10     Q.   And both at -- during your entire time at
11 Think Finance, you were the CFO?
12     A.   Yes, I was the CFO.
13     Q.   And you're the CFO at Elevate?
14     A.   Yes.
15     Q.   Okay.  And as I understand from your bio,
16 you're also on the board of a bank named Central
17 Pacific Bank?
18     A.   Yes.  I was recently appointed to that.
19     Q.   And where is that?
20     A.   That's in Honolulu, Hawaii.
21     Q.   Lucky you.
22     A.   Well, it's lucky except when you have to
23 make the flight eight times a year.
24     Q.   Okay.  All right.  Just a few questions
25 about Silicon Valley Bank.  Is it regulated by the

1  FDIC?
2      A.   Yes, it is.
3      Q.   And so then I take it you're familiar with
4  the regulatory environment within which banks
5  operate?
6      A.   Sure.
7           MR. SCHEFF:  Object to the form.
8  BY MR. ACKELSBERG:
9      Q.   And the -- and Silicon Valley Bank, during
10 the years you were there, did they offer mortgages?
11     A.   No, I do not believe we did.
12     Q.   Did you offer --
13     A.   The qualification would be if we did, it
14 would be to our private wealth customers.
15     Q.   Okay.  Did you have any consumer lending
16 products?
17     A.   To my knowledge, no, we did not.
18     Q.   Are -- are you familiar with the -- just
19 from being in the banking world, are you familiar
20 with the way mortgage lending works or consumer
21 lending, in general, within a regulated environment?
22          MR. SCHEFF:  Object to the form.
23     You can answer the question.
24     A.   Yes, I'm familiar with consumer lending.
25 Prior to Silicon Valley Bank, I worked for Household

1  Credit Services, which was credit cards.
2  BY MR. ACKELSBERG:
3      Q.   Okay.  All right.  And so you understand
4  that sometimes lenders in a -- in a regulated
5  environment, sometimes they're making loans to hold
6  on their own books, and sometimes they're making
7  loans that they then sell in the secondary market.
8  You're familiar with that, right?
9           MR. SCHEFF:  Object to the form.
10     You can answer.
11     A.   Yes, I am familiar with that.
12 BY MR. ACKELSBERG:
13     Q.   And in a -- in a case where -- so, for
14 example, I mean, we all watched the mortgage debacle
15 ten years ago.  You're familiar a little bit with,
16 like, what happened there, right?
17          MR. SCHEFF:  Object to the form.
18     You can answer the question.
19     A.   I'm not familiar with the specific aspect
20 of the mortgage.  I lived through that financial
21 crisis while I was the CFO at Think Finance.
22 BY MR. ACKELSBERG:
23     Q.   Right.  So in a regulated -- again, just
24 from what -- just from what you know about the way
25 banks operate within a regulated environment,

1  sometimes -- like you said, sometimes the banks are
2  making loans to hold on their own balance sheet, and
3  sometimes they're -- they're selling the loan off
4  after they originate it, right?
5           MR. SCHEFF:  Object to the form.
6      You can answer.
7      A.   Yes.
8  BY MR. ACKELSBERG:
9      Q.   And sometimes a lender -- a bank lender
10 might, even though it sells the loan, it might take
11 back the servicing of that loan.  You're familiar
12 with those kind of transactions, right?
13          MR. SCHEFF:  Object to the form.
14          MR. SHELDON:  Object to form.
15     A.   Yes, I'm familiar primarily with the
16 mortgage industry generally, yeah.
17 BY MR. ACKELSBERG:
18     Q.   Yeah.  And so in that -- in a situation
19 where, you know, a bank is making the loan but
20 taking back the servicing, the bank would generally
21 make a fee from the origination transaction and then
22 make a fee through the servicing work that it does
23 on the -- on the mortgage in that kind of a
24 situation?
25          MR. SCHEFF:  Object to the form.

UNSEALED

1  BY MR. ACKELSBERG:
2  Q. It's typically the way --
3  A. I would say there's multiple ways, from my
4  perspective that --
5  Q. Right.
6  A. -- that banks could generate fees.
7  Q. Right.
8  A. It doesn't necessarily need to just be
9  through --
10  Q. And a --
11  A. -- the servicing.
12  Q. And a bank could generate a fee --
13       MR. SCHEFF: Please let him finish his
14  answer.
15  BY MR. ACKELSBERG:
16  Q. And a bank could generate fees on
17  transactions where they don't hold the loan itself
18  on it -- on their books; that's -- that's pretty
19  common, right?
20       MR. SCHEFF: Object to the form.
21       You can answer the question if you can.
22  A. From my perspective, that's getting a
23  little bit out of my expertise because I haven't
24  been in that situation.
25  BY MR. ACKELSBERG:

1  one question. And then you said, "You know what
2  special purpose vehicles are, correct?" So which
3  question do you want him to answer?
4       MR. ACKELSBERG: He already answered
5  both of those.
6       MR. SCHEFF: I don't know that he did.
7  If he did, then let's move on to the next question.
8  A. I do not -- I do know what a special
9  purpose vehicle is.
10  BY MR. ACKELSBERG:
11  Q. Okay. What is it?
12  A. It's typically a conduit, a legal entity
13  where, you know, a bank whose capital constraint
14  will typically sell some type of loan participation
15  or an outright sell, you know, to that third party,
16  SPV, that typically has third-party investors that
17  are purchasing it.
18  Q. And, typically, in that situation, the --
19  there would be an asset that would be owned by the
20  special purpose vehicle, and -- and some other
21  entity would be providing services to that special
22  purpose vehicle, like, collecting the payments,
23  things like that, right? You're --
24       MR. SCHEFF: Object to the form.
25  BY MR. ACKELSBERG:

1  Q. All right. You're familiar with the
2  securitization of mortgages, how that happened?
3  A. I'm familiar with the term securitization
4  in mortgages. I've never been involved in a
5  mortgage securitization.
6  Q. Okay. But you understand that mortgage
7  lenders will often sell the mortgage to something
8  called a "special purpose vehicle"? You know what
9  special purpose vehicles are, correct?
10       MR. SCHEFF: Object to the form.
11  Which question do you want him to answer? Which
12  question do you want him to answer? You've got two
13  questions there. You've got to choose which one
14  because we want to have a clean record.
15       MR. ACKELSBERG: Richard, this is
16  going to be a long day.
17       MR. SCHEFF: I know. But you need
18  to -- you need to ask good questions.
19       MR. ACKELSBERG: We have barely
20  started, Richard.
21       MR. SCHEFF: I understand, Irv, but
22  you need to ask good questions. You asked him, "You
23  understand" -- and maybe we can -- "You understand
24  that mortgage lenders will often sell mortgages to
25  something called a special purpose vehicle?" That's

1  Q. In the mortgage context, that's -- that's
2  the way it works, right?
3       MR. SCHEFF: Object to the form.
4  A. From my perspective, special purpose
5  vehicles can buy the whole receivable. They can buy
6  a participation in the receivable. So they can hold
7  assets in various ways.
8  BY MR. ACKELSBERG:
9  Q. Were there -- were there any loans that
10  Silicon Valley made while you were there that used
11  special purpose vehicles?
12  A. No.
13  Q. Was -- so your first was -- well, what
14  about at Household?
15  A. At Household, yes. Although, I was not
16  involved in that, and that's going back, you know,
17  almost 25 years. But Household did securitize
18  credit card receivables.
19  Q. Would it be -- would it be fair to say that
20  the first time you actually were working with a
21  special purpose vehicle structure would have been
22  the Universal Fund at -- when you got to Think
23  Finance?
24  A. That would have been the most recent as a
25  CFO. Like I said, when I was at Household, you

UNSEALED

1  know, we did do credit card securitizations, and I
2  was in the regulatory accounting area. My wife,
3  actually, was involved in the financial
4  securitization aspect. So I was familiar with the
5  concept. But, yes, from an actual practical
6  standpoint and as a CFO, the first time that I dealt
7  with a special purpose vehicle would have been at --
8  with the Universal Fund II.
9      Q.  Well, let's just talk about your hiring by
10 Think Finance. How did that -- how did that happen?
11     A.  I think the connection at the time was --
12 well, one, Think Finance didn't have -- and it
13 technically wasn't Think Finance at the time. The
14 entity name was PayDay One Corporation. PayDay One,
15 Inc., I believe.
16     The connection was is that my CEO at
17 Silicon Valley Bank, John Dean, was an early
18 investor in Think Finance, or the predecessor
19 company. He was also on the board of directors. He
20 knew they were looking for a chief financial
21 officer. Sequoia Capital and Technology Crossover
22 Ventures were venture capital investors in it.
23     I think, you know, the way it was pitched
24 to me is that this was an entity that was looking to
25 go public at some point in the near future, they

1  would like to have a CFO with public company
2  experience. I was a public company CFO at Silicon
3  Valley Bank, but one thing that I was never -- I
4  guess one remaining item on my CFO bucket list, so
5  to speak, would be to take a company public. And I
6  know with Sequoia Capital and TCV, those are two
7  very well-respected venture capital firms, and it
8  looked like a -- a good opportunity. And so that
9  was the connection and how I ended up interviewing
10 for -- for Think Finance.
11     Q.  Do you -- do you know how Mr. Dean and
12 Think Finance got connected?
13     A.  Yes. Mr. Dean is -- after leaving Silicon
14 Valley Bank, he started a company small venture
15 capital fund called Startup Capital Ventures, and
16 one of his other venture partners is, Bob Rees, who
17 is the uncle of Ken Rees, the CEO, at the time, of
18 PayDay One and Think Finance.
19     Q.  So PayDay One was -- so PayDay One, back in
20 those days before you -- before you got there was
21 kind of a startup that was -- that was connecting to
22 venture capital?
23     A.  It was a start- --
24         MR. SCHEFF: Object to the form.
25     A.  I'll answer the question based on -- on my

1  knowledge because it's prior to me arriving in
2  January of 2007. You know, the PayDay One was
3  founded in the 2001, 2002 time span by some local
4  Fort Worth businessmen that were familiar with
5  financial services. They kind of bootstrapped the
6  company up with their own capital, and, you know,
7  local funding efforts. Generated, I think, a decent
8  sized company. I mean, it was probably -- I know
9  when I joined in -- at the end of 2006, per my
10 recollection of looking at the audited financials
11 when I arrived, that they had 86 million of revenue,
12 and that would have all been from the payday product
13 that they were offering at that point in time.
14     They brought in the venture capitalists in
15 2005. September of 2005, Sequoia Capital, at that
16 round and then again in February of 2006. But
17 the -- the venture capital money raised ended up
18 being really a liquidity event for the original
19 founders/investors in the company. Not my prior
20 CEO, John Dean, but Startup Capital Ventures. It
21 would have been the -- the two local Fort Worth
22 businessmen.
23 BY MR. ACKELSBERG:
24     Q.  And when you say liquidity event, that
25 really means, like, paying them -- paying that --

1      A.  Exactly. The --
2      Q.  -- investment off that?
3      A.  -- capital didn't stay on the balance sheet
4  to, like, fund future growth of the company. It
5  went to the founders as a liquidity event, and they
6  exchanged, you know, their ownership in the company
7  to -- to the venture capital firms.
8      Q.  And who were those founders?
9      A.  "Founders" is a loose term that I use, so I
10 may not be correct in, quote, calling them founders.
11     Q.  I understand.
12     A.  I do know that the original founder of the
13 company was Mike Stinson.
14     Q.  Because I've seen his name --
15     A.  Yes.
16     Q.  -- as one of the -- one of the
17 stakeholders. So he was one of those Fort Worth
18 businessmen that was actually doing the payday
19 business -- payday loan business initially?
20     A.  Yes.
21     Q.  And then -- and then he --
22     A.  Yeah, he, along with his wife, Linda
23 Stinson.
24         MR. SCHEFF: Wait until he finishes
25 asking the question.

UNSEALED

1    A.  Sorry.  I apologize.
2  BY MR. ACKELSBERG:
3    Q.  I got it.
4        Okay.  And then the result of the -- the
5  venture capital investment from TCV and Sequoia was
6  that the Stinsons could get -- could, basically,
7  get -- cash in some of their money?
8        MR. SCHEFF:  Object to the form.
9        You can answer the question.
10   A.  Yes, that is my belief.  Although, I wasn't
11  there at the time.
12  BY MR. ACKELSBERG:
13   Q.  Okay.  And what's the date of your hire --
14   A.  It was --
15   Q.  -- at Think?
16   A.  The date of my hire, again, as CFO at
17  PayDay One was January of 2007.
18   Q.  When did -- when did PayDay One start
19  using -- I think it was -- before it was Think
20  Finance, it was ThinkCash, right?  I don't know if
21  that was the formal name or just the doing
22  business --
23   A.  Yes.  Yes, it was.
24   Q.  Was that -- it started out as just a d/b/a,
25  right, the ThinkCash?

1    A.  That, I don't know.  That's probably more
2  of a -- a legal thing.
3    Q.  Okay.  But you still -- you got there
4  January of 2007, and the company's name is PayDay
5  One?
6    A.  Right.
7    Q.  Okay.  But that also -- that day,
8  January -- or that period of time, January 2007, is
9  also the time when the ThinkCash product with First
10  Bank of Delaware was launched, right?
11       MR. SCHEFF:  Object to the form.
12       You can answer the question.
13   A.  Yes, the ThinkCash product was launched
14  with First Bank of Delaware in February of 2007.
15  The structure and all of the agreements were already
16  in place.  The agreements had already been finalized
17  with First Bank of Delaware prior to my arrival.  So
18  I really don't have any expertise related to or
19  experience related to the negotiations and the
20  discussions of the product and why they decided upon
21  the structure that they did or whatnot.
22  BY MR. ACKELSBERG:
23   Q.  But the structure as -- but why don't you
24  just describe for us the structure that was already
25  in place that you had to learn to understand.

1    A.  I'll -- I'll answer the question, but I'll
2  change it slightly.  The structure, technically,
3  wasn't in place because we didn't launch until
4  February of 2007.  And when I say "we," that would
5  be we as the service provider to First Bank of
6  Delaware that was the originator of the loan.
7        The structure per the agreements -- and
8  the agreements, again, were in place prior to me
9  arriving -- would be that the bank, First Bank of
10  Delaware, would be the originator of the loans, that
11  there would be a marketing agreement between, at the
12  time, the PayDay One entity.  I think it was about
13  to become called the ThinkCash entity.  So if you
14  don't mind, I'll just start calling it ThinkCash at
15  this point in time.  It would be -- a ThinkCash
16  subsidiary would provide marketing services to the
17  bank and -- and receive a fee.
18       I believe there might have also been a
19  licensing entity that licensed the technology
20  platform, some underwriting scores and other IT-type
21  of services to the bank for a fee.  And that was the
22  structure of that initial launch of the product.
23   Q.  So there -- as I understand it, there
24  was -- the marketing -- under the arrangement with
25  First Bank of Delaware, the marketing would be done

1  by the ThinkCash entity, right?  The -- there's a
2  website, right?
3    A.  My understanding is, is that the -- the
4  bank owned the website.  It was a bank website.
5    Q.  I didn't mean whether it was owned.
6    A.  Yeah.
7    Q.  I'm not really --
8    A.  Okay.
9    Q.  I'm not talking ownership.  I'm really
10  talking about operations and --
11       MR. SCHEFF:  Object to the form.  You
12  know, this -- we're not in a question-and-answer
13  mode here.  Please ask questions and answer the
14  questions as opposed to having a conversation
15  because the record is a mess.  So please ask a
16  question.
17  BY MR. ACKELSBERG:
18   Q.  You're familiar with those agreements.  I
19  mean, it might make sense for us to -- just to put
20  them in front of you and then. . .
21       MR. ACKELSBERG:  So what I'm going
22  to -- these are -- these are exhibits that have
23  already been identified.  This is Exhibits P-102 and
24  103.  This is already marked.
25   A.  (Reviews document.)

UNSEALED

1       Apologies for me taking a minute to flip
2  through. I haven't looked at this agreement in
3  years.
4       MR. SCHEFF: Just for the record, in
5  102 and there may be more instances of this, I
6  just don't know. Bu in 102, there's TF-PA 00875.
7  The next page is TF-PA 00840, so it went back
8  35 pages.
9       MR. ACKELSBERG: Right. Thank you.
10      MR. SHELDON: And just to note, the
11  pages after that continue consecutively in the 840
12  and 841 and so range.
13      MR. ACKELSBERG: This is an exhibit
14  that we've already had. It's in the record. But
15  anyway, thank you for all of that.
16  BY MR. ACKELSBERG:
17    Q. But the -- so first of all, I know that
18  soon after this period -- I mean, this is -- this is
19  preTailwind and TC Decision Sciences, right?
20      MR. SCHEFF: Object to the form.
21  BY MR. ACKELSBERG:
22    Q. You know what I'm -- you understand that,
23  right?
24      MR. SCHEFF: Object to the form.
25  BY MR. ACKELSBERG:

1    Q. There came a time when the marketing entity
2  was called TailWind and the -- and the technology
3  entity was called TC Decision Sciences?
4      MR. SCHEFF: Object to the form.
5  BY MR. ACKELSBERG:
6    Q. You remember -- you remember that, right?
7      MR. SCHEFF: Object to the form.
8      You can answer the question.
9    A. Yes, I do.
10  BY MR. ACKELSBERG:
11    Q. Okay. And this is from before that, before
12  they're -- before Think was using -- or PayDay One
13  was using TailWind and TC Decision Sciences, right?
14      MR. SCHEFF: Object to the form.
15      You can answer the question.
16    A. Yes, I believe these were the agreements
17  that were, if not the original, at least preceded
18  those agreements.
19  BY MR. ACKELSBERG:
20    Q. So the -- the Think entity that was
21  providing all of the services, whether marketing or
22  technology, was called at this point TC -- TC Loan,
23  right?
24    A. Based on looking at this agreement, yes,
25  the -- entity that entered into the marketing

1  and servicing agreement was TC Loan Service, LLC.
2    Q. And there was also -- it's actually two
3  agreements. There's also a guarantee agreement,
4  that's the -- the last pages that are out of order
5  that your lawyers were referencing that. Do you see
6  that? There was --
7    A. What pages would those be?
8    Q. It's at the end. It actually starts at
9  TF-PA 840.
10    A. Oh, yes, I see.
11    Q. Do you see it?
12    A. Yes, I do.
13    Q. Okay. And this was -- and this was a
14  guarantee made by the corporate umbrella, the PayDay
15  One entity, to First Bank of Delaware, right?
16      MR. SCHEFF: Object to the form.
17  BY MR. ACKELSBERG:
18    Q. Do you see that?
19      MR. SCHEFF: Object to the form.
20    A. Yes, I do.
21  BY MR. ACKELSBERG:
22    Q. Okay. And then there was also what was
23  called a master participation agreement that was
24  also entered -- that was also signed on January 23,
25  2007, or -- do you see that? That was another part

1  of the -- it was one of the agreements that
2  constituted the original structure.
3    A. Yes, it was.
4    Q. Yeah. All right. And that was with a
5  different Think entity called TC Financial?
6    A. In looking at this master participation
7  agreement, yes, TC Financial, LLC, entered into the
8  agreement.
9    Q. And so -- and just so -- and if you look
10  at -- staying on the master participation agreement,
11  if you look at page 4, at this point in time, the --
12  the same day that the loan was originated in the
13  name of First Bank of Delaware, a 99 percent
14  participation interest in the loan was conveyed to
15  the Think entity, TC Financial. Do you see that?
16      MR. SCHEFF: Object to the form.
17    A. Give me one minute to read the paragraph.
18  BY MR. ACKELSBERG:
19    Q. Sure.
20    A. I'm assuming you're referring to clause
21  2.2?
22    Q. Yes.
23    A. (Reviews document.)
24    Could you restate your question again now
25  that I've read it?

UNSEALED

1     Q.  That -- is it -- am I correct, that under
2  this agreement, the loans that were originated in
3  the name of First Bank of Delaware, with regard to
4  those -- each of those loans, a 99 percent
5  participation interest was conveyed to Think -- TF
6  Financial on a daily basis?
7          MR. SCHEFF:  Object to the form.
8          MR. SHELDON:  Object to form.
9     A.  Based on my recollection and looking at
10  this agreement, each day 99 percent participation
11  interest in the ThinkCash installment loan product.
12  Your question had referred to just the bank product,
13  but this would be the ThinkCash installment loan
14  product was sold by First Bank of Delaware to TC
15  Financial, LLC.
16  BY MR. ACKELSBERG:
17     Q.  Yeah, and just so that we're clear during
18  this period of time, the company still had its own
19  PayDay One label that it -- it was marketing, right?
20          MR. SCHEFF:  Object to the form.
21      You can answer the question.
22          MR. SHELDON:  Same objection.
23     A.  Yes, at that point in time in early 2007,
24  the company was also marketing -- lending directly a
25  Payday One product.

1  BY MR. ACKELSBERG:
2     Q.  And so from the standpoint of view as -- as
3  a financial -- as the CFO in terms of the financial
4  activity being generated by these two products, you
5  had -- you had on your balance sheet the -- the
6  loans that were -- the PayDay One loans that were
7  made directly, right?  Those were on the balance
8  sheet, correct?
9          MR. SCHEFF:  Object to the form.
10     A.  Yes.  The PayDay loans sat directly on our
11  balance sheet since we were the direct lender.
12  BY MR. ACKELSBERG:
13     Q.  And a 99 percent interest in the -- in the
14  ThinkCash loans during this period of time would
15  also have been sitting on the balance sheet?
16          MR. SCHEFF:  Object to the form.
17     A.  Yes, the 99 percent participation purchased
18  from the bank on the ThinkCash installment loans
19  were also on our balance sheet.
20  BY MR. ACKELSBERG:
21     Q.  Okay.  And then during the course of 2007
22  and then into 2008, the transaction with -- the
23  structure, the arrangement that your company had
24  with First Bank of Delaware, it went through various
25  iterations, various revisions; am I right?

1     A.  I would say it -- I would phrase that as it
2  evolved based upon the bank and feedback the bank
3  was receiving, from my perspective, from the FDIC
4  and its regulators on how to further strengthen the
5  structure of the product.
6     Q.  And what do you remember about some of that
7  feedback?
8     A.  The -- the first feedback that I remember
9  would have been sometime -- and I'm guessing, so
10  forgive me if I'm off a year or so -- sometime in
11  mid to late 2008.  I don't think it was in 2009.  I
12  think it would have been late 2008 that Alonzo
13  Primus, the -- and I believe I'm pronouncing his
14  name right -- the CEO and president of First Bank of
15  Delaware -- and this is my recollection.  He didn't
16  have this discussion with me.
17      But what I believe happened was, is that
18  he had talked with Ken Rees after the bank, I think,
19  had gone through their first FDIC exam with this
20  program and the ThinkCash installment loan in place.
21  And the feedback was, is that the regulators were --
22  would recommend that we set up an SPV type
23  structure.  And by "we," the bank would set up an
24  SPV type structure.
25      They realized that the bank was capital

1  constrained and couldn't keep, you know, all of
2  those install- -- ThinkCash installment loans on
3  their books.  Rather than selling a 99 percent
4  interest back to -- back to TC Financial, LLC, they
5  recommended to the bank that the bank set up an SPV
6  and have third-party investors, lenders lend to that
7  SPV and have that SPV purchase the participations,
8  the 99 percent participations from the bank.
9      I think they also recommended some other
10  changes, such as instituting a licensing
11  technology-type agreement whereby a Think Finance
12  entity would provide licensing the -- the technology
13  loan platform for the bank and also the underwriting
14  scores as suggestions for -- to help the bank
15  underwrite those customers.  And there probably
16  would have been some changes to the marketing
17  agreement, I believe, as well at that point in time.
18     Q.  And you think those were actually
19  suggestions by the FDIC?
20     A.  That is my recollection or my general
21  understanding.  Again, I didn't have a privy direct
22  conversation with the Alonzo or the bank regarding
23  that, or did I ever see, but that was my impression.
24     Q.  Since you didn't hear from that -- from the
25  FDIC directly, or from the bank, I mean -- well, how

UNSEALED

1   did you gain that understanding?
2       A.  Well, from my perspective, why would we be
3   changing the program from -- you know, my
4   understanding is, is that the -- it was the bank had
5   gone through their first exam with the regulators.
6   There was no criticism, per se, of the program, but
7   the FDIC had recommended to the bank was to make
8   these changes.  That's my recollection of what
9   happened.
10      Q.  Now, you do remember the cease and desist
11  from the FDIC in October of 2008, right?  You do
12  remember that?
13      A.  I am somewhat familiar with that.  I never
14  saw the cease and desist because, clearly, that's a
15  private, you know, confidential document between the
16  bank and its regulators.
17      Q.  And the taxpayers.  I mean, it's -- it's --
18          MR. SCHEFF:  Object to the form.
19  BY MR. ACKELSBERG:
20      Q.  You know, just so you know, cease and
21  desists are public documents.  So at least this one
22  was.  I mean, that's where I read it.  So I -- but
23  if you've never looked at or seen that --
24      A.  I have -- I have --
25      Q.  -- that's fine.

1       A.  -- never looked --
2           MR. SCHEFF:  Just wait for him to
3   finish.
4   BY MR. ACKELSBERG:
5       Q.  That's fine.  I mean, but -- but, again,
6   I'm just trying to understand where you were getting
7   your information about what the bank was -- was
8   being told by the FDIC.
9       A.  Your question to me seemed to be why did we
10  make -- why were these changes made.  And my
11  understanding, based on discussions with Ken Rees or
12  other senior execs of Think Finance, ThinkCash at
13  the time, that would have had those conversations
14  with the bank is that those were suggestions coming
15  from the FDIC regulators to the bank and the bank to
16  us.
17      Q.  All right.  Now -- I understand now.  Okay.
18          What I want to do, I want to just go
19  through a little bit of the evolution of the product
20  in the deal documents, if I could.  I want to show
21  you another exhibit that's already in the record,
22  104.
23      A.  If you don't mind, I'm going to take a few
24  minutes to read this document.
25      Q.  Oh, sure.

1       A.  (Reviews document.)
2           On page 1, I'm a bit confused, it's
3   referring to a Section 20.1 of the agreement, which
4   I assume is this marketing and servicing agreement
5   that you gave me, but I don't see a Section 20.1 in
6   the document that you gave me in that marketing.
7   I'm trying to understand what this --
8       Q.  There's also a participation agreement, so
9   I think you're maybe looking at the wrong one.
10  There is a Section 20 in the participation
11  agreement, so I don't know -- it may be that -- I
12  don't know.  I mean, I'm just --
13      A.  No, the only reason I'm asking is because
14  here it defines the agreement is the marketing and
15  servicing.
16      Q.  Right.
17      A.  So the next paragraph refers to
18  Section 20.1 of the agreement.
19      Q.  I see that.
20      A.  So. . .
21      Q.  If you'd look at page 24 of the
22  participation.
23      A.  Okay.  Let me take a look at that, then.
24  Apologies.
25          (Reviews document.)

1       Q.  You see it's talking about reserve
2   accounts?
3       A.  Yes.  Yes.
4       Q.  And that actually -- it's probably just
5   a --
6       A.  Yeah, it was probably just a typo on -- on
7   this
8       Q.  A typo.  They're probably referencing the
9   participation agreement, right?  Do you see that?
10      A.  Yes, I believe now, in looking at it,
11  referencing the participation agreement.
12      Q.  So --
13      A.  Hold on one second.
14      Q.  Oh, sure.
15      A.  I'm still -- I'm sorry, I'm still reading
16  this now that I know what they're referencing.
17      Q.  Sure.
18      A.  (Reviews document.)
19          Okay.
20      Q.  Okay.  So it looks like from this, and tell
21  me if this -- if I'm -- you should explain whether
22  you're responding based on your own recollection of
23  the way it worked or just based on the documents.  I
24  don't -- you know, you can -- you can clarify any
25  way you want to.  But am I right that what this

UNSEALED

1  rework of the agreement did in -- in September of
2  2007 -- well, one thing that it did was the bank was
3  going to retain a larger percentage of an interest
4  in the -- in the loans, right?  It went from a 1
5  percent share -- a 1 percent ownership stake to a
6  10 percent ownership stake; am I right?
7         MR. SCHEFF:  Object to the form.
8     A.   In reviewing this amendment to the master
9  participation agreement on Section 2.2(a), yes, I
10  believe that based on my recollection and in looking
11  at this document as well, what this Section 2.2(a)
12  of the amendment is doing is increasing the bank
13  retaining 10 percent of the ThinkCash installment
14  loans on its books and selling 90 percent to, I
15  believe, TC Financial, as opposed to the prior
16  original agreement would have been the bank keeping
17  1 percent, retaining 1 percent on their books and
18  selling a 99 percent participation to TC Financial.
19  BY MR. ACKELSBERG:
20     Q.   Now, with regard to the bank's stake, which
21  was originally 1 percent but then a few months later
22  became -- became 10 percent, was the bank using its
23  own capital for that -- for that portion of the --
24  of the stake in the product?
25         MR. SCHEFF:  Object to the form.

1     A.   Capital can be defined many ways, so I'm
2  not -- you know, from my perspective -- let me
3  rephrase your question, but I think I still get the
4  intent of it by answering it this way.  The bank was
5  using their own funds --
6  BY MR. ACKELSBERG:
7     Q.   Yes.
8     A.   -- to originate all of the loan and retain
9  10 percent, whether that came in the form of equity
10  capital or debt or deposits from their bank
11  customers, however, they were using their own
12  liquidity to originate a hundred percent and then
13  also to maintain 10 percent on their books.
14     Q.   Okay. So -- right.  And I appreciate the
15  clarification.  And I'm sure this is going to happen
16  over the course of the day that I'm not -- this
17  isn't my field, and it's -- it's been quite an
18  experience trying to understand all this.
19         But -- so the loan -- on day one the loan
20  is made, and that loan -- and what that means is,
21  money is going to go into a consumer's account,
22  right?  That's -- in a practical sense, that's what
23  funding a loan means, someone's got to come up with
24  the dollars -- the lending -- the lending capital to
25  put into a consumer's bank account.  That's what

1  we're talking about, right?
2         MR. SCHEFF:  Object to the form.
3         You can answer the question if you can.
4     A.   Yeah, let me restate that a little bit,
5  because, again, I get where you're going with the
6  intent.  But the bank would approve a ThinkCash
7  installment loan customer for a loan.  They would
8  fund out of their own bank account -- let's assume
9  it was a $2,000 loan to the customer.  They would
10  fund all $2,000 out of that -- out of their own
11  funds to that customer, typically, via ACH on an
12  overnight basis.  So they would approve a customer
13  on a Monday.  Typically, the customer would receive
14  the funds on a Tuesday via ACH.
15  BY MR. ACKELSBERG:
16     Q.   And then at some point, I don't know
17  whether -- whether it was still on the current
18  business day or -- I know later it became a two-day
19  delay.  But then at some point, the participation
20  transaction occurs, and some of that 2,000 -- in
21  that example, some of that money would then be
22  replaced by the participation entity; am I right?
23         MR. SCHEFF:  Object to the form.
24         You can answer the question if you can.
25     A.   Yeah, my recollection -- recollection and

1  understanding is, is that -- well, first, a lot of
2  this -- you know, in regards to this particular
3  amendment, again, I believe -- I don't have direct
4  knowledge, but I believe that the reason for this
5  change from the bank holding just 1 percent --
6  retaining 1 percent to 10 percent was upon the
7  recommendation of the FDIC or its regulators.
8  Because from my perspective in what I heard, the
9  regulators wanted the bank to have more skin in the
10  game, so to speak, you know, have more of the loan
11  balance on their books on a routine basis.
12         They would then, you know, sell under this
13  agreement the 10 percent or -- pardon me.  They
14  would retain 10 percent and sell 90 percent.  So in
15  my example, if we had a $2,000 loan, if they
16  originated a $2,000 loan, they approve a customer on
17  a Monday, overnight via ACH the $2,000 gets
18  deposited into the customer's account the bank, the
19  bank's account on a Tuesday, on that Tuesday we
20  would also -- we, in terms of helping the bank --
21  "we" being Think Finance helping the bank settle
22  that using our loan platform, remit $1,800 back to
23  the bank.  So that way the bank would end up holding
24  $200 on their balance sheet, and TC Financial would
25  have $1800, or 90 percent participation interest.

UNSEALED

App. 0178

1      Again, it's because, from my perspective,
2  the bank's capital constrained.  I also don't think
3  the bank's regulators wanted them holding a hundred
4  percent of these -- I think the regulators probably
5  view these, rightly or wrongly, more risky than your
6  traditional mortgage or prime credit cards, so they
7  didn't want the bank setting aside a large amount of
8  capital for these types of loans, but they were
9  comfortable with the bank retaining up to 10 percent
10  of the loan balances on their books.
11 BY MR. ACKELSBERG:
12     Q.  Okay.  And the other thing it looks
13  happened in September of 2007, was the introduction
14  of a concept called "revenue share."  Am I right?
15  That's -- that's when the revenue share started?
16     A.  To be honest, from my perspective, I would
17  have assumed it started day one, but I may be wrong
18  on that.  I mean, that -- certainly, Exhibit E, this
19  particular amendment introduces -- or I shouldn't
20  say introduces -- definitely details out the
21  computation of program revenues.
22      So based upon looking at this amendment, I
23  would say that, yes, this would probably be the
24  first time that the concept of a program revenue
25  share between TC Financial and First Bank of

1  Delaware came into play.
2      And it's possible, I guess, in retrospect,
3  looking back, that probably weren't sure, we and the
4  bank, you know, whether the product would take off.
5  And I think at this point in time, as I recall,
6  the -- the bank was pretty successful in originating
7  loans to consumers during that point in time.
8      And so I think at that point, my guess
9  is -- again, I wasn't involved in -- even though I
10  was the CFO, strangely, I wasn't -- I don't recall
11  being involved in the discussions as to what the
12  profit share amount should be, but we probably
13  decided, hey, we've got to figure out a way to, you
14  know -- because most financial banks, when they're
15  selling, are either retaining mortgage servicing
16  rights, to your point, in generating some fee income
17  or selling the participations at a premium or doing
18  something to kind of get compensated for the fact if
19  you're only -- if you're originating a hundred
20  percent of the loan but only keeping 10 percent of
21  the loan on your books, you're certainly giving up
22  some amount of revenue stream by selling the
23  participation off.
24      And a lot of times, at least it's my
25  understanding, that companies will sell those

1  participations at a premium or through other some
2  type of, you know, revenue share, profit share type
3  of arrangement.
4     Q.  And just so that we're clear on what we
5  mean by "revenue share," so we're talking about a
6  percentage based fee on the -- on the 90 percent
7  that the bank is selling off, right?  That's,
8  essentially, what we're talking about, right?
9          MR. SCHEFF:  Object to the form.
10     A.  In looking at Exhibit E of this amendment,
11  you know, it says "Computation of Program Revenues,"
12  and it says, "TC Financial shall pay the lender" --
13  and the lender is First Bank of Delaware -- "a
14  percentage of program revenues as follows."
15      And let me read it for a second.
16      (Reviews document.)
17      To your question, you know, I'm not
18  sure in looking at this.  I probably need a little
19  bit more time.  And if it's important, I can take
20  some more time.
21 BY MR. ACKELSBERG:
22     Q.  We don't need to get -- we really don't
23  need to get into details.
24     A.  Yeah, I'm not quite clear whether the --
25  the program revenue share was on the full 100

1  percent of the loans or just on the 90 percent
2  participation, but. . .
3     Q.  Okay.  But --
4     A.  But at a minimum, it would be at least on
5  a -- on --
6     Q.  On the 90 percent.
7     A.  -- on the 90 percent participation.
8     Q.  Yeah.  Okay.  Now, we're talking about
9  consumer loans with an average APR in excess of 200
10  percent, right?
11          MR. SCHEFF:  Object to the form.
12     A.  Yeah, I actually don't recall what the
13  average APR --
14 BY MR. ACKELSBERG:
15     Q.  They were high, though, right?
16          MR. SCHEFF:  Object to the form.
17     A.  I would say based on my understanding,
18  the -- the APR of the loans -- of the ThinkCash
19  loans originated by First Bank of Delaware were
20  north of a 36 percent APR.
21 BY MR. ACKELSBERG:
22     Q.  Well, how far north?
23          MR. SCHEFF:  Object to the form.
24      If you want a document to show him, then
25  please show him.  Don't make him guess out of thin

1 air. He's testified that he doesn't recall.
2    A. I actually don't recall.
3 BY MR. ACKELSBERG:
4    Q. Okay.
5    A. I mean, because we had other products,
6 we've had other things over time. I do know that
7 they would be north of 36 percent.
8    Q. Okay. Now, at the time that -- this is in
9 the 2007 time period. Am I right that First Bank of
10 Delaware had products that it was marketing through
11 other entities besides Think Finance, other
12 so-called service providers?
13       MR. SCHEFF: Object to the form.
14    A. Based on my recollection -- again, I did
15 not have a lot of direct interaction with -- with
16 the bank at all during that time span -- I would
17 assume that since they're a bank, they offer lots of
18 products and services. They take deposits. They
19 make loans. But I'm not aware of, you know, who
20 they partnered with if they had other types of
21 partners similar to our type of arrangement.
22 BY MR. ACKELSBERG:
23    Q. I mean, specifically, online lenders.
24    A. I do not have any recollection.
25    Q. Okay. Now --

1    A. I'll qualify that in one sense. And I
2 apologize. I would have assumed later that when we
3 get to the point of Universal Fund II, the reason
4 why there's a Universal Fund II is because there was
5 a Universal Fund I with some other program. I do
6 not know what that program related to, whether that
7 was north of 36 percent APR loans, whether it was
8 online or partnering with a brick-and-mortar
9 program, but I do know when we get to discussing --
10 and I assume at some point we will discuss Universal
11 Fund II -- the reason why it was called, and that
12 was a name that the bank, Alonzo Primus, suggested
13 because there was already a Universal Fund I that we
14 had nothing to do with.
15    Q. So let's go -- let's go to the Universal
16 Fund period and -- but just -- and we can look at
17 the deal documents if we need to, but just to try to
18 cut through it, in roughly October 2008, there were
19 new -- new deal documents between Think and First
20 Bank of Delaware where the marketing was going to be
21 charged by TailWind and the technology services by
22 TC Decision Sciences. Do you remember that --
23       MR. SCHEFF: Object to --
24 BY MR. ACKELSBERG:
25    Q. -- in October 2008?

1       MR. SCHEFF: Object to the form.
2    You can answer.
3    A. Again, my recollection based on that point
4 in time -- and, again, I think a lot of the
5 suggestions for these amendments or evolution of the
6 program came directly from the bank. They weren't,
7 based on my understanding, you know, suggestions
8 from us. It was suggested by Alonzo Primus, the CEO
9 and president of First Bank of Delaware. And,
10 again, I will assume that a lot of those
11 recommendations that he requested related to the
12 program came from his discussions with the
13 regulators through the second -- or first or second
14 exam related to them overseeing the product.
15 BY MR. ACKELSBERG:
16    Q. I mean, I don't --
17    A. But, yet, to answer the question more
18 directly, yes, based on my recollection, sometime in
19 late 2008, based upon the bank's recommendations, we
20 further amended or at least changed the name of the
21 marketing entity to TailWind Marketing. Yes,
22 there -- at that time, I think, there was the first
23 agreement from a Decision -- TC Decision Sciences'
24 standpoint licensing the technology and platform and
25 underwriting scores to the bank to help them

1 originate their loans. Yes.
2    Q. Okay. So we don't need to -- we don't need
3 to go over the agreements. Just on that point that
4 you -- that you just -- you just mentioned, that you
5 do remember that in October 2008, the services being
6 provided by -- previously by TC Loan Services were
7 split into two different agreements, one with the
8 Think entity called TailWind and the other with the
9 Think entity called TC Decision Sciences, you
10 remember that, and you remember it being at the
11 instigation of First Bank of Delaware?
12       MR. SCHEFF: Object to the form.
13    You can answer if you can.
14    A. In -- in 2008, fall of 2008, my
15 understanding, is that, yes, we did amend the
16 structure of the program, again, at the request of
17 First Bank of Delaware, to amend the marketing
18 agreement, and, in particular, change the name of
19 the marketing entity from -- I think it was TC Loan
20 Service, LLC, in this first agreement dated
21 January 23, 2007, to TailWind Marketing, LLC, I
22 believe.
23    And at the bank's request, we also entered
24 into a new agreement with them, between TC Decision
25 Sciences, LLC, and First Bank of Delaware, to

UNSEALED

App. 0180

1  formally officially license the technology platform,
2  provide underwriting scores, other types of IT
3  services related to their ThinkCash installment loan
4  product.
5  BY MR. ACKELSBERG:
6      Q.  Okay.  And then we get to the Universal
7  Fund, which, as I understand, it was formed in 2008
8  but didn't actually start functioning until -- until
9  sometime in early 2009.  Does that sound right?
10         MR. SCHEFF:  Object to the form.
11         You can answer.
12      A.  I'm not -- I don't quite recollect when the
13  Universal Fund II was actually established.  We
14  didn't own that legal entity, "we" being ThinkCash,
15  Think Finance at the time, whatever our corporate --
16  legal corporate entity name was.  Universal Fund II
17  was -- was never owned by us, so I'm not quite sure
18  when it was established and who established it.  And
19  I actually don't even recall at that time -- because
20  this is also, appreciate, kind of at the height of
21  the financial crisis.
22         I mean, Think Finance -- or ThinkCash, the
23  way prior to -- for -- the way TC Financial, LLC,
24  came up with the cash to purchase the 90 percent
25  participations was with a lending relationship with

1  a hedge fund called Silver Point Capital.  I believe
2  they were technically out of the Chicago; although,
3  the hedge fund, I think, is in Connecticut, like
4  most hedge funds.
5         And so through 2007 and 2008, Silver Point
6  was providing the funding for TC Financial to
7  purchase the participations, whether it was
8  90 percent or 99 percent originally, from First Bank
9  of Delaware.  Silver Point Capital was also
10  providing financing to PayDay One, ThinkCash at the
11  time, for the direct payday -- direct lending payday
12  product --
13  BY MR. ACKELSBERG:
14      Q.  Do you remember --
15      A.  -- as well.
16      Q.  Do you remember how much you had to pay for
17  that -- for their money back then?
18         MR. SCHEFF:  Object to the form.
19      A.  I -- I'm going to guess, the range would
20  have been, roughly, 9 to 12 percent, but the
21  agreement -- and that agreement, again, the reason I
22  don't know -- I can't remember, it was floating
23  rates, so it was -- and it was a revolver in nature,
24  so I'm sure the rates were changing a little bit.
25         The agreement was at -- both -- both

1  facilities with Silver Point Capital -- and I can't
2  remember if it was a combined facility for both
3  products or two separate facilities for each
4  product, that was negotiated prior to me stepping on
5  as CFO in January 2007.  Ken Rees and Jason Harvison
6  had kind of closed that financing transaction with
7  Silver Point just prior to me arriving.
8         So the -- it would have been done
9  prefinancial crisis in the 2006 time span.  And I
10  think the rates seemed very reasonable and
11  attractive, certainly compared to, you know,
12  post-financial crisis or during the financial
13  crisis.  Ultimately, what the cost of funds related
14  to, you know, any of -- any of the loans, whether
15  it's our direct lending or whether, you know, for
16  the -- the people originating and what the lenders
17  lend to the SPV end up getting, or even today from
18  an Elevate perspective, you know, the cost of funds
19  is most -- much higher --
20  BY MR. ACKELSBERG:
21      Q.  Right.
22      A.  -- post-financial crisis.  But I'm just --
23  I'm sorry, I was suggesting that there was a
24  financing arrangement in advance of Universal Fund
25  II.  But then let me finish my thought here, and

1  bear with me for a second.
2         What ended up happening during the
3  financial crisis, and I specifically remember this
4  in 2008, because that's when, you know, a lot of
5  hedge funds, investments banks were really starting
6  to struggle, primarily related to mortgage loans,
7  credit cards, really not, from my perspective,
8  anything related to do with nonprime installment
9  loans with APRs greater than 36 percent.  What
10  really caused the financial crisis was, you know,
11  just traditional mortgages at -- at higher rates but
12  definitely well below 36 percent-type APR products.
13  And certainly credit cards also struggled at that
14  point in time.
15         But Silver Point had a lot of exposure and
16  was highly leveraged.  They came to us in 2008 and
17  said:  Hey, you know, we really need to skinny down
18  or be repaid on our facility.  And they had the
19  right, per the -- the debt agreement, as I recall at
20  that point in time, to request us to repay them.
21         And so that is when I remember myself and
22  Ken Rees -- and Ken going to the bank and saying:
23  Hey, you know, under the existing relationship with
24  TC Financial, LLC, we're not going to be able to
25  borrow as much, to continue to purchase

UNSEALED

1  participations from First Bank of Delaware. We're
2  going to try and find another source. Silver
3  Point's requested that we pay down or completely pay
4  off their facility. So you, as the originator,
5  we're letting you know that if you're selling the
6  90 percent participation to us, we're not going to
7  probably be able to grow the portfolio much. If you
8  can go out and find some other third party to
9  purchase the participations, that's great. We'll
10  continue to market, help you market that product.
11  We'll continue to, you know, license our technology,
12  and you pay us under the marketing agreement and the
13  licensing and technology agreement. But when you
14  originate, if you're still going to intend to sell
15  90 percent, you're going to have to find third-party
16  investors or some -- or keep it on your books, or
17  whatnot, but we're not going to be able to buy as
18  much of the loan originations on a go-forward basis
19  because, in essence, we've lost our funding source,
20  Silver Point Capital.
21      Q.  All right. And so --
22      A.  And this was all happening during 2008.
23      Q.  Right. Right. And so let's just talk
24  about the formation of the Universal Fund. And I --
25  and I understand that this was largely coming from

1  First Bank of Delaware, as -- I understand it.
2  But how did it come to be? Who was doing what? How
3  did -- how did this all get put together?
4          MR. SCHEFF: Object to the form.
5      You can answer.
6      A.  You've got a lot of questions there. I'll
7  try -- I think your first question was, you know,
8  who established Universal Fund II. As I said,
9  Universal Fund II was not our entity.
10  BY MR. ACKELSBERG:
11      Q.  I understand.
12      A.  I believe it was a gentleman named Mark
13  Wildstein who, you know, ended up being the manager,
14  managing member. I believe he technically
15  established Universal Fund II. Whether he did that
16  on his own or whether he did that with the help of
17  the bank -- the bank being First Bank of Delaware --
18  or some other third parties --
19      Q.  We've already deposed Mr. Wildstein.
20      A.  Okay.
21          MR. SCHEFF: Let him finish his
22  answer. Okay? You asked him a question. Let him
23  finish his answer.
24  BY MR. ACKELSBERG:
25      Q.  We've already deposed Mr. Wildstein, and

1  I'll represent to you that he didn't do -- he didn't
2  appear to have done a lot in terms of actually
3  putting this thing together. Right? You remember
4  that he was -- he was a brother of one of the First
5  Bank of Delaware directors? You remember that,
6  right?
7          MR. SCHEFF: Object to the form;
8  misstates the testimony of the other witness.
9      A.  Yeah, that -- that --
10          MR. SCHEFF: You can answer the
11  question.
12      A.  Yeah, you asked a couple of questions, or
13  comments in there. From my perspective, as I said,
14  ThinkCash, at the time, did not establish the
15  Universal Fund II.
16  BY MR. ACKELSBERG:
17      Q.  I understand that.
18      A.  I know for a fact that Mark Wildstein was
19  the managing member, for lack of a better term, of
20  Universal Fund II. So I would assume that he would
21  have had to have been the person that signed the
22  legal documents establishing Universal Fund II.
23          As I said when I answered the last
24  question, whether he did that himself or whether he
25  got help from First Bank of Delaware or some other

1  sets of lawyers or other third-party consultants,
2  whatnot, I don't recall us being actively involved
3  at all in helping him set that up, and we definitely
4  did not legally own that.
5          Again, this concept came -- was presented
6  to us by Alonzo Primus at First Bank of Delaware
7  because they had already established a similar type
8  of structure once before, hence, the reason why this
9  was Universal Fund II.
10      Q.  Now, once the Universal Fund II was
11  created, there -- as I understand it, a new -- a new
12  contractual -- a new form of contract entered --
13  entered the structure called an "administrative
14  agency agreement." Do you remember that?
15      A.  I do remember us entering in as part of the
16  proposed structure with First Bank of Delaware and
17  Universal Fund II the administrative agency
18  agreement.
19      Q.  And so before Universal -- before Universal
20  entered the scene, we had a Think -- a Think entity
21  called TailWind doing the marketing, right?
22      A.  That is correct.
23      Q.  And paid a per-loan fee for that service?
24      A.  That is correct.
25      Q.  We had a TC Decision Sciences entity doing

UNSEALED

App. 0182

1  the technology side of the service and getting a
2  per-loan fee for that, right?
3      A.  That is correct.
4      Q.  Okay.  And now, with the entrance of the
5  administrative agency agreement, we -- we have a new
6  Think entity called TC Administrative Services, or
7  TCAS, that was performing a function -- a new
8  function called the administrative function under
9  the administrative agency agreement, the
10 administrative agent function?
11     A.  As I --
12         MR. SCHEFF:  Object to the form.
13     Go ahead.
14     A.  As I recall, the administrative agency
15 agreement was a broader type of agreement.  It was
16 proposed by Alonzo, because what he had proposed
17 with Universal Fund II, similar to Universal Fund
18 I -- and I imagine they had a similar type of
19 administrative agency agreement with Universal Fund
20 I -- was -- what he proposed was, Universal Fund II
21 is, in essence, an SPV, and he was going to go out
22 with Mark Wildstein and find lenders, investors.  I
23 use that term interchangeably, and so pardon that.
24 I know there might be a technical difference.
25         But, generally speaking, people that would

1  put money into what I would -- quote, invest money
2  into Universal Fund II.  I don't believe they got an
3  actual equity ownership but they're probably
4  lending.  That they would put money into this SPV to
5  buy participations from the banks so that the bank
6  can continue to originate loans, retain 10 percent
7  on their books and sell 90 percent to this Universal
8  Fund II SPV.
9          When he approached us about that concept,
10 he said the difficulty that he -- that they would
11 have in raising money in that SPV 2 was getting
12 investors, lenders in -- in Universal Fund II to get
13 comfortable with the credit risk of these north of
14 36 percent APR loans.  A lot of these investors that
15 he believed he could get money to lend into would be
16 friends and family of First Bank of Delaware.
17         And so they're, I would assume, accredited
18 investors but by no means are they a Silver Point
19 Capital, hedge fund type of entity lending in, or a
20 Victory Park Capital entity lending in.  I mean,
21 these are people investing 100,000, 250,000,
22 whatnot.
23         So he believed that an important way for
24 them -- "them" being the bank -- to get investors
25 to -- to invest or lend to Universal Fund II, he

1  approached us about creating an admin agency
2  agreement that would really serve two purposes.  One
3  would just be to handle the basic accounting
4  treasury administration of this SPV, which I guess
5  happens in probably most SPV type of structure
6  environments.
7          But, secondarily, and more importantly --
8  and I think in the back of his mind he knew that we
9  were losing some of the profitability from TC
10 Financial purchasing participations directly from
11 them, and we had lost our source of capital.  His
12 point to us was, would you be interested in
13 providing the equivalent of a credit default swap to
14 Universal Fund II so that the investors in Universal
15 Fund II -- because if you think about it, Universal
16 Fund II, if you look at just the basic P&L structure
17 and balance sheet, it's getting 90 percent of the
18 loan participations on its books.  So it's going to
19 get 90 percent of the revenue and incur 90 percent
20 of the losses.
21         Well, the investors lending to this,
22 again, accredited but not overly sophisticated, you
23 know, probably were worried about the risk of loss:
24 What if I put my $100,000 in and then all of those
25 loans go bad, I lose my $100,000?  What they were

1  interested in was a fixed return.
2          What Alonzo kind of proposed to us, and
3  what we looked at and did the math on and it made
4  sense from our perspective was enter -- as part of
5  this admin agency agreement, let's enter into -- in
6  essence, it becomes a credit default swap as well,
7  whereby, if you took the revenue on the 90 percent
8  of the loans, less the losses on the 90 percent of
9  the loans, less some of the out-of-pocket expenses
10 related to reimbursing the Universal Fund II,
11 reimbursing the bank for the servicing, customer
12 support, collections, data costs, anything related
13 to specifically helping originate those loans, and
14 then paying the bank their, for lack of a better
15 term, profit share, premium, whatever we want to
16 call it, how the bank was earning some additional
17 revenue off the 90 percent that it had sold to
18 Universal Fund II, it would then also, Universal
19 Fund II, promise to pay these third-party investors,
20 lenders to the Universal Fund II a fixed return.
21 And I can't remember what it was.  I know it was a
22 very high teens, if not 20 percent return.
23 BY MR. ACKELSBERG:
24     Q.  Would 18 percent sound about right?
25     A.  18 percent probably sounds about right.

16  (Pages 61 to 64)

UNSEALED

1  And I believe Mr. Wildstein, as the manager/owner,
2  would get a 1 percent management fee.
3      Q.  Out of that 18 percent, right?
4      A.  I don't recall.  I mean, whether it was on
5  top of or out of, I do know that he got compensated
6  for kind of acting as the administrator and really
7  helping kind of introduce more friends and family
8  in.
9          Let me finish my thought.  The net
10  remaining P&L, if it was positive, by us -- what we
11  agreed to do was buy the losses at 60 days past due.
12  We define -- under the bank's charge-off policy,
13  when a customer's loan went 60 days past due, it was
14  deemed to be a charge-off, or a loss.  And so what
15  Alonzo requested that we work into this admin agency
16  agreement as kind of the credit default swap is, is
17  that when a loan -- any loan that went 60 days past
18  due -- and the bank would, I assume, take a loss on
19  their 10 percent, but the 90 percent held by the
20  Universal Fund II, we would then buy that -- that
21  loan, that 60-day past due loss loan off the books
22  at par value and bring it off of Universal Fund.
23          So if it was a $2,000 loan that went
24  60 days past due, at the end of the month, we would
25  be responsible -- "we," the admin agency, I think it

1  was TCAS -- would have to pay Universal Fund $2,000
2  and move that loan onto our books.
3          But at the end of all that P&L, if the --
4  if it was in a negative situation, TCAS, under a
5  normal type of credit default situation, would be
6  responsible for kind of -- if it was a negative
7  $10,000 at the end of the month, TCAS would be
8  responsible for putting $10,000 into Universal Fund
9  II.  So that way these investors knew that their
10  principal at the end of every month -- Alonzo, I
11  remember him stressing, this is really critical.
12  Again, you know, these are friends and family of the
13  bank.  They want to be assured that their
14  principal -- you know, they're not interested in all
15  of the upside on these loans, and they don't want to
16  take any downside.  They just want a fixed return,
17  but they're willing to invest, but you've got to buy
18  it off.
19          But, you know, we would -- you know, if it
20  was negative, we would put money in.  If it was a
21  surplus, like we certainly felt it would be,
22  these -- we felt if the bank is using our technology
23  and using our underwriting scores and, you know, us
24  helping market -- boy, it's really ugly out
25  there.  Apologies.  It's a big lightning strike --

1  the marketing, we felt comfortable that we could
2  enter into a credit default swap with Universal Fund
3  II.  And it was a way for us to kind of enhance the
4  return that we were getting in addition to the
5  marketing fees and the technology fees, that we
6  could also get, you know, off this credit -- I call
7  it a credit default swap, you know, additional fee
8  income.
9      Q.  All right.
10      A.  And more importantly, for the bank, it was
11  a way for them to really attract more third-party
12  capital in so that they could continue to originate
13  loans.
14      Q.  Okay.
15          MR. SCHEFF:  Can we -- I need a bio
16  break, so can we take a short break?
17          MR. ACKELSBERG:  Yes.
18          THE VIDEOGRAPHER:  We are off the
19  record at 10:15 a.m.
20          (Break taken, 10:15 a.m. to 10:35 a.m.)
21          THE VIDEOGRAPHER:  We are back on the
22  record at 10:35 a.m.
23  BY MR. ACKELSBERG:
24      Q.  Mr. Lutes, I want to thank you for that
25  extensive explanation for how the administrative

1  agency functioned -- the administrative agency
2  agreement functioned.
3          There is one other element in the
4  relationship that I wanted -- that you didn't
5  mention that I wanted to ask about.  My
6  understanding is that besides providing the
7  services -- upfront services via TailWind and TCDS
8  and the administrative services via TCAS, Think was
9  also an investor in Universal Fund.  Am I right?
10          MR. SCHEFF:  Object to the form.
11      A.  Yes, we did invest some of our, what I
12  would say, corporate available cash into the
13  Universal Fund II.
14  BY MR. ACKELSBERG:
15      Q.  And just looking at the -- there was --
16  during Mr. Wildstein's deposition we looked actually
17  at a -- at a list of early -- the investors back in
18  '09.  There was also an investment from something
19  called Heartland Exploration.  That's a Ken Rees
20  entity.
21          MR. SCHEFF:  Object to the form.
22  BY MR. ACKELSBERG:
23      Q.  Or Ken Rees, Sr., entity I think.  Do you
24  remember that?
25          MR. SCHEFF:  Object to the form;

UNSEALED

1   misstates the testimony and the document.
2       You can answer the question.
3       A.  Yes, there was an investor in Universal
4   Fund II named Heartland Exploration that, I believe,
5   was Ken Rees, Sr., the -- the father of Ken Rees,
6   our CEO of ThinkCash, was involved in that.
7   BY MR. ACKELSBERG:
8       Q.  And also someone named John Claster.  It
9   says Rosenberg's uncle.  Who's Rosenberg?
10      A.  John Rosenberg, in reference to that
11  particular spreadsheet -- and I don't know if I
12  prepared that spreadsheet or if Mark prepared --
13      Q.  We can put it up on the screen.
14      A.  No, no.  Based off the name, when you said
15  Rosenberg, the Rosenberg would reference John
16  Rosenberg who was on our board of directors and who
17  was a member of Technology Crossover Ventures.
18      Q.  Okay.  So let me -- let me just get it
19  straight.  So we're in the Universal period.  The
20  revenue coming to Think Finance, which I don't know
21  if it was called PayDay One at that time, or
22  whatever it was called back in, let's say, '09,
23  there would be the -- the fee revenue from the
24  TailWind and TCDS charges, right?
25      MR. SCHEFF:  Object to the form.

1   BY MR. ACKELSBERG:
2       Q.  That would be one source of revenue to the
3   company?  With -- with regard to the ThinkCash
4   product I'm talking about.
5       MR. SCHEFF:  Object to the form.
6       You can answer the question.
7       A.  I'm sorry.
8   BY MR. ACKELSBERG:
9       Q.  I'm just trying to -- I'm just trying to
10  list the sources of revenue for your company during
11  the Universal Fund period, and I -- and I think
12  there's three separate sources of income, and I just
13  want confirmation of that.  Or if I have it wrong,
14  you explain it to me.  Number 1 is fee revenue from
15  the TailWind or TCDS contracts.  That's one of
16  source of revenue, right?
17      A.  Yes.  From my perspective, yes, the -- one
18  of the -- one of the sources of revenue for us
19  related to the ThinkCash installment loan, First
20  Bank of Delaware program, would have been the
21  marketing fees paid by First Bank of Delaware to us
22  for marketing the ThinkCash installment loan.
23      Q.  And, similarly, the fees paid to TCDS?
24      A.  Yes, there would have also been fee income
25  that we realized from First Bank of Delaware related

1   to the licensing of the technology.
2       Q.  Okay.  And then in the role of
3   administrative agent for the Universal Fund, to the
4   extent there would be any money left over after
5   paying all the other program costs, that -- that
6   residual would be the administrative fee, right?
7       MR. SCHEFF:  Object to the form.
8   BY MR. ACKELSBERG:
9       Q.  If it was positive, that would be realized
10  revenue for the company?
11      MR. SCHEFF:  Object to the form.
12      You can answer the question.
13      A.  As I recall, and as I explained in my
14  somewhat long-winded testimony earlier, the net P&L
15  at the end of every month, if it was positive, that
16  positive amount of net income in Universal Fund II,
17  if it was $5,000, would be -- come over to TCAS as a
18  payment for the credit default swap administrative
19  agency agreement.
20      If it was negative -- so that's why I
21  would say it's not always revenue.  And there were
22  probably months -- I don't recall, but there were
23  probably some months where maybe the -- the expenses
24  for Universal Fund II exceeded the amount of revenue
25  that the 90 percent participation loans generated,

1   but there probably were some months where it was
2   negative, in which case TCAS would have been
3   responsible for paying money too.
4   BY MR. ACKELSBERG:
5       Q.  I understand.
6       A.  Okay.
7       Q.  All right.  So -- but to the extent it was
8   positive, that would be another source of revenue,
9   the admin fee, correct?
10      A.  Yes, that, I would agree with.
11      Q.  Okay.  And then the third source of revenue
12  would be interest on the --
13      A.  Fourth.  Fourth.  I'm sorry to interrupt.
14  Fourth.  You said third.
15      Q.  The first would be TailWind and TCDS fees,
16  the second would be any upside in the program
17  producing an admin fee.
18      A.  No, I thought the second was the TC
19  Decision Sciences fee.
20      Q.  Fine, we can do it that way.
21      A.  Okay.
22      Q.  It's absolutely fine.
23      And then using your numbers, then the
24  fourth would be any income -- any interest income
25  resulting from participation as an investor in

UNSEALED

1  the -- in the Universal Fund?
2      A.  Yes, to the extent that we invested some of
3  our corporate available cash into the Universal
4  Fund, like some of the other third-party investors,
5  we would have returned, then, 18 or 17 percent,
6  whatever the applicable interest would have been.
7      Q.  Okay.  Thanks.
8          And the deal documents laying out all of
9  these -- this structure -- and just to sort of --
10 and this is really just meant to summarize.  There
11 would be services agreements between First Bank of
12 Delaware and TailWind and TCDS, servicing or
13 licensing the -- the agreements, providing for the
14 fees that -- the number 1 and 2 we just talked
15 about.  Right?
16         MR. SCHEFF:  Object to the form.
17     You can answer if you can.
18     A.  Yes, there were -- there was a -- a
19 marketing agreement between a Think Finance entity,
20 TailWind Marketing and First Bank of Delaware.
21 There was also a licensing and technology agreement
22 between TC Decision Sciences and First Bank of
23 Delaware.
24 BY MR. ACKELSBERG:
25     Q.  And then there would be a participation

1  agreement between First Bank of Delaware and the
2  Universal Fund, correct?
3      A.  Yes.  Universal Fund II, there was a
4  participation agreement.
5      Q.  Yes.  And then there would be an
6  administrative agency agreement and a guarantee
7  agreement between Think and the Universal Fund
8  entity?
9          MR. SCHEFF:  Object to the form.
10     A.  By "Think," I would refer specifically
11 there was an administrative agency agreement between
12 TCAS, which is a subsidiary of Think, and the
13 Universal Fund II, and then a corporate guarantee --
14 I don't recall, I'm assuming that the corporate
15 guarantee would have been at the parent level or at
16 the TC Loan Services level to Universal Fund II,
17 yes.
18 BY MR. ACKELSBERG:
19     Q.  Okay.  All right.  And you remember being
20 involved a little bit in the -- in the marketing of
21 the product to the -- to the investors, or at least
22 providing a little bit of help to Mr. Wildstein?
23         MR. SCHEFF:  Object to the form.
24     You can answer the question.
25     A.  I don't specifically recall any specific

1  meetings or presentations.  As you can appreciate as
2  a CFO, I've made numerous, for lack of a better
3  term, investment presentations or debt pitches over
4  my 12 years as CFO at Elevate and at Think Finance.
5  But I would assume that I would be somehow involved
6  in helping Mark describe the program.
7  BY MR. ACKELSBERG:
8      Q.  And I'm showing you a document --
9      A.  And by Mark, I meant Mark Wildstein.
10     Q.  Yes, I understand.
11         And I'm showing you a document that was
12 identified at the Wildstein deposition as P-3.  Oh,
13 and by the way, the -- just so you know, the -- how
14 these numbers work, we -- there's something called
15 "Bates numbers."  You're familiar with that term?
16     A.  I'm not familiar.  I heard it for the first
17 time yesterday.
18     Q.  Okay.  All right.  So what you're going to
19 see over the course of the day are some documents
20 that we, the plaintiff, got from Mr. Wildstein, some
21 documents that we got from Think Finance, some
22 documents that we got from Victory Park, and they're
23 going to have -- and then they're numbered in order.
24         So what you're looking at is a document
25 that was used in the Wildstein deposition and was

1  identified as P-3.  And you can see from the -- the
2  numbering below that, the Bates numbering, that it's
3  actually the -- it starts at page 504 of the
4  documents we got from Mr. Wildstein, just so you
5  understand the convention of how this works, the
6  numbering of the documents.  Okay?
7      A.  Okay.
8      Q.  All right.  And so -- and so my question --
9  my first question to you regarding this document is,
10 do you recall participating in the creation of this
11 document or documents like this?
12     A.  Can you give me one second to look at this
13 document?
14     Q.  Sure.
15     A.  Thank you.
16     (Reviews document.)
17         MR. ACKELSBERG:  And, also, if it --
18 this is actually a document that we have from a
19 variety of sources.  We have a variety of copies,
20 and if you want, I'll put up on the -- I'm going to
21 put up on the screen TF-PA 504636.
22         MR. SCHEFF:  Are you sure it's
23 identical?  Just -- I just --
24         MR. ACKELSBERG:  I have no idea.  I
25 mean, you --

UNSEALED

1          MR. SCHEFF:  Well, let's not -- let's
2  not --
3          MR. ACKELSBERG:  I think it's
4  identical, but, I mean, we can --
5      A.  You don't need to put it up on the screen
6  if I have a hard copy of this other document.
7  BY MR. ACKELSBERG:
8      Q.  Yeah, I mean, we've also got one of these
9  from Think Finance is what -- or it looks like it.
10      A.  Okay.  Can you repeat your question now
11  that I've had a chance to look at this?
12      Q.  Sure.  Did you -- did you help prepare
13  this -- this investor overview or, if not this one,
14  similar ones for the marketing of the Universal
15  Fund?
16          MR. SCHEFF:  Object to the form.
17      A.  I don't recall specifically preparing this
18  or any.  I think it's reasonable to assume as the
19  CFO at ThinkCash at that time as part of this
20  program, that I would have either been involved in
21  helping prepare or at least explaining and involved
22  maybe in the preparation, but I don't recall
23  specifically.
24  BY MR. ACKELSBERG:
25      Q.  And reviewing it to make sure it's properly

1  describing the program for investors, that --
2      A.  I would say from my perspective, any
3  presentation that I was asked to help with or make,
4  I would be primarily focused on just looking at the
5  slides related specifically to the finance aspect or
6  the accounting aspect.
7      Q.  Okay.  Fine.
8      A.  There may be other things related to the
9  structure of the product that I'm not familiar with
10  or other things, as you can appreciate.
11      Q.  Well, on the exhibit that you have before
12  you, Exhibit 3, turn to slide No. 5.  I would just
13  ask if this is a slide where the information is --
14  that's communicated on this slide is information
15  that's familiar to you?
16      A.  Give me one quick minute to look at it
17  again.
18          (Reviews document.)
19          After looking at this, yes, I think that
20  this page kind of describes what I explained earlier
21  in regards to how we would calculate the -- the
22  amount of, for lack of a better term, credit default
23  swap income at the end of every month related to
24  Universal Fund II.
25      Q.  Okay.  And the use of the term "waterfall,"

1  that's a -- in the financial area, that's a --
2  that's a term you've heard of, right?  It's a term
3  you're familiar with?
4          MR. SCHEFF:  Object to the form.
5      A.  The term "waterfall," payment waterfall is
6  a term that I'm familiar with.  I, strangely, as a
7  CFO rarely use it.  So I would probably not have
8  prepared this slide because I would -- as I recall,
9  I don't think I've ever used the term "waterfall."
10  But, yes, I am familiar with what the concept of
11  what a waterfall refers.
12  BY MR. ACKELSBERG:
13      Q.  And, basically, if this -- if the purpose
14  of this slide is to help investors understand how
15  the program functions, it -- it looks like this
16  is -- this is, in part, to communicate how the --
17  what you called the credit default swap function so
18  as to alleviate concerns that investors might have
19  about -- about the -- you know, the riskiness of
20  this investment.  That's kind of what this is
21  directed towards, right?
22          MR. SCHEFF:  Object to the form.
23      A.  What this slide, from my -- from my
24  perspective, is meant to depict is kind of the --
25  the excess cash, the -- the amount of, you know,

1  credit default swap income, excess cash flow,
2  however you want to characterize it, you know, that
3  in a normal environment, you know, on a regularly
4  monthly basis potentially could, you know -- it's
5  getting, you know, the -- the coverage that
6  investors in looking at this could probably feel
7  comfortable that there's an adequate amount of cash
8  flow coming from the underlying loans, the
9  90 percent participations in Universal Fund II to
10  cover the loan losses, to, you know, pay the bank
11  their, you know, revenue share, to pay the
12  investors, which probably as a third-party investor
13  would be most important, the 17 percent.  The
14  management fee and the -- the investment interest
15  reserve.
16          I think it's also, as this says, in
17  parentheses, "In order of priority."  Meaning that
18  first and foremost, you know, losses are
19  typically -- ever since I have been involved in
20  Think Finance as the CFO, or even Elevate, or just
21  other competitors, typically, losses are roughly
22  about half of the APR or half the revenue.
23          And so, you know, losses, first and
24  foremost, come out of the cash flow.  Then there's
25  the bank.  The bank wanted to make sure that they

UNSEALED

were kind of after losses at the top of the
waterfall to be paid.  Again, probably from a
regulatory perspective.
        And then third on that list would be the
investors which get their 17 percent return, and
then Mark Wildstein as the manager of the Universal
Fund II would be entitled to his 1 percent to the
extent that there was still cash flow available.
        And then fifth would be the investor
interest reserve, which I vaguely remember that
concept.  I'm assuming that it was kind of like,
just a cash collateral, you know, that investors
would always want to have set aside within that
special purpose vehicle kind of some buffer cash or
capital in case losses spike.
        And then the remaining amount of -- on a
particular month, if there was a remaining amount of
cash flow from a P&L perspective, that TCAS would be
able to take that as its credit default swap or --
or admin agency income.  If it was negative, then
TCAS would have to put in the same amount.
BY MR. ACKELSBERG:
    Q.  Now, before you mentioned interest rates
north of 36.  I mean, we're -- obviously, here, at
least on this display, it appears to be describing

an average APR of 220 percent.  Am I right?
        MR. SCHEFF:  Object to the form;
misstates the document.
BY MR. ACKELSBERG:
    Q.  That's what -- that's what this is
basically saying, right?
        MR. SCHEFF:  Object to the form;
misstates the document.
        You can answer.
    A.  Yeah, as I recall, when -- when you asked
me the earlier question, what I wasn't familiar with
was whether we had -- whether the bank offered the
installment loans at varying interest rates.  I
would say looking at this, on average, a 220 percent
APR for the average ThinkCash installment loan
portfolio on a gross basis seems reasonable.
BY MR. ACKELSBERG:
    Q.  Okay.  And, actually, if you'll turn to
slide 11, there's more APR information to refresh
your recollection.  Slide 11.
    A.  Sorry, I was looking at the 511 instead of
the slide 11.
    Q.  And so looking at slide 11, you'll see that
in the same presentation, the APR, as you described,
was variable with a high of 334 percent, a low of

87 percent, depending on the maximum loan amount and
the term of the -- and the term of the loan.  Do you
see that?
        MR. SCHEFF:  Object to the form.
    A.  You know, I -- like I said, I didn't
prepare this particular side, so I really couldn't
ascertain. . .
BY MR. ACKELSBERG:
    Q.  Well, let's just take --
        MR. SCHEFF:  Were you done with your
answer or --
        THE WITNESS:  Yeah, I'm done with my
answer there.
    A.  I don't -- you know, I can't -- I don't
know if this was the actual, you know, APRs, you
know, that the bank was offering under the ThinkCash
installment product.  I know it's part of this
presentation, but I --
BY MR. ACKELSBERG:
    Q.  Am I correct that during the entire --
        MR. SCHEFF:  Let him finish his
answer, Irv.
BY MR. ACKELSBERG:
    Q.  From the time that the --
        MR. SCHEFF:  Irv, we've got a new

agreement here.  When he's talking, don't ask your
question.  Let him finish.  He'll do the same with
you.  Okay?
BY MR. ACKELSBERG:
    Q.  When -- from the time of -- that the
ThinkCash product began, soon after you arrived,
until the time you left the company in 2014, am I
right that there always was an installment loan
product?
        MR. SCHEFF:  Object to the form.
    A.  As a third party -- actually, I would
disagree with that statement because there were
probably periods of time where we might not have
been providing our services, being a service
provider to either a third-party bank or a
third-party tribe or some other third-party lender
that would have offered an installment loan.
Generally, over that period of time, I would agree,
but there might have been a month or two.  There
were transitions in between products and in between
programs.
BY MR. ACKELSBERG:
    Q.  You're talking about the period in 2010
when the bank shut down originations?  Is that what
you're referring to?

UNSEALED

1  A.  No, that I'm referring to -- that's a broad
2  period of time, and I can't recall.  But
3  generally -- I guess I'm generally agreeing with the
4  statement that, from my perspective, there was
5  probably from two-thousand- -- February of 2007
6  through when I left Think Finance as CFO at the end
7  of 2014, that there was probably always generally an
8  installment program that Think Finance was involved
9  with either as a direct lender or as a service
10 provider to some other --
11     Q.  And am I right --
12     A.  -- third-party originator.
13     Q.  -- that all during that period, the average
14 APR on the installment loan product was north of
15 220 percent?
16     A.  No, I would not agree with that statement.
17 The only thing that I can recall specifically is I
18 know for a -- from my perspective, we never had an
19 APR below 36 percent.  As you can see even on this
20 particular schedule, which, again --
21     Q.  I'm just --
22     A.  -- I didn't prepare it, I don't know.
23     Q.  Mr. Lutes.  Mr. Lutes.
24        MR. SCHEFF:  Let him finish.  Don't
25 interrupt him, Irv.

1  BY MR. ACKELSBERG:
2     Q.  I'm not asking you for what individual --
3  what individual borrowers paid on individual --
4  that's not my question.  Let me ask you another
5  question.
6        You prepared -- you're familiar with
7  something called the "base forecast"?  Am I right?
8  You know -- you remember that, right?
9        MR. SCHEFF:  Object to the form.
10    A.  I have -- I'm familiar with the term
11 "base," and I'm familiar with the term "forecast,"
12 but in -- I mean, I've prepared lots of forecasts
13 over time.
14 BY MR. ACKELSBERG:
15    Q.  I'm talking about the base forecast that
16 every month you sent to Victory Park during tribal
17 period.  You know what I'm talking about, don't you?
18       MR. SCHEFF:  Well, then ask that
19 question, Irv.
20    A.  Yeah, I'm familiar with forecast models
21 that I've sent to Victory Park, that I've sent to my
22 CEO and to others.  I mean, we have prepared various
23 forecast models.
24 BY MR. ACKELSBERG:
25    Q.  And one element of that base forecast would

1  be a reference to the average APR.  And, in fact,
2  you're projecting into the future what an average
3  APR would be; am I right --
4        MR. SCHEFF:  Object to the form.
5  BY MR. ACKELSBERG:
6     Q.  -- on those base forecasts?  We can put one
7  up on the screen.  I mean, I think that's -- I
8  didn't realize you would fight that.
9        MR. SCHEFF:  Object to the form;
10 mischaracterization.  You're asking him stupid
11 questions that are open-ended.  Why don't you ask
12 him a specific question and show him a document if
13 you want to.
14    A.  Irv, what you're asking me is to state that
15 the average APR was always north of 220 percent, if
16 I go back to your original question.  I don't recall
17 if our average APR with bank installment loans or
18 tribal installment loans or any other products or
19 installment loans that we were involved with always
20 averaged on a blended basis greater than
21 220 percent.
22       What I know for a fact is, since I have
23 been the CFO at both Think Finance and at Elevate,
24 we have never lent to customers at an APR below
25 36 percent.  That, I'm comfortable testifying to.

1        MR. SCHEFF:  Limit your answers to
2  Think Finance, not Elevate.  Elevate is not part of
3  this lawsuit.
4        MR. ACKELSBERG:  It certainly is.
5        MR. SCHEFF:  No, it's not.
6  BY MR. ACKELSBERG:
7     Q.  Let's talk about the transition from
8  Universal Fund to -- to tribal.  Let's start in
9  the -- in the fall of -- actually, let's -- before
10 we get to there, there was a point in early -- in
11 the summer of 2010 when Victory Park took over
12 for -- for Universal Fund, right?
13       MR. SHAPIRO:  Objection; form.
14       MR. SCHEFF:  Object to the form.
15 BY MR. ACKELSBERG:
16    Q.  You remember that?
17    A.  No, I don't agree with that statement.
18 What happened in -- in July of 2010, the bank was
19 continuing to originate new installment loans,
20 ThinkCash installment loans to customers, and was
21 successful in doing that.  They were having
22 trouble -- you know, it was growing so fast, that we
23 just couldn't find -- they couldn't find more
24 friends and family.  I couldn't help provide any
25 more friends and family, you know, into the

UNSEALED

1   Universal Fund II structure.
2           And, you know, the bank and we at Think
3   Fina- -- ThinkCash, you know, agreed that, you know,
4   we needed -- and by this point, it was now the end
5   of 2010.  The financial crisis is starting to wind
6   down.  I think more sophisticated institutional
7   lenders/investors were getting more comfortable
8   coming back in and providing liquidity into the
9   marketplace, and so we were able to -- and by "we,"
10  we, us, ThinkCash and First Bank of Delaware -- were
11  able to be put in touch through a third-party debt
12  broker, for lack of a better term, with Victory Park
13  Capital to come in and supplement with additional
14  capital on top of or in excess of the existing
15  investors in Universal Fund II.
16          By no means did they come in and swap out
17  and we make all of the existing friends and family
18  go.  Let's just use a number.  If the original
19  friends and family number was, say, 50 million,
20  Victory Park Capital came in and, I think, provided
21  initially, I'm going to guess, an incremental
22  25 million in July of 2010.  And I'm guessing as to
23  the actual amount that they put in, but I do know
24  that they came in, to your point, sometime of
25  July 2010.

1       Q.  And they came in at a -- at a premium,
2   right?  I mean, you had to pay them 20 percent
3   compared to the 18 percent that you were paying to
4   Universal Fund, right?
5           MR. SHAPIRO:  Object to form.
6           MR. SCHEFF:  Object to the form.
7       A.  I -- I don't recall the specific interest
8   rate.  If you have a document that shows me, I can
9   verify that.
10  BY MR. ACKELSBERG:
11      Q.  Well, all right.  Would it be fair to say
12  that Victory Park exerted more control over the --
13  over the structure over the program than
14  Mr. Wildstein had?
15          MR. SHAPIRO:  Objection; form.
16      A.  I absolutely disagree with that statement.
17  Victory Park Capital came in really under the
18  existing general terms and structures of the
19  product.  They created, as you can appreciate, being
20  a more sophisticated institutional investor/lender.
21  They -- as I recall, they did not want to put their
22  money directly into the Universal Fund II SPV along
23  with all of these friends and family
24  less-sophisticated lenders/investors.
25          They got the advice, from my perspective

1   and my recollection of the deal structure, they
2   wanted to create kind of their own SPV, kind of,
3   like, a -- that would sit side by side, and that
4   they would participate, for lack of a better term --
5   and this will really sound really strange and -- as
6   I recall, I had never really -- sub-participations
7   of the participations.
8           So the bank would continue to sell a
9   90 percent participation to Universal Fund II, and
10  Universal Fund II would then turn around and sell
11  either a hundred percent or some -- some percentage
12  of that participation to the SPV that Victory Park
13  Capital set up.
14  BY MR. ACKELSBERG:
15      Q.  Okay.  So let's --
16      A.  But by no -- but I don't agree with the
17  statement that they exerted control over -- over
18  Universal Fund II.
19      Q.  All right.  We'll talk about that later.
20  Just let's -- let's just situate things.  The summer
21  of 2010, as of that point in time, Think Finance
22  still has, basically, two products, the direct
23  lending product, PDO, that's still happening at
24  that -- as of summer 2010, right?
25      A.  In -- 2010, we were still the direct

1   lender for a payday product, correct.
2       Q.  And you still -- and then you had -- you
3   had -- and your service provider for -- for the
4   ThinkCash installment loan product originated by
5   First Bank of Delaware, right?
6       A.  Yes, we were the -- the service providers
7   we've discussed.
8       Q.  And at that point in time, in the summer of
9   2010, as you described, the -- the participation was
10  supplied by some combination of the old Universal
11  Fund and some new SPV that Victory Park had put
12  together?
13          MR. SCHEFF:  Object to the form.
14      A.  And if you don't mind, if I can interrupt
15  on -- on one point, or just clarify, I believe in
16  2009 -- 2009, 2010, we had also began a partnership
17  with another bank, Irving Trust Bank, in terms of
18  offering a line of credit product.  I believe it was
19  called Elastic with Irving Trust Bank.  So it was a
20  similar type of structure and relationship but a
21  different product, different bank in -- I'm going to
22  guess, late 2009, end of 2010.
23  BY MR. ACKELSBERG:
24      Q.  Was Victory Park involved in the Elastic
25  product?

UNSEALED

1       MR. SHAPIRO:  Objection; form.
2       A.  I don't -- I don't recall.  I really -- I
3   can't remember.
4   BY MR. ACKELSBERG:
5       Q.  All right.  And then -- and then at some
6   point -- well, strike that.
7           Once Victory Park entered -- entered the
8   scene on the participation side of the ThinkCash
9   product, that actually -- it was only within months
10  that the FDIC told the -- told the bank to stop
11  originations altogether; am I right?
12          MR. SCHEFF:  Object to the form.
13      A.  No, you're --
14          MR. SCHEFF:  Lacks foundation.
15      A.  No, you're -- I'll answer the question.
16  No, you're not right in that statement.  To my
17  knowledge, the FDIC never told the bank to stop
18  originating the ThinkCash product.  My
19  understanding, and I don't have direct knowledge,
20  but my understanding was what was communicated to
21  us -- and "us" would probably be from Alonzo Primus
22  to Ken Rees as CEO, was that the board of directors
23  and First Bank of Delaware and Alonzo as CEO of
24  First Bank of Delaware had decided on their own to
25  stop originating the ThinkCash installment loan

1   product --
2   BY MR. ACKELSBERG:
3       Q.  All right.  But whoever --
4       A.  -- as of 12/31/2010.
5       Q.  Right.  So whoever -- whoever made the
6   decision, however that happened, on the First Bank
7   of Delaware end, it was communicated to Ken Rees
8   that the bank was no longer going to be buying --
9   was no longer going to be originating loans as of
10  the end of 2010.  That's what you remember?
11          MR. SCHEFF:  Object to the form.
12      A.  Yes, what I recall being informed of was
13  sometime in late fall of -- of 2010, that the bank
14  had informed -- "the bank" probably being Alonzo as
15  the CEO -- had informed Ken Rees that effective
16  December 31, 2010 -- or really effective January 1,
17  2011, that the bank would no longer originate
18  ThinkCash installment loans.
19  BY MR. ACKELSBERG:
20      Q.  And there was some earlier testimony about
21  an executive offsite in either the end of October,
22  beginning of November 2010, where the executives
23  gathered to begin to figure out what the next move
24  for Think Finance would be with regard to the
25  installment loan product; am I right?

1       A.  I would say, from my perspective, as
2   executives, we're always evaluating new product
3   innovations.  As I mentioned earlier, you know,
4   sometime in late 2009, 2010 we had rolled out a line
5   of credit product where we partnered with Irving
6   Trust Bank and them rolling out a line of credit
7   product.
8           So there was always discussions related to
9   new products going on.  I do recall, you know, in
10  the fall of 2010 -- because first it was Irving
11  Trust Bank in August of 2010, and then subsequently
12  First Bank of Delaware later -- a few months later,
13  you know, both informing us that -- that they had
14  chosen on their own to no longer, you know,
15  originate their products by the end of 2010.
16          So we, as an executive team -- I don't
17  know when the meeting happened, whether it was on a
18  weekend or just during the normal course of -- it
19  would have been the fall of 2010, you know, got
20  together to continue to strategize on what other,
21  you know, new products, opportunities we could do.
22          I know, for instance, one of the things we
23  looked at was -- at the time, there was a lot of
24  online lending happening in the UK.  So, you know,
25  we -- that was certainly something we considered.

1   And we ultimately did, I do recall, going out in
2   November of 2010, and we ended up acquiring a small
3   entity that did online lending and completed that
4   transaction by the end of 2010.
5           We looked at a rent-to-own product.  We
6   looked at a prepaid card product.  There were a
7   variety of products we were looking in that time, as
8   well as just, you know, figuring out -- or looking
9   at, you know, other installment-type products as
10  well as, you know, what we could continue to do as a
11  direct lender.
12      Q.  At this point in time, the installment loan
13  product was the biggest revenue source for the
14  company; am I right?
15          MR. SCHEFF:  Object to the form.
16      A.  As I recall, the -- I don't know specific
17  dollar amounts or percentages, but I think it's
18  reasonable to assume that the -- that the ThinkCash
19  installment product was the -- the largest product
20  from a revenue generations standpoint.
21  BY MR. ACKELSBERG:
22      Q.  And so from a revenue generation
23  standpoint, the executives needed to figure out how
24  to -- if that revenue was going to go down, how to
25  replace that revenue.  That's -- that's what

UNSEALED

1  executives do, right?
2       MR. SCHEFF: Object to the form.
3       You can answer the question.
4       A.  As I said earlier, I mean, as executives,
5  we're always looking for new products to try and
6  grow revenue. So, certainly, when you lose, you
7  know -- or when a product that you're providing
8  services for, you know, is going to have origination
9  stopped and potentially that fee revenue, you know,
10  slow down and eventually potentially go away, yeah,
11  you're always looking for new products.
12  BY MR. ACKELSBERG:
13       Q.  And when the executives gathered to discuss
14  those kind of issues, who would generally be there?
15       MR. SCHEFF: Who was there at this
16  particular meeting, or you're just talking about
17  all --
18  BY MR. ACKELSBERG:
19       Q.  If you -- if you --
20       MR. SCHEFF: -- for the last six
21  years?
22  BY MR. ACKELSBERG:
23       Q.  -- remember the particular meeting, that's
24  fine.
25       A.  I don't remember the particular meeting.

1  But, generally, as executives, we met once a week to
2  discuss performance of existing products to
3  strategize and discuss new products, new other
4  opportunities. I mean, we talked with large banks.
5  I mean, there's --
6       Q.  Who would -- who would generally run those
7  meetings?
8       MR. SCHEFF: Can you let him finish
9  his answers, plea, Irv? You do this repeatedly.
10  I've asked you not to. Let him finish his answers
11  and then ask your next question.
12       A.  Members of the executive management team
13  would attend the executive --
14  BY MR. ACKELSBERG:
15       Q.  I didn't say who would attend. I said, who
16  would lead the meetings?
17       A.  Oh. Lead is -- Ken Rees, for lack of a
18  better term, would lead -- as CEO would lead the
19  meeting. But, you know, in terms of actually
20  leading, I mean there was -- the agenda varied from
21  time to time, and, you know, I would present -- if
22  it was the end of the month or beginning of the
23  month, I would present a financial update. You
24  know, there were lots of things. But Ken Rees, as
25  CEO, clearly, like any other company, would probably

1  lead a weekly or monthly executive meeting.
2       Q.  How long have you worked for Mr. Rees?
3       A.  Since January 2007.
4       Q.  And you're still working for him today at
5  Elevate, right?
6       A.  Yes, I still report directly to Ken Rees.
7       Q.  Okay. How would you describe his
8  leadership style?
9       A.  Well, that's -- from my perspective, that's
10  a pretty subjective question. Let's put it this
11  way, the fact that I have been the CFO for Ken
12  pretty much over a 12-year period, speaks very
13  highly of -- I enjoy working with him.
14       Q.  He's an effective leader --
15       MR. SCHEFF: Object to the form.
16  BY MR. ACKELSBERG:
17       Q.  -- in your subjective judgment?
18       MR. SCHEFF: Object to the form.
19       You can answer the question.
20       A.  Yes, I find Ken a very effective leader.
21  BY MR. ACKELSBERG:
22       Q.  Is he someone that holds -- holds the other
23  executives accountable to do their jobs?
24       MR. SCHEFF: Object to the form.
25       A.  Yes, he holds people accountable.

1  BY MR. ACKELSBERG:
2       Q.  Occasionally expressing displeasure at
3  performance when it doesn't meet his standards?
4       MR. SCHEFF: Object to the form.
5       A.  From my perspective, no. I think as
6  executives, we always hold ourselves to a very high
7  standard, and, generally, we collectively are
8  equally, you know, disappointed when we're, you
9  know, not performing as expected and equally happy
10  when we're performing better than expected.
11  BY MR. ACKELSBERG:
12       Q.  I'm familiar with some organizations where
13  CEOs aren't around much, don't -- don't really
14  involve themselves much in what's happening. Would
15  you regard him as more hands-on or less -- or less
16  personally involved?
17       A.  No, Ken -- Ken, is my opinion, a hands on
18  CEO.
19       Q.  He knows what's going on in the company?
20       MR. SCHEFF: Object to the form.
21       A.  That's kind of a broad statement, he -- he
22  knows.
23  BY MR. ACKELSBERG:
24       Q.  For strategic -- strategic decisions of the
25  company, Ken Rees is at the table and making his

UNSEALED

1  opinions known to his -- to the other executives; am
2  I right?
3          MR. HERMAN: Objection; form.
4          MR. SCHEFF: Object to the form.
5      A.  As -- as CEO of -- when I've worked with
6  Ken CEO, yes, he is involved in the strategic
7  decisions of the company, and he involves a lot of
8  us other executives as well. Not all of the ideas
9  are his. He's open. But he's definitely involved
10 from a strategy standpoint of running the company.
11 BY MR. ACKELSBERG:
12     Q.  Now, what do you remember about the -- so
13 we know that by the spring of 2011, there were
14 tribal contracts in place. Right? Right?
15         MR. HERMAN: Objection; form.
16     A.  By the spring of 2011, we had entered into
17 agreements as the service provider for one tribe
18 that I'm aware of, the Chippewa Cree.
19 BY MR. ACKELSBERG:
20     Q.  Right. And that eventually became three
21 tribes, right?
22     A.  Eventually, we entered into agreements with
23 two additional tribes during the -- that same
24 two-thousand-and -- time -- time span with the
25 Otoe-Missouria, I believe in, roughly, I'm going to

1  guess, the July, August 2011 time span, and then we
2  also entered into service provider agreements with
3  the Tunica-Biloxi tribe in, roughly, the September,
4  October, November 2011 time span.
5      Q.  Right. So what I focus on is the -- is the
6  process going on within the company, between the
7  time you learned that -- that there would be no more
8  originations by the bank, and -- and the
9  identification of tribal partners, I mean, first
10 there had to have been a decision to -- to explore
11 the tribal option, right?
12         MR. SCHEFF: Object to the form.
13 BY MR. ACKELSBERG:
14     Q.  You remember that happening?
15         MR. SCHEFF: Object to the form.
16     A.  My understanding -- and I wasn't actively
17 involved. I mean, some of this even predates me. I
18 think tribal lending had gone on prior to -- not
19 with us, but there had been tribal lending, you
20 know, as far back prior to 2007. And it's quite
21 possible that the company had looked at it then.
22         So, I mean, that's -- you know, it was one
23 form of, you know, for lack of a better term,
24 regulatory distribution diversification, similar to
25 we can be a direct lender, we can partner with

1  banks, we can partner -- partner as a service
2  provider with other third-party lenders. We could
3  partner as a service provider with tribes. I mean,
4  there was a variety of ways that we could use the
5  marketing and technology skills that we possessed to
6  either do direct lending or to partner with other
7  third-party lenders, whoever they may be.
8  BY MR. ACKELSBERG:
9      Q.  Well, at some point a decision was made to
10 pursue a tribal partner during this period, the end
11 of 2010; am I right?
12         MR. SCHEFF: Object to the form.
13     A.  I can't recall if it was -- and by -- we
14 were certainly exploring partnering with tribes in
15 the fall of 2010 into the spring of -- spring, first
16 quarter of 2011.
17 BY MR. ACKELSBERG:
18     Q.  As the CFO, were you the -- I assume you
19 were involved in the communications with Victory
20 Park during this period of time?
21     A.  Well, I'm always involved in the -- in the
22 discussions as CFO with -- with Victory Park,
23 typically, on a once-a-month basis to at least
24 report the financial performance.
25         I would have been involved in the

1  discussions that we probably had in the fall of 2010
2  with Victory Park, appreciating that they were new,
3  that they had really just come on board and began
4  lending -- or purchasing participations through
5  Universal Fund II in July of 2010, was first
6  informing them of First Bank of Delaware's decision
7  to stop originating loans at the end of 2010, and
8  then to, you know, potentially discuss with them
9  other new opportunities. For instance, as I had
10 mentioned earlier, you know, we were looking at and
11 we ended -- did end up acquiring a UK online lending
12 entity, and we needed financing potentially for
13 that.
14     Q.  All right. Well, we're not talking about
15 the UK today. We're just talking about --
16     A.  Well, but your question was, you know, do I
17 talk. I talk to them about a variety of things.
18     Q.  I understand. But I really want to -- I
19 really want to talk about the development of the
20 tribal products. And so do you remember
21 consulting -- or the company consulting with Victory
22 Park about the tribal option during this period of
23 time?
24         MR. SHAPIRO: Object to form.
25         MR. SCHEFF: Object to the form.

UNSEALED

1  A. I recall two conversations vaguely. The
2  first was with Ken Rees, the CEO, sometime in
3  probably the fall of 2010 just saying that, you
4  know: Ken, as we explore, you know -- and I'll just
5  limit this specifically with tribal, but I would
6  have this type of discussion with him regarding any
7  potential new product. You know: Ken, we've
8  also -- it's great if we can find a third-party
9  lender, whoever that may be, bank, tribe, other
10  licensed third-party lender, to offer services to,
11  but from my perspective, you know, whoever we end up
12  providing service -- you know, entering into a
13  service relationship with, they're probably going to
14  be capital constrained, banks are capital
15  constrained, other third-party lenders, that we're
16  going to need to have a funding source. "We"
17  collectively being whoever is originating the loans
18  as well as us as the service provider, we're going
19  to have to find somebody that's going to be willing
20  to purchase participations from the originator of
21  those loans.
22  So I do recall in the fall/winter of 2010
23  discussing with Ken Rees that if we do explore
24  tribal -- if we do explore -- you know, if we enter
25  in -- "explore" is the wrong word.

1  If we enter into a service relationship
2  with a tribe before finalizing that agreement, we
3  need to work with the tribe and make sure that
4  either Victory Park Capital or some other
5  third-party lender is going to be comfortable
6  providing lending funds into an SPV to purchase
7  participations from the tribe.
8  BY MR. ACKELSBERG:
9  Q. And what's the other conversation you
10  remember?
11  A. The second conversation is after I just
12  reminded him that, you know, this is as great as our --
13  as great as our services are and we can find all
14  the, you know, third-party originators that, you
15  know, if you can't find somebody to buy the -- you know,
16  buy a large amount of the participations, you know,
17  you really don't have a product to offer or a
18  service to provide because they're not going to be
19  able to originate the loans.
20  So then shortly thereafter, as we became
21  more interested in potentially finalizing a deal
22  with the tribes, I remember a call that Ken and I
23  had with, I believe, Richard Levy at Victory Park
24  Capital. Richard, I think, for lack of a better
25  term, is the head CEO. I'm not sure what his

1  official title is. But just saying, you know --
2  again, reiterating how the bank hasn't changed its
3  mind, you know, they're still going to stop
4  originating the installment loans effective January
5  1, 2011.
6  You know, one of the things that we are --
7  "we," ThinkCash, Think Finance -- are looking at is
8  offering our services to third-party tribes, tribal
9  lenders: Would you be interested in providing
10  funding liquidity for purchasing participations
11  from, whether it be installment loans or lines of
12  credit, that tribes would originate?
13  Q. And do you remember in that conversation or
14  in subsequent conversations with Victory Park, them
15  sharing with you their -- their own experience with
16  other service providers that were in deals with
17  Indian tribes?
18  MR. SCHEFF: Object to the form.
19  MR. SHAPIRO: Object to form.
20  A. I don't recall having a conversation with
21  them or them bringing up any expertise that they had
22  in doing that. Whether they were looking at it at
23  the time, I don't know. I don't recall.
24  BY MR. ACKELSBERG:
25  Q. So before a tribe was identified, I assume

1  as CFO you would have -- you would have had to start
2  conceptualizing how the program would work if you
3  were successful in identifying a tribe and if
4  Victory Park was willing to provide the
5  participation funding. Am I right?
6  A. Actually, no, I would disagree with that
7  statement. Really, what we, as a service provider,
8  felt comfortable with was the structure, kind of
9  replicating the same existing structure that we had
10  in place with First Bank of Delaware and with Irving
11  Trust Bank. We felt that that had gone through
12  numerous regulatory exams.
13  From our perspective, my perspective, as I
14  recollect, the FDIC never formally told either of
15  those banks: No, you cannot, you know, originate
16  these types of loans under the structure.
17  As I mentioned earlier, I felt that a lot
18  of the changes that we had made as the program, with
19  the First Bank of Delaware, in particular, evolved,
20  it came at the recommendation of the FDIC.
21  So as the CFO, you know, what I remember
22  communicating to Ken and the other execs is I
23  literally described that from an accounting
24  perspective, we could replicate the existing
25  structure as we go to work tribal lenders or even

UNSEALED

1   other third-party type of lenders.
2           What I was primarily focused with is
3   providing the funding.  And as part of your
4   question, if Victory Park Capital agreed to come
5   over and buy participations from tribal lenders or
6   any other third-party lenders that we may have
7   identified to originate loans, you know, that
8   certainly helps from a funding perspective.
9       Q.   Sure.
10          MR. ACKELSBERG:  I want to show you a
11  document which I am going to identify as Plaintiff's
12  Exhibit 243.
13          (Exhibit No. 243 marked.)
14  BY MR. ACKELSBERG:
15      Q.   And I am going to represent to you that --
16  that we actually got several -- several copies of
17  this document.  The one I am showing you, according
18  to the metadata, it does not have a date but it has
19  you as the author on the metadata.
20          MR. SCHEFF:  Is this attached to an
21  e-mail?
22          MR. ACKELSBERG:  No.
23          MR. SCHEFF:  It's not?  It just a
24  stand-alone document?
25          MR. ACKELSBERG:  Uh-huh (affirmative

1   response).
2       A.   Can I take a minute to read it?
3   BY MR. ACKELSBERG:
4       Q.   Of course.
5       A.   (Reviews document.)
6            Okay.
7       Q.   Do you remember this document?
8       A.   I don't specifically remember it, but. . .
9       Q.   Okay.  So do you remember there was a point
10  in the discussions with potential tribes that a --
11  the Otoe-Missouria were identified early on; do you
12  remember that?
13          MR. SCHEFF:  Object to the form.
14      A.   I do recall that one of the tribes in late
15  2010, early 2011, that we were considering
16  partnering with was the Otoe-Missouria tribe.
17  BY MR. ACKELSBERG:
18      Q.   And when you were having discussions with
19  them, your discussions were actually with an
20  intermediary organization led by someone named Mark
21  Curry, right?
22          MR. SCHEFF:  Object to the form.
23  BY MR. ACKELSBERG:
24      Q.   Do you remember that?
25      A.   I'm familiar with the name Mark Curry.

1   I've never met him, and I was not involved in any of
2   those discussions.
3       Q.   Okay.  All right.  Do --
4       A.   So I'm not -- I'm not sure who had those
5   discussions.
6       Q.   So, ultimately, the -- the special purpose
7   vehicle that funded the tribal lending was something
8   called GPLS or GPL Servicing Limited, right?
9       A.   Yes.  The -- the purchaser of the
10  participations from all three tribes that we
11  ultimately ended up partnering with, providing
12  services to, was GPLS.
13      Q.   And do you remember how that -- where that
14  name came from?
15      A.   As I recall, for -- for -- it -- I think it
16  was just an acronym, really, for Great Plains
17  Lending.
18      Q.   Right.
19      A.   And I don't know what the "S" would have
20  stood for at the end.
21      Q.   So the original concept, the original
22  product as conceived -- before there were any
23  contracts with anybody, the original concept was
24  called Great Plains Lending within -- within the
25  company, within Think Finance.  You remember that

1   period, right?
2           MR. SCHEFF:  Object to the form.
3       A.   Yes, I believe in the fourth quarter of
4   2010, as we started to think about, you know, how to
5   brand -- and I wasn't actively involved, but I
6   remember as an executive -- because it would have
7   been presented, like, at the weekly executive
8   meeting -- that there was probably a presentation
9   where if we're going to partner with a third-party
10  tribe -- and I believe at the time probably one of
11  the first ones we looked at was the Otoe-Missouria.
12  But regardless, whoever it was, the initial branding
13  concept was Great Plains Lending, you know, because
14  we did not want to -- we couldn't use ThinkCash.
15  That belonged to First Bank of Delaware.  Couldn't
16  use whatever the product name was with Irving Trust
17  Bank.  So we had to, as marketer, come up with a
18  potential brand name that whatever tribe we ended up
19  partnering with, you know, would adopt and agree to.
20  BY MR. ACKELSBERG:
21      Q.   Okay.  And eventually -- eventually,
22  though, the initial -- the initial -- the initial
23  contract was the actual contract signed -- signed
24  and sealed was with a different tribe, the Chippewa
25  Cree; am I right?

28  (Pages 109 to 112)

UNSEALED

1    A.  I'll rephrase that question.  I mean, from
2  my perspective, the first tribe that we began
3  providing services to was the Chippewa Cree, and I
4  believe that would have been in the April
5  two-thousand- -- May 2011 time span.
6    Q.  I'm curious why you corrected the -- what
7  was in my question that was -- that --
8    A.  You said that that was -- I just wanted to
9  clarify.  I might have misheard your question.  I
10  apologize.  The first tribe that we officially --
11    Q.  Partnered with.
12    A.  -- partnered with was the Chippewa Cree,
13  yes.
14    Q.  Okay.  And do you remember the reasons for
15  the switch from the -- the Otoe-Missouria to the --
16  to the Chippewa Cree?
17        MR. SCHEFF:  Object to the form.
18    A.  No, that -- I wasn't involved in those
19  discussions.
20  BY MR. ACKELSBERG:
21    Q.  The -- so with -- there was this existing
22  customer portfolio at ThinkCash from the ThinkCash
23  product, right?
24        MR. SCHEFF:  Object to the form.
25    A.  I would not say that they were necessarily

1  our customers.  They were the bank's customers.  The
2  bank had originated the loans to those customers.
3  We just provided third-party services to the bank to
4  help them originate those loans.
5  BY MR. ACKELSBERG:
6    Q.  And am I also -- so is it correct that in
7  any -- in any of the products, any of the Think's
8  products, whether it's service provider product, the
9  direct lending product, the existing customers are
10  viewed as potential customers for future -- future
11  loans?
12    A.  I don't recall specifically, you know,
13  whether in the marketing agreements we, you know,
14  inserted legal to -- you know, legal language that
15  gave us the right to potentially market -- you know,
16  if we offered marketing services to some other
17  third-party originator.  I don't -- I don't
18  really -- that's not really a financial matter.
19  It's more of a marketing matter to me.
20    Q.  I'm sorry, I mean, I thought -- I thought
21  you were kind of more involved than maybe you are.
22  But I've been immersed in all of this material for
23  months, and one of the things that I have seen is a
24  distinction between new and existing customers or
25  new and former customers or things -- that's --

1  that's a term you've heard of, hasn't it -- isn't it?
2        MR. SCHEFF:  Object to the form.
3    A.  Yes.  I mean, we -- we use that metric
4  throughout the company in terms of, you know, when
5  we define a new customer, it's, you know, kind of
6  what it says, a loan to -- you know, a first-time
7  loan to a new customer.  That does not specifically
8  mean -- because we're a lot of times providing the
9  reporting to third-party, you know, banks or other
10  lenders.
11        If we used "customer," it doesn't
12  necessarily mean that it's our customer.  It's a
13  generic term to reply from a reporting standpoint
14  whether we as the direct lender, it would be truly a
15  first-time loan to our new customer, or if we were
16  the service provider to a bank, to a tribe or some
17  other third-party lender, the term "new customer,"
18  if we use it on our own reports, it's to help them
19  identify that from their perspective, it's a new
20  customer, not necessarily to imply that it's
21  technically our customer.
22  BY MR. ACKELSBERG:
23    Q.  So the --
24    A.  And -- I'm sorry, let me finish, because
25  the second part of your question was former.

1    A.  A former customer would imply that that
2  would be a customer that had already paid off
3  their -- their loan either directly to us if we were
4  the direct lender or to the third-party originating
5  bank or third-party tribe if they were the
6  originating lender, and then that third-party
7  originator or us turned around and made a second
8  loan to the customer.
9    Q.  Now, you're aware, are you not, that
10  Think -- ThinkCash customers, when it was still
11  First Bank of Delaware, if they wanted former
12  customers, if they wanted to return and get another
13  loan, they could just log onto the website and apply
14  for another loan, right?  That's -- that's the way
15  the platform -- the platform allowed that; am I
16  right?
17        MR. SCHEFF:  Object to the form.
18    A.  It gets a little bit outside of my
19  expertise because I'm not really that familiar with
20  the customer flow from a website design and -- and
21  whatnot.  But I guess maybe rephrase the question.
22  What you're trying to ask me to really answer is, is
23  that is it -- rephrase the question.
24  BY MR. ACKELSBERG:
25    Q.  At the end of 2010, it was a matter of some

UNSEALED

App. 0196

1  urgency to have a place to send existing or former
2  ThinkCash customers who might be in the market for a
3  new -- a new installment loan; am I right?
4      MR. SCHEFF:  Object to the form.
5      A.  I wouldn't agree with that question or
6  phrase.  From my perspective, the bank had decided
7  to stop originating installment loans effective
8  January 1, 2011, to their customers.  We, as the
9  service provider, you know, we're certainly looking
10  to provide our services to other third-party tribes
11  or other third-party licensed lenders.
12  BY MR. ACKELSBERG:
13      Q.  And to replace the revenue, it would be --
14      MR. SCHEFF:  I don't think he was
15  finished answering the question.
16      A.  Yeah, I wasn't finished.  I wasn't
17  finished.  Because you were saying that there was a
18  sense of urgency -- or you were implying that there
19  was a sense of urgency to move ThinkCash customers
20  somewhere else.
21      No, I mean, from our perspective, our --
22  our goal was to look to continue to provide
23  additional services to other third-party tribes or
24  lenders to -- you know, in the same format that we
25  did with First Bank of Delaware.  Whether those were

1  with customers just through mere coincidence,
2  happened to also -- at some point in time, you know,
3  had received a loan from First Bank of Delaware or
4  even from us with our PayDay One direct lending
5  product -- because quite conceivably, we could have
6  offered our payday loans to some of those customers
7  under the state license law.
8  BY MR. ACKELSBERG:
9      Q.  Mr. Lutes.
10      MR. SCHEFF:  Let him finish.
11      A.  So I'm just trying to get at, you're making
12  it sound like that there was an intent to
13  intentionally transfer.
14  BY MR. ACKELSBERG:
15      Q.  Please --
16      A.  From my perspective, there wasn't.
17      MR. SCHEFF:  Let him finish.
18  BY MR. ACKELSBERG:
19      Q.  I'm asking for answers to my questions, not
20  a speech.
21      MR. SCHEFF:  He's answering your
22  question.
23      MR. ACKELSBERG:  He's giving --
24      MR. SCHEFF:  The fact that you don't
25  like it is not his problem.

1      MR. ACKELSBERG:  Okay.  Thank you,
2  Richard.
3      MR. SCHEFF:  But let him finish
4  answering before you ask another question, and don't
5  interrupt him.
6  BY MR. ACKELSBERG:
7      Q.  Now, Mr. Lutes, you're aware, are you not,
8  that one of the things -- that one of the benefits
9  that Think offered the Chippewa Cree was the
10  ThinkCash customer portfolio?
11      MR. SCHEFF:  Object to the form.
12  BY MR. ACKELSBERG:
13      Q.  Am I right?
14      A.  I wasn't involved in those discussions.
15      Q.  I didn't ask you whether you were involved
16  in the discussions.  You knew that was being
17  offered, didn't you?
18      A.  No, I did not.
19      Q.  You didn't know that.  Okay.
20      Another document.
21      A.  What time are we breaking for lunch?  I am
22  going to need either a bathroom break or a lunch
23  break.
24      MR. ACKELSBERG:  We can take a
25  bathroom break, go ahead.  This is a good time.

1  We're about to -- about to show you a document.
2      THE VIDEOGRAPHER:  We're off the
3  record at 11:34 a.m.
4      (Break taken, 11:34 a.m. to 11:44 a.m.)
5      THE VIDEOGRAPHER:  We are back on the
6  record at 11:44 a.m.
7  BY MR. ACKELSBERG:
8      Q.  Mr. Lutes, I am showing you another
9  document that was previously used in the deposition
10  program, and it's identified as Exhibit P-127.  Can
11  you identify this document?
12      A.  At the top it says "Term Sheet for Think
13  Finance-Chippewa Cree Transaction."  I did notice on
14  the back that it's not signed by any of the parties,
15  nor dated.
16      Q.  Right.
17      A.  So I'm assuming it's -- it's draft form, or
18  maybe it is the final.  But I don't know since it
19  wasn't signed.  So. . .
20      Q.  Right.  But, I mean, is this a document
21  you're familiar with?
22      A.  No.
23      Q.  You've never seen this before?
24      A.  I don't recall seeing it, no.
25      Q.  Okay.  As the CFO, were you consulted

UNSEALED

1  before Think submitted a -- you know, a proposed
2  transaction to the Chippewa Cree?
3        MR. SCHEFF:  Object to the form.
4     A.  As the CFO, I would be consulted regarding
5  the proposed -- any proposed financial terms in a
6  term sheet between Think Finance and any of the
7  three tribes.
8  BY MR. ACKELSBERG:
9     Q.  The term sheet references, you know,
10 someone named Haynes.  Is that someone you're
11 familiar with?
12    A.  Yes.  I'm assuming by Haynes Investments,
13 I'm assuming it's referring to -- to Steven Haynes.
14    Q.  Okay.  And how did you first come to learn
15 of Steven Haynes?
16    A.  I -- I never met Steven Haynes until
17 probably late 2012, 2013.  My understanding is -- so
18 I never had any initial direct interaction with him.
19 My understanding is, is that Jason Harvison had met
20 him at some industry conference or became aware of
21 him, that -- that Mr. Haynes had done a lot of
22 business with -- with tribes.  And by business, I
23 mean not just lending business, other types of
24 business as well.
25    Q.  Are you familiar with the name Rick Eckman?

1     A.  Yes, I'm familiar with the name Rick
2  Eckman.
3     Q.  Okay.  And how did you first come to know
4  Rick Eckman?
5     A.  Rick Eckman I knew through the First Bank
6  of Delaware relationship.  I think he was involved
7  with First Bank of Delaware as their outside counsel
8  in some -- some manner.
9     Q.  And was he involved at all in putting
10 together some of the Universal Fund transaction
11 documents?
12    A.  I don't recall specifically, but I think he
13 was, yes.
14    Q.  Okay.  And is there any connection that you
15 recall between Mr. Eckman and Mr. Haynes?
16    A.  No, I --
17       MR. SCHEFF:  Object to the form.
18    A.  No, I don't recall any connection between
19 the two.
20 BY MR. ACKELSBERG:
21    Q.  Okay.  Do you recall anything about the
22 approach to the -- the Chippewa Cree?
23       MR. SCHEFF:  Object to the form.
24 BY MR. ACKELSBERG:
25    Q.  And I'm -- I know you weren't there.  I

1  mean, I'm not -- so I appreciate that.  I'm really
2  talking in terms of your input, your -- any
3  conversations you had; basically, what involvement
4  you had personally in the terms that were submitted
5  to the Chippewa Cree.
6        MR. SCHEFF:  Object to the form.
7     A.  I wasn't personally involved in any of the
8  negotiations.  As I stated earlier, I would have
9  provided, you know, a consultation or reviewed a
10 potential term sheet to any of the three tribes, at
11 least -- you know, from a financial -- at least what
12 the financial terms or implications would be.
13 BY MR. ACKELSBERG:
14    Q.  Okay.  One of the things that you said
15 earlier this morning was that one question you would
16 have for a potential partner playing the role of the
17 lender would be whether that entity had access to
18 capital to fund the loans in the first place before
19 a participation happens, right?
20       MR. SCHEFF:  Object to the form;
21 misstates the testimony.
22    A.  That would be one of your concerns; am I
23 right?
24
25       MR. SCHEFF:  Misstates the testimony.

1     You can answer the question.
2     A.  Can you rephrase the question?  When you
3  say "entity," are you referring to the originating
4  lender?
5  BY MR. ACKELSBERG:
6     Q.  Yes.
7     A.  Oh, the originating lender.
8     Q.  Yes.
9     A.  Yes, that's something that we would always
10 evaluate from the financial perspective.  I mean,
11 being the CFO, I'm responsible for, you know, kind
12 of understanding, you know, the economics of the
13 transaction.  Does the originator lender intend to
14 hold all of the loan, participate out 90 percent,
15 99 percent?  So. . .
16    Q.  So at -- so we're talking, like, the end of
17 2010, the beginning of 2011, Think is talking to,
18 initially, the Otoe-Missouria.  Later they're
19 talking to the Chippewa Cree.  What do you recall
20 about the way that those potential originating
21 lenders would fund the loans?
22       MR. SCHEFF:  Object to the form.
23    A.  From my perspective, you know, when we as
24 an executive team discuss participating with -- you
25 know, offering services to tribes or, again, any

UNSEALED

1    other third-party potential lenders besides tribes
2    at that point in time, it was -- my preference was I
3    liked the existing structure that we had in place,
4    you know, with First Bank of Delaware and with
5    Irving Trust Bank, that if we could replicate that
6    with whoever, you know, we ended up offering
7    additional services to and them originating loans,
8    and then, as I mentioned earlier, discussing with
9    VPC, or if VPC couldn't get involved, you know, that
10   we would need to find some other -- "we" being me
11   and whoever the -- the third party originator was,
12   would have to find some source of funding or
13   liquidity.
14        Because, like I said, regardless of
15   whether it was a bank or a tribe or other
16   third-party lender, I know that it's almost kind of
17   common sense in financial services that nobody
18   really can retain, you know, a hundred percent on
19   their balance sheet and they're always looking to,
20   you know, offload, securitize some -- some large
21   participation in those loans.
22   BY MR. ACKELSBERG:
23      Q.  You testified previously that First Bank of
24   Delaware supplied its own funds for purposes of
25   originating the loans, right?

1      A.  Yes, I -- well, what I testified was, is
2    that when you said capital, I assume that they came
3    up and by "own funds," they could have gone out and
4    borrowed funds from somebody else, deposits that
5    they -- you know, use their deposit base.  That's,
6    in essence, borrowing funds from third-party
7    depositors, or it could have been their own capital,
8    their own excess cash flow.  So when you used the
9    term "capital," I said they came up with the
10   liquidity either in the form of debt or capital
11   to -- to originate their loans.
12      Q.  What -- what was your understanding of what
13   the source of the initial capital would be for
14   either the Otoe-Missouria or the Chippewa Cree that
15   Think was talking to in this period of time?
16      A.  Well, I knew through third-party
17   conversations that both of those tribes had existing
18   lending relationships that -- outside of us; that
19   the Chippewa Cree was doing some type of this online
20   lending with some other third-party service
21   provider; and that I knew, even though I had never
22   directly met Mark Curry, that the Otoe-Missouria was
23   offering, again, some type of online lending product
24   and kind of partnering with Mark Curry and whatever
25   his entity was called at the time.

1        So I assumed based on, you know, the fact
2    that they already have existing online lending
3    relationships up and running, that they had access
4    to capital.
5      Q.  Do you -- do you remember the company doing
6    any due diligence on either of the tribes with
7    regard to their history or experience with online
8    lending?
9        MR. SCHEFF:  Object to the form.
10      A.  I don't recall.  I don't recall that, no.
11   BY MR. ACKELSBERG:
12      Q.  I mean --
13      A.  I specifically did not do any due diligence
14   on the Chippewa Cree or the Otoe-Missouria in terms
15   of looking -- I mean, they're privately -- private
16   entities, tribes.  So I'm not sure that I had access
17   to any of that.  And, frankly, just from my
18   perspective, based on the fact that they had
19   existing lending relationships, I assumed that they
20   had access to capital.
21      Q.  Well, it's not unusual for Think to do due
22   diligence on potential counterparties, right?  I
23   mean, that happens all the time, doesn't it?
24        MR. SCHEFF:  Object to the form.
25      A.  I would actually say that during my time at

1    Think Finance, I did not do -- now, granted, the
2    relationship with First Bank of Delaware was already
3    established, but I didn't do due diligence on First
4    Bank of Delaware even, you know, on a quarterly
5    basis looking at their call reports.  And the same
6    with Irving Trust Bank.  So, no, at least from my
7    perspective as CFO, I never really did any due
8    diligence on third-party originating lenders.
9    BY MR. ACKELSBERG:
10      Q.  Well, particularly, if they're -- they're
11   banks and they're regulated entities, you've got to
12   assume there's something bona fide about it, right,
13   I mean, if they're -- if they're banks?
14        MR. SCHEFF:  Object to the form.
15      A.  Your question was whether I did any due
16   diligence and my answer -- on third-party
17   originating banks or lenders, and my answer is, no,
18   I didn't.
19   BY MR. ACKELSBERG:
20      Q.  Okay.  Do you know if anybody did any due
21   diligence on the Chippewa Cree or the
22   Otoe-Missouria?
23      A.  I don't -- I don't know the answer to that
24   question.
25      Q.  Do you know it ever coming up as a subject

UNSEALED

1  during these weekly meetings of the executives
2  during this period of time?
3      A.  I don't -- I don't know.  I do know that we
4  did a site visit before -- either right in advance
5  of launching the product or shortly thereafter.  I,
6  specifically, at that point in time was just
7  interested in going up and visiting them and seeing
8  their operations.
9          So myself, Jason Harvison, I believe
10 Michelle Nguyen and Steve Schafer all went up and
11 did a site visit of the Chippewa Cree before
12 launching it, but I -- if you call that due
13 diligence, that's due -- I mean, we at least went
14 up and -- I specifically wanted to go up and do a
15 site visit, just meet the people because I hadn't
16 met them before.
17     Q.  Well, this is before the contracts were
18 signed?
19     A.  I don't recall.  I -- it would have been in
20 the March or April 2011 time span.
21     Q.  Okay.
22     A.  It was either just before or just after.
23     Q.  And when you went up there, what did you
24 see with regard to the existing online lending
25 operation that you referred to before?

1      A.  Well, we saw that there was an existing
2  online lending operation.  They had other
3  businesses.  I visited the casino that they ran.  So
4  they appeared to be a pretty -- for a -- for a
5  tribal entity, they were running multiple
6  businesses.
7      Q.  And was Mr. Haynes there at that meeting?
8      A.  No, I don't recall him being there.
9      Q.  Now, you mentioned the casino, but I'm not
10 really interested in the casino at the moment.  I'm
11 interested in the online lending operation.  Was
12 there a call center before you arrived?
13     A.  I don't recall visiting the call center or
14 whether they had one prior -- prior to us arriving.
15     Q.  Did you look at -- did they have a did
16 they have a credit committee?
17     A.  They had -- no, they did not have a --
18 well, let me rephrase my answer there.  The folks --
19 the people with the tribe that we met with were the
20 tribal lending council and CEO, COO of their tribal
21 lending operation.  And we also, I believe, met with
22 a few of the other just tribal council members in
23 addition to tribal lending council.
24     Q.  Now, you remember that at the time you
25 approached the Chippewa Cree, the Chippewa Cree had

1  some sort of a relationship with a Las Vegas entity
2  called Encore Services, right?
3      A.  Let me -- if you don't mind, rephrase your
4  question.  You said "you."  I didn't approach the
5  Chippewa Cree.  At the time that Think Finance
6  approached the Chippewa Cree, like I said, I was
7  aware that they were involved with some other
8  third-party in terms of having an existing online
9  lending relationship.  I didn't know at the time
10 the -- what the name of that entity was.  Subsequent
11 down, you know, six months, a year after the fact,
12 you know, I became aware that the -- the name of the
13 entity was Encore.
14     Q.  Well --
15     A.  But that's about the extent of my knowledge
16 related to that particular program.
17     Q.  What was the name of the -- of the loan
18 product that they supposedly were --
19     A.  I actually forget.  I know that there was
20 one, but I don't -- I don't remember what the name
21 is.
22     Q.  Do you know if they had any borrowers, any
23 customers?
24     A.  I would assume so, yes.
25     Q.  Well, I'm not asking what you assume.  I'm

1  saying, were you actually shown anything in your
2  visit with regard to the operations of a -- of a
3  lender?
4      A.  When we went up there and visited them in
5  person, we had -- I left with the -- the
6  understanding and the basic knowledge that yes, they
7  had an existing lending operation.  Did I see actual
8  customer loan agreements?  No.  Did I see actual
9  customers?  No.  It's an online lending entity.
10     Q.  And did you go on the -- on the internet to
11 see what the website looked like?
12     A.  No, I did not.
13     Q.  Do you know for a fact that there was --
14 was another lending operation that was -- that was
15 online at that point sponsored by the Chippewa Cree?
16     A.  Today, as I sit here, yes, I believe that
17 they had an existing prior lending -- online lending
18 operation with Encore prior to, you know, us
19 providing services --
20     Q.  Okay.
21     A.  -- for the Chippewa Cree.
22         MR. SCHEFF:  Let him finish.
23 BY MR. ACKELSBERG:
24     Q.  So to the extent that they were doing
25 anything online, it would have been through this

UNSEALED                    App. 0200

1  relationship, this prior relationship with Encore?
2      MR. SCHEFF: Object to the form.
3      A. My belief -- again, as I sit here today,
4  yes, they partnered with a company named Encore to
5  provide online lending products.
6  BY MR. ACKELSBERG:
7      Q. And what do you know about Encore, sitting
8  here today?
9      A. I know nothing about Encore.
10     Q. Nothing at all?
11     A. Nothing.
12     Q. Do you know if any of them went to jail?
13     A. No, I don't.
14     Q. Okay. So you went up with Jason and
15  Michelle. And was Ken there at that meeting?
16     A. Ken was not at that initial on-site.
17     Q. Okay. Was there -- was there any -- there
18  was no term sheet that was discussed at that
19  meeting?
20     A. As I said earlier, I don't recall when we
21  visited them, whether that was before signing the
22  term sheet or after the program had gone live. It
23  was right around that time. It could have been just
24  in advance. It could have been just after. I
25  apologize, I don't recall.

1      Q. And you don't remember the subject coming
2  up of how the tribe was going to fund -- fund the --
3  the loan originations?
4      A. No, I don't believe we discussed that.
5      Q. Do you remember discussing the revenue
6  share?
7      A. No. As I -- as I stated earlier, I was not
8  involved in the actual discussions with the tribe
9  regarding any of the term sheet.
10     Q. Who negotiated from the Think Finance side
11  the terms of the relationship with -- with Plain
12  Green?
13     A. I believe it was Jason Harvison.
14     Q. And was he also the one who was negotiating
15  with the Otoe-Missouria?
16     A. No, I believe that was Ken Rees.
17     Q. Okay. And on the Otoe-Missouria side, who
18  was Ken Rees negotiating with?
19     A. I don't know. I would assume it would be
20  the Otoe-Missouria tribe directly.
21     Q. Not with Mark Curry?
22     A. I -- I don't know. I wasn't involved in
23  that.
24     Q. Okay. And what about on the Plain Green
25  side, who was -- who was Jason negotiating with?

1      A. I believe it was Neal Rosette, and who, at
2  the time, I think was the CEO of the online lending
3  operation that they ran.
4      Q. Who worked on the deal documents once --
5  once there was a handshake with the Chippewa Cree?
6      MR. SCHEFF: Object to the form.
7      A. Once we had -- I'm assuming your question
8  is that once we had a signed term sheet by handshake
9  agreement, a term sheet, you know, I believe our
10  outside counsel would have been Paul Tauber with the
11  law firm Coblentz, Patch & Duffy, I think, was the
12  last -- the law firms with all the different names
13  involved. It would have been Paul Tauber. I don't
14  recall who represented the tribe, the Chippewa Cree.
15  I do know that Katten, you know, represented VPC,
16  you know, on behalf of GPLS.
17  BY MR. ACKELSBERG:
18     Q. Now, once there were deal docs, am I right
19  that they looked somewhat like the deal docs from
20  the Universal period?
21     MR. SCHEFF: Object to the form.
22     MR. SHAPIRO: Object to form.
23     A. In terms of the structure, as I answered
24  previously, from an accounting finance perspective,
25  the structure was very similar with the Chippewa

1  Cree, the Otoe-Missouria, the Tunica-Biloxi is what
2  it was with First Bank of Delaware and Irving Trust
3  Bank in terms of you have originating lenders, we
4  provided up front marketing services. As Think
5  Finance, we provided -- you know, licensed our
6  technology platform to the third-party lenders. And
7  then on the back end, there was the equivalent of an
8  admin agency agreement between us and the SPV,
9  whether it be the Universal Fund II or the GPLS
10  entity.
11  BY MR. ACKELSBERG:
12     Q. And there also was a guarantee and security
13  agreement where the corporation, Think Finance, was
14  backing certain obligations made by the various
15  subsidiary entities?
16     MR. SCHEFF: Object to the form.
17     A. There was a corporate guarantee involved in
18  the First Bank of Delaware, Irving Trust Bank and
19  then, yes, with the GPLS structure.
20  BY MR. ACKELSBERG:
21     Q. Now, let's -- let's just focus on Plain
22  Green at the moment, the first one. So we -- you
23  can agree that there was a marketing agreement with
24  TailWind, between TailWind and Plain Green, as there
25  was with the First Bank of Delaware, right?

UNSEALED

App. 0201

1    A.  I would agree with that, yes.
2    Q.  And there was another contract dealing with
3  the technology services and the loan platform with
4  TCDS, right?
5    A.  TCDS and Plain Green, yes.
6    Q.  Yes.  And there would have been a
7  participation agreement between GPLS, the special
8  purpose vehicle, and -- and Plain Green?
9    A.  Yes.
10    Q.  And there was an administrative agency
11  agreement, as you described, that had had a lot of
12  similarities to the administrative agency agreement
13  that predated the tribal contracts?
14    MR. SCHEFF:  Object to the form.
15    A.  There was an administrative agency
16  agreement between TCAS and GPLS.
17  BY MR. ACKELSBERG:
18    Q.  And a guarantee and security agreement
19  between GPLS and the corporate umbrella?
20    MR. SCHEFF:  Object to the form.
21    A.  Yes, there was a corporate agreement and --
22  or a corporate guarantee and security agreement
23  between --
24  BY MR. ACKELSBERG:
25    Q.  Now, the --

1    MR. SCHEFF:  Wait, let him finish.
2  BY MR. ACKELSBERG:
3    Q.  I'm sorry.
4    A.  -- between the parent company, Think
5  Finance, Inc., and the GPLS entity.
6    Q.  The revenue share that was paid to the --
7  to the Plain Green tribe pursuant to the master
8  participation agreement was 4.5 percent; am I right?
9    A.  As I recall, that is correct.
10    Q.  Okay.  And the guaranteed return to GPLS
11  was how much in the beginning?
12    A.  I don't recall.  I don't recall
13  specifically.  I'm going to guess that the -- it was
14  in the 18 to 20 percent range, 17 to 20 percent
15  range.
16    Q.  And how would you compare the obligations
17  that Think had to VP -- to Victory Park with the
18  obligations that Think Finance had to Wildstein back
19  in the original Universal era?
20    MR. SHAPIRO:  Object to form.
21    MR. SCHEFF:  Object to the form.
22    A.  I -- I could answer the question, from my
23  perspective, the corporate guarantee was generally
24  the same between Think Finance and the Universal
25  Fund II.  I wouldn't say -- you said Mark Wildstein.

1  I would say the guarantee was to, you know, the
2  performance of the credit default swap between
3  Universal Fund II and TCAS and the corporate
4  guarantee between Think Finance, Inc., and GPLS
5  and -- again, and a similar type of credit default
6  swap arrangement was relatively the same.
7    Q.  Was there a new element of exclusivity
8  introduced into the relationship between Think
9  Finance and Victory Park?
10    MR. SHAPIRO:  Object to the form.  The
11  witness just -- you're not listening to his
12  testimony, and you're misstating it, deliberately, I
13  think.
14    Go ahead.
15    A.  Can you repeat the question?
16  BY MR. ACKELSBERG:
17    Q.  I'm -- was there an element of exclusivity
18  in the arrangement between Think Finance and -- and
19  GPLS?
20    MR. SHAPIRO:  Object to form.
21    Go ahead.
22    A.  As I recall, I wouldn't say exclusivity.  I
23  believe that, like any typical lending relationship,
24  VPC, Victory Park Capital, providing the lending
25  into the GPLS entity had a right of first refusal to

1  match the potential terms of any other third-party
2  lender that may want to come in and lend to that
3  GPLS entity.
4    At the same time, the GPLS entity really
5  was, for lack of a better term, owned -- or at least
6  structured by Victory Park Capital.  So if -- that's
7  how I would answer that question.
8  BY MR. ACKELSBERG:
9    Q.  Did Think Finance have the power to -- have
10  the ability to assume any other debt, to take on any
11  other debt without the permission of Victory Park?
12    MR. SCHEFF:  Object to the form.
13    MR. SHELDON:  Object to form.
14    MR. SCHEFF:  You're talking about in
15  2011?
16    MR. ACKELSBERG:  Yeah.
17    MR. SCHEFF:  Thank you.
18    A.  It probably would have -- we would have
19  been able to raise other debt, again, under the
20  right of first refusal type of situation with
21  Victory Park Capital.  Meaning that, like, again,
22  any lending relationship, if we suddenly needed, you
23  know, financing for our direct lending payday
24  product -- which at the time I think we were
25  self-financing it, so we didn't.  But let's say that

UNSEALED

1  for whatever reason it really started to grow, we
2  would have, first, just because of the nature of the
3  relationship, approached Victory Park Capital. But
4  I believe -- and I may not be right on this, whether
5  they had a right of first refusal on anything else.
6       Clearly, they -- if we had brought in
7  another lender, for whatever reason, let's say that
8  they approved it, or even if they didn't need to
9  approve it, because they had the security agreement
10  on a lot of the other assets of Think Finance, you
11  know, any new lender would have been subordinated to
12  them in terms of those other assets.
13  BY MR. ACKELSBERG:
14      Q.  And did -- and, again, from -- we're
15  talking about 2011, the original deal with --
16  pertaining to Plain Green, did Victory Park have a
17  blanket security interest on the assets of Think
18  Finance?
19           MR. SHAPIRO:  Object to form.
20      A.  Yes.  As -- as I just mentioned, as part of
21  the structure with GPLS, because they were now a
22  sophisticated, you know, lender, they, like any
23  other one, we had a lending relationship with Silver
24  Park -- Silver Point Capital, as I talked about
25  earlier, you know, have a lien on the assets of the

1  company.
2  BY MR. ACKELSBERG:
3      Q.  The lien that Victory Park had, though, was
4  a senior lien that trumped -- that trumped other
5  liens; am I right?
6           MR. SCHEFF:  Object to the form.
7           MR. SHAPIRO:  Object to form.
8      A.  Well, at that point in time, we didn't have
9  any other debt relationship with any other
10  third-party lender, so it -- it was really
11  standalone.  It was senior to nothing else.  We had
12  nothing else -- and, really, the essence of that was
13  to provide, you know, additional collateral support
14  for the equivalent of the credit default swap
15  between TCAS and GPLS.
16  BY MR. ACKELSBERG:
17      Q.  And another form of collateral was --
18  required minimum investment by Think in GPLS; am I
19  right?
20      A.  That is correct.
21      Q.  And that's referred to as LTV?
22      A.  Yes, when you use the term "LTV," I
23  would -- I think it's an acronym for "loan to
24  value."
25      Q.  And so what was the nature of that -- of

1  that obligation that Think had?
2      A.  It was just -- as I just mentioned, it was
3  to -- in addition to having the blanket lien on the
4  other assets -- because when you look at a credit
5  default swap type of situation -- which is, again,
6  what we had between TCAS and GPLS -- on a monthly
7  basis, if there's, as I mentioned earlier, excess
8  net income at the end of the month, we were entitled
9  to that.  Under the credit default swap, that money
10  would be moved over to TCAS.  But then, technically
11  speaking, we could move that money from TCAS to our
12  parent company, to a PayDay One entity, to any
13  entity for general corporate purposes.
14      But Victory Park Capital -- and I get
15  this -- like any, you know, SPV-type structure would
16  be nervous that, well, really their agreement is
17  only between TCAS and them.  So as TCAS is, you
18  know, collecting premiums on the credit default
19  swap, if they're turning around and moving that
20  money out of TCAS to another Think Finance legal
21  entity, TCAS, theoretically, could not have any
22  assets.
23      And then suddenly -- if TCAS owed money to
24  GPLS because the loans went bad, then suddenly
25  they're a little bit more naked because -- and so

1  hence the reason for having kind of the lien and the
2  corporate guarantee, but then also the reason why
3  they would want us to kind of collateralize part of
4  that credit default swap, you know, to kind of
5  create similar to what we had shown on that earlier
6  slide, you know, a buffer between, you know, the
7  normal cash flows that typically exceed.  But in the
8  event that there was a hiccup and losses, you know,
9  they were requested and we were comfortable
10  providing, you know, kind of a reserve, so to speak,
11  to kind of collateralize the credit default swap.
12      Q.  And the way that functioned is that -- is
13  that you, as the CFO, would have to monitor the size
14  of the GPLS holding and -- and might have to, for
15  example, increase the investment that Think -- you
16  would have to monitor the -- the extent of the Think
17  investment on a monthly basis as it related to the
18  total GPLS fund; am I right?
19           MR. SCHEFF:  Object to the form.
20      A.  From my perspective, what that reserve or
21  investment required was similar to any other type of
22  traditional kind of credit default swap or, you
23  know, arrangement in terms of as the assets of GPLS
24  increased, meaning the participations purchased from
25  the various tribes, it seemed reasonable, yes, that

UNSEALED

App. 0203

1   we would have to increase the size of our kind of
2   collateral -- collateralizing part of our credit
3   default swap obligation to GPLS.
4           Conversely, if in -- you know, in this
5   particular industry, there's a seasonality aspect,
6   typically during Q1, customers, you know, related to
7   the loans get tax refunds and use -- in the right
8   way, you know, use a lot of the tax refund to pay
9   down -- pay down or pay off their loans with the
10  third-party lenders, which would then also reduce
11  the amount of assets in GPLS. We would -- at that
12  point, would also be able to reduce the size of our
13  credit default swap collateral obligation. So it
14  went up and down, and you're right, we did monitor
15  it on a monthly basis.
16  BY MR. ACKELSBERG:
17      Q.  And when -- and when sales were up, that
18  would mean that the way that that would work would be,
19  what you're describing as a reserve, you would
20  actually have to purchase a share -- purchase shares
21  in that amount in GPLS. Isn't that the way it would
22  work?
23          MR. SCHEFF:  Object to the form.
24      A.  The way it worked was that, yes, when we
25  put money in, we technically invested in GPLS but

1   that Victory Park, having, lack of a better term,
2   ownership or control of the GPLS entity, would have
3   the right to that. But, yes, we would buy a share
4   like any other third-party investor that VPC allowed
5   into the GPLS entity.
6   BY MR. ACKELSBERG:
7       Q.  And there also were in place things called
8   DACAs; am I right? You know what a -- DACA, that's
9   a deposit account control agreement?
10      A.  Yes.
11      Q.  Okay. And a -- and a DACA is, effectively,
12  a security interest on a bank account, right?
13          MR. SHAPIRO:  Object to form.
14  BY MR. ACKELSBERG:
15      Q.  It works like that?
16          MR. SHAPIRO:  Same objection.
17          MR. SHELDON:  Object to form.
18      A.  Say that one more time. And I apologize.
19  BY MR. ACKELSBERG:
20      Q.  Fine. What's a DACA?
21      A.  From my perspective, a DACA is -- is -- I'm
22  trying to think of how it would apply to the GPLS --
23  well, let's -- between GPLS and us, that we would
24  have nonTCAS bank accounts. So let's say that we
25  have a bank account at our parent company, Think

1   Finance, Inc., and we've got $5 million in that.
2   Well, because of the -- the security agreement
3   between GPLS and Think Finance, Inc., you know, in
4   the event that TCAS defaulted on the credit default
5   swap obligation and GPLS couldn't be made whole
6   from, you know, the investment reserve concept where
7   we had put money in, that they would have the right
8   to then go to whoever our bank was with the parent
9   company under the deposit account control agreement
10  and say:  Hey, Think Finance/TCAS is in default on
11  this credit default swap obligation, you know, we
12  want to be able to, for lack of a better term,
13  freeze or take control of the parent company cash
14  account.
15          So my understanding is really the DACA
16  really is only effective, you know, in the event of
17  default where we don't have the ability to remediate
18  or pay them off.
19      Q.  But it gives them a remedy with --
20  specifically with regard to bank accounts, right?
21          MR. SCHEFF:  Object to the form.
22  BY MR. ACKELSBERG:
23      Q.  In the event of a default?
24      A.  It gives them a remedy to bank accounts in
25  the event of default.

1       Q.  And that -- and there also were DACAs with
2   regard to the -- to the tribal -- well, let's stick
3   with -- let's stick with Plain Green. With regard
4   to the Plain Green funding account and collection
5   account, in other words, the accounts that were used
6   in the -- in the funding and collecting of loans; am
7   I right?
8       A.  The way the DACAs worked with Plain Green
9   and GPLS is because -- and I'll just use Plain
10  Green, but it was similar with Great Plains Lending
11  and similar with Mobiloans lending and those tribes.
12  Is that as the originating lender, the tribe was
13  responsible for, you know, funding all of the -- a
14  hundred percent of the customer loans, and then two
15  to three days later, they would sell a participation
16  interest into the GPLS fund.
17          When a customer made a payment on the
18  loans, a hundred percent of the customer payments
19  went into a Plain Green collections account, and
20  Plain Green would then be responsible for -- and
21  forgive me, I don't know whether it happened same
22  day or next day, but be responsible. And we, as
23  TCAS, part of our accounting -- and I know that
24  you've previously deposed Linda Rogenski and Linda
25  Callnin, but that's part of their responsibility

UNSEALED

was, you know, ensuring that the tribes, you know, were moving, you know, 90 percent of the collections from the Plain Green collection account to the GPLS collection account.

So my understanding in that kind of situation, the DACA would be there to help enforce that if for some reason the Chippewa Cree and the Plain Green, you know, collection account wasn't properly remitting, you know, the money under the participation agreement the 90 percent of the collection to the GPLS, that VPC would have the right to go to the Plain Green bank and say, hey, they're in default under our participation agreement, you know, we have the right to get our 90 percent.

Q. Yeah, and I appreciate you saving us some time in saying that this was true of Great Plains Lending and Mobiloans, that that -- that these features with regard to the relationship between Think Finance and VPC, it really -- it -- there really wasn't a difference tribe by tribe except as to the amount of the revenue share; am I -- am I right?

MR. SCHEFF: Object to the form.

A. The way I would view GPLS is it was almost

kind of, like, a master SPV that was created in a way that VPC would be the primary lender into that SPV. Theoretically, they could allow other lenders into that SPV if they so chose. But, yes, that that GPLS master SPV was buying participations from multiple tribal entities, not just one.

BY MR. ACKELSBERG:

Q. Yeah.

A. And that was done more for probably just ease overall. I mean, it's easier for us to, you know --

Q. I would think so.

A. For them to manage one and for us to move money back and forth between one and three tribes rather than to have. . .

Q. Right. I understand.

But I'm also right, though, that there was one difference tribe to tribe, and that is the amount of the revenue share?

A. Yes, because, I mean, each tribe was a separate relationship between -- each tribal lending was a separate relationship between that particular tribe and GPLS, and even us as the service provider under the marketing agreement and the Decision Sciences agreement, yes.

Q. Well, but those -- the TailWind and Decision Science ones, that was standard across all three of the tribes; am I right?

MR. SCHEFF: Object to the form.

A. Yeah, I -- I don't recall whether we charged each tribe the same marketing fee or -- or licensing fee. It's quite possible and reasonable, but at the same time I would also say that we would have the right to make them different if we so chose. If some reason we were incurring more marketing expense to, you know, attract customers to the Tunica-Biloxi Mobiloans product, we would have the right, if we so chose, to change the marketing fee between us and them to increase that fee.

BY MR. ACKELSBERG:

Q. But if we wanted to know whether there were differences in the fees or they were the same, we would just look at the respective marketing and servicing and licensing agreements, right?

A. Yes. I mean, you know, we had separate marketing agreements between us, our TailWind entity and each of the three tribes. And the same with the TC Decision Sciences entity.

Q. Right.

A. So -- and as I said, I don't recall if they

were the same. They might have been just for -- for ease. And, generally, the -- the amount of marketing and servicing was -- probably cost us the same.

Q. And with regard to the -- to the participation agreements that GPLS had with the three different tribes, there was a difference with regard to the revenue share that GPLS would pay to the respective tribal entity; am I right?

A. As I recall, yes, when I remember looking at the -- back in time in looking at those master participation agreements between GPLS and each of the three individual tribes, there -- there probably were differences in the revenue profit share.

Q. So am I right -- so we already mentioned that Plain Green was a 4.5 percent revenue share, right?

A. I believe so, yes.

Q. And Mobiloans was a 4 percent, a little bit lower; am I right?

A. I don't recall specifically, but I'll -- I'll assume that you're telling me the correct percentage.

Q. And Great Plains Lending was more a, sort of, sliding scale like it was with First Bank of

UNSEALED

1   Delaware; am I right?
2       MR. SCHEFF: Object to the form.
3       A.   Yes, as I recall, it was -- the
4   participation agreement in terms of profit share,
5   revenue share between GPLS and Great Plains Lending
6   was a sliding scale.
7   BY MR. ACKELSBERG:
8       Q.   And during the course of the products, the
9   GPL -- the Great Plains Lending revenue share paid
10  by GPLS tended to be higher than the revenue share
11  paid by Mobiloans -- paid to Mobiloans or Plain
12  Green; am I right?
13      MR. SHELDON: Object to form.
14      A.   My understanding is, yes, the -- the level
15  of profit share being paid by GPLS to Great Plains
16  Lending was higher than the other two tribes, but my
17  understanding, also, was that the average APR and it
18  was higher for that Great Plains Lending product
19  because it was viewed as a slightly riskier customer
20  base that they were targeting. The Otoe-Missouria
21  was a slightly riskier customer than what Plain
22  Green would have been originating to or what Tunica
23  through Mobiloans would have been originating to.
24      So I think that's probably the reason why
25  Great Plains received a higher profit share was

1   because the APR, in general, was higher. It was a
2   riskier customer. So GPLS, with their 90 percent,
3   would have been probably receiving more revenue, on
4   average, potentially, per customer, so they were
5   willing to give more profit share to Great Plains.
6   BY MR. ACKELSBERG:
7       Q.   And the -- so that would have been really
8   part of the -- those initial negotiations that you
9   weren't a part of; am I right?
10      MR. SCHEFF: Object to the form.
11      A.   The -- the participation agreements -- I
12  mean, really, the participation agreements between
13  GPLS and each of the three tribes, yes, I wasn't
14  directly, you know, involved in. But, yeah, whoever
15  was negotiating those agreements certainly would
16  have negotiated those terms.
17  BY MR. ACKELSBERG:
18      Q.   And you don't -- you don't recall who was
19  negotiating for Plain Green, right? I think you
20  told us that before.
21      A.   Yeah, yeah, I don't recall who negotiated
22  on behalf of Plain Green.
23      Q.   And is the answer the same for Mobiloans?
24      A.   For Mobiloans, I don't recall. I mean, I
25  recall visiting them on site, along with Jason

1   Harvison, and, you know, presenting the concept to
2   their entire tribal council, not just their tribal
3   lending entity but their entire tribal council. But
4   I don't -- I can't recall exactly who handled the
5   negotiations for the Tunica -- on behalf of the
6   Tunica tribe or the -- the Mobiloans entity. I do
7   recall that Rick Eckman, I believe, was their
8   outside general counsel and representing them on
9   those transactions.
10      Q.   And he was the counsel for First Bank of
11  Delaware as well?
12      A.   He was at one point in time, I believe, an
13  outside general counsel for -- for First Bank of
14  Delaware. I don't know if he was still at that same
15  time. I don't know.
16      Q.   But you don't know if he was representing
17  Plain Green?
18      A.   I don't remember if he was representing
19  Plain Green in their initial discussions with this.
20      Q.   Okay. So just as you did an early trip
21  personally, you were part of the Think delegation to
22  Box Elder, you were also --
23      A.   I'm smiling because I -- I forgot the name
24  of the city right there, but yeah.
25      Q.   I know. You stayed in a motel in Havre,

1   and -- yeah.
2       A.   Yeah.
3       Q.   We know the whole -- the whole routine,
4   yeah.
5       A.   It's actually very pretty country.
6       Q.   Yeah, right, it is.
7       You were also part of a delegation
8   precontract with the Tunica-Biloxi?
9       A.   Yeah, the -- the Tunica-Biloxi relationship
10  happened later in 2011. As I recall, they were
11  referred to us by Bob Johnson, who we had partnered
12  with through the Irving Trust Bank agreement. We
13  were interested in offering a line of credit product
14  like we did with Irving Trust -- through Irving
15  Trust Bank.
16      We were interested in offering a similar
17  type of line of credit product with the tribe, and
18  Bob was aware of the Tunica-Biloxi tribe because --
19  I believe they might be be the only African American
20  Indian tribe in the U.S., and Bob, you know, founder
21  of the black entertainment network, heavily involved
22  in, you know, the African American business
23  community had, you know, somehow established a
24  relationship with them up through DC lobbying
25  efforts or whatnot.

UNSEALED

But -- you know, and we had kept in touch with Bob after we stopped partnering with Irving Trust Bank. And if I say it was his bank, he technically didn't own all of it, but he was involved in that bank somehow. But, you know, he referred us to them.

And so we had to go out -- "we," Jason, myself, Michelle Nguyen, I believe, went and did a presentation to the Tunica-Biloxi tribe, because unlike the other two, I don't believe that they had an existing online lending product or relationship with any other service provider. So this was new to them. So, you know, Bob encouraged us to go out and make a presentation to their formal tribal council.

Q. And how -- and what were you suggesting to the Tunica would be their means -- or did you suggest any way that they could fund the loans up front?

A. The thing that I still recall to this day, I was amazed when we -- when we flew into Tunica-Biloxi, Louisiana, what really struck me was, one, how large their tribal casino was; two, how large their, you know, tribal government office, so to speak, was.

And as we were -- we were -- we got there early for the presentation. We were in a separate room kind of like outside of here. And we were sitting in the lobby, and there were two gentlemen across from us with either, like, Goldman Sachs or Credit Suisse, investment bankers, that were pitching another deal to this tribe. And I'm, like, wow.

I remember whispering to Jason that this must be a pretty sophisticated tribe given the size of their casino, which was easily six or seven stories high, hotel casino, and then the fact that there's, you know, investment bankers in the lobby waiting to pitch whatever the next deal happened to be.

So I think maybe -- well, I mean, I was impressed with, you know, their operations. They seemed to be pretty sophisticated. So to your question about whether I was nervous or whatnot about, you know, how they would come up with the capital, clearly not because they -- just based on bumping into investment bankers in their lobby, seeing the size of their operations, even more so than the other two tribes, they seemed to be pretty sophisticated and definitely had access to

capital.

Q. Have the Tunica-Biloxi, over the course of their relationship with Think Finance, ever provided the -- the funding capital for the loans originated in the name of Mobiloans?

A. I don't recall specifically whether they -- they provide the upfront money to originate their loans or whether they were borrowing that from some other third-party entity.

Q. Or what about from GPLS?

A. Well, GPLS would -- as part of the structure -- and this makes sense from a tax perspective -- is that the one thing that all of the tribes -- and I think even when you go back to the First Bank of Delaware agreement, from a regulatory perspective, the FDIC, you know, the bank -- the tribes are capital constrained. There's always a concern that what if we originate a hundred percent of the loan, and as part of these master participation agreements, which I'm sure you're aware, you know, at any point in time GPLS can say, no, we choose to no longer purchase participations.

One of the things I always liked about the structure we had with the bank -- banks and the structure with the tribes is that at any one point

in time, any of the three parties involved could choose to stop being a part of the relationship. At any point in time, any of the tribes or the banks could say we choose to no longer originate loans. At any point in time as part of the master participation agreement, GPLS could say we choose to no longer purchase participations. And we, at any point in time, as the marketer licensing the technology could choose upon whatever the required notice was to say we're no longer going to market your product or give you our scores.

So what -- what the tribes were concerned about, and the same with the FDIC concern from First Bank of Delaware's perspective is, what happens if you originate the loans a hundred percent and before you can sell them, the 90 percent or 99 percent participation interest to GPLS or the Universal Fund II, what happens if those investors say we're not going to buy anymore? And so there was this concept both with -- I believe with First Bank of Delaware and then also with the tribes, and the tribes in particular -- because you can appreciate, even Tunica, as sophisticated as they are, are probably more capital constrained than your traditional bank -- you know, there -- and the fact that we had

1  also -- I shouldn't say "we." The lawyers had
2  introduced the concept of you've got to wait two or
3  three days -- I think it might be two, maybe
4  three -- from the point --
5          MR. SHELDON: Let me just put in an
6  objection here and just say to the extent that your
7  answer requires revealing any information that was
8  communicated to you by Think's lawyers or Think's
9  outside counsel, please don't give -- provide that
10  answer. If you have any questions about it, we can
11  step out in the hall. To the extent your answer is
12  just conveying what ended up in a document, you
13  know, please talk about what ended up in a document,
14  not what -- what was communicated to you by Think's
15  in-house or outside counsel. Okay?
16      A.  Okay. Let me just finish the thought. I
17  know this was a little long-winded, but I think it
18  was an important point and that's why I'm taking my
19  time here.
20          Is that with each of the tribes, for tax
21  purposes, they held on to a hundred percent of the
22  originations of the loans for two to three business
23  days before they sold the participation to the GPLS
24  entity.
25          As you can appreciate, thousands of

1  customer loans could be originated on a daily basis
2  by each of those tribes. They were concerned that
3  they would originate two to three days' worth of
4  loan and GPLS would say: We're not going to buy it.
5  And, suddenly, they're on the hook for a hundred --
6  holding a hundred percent of those loans and being
7  capital constrained on a pretty immediate time
8  space.
9          So what the lawyer -- what the concept
10  was, was to introduce that GPLS would advance two to
11  three days in the form of a reserve that in the
12  event that it said, no, we're not going to buy any
13  more, there was already a reserve to cover the two
14  to three days' worth of loans originated.
15  BY MR. ACKELSBERG:
16      Q.  Okay. That's what I was --
17      A.  So I'm sorry it was so longwinded, but
18  that's -- I wanted to get that out there. It was
19  really for the -- from my perspective, the tax and
20  the delay in being able to sell same day.
21      Q.  So I just -- I think I understand your
22  answer.
23          So I was asking how the loans were funded
24  in the first place, and it sounds like with
25  Mobiloans, the answer was there was a reserve

1  account that GPLS set up to serve that function. Am
2  I right?
3          MR. SCHEFF: Object to the form;
4  misstates the testimony.
5          Answer the question if you can.
6      A.  I wouldn't phrase it that way. There was a
7  reserve that if the tribe wanted to use it for
8  originating loans or for other purposes, it had,
9  because it was meant -- capital meant to kind of
10  cover them in the situation that if GPLS stopped
11  buying, that covered the two to three days' worth of
12  loans that -- that they would have originated. Each
13  of the tribes could have had alternative sources for
14  funding the loans. I don't have privy to that
15  information.
16  BY MR. ACKELSBERG:
17      Q.  Well, they could have, but you're -- you're
18  not aware of them ever having -- having supplied any
19  outside funding capital to the funding of Mobiloans
20  loans --
21          MR. SCHEFF: Object to the form.
22          You can answer the question.
23  BY MR. ACKELSBERG:
24      Q.  -- loans, do you?
25      A.  I'm not aware of -- I just don't -- I don't

1  have enough knowledge to answer that question. I
2  don't know.
3      Q.  You sat in, it sounds like, on two -- two
4  sales -- sales visits, one at the Chippewa Cree and
5  one at Mobiloans. You went with Jason and Michelle
6  or people from the product side, right? So this
7  happened twice, right?
8          MR. SCHEFF: Object to the form.
9          You can answer the question.
10      A.  From my perspective, I wouldn't call those
11  sales pitches. The Chippewa Cree was not a sales
12  pitch, as I think we discussed earlier. We might
13  have already signed the term sheet or we might have
14  been in the process. It was more of just an onsite
15  visit to meet our business partners.
16  BY MR. ACKELSBERG:
17      Q.  Do you remember -- do you remember the
18  term -- do you remember the -- you were at the
19  initial Mobiloans trip, though. And I'm wondering,
20  during that trip, do you remember someone on the
21  Think side explaining that the Tunica would not have
22  to lay out any money?
23      A.  I -- I don't -- I was at that presentation.
24  I don't specifically recall, but it's -- yeah, I
25  don't -- I don't recall specifically. I'm sure what

UNSEALED

1   we would have -- would have explained to them is
2   with the reserve concept, that they shouldn't be
3   concerned from a capital perspective that they would
4   be originating loans that they would not be able to
5   sell at least 90 percent participation interest to
6   GPLS.
7       Q.  Okay.  Thank you.
8       Do you remember the term "turnkey"?
9       A.  I would not have used it from a finance
10  perspective.  So I --
11      Q.  I'm not suggesting it's a financial term.
12  I'm asking whether --
13          MR. SCHEFF:  Let him finish his
14  answer.
15  BY MR. ACKELSBERG:
16      Q.  -- you remember the term being used by
17  other members of the team:  Michelle or Jason, for
18  example?
19          MR. SCHEFF:  Object to the form.
20      You can answer the question if you can.
21      A.  No, I don't specifically recall.
22  BY MR. ACKELSBERG:
23      Q.  You have seen it -- you have seen marketing
24  material where Think's services as a service
25  provider are described as a turnkey, haven't you?

1           MR. SCHEFF:  Object to the form.
2       You can answer the question.
3       A.  I would say that from the services we
4   provide, the marketing services, the licensing of
5   the technology, in essence, yes, what we do is
6   turnkey.  But there were certainly obligations that
7   the tribes as the originating lender would still be
8   a hundred percent responsible for that we were not
9   involved in at all.  So --
10  BY MR. ACKELSBERG:
11      Q.  Like what?
12          MR. SHELDON:  Hold on.  Can we stop
13  for a second, please?  Irv, I realize that you're
14  frustrated with some of the witness's answers and
15  you don't like some of the answers because of your
16  tone and you don't like the length of answers.
17  But at probably a dozen different points through
18  this deposition already, which is only halfway
19  through, you've cut the witness off.  And I'd just
20  ask you to please let the witness finish and wait
21  until the end.  The witness is allowed to give the
22  full answer that he believes is necessary for any of
23  your questions.  Okay?
24  BY MR. ACKELSBERG:
25      Q.  My question was, like what?

1       A.  From my perspective, things that the tribe
2   would be responsible for besides just originating
3   the loan and, you know, reviewing, you know, the --
4   the credit decisioning suggestions or scores that we
5   gave them for their approval and understanding, and,
6   you know, the ACH things out of their accounts and
7   all of that stuff, they would be responsible for
8   the -- the customer support and the collections.
9       We did not handle the collections in any
10  way.  We helped provide monitoring services to help
11  them monitor the outsourced customer support and
12  collections, but that ultimately was responsible for
13  the tribes.  I'm sure I'm probably forgetting some
14  other operational things, but by no means did we
15  ever provide everything.
16          MR. ACKELSBERG:  I'm going to break
17  very soon.  I know we're all hungry.  I'm just
18  trying to get to a good cutoff point.
19  BY MR. ACKELSBERG:
20      Q.  So with Mobiloans, the funding of the loans
21  up front was done through a -- the reserve account,
22  right, that you described?
23          MR. SHAPIRO:  Object to form.
24          MR. SCHEFF:  Object to the form.
25      A.  That's not how I would phrase my answer.

1   There was a reserve account established, like I said
2   previously, to cover the two to three days' worth of
3   originations that they provided.  Whether they chose
4   to use some of those funds to help them originate
5   loans or whether they used other third-party
6   capital, I'm not aware of.
7   BY MR. ACKELSBERG:
8       Q.  Okay.  And the same was true of Great
9   Plains Lending?
10      A.  Yes, I believe so.
11      Q.  And what about Plain Green?
12      A.  Plain Green, that was the -- as you're
13  aware, the first transaction that we entered into.
14  I don't think the reserve concept was introduced
15  with them.  Like I said, I know that they had an
16  existing lending relationship with Encore or
17  whoever.  They had other capital means.  So, no,
18  there was no reserve -- initial -- initial reserve
19  concept, as I recall.  Whether we amended that
20  later, I know that there was suggestions, but I
21  can't recall whether that actually happened.
22          MR. ACKELSBERG:  Okay.  This is a good
23  time to break.
24          THE VIDEOGRAPHER:  We are off the
25  record at 12:41 p.m.

## Page 169

1    (Break taken, 12:41 p.m to 1:22 p.m.)
2    THE VIDEOGRAPHER: We are back on the
3  record at 1:22 p.m.
4  BY MR. ACKELSBERG:
5    Q.  Before we broke, Mr. Lutes, we were talking
6  about the -- how the loans got funded in the first
7  instance, specifically with regard to Plain Green,
8  and I want to show you a few agreements and ask
9  for -- for your comments.
10   A.  Sure.
11     MR. ACKELSBERG: So the first one, I
12  am going to -- I am going to identify it as Exhibit
13  P-244.
14     (Exhibit No. 244 marked.)
15   A.  (Reviews document.)
16   Okay.
17  BY MR. ACKELSBERG:
18   Q.  Okay.  Does this -- does this refresh your
19  recollection at all about how the loans got funded
20  in the first instance in the beginning of the Plain
21  Green relationship?
22     MR. SCHEFF: Object to the form.
23   A.  As I've discussed before, I'm not sure
24  whether there were any other capital arrangements
25  for Plain Green to help fund loans, but I am

## Page 170

1  familiar with the Haynes Investment to Plain Green,
2  LLC.
3  BY MR. ACKELSBERG:
4    Q.  And so at the inception of the product,
5  Mr. Haynes, through this entity Haynes Investment,
6  provided $2 million in lending capital to the tribe;
7  am I right, to -- to Plain Green, LLC?
8     MR. SCHEFF: Object to the form.
9    A.  I'm not sure I would use the term "lending
10  capital." Working capital for the -- for the
11  program, yeah.
12  BY MR. ACKELSBERG:
13   Q.  Okay.  Well, in fact, it had to be used to
14  fund loans.  It couldn't be used for any other
15  purpose; isn't that what the -- wasn't that your
16  understanding of what the purpose of this was?  I'm
17  not asking for your legal opinion.
18   A.  No, no, I'm just -- I wasn't a hundred
19  percent certain whether it was required just for
20  funding the loans or whether it could be used for
21  other working capital related to the -- the loan
22  program.
23   Q.  Okay.  I see.
24   You'll see that under the Recital B, "The
25  credit facility will be used to assist the borrower

## Page 171

1  with the funding of certain installment loan
2  programs." Do you see that?
3   A.  Yes.
4   Q.  Okay.  So you -- you do remember there
5  being a credit facility that Plain Green, LLC, had
6  with Haynes Investments in the beginning?
7   A.  Yes.
8   Q.  Okay.  Do you remember anything about how
9  it came to be?
10   A.  No.  I -- I don't recall those initial
11  conversations regarding Plain Green, Haynes or even
12  us and how we were involved with Haynes.
13   Q.  Okay.  And let me show you another
14  agreement.
15     MR. ACKELSBERG: This one is 245.
16     (Exhibit No. 245 marked.)
17   A.  (Reviews document.)
18   Okay.
19  BY MR. ACKELSBERG:
20   Q.  Do you remember this agreement?
21   A.  Yes, I do.
22   Q.  And why don't you explain to me what the
23  purpose of this agreement was?
24   A.  The purpose of this agreement was for us to
25  lend money to Haynes Investment.

## Page 172

1   Q.  So that Haynes Investment could lend it to
2  Plain Green, right?
3   A.  Correct.
4   Q.  Okay.  And, in fact, I recall it was either
5  the deposition of -- it was one of the Lindas where
6  she kind of described there actually was a bank
7  account that was a -- was a Haynes bank account and
8  a Plain Green bank account where -- and a -- and a
9  Think -- I forgot which entity it was which --
10     MR. SCHEFF: Let him finish his
11  question.
12  BY MR. ACKELSBERG:
13   Q.  I forgot what the name of the Think entity
14  was, but there actually were -- there was actually a
15  tran- -- on occasion, a transfer of money
16  facilitated by the finance department staff from the
17  Think Finance account to the Haynes account to the
18  Plain Green funding account.  Right?  And so you're
19  familiar that that was -- that there was actually a
20  Think Finance operation that corresponded to these
21  agreements?
22   A.  Yes.
23   Q.  Okay.  What was the purpose of Think
24  Finance giving money to Haynes to give to the tribe?
25     MR. SCHEFF: Object to the form.

WWW.KLWREPORTERS.COM

UNSEALED
App. 0210

A. I'll go ahead and answer. Like I said, I wasn't sure exactly, you know, whose idea it was to set the lending relationship this way, you know -- you know, us to Haynes, Haynes to Plain Green, or -- instead of us directly to Plain Green or Plain Green from someone else. I think -- because I wasn't involved act- -- as I mentioned earlier, actively involved in the discussion. As the CFO, I was more concerned about, you know, the ultimate repayment of any loan, whether it was our loan to Haynes or loan -- corresponding loan to Plain Green.

And so, you know, regardless of how we set it up, in retrospect, what I was comfortable with -- or what I was told at the time is, well, one, Haynes introduced us to Plain Green. Haynes has done previous financings with Plain Green. So I think there was a comfort level of -- in terms of providing funds from Think Finance, ultimately, you know, to Plain Green, that it was the preference, my guess, of Haynes and the Plain Green Chippewa Cree tribe to have them have an existing lending relationship, because they had had prior existing lending relationships.

We had met Steven Haynes. I think, from my perspective, as the CFO, even though I didn't --

I can't say that I came up with this, we've got to lend to Haynes and Haynes has got to lend to the tribe, I got comfortable, because, from my perspective, I'm ultimately, as CFO, concerned about repayment. And it seemed a lot easier to be repaid by Haynes than necessarily by the tribe in the event that -- like in any -- I always assume any -- any business deal can go sideways. If I ended up in court, I would rather end up in court with Steven Haynes as an individual than, you know, the Plain Green tribe that I had never done business with before.

BY MR. ACKELSBERG:
Q. So you think this might have been actually to provide some sense of security to Think?
A. I wouldn't phrase it that way. I said in retrospect, as the CFO, I would be more comfortable lending to Haynes and Haynes lending to the tribe rather than Think Finance lending directly to the tribe, because I would view, again, that in the event that the deal went sideways, two things: One, it's easier for -- I believe easier for us to sue or, you know, whatever it takes to get our money back from Haynes, than it would be to go through the process of trying to get our money back from a

tribe.

And, two, I also kind of viewed it as there's two sources of repayment. You know, there also, you know, clearly entering into a business relationship with the Chippewa Cree Plain Green. So, you know, I know ultimately my first source of repayment is from Haynes, but, you know, he technically is being repaid by Plain Green. So if -- if Haynes doesn't repay us, I can always go to Plain Green, you know, through our relationship, and say, hey, you know, you borrowed from Haynes, and we had lent to Haynes, you owe us since Haynes is reneging on this deal.

Q. And do you think it was -- it was largely Think that drove the decision to structure it this way as opposed to --
A. No, no. Well, I don't recall. I believe it was a comfort level between Plain Green and Haynes, because Plain Green had done business with Haynes before. Appreciate, from their perspective, they had generally never met us before. I mean, you know, I think they felt much more comfortable interacting with Steven. Steven had introduced us to them, is my understanding.

From my perspective, I believe it was a

comfortable level that Haynes and Plain Green had with each other that, hey, if we're going to be lending money, have Think lend to Haynes, have Haynes lend to Plain Green. That's my belief.
Q. How -- was this just another cost that was reimbursed, or was -- did this come out of the -- I'm talking about the -- so the interest cost to the tribe, whether -- whether you look at it as getting the money from Think or you're looking at it as getting the money from Haynes, the tribe is borrowing money at -- what was it, 6 percent? I'm trying to remember what -- you know, help me -- help me remember what the terms were.
A. Well, let's look at the actual agreement. On page 2, Section 2.3, it says, "The rate of interest will bear at 5 percent per annum," which at that time was probably, you know, fair value.
Q. And the same 5 percent Think to -- Think to Haynes, right?
A. Yeah.
Q. Yeah. Okay.
So what I'm asking is, was that -- we -- in other depositions we've gone through the whole way that -- that the tribe's expenses were reimbursable through the program.

44 (Pages 173 to 176)

UNSEALED

App. 0211

```
 1        A.   The program-related expenses?
 2        Q.   Yes.  Yes.  And would this be considered a
 3   program-related expense, that the interest -- the
 4   interest expense under these credit agreements?
 5        A.   Yeah, I -- I don't recall off the top of my
 6   head.  I'm assuming that because these are
 7   stand-alone credit agreements separate from the
 8   master participation agreement, which typically
 9   would handle the reimbursements that are program
10   related between the tribe and GPLS, that, no, that
11   they wouldn't be subject to that master
12   participation agreement, that the tribe would be
13   responsible for paying 5 percent interest to Haynes
14   and Haynes would be responsible for paying 5 percent
15   interest to us.
16        Q.   So would then -- and would Think, in its
17   distribution to the tribe, then reduce the
18   tribe's -- the tribe's program revenue by the amount
19   that they owed to -- the amount that they owed under
20   this credit facility?
21        A.   I don't recall whether we netted that as
22   just part of, like, a monthly settlement that, hey,
23   you know, here's, you know, what you owe -- what you
24   owe us from a marketing standpoint and a licensing
25   fee standpoint, and, by the way -- you know, I'm not
```

```
 1   sure how it eventually got settled, if it was net or
 2   whether it was gross.
 3        Q.   Well, with regard to for, example, the --
 4   the TailWind and the TCDS fees, the tribes never
 5   paid that, right?
 6             MR. SCHEFF:  Object to the form.
 7        A.   I'm confused by the question.  Can you say
 8   that again?  You said that they --
 9   BY MR. ACKELSBERG:
10        Q.   Well, the tribes never had to actually pay
11   that, right?  They would just -- there would be
12   money in from GPLS to pay that bill, and then it
13   would be paid.  It was just money in, money out.  It
14   was not a -- it was a wash every month.  I think we
15   already went through this.
16        A.   No, I don't -- I don't think that's my
17   understanding.  My understanding is I think it would
18   have been split 1 percent/99 percent.  So the tribe
19   would have been responsible for settling up on the
20   marketing fee directly with TailWind Marketing, the
21   same with TC Decision Sciences.  Typically on the
22   same day, the tribe would settle with GPLS for
23   99 percent of that applicable amount.
24        Q.   Right.  So -- so at least as to 99 percent
25   of the fees charged by TCDS and TailWind, the tribe
```

```
 1   wouldn't actually have to lay that money out; it was
 2   really just money in, money out, right?  They'd get
 3   the reimbursement from -- from GPLS, and then the
 4   money would effectively --
 5        A.   Yeah, I'd probably refer you back to Linda
 6   Rogenski and Linda Callnin's testimony.  But, I
 7   mean, the way I would have conceptualized it is, is
 8   that literally on the same day of every month end
 9   when we kind of settled the month-end books,
10   TailWind would bill Plain Green or the other tribes
11   a certain marketing fee.  They'd bill them a
12   Decision Sciences fee.  The tribes would pay that
13   full amount, but on that same day, the tribes would
14   also be reimbursed by GPLS.
15             So they were gross transactions, because
16   they're individual transactions.  We're not netting
17   it.  But that, you know, it all happened on the same
18   day.  Because, clearly, I mean, again, the tribes
19   are somewhat capital constrained and, you know, the
20   marketing fee or the licensing fee could be a pretty
21   large dollar amount and they need to be reimbursed
22   that same day by 99 percent.
23        Q.   And --
24        A.   So it all happens on the same day.  I'm
25   just not sure -- I would not agree that it's all
```

```
 1   just kind of netted together.  I think there's
 2   individual transactions that end up netting on the
 3   same day.
 4        Q.   I see.  You read the transcripts for Linda
 5   Rogenski and Linda Callnin?
 6        A.   No, I did not.
 7        Q.   Oh, you didn't?  Okay.
 8        A.   Sorry.
 9        Q.   And that -- and other expenses that the
10   tribes incurred were handled the same way as the --
11   as the TailWind and the -- and the TCDS fees; in
12   other words, if the tribes incurred program-related
13   expenses, like, for example, their legal fees, that
14   was reimbursed by GPLS, right?
15             MR. SCHEFF:  Object to the form.
16        A.   The -- the expenses that would be
17   reimbursed by GPLS to Plain Green or to any of the
18   other two tribes would either have been directly
19   outlined in the master participation agreement, or
20   in the event that, for some reason, that master
21   participation agreement was somewhat ambiguous as to
22   whether the expense should be reimbursed, there
23   would probably be separate phone calls, whatnot,
24   related to agreeing to whether or not it ended up
25   being reimbursed.  So, I mean, I'm sure there was --
```

UNSEALED

BY MR. ACKELSBERG:

Q. Phone calls to who?

A. I would say phone calls probably between Plain Green -- for instance, Billi Anne saying: I have incurred X legal expense. You know, we believe that this is program related and should be reimbursed by GPLS, but it's not necessarily spelled out in the participation agreement. We'll submit the invoice. You know, do you agree and can you, you know, agree that GPLS and us, as the admin agent, kind of, you know, moving the funds between GPLS and Plain Green? You know, it would probably be, like, Michelle Nguyen or Jason Harvison that would typically sign off on that type of expense if it was, indeed, reimbursable. Of if it wasn't, they would probably, you know, have the conversation or an e-mail explaining, no, we feel this is something that's outside the program and the tribe has to absorb this expense themselves.

Q. And your recollection or belief is that the -- that the interest expense from the Haynes transaction was not treated as a programming expense, that it was something that the tribe had to take care of itself?

A. I don't recall whether -- whether they paid

it or whether it was one of those types of lending relationships where it accrues but is really not paid until ultimately the loan is ultimately repaid at the end. I can't recall if they paid us -- paid Haynes and Haynes paid us on a monthly basis or it just continued to accrue interest and settled all at the end. From my perspective, it was rather immaterial to the overall relationship.

MR. ACKELSBERG: Okay. All right. Let's look at another document, 246.

(Exhibit No. 246 marked.)

BY MR. ACKELSBERG:

Q. And just so you understand that the -- on the lower right-hand corner, this Bates is a different -- has a different prefix. You see it says GPLP. That means we got it from Victory Park. Okay?

A. Okay. Can I have a quick minute --

Q. Oh, of course. Yeah, yeah.

A. -- to read the e-mail chain? Because I see that it was coming from me originally.

(Reviews document.)

Okay.

Q. My question -- well, first of all, so this is -- as you can see, it's an exchange, June 2012,

between yourself, various people from either Victory Park or Katten, right?

A. Correct.

Q. And also Ken Rees. Angela McQuien was -- was your account --

A. McQuien.

Q. McQuien -- was your accounting?

A. She was my chief accounting officer.

Q. Right. And Paul Tauber, you mentioned he was outside counsel?

A. Yes.

Q. And you make reference to the conversation you had with Rick Eckman about changing this and -- what you're talking about is changing the -- the change in point 1 in your initial e-mail, it's with regards to the -- to the funding the credit agreements we were just looking at, right?

A. Correct.

Q. Yeah. Okay. And so you said you talked to Rick Eckman yesterday and he's now comfortable with eliminating the Haynes loan to the tribe. Now, when you were talking with Rick Eckman, was that in his capacity as counsel to the tribe or counsel to Haynes?

A. I believe at that --

MR. SHAPIRO: Object to form.

A. I am going to go ahead and answer, if that's okay.

MR. SCHEFF: Yeah.

A. I believe that he was representing the -- the Plain Green tribe at that point in time.

And just to clarify some of my earlier testimony, I wasn't sure if he was involved originally with the Plain Green negotiations, but I do recall at this point in time, especially after we had already signed the deal with Tunica and he had represented to Tunica, that I do believe that he had gotten involved in representing the Plain Green tribe as their outside counsel.

BY MR. ACKELSBERG:

Q. Okay. So there -- and do you remember that there was -- so do you remember, like, this topic, that there was an idea that Haynes' role on the funding of originations would -- would end and that you would use -- it would use another vehicle to fund the loans?

MR. SCHEFF: Object to the form.

A. I'll answer. From my perspective, what I liked, and as I think I mentioned before lunch, you know, the Plain Green was the first deal, and so it

UNSEALED

1  didn't have this concept of the GPLS, you know,
2  reserve to kind of protect against the two to three
3  days of originations. And so with -- and I think it
4  might have been Eckman that might have suggested
5  that when he represented Tunica the first time
6  around of creating that concept. And I liked that.
7      And I liked it for -- for one main reason,
8  from my perspective, as the corporate CFO of overall
9  Think Finance, with the Plain Green deal, we were
10 lending money out of our corporate cash availability
11 to Haynes. Haynes was lending that to Plain Green.
12 I think that's what these agreements encompass.
13     Under the other two deals with
14 Otoe-Missouria and Tunica, the GPLS reserve, because
15 it was -- they were provided in case the tribes --
16 you know, GPLS decided, as we talked about before,
17 to stop purchasing, the tribes could use that to
18 originate the loans. That was money coming from
19 Victory Park Capital or other investors in GPLS.
20     And so by -- the main reason why I was
21 talking with Rick, who, at that point was then
22 representing Plain Green, I said: I liked what you
23 came up with the Tunica deal. You know, we'd
24 love to have GPLS create this two- to three-day
25 reserve and have Plain Green use that to kind of

1  cover their capital needs, so to speak, and we then
2  get repaid out of that amount. The tribe would
3  repay Haynes and Haynes would repay us, and that
4  frees up my corporate cash for any reason.
5  BY MR. ACKELSBERG:
6      Q. Good. Okay.
7      A. So from my perspective, it was kind of a
8  return of capital to Think Finance.
9      MR. ACKELSBERG: All right. Some more
10 e-mails on the same topic let's have you look at.
11 This is 247.
12     (Exhibit No. 247 marked.)
13     A. (Reviews document.)
14     Okay. This is, like, one or two-weeks
15 later it looks like from the prior e-mail.
16 BY MR. ACKELSBERG:
17     Q. Yeah. Yeah. And you're -- it looks like
18 you're still trying to push this. And then you get
19 a response from Rick Eckman on June 19th, "We should
20 think about doing this in light of the GPLS CID."
21     Do you remember any connection, like,
22 what -- do you understand what this has to do with
23 a -- with the CF- -- why there would be some
24 decision -- why the CFPB CID would play any role in
25 the decision of whether to change the Haynes --

1      A. I think it's because the --
2      MR. SCHEFF: You've got to wait until
3  he finishes.
4      A. I apologize.
5  BY MR. ACKELSBERG:
6      Q. Well, it's just -- I think you hear it. I
7  mean, whether -- whether -- what does the CFPB have
8  to do with the -- with the Haynes deal? Why would
9  considerations regarding the CFPB enter into the
10 decision about Haynes?
11     MR. SCHEFF: Object to the form;
12 compound question.
13     You can answer whatever question you
14 choose.
15 BY MR. ACKELSBERG:
16     Q. You can answer the second one.
17     A. As I recall, at the time, that is when the
18 tribes, as well as, I think, us, received a CID,
19 civil investigative demand, from the CFPB, well,
20 right around what we would label kind of a fishing
21 expedition where they wanted a lot of information
22 related to the tribal programs. I think we received
23 -- the tribes and us received that right around that
24 time.
25     So assuming Rick was just saying: Hey, we

1  just got this notice from the CFPD, that the -- the
2  CFPB, that they're interested in, you know, all of
3  this stuff. He's representing Plain Green, and so
4  I'm sure they probably, from his perspective, just
5  wanted time to kind of digest exactly what was
6  exactly going on with that CID request.
7      Q. But do you know why he thought that taking
8  Haynes out and using the reserve concept would --
9  would be a good idea in light of the CFPB's action?
10     MR. SCHEFF: Object to the form;
11 mischaracterizes the document.
12     You can answer the question.
13     A. Yeah, I'll answer the question. I don't
14 think that's -- my interpretation of this e-mail
15 chain, that's not what he was getting at at all. It
16 was, as I just said: Hey, we just got -- my tribe
17 just got a CID. Before we amend anything, whether
18 it's Haynes or anything else, we need time to sit
19 down legally and think about, you know, what the
20 CFPB just issued to us. That's where I'm coming
21 from with this. That's my interpretation of this
22 e-mail chain.
23     (Exhibit No. 248 marked.)
24 BY MR. ACKELSBERG:
25     Q. Look at 248. It's later in the year. It's

UNSEALED

1  some more e-mails on the same subject.
2      A.  (Reviews document.)
3      Okay.
4      Q.  It looks like the -- there's still some
5  discussions going on about Haynes.  It's -- there's
6  now reference to something called a "Put Agreement."
7  You remember that, right?  Or what's a put
8  agreement?
9      A.  A put agreement, my basic understanding as
10  a CFO, it allows somebody to kind of sell or put the
11  assets to somebody else upon an agreed upon
12  contractual --
13          MR. SHELDON:  Pardon me for a second.
14  I actually need to talk to the -- to the witness
15  about a privilege issue, Irv.  If we can just go
16  offline for a second, if we could step outside.
17          THE VIDEOGRAPHER:  We are off record
18  at 1:50 p.m.
19          (Break taken, 1:50 p.m. to 1:51 p.m.)
20          THE VIDEOGRAPHER:  We are back on the
21  record at 1:51 p.m.
22          MR. SHELDON:  The document that was
23  just introduced as an exhibit, TF-PA 608431, is
24  an e-mail chain, and the very top communication in that
25  e-mail chain is a privileged communication that was

1  inadvertently produced by Think Finance.  We are
2  going to exercise our right to claw back that
3  communication in this document pursuant to the
4  protective order in this matter, which we will do
5  subsequent to this deposition.  I have agreed with
6  opposing counsel that for purposes of this
7  deposition only, he may ask the witness questions
8  regarding this document concerning the e-mail chain
9  prior to the privileged communication, which we both
10  understand to be the top communication on the e-mail
11  chain.  Agreed?
12          MR. ACKELSBERG:  Agreed.
13          MR. SHELDON:  Thank you.
14  BY MR. ACKELSBERG:
15      Q.  So my first question is -- well, let's --
16  you told us what -- you gave an explanation of what
17  a put agreement is.  Let's -- I'm going to show you
18  what I think is a put agreement in a minute.  So why
19  don't we just leave it until we're actually looking
20  at the put agreement.
21      But you see that you're asking -- it looks
22  like in this -- in the -- in the e-mail on the first
23  page where you're communicating with Rick Eckman,
24  November 14th, right, and you say, "Rick," at the
25  end of your e-mail, "any idea who Plain Green will

1  have to review these agreements?"  Right?
2      A.  Yes, that's -- that's my statement.
3      Q.  He responds, "We're" -- "We are
4  representing Plain Green.  I will send to Dan
5  Belcourt to review."  Do you see that?
6      A.  Yes, I see that.
7      Q.  So when you asked him is it possible --
8  when you asked him who's representing Plain Green or
9  who's going to review this on behalf of Plain Green,
10  is it possible that you were thinking at that point
11  that he -- he was in these discussions on behalf of
12  Mr. Haynes?
13          MR. SCHEFF:  Object to the form.
14      A.  I don't believe so.  I mean, I may be wrong
15  on that.  My interpretation when I look at that line
16  is that I -- as I mentioned earlier, I felt that at
17  this point in time, that Rick Eckman was
18  representing Plain Green.  And I think what I was
19  getting at, "Rick, any idea who Plain Green will
20  have review these agreements," who at Plain Green is
21  going to sign off on this, not just you, Rick
22  Eckman; is it going to be Billi Anne or somebody
23  else within the tribal lending or tribal council
24  sign off on this?  That's where I think my comment
25  was coming from.

1  BY MR. ACKELSBERG:
2      Q.  All right.  So let me give you another
3  document, which will be 249.  And I apologize for
4  this being a little bit out of chronological
5  sequence.
6          (Exhibit No. 249 marked.)
7          MR. SCHEFF:  Hey, Matt, same issue.
8          MR. ACKELSBERG:  Well, Eckman is in
9  here.
10          THE WITNESS:  Yeah, but so is Paul
11  Tauber.
12          MR. SCHEFF:  Just wait.  Just --
13  let -- this is Matt's issue.
14          MR. SHELDON:  Let me step out in the
15  hall and talk to the client, please.  Just bear with
16  me.
17          MR. ACKELSBERG:  Okay.
18          VIDEOGRAPHER:  We are off record at
19  1:55 p.m.
20          (Break taken, 1:55 p.m. to 1:57 p.m.)
21          THE VIDEOGRAPHER:  We are back on the
22  record at 1:57 p.m.
23  BY MR. ACKELSBERG:
24      Q.  So, again, I apologize for giving you these
25  out of -- out of sequence.  This one is -- we're now

UNSEALED

1  back in September of 2012. Do you see?
2      A. Uh-huh (affirmative response).
3      Q. And so you're in conversation with --
4  again, with Mr. Tauber and Mr. Eckman, and you're
5  saying that we finally figured out a way to get TF
6  from lending money to Haynes who then lends money to
7  PGL. Do you see that?
8      A. Yes, I do.
9      Q. Okay. Now, the thing that confused me
10  about this is you're talking about now a deal where
11  there's a 15 percent loan to some -- made by some
12  investment fund associated with Haynes to the tribe.
13  Right? And then you would then reimburse that fund?
14      A. Can I have one minute to read it?
15      Q. Oh, sure.
16      A. Because when I stepped outside, I didn't
17  have a -- I just. . .
18         (Reviews document.)
19         Okay.
20      Q. So we before looked at the original credit
21  facility agreements, and it was for 5 percent money
22  loaned by Haynes to Plain Green and then 5 percent
23  Think Finance lending money to Haynes, right?
24      A. That's correct.
25      Q. All right. So at this point, it looks like

1  what's being contemplated, this -- this thing that
2  you figured out, is still going to be you lending
3  money to some intermediary who would then lend money
4  to the tribe, only here instead of it being Haynes,
5  it would be some investment fund that he would --
6  that he would put together, right? I mean, that's
7  one change; am I right?
8         MR. SCHEFF: Object to the form.
9         MR. SHELDON: Object to form.
10  BY MR. ACKELSBERG:
11      Q. That's in terms of your idea?
12      A. Let me explain.
13      Q. I will let you explain. I just want to
14  first identify just the two things that are going to
15  be different than the original, and then you can
16  explain how -- what -- how this works.
17         One change would be instead of the
18  intermediary being Haynes Investment, it would be
19  some fund that would be independent from Haynes
20  somehow, right?
21         MR. SCHEFF: Object to the form.
22      A. I wouldn't agree with that because we would
23  not be lending to this fund. This fund would be
24  raised from other outside capital not related to
25  Think Finance.

1  BY MR. ACKELSBERG:
2      Q. I used the wrong term, "lending money."
3  But, I mean, what you -- what you say here is you
4  would pay or reimburse. So the idea is that this
5  would be a -- basically, a program expense that
6  would be reimbursed by GPLS; isn't that what you
7  mean?
8      A. No, I don't believe it would be reimbursed
9  by GPLS. I believe that the 15 percent would be
10  paid directly by Think Finance.
11      Q. Oh, okay.
12      A. I may be mistaken on that but. . .
13      Q. Okay. All right. I stand corrected.
14         But -- so whoever it is that's paying the
15  reimbursement, it -- so before Think Finance was
16  providing money at 5 percent to Haynes, who was then
17  providing money at 5 percent to Think, to -- to
18  Plain Green?
19      A. Can I reverse that? Haynes would be paying
20  us 5 percent and the tribe would be paying Haynes
21  5 percent. You made it sound like we were paying
22  5 percent.
23      Q. I'm sorry, you're -- it's late in the day,
24  and you're absolutely right.
25         The other thing that I'm trying to

1  understand, the other change, is that that 5 percent
2  is now going to become 15 percent, that the tribe
3  would now be charged 15 percent by this entity and
4  that Think Finance would reimburse the tribe for
5  that expense. Why in the world was this being --
6  being discussed at this time?
7      A. Can I explain now? Okay. Because this --
8  pardon me, this might be a little long-winded, but
9  I'll try and keep it shorter than some of my prior
10  answers.
11         Again, from -- from my perspective, what I
12  wanted to do as the corporate CFO related to the
13  Haynes relationship, appreciate this point in time
14  the amount of money that we've lent Haynes and
15  Haynes has lent to Plain Green has now increased
16  from the original 2 million amount. I am going to
17  guess it was somewhere between 5- and 10 million.
18  It's a pretty significant amount of capital for us
19  that I would love to get repaid and reallocate to
20  other products or for other, you know, corporate
21  reasons. So that was my intent as the CFO is how
22  can I get back my capital quicker?
23         The original concept, you know, when I --
24  the proposal when we went ahead a little bit was,
25  well, let's take this interest reserve that we had

UNSEALED

1  implemented with Tunica and implement that and have
2  GPLS, you know, through monies lent to GPLS by VPC,
3  move that money to -- to Plain Green to handle this,
4  and then Plain Green would repay Haynes and Haynes
5  would repay us.
6          And under that concept, if --
7  theoretically, VPC would probably have to lend more
8  money into GPLS to now cover the two to three days'
9  worth of originations.  And remember, on the credit
10  default swap -- and this is where it will start to
11  make sense now -- you know, we're paying, you know,
12  VPC, GPLS, I am going to guess, 18 to 20 percent.
13  You know, they get a fixed return, and that comes
14  out of our credit default premium.
15          So, in essence, by -- under my concept in
16  that previous e-mail, we're going to have to pay --
17  not "we," but it reduces our credit default premium
18  by, roughly, 18 to 20 percent for the amount that
19  they're putting in to do this.
20          What Haynes came back and proposed in this
21  e-mail, and I think it was a way for Mr. Haynes to
22  also continue to profit off of the arrangement, was
23  he said:  I can go out and find -- rather than doing
24  that concept, Chris, I can go out and find a group
25  of investors, put together a fund, raise 10- to

1  $15 million, and the fund will lend money to the
2  tribe, the tribe could take that money and repay
3  Haynes and Haynes can repay you, but I am going to
4  have to promise my investors some type of fixed
5  return.  But it was going to be lower than what
6  GPLS's fixed return was.
7          So from an economic standpoint, I think,
8  at that point in time, as I recollect, I told
9  Steven:  Well, if you can go out and, you know,
10  raise 10- to $15 million that would lend money to
11  the tribe to give them the working capital that they
12  need to continue to originate loans and cover the
13  reserve and all this and that, and if I can get VPC
14  comfortable with them doing that, I ultimately end
15  up getting my capital back, which is what I wanted
16  from Haynes; and, two, it would actually be at a
17  slightly cheaper cost to me than if VPC put in and
18  created the reserve.
19     Q.  I've got it.
20     A.  Because VPC -- so that's why.  Now, if --
21  I'll end my answer there.
22     Q.  No, I --
23     A.  It was long-winded enough.
24     Q.  It may have been long-winded, but it was --
25  it was very informative.  So thank you.

1          All right.  Let's -- there are a few more
2  of these and -- about this issue.
3          MR. ACKELSBERG:  This one is a 250.
4          (Exhibit No. 250 marked.)
5     A.  May I have a moment to read before you ask
6  the question?
7  BY MR. ACKELSBERG:
8     Q.  Of course.
9     A.  Thank you.
10         (Reviews document.)
11         Okay.
12     Q.  So you see this is an e-mail exchange
13  between you and Michelle Nguyen in January of 2013,
14  and -- and you see in the middle where Michelle asks
15  you, "Is Eckman representing PG or Haynes?"  Do you
16  see that?
17     A.  Yes, I do.
18     Q.  And your answer to her was that, "He is
19  representing Haynes."  Do you see that?
20     A.  Yes, I am.
21     Q.  Okay.  So I'm just wondering if your
22  recollection, given that I asked you that same
23  question who's Eckman representing, whether your --
24  whether that changes your recollection at all
25  or. . .

1     A.  I don't know what this PG credit agreement
2  relates to.  I don't know if it relates to these
3  prior things or if it was something else.  So I'm
4  not sure when I say, "He's representing Haynes," and
5  it's referencing this Plain Green credit agreement,
6  but -- credit agreement that it's referencing.
7     Q.  Well, let's look at an agreement and see if
8  this might be what you're -- what you're
9  referencing.
10         MR. ACKELSBERG:  This is P-251.
11         (Exhibit No. 251 marked.)
12     A.  Give me a minute just to. . .
13         (Reviews document.)
14         MR. ACKELSBERG:  And, actually, I'll
15  have you look at two agreements at once.  There's
16  251, and I'll label this other one 252.
17         (Exhibit No. 252 marked.)
18     A.  (Reviews document.)
19         Okay.  I think I've refreshed my memory.
20  BY MR. ACKELSBERG:
21     Q.  Starting with page 251.  So there was a new
22  credit facility set up with an entity called
23  ███████████.  This was the outside
24  group that -- that Haynes was previously talking
25  about, right?

UNSEALED

App. 0217

1    MR. SCHEFF:  Object to the form.
2    A.  Yes, I believe it was.
3    BY MR. ACKELSBERG:
4    Q.  And do you know anything about ███
5    ████████████ other than they're a signature on
6    this agreement?
7    A.  No, I don't.
8    Q.  Do you know who Haynes' associates were in
9    that -- in that deal, who these outside lenders
10   were?
11   A.  No, I don't.
12   Q.  You haven't had any connection to the
13   casino on the -- on the reservation?
14   A.  Not that I'm aware of, no.
15   Q.  Okay.  And the put agreement, using my --
16   let me see if I can just summarize it quickly.
17   We're looking at 252.  Is that, basically, in
18   effect, Think Finance guaranteeing the payments --
19   the repayment owed by the tribe to this ████████
20   ████████████ group?
21        MR. SCHEFF:  Object to the form.
22   A.  Yes.  In looking at the put agreement,
23   which struck me is, in essence, it kind of looked
24   like it was a corporate guarantee whereby at any
25   point in time the transferrer could put the

1    agreement to the transferee $15,000,000.
2    Q.  Okay.  We'll drop that, and I am going to
3    move to another subject.
4        (Exhibit No. 253 marked.)
5    BY MR. ACKELSBERG:
6    Q.  So what this means is that just -- you may
7    see a couple more documents like this.  We were
8    produced a document native, in Excel form, and in
9    the production it was TF-PA 290895.  And then what
10   I've done is just print out that Excel sheet.  Okay.
11   You see what I've done?
12   A.  Okay.
13   Q.  Okay.  So do you remember being interviewed
14   by someone named Kirk Tunnell in September of 2011
15   as part of a risk -- enterprise risk assessment
16   project?
17   A.  I absolutely do not remember this
18   interview.
19   Q.  Okay.
20   A.  Or this -- or this template form.
21   Q.  Well -- okay.  So you don't remember the
22   interview.  This is -- if it's in there in the -- in
23   production, you don't -- it might have happened,
24   you just don't remember, right?
25   A.  It might have happened.  I don't even

1    remember who Kirk Tunnell or Tunnell is.
2    Q.  Okay.  All right.  That's fine.  We'll move
3    on to another document.
4        (Exhibit No. 254 marked.)
5    A.  May I have a minute to. . .
6    BY MR. ACKELSBERG:
7    Q.  Of course.
8    A.  (Reviews document.)
9        Okay.
10   Q.  Do you remember this e-mail -- this e-mail
11   exchange?
12   A.  I don't remember it specifically, but. . .
13   Q.  But you remember the topic being
14   considered?
15   A.  I remember the topic, yeah.
16   Q.  And you remember it's something that was
17   discussed between you and Tom Welch at Victory Park?
18   A.  I mean, based on the e-mail chain, yes.
19   Q.  Well, the -- this -- there were times when
20   Mr. Welch would ask you questions -- I mean, you
21   were -- you were often, I think you said earlier,
22   the contact person for Victory Park.  Right?
23   A.  From a finance department perspective, yes.
24   Q.  Well, and the issue of what states are the
25   tribes lending in was, at times, the subject that

1    you would discuss with Mr. Welch, right?
2    A.  I would discuss with Mr. Welch more in the
3    context of the expected loan volumes and the
4    particular funding needs that GPLS would have based
5    on my forecasts, which, yes, would be tied to, you
6    know, the states than the tribes are originating
7    loans in.  So I wouldn't -- it would be -- the
8    discussion would be in the context of a forecast and
9    expected, you know, funding requirements and loan
10   volumes, less about legally why the tribes may be
11   lending in a particular state or not lending in a
12   particular state.
13   Q.  Well, what -- what do you know about how
14   the decision was made by the tribes to lend in a
15   particular state?
16   A.  Very little.  I mean, typically, as this
17   e-mail chain, you know, really communicates, you can
18   see it was Michelle Nguyen that was communicating to
19   me really for forecast purposes so that I could
20   update my forecast and have a communication with Tom
21   and VPC regarding, you know, here's where, you know,
22   changes that are happening in terms of where the
23   tribes are originating business.  And I would work
24   with Michelle and the marketing folks on -- in their
25   communications with tribes on how that may impact

UNSEALED

## Page 205

loan origination volume, so I could just make Tom
aware of: Hey, this is what could happen from a
funding origination standpoint and what GPLS may
need to, you know, incrementally lend to/invest in
GPLS for origination volumes.

Q. There were -- there were occasions when
investors in GPLS would raise questions about, "Why
are you in this state," or, "Why not in that state,"
things like that, right? I mean, you would
sometimes have those kind of questions, right?

MR. SHAPIRO: Objection to form.

A. I wouldn't be privy to those discussions.
Those would have been between VPC and their
investors.

BY MR. ACKELSBERG:

Q. No, I mean -- well, I'm not -- I'm really
referencing concerns of investors that might have
been relayed to you via Tom Welch or someone else at
Victory Park.

MR. SHAPIRO: So what's your question?

MR. SCHEFF: What's the question?

MR. ACKELSBERG: Jeez, let me finish.

MR. SHAPIRO: Well, it's hard to tell
when you're done.

MR. ACKELSBERG: Oh, okay.

## Page 206

BY MR. ACKELSBERG:

Q. So were there occasions where inquiries
would be communicated from GPLS investors to you via
Mr. Welch or someone else at Victory Park?

A. Not that I recall specifically, no.

Q. Were there occasions where ACH providers or
potential ACH providers were asking questions of you
regarding why are you in this state, why you're not
in that state, things like that?

A. I would have occasional discussions with
existing or potential ACH providers regarding where
loan volume related to the ACH transactions that
these processors would be responsible for
processing, what states they would come from. We
never specifically got into the reasons why the
tribes lent in one state or another state or not in
a state. They were more interested in just knowing
the actual states that they would be processing
customer ACH transactions. And by "customers,"
customers of the tribes.

Q. You're aware, are you not, that the kind of
lending done by Plain Green or Great Plains -- Great
Plains Lending or Mobiloans in some states could not
have been done directly by Think Finance due to the
laws in particular states?

## Page 207

MR. SHELDON: Object to form.

MR. SCHEFF: Object to the form.

A. That -- that gets into a legal aspect that
it's either privileged or I don't know the answer to
it. So. . .

BY MR. ACKELSBERG:

Q. You don't know that it's -- that online
lending, like -- let's say that -- right now you --
right now you have -- you're at Elevate and you have
the product RISE, right?

MR. SCHEFF: Just wait a second.
We're not talking about Elevate. You want to ask
him about Think Finance, you ask about Think
Finance.

MR. ACKELSBERG: I'm asking about RISE
right now.

MR. SCHEFF: Well, we're not asking
about RISE as it relates to -- to Elevate. We're
not going there, Irv. So why don't you ask him
about Think Finance.

MR. ACKELSBERG: I'm asking about
RISE.

MR. SCHEFF: Go ahead, and then I'll
direct not to answer.

BY MR. ACKELSBERG:

## Page 208

Q. Does RISE lend in Pennsylvania?

MR. SCHEFF: Don't answer the
question.

MR. ACKELSBERG: What's the --
Richard, under Rule 30, what in the world is your
basis --

MR. SCHEFF: I'm sorry, we're -- this
is not a case about Elevate and Elevate's lending
and what it does today or at any time. This is
about Think Finance. And Mr. Lutes is here because
he was the CFO of Think Finance. And he's asked --
answered every question you've asked about Think
Finance. But we're not going to have a fishing
expedition into Elevate. If you want to go to Judge
Joiner, we'll do that. But we're not going to do that.

BY MR. ACKELSBERG:

Q. Mr. Lutes, before you went to Elevate, you
were still the CFO of Think Finance. One of your
products was called RISE, was it not?

A. When I was the CFO prior to the spinoff,
yes, RISE would have -- we would have launched, I
believe, sometime in 2013 the RISE install- -- state
licensed --

Q. And that was --

A. -- installment loan --

UNSEALED

1    Q. -- a state licensed product, was it not?
2    A. Yes, it was.
3    Q. Okay. And by definition, that was only
4  offered in states where you could get a state
5  license; am I right, the RISE product?
6        MR. SCHEFF: Mr. Lutes, answer that
7  question to the extent you can without disclosing
8  attorney-client communications. And if you can't do
9  that, just tell us, and then don't answer the
10  question.
11    A. Yeah, I -- I was not involved in the -- the
12  process of what states we could legally obtain
13  licenses. That's a legal question.
14  BY MR. ACKELSBERG:
15    Q. Okeydoke.
16        (Exhibit No. 255 marked.)
17    A. (Reviews document.)
18     Okay.
19  BY MR. ACKELSBERG:
20    Q. So this e-mail chain is in November of
21  2013, and this was a period of time where the
22  company was having a hard time finding banks and
23  payment processors to handle the ACH processing for
24  the three products; am I right?
25        MR. SCHEFF: Object to the form.

1    A. During the -- the fall of 2013 would have
2  been the height of Operation Choke Point where the
3  government was putting, in my opinion, undue
4  pressure on a lot of banks to not provide ACH
5  services to -- to people in the greater than 36
6  percent APR space, whether state licensed or tribal
7  or any other format.
8  BY MR. ACKELSBERG:
9    Q. And this is an exchange you had with
10  someone at Bank of Montreal in Canada; am I right?
11    A. Correct.
12    Q. All right. And there was a period of time
13  where Bank of Montreal was handling the -- was the
14  ODFI for the -- for the ACH processing; am I right?
15    A. Technically, there was a point in time
16  where Bank of Montreal's U.S. Bank subsidiary,
17  Harris Bank --
18    Q. Right.
19    A. -- was the ODFI handling the ACH
20  transaction.
21    Q. Right. During the period of time that
22  you're corresponding with this gentleman in -- it
23  looks like in Montreal or somewhere?
24    A. It's Montreal.
25    Q. Yeah. Okay. And the context is that he

1  saw an article, apparently, about U.S. Bank being
2  sued for processing allegedly illegal loans, and it
3  looks like he forwards this -- actually, it starts
4  off with you, I guess. Right? Let me see. You're
5  forwarding this to Mr. Poisson in Montreal; am I
6  right?
7    A. Yes, it appears that I'm forwarding an
8  article from the Minneapolis Star Tribune, along
9  with a listing of states that the tribal -- the
10  tribes we partnered with did not originate loans in.
11    Q. That was called a "no-state list." That's
12  a term you remember, right?
13    A. Yes.
14    Q. Okay. And, now, prior to 2013, there was
15  no no-state list, was there?
16    A. You know, I don't -- I don't recall. I
17  don't believe that would be the case because I
18  believe that the tribes always, at some point in
19  time since they began originating, always chose not
20  to originate in their home state. So I would assume
21  that there would be a no-state list really from the
22  start, technically speaking.
23    Q. Well, at least as to the one state that
24  they're situated in?
25    A. Yeah.

1    Q. And what's your understanding of why the
2  tribes wouldn't want to lend -- wouldn't want to
3  make 220 percent loans to their neighbors across the
4  line of the reservation?
5        MR. SHELDON: Object to form.
6        MR. SCHEFF: Object to the form.
7    A. I'll answer. While I didn't have a direct
8  conversation with the tribes regarding that
9  particular situation, my understanding was, is that,
10  as you could expect, there's sensitivity. I mean,
11  the tribes are originating loans. They have certain
12  members of their tribe that are working for the
13  Plain Green entity or the Otoe-Missouria Great
14  Plains entity or the Mobiloans entity, and I think
15  there was sensitivity to, you know, certain of their
16  employees being aware that maybe some of their other
17  tribal members might be applying for a high interest
18  rate loan. And so I think just from a
19  confidentiality standpoint, as you can appreciate
20  tribes are almost like close-knit families, I think
21  they just chose to -- didn't want to have any,
22  quote, type of inner-family political issues, and so
23  just chose that it was safer to -- from their
24  perspective, to not, you know, have that happen.
25  BY MR. ACKELSBERG:

UNSEALED

## Page 213

1    Q.  Okay.  So I understand why Plain Green is
2 not lending in Montana, why Great Plains isn't
3 lending in Oklahoma and why Mobiloans are not
4 lending in Louisiana.  But I'm wondering why -- why
5 all three of them have decided not to lend in the
6 other 11 states listed in the e-mail.  Do you know
7 why?
8    A.  I -- I really don't know why.  That was
9 conversations between other members of Think Finance
10 and the tribes as to why they chose those other 11
11 states.
12    Q.  Well, my recollection of the -- in the
13 previous exhibit we were looking at, there was
14 reference to Patton Boggs and Claudia having
15 something to do with that no-state list.  Do you
16 remember that?
17    A.  That was listed in that e-mail that you
18 provided to me, but I did not have that conversation
19 with Patton Boggs or Claudia.
20    Q.  Do you know who Claudia is?
21    A.  I'm assuming it's Claudia Callaway.
22    Q.  And what interaction have you had with
23 Claudia Callaway?
24    A.  Very little interaction with Claudia
25 Callaway.

## Page 214

1    Q.  Well, the little that you've had, what did
2 it involve?
3    A.  I remember her --
4    MR. SHELDON:  Let me just make an
5 objection here.  Claudia Callaway, counsel for
6 Think, obviously, so --
7    MR. ACKELSBERG:  I don't know if
8 that's -- is it counsel for Think or counsel for
9 Victory Park?  I don't -- I don't know.
10    MR. SHELDON:  I'm happy to step
11 outside and we can -- we can confer on it.  Let's go
12 off the record for a second --
13    MR. ACKELSBERG:  Sure.
14    MR. SHELDON:  -- and let me find out
15 what the witness is going to say.
16    THE VIDEOGRAPHER:  We are off the
17 record at 2:30 p.m.
18    (Break taken, 2:30 p.m. to 2:35 p.m.)
19    THE VIDEOGRAPHER:  We are back on the
20 record at 2:35 p.m.
21    MR. SHELDON:  The individual
22 previously being asked about, Claudia Callaway, was
23 outside counsel for Think Finance.  I'm going to
24 instruct the witness not to answer any -- any
25 questions that would reveal the communications with

## Page 215

1 Ms. Callaway in any way.
2    Do you understand?
3    THE WITNESS:  Yes, I agree.
4    MR. SHELDON:  To the extent
5 Mr. Ackelsberg has general questions about how
6 frequently you communicated with Ms. Callaway or in
7 what means, you may answer those, but in doing so,
8 please be careful not to reveal the substance of any
9 of your communications, electronic or oral, with
10 Ms. Callaway.  Do you understand?
11    THE WITNESS:  Yes.
12    MR. SHELDON:  Thank you.
13 BY MR. ACKELSBERG:
14    Q.  How many times did you have conversations
15 with Claudia Callaway?
16    A.  Directly, I would say zero.  As being part
17 of in a room with her, it would be -- well, I'll
18 just say, I mean --
19    Q.  So much for that.
20    A.  In a room, I mean, you know -- you know,
21 probably less than ten.
22    Q.  When you were in the room with Claudia, who
23 else was there in the room?  Was this at, like, a
24 board of directors meeting --
25    A.  No.

## Page 216

1    Q.  -- or an executive committee meeting?
2    A.  No, it would not have been in a board of
3 directors-type of situation or an exec meeting.  It
4 would have been something related to discussing --
5    MR. SCHEFF:  Not the subject matter.
6 Just who was in the room, people.
7    A.  Sarah Cutrona, our general counsel, would
8 typically have been in the room.
9 BY MR. ACKELSBERG:
10    Q.  And what about people from outside Think
11 Finance?
12    A.  Can't recall.
13    Q.  Tom Welch?
14    A.  No.
15    Q.  Anyone else from Victory Park?
16    A.  Not that I'm aware of, no.
17    MR. ACKELSBERG:  Okay.  We'll move on
18 to another document, 256.
19    (Exhibit No. 256 marked.)
20    MR. SCHEFF:  Irv, is this attached to
21 an e-mail?
22    MR. ACKELSBERG:  No.  It's --
23    MR. SCHEFF:  It actually is.  I know
24 that it is.
25    MR. ACKELSBERG:  I don't think it is.

54  (Pages 213 to 216)

UNSEALED

App. 0221

1      MR. SCHEFF: It actually is. So --
2      MR. ACKELSBERG: Well, if it is --
3      MR. SCHEFF: It actually is because
4  I've looked at this document in prep, and it is
5  attached to an e-mail.
6      MR. ACKELSBERG: Well, we'll get it
7  up.
8      MR. SCHEFF: Thank you.
9      MR. ACKELSBERG: We'll put it on the
10 screen. Hang on.
11     MR. SCHEFF: Thank you. That's great.
12  A.  While you are doing that, I'm going to
13 start reading the document.
14     (Reviews document.)
15     MR. ACKELSBERG: There's no e-mail.
16 I'm looking at it, Richard. I mean, there's
17 multiple copies of so many documents. This
18 particular -- I'm looking at the production,
19 Richard.
20     MR. SCHEFF: Then you marked one --
21 this definitely is connected to an e-mail and
22 attached to an e-mail. I looked at it yesterday.
23     MR. ACKELSBERG: Richard, come -- you
24 can come look at --
25     MR. SCHEFF: I don't need to. I'm

1  just telling you what I know.
2      MR. ACKELSBERG: All right. Fine.
3  All right.
4  BY MR. ACKELSBERG:
5   Q.  My question -- my question to you,
6  Mr. Lutes, is, is this a letter that looks familiar
7  to you?
8   A.  Yes, I recall it.
9   Q.  Okay. Now, before, you were talking about
10 problems with regard to ACH, you mentioned Operation
11 Choke Point. Can you tell us something about
12 this -- this appears to be a form letter that --
13 were you sending this to banks at this point?
14  A.  Yes. As -- as I recall, this was, again,
15 at the height of Operation Choke Point when the
16 federal regulators, I guess, subsequently to all
17 this, you know, clearly were proven to abuse their
18 power in pressuring banks not to process ACH
19 transactions for a variety of industries, including
20 ours. And for us, it was affecting not just our
21 tribal clients, it was also affecting us from our
22 RISE installment loan where we were the direct
23 lender as well.
24     And so as I recall, that this letter -- I
25 think it came at the request of Bob Johnson on our

1  board of directors, that he, as you can appreciate,
2  was pretty well connected within the African
3  American business community and was aware of several
4  African American minority-owned banks that might be
5  interested in the fee revenue from ACH transactions.
6      So he suggested, can you put together a
7  form letter, outline kind of the -- you know, the
8  company, because they wouldn't know anything about
9  Think Finance or the -- the tribes, put together,
10 you know, an overview of the products, the volumes,
11 just so that he could -- either he could introduce
12 me to some of these banks or he, himself, could
13 forward on this form letter and attachment, you
14 know, to the banks to see if they might be
15 interested in processing ACH transactions.
16  Q.  And you did forward it to banks?
17  A.  I believe so. I know I certainly did, yes.
18  Q.  Okay.
19  A.  I can't recall which ones, but. . .
20     MR. ACKELSBERG: Okay. Next document,
21 257.
22     (Exhibit No. 257 marked.)
23 BY MR. ACKELSBERG:
24  Q.  Sorry for the small print.
25  A.  Again, I request just a quick minute to

1  refresh myself.
2   Q.  Of course. Of course.
3   A.  (Reviews document.)
4      Okay.
5   Q.  So during this period of time where you
6  were having difficulties locating or retaining ACH
7  providers, this was an issue that was being
8  discussed fairly regularly with VPC; am I right?
9      MR. SCHEFF: Object to the form.
10  A.  I'm not sure that I would say that we were
11 fairly frequently, or whatever term you used, but
12 certainly I was keeping VPC aware of the potential
13 impact of ACH providers because GPLS had an existing
14 large participation interest in the tribal
15 portfolios, and ACH is the primary mechanism for
16 collecting the payments related to the
17 participations that GPLS held.
18 BY MR. ACKELSBERG:
19  Q.  And would I be correct in -- saying that
20 during this period of time in August of 2013,
21 Victory Park was expressing to you serious concern
22 about the problem of ACH?
23     MR. SHAPIRO: Object to form.
24     MR. SCHEFF: Object to the form.
25  A.  I would say, you know, based upon this

55  (Pages 217 to 220)

UNSEALED

Page 221

1   article and some of the other things that we were
2   experiencing related to transitioning from one ACH
3   provider to another, you know, multiple times over
4   the 2012, 2013 time span, that, yes, as a -- the
5   lender to a special purpose vehicle that holds a
6   large portfolio of loans that require ACH debit
7   processing to process transactions, that I can
8   understand why they would be concerned.
9           MR. ACKELSBERG:  On the same topic,
10  let's look at 258.  We're looking at P-258 Bates
11  TF-PA 678633.
12          (Exhibit No. 258 marked.)
13  A.  (Reviews document.)
14      Okay.
15          MR. SHAPIRO:  Hang on just a second,
16  please.
17      Thank you.  Go ahead.
18  BY MR. ACKELSBERG:
19  Q.  So when you write back to Mr. Welch on
20  August 14, that you appreciate the concern of the
21  LP, I just want to clarify that you're -- the LP
22  refers to the investors in GPLS; am I right?
23  A.  That is correct.
24          MR. SHAPIRO:  Object; foundation.
25  Late objection.  I'm sorry.

Page 222

1   BY MR. ACKELSBERG:
2   Q.  And then Mr. Rees, who apparently was -- it
3   looks like he shared this -- this chain -- this
4   exchange you have with Mr. Welch that you exchange
5   with Mr. Rees, and you say, "For your information,
6   prep questions for the call with ██████ tomorrow
7   morning at 7 a.m."  Do you see that?
8   A.  Yes, I do.
9   Q.  Now, ██████ refers to one of the major
10  investors in GPLS, right?
11          MR. SCHEFF:  Object to the form.
12  A.  As to whether they were the largest or
13  whatnot, they were a material investor in GPLS.
14  BY MR. ACKELSBERG:
15  Q.  Was there -- discounting the -- aside from
16  the investment of Think Finance itself, was there
17  any investor that had a bigger stake in GPLS than
18  ██████?
19          MR. SHAPIRO:  Object to form.
20          MR. SCHEFF:  Object to the form.
21  BY MR. ACKELSBERG:
22  Q.  If you know.
23  A.  I'm not aware.  I didn't have the detail of
24  all of their LPs.
25  Q.  Okay.  So do you know why you and Ken Rees

Page 223

1   would be talking with ██████?
2   A.  It was -- I think the reason why we would
3   have a call with ██████ would be at the request
4   of VPC to ██████ being, you know, probably a
5   large investor LP in the GPLS fund, probably wanted
6   to hear directly from Ken and I in regards to, you
7   know, the concerns over Operation Choke Point and
8   the ACH processing.
9   Q.  And did you, in fact, have that
10  conversation?
11  A.  I believe so, yes.
12  Q.  And did they sound concerned about the ACH
13  problem?
14          MR. SHAPIRO:  Object to form.
15  A.  No, I think after the conversation they
16  were comfortable because, to my knowledge, they --
17  they left their money in GPLS and didn't withdraw
18  it.  I'm not sure if they had the right to withdraw
19  it, but, you know, they seemed fine after the
20  conversation with us.  I mean, we all had some level
21  of concern, but. . .
22  BY MR. ACKELSBERG:
23  Q.  These conversations that -- I mean, let's
24  step back for a minute.  So you're writing -- you're
25  writing to banks.  There's -- there's references to

Page 224

1   lots of conversations with lots of banks about
2   trying to -- trying to find somebody to process the
3   payments, right?  I mean, this was -- this was a
4   big -- this was a big part of what you and Ken were
5   focused on at this point in time in the -- in the
6   company; am I right?
7           MR. SCHEFF:  Object to the form.
8           MR. SHELDON:  Object to form.
9   A.  I'll go ahead and answer the question.  I
10  wouldn't necessarily characterize it as Ken being
11  heavily involved, but certainly myself, as the CFO
12  and responsible for the treasury function and
13  finance function, was actively involved.  It was
14  probably my number one priority at that particular
15  time was, you know, continuing to talk with ACH
16  processors, potential ODFIs.
17  BY MR. ACKELSBERG:
18  Q.  And I realize that maybe Ken wasn't doing
19  the actual outreach to the banks, but you were
20  having -- you were frequently talking to Ken about
21  the problem?  It was --
22  A.  Yes, I was giving him frequent updates.
23  Q.  Okay.  It was a source of concern for both
24  of you, right?
25          MR. SCHEFF:  Object to the form.

UNSEALED

App. 0223

1     A.  It was a concern from the standpoint that
2 to the extent that -- twofold:  One, you need ODFIs
3 to process ACH credits so that the tribes can
4 originate loans.  And then, also, you need ODFIs and
5 banks and ACH processors to process the collections.
6 And so from both perspectives, yes, there was a
7 concern.
8 BY MR. ACKELSBERG:
9     Q.  I've noticed a lot of -- that there's a lot
10 of documents that -- in the production with -- with
11 regard to outreach to banks.  In fact, there were --
12 there were board members, I think you said, that
13 were involved, Mr. Johnson.  Alonzo Primus was
14 actually involved in looking for banks.  Am I right?
15     A.  Yes.  Yes, as I recollect, he was.
16     Q.  How did he reappear on the scene?
17     A.  That's a good question.  I'm not sure.  I
18 did not contact him directly.  He might have reached
19 out.  As I recall -- and I may be wrong in this, but
20 as I recall, I think he had somehow hooked up with
21 Steven Haynes in regards to knowing.  And it was
22 probably through Steven and Alonzo's experience, you
23 know, being in this space and operating First Bank
24 of Delaware, I think they had mutual connections
25 into certain ACH processors, whatnot.  So. . .

1     Q.  So one thing I haven't noticed in the
2 production is any involvement of any tribal members
3 in any of these conversations with regard to ACH
4 providing -- providers.  Do you recall the tribes
5 ever being involved in any of this -- in this
6 search?
7     A.  Yes, I do.  I mean, one, besides just
8 frequently updating him on the status, all three
9 tribes were involved to some extent, based upon my
10 recollection.  Some where I had direct
11 conversations, probably not e-mail but direct
12 conversations, and some that I just was aware of
13 tangentially.
14     For instance, I know the Plain Green
15 Chippewa Cree tribe, at one point, they had hired
16 their exbanker from Wells Fargo, Tim -- I forget
17 what his last name is -- McInerney, or something
18 like that.  He was certainly, you know, being an
19 exbanker, actively involved trying to understand are
20 there locals banks in the Montana region that might
21 be able to process the ACH transactions for the
22 Chippewa Cree Plain Green operation.
23     I know that the Otoe-Missouria, along with
24 Mark Curry, were actively looking for ACH
25 processors, especially since they had their

1 secondary, you know, other lending program besides
2 us.
3     And I know that the Tunica-Biloxi tribe,
4 along with Mobiloans, in particular Marshall Perot,
5 I believe is how you pronounce his last name, or
6 Perot, who was on the Mobiloans lending board and
7 was actively involved in Washington and was an
8 African American as well, was actively reaching out
9 to potential minority-owned banks as well.
10     So all three were actively involved.  All
11 three understood the importance because they needed,
12 you know, ACH processors and banks to process the
13 loans that they were originating and to process the
14 collections for the portfolio that was already
15 outstanding.  So it was a combined effort.
16     Q.  Okay.  Thank you.
17     MR. ACKELSBERG:  Let's look at 259.
18     (Exhibit No. 259 marked.)
19     A.  (Reviews document.)
20     Okay.
21 BY MR. ACKELSBERG:
22     Q.  So you see this is in the same period,
23 August of 2013, right?
24     A.  Yeah.
25     Q.  Okay.

1     A.  It's a little bit later, I believe, than
2 some of the other e-mails.
3     Q.  Right.  So still in the ACH crisis?
4     A.  I would characterize it as it was getting
5 close to the height of Operation Choke Point, yes.
6     Q.  And we haven't mentioned this, but there
7 was another issue going on, as I recall.  During
8 this period of time, there was -- there was a
9 lawsuit filed by the New York state banking
10 regulator challenging the legality of the program;
11 am I right?
12     A.  I don't know if I would characterize it
13 that way.  I thought that the attorney general in
14 New York had issued, like, a broad blanketed
15 statement asking banks not to process ACH
16 transactions for these certain industries.
17     Q.  You don't remember a cease and desist from
18 the New York banking regulator?
19     A.  No.  Like I said, I mean, maybe that was
20 what I meant by a broad blanketed statement, but I
21 don't remember the specific lawsuit by the AG.
22     Q.  Okay.  So August 19, 2013, you're writing
23 to Tom Welch and Richard Levy with a cc to Ken.  Do
24 you see that?
25     A.  Yes.

UNSEALED           App. 0224

1    Q.  Saying that you talked with Ken, "And I
2   will run two updated forecasts for us to discuss.
3   No. 1, we stop all new tribal customer acquisition
4   through the end of the year but still fund tribal
5   formers.  No. 2, we stop all loan fundings through
6   the end of the year for tribal, new and formers.
7   We'll see what type of cash balances that drives."
8          Am I right that the context for this
9   e-mail is that Victory Park had already told you
10  that they were thinking of pulling the plug on GPLS?
11         MR. SCHEFF:  Object to the form.
12         A.  I'll answer the question.  But, no,
13  that's -- that's not how I would characterize it.
14  Really, it's what Tom, I believe, references at the
15  top part of the e-mail chain.  The real ask here is
16  to see how quickly we can get to 136 million of cash
17  in GPLS, which is 50 percent.  So I'm assuming that
18  GPLS probably had, roughly, 272 million of
19  funding into -- or VPC had 272 million of funding
20  into GPLS.
21         And so what they were asking us from a
22  forecasting standpoint was, well, how quickly
23  could -- if you -- if the tribes and us minimize the
24  amount of marketing to new customers, how quickly
25  would the cash buildup get to the 50 percent be,

1   or would it need to be even more drastic, meaning
2   that the tribes would have to stop originating new
3   loans to both new and former customers, you know,
4   how quickly would it get -- because I -- that, to
5   me, was the characterization of the -- of why they
6   asked me to run the forecast and what -- not that
7   they were pulling the plug, but they wanted to
8   create a -- kind of a cash reserve on what they had
9   invested into the GPLS fund.
10  BY MR. ACKELSBERG:
11         Q.  A cash reserve to enable them to exit the
12  program, right?
13         MR. SHAPIRO:  Object to form.
14         MR. SCHEFF:  Object to the form.
15  BY MR. ACKELSBERG:
16         Q.  If necessary.  If necessary.
17         MR. SCHEFF:  Object to the form.
18         A.  No, I would view it as like any other
19  lending situation, if you were lending in real
20  estate and you felt that loan -- that real estate
21  values were going to go down, you may request the
22  owner of the real estate to put in more cash.  I
23  think what their -- their concern was definitely
24  related to Operation Choke Point in the fact that
25  they had this large existing portfolio of

1   participations that they had purchased from the
2   three tribes, and they were concerned through
3   Operation Choke Point that the government was
4   putting undue pressure on banks and ACH processors
5   not to process collections.  And so what they wanted
6   to do was to minimize the amount of loan balance in
7   GPLS and increase the amount of cash reserve to help
8   minimize their potential exposure.
9   BY MR. ACKELSBERG:
10         Q.  All right.  So let's look at the -- an
11  e-mail from the day after on August 20th.
12         MR. ACKELSBERG:  This is 260, TF-PA
13  677073.
14         (Exhibit No. 260 marked.)
15  BY MR. ACKELSBERG:
16         Q.  As in all e-mails, start from the back.
17         A.  Yeah.  Give me a quick minute again.
18         (Reviews document.)
19         Okay.
20         Q.  So on August 20th, Mr. Welch is telling you
21  and Ken together, giving you a heads up that they're
22  going to put a halt to all lending, right?
23         MR. SHAPIRO:  Object to form.  That's
24  not what this says.
25  BY MR. ACKELSBERG:

1         Q.  That's what happened on August 20th, right?
2         MR. SHAPIRO:  Same objection.  You're
3   misleading the witness.
4         A.  Yeah, the -- it's not lending.  I mean,
5   what it says was as I've stated before, GPLS had the
6   right to halt buying participation interests --
7   BY MR. ACKELSBERG:
8         Q.  Well, I --
9         A.  -- from the loans originated by tribes.
10         MR. SHAPIRO:  Let him finish.
11  BY MR. ACKELSBERG:
12         Q.  I appreciate the distinction, but if GPLS
13  doesn't buy, the tribes don't make the loans, right?
14         MR. SCHEFF:  Object to the form.
15         A.  No, I wouldn't necessarily agree with that.
16  There's the possibility that the tribes could
17  originate and hold onto the loans themselves if they
18  had the capital or if the tribes had the ability to
19  go out to other third-party lenders besides VPC and
20  create separate SPVs.  This was just related to the
21  GPLS.
22         So to say that the tribes couldn't
23  originate -- now, on a short-term basis, that's
24  probably a potential outcome.  But long-term, that
25  doesn't necessarily mean that the tribes couldn't

UNSEALED

App. 0225

1  originate just because VPC decided to stop.
2  BY MR. ACKELSBERG:
3      Q.  No, yeah, and I appreciate the distinction.
4  I'm not asking for what the tribes theoretically had
5  the right to do, perhaps the ability to do with some
6  other funding source.  But from the -- I think you
7  answered the question.  From the standpoint of the
8  system as it was currently set up, not from what --
9  how it might be set up in the future, if -- if GPLS
10 is telling Think Finance no more originations --
11     MR. SHAPIRO:  Objection.  You're
12 misstating the testimony and the document.
13     MR. ACKELSBERG:  I'll restate -- I'll
14 restate the question.  The last thing I want to do
15 is misstate it.
16     MR. SHAPIRO:  Well, just look at the
17 language of the document you showed him.  I mean,
18 that's probably the easiest way to do it.
19 BY MR. ACKELSBERG:
20     Q.  So at August -- in August 20th, Victory
21 Park is providing you notice that they're going to
22 put a halt to all participation interests, right?
23     A.  They're saying --
24     MR. SHAPIRO:  Object to form.
25 BY MR. ACKELSBERG:

1      Q.  Participation purchases.
2      MR. SHAPIRO:  Objection; form.  You're
3  misquoting the document.
4      A.  I think I can answer your question, but I
5  will rephrase the question that I think Dan would
6  find acceptable.  On August 20th, what Tom was
7  saying was we're going to send over a formal letter
8  to you, Think Finance, to let you know that it is
9  our intent to have GPLS halt the purchase of
10 participations from the three tribes.  Could you
11 please -- and I know it's not worded here -- also
12 forward that on to the tribes to let them know that
13 we're exercising this right under our master
14 participation agreement?
15 BY MR. ACKELSBERG:
16     Q.  Okay.  And --
17     MR. SHELDON:  Lets give Dan a chance
18 to object to the question formed by the witness,
19 too.
20     MR. SCHEFF:  And the answer.
21     MR. SHELDON:  And the answer.
22     MR. SHAPIRO:  Well, so as long as you
23 have been kind enough, the -- I would just say that
24 the document that everybody is referring to, the
25 August 20, 2013, e-mail from Tom Welch, speaks for

1  itself, and if anybody reads it -- just read it into
2  the record.  It says what it says.  We don't all
3  need to sit here and sort of divine what Tom Welch
4  was saying.  He said it.
5      MR. ACKELSBERG:  I agree with you.  I
6  agree with you.
7  BY MR. ACKELSBERG:
8      Q.  Now, there's one other aspect of the -- I'm
9  trying to avoid some unnecessary embarrassment.  So
10 there is other -- there are other e-mails where
11 you're letting people in the -- in the -- see if
12 this refreshes your recollection.  You're advising
13 Jason that -- as to what you heard from Tom Welch,
14 and Jason tells you, "But we just dropped a big
15 direct mail from Mobiloans."  Do you remember that?
16     A.  I think it's -- what I see in this -- this
17 document that you provided to me, and I think I
18 summarize that in my response to Tom is --
19     Q.  Right.
20     A.  -- that one issue we should discuss is
21 we're in the middle of two existing preapproved
22 direct mail campaigns.
23     Q.  Right.  Okay.  I'm trying to provide some
24 context for your response.  So you -- after you get
25 the information from your people, from Jason,

1  whoever, you then communicate back to Tom:  We have
2  a problem, we've already done a mail drop, direct
3  mail on Mobiloans.  This potentially -- I mean,
4  you're basically -- a direct mail drop is
5  effectively offering a loan to people in some --
6  right?
7      MR. SCHEFF:  Object to the form.
8  BY MR. ACKELSBERG:
9      Q.  It's -- these are often preapproved loans,
10 right?
11     MR. SCHEFF:  Object to the form.
12     A.  I'll answer it exactly as I outlined in the
13 e-mail, you know, one issue we discussed is we're in
14 the middle of two existing preapproved --
15 preapproved direct mail campaigns.
16 BY MR. ACKELSBERG:
17     Q.  Okay.  And so then you get -- and then --
18 and then Tom is responding to that, that they might
19 soften their restriction at least as to -- as to the
20 preapprovals that have already gone out, they
21 mail -- let that -- let that go, right?
22     A.  From my perspective, in reviewing this
23 e-mail chain, yes, what I recollect is that they
24 softened their stance and didn't provide an
25 immediate hard stop on purchasing the

UNSEALED

1  participations. They understood that, legally, the
2  lenders are, you know, required to honor any
3  customer that -- that, you know, submits an
4  application for a loan that, in essence, they were
5  preapproved for and, you know, were rightfully to be
6  funded.
7      Q.  Okay.  And then on that same day, you,
8  again, communicate with Tom Welch -- and I want you
9  to explain what you mean by, "We will shut
10 everything down by the end of this week."
11     A.  When I use that characterization, it is
12 based on, you know, other communications between
13 Jason Harvison, Michelle Nguyen, you know, to the
14 three tribes letting them know what based on what
15 this e-mail chain alluded to, that it appeared that
16 GPLS was going to stop purchasing participations,
17 and that outside of the existing preapproved direct
18 mail campaigns that were already outstanding, that
19 we collectively, the Think Finance along with the
20 three tribes in terms of marketing the program and
21 originating the loans related to GPLS, GPLS would
22 not purchase the loans.
23     Q.  All right.  Now, I am going to give you an
24 e-mail from two months -- or close to two months
25 later in October.

1      MR. ACKELSBERG:  This is 261.
2      MR. SCHEFF:  Are you all right?  Need
3  a break?  Are you good?
4      THE WITNESS:  No, I'm good for a few
5  more minutes.  Once we wrap up this line of
6  questioning, if I could take a quick break --
7      MR. ACKELSBERG:  Oh, sure.
8      THE WITNESS:  -- just to refresh.
9      MR. ACKELSBERG:  This is Bates No.
10 TF-PA 309723, Exhibit 261.
11     (Exhibit No. 261 marked.)
12     A.  (Reviews document.)
13     Okay.
14 BY MR. ACKELSBERG:
15     Q.  So we're now two months later.  It's now
16 October of 2013.  Tell us, based on this e-mail, the
17 status of new loan originations across the three
18 projects -- the three products.
19     A.  Goodness, I actually don't recollect
20 exactly where we would have been on that.  It seems
21 based on this e-mail chain that -- and I'm just
22 guessing -- that the new origination volume would
23 have been pretty minimal.  It appears that the
24 tribes and us were asking GPLS to allow a small
25 amount of new originations just to test or -- you

1  know, some of the new small IT changes or product
2  changes.  So that would be my guess.  But I can't
3  recall specifically what the volume was.
4      Q.  All right.  We'll do one more, and then
5  we'll take a break.  All right?
6      A.  Okay.  Thank you.
7      MR. ACKELSBERG:  262.  This is GPLP
8  5108002.
9      (Exhibit No. 262 marked.)
10     A.  (Reviews document.)
11     Okay.
12     MR. SHAPIRO:  Hang on.  I'm sorry.
13     Okay.  Thank you.
14 BY MR. ACKELSBERG:
15     Q.  So this is, roughly, the same period of
16 time, a few days earlier.  Why don't you explain
17 what's going on here.  What's -- you're asking for a
18 letter to the tribes from GPLS, right?
19     A.  Yes.
20     Q.  Now, before I -- before you -- I ask my
21 next question about that, let me just in terms of
22 understanding the protocol, did the tribes have
23 direct day-to-day communication with VPC?
24     A.  No, they didn't.
25     MR. SHAPIRO:  Objection; form.

1  BY MR. ACKELSBERG:
2      Q.  And those communications would be through
3  you, right?
4      MR. SCHEFF:  "You" being Think Finance
5  or "you" being Chris Lutes?
6      MR. ACKELSBERG:  Either one.
7      A.  Me being the CFO of Think Finance, I would
8  assume that a majority of the communications between
9  VPC GPLS related to this relationship came to me
10 directly.  I wouldn't necessarily be aware if VPC
11 reached out to any of the three tribes directly.
12 BY MR. ACKELSBERG:
13     Q.  All right.  So what was explained to the
14 tribes with regard -- up until this point -- so it's
15 now, roughly, close to two months where at least as
16 to new customers, the -- the system has been shut
17 down, right?
18     A.  My knowledge may be incorrect, but my
19 understanding at this point in time was at one point
20 GPLS provided a formal notification to us and all
21 three tribes that they were not purchasing any more
22 participations.  I think that softened a little bit,
23 as the last e-mail chain alluded to, and I think
24 what I was asking for was documentation to support
25 that they were now comfortable allowing a small

UNSEALED

1  amount of former repeat customers and the new
2  customers that were referenced in the prior e-mail
3  chain to be originated by the three tribes, that
4  they would buy, you know, those -- those -- that
5  minimal amount of participation as being originated.
6     Q.  Do you remember any formal communications
7  going from Think Finance to the tribes explaining
8  the reasons for the -- either the stoppage or the
9  slowdown in new originations?
10    A.  From my perspective, there certainly would
11  have been -- and it probably would have been between
12  Jason Harvison and the tribes or Michelle Nguyen and
13  the tribes, since they had the direct kind of
14  product relationships with all three tribes.
15     But I would have communicated to them --
16  and, clearly, the tribes were aware.  I mean,
17  Operation Choke Point is at a height.  I mean, it's
18  somewhat understandable that GPLS would have
19  concerns buying a large amount of loan
20  participations, again, with concerns that if the
21  government, is, in my opinion, you know, exercising
22  undue influence and pressure on banks and ACH
23  processors not to process transactions, you can
24  understand why GPLS would be nervous.
25     As I would recollect, you know, that would

1  require a formal letter, as this e-mail, you know,
2  would allude to, in terms of GPLS per the master
3  participation agreement saying that it is no longer
4  interested or at least minimizing, and, you know, we
5  would pass on that formal communication directly to
6  the tribes.  And if it wasn't formally passed on, it
7  certainly was verbally passed on in the form of
8  communication from Michelle or Jason to the tribes.
9    Q.  Did Michelle or Jason or anybody else
10  associated with the tribal products ask you to get
11  some kind of a letter from GPLS, or you just thought
12  it would be a good idea to ask them on your own?
13    A.  The way I would phrase that question is,
14  one, I mean, just my awareness of the agreement, I
15  mean, I felt that, you know, per the master
16  participation agreement, I'm sure -- I would have to
17  go back and look at the specific clause, but I'm
18  sure GPLS was required to give notice to all three
19  tribes that they were halting or minimizing the
20  amount of participations purchased.
21     And then as the top of this e-mail chain
22  also alludes to, for us directly, I think I needed
23  something to provide to KapCharge as the ACH
24  processor, because I think our agreement with them,
25  we were getting charged a certain amount of ACH

1  expense based on volume, and I just wanted to alert
2  them that, you know, GPLS not purchasing
3  participations and the tribes having to eliminate
4  their originations would certainly impact ACH
5  volumes.
6     MR. ACKELSBERG:  Okay.  You can take a
7  break.
8     THE VIDEOGRAPHER:  We are off the
9  record at 3:12 p.m.
10     (Exhibit No. 263 A&B marked.)
11     (Break taken, 3:12 p.m. to 3:25 p.m.)
12     THE VIDEOGRAPHER:  We are back on the
13  record at 3:25 p.m.
14  BY MR. ACKELSBERG:
15    Q.  So we're looking at Exhibit 263A and B, A
16  being the cover e-mail and B the attachment.  Am I
17  right that during this time period where a window down
18  of GPLS is being discussed, am I right that there is
19  at least an ask by Think Finance of Victory Park to
20  shift some of the funding to the RISE product?  Is
21  that -- is that correct?
22    A.  No, I wouldn't view it that way.  I really
23  view it two separate things going on during this
24  time span.  One is I wouldn't necessarily call it a
25  wind down of GPLS.  I would call it kind of a

1  downsizing or, you know, VPC GPLS's request to have
2  more cash, less loans.  And -- but I think at the
3  same time what this e-mail chain refers to is, to
4  that ███████, ██████ is interested in keeping their
5  50 million in the GPLS fund.
6     Separate, what this 263B refers to, it's a
7  term sheet.  Separate at this time, in the middle of
8  2013, we -- we decided to launch our RISE
9  installment state-based state-licensed lending
10  product, and it was starting to grow pretty rapidly.
11  And so we were not going to be able to finance it
12  out of our own existing cash flow, and so -- it's
13  kind of a separate transaction, so I would not say
14  that we were shifting funds from GPLS.  It's a whole
15  separate product.  It could have different LPs.  If
16  VPC didn't want to provide funding for it, we could
17  go out and find funding from somebody else.
18    Q.  Okay.  And that's the subject of the -- of
19  the e-mail, that topic?
20    A.  Well, the subject of the e-mail -- good
21  question.  What this gets into is that because GPLS
22  is, for lack for a better term, downsizing and there
23  aren't a lot of new loan originations -- or loan
24  originations from the three tribes happening from an
25  origination standpoint, I am going to assume that

UNSEALED

1  the credit default swap, for a short period of time,
2  is becoming pretty profitable. Because you've got
3  an existing portfolio that's generating nice APRs,
4  but there's not a lot of marketing expense that
5  we're incurring at Think Finance, and there is --
6  the loan losses are probably improving a little bit
7  because new customers typically have a higher risk
8  of loss than existing customers. So if you don't
9  have a lot new customer loan origination, credit
10 quality improves.
11      So we're getting credit -- you know, we're
12 getting cash flow as a part of our credit default
13 swap with GPLS, and at the same time, I'm
14 communicating to GPLS, you know, it's nice that, you
15 know, you want 50 percent cash reserve, you know, in
16 the GPLS with your investment, but, you know, at the
17 same time, I'm not thrilled about, you know, as part
18 of the credit default swap arrangement that you're
19 getting -- I don't know if it was 17, 18 --
20 somewhere between a 17 to 20 percent return on what
21 I affectionally joked in a verbal discussion with
22 Tom Welch was a money market mutual fund, you know,
23 that -- you know, and so we're going to start to
24 look to prepay down some of the GPLS facility
25 because it makes no sense for our credit default

1  swap to be incurring a 17 to 20 percent, you know,
2  cost of funds associated with it.
3      So then what we get into is with this -- I
4  mean -- but Tom, what he's alluding to in this
5  e-mail, we would like to protect ██████ investment,
6  you know, don't pay down GPLS so much that we have
7  to return ██████ money to them and GPLS.
8      And I said, well, that's fine. What we'll
9  then end up doing is we won't pay down GPLS as much,
10 but from a corporate CFO perspective, I said what
11 that means is, I'll probably -- I want to finalize
12 this RISE facility, but I probably won't be
13 borrowing as much initially because I'll use my
14 excess cash flow. Rather than paying down GPLS,
15 I'll use it to self-fund our RISE growth for a
16 little bit.
17      So that's kind of how it all ties to --
18 kind of together as to why we were mentioning both
19 in the same e-mail even though they're two distinct
20 facilities.
21      Q.  In your mind, other than the fact that
22 one's state licensed and one is not, what's -- from
23 a -- from the standpoint of the CFO, what was the
24 difference between the ILP product that was being
25 marketed for Plain Green, for example, and the --

1  and the ILP product that the company was marketing
2  for itself under the RISE label?
3          MR. SCHEFF:  Object to the form. From
4  a CFO perspective?
5          MR. ACKELSBERG:  Well, I mean. . .
6          MR. SCHEFF:  Answer the question if
7  you can.
8      A.  I'm just going to answer it from my
9  perspective. Without getting into the -- the unit
10 economics are certainly different between the two,
11 to a certain extent. I think RISE, from our
12 perspective, was a product where as the state
13 licensed direct lender, we could offer some other,
14 you know, unique features that Ken Rees, Jason
15 Harvison, Michelle Nguyen and others felt was
16 important.
17      You know -- well, one, first and foremost,
18 it's just -- especially, as you can appreciate in
19 this type of environment, regulatory diversity.
20 Being a direct state licensed lender definitely, I
21 think, had -- was one way of operating. And then
22 you also had, you know, the service provider model.
23 So it was two different ways of distributing the
24 same. So, I mean, from that perspective, from the
25 CSO -- CFO perspective, it gave us multiple

1  abilities to lend in a similar type of -- not us
2  lend but gave us the ability with RISE to lend
3  directly with the tribal programs, as we talked. It
4  gave them -- you know, us the ability to participate
5  as a service provider to them lending -- lending
6  their products.
7      But there were different features. You
8  know, RISE offered price -- price progression, you
9  know, down to 36 percent, other, you know, other
10 bells and whistles. But -- so there were -- there
11 were definitely differences between the two
12 products.
13 BY MR. ACKELSBERG:
14      Q.  Well, you don't have to pay a revenue share
15 for RISE, right?
16      A.  Yeah, I would argue, I mean, from a CFO
17 perspective it would probably be more profitable.
18 But, really, all of the products that we were
19 involved with, whether we were the direct lender or
20 the service provider, what we were trying to target
21 was, roughly, you know, a 20 percent operating
22 margin, you know, across all of the products.
23      In fact, you know, when you look at, you
24 know, these relationships, you know, from a tribal
25 lending perspective -- you know, I went back and

UNSEALED

1  looked at the audited financials from 2011 through
2  2013 when I was the CFO in advance of this
3  deposition, just to kind of refresh myself on the
4  economics because I figured it would come up at some
5  point. But, you know, Think Finance had roughly 60
6  million of net income from 2011 through 2013.
7       Looking at the audited financials, I could
8  look at the interest expense line item and see that
9  the interest expense, that we had to characterize
10  the VPC guaranteed return on the GPLS facility and
11  maybe a small amount of debt related to RISE was
12  roughly 92 million during that three-year period,
13  and the tribes, from what I could gather in looking
14  at the other cost of sales and the profit share paid
15  to them was roughly 60 million.
16       So it was about a 30 percent split to us,
17  30 percent to the tribes, and 40 percent to VPC. So
18  it seemed reasonable that all three, as I kind of
19  thought, were making relatively about the --
20  same amount of money, or it wasn't completely
21  disproportionate.
22       So I would say, you know, back to your
23  regarding, you know, would it be more profitable for
24  us to do it directly ourselves, yeah, but we -- you
25  know, with the price progression and some other

1  things, we kind of generally always targeted
2  20 percent operating margin on the revenue for any
3  of the products or -- or being a service provider
4  that we would offer.
5       Q.  Well, I'll go -- so what was that, 30
6  percent -- 30 percent Think, 30 percent tribe, and
7  40 percent VPC, that's your sense of how the
8  money --
9       A.  That's my sense in looking from 2011 to
10  2013.  Even though I stayed to the end of 2014, I
11  wasn't around in early 2015 when the audit for 2014
12  got done.
13       Q.  All right.  Well, I'll ask you more about
14  that before we go, but I want to -- I want to sort
15  of stick with, like, what's going on in this end of
16  2013 period.
17       MR. ACKELSBERG:  This will be 264.
18       (Exhibit No. 264 marked.)
19       MR. SHELDON:  Whoever stapled this is
20  testing my page flipping ability skills.
21       MR. ACKELSBERG:  Sometimes it's the
22  machine.  This one looks like the machine.
23       A.  (Reviews document.)
24       Okay.
25       MR. SHELDON:  I'll need another

1  minute.  He's faster than me.
2       MR. SHAPIRO:  Well, by the time the
3  documents get down here, it's --
4       MR. ACKELSBERG:  Yeah, yeah, yeah,
5  you're at an unfair advantage down there.
6       MR. SHAPIRO:  A little.
7       MR. HERMAN:  I hear you blaming me.
8       MR. ACKELSBERG:  I'll throw them down
9  that end first and it will work its way down.
10       THE WITNESS:  Trust me, if it was
11  numbers, I would look a lot more closely.  I'm just
12  trained that way.
13       MR. SHAPIRO:  Okay.  Thank you.
14       MR. SHELDON:  Thank you.
15  BY MR. ACKELSBERG:
16       Q.  So this begins with an e-mail from Linda
17  Rogenski to -- well, what's called, "To:
18  Reporting," and this has to do with the monthly
19  reporting protocol, right, that Linda was in charge
20  of, or that -- that finance was in charge of,
21  somebody in finance was in --
22       A.  Somebody in Think Finance, yeah, we would
23  report the results monthly to Victory Park Capital.
24       Q.  And I think Linda did -- L2 did --
25       A.  Oh, that's very good.

1       Q.  Thank you.
2       Did -- tell us a little bit about this
3  monthly report that would be sent to VPC every
4  month.  So it would include the board of directors
5  package, right?
6       A.  Yes.
7       Q.  And it would also include this large --
8  very large spreadsheet, the --
9       A.  Excel file with multiple spreadsheets in
10  it, yes.
11       Q.  Yeah.  And it sounds like Tom Welch is
12  communicating back that there's some -- something
13  came up at the meeting that -- that he hadn't heard
14  about before.
15       A.  Well, as part of -- I'll take that.  I
16  understand the gist of your question.  In the board
17  dec, I think he's referring in the back of this
18  e-mail that there was a section that we redacted,
19  cut out in terms of the board pack related to
20  Project Exclaim.  And so then what I was telling him
21  is that we didn't want him to see that just yet.
22  Ken and I had scheduled a call, I believe, with him
23  and Richard Levy for early that following week to
24  discuss that Project Exclaim.
25       Q.  And Project Exclaim is the spinoff, right?

UNSEALED

1  A.  Correct.
2  Q.  Okay.  So this is the point where Think
3  Finance has decided to split into two and -- and the
4  co- -- and had not yet informed Victory Park about
5  that decision?
6  A.  I would say this is the point at the -- no,
7  it was probably the early December because in -- it
8  was either the November board meeting of 2013 or it
9  could have been the December board meeting of 2013,
10  because sometimes we have our December board meeting
11  a little bit earlier given the holidays, that we
12  had, I believe, first discussed with our board of
13  directors the possibility of spinning off the direct
14  lending platform of our business, which would have
15  at that time encompassed RISE as well as the UK as
16  well as some other things that we were looking at
17  doing.
18  Q.  Everything except for tribal, right?
19  A.  Everything -- well, we would consider
20  anything that was related to the service provider
21  platform, which at that time was primarily -- I
22  think it was all tribal, yes.
23  So I wouldn't say that it was finalized at
24  that time.  I would have to go back and look when it
25  was done, but we were strongly considering doing it.

1  We knew that in order to do it, we would certainly
2  have to get their approval.  "They" being Victory
3  Park Capital.
4  Q.  Why is that?
5  A.  Well, they are the lender right now to --
6  to us directly through the RISE facility, or about
7  to be through the RISE facility, as well as with the
8  GPLS.  And because of the corporate guarantee and
9  lien on our assets, I'm sure -- I'm just assuming,
10  but I'm pretty sure that, you know, at this point
11  you've got to get them to bless any major
12  transaction like that.
13  MR. ACKELSBERG:  Okay.  And just
14  keeping with this topic, we'll move to 265.  This is
15  Bates TF-PA 674500.
16  (Exhibit No. 265 marked.)
17  A.  Give me one minute to review this proposed
18  structure.
19  (Reviews document.)
20  Okay.
21  BY MR. ACKELSBERG:
22  Q.  So I take it that there's -- there's sort
23  of -- it sounds like there's sort of two things
24  going on here in this.  One is that you and Victory
25  Park are still discussing a way to possibly fund

1  RISE loans with -- with them involved, and the other
2  thing that's being discussed is the idea that this
3  facility would move to the -- to the new company if,
4  in fact, you did split?
5  A.  I'll answer the first question first, which
6  was, yes, what this was related to, this particular
7  structure was related to financing the -- the RISE
8  product that we had launched, the state-licensed
9  installment loan product that we had launched in
10  2013.
11  The second question, I wouldn't
12  necessarily agree with that, because irrespective of
13  whether we did a spinoff or not, as I mentioned
14  earlier, we would need to finance the RISE
15  facilities.  So, you know, I would say that this
16  structure would have worked had we not done a spun
17  off, or, in retrospect, since we did a spinoff, it
18  worked as well.  But we didn't -- they didn't set up
19  the structure because of the spinoff.
20  MR. ACKELSBERG:  All right.  Let's
21  look at 266, now moving into January of 2014.
22  (Exhibit No. 266 marked.)
23  A.  Wow, landscaping.
24  BY MR. ACKELSBERG:
25  Q.  Yeah, blame -- blame this on Katten.  I

1  mean, we're getting -- the GPL documents are really
2  hard to read.  So I apologize on behalf of Katten.
3  MR. SHAPIRO:  Thank you.  Is this 266?
4  MR. ACKELSBERG:  Yes.  GPLP 161130.
5  A.  (Reviews document.)
6  Okay.
7  BY MR. ACKELSBERG:
8  Q.  Do you remember this e-mail?
9  A.  Not -- not specifically, but after
10  rereading, I think I kind of understand why I sent
11  the e-mail.
12  Q.  Okay.  Earlier in this discussion, I asked
13  you if -- if GPLS -- I think I asked you if GPLS
14  money -- we were discussing GPLS money being
15  rerouted into RISE, and you said, no, that's not
16  what's going on.  And I guess part of my question
17  is -- because I knew this one was -- I had seen this
18  one.  So it looks to me like that's what you're
19  talking about.  So tell me what I -- what I
20  misunderstood.
21  A.  I think in that earlier one -- and I'm kind
22  of glad this is being chronologically because it
23  kind of makes me think of how things, you know,
24  actually happened.  I think in that point in time, I
25  really viewed GPLS and RISE SPV as two separate

1  facilities, which they were.
2      At this point in time, I'm going to guess
3  why I wrote this e-mail was -- it was kind of
4  alluded to earlier.  You know, I still -- we still
5  probably had a large amount of cash sitting in GPLS
6  that is reducing my credit default swap admin fee by
7  a 17 to 20 percent rate, and I'm, like, okay, you
8  know, we're getting -- RISE is growing.  We have got
9  this RISE facility.  You know, can you be nice to us
10 and can we just move some of that money out of GPLS
11 into RISE at that point.
12     Q.  Right.  That was my understanding.  And
13 so --
14     A.  Yeah.  So that's why -- I apologize.  Back
15 in October, I probably wasn't thinking that way, but
16 now here it is in January of 2014, RISE is really
17 starting to grow, you know, the -- the tribal model
18 is not originating as much, and there's a lot of
19 cash in GPLS.  I'm doing what any good CFO does,
20 trying to convince my lender to divert funds from
21 one facility where they've got excess cash into
22 another so I can pay less interest.
23         MR. ACKELSBERG:  Okay.  267.  This one
24 actually alludes to an attachment -- makes reference
25 to an attachment, but I don't believe the attachment

1  was produced.  That's purely for Richard's benefit.
2         MR. SCHEFF:  Thank you.
3         (Exhibit No. 267 marked.)
4     A.  (Reviews document.)
5         Okay.
6  BY MR. ACKELSBERG:
7     Q.  And so is this an accurate summary of your
8  thinking about -- about the spinoff at this point in
9  time?
10    A.  Well, in looking at the subject, I mean,
11 there's -- there's multiple, you know,
12 constituencies involved in a spinoff, and, you know,
13 the messaging or what they would be interested in or
14 what affects them about the spinoff could be
15 different in lots of ways.
16        So in this context this e-mail is really
17 guards towards our insurance underwriters because
18 what it's getting at -- and Badr Qureshi was my
19 treasurer at the time, and so he was responsible for
20 cooperate insurance and discussing with our
21 insurance broker, which, I believe, was Woodruff &
22 Sawyer out of the Bay area, you know, hey, we're
23 thinking about spinning off our entity as we go
24 out -- and, typically, this was -- I think our
25 corporate insurance policies typically renew in the

1  April, May time span.  So that's probably why.
2         And we would -- regardless even with the
3  spinoff happening, effective, like, May 1st, 2014,
4  we would have to have corporate insurance for the
5  new entity.  I was giving the reasons to him why so
6  that when he had the discussion with Woodruff &
7  Sawyer, from a corporate insurance perspective, this
8  would probably be what they would be interested in
9  at a high level, "Gee, why are you doing this
10 spinoff?"
11    Q.  Now, one of the things that -- there's an
12 aspect to the spinoff that we haven't talked about
13 before, which you allude to in No. 1 where you say,
14 "The tribal litigation would hold up our ability to
15 go public."
16        And so the -- you told us, like, right
17 from the beginning when you came to Think Finance,
18 the -- the hope was to go public at some point,
19 right?
20    A.  I think that would have been the primary --
21 the primary mechanism for the investors, mainly the
22 venture capitalists, would be an IPO.
23    Q.  Okay.  And so -- and that desire to go
24 public, to do an IPO, that -- that desire didn't go
25 away from 2007 all through the tribal period, right?

1         MR. SCHEFF:  Object to the form.
2     A.  I'll answer the question.  From my
3  perspective, I believe my desire to take the company
4  public never changed.  I mean, we always operated
5  in -- the company in a manner that we felt that an
6  IPO would be a liquidity event for our investors.
7  BY MR. ACKELSBERG:
8     Q.  Okay.  Well, and it would be a liquidity
9  event for the executives, too.  I mean, let's be
10 frank.
11        MR. SCHEFF:  Object to the form.
12    A.  I could comment based on what -- never
13 mind.  Yes, it would be a liquidity event for -- for
14 certain employees that had stock in the company.
15 BY MR. ACKELSBERG:
16    Q.  Well, particularly, Ken, you and Jason
17 Harvison, right?
18    A.  Well, and any other executive that had
19 stock options or restricted stock units as well.  I
20 mean, it was more than just Ken, Jason and I that
21 had stock or stock options in the company.
22    Q.  And it's true that -- that you and Ken were
23 making sort of explorations about -- about going
24 public during the -- in 2012, 2013?
25    A.  I would say going all the way back to when

1  I first started in 2007, there were always
2  high-level discussions with investment bankers that
3  would be potentially interested in, you know, taking
4  us public if they felt we could go public.
5       Q.  And whether it was the ACH crisis or the
6  New York litigation, the tribal aspect of your
7  business was becoming problematic from the
8  standpoint of going public; am I right?
9            MR. SCHEFF:  Object to the form.
10      A.  I'll answer the question.  I'll rephrase it
11  a different way.  I really felt as we outlined in
12  the KPMG tax opinion regarding the spinoff, that we
13  had two distinct business lines.  We had the service
14  provider platform, which is where we provided
15  services to the tribes, and we also had the direct
16  lending platform where we were the direct lender
17  under RISE.  We had the UK business.
18          It was Operation Choke Point, from my
19  perspective, that was really putting pressure on the
20  entire Think Finance organization; meaning, that the
21  undue stress of trying to get ACH providers, not
22  just for tribal, but Operation Choke Point was
23  really having an impact on our ability to get
24  potentially ACH providers for our RISE product.
25          We lost our -- our corporate Wells Fargo

1  checking account.  I mean, I can't imagine any -- I
2  can't imagine operating a business without a basic
3  business checking account.  We're not ACH
4  processing.  We're not talking anything related to
5  any particular loan product.  Wells Fargo told me,
6  point blank, because of the Operation Choke Point
7  and the regulators' pressure on them, to not provide
8  any type of services to Think Finance, Inc., related
9  to the spinoff under the Operation Choke Point.
10         It got to a point where it was very
11  difficult to do business even under the state
12  license model because of the regulatory -- you know,
13  the Operation Choke Point, which I would say was
14  probably geared more towards the tribal model and
15  some other, you know, industries, but was also
16  having an impact on just our regular state license
17  model.
18         And so that was really the main impetus
19  for considering the spinoff is, gosh, we've got this
20  nice business off to the side, the direct lending
21  platform that's starting to grow, and we're having
22  difficulty getting basic checking.  We're having
23  difficulty getting a big four auditor.  We're having
24  difficulty getting, you know, ACH processing.  Or if
25  we do, it's expensive.  It's as expensive as they

1  were processing for tribal.
2            And in talking with investment bankers,
3  because of the litigation related to the tribal
4  model, it would be very difficult to take the
5  company public until the litigation related to
6  tribal eventually settled.  And I don't think it
7  took a lot of rocket science to gather that that was
8  going to be years down the road, if ever.
9            And so all of those reasons were the
10  reasons why we strongly considered and proposed to
11  the board that we consider doing a spinoff.
12           MR. ACKELSBERG:  Okay.  And this --
13  another one in March of 2014.  This is Plaintiff's
14  Exhibit 268, Bates TF-PA 108729.
15           (Exhibit No. 268 marked.)
16      A.  I think these e-mail chains would be a lot
17  smaller if VPC didn't have, like, six lines between
18  their name, their address and. . .
19  BY MR. ACKELSBERG:
20      Q.  They're taking -- they're taking all the
21  blame.
22      A.  Sorry.
23          (Reviews document.)
24          Okay.
25           MR. SHELDON:  I need another second,

1  please.
2            Okay.  Thank you.
3  BY MR. ACKELSBERG:
4       Q.  So can you explain to me the subject
5  with -- that's referencing the transfer of net
6  assets, the $65 million?
7            MR. SCHEFF:  Where are you referring
8  to?
9            MR. ACKELSBERG:  In the middle of the
10  second page.  So it's the --
11           MR. SCHEFF:  Okay.  Why don't you
12  direct him to it --
13           MR. ACKELSBERG:  Sure.
14           MR. SCHEFF:  -- so the record is clear
15  what you're doing.
16  BY MR. ACKELSBERG:
17      Q.  It's the e-mail, Chris Lutes to Tom Welch,
18  regarding the GPLS split discussion.  And you --
19  well, I'll read it to you.  "We also need to discuss
20  the initial transaction.  Looks like roughly
21  $65 million in net assets will be dividended by" --
22  "by Think Finance to Elevate.  I had originally
23  accounted for this as a noncash loan by TF to EL,
24  but it's actually a reduction of TF's equity is what
25  Grant Thorton is saying.  Makes sense since it is

UNSEALED

1  technically a spinoff."  Right?
2       So at this point in time -- I mean, and my
3  understanding of -- of splits or spinoffs is that
4  there are tax considerations, such -- there are tax
5  considerations in a -- in a spinoff, right?  If you
6  could explain to us just generally what those are,
7  that --
8    A.  Yeah, I'm --
9       MR. HERMAN:  I object to form.
10  BY MR. ACKELSBERG:
11    Q.  I know, I'm -- look, I'm not asking for
12  a -- I'm not asking for a tax -- I'm sorry, I'll
13  withdraw that question.  I mean, that's -- that was
14  an inartful question.
15       So one of the -- the issues that's
16  involved in creating a new company out of -- out of
17  a parent company is -- is where the capital comes
18  from for the new company.  The new company has to
19  start with working capital, right?
20    A.  Yes.
21    Q.  And because it's a spinoff, because it's,
22  essentially, a split of an existing company, that
23  working capital is coming from the original company,
24  right?
25    A.  Potentially, but not necessarily.

1    Q.  Okay.  But that's what -- that's the
2  subject of your discussion here with Tom, right?
3    A.  Not quite.  And we can -- I can answer that
4  question later.  This one, I think, had more to do
5  with the fact that from VPC's perspective, and what
6  started this e-mail chain was, as you can
7  appreciate, their concern.  I mean, they've, you
8  know, lent to -- you know, they have the GPLS
9  facility that's going to stay behind in Think
10  Finance as part of the service provider platform to
11  the tribes, and then they have this new facility
12  with RISE that's going to be spun off into the new
13  entity Elevate.
14       When it was all combined, they felt good
15  that they had, you know, adequate coverage
16  collateral on both facilities because they had a
17  lien on all of Think Finance's assets.  And now
18  they're just trying to understand when you split it,
19  you know, does anything bad happen to them from a
20  collateral perspective, are they somehow -- their
21  collateral position under either entity being
22  harmed.
23       And so what I was pointing out to Tom in
24  this e-mail, originally -- and this is where it kind
25  of gets -- the dividend and the thing was

1  originally -- you know, we always were really good
2  with -- dating back to when I first started in 2007
3  and having -- regardless of -- we had numerous legal
4  entities, as you can appreciate, for state licensed
5  lending, for the tribal models when we partnered
6  with the bank, to really kind of easily in their
7  general ledger segregate all of the assets, and the
8  assets primarily related to any lending program are
9  cash and the actual loan balances.  And then we had,
10  you know, debt facilities that were typically
11  structured, you know, for each of those particular
12  programs.  Like I said, we had GPLS.  We had the
13  RISE debt facility.
14       And so when I originally kind of provided
15  them a model, because they wanted to see a model on
16  how the pro forma would look when we split, what I
17  did was I said, well -- I had -- I had grossed it
18  originally, saying that if you had ten -- I am going
19  to just -- 10 million of cash for RISE and 75
20  million of loans for RISE, that we would move
21  $85 million over to RISE and the related debt
22  facility over to RISE and any retained earnings or,
23  you know, capital related to those RISE legal
24  entities over to -- I'm saying RISE.  I meant
25  Elevate.

1       But what Grant Thorton, our auditors, came
2  back and said, is, no, technically, what happens is
3  you collapse all that and it's a net dividend.  So
4  the cash and the loan balances go over but not the
5  related debt facility.  It just comes out of the
6  capital of Think Finance.  So, in essence, the
7  overall capital of Think Finance drops because it's
8  a dividend.  You're not just moving over assets and
9  liabilities and a small amount of equity.
10       So I wanted to make sure Tom understood,
11  because I think there was a covenant related to the
12  overall equity position of Think Finance that, hey,
13  you know, this is now a dividend, so suddenly the
14  equity base of Think Finance will drop because it's
15  technically dividending under the -- the accounting
16  rules, not a grossed up transfer.
17    Q.  When you say "dividending," we're talking
18  about a transfer of equity from -- from the -- from
19  Think to Elevate?
20    A.  No, no, what we're talk- --
21       MR. HERMAN:  Objection; form.
22       THE WITNESS:  I'm sorry  if I
23  interrupted.
24    A.  No, from my perspective, what we're talking
25  about is, like I said, if you had 10 million of cash

1    that was specifically in RISE legal entities as part
2    of Think Finance and you had 75 million of loan
3    balances for RISE that were in Think Finance, and
4    that -- and then you had a related debt facility of
5    75 million, that we would move 10 million over, 75
6    million over, 75 million over and then the small
7    amount of retained earnings.  What they said was you
8    had to collapse everything, and it gets dividended
9    out of the net equity position of Think Finance.
10   BY MR. ACKELSBERG:
11      Q.  Right.  So that's what I'm -- so I'm --
12      A.  But it all related.  And maybe it's we're
13   saying the same thing just in different manners.  So
14   I apologize.
15      From my perspective, what ended up being
16   dividended over, or if it was going to be moved like
17   I originally expected, was truly just the net assets
18   related to the RISE legal entities that were being
19   spun off or the net assets and related equity
20   position of the UK that was being spun off.
21      Q.  But from the standpoint of your auditor --
22   that's who Grant Thorton is, right?
23      A.  Yes.
24      Q.  Okay.  So from the auditor, what they were
25   telling you was that, in their mind, what -- in

1    their judgment, what was happening was that 65
2    million of equity that's on the balance sheet of
3    Think Finance would have to move to the balance
4    sheet of Elevate?
5      A.  Because it --
6      Q.  "Yes" or "no," and then -- and then you
7   can --
8      MR. SCHEFF:  He can answer the
9   question however he wants.
10      A.  I will answer by expanding upon it.  What
11   they were saying was, is that there are 65 million
12   of net equity -- net assets -- sorry, not net
13   equity, but net assets -- related to the direct
14   lending platform, and those needed to be dividended
15   out of Think Finance.  Those net assets, again, as I
16   would say, would be relate to cash specifically
17   related to the RISE or the UK programs and the loan
18   balances related to those programs.  So, again,
19   everything was done clearly just on a distinct legal
20   entity basis.  There was no -- if there was
21   corporate cash at Think Finance, that stayed at
22   Think Finance.  It did not move over.
23   BY MR. ACKELSBERG:
24      Q.  What about -- well, first of all, let me
25   just stay with the 65 million.  When, in fact,

1    Elevate opened -- and what's that date?  Is that
2    May 1st?
3      A.  May 1st, 2014.
4      Q.  Okay.  So May 1st, 2014, Elevate begins.
5   And you're still the CFO of Think at that point,
6   right?
7      A.  CFO at Think.  But for the first five
8   months, I think, through the end of September or
9   October, we considered it, like in most other
10   spinoffs, shared services where, technically, I
11   could act on behalf of both entities --
12      Q.  Right.
13      A.  -- because it's impossible to build up a
14   new accounting staff immediately.
15      Q.  I understand.
16      So when Elevate began as -- in operation
17   as a legal entity on May 1st, 2014, how much working
18   capital did it, in fact, begin with according to
19   your accounting -- according to your accounting
20   records -- go ahead.  You're --
21      A.  I was going to say, I don't recall the
22   specific amount of capital, but that's -- from a
23   working capital -- from capital -- or assets related
24   to specific lending programs, which I don't consider
25   working capital, those moved over.  So if there was

1    any RISE kind of cash-in-process, a collection
2    related to funding accounts, that moved over.  If
3    there were any loan balances related to RISE, that
4    moved over to Elevate.  Same with the UK.  UK, you
5    can appreciate, that's pretty easy because it's a
6    collapsed international legal entity that moved
7    over.
8      The working capital to then fund payroll,
9   other, you know, ancillary expenses, that was the
10   reason why we set up the Think Finance/Elevate kind
11   of intercompany debt facility between the two
12   entities on a somewhat temporary basis, because we
13   realized, like any spinoff, you know, a lot of the
14   corporate cash is held at Think Finance.  It stays
15   behind at Think Finance.
16      You know, Elevate is a new entity.  It
17   needs to either borrow money from somebody or raise
18   capital from somebody.  And what we agreed, and what
19   the board of directors on both companies agreed, is
20   that there would be an arm's length transaction and
21   an arm's length fair value interest rate whereby
22   Think Finance, because it was sitting on excess
23   cash -- again, as you can appreciate, the GPLS
24   portfolio was, you know, stagnated or winding down,
25   so they were getting excess cash flow from the GPLS

UNSEALED

1  credit default swap, and they decided that it made
2  sense from a stand-alone board perspective to make a
3  loan to -- to Elevate to help them fund their
4  working capital. And so we put that facility in
5  place. My understanding is that's rather common in
6  spinoffs.
7        What we were able to do, we did initially
8  borrow from Think -- "we," Elevate, did initially
9  borrow from Think Finance under that facility to
10 fund working capital for a period of time, until, I
11 believe, it was sometime later in 2014 or early 2015
12 where Elevate actually borrowed working capital from
13 Victory Park Capital and used the proceeds to pay
14 off Think Finance.
15       So by the end, I'm a hundred percent
16 certain that by the end of 2014, whereas Think
17 Finance had lent money to Elevate to provide them
18 working capital on a temporary basis, Elevate had
19 completely paid it back because either through their
20 own other funding efforts, I think primarily from
21 Victory Park Capital, were able to raise enough
22 working capital to pay it off and use that to go
23 forward.
24     Q.  You're familiar -- well, the -- one of the
25 assets that the old Think Finance company had was

1  its whole proprietary risk expertise, its -- its
2  decision engine and the analytics that go with it,
3  right?
4      A.  Correct.
5      Q.  And the -- there is something called the
6  Legacy Platform. You know what -- you know what I'm
7  referring to, right, when I refer to the Legacy
8  Platform?
9      A.  Yes, I do know what you're referring to.
10     Q.  Okay. And as I understand it from prior
11 testimony, that the -- that the Legacy Platform is
12 the platform on which the original PayDay One
13 product was based. It later was the platform on
14 which the two tribe -- on which the first First Bank
15 of Delaware ThinkCash product was built, and later
16 it was the same platform on which the two tribal
17 installment loan products were based. And, finally,
18 it -- when RISE was developed at Think Finance,
19 that, too, was housed in some form on the Legacy
20 Platform. You know that, right?
21         MR. HERMAN: Objection; form.
22         MR. SCHEFF: Object to the form.
23     A.  I'm fine answering. Yes.
24 BY MR. ACKELSBERG:
25     Q.  Yes.

1      A.  So all of those products were housed on our
2  Legacy Platform.
3      Q.  Okay. And so -- and I also understand that
4  in terms of the mechanics, the way that the -- the
5  spinoff was implemented with regard to the platform
6  is that there was a copy made of the data that
7  resided on the platform and that the copy went --
8  went to RISE. Is that -- is that your
9  understanding?
10         MR. SCHEFF: Object to the form.
11     A.  My understanding at a high level, and
12 appreciate I'm not a chief technology officer or an
13 IT expert in any stretch of the imagination and --
14 I'll answer it in two manners. One is really what
15 you're getting at from your question but then also
16 from an accounting perspective, at a high level,
17 yes, there was a copy made because, to your point,
18 the Legacy Platform included the original RISE -- or
19 the original PayDay One product, so there was
20 retained earnings that, you know, moved over to
21 Elevate related to that since that was a direct
22 lending product, as well as the RISE installment
23 loan product that was a direct lender product.
24       You know, there was a lot of, you know --
25 you know, a lot of products were -- were generated

1  or housed on those particular platforms. So what
2  was decided upon spinoff was, literally, at that
3  point in time, you kind of just made a copy of that
4  Legacy Platform and, you know, provided that -- this
5  is where I'm getting a little bit out of my
6  expertise -- that code or whatever was also made
7  available to Elevate, so that as of May 1st, 2014,
8  for a certain point in that time, there were two
9  copies of the Legacy Platform that were equal for
10 both companies.
11 BY MR. ACKELSBERG:
12     Q.  And that -- go ahead, sure.
13     A.  I'm sorry. From an accounting perspective,
14 I'm not sure that we considered that an asset on the
15 books of Elevate. We left all of that -- you know,
16 any expense or whatnot related to that would have
17 probably depreciated expense. If there was anything
18 left, it would have stayed on the books of Think
19 Finance. I may be wrong on that. We may have
20 figured out some way to split the -- maybe we did a
21 50/50 split, but. . .
22     Q.  But sitting here today, you don't -- you
23 don't think it was really accounted for in the
24 accounting related to the spinoff?
25         MR. SCHEFF: Object to the form;

UNSEALED

1  misstates the testimony.
2      A.  I don't -- I don't recall.  It wouldn't
3  have been material to the overall books because that
4  platform had been around so long, a lot of it would
5  have been fully depreciated.
6  BY MR. ACKELSBERG:
7      Q.  Now, what I -- now, I want to make sure I
8  understand what you mean by "platform."  That --
9  so as I interpreted, the description of the
10  company's core products, the risk analytic side of
11  that, it's that Think has developed -- that Think
12  Finance had developed a state-of-the-art risk
13  analytics system that relied on historical data
14  that -- that Think had internally as well as
15  third-party data that it was -- that it was
16  purchasing, and that the combination of all of that
17  data and Think's ability to use that data and
18  analyze that data, along with the additional data it
19  got from third parties, was the key to the
20  competitive edge where the -- the product that Think
21  was most proud of.  Something like that?
22          MR. SCHEFF:  Object to the form.
23          MR. SHELDON:  Let me say, there were a
24  lot of data references in that question, and I'm
25  lost as to what data is being discussed.

1          MR. HERMAN:  I'm also going to object
2  to the form and say that that mischaracterizes the
3  former testimony.
4  BY MR. ACKELSBERG:
5      Q.  Okay.  So we'll take it in pieces.  Think
6  Finance, before the split, had -- had risk analytic
7  specialists working for it, right?
8      A.  Yes.
9      Q.  Okay.  And their responsibility was
10  something called a "decision engine," among other
11  things?
12      A.  Let me phrase it this way.  You know, the
13  risk department has kind of numerous subdepartments
14  and employees working in it.  One would be those
15  data scientists responsible for building the credit
16  scores.  It would have employees that were
17  responsible to -- I think what you're kind of
18  alluding to, this maintaining the IT work related to
19  the credit decision engine, how do you get the
20  scores that are developed into an IT platform that,
21  you know, analyzes customer application data to help
22  decide whether or not --
23      Q.  Yes.
24      A.  -- to approve a customer loan, and then
25  there were also risk employees that were responsible

1  for kind of managing the day-to-day operations of
2  the loan portfolio or making recommendations to the
3  various third-party loan originators.
4      Q.  And so what I'm trying to establish is that
5  when you said the platform was copied, that
6  that was the agreement that it's incorporating --
7  it's incorporating a lot of history, a lot of work
8  by the risk people, right?
9      A.  Well, let me -- let me recharacterize
10  because when I first said it was copied, I was
11  referencing more to the actual true -- when you
12  brought up the term Legacy Loan Platform, that -- or
13  the Legacy Platform, I interpreted that to be more
14  of the Legacy Loan Platform, the actual loan system
15  on which the loans are housed, not necessarily the
16  credit decisioning aspect of all of that.
17      Q.  Well, so did --
18      A.  Because there's IT work related to that as
19  well.
20      Q.  I understand.  But when Elevate began, did
21  it just start from scratch without any benefit of
22  the historical work done by the Think risk analytics
23  people?
24      A.  No, not --
25          MR. SCHEFF:  Object to the form.

1      A.  I'm not implying that at all.  What moved
2  over on May 1st, 2014, would have been the existing
3  credit risk scores, decision engine related to the
4  RISE installment loan product, related to the UK
5  Sunny installment loan product.  Any credit scores,
6  credit information, from my perspective, IT decision
7  engine, a lot of that may be shared.  I don't know.
8  It's getting a little bit out of my expertise in
9  terms of how risk stored all of that data, whether
10  it was one huge database or whether they had, you
11  know, individual databases just for RISE and for
12  Sunny and for the various tribal products.  I don't
13  know how they mingled or commingled all of that
14  data.
15          But my understanding is, is that it was
16  pretty much just that which was necessary and
17  applicable to Elevate and its products definitely
18  moved over, and stuff that wasn't, you know, stayed
19  behind.  But it could have been an exact copy of
20  everything.  That's probably a question better for
21  Jason or Michelle or Ken Rees.  I don't -- I just
22  don't have that expertise.
23  BY MR. ACKELSBERG:
24      Q.  Well, but none of them are -- are data or
25  risk specialists, right?  So, I mean, if I really

UNSEALED

1  wanted to know more about, like, what exactly --
2  what exactly was the nature of the transfer from --
3  the copy or the transfer, whatever word you want to
4  use, that went from Think to Elevate, who would --
5  who would know that?
6      A.  Well, one, I believe that there was some
7  type of share -- information sharing agreement or
8  something.  There might have been an agreement as
9  part of the spinoff between the two entities to
10  document just that.  If there wasn't, it would have
11  probably been -- at that point in time, from an IT
12  perspective, it would have been Bill Kontgis, who
13  was the chief information officer of the combined
14  entity, and he had stayed behind at Think.  But he
15  would have understood, from an IT perspective, what
16  was being replicated.  And from a credit
17  perspective, it would have been Walt Ramsey, the
18  chief credit officer at the time.
19      Q.  Is Walt Ramsey still with Elevate?
20      A.  No, he's no longer with Elevate.
21      Q.  Where is he?
22      A.  I don't know.  He stepped down last
23  September, I believe.
24      Q.  What about Bill Kontgis?
25      A.  Bill stayed behind at Think Finance.  I

1  don't believe he's there anymore.
2      Q.  Do you know where he is?
3      A.  No, I don't.
4          MR. ACKELSBERG:  All right.  This
5  would be a good time for a break.
6          THE VIDEOGRAPHER:  We are off record
7  at 4:17 p.m.
8          (Break taken, 4:17 p.m. to 4:45 p.m.)
9          THE VIDEOGRAPHER:  We are back on the
10  record at 4:45 p.m.
11  BY MR. ACKELSBERG:
12      Q.  Mr. Lutes, thank you for your patience.
13  We're almost done here.
14      A.  Sure.
15      Q.  A while back in the deposition, we were
16  talking about the monthly package that -- well,
17  monthly report that went to Victory Park that
18  finance would send out, and that that included the
19  large board dec and also included a very, very large
20  spreadsheet.  I think it was called the forecast,
21  the BOD forecast, or something like that.  You know
22  what I'm talking about, right?
23      A.  Generally, yes.  It could change from month
24  to month, but yes.
25      Q.  All right.  So what we're going to do is,

1  I'm just going to ask you -- I'm going to -- we're
2  actually going to -- we're going to do a couple of
3  things.  One is we're going to put up on the screen
4  one of those forecasts, but before I do that, I want
5  to -- mostly for the benefit of all the lawyers in
6  the room that are really interested in this, I want
7  to sort of show them where it came from in the
8  production, and then we'll talk about the forecast
9  itself.
10          You would agree that the forecast is not
11  something that's possible to put on a couple of
12  pieces of paper?
13      A.  I would agree with that.
14      Q.  We're talking about an Excel sheet with
15  more than a hundred different worksheets within it,
16  right?
17          MR. HERMAN:  Workbooks.
18          MR. ACKELSBERG:  Workbooks within it.
19  Thank you.
20      A.  Yes.
21  BY MR. ACKELSBERG:
22      Q.  Yes.  Okay.  So what I want to do is, I'm
23  going to mark this document as P-271, mainly just to
24  show you and the lawyers where this all comes from.
25          (Exhibit No. 271 marked.)

1  BY MR. ACKELSBERG:
2      Q.  Just so you see it, at this -- we're
3  getting -- this is actually coming from the Great
4  Plains -- the Great Plains -- the GPLS production,
5  the Victory Park production, and it's an -- it
6  starts with an e-mail, GPLP 383459.  And if you look
7  at the cover, you'll see that this is Linda Rogenski
8  sending this to the various people that get -- that
9  are designated to get the report.  This is sent on
10  June 20, 2014, with all the various monthly
11  reporting items attached.  Do you see that?
12      A.  Yes.
13      Q.  Okay.  And then there are a bunch of things
14  that are -- so you see that she -- what she attaches
15  is something called the GPLS books, the current
16  Exhibit A, form of compliance certificate.  Do you
17  see that?  And what I've done is on the board
18  package, I didn't -- I didn't copy the whole hundred
19  pages, but I do have the first and last page, just
20  so -- I have no questions about that.  I just want
21  you to see, in fairness to you, where -- where I'm
22  getting all this from.  Okay?
23      A.  Sure.
24      Q.  And then, finally, the last item you'll
25  see, "File Provided Natively," and it's entitled

UNSEALED

1 "June 2014 BOD Forecast Final," and it's an Excel.
2      MR. SCHEFF: It's the last page.
3     A. Yes.
4 BY MR. ACKELSBERG:
5     Q. Okay. So now what I'm going to do is I'm
6 going to put up on the screen that Excel sheet,
7 which we -- we got with this production. Okay? And
8 then you'll be able to see it and manipulate it,
9 too. I mean, you'll be able to see it on the screen
10 there. Okay.
11     Does this document look familiar? Does
12 this look like the --
13     A. Yeah, I'm familiar with this file format.
14     Q. Okay. And if we go -- there's a tab for
15 the TF balance sheet. Do you see -- that's the tab
16 that we're on now. Do you see that?
17     A. Yes.
18     Q. Okay. And the way this is organized, you
19 can see that it has actual numbers for January 2014
20 through May of 2014, and then -- and then you get
21 future months that are labelled as forecasts. So
22 there's a -- there's a difference between actual and
23 forecast, right?
24     A. Yeah, I think this would reflect the actual
25 results through May 31st, and the forecasts would

1 represent the forecasted model for the Think -- in
2 this particular case, the Think Finance balance
3 sheet for the rest of the year, I am going to
4 assume, on a -- this is an assumption. Might need
5 to drill -- on a post-split basis, post-spinoff
6 basis, but I'm not sure. I'd have to look at that.
7     Q. Okay. But my question for now is simply
8 just to confirm that the columns that have "Actual"
9 over them, the numbers that would be in those
10 columns represent the real transactional numbers
11 that come from the general ledger of the company?
12     A. It may not be exact in terms of, like,
13 following Generally Accepted Accounting Principals
14 in terms of, you know, how we would -- this model --
15 if you looked at the December 31st column, it might
16 not translate exactly into the audited financials,
17 but it would be a fair representation, yes.
18     Q. Okay.
19     A. And it would be populated from the general
20 ledger.
21     Q. Yes. Okay. And what are the forecast
22 numbers?
23     A. The forecast numbers would be based upon,
24 you know, various forecasted assumptions that
25 finance would gather in discussions with the product

1 managers, like, Jason and Michelle. It would be --
2 and if this was post-spinoff, it would be probably
3 just whoever was running -- Michelle would have
4 stayed at Think Finance post-spinoff. So it would
5 have looked at potential marketing volumes for the
6 tribes, potential losses based on risk. Just
7 various assumptions from parts of the business unit
8 or just within the finance accounting department.
9     Q. Okay. Now, from this sheet, can you show
10 us the spinoff retained earnings?
11     A. Can you scroll down?
12     Q. I think you can, but we'll do it for you.
13     A. How do I do it? With my finger?
14     Q. I thought you had -- there's no -- oh,
15 there's no mouse there. All right. We'll do it.
16     So look and confirm that you'll see what
17 we're doing there. Right? I think we're there at
18 the screen, I think that we're now. You can see it,
19 right?
20     A. Yes.
21     Q. Okay. So what do you show for the retained
22 earnings at Think on May -- end of May 2014?
23     A. At the end of May 2014 -- and, really, what
24 I'll reference -- well, I'll answer your question,
25 and then I'll reference one other line item. On --

1 at May 30th, 2014, May 31st, the total equity of
2 Think Finance post-spinoff would have been
3 $55.8 million. If you reference back up to line 69,
4 Row 69, what would have been contributed would
5 have -- as part of the spinoff -- and that's per
6 this model. I would have to go back and, you know,
7 verify it based upon, you know, the final audit
8 because I think when we audited -- when Grant
9 Thorton did a separate audit of Elevate, they would
10 have audited the opening balance sheet.
11     But if this spreadsheet was correct, it
12 would have showed -- tied to those audited
13 financials, it would have showed that, roughly,
14 77.3 million of net assets would have been
15 contributed from Think Finance to Elevate.
16     Q. And you could check that on the Elevate
17 side, right? I mean, so, for example -- Elevate is
18 a public company, right? And because it's a public
19 company, your financials are actually filed with
20 the -- with the SEC on a periodic basis; am I right?
21     A. Well, as I just said, even going back to
22 that in my prior answer, if this model is correct --
23 and looking at it, I am going to assume it probably
24 is correct -- you know, the open -- the 2014 audited
25 financials for Elevate, which we would have been

UNSEALED

1 required to produce -- we weren't public, but we
2 would have been -- just as part of the VPC debt
3 facility, they require audited financials. There
4 would have been an audit of the opening balance
5 sheet by Grant Thorton, and we would have to tie
6 that amount back to the opening balance sheet. But
7 I'm assuming it would probably tie or come pretty
8 close.
9    Q.  Okay.
10    A.  If this was done in -- if I can add one
11 other comment, the only potential change was, you
12 know, this being produced in June of 2014 was
13 clearly in advance of the ultimate audit done
14 sometime in -- during the first quarter of 2015.
15 It's quite possible that Grant Thorton could have
16 come up with some type of proposed audit
17 adjustments. Or as I mentioned earlier, this model
18 wasn't necessarily made to reflect the way the GAAP
19 financials, the audited financials actually play
20 out.
21    Q.  And is there a formula attached to that --
22 to that cell? In other words, where did -- how do
23 you -- how do you arrive at that number, the
24 $77.3 million? You're --
25    A.  My guess, since it's -- since it's an

1 actual hard copy number, you know, typed in there,
2 that that would have been based on the April 30th
3 transaction spinoff date. And as you can imagine,
4 given a spinoff, the accounting finance department
5 played really, really close attention to what that
6 number was, again, subject to audit at the end of
7 the year.
8       But that number probably would have came
9 from the detail of the net assets based on all the
10 various legal entities that were transferred from
11 Think Fiance over to the Elevate entity. So it was
12 probably the net sum of the net assets transferred.
13    Q.  Now, am I -- am I correct that in this --
14 in this spreadsheet, you also keep track of profit
15 and loss on a product specific basis?
16    A.  To the best that we can using assumptions,
17 but yes.
18    Q.  Okay. So if you'll watch what we do here,
19 what we're going to do is move to the product
20 specific part of the tabs within the -- within the
21 spreadsheet. Okay?
22    A.  Sure.
23    Q.  Okay.
24    A.  If you want, I can probably do it.
25    Q.  Yeah, go ahead.

1    A.  Which year are you looking in, and what are
2 you --
3    Q.  Well, let's say -- let's say 2013, yeah.
4    A.  Okay.
5    Q.  All right. So, now, we're now looking at a
6 tab that's called "Product P&L 2013," right?
7    A.  Yes. But it's the -- the P&L only down
8 through EBITDA. It's not the full net income. It
9 wouldn't include interest, expense, taxes,
10 depreciation, some other line items that fall below
11 EBITDA.
12    Q.  Okay. But this is a way that -- but this
13 particular workbook is a way that the finance
14 department can assess the relative profitability of
15 different products, right? That's one of the
16 functions it -- that's the whole point of this
17 exercise, right?
18    A.  Yes.
19    Q.  Okay. And so -- and what you have listed
20 here would be the different product lines that Think
21 had in this particular year. We're looking at 2013,
22 right?
23    A.  Yes.
24    Q.  And so we have RISE. We have the
25 installment loan product. And just to be clear, ILP

1 would be Plain Green and Great Plains Lending
2 together, right?
3    A.  Yes, it would.
4    Q.  LOC represents Mobiloans, correct?
5    A.  Correct.
6    Q.  And then you have UK is what you're doing
7 in England. RTO is rent-to-own. And then you have
8 two other product lines, Card and Elastic, with --
9 with not a lot of -- not a lot of revenue attached
10 to them, right?
11    A.  Correct.
12    Q.  So --
13    A.  But it also highlights, by the way, on
14 Row 16 the amount of profit-sharing paid to the
15 tribes in that particular year, which was
16 $28.7 million.
17    Q.  Right. And, actually -- so that's a --
18 that's a good point. Well -- and I'll get to that
19 in a minute, but -- I'll take that point, but first
20 let me say that what this shows is that at least in
21 2013, RISE lost -- if we just look at the EBITDA,
22 RISE lost about $10.9 million, right?
23    A.  Uh-huh (affirmative response).
24    Q.  The installment loan product earned
25 $126 million, correct?

UNSEALED

1    A.  Before interest expense.
2    Q.  And that's after paying the tribes a profit
3  share of $22.3 million, right?
4    A.  But, again, before paying GPLS their 17 to
5  20 percent fixed return.
6    Q.  Okay.  And the line of credit that's
7  Mobiloans, that was also a money maker, not -- not
8  anywhere near as much a money maker as the
9  installment loan product, right, but still it made
10  27 million after paying the Tunica a profit share of
11  6.4 million, right?
12    A.  Correct.
13    Q.  Okay.  The UK product was a loser, right,
14  at $24 million, right, during this year?
15    A.  It lost money.  I wouldn't call it a loser.
16    Q.  I'm sorry, I don't --
17    A.  I know.
18    Q.  It lost money.  As did RTO and the other
19  two products, correct?
20    A.  Yes, sir.
21    Q.  Okay.  So during this year, the two
22  products that made money -- the two product lines
23  that made money were the tribal products, the ILP
24  based at Great Plains and Plain Green and the LOC
25  based at Mobiloans, right?

1    A.  Yes, that would be correct.
2    Q.  Okay.  And now before, when you were
3  telling us about this, I think, you said 30/30/40
4  split, I think what you -- as I understand what you
5  told us, you came to that number by looking at the
6  consolidated financial statements, right?
7    A.  Generally speaking, yes.
8    Q.  And so when you look at the consolidated
9  financial -- financial statements, you're basically
10  looking at the -- total company with all the --
11  with all the -- sort of the wins and losses all
12  combined, right?
13    A.  Yes.  But as I also point out on this
14  spreadsheet, these numbers are before interest
15  expense.  For RISE and the UK, those were
16  self-funded products.  I believe, at the time, there
17  wouldn't have been any interest expense associated
18  with those products.  Whereas, with ILP and LOC, if
19  you go to the full 2014 P&L tab, I can point out
20  what the total amount of interest expense that we
21  would have had to have backed out of the --
22    Q.  Why don't we do that.  Why don't you show
23  us which tab.
24    A.  Can you do that drop-down here again?  Or,
25  here, you know what, let me -- if you don't mind, I

1  am going to -- it's not letting me drive it.
2    Q.  My associate is here saying you know it a
3  whole lot better than we do, so go ahead.
4    A.  Okay.  So I'm looking at 2013.  So there
5  would have been in 2013 49.1 million of interest
6  expense backed out of the tribal profits, and then
7  it would have been taxed at, roughly, the 40 percent
8  effective tax rate.  So if I go back to the 2013
9  product P&L, you would -- these two would have
10  combined to 153 million, back out 49 million for
11  simplicity can we just say, and it rounds down to --
12    Q.  And you're combining now ILP and LOC?
13    A.  Yes, that's right.
14    Q.  Okay.  So if you combine --
15    A.  A hundred million and then you tax it at
16  40 percent, after tax, it would have been probably,
17  roughly, about 60 million, and there would have been
18  some depreciation expense.
19    Q.  Well -- okay.  So, I mean, we could -- we
20  could -- we can -- let's just establish what those
21  numbers are.  So before the ILP had --
22      (Interruption in proceedings.)
23  BY MR. ACKELSBERG:
24    Q.  So we started with the product specific
25  P&Ls, and we had a bit --

1      (Interruption in proceedings.)
2    A.  I'm pointing out on how the -- on that
3  product --
4  BY MR. ACKELSBERG:
5    Q.  Wait, wait, wait.
6      MR. ACKELSBERG:  Are you on?  Yeah,
7  okay.
8  BY MR. ACKELSBERG:
9    Q.  Go ahead.  I'm sorry.
10    A.  Apologies.
11      You know, on this -- what I have
12  highlighted on this particular spreadsheet is the
13  115-million-273.  This would have been, you know,
14  from my perspective -- I think ties to the audited
15  financial somehow, but it also ties back to that
16  product 2013.  Like I said, you know, all of this
17  interest expense line item would have related to the
18  VPC GPLS debt facility, so you would have backed
19  that out of all the profits.
20      I would say a majority of the depreciation
21  and amortization at the time would have related to
22  the IOP programs, and then they also would have been
23  taxed at 40 percent.  So, you know, by no means
24  does, you know, the tribal on a gross basis --
25  our -- our profitability from tribal is, you know,

UNSEALED

App. 0241

1    significantly less.
2            And you can see, again, what I highlighted
3    earlier when I was referencing the 60 million, you
4    can see a little bit more.  But 63 million of net
5    income through 2011 through 2013 is what Think
6    Finance earned.
7            I understand your point of -- that there
8    were, you know, other products that were in a loss
9    position at that particular time that would have,
10   you know, grossed up the tribal net income that we
11   would have made during that time span, but what I
12   had said earlier in my testimony was Think Finance
13   ended up making, roughly, 60 million of net
14   income --
15       Q.  But when you set --
16       A.  -- during that three-year period.
17       Q.  But that reference to -- just to be clear,
18   the reference to that, roughly, 30/30/40 split, when
19   you said that Think Finance made, essentially, the
20   same amount of money that the tribes, you're
21   basically looking at the total --
22       A.  Of Think Finance.  Which is what I said.  I
23   can revise that, and if you want, we can probably
24   quickly generalize, you know, what this would have
25   said.

1            Like I said, if you add up column C and D
2    from an EBITDA perspective, you're at 153 million.
3    Give me the liberty of just rounding down to
4    150 million for simplicity's sake.  And as I showed
5    on that other spreadsheet, the interest expense was,
6    roughly, 50 million.  So the tribal would have made
7    pretax in 2013, roughly, $100 million.  After tax,
8    if it was a simplistic 40 percent tax rate, it would
9    have made about 60 million of net income after tax
10   in 2013.
11           You could probably do the same thing for
12   2012 where the profits -- as you can see, in fact,
13   Mobiloans in 2012 was a loser, whereas, PayDay
14   One -- because at the time, this would have been the
15   Legacy payday product, not the new launch of the
16   RISE product.  You know, the -- the same where
17   you're picking up and, pardon me for saying picking
18   on, 2013, you know, you can use the same analogy,
19   but it will probably lower our profits from the
20   tribal program in 2012, or even in 2011 when we
21   started up.
22           In fact, in 2011 you can see that the
23   EBITDA for the combined two was roughly 28 million.
24   And if you back out all of the interest expense in
25   2011 related to that program, I would guess it would

1    probably be even less than the net income, that we
2    were generating most of our net income in 2011 and
3    2012 off of our Legacy payday product, not the
4    tribal products.
5            So I admit, it was kind of a gross
6    generalization, but I'll bet it kind of balances
7    out, because you can see in 2011 and in 2012 there
8    was almost 40 million of interest expense.  And,
9    again, all of that would have related to GPLS and
10   the tribal programs.
11           So net -- I mean, Irv, we can play with
12   the percentages, but I'll bet I could go back and,
13   you know, if you wanted as an additional thing for
14   all of you, I could do a more exact calculation as
15   to how that played out.  But, whereas, 2013 we
16   probably ended up making more off the tribal
17   program, and 2011, 2012, was kind of a startup
18   operation and we ended up incurring far
19   significantly less.
20           And, in fact, in a couple of cases, you
21   know, when you spin up, you end up losing money off
22   the particular product that particular year, even
23   though you can see Think Finance, in general, had
24   13.7 million of net income in 2011 and 27.1 million
25   in 2012, and 21.9 million in 2013.  And I'll bet --

1    I don't have privy to the audited financials for
2    2014, but my guess is, is that you would see the
3    tribes and GPLS making a lot more net income than
4    the tribal operations did in 2014 just because it
5    was in wind-down mode and having to still pay a lot
6    of interest expense to GPLS.
7            MR. ACKELSBERG:  Okay.  Just one
8    minute.
9            I have no further questions.
10           MR. HERMAN:  Mr. Ackelsberg, I just --
11   before we finish with this document, I would just
12   like to state for the record that what has been
13   shown to Mr. Lutes here is not in the form that it
14   was produced by GPLS.  There are certain sheets that
15   were not present initially which were just not in
16   the original, what was shown publicly to GPLS.
17   There are sheets that were, I guess, hidden or
18   unhidden, but they were not in what was produced by
19   GPLS in its original form.  This has been altered.
20           MR. ACKELSBERG:  Yeah, I mean, what
21   we'll do is we will send it on disk.  I mean, you
22   can make --
23           MR. HERMAN:  I just pulled it from the
24   database.  I'm telling you --
25           MR. ACKELSBERG:  Okay.  Well, we

UNSEALED

1 haven't done anything with --
2 MR. HERMAN: -- what has happened with
3 this exhibit. I just want you to be aware and want
4 the record to be clear that there were alterations.
5 I'm not saying there were alterations to any
6 numbers, I'm not saying there are any alterations
7 elsewhere, but in the form that was produced by
8 GPLS, there has been an alteration, at least one.
9 MR. ACKELSBERG: In the form that was
10 produced by GPLS?
11 MR. HERMAN: Correct. Meaning --
12 okay. The native file.
13 (Interruption in proceedings.)
14 MR. ACKELSBERG: I just want to
15 understand exactly what you're saying, Dave. So
16 you're saying -- so what we put up was the
17 spreadsheet that we got from Victory Park.
18 MR. HERMAN: I'm telling you it is not
19 exactly what was sent.
20 MR. ACKELSBERG: By -- by Think
21 Finance to Victory Park?
22 MR. HERMAN: This is not the native
23 file. There have been alterations to the file.
24 MR. ACKELSBERG: Are you saying that
25 we have -- we have somehow done something?

1 MR. HERMAN: There are columns or
2 workbooks on here which were hidden or otherwise not
3 part of the package which have been unhidden,
4 specifically that 2013 product P&L was not an active
5 worksheet, it was not a worksheet that was present
6 at the bottom. You have to take some steps to alter
7 that to make it visible again.
8 MR. ACKELSBERG: Well, I understand
9 that the -- that this is so large that you can't see
10 everything at once. But I'm not --
11 MR. HERMAN: No, this is beyond that,
12 Mr. Ackelsberg. This is not mere scrolling or --
13 these are sheets that were not active, these are
14 sheets which were not presented specifically in this
15 spreadsheet. They may have been used in earlier
16 versions of the spreadsheet, but they are not a part
17 of the workbooks, as Mr. Byers corrected earlier,
18 that were active and shown to GPLS in this document
19 when it was produced to GPLS and when GPLS produced
20 it to the Commonwealth.
21 MR. ACKELSBERG: Well, all -- well,
22 what we'll do is provide a copy of the document
23 that -- of this document, the document that -- and
24 you will do with it as you please. But I can assure
25 that we haven't done anything to this document. I

1 barely understand this document. So. . .
2 MR. HERMAN: I do.
3 MR. SCHEFF: Patrick, do you have any
4 questions?
5 MR. DAUGHERTY: No.
6 MR. SHELDON: Dan?
7 MR. SHAPIRO: No.
8 MR. SCHEFF: Matt?
9 MR. SHELDON: Just a half hour or so.
10 If you wouldn't mind turning back to
11 Exhibit -- no, I'm just kidding. I'm done.
12 MR. SCHEFF: Dave?
13 MR. HERMAN: No questions on behalf of
14 Mr. Rees.
15 MR. SCHEFF: I have none.
16 THE VIDEOGRAPHER: We are off the
17 record at 5:13 p.m.
18 (Deposition concluded at 5:13 p.m.)
19
20
21
22
23
24
25

1 CHANGES AND SIGNATURE
2 CHRISTOPHER LUTES MAY 3, 2018
3 Reason Codes: (1) to clarify the record; (2) to
4 conform to the facts; (3) to correct a transcription
5 error; (4) other (please explain)
6 PAGE  LINE     CHANGE          REASON
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

UNSEALED

App. 0243

SIGNATURE

1
2
3       I, CHRISTOPHER LUTES, have read the
4   foregoing deposition, or have had it read to me, and
5   hereby affix my signature that same is true and
6   correct, except as noted above.
7
8       _____
9       CHRISTOPHER LUTES
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   proceeding was taken, and further that I am not
2   financially or otherwise interested in the outcome
3   of the action.
4       Subscribed and sworn to on this the 7th
5   day of May, 2018.
6
7
8       _____
9       CHRISTY R. SIEVERT, CSR, RPR
        Texas CSR 8172
10      Expiration Date: 12/31/2018
        Huseby, Inc.
11      Firm No. 660
        7000 North Mopac Freeway
12      2nd Floor
        Austin, Texas 78731
13      (512) 687-0421 (tel)
14
15
16
17
18
19
20
21
22
23
24
25

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
        COMMONWEALTH OF PENNSYLVANIA *
3       BY ATTORNEY GENERAL JOSH    *
        SHAPIRO,                    *
4           Plaintiff,             *
                                    *
5       VS.                 * Civil Action
                    * No. 14-7139-JCJ
6       THINK FINANCE, INC., et al., *
            Defendants.         *
7
        REPORTER'S CERTIFICATION
8       DEPOSITION OF CHRISTOPHER LUTES
        MAY 3, 2018
9
10      I, CHRISTY R. SIEVERT, CSR, RPR, in
11  and for the State of Texas, hereby certify to the
12  following:
13      That the witness, CHRISTOPHER LUTES, was
14  duly sworn by the officer and that the transcript of
15  the oral deposition is a true record of the
16  testimony given by the witness;
17      I further certify that the signature of
18  the deponent was requested by the deponent or a
19  party and is to be returned within 30 days from date
20  of receipt of the transcript. If returned, the
21  attached Changes and Signature Page contains any
22  changes and the reasons therefor;
23      I further certify that I am neither
24  counsel for, related to, nor employed by any of the
25  parties or attorneys in the action in which this

UNSEALED

## A

**A&B** 243:10
**a.m** 1:19 8:4
67:19,20,20,22
120:3,4,4,6
222:7
**abilities** 248:1
**ability** 140:10
147:17 232:18
233:5 248:2,4
250:20 259:14
261:23 277:17
**able** 56:24 57:7
57:17 81:19
89:9,11 106:19
140:19 145:12
147:12 162:20
165:4 226:21
244:11 273:7
273:21 285:8,9
**above-styled**
1:18
**absolutely** 72:22
90:16 195:24
202:17
**absorb** 181:19
■ 222:6,9,18
223:1,3,4
244:4
**abuse** 218:17
**acceptable**
234:6
**Accepted** 286:13
**access** 123:17
127:3,16,20
158:25
**account** 42:21
42:25 43:8
44:18,19 146:9
146:12,25
147:9,14 148:4
148:5,19 149:3
149:4,8 163:1
167:21 168:1
172:7,7,8,17
172:17,18

183:5 262:1,3
**accountable**
99:23,25
**accounted**
264:23 276:23
**accounting** 21:2
63:3 78:6
108:23 135:24
148:23 183:7,8
268:15 271:14
271:19,19
275:16 276:13
276:24 286:13
287:8 290:4
**accounts** 40:2
146:24 147:20
147:24 148:5
167:6 272:2
**accredited** 62:17
63:22
**accrue** 182:6
**accrues** 182:2
**accurate** 258:7
**ACH** 43:11,14
44:17 167:6
206:6,7,11,12
206:19 209:23
210:4,14,19
218:10,18
219:5,15 220:6
220:13,15,22
221:2,6 223:8
223:12 224:15
225:3,5,25
226:3,21,24
227:12 228:3
228:15 231:4
241:22 242:23
242:25 243:4
261:5,21,24
262:3,24
**Ackelsberg** 2:4
4:6 8:16,17,22
9:14 14:8 15:2
15:12,22 16:8
16:17 17:1,15

17:25 18:15,19
19:4,10,25
20:8 23:23
25:2,12 26:22
28:17,21 29:9
29:13,16,21,25
30:5,10,19
31:17,21 32:18
33:16 34:1,12
34:20 37:19
38:4 41:19
42:6 43:15
45:11 47:21
48:14,21 49:3
49:22 50:24
51:15 53:5
54:13 55:20
58:10,24 59:16
64:23 67:17,23
68:14,22 69:7
70:1,8 71:8
72:4 73:24
74:18 75:7
76:17,24 77:3
77:7,24 79:12
81:22 82:4,17
83:8,19,23
84:4,22 86:1
86:14,24 87:5
88:4,6,15
90:10 91:14
92:23 93:4
94:2,19 96:21
97:12,18,22
98:14 99:16,21
100:1,11,23
101:11,19
102:13 103:8
103:17 106:8
107:24 109:10
109:14,22,25
110:3,17,23
112:20 113:20
114:5 115:22
116:24 117:12
118:8,14,18,23

119:1,6,12,24
120:7 121:8
122:20,24
123:13,22
124:5 125:22
127:11 128:9
128:19 132:23
133:6 135:17
136:11,20
137:17,24
138:2 139:16
140:8,16
141:13 142:2
142:16 145:16
146:6,14,19
147:22 150:7
151:15 153:7
154:6,17
162:15 163:16
163:23 164:16
165:15,22
166:10,24
167:16,19
168:7,22 169:4
169:11,17
170:3,12
171:15,19
172:12 174:13
178:9 181:1
182:9,12
184:15 186:5,9
186:16 187:5
187:15 188:24
190:12,14
192:1,8,17,23
194:10 195:1
199:3,7 200:10
200:14,20
201:3 202:5
203:6 205:15
205:22,25
206:1 207:6,15
207:21,25
208:4,16
209:14,19
210:8 212:25

214:7,13 215:5
215:13 216:9
216:17,22,25
217:2,6,9,15
217:23 218:2,4
219:20,23
220:18 221:9
221:18 222:1
222:14,21
223:22 224:17
225:8 227:17
227:21 230:10
230:15 231:9
231:12,15,25
232:7,11 233:2
233:13,19,25
234:15 235:5,7
236:8,16 238:1
238:7,9,14
239:7,14 240:1
240:6,12 243:6
243:14 247:5
248:13 250:17
250:21 251:4,8
251:15 254:13
254:21 255:20
255:24 256:4,7
257:23 258:6
260:7,15
263:12,19
264:3,9,13,16
265:10 269:10
270:23 274:24
276:11 277:6
278:4 280:23
282:4,11
283:18,21
284:1 285:4
295:23 296:4,6
296:8 300:7,10
300:20,25
301:9,14,20,24
302:8,12,21
**acquiring** 96:2
104:11
**acquisition**

229:3
**acronym** 111:16
142:23
**act** 11:3 271:11
**act-** 173:7
**acting** 65:6
**action** 1:5 8:7
188:9 306:5,25
307:3
**active** 302:4,13
302:18
**actively** 60:2
102:16 112:5
173:7 224:13
226:19,24
227:7,8,10
**activity** 34:4
**actual** 21:5 62:3
83:15 89:23
112:23 132:7,8
134:8 176:14
206:18 224:19
267:9 279:11
279:14 285:19
285:22,24
286:8 290:1
**add** 289:10
298:1
**addition** 67:4
130:23 143:3
**additional** 64:16
67:7 89:13
101:23 117:23
125:7 142:13
277:18 299:13
**address** 263:18
**adequate** 80:7
266:15
███ 244:4
███ 246:5,7
**Adjusters** 3:13
9:9
**adjustments**
289:17
**admin** 63:1 64:5
65:15,25 72:9

72:17 81:20
136:8 181:10
257:6
**administration**
63:4
**administrative**
60:13,17 61:5
61:6,8,9,10,14
61:19 67:25
68:1,8 71:3,6
71:18 74:6,11
137:10,12,15
**administrator**
65:6
**admit** 299:5
**adopt** 112:19
**advance** 55:24
129:4 133:24
162:10 249:2
289:13
**advantage** 251:5
**advice** 90:25
**advising** 235:12
**affectionally**
245:21
**affirmative**
11:17 109:25
193:2 292:23
**affix** 305:5
**African** 156:19
156:22 219:2,4
227:8
**AG** 228:21
**agency** 60:14,17
61:5,9,14,19
63:1 64:5
65:15,25 68:1
68:1 71:19
74:6,11 81:20
136:8 137:10
137:12,15
**agenda** 98:20
**agent** 61:10 71:3
181:11
**ago** 15:15
**agree** 72:10

84:18 85:16
88:17 91:16
112:19 117:5
136:23 137:1
179:25 181:9
181:10 194:22
215:3 232:15
235:5,6 255:12
283:10,13
**agreed** 65:11
89:3 109:4
189:11 190:5
190:11,12
272:18,19
**agreeing** 85:3
180:24
**agreement** 5:5,8
5:15,20,22,24
27:11 29:2
30:24 31:1,3
31:23 32:7,8
32:10 33:2,10
36:11,17 39:3
39:4,8,11,14
39:18 40:9,11
41:1,9,16
44:13 51:23
52:18,20,24
54:21,21,25
56:19 57:12,13
60:14,18 61:5
61:9,15,15,19
63:2 64:5
65:16 68:2
71:19 73:19,21
74:1,4,6,7,11
84:1 106:2
135:9 136:8,13
136:23 137:7
137:11,12,16
137:18,21,22
138:8 141:9
143:16 146:9
147:2,9 149:10
149:14 150:24
150:25 153:4

156:12 159:15
160:6 171:14
171:20,23,24
176:14 177:8
177:12 180:19
180:21 181:8
189:6,8,9
190:17,18,20
200:1,5,6,7
201:6,15,22
202:1 234:14
242:3,14,16,24
279:6 281:7,8
**agreements**
26:15,16 27:7
27:8 28:18
30:16,18 31:3
32:1 52:3,7
73:11,13
101:17,22
102:2 114:13
132:8 151:19
151:21 152:6
152:12 154:11
154:12,15
159:20 169:8
172:21 177:4,7
183:17 185:12
191:1,20
193:21 200:15
**ahead** 61:13
119:25 139:14
139:21 173:1
184:2 196:24
207:23 221:17
224:9 271:20
276:12 290:25
295:3 296:9
**air** 49:1
**al** 1:6 8:6,7
306:6
**alert** 243:1
**allegedly** 211:2
**alleviate** 79:18
**allow** 150:3
238:24

**allowed** 116:15
146:4 166:21
**allowing** 240:25
**allows** 189:10
**allude** 242:2
259:13
**alluded** 237:15
240:23 257:4
**alludes** 242:22
257:24
**alluding** 246:4
278:18
**Alonzo** 35:12
36:22 50:12
51:8 60:6
61:16 64:2
65:15 66:10
93:21,23 94:14
225:13
**Alonzo's** 225:22
**alter** 302:6
**alteration** 301:8
**alterations**
301:4,5,6,23
**altered** 300:19
**alternative**
163:13
**altogether** 93:11
**amazed** 157:21
**ambiguous**
180:21
**amend** 52:15,17
188:17
**amended** 51:20
168:19
**amendment**
5:13 41:8,12
44:3 45:19,22
47:10
**amendments**
51:5
**American**
156:19,22
219:3,4 227:8
**amortization**
296:21

UNSEALED

46:12,22 71:16
71:24 78:22
79:25 80:7
81:16,17,21
83:1 89:23
106:16 145:11
145:21 149:22
150:19 152:2
177:18,19
178:23 179:13
179:21 186:2
196:14,16,18
197:18 229:24
231:6,7 238:25
241:1,5,19
242:20,25
249:11,20
257:5 268:9
269:7 271:22
289:6 292:14
294:20 297:20
**amounts** 96:17
**analogy** 298:18
**analytic** 277:10
278:6
**analytics** 274:2
277:13 279:22
**analyze** 277:18
**analyzes** 278:21
**ancillary** 272:9
**Angela** 183:4
**Anne** 181:4
191:22
**annum** 176:16
**answer** 10:2,7,9
10:16 11:9,15
11:24 14:23
15:10,18 16:6
17:14,21 18:11
18:12 19:3
22:25 25:9
26:12 27:1
28:13 30:8,15
33:21 43:3,24
51:2,17 52:13
53:11 58:5,22

58:23 59:10
69:2 70:6
71:12 73:17
74:24 82:9
83:11,13,22
93:15 97:3
99:19 116:22
124:1 128:16
128:17,23
130:18 138:22
140:7 154:23
161:7,10,11
162:22,25
163:5,22 164:1
164:9 165:14
165:20 166:2
166:22 167:25
173:1 184:2,23
187:13,16
188:12,13
198:21 199:18
207:4,24 208:2
209:6,9 212:7
214:24 215:7
224:9 229:12
234:4,20,21
236:12 247:6,8
255:5 260:2
261:10 266:3
270:8,10
275:14 287:24
288:22
**answered** 19:4
59:23 135:23
208:12 233:7
**answering** 42:4
117:15 118:21
119:4 274:23
**answers** 10:1
88:1 98:9,10
118:19 166:14
166:15,16
196:10
**anybody** 111:23
128:20 235:1
242:9

**anymore** 160:19
282:1
**anyway** 29:15
**Apologies** 29:1
39:24 66:25
296:10
**apologize** 25:1
50:2 113:10
133:25 146:18
187:4 192:3,24
256:2 257:14
269:14
**apparently**
211:1 222:2
**appear** 59:2
**appearances** 4:2
8:15
**appeared** 130:4
237:15
**appears** 81:25
211:7 218:12
238:23
**applicable** 73:6
178:23 280:17
**application**
237:4 278:21
**apply** 116:13
146:22
**applying** 212:17
**appointed** 13:18
**appreciate**
42:14 53:20
75:1 78:10
90:19 123:1
149:16 160:22
161:25 175:20
196:13 212:19
219:1 221:20
232:12 233:3
247:18 266:7
267:4 272:5,23
275:12
**appreciating**
104:2
**approach**
122:22 131:4

**approached**
62:9 63:1
130:25 131:6
141:3
**approval** 167:5
254:2
**approve** 43:6,12
44:16 141:9
278:24
**approved** 141:8
**APR** 48:9,13,18
48:20 50:7
56:12 62:14
80:22 82:1,15
82:19,24 85:14
85:19 87:1,3
87:15,17,24
153:17 154:1
210:6
**April** 113:4
129:20 259:1
290:2
**APRs** 56:9
83:15 245:3
**Arch** 2:5,9
**area** 21:2 79:1
258:22
**argue** 248:16
**Arizona** 12:13
**arm's** 272:20,21
**arrangement**
27:24 34:23
47:3 49:21
55:24 139:6,18
144:23 197:22
245:18
**arrangements**
169:24
**arrival** 26:17
**arrive** 289:23
**arrived** 23:11
84:6 130:12
**arriving** 23:1
27:9 55:7
130:14
**article** 6:13

211:1,8 221:1
**ascertain** 83:7
**aside** 45:7 81:13
222:15
**asked** 18:22
58:22 59:12
78:3 82:10
98:10 191:7,8
199:22 208:11
208:12 214:22
230:6 256:12
256:13
**asking** 24:25
39:13 86:2
87:10,14
118:19 131:25
162:23 165:12
170:17 176:22
190:21 206:7
207:15,17,21
228:15 229:21
233:4 238:24
239:17 240:24
265:11,12
**asks** 199:14
**aspect** 15:19
21:4 78:5,6
145:5 207:3
235:8 259:12
261:6 279:16
**assess** 291:14
**assessment** 6:3
202:15
**asset** 19:19
276:14
**assets** 20:7
141:10,12,17
141:25 143:4
143:22 144:23
145:11 189:11
254:9 264:6,21
266:17 267:7,8
268:8 269:17
269:19 270:12
270:13,15
271:23 273:25

UNSEALED

288:14 290:9
290:12
**assist** 170:25
**associate** 295:2
**associated**
193:12 242:10
246:2 294:17
**associates** 201:8
**assume** 39:4
43:8 49:17
50:10 51:10
59:20 62:17
65:18 75:5
77:18 96:18
103:18 107:25
126:2 128:12
131:24,25
134:19 140:10
152:22 174:7
211:20 240:8
244:25 286:4
288:23
**assumed** 45:17
50:2 127:1,19
**assuming** 32:20
74:14 81:11
120:17 121:12
121:13 135:7
177:6 187:25
213:21 229:17
254:9 289:7
**assumption**
286:4
**assumptions**
286:24 287:7
290:16
**assure** 10:3
302:24
**assured** 66:13
**attached** 1:25
109:20 216:20
217:5,22
284:11 289:21
292:9 306:21
**attaches** 284:14
**attachment**

219:13 243:16
257:24,25,25
**attend** 98:13,15
**attention** 12:5
290:5
**attorney** 1:3 2:8
8:19 228:13
306:3
**attorney-client**
209:8
**attorneys**
306:25
**attract** 67:11
151:11
**attractive** 55:11
**audit** 250:11
288:7,9 289:4
289:13,16
290:6
**audited** 23:10
249:1,7 286:16
288:8,10,12,24
289:3,19
296:14 300:1
**auditor** 262:23
269:21,24
**auditors** 268:1
**August** 95:11
102:1 220:20
221:20 227:23
228:22 231:11
231:20 232:1
233:20,20
234:6,25
**Austin** 307:12
**author** 109:19
**availability**
185:10
**available** 68:12
73:3 81:8
276:7
**Avenue** 3:4
**average** 48:9,13
82:1,14,15
85:13 87:1,2
87:15,17

153:17 154:4
**averaged** 87:20
**avoid** 235:9
**aware** 49:19
101:18 116:9
119:7 121:20
131:7,12
156:18 159:21
163:18,25
168:6,13
201:14 205:2
206:21 212:16
216:16 219:3
220:12 222:23
226:12 240:10
241:16 301:3
**awareness**
242:14

### B

**B** 5:1 6:1 7:1
170:24 243:15
243:16
**back** 16:11,20
20:16 22:19
29:7 36:4,4
44:22 46:3
54:17 63:8
67:21 68:17
69:22 87:16
89:8 102:20
120:5,14 136:7
138:18 150:14
152:11 159:14
169:2 174:24
174:25 179:5
189:20 190:2
192:21 193:1
196:22 197:20
198:15 214:19
221:19 223:24
231:16 236:1
242:17 243:12
248:25 249:22
252:12,17
253:24 257:14

260:25 267:2
268:2 273:19
282:9,15 288:3
288:6,21 289:6
295:8,10
296:15 298:24
299:12 303:10
**backed** 294:21
295:6 296:18
**background**
12:9
**backing** 136:14
**bad** 63:25
143:24 266:19
**Badr** 258:18
**balance** 16:2
24:3 34:5,7,11
34:15,19 44:11
44:24 63:17
125:19 231:6
270:2,3 285:15
286:2 288:10
289:4,6
**balances** 45:10
229:7 267:9
268:4 269:3
270:18 272:3
299:6
**bank** 12:19,24
12:25 13:16,17
13:25 14:9,25
16:9,19,20
17:12,16 19:13
21:17 22:3,14
26:10,14,17
27:5,9,9,17,21
27:25 28:4,4
31:15 32:13
33:3,12,14
34:18,24 35:2
35:2,14,18,23
35:25 36:5,5,8
36:13,14,22,25
37:4,7,16 38:7
38:14,15,15
41:2,12,16,22

42:4,10,25
43:6,8 44:5,9
44:18,20,21,23
44:23 45:7,9
45:25 46:4,6
47:7,13 48:19
49:9,16,17
50:12,20 51:6
51:9,25 52:11
52:17,25 54:8
56:22 57:1
58:1,17,17,17
59:5,25 60:6
60:16 62:5,16
62:24 64:11,14
64:16 65:18
66:13,22 67:10
70:20,21,25
73:11,20,22
74:1 80:10,25
80:25 82:12
83:16 84:15,24
87:17 88:18
89:2,10 91:8
92:5,17,17,19
92:21 93:10,17
93:23,24 94:6
94:8,13,14,17
95:6,11,12
102:8 104:6
105:9 107:2
108:10,11,19
112:15,17
114:2,3 115:16
116:5,11 117:6
117:25 118:3
122:5,7 125:4
125:5,15,23
128:2,4,6
136:2,3,18,18
136:25 146:12
146:24,25
147:8,20,24
149:12 152:25
155:10,13
156:12,15

UNSEALED

157:3,3,5
159:15,16,24
160:14,20,25
172:6,7,8
210:10,13,16
210:16,17
211:1 225:23
267:6 274:14
**bank's** 41:20
44:19 45:2,3
51:19 52:23
65:12 114:1
**bankers** 158:6
158:13,22
261:2 263:2
**banking** 14:19
228:9,18
**banks** 14:4
15:25 16:1
17:6 46:14
56:5 62:5 98:4
103:1 105:14
108:15 115:9
128:11,13,17
159:24 160:3
209:22 210:4
218:13,18
219:4,12,14,16
223:25 224:1
224:19 225:5
225:11,14
226:20 227:9
227:12 228:15
231:4 241:22
**barely** 18:19
303:1
**base** 86:7,11,15
86:25 87:6
126:5 153:20
268:14
**based** 22:25
30:24 33:9
35:2 38:11
40:22,23 41:10
45:22 47:6
48:17 49:14

51:3,7,18,19
69:14 127:1,18
158:21 203:18
204:4 220:25
226:9 237:12
237:14 238:16
238:21 243:1
260:12 274:13
274:17 286:23
287:6 288:7
290:2,9 293:24
293:25
**basic** 63:3,16
132:6 189:9
262:2,22
**basically** 9:25
25:6 79:13
82:6 91:22
123:3 195:5
201:17 236:4
294:9 297:21
**basis** 33:6 43:12
44:11 57:18
80:4 82:16
87:20 103:23
128:5 143:7
144:17 145:15
162:1 182:6
208:6 232:23
270:20 272:12
273:18 286:5,6
288:20 290:15
296:24
**Bates** 75:15 76:2
182:14 221:10
238:9 254:15
263:14
**bathroom**
119:22,25
**Bay** 258:22
**bear** 56:1
176:16 192:15
**becoming** 245:2
261:7
**began** 84:6
92:16 104:3

113:2 211:19
271:16 279:20
**beginning** 94:22
98:22 124:17
138:11 169:20
171:6 259:17
**begins** 251:16
271:4
**behalf** 9:9
135:16 154:22
155:5 191:9,11
256:2 271:11
303:13
**Belcourt** 191:5
**belief** 25:10
133:3 176:4
181:20
**believe** 14:11
21:15 27:18
30:16 35:13,17
36:17 40:10
41:10,15 44:3
44:4 52:22
54:1 58:12,14
62:2 65:1 69:4
92:15,18
101:25 106:23
108:23 112:3
112:10 113:4
129:9 130:21
132:16 134:4
134:13,16
135:1,9 139:23
141:4 152:18
155:7,12
156:19 157:8
157:10 160:20
168:10 174:22
175:17,25
181:5 183:25
184:5,12
191:14 195:8,9
201:2 208:22
211:17,18
219:17 223:11
227:5 228:1

229:14 252:22
253:12 257:25
258:21 260:3
273:11 281:6
281:23 282:1
294:16
**believed** 62:15
62:23
**believes** 166:22
**bells** 248:10
**belonged** 112:15
**benefit** 258:1
279:21 283:5
**benefits** 119:8
**best** 10:2 11:12
290:16
**bet** 299:6,12,25
**better** 59:19
64:14 75:2
78:22 89:12
91:4 98:18
100:10 102:23
106:24 140:5
146:1 147:12
244:22 280:20
295:3
**beyond** 302:11
**big** 66:25 224:4
224:4 235:14
262:23
**bigger** 222:17
**biggest** 96:13
**bill** 178:12
179:10,11
281:12,24,25
**Billi** 181:4
191:22
**bio** 13:15 67:15
**bit** 12:9 15:15
17:23 38:19
39:2 43:4
47:19 54:24
74:20,22
116:18 143:25
152:19 192:4
196:24 228:1

240:22 245:6
246:16 252:2
253:11 276:5
280:8 295:25
297:4
**black** 156:21
**blame** 255:25,25
263:21
**blaming** 251:7
**blank** 262:6
**blanket** 141:17
143:3
**blanketed**
228:14,20
**blended** 87:20
**bless** 254:11
**board** 13:16
21:19 69:16
93:22 104:3
215:24 216:2
219:1 225:12
227:6 252:4,16
252:19 253:8,9
253:10,12
263:11 272:19
273:2 282:19
284:17
**Bob** 22:16
156:11,18,20
157:2,13
218:25
**BOD** 282:21
285:1
**Boggs** 213:14,19
**bona** 128:12
**books** 15:6
17:18 36:3
41:14,17 42:13
44:11 45:10
46:21 57:16
62:7 63:18
65:21 66:2
179:9 276:15
276:18 277:3
284:15
**bootstrapped**

UNSEALED

23:5
**borrow** 56:25
  272:17 273:8,9
**borrowed** 126:4
  175:11 273:12
**borrower**
  170:25
**borrowers** 86:3
  131:22
**borrowing**
  126:6 159:8
  176:11 246:13
**bottom** 302:6
**Box** 155:22
**boy** 66:24
**brand** 112:5,18
**branding**
  112:12
**break** 11:21
  67:16,16,20
  119:22,23,25
  120:4 167:16
  168:23 169:1
  189:19 192:20
  214:18 238:3,6
  239:5 243:7,11
  282:5,8
**breaking** 119:21
**breaks** 11:19,20
**breeze** 12:11
**brick-and-mo...**
  50:8
**bring** 65:22
**bringing** 107:21
**broad** 2:14,19
  85:1 100:21
  228:14,20
**broader** 61:15
**broke** 169:5
**broker** 89:12
  258:21
**brother** 59:4
**brought** 23:14
  141:6 279:12
**Bu** 29:6
**bucket** 22:4

**buffer** 81:14
  144:6
**build** 271:13
**building** 278:15
**buildup** 229:25
**built** 274:15
**bumping** 158:22
**bunch** 284:13
**Bureau** 2:8
**business** 24:19
  24:19 25:22
  43:18 121:22
  121:22,23,24
  156:22 161:22
  164:15 174:8
  174:11 175:4
  175:19 200:23
  201:5,20
  204:23 219:3
  253:14 261:7
  261:13,17
  262:2,3,11,20
  287:7
**businesses** 130:3
  130:6
**businessmen**
  23:4,22 24:18
**buy** 20:5,5 57:17
  62:5 65:11,20
  66:17 106:15
  106:16 109:5
  146:3 160:19
  162:4,12
  232:13 241:4
**buying** 94:8
  150:5 163:11
  232:6 241:19
**Byers** 3:20 8:23
  302:17

──────────
**C**
**C** 2:1 3:1 6:10
  8:1 298:1
**calculate** 78:21
**calculation**
  299:14

**California** 12:22
**call** 64:16 67:6
  106:22 128:5
  129:12 130:12
  130:13 164:10
  222:6 223:3
  243:24,25
  252:22 293:15
**Callaway**
  213:21,23,25
  214:5,22 215:1
  215:6,10,15
**called** 18:8,25
  22:15 27:13
  30:2,3,22
  31:23 32:5
  45:14 50:11
  52:8,9 54:1
  60:13,21 61:6
  61:8 68:19
  69:21,22 75:14
  79:17 86:7
  92:19 111:8,24
  126:25 131:2
  146:7 189:6
  200:22 208:19
  211:11 251:17
  274:5 278:10
  282:20 284:15
  291:6
**calling** 24:10
  27:14
**Callnin** 148:25
  180:5
**Callnin's** 179:6
**calls** 180:23
  181:2,3
**campaigns**
  235:22 236:15
  237:18
**Canada** 210:10
**capacity** 183:23
**capital** 3:7 19:13
  21:21,22 22:6
  22:7,15,15,22
  23:6,15,17,20

24:3,7 25:5
  35:25 41:23
  42:1,10,24
  45:2,8 54:1,9
  55:1 57:20
  62:19,20 63:11
  67:12 81:15
  89:13,14,20
  90:17 91:13
  105:14,14
  106:4,24 109:4
  123:18 126:2,7
  126:9,10,13
  127:4,20
  139:24 140:6
  140:21 141:3
  141:24 143:14
  158:21 159:1,4
  159:17 160:24
  162:7 163:9,19
  165:3 168:6,17
  169:24 170:6
  170:10,10,21
  179:19 185:19
  186:1,8 194:24
  196:18,22
  198:11,15
  232:18 251:23
  254:3 265:17
  265:19,23
  267:23 268:6,7
  271:18,22,23
  271:23,25
  272:8,18 273:4
  273:10,12,13
  273:18,21,22
**capitalists** 23:14
  259:22
**card** 20:18 21:1
  96:6 292:8
**cards** 15:1 45:6
  56:7,13
**care** 181:24
**careful** 215:8
**case** 15:13 72:2
  81:15 185:15

208:8 211:17
  286:2
**cases** 299:20
**cash** 25:7 53:24
  68:12 73:3
  79:25 80:1,7
  80:24 81:8,12
  81:14,18 126:8
  144:7 147:13
  185:10 186:4
  229:7,16,25
  230:8,11,22
  231:7 244:2,12
  245:12,15
  246:14 257:5
  257:19,21
  267:9,19 268:4
  268:25 270:16
  270:21 272:14
  272:23,25
**cash-in-process**
  272:1
**casino** 130:3,9
  130:10 157:23
  158:11,12
  201:13
**cause** 1:18
**caused** 56:10
**cc** 228:23
**cease** 37:10,14
  37:20 228:17
**cell** 289:22
**center** 130:12,13
**Central** 13:16
**CEO** 12:18
  21:16 22:17
  23:20 35:14
  51:8 69:6
  86:22 93:22,23
  94:15 98:18,25
  100:18 101:5,6
  105:2 106:25
  130:20 135:2
**CEOs** 100:13
**certain** 136:14
  170:19 171:1

179:11 212:11
212:15 225:25
228:16 242:25
247:11 260:14
273:16 276:8
300:14
**certainly** 45:18
46:21 55:11
56:13 66:21
88:4 95:25
97:6 103:14
109:8 117:9
154:15 166:6
219:17 220:12
224:11 226:18
241:10 242:7
243:4 247:10
254:1
**certificate**
284:16
**certification** 4:9
12:15 306:7
**certify** 306:11
306:17,23
**CF-** 186:23
**CFO** 12:18 13:1
13:3,4,11,12
13:13 15:21
20:25 21:6
22:1,2,4 25:16
34:3 46:10
55:5 75:2,4
77:19 79:7
80:20 85:6
87:23 99:11
103:18,22
108:1,21
120:25 121:4
124:11 128:7
144:13 173:8
173:25 174:4
174:17 185:8
189:10 196:12
196:21 208:11
208:18,20
224:11 240:7

246:10,23
247:4,25
248:16 249:2
257:19 271:5,7
**CFPB** 186:20,24
187:7,9,19
188:2,20
**CFPB's** 188:9
**CFPD** 188:1
**chain** 182:20
188:15,22
189:24,25
190:8,11
203:18 204:17
209:20 222:3
229:15 236:23
237:15 238:21
240:23 241:3
242:21 244:3
266:6
**chains** 263:16
**challenging**
228:10
**chance** 77:11
234:17
**change** 27:2
44:5 52:18
151:13 183:15
186:25 194:7
194:17 196:1
282:23 289:11
304:6
**changed** 51:20
107:2 260:4
**changes** 4:8
36:10,16 37:8
38:10 108:18
199:24 204:22
239:1,2 304:1
306:21,22
**changing** 37:3
54:24 183:13
183:14
**characterizati...**
230:5 237:11
**characterize**

80:2 224:10
228:4,12
229:13 249:9
**charge** 251:19
251:20
**charge-off** 65:12
65:14
**charged** 50:21
151:6 178:25
196:3 242:25
**charges** 69:24
**Chart** 7:11
**cheaper** 198:17
**check** 288:16
**checking** 262:1
262:3,22
**Chicago** 3:10
54:2
**chief** 12:18
21:20 183:8
275:12 281:13
281:18
**Chippewa**
101:18 112:24
113:3,12,16
119:9 121:2
122:22 123:5
124:19 126:14
126:19 127:14
128:21 129:11
130:25,25
131:5,6 132:15
132:21 135:5
135:14,25
149:7 164:4,11
173:20 175:5
226:15,22
**Choke** 210:2
218:11,15
223:7 228:5
230:24 231:3
241:17 261:18
261:22 262:6,9
262:13
**choose** 18:13
159:22 160:2,4

160:6,9 187:14
**chose** 150:4
151:10,13
168:3 211:19
212:21,23
213:10
**chosen** 95:14
**Chris** 8:3 197:24
240:5 264:17
**Christopher** 1:9
1:15 2:12 4:5
8:25 9:10
304:2 305:3,9
306:8,13
**Christy** 1:20
8:10 306:10
307:9
**chronological**
192:4
**chronologically**
256:22
**CID** 186:20,24
187:18 188:6
188:17
**city** 155:24
**civil** 1:5,23 8:7
187:19 306:5
**Clara** 12:22
**clarification**
42:15
**clarify** 11:14
40:24 92:15
113:9 184:7
221:21 304:3
**Claster** 69:8
**Claudia** 213:14
213:19,20,21
213:23,24
214:5,22
215:15,22
**clause** 32:20
242:17
**claw** 190:2
**clean** 18:14
**clear** 33:17 47:4
47:24 264:14

291:25 297:17
301:4
**clearly** 37:14
98:25 141:6
158:21 175:4
179:18 218:17
241:16 270:19
289:13
**client** 192:15
**clients** 218:21
**close** 228:5
237:24 240:15
289:8 290:5
**close-knit**
212:20
**closed** 55:6
**closely** 251:11
**Club** 1:22
**co-** 253:4
**Coblentz** 135:11
**code** 276:6
**Codes** 304:3
**coincidence**
118:1
**collapse** 268:3
269:8
**collapsed** 272:6
**collateral** 81:12
142:13,17
145:2,13
266:16,20,21
**collateralize**
144:3,11
**collateralizing**
145:2
**collecting** 19:22
143:18 148:6
220:16
**collection** 148:4
149:3,4,8,11
272:1
**collections** 64:12
148:19 149:2
167:8,9,12
225:5 227:14
231:5

UNSEALED

collectively
100:7 105:17
237:19
column 286:15
298:1
columns 286:8
286:10 302:1
combination
92:10 277:16
combine 295:14
combined 55:2
227:15 266:14
281:13 294:12
295:10 298:23
combining
295:12
come 42:23 58:2
71:17 80:24
89:13,16 104:3
109:4 112:17
121:14 122:3
140:2 158:20
176:6 206:14
217:23,24
249:4 286:11
289:7,16
comes 197:13
265:17 268:5
283:24
comfort 173:17
175:18
comfortable
45:9 62:13
67:1 80:7
87:25 89:7
106:5 108:8
144:9 173:13
174:3,17
175:22 176:1
183:20 198:14
223:16 240:25
coming 38:14
57:25 69:20
80:8 89:8
128:25 134:1
182:21 185:18

188:20 191:25
265:23 284:3
comment 191:24
260:12 289:11
comments 59:13
169:9
commingled
280:13
committee
130:16 216:1
common 17:19
125:17 273:5
Commonwealth
1:2 2:3 8:5,16
302:20 306:2
communicate
79:16 236:1
237:8
communicated
78:14 93:20
94:7 161:8,14
206:3 215:6
241:15
communicates
204:17
communicating
108:22 190:23
204:18 245:14
252:12
communication
189:24,25
190:3,9,10
204:20 239:23
242:5,8
communicatio...
103:19 204:25
209:8 214:25
215:9 237:12
240:2,8 241:6
community
156:23 219:3
companies
46:25 272:19
276:10
company 21:19
22:1,2,5,14

23:6,8,19 24:4
24:6,13 33:18
33:24 34:23
70:3,10 71:10
84:7 96:14
98:25 100:19
100:25 101:7
101:10 102:6
102:21 104:21
111:25 115:4
127:5 133:4
138:4 142:1
143:12 146:25
147:9,13
209:22 219:8
224:6 247:1
255:3 260:3,5
260:14,21
263:5 265:16
265:17,18,18
265:22,23
273:25 286:11
288:18,19
294:10
company's 26:4
277:10
compare 138:16
compared 55:11
90:3
compensated
46:18 65:5
competitive
277:20
competitors
80:21
completed 96:3
completely 57:3
249:20 273:19
compliance
284:16
compound
187:12
computation
45:21 47:11
conceivably
118:5

conceived
111:22
concept 21:5
45:14,24 60:5
62:9 79:10
81:11 111:21
111:23 112:13
147:6 155:1
160:19 161:2
162:9 165:2
168:14,19
185:1,6 188:8
196:23 197:6
197:15,24
conceptualized
179:7
conceptualizing
108:2
concern 159:18
160:13 220:21
221:20 223:21
224:23 225:1,7
230:23 266:7
concerned
160:12 162:2
165:3 173:9
174:4 221:8
223:12 231:2
concerning
190:8
concerns 79:18
123:23 205:17
223:7 241:19
241:20
concluded
303:18
conduit 19:12
confer 214:11
conference
121:20
confidential
37:15
confidentiality
212:19
confirm 286:8
287:16

confirmation
70:13
conform 304:4
confused 39:2
178:7 193:9
connected 22:12
217:21 219:2
Connecticut
54:3
connecting
22:21
connection
21:11,16 22:9
122:14,18
186:21 201:12
connections
225:24
consecutively
29:11
consider 253:19
263:11 271:24
considerations
187:9 265:4,5
considered
95:25 177:2
203:14 263:10
271:9 276:14
considering
110:15 253:25
262:19
consolidated
294:6,8
constituencies
258:12
constituted 32:2
constrained
36:1 45:2
105:14,15
159:17 160:24
162:7 179:19
constraint 19:13
consultant 8:23
consultants 60:1
consultation
123:9
consulted

UNSEALED

120:25 121:4
**consulting**
104:21,21
**consumer** 2:8
14:15,20,24
48:9
**consumer's**
42:21,25
**consumers** 46:7
**contact** 203:22
225:18
**contains** 306:21
**contemplated**
194:1
**context** 20:1
204:3,8 210:25
229:8 235:24
258:16
**continue** 29:11
56:25 57:10,11
62:6 67:12
91:8 95:20
96:10 117:22
197:22 198:12
**continued** 3:1
6:1 7:1 182:6
**continuing**
88:19 224:15
**contract** 60:12
112:23,23
137:2
**contracts** 70:15
101:14 111:23
129:17 137:13
**contractual**
60:12 189:12
**contributed**
288:4,15
**control** 90:12
91:17 146:2,9
147:9,13
**controller** 13:4
**convention** 76:5
**conversation**
28:14 36:22
106:9,11

107:13,20
181:16 183:12
193:3 212:8
213:18 223:10
223:15,20
**conversations**
38:13 105:1
107:14 123:3
126:17 171:11
213:9 215:14
223:23 224:1
226:3,11,12
**Conversely**
145:4
**conveyed** 32:14
33:5
**conveying**
161:12
**convince** 257:20
**COO** 130:20
**cooperate**
258:20
**copied** 279:5,10
**copies** 76:19
109:16 217:17
276:9
**copy** 77:6 275:6
275:7,17 276:3
280:19 281:3
284:18 290:1
302:22
**core** 277:10
**corner** 182:14
**corporate** 31:14
53:15,16 68:12
73:3 74:13,14
136:17 137:19
137:21,22
138:23 139:3
143:13 144:2
185:8,10 186:4
196:12,20
201:24 246:10
254:8 258:25
259:4,7 261:25
270:21 272:14

**corporation**
21:14 136:13
**correct** 18:9
19:2 24:10
33:1 34:8
60:22,24 61:3
72:9 74:2
83:20 92:1
114:6 138:9
142:20 152:22
172:3 183:3,18
193:24 210:11
220:19 221:23
243:21 253:1
274:4 288:11
288:22,24
290:13 292:4,5
292:11,25
293:12,19
294:1 301:11
304:4 305:6
**corrected** 113:6
195:13 302:17
**corresponded**
172:20
**correspondence**
5:10,12,14,17
5:19 6:5,8,12
6:14,16,18,20
6:22 7:3,7,10
7:12,14,16,20
**corresponding**
173:11 210:22
**cost** 55:13,18
152:3 176:5,7
198:17 246:2
249:14
**costs** 64:12 71:5
**council** 130:20
130:22,23
155:2,3 157:15
191:23
**counsel** 2:3,12
2:17 3:2,7,13
8:14 122:7
135:10 155:8

155:10,13
161:9,15
183:10,23,23
184:14 190:6
214:5,8,8,23
216:7 306:24
**counterparties**
127:22
**country** 156:5
**couple** 59:12
202:7 283:2,11
299:20
**course** 34:21
42:16 75:19
95:18 110:4
153:8 159:2
182:19 199:8
203:7 220:2,2
**court** 1:1 8:9,10
8:12 10:14,21
174:9,9 306:1
**covenant** 268:11
**cover** 80:10
162:13 163:10
168:2 186:1
197:8 198:12
243:16 284:7
**coverage** 80:5
266:15
**covered** 11:18
163:11
**CPA** 12:12
**create** 91:2
144:5 185:24
230:8 232:20
**created** 60:11
90:19 150:1
198:18
**creating** 63:1
185:6 265:16
**creation** 76:10
**credit** 3:13 5:5,8
5:20,22 9:9
15:1,1 20:18
21:1 45:6 56:7
56:13 62:13

63:13 64:6
65:16 66:5
67:2,6,7 71:18
78:22 79:17
80:1 81:19
92:18 95:5,6
107:12 130:16
139:2,5 142:14
143:4,9,18
144:4,11,22
145:2,13 147:4
147:11 156:13
156:17 158:6
167:4 170:25
171:5 177:4,7
177:20 183:16
193:20 197:9
197:14,17
200:1,5,6,22
245:1,9,11,12
245:18,25
257:6 273:1
278:15,19
279:16 280:3,5
280:6 281:16
281:18 293:6
**credits** 225:3
**Cree** 101:18
112:25 113:3
113:12,16
119:9 120:13
121:2 122:22
123:5 124:19
126:14,19
127:14 128:21
129:11 130:25
130:25 131:5,6
132:15,21
135:5,14 136:1
149:7 164:4,11
173:20 175:5
226:15,22
**crisis** 15:21
53:21 55:9,12
55:13,22 56:3
56:10 89:5

UNSEALED

critical 66:11
criticism 37:6
Crossover 21:21
69:17
CSO 247:25
CSR 1:20
306:10 307:9,9
curious 113:6
current 12:15
43:17 284:15
currently 233:8
Curry 110:21,25
126:22,24
134:21 226:24
customer 43:7,9
43:11,12,13
44:16 64:11
113:22 115:5,7
115:11,12,15
115:17,20,21
116:1,2,8,20
119:10 132:8
148:14,17,18
153:19,21
154:2,4 162:1
167:8,11
206:19 229:3
237:3 245:9
278:21,24
customer's
44:18 65:13
customers 14:14
36:15 42:11
87:24 88:20
114:1,1,2,9,10
114:24,25
116:10,12
117:2,8,19
118:1,6 131:23
132:9 145:6
151:11 206:19
206:20 229:24
230:3 240:16
241:1,2 245:7
245:8
cut 50:18 166:19

252:19
cutoff 167:18
Cutrona 216:7

—————
**D**
D 4:1 8:1 298:1
D.C 3:5,16
d/b/a 25:24
DACA 146:8,11
146:20,21
147:15 149:6
DACAs 146:8
148:1,8
daily 33:6 162:1
Dan 9:5 191:4
234:5,17 303:6
DANIEL 3:8
daniel.shapiro...
3:11
data 64:12 275:6
277:13,15,17
277:17,18,18
277:24,25
278:15,21
280:9,14,24
database 280:10
300:24
databases
280:11
date 25:13,16
109:18 271:1
290:3 306:19
307:10
dated 52:20
120:15
dating 267:2
Daugherty 3:14
9:8,8 303:5
Dave 301:15
303:12
David 2:18 9:1
day 1:18 11:19
18:16 26:7
32:12 33:10
42:16,19 43:18
45:17 75:19

148:22,22
157:20 162:20
178:22 179:8
179:13,18,22
179:24 180:3
195:23 231:11
237:7 307:5
day-to-day
239:23 279:1
days 22:20
65:11,13,17,24
148:15 161:3
161:23 162:11
185:3 239:16
306:19
days' 162:3,14
163:11 168:2
197:8
DC 156:24
deal 38:20 50:17
50:19 73:8
91:1 106:21
135:4,18,19
141:15 158:7
158:14 174:8
174:21 175:13
184:11,25
185:9,23 187:8
193:10 201:9
dealing 137:2
deals 107:16
185:13
dealt 21:6
Dean 21:17
22:11,13 23:20
debacle 15:14
debit 221:6
debt 42:10 56:19
75:3 89:11
126:10 140:10
140:11,19
142:9 249:11
267:10,13,21
268:5 269:4
272:11 289:2
296:18

dec 252:17
282:19
December 94:16
253:7,9,10
286:15
decent 23:7
decide 278:22
decided 26:20
46:13 93:24
117:6 185:16
213:5 233:1
244:8 253:3
273:1 276:2
decision 29:19
30:3,13 50:22
51:23,23 52:9
52:24 60:25
72:19 73:22
94:6 102:10
103:9 104:6
150:24 151:2
151:23 175:15
178:21 179:12
186:24,25
187:10 204:14
253:5 274:2
278:10,19
280:3,6
decisioning
167:4 279:16
decisions 100:24
101:7
deemed 65:14
default 63:13
64:6 65:16
66:5 67:2,7
71:18 78:22
79:17 80:1
81:19 139:2,5
142:14 143:5,9
143:18 144:4
144:11,22
145:3,13 147:4
147:10,11,17
147:23,25
149:13 197:10

197:14,17
245:1,12,18,25
257:6 273:1
defaulted 147:4
defendants 1:6
9:4,6 306:6
define 65:12
115:5
defined 42:1
defines 39:14
definitely 45:20
56:12 60:3
101:9 158:25
217:21 230:23
247:20 248:11
280:17
definition 209:3
Delaware 26:10
26:14,17 27:6
27:10,25 31:15
32:13 33:3,14
34:24 35:15
46:1 47:13
48:19 49:10
50:20 51:9
52:11,17,25
54:9 57:1 58:1
58:17 59:5,25
60:6,16 62:16
70:20,21,25
73:12,20,23
74:1 89:10
92:5 93:23,24
94:7 95:12
108:10,19
112:15 116:11
117:25 118:3
122:6,7 125:4
125:24 128:2,4
136:2,18,25
153:1 155:11
155:14 159:15
160:20 225:24
274:15
Delaware's
104:6 160:14

UNSEALED

delay 43:19
162:20
delegation
155:21 156:7
deliberately
139:12
demand 187:19
department
172:16 203:23
278:13 287:8
290:4 291:14
depending 83:1
depict 79:24
deponent 306:18
306:18
deposed 9:21
58:19,25
148:24
deposit 126:5
146:9 147:9
deposited 44:18
deposition 1:9
1:15 8:3 10:6
10:20 12:5
68:16 75:12,25
120:9 166:18
172:5 190:5,7
249:3 282:15
303:18 305:4
306:8,15
depositions
176:23
depositors 126:7
deposits 42:10
49:18 126:4
depreciated
276:17 277:5
depreciation
291:10 295:18
296:20
Deputy 2:8
describe 26:24
75:6 99:7
described 82:24
92:9 137:11
165:25 167:22

172:6
describes 78:20
describing 78:1
81:25 145:19
description 5:2
6:2 7:2 277:9
design 116:20
designated
284:9
desire 259:23,24
260:3
desist 37:10,14
228:17
desists 37:21
detail 222:23
290:9
details 45:20
47:23
developed
274:18 277:11
277:12 278:20
development
104:19
█████ 222:6,9
222:18 223:1,3
223:4 244:4
dherman@m...
2:20
difference 61:24
149:21 150:18
152:7 246:24
285:22
differences
151:17 152:14
248:11
different 32:5
52:7 92:21,21
112:24 135:12
151:9 152:7
166:17 182:15
182:15 194:15
244:15 247:10
247:23 248:7
258:15 261:11
269:13 283:15
291:15,20

difficult 262:11
263:4
difficulties
220:6
difficulty 62:10
262:22,23,24
digest 188:5
diligence 127:6
127:13,22
128:3,8,16,21
129:13
direct 34:11
36:21 44:3
49:15 54:11,11
55:15 85:9
91:22,25 93:19
96:11 102:25
103:6 114:9
115:14 116:4
118:4 121:18
140:23 207:24
212:7 218:22
226:10,11
235:15,22
236:2,4,15
237:17 239:23
241:13 247:13
247:20 248:19
253:13 261:15
261:16 262:20
264:12 270:13
275:21,23
directed 79:21
directly 33:24
34:7,10 36:25
51:6,18 63:10
90:22 99:6
116:3 126:22
134:20 154:14
173:5 174:19
178:20 180:18
195:10 206:24
215:16 223:6
225:18 240:10
240:11 242:5
242:22 248:3

249:24 254:6
directors 21:19
59:5 69:16
93:22 215:24
219:1 252:4
253:13 272:19
directors-type
216:3
directs 10:9
disagree 84:12
90:16 108:6
disappointed
100:8
disclosing 209:7
discounting
222:15
discuss 50:10
97:13 98:2,3
104:8 124:24
204:1,2 229:2
235:20 252:24
264:19
discussed 92:7
133:18 134:4
164:12 169:23
196:6 203:17
220:8 236:13
243:18 253:12
255:2 277:25
discussing 50:9
105:23 125:8
134:5 216:4
254:25 256:14
258:20
discussion 7:17
35:16 105:6
173:8 204:8
245:21 256:12
259:6 264:18
266:2
discussions
26:20 38:11
46:11 51:12
95:8 103:22
104:1 110:10
110:18,19

111:2,5 113:19
119:14,16
134:8 155:19
189:5 191:11
205:12 206:10
261:2 286:25
disk 300:21
disorder 12:3
display 81:25
displeasure
100:2
disproportion...
249:21
disrespect 11:4
distinct 246:19
261:13 270:19
distinction
114:24 232:12
233:3
distributing
247:23
distribution
102:24 177:17
District 1:1,1
8:8,9 306:1,1
Diver 2:4
diversification
102:24
diversity 247:19
divert 257:20
dividend 266:25
268:3,8,13
dividended
264:21 269:8
269:16 270:14
dividending
268:15,17
divine 235:3
docs 135:18,19
document 28:25
32:23 37:15
38:24 39:1,6
39:25 40:18
41:11 47:16
48:24 69:1
75:8,11,24

UNSEALED

App. 0255

76:9,11,13,16
76:18 77:6
78:18 82:3,8
87:12 90:8
109:11,17,24
110:5,7 119:20
120:1,9,11,20
161:12,13
169:15 171:17
182:10,22
186:13 188:11
189:2,22 190:3
190:8 192:3
193:18 199:10
200:13,18
202:8 203:3,8
209:17 216:18
217:4,13,14
219:20 220:3
221:13 227:19
231:18 233:12
233:17 234:3
234:24 235:17
238:12 239:10
250:23 254:19
256:5 258:4
263:23 281:10
283:23 285:11
300:11 302:18
302:22,23,23
302:25 303:1
**documentation**
240:24
**documents**
37:21 38:20
40:23 50:17,19
59:22 73:8
75:19,21,22
76:4,6,11
122:11 135:4
202:7 217:17
225:10 251:3
256:1
**doing** 10:10
24:18 25:21
41:12 46:17

58:2 60:21,25
88:21 107:22
126:19 127:5
132:24 186:20
197:23 198:14
208:15 215:7
217:12 224:18
246:9 253:17
253:25 257:19
259:9 263:11
264:15 287:17
292:6
**dollar** 96:17
179:21
**dollars** 42:24
**downside** 66:16
**downsizing**
244:1,22
**dozen** 166:17
**draft** 120:17
**drastic** 230:1
**drill** 286:5
**drive** 295:1
**drives** 229:7
**drop** 202:2
236:2,4 268:14
**drop-down**
294:24
**dropped** 235:14
**drops** 268:7
**drove** 175:15
**due** 65:11,13,18
65:21,24 127:6
127:13,21
128:3,7,15,20
129:12,13
206:24
**Duffy** 135:11
**duly** 1:17 9:11
306:14

___

**E**

**E** 2:1,1,17 3:1,1
4:1 5:1 6:1 7:1
8:1,1 9:2 45:18
47:10

**e-mail** 2:6,10,15
2:20 3:6,11,17
5:10,12,14,17
5:19 6:5,8,12
6:14,16,18,20
6:22 7:3,7,10
7:12,14,16,20
109:21 181:17
182:20 183:15
186:15 188:14
188:22 189:24
189:25 190:8
190:10,22,25
197:16,21
199:12 203:10
203:10,18
204:17 209:20
213:6,17
216:21 217:5
217:15,21,22
226:11 229:9
229:15 231:11
234:25 236:13
236:23 237:15
237:24 238:16
238:21 240:23
241:2 242:1,21
243:16 244:3
244:19,20
246:5,19
251:16 252:18
256:8,11 257:3
258:16 263:16
264:17 266:6
266:24 284:6
**e-mails** 186:10
189:1 228:2
231:16 235:10
**earlier** 71:14
78:20 82:11
94:20 95:3
97:4 104:10
108:17 123:8
123:15 125:8
133:20 134:7
141:25 143:7

144:5 164:12
173:7 184:7
191:16 203:21
239:16 253:11
255:14 256:12
256:21 257:4
289:17 297:3
297:12 302:15
302:17
**early** 21:17
33:23 53:9
68:17 88:10
110:11,15
155:20 158:2
250:11 252:23
253:7 273:11
**earned** 292:24
297:6
**earning** 64:16
**earnings** 267:22
269:7 275:20
287:10,22
**ease** 150:10
152:2
**easier** 150:10
174:5,22,22
**easiest** 233:18
**easily** 158:11
267:6
**Eastern** 1:1 8:9
306:1
**easy** 272:5
**EBITDA** 291:8
291:11 292:21
298:2,23
**Eckman** 121:25
122:2,4,5,15
155:7 183:13
183:20,22
185:4 186:19
190:23 191:17
191:22 192:8
193:4 199:15
199:23
**economic** 198:7
**economics**

124:12 247:10
249:4
**edge** 277:20
**effect** 201:18
**effective** 94:15
94:16 99:14,20
107:4 117:7
147:16 259:3
295:8
**effectively**
146:11 179:4
236:5
**effort** 227:15
**efforts** 23:7
156:25 273:20
**eight** 13:23
**either** 46:15
77:20 84:15
85:9 91:11
94:21 103:6
106:4 108:14
116:3 119:22
126:10,14
127:6 129:4,22
158:5 172:4
180:18 183:1
207:4 219:11
240:6 241:8
253:8 266:21
272:17 273:19
**EL** 264:23
**Elastic** 92:19,24
292:8
**Elder** 155:22
**electronic** 215:9
**element** 68:3
86:25 139:7,17
**Elevate** 13:8,13
55:18 75:4
80:20 87:23
88:2,2 99:5
207:9,12,18
208:8,14,17
264:22 266:13
267:25 268:19
270:4 271:1,4

UNSEALED

271:16 272:4
272:16 273:3,8
273:12,17,18
275:21 276:7
276:15 279:20
280:17 281:4
281:19,20
288:9,15,16,17
288:25 290:11
**Elevate's** 208:8
**eliminate** 243:3
**eliminating**
183:21
**embarrassment**
235:9
**employed**
306:24
**employees**
212:16 260:14
278:14,16,25
**enable** 230:11
**encompass**
185:12
**encompassed**
253:15
**Encore** 131:2,13
132:18 133:1,4
133:7,9 168:16
**encouraged**
157:13
**ended** 22:9
23:17 56:2
58:13 96:2
104:11 111:11
112:18 125:6
161:12,13
174:8 180:24
269:15 297:13
299:16,18
**enforce** 149:6
**engine** 274:2
278:10,19
280:3,7
**England** 292:7
**enhance** 67:3
**enjoy** 99:13

**ensuring** 149:1
**enter** 64:4,5
67:2 105:24
106:1 187:9
**entered** 30:25
31:24 32:7
52:23 60:12,13
60:20 93:7,7
101:16,22
102:2 168:13
**entering** 60:15
105:12 175:4
**enterprise** 6:3
202:15
**entertainment**
156:21
**entire** 13:10
83:20 155:2,3
261:20
**entities** 49:11
127:16 128:11
136:15 150:6
267:4,24 269:1
269:18 271:11
272:12 281:9
290:10
**entitled** 81:7
143:8 284:25
**entity** 19:12,21
21:14,24 27:12
27:13,19 28:1
30:1,3,20,25
31:15 32:5,15
36:12 43:22
51:21 52:8,9
52:19 53:14,16
58:9 60:20,25
61:6 62:19,20
68:20,23 73:19
74:8 96:3
104:12 123:17
124:3 126:25
130:5 131:1,10
131:13 132:9
136:10 138:5
139:25 140:3,4

143:12,13,21
146:2,5 151:21
151:23 152:9
155:3,6 159:9
161:24 170:5
172:9,13 196:3
200:22 212:13
212:14,14
258:23 259:5
266:13,21
270:20 271:17
272:6,16
281:14 290:11
**entrance** 61:4
**environment**
14:4,21 15:5
15:25 80:3
247:19
**environments**
63:6
**equal** 276:9
**equally** 100:8,9
**equity** 42:9 62:3
264:24 268:9
268:12,14,18
269:9,19 270:2
270:12,13
288:1
**equivalent** 63:13
136:7 142:14
**era** 138:19
**error** 304:5
**especially**
184:10 226:25
247:18
**essence** 57:19
61:21 64:6
126:6 142:12
166:5 197:15
201:23 237:4
268:6
**essentially** 47:8
265:22 297:19
**establish** 59:14
279:4 295:20
**established**

53:13,18,18
58:8,15 60:7
128:3 156:23
168:1
**establishing**
59:22
**estate** 230:20,20
230:22
**et** 1:6 8:6,7
306:6
**evaluate** 124:10
**evaluating** 95:2
**event** 23:18,24
24:5 144:8
147:4,16,23,25
162:12 174:6
174:21 180:20
260:6,9,13
**eventually** 97:10
101:20,22
112:21,21
178:1 263:6
**everybody**
234:24
**evolution** 38:19
51:5
**evolved** 35:2
108:19
**exact** 280:19
286:12 299:14
**exactly** 24:1
155:4 173:2
188:5,6 236:12
238:20 281:1,2
286:16 301:15
301:19
**exam** 35:19 37:5
51:14
**Examination**
4:6 9:13
**example** 15:14
43:21 44:15
144:15 165:18
178:3 180:13
246:25 288:17
**exams** 108:12

**exbanker**
226:16,19
**exceed** 144:7
**exceeded** 71:24
**Excel** 202:8,10
252:9 283:14
285:1,6
**excess** 48:9
79:25 80:1
89:14 126:8
143:7 246:14
257:21 272:22
272:25
**exchange** 182:25
199:12 203:11
210:9 222:4,4
**exchanged** 24:6
**Exclaim** 252:20
252:24,25
**exclusivity**
139:7,17,22
**exec** 216:3
**execs** 38:12
108:22
**executive** 94:21
95:16 98:12,13
99:1 112:6,7
124:24 216:1
260:18
**executives** 94:22
95:2 96:23
97:1,4,13 98:1
99:23 100:6
101:1,8 129:1
260:9
**exercise** 190:2
291:17
**exercising**
234:13 241:21
**exerted** 90:12
91:17
**exhibit** 5:3,5,8
5:10,12,14,17
5:19,22,24 6:3
6:5,8,10,12,14
6:16,18,20,22

UNSEALED

7:3,5,7,10,12
7:14,16,19,20
29:13 38:21
45:18 47:10
78:11,12
109:12,13
120:10 169:12
169:14 171:16
182:11 186:12
188:23 189:23
192:6 199:4
200:11,17
202:4 203:4
209:16 213:13
216:19 219:22
221:12 227:18
231:14 238:10
238:11 239:9
243:10,15
250:18 254:16
255:22 258:3
263:14,15
283:25 284:16
301:3 303:11
**exhibits** 4:3
28:22,23
**existing** 56:23
89:14,17 90:18
98:2 108:9,24
113:21 114:9
114:24 117:1
125:3 126:17
127:2,19
129:24 130:1
131:8 132:7,17
157:11 168:16
173:21,22
206:11 220:13
230:25 235:21
236:14 237:17
244:12 245:3,8
265:22 280:2
**exit** 230:11
**expanding**
270:10
**expect** 212:10

**expected** 100:9
100:10 204:3,9
269:17
**expecting** 55:23
**expedition**
187:21 208:14
**expense** 151:11
177:3,4 180:22
181:5,14,19,21
181:23 195:5
196:5 243:1
245:4 249:8,9
276:16,17
291:9 293:1
294:15,17,20
295:6,18
296:17 298:5
298:24 299:8
300:6
**expenses** 64:9
71:23 176:24
177:1 180:9,13
180:16 272:9
**expensive**
262:25,25
**experience** 22:2
26:19 42:18
107:15 127:7
225:22
**experiencing**
221:2
**expert** 275:13
**expertise** 17:23
26:18 107:21
116:19 274:1
276:6 280:8,22
**Expiration**
307:10
**explain** 40:21
70:14 171:22
194:12,13,16
196:7 237:9
239:16 264:4
265:6 304:5
**explained** 71:13
78:20 165:1

240:13
**explaining**
77:21 164:21
181:17 241:7
**explanation**
67:25 190:16
**Exploration**
68:19 69:4
**explorations**
260:23
**explore** 102:10
105:4,23,24,25
**exploring**
103:14
**exposure** 56:15
231:8
**expressing**
100:2 220:21
**extensive** 67:25
**extent** 71:4 72:7
73:2 81:8
131:15 132:24
144:16 161:6
161:11 209:7
215:4 225:2
226:9 247:11

**F**

**F** 2:18
**facilitated**
172:16
**facilities** 55:1,3
246:20 255:15
257:1 266:16
267:10
**facility** 55:2
56:18 57:4
170:25 171:5
177:20 193:21
200:22 245:24
246:12 249:10
254:6,7 255:3
257:9,21 266:9
266:11 267:13
267:22 268:5
269:4 272:11

273:4,9 289:3
296:18
**fact** 46:18 59:18
87:1,22 99:11
118:24 127:1
127:18 131:11
132:13 158:12
160:25 170:13
172:4 223:9
225:11 230:24
246:21 248:23
255:4 266:5
270:25 271:18
298:12,22
299:20
**facts** 304:4
**fair** 20:19 90:11
176:17 272:21
286:17
**fairly** 220:8,11
**fairness** 284:21
**fall** 52:14 88:9
94:13 95:10,19
103:15 104:1
105:3 210:1
291:10
**fall/winter**
105:22
**familiar** 14:3,18
14:19,24 15:8
15:11,15,19
16:11,15 18:1
18:3 21:4 23:4
28:18 37:13
75:15,16 78:9
78:15 79:3,6
79:10 82:11
86:6,10,11,20
100:12 110:25
116:19 120:21
121:11,25
122:1 170:1
172:19 218:6
273:24 285:11
285:13
**families** 212:20

**family** 62:16
65:7 66:12
88:24,25 89:17
89:19 90:23
**far** 48:22 102:20
299:18
**Fargo** 226:16
261:25 262:5
**fast** 88:22
**faster** 251:1
**father** 69:5
**FDIC** 14:1 35:3
35:19 36:19,25
37:7,11 38:8
38:15 44:7
93:10,17
108:14,20
159:16 160:13
**features** 149:19
247:14 248:7
**February** 23:16
26:14 27:4
85:5
**federal** 1:23
218:16
**fee** 16:21,22
17:12 27:17,21
46:16 47:6
60:23 61:2
65:2 67:7
69:23 70:14,24
71:6 72:9,17
72:19 80:14
97:9 151:6,7
151:14,14
177:25 178:20
179:11,12,20
179:20 219:5
257:6
**feedback** 35:2,7
35:8,21
**feel** 80:6 181:17
**fees** 17:6,16 67:5
67:5 70:21,23
72:15 73:14
151:2,17 178:4

UNSEALED

App. 0258

178:25 180:11
180:13
**Feldman** 3:15
**felt** 66:21,22
67:1 108:8,11
108:17 175:22
191:16 230:20
242:15 247:15
260:5 261:4,11
266:14
**Fiance** 290:11
**fide** 128:12
**field** 42:17
**fifth** 81:9
**fight** 87:8
**figure** 46:13
94:23 96:23
**figured** 193:5
194:2 249:4
276:20
**figuring** 96:8
**file** 252:9 284:25
285:13 301:12
301:23,23
**filed** 228:9
288:19
**Fina-** 89:3
**final** 6:6 120:18
285:1 288:7
**finalize** 246:11
**finalized** 26:16
253:23
**finalizing** 106:2
106:21
**finally** 9:16 12:2
193:5 274:17
284:24
**finance** 1:6 3:2
5:9 8:6 9:4
13:5,11 15:21
20:23 21:10,12
21:13,18 22:10
22:12,18 25:20
36:11 38:12
44:21 49:11
53:15,22 69:20

73:19 75:4,21
77:9 78:5
80:20 85:6,8
87:23 88:2
91:21 94:24
107:7 111:25
121:6 128:1
131:5 134:10
135:24 136:5
136:13 138:5
138:18,24
139:4,9,18
140:9 141:10
141:18 143:20
147:1,3 149:20
159:3 165:9
172:16,17,20
172:24 173:18
174:19 185:9
186:8 190:1
193:23 194:25
195:10,15
196:4 201:18
203:23 206:24
207:13,14,20
208:10,11,13
208:18 213:9
214:23 216:11
219:9 222:16
224:13 233:10
234:8 237:19
240:4,7 241:7
243:19 244:11
245:5 249:5
251:20,21,22
253:3 255:14
259:17 261:20
262:8 264:22
266:10 268:6,7
268:12,14
269:2,3,9
270:3,15,21,22
272:14,15,22
273:9,14,17,25
274:18 276:19
277:12 278:6

281:25 282:18
286:2,25 287:4
287:8 288:2,15
290:4 291:13
297:6,12,19,22
299:23 301:21
306:6
**Finance's**
266:17
**Finance-Chip...**
120:13
**Finance/Elevate**
272:10
**Finance/TCAS**
147:10
**financial** 12:18
15:20 21:3,20
23:5 32:5,7,15
33:6,15 34:3,3
36:4 41:15,18
44:24 45:25
46:14 47:12
53:21,23 54:6
55:12 56:3,10
56:24 63:10
79:1 89:5
98:23 103:24
114:18 121:5
123:11,12
124:10 125:17
165:11 294:6,9
294:9 296:15
**financially**
307:2
**financials** 23:10
249:1,7 286:16
288:13,19,25
289:3,19,19
300:1
**financing** 54:10
55:6,24 104:12
140:23 255:7
**financings**
173:16
**find** 57:2,8,15
61:22 88:23,23

99:20 105:8,19
106:13,15
125:10,12
197:23,24
214:14 224:2
234:6 244:17
**finding** 209:22
**fine** 11:10 37:25
38:5 72:20,22
78:7 97:24
146:20 203:2
218:2 223:19
246:8 274:23
**finger** 287:13
**finish** 11:23
17:13 38:3
55:25 58:21,23
65:9 83:21
84:2 85:24
98:8,10 115:24
118:10,17
119:3 132:22
138:1 161:16
165:13 166:20
172:10 205:22
232:10 300:11
**finished** 117:15
117:16,17
**finishes** 24:24
187:3
**firm** 135:11
307:11
**firms** 22:7 24:7
135:12
**first** 9:11,19
20:13,20 21:6
26:9,14,17
27:5,9,25
29:17 31:15
32:13 33:3,14
34:24 35:8,14
35:19 37:5
44:1 45:24,25
47:13 48:19
49:9 50:19
51:9,13,22

52:11,17,20,25
54:8 57:1 58:1
58:7,17 59:4
59:25 60:6,16
62:16 70:19,21
70:25 72:15
73:11,20,22
74:1 75:16
76:9 80:18,23
89:10 92:5
93:23,24 94:6
95:10,12 102:9
103:15 104:5,6
105:2 108:10
108:19 112:11
112:15 113:2
113:10 116:11
117:25 118:3
121:14 122:3,5
122:7 123:18
125:4,23 128:2
128:3 136:2,18
136:22,25
139:25 140:20
141:2,5 152:25
155:10,13
159:15 160:13
160:20 162:24
168:13 169:6
169:11,20
175:6 182:24
184:25 185:5
190:15,22
194:14 225:23
247:17 251:9
253:12 255:5,5
261:1 267:2
270:24 271:7
274:14,14
279:10 284:19
289:14 292:19
**first-time** 115:6
115:15
**fishing** 187:20
208:13
**five** 271:7

UNSEALED

**fixed** 64:1,20
  66:16 197:13
  198:4,6 293:5
**flew** 157:21
**flight** 13:23
**flip** 29:1
**flipping** 250:20
**floating** 54:22
**Floor** 3:16
  307:12
**flow** 5:3 80:1,8
  80:24 81:8,18
  116:20 126:8
  244:12 245:12
  246:14 272:25
**flows** 144:7
**focus** 102:5
  136:21
**focused** 78:4
  109:2 224:5
**folks** 130:18
  204:24
**following**
  252:23 286:13
  306:12
**follows** 9:12
  47:14
**forecast** 86:7,11
  86:15,20,23,25
  204:8,19,20
  230:6 282:20
  282:21 283:8
  283:10 285:1
  285:23 286:21
  286:23
**forecasted** 286:1
  286:24
**forecasting**
  229:22
**forecasts** 6:17
  86:12 87:6
  204:5 229:2
  283:4 285:21
  285:25
**foregoing** 305:4
**foremost** 80:18

80:24 247:17
**forget** 131:19
  226:16
**forgetting**
  167:13
**forgive** 35:10
  148:21
**forgot** 155:23
  172:9,13
**form** 14:7,22
  15:9,17 16:5
  16:13,14,25
  17:20 18:10
  19:24 20:3
  22:24 25:8
  26:11 28:11
  29:20,24 30:4
  30:7,14 31:16
  31:19 32:16
  33:7,8,20 34:9
  34:16 37:18
  41:7,25 42:9
  43:2,23 47:9
  48:11,16,23
  49:13 51:1
  52:12 53:10
  54:18 58:4
  59:7 60:12
  61:12 68:10,21
  68:25 69:25
  70:5 71:7,11
  73:16 74:9,23
  77:16 79:4,22
  82:2,7 83:4
  84:10 86:9
  87:4,9 88:13
  88:14 90:5,6
  90:15 92:13
  93:1,12 94:11
  96:15 97:2
  99:15,18,24
  100:4,20 101:3
  101:4,15
  102:12,15,23
  103:12 104:24
  104:25 107:18

107:19 110:13
  110:22 112:2
  113:17,24
  115:2 116:17
  117:4 119:11
  120:17 121:3
  122:17,23
  123:6,20
  124:22 126:10
  127:9,24
  128:14 133:2
  135:6,21,22
  136:16 137:14
  137:20 138:20
  138:21 139:10
  139:20 140:12
  140:13 141:19
  142:6,7,17
  144:19 145:23
  146:13,17
  147:21 149:24
  151:4 153:2,13
  154:10 162:11
  163:3,21 164:8
  165:19 166:1
  167:23,24
  169:22 170:8
  172:25 178:6
  180:15 184:1
  184:22 187:11
  188:10 191:13
  194:8,9,21
  201:1,21 202:8
  202:20 205:11
  207:1,2 209:25
  212:5,6 218:12
  219:7,13 220:9
  220:23,24
  222:11,19,20
  223:14 224:7,8
  224:25 229:11
  230:13,14,17
  231:23 232:14
  233:24 234:2
  236:7,11
  239:25 242:7

247:3 260:1,11
  261:9 265:9
  268:21 274:19
  274:21,22
  275:10 276:25
  277:22 278:2
  279:25 284:16
  300:13,19
  301:7,9
**forma** 267:16
**formal** 25:21
  157:14 234:7
  240:20 241:6
  242:1,5
**formally** 53:1
  108:14 242:6
**format** 6:4
  117:24 210:7
  285:13
**formation** 57:24
**formed** 53:7
  234:18
**former** 114:25
  115:25 116:1
  116:11 117:1
  230:3 241:1
  278:3
**formers** 229:5,6
**formula** 289:21
**Fort** 1:21,22
  23:4,21 24:17
**forth** 150:14
**forward** 219:13
  219:16 234:12
  273:23
**forwarding**
  211:5,7
**forwards** 211:3
**foundation**
  93:14 221:24
**founded** 23:3
**founder** 24:12
  156:20
**founders** 24:5,8
  24:9,10
**founders/inve...**

23:19
**four** 262:23
**fourth** 72:13,13
  72:14,24 112:3
**frank** 260:10
**frankly** 127:17
**frees** 186:4
**Freeway** 307:11
**freeze** 147:13
**frequent** 224:22
**frequently** 215:6
  220:11 224:20
  226:8
**friends** 62:16
  65:7 66:12
  88:24,25 89:17
  89:19 90:23
**front** 28:20
  136:4 157:19
  167:21
**frustrated**
  166:14
**full** 12:5 47:25
  166:22 179:13
  291:8 294:19
**fully** 277:5
**function** 61:7,8
  61:8,10 79:17
  163:1 224:12
  224:13
**functioned** 68:1
  68:2 144:12
**functioning** 53:8
**functions** 79:15
  291:16
**fund** 20:22 21:8
  22:15 24:4
  43:8,10 50:3,4
  50:5,11,13,16
  53:7,13,16
  54:1,3 55:24
  57:24 58:8,9
  58:15 59:15,20
  59:22 60:9,10
  60:17 61:17,17
  61:19,20 62:2

UNSEALED

| | | | | |
|---|---|---|---|---|
| 62:8,12,19,25 | 244:16,17 | **generally** 16:16 | 192:2 198:11 | 296:9 299:12 |
| 63:14,15,16 | 272:2 273:20 | 16:20 61:25 | 200:12 231:17 | **go-forward** |
| 64:10,18,19,20 | **fundings** 229:5 | 84:18 85:3,3,7 | 234:17 237:23 | 57:18 |
| 65:20,22 66:1 | **funds** 5:3 42:5 | 97:14 98:1,6 | 242:18 254:17 | **goal** 117:22 |
| 66:8 67:2 68:9 | 43:11,14 54:4 | 100:7 138:23 | 298:3 | **going** 9:25 10:10 |
| 68:13 69:4 | 55:13,18 56:5 | 152:2 175:21 | **given** 158:10 | 11:1,19 12:8 |
| 70:11 71:3,16 | 106:6 125:24 | 250:1 265:6 | 199:22 253:11 | 12:11 18:16 |
| 71:24 73:1,4 | 126:3,4,6 | 282:23 286:13 | 290:4 306:16 | 20:16 28:21 |
| 74:2,3,7,13,16 | 168:4 173:18 | 294:7 | **gives** 147:19,24 | 38:23 41:3 |
| 77:15 78:24 | 181:11 244:14 | **generate** 17:6,12 | **giving** 12:5 | 42:15,21 43:5 |
| 80:9 81:7 88:8 | 246:2 257:20 | 17:16 | 46:21 118:23 | 50:20 54:19 |
| 88:12 89:1,15 | **further** 35:4 | **generated** 23:7 | 172:24 192:24 | 56:22,24 57:2 |
| 90:4,22 91:9 | 51:20 300:9 | 34:4 71:25 | 224:22 231:21 | 57:6,14,15,17 |
| 91:10,18 92:11 | 306:17,23 | 275:25 | 259:5 | 61:21 63:18 |
| 104:5 122:10 | 307:1 | **generating** | **glad** 256:22 | 75:18,23 76:20 |
| 123:18 124:21 | **future** 21:25 | 46:16 245:3 | **go** 9:18 11:24 | 89:21 92:21 |
| 134:2,2 136:9 | 24:4 87:2 | 299:2 | 12:8 21:25 | 94:8,9 95:9 |
| 138:25 139:3 | 114:10,10 | **generation** | 38:18 42:21 | 96:1,24 97:8 |
| 144:18 148:16 | 233:9 285:21 | 96:22 | 50:15,15 52:3 | 100:19 101:25 |
| 157:18 160:17 | **Fw** 5:15 6:13,21 | **generations** | 57:8 61:13,21 | 102:6 105:13 |
| 169:25 170:14 | 7:10 | 96:20 | 63:25 87:16 | 105:16,18,19 |
| 184:21 193:12 | | **generic** 115:13 | 89:18 96:24 | 106:5,18 107:3 |
| 193:13 194:5 | **G** | **gentleman** 58:12 | 97:10 108:25 | 109:11,15 |
| 194:19,23,23 | **G** 8:1 | 210:22 | 119:25 129:14 | 112:9 119:22 |
| 197:25 198:1 | **GAAP** 289:18 | **gentlemen** 158:4 | 132:10 139:14 | 129:7 134:2 |
| 223:5 229:4 | **gain** 37:1 | **getting** 17:22 | 139:21 147:8 | 138:13 160:10 |
| 230:9 244:5 | **game** 44:10 | 38:6 55:17 | 149:12 157:7 | 160:19 162:4 |
| 245:22 254:25 | **gather** 249:13 | 61:1 62:11 | 157:13 159:14 | 162:12 167:16 |
| 272:8 273:3,10 | 263:7 286:25 | 63:17 67:4 | 173:1 174:8,24 | 169:12,12 |
| **funded** 111:7 | **gathered** 94:23 | 80:5 89:7 | 175:9 184:2 | 176:2 184:2 |
| 162:23 169:6 | 97:13 | 176:8,10 | 189:15 197:23 | 188:6 189:5 |
| 169:19 237:6 | **geared** 262:14 | 188:15 191:19 | 197:24 198:9 | 190:2,17 191:9 |
| **funding** 23:7 | **Gee** 259:9 | 198:15 228:4 | 207:23 208:14 | 191:21,22 |
| 42:23 54:6 | **general** 1:3 2:8 | 242:25 245:11 | 214:11 221:17 | 194:2,14 196:2 |
| 57:19 105:16 | 14:21 36:20 | 245:12,19 | 224:9 230:21 | 196:16 197:12 |
| 107:10 108:5 | 90:18 143:13 | 247:9 256:1 | 232:19 236:21 | 197:16 198:3,5 |
| 109:3,8 125:12 | 154:1 155:8,13 | 257:8 258:18 | 242:17 244:17 | 202:2 207:19 |
| 148:4,6,13 | 215:5 216:7 | 262:22,23,24 | 250:5,14 | 208:13 214:15 |
| 159:4 163:14 | 228:13 267:7 | 272:25 275:15 | 253:24 258:23 | 214:23 217:12 |
| 163:19,19 | 286:11,19 | 276:5 280:8 | 259:15,18,23 | 228:7 230:21 |
| 167:20 170:20 | 299:23 306:3 | 284:3,22 | 259:24 261:4 | 231:22 233:21 |
| 171:1 172:18 | **general's** 8:19 | **gist** 252:16 | 268:4 271:20 | 234:7 237:16 |
| 183:16 184:19 | **generalization** | **give** 32:17 76:12 | 273:22 274:2 | 237:23 239:17 |
| 204:4,9 205:3 | 299:6 | 78:16 154:5 | 276:12 285:14 | 241:7 243:23 |
| 229:19,19 | **generalize** | 160:11 161:9 | 288:6 290:25 | 244:11,25 |
| 233:6 243:20 | 297:24 | 166:21 172:24 | 294:19 295:3,8 | 245:23 247:8 |

UNSEALED

App. 0261

250:15 254:24
256:16 257:2
260:23,25
261:8 263:8
266:9,12
267:18 269:16
271:21 278:1
282:25 283:1,1
283:2,2,3,23
285:5,6 286:3
288:21,23
290:19 295:1
**Goldman** 158:5
**good** 9:15 18:18
  18:22 22:8
  119:25 167:18
  168:22 186:6
  188:9 225:17
  238:3,4 242:12
  244:20 251:25
  257:19 266:14
  267:1 282:5
  292:18
**Goodness**
  238:19
**Goodwin** 3:4
**gosh** 262:19
**gotten** 184:13
**government**
  157:24 210:3
  231:3 241:21
**GPL** 6:6 111:8
  153:9 256:1
**GPLP** 5:11 6:13
  6:23 7:9,13,21
  182:16 239:7
  256:4 284:6
**GPLS** 6:19,23
  111:8,12
  135:16 136:9
  136:19 137:7
  137:16,19
  138:5,10 139:4
  139:19,25
  140:3,4 141:21
  142:15,18

143:6,24
144:14,18,23
145:3,11,21,25
146:2,5,22,23
147:3,5 148:9
148:16 149:3
149:11,25
150:5,23 152:6
152:8,12 153:5
153:10,15
154:2,13
159:10,11,21
160:6,17
161:23 162:4
162:10 163:1
163:10 165:6
177:10 178:12
178:22 179:3
179:14 180:14
180:17 181:7
181:10,12
185:1,14,16,19
185:24 195:6,9
197:2,2,8,12
204:4 205:3,5
205:7 206:3
220:13,17
221:22 222:10
222:13,17
223:5,17
229:10,17,18
229:20 230:9
231:7 232:5,12
232:21 233:9
234:9 237:16
237:21,21
238:24 239:18
240:9,20
241:18,24
242:2,11,18
243:2,18,25
244:5,14,21
245:13,14,16
245:24 246:6,7
246:9,14
249:10 254:8

256:13,13,14
256:25 257:5
257:10,19
264:18 266:8
267:12 272:23
272:25 284:4
284:15 293:4
296:18 299:9
300:3,6,14,16
300:19 301:8
301:10 302:18
302:19,19
**GPLS's** 198:6
  244:1
**GPLS/Split** 7:17
**Grant** 264:25
  268:1 269:22
  288:8 289:5,15
**granted** 128:1
**great** 5:3 57:9
  105:8 106:12
  106:13 111:16
  111:24 112:13
  148:10 149:17
  152:24 153:5,9
  153:15,18,25
  154:5 168:8
  206:22,22
  212:13 213:2
  217:11 284:3,4
  292:1 293:24
**greater** 56:9
  87:20 210:5
**Green** 5:6
  134:12,24
  136:22,24
  137:5,8 138:7
  141:16 148:3,4
  148:8,10,19,20
  149:3,8,12
  152:16 153:12
  153:22 154:19
  154:22 155:17
  155:19 168:11
  168:12 169:7
  169:21,25

170:1,7 171:5
171:11 172:2,8
172:18 173:4,5
173:5,11,15,16
173:19,20
174:11 175:5,8
175:10,18,19
176:1,4 179:10
180:17 181:4
181:12 184:6,9
184:13,25
185:9,11,22,25
188:3 190:25
191:4,8,9,18
191:19,20
193:22 195:18
196:15 197:3,4
200:5 206:22
212:13 213:1
226:14,22
246:25 292:1
293:24
**Grogan** 2:4
**gross** 82:16
  178:2 179:15
  296:24 299:5
**grossed** 267:17
  268:16 297:10
**group** 197:24
  200:24 201:20
**grow** 57:7 97:6
  141:1 244:10
  257:17 262:21
**growing** 88:22
  257:8
**growth** 24:4
  246:15
**guarantee** 31:3
  31:14 74:6,13
  74:15 136:12
  136:17 137:18
  137:22 138:23
  139:1,4 144:2
  201:24 254:8
**guaranteed**
  138:10 249:10

**guaranteeing**
  201:18
**guards** 258:17
**guess** 22:4 46:2
  46:8 48:25
  54:19 63:4
  85:3 89:21
  92:22 102:1
  116:21 138:13
  173:20 196:17
  197:12 211:4
  218:16 239:2
  256:16 257:2
  289:25 298:25
  300:2,17
**guessing** 10:10
  35:9 89:22
  238:22

## H

**H** 5:1 6:1 7:1
**half** 80:22,22
  303:9
**halfway** 166:18
**hall** 8:18 9:7
  161:11 192:15
**halt** 231:22
  232:6 233:22
  234:9
**halting** 242:19
**handle** 63:3
  167:9 177:9
  197:3 209:23
**handled** 155:4
  180:10
**handling** 210:13
  210:19
**hands** 100:17
**hands-on**
  100:15
**handshake**
  135:5,8
**Hang** 217:10
  221:15 239:12
**happen** 21:10
  42:15 205:2

UNSEALED

212:24 266:19
**happened** 15:16
18:2 35:17
37:9 45:13
88:18 94:6
95:17 118:2
148:21 156:10
158:14 164:7
168:21 179:17
202:23,25
232:1 256:24
301:2
**happening** 9:21
56:2 57:22
91:23 95:24
100:14 102:14
204:22 244:24
259:3 270:1
**happens** 63:5
123:19 127:23
160:14,18
179:24 268:2
**happy** 100:9
214:10
**hard** 77:6
205:23 209:22
236:25 256:2
290:1
**harmed** 266:22
**Harris** 210:17
**Harvison** 55:5
121:19 129:9
134:13 155:1
181:13 237:13
241:12 247:15
260:17
**Havre** 155:25
**Hawaii** 13:20
**Haws** 3:9 9:6
**Haynes** 5:6,8,13
5:18 121:10,12
121:13,15,16
121:21 122:15
130:7 170:1,5
170:5 171:6,11
171:12,25

172:1,7,17,24
173:4,4,10,14
173:15,20,24
174:2,2,6,10
174:18,18,24
175:7,9,11,12
175:12,19,20
176:1,3,4,10
176:19 177:13
177:14 181:21
182:5,5 183:21
183:24 185:11
185:11 186:3,3
186:25 187:8
187:10 188:8
188:18 189:5
191:12 193:6
193:12,22,23
194:4,18,19
195:16,19,20
196:13,14,15
197:4,4,20,21
198:3,3,16
199:15,19
200:4,24
225:21
**Haynes'** 184:18
201:8
**He'll** 84:2
**head** 10:25
106:25 177:6
**heads** 231:21
**hear** 36:24
187:6 223:6
251:7
**heard** 44:8
75:16 79:2
115:1 235:13
252:13
**hearing** 12:3
**Heartland** 68:19
69:4
**heavily** 156:21
224:11
**hedge** 54:1,3,4
56:5 62:19

**height** 53:20
210:2 218:15
228:5 241:17
**held** 8:8 65:19
161:21 220:17
272:14
**help** 36:14 51:25
57:10 58:16
59:25 74:22
77:12 78:3
79:14 88:24
114:4 115:18
149:6 167:10
168:4 169:25
176:12,12
231:7 273:3
278:21
**helped** 167:10
**helping** 44:20,21
60:3 64:13
65:7 66:24
75:6 77:21
**helps** 109:8
**hereto** 1:25
**Herman** 2:18
9:1,1 101:3,15
251:7 265:9
268:21 274:21
278:1 283:17
300:10,23
301:2,11,18,22
302:1,11 303:2
303:13
**hey** 46:13 56:17
56:23 147:10
149:12 175:11
176:2 177:22
187:25 188:16
192:7 205:2
258:22 268:12
**hiccup** 144:8
**hidden** 300:17
302:2
**high** 48:15 64:22
82:25 100:6
158:12 212:17

259:9 275:11
275:16
**high-level** 261:2
**higher** 55:19
56:11 153:10
153:16,18,25
154:1 245:7
**highlighted**
296:12 297:2
**highlights**
292:13
**highly** 56:16
99:13
**hire** 25:13,16
**hired** 226:15
**hiring** 21:9
**historical**
277:13 279:22
**history** 127:7
279:7
**hold** 15:5 16:2
17:17 20:6
40:13 100:6
124:14 166:12
232:17 259:14
**holding** 44:5,23
45:3 144:14
162:6
**holds** 99:22,22
99:25 221:5
**holidays** 253:11
**home** 211:20
**honest** 45:16
**Honolulu** 13:20
**honor** 237:2
**hook** 162:5
**hooked** 225:20
**hope** 259:18
**hotel** 158:12
**hour** 303:9
**housed** 274:19
275:1 276:1
279:15
**Household**
14:25 20:14,15
20:17,25

**huge** 280:10
**hundred** 42:12
45:3 46:19
91:11 125:18
148:14,18
159:18 160:15
161:21 162:5,6
166:8 170:18
273:15 283:15
284:18 295:15
**hungry** 167:17
**Huseby** 307:10

---

**I**

**iackelsberg@l...**
2:6
**idea** 76:24 173:2
184:18 188:9
190:25 191:19
194:11 195:4
242:12 255:2
**ideas** 101:8
**identical** 76:23
77:4
**identification**
102:9
**identified** 7:19
28:23 75:12
76:1 107:25
109:7 110:11
120:10
**identify** 8:21
109:11 115:19
120:11 169:12
194:14
**identifying**
108:3
**II** 21:8 50:3,4,11
53:13,16 55:25
58:8,9,15
59:15,20,22
60:9,10,17
61:17,20 62:2
62:8,12,25
63:14,15,16
64:10,18,19,20

UNSEALED

App. 0263

65:20 66:9
67:3 68:13
69:4 71:16,24
74:3,13,16
78:24 80:9
81:7 89:1,15
90:22 91:9,10
91:18 104:5
136:9 138:25
139:3 160:18
**illegal** 211:2
**Illinois** 3:10
**illness** 12:3
**ILP** 246:24
247:1 291:25
293:23 294:18
295:12,21
**imagination**
275:13
**imagine** 61:18
262:1,2 290:3
**immaterial**
182:8
**immediate**
162:7 236:25
**immediately**
271:14
**immersed**
114:22
**impact** 204:25
220:13 243:4
261:23 262:16
**impetus** 262:18
**implement**
197:1
**implemented**
197:1 275:5
**implications**
123:12
**imply** 115:20
116:1
**implying** 117:18
280:1
**importance**
227:11
**important** 10:13

47:19 62:23
80:13 161:18
247:16
**importantly**
63:7 67:10
**impossible**
271:13
**impressed**
158:17
**impression**
36:23
**improves** 245:10
**improving** 245:6
**in-house** 161:15
**inadvertently**
190:1
**inartful** 265:14
**inception** 170:4
**include** 252:4,7
291:9
**included** 275:18
282:18,19
**including**
218:19
**income** 46:16
67:8 70:12,24
71:16 72:24,24
78:23 80:1
81:20 143:8
249:6 291:8
297:5,10,14
298:9 299:1,2
299:24 300:3
**Incorporated**
8:7
**incorporating**
279:6,7
**incorrect** 240:18
**increase** 144:15
145:1 151:14
231:7
**increased**
144:24 196:15
**increasing** 41:12
**incremental**
89:21

**incrementally**
205:4
**incur** 63:19
**incurred** 180:10
180:12 181:5
**incurring**
151:10 245:5
246:1 299:18
**independent**
194:19
**Indian** 107:17
156:20
**individual** 86:2
86:3,3 152:13
174:10 179:16
180:2 214:21
280:11
**industries**
218:19 228:16
262:15
**industry** 16:16
121:20 145:5
**influence** 241:22
**information**
38:7 78:13,14
82:19 161:7
163:15 187:21
222:5 235:25
280:6 281:7,13
**informative**
198:25
**informed** 94:12
94:14,15 253:4
**informing** 95:13
104:6
**initial** 27:22
112:12,22,22
112:22 121:18
126:13 133:16
154:8 155:19
164:19 168:18
168:18 171:10
183:15 264:20
**initially** 24:19
89:21 124:18
246:13 273:7,8

300:15
**inner-family**
212:22
**innovations**
95:3
**input** 123:2
**inquiries** 206:2
**inserted** 114:14
**install-** 36:2
208:22
**installment**
33:11,13 34:18
35:20 36:2
41:13 43:7
53:3 56:8
70:19,22 82:13
82:15 83:17
84:8,17 85:8
85:14 87:17,18
87:19 88:19,20
92:4 93:25
94:18,25 96:12
96:19 107:4,11
117:3,7 171:1
208:25 218:22
244:9 255:9
274:17 275:22
280:4,5 291:25
292:24 293:9
**installment-ty...**
96:9
**instance** 1:16
95:22 104:9
169:7,20 181:4
226:14
**instances** 29:5
**instigation**
52:11
**instituting** 36:10
**institutional**
89:6 90:20
**instruct** 214:24
**insurance** 7:15
258:17,20,21
258:25 259:4,7
**intend** 57:14

124:13
**intent** 42:4 43:6
118:12 196:21
234:9
**intentionally**
118:13
**interacting**
175:23
**interaction**
49:15 121:18
213:22,24
**interchangeably**
61:23
**intercompany**
272:11
**interest** 32:14
33:5,11 34:13
36:4 41:3
44:25 72:12,24
73:6 80:14
81:10,23 82:13
90:7 141:17
146:12 148:16
160:17 165:5
176:7,16 177:3
177:4,13,15
181:21 182:6
196:25 212:17
220:14 249:8,9
257:22 272:21
291:9 293:1
294:14,17,20
295:5 296:17
298:5,24 299:8
300:6
**interested** 63:12
64:1 66:14
106:21 107:9
129:7 130:10
130:11 156:13
156:16 188:2
206:17 219:5
219:15 242:4
244:4 258:13
259:8 261:3
283:6 307:2

UNSEALED

interests 232:6
233:22
intermediary
110:20 194:3
194:18
internally
277:14
international
272:6
internet 132:10
interpretation
188:14,21
191:15
interpreted
277:9 279:13
interrupt 72:13
85:25 92:14
119:5
interrupted
268:23
Interruption
295:22 296:1
301:13
interview
202:18,22
interviewed
202:13
interviewing
22:9
introduce 65:7
162:10 219:11
introduced
139:8 161:2
168:14 173:15
175:23 189:23
introduces
45:19,20
introduction
45:13
invest 62:1,25
66:17 68:11
invested 73:2
145:25 230:9
investigative
187:19
investing 62:21

investment 24:2
25:5 68:18
75:3 79:20
80:14 142:18
144:15,17,21
147:6 158:6,13
158:22 170:1,5
171:25 172:1
193:12 194:5
194:18 222:16
245:16 246:5
261:2 263:2
investments 5:6
5:8 56:5
121:12 171:6
investor 21:18
68:9 69:3
72:25 77:13
80:12 81:9
146:4 222:13
222:17 223:5
investor/lender
90:20
investors 19:16
21:22 36:6
57:16 61:22
62:12,14,18,24
63:14,21 64:19
66:9 68:17
73:4 74:21
78:1 79:14,18
80:6,12 81:5
81:12 89:15
160:18 185:19
197:25 198:4
205:7,14,17
206:3 221:22
222:10 259:21
260:6
invoice 181:9
involve 100:14
214:2
involved 18:4
20:16 21:3
46:9,11 60:2
69:6 74:20

75:5 77:20,21
80:19 85:8
87:19 92:24
100:16 101:6,9
102:17 103:19
103:21,25
111:1 112:5
113:18 114:21
119:14,15
122:6,9 123:7
125:9 131:7
134:8,22
135:13 136:17
154:14 156:21
157:5 160:1
166:9 171:12
173:7,8 184:8
184:13 209:11
224:11,13
225:13,14
226:5,9,19
227:7,10
248:19 255:1
258:12 265:16
involvement
123:3 226:2
involves 101:7
IOP 296:22
IPO 259:22,24
260:6
irrespective
255:12
Irv 2:4 8:17,20
18:21 83:22,25
85:25 86:19
87:14 98:9
166:13 189:15
207:19 216:20
299:11
Irving 92:17,19
95:5,10 108:10
112:16 125:5
128:6 136:2,18
156:12,14,14
157:2
issue 189:15

192:7,13 199:2
203:24 220:7
228:7 235:20
236:13
issued 188:20
228:14
issues 97:14
212:22 265:15
IT-type 27:20
item 22:4 249:8
284:24 287:25
296:17
items 284:11
291:10
iterations 34:25

___
**J**
___

jail 133:12
January 23:2
25:17 26:4,8,8
31:24 52:21
55:5 94:16
99:3 107:4
117:8 199:13
255:21 257:16
285:19
Jason 55:5
121:19 129:9
133:14 134:13
134:25 154:25
157:7 158:9
164:5 165:17
181:13 235:13
235:14,25
237:13 241:12
242:8,9 247:14
260:16,20
280:21 287:1
Jeez 205:22
Jefferson 3:15
jobs 99:23
John 21:17
23:20 69:8,10
69:15
Johnson 156:11
218:25 225:13

joined 23:9
**Joiner** 208:15
joining 9:7
joked 245:21
**JOSH** 1:3 306:3
**Judge** 208:14
judgment 99:17
270:1
**July** 88:18 89:22
89:25 102:1
104:5
**June** 182:25
186:19 284:10
285:1 289:12

___
**K**
___

**KapCharge**
242:23
**Kaplan** 8:12
**Katten** 3:9
135:15 183:2
255:25 256:2
keep 36:1 57:16
196:9 290:14
keeping 41:16
46:20 220:12
244:4 254:14
**Ken** 22:17 35:18
38:11 55:5
56:22,22 68:19
68:23 69:5,5
93:22 94:7,15
98:17,24 99:6
99:11,20
100:17,17,25
101:6 105:2,4
105:7,23
106:22 108:22
133:15,16
134:16,18
183:4 222:25
223:6 224:4,10
224:18,20
228:23 229:1
231:21 247:14
252:22 260:16

UNSEALED

| | | | | |
|---|---|---|---|---|
| 260:20,22 | **knew** 21:20 63:8 | 97:8,9 98:19 | 154:14 155:1 | 237:5,12,13,14 |
| 280:21 | 66:9 119:16 | 98:21,24 100:8 | 155:14,15,16 | 239:1 241:4,21 |
| **Kenneth** 2:17 | 122:5 126:16 | 100:9 101:13 | 155:25 156:3 | 241:25 242:1,4 |
| 9:1 | 126:21 254:1 | 102:20,22,23 | 156:20,22,23 | 242:15 243:2 |
| **kept** 157:1 | 256:17 | 104:8,10,16 | 157:1,5,13,24 | 244:1 245:11 |
| **Kevin** 3:20 8:22 | **know** 9:18 10:10 | 105:4,4,7,11 | 158:13,17,20 | 245:14,15,15 |
| **key** 277:19 | 10:23 11:9,10 | 105:12,24 | 159:16,21 | 245:16,17,19 |
| **kidding** 303:11 | 15:24 16:19 | 106:12,14,15 | 160:25 161:13 | 245:22,23 |
| **kind** 16:12,23 | 18:8,17 19:1,6 | 106:16 107:1,3 | 161:17 164:2 | 246:1,6 247:14 |
| 22:21 23:5 | 19:8,13,15 | 107:6,23 | 167:3,3,6,17 | 247:17,22 |
| 46:18 53:20 | 20:16 21:1,23 | 108:15,21 | 168:15,20 | 248:4,8,9,9,21 |
| 55:6 64:2 65:6 | 22:6,11 23:2,6 | 109:7 111:19 | 173:2,3,4,9,12 | 248:22,23,24 |
| 65:7,16 66:6 | 23:8 24:6,12 | 112:4,13,19 | 173:19 174:10 | 248:25 249:1 |
| 67:3 78:20 | 25:20 26:1 | 114:12,13,14 | 174:23 175:3,4 | 249:5,22,23,25 |
| 79:20,24 81:1 | 28:12 29:6,17 | 114:15 115:4,5 | 175:6,6,7,10 | 254:10 255:15 |
| 81:11,14 91:2 | 29:22 36:1 | 115:6,9 117:9 | 175:11,22 | 256:23 257:4,8 |
| 91:2 97:14 | 37:3,15,20,20 | 117:24 118:2 | 176:12,17 | 257:9,17 |
| 100:21 108:8 | 39:11,12 40:16 | 119:19 120:18 | 177:23,23,25 | 258:11,12,22 |
| 114:21 115:5 | 40:24 42:2 | 121:1,9 122:3 | 179:17,19 | 261:3 262:12 |
| 124:11 125:16 | 43:16,18 44:2 | 122:25 123:9 | 181:5,9,10,11 | 262:15,24 |
| 126:24 144:1,3 | 44:10,12 46:4 | 123:11 124:11 | 181:12,16 | 265:11 266:8,8 |
| 144:4,10,11,22 | 46:14 47:2,11 | 124:12,23,25 | 184:25 185:1 | 266:15,19 |
| 145:1 149:5 | 47:17 49:6,19 | 125:4,6,9,16 | 185:16,23 | 267:1,10,11,23 |
| 150:1 158:3 | 50:6,9 51:7 | 125:18,20 | 188:2,7,19 | 268:13 272:9 |
| 163:9 172:6 | 54:22 55:11,14 | 126:5 127:1 | 196:20,23 | 272:13,16,24 |
| 175:2 179:9 | 55:15,18 56:4 | 128:4,20,23,25 | 197:2,11,11,13 | 274:6,6,9,20 |
| 180:1 181:11 | 56:10,17,23 | 129:3,3 131:9 | 198:9 200:1,2 | 275:20,24,24 |
| 185:2,25 186:7 | 57:5,11 58:7 | 131:11,12,19 | 201:4,8 204:6 | 275:25 276:4 |
| 187:20 188:5 | 58:13 59:18 | 131:22 132:13 | 204:9,13,17,21 | 276:15 278:12 |
| 189:10 201:23 | 61:24 63:23 | 132:18 133:7,9 | 204:21 205:4 | 278:21 280:7 |
| 205:10 206:21 | 64:21 65:5 | 133:12 134:19 | 207:4,7 211:16 | 280:11,13,18 |
| 219:7 230:8 | 66:12,14,19,19 | 134:22 135:9 | 212:15,24 | 281:1,5,22 |
| 234:23 241:13 | 66:23 67:6,7 | 135:15,15,16 | 213:6,8,20 | 282:2,21 |
| 242:11 243:25 | 69:11,20 75:13 | 136:5 139:1 | 214:7,9 215:20 | 286:14,24 |
| 244:13 246:17 | 79:19,25 80:2 | 140:23 141:11 | 215:20 216:23 | 288:6,7,24 |
| 246:18 249:3 | 80:3,4,5,10,11 | 141:22,25 | 218:1,17 219:7 | 289:12 290:1 |
| 249:18 250:1 | 80:18,23 81:12 | 142:13 143:15 | 219:8,10,14,17 | 293:17 294:25 |
| 256:10,21,23 | 83:5,14,15,15 | 143:18 144:4,6 | 220:25 221:3 | 295:2 296:11 |
| 257:3 266:24 | 83:16,17 85:18 | 144:6,8,10,23 | 222:22,25 | 296:13,16,23 |
| 267:6,14 272:1 | 85:22 86:8,17 | 145:4,6,8 | 223:4,7,19 | 296:24,25 |
| 272:10 276:3 | 87:22 88:22,25 | 146:8 147:3,6 | 224:15 225:23 | 297:8,10,24 |
| 278:13,17 | 89:2,3,3,23 | 147:11,16 | 226:14,18,23 | 298:16,18 |
| 279:1 299:5,6 | 95:3,9,13,14 | 148:13,21,23 | 227:1,3,12 | 299:13,21 |
| 299:17 | 95:17,19,21,22 | 149:1,1,2,8,9 | 228:12 230:3 | **knowing** 206:17 |
| **Kirk** 202:14 | 95:24 96:8,9 | 149:14 150:11 | 234:8,11,12 | 225:21 |
| 203:1 | 96:10,16 97:7 | 151:11,16,20 | 236:13 237:2,3 | **knowledge** |

UNSEALED

14:17 23:1
44:4 93:17,19
131:15 132:6
164:1 223:16
240:18
**known** 101:1
**knows** 100:19
100:22
**Kontgis** 281:12
281:24
**KPMG** 261:12

**L**

**L** 2:13
**L2** 251:24
**label** 33:19
187:20 200:16
247:2
**labelled** 285:21
**lack** 12:3 59:19
64:14 75:2
78:22 89:12
91:4 98:17
102:23 106:24
140:5 146:1
147:12 244:22
**Lacks** 93:14
**landscaping**
255:23
**Langer** 2:4
**language** 114:14
233:17
**large** 45:7 98:4
106:16 125:20
157:23,24
179:21 220:14
221:6 223:5
230:25 241:19
252:7,8 257:5
282:19,19
302:9
**largely** 57:25
175:14
**larger** 41:3
**largest** 96:19
222:12

**Las** 131:1
**late** 35:11,12
51:19 92:22
94:13 95:4
110:14 121:17
195:23 221:25
**launch** 27:3,22
244:8 298:15
**launched** 26:10
26:13 208:21
255:8,9
**launching** 129:5
129:12
**law** 118:7
135:11,12
**laws** 206:25
**lawsuit** 88:3
228:9,21
**lawyer** 9:23 10:3
10:4,8 162:9
**lawyer's** 10:15
**lawyers** 10:5
31:5 60:1
161:1,8 283:5
283:24
**lay** 164:22 179:1
**laying** 73:8
**lead** 98:16,17,18
98:18 99:1
**leader** 99:14,20
**leadership** 99:8
**leading** 98:20
**Leaman** 8:12
**learn** 26:25
121:14
**learned** 102:7
**leave** 190:19
**leaving** 22:13
**led** 110:20
**ledger** 267:7
286:11,20
**left** 71:4 84:7
85:6 132:5
223:17 276:15
276:18
**Legacy** 274:6,7

274:11,19
275:2,18 276:4
276:9 279:12
279:13,14
298:15 299:3
**legal** 19:12 26:2
53:14,16 59:22
114:14,14
143:20 170:17
180:13 181:5
207:3 209:13
267:3,23 269:1
269:18 270:19
271:17 272:6
290:10
**legality** 228:10
**legally** 60:4
188:19 204:10
209:12 237:1
**lend** 36:6 55:17
62:15,25 140:2
171:25 172:1
174:2,2 176:3
176:4 194:3
197:7 198:1,10
204:14 205:4
208:1 212:2
213:5 248:1,2
248:2
**lender** 16:9,9
34:11 47:12,13
84:16 85:9
92:1 96:11
102:25 105:9
105:10 106:5
115:14,17
116:4,6 123:17
124:4,7,13
125:16 132:3
140:2 141:7,11
141:22 142:10
148:12 150:2
166:7 218:23
221:5 247:13
247:20 248:19
254:5 257:20

261:16 275:23
**lenders** 15:4
18:7,24 36:6
49:23 55:16
61:22 62:12
64:20 103:2,7
105:15 107:9
108:25 109:1,5
109:6 115:10
117:11,24
124:21 125:1
128:8,17 136:3
136:6 145:10
150:3 201:9
232:19 237:2
**lenders/invest...**
89:7 90:24
**lending** 5:3
14:15,20,21,24
33:24 42:24,24
53:25 54:11
55:15 62:4,19
62:20 63:21
91:23 95:24
96:3 102:18,19
103:6 104:4,11
106:6 111:7,17
111:24 112:13
114:9 118:4
121:23 126:18
126:20,23
127:2,8,19
129:24 130:2
130:11,20,21
130:23 131:9
132:7,9,14,17
132:17 133:5
135:2 139:23
139:24 140:22
140:23 141:23
148:10,11
149:18 150:21
152:24 153:5,9
153:16,18
155:3 157:11
168:9,16 170:6

170:9 173:3,21
173:23 174:18
174:18,19
176:3 182:1
185:10,11
191:23 193:6
193:23 194:2
194:23 195:2
203:25 204:11
204:11 206:22
206:23 207:8
208:8 213:2,3
213:4 227:1,6
230:19,19
231:22 232:4
244:9 248:5,5
248:25 253:14
261:16 262:20
267:5,8 270:14
271:24 275:22
292:1
**lends** 193:6
**length** 166:16
272:20,21
**lent** 87:24
175:12 196:14
196:15 197:2
206:16 266:8
273:17
**less-sophistica...**
90:24
**let's** 11:18 19:7
21:9 43:8
50:15,15 57:23
64:5 69:22
77:1,1 83:9
88:7,8,9 89:18
91:15,20,20
99:10 136:21
136:21 140:25
141:7 146:23
146:24 148:2,3
176:14 182:10
186:10 190:15
190:17 196:25
199:1 200:7

UNSEALED

App. 0267

207:8 214:11
221:10 223:23
227:17 231:10
255:20 260:9
291:3,3 295:20
**letter** 6:10,19
218:6,12,24
219:7,13 234:7
239:18 242:1
242:11
**letting** 57:5
235:11 237:14
295:1
**level** 74:15,16
153:14 173:17
175:18 176:1
223:20 259:9
275:11,16
**leveraged** 56:16
**Levy** 106:23
228:23 252:23
**liabilities** 268:9
**liberty** 298:3
**license** 53:1
57:11 118:7
209:5 262:12
262:16
**licensed** 27:19
105:10 117:11
136:5 208:23
209:1 210:6
246:22 247:13
247:20 267:4
**licenses** 209:13
**licensing** 27:19
36:10,12 51:24
57:13 71:1
73:13,21 151:7
151:19 160:8
166:4 177:24
179:20
**lien** 141:25
142:3,4 143:3
144:1 254:9
266:17
**liens** 142:5

**light** 186:20
188:9
**lightning** 66:25
**liked** 125:3
159:23 184:24
185:6,7,22
**Likewise** 9:17
**limit** 88:1 105:5
**Limited** 111:8
**Linda** 24:22
148:24,24
179:5,6 180:4
180:5 251:16
251:19,24
284:7
**Lindas** 172:5
**line** 92:18 95:4,6
156:13,17
191:15 212:4
238:5 249:8
287:25 288:3
291:10 293:6
296:17 304:6
**lines** 107:11
261:13 263:17
291:20 292:8
293:22
**liquidity** 23:18
23:24 24:5
42:12 89:8
107:10 125:13
126:10 260:6,8
260:13
**list** 22:4 68:17
70:10 81:4
211:11,15,21
213:15
**listed** 213:6,17
291:19
**listening** 139:11
**listing** 211:9
**lists** 6:6
**literally** 108:23
179:8 276:2
**litigation** 259:14
261:6 263:3,5

**little** 12:8 15:15
17:23 38:19
43:4 47:18
54:24 74:20,22
116:18 143:25
152:19 161:17
192:4 196:8,24
204:16 213:24
214:1 228:1
240:22 245:6
246:16 251:6
252:2 253:11
276:5 280:8
297:4
**live** 133:22
**lived** 15:20
**LLC** 5:6 31:1
32:7 33:15
36:4 52:20,21
52:25 53:23
56:24 170:2,7
171:5
**LLP** 2:13,18 3:4
3:9,15
**loan** 5:4,18 16:3
16:10,11,19
17:17 19:14
24:19 27:6
30:22 31:1
32:12,14 33:11
33:13 35:20
36:13 42:8,19
42:19,20,23
43:7,7,9 44:10
44:15,16,22
45:10 46:20,21
52:6,19 53:3
57:18 63:18
65:13,17,17,21
65:21,23 66:2
70:19,22 74:16
80:10 82:15
83:1,2 84:8,17
85:14 92:4
93:25 94:25
96:12 115:6,7

115:15 116:3,8
116:13,14
117:3 118:3
124:14 131:17
132:8 134:3
137:3 142:23
159:19 162:4
167:3 170:21
171:1 173:10
173:10,11,11
182:3 183:21
193:11 204:3,9
205:1 206:12
208:25 212:18
218:22 229:5
230:20 231:6
236:5 237:4
238:17 241:19
244:23,23
245:6,9 255:9
262:5 264:23
267:9 268:4
269:2 270:17
272:3 273:3
274:17 275:23
278:24 279:2,3
279:12,14,14
280:4,5 291:25
292:24 293:9
**loaned** 193:22
**loans** 15:5,7
16:2 20:9
27:10 33:2,4
34:6,6,10,14
34:18 36:2
41:4,14 45:8
46:7 48:1,9,18
48:19 49:19
50:7 52:1
55:14 56:6,9
62:6,14 63:25
64:8,9,13
66:15 67:13
71:25 80:8
82:13 87:17,18
87:19 88:19,20

94:9,18 104:7
105:17,21
106:19 107:4
107:11 108:16
109:7 114:2,4
114:11 117:7
118:6 123:18
124:21 125:7
125:21,25
126:11 143:24
145:7,9 148:6
148:14,18
157:18 159:4,8
160:4,15
161:22 162:1,6
162:14,23
163:8,12,14,20
163:24 165:4
167:20 168:5
169:6,19,25
170:14,20
184:21 185:18
198:12 204:7
211:2,10 212:3
212:11 221:6
225:4 227:13
230:3 232:9,13
232:17 236:9
237:21,22
244:2 255:1
267:20 279:15
**lobby** 158:4,13
158:22
**lobbying** 156:24
**LOC** 292:4
293:24 294:18
295:12
**local** 23:3,7,21
**locals** 226:20
**located** 12:21,22
**locating** 220:6
**log** 116:13
**long** 11:19 18:16
99:2 234:22
277:4
**long-term**

UNSEALED

App. 0268

232:24
**long-winded**
71:14 161:17
196:8 198:23
198:24
**longer** 94:8,9,17
95:14 159:22
160:4,7,10
242:3 281:20
**longwinded**
162:17
**look** 32:9,11
39:21,23 50:16
63:16 76:12
77:11 78:16
117:22 130:15
143:4 151:18
176:8,14
182:10 186:10
188:25 191:15
200:7,15
217:24 221:10
227:17 231:10
233:16 242:17
245:24 248:23
249:8 251:11
253:24 255:21
265:11 267:16
284:6 285:11
285:12 286:6
287:16 292:21
294:8
**looked** 22:8 29:2
37:23 38:1
64:3 68:16
95:23 96:5,6
102:21 112:11
132:11 135:19
193:20 201:23
217:4,22 249:1
286:15 287:5
**looking** 21:20,24
23:10 30:24
32:6 33:9 39:9
40:10 41:10
45:22 46:3

47:10,18 66:24
68:15 75:24
78:4,19 80:6
82:14,21,23
96:7,8 97:5,11
104:10 107:7
107:22 117:9
125:19 127:15
128:5 152:10
152:11 176:9
183:17 190:19
201:17,22
213:13 217:16
217:18 221:10
225:14 226:24
243:15 249:7
249:13 250:9
253:16 258:10
288:23 291:1,5
291:21 294:5
294:10 295:4
297:21
**looks** 40:20
45:12 77:9
79:15 186:15
186:17 189:4
190:21 193:25
210:23 211:3
218:6 222:3
250:22 256:18
264:20
**loose** 24:9
**lose** 63:25 97:6
**loser** 293:13,15
298:13
**losing** 63:9
299:21
**loss** 63:23 65:14
65:18,21 245:8
290:15 297:8
**losses** 63:20 64:8
65:11 80:10,18
80:21,23 81:1
81:15 144:8
245:6 287:6
294:11

**lost** 57:19 63:11
261:25 277:25
292:21,22
293:15,18
**lot** 10:11 44:1
46:24 49:15
51:4,10 56:4
56:15 58:6
59:2 62:14
95:23 101:7
108:17 115:8
121:21 137:11
141:10 145:8
174:5 187:21
210:4 225:9,9
244:23 245:4,9
251:11 257:18
263:7,16
272:13 275:24
275:25 277:4
277:24 279:7,7
280:7 292:9,9
295:3 300:3,5
**lots** 49:17 86:12
98:24 224:1,1
258:15
**Louisiana**
157:22 213:4
**love** 185:24
196:19
**low** 82:25
**lower** 152:20
182:14 198:5
298:19
**LP** 221:21,21
223:5
**LPs** 222:24
244:15
**LTV** 142:21,22
**lucky** 13:21,22
**lunch** 119:21,22
184:24
**Lutes** 1:9,15
2:12 4:5 6:11
8:3,25 9:10,15
67:24 85:23,23

118:9 119:7
120:8 169:5
208:10,17
209:6 218:6
240:5 264:17
282:12 300:13
304:2 305:3,9
306:8,13

_____

**M**

**machine** 1:21
250:22,22
**mail** 235:15,22
236:2,3,4,15
236:21 237:18
**main** 185:7,20
262:18
**maintain** 42:13
**maintaining**
278:18
**major** 222:9
254:11
**majority** 240:8
296:20
**maker** 293:7,8
**making** 15:5,6
16:2,19 100:25
118:11 249:19
260:23 279:2
297:13 299:16
300:3
**manage** 150:13
**management**
65:2 80:14
98:12
**manager** 58:13
81:6
**manager/owner**
65:1
**managers** 287:1
**managing** 58:14
59:19 279:1
**manipulate**
285:8
**manner** 122:8
260:5

**manners** 269:13
275:14
**March** 129:20
263:13
**margin** 248:22
250:2
**mark** 58:12
59:18 61:22
69:12 75:6,9,9
81:6 110:20,25
126:22,24
134:21 138:25
226:24 283:23
**marked** 7:19
28:24 109:13
169:14 171:16
182:11 186:12
188:23 192:6
199:4 200:11
200:17 202:4
203:4 209:16
216:19 217:20
219:22 221:12
227:18 231:14
238:11 239:9
243:10 250:18
254:16 255:22
258:3 263:15
283:25
**market** 15:7
57:10,10 66:24
114:15 117:2
160:10 245:22
**marketed**
246:25
**marketer**
112:17 160:8
**marketing** 27:11
27:16,24,25
30:1,21,25
33:19,24 36:16
39:4,6,14
49:10 50:20
51:21,21 52:17
52:19,21 57:12
60:21 67:1,5

UNSEALED

73:20 74:20
77:14 103:5
114:13,16,19
136:4,23
150:24 151:6
151:11,13,18
151:21 152:3
165:23 166:4
177:24 178:20
178:20 179:11
179:20 204:24
229:24 237:20
245:4 247:1
287:5
**marketplace**
89:9
**Marshall** 227:4
**master** 31:23
32:6,10 41:8
138:7 150:1,5
152:11 159:19
160:5 177:8,11
180:19,20
234:13 242:2
242:15
**match** 140:1
**material** 114:22
165:24 222:13
277:3
**math** 64:3
**Matt** 9:3,6 192:7
303:8
**Matt's** 192:13
**matter** 8:5
114:18,19
116:25 190:4
216:5
**MATTHEW** 3:3
3:9
**matthew.haws...**
3:12
**maximum** 83:1
**McCracken**
2:13,18
**McInerney**
226:17

**McQuien** 183:4
183:6,7
**mean** 10:24 11:2
15:14 23:8
28:5,19 29:18
36:25 37:17,22
38:5 39:12
45:18 47:5
49:5,23 51:16
53:22 62:20
65:4 76:25
77:4,8 81:24
86:12,22 87:7
90:2 97:4 98:4
98:5,20 102:9
102:17,22
103:3 113:1
114:20 115:3,8
115:12 117:21
120:20 121:23
123:1 124:10
127:12,15,23
128:13 129:13
145:18 150:10
150:20 151:20
154:12,24
158:16 175:21
179:7,18
180:25 187:7
191:14 194:6
195:3,7 203:18
203:20 204:16
205:9,16
212:10 215:18
215:20 217:16
223:20,23
224:3 226:7
228:19 232:4
232:25 233:17
236:3 237:9
241:16,17
242:14,15
246:4 247:5,24
248:16 256:1
258:10 260:4,9
260:20 262:1

265:2,13 266:7
277:8 280:25
285:9 288:17
295:19 299:11
300:20,21
**meaning** 80:17
140:21 144:24
230:1 261:20
301:11
**means** 23:25
42:20,23 62:18
89:16 157:17
167:14 168:17
182:16 202:6
215:7 246:11
296:23
**meant** 73:10
75:9 79:24
163:9,9 228:20
267:24
**mechanics** 275:4
**mechanism**
220:15 259:21
**medication** 12:3
**meet** 9:16 100:3
129:15 164:15
**meeting** 95:17
97:16,23,25
98:19 99:1
112:8 130:7
133:15,19
215:24 216:1,3
252:13 253:8,9
253:10
**meetings** 75:1
98:7,16 129:1
**member** 58:14
59:19 69:17
**members** 98:12
130:22 165:17
212:12,17
213:9 225:12
226:2
**memory** 200:19
**mention** 68:5
**mentioned** 52:4

81:23 95:3
104:10 108:17
125:8 130:9
141:20 143:2,7
152:15 173:7
183:9 184:24
191:16 218:10
228:6 255:13
289:17
**mentioning**
246:18
**mere** 118:1
302:12
**mess** 28:15
**messaging**
258:13
**met** 98:1 111:1
121:16,19
126:22 129:16
130:19,21
173:24 175:21
**metadata**
109:18,19
**metric** 115:3
**Michelle** 129:10
133:15 157:8
164:5 165:17
181:13 199:13
199:14 204:18
204:24 237:13
241:12 242:8,9
247:15 280:21
287:1,3
**mid** 35:11
**middle** 199:14
235:21 236:14
244:7 264:9
**Mike** 24:13
**million** 23:11
89:19,22 147:1
170:6 196:16
196:17 198:1
198:10 229:16
229:18,19
244:5 249:6,12
249:15 264:6

264:21 267:19
267:20,21
268:25 269:2,5
269:5,6,6
270:2,11,25
288:3,14
289:24 292:16
292:22,25
293:3,10,11,14
295:5,10,10,15
295:17 297:3,4
297:13 298:2,4
298:6,7,9,23
299:8,24,24,25
**mind** 27:14
38:23 63:8
92:14 107:3
131:3 246:21
260:13 269:25
294:25 303:10
**mingled** 280:13
**minimal** 238:23
241:5
**minimize** 229:23
231:6,8
**minimizing**
242:4,19
**minimum** 48:4
142:18
**Minneapolis**
211:8
**minority-owned**
219:4 227:9
**minute** 29:1
32:17 78:16
110:2 182:18
190:18 193:14
200:12 203:5
219:25 223:24
231:17 251:1
254:17 292:19
300:8
**minutes** 38:24
238:5
**Mirarchi** 2:7
8:18

UNSEALED

mischaracteri...
87:10
mischaracteri...
188:11 278:2
misheard 113:9
misleading
232:3
misquoting
234:3
misstate 233:15
misstates 59:8
69:1 82:3,8
123:21,25
163:4 277:1
misstating
139:12 233:12
mistaken 195:12
misunderstood
256:20
Mobi 6:6,21
Mobiloans
148:11 149:18
151:12 152:19
153:11,11,23
154:23,24
155:6 159:5
162:25 163:19
164:5,19
167:20 206:23
212:14 213:3
227:4,6 235:15
236:3 292:4
293:7,25
298:13
mode 28:13
300:5
model 7:4
247:22 257:17
262:12,14,17
263:4 267:15
267:15 286:1
286:14 288:6
288:22 289:17
models 86:20,23
267:5
moment 130:10

136:22 199:5
Monday 43:13
44:17
money 23:17
25:7 42:21
43:21 54:17
62:1,1,4,11,15
66:20 71:4
72:3 90:22
143:9,11,20,23
145:25 147:7
149:9 150:14
159:7 164:22
171:25 172:15
172:24 174:23
174:25 176:3,9
176:10,11
178:12,13,13
179:1,2,2,4
185:10,18
193:6,6,21,23
194:3,3 195:2
195:16,17
196:14 197:3,8
198:1,2,10
223:17 245:22
246:7 249:20
250:8 256:14
256:14 257:10
272:17 273:17
293:7,8,15,18
293:22,23
297:20 299:21
monies 197:2
monitor 144:13
144:16 145:14
167:11
monitoring
167:10
Monroe 3:10
Montana 213:2
226:20
Montgomery
2:13,18
month 65:24
66:7,10 71:15

78:23 81:17
84:19 86:16
98:22,23 143:8
178:14 179:8
252:4 282:23
282:24
month-end
179:9
monthly 7:8,20
80:4 99:1
143:6 144:17
145:15 177:22
182:5 251:18
251:23 252:3
282:16,17
284:10
months 41:21
71:22,23 72:1
93:9 95:12
114:23 131:11
237:24,24
238:15 240:15
271:8 285:21
Montreal
210:10,13,23
210:24 211:5
Montreal's
210:16
Mopac 307:11
morning 9:15
123:15 222:7
mortgage 14:20
15:14,20 16:16
16:23 18:5,6,7
18:24 20:1
45:6 46:15
56:6
mortgages 14:10
18:2,4,24
56:11
motel 155:25
mouse 287:15
move 19:7 66:2
94:23 117:19
143:11 150:13
197:3 202:3

203:2 216:17
254:14 255:3
257:10 267:20
269:5 270:3,22
290:19
moved 143:10
269:16 271:25
272:2,4,6
275:20 280:1
280:18
moving 143:19
149:2 181:11
255:21 268:8
msheldon@go...
3:6
Muchin 3:9
multiple 17:3
130:5 150:6
217:17 221:3
247:25 252:9
258:11
mutual 225:24
245:22

N

N 2:1 3:1 4:1 8:1
naked 143:25
name 21:14
24:14 25:21
26:4 32:13
33:3 35:14
50:12 51:20
52:18 53:16
69:14 110:25
111:14 112:16
112:18 121:25
122:1 131:10
131:12,17,20
155:23 159:5
172:13 226:17
227:5 263:18
named 13:16
58:12 69:4,8
110:20 121:10
133:4 202:14
names 135:12

National 3:13
9:9
native 6:4 202:8
301:12,22
Natively 284:25
nature 54:23
141:2 142:25
281:2
Neal 135:1
near 21:25
293:8
necessarily 17:8
113:25 115:12
115:20 174:6
181:7 224:10
232:15,25
240:10 243:24
255:12 265:25
279:15 289:18
necessary
166:22 230:16
230:16 280:16
need 9:24 11:8
11:20 17:8
18:17,18,22
47:18,22,23
50:17 52:2,2
56:17 67:15
77:5 105:16
106:3 119:22
125:10 141:8
179:21 188:18
189:14 198:12
205:4 217:25
225:2,4 230:1
235:3 238:2
250:25 255:14
263:25 264:19
286:4
needed 89:4
96:23 104:12
140:22 227:11
242:22 270:14
needs 186:1
204:4 272:17
negative 66:4,6

UNSEALED

66:20 71:20
72:2 81:20
**negotiated** 55:4
134:10 154:16
154:21
**negotiating**
134:14,18,25
154:15,19
**negotiations**
26:19 123:8
154:8 155:5
184:9
**neighbors** 212:3
**neither** 306:23
**nervous** 143:16
158:19 241:24
**Ness** 3:15
**net** 65:9 71:14
71:16 143:8
178:1 249:6
264:5,21 268:3
269:9,17,19
270:12,12,12
270:13,15
288:14 290:9
290:12,12
291:8 297:4,10
297:13 298:9
299:1,2,11,24
300:3
**netted** 177:21
180:1
**netting** 179:16
180:2
**network** 156:21
**never** 18:4 22:3
37:13,23 38:1
53:17 85:18
87:24 91:6
93:17 108:14
111:1 120:23
121:16,18
126:21 128:7
174:11 175:21
178:4,10
206:15 260:4

260:12
**new** 3:4 50:19
50:19 52:24
60:11,11,12
61:5,7 83:25
88:19 92:11
95:2,9,21 97:5
97:11 98:3,3
104:2,9 105:7
114:24,25
115:5,7,15,17
115:19 117:3,3
139:7 141:11
157:12 200:21
228:9,14,18
229:3,6,24
230:2,3 238:17
238:22,25
239:1 240:16
241:1,9 244:23
245:7,9 255:3
259:5 261:6
265:16,18,18
266:11,12
271:14 272:16
298:15
**Nguyen** 129:10
157:8 181:13
199:13 204:18
237:13 241:12
247:15
**nice** 9:15 245:3
245:14 257:9
262:20
**no-state** 211:11
211:15,21
213:15
**nod** 10:25
**nods** 11:1,7
**noncash** 264:23
**nonprime** 56:8
**nonTCAS**
146:24
**nonverbal** 10:23
**normal** 66:5
80:3 95:18

144:7
**north** 48:20,22
49:7 50:7
62:13 81:24
85:14 87:15
307:11
**note** 29:10
**noted** 305:6
**notice** 120:13
160:10 188:1
233:21 242:18
**noticed** 225:9
226:1
**notification**
240:20
**November** 94:22
96:2 102:4
190:24 209:20
253:8
**number** 5:2 6:2
7:2 70:14
73:14 89:18,19
224:14 289:23
290:1,6,8
294:5
**numbered** 1:18
75:23
**numbering** 76:2
76:2,6
**numbers** 72:23
75:14,15
251:11 285:19
286:9,10,22,23
294:14 295:21
301:6
**numerous** 75:2
108:12 267:3
278:13
**NW** 3:4,15

---

# O

**O** 8:1
**object** 14:7,22
15:9,17 16:5
16:13,14,25
17:20 18:10

19:24 20:3
22:24 25:8
26:11 28:11
29:20,24 30:4
30:7,14 31:16
31:19 32:16
33:7,8,20 34:9
34:16 37:18
41:7,25 43:2
43:23 47:9
48:11,16,23
49:13 50:23
51:1 52:12
53:10 54:18
58:4 59:7
61:12 68:10,21
68:25 69:25
70:5 71:7,11
73:16 74:9,23
77:16 79:4,22
82:2,7 83:4
84:10 86:9
87:4,9 88:14
90:5,6 92:13
93:12 94:11
96:15 97:2
99:15,18,24
100:4,20 101:4
102:12,15
103:12 104:24
104:25 107:18
107:19 110:13
110:22 112:2
113:17,24
115:2 116:17
117:4 119:11
121:3 122:17
122:23 123:6
123:20 124:22
127:9,24
128:14 133:2
135:6,21,22
136:16 137:14
137:20 138:20
138:21 139:10
139:20 140:12

140:13 141:19
142:6,7 144:19
145:23 146:13
146:17 147:21
149:24 151:4
153:2,13
154:10 163:3
163:21 164:8
165:19 166:1
167:23,24
169:22 170:8
172:25 178:6
180:15 184:1
184:22 187:11
188:10 191:13
194:8,9,21
201:1,21 207:1
207:2 209:25
212:5,6 220:9
220:23,24
221:24 222:11
222:19,20
223:14 224:7,8
224:25 229:11
230:13,14,17
231:23 232:14
233:24 234:18
236:7,11 247:3
260:1,11 261:9
265:9 274:22
275:10 276:25
277:22 278:1
279:25
**objection** 10:16
33:22 88:13
90:15 93:1
101:3,15
146:16 161:6
205:11 214:5
221:25 232:2
233:11 234:2
239:25 268:21
274:21
**objections** 10:3
10:4,7,12
**obligation** 143:1

UNSEALED

145:3,13 147:5
147:11
**obligations**
136:14 138:16
138:18 166:6
**obtain** 209:12
**obviously** 81:24
214:6
**occasion** 172:15
**occasional**
206:10
**Occasionally**
100:2
**occasions** 205:6
206:2,6
**occurs** 43:20
**October** 7:6
37:11 50:18,25
52:5 94:21
102:4 237:25
238:16 257:15
271:9
**ODFI** 210:14,19
**ODFIs** 224:16
225:2,4
**offer** 14:10,12
49:17 105:10
106:17 247:13
250:4
**offered** 82:12
84:17 114:16
118:6 119:9,17
209:4 248:8
**offering** 23:13
83:16 92:18
107:8 124:25
125:6 126:23
156:13,16
236:5
**office** 8:19
157:24
**officer** 12:19
21:21 183:8
275:12 281:13
281:18 306:14
**official** 10:20

107:1
**officially** 53:1
113:10
**offline** 189:16
**offload** 125:20
**offsite** 94:21
**oh** 31:10 38:25
40:14 75:12
98:17 124:7
180:7 182:19
193:15 195:11
205:25 238:7
251:25 287:14
**okay** 9:23 10:19
11:22 12:8,14
12:17 13:5,15
13:24 14:15
15:3 18:6
19:11 25:4,13
26:3,7 28:8
30:11 31:13,22
34:21 38:17
39:23 40:19,20
42:14 45:12
48:3,8 49:4,8
49:25 52:2
53:6 58:20,22
61:4 67:14
69:18 71:2
72:6,11,21
73:7 74:19
75:18 76:6,7
77:10 78:7,25
82:18 84:3
91:15 99:7
110:6,9 111:3
112:21 113:14
119:1,19
120:25 121:14
122:3,14,21
123:14 128:20
129:21 132:20
133:14,17
134:17,24
138:10 146:11
155:20 161:15

161:16 162:16
165:7 166:23
168:8,22
169:16,18
170:13,23
171:4,8,13,18
172:4,23
176:21 180:7
182:9,17,18,23
183:19 184:3
184:16 186:6
186:14 189:3
192:17 193:9
193:19 195:11
195:13 196:7
199:11,21
200:19 201:15
202:2,10,12,13
202:19,21
203:2,9 205:25
209:3,18
210:25 211:14
213:1 216:17
218:9 219:18
219:20 220:4
221:14 222:25
224:23 227:16
227:20,25
228:22 231:19
234:16 235:23
236:17 237:7
238:13 239:6
239:11,13
243:6 244:18
250:24 251:13
253:2 254:13
254:20 256:6
256:12 257:7
257:23 258:5
259:23 260:8
263:12,24
264:2,11 266:1
269:24 271:4
274:10 275:3
278:5,9 283:22
284:13,22

285:5,7,10,14
285:18 286:7
286:18,21
287:9,21 289:9
290:18,21,23
291:4,12,19
293:6,13,21
294:2 295:4,14
295:19 296:7
300:7,25
301:12
**Okeydoke**
209:15
**Oklahoma**
213:3
**old** 92:10 273:25
**on-site** 133:16
**once** 60:8,10
93:7 98:1
135:4,5,7,8,18
200:15 238:5
302:10
**once-a-month**
103:23
**one's** 246:22
**ones** 77:14
112:11 219:19
**Ongoing** 5:3
**online** 49:23
50:8 95:24
96:3 104:11
126:19,23
127:2,7 129:24
130:2,11 131:8
132:9,15,17,25
133:5 135:2
157:11 207:7
**onsite** 164:14
**open** 101:9
288:24
**open-ended**
87:11
**opened** 271:1
**opening** 288:10
289:4,6
**operate** 14:5

15:25
**operated** 260:4
**operating**
225:23 247:21
248:21 250:2
262:2
**operation**
129:25 130:2
130:11,21
132:7,14,18
135:3 172:20
210:2 218:10
218:15 223:7
226:22 228:5
230:24 231:3
241:17 261:18
261:22 262:6,9
262:13 271:16
299:18
**operational**
167:14
**operations**
28:10 129:8
132:2 158:17
158:23 279:1
300:4
**opinion** 100:17
170:17 210:3
241:21 261:12
**opinions** 101:1
**opportunities**
95:21 98:4
104:9
**opportunity**
22:8
**opposed** 10:6
28:14 41:15
175:16
**opposing** 190:6
**option** 102:11
104:22
**options** 260:19
260:21
**oral** 1:9 215:9
306:15
**order** 31:4 75:23

UNSEALED

80:17 190:4
254:1
**organization**
110:20 261:20
**organizations**
100:12
**organized**
285:18
**original** 23:18
24:12 30:17
32:2 41:16
87:16 89:18
111:21,21,23
138:19 141:15
193:20 194:15
196:16,23
265:23 274:12
275:18,19
300:16,19
**originally** 41:21
54:8 182:21
184:9 264:22
266:24 267:1
267:14,18
269:17
**originate** 16:4
42:8,12 52:1
57:14 62:6
64:13 67:12
88:19 94:17
95:15 106:19
107:12 108:15
109:7 114:4
126:11 159:7
159:18 160:4
160:15 162:3
168:4 185:18
198:12 211:10
211:20 225:4
232:17,23
233:1
**originated** 32:12
33:2 44:16
48:19 92:4
114:2 159:4
162:1,14

163:12 232:9
241:3,5
**originating** 46:6
46:19 55:16
93:18,25 94:9
104:7 105:17
107:4 116:4,6
117:7 124:3,7
124:20 125:7
125:25 128:8
128:17 136:3
148:12 153:22
153:23 163:8
165:4 166:7
167:2 204:6,23
211:19 212:11
227:13 230:2
237:21 257:18
**origination**
16:21 97:8
205:1,3,5
238:22 244:25
245:9
**originations** 5:4
57:18 84:24
93:11 102:8
134:3 161:22
168:3 184:19
185:3 197:9
233:10 238:17
238:25 241:9
243:4 244:23
244:24
**originator** 27:6
27:10 57:4
85:12 105:20
114:17 116:7
124:13 125:11
**originators**
106:14 279:3
**Otoe-Missouria**
101:25 110:11
110:16 112:11
113:15 124:18
126:14,22
127:14 128:22

134:15,17,20
136:1 153:20
185:14 212:13
226:23
**out-of-pocket**
64:9
**outcome** 232:24
307:2
**outline** 219:7
**outlined** 180:19
236:12 261:11
**outreach** 224:19
225:11
**outright** 19:15
**outside** 116:18
122:7 126:18
135:10 155:8
155:13 158:3
161:9,15
163:19 181:18
183:10 184:14
189:16 193:16
194:24 200:23
201:9 214:11
214:23 216:10
237:17
**outsourced**
167:11
**outstanding**
227:15 237:18
**overall** 150:10
182:8 185:8
268:7,12 277:3
**overly** 63:22
**overnight** 43:12
44:17
**overseeing**
51:14
**overview** 7:11
7:15 77:13
219:10
**owe** 175:12
177:23,24
**owed** 143:23
177:19,19
201:19

**owned** 19:19
28:4,5 53:17
140:5
**owner** 230:22
**ownership** 24:6
28:9 41:5,6
62:3 146:2

_____
**P**
**P** 2:1,1 3:1,1,8
8:1
**P-102** 28:23
**P-127** 120:10
**P-244** 169:13
**P-251** 200:10
**P-258** 221:10
**P-271** 283:23
**P-3** 75:12 76:1
**P&L** 63:16
65:10 66:3
71:14 81:18
291:6,7 294:19
295:9 302:4
**P&Ls** 295:25
**p.m** 1:19 168:25
169:1,1,3
189:18,19,19
189:21 192:19
192:20,20,22
214:17,18,18
214:20 243:9
243:11,11,13
282:7,8,8,10
303:17,18
**Pacific** 13:17
**pack** 252:19
**package** 7:8,21
252:5 282:16
284:18 302:3
**page** 4:1 5:2 6:2
7:2 29:7 32:11
39:2,21 76:3
78:20 176:15
190:23 200:21
250:20 264:10
284:19 285:2

304:6 306:21
**pages** 29:8,11
31:4,7 284:19
**paid** 60:23 70:21
70:23 81:2
86:3 116:2
138:6 153:9,11
153:11,15
178:5,13
181:25 182:3,4
182:5,5 195:10
249:14 273:19
292:14
**paper** 283:12
**par** 65:22
**paragraph**
32:17 39:17
**pardon** 44:13
61:23 189:13
196:8 298:17
**parent** 74:15
138:4 143:12
146:25 147:8
147:13 265:17
**parentheses**
80:17
**Park** 3:7 9:6
62:20 75:22
86:16,21 88:11
89:12,20 90:12
90:17 91:12
92:11,24 93:7
103:20,22
104:2,22 106:4
106:23 107:14
108:4 109:4
138:17 139:9
139:24 140:6
140:11,21
141:3,16,24
142:3 143:14
146:1 182:16
183:2 185:19
203:17,22
205:19 206:4
214:9 216:15

UNSEALED

| | | | | |
|---|---|---|---|---|
| 220:21 229:9 | 149:10,13 | 128:10 260:16 | **payday** 21:14,14 | **per-loan** 60:23 |
| 233:21 243:19 | 152:6,12 153:4 | **parties** 58:18 | 22:18,19,19 | 61:2 |
| 251:23 253:4 | 154:11,12 | 120:14 160:1 | 23:2,12 24:18 | **percent** 32:13 |
| 254:3,25 | 159:20 160:6 | 277:19 306:25 | 24:19 25:17,18 | 33:4,10 34:13 |
| 273:13,21 | 160:17 161:23 | **partner** 102:25 | 26:4 27:12 | 34:17 36:3,8 |
| 282:17 284:5 | 165:5 177:8,12 | 103:1,1,3,6,10 | 30:12 31:14 | 41:5,5,6,13,14 |
| 301:17,21 | 180:19,21 | 112:9 123:16 | 33:19,25 34:6 | 41:17,17,18,21 |
| **part** 31:25 60:15 | 181:8 220:14 | **partnered** 49:20 | 34:10 54:10,11 | 41:22 42:9,12 |
| 64:4 77:19 | 232:6 233:22 | 95:5 113:11,12 | 54:11 69:21 | 42:13 44:5,6,6 |
| 79:16 83:17 | 234:1,14 241:5 | 133:4 156:11 | 92:1 118:4,6 | 44:13,14,14,25 |
| 88:2 109:3 | 242:3,16 | 211:10 267:5 | 140:23 143:12 | 45:4,9 46:20 |
| 115:25 141:20 | **participations** | **partnering** 50:8 | 274:12 275:19 | 46:20 47:6 |
| 144:3 145:2 | 36:7,8 46:17 | 103:14 110:16 | 298:13,15 | 48:1,1,6,7,10 |
| 148:23,25 | 47:1 53:25 | 111:11 112:19 | 299:3 | 48:20 49:7 |
| 154:8,9 155:21 | 54:7 57:1,9 | 126:24 157:2 | **paying** 23:25,25 | 50:7 53:24 |
| 156:7 159:11 | 62:5 63:10,18 | **partners** 22:16 | 64:14 71:5 | 54:8,8,20 56:9 |
| 159:19 160:2,5 | 80:9 91:7 | 49:21 102:9 | 72:3 90:3 | 57:6,15 62:6,7 |
| 177:22 202:15 | 104:4 105:20 | 164:15 | 177:13,14 | 62:14 63:17,19 |
| 215:16 224:4 | 106:7,16 | **partnership** | 195:14,19,20 | 63:19 64:7,8 |
| 229:15 245:12 | 107:10 109:5 | 92:16 | 195:21 197:11 | 64:17,22,24,25 |
| 245:17 252:15 | 111:10 144:24 | **parts** 287:7 | 246:14 293:2,4 | 65:2,3,19,19 |
| 256:16 266:10 | 150:5 159:22 | **party** 19:15 57:8 | 293:10 | 71:25 73:5 |
| 269:1 281:9 | 160:7 220:17 | 84:11 125:11 | **payment** 71:18 | 80:9,13 81:5,7 |
| 288:5 289:2 | 231:1 234:10 | 306:19 | 79:5 148:17 | 82:1,14,25 |
| 290:20 302:3 | 237:1,16 | **pass** 242:5 | 209:23 | 83:1 85:15,19 |
| 302:16 | 240:22 241:20 | **passed** 242:6,7 | **payments** 19:22 | 87:15,21,25 |
| **participate** 91:4 | 242:20 243:3 | **Patch** 135:11 | 148:18 201:18 | 90:2,3 91:9,11 |
| 124:14 248:4 | **particular** 44:2 | **patience** 282:12 | 220:16 224:3 | 124:14,15 |
| **participating** | 45:19 52:18 | **Patrick** 3:14 9:8 | **payroll** 272:8 | 125:18 138:8 |
| 76:10 124:24 | 69:11 81:17 | 303:3 | **PC** 2:4 | 138:14,14 |
| **participation** | 83:6 85:20 | **Patton** 213:14 | **PDO** 91:23 | 148:14,18 |
| 19:14 20:6 | 97:16,23,25 | 213:19 | **pending** 11:24 | 149:2,10,15 |
| 31:23 32:6,10 | 108:19 131:16 | **Paul** 135:10,13 | **Pennsylvania** | 152:16,19 |
| 32:14 33:5,10 | 145:5 150:22 | 183:9 192:10 | 1:1,2 2:3,5,9 | 154:2 159:18 |
| 34:17 39:8,10 | 160:22 204:4 | **pay** 47:12 54:16 | 2:14,19 8:6,9 | 160:15,16,16 |
| 39:22 40:9,11 | 204:11,12,15 | 57:3,3,12 | 8:17 208:1 | 161:21 162:6 |
| 41:9,18 43:19 | 206:25 212:9 | 64:19 66:1 | 306:1,2 | 165:5 166:8 |
| 43:22 44:25 | 217:18 224:14 | 80:10,11 90:2 | **people** 55:16 | 170:19 176:11 |
| 46:23 48:2,7 | 227:4 255:6 | 145:8,9,9 | 61:25 62:21 | 176:16,18 |
| 57:6 71:25 | 262:5 267:11 | 147:18 152:8 | 99:25 129:15 | 177:13,14 |
| 72:25 73:25 | 276:1 286:2 | 178:10,12 | 130:19 164:6 | 178:18,23,24 |
| 74:4 91:9,12 | 291:13,21 | 179:12 195:4 | 183:1 210:5 | 179:22 193:11 |
| 92:9 93:8 | 292:15 296:12 | 197:16 246:6,9 | 216:6,10 | 193:21,22 |
| 108:5 123:19 | 297:9 299:22 | 248:14 257:22 | 235:11,25 | 195:9,16,17,20 |
| 125:21 137:7 | 299:22 | 273:13,22 | 236:5 279:8,23 | 195:21,22 |
| 138:8 148:15 | **particularly** | 300:5 | 284:8 | 196:1,2,3 |

UNSEALED

App. 0275

197:12,18
210:6 212:3
229:17,25
245:15,20
246:1 248:9,21
249:16,17,17
250:2,6,6,6,7
257:7 273:15
293:5 295:7,16
296:23 298:8
**percent-type**
56:12
**percent/99**
178:18
**percentage** 41:3
47:6,14 91:11
152:23
**percentages**
96:17 299:12
**performance**
98:2 100:3
103:24 139:2
**performing** 61:7
100:9,10
**period** 12:23
26:8 29:18
33:18 34:14
49:9 50:16
69:19 70:11
84:18,23 85:2
85:13 86:17
99:12 103:10
103:20 104:22
112:1 126:15
129:2 135:20
209:21 210:12
210:21 220:5
220:20 227:22
228:8 239:15
243:17 245:1
249:12 250:16
259:25 273:10
297:16
**periodic** 288:20
**periods** 84:13
**permission**

140:11
**Perot** 227:4,6
**person** 59:21
132:5 203:22
**personally**
100:16 123:4,7
155:21
**perspective** 17:4
17:22 20:4
35:3 37:2 42:2
44:8 45:1,16
55:18 56:7
59:13 64:4
70:17 78:2
79:24 81:3,18
85:4,18 90:25
95:1 99:9
100:5 105:11
108:13,13,24
109:8 113:2
115:19 117:6
117:21 118:16
124:10,23
127:18 128:7
135:24 138:23
144:20 146:21
159:13,16
160:14 162:19
164:10 165:3
165:10 167:1
173:25 174:4
175:20,25
182:7 184:23
185:8 186:7
188:4 196:11
203:23 212:24
236:22 241:10
246:10 247:4,9
247:12,24,25
248:17,25
259:7 260:3
261:19 266:5
266:20 268:24
269:15 273:2
275:16 276:13
280:6 281:12

281:15,17
296:14 298:2
**perspectives**
225:6
**pertaining**
141:16
**PG** 5:20 6:6
199:15 200:1
**PGL** 5:18 193:7
**Philadelphia** 2:5
2:9,14,19
**phone** 2:6,10,15
2:20 3:5,11,17
180:23 181:2,3
**phrase** 35:1
117:6 163:6
167:25 174:16
242:13 278:12
**picked** 10:23
11:1
**picking** 298:17
298:17
**pieces** 278:5
283:12
**pitch** 158:14
164:12
**pitched** 21:23
**pitches** 75:3
164:11
**pitching** 158:7
**place** 26:16,25
27:3,8 35:20
101:14 108:10
117:1 123:18
125:3 146:7
162:24 273:5
**Plain** 5:5 134:11
134:24 136:21
136:24 137:5,8
138:7 141:16
148:3,4,8,9,19
148:20 149:3,8
149:12 152:16
153:11,21
154:19,22
155:17,19

168:11,12
169:7,20,25
170:1,7 171:5
171:11 172:2,8
172:18 173:4,5
173:5,11,15,16
173:19,20
174:10 175:5,8
175:10,18,19
176:1,4 179:10
180:17 181:4
181:12 184:6,9
184:13,25
185:9,11,22,25
188:3 190:25
191:4,8,9,18
191:19,20
193:22 195:18
196:15 197:3,4
200:5 206:22
212:13 213:1
226:14,22
246:25 292:1
293:24
**Plains** 5:3
111:16,24
112:13 148:10
149:17 152:24
153:5,9,15,18
153:25 154:5
168:9 206:22
206:23 212:14
213:2 284:4,4
292:1 293:24
**plaintiff** 1:4,17
75:20 306:4
**Plaintiff's**
109:11 263:13
**platform** 27:20
36:13 44:22
51:24 53:1
116:15,15
136:6 137:3
253:14,21
261:14,16
262:21 266:10

270:14 274:6,8
274:11,12,13
274:16,20
275:2,5,7,18
276:4,9 277:4
277:8 278:20
279:5,12,13,14
**platforms** 276:1
**play** 46:1 186:24
289:19 299:11
**played** 290:5
299:15
**playing** 123:16
**plea** 98:9
**please** 8:14
11:11 17:13
28:13,15 48:25
118:15 161:9
161:13 166:13
166:20 192:15
215:8 221:16
234:11 264:1
302:24 304:5
**plenty** 10:12
**plug** 229:10
230:7
**pod@vnf.com**
3:17
**point** 12:17
21:25 23:13
27:15 30:22
32:11 33:23
36:17 43:16,19
46:5,7,8,16
50:3,10 51:3
52:3 54:1,5,9
55:1,7 56:14
56:15,20 57:20
62:18 63:12
88:10 89:4,24
91:21 92:8,15
93:6 96:12
103:9 110:9
118:2 125:2
129:6 132:15
141:24 142:8

UNSEALED

App. 0276

145:12 155:12
159:21,25
160:3,5,8
161:4,18
167:18 183:15
184:6,10
185:21 191:10
191:17 193:25
196:13 198:8
201:25 210:2
210:15 211:18
218:11,13,15
223:7 224:5
226:15 228:5
230:24 231:3
240:14,19,19
241:17 249:5
253:2,6 254:10
256:24 257:2
257:11 258:8
259:18 261:18
261:22 262:6,6
262:9,10,13
265:2 271:5
275:17 276:3,8
281:11 291:16
292:18,19
294:13,19
297:7
**Point's** 57:3
**pointing** 266:23
296:2
**points** 166:17
**Poisson** 211:5
**policies** 258:25
**policy** 65:12
**political** 212:22
**populated**
286:19
**portfolio** 57:7
82:16 113:22
119:10 221:6
227:14 230:25
245:3 272:24
279:2
**portfolios**

220:15
**portion** 41:23
**position** 13:2
266:21 268:12
269:9,20 297:9
**positive** 65:10
71:9,15,16
72:8
**possessed** 103:5
**possibility**
232:16 253:13
**possible** 46:2
102:21 151:7
191:7,10
283:11 289:15
**possibly** 254:25
**post-financial**
55:12,22
**post-spinoff**
286:5 287:2,4
288:2
**post-split** 286:5
**potential** 105:7
110:10 112:18
114:10 123:10
123:16 124:20
125:1 127:22
140:1 206:7,11
220:12 224:16
227:9 231:8
232:24 287:5,6
289:11
**potentially** 80:4
97:9,10 104:8
104:12 106:21
114:15 154:4
236:3 261:3,24
265:25
**power** 140:9
218:18
**practical** 21:5
42:22
**preapprovals**
236:20
**preapproved**
235:21 236:9

236:14,15
237:5,17
**preceded** 30:17
**precontract**
156:8
**predated** 137:13
**predates** 102:17
**predecessor**
21:18
**preference**
125:2 173:19
**prefinancial**
55:9
**prefix** 182:15
**preliminaries**
9:19
**premium** 46:17
47:1 64:15
90:1 197:14,17
**premiums**
143:18
**prep** 217:4
222:6
**prepaid** 96:6
**preparation**
77:22
**prepare** 77:12
77:21 83:6
85:22
**prepared** 69:12
69:12 79:8
86:6,12,22
**preparing** 10:22
77:17
**prepay** 245:24
**present** 3:19
98:21,23
300:15 302:5
**presentation**
78:3 82:24
83:18 112:8
157:9,14 158:2
164:23
**presentations**
75:1,3
**presented** 60:5

112:7 302:14
**presenting**
155:1
**president** 35:14
51:9
**pressure** 210:4
231:4 241:22
261:19 262:7
**pressuring**
218:18
**preTailwind**
29:19
**pretax** 298:7
**pretty** 17:18
46:6 99:10,12
130:4 156:5
158:10,18,25
162:7 179:20
196:18 219:2
238:23 244:10
245:2 254:10
272:5 280:16
289:7
**previous** 173:16
197:16 213:13
**previously** 52:6
120:9 125:23
135:24 148:24
168:2 200:24
214:22
**price** 248:8,8
249:25
**primarily** 16:15
56:6 78:4
109:2 253:21
267:8 273:20
**primary** 150:2
220:15 259:20
259:21
**prime** 45:6
**Primus** 35:13
50:12 51:8
60:6 93:21
225:13
**principal** 66:10
66:14

**Principals**
286:13
**print** 202:10
219:24
**prior** 14:25 23:1
23:19 26:17
27:8 41:15
53:23 55:4,7
102:18,20
130:14,14
132:17,18
133:1 173:22
186:15 190:9
196:9 200:3
208:20 211:14
241:2 274:10
288:22
**priority** 80:17
224:14
**private** 14:14
37:15 127:15
**privately** 127:15
**privilege** 189:15
**privileged**
189:25 190:9
207:4
**privy** 36:21
163:14 205:12
300:1
**pro** 267:16
**probably** 23:8
26:1 36:15
40:4,6,8 45:4
45:23 46:3,12
47:18 57:7
62:3 63:5,23
64:25 71:22,23
72:1 79:7 80:6
80:12 81:2
84:13 85:5,7
93:21 94:14
98:25 104:1
105:3,13 112:8
112:10 121:17
140:18 150:9
152:3,13

UNSEALED

153:24 154:3
160:23 166:17
167:13 176:17
179:5 180:23
181:3,12,16
188:4 197:7
215:21 223:4,5
224:14 225:22
226:11 229:18
232:24 233:18
241:11 245:6
246:11,12
248:17 253:7
257:5,15 259:1
259:8 262:14
276:17 280:20
281:11 287:2
288:23 289:7
290:8,12,24
295:16 297:23
298:11,19
299:1,16
**problem** 118:25
220:22 223:13
224:21 236:2
**problematic**
261:7
**problems**
218:10
**procedure** 1:24
9:20
**proceed** 9:25
**proceeding**
307:1
**proceedings** 4:4
295:22 296:1
301:13
**proceeds** 273:13
**process** 102:6
164:14 174:25
209:12 218:18
221:7 224:2
225:3,5 226:21
227:12,13
228:15 231:5
241:23

**processing**
206:14,18
209:23 210:14
211:2 219:15
221:7 223:8
262:4,24 263:1
**processor**
242:24
**processors**
206:13 209:23
224:16 225:5
225:25 226:25
227:12 231:4
241:23
**Procter** 3:4
**produce** 289:1
**produced** 1:16
6:4 190:1
202:8 258:1
289:12 300:14
300:18 301:7
301:10 302:19
302:19
**producing** 72:17
**product** 23:12
26:9,13,20
27:22 33:11,12
33:14,25 35:5
38:19 41:24
46:4 51:14
53:4 54:12
55:4 57:10
70:4 74:21
78:9 83:17
84:6,9 85:14
90:19 91:23
92:1,4,18,21
92:25 93:9,18
94:1,25 95:2,5
95:7 96:5,6,13
96:19,19 97:7
105:7 106:17
111:22 112:16
113:23 114:8,9
118:5 126:23
129:5 131:18

140:24 151:12
153:18 156:13
156:17 157:11
160:11 164:6
170:4 207:10
209:1,5 239:1
241:14 243:20
244:10,15
246:24 247:1
247:12 255:8,9
261:24 262:5
274:13,15
275:19,22,23
275:23 277:20
280:4,5 286:25
290:15,19
291:6,20,25
292:8,24 293:9
293:13,22
295:9,24 296:3
296:16 298:15
298:16 299:3
299:22 302:4
**production**
202:9,23
217:18 225:10
226:2 283:8
284:4,5 285:7
**products** 14:16
34:4 49:5,10
49:18 55:3
56:12 84:20
87:18 91:22
95:9,15,21
96:7,9 97:5,11
98:2,3 104:20
114:7,8 133:5
153:8 196:20
208:19 209:24
219:10 238:18
242:10 248:6
248:12,18,22
250:3 274:17
275:1,25
277:10 280:12
280:17 291:15

293:19,22,23
294:16,18
297:8 299:4
**profit** 46:12
47:2 64:15
152:14 153:4
153:15,25
154:5 197:22
249:14 290:14
293:2,10
**profit-sharing**
292:14
**profitability**
63:9 291:14
296:25
**profitable** 245:2
248:17 249:23
**profits** 295:6
296:19 298:12
298:19
**program** 35:20
37:3,6 45:21
45:24 47:11,14
47:25 50:5,6,9
51:6,12 52:16
70:20 71:5
72:16 75:6
77:20 78:1
79:15 85:8
90:13 108:2,18
120:10 131:16
133:22 170:11
170:22 176:25
177:9,18 181:6
181:18 195:5
227:1 228:10
230:12 237:20
267:8 298:20
298:25 299:17
**program-relat...**
177:1,3 180:12
**programming**
181:22
**programs** 84:21
171:2 187:22
248:3 267:12

270:17,18
271:24 296:22
299:10
**progression**
248:8 249:25
**project** 202:16
252:20,24,25
**projecting** 87:2
**projects** 238:18
**promise** 64:19
198:4
**pronounce**
227:5
**pronouncing**
35:13
**properly** 77:25
149:9
**proposal** 196:24
**proposed** 60:16
61:16,16,20
64:2 121:1,5,5
197:20 254:17
263:10 289:16
**proprietary**
274:1
**protect** 185:2
246:5
**Protection** 2:8
**protective** 190:4
**protocol** 239:22
251:19
**proud** 277:21
**proven** 218:17
**provide** 27:16
36:12 53:2
88:24 106:18
108:4 117:10
117:22 133:5
142:13 159:7
161:9 166:4
167:10,15
174:15 210:4
235:23 236:24
242:23 244:16
262:7 273:17
302:22

UNSEALED

**provided** 52:6
89:20 114:3
123:9 136:4,5
159:3 168:3
170:6 185:15
213:18 235:17
240:20 261:14
267:14 276:4
284:25
**provider** 27:5
84:15 85:10
92:3 101:17
102:2 103:2,3
105:18 108:7
114:8 115:16
117:9 126:21
150:23 157:12
165:25 221:3
247:22 248:5
248:20 250:3
253:20 261:14
266:10
**providers** 49:12
92:6 107:16
206:6,7,11
220:7,13 226:4
261:21,24
**providing** 19:21
30:21 54:6,10
63:13 68:6
73:13 74:22
84:14 89:8
97:7 105:12
106:6 107:9
109:3 111:11
113:3 115:8
132:19 139:24
144:10 173:18
195:16,17
226:4 233:21
**provisions** 1:24
**public** 21:25
22:1,2,5 37:21
259:15,18,24
260:4,24 261:4
261:4,8 263:5

288:18,18
289:1
**publicly** 300:16
**pulled** 300:23
**pulling** 229:10
230:7
**purchase** 36:7
53:24 54:7
56:25 57:9
105:20 106:6
145:20,20
159:22 160:7
234:9 237:22
**purchased** 34:17
144:24 231:1
242:20
**purchaser** 111:9
**purchases** 234:1
**purchasing**
19:17 63:10
104:4 107:10
185:17 236:25
237:16 240:21
243:2 277:16
**purely** 258:1
**purpose** 18:8,9
18:25 19:2,9
19:20,22 20:4
20:11,21 21:7
79:13 81:14
111:6 137:8
170:15,16
171:23,24
172:23 221:5
**purposes** 63:2
125:24 143:13
161:21 163:8
190:6 204:19
**pursuant** 1:23
138:7 190:3
**pursue** 103:10
**push** 186:18
**put** 5:15,24
28:19 42:25
58:3 62:1,4
63:24 66:20

69:13 76:20,21
77:5 81:21
87:6 89:11,23
90:21 92:11
99:10 145:25
147:7 161:5
189:6,7,9,10
190:17,18,20
194:6 197:25
198:17 201:15
201:22,25
217:9 219:6,9
230:22 231:22
233:22 273:4
283:3,11 285:6
301:16
**putting** 59:3
66:8 122:9
197:19 210:3
231:4 261:19

---

**Q**

**Q1** 145:6
**qualification**
14:13
**qualify** 50:1
**quality** 245:10
**quarter** 103:16
112:3 289:14
**quarterly** 128:4
**question** 10:2,8
10:9,15 11:11
11:13,14,15,24
14:23 15:18
17:21 18:11,12
19:1,3,7 22:25
24:25 25:9
26:12 27:1
28:16 30:8,15
32:24 33:12,21
38:9 42:3 43:3
43:24 47:17
51:17 58:7,22
59:11,24 69:2
70:6 71:12
74:24 76:8,9

77:10 82:11
84:2 86:4,5,19
87:12,16 93:15
97:3 98:11
99:10,19
104:16 109:4
113:1,7,9
115:25 116:21
116:23 117:5
117:15 118:22
119:4 123:15
124:1,2 128:15
128:24 131:4
135:7 138:22
139:15 140:7
158:19 163:5
163:22 164:1,9
165:20 166:2
166:25 172:11
178:7 182:24
187:12,13
188:12,13
190:15 199:6
199:23 205:20
205:21 208:3
208:12 209:7
209:10,13
218:5,5 224:9
225:17 229:12
233:7,14 234:4
234:5,18
239:21 242:13
244:21 247:6
252:16 255:5
255:11 256:16
260:2 261:10
265:13,14
266:4 270:9
275:15 277:24
280:20 286:7
287:24
**question-and-...**
28:12
**questioning**
238:6
**questions** 10:1

13:24 18:13,18
18:22 28:13,14
58:6 59:12
87:11 118:19
161:10 166:23
190:7 203:20
205:7,10 206:7
214:25 215:5
222:6 284:20
300:9 303:4,13
**quick** 78:16
182:18 219:25
231:17 238:6
**quicker** 196:22
**quickly** 201:16
229:16,22,24
230:4 297:24
**quite** 42:17
47:24 53:12,17
102:20 118:5
151:7 266:3
289:15
**quote** 24:10 62:1
212:22
**Qureshi** 258:18

---

**R**

**R** 1:20 2:1 3:1
8:1 306:10
307:9
**Raine** 3:20 8:11
**raise** 140:19
197:25 198:10
205:7 272:17
273:21
**raised** 23:17
194:24
**raising** 62:11
**Ramsey** 281:17
281:19
**ran** 130:3 135:3
**range** 29:12
54:19 138:14
138:15
**rapidly** 244:10
**rarely** 79:7

UNSEALED

**rate** 90:8 176:15
212:18 257:7
272:21 295:8
298:8
**rates** 54:23,24
55:10 56:11
81:23 82:13
**reached** 225:18
240:11
**reaching** 227:8
**read** 32:17,25
37:22 38:24
47:15 110:2
180:4 182:20
193:14 199:5
235:1 256:2
264:19 305:3,4
**reading** 40:15
217:13
**reads** 235:1
**real** 229:15
230:19,20,22
286:10
**realize** 87:8
166:13 224:18
**realized** 35:25
70:25 71:9
272:13
**reallocate**
196:19
**really** 23:18,25
26:18 28:7,9
47:22 56:5,7
56:10,17 63:2
65:6 66:11,24
67:11 73:10
83:6 90:17
91:5,5,6 93:2
94:16 100:13
104:3,18,19
106:17 108:7
111:16 114:18
114:18 116:19
116:22 123:1
125:18 128:7
130:10 140:4

141:1 142:10
142:12 143:16
147:15,16
149:20,21
154:7,12
157:22 162:19
179:2 182:2
204:17,19
205:16 211:21
213:8 229:14
243:22 248:18
256:1,25
257:16 258:16
261:11,19,23
262:18 267:1,6
275:14 276:23
280:25 283:6
287:23 290:5,5
**reappear** 225:16
**reason** 10:22
12:2 39:13
44:4 50:3,11
54:21 60:8
141:1,7 144:1
144:2 149:7
151:10 153:24
180:20 185:7
185:20 186:4
223:2 272:10
304:3,6
**reasonable**
55:10 77:18
82:16 96:18
144:25 151:7
249:18
**reasons** 113:14
196:21 206:15
241:8 259:5
263:9,10
306:22
**recall** 46:5,10
48:12 49:1,2
53:19 56:19
60:2 61:14
65:4 71:13,22
74:14,25 76:10

77:17,22 79:8
82:10 85:2,17
87:16 90:7,21
91:6 93:2
94:12 95:9
96:1,16 103:13
105:1,22
107:20,23
110:14 111:15
114:12 120:24
122:12,15,18
122:21 124:19
127:10,10
129:19 130:8
130:13 133:20
133:25 135:14
138:9,12,12
139:22 151:5
151:25 152:10
152:21 153:3
154:18,21,24
154:25 155:4,7
156:10 157:20
159:6 164:24
164:25 165:21
168:19,21
171:10 172:4
175:17 177:5
177:21 181:25
182:4 184:10
187:17 206:5
211:16 216:12
218:8,14,24
219:19 225:19
225:20 226:4
228:7 239:3
271:21 277:2
**receipt** 306:20
**receivable** 20:5
20:6
**receivables**
20:18
**receive** 27:17
43:13
**received** 118:3
153:25 187:18

187:22,23
**receiving** 35:3
154:3
**recharacterize**
279:9
**Recital** 170:24
**recollect** 53:12
108:14 198:8
225:15 236:23
238:19 241:25
**recollection**
23:10 33:9
35:15 36:20
37:8 40:22
41:10 43:25,25
49:14,24 51:3
51:18 82:20
91:1 169:19
181:20 199:22
199:24 213:12
226:10 235:12
**recommend**
35:22
**recommendati...**
44:7 108:20
**recommendati...**
51:11,19 279:2
**recommended**
36:5,9 37:7
**record** 1:24 8:3
8:15 10:20
11:6,25 18:14
28:15 29:4,14
38:21 67:19,22
120:3,6 168:25
169:3 189:17
189:21 192:18
192:22 214:12
214:17,20
235:2 243:9,13
264:14 282:6
282:10 300:12
301:4 303:17
304:3 306:15
**records** 271:20
**redacted** 252:18

**reduce** 145:10
145:12 177:17
**reduces** 197:17
**reducing** 257:6
**reduction**
264:24
**Rees** 2:17 9:2
22:16,17 35:18
38:11 55:5
56:22 68:19,23
69:5,5 93:22
94:7,15 98:17
98:24 99:2,6
100:25 105:2
105:23 134:16
134:18 183:4
222:2,5,25
247:14 280:21
303:14
**refer** 74:10
179:5 274:7
**reference** 69:10
69:15 87:1
183:12 189:6
213:14 257:24
287:24,25
288:3 297:17
297:18
**referenced**
241:2
**references** 121:9
223:25 229:14
277:24
**referencing** 31:5
40:8,11,16
200:5,6,9
205:17 264:5
279:11 297:3
**referred** 33:12
129:25 142:21
156:11 157:6
**referring** 32:20
39:3 84:25
85:1 121:13
124:3 234:24
252:17 264:7

UNSEALED

App. 0280

274:7,9
**refers** 39:17
79:11 221:22
222:9 244:3,6
**reflect** 285:24
289:18
**refresh** 82:19
169:18 220:1
238:8 249:3
**refreshed**
200:19
**refreshes** 235:12
**refund** 145:8
**refunds** 145:7
**refusal** 139:25
140:20 141:5
**regard** 33:3
41:20 70:3
94:24 100:15
127:7 129:24
132:2 147:20
148:2,3 149:19
152:5,8 169:7
178:3 218:10
225:11 226:3
240:14 275:5
**regarding** 36:22
76:9 105:6
121:4 134:9
171:11 187:9
190:8 204:21
206:8,11 212:8
249:23 261:12
264:18
**regardless**
112:12 125:14
173:12 259:2
267:3
**regards** 44:2
78:21 183:16
223:6 225:21
**region** 226:20
**regular** 262:16
**regularly** 80:3
220:8
**regulated** 13:25

14:21 15:4,23
15:25 128:11
**regulator**
228:10,18
**regulators** 35:4
35:21 37:5,16
38:15 44:7,9
45:3,4 51:13
218:16
**regulators'**
262:7
**regulatory** 14:4
21:2 81:3
102:24 108:12
159:15 247:19
262:12
**reimbursable**
176:25 181:15
**reimburse**
193:13 195:4
196:4
**reimbursed**
176:6 179:14
179:21 180:14
180:17,22,25
181:7 195:6,8
**reimbursement**
179:3 195:15
**reimbursements**
177:9
**reimbursing**
64:10,11
**reiterating**
107:2
**related** 26:18,19
50:6 51:11,14
53:3 55:13
56:6,8 64:10
64:12 70:19,25
78:5,8,23 95:8
131:16 144:17
145:6 170:21
177:10 180:24
181:6 187:22
194:24 196:12
206:12 216:4

220:16 221:2
230:24 232:20
237:21 240:9
249:11 252:19
253:20 255:6,7
262:4,8 263:3
263:5 267:8,21
267:23 268:5
268:11 269:4
269:12,18,19
270:13,16,17
270:18 271:23
272:2,3 275:21
276:16,24
278:18 279:18
280:3,4 296:17
296:21 298:25
299:9 306:24
**relates** 200:2,2
207:18
**relationship**
53:25 56:23
68:4 92:20
105:13 106:1
122:6 128:2
131:1,9 133:1
133:1 134:11
139:8,23
140:22 141:3
141:23 142:9
149:19 150:21
150:22 156:9
156:24 157:11
159:3 160:2
168:16 169:21
173:3,22 175:5
175:10 182:8
196:13 240:9
**relationships**
126:18 127:3
127:19 173:23
182:2 241:14
248:24
**relative** 291:14
**relatively** 139:6
249:19

**relayed** 205:18
**relied** 277:13
**remaining** 22:4
65:10 81:16,17
**remediate**
147:17
**remedy** 147:19
147:24
**remember** 30:6
30:6 35:6,8
37:10,12 50:22
52:5,10,10
54:14,16,22
55:2 56:3,21
59:3,5 60:14
60:15 64:21
66:11 68:24
74:19 81:10
86:8 88:16
93:3 94:10
97:23,25
101:12 102:14
104:20 106:10
106:22 107:13
108:21 110:7,8
110:9,12,24
111:13,25
112:6 113:14
127:5 130:24
131:20 134:1,5
152:10 155:18
158:9 164:17
164:17,18,20
165:8,16 171:4
171:8,20
176:12,13
184:16,17
186:21 189:7
197:9 202:13
202:17,21,24
203:1,10,12,13
203:15,16
211:12 213:16
214:3 228:17
228:21 235:15
241:6 256:8

**reminded**
106:12
**remit** 44:22
**remitting** 149:9
**reneging** 175:13
**renew** 258:25
**rent-to-own**
96:5 292:7
**repaid** 56:18
174:5 175:8
182:4 186:2
196:19
**repay** 56:20
175:9 186:3,3
197:4,5 198:2
198:3
**repayment**
173:9 174:5
175:3,7 201:19
**repeat** 77:10
139:15 241:1
**repeatedly** 98:9
**rephrase** 42:3
113:1 116:21
116:23 124:2
130:18 131:3
234:5 261:10
**replace** 96:25
117:13
**replaced** 43:22
**replicate** 108:24
125:5
**replicated**
281:16
**replicating**
108:9
**reply** 115:13
**report** 99:6
103:24 251:23
252:3 282:17
284:9
**reported** 1:21
**reporter** 8:10,13
10:14,21
**Reporter's** 4:9
306:7

UNSEALED

reporting 7:8,21
115:9,13
251:18,19
284:11
reports 115:18
128:5
represent 59:1
109:15 286:1
286:10
representation
286:17
representatives
8:12
represented
135:14,15
184:12 185:5
representing
155:8,16,18
184:5,13
185:22 188:3
191:4,8,18
199:15,19,23
200:4
represents 292:4
request 52:16,23
56:20 188:6
218:25 219:25
223:3 230:21
244:1
requested 51:11
57:3 65:15
144:9 306:18
require 221:6
242:1 289:3
required 142:18
144:21 160:9
170:19 237:2
242:18 289:1
requirements
204:9
requires 161:7
rereading
256:10
rerouted 256:15
reservation
201:13 212:4

reserve 40:1
80:15 81:10
144:10,20
145:19 147:6
162:11,13,25
163:7 165:2
167:21 168:1
168:14,18,18
185:2,14,25
188:8 196:25
198:13,18
230:8,11 231:7
245:15
resided 275:7
residual 71:6
respective
151:18 152:9
responding
40:22 236:18
responds 191:3
response 11:17
110:1 186:19
193:2 235:18
235:24 292:23
responses 10:23
responsibility
148:25 278:9
responsible
65:25 66:6,8
72:3 124:11
148:13,20,22
166:8 167:2,7
167:12 177:13
177:14 178:19
206:13 224:12
258:19 278:15
278:17,25
rest 286:3
restate 32:24
43:4 233:13,14
restricted
260:19
restriction
236:19
result 25:4
resulting 72:25

results 251:23
285:25
retain 41:3 42:8
44:14 62:6
125:18
retained 267:22
269:7 275:20
287:10,21
retaining 41:13
41:17 44:6
45:9 46:15
220:6
retrospect 46:2
173:13 174:17
255:17
return 64:1,20
64:22 66:16
67:4 81:5
116:12 138:10
186:8 197:13
198:5,6 245:20
246:7 249:10
293:5
returned 73:5
306:19,20
reveal 214:25
215:8
revealing 161:7
revenue 23:11
45:14,15,24
46:22 47:2,5
47:25 63:19
64:7,17 69:20
69:23 70:2,10
70:14,16,18
71:10,21,24
72:8,11 80:11
80:22 96:13,20
96:22,24,25
97:6,9 117:13
134:5 138:6
149:22 150:19
152:8,14,16
153:5,9,10
154:3 177:18
219:5 248:14

250:2 292:9
revenues 45:21
47:11,14
reverse 195:19
review 5:16
191:1,5,9,20
254:17
reviewed 123:9
reviewing 41:8
77:25 167:3
236:22
Reviews 28:25
32:23 39:1,25
40:18 47:16
76:16 78:18
110:5 169:15
171:17 182:22
186:13 189:2
193:18 199:10
200:13,18
203:8 209:17
217:14 220:3
221:13 227:19
231:18 238:12
239:10 250:23
254:19 256:5
258:4 263:23
revise 297:23
Revised 5:11,15
7:4
revisions 34:25
revolver 54:23
rework 41:1
Rhoads 2:13,18
Richard 2:13
8:25 18:15,20
106:23,24
119:2 208:5
217:16,19,23
228:23 252:23
Richard's 258:1
Rick 121:25
122:1,4,5
155:7 183:13
183:20,22
185:21 186:19

187:25 190:23
190:24 191:17
191:19,21
right 9:7 11:7
12:12,17 13:24
15:3,8,16,23
16:4,12 17:5,7
17:19 18:1
19:23 20:2
25:20,25 26:6
26:10 28:1,2
29:9,19,23
30:6,13,23
31:15 32:4
33:19 34:7,25
35:14 37:11
38:17 39:16
40:9,25 41:4,6
42:14,22 43:1
43:22 45:14
47:7,8 48:10
48:15 49:9
53:9 55:21
56:19 57:21,23
57:23 59:3,6
60:21 61:2
64:24,25 65:3
67:9 68:9
69:24 70:16
71:6 72:7
73:15 74:19
75:18 76:8
79:2,21 82:1,6
84:8 85:11
86:7,8 87:3
88:12 90:2,4
90:11 91:19,24
92:5 93:5,11
93:16 94:3,5
94:25 96:14
97:1 99:5
101:2,14,14,20
101:21 102:5
102:11 103:11
104:14 108:5
110:21 111:3,8

UNSEALED

111:18 112:1
112:25 113:23
114:15 116:14
116:11 117:3
119:13 120:16
120:20 123:19
123:24 125:25
127:22 128:12
129:4 131:2
133:23 135:18
136:25 137:4
138:8 139:25
140:20 141:4,5
142:5,19
144:18 145:7
145:14 146:3,8
146:12 147:7
147:20 148:7
149:12,14,23
150:16,17
151:3,9,13,19
151:24 152:9
152:15,17,20
153:1,12 154:9
154:19 155:11
155:24 156:6
163:2 164:6,7
167:22 170:7
172:2,18
176:19 178:5
178:11,24
179:2 180:14
182:9 183:2,9
183:17 186:9
187:20,23
189:7 190:2,24
191:1 192:2
193:13,23,25
194:6,7,20
195:13,24
199:1 200:25
202:24 203:2
203:22 204:1
205:9,10 207:8
207:9,10,16
209:5,24

210:10,12,14
210:18,21
211:4,6,12
218:2,3 220:8
221:22 222:10
223:18 224:3,6
224:24 225:14
227:23 228:3
228:11 229:8
230:12 231:10
231:22 232:1,6
232:13 233:5
233:22 234:13
235:19,23
236:6,10,21
237:23 238:2
239:4,5,18
240:3,13,17
243:17,18
248:15 250:13
251:19 252:5
252:25 253:18
254:5 255:20
257:12 259:16
259:19,25
260:17 261:8
265:1,5,19,24
266:2 269:11
269:22 271:6
271:12 274:3,7
274:20 278:7
279:8 280:25
282:4,22,25
283:16 285:23
287:15,17,19
288:17,18,20
291:5,6,15,17
291:22 292:2
292:10,17,22
293:3,9,11,13
293:14,25
294:6,12
295:13
**right-hand**
182:14
**rightfully** 237:5

**rightly** 45:5
**rights** 46:16
**Rise** 7:10,13
207:10,15,18
207:22 208:1
208:19,21,22
209:5 218:22
243:20 244:8
246:12,15
247:2,11 248:2
248:8,15
249:11 253:15
254:6,7 255:1
255:7,14
256:15,25
257:8,9,11,16
261:17,24
266:12 267:13
267:19,20,21
267:22,23,24
269:1,3,18
270:17 272:1,3
274:18 275:8
275:18,22
280:4,11
291:24 292:21
292:22 294:15
298:16
**risk** 6:3 62:13
63:23 202:15
202:15 245:7
274:1 277:10
277:12 278:6
278:13,25
279:8,22 280:3
280:9,25 287:6
**riskier** 153:19
153:21 154:2
**riskiness** 79:19
**risky** 45:5
**road** 263:8
**rocket** 263:7
**Rogenski** 148:24
179:6 180:5
251:17 284:7
**role** 71:2 123:16

184:18 186:24
**rolled** 95:4
**rolling** 95:6
**room** 158:3
215:17,20,22
215:23 216:6,8
283:6
**Rosenberg** 69:9
69:10,15,15,16
**Rosenberg's**
69:9
**Rosenman** 3:9
**Rosette** 135:1
**roughly** 50:18
54:20 80:21
101:25 102:3
197:18 229:18
239:15 240:15
248:21 249:5
249:12,15
264:20 288:13
295:7,17
297:13,18
298:6,7,23
**round** 23:16
**rounding** 298:3
**rounds** 295:11
**routine** 44:11
156:3
**Row** 288:4
292:14
**RPR** 1:20
306:10 307:9
**rscheff@mm...**
2:15
**RTO** 292:7
293:18
**Rule** 208:5
**rules** 1:23
268:16
**run** 98:6 229:2
230:6
**running** 101:10
127:3 130:5
287:3

| **S** |
| --- |
**S** 2:1 3:1,3 5:1
6:1 7:1 8:1
111:19
**Sachs** 158:5
**safer** 212:23
**sake** 298:4
**sales** 5:4 145:17
164:4,4,11,11
249:14
**SAM** 2:7
**Santa** 12:22
**Sarah** 216:7
**sat** 34:10 164:3
**Saverio** 2:7 8:18
**saving** 149:16
**saw** 37:14 130:1
211:1
**Sawyer** 258:22
259:7
**saying** 56:22
82:6 105:3
107:1 117:17
132:1 149:17
181:4 187:25
193:5 220:19
229:1 233:23
234:7 235:4
242:3 264:25
267:18,24
269:13 270:11
295:2 298:17
301:5,6,15,16
301:24
**says** 47:11,12
69:9 80:16
115:6 120:12
176:15 182:16
231:24 232:5
235:2,2
**scale** 152:25
153:6
**scene** 60:20 93:8
225:16
**Schafer** 129:10
**schedule** 85:20

UNSEALED

App. 0283

**scheduled**
252:22
**Scheff** 2:13 8:20
8:24,25 14:7
14:22 15:9,17
16:5,13,25
17:13,20 18:10
18:17,21 19:6
19:24 20:3
22:24 24:24
25:8 26:11
28:11 29:4,20
29:24 30:4,7
30:14 31:16,19
32:16 33:7,20
34:9,16 37:18
38:2 41:7,25
43:2,23 47:9
48:11,16,23
49:13 50:23
51:1 52:12
53:10 54:18
58:4,21 59:7
59:10 61:12
67:15 68:10,21
68:25 69:25
70:5 71:7,11
73:16 74:9,23
76:22 77:1,16
79:4,22 82:2,7
83:4,10,21,25
84:10 85:24
86:9,18 87:4,9
88:1,5,14 90:6
92:13 93:12,14
94:11 96:15
97:2,15,20
98:8 99:15,18
99:24 100:4,20
101:4 102:12
102:15 103:12
104:25 107:18
109:20,23
110:13,22
112:2 113:17
113:24 115:2

116:17 117:4
117:14 118:10
118:17,21,24
119:3,11 121:3
122:17,23
123:6,20,25
124:22 127:9
127:24 128:14
132:22 133:2
135:6,21
136:16 137:14
137:20 138:1
138:21 140:12
140:14,17
142:6 144:19
145:23 147:21
149:24 151:4
153:2 154:10
163:3,21 164:8
165:13,19
166:1 167:24
169:22 170:8
172:10,25
178:6 180:15
184:4,22 187:2
187:11 188:10
191:13 192:7
192:12 194:8
194:21 201:1
201:21 205:21
207:2,11,17,23
208:2,7 209:6
209:25 212:6
216:5,20,23
217:1,3,8,11
217:20,25
220:9,24
222:11,20
224:7,25
229:11 230:14
230:17 232:14
234:20 236:7
236:11 238:2
240:4 247:3,6
258:2 260:1,11
261:9 264:7,11

264:14 270:8
274:22 275:10
276:25 277:22
279:25 285:2
303:3,8,12,15
**science** 151:2
263:7
**Sciences** 29:19
30:3,13 50:22
52:9,25 60:25
72:19 73:22
150:25 151:23
178:21 179:12
**Sciences'** 51:23
**scientists** 278:15
**scores** 27:20
36:14 51:25
53:2 66:23
160:11 167:4
278:16,20
280:3,5
**scratch** 279:21
**screen** 69:13
76:21 77:5
87:7 217:10
283:3 285:6,9
287:18
**scroll** 287:11
**scrolling** 302:12
**se** 37:6
**sealed** 112:24
**search** 226:6
**seasonality**
145:5
**SEC** 288:20
**second** 40:13
47:15 51:13,13
56:1 72:16,18
76:12 106:11
115:25 116:7
166:13 187:16
189:13,16
207:11 214:12
221:15 255:11
263:25 264:10
**secondarily** 63:7

**secondary** 15:7
227:1
**section** 39:3,5,10
39:18 41:9,11
176:15 252:18
**securitization**
18:2,3,5 21:4
**securitizations**
21:1
**securitize** 20:17
125:20
**security** 5:22
136:12 137:18
137:22 141:9
141:17 146:12
147:2 174:15
**see** 11:18 31:5
31:10,11,18,25
32:15 36:23
39:5,19 40:1,9
75:19 76:1
82:23 83:3
85:19 129:24
132:7,8,11
170:23,24
171:2 180:4
182:15,20,25
190:21 191:5,6
193:1,7 199:12
199:14,16,19
200:7 201:16
202:7,11
204:18 211:4
219:14 222:7
227:22 228:24
229:7,16
235:11,16
249:8 252:21
267:15 284:2,7
284:11,14,17
284:21,25
285:8,9,15,16
285:19 287:16
287:18 297:2,4
298:12,22
299:7,23 300:2

302:9
**seeing** 120:24
129:7 158:23
**seen** 24:14 37:23
114:23 120:23
165:23,23
256:17
**segregate** 267:7
**self-financing**
140:25
**self-fund** 246:15
**self-funded**
294:16
**sell** 15:7 18:7,24
19:14,15 44:12
44:14 46:25
57:14 62:7
91:8,10 148:15
160:16 162:20
165:5 189:10
**selling** 16:3 36:3
41:14,18 46:15
46:17,22 47:7
57:5
**sells** 16:10
**send** 117:1
191:4 234:7
282:18 300:21
**sending** 218:13
284:8
**senior** 2:8 38:12
142:4,11
**sense** 28:19
42:22 50:1
64:4 117:18,19
125:17 159:12
174:15 197:11
245:25 250:7,9
264:25 273:2
**sensitivity**
212:10,15
**sent** 86:16,21,21
252:3 256:10
284:9 301:19
**separate** 55:3
70:12 150:21

UNSEALED

150:22 151:20
158:2 177:7
180:23 232:20
243:23 244:6,7
244:13,15
256:25 288:9
**September**
23:15 41:1
45:13 102:3
193:1 202:14
271:8 281:23
**sequence** 192:5
192:25
**Sequoia** 21:21
22:6 23:15
25:5
**series** 10:1
**serious** 220:21
**serve** 63:2 163:1
**service** 27:5
31:1 49:12
52:20 60:23
61:1 84:14
85:9 92:3,6
101:17 102:2
103:1,3 105:12
105:13,18
106:1,18
107:16 108:7
114:8 115:16
117:9 126:20
150:23 157:12
165:24 247:22
248:5,20 250:3
253:20 261:13
266:10
**serviced** 6:8
**services** 15:1
19:21 23:5
27:16,21 30:21
49:18 50:21
52:5,6 53:3
61:6 68:7,7,8
73:11 74:16
84:14 97:8
105:10 106:13

107:8 111:12
113:3 114:3,16
117:10,23
124:25 125:7
125:17 131:2
132:19 136:4
137:3 165:24
166:3,4 167:10
210:5 261:15
262:8 271:10
**servicing** 16:11
16:20,22 17:11
31:1 39:4,15
46:15 64:11
73:12 111:8
151:19 152:3
**set** 35:22,23 36:5
60:3 81:13
91:13 163:1
173:3,12
200:22 233:8,9
255:18 272:10
297:15
**sets** 60:1
**setting** 45:7
**settle** 44:21
178:22
**settled** 178:1
179:9 182:7
263:6
**settlement**
177:22
**settling** 178:19
**seven** 158:11
**Seventh** 3:16
**Shapiro** 1:3 3:8
9:5,5 88:13
90:5,15 93:1
104:24 107:19
135:22 138:20
139:10,20
141:19 142:7
146:13,16
167:23 184:1
205:11,20,23
220:23 221:15

221:24 222:19
223:14 230:13
231:23 232:2
232:10 233:11
233:16,24
234:2,22
239:12,25
251:2,6,13
256:3 303:7
306:3
**share** 41:5 45:14
45:15,25 46:12
47:2,2,5,25
64:15 80:11
134:6 138:6
145:20 146:3
149:22 150:19
152:8,14,16
153:4,5,9,10
153:15,25
154:5 248:14
249:14 281:7
293:3,10
**shared** 222:3
271:10 280:7
**shares** 145:20
**sharing** 107:15
281:7
**sheet** 16:2 24:3
34:5,8,11,15
34:19 44:24
63:17 120:12
121:6,9 123:10
125:19 133:18
133:22 134:9
135:8,9 164:13
202:10 244:7
270:2,4 283:14
285:6,15 286:3
287:9 288:10
289:5,6
**sheets** 300:14,17
302:13,14
**Sheldon** 3:3 9:3
9:3 16:14
29:10 33:8,22

140:13 146:17
153:13 161:5
166:12 189:13
189:22 190:13
192:14 194:9
207:1 212:5
214:4,10,14,21
215:4,12 224:8
234:17,21
250:19,25
251:14 263:25
277:23 303:6,9
**shift** 243:20
**shifting** 244:14
**short** 67:16
245:1
**short-term**
232:23
**shorter** 196:9
**shorthand** 1:21
**shortly** 9:7
106:20 129:5
**show** 38:20
48:24,25 87:12
109:10 120:1
169:8 171:13
190:17 283:7
283:24 287:9
287:21 294:22
**showed** 233:17
288:12,13
298:4
**showing** 75:8,11
109:17 120:8
**shown** 132:1
144:5 300:13
300:16 302:18
**shows** 90:8
292:20
**shrugs** 11:7
**shut** 84:24 237:9
240:16
**side** 61:1 83:6
91:3,3 93:8
134:10,17,25
164:6,21

262:20 277:10
288:17
**sideways** 174:8
174:21
**Sievert** 1:20
8:10 306:10
307:9
**sign** 181:14
191:21,24
**signature** 4:8
201:5 304:1
305:1,5 306:17
306:21
**signed** 31:24
59:21 112:23
112:23 120:14
120:19 129:18
135:8 164:13
184:11
**significant**
196:18
**significantly**
297:1 299:19
**signing** 133:21
**Silicon** 12:19
13:25 14:9,25
20:10 21:17
22:2,13
**Silver** 54:1,5,9
55:1,7 56:15
57:2,20 62:18
141:23,24
**similar** 49:21
60:7 61:17,18
77:14 92:20
102:24 135:25
139:5 144:5,21
148:10,11
156:16 248:1
**similarities**
137:12
**similarly** 70:23
**simplicity**
295:11
**simplicity's**
298:4

UNSEALED

simplistic 298:8
simply 286:7
sir 293:20
sit 91:3 132:16
133:3 188:18
235:3
site 129:4,11,15
154:25
sitting 34:15
133:7 158:4
257:5 272:22
276:22
situate 91:20
situated 211:24
situation 16:18
16:24 17:24
19:18 66:4,5
140:20 143:5
149:6 163:10
212:9 216:3
230:19
six 97:20 131:11
158:11 263:17
size 144:13
145:1,12
158:10,23
sized 23:8
skills 103:5
250:20
skin 44:9
skinny 56:17
sleep 12:4
slide 78:12,13,14
79:8,14,23
82:19,20,22,23
144:6
slides 78:5
sliding 152:25
153:6
slightly 27:2
153:19,21
198:17
slow 97:10
slowdown 241:9
small 22:14 96:2
219:24 238:24

239:1 240:25
249:11 268:9
269:6
smaller 263:17
smiling 155:23
smirarchi@at...
2:10
so-called 49:12
soften 236:19
softened 236:24
240:22
sold 33:14 64:17
161:23
███████
200:23 201:5
201:20
somebody
105:19 106:15
126:4 189:10
189:11 191:22
224:2 244:17
251:21,22
272:17,18
someone's 42:23
somewhat 37:13
71:14 135:19
179:19 180:21
241:18 272:12
soon 29:18 84:6
167:17
sophisticated
63:22 89:6
90:20 141:22
158:10,18,25
160:23
sorry 25:1 40:15
55:23 70:7
72:13 82:21
114:20 115:24
138:3 162:17
180:8 195:23
208:7 219:24
221:25 239:12
263:22 265:12
268:22 270:12
276:13 293:16

296:9
sort 73:9 131:1
152:24 235:3
250:14 254:22
254:23 260:23
283:7 294:11
sound 53:9
64:24 91:5
118:12 195:21
223:12
sounds 64:25
162:24 164:3
252:11 254:23
source 57:2,19
63:11 70:2,16
72:8,11 96:13
105:16 125:12
126:13 175:6
224:23 233:6
sources 70:10,12
70:18 76:19
163:13 175:3
South 2:14,19
███████
200:23 201:4
201:19
space 162:8
210:6 225:23
262:9
span 23:3 49:16
55:9 101:24
102:1,4 113:5
129:20 221:4
243:24 259:1
297:11
speak 22:5
44:10 144:10
157:25 186:1
speaking 61:25
143:11 211:22
294:7
speaks 99:12
234:25
special 18:8,9,25
19:2,8,20,21
20:4,11,21

21:7 81:14
111:6 137:7
221:5
specialists 278:7
280:25
specific 15:19
74:25 87:12
90:7 96:16
228:21 242:17
271:22,24
290:15,20
295:24
specifically 10:8
49:23 56:3
64:13 74:10,25
77:17,23 78:5
85:17 105:5
110:8 114:12
115:7 122:12
127:13 129:6
129:14 138:13
147:20 152:21
159:6 164:24
164:25 165:21
169:7 203:12
206:5,15 239:3
256:9 269:1
270:16 302:4
302:14
speech 118:20
spelled 181:7
spike 81:15
spin 299:21
spinning 253:13
258:23
spinoff 208:20
252:25 255:13
255:17,19
258:8,12,14
259:3,10,12
261:12 262:19
263:11 265:1,5
265:21 272:13
275:5 276:2,24
281:9 287:10
288:5 290:3,4

spinoffs 265:3
271:10 273:6
split 52:7 178:18
249:16 253:3
255:4 264:18
265:22 266:18
267:16 276:20
276:21 278:6
294:4 297:18
splits 265:3
sponsored
132:15
spreadsheet
69:11,12 252:8
282:20 288:11
290:14,21
294:14 296:12
298:5 301:17
302:15,16
spreadsheets
252:9
spring 101:13
101:16 103:15
103:15
spun 255:16
266:12 269:19
269:20
SPV 19:16 35:22
35:24 36:5,7,7
55:17 61:21
62:4,8,11 63:4
63:5 90:22
91:2,12 92:11
106:6 136:8
150:1,3,4,5
256:25
SPV-type
143:15
SPVs 232:20
Sr 68:23 69:5
staff 172:16
271:14
stagnated
272:24
stake 41:5,6,20
41:24 222:17

**stakeholders** 24:17
**stance** 236:24
**stand** 195:13
**stand-alone** 109:24 177:7 273:2
**standalone** 142:11
**standard** 100:7 151:2
**standards** 100:3
**standpoint** 21:6 34:2 51:24 96:20,23 101:10 115:13 177:24,25 198:7 205:3 212:19 225:1 229:22 233:7 244:25 246:23 261:8 269:21
**stapled** 250:19
**Star** 211:8
**start** 25:18 27:14 53:8 88:8 108:1 197:10 211:22 217:13 231:16 245:23 265:19 279:21
**start-** 22:23
**started** 18:20 22:14 25:24 45:15,17 112:4 141:1 261:1 266:6 267:2 295:24 298:21
**starting** 56:5 89:5 200:21 244:10 257:17 262:21
**starts** 31:8 76:3 211:3 284:6
**startup** 22:15,21 23:20 299:17

**state** 1:20 6:6 8:14 12:13 87:14 118:7 204:11,12,15 205:8,8 206:8 206:9,16,16,17 208:22 209:1,4 210:6 211:20 211:23 228:9 246:22 247:12 247:20 262:11 262:16 267:4 300:12 306:11
**state-based** 244:9
**state-licensed** 244:9 255:8
**state-of-the-art** 277:12
**stated** 1:24 123:8 134:7 232:5
**statement** 84:12 85:4,16 88:17 90:16 91:17 93:16 100:21 108:7 191:2 228:15,20
**statements** 294:6,9
**states** 1:1 6:8 8:8 203:24 204:6 206:14,18,23 206:25 209:4 209:12 211:9 213:6,11 306:1
**status** 226:8 238:17
**stay** 24:3 266:9 270:25
**stayed** 155:25 250:10 270:21 276:18 280:18 281:14,25 287:4
**staying** 32:10

**stays** 272:14
**step** 161:11 189:16 192:14 214:10 223:24
**stepped** 193:16 281:22
**stepping** 55:4
**steps** 302:6
**Steve** 129:10
**Steven** 121:13 121:15,16 173:24 174:9 175:23,23 198:9 225:21 225:22
**stick** 148:2,3 250:15
**Stinson** 24:13,23
**Stinsons** 25:6
**stock** 260:14,19 260:19,21,21
**stood** 111:20
**stop** 93:10,17,25 104:7 107:3 117:7 160:2 166:12 185:17 229:3,5 230:2 233:1 236:25 237:16
**stoppage** 241:8
**stopped** 97:9 157:2 163:10
**stored** 280:9
**stories** 158:12
**straight** 69:19
**strange** 91:5
**strangely** 46:10 79:6
**strategic** 100:24 100:24 101:6
**strategize** 95:20 98:3
**strategy** 101:10
**stream** 46:22
**Street** 1:22 2:5,9 2:14,19 3:10

3:15
**strengthen** 35:4
**stress** 10:22 261:21
**stressing** 66:11
**stretch** 275:13
**strike** 66:25 93:6
**strongly** 253:25 263:10
**struck** 157:22 201:23
**Structural** 7:11
**structure** 5:11 20:21 26:15,21 26:23,24 27:2 27:7,22 32:2 34:23 35:5,23 35:24 52:16 60:8,13,16 63:5,16 73:9 78:9 89:1 90:13 91:1 92:20 108:8,9 108:16,25 125:3 135:23 135:25 136:19 141:21 143:15 159:12,24,25 175:15 254:18 255:7,16,19
**structured** 140:6 267:11
**structures** 90:18
**struggle** 56:6
**struggled** 56:13
**stuff** 167:7 188:3 280:18
**stupid** 87:10
**style** 99:8
**sub-participat...** 91:6
**subdepartments** 278:13
**subject** 128:25 134:1 177:11

189:1 202:3 203:25 216:5 244:18,20 258:10 264:4 266:2 290:6
**subjective** 99:10 99:17
**submit** 181:8
**submits** 237:3
**submitted** 121:1 123:4
**subordinated** 141:11
**Subscribed** 307:4
**subsequent** 107:14 131:10 190:5
**subsequently** 95:11 218:16
**subsidiary** 27:16 74:12 136:15 210:16
**substance** 215:8
**successful** 46:6 88:21 108:3
**suddenly** 140:22 143:23,24 162:5 268:13
**sue** 174:22
**sued** 211:2
**suggest** 157:18
**suggested** 50:12 51:8 185:4 219:6
**suggesting** 157:16 165:11
**suggestions** 36:14,19 38:14 51:5,7 167:4 168:20
**Suisse** 158:6
**Suite** 2:5,9
**sum** 290:12
**summarize** 73:10 201:16

UNSEALED

235:18
**summary** 7:5
258:7
**summer** 88:11
91:20,24 92:8
**Sunny** 280:5,12
**supplement**
89:13
**supplied** 92:10
125:24 163:18
**support** 64:12
142:13 167:8
167:11 240:24
**supposedly**
131:18
**sure** 9:19,23
12:10 14:6
32:19 38:25
40:14,17 42:15
46:3 47:18
53:17 54:24
76:14,22 77:12
77:25 80:25
106:3,25 109:9
111:4 127:16
159:20 164:25
167:13 169:10
169:23 170:9
173:2 178:1
179:25 180:25
184:8 188:4
193:15 200:4
214:13 220:10
223:18 225:17
238:7 242:16
242:18 254:9
254:10 264:13
268:10 276:12
276:14 277:7
282:14 284:23
286:6 290:22
**surplus** 66:21
**swap** 63:13 64:6
65:16 67:2,7
71:18 78:23
79:17 80:1

81:19 89:16
139:2,6 142:14
143:5,9,19
144:4,11,22
145:3,13 147:5
147:11 197:10
245:1,13,18
246:1 257:6
273:1
**switch** 113:15
**sworn** 1:17 9:11
306:14 307:4
**system** 233:8
240:16 277:13
279:14

――――――――
**T**
――――――――
**T** 5:1 6:1 7:1
**tab** 285:14,15
291:6 294:19
294:23
**table** 100:25
**tabs** 290:20
**TailWind** 30:2
30:13 50:21
51:21 52:8,21
60:21 68:7
69:24 70:15
72:15 73:12,20
136:24,24
151:1,21 178:4
178:20,25
179:10 180:11
**take** 11:19,20
14:3 16:10
22:5 38:23
39:23 46:4
47:19 49:18
65:18 66:16
67:16 81:19
83:9 110:2
119:24 140:10
147:13 181:24
196:25 198:2
238:6 239:5
243:6 252:15

254:22 260:3
263:4 278:5
292:19 302:6
**taken** 1:17 67:20
120:4 169:1
189:19 192:20
214:18 243:11
282:8 307:1
**takes** 174:23
**talk** 10:13 21:9
57:23 88:7
91:19 104:17
104:17,19
161:13 189:14
192:15 224:15
283:8
**talk-** 268:20
**talked** 35:18
73:14 98:4
141:24 183:19
185:16 229:1
248:3 259:12
**talking** 28:9,10
40:1 43:1 47:5
47:8 48:8 70:4
84:1,23 86:15
86:17 97:16
104:14,15
123:2 124:16
124:17,19
126:15 140:14
141:15 169:5
176:7 183:14
183:22 185:21
193:10 200:24
207:12 218:9
223:1 224:20
256:19 262:4
263:2 268:17
268:24 282:16
282:22 283:14
**tangentially**
226:13
**target** 248:20
**targeted** 250:1
**targeting** 153:20

**Tauber** 135:10
135:13 183:9
192:11 193:4
**tax** 145:7,8
159:12 161:20
162:19 261:12
265:4,4,12
295:8,15,16
298:7,8,9
**taxed** 295:7
296:23
**taxes** 291:9
**taxpayers** 37:17
**TC** 29:19 30:3
30:13,22,22
31:1 32:5,7,15
33:14 36:4
41:15,18 44:24
45:25 47:12
50:22 51:23
52:6,9,19,24
53:23 54:6
56:24 60:25
61:6 63:9
72:18 73:22
74:16 151:23
178:21
**TCAS** 61:7 66:1
66:4,7 68:8
71:17 72:2
74:12 81:18,21
137:16 139:3
142:15 143:6
143:10,11,17
143:17,20,21
143:23 147:4
148:23
**TCDS** 68:7
69:24 70:15,23
72:15 73:12
137:4,5 178:4
178:25 180:11
**TCV** 22:6 25:5
**team** 95:16
98:12 124:24
165:17

**technical** 61:24
**technically**
21:13 27:2
54:2 58:14
115:21 143:10
145:25 157:4
175:8 210:15
211:22 265:1
268:2,15
271:10
**technology**
21:21 27:19
30:2,22 36:12
50:21 51:24
53:1 57:11,13
61:1 66:22
67:5 69:17
71:1 73:21
103:5 136:6
137:3 160:9
166:5 275:12
**technology-type**
36:11
**teens** 64:22
**tel** 307:13
**tell** 11:11,21
40:20 205:23
209:9 218:11
238:16 252:2
256:19
**telling** 152:22
218:1 231:20
233:10 252:20
269:25 294:3
300:24 301:18
**tells** 235:14
**template** 202:20
**temporarily**
8:18
**temporary**
272:12 273:18
**ten** 15:15 215:21
267:18
**tended** 153:10
**term** 18:3 24:9
59:19 61:23

64:15 75:3,15
78:22,25 79:2
79:2,5,6,9 83:2
83:2 86:10,11
89:12 91:4
98:18 102:23
106:25 115:1
115:13,17
120:12 121:6,9
123:10 126:9
133:18,22
134:9 135:8,9
140:5 142:22
146:1 147:12
164:13,18
165:8,11,16
170:9 195:2
211:12 220:11
244:7,22
279:12
**terms** 7:5 34:3
44:20 59:2
90:18 92:17
98:19 115:4
121:5 123:2,4
123:12 127:14
131:8 134:11
135:23 136:3
140:1 141:12
144:23 153:4
154:16 173:17
176:13 194:11
204:22 237:20
239:21 242:2
252:19 275:4
280:9 286:12
286:14
**test** 238:25
**testified** 9:12
49:1 125:23
126:1
**testifying** 87:25
**testimony** 59:8
69:1 71:14
94:20 123:21
123:25 139:12

163:4 179:6
184:8 233:12
274:11 277:1
278:3 297:12
306:16
**testing** 250:20
**Texas** 1:21,22
306:11 307:9
307:12
**TF** 33:5 193:5
264:23 285:15
**TF's** 264:24
**TF-PA** 5:4,7,9
5:13,16,18,21
5:23,24 6:4,7,9
6:11,15,17,19
6:21 7:4,6,11
7:15,18 29:6,7
31:9 76:21
189:23 202:9
221:11 231:12
238:10 254:15
263:14
**thank** 8:24 9:17
29:9,15 67:24
76:15 119:1
140:17 165:7
190:13 198:25
199:9 215:12
217:8,11
221:17 227:16
239:6,13
251:13,14
252:1 256:3
258:2 264:2
282:12 283:19
**Thanks** 73:7
**theoretically**
143:21 150:3
197:7 233:4
**therefor** 306:22
**They'd** 179:2,11
**thin** 48:25
**thing** 10:16 22:3
26:2 41:2
45:12 59:3

85:17 157:20
159:13 193:9
194:1 195:25
226:1 233:14
255:2 266:25
269:13 298:11
299:13
**things** 12:4
19:23 49:6
78:8,10 91:20
95:22 98:24
104:17 107:6
114:23,25
119:8 123:14
146:7 159:23
167:1,6,14
174:21 194:14
200:3 205:9
206:9 221:1
243:23 250:1
253:16 254:23
256:23 259:11
278:11 283:3
284:13
**think** 1:6 3:2 5:9
8:6 9:4 13:5,11
15:21 20:22
21:10,11,12,13
21:18,23 22:10
22:12,18 23:7
25:15,19,19
27:12 30:12,20
32:5,15 33:5
35:11,12,18
36:9,11,18
38:12 39:9
42:3 44:21
45:2,4 46:5,8
49:11 50:19
51:4,22 52:8,9
52:19 53:15,22
54:3 55:10
58:7 60:20,20
61:6 63:8,15
65:25 68:8,23
69:20 70:11

73:19 74:7,10
74:12 75:4,21
77:3,9,18
78:19 79:9
80:16,20 85:6
85:8 87:7,23
88:2 89:2,6,20
91:21 94:24
96:17 100:5
102:18 106:24
107:7 111:15
111:25 112:4
116:10 117:14
119:9 120:12
121:1,6 122:6
122:12 124:17
126:15 127:21
128:1 131:5
134:10 135:2
135:11 136:4
136:13 138:4
138:17,18,24
139:4,8,13,18
140:9,24
141:10,17
142:18,23
143:1,20
144:15,16
146:22,25
147:3,10
149:20 150:12
153:24 154:19
155:21 158:16
159:3,14 161:3
161:17 162:21
164:12,21
168:14 172:9
172:13,17,20
172:23 173:6
173:16,18,24
174:14,15,19
175:14,15,22
176:3,9,18,18
177:16 178:14
178:16,17
180:1 184:24

185:3,9,12
186:8,20 187:1
187:6,18,22
188:14,19
190:1,18
191:18,24
193:23 194:25
195:10,15,17
196:4 197:21
198:7 200:19
201:18 203:21
206:24 207:13
207:13,20
208:10,11,12
208:18 212:14
212:18,20
213:9 214:6,8
214:23 216:10
216:25 218:25
219:9 222:16
223:2,15
225:12,20,24
230:23 233:6
233:10 234:4,5
234:8 235:16
235:17 237:19
240:4,7,22,23
241:7 242:22
242:24 243:19
244:2 245:5
247:11,21
249:5 250:6
251:22,24
252:17 253:2
253:22 256:10
256:13,21,23
256:24 258:24
259:17,20
261:20 262:8
263:6,16
264:22 266:4,9
266:17 268:6,7
268:11,12,14
268:19 269:2,3
269:9 270:3,15
270:21,22

UNSEALED

271:5,7,8
272:10,14,15
272:22 273:8,9
273:14,16,20
273:25 274:18
276:18,23
277:11,11,14
277:20 278:5
278:17 279:22
281:4,14,25
282:20 285:24
286:1,2 287:4
287:12,17,18
287:22 288:2,8
288:15 290:11
291:20 294:3,4
296:14 297:5
297:12,19,22
299:23 301:20
306:6
**Think's** 114:7
161:8,8,14
165:24 277:17
**ThinkCash**
25:20,25 26:9
26:13 27:13,14
27:15 28:1
33:11,13 34:14
34:18 35:20
36:2 38:12
41:13 43:6
48:18 53:3,14
53:22 54:10
59:14 69:6
70:3,19,22
77:19 82:15
83:16 84:6
88:20 89:3,10
92:4 93:8,18
93:25 94:18
96:18 107:7
112:14 113:22
113:22 116:10
117:2,19
119:10 274:15
**thinking** 191:10

229:10 257:15
258:8,23
**third** 19:15 57:8
58:18 72:11,14
81:4 84:11
125:11 277:19
**third-party**
19:16 36:6
57:15 60:1
64:19 67:11
73:4 80:12
84:15,16,16
85:12 89:11
103:2,7 105:8
105:10,15
106:5,14 107:8
109:1,6 112:9
114:3,17 115:9
115:17 116:4,5
116:6 117:10
117:11,23
125:1,16 126:6
126:16,20
128:8,16 131:8
136:6 140:1
142:10 145:10
146:4 159:9
168:5 232:19
277:15 279:3
**Thomas** 3:15
**Thorton** 264:25
268:1 269:22
288:9 289:5,15
**thought** 55:25
65:9 72:18
114:20,20
161:16 188:7
228:13 242:11
249:19 287:14
**thousands**
161:25
**three** 70:12
101:20 111:10
121:7 123:10
148:15 150:14
151:3,22 152:7

152:13 154:13
160:1 161:3,4
161:22 162:3
162:11,14
163:11 168:2
185:2 197:8
209:24 213:5
226:8 227:10
227:11 231:2
234:10 237:14
237:20 238:17
238:18 240:11
240:21 241:3
241:14 242:18
244:24 249:18
**three-day**
185:24
**three-year**
249:12 297:16
**thrilled** 245:17
**throw** 251:8
**tie** 289:5,7
**tied** 204:5
288:12
**ties** 246:17
296:14,15
**Tim** 226:16
**time** 8:4 12:23
13:10 20:20
21:6,11,13
22:17 23:3,13
25:11 26:8,9
27:12,15 30:1
32:11 33:18,23
34:14 36:17
38:13 45:24
46:5,7 47:19
47:20 49:6,8,9
49:16 51:4,22
53:15,19 54:11
55:9 56:14,20
59:14 69:21
75:17 77:19
83:24 84:5,7
84:13,18 85:2
86:13 91:21

92:8 95:23
96:7,12 98:21
98:21 101:24
101:24 102:1,4
102:7 103:20
104:23 107:23
112:10 113:5
118:2 119:21
119:25 125:2
126:15,25
127:23,25
129:2,6,20
130:24 131:5,9
133:23 135:2
140:4,24 142:8
146:18 149:17
151:8 152:11
155:12,15
159:21 160:1,3
160:5,8 161:19
162:7 168:23
173:14 176:17
184:6,10 185:5
187:17,24
188:5,18
191:17 196:6
196:13 198:8
201:25 208:9
209:21,22
210:12,15,21
211:19 220:5
220:20 221:4
224:5,15 228:8
239:16 240:19
243:17,24
244:3,7 245:1
245:13,17
251:2 253:15
253:21,24
256:24 257:2
258:9,19 259:1
265:2 273:10
276:3,8 281:11
281:18 282:5
294:16 296:21
297:9,11

298:14
**times** 13:23
46:24 115:8
203:19,25
215:14 221:3
**title** 107:1
**to/invest** 205:4
**today** 10:11,19
12:6 55:17
99:4 104:15
132:16 133:3,8
208:9 276:22
**told** 38:8 93:10
93:10,17
108:14 154:20
173:14 190:16
198:8 229:9
259:16 262:5
294:5
**Tom** 203:17
204:20 205:1
205:18 216:13
228:23 229:14
234:6,25 235:3
235:13,18
236:1,18 237:8
245:22 246:4
252:11 264:17
266:2,23
268:10
**tomorrow** 222:6
**tone** 166:16
**top** 65:5 81:1
89:14 120:12
177:5 189:24
190:10 229:15
242:21
**topic** 184:17
186:10 203:13
203:15 221:9
244:19 254:14
**total** 144:18
288:1 294:10
294:20 297:21
**touch** 89:11
157:1

UNSEALED

**track** 290:14
**traditional** 45:6
  56:11 144:22
  160:24
**trained** 251:12
**tran-** 172:15
**transaction**
  16:21 34:22
  43:20 55:6
  96:4 120:13
  121:2 122:10
  124:13 168:13
  181:22 210:20
  244:13 254:12
  264:20 272:20
  290:3
**transactional**
  286:10
**transactions**
  16:12 17:17
  155:9 179:15
  179:16 180:2
  206:12,19
  218:19 219:5
  219:15 221:7
  226:21 228:16
  241:23
**transcript** 10:21
  306:14,20
**transcription**
  304:4
**transcripts**
  180:4
**transfer** 118:13
  172:15 264:5
  268:16,18
  281:2,3
**transferee** 202:1
**transferred**
  290:10,12
**transferrer**
  201:25
**transition** 88:7
**transitioning**
  221:2
**transitions**

  84:20
**translate** 286:16
**treasurer**
  258:19
**treasury** 63:4
  224:12
**treated** 181:22
**trial** 10:6
**tribal** 86:16
  87:18 88:8
  101:14 102:9
  102:11,18,19
  103:10 104:20
  104:22 105:5
  105:24 107:8
  108:25 109:5
  111:7 130:5,20
  130:20,22,23
  137:13 148:2
  150:6,21 152:9
  155:2,2,3
  157:14,23,24
  187:22 191:23
  191:23 210:6
  211:9 212:17
  218:21 220:14
  226:2 229:3,4
  229:6 242:10
  248:3,24
  253:18,22
  257:17 259:14
  259:25 261:6
  261:22 262:14
  263:1,3,6
  267:5 274:16
  280:12 293:23
  295:6 296:24
  296:25 297:10
  298:6,20 299:4
  299:10,16
  300:4
**tribe** 84:16
  101:17 102:3
  105:9 106:2,3
  106:7 107:25
  108:3 110:16

  112:10,18,24
  113:2,10
  115:16 116:5
  125:15 130:19
  134:2,8,20
  135:14 138:7
  148:12 149:21
  149:21 150:18
  150:18,20,23
  151:6 155:6
  156:17,18,20
  157:9 158:7,10
  163:7 167:1
  170:6 172:24
  173:21 174:3,6
  174:11,18,20
  175:1 176:8,10
  177:10,12,17
  178:18,22,25
  181:18,23
  183:21,23
  184:6,14 186:2
  188:16 193:12
  194:4 195:20
  196:2,4 198:2
  198:2,11
  201:19 212:12
  226:15 227:3
  250:6 274:14
**tribe's** 176:24
  177:18,18
**tribes** 6:9
  101:21,23
  103:3,14
  106:22 107:8
  107:12,17
  110:10,14
  111:10 117:10
  117:23 121:7
  121:22 123:10
  124:25 125:1
  126:17 127:6
  127:16 144:25
  148:11 149:1
  150:14 151:3
  151:22 152:7

  152:13 153:16
  154:13 158:24
  159:14,17,25
  160:3,12,21,21
  161:20 162:2
  163:13 166:7
  167:13 178:4
  178:10 179:10
  179:12,13,18
  180:10,12,18
  185:15,17
  187:18,23
  203:25 204:6
  204:10,14,23
  204:25 206:16
  206:20 211:10
  211:18 212:2,8
  212:11,20
  213:10 219:9
  225:3 226:4,9
  229:23 230:2
  231:2 232:9,13
  232:16,18,22
  232:25 233:4
  234:10,12
  237:14,20
  238:24 239:18
  239:22 240:11
  240:14,21
  241:3,7,12,13
  241:14,16
  242:6,8,19
  243:3 244:24
  249:13,17
  261:15 266:11
  287:6 292:15
  293:2 297:20
  300:3
**Tribune** 211:8
**trip** 155:20
  164:19,20
**trouble** 88:22
**true** 149:17
  168:8 260:22
  279:11 305:5
  306:15

**truly** 115:14
  269:17
**trumped** 142:4
  142:4
**Trust** 92:17,19
  95:6,11 108:11
  112:16 125:5
  128:6 136:2,18
  156:12,14,15
  157:3 251:10
**try** 12:11 50:17
  57:2 58:7 97:5
  196:9
**trying** 11:3 38:6
  39:7 42:18
  70:9,9 116:22
  118:11 146:22
  167:18 174:25
  176:12 186:18
  195:25 224:2,2
  226:19 235:9
  235:23 248:20
  257:20 261:21
  266:18 279:4
**Tuesday** 43:14
  44:19,19
**Tunica** 153:22
  155:5,6 157:17
  160:23 164:21
  184:11,12
  185:5,14,23
  197:1 293:10
**Tunica-Biloxi**
  102:3 136:1
  151:12 156:8,9
  156:18 157:9
  157:22 159:2
  227:3
**Tunnell** 202:14
  203:1,1
**turn** 78:12 82:18
  91:10
**turned** 116:7
**turning** 143:19
  303:10
**turnkey** 165:8

UNSEALED

165:25 166:6
**twice** 164:7
**two** 18:12 22:6
23:21 31:2
34:4 52:7 55:3
63:2 84:19
91:22 101:23
105:1 122:19
148:14 153:16
157:10,23
158:4,24 161:2
161:3,22 162:3
162:10,13
163:11 164:3,3
168:2 174:21
175:2,3 180:18
185:2,13
194:14 197:8
198:16 200:15
229:2 235:21
236:14 237:24
237:24 238:15
240:15 243:23
246:19 247:10
247:23 248:11
253:3 254:23
256:25 261:13
272:11 274:14
274:16 275:14
276:8 281:9
292:8 293:19
293:21,22
295:9 298:23
**two-** 185:24
**two-day** 43:18
**two-thousand-**
85:5 113:5
**two-thousand...**
101:24
**two-weeks**
186:14
**twofold** 225:2
**type** 19:14 35:22
35:24 47:2,2
49:21 60:7
61:15,18 62:19

63:5 66:5
92:20 105:6
109:1 126:19
126:23 139:5
140:20 143:5
144:21 156:17
181:14 198:4
212:22 229:7
247:19 248:1
262:8 281:7
289:16
**typed** 290:1
**types** 45:8 49:20
53:2 108:16
121:23 182:1
**typical** 139:23
**typically** 17:2
19:12,14,16,18
43:11,13 80:19
80:21 103:23
144:7 145:6
177:8 178:21
181:14 204:16
216:8 245:7
258:24,25
267:10
**typo** 40:6,8

_____
**U**

**U.S** 156:20
210:16 211:1
**ugly** 66:24
**Uh-huh** 11:17
109:25 193:2
292:23
**UK** 95:24
104:11,15
253:15 261:17
269:20 270:17
272:4,4 280:4
292:6 293:13
294:15
**ultimate** 173:9
289:13
**ultimately** 55:13
96:1 111:6,11

167:12 173:18
174:4 175:6
182:3,3 198:14
**umbrella** 31:14
137:19
**uncle** 22:17 69:9
**underlying** 80:8
**understand** 9:20
10:17 11:11,13
11:16 13:15
15:3 18:6,21
18:23,23 24:11
26:25 27:23
29:22 38:6,17
39:7 42:18
53:7 57:25
58:1,11 59:17
60:11 72:5
75:10 76:5
79:14 104:18
150:16 162:21
182:13 186:22
190:10 196:1
213:1 215:2,10
221:8 226:19
241:24 252:16
256:10 266:18
271:15 274:10
275:3 277:8
279:20 294:4
297:7 301:15
302:8 303:1
**understandable**
241:18
**understanding**
12:12 28:3
36:21 37:1,4
38:11 44:1
46:25 48:17
51:7 52:15
68:6 93:19,20
102:16 121:17
121:19 124:12
126:12 132:6
147:15 149:5
153:14,17

167:5 170:16
175:24 178:17
178:17 189:9
212:1,9 239:22
240:19 257:12
265:3 273:5
275:9,11
280:15
**understood** 11:5
227:11 237:1
268:10 281:15
**underwrite**
36:15
**underwriters**
258:17
**underwriting**
27:20 36:13
51:25 53:2
66:23
**undue** 210:3
231:4 241:22
261:21
**unfair** 251:5
**unhidden**
300:18 302:3
**unique** 247:14
**unit** 247:9 287:7
**United** 1:1 8:8
306:1
**units** 260:19
**Universal** 20:22
21:8 50:3,4,5
50:10,13,15
53:6,13,16
55:24 57:24
58:8,9,15
59:15,20,22
60:9,10,17,19
60:19 61:17,17
61:19,20 62:2
62:7,12,25
63:14,14,15
64:10,18,18,20
65:20,22 66:1
66:8 67:2 68:9
68:13 69:3,19

70:11 71:3,16
71:24 73:1,3
74:2,3,7,13,16
77:14 78:24
80:9 81:6 88:8
88:12 89:1,15
90:4,22 91:9
91:10,18 92:10
104:5 122:10
135:20 136:9
138:19,24
139:3 160:17
**unnecessary**
235:9
**unusual** 127:21
**update** 98:23
204:20
**updated** 229:2
**updates** 224:22
**updating** 226:8
**upfront** 68:7
159:7
**upside** 66:15
72:16
**urgency** 117:1
117:18,19
**use** 24:9 61:23
78:25 79:7
89:18 103:4
112:14,16
115:3,18 126:5
142:22 145:7,8
148:9 163:7
168:4 170:9
184:20,20
185:17,25
237:11 246:13
246:15 273:22
277:17 281:4
298:18

_____
**V**

**vaguely** 81:10
105:1
**Valley** 12:19
13:25 14:9,25

20:10 21:17 22:3,14
**value** 65:22 142:24 176:17 272:21
**values** 230:21
**Van** 3:15
**variable** 82:25
**varied** 98:20
**variety** 76:19,19 96:7 103:4 104:17 218:19
**various** 20:7 34:24,25 86:22 136:14 144:25 183:1 279:3 280:12 284:8 284:10 286:24 287:7 290:10
**varying** 82:13
**Vegas** 131:1
**vehicle** 18:8,25 19:9,20,22 20:21 21:7 81:14 111:7 137:8 184:20 221:5
**vehicles** 18:9 19:2 20:5,11
**venture** 21:22 22:7,14,16,22 23:14,17 24:7 25:5 259:22
**Ventures** 21:22 22:15 23:20 69:17
**verbal** 11:8 245:21
**verbally** 242:7
**verify** 90:9 288:7
**versions** 302:16
**Victory** 3:7 9:6 62:20 75:22 86:16,21 88:11 89:12,20 90:12

90:17 91:12 92:11,24 93:7 103:19,22 104:2,21 106:4 106:23 107:14 108:4 109:4 138:17 139:9 139:24 140:6 140:11,21 141:3,16 142:3 143:14 146:1 182:16 183:1 185:19 203:17 203:22 205:19 206:4 214:9 216:15 220:21 229:9 233:20 243:19 251:23 253:4 254:2,24 273:13,21 282:17 284:5 301:17,21
**video** 8:3
**videographer** 3:20 8:2,11 67:18,21 120:2 120:5 168:24 169:2 189:17 189:20 192:18 192:21 214:16 214:19 243:8 243:12 282:6,9 303:16
**videotaped** 1:9 10:19
**view** 34:2 45:5 149:25 174:20 230:18 243:22 243:23
**viewed** 114:10 153:19 175:2 256:25
**visible** 302:7
**visit** 129:4,11,15 132:2 164:15
**visited** 130:3

132:4 133:21
**visiting** 129:7 130:13 154:25
**visits** 164:4
**volume** 205:1 206:12 238:22 239:3 243:1
**volumes** 204:3 204:10 205:5 219:10 243:5 287:5
**VP** 138:17
**VPC** 6:15 7:5 125:9,9 135:15 139:24 146:4 149:11,20 150:2 197:2,7 197:12 198:13 198:17,20 204:21 205:13 220:8,12 223:4 229:19 232:19 233:1 239:23 240:9,10 244:1 244:16 249:10 249:17 250:7 252:3 263:17 289:2 296:18
**VPC's** 266:5
**vs** 1:5 8:6 306:5

### W

**W** 3:9,10
**wait** 24:24 38:2 138:1 161:2 166:20 187:2 192:12 207:11 296:5,5,5
**waiting** 158:14
**Walker** 2:13,18
**Walt** 281:17,19
**want** 18:11,12 18:14 19:3 38:18,18,20 40:25 45:7 48:24 64:15

66:13,15,16 67:24 70:13 76:20 80:2 81:13 87:13 90:21 104:18 104:19 109:10 112:14 140:2 144:3 147:12 169:8 194:13 207:12 208:14 212:2,2,21 221:21 233:14 237:8 244:16 245:15 246:11 250:14,14 252:21 277:7 281:3 283:4,6 283:22 284:20 290:24 297:23 301:3,3,14
**wanted** 44:9 45:3 68:4,5 80:25 91:2 113:8 116:11 116:12 129:14 151:16 162:18 163:7 187:21 188:5 196:12 198:15 223:5 230:7 231:5 243:1 267:15 268:10 281:1 299:13
**wants** 270:9
**wash** 178:14
**Washington** 3:5 3:16 227:7
**wasn't** 21:13 25:10 27:3 46:9,10 82:11 102:16 112:5 113:18 117:16 117:16 118:16 119:14 120:19 123:7 134:22 149:8,21

154:13 170:15 170:18 173:2,6 181:15 184:8 224:18 242:6 249:20 250:11 257:15 280:18 281:10 289:18
**watch** 290:18
**watched** 15:14
**waterfall** 78:25 79:5,5,9,11 81:2
**way** 9:25 10:5,5 12:4 14:20 15:24 17:2 20:2 21:23 40:23,25 42:4 44:23 46:13 53:23,23 62:23 66:9 67:3,11 72:20 75:13 99:11 116:14 124:20 144:12 145:8,18,21,24 148:8 149:25 150:2 157:18 163:6 167:10 173:3 174:16 175:16 176:24 177:25 179:7 180:10 193:5 197:21 215:1 228:13 233:18 242:13 243:22 247:21 251:9 251:12 254:25 257:15 260:25 261:11 275:4 276:20 278:12 285:18 289:18 291:12,13 292:13
**ways** 17:3 20:7 42:1 103:4 247:23 258:15
**we'll** 11:20 57:9

UNSEALED

| | | | | |
|---|---|---|---|---|
| 57:11 91:19 | 291:21 | 154:9 289:1 | **wondering** | 106:14 196:5 |
| 181:8 202:2 | **we've** 29:14 | **West** 1:22 | 164:19 199:21 | 208:5 |
| 203:2 208:15 | 46:13 49:6 | **whatnot** 26:21 | 213:4 | **worried** 63:23 |
| 216:17 217:6,9 | 57:19 58:19,25 | 57:17 60:2 | **Woodruff** | **worth** 1:22,22 |
| 229:7 239:4,5 | 77:8 83:25 | 62:22 116:21 | 258:21 259:6 | 23:4,21 24:17 |
| 246:8 254:14 | 92:7 105:7 | 156:25 158:19 | **word** 105:25 | 162:3,14 |
| 278:5 283:8 | 147:1 174:1 | 180:23 222:13 | 281:3 | 163:11 168:2 |
| 287:12,15 | 176:23 196:14 | 225:25 276:16 | **worded** 234:11 | 197:9 |
| 300:21 302:22 | 236:2 262:19 | **whispering** | **words** 148:5 | **wouldn't** 117:5 |
| **we're** 9:25 10:10 | **wealth** 14:14 | 158:9 | 180:12 289:22 | 138:25 139:22 |
| 11:19 28:12 | **website** 28:2,4,4 | **whistles** 248:10 | **work** 11:7,14 | 163:6 164:10 |
| 33:17 43:1 | 116:13,20 | **wife** 21:2 24:22 | 16:22 65:15 | 174:16 177:11 |
| 47:4,5,8 48:8 | 132:11 | **Wildstein** 58:13 | 75:14 106:3 | 179:1 194:22 |
| 56:24 57:1,5,6 | **week** 98:1 | 58:19,25 59:18 | 108:2,25 | 204:7 205:12 |
| 57:17 69:19 | 237:10 252:23 | 61:22 65:1 | 145:18,22 | 212:2,2 219:8 |
| 81:24 95:2 | **weekend** 95:18 | 74:22 75:9,12 | 204:23 251:9 | 224:10 232:15 |
| 97:5 100:8,10 | **weekly** 99:1 | 75:20,25 76:4 | 278:18 279:7 | 240:10 243:22 |
| 104:14,15 | 112:7 129:1 | 81:6 90:14 | 279:18,22 | 243:24 253:23 |
| 105:15,18 | **Welch** 203:17 | 138:18,25 | **workbook** | 255:11 277:2 |
| 112:9 115:8 | 203:20 204:1,2 | **Wildstein's** | 291:13 | 291:9 293:15 |
| 117:9 120:1,2 | 205:18 206:4 | 68:16 | **workbooks** | 294:17 303:10 |
| 124:16 141:14 | 216:13 221:19 | **willing** 66:17 | 283:17,18 | **wow** 158:8 |
| 160:10,18 | 222:4 228:23 | 105:19 108:4 | 302:2,17 | 255:23 |
| 162:4,12 | 231:20 234:25 | 154:5 | **worked** 14:25 | **wrap** 238:5 |
| 167:17 175:3 | 235:3,13 237:8 | **wind** 89:5 | 40:23 99:2 | **write** 221:19 |
| 176:2 179:16 | 245:22 252:11 | 243:17,25 | 101:5 135:4 | **writing** 223:24 |
| 190:19 191:3 | 264:17 | **wind-down** | 145:24 148:8 | 223:25 228:22 |
| 192:25 197:11 | **well-respected** | 300:5 | 255:16,18 | **written** 10:21 |
| 197:16 201:17 | 22:7 | **winding** 272:24 | **working** 20:20 | **wrong** 39:9 |
| 207:12,17,18 | **Wells** 226:16 | **wins** 294:11 | 99:4,13 170:10 | 45:17 70:13 |
| 208:7,13,15 | 261:25 262:5 | **withdraw** | 170:21 198:11 | 105:25 191:14 |
| 221:10 234:7 | **went** 13:8 24:5 | 223:17,18 | 212:12 265:19 | 195:2 225:19 |
| 234:13 235:21 | 29:7 34:24 | 265:13 | 265:23 271:17 | 276:19 |
| 236:13 238:15 | 41:4 65:13,17 | **witness** 1:16 | 271:23,25 | **wrongly** 45:5 |
| 243:15 245:5 | 65:23 129:10 | 59:8 83:12 | 272:8 273:4,10 | **wrote** 257:3 |
| 245:11,11,23 | 129:13,23 | 139:11 166:19 | 273:12,18,22 | **WSJ** 6:13 |
| 256:1 257:8 | 132:4 133:12 | 166:20,21 | 278:7,14 | |
| 258:22 262:3,4 | 133:14 143:24 | 189:14 190:7 | **works** 10:6 | |
| 262:21,22,23 | 145:14 148:19 | 192:10 214:15 | 14:20 20:2 | **X** |
| 268:17,20,24 | 157:8 164:5 | 214:24 215:3 | 76:5 146:15 | **X** 4:1 5:1 6:1 7:1 |
| 269:12 282:13 | 174:21 178:15 | 215:11 232:3 | 194:16 | 181:5 |
| 282:25 283:1,2 | 196:24 208:17 | 234:18 238:4,8 | **worksheet** 302:5 | |
| 283:3,14 284:2 | 248:25 275:7,8 | 251:10 268:22 | 302:5 | **Y** |
| 285:16 287:17 | 281:4 282:17 | 306:13,16 | **worksheets** | **yeah** 10:18 11:1 |
| 287:17,18 | **weren't** 46:3 | **witness's** 166:14 | 283:15 | 16:16,18 24:22 |
| 290:19 291:5 | 51:6 122:25 | **Wolfe** 8:12 | **world** 14:19 | 28:6 32:4 |
| | | | | 33:17 40:6 |

UNSEALED

43:4,25 47:24
48:8,12 59:9
59:12 77:8
82:10 83:12
86:20 97:10
117:16 140:16
149:16 150:8
151:5 154:14
154:21,21
155:24 156:1,2
156:4,6,9
164:24 170:11
176:20,21
177:5 179:5
182:19,19
183:19 184:4
186:17,17
188:13 192:10
203:15 209:11
210:25 211:25
227:24 231:17
232:4 233:3
248:16 249:24
251:4,4,4,22
252:11 255:25
257:14 265:8
285:13,24
290:25 291:3
296:30 300:20
**year** 13:23 35:10
131:11 188:25
229:4,6 286:3
290:7 291:1,21
292:15 293:14
293:21 299:22
**years** 14:10
15:15 20:17
29:3 75:4
97:21 263:8
**yesterday** 75:17
183:20 217:22
**York** 3:4 228:9
228:14,18
261:6

_____

**Z**
_____

**zero** 215:16

_____

**0**
_____

**00008844** 6:13
**00008845** 6:13
**00014578** 7:9
**00014581** 7:9
**00016130** 7:13
**000491** 5:7
**000503** 5:7
**000504** 5:23
**000529** 5:23
**001231** 5:9
**001242** 5:9
**00151908** 5:11
**00151909** 5:11
**00383459** 7:21
**00383563** 7:21
**00518002** 6:23
**00840** 29:7
**00875** 29:6
**013418** 5:4
**041391** 5:21
**041392** 5:21
**041394** 6:11
**041397** 6:11
**09** 68:18 69:22

_____

**1**
_____

**1** 39:2 41:4,5,17
41:17,21 44:5
44:6 65:2
70:14 73:14
81:7 94:16
107:5 117:8
178:18 183:15
229:3 259:13
304:3
**1-16-14** 7:13
**1-18-13** 5:20
**1,800** 44:22
**1:22** 169:1,3
**1:50** 189:18,19
**1:51** 189:19,21
**1:55** 192:19,20
**1:57** 192:20,22

**10** 41:6,13,22
42:9,13 44:6
44:13,14 45:9
46:20 62:6
65:19 196:17
267:19 268:25
269:5
**10-** 197:25
198:10
**10-10-13** 6:21
**10-29-13** 7:4
**10-7-13** 6:23
**10,000** 66:7,8
**10.9** 292:22
**10:15** 67:19,20
**10:35** 67:20,22
**100** 47:25 298:7
**100,000** 62:21
63:24,25
**102** 29:5,6
**103** 28:24
**104** 38:22
**1050** 3:15
**108729** 7:18
263:14
**108732** 7:18
**109** 5:3
**11** 82:19,20,22
82:23 213:6,10
**11-15-12** 5:15
**11-20-13** 6:8
**11:34** 120:3,4
**11:44** 120:4,6
**115-million-273**
296:13
**12** 54:20 75:4
**12-14-13** 7:8
**12-24-13** 7:10
**12-year** 99:12
**12/31/2010** 94:4
**12/31/2018**
307:10
**12:41** 168:25
169:1
**123** 2:14,19
**126** 292:25

**13.7** 299:24
**136** 229:16
**14** 13:8 221:20
**14-7139-JCJ** 1:5
8:7 306:5
**14th** 190:24
**15** 193:11 195:9
196:2,3 198:1
198:10
**15,000,000**
202:1
**150** 298:4
**153** 295:10
298:2
**16** 292:14
**1600** 2:9
**161130** 256:4
**169** 5:5
**17** 73:5 80:13
81:5 138:14
245:19,20
246:1 257:7
293:4
**171** 5:8
**1717** 2:5
**18** 64:24,25 65:3
73:5 90:3
138:14 197:12
197:18 245:19
**1800** 44:25
**182** 5:10
**186** 5:12
**188** 5:14
**19** 228:22
**191** 5:17
**19103** 2:5,9
**19109** 2:14,19
**198** 5:19
**1994** 12:25
**1998** 13:1
**19th** 186:19
**1st** 259:3 271:2
271:3,4,17
276:7 280:2

_____

**2**
_____

**2** 62:11 73:14
170:6 176:15
196:16 229:5
304:3
**2-3** 4:2
**2,000** 43:9,10,20
44:15,16,17
65:23 66:1
**2.2** 32:21
**2.2(a)** 41:9,11
**2.3** 176:15
**2:30** 214:17,18
**2:35** 214:18,20
**20** 39:10 64:22
90:2 138:14,14
197:12,18
234:25 245:20
246:1 248:21
250:2 257:7
284:10 293:5
**20.1** 39:3,5,18
**200** 5:22,24
44:24 48:9
**20001** 3:5
**2001** 12:25 13:1
23:3
**2002** 23:3
**2005** 23:15,15
**2006** 23:9,16
55:9
**2007** 13:6 23:2
25:17 26:4,8
26:14 27:4
31:25 33:23
34:21 41:2
45:13 49:9
52:21 54:5
55:5 85:5 99:3
102:20 259:25
261:1 267:2
**2008** 34:22
35:11,12 37:11
50:18,25 51:19
52:5,14,14
53:7 54:5 56:4
56:16 57:22

**2009** 35:11 53:9
  92:16,16,22
  95:4
**2010** 84:23
  88:11,18 89:5
  89:22,25 91:21
  91:24,25 92:9
  92:16,22 94:10
  94:13,16,22
  95:4,10,11,15
  95:19 96:2,4
  103:11,15
  104:1,5,7
  105:3,22
  110:15 112:4
  116:25 124:17
**2011** 94:17
  101:13,16
  102:1,4 103:16
  107:5 110:15
  113:5 117:8
  124:17 129:20
  140:15 141:15
  156:10 202:14
  249:1,6 250:9
  297:5 298:20
  298:22,25
  299:2,7,17,24
**2012** 121:17
  182:25 193:1
  221:4 260:24
  298:12,13,20
  299:3,7,17,25
**2013** 7:6 121:17
  199:13 208:22
  209:21 210:1
  211:14 220:20
  221:4 227:23
  228:22 234:25
  238:16 244:8
  249:2,6 250:10
  250:16 253:8,9
  255:10 260:24
  291:3,6,21
  292:21 295:4,5
  295:8 296:16

297:5 298:7,10
298:18 299:15
299:25 302:4
**2014** 13:7 84:7
  85:7 250:10,11
  255:21 257:16
  259:3 263:13
  271:3,4,17
  273:11,16
  276:7 280:2
  284:10 285:1
  285:19,20
  287:22,23
  288:1,24
  289:12 294:19
  300:2,4
**2015** 250:11
  273:11 289:14
**2018** 1:10,19 8:4
  304:2 306:8
  307:5
**202** 6:3
**202-298-1874**
  3:17
**202-346-4000**
  3:5
**203** 6:5
**209** 6:8
**20th** 231:11,20
  232:1 233:20
  234:6
**21.9** 299:25
**210850** 7:15
**215-320-5701**
  2:6
**215-560-2445**
  2:10
**215-772-7502**
  2:15,20
**216** 6:10
**219** 6:12
**22.3** 293:3
**220** 82:1,14
  85:15 87:15,21
  212:3
**221** 6:14

**227** 6:16
**228363** 6:9
**228365** 6:9
**228385** 5:24
**23** 31:24 52:21
**231** 6:18
**238** 6:20
**239** 6:22
**24** 39:21 293:14
**243** 5:3 7:3,5
  109:12,13
**244** 5:5 169:14
**245** 5:8 171:15
  171:16
**246** 5:10 182:10
  182:11
**247** 5:12 186:11
  186:12
**248** 5:14 188:23
  188:25
**249** 5:17 192:3,6
**25** 20:17 89:22
**250** 5:19 7:7
  199:3,4
**250,000** 62:21
**251** 5:22 200:11
  200:16,21
**252** 5:24 200:16
  200:17 201:17
**253** 6:3 202:4
**254** 6:5 7:10
  203:4
**255** 6:8 7:12
  209:16
**256** 6:10 216:18
  216:19
**257** 6:12 7:14
  219:21,22
**258** 6:14 221:10
  221:12
**259** 6:16 227:17
  227:18
**260** 6:18 231:12
  231:14
**261** 6:20 238:1
  238:10,11

**262** 6:22 239:7,9
**263** 7:16 243:10
**263A** 7:3 243:15
**263B** 7:5 244:6
**264** 7:7 250:17
  250:18
**265** 7:10 254:14
  254:16
**266** 7:12 255:21
  255:22 256:3
**267** 7:14 257:23
  258:3
**267158** 6:7
**267160** 6:7
**268** 7:16 263:14
  263:15
**269-270** 7:19
**269583** 5:24
**27** 293:10
**27.1** 299:24
**271** 7:20 283:25
**272** 229:18,19
**28** 298:23
**28.7** 292:16
**284** 7:20
**29** 7:6
**290895** 6:4
  202:9
**2nd** 307:12

---
**3**

**3** 1:10 8:4 78:12
  304:2,4 306:8
**3-13-14** 7:15
**3-19-14** 7:17
**3:12** 243:9,11
**3:25** 243:11,13
**30** 208:5 249:16
  249:17 250:5,6
  250:6 306:19
**30/30/40** 294:3
  297:18
**300** 2:9
**304-305** 4:8
**306** 1:22
**306-307** 4:9

**309723** 6:21
  238:10
**309725** 6:21
**30th** 288:1 290:2
**31** 94:16
**312-902-5622**
  3:11
**31st** 285:25
  286:15 288:1
**334** 82:25
**35** 29:8
**36** 48:20 49:7
  50:7 56:9,12
  62:14 81:24
  85:19 87:25
  210:5 248:9
**367418** 6:17
**367420** 6:17
**383459** 284:6
**3rd** 1:18

---
**4**

**4** 32:11 152:19
  304:5
**4-18-13** 6:6
**4.5** 138:8 152:16
**4:17** 282:7,8
**4:45** 282:8,10
**40** 249:17 250:7
  295:7,16
  296:23 298:8
  299:8
**4130** 2:5
**49** 295:10
**49.1** 295:5

---
**5**

**5** 78:12 147:1
  176:16,18
  177:13,14
  193:21,22
  195:16,17,20
  195:21,22
  196:1
**5-** 196:17
**5-7** 4:3

UNSEALED

**5,000** 71:17
**5:13** 1:19 303:17
  303:18
**50** 89:19 229:17
  229:25 244:5
  245:15 298:6
**50/50** 276:21
**504** 76:3
**504636** 76:21
**5108002** 239:8
**511** 82:21
**512** 307:13
**525** 3:10
**55.8** 288:3
**575001** 7:4
**575005** 7:4
**575012** 7:6
**575015** 7:6
**582865** 5:18
**583777** 5:13
**583778** 5:13

— **6** —

**6** 176:11
**6-19-12** 5:13
**6-20-14** 7:20
**6-7-12** 5:11
**6.4** 293:11
**60** 65:11,13,17
  65:24 249:5,15
  295:17 297:3
  297:13 298:9
**60-day** 65:21
**60661** 3:10
**608431** 5:16
  189:23
**608433** 5:16
**63** 297:4
**65** 264:6,21
  270:1,11,25
**660** 307:11
**674500** 7:11
  254:15
**674502** 7:11
**677073** 6:19
  231:13

**678633** 6:15
  221:11
**678635** 6:15
**687-0421** 307:13
**69** 288:3,4

— **7** —

**7** 222:7
**7-25-13** 6:10
**7000** 307:11
**75** 267:19 269:2
  269:5,5,6
**76102** 1:23
**77.3** 288:14
  289:24
**78731** 307:12
**7th** 1:22 307:4

— **8** —

**8** 4:4
**8-14-13** 6:15
**8-19-13** 6:17
**8-21-13** 6:19
**8-8-13** 6:13
**8172** 307:9
**840** 29:11 31:9
**841** 29:12
**85** 267:21
**86** 23:11
**87** 83:1

— **9** —

**9** 4:6 54:20
**9-11-12** 5:18
**9:03** 1:19 8:4
**90** 41:14 44:14
  44:25 47:6
  48:1,6,7 53:24
  54:8 57:6,15
  62:7 63:17,19
  63:19 64:7,8
  64:17 65:19
  71:25 80:9
  91:9 124:14
  149:2,10,15
  154:2 160:16
  165:5

**901** 3:4
**92** 249:12
**99** 32:13 33:4,10
  34:13,17 36:3
  36:8 41:18
  54:8 124:15
  160:16 178:23
  178:24 179:22

UNSEALED

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

COMMONWEALTH OF :
PENNSYLVANIA :
   Plaintiff :
    :
VS. : CIVIL ACTION NUMBER
    : 2:14-CV-07139
THINK FINANCE, INC., :
ET AL., :
   Defendants :
- - -
APRIL 11, 2018
- - -

   Videotaped deposition of LEE TYLER REMPEL, was taken pursuant to notice at 1600 Arch Street, Suite 300, Philadelphia, Pennsylvania, beginning at or about 9:00 a.m. before Jeannine Cancelliere, Court Reporter and Notary Public and David Levin, Videotape Operator, there being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102
(215) 922-7112

**Page 2**

1 APPEARANCES:
2
3 LANGER, GROGAN & DIVER, P C
   BY: IRV ACKELSBERG, ESQUIRE
   BY: JOHN J GROGAN, ESQUIRE
4 1717 Arch Street, Suite 4130
   Philadelphia, Pennsylvania 19103
5 Phone: (215) 320-5701
   Representing the Plaintiff
6 iackelsberg@langergrogan com
7
8 ATTORNEY GENERAL'S OFFICE
   BY: SAVERIO MIRARCHI, ESQUIRE
9 1600 Arch Street, 3rd Floor
   Philadelphia, Pennsylvania 19103
10 Phone: (215) 560-2445
   Representing the Defendant
11 smirarchi@attorneygeneral gov
12
13 MONTGOMERY McCRACKEN
   BY: JONATHAN P BOUGHRUM, ESQUIRE
14 123 South Broad Street
   Philadelphia, Pennsylvania 19109
15 Phone: (215) 772-7228
   Representing Ken Rees
16 jboughrum@mmwr com
17
18 KATTEN, MUCHIN, ROSENMAN LLP
   BY: J MATTHEW HAWS, ESQUIRE
19 Chicago, Illinois 60661-3693
   Phone: (312) 902-5319
20 Representing Victory Park
   matthew haws@kattenlaw com
21
22
23
24

**Page 3**

1 APPEARANCE (continued)
2
3 GOODWIN PROCTER
   BY: MATTHEW SHELDON, ESQUIRE
   BY: JENNY K. MORRIS, ESQUIRE
4 901 New York Avenue, NW
   Washington, DC 20001
5 Phone: (202) 346-4000
   msheldon@goodwinprocter.com
6 Representing Think Finance
7
8 VAN NESS FELDMAN
   BY: PATRICK DAUGHERTY, ESQUIRE
9 1050 Thomas Jefferson St., NW
   Washington, DC 20007-3877
10 Phone: (202) 298-1800
   Representing National Credit
11 Adjusters LLC
   pod@vnf.com
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1      - - -
2      I N D E X
3      - - -
4 LEE TYLER REMPEL      PAGE
5 BY MR. ACKELSBERG      7
6
7      - - -
8      E X H I B I T S
9      - - -
10 EXHIBIT NO.   DESCRIPTION     PAGE
11 P-65   Organizational Chart   47
12 P-66   Due Diligence Summary   74
13 P-67   E-Mails   80
14 P-68   E-Mails   88
15 P-69   Transmittal & Agreement   91
16 P-70   E-Mails   99
17 P-71   E-Mails   102
18 P-72   E-Mails   104
19 P-73   Loan Sale Agreement   109
20 P-74   E-mails   113
21 P-75   Loan Sale Agreement   113
22 P-76   Loan Sale Agreement   113
23 P-77   Loan Sale Agreement   119
24 P-78   Loan Sale Agreement   119

UNSEALED

App. 0298

Page 5

```
1              - - -
2          E X H I B I T S
3              - - -
4    EXHIBIT NO.    DESCRIPTION        PAGE
5    P-79     Loan Sale Agreement      119
6    P-80         E-mail               140
7    P-81       Amended Agreement      147
8    P-82       Amended Agreement      149
9    P-83         E-mails              154
10   P-84    Sale Agreement (Execution Copy)  154
11   P-85    Sale Agreement (Final Copy)  154
12   P-86       Service Agreement      162
13   P-87         E-Mails              164
14   P-88         Spreadsheet          178
15   P-89       Summary Report         181
16   P-90       Compliance Log         187
17   P-91         E-Mails              203
18   P-92         E-Mails              206
19   P-93    Due Diligence Questionnaire  208
20   P-94         E-Mails              212
21   P-95         E-Mails              215
22   P-96         E-Mails              219
23   P-97         E-Mails              225
24   P-98         E-Mails              225
```

Page 6

```
1              - - -
2          (Whereupon Exhibit Rempel-1 was
3    marked for identification.)
4              - - -
5          VIDEOTAPE OPERATOR:  We're now
6    on the record.  My name is David Levin, I am
7    the videographer employed by On the Record.
8    This is a video deposition in the United
9    States District Court for the Eastern District
10   of Pennsylvania, Civil Action Number
11   14-7139-JCJ.  Today's date is Wednesday, April
12   11th, 2018 and the video time is 9:11 a.m.
13         This deposition is being held at
14   1600 Arch Street, Third Floor, Philadelphia,
15   Pennsylvania in the matter of Commonwealth of
16   Pennsylvania by Attorney Josh Shapiro versus
17   Think Finance Incorporated, Et Al.  The
18   deponent is Lee T. Rempel.  Counsel will be
19   noted on the stenographic record.  The court
20   reporter is Jeannine Cancelliere.  She will
21   now swear in the witness.
22             - - -
23         LEE TYLER REMPEL, after having
24   been first duly sworn, was examined and
```

Page 7

```
1    testified as follows:
2              - - -
3          VIDEOTAPE OPERATOR:  Please
4    proceed, counsel.
5              - - -
6          EXAMINATION
7              - - -
8    BY MR. ACKELSBERG:
9    Q.   Good morning Mr. Rempel.
10   A.   Good morning.
11   Q.   I have already introduced myself.  I'm
12   Irv Ackelsberg and I'm special counsel to the
13   Commonwealth, to the Attorney General.  As you
14   know, this is an action against Think Finance,
15   its former CEO, Ken Rees, a hedge fund named
16   Victory Park Capital against your company,
17   National Credit Adjusters.  You understand
18   that, right?
19   A.   Yes.
20   Q.   So just a few preliminaries before we
21   get into the substance, have you ever been
22   deposed before?
23   A.   No.
24   Q.   Okay.  So I'm sure your lawyer described
```

Page 8

```
1    how this works, but I have to just confirm
2    that you understand on the record.  So if you
3    can indulge me for just a little bit of these
4    preliminary questions.  I just want to make
5    sure that you understand that the way that
6    we're going to proceed is I'm going to ask you
7    questions and wait for your answer, and that
8    both my question, your answer and any comments
9    made by the lawyers in the room will be part
10   of a written transcript that the court
11   reporter will prepare afterwards.  You
12   understand that, right?
13   A.   Yes.
14   Q.   Okay.  And that transcript could
15   possibly be used by one of the parties in this
16   case.  Do you understand that?
17   A.   Yes.
18   Q.   And that you just received an oath
19   administered by the court reporter and you're
20   appearing here under oath as if we were
21   sitting in a federal courtroom.  Do you
22   understand that?
23   A.   Yes.
24   Q.   Okay.  And because the official
```

2 (Pages 5 to 8)

UNSEALED

App. 0299

1 transcript, the official record -- because the
2 official record of this deposition is the
3 transcript, as opposed to the videotape, it's
4 really important that you answer all of the
5 questions verbally. So even though all of us
6 in the room will be able to interpret, for
7 example, a shrug or some kind of non-verbal
8 gesture, the court reporter can't do that. So
9 a nod won't work. You actually have to say
10 yes, because we're working with this
11 transcript.
12 A. I understand.
13 Q. Okay. And I also want to make sure it's
14 clear to you that if you don't understand a
15 question, it's perfectly fine to say, I don't
16 understand; or you can explain to me what part
17 of the question you want me to clarify.
18 That's perfectly fine.
19         But if you answer the
20 question, I'm going to assume you understood
21 what I was asking you, right? You understand
22 that, right?
23 A. Yes, I do.
24 Q. Your lawyer may, and I'm sure he will,

1 object to some questions, but as I'm sure he
2 has explained to you, unless he directs you
3 not to answer, you still have to answer the
4 question. All right?
5 A. Okay.
6 Q. So the way it will work is, I ask a
7 question, the lawyer will object or some other
8 lawyer may have a comment; and then after they
9 finish saying what they need to say, then you
10 have to go and answer the question, unless
11 your lawyer directs you not to answer the
12 question. Okay?
13 A. Okay.
14 Q. We will take breaks. You can also ask
15 for a break. This isn't an endurance course.
16 We'll be taking plenty of breaks over the
17 course of the day. But if you need a break,
18 just ask for one. You just need to answer
19 whatever question was pending at the time, and
20 once you finish that we can break and you can
21 take off and come back. Okay?
22 A. Okay.
23 Q. Last, is there any reason such as
24 illness, hearing disorder, medication, lack of

1 sleep, anything like that, that would prevent
2 you from giving this deposition today your
3 complete attention?
4 A. No.
5 Q. Okay. So let's begin. First, I want to
6 make sure that you understand that you're
7 appearing here today on behalf of the
8 defendant, National Credit Adjusters with
9 respect to certain topics. Do you understand
10 that?
11 A. Yes.
12 Q. Okay. And I just want to confirm, I'm
13 going to show you an exhibit that we've
14 pre-marked Rempel-1. I want to make sure that
15 you've seen that before, the list of topics
16 that will be covered today.
17 A. Yes.
18 Q. Fine. Okay fine. Let's start with a
19 little bit of background regarding the company
20 and your responsibilities there. Can you
21 describe the nature of the company's business?
22 A. The nature of National Credit Adjusters
23 business from existence has been as a debt
24 buyer purchasing charged off accounts

1 receivables, predominantly consumer loans.
2 With those charged off consumer loans we have
3 call centers and we engage in collection
4 activity for the purpose of recovering those
5 delinquent receivables. That's our primary
6 focus as an organization.
7 Q. In terms of the kind of consumer loans
8 that you tend to work on, is the company
9 specialized in certain areas of consumer
10 loans?
11 A. We've really purchased and collected on
12 many different consumer loans over the course
13 of time. To say that we specialize in a
14 specific product line, I don't know if I'd
15 consider us specialized in any specific
16 product line.
17         Over the past eight to ten
18 years, we have primarily purchased and
19 collected on loans that would be considered in
20 the short term arena, as well as internet
21 based installment loans, lines of credit. The
22 main reason for us migrating to that segment
23 line has mainly to do with price points on the
24 debt that we purchase.

UNSEALED

1    Over the course of time we
2  have purchased and collected on product lines
3  like consumer bank cards, consumer retail,
4  things such as HSBC, those business lines
5  would be retail credit cards, bank cards,
6  somebody goes down to Lowe's or whatnot and
7  receives credit. We've also worked in the
8  lines of Sterling Jewelers credit, as well as
9  Wells Fargo, Chase.
10    So over the last 15 years we
11  really have collected on many different
12  consumer lines of credit, if you will, or
13  products.
14  Q.   Well, let me start with the category
15  that you mentioned first, the short term
16  consumer loans. That also goes by the name
17  Payday Loans, right?
18  A.   In the past people have considered it
19  Payday. I think over the last six or seven
20  years, it has really transitioned to short
21  term, as we know it today. But one could
22  consider it Payday, yes.
23  Q.   And if we -- and the installment -- you
24  mentioned also, online installment or line of

1  credit. You're only talking about high rate
2  loans, right? High rate credit?
3  A.   High rate in the form of interest?
4  Q.   Yes.
5  A.   Yes. They are typically higher than a
6  loan, a consumer loan on an asset that is
7  going to be paid back over the course of five
8  years, six years, mortgage loans, et cetera.
9  In comparing a short term loan interest rate
10  versus those, one could consider it higher,
11  yes.
12  Q.   Well, I mean just to be clear, we're
13  talking about credit that's generally in the
14  triple digits, more than 100, 200 sometimes
15  300 percent APR, right?
16  A.   Yes.
17  Q.   Okay. If we could just take the Payday
18  Loans, the installment loans, the line of
19  credit, all of these high rate kinds of
20  products, how big a portion of NCA's portfolio
21  of debt would be those kind of consumer
22  obligations?
23  A.   I don't know that I could give you a
24  specific number, but I would say it's north of

1  50 percent.
2  Q.   Okay. Has that been true -- is that
3  what it is today, north of 50 percent?
4  A.   Yes.
5  Q.   And what about three or four years ago,
6  also north of 50 percent?
7  A.   I don't know if I can answer that. If I
8  made an assumption, I would say yes. The last
9  three or four years predominantly what we were
10  purchasing at the time, I can't confirm that
11  it would be north of 50 percent,
12  predominantly.
13  Q.   Okay. But it's at least 50 percent?
14  A.   Yes.
15  Q.   Where is the company located?
16  A.   Our corporate offices are located in
17  Hutchinson, Kansas. We have remote call
18  centers in Phoenix, Arizona. And we have a
19  branch in Jamaica.
20  Q.   The island in Jamaica?
21  A.   Montego Bay.
22  Q.   So the call center work is happening
23  either in Phoenix or Jamaica?
24  A.   No, we do have a call center in

1  Hutchinson. That was where our initial
2  company got started. We had a call center
3  there, and over the course of time had
4  branched out to other markets and locations.
5  Q.   The high rate consumer loans that we're
6  talking about, Payday, online installment or
7  credit lines, are they handled -- tend to be
8  handled in one of the three offices or in all
9  three?
10    MR. DAUGHERTY: Object to
11  form.
12    THE WITNESS: They're handled
13  in all of the offices. We really don't have
14  specific offices for specific products. It's
15  really a strategy that is applied whether
16  you're sitting in Hutchinson or sitting in
17  Phoenix or Jamaica. A collector could be
18  working on the same team or division, let's
19  say, that somebody is in Hutch, as well as in
20  Phoenix, as well as in Jamaica. So they're
21  seeing the same collection strategy, as well
22  as accounts.
23  BY MR. ACKELSBERG:
24  Q.   How many employees does NCA have at the

4 (Pages 13 to 16)

UNSEALED

1   moment?
2   A.   At the moment, roughly 300.
3   Q.   What is your current position with the
4   company?
5   A.   Chief executive officer.
6   Q.   How long have you held that title?
7   A.   Since November of 2016.
8   Q.   And when did you start with the company?
9   A.   In 2008.
10  Q.   When you were hired, what position were
11  you hired into?
12  A.   I was hired into a director role
13  overseeing the Hutchinson call center.  At
14  that time, that was the only call center we
15  had.
16  Q.   And then between -- when did the other
17  offices open?
18  A.   Phoenix opened I believe in 2012, May;
19  Jamaica we opened in June of 2016.  And to be
20  clear, Phoenix -- we actually have two small
21  offices.  One is on the southeastern side,
22  Chandler, Arizona.  The other one is on the
23  northwest side in Peoria, Arizona.  The Peoria
24  office, I'm sorry, opened in October of 2014.

1   Q.   Did you hold other positions in the
2   company between 2008 when you were hired to
3   run the Hutchinson call center and your
4   elevation to CEO?
5   A.   Yes, I moved from a director of
6   operations over the Hutchinson call center to
7   a vice president of operations over all of our
8   domestic call centers.  At the time we only
9   had domestic call centers.
10           I held that vice president of
11  operations title until I was named chief
12  executive officer.
13  Q.   So you were vice president from when
14  until November 2016?
15  A.   From 2013 until 2016.
16  Q.   And were you -- at the time you were
17  hired, were you already working in the debt
18  collection field?
19  A.   I was not.  I recently had graduated
20  from Wichita State University in 2007.
21  Collection is -- often you'll hear people say
22  they never expect to get into or that be their
23  career.  Hutchinson, Kansas is a small town.
24  And there was a job opening that I interviewed

1   for and it seemed very interesting to me.
2           Often times a person thinks
3   of call centers or collections to be just a
4   bunch of people on the telephone making phone
5   calls from a list.  What stoked my interest
6   was the analytical side, you know, from a
7   strategic approach and that there's so much
8   more to being successful in the debt
9   collection industry.
10           So that's what -- obviously I
11  interviewed well and got an opportunity.
12  Q.   What would -- in your view, what is the
13  key to success?  What has been the key to
14  NCA's success?
15  A.   NCA has had success and it has had
16  failures.  For me, the key to being
17  successful, you know, in the collection
18  business is probably similar to what's being
19  successful in other industries, as well.  I'm
20  a type of person that believes in -- I use the
21  analogy of blocking and tackling well and
22  execution, not creating self-inflicted fires
23  et cetera, and really focusing on, you know,
24  the basics, you know not over complicating,

1   you know, your strategy and looking for a
2   quick win, so to speak.  It's developing a
3   good foundation of operating in an ethical and
4   compliant manner, and one that people believe
5   in and want to work for and have confidence in
6   their leadership team.
7           I think that will ultimately
8   provide a successful environment.  Over the
9   years, NCA hasn't been successful.  There was
10  good years, and over the past five years we
11  have been in very challenging times from a
12  financial perspective.  We have gone through a
13  lot of changes and I've got a tall task in
14  front of me.
15  Q.   What account -- what accounts were those
16  challenges over the last five years?
17  A.   A lot of things, you know, pricing when
18  you're a debt buyer changes a lot of things.
19  If you don't buy right, it's going to be very
20  difficult to ever turn a profit on, you know,
21  if you overpay for something.  I guess that's
22  typical in any business or industry.  But from
23  2000 really '10 to late 2015, we saw price
24  increases on the debt purchases to levels

UNSEALED

App. 0302

1  that, you know, made it very difficult.
2      We experienced high levels of
3  attrition at the collector level, which we
4  believe that it takes roughly 12 months to
5  grow and develop a collector into somebody
6  that becomes an asset for you.
7      So turning people over early
8  on makes it very difficult to, you know,
9  continue to perform. I believe we have made
10 poor decisions over the course of time from,
11 you know, from a capital standpoint. And what
12 I mean by that is, if you pay too much for
13 something and you're financing it at high
14 rates, you have very small margins. And if
15 you make a mistake or don't perform, you can
16 see poor performance financial results.
17     We've also, as you know, have
18 had our share of regulatory challenges as it
19 relates to New York, New York City, Arkansas,
20 Connecticut, Maryland, that we've, you know,
21 over time had to deal with. A small company
22 like us, when you have very important matters
23 like those, it can take, you know, your focus
24 away from just the day-to-day operations. And

1  it's very easy and very quick for things to,
2  you know, get off track from just a day-to-day
3  standpoint.
4  Q.  Let me ask you just a couple of
5  follow-up questions.
6  A.  Sure.
7  Q.  You mentioned some challenges in terms
8  of -- on the capital side. So in order to
9  purchase high volumes of consumer debt, you
10 need to have a source of capital to finance
11 those purchases, right?
12 A.  Yes.
13 Q.  And so how does that work in terms of
14 NCA? Do you have credit lines? Do you have
15 big investors? How do you get your capital to
16 buy these loans?
17     MR. DAUGHERTY:  Object to
18 form.
19     THE WITNESS:  Over the course
20 of time, the capital has changed. In the
21 first ten years, the partners put in their own
22 capital.
23 BY MR. ACKELSBERG:
24 Q.  When you talk about the first ten years,

1  the first ten years of you being there or the
2  company?
3  A.  The existence of the company.
4  Q.  And that was roughly 2001 or so; does
5  that sound about right?
6  A.  Yes. So it was privately funded, you
7  know. In the last five to seven years, we've
8  utilized different credit facilities within
9  the industry, folks such as Credit Max. I'm
10 not sure if you're aware or know who they are.
11 They typically fund, you know, debt
12 purchasing, a lot of traditional banks or
13 local small town banks. It's not a space that
14 they understand, nor do they know what to do
15 with a bad debt file as collateral, right.
16     So that's really how we've
17 been funded. Up until 2012, portfolio sales
18 were more prevalent from a strategic
19 standpoint. A person or NCA would typically
20 buy a debt file, manage, service it for 12 to
21 18 months. And it had qualified buyers on the
22 back end that would purchase it -- call it a
23 back end flow.
24     That was important from a

1  capitalization standpoint because you had
2  money coming in from the debt sale, as opposed
3  to when you buy something today, it may take
4  five to seven years before you start to see a
5  recognized profits.
6  Q.  So let me make sure I understand. So
7  what you would -- you would have a financial
8  source to finance the purchase of debt, but
9  you also would have a market that you knew you
10 could sell the debt after you have worked the
11 accounts for a year or 18 months?
12     MR. DAUGHERTY:  Object to
13 form.
14 BY MR. ACKELSBERG:
15 Q.  That's kind of the way -- that was the
16 basic model that you used previously?
17     MR. DAUGHERTY:  Object to
18 form.
19     THE WITNESS:  That was the
20 strategy of the company.
21 BY MR. ACKELSBERG:
22 Q.  Up until when?
23 A.  Up until roughly 2012. I can say that
24 not every product line or purchase would be

UNSEALED

1    resold.  But that was part of the company's
2    strategy.
3        Q.   Let's just focus on Payday.  Really for
4    purposes of today's discussion, we're
5    primarily talking about the Payday and online
6    installment and line of credit.  You
7    understand that, right?
8        A.   Yes.
9        Q.   So with regard to the description that
10   you gave as to the model up until 2012, we're
11   talking that applies to the high rate consumer
12   loans that we've been discussing?
13           MR. DAUGHERTY:  I apologize
14   for interrupting, but I just want to ask for a
15   clarification.  The deposition notice made
16   repeated reference to capital C, capital L
17   Consumer Loans as it relates to this case.
18   And I just want to be clear when you're asking
19   the witness questions, if you can distinguish
20   between what you consider to be short term
21   loans generally or when you use the phrase
22   Consumer Loans, meaning it as defined in the
23   deposition notice.
24           MR. ACKELSBERG:  We're going

1    to get very shortly to the Think Finance
2    relationship.  I appreciate the clarification.
3    BY MR. ACKELSBERG:
4        Q.   We're really still just in the broad
5    background of how the business functions with
6    regard to this class of consumer debt.  Okay?
7        A.   Yes.
8        Q.   All right.  So as I understand what
9    you've told us, is that up until 2012 NCA's
10   model with regard to this form of consumer
11   debt was to finance the purchase of loan
12   portfolios with the expectation that after the
13   company worked the accounts for a period of
14   roughly a year to 18 months, it could then
15   resell those -- the balances left to someone
16   else?
17           MR. DAUGHERTY:  Object to
18   form, object on the grounds that it
19   mischaracterizes prior testimony.
20   BY MR. ACKELSBERG:
21       Q.   You can answer.
22       A.   I will back up.  Like I stated
23   previously, the company originally was funded,
24   privately funded by its partners, its members,

1    the owners.  You know, up until -- really
2    2012, that's the way it was funded.  During
3    that time, you know, purchasing a forward flow
4    or a purchase of bad debt file, if you work it
5    for 12 to 18 months and then have a back and
6    sell, it helps from a cash flow standpoint
7    because you have income coming in or cash
8    coming in, you know, on that sale, as opposed
9    to continuing to collect it over the next four
10   and a half years, which would spread that cash
11   flow out.  It just aided, you know, from a
12   strategic standpoint in the ability to
13   continue to purchase every month most forward
14   flows or debt purchases that come on a monthly
15   basis, that's what you're contractually agreed
16   to or obligated to buy a fund, and as you
17   stated earlier, it can get very cash
18   intensive.
19           So as part of the company's
20   strategy, it wasn't just the company's
21   strategy, it was very normal in the industry
22   to resell portfolio, you know, to a secondary
23   buyer.
24       Q.   But then something happened in 2012.

1    What happened in 2012 or roughly about that
2    time?
3           MR. DAUGHERTY:  Object to
4    form.
5           THE WITNESS:  At that time
6    the CFPB dot frank changed the landscape.  I
7    do believe that companies such as ourselves,
8    as well as the credit issuers didn't really
9    know what direction, you know, that things
10   were going to go as it relates to debt sales.
11   Everybody did though, have concern that, you
12   know, the discussion about vicarious liability
13   and different things that have been spoken
14   about or tossed around at the federal level,
15   that it was just smarter and safer for the
16   issuers to change their contracts to state
17   that, you know, there can be no resale of the
18   portfolio.
19           A lot of folks did that, as
20   well as large credit card issuers until they
21   knew and had a better understanding of what
22   the market and the regulatory side of things,
23   you know, how it was going to shake out.
24           You know, a lot of it was not

UNSEALED

1  necessarily by our choice, it was, you know,
2  often times when we negotiate or at those
3  times when Brad Hochstein negotiate a contract
4  or forward flow of a credit issuer, you would
5  do that for a 12-month time period.  And once
6  that expires, you would renegotiate the
7  pricing market changes.  And at that time we
8  saw a majority of the issuers or products that
9  we were purchasing went to a no resale clause
10 in those contracts, you know, just to protect
11 themselves.
12        I think at that time, you
13 know, the industry not just on the collection
14 front but the lineage side of things, you
15 know, felt that that's the direction that the
16 regulatory environment was headed.
17 Q.   You used a term forward flow, and I
18 think you -- I think the course of your
19 testimony, I think you've explained it, but I
20 want to make sure I understand what you said.
21        So a forward flow refers to
22 an ongoing relationship with a particular
23 credit issuer, such that there would be an
24 expectation of periodic purchases from that

1  issuer by NCA over a particular period of
2  time.  Is that what we mean by a forward flow
3  agreement?
4        MR. DAUGHERTY:  Objection to
5  form.
6        THE WITNESS:  Yes, and just
7  to clarify, it's a term that the industry
8  uses.  But yes, it could be quarterly charge
9  off installments where your flow would be --
10 you've committed to purchasing the charge offs
11 of a credit lender or issuer on a quarterly
12 basis.  And, you know, within the contract
13 sometimes you'll see that there's an expected
14 volume, you know, not to go over or under.
15        So it's just a way to plan
16 staff.  The credit lender needs to, you know,
17 be able to plan for their debt sales and
18 budget et cetera, as well as a company like us
19 who needs to be able to do the same.
20        So ultimately you sign a
21 contract that will have monthly packages that
22 will be available for purchase in that
23 contract.  We agree to purchase them, you
24 know, over the course of that, you know, flow,

1  if you will.  We call it a flow.  Does that
2  answer your question?
3  BY MR. ACKELSBERG:
4  Q.   Yeah, I think I understand.  You also
5  mentioned the regulatory challenges, you said,
6  that the company had.  And you mentioned New
7  York, Arkansas, Connecticut, Maryland.  Can
8  you explain what was the nature of those
9  challenges?
10        MR. DAUGHERTY:  Object to
11 form.
12        THE WITNESS:  Each one was
13 potentially a little different.  You know, the
14 allegations, you know, in those orders related
15 to loans that didn't adhere to the user rates
16 within their state.  Not only that, but over
17 the course of time, the company had purchased
18 loans that, you know, were considered not just
19 usurious but unlicensed, as we know here.
20        Those New York, New York
21 State, Maryland, really all but Arkansas, that
22 was predominantly the allegation, that we
23 collected on usurious loans or unlicensed
24 loans, you know, above and beyond the state

1  cap.  And that's really the target of those
2  complaints.
3  BY MR. ACKELSBERG:
4  Q.   Were those allegations correct?
5  A.   We didn't --
6        MR. DAUGHERTY:  I'll object
7  to the question on the grounds that it calls
8  for a legal conclusion.  But you can answer
9  Tyler.
10        THE WITNESS:  We didn't agree
11 with the allegations.  We reached a consent
12 order agreement and ultimately ended up having
13 to pay back consumers above and beyond, in
14 most cases, what was collected above and
15 beyond the state cap.
16 BY MR. ACKELSBERG:
17 Q.   Was the New York case about Payday or
18 high rate installment loans?
19        MR. DAUGHERTY:  Object to
20 form.
21        THE WITNESS:  I don't know
22 that it specifically was about Payday or high
23 rate installment loans, as much as it was
24 about loans that ultimately the APR was higher

UNSEALED

1 than the state allowed, you know, rate.
2 BY MR. ACKELSBERG:
3 Q. Does -- let's talk about the company
4 today. Does the company have a -- does the
5 company do some form of review or due
6 diligence regarding loan portfolios that it
7 purchases, as to the legality of the
8 particular loans?
9 MR. DAUGHERTY: Object to
10 form.
11 THE WITNESS: Yes, we do. We
12 take that very seriously because it has cost
13 us over the course of time. We typically
14 review, you know, each potential purchase or
15 product, we put it through what we consider an
16 onboarding process. We have a process that we
17 want to evaluate, not just the legality of it,
18 but the reputation of the issuer, whoever is
19 providing the credit, the states in which they
20 operate in, you know, the licenses they carry
21 within those states, as well as the licenses
22 that they, you know, had at the time of the --
23 when the loans were issued.
24 We do a background check on

1 the company, like they will be doing on us.
2 And we have to answer questions about the
3 cases we just discussed. We evaluate each new
4 product line or potential purchase to make
5 sure that it's not going to put us in harm's
6 way.
7 Q. Some of these things that you described
8 are things that you put in place when you
9 became the CEO?
10 MR. DAUGHERTY: Object to
11 form.
12 THE WITNESS: Formally, you
13 know, I believe over the course of time the
14 company was informally doing evaluations.
15 Brad Hochstein, in the past was, you know,
16 responsible for the purchasing. And I can't
17 definitively say what his exact process was.
18 It wasn't necessarily documented. But I do
19 know that he -- I believe he had a process of
20 evaluation that he did.
21 BY MR. ACKELSBERG:
22 Q. Is that based on descriptions by him to
23 you? How do you -- or just your inferences
24 from looking at things since you became CEO?

1 What's the basis of your understanding of the
2 criteria that Brad Hochstein applied. Make
3 sure we have -- it's Hochstein,
4 H-O-C-H-S-T-E-I-N.
5 A. Yes.
6 Q. He's the former CEO, right?
7 A. Yes.
8 Q. Okay. And he was also funding some of
9 the purchases himself?
10 MR. DAUGHERTY: Object to
11 form.
12 THE WITNESS: I personally
13 don't know the capital side of, you know, who
14 put in their own capital from day one, et
15 cetera.
16 BY MR. ACKELSBERG:
17 Q. So we're talking about -- let's say when
18 you started in 2008 and you were running the
19 Hutchinson call center, did you have any
20 understanding at that time of how the company
21 decided what debt it was going to purchase?
22 A. At that time when I started in 2008,
23 early in my tenure at NCA, I can answer that
24 question with, no, I didn't know.

1 Q. When you started, was the Hutchinson
2 call center collecting Payday Loans?
3 MR. DAUGHERTY: Object to
4 form.
5 THE WITNESS: I believe so.
6 I believe a small -- a small amount. At that
7 time I believe it was when Brad really started
8 to purchase the short term loans.
9 BY MR. ACKELSBERG:
10 Q. Because it got to a point of -- you said
11 50 percent or more. So what happened to shift
12 into the Payday market?
13 A. What caused it?
14 Q. Yes.
15 A. Largely price points on the consumer
16 bank card side of things. They just continued
17 to rise, basically pricing a small company
18 like us out of that market.
19 Q. So the credit card debt became too
20 expensive, so you had to find another market
21 to focus on?
22 A. I would say that's a fair representation
23 of that.
24 Q. Okay. So we're talking about 2010,

UNSEALED

App. 0306

1   2011, that Hochstein is buying more and more
2   of this kind of -- the high rate Payday
3   installment loans, other forms of online
4   consumer debt, right?
5           MR. DAUGHERTY:  Object to
6   form.
7           THE WITNESS:  Yes.  In
8   addition to that product line, Brad and the
9   company was buying other products like
10  Sterling Jewelers, HSVC Retail, I believe.
11  Those two we were purchasing up through
12  roughly the 2012, don't quote me on the
13  timeframe there.
14          But you're really asking, in
15  my mind, about the velocity of how quickly the
16  short term lending segment became more of a
17  primary product; is that correct?
18  Q.   Yes, yes.
19  A.   You know, it just continued to increase,
20  I would say really as I started in 2008 and
21  each year it just became more of a primary,
22  you know, product line for us until today.
23  Q.   Now when you described the process that
24  you instituted now as a formal matter to

1   really look carefully at the reputation of the
2   credit issuer, you're getting the loans from
3   the states in which they are operating,
4   whether they have licenses.
5           What -- did you see any signs
6   of that during the increase in velocity, let's
7   say 2010, 2011; were you seeing any signs of
8   that kind of review that you consider to be
9   important today?
10          MR. DAUGHERTY:  Object to
11  form.
12          THE WITNESS:  Can you clarify
13  what you mean by signs?
14  BY MR. ACKELSBERG:
15  Q.   Well, sure.  I mean you became -- well,
16  let's talk about by the time you were -- well
17  let's talk about -- let's say 2012, that
18  range, just before you became director of --
19  the vice president for operations.
20          Were you aware of any due
21  diligence that Brad or anyone else at the
22  company was doing with regard to the Payday
23  Loans it was buying?
24          MR. DAUGHERTY:  Object to

1   form.
2           THE WITNESS:  Aware of any,
3   you know, formal documented structure or
4   process, I can say I was not.  I don't know
5   that it existed.
6   BY MR. ACKELSBERG:
7   Q.   Did Brad differentiate, as far as you
8   knew, between states he was willing to operate
9   in?  And when I say operate in, meaning would
10  he -- would he -- would it matter to him what
11  state the consumer resided in, of the debt he
12  what buying?
13          MR. DAUGHERTY:  Object to
14  form.
15          THE WITNESS:  Yes, I do know
16  that it would matter on several fronts.  You
17  know each state performs a little differently.
18  BY MR. ACKELSBERG:
19  Q.   What do you mean perform?
20  A.   You know, from a collections standpoint,
21  you know, just a performance standpoint on one
22  side; and from a compliance standpoint and a
23  regulatory standpoint.  You know, I know that
24  he viewed some states to be more aggressive

1   than others.  And to be clear -- we're calling
2   it Payday, short term, I'm using the terms
3   that you're using, we would seek advice of
4   counsel.
5           When I say, we, the company,
6   Brad.  We were buying products that would be
7   considered -- or choice of law contracts
8   provisions.
9           MR. DAUGHERTY:  I need to
10  interject.  Tyler, I want you to answer Mr.
11  Ackelsberg's question, but would just ask you
12  not to divulge the contents of any advice you
13  received from the company's counsel either at
14  the time or presently.
15  BY MR. ACKELSBERG:
16  Q.   Let's stick with -- just to be
17  consistent, we'll stick with the 2012 --
18  roughly 2012, just before you became vice
19  president of operations.  Were you aware of
20  any states in which Brad would not -- would
21  not buy loans, these kinds of loans.
22          When I say loans, we're
23  talking about the high rate Payday
24  installment, various online products that

UNSEALED

1  we've been describing. Were there states that
2  you knew Brad didn't want to be operating in?
3  A.  I can't say from a time standpoint, but
4  from 2012, you know, roughly in that general
5  ballpark, there was beginning to be states
6  that he didn't want to purchase specific
7  products in.
8  Q.  You don't remember what states they
9  were?
10 A.  I don't remember exactly, you know, what
11 states, there were some. It was a volume
12 thing, as well as just a concern, a regulatory
13 concern.
14 Q.  Let me ask what you mean by a volume
15 thing. Why don't you explain what that means?
16 A.  Maybe it's a state that you buy 1,000
17 accounts and 1,000 consumers, and I charge off
18 filed it. Maybe there's a state that is
19 small, you know, like five or six accounts
20 that, you know, the perceived risk associated
21 with those accounts may not be worth buying.
22 So we would ask for those to be held out.
23 Q.  When you say perceived risk, meaning
24 regulatory risk, right? In other words, like

1  an attorney general or a banking department
2  giving you grief about collecting loans that
3  aren't legal in that state; that's what you're
4  talking about, right?
5          MR. DAUGHERTY: Object to
6  form.
7  BY MR. ACKELSBERG:
8  Q.  That kind of a problem.
9  A.  Potentially, yes. In some of the areas,
10 I don't know that it was known what direction,
11 you know, the state was going to, you know, go
12 with their opinion of a loan. But the
13 decision, you know, in some of those states
14 was made to stop buying.
15 Q.  You know -- I'm going to be moving into
16 the Think Finance relationship specifically,
17 and it's true that at some point in 2015 you
18 stopped -- you stopped collecting Pennsylvania
19 loans for -- that you had gotten from Think
20 Finance, right?
21 A.  Yes.
22 Q.  Before that decision, had you -- do you
23 recall any conversations within the company
24 about whether or not to operate in

1  Pennsylvania?
2          MR. DAUGHERTY: I'll object
3  on the grounds --
4  BY MR. ACKELSBERG:
5  Q.  Other than discussions with counsel.
6  A.  I can't say that I was, you know,
7  involved in any of those discussions as far as
8  Pennsylvania, you know, is concerned. I do
9  believe that there were discussions being had,
10 obviously with counsel, as well as internally.
11 Q.  What about conversations you might have
12 had with Brad? He's the CEO. Let's say, it's
13 now 2013, you're vice president of operations.
14 Do you recall any conversation with Brad about
15 operations in Pennsylvania? And this is
16 really up until the time that this suit was
17 filed.
18         Do you recall -- before this
19 suit was filed, do you recall any
20 conversations with Brad about operations in
21 Pennsylvania?
22 A.  No. Can I clarify, as well, my
23 responsibilities as the vice president of
24 operation?

1  Q.  Sure.
2  A.  My focus at that time was really the
3  collections from our internal call centers.
4  At that point in time we had collectors in
5  Hutchinson, as well as our two sites in
6  Phoenix. I guess post 2015, we ended up with
7  Jamaica.
8          My responsibility in what I
9  dealt with on a day-to-day basis was the
10 performance and day-to-day operation of those
11 folks and those call centers.
12 Q.  Not the purchase of loans?
13 A.  Not the purchase of loans.
14 Q.  Nor the decision of what kinds of loans
15 to purchase?
16 A.  Nor that decision.
17 Q.  Nor the decision as to which states in
18 which to operate?
19 A.  Correct.
20 Q.  But as the CEO, that became something
21 that you were paying close attention to,
22 correct?
23 A.  Correct.
24 Q.  With regard to the determination of what

UNSEALED

| Page 45 | Page 47 |
|---|---|

**Page 45**

1  state in which -- let me ask you this: Is the
2  company today still purchasing Payday Loans or
3  other forms of high rate online consumer debt?
4            MR. DAUGHERTY: Object to
5  form.
6            THE WITNESS: Yes, we are.
7  BY MR. ACKELSBERG:
8     Q.   Are you purchasing any Pennsylvania
9  loans?
10    A.   No.
11    Q.   You mentioned -- I assumed that the
12  states that you mentioned, New York, Arkansas,
13  Connecticut and Maryland, you're not
14  purchasing that kind of consumer debt in those
15  states either?
16            MR. DAUGHERTY: Object to
17  form.
18            THE WITNESS: That's correct.
19  BY MR. ACKELSBERG:
20    Q.   I think you eluded to some kind of --
21  let me ask you this: Did you institute
22  enhanced due diligence to make the kind of
23  evaluations that you described before, before
24  purchasing debt?

**Page 46**

1            MR. DAUGHERTY: Object to
2  form.
3            THE WITNESS: Yes. I along
4  with, at the time our compliance officer, we
5  worked as obviously a team and documented the
6  process of onboarding.
7  BY MR. ACKELSBERG:
8     Q.   As you began to do that, and we're
9  talking post November 2016, right, since
10  you became the CEO, that's what you're
11  describing, right?
12    A.   Yes.
13    Q.   What did you discover with regard to any
14  prior processes in place during the Brad
15  Hochstein error?
16            MR. DAUGHERTY: Object to
17  form.
18            THE WITNESS: I don't know
19  that we necessarily discovered anything. I
20  think our track record spoke to that there
21  were some problems. You know, there was not a
22  documented -- he didn't have a documented
23  process. That doesn't mean that he didn't
24  have a process.

**Page 47**

1            The approach that I took was,
2  you know, we need to make sure we have a
3  documented process --
4  BY MR. ACKELSBERG:
5     Q.   I understand.
6     A.   I want to hold people accountable within
7  our organization to a process, as well as
8  making sure that evaluations and onboarding of
9  new purchases is completed.
10    Q.   Did you ever ask Brad Hochstein what his
11  process was for deciding what loans to buy,
12  what states to buy them in?
13    A.   I can't say that I did.
14    Q.   All right, I'm going to start showing
15  you some documents. And we're going to assign
16  numbers to them and we're going to go in
17  order, and we're going to start with number 65
18  just because there have been other depositions
19  before yours. And we're just keeping with the
20  same numbers.
21            So I'm going to show you a
22  document that we pre-marked as exhibit P-65.
23            - - -
24            (Whereupon Exhibit P-65 was

**Page 48**

1  marked for identification.)
2            - - -
3  BY MR. ACKELSBERG:
4     Q.   For clarity, we're looking at -- Exhibit
5  P-65 is a multipage discovery document
6  starting with TF-PA 405052. Just so that you
7  understand, Mr. Rempel, we're going to be
8  showing you some documents that were produced
9  in discovery by Think Finance and some that
10  were produced by NCA. And if you look in the
11  lower right-hand corner, you'll see there's a
12  number with TF-PA in front of it. That means
13  that it was produced by Think Finance.
14            You also will be seeing some
15  documents that say NCA-PA, which then means
16  that it came from your company. Okay?
17    A.   Okay.
18    Q.   All right. Now, this document appears
19  to be a -- organizational -- some
20  organizational information that National
21  Credit Adjusters provided to Think Finance.
22  Do you see that? Have you gone through the
23  document?
24    A.   No.

UNSEALED

1 Q. Why don't you do that first?
2 A. (Witness complies.)
3 Q. All right. Have you had a chance to
4 look at it?
5 A. Yes.
6 Q. Have you ever seen this document before,
7 anything sort of like this?
8 A. I can say that I've seen documents like
9 this.
10 Q. And it's common, I think you mentioned
11 in your testimony that it's common in the
12 industry that the credit issuer will be doing
13 due diligence on -- some due diligence on the
14 debt buyer, and the debt buyer might be doing
15 due diligence back in the other direction,
16 correct?
17 A. Correct.
18 Q. So it's not surprising to see that NCA
19 produced a detailed organizational chart like
20 the one we're looking at for Think Finance?
21    MR. DAUGHERTY: Object to
22 form.
23 BY MR. ACKELSBERG:
24 Q. That's to be expected, right?

1 A. To be expected, yes.
2 Q. Are you personally aware of any due
3 diligence that the company -- any due
4 diligence that Think Finance conducted
5 regarding NCA before you became CEO?
6 A. I am. So the question is, what due
7 diligence am I aware of that Think Finance did
8 looking into National Credit Adjusters,
9 correct?
10 Q. Yes, either originally or over the
11 course of their relationship.
12 A. Over the course of time, I can say that
13 early on in the relationship with Think
14 Finance, we -- Think Finance was involved from
15 a compliance and onboarding standpoint. And
16 don't quote me on the ages here, but I want to
17 talk -- I'm really talking about 2010, '11,
18 '12, '13.
19    There is a timeframe where
20 the onboarding traditionally was done by Think
21 Finance. But from roughly 2013 forward, Think
22 Finance relied or the tribes that we purchased
23 from, Plain Green, Great Plains, Mobil Loans
24 would conduct their own, for example, for the

1 last six years roughly, maybe not that long,
2 three years folks from Plain Green would
3 actually come in, because that's who we were
4 buying from. We haven't bought debt from
5 Think Finance, as you know it.
6    It has been from the issuers,
7 the credit issuers, like originally Think
8 Cash, Payday One, over time they stopped
9 lending and the due diligence would be done by
10 the credit issuer that we buy from, that our
11 contract is with.
12 Q. Okay, let's talk about the earlier
13 period that I think you said was roughly
14 through 2013 where Think Finance was, you said
15 was doing the onboarding. What do you mean by
16 that, doing the onboarding?
17 A. The request for, you know, information,
18 how we operated, our compliance management, et
19 cetera, which really became more prevalent in
20 2012, '13 timeframe. I think the industry
21 everywhere, if you want to be in it, the
22 compliance expectations and compliance
23 management systems really improved, increased
24 that timeframe.

1    I specifically can't recall
2 me being a part of or going through an actual
3 packet, you know. We consider onboarding
4 packets questionnaires, et cetera, as normal
5 today. I'm sure there was one, I just can't
6 recall, you know, going through it or being
7 part of that.
8 Q. So when you talk about onboarding,
9 you're really talking about the companies
10 learning more detailed information about each
11 other? Is that what you're talking about,
12 sort of a due diligence? Is that what you
13 mean by onboarding?
14 A. Yes.
15 Q. Okay. So up until 2013, whether we're
16 talking about Plain Green or Great Plains
17 Lending or Mobil Loans or the earlier
18 products, Think Cash; you were primarily
19 interacting with Think Finance?
20    MR. SHELDON: Object to form.
21 BY MR. ACKELSBERG:
22 Q. You, I mean NCA was primarily
23 interacting with Think Finance?
24    MR. SHELDON: Object to form.

UNSEALED

1    MR. DAUGHERTY: Object to
2  form.
3    THE WITNESS: Can you clarify
4  your timeframe that you're talking?
5  BY MR. ACKELSBERG:
6    Q. I'm trying to understand -- you said
7  that there was sort of one system where Think
8  Finance was doing the onboarding, you said
9  through roughly 2013, I think you said. And
10  then later it was more directly with the
11  tribes.
12    MR. DAUGHERTY: Object to
13  form.
14  BY MR. ACKELSBERG:
15    Q. I'm just trying to focus on that earlier
16  period and understand what you're saying.
17    A. Understood. I can't honestly answer. I
18  don't know the process or what was happening
19  from an onboarding standpoint.
20    Q. Because you weren't dealing with that
21  part of the business?
22    A. Because I wasn't. What I do recall is
23  when we would have an issuer come on-site, you
24  know, that's part of the due diligence,

1  sometimes I would be invited to -- whether it
2  be give the tour or discuss, talk about, you
3  know, our collection strategy and just give an
4  update on how we're operating from a policy
5  procedural standpoint.
6    Q. Did you give some tours to Think Finance
7  people?
8    A. I can honestly say that I don't recall,
9  but don't I believe that I gave any tours or
10  sit down in our conference room in Hutchinson,
11  Kansas and spoke to Think Finance directly
12  individually.
13    Q. You weren't the person at NCA
14  responsible for the relationship with Think
15  Finance, correct?
16    A. That's correct.
17    Q. Who would that have been, in the earlier
18  period?
19    A. Brad Hochstein would have been the
20  relationship guy responsible for the
21  relationships of all of our debt purchasing.
22  That was predominantly his responsibility.
23    Q. Let's go back to the exhibit. It looks
24  here that on the first page -- it's looking

1  like it -- that the company is giving its
2  staffing levels at three different locations,
3  correct?
4    A. Yes.
5    Q. Chandler, that's the call center in
6  Arizona, right?
7    A. Yes.
8    Q. And Hutchinson is both the corporate
9  office and the original call center, right?
10    A. Yes.
11    Q. What's Ottawa?
12    A. So Ottawa we no longer have that call
13  center. That was a small collection shop that
14  we indirectly inherited. There was a shop
15  there that we utilized as a third party agency
16  for us, that ultimately got behind on remits,
17  paying us, et cetera.
18    At the time, honestly I can't
19  remember the exact date. It was an
20  opportunity for us to expand from a head count
21  standpoint. This agency owed us money, and so
22  we just worked out a deal to ultimately make
23  this small Ottawa office part of our remote
24  call center setup.

1    Q. So it started out as an agency you would
2  outsource business to, work to, but then you
3  ultimately acquired it?
4    A. Yes.
5    Q. Can you tell from the head counts on
6  this exhibit, roughly what year we're looking
7  at?
8    A. I can't. Roughly 2013. I was going to
9  ask you the same question about what year we
10  were looking at, if you know.
11    Q. I don't know. Maybe you can -- you'll
12  be able to get more information from the other
13  pages.
14    A. Sure.
15    Q. The next page is the board of directors,
16  right?
17    A. Yes.
18    Q. Now I didn't ask before -- I didn't
19  think to ask when you were describing your
20  various positions you've held, I didn't
21  realize that you were on the board of
22  directors. When did you join the Board of
23  Directors of NCA?
24    A. It would have been -- I honestly -- I

UNSEALED

1  don't know the exact date or year. It would
2  have been prior to 2013. I don't know when
3  the operating agreement was formally amended
4  or changed. I can say that I sat in board
5  meetings dating back to 2010.
6  Q.  Remember I asked you previously whether
7  you had -- you could recall any conversations
8  that you had with Brad Hochstein about his
9  criteria for purchasing high rate consumer
10  debt, right?
11  A.  Yes.
12  Q.  I think your answer was, you couldn't
13  recall any specific conversations, right?
14  A.  Right.
15  Q.  What about any discussions at the board
16  level from the time that you joined the board;
17  was there ever any discussion about -- let's
18  say about regulatory risk, about what states
19  to operate in? Whether we should be buying
20  Payday Loans from here or from there?
21  Anything like that? Was that a board level
22  discussion?
23      MR. DAUGHERTY:  Tyler, please
24  answer Mr. Ackelsberg's question, but omit

1  from your answer any advice the board received
2  from its general counsel or any outside
3  attorneys.
4      THE WITNESS:  There was
5  discussions. The discussions were primarily
6  held by Brad. You know, the questions from
7  the other board members and owners were really
8  to understand the environment and why it's
9  becoming challenging or why we are seeing the
10  problems, right.
11  BY MR. ACKELSBERG:
12  Q.  Before there were any cases filed, I
13  mean you mentioned these states -- they came
14  later, right?
15  A.  Right.
16  Q.  So before you started getting sued by
17  various states, do you recall it ever being
18  discussed at the board level what state to
19  operate in, with regard to high rate consumer
20  loans?
21  A.  I don't recall the conversation.
22  Q.  Do you recall any board level
23  discussions about whether to buy from tribal
24  affiliated credit issuers?

1  A.  I do remember vaguely discussions about
2  buying from tribes or tribal affiliated
3  issuers. Those discussions I can't remember
4  exactly, you know, what all was said, you
5  know, during those discussions. But it was
6  more about the -- it was just the products
7  themselves, the market.
8      It was starting to become,
9  you know, a lending practice. There was more
10  tribes getting involved in consumer lending,
11  something we hadn't, you know, necessarily
12  seen before. We had opportunities to, you
13  know, purchase it. And sure there was
14  discussions about making that decision and
15  spending the money, I can't speak to
16  discussions that were had at the board level
17  about the compliance approach or the product
18  itself.
19  Q.  When you say you can't speak to it,
20  meaning you don't recall hearing any such
21  discussions, right?
22  A.  Yes. I mean it was new.
23  Q.  So it was a business opportunity, the
24  board was informed about that, but you don't

1  recall any concerns being expressed by other
2  board members about whether this might be
3  legal or not?
4  A.  I can't remember an exact conversation
5  about that. What I can say is from a
6  purchasing standpoint, I know we're talking
7  about the board at this point, Brad really
8  controlled not just the company, but he's the
9  one with 30 years of experience, et cetera.
10  Everybody really looked up to him.
11  Q.  So if Brad told the board this is a
12  really exciting business opportunity, it's
13  unlikely the board would challenge him and
14  tell him not to pursue it?
15      MR. DAUGHERTY:  Object to
16  form.
17      THE WITNESS:  I would say
18  that it's not unlikely, but, you know
19  throughout a discussion --
20  BY MR. ACKELSBERG:
21  Q.  It's not likely or unlikely?
22  A.  Can you restate your question? You're
23  getting me confused.
24  Q.  Do you recall any -- do you recall any

UNSEALED

1    time when the board challenged Brad about any
2    of his purchasing decisions?
3    A.   I can't recall any specific time.  I
4    know that there was discussions.  You know, I
5    think that anybody putting their own money in
6    is going to have questions.  The degree of
7    challenge, I can't speak to.  But I know there
8    was discussions.  I apologize, I can't
9    remember that far back to exactly what those
10   discussions were.
11   Q.   Looking at the chart, who is Richard
12   Smith?
13   A.   Dick Smith, he's a shareholder.
14   Q.   So he's an investor in the company?
15   A.   Yes.
16   Q.   He's not involved in operations?
17   A.   No.
18   Q.   What about Mark Huston?
19   A.   Shareholder, very passive, very similar
20   to Mr. Smith.
21   Q.   So basically they were supplying capital
22   to Mr. Hochstein to purchase the debt?
23   A.   Yes.
24   Q.   And Shawn Gylling, G-Y-L-L-I-N-G,

1    Gylling?
2    A.   Shawn was our chief operating officer up
3    until June of 2016.
4    Q.   Was he also an investor?
5    A.   He also did have ownership.  I believe
6    he started -- he started before I did.  I
7    don't know what the deal was necessarily on
8    how he obtained his ownership, but he was a
9    shareholder at the time he was there.  When he
10   was let go in 2016, the company negotiated a
11   buyout.
12   Q.   Was he fired?
13   A.   Yes.
14   Q.   For what?
15   A.   He -- ultimately Brad and him just were
16   not seeing eye to eye on a lot of things.
17   Q.   Like what, what is the nature of the
18   disagreements?
19          MR. DAUGHERTY:  Object to the
20   question on the grounds that it's beyond the
21   scope of the deposition notice.  You can
22   answer.
23          THE WITNESS:  It really got
24   to a point about anything and everything, the

1    way that potential employees were handled.
2    Shawn may have been more structured, et
3    cetera; Brad may have been less structured.
4    Literally, it became a point where there was
5    just a lot of bickering.  I mean they couldn't
6    agree on anything.  The direction of the
7    organization was being challenged.  You know,
8    and ultimately all of the way down to the
9    collector, people feel that when your
10   leadership isn't on the same page.
11   BY MR. ACKELSBERG:
12   Q.   Where -- is Mr. Gylling still in the
13   industry, that you know of?
14   A.   To my knowledge, he is not.
15   Q.   If you flip the page to the executive
16   team, it shows that you reported to Shawn, who
17   in turn reported to Brad.  Is that the way you
18   recall it?
19   A.   Yes.
20   Q.   And does that help you understand the
21   timeframe?
22   A.   No, it doesn't.
23   Q.   That's fine.
24   A.   Shawn hired me, so I ultimately reported

1    to him throughout my tenure.
2    Q.   Look -- flip to page entitled NCA
3    Operations.  There's a reference to a director
4    of analytics.  Do you see that?
5    A.   Yes.  405055, just making sure we're on
6    the same page.
7    Q.   Yes.
8    A.   Okay, yes.
9    Q.   Is Mr. Mahoney still employed as
10   director of analytics?
11   A.   Yes.
12   Q.   And what does the director of analytics
13   do?
14   A.   He's responsible for really the
15   development of a lot of reporting functions
16   that we have from an operational standpoint,
17   you know, liquidation reporting down to
18   collector level evaluations, metrics.  He
19   would be somebody that today is used for
20   helping identify the right price to pay for,
21   you know, a potential purchase, as well as
22   providing, you know, finance to our accounting
23   department with our performance or accretion
24   curves.

16  (Pages 61 to 64)

UNSEALED

1    Q.   What does that mean?
2    A.   GAP requires us, which I just learned
3    that may be changing, to utilize a method of
4    accretive accounting.  Ultimately you project
5    out what you expect to collect over the
6    lifetime of that portfolio.  And it's
7    ultimately a way to recognize revenue.
8    Q.   In the consumer loan -- the kind of
9    consumer loans that we've been talking about,
10   is there a working -- based on the data that
11   you generate through your analytics
12   department, do you have an expectation of how
13   long you need to work an account to start to
14   make money?
15   A.   An expectation of how long to work a
16   single account?
17   Q.   A portfolio.
18   A.   A portfolio.  Okay.
19   Q.   That's the way you look at it is
20   portfolio, right?
21   A.   Yes, the purchase.  Yeah, we have an
22   expectation.  You know, that expectations can
23   change over time based on the cost to operate
24   rate, and you know, the cost you pay for it is

1    the cost you pay for it.  That's your
2    investment.
3         So performance as well as the
4    cost to operate changes.  But we have an
5    expected return, ROI, like anybody would from
6    an investment perspective.  Does that answer
7    your question?
8    Q.   Yeah, I'm just curious about in this
9    area of high rate consumer debt, are you
10   generally going to be looking at a profit
11   after six months, after 12 months?  How long
12   do you need to work an account like this in
13   order to start seeing profit.
14        MR. DAUGHERTY:  Object to
15   form.
16        THE WITNESS:  Well, it really
17   depends on what you initially paid for it.
18   Let's make an assumption, I guess, that we
19   paid a price that should allow us to reach a
20   return.  On average we looked to get our
21   investment back in 18 to 24 months, which is
22   pretty standard for the average balances that
23   we purchase.
24   BY MR. ACKELSBERG:

1    Q.   Parallel -- next to -- on this same
2    chart next to the director of analytics is a
3    legal manager, Kevin Emmerich.  Is Kevin
4    Emmerich still with the company?
5    A.   No.
6    Q.   Was he let go also?
7    A.   He was let go.
8    Q.   By you or by Brad?
9    A.   By me.
10   Q.   Why?
11   A.   He was --
12        MR. DAUGHERTY:  I'll object
13   on the grounds that it's outside the scope of
14   the deposition notice.  You can answer.
15        THE WITNESS:  I'm happy to
16   answer it.  He was part of a layoff here in
17   January of this year.
18   BY MR. ACKELSBERG:
19   Q.   His title on this chart is legal
20   manager.  He's not a lawyer, right?
21   A.   No.
22   Q.   What does a non-lawyer legal manager
23   mean?  Is that like a paralegal?
24   A.   I honestly can't answer what that means

1    or why the title is legal manager.  I can
2    speak to what he actually did.
3    Q.   Okay, what did he do.  I'm asking about
4    him, because he actually appears on a number
5    of the documents with Think Finance.  What was
6    his job?
7    A.   Sure.  He worked underneath -- this says
8    Shawn Gylling, but I feel like he spent more
9    time with Brad over the years.  He'd be the
10   one to coordinate the contracts, draft the
11   contracts; not draft the contracts, review the
12   contracts on a forward flow basis or
13   purchasing basis each month or maybe an annex,
14   et cetera.
15        His responsibility was to
16   review those, read those, provide them to Brad
17   with any, you know, thoughts that he had.  And
18   then I believe he executed some of those.
19        I also -- he handled some, he
20   was previously -- he has been in the industry
21   a long time.  He oversaw early, early on
22   that's probably why it's a legal manager here.
23   There's a team of collectors very early on
24   that they were performing legal collections.

UNSEALED

1      So accounts that would be
2  suit eligible, this team -- often times in
3  call centers it's called the legal team, where
4  they make phone calls to the consumer, inform
5  the consumer that the company has been unable
6  to recover or collect the debt.  And at that
7  point in time it would be referred to an
8  attorney in their state to pursue recovery,
9  just to clarify that.
10  BY MR. ACKELSBERG:
11  Q.   On the chart under you, under operations
12  is a person who has the title dial manager.
13  What does that mean?
14  A.   Ken Newberg, the dialer manager is
15  responsible for -- we utilize predictive
16  dialers to make our outbound phone calls.  He
17  would be the one that would actually build the
18  campaign within the dialer, launch the
19  campaign, make sure that the campaign is --
20  the dialer is running at an optimal rate.
21      For example, making sure
22  collectors wait times -- a wait time would be
23  a collector gets off one phone call, documents
24  the account and moves, you know, back into an

1  available status within the dialer so they can
2  receive another call.
3  Q.   So we're talking about outbound calls
4  that are being done in some automated fashion?
5  A.   The predictive fashion is what I would
6  consider it.
7  Q.   What does that mean?
8  A.   A predictive dialer, the way it
9  functions is, it's predicting, based on your
10  head counts, the average talk time for each
11  collector, et cetera, you know, how many lines
12  to ultimately dial out on.
13      And the predictive part of it
14  is to make sure you're not over dialing or
15  whatnot and you have consumers that nobody is
16  available to manage them.  It's a hosted
17  solution.
18  Q.   And the actual calling is done by some
19  automated system?
20  A.   Yeah, it's from an outbound dialer
21  platform.  When you say automated --
22  Q.   A computer.
23  A.   So in the line of TC-PA, et cetera,
24  there is a very, you know, the definitions of

1  an automated dialer is different from the
2  product that we use.  So I want to be careful.
3  Q.   I'm sorry, I'm not really --
4  A.   I understand that.
5  Q.   I'm not talking -- I wasn't trying to
6  make a legally sound --
7  A.   Understood.
8  Q.   -- distinction there.  Okay.  Flip two
9  more pages, there's something that says NCA
10  compliance.  There's a compliance officer and
11  it says that she reports to the board of
12  directors.  Would it be more accurate to say
13  that she reported to Brad too?
14      MR. DAUGHERTY:  Object to
15  form.
16      THE WITNESS:  I would say she
17  -- to be more accurate, she reported on paper
18  to board of directors.  She would come in and
19  go through complaint logs, et cetera, you
20  know, with the board.  I can't answer whether
21  it whether it would be fair to say that she
22  reported to Brad?
23  Q.   That's fine.  But you do remember her
24  coming?

1  A.   Yes.
2  Q.   So her job was to bring complaints to
3  the attention of the board?
4  A.   Complaints --
5  Q.   When we're talking about complaints, are
6  we talking about consumer complaints?
7  A.   Yeah, Lori, as a compliance officer, the
8  complaints that she would typically handle and
9  bring to the board were more along the lines
10  of consumer complaints.  If it was a
11  regulatory complaint or a matter, we would
12  typically receive an update by our internal
13  counsel.
14  Q.   There is something called a compliance
15  board and something called a policy and
16  procedure review board.  Are you familiar with
17  those entities?
18  A.   Yes.
19  Q.   Could you explain what they are?
20  A.   So the compliance board was made up of
21  it shows here -- the purpose of it was if we
22  received a complaint, whether it be written or
23  oral on a collector, that complaint needed not
24  only to be reviewed by our auditors, but we

UNSEALED

App. 0315

1 also wanted a group that would listen to the
2 call in a senior position and make
3 recommendations based on, you know, that
4 collector or employee I should say, whether it
5 be punishment or write-ups, termination, et
6 cetera. It was our way of --
7 Q. Keeping an eye on the collectors?
8 A. Not just keeping an eye on the
9 collectors, but making sure that the
10 collectors believed that, you know, it wasn't
11 just one person ultimately making a decision
12 on the fate of their job, right. That's what
13 the compliance board was designed and still
14 does.
15 The second part of your
16 question, as far as policy and procedures,
17 review board, that was created initially to
18 review the drafted policies, collection
19 policies and procedures of our company.
20 Q. Okay. I'm going to show you another
21 document --
22 MR. DAUGHERTY: Irv, if
23 you're ready to move on to another document,
24 we've gone for about 90 minutes. It might be

1 a good time for a break.
2 VIDEOTAPE OPERATOR: That
3 concludes DVD number one, the time is 10:45.
4 We're off the record.
5 - - -
6 (Whereupon Exhibit P-66 was
7 marked for identification.)
8 - - -
9 VIDEOTAPE OPERATOR: This begins
10 DVD number two, 10:50 p.m. We're on the
11 record.
12 BY MR. ACKELSBERG:
13 Q. Mr. Rempel, I've given you another
14 document that we've marked P-66. This, I
15 believe, is another of the due diligence
16 documents about NCA that we got from Think
17 Finance. And if you can turn to the second
18 page of the document, there is under financial
19 review it just gives some information about
20 the company. And I want to just get you to
21 confirm it.
22 So under overview of NCA, it
23 says that the company was founded in 2001
24 privately held and privately capitalized.

1 That's correct, as far as you know?
2 A. Yes.
3 Q. Okay. And then there's reference to
4 another entity, Level Financial LLC, which
5 says, according to this document, that it was
6 created as a special purpose entity of NCA in
7 early 2014 to operate solely as the debt
8 buying entity for current and future
9 agreements. Do you see that?
10 A. Yes. Do you mind if I read through this
11 real quick?
12 Q. Absolutely, sure. Take whatever time
13 you need.
14 A. Okay, thank you.
15 Q. Okay.
16 A. Are we just going to be speaking
17 about --
18 Q. I think so, yeah. You can look at the
19 next page, too.
20 A. Okay.
21 Q. So we're just asking you about Level
22 Financial. There's a description of what
23 Level Financial is. I gather it's an
24 affiliated company?

1 A. Is that a question.
2 Q. Yes, that's a company affiliated with
3 NCA, right?
4 A. Yes, it's actually -- exactly what it's
5 listed as, a special purpose entity, the
6 purpose of that was really -- that was the
7 time that we started utilizing capital
8 provided by an outside lender. Flock
9 Financial is a group that --
10 Q. Spell that again?
11 A. Flock, F-L-O-C-K.
12 Q. Flock Financial?
13 A. Yes.
14 Q. That's the company that was providing
15 the financing starting in 2014 or so?
16 A. Yes. I don't know that they were
17 financing every purchase, but the purpose of
18 Level was -- as a special purpose entity, was
19 for protection, asset protection of what they
20 were funding. You know, they were
21 collateralized by those purchases and they
22 didn't want them intertwined with other
23 purchases that NCA may have been making that
24 they were not funding et cetera.

UNSEALED

1       It was really a protection
2  from them from a collateral perspective.
3  Q.  And then in the next category it says:
4  Ownership structure, and this provides the
5  percentage of ownership at this point in time.
6  Is this something you're familiar with, these
7  percentages?
8  A.  Yes.
9  Q.  This looks to be accurate?
10  A.  Yes.
11  Q.  So Brad was not only the CEO, but he was
12  the majority shareholder?  Not the
13  shareholder, he had the biggest -- he had 37.6
14  percent of ownership?
15  A.  Yes.
16  Q.  All right.  And then you've already
17  described the executive team, the employees.
18  Let's look at the next page under active
19  inventory.  Does this -- are these numbers
20  that you're familiar with?
21  A.  I can say that they look like --
22  Q.  -- in the ball park?
23  A.  In the ball park.  I mean you're asking
24  a question from 2013 of a lot of different

1  accounts.  I can't say that I know them to be
2  100 percent accurate, but they're --
3  Q.  Sure, I understand.
4  A.  But it looks like a good representation.
5  Q.  When you talked before about the high
6  rate consumer loans being 50 percent or more
7  of the inventory, it would be 50 percent or
8  more of these numbers here that we're looking
9  at?
10       MR. DAUGHERTY:  Object to
11  form.
12       THE WITNESS:  I don't know
13  that to be 100 percent true, but I also
14  don't -- that could be accurate.  I just don't
15  know at that time.
16  BY MR. ACKELSBERG:
17  Q.  Okay, that's fine.
18  A.  We had a fair amount volume of short
19  term loans, you know, internet based loans is
20  the way I describe them.  You're describing
21  them as high rate interest loans.
22  Q.  There's a category of subagencies.  What
23  are subagencies?
24  A.  Those are agencies that would -- we

1  would place our accounts out with -- and they
2  would work them as a third party contractual
3  relationship.
4  Q.  So in that case, in that kind of a
5  situation, NCA would be the owner of the debt,
6  and the agency would then be the direct
7  collector?
8  A.  Yes.
9  Q.  In that kind of an arrangement, would
10  they collect in the name of NCA?
11  A.  No, they would collect in the name of
12  their agency.  They would inform the consumer
13  that NCA was the owner of the debt.
14  Q.  So when a subagency made a call to a
15  Pennsylvania consumer about an account that
16  NCA purchased from one of -- from let's say it
17  was a loan that was connected to Think Finance
18  in some fashion, the subagency making the call
19  would tell the consumer that this is the
20  agency calling and we're working an account, a
21  debt that you owe to NCA?
22       MR. DAUGHERTY:  Object to
23  form.
24       THE WITNESS:  Something in

1  that nature.  They need to educate the
2  consumer on how that account got to their
3  agency and the relationship they had with NCA,
4  and NCA is owning the title of that debt.
5  BY MR. ACKELSBERG:
6  Q.  Let's look at another document.  Now
7  we're going to start looking specifically at
8  the relationship with Think Finance.
9       - - -
10     (Whereupon Exhibit P-67 was
11  marked for identification.)
12       - - -
13  BY MR. ACKELSBERG:
14  Q.  This document you can see we actually
15  got from NCA.  You see that in the lower
16  right-hand corner.  Okay?
17  A.  Okay.
18  Q.  It appears to originate, so this is like
19  four e-mails in a chain and you're familiar
20  how that works, right, where you're printing
21  out an e-mail chain?
22  A.  Yes.
23  Q.  Okay.  So it looks like the first e-mail
24  message is from someone named Phil Durham at

UNSEALED

1    Think Finance, and he's communicating with
2    Brad Hochstein, right?  Do you see that?
3    A.   Yes.
4    Q.   And it's a cc to someone named Brett
5    Horrocks.  It appears to be an initial contact
6    about placing some debt.  Do you see that?
7    A.   I see, yes, that Brett Horrocks was cc'd
8    on it and it was a discussion about placing or
9    selling debt, yes.
10   Q.   Well, and also you'll see that Mr.
11   Durham -- it also tells Brad that Think
12   Finance is contracted with a company named
13   Sourceit One, to handle the sale.  Do you see
14   that?
15   A.   Yes.
16   Q.   And that's who Brett Horrocks is,
17   Sourceit One, right?
18            MR. DAUGHERTY:  Object to
19   form.
20            THE WITNESS:  Yes, I know him
21   to be a affiliated with Sourceit One, yes.
22   BY MR. ACKELSBERG:
23   Q.   So it looks like, first of all it looks
24   like this is the beginning of the relationship

1    with Think Finance, correct?
2            MR. DAUGHERTY:  Object to
3    form.
4    BY MR. ACKELSBERG:
5    Q.   That's what it looks like?
6    A.   From a general timing standpoint, yes.
7    And the first e-mail in the chain, I would
8    lean in that direction, yes.
9    Q.   All right.  And then you see there is
10   also a follow up e-mail from Brett Horrocks to
11   Brad Hochstein confirming that he is
12   representing Think Finance.  Basically he is
13   the broker in this proposed transaction.
14            MR. DAUGHERTY:  Object to
15   form.
16   BY MR. ACKELSBERG:
17   Q.   Do you see that?
18   A.   Can you restate the question?  You were
19   just walking me through this document.
20   Q.   Sure.  Look at the second e-mail in the
21   chain.
22   A.   Okay, from Brett Horrocks.
23   Q.   Right.  And he's confirming to Brett --
24   to Brad Hochstein that his company Sourceit

1    One has been contracted to handle the sale and
2    placement of Think Finance write offs, do you
3    see that?
4    A.   Yes.
5    Q.   And he also talks specifically about the
6    deal that is being contemplated.  He
7    specifically talks about 80 million dollars
8    worth of Payday Loans and 80 million dollars
9    worth of installment loans, right?  That's
10   what it says?
11   A.   That's what the e-mail says, yes.
12   Q.   To be funded by December 1st, 2010.  And
13   he also makes reference to a forward flow
14   beginning in December, right?
15   A.   Yes.
16   Q.   So let me make sure I understand, based
17   on your description before, of what a forward
18   flow agreement is, you're being presented with
19   the possibility of buying a portfolio right
20   now in December, but also establishing an
21   ongoing relationship for a period of time
22   where periodically there would be future
23   purchases based on an agreed upon price of
24   these kinds of loans?

1            MR. DAUGHERTY:  Object to
2    form.
3            THE WITNESS:  Yes.
4    BY MR. ACKELSBERG:
5    Q.   Do you know Brett Horrocks?
6    A.   Yes.
7    Q.   Who is he?
8    A.   He is -- initially as this e-mail
9    states, he brought the opportunity to buy in
10   the very beginning Think Cash and Payday One
11   to NCA, you know, as a broker.  At that point
12   in time, we, as the e-mail states, understood
13   that he was contracted or hired to represent
14   Think Finance, you know, and navigate through
15   the market of debt sales.
16   Q.   In your world, within this industry, is
17   it common for creditors to approach potential
18   debt buyers through a broker?
19   A.   Yes, very common.
20   Q.   Why is it done that way, do you know?
21   A.   I can't speak for the issuers.  I can
22   make an assumption that it's to bring in
23   expertise of the market, as well as folks that
24   may have access to a larger network of

UNSEALED

1  potential buyers. And that's just me making
2  an assumption on why the issuers would use a
3  broker. It takes time to build that network
4  up. So...
5  Q.  Do you know Brett Horrocks from any
6  other capacity, other than him being a broker?
7  A.  As stated before, and what I'm seeing in
8  this e-mail chain, I've known that he works
9  the 0 to 60 day, I believe, charge offs for,
10  at that time, the -- I believe the Think Cash,
11  the Payday One. Don't quote me on that.
12      But today I believe that he's
13  managing the early charge offs for Plain Green
14  or Great Plains. I don't know who he's
15  managing it for today. I know that he was
16  working the accounts before we would buy them.
17  So I know that he was --
18  Q.  He's involved in some fashion in the
19  collection of these loans --
20  A.  Yes, yes.
21  Q.  -- before the charge offs would be sold
22  to NCA?
23  A.  Yes. As the e-mail states, I knew that
24  he was representing himself, as well as

1  helping Think Cash, Think Finance wade through
2  the relationship with us.
3  Q.  Do you know, I realize you had a
4  different position back in 2010, but let me
5  ask you this: When did you first come to know
6  Brett Horrocks?
7  A.  I can't say exactly when. It was early
8  on in the relationship, simply as we were
9  getting ready to potentially buy a large
10  volume. And that was going to impact our
11  staffing, et cetera. And so getting an
12  understanding and knowing that he had
13  knowledge of the products, if you will, I do
14  believe I met him early on to simply
15  understand the products as well as future
16  volumes, and his experiences with the 0 to 60
17  days on the collections to better prepare for
18  my collection group.
19  Q.  Has Mr. Horrocks brokered other debt
20  purchase relationships with NCA, other than
21  Think Finance?
22  A.  Yes.
23  Q.  Other than other Payday lenders or
24  online lenders?

1      MR. DAUGHERTY: Object to
2  form.
3      THE WITNESS: Yes, other
4  internet based online lenders.
5  BY MR. ACKELSBERG:
6  Q.  Would you view Horrocks as kind of a
7  specialized intermediary between NCA and the
8  issuers in this particular area of the
9  consumer credit market?
10  A.  I guess you could say that. I don't
11  know that I view him that way. I've never
12  thought of it from that context.
13  Q.  What other customers has Brett Horrocks
14  brokered -- what other Payday lenders or
15  online consumer lenders that NCA is buying
16  debt from -- I'm tripping over my question
17  here. But other than -- you're also
18  collecting -- you're also buying, Think
19  Finance isn't the only issuer of -- isn't the
20  only source of let's say tribal loans that you
21  have dealt with, right.
22      MR. DAUGHERTY: Object to
23  form.
24      THE WITNESS: We bought other

1  tribal loans, yes, over time.
2  BY MR. ACKELSBERG:
3  Q.  Did Brett Horrocks broker any of those?
4  A.  No.
5  Q.  So based on your understanding of the
6  industry and how these broker relationships
7  work, it would have been the company's, NCA's
8  expectation that Think was paying Mr. Horrocks
9  to act as its representative in dealing with
10  NCA?
11      MR. DAUGHERTY: Object to
12  form.
13      THE WITNESS: I think that
14  would be a fair assumption, yes. I don't know
15  who works for nothing anymore.
16  BY MR. ACKELSBERG:
17  Q.  Let's go to the next --
18  A.  Am I to just be stacking these up here?
19  Q.  Yeah, that would be fine.
20          - - -
21      (Whereupon Exhibit P-68 was
22  marked for identification.)
23          - - -
24  BY MR. ACKELSBERG:

UNSEALED

1    Q.   In Exhibit 68, you see there is a
2  transmittal -- there's a transmittal e-mail.
3  So this appears to be at the point where that
4  transaction with -- that initial transaction
5  with -- between Think Finance and NCA is
6  beginning to happen, correct?
7    A.   Yeah, it looks to me like an e-mail
8  chain of that representing somewhat
9  negotiations, I guess.
10    Q.   Horrocks says -- Horrocks says to
11  Hochstein that -- it says, if you look on the
12  second page, the e-mail of November 18th,
13  2010, it says:  Where are we on this and each
14  of the segments of the warehouse?  What does
15  that mean?
16    A.   Typically when a lender hasn't sold,
17  they're still charging off the accounts.  And
18  if they're not placing them in an agency or
19  selling them, they call it a warehouse.  They
20  just keep stacking up charged off debts and
21  the amounts just keep growing.  The age of
22  them keeps getting older, et cetera.  It's
23  just a generic term.
24    Q.   I take it from these charts on the

1  exhibit, that the older the debt, the less
2  valuable price it gets in a purchase?
3    A.   Correct.
4    Q.   That seems to be common sense.  Yeah.
5  Okay.  Do you see up at the top, the last
6  e-mail is from Brad to Shawn with a cc to you
7  that says:  Mentions when Brad expects to be
8  getting the loans, and then he says:  We need
9  to talk strategy on this.  What would that
10  mean?  Would that be about staffing?
11    A.   I don't know what he was thinking at the
12  time that he wrote it.  But generically I
13  would -- we would talk as a group at that
14  time, just about how we were going to approach
15  the product.  It could be staffing, they are
16  calling it strategy.
17        This was a fairly large
18  volume of accounts and just making sure that
19  everybody is on the same page with what's
20  coming in and the information needed to put
21  this into our daily collection strategy.
22    Q.   Let me go to another document, 69.
23        - - -
24        (Whereupon Exhibit P-69 was

1  marked for identification.)
2        - - -
3  BY MR. ACKELSBERG:
4    Q.   It's a transmittal and an agreement.
5  These don't have -- aren't stapled, beware.
6  So we're looking at Exhibit P-69 is NCA-PA 315
7  and then the attachment is 341.
8        So even though Brad -- even
9  though NCA understood that Brad was
10  representing Think Finance coming forward with
11  these loans, it looks like the installment
12  loans, the named seller was going to be First
13  Bank of Delaware.  Do you see that?
14        MR. DAUGHERTY:  Object to
15  form.
16        THE WITNESS:  You're speaking
17  about Brett, you said Brad.
18  BY MR. ACKELSBERG:
19    Q.   I meant Brett. I'm sorry, you're right.
20  This started a few months earlier.  Brett
21  says: I'm here to talk about selling some
22  Think Finance debt, some of it's Payday, some
23  of it is installment, about 80 million of
24  each.  That's how this started?

1        MR. SHELDON:  Object to form.
2        MR. DAUGHERTY:  Object to
3  form.
4  BY MR. ACKELSBERG:
5    Q.   Here we have, what I believe to be the
6  sale agreement for the installment loans,
7  correct?  That's what we're looking at?
8    A.   Yes.
9    Q.   And in this kind of an arrangement where
10  the name of the creditor is different than
11  the -- strike that question.
12        Based on your understanding
13  of the industry and how these kinds of -- and
14  the company and how these transactions work,
15  it would appear that this contract with First
16  Bank of Delaware was being delivered by Brett
17  Horrocks, Think Finance's broker?
18        MR. SHELDON:  Object to form.
19        MR. DAUGHERTY:  Object to
20  form.
21  BY MR. ACKELSBERG:
22    Q.   Correct?
23    A.   This is an attachment from this e-mail?
24    Q.   Uh-huh.

UNSEALED

1    MR. DAUGHERTY: For the
2  record, it appears to me, at least, that we
3  have one of the two attachments mentioned in
4  the e-mail.
5    MR. ACKELSBERG: Right, and I
6  didn't include the Payday One because I
7  thought that would just muck up the record.
8  Since we're focusing on the installment loans,
9  I thought it would be --
10    MR. DAUGHERTY: Understood.
11  I just want it to be clear. We have the
12  second attachment mentioned in the e-mail --
13    MR. ACKELSBERG: That's
14  correct, but not the first attachment.
15    MR. SHELDON: The e-mail
16  says: Please sign and get them back to me and
17  I will have the bank and TF sign.
18    MR. ACKELSBERG: Right.
19    MR. SHELDON: That was a
20  reference to separately the different two
21  attachments, one of which the bank was buying,
22  one of which Think Finance bought?
23  BY MR. ACKELSBERG:
24  Q.   Yeah, understood, understood.

1    That's your understanding, as
2  well, right? I'm not sure you caught that.
3  A.   No, I was listening. The question was,
4  is it normal in the industry for a
5  counterpart, a broker, to deliver contracts
6  for signature. And the answer to that
7  question is yes, it is.
8  Q.   And that appears to be what's happening
9  here?
10  A.   It appears to be.
11  Q.   Before this sale, you know if you
12  remember, fine; if you don't remember, that's
13  fine too. Before this sale that was arranged
14  by Brad Horrocks, had NCA purchased any
15  installment loans -- other installment loans
16  where the main seller was First Bank of
17  Delaware?
18  A.   Not to my knowledge, but I can't
19  honestly remember. My recollection is that's
20  the first time we purchased First Bank of
21  Delaware.
22  Q.   The way these contracts work is, I'm
23  going to show you a few of these, is that the
24  actual number of contracts, the purchase

1  price, the applicable percentage, all of that
2  would be attached to a document called an
3  Annex or Annex I, right?
4    MR. DAUGHERTY: Object to
5  form, specifically counsel, my objection would
6  be you're referring to the number of
7  contracts. I believe the annex refers to
8  number of accounts. You're right. Withdrawn.
9    THE WITNESS: You made a
10  comment, and I was trying to go back and
11  understand the question about an interest
12  rate.
13  BY MR. ACKELSBERG:
14  Q.   I don't mean the interest rate on the
15  loans, I meant how the price is calculated,
16  what NCA is paying.
17  A.   Okay.
18  Q.   I'm sorry if I misspoke.
19  A.   You're fine. I just wanted to
20  understand the question. You're correct. The
21  annex would qualify the number of accounts or
22  contracts that you're going to buy, the total
23  face amount and the price being paid.
24  Q.   We're looking at NCA-PA 369, and this

1  would be the annex with attached to that
2  initial sale agreement with purchased
3  agreement with First Bank of Delaware, and
4  what's happening is NCA is buying roughly
5  9,000 installment loans. These are Think Cash
6  loans, right, that's what we're looking at?
7  A.   Yes.
8  Q.   The principal balance of 10.5 million,
9  and NCA is paying seven cents on the dollar
10  for those accounts, correct?
11  A.   Correct.
12  Q.   There's also reference in the annex to
13  something called an ineligible contract. And
14  that's a term you're familiar with, right?
15  A.   Yes.
16  Q.   So the way this works is that NCA has a
17  right to return and receive a refund for any
18  ineligible contracts that NCA discovers in the
19  portfolio that it's buying, correct?
20    MR. DAUGHERTY: Object to
21  form.
22    THE WITNESS: That is
23  correct. For most contracts we'll have a
24  specified time period.

UNSEALED

BY MR. ACKELSBERG:
Q.   And am I also correct that First Bank of
Delaware under this contract would have the
right to buy back accounts if it determines
there's a legal issue with regard to a
specific account?
        MR. DAUGHERTY:  Object to
form.
BY MR. ACKELSBERG:
Q.   Am I right?  If you want to go back to
the agreement and look -- let's look at
article six, page 19 of the agreement NCA-361.
I said right to buy back.  It's really more
like an obligation to buy back, right?
        MR. DAUGHERTY:  Object to
form.
        THE WITNESS:  The question
is, is that typical to see in a contract?
BY MR. ACKELSBERG:
Q.   Yes.
A.   Yes.
Q.   Okay.  What kind of circumstances
typically would the issuer be buying back sold
accounts?

A.   There are several, quite a few probable
scenarios.  If the consumer is disputing it
directly through the issuer, et cetera, the
issuer simply wanted to buy it back to handle
it, part of it is just being a good partner --
a good working relationship to handle the
consumer the best way that -- the most
feasible correct way so the consumer is not
confused, et cetera.
        Sometimes a consumer may --
some of it is timing, right, of when the
account gets sold, for example, a bankrupt
account or whatnot.  When we purchased the
9,000 some odd accounts in this scenario,
we'll run it through a bankruptcy scrub and
identify consumers that have filed.  And the
issuer will buy those back.  The same thing
with deceased, et cetera.
        There's just many different
scenarios, I guess.  A lot of times the it's
just -- the consumer wants the best way to
handle it.
Q.   Let's look at another document we're
marking as P-70.  This also is a document

produced by NCA, Bates numbered 15154.
        - - -
        (Whereupon Exhibit P-70 was
marked for identification.)
        - - -
BY MR. ACKELSBERG:
Q.   And you'll see this is more
documentation of the development of the
relationship between NCA and Think Finance.
And you see that this is now April of 2011,
and more paperwork coming from Brett Horrocks
to Brad.
        MR. DAUGHERTY:  Object to
form.
BY MR. ACKELSBERG:
Q.   Do you see that?  And he references
attached:  Forward flow for Payday One the
LOI, I believe that's the letter of intent,
for the installment loans and some additional
documents.
        And I believe the second page
of the exhibit, again Patrick I didn't include
the Payday One documents.  I've just included
the installment loan.

        MR. DAUGHERTY:  Right,
because we jumped from Bates 54 to Bates 78.
        MR. ACKELSBERG:  Right.  I'll
represent to you that if you looked at
production, all I have done is taken out the
PDO related documents.
        MR. DAUGHERTY:  Are you able
to tell me between -- there are what, 1, 2, 3,
4, 5 attachments?
        MR. ACKELSBERG:  There's a
lot of attachments.
        MR. DAUGHERTY:  Which
attachments do we have in this exhibit?
        MR. ACKELSBERG:  I believe
that you have -- I'm not sure that I can
connect them to the attachments listed, and I
don't know if they're in that exact same
order.  But what I can tell you is that I took
out the Payday One, it was a large Payday One
contract, the forward flow for Payday One.  Do
you see reference to a forward flow document?
        MR. DAUGHERTY:  Okay.
BY MR. ACKELSBERG:
Q.   Just looking at the second page --

1          MR. SHELDON:  I'm going to
2     place a continuing objection here to the
3     extent that removal of those attachments, it's
4     not longer clear to me how those attachments
5     necessarily sync up with the documents
6     referenced in here.
7          MR. ACKELSBERG:  I
8     understand.  You'll, I'm sure be checking my
9     deletions, what I included in the exhibit and
10    what I didn't.  I will represent to you that I
11    took out the Payday One forward flow
12    agreement.  And I believe that I left the rest
13    of the documents in there.  I wasn't sure what
14    they connected to.
15    BY MR. ACKELSBERG:
16    Q.   Did you have a chance to look at the
17    letter of intent dated March 25, 2011?
18    A.   Yes.
19    Q.   This appears to be a letter of intent to
20    enter into a formal forward flow agreement for
21    more installment loans over the next 12
22    months, correct?
23          MR. DAUGHERTY:  Object to
24    form.

1          THE WITNESS:  That's what it
2     appears to be.
3     BY MR. ACKELSBERG:
4     Q.   At the same seven percent price?
5     A.   Yes.
6     Q.   Signed by Jason Harbison, senior vice
7     president of Think Finance.
8          MR. SHELDON:  Objection to
9     form?
10    BY MR. ACKELSBERG:
11    Q.   Or TC Administrative Services.
12    A.   Yes, that's what the document reads.
13    Q.   And the first sale under that forward
14    flow I believe happened in early May.  Let's
15    give you another document.  We're in the year
16    2011.
17               - - -
18          (Whereupon Exhibit P-71 was
19    marked for identification.)
20               - - -
21    BY MR. ACKELSBERG:
22    Q.   It looks like you were actually included
23    in these e-mails where you're being cc'd by
24    Brad to let you know that the Think flow sale

1     is coming, correct?
2          MR. DAUGHERTY:  Objection,
3     mischaracterizes the document.
4     BY MR. ACKELSBERG:
5     Q.   That it's imminent?
6     A.   Based on the three e-mails here, I
7     assume we would execute and receive a new
8     volume of accounts.
9     Q.   When you say -- reply to Brad and Shawn:
10    Be ready to get after it in Phoenix.  What are
11    you referencing there?
12    A.   You know, trying to go back to the frame
13    of mind I was in at that time.  I think it was
14    just a simple -- when you have call centers,
15    one thing that you'll quickly learn from
16    collectors is they get excited about new
17    business.  So when we had new business coming
18    in, it was an exciting time for our call
19    centers.
20          So, you know, just from an
21    energy standpoint et cetera, we were ready and
22    excited about a potential new batch of
23    accounts.
24               - - -

1          (Whereupon Exhibit P-72 was
2     marked for identification.)
3               - - -
4     BY MR. ACKELSBERG:
5     Q.   Okay, let's look at seven P 72 which I
6     am going to show you now.  Now this appears to
7     be Horrocks closing, in December 2011,
8     Horrocks closing a new deal for forward flow
9     between Think Finance and NCA, correct?
10          MR. DAUGHERTY:  Object to
11    form.
12          THE WITNESS:  To me the flow
13    of e-mails was, you know, just from a timing
14    standpoint is the forward flow was up for
15    renewal and renegotiating.
16    BY MR. ACKELSBERG:
17    Q.   And it looks like the price is being
18    renegotiated, as well, correct?
19    A.   Yes, that's what it looks like.
20    Q.   It looks like, it's like Brett Horrocks
21    negotiated a slightly higher price for the --
22    for the loans going forward, correct?
23    A.   I can't confirm that Brett negotiated --
24    Q.   Somebody did?

UNSEALED

1    A.   Somebody did, yes, there's a higher
2  price than what was being paid, but yes.
3    Q.   Sticking with that for a minute, in the
4  middle on the first page of the document, the
5  next to last e-mail, the one from December
6  12th, I'm sorry.  Yeah, it looks like December
7  12th, but I'm looking at the one from Brett
8  Horrocks.  He's saying, I guess to Brad, what
9  about an increase of 10 BPS for us when we get
10  this thing done.  Do you see that?
11    A.   Yes.
12    Q.   BPS is basis points, right?
13    A.   Yes, that's the way I read it.
14    Q.   And Brad seems to say in reply that he
15  doesn't have a problem with that?
16    A.   That's what Brad's rely says, yes.
17    Q.   Am I -- do I understand this to mean
18  that NCA is also paying Horrocks?
19    A.   Yes, NCA was also paying Horrocks.
20    Q.   And that's standard or is that unusual?
21    A.   It's standard.  Typically the brokers
22  will -- they have different pricing
23  structures.  Brad's looks like -- was
24  basically just on basis points.  Some will do

1  a percentage of the overall sale on a monthly
2  basis.  It's very typical.  We still see it
3  today.
4    Q.   Do you know if Brad -- I'm sorry.  Do
5  you know if Brett Horrocks was paid a fee for
6  all of the Think Finance business by NCA, as
7  well as Think Finance?
8         MR. DAUGHERTY:  Object to
9  form.
10         THE WITNESS:  I don't know
11  whether he was getting paid by Think Finance.
12  What I can say is I would expect that he
13  would, but I don't know if that was happening.
14  BY MR. ACKELSBERG:
15    Q.   Right.  You would expect that he was
16  paid by Think Finance because, as you said
17  before, no one works for nothing?
18    A.   Right.
19    Q.   And he's representing Think Finance in
20  his dealings with NCA, correct?
21         MR. DAUGHERTY:  Object to
22  form.
23  BY MR. ACKELSBERG:
24    Q.   Right, that's what we're talking about?

1    A.   Yeah, he's brokering the debt sale and
2  he's doing other things outside of my
3  knowledge.
4    Q.   As the broker for Think Finance, one of
5  the things he'd be trying to deliver to Think
6  Finance would be the best possible price, the
7  highest price that he could get from NCA,
8  correct?
9         MR. DAUGHERTY:  Object to
10  form.
11         THE WITNESS:  I don't know
12  that I agree with that.  We work with brokers
13  today, one of them called Debt Trader and
14  they're very prevalent in this space.  Their
15  goal is to get something marketed and sold.
16  And so that requires discussions on both sides
17  of the fence, right.
18  BY MR. ACKELSBERG:
19    Q.   Uh-huh.
20    A.   What we want to buy it for in a perfect
21  world is much different than what the seller
22  wants to sell it for.  So brokers, in my best
23  understanding, will ultimately work with both
24  parties to get somebody to a point that it

1  makes sense, right.
2         So the fact that if he was
3  being paid on a monthly basis for brokering
4  the debt sale from Think Finance or any of the
5  other issuers that we had contracts with, it
6  doesn't surprise me, I guess.
7    Q.   So based on your experience within this
8  space, do the issuers that -- is there an
9  expectation among the issuers that the broker
10  is going to get paid by both parties?
11         MR. DAUGHERTY:  Object to
12  form.
13         THE WITNESS:  I don't know
14  that I can answer that.  I can tell you that
15  other brokers that we worked with, it's well
16  known by both parties that the broker is being
17  paid by both parties.  So I would say that it
18  would be a common practice.
19  BY MR. ACKELSBERG:
20    Q.   All right.  You'll see that he
21  references installment -- in this new forward
22  flow, the installment loan purchases would
23  start in December.  You're in December there
24  in these e-mails.  So it would be starting

UNSEALED

1 right away?
2 A.   Can you tell me which document or e-mail
3 you're referring to.  Just make sure I'm
4 looking --
5 Q.   It looks like -- the whole thing, it
6 looks like it's getting ready for a sale in
7 January of 2012, that's what it looks like,
8 the last e-mail, correct?  Whatever.  You
9 don't know when --
10 A.   Yeah, I mean directionally, yeah, I
11 would.  I would agree that that's what it
12 looks like.  And it would, based on the
13 previous documents that we looked at, it would
14 line up with the original forward flow.
15                - - -
16           (Whereupon Exhibit P-73 was
17 marked for identification.)
18                - - -
19 BY MR. ACKELSBERG:
20 Q.   Let's look at P-73, I believe this is
21 the forward flow that is being described.
22 A.   But this wasn't attached to that
23 previous -- you're just saying it's the flow
24 being described?

1 Q.   Yes.  It's not an attachment.
2           MR. DAUGHERTY:  Irv, I don't
3 know that I agree with your characterization.
4 BY MR. ACKELSBERG:
5 Q.   Let me withdrawal the characterization,
6 because I'm actually not entirely sure how it
7 connects to the e-mail.  I will let the
8 witness make that -- I'll ask the witness.
9           I want to show you a document
10 that has been marked P-73 entitled Loan Sale
11 Agreement.
12 A.   Okay.
13 Q.   You will see it actually has the same
14 date as the last e-mail.  Why don't you tell
15 me what we're looking at.
16           MR. DAUGHERTY:  You're
17 referring now to Exhibit-73?
18 BY MR. ACKELSBERG:
19 Q.   Yes.
20 A.   It's a loan sale agreement.
21 Q.   Let me ask you this and try to move this
22 along.  Would I be correct in stating that
23 this is the first loan sale agreement between
24 Plain Green and NCA?

1 A.   The question is, would you be correct in
2 stating that this is the first purchase sale
3 agreement between Plain Green and NCA; am I
4 understanding that correctly.
5 Q.   Yes.
6 A.   I don't --
7 Q.   This looks like it's not a forward flow,
8 right.  This one actually looks like it's just
9 a sale for specific loans, if you look at the
10 annex.
11           MR. DAUGHERTY:  Object to the
12 characterization of the document.
13           THE WITNESS:  Typically you
14 would have the annex for that monthly sale.
15 BY MR. ACKELSBERG:
16 Q.   You say this could be a forward flow?
17 A.   I'm actually reading through it so I can
18 answer that initial question.
19           I can't say whether this was
20 used as the forward flow agreement, but I mean
21 it's a loan sale agreement.  And typically you
22 would see this, you know with a timeframe of
23 what the flow might look like, and then we'd
24 execute an annex on a monthly basis.

1 Q.   Right.  So would it be common to -- if
2 you're -- if NCA is buying a new portfolio or
3 a portfolio from a new issuer, to first buy an
4 initial set of loans before committing to a
5 forward flow?
6 A.   That would be in the best interest of
7 NCA or the debt buyer.  It doesn't always get
8 that luxury.  A lot of times -- I know that
9 Brad and -- even today we'll ask if we can
10 start off with a short term flow or a sample
11 purchase, et cetera, specifically if it's a
12 product that we never purchased or a different
13 product line, you know, just to understand and
14 learn what the value might be based on it.
15 Q.   Why don't we take a look at another
16 agreement.  The next -- I see, I did it
17 slightly differently.  The next document is
18 just a transmittal, a transmittal e-mail.
19 It's 74.  In this case I did actually copy, if
20 any of you all would like to see it, the rest
21 of the attachments that I'm not going to be
22 including.  But it's here for anybody to look
23 at, if you want.
24           I'm going to also show you --

UNSEALED

1    I want to show you three exhibits, 74, 75 and
2    76. We will do this together.
3                  - - -
4              (Whereupon Exhibits P-74, P-75
5    and P-76 were marked for identification.)
6                  - - -
7          MR. SHELDON: Irv, are you
8    representing that 75 and 76 are some of the
9    attachments to 74?
10         MR. ACKELSBERG: I am. And I
11   have others that I brought with me, because I
12   anticipated that question. So if you want to
13   take a look at the others in that e-mail, I
14   have them here. But again, I'm not including
15   the Payday One documentation.
16   BY MR. ACKELSBERG:
17   Q.   We can start with 74. That's NCA page
18   number 659. You'll see that's an e-mail
19   between NCA and Horrocks, right, where
20   Horrocks says that he is sending -- he's
21   attaching for NCA both an agreement for sale
22   of Plain Green debt for that month, as well as
23   a forward flow agreement. Do you see that?
24   A.   Yes.

1          MR. SHELDON: Object to form.
2    BY MR. ACKELSBERG:
3    Q.   If you look at Exhibit-75, this would
4    appear to be the sale for that particular
5    month that he was referring to, right?
6          MR. DAUGHERTY: Object to
7    form.
8          THE WITNESS: This was a sale
9    that was closed on February 10, 2012.
10   BY MR. ACKELSBERG:
11   Q.   Which is the date of the e-mail, right?
12   A.   Which is the date of the e-mail.
13   Q.   And then if you look at -- that does
14   appear to be a -- what he -- it appears to be
15   what he's referring to as the sale for the
16   current month of Plain Green loans, right?
17   A.   It appears that's what he's referring
18   to, yes.
19   Q.   If you look at Exhibit-76, starting with
20   NCA Bates number 603, this would appear to be
21   the forward flow that Brett was referring to
22   or Brett was attaching in his e-mail. Do you
23   see that?
24         MR. DAUGHERTY: Object to

1    form.
2    BY MR. ACKELSBERG:
3    Q.   I mean if you go down to the last page
4    -- if you go down to the annex on this
5    exhibit, it's page 622 of NCA.
6    A.   Yes.
7    Q.   You'll see that it's all to be
8    determined. This is what a forward flow looks
9    like, right, that you're talking about what
10   the annex agreements will look like pursuant
11   to this particular forward flow over the
12   course of the next 12 months or so.
13   A.   Correct.
14         MR. SHELDON: I'm just going
15   to lodge a continuing objection to questions
16   regarding these documents. The e-mail that's
17   being quoted is from Brett Horrocks on
18   February 10th, 2012, it references attaching
19   several agreements. But the top e-mail in
20   that chain is from Lori Bates to several
21   individuals, including Brett Horrocks, and it
22   says executed. And then attached is a series
23   of PDFs implying that the documents have been
24   executed that were attached to this e-mail.

1    And I don't see signatures on either of the
2    two documents that are being referenced in the
3    questioning.
4          MR. DAUGHERTY: That's fine.
5    I also note for the record that the e-mail
6    appears to have a higher Bates number than the
7    attachments. The e-mail starts at 659. The
8    attachments are at 599 and 603, typically what
9    I would expect is for the attachments to have
10   a higher beginning Bates number than the
11   e-mail.
12         MR. ACKELSBERG: Right. In
13   the production that I received from your firm,
14   Patrick, I received multiple copies of these
15   documents. I can't tell you that it's the
16   exact -- I can tell you it's identical to the
17   one in the sequence, that there's no rhyme or
18   reason to me using one or the other.
19         If you want to represent that
20   these were never executed, that's fine. I'm
21   assuming they were and you have multiple
22   copies of these. But your objections are
23   noted.
24   BY MR. ACKELSBERG:

1  Q.  So I think -- remembering your previous
2  testimony, Mr. Rempel, you told us that up
3  until -- I believe it was -- I think you said
4  2014 or before that, the -- with regard to
5  purchasing from Think Finance's tribal
6  partners, you were basically getting the
7  documentation initially, directly from Think
8  Finance, during the earlier period, right?
9       MR. SHELDON:  Objection to
10  form.
11       MR. DAUGHERTY:  Object to
12  form.
13       THE WITNESS:  As we seen in a
14  lot of the e-mails, Brett Horrocks being the
15  in between was the one actually getting the
16  documents to us, as to who he was directly
17  getting them from and acting on behalf of, I
18  don't know that I can answer that.
19       However, in my earlier
20  testimony I did say my recollection of the
21  early parts of the relationship that we were
22  more involved or Think Cash, Think Finance was
23  more involved with, just the building of the
24  relationship and the transfer of that

1  relationship to the tribes and who we were
2  dealing with.
3  BY MR. ACKELSBERG:
4  Q.  In these -- typically in these forward
5  flow agreements, would -- so NCA is agreeing,
6  like the one we just looked at, NCA would be
7  agreeing to purchase periodic -- make periodic
8  purchases during the term covered by the
9  forward flow agreement, correct?
10       MR. DAUGHERTY:  Object to
11  form.
12  BY MR. ACKELSBERG:
13  Q.  That would be the expectation?
14  A.  Yes, typically the expectation would be
15  known as far as whether it's a monthly sell or
16  12 installments let's say or six or three.
17  Q.  Would the understanding be that in this
18  context that the Plain Green loans would be --
19  during the course of the forward flow, that
20  the Plain Green loans would be sold
21  exclusively to NCA; is that part of the
22  understanding?
23       MR. DAUGHERTY:  Object to
24  form.

1       THE WITNESS:  I don't know if
2  that was part of the understanding.  And I
3  honestly wouldn't know if they had another
4  debt buyer.  I think maybe we made the
5  assumption that we were the only ones buying
6  it, but I don't know that.
7  BY MR. ACKELSBERG:
8  Q.  Now if you go back to the e-mail, I
9  believe it's 74, do you see Brett Horrocks in
10  his e-mail to NCA saying that he's also
11  working on the first sale of the Great Plain
12  product?
13  A.  Yes, I see that.
14  Q.  In fact, that eventually happened as
15  well, correct?
16  A.  Yes.
17  Q.  If we look at the next exhibit, 77, I
18  think we're going to see a contract that Brett
19  delivered with regard to Great Plains.
20       - - -
21      (Whereupon Exhibits P-77, P-78
22  and P-79 were marked for identification.)
23       - - -
24  BY MR. ACKELSBERG:

1  Q.  Let me also show you 78 and 79 and move
2  this along.  Here is 78 and here is 79.  If
3  you look at 77, it says it's a draft.  Do you
4  see it says, draft February 8th, 2012?  Do you
5  see that?
6  A.  Yes, I do.
7  Q.  Can you tell, looking at this document,
8  who is doing the drafting, whether Brett was
9  delivering a draft agreement or whether it
10  would have come from Brad?
11       MR. DAUGHERTY:  Object to
12  form.  Counsel, I also have an objection that
13  often there's questions about who it came from
14  and things like that.  It can be answered by
15  producing or showing the witness the
16  associated e-mail.  Are you representing to me
17  that this was a standalone document as it was
18  produced, it was a child to an e-mail?
19       MR. ACKELSBERG:  I don't
20  remember.  I think it's standalone.  We got
21  many standalone agreements from NCA.  It was
22  hard reconstructing.
23       THE WITNESS:  Answering the
24  question, I can't tell from the timeframe who

UNSEALED

1 -- where it came from, who drafted it, I don't
2 know.
3 BY MR. ACKELSBERG:
4 Q. And then there's a document that has the
5 title execution copy. Do you see that?
6 A. Yes.
7 Q. It's February 27th. Do you know
8 anything about the negotiation of this
9 agreement and what the hold up was?
10       MR. SHELDON: Object to form.
11       MR. DAUGHERTY: Objection to
12 the characterization of there being a hold up.
13       THE WITNESS: Your question,
14 why -- I guess I don't understand the
15 question, the time between February 8th and
16 February 27th?
17 BY MR. ACKELSBERG:
18 Q. Yeah. You don't know any issues that
19 were --
20 A. No.
21 Q. You weren't involved in this negotiation
22 at all, were you?
23 A. No, without the corresponding e-mails,
24 it could be that there was that amount of time

1 that could be utilized, right.
2 Q. Right.
3 A. I'm sure there was other work, whoever
4 was executing these was doing.
5 Q. The signator on this particular document
6 from the Great Plains lending site was someone
7 named Charles Moncooyea, President. This
8 being in 2012, it would have been your
9 expectation that with regard to getting the
10 signature of someone from the tribe, that
11 would have been part of Brett's job. That
12 would have been your expectation, right?
13       MR. DAUGHERTY: Object to
14 form.
15       THE WITNESS: Yes, I mean he
16 delivered them to us, my expectation. You
17 know, the relationship is we would have
18 delivered them back to him for signature from
19 the tribe, and we could get an executed copy,
20 both parties would.
21 BY MR. ACKELSBERG:
22 Q. If we look at Exhibit-79, that appears
23 to be the first of the loan sales pursuant
24 to --

1       MR. SHELDON: Can you tell me
2 the Bates number?
3       MR. ACKELSBERG: Yes, 899.
4       MR. SHELDON: Thanks.
5       MR. DAUGHERTY: Did you have
6 a question pending for the witness?
7 BY MR. ACKELSBERG:
8 Q. Is this the initial Great Plain loan
9 sale pursuant to the forward flow?
10       MR. DAUGHERTY: Object to
11 form.
12       THE WITNESS: I honestly
13 can't -- I don't know.
14 BY MR. ACKELSBERG:
15 Q. You see it's dated February 27th,
16 correct?
17       MR. SHELDON: Note the
18 document is not executed.
19       MR. ACKELSBERG: Right. Some
20 of the documents produced have executed, some
21 of them aren't. I assume there's an executed
22 copy. You're right, your comment is noted.
23       MR. DAUGHERTY: I think the
24 witness was remarking that there appears to

1 be, assuming other portions of the document
2 are correct, a typographical error under item
3 one on the first page.
4 BY MR. ACKELSBERG:
5 Q. Right, the date, the 2015.
6 A. The volume, et cetera, it could be the
7 initial Annex I.
8 Q. Now over the course of the next several
9 years, from 2012, 2013, 2014 there were, in
10 fact, monthly sales of both Plain Green and
11 Great Plains Lending charge offs from that NCA
12 purchase, right?
13 A. Yes.
14 Q. At least up until 2014, they were all
15 brokered by Brett Horrocks, right?
16 A. Until 20 what?
17 Q. Up until 2014.
18 A. Yes.
19 Q. And that was in his capacity as the
20 broker for Think Finance?
21       MR. DAUGHERTY: Object to
22 form.
23 BY MR. ACKELSBERG:
24 Q. As far as NCA knew?

UNSEALED

1    A.  As far as we knew, yes.  We were paying
2    for brokering the deals for us, as well.
3    Q.  What about Think's other installment
4    loan product, a product called Rise.  Did NCA
5    also purchase Rise charge offs from Think?
6          MR. DAUGHERTY:  I'll object
7    on the grounds that it's outside the scope of
8    the 30(b)6 deposition notice.
9    BY MR. ACKELSBERG:
10   Q.  If you know.
11   A.  We have and do buy the product of Rise.
12   Q.  And you're doing that today, correct?
13   A.  We do it today, with the exception of
14   it's bought from a group called Elevate as
15   opposed to Think Cash or Think Finance.
16   Q.  Are those two brokered by Brett
17   Horrocks?
18         MR. DAUGHERTY:  Same
19   objection.
20         THE WITNESS:  The Rise is not
21   brokered by Brett Horrocks.
22   BY MR. ACKELSBERG:
23   Q.  I want to ask a question about the
24   procedures.  So with regard to these rough

1    periodic sales, roughly on a monthly basis,
2    can you tell what would happen from -- and I'm
3    really trying to understand this sort of
4    uploading, the process.
5         So there's a sale of Plain
6    Green or Great Plains loans in a particular
7    month.  The sale goes -- you mentioned
8    scrubbing files, right.  When does that happen
9    and who does that?
10   A.  It happens after the delivery of the
11   account.  I mean the process would be to
12   execute the contracts, get a mass file so we
13   can-
14   Q.  Are you talking about an electronic
15   transmission?
16   A.  Yeah, electronic mass file to compare
17   the bill of sale to -- or the annex to the
18   mass file, the number, the volume, et cetera.
19   Q.  That transmission would come from Think
20   Finance, correct?
21         MR. SHELDON:  Objection.
22         THE WITNESS:  I can't say
23   specifically say I know where it came from.  I
24   do believe that we were receiving that from

1    Brett Horrocks through NSFTP.
2    BY MR. ACKELSBERG:
3    Q.  So it wouldn't come directly from Think,
4    it would come Think to Brett, from Brett to
5    NCA?
6          MR. SHELDON:  Object to form,
7    mischaracterizes his testimony.
8         THE WITNESS:  That's not my
9    understanding.
10   BY MR. ACKELSBERG:
11   Q.  What's your understanding?
12   A.  My understanding is, as we've seen here,
13   the contracts are with either Plain Green or
14   Great Plains, based on the transmission of
15   those contracts and signatures, my assumption
16   and understanding is that Brett would get the
17   signatures directly from the tribe, et cetera,
18   provide it to us, such as --
19   Q.  No, no, I understand that with the
20   contract.  I'm talking about the massive
21   electronic file, where would Brett get that
22   from?
23   A.  I can't tell you where he would get it
24   from.  I assume that he was getting it from

1    Great Plains, Plain Green, the owners of the
2    lending institution.
3    BY MR. ACKELSBERG:
4    Q.  Do you think they had any capacity to do
5    that, to transmit those big electronic files?
6          MR. DAUGHERTY:  Object to
7    form.
8    BY MR. ACKELSBERG:
9    Q.  In 2012, 2013?
10   A.  I don't know whether they did or didn't.
11   We did execute on a monthly basis the timeline
12   from, you know, when we executed these
13   contracts that we're seeing examples of today,
14   to the time that we would have the file
15   dropped to a secured server.
16   Q.  So you would get those -- you know that
17   you got the files from Brett, right?
18   A.  Yes.
19   Q.  How exactly Brett got them, you don't
20   really know, do you?
21         MR. DAUGHERTY:  Object to
22   form.
23         THE WITNESS:  No, I don't
24   know.  I mean our relationship was with Brett

UNSEALED

1  and contractually going through to the tribe.
2  BY MR. ACKELSBERG:
3  Q.   All right.  So you get an electronic
4  transmission from Brett, and what's the next
5  thing that would happen?  Is that the
6  scrubbing?
7  A.   Well, once we funded -- once we actually
8  get --
9  Q.   Oh, we didn't talk about the money,
10 yeah, yeah, yeah.  So how would that happen?
11 You get a wire, right?  You would send a wire?
12 A.   We would send a wire to the account.
13 Q.   That's listed in the Annex I, right?
14 A.   Listed in the annex, right.  Upon
15 delivering that transfer of money, Brett would
16 put a -- not a mass file but the actual data
17 file -- load file is what we call it, on the
18 SFDP.  That would be pulled down by a
19 gentleman by the name of Steven Torres with
20 NCA.  He's in our IT Department.  He would
21 load that into WinDet, our system of record.
22 (Reporter clarification.)  Windet, our
23 collection platform system.
24       When he does that, as he's

1  doing that there are some steps that his team
2  or he does to make sure that we received all
3  of the information and the file format meets
4  the expectation.  We can have charge off
5  dates, date of birth, socials, et cetera, to
6  just verify that the file is correct.
7       Once that's done, it would
8  get loaded into our system.  That night into
9  day processes would scrub the file for --
10 actually build it.  They would build an output
11 file to go to vendors that would scrub, send
12 us hits back, let us know if it's bankrupt,
13 deceased, et cetera.
14       Those accounts would be
15 identified and sold back to Great Plains or
16 Plain Green or Payday loan, whomever we bought
17 from.  At that point, we would assign and
18 purchase a Trans Union recovery score, apply
19 it to the file.
20 Q.   What's the purpose of that?
21 A.   It helps prioritize our work.  It's not
22 a credit or a FICO score, it's just a recovery
23 tool that helps us identify who may be more
24 apt to pay, et cetera.  So you can prioritize

1  your work with your resources.
2       The next steps are, we
3  ultimately get it out to our call centers.
4  Q.   What -- in a particular -- for a
5  particular loan, loan account, within a
6  portfolio that you just bought and just
7  uploaded, what content do you have with regard
8  to a particular consumer debt?
9       MR. DAUGHERTY:  Object to
10 form.
11      THE WITNESS:  Just a general
12 consumer account.
13 BY MR. ACKELSBERG:
14 Q.   So you have payment history?
15 A.   Yes.  It differs from, you know,
16 products, but we have to have a payment
17 history or access to it.  We have to have --
18 the original media is what we call the
19 contracts that the consumer signed or access
20 to it.
21      Today it's more typical in
22 the electronic age that everything is on a
23 disc or sent electronically.  Immediately upon
24 the purchase, you know, we have qualifying --

1  everything needed to qualify that the consumer
2  is the one that took out the loan, verify it,
3  you know, the address, all of the way to the
4  -- some internet based loans, the computer
5  that it was taken from.
6  Q.   So we're going to talk later about the
7  buy back of the Pennsylvania loans, but I am
8  curious about what you have within your data
9  today about the Pennsylvania loans.  And I'm
10 talking about Plain Green, Great Plains
11 Lending, Mobil Loans, do you still have data,
12 even though you sent the loans back to Think?
13      MR. SHELDON:  Objection to
14 form.
15      THE WITNESS:  Your comment
16 about we're going to get to that later today,
17 I mean --
18 BY MR. ACKELSBERG:
19 Q.   I'm just curious about -- I'm just
20 asking about data.  Do you still have data?
21 A.   Yes.
22 Q.   You don't have loans anymore?
23 A.   Yes, we still have data.
24      MR. DAUGHERTY:  Objection.

UNSEALED

1　　　　　THE WITNESS: We still have
2　inactive Pennsylvania accounts that are not
3　being collected, called, et cetera, in our
4　system.
5　BY MR. ACKELSBERG:
6　Q.　Okay. If we were to ask your IT people
7　to generate a file listing all of those
8　inactive Pennsylvania accounts, could that be
9　done?
10　　　　　MR. SHELDON: Objection.
11　　　　　MR. DAUGHERTY: Irv, I object
12　to you essentially directing a request for
13　production to the witness.
14　　　　　MR. ACKELSBERG: I didn't
15　direct it. I'm asking him -- it's perfectly
16　legitimate. I'm asking what his system is
17　capable of producing. In fact, I believe this
18　connects to the topic of the Pennsylvania
19　accounts.
20　BY MR. ACKELSBERG:
21　Q.　So anyway, could that be done?
22　A.　Yes, we could create a file, yes.
23　Q.　And could you also retrieve the actual
24　loan agreements, the Pennsylvania borrowers

1　who NCA was collecting? And I am talking
2　about Plain Green, Great Plains Lending and
3　Mobil Loans?
4　　　　　MR. DAUGHERTY: Same
5　objection.
6　　　　　THE WITNESS: I do believe
7　that we have access to those.
8　　　　　MR. ACKELSBERG: Is this a
9　good time for a break?
10　　　　　MR. DAUGHERTY: Do you want
11　to do lunch now?
12　　　　　MR. ACKELSBERG: Yeah. I'm
13　about ready to switch.
14　　　　　VIDEOTAPE OPERATOR: That
15　concludes DVD number two. The time is 12:29
16　p m. We are off the record.
17　　　　　- - -
18　　　　　(Whereupon Exhibit P-80 was
19　marked for identification.)
20　　　　　- - -
21　　　　　VIDEOTAPE OPERATOR: This begins
22　DVD number three, the time is 1:22, we're on
23　the record.
24　BY MR. ACKELSBERG:

1　Q.　Mr. Rempel, I'm showing you an exhibit
2　that we have marked as Plaintiff's Exhibit 80.
3　It's a Think Finance document, 61148. You'll
4　see that -- I realize there's no one from NCA
5　who is on the e-mail itself, though the
6　subject appears to about be about NCA. Do you
7　see that?
8　A.　Yes, I see that it's a discussion about
9　the sales that we were buying at that time,
10　and ultimately renewing the flow. But just
11　based on the e-mail, I'm making that
12　assumption because we were buying it, right.
13　　　　　For I all I know in this
14　e-mail, they could have been looking at
15　selling it to somebody else. Is that fair?
16　Q.　I guess my question is, do you know if,
17　in fact, NCA was renegotiating the agreements
18　with Think Finance in this timeframe?
19　A.　Yes. Can I clarify that.
20　Q.　Sure, go ahead.
21　A.　We've been discussing this all morning,
22　but it would have been -- our contact would
23　have been with Brett Horrocks.
24　Q.　Sure, sure. I know what you mean. I

1　understand.
2　　　　　Do you remember there being a
3　back and forth? I mean it looks like they are
4　discussing a redline that Brett got back from
5　NCA. Do you remember any of that?
6　A.　I don't necessarily remember it. That's
7　fairly normal, typical, you know, during the
8　negotiations or changes to the charge off, not
9　just change the dates, but saying that we're
10　going to move a to a 60-day delinquency as
11　opposed to -- I don't know what it was before,
12　maybe 90. And in their eyes, the way I read
13　this is, what's going to warrant a price
14　increase.
15　Q.　So do you remember that, that he started
16　getting 60 day as opposed to older debt from
17　Think Finance?
18　　　　　MR. DAUGHERTY: Object to
19　form.
20　　　　　THE WITNESS: I don't know
21　that I individually remember that. I do
22　recall the price point change. I'm sure that
23　there would have been a discussion amongst the
24　executive team that, you know, based on the

UNSEALED

1  price increase, the delinquency timeframe
2  would be reduced to 60 days.  At the time with
3  what I was responsible for, I clearly remember
4  the price increase, simply because when I look
5  at, you know, performance reports, et cetera,
6  it's important to know what you pay for it.
7  Otherwise you don't really know how you're
8  doing, right.
9  BY MR. ACKELSBERG:
10  Q.   Right.
11  A.   So I would pay attention to that.
12  Q.   There's also reference to -- you'll see
13  that Brett is saying to the recipients of this
14  e-mail that -- he says we will be working on
15  the agreement and needed changes to get Mobil
16  Loans into the process.  You see that the last
17  sentence in the first paragraph?
18  A.   Yes.
19  Q.   Do you remember anything about the -- up
20  until now, we've just been talking about Plain
21  Green and Great Plains Lending.  Do you
22  remember anything about the beginning of the
23  purchase of the Mobil Loans debt, as well?
24  A.   If anything, I would be speculating.

1  What I can say is Mobil Loans, before they
2  started selling to us, we knew just based on
3  whether it was feedback received from Brett or
4  requests for us to provide, you know,
5  onboarding documents or information that they
6  had concerns, just with the idea of selling
7  bad debt, which is not really anything that we
8  would be concerned about.
9        I mean it's somewhat typical
10  in our industry where you might have an issuer
11  that they're concentrated on the front end and
12  feel that, you know, what we might get for
13  selling the debt may not be worth the more
14  time it's going to take, you know, to spend,
15  maybe they don't have expertise at.  Again,
16  I'm speculating on all that.  But it's fairly
17  typical in our industry that somebody may have
18  concerns with just selling debt.  So I'm
19  reading into that.
20        Another question I would have
21  is, for you, in the attachment, referring to
22  what I believe is a power point, and your
23  comment about redline is really within that
24  power point.  So whatever power point, Think

1  Finance potentially put together, somebody was
2  redlining their own -- without seeing it, I
3  don't know what was being redlined.
4  Q.   Yeah, yeah, sure.  I understand.  Let's
5  look at 81.
6        - - -
7        (Whereupon Exhibit P-81 was
8  marked for identification.)
9        - - -
10  BY MR. ACKELSBERG:
11  Q.   Have you had a chance to review
12  Plaintiff's Exhibit 82 -- 81?
13  A.   Is there a specific question?
14  Q.   Yeah, I just wanted to give you the time
15  you needed to see what it is.
16  A.   Yeah, I know what it is.
17  Q.   What is it?
18  A.   It's a restated loan and sale agreement.
19  It's an amended restated loan and sale
20  agreement.  It looks to me that maybe this is
21  when the price changed from --
22  Q.   From 7 to 8.65 or 7 point something.
23  This appears then to be the new agreement, as
24  it applies to Plain Green, that was discussed

1  in the prior e-mail, that was being discussed,
2  right?
3        MR. DAUGHERTY:  Object to
4  form.
5        THE WITNESS:  The 8.65, it
6  looks like it was around that timeframe and
7  ultimately through negotiations that's what
8  both parties agreed on.
9  BY MR. ACKELSBERG:
10  Q.   I notice that there is some additions to
11  this agreement that I didn't see in the
12  earlier ones.  I'm going to point you to the
13  Bates number in the lower right-hand corner to
14  386418 and 9.
15        Let's just go to -- let's
16  start with 417.  It's a Schedule A.  Do you
17  see there's a Schedule A attached to this one?
18  It starts at 386417?
19  A.   Yes.
20  Q.   Is this -- this schedule, is this --
21  have you ever seen -- are you familiar with
22  this attachment to the -- is this unique?
23  Have you ever seen this before?
24  A.   I don't know that I've ever seen it, you

UNSEALED

1  know, structured quite like this.  If I recall
2  at this time, the industry itself was
3  migrating into what we call a compliance
4  management system.  It was a time when it was
5  expected, that you don't just have a
6  compliance function, that you actually have a
7  compliance officer and you actually have a
8  documented, you know, compliance management
9  system.
10         I don't know that these were
11 ever documented requirements from the Federal
12 level, but they were being spoke of and it was
13 really something that the industry changed to
14 at the same point in time we were requiring
15 our agencies to provide us with a document
16 management system -- not a document -- a
17 compliance management system.
18         As I look at this, it appears
19 to me that this was when Plain Green, you
20 know, wanted to step up the game as it related
21 to oversight to, you know, just compliance and
22 ensure that NCA, us, understand that it would
23 agree to making sure that we had processes and
24 procedures in place to meet the expectation,

1  not only of them but ourselves, as well.
2  Q.   What makes you think that was coming
3  from Plain Green as opposed to Think Finance?
4  A.   Looking at the documents, it's a Plain
5  Green contract, the CEO of Plain Green signed
6  them.  They would have been delivered through
7  Horrocks, but --
8  Q.   Why don't we look at the next document
9  with this one, see if you come to the same
10 conclusion.  This will be P-82.  This, I
11 think, is equivalent document for Great Plains
12 Lending.
13         - - -
14         (Whereupon Exhibit P-82 was
15 marked for identification.)
16         - - -
17         MR. SHELDON:  For the record,
18 unless I am missing a signature page, it
19 doesn't look like this document has been
20 executed.
21 BY MR. ACKELSBERG:
22 Q.   Exhibit-82 is the -- what's labeled the
23 execution copy of the equivalent document for
24 Great Plains; am I right?

1         MR. DAUGHERTY:  Object to
2  form.
3  BY MR. ACKELSBERG:
4  Q.   Am I right?
5  A.   You're correct.
6  Q.   It has the same 8.65 percent price,
7  right?
8  A.   Yes.
9  Q.   And it has that same Schedule A, as
10 well, right?
11 A.   Correct.
12 Q.   So the same Schedule A that's -- other
13 than the different names for, it looks like on
14 this copy the Great Plains is blank.  But
15 putting aside the seller contact name on the
16 third page of Schedule A, we're looking at two
17 identical documents, correct?
18         MR. DAUGHERTY:  Object to
19 form.
20         THE WITNESS:  Correct.
21 BY MR. ACKELSBERG:
22 Q.   Now on these two Schedule A's, we start
23 from the top, it says:  Agencies to be fully
24 onboarded within 60 days of the effective

1  date.  And then it lists three companies:
2  Account Discovery Systems, Kramer and
3  Associates, RJA Capital and Zenith Financial
4  Network.  These are companies you're familiar
5  with?
6  A.   Yes.
7  Q.   What's the nature of the service
8  provided by these companies and to whom?
9  A.   These would be services provided to NCA,
10 these would be those agencies -- outsourced
11 agencies we'd have contracts with, we place
12 paper.  They work it for a fee.
13 Q.   So this is, as you described before,
14 these are effectively collectors hired by NCA
15 to collect for NCA on debt that NCA owns?
16 A.   Correct.
17 Q.   And these two contracts, the Plain Green
18 and the Great Plains Lending contracts specify
19 that those are -- effectively that those are
20 the only agencies you can use, right?
21         MR. DAUGHERTY:  Object to
22 form.
23         MR. SHELDON:  Objection.
24 BY MR. ACKELSBERG:

UNSEALED

1  Q.   That's the intent of this, right?
2  A.   So the intent is that any third party
3  agency besides National Credit Adjusters that
4  would work the accounts must be approved and
5  fully vetted, not only by NCA but by the
6  seller, the issuer.
7  Q.   And both of them identify the seller's
8  servicer as Gio Rodriguez and Think Finance,
9  correct?
10 A.   Correct.
11 Q.   Is that someone you know, Gio Rodriguez,
12 do you remember him?
13 A.   I do remember him.  I want to say
14 vaguely, but I do remember Gio.
15 Q.   What was his role with regard to the
16 Plain Green and Great Plains contracts?
17         MR. DAUGHERTY:  Objection to
18 form.
19         THE WITNESS:  I don't know
20 what his particular role with regard to the
21 contracts.  Here it's noting him as the seller
22 servicer contact.
23 BY MR. ACKELSBERG:
24 Q.   How did you know him?

1  A.   I knew him -- so when Plain Green came
2  and did a site visit of NCA, they were
3  accompanied by, I believe Gio, as well as
4  Kevin Banks initially.  I think the very first
5  site visit that was conducted.
6  Q.   What timeframe are we talking about?
7  A.   It would have been after this contract.
8  I would expect shortly after it.  I can't
9  specifically say.
10 Q.   And would that have been the first time
11 that you actually saw face-to-face anyone from
12 the tribal entities?
13 A.   I believe so.
14 Q.   They were with Gio Rodriguez and Kevin
15 Banks from Think Finance?
16 A.   With -- it was a site visit.  It's
17 typical in what we do.  Both parties came,
18 yes.  So whether or not the folks from Plain
19 Green were with Gio and Kevin or Kevin and Gio
20 was with the folks from Plain Green, they all
21 came to Hutchinson and we went through a
22 compliance management presentation.
23         At that time it would have
24 been delivered, I believe by Lori Patnode.

1  Some of the documents you're seeing, probably
2  Lori Bates.  She has changed last names.  But
3  that's what the point of them coming to
4  Hutchinson would have been.
5  Q.   So you remember this trip where Think
6  Finance came with some representatives of
7  Plain Green, right?
8  A.   Yes.
9  Q.   Do you remember who from Plain Green was
10 there?
11 A.   The initial trip, I believe it was Greg
12 Hilliard.  And there was, I believe a gal that
13 came with him, I can't remember her name.  But
14 I believe she was from the tribe.  Pardon me,
15 but I just don't remember her name.  I do
16 remember she was learning and the purpose of
17 her being part of the visit was to grow and
18 understand exactly how these visits go.
19 Q.   Bobbi Jo Favel, does that sound
20 familiar?
21 A.   It sounds familiar.  I can't say for
22 sure that was who it was.
23 Q.   Did you ever have a similar meeting with
24 Great Plains?

1  A.   I don't recall having a meeting with
2  Great Plains, no.
3  Q.   Do you remember anyone at NCA ever
4  meeting anybody from Great Plains?
5  A.   I personally don't remember meeting
6  anybody from Great Plains, no.
7  Q.   Do you remember seeing anyone from Great
8  Plains on the premises?
9  A.   I do not, no.
10 Q.   And that's even post -- you mentioned
11 when the tribes were taking things over more
12 themselves, like in 2014, you didn't see
13 anyone from Great Plains then either?
14         MR. DAUGHERTY:  Object to
15 form.
16         THE WITNESS:  No.  What I
17 will say is, we have had other products over
18 the course of time that they did come on site.
19 We, through the expectations of really the
20 onboarding, as well as compliance management
21 overview, we would be providing and still do
22 to this day, on a weekly basis, monthly basis,
23 documentation of all of our complaints, as
24 well as provide access to Great Plains, Mobil,

UNSEALED

App. 0334

1　Plain Green, provide them access to their
2　information to show them where every single
3　one of their accounts is at, time give them a
4　report to show a number of attempts, different
5　things like that.
6　　　　It's just a very well rounded
7　summary of what was happening on their
8　accounts, as well as if we had a complaint
9　from a consumer.  We would have that
10　investigated internally.  A summary would be
11　prepared by our compliance department.  That
12　would be provided to a company, the complaint
13　log.  And we would receive questions from
14　associates at Great Plains.
15　　　　Right, wrong or in different,
16　that was the relationship with Great Plains
17　and I don't recall ever seeing them on site.
18　BY MR. ACKELSBERG:
19　Q.　Did you ever meet anyone from Plain
20　Greens off site?
21　　　　MR. DAUGHERTY:  Objection to
22　form.
23　　　　MR. SHELDON:  Object to form.
24　　　　THE WITNESS:  Off site in

1　terms of away from our office or just anywhere
2　in general?
3　BY MR. ACKELSBERG:
4　Q.　Yes.
5　A.　Not to my knowledge, no.
6　Q.　So you've had no face-to-face contact
7　with anyone from Great Plains that you can
8　recall?
9　A.　The last question you said Plain Green,
10　were you referring to --
11　Q.　I'm sorry, Great Plains.
12　A.　No.
13　Q.　Schedule A also references some training
14　that is supposed to happen.  Employee
15　contractors must complete seller mandated
16　training, right.
17　　　　So my question is, who is
18　doing the mandating and the training?
19　　　　MR. SHELDON:  Object to form.
20　BY MR. ACKELSBERG:
21　Q.　Why don't we just ask the training.  Who
22　was expected to do the training here?  It
23　says:  Seller mandated training.
24　A.　So I believe what this is ultimately

1　speaking to is both federal and state
2　regulatory training.  And I specifically
3　remember we contracted with a company called
4　FIS, which provides not only the training, but
5　the testing, as well.  It's very widely
6　utilized.  And that's what we put in place on
7　a semi-annual basis.
8　Q.　And the contract also required weekly
9　call monitoring?
10　A.　Yes, we had and have what we call a
11　quality assurance department.  They would
12　listen to calls, collective calls and grade
13　them without bias.  Each collector had to have
14　"X" number of calls graded per week, I believe
15　it's three, three to five.
16　Q.　So this is monitoring that would be done
17　internally?
18　A.　We would do that internally.  And in
19　addition we would take -- I don't know if it
20　was those calls that were reviewed by us, I
21　don't believe so.  But a random -- I think 50
22　calls related to the specific accounts that
23　each contracts with.
24　　　　For example, we wouldn't send

1　calls from Plain Green to Great Plains or vice
2　versa or to any other issuer.  We would have a
3　third party disclosure problem.  But we would
4　provide SFD&P access to where those calls
5　could be listened to by the tribes or any
6　other issuer that requested that.
7　Q.　It also references weekly dialer call
8　reporting and complaint monitoring.  Are these
9　other sort of compliance activities that would
10　be done internally within NCA?
11　A.　Yes.
12　Q.　And it sounds like these -- all of these
13　monitoring activities applied to the
14　outsourced agencies, as well.  So how would
15　that -- how would the agencies be monitored?
16　A.　So the agencies -- they would have the
17　same requirements like you stated.  They would
18　provide us with phone calls to drop directly
19　to the issuers.  You know, we would request --
20　complaint monitoring was a big one with our
21　agencies.  They were required to fill out a
22　complaint log and provide them to us.
23　Q.　So NCA would effectively be monitoring
24　the agencies --

UNSEALED

1  A.  Correct.
2  Q.  Is that the way it worked?
3  A.  Yes.
4  Q.  Who would be monitoring NCA?
5  A.  We monitor ourselves.
6  Q.  Were you accountable -- was NCA
7  accountable at all to Think Finance and to the
8  people like Gio Rodriguez over there?
9  A.  In the beginning, early on in the
10  contract, as we talked about earlier, we would
11  receive questions from Gio or Kevin, as well
12  as from folks like Greg at Plain Green or
13  folks at both Great Plains and Mobil Loans, as
14  well.
15      To be honest with you, we
16  executed quite well on what we were supposed
17  to do and everything was dumped in a secure
18  location.  Brett Horrocks, I believe, had
19  access to we'd notify by e-mail that whatever
20  documents or phone calls et cetera were there,
21  and to my knowledge, I don't recall being
22  called or told.  Maybe it's just an area that
23  I wasn't notified.  I'm sure that there was
24  times where we didn't provide something, and

1  they're looking for it.  I don't know who was
2  notifying us at that time.  And it wouldn't
3  surprise me if we would get a notification
4  from a Kevin or from a Gio or directly from
5  Greg.  I don't know that there was a
6  systematic expectation on our side.
7  Q.  Okay.  You have mentioned a few times
8  Mobil Loans.  They did eventually -- there
9  eventually was an agreement that covered Mobil
10  Loans.  We haven't looked at that yet.  I
11  wanted to show you what I think are the Mobil
12  Loan documents and ask you whether those are
13  what I think they are.
14      - - -
15      (Whereupon Exhibits P-83 through
16  P-85 was marked for identification.)
17      - - -
18  BY MR. ACKELSBERG:
19  Q.  I will give you Exhibit 83 and 84.  I'm
20  sorry, I'm mixing up -- hold on.  I think I
21  numbered it wrong.  I am going to give you
22  three documents.
23      MR. DAUGHERTY:  Irv, are we
24  done with 80, 81 and 82 for the time being?

1  BY MR. ACKELSBERG:
2  Q.  Yes.  83, 84 and 85.  Just so we're all
3  on the same page, 83 is an e-mail, TF-PA
4  610807.  And then there are two versions of --
5  there are Mobil Loan agreements with different
6  Bates 565648 and that's P-84.  P-85 is 272605.
7  The first one is marked execution copy with a
8  date of November 26th, 2013.  The second one
9  is called a final copy with a different date
10  of March 12th, 2014.
11      Also note that the first
12  contract is between MBL, Mobil Loans, and NCA.
13  And the second contract is between Mobil Loans
14  and Level Financial.
15      All right, let's start with
16  the e-mail -- and again, this is an e-mail
17  that is Brett Horrocks communicating with
18  Think Finance.  It's an e-mail chain.  And the
19  subject of e-mail chain is the Mobil Loan debt
20  sale.
21  A.  Okay.
22  Q.  Yes.  So my first question is whether
23  you know any -- besides Brett Horrocks and Gio
24  Rodriguez who you've already mentioned, do you

1  know any of the other individuals at Think
2  Finance who are in these e-mails?  Have you
3  had any interactions with them or know who
4  they are?
5  A.  They all -- Ranga sounds familiar to me.
6  So does Carrie, it's hard for me to place
7  either one.
8  Q.  I mean it's fine if you don't remember.
9  A.  Yeah, the names sound familiar.
10  Q.  Okay.  That's fine.  Now there's
11  reference in the e-mail to a Think Finance
12  meeting with NCA about Mobil Loans.  Do you
13  remember that happening back in October of
14  2013?
15      MR. DAUGHERTY:  Irv, can you
16  be specific about which portion of the five
17  page e-mail, four or five-page e-mail you're
18  referencing there?
19      MR. SHELDON:  Is the witness
20  on this e-mail chain anywhere?
21      MR. ACKELSBERG:  No, he's
22  not.  We established that in the beginning.
23      MR. DAUGHERTY:  I see where
24  you are, the one ending 809.

1    BY MR. ACKELSBERG:
2    Q.   Yeah.
3    A.   Yeah, it's stating we met with NCA
4    today.  I don't know whether that's via phone
5    or maybe you have another document.
6    Q.   It could have been a phone meeting.  I
7    guess my question is, do you remember there
8    being issues about the Mobil Loan sale?  I
9    remember you testified previously that there
10   was some hesitation, you remember, from them
11   doing a debt sale at all, right?
12   A.   Yes, that's correct.  And reading into
13   this -- this is the first time for -- I'd say
14   prepping, as well as today, is the first time
15   I had seen, you know, this e-mail.  I don't
16   recall specific discussions as an executive
17   team or about the topics here, as far as
18   leasing account, ownership, you know, for
19   Mobil Loans, placement options, et cetera.
20        That doesn't mean that it
21   didn't take place.  I am sure it took place.
22   Q.   That's fine.  I just was curious whether
23   you had any recollection of these meetings or
24   anything more than -- you remember that Mobil

1    Loan is being reluctant to sell, but you don't
2    remember more to it than that?
3    A.   Yeah, that's right.
4    Q.   That's fine?
5    A.   That's as easy to put it as you can.
6    Q.   Looking at these agreements, can you
7    determine or from your memory, when it is that
8    NCA started buying the Mobil Loans debt?
9    A.   When?
10   Q.   Yes.
11        MR. SHELDON:  Are you
12   including Level Financial in your reference to
13   NCA?
14        MR. ACKELSBERG:  Yeah, sure.
15   He said that --
16        MR. SHELDON:  Right, it's
17   just one of the agreements says NCA, and one
18   of the agreements says Level Financial.
19        MR. ACKELSBERG:  It's kind of
20   the same thing operationally, right?
21        MR. DAUGHERTY:  Object to
22   form.
23        THE WITNESS:  Yes.  It's a
24   special purchase entity that was discussed

1    earlier.
2    BY MR. ACKELSBERG:
3    Q.   It has no practical consequence in terms
4    of how you're going to work the account,
5    right, whether it's purchased by NCA or later
6    by Level?
7         MR. DAUGHERTY:  Object to
8    form.
9         THE WITNESS:  Consequential,
10   no.  A collector might have to say that this
11   account is owned by Level Financial as opposed
12   to NCA.
13   BY MR. ACKELSBERG:
14   Q.   I see.  I see.
15   A.   Looking at this contract, I would say
16   2013 or thereabouts.
17   Q.   I apologize to the extent I've been
18   provided copies without signatures, but the
19   fact that one -- does the fact that one is
20   with NCA and one is with Level, suggest that
21   they actually both did happen?
22        MR. DAUGHERTY:  Object to
23   form.
24        THE WITNESS:  I can tell you

1    that we bought Mobil Loans, as well as Level.
2    BY MR. ACKELSBERG:
3    Q.   And that you were buying them as of the
4    end of 2013, does that sound about right?
5    A.   Yeah, to the best of my recollection,
6    yes.
7    Q.   By the way, these agreements have the
8    same Schedule A that the Plain Green and Great
9    Plains Lending have, don't they?
10        MR. DAUGHERTY:  Object to
11   form.
12        THE WITNESS:  They look very
13   similar.  It looks like one of the Mobil Loans
14   is redrafted.  But from just an expectation
15   requirement standpoint, I didn't go through
16   word by word.
17   BY MR. ACKELSBERG:
18   Q.   They look pretty similar?
19   A.   At quick glance, they look very similar.
20   Q.   Schedule A, would these have been --
21   I'll withdrawal the question.
22        So the same 8.65 percent
23   price, Gio Rodriguez is the same contact,
24   right?

WWW.KLWREPORTERS.COM

UNSEALED

1      MR. DAUGHERTY: Object to
2  form.
3      THE WITNESS: Based on these
4  documents and the Schedule A, Gio is listed as
5  the servicer contact.
6      MR. DAUGHERTY: Hold on. I
7  think that's actually not correct with respect
8  to Exhibit-85.
9      MR. ACKELSBERG: 86 has him
10  on there.
11      MR. DAUGHERTY: Tyler, if
12  you're asked a question about what does the
13  document say, I'd ask you to actually take a
14  quick look at it before you agree with what
15  opposing counsel suggests.
16  BY MR. ACKELSBERG:
17  Q.   I don't want there to be any confusion.
18  Let's look at TF-PA. We're in 84. We're in
19  Exhibit-84, TF-PA, 565669, towards the back.
20  Services contact is who?
21  A.   Gio Rodriguez.
22  Q.   At Think Finance?
23  A.   Yes. I think the clarification that was
24  needed on Exhibit-85, the service contact was

1  actually Kevin Banks, seller's service
2  contact.
3  Q.   Right, so is it different -- but it's
4  still Think Finance, it's just Kevin rather
5  than Gio.
6  A.   Gio.
7                - - -
8      (Whereupon Exhibit P-86 was
9  marked for identification.)
10                - - -
11  BY MR. ACKELSBERG:
12  Q.   Okay. I am going to show you what has
13  been marked Plaintiff's Exhibit 86. This is
14  TF-PA, the document beginning at TF-PA 557226.
15  A.   Okay.
16  Q.   Do you have any idea what this is?
17  A.   After reading it, I have an ideas of
18  what it is. I've never seen it before. It
19  looks like a First Party Collection Services
20  Agreement between Plain Green and National
21  Recovery Services, which is a Kansas Limited
22  Liability Company.
23  Q.   And this signator, by the way, the
24  address is the Ottawa, Kansas address of the

1  agency that you have that previously -- at one
2  point was an NCA agency, right?
3  A.   Correct.
4  Q.   I think you told us, and by the way, the
5  signator for this company, National Recovery
6  Services, on page four of the agreement, Brad
7  DeCray, he actually later became an employee
8  of NCA, correct?
9  A.   That's correct.
10  Q.   And reported to you?
11  A.   That is correct.
12  Q.   So I believe you explained in your
13  previous testimony that the Ottawa office was
14  a collection company that was ultimately
15  acquired?
16  A.   Correct.
17  Q.   Right. So would this be from the period
18  before the acquisition?
19  A.   This document?
20  Q.   Yes.
21  A.   Yes, this would have been prior to the
22  acquisition of the Ottawa office.
23  Q.   So it would appear that at this point in
24  time, it looks like there was collection of

1  loans that were still in the portfolio owned
2  by Plain Green, as opposed to NCA? This is
3  before -- these were loans that were being
4  worked by -- according to this agreement, by
5  Plain Green, right?
6      MR. DAUGHERTY: Object to
7  form.
8  BY MR. ACKELSBERG:
9  Q.   It was Plain Green Loans being worked by
10  National Recovery Services?
11  A.   That's what the agreement suggests, yes.
12  Q.   Okay.
13                - - -
14      (Whereupon Exhibit P-87 was
15  marked for identification.)
16                - - -
17  BY MR. ACKELSBERG:
18  Q.   All right. Can you explain this e-mail?
19  We're looking at an NCA document, NCA-14894,
20  which we've labeled as Plaintiff's Exhibit 87.
21      MR. DAUGHERTY: Object,
22  vague.
23      THE WITNESS: Yeah, it looks
24  like an e-mail series discussing a compliance

UNSEALED

1   meeting with NCA, at least the back.  I don't
2   know if that's the attachment from the --
3   BY MR. ACKELSBERG:
4   Q.   Right, well I don't know either.  It
5   looks like it's the last page of the
6   production.  So it looks like there is some
7   discussions internally about a proposed agenda
8   for a compliance meeting that's to take place
9   in two days, right?  Correct?
10   A.   Yes, that's correct.
11   Q.   You're basically approving the agenda,
12   right?
13   A.   It looks that way, based on these
14   e-mails.  That's why I was asking if this was
15   the actual attachment or if there was another
16   attachment.  I find it odd that I responded
17   with simply, yes, this would be fine.  This is
18   an e-mail forwarded from Shawn Gylling to me
19   with nothing written by Shawn and the first
20   e-mail being from Brett, but it's an agenda.
21   Q.   It looks like -- it looks like Brad
22   forwarded a proposed agenda to -- Brett
23   forwarded -- Brett Horrocks forwarded a
24   proposed agenda to Brad, and it looks like it

1   somehow got to Shawn, who is forwarding it to
2   you, correct?  That's what it looks like.
3   A.   That's what it looks like, yes.
4   Q.   Now, were there, in fact, ongoing
5   compliance meetings as described in this
6   agenda?
7   A.   I believe there was in the beginning.
8   Q.   Is May 2013 the beginning?
9   A.   Early on.
10   Q.   I'm just trying to get a sense of your
11   labels, yeah.
12   A.   Yeah, I consider that in the beginning,
13   probably because it's shortly after the new
14   contract site, Exhibit-A, with a laundry list
15   of expectations.
16   Q.   And these are the kinds of meetings that
17   would take place to go over the items covered
18   in Exhibit-A in the sale agreements?
19        MR. DAUGHERTY:  Objection,
20   mischaracterizes the document.
21        THE WITNESS:  I don't know
22   whether this was an on-site meeting or whether
23   this was -- this particular document speaking
24   to a certain date, I do believe that there was

1   a monthly or weekly call.
2   BY MR. ACKELSBERG:
3   Q.   That's what it looks like this is.  It
4   looks almost like maybe it's an Outlook invite
5   or something like that for a call, I don't
6   know.
7   A.   Yeah, I would be speculating there, as
8   well.  But there's a meeting obviously that
9   was scheduled here.  I can't recall being on a
10   phone call on a monthly basis, but we did from
11   a compliant standpoint, Sarah Waggerman and
12   Lori Bates Patnode would have been one to
13   handle a lot of those calls.
14   Q.   These calls -- it looks like these calls
15   were between this group from NCA and a group
16   from Think Finance --
17        MR. DAUGHERTY:  Objection to
18   form.
19   BY MR. ACKELSBERG:
20   Q.   That's what, at least, this meeting was,
21   right?
22        MR. DAUGHERTY:  Objection to
23   form.
24        THE WITNESS:  This meeting,

1   in particular, that's what the attendee list
2   is.  Who was invited to other meetings, I
3   couldn't tell you.
4   BY MR. ACKELSBERG:
5   Q.   You mention Gio and Ranga -- Gio -- you
6   had some dealings with Ranga, a familiar name.
7   What about Tammy and Tally, the other two
8   Think Finance people mentioned?
9   A.   Tally, yes.  I believe her last name was
10   Pleats.  I think that she was the compliance
11   officer for Think Finance at that time, if I
12   am remembering correctly.
13   Q.   So you do recall in that period of time
14   there being compliance calls between NCA and
15   Think Finance?
16        MR. DAUGHERTY:  Object to
17   form.
18        THE WITNESS:  I do.  I do,
19   you know, looking at this e-mail and this
20   agenda, there was -- my recollection is that
21   there was some compliance calls when they
22   transitioned or whatnot, how often they were,
23   et cetera.  It really wasn't, you know, what I
24   was responsible for at the time.

42  (Pages 165 to 168)

UNSEALED

App. 0339

BY MR. ACKELSBERG:

Q. But you knew these calls were happening?

A. I knew that there was a higher level of expectation, just from an oversight standpoint in general and accountability factor to it from a speculative standpoint. With what I was doing, if I wanted to improve the efforts of a certain agenda, so to speak, I would have phone calls or I'd have meetings, et cetera, with the folks that needed to be there. That's I guess what I can say about that.

Q. Were you ever a party to any compliance calls with Think Finance; or was this just in another area?

A. I'm sure I was. I can't specifically remember specific conversations, so to speak. But dealing with the collection floor, et cetera, I believe I would have had to have been on, you know, some calls related to compliance.

Q. Given the timeframe here, May of 2013, this would have been before Mobil Loans it looks like. So probably the subject would have been at this point in time mainly Plain

Green and Great Plains Lending, right?

MR. DAUGHERTY: Object to form.

BY MR. ACKELSBERG:

Q. Given the timeframe.

A. You can make that assumption, yes. We've gone over the contracts. Mobil Loans here is late 2013. I'm certain that I think that's when we started buying it. This was prior to that.

To say for exact that this particular meeting referenced in this e-mail was prior to the person at Mobil Loans, I don't want to commit to that.

BY MR. ACKELSBERG:

Q. Did there ever -- did this compliance meeting protocol continue through the years, 2013, 2014, 2015?

A. I don't believe so. If it did, I feel like I would have a better recollection of it actually happening. I don't believe that this example of a meeting continued into 2014, '15. It stopped at some point, but I do believe that part of that is due to -- if the

information that's being provided on a weekly, monthly basis is accurate, as well as full and complete as it relates to our complaints, the number of phone calls that we make, us being accountable to Schedule A, at some point you don't really need a weekly call, right.

Q. Right. So to the extent that Think Finance developed growing confidence in NCA's compliance with Exhibit-A, there might have been less calls for these preaudit calls?

MR. SHELDON: Object to form.

MR. DAUGHERTY: Object to form.

THE WITNESS: Think Finance, Brett, the tribes, if the call discontinued, whomever was on the call, both parties, it would have been because everybody was happy with the way things were functioning.

BY MR. ACKELSBERG:

Q. All right, but in this particular call, the agenda that you approved, there wasn't anyone from a tribe there, was there?

A. No --

MR. DAUGHERTY: Object to

form.

THE WITNESS: -- there is not.

BY MR. ACKELSBERG:

Q. In your reply to Shawn, you didn't say, well, maybe we should invite someone from the tribe there, did you?

MR. SHELDON: Object to form.

MR. DAUGHERTY: Object to form.

THE WITNESS: No, I didn't. I'm not sure -- I don't know whether there was a time -- I say, yes, this will be fine. Approval to me is a very strong word. I don't know that I had authority to approve an agenda for a compliance meeting, as being set up.

However, to answer your question, no, there is, to my knowledge, nobody from the tribes on this attendee list for the meeting scheduled for May 8th, 2013.

BY MR. ACKELSBERG:

Q. Do you see under -- on the agenda, it says compliance program update in bold?

A. Yes.

Q. And it talks about progress and items

UNSEALED

1    identified during the site visit, do you see
2    that?
3    A.    Yes.
4    Q.    Can you read the first item that was
5    identified during the site visit?
6    A.    Read it out loud?
7    Q.    Yes.
8    A.    No reference to TF-N Systems and
9    training materials.  All products referred by
10   lender.
11   Q.    Right.  Do you recall this topic as
12   being of concern to Think Finance?
13   A.    I don't know -- yes, concern, not just
14   to Think Finance, I think to really all
15   parties involved.  So you remember the
16   relationship started with the purchase of
17   Think Cash.  Sometimes changing collector
18   habits is not as simple as it may sound.
19           So migrating to Plain Green,
20   Great Plains, in making sure that collectors
21   aren't trying to refer to them as something
22   different, because the actual loan wasn't
23   completed or given by Plain Green or Great
24   Plains.  We deal with it outside of just

1    tribal or other products where an issuer will,
2    you know, be bought by somebody or --
3    Q.    Right, I understand.
4    A.    It's just making sure that our
5    collectors aren't referring to an account by a
6    different name.
7    Q.    Right, but I guess my question is, do
8    you remember -- that's in general.  I
9    understand that, but I am really talking
10   specifically about, you know, the relationship
11   with Think Finance that NCA had through Brett,
12   but --
13   A.    I do believe Think Finance wanted to
14   make sure that we didn't refer to the accounts
15   as anything but the originator or the current
16   lender.
17   Q.    Do you remember Think Finance being
18   hypersensitive to its name being used at all?
19           MR. DAUGHERTY:  Object to
20   form.
21           MR. SHELDON:  Object to form.
22           THE WITNESS:  I don't
23   remember them being hypersensitive.  I
24   remember that -- just like -- I remember it

1    being a point that we need to make sure that
2    we call the consumers and inform them of the
3    originator, the issuer of the loan because
4    that's what the consumer would recognize, et
5    cetera.  And that's who issued the loan.  I do
6    remember that.
7    Q.    How -- do you remember anyone in
8    particular kind of communicating that to you?
9           MR. SHELDON:  Object to form.
10           THE WITNESS:  No, I don't,
11   and it's partly, I think, because issuers -- I
12   received this complaint from other issuers
13   that we buy from.  Because our collectors will
14   -- consumers often times may have more than
15   one loan, right.  They have a loan from Plain
16   Green and have another loan from a Rise or a
17   Cash Net or a Sterling Jewelers.  They could
18   have multiple debts that NCA level
19   subsidiaries just happen to buy.
20           So through our quality
21   assurance process, as well as providing
22   issuers recordings of those phone calls, we
23   did receive issues or complaints where our
24   collector would foul up the conversation

1    because there were two accounts where they
2    would name -- they would state the wrong name
3    for the wrong account, wrong account number.
4    And they would be hypersensitive in that
5    scenario, that they don't want their loans to
6    be misrepresented to the consumer.
7    Q.    Did you ever have -- do you recall ever
8    having a consumer who you were collecting for
9    that had Plain Green and a Great Plains
10   Lending account?
11   A.    I don't.  I don't recall.  I don't know
12   whether it happened, didn't happen.  The main
13   reason that we have consumers that link up, we
14   call them links, account links, where they
15   have debts with different originators, right.
16   So it's not that abnormal.
17   Q.    Is that something that your data would
18   also be able to retrieve?
19   A.    Absolutely, it's two different loans.
20   Q.    So I mean you'd be able to -- if I were
21   to ask you how many Pennsylvania people had
22   loans with Plain Green and Great Plains
23   Lending or Mobil Loans, depending on how I
24   framed the request, that's probably something

UNSEALED

1  that your data people could figure out?
2      MR. DAUGHERTY: Counsel, I'll
3  allow the witness to answer the question, but
4  I just want to make clear on the record that
5  an affirmative response from the witness is
6  not an indication that the company believes
7  further recovery requests are appropriate at
8  this time.
9  BY MR. ACKELSBERG:
10  Q.  I understand.
11  A.  We can.  I mean...
12  Q.  You could do that?
13  A.  Yes.  We have record of all the accounts
14  we bought.
15  Q.  You could sort them by lender, by
16  person?
17  A.  I probably couldn't, but somebody could.
18  Q.  But someone who works for you could?
19  A.  Yeah.
20      VIDEOTAPE OPERATOR: 2:30 off
21  the record.
22          - - -
23      (Whereupon Exhibit P-88 was
24  marked for identification.)

1      VIDEOTAPE OPERATOR: 2:41, we're
2  back on the record.
3  BY MR. ACKELSBERG:
4  Q.  I will show you a few more documents
5  connected to this compliance function.  P-88,
6  NCA document 14323.  This document appears to
7  deal with -- strike it.  The last exhibit we
8  looked at, 87 was about a compliance meeting
9  that NCA had with Brett and the Think Finance
10  people in May of 2013.
11  A.  Okay.
12  Q.  This one appears to be -- this appears
13  to be about a compliance call two months later
14  in July.  Do you see that?
15  A.  I do.
16  Q.  The participants again are NCA people,
17  Think Finance people and Brett Horrocks,
18  right?
19  A.  That's what it appears to be, yes.
20  Q.  Now there were a lot of attachments to
21  this one, and I was wondering if you could
22  explain what we're looking at here.  The
23  attachments appear to have had something to do
24  with the compliance call.

1      MR. DAUGHERTY: Object to the
2  characterization of there being lots of
3  attachments.  There's one attachment listed
4  that appears to be 22 to 23 pages long.
5  BY MR. ACKELSBERG:
6  Q.  All right.
7  A.  Generally are you asking really what the
8  attachment is?
9  Q.  Let's start with the general.  What does
10  all of this appear to be?
11  A.  It appears to me to be really a project
12  tracking for a spreadsheet of a Schedule A, to
13  make sure we are on top of meeting those
14  expectations and obligations.
15  Q.  All of the expectations that were in the
16  Schedule A's, attached to all the various sale
17  agreements?
18  A.  Yes, that's what it appears to me what
19  this is, the estimated due date and really the
20  basis for the weekly discussion what it
21  appears.  I'm making that assumption simply
22  based on Lori Hess.  Lori Hess is also Lori
23  Bates and Lori Patnode.  So...  Stating that
24  we'd like to defer the meetings for the 10th

1  and 17th.  There was a weekly meeting to track
2  progress of completing the management system
3  request that requested a Schedule A.
4  Q.  But you were not a participant in this
5  discussion, because you were generally not in
6  the compliance calls, right?
7  A.  That's correct.
8          - - -
9      (Whereupon Exhibit P-89 was
10  marked for identification.)
11          - - -
12      THE WITNESS: The other thing
13  I would like to point out, I don't know if
14  this is just a working -- it looks like Lori
15  was transitioning to whatever project plan she
16  was using prior to that, tracking mechanism.
17  I don't know if this was just the first view
18  of it for her to -- from her to the group or
19  whatnot.  But I felt it important to bring
20  that up.
21  Q.  So in the documents, Lori Hess and Lori
22  Patnode that's the same person.  And there is
23  another last name too.
24  A.  Bates.

UNSEALED

1  Q.  Bates, B-A-T-E-S?
2  A.  Yes.
3          - - -
4       (Whereupon Exhibit P-89 was
5  marked for identification.)
6          - - -
7  BY MR. ACKELSBERG:
8  Q.  Let me -- this is an e-mail that you're
9  included in.  I did not include everything in
10  the attachment.  My questions are going to be
11  fairly limited.  So let's just start with the
12  e-mail.
13  A.  Okay.
14  Q.  So in addition to there being periodic
15  meetings, compliance meetings, there also were
16  monthly reports that NCA did for Think
17  Finance, right?
18  A.  Correct.
19  Q.  So on a monthly basis, it's sent to
20  Think Finance data, collection data, data that
21  NCA had, pertaining to the Think product, the
22  various Think products, correct?
23  A.  That's what the e-mail states, yes.
24  Q.  But that's what you did, right?

1  A.  That's what we did.
2  Q.  By the Think products, at this point in
3  time in May of 2014, we're referring to the
4  three products we have been talking about,
5  Plain Green, Great Plains Lending and Mobil
6  Loans, correct?
7  A.  Correct, I'm looking at the attachments.
8  Q.  The attachment is actually a large --
9  it's a spreadsheet.  You're familiar with what
10  this document looks like?
11  A.  In some form, yes.  It has changed over
12  the course of time, but...
13  Q.  Basically there's an Excel sheet that's
14  prepared for each of the three Think products,
15  correct?  That's how it worked, right?
16       MR. DAUGHERTY:  I'll just
17  object on the grounds -- I see that there are
18  three XLSX attachments listed in the
19  attachment line, but you haven't actually --
20  at least you told us you haven't actually
21  provided full copies of all of the
22  spreadsheets.
23       MR. ACKELSBERG:  That's
24  correct.

1       MR. SHELDON:  I'll just add
2  there's an additional document that ends in
3  DOCX.
4       MR. ACKELSBERG:  Yes, the TF
5  memo that I didn't include, you're correct.
6  BY MR. ACKELSBERG:
7  Q.  So am I right that the procedure was
8  that NCA would send to Think on a monthly
9  basis, at least during this point in time, the
10  kind of data that you're seeing here on the
11  three pages that I copied?
12  A.  Yeah, and I'm assuming more, as well.  I
13  mean I don't know what the other attachments
14  were.  I mean we were grading calls, right.
15  Q.  Right.  If you look at -- what I've done
16  is, I took a screen shot actually of before --
17  before I actually printed out the three tabs.
18  Do you see there's three tabs, dialer calls,
19  complaints and QA trends?
20       MR. DAUGHERTY:  For the
21  record, you created the second page of this
22  document?
23       MR. ACKELSBERG:  Yes, I
24  created the second page.

1       MR. SHELDON:  Did you just
2  call it dialer calls or dialer fails?
3       MR. ACKELSBERG:  Dialer
4  fails, I think.  I'm sorry.
5  BY MR. ACKELSBERG:
6  Q.  So if I would open one of those
7  spreadsheets on my computer, I would see that
8  it would open up to one of the tabs, and then
9  there's two other tabs?
10  A.  And one of the tabs was called dialer
11  fails?
12  Q.  That's what it looks like.  Are you
13  familiar with this?
14  A.  Not in the context of dialer fails.  I
15  mean I'd be making an assumption that it would
16  be -- I really don't know what -- I don't know
17  what a dialer fail is.
18  Q.  I mean I don't either.
19  A.  Maybe a call that maybe didn't go
20  through or something.
21  Q.  Okay.  But apparently it was just a
22  number that either Think Finance wanted or NCA
23  thought Think Finance wanted?
24  A.  I really don't know.  I don't know if

UNSEALED

1  this was a report that was being -- what's the
2  date?
3  Q.  I think it's May of 2014.
4  A.  It could be what somebody wanted or
5  Think or the tribes wanted.  I really don't
6  know what the dialer fail is.  The original
7  comment that we produced reports related to
8  our activity pertaining to Schedule A we did.
9  Q.  There is a tab on these spreadsheets
10 called complaints?
11 A.  Yes.
12 Q.  Is that a report that you're familiar
13 with?
14 A.  We have a lot of different tabs,
15 probably spreadsheets.  It's hard for me to
16 answer that question.  It's a tab and the
17 example is --
18 Q.  Is this a metric that you're familiar
19 with, complaint per 1,000 accounts?
20 A.  I'm not.  To be honest it's not a metric
21 I'm familiar with, it's not.  But it's not a
22 bad representation of what's happening.
23         I would like to understand
24 what's driving this, you know, what

1  information was being provided to drive this
2  report.  Because I can't tell you whether it
3  was a complaint from the consumer, from BBB,
4  from Plain Green, the issuer or Think Finance,
5  I don't know that.
6  Q.  So it sounds like this isn't -- these
7  aren't reports that you're familiar with?
8  A.  Not me personally familiar with it, the
9  way that -- on the internal front of managing
10 the call centers, we had more of a gooey
11 interface than -- (reporter clarification) a
12 gooey interface -- reporting mechanism, based
13 on the complaints that were received,
14 documented, et cetera, as well as the quality
15 assurance, call grading, they would all go
16 into a database.  It would be broken down by
17 collector, by team, et cetera.  That's what I
18 use.  That's what my managers, et cetera, use.
19        But as far as if this was a
20 request by an issuer, by Brett Horrocks or
21 Tammy or Tally, I don't know.  Schedule A just
22 speaks to the oversight, right, and this could
23 be part of that.
24            - - -

1        (Whereupon Exhibit P-90 was
2  marked for identification.)
3            - - -
4  BY MR. ACKELSBERG:
5  Q.  Okay.  Let's look at next exhibit.  This
6  is NCA 1293 and NCA 4562 and NCA 1293.  It's
7  one exhibit with three pages from the
8  production?
9  A.  I've got two.
10 Q.  Yes, yes, I found the other copy.  Here
11 it is.  Here, it's two pages.  Here is the
12 missing copy.
13        Again I apologize for that
14 mistake.  It's two pages, NCA-PA 1293 and
15 NCA-PA 4562.
16        There were -- I will
17 represent to you, a lot of these in the
18 production.  And I'm just -- I took two out
19 and I'm just going to ask you some questions
20 about them.
21 A.  Okay.
22 Q.  Are you familiar with -- can you tell us
23 what these are?  It says entries and
24 compliance logs.  But what am I looking at

1  here?
2  A.  Exactly that, it's just the log of which
3  is capturing the complaints as they come in,
4  compliance log.  For example, the first one in
5  the category dispute validity of debt, that
6  could have came in the form of -- that was a
7  complaint that was received back from Kramer
8  and Associates, which is a third party agency.
9        I mean it's a log of the
10 complaints and different complaints that we
11 get.
12 Q.  There are some codes that I'm not
13 familiar with.  So there's a column that says
14 WD status?
15 A.  Yes.
16 Q.  Can you -- what does FFWD mean?
17 A.  So FFWD is just a status that represents
18 that the account is forwarded to -- it's
19 forwarded out for collection, outside of our
20 agency, outside of our internal call center.
21 Q.  What does BHLD stand for?
22 A.  We call that -- it's a status for
23 accounts that are moved off of the floor that
24 we put into an inactive status for multiple

UNSEALED

1  reasons.  It could be just a holding status
2  that an account is in question.
3          This one says category, cease
4  communications.  I would have to see the other
5  underlying information related to cease
6  communications to understand why I moved into
7  a status that took it off the floor.  If it's
8  in a BHLD status, it's not in an active
9  collection status.
10 Q.  So no one should be getting a call then?
11 A.  No one should be getting a call if it's
12 in -- no, we get consumers that will call us,
13 but no outbound activities or letters.
14 Q.  Right.  What do those letters stand for,
15 do you know?
16 A.  I honestly don't know.  I know that for
17 me, just internally, like FFWD, in my mind
18 that means forward.  BHLD I would always call
19 it B-hold.  I couldn't tell you why.
20 Q.  Okay.  And then the last entry on the
21 first page has another status, CDDP.
22 A.  That is cease and desist dispute, just
23 another status that would be considered
24 inactive.

1  Q.  What's the difference between CDP and
2  BHLD?
3  A.  Once an account goes to BHLD, I believe
4  that it normally would never become active
5  again.
6  Q.  So does that mean that the Pennsylvania
7  accounts that you talked about as being
8  inactive, would probably be in your system as
9  BHLD's?
10 A.  They very well could be in the system as
11 BHLD's.  The dispute, it's a different status
12 because those accounts can go back --
13 Q.  You're just waiting for the dispute to
14 be resolved, right?
15 A.  To be processed, to send them the
16 original contract they signed and go through
17 the waiting period, et cetera.
18 Q.  The next page has two other statuses,
19 IC&D is one.  Do you know what that is?  Is
20 that another form of cease and desist?
21 A.  I believe so.  I am trying to recollect
22 why it's a different form.
23 Q.  Could it be because of a different
24 period of time, did you change codes?

1  A.  No, I don't --
2  Q.  If you don't remember, that's fine.
3  A.  I don't remember, I mean these
4  categories --
5  Q.  What about the next category on the
6  second page, the second complaints, like IDSP.
7  A.  IDSP, in dispute, dispute validity of
8  debt.  I believe that that's another form of a
9  dispute status along with the IC&D, along with
10 the CDBP.  I just -- I can't explain the
11 difference in what they are right now.
12 Q.  So at this point in time, it looks like,
13 at least with regard to the compliance log, if
14 you look at the first page, it's a Great
15 Plains compliance log from September of 2015.
16 It looks like at this point in time, the
17 compliance log is sent to various people at
18 Think Finance, at NCA to Brett Horrocks, but
19 now it also includes some e-mail addresses at
20 the tribal entity, correct?
21 A.  Correct.
22 Q.  And you see that on the next page, as
23 well, only it's a different tribal entity,
24 right?

1  A.  Correct.
2  Q.  So tell me what the procedure is.  Let
3  me give you an example.  A consumer -- let's
4  just take the first one.  There's a consumer
5  with a Great Plains Lending loan who disputes
6  the validity of the debt, at least that's the
7  way it was entered in the system.
8          That would go into the system
9  by the person on the collection floor?
10 A.  No.
11 Q.  Who would categorize?
12 A.  It would be somebody on the compliance
13 team in a support or administrative function.
14 So what I can't tell you, whether there's a
15 letter associated to this.  I don't know just
16 based on the log whether -- the form of how we
17 were informed.
18 Q.  So source and attorney.
19 A.  So most likely it would have been a
20 letter disputing the validity.
21 Q.  Let's not -- let's leave the attorney
22 letters out of it for the moment.  Why don't
23 you just tell me how the system works.  So a
24 consumer -- let's say it's Plain Green or

UNSEALED

```
 1    Great Plains, the system is going to be the
 2    same except that it's a different lender,
 3    right?
 4    A.   When you say system --
 5    Q.   For handling a complaint?
 6    A.   The process?
 7    Q.   Yes.  Let's say, we're talking about a
 8    Plain Green account, 2014?
 9    A.   Okay.
10    Q.   The consumer in a conversation with a
11    collector, either at NCA or at one of your
12    agencies says, I don't believe I am legally
13    obligated to pay this back.
14    A.   Are we role playing?
15    Q.   We kind of are, yeah.  What's the system
16    for handling that?
17    A.   If the collector is on the phone with
18    the consumer and the consumer says --
19    Q.   I'm not going to pay because I don't
20    think this loan is legal.  How would you
21    handle that complaint?  You, as the CEO, is
22    there an expectation that you have for how
23    that would be handled?
24    A.   Yeah, you know, we get -- collections
```

```
 1    get told a lot of things.  So they're trained
 2    to ask questions, you know, why do you believe
 3    that you don't owe this account?  Why do you
 4    believe that this debt is not valid?  Did you
 5    take the loan out?
 6         Like just try to get on a
 7    playing field that both the collector and the
 8    consumer may be agreeing on something.  If
 9    they're able to do that and the consumer is
10    still stating that they don't believe that
11    this loan is valid or they don't believe that
12    they owe the debt for whatever reason, that
13    account would ultimately end up in a dispute,
14    because that's a form of dispute and the
15    collectors are aware of that.
16         It's -- we don't ask our
17    collectors to get into a legal discussion
18    about whether or not they are right and the
19    consumer is wrong and vice versa.  I figure
20    that would only create a lot of problems for a
21    lot of people.  Does that answer your
22    question?
23    Q.   Well, part of it.  So --
24    A.   The process.
```

```
 1    Q.   The collectors aren't supposed to be
 2    giving legal advice or legal assessment or
 3    anything like that, of course?
 4    A.   Right.
 5    Q.   What is the collector supposed to do
 6    then?
 7    A.   They would put the account into a
 8    dispute status code, that account overnight
 9    would be swept off the floor into a dispute
10    status.  We have in our compliance or back
11    office somebody that goes through.  If we have
12    the electronic or the original contract or
13    whatnot on hand, they would find that.  They
14    would attach it to a letter informing the
15    consumer that and provide the original
16    contract that the consumer signed.
17         So for a cease and desist
18    everything has its own process because they
19    can't be treated the same.
20    Q.   Does anything ever get -- at what point
21    do complaints like that get referred back to
22    the credit issuer?
23    A.   Well, they would be logged in this log
24    if it was a dispute or a complaint or a cease
```

```
 1    communications.  If it was a more intense
 2    complaint, so to speak, I don't know how to
 3    describe that.  But in collections, things
 4    like dispute and cease and desist are pretty
 5    regular and normal.
 6         That's one way that a
 7    consumer may feel like they either might be
 8    able to get out of it.  In fact, there's
 9    company's out there that are hired to send
10    dispute letters to collection agencies like
11    us, over and over and over again with the
12    intent of the collection agency not responding
13    to that dispute letter and ultimately
14    requiring the owner of the debt to remove it
15    from credit bureau.
16         My only point with that is,
17    stating that disputes and cease and desist and
18    those types of things are not abnormal for
19    collectors on a day to day basis to deal with.
20    So we have a process.
21         Do we inform every issuer how
22    many disputes that we had yesterday?  I can't
23    say that we do.  If we identified a trend that
24    was, you know, a higher volume of disputes or
```

UNSEALED

1 fraud accounts, et cetera, we would absolutely
2 notify the issuer because there's something
3 wrong, right.
4   Q.   Let me be more specific.  At some point
5 NCA sent all of the Plain Green, Great Plains
6 Lending and Mobil Loans for Pennsylvania back
7 to Think Finance, right?
8        MR. DAUGHERTY:  Objection to
9 form.
10 BY MR. ACKELSBERG:
11   Q.   That happened at some point, right?
12   A.   That is not correct.
13   Q.   Let me phrase it another way.  There's
14 some point at which you stopped collecting on
15 Pennsylvania loans?
16   A.   Correct.
17   Q.   Okay.  Before that happened, did NCA get
18 any complaints from Pennsylvania borrowers
19 complaining that these loans aren't legal in
20 Pennsylvania?
21   A.   I can't say whether I know whether we
22 did or didn't.  I can make the assumption that
23 we would have received some complaints.  The
24 complaints that I reviewed in preparation, I

1 didn't see in my review any complaint
2 specifying that they believe that the loan is
3 illegal in Pennsylvania.  But I'm not going to
4 say it didn't happen.
5   Q.   Before you stopped collecting Payday
6 Loans in New York, did you ever get a
7 complaint from a New York consumer that, these
8 loans aren't legal I hear?
9        MR. DAUGHERTY:  Objection,
10 beyond the scope of the 30-B(6) notice.
11        THE WITNESS:  Getting
12 complaints is serious to us.  You're speaking
13 directly about whether or not a consumer is
14 asking or telling us that they believe the
15 loan is illegal.  I don't, to my knowledge,
16 know when we got those complaints, how many
17 complaints.  Did it happen?  I'm sure it did
18 happen.  And I'm sure we've got them
19 documented, along with many other complaints,
20 as well.  Some are valid and some are not.
21        When we buy a portfolio, we
22 may only contact 30 percent of the borrowers,
23 right.  And of those 30 percent of the
24 borrowers that we actually contact, we don't

1 collect, you know, from each one of those,
2 hence why most issuers end up selling their
3 debt.
4        Of those, many have a good
5 reason why they don't believe they should pay
6 the debt.  So it's up to us to understand and
7 treat complaints very seriously and try to
8 understand the validity of it, as well.
9   Q.   But going back to the procedures, and I
10 understand that you can't recall any
11 complaints specifically disputing the legality
12 of the loan, but was there a procedure for
13 what would happen with -- I mean you're aware
14 that --- you're certainly aware now that it's
15 not legal -- lending is not legal in all
16 states, right?
17   A.   Right.
18        MR. DAUGHERTY:  Objection.
19 It calls for a legal conclusion.
20 BY MR. ACKELSBERG:
21   Q.   You've actually, as part of your efforts
22 to turn things around at the company, are
23 paying more attention to things like that,
24 correct, than maybe Mr. Hochstein did in the

1 past?
2        MR. DAUGHERTY:  Objection to
3 form.
4        THE WITNESS:  Paying
5 attention to a lot of things, yes, to make
6 sure that we don't put ourselves into a
7 position that would be negative.
8 BY MR. ACKELSBERG:
9   Q.   What would be your expectation of how
10 your collectors today would handle a call if
11 someone said, this is a Payday loan that I
12 think is illegal?
13   A.   My expectation again would be that that
14 account ends up into a dispute status with
15 notes within the account.  That would fall
16 into a dispute report that somebody in our
17 back office would go through and go through
18 the process.
19   Q.   Am I right that over the course of the
20 relationship, between NCA and the Think
21 Finance products, that there would be on
22 occasion a referral of a complaint to Brett
23 Horrocks to send to the appropriate person?
24        MR. DAUGHERTY:  Object to

UNSEALED

1    form.

2          MR. SHELDON: Same objection.

3          THE WITNESS: It definitely

4    could have happened. I believe he's on these

5    logs, and he did have access to. This is via

6    e-mail. There is an SFDP that you can't send

7    everything through e-mail, right. So access

8    to it was where most of our reports would set.

9    BY MR. ACKELSBERG:

10    Q. Who had access to the SFDP?

11    A. I don't particularly know. I believe

12    Brett would have had access to it. I believe

13    the folks that needed access at the tribes at

14    the credit issuer would have access, as well

15    as folks at Think Finance would have access to

16    it.

17    Q. One thing we haven't talked about, we

18    have talked about the relationships that NCA

19    has with agencies that are collecting, hired

20    as collectors for NCA. We haven't -- I don't

21    believe that we talked about NCA actually

22    selling debt to secondary purchasers. And

23    that's something that has happened in the

24    past; am I right?

1    A. Yes.

2    Q. Does it happen now?

3    A. In 2016, late 2016, when I took over, we

4    suspended debt sales. We did that because I

5    didn't feel like I had my hands around the

6    process to onboard, you know, potential

7    buyers. And I just wanted to make sure that

8    we were confident with identifying potential

9    partners to sell to.

10    Q. Before you did stop the practice of

11    reselling your debt, how much of NCA's debt

12    was it selling to secondary purchasers?

13          MR. DAUGHERTY: Objection to

14    form.

15          THE WITNESS: I honestly

16    can't answer the percentage or how much debt.

17    I think stated earlier today, there was --

18    debt sales were more prevalent leading up to

19    2012, '13, before issuers started requesting

20    that there would be no resale clauses in their

21    contracts. I know that there were some debt

22    sales, you know, in 2015. I don't recall

23    exactly what they were, I don't know.

24          But pertaining to these

1    products et cetera, they would have halted

2    upon the new contract that -- about the same

3    time as Schedule A.

4    Q. I want to -- there were some documents

5    in the production concerning some sale of

6    Plain Green debt, and I wanted to bring some

7    of these to your attention and see if you can

8    -- do you want to change the DVD. I have

9    roughly 20 minutes left, a half hour.

10          VIDEOTAPE OPERATOR: That

11    concludes DVD number three, the time is 3:21

12    We're off the record.

13          - - -

14          (Whereupon Exhibit P-91 was

15    marked for identification.)

16          - - -

17          VIDEOTAPE OPERATOR: This begins

18    DVD number four, the time is 3:27 p.m.

19    BY MR. ACKELSBERG:

20    Q. Mr. Rempel, I'm showing you what has

21    been marked as Plaintiff's Exhibit 91. It's

22    an NCA document numbered 10393. You'll see

23    this is from May of 2012. It looks like this

24    e-mail chain began with someone at Think

1    Finance named Joan Verna, who has the title of

2    legal specialist. Is that someone you ever

3    heard of?

4    A. It's not somebody I am familiar with,

5    no.

6    Q. So she looks like she had some

7    complaints from consumers and she is

8    forwarding to Brett, right, do you see that?

9    A. Yes, that looks correct to me.

10    Q. It's three complaints. One is the Think

11    Cash account, one is a Payday One account, and

12    one is a Plain Green account. Do you see

13    that?

14    A. I do.

15    Q. Brett forwards her request to Kevin

16    Emmerich, right?

17    A. Correct.

18    Q. And then if we look up the chain, it

19    looks like Kevin reports back to Brett with

20    regard to the Plain Green account, Brenda

21    Stevens. And this is what Kevin says: Craig

22    said the account was at Frontier, and he

23    called them. And then they said they never

24    refused the consumer address information. He

UNSEALED

1  told them to be sure to always supply this to
2  the consumer and any others that requested it.
3  Right.  Do you know who Craig is?
4  A.   Yes.
5  Q.   Who is Craig?
6  A.   I believe Kevin would be referring to
7  Craig Dilbeck.  He's an NCA employee.  His
8  responsibility at that time was -- he was an
9  agency manager.
10  Q.   And so it sounds like what Craig is
11  reporting back to Kevin was that this Plain
12  Green account had been sold to Frontier,
13  right?
14        MR. DAUGHERTY:  Objection to
15  form.
16        THE WITNESS:  I would say
17  that he didn't state that it had been sold.
18  BY MR. ACKELSBERG:
19  Q.   I know that.  Was Frontier a collector
20  for you back then?
21  A.   Frontier was a collector, yes, it was an
22  agency.
23  Q.   Maybe it's collecting debt for you --
24  was Frontier also buying?

1  A.   Honestly, I don't recall.  We had sold
2  debt to them in the past, I can't say whether
3  these accounts were.
4        - - -
5      (Whereupon Exhibit P-92 was
6  marked for identification.)
7        - - -
8  BY MR. ACKELSBERG:
9  Q.   So this is an e-mail from about two
10  weeks later.  Do you see that?  Also between
11  Kevin and Brett Horrocks.  And they're
12  discussing sales to someone named Marty
13  Mazzara, right?
14  A.   Yes.
15  Q.   Is Marty Mazzara someone that you know?
16  A.   I do know who he is.  I know him as the
17  owner of Frontier.  I had heard of SKUTR.  I
18  don't know the ownership of it, et cetera, or
19  Worldwide.  But I had known that he was
20  involved some way or some form, and those -- I
21  don't know even know what they do.
22        Frontier, I know them as an
23  agency that we placed with and sold paper to.
24  I don't know if SKUTR would be the buying

1  entity.  It's listed on the e-mail, that's why
2  I'm speaking to it.
3  Q.   And you see the next page it's -- it
4  looks like an hour earlier, I'm sorry.  It's a
5  day later.  A day later Kevin telling Brett,
6  Brad told me to send you the information we
7  have on Frontier to try to get them approved.
8  What do you think that's about?
9        MR. DAUGHERTY:  Object to
10  form.
11  BY MR. ACKELSBERG:
12  Q.   Does he mean get them approved by Think
13  Finance for selling the debt that we buy to
14  Frontier?
15        MR. SHELDON:  Objection to
16  form.
17        MR. DAUGHERTY:  Objection to
18  form.
19        THE WITNESS:  I honestly -- I
20  wouldn't know.  Do you have -- I can't answer
21  that.  I don't know what the request for
22  approval was.
23  BY MR. ACKELSBERG:
24  Q.   But you do know that in that time

1  period, some portion of NCA's Payday Loans or
2  installment loans were being sold to Marty
3  Mazzara.  You do know that though, right?
4  A.   Yes, and based on this e-mail, it's
5  saying that it sold to Marty Mazzara, Payday
6  Loans and Think Cash.
7  Q.   How would Kevin have gotten that
8  information?
9  A.   So Kevin would have -- he would have
10  been the one to put together the sales
11  contract and update it with the volumes, et
12  cetera, and execute the sale with whomever is
13  buying.  And that's why Kevin would be
14  involved, you know, on that side of it.
15        - - -
16      (Whereupon Exhibit P-93 was
17  marked for identification.)
18        - - -
19  BY MR. ACKELSBERG:
20  Q.   Let's look at the next document in this
21  sequence.  So this appears to be some
22  information about Marty.  You take that to
23  mean Marty Mazzara, right?
24  A.   Yes.

UNSEALED

1    Q.   So this is information about Marty
2    Mazzara that Kevin is providing to Brett
3    Horrocks, right?
4    A.   That is what the exhibit represents,
5    yes.
6    Q.   The first page of the due diligence
7    questionnaire, the second page of the exhibit
8    references an address, Galleria Drive in
9    Henderson, Nevada.  Is that where you know
10   Marty's group is located?
11          MR. DAUGHERTY:  Objection to
12   form.
13          THE WITNESS:  I knew that his
14   group was located in --
15   BY MR. ACKELSBERG:
16   Q.   Near Las Vegas?
17   A.   Henderson, Nevada, yeah.
18   Q.   And then on the third page of the due
19   diligence, one of his trade references a
20   company called United Debt Holdings, with a
21   contact of Craig Manseth.  Is that a company
22   you're familiar with?
23   A.   Yes.
24   Q.   Am I right that NCA sold debt to United

1    Debt Holdings?
2    A.   I believe so, yes.
3    Q.   Including -- and talking specifically
4    about the high rate online consumer debt?
5          MR. DAUGHERTY:  Object to
6    form.
7          THE WITNESS:  I wouldn't --
8    when you say that question specifically, the
9    high rate, did we sell him --
10   BY MR. ACKELSBERG:
11   Q.   Payday Loans.
12          MR. DAUGHERTY:  Object to
13   form.
14          THE WITNESS:  Yeah, we very
15   well could have, yes.
16   BY MR. ACKELSBERG:
17   Q.   And these other company names, for
18   what's referred to as Marty's group, if you
19   turn the page on five, there's something
20   called SKUTR Financial, SKUTR.  Is that a
21   company you've heard of?
22   A.   I've heard of them.
23   Q.   Do you know what the difference is
24   between Frontier and SKUTR?

1    A.   Reading through, just this attachment, I
2    don't know what the difference is.  It appears
3    to me that Frontier would be a collection
4    entity and maybe SKUTR is the financial buyer.
5    Q.   Like Level is for you?
6    A.   Potentially, maybe just the investor.  I
7    don't know the structure.
8    Q.   What about the name on that letter from
9    SKUTR, Zachary Roberts.  Did you ever hear of
10   him?
11   A.   I can't say that I remember that.
12   Actually, I don't know Zach Robert's.
13   Q.   What about on page seven, under Zachary
14   Roberts, the president, the chief financial
15   officer.  If I told you his name was Michael,
16   would that be a familiar name to you, Michael
17   Friedl, F-R-I-E-D-L?
18   A.   No, it doesn't ring a bell to me.  The
19   Frontier folks, I may not know who they are.
20   Q.   Who are they?
21   A.   Martin Mazzara, Peter Jaselli.
22   Q.   Do you know them personally?  Have you
23   ever met Marty Mazzara?
24   A.   I have.

1    Q.   What context?
2    A.   I had met Marty out at a trade show in
3    Las Vegas at the debt buyers convention.  Brad
4    had a meeting with him simply discussing, in
5    the very beginning, the placement of potential
6    accounts to Frontier to work on a contingent
7    basis.  I can't tell you what year that was.
8          Peter Jaselli, I can't
9    remember when I met him.  He has been in the
10   industry for a long time.  I can't recall if I
11   met him prior to Frontier.  I believe now he's
12   working at Trans Union.
13          Anthony Guadagna,
14   G-U-A-D-A-G-N-A, he I believe is Marty's son.
15   Michael Hall, I don't know that I've ever met
16   Michael Hall.
17          - - -
18       (Whereupon Exhibit P-94 was
19   marked for identification.)
20          - - -
21   BY MR. ACKELSBERG:
22   Q.   Let's look at the next document, 94.  So
23   we're actually looking at 94.
24          (Cross Talk)

UNSEALED

App. 0350

1   A.   We're actually looking at 94?
2   Q.   Yes, we're looking at 94 now.
3          MR. DAUGHERTY:  Can I get the
4   Bates on 94, just to make sure I've got the
5   right document.
6          MR. ACKELSBERG:  NCA-11970.
7          MR. DAUGHERTY:  Thank you.
8   BY MR. ACKELSBERG:
9   Q.   So if we start from the beginning of the
10  chain, this is now -- this is in October of
11  the same year, 2012.  This is originating from
12  the same person at Think Finance, Joan Verna.
13         MR. DAUGHERTY:  Objection to
14  form.
15  BY MR. ACKELSBERG:
16  Q.   Sending, and also to Brett Horrocks
17  information about someone named -- a Plain
18  Green customer named Denise Addison.  And
19  she's asking, who is handling this account?
20  Do you see that?
21  A.   Yes, I see that.
22  Q.   Eventually it goes to Vicky Elsey at NCA
23  and then Vicky reports to Brett that this
24  account has been confirmed closed with our

1   buyer.  The agency that had the account was
2   Frontier Financial.  Do you see that?
3   A.   I do see that.
4   Q.   So this is -- before you weren't sure if
5   the account going to Frontier, the Plain Green
6   account was either -- was a sold account or
7   Frontier was just doing collection work for
8   NCA.  Here is one where the account appears to
9   have been sold.  The Plain Green loan was sold
10  by NCA to Frontier Financial, correct?
11         MR. DAUGHERTY:  Objection,
12  mischaracterizes the document.
13  BY MR. ACKELSBERG:
14  Q.   That's what this e-mail says; am I
15  right?
16         MR. DAUGHERTY:  Same
17  objection.
18         THE WITNESS:  I don't know
19  that you can make that assumption.  I'm not
20  saying it's correct.  It could be.  We didn't
21  only sell to Frontier.  The agency that had it
22  may have had the account and created -- I
23  don't know --
24  BY MR. ACKELSBERG:

1   Q.   So maybe you sold it to a different
2   buyer, and that buyer was having Marty's group
3   collect on it?
4   A.   Potentially.  I just don't know.  But it
5   would be easy to assume that it was sold to
6   Frontier.  But I just can't say whether that
7   is 100 percent accurate.
8                - - -
9          (Whereupon Exhibit P-95 was
10  marked for identification.)
11               - - -
12  BY MR. ACKELSBERG:
13  Q.   Let's look at 95, this is one page.
14  This is -- the following the month, this is
15  now November of 2012, same year.  Again, Joan
16  Verna, this is now a different Plain Green
17  account, right?
18  A.   Yes.
19  Q.   And she is saying according to the
20  system, it was sold December 12th, 2011 to
21  NCA, and then she is telling Brett that it
22  appears it was passed on to Frontier Financial
23  and asking that it be brought back.  Do you
24  see that?

1   A.   Yes, I do.
2   Q.   Again, you can't be sure whether
3   Frontier was functioning as an agent for NCA
4   or actually had purchased the loan?
5   A.   That is correct, only because we utilize
6   Frontier as both an agency as well as a group
7   that was sold to.  I know that they received
8   placements from other debt buyers as well.
9   Without looking at who all was purchasing or
10  being sold to at that time, it would be hard
11  for me to say that this was a purchased
12  account by Frontier, as opposed to a placed
13  account sold to somebody else.
14  Q.   I think you said previously that
15  Frontier is doing some collection for NCA now?
16  A.   Today?
17  Q.   Uh-huh.
18  A.   No.
19  Q.   No, they're not, okay.
20  A.   I did not say that.
21  Q.   I'm sorry.  I misunderstood.  At some
22  point they were, but that relationship ceased?
23  A.   That's correct.
24  Q.   Do you recall when that might have been,

1  roughly?
2  A.  Roughly March -- mid 2017, let's just
3  call it.
4  Q.  So fairly recently?
5  A.  Yeah, fairly recently.
6  Q.  What caused that?
7  A.  Just a handful of things, the
8  responsiveness of them responding to requests,
9  they were behind on remits to us, as far as
10  sending money.  Every time that we'd have a
11  discussion about getting back on track, it
12  wouldn't happen.  The relationship dwindled.
13  If we had requests for -- such as to close an
14  account, it was very -- there was a lot of
15  work on our side to get it done.  They weren't
16  responsive, weren't being good partners and
17  made the decision that that's not a group we
18  want to do business with.
19  Q.  I notice that Frontier was not listed as
20  the agents on any of the Schedule A's that we
21  looked at before.  Is there a reason for them
22  not being included?
23  A.  Yes, it -- so I believe that schedule A
24  was later than these e-mails of 2012.  And

1  Frontier changed their name to -- it's
2  escaping me.  Frontier ultimately changed
3  their name from Frontier to.
4          MR. SHELDON:  Global?
5          THE WITNESS:  Summit, Summit
6  Receivables.  I can't remember when that was.
7  It was some time ago.  I don't even know if
8  you see Summit on that original list of
9  agencies.  But if they weren't approved, we
10  wouldn't have been placing new accounts after
11  that approval process was put in place.
12  BY MR. ACKELSBERG:
13  Q.  What was the nature of the approval
14  process?  Who had to do the approving, with
15  regard to Plain Green and Great Plains loans?
16  A.  Well, it appears that the questionnaires
17  that would be provided to us by Brett Horrocks
18  or the likes, we would provide them to the
19  issuer -- not the issuer, the agency.  They
20  would fill them out and they would make their
21  way back to Brett Horrocks.
22  Q.  And he would tell you yay or nay with
23  regard to a particular agency?
24          MR. DAUGHERTY:  Object to

1  form.
2          THE WITNESS:  I don't know if
3  he would be making the decision, but he would
4  be informing us of the decision.
5          - - -
6          (Whereupon Exhibit P-96 was
7  marked for identification.)
8          - - -
9  BY MR. ACKELSBERG:
10  Q.  Right, okay.  This the last of the
11  documents dealing with the debt sales, P-96.
12  The court reporter appreciates you keeping
13  them in order.
14  A.  I can't guarantee that they are in
15  order, my apologies.
16  Q.  So -- I'll let you finish reading.  So
17  again it's the same Joan Verna at Think
18  Finance bringing a complaint to Brett's
19  attention, correct?
20  A.  Correct.
21  Q.  This would be about a consumer being
22  treated improperly by a collector.  How would
23  a consumer know -- we've seen all of these,
24  they are originating with this legal

1  specialist named Joan Verna at Think Finance.
2  So the consumers have -- whether it's a Think
3  Cash loan or a Plain Green loan, how would
4  they know to call Think Finance, do you know?
5  Do you know how that would end up getting
6  there?  Or would this be a complaint being
7  communicated through some system?  How did
8  work?  How did consumer complaints like this,
9  during this period of time, make their way to
10  Think Finance and then to Brett Horrocks?
11          MR. DAUGHERTY:  Objection to
12  form.
13          THE WITNESS:  I can't answer
14  how they would make their way to Think
15  Finance.  Is this particular complaint or
16  account that's being complained about -- does
17  it specify what kind of account it was?
18  BY MR. ACKELSBERG:
19  Q.  Yeah, it was a Think Cash loan.  It's
20  First Bank of Delaware, right?
21  A.  But your question isn't related to how
22  this one made it's way to Think Finance, or is
23  it?
24  Q.  I was curious, just in terms of the

UNSEALED          App. 0352

1    process. We've seen all of these, this as
2    well as the earlier ones that were involved
3    with Frontier, they all start with this woman
4    named Joan at Think Finance. I'm just curious
5    how --
6    A.   I couldn't answer. I apologize.
7    Q.   We'll ask Think Finance. So this, like
8    the others, makes it way up the chain. She
9    sends this complaint to Brett. Brett sends it
10   to it Kevin or Brad or whoever, in this case
11   Kevin; and then we end up with a report to
12   Brett. It's at the top, Brett's thanking
13   Brett -- thanking Kevin for the information.
14   And it looks like the information that comes
15   back from Kevin Emmerich at NCA is that NCA
16   looks like sold the account to some companies
17   associated with Brad Spoor, who in turn sold
18   the account a third time to some buyer named
19   Northern Resolution Group, and it gives the
20   name of the people, Mark Gray and Doug
21   Mackinnon, M-A-C-K-I-N-N-O-N. They also use
22   the name Cooper Financial in Delray. And then
23   they, in turn, placed the collection with an
24   agency named Bova Juliani, and that the

1    improper conduct -- improper collection call
2    was from this Bova Juliani. Do you see this?
3    A.   I do.
4    Q.   Is this unusual for you to see -- it
5    looks like the debt was actually sold two
6    times after you bought it. You sold it to one
7    company, and that company sold it to another
8    company that had another company do the
9    collections.
10           MR. DAUGHERTY: Object to
11   form.
12           MR. SHELDON: Object to form.
13           THE WITNESS: Is that normal
14   is what you're asking?
15   BY MR. ACKELSBERG:
16   Q.   Yeah, I guess that is what I'm asking.
17   A.   I wouldn't characterize it as normal in
18   today's environment.
19   Q.   In 2012, was it normal?
20   A.   In 2012 I think -- define normal, I
21   guess. This is, just as I read through this,
22   it's a very concerning complaint to me. I
23   can't say that I had seen it previously, but I
24   don't know that it's normal really, or whether

1    I can answer whether it's normal, I guess.
2    Q.   I'm really not asking, I mean I'm sure
3    that this kind of conduct -- I'm not
4    suggesting that this kind of conduct by a
5    collector is normal. I mean that really was
6    not what I was focusing on. At this point --
7    in this period of time, was it unusual for the
8    kind of debt that we're talking about, this
9    high rate consumer online debt to be sold
10   three or four times?
11           MR. DAUGHERTY: Objection to
12   form.
13           THE WITNESS: I don't know.
14   I honestly don't know if that is a normal
15   process or not. I would also -- I would say
16   that it's a -- to sell and resell a bad debt
17   portfolio was not abnormal, and to state that
18   it's specific to short term or high rate
19   interest rate loans, I would say is
20   misrepresented.
21   BY MR. ACKELSBERG:
22   Q.   It's more --
23   A.   It's just a practice.
24   Q.   In the debt buying world, in general?

1    A.   Over the course of -- at least my career
2    in the space, it was something that companies
3    utilized.
4            Now if you go look at your
5    public company, your Encores, PRA's may be
6    less prevalent there. They are operating
7    with, you know, a different capital structure
8    that may benefit more by keeping a product --
9    you know, cradle to grave is what I call it.
10   Purchase it and keep it forever.
11           For a company of our size or
12   smaller companies, it's not abnormal for, you
13   know, debt to be sold multiple times. My
14   opinion of is that's why issuers, as well as
15   regulars came out in 2012 or later and tried
16   to rein that in, because it creates a
17   different he difficult environment,
18   potentially on the consumer.
19   Q.   It's hard to maintain accountability
20   when you don't know who owns what, right?
21           MR. DAUGHERTY: Objection to
22   form.
23           THE WITNESS: If I put myself
24   in a consumer's shoes, I would find it

UNSEALED

1  difficult if I was being called on the same
2  account over the course of time, not knowing
3  where it's at et cetera.  If everybody in the
4  line of purchasing is following the law, which
5  you have to make the assumption that people
6  would do that, each one of the purchasers
7  would have sent a first notice letter to the
8  consumer at the address and informed them that
9  they purchased it and who to contacts to pay
10  it.
11          I feel like a lot of
12  speculation.  I'm just more -- I don't like
13  reading about complaints like this.  So...
14  Q.   All right.  So let's turn to the topic
15  that we eluded to before but haven't actually
16  directly covered, and that is the recall of
17  the Pennsylvania loans.  This is Exhibit P-97.
18  While we're at it, there's a second one that
19  we'll call 98 on the same subject.  So we may
20  as well discuss them together.
21              - - -
22          (Whereupon Exhibits P-97 and
23  P-98 were marked for identification.)
24              - - -

1  BY MR. ACKELSBERG:
2  Q.   So 97 is NCA-2603 and the Bates number
3  on Exhibit-98 is NCA-7264.  So we'll take
4  these in order.  So the first is from August
5  2015.  The initial -- it looks like the
6  initial -- let's start with the initial
7  e-mail.  It's from Jack Mahoney to a variety
8  of people in the company, including yourself
9  Mr. Rempel.  And the subject is Think Product
10  Close and Recall PA.
11          First of all, do you remember
12  this happening back in August of 2015?
13  A.   I do recall this happening in 2015.
14  Q.   The e-mail is coming from your data guy,
15  Jack Maloney.  This wouldn't have started with
16  him, right.  So do you recall what happened to
17  trigger this e-mail from Jack?
18  A.   I can't say that I recall.  My
19  assumption would be that Shawn Gylling would
20  have directed or Brad would have been
21  directing Jack to pull this information.
22  Ultimately Brad would have been the one to
23  make the decision to move them off of the
24  collection floor.

1  Q.   All right and so -- and this recall
2  covers all active Think product accounts with
3  -- that are coded as Pennsylvania, correct?
4          MR. DAUGHERTY:  Objection to
5  form.
6          THE WITNESS:  I will just
7  quickly go through this.
8  BY MR. ACKELSBERG:
9  Q.   Sure.
10  A.   I would say your comment is correct.
11  Q.   And what Jack is doing is also listing
12  all of the accounts that he can that you know
13  that he can identify within the NCA system in
14  a first look, right, that's what he's doing
15  here?
16          MR. DAUGHERTY:  Objection to
17  form.
18          THE WITNESS:  That would
19  effectively meet the state placed or current
20  residence of an address within Pennsylvania.
21  BY MR. ACKELSBERG:
22  Q.   Okay.  And then it lists the various
23  products that are included within this recall,
24  right?

1  A.   Correct.
2  Q.   These are the lists of the various Think
3  products.  Now there's something named
4  Elastic.  We haven't talked about that and I
5  don't think we need to.  There's Great Plains,
6  where there is 2,779 accounts, right?  A total
7  of roughly 3.4 million dollars in account
8  balance, right?  Do you see that?
9  A.   Yes, I do.
10  Q.   And there's -- I'm confused, there
11  a breakout for Payday One, Plain Green and
12  Think Cash.  But there is a separate category
13  called JC Payday One, JC Plain Green and JC
14  Think Cash.  Do you know what that means?
15  A.   Yes, that was account that were bought
16  back, got labeled JC -- I believe that was
17  just a coin notation from -- at one point we
18  had to buy -- I don't know if it was these
19  particular accounts or another set of accounts
20  back from an agency called ADS or Johnny
21  Chabot was the owner of it.  So the initials
22  JC got associated with when we started buying
23  back these accounts.  That's how we put them
24  in out system.  It was just a way to notate

UNSEALED

1    these accounts were owned at one point in
2    time, sold and bought back.
3    Q.   And so if you wanted the total number of
4    Plain Green loans, you would need to add up
5    the two different Plain Greens, the JC Plain
6    Green and the Plain Green?
7            MR. DAUGHERTY:  Objection to
8    form.
9            THE WITNESS:  I believe so.
10   BY MR. ACKELSBERG:
11   Q.   Okay.  As you explained, when Jack says
12   they've been moved to BHLD, that's the hold
13   code, moving off the floor making the account
14   inactive that you described before?
15   A.   Correct.
16   Q.   And I think this is -- and I think
17   you've already explained to us that on your
18   system, these Pennsylvania accounts would
19   still be there but would be classified as
20   BHLD?
21   A.   Yes, they would be not in a state to be
22   -- I mean collectors would identify it as an
23   ineligible account.  For example, if this
24   consumer had another account, such as a

1    Sterling Jeweler account, they could still see
2    the other account.  The phones numbers would
3    be grayed out, et cetera, things like that.
4    Q.   If let's say the same person who has a
5    BHLD Plain Green account from Pennsylvania
6    were to go delinquent on a Sterling account --
7    are you still collecting for Sterling today?
8            MR. DAUGHERTY:  Objection,
9    beyond the scope of that deposition notice.
10           THE WITNESS:  We still own
11   Sterling debt.  So it would be an assumption
12   that we do collect --
13   BY MR. ACKELSBERG:
14   Q.   It doesn't even have to be Sterling.
15   Let's say you're collecting -- you still
16   collect other kinds of consumer debt other
17   than Payday Loans for Pennsylvania consumers,
18   right?
19   A.   It's possible, yes.
20   Q.   Let's say you're collecting a loan on a
21   credit card for someone that lives in
22   Pennsylvania and who previously had a debt to
23   Plain Green that you're collecting.
24   A.   Okay.

1    Q.   Would your system alert -- would there
2    be any alert in the system to the fact that
3    there is information about this consumer in
4    BHLD?
5            MR. DAUGHERTY:  Objection to
6    form.
7            THE WITNESS:  Information
8    about this consumer in BHLD.  The collector
9    would -- I don't know if alert is the correct
10   word --
11   BY MR. ACKELSBERG:
12   Q.   But the collector would know it, right?
13   A.   They would be able to identify that
14   there was an account that they cannot
15   technically work, as well as the consumer's
16   information associated to that account would
17   not be accessible to them, et cetera, that we
18   purchased from, you know, that account.
19   Q.   I think you answered my question that I
20   intended to ask.  So the collector could not
21   access that BHLD information concerning the
22   Plain Green loan?
23   A.   They couldn't access that consumer's
24   information related to the Plain Green loan.

1    They could see the consumer's name, they could
2    see that it was a Plain Green loan.  And I'm
3    using this as an example, they could see that
4    the account is inactive.  I actually believe
5    it might be all red or highlighted, if you
6    will.  But if there is another account, X,Y,Z
7    that is eligible to be collected or whatnot,
8    the information associated to that account
9    would be available to the collector.
10   Q.   It would or would not be?
11   A.   It would be.  I feel like you're
12   confused with that answer.
13   Q.   I think it just may be that I lost track
14   of your answer.  The collector does not have
15   access to that Plain Green information, other
16   than the fact that this person had a Plain
17   Green loan, right?  Is that what you're
18   saying?
19   A.   That's correct.  They don't have any
20   access to anything that could harm that
21   consumer, that they could utilize to either
22   call that consumer -- they don't know the
23   balance, they don't know --
24   Q.   Right, but the information is there and

UNSEALED

1   it's accessible to some people in the company
2   though, right?
3   A.  Yes.
4   Q.  What use is made of that information?
5   A.  Nothing material that I can --
6   Q.  Is it ever sold?
7   A.  No.
8   Q.  And then it looks like he's also saying
9   that some of these -- some have been already
10  moved to BHLD, and some of them it says:  Need
11  Recall.  These are all FFW accounts.  So this
12  means that they need to be recalled from the
13  agency that has them, right?
14  A.  You're still on --
15  Q.  I'm still on the same document.
16  A.  97.
17  Q.  The initial e-mail from August 10th of
18  2015 from Jack Mahoney.  Do you see his first
19  category is move to BHLD and the next category
20  it says, Need Recall.  When he says these are
21  all FFW accounts, that means that they were
22  sent out to an agency, right?
23  A.  Correct.
24  Q.  Allow agencies to keep current payers

1   but recall all others.  What does that mean?
2   A.  The way I read that to mean would be to
3   recall all accounts that are not in a current
4   paying status, meaning the consumer hadn't
5   agreed to set up a secured payment
6   arrangement, is the way I read that.
7   Q.  Doesn't this mean that if people are, in
8   fact paying, that the agency should continue
9   to work the account?
10         MR. DAUGHERTY:  Objection to
11  form.
12  BY MR. ACKELSBERG:
13  Q.  Isn't that what that says?
14  A.  I don't read it that way.  The way I
15  read it and understand it, just the way that
16  we approached it, I believe, is that there
17  would not be future collection phone calls,
18  activity made.  If a consumer stopped paying,
19  et cetera, that account would be immediately
20  sent back to NCA.
21  Q.  Right.  But if the consumer continued
22  paying, the agency could keep the money,
23  right?
24        MR. DAUGHERTY:  Objection to

1   form.
2   BY MR. ACKELSBERG:
3   Q.  That's what it says, right?
4        MR. DAUGHERTY:  Same
5   objection.
6        THE WITNESS:  They could keep
7   the paying accounts.  If the consumer made a
8   payment, it would follow the same -- the way I
9   read this, they would end up getting a fee out
10  of it and the money should be remitted back to
11  NCA.
12  BY MR. ACKELSBERG:
13  Q.  Let's go back up to the accounts that
14  are still with NCA.  It's the same thing,
15  right, because what Jack says is, these are
16  all active accounts not forwarded, and with
17  and then he emphasizes in italics, no active
18  promise on file.
19        So that would mean that the
20  same thing applied -- the same rule was
21  applied to the accounts that were in house,
22  that if the consumer was paying, NCA accepted
23  the money, right?
24  A.  That would insinuate that, yes.

1   Q.  Has that continued?  I mean how far into
2   the future -- did there ever come a point
3   where you stopped accepting payments from
4   Pennsylvania Plain Green, Great Plains or
5   Mobil Loans customers that were paying?
6        MR. DAUGHERTY:  Objection to
7   form.
8        THE WITNESS:  I don't -- I
9   can't speak specifically to a time that we
10  completely stopped.  I can't say that we
11  haven't either.
12  BY MR. ACKELSBERG:
13  Q.  What's this next category, APOC?  These
14  need to be closed and moved to BHLD.  Do you
15  know what APOC is?
16  A.  I don't.
17  Q.  What about SIF review?
18  A.  That would be settlement in full review.
19  Q.  What in full?
20  A.  Settlement in full.  It's just a term,
21  if a consumer would settle an account, if they
22  had a debt for $500 and we agreed to settle it
23  for 100, we would consider it settled in full.
24  So...

UNSEALED

1  Q.  So that's basically the same as people
2  that are paying, right?
3          MR. DAUGHERTY:  Objection to
4  form.
5          THE WITNESS:  I don't know
6  that to be true.  I don't know -- in these
7  e-mails, and I understand Jack is the one that
8  has prepared them, he's using the term status
9  literally in one, two, three different ways.
10          I know status to be the
11  questions you were asking about, you know
12  ACOL, FFWD, those are account statuses.  The
13  status of move to BHLD or move to SIF review,
14  I don't know if that's an action or a status
15  like FFWD.  I can't answer that.
16  BY MR. ACKELSBERG:
17  Q.  All right, and if you continue up the
18  e-mail chain, it looks like a few weeks later
19  Jack is letting the same group know that he
20  had forgotten to include Mobil Loans in the
21  last -- in the initial analysis, right?  And
22  now you're getting the Mobil Loans numbers.
23  So this is an additional five million dollars
24  of loans that had been left off, right?

1          MR. DAUGHERTY:  Objection to
2  form.
3          THE WITNESS:  It appears that
4  way, yes.
5  BY MR. ACKELSBERG:
6  Q.  Besides so his grand total, it looks
7  like of accounts is 24 -- roughly 24.5 million
8  dollars in balances, of all the Think products
9  combined?
10          MR. DAUGHERTY:  Objection to
11  form.
12          MR. SHELDON:  Objection to
13  form.
14          THE WITNESS:  That's what
15  this is representing, yes.
16  BY MR. ACKELSBERG:
17  Q.  And then so the right-hand side breaks
18  it out by product, right?
19  A.  The right-hand side breaks it out by
20  issuer, is that what you're saying?
21  Q.  Yeah, yeah, whatever, issuer or product?
22  A.  Yes.
23  Q.  And the left-hand side is showing where
24  the accounts are, that's what he means by

1  status, right?  So let me make sure I
2  understand, of the 24 -- roughly 24.5 million
3  dollars in these various Think Finance
4  affiliated balances, 21.5 million was moved to
5  BHLD, right?
6          MR. DAUGHERTY:  Objection to
7  form.
8          MR. DAUGHERTY:  Object to
9  form.
10  BY MR. ACKELSBERG:
11  Q.  Is that what --
12  A.  We're talking about the last e-mail that
13  Jack sent out including Mobil Loans?
14  Q.  Yeah.
15  A.  That's what it represents, 21.5 million.
16  Q.  Or said in terms of just numbers of
17  accounts, there were 24,000 accounts that at
18  the time of the recall -- and these are 24,000
19  accounts that were in Pennsylvania with one of
20  these listed Think Finance products.
21          MR. DAUGHERTY:  Object to
22  form.
23          MR. SHELDON:  Objection to
24  form.

1          THE WITNESS:  In one of these
2  statuses yes, that's what this is
3  representing.
4  BY MR. ACKELSBERG:
5  Q.  Right, okay, in one of these statuses.
6  A.  On this date -- that's what the --
7  Q.  If I wanted to know -- well, as of this
8  date, how many accounts -- how many accounts
9  representing how big a debt, a total debt, NCA
10  had of Think Finance products with
11  Pennsylvania consumers, it was roughly 24,000
12  different accounts for a total of 24.5 million
13  dollars in debt?
14          MR. DAUGHERTY:  Objection to
15  form.
16          MR. SHELDON:  Same objection.
17          THE WITNESS:  Correct.
18  BY MR. ACKELSBERG:
19  Q.  Of those roughly 20,000 or 20,230
20  accounts representing 21.5 million dollars in
21  balance, were put into this inactive status
22  called BHLD, correct?
23          MR. SHELDON:  Object to form.
24          THE WITNESS:  Correct, as of

UNSEALED

1  this e-mail.
2  BY MR. ACKELSBERG:
3  Q.   And as of this date, the remaining
4  accounts would have remained in some form of
5  active status?
6       MR. DAUGHERTY:  Objection,
7  mischaracterizes the document.
8       MR. SHELDON:  Object to form.
9  BY MR. ACKELSBERG:
10  Q.   Am I right?
11  A.   I don't know that you can make that leap
12  from just this e-mail.  But based on the
13  status, ACOL would have been an active status.
14  Q.   What does ACOL mean?
15  A.   It's a collector owned account, meaning
16  the collector at some point in time had talked
17  to the consumer and taken ownership of it,
18  because the consumer may be calling them back
19  or making a payment.  Those would be the ones
20  that I would consider that are in a payment
21  stream or payment status.
22  Q.   So when you say, a collector owns the
23  account, meaning that the consumer -- the
24  collector has established a relationship with

1  the consumer, such that the consumer is either
2  paying or the collector has an expectation
3  that the consumer will pay?
4  A.   That's a good representation of it or
5  understanding, yes.
6  Q.   Now let's look at the next Exhibit P-98.
7  And this is now covering the Pennsylvania
8  accounts, this is, I guess, updated
9  information four months later -- yeah, four
10  months later, three months later.
11  A.   Okay.
12  Q.   I'm trying to understand this -- I
13  assume the column on the left is providing
14  just how old the debt is, right, that's 1 to
15  90, 91 to 180 --
16  A.   -- old in the sense of from when we
17  purchased it.
18  Q.   Oh, I see.  So this doesn't -- this
19  doesn't connect back to --
20  A.   -- origination.
21  Q.   The origination, I see.  So this goes
22  back to whenever that particular Annex -- the
23  particular sale of that debt to NCA was?
24  A.   Correct.

1  Q.   And then placed -- is placed in current
2  balance and the current balance would be, is
3  CNT current?  I'm saying current but I don't
4  know what -- what is CNT balance?
5       MR. DAUGHERTY:  Objection.
6  Irv, I think for the record that's a CRNT.
7  BY MR. ACKELSBERG:
8  Q.   Oh good, so I was right, okay.
9  A.   You are correct.
10  Q.   So like with Great Plains, just so I
11  understand how to read this, that in total
12  there were -- there was on the system 2,731
13  accounts that were originally, at the time of
14  purchase were 3.5 million dollars in balances,
15  and that the current balances are roughly just
16  100,000 less.  Is that how to read it?
17  A.   Yes.
18  Q.   What is --
19  A.   You can make an assumption of that,
20  yeah.
21  Q.   What does the column, futures, refer to?
22  What does that mean, futures?
23  A.   Futures would be future payments that
24  the consumer had set up and secured, whether

1  it be ACH or credit card.
2  Q.   Tell me what this means.  I'm a little
3  confused here.  Here is what I interpret and
4  tell me if I'm correct, that with regard --
5  that as of this point in time, in December of
6  2015, let me start over.
7       What are we looking at, the
8  accounts that are active, inactive, both?
9  What are we looking at here?
10  A.   I don't know that I can tell what
11  necessarily we're looking at, because it's
12  what's being displayed, at least in the
13  printout of the e-mail.  Now there's an
14  attachment, it looks like with a file, sent to
15  Brad, Shawn and Mark.
16       The e-mail states that
17  there's filters -- there must have been a
18  discussion -- project to bill this and provide
19  a summary this way.  I can't speak to really
20  -- the assumptions you made as far as if the
21  placed -- face value or face amount, the three
22  million 530 is now three million 390.  To make
23  the assumption that the difference would have
24  been collected and/or, you know, an account

UNSEALED

1    that moves off the floor because of a dispute,
2    cease and desist or an account that just gets
3    written off, potentially could reduce that
4    balance, as well.
5    Q.   Does this mean that as of December 2015,
6    December 3rd of 2015, there was estimated to
7    be $104,000 in payments still to be received
8    by active Pennsylvania borrowers?
9          MR. DAUGHERTY:  Objection to
10   form.
11  BY MR. ACKELSBERG:
12    Q.   If you look at the futures added up, I
13    think you get a sum on the last page.
14    A.   You can make that assumption, yes, that
15    is correct.  It's Pennsylvania consumers,
16    either state placed or current residence.
17    Q.   In preparation for your deposition
18    today, did you look at what that futures
19    number is for Pennsylvanians today?
20    A.   I did not.  To be honest, I assumed that
21    they were all removed and not --
22    Q.   So this is a surprise to you?
23    A.   Well, it's not necessarily a surprise to
24    me, I still believe that there's not futures

1    -- but this is a 2015 December e-mail from a
2    decision that Shawn Gylling and Brad Hochstein
3    made.
4    Q.   Do you remember making any decision to
5    reverse that decision to stop accepting money
6    from Pennsylvania, Plain Green, Great Plain or
7    Mobil Loans customers?
8    A.   I don't know that I specifically made
9    that decision, but we had many discussions
10  about these types of scenarios and how we want
11  to do things the right way.  So -- it's the
12  first call I want to make as I leave here.
13          MR. ACKELSBERG:  Patrick,
14  without getting into the issue of an
15  additional written discovery request, we have
16  already made certain discovery requests,
17  clearly there was at least a file here that
18  wasn't produced that's attached.  We would ask
19  for any -- as within the scope of discovery
20  that was requested probably a year ago, I
21  would ask for all files connected to the
22  Pennsylvania accounts.
23          MR. DAUGHERTY:  Look Irv, I
24  think what this e-mail looks like to me is

1    that a spreadsheet was cut and pasted into the
2    body of the e-mail, and then that e-mail was
3    forwarded.  The attachment doesn't seem to be
4    forwarded.  I'm happy to look for the December
5    3rd, 2015, 2:56 p.m. e-mail and see if we can
6    get you the .XLSX file that accompanied it, if
7    it hasn't already been produced.
8    BY MR. ACKELSBERG:
9    Q.   Now do you know if there was any
10  transaction with regard to the recall that
11  included money transferred, being transferred?
12          MR. DAUGHERTY:  Objection to
13  form.
14          THE WITNESS:  Money
15  transferred on recall?
16  BY MR. ACKELSBERG:
17    Q.   In other words, did NCA receive money
18  from either Think or the tribes or someone
19  with regard to the debts that were being put
20  in inactive status?
21    A.   No.
22    Q.   Did NCA buy tribal related loans from
23  any of the companies associated with Scott
24  Tucker?

1    A.   Not to my knowledge.
2    Q.   So that includes Ameri Loans, United
3    Cash Loans, US Fast Cash, Preferred Cash, One
4    Click Cash, Miami Tribe of Oklahoma, Santee
5    Sioux Nation, these aren't products that you
6    think are on the NCA system or were on the NCA
7    system?
8    A.   Not to my knowledge.  I don't recall
9    that.  I didn't prep for that.
10    Q.   What about Cash Call?
11    A.   Cash Call, we did buy some Cash Call, as
12  well as Western Sky.
13    Q.   That would include the Western Sky
14  originated loans.  Okay.  What about the
15  tribal loans associated with Charlie Hallinan?
16          MR. DAUGHERTY:  Objection to
17  form.
18          THE WITNESS:  The name
19  doesn't sound familiar.  To my knowledge,
20  there is a list of about four or five, maybe
21  six other products that were considered
22  tribal.  But the volumes of them were quite
23  small.
24  BY MR. ACKELSBERG:

UNSEALED

1    Q.   Would it be fair to say that the largest
2    volume of your tribal were the three Think
3    products that we have been discussing?
4              MR. SHELDON:  Object to form.
5              THE WITNESS:  I would say
6    that the largest volume would be the Plain
7    Green, Great Plains and Mobil Loans.
8    BY MR. ACKELSBERG:
9    Q.   You did buy loans from -- you did buy
10   loans from Adrian Rubin, didn't you?
11             MR. DAUGHERTY:  Objection,
12   beyond the scope of the deposition notice?
13   BY MR. ACKELSBERG:
14   Q.   Tribal loans.
15   A.   To be honest, I don't know whether we
16   did we or didn't.  I don't know who Adrian
17   Rubin is.
18   Q.   What about -- have you ever heard of
19   HNIC Services?
20   A.   I can say that I haven't.
21   Q.   Tribal Ventures Management Group?
22   A.   I have not.
23   Q.   With regard to Charlie Hallinan, I am
24   going to give you names of products and tell

1    me if this sounds familiar.
2    A.   Okay.
3    Q.   MTE Financial?
4    A.   That doesn't sound familiar.
5    Q.   Cash Advance Network?
6    A.   It sounds familiar only because a lot of
7    names are Cash Advance something.
8    Q.   Instant Cash USA?
9    A.   These are tribal products is what you're
10   telling me?
11   Q.   Yes.
12   A.   They don't.
13   Q.   Paycheck Today?
14   A.   No.
15   Q.   Apex One Processing, does that sound
16   familiar?
17   A.   It does not.
18   Q.   5th Avenue Financial, Tribal Lending
19   Enterprise, Sequoia Trial Enterprises?
20   A.   It does not.
21   Q.   If the Think related tribal products
22   were your biggest -- was the biggest portion
23   of the tribal portfolio, what was the second
24   biggest, would that have been Cash Call?

1              MR. DAUGHERTY:  Objection to
2    form.
3              THE WITNESS:  Honestly, I
4    don't know that I know that answer either.
5    Combined there are a handful of travel
6    products that we purchased over the years.  I
7    think we collected a total of $60,000, if that
8    gives you context to gross volume.
9    Q.   Is that all tribal products, including
10   Think Finance?
11   A.   No.
12             MR. DAUGHERTY:  Objection to
13   form.
14             THE WITNESS:  Outside of
15   Think Finance and Great Plains, Plain Green --
16   BY MR. ACKELSBERG:
17   Q.   Have you analyzed how much you've
18   collected from these three Think Finance
19   products we have been discussing?
20             MR. DAUGHERTY:  Objection to
21   form.
22             MR. SHELDON:  Object to form.
23             MR. DAUGHERTY:  Tyler,
24   understanding that when Irv says Think Finance

1    products, he means Great Plains, Plain Green
2    and Mobil Loans, you can answer the question.
3    BY MR. ACKELSBERG:
4    Q.   You understood that, didn't you?
5    A.   Yes.
6    Q.   Okay.
7    A.   The last question, can you repeat that?
8    Sorry.
9    Q.   How much has -- since it began -- since
10   back in 2012 when Brad Horrocks first started
11   selling the Think Cash loans, how much has NCA
12   collected off of the relationship with Think
13   Finance?
14             MR. SHELDON:  Object to form.
15   Continuing objection.
16             MR. DAUGHERTY:  Object to
17   form.
18             THE WITNESS:  As it relates
19   to Pennsylvania, 4.4 million dollars.
20             MR. DAUGHERTY:  Hold on, Irv,
21   I need to get this on the record, Irv, because
22   the witness, I think was asked to prepare very
23   specifically for Pennsylvania collections, not
24   gross collections in the United States.  So

UNSEALED

Page 253

1    numbers you're going to get from him are ones
2    that he prepped in response to your topic,
3    which was Pennsylvania specific.
4    BY MR. ACKELSBERG:
5    Q.   So the 4.4 million, was that
6    Pennsylvania?
7    A.   Yes.
8    Q.   What is the national number, if you know
9    it?
10              MR. DAUGHERTY:  Objection,
11   beyond the scope of the deposition?
12              THE WITNESS:  I don't know it
13   off the top of my head.
14              MR. ACKELSBERG:  I have no
15   further questions.
16              MR. DAUGHERTY:  None for me.
17              VIDEOTAPE OPERATOR:  That
18   concludes this deposition, the time is 4:44
19   p m.  We are off the record.
20              - - -
21         (Whereupon the deposition
22   concluded at 4:44 p.m.)
23              - - -
24

Page 254

1       Read your deposition over carefully.  It is
2    your right to read your deposition and make
3    changes in form or substance.  You should
4    assign a reason in the appropriate column on
5    the errata sheet for any change made.   After
6    making any change in form or substance which
7    has been noted on the following errata sheet
8    along with the reason for any change, sign
9    your name on the errata sheet and date it.
10   Then sign your deposition at the end of your
11   testimony in the space provided.  You are
12   signing it subject to the changes you have
13   made in the errata sheet, which will be
14   attached to the deposition before filing.  You
15   must sign it in front of a witness.  Have the
16   witness sign in the space provided.  The
17   witness need not be a notary public.  Any
18   competent adult may witness your signature.
19   Return the original errata sheet & transcript
20   to deposing attorney, (attorney asking
21   questions) promptly.  Court rules require
22   filing within 30 days after you receive the
23   deposition.  Thank you.
24

Page 255

1              C E R T I F I C A T E
2                   - - -
3              I, Jeannine Cancelliere, Court
4    Reporter and Notary Public and for
5    Philadelphia, Pennsylvania, do hereby certify
6    that the foregoing testimony of LEE TYLER
7    REMPEL, was taken before me at 1600 Arch
8    Street, Suite 300, Philadelphia, Pennsylvania
9    on Wednesday, April 11, 2018; that the
10   foregoing testimony was taken by me in
11   shorthand by myself and reduced to typing
12   under my direction and control, that the
13   foregoing pages contain a true and correct
14   transcription of all of the testimony of said
15   witness.
16
17
18              .............
19              JEANNINE CANCELLIERE
                Notary Public
                My commission expires
20              October 13, 2019
21
22
23
24

Page 256

1       I have read the foregoing deposition
2    and the answers given by me are true and
3    correct, to the best of my knowledge and
4    belief.
5
6
7              ...........................
8              LEE TYLER REMPEL
9
10
11
12
13   Witness to signature
14
15
16
17   Address
18
19
20
21
22         My Commission expires
23              .............
24

64  (Pages 253 to 256)

UNSEALED

App. 0361

Page 257

```
 1              ERRATA SHEET
 2      PAGE  LINE #   CHANGE   REASON THEREFORE
 3      _____
 4      _____
 5      _____
 6      _____
 7      _____
 8      _____
 9      _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20      _____
21      _____
22      _____
23      _____
24      _____
```

UNSEALED

App. 0362

**A**

**A's** 143:22
179:16 217:20
**a.m** 1:14 6:12
**ability** 27:12
**able** 9:6 30:17
30:19 56:12
100:7 176:18
176:20 194:9
196:8 231:13
**abnormal**
176:16 196:18
223:17 224:12
**absolutely** 75:12
176:19 197:1
**accepted** 235:22
**accepting** 236:3
246:5
**access** 84:24
131:17,19
134:7 148:24
149:1 152:4
153:19 201:5,7
201:10,12,13
201:14,15
231:21,23
232:15,20
**accessible**
231:17 233:1
**accompanied**
146:3 247:6
**account** 20:15
65:13,16 66:12
69:24 79:15,20
80:2 97:6
98:12,13
126:11 129:12
131:5,12 144:2
157:18 159:4
159:11 174:5
176:3,3,10,14
188:18 189:2
190:3 193:8
194:3,13 195:7
195:8 200:14
200:15 204:11

204:11,12,20
204:22 205:12
213:19,24
214:1,5,6,6,8
214:22 215:17
216:12,13
217:14 220:16
220:17 221:16
221:18 225:2
228:7,15
229:13,23,24
230:1,2,5,6
231:14,16,18
232:4,6,8
234:9,19
236:21 237:12
241:15,23
244:24 245:2
**accountability**
169:5 224:19
**accountable**
47:6 153:6,7
171:5
**accounting**
64:22 65:4
**accounts** 11:24
16:22 20:15
24:11 26:13
41:17,19,21
69:1 78:1 79:1
85:16 89:17
90:18 95:8,21
96:10 97:4,24
98:14 103:8,23
130:14 133:2,8
133:19 145:4
149:3,8 151:22
174:14 176:1
177:13 185:19
188:23 190:7
190:12 197:1
206:3 212:6
218:10 227:2
227:12 228:6
228:19,19,23
229:1,18

233:11,21
234:3 235:7,13
235:16,21
238:7,24
239:17,17,19
240:8,8,12,20
241:4 242:8
243:13 244:8
246:22
**accretion** 64:23
**accretive** 65:4
**accurate** 71:12
71:17 77:9
78:2,14 171:2
215:7
**ACH** 244:1
**Ackelsberg** 2:3
4:5 7:8,12
16:23 22:23
24:14,21 25:24
26:3,20 31:3
32:3,16 33:2
34:21 35:16
36:9 38:14
39:6,18 40:15
42:7 43:4 45:7
45:19 46:7
47:4 48:3
49:23 52:21
53:5,14 58:11
60:20 63:11
66:24 67:18
69:10 74:12
78:16 80:5,13
81:22 82:4,16
84:4 87:5 88:2
88:16,24 91:3
91:18 92:4,21
93:5,13,18,23
95:13 97:1,9
97:19 99:6,15
100:3,10,14,23
101:7,15 102:3
102:10,21
103:4 104:4,16
106:14,23

107:18 108:19
109:19 110:4
110:18 111:15
113:10,16
114:2,10 115:2
116:12,24
118:3,12 119:7
119:24 120:19
121:3,17
122:21 123:3,7
123:14,19
124:4,23 125:9
125:22 127:2
127:10 128:3,8
129:2 131:13
132:18 133:5
133:14,20
134:8,12,24
137:9 139:10
140:9 142:21
143:3,21
144:24 145:23
149:18 150:3
150:20 154:18
155:1 156:21
157:1 158:14
158:19 159:2
159:13 160:2
160:17 161:9
161:16 162:11
164:8,17 165:3
167:2,19 168:4
169:1 170:4,15
171:19 172:3
172:20 177:9
178:3 179:5
181:7 182:23
183:4,6,23
184:3,5 187:4
197:10 199:20
200:8 201:9
203:19 205:18
206:8 207:11
207:23 208:19
209:15 210:10
210:16 212:21

213:6,8,15
214:13,24
215:12 218:12
219:9 220:18
222:15 223:21
226:1 227:8,21
229:10 230:13
231:11 234:12
235:2,12
236:12 237:16
238:5,16
239:10 240:4
240:18 241:2,9
243:7 245:11
246:13 247:8
247:16 248:24
249:8,13
251:16 252:3
253:4,14
**Ackelsberg's**
40:11 57:24
**ACOL** 237:12
241:13,14
**acquired** 56:3
163:15
**acquisition**
163:18,22
**act** 88:9
**acting** 117:17
**action** 1:4 6:10
7:14 237:14
**active** 77:18
189:8 190:4
227:2 235:16
235:17 241:5
241:13 244:8
245:8
**activities** 152:9
152:13 189:13
**activity** 12:4
185:8 234:18
**actual** 52:2
70:18 94:24
129:16 133:23
165:15 173:22
**add** 183:1 229:4

UNSEALED

added 245:12
Addison 213:18
addition 37:8
  151:19 181:14
additional 99:19
  183:2 237:23
  246:15
additions
  140:10
address 132:3
  162:24,24
  204:24 209:8
  225:8 227:20
  256:17
addresses
  191:19
adhere 31:15
Adjusters 3:11
  7:17 11:8,22
  48:21 50:8
  145:3
administered
  8:19
administrative
  102:11 192:13
Adrian 249:10
  249:16
ADS 228:20
adult 254:18
Advance 250:5
  250:7
advice 40:3,12
  58:1 195:2
affiliated 58:24
  59:2 75:24
  76:2 81:21
  239:4
affirmative
  177:5
age 89:21
  131:22
agencies 78:24
  141:15 143:23
  144:10,11,20
  152:14,15,16
  152:21,24

193:12 196:10
201:19 218:9
233:24
agency 55:15,21
  56:1 79:6,12
  79:20 80:3
  89:18 145:3
  163:1,2 188:8
  188:20 196:12
  205:9,22
  206:23 214:1
  214:21 216:6
  218:19,23
  221:24 228:20
  233:13,22
  234:8,22
agenda 165:7,11
  165:20,22,24
  166:6 168:20
  169:8 171:21
  172:14,21
agent 216:3
agents 217:20
ages 50:16
aggressive 39:24
ago 15:5 218:7
  246:20
agree 30:23
  32:10 63:6
  107:12 109:11
  110:3 141:23
  161:14
agreed 27:15
  83:23 140:8
  234:5 236:22
agreeing 118:5,7
  194:8
agreement 4:15
  4:19,21,22,23
  4:24 5:5,7,8,10
  5:11,12 30:3
  32:12 57:3
  83:18 91:4
  92:6 96:2,3
  97:11,12
  101:12,20

110:11,20,23
111:3,20,21
112:16 113:21
113:23 118:9
120:9 121:9
137:15 139:18
139:20,23
140:11 154:9
162:20 163:6
164:4,11
agreements 75:9
  115:10,19
  118:5 120:21
  133:24 135:17
  155:5 158:6,17
  158:18 160:7
  166:18 179:17
ahead 135:20
aided 27:11
AI 1:6 6:17
alert 231:1,2,9
allegation 31:22
allegations
  31:14 32:4,11
allow 66:19
  177:3 233:24
allowed 33:1
amended 5:7,8
  57:3 139:19
Ameri 248:2
amount 36:6
  78:18 95:23
  121:24 244:21
amounts 89:21
analogy 19:21
analysis 237:21
analytical 19:6
analytics 64:4
  64:10,12 65:11
  67:2
analyzed 251:17
and/or 244:24
annex 68:13
  95:3,3,7,21
  96:1,12 111:10
  111:14,24

115:4,10 124:7
126:17 129:13
129:14 242:22
answer 8:7,8 9:4
  9:19 10:3,3,10
  10:11,18 15:7
  26:21 31:2
  32:8 34:2
  35:23 40:10
  53:17 57:12,24
  58:1 62:22
  66:6 67:14,16
  67:24 71:20
  94:6 108:14
  111:18 117:18
  172:16 177:3
  185:16 194:21
  202:16 207:20
  220:13 221:6
  223:1 232:12
  232:14 237:15
  251:4 252:2
answered
  120:14 231:19
Answering
  120:23
answers 256:2
Anthony 212:13
anticipated
  113:12
anybody 61:5
  66:5 112:22
  148:4,6
anymore 88:15
  132:22
anyway 133:21
Apex 250:15
APOC 236:13
  236:15
apologies 219:15
apologize 25:13
  61:8 159:17
  187:13 221:6
apparently
  184:21
appear 92:15

114:4,14,20
163:23 178:23
179:10
APPEARANCE
  3:1
APPEARAN...
  2:1
appearing 8:20
  11:7
appears 48:18
  68:4 80:18
  81:5 89:3 93:2
  94:8,10 101:19
  102:2 104:6
  114:14,17
  116:6 122:22
  123:24 135:6
  139:23 141:18
  178:6,12,12,19
  179:4,11,18,21
  208:21 211:2
  214:8 215:22
  218:16 238:3
applicable 95:1
applied 16:15
  35:2 152:13
  235:20,21
applies 25:11
  139:24
apply 130:18
appreciate 26:2
appreciates
  219:12
approach 19:7
  47:1 59:17
  84:17 90:14
approached
  234:16
appropriate
  177:7 200:23
  254:4
approval 172:13
  207:22 218:11
  218:13
approve 172:14
approved 145:4

171:21 207:7
207:12 218:9
**approving**
165:11 218:14
**APR** 14:15
32:24
**April** 1:8 6:11
99:10 255:9
**apt** 130:24
**Arch** 1:13 2:4,9
6:14 255:7
**area** 66:9 87:8
153:22 169:14
**areas** 12:9 42:9
**arena** 12:20
**Arizona** 15:18
17:22,23 55:6
**Arkansas** 21:19
31:7,21 45:12
**arranged** 94:13
**arrangement**
79:9 92:9
234:6
**article** 97:12
**aside** 143:15
**asked** 57:6
161:12 252:22
**asking** 9:21
25:18 37:14
68:3 75:21
77:23 132:20
133:15,16
165:14 179:7
198:14 213:19
215:23 222:14
222:16 223:2
237:11 254:20
**assessment**
195:2
**asset** 14:6 21:6
76:19
**assign** 47:15
130:17 254:4
**associated** 41:20
120:16 192:15
221:17 228:22

231:16 232:8
247:23 248:15
**associates** 144:3
149:14 188:8
**assume** 9:20
103:7 123:21
127:24 215:5
242:13
**assumed** 45:11
245:20
**assuming**
116:21 124:1
183:12
**assumption** 15:8
66:18 84:22
85:2 88:14
119:5 127:15
135:12 170:6
179:21 184:15
197:22 214:19
225:5 226:19
230:11 243:19
244:23 245:14
**assumptions**
244:20
**assurance**
151:11 175:21
186:15
**attach** 195:14
**attached** 95:2
96:1 99:17
109:22 115:22
115:24 140:17
179:16 246:18
254:14
**attaching**
113:21 114:22
115:18
**attachment** 91:7
92:23 93:12,14
110:1 138:21
140:22 165:2
165:15,16
179:3,8 181:10
182:8,19 211:1
244:14 247:3

**attachments**
93:3,21 100:9
100:11,13,16
101:3,4 112:21
113:9 116:7,8
116:9 178:20
178:23 179:3
182:7,18
183:13
**attempts** 149:4
**attendee** 168:1
172:18
**attention** 11:3
44:21 72:3
137:11 199:23
200:5 203:7
219:19
**attorney** 2:8
6:16 7:13 42:1
69:8 192:18,21
254:20,20
**attorneys** 58:3
**attrition** 21:3
**auditors** 72:24
**August** 226:4,12
233:17
**authority**
172:14
**automated** 70:4
70:19,21 71:1
**available** 30:22
70:1,16 232:9
**Avenue** 3:4
250:18
**average** 66:20
66:22 70:10
**aware** 23:10
38:20 39:2
40:19 50:2,7
194:15 199:13
199:14

———————
**B**
**B** 4:8 5:2
**B-A-T-E-S**
181:1

**B-hold** 189:19
**back** 10:21 14:7
23:22,23 26:22
27:5 32:13
49:15 54:23
57:5 61:9
66:21 69:24
86:4 93:16
95:10 97:4,10
97:13,14,23
98:4,17 103:12
119:8 122:18
130:12,15
132:7,12 136:3
136:4 156:13
161:19 165:1
178:2 188:7
190:12 193:13
195:10,21
197:6 199:9
200:17 204:19
205:11,20
215:23 217:11
218:21 221:15
226:12 228:16
228:20,23
229:2 234:20
235:10,13
241:18 242:19
242:22 252:10
**background**
11:19 26:5
33:24
**bad** 23:15 27:4
138:7 185:22
223:16
**balance** 96:8
228:8 232:23
240:21 243:2,2
243:4 245:4
**balances** 26:15
66:22 238:8
239:4 243:14
243:15
**ball** 77:22,23
**ballpark** 41:5

**bank** 13:3,5
36:16 91:13
92:16 93:17,21
94:16,20 96:3
97:2 220:20
**banking** 42:1
**bankrupt** 98:12
130:12
**bankruptcy**
98:15
**banks** 23:12,13
146:4,15 162:1
**based** 12:21
34:22 65:10,23
70:9 73:3
78:19 83:16,23
87:4 88:5
92:12 103:6
108:7 109:12
112:14 127:14
132:4 135:11
136:24 138:2
161:3 165:13
179:22 186:12
192:16 208:4
241:12
**basic** 24:16
**basically** 36:17
61:21 82:12
105:24 117:6
165:11 182:13
237:1
**basics** 19:24
**basis** 27:15
30:12 35:1
44:9 68:12,13
105:12,24
106:2 108:3
111:24 126:1
128:11 148:22
148:22 151:7
167:10 171:2
179:20 181:19
183:9 196:19
212:7
**batch** 103:22

**Bates** 99:1 100:2
100:2 114:20
115:20 116:6
116:10 123:2
140:13 147:2
155:6 167:12
179:23 180:24
181:1 213:4
226:2
**Bay** 15:21
**BBB** 186:3
**becoming** 58:9
**began** 46:8
203:24 252:9
**beginning** 1:14
41:5 81:24
83:14 84:10
89:6 116:10
137:22 153:9
156:22 162:14
166:7,8,12
212:5 213:9
**begins** 74:9
134:21 203:17
**behalf** 11:7
117:17
**belief** 256:4
**believe** 17:18
20:4 21:4,9
28:7 34:13,19
36:5,6,7 37:10
43:9 54:9 62:5
68:18 74:15
85:9,10,12
86:14 92:5
95:7 99:18,21
100:14 101:12
102:14 109:20
117:3 119:9
126:24 133:17
134:6 138:22
146:3,13,24
147:11,12,14
150:24 151:14
151:21 153:18
163:12 166:7

166:24 168:9
169:18 170:19
170:21,23
174:13 190:3
190:21 191:8
193:12 194:2,4
194:10,11
198:2,14 199:5
201:4,11,12,21
205:6 210:2
212:11,14
217:23 228:16
229:9 232:4
234:16 245:24
**believed** 73:10
**believes** 19:20
177:6
**bell** 211:18
**benefit** 224:8
**best** 98:7,21
107:6,22 112:6
160:5 256:3
**better** 28:21
86:17 170:20
**beware** 91:5
**beyond** 31:24
32:13,15 62:20
198:10 230:9
249:12 253:11
**BHLD** 188:21
189:8,18 190:2
190:3 229:12
229:20 230:5
231:4,8,21
233:10,19
236:14 237:13
239:5 240:22
**BHLD's** 190:9
190:11
**bias** 151:13
**bickering** 63:5
**big** 14:20 22:15
128:5 152:20
240:9
**biggest** 77:13
250:22,22,24

**bill** 126:17
244:18
**birth** 130:5
**bit** 8:3 11:19
**blank** 143:14
**blocking** 19:21
**board** 56:15,21
56:22 57:4,15
57:16,21 58:1
58:7,18,22
59:16,24 60:2
60:7,11,13
61:1 71:11,18
71:20 72:3,9
72:15,16,20
73:13,17
**Bobbi** 147:19
**body** 247:2
**bold** 172:22
**borrowers**
133:24 197:18
198:22,24
245:8
**BOUGHRUM**
2:13
**bought** 51:4
87:24 93:22
125:14 130:16
131:6 160:1
174:2 177:14
222:6 228:15
229:2
**Bova** 221:24
222:2
**BPS** 105:9,12
**Brad** 29:3 34:15
35:2 36:7 37:8
38:21 39:7
40:6,20 41:2
43:12,14,20
46:14 47:10
54:19 57:8
58:6 60:7,11
61:1 62:15
63:3,17 67:8
68:9,16 71:13

71:22 77:11
81:2,11 82:11
82:24 90:6,7
91:8,9,17
94:14 99:12
102:24 103:9
105:8,14 106:4
112:9 120:10
163:6 165:21
165:24 207:6
212:3 221:10
221:17 226:20
226:22 244:15
246:2 252:10
**Brad's** 105:16
105:23
**branch** 15:19
**branched** 16:4
**break** 10:15,17
10:20 74:1
134:9
**breakout** 228:11
**breaks** 10:14,16
238:17,19
**Brenda** 204:20
**Brett** 81:4,7,16
82:10,22,23
84:5 85:5 86:6
87:13 88:3
91:17,19,20
92:16 99:11
104:20,23
105:7 106:5
114:21,22
115:17,21
117:14 119:9
119:18 120:8
124:15 125:16
125:21 127:1,4
127:4,16,21
128:17,19,24
129:4,15
135:23 136:4
137:13 138:3
153:18 155:17
155:23 165:20

165:22,23
171:15 174:11
178:9,17
186:20 191:18
200:22 201:12
204:8,15,19
206:11 207:5
209:2 213:16
213:23 215:21
218:17,21
220:10 221:9,9
221:12,13
**Brett's** 122:11
219:18 221:12
**bring** 72:2,9
84:22 180:19
203:6
**bringing** 219:18
**broad** 1:22 2:14
26:4
**broken** 186:16
**broker** 82:13
84:11,18 85:3
85:6 88:3,6
92:17 94:5
107:4 108:9,16
124:20
**brokered** 86:19
87:14 124:15
125:16,21
**brokering** 107:1
108:3 125:2
**brokers** 105:21
107:12,22
108:15
**brought** 84:9
113:11 215:23
**budget** 30:18
**build** 69:17 85:3
130:10,10
**building** 117:23
**bunch** 19:4
**bureau** 196:15
**business** 11:21
11:23 13:4
19:18 20:22

26:5 53:21
56:2 59:23
60:12 103:17
103:17 106:6
217:18
**buy** 20:19 22:16
23:20 24:3
27:16 40:21
41:16 47:11,12
51:10 58:23
84:9 85:16
86:9 95:22
97:4,13,14
98:4,17 107:20
112:3 125:11
132:7 175:13
175:19 198:21
207:13 228:18
247:22 248:11
249:9,9
**buyer** 11:24
20:18 27:23
49:14,14 112:7
119:4 211:4
214:1 215:2,2
221:18
**buyers** 23:21
84:18 85:1
202:7 212:3
216:8
**buying** 37:1,9
38:23 39:12
40:6 41:21
42:14 51:4
57:19 59:2
75:8 83:19
87:15,18 93:21
96:4,19 97:23
112:2 119:5
135:9,12 158:8
160:3 170:9
205:24 206:24
208:13 223:24
228:22
**buyout** 62:11

---

**C**

**C** 25:16 255:1,1
**calculated** 95:15
**call** 12:3 15:17
15:22,24 16:2
17:13,14 18:3
18:6,8,9 19:3
23:22 31:1
35:19 36:2
44:3,11 55:5,9
55:12,24 69:3
69:23 70:2
73:2 79:14,18
89:19 103:14
103:18 129:17
131:3,18 141:3
151:9,10 152:7
167:1,5,10
171:6,15,16,20
175:2 176:14
178:13,24
184:2,19
186:10,15
188:20,22
189:10,11,12
189:18 200:10
217:3 220:4
222:1 224:9
225:19 232:22
246:12 248:10
248:11,11
250:24
**called** 69:3
72:14,15 95:2
96:13 107:13
125:4,14 133:3
151:3 153:22
155:9 184:10
185:10 204:23
209:20 210:20
225:1 228:13
228:20 240:22
**calling** 40:1
70:18 79:20
90:16 241:18
**calls** 19:5 32:7

---

69:4,16 70:3
151:12,12,14
151:20,22
152:1,4,18
153:20 167:13
167:14,14
168:14,21
169:2,9,13,19
171:4,10,10
175:22 180:6
183:14,18
184:2 199:19
234:17
**campaign** 69:18
69:19,19
**can-** 126:13
**Cancelliere** 1:15
6:20 255:3,18
**cap** 32:1,15
**capable** 133:17
**capacity** 85:6
124:19 128:4
**capital** 7:16
21:11 22:8,10
22:15,20,22
25:16,16 35:13
35:14 61:21
76:7 144:3
224:7
**capitalization**
24:1
**capitalized**
74:24
**capturing** 188:3
**card** 28:20
36:16,19
230:21 244:1
**cards** 13:3,5,5
**career** 18:23
224:1
**careful** 71:2
**carefully** 38:1
254:1
**Carrie** 156:6
**carry** 33:20
**case** 8:16 25:17

---

32:17 79:4
112:19 221:10
**cases** 32:14 34:3
58:12
**cash** 27:6,7,10
27:17 51:8
52:18 84:10
85:10 86:1
96:5 117:22
125:15 173:17
175:17 204:11
208:6 220:3,19
228:12,14
248:3,3,3,4,10
248:11,11
250:5,7,8,24
252:11
**categories** 191:4
**categorize**
192:11
**category** 13:14
77:3 78:22
188:5 189:3
191:5 228:12
233:19,19
236:13
**caught** 94:2
**caused** 36:13
217:6
**cc** 81:4 90:6
**cc'd** 81:7 102:23
**CDBP** 191:10
**CDDP** 189:21
**CDP** 190:1
**cease** 189:3,5,22
190:20 195:17
195:24 196:4
196:17 245:2
**ceased** 216:22
**center** 15:22,24
16:2 17:13,14
18:3,6 35:19
36:2 55:5,9,13
55:24 188:20
**centers** 12:3
15:18 18:8,9

---

19:3 44:3,11
69:3 103:14,19
131:3 186:10
**cents** 96:9
**CEO** 7:15 18:4
34:9,24 35:6
43:12 44:20
46:10 50:5
77:11 142:5
193:21
**certain** 11:9
12:9 166:24
169:8 170:8
246:16
**certainly** 199:14
**certify** 255:5
**cetera** 14:8
19:23 30:18
35:15 51:19
52:4 55:17
60:9 63:3
68:14 70:11,23
71:19 73:6
76:24 86:11
89:22 98:3,9
98:18 103:21
112:11 124:6
126:18 127:17
130:5,13,24
133:3 137:5
153:20 157:19
168:23 169:9
169:18 175:5
186:14,17,18
190:17 197:1
203:1 206:18
208:12 225:3
230:3 231:17
234:19
**CFPB** 28:6
**Chabot** 228:21
**chain** 80:19,21
82:7,21 85:8
89:8 115:20
155:18,19
156:20 203:24

UNSEALED

204:18 213:10
221:8 237:18
**challenge** 60:13
61:7
**challenged** 61:1
63:7
**challenges** 20:16
21:18 22:7
31:5,9
**challenging**
20:11 58:9
**chance** 49:3
101:16 139:11
**Chandler** 17:22
55:5
**change** 28:16
65:23 136:9,22
190:24 203:8
254:5,6,8
257:2
**changed** 22:20
28:6 57:4
139:21 141:13
147:2 182:11
218:1,2
**changes** 20:13
20:18 29:7
66:4 136:8
137:15 254:3
254:12
**changing** 65:3
173:17
**characterizati...**
110:3,5 111:12
121:12 179:2
**characterize**
222:17
**charge** 30:8,10
41:17 85:9,13
85:21 124:11
125:5 130:4
136:8
**charged** 11:24
12:2 89:20
**charging** 89:17
**Charles** 122:7

**Charlie** 248:15
249:23
**chart** 4:11 49:19
61:11 67:2,19
69:11
**charts** 89:24
**Chase** 13:9
**check** 33:24
**checking** 101:8
**Chicago** 2:19
**chief** 17:5 18:11
62:2 211:14
**child** 120:18
**choice** 29:1 40:7
**circumstances**
97:22
**City** 21:19
**Civil** 1:4 6:10
**clarification**
25:15 26:2
129:22 161:23
186:11
**clarify** 9:17 30:7
38:12 43:22
53:3 69:9
135:19
**clarity** 48:4
**class** 26:6
**classified** 229:19
**clause** 29:9
**clauses** 202:20
**clear** 9:14 14:12
17:20 25:18
40:1 93:11
101:4 177:4
**clearly** 137:3
246:17
**Click** 248:4
**close** 44:21
217:13 226:10
**closed** 114:9
213:24 236:14
**closing** 104:7,8
**CNT** 243:3,4
**code** 195:8
229:13

**coded** 227:3
**codes** 188:12
190:24
**coin** 228:17
**collateral** 23:15
77:2
**collateralized**
76:21
**collect** 27:9 65:5
69:6 79:10,11
144:15 199:1
215:3 230:12
230:16
**collected** 12:11
12:19 13:2,11
31:23 32:14
133:3 232:7
244:24 251:7
251:18 252:12
**collecting** 36:2
42:2,18 87:18
134:1 176:8
197:14 198:5
201:19 205:23
230:7,15,20,23
**collection** 12:3
16:21 18:18,21
19:9,17 29:13
54:3 55:13
73:18 85:19
86:18 90:21
129:23 162:19
163:14,24
169:17 181:20
188:19 189:9
192:9 196:10
196:12 211:3
214:7 216:15
221:23 222:1
226:24 234:17
**collections** 19:3
39:20 44:3
68:24 86:17
193:24 196:3
222:9 252:23
252:24

**collective** 151:12
**collector** 16:17
21:3,5 63:9
64:18 69:23
70:11 72:23
73:4 79:7
151:13 159:10
173:17 175:24
186:17 193:11
193:17 194:7
195:5 205:19
205:21 219:22
223:5 231:8,12
231:20 232:9
232:14 241:15
241:16,22,24
242:2
**collectors** 44:4
68:23 69:22
73:7,9,10
103:16 144:14
173:20 174:5
175:13 194:15
194:17 195:1
196:19 200:10
201:20 229:22
**column** 188:13
242:13 243:21
254:4
**combined** 238:9
251:5
**come** 10:21
27:14 51:3
53:23 71:18
86:5 120:10
126:19 127:3,4
142:9 148:18
188:3 236:2
**comes** 221:14
**coming** 24:2
27:7,8 71:24
90:20 91:10
99:11 103:1,17
142:2 147:3
226:14
**comment** 10:8

95:10 123:22
132:15 138:23
185:7 227:10
**comments** 8:8
**commission**
255:19 256:22
**commit** 170:14
**committed**
30:10
**committing**
112:4
**common** 49:10
49:11 84:17,19
90:4 108:18
112:1
**Commonwealth**
1:2 6:15 7:13
**communicated**
220:7
**communicating**
81:1 155:17
175:8
**communicatio...**
189:4,6 196:1
**companies** 28:7
52:9 144:1,4,8
221:16 224:2
224:12 247:23
**company** 7:16
11:19 12:8
15:15 16:2
17:4,8 18:2
21:21 23:2,3
24:20 26:13,23
30:18 31:6,17
33:3,4,5 34:1
34:14 35:20
36:17 37:9
38:22 40:5
42:23 45:2
48:16 50:3
55:1 60:8
61:14 62:10
67:4 69:5
73:19 74:20,23
75:24 76:2,14

UNSEALED

81:12 82:24
92:14 149:12
151:3 162:22
163:5,14 177:6
199:22 209:20
209:21 210:17
210:21 222:7,7
222:8,8 224:5
224:11 226:8
233:1
**company's**
11:21 25:1
27:19,20 40:13
88:7 196:9
**compare** 126:16
**comparing** 14:9
**competent**
254:18
**complained**
220:16
**complaining**
197:19
**complaint** 71:19
72:11,22,23
149:8,12 152:8
152:20,22
175:12 185:19
186:3 188:7
193:5,21
195:24 196:2
198:1,7 200:22
219:18 220:6
220:15 221:9
222:22
**complaints** 32:2
72:2,4,5,6,8,10
148:23 171:3
175:23 183:19
185:10 186:13
188:3,10,10
191:6 195:21
197:18,23,24
198:12,16,17
198:19 199:7
199:11 204:7
204:10 220:8

225:13
**complete** 11:3
150:15 171:3
**completed** 47:9
173:23
**completely**
236:10
**completing**
180:2
**compliance** 5:16
39:22 46:4
50:15 51:18,22
51:22 59:17
71:10,10 72:7
72:14,20 73:13
141:3,6,7,8,17
141:21 146:22
148:20 149:11
152:9 164:24
165:8 166:5
168:10,14,21
169:12,20
170:16 171:9
172:15,22
178:5,8,13,24
180:6 181:15
187:24 188:4
191:13,15,17
192:12 195:10
**compliant** 20:4
167:11
**complicating**
19:24
**complies** 49:2
**computer** 70:22
132:4 184:7
**concentrated**
138:11
**concern** 28:11
41:12,13
173:12,13
**concerned** 43:8
138:8
**concerning**
203:5 222:22
231:21

**concerns** 60:1
138:6,18
**concluded**
253:22
**concludes** 74:3
134:15 203:11
253:18
**conclusion** 32:8
142:10 199:19
**conduct** 50:24
222:1 223:3,4
**conducted** 50:4
146:5
**conference**
54:10
**confidence** 20:5
171:8
**confident** 202:8
**confirm** 8:1
11:12 15:10
74:21 104:23
**confirmed**
213:24
**confirming**
82:11,23
**confused** 60:23
98:9 228:10
232:12 244:3
**confusion**
161:17
**connect** 100:16
242:19
**connected** 79:17
101:14 178:5
246:21
**Connecticut**
21:20 31:7
45:13
**connects** 110:7
133:18
**consent** 32:11
**consequence**
159:3
**Consequential**
159:9
**consider** 12:15

13:22 14:10
25:20 33:15
38:8 52:3 70:6
166:12 236:23
241:20
**considered**
12:19 13:18
31:18 40:7
189:23 248:21
**consistent** 40:17
**consumer** 12:1,2
12:7,9,12 13:3
13:3,12,16
14:6,21 16:5
22:9 25:11,17
25:22 26:6,10
36:15 37:4
39:11 45:3,14
57:9 58:19
59:10 65:8,9
66:9 69:4,5
72:6,10 78:6
79:12,15,19
80:2 87:9,15
98:2,7,8,10,21
131:8,12,19
132:1 149:9
175:4 176:6,8
186:3 192:3,4
192:24 193:10
193:18,18
194:8,9,19
195:15,16
196:7 198:7,13
204:24 205:2
210:4 219:21
219:23 220:8
223:9 224:18
225:8 229:24
230:16 231:3,8
232:21,22
234:4,18,21
235:7,22
236:21 241:17
241:18,23
242:1,1,3

243:24
**consumer's**
224:24 231:15
231:23 232:1
**consumers**
32:13 41:11
70:15 98:16
175:2,14
176:13 189:12
204:7 220:2
230:17 240:11
245:15
**contact** 81:5
135:22 143:15
145:22 150:6
160:23 161:5
161:20,24
162:2 198:22
198:24 209:21
**contacts** 225:9
**contain** 255:13
**contemplated**
83:6
**content** 131:7
**contents** 40:12
**context** 87:12
118:18 184:14
212:1 251:8
**contingent**
212:6
**continue** 21:9
27:13 170:17
234:8 237:17
**continued** 3:1
36:16 37:19
170:22 234:21
236:1
**continuing** 27:9
101:2 115:15
252:15
**contract** 29:3
30:12,21,23
51:11 92:15
96:13 97:3,18
100:20 119:18
127:20 142:5

UNSEALED

146:7 151:8
153:10 155:12
155:13 159:15
166:14 190:16
195:12,16
203:2 208:11
**contracted**
81:12 83:1
84:13 151:3
**contractors**
150:15
**contracts** 28:16
29:10 40:7
68:10,11,11,12
94:5,22,24
95:7,22 96:18
96:23 108:5
126:12 127:13
127:15 128:13
131:19 144:11
144:17,18
145:16,21
151:23 170:7
202:21
**contractual** 79:2
**contractually**
27:15 129:1
**control** 255:12
**controlled** 60:8
**convention**
212:3
**conversation**
43:14 58:21
60:4 175:24
193:10
**conversations**
42:23 43:11,20
57:7,13 169:16
**Cooper** 221:22
**coordinate**
68:10
**copied** 183:11
**copies** 116:14,22
159:18 182:21
**copy** 5:10,11
112:19 121:5

122:19 123:22
142:23 143:14
155:7,9 187:10
187:12
**corner** 48:11
80:16 140:13
**corporate** 15:16
55:8
**correct** 32:4
37:17 44:19,22
44:23 45:18
49:16,17 50:9
54:15,16 55:3
75:1 82:1 89:6
90:3 92:7,22
93:14 95:20
96:10,11,19,23
97:2 98:8
101:22 103:1
104:9,18,22
106:20 107:8
109:8 110:22
111:1 115:13
118:9 119:15
123:16 124:2
125:12 126:20
130:6 143:5,11
143:17,20
144:16 145:9
145:10 153:1
157:12 161:7
163:3,8,9,11
163:16 165:9
165:10 166:2
180:7 181:18
181:22 182:6,7
182:15,24
183:5 191:20
191:21 192:1
197:12,16
199:24 204:9
204:17 214:10
214:20 216:5
216:23 219:19
219:20 227:3
227:10 228:1

229:15 231:9
232:19 233:23
240:17,22,24
242:24 243:9
244:4 245:15
255:13 256:3
**correctly** 111:4
168:12
**corresponding**
121:23
**cost** 33:12 65:23
65:24 66:1,4
**counsel** 6:18 7:4
7:12 40:4,13
43:5,10 58:2
72:13 95:5
120:12 161:15
177:2
**count** 55:20
**counterpart**
94:5
**counts** 56:5
70:10
**couple** 22:4
**course** 10:15,17
12:12 13:1
14:7 16:3
21:10 22:19
29:18 30:24
31:17 33:13
34:13 50:11,12
115:12 118:19
124:8 148:18
182:12 195:3
200:19 224:1
225:2
**court** 1:1,15 6:9
6:19 8:10,19
9:8 219:12
254:21 255:3
**courtroom** 8:21
**covered** 11:16
118:8 154:9
166:17 225:16
**covering** 242:7
**covers** 227:2

**cradle** 224:9
**Craig** 204:21
205:3,5,7,10
209:21
**create** 133:22
194:20
**created** 73:17
75:6 183:21,24
214:22
**creates** 224:16
**creating** 19:22
**credit** 3:10 7:17
11:8,22 12:21
13:5,7,8,12
14:1,2,13,19
16:7 22:14
23:8,9 25:6
28:8,20 29:4
29:23 30:11,16
33:19 36:19
38:2 48:21
49:12 50:8
51:7,10 58:24
87:9 130:22
145:3 195:22
196:15 201:14
230:21 244:1
**creditor** 92:10
**creditors** 84:17
**criteria** 35:2
57:9
**CRNT** 243:6
**Cross** 212:24
**curious** 66:8
132:8,19
157:22 220:24
221:4
**current** 17:3
75:8 114:16
174:15 227:19
233:24 234:3
243:1,2,3,3,15
245:16
**curves** 64:24
**customer** 213:18
**customers** 87:13

236:5 246:7
**cut** 247:1

**D**

**D** 4:2
**daily** 90:21
**data** 65:10
129:16 132:8
132:11,20,20
132:23 176:17
177:1 181:20
181:20,20
183:10 226:14
**database** 186:16
**date** 6:11 55:19
57:1 110:14
114:11,12
124:5 130:5
144:1 155:8,9
166:24 179:19
185:2 240:6,8
241:3 254:9
**dated** 101:17
123:15
**dates** 130:5
136:9
**dating** 57:5
**DAUGHERTY**
3:8 16:10
22:17 24:12,17
25:13 26:17
28:3 30:4
31:10 32:6,19
33:9 34:10
35:10 36:3
37:5 38:10,24
39:13 40:9
42:5 43:2 45:4
45:16 46:1,16
49:21 53:1,12
57:23 60:15
62:19 66:14
67:12 71:14
73:22 78:10
79:22 81:18
82:2,14 84:1

UNSEALED

87:1,22 88:11
91:14 92:2,19
93:1,10 95:4
96:20 97:7,15
99:13 100:1,7
100:12,22
101:23 103:2
104:10 106:8
106:21 107:9
108:11 110:2
110:16 111:11
114:6,24 116:4
117:11 118:10
118:23 120:11
121:11 122:13
123:5,10,23
124:21 125:6
125:18 128:6
128:21 131:9
132:24 133:11
134:4,10
136:18 140:3
143:1,18
144:21 145:17
148:14 149:21
154:23 156:15
156:23 158:21
159:7,22
160:10 161:1,6
161:11 164:6
164:21 166:19
167:17,22
168:16 170:2
171:12,24
172:8 174:19
177:2 179:1
182:16 183:20
197:8 198:9
199:18 200:2
200:24 202:13
205:14 207:9
207:17 209:11
210:5,12 213:3
213:7,13
214:11,16
218:24 220:11

222:10 223:11
224:21 227:4
227:16 229:7
230:8 231:5
234:10,24
235:4 236:6
237:3 238:1,10
239:6,8,21
240:14 241:6
243:5 245:9
246:23 247:12
248:16 249:11
251:1,12,20,23
252:16,20
253:10,16
**David** 1:16 6:6
**day** 10:17 35:14
85:9 130:9
136:16 148:22
196:19,19
207:5,5
**day-to-day**
21:24 22:2
44:9,10
**days** 86:17
137:2 143:24
165:9 254:22
**DC** 3:4,9
**deal** 21:21 55:22
62:7 83:6
104:8 173:24
178:7 196:19
**dealing** 53:20
88:9 118:2
169:17 219:11
**dealings** 106:20
168:6
**deals** 125:2
**dealt** 44:9 87:21
**debt** 11:23 12:24
14:21 18:17
19:8 20:18,24
22:9 23:11,15
23:20 24:2,8
24:10 26:6,11
27:4,14 28:10

30:17 35:21
36:19 37:4
39:11 45:3,14
45:24 49:14,14
51:4 54:21
57:10 61:22
66:9 69:6 75:7
79:5,13,21
80:4 81:6,9
84:15,18 86:19
87:16 90:1
91:22 107:1,13
108:4 112:7
113:22 119:4
131:8 136:16
137:23 138:7
138:13,18
144:15 155:19
157:11 158:8
188:5 191:8
192:6 194:4,12
196:14 199:3,6
201:22 202:4
202:11,11,16
202:18,21
203:6 205:23
206:2 207:13
209:20,24
210:1,4 212:3
216:8 219:11
222:5 223:8,9
223:16,24
224:13 230:11
230:16,22
236:22 240:9,9
240:13 242:14
242:23
**debts** 89:20
175:18 176:15
247:19
**deceased** 98:18
130:13
**December** 83:12
83:14,20 104:7
105:5,6 108:23
108:23 215:20

244:5 245:5,6
246:1 247:4
**decided** 35:21
**deciding** 47:11
**decision** 42:13
42:22 44:14,16
44:17 59:14
73:11 217:17
219:3,4 226:23
246:2,4,5,9
**decisions** 21:10
61:2
**DeCray** 163:7
**defendant** 2:10
11:8
**Defendants** 1:6
**defer** 179:24
**define** 222:20
**defined** 25:22
**definitely** 201:3
**definitions**
70:24
**definitively**
34:17
**degree** 61:6
**Delaware** 91:13
92:16 94:17,21
96:3 97:3
220:20
**deletions** 101:9
**delinquency**
136:10 137:1
**delinquent** 12:5
230:6
**deliver** 94:5
107:5
**delivered** 92:16
119:19 122:16
122:18 142:6
146:24
**delivering** 120:9
129:15
**delivery** 126:10
**Delray** 221:22
**Denise** 213:18
**department**

42:1 64:23
65:12 129:20
149:11 151:11
**depending**
176:23
**depends** 66:17
**deponent** 6:18
**deposed** 7:22
**deposing** 254:20
**deposition** 1:11
6:8,13 9:2 11:2
25:15,23 62:21
67:14 125:8
230:9 245:17
249:12 253:11
253:18,21
254:1,2,10,14
254:23 256:1
**depositions**
47:18
**describe** 11:21
78:20 196:3
**described** 7:24
34:7 37:23
45:23 77:17
109:21,24
144:13 166:5
229:14
**describing** 41:1
46:11 56:19
78:20
**description** 4:10
5:4 25:9 75:22
83:17
**descriptions**
34:22
**designed** 73:13
**desist** 189:22
190:20 195:17
196:4,17 245:2
**detailed** 49:19
52:10
**determination**
44:24
**determine** 158:7
**determined**

UNSEALED

115:8
**determines** 97:4
**develop** 21:5
**developed** 171:8
**developing** 20:2
**development**
64:15 99:8
**dial** 69:12 70:12
**dialer** 69:14,18
69:20 70:1,8
70:20 71:1
152:7 183:18
184:2,2,3,10
184:14,17
185:6
**dialers** 69:16
**dialing** 70:14
**Dick** 61:13
**difference** 190:1
191:11 210:23
211:2 244:23
**different** 12:12
13:11 23:8
28:13 31:13
55:2 71:1
77:24 86:4
92:10 93:20
98:19 105:22
107:21 112:12
143:13 149:4
149:15 155:5,9
162:3 173:22
174:6 176:15
176:19 185:14
188:10 190:11
190:22,23
191:23 193:2
215:1,16 224:7
224:17 229:5
237:9 240:12
**differentiate**
39:7
**differently**
39:17 112:17
**differs** 131:15
**difficult** 20:20

21:1,8 224:17
225:1
**digits** 14:14
**Dilbeck** 205:7
**diligence** 4:12
5:19 33:6
38:21 45:22
49:13,13,15
50:3,4,7 51:9
52:12 53:24
74:15 209:6,19
**direct** 79:6
133:15
**directed** 226:20
**directing** 133:12
226:21
**direction** 28:9
29:15 42:10
49:15 63:6
82:8 255:12
**directionally**
109:10
**directly** 53:10
54:11 98:3
117:7,16 127:3
127:17 152:18
154:4 198:13
225:16
**director** 17:12
18:5 38:18
64:3,10,12
67:2
**directors** 56:15
56:22,23 71:12
71:18
**directs** 10:2,11
**disagreements**
62:18
**disc** 131:23
**disclosure** 152:3
**discontinued**
171:15
**discover** 46:13
**discovered**
46:19
**discovers** 96:18

**discovery** 48:5,9
144:2 246:15
246:16,19
**discuss** 54:2
225:20
**discussed** 34:3
58:18 139:24
140:1 158:24
**discussing** 25:12
135:21 136:4
164:24 206:12
212:4 249:3
251:19
**discussion** 25:4
28:12 57:17,22
60:19 81:8
135:8 136:23
179:20 180:5
194:17 217:11
244:18
**discussions** 43:5
43:7,9 57:15
58:5,5,23 59:1
59:3,5,14,16
59:21 61:4,8
61:10 107:16
157:16 165:7
246:9
**disorder** 10:24
**displayed**
244:12
**dispute** 188:5
189:22 190:11
190:13 191:7,7
191:9 194:13
194:14 195:8,9
195:24 196:4
196:10,13
200:14,16
245:1
**disputes** 192:5
196:17,22,24
**disputing** 98:2
192:20 199:11
**distinction** 71:8
**distinguish**

25:19
**District** 1:1,1
6:9,9
**DIVER** 2:2
**division** 16:18
**divulge** 40:12
**document** 47:22
48:5,18,23
49:6 73:21,23
74:14,18 75:5
80:6,14 82:19
90:22 95:2
98:23,24
100:21 102:12
102:15 103:3
105:4 109:2
110:9 111:12
112:17 120:7
120:17 121:4
122:5 123:18
124:1 135:3
141:15,16
142:8,11,19,23
157:5 161:13
162:14 163:19
164:19 166:20
166:23 178:6,6
182:10 183:2
183:22 203:22
208:20 212:22
213:5 214:12
233:15 241:7
**documentation**
99:8 113:15
117:7 148:23
**documented**
34:18 39:3
46:5,22,22
47:3 141:8,11
186:14 198:19
**documents**
47:15 48:8,15
49:8 68:5
69:23 74:16
99:20,23 100:6
101:5,13

109:13 115:16
115:23 116:2
116:15 117:16
123:20 138:5
142:4 143:17
147:1 153:20
154:12,22
161:4 178:4
180:21 203:4
219:11
**DOCX** 183:3
**doing** 34:1,14
38:22 49:12,14
51:15,16 53:8
107:2 120:8
122:4 125:12
130:1 137:8
150:18 157:11
169:7 214:7
216:15 227:11
227:14
**dollar** 96:9
**dollars** 83:7,8
228:7 237:23
238:8 239:3
240:13,20
243:14 252:19
**domestic** 18:8,9
**dot** 28:6
**Doug** 221:20
**draft** 68:10,11
120:3,4,9
**drafted** 73:18
121:1
**drafting** 120:8
**drive** 186:1
209:8
**driving** 185:24
**drop** 152:18
**dropped** 128:15
**due** 4:12 5:19
33:5 38:20
45:22 49:13,13
49:15 50:2,3,6
51:9 52:12
53:24 74:15

UNSEALED

170:24 179:19 209:6,18
**duly** 6:24
**dumped** 153:17
**Durham** 80:24 81:11
**DVD** 74:3,10 134:15,22 203:8,11,18
**dwindled** 217:12

**E**

**E** 4:2,8 5:2 255:1,1
**e-mail** 5:6 80:21 80:23 82:7,10 82:20 83:11 84:8,12 85:8 85:23 89:2,7 89:12 90:6 92:23 93:4,12 93:15 105:5 109:2,8 110:7 110:14 112:18 113:13,18 114:11,12,22 115:16,19,24 116:5,7,11 119:8,10 120:16,18 135:5,11,14 137:14 140:1 153:19 155:3 155:16,16,18 155:19 156:11 156:17,17,20 157:15 164:18 164:24 165:18 165:20 168:19 170:12 181:8 181:12,23 191:19 201:6,7 203:24 206:9 207:1 208:4 214:14 226:7

226:14,17 233:17 237:18 239:12 241:1 241:12 244:13 244:16 246:1 246:24 247:2,2 247:5
**e-mails** 4:13,14 4:16,17,18,20 5:9,13,17,18 5:20,21,22,23 5:24 80:19 102:23 103:6 104:13 108:24 117:14 121:23 156:2 165:14 217:24 237:7
**earlier** 27:17 51:12 52:17 53:15 54:17 91:20 117:8,19 140:12 153:10 159:1 202:17 207:4 221:2
**early** 21:7 35:23 50:13 68:21,21 68:23 75:7 85:13 86:7,14 102:14 117:21 153:9 166:9
**Eastern** 1:1 6:9
**easy** 22:1 158:5 215:5
**educate** 80:1
**effective** 143:24
**effectively** 144:14,19 152:23 227:19
**efforts** 169:7 199:21
**eight** 12:17
**either** 15:23 40:13 45:15 50:10 116:1 127:13 148:13 156:7 165:4

184:18,22 193:11 196:7 214:6 232:21 236:11 242:1 245:16 247:18 251:4
**Elastic** 228:4
**electronic** 126:14,16 127:21 128:5 129:3 131:22 195:12
**electronically** 131:23
**Elevate** 125:14
**elevation** 18:4
**eligible** 69:2 232:7
**Elsey** 213:22
**eluded** 45:20 225:15
**Emmerich** 67:3 67:4 204:16 221:15
**emphasizes** 235:17
**employed** 6:7 64:9
**employee** 73:4 150:14 163:7 205:7
**employees** 16:24 63:1 77:17
**Encores** 224:5
**ended** 32:12 44:6
**ends** 183:2 200:14
**endurance** 10:15
**energy** 103:21
**engage** 12:3
**enhanced** 45:22
**ensure** 141:22
**enter** 101:20
**entered** 192:7

**Enterprise** 250:19
**Enterprises** 250:19
**entirely** 110:6
**entities** 72:17 146:12
**entitled** 64:2 110:10
**entity** 75:4,6,8 76:5,18 158:24 191:20,23 207:1 211:4
**entries** 187:23
**entry** 189:20
**environment** 20:8 29:16 58:8 222:18 224:17
**equivalent** 142:11,23
**errata** 254:5,7,9 254:13,19 257:1
**error** 46:15 124:2
**escaping** 218:2
**ESQUIRE** 2:3,3 2:8,13,18 3:3,3 3:8
**essentially** 133:12
**established** 156:22 241:24
**establishing** 83:20
**estimated** 179:19 245:6
**et** 1:6 6:17 14:8 19:23 30:18 35:14 51:18 52:4 55:17 60:9 63:2 68:14 70:11,23 71:19 73:5 76:24 86:11

89:22 98:3,9 98:18 103:21 112:11 124:6 126:18 127:17 130:5,13,24 133:3 137:5 153:20 157:19 168:23 169:9 169:17 175:4 186:14,17,18 190:17 197:1 203:1 206:18 208:11 225:3 230:3 231:17 234:19
**ethical** 20:3
**evaluate** 33:17 34:3
**evaluation** 34:20
**evaluations** 34:14 45:23 47:8 64:18
**eventually** 119:14 154:8,9 213:22
**everybody** 28:11 60:10 90:19 171:17 225:3
**exact** 34:17 55:19 57:1 60:4 100:17 116:16 170:11
**exactly** 41:10 59:4 61:9 76:4 86:7 128:19 147:18 188:2 202:23
**EXAMINATI...** 7:6
**examined** 6:24
**example** 9:7 50:24 69:21 98:12 151:24 170:22 185:17 188:4 192:3 229:23 232:3

UNSEALED

examples 128:13
Excel 182:13
exception 125:13
excited 103:16 103:22
exciting 60:12 103:18
exclusively 118:21
execute 103:7 111:24 126:12 128:11 208:12
executed 68:18 115:22,24 116:20 122:19 123:18,20,21 128:12 142:20 153:16
executing 122:4
execution 5:10 19:22 121:5 142:23 155:7
executive 17:5 18:12 63:15 77:17 136:24 157:16
exhibit 4:10 5:4 6:2 11:13 47:22,24 48:4 54:23 56:6 74:6 80:10 88:21 89:1 90:1,24 91:6 99:3,22 100:13 101:9 102:18 104:1 109:16 115:5 119:17 134:18 135:1,2 139:7,12 142:14 154:19 162:8,13 164:14,20 177:23 178:7 180:9 181:4 187:1,5,7

203:14,21 206:5 208:16 209:4,7 212:18 215:9 219:6 225:17 242:6
Exhibit-73 110:17
Exhibit-75 114:3
Exhibit-76 114:19
Exhibit-79 122:22
Exhibit-82 142:22
Exhibit-84 161:19
Exhibit-85 161:8,24
Exhibit-98 226:3
Exhibit-A 166:14,18 171:9
exhibits 113:1,4 119:21 154:15 225:22
existed 39:5
existence 11:23 23:3
expand 55:20
expect 18:22 65:5 106:12,15 116:9 146:8
expectation 26:12 29:24 65:12,15,22 88:8 108:9 118:13,14 122:9,12,16 130:4 141:24 154:6 160:14 169:4 193:22 200:9,13 242:2
expectations 51:22 65:22

148:19 166:15 179:14,15
expected 30:13 49:24 50:1 66:5 141:5 150:22
expects 90:7
expensive 36:20
experience 60:9 108:7
experienced 21:2
experiences 86:16
expertise 84:23 138:15
expires 29:6 255:19 256:22
explain 9:16 31:8 41:15 72:19 164:18 178:22 191:10
explained 10:2 29:19 163:12 229:11,17
expressed 60:1
extent 101:3 159:17 171:7
eye 62:16,16 73:7,8
eyes 136:12

F

F 255:1
F-L-O-C-K 76:11
F-R-I-E-D-L 211:17
face 95:23 244:21,21
face-to-face 146:11 150:6
facilities 23:8
fact 108:2 119:14 124:10 133:17 135:17

159:19,19 166:4 196:8 231:2 232:16 234:8
factor 169:5
fail 184:17 185:6
fails 184:2,4,11 184:14
failures 19:16
fair 36:22 71:21 78:18 88:14 135:15 249:1
fairly 90:17 136:7 138:16 181:11 217:4,5
fall 200:15
familiar 72:16 77:6,20 80:19 96:14 140:21 144:4 147:20 147:21 156:5,9 168:6 182:9 184:13 185:12 185:18,21 186:7,8 187:22 188:13 204:4 209:22 211:16 248:19 250:1,4 250:6,16
far 39:7 43:7 61:9 73:16 75:1 118:15 124:24 125:1 157:17 186:19 217:9 236:1 244:20
Fargo 13:9
fashion 70:4,5 79:18 85:18
Fast 248:3
fate 73:12
Favel 147:19
feasible 98:8
February 114:9 115:18 120:4 121:7,15,16

123:15
federal 8:21 28:14 141:11 151:1
fee 106:5 144:12 235:9
feedback 138:3
feel 63:9 68:8 138:12 170:19 196:7 202:5 225:11 232:11
FELDMAN 3:8
felt 29:15 180:19
fence 107:17
FFW 233:11,21
FFWD 188:16 188:17 189:17 237:12,15
FICO 130:22
field 18:18 194:7
figure 177:1 194:19
file 23:15,20 27:4 126:12,16 126:18 127:21 128:14 129:16 129:17,17 130:3,6,9,11 130:19 133:7 133:22 235:18 244:14 246:17 247:6
filed 41:18 43:17 43:19 58:12 98:16
files 126:8 128:5 128:17 246:21
filing 254:14,22
fill 152:21 218:20
filters 244:17
final 5:11 155:9
finance 1:5 3:6 6:17 7:14 22:10 24:8 26:1,11 42:16

42:20 48:9,13
48:21 49:20
50:4,7,14,14
50:21,22 51:5
51:14 52:19,23
53:8 54:6,11
54:15 64:22
68:5 74:17
79:17 80:8
81:1,12 82:1
82:12 83:2
84:14 86:1,21
87:19 89:5
91:10,22 93:22
99:9 102:7
104:9 106:6,7
106:11,16,19
107:4,6 108:4
117:8,22
124:20 125:15
126:20 135:3
135:18 136:17
139:1 142:3
145:8 146:15
147:6 153:7
155:18 156:2
156:11 161:22
162:4 167:16
168:8,11,15
169:13 171:8
171:14 173:12
173:14 174:11
174:13,17
178:9,17
181:17,20
184:22,23
186:4 191:18
197:7 200:21
201:15 204:1
207:13 213:12
219:18 220:1,4
220:10,15,22
221:4,7 239:3
239:20 240:10
251:10,15,18
251:24 252:13

**Finance's** 92:17
117:5
**financial** 20:12
21:16 24:7
74:18 75:4,22
75:23 76:9,12
144:3 155:14
158:12,18
159:11 210:20
211:4,14 214:2
214:10 215:22
221:22 250:3
250:18
**financing** 21:13
76:15,17
**find** 36:20
165:16 195:13
224:24
**fine** 9:15,18
11:18,18 63:23
71:23 78:17
88:19 94:12,13
95:19 116:4,20
156:8,10
157:22 158:4
165:17 172:12
191:2
**finish** 10:9,20
219:11
**fired** 62:12
**fires** 19:22
**firm** 116:13
**first** 6:24 11:5
13:15 22:21,24
23:1 49:1
54:24 80:23
81:23 82:7
86:5 91:12
92:15 93:14
94:16,20,20
96:3 97:2
102:13 105:4
110:23 111:2
112:3 119:11
122:23 124:3
137:17 146:4

146:10 155:7
155:11,22
157:13,14
162:19 165:19
173:4 180:17
188:4 189:21
191:14 192:4
209:6 220:20
225:7 226:4,11
227:14 233:18
246:12 252:10
**FIS** 151:4
**five** 14:7 20:10
20:16 23:7
24:4 41:19
151:15 156:16
210:19 237:23
248:20
**five-page** 156:17
**flip** 63:15 64:2
71:8
**Flock** 76:8,11,12
**floor** 2:9 6:14
169:17 188:23
189:7 192:9
195:9 226:24
229:13 245:1
**flow** 23:23 27:3
27:6,11 29:4
29:17,21 30:2
30:9,24 31:1
68:12 83:13,18
99:17 100:20
100:21 101:11
101:20 102:14
102:24 104:8
104:12,14
108:22 109:14
109:21,23
111:7,16,20,23
112:5,10
113:23 114:21
115:8,11 118:5
118:9,19 123:9
135:10
**flows** 27:14

**focus** 12:6 21:23
25:3 36:21
44:2 53:15
**focusing** 19:23
93:8 223:6
**folks** 23:9 28:19
44:11 51:2
84:23 146:18
146:20 153:12
153:13 169:10
201:13,15
211:19
**follow** 82:10
235:8
**follow-up** 22:5
**following**
215:14 225:4
254:7
**follows** 7:1
**foregoing** 255:6
255:10,13
256:1
**forever** 224:10
**forgotten** 237:20
**form** 14:3 16:11
22:18 24:13,18
26:10,18 28:4
30:5 31:11
32:20 33:5,10
34:11 35:11
36:4 37:6
38:11 39:1,14
42:6 45:5,17
46:2,17 49:22
52:20,24 53:2
53:13 60:16
66:15 71:15
78:11 79:23
81:19 82:3,15
84:2 87:2,23
88:12 91:15
92:1,3,18,20
95:5 96:21
97:8,16 99:14
101:24 102:9
104:11 106:9

106:22 107:10
108:12 114:1,7
115:1 117:10
117:12 118:11
118:24 120:12
121:10 122:14
123:11 124:22
127:6 128:7,22
131:10 132:14
136:19 140:4
143:2,19
144:22 145:18
148:15 149:22
149:23 150:19
158:22 159:8
159:23 160:11
161:2 164:7
167:18,23
168:17 170:3
171:11,13
172:1,7,9
174:20,21
175:9 182:11
188:6 190:20
190:22 191:8
192:16 194:14
197:9 200:3
201:1 202:14
205:15 206:20
207:10,16,18
209:12 210:6
210:13 213:14
219:1 220:12
222:11,12
223:12 224:22
227:5,17 229:8
231:6 234:11
235:1 236:7
237:4 238:2,11
238:13 239:7,9
239:22,24
240:15,23
241:4,8 245:10
247:13 248:17
249:4 251:2,13
251:21,22

UNSEALED

App. 0375

252:14,17
254:3,6
**formal** 37:24
39:3 101:20
**formally** 34:12
57:3
**format** 130:3
**former** 7:15
35:6
**forms** 37:3 45:3
**forth** 136:3
**forward** 27:3,13
29:4,17,21
30:2 50:21
68:12 83:13,17
91:10 99:17
100:20,21
101:11,20
102:13 104:8
104:14,22
108:21 109:14
109:21 111:7
111:16,20
112:5 113:23
114:21 115:8
115:11 118:4,9
118:19 123:9
189:18
**forwarded**
165:18,22,23
165:23 188:18
188:19 235:16
247:3,4
**forwarding**
166:1 204:8
**forwards** 204:15
**foul** 175:24
**found** 187:10
**foundation** 20:3
**founded** 74:23
**four** 15:5,9 27:9
80:19 156:17
163:6 203:18
223:10 242:9,9
248:20
**frame** 103:12

**framed** 176:24
**frank** 28:6
**fraud** 197:1
**Friedl** 211:17
**front** 20:14
29:14 48:12
138:11 186:9
254:15
**Frontier** 204:22
205:12,19,21
205:24 206:17
206:22 207:7
207:14 210:24
211:3,19 212:6
212:11 214:2,5
214:7,10,21
215:6,22 216:3
216:6,12,15
217:19 218:1,2
218:3 221:3
**fronts** 39:16
**full** 171:2
182:21 236:18
236:19,20,23
**fully** 143:23
145:5
**function** 141:6
178:5 192:13
**functioning**
171:18 216:3
**functions** 26:5
64:15 70:9
**fund** 7:15 23:11
27:16
**funded** 23:6,17
26:23,24 27:2
83:12 129:7
**funding** 35:8
76:20,24
**further** 177:7
253:15
**future** 75:8
83:22 86:15
234:17 236:2
243:23
**futures** 243:21

243:22,23
245:12,18,24

### G

**G-U-A-D-A-G...**
212:14
**G-Y-L-L-I-N-G**
61:24
**gal** 147:12
**Galleria** 209:8
**game** 141:20
**GAP** 65:2
**gather** 75:23
**general** 7:13
41:4 42:1 58:2
82:6 131:11
150:2 169:5
174:8 179:9
223:24
**GENERAL'S**
2:8
**generally** 14:13
25:21 66:10
179:7 180:5
**generate** 65:11
133:7
**generic** 89:23
**generically**
90:12
**gentleman**
129:19
**gesture** 9:8
**getting** 38:2
58:16 59:10
60:23 86:9,11
89:22 90:8
106:11 109:6
117:6,15,17
122:9 127:24
136:16 189:10
189:11 198:11
217:11 220:5
235:9 237:22
246:14
**Gio** 145:8,11,14
146:3,14,19,19

153:8,11 154:4
155:23 160:23
161:4,21 162:5
162:6 168:5,5
**give** 14:23 54:2
54:3,6 102:15
139:14 149:3
154:19,21
192:3 249:24
**given** 74:13
169:21 170:5
173:23 256:2
**gives** 74:19
221:19 251:8
**giving** 11:2 42:2
55:1 195:2
**glance** 160:19
**Global** 218:4
**go** 10:10 28:10
30:14 42:11
47:16 54:23
62:10 67:6,7
71:19 88:17
90:22 95:10
97:10 103:12
115:3,4 119:8
130:11 135:20
140:15 147:18
160:15 166:17
184:19 186:15
190:12,16
192:8 200:17
200:17 224:4
227:7 230:6
235:13
**goal** 107:15
**goes** 13:6,16
126:7 190:3
195:11 213:22
242:21
**going** 8:6,6 9:20
11:13 14:7
20:19 25:24
28:10,23 34:5
35:21 42:11,15
47:14,15,16,17

47:21 48:7
52:2,6 56:8
61:6 66:10
73:20 75:16
80:7 86:10
90:14 91:12
94:23 95:22
101:1 104:6,22
108:10 112:21
112:24 115:14
119:18 129:1
132:6,16
136:10,13
138:14 140:12
154:21 159:4
162:12 181:10
187:19 193:1
193:19 198:3
199:9 214:5
249:24 253:1
**good** 7:9,10 20:3
20:10 74:1
78:4 98:5,6
134:9 199:4
217:16 242:4
243:8
**GOODWIN** 3:2
**gooey** 186:10,12
**gotten** 42:19
208:7
**grade** 151:12
**graded** 151:14
**grading** 183:14
186:15
**graduated** 18:19
**grand** 238:6
**grave** 224:9
**Gray** 221:20
**grayed** 230:3
**Great** 50:23
52:16 85:14
119:11,19
122:6 123:8
124:11 126:6
127:14 128:1
130:15 132:10

UNSEALED

134:2 137:21
142:11,24
143:14 144:18
145:16 147:24
148:2,4,6,7,13
148:24 149:14
149:16 150:7
150:11 152:1
153:13 160:8
170:1 173:20
173:23 176:9
176:22 182:5
191:14 192:5
193:1 197:5
218:15 228:5
236:4 243:10
246:6 249:7
251:15 252:1
**Green** 50:23
51:2 52:16
85:13 110:24
111:3 113:22
114:16 118:18
118:20 124:10
126:6 127:13
128:1 130:16
132:10 134:2
137:21 139:24
141:19 142:3,5
142:5 144:17
145:16 146:1
146:19,20
147:7,9 149:1
150:9 152:1
153:12 160:8
162:20 164:2,5
164:9 170:1
173:19,23
175:16 176:9
176:22 182:5
186:4 192:24
193:8 197:5
203:6 204:12
204:20 205:12
213:18 214:5,9
215:16 218:15

220:3 228:11
228:13 229:4,6
229:6 230:5,23
231:22,24
232:2,15,17
236:4 246:6
249:7 251:15
252:1
**Greens** 149:20
229:5
**Greg** 147:11
153:12 154:5
**grief** 42:2
**GROGAN** 2:2,3
**gross** 251:8
252:24
**grounds** 26:18
32:7 43:3
62:20 67:13
125:7 182:17
**group** 73:1 76:9
86:18 90:13
125:14 167:15
167:15 180:18
209:10,14
210:18 215:2
216:6 217:17
221:19 237:19
249:21
**grow** 21:5
147:17
**growing** 89:21
171:8
**Guadagna**
212:13
**guarantee**
219:14
**guess** 20:21 44:6
66:18 87:10
89:9 98:20
105:8 108:6
121:14 135:16
157:7 169:11
174:7 222:16
222:21 223:1
242:8

**guy** 54:20
226:14
**Gylling** 61:24
62:1 63:12
68:8 165:18
226:19 246:2

------
**H**

**H** 4:8 5:2
**H-O-C-H-S-T...**
35:4
**habits** 173:18
**half** 27:10 203:9
**Hall** 212:15,16
**Hallinan** 248:15
249:23
**halted** 203:1
**hand** 195:13
**handful** 217:7
251:5
**handle** 72:8
81:13 83:1
98:4,6,22
167:13 193:21
200:10
**handled** 16:7,8
16:12 63:1
68:19 193:23
**handling** 193:5
193:16 213:19
**hands** 202:5
**happen** 89:6
126:2,8 129:5
129:10 150:14
159:21 175:19
176:12 198:4
198:17,18
199:13 202:2
217:12
**happened** 27:24
28:1 36:11
102:14 119:14
176:12 197:11
197:17 201:4
201:23 226:16
**happening**

15:22 53:18
94:8 96:4
106:13 149:7
156:13 169:2
170:21 185:22
226:12,13
**happens** 126:10
**happy** 67:15
171:17 247:4
**Harbison** 102:6
**hard** 120:22
156:6 185:15
216:10 224:19
**harm** 232:20
**harm's** 34:5
**HAWS** 2:18
**head** 55:20 56:5
70:10 253:13
**headed** 29:16
**hear** 18:21
198:8 211:9
**heard** 204:3
206:17 210:21
210:22 249:18
**hearing** 10:24
59:20
**hedge** 7:15
**held** 6:13 17:6
18:10 41:22
56:20 58:6
74:24
**help** 63:20
**helping** 64:20
86:1
**helps** 27:6
130:21,23
**Henderson**
209:9,17
**hesitation**
157:10
**Hess** 179:22,22
180:21
**high** 14:1,2,3,19
16:5 21:2,13
22:9 25:11
32:18,22 37:2

40:23 45:3
57:9 58:19
66:9 78:5,21
210:4,9 223:9
223:18
**higher** 14:5,10
32:24 104:21
105:1 116:6,10
169:3 196:24
**highest** 107:7
**highlighted**
232:5
**Hilliard** 147:12
**hired** 17:10,11
17:12 18:2,17
63:24 84:13
144:14 196:9
201:19
**history** 131:14
131:17
**hits** 130:12
**HNIC** 249:19
**Hochstein** 29:3
34:15 35:2,3
37:1 46:15
47:10 54:19
57:8 61:22
81:2 82:11,24
89:11 199:24
246:2
**hold** 18:1 47:6
121:9,12
154:20 161:6
229:12 252:20
**holding** 189:1
**Holdings** 209:20
210:1
**honest** 153:15
185:20 245:20
249:15
**honestly** 53:17
54:8 55:18
56:24 67:24
94:19 119:3
123:12 189:16
202:15 206:1

207:19 223:14
251:3
**Horrocks** 81:5,7
81:16 82:10,22
84:5 85:5 86:6
86:19 87:6,13
88:3,8 89:10
89:10 92:17
94:14 99:11
104:7,8,20
105:8,18,19
106:5 113:19
113:20 115:17
115:21 117:14
119:9 124:15
125:17,21
127:1 135:23
142:7 153:18
155:17,23
165:23 178:17
186:20 191:18
200:23 206:11
209:3 213:16
218:17,21
220:10 252:10
**hosted** 70:16
**hour** 203:9
207:4
**house** 235:21
**HSBC** 13:4
**HSVC** 37:10
**Huston** 61:18
**Hutch** 16:19
**Hutchinson**
15:17 16:1,16
17:13 18:3,6
18:23 35:19
36:1 44:5
54:10 55:8
146:21 147:4
**hypersensitive**
174:18,23
176:4

_____
**I**
_____
**iackelsberg@l...**

2:6
**IC&D** 190:19
191:9
**idea** 138:6
162:16
**ideas** 162:17
**identical** 116:16
143:17
**identification**
6:3 48:1 74:7
80:11 88:22
91:1 99:4
102:19 104:2
109:17 113:5
119:22 134:19
139:8 142:15
154:16 162:9
164:15 177:24
180:10 181:5
187:2 203:15
206:6 208:17
212:19 215:10
219:7 225:23
**identified**
130:15 173:1,5
196:23
**identify** 64:20
98:16 130:23
145:7 227:13
229:22 231:13
**identifying**
202:8
**IDSP** 191:6,7
**illegal** 198:3,15
200:12
**Illinois** 2:19
**illness** 10:24
**immediately**
131:23 234:19
**imminent** 103:5
**impact** 86:10
**implying** 115:23
**important** 9:4
21:22 23:24
38:9 137:6
180:19

**improper** 222:1
222:1
**improperly**
219:22
**improve** 169:7
**improved** 51:23
**inactive** 133:2,8
188:24 189:24
190:8 229:14
232:4 240:21
244:8 247:20
**include** 93:6
99:22 181:9
183:5 237:20
248:13
**included** 99:23
101:9 102:22
181:9 217:22
227:23 247:11
**includes** 191:19
248:2
**including**
112:22 113:14
115:21 158:12
210:3 226:8
239:13 251:9
**income** 27:7
**Incorporated**
6:17
**increase** 37:19
38:6 105:9
136:14 137:1,4
**increased** 51:23
**increases** 20:24
**indication** 177:6
**indirectly** 55:14
**individually**
54:12 136:21
**individuals**
115:21 156:1
**indulge** 8:3
**industries** 19:19
**industry** 19:9
20:22 23:9
27:21 29:13
30:7 49:12

51:20 63:13
68:20 84:16
88:6 92:13
94:4 138:10,17
141:2,13
212:10
**ineligible** 96:13
96:18 229:23
**inferences** 34:23
**inform** 69:4
79:12 175:2
196:21
**informally**
34:14
**information**
48:20 51:17
52:10 56:12
74:19 90:20
130:3 138:5
149:2 171:1
186:1 189:5
204:24 207:6
208:8,22 209:1
213:17 221:13
221:14 226:21
231:3,7,16,21
231:24 232:8
232:15,24
233:4 242:9
**informed** 59:24
192:17 225:8
**informing**
195:14 219:4
**inherited** 55:14
**initial** 16:1 81:5
89:4 96:2
111:18 112:4
123:8 124:7
147:11 226:5,6
226:6 233:17
237:21
**initially** 66:17
73:17 84:8
117:7 146:4
**initials** 228:21
**insinuate** 235:24

**installment**
12:21 13:23,24
14:18 16:6
25:6 32:18,23
37:3 40:24
83:9 91:11,23
92:6 93:8
94:15,15 96:5
99:19,24
101:21 108:21
108:22 125:3
208:2
**installments**
30:9 118:16
**Instant** 250:8
**institute** 45:21
**instituted** 37:24
**institution** 128:2
**intended** 231:20
**intense** 196:1
**intensive** 27:18
**intent** 99:18
101:17,19
145:1,2 196:12
**interacting**
52:19,23
**interactions**
156:3
**interest** 14:3,9
19:5 78:21
95:11,14 112:6
223:19
**interesting** 19:1
**interface** 186:11
186:12
**interject** 40:10
**intermediary**
87:7
**internal** 44:3
72:12 186:9
188:20
**internally** 43:10
149:10 151:17
151:18 152:10
165:7 189:17
**internet** 12:20

UNSEALED

App. 0378

78:19 87:4
132:4
**interpret** 9:6
244:3
**interrupting**
25:14
**intertwined**
76:22
**interviewed**
18:24 19:11
**introduced** 7:11
**inventory** 77:19
78:7
**investigated**
149:10
**investment** 66:2
66:6,21
**investor** 61:14
62:4 211:6
**investors** 22:15
**invite** 167:4
172:5
**invited** 54:1
168:2
**involved** 43:7
50:14 59:10
61:16 85:18
117:22,23
121:21 173:15
206:20 208:14
221:2
**Irv** 2:3 7:12
73:22 110:2
113:7 133:11
154:23 156:15
243:6 246:23
251:24 252:20
252:21
**island** 15:20
**issue** 97:5
246:14
**issued** 33:23
175:5
**issuer** 29:4,23
30:1,11 33:18
38:2 49:12

51:10 53:23
87:19 97:23
98:3,4,17
112:3 138:10
145:6 152:2,6
174:1 175:3
186:4,20
195:22 196:21
197:2 201:14
218:19,19
238:20,21
**issuers** 28:8,16
28:20 29:8
51:6,7 58:24
59:3 84:21
85:2 87:8
108:5,8,9
152:19 175:11
175:12,22
199:2 202:19
224:14
**issues** 121:18
157:8 175:23
**italics** 235:17
**item** 124:2 173:4
**items** 166:17
172:24

___

**J**

**J** 2:3,18
**Jack** 226:7,15
226:17,21
227:11 229:11
233:18 235:15
237:7,19
239:13
**Jamaica** 15:19
15:20,23 16:17
16:20 17:19
44:7
**January** 67:17
109:7
**Jaselli** 211:21
212:8
**Jason** 102:6
jboughrum@...

2:16
**JC** 228:13,13,13
228:16,22
229:5
**Jeannine** 1:15
6:20 255:3,18
**Jefferson** 3:9
**JENNY** 3:3
**Jeweler** 230:1
**Jewelers** 13:8
37:10 175:17
**Jo** 147:19
**Joan** 204:1
213:12 215:15
219:17 220:1
221:4
**job** 18:24 68:6
72:2 73:12
122:11
**JOHN** 2:3
**Johnny** 228:20
**join** 56:22
**joined** 57:16
**JONATHAN**
2:13
**Josh** 6:16
**Juliani** 221:24
222:2
**July** 178:14
**jumped** 100:2
**June** 17:19 62:3

___

**K**

**K** 3:3
**Kansas** 15:17
18:23 54:11
162:21,24
**KAPLAN** 1:21
**KATTEN** 2:18
**keep** 89:20,21
224:10 233:24
234:22 235:6
**keeping** 47:19
73:7,8 219:12
224:8
**keeps** 89:22

**Ken** 2:15 7:15
69:14
**Kevin** 67:3,3
146:4,14,19,19
153:11 154:4
162:1,4 204:15
204:19,21
205:6,11
206:11 207:5
208:7,9,13
209:2 221:10
221:11,13,15
**key** 19:13,13,16
**kind** 9:7 12:7
14:21 24:15
37:2 38:8 42:8
45:14,20,22
65:8 79:4,9
87:6 92:9
97:22 158:19
175:8 183:10
193:15 220:17
223:3,4,8
**kinds** 14:19
40:21 44:14
83:24 92:13
166:16 230:16
**knew** 24:9 28:21
39:8 41:2
85:23 124:24
125:1 138:2
146:1 169:2,3
209:13
**know** 7:14 12:14
13:21 14:23
15:7 19:6,17
19:23,24 20:1
20:17,20 21:1
21:8,11,17,20
21:23 22:2
23:7,10,11,14
27:1,3,8,11,22
28:9,9,12,17
28:23,24 29:1
29:10,13,15
30:12,14,16,24

30:24 31:13,14
31:18,19,24
32:21 33:1,14
33:20,22 34:13
34:15,19 35:13
35:13,24 37:19
37:22 39:3,4
39:15,17,20,21
39:23,23 41:4
41:10,19,20
42:10,11,11,13
42:15 43:6,8
46:18,21 47:2
51:5,17 52:3,6
53:18,24 54:3
56:10,11 57:1
57:2 58:6 59:4
59:5,9,11,13
60:6,18 61:4,4
61:7 62:7 63:7
63:13 64:17,21
64:22 65:22,24
68:17 69:24
70:11,24 71:20
73:3,10 75:1
76:16,20 78:1
78:12,15,19
81:20 84:5,11
84:14,20 85:5
85:14,15,17
86:3,5 87:11
88:14 90:11
94:11 100:17
102:24 103:12
103:20 104:13
106:4,5,10,13
107:11 108:13
109:9 110:3
111:22 112:8
112:13 117:18
119:1,3,6
121:2,7,18
122:17 123:13
125:10 126:23
128:10,12,16
128:20,24

UNSEALED

130:12 131:15
131:24 132:3
135:13,16,24
136:7,11,20,24
137:5,6,7
138:4,12,14
139:3,16
140:24 141:1,8
141:10,20,21
145:11,19,24
151:19 152:19
154:1,5 155:23
156:1,3 157:4
157:15,18
165:2,4 166:21
167:6 168:19
168:23 169:19
172:11,14
173:13 174:2
174:10 176:11
180:13,17
183:13 184:16
184:16,24,24
185:6,24 186:5
186:21 189:15
189:16,16
190:19 192:15
193:24 194:2
196:2,24
197:21 198:16
199:1 201:11
202:6,21,22,23
205:3,19
206:15,16,16
206:18,21,21
206:22,24
207:20,21,24
208:3,14 209:9
210:23 211:2,7
211:12,19,22
212:15 214:18
214:23 215:4
216:7 218:7
219:2,23 220:4
220:4,5 222:24
223:13,14

224:7,9,13,20
227:12 228:14
228:18 231:9
231:12,18
232:22,23
236:15 237:5,6
237:10,11,14
237:19 240:7
241:11 243:4
244:10,24
246:8 247:9
249:15,16
251:4,4 253:8
253:12
**knowing** 86:12
225:2
**knowledge**
63:14 86:13
94:18 107:3
150:5 153:21
172:17 198:15
248:1,8,19
256:3
**known** 42:10
85:8 108:16
118:15 206:19
**Kramer** 144:2
188:7

**L**

**L** 25:16
**labeled** 142:22
164:20 228:16
**labels** 166:11
**lack** 10:24
**landscape** 28:6
**LANGER** 2:2
**large** 28:20 86:9
90:17 100:19
182:8
**Largely** 36:15
**larger** 84:24
**largest** 249:1,6
**Las** 209:16
212:3
**late** 20:23 170:8

202:3
**launch** 69:18
**laundry** 166:14
**law** 40:7 225:4
**lawyer** 7:24 9:24
10:7,8,11
67:20
**lawyers** 8:9
**layoff** 67:16
**leadership** 20:6
63:10
**leading** 202:18
**LEAMAN** 1:21
**lean** 82:8
**leap** 241:11
**learn** 103:15
112:14
**learned** 65:2
**learning** 52:10
147:16
**leasing** 157:18
**leave** 192:21
246:12
**Lee** 1:11 4:4
6:18,23 255:6
256:8
**left** 26:15 101:12
203:9 237:24
242:13
**left-hand** 238:23
**legal** 32:8 42:3
60:3 67:3,19
67:22 68:1,22
68:24 69:3
97:5 193:20
194:17 195:2,2
197:19 198:8
199:15,15,19
204:2 219:24
**legality** 33:7,17
199:11
**legally** 71:6
193:12
**legitimate**
133:16
**lender** 30:11,16

76:8 89:16
173:10 174:16
177:15 193:2
**lenders** 86:23,24
87:4,14,15
**lending** 37:16
51:9 52:17
59:9,10 122:6
124:11 128:2
132:11 134:2
137:21 142:12
144:18 160:9
170:1 176:10
176:23 182:5
192:5 197:6
199:15 250:18
**let's** 11:5,18
16:18 25:3
33:3 35:17
38:6,16,17,17
40:16 43:12
51:12 54:23
57:17 66:18
77:18 79:16
80:6 87:20
88:17 97:11
98:23 102:14
104:5 109:20
118:16 139:4
140:15,15
155:15 161:18
179:9 181:11
187:5 192:3,21
192:21,24
193:7 208:20
212:22 215:13
217:2 225:14
226:6 230:4,15
230:20 235:13
242:6
**letter** 99:18
101:17,19
192:15,20
195:14 196:13
211:8 225:7
**letters** 189:13,14

192:22 196:10
**letting** 237:19
**level** 21:3 28:14
57:16,21 58:18
58:22 59:16
64:18 75:4,21
75:23 76:18
141:12 155:14
158:12,18
159:6,11,20
160:1 169:3
175:18 211:5
**levels** 20:24 21:2
55:2
**Levin** 1:16 6:6
**liability** 28:12
162:22
**licenses** 33:20
33:21 38:4
**lifetime** 65:6
**likes** 218:18
**limited** 162:21
181:11
**line** 12:14,16,23
13:24 14:18
24:24 25:6
34:4 37:8,22
70:23 109:14
112:13 182:19
225:4 257:2
**lineage** 29:14
**lines** 12:21 13:2
13:4,8,12 16:7
22:14 70:11
72:9
**link** 176:13
**links** 176:14,14
**liquidation**
64:17
**list** 11:15 19:5
166:14 168:1
172:18 218:8
248:20
**listed** 76:5
100:16 129:13
129:14 161:4

UNSEALED

179:3 182:18
207:1 217:19
239:20
**listen** 73:1
151:12
**listened** 152:5
**listening** 94:3
**listing** 133:7
227:11
**lists** 144:1
227:22 228:2
**literally** 63:4
237:9
**little** 8:3 11:19
31:13 39:17
244:2
**lives** 230:21
**LLC** 3:11 75:4
**LLP** 2:18
**load** 129:17,21
**loaded** 130:8
**loan** 4:19,21,22
4:23,24 5:5
14:6,6,9 26:11
33:6 42:12
65:8 79:17
99:24 108:22
110:10,20,23
111:21 122:23
123:8 125:4
130:16 131:5,5
132:2 133:24
139:18,19
154:12 155:5
155:19 157:8
158:1 173:22
175:3,5,15,15
175:16 192:5
193:20 194:5
194:11 198:2
198:15 199:12
200:11 214:9
216:4 220:3,3
220:19 230:20
231:22,24
232:2,17

**loans** 12:1,2,7
12:10,12,19,21
13:16,17 14:2
14:8,18,18
16:5 22:16
25:12,17,21,22
31:15,18,23,24
32:18,23,24
33:8,23 36:2,8
37:3 38:2,23
40:21,21,22
42:2,19 44:12
44:13,14 45:2
45:9 47:11
50:23 52:17
57:20 58:20
65:9 78:6,19
78:19,21 83:8
83:9,24 85:19
87:20 88:1
90:8 91:11,12
92:6 93:8
94:15,15 95:15
96:5,6 99:19
101:21 104:22
111:9 112:4
114:16 118:18
118:20 126:6
132:4,7,9,11
132:12,22
134:3 137:16
137:23 138:1
153:13 154:8
154:10 155:12
155:13 156:12
157:19 158:8
160:1,13 164:1
164:3,9 169:22
170:7,13 176:5
176:19,22,23
182:6 197:6,15
197:19 198:6,8
208:1,2,6
210:11 218:15
223:19 225:17
229:4 230:17

236:5 237:20
237:22,24
239:13 246:7
247:22 248:2,3
248:14,15
249:7,9,10,14
252:2,11
**local** 23:13
**located** 15:15,16
209:10,14
**location** 153:18
**locations** 16:4
55:2
**lodge** 115:15
**log** 5:16 149:13
152:22 188:2,4
188:9 191:13
191:15,17
192:16 195:23
**logged** 195:23
**logs** 71:19
187:24 201:5
**LOI** 99:18
**long** 17:6 51:1
65:13,15 66:11
68:21 179:4
212:10
**longer** 55:12
101:4
**look** 38:1 48:10
49:4 64:2
65:19 75:18
77:18,21 80:6
82:20 89:11
97:11,11 98:23
101:16 104:5
109:20 111:9
111:23 112:15
112:22 113:13
114:3,13,19
115:10 119:17
120:3 122:22
137:4 139:5
141:18 142:8
142:19 160:12
160:18,19

161:14,18
183:15 187:5
191:14 204:18
208:20 212:22
215:13 224:4
227:14 242:6
245:12,18
246:23 247:4
**looked** 60:10
66:20 100:4
109:13 118:6
154:10 178:8
217:21
**looking** 20:1
34:24 48:4
49:20 50:8
54:24 56:6,10
61:11 66:10
78:8 80:7 91:6
92:7 95:24
96:6 100:24
105:7 109:4
110:15 120:7
135:14 142:4
143:16 154:1
158:6 159:15
164:19 168:19
178:22 182:7
187:24 212:23
213:1,2 216:9
244:7,9,11
**looks** 54:23 77:9
78:4 80:23
81:23,23 82:5
89:7 91:11
102:22 104:17
104:19,20
105:6,23 109:5
109:6,7,12
111:7,8 115:8
136:3 139:20
140:6 143:13
160:13 162:19
163:24 164:23
165:5,6,13,21
165:21,24

166:2,3 167:3
167:4,14
169:23 180:14
182:10 184:12
191:12,16
203:23 204:6,9
204:19 207:4
221:14,16
222:5 226:5
233:8 237:18
238:6 244:14
246:24
**Lori** 72:7 115:20
146:24 147:2
167:12 179:22
179:22,22,23
180:14,21,21
**lost** 232:13
**lot** 20:13,17,18
23:12 28:19,24
62:16 63:5
64:15 77:24
98:20 100:11
112:8 117:14
167:13 178:20
185:14 187:17
194:1,20,21
200:5 217:14
225:11 250:6
**lots** 179:2
**loud** 173:6
**Lowe's** 13:6
**lower** 48:11
80:15 140:13
**lunch** 134:11
**luxury** 112:8

---

**M**

**M-A-C-K-I-N...**
221:21
**Mackinnon**
221:21
**Mahoney** 64:9
226:7 233:18
**main** 12:22
94:16 176:12

UNSEALED

| | | | | |
|---|---|---|---|---|
| **maintain** 224:19 | 110:10 113:5 | **Mazzara** 206:13 | 95:15 | **Michael** 211:15 |
| **majority** 29:8 | 119:22 134:19 | 206:15 208:3,5 | **mechanism** | 211:16 212:15 |
| 77:12 | 135:2 139:8 | 208:23 209:2 | 180:16 186:12 | 212:16 |
| **making** 19:4 | 142:15 154:16 | 211:21,23 | **media** 131:18 | **mid** 217:2 |
| 47:8 59:14 | 155:7 162:9,13 | **MBL** 155:12 | **medication** | **middle** 105:4 |
| 64:5 69:21 | 164:15 177:24 | **McCRACKEN** | 10:24 | **migrating** 12:22 |
| 73:9,11 76:23 | 180:10 181:5 | 2:13 | **meet** 141:24 | 141:3 173:19 |
| 79:18 85:1 | 187:2 203:15 | **mean** 14:12 | 149:19 227:19 | **million** 83:7,8 |
| 90:18 135:11 | 203:21 206:6 | 21:12 30:2 | **meeting** 147:23 | 91:23 96:8 |
| 141:23 173:20 | 208:17 212:19 | 38:13,15 39:19 | 148:1,4,5 | 228:7 237:23 |
| 174:4 179:21 | 215:10 219:7 | 41:14 46:23 | 156:12 157:6 | 238:7 239:2,4 |
| 184:15 219:3 | 225:23 | 51:15 52:13,22 | 165:1,8 166:22 | 239:15 240:12 |
| 229:13 241:19 | **market** 24:9 | 58:13 59:22 | 167:8,20,24 | 240:20 243:14 |
| 246:4 254:6 | 28:22 29:7 | 63:5 65:1 | 170:12,17,22 | 244:22,22 |
| **Maloney** 226:15 | 36:12,18,20 | 67:23 69:13 | 172:15,19 | 252:19 253:5 |
| **manage** 23:20 | 59:7 84:15,23 | 70:7 77:23 | 178:8 179:13 | **mind** 37:15 |
| 70:16 | 87:9 | 89:15 90:10 | 180:1 212:4 | 75:10 103:13 |
| **management** | **marketed** | 95:14 105:17 | **meetings** 57:5 | 189:17 |
| 51:18,23 141:4 | 107:15 | 109:10 111:20 | 157:23 166:5 | **minute** 105:3 |
| 141:8,16,17 | **markets** 16:4 | 115:3 122:15 | 166:16 168:2 | **minutes** 73:24 |
| 146:22 148:20 | **marking** 98:24 | 126:11 128:24 | 169:9 179:24 | 203:9 |
| 180:2 249:21 | **Martin** 211:21 | 132:17 135:24 | 181:15,15 | **MIRARCHI** 2:8 |
| **manager** 67:3 | **Marty** 206:12 | 136:3 138:9 | **meets** 130:3 | **mischaracteri...** |
| 67:20,22 68:1 | 206:15 208:2,5 | 156:8 157:20 | **members** 26:24 | 26:19 103:3 |
| 68:22 69:12,14 | 208:22,23 | 176:20 177:11 | 58:7 60:2 | 127:7 166:20 |
| 205:9 | 209:1 211:23 | 183:13,14 | **memo** 183:5 | 214:12 241:7 |
| **managers** | 212:2 | 184:15,18 | **memory** 158:7 | **misrepresented** |
| 186:18 | **Marty's** 209:10 | 188:9,16 190:6 | **mention** 168:5 | 176:6 223:20 |
| **managing** 85:13 | 210:18 212:14 | 191:3 199:13 | **mentioned** | **missing** 142:18 |
| 85:15 186:9 | 215:2 | 207:12 208:23 | 13:15,24 22:7 | 187:12 |
| **mandated** | **Maryland** 21:20 | 223:2,5 229:22 | 31:5,6 45:11 | **misspoke** 95:18 |
| 150:15,23 | 31:7,21 45:13 | 234:1,2,7 | 45:12 49:10 | **mistake** 21:15 |
| **mandating** | **mass** 126:12,16 | 235:19 236:1 | 58:13 93:3,12 | 187:14 |
| 150:18 | 126:18 129:16 | 241:14 243:22 | 126:7 148:10 | **misunderstood** |
| **manner** 20:4 | **massive** 127:20 | 245:5 | 154:7 155:24 | 216:21 |
| **Manseth** 209:21 | **material** 233:5 | **meaning** 25:22 | 168:8 | **mixing** 154:20 |
| **March** 101:17 | **materials** 173:9 | 39:9 41:23 | **Mentions** 90:7 | **Mobil** 50:23 |
| 155:10 217:2 | **matter** 6:15 | 59:20 234:4 | **message** 80:24 | 52:17 132:11 |
| **margins** 21:14 | 37:24 39:10,16 | 241:15,23 | **met** 86:14 157:3 | 134:3 137:15 |
| **Mark** 61:18 | 72:11 | **means** 41:15 | 211:23 212:2,9 | 137:23 138:1 |
| 221:20 244:15 | **matters** 21:22 | 48:12,15 67:24 | 212:11,15 | 148:24 153:13 |
| **marked** 6:3 48:1 | **MATTHEW** | 189:18 228:14 | **method** 65:3 | 154:8,9,11 |
| 74:7,14 80:11 | 2:18 3:3 | 233:12,21 | **metric** 185:18 | 155:5,12,13,19 |
| 88:22 91:1 | **matthew.haws...** | 238:24 244:2 | 185:20 | 156:12 157:8 |
| 99:4 102:19 | 2:20 | 252:1 | **metrics** 64:18 | 157:19,24 |
| 104:2 109:17 | **Max** 23:9 | **meant** 91:19 | **Miami** 248:4 | 158:8 160:1,13 |

UNSEALED

169:22 170:7
170:13 176:23
182:5 197:6
236:5 237:20
237:22 239:13
246:7 249:7
252:2
**model** 24:16
25:10 26:10
**moment** 17:1,2
192:22
**Moncooyea**
122:7
**money** 24:2
55:21 59:15
61:5 65:14
129:9,15
217:10 234:22
235:10,23
246:5 247:11
247:14,17
**monitor** 153:5
**monitored**
152:15
**monitoring**
151:9,16 152:8
152:13,20,23
153:4
**Montego** 15:21
**MONTGOM...**
2:13
**month** 27:13
68:13 113:22
114:5,16 126:7
215:14
**monthly** 27:14
30:21 106:1
108:3 111:14
111:24 118:15
124:10 126:1
128:11 148:22
167:1,10 171:2
181:16,19
183:8
**months** 21:4
23:21 24:11

26:14 27:5
66:11,11,21
91:20 101:22
115:12 178:13
242:9,10,10
**morning** 7:9,10
135:21
**MORRIS** 3:3
147:2 156:9
**mortgage** 14:8
**move** 73:23
110:21 120:1
136:10 226:23
233:19 237:13
237:13
**moved** 18:5
188:23 189:6
229:12 233:10
236:14 239:4
**moves** 69:24
245:1
**moving** 42:15
229:13
**msheldon@go...**
3:5
**MTE** 250:3
**MUCHIN** 2:18
**muck** 93:7
**multipage** 48:5
**multiple** 116:14
116:21 175:18
188:24 224:13

_____
**N**
_____

**N** 4:2
**name** 6:6 13:16
79:10,11 92:10
129:19 143:15
147:13,15
168:6,9 174:6
174:18 176:2,2
180:23 211:8
211:15,16
218:1,3 221:20
221:22 232:1
248:18 254:9
**named** 7:15

18:11 80:24
81:4,12 91:12
122:7 204:1
206:12 213:17
213:18 220:1
221:4,18,24
228:3
**names** 143:13
147:2 156:9
210:17 249:24
250:7
**Nation** 248:5
**national** 3:10
7:17 11:8,22
48:20 50:8
145:3 162:20
163:5 164:10
253:8
**nature** 11:21,22
31:8 62:17
80:1 144:7
218:13
**navigate** 84:14
**nay** 218:22
**NCA** 16:24
19:15 20:9
22:14 23:19
30:1 35:23
48:10 49:18
50:5 52:22
54:13 56:23
64:2 71:9
74:16,22 75:6
76:3,23 79:5
79:10,13,16,21
80:3,4,15
84:11 85:22
86:20 87:7,15
88:10 89:5
91:9 94:14
95:16 96:4,9
96:16,18 99:1
99:9 104:9
105:18,19
106:6,20 107:7
110:24 111:3

112:2,7 113:17
113:19,21
114:20 115:5
118:5,6,21
119:10 120:21
124:11,24
125:4 127:5
129:20 134:1
135:4,6,17
136:5 141:22
144:9,14,15,15
145:5 146:2
148:3 152:10
152:23 153:4,6
155:12 156:12
157:3 158:8,13
158:17 159:5
159:12,20
163:2,8 164:2
164:19 165:1
167:15 168:14
174:11 175:18
178:6,9,16
181:16,21
183:8 184:22
187:6,6,6
191:18 193:11
197:5,17
200:20 201:18
201:20,21
203:22 205:7
209:24 213:22
214:8,10
215:21 216:3
216:15 221:15
221:15 227:15
234:20 235:11
235:14,22
240:9 242:23
247:17,22
248:6,6 252:11
**NCA's** 14:20
19:14 26:9
88:7 171:8
202:11 208:1
**NCA-11970**

213:6
**NCA-14894**
164:19
**NCA-2603**
226:2
**NCA-361** 97:12
**NCA-7264**
226:3
**NCA-PA** 48:15
91:6 95:24
187:14,15
**Near** 209:16
**necessarily** 29:1
34:18 46:19
59:11 62:7
101:5 136:6
244:11 245:23
**need** 10:9,17,18
22:10 40:9
47:2 65:13
66:12 75:13
80:1 90:8
171:6 175:1
228:5 229:4
233:10,12,20
236:14 252:21
254:17
**needed** 72:23
90:20 132:1
137:15 139:15
161:24 169:10
201:13
**needs** 30:16,19
**negative** 200:7
**negotiate** 29:2,3
**negotiated** 62:10
104:21,23
**negotiation**
121:8,21
**negotiations**
89:9 136:8
140:7
**NESS** 3:8
**Net** 175:17
**network** 84:24
85:3 144:4

UNSEALED

250:5
**Nevada** 209:9
 209:17
**never** 18:22
 87:11 112:12
 116:20 162:18
 190:4 204:23
**new** 3:4 21:19
 21:19 31:6,20
 31:20 32:17
 34:3 45:12
 47:9 59:22
 103:7,16,17,22
 104:8 108:21
 112:2,3 139:23
 166:13 198:6,7
 203:2 218:10
**Newberg** 69:14
**night** 130:8
**nod** 9:9
**non-lawyer**
 67:22
**non-verbal** 9:7
**normal** 27:21
 52:4 94:4
 136:7 196:5
 222:13,17,19
 222:20,24
 223:1,5,14
**normally** 190:4
**north** 14:24 15:3
 15:6,11
**Northern**
 221:19
**northwest** 17:23
**notary** 1:16
 254:17 255:4
 255:19
**notate** 228:24
**notation** 228:17
**note** 116:5
 123:17 155:11
**noted** 6:19
 116:23 123:22
 254:7
**notes** 200:15

**notice** 1:12
 25:15,23 62:21
 67:14 125:8
 140:10 198:10
 217:19 225:7
 230:9 249:12
**notification**
 154:3
**notified** 153:23
**notify** 153:19
 197:2
**notifying** 154:2
**noting** 145:21
**November** 17:7
 18:14 46:9
 89:12 155:8
 215:15
**NSFTP** 127:1
**number** 1:4 6:10
 14:24 47:17
 48:12 68:4
 74:3,10 94:24
 95:6,8,21
 113:18 114:20
 116:6,10 123:2
 126:18 134:15
 134:22 140:13
 149:4 151:14
 171:4 176:3
 184:22 203:11
 203:18 226:2
 229:3 245:19
 253:8
**numbered** 99:1
 154:21 203:22
**numbers** 47:16
 47:20 77:19
 78:8 230:2
 237:22 239:16
 253:1
**NW** 3:4,9

___
**O**

**oath** 8:18,20
**object** 10:1,7
 16:10 22:17

24:12,17 26:17
 26:18 28:3
 31:10 32:6,19
 33:9 34:10
 35:10 36:3
 37:5 38:10,24
 39:13 42:5
 43:2 45:4,16
 46:1,16 49:21
 52:20,24 53:1
 53:12 60:15
 62:19 66:14
 67:12 71:14
 78:10 79:22
 81:18 82:2,14
 84:1 87:1,22
 88:11 91:14
 92:1,2,18,19
 95:4 96:20
 97:7,15 99:13
 101:23 104:10
 106:8,21 107:9
 108:11 111:11
 114:1,6,24
 117:11 118:10
 118:23 120:11
 121:10 122:13
 123:10 124:21
 125:6 127:6
 128:6,21 131:9
 133:11 136:18
 140:3 143:1,18
 144:21 148:14
 149:23 150:19
 158:21 159:7
 159:22 160:10
 161:1 164:6,21
 168:16 170:2
 171:11,12,24
 172:7,8 174:19
 174:21 175:9
 179:1 182:17
 200:24 207:9
 210:5,12
 218:24 222:10
 222:12 239:8

239:21 240:23
 241:8 249:4
 251:22 252:14
 252:16
**objection** 30:4
 95:5 101:2
 102:8 103:2
 115:15 117:9
 120:12 121:11
 125:19 126:21
 132:13,24
 133:10 134:5
 144:23 145:17
 149:21 166:19
 167:17,22
 197:8 198:9
 199:18 200:2
 201:2 202:13
 205:14 207:15
 207:17 209:11
 213:13 214:11
 214:17 220:11
 223:11 224:21
 227:4,16 229:7
 230:8 231:5
 234:10,24
 235:5 236:6
 237:3 238:1,10
 238:12 239:6
 239:23 240:14
 240:16 241:6
 243:5 245:9
 247:12 248:16
 249:11 251:1
 251:12,20
 252:15 253:10
**objections**
 116:22
**obligated** 27:16
 193:13
**obligation** 97:14
**obligations**
 14:22 179:14
**obtained** 62:8
**obviously** 19:10
 43:10 46:5

167:8
**occasion** 200:22
**October** 17:24
 156:13 213:10
 255:20
**odd** 98:14
 165:16
**office** 2:8 17:24
 55:9,23 150:1
 163:13,22
 195:11 200:17
**officer** 17:5
 18:12 46:4
 62:2 71:10
 72:7 141:7
 168:11 211:15
**offices** 15:16
 16:8,13,14
 17:17,21
**official** 8:24 9:1
 9:2
**offs** 30:10 83:2
 85:9,13,21
 124:11 125:5
**Oh** 129:9 242:18
 243:8
**okay** 7:24 8:14
 8:24 9:13 10:5
 10:12,13,21,22
 11:5,12,18
 14:17 15:2,13
 26:6 35:8
 36:24 48:16,17
 51:12 52:15
 64:8 65:18
 68:3 71:8
 73:20 75:3,14
 75:15,20 78:17
 80:16,17,23
 82:22 90:5
 95:17 97:22
 100:22 104:5
 110:12 133:6
 154:7 155:21
 156:10 162:12
 162:15 164:12

UNSEALED

178:11 181:13
184:21 187:5
187:21 189:20
193:9 197:17
216:19 219:10
227:22 229:11
230:24 240:5
242:11 243:8
248:14 250:2
252:6
**Oklahoma**
248:4
**old** 242:14,16
**older** 89:22 90:1
136:16
**omit** 57:24
**on-site** 53:23
166:22
**onboard** 202:6
**onboarded**
143:24
**onboarding**
33:16 46:6
47:8 50:15,20
51:15,16 52:3
52:8,13 53:8
53:19 138:5
148:20
**once** 10:20 29:5
129:7,7 130:7
190:3
**ones** 119:5
140:12 221:2
241:19 253:1
**ongoing** 29:22
83:21 166:4
**online** 13:24
16:6 25:5 37:3
40:24 45:3
86:24 87:4,15
210:4 223:9
**open** 17:17
184:6,8
**opened** 17:18,19
17:24
**opening** 18:24

**operate** 33:20
39:8,9 42:24
44:18 57:19
58:19 65:23
66:4 75:7
**operated** 51:18
**operating** 20:3
38:3 41:2 54:4
57:3 62:2
224:6
**operation** 43:24
44:10
**operational**
64:16
**operationally**
158:20
**operations** 18:6
18:7,11 21:24
38:19 40:19
43:13,15,20
61:16 64:3
69:11
**Operator** 1:17
6:5 7:3 74:2,9
134:14,21
177:20 178:1
203:10,17
253:17
**opinion** 42:12
224:14
**opportunities**
59:12
**opportunity**
19:11 55:20
59:23 60:12
84:9
**opposed** 9:3
24:2 27:8
125:15 136:11
136:16 142:3
159:11 164:2
216:12
**opposing** 161:15
**optimal** 69:20
**options** 157:19
**oral** 72:23

**order** 22:8 32:12
47:17 66:13
100:18 219:13
219:15 226:4
**orders** 31:14
**organization**
12:6 47:7 63:7
**organizational**
4:11 48:19,20
49:19
**original** 55:9
109:14 131:18
185:6 190:16
195:12,15
218:8 254:19
**originally** 26:23
50:10 51:7
243:13
**originate** 80:18
**originated**
248:14
**originating**
213:11 219:24
**origination**
242:20,21
**originator**
174:15 175:3
**originators**
176:15
**Ottawa** 55:11,12
55:23 162:24
163:13,22
**outbound** 69:16
70:3,20 189:13
**Outlook** 167:4
**output** 130:10
**outside** 58:2
67:13 76:8
107:2 125:7
173:24 188:19
188:20 251:14
**outsource** 56:2
**outsourced**
144:10 152:14
**overall** 106:1
**overnight** 195:8

**overpay** 20:21
**oversaw** 68:21
**overseeing**
17:13
**oversight** 141:21
169:4 186:22
**overview** 74:22
148:21
**owe** 79:21 194:3
194:12
**owed** 55:21
**owned** 159:11
164:1 229:1
241:15
**owner** 79:5,13
196:14 206:17
228:21
**owners** 27:1
58:7 128:1
**ownership** 62:5
62:8 77:4,5,14
157:18 206:18
241:17
**owning** 80:4
**owns** 144:15
224:20 241:22

—————————
**P**

**P** 2:13 104:5
**P-65** 4:11 47:22
47:24 48:5
**P-66** 4:12 74:6
74:14
**P-67** 4:13 80:10
**P-68** 4:14 88:21
**P-69** 4:15 90:24
91:6
**P-70** 4:16 98:24
99:3
**P-71** 4:17
102:18
**P-72** 4:18 104:1
**P-73** 4:19
109:16,20
110:10
**P-74** 4:20 113:4

**P-75** 4:21 113:4
**P-76** 4:22 113:5
**P-77** 4:23
119:21
**P-78** 4:24
119:21
**P-79** 5:5 119:22
**P-80** 5:6 134:18
**P-81** 5:7 139:7
**P-82** 5:8 142:10
142:14
**P-83** 5:9 154:15
**P-84** 5:10 155:6
**P-85** 5:11
154:16 155:6
**P-86** 5:12 162:8
**P-87** 5:13
164:14
**P-88** 5:14
177:23 178:5
**P-89** 5:15 180:9
181:4
**P-90** 5:16 187:1
**P-91** 5:17
203:14
**P-92** 5:18 206:5
**P-93** 5:19
208:16
**P-94** 5:20
212:18
**P-95** 5:21 215:9
**P-96** 5:22 219:6
219:11
**P-97** 5:23
225:17,22
**P-98** 5:24
225:23 242:6
**P.C** 2:2
**p.m** 74:10
134:16 203:18
247:5 253:19
253:22
**PA** 226:10
**packages** 30:21
**packet** 52:3
**packets** 52:4

UNSEALED

App. 0385

**page** 4:4,10 5:4
54:24 56:15
63:10,15 64:2
64:6 74:18
75:19 77:18
89:12 90:19
97:12 99:21
100:24 105:4
113:17 115:3,5
124:3 142:18
143:16 155:3
156:17 163:6
165:5 183:21
183:24 189:21
190:18 191:6
191:14,22
207:3 209:6,7
209:18 210:19
211:13 215:13
245:13 257:2
**pages** 56:13 71:9
179:4 183:11
187:7,11,14
255:13
**paid** 14:7 66:17
66:19 95:23
105:2 106:5,11
106:16 108:3
108:10,17
**paper** 71:17
144:12 206:23
**paperwork**
99:11
**paragraph**
137:17
**paralegal** 67:23
**Parallel** 67:1
**Pardon** 147:14
**park** 2:20 7:16
77:22,23
**part** 8:9 9:16
25:1 27:19
52:2,7 53:21
53:24 55:23
67:16 70:13
73:15 98:5

118:21 119:2
122:11 147:17
170:24 186:23
194:23 199:21
**participant**
180:4
**participants**
178:16
**particular** 29:22
30:1 33:8 87:8
114:4 115:11
122:5 126:6
131:4,5,8
145:20 166:23
168:1 170:12
171:20 175:8
218:23 220:15
228:19 242:22
242:23
**particularly**
201:11
**parties** 8:15
107:24 108:10
108:16,17
122:20 140:8
146:17 171:16
173:15
**partly** 175:11
**partner** 98:5
**partners** 22:21
26:24 117:6
202:9 217:16
**parts** 117:21
**party** 55:15 79:2
145:2 152:3
162:19 169:12
188:8
**passed** 215:22
**passive** 61:19
**pasted** 247:1
**Patnode** 146:24
167:12 179:23
180:22
**Patrick** 3:8
99:22 116:14
246:13

**pay** 21:12 32:13
64:20 65:24
66:1 130:24
137:6,11
193:13,19
199:5 225:9
242:3
**Paycheck**
250:13
**Payday** 13:17,19
13:22 14:17
16:6 25:3,5
32:17,22 36:2
36:12 37:2
38:22 40:2,23
45:2 51:8
57:20 83:8
84:10 85:11
86:23 87:14
91:22 93:6
99:17,23
100:19,19,20
101:11 113:15
130:16 198:5
200:11 204:11
208:1,5 210:11
228:11,13
230:17
**payers** 233:24
**paying** 44:21
55:17 88:8
95:16 96:9
105:18,19
125:1 199:23
200:4 234:4,8
234:18,22
235:7,22 236:5
237:2 242:2
**payment** 131:14
131:16 234:5
235:8 241:19
241:20,21
**payments** 236:3
243:23 245:7
**PDFs** 115:23
**PDO** 100:6

**pending** 10:19
123:6
**Pennsylvania**
1:1,3,14,23 2:4
2:9,14 6:10,15
6:16 42:18
43:1,8,15,21
45:8 79:15
132:7,9 133:2
133:8,18,24
176:21 190:6
197:6,15,18,20
198:3 225:17
227:3,20
229:18 230:5
230:17,22
236:4 239:19
240:11 242:7
245:8,15 246:6
246:22 252:19
252:23 253:3,6
255:5,8
**Pennsylvanians**
245:19
**people** 13:18
18:21 19:4
20:4 21:7 47:6
54:7 63:9
133:6 153:8
168:8 176:21
177:1 178:10
178:16,17
191:17 194:21
221:20 225:5
226:8 233:1
234:7 237:1
**Peoria** 17:23,23
**perceived** 41:20
41:23
**percent** 14:15
15:1,3,6,11,13
36:11 77:14
78:2,6,7,13
102:4 143:6
160:22 198:22
198:23 215:7

**percentage** 77:5
95:1 106:1
202:16
**percentages**
77:7
**perfect** 107:20
**perfectly** 9:15
9:18 133:15
**perform** 21:9,15
39:19
**performance**
21:16 39:21
44:10 64:23
66:3 137:5
**performing**
68:24
**performs** 39:17
**period** 26:13
29:5 30:1
51:13 53:16
54:18 83:21
96:24 117:8
163:17 168:13
190:17,24
208:1 220:9
223:7
**periodic** 29:24
118:7,7 126:1
181:14
**periodically**
83:22
**person** 19:2,20
23:19 54:13
69:12 73:11
170:13 177:16
180:22 192:9
200:23 213:12
230:4 232:16
**personally** 35:12
50:2 148:5
186:8 211:22
**perspective**
20:12 66:6
77:2
**pertaining**
181:21 185:8

UNSEALED

202:24
**Peter** 211:21
212:8
**Phil** 80:24
**Philadelphia**
1:13,23 2:4,9
2:14 6:14
255:5,8
**Phoenix** 15:18
15:23 16:17,20
17:18,20 44:6
103:10
**phone** 2:5,10,15
2:19 3:5,10
19:4 69:4,16
69:23 152:18
153:20 157:4,6
167:10 169:9
171:4 175:22
193:17 234:17
**phones** 230:2
**phrase** 25:21
197:13
**place** 34:8 46:14
79:1 101:2
141:24 144:11
151:6 156:6
157:21,21
165:8 166:17
218:11
**placed** 206:23
216:12 221:23
227:19 243:1,1
244:21 245:16
**placement** 83:2
157:19 212:5
**placements**
216:8
**placing** 81:6,8
89:18 218:10
**Plain** 50:23 51:2
52:16 85:13
110:24 111:3
113:22 114:16
118:18,20
119:11 123:8

124:10 126:5
127:13 128:1
130:16 132:10
134:2 137:20
139:24 141:19
142:3,4,5
144:17 145:16
146:1,18,20
147:7,9 149:1
149:19 150:9
152:1 153:12
160:8 162:20
164:2,5,9
169:24 173:19
173:23 175:15
176:9,22 182:5
186:4 192:24
193:8 197:5
203:6 204:12
204:20 205:11
213:17 214:5,9
215:16 218:15
220:3 228:11
228:13 229:4,5
229:5,6 230:5
230:23 231:22
231:24 232:2
232:15,16
236:4 246:6,6
249:6 251:15
252:1
**Plains** 50:23
52:16 85:14
119:19 122:6
124:11 126:6
127:14 128:1
130:15 132:10
134:2 137:21
142:11,24
143:14 144:18
145:16 147:24
148:2,4,6,8,13
148:24 149:14
149:16 150:7
150:11 152:1
153:13 160:9

170:1 173:20
173:24 176:9
176:22 182:5
191:15 192:5
193:1 197:5
218:15 228:5
236:4 243:10
249:7 251:15
252:1
**Plaintiff** 1:3 2:5
**Plaintiff's** 135:2
139:12 162:13
164:20 203:21
**plan** 30:15,17
180:15
**platform** 70:21
129:23
**playing** 193:14
194:7
**please** 7:3 57:23
93:16
**Pleats** 168:10
**plenty** 10:16
**pod@vnf.com**
3:11
**point** 36:10
42:17 44:4
60:7 62:24
63:4 69:7 77:5
84:11 89:3
107:24 130:17
136:22 138:22
138:24,24
139:22 140:12
141:14 147:3
163:2,23
169:24 170:23
171:5 175:1
180:13 182:2
183:9 191:12
191:16 195:20
196:16 197:4
197:11,14
216:22 223:6
228:17 229:1
236:2 241:16

244:5
**points** 12:23
36:15 105:12
105:24
**policies** 73:18,19
**policy** 54:4
72:15 73:16
**poor** 21:10,16
**portfolio** 14:20
23:17 27:22
28:18 65:6,17
65:18,20 83:19
96:19 112:2,3
131:6 164:1
198:21 223:17
250:23
**portfolios** 26:12
33:6
**portion** 14:20
156:16 208:1
250:22
**portions** 124:1
**position** 17:3,10
73:2 86:4
200:7
**positions** 18:1
56:20
**possibility** 83:19
**possible** 107:6
230:19
**possibly** 8:15
**post** 44:6 46:9
148:10
**potential** 33:14
34:4 63:1
64:21 84:17
85:1 103:22
202:6,8 212:5
**potentially**
31:13 42:9
86:9 139:1
211:6 215:4
224:18 245:3
**power** 138:22,24
138:24
**PRA's** 224:5

**practical** 159:3
**practice** 59:9
108:18 202:10
223:23
**pre-marked**
11:14 47:22
**preaudit** 171:10
**predicting** 70:9
**predictive** 69:15
70:5,8,13
**predominantly**
12:1 15:9,12
31:22 54:22
**Preferred** 248:3
**preliminaries**
7:20
**preliminary** 8:4
**premises** 148:8
**prep** 248:9
**preparation**
197:24 245:17
**prepare** 8:11
86:17 252:22
**prepared** 149:11
182:14 237:8
**prepped** 253:2
**prepping** 157:14
**present** 1:17
**presentation**
146:22
**presented** 83:18
**presently** 40:14
**president** 18:7
18:10,13 38:19
40:19 43:13,23
102:7 122:7
211:14
**pretty** 66:22
160:18 196:4
**prevalent** 23:18
51:19 107:14
202:18 224:6
**prevent** 11:1
**previous** 109:13
109:23 117:1
163:13

UNSEALED

previously 24:16
26:23 57:6
68:20 157:9
163:1 216:14
222:23 230:22
price 12:23
20:23 36:15
64:20 66:19
83:23 90:2
95:1,15,23
102:4 104:17
104:21 105:2
107:6,7 136:13
136:22 137:1,4
139:21 143:6
160:23
pricing 20:17
29:7 36:17
105:22
primarily 12:18
25:5 52:18,22
58:5
primary 12:5
37:17,21
principal 96:8
printed 183:17
printing 80:20
printout 244:13
prior 26:19
46:14 57:2
140:1 163:21
170:10,13
180:16 212:11
prioritize
130:21,24
privately 23:6
26:24 74:24,24
probable 98:1
probably 19:18
68:22 147:1
166:13 169:23
176:24 177:17
185:15 190:8
246:20
problem 42:8
105:15 152:3

problems 46:21
58:10 194:20
procedural 54:5
procedure 72:16
183:7 192:2
199:12
procedures
73:16,19
125:24 141:24
199:9
proceed 7:4 8:6
process 33:16,16
34:17,19 37:23
39:4 46:6,23
46:24 47:3,7
47:11 53:18
126:4,11
137:16 175:21
193:6 194:24
195:18 196:20
200:18 202:6
218:11,14
221:1 223:15
processed
190:15
processes 46:14
130:9 141:23
Processing
250:15
PROCTER 3:2
produced 48:8
48:10,13 49:19
99:1 120:18
123:20 185:7
246:18 247:7
producing
120:15 133:17
product 12:14
12:16 13:2
24:24 33:15
34:4 37:8,17
37:22 59:17
71:2 90:15
112:12,13
119:12 125:4,4
125:11 181:21

224:8 226:9
227:2 238:18
238:21
production
100:5 116:13
133:13 165:6
187:8,18 203:5
products 13:13
14:20 16:14
29:8 37:9 40:6
40:24 41:7
52:18 59:6
86:13,15
131:16 148:17
173:9 174:1
181:22 182:2,4
182:14 200:21
203:1 227:23
228:3 238:8
239:20 240:10
248:5,21 249:3
249:24 250:9
250:21 251:6,9
251:19 252:1
Professional
1:22
profit 20:20
66:10,13
profits 24:5
program 172:22
progress 172:24
180:2
project 65:4
179:11 180:15
244:18
promise 235:18
promptly
254:21
proposed 82:13
165:7,22,24
protect 29:10
protection 76:19
76:19 77:1
protocol 170:17
provide 20:8
68:16 127:18

138:4 141:15
148:24 149:1
152:4,18,22
153:24 195:15
218:18 244:18
provided 48:21
76:8 144:8,9
149:12 159:18
171:1 182:21
186:1 218:17
254:11,16
provides 77:4
151:4
providing 33:19
64:22 76:14
148:21 175:21
209:2 242:13
provisions 40:8
public 1:16
224:5 254:17
255:4,19
pull 226:21
pulled 129:18
punishment
73:5
purchase 12:24
22:9 23:22
24:8,24 26:11
27:4,13 30:22
30:23 33:14
34:4 35:21
36:8 41:6
44:12,13,15
59:13 61:22
64:21 65:21
66:23 76:17
86:20 90:2
94:24 111:2
112:11 118:7
124:12 125:5
130:18 131:24
137:23 158:24
173:16 224:10
243:14
purchased 12:11
12:18 13:2

31:17 50:22
79:16 94:14,20
96:2 98:13
112:12 159:5
216:4,11 225:9
231:18 242:17
251:6
purchasers
201:22 202:12
225:6
purchases 20:24
22:11 27:14
29:24 33:7
35:9 47:9
76:21,23 83:23
108:22 118:8
purchasing
11:24 15:10
23:12 27:3
29:9 30:10
34:16 37:11
45:2,8,14,24
54:21 57:9
60:6 61:2
68:13 117:5
216:9 225:4
purpose 12:4
72:21 75:6
76:5,6,17,18
130:20 147:16
purposes 25:4
pursuant 1:12
115:10 122:23
123:9
pursue 60:14
69:8
put 22:21 33:15
34:5,8 35:14
90:20 129:16
139:1 151:6
158:5 188:24
195:7 200:6
208:10 218:11
224:23 228:23
240:21 247:19
putting 61:5

UNSEALED

143:15

**Q**

**QA** 183:19
**qualified** 23:21
**qualify** 95:21
132:1
**qualifying**
131:24
**quality** 151:11
175:20 186:14
**quarterly** 30:8
30:11
**question** 8:8
9:15,17,20
10:4,7,10,12
10:19 31:2
32:7 35:24
40:11 50:6
56:9 57:24
60:22 62:20
66:7 73:16
76:1 77:24
82:18 87:16
92:11 94:3,7
95:11,20 97:17
111:1,18
113:12 120:24
121:13,15
123:6 125:23
135:16 138:20
139:13 150:9
150:17 155:22
157:7 160:21
161:12 172:17
174:7 177:3
185:16 189:2
194:22 210:8
220:21 231:19
252:2,7
**questioning**
116:3
**questionnaire**
5:19 209:7
**questionnaires**
52:4 218:16

**questions** 8:4,7
9:5 10:1 22:5
25:19 34:2
58:6 61:6
115:15 120:13
149:13 153:11
181:10 187:19
194:2 237:11
253:15 254:21
**quick** 20:2 22:1
75:11 160:19
161:14
**quickly** 37:15
103:15 227:7
**quite** 98:1 141:1
153:16 248:22
**quote** 37:12
50:16 85:11
**quoted** 115:17

**R**

**R** 255:1
**random** 151:21
**Ranga** 156:5
168:5,6
**range** 38:18
**rate** 14:1,2,3,9
14:19 16:5
25:11 32:18,23
33:1 37:2
40:23 45:3
57:9 58:19
65:24 66:9
69:20 78:6,21
95:12,14 210:4
210:9 223:9,18
223:19
**rates** 21:14
31:15
**reach** 66:19
**reached** 32:11
**read** 68:16
75:10 105:13
136:12 173:4,6
222:21 234:2,6
234:14,15

235:9 243:11
243:16 254:1,2
256:1
**reading** 111:17
138:19 157:12
162:17 211:1
219:16 225:13
**reads** 102:12
**ready** 73:23
86:9 103:10,21
109:6 134:13
**real** 75:11
**realize** 56:21
86:3 135:4
**really** 9:4 12:11
13:11,20 16:13
16:15 19:23
20:23 23:16
25:3 26:4 27:1
28:8 31:21
32:1 36:7
37:14,20 38:1
43:16 44:2
50:17 51:19,23
52:9 58:7 60:7
60:10,12 62:23
64:14 66:16
71:3 76:6 77:1
97:13 126:3
128:20 137:7
138:7,23
141:13 148:19
168:23 171:6
173:14 174:9
179:7,11,19
184:16,24
185:5 222:24
223:2,5 244:19
**reason** 10:23
12:22 116:18
176:13 194:12
199:5 217:21
254:4,8 257:2
**reasons** 189:1
**recall** 42:23
43:14,18,19

52:1,6 53:22
54:8 57:7,13
58:17,21,22
59:20 60:1,24
60:24 61:3
63:18 136:22
141:1 148:1
149:17 150:8
153:21 157:16
167:9 168:13
173:11 176:7
176:11 199:10
202:22 206:1
212:10 216:24
225:16 226:10
226:13,16,18
227:1,23
233:11,20
234:1,3 239:18
247:10,15
248:8
**recalled** 233:12
**receivables** 12:1
12:5 218:6
**receive** 70:2
72:12 96:17
103:7 149:13
153:11 175:23
247:17 254:22
**received** 8:18
40:13 58:1
72:22 116:13
116:14 130:2
138:3 175:12
186:13 188:7
197:23 216:7
245:7
**receives** 13:7
**receiving** 126:24
**recipients**
137:13
**recognize** 65:7
175:4
**recognized** 24:5
**recollect** 190:21
**recollection**

94:19 117:20
157:23 160:5
168:20 170:20
**recommendati...**
73:3
**reconstructing**
120:22
**record** 6:6,7,19
8:2 9:1,2 46:20
74:4,11 93:2,7
116:5 129:21
134:16,23
142:17 177:4
177:13,21
178:2 183:21
203:12 243:6
252:21 253:19
**recordings**
175:22
**recover** 69:6
**recovering** 12:4
**recovery** 69:8
130:18,22
162:21 163:5
164:10 177:7
**red** 232:5
**redline** 136:4
138:23
**redlined** 139:3
**redlining** 139:2
**redrafted**
160:14
**reduce** 245:3
**reduced** 137:2
255:11
**Rees** 2:15 7:15
**refer** 173:21
174:14 243:21
**reference** 25:16
64:3 75:3
83:13 93:20
96:12 100:21
137:12 156:11
158:12 173:8
**referenced**
101:6 116:2

UNSEALED

170:12
**references** 99:16
108:21 115:18
150:13 152:7
209:8,19
**referencing**
103:11 156:18
**referral** 200:22
**referred** 69:7
173:9 195:21
210:18
**referring** 95:6
109:3 110:17
114:5,15,17,21
138:21 150:10
174:5 182:3
205:6
**refers** 29:21
95:7
**refund** 96:17
**refused** 204:24
**regard** 25:9 26:6
26:10 38:22
44:24 46:13
58:19 97:5
117:4 119:19
122:9 125:24
131:7 145:15
145:20 191:13
204:20 218:15
218:23 244:4
247:10,19
249:23
**regarding** 11:19
33:6 50:5
115:16
**Registered** 1:22
**regular** 196:5
**regulars** 224:15
**regulatory**
21:18 28:22
29:16 31:5
39:23 41:12,24
57:18 72:11
151:2
**rein** 224:16

**related** 31:14
100:6 141:20
151:22 169:19
185:7 189:5
220:21 231:24
247:22 250:21
**relates** 21:19
25:17 28:10
171:3 252:18
**relationship**
26:2 29:23
42:16 50:11,13
54:14,20 79:3
80:3,8 81:24
83:21 86:2,8
98:6 99:9
117:21,24
118:1 122:17
128:24 149:16
173:16 174:10
200:20 216:22
217:12 241:24
252:12
**relationships**
54:21 86:20
88:6 201:18
**relied** 50:22
**reluctant** 158:1
**rely** 105:16
**remained** 241:4
**remaining** 241:3
**remarking**
123:24
**remember** 41:8
41:10 55:19
57:6 59:1,3
60:4 61:9
71:23 94:12,12
94:19 120:20
136:2,5,6,15
136:21 137:3
137:19,22
145:12,13,14
147:5,9,13,15
147:16 148:3,5
148:7 151:3

156:8,13 157:7
157:9,10,24
158:2 169:16
173:15 174:8
174:17,23,24
174:24 175:6,7
191:2,3 211:11
212:9 218:6
226:11 246:4
**remembering**
117:1 168:12
**remits** 55:16
217:9
**remitted** 235:10
**remote** 15:17
55:23
**removal** 101:3
**remove** 196:14
**removed** 245:21
**Rempel** 1:12 4:4
6:18,23 7:9
48:7 74:13
117:2 135:1
203:20 226:9
255:7 256:8
**Rempel-1** 6:2
11:14
**renegotiate** 29:6
**renegotiated**
104:18
**renegotiating**
104:15 135:17
**renewal** 104:15
**renewing** 135:10
**repeat** 252:7
**repeated** 25:16
**reply** 103:9
105:14 172:4
**report** 5:15
149:4 185:1,12
186:2 200:16
221:11
**reported** 63:16
63:17,24 71:13
71:17,22
163:10

**reporter** 1:15
6:20 8:11,19
9:8 129:22
186:11 219:12
255:4
**Reporters** 1:22
**reporting** 64:15
64:17 152:8
186:12 205:11
**reports** 71:11
137:5 181:16
185:7 186:7
201:8 204:19
213:23
**represent** 84:13
100:4 101:10
116:19 187:17
**representation**
36:22 78:4
185:22 242:4
**representative**
88:9
**representatives**
147:6
**representing** 2:5
2:10,15,20 3:6
3:10 82:12
85:24 89:8
91:10 106:19
113:8 120:16
238:15 240:3,9
240:20
**represents**
188:17 209:4
239:15
**reputation**
33:18 38:1
**request** 51:17
133:12 152:19
176:24 180:3
186:20 204:15
207:21 246:15
**requested** 152:6
180:3 205:2
246:20
**requesting**

202:19
**requests** 138:4
177:7 217:8,13
246:16
**require** 254:21
**required** 151:8
152:21
**requirement**
160:15
**requirements**
141:11 152:17
**requires** 65:2
107:16
**requiring**
141:14 196:14
**resale** 28:17
29:9 202:20
**resell** 26:15
27:22 223:16
**reselling** 202:11
**resided** 39:11
**residence**
227:20 245:16
**resold** 25:1
**Resolution**
221:19
**resolved** 190:14
**resources** 131:1
**respect** 11:9
161:7
**responded**
165:16
**responding**
196:12 217:8
**response** 177:5
253:2
**responsibilities**
11:20 43:23
**responsibility**
44:8 54:22
68:15 205:8
**responsible**
34:16 54:14,20
64:14 69:15
137:3 168:24
**responsive**

UNSEALED

217:16
**responsiveness**
217:8
**rest** 101:12
112:20
**restate** 60:22
82:18
**restated** 139:18
139:19
**results** 21:16
**retail** 13:3,5
37:10
**retrieve** 133:23
176:18
**return** 66:5,20
96:17 254:19
**revenue** 65:7
**reverse** 246:5
**review** 33:5,14
38:8 68:11,16
72:16 73:17,18
74:19 139:11
198:1 236:17
236:18 237:13
**reviewed** 72:24
151:20 197:24
**rhyme** 116:17
**Richard** 61:11
**right** 7:18 8:12
9:21,22 10:4
13:17 14:2,15
20:19 22:11
23:5,15 25:7
26:8 35:6 37:4
41:24 42:4,20
46:9,11 47:14
48:18 49:3,24
55:6,9 56:16
57:10,13,14
58:10,14,15
59:21 64:20
65:20 67:20
73:12 76:3
77:16 80:20
81:2,17 82:9
82:23 83:9,14

83:19 87:21
91:19 93:5,18
94:2 95:3,8
96:6,14,17
97:4,10,13,14
98:11 100:1,3
105:12 106:15
106:18,24
107:17 108:1
108:20 109:1
111:8 112:1
113:19 114:5
114:11,16
115:9 116:12
117:8 122:1,2
122:12 123:19
123:22 124:5
124:12,15
126:8 128:17
129:3,11,13,14
135:12 137:8
137:10 140:2
142:24 143:4,7
143:10 144:20
145:1 147:7
149:15 150:16
155:15 157:11
158:3,16,20
159:5 160:4,24
162:3 163:2,17
164:5,18 165:4
165:9,12
167:21 170:1
171:6,7,20
173:11 174:3,7
175:15 176:15
178:18 179:6
180:6 181:17
181:24 182:15
183:7,14,15
186:22 189:14
190:14 191:11
191:24 193:3
194:18 195:4
197:3,7,11
198:23 199:16

199:17 200:19
201:7,24 204:8
204:16 205:3
205:13 206:13
208:3,23 209:3
209:24 213:5
214:15 215:17
219:10 220:20
224:20 225:14
226:16 227:1
227:14,24
228:6,8 230:18
231:12 232:17
232:24 233:2
233:13,22
234:21,23
235:3,15,23
237:2,17,21,24
238:18 239:1,5
240:5 241:10
242:14 243:8
246:11 254:2
**right-hand**
48:11 80:16
140:13 238:17
238:19
**ring** 211:18
**rise** 36:17 125:4
125:5,11,20
175:16
**risk** 41:20,23,24
57:18
**RJA** 144:3
**Robert's** 211:12
**Roberts** 211:9
211:14
**Rodriguez** 145:8
145:11 146:14
153:8 155:24
160:23 161:21
**ROI** 66:5
**role** 17:12
145:15,20
193:14
**room** 8:9 9:6
54:10

**ROSENMAN**
2:18
**rough** 125:24
**roughly** 17:2
21:4 23:4
24:23 26:14
28:1 37:12
40:18 41:4
50:21 51:1,13
53:9 56:6,8
96:4 126:1
203:9 217:1,2
228:7 238:7
239:2 240:11
240:19 243:15
**rounded** 149:6
**Rubin** 249:10,17
**rule** 235:20
**rules** 254:21
**run** 18:3 98:15
**running** 35:18
69:20

_____

**S**

**S** 1:22 4:8 5:2
**safer** 28:15
**sale** 4:19,21,22
4:23,24 5:5,10
5:11 24:2 27:8
81:13 83:1
92:6 94:11,13
96:2 102:13,24
106:1 107:1
108:4 109:6
110:10,20,23
111:2,9,14,21
113:21 114:4,8
114:15 119:11
123:9 126:5,7
126:17 139:18
139:19 155:20
157:8,11
166:18 179:16
203:5 208:12
242:23
**sales** 23:17

28:10 30:17
84:15 122:23
124:10 126:1
135:9 202:4,18
202:22 206:12
208:10 219:11
**sample** 112:10
**Santee** 248:4
**Sarah** 167:11
**sat** 57:4
**SAVERIO** 2:8
**saw** 20:23 29:8
146:11
**saying** 10:9
53:16 105:8
109:23 119:10
136:9 137:13
208:5 214:20
215:19 232:18
233:8 238:20
243:3
**says** 68:7 71:9
71:11 74:23
75:5 77:3
83:10,11 89:10
89:10,11,13
90:7,8 91:21
93:16 105:16
113:20 115:22
120:3,4 137:14
143:23 150:23
158:17,18
172:22 187:23
188:13 189:3
193:12,18
204:21 214:14
229:11 233:10
233:20,20
234:13 235:3
235:15 251:24
**scenario** 98:14
176:5
**scenarios** 98:2
98:20 246:10
**schedule** 140:16
140:17,20

UNSEALED

150:13 160:8
160:20 161:4
171:5 179:12
179:16 180:3
185:8 186:21
203:3 217:20
217:23
**scheduled** 167:9
172:19
**scope** 62:21
67:13 125:7
198:10 230:9
246:19 249:12
253:11
**score** 130:18,22
**Scott** 247:23
**screen** 183:16
**scrub** 98:15
130:9,11
**scrubbing** 126:8
129:6
**second** 73:15
74:17 82:20
89:12 93:12
99:21 100:24
155:8,13
183:21,24
191:6,6 209:7
225:18 250:23
**secondary** 27:22
201:22 202:12
**secure** 153:17
**secured** 128:15
234:5 243:24
**see** 21:16 24:4
30:13 38:5
48:11,22 49:18
64:4 75:9
80:14,15 81:2
81:6,7,10,13
82:9,17 83:3
89:1 90:5
91:13 97:18
99:7,10,16
100:21 105:10
106:2 108:20

110:13 111:22
112:16,20
113:18,23
114:23 115:7
116:1 119:9,13
119:18 120:4,5
121:5 123:15
135:4,7,8
137:12,16
139:15 140:11
140:17 142:9
148:12 156:23
159:14,14
172:21 173:1
178:14 182:17
183:18 184:7
189:4 191:22
198:1 203:7,22
204:8,12
206:10 207:3
213:20,21
214:2,3 215:24
218:8 222:2,4
228:8 230:1
232:1,2,3
233:18 242:18
242:21 247:5
**seeing** 16:21
38:7 48:14
58:9 62:16
66:13 85:7
128:13 139:2
147:1 148:7
148:19 183:10
**seek** 40:3
**seen** 11:15 49:6
49:8 59:12
117:13 127:12
140:21,23,24
157:15 162:18
219:23 221:1
222:23
**segment** 12:22
37:16
**segments** 89:14
**self-inflicted**

19:22
**sell** 24:10 27:6
107:22 118:15
158:1 202:9
210:9 214:21
223:16
**seller** 91:12
94:16 107:21
143:15 145:6
145:21 150:15
150:23
**seller's** 145:7
162:1
**selling** 81:9
89:19 91:21
135:15 138:2,6
138:13,18
199:2 201:22
202:12 207:13
252:11
**semi-annual**
151:7
**send** 129:11,12
130:11 151:24
183:8 190:15
196:9 200:23
201:6 207:6
**sending** 113:20
213:16 217:10
**sends** 221:9,9
**senior** 73:2
102:6
**sense** 90:4 108:1
166:10 242:16
**sent** 131:23
132:12 181:19
191:17 197:5
225:7 233:22
234:20 239:13
244:14
**sentence** 137:17
**separate** 228:12
**separately** 93:20
**September**
191:15
**sequence** 116:17

208:21
**Sequoia** 250:19
**series** 115:22
164:24
**serious** 198:12
**seriously** 33:12
199:7
**server** 128:15
**service** 5:12
23:20 144:7
161:24 162:1
**servicer** 145:8
145:22 161:5
**services** 102:11
144:9 161:20
162:19,21
163:6 164:10
249:19
**set** 112:4 172:15
201:8 228:19
234:5 243:24
**settle** 236:21,22
**settled** 236:23
**settlement**
236:18,20
**setup** 55:24
**seven** 13:19 23:7
24:4 96:9
102:4 104:5
211:13
**SFD&P** 152:4
**SFDP** 129:18
201:6,10
**shake** 28:23
**Shapiro** 6:16
**share** 21:18
**shareholder**
61:13,19 62:9
77:12,13
**Shawn** 61:24
62:2 63:2,16
63:24 68:8
90:6 103:9
165:18,19
166:1 172:4
226:19 244:15

246:2
**sheet** 182:13
254:5,7,9,13
254:19 257:1
**SHELDON** 3:3
52:20,24 92:1
92:18 93:15,19
101:1 102:8
113:7 114:1
115:14 117:9
121:10 123:1,4
123:17 126:21
127:6 132:13
133:10 142:17
144:23 149:23
150:19 156:19
158:11,16
171:11 172:7
174:21 175:9
183:1 184:1
201:2 207:15
218:4 222:12
238:12 239:23
240:16,23
241:8 249:4
251:22 252:14
**shift** 36:11
**shoes** 224:24
**shop** 55:13,14
**short** 12:20
13:15,20 14:9
25:20 36:8
37:16 40:2
78:18 112:10
223:18
**shorthand**
255:11
**shortly** 26:1
146:8 166:13
**shot** 183:16
**show** 11:13
47:21 73:20
94:23 104:6
110:9 112:24
113:1 120:1
149:2,4 154:11

UNSEALED

162:12 178:4
212:2
**showing** 47:14
48:8 120:15
135:1 203:20
238:23
**shows** 63:16
72:21
**shrug** 9:7
**side** 17:21,23
19:6 22:8
28:22 29:14
35:13 36:16
39:22 154:6
208:14 217:15
238:17,19,23
**sides** 107:16
**SIF** 236:17
237:13
**sign** 30:20 93:16
93:17 254:8,10
254:15,16
**signator** 122:5
162:23 163:5
**signature** 94:6
122:10,18
142:18 254:18
256:13
**signatures** 116:1
127:15,17
159:18
**signed** 102:6
131:19 142:5
190:16 195:16
**signing** 254:12
**signs** 38:5,7,13
**similar** 19:18
61:19 147:23
160:13,18,19
**simple** 103:14
173:18
**simply** 86:8,14
98:4 137:4
165:17 179:21
212:4
**single** 65:16

149:2
**Sioux** 248:5
**sit** 54:10
**site** 122:6 146:2
146:5,16
148:18 149:17
149:20,24
166:14 173:1,5
**sites** 44:5
**sitting** 8:21
16:16,16
**situation** 79:5
**six** 13:19 14:8
41:19 51:1
66:11 97:12
118:16 248:21
**size** 224:11
**SKUTR** 206:17
206:24 210:20
210:20,24
211:4,9
**Sky** 248:12,13
**sleep** 11:1
**slightly** 104:21
112:17
**small** 17:20
18:23 21:14,21
23:13 36:6,6
36:17 41:19
55:13,23
248:23
**smaller** 224:12
**smarter** 28:15
**smirarchi@at...**
2:11
**Smith** 61:12,13
61:20
**socials** 130:5
**sold** 85:21 89:16
97:23 98:12
107:15 118:20
130:15 205:12
205:17 206:1
206:23 208:2,5
209:24 214:6,9
214:9 215:1,5

215:20 216:7
216:10,13
221:16,17
222:5,6,7
223:9 224:13
229:2 233:6
**solely** 75:7
**solution** 70:17
**somebody** 13:6
16:19 21:5
64:19 104:24
105:1 107:24
135:15 138:17
139:1 174:2
177:17 185:4
192:12 195:11
200:16 204:4
216:13
**somewhat** 89:8
138:9
**son** 212:14
**sorry** 17:24 71:3
91:19 95:18
105:6 106:4
150:11 154:20
184:4 207:4
216:21 252:8
**sort** 49:7 52:12
53:7 126:3
152:9 177:15
**sound** 23:5 71:6
147:19 156:9
160:4 173:18
248:19 250:4
250:15
**sounds** 147:21
152:12 156:5
186:6 205:10
250:1,6
**source** 22:10
24:8 87:20
192:18
**Sourceit** 81:13
81:17,21 82:24
**South** 2:14
**southeastern**

17:21
**space** 23:13
107:14 108:8
224:2 254:11
254:16
**speak** 20:2
59:15,19 61:7
68:2 84:21
169:8,16 196:2
236:9 244:19
**speaking** 75:16
91:16 151:1
166:23 198:12
207:2
**speaks** 186:22
**special** 7:12 75:6
76:5,18 158:24
**specialist** 204:2
220:1
**specialize** 12:13
**specialized** 12:9
12:15 87:7
**specific** 12:14,15
14:24 16:14,14
41:6 57:13
61:3 97:6
111:9 139:13
151:22 156:16
157:16 169:16
197:4 223:18
253:3
**specifically**
32:22 42:16
52:1 80:7 83:5
83:7 95:5
112:11 126:23
146:9 151:2
169:15 174:10
199:11 210:3,8
236:9 246:8
252:23
**specified** 96:24
**specify** 144:18
220:17
**specifying** 198:2
**speculating**

137:24 138:16
167:7
**speculation**
225:12
**speculative**
169:6
**Spell** 76:10
**spend** 138:14
**spending** 59:15
**spent** 68:8
**spoke** 46:20
54:11 141:12
**spoken** 28:13
**Spoor** 221:17
**spread** 27:10
**spreadsheet**
5:14 179:12
182:9 247:1
**spreadsheets**
182:22 184:7
185:9,15
**St** 3:9
**stacking** 88:18
89:20
**staff** 30:16
**staffing** 55:2
86:11 90:10,15
**stand** 188:21
189:14
**standalone**
120:17,20,21
**standard** 66:22
105:20,21
**standpoint**
21:11 22:3
23:19 24:1
27:6,12 39:20
39:21,22,23
41:3 50:15
53:19 54:5
55:21 60:6
64:16 82:6
103:21 104:14
160:15 167:11
169:4,6
**stapled** 91:5

UNSEALED

**start** 11:18
13:14 17:8
24:4 47:14,17
65:13 66:13
80:7 108:23
112:10 113:17
140:16 143:22
155:15 179:9
181:11 213:9
221:3 226:6
244:6
**started** 16:2
35:18,22 36:1
36:7 37:20
56:1 58:16
62:6,6 76:7
91:20,24
136:15 138:2
158:8 170:9
173:16 202:19
226:15 228:22
252:10
**starting** 48:6
59:8 76:15
108:24 114:19
**starts** 116:7
140:18
**state** 18:20
28:16 31:16,21
31:24 32:15
33:1 39:11,17
41:16,18 42:3
42:11 45:1
58:18 69:8
151:1 176:2
205:17 223:17
227:19 229:21
245:16
**stated** 26:22
27:17 85:7
152:17 202:17
**states** 1:1 6:9
33:19,21 38:3
39:8,24 40:20
41:1,5,8,11
42:13 44:17

45:12,15 47:12
57:18 58:13,17
84:9,12 85:23
181:23 199:16
244:16 252:24
**stating** 110:22
111:2 157:3
179:23 194:10
196:17
**status** 70:1
188:14,17,22
188:24 189:1,7
189:8,9,21,23
190:11 191:9
195:8,10
200:14 234:4
237:8,10,13,14
239:1 240:21
241:5,13,13,21
247:20
**statuses** 190:18
237:12 240:2,5
**stenographic**
6:19
**step** 141:20
**steps** 130:1
131:2
**Sterling** 13:8
37:10 175:17
230:1,6,7,11
230:14
**Steven** 129:19
**Stevens** 204:21
**stick** 40:16,17
**Sticking** 105:3
**stoked** 19:5
**stop** 42:14
202:10 246:5
**stopped** 42:18
42:18 51:8
170:23 197:14
198:5 234:18
236:3,10
**strategic** 19:7
23:18 27:12
**strategy** 16:15

16:21 20:1
24:20 25:2
27:20,21 54:3
90:9,16,21
**stream** 241:21
**Street** 1:13,22
2:4,9,14 6:14
255:8
**strike** 92:11
178:7
**strong** 172:13
**structure** 39:3
77:4 211:7
224:7
**structured** 63:2
63:3 141:1
**structures**
105:23
**subagencies**
78:22,23
**subagency** 79:14
79:18
**subject** 135:6
155:19 169:23
225:19 226:9
254:12
**subsidiaries**
175:19
**substance** 7:21
254:3,6
**success** 19:13,14
19:15
**successful** 19:8
19:17,19 20:8
20:9
**sued** 58:16
**suggest** 159:20
**suggesting** 223:4
**suggests** 161:15
164:11
**suit** 43:16,19
69:2
**Suite** 1:13,22 2:4
255:8
**sum** 245:13
**summary** 4:12

5:15 149:7,10
244:19
**Summit** 218:5,5
218:8
**supply** 205:1
**supplying** 61:21
**support** 192:13
**supposed**
150:14 153:16
195:1,5
**sure** 7:24 8:5
9:13,24 10:1
11:6,14 22:6
23:10 24:6
29:20 34:5
35:3 38:15
44:1 47:2,8
52:5 56:14
59:13 64:5
68:7 69:19,21
70:14 73:9
75:12 78:3
82:20 83:16
90:18 94:2
100:15 101:8
101:13 109:3
110:6 122:3
130:2 135:20
135:24,24
136:22 139:4
141:23 147:22
153:23 157:21
158:14 169:15
172:11 173:20
174:4,14 175:1
179:13 198:17
198:18 200:6
202:7 205:1
213:4 214:4
216:2 223:2
227:9 239:1
**surprise** 108:6
154:3 245:22
245:23
**surprising** 49:18
**suspended**

202:4
**swear** 6:21
**swept** 195:9
**switch** 134:13
**sworn** 6:24
**sync** 101:5
**system** 53:7
70:19 129:21
129:23 130:8
133:4,16 141:4
141:9,16,17
180:2 190:8,10
192:7,8,23
193:1,4,15
215:20 220:7
227:13 228:24
229:18 231:1,2
243:12 248:6,7
**systematic** 154:6
**systems** 51:23
144:2 173:8

**T**

**T** 4:8 5:2 6:18
255:1,1
**tab** 185:9,16
**tabs** 183:17,18
184:8,9,10
185:14
**tackling** 19:21
**take** 10:14,21
14:17 21:23
24:3 33:12
75:12 89:24
112:15 113:13
138:14 151:19
157:21 161:13
165:8 166:17
192:4 194:5
208:22 226:3
**taken** 1:12 100:5
132:5 241:17
255:7,10
**takes** 21:4 85:3
**talk** 22:24 33:3
38:16,17 50:17

UNSEALED

App. 0394

51:12 52:8
54:2 70:10
90:9,13 91:21
129:9 132:6
212:24
**talked** 78:5
153:10 190:7
201:17,18,21
228:4 241:16
**talking** 14:1,13
16:6 25:5,11
35:17 36:24
40:23 42:4
46:9 50:17
52:9,11,16
53:4 60:6 65:9
70:3 71:5 72:5
72:6 106:24
115:9 126:14
127:20 132:10
134:1 137:20
146:6 174:9
182:4 193:7
210:3 223:8
239:12
**talks** 83:5,7
172:24
**tall** 20:13
**Tally** 168:7,9
186:21
**Tammy** 168:7
186:21
**target** 32:1
**task** 20:13
**TC** 102:11
**TC-PA** 70:23
**team** 16:18 20:6
46:5 63:16
68:23 69:2,3
77:17 130:1
136:24 157:17
186:17 192:13
**technically**
231:15
**telephone** 19:4
**tell** 56:5 60:14

79:19 100:8,18
108:14 109:2
110:14 116:15
116:16 120:7
120:24 123:1
126:2 127:23
159:24 168:3
186:2 187:22
189:19 192:2
192:14,23
212:7 218:22
244:2,4,10
249:24
**telling** 198:14
207:5 215:21
250:10
**tells** 81:11
**ten** 12:17 22:21
22:24 23:1
**tend** 12:8 16:7
**tenure** 35:23
64:1
**term** 12:20
13:15,21 14:9
25:20 29:17
30:7 36:8
37:16 40:2
78:19 89:23
96:14 112:10
118:8 223:18
236:20 237:8
**termination**
73:5
**terms** 12:7 22:7
22:13 40:2
150:1 159:3
220:24 239:16
**testified** 7:1
157:9
**testimony** 26:19
29:19 49:11
117:2,20 127:7
163:13 254:11
255:6,10,14
**testing** 151:5
**TF** 93:17 183:4

**TF-N** 173:8
**TF-PA** 48:6,12
155:3 161:18
161:19 162:14
162:14
**thank** 75:14
213:7 254:23
**thanking** 221:12
221:13
**Thanks** 123:4
**thereabouts**
159:16
**thing** 41:12,15
98:17 103:15
105:10 109:5
129:5 158:20
180:12 201:17
235:14,20
**things** 13:4
20:17,18 22:1
28:9,13,22
29:14 34:7,8
34:24 36:16
62:16 107:2,5
120:14 148:11
149:5 171:18
194:1 196:3,18
199:22,23
200:5 217:7
230:3 246:11
**think** 1:5 3:6
6:17 7:14
13:19 20:7
26:1 29:12,18
29:18,19 31:4
42:16,19 45:20
46:20 48:9,13
48:21 49:10,20
50:4,7,13,14
50:20,21 51:5
51:7,13,14,20
52:18,19,23
53:7,9 54:6,11
54:14 56:19
57:12 61:5
68:5 74:16

75:18 79:17
80:8 81:1,11
82:1,12 83:2
84:10,14 85:10
86:1,1,21
87:18 88:8,13
89:5 91:10,22
92:17 93:22
96:5 99:9
102:7,24
103:13 104:9
106:6,7,11,16
106:19 107:4,5
108:4 117:1,3
117:5,7,22,22
119:4,18
120:20 123:23
124:20 125:5
125:15,15
126:19 127:3,4
128:4 132:12
135:3,18
136:17 138:24
142:2,3,11
145:8 146:4,15
147:5 151:21
153:7 154:11
154:13,20
155:18 156:1
156:11 161:7
161:22,23
162:4 163:4
167:16 168:8
168:10,11,15
169:13 170:8
171:7,14
173:12,14,14
173:17 174:11
174:13,17
175:11 178:9
178:17 181:16
181:20,21,22
182:2,14 183:8
184:4,22,23
185:3,5 186:4
191:18 193:20

197:7 200:12
200:20 201:15
202:17 203:24
204:10 207:8
207:12 208:6
213:12 216:14
219:17 220:1,2
220:4,10,14,19
220:22 221:4,7
222:20 226:9
227:2 228:2,5
228:12,14
229:16,16
231:19 232:13
238:8 239:3,20
240:10 243:6
245:13 246:24
247:18 248:6
249:2 250:21
251:7,10,15,18
251:24 252:11
252:12,22
**Think's** 125:3
**thinking** 90:11
**thinks** 19:2
**third** 6:14 55:15
79:2 143:16
145:2 152:3
188:8 209:18
221:18
**Thomas** 3:9
**thought** 87:12
93:7,9 184:23
**thoughts** 68:17
**three** 15:5,9
16:8,9 51:2
55:2 103:6
113:1 118:16
134:22 144:1
151:15,15
154:22 182:4
182:14,18
183:11,17,18
187:7 203:11
204:10 223:10
237:9 242:10

UNSEALED

App. 0395

244:21,22
249:2 251:18
**time** 6:12 10:19
12:13 13:1
15:10 16:3
17:14 18:8,16
21:10,21 22:20
27:3 28:2,5
29:5,7,12 30:2
31:17 33:13,22
34:13 35:20,22
36:7 38:16
40:14 41:3
43:16 44:2,4
46:4 50:12
51:8 55:18
57:16 61:1,3
62:9 65:23
68:9,21 69:7
69:22 70:10
74:1,3 75:12
76:7 77:5
78:15 83:21
84:12 85:3,10
88:1 90:12,14
94:20 96:24
103:13,18
121:15,24
128:14 134:9
134:15,22
135:9 137:2
138:14 139:14
141:2,4,14
146:10,23
148:18 149:3
154:2,24
157:13,14
163:24 168:11
168:13,24
169:24 172:12
177:8 182:3,12
183:9 190:24
191:12,16
203:3,11,18
205:8 207:24
212:10 216:10

217:10 218:7
220:9 221:18
223:7 225:2
229:2 236:9
239:18 241:16
243:13 244:5
253:18
**timeframe** 37:13
50:19 51:20,24
53:4 63:21
111:22 120:24
135:18 137:1
140:6 146:6
169:21 170:5
**timeline** 128:11
**times** 19:2 20:11
29:2,3 69:2,22
98:20 112:8
153:24 154:7
175:14 222:6
223:10 224:13
**timing** 82:6
98:11 104:13
**title** 17:6 18:11
67:19 68:1
69:12 80:4
121:5 204:1
**today** 11:2,7,16
13:21 15:3
24:3 33:4
37:22 38:9
45:2 52:5
64:19 85:12,15
106:3 107:13
112:9 125:12
125:13 128:13
131:21 132:9
132:16 157:4
157:14 200:10
202:17 216:16
230:7 245:18
245:19 250:13
**today's** 6:11
25:4 222:18
**told** 26:9 60:11
117:2 153:22

163:4 182:20
194:1 205:1
207:6 211:15
**tool** 130:23
**top** 90:5 115:19
143:23 179:13
221:12 253:13
**topic** 133:18
173:11 225:14
253:2
**topics** 11:9,15
157:17
**Torres** 129:19
**tossed** 28:14
**total** 95:22
228:6 229:3
238:6 240:9,12
243:11 251:7
**tour** 54:2
**tours** 54:6,9
**town** 18:23
23:13
**track** 22:2 46:20
180:1 217:11
232:13
**tracking** 179:12
180:16
**trade** 209:19
212:2
**Trader** 107:13
**traditional**
23:12
**traditionally**
50:20
**trained** 194:1
**training** 150:13
150:16,18,21
150:22,23
151:2,4 173:9
**Trans** 130:18
212:12
**transaction**
82:13 89:4,4
247:10
**transactions**
92:14

**transcript** 8:10
8:14 9:1,3,11
254:19
**transcription**
255:14
**transfer** 117:24
129:15
**transferred**
247:11,11,15
**transitioned**
13:20 168:22
**transitioning**
180:15
**transmission**
126:15,19
127:14 129:4
**transmit** 128:5
**transmittal** 4:15
89:2,2 91:4
112:18,18
**travel** 251:5
**treat** 199:7
**treated** 195:19
219:22
**trend** 196:23
**trends** 183:19
**Trial** 250:19
**tribal** 58:23 59:2
87:20 88:1
117:5 146:12
174:1 191:20
191:23 247:22
248:15,22
249:2,14,21
250:9,18,21,23
251:9
**tribe** 122:10,19
127:17 129:1
147:14 171:22
172:6 248:4
**tribes** 50:22
53:11 59:2,10
118:1 148:11
152:5 171:15
172:18 185:5
201:13 247:18

**tried** 224:15
**trigger** 226:17
**trip** 147:5,11
**triple** 14:14
**tripping** 87:16
**true** 15:2 42:17
78:13 237:6
255:13 256:2
**try** 110:21 194:6
199:7 207:7
**trying** 53:6,15
71:5 95:10
103:12 107:5
126:3 166:10
173:21 190:21
242:12
**Tucker** 247:24
**turn** 20:20 63:17
74:17 199:22
210:19 221:17
221:23 225:14
**turning** 21:7
**two** 17:20 37:11
44:5 71:8
74:10 93:3,20
116:2 125:16
134:15 143:16
143:22 144:17
155:4 165:9
168:7 176:1,19
178:13 184:9
187:9,11,14,18
190:18 206:9
222:5 229:5
237:9
**Tyler** 1:11 4:4
6:23 32:9
40:10 57:23
161:11 251:23
255:6 256:8
**type** 19:20
**types** 196:18
246:10
**typical** 20:22
97:18 106:2
131:21 136:7

UNSEALED

138:9,17
146:17
**typically** 14:5
23:11,19 33:13
72:8,12 89:16
97:23 105:21
111:13,21
116:8 118:4,14
**typing** 255:11
**typographical**
124:2

___

**U**

**Uh-huh** 92:24
107:19 216:17
**ultimately** 20:7
30:20 32:12,24
55:16,22 56:3
62:15 63:8,24
65:4,7 70:12
73:11 107:23
131:3 135:10
140:7 150:24
163:14 194:13
196:13 218:2
226:22
**unable** 69:5
**underlying**
189:5
**underneath** 68:7
**understand** 7:17
8:2,5,12,16,22
9:12,14,16,21
11:6,9 23:14
24:6 25:7 26:8
29:20 31:4
47:5 48:7 53:6
53:16 58:8
63:20 71:4
78:3 83:16
86:15 95:11,20
101:8 105:17
112:13 121:14
126:3 127:19
136:1 139:4
141:22 147:18

174:3,9 177:10
185:23 189:6
199:6,8,10
234:15 237:7
239:2 242:12
243:11
**understanding**
28:21 35:1,20
86:12 88:5
92:12 94:1
107:23 111:4
118:17,22
119:2 127:9,11
127:12,16
242:5 251:24
**understood** 9:20
53:17 71:7
84:12 91:9
93:10,24,24
252:4
**Union** 130:18
212:12
**unique** 140:22
**United** 1:1 6:8
209:20,24
248:2 252:24
**University** 18:20
**unlicensed**
31:19,23
**unusual** 105:20
222:4 223:7
**update** 54:4
72:12 172:22
208:11
**updated** 242:8
**uploaded** 131:7
**uploading** 126:4
**USA** 250:8
**use** 19:20 25:21
71:2 85:2
144:20 186:18
186:18 221:21
233:4
**user** 31:15
**uses** 30:8
**usurious** 31:19

31:23
**utilize** 65:3
69:15 216:5
232:21
**utilized** 23:8
55:15 122:1
151:6 224:3
**utilizing** 76:7

___

**V**

**vague** 164:22
**vaguely** 59:1
145:14
**valid** 194:4,11
198:20
**validity** 188:5
191:7 192:6,20
199:8
**valuable** 90:2
**value** 112:14
244:21
**VAN** 3:8
**variety** 226:7
**various** 40:24
56:20 58:17
179:16 181:22
191:17 227:22
228:2 239:3
**Vegas** 209:16
212:3
**velocity** 37:15
38:6
**vendors** 130:11
**Ventures** 249:21
**verbally** 9:5
**verify** 130:6
132:2
**Verna** 204:1
213:12 215:16
219:17 220:1
**versa** 152:2
194:19
**versions** 155:4
**versus** 6:16
14:10
**vetted** 145:5

**vicarious** 28:12
**vice** 18:7,10,13
38:19 40:18
43:13,23 102:6
152:1 194:19
**Vicky** 213:22,23
**Victory** 2:20
7:16
**video** 6:8,12
**videographer**
6:7
**videotape** 1:16
6:5 7:3 9:3
74:2,9 134:14
134:21 177:20
178:1 203:10
203:17 253:17
**Videotaped** 1:11
**view** 19:12 87:6
87:11 180:17
**viewed** 39:24
**visit** 146:2,5,16
147:17 173:1,5
**visits** 147:18
**volume** 30:14
41:11,14 78:18
86:10 90:18
103:8 124:6
126:18 196:24
249:2,6 251:8
**volumes** 22:9
86:16 208:11
248:22
**VS** 1:4

___

**W**

**wade** 86:1
**Waggerman**
167:11
**wait** 8:7 69:22
69:22
**waiting** 190:13
190:17
**walking** 82:19
**want** 8:4 9:13,17
11:5,12,14

20:5 25:14,18
29:20 33:17
40:10 41:2,6
47:6 50:16
51:21 71:2
74:20 76:22
93:11 97:10
107:20 110:9
112:23 113:1
113:12 116:19
125:23 134:10
145:13 161:17
170:14 176:5
177:4 203:4,8
217:18 246:10
246:12
**wanted** 73:1
95:19 98:4
139:14 141:20
154:11 169:7
174:13 184:22
184:23 185:4,5
202:7 203:6
229:3 240:7
**wants** 98:21
107:22
**warehouse**
89:14,19
**warrant** 136:13
**Washington** 3:4
3:9
**wasn't** 27:20
34:18 53:22
71:5 73:10
101:13 109:22
153:23 168:23
171:21 173:22
246:18
**way** 8:5 10:6
24:15 27:2
30:15 34:6
63:1,8,17 65:7
65:19 70:8
73:6 78:20
84:20 87:11
94:22 96:16

98:7,8,21
105:13 132:3
136:12 153:2
160:7 162:23
163:4 165:13
171:18 186:9
192:7 196:6
197:13 206:20
218:21 220:9
220:14,22
221:8 228:24
234:2,6,14,14
234:15 235:8
238:4 244:19
246:11
**ways** 237:9
**WD** 188:14
**we'll** 10:16
40:17 96:23
98:15 112:9
221:7 225:19
226:3
**we're** 6:5 8:6
9:10 14:12
16:5 25:4,10
25:24 26:4
35:17 36:24
40:1,22 46:8
47:15,16,17,19
48:4,7 49:20
52:15 54:4
56:6 60:6 64:5
70:3 72:5 74:4
74:10 75:21
78:8 79:20
80:7 91:6 92:7
93:8 95:24
96:6 98:23
102:15 106:24
110:15 119:18
128:13 132:6
132:16 134:22
136:9 143:16
155:2 161:18
161:18 164:19
178:1,22 182:3

193:7 203:12
212:23 213:1,2
223:8 225:18
239:12 244:11
**we've** 11:13
12:11 13:7
21:17,20 23:7
23:16 25:12
41:1 65:9
73:24 74:14
127:12 135:21
137:20 164:20
170:7 198:18
219:23 221:1
**Wednesday** 6:11
255:9
**week** 151:14
**weekly** 148:22
151:8 152:7
167:1 171:1,6
179:20 180:1
**weeks** 206:10
237:18
**Wells** 13:9
**went** 29:9
146:21
**weren't** 53:20
54:13 121:21
214:4 217:15
217:16 218:9
**Western** 248:12
248:13
**whatnot** 13:6
70:15 98:13
168:22 180:19
195:13 232:7
**Wichita** 18:20
**widely** 151:5
**willing** 39:8
**win** 20:2
**WinDet** 129:21
129:22
**wire** 129:11,11
129:12
**withdrawal**
110:5 160:21

**Withdrawn**
95:8
**witness** 6:21
16:12 22:19
24:19 25:19
28:5 30:6
31:12 32:10,21
33:11 34:12
35:12 36:5
37:7 38:12
39:2,15 45:6
45:18 46:3,18
49:2 53:3 58:4
60:17 62:23
66:16 67:15
71:16 78:12
79:24 81:20
84:3 87:3,24
88:13 91:16
95:9 96:22
97:17 102:1
104:12 106:10
107:11 108:13
110:8,8 111:13
114:8 117:13
119:1 120:15
120:23 121:13
122:15 123:6
123:12,24
125:20 126:22
127:8 128:23
131:11 132:15
133:1,13 134:6
136:20 140:5
143:20 145:19
148:16 149:24
156:19 158:23
159:9,24
160:12 161:3
164:23 166:21
167:24 168:18
171:14 172:2
172:10 174:22
175:10 177:3,5
180:12 198:11
200:4 201:3

202:15 205:16
207:19 209:13
210:7,14
214:18 218:5
219:2 220:13
222:13 223:13
224:23 227:6
227:18 229:9
230:10 231:7
235:6 236:8
237:5 238:3,14
240:1,17,24
247:14 248:18
249:5 251:3,14
252:18,22
253:12 254:15
254:16,17,18
255:15 256:13
**WOLFE** 1:21
**woman** 221:3
**wondering**
178:21
**word** 160:16,16
172:13 231:10
**words** 41:24
247:17
**work** 9:9 10:6
12:8 15:22
20:5 22:13
27:4 56:2
65:13,15 66:12
79:2 88:7
92:14 94:22
107:12,23
122:3 130:21
131:1 144:12
145:4 159:4
212:6 214:7
217:15 220:8
231:15 234:9
**worked** 13:7
24:10 26:13
46:5 55:22
68:7 108:15
153:2 164:4,9
182:15

**working** 9:10
16:18 18:17
65:10 79:20
85:16 98:6
119:11 137:14
180:14 212:12
**works** 8:1 80:20
85:8 88:15
96:16 106:17
177:18 192:23
**world** 84:16
107:21 223:24
**Worldwide**
206:19
**worth** 41:21
83:8,9 138:13
**wouldn't** 119:3
127:3 151:24
154:2 207:20
210:7 217:12
218:10 222:17
226:15
**write** 83:2
**write-ups** 73:5
**written** 8:10
72:22 165:19
245:3 246:15
**wrong** 149:15
154:21 176:2,3
176:3 194:19
197:3
**wrote** 90:12

| X |
|---|

**X** 4:2,8 5:2
151:14
**X,Y,Z** 232:6
**XLSX** 182:18
247:6

| Y |
|---|

**yay** 218:22
**yeah** 31:4 65:21
66:8 70:20
72:7 75:18
88:19 89:7

UNSEALED

90:4 93:24
105:6 107:1
109:10,10
121:18 126:16
129:10,10,10
134:12 139:4,4
139:14,16
156:9 157:2,3
158:3,14 160:5
164:23 166:11
166:12 167:7
177:19 183:12
193:15,24
209:17 210:14
217:5 220:19
222:16 238:21
238:21 239:14
242:9 243:20
**year** 24:11 26:14
37:21 56:6,9
57:1 67:17
102:15 212:7
213:11 215:15
246:20
**years** 12:18
13:10,20 14:8
14:8 15:5,9
20:9,10,10,16
22:21,24 23:1
23:7 24:4
27:10 51:1,2
60:9 68:9
124:9 170:17
251:6
**yesterday**
196:22
**York** 3:4 21:19
21:19 31:7,20
31:20 32:17
45:12 198:6,7

**Z**

**Zach** 211:12
**Zachary** 211:9
211:13
**Zenith** 144:3

**0**

**0** 85:9 86:16

**1**

**1** 100:8 242:14
**1,000** 41:16,17
185:19
**1:22** 134:22
**10** 20:23 105:9
114:9
**10.5** 96:8
**10:45** 74:3
**10:50** 74:10
**100** 14:14 78:2
78:13 215:7
236:23
**100,000** 243:16
**102** 4:17
**10393** 203:22
**104** 4:18
**104,000** 245:7
**1050** 3:9
**109** 4:19
**10th** 115:18
179:24 233:17
**11** 1:8 50:17
255:9
**113** 4:20,21,22
**119** 4:23,24 5:5
**11th** 6:12
**12** 21:4 23:20
27:5 50:18
66:11 101:21
115:12 118:16
**12-month** 29:5
**12:29** 134:15
**123** 2:14
**1293** 187:6,6,14
**12th** 105:6,7
155:10 215:20
**13** 50:18 51:20
202:19 255:20
**1303** 1:22
**14-7139-JCJ**
6:11
**140** 5:6

**14323** 178:6
**147** 5:7
**149** 5:8
**15** 13:10 170:22
**15154** 99:1
**154** 5:9,10,11
**1600** 1:12 2:9
6:14 255:7
**162** 5:12
**164** 5:13
**1717** 2:4
**178** 5:14
**17th** 180:1
**18** 23:21 24:11
26:14 27:5
66:21
**180** 242:15
**181** 5:15
**187** 5:16
**18th** 89:12
**19** 97:12
**19102** 1:23
**19103** 2:4,9
**19109** 2:14
**1st** 83:12

**2**

**2** 100:8
**2,731** 243:12
**2,779** 228:6
**2:14-CV-07139**
1:5
**2:30** 177:20
**2:41** 178:1
**2:56** 247:5
**20** 124:16 203:9
**20,000** 240:19
**20,230** 240:19
**200** 14:14
**2000** 20:23
**20001** 3:4
**20007-3877** 3:9
**2001** 23:4 74:23
**2007** 18:20
**2008** 17:9 18:2
35:18,22 37:20

**2010** 36:24 38:7
50:17 57:5
83:12 86:4
89:13
**2011** 37:1 38:7
99:10 101:17
102:16 104:7
215:20
**2012** 17:18
23:17 24:23
25:10 26:9
27:2,24 28:1
37:12 38:17
40:17,18 41:4
51:20 109:7
114:9 115:18
120:4 122:8
124:9 128:9
202:19 203:23
213:11 215:15
217:24 222:19
222:20 224:15
252:10
**2013** 18:15
43:13 50:21
51:14 52:15
53:9 56:8 57:2
77:24 124:9
128:9 155:8
156:14 159:16
160:4 166:8
169:21 170:8
170:18 172:19
178:10
**2014** 17:24 75:7
76:15 117:4
124:9,14,17
148:12 155:10
170:18,22
182:3 185:3
193:8
**2015** 20:23
42:17 44:6
124:5 170:18
191:15 202:22
226:5,12,13

**233**:18 244:6
245:5,6 246:1
247:5
**2016** 17:7,19
18:14,15 46:9
62:3,10 202:3
202:3
**2017** 217:2
**2018** 1:8 6:12
255:9
**2019** 255:20
**202** 3:5,10
**203** 5:17
**206** 5:18
**208** 5:19
**21.5** 239:4,15
240:20
**212** 5:20
**215** 1:23 2:5,10
2:15 5:21
**219** 5:22
**22** 179:4
**225** 5:23,24
**23** 179:4
**230** 1:22
**24** 66:21 238:7
239:2
**24,000** 239:17
239:18 240:11
**24.5** 238:7 239:2
240:12
**25** 101:17
**26th** 155:8
**272605** 155:6
**27th** 121:7,16
123:15
**298-1800** 3:10

**3**

**3** 100:8
**3.4** 228:7
**3.5** 243:14
**3:21** 203:11
**3:27** 203:18
**30** 60:9 198:22
198:23 254:22

UNSEALED

**30-B(6)** 198:10
**30(b)6** 125:8
**300** 1:13 14:15
  17:2 255:8
**312** 2:19
**315** 91:6
**320-5701** 2:5
**341** 91:7
**346-4000** 3:5
**369** 95:24
**37.6** 77:13
**386417** 140:18
**386418** 140:14
**390** 244:22
**3rd** 2:9 245:6
  247:5

**4**

**4** 100:9
**4.4** 252:19 253:5
**4:44** 253:18,22
**405052** 48:6
**405055** 64:5
**4130** 2:4
**417** 140:16
**4562** 187:6,15
**47** 4:11

**5**

**5** 100:9
**50** 15:1,3,6,11
  15:13 36:11
  78:6,7 151:21
**500** 236:22
**530** 244:22
**54** 100:2
**557226** 162:14
**560-2445** 2:10
**565648** 155:6
**565669** 161:19
**599** 116:8
**5th** 250:18

**6**

**60** 85:9 86:16
  136:16 137:2
  143:24

**60-day** 136:10
**60,000** 251:7
**603** 114:20
  116:8
**60661-3693** 2:19
**610807** 155:4
**61148** 135:3
**622** 115:5
**65** 47:17
**659** 113:18
  116:7
**68** 89:1
**69** 90:22

**7**

**7** 4:5 139:22,22
**72** 104:5
**74** 4:12 112:19
  113:1,9,17
  119:9
**75** 113:1,8
**76** 113:2,8
**77** 119:17 120:3
**772-7228** 2:15
**78** 100:2 120:1,2
**79** 120:1,2

**8**

**8.65** 139:22
  140:5 143:6
  160:22
**80** 4:13 83:7,8
  91:23 135:2
  154:24
**809** 156:24
**81** 139:5,12
  154:24
**82** 139:12
  154:24
**83** 154:19 155:2
  155:3
**84** 154:19 155:2
  161:18
**85** 155:2
**86** 161:9 162:13
**87** 164:20 178:8

**88** 4:14
**899** 123:3
**8th** 120:4 121:15
  172:19

**9**

**9** 140:14
**9,000** 96:5 98:14
**9:00** 1:14
**9:11** 6:12
**90** 73:24 136:12
  242:15
**901** 3:4
**902-5319** 2:19
**91** 4:15 203:21
  242:15
**922-7112** 1:23
**94** 212:22,23
  213:1,2,4
**95** 215:13
**97** 226:2 233:16
**98** 225:19
**99** 4:16

UNSEALED

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF PENNSYLVANIA


| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ) | |
| By Attorney General ) | |
| JOSH SHAPIRO, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | NO.14-cv-07139-JCJ |
| v. ) | |
| ) | |
| THINK FINANCE, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |


Videotaped Deposition of BOBBI JO FAVEL

Great Falls, Montana

Tuesday, June 19, 2018 - 1:02 p.m.


Reported by:

Bambi A. Goodman

Job no: 21969

UNSEALED

App. 0401

1       On Tuesday, June 19, 2018, beginning at
2  1:02 p.m., the videotape deposition of BOBBI JO FAVEL,
3  appearing at the insistence of Defendant Think Finance,
4  was taken at The Mansfield Center for the Performing
5  Arts, 2 Park Drive South, Great Falls, Montana, pursuant
6  to the Federal Rules of Civil Procedure, before Bambi A.
7  Goodman, Registered Professional Reporter, Certified
8  Realtime Reporter, Notary Public and John Nordhagen,
9  videographer.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    Patrick Daugherty, Of Counsel
2     VAN NESS FELDMAN, LLP
3     1050 Thomas Jefferson Street, NW, 7th Floor
4     Washington, DC 20007
5     pod@vnf.com
6     personally appeared on behalf of Defendant
7     National Credit Adjusters.
8
9    Patrick M. Smith, Esq.
10   KATTEN MUCHIN ROSENMAN, LLP
11   525 West Monroe Street
12   Chicago, IL 60661
13   patrick.smith@kattenlaw.com
14   personally appeared on behalf of Defendants GPLS
15   and Victory Park.
16
17
18
19
20
21
22
23
24
25

1       A P P E A R A N C E S
2
3    John J. Grogan, Esq.
4     LANGER GROGAN & DIVER, PC
5     1717 Arch Street, Suite 4020
6     Philadelphia, PA 19103
7     jgrogan@langergrogan.com
8     personally appeared on behalf of Plaintiff.
9
10   Matthew O. Gatewood, Esq.
11   EVERSHEDS SUTHERLAND, LLP
12   700 Sixth Street, NW, Suite 700
13   Washington, DC 20001
14   matthewgatewood@eversheds-sutherland.com
15   personally appeared on behalf of Defendant
16   Think Finance.
17
18   Richard L. Scheff, Esq. and David F. Herman, Esq.
19   MONTGOMERY MCCRACKEN
20   1735 Market Street, 21st Floor
21   Philadelphia, PA 19103
22   rscheff@mmwr.com
23   personally appeared on behalf of Defendant
24   Kenneth Rees.
25

1       I N D E X
2  WITNESS:                PAGE:
3  BOBBI JO FAVEL,
4   Examination by Mr. Gatewood       7
5
6  EXHIBITS:
7   Deposition Exhibit No. 41
8    Bates TF-PA-303899-900; 11/21/2012 B.
9    Favel Email
10    marked for identification      26
11
12   Deposition Exhibit No. 42
13    Bates TF-PA-569172; 6/10-11/2012
14    Email Chain
15    marked for identification      30
16   Deposition Exhibit No. 43
17    Bates TF-PA-378414-8417; 5/30/2012 B.
18    Favel Email With Attachment
19    marked for identification      33
20
21   Deposition Exhibit No. 44
22    Bates TF-PA-319516-517; 1/30/2013 B.
23    Favel Email
24    marked for identification      54
25

2 (Pages 2 to 5)

UNSEALED

App. 0402

1
2      THE VIDEOGRAPHER:  The time is 1:02 p.m.
3  We are on the record.  This is tape number one of the
4  videotape deposition of Bobbi Jo Favel in the matter of
5  Commonwealth of Pennsylvania versus Think Finance, Inc.,
6  et al.  This is Civil Action Number 14-cvV-07139-JCJ in
7  the United States District Court for the Eastern District
8  of Pennsylvania.
9      This deposition is being taken on Tuesday, the
10  19th day of June, 2018 at Mansfield Center for the
11  Performing Arts, 2 Park Drive South in Great Falls,
12  Montana.
13      The videographer is John Nordhagen.  The court
14  reporter is Bambi Goodman.
15      Counsel will now introduce themselves after
16  which the court reporter will swear in the witness.
17      MR. GATEWOOD:  Matthew Gatewood on behalf
18  of the Think Finance Defendants.
19      MR. HERMAN:  David Herman on behalf of
20  Kenneth Rees.
21      MR. SMITH:  Patrick Smith in behalf of GPLS
22  and Victory Park, Defendants.
23      MR. DAUGHERTY:  Patrick Daugherty on behalf
24  of National Credit Adjusters.
25      MR. SCHEFF:  Richard Scheff for Kenneth

1  Rees.
2      MR. GROGAN:  John Grogan for the
3  Commonwealth of Pennsylvania.
4      THE WITNESS:  Bobbi Favel.
5      BOBBI JO FAVEL,
6  having been first duly sworn to testify to the truth, the
7  whole truth and nothing but the truth, testified upon her
8  oath as follows:
9      EXAMINATION
10  BY MR. GATEWOOD:
11      Q  Ms. Favel, good afternoon.  My name's Matt
12  Gatewood, and I represent the Think Finance Defendants,
13  and I'll be the primary questioner of your deposition
14  this afternoon.
15      A  Okay.
16      Q  Are you a member of the Chippewa Cree Tribe?
17      A  Yes, I am.
18      Q  And do you live on the reservation?
19      A  Yes, I do.
20      Q  Have you ever been deposed before?
21      A  No.
22      Q  Do you understand the oath that you were just
23  administered?
24      A  Yes.
25      Q  And that your obligation is to answer my

1  questions truthfully?
2      A  Yes.
3      Q  And if you don't understand one of my
4  questions, please let me know that; okay?
5      A  Yes.
6      Q  And because this deposition is having a
7  transcript typed out as you and I speak, you can't say
8  Uh-huh, or anything like that or head nods, for example.
9  You have to actually provide yes or no answers.  Do you
10  understand that?
11      A  Yes, I do.
12      Q  At some point in your career did you work for
13  Plain Green, LLC?
14      A  Yes, I did.
15      Q  And do you remember when you started at Plain
16  Green?
17      A  Yes.  I started in February of 2012.
18      Q  And when was your last day?
19      A  March 26, 2013.
20      Q  What was your title or role during that time?
21      A  I was the compliance -- regulatory compliance
22  officer.
23      Q  Were you the regulatory compliance officer from
24  February 2012 through March 2013?
25      A  When I first started, I was just compliance.

1  And then we added that regulatory title a couple months
2  after that.
3      Q  So around April, May of 2012?
4      A  Probably more July.
5      Q  Of 2012?
6      A  A little later, yes.
7      Q  What type of educational background do you
8  have?
9      A  I have a law degree from the University of
10  Montana.
11      Q  Do you have an undergraduate degree as well?
12      A  I have an undergraduate degree in research
13  management from the University of Montana as well.
14      Q  Did you take any time off between undergrad and
15  law school, or did you go straight through?
16      A  I took approximately five years off.
17      Q  What did you do during that time?
18      A  I was a forester for the Confederated Salish
19  and Kootenai Tribes.
20      Q  Where is that located?
21      A  In Flathead, Montana.  Ronan specifically,
22  Ronan, Montana.
23      Q  Why did you go to law school?
24      A  I don't know.  Well, I had an environmental
25  background and I actually wanted to go and get the Indian

3 (Pages 6 to 9)

UNSEALED

App. 0403

1 and talk about them in a little bit greater details.
2     A  Okay.
3     Q  So can you help me come up with that list of
4 everything that you can remember that you were
5 responsible for or that you did at Plain Green.
6     A  Okay. So of course the SOPs, the operating.
7     Q  Those are standard operating procedures?
8     A  Procedures, yeah. So basically we were to
9 develop a manual with those for each -- for issues
10 that -- well, not issues, but I guess for how --
11 procedure of how things were supposed to be done with the
12 loans; how everything moved. We developed -- we started
13 working on a flowchart for the tribal -- for the -- well
14 not only the council but the board, the board of
15 directors, which was mostly made up of tribal council
16 members.
17     Q  Okay; and we'll come back to that. Let's just
18 try to get the list together now of everything that you
19 did, and then we'll come back and ask more detailed
20 questions.
21     A  Okay. So yeah, the flowchart of how the loans
22 worked, how the fund was to be, I guess, utilized for the
23 loans, how many days it took for the loans to go out and
24 come back, the payments. Gosh, forgive me. It's been a
25 long time since I thought about some of this stuff. Oh,

1 what else did we do?
2     Q  You worked on complaints?
3     A  Yeah, we did complaints. We had an account
4 through the BBB that we could log into and see if there
5 were any new complaints. So we would address those as
6 they came.
7       Also, there was another business that I worked
8 a lot on as well, FACR, First American Capital Resources,
9 which was the tribe's lending business. So I was also
10 working on -- we were kind of mirroring. We figured if
11 we -- if we developed this stuff on the Think
12 Finance -- on the Plain Green side of it, then we could
13 also use that on the FACR side of it too. So there was a
14 lot of back-and-forth. Worked with the tribal
15 attorney -- or the Plain Green attorney, excuse me, who
16 was a tribal attorney as well.
17     Q  And who was that?
18     A  His name's Dan Belcourt. We had conference
19 calls almost every day that I participated in for
20 compliance.
21     Q  With just Plain Green employees?
22     A  No. No, usually the FACR folks were on those
23 calls with us, Lee Broome or Gordon --
24     Q  Is it Gordon Jones?
25     A  I don't remember if it was Jones. Is it Jones?

1 Gordon -- I don't think it was Jones. So they were on
2 pretty much all the calls. It was mostly with them.
3 When we actually talked to Think Finance, they weren't on
4 those calls.
5     Q  Okay. So you would have compliance calls with
6 just employees from Plain Green and FACR.
7     A  Uh-huh.
8     Q  Without any outside individuals.
9     A  Uh-huh.
10     Q  Is that a yes?
11     A  Yes; sorry.
12       MR. GROGAN: Objection to form.
13     Q  (By Mr. Gatewood) You said you worked with the
14 tribal attorney Dan Belcourt. What types of issues would
15 you work with him on?
16     A  Contracts. He was to provide input on a lot of
17 the contracts with the different service providers,
18 Decision Science, Victory Park. There was a
19 number -- there were a number of different contracts that
20 we had that he provided input on and reviewed.
21     Q  Did you rely on his expertise in helping review
22 contracts?
23     A  Yes.
24     Q  What other lawyers did you work with from Plain
25 Green?

1     A  I can only remember him at the time for Plain
2 Green.
3     Q  Did you work with Robin Kovash?
4     A  I think -- I remember meeting with Robin. No,
5 that wasn't on a Plain Green issue, that was a different
6 tribal. But Robin -- and I know Robin. But he -- no, he
7 didn't work with -- while I was there, he didn't help us
8 with anything, to my knowledge, as far as where those --
9     Q  Okay; what about Leann Montes?
10     A  She -- she did work on a few things with Dan.
11 She wasn't as involved though. She wasn't there every
12 day or at every meeting. It was just kind of sporadic
13 with Leann.
14     Q  What about Rick Eckman?
15     A  Nope. Rick Eckman attended the OLA
16 meeting -- or the NAFSA meeting; sorry. Native American
17 Financial Services Association; sorry. He attended those
18 meetings and would sit in on the smaller sessions with
19 the tribe and with Think Finance. But I don't recall him
20 actually participating in our operations, contracts,
21 things like that.
22     Q  Okay. So on the list of items that I have that
23 you remember doing at Plain Green, I've got SOPs,
24 payments, complaints, working with the tribal attorneys,
25 conference calls for compliance. Did you have anything

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

UNSEALED

1  else we can add to the list?
2      A   The contracts.  We'd all review the contracts,
3  do mark-ups on them, questions if we had them.  Contract
4  review.
5      Q   And that's contracts not just with Think
6  Finance but with all of Plain Green's vendors?
7      A   The third-party service providers.
8      Q   Did you have any responsibility for approvals
9  of various items?
10     A   No, just input, not any kind of approvals for
11 anything.  Everything had to go through Billi Ann for
12 approval.
13     Q   What about with respect to any responsibility
14 for wire transfers?
15     A   No, that was not my department.  That was
16 another person's responsibility to do the loans, the
17 approvals and things of that such.
18     Q   Who was that?
19     A   Neal Rosette, Junior.
20     Q   He was responsible for actually approving the
21 Plain Green loans?
22     A   No, not the Plain Green loans.  He did the FACR
23 loans.  I don't think -- he may have.  I couldn't tell
24 you for certain if he was doing the Plain Green loans as
25 well.

1      Q   But it was someone else other than yourself --
2      A   Yep.
3      Q   -- that was responsible for approving the Plain
4  Green loans.
5      A   Yes.  I didn't have anything to do with the
6  daily approvals on loans or anything like that.
7      Q   Did you have any responsibility for approving
8  marketing campaigns?
9      A   I wouldn't say approving, but I did have input.
10 They would send me what they call, I believe, rollouts
11 for each month.  They would send them out to all of us
12 and we'd look through them and look at them.  And if we
13 see any typos or anything that didn't look accurate as
14 far as information-wise.  Otherwise, I mean, they would
15 send them to us just to review.  They were already done.
16     Q   Just to clarify, the "they" in that sentence --
17     A   Think Finance.
18     Q   -- is Think Finance.
19     A   Yeah.  One of their subsidiaries, TC Decisions,
20 I think it was.  I think there was a Tailwind, Tailwind
21 Marketing too.
22     Q   And on any of these items where the tribe would
23 have to approve something, you said you provided input,
24 even though you may not have been the person actually
25 approving it.

1      A   Uh-huh, yes.
2      Q   What types of input would you provide?
3      A   I guess just reading through things, like I
4  said, to check for accuracy of information.  It
5  wasn't -- it wasn't a whole lot.  Like I said, a lot of
6  it came that was already done and ready to go.  I mean,
7  obviously they people knew what they were doing, so it
8  wasn't like we really knew what we were supposed to be
9  looking for.  I felt it was more just a formality than,
10 you know, to say that Well, somebody from the tribe
11 looked at it and said it was okay.
12     Q   But it's fair to say that when Think Finance
13 would provide Plain Green with some information, that
14 before Plain Green would actually approve it, they would
15 review it.
16         Start over?
17         It's fair to say that when Think Finance
18 provided Plain Green with some type of information, it
19 needed to be approved, that Plain Green would actually
20 review the information before approving it.
21         MR. GROGAN:  Objection to form.
22         THE WITNESS:  I would say that is not
23 accurate in the sense that we weren't approving -- there
24 wasn't a time where we were ever going to say No, we're
25 not approving this.  That information came to us already

1  packaged and ready to go.  Basically, I felt like we were
2  just looking at it and saying This looks good, because
3  that's what we were supposed to do.
4      Q   (By Mr. Gatewood)  But as the compliance -- the
5  individual focused on compliance at Plain Green, you
6  would not be comfortable approving something without
7  actually looking at it.
8      A   Well, first of all, I didn't have any kind of a
9  compliance training as to what the work was actually
10 entailing.  When we worked with Think Finance, who was
11 already established in this industry, the thinking was
12 that we were going to be taught these things.  So when
13 somebody sends you something and says We need an
14 approval, in my opinion, we're not going to say No.  It
15 will be approved because they're the experts and they're
16 sending us something that they've done hundreds, if not
17 thousands, of times.  So we're going to approve it.
18 There wasn't ever a time where I said No, this doesn't
19 look good.  It was always approved.  Sorry; I don't know
20 if that was your actual question but --
21     Q   No, that's okay.
22         Can you describe how the compliance process
23 changed from the time you started at Plain Green to the
24 time that you stopped working there?
25     A   Well, we added another employee to help with

UNSEALED

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
     Plaintiff, *
          *
VS.        * Civil Action
        * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
     Defendants. *

*******************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
JASON HARVISON
APRIL 17, 2018
*******************************************************

DEPOSITION of JASON HARVISON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 17th day of April, 2018, from 8:53 a.m. to 4:22 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

1             A P P E A R A N C E S
2
3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4     MR  IRV ACKELSBERG
         MR  JOHN J  GROGAN
5      Langer, Grogan & Diver, PC
         1717 Arch Street, Suite 4130
6      Philadelphia, Pennsylvania  19103
         Phone:   215-320-5701
7      E-mail:  iackelsberg@langergrogan com
               jgrogan@langergrogan com
8
      MR  SAVERIO "SAM" MIRARCHI
9      Senior Deputy Attorney General
         Bureau of Consumer Protection
10     1600 Arch Street, Suite 300
         Philadelphia, Pennsylvania  19103
11     Phone:   215-560-2445
         E-mail:  smirarchi@attorneygeneral gov
12
13   COUNSEL FOR JASON HARVISON:
14     MR  RICHARD L  SCHEFF
         Montgomery, McCracken, Walker & Rhoads, LLP
15     123 South Broad Street
         Philadelphia, Pennsylvania  19109
16     Phone:   215-772-7502
         E-mail:  rscheff@mmwr com
17
18   COUNSEL FOR KENNETH REES:
19     MR  DAVID HERMAN
         Montgomery, McCracken, Walker & Rhoads, LLP
20     123 South Broad Street
         Philadelphia, Pennsylvania  19109
21     Phone:   215-772-7502
         E-mail:  jboughrum@mmwr com
22
23
24
25

## Page 3

1            A P P E A R A N C E S
2               (continued)
3   COUNSEL FOR THINK FINANCE, INC :
4     MR  MATT GATEWOOD
         Eversheds Sutherland (US), LLP
         700 Sixth Street, NW, Suite 700
5     Washington, D C  20001
         Phone:   202-383-0100
6     E-mail:  mattgatewood@eversheds-sutherland com
7
8   COUNSEL FOR VICTORY PARK CAPITAL:
9     MR  DANIEL P  SHAPIRO
         MR  MATTHEW W  HAWS
         Katten Muchin Rosenman, LLP
10     525 W  Monroe Street
         Chicago, Illinois  60661
11     Phone:   312-902-5622
         E-mail:  daniel shapiro@kattenlaw com
12               matthew haws@kattenlaw com
13
14   COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15     MR  PATRICK DAUGHERTY
         Van Ness Feldman, LLP
16     1050 Thomas Jefferson Street, NW
         Seventh Floor
17     Washington, D C
         Phone:   202-298-1874
         E-mail:  pod@vnf com
18
19   ALSO PRESENT:
20     GUS PHILLIPS, Videographer
         KEVIN BYERS
21
22
23
24
25

## Page 4

1             I N D E X
2               PAGE
3   Appearances................................. 2-3
4   Exhibits..................................... 5-9
5   Proceedings................................. 10
6   JASON HARVISON:
7     Examination by Mr. Ackelsberg............. 11
8   Changes and Signature................... 268-269
9   Reporter's Certification............... 270-271
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNSEALED

App. 0406

## Page 5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 99 | Think Finance; Cap Table Produced in Native Format TF-PA 511193 | 24 |
| Exhibit 100 | Company Update January 2013 GPLO00003341, 00003348 | 28 |
| Exhibit 101 | Loan Broker Registration Application PAOAG 0000207 - 0000218 PAOAG 0000244 - 000247 | 34 |
| Exhibit 102 | Marketing And Servicing Agreement TF-PA 000845 - 0000875 TF-PA 000840 - 000844 | 45 |
| Exhibit 103 | Master Participation Agreement TF-PA 000876 - 000910 | 51 |
| Exhibit 104 | 9-27-07 letter to K Rees from A Primus TF-PA 000989 - 000993 | 58 |
| Exhibit 105 | Marketing Agreement TF-PA 000723 - 000744 TF-PA 000759 - 000762 | 60 |
| Exhibit 106 | Software License & Support Agreement TF-PA 000745 - 000755 TF-PA 000756 | 60 |
| Exhibit 107 | E-mail correspondence, 3-20-09 Re: Follow-up on Recommended Changes to TailWind Marketing Amendment TF-PA 623377 - 623381 | 64 |
| Exhibit 108 | E-mail communication | 65 |
| Exhibits 109-110 (Not marked or identified ) | | |

## Page 6

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 111 | Memorandum, 4-15-09 TF-PA 724002 - 724005 | 68 |
| Exhibit 112 | E-mail correspondence, 8-11-09 Re: Discuss CashNet Ph 2 000269 | 68 |
| Exhibit 113 | E-mail correspondence, 9-15-09 Re: Fw: Pennsylvania No State TF-PA 000011 - 0000012 | 72 |
| Exhibit 114 | Memorandum, 9-16-10 TF-PA 476958 - 476961 | 75 |
| Exhibit 115 | Board of Directors Meeting 10-15-10 TF-PA 671848 - 671851 | 77 |
| Exhibit 116 | Leadership Team Session TF-PA 671696 - 671705 | 85 |
| Exhibit 117 | (Not marked or identified ) | |
| Exhibit 118 | Memorandum, 11-17-10 TF-PA 476860 - 476862 | 93 |
| Exhibit 119 | Board of Directors Meeting 4-15-11 TF-PA 670117 TF-PA 670174 - 670182 | 98 |
| Exhibit 120 | Great Plains Lending December 2010 TF-PA 03270 - 013295 | 106 |
| Exhibit 121 | Great Plains Lending Meeting TF-PA 001675 - 001686 | 112 |
| Exhibit 122 | Emergency Cash Lending A New Source of Tribal Revenue February 2011 TF-PA 098567 - 098583 | 115 |

## Page 7

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 123 | Memorandum, 1-21-11 TF-PA 411039 - 411043 | 133 |
| Exhibit 124 | E-mail correspondence, 2-14-11 Re: Signed URL assignment doc TF-PA 003273 - 003281 | 139 |
| Exhibit 125 | A Resolution Creating Great Plains Lending, LLC TF-PA 013301 - 013302 | 141 |
| Exhibit 126 | Mutual Nondisclosure Agreement TF-PA 001034 - 001036 | 143 |
| Exhibit 127 | Term Sheet for Think Finance Chippewa Cree Transaction TF-PA 397320 - 397323 | 153 |
| Exhibit 128 | Marketing Agreement TF-PA 001151 - 001166 | 157 |
| Exhibit 129 | License and Support Agreement TF-PA 001135 - 001150 | 157 |
| Exhibit 130 | Servicing Agreement TF-PA 001167 - 001178 | 157 |
| Exhibit 131 | Participation Agreement Plain Green TF-PA 000039 - 000046 | 157 |
| Exhibit 132 | Referral Agreement TF-PA 000029 - 000038 | 158 |
| Exhibit 133 | License and Support Agreement TF-PA 000189 - 000201 | 158 |
| Exhibit 134 | Marketing Agreement TF-PA 000202 - 000217 | 162 |
| Exhibit 135 | Servicing Agreement TF-PA 000219 - 000225 | 162 |

## Page 8

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 136 | Participation Agreement Great Plains Lending TF-PA 244514 - 244545 | 162 |
| Exhibit 137 | (Not marked or identified ) | |
| Exhibit 138 | Nonbinding Summary of Key Terms for Lending Programs TF-PA 025020 - 025025 | 166 |
| Exhibit 139 | Memorandum, 8-14-11 TF-PA 476966 - 476969 | 170 |
| Exhibit 140 | Memorandum, 9-15-11 TF-PA 504126 - 504128 | 179 |
| Exhibit 141 | Enterprise Risk Assessment Produced in Native Format TF-PA 290895 | 195 |
| Exhibit 142 | Memorandum, 3-14-12 TF-PA 518679 - 518682 | 197 |
| Exhibit 143 | PartnerWeekly Lead Purchase Agreement, Consumer Loan PA-SS 000136 - 0000150 | 205 |
| Exhibit 144 | PartnerWeekly Lead Purchase Insertion Order PA-SS 000199 - 0000200 PA-SS 000097 - 0000098 PA-SS 000117 - 0000118 PA-SS 000091 - 000092 PA-SS 000164 - 0000165 PA-SS 000095 - 0000096 | 206 |
| Exhibit 145 | Marketing Proposal/Change Control TF-PA013478 - 013481 PA-SS 000107 - 0000108 PA-SS 0000230 | 222 |

2 (Pages 5 to 8)

UNSEALED

App. 0407

E X H I B I T S
(continued)

NUMBER          DESCRIPTION          PAGE

Exhibit 146  Product and Operations          229
            Overview
            11-7-12
            TF-PA 325436 - 325475
Exhibits 147 - 148 (Not marked or identified )
Exhibit 149  Strengthening the Tribal          234
            Model and Program Update
            December 20, 2012
            TF-PA 369516 - 369534

Exhibit 150  Proposal for Compliance          245
            Risk Assessment Review
            and Audit, Plain Green
            Loans, LLC, The Chippewa
            Cree Tribe
            August 22, 2012
            TF-PA 572588
            TF-PA 572589 - 572595
Exhibit 151  CFPB Readiness Exams, Tribal          246
            January 7, 2013, Preliminary
            Draft
            TF-PA 572596 - 572623

Exhibit 152  (Not marked or identified )

Exhibit 153  Map and Legend          256
            TF-PA 014425 - 014426
Exhibit 154  E-mail correspondence, 9-26-13          258
            Re: Ho Chunk
            TF-PA 257992 - 258004

1   THE VIDEOGRAPHER:  We are now on the
2   record for the videotaped deposition of Jason
3   Harvison.  The time is 8:53 a m., April 17, 2018, in
4   the matter of Commonwealth of Pennsylvania, et al.,
5   vs. Think Finance, et al., Case No. 14-7139-JCJ,
6   being held in the United States Eastern District of
7   Pennsylvania.
8       The court reporter is Christy Sievert, and
9   the videographer is Gus Phillips.  Both are
10  representatives of Kaplan Leaman & Wolfe Court
11  Reporters.
12      Will counsel please state their
13  appearances for the record.
14      MR. ACKELSBERG:  Irv Ackelsberg for
15  the Commonwealth of Pennsylvania.
16      MR. GROGAN:  John Grogan, also for the
17  Commonwealth.
18      MR. MIRARCHI:  Saverio Mirarchi for
19  the Commonwealth of Pennsylvania.
20      MR. DAUGHERTY:  Andrew Daugherty on
21  behalf of National Credit Adjusters.
22      MR. HAWS:  Matthew Haws on behalf of
23  the Victory Park defendants.
24      MR. SHAPIRO:  Daniel Shapiro for the
25  Victory Park defendants.

1   MR. GATEWOOD:  Matthew Gatewood for
2   the Think Finance defendants.
3       MR. HERMAN:  David Herman on behalf of
4   Kenneth E. Rees.
5       MR. SCHEFF:  Richard Scheff for Jason
6   Harvison.
7       THE VIDEOGRAPHER:  Counsel on the
8   phone?
9       MR. SCHEFF:  There's no -- one of the
10  Victory Park guys, one of the clients.
11      THE VIDEOGRAPHER:  Will the court
12  reporter please administer the oath.
13          JASON HARVISON
14      having been first duly sworn,
15          testified as follows:
16          EXAMINATION
17  BY MR. ACKELSBERG:
18  Q.  Good morning, Mr. Harvison.
19      MR. SCHEFF:  Hold on, we --
20      MR. ACKELSBERG:  Yeah, we're going to
21  put on the record first.
22      MR. GATEWOOD:  The parties have
23  conferred, and to facilitate the deposition process
24  and to avoid multiple disruptions per question, any
25  defendant that raises an objection; form, preserves

1   the objection with respect to all other defendants
2   as well, and the parties have agreed on that.
3       MR. ACKELSBERG:  And I think we'll do
4   that -- you want to do that in -- going forward in
5   the other depositions so we won't even have to make
6   this statement going forward, right?
7       MR. GATEWOOD:  That's right, it
8   will -- it will apply to all depositions.
9       MR. ACKELSBERG:  Okay.  Anything else
10  anyone wants to put on the record before we begin?
11  BY MR. ACKELSBERG:
12  Q.  Good morning, Mr. Harvison.
13  A.  Good morning.
14  Q.  Welcome.  I want to -- I'm Irv Ackelsberg,
15  as you know, representing the Commonwealth of
16  Pennsylvania.
17      Before we get into the substance of the
18  matters here, I want to -- I want to ask you a few
19  preliminary questions.  The first is whether you
20  have been deposed before?
21  A.  Yes, I have.
22  Q.  Okay.  And how many times?
23  A.  Three separate times.
24  Q.  Okay.  And could you identify the three
25  times?  And if you could, roughly, when it happened,

UNSEALED

Page 13

1  who was taking your deposition, and what the matter
2  involved.
3      A.  Sure.  I'll be a little fuzzy on the first
4  two.  They were quite -- quite a while ago.  One was
5  just a civil matter where my house we built flooded.
6  So we sued the developer of the house and was
7  deposed as part of that.
8      Q.  And that was a personal?
9      A.  Personal, yeah.
10     Q.  Okay.
11     A.  And then probably about ten years ago, at
12  Think Finance we had an employee was -- was pushing
13  back for wrongful termination.  So I was deposed in
14  that matter.
15     Q.  Okay.
16     A.  And then in the fall of 2016, I was deposed
17  by the CFPB.
18     Q.  Okay.  And that was regarding Think
19  Finance?
20     A.  That was, yes.
21     Q.  Okay.  And do you remember who at the CFPB
22  took your deposition?
23     A.  There was -- there was two representatives.
24  One was Ben Vaughn, I believe, and I can't remember
25  the other name.

Page 14

1      Q.  Okay.  And did you have representation
2  there?
3      A.  I did.
4      Q.  And who represented you?
5      A.  Rich Scheff, and David Herman was there
6  with me, and then Sarah Cutrona, my personal
7  attorney as well.
8      Q.  Okay.  And did you or your attorney receive
9  a copy of the transcript of the CFPB deposition?
10     A.  Yes.
11     Q.  Okay.  And you still have that, you or your
12  attorneys still have that?
13     A.  Yes, we do.
14     MR. ACKELSBERG:  Okay.  Obviously, we
15  would like a copy.
16     MR. SCHEFF:  I don't know that I'm
17  permitted -- first of all, we didn't -- we weren't
18  provided one by the CFPB.  And I don't know -- we
19  have to check the regulations as to whether or not
20  we're permitted to disclose it.  If we are,
21  obviously, we'll share it with you.  And if not,
22  there may be a procedure to get permission to do
23  that.  I just don't know, but I'm happy to look into
24  that.
25     MR. ACKELSBERG:  Okay.  And we can

Page 15

1  work with you, too.
2      MR. SCHEFF:  Yeah, no, I understand.
3  BY MR. ACKELSBERG:
4      Q.  Did you review that transcript in preparing
5  for today?
6      A.  I did -- I did read through it.
7      Q.  You did read through it.  Okay.  Did you
8  read through -- did you review any other documents
9  before -- before today in preparing for the
10  deposition?
11     A.  Yes, I did.
12     Q.  Can you tell me what documents you
13  reviewed?
14     A.  I read through a handful of board memos
15  that were presented back in history and also some
16  other documents that had been submitted as part of
17  due diligence for this -- this hearing.
18     Q.  Were these documents that you selected or
19  that someone selected for you?
20     A.  As part of the preparation, I met with
21  Mr. Scheff yesterday.  He had some documents he
22  prepared.
23     Q.  Okay.  Well, I'm not -- I'm not asking you
24  anything about -- about anything that was
25  communicated between you and your lawyer.  I'm just

Page 16

1  really specifically focused on the documents.  So
2  the documents were just documents that were reviewed
3  during the course of that meeting?
4      A.  Yes.
5      Q.  Okay.  Did you -- did you discuss your
6  deposition today with anyone other than counsel?
7      A.  No, I did not.
8      Q.  Now, because you've been deposed before,
9  I assume you know the ropes, like, what we're doing
10  here, but just for clarity in the record, I do want
11  to just confirm with you your understanding of
12  what's happening here today.
13     You understand that this -- that we're
14  proceeding with questions and answers, both my
15  question, your answers and any objections or
16  comments of counsel will be transcribed into a
17  transcript like the one that you apparently --
18  apparently was done after the CFPB deposition.  Do
19  you understand that?
20     A.  I do.
21     Q.  Okay.  And that transcript could be used by
22  a party in this case --
23     A.  Okay.
24     Q.  -- in further proceedings?  You understand
25  that.  Okay.  And you also understand that you're

4  (Pages 13 to 16)

UNSEALED

App. 0409

1  under oath today just as if you were testifying in
2  federal court?
3      A.  I do.
4      Q.  Okay.  Now, we're also -- I don't know if
5  the -- if in the previous depositions you had a
6  videotape going, but we do have a videotape, as
7  you're aware.  And I just want to make it clear to
8  you that the official transcript will be what the
9  court reporter -- the official record will be the
10  transcript that the court reporter will prepare.
11  So, therefore, nonverbals aren't picked up on the
12  transcript.  You have to -- you know, a nod of the
13  head isn't going to work.  It will have to be "yes."
14  Or a shaken head doesn't work.  We need a -- we need
15  an affirmative "no."
16      So the other thing I want to make clear to
17  you is that if you don't understand the question,
18  just make -- just say that, and I'll try to rephrase
19  it.
20      A.  Okay.
21      Q.  Your lawyer may object to a question.  I'm
22  sure he will.  Other lawyers may have something to
23  say also.  But it's important for you to understand
24  that even -- even if there is an objection, unless
25  your lawyer directs you not to answer that question,

1  you still have to answer it.  Okay?
2      A.  Understand.
3      Q.  So the way it will -- in that case, you
4  know, I'll ask the question, there will be an
5  objection, we'll wait until the objection is over,
6  and then you -- and then you respond with your
7  answer.  Okay?  Is that understood?
8      A.  Understood.
9      Q.  Great.  We will take breaks.  This isn't an
10  endurance course.  If you need a break, let us know.
11  We'll just ask you to finish the -- your answer to
12  the pending question, and then we'll go off the
13  record.  We will take periodic breaks.  So, again,
14  let us know if you need a break.  But I assure you
15  that this -- we're not going to be just going all
16  through until lunch.  There will be at least one
17  break before lunch.
18      And, finally, is there any reason, such as
19  illness, hearing disorder, medication, lack of
20  sleep, why you can't give this deposition your full
21  attention this morning?
22      A.  No, there's not.
23      Q.  Okay.  Great.  So let's start with your
24  position that you currently have, your employment
25  position.

1      A.  Currently, I'm the chief operating officer
2  of Elevate Credit.
3      Q.  Of Elevate Credit.  Okay.  And Elevate
4  was formed -- when did Elevate first start
5  operations?
6      A.  Elevate began operations in May of 2014.
7      Q.  And what position did -- and you went to
8  Elevate in the beginning, correct?
9      A.  That's correct.
10      Q.  And you held what position?
11      A.  I was chief operating officer there as
12  well.
13      Q.  Okay.  And at the time, just prior to
14  moving to Elevate, you had a position at Think
15  Finance, correct?
16      A.  That's correct.
17      Q.  And what was the position there?
18      A.  I was -- I went through a handful of
19  positions.  I believe my last position there was
20  chief -- chief product officer.  It was right around
21  that same time that I was promoted to chief
22  operating officer.  So it's one of those two -- two
23  roles there.
24      Q.  Okay.  And as chief product officer, what
25  were your responsibilities at Think Finance?

1      A.  Sure.  So I had three different groups that
2  reported to me, one being our operations team that
3  managed the customer service and call centers for
4  the products within Elevate, and then also the
5  product --
6      Q.  With Elevate or Think Finance?
7      A.  I'm sorry, with Think Finance.  It's been a
8  while.
9      And then also I had two different product
10  teams reporting to me.  One was around installment
11  lending products, and some were around the single
12  pay or direct lending products.
13      Q.  So the -- the two -- so there also was a
14  line of credit product, right?
15      A.  Right, there was a line of credit product
16  that was -- that there was the third piece of that,
17  too, as well.  I'm sorry.
18      Q.  So you had the operations team working on
19  call centers and collections, right?
20      A.  I didn't have the collections at that time.
21      Q.  Okay.  I thought -- I thought you
22  said collect- -- I'm sorry.
23      A.  I'm sorry, it was customer service.  The
24  operations was specific to the customer service
25  piece.  The collections piece was within our risk

UNSEALED

1  organization.
2      Q.  The risk organization.  And that's a
3  whole --
4      A.  That's correct.
5      Q.  -- separate team?  Okay.
6          MR. SCHEFF:  Let him finish his
7  question before you answer.
8  BY MR. ACKELSBERG:
9      Q.  So at the time that you -- just prior to
10 leaving for Elevate, you -- you had the operations
11 team, which mainly was customer service and call
12 centers, right?
13     A.  That's correct.
14     Q.  And then you had a -- you also -- you
15 managed a team for the installment loan products,
16 right?
17     A.  That's correct.
18     Q.  That would have been Plain Green and Great
19 Plains Lending; am I right?
20     A.  That's correct.
21     Q.  And you managed the team for the line of
22 credit product.  That would have been Mobiloans?
23     A.  That's correct.
24     Q.  And then you also managed a team for the --
25 for the single pay direct lending product, right?

1      A.  That's correct.
2      Q.  And that would have been RISE?
3      A.  That's correct.
4      Q.  Okay.  When did you -- when did you start
5  at Think Finance?
6      A.  So I started at a predecessor of Think
7  Finance.  The name changed a couple times through
8  the years.  But with a company called Payday One
9  back in 2003.
10     Q.  And when you were hired in 2003, what --
11 what was your position?
12     A.  I believe I came in as either a VP of
13 operations or an SVP of operations.
14     Q.  When you say "SVP," senior vice president?
15     A.  That's correct.
16     Q.  So either a senior or -- but sort of a vice
17 president of operations?
18     A.  That's correct.
19     Q.  And when you started, what were your
20 responsibilities in 2003?
21     A.  Yeah, at that point in 2003, there was
22 probably only 15 people within the organization.  So
23 while I was working with the -- the customer service
24 operations piece, we did a little bit of everything.
25 So I worked with our finance team with forecasting

1  as well.  Worked with the IT -- IT team on product
2  design and product features.  So a little bit of
3  everything at that -- that stage.
4      Q.  And what was your background?  I mean,
5  where did -- where did you work before you came to
6  Think Finance?
7      A.  Sure.  Prior to -- prior to when I was with
8  Payday One, I was with Guaranty Bank doing
9  commercial lending.  So finance, office buildings,
10 commercial real estate, apartments, things like
11 that.
12     Q.  And was that your first job, Guaranty Bank?
13     A.  That was.
14     Q.  So you started there right out of college?
15     A.  That's correct.
16     Q.  Where did you go to school?
17     A.  Texas A&M.
18     Q.  And so how did you end up at Payday One?
19 Or if I -- if I use the term "Think Finance,"
20 that's -- you understand that includes the earlier
21 names?
22     A.  Sure.
23     Q.  Okay.  So we'll just say "Think Finance."
24     So when you started at Think Finance in
25 2003, I mean, how did that happen?

1      A.  Sure.  The founder of Think Finance was a
2  gentleman named Mike Stinson.  He was a friend of
3  the family's.  And my family had made an investment
4  into Payday One back in 2002.  And through
5  conversations with Mike, he asked me to come over
6  and help him start to build up Payday One and take
7  it from a start-up to -- to grow to see where we
8  could go from there.
9      Q.  And had Ken Rees not started yet at -- when
10 you -- did you arrive at the company before Ken
11 Rees?
12     A.  I was there before Ken -- Ken, yes.
13     Q.  And so you mentioned the family.  So
14 your -- your family was one of the original owner
15 investors in the company, in Payday One, at the
16 time?
17     A.  So it was an entity that's owned by my
18 grandfather and his children.  I'm not part of that.
19 But it was -- it was that group that invested in
20 Payday One back then.
21     Q.  Okay.  I am going to show you an exhibit.
22         MR. ACKELSBERG:  We'll mark this as
23 Plaintiff's Exhibit 99.
24         (Exhibit No. 99 marked.)
25         MR. SCHEFF:  Irv, was this attached to

1    something? Because if it's been produced in native,
2    that means it was attached to something.
3          MR. ACKELSBERG: Yes.
4          MR. SCHEFF: Do we have the
5    attachment?
6          MR. ACKELSBERG: No, no, that's all it
7    is.
8          MR. SCHEFF: That's all it is?
9    There's no other attachment to this?
10         MR. ACKELSBERG: I don't -- I don't
11    think so. I think that's all that it is. You mean
12    was there -- was there an e-mail?
13         MR. SCHEFF: Typically, as I
14    understand --
15         MR. ACKELSBERG: I can't -- I really
16    can't tell you, Richard.
17         MR. SCHEFF: All right. As we've
18    discussed before, and I'll put it on the record now
19    again, my concern about showing attachments to
20    e-mails to witnesses without the e-mail is that it's
21    out of context.
22         MR. ACKELSBERG: I don't know that
23    there is an e-mail.
24         MR. SCHEFF: Just let me finish, and
25    then you can respond.

1        And, obviously, what's important is that
2    we all get truthful testimony that's -- that's put
3    in context. And so I'll ask again, going forward,
4    that if you're going to mark an attachment, and
5    typically that's what it would be if this was the
6    case, then mark the e-mail as well so that the
7    witness can get the full benefit of the entire
8    document.
9         MR. ACKELSBERG: Okay. Thank you.
10    BY MR. ACKELSBERG:
11      Q. So, Mr. Harvison, if you'd take a look at
12    the -- at the document -- so just you know what --
13    well, we'll be showing you a number of documents
14    here today. So you'll see on the -- on the top of
15    the first page of the document in the lower left --
16    the lower right-hand corner, you'll see it says
17    TF-PA and there's a number. We call that a Bates
18    number. And what this means is this was part of
19    the -- this was among the documents that Think
20    Finance, that's what the TF stands for, produced
21    for -- to us in the course of the discovery. And
22    some of these documents were actually spreadsheets
23    or some other form of native document that -- and
24    what -- the first page is just for the benefit of
25    counsel to show them where in the production I got

1    this. Do you understand that?
2      A. I understand.
3      Q. Okay. So if you look at -- if you look at
4    this, you'll see that it's a list of ownership. Do
5    you see that?
6      A. I do.
7      Q. And there's a reference to 7HBF. Do you
8    see that?
9      A. I do.
10      Q. And is that the family entity that you
11    referred to?
12      A. That is.
13      Q. Okay. What does 7HBF stand for? Do you
14    know?
15      A. It's stands for seven because there were
16    seven kids. Harvison. And then BF stands for --
17    it's -- it stands for "bad funds."
18      Q. What does that mean?
19      A. It -- you'd have to ask my granddad on it.
20    I'm not really sure.
21      Q. Okay. And so at that point in time,
22    apparently April of 2012, your family owned,
23    roughly, 16 percent of the company. Does that --
24    does that sound about right?
25      A. That's what it says, yes.

1      Q. Is that a -- well, you had some sense of how
2    much -- how big a share your family had, didn't you,
3    when you were there?
4      A. That sounds about right.
5      Q. Okay. And. . .
6         MR. ACKELSBERG: All right. Let's
7    take a look at another exhibit.
8         (Exhibit No. 100 marked.)
9         MR. SCHEFF: Just for the record, that
10    document -- this document you marked as Exhibit 99
11    was attached to an e-mail.
12         MR. ACKELSBERG: You can read the
13    e-mail if you would like.
14         MR. SCHEFF: From Jeffery Yost to
15    somebody named Kirsten. So, again, you know, when
16    you prepare exhibits to mark and use at depositions,
17    please mark the complete document.
18    BY MR. ACKELSBERG:
19      Q. I am going to show you another exhibit.
20    Now, here on this document, you'll notice there's a
21    different number in the lower right-hand side. Do
22    you see that?
23      A. I do.
24      Q. And that says "GPLP," and then it has a
25    number. Do you see that?

UNSEALED

1    A. I do.
2    Q. Now, what that means, it was in the
3  production that we got from Victory Park. Okay?
4    A. Okay.
5    Q. It's just so you understand how that works.
6    So if you -- if you look at this document,
7  it's -- it's just a piece of a presentation titled
8  "Management Team and Board" and --
9    A. Is there a way to see the whole
10 presentation?
11   Q. I didn't copy the whole presentation.
12     MR. SCHEFF: Again, we're -- going
13 forward, we're not going to permit this. You have
14 to mark the complete document so the witness can see
15 the page that you're referencing in the context of
16 the entire document. This is not fair to the
17 witness. And you need to do that. And we're not
18 going to permit you to mark partial documents. It's
19 just not fair. So please do that.
20     MR. ACKELSBERG: You have the exhibits
21 right there.
22     MR. SCHEFF: Yeah, but the witness --
23     MR. ACKELSBERG: You can -- can you --
24     MR. SCHEFF: Irv, please.
25     MR. ACKELSBERG: Can you show the

1  witness -- if you want him to see the whole damn
2  thing, you can put it on the screen. It's right
3  there next to you.
4      MR. SCHEFF: Mr. Ackelsberg, it is
5  your responsibility to treat the witness fairly and
6  present complete documents to the witness, not one
7  page. And so that's just not fair. And so if we
8  can pull it up, you know, we're happy to show it to
9  him, but it's your responsibility to do that and
10 mark it, and then -- and mark so the witness, as the
11 witness is answering your questions, can see the
12 full context of the page that you're showing him.
13     So, Mr. Herman, if you can do that, I
14 would appreciate you pulling it up. If you can't,
15 you can't.
16     But it's just not fair. You've got to --
17 you've got to show the witness the complete
18 document.
19     MR. HERMAN: Mr. Ackelsberg, I will
20 remind you, I am here representing Mr. Rees. I am
21 not Mr. Harvison's attorney. I can do my best here
22 to try and pull things up.
23     MR. ACKELSBERG: You're partners. I
24 mean, come on.
25     MR. HERMAN: I'm not a partner. I

1  appreciate the promotion. But I'm telling you,
2  Mr. Ackelsberg, I will do my best here to try and
3  present the complete context. But, again, you
4  should present full exhibits and not rely on us to
5  do so.
6      MR. ACKELSBERG: Fine. Thank you.
7  BY MR. ACKELSBERG:
8    Q. Mr. Harvison, looking -- looking at the one
9  page that I did copy, is that an accurate list of
10 the management team and board of the company in
11 January of 2013? Was Ken Rees the president and CEO
12 and chairman of the board?
13   A. Yes, he was.
14   Q. All right. And the other -- the people
15 that are listed as key executives, was Chris Lutes
16 the CFO?
17   A. He was.
18   Q. And was Bill Kontgis the chief information
19 officer?
20   A. Yes.
21   Q. And was Walt Ramsey the chief risk officer?
22   A. Yes.
23   Q. Was Kevin Dahlstrom the chief marketing
24 officer?
25   A. He was.

1    Q. And the rest of the people listed, were
2  they, in fact, the key executives at Think Finance
3  in this time period, January 2013?
4      MR. SCHEFF: Object to the form.
5    You can answer the question.
6    A. Yes, they were.
7  BY MR. ACKELSBERG:
8    Q. Okay. And that lists the board of
9  directors. Do you see that?
10   A. I do.
11   Q. And I notice that you are listed as a board
12 member. You were a board member?
13   A. That's correct.
14   Q. Okay. And the other individuals listed on
15 the exhibit, were they serving with you as -- on the
16 board of directors of Think Finance at this period
17 of time?
18   A. Yes, they were.
19   Q. When did you join the board of Think
20 Finance?
21   A. I believe that would be -- it would be in
22 the mid to late 2000s.
23   Q. And during your tenure on the board, were
24 you the sole executive that was a member of the
25 board?

UNSEALED

Page 33

1      A.   Ken Rees was on the board as well.
2      Q.   Okay.   Now, when you were appointed to the
3 board, were you appointed as a representative of
4 your family?
5      A.   Based on the -- I believe the way the
6 bylaws are written, based on the size investment my
7 family had, they had the right to appoint one board
8 member, and I was their representative on the board.
9      Q.   Okay.   Now, when you first arrived at -- at
10 the company, which was then called Payday One, and
11 you said it only had 15 employees, the product
12 was -- was what?
13      A.   When I joined, the product was -- it was
14 called Payday One.   It was a -- a single pay product
15 offered in probably -- I think when I first joined,
16 it was only offered in about five to ten states, and
17 then it grew over the years.
18      Q.   And you said that there were 15 employees.
19 How many employees were there prior to the move to
20 Elevate?
21           MR. GATEWOOD:   Objection; form.
22      A.   I believe when the move to Elevate took
23 place in 2014, there was probably close to 500
24 employees.   I don't know the exact number, but I'm
25 guessing around 500 employees.

Page 34

1 BY MR. ACKELSBERG:
2      Q.   Okay.   Now, at some point, Payday One began
3 offering a longer term loan product called
4 ThinkCash, correct?
5      A.   That's correct.
6      Q.   And does -- do you remember approximately
7 when?
8      A.   Well, actually, I probably would want to
9 restate that.   The -- the ThinkCash product was
10 launched, I'm going to guess, in the 2006, 2007 time
11 frame, roughly.   But that wasn't a product offered
12 by Think Finance or ThinkCash at that time or Payday
13 One, our brand name.   It was actually through a
14 partnership with First Bank of Delaware where they
15 were the originator of that, and we were a service
16 provider to them.
17      Q.   Okay.
18           MR. ACKELSBERG:   So the next exhibit.
19           (Exhibit No. 101 marked.)
20 BY MR. ACKELSBERG:
21      Q.   Just so you understand, the -- do you see
22 this has the Bates number PAOAG?   This is a document
23 that was produced by the State of Pennsylvania.
24 Okay.   You've got that?
25      A.   Yes.

Page 35

1      Q.   Okay.   So looking at Exhibit 101, this loan
2 broker registration application that was in the
3 records of the Commonwealth, do you recall the
4 company submitting a loan broker application to the
5 Commonwealth of Pennsylvania?
6      A.   I knew we submitted one, yes.
7      Q.   Okay.   And if you'll look on page 2,
8 that's -- that's you identified as the contact for
9 the company?
10      A.   That's correct.
11      Q.   Okay.   The address listed for the company,
12 4150 International Plaza, am I right, that's
13 where -- that's the current address of Elevate as
14 well?
15      A.   Well, Elevate is at 4150 International
16 Plaza, Suite 300, but. . .
17      Q.   But the same building.
18      A.   Yeah.
19      Q.   Okay.   Thank you.
20       And on -- if you turn the page to item --
21 Item 5 on the application, you see it's -- in the
22 lower right-hand corner, it has page 210?
23      A.   I do.
24      Q.   Okay.   And I was wondering if you could
25 explain Item 5, where it asks for the name and

Page 36

1 address of the agents or employees of the loan
2 broker and the application says, "None.   See
3 attached" -- "See Attachment 2, automated decision
4 engine."   Do you see that?
5      A.   I do.   I'm just reviewing it real quick.
6      Q.   Okay.
7      A.   (Reviews document.)
8       I'm sorry, can you repeat the question
9 now?
10      Q.   Oh, I was just -- you see where I'm looking
11 at?
12      A.   I do.
13      Q.   Okay.   So I was wondering if you could
14 explain what this means, to mean -- what the -- what
15 the intent of the company was with regard to this
16 particular -- the answer to this particular question
17 on the -- on the application that no employees but
18 there's an automated decision engine.   What -- what
19 is the intent?
20           MR. SCHEFF:   Object to the form.
21       You can answer the question if you can.
22      A.   So I'm not -- I'm certain -- exactly
23 certain, but I can take a guess at what -- what that
24 was meant for.   I think in a typical mortgage broker
25 relationship, there's an actual mortgage lender

UNSEALED

App. 0414

Page 37

1  person who's referring the loan over. And if you
2  read back in -- in Attachment 2, what we were
3  talking about is being a marketer to provide leads
4  to a website, not an individual. And the website
5  was licensed by the bank, and the bank would do the
6  underwriting on that. And so since there was not a
7  specific individual, I assume they went with an
8  automated decision, an automated process because
9  there's no specific person referring the leads over.
10 BY MR. ACKELSBERG:
11 Q.  What is that -- that's a term you're
12 familiar with, an automated decision engine, right?
13 A.  It is.
14 Q.  Okay. And what does that mean?
15 A.  To me, what an automated decision is, is
16 there's -- and just in general terms, there's preset
17 variables that go into making some -- some --
18      MR. SCHEFF:  Go ahead and finish the
19 question, and then I'll make a comment.
20 A.  -- to making some sort of decision. It
21 could -- and it could be anything from lending rules
22 to triggers for marketing initiatives. But it's
23 just taking a set of rules, automating that there's
24 no human involved in that process, and then coming
25 up with a decision and -- and the outcome that comes

Page 38

1  out with the variables.
2  BY MR. ACKELSBERG:
3  Q.  And when you say "a decision" --
4      MR. SCHEFF:  Before -- before you ask
5  a question, I want to note for the record that
6  Exhibit 101 starts with PAOAG 0000207, and it ends
7  at PAOAG 0000247, but numbers PAOAG 0000219 through
8  243 are missing from this document. So this is an
9  incomplete document, again, that you're asking this
10 witness about.
11     So, again, Mr. Ackelsberg, you must mark
12 complete documents in fairness to the witness.
13 We're -- we can't have depositions where witnesses
14 see pieces of exhibits. It's just not fair.
15     You can ask your next question.
16     MR. HERMAN:  For the record, I would
17 also like to note, Mr. Ackelsberg, I'm not sure this
18 is the correct Bates number from the latest
19 Pennsylvania production. This may have been from an
20 earlier production which was superseded by the
21 Commonwealth. The current Bates number page I have
22 for 207 is an article that you have referenced, and
23 this is PAOAG 0001940.
24     MR. ACKELSBERG:  1940. Okay. Thank
25 you.

Page 39

1  BY MR. ACKELSBERG:
2  Q.  So when -- when you were referring to a
3  decision in describing an automated decision engine,
4  am I right that we're talking about a decision
5  whether to approve a loan or deny a loan
6  application? Is that what we're talking about?
7      MR. GATEWOOD:  Objection; form.
8  A.  So as I said, actually, a decision engine
9  could be used for multiple purposes. One purpose
10 could be for an approval on a loan. It also could
11 be for different account management functions. It
12 could be for variables that come in on customer
13 interactions, if you want to send out customer
14 communications. So it can be -- it can be leveraged
15 in multiple different ways.
16 BY MR. ACKELSBERG:
17 Q.  But that's in -- I see. You're saying what
18 an automated decision engine could be in other
19 context. But I'm talking about the context here,
20 meant that the role of broker was that -- the role
21 of broker that was being played by Think Finance
22 with regard to the ThinkCash product was its
23 automated decision engine for deciding on whether to
24 approve a loan application. That's what we're
25 talking about, right?

Page 40

1      MR. SCHEFF:  Object to the form.
2      You can answer the question if you can.
3  A.  So my understanding the way this would --
4  this was prepared, and I -- this goes back quite a
5  while ago, was that we were going to be providing
6  leads over to a site. There wasn't a specific
7  person to be the broker. That's why that was left
8  off.
9  BY MR. ACKELSBERG:
10 Q.  And the site was your site, right?
11     MR. SCHEFF:  Were you done -- were you
12 done with your answer before Mr. Ackelsberg asked
13 the next question?
14     THE WITNESS:  I am done now.
15     MR. SCHEFF:  All right. Go ahead.
16 BY MR. ACKELSBERG:
17 Q.  And the site was the ThinkCash site,
18 correct?
19 A.  Well, the site was licensed to First Bank
20 of Delaware. So they had a license agreement to --
21 to take ownership of that site.
22 Q.  Of the ThinkCash decision engine, correct?
23     MR. SCHEFF:  Object to the form.
24     You can answer the question if you can.
25 A.  So the decision engine was created by Think

UNSEALED

Page 41

Finance, but any variable that went in to make a
decision based on the criteria that the applicant
inputted was set by the bank, approved by the bank
and any modification of that was -- was at the
bank's discretion.
BY MR. ACKELSBERG:
    Q.  Okay.  And you can see there's an
Attachment 2 that's entitled "ThinkCash Program
Review."  That's at the end of the exhibit.  You see
that, right?
    A.  I do.
    Q.  And this is a document that was drafted
by -- by Think -- by Payday One or ThinkCash, right?
        MR. SCHEFF:  Object to the form.
        You can answer the question if you can.
    A.  I believe it was.
BY MR. ACKELSBERG:
    Q.  Okay.  And which department would have
drafted this document?
        MR. SCHEFF:  Object to the form.
    A.  I would assume that the -- our legal
department would have drafted this.
BY MR. ACKELSBERG:
    Q.  Okay.  But it's a document that -- it looks
familiar to you?  You remember seeing it, right?

Page 42

    A.  It's -- it's been a long time.  I can't
remember specifically, but. . .
    Q.  But it looks familiar?
    A.  It looks familiar.
    Q.  Thank you.
        In the second paragraph, it states, "TC
Loan Service, doing business as ThinkCash, the
marketing and service entity of PayDay One, will
provide all marketing and servicing for the program,
and the lender will be one or more state banks."  Do
you see that?
    A.  I do.
    Q.  "Currently, we're working with the First
Bank of Delaware."
        Now, my question is, was there a time when
the company imagined more than one bank partnering
with the company for this -- for this type of
product?
        MR. SCHEFF:  Object to the form.
    A.  Yes, our intent was that we could create
products with multiple bank partners behind it to
help support any banks that wanted to get in the
lending space.
BY MR. ACKELSBERG:
    Q.  But am I right, that the only bank

Page 43

partnership that you ever had with regard to this
particular installment loan product was First Bank
of Delaware?
    A.  In regards to the ThinkCash product, the
First Bank of Delaware was the only bank partner we
had.  We had bank partnerships prior to that and
bank partnerships post that.  But specifically for
ThinkCash, that's correct.
    Q.  Okay.  And if you look at the graphic, the
last page, is this an accurate representation of the
different roles played by ThinkCash and First Bank
of Delaware when that product was in operation?
        MR. SCHEFF:  Object to the form.
    A.  So I would say this was an outline of how
we first approached the bank to talk about
structuring the program.  It evolved over time.  So
I think as -- as the program matured and evolved,
not only did the bank have control over the
underwriting criteria and the verifications about
the ACH processing, but they also took on the
customer support and collections of product over
time.
BY MR. ACKELSBERG:
    Q.  Okay.  Now, you mentioned that the -- that
this relates to the earlier time when you approached

Page 44

the bank about the product.  Were you part of the
team that approached the bank?
    A.  I made the first introduction to the CEO of
the bank, and then negotiations from there were
handled with our CEO and our legal team.
    Q.  Being Ken Rees?
    A.  Yes.
    Q.  Okay.  So you made the first contact.  But
that was with who at First Bank of Delaware?
    A.  Alonzo Primus.
    Q.  And did you have a preexisting relationship
with Mr. Primus?
    A.  We did not.
    Q.  Were you aware that Mr. Primus, that the
bank had partnerships with other payday lenders at
the time?
        MR. SCHEFF:  Object to the form.
        You can answer.
    A.  We were aware that First Bank of Delaware
had other service provider relationships, which is
why we were -- we were looking for banks to partner
with in a similar fashion.  So he was somebody we
wanted to speak with.
BY MR. ACKELSBERG:
    Q.  And do you remember who some of the other

11  (Pages 41 to 44)

UNSEALED

App. 0416

1  you were a party to. Do you see that?
2  A. I do.
3  Q. Okay. And so -- now, the other people, do
4  you recall these people, like, John Gallagher at
5  First Bank of Delaware? Do you remember him?
6  A. I do.
7  Q. Was he one of the people you were
8  interacting with with regard to the operation of the
9  product?
10  A. He was.
11  Q. Okay. And it looks like the topic that was
12  being discussed with the bank was what happens to
13  leads that don't result in funded applications with
14  the bank, right?
15  A. Yes.
16  Q. And do you recall how -- how this issue was
17  resolved? Did, in fact, Think retain the right to
18  market the leads that did not result in completed
19  ThinkCash loans?
20  MR. GATEWOOD: Objection; form.
21  A. I'd have to go back and look at some
22  documents. I don't remember how that was resolved.
23  MR. ACKELSBERG: Okay. Look at 108.
24  (Exhibit No. 108 marked.)
25  MR. SCHEFF: Again, I'm going to note

1  for the record, that the top of this document says,
2  "Case 2:14-cv-07139-JCJ, Document 205-1, Filed
3  12/21/17, page 5 of 8." So --
4  MR. ACKELSBERG: A page from the
5  complaint, Richard.
6  MR. SCHEFF: You know, again, show him
7  the complete document, Mr. Ackelsberg. This will be
8  the last deposition where this occurs.
9  MR. ACKELSBERG: You have given this
10  speech how many times.
11  MR. SCHEFF: Then just represent to me
12  that this will be corrected so I can tell my client
13  for tomorrow that, in fact, she will be deposed. If
14  not, she will not be. Okay?
15  BY MR. ACKELSBERG:
16  Q. So I'm showing you just a page from the
17  complaint, an exhibit that was attached to the
18  complaint in this matter and showing an e-mail. And
19  I'm just asking you, just based on your recollection
20  of the product, does this look like the kind of
21  communication that Think would have sent to
22  consumers that were involved in the -- well, that
23  were being marketed for the product?
24  MR. SCHEFF: Object to the form.
25  MR. GATEWOOD: Objection; form.

1  A. So, yes, this looks like the type of
2  advertisement approved by the bank that Think would
3  send out to -- to attract customers.
4  BY MR. ACKELSBERG:
5  Q. And was that -- and it references that
6  consumers can apply for the product at the website
7  thinkcash.com, you recall that, correct?
8  A. I do.
9  MR. ACKELSBERG: All right. Why don't
10  we -- this would be a good place to stop.
11  MR. SCHEFF: Sure. That's fine.
12  THE VIDEOGRAPHER: We are off the
13  record. The time 10:12 a.m.
14  (Break taken, 10:12 a.m. to 10:32 a.m.)
15  THE VIDEOGRAPHER: We are back on the
16  record. The time is 10:32 a.m.
17  BY MR. ACKELSBERG:
18  Q. Mr. Harvison, do you remember in 2009 the
19  company being notified by the Pennsylvania banking
20  department that online -- online lending, like being
21  done with the Think -- like in the ThinkCash
22  product, would no longer be allowed in Pennsylvania?
23  Do you remember that happening?
24  MR. GATEWOOD: Objection; form.
25  MR. SCHEFF: Object to the form.

1  You can answer the question.
2  A. No, I don't remember that.
3  MR. ACKELSBERG: Okay. I'm going to
4  skip -- skip a few documents in the numbering and go
5  to No. 112.
6  MR. GATEWOOD: Irv, you're skipping a
7  few numbers?
8  MR. ACKELSBERG: Yes. Actually, I am
9  going to -- let me identify 111, too. I am going to
10  show you both of them.
11  (Exhibit Nos. 111 and 112 marked.)
12  BY MR. ACKELSBERG:
13  Q. Now, both Exhibits 111 and 112, pertain to
14  a topic I just want to ask you briefly about, and
15  that is with regard to Think Finance buying leads
16  from CashNetUSA. Do you remember that?
17  A. I do remember.
18  Q. You do. Yeah, okay. So why don't we start
19  with 111. And first, let me -- let me just ask
20  you -- we're going to look at several board memos
21  over the course of the deposition. And you
22  mentioned that -- you confirmed that you were a
23  board member at Think Finance during this period of
24  time. And as a member of the board, did you receive
25  board packages before a meeting?

UNSEALED

1         MR. SCHEFF: Object to the form;
2 misstating the testimony.
3         You can answer the question if you can.
4    A. Board members typically receive the board
5 package the day before the meeting.
6 BY MR. ACKELSBERG:
7    Q. And part of that package would be a memo
8 from the CEO, Ken Rees?
9    A. That's correct.
10    Q. And, typically, would that report be
11 discussed at the meeting, the -- the CEO report?
12         MR. SCHEFF: Object to the form.
13         You can answer the question.
14    A. Typically, the memo wasn't discussed at the
15 meeting. It was really the contents of the
16 presentation.
17 BY MR. ACKELSBERG:
18    Q. Okay. But the memo there -- the board
19 members would have the memo prior to the meeting?
20    A. That's correct.
21    Q. And so if you look at 111, I believe I'm
22 showing you one of -- am I right, that this would --
23 this would be what we're talking about with a CEO
24 memo to the board? This would be one such memo?
25    A. Yes.

1    Q. We're looking at TF-PA 724002. And I want
2 you to look at the second page under "ThinkCash,"
3 the next to the last paragraph. And why don't you
4 read that out loud?
5    A. Sure. It says, "We are also working on
6 some strategic opportunities to buy traffic from
7 lenders who have exited from certain states. In
8 particular, we're close to a deal with CashNetUSA
9 and one other online lender. I hope to expand these
10 over time."
11    Q. And then if you look at -- well, let's just
12 stay with that -- with that sentence. So what can
13 you tell us -- what do you remember about that line
14 of business, buying leads from CashNetUSA?
15         MR. GATEWOOD: Objection; form.
16         MR. SCHEFF: Object to the form.
17 BY MR. ACKELSBERG:
18    Q. Did it actually happen? There was a period
19 you were, in fact, buying leads?
20         MR. SCHEFF: Object to the form.
21         You can answer.
22         Is that a question? Because it sounded --
23 BY MR. ACKELSBERG:
24    Q. Was there a period of time that Think did,
25 in fact, buy leads from CashNetUSA?

1    A. So, yes, there was.
2    Q. Okay. And what do you recall with regard
3 to that line of business?
4    A. What I remember about that structure being
5 is that CashNet would have traffic that they either
6 they -- they couldn't approve based on not meeting
7 their underwriting criteria or they had states that
8 they didn't service. And if it matched up with a
9 partner of ours, like, the ThinkCash program, that
10 we could purchase some of those leads and send it
11 over to the bank for them to review.
12    Q. Okay. And that looking at the next
13 exhibit, 112, where are, in fact, some of those
14 leads then considered for ThinkCash loans?
15         MR. SCHEFF: Object to the form.
16         You can answer the question.
17    A. I'm sorry, can you restate that one more
18 time?
19 BY MR. ACKELSBERG:
20    Q. If you look at -- if you look at 112, it
21 appears to be an Outlook appointment with -- between
22 yourself and people at First Bank of Delaware.
23 Correct?
24    A. Correct.
25    Q. So is it correct, that first -- that the

1 ThinkCash program, in fact, did take applications
2 that were leads from CashNetUSA?
3         MR. GATEWOOD: Objection; form.
4 BY MR. ACKELSBERG:
5    Q. Did that happen?
6    A. Yes, so this -- this meeting was probably,
7 what, four months after the board memo. But at some
8 point, there -- there was time where ThinkCash took
9 volume from other providers.
10    Q. Okay. Thank you.
11         MR. ACKELSBERG: I am going to show
12 you another exhibit, P-113.
13         (Exhibit No. 113 marked.)
14 BY MR. ACKELSBERG:
15    Q. Was there -- looking at Exhibit 113, was
16 there an e-mail list internally called "PDO
17 Corporate"?
18    A. Yes.
19    Q. And were you on that list?
20    A. I was.
21    Q. Okay. So you would have received this
22 e-mail, then, from Sarah Cutrona in July of 2009?
23    A. Yes, I would have.
24    Q. And do you recall the e-mail?
25    A. I don't remember particularly, but,

18 (Pages 69 to 72)

UNSEALED

1   obviously, I received it.
2       Q.  Do you remember -- do you remember anything
3   at all with regard to the topic of -- you don't
4   recall the specific e-mail, but do you recall the
5   subject discussed in the e-mail?
6       A.  I do.
7       Q.  Okay.  And what do you remember about it?
8           MR. SCHEFF:  Again, to the extent you
9   can answer this question without disclosing
10  communications with counsel for Think Finance,
11  please do.  And if you can't, then I assume there's
12  a direction not to answer, Mr. Gatewood?
13          MR. GATEWOOD:  Yes, that's right.
14      A.  So, I mean, I think it's -- my response
15  would be pretty much what's contained within this --
16  this e-mail, in that there was a regulatory change
17  within the state of Pennsylvania.  So the direct
18  lending product that we had through PayDay One in
19  the state was -- was paused, and we stopped
20  marketing that product in the state of Pennsylvania.
21  BY MR. ACKELSBERG:
22      Q.  Now, in the second -- at the end of the
23  second paragraph of the Cutrona e-mail, it says,
24  "Our diversification strategy is indeed paying off."
25  Do you see that?

1       A.  I do.
2       Q.  And you know what she's referencing, don't
3   you?
4           MR. SCHEFF:  Object to the form.
5           You can answer the question if you can.
6   And, again, to the extent that you can answer the
7   question without disclosing confidential
8   communications with counsel, you may.  And if not, I
9   assume Mr. Gatewood will direct you not to answer
10  the question.
11      A.  I mean, that -- that would be stuff -- a
12  conversation that we had with Sarah.
13  BY MR. ACKELSBERG:
14      Q.  Well, what -- I'm not asking for your
15  conversation with Sarah.  I'm asking within --
16  within the executives, do you know what this refers
17  to, a diversification strategy?
18          MR. GATEWOOD:  And I instruct the
19  witness not to answer that question.  He's stated
20  that -- you asked him what diversification strategy
21  means within the context of Mr. Cutrona's e-mail,
22  and he's indicated that that meaning derives from
23  his conversation with Ms. Cutrona, and, therefore,
24  is confidential attorney-client communication and
25  I'm instructing the witness not to answer.

1           MR. ACKELSBERG:  Okay.
2           (Exhibit No. 114 marked.)
3   BY MR. ACKELSBERG:
4       Q.  All right.  We're looking at the Rees
5   report to the board members dated September 16,
6   2010.  Do you see that?
7       A.  I do.
8       Q.  All right.  And if you'd turn to Mr. Rees's
9   discussion of the ThinkCash product on page 2.
10          MR. GATEWOOD:  Mr. Ackelsberg, is this
11  Exhibit 114?
12          MR. ACKELSBERG:  Yes, it is.
13  BY MR. ACKELSBERG:
14      Q.  Why don't you read the second paragraph in
15  the ThinkCash discussion.
16      A.  It says, "We are going to be consciously
17  slowing the growth of ThinkCash between now and the
18  end of the year.  First Bank of Delaware has become
19  concerned that we are growing so fast that the
20  regulators may become upset.  They want to make sure
21  they have a good exam this year, so they are
22  hypersensitive to anything that might cause
23  problems."
24      Q.  Do you -- do you -- my first question is,
25  do you recall First Bank of Delaware being concerned

1   that the product -- that the -- that the product was
2   growing too fast for its appetite?
3           MR. GATEWOOD:  Objection; form.
4       A.  So my recollection was that the -- the
5   product was -- was at a nice growth rate and they
6   wanted to make sure that they had the proper support
7   for a program growing at that rate.  So they -- they
8   did ask to slow down the program some.
9   BY MR. ACKELSBERG:
10      Q.  There's reference to also in -- under
11  "ThinkCash" an upcoming release for ThinkCash 2.0.
12  Do you see that at the bottom?
13      A.  I do.
14      Q.  What was ThinkCash 2.0?
15      A.  My recollection on this was a -- what we
16  would call a refresh or a reskin of the website, so
17  improve the look and feel, the application flow.
18  And so through that process, we worked with the bank
19  to redesign what the first release of the -- the
20  website content looked like to help improve
21  comparisons with the -- the second release of it.
22      Q.  Okay.  Now, when -- you mentioned that
23  when -- that prior to the board -- the day before
24  the board would meet, they would get a package,
25  right?

UNSEALED

1    A.   Correct.
2    Q.   Okay.  And besides the CEO's report, there
3  would be a large -- a large dec that was also
4  generally produced, right?
5         MR. SCHEFF:  Object to the form.
6         You can answer the question if you can.
7    A.   Yes.
8  BY MR. ACKELSBERG:
9    Q.   And that -- those decs could be very
10  numerous in terms of the pages; am I right?
11         MR. SCHEFF:  Object to the form.
12    A.   The presentation is very lengthy, yes.
13  BY MR. ACKELSBERG:
14    Q.   It could be a very -- very lengthy
15  presentation.  Okay.
16         MR. ACKELSBERG:  Well, I want to show
17  you -- in the production we got a number of these
18  presentations, and I want to show you a piece of one
19  of those.  And what I have done here is I have
20  copied the first page of the dec so you know which
21  dec it came out of.  And I'm calling this
22  Exhibit 115.
23         (Exhibit No. 115 marked.)
24         MR. SCHEFF:  How many pages is this
25  dec, Mr. Ackelsberg?

1         MR. ACKELSBERG:  It was too big to fit
2  in my notebook.
3         MR. SCHEFF:  Well, the next time it
4  won't be.  And you're going to have to show the
5  entire exhibit.
6  BY MR. ACKELSBERG:
7    Q.   So I'm showing you from the dec pages
8  671848 and 671849.  And, again, this is -- you'll
9  see this is from the October 15th, 2010, meeting.
10  Do you see that?
11    A.   Yes.
12    Q.   All right.  And what -- well, let me ask
13  you about these decs.  I mean, who would generally
14  prepare them for the board?
15         MR. SCHEFF:  Object to the form.
16    A.   The board decs were generally prepared by
17  the -- the finance department, and then for special
18  topics, it would depend on which topic we were going
19  into.  You know, Ken would have a few slides in
20  that, maybe our regulatory team, and sometimes the
21  product teams.
22  BY MR. ACKELSBERG:
23    Q.   So in looking at -- in looking at this --
24  this subject here, "Operating Margin Improvement
25  Initiatives," would this likely have been produced

1  by then either Ken or the finance department?  Is
2  that -- is that what you think?
3         MR. SCHEFF:  Object to the form.
4    A.   Yes.
5  BY MR. ACKELSBERG:
6    Q.   With regard to -- under "Collections," you
7  see it says, "Will sell off old bad debt this year."
8  Do you see that?
9    A.   I do.
10    Q.   And it says, also, that the company is
11  working with a debt monetization expert to optimize
12  sales.  Do you see that?
13    A.   I do.
14    Q.   And that would have been Bret Horrocks of
15  SourceItOne, correct?
16         MR. SCHEFF:  Object to the form.
17    A.   Bret was the consultant that we were
18  working with for the debt sale process.
19  BY MR. ACKELSBERG:
20    Q.   And you worked on that project, correct?
21    A.   I did some, yes.
22    Q.   And what were -- and what were the terms of
23  his engagement?  Do you recall?
24    A.   I'd have to go back to his contract to look
25  at what the terms are.

1    Q.   Basically, what was his job?  What was
2  he -- what was he retained to do?
3    A.   What I remember the purpose of his
4  engagement was twofold.  One, was to look at and
5  evaluate the potential to sell off bad debt, who the
6  vendors are that could purchase that debt either
7  from -- from Think at that time or from the bank
8  product.  And then also to do a review of collection
9  practices, either for Think or for our partners, and
10  making recommendations on how to improve the
11  collection strategies there.
12    Q.   And, ultimately, it was Bret Horrocks that
13  connected you with National Credit Adjusters, right?
14         MR. DAUGHERTY:  Objection to form.
15    A.   I believe he did make the introduction.
16  BY MR. ACKELSBERG:
17    Q.   And, in fact, the debt sales were made -- I
18  mean, in fact, Think did sell the debt to NCA,
19  right?
20         MR. SCHEFF:  Object to the form.
21  BY MR. ACKELSBERG:
22    Q.   That happened over time, right?
23         MR. SCHEFF:  Object to the --
24         MR. ACKELSBERG:  Go ahead.
25         MR. SCHEFF:  Object to the form.

UNSEALED

1    A.  So my recollection was, there was debt
2  sales made to NCA, but it was not just Think. It
3  was the Think and then also some of the partners
4  that -- that licensed Think's products to lenders on
5  those products as well.
6  BY MR. ACKELSBERG:
7    Q.  Right, but those were arranged through Bret
8  Horrocks, correct?
9        MR. SCHEFF:  Object to the form.
10    A.  Bret made the introduction in the -- like,
11  the proposal was made to the lender up, but it was
12  to them to decide whether they wanted to sell that
13  debt off.
14  BY MR. ACKELSBERG:
15    Q.  Right.  And it was -- and it was Think that
16  would decide what -- Think would actually -- how did
17  the debt sales work?  Tell me how the debt sales
18  worked.
19    A.  Initially, Bret did go out and talk to
20  different vendors of their level of interest in
21  purchasing debt from the various entities.
22  Proposals were made of what they would be willing to
23  pay for the debt.  Those were shared with the
24  lenders, whether that be us or our partners.  And
25  once that was agreed upon, there was -- a purchase

1  was made and signed off on by each of the lenders,
2  whether that was as with the third-party lender,
3  depending on the portfolio.  And I can't remember if
4  it happened initially or if it was over time, a --
5  an agreed upon forward flow agreement was put in
6  place so that each month that debt was charged off
7  by the individual portfolios, that lender would sell
8  that debt to the third-party buyer.
9    Q.  And then there was a unit at Think Finance that
10  would -- that would determine on a monthly basis
11  what debt would be ready for sale?
12        MR. GATEWOOD:  Objection; form.
13        MR. SCHEFF:  Object to the form.
14    A.  There would not be a -- it was not a group
15  within Think that would determine what debt would be
16  sold.  What debt would be sold was agreed upon in
17  the contracts up front between the lender and the
18  buyer.  So if anything was to be excluded, for
19  instance, bankruptcies or deaths of individuals,
20  those would be excluded before they were sold.
21  And. . .
22  BY MR. ACKELSBERG:
23    Q.  And then how would the determination be
24  made?  What contracts -- what contracts met -- what
25  accounts met the terms of the contracts and were

1  ready for -- ready for sale pursuant to those
2  contracts?
3        MR. SCHEFF:  Object to the form;
4  compound question.
5    A.  So, typically, an account would be
6  identified within the system if we -- if the lender
7  received a deceased notification, for instance, that
8  would be flagged in the system.  So when those
9  accounts rolled to a charge off, they would be
10  pulled out of the file before it was sent on behalf
11  of the lender to the third party for the debt sale.
12  BY MR. ACKELSBERG:
13    Q.  And the chargeoffs would be identified by
14  Think and forwarded to Brett Horrocks, correct?
15        MR. SCHEFF:  Object to the form.
16        MR. GATEWOOD:  Objection; form.
17    A.  So, as I mentioned before, the criteria of
18  what account would be excluded was predetermined by
19  the lenders up front based on their risk appetite.
20  Because the lender licensed our platform, we
21  could -- the system had flagged within it which of
22  those accounts met that criteria before it was sold.
23  BY MR. ACKELSBERG:
24    Q.  Okay.  And that -- that system continued
25  into the tribal period; am I right?

1        MR. SCHEFF:  Object to the form.
2    A.  This system that was -- I'm sorry, which
3  system were you talking about there?
4  BY MR. ACKELSBERG:
5    Q.  That you just described.  So criteria would
6  be -- would be approved by the particular lender,
7  and the system, meaning the Think Finance system,
8  would identify the -- the delinquent accounts that
9  were ready for sale, correct?
10        MR. SCHEFF:  Object to the form.
11    A.  So as I mentioned, with the tribal partners
12  as well, the tribal lender would set the criteria up
13  front.
14  BY MR. ACKELSBERG:
15    Q.  Understood.
16    A.  And was -- since the tribe -- or the lender
17  had actually licensed the system -- it was their
18  systems, but the system allowed for those accounts
19  to be flagged so that they wouldn't be sold
20  erroneously.
21    Q.  Right.  And they would generally be
22  forwarded to the -- the accounts would be forwarded
23  to Bret, who would then forward it to the
24  appropriate lender?  Is that the way it worked?
25    A.  So my recollection was that Bret did have

UNSEALED

1  some -- there was access to certain databases that
2  in case we weren't notified of a -- of a bankruptcy
3  or a deceased, a part of his contract allowed him
4  to -- to look at those files and make sure that
5  those were excluded so they wouldn't be sold as a --
6  as a second step or a backup step, to make sure if
7  the system wasn't flagged, we could use these
8  third-party databases.  And he was -- he was part of
9  the -- I would call what he was for us was part of
10  the overall loan management system to flag those
11  accounts.
12       Q.  Now, this stack is in -- the period of time
13  that's October 2010, and this is roughly about the
14  time that the -- that Think learned that First Bank
15  of Delaware wanted to pull out of ThinkCash, right?
16            MR. SCHEFF:  Object to the form.
17       A.  So my recollection was that happened later
18  on that year.  Actually, it was -- I think it was
19  more, like, November, but could have been late
20  October.
21            MR. ACKELSBERG:  Well, let's look
22  at -- let's look at another document.  Maybe your
23  recollection will be refreshed.
24            (Exhibit No. 116 marked.)
25            MR. GATEWOOD:  This is No. 116?

1            MR. ACKELSBERG:  Uh-huh (affirmative
2  response).
3  BY MR. ACKELSBERG:
4       Q.  Now, this -- this dec was not in a -- I
5  didn't see it as a -- as a board dec.  It just says
6  "Leadership Team Session."  Can you -- can you tell
7  us who would have been preparing this and for what
8  audience?
9            MR. SCHEFF:  Object to the form.
10            Answer if you can.
11       A.  My recollection is this would have been Ken
12  preparing this to chat with the executive team at
13  Think Finance.
14  BY MR. ACKELSBERG:
15       Q.  Ken Rees you mean?
16       A.  That's correct.
17       Q.  And so do you remember -- in looking at
18  this, do you remember this particular presentation
19  by Mr. Rees?
20            MR. SCHEFF:  Object to the form;
21  misstates the testimony.
22       A.  Sorry.  I'm just trying to read this real
23  quick.
24  BY MR. ACKELSBERG:
25       Q.  Sure.

1            MR. SCHEFF:  Take your time,
2  Mr. Harvison.
3       A.  (Reviews document.)
4            Okay.  Sorry.
5  BY MR. ACKELSBERG:
6       Q.  Now, who would have been the audience for
7  this presentation by Mr. Rees?
8            MR. SCHEFF:  Object to the form.
9       A.  Typically, this would have been shared with
10  Ken's direct reports, the executive team at Think
11  Finance.
12  BY MR. ACKELSBERG:
13       Q.  That would be you, Chris Lutes.  Who else?
14       A.  Sarah Cutrona, Kevin Dahlstrom.  And at
15  that point, I can't remember who our head of risk
16  was or head of IT, but they would have been there as
17  well.
18       Q.  Okay.  And turn to page 4 of the -- of the
19  presentation.  It's 676199.  And the third -- the
20  third item, "Less focus on banks due to the current
21  regulatory uncertainty."  Do you recall during this
22  period of time that the -- this being a discussion
23  within -- within the executive team to find -- well,
24  less focus on banks?  Do you remember that?
25            MR. GATEWOOD:  Mr. Harvison, to the

1  extent that your recollection comes from information
2  you obtained from Ms. Cutrona, I would instruct you
3  not to answer.
4       A.  Sure.  What I do remember that was not part
5  of this conversation was just, well, what are other
6  business lines can we look into to help grow the
7  business.
8  BY MR. ACKELSBERG:
9       Q.  Now, you were aware during this period of
10  time that other -- other, let's say, competitors
11  were partnering with Indian tribes; am I right,
12  during. . .
13       A.  We were generally aware that some -- some
14  of those operations were taking place.
15       Q.  But up until this point in time, you were
16  not exploring partnerships with -- with Native
17  American tribes; am I right?
18       A.  Through the years, we have looked at that
19  model a couple of different times.
20       Q.  When do you think you looked?  When do you
21  remember looking?
22       A.  I want to say we looked at it first back in
23  2008, and then, once again, in 2010 time frame.
24       Q.  But am I right that, you didn't pursue it
25  because you had this relationship with First Bank of

1    Delaware and you didn't really need -- you didn't
2    need another -- another model since ThinkCash was
3    working so well?
4          MR. SCHEFF:  Object to the form.
5          MR. GATEWOOD:  Objection.
6    BY MR. ACKELSBERG:
7      Q.  That would be -- that would be a fair
8    summary, wouldn't it?
9      A.  What I recall is that our legal team
10   couldn't get comfortable with the model in 2008, and
11   then with some changes that took place in 2010, they
12   were able to get comfortable with that model.
13      Q.  And do you remember what those changes
14   were?
15      A.  Those were conversations with -- with --
16   with Sarah, so I can't disclose those.
17      Q.  And so at some point, around -- around the
18   time that you learned that First Bank of Delaware
19   was going to be withdrawing from the ThinkCash
20   product, the decision was made to begin to search
21   for potential tribal partners?
22         MR. GATEWOOD:  Objection; form.
23      A.  So, I mean, I think if you -- if you look
24   on slide 8, that -- you know, what we decided was --
25   and this was a very early on presentation, but we

1    needed to explore multiple different offers.  We
2    just lost two partners that generate somewhere
3    between 70, 80 percent of the revenue for the
4    business.  And so we started to expand and look out
5    for other opportunities.
6       And I think if you look in the 2011 --
7    actually, at the end of 2010, we actually purchased
8    a UK business to help move down that vertical.  We
9    launched two products, one being a prepaid card
10   product called Spendable, a rent-to-own product
11   called Presta, and then we also started exploring
12   and going down the path of the tribal products as
13   well.
14   BY MR. ACKELSBERG:
15      Q.  If you go to page 7 of the -- of the dec,
16   it's talking about the core business, right?  And so
17   state-based ThinkCash was the -- was that pursued?
18      A.  So this is where we were looking at state
19   license installment lending, where that could be
20   applicable.
21      Q.  I mean, that, ultimately, is what you did
22   with RISE, right?
23      A.  So if you look at the first two there --
24   sorry.  If you look at what we had with RISE, that's
25   correct, we -- we ended up getting RISE licensed to

1    do state -- to do installment lending license on a
2    state-by-state basis.
3      Q.  And the last thing mentioned, "Optimize
4    ThinkCash migration and enterprise value," what did
5    that mean?
6      A.  So that there was -- there was a portfolio
7    there within ThinkCash, and the question was do we
8    let that liquidate down or do you find through
9    working with a bank, are there other products that
10   can be offered to those consumers that were
11   interested in the lending products.
12      Q.  So we're talking there about the -- in
13   part, about the customer base of ThinkCash, right?
14      A.  Yes.
15      Q.  Because the way the product works was a lot
16   of your new loan -- a lot of your -- your new
17   originations would come from existing customers,
18   right, returning customers?
19         MR. GATEWOOD:  Objection; form.
20         MR. SCHEFF:  Object to the form.
21      A.  So I'd say there was a good -- for the --
22   for the ThinkCash -- for the bank, the lender there,
23   there was a good split between new customer traffic
24   and returning customer traffic for them.
25   BY MR. ACKELSBERG:

1      Q.  And what part of what your -- what you
2    didn't want to do was lose those -- the potential
3    for those customers to return for another loan,
4    right?
5         MR. SCHEFF:  Object to the form.
6      A.  The way I recall the -- the contracts being
7    set up is the marketing entity, TailWind, had the --
8    had the right to continue to market to those
9    accounts even if the relationship with the bank
10   terminated.  So we were trying to find a way how to
11   best market to those consumers.
12   BY MR. ACKELSBERG:
13      Q.  Now, am I right that within -- within weeks
14   of the discussions in October of 2010, the company
15   had developed a tribal product -- a concept of a
16   tribal product named Great Plains?
17         MR. GATEWOOD:  Objection; form.
18      A.  So I wouldn't characterize it within weeks.
19   As I mentioned before, we were looking at, you know,
20   various different initiatives, and -- and I believe
21   Sarah was trying to evaluate what those -- what that
22   model might look like.
23         MR. ACKELSBERG:  All right.  Let's
24   look at 118.  I am going to skip -- we're going to
25   skip 117.

UNSEALED

1          MR. SCHEFF:  I want to take about a
2    three-minute bio break.
3          MR. ACKELSBERG:  Okay.
4          THE VIDEOGRAPHER:  Off the record?  We
5    are off the record.  The time is 11:08 a.m.
6          (Break taken, 11:08 a.m. to 11:12 a.m.)
7          THE VIDEOGRAPHER:  We are back on the
8    record.  The time is 11:12 a.m.
9          (Exhibit No. 118 marked.)
10   BY MR. ACKELSBERG:
11        Q.  So, Mr. Harvison, I show you what's been
12   marked as Plaintiff's Exhibit 118.  I am showing you
13   another one of these reports to the board by
14   Mr. Rees.  And you see it's -- the date is
15   November 17th, 2010?
16        A.  Yes.
17        Q.  Okay.  And do you see in the second
18   paragraph  that Ken is discussing -- he says, "We'll
19   discuss our plans for moving ahead with Great Plains
20   Financial"?
21        A.  I do see that.
22        Q.  Okay.  So by November 17th, 2010, there was
23   a concept that was being developed internally in the
24   company called Great Plains Financial; am I right?
25        MR. SCHEFF:  Object to the form.

1        A.  What I remember is we were exploring that
2    option along with other options we talked about
3    earlier.
4    BY MR. ACKELSBERG:
5        Q.  Yeah, but there was a group that was
6    actually putting together the infrastructure for a
7    potential tribal product called Great Plains
8    Financial, was there not?
9          MR. SCHEFF:  Object to the form; asked
10   and answered.
11         You can answer it again.
12        A.  As I mentioned, there was a -- there was a
13   group looking at how a product could be put together
14   for a tribal partner.  That was one area they were
15   exploring.
16   BY MR. ACKELSBERG:
17        Q.  And by "exploring," meaning they're --
18   they're actually coming up with mock -- mock-ups for
19   websites, right?  That was one of the things that
20   was being done?
21         MR. SCHEFF:  Object to the form.
22         MR. GATEWOOD:  Objection; form.
23        A.  So what I would say from an exploration --
24   exploration standpoint, the team was looking at the
25   legal structure of how a tribal partnership could be

1    set up, in conjunction at the same time of could we
2    build -- or use the technology we had already built
3    with bank partners to be used with tribal lenders as
4    well.
5    BY MR. ACKELSBERG:
6        Q.  And you already began doing that, didn't
7    you?  As of this point in time, there were people
8    that were actually building that, weren't there?
9          MR. SCHEFF:  Object to the form.
10         MR. GATEWOOD:  Because the witness has
11   testified previously that the legal group was --
12         MR. ACKELSBERG:  I'm not talking about
13   the legal.
14         MR. GATEWOOD:  Hold on -- that the
15   legal group was reviewing several options that had
16   been developed, I would instruct the witness not to
17   answer to the extent that it calls for information
18   that was derived from legal counsel.
19        A.  Sure.  So -- so I would probably put this
20   in context of in October we were notified by First
21   Bank of Delaware that they were exiting the program
22   in December.  So from an organizational standpoint,
23   we had just lost one of our biggest partners.  So
24   when that happens, obviously, you saw from the
25   earlier slide dec, that we were looking to explore

1    multiple different things, which means you might
2    have to take some chances and make investments to
3    build some things out that may or may not come to
4    fruition.
5          So we spent a lot of time exploring the UK
6    operation.  We actually built, as I talked about
7    earlier, two other products that were launched in
8    2011 that were eventually shut down.  And this is an
9    example where we were exploring the regulatory
10   model, but at the same time, we said let's go ahead
11   and invest some on the IT side and -- in hopes that
12   everything works out so we're a step ahead.
13         If it didn't work out, then that would
14   have been an opportunity cost that we would have
15   missed out on, but it was -- it was an investment we
16   were willing to make as we were exploring multiple
17   different options at that time.
18   BY MR. ACKELSBERG:
19        Q.  And who came up with the name Great Plains
20   Financial?
21        A.  That would have been somebody on our
22   marketing team.
23        Q.  And if you'd turn to the second page, the
24   last paragraph under "ThinkCash," where Mr. Rees
25   says, "As mentioned above, we propose to migrate the

UNSEALED

1 balances to another lender that will be able to lend
2 in 48 states except South Dakota and West Virginia."
3 Do you see that?
4     A.  I do see that.
5     Q.  All right.  And do you know why South
6 Dakota and West Virginia was excluded at that point?
7     A.  I don't know why Ken wrote those two states
8 in the memo.
9     Q.  Okay.  Now, am I right that what was being
10 explored was the possibility of migrating the
11 ThinkCash customer base to a potential tribal
12 lender?
13         MR. SCHEFF:  Object to the form.
14 BY MR. ACKELSBERG:
15     Q.  That's what was being contemplated then
16 and -- at this point?
17     A.  So the way I recall, I don't know if
18 migrate the balance was the best use of the words in
19 this -- this memo, as I -- as I mentioned earlier,
20 we were looking for other partners that we could --
21 we could help market loans to their site.  But part
22 of the conversation -- I don't know -- I don't know
23 if the balance would actually be purchased unless we
24 found a lender that had the balance sheet to
25 actually purchase that from the bank.  It would be

1 more about a partner that we could -- we could help
2 market some of these products to.
3     Q.  All right.  What I want to do now is sort
4 of -- I'm going to take you through a number of
5 these board meetings, but I want to jump ahead to
6 April 15th of 2011.  And there's a portion of that
7 dec that I want to -- that I want to show you.
8         MR. ACKELSBERG:  And this is P-119.
9         (Exhibit No. 119 marked.)
10         MR. ACKELSBERG:  I did -- I did copy
11 the -- Richard, if you would like to have -- for
12 your benefit, I have the various pieces of that
13 agenda, which is the next page from the cover page
14 so you can see what was there.  And I've just taken
15 the piece called "Tribal Lending Update."
16         MR. SCHEFF:  In the future, just mark
17 the entire dec as an exhibit.
18 BY MR. ACKELSBERG:
19     Q.  Now, there's a -- there's a timeline in
20 this section called "Tribal Update."  And I'm
21 looking at TF-PA 670175.  And I want to just have
22 you look at this timeline and ask if it is
23 consistent with what you remember?
24     A.  This seems about right.
25     Q.  Okay.  So at some point in December -- I'm

1 sorry -- at some point in November of 2010, an
2 actual decision was made within the company, within
3 the executive team to pursue a tribal partner,
4 correct?
5         MR. GATEWOOD:  Objection; form.
6         MR. SCHEFF:  Object to the form.
7     A.  Yes.
8 BY MR. ACKELSBERG:
9     Q.  Okay.  And the first tribe that was
10 identified as a potential trib- -- as a -- as a
11 partner was the Otoe-Missouria tribe that was
12 loca- -- that was  identified in January of 2011,
13 correct?
14     A.  Actually, prior to talking with the
15 Otoe-Missouria tribe, there was another group that
16 we were in contact with that was a group out of, I
17 believe, South Dakota.  And we went through
18 extensive conversations with that group but couldn't
19 get comfortable with their model being that it was a
20 member of the tribe wanting to be the lender versus
21 an entity of the tribe.  And so we actually walked
22 away from that deal and found the Otoe-Missouria
23 tribe to begin talking to.
24     Q.  So the first -- the first tribe that you
25 found -- that you were comfortable with pursuing a

1 potential partnership was the Otoe-Missouria, and
2 that occurred in roughly January of 2011?
3     A.  Well, it -- yeah, it was the second tribe
4 that we went through due diligence with and began to
5 move forward with the contracts.  Yes, the first one
6 with contracts was the Otoe-Missouria.
7     Q.  Well, there was no contract yet as of
8 January 2011; am I right?
9     A.  I'm sorry, I meant to say working through
10 contracts, like it says here.
11     Q.  Yeah.  Okay.  And then by Feb- -- according
12 to this timeline, by February 16, 2011, the
13 contracts were all in place and you were just
14 waiting for the -- for the tribe to agree, right?
15         MR. GATEWOOD:  Objection; form.
16 BY MR. ACKELSBERG:
17     Q.  That's what -- that's what that says,
18 right?
19         MR. SCHEFF:  Object to the form.
20         You can answer if you can.
21     A.  So I don't remember exactly what was taking
22 place in February.  I know there's still contract
23 negotiations -- contract negotiations going on, but
24 I don't know what -- what spot they were in in that
25 process.

UNSEALED

BY MR. ACKELSBERG:

Q. Now, up until that point in time, the hope was that the ThinkCash customers would -- could be migrated to Great Plains Lending. That was the hope at that time, right?

MR. SCHEFF: Object to the form.

A. I guess I go back and -- and reiterate what I've said before, the -- when we -- if we were able to find a partner that could lend across states similar to what First Bank of Delaware was lending in, it wasn't to migrate the portfolios but to remarket to former customers of -- of that portfolio.

BY MR. ACKELSBERG:

Q. Okay. And according to this timeline, though, there was a tribe switch. Instead of signing with the Otoe-Missouria, the company signed with the Chippewa Cree tribe. Do you remember that?

A. Yes, I do remember that.

Q. And that just 20 days from the contract signing with the Chippewa Cree, Plain Green went live on April 5th, 2011. Do you remember that?

A. I do.

Q. Okay. If you continue with this -- with this dec, there's some pictures, and then if --

there's a mock-up of -- it's page 670178. It's a mock-up of the website, a page on the website Plain Green, right?

MR. SCHEFF: Object to the form.

A. Yes, it's a mock-up of a website.

BY MR. ACKELSBERG:

Q. And then the next page, it gives some sense of the loan volume that occurred on the first day that Plain Green went live. Do you see that?

A. I do.

Q. The following slide refers to price changes, and I think it's comparing the ThinkCash price to the price that would be on the Plain Green site. Do you -- do you remember anything about these price changes?

MR. SCHEFF: Object to the form.

A. I mean, I was -- I was part of the conversations, but I'd have to refresh my memory on all of it. But, vaguely, I remember this, yes.

BY MR. ACKELSBERG:

Q. Okay. And the following page, too, actually has the -- the new prices that were on the -- on the Plain Green site?

A. Yeah, so what I remember, this is what we proposed to -- to the tribe for them to review.

Q. All right. Now, if you can flip the page, we're now on -- this is TF-PA 670182. I was wondering if you could explain this slide, "Multiple Sites = Differentiation."

A. So it's been a while since I've looked at something like this, but what -- at a high level, what I remember was when we were first exploring multiple partnerships, do we talk to the tribes from the marketing standpoint, do they want to be channel specific or have more of a product functionality differentiation. And so this was one concept of could we propose to different tribes of where they want to be channel specific, meaning which channels we market for them to acquire customers through, to be that kind of a primary source of traffic.

Q. What would it -- what does the term "affiliate only" mean?

A. Affiliate only, at that point in time, was really referring to certain partnerships. I can't remember back at that point in time. Today would be somebody, like, a Credit Karma or a Credit Sesame. But I can't remember exactly whose those affiliates would be at that point in time.

Q. Meaning other websites that would -- that would be a source of leads?

A. It would be a -- a lead, yes, like, a Lending Tree that they could -- we could help them partner with to draw traffic to.

Q. And what would -- what does "Paid Search" referred to?

A. Paid search is if you go and put an ad on Google or Yahoo, there's a pay for placement so you can advertise the product there.

Q. And what about -- and there's "DM." That means direct mail; am I right?

A. DM would stand for direct mail, yes.

Q. And what does affiliate stand for?

A. It would be the same affiliate conversation we just had.

Q. Meaning -- right, okay. Right.

And lead generator, what would a lead generator be as opposed to an affiliate? What's the difference?

MR. SCHEFF: Object to the form.

A. So back in this time frame, there was a channel that we -- we termed internally lead generators, and that was third parties that would also aggregate sites -- aggregate traffic, but there was a bidding model to where you could bid on the traffic coming through, so multiple lenders could

1  bid at the same time to try to buy that traffic.
2  And it was a thought of could we make -- could we
3  use that channel as a driver of traffic.
4  BY MR. ACKELSBERG:
5      Q.  Eventually -- so you signed up Great Plains
6  Lending and you signed up Plain Green.  And were --
7  did these two tribes, the Chippewa Cree and
8  Otoe-Missouria, did they get a particular kind of
9  assignment of marketing channel like as contemplated
10  within this -- within this slide?
11          MR. GATEWOOD:  Objection; form.
12          MR. SCHEFF:  Object to the form.
13      A.  So this was just as the programs were being
14  launched.  What -- what I remember is they ended up
15  actually having a multichannel acquisition strategy.
16  So it didn't ever play out the way like it was laid
17  out here.  They had the ability to drive traffic
18  from multiple channels.
19  BY MR. ACKELSBERG:
20      Q.  All right.  Now, we're going to -- we'll
21  refer back to the timeline, but I want to in the
22  next -- in the next exhibit go back in time a little
23  bit to December of 2010.  And this is a dec entitled
24  "Great Plains Lending, December 2010."
25          MR. ACKELSBERG:  This is exhibit --

1  Plaintiff's Exhibit 120.
2          (Exhibit No. 120 marked.)
3  BY MR. ACKELSBERG:
4      Q.  Now, referring back just a second to the
5  timeline, January is when you -- was when the
6  company -- January of 2011 is when the company first
7  became comfortable with the Otoe-Missouria and
8  decided to pursue it.  This dec that -- this
9  presentation that we're looking at is from the
10  previous month, December 2010, and I want to ask you
11  what -- first of all, are you familiar with this
12  dec, or do you recall decs like this from this
13  period of time?
14          MR. SCHEFF:  Object to the form.
15      A.  So I don't remember the specific dec, but I
16  have seen similar content in other decs.
17  BY MR. ACKELSBERG:
18      Q.  And when you were -- am I right that when
19  the company was discussing in the early stages the
20  potential partnership with -- with a Native American
21  tribe, part of that process would be to -- use
22  PowerPoint presentations like this one, like P-120?
23  Am I right?
24          MR. GATEWOOD:  Objection; form.
25      A.  So I'll tell you, I mean, anytime you're

1  trying to do a new deal transaction, regardless what
2  size, there's going to be a dec put together to
3  introduce the two organizations and what -- what the
4  proposed topic is going to be.  So it's a standard
5  format of how we make an introduction, whether it's
6  to a bank, a tribe, a creative agency, whoever it
7  is, we -- we put together some sort of dec for that
8  conversation.
9  BY MR. ACKELSBERG:
10      Q.  And this would be done under your
11  supervision?
12      A.  It would depend on the partner and what the
13  complexities of that relationship might be.
14      Q.  Well, with regard to Great Plains, were --
15  you were involved in that approach, were you not?
16          MR. SCHEFF:  Object to the form.
17      A.  I was involved in those conversations.
18  BY MR. ACKELSBERG:
19      Q.  Okay.  And so this -- this presentation,
20  what we're looking at, was likely prepared for the
21  purpose of -- of a presentation made to the
22  Otoe-Missouria, right, about what the Great Plains
23  Lending concept would look like?
24          MR. GATEWOOD:  Objection; form.
25          MR. SCHEFF:  Object to the form.

1      A.  Right.  So as I mentioned, I don't know if
2  this is the exact presentation that we used for the
3  introduction, but when we met with them for the
4  first time, we would make some sort of presentation
5  telling them about what -- who Think Finance was and
6  what a possible product could like if they were
7  willing to move forward.
8  BY MR. ACKELSBERG:
9      Q.  And you would use a dec that looks like --
10  roughly like this, right?
11          MR. SCHEFF:  Object to the form; asked
12  and answered.
13          You can answer it again.
14      A.  It would be similar to something like this.
15  BY MR. ACKELSBERG:
16      Q.  Now, if -- if you'd turn to TF-PA 13289,
17  that's a familiar look- -- oh, I'm sorry, you're not
18  there.
19      A.  I'm sorry.
20      Q.  Now, what we're looking at here is a -- is
21  a revised version of the graphic for ThinkCash that
22  was in that document we looked at at the beginning
23  of the deposition, right?
24          MR. SCHEFF:  Object to the form.
25      A.  This is a similar slide that we showed.

UNSEALED

App. 0427

BY MR. ACKELSBERG:

Q. So, basically -- and that's because in designing the Think -- in designing the Great Plains product, the idea was to try to -- to continue as much as possible what -- what the company -- the model that had been used with the bank?

MR. SCHEFF: Object to the form.

MR. GATEWOOD: Objection; form.

BY MR. ACKELSBERG:

Q. With the First Bank of Delaware.

A. So I would say, you know, over time we had developed a servicing platform, and who that lender is could be a number of different parties. And so we had done quite a bit of work building that out for a couple of our bank partners previously. And I think it's prudent business practice to try to use that on a go-forward basis, if we could find another lender that was -- was agreeable to that product construct.

Q. Okay. Understood.

And what -- would this have been -- what team would be working on graphics like this that we're looking at?

A. I can't remember if this was a slide that somebody on my team put together or if Ken put it

together, but it would be one of ours working together on it.

Q. So either your team or Ken?

A. Correct.

Q. Now, if you'd -- if you'd turn back a few pages.

A. Which page?

Q. 13286. Now, this is a -- again, a mock-up of something a consumer might see in -- under this Great Plains Lending model, right? That's what we're looking at here?

A. So I remember this. This is, really, just a draft of what could be done. I don't know if it was actually put into production.

Q. And what about the actual phone numbers, the 877 phone numbers, where would that -- those numbers have been to?

A. I don't recall.

Q. It likely was somewhere in the Fort Worth office?

MR. GATEWOOD: Objection; form.

MR. SCHEFF: Object to the form.

A. I have no idea where these numbers went to. It was a draft document.

BY MR. ACKELSBERG:

Q. Now, there -- if you look, you see there's "Great Plains Customer Support," and there's a phone number there, right? And then to the right of that, there's another entity mentioned, GPL Servicing, LLC, Customer Support, in Wilmington, Delaware. Do you see that?

A. I do.

Q. Do you know what that reference is?

A. So as I mentioned before, this is a draft document on an intro presentation, so this -- this could have been a mock-up from an old program and we just tried to switch out some -- some of the language and graphics just to give them an idea. So this could have been coming from anywhere. I don't know.

Q. Now, other than changing the name and the graphics, how much of the infrastructure from ThinkCash were you able to use in creating the tribal installment loan platforms?

MR. SCHEFF: Object to the form.

MR. GATEWOOD: Objection; form.

A. I mean, I think if you look at what Think had created, an installment loan platform is -- is fairly straightforward. So once it was created, it could be duplicated and -- and reused, just like a

Fiserv, once they create their accrual system for many banks to use was there. So we were able to, you know, work with -- with the first partner, and it actually ended up being Plain Green. But they were able to design what the product features and the look and feel. So we would have to make some UX changes and some pricing and loan structure changes, but the core mechanics of the system had already been built out.

MR. ACKELSBERG: Okay. All right. Let's look at the next dec. This is Exhibit 121.

(Exhibit No. 121 marked.)

BY MR. ACKELSBERG:

Q. So when you -- you mentioned that --

A. I'm sorry, can I just look at this real quick?

Q. Sure. Sure.

A. (Reviews document.)

Okay.

Q. So the fist dec you'll see is titled "Great Plains Lending," and it's from December of 2010. The second dec --

MR. SCHEFF: Object to the form; misstates the exhibit.

UNSEALED

BY MR. ACKELSBERG:

Q.  Well, I'll do it again.  The first dec is entitled "Great Plains Lending," right?  That was --

MR. SCHEFF:  Object to the form; misstates --

BY MR. ACKELSBERG:

Q.  Do you see that, the -- looking at 120, Exhibit 120?

A.  I see that.

Q.  Right?  And then this next -- 121 is entitled "Great Plains Lending Meeting," with a date of January 12th, of 2011.  Do you see that?

A.  I do.

Q.  Is it likely that this is the one that was actually -- the version that was actually used at the meeting with the Otoe-Missouria?

MR. SCHEFF:  Object to the form.

You can answer the question if you can.

A.  I'd have to say, I mean, I don't know exactly which final dec was used to present to the dec -- I mean, present to the -- the partner, but -- so I can't say that this is the exact one.

BY MR. ACKELSBERG:

Q.  Okay.  Is there anyone who would have a better idea of, like, what specifically was used in

the -- well, let me ask you this:  In the meetings with, let's just say the Otoe-Missouria, who was involved in the initial meeting with the Otoe-Missouria?

A.  That probably would have been myself and Michelle.

Q.  Michelle Nguyen?

A.  Michelle Nguyen, yes.

Q.  That's N-g-u-y-e-n.

A.  And probably Ken and maybe somebody on our legal team.

Q.  So probably -- roughly, maybe four people that's --

A.  It would depend on what level of -- what stage we were at.  Early on it would have been probably there's three or four.  As we got closer to finalizing contracts, we'd bring in a much more expanded team and -- so we could dive deeper into IT and operations and -- and risk management, things like that.

Q.  But when you were still at the exploratory phase, it would likely have been you, Michelle Nguyen, Ken Rees and someone from legal?

A.  That's correct.

MR. ACKELSBERG:  Okay.  Now, let's

look at the next dec, which is 122.

(Exhibit No. 122 marked.)

BY MR. ACKELSBERG:

Q.  Now, it appears that this -- this was prepared for a -- does it look to you like this was prepared for a meeting with a -- with a different tribe than the -- than the Otoe-Missouria?

MR. SCHEFF:  Object to the form.

A.  So this looks similar to an intro dec we might use to go talk to a potential partner.

BY MR. ACKELSBERG:

Q.  And if you went to -- like, do you remember the initial meeting with the Chippewa Cree?

A.  I don't remember off the top of my head.  I mean, I know we had one, obviously.

Q.  And was it the same:  You, Michelle, Ken and someone from legal?

A.  I would say the -- I'm sorry, did you say the Chippewa Cree tribe?

Q.  Yes.

A.  With the Chippewa Cree tribe, it would have probably been myself and another gentleman named Steve Schafer and Michelle meeting with them.

Q.  And who was Steve Schafer?

A.  He was a board member at that time at Think

Finance.

Q.  And why would he have been at that meeting?

A.  He had volunteered to help out since a lot of this was going to sales calls, going to talk to banks or to tribes, he had volunteered to help out to go make some of those calls for us.

Q.  Okay.  And when you and Mr. Schafer went to meet with the Chippewa Cree, did you also have a PowerPoint presentation that you used?

A.  I'm sure we did, yes.

Q.  Okay.  And might this be the one that you presented to the Chippewa Cree?

MR. SCHEFF:  Object to the form.

A.  As I mentioned, I can't remember exactly which slide dec it was.  So I can't say this is the one that we -- we used, but I know we used something.

BY MR. ACKELSBERG:

Q.  And this is -- this is a slightly different format than the last ones we talked to.  This has a title "Emergency Cash Lending, A New Source of Tribal Revenue."  Do you remember that -- do you remember that?  Do you remember that approach to the -- to the presentations?

MR. GATEWOOD:  Objection; form.

UNSEALED

1    A.   Yeah, my recollection was a slide titled
2  like this was when we wanted to go talk to, you
3  know, first-time potential partners to make the
4  introduction.
5  BY MR. ACKELSBERG:
6    Q.   Okay.  All right.  And if you look at the
7  second page, this is a slide that -- that you used
8  with first-time partners?
9    A.   Potentially, yes.
10    Q.   There's a -- there's a term called a
11 "turnkey solution."  I've seen that referenced in a
12 number of documents.  I mean, that was a term that
13 you used in the -- in the sales presentations?
14        MR. GATEWOOD:  Objection; form.
15    A.   Yes, it was in some of the decs.
16 BY MR. ACKELSBERG:
17    Q.   And in your own words, what -- what's a
18 turnkey solution?
19    A.   To me, when we referenced turnkey, it was
20 that we had the core of the system or platform
21 created, and then working with the partner, we could
22 customize it to their best fitting.  But it was
23 on -- I'll use the example again of, like, a Fiserv
24 to where they have a turnkey solution for running
25 banks with back-end operations that's there, ready

1  to go, just needs some configuration and approval of
2  the partner on how they want to set up the program.
3    Q.   Okay.  And just looking at the last
4  paragraph, why don't you read it out loud?
5    A.   It says, "Using Think Finance" -- "Think
6  Finance technology and services, tribes can generate
7  millions of dollars in cash flow with no investment
8  in technology, lending capital or marketing costs
9  and with no risk of loss."
10    Q.   And, in fact, that's what -- what Think was
11 offering, right?  I mean, this is exactly that,
12 right?
13    A.   Well, I mean, when I go through this dec
14 and look back at -- we have that -- that paragraph
15 up front, but as the -- as the programs were
16 established, there was a risk of loss created that
17 ended up being as part of the program.  So I don't
18 know if that was the best term to use in this
19 presentation.  I think, also, if you look back, you
20 know, there are expectations -- I think we look back
21 on slide 12, of different expectations that were
22 needed from the tribe as part of this process to
23 keep the product up and running and to have staff
24 and things like that.  So there is some risk there
25 for the tribes.

1    Q.   Well, I under- -- I'm not really referring
2  to some risk that may have -- may have been added to
3  this -- to the relationship later on.  I'm talking
4  about early on, though.  I mean, you were, in fact,
5  representing early on that the tribe would have no
6  risk of loss; am I right?
7        MR. GATEWOOD:  Objection; form.
8        MR. SCHEFF:  Object to the form.
9    A.   As I just said, looking back on this, I
10 don't know if that was the best set of words to use
11 in this presentation, because when we talk about it
12 later on, there are things that are expected of the
13 tribe and they do have exposures.
14    Q.   You're talking about on page 12?
15        MR. SCHEFF:  Don't cut him off.  Don't
16 cut him off, please.  Let him finish his answer.
17 BY MR. ACKELSBERG:
18    Q.   Are you talking about page 12?
19    A.   I'm sorry, I'm on page 2.
20    Q.   No, but when you say "later on," that's
21 what --
22    A.   So, I'm sorry, within this dec, when we're
23 talking to the tribes, these are expectations that
24 would be set out of what they would need to do to --
25 and as I mentioned, as you go through the

1  negotiation process, in the product struc- -- the
2  program changed or is modified, there is some
3  ownership that the tribes had in -- in each of the
4  programs that were launched.
5    Q.   So let's go to -- let's go to page 12.  And
6  is that -- you know, the title is "Think Finance &
7  Tribe Partner Roles:  Who does what?"  So this is --
8  this is attempting to break out for the potential
9  tribal partner what Think Finance does and what the
10 tribal entity would do, right?
11    A.   So this is, you know, a 30,000 foot
12 overview of what would be done, and there's -- I
13 think we even have other presentations that go into
14 more detail of what that expands into, but this is
15 the 30,000 foot level, yes.
16    Q.   And so with regard to consumer marketing,
17 Think Finance has the platform, it has the ads,
18 it -- it comes up with the radio, TV, print.  It has
19 the search engines.  It has the brand development.
20 And the role of the tribe would be to review and
21 approve anything that went out under the name of the
22 tribe, right?
23    A.   And make any changes they see necessary.
24    Q.   Right.  Okay.  Anything else the tribe
25 would do with regard to marketing?

UNSEALED

A. Early on that was the expectations.

Q. Okay. And we're just talking about early on. I know there were changes made, and I -- and we'll -- promise you, we're going to -- we're going to work our way through them. But I'm just really dealing with the -- the initial -- establishing the relationships the way things were in the beginning. Okay?

A. Okay.

Q. With regard to application processing, well, this -- this relates to the decision engine that we talked about before; am I right?

A. So, actually, I would say the decision engine piece would be one below. Application processing is --

Q. Okay. That's the website?

A. Yes.

Q. And Think Finance was telling the tribe: We can -- we'll put together the website for you, right?

A. So, actually, let me back up just real quick. So, yes, so the application processing piece would be -- you're right. I was getting confused here. It would be on the -- what the tribes wanted for the look and feel of the site, what kind of

creative, what kind of verbiage they wanted out there, and also any kind of communications with the customer before the application process was completed.

Q. And then under "Underwriting Criteria," then that's -- that's the decision engine, right?

A. So here what would be requested -- required of the tribes would be that they would have to approve up front any kind of underwriting criteria, whether that's knockout rules, score cuts that -- that they would set. And then on a go-forward basis any kind of modifications that needed to be made had to be approved and -- reviewed and approved by the tribe, and then there would also be ongoing reporting on how the portfolio performed that they would be expected to -- to review to make sure they understand the portfolio is performing.

Q. Now, I mean, when you went to the Chippewa Cree, I mean, they didn't have any -- they didn't have any experience running a loan operation like you were -- like you were -- like you were offering to set up for them, had they?

MR. GATEWOOD: Objection; form.

MR. SCHEFF: Object to the form.

A. Sure. I mean, actually, one of the

interesting things about the Chippewa Cree tribe that we felt that they were a good partner was they actually had an established lending operation already set up through another third-party servicer.

BY MR. ACKELSBERG:

Q. Meaning Encore?

A. I believe that was the partner that they had.

Q. Well, had they ever made a loan with Encore?

A. Have I ever made?

Q. No. Had the tribe ever made a loan with Encore?

A. It was my understanding that they had an established platform, established site, and a portfolio that was there.

Q. That wasn't my question. My question was whether they were actually making loans on that platform?

MR. SCHEFF: Object to the form; asked and answered.

You can answer again.

A. That was my complete understanding.

BY MR. ACKELSBERG:

Q. That you thought they were making loans?

A. (Nods head affirmatively.)

Q. Okay. And so in terms of the -- the role of the tribe with regard to underwriting, the tribe had to -- the tribe had to approve any -- the development of the -- the decision engine required certain parameters that the tribe would have to -- would have to agree to, right? They would have to approve certain -- whatever the particular underwriting criteria were of the platform that was set up, right?

A. The tribe would have to approve anything that into the -- the underwriting.

Q. Right. So Think Finance would have to develop something in order to -- there would have to then be someone saying: Yes, I approve that. Right? That's -- that's what the tribal role would be, to approve what Think Finance put in front of them, right?

MR. GATEWOOD: Objection; form.

A. My understanding was, and the way it actually took place, was not that they just approve anything that was sent over to them. They -- they would have to review any kind of changes that were being proposed, understand the impacts that it would have to the portfolio. And since they did own a

UNSEALED

1  piece of the portfolio, that they -- you know, they
2  wanted to make sure that it was a prudent decision.
3  So they -- they were the ones that had to review and
4  approve and make any suggested modifications back to
5  us --
6  BY MR. ACKELSBERG:
7      Q.  And your --
8      A.  -- on anything.
9      Q.  And your sense was that the tribe really
10 understood all that and they understood -- when you
11 sent loan criteria, they understood that?  I mean,
12 were you involved in that?
13         MR. GATEWOOD:  Objection; form.
14     A.  So most of the -- from a -- an underwriting
15 standpoint, a lot of that conversation came from our
16 risk department with -- with the partners.  But I
17 reviewed some of the documentation that was sent --
18 you know, not every documentation but -- but how
19 that structure was put together, and I thought they
20 were thorough on what the -- the changes were
21 being proposed for, what the impact would be so that
22 the tribe could really understand what was going on
23 and ask the questions they needed to ask to get
24 comfortable.
25 BY MR. ACKELSBERG:

1  right?
2         MR. SCHEFF:  Objection; asked and
3  answered.
4      You can answer it again.
5  BY MR. ACKELSBERG:
6      Q.  That's -- right?
7      A.  So I would say you see many lenders out
8  there partner with ad agencies, creative agencies to
9  do marketing for them on behalf of their products.
10 And so this is --
11     Q.  Understood.
12     A.  And so, just -- just as you see as in many
13 other industries, the tribe contracted with
14 telemarketing to do that -- that marketing, but they
15 had to be involved with every piece of communication
16 and creative to make sure it met their criteria.
17     Q.  I understand.  And they contract with Think
18 Finance to -- to operate the website and decision
19 engine?
20     A.  So, I mean, once again, on the website
21 creative, there was -- there was work done with the
22 tribes on how to propose what that look and feel,
23 what that language would be that the tribes had
24 input on.  Any kind of verbiage that was out there,
25 it had to be approved upon.  And then the same thing

1      Q.  What about under "Funding and Payment
2  Processing," that was, basically, all done by Think
3  Finance, wasn't it?
4         MR. GATEWOOD:  Objection; form.
5         MR. SCHEFF:  Object to the form.
6      A.  So under "Funding and Payment Processing,"
7  as -- as part of the system, the system would cue up
8  what -- what loans needed to be funded that night,
9  what loans needed to take payments out of.
10 BY MR. ACKELSBERG:
11     Q.  Whose system?
12     A.  The loan management system that was
13 licensed by the tribe.  So based on loans that they
14 had originated, the system would cue up any kind of
15 outgoing credits or incoming debits, but those
16 were -- would all be going into a tribal account
17 that they owned.
18     Q.  That would all be managed by Think Finance,
19 right?
20     A.  That was the tribe's product that they
21 were -- I don't understand what you're saying.
22     Q.  Well, I'm just trying to understand who's
23 doing what here.  So let's go to the top -- from the
24 top.  The tribe -- the marketing is done by Think,
25 but the tribe has to approve it before it goes out,

1  with the underwriting criteria, as I mentioned
2  earlier, that was something that it was their
3  underwriting criteria, they -- they set that
4  criterion up front when the program was established.
5  Any changes that were proposed, they approved or
6  made modifications to.
7      And the other thing they had -- they had
8  access to was at the end of the day, the -- the
9  decision engine that underwrote the loans based on
10 their criteria, it would say these are the loans
11 that met your criteria and these are the loans that
12 did not meet your criteria and so it had to be
13 declined, and they had the ability to go in and
14 review any and all of those to audit and sample and
15 make sure it met their criteria.
16     Q.  Well, they had the ability, but they
17 didn't -- they didn't really have to do it in order
18 for the loans to be either approved or denied,
19 right?
20         MR. SCHEFF:  Object to the form.
21         MR. GATEWOOD:  Objection; form.
22     A.  So to me, that's -- that's what I would
23 call a belts and suspenders approach.  They had
24 already set up the criteria up front.  They had
25 already made approvals on any changes that were made

UNSEALED

1  identify these -- these agreements. Okay?
2       So we'll start with -- we'll start with
3  Plain Green. So I am going to mark as P-128 the
4  marketing agreement dated March 18, 2011, between
5  Plain Green, LLC, and TailWind Marketing. 129 is an
6  agreement entitled "License and Support Agreement"
7  with the same date, March 18, 2011, between Plain
8  Green, LLC, and TC Decision Sciences. And then 130
9  is an agreement named "Servicing Agreement," same
10  date, March 18, 2011, between Plain Green, LLC, and
11  TC Decision Sciences.
12      And I am going to show you a fourth
13  agreement dated, again, the same date, March 18,
14  2011. This one is between Plain Green, LLC, and GPL
15  Servicing Limited, and it's entitled "Participation
16  Agreement (Plain Green)."
17      (Exhibit Nos. 128 - 131 marked.)
18  BY MR. ACKELSBERG:
19    Q. So my question is -- is simply whether you
20  agree these four agreements are, in fact, the
21  agreements that established the initial relationship
22  underlying the Plain Green product?
23      MR. SCHEFF: Object to the form.
24    A. These look like the four documents that
25  established the program.

1      MR. ACKELSBERG: Okay. And I want to
2  show you one additional agreement regarding Plain
3  Green. This is Plaintiff's Exhibit 132. Same date,
4  March 18, 2011. And this is an agreement between
5  Haynes Investments and TC Administrative Services.
6      (Exhibit No. 132 marked.)
7  BY MR. ACKELSBERG:
8    Q. Now, TC Administrative Services, we haven't
9  mentioned that previously today among the Think
10  Finance affiliates. What was your understanding of
11  the role that TC Administrative Services played in
12  this?
13    A. You know, I can't remember the specific
14  role for TCAS as it was set up in this arrangement.
15    Q. Okay. Now, it looks like this is an
16  agreement that -- that TCAS -- that's all caps,
17  TCAS, that's what -- that's how you refer to
18  TC Administrative Services?
19    A. Yes.
20    Q. Okay. And am I right that under this
21  agreement, TC Administrative Services is agreeing to
22  pay to Haynes Investments a fee called a consulting
23  fee equal to 1 percent of the cash revenue received
24  by GPLS --
25      MR. GATEWOOD: Objection; form.

1  BY MR. ACKELSBERG:
2    Q. -- during each calendar month? Do you see
3  the --
4      MR. SCHEFF: Object to the form. The
5  document speaks for itself.
6      You can answer if you can.
7  BY MR. ACKELSBERG:
8    Q. Look on page 2, in case you're wanting to
9  reference --
10      MR. SCHEFF: Refer to as much of the
11  agreement as you think you need to.
12  BY MR. ACKELSBERG:
13    Q. Definition, Section 1(g), do you see that?
14    A. I do.
15    Q. Okay. Do you recall that Think was
16  agreeing to pay -- or was agreeing to have GPLS pay
17  a 1 percent fee to Haynes Investments every month
18  going forward?
19      MR. GATEWOOD: Objection; form.
20  BY MR. ACKELSBERG:
21    Q. Do you remember that?
22    A. I do remember there being a consulting fee
23  set up to be paid to GPLS.
24    Q. And what was your understanding of this?
25  Was this -- this was going to go on -- at the time,

1  it was going to go on into the future? Every month
2  Haynes was going to get 1 percent of the revenue?
3      MR. SCHEFF: Object to the form;
4  compound question.
5  BY MR. ACKELSBERG:
6    Q. Was that your understanding?
7      MR. SCHEFF: Object to the form.
8    A. This is the part of this agreement with --
9  with Steve, for him making the introduction, he was
10  going to get this consulting fee for -- if I
11  remember correctly, there was not a termination date
12  on the agreement. So. . .
13  BY MR. ACKELSBERG:
14    Q. And when did -- when did you first learn
15  that -- when did Haynes first ask for a fee of
16  this -- a 1 percent fee going forward? When did
17  that come up in your conversation?
18      MR. GATEWOOD: Objection; form.
19    A. So my recollection was that was part of the
20  conversations as we were mak- -- as he -- just
21  before or as he was making the introductions to
22  tribes, that we would pay him a 1 percent fee for
23  any -- any introduction that turned into a
24  partnership with a -- with a tribe.
25  BY MR. ACKELSBERG:

UNSEALED

1    Q.   And was Haynes -- was the intent of this
2  agreement that -- or the expectation -- strike that.
3         Was the expectation of Think underlying
4  this agreement that Haynes would provide any
5  services in the future other -- well, they would
6  provide any services in the future --
7         MR. GATEWOOD:  Objection; form.
8  BY MR. ACKELSBERG:
9    Q.   -- in return for this 1 percent fee?
10   A.   Sure.  My recollection was there was an
11 understanding of, one, that he would also make
12 additional introductions to other potential tribal
13 partners in Indian country.  And as -- as regards to
14 working with Plain Green, he had already had an
15 established relationship with the Chippewa Cree
16 tribe and had done a handful of transactions there
17 on the reservation and was going to work with -- was
18 to help, this being our first venture with
19 partnering with a tribe, on any kind of, I don't
20 know, how to best optimize that relationship and
21 make sure that -- that we could make it run as
22 smoothly as possible.
23   Q.   Do you know specifically what his prior
24 business relationship was with the tribe?
25   A.   My understanding was he helped finance the

1  slot machines for the casinos, is what I remember.
2    Q.   All right.  What I would like to do now is
3  just to go through the same set of agreements -- the
4  same corresponding set of agreements on the GPL --
5  on the Great Plains Lending side.  Okay?
6    A.   Okay.
7         MR. ACKELSBERG:  And then we'll
8  starting -- starting with -- so 134 -- we'll do 133,
9  134, and 135.  So Plaintiff's Exhibit P-134 will be
10 the marketing agreement between TailWind Marketing
11 and Great Plains Lending, LLC, dated May 25, 2011.
12 Exhibit P-133 is the license and support agreement,
13 same date, May 25, 2011, between Great Plains
14 Lending, LLC, and TC Decision Sciences.  And Exhibit
15 P-135, same date, the agreement is entitled
16 "Servicing Agreement" between Great Plains Lending,
17 LLC, and TC Decision Sciences.  Oh, and, finally,
18 the participation agreement for Great Plains
19 Lending, which is 136.  Now, this does not have a
20 date filled in.  It does have a signature of the --
21 of the tribe.  It's TF-PA 244514.
22        (Exhibit Nos. 133 - 136 marked.)
23 BY MR. ACKELSBERG:
24   Q.   And am I correct that these four agreements
25 that have been identified as Exhibits 134 -- 133,

1  134, 135 and 136 are the four agreements that
2  established the initial relationship between Think
3  Finance and the Otoe-Missouria tribe regarding the
4  Great Plains Lending product?
5         MR. SHAPIRO:  Objection; form.
6    A.   These look like the four key documents that
7  set up the relationship with Great Plains Lending.
8  BY MR. ACKELSBERG:
9    Q.   Okay.  Now, I didn't see any similar
10 referral agreement with Great Plains Lending.  Did
11 MacFarlane get any kind of a finder's fee like --
12 like Haynes did?
13        MR. GATEWOOD:  Objection; form.
14   A.   My understanding is he didn't receive any
15 kind of compensation from Think Finance as a
16 finder's fee for that relationship.  So I don't
17 think there was ever a document signed for that.
18 BY MR. ACKELSBERG:
19   Q.   Was it your understanding that he was being
20 compensated by the tribe instead?
21        MR. SCHEFF:  Object to the form.
22   A.   I did -- my understanding was that there
23 was some sort of compensation from the tribe to him
24 for that partnership.
25 BY MR. ACKELSBERG:

1    Q.   Okay.  So some portion -- as far as -- as
2  far as your understanding goes, that some -- some of
3  the revenues that the tribe would receive from the
4  Great Plains Lending product would -- would go --
5  they would pay some portion of that to MacFarlane
6  for his services to them?
7         MR. SCHEFF:  Object to the form.
8  BY MR. ACKELSBERG:
9    Q.   And I say "his."  Its service.  But we're
10 talking about Mark Curry, basically, right?
11        MR. SCHEFF:  Object to the form.
12   A.   So I never saw any kind of documentation on
13 what the transaction was or what the fee was being
14 paid for.  I just had an understanding that there
15 was compensation.  I don't know if it was for --
16 what services it was -- what he was being
17 compensated for.
18 BY MR. ACKELSBERG:
19   Q.   And did you have any understanding or
20 belief regarding a similar relationship between the
21 Chippewa Cree and Encore Services?
22        MR. SCHEFF:  Object to the form.
23   A.   Going into the transaction, I didn't know
24 that there was anything like that taking place.
25 Through the course of the relationship, I did come

UNSEALED

1  to understand that there was some sort of consulting
2  fee being paid back to Encore.
3  BY MR. ACKELSBERG:
4     Q.  A fairly substantial one, correct?
5     A.  I never saw what the numbers were.
6     Q.  You didn't hear the -- what are the
7  numbers?  You say "saw."  I mean, I'm not asking
8  whether you saw a document, but what -- did you come
9  to learn the amount of Plain Green revenues that was
10  being paid over to Encore?
11     A.  I mean, I never knew the exact fee or --
12  through any means.  I knew there was a fee being
13  paid, but I -- I didn't know what it was.
14     Q.  Well, it doesn't have to be exact.  What do
15  you remember, if you -- if you remember anything?
16     A.  I'd be guessing at this point to say.
17     Q.  Okay.  All right.  Now, there was a third
18  tribal contract with the Tunica tribe in Louisiana,
19  correct?
20     A.  Yes, it was the Tunica-Biloxi.
21     Q.  Tunica-Biloxi tribe.  And this -- and this
22  is -- and those -- and that relationship concerned
23  the line of credit product called Mobiloans,
24  correct?
25     A.  That's correct.

1     MR. ACKELSBERG:  All right.  We are
2  going to skip a -- skip a number.  The next document
3  is going to be Exhibit P-138.
4     (Exhibit No. 138 marked.)
5  BY MR. ACKELSBERG:
6     Q.  Now, with regard to the Tunica-Biloxi
7  tribe, was there also a matchmaker here similar to
8  the role played by Haynes and Mark Curry?
9     MR. SCHEFF:  Object to the form.
10     A.  So there was an introduction made to the
11  Tunica-Biloxi tribe through RLJ Financial.
12  BY MR. ACKELSBERG:
13     Q.  And by RLJ Financial, we're talking about,
14  also, board member, Robert Johnson?
15     A.  Bob Johnson was -- I don't know if he was
16  the sole owner of RLJ Financial, but he was a part
17  owner there, for sure.
18     Q.  So Bob Johnson made the connection between
19  Think and the Tunica-Biloxi, correct?
20     A.  That's correct.
21     Q.  And the result of that connection was there
22  were meetings like you had with the Otoe-Missouria
23  and the Chippewa Cree?
24     A.  There were -- there were introduction
25  meetings to introduce them to who Think Finance was

1  and the type of products that we could design if
2  they had an interest.
3     Q.  And also there were the face-to-face -- was
4  there a face-to-face sales meeting on the
5  reservation?
6     MR. SCHEFF:  Object to the form.
7     A.  Yes, we met with their tribal council and
8  with their -- I think it was their business board.
9  BY MR. ACKELSBERG:
10     Q.  And when you say "we," who was there
11  besides you?
12     A.  I believe that was myself.  And I can't
13  remember if that was -- a lady that worked on my
14  team, either Kerry Miles or Michelle Nguyen were one
15  of the two with me.  And then, I believe, Steve
16  Schafer was there with me as well.
17     Q.  Okay.  And is Exhibit P-138 the term sheet
18  that was, in fact, executed between the parties?
19     A.  It looks like to be that document.
20     MR. SHAPIRO:  Object to form.
21  BY MR. ACKELSBERG:
22     Q.  And were there -- for the -- for the
23  Mobiloans product, was there also a marketing
24  agreement, a license and support agreement, a
25  servicing agreement and a participation agreement

1  like we have looked at with regard to the other two
2  tribes?
3     MR. GATEWOOD:  Objection; form.
4     A.  My recollection is that we had those
5  similar four documents.
6  BY MR. ACKELSBERG:
7     Q.  Okay.  Now, the Plain Green and Great
8  Plains Lending, those were installment loan
9  products, right?
10     A.  They were installment loans, yes.
11     Q.  And the Mobiloans was line of credit?
12     A.  That's correct.
13     Q.  Now, the two installment loan products,
14  were they operated on the Think side on the same
15  loan platform?
16     MR. SCHEFF:  Object to the form.
17     MR. GATEWOOD:  Objection; form.
18     A.  My recollection was they were within the
19  same -- we had a loan management system that could
20  be separated for multiple parties to use it.
21  BY MR. ACKELSBERG:
22     Q.  And what -- how did you refer to that
23  platform?  What's the generic name for that platform
24  that was modified to serve different -- the two
25  different installment loan customers?

UNSEALED

App. 0435

1  A.  So the way I remember it is when the call
2  center on the Chippewa Cree was built, it's like any
3  new operations for -- for any entity, there's
4  growing pains on getting something off the ground
5  and launched, getting the staff hired up, beginning
6  to scale it.  And so as that was first launched and
7  bringing the staff on board and getting them trained
8  up, it took -- it took time and effort to partner
9  with the tribe to make sure that they could get the
10  quality employees that they were looking for.
11  Q.  Because they didn't have a call center
12  before, right?
13  A.  When we -- when we began working with them
14  they had -- what I remember is they had people
15  taking calls for their existing portfolio, but it
16  wasn't in a -- in a setup that could be scaled to
17  support, call it, a 50 seat call center.  And so the
18  idea was to help -- help them build something that
19  they could go into that so they could scale much
20  more beyond what they had.
21  Q.  So let's just talk very briefly about the
22  specific role of the call center that was located in
23  the Chippewa Cree reservation.  Am I right that the
24  role they played was verifications?
25  A.  So initially they were set up to handle

1  verification work.  So when a loan was approved, it
2  would go through their underwriting, meet their
3  criteria, and it would be approved.  It would also
4  go through an automated verification set of rules
5  that they had preapproved.  And if there was
6  additional information that was needed to validate
7  that identity, then they were able to work -- you
8  know, maybe somebody had to fax in a driver's
9  license or a pay stub or something like that, they
10  were able to manage those calls.
11  Q.  So this was entirely calls on the front end
12  regarding the application process, right?
13  A.  Initially, they took calls on the front end
14  on the application process.  Over time, as it
15  evolved, I believe they were also taking customer
16  service calls as well.
17  Q.  All right.  So let's just -- let's just
18  deal with the early period first.  So some -- some
19  loans are approved automatically.  Right?
20  MR. SCHEFF:  Object to the form.
21  BY MR. ACKELSBERG:
22  Q.  I know pursuant to -- pursuant to criteria
23  preapproved by the tribe.  I understand that part.
24  But I'm just trying to look at the operational side.
25  So some -- some loans are approved by the engine

1  itself, right?
2  MR. SCHEFF:  Object to the form;
3  misstates the testimony.
4  You can answer the question if you can.
5  A.  So, yes, so applications go through the
6  decision engine, and based on their criteria,
7  some --
8  BY MR. ACKELSBERG:
9  Q.  Okay.
10  A.  -- some are approved and some are out
11  sorted for additional. . .
12  Q.  Right.  Okay.  So this is part of what
13  the -- the engine does, is it keeps sorting out the
14  applications based on various criteria, correct?
15  MR. SCHEFF:  Object to the form;
16  misstates the testimony.
17  You can answer the question if you can.
18  A.  So, yeah, it separated to me one to three
19  buckets, either to approved, need more information
20  or declined.
21  BY MR. ACKELSBERG:
22  Q.  Okay.  So with the approved bucket, the
23  call center doesn't have to do anything, right?
24  A.  That's correct.
25  Q.  And, in fact, no one at the tribe has to do

1  anything for that bucket, right?
2  MR. SCHEFF:  Object to the form;
3  misstates the testimony.
4  You can answer the question if you can.
5  BY MR. ACKELSBERG:
6  Q.  With regard to a specific loan application
7  that is approved by the engine, the tribe, with
8  regard to that application, doesn't have to do
9  anything, do they?
10  MR. SCHEFF:  Object to the form;
11  misstates the testimony.
12  You can answer the question if you can.
13  A.  Other than the approval they've already
14  done to outline the criteria for it to be approved
15  and the ability to go in later that day to audit to
16  make sure it meets the criteria, there's nothing
17  else that needs to be done.
18  BY MR. ACKELSBERG:
19  Q.  Okay.  But then there's the second bucket,
20  and that's the verification bucket.  And with regard
21  to the verifications, some portion of the
22  verifications work was done in the early -- well,
23  let's say when -- in April of 2011, when the -- when
24  Plain Green went online, there was no call center at
25  that point, right, at -- on the -- on the

UNSEALED

1    reservation.
2       A.  That's correct.
3       Q.  Okay.  So at some point, between April of
4    2011 and September of 2011, when Mr. Rees is
5    reporting to the board, there was a -- there was a
6    call center established, it was built and staffed on
7    the -- on the tribal lands, correct?
8       A.  That's correct.
9       Q.  Okay.  Now, even when that -- when that
10   went operational, some of the -- the verifications
11   work was being done by outside vendors, right?
12          MR. SCHEFF:  Object to the form.
13          You can answer the question.
14      A.  So my memory on it was that similar to --
15   well, sorry, scratch that.
16          My memory was that the -- the call center
17   there was set up to take the first set of -- the
18   first amount of capacity that was coming in.  So if
19   you had a large volume day, they were staffed up.
20   They would take as much volume as they can handle
21   for verification.  The overflow would go to a third
22   party that they signed a contract with to manage
23   verifications and customer service work beyond their
24   capacity.
25   BY MR. ACKELSBERG:

1       Q.  And it went -- and those vendors were --
2    like, for example, I think MetaSource was one of
3    those vendors?
4       A.  MetaSource was one, yes.
5       Q.  Located in -- where is MetaSource located?
6       A.  Salt Lake City, Utah.
7       Q.  Okay.  And who established the system
8    that -- that such that the calls -- the overflow
9    calls could be routed from Montana to Meta in Salt
10   Lake City?
11          MR. SCHEFF:  Object to the form.
12      A.  Sure.  So as in conversations with Plain
13   Green, the calls were going through -- as part of
14   the technology they had licensed from us -- we have
15   a technology -- or a telephone platform, so when a
16   call comes in, they can be first routed to their
17   call center, and any overflow would be routed to
18   their backup call center.
19   BY MR. ACKELSBERG:
20      Q.  So this telephone platform, is that
21   different than the loan platform?  Is that a -- is
22   that a different platform?
23      A.  It is different.
24      Q.  Okay.  So that's part of the Think Finance
25   platform that -- that was licensed through the TCDS

1    servicing -- licensing and servicing contract?
2       A.  Correct.
3          MR. GATEWOOD:  Objection; form.
4          MR. SCHEFF:  Object to the form.
5       A.  That's my understanding, yes.
6    BY MR. ACKELSBERG:
7       Q.  Yes.  Okay.  And, now, with regard to --
8    there, also, is a part of the operation that, I
9    guess, is called collections, where you have to
10   contact borrowers that aren't paying.  Right?
11          MR. SCHEFF:  Objection; form.
12      A.  Yes, once a -- if a customer does not pay,
13   then it roles into a delinquent -- delinquency
14   status, and collection efforts are pursued.
15   BY MR. ACKELSBERG:
16      Q.  And am I -- am I correct that those -- and
17   that that work, the collections work would be done
18   by outside collection companies?
19      A.  So Plain Green would contract with a third
20   party to do collections on their behalf.
21      Q.  So the answer is, "yes," right, their --
22          MR. SCHEFF:  The answer to what is
23   yes?
24   BY MR. ACKELSBERG:
25      Q.  The work would be done by outside vendors,

1    right?
2          MR. SCHEFF:  Object to the form.
3          You can answer the question again.
4       A.  So, yes, Plain Green contracted with third
5    parties to collect on their behalf.
6    BY MR. ACKELSBERG:
7       Q.  And Think Finance would guarantee Plain
8    Green's payments to those vendors; am I also
9    correct?
10          MR. SCHEFF:  Object to the form.
11      A.  From my -- what I remember in the early
12   days, to get -- to get the partners comfortable with
13   signing a contract with a tribal entity, Think
14   Finance would -- would do that.
15   BY MR. ACKELSBERG:
16      Q.  And how long did those early days last,
17   that Think provided a guarantee to the collection
18   vendors?
19          MR. GATEWOOD:  Objection; form.
20      A.  I don't remember the day when that -- that
21   ceased.
22   BY MR. ACKELSBERG:
23      Q.  I mean, are we talking about a month?  Are
24   we talking about a couple years?  What --
25          MR. SCHEFF:  Objection; asked and

UNSEALED

1 answered.
2     You can answer the question again.
3       MR. GATEWOOD: Objection; form.
4   A. I'd -- I'd be guessing. Longer than a
5 month.
6 BY MR. ACKELSBERG:
7   Q. Now, other than -- as of, let's say this
8 date, September 2011, was there any activity
9 regarding the day-to-day operations of the Plain
10 Green product that was located -- that occurred on
11 tribal lands other than the people sitting in the
12 verification call center?
13       MR. GATEWOOD: Objection; form.
14       MR. SCHEFF: Object to the form.
15   A. So they had -- the Plain Green management
16 team was based there on the reservation. So they --
17 from what I remember, they had, you know, either a
18 president or a GM, they had a compliance officer.
19 They had somebody managing the accounting and also
20 some of the -- the reviews of all the documentation
21 coming through. So they had a staff -- I think they
22 had a core staff of probably -- of the management
23 team, call it, six people, plus the call center
24 staff.
25 BY MR. ACKELSBERG:

1   Q. Well, what did those six people actually do
2 on a day-to-day basis?
3   A. Well, as I just -- as I just mentioned,
4 between -- on -- on the financial side or accounting
5 side, there was somebody there looking at the -- the
6 balances and the -- and the originations that were
7 being created and keeping the books there. On the
8 compliance side, they were able to go in and audit
9 any kind of customer communications and review
10 anything around that. And then, also, as the
11 business is growing and maturing, they're looking at
12 the numbers going throughout the day, week to week,
13 month to month, to see the performance of -- of the
14 program.
15   Q. And did -- was it your sense back at the
16 early days of the program that the tribe was, in
17 fact, doing meaningful work with regard to the --
18 I'm not talking about the call center. I'm just
19 talking about those management people you were
20 referring to do, that they were doing some
21 meaningful work on a day-to-day basis regarding the
22 operations of the program?
23       MR. GATEWOOD: Objection; form.
24       MR. SCHEFF: Object to the form.
25   A. So my recollection was we -- my team was

1 having weekly calls with their team on -- whether it
2 was the operational side or was it on the product
3 side on what they're seeing from a performance
4 standpoint. When we would visit the tribe for our
5 regular visits, they had board meetings with their
6 Plain Green board that was looking at metrics and
7 documentation they had put together. So everything
8 that we saw, it appeared that they were managing
9 that business from -- from the reservation.
10 BY MR. ACKELSBERG:
11   Q. And your sense was they were doing a
12 thorough and competent job in doing that?
13       MR. SCHEFF: Object to the form.
14       MR. GATEWOOD: Objection; form.
15       MR. SCHEFF: You can answer the
16 question if you can.
17   A. As I mentioned, they -- they had a board
18 established. They had a management team together.
19 They had regular meetings. They were looking at the
20 right information.
21 BY MR. ACKELSBERG:
22   Q. I know, you mentioned that. But that
23 wasn't what I asked you. I said was it your
24 assessment --
25       MR. SCHEFF: Irv, please let him

1 finish his --
2 BY MR. ACKELSBERG:
3   Q. Was -- was it your assessment that they
4 were --
5       MR. SCHEFF: Irv. Irv.
6 BY MR. ACKELSBERG:
7   Q. -- doing a competent job?
8       MR. SCHEFF: Do not cut him off. Let
9 him finish his answer, please. Thank you.
10       MR. ACKELSBERG: Are you finished?
11       MR. SCHEFF: I am, so --
12       MR. ACKELSBERG: Thank you.
13       MR. SCHEFF: -- as long as you comply.
14 Okay?
15 BY MR. ACKELSBERG:
16   Q. Now, please answer the question. Was it
17 your assessment -- I know they had people with
18 titles, but my question is whether the people with
19 titles, in your assessment, were doing any
20 meaningful and competent day-to-day management of
21 the Plain Green product?
22       MR. GATEWOOD: Objection; form.
23       MR. SCHEFF: Object to the form.
24     Answer the question again if you can.
25   A. So as I mentioned, there was -- there

UNSEALED

1    MoneyMutual is not -- will not accept the
2    application, here is someone who might accept the
3    application.  That's, basically, what -- the
4    way this worked, right?
5          MR. GATEWOOD:  Objection; form.
6      A.  So I don't -- I don't remember this
7    campaign, specifically, but as I mentioned, what I
8    remember is MoneyMutual having multiple different
9    verticals that people could apply through.  And so I
10   don't know if this was through, as we talked about
11   earlier, like, a single pay vertical that they
12   couldn't find a match and were moving to an
13   installment vertical, or if it was they try to get a
14   few partners to underwrite and they couldn't approve
15   them and sent back to MoneyMutual to find another
16   lender.  I'm just not sure exactly what this
17   campaign was structured as.
18   BY MR. ACKELSBERG:
19     Q.  And if look at the page -- the insertion
20   order pages that are attached to the exhibit, PA-SS
21   107 and 108, this is an insertion order that you
22   signed, right?
23     A.  It is.
24     Q.  And this concerns a campaign called,
25   "Mobiloans MoMu State Fails," right?

1     A.  It does.
2     Q.  And so this is -- this is a campaign,
3    correct me if I'm wrong, where -- where people who
4    went on the Mobiloans -- the MoneyMutual site, where
5    they were rejected because of the state that they
6    resided in were directed to Mobiloans, right?
7         MR. ACKELSBERG:  Objection; form.
8         MR. SCHEFF:  Mr. Ackelsberg, you're
9    not contenting that the document --
10       MR. ACKELSBERG:  No, no, no.  No,
11   these are diff- --
12       MR. SCHEFF:  You're not contending the
13   document that starts PA-SS 00107 and 108 has
14   anything to do with Think Finance Document 013478
15   through 81, are you?
16   BY MR. ACKELSBERG:
17     Q.  So -- so --
18       MR. SCHEFF:  Are you?
19   BY MR. ACKELSBERG:
20     Q.  So, Mr. --
21       MR. SCHEFF:  Are you?  Because they're
22   two years apart.
23       MR. ACKELSBERG:  I'm aware of that.
24       MR. SCHEFF:  Okay.  Well, then please
25   don't mislead the witness.  You put documents --

1         MR. ACKELSBERG:  The witness isn't
2   misled.
3       MR. SCHEFF:  -- together that are two
4   years apart.  That's outrageous.
5   BY MR. ACKELSBERG:
6     Q.  So the first -- the first one we looked at
7   was a -- was a campaign for Plain -- a proposed
8   campaign for Plain Green to get no-stated
9   MoneyMutual clients directed to Plain Green, right?
10   That was the first one we looked at, right?
11       MS. SCHEFF:  Object to the form.
12     A.  That's correct.
13   BY MR. ACKELSBERG:
14     Q.  Okay.  The second one we looked at deals
15   with no-states on MoneyMutual being directed to the
16   Mobiloans site two years later, correct?
17       MR. SCHEFF:  Object to the form.
18     A.  So, I mean, I -- I agree that's what the
19   documents are.  I just -- when I look at these two
20   together and then the third document that's -- I
21   don't know that that was even attached or can -- is part
22   of the other two insertions, I don't know that they
23   all relate together.
24   BY MR. ACKELSBERG:
25     Q.  Well -- I understand.  So let me -- let me

1   just ask you this:  Do you agree that in 2011, 2012
2   and 2013, customers applying on the MoneyMutual site
3   or some other site of PartnerWeekly who were
4   rejected on those sites because of their state,
5   could have been redirected, possibly, to a Plain
6   Green, to a Great Plains Lending or to a Mobiloans
7   site depending on the particular insertion order
8   campaign that was in effect at that point in time?
9       MR. GATEWOOD:  Objection; form.
10       MR. SCHEFF:  Object to the form.
11     A.  So, as I mentioned, there was different
12   insertion orders to buy traffic from PartnerWeekly,
13   and that -- that could have been one of them.
14   BY MR. ACKELSBERG:
15     Q.  But -- and that included, specifically,
16   people who were rejected because of what state they
17   lived in on the MoneyMutual site, they were, by
18   agreement, redirected to in some cases Plain Green,
19   in some cases Great Plains Lending, and in some
20   cases Mobiloans?
21       MR. GATEWOOD:  Objection; form.
22       MS. SCHEFF:  Object to the form.
23     A.  So we're saying they're rejected on the
24   MoneyMutual site.  As I mentioned earlier,
25   MoneyMutual -- my recollection is they're not a

UNSEALED

1 lender. They're trying to find a lender for a
2 consumer that's seeking credit. And so when we
3 define is that -- is that a no-state on the
4 MoneyMutual site, I know it says it here in this
5 insertion order, I'm just not familiar with exactly
6 how we were defining that and describing it back to
7 the tribe. So it's hard for me to speak exactly
8 what -- what led them down this campaign for them to
9 be purchased by us.
10          MR. ACKELSBERG: Okay. Exhibit 146.
11          (Exhibit No. 146 marked.)
12 BY MR. ACKELSBERG:
13     Q. Am I right that on a fairly regular basis,
14 Think would generate loan data for each of the three
15 products: Plain Green, Great Plains Lending and
16 Mobiloans?
17          MR. SCHEFF: Object to the form.
18     A. That's correct.
19 BY MR. ACKELSBERG:
20     Q. Okay. And am I -- am I also correct that
21 one of the pieces of data that Think Finance would
22 keep track of was the state in which the customer --
23 the customer of the particular product lived?
24     A. That's correct.
25          MR. GATEWOOD: Objection; form.

1 BY MR. ACKELSBERG:
2     Q. And am I also correct that it would also
3 track the -- the amount of loan principal
4 outstanding at a particular period of time that was
5 attributable to consumers in a particular state by
6 product?
7          MR. GATEWOOD: Objection; form.
8     A. Yes, it would.
9 BY MR. ACKELSBERG:
10     Q. Okay. And so if you turn to page TF-PA
11 32- -- 325464 -- and just so -- just so we're clear,
12 I believe the -- this overview presentation that
13 we're looking at is grouped by product. Correct?
14     A. I guess I'm trying to refresh my memory on
15 this document. Was this all one single
16 presentation, or is this parts of multiple
17 presentations?
18     Q. I believe this is all one single
19 presentation.
20     A. Okay. Because, usually, when we have an
21 agenda like this, we would -- like, if you look on
22 325458, it's starting with Section 3, but we didn't
23 cover -- we usually would have an agenda section
24 that kind of intros each area we're going into. I
25 was just trying to confirm if this is all one -- one

1 presentation.
2     Q. So, for example, at 325465, where it shows
3 the Mobiloans outstanding by state --
4     A. Sorry, just real quick. Okay.
5     Q. You see that, correct?
6     A. I do.
7     Q. And that's a typical -- that's a typical
8 format?
9          MR. SCHEFF: Object to the form.
10 BY MR. ACKELSBERG:
11     Q. The information was -- was presented in
12 this manner on a -- what, on a monthly basis or a
13 weekly basis or. . .
14          MR. SCHEFF: Object to the form.
15 BY MR. ACKELSBERG:
16     Q. How often was -- was Think assessing the
17 state distribution of its particular -- in its
18 particular products by loan balance?
19          MR. SCHEFF: Is it the last question
20 you want him to answer, or the other three?
21     A. Typically, a report like on 465 would be
22 created monthly and shared with the lenders and
23 internally.
24 BY MR. ACKELSBERG:
25     Q. And, in fact, on the previous page, this

1 one is -- when it says "ILP," this would be combined
2 Great Plains and Plain Green, right, if it was done
3 in this manner?
4     A. That's correct, this would be both --
5 both two -- both of those products.
6     Q. Okay. And on TF-PA 325473, this says --
7 it's a map of outsource partners?
8     A. That's correct.
9     Q. CenterOne, that's CMS?
10     A. Yes.
11     Q. And they were located in Buffalo?
12     A. That's correct.
13     Q. And MetaSource was located in Pennsylvania
14 and in Salt Lake City?
15     A. That's correct.
16     Q. And Televista was located in Mexico?
17     A. Yes, that's correct.
18     Q. And KM2 was located in Honduras?
19     A. That's correct.
20     Q. And these were -- and these were various
21 call centers that were operating -- that were
22 outsourcing some of the collection calls for the
23 three products?
24     A. So my recollection is the collection calls
25 for the lenders were handled through CenterOne. The

UNSEALED

1   other -- the other three, MetaSource and Televista,
2   and KM2, were handling customer service calls for
3   the partners and, of course, some of Think's direct
4   products.
5       Q.   Now, is customer service different than
6   verifications?
7       A.   I believe that at this point in time, we
8   had verifications trained separately from customer
9   service.  I think over time, as it evolved, they
10  were -- they became -- became grouped together down
11  the road.  But at this point, verifications was
12  separate.
13      Q.   And what kind of an issue would customer
14  service deal with?
15      A.   Customer service is typically once an
16  account is on-boarded and has an active loan.  So if
17  a consumer is calling in to ask to make a payment,
18  to move a due date, just ask general questions about
19  their payoff balance.  So once an account is
20  on-boarded, that would be more of a customer service
21  question.
22      Q.   Okay.
23          MR. ACKELSBERG:  I am going to skip
24  two documents to move things along and just go right
25  to 14-  -- go to 149.

1           (Exhibit No. 149 marked.)
2   BY MR. ACKELSBERG:
3       Q.   Now, on -- now, I am going to represent to
4   you, Mr. Harvison, that when this document was
5   produced to us, it came with metadata that said you
6   were the author and the custodian of this document.
7   Does it look familiar to you?
8       A.   It looks familiar.
9       Q.   Okay.  And do you recall preparing it?
10      A.   I do.
11      Q.   So if you could turn to page 3 of the --
12  and this is a PowerPoint?
13      A.   That's correct.
14      Q.   And who would have been the audience for
15  this PowerPoint?
16      A.   So this here, I'm not sure if this was just
17  shared internally or -- I believe this was just
18  shared internally.
19      Q.   "Internally," meaning the executive team?
20      A.   I believe so.
21      Q.   Or the products team or what?
22      A.   It would have been the executive team and
23  some of the product teams.
24      Q.   Okay.  And I want to focus on -- so the
25  date of this -- the document is December 20th, 2012.

1   The -- the presentation is entitled "Strengthening
2   Tribal Model and Program Update."  And on page 3 of
3   the presentation, there are two item listed under
4   "Tribal Model Concerns."  Do you see that?
5       A.   I do.
6       Q.   Okay.  And the first is "Aiding Abetting"
7   and the second is "True Lender"?
8       A.   Yes.
9       Q.   Okay.  So what do you recall -- what
10  were -- what were your concerns with regard to the
11  true lender?  You say in the bullet, "States may
12  argue that the tribe is not the true lender," and
13  that, "Recent cases have suggested potential
14  liability."
15          MR. GATEWOOD:  Mr. Ackelsberg, can I
16  confer -- can we take a short break for me to confer
17  with the witness to ask a couple questions about the
18  document --
19          MR. ACKELSBERG:  Sure.
20          MR. GATEWOOD:  -- to ensure that there
21  are no privilege concerns here?
22          THE VIDEOGRAPHER:  We are off the
23  record.  The time is 3:25 p.m.
24          (Break taken, 3:25 p.m. to 3:30 p.m.)
25          THE VIDEOGRAPHER:  We are back on

1   record.  The time is 3:30 p.m.
2   BY MR. ACKELSBERG:
3       Q.   During this period of time, or shortly
4   thereafter, do you remember the executive team
5   having an initiative that was referred to as
6   "tribalization"?
7       A.   So what I recall is around the fall of
8   2012, we had been partnering with tribal partners
9   for almost two years now, and I think a term came
10  up, tribalization.  But the whole -- the whole
11  meaning behind that was we knew that the
12  partnerships with the tribes would be an evolution.
13  So what was established on day one, that would
14  continue to evolve, and they would take more and
15  more ownership and responsibilities and build out
16  their internal staffs and their -- their control and
17  capabilities.
18          And so as you get to the fall of 2012,
19  it's -- it's become a very sizable business for
20  Think Finance, and so this is a point where we're
21  trying to look at, you know, how do you make sure
22  that is this the strongest model possible.
23      Q.   And one of the things you wanted to do was
24  to improve the optics as well, right?
25          MR. SCHEFF:  Object to the form.

UNSEALED

1  they did provide some feedback early on.  I thought
2  I saw that.  Yeah, so -- so the way this timeline
3  reads, there was some draft documentation in October
4  and November.  So I don't know how much -- a lot of
5  this data that I pulled together in this
6  presentation was pulling from conversations with
7  Sarah and some of the research she's done and also
8  the compliance thing that they had looked at in
9  working with CRA.  So --
10          MR. SCHEFF:  I caution you not to
11  disclose your communications with counsel.
12      A.   And so while I did create -- I was the
13  creator of this document, I was taking pages from
14  other documents and then created it and put it in
15  there to share with the team.
16  BY MR. ACKELSBERG:
17      Q.   Including some information you had received
18  from Charles River Associates?
19      A.   So, as I mentioned, I was taking excerpts
20  from other slides, other -- other presentations to
21  put in here.  So while our compliance team and legal
22  team might have been pulling this -- some of the
23  slides together that I was leveraging, I'm not a
24  hundred percent certain whether they leveraged some
25  of this information from -- in a draft form to come

1  to these conclusions or if that was from research on
2  their own.
3      Q.   So, I'm sorry, I thought -- I thought we
4  already established that you -- you were the author
5  of the -- of the PowerPoint at 149?
6          MR. GATEWOOD:  Objection.  You --
7          MR. SCHEFF:  Is there a question?
8          MR. GATEWOOD:  That's a
9  mischaracterization of his prior testimony.
10  BY MR. ACKELSBERG:
11      Q.   Okay.  Let's just clarify.  So -- and I
12  want to clarify it.
13          So we started off our discussion of 149
14  that, according to the metadata, you were the author
15  and the custodian.  So I think what you're saying is
16  that you actually didn't prepare all of those slides
17  yourself?
18      A.   That -- that's correct.
19      Q.   You used slides that came from other --
20  from other people?
21      A.   That's correct.
22      Q.   I see.
23          Do you recall looking at any of the
24  Charles River -- any preliminary findings from
25  Charles River at the time that you were -- that you

1  were putting these slides together on Exhibit 149?
2      A.   I don't.
3      Q.   You don't.  Okay.
4          Do you -- when the Charles River report
5  came in, was it -- was it considered a crisis by
6  the --
7          MR. SCHEFF:  Object to the form.
8  BY MR. ACKELSBERG:
9      Q.   -- by the executives?
10          MR. SCHEFF:  Object to the form.
11      A.   So I wouldn't characterize it as -- as a
12  crisis.  I think, as I mentioned already in the
13  conversation, that when these businesses start to
14  scale to the size that they have, I think it's --
15  it's an understanding that there's going to be
16  opportunities to improve and mature and specialize
17  in certain areas.  And Plain Green, being the larger
18  of the three programs, was -- was first to have
19  these type of conversations with on how they could
20  mature their organization and go ahead -- go --
21  continue to build it out and specialize in certain
22  areas because it had become such a sizable entity.
23          MR. ACKELSBERG:  All right.  I'm going
24  to skip to a document that I have labelled 153,
25  Plaintiff's Exhibit 153.

1          (Exhibit No. 153 marked.)
2          MR. SCHEFF:  Again, you know, you've
3  marked this before and this is attached to an
4  e-mail.  Again, you know, you take things out of
5  context, and it makes it difficult for the witness
6  to respond to questions accurately.  Ask your
7  questions.
8  BY MR. ACKELSBERG:
9      Q.   So I want to show you another version of
10  that map that we looked at before of the service
11  providers.  This is TF-PA 14425 and 14426.  And
12  you'll see that besides the map, there's actually a
13  legend that gives a little more information about
14  the vendor and the particular products that the
15  vendor was -- was servicing.  Do you see that?
16      A.   I do.
17      Q.   And so let me make -- so, for example,
18  there's the company, which we haven't mentioned
19  before, Yessio, Y-e-s-s-i-o, that has legend J --
20  icon J on it.  Do you see that?
21      A.   Yes.
22      Q.   And Yessio was another collection company
23  that was utilized by -- that did collection work for
24  these products?
25          MR. SCHEFF:  Object to the form.

1    A.  So did collection work for -- I can't
2  remember if it did it for one or all of the
3  products, but they did do some work on -- on those
4  programs.
5  BY MR. ACKELSBERG:
6    Q.  And is this -- is this legend on the second
7  page of the exhibit, does -- is this consistent with
8  your recollection about how the various service
9  providers were assigned to particular products?
10        MR. SCHEFF:  Object to the form.
11        MR. GATEWOOD:  Objection; form.
12    A.  That -- that looks correct.
13  BY MR. ACKELSBERG:
14    Q.  Okay.  Now, Yessio is another company.
15  That's Bret Horrocks' company, isn't it?
16    A.  That was a company started by Bret
17  Horrocks.
18    Q.  So explain to me the difference between the
19  services provided for the company we talked
20  previously about, SourceItOne, and this company
21  called Yessio.
22    A.  Sure.  SourceItOne was more of a consulting
23  company to help with, as I mentioned earlier,
24  identifying potential debt buyers, how to optimize,
25  make suggestions on collection strategies, and

1  potentially find other third-party collectors to
2  collect on behalf of the lenders.
3      Yessio, the way I remember it, was Bret
4  started this up to be an actual collection service
5  organization so they would actually have collectors
6  in-house doing the collections themselves.
7    Q.  All right.  Let me show you one other
8  document with regard to Yessio and yourself.
9        (Exhibit No. 154 marked.)
10        MR. SCHEFF:  What's this one?
11        MR. ACKELSBERG:  154.
12  BY MR. ACKELSBERG:
13    Q.  Now, do you remember this whole saga
14  regarding yourself and Bret Horrocks and another
15  Indian tribe called the Ho Chunks?
16        MR. GATEWOOD:  Objection; form.
17        MR. SCHEFF:  Object to the form.
18    A.  I do remember the discussion.
19  BY MR. ACKELSBERG:
20    Q.  Okay.  And this presentation that's
21  attached to the -- to the e-mail, is that a
22  presentation that you prepared?
23    A.  Yes, it is.
24    Q.  And am I right that you and Bret were --
25  had this idea to create a tribal collection company?

1    A.  So at this point in time, we were looking
2  to see how much more the lending operations could be
3  expanded within -- within Indian country.  Ho Chunk
4  was a tribe that has multiple different business
5  ventures, and so we went to meet with them to see if
6  they would be interested in -- in partnering to --
7  to take over some collection activities and help
8  support the partners that we also had and also look
9  to grow that from there.
10    Q.  So why don't you tell us how this was going
11  to work.  This never came to fruition; am I right?
12    A.  That's correct, nothing ever came of it.
13    Q.  Now, was this your idea or Bret's idea?
14    A.  I think this probably came -- actually, I
15  don't remember who came up with this idea.  Might
16  have been on our side, brainstorming side, I think.
17    Q.  And this was another way to increase the
18  tribal involvement in the business?
19    A.  Yeah, as I mentioned earlier, this -- this
20  was a thought of could you have another tribal
21  venture, for instance, having the collections being
22  done by a tribal entity.
23    Q.  So -- and as you're describing the deal,
24  the basics of the deal in the e-mail -- so first of
25  all, when you -- when SIO is mentioned, that's

1  SourceItOne, right?
2    A.  That's correct.
3    Q.  Okay.  So the Ho Chunk tribe would buy
4  Yessio from Bret Horrocks for a nominal amount.
5  That was Step 1, right?
6    A.  That's correct.
7    Q.  Okay.  Step 2, Yessio would sign a
8  management contract with SIO, Bret's other company,
9  to actually do the work, right?
10    A.  When you say "work". . .
11    Q.  Well, the idea here was that -- was that
12  Bret would continue to do the collections, only
13  you're just changing -- changing the ownership,
14  right?
15        MR. GATEWOOD:  Objection; form.
16  BY MR. ACKELSBERG:
17    Q.  Isn't that -- wasn't that the basic idea?
18    A.  So the actual thought was that -- that
19  Ho Chunk could actually own what -- could buy what
20  Bret had built out within Yessio, and then, yes,
21  they would service -- they'd contract back with Bret
22  to help teach them the business and grow it so that
23  they could take on more and more responsibility of
24  the collections process.
25    Q.  And Ho Chunk would get a fee from SIO for

UNSEALED

1  owning the company?
2      MR. GATEWOOD: Objection; form.
3      A. I'd have to go back and look exactly. I
4  believe Ho Chunk would actually get -- since
5  Ho Chunk owns Yessio -- the way it was proposed,
6  Ho Chunk would own Yessio. Yessio would contract
7  with third-party lenders. They would pay fees back
8  into Yessio. Yessio would contract with SourceItOne
9  for different services. But then those
10 distributions could be paid out to Ho Chunk so they
11 could earn -- they could earn a revenue stream off
12 of -- off of that call center.
13 BY MR. ACKELSBERG:
14     Q. I want to shift to a different subject, the
15 split into two companies. At the time of the split,
16 before you went over to Elevate, what was your
17 compensation package with Think Finance?
18     A. Gosh, that was about four years ago. I
19 would have to go back and look. It was probably
20 roughly around a base salary of 300,000.
21     Q. And did you also own shares in Think?
22     A. I did have a small amount of shares that
23 I -- well, I had exercised some options and had
24 shares in Think.
25     Q. And after the split, you immediately moved

1  to Elevate with Ken Rees, right?
2      A. That's correct.
3      Q. What are you being paid now?
4      A. My base pay is around $400,000.
5      Q. And do you own shares in Elevate?
6      A. I do.
7      Q. And how many shares?
8      A. Shares that I own outright, I probably own
9  150,000 shares.
10     Q. And from the time that the company split,
11 have there been any distributions to Elevation -- to
12 Elevate shareholders?
13     MR. GATEWOOD: Objection; form.
14     MR. SCHEFF: Objection. Why are we
15 asking these questions about Elevate? This case
16 isn't about Elevate. If you want to ask about the
17 spinoff, that's fine. But I don't know the basis
18 for asking these questions. So I would like an
19 answer to that question. Distributions from Elevate
20 to Mr. Harvison?
21     MR. ACKELSBERG: Yeah.
22     MR. SCHEFF: We're not talking about
23 that.
24     MR. ACKELSBERG: Okay.
25     MR. SCHEFF: Move on.

1      MR. ACKELSBERG: So you're directing
2  him not to answer?
3      MR. SCHEFF: I am.
4  BY MR. ACKELSBERG:
5      Q. Okay. How is the decision made with regard
6  to who stays at Think and who goes to Elevate?
7      MR. GATEWOOD: Objection; form.
8      I'll just instruct the witness not to
9  answer to the extent that the answer requires
10 information divulged to you from Think's counsel.
11     A. Sure. So I think if you look at the way
12 that the company was operating exiting 2013 going
13 into 2014, on the product side, there was fairly
14 clear distinct lines of -- of Michelle had been
15 running the -- the tribal businesses. Another lady
16 had been working with me to run the -- the RISE
17 product, and we had another product we were looking
18 to take to market. So it was an easy identification
19 to figure out who would split there.
20     You look at -- on the IT side, we had two
21 senior leaders, very capable of being CIOs. So we
22 made decisions to split that, and they allocated
23 their staff appropriately. On the -- on the finance
24 side, the intent was for Chris to move over to
25 Elevate, but Think Finance needed to hire somebody

1  to backfill for that. So that's why Chris stayed
2  for about a year following the split.
3      But the company, at that point of, you
4  know, the split, I think in 2013, had generated
5  600-, $650 million of revenue, had 400 or 500
6  employees. It was at a size where there were -- we
7  had -- we had -- I wouldn't say we had enough
8  employees staffed to actually do a split where
9  everything was fully staffed, but we could support
10 the business lines and then each organization could
11 grow on its own from there.
12 BY MR. ACKELSBERG:
13     Q. And am I right what was left at Think was
14 entirely -- was just the tribal products?
15     MR. GATEWOOD: Objection; form.
16     A. So what remained with Think Finance was the
17 service provider products.
18 BY MR. ACKELSBERG:
19     Q. The three tribal products?
20     A. That's correct.
21     MR. ACKELSBERG: Take a brief break.
22 We're close to the end.
23     THE VIDEOGRAPHER: We're off the
24 record. The time is 4:10 p.m.
25     (Break taken, 4:10 p.m. to 4:19 p.m.)

UNSEALED

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
by Attorney General JOSH      *
SHAPIRO,                      *
    Plaintiff,          *
               *
VS.              * Civil Action
          * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants.         *

*****************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
LINDA CALLNIN
MARCH 8, 2018
*****************************************************

       DEPOSITION of LINDA CALLNIN, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and
numbered cause on the 8th day of March, 2018, from
9:08 a.m. to 3:15 p.m., before Christy R. Sievert,
CSR, RPR, in and for the State of Texas, reported by
machine shorthand, at the offices of Hunton &
Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas,
Texas 75202, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## Page 2

1         A P P E A R A N C E S
2
3 COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4  MR IRV ACKELSBERG
    MR JOHN J GROGAN
5  Langer, Grogan & Diver, PC
    1717 Arch Street, Suite 4130
6  Philadelphia, Pennsylvania 19103
    Phone:   215-320-5701
7  E-mail:  iackelsberg@langergrogan com
           jgrogan@langergrogan com
8
9 COUNSEL FOR THINK FINANCE, INC :
10  MR MATTHEW S SHELDON
    Goodwin Procter, LLP
11  901 New York Avenue, NW
    Washington, D C  20001
12  Phone:   202-346-4000
    E-mail:  msheldon@goodwinprocter com
13
14 COUNSEL FOR VICTORY PARK CAPITAL:
15  MR DANIEL P SHAPIRO
    Katten Muchin Rosenman, LLP
16  525 W  Monroe Street
    Chicago, Illinois 60661
17  Phone:   312-902-5622
    E-mail:  daniel shapiro@kattenlaw com
18
19 COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
20  MS FRANCES B MORRIS
    Van Ness Feldman, LLP
21  1050 Thomas Jefferson Street, NW
    Seventh Floor
22  Washington, D C
    Phone:   202-298-1874
23  E-mail:  ftb@vnf com
24
25

## Page 3

1        A P P E A R A N C E S
          (continued)
2
    COUNSEL FOR KENNETH REES:
3
    MR. RICHARD L. SCHEFF
4  Montgomery, McCracken, Walker & Rhoads, LLP
    123 South Broad Street
5  Philadelphia, Pennsylvania 19109
    Phone:   215-772-7502
6  E-mail:  rscheff@mmwr.com
7 ALSO PRESENT:
8  GUS PHILLIPS, Videographer
    KEVIN BYERS
9  TOM GRABER
    SAVERIO "SAM" MIRARCHI, (Appearing Telephonically)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1        I N D E X
                PAGE
2

Appearances.................................. 2-3

Exhibits..................................... 5-7

Proceedings.................................. 8

LINDA CALLNIN:

    Examination by Mr. Ackelsberg.............. 9

Changes and Signature.................. 250-251
Reporter's Certification............... 252-253

1 (Pages 1 to 4)

UNSEALED

App. 0445

Page 5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 23 | Companies a part of Think Finance, Inc | 25 |
| | TF-PA-228224 | |
| Exhibit 24 | Finance Org Structure | 35 |
| | TF-PA409810, TF-PA178525 | |
| Exhibit 25 | Daily Cash Instructions | 44 |
| | TF-PA318531 - 318539 | |
| Exhibit 26 | E-mail correspondence, 11-19-12 Re: Cash Movement | 49 |
| | TF-PA540675 - 540678 | |
| Exhibit 27 | E-mail correspondence, 9-10-12 Re: Great Plains Lending Daily Settlement Reports for 09-07-2012 | 74 |
| | TF-PA325814 - 325816 | |
| Exhibit 28 | E-mail correspondence, 9-19-12 Re: Approvals | 85 |
| | TF-PA527512 - 527513 | |
| Exhibit 29 | TC Loan Service, Account Clarification, 9-30-12 | 92 |
| | GPLP00313236 - 00313246 | |
| Exhibit 30 | Spreadsheet | 98 |
| | GPLP00435570 - 00435590 | |
| Exhibit 31 | E-mail correspondence, 11-15-12 Re: Docs Highlighting Control of Tribal Accounts | 122 |
| | GPLP00048680 - 00048681 | |
| Exhibit 32 | Wells Fargo, Commercial Electronic Office (CEO) Portal | 128 |
| Exhibit 33 | E-mail correspondence, 10-18-13 Re: Wire Approval | 130 |
| | TF-PA288913 - 288915 | |
| Exhibit 34 | E-mail correspondence, 10-4-13 Re: Cash | 131 |
| | TF-PA684666, TF-PA429839 - 429840 | |

Page 7

E X H I B I T S (continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 43 | E-mail correspondence, 9-23-14 Re: Portfolio Access | 209 |
| | TF-PA051916 - 051919 | |
| Exhibit 44 | E-mail correspondence, 9-22-14 Re: Portfolio Access | 212 |
| | TF-PA052208 - 052209 | |
| Exhibits 45-48 (Not identified or marked.) | | |
| Exhibit 49 | Finance Team - Structure-Draft | 221 |
| | TF-PA178509 - 178510 | |
| Exhibit 50 (Not identified or marked.) | | |
| Exhibit 51 | Think Finance Defendants' Response To Plaintiff's First Set of Interrogatories | 237 |
| Exhibit 52A | E-mail correspondence, 1-5-15 Re: Fw: Clayton Wire - Today | 245 |
| | TF-PA 393463 - 393465 | |
| Exhibit 52B | E-mail correspondence, 12-23-14 Re: New Investor for PA loans | |
| | TF-PA038003 - 038004 | |

Page 6

E X H I B I T S (continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | Third Amended and Restated Administrative Agency Agreement | 137 |
| | TF-PA-000241 - 000275 | |
| Exhibit 36 | E-mail correspondence, 7-6-15 Re: Tribe Financials | 142 |
| | TF-PA070356 - 470358 | |
| Exhibit 37 | Plain Green, LLC Standard Operating Procedure #300-40 Daily Wire Transfers | 164 |
| | TF-PA378980 - 378981 | |
| Exhibit 38A | E-mail correspondence, 1-30-15 Re: Daily Wire Transfer SOP | 176 |
| | TF-PA096707 - 096709 | |
| Exhibit 38B | Standard Operating Procedure | 176 |
| | TF-PA178669 - 178670 | |
| Exhibit 39A | E-mail correspondence, 3-21-13 Re: Call Centers | 187 |
| | TF-PA013829 - 013831 | |
| Exhibit 39B | Map | 187 |
| | TF-PA014425 - 014426 | |
| Exhibit 40 | Information obtained through inquiry of Linda Callnin and Janice Weikert, 8-11-15 | 194 |
| | TF-PA300153 - 300154 | |
| Exhibit 41A | E-mail correspondence, 9-27-1 Re: Incident #IR-0101078 is closed | 199 |
| | TF-PA291639 - 291640 | |
| Exhibit 41B | E-mail correspondence, 9-4-14 Re: Fw: Wire Approvals | 199 |
| | TF-PA291806 | |
| Exhibit 42 | E-mail correspondence, 9-4-14 Re: Wire Approvals | 207 |
| | TF-PA440122 - 440125 | |

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record for the videotaped deposition of Linda Callnin.  The time is 9:08 a.m., March 8, 2018, in the matter of Commonwealth of Pennsylvania, et al., vs. Think Finance.  Civil Action No. 14-7139-JC- -- excuse me -- JCJ, being held in the United States District Court for the Eastern District of Pennsylvania.

The court reporter is Linda Callnin, and the videog- -- excuse me.  The court reporter is Christy Sievert, and the videographer is Gus Phillips.  Both are representatives of Kaplan, Leaman & Wolfe Court Reporters.

Will the court reporter please administer the oath.

(Oath administered.)

THE VIDEOGRAPHER:  Will counsel please state their appearances for the record.

MR. ACKELSBERG:  Irv Ackelsberg for the plaintiff, Commonwealth of Pennsylvania.

MR. GROGAN:  John Grogan, also for the Commonwealth.

MS. MORRIS:  Francis Morris for National Credit Adjusters.

UNSEALED

App. 0446

1      MR. SHAPIRO:  Dan Shapiro for the
2  Victory Park defendants.
3      MR. SCHEFF:  Richard Scheff for Ken
4  Rees.
5      MR. SHELDON:  Matt Sheldon for Think
6  Finance, joined with -- by Tom Graber with Think
7  Finance.
8          LINDA CALLNIN
9        having been first duly sworn,
10        testified as follows:
11        EXAMINATION
12  BY MR. ACKELSBERG:
13    Q.  Ms. Callnin, good morning.
14    A.  Good morning.
15    Q.  I am Irv Ackelsberg, and I represent the
16  Pennsylvania Attorney General in -- in a civil
17  action against Think Finance, Mr. Rees, and Victory
18  Park Capital concerning certain loan programs.  You
19  understand that, correct?
20    A.  Yes.
21    Q.  Okay.  And you're going to have to speak
22  up.  The -- court reporter has to hear your
23  answer, and -- and also, the videographer has to --
24  has to hear it.  Okay?
25    A.  Okay.

1    Q.  And let -- let's just start with who you're
2  employed by.
3    A.  Think Finance.
4    Q.  And what's your position there?
5    A.  Accounting operations controller.
6    Q.  And as operations controller, you're
7  responsible for, among other things, accounting for
8  the ACH transfers going in and out every day?
9    A.  Yes.  Responsible for making sure that cash
10  balances the system that goes in and out every day.
11    Q.  And that includes the ACH -- the ACH
12  activity as well as the activity of the various bank
13  accounts that you're -- you're managing, correct?
14        MR. SHELDON:  Object to form.
15        At various times today, Ms. Callnin, I may
16  object.  And unless I instruct you not to answer --
17        THE WITNESS:  Okay.
18        MR. SHELDON:  -- please do answer, and
19  you -- you can ignore my objections.
20        MR. ACKELSBERG:  I appreciate it.
21  Thank you.
22    A.  Yeah, for -- for accounts that are within
23  the program, yes.
24  BY MR. ACKELSBERG:
25    Q.  Okay.  And -- and you're also responsible

1  for figuring out who's owed what and from which
2  account, things like that?
3        MR. SHELDON:  Object to form.
4    A.  Not for the entire program.  Only -- only
5  for certain pieces of the program.
6  BY MR. ACKELSBERG:
7    Q.  Okay.  And we'll -- we'll get into that.
8        But for certain pieces of the program,
9  you're responsible for figuring out who's owed what
10  and from which account?
11    A.  Correct.
12    Q.  And -- and are you responsible for making
13  sure that -- either past or present, because we're
14  talking about a period of time going back a ways,
15  but have you also been responsible for making sure
16  that GPLS was paid what Think was obligated to pay
17  them?
18        MR. SHELDON:  Object to form.
19    A.  That was not in my area.
20  BY MR. ACKELSBERG:
21    Q.  Okay.  That was in someone -- someone else
22  within finance?
23    A.  Yes.
24    Q.  Okay.  And what about invoicing and paying
25  fees owed by the tribal entities?

1    A.  The invoicing was not in my area.
2    Q.  Now -- but it's something that you
3  understand how the -- how the process works, though?
4    A.  I have -- I have limited knowledge of the
5  process, yes.
6    Q.  Okay.  And -- and is that also true of --
7  of the -- of the payments to GPLS, that you have
8  knowledge, some knowledge, limited knowledge, but
9  you're not immediately responsible for that?
10        MR. SHELDON:  Object to form.
11    A.  I have limited knowledge of that process.
12  BY MR. ACKELSBERG:
13    Q.  And that's -- but that goes on within the
14  Think finance department?
15    A.  Yes, it does.
16    Q.  And what about the invoicing and paying the
17  revenue share payments to the tribal entities?
18    A.  I have limited knowledge of that, yes.
19    Q.  Okay.  But that also goes on within --
20    A.  Yes, it does.
21    Q.  -- the finance department?  Okay.
22        MR. SHELDON:  Linda, just make sure
23  you wait for Mr. Ackelsberg to finish asking his
24  question.  In some cases, you're going to know the
25  answer, and you already have known several answers,

UNSEALED

App. 0447

1  I've forgotten the first 22.  Don't worry about the
2  numbers.  The numbers are just what the numbers are.
3  Okay?
4            MR. SHELDON:  And don't think you're
5  going to have to look at the first 22, necessarily.
6  BY MR. ACKELSBERG:
7      Q.  In fact, I'll promise you that you won't
8  have to look at those -- all those 22.
9            (Exhibit No. 23 marked.)
10           MR. SHELDON:  Irv, am I correct that
11  if you pulled a document from its native state and
12  printed it off for this deposition, that you would
13  have put "Confidential" on it if it was produced
14  subject to the confidential designation?
15           MR. ACKELSBERG:  Yes.  So what I --
16  what I did, for every -- I'm better organized than I
17  was at the Wilksteen deposition.  And so what I've
18  done is, for every time that I'm using a native, I
19  start off with the page that you'd see that -- that
20  just says "spreadsheet" or -- and then it has the TF
21  PA number and "Confidential" on it.  You'll see it
22  when we get to the first one.  But this isn't one of
23  those.  So. . .
24           MR. SHELDON:  Thank you.
25           MR. ACKELSBERG:  Yeah.

1  BY MR. ACKELSBERG:
2      Q.  All right.  So let me also explain
3  something to you that -- as you probably know,
4  before this deposition, there's been a lot of
5  documents exchanged.  And the documents that came
6  from Think Finance are designated "TF PA."  Okay?
7  And you'll see in the lower right-hand corner -- you
8  see that?  So we're looking at a document that we've
9  marked today as 23, Plaintiff's Exhibit 23, but also
10  has another identifying mark at the bottom, a Bates
11  number of TF-PA-228224.  Do you see that?
12     A.  Uh-huh, yes, sir.
13     Q.  So I'm showing you a document that Think
14  Finance produced to us.  Okay?  And I'm going to ask
15  you to look at this and -- and tell me what you see
16  here.
17     A.  In my world, legal entities.
18     Q.  Okay.  And are these entities that are part
19  of the Think Finance company?
20     A.  I know that the -- they are part of the
21  general ledger, which is my world.
22     Q.  Okay.  And so do you -- and do you
23  recognize all of these companies as part of the
24  general ledger of Think Finance, Incorporated?
25     A.  Yes.

1      Q.  So you see under TC Loan Service a company
2  called Tailwind Marketing.  You see that, right?
3      A.  Yes, sir.
4      Q.  And is Tailwind a -- a subsidiary that you
5  are familiar with?
6      A.  I have limited knowledge of Tailwind
7  Marketing.
8      Q.  And what is your knowledge of Tailwind?
9      A.  That it is a servicing entity that did --
10  that provided marketing services.
11     Q.  Okay.  And the first -- let's say, in the
12  middle, there's a company called TC Decision
13  Sciences.  Is this also a company that you're
14  familiar with from the ledger?
15     A.  Yes.
16     Q.  And what is TC Decision Sciences, to the
17  best of your knowledge?
18     A.  A servicing company that provided decision
19  sciences to clients.
20     Q.  What does that mean, "decision sciences"?
21     A.  Meaning there are people that provide risk
22  analysis and that kind of service, you know -- it's
23  hard to explain.  So if you are going to market to
24  customers, you are going to market to certain
25  segments of customers, and some customers are more

1  risky than others.  These people -- or that entity
2  provided that service.
3      Q.  And -- and would that include deciding --
4  people applying for a loan, deciding who to -- who
5  to approve and who not to approve, as best as you
6  know?
7      A.  As best as I know, yes.
8      Q.  Okay.  And what about TC Administrative
9  Services, is that also a subsidiary that you're
10  familiar with from the standpoint of doing the
11  ledgers?
12     A.  Yes, that would have been the entity
13  that provided administrative services to clients.
14     Q.  Like who?  Who is the client that TC
15  Administrative Services provided services to?
16     A.  That would be likely the -- our partners
17  that we have, I would say, agreements with, being
18  Plain Green, Mobiloans, Great Plains.
19     Q.  And what about Victory Park?
20     A.  I do not know --
21     Q.  Okay.
22     A.  -- if TC Administrative had an agreement.
23     Q.  Okay.  Now, these companies that we've
24  mentioned -- well, let me ask another one first.
25  What about TC Loan Services, what's that company?

UNSEALED

App. 0448

1  Do you know?
2       MR. SHELDON: Object to form.
3  BY MR. ACKELSBERG:
4    Q. What's that subsidiary -- what's that
5  subsidiary of Think Finance do, as far as you know?
6    A. I have very limited knowledge of that other
7  than it was an entity set up for some sort of legal
8  purpose.
9    Q. Okay. Now, does -- does Tailwind Marketing
10  have its own employees?
11    A. No, it does not.
12    Q. Does TF -- TC Decision Sciences, does that
13  have its own employees?
14    A. Not that I'm aware of.
15    Q. TC Administrative Services, does it have
16  its own employees?
17    A. Not that I'm --
18    Q. Do any of these companies that we've talked
19  about have their own employees?
20       MR. SHELDON: Object to form.
21    A. I believe TC Loan Services had employees.
22  BY MR. ACKELSBERG:
23    Q. And who would those employees be? Do you
24  know?
25    A. Employees of Think Finance.

1    Q. Pardon?
2    A. Employees of Think Finance.
3    Q. Okay. So -- so when you got a paycheck,
4  did you get a paycheck from TC Loan Services?
5       MR. SHELDON: Object to form.
6    A. I believe that's what my pay -- that's what
7  the paycheck says.
8  BY MR. ACKELSBERG:
9    Q. Okay. And that's true of everybody at
10  Think Finance, as far as you know?
11    A. To the best of my ability, yeah.
12    Q. From the CEO down to the clerks?
13    A. I don't -- I don't know their level of
14  paycheck.
15    Q. Okay. All right. That's fine.
16    And did -- did Tailwind have its own floor
17  in the building or its own section or -- or was this
18  really just a ledger. . .
19       MR. SHELDON: Object to form.
20  BY MR. ACKELSBERG:
21    Q. Yeah. I mean, what -- so -- so Tailwind --
22  Tailwind didn't have its own employees, right? Did
23  it have a section? Was there, like, a section
24  marked off in the office, this is the Tailwind
25  section?

1    A. Not -- not that I'm aware of.
2    Q. Okay. So basically -- well, why don't --
3  why don't you -- let's take a point in time. Let's
4  say -- well, let me ask you this: Was there a point
5  in time between 2007 and now that you can identify
6  as the point where Think Finance had the biggest
7  staff level, the most employees?
8    A. I'm -- I'm confused on your question.
9    Q. Okay. Sure.
10    A. I --
11    Q. So -- so you said in 2007, when they --
12  when you arrived, there were a hundred to 200
13  employees, right?
14    A. Yes.
15    Q. How many are there now, in 2018?
16    A. 2018? Less than a hundred.
17    Q. Less than a hundred. Okay. So was there a
18  point in time where there were more than 200?
19    A. I believe so.
20    Q. Would it -- would it be, like, roughly 2013
21  or so?
22       MR. SHELDON: Object to form.
23  BY MR. ACKELSBERG:
24    Q. Would that sound about right?
25    A. That could possibly be.

1    Q. Okay. At that point, when it was the
2  biggest, and let's say around 2013 or -- but the
3  date isn't so much -- it's not so important as the
4  point when the employees were at their highest --
5  their highest number. Okay?
6    A. Uh-huh (affirmative response).
7    Q. Can you describe -- well, first of all, how
8  many floors in the building did the company have?
9       MR. SHELDON: Object to form.
10    A. Two that I'm aware of, that I can remember.
11  BY MR. ACKELSBERG:
12    Q. Okay. And this is at the same Fort Worth
13  address that you started at?
14    A. Yes, sir.
15    Q. And what is that address?
16    A. 4150 International Plaza.
17    Q. In Fort Worth?
18    A. Fort Worth.
19    Q. Okay. And can you explain what happened
20  on -- what activities occurred on the two floors?
21  How were -- how were -- back in that -- in that
22  period of time, when -- when the staff was at its
23  biggest, what went on in those two different floors?
24  First of all, where were you? Where were you
25  located?

UNSEALED

1    Q.  Okay.  And this was the responsibility of
2  your team?
3    A.  Yes.
4    Q.  Okay.  Well, I'll tell you what, if you --
5  if you're not familiar with this document, we'll
6  just -- we'll we'll ask someone -- who would
7  know?  Do you know?  Do you know who likely would
8  know about this?
9    A.  Given -- given the year, it was treasury,
10  David Gentry, which may have fallen under L2.
11    Q.  Okay.  We'll ask L2.
12        MR. ACKELSBERG:  I'm going to show you
13  another document, 27.
14        MR. SHAPIRO:  27?
15        MR. ACKELSBERG:  26.  I'm sorry.
16        MR. SHELDON:  For the record, this
17  document is also marked "Confidential."
18        (Exhibit No. 26 marked.)
19  BY MR. ACKELSBERG:
20    Q.  Now, this is -- this is -- I realize this
21  is a document that has Linda -- Linda 2 on it, not
22  Linda 1.  And I'm going to ask you questions about
23  it, but I guess the first question would be, is this
24  something you had ever seen before?
25    A.  Not -- not this --

1    Q.  Well, the e-mail -- it looks like you're
2  not on the e-mail.  But what about the attachment to
3  the e-mail?
4        MR. ACKELSBERG:  And by the way, Matt,
5  you can see how I -- you can -- let me show you how
6  I -- how I did prepare the exhibit.  So -- this goes
7  to your question at the beginning.  So attached to
8  this e-mail was a file, the file -- the -- that page
9  in nonnative shows the "Confidential" stamp.  Do you
10  see?  And then the next thing I did was, I down- --
11  I then downloaded the native Excel, and I made a
12  screenshot so you can see the tabs on it.  And then
13  I just copied the tabs.  And that's -- that's how I
14  created this exhibit.
15        MR. SHELDON:  Thank you for that.  And
16  for the record, the entire Exhibit P-26 was produced
17  as confidential and is marked as "Confidential" in
18  the way Irv described, wherein the page Bates
19  numbered TF-PA-540678 indicates confidentiality of
20  the subsequent pages.
21  BY MR. ACKELSBERG:
22    Q.  So let me -- let me just start with -- you
23  can see this is an e-mail that -- there's an e-mail
24  trail here that starts from the second page, and
25  it -- you can see it -- it's from Linda Rogenski to

1  Billi Anne Morsette and -- and Bobbi Favel.  Do you
2  see that?
3    A.  Yes, sir.
4    Q.  Okay.  Are these people that you have --
5  you've had any contact with in the past, Billi Anne
6  Morsette or Bobbi Favel?
7    A.  No.
8    Q.  No -- no -- no --
9    A.  I have --
10    Q.  -- direct contact --
11    A.  Not to my --
12    Q.  -- at all?
13    A.  No.  No.
14    Q.  Okay.
15        MR. SHELDON:  And, Linda, don't
16  forget, you need to let Irv finish asking his
17  questions.
18        Irv, don't forget, Linda needs to be able
19  to finish --
20        MR. ACKELSBERG:  Sure.
21        MR. SHELDON:  -- answering her
22  question.
23  BY MR. ACKELSBERG:
24    Q.  Let me ask you this:  Did the -- did you
25  have contact with anyone at Plain Green, you have

1  direct contact?
2    A.  In their accounting area.
3    Q.  Okay.  And would that be true also of Great
4  Plains Lending and Mobiloans?
5    A.  Yes, sir.
6    Q.  Okay.  So and who is -- there's a Michelle
7  Nguyen, N-g-u-y-e-n.
8    A.  Uh-huh (affirmative response).
9    Q.  Is Michelle Nguyen -- who is she?
10    A.  At that time, she worked for Think Finance,
11  and she was a product manager.
12    Q.  She's not at Think Finance now?
13    A.  No.
14    Q.  Where is she?
15    A.  I am not sure.
16    Q.  Okay.  So you see that Linda is sending --
17  well, let me ask you this:  Are these names you've
18  heard of?  Did you ever hear the name Billi Anne
19  Morsette or Bobbi Jo Favel?
20    A.  Bobbi Jo, I had never heard of.  Billi
21  Anne, I had heard the name.
22    Q.  You knew of the name?
23    A.  I knew of the name.
24    Q.  Okay.  So you see the context here, that
25  Linda is sending two people at Plain Green what

UNSEALED

1   Linda describes as a "high-level cash movement
2   analysis."  Do you see that?
3       A.  Uh-huh (affirmative response).
4       Q.  Okay.  Flip the pages to the -- well, first
5   of all, let me ask you this before we flip the
6   pages:  Do you see that on -- on page 3 -- actually,
7   on the very -- very first page, both of them, that
8   Linda 2 identified -- is identified on the -- the
9   e-mail as the "Universal Fund controller."  Do you
10  see that?
11      A.  I see it there, yeah.
12      Q.  Do you know why she's called the Universal
13  Fund controller?
14      A.  I do not know why she's called. . .
15      Q.  Okay.  The -- so let's look at the
16  spreadsheet that was attached to the e-mail, and --
17  and let's look at the first tab, the one that says
18  "Plain Green high-level discussion of daily
19  movement."  And -- and what I want to ask you is
20  just if -- if this is something that you have any
21  knowledge of.  I mean, is there an account -- or was
22  there an account at that point in time called the
23  "Plain Green purchasing account"?
24      A.  In -- in the purchasing -- the Plain Green
25  "purchasing account" and "funding account" were used

1   interchangeably.  So I don't know if she -- in my
2   shop, it would be the "funding account," and I -- I
3   don't know if L2 switched it to "purchasing" for
4   this process.
5       Q.  Okay.  So you know of a funding account?
6       A.  Uh-huh (affirmative response).
7       Q.  And would there be a Plain Green funding
8   account?
9       A.  Yes.  Plain Green owned, yes.
10      Q.  And would there be a Plain Green
11  collections account?
12      A.  Yes.
13      Q.  Okay.  And would the same be true of the
14  other two tribal entities, Mobiloans --
15      A.  Yes.
16      Q.  -- and Great Plains Lending?
17      A.  Yes.
18      Q.  Okay.  And so there is -- for each one of
19  the tribes, there was a bank account in the name of
20  that tribal entity that was used to fund
21  originations of customer loans?
22      A.  (Nods head affirmatively.)
23      Q.  You've got to say "yes" or "no."
24      A.  Yes, sir.
25      Q.  And similarly, there was a second account

1   for each one of the tribal entities called a
2   "collections account"?
3       A.  Yes, sir.
4       Q.  And there -- at this point in time, there
5   was an ACH provider named Intercept; is that
6   correct?
7       A.  Which year are we going?
8       Q.  Well, do you remember when there was --
9       A.  Yes, I do remember Intercept, yes.
10      Q.  So presumably, if -- if Linda is explaining
11  to people at Plain Green about how it works, this
12  was at a time when Intercept was the provider,
13  right?
14      A.  Yes.
15          MR. SHELDON:  Object to form.
16  BY MR. ACKELSBERG:
17      Q.  You understand that, right?
18      A.  Yes, Intercept was the provider at that
19  time.
20      Q.  Okay.  And -- and then GPLS is the -- and
21  you remember that GPLS was the entity that purchased
22  participations in the loan that Plain Green
23  originated?  You remember that, right?
24      A.  Yes, sir.
25      Q.  And that was true of Mobiloans and Great

1   Plains Lending as well, correct?
2       A.  Yes, sir.
3       Q.  Okay.  And -- and so let's just see if in
4   the next -- you know, in the next part of the -- of
5   the exhibit, whether you also agree that -- the way
6   that the -- that Linda describes the funding of
7   loans and then the collections of loan.  So she says
8   first, "Cash is transferred from the Plain Green" --
9   and I'll use the term "funding account" -- "to an
10  account at Intercept."  Was that the way it worked?
11          MR. SHELDON:  For the record, the
12  document says "Plain Green purchasing account."
13          MR. ACKELSBERG:  I know.  Right.
14      A.  We called it "funding account" --
15  BY MR. ACKELSBERG:
16      Q.  Right.
17      A.  -- just in -- in layman's terms.
18          Yes, that is how it worked.
19      Q.  And then, "Intercept processed the nightly
20  delivered ACH file to fund approved customer loans,"
21  correct?
22      A.  Yes.
23      Q.  And then, "Two days after origination of
24  those loans, GPLS purchased a 99 percent
25  participation in those loans by transferring cash to

1 the Plain Green" -- and I'll say "funding account."
2 Right?
3      A.  That is correct.
4      Q.  Okay.  And if I substituted "Mobiloans" or
5 "Great Plains Lending" for "Plain Green" in this, it
6 would -- it would be an accurate description of the
7 way it worked as regarding -- as regards to those
8 other tribal entities, correct?
9          MR. SHELDON:  Object to form.
10     A.  They -- they had -- their agreements -- in
11 accordance with their agreements, but they were very
12 similar.  Yes, sir.
13 BY MR. ACKELSBERG:
14     Q.  And then if we move to the collections
15 side, every night Intercept processed -- well,
16 delivered an ACH file to collect the payments from
17 customers, right?
18     A.  The loan management system sent an ACH file
19 for Intercept to process to collect payments from
20 the customer.
21     Q.  Okay.  So there would be a -- a data
22 transmission from Think Finance to Intercept which
23 would then trigger Intercept going into the customer
24 accounts and pulling out the appropriate payments?
25     A.  Systemically, that is how it worked, yes.

1      Q.  Okay.  And then Intercept would hold the
2 collected funds for four days to ensure that the
3 majority of returns were processed, right?
4      A.  That is correct.
5      Q.  Okay.  And then after four days, Intercept
6 would remit those collected funds to the Plain Green
7 collections account, right?
8      A.  That is correct.
9      Q.  Or if we're talking about Mobiloans, it
10 would be the Mobiloans collection account?
11     A.  Yes, sir.
12     Q.  Or the Plain Green -- or the Great Plains
13 Lending account?
14     A.  Yeah.
15     Q.  Okay.  And then the -- and then Plain Green
16 would transfer 99 percent of those collections out
17 of that account to GPLS, right?
18     A.  That is correct.
19     Q.  Okay.  So -- so this is an accurate
20 description of how the money flowed in the system
21 that you're -- you're familiar with, right?
22     A.  Yes.
23     Q.  Okay.  Now, the second page is a flowchart,
24 and it -- it looks like to me it -- well, why don't
25 you look at it.

1      A.  The next -- the flowchart or my -- the
2 next --
3      Q.  Yeah.  Flip the page now.
4      A.  I've got --
5      Q.  Let's go to -- you don't have it?
6      A.  I do.  It's the third page.
7      Q.  I meant the -- it's called -- it's called
8 "Tab 2" on it.  Do you see -- I wrote that "Tab 2."
9      A.  Oh, okay.
10         MR. SHELDON:  For the record, the
11 third page of the native document has "Tab No. 2,"
12 language I can't read, written in the upper
13 right-hand corner.
14         MR. ACKELSBERG:  That's my initials,
15 just to make clear that I wrote that.  So -- and it
16 corresponds with the tab on the -- on the screenshot
17 that we -- we -- that's a few pages before that.  Do
18 you see that?  Matt, do you -- I want to make sure
19 that you. . .
20         MR. SHELDON:  Yes.
21         MR. ACKELSBERG:  I want to make sure
22 that it's clear to you.
23         MR. SHELDON:  Yeah.  Okay.  Good.
24 BY MR. ACKELSBERG:
25     Q.  So Tab No. 2 has a flowchart.

1      A.  Yes, sir.
2      Q.  And did -- was it -- were there -- if
3 you've never -- you know, maybe you've seen this
4 flowchart or maybe you -- have you -- have you ever
5 seen this particular flowchart?
6      A.  Yes, I have.
7      Q.  Oh, you have?  Okay.  So where did -- tell
8 me what you -- what you remember about this
9 flowchart.  Where did it come from?  Who made it?
10     A.  I would say I made it.
11     Q.  Oh.  Great.  Okay.  So this is a document
12 you created?
13     A.  Yes.
14     Q.  Okay.  And so would it -- would I be
15 correct in saying that this is a sort of visual
16 presentation of what was described in words in the
17 previous tab, in the -- in the previous picture,
18 that you're trying to put a -- make a flowchart that
19 sort of shows what we were just looking at?
20         MR. SHELDON:  Objection.  The previous
21 tab -- oh, I'm sorry.  I see what you were doing
22 here now, that the previous tab was -- sorry.  You
23 can continue.  If you want to read back the question
24 or otherwise proceed, that's fine.
25         MR. ACKELSBERG:  I think -- I think

UNSEALED

1  the witness knows.
2      A.  It is a flow that describes this -- and I
3  want to say between here and here, what is going on.
4  BY MR. ACKELSBERG:
5      Q.  Okay.  So you're pointing to -- there's a
6  column, you see it says --
7      A.  That says "Think Finance Systems."
8      Q.  Yes.  And under that, it says "ACH."
9      A.  Yeah.  And that -- that column, and then
10 what is going on over on the right, the column into
11 the -- the collection account for -- at Citibank.
12     Q.  Where it says GPL Servicing, LTD, and then
13 "Purchase Account" and "Collections" and --
14     A.  Yeah.
15     Q.  -- "Maintenance" and all that?
16     A.  Yeah.
17     Q.  Okay.  So when -- when the 99 percent of
18 collections from tribal entity's collection account
19 would be transferred to GPLS, that would go to an
20 account at Citibank, correct?
21     A.  Correct.
22     Q.  And all of the various GPL -- GPLS accounts
23 were at Citibank, right?
24     A.  To the best of my knowledge, yes.
25     Q.  And the tribal accounts were at different

1  banks, right?
2      A.  Yes, sir.
3      Q.  And the -- the Think Finance finance people
4  were authorized to move money in and out of the GPLS
5  accounts at Citibank, some -- some of those
6  accounts, correct?
7          MR. SHELDON:  Object to form.
8      A.  The Think Finance -- some of the accounts,
9  yes.
10 BY MR. ACKELSBERG:
11     Q.  Now, 99 percent of the loan fundings came
12 from the -- a GPLS account at Citibank, right?
13         MR. SHELDON:  Object to form.
14     A.  The funds came -- yes.  If GPL purchased
15 their participations, yes.
16 BY MR. ACKELSBERG:
17     Q.  Where did the other 1 percent come from?
18     A.  The tribe would have to -- that would be
19 from the tribe.
20     Q.  Okay.  Well, let's look at your chart that
21 you prepared.  And what it looks like, and correct
22 me if I'm wrong, that the 1 percent comes from
23 something called the Haynes Investment account?
24     A.  I know very little about the Haynes
25 Investment account.  So I don't -- I can't speak to

1  how the tribe got their money.  The funding account
2  would have enough in it to send to the ACH processor
3  to cover the files that were forecasted.  We
4  forecast the amount of the files.  And that's where
5  it was picked up from there.
6      Q.  And 99 percent of those funds came from
7  GPLS?
8      A.  And those came -- came back into that
9  account from GPLS.
10         MR. SHELDON:  Object to form.  I think
11 you two are actually crossing -- talking across each
12 other.  She's talking about an event after the
13 funding, and you're talking about an event before
14 the funding.
15 BY MR. ACKELSBERG:
16     Q.  Why don't -- is that correct?
17     A.  Which part?
18     Q.  What your lawyer just said.  I'm sorry.
19     A.  Probab- -- probably.
20     Q.  Probably.  All right.
21         So let's -- let's do it my way.  So
22 99 percent of the money to fund loans that
23 ultimately ends up at the ACH provider is
24 effectively coming from GPLS, right?
25         MR. SHELDON:  Object to form.

1      A.  A hundred percent of the loan funding has
2  to be at the ACH provider to cover the file.
3  BY MR. ACKELSBERG:
4      Q.  Right.  And -- and you have to -- or
5  treasury -- somebody at Think Finance has to make
6  sure that they have a hundred percent?
7      A.  We monitor that as a service.
8      Q.  Okay.
9      A.  Correct.  To make sure the tribes got
10 their --
11     Q.  And would that be your job or -- to monitor
12 that?
13     A.  No.  That was treasury.
14     Q.  That would be treasury.  Okay.  So treasury
15 would have to make sure that a hundred percent of
16 the loan fundings was in the hands of the ACH
17 provider?
18     A.  (Nods head affirmatively.)
19     Q.  And they'd have to effectively predict how
20 much the ACH provider would need, right?
21     A.  It would be a forecast, yes.
22     Q.  Okay.  And then after the fact, there's --
23 there's a reconciling, right?
24     A.  Yes, sir.
25     Q.  Okay.  And 99 percent of the funds that

UNSEALED

1  were put out eventually gets replenished by GPLS?
2      MR. SHELDON: Object to form.
3      A.  They were purchased by GPLS, the
4  participation.
5  BY MR. ACKELSBERG:
6      Q.  But in terms of the -- in terms of the flow
7  of money, though, you're basically replenishing the
8  money that was put out to -- in the few fundings,
9  right?
10     A.  The funds were transferred back into the
11 purchasing account when they purchased --
12     Q.  Right.
13         MR. SHELDON: Object to form back on
14 that prior question.
15 BY MR. ACKELSBERG:
16     Q.  And then the 1 percent, the tribe -- the
17 tribal portion of -- of the loans that were -- that
18 were made, are -- do you remember an account called
19 Haynes Investment?  I mean, you -- you did this --
20 you --
21     A.  I -- that --
22         MR. SHELDON: Object to form.
23     A.  I -- I don't know of an account called
24 Haynes Investment.  I just knew that a Haynes
25 Investment existed, and I put an account there.

1  BY MR. ACKELSBERG:
2      Q.  And did you know that that -- that money
3  for the 1 percent came from that account?
4      A.  I do not know if that came there.
5      Q.  Okay.  Okay.  We'll ask --
6      A.  That's going to be out of my --
7      Q.  That would be --
8         COURT REPORTER:  I'm sorry, your
9  answer?
10     A.  I do not know that. . .
11 BY MR. ACKELSBERG:
12     Q.  That was someone else's responsibility?
13     A.  Yeah.
14     Q.  And most likely, Linda Rogenski?  Linda
15 Rogenski?
16     A.  She might be more familiar with it.
17     Q.  Okay.  We'll -- we'll ask her.
18         There's a line to the left, you see,
19 between "Haynes Investment Account" and then the
20 "Plain Green Funding Account," it says "Excess
21 estimate swept to Haynes Investment."  Do you see
22 that?
23     A.  I see it.
24     Q.  Do you know what it means?
25     A.  I was instructed that that is something

1  that may or could happen.  I am unaware if that ever
2  happened.
3      Q.  Okay.  And who instructed you so, in that
4  fashion?
5      A.  That would have been someone more familiar
6  with it, which would have been Linda.
7      Q.  Okay.  Now, some customers made their
8  payments -- well, let me ask you this:  Do you know
9  how many -- what percentage of customers paid via
10 ACH?
11     A.  Almost all customers.
12     Q.  Almost all?
13         MR. SHELDON:  I need a break soon.  So
14 if you're done with the document -- we can take it
15 whenever you want, but in the next five minutes.
16         MR. ACKELSBERG:  We can -- we can
17 break now.  That will be fine.
18         MR. SHELDON:  Great.
19         THE VIDEOGRAPHER:  We are off the
20 record.  The time is 10:21 a.m.
21         (Break taken, 10:21 a.m. to 10:34 a.m.)
22         THE VIDEOGRAPHER:  We are back on the
23 record.  The time is 10:34 a.m.
24 BY MR. ACKELSBERG:
25     Q.  Ms. Callnin, what's your understanding of

1  what GPLS was?
2      A.  An investor.
3      Q.  Okay.  And was there -- I mean, did GPLS
4  have employees?  Was it a person?  I mean, what was --
5         MR. SHELDON: Object to form.
6  BY MR. ACKELSBERG:
7      Q.  What did you -- what was your understanding
8  of what GPLS -- what -- what was the nature of GPLS?
9      A.  That they were an investor.
10     Q.  And who was "they"?
11     A.  Whatever company was behind GP- -- or what
12 persons or whatever that were behind.
13     Q.  And did you know the -- did you know that --
14 the persons behind GPLS at all?
15     A.  No.
16         MR. SHAPIRO:  Object to form.
17 BY MR. ACKELSBERG:
18     Q.  Did you have any interaction with anyone
19 from Victory Park Capital at all?
20     A.  Only in e-mails every now and then.
21     Q.  But you never met any of those people?
22     A.  Did not, no, sir.
23     Q.  Okay.  What was your understanding of what
24 the Universal Fund was?
25     A.  Oh, I do not recall.

17  (Pages 65 to 68)

UNSEALED

App. 0454

1  Q. Well, do you remember if it was an
2  investor?
3  A. I don't remember.
4  Q. Okay.
5  A. I don't remember.
6  Q. Do you remember First Bank of Delaware?
7  A. I remember First Bank of Delaware, yes,
8  sir.
9  Q. And what -- what do you remember about
10 First Bank of Delaware? What was their role, that
11 you remember?
12 A. That they --
13      MR. SHELDON: Object to form.
14 A. That they were a partner. Similar to the
15 tribes.
16 BY MR. ACKELSBERG:
17 Q. Okay. So there -- and did the accounting
18 work similarly back in those days, that there would
19 be a portion of the funding that would be replenished by --
20 A. A participation purchaser.
21 Q. -- a participation purchaser, right?
22 A. Yes.
23 Q. And might that have been the Universal Fund
24 back then?
25      MR. SHELDON: Object to form.

1  A. I don't -- I don't know.
2  BY MR. ACKELSBERG:
3  Q. You don't remember?
4  A. No.
5  Q. Okay.
6  A. I don't remember.
7  Q. And First Bank of -- was First Bank of
8  Delaware providing other services back then as well?
9      MR. SHELDON: Object to form.
10 A. Clarify what "other services" are.
11 BY MR. ACKELSBERG:
12 Q. Am I right that before Intercept was your
13 ACH provider, First Bank of Delaware was an ACH
14 provider?
15 A. They -- I don't know if they provided it
16 themselves or outsourced it. I do not know.
17 Q. But do you remember when Intercept first
18 started?
19      MR. SHELDON: Object to form.
20 A. Not the exact date, but. . .
21 BY MR. ACKELSBERG:
22 Q. Well, let's -- let's go back to the point --
23 do you remember the transition from First Bank of
24 Delaware to the tribal entities?
25      MR. SHELDON: Object to form.

1  A. Only the transition, not the mechanics
2  behind it.
3  BY MR. ACKELSBERG:
4  Q. Okay. But you remember the -- you remember
5  the transition? You remember -- you remember it
6  happening?
7  A. I remember it happening, yes.
8  Q. Okay. And do you remember at the time that
9  it happened, for a while, First Bank of Delaware was
10 still handling the ACH processing?
11      MR. SHELDON: Object to form.
12 BY MR. ACKELSBERG:
13 Q. Or somebody that they -- that they hired?
14 A. Yeah, I -- I see a debit and credit in the
15 checking account. If First Bank of Delaware was the
16 ACH provider or they outsourced it, I don't know.
17 Q. But they did one or the other in the
18 beginning?
19 A. They could have, yes.
20 Q. Okay. Are you aware that each of the
21 tribal entities were charged fees by Tailwind and by
22 TC Decision Sciences?
23      MR. SHELDON: Object to form.
24 A. I was aware that the agreements had fees
25 that were being charged back and forth.

1  BY MR. ACKELSBERG:
2  Q. Okay. And was someone in finance
3  responsible for paying those fees?
4      MR. SHELDON: Object to form.
5  BY MR. ACKELSBERG:
6  Q. Or for invoicing those fees, or any -- any
7  activity with regard to those fees?
8      MR. SHELDON: Object to form.
9  A. The -- there was -- yes. To my knowledge,
10 yes.
11 BY MR. ACKELSBERG:
12 Q. And -- and am I right that that was done on
13 a monthly basis?
14 A. In accordance with the agreements.
15 Q. Which agreements are you referring to? The
16 participation agreements? Or. . .
17 A. The participation or servicing agreements
18 or whatever agreements they had.
19 Q. Okay. And so which -- which team within
20 finance prepared the invoices?
21 A. That's going to be under L2.
22 Q. Linda Rogenski --
23 A. Linda Rogenski.
24 Q. -- would do that?
25 A. Yeah.

18 (Pages 69 to 72)

UNSEALED

App. 0455

1      Q.   Okay.  And which team would be responsible
2  for the accounting with regard to those -- to those
3  fees, any payments connected to those fees?
4           MR. SHELDON:  Object to form.
5  BY MR. ACKELSBERG:
6      Q.   Or transfers connected to those fees?
7           MR. SHELDON:  Object to -- object to
8  form.
9      A.   It -- it would be the treasury in
10  conjunction with that, you know --
11  BY MR. ACKELSBERG:
12     Q.   So the treasury would -- would facilitate
13  whatever transfers were required, right?
14     A.   Uh-huh (affirmative response).
15     Q.   Now, am I right that your team, though,
16  occasionally would approve -- would have some
17  approval function with -- with regard to the
18  transfers?
19     A.   Only as --
20          MR. SHELDON:  Object to form.
21     A.   Only as backup.
22  BY MR. ACKELSBERG:
23     Q.   Okay.  Who -- if -- who was the primary
24  approving person or team within -- in that -- who --
25  so treasury would prepare a wire transfer with

1  regard to the Tailwind or TCDS fee, right?
2      A.   (Nods head affirmatively.)
3      Q.   And somebody --
4      A.   Yes, sir.
5      Q.   Somebody would have to approve that before
6  the wire would actually -- the wires would actually
7  hit, right?
8      A.   That's correct, sir.
9      Q.   And who was the primary approving party?
10     A.   Primary would be Linda Rogenski or Badr
11  Qureshi.  I was, like, backup for them.
12     Q.   Okay.  And if they weren't available, then
13  you would be the one --
14     A.   Yes.
15     Q.   -- who would approve those?
16     A.   Yeah.
17     Q.   Okay.  Well, I want to -- we're going to
18  look at one where I think you had some role.
19          MR. ACKELSBERG:  So why don't we turn
20  to Document 27, P-27.
21          (Exhibit No. 27 marked.)
22          MR. SHELDON:  For the record,
23  Document 27 appears to be an e-mail with an
24  attachment.  The e-mail does not have a
25  confidentiality stamp on it, but the attachment does

1  have a confidentiality stamp on it.
2           MR. ACKELSBERG:  And just to be clear,
3  I did the copying -- the preparation of this --
4  Mr. Sheldon, I did the copying of this -- or the
5  preparation of this exhibit in the same way that I
6  did the one that we were looking at before, you
7  know, the previous exhibit, where, after -- after
8  I've copied the -- the page that has the
9  "Confidential" stamp on it that says "Produced in
10  Native Format," I then -- I then produced -- I then
11  created a copy of the image of what you see when you
12  download the native file, and -- and then -- and
13  then the subsequent pages are the various tabs that
14  are listed at the bottom of that Excel sheet.  Okay?
15  Just so you understand what I've done there.
16          MR. SHELDON:  I -- I believe I do.
17          MR. ACKELSBERG:  Okay.  Thank you.
18          MR. GROGAN:  For the record, Matt, for
19  the rest of the deposition, when he says he did it
20  that way, the way he just said, that's how we did
21  it, so he doesn't have to explain it each time.
22  BY MR. ACKELSBERG:
23     Q.   All right.  So what I think I'm showing you
24  is the invoicing for the Tailwind and TCDS charges
25  for August of 2013.  And why don't you look through

1  it and tell me if I -- 2012, I'm sorry.  I had the
2  wrong year.  So we're looking at an e-mail from
3  September of 2012, and I think it's attaching
4  invoices for the -- the August of 2012 billing.  Do
5  you see that?
6      A.   I see, yes, sir.
7      Q.   And you're actually included in the e-mail.
8  You see that, right?
9      A.   Yes, sir.
10     Q.   And was that common that you would be CC'd
11  in -- in the monthly invoicing like this?
12     A.   Yes.  Yes, sir.
13     Q.   Okay.  So this was part of the standard
14  procedure?
15     A.   Yes, sir.
16     Q.   Okay.  Now, why don't you turn to the
17  invoices.  First of all -- yeah, okay, let's turn to
18  the invoices and let me ask you -- and we're looking
19  at just -- we're looking at Great Plains here,
20  right?
21     A.   Yes, sir.
22     Q.   Who -- what was the standard practice in
23  terms of preparation of these invoices?  Who would
24  do that?
25     A.   Someone --

UNSEALED

App. 0456

1            MR. SHELDON:  Object to form.
2        A.  They were prepared by someone in Linda
3    Rogenski's group.
4    BY MR. ACKELSBERG:
5        Q.  Okay.  So Linda Rogenski would prepare --
6    and let's just walk through this.  So the first
7    document -- the first invoice we see is an invoice
8    from Tailwind Marketing, billed to Great Plains
9    Lending, right?
10        A.  Yes, sir.
11        Q.  And that's the marketing fee that was being
12    billed pursuant to the agreement between Tailwind
13    Marketing and Great Plains, correct?
14        A.  To the best of my knowledge, yes.
15        Q.  Okay.  And this is a bill for $661,400,
16    correct?
17        A.  Yes, sir.
18        Q.  Okay.  And then the next invoice, am I
19    right, is for the same amount, the same $661,400,
20    which is billed by Great Plains Lending to GPLS, and
21    this is for reimbursement of the same fee, correct?
22        A.  It -- I -- I -- in -- it is done in
23    accordance with the agreement.  If the intent was
24    reimbursement, it's -- whatever the agreement says.
25        Q.  Okay.  I don't mean to -- I don't mean

1    to -- the -- I don't -- I don't need you to
2    characterize it.  You're just talking about -- we're
3    just talking about money flows here, right?
4        A.  Yeah.
5        Q.  That's what you know?
6        A.  Yes, that's what I know.
7        Q.  Okay.  So a bill would -- would go from
8    Tailwind to Great Plains Lending in -- in a certain
9    amount, and simultaneously, a bill for the same
10    amount would go from Great Plains Lending to GPLS?
11            MR. SHELDON:  Object to form.
12    BY MR. ACKELSBERG:
13        Q.  Right?
14        A.  Yes, sir.
15        Q.  Okay.  And that was the standard practice?
16        A.  If that's what the agreement said.
17        Q.  Done every month?
18        A.  That's what was done, yes, sir.
19        Q.  And -- and it would be done the same way
20    for the other tribal entities as well, in accordance
21    with their agreements?
22        A.  Whatever their agreements said --
23        Q.  That would be --
24        A.  -- would be done.
25        Q.  -- one bill going from Tailwind to the

1    tribal entity, and then a bill in the same amount
2    going from the tribal entity to GPLS?
3        A.  I --
4            MR. SHELDON:  Object to form.
5        A.  I don't know that all the other tribes were
6    set up with the exact same agreements.  Each tribe
7    has its own set of agreements.  Mechanically, it may
8    not have been done the same way.
9    BY MR. ACKELSBERG:
10        Q.  And you don't remember if mechanically
11    there were -- there were simultaneous invoices?
12        A.  They -- they --
13        Q.  I'm not asking for the amount of the -- I'm
14    not asking you to -- to remember the amount of fee
15    paid by Plain Green, for example.  But am I right
16    that on a monthly basis, there would be similarly
17    for Plain Green, a -- this sort of double invoicing
18    for whatever the Tailwind fee was?
19            MR. SHELDON:  Object to form; asked
20    and answered.
21    BY MR. ACKELSBERG:
22        Q.  Go ahead.  You can answer now.
23        A.  I don't guarantee that the -- this is the
24    Great Plains agreement and how it was done.  I -- I
25    don't remember off the top of my head if Plain Green

1    or Mobil were done in the exact same manner.
2        Q.  Okay.  All right.  But we're looking at
3    Great Plains Lending.
4        A.  That's what we're looking at.
5        Q.  And this is the way it was done with Great
6    Plains -- and you're confident this is the way it
7    was done with Great Plains Lending?
8            MR. SHELDON:  Object to form.
9        A.  To what I know of, this is what was done.
10    BY MR. ACKELSBERG:
11        Q.  Okay.  And then let's turn to the next --
12    the next two invoices.  Now we're -- now we're
13    dealing with the monthly license and support fee
14    that TC Decision Sciences would bill to Great
15    Plains, right?  And then -- and that's in the amount
16    of $330,700, right?
17        A.  Correct.
18        Q.  And there is an invoice in the exact same
19    amount from -- going a different direction, from
20    Great Plains Lending to GPL Servicing, right?
21        A.  Yes, sir.
22        Q.  And both of these invoices would have been
23    prepared by Linda Rogenski's team?
24        A.  Correct.
25        Q.  And then the third set of invoices are for

1 a different TC Decision Sciences fee called the
2 "servicing fee," right?
3    A. Correct.
4    Q. And this works the same way, a simultaneous
5 invoice from TC Decision Sciences to Great Plains,
6 and then an invoice for the same amount on the same
7 day going from Great Plains Lending to GPLS, right?
8    A. Correct.
9    Q. Okay. And then there's a final -- a final
10 invoice. And this is called a service fee, and this
11 is Great Plains Lending billing GPL -- GPLS, right?
12    A. Correct.
13    Q. And -- and what are we looking at here?
14    A. This -- as a service to Great Plains, we
15 prepare the invoice for them, but it's -- the
16 contract -- the description up in the right-hand
17 corner was meant to be the description of the
18 transaction in accordance with the contract. So . . .
19    Q. Do you remember -- do you remember the
20 concept called "revenue share"?
21    A. I do.
22    Q. Okay. Are we looking at revenue share?
23    A. We could be.
24    Q. What do you mean "we could be"? Are we or
25 aren't we?

1    A. Well, I -- well, it -- it could be revenue
2 share, but it was called "service fee" --
3    Q. Well, I know, but --
4    A. -- in the contract.
5    Q. And is it possible -- so it's possible that
6 the contract referred to the revenue share as
7 "service fee"?
8       MR. SHELDON: Object to form.
9    A. That -- that could be possible.
10 BY MR. ACKELSBERG:
11    Q. Okay. Well, looking at the calculation
12 that was done, do you see --
13    A. Uh-huh (affirmative response).
14    Q. -- it's the amount of loan fees collected,
15 less return fees. Do you see that?
16    A. Yes, sir.
17    Q. And there's a net fee collected?
18    A. Uh-huh (affirmative response).
19    Q. And when we're talking about net fees
20 collected, we're talking about the GPLS portion, the
21 99 percent, right?
22       MR. SHELDON: Object to form.
23    A. The -- that is the gross amount, the 5365.
24 The GPLS portion is 5311.
25 BY MR. ACKELSBERG:

1    Q. Right. That's the 99 percent --
2    A. Correct.
3    Q. -- correct?
4       Okay. And then of that, it looks -- it
5 looks like Plain Green -- or Great Plains Lending
6 was paid 9 percent of that, correct?
7    A. Correct.
8    Q. Okay. And that's what you understood to be
9 revenue share, right?
10    A. Correct.
11    Q. Okay. You -- what you're not -- what
12 you're not sure of is whether revenue share in the
13 contracts was called "service fee"?
14    A. Correct.
15    Q. Okay. Now, am I right that Plain Green
16 also was paid a revenue share of a -- of some
17 amount, of some percentage?
18       MR. SHELDON: Object to form.
19    A. I believe -- I believe so. That's -- yes.
20 BY MR. ACKELSBERG:
21    Q. And do you -- do you recall the four and a
22 half percent number?
23    A. There -- possibly.
24    Q. Okay. And Mobiloans was also paid a
25 revenue share out of the 99 percent of collections?

1    A. If that's --
2       MR. SHELDON: Object to form.
3    A. If that's what was in their contract, yes.
4 BY MR. ACKELSBERG:
5    Q. Okay. And that might have been 4 percent?
6 Does that sound familiar?
7    A. Four, four and a half. They -- could be.
8 I don't know which one's which --
9    Q. Okay.
10    A. -- without looking at the invoice.
11    Q. But you do you recall that each one of the
12 tribal entities were paid a percentage of GPLS's
13 share of the collect -- the net collections?
14    A. Yes, sir.
15    Q. Okay. That you knew as revenue share, but
16 might have been contractually referred to as
17 "service fee"?
18    A. Correct.
19    Q. Okay. And then am I right that the
20 treasury people would prepare wires that would
21 transfer money consistent with the invoices that we
22 were looking at?
23    A. Yes, sir.
24    Q. And that -- and that was done on a monthly
25 basis?

UNSEALED

1    A.  Yes, sir.
2    Q.  And was that done for all tribes -- all of
3  the tribal entities?
4    A.  Yes, sir.
5         MR. ACKELSBERG:  All right.  Let's
6  look at the next exhibit, 28.
7         (Exhibit No. 28 marked.)
8         MR. ACKELSBERG:  And just to save some
9  time, it's marked "Confidential."  I mean, I don't
10  know that we really need to do this on the record
11  for every single document.  But it's marked
12  "Confidential."
13         MR. SHELDON:  I don't think that took
14  too long.
15  BY MR. ACKELSBERG:
16    Q.  Now, we're looking at the -- we're looking
17  at some wire approvals that occurred on
18  September 19th, correct, of 2012?
19    A.  Correct.
20    Q.  And -- and if you look at the Great Plains
21  portion of the wires, we're looking at the Citibank
22  wires.  When we're talking about Citibank, we're
23  talking about the GPLS accounts, correct?
24    A.  Correct.
25    Q.  And if you look at the GP wire, you see

1  it's $1,187,285?
2    A.  Yes.
3    Q.  Okay.  And if you need to calculate it,
4  that's fine, or if -- if you know, is that
5  $1,187,285 the sum of the three invoices for
6  Tailwind and TCDS that we were just looking at?
7         MR. SHELDON:  Object to form.
8    A.  Do you have a calculator that. . .
9  BY MR. ACKELSBERG:
10    Q.  Sure.
11         MR. SHELDON:  Do you have a piece of
12  paper she can do the calculations on?
13         MR. ACKELSBERG:  It's probably easier
14  to do it on -- on my iPhone.  So. . .
15         MR. SHELDON:  For the record, the
16  witness is looking back at Document P-27 and is
17  performing calculations of invoices discussed
18  regarding that exhibit.
19    A.  That is correct.
20  BY MR. ACKELSBERG:
21    Q.  So -- you can hold that exhibit.  I'll just
22  take my phone back.  Okay.  Thanks.
23         So -- so we're basically looking at the
24  wires that were prepared.  Now, were these wires
25  coming out of the Citibank account to the -- to the

1  tribal accounts -- to the -- to the G -- to the
2  Great Plains Lending account?
3         MR. SHELDON:  Object to form.
4  BY MR. ACKELSBERG:
5    Q.  Is that what we're looking at?
6    A.  I would have to see the wire transaction
7  itself to see which way it was going.
8    Q.  Okay.  But it's one of those two
9  directions, right?
10    A.  Yes, sir.
11    Q.  Okay.  Now, the procedure was that -- now,
12  David Gentry, he worked for Badr Qureshi?
13    A.  In that time frame, I'm not sure if Badr. . .
14    Q.  Well, it looks like David Gentry is -- has
15  prepared these wires, correct?
16    A.  Yeah.  And he copied Badr on it, yes.
17    Q.  Yes.  Okay.
18    A.  Okay.
19    Q.  And -- and he's -- and he's asking you,
20  Linda 1, for approval, right?
21    A.  Yes.
22    Q.  Okay.  And that means that -- that someone
23  else wasn't around?
24    A.  That's correct.
25    Q.  And -- and we're talking about with regard

1  to the -- to the Great Plains Lending invoice that
2  we -- that we saw, that this could be a wire out
3  of -- I mean, you wouldn't need to -- would you need
4  to get approval for a wire into -- into the Citibank
5  account?
6         MR. SHELDON:  Object to form.
7    A.  No.  No.  Incoming wires to --
8  BY MR. ACKELSBERG:
9    Q.  Right.
10    A.  -- only -- only. . .
11    Q.  Right.  So we're basically looking at the
12  transfer of money that went from the Citibank GPLS
13  account to Great Plains Lending for those three fees
14  that we were -- that we were looking at in the
15  previous exhibit, correct?
16         MR. SHELDON:  Object to form.
17    A.  To the best of my knowledge, yes, without
18  looking at the debits and credits and the wire
19  transfer.
20  BY MR. ACKELSBERG:
21    Q.  Okay.  When you -- when the finance
22  department would -- I mean, what we're looking at
23  was a common occurrence, right?  This happened every
24  month, something like this?
25    A.  This was part of the monthly invoicing in

UNSEALED

accordance with the agreements.

Q. Okay. And by the way, was it common to -- in the wiring, to combine all three of the tribal entities at once like you see here? You can see there's -- there's Mobiloans, there's Great Plains, and -- and Plain Green all in the same -- same approval. Do you see that?

A. It's on the same approval e-mail. Independent transactions as far as wires.

Q. Okay. But they would -- they would be processed all together?

A. Monthly, and they were done at the same time.

Q. Okay. And so in this case, David Gentry is asking for your approval to take money out of the GPLS account and wire it to Great Plains Lending?

A. We were authorized by GPLS or have authority out of -- I don't remember which specific account, but to do these transactions.

Q. And you didn't need to get an approval from GPLS every time you did that?

A. They were copied on some e-mails.

Q. They're not copied on this e-mail, right?

A. I don't know which ones, but they were sent e-mails on the transactions that we were going to

have.

Q. Okay. Okay. Now, were there similar wires that had to be prepared for the -- for the flow of money in the opposite direction, from the tribal accounts to GPLS?

A. Yes.

Q. Or from the tribal -- I'm sorry. From the tribal accounts to Tailwind or to TC Decision?

A. Not that I'm aware of. I don't -- I don't -- if -- if the tribe authorized us to set up the wire, if that was the case, then we would set it up. But the tribe would have to approve it.

Q. Would the tribe have to approve every single wire?

A. Out of their accounts, yes.

Q. Okay. And how would that approval happen?

A. We would send them an e-mail: Here are the wires to be approved and here's the calculations.

Q. And -- and they would always do it?

A. Unless they --

MR. SHELDON: Object to form.

BY MR. ACKELSBERG:

Q. Would they always do it?

A. Unless they had a disagreement with the calculation.

Q. Okay. And was that -- was it true of the whole period of time of the tribal products, that -- that they would always approve every single wire?

MR. SHELDON: Object to form.

A. Well, you're saying that in a form that's like, every single -- every wire that was -- every wire that was part of the program that had the calculations and was sent to them for approval as part of the program, yes, they would -- they would approve them.

BY MR. ACKELSBERG:

Q. And were there situations where they forgot to approve, and the wire went through, or they would approve after the wire? I mean, was it -- was -- in this -- was the system set up in such a way that if you didn't get a reply from the tribe, you couldn't make the transfer?

A. That is correct.

Q. All right. And was that true in 2012 and 2013?

MR. SHELDON: Object to form.

BY MR. ACKELSBERG:

Q. Or 2011?

A. If -- as far as I can remember, possibly, yes. Yeah, I believe so.

MR. SHELDON: Sorry, which one of his questions are you answering to?

A. Well, yeah, I know, I'm getting. . .

They had to approve the wires, and we -- we had occasions where they didn't, and money wasn't sent.

MR. ACKELSBERG: Okay. All right. Next exhibit, 29.

(Exhibit No. 29 marked.)

MR. SHELDON: For the record, this document is marked "Confidential, Attorneys' Eyes Only."

BY MR. ACKELSBERG:

Q. Now, you'll notice that, Ms. Callnin, on the lower right-hand corner, that the marking is a little bit different. It says "GPLP." That means this document came from GPLS, from Victory Park, not from -- not from -- from Think Finance, okay, just so you understand what -- what these numbers mean.

A. Uh-huh (affirmative response).

Q. You got that?

A. Yes. Yes, sir.

Q. Okay. Now, what I think I'm showing you, and ask me -- and tell me whether I'm right, is that this is a bank account reconciliation of the GPLS

1    account that was done September -- that was done
2    September 30th.
3        A.  Yes, sir.
4        Q.  For -- and this shows the -- the activity
5    in the accounts that occurred during the month of
6    September.
7        A.  Yes, sir.
8        Q.  And who would have prepared the document
9    that we're looking at?  Which -- which team?
10       A.  That would have been someone under my -- my
11   team, and it was Jill Carter.
12       Q.  And Jill Carter was someone that you
13   supervised?
14       A.  Yes, sir.
15       Q.  Okay.  And it's reviewed by somebody.
16       A.  That would have been me.
17       Q.  So that's your -- that's your -- those are
18   your initials there?
19       A.  Uh-huh (affirmative response).
20       Q.  Okay.  So this is a document that -- that
21   Jill Carter prepared under your supervision, that
22   you reviewed and signed off on the following month,
23   correct?
24            MR. SHELDON:  Object to form.
25       A.  She prepared it 10/8, and I signed it

1    10/29.
2    BY MR. ACKELSBERG:
3        Q.  Right.  Okay.  Now, if you go to, I believe
4    the third page.  Is what we're looking at here daily
5    transaction entries from the GPLS ledger?
6        A.  We're looking at this?
7        Q.  Yes.
8        A.  It's from our general ledger.
9        Q.  Your general ledger.  Your general ledger
10   for GPLS?
11       A.  Correct.
12       Q.  Okay.  And you see that -- the part of the
13   ledger that I marked at the bottom?
14       A.  Correct.
15       Q.  Okay.  That's my marking.  And if we look
16   at -- "PG" means Plain Green, correct?
17       A.  Correct.
18       Q.  And -- and "GP" is Great Plains Lending?
19       A.  Correct.
20       Q.  And "ML" is Mobiloans?
21       A.  Correct.
22       Q.  Okay.  And what we're doing -- what you're
23   doing here on the ledger is -- is showing the kind
24   of activity that we were looking at in the invoices
25   that we were looking in the previous exhibits,

1    right?
2        A.  Correct.
3        Q.  And in fact, for -- for Great Plains
4    Lending, those are the very -- the very invoices
5    that we were looking at in the -- in the previous
6    exhibit, correct?
7        A.  That's correct.
8        Q.  And so what this reflects is the work that
9    your team did in ledgering -- I don't know if that's
10   a -- in the accounting world, is that a proper --
11       A.  Ledgering, booking.
12       Q.  "Ledgering" is okay?  You can --
13       A.  Yeah.
14       Q.  You can verb it.  Okay.
15       A.  Yeah.
16       Q.  So this -- this reflects under the GP the
17   three -- the three back-and-forths that you -- we
18   were previously looking at, right?
19       A.  Correct.
20       Q.  Okay.  And that was true of Plain Green and
21   for Mobiloans?
22       A.  Correct.
23       Q.  Okay.  And you mentioned that generally, at
24   the same time of the month, you would -- or that --
25   that Ms. Rogenski's people, but finance department

1    would prepare the invoices and then do the wires,
2    and -- and they would do it for all three of the
3    tribes at the same time, right?
4        A.  Yes, sir.
5        Q.  And then similarly, your people in -- on
6    the settlement side would then make sure that all
7    those transactions were ledgered into the general
8    ledger that Think Finance maintained for GPLS?
9        A.  Correct.
10       Q.  And when it says in the right, "BA funds,"
11   are we talking about bank account?
12       A.  That is -- that --
13       Q.  What's "BA"?
14       A.  That download is the description from the
15   bank.  That's the bank side.
16       Q.  Okay.  So the -- so the far right column is
17   a download from the bank?
18       A.  Uh-huh (affirmative response).
19       Q.  Okay.  And whereas, the column under
20   "Reference" would be from the general ledger?
21       A.  Correct.
22       Q.  And this is done automatically?  Is this
23   generated automatically, or. . .
24       A.  No.  My -- my team would down -- download
25   the activity for the month from the bank, and

UNSEALED

1 work straight through to the lunch break from here.
2 MR. ACKELSBERG: Well, then why don't --
3 why don't we just take a quick break now.
4 MR. SHELDON: That's fine. Whatever --
5 whatever your preference.
6 THE VIDEOGRAPHER: We are off the
7 record. The time is 11:32 a.m.
8 (Break taken, 11:32 a.m. to 11:46 a.m.)
9 THE VIDEOGRAPHER: We are back on the
10 record. The time is 11:46 a.m.
11 BY MR. ACKELSBERG:
12 Q. Ms. Callnin, before we get to the next --
13 next exhibit, we spent a lot of time on the monthly
14 invoicing and reconciliation that -- that -- that
15 you were involved in, but I want to go back just for
16 a second to the daily reconciliations that -- the
17 daily settlement work that -- that you were
18 responsible for. And I think we -- I think we
19 talked at the beginning of the deposition about the
20 funding process, but I don't -- I want to focus on
21 the collection side and just ask you what the daily
22 reconciliation process consists of on the collection
23 side.
24 A. The ACH file that was produced by the loan
25 management system for collecting payments would be

1 sent to the ACH pro- -- would be sent to the ACH
2 processor. We would -- the ACH processors would
3 have a reporting system or a portal or something
4 where we could go view to see that they accepted it
5 and it was the same amount that was posting as
6 payments on the customer's system.
7 We would then -- when they -- the ACH
8 processors were done with their hold period, those
9 funds were then remitted back to the collection
10 account, and we would record the ledger entries.
11 Q. And so there's -- there's something called
12 reconciliation, and then there's -- and there's
13 also, then, the wire preparations, right? Those are
14 two separate activities that occur, right?
15 A. They're very different, yes.
16 Q. Yeah. So which comes first? Can you sort
17 of explain how it works in -- in terms of order?
18 A. Wire activities are -- okay. ACH and
19 reconciliation and validating the collections and
20 the funding are all systemic. Okay. Those ACH
21 files and everything are all systemic in passing
22 through. So we don't touch anything. We don't do
23 anything. We just validate the numbers from the --
24 from the ACH processor and from the system.
25 The wire transfer activities at any point

1 in time are something that you prepare and do. So
2 it could be -- if you're talking about the daily
3 participation transfer of cash receipts of -- you
4 know, cash received over to GPLS, that's something
5 that you every morning bring up the checking
6 account, see what was remitted, and then -- and then
7 the transfer to GPLS was done. If it was the
8 funding for the ACH, that is something that you
9 forecast the fundings for the day, prepare the wire,
10 and then send that off to be approved -- both off to
11 be approved by the tribes or whoever the approver
12 was.
13 Q. And so -- and so we're talking about, for
14 example, the wire representing the 99 percent share
15 that goes to GPLS, right?
16 MR. SHELDON: Object to form.
17 BY MR. ACKELSBERG:
18 Q. Am I right?
19 A. Well, I gave you two. So which one do you
20 want to ask? I gave -- you know, there's the
21 systemic side, the ACH processor doing its thing,
22 and moving money back and forth. And then there's
23 doing the collections transfer to GPLS or the
24 funding transfer over to --
25 Q. Well, let's talk about the collections

1 transfer to GPLS.
2 MR. SHAPIRO: I'm sorry, we -- you're
3 stepping on the end of her testimony a little bit.
4 MR. ACKELSBERG: Oh, I'm sorry.
5 MR. SHELDON: We're not getting --
6 you -- the witness just said "collection transfer to
7 GPLS or the funding transfer over to."
8 A. To the tribes. The tribe -- you know,
9 letting them know what to send to the ACH processor.
10 BY MR. ACKELSBERG:
11 Q. When -- when you say "letting them know
12 what to send," you've got me confused.
13 A. That's the funding account. Right? We
14 would forecast the funding file. It had to be at
15 the processor. The processor had to have the cash
16 for the file that they were going to receive that
17 night.
18 Q. What confused me was -- was, I think your
19 pronoun "them." I think you're referring to the
20 tribes?
21 A. Yeah.
22 Q. You need to -- you told us before that you
23 need to get approvals from the tribes, right?
24 A. Yes, they have to -- they have to --
25 Q. But the actual work of actually doing the

UNSEALED App. 0462

1 wires, doing the reconciliations, that's the Think
2 Finance finance department, right?
3      A.   We --
4           MR. SHELDON:  Object to form.
5      A.   We did it on beha- -- to make sure that our
6 systems and what was happening with the processors
7 were correct.  Okay.  I do not know if the tribes
8 did their own reconciliations.  They may very well
9 could have.  GPLS could be doing -- looking at their
10 accounts and doing their own reconciliations.
11 BY MR. ACKELSBERG:
12      Q.   Yeah, and I'm not asking what the tribes
13 did on their end for reconciliations.  I'm just --
14 I'm just trying to -- let -- let's focus on, as an
15 example, the transfer from the tribal collections
16 account to the GPLS collections account for the
17 99 percent share that GPLS had in the collections.
18 Right?
19      A.   Uh-huh (affirmative response).
20      Q.   You follow?
21      A.   Uh-huh (affirmative response).
22      Q.   And there's got to be a transfer, a wire
23 transfer, from the account that's in the name of the
24 tribe to the account at Citibank in the -- in the
25 name of GPLS, correct?

1      A.   Uh-huh, yes, sir.
2      Q.   And putting aside whatever approvals you
3 need to get, whatever e-mails have to occur, the
4 actual work of preparing the wire, doing the
5 reconciliations, that's done by treasury and
6 settlements at Think Finance, correct?
7           MR. SHELDON:  Object to form.
8      A.   Right.
9 BY MR. ACKELSBERG:
10      Q.   You did that for the tribes?
11      A.   We did that -- we did that on behalf of --
12 as an admin agent for GPLS.  Okay.  The -- that
13 information was sent to the tribes.  The tribes may
14 have done it themselves and compared to make sure
15 things were correct.
16      Q.   But you don't know one way or the other
17 what they did?
18      A.   No.
19      Q.   All right.  Let's go to the next -- next
20 exhibit.
21           MR. ACKELSBERG:  We're now up to 31, I
22 believe.
23           (Exhibit No. 31 marked.)
24           MR. SHELDON:  This exhibit also
25 appears to be marked "Confidential, Attorney's Eyes

1 Only."
2 BY MR. ACKELSBERG:
3      Q.   Now, we're looking at an e-mail chain that
4 you're not -- you're not involved, and Linda
5 Rogenski is.  But I just want to -- I'm going to ask
6 you some questions just about your understanding of --
7 you know, of the system.
8           So you see that it starts off where --
9 November 15, 2012, and you see it's an e-mail from
10 Thomas Welch to Chris Lutes?
11           MR. SHELDON:  She's not -- she doesn't
12 know what page you're on.
13 BY MR. ACKELSBERG:
14      Q.   I'm sorry.  The second page of -- it's a
15 two-page document.  Look at the beginning -- the
16 beginning of the e-mail trail.  You with me now?
17      A.   Uh-huh (affirmative response).
18      Q.   You've got to say "yes."
19      A.   Yes, sir.
20      Q.   Okay.  So it starts with an e-mail from Tom
21 Welch to Chris Lutes on November 15, 2012.  Do you
22 see that?
23      A.   Yes, sir.
24      Q.   And so Mr. Welch asks Mr. Lutes, "What
25 documents govern the fact that TCAS is ultimately

1 the administrator for the Plain Green accounts and
2 that it has the ability to both initiate and release
3 wires for the other two tribes' accounts?  Can you
4 have someone pass along?"
5           Do you understand what this -- first of
6 all, you -- you know who this -- I'm not asking if
7 you know him personally, but do you know who Tom
8 Welch is or was?
9      A.   Yes, I do.
10      Q.   Who was he?
11      A.   He was somebody -- he was somebody at
12 Victory Park Capital.
13      Q.   Okay.
14           MR. SHELDON:  Irv, can I have a minute
15 to read the document first?  I don't think --
16           MR. ACKELSBERG:  Absolutely.
17           MR. SHELDON:  -- myself or the witness
18 has read it, so if you don't mind. . .
19           MR. ACKELSBERG:  Sure.
20           MR. SHELDON:  Thank you.
21           I've finished reading it.
22           Linda, have you finished reading it?
23           THE WITNESS:  Yeah.
24 BY MR. ACKELSBERG:
25      Q.   Okay.  So you see that it starts off that

UNSEALED

1 Tom Welch -- Tom Welch is e-mailing Chris Lutes and
2 asking him what documents govern the fact that TCAS
3 -- that's TC Administrative Services, right?
4     A. Correct.
5     Q. Okay. And that's the entity that serves as
6 the administrative agent for Victory Park, right?
7           MR. SHELDON: Object to form.
8     A. To the best of my knowledge, yes.
9 BY MR. ACKELSBERG:
10     Q. Okay. And, "What document governs the fact
11 that TAS (sic) is ultimately the administrator for
12 the PG accounts and that it has the ability to both
13 initiate and release wires for the other two tribes'
14 accounts. Can you have someone pass that along?"
15 Do you see that?
16     A. I see it.
17     Q. Okay. And then -- and then you see the
18 next thing that happens is that Chris Lutes says
19 he's "Not sure it's a document as much as how we set
20 up the accounts with Wells Fargo as part of the
21 online banking admin process. Linda?" And then he
22 forwards it to Linda for her comments. Do you see
23 that?
24     A. I see it, yes.
25     Q. Okay.

1           MR. SHELDON: Object to form. And
2 I'll just say, for all questions regarding this
3 document, you can just -- even if I don't get my
4 "object to form" in at all times, I have a
5 continuing objection in that the witness isn't on
6 this document anywhere.
7           MR. ACKELSBERG: Understood.
8 Understood.
9 BY MR. ACKELSBERG:
10     Q. And -- and then you see Linda then replies
11 to both Chris Lutes and Tom Welch. Do you see that?
12     A. Yes, sir.
13     Q. "Chris is" -- and here's what she says:
14 "Chris is correct in that it is a function of the
15 accounts being included in the group of accounts
16 managed under Think Finance in the Wells Fargo CEO
17 online system. Since Think Finance is the
18 administrator of the CEO, then we ultimately have
19 the ability to manage the access of the accounts.
20 The CEO is set up to require at least two people to
21 approve any additions or changes anywhere in the
22 system." Do you see that?
23     A. I see it.
24     Q. All right. Are you familiar with the Wells
25 Fargo CEO system?

1     A. No.
2     Q. Okay. You don't know what that is?
3     A. I know it's their online business system.
4     Q. And -- and -- and that's a system that you
5 utilized, didn't you?
6     A. When you do -- when you set up accounts
7 with them, just like you have your checking account
8 online, if you are a corporation, I believe they
9 make you use this system, which is different than
10 personal.
11     Q. Right. And what Linda is saying is that
12 it's through the setup of the Wells Fargo CEO that
13 Think Finance is able to exercise the authority that
14 we were looking at before with regard to these
15 various accounts?
16           MR. SHELDON: Object to form.
17 BY MR. ACKELSBERG:
18     Q. Do you understand what. . .
19     A. Yeah, I -- I see what it's saying, yes.
20     Q. And -- and is that consistent with your
21 understanding?
22     A. If the -- if that's how the accounts were
23 set up, then yes.
24     Q. Okay. I'm -- I'm -- and I'm -- and you --
25 and I think you told us you weren't involved in the

1 setup of the accounts, right?
2     A. That's correct.
3     Q. Right. I understand that. But -- but
4 you're familiar with the Wells Fargo CEO system,
5 correct?
6     A. Everybody had to use it to access whatever
7 we did.
8     Q. Right. That's how you accessed -- that's
9 how you did what you needed to do, right --
10           MR. SHELDON: Object to form.
11 BY MR. ACKELSBERG:
12     Q. -- with regard to the Wells Fargo accounts?
13 It was through the CEO?
14     A. Yes.
15     Q. Okay.
16           MR. ACKELSBERG: Okay. And just very
17 quickly, Exhibit 32.
18           (Exhibit No. 32 marked.)
19 BY MR. ACKELSBERG:
20     Q. Now, this document, I just went online on
21 Wells Fargo and printed out, on their website,
22 something called "Commercial Electronic Office."
23 And is that what we're talking about when you say
24 "CEO"?
25     A. I -- to the best of my knowledge, I believe

UNSEALED

1  so.
2    Q.  Okay.  In terms of handling the
3  relationship between Wells Fargo and Think Finance
4  and these various accounts, would that be Linda 2 as
5  opposed to Linda 1?
6         MR. SHELDON:  Object to form.
7    A.  I had nothing to do with the setup of the
8  accounts, so yes.
9  BY MR. ACKELSBERG:
10    Q.  Well, who was in charge of the relationship
11  between Think Finance and Wells Fargo?  Do you know?
12    A.  It would be treasury.  Treasury.
13    Q.  So probably Badr's people during that
14  period of time?
15    A.  If he -- yeah, if he was there at that
16  time.
17    Q.  And who's -- who's at treasury now?  Who's
18  performing that function at the company?
19    A.  Currently at Think Finance?  Michael
20  Lobell.
21    Q.  How do you spell that?
22    A.  L-o-b-e-l-l.
23    Q.  Okay.  How long has he been there?
24    A.  Less than a year.
25    Q.  And you said, I believe, that GPLS accounts

1  are still at Citibank?
2    A.  As far as I know, yes.
3    Q.  And the tribal accounts, though, change
4  from time to time, which bank they use?
5    A.  Yes.  As far as I know, yes.
6    Q.  Do you -- do you remember any reasons why
7  the tribe -- tribe -- tribal accounts change?
8  Anything you've heard or. . .
9         MR. SHELDON:  Object to form.
10    A.  Other than we were told that they would
11  be -- the tribe would let us know they would be no
12  longer using that bank, that the -- whatever reason
13  the bank notified them, for whatever reason.
14  BY MR. ACKELSBERG:
15    Q.  Who -- who is -- who would be the person
16  most knowledgeable in the finance department, past
17  or present, about the reasons for the -- the tribes
18  changing bank accounts?
19         MR. SHELDON:  Object to form.
20    A.  It could be treasury or CEO.
21  BY MR. ACKELSBERG:
22    Q.  Okay.  Or the CFO?
23    A.  CFO, yeah.
24    Q.  Okay.
25    A.  Sorry.

1         MR. ACKELSBERG:  All right.  34.
2         (Exhibit No. 33 marked.)
3         MR. SHELDON:  Is it 34 or 33?
4         MR. ACKELSBERG:  33.  I'm sorry.  I
5  keep doing that.
6  BY MR. ACKELSBERG:
7    Q.  Now, I want to start off with the first
8  e-mail in the chain -- wait a minute.  Is this the
9  right document?
10         MR. SHELDON:  Irv, does this have
11  Ms. Callnin on it?
12         THE WITNESS:  Huh-uh (negative
13  response).
14         MR. ACKELSBERG:  Yeah, I'm not -- and
15  I'm not sure this is the right document.  Yeah,
16  let's -- let's forget about 33.  And just so that --
17  just to -- let's just keep 33 -- well, I'll keep
18  this marked.  I may use it later.  But let's just
19  forget about 33.  Let's go to 34.
20         (Exhibit No. 34 marked.)
21         MR. SHAPIRO:  We're one short over
22  here.  Do you have another?
23         MR. GROGAN:  I don't know why we would
24  be one short.
25         MR. ACKELSBERG:  We're just short.

1         MR. GROGAN:  We meant to screw with
2  Dan.
3         MR. ACKELSBERG:  It's only two pages.
4  Is it two?  We've got. . .
5         MR. GROGAN:  Maybe I had two copies
6  here.
7         MR. ACKELSBERG:  No, it's three pages.
8  It is three pages.
9         MR. SHELDON:  You need to take your
10  time and read the whole thing.
11         MR. ACKELSBERG:  I'm sorry.
12         MR. SHAPIRO:  All right.  Got it.
13  BY MR. ACKELSBERG:
14    Q.  All right.  So, basically, this exhibit
15  consists of two separate e-mails.  And I -- let's
16  start with the one on top.  And -- and I want to ask
17  you whether it is -- was part of the ordinary -- the
18  standard and ordinary practice for the finance
19  department to send an e-mail about the -- essentially
20  be a daily cash report?
21    A.  Yes.
22    Q.  And are we looking at an example of that?
23    A.  As far as I know, yes.
24    Q.  Okay.  And you'll see that this -- and
25  you're among the people -- Amy Nay, she was -- she

UNSEALED

App. 0465

1  worked under Badr, correct?
2     A.  Correct.
3     Q.  Okay.  And she's sending this to -- this
4  report to the CEO, Mr. Rees; the chief product
5  officer, Mr. Harvison; the CFO, Mr. Lutes; various
6  people in finance, including yourself, right?
7     A.  Correct.
8     Q.  And she -- and also, a copy to Mr. Welch at
9  Victory Park, right?
10    A.  Correct.
11    Q.  And was this part of the daily protocol
12 that treasury performed, that every day they would
13 send an e-mail that looked like this to the people
14 that appear at the -- at the top of people who got
15 this particular e-mail?
16    A.  Yes, sir.
17      MR. SHAPIRO:  Object to form.
18      Go ahead.
19      MR. SHELDON:  Just for the record, it
20 looks like, as Irv said, this is two different
21 documents.  This second e-mail is marked
22 "Confidential."
23      MR. ACKELSBERG:  They both are.
24      MR. SHELDON:  Thank you.  They both
25 are.

1       MR. ACKELSBERG:  Pleased to be of
2  help.
3  BY MR. ACKELSBERG:
4     Q.  All right.  Now, let's look at the next
5  one.  This starts with -- you'll see at the -- if
6  you'll go the last page first, this starts with a --
7  a daily cash e-mail out of treasury, correct?
8     A.  Correct.
9     Q.  Now, this time, it's from Adam Kramer.  Do
10 you see that?
11    A.  Yeah.  Yeah.  Because Amy was '13, and Adam
12 was '14.  Yes.  Okay.
13    Q.  These are just from two different periods
14 of time, correct?
15    A.  Correct.
16    Q.  Okay.  But these were both people who, at
17 different -- Adam and Amy, at two different points
18 in time, were the people within finance that would
19 generate these daily reports, right?
20    A.  Yes.  Yes.
21    Q.  Okay.  So we're looking at one in 2014.
22 It's going to roughly the same group of people at --
23 at Think Finance, and similar, a copy also being
24 sent to Mr. Welch at Victory Park, correct?
25    A.  Correct.

1     Q.  Okay.  And then the -- the -- the next
2  e-mail, you're not included in, but you see it's Amy
3  telling Chris, "Based on the discussion in
4  yesterday's meeting, Adam is working on splitting
5  out the tribe available cash between funding and
6  collections, so future e-mails should reflect the
7  change."  Do you remember that, that --that
8  discussion about that issue?
9     A.  I don't remember that discussion.
10    Q.  Okay.  That's fine.
11      Then the next e-mail is from Chris Lutes,
12 and you're -- you're included in this one.  Do you
13 see?
14    A.  Yeah.
15    Q.  And his reply is, "Perfect.  Thanks.  Badr
16 and Adam, I want the collections account for the
17 tribes to almost act like a clearing account.
18 Payments come in daily, we move 99 percent to GPLS
19 and 1 percent stays.  At the end of the month, the
20 net revenue, revenues less losses, from the
21 1 percent is moved to the tribe's main operating
22 account, since they get the P&L from the 1 percent,
23 and the remaining principal collections on the 1
24 percent are moved over to the funding account."  Do
25 you see that?

1     A.  I see that.
2     Q.  "So the collections account should never
3  have a buildup of cash."
4       Up until -- up until this point -- do you
5  remember this issue or this e-mail?
6     A.  I vaguely remember this e-mail, yeah.
7     Q.  Okay.  And is that consistent with your
8  understanding of what Mr. Lutes is describing as --
9  as how the -- the tribe's collection account is --
10 is -- is effectively a clearing account?  Was that
11 your understanding?
12    A.  My understanding of the collection account
13 is that for my purposes, I take -- I see the funds
14 coming in, in the current day, and take 99 percent
15 of those funds and calculate the amount that goes
16 over to GPLS.
17    Q.  And that happens --
18    A.  And get that distributed.
19    Q.  That happens every day?
20    A.  Correct.  And that the remaining was not
21 my -- the remaining 1 percent that remains there is
22 not my business.
23    Q.  But it's your -- but part of your job is to
24 make sure that only 1 percent remained?
25    A.  From the current days, yes.

UNSEALED

1    Q.  Okay.
2         MR. ACKELSBERG:  All right.  No. 35.
3    (Exhibit No. 35 marked.)
4         MR. SHELDON:  Would you like the
5  witness to read it in full or simply --
6         MR. ACKELSBERG:  No, I don't think she
7  needs to read it in full.
8  BY MR. ACKELSBERG:
9    Q.  Have you ever seen the administrative
10  agency agreement?
11    A.  Pieces of it.
12    Q.  Okay.  Now -- and your understanding was,
13  this is the agreement that defined the relationship
14  between TCAS and Victory Park, right?
15    A.  As of October 4, 2011, yeah.
16    Q.  Right.  And there were subsequent ones from
17  other -- they got updated, right?
18    A.  As far as I know, yes.
19    Q.  All right.  If you -- if you go to -- let's
20  first start at the definitions.  And let's look
21  first at service fee, since this came up before.
22  It's on page 8.  Do you see how service fee is
23  defined?  It's defined as -- as however it's defined
24  in the participation agreements?
25    A.  Correct.

1    Q.  And -- and so that's consistent with what
2  you were saying before, that -- that -- that it
3  might be that the service fee and the revenue share
4  are the same thing?
5    A.  Yes.
6    Q.  And so can we now agree they're the same
7  thing?
8         MR. SHELDON:  Object to form.
9    A.  Possibly be the same thing, yes.
10  BY MR. ACKELSBERG:
11    Q.  Okay.  All right.  Now, if we -- if we move
12  to Section 2.2 of the -- of the agreement, on
13  page 9, starting on page 9, and this outlines the
14  services that the agent shall perform.  Now, the
15  agent here, we're talking, is Think Finance, right?
16    A.  Correct.  Is my understanding.
17    Q.  Okay.  And these are the services that --
18  that Think Finance is supposed to perform for GPLS,
19  right?
20         MR. SHAPIRO:  Object to form.
21  BY MR. ACKELSBERG:
22    Q.  We're looking at -- okay.
23    A.  As stated in here, yes.
24    Q.  Okay.  So --
25         MR. SHELDON:  Objection to the

1  previous question in that "agent" is defined
2  otherwise on the first page.
3         MR. ACKELSBERG:  Yeah, okay.
4  BY MR. ACKELSBERG:
5    Q.  Section 2.2, "performing daily loan
6  settlement reporting and accounting," that's --
7  that's what you do, right?
8    A.  That's what I do, yes, sir.
9    Q.  C, "disbursing funds for the purchase of
10  the participation interest by GPLS using funds in
11  the purchasing account, provided that such funds
12  shall only be used to purchase participation
13  interests."  That's what you do, right?
14    A.  That -- that is the process that gets done
15  in accounting.
16    Q.  Right.  Whether you personally do it --
17    A.  Yeah.
18    Q.  -- it's the people in your --
19    A.  In --
20    Q.  -- in your direct --
21    A.  In finance, in the world of finance.
22    Q.  In -- in the finance department.  Okay.
23  And similarly, in D, "depositing into the
24  collection account funds reflecting all principal,
25  interests, fees, and other amounts collected from

1  (i) the borrowers with respect to the loans
2  purchased pursuant to loan purchase agreement and
3  ((indiscernible)) the applicable tribe with respect
4  to participation interests purchased pursuant to a
5  participation agreement."
6    That, too, is activity that the Think
7  Finance finance department performed?
8    A.  The majority -- if you talk about
9  collections account, the funds that get in there are
10  the -- are coming from the ACH processors.
11    Q.  Right.
12    A.  We would ensure that they got there.
13    Q.  Okay.  And otherwise, that -- the rest of
14  it, that's what the finance people did, right?
15    A.  Yes.
16    Q.  That's a -- that's a "yes"?
17    A.  Yes.
18    Q.  Okay.  And I know that -- well, it says
19  preparing and delivering financial statements and
20  draft balance sheet.  That's all Linda Rogenski's
21  department, right?
22         MR. SHELDON:  I'm sorry, I've lost
23  you.  I was reading "preparing and delivering," but
24  then I -- I didn't get where you got "financial
25  statements."

UNSEALED

BY MR. ACKELSBERG:
Q.   The activity in E, that's -- that's the --
E and -- E is the -- is the responsibility of Mr. --
Ms. Rogenski?
A.   Preparing and delivering. . . (Reviews
document.)  Balance sheet draft and statements of
shareholders' equity, yes.
Q.   That's -- that's L2?
A.   Yes.
Q.   "Maintaining or monitoring" -- we're now at
F.  "Maintaining and monitoring the maintenance of
the books, records, registers, and associated
filings of GPLS."
A.   That would -- the way that's worded, it
could be both of us.
Q.   Right.  Because we were already looking at
some of the -- the ledger and -- and bank
reconciliations that you did, right?
A.   Correct.
Q.   And -- and some -- but there's also
additional work with regard to the maintenance of
the books of GPLS that -- that Linda 2 would do?
A.   That's correct.
Q.   Okay.  And then in H, "paying the service
fee," that's what we were -- the service fee with

respect to the participation interest, that's the
revenue share that we were talking about before,
correct?
          MR. SHELDON:  Object to form.
BY MR. ACKELSBERG:
Q.   Correct?
A.   The service fee and participation -- yes,
it would be that portion of it, I believe, to the
best of my knowledge.
Q.   All right.  That's it with that exhibit.
          MR. ACKELSBERG:  All right.  36.
          (Exhibit No. 36 marked.)
          MR. SHELDON:  And this document is
also marked "Confidential."
          MR. ACKELSBERG:  And, again, Matthew,
the -- it was prepared similar to the other ones
that we've looked at.
          MR. SHELDON:  Yes.  Thank you.
BY MR. ACKELSBERG:
Q.   All right.  Now, this is an e-mail with an
attachment, and the e-mail is sent from -- this is a
July 2015 e-mail from Carlos Lock to you.  Do you
see that?
A.   Correct.
Q.   You've got to. . .

A.   Correct.  Yeah.
Q.   And he -- he was in the -- he was in the --
in the -- in the planning side, the financial
planning side?
A.   Yes, sir.
Q.   That used to be at one point Oscar Garcia?
A.   Yes, sir.
Q.   Okay.  And he is sending you something
called the MBL and GPL financials for you to do
something called "validate expenses."
A.   Yes, sir.
Q.   Okay.  Can you explain what it is that's
happening here?
A.   The -- the system that was used to create
the financials is called Host.
Q.   Host?
A.   Host.  Okay.  It's a reporting system.  Our
general ledger goes into Host.  So what they would
do, would send them to me just to make sure, on
expenses, that they agreed back directly to the
general ledger system, because I always go to the
general ledger system.  I don't use Host.
Q.   Okay.
A.   So he would just ask me to validate the --
Q.   And this is something that you would do

periodically?
A.   Uh-huh (affirmative response).  Whenever
they sent them to me to do.
Q.   Okay.  So let's -- let's look at -- you
know, at some of these, and -- and I'll ask -- and
I'll ask you to explain what we're looking at and
what -- what you were doing.  So let's start with
the -- the tab on the spreadsheet that is entitled
"Mobiloans Lending Program Income Statement" for
June 2015.  Do you see that?
A.   Yes, sir.
Q.   Okay.  Now, you -- while you don't prepare
these statements, these statements are sent to you.
In order for you to do your job, you have to
understand what you're looking at here, right?
A.   Correct.
Q.   Okay.  So why don't you explain to us what
this -- what this chart or -- or spreadsheet is
showing us.
A.   So this is showing us the -- the tribal
financials from a tribal look.  Balance sheet,
income statement in a -- in a very concise manner.
And then reimbursable program expenses, which are
the invoices.  Then down below, the other expenses,
which are in our general ledger, and some of the

UNSEALED

1    companies in our -- would be booked in our general
2    ledger certain product codes identifying whether it
3    was Plain Green, Great Plains, and those.  And I
4    would validate those numbers.  I would actually dig
5    into the ledger and make sure that he had those
6    correct.
7        Q.  Had the right numbers?
8        A.  Yeah.
9        Q.  Okay.  So -- so let's -- and let -- let me
10   first ask you, you -- you said this is -- this is a
11   tribal look.
12       A.  Uh-huh (affirmative response).
13       Q.  And what -- what you're meaning -- I take
14   it from your meaning is that this is the flow of
15   money from the standpoint of the tribe, the tribal
16   entity?
17       A.  Well, it --
18           MR. SHELDON:  Object to form.
19   BY MR. ACKELSBERG:
20       Q.  What do you mean?
21       A.  I meaning if -- if the tribe owns
22   1 percent, this is the 1 percent look.
23       Q.  Okay.  Well, it also -- okay.  And -- and
24   it also includes the -- the invoicing that we were
25   looking at before, the invoicing that comes in and

1    out?
2        A.  Correct.
3        Q.  And -- and that's off of the GPLS
4    99 percent portion, right?
5        A.  Yes.
6        Q.  Okay.  So --
7        A.  On the one invoice.
8        Q.  Yes.
9        A.  Yes.
10       Q.  Yeah.  Okay.  So -- well, we were looking
11   at Great Plains Lending before, and now we're
12   looking at Mobiloans, right?
13       A.  Uh-huh (affirmative response).
14       Q.  Correct?
15       A.  Correct.
16       Q.  Okay.  So let's first look at Items 1
17   through 7.  So "Cash Revenue on 1 Percent Retained."
18   So this would be the total -- this is 1 percent of
19   the total collections that -- that were retained by
20   Mobiloans --
21       A.  Correct.
22       Q.  -- for that month?
23       A.  Correct.
24       Q.  Meaning that if this is 1 percent, then the
25   99 percent ended up going into the Citibank GPLS

1    account?
2            MR. SHELDON:  Object to form.
3        A.  99 percent of what customers pay went to --
4    to Citibank, and the 1 percent was retained by the
5    tribes.
6    BY MR. ACKELSBERG:
7        Q.  And when you say "Citibank," we're talking
8    about GPLS?
9        A.  Yes.
10       Q.  Okay.  So this is just the -- the 1 percent
11   that the -- the tribal entity retained.  And then
12   there's a -- a reduction for loan losses on
13   1 percent retained.  What's -- explain to us what
14   that means.
15       A.  That would be the charge-offs.  So the
16   program would -- the tribe would retain 1 percent of
17   their charge-offs, and the rest would flow through --
18       Q.  Through GPLS?
19       A.  Yes.
20       Q.  Yes.  Okay.  And then there's -- that --
21   that leaves a net -- the net 1 percent that they --
22   that they have.  That's their share of the -- of the
23   interest and fees that customers paid over the
24   course of June, net -- netting out the -- the losses
25   that occur, the charge-offs during that same period

1    of time?
2        A.  Correct.
3        Q.  And then you have the profit share on the
4    loans sold.  Now, this is -- this is what we've been
5    talking about the service fee or the -- or the -- or
6    the revenue share, right?  That's the same -- this
7    is just -- when they say "profit share," we're --
8    we're back -- this is just another way of referring
9    to the revenue share or the service fee, correct?
10           MR. SHELDON:  Object to form.
11   BY MR. ACKELSBERG:
12       Q.  Correct?
13       A.  The -- the way that I understood it, yes.
14       Q.  Okay.  And so this is -- apparently, from
15   Mobiloans, it was 4 percent, according to this --
16       A.  Document, yes.
17       Q.  Okay.  And then what's "Cost of Sales,
18   $20"?  What is that?
19       A.  Those -- those would be, like, their
20   portion of -- like, a customer loss if there was
21   a -- if there was a system error, and they had to
22   forgive a portion of a customer payment, that kind
23   of thing.  Errors on the system.
24       Q.  So if there was a forgiveness of a customer
25   payment during the month, the tribe would have to

UNSEALED

1    swallow their 1 percent portion of that?
2        A.   Uh-huh (affirmative response).
3        Q.   Okay.  So if, for example -- so if a
4    decision was made -- I mean, let's give you an
5    example.  Customer says, "I don't owe this because
6    it's illegal."  And the decision is made to forgive
7    the balance.  The way that would be handled on the
8    accounting -- on the accounting side would be,
9    99 percent of that lost principal would go to GPLS,
10   and 1 percent would go to the tribal entity?
11       A.   Correct.
12            MR. SHELDON:  Object to form.
13       A.   Yes.
14   BY MR. ACKELSBERG:
15       Q.   All right.  And then it says "Operating
16   Expenses."  That's another reduction.  What kind of
17   operating expenses would be -- would be on this part
18   of the ledger?
19       A.   I'm not sure.  I would have to go into the
20   --
21       Q.   Okay.
22       A.   -- the roll-up behind it.
23       Q.   Well, it's a small amount, so --
24       A.   Yeah.
25       Q.   -- it's probably not worth talking about.

1    But the -- so the net program revenue for Mobiloans
2    was -- in June of 2015 was $306,653, right?
3        A.   Correct.
4        Q.   Okay.  Now we deal with the reimbursable
5    program expenses.  And -- and this relates to the
6    kind of invoicing that we were looking at before,
7    right?
8        A.   (Nods head affirmatively.)
9        Q.   You've got to say "yes" or "no."
10       A.   Yes.  Yes.
11       Q.   Okay.  And so there's the Tailwind charge
12   of $100 a loan, right?
13       A.   Yes, sir.
14       Q.   The TC Decision Sciences charge of $25 a
15   loan.  And then there's a different -- there's
16   another fee, "Loan to TC Admin."  Do you know what
17   that is?  Due annually.  Do you have any idea what
18   that is?
19       A.   Not -- not off the top of my head.
20       Q.   Okay.  All right.  But there are these --
21   there are -- there's a variety of -- and then -- and
22   there's "Internal Tribal Expenses."  What's that?
23       A.   In the program, I'm -- the tribe had
24   expenses that they would let us know that they paid.
25       Q.   Okay.  And then -- then "Other Reimbursable

1    Expenses."  This -- this would be sort of the
2    same -- well, this is what's -- I see.  This is
3    what's asterisk down at the bottom.
4        A.   Yes.
5        Q.   Right?  And this is among the expenses that
6    you had to verify, right?
7        A.   Correct.
8        Q.   Okay.  But before we get to that -- or --
9    well, why don't we go right there.  That's fine.
10            So Clarity Services, what's that?
11       A.   They provided some sort of -- and it's a
12   data verification.
13       Q.   So this is -- this is third-party billing
14   that's connected to the loan decisioning process,
15   correct?
16       A.   Yes.
17       Q.   So some data is pulled from Clarity
18   expenses to decide whether to make a loan, and
19   that's a charge, it's an expense?
20       A.   That is correct.
21       Q.   Okay.  And then there's something called
22   Iovation.  Is that similar?
23       A.   Yeah, I know very little about what each
24   one exactly did, but they were all in verifying
25   customer data in order --

1        Q.   Okay.  All of --
2        A.   -- to approve the loan.
3        Q.   In order to approve the loan.  Or deny the
4    loan, right?
5        A.   Yes.
6        Q.   Okay.  And then there are other costs of
7    sale.  There's the ACH processing.  So these would
8    be the fees charged by the ACH processor, right?
9        A.   Correct.
10       Q.   And similarly, for credit card processing,
11   there would be fees?
12       A.   Yes, sir.
13       Q.   So some customers are paying by credit card
14   rather than ACH, right?
15       A.   Yes.  Debit card.
16       Q.   Or debit card.  Okay.
17            So you couldn't pay by credit card, you'd
18   have to pay by debit card?
19       A.   (Nods head affirmatively.)
20       Q.   I was wondering.  You -- okay?
21            MR. SHELDON:  Don't forget to -- to be
22   verbal in your --
23       A.   Yes.  Yes.
24   BY MR. ACKELSBERG:
25       Q.   And then there are charges to MetaSource

**38 (Pages 149 to 152)**

UNSEALED

App. 0470

1  and Yessio. Am I right that these are collection
2  companies?
3     A. Customer service and collections.
4     Q. Customer service and collections. So these
5  would be like if a -- if a Mobiloans customer called
6  or was called, there would be a -- they'd be talking
7  with a customer service representative who worked
8  for MetaSource or Yessio.
9     MR. SHELDON: Object to form.
10  BY MR. ACKELSBERG:
11     Q. Correct?
12     A. They -- they were contracted by the -- by
13  the tribes, yes, and worked for them, yes.
14     Q. And -- and -- and all of these costs during
15  June were added up, it came up to 302,240, right?
16     A. Correct.
17     Q. And that got -- then got inserted into
18  line 12, "Other Reimbursable Expenses"?
19     A. Yes, sir.
20     Q. Now, let me make sure I understand how this
21  works. So all -- 8, 9, 10, 11, 12 are all the
22  expenses that were charged to the tribal entity for
23  that -- during that month period, right?
24     A. Correct.
25     Q. And those then are all zeroed out by a

1  reimbursement, line 13, from GPLS for the exact same
2  amount of money, right?
3     A. Correct.
4     Q. This is the way all of the tribal programs
5  worked; am I right, that whatever operating expenses
6  existed were charged as an accounting matter to the
7  tribe, but then zeroed out by a reimbursement from
8  GPLS in the exact same amount?
9     MR. SHELDON: Object to form.
10     A. I don't know exactly how it was done.
11  Okay. Because, you know, if you're -- if you're --
12  are you stating that the tribe received
13  1-million-490?
14  BY MR. ACKELSBERG:
15     Q. No. What I'm -- what I'm asking you --
16  remember about an hour or so ago, we were looking at
17  those invoices for the --
18     A. Right.
19     Q. -- Tailwind, and -- and what you showed us
20  was that -- that Think Finance would create invoices
21  going in and out.
22     A. Correct.
23     Q. And -- and so that effectively, in the end,
24  the tribe wasn't actually paying anything; it was
25  GPLS that was paying it. Am I right?

1     A. Yes.
2     Q. Okay. And that's what this is showing
3  here.
4     A. Yes.
5     Q. Right?
6     A. Yes.
7     Q. Yes. And that's the way it worked with
8  Mobiloans, Plain Green, and Great Plains Lending?
9     MR. SHELDON: Object to form.
10     A. Well, I won't guarantee it worked exactly
11  the same for each one, but the Mobil- --
12  BY MR. ACKELSBERG:
13     Q. The concept -- the concept was the same?
14     A. If that's what the agreement said. I don't
15  remember off the top of my head.
16     Q. I'm not asking you to remember the
17  agreements. I'm just asking you to remember the
18  accounting.
19     A. If that's -- yeah, if it's the same
20  represents -- representation on their financials,
21  yes.
22     Q. And so the net program profit -- and we're
23  here -- we're now -- we're not talking about the
24  profit that Think Finance made, right?
25     A. As far as I know, yes, that's correct, this

1  would be --
2     Q. And we're not talking about -- let me make
3  sure I -- I'm not sure I got the negatives or the
4  positives there. So -- so we're looking here at
5  what the tribe -- the tribal entity made during the
6  month of June 2015?
7     A. That is correct.
8     Q. We're not looking at the amount that Think
9  Finance or Victory Park made during June 2015 from
10  the interest and fees paid by Mobiloans customers?
11     A. That is correct.
12     Q. Okay. That's what you meant by "tribal
13  look"?
14     A. Yes.
15     Q. And they don't ever see what Think Finance
16  or Victory Park made, right --
17     MR. SHELDON: Object to form.
18  BY MR. ACKELSBERG:
19     Q. -- in the reporting, as far as you know?
20     A. Not that I know of.
21     Q. Okay.
22     THE VIDEOGRAPHER: Counsel, I
23  apologize.
24     Ms. Callnin, you have the cable in your
25  hands. It's -- if you -- there you go. Thank you.

UNSEALED

1    BY MR. ACKELSBERG:
2        Q.   All right.  So -- now let's -- let's turn
3    the page, and we're looking at now a year-to-date.
4    And this is still on the tribal side, correct?
5        A.   Yes.
6        Q.   And this is just the same information that
7    we saw for June of 2015, now giving you January
8    through June of 2015, right?
9        A.   That is correct.
10       Q.   And -- okay.  And again, this is still just
11   the tribal side, not Think Finance and Victory Park?
12       A.   That is correct.
13       Q.   Okay.  And similarly, the next page is
14   inception to date.  So if -- if I told you that
15   Mobiloans started towards the end of 2011, does that
16   sound about right?
17       A.   Yes, sir.
18       Q.   Okay.  So this is from the end of 2011
19   through June of 2015, how much the tribe -- the
20   tribal entity, Mobiloans, actually made over the
21   course of the -- of the whole program, correct?
22       A.   Correct.
23       Q.   That they made roughly $6.4 million in --
24   in program revenue, correct?
25            MR. SHELDON:  Object to form.

1        A.   I'm sorry, what amount did you -- do I --
2    BY MR. ACKELSBERG:
3        Q.   16 -- $16.4 million.
4        A.   16.  Okay.  Yeah.
5        Q.   I'm sorry, I might have misspoken.
6        A.   Yeah.
7        Q.   Okay.  And -- and during that -- during the
8    inception, Tailwind Marketing billed and was paid by
9    GPLS approximately $42.4 million.  Do you see that?
10       A.   That is correct.
11       Q.   And TC Decision Sciences was paid
12   approximately 10.6 million, right?
13       A.   That is correct.
14       Q.   TC Admin Services, 10.6 million.  Do you
15   see that?
16       A.   Uh-huh (affirmative response).
17       Q.   But those were all -- the tribes didn't
18   actually have to pay that.  That was zeroed out by
19   the invoicing and accounting that we've been talking
20   about, correct?
21       A.   Correct.
22       Q.   Now, turn the page and tell me what this
23   is.  This was in the same spreadsheet.
24       A.   This is the breakdown of every general
25   ledger account that supports those numbers that we

1    saw somewhere else.
2        Q.   Okay.  And if you look at the top, there's
3    reference to Clayton and KapCharge and Intercept.  I
4    see there are no -- well -- well, Clayton has -- has
5    items, and -- oh, and KapCharge.  So am I right that
6    during this particular period of time, Clayton and,
7    it looks like Reliafund and KapCharge -- were these
8    different ACH providers?
9        A.   Yes, sir.
10       Q.   When did Intercept stop?
11            MR. SHELDON:  Object to form.
12       A.   I don't remember exactly.  '12.  2012.  '11
13   or '12.
14   BY MR. ACKELSBERG:
15       Q.   Do you know why -- it -- it appears that in
16   June of 2015, at least on the Mobiloans side, you're
17   dealing with three different ACH providers.
18       A.   That's correct.
19       Q.   Clayton, Reliafund, and KapCharge.
20       A.   That's correct.
21       Q.   That sounds like it's making matters more
22   complicated than it needs to be.
23       A.   It's a lot of work.
24            MR. SHELDON:  Object to form.
25   BY MR. ACKELSBERG:

1        Q.   It's a lot of work.  I bet it is.  Why --
2    why three instead of one?
3        A.   If I owned a business, I wouldn't want to
4    put all my chickens in one basket.
5        Q.   That sounds rather speculative.  I'm asking
6    more like what you remember happening.
7        A.   They did -- they did -- they did not want
8    to have all ACHes running out of -- all volume
9    running out of one processor.
10       Q.   And who is "they"?
11       A.   Management.  Management and the tribe
12   didn't feel it was in good form to have all -- all
13   the ACH volume out of one processor.
14       Q.   Now, was that true of -- of the other two
15   tribal entities as well, that the ACH got split
16   between multiple ACH providers?
17       A.   That is correct.
18       Q.   They added to your work?
19       A.   (Nods head affirmatively.)
20       Q.   Did they add to your staff?
21       A.   (Shakes head negatively.)
22            MR. SHELDON:  Don't forget you've got
23   to -- verbal -- verbal responses.
24       A.   Added to my work, yes.  Added to my staff,
25   no.

UNSEALED

BY MR. ACKELSBERG:

Q.   Okay.

A.   I should say "our" work.

Q.   And why don't we flip and -- I guess we can go through this quickly.  The -- the -- that e-mail also was asking you to verify the reimbursable expenses for Great Plains Lending for June 2015 as well, right?

A.   Yes, sir.

Q.   And -- and we're looking at the equivalent statement for Great Plains Lending?

A.   Yes.

Q.   That was prepared in the same way that you described for Mobiloans, and it -- and other than the fact that the profit share -- where is that?  Looks like I didn't -- looks like I didn't include the -- my copying was bad.  Okay.

    Do you -- the profit share, whatever percentage -- whatever percentage it was, it was, right?  And that's according to the agreement --

A.   Yes.

Q.   -- that -- that that -- that the Great Plains Lending had?

A.   Correct.

Q.   Okay.  But the -- the structure of the

financial statements for Great Plains Lending, it was the same -- the same structure that we were just looking at for Mobiloans?

    MR. SHELDON:  Which two pages are you -- are you asking to be compared between?

    MR. ACKELSBERG:  The last three pages of the document.

    MR. SHELDON:  Right, but what are you comparing them to?

    MR. ACKELSBERG:  I'm trying to save time, Matthew, but if you'd like me to go through it, I'll be more than happy to.

    MR. SHELDON:  No, I'm just -- so I'm looking at the top of the document.  I'm asking you because the page that's titled "Mobiloans Lending Program Income Statement June 2015" -- because I think what you're asking to compare it to --

    MR. ACKELSBERG:  Yeah.

    MR. SHELDON:  -- the page "Great Plains Lending, LLC, Program Income Statement June 2015," and there's just a formatting difference, and I don't know if that's a printing difference or if that's --

    MR. ACKELSBERG:  It's probably a printing difference.

    MR. SHELDON:  Do you see how the table below isn't on the second one, but it's on the first one?

    MR. ACKELSBERG:  I'm trying to think what -- let me see what --

    MR. SHELDON:  So the first one has this table.

    MR. ACKELSBERG:  You mean Mobiloans.  Yeah.  No, I see that.  It's not -- it's not on there.

BY MR. ACKELSBERG:

Q.   So it's probably -- I mean, I actually could -- I have the actual spreadsheet that I can put up on the -- on the screen.

A.   It's okay.

Q.   It's not necessary, is it?

A.   No.

Q.   Okay.  If -- if I printed this out correctly, there would have been a table of reimbursable expenses for Great Plains Lending just like there was for Mobiloans, correct?

A.   I believe there should have been, yes.

Q.   Because that's what they were asking you to do, to check --

A.   Yeah.

Q.   -- the expenses, right?

A.   Yes.

Q.   Okay.  And if we look at the way that -- and reimbursable expenses were zeroed out in the same way that -- that we were talking about before in Mobiloans so that the tribes effectively didn't have to pay any of those, that it just got paid by GPLS, correct?

    MR. SHELDON:  Object to form.

A.   It got paid out of the program, yes.

BY MR. ACKELSBERG:

Q.   Yes.  Out of the GPLS side of the program?

A.   Yes.

Q.   Okay.

    MR. ACKELSBERG:  This would -- this would be a good time to break, I think.

    THE VIDEOGRAPHER:  Off record now?  We are off the record.  The time is 12:44 p.m.

    (Break taken, 12:44 p.m. to 1:17 p.m.)

    THE VIDEOGRAPHER:  We are back on the record.  The time is 1:17 p.m.

    (Exhibit No. 37 marked.)

    MR. ACKELSBERG:  While we were offline, I presented the witness with Exhibit P-37, which she is reviewing.

UNSEALED

1  MR. SHELDON: Which is marked
2  "Confidential."
3  MR. ACKELSBERG: That was your cue.
4  A. (Reviews document.)
5  Okay.
6  BY MR. ACKELSBERG:
7  Q. All right. You ready?
8  A. Okay.
9  Q. Okay. So Exhibit 37, what is it?
10  Something you've seen before?
11  A. This one, no. It's -- but the format is
12  the standard operating procedure format.
13  Q. So there are documents like this that
14  you've seen, correct?
15  A. Yes. Yes.
16  Q. Okay. And -- they exist for -- for all
17  three of the tribal entities, Plain Green,
18  Mobiloans, and Great Plains Lending?
19  A. I believe so, yes.
20  Q. All right. And we're looking at one that
21  was dated back in March of 2012, and it's covering
22  daily wire transfers. Do you see that?
23  A. To replenish the funding account and
24  collections, yes.
25  Q. Okay. So -- and standard operating

1  procedures, who -- who at -- what department at
2  Think Finance generated standard operating
3  procedures?
4  A. There -- there was someone in the
5  operations group that was responsible for creating
6  all the operating procedures for each of the
7  products.
8  Q. And, now, this particular one covers a
9  finance responsibility, correct, in how -- in fact,
10  this is some of the same activities that we were
11  talking about this morning, wire transfers, correct?
12  A. Correct.
13  Q. And so someone in operations, you're not
14  sure who, would have drafted this, presumably back
15  in 2012, to describe the procedures followed by the
16  Think Finance finance people with regard to wire
17  activity?
18  A. Yes.
19  Q. And do you remember -- and I -- I realize
20  this goes back a long ways. Do you remember being
21  involved in or consulted in the drafting of a
22  standard operating procedure dealing with daily wire
23  transfers?
24  A. Not the daily wire transfers.
25  Q. You don't remember that?

1  A. No.
2  Q. You were involved in a different one?
3  A. I had -- I think they asked me about --
4  what was it? Payment -- payments -- the payment
5  process. There were a couple they asked me about,
6  but I don't remember the -- daily wire transfer
7  one.
8  Q. And when you say "they," do you remember
9  who would have --
10  A. That would have been the operations group
11  that was writing this.
12  Q. Okay.
13  A. So I -- I don't know for sure, they may
14  have consulted with treasury on this. I don't know
15  for sure.
16  Q. Okay. All right.
17  A. I don't remember this one.
18  Q. Now, when there's -- the way this is
19  written, it refers to "third-party service provider,
20  TPSP." That's Think Finance, am I correct, the way
21  this is -- the way this is set up?
22  MR. SHELDON: Object to form.
23  A. That's the way it -- it kind of reads, from
24  me reading it.
25  BY MR. ACKELSBERG:

1  Q. Right. So there's a reference to
2  "authorized lender." And when it says "authorized
3  lender," in this case we're talking about Plain
4  Green, right?
5  A. That would be correct.
6  Q. Whereas, the "TPSP" would be Think Finance?
7  MR. SHELDON: Object to form. The
8  witness has testified she doesn't know this
9  document.
10  BY MR. ACKELSBERG:
11  Q. Yeah. Okay. What -- what -- TPSP in
12  this -- in this circumstance, we're -- we're talking
13  about the treasury people, right, in -- in finance?
14  A. (Reviews document.)
15  It sounds like the -- the process that
16  gets done.
17  Q. By the Think Finance finance people, right?
18  A. Yes.
19  Q. Okay. There's also reference, I believe,
20  to "ACH service provider" here. You can see that
21  under Item 2, right? The second section of the --
22  A. Second section, yeah.
23  Q. Yeah. "Daily wire transfer of collected
24  payments to be remitted" -- well, it's actually
25  referenced above, too, at Item 1, No. 2, "TPSP

UNSEALED

App. 0474

1 determines necessary amounts to be wired to ACH
2 service provider," right?
3     A.   Correct.
4     Q.   And then down under Item 2, "ACH service
5 provider determines amount of collected funds
6 received to be remitted to the lender's collection
7 account." All right.  This is what -- this is what
8 we were talking about this morning, right?
9     A.   Yes.
10    Q.   Okay.
11    A.   They -- they do it.
12    Q.   Yeah.  I mean, this is -- this is just an
13 attempt to describe the standard operating
14 procedures for the wire activity that you were
15 explaining to us this morning, correct?
16         MR. SHELDON:  Object to form.
17    A.   Yes.
18 BY MR. ACKELSBERG:
19    Q.   Okay.
20    A.   Pretty much.  And all the standard
21 operating procedures were approved by the client.
22    Q.   I understand.  So -- so in order -- so the
23 way it would work would be, someone in operations
24 would draft this, and once everybody was on board at
25 Think Finance, you would then take this to the -- to

1 the particular tribal entity for their approval,
2 correct?
3     A.   Correct.
4     Q.   That was the system?
5     A.   Yes.  That was the way I understood it, yes.
6     Q.   Yes.  Okay.  Okay.  Now, if you'll look at
7 Item 1 point -- and you can see how -- first of all,
8 it looks like the way this is broken down is, it's
9 broken down into Section 1 or Item 1 and Section 2
10 or Item 2, where 1 is dealing with the funding
11 account, and -- and 2 is the collections account,
12 right?
13    A.   Correct.
14    Q.   Okay.  So let's look at funding.  And look
15 at No. 9.
16    A.   Yeah.  Okay.
17    Q.   "In instances where lender cannot" -- and
18 "lender" is Plain Green in this case, right?
19    A.   Correct.
20    Q.   Okay.  "In instances where lender cannot
21 access online bank account and does not provide
22 e-mail approval to TPSP before the applicable bank
23 wire cut-off time, TPSP may release wire transfers
24 so long as such wire transfers are in the ordinary
25 course of business and consistent with past

1 practices and lender's relationship with TPSP."  Do
2 you see that?
3     A.   Uh-huh (affirmative response).
4     Q.   Okay.  Now, I'm going to put it in my own
5 words and -- and see if I'm correctly summarizing
6 what this is saying.  That in the fund -- when
7 you're talking about transferring money from the
8 tribal account -- the tribal funding account to the
9 ACH provider, that ordinarily, you should get an
10 approval from the lender; in this case, Plain Green.
11 But if that doesn't happen, if the -- if the
12 approval hasn't been received, the wire activity can
13 still occur as long as the transfer is in the
14 ordinary course of business and consistent with past
15 practices and, in this case, Plain Green's
16 relationship with Think Finance.  Am I --
17         MR. SHELDON:  Object to form.  The
18 witness has already testified she's not familiar
19 with this document.
20         MR. ACKELSBERG:  Yeah, I -- right.  I
21 understand.
22 BY MR. ACKELSBERG:
23    Q.   Now you can answer.  That's what it says,
24 right?
25    A.   That's what it says.

1     Q.   Okay.  And is that -- I know this morning,
2 you -- you said that you thought that the wires
3 always had tribal approval.
4     A.   Yeah, I --
5         MR. SHELDON:  Object to form.
6 BY MR. ACKELSBERG:
7     Q.   Was that because -- you weren't actually
8 the one that did the wires, it was -- it was the
9 treasury side that did the wires?
10    A.   Treasury side filled out its standard wire --
11 repetitive wire transfer form.
12    Q.   And the only time that you would be
13 involved in a wire is if you were serving as to the
14 backup, like you explained before.  Otherwise, you
15 wouldn't have -- you wouldn't be involved in the
16 wiring at all, right?
17    A.   That's correct.
18    Q.   Okay.  So you -- you don't really know, do
19 you, if there were occasions when the -- the wire --
20 that the treasury people processed a wire without
21 tribal approval?  You don't --
22    A.   Not off the top of my head.
23    Q.   Right.  And -- and if the standard
24 operating procedure says they could do it as long as
25 it was in the ordinary course and consistent with

UNSEALED

1 past practices, well, they -- that's what the
2 standard operating procedure says, and they probably
3 followed that, right?
4     MR. SHELDON: Object to form.
5     MR. SHAPIRO: Object to form.
6 BY MR. ACKELSBERG:
7   Q. You can answer it now.
8   A. Yes, I -- at that point in time, yes.
9   Q. Okay. And the -- and it looks like Item 2
10 has -- if you look at -- the same language --
11 there's a 9 under -- for collections, and there's
12 the same thing, that if you -- effectively, if you
13 can't get Plain Green's approval for a wire, you can
14 still do the wire, you can still transfer money, in
15 this case, out of the tribal account to -- the
16 99 percent to -- to GPLS as long as it's in the
17 ordinary course of business and consistent with past
18 practice. That -- that's what the standard
19 operating procedure was at least as of March of
20 2012?
21     MR. SHAPIRO: Objection.
22     MR. SHELDON: Object to form. The
23 witness has said she is not familiar with this
24 document.
25 BY MR. ACKELSBERG:

1   Q. Right. Okay. Now you can answer.
2   A. That's -- that's the way it reads, yes.
3   Q. Okay. And standard operating procedures,
4 were they there to be followed or ignored?
5   A. Followed.
6   Q. It was important to follow them, right?
7   A. They were -- they were there to be followed
8 as -- as a guide. So it -- and when audit came in,
9 you know, they would have asked if we had standard
10 -- there were standard operating procedures for
11 everything.
12   Q. And do you remember -- so you remember
13 auditors coming in and asking about standard
14 operating procedures?
15   A. They would ask for them, yeah.
16   Q. And what -- auditing what? Do you remember
17 specific situations where there was an auditor
18 coming in and asking -- were you actually asked
19 about standard operating procedures?
20     MR. SHELDON: Object to form;
21 compound.
22   A. Let's go back to -- auditing what? Were --
23 the ques- -- I'll ask you to clarify.
24 BY MR. ACKELSBERG:
25   Q. Sure.

1   A. Which auditors?
2   Q. Well, and that could actually --
3   A. Because there are lots of auditors.
4   Q. That's helpful, because that actually is my
5 question. You mentioned that the auditors sometimes
6 would come in and ask to see standard operating
7 procedures.
8   A. Yes.
9   Q. So give me an example. Like, if you --
10 from -- do you remember, like, an auditor asking
11 for. . .
12   A. If Plain Green's auditors came in, they
13 would ask for --
14   Q. I see. So these were auditors for the
15 tribal entities you're talking about?
16   A. Some of -- sometimes their auditors came
17 in, yes.
18   Q. Okay. And if -- and if it was a standard
19 operating procedure that specifically concerned your
20 activity, like, for example, involving ACH
21 processor, the auditor would talk to you and would
22 review the standard operating procedure and make
23 sure that the standard operating procedure was
24 consistent with what, in fact, happened?
25     MR. SHELDON: Object to form.

1   A. They would review it with us, yes, if
2 they -- if they did come to review with us, yes.
3 BY MR. ACKELSBERG:
4   Q. And so -- and so you would expect that
5 during that same audit, that -- that the tribal
6 auditors would -- would talk to you about, for
7 example, ACH processing or -- or daily
8 reconciliations, they would be talking to treasury
9 about the standard operating procedure covering
10 daily wire transfers?
11     MR. SHELDON: Object to form; calls
12 for speculation.
13     MR. SHAPIRO: Object to form.
14 BY MR. ACKELSBERG:
15   Q. Okay. Now you can answer.
16   A. I believe they would.
17   Q. Yes. Okay.
18     MR. ACKELSBERG: Now, next exhibit,
19 38.
20     (Exhibit No. 38 marked.)
21     MR. SHELDON: Exhibit 38 is also
22 marked "Confidential."
23   A. (Reviews document.)
24   Okay.
25 BY MR. ACKELSBERG:

UNSEALED

1    Q.  All right.  Ready to go?
2    A.  Uh-huh (affirmative response).
3        MR. SHELDON:  Not just yet.
4    Okay.
5    BY MR. ACKELSBERG:
6    Q.  So it looks like, Ms. Callnin, that at the
7    end of -- at the end of 2014, going into early 2015,
8    this daily wire transfer standard operating
9    procedure was revised.
10   A.  Looks to be.
11   Q.  Do you remember this happening?
12   A.  I remember being copied on some of the
13   e-mails, yeah.
14   Q.  Okay.  And -- and that's what we're looking
15   at, right?
16   A.  That's correct.
17   Q.  Okay.  And so what it looks like is,
18   someone named LeAnna Brillhart, who -- senior
19   policy -- policies analyst, is -- would this be one
20   of those operations people you were talking about
21   before?
22   A.  Yes.
23   Q.  Okay.  So -- so LeAnna Brillhart would have
24   been a person whose responsibility was dealing with
25   standard operating procedures?

1    A.  Correct.
2    Q.  And updating them or drafting them or
3    dealing with them to get them up to -- updated?
4    A.  Correct.
5    Q.  Okay.  By the way, is LeAnna Brillhart
6    still with the company?
7    A.  No.
8    Q.  Is there anybody there who's in charge of
9    standard operating procedures, that you know of?
10   A.  Not currently.  They may have folded in
11   under compliance.
12   Q.  Okay.  So -- so LeAnna Brillhart is
13   sending -- this starts -- these e-mails start off
14   December 1, 2014, Ms. Brillhart sends to you a copy
15   of this draft wire transfer memo, right?
16   A.  Uh-huh (affirmative response).
17   Q.  And she's asking you whether you were able
18   to review it.  And then she sends, it looks like a
19   follow-up, January 29th, "The SOP is now out of
20   date.  I'm pending your review so that it may be
21   sent to compliance.  Please take a look at it
22   immediately."
23       Why would she -- why would LeAnna
24   Brillhart be sending you the wire transfer standard
25   operating procedure?

1        MR. SHAPIRO:  Object to the form.
2    A.  Because she didn't know to send it to --
3    BY MR. ACKELSBERG:
4    Q.  To Adam, right?  She sent to it the wrong
5    person, right?
6    A.  Correct.
7    Q.  Okay.  So then you said -- well, I don't
8    know what you said.  But she -- she eventually --
9    you say, "Adam, this falls into your territory,"
10   right?
11   A.  Yes.  With a smiley.
12   Q.  With a smile.  I actually noticed there's a
13   lot of smiles.
14   A.  I try.
15   Q.  This seems to be part of the standard
16   operating procedure.
17   A.  Procedure, yes.
18   Q.  And Adam then comments to you, "This SOP is
19   fine, except TPSP can't release the wires.  Only
20   Plain Green employees are able to release wires.  If
21   PGL does not approve by a certain time, then the
22   TPSP will follow up to remind them."
23       So it sounds like -- well, let --
24   A.  It changed.
25   Q.  So do you -- go ahead.  What were you going

1    to say?
2    A.  No, no, no.  It sounds like it changed.
3    Q.  A change.  Like -- or he was proposing a
4    change?
5    A.  (Shakes head negatively.)
6    Q.  No?
7    A.  It changed.
8    Q.  There was a change?
9    A.  Uh-huh (affirmative response).
10   Q.  And the change is in -- in this SOP that
11   we're looking at, right?
12       MR. SHELDON:  Which SOP are you
13   referring to?
14       MR. ACKELSBERG:  The one that's
15   attached to the e-mail.
16       MR. SHELDON:  Well, hold on.  I
17   actually have a question for you.  I wasn't going to
18   raise it until you tried to refer to it.  But the
19   Bates numbers are not consecutive, and if you look
20   at the top e-mail --
21       MR. ACKELSBERG:  Oh, okay.
22       MR. SHELDON:  -- there's a reply.
23       MR. ACKELSBERG:  Oh, okay.
24       MR. SHELDON:  And documents don't get
25   attached to replies.

UNSEALED

App. 0477

1      MR. ACKELSBERG:  Right.  Maybe --
2  you're right.
3      MR. SHELDON:  I'm not sure how this
4  got attached to this chain.
5      MR. ACKELSBERG:  I probably went
6  searching in the -- it looks like I went -- I
7  probably went searching for it in the -- in the
8  production.  So -- all right.  So let's -- let's
9  treat this as -- let's call this 38-A and B.  38-A
10  will be the e-mails, and 38-B will be the standard
11  operating procedure.  Thanks for pointing that out.
12  BY MR. ACKELSBERG:
13      Q.  So you said that you -- you vaguely
14  remember this happening, right?  You remember
15  getting the e-mails and you remember -- I think you
16  testified that you remember trying to bring Adam in
17  because this wire transfer was -- was his bailiwick,
18  right?
19      A.  It was under his area.
20      Q.  Right.
21      COURT REPORTER:  It was under his --
22  I'm sorry?
23      THE WITNESS:  Area.
24      MR. SHELDON:  You just need to
25  remember to speak up --

1      THE WITNESS:  Yeah.
2      MR. SHELDON:  -- and verbalize.
3  BY MR. ACKELSBERG:
4      Q.  And it looks like LeAnna, based on -- so it
5  looks like LeAnna is looking at the version that we
6  were looking at before, about ordinary course of
7  business, right?  That you can do it even if you
8  don't get the approvals as long as it's in the
9  ordinary course.  Do you see that?
10      MR. SHELDON:  Object to form.
11  BY MR. ACKELSBERG:
12      Q.  Do you see that?
13      A.  On the -- on the SOP?
14      Q.  Yeah.
15      A.  Yeah.
16      Q.  It looks like -- it looks like --
17  effectively, Adam, it looks like, wants to change
18  1 -- 1.9 and 2.9 -- or 1.8 and 1.9.
19      A.  That's correct.
20      Q.  Right?  Okay.  He wants to delete 1.8,
21  which we were looking at before, said, "In instances
22  where lender cannot access online bank account,
23  authorized lender representative will e-mail
24  approval to Think Finance," right?  That's what it
25  was before.  He's saying delete that and add -- and

1  add a new 1.9.
2      MR. SHELDON:  Object to form.  Is that
3  a pending question?
4  BY MR. ACKELSBERG:
5      Q.  And then he does the same thing with --
6  with 2.9.  He's got new language, right?
7      A.  He has new language, yes, sir.
8      Q.  Okay.  And -- and actually, if we look at
9  38-B, 38-B is a document that appears to be a daily
10  wire transfer operating -- standard operating
11  procedure that was -- became effective January 30th,
12  2015.  Do you see?  And that's --
13      A.  Yes.
14      Q.  And that's around the same time period.  In
15  fact, that's the same day that -- that Adam e-mails
16  to LeAnna what -- what should be in there, right?
17      A.  Correct.
18      Q.  Okay.  So now, as of -- so as of
19  January 2015, the new language is -- well, there's
20  no longer any reference to the -- the "ordinary
21  course."  And it now says -- well, it really doesn't --
22  it just doesn't have anything in there about it.  It
23  says that -- well, 1.8 says that you can't e-mail
24  without -- without the e-mail approval of the
25  lender, right?

1      A.  Correct.
2      Q.  And 1.9 has removed all reference to the
3  "ordinary course."  It just says that Think -- Think
4  will retain wire confirmations and backup.  That's
5  all, right?
6      A.  Correct.
7      Q.  Okay.  So -- and did the same thing -- do --
8  do you recall, with regard to the other tribal
9  entities, Mobiloans and Great Plains Lending, were --
10  were -- were they changing -- were they changing all
11  three of them at -- if you remember, or was it just
12  Plain Green?
13      MR. SHELDON:  Object to form.
14      A.  I don't -- I don't remember exactly all
15  three changing.  I do remember Great Plains changed
16  also.
17  BY MR. ACKELSBERG:
18      Q.  Well, this is --
19      A.  This is -- this is Plain Green.
20      Q.  This is Plain Green.
21      A.  Yeah.
22      Q.  So you remember Plain Green changing?
23      A.  Plain Green changing, yes.
24      Q.  Yes.  Okay.  You don't remember the others
25  changing?

UNSEALED

1    A.  Great Plains changed.
2    Q.  Oh, Great Plains -- so Great Plains changed
3  like this?
4    A.  Very -- yes, very similar to this.
5    Q.  Okay.  So there was -- Great Plains had
6  a -- an older version that had the same "ordinary
7  course" language that the Plain Green standard
8  operating procedure had, but -- and -- and
9  similarly, in -- in January of 2015, that language
10  was removed from the Great Plains Lending standard
11  operating procedure?
12    A.  I don't remember seeing it to confirm it.
13    Q.  Okay.  All right.  That's fine.
14    But we can agree at least as to Plain
15  Green, looking at these two standard operating
16  procedures -- and -- and by the way, if you look at
17  the -- at the last page -- well, actually, it says
18  the -- the author was the lender representative.  So
19  who's that?  I mean, that -- that's really -- we're
20  talking about LeAnna Brillhart, right?
21        MR. SHELDON:  Object to form.
22    A.  I don't know if that was the intent.  I
23  don't know if that was the intent or not.
24  BY MR. ACKELSBERG:
25    Q.  Okay.  And it says approved by legal and

1  compliance.  So we don't really -- we don't know if
2  it got approved by -- you would presume, though, at
3  some point, it would have -- it would have gotten
4  sent to the -- sent to the -- sent to the tribal
5  entity for approval, right?
6    A.  Yes.
7    Q.  Okay.  But can we agree at least as to
8  Plain Green -- you don't -- you don't remember Great
9  Plains Lending or Mobiloans, but from the inception --
10  or at least from 2012, from March of 2012 until
11  July -- to January of 2015, the standard operating
12  procedure was that the treasury people in finance
13  could move money in and out of Plain Green accounts
14  without tribal involvement as long as it was in the
15  ordinary course of business and consistent with past
16  practices and Plain Green's relationship with Think.
17  That's what the standard operating procedure was for
18  that earlier period of time, correct?
19        MR. SHAPIRO:  Object to form.
20        MR. SHELDON:  Object to form.
21    A.  I believe so, yes.
22  BY MR. ACKELSBERG:
23    Q.  And that starting in January, that
24  discretion was removed from the standard operating
25  procedure?

1        MR. SHELDON:  Object to form.
2    A.  From what it reads, yes.
3  BY MR. ACKELSBERG:
4    Q.  Yeah.  Do you remember any changes being
5  made to the standard operating procedures that you
6  were more -- that more directly related to your area
7  of responsibility around the same time period?
8    A.  No.  My processes really didn't change.
9        MR. ACKELSBERG:  Okay.  This will be
10  quick.  39.
11        (Exhibit No. 39 marked.)
12  BY MR. ACKELSBERG:
13    Q.  Now, if -- let me see.  Let's call this --
14  let's do the same thing we did before and call this
15  39-A and B.  And 39-A will be the e-mail, and 39-B
16  will be the map.
17    Now, Ms. Callnin, before, when we were
18  talking about the reimbursable expenses -- remember?
19  -- that -- that you were -- you were being asked
20  to -- to verify.  And we were looking at some vendor
21  payments.
22    A.  Uh-huh (affirmative response).
23    Q.  Okay.  I believe this relates to vendor
24  payments like that.  Let me ask you this first:  Do
25  you remember April Sealy?

1    A.  Yes.
2    Q.  Okay.  What department was she in?
3    A.  I want to -- I want to say operations.  She
4  had some sort of title.  I can't remember it.
5    Q.  Okay.  Is she there anymore?
6    A.  She is at Elevate.
7    Q.  She's at Elevate.  Okay.
8    What about Cynthia Worthington, do you
9  remember her?
10    A.  Uh-huh (affirmative response).
11    Q.  Was she also -- well, it says -- no,
12  actually, it looks -- April Sealy, I'm noticing here
13  on the second page, senior director, operations and
14  BPO, right?
15    A.  Yeah.
16    Q.  What's BPO?  That's all right.  Don't worry
17  about it.
18    A.  BPO, I don't remember.
19    Q.  Okay.  That's fine.
20    Was Ms. Worthington -- it says director of
21  program -- process improvement.
22    A.  Process improvement.
23    Q.  Is that operations too?
24    A.  It's down in that area, yeah.
25    Q.  Yeah.  Is she still at the company?

UNSEALED

1    A.  She's still at -- she's at Elevate.
2    Q.  She's at Elevate, too.  Okay.
3         So it seems to be that you're -- you're
4  checking with -- with April and Cynthia about some
5  bill -- some invoices from call centers, right?
6    A.  Correct.
7    Q.  And you wanted to just make -- this is you
8  in the capacity of verifying expenses?
9    A.  Yes.  Both -- both us Lindas wanted to make
10 sure that --
11   Q.  You're paying the right --
12   A.  Right stuff.
13   Q.  The right stuff.  Okay.
14        And this would be the kind of bills that
15 would be paid out of the GPLS collections account,
16 correct?
17        MR. SHELDON:  Object to form.
18 BY MR. ACKELSBERG:
19   Q.  Well, it would be -- it would be like the
20 invoicing we saw before?
21   A.  It would be paid out of the program.
22   Q.  Yeah.
23   A.  To which account. . .
24   Q.  Right.  But effectively paid out of the
25 99 percent, right?

1         MR. SHELDON:  Object to form.
2  BY MR. ACKELSBERG:
3    Q.  Because it's a reimbursable expense.  It
4  would be like we were looking at before, it would
5  be -- it would be billed to -- it would be billed
6  to -- to the tribe -- tribal entity, but then the
7  tribal entity would be reimbursed for that expense
8  out of the 99 percent GPLS share.  It was like we
9  were looking at before, right?
10        MR. SHELDON:  Object to form.
11   A.  Yes.  And I'm -- I'm not exactly sure
12 the -- the flow.
13 BY MR. ACKELSBERG:
14   Q.  Okay.  We're not sure what -- what account
15 or what --
16   A.  Yeah.
17   Q.  Right.  I understand.  But in terms of the
18 overall --
19   A.  It came out of the program, yes.
20   Q.  Yes.  Okay.  And, again, "coming out of the
21 program" means coming out of the GPLS 99 percent
22 share of revenue --
23        MR. SHELDON:  Object to form.
24 BY MR. ACKELSBERG:
25   Q.  -- correct?

1    A.  That's -- when I say "program" --
2    Q.  That's what you mean, right?
3    A.  Yes.
4    Q.  Yeah.  Okay.  And so then they are telling
5  you who the -- you know, where these call centers
6  are, right, and who -- for which tribe -- tribal
7  entity they work, right?
8    A.  Correct.
9    Q.  So she's telling you that on the Meta bill,
10 that -- that Meta contracts with Plain Green and
11 Great Plains and sends a separate invoice to each,
12 right?  "CMS/Center One contracts with Plain Green
13 and Great Plains, and Mobiloans as well, and sends
14 them each an invoice," right?
15   A.  Correct.
16   Q.  And Telvista contracts with Plain Green and
17 Mobiloans, and sends separate invoices to them.  And
18 it says, "Mobiloans is just beginning next week."
19        And Yessio, I think we saw that.  Now, we
20 were looking at an invoice -- we were looking at a
21 statement from -- from -- a financial statement for
22 Great Plains Lending for -- and Mobiloans, I think,
23 from 2015 where -- where they had Yessio expenses.
24 But it looks like at this point in time, Yessio was
25 only with PayDay One, right?

1    A.  That could be, yes.
2    Q.  Okay.  And then -- and you needed this
3  information.  And it looks like you were also asking
4  who's in Honduras, that you were suspicious -- not
5  suspicious, but you're questioning if there's a bill
6  we're supposed to send to Honduras, you didn't know
7  who that was, right?
8    A.  That is correct.
9    Q.  Okay.
10   A.  Neither one of us did.
11   Q.  And so then she -- she sent you a map,
12 right?
13   A.  Uh-huh (affirmative response).
14   Q.  Okay.  And then I think I found the map,
15 not in consecutive order, but somewhere else.  And
16 see if this looks familiar.
17        MR. SHELDON:  Is that the last page
18 of --
19        MR. ACKELSBERG:  Yeah.
20        MR. SHELDON:  Or second-to-last page,
21 sorry, of this exhibit?
22        MR. ACKELSBERG:  The last -- the last
23 two pages, the map and the legend, is 39-B.  I -- I
24 called one 38-B, right?  You weren't listening.  So
25 38-A is the e-mail -- 38-A are the e-mails.

UNSEALED

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO,                    *
         Plaintiff,         *
                            *
VS.              * Civil Action
                 * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
         Defendants.        *

*******************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
LINDA ROGENSKI
APRIL 19, 2018
*******************************************************

DEPOSITION of LINDA ROGENSKI, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of April, 2018, from 9:06 a.m. to 4:49 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

```
 1              A P P E A R A N C E S
 2
 3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
 4     MR  IRV ACKELSBERG
       MR  JOHN J  GROGAN
 5     Langer, Grogan & Diver, PC
       1717 Arch Street, Suite 4130
 6     Philadelphia, Pennsylvania  19103
       Phone:   215-320-5701
 7     E-mail:  iackelsberg@langergrogan com
                jgrogan@langergrogan com
 8
       MR  SAVERIO "SAM" MIRARCHI
 9     Senior Deputy Attorney General
       Bureau of Consumer Protection
10     1600 Arch Street, Suite 300
       Philadelphia, Pennsylvania  19103
11     Phone:   215-560-2445
       E-mail:  smirarchi@attorneygeneral gov
12
13   COUNSEL FOR LINDA ROGENSKI:
14     MR  RICHARD L  SCHEFF
       Montgomery, McCracken, Walker & Rhoads, LLP
15     123 South Broad Street
       Philadelphia, Pennsylvania  19109
16     Phone:   215-772-7502
       E-mail:  rscheff@mmwr com
17
18   COUNSEL FOR KENNETH REES:
19     MR  JONATHAN BOUGHRUM
       Montgomery, McCracken, Walker & Rhoads, LLP
20     123 South Broad Street
       Philadelphia, Pennsylvania  19109
21     Phone:   215-772-7502
       E-mail:  jboughrum@mmwr com
22
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
 2                   (continued)
 3   COUNSEL FOR THINK FINANCE, INC :
 4     MR  MATTHEW S  SHELDON
       Goodwin Procter, LLP
       901 New York Avenue, NW
 5     Washington, D C  20001
       Phone:   202-346-4000
 6     E-mail:  msheldon@goodwinprocter com
 7
 8   COUNSEL FOR VICTORY PARK CAPITAL:
 9     MR  DANIEL P  SHAPIRO
       MR  MATTHEW W  HAWS
10     Katten Muchin Rosenman, LLP
       525 W  Monroe Street
11     Chicago, Illinois  60661
       Phone:   312-902-5622
12     E-mail:  daniel shapiro@kattenlaw com
                matthew haws@kattenlaw com
13
14   COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15     MR  PATRICK DAUGHERTY
       Van Ness Feldman, LLP
16     1050 Thomas Jefferson Street, NW
       Seventh Floor
17     Washington, D C
       Phone:   202-298-1874
18     E-mail:  pod@vnf com
19   ALSO PRESENT:
20     GUS PHILLIPS, Videographer
       KEVIN BYERS
21     SCOTT ZEMINCK (Appearing telephonically)
22
23
24
25
```

## Page 4

```
 1                 I N D E X
 2                                        PAGE
 3   Appearances................................ 2-3
 4   Exhibits................................... 5-7
 5   Proceedings................................ 8
 6   LINDA ROGENSKI:
 7     Examination by Mr. Ackelsberg.............. 9
 8   Changes and Signature.................. 273-274
 9   Reporter's Certification............... 275-276
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNSEALED

App. 0481

Page 5

E X H I B I T S

NUMBER          DESCRIPTION          PAGE

Exhibit 155     Universal Fund II        31
                Financial Result
                August 2010
                TF-PA 504628

Exhibit 156     Draft, Funds Flow        57
                Structure for GPL
                TF-PA098465 - 098467

Exhibit 157     E-mail correspondence    108
                10-21-14, Re: Paths and other
                info you requested
                TF-PA 454508 - 454014

Exhibit 158     Wells Fargo, WellsOne     125
                Account
                TF-PA 454501 - 454507

Exhibits 159-161 (Not marked or identified.)

Exhibit 162     E-mail correspondence    134
                7-18-14, Re: Debt Sale wire
                requests
                TF-PA 359539 - 359551

Exhibit 163A    E-mail correspondence    220
                9-24-12, Re: Plain Green
                Audit Questions
                TF-PA 351208 - 351217

Exhibit 163B    Think Finance - SOX      224
                Process Documentation, 5.3.0
                Daily Settlement
                TF-PA 351218 - 351231

Exhibit 164     E-mail correspondence    134
                7-26-12, Re: Weekly Package
                GPLP00209657 - 00209727

Exhibit 165A    VPC Monthly Package      153
                Checklist Produced in
                Native Format
                TF-PA 389604

Page 6

E X H I B I T S
(continued)

NUMBER          DESCRIPTION          PAGE

Exhibit 165B    E-mail correspondence    154
                6-21-13, Re: GPLS Monthly
                Package, May 2013
                GPLP00007224

Exhibit 166A    E-mail correspondence    187
                6-6-13, Re: (Near Final)
                Tribe Financials
                TF-PA 368104

Exhibit 166B    Plain Green Lending      187
                Financial Results, May 2013
                Produced in Native Format
                TF-PA 368105

Exhibit 166C    Mobiloans Lending        187
                Financial Results, May 31, 2013
                Produced in Native Format
                TF-PA 3668106

Exhibit 166D    Great Plains Lending, LLC 187
                Financial Results, May 2013
                Produced in Native Format
                TF-PA 368107

Exhibit 166E    E-mail correspondence    207
                6-12-13, Re: May Financials
                TF-PA 434714 - 434715

Exhibits 167-172 (Not marked or identified )

Exhibit 173     E-mail correspondence    233
                9-13-12, Re: Plain Green
                Audit Questions
                TF-PA 323902 - 323910

Exhibits 174-175 (Not marked or identified )

Exhibit 176     E-mail correspondence    238
                4-10-13, Re: PGL Financial
                support for December 2012
                TF-PA 535853 - 535854

Page 7

E X H I B I T S
(continued)

NUMBER          DESCRIPTION          PAGE

Exhibit 177     E-mail correspondence    248
                4-17-13, Re: Other PG items
                TF-PA 104005

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record for the videotaped deposition of Linda Rogenski.  The time is 9:06 a.m., April 18, 2018.  In the matter of the Commonwealth of Pennsylvania, et al, vs. Think Finance, Civil Action No. 14-7139-JCJ.  Being held in the United States District Court for the Eastern District of Pennsylvania.

The court reporter is Christy Sievert, and the videographer is Gus Phillips.  Both are representatives of Kaplan Leaman and Wolfe Court Reporters.

Will counsel please state their appearances for the record.

MR. ACKELSBERG:  Irv Ackelsberg, special counsel for the Commonwealth of Pennsylvania.

MR. MIRARCHI:  Saverio Mirarchi, for the Commonwealth of Pennsylvania.

MR. GROGAN:  John Grogan, also for the Commonwealth.

MR. DAUGHERTY:  Andrew Daughtery, on behalf of National Credit Adjusters.

MR. HAWS:  Matthew Haws, on behalf of

UNSEALED

App. 0482

1    the Victory Park defendants.
2        MR. SHAPIRO: Dan Shapiro, for the
3    Victory Park defendants. And Scott Zeminck, the
4    general counsel of Victory Park, on the telephone
5    with us as well.
6        MR. SHELDON: Matt Sheldon, for the
7    Think Finance defendants.
8        MR. BOUGHRUM: Jonathan Boughrum, for
9    Ken Rees.
10       MR. SCHEFF: Richard Scheff, for Linda
11   Rogenski.
12       LINDA ROGENSKI
13       having been first duly sworn,
14       testified as follows:
15       EXAMINATION
16   BY MR. ACKELSBERG:
17       Q. Good morning, Ms. Rogenski. And is it
18   Rogenski or Rogenski?
19       A. It's Rogenski.
20       Q. Rogenski. Okay.
21       I introduced myself to you before. I'm
22   Irv Ackelsberg, and I'm with -- representing the
23   Commonwealth of Pennsylvania, and you understand
24   this is litigation against your former employer,
25   Think Finance?

1        A. Yes.
2        Q. Okay. And various other -- other
3    defendants.
4        Ms. Rogenski, have you ever been deposed
5    before?
6        A. One time.
7        Q. Okay. And was that in a personal matter or
8    related to your job?
9        A. Personal matter.
10       Q. Okay. And what kind of a case was that?
11       A. A car accident.
12       Q. Okay. So you might have some -- how long
13   ago was that?
14       A. It was in my early 20s.
15       Q. Okay.
16       A. So a long time ago.
17       Q. So -- okay. So -- so I'm sure your lawyer
18   has gone over, like, how this all works, and you've
19   got a -- a feel already for how this is going to
20   happen, but just to clarify that you do understand
21   what's going on here, I need to just run through a
22   few preliminaries.
23       And the first is -- is just to confirm
24   with you that the way this -- the way this
25   proceeding works is that it's a series of questions

1    and answers. And, you know, I'll be asking
2    questions. You -- you then answer. And then
3    your -- my questions, your answers are going to be
4    in a transcript that the court reporter here is
5    going to be preparing at the end, a written
6    transcript. Do you understand that?
7        A. Yes.
8        Q. And that it's possible that that transcript
9    could be used by any of the parties in this case
10   over the course of the -- the proceedings in this --
11   in this lawsuit. Okay?
12       A. Yes.
13       Q. Now, it's not just -- as you see, there's
14   lots of lawyers in the room. And so from time to
15   time, there may be an objection. Your lawyer may
16   object, but also some of these -- other lawyers
17   representing the other parties may insert an
18   objection. They're objecting to my question. What
19   you need to understand is that unless your lawyer
20   directs you not to answer that specific question,
21   you still have to answer the question, even though
22   lawyers have objected. Okay?
23       A. Okay.
24       Q. All right. So court reporter is going
25   to be typing -- well, not just my questions, not

1    just your answers, but all the objections.
2    Everything that happens here on the record is going
3    to be recorded, and that's the official -- the
4    official transcript. Okay?
5        A. Okay.
6        Q. And because the written transcript, rather
7    than the videotape that -- that is being prepared,
8    is going to be the official record, we really need
9    you to -- to give us verbal responses to all the
10   questions. So nods or shakes or shrugs, those
11   things don't get -- make -- that's hard for the
12   court reporter to -- to record. So there may be a
13   moment when I say, "Is that a yes?" And, you know,
14   it -- please forgive me. It's not intended to be
15   disrespectful. It's just that we need -- we need
16   verbal responses to everything. Okay?
17       A. Okay.
18       Q. Alrighty. Another sort of ground rule is
19   that if you don't understand my question, it's
20   perfectly fine to say, "I don't understand the
21   question," and then I'll try to rephrase it. If you
22   don't know the answer to the question, you can --
23   that's perfectly fine too. You can just tell me, "I
24   don't know the answer to that."
25       Now, the -- whole thing here is just --

UNSEALED

1  had to come from somewhere.
2      Q.  Okay.  And what we now see on page 7 is
3  where it actually comes from in -- in practice with
4  regard to the Plain Green product, right?
5      A.  That's correct.
6      Q.  Okay.  And it looks like what happens is,
7  Think Finance gives up to $2 million to Haynes
8  Investment, which then gives to it the tribe.
9          MR. SCHEFF:  Object to the form.
10          MR. SHELDON:  Object to form.
11  BY MR. ACKELSBERG:
12      Q.  Do I have that right?
13      A.  That's what's happening with this funds
14  flow, yes.
15      Q.  Okay.  So Plain Green is providing money,
16  but it just goes through the -- through Haynes
17  Investment first?
18          MR. SCHEFF:  Object to the form.
19  BY MR. ACKELSBERG:
20      Q.  Am I right?
21      A.  That was the structure that was set up.
22      Q.  Okay.  Do you know why that structure was
23  set up?
24      A.  I do not.
25      Q.  Did you ever ask anybody, "Why -- why don't

1  we just give the money directly?  Why do we have to
2  run it through the -- through Haynes Investment
3  first"?
4          MR. SCHEFF:  Object to the form.
5      You can answer the question.
6      A.  I follow the documents that were agreed
7  upon and signed.
8  BY MR. ACKELSBERG:
9      Q.  Okay.  And on the left-hand side, that you
10  have the -- so we have TailWind and -- and TC
11  Decision Sciences.  They're -- they're the entities
12  that are invoicing Plain Green on a monthly -- on a
13  monthly basis for the fees charged to Plain Green,
14  right?
15      A.  Correct.
16      Q.  Now, those are all charges that we -- I
17  know we were looking previously at the Universal
18  Fund financial statement, not the GPLS fund
19  statement.  But am I right that in the GPLS
20  structure, the expenses work the same way, that they
21  end up getting reimbursed every month by the
22  investment structure; in this case, GPLS?
23          MR. SCHEFF:  Object to the form.
24          MR. SHELDON:  Object to form.
25      A.  That's correct.  Because there were

1  agreements in place between Plain Green and the
2  Think Finance entities that would charge those
3  charges.  There were also agreements in place
4  between the VPC entities and Plain Green that they
5  would be reimbursed for expenses related to their
6  participations.
7  BY MR. ACKELSBERG:
8      Q.  Right.  Okay.  And -- and so with regard to
9  the tribal entities, the -- the expenses charged by
10  TailWind or Decision Sciences would not actually, in
11  a -- in a real way, be paid by the tribe, it was
12  really just money in, money out?
13          MR. SHELDON:  Object to form.
14          MR. SCHEFF:  Object to the form.
15      A.  They were paid by the tribe.  The tribe
16  just happened to get reimbursement for the expenses
17  due to their arrangement for the participation
18  sales.
19  BY MR. ACKELSBERG:
20      Q.  Right.  But what I -- what I remember when
21  we were looking at the Universal Fund -- and we'll --
22  we'll take a look at some of the -- the actual GPLS
23  and -- and tribal reports later.  But -- but as I
24  recall from when we looked at Universal, that the
25  charges made by TailWind and TC Decision Sciences to

1  First Bank of Delaware back then, were effectively,
2  from the standpoint of the -- of the investment,
3  which in -- which in that case was Universal, they
4  were just reim- -- those are -- those were just
5  charges that were reimbursed by -- by the investment
6  structure; in that case, Universal, right?
7          MR. SCHEFF:  Object to the form.
8          MR. SHELDON:  Object to form.
9      A.  Again, you have to -- you can't look at
10  that as a -- and skip all the pieces in between.
11  The deals are structured in a format that affords
12  the best tax advantage, the best accounting
13  advantage, and the best economic advantage for all
14  the parties that agree to the contracts, and you
15  need to follow the funds flow the way that it's
16  designed.
17      It was designed that services provided by
18  Think Finance were provided to the tribe that was
19  doing the lending, and we charged them for our
20  services for those particular items.  They arranged
21  an agreement with VPC to buy participations in their
22  loans, and they also agreed to get reimbursed on the
23  expenses.
24  BY MR. ACKELSBERG:
25      Q.  Would --

UNSEALED

App. 0484

1  A.  So you're skipping a whole step when you
2  say it's this and then it's this.  It's like, no,
3  the money needed to move in accordance with the way
4  the deal was structured because it had valid
5  business purposes.
6  Q.  Okay.  And -- what is the -- the
7  business purpose, as far as you understand, for --
8  and let's take -- let's take a TailWind marketing
9  charge to Plain Green.  So the system is that the
10  marketing charge is invoiced by TailWind to the
11  tribe, to Plain Green, right?
12  A.  Yes, sir.
13  Q.  And then there's another invoice for the
14  same amount, Plain Green back to GPLS, right?
15  A.  That's correct.
16  Q.  And it's the Think Finance finance
17  department that prepares both of those
18  simultaneously; am I right?
19  A.  As our role as an admin agent and back
20  office.
21  Q.  So that's a "yes," right?
22  A.  Yes.
23  Q.  Okay.  And so -- and on the same day that
24  money goes -- would -- the -- the same day that the
25  money -- well, so the money would -- the actual cash

1  flows connected to those -- they would -- they would
2  actually be cash transfers connected to those double
3  invoices, right?
4  MR. SCHEFF:  Object to the form.
5  A.  That's correct.
6  BY MR. ACKELSBERG:
7  Q.  And so there -- there would be a -- there's
8  a reimbursement going from GPLS to the tribal
9  account, and a payment from the tribal account to
10  TailWind?
11  A.  That would be correct.
12  Q.  Okay.  And all of that is managed by, I
13  think -- I'm trying to remember who -- who Linda
14  Callnin told us.  But you tell us, who -- who would
15  handle -- so who -- who were the people that did the
16  invoicing?
17  A.  Think Finance employees.  So normally, it
18  would have been one of the -- either be one of the
19  controllers, such as David Gentry, or one of the
20  accountants.
21  Q.  And then who would do the actual fund
22  transfers?
23  A.  So that was a variety of people.  For
24  this -- for the Plain Green tribe, initially it
25  was -- they had us set up to have access to their

1  accounts.  We would do a wire setup, get approval
2  from them, and then we would release the wire.  And
3  it takes two people.  The same person can't set it
4  up and release it.
5  In the case of VPC, we had access to set
6  up wires on their accounts.  We would set them up,
7  send them -- send them copies of the invoices, let
8  them know the wires were ready, and they would
9  actually release them.
10  Q.  All right.  Thank you.
11  Now, going back to page 7 of the exhibit.
12  There's reference to an entity we haven't talked
13  about before, Think Finance SPV.  And why don't you
14  explain what that is.
15  A.  I don't really recall what it was right
16  now.  It's been too long.
17  Q.  Was there an entity within Think Finance
18  that was actually purchasing shares in the GPLS
19  fund, much like it was previously -- like Think was
20  purchasing in the Universal Fund?
21  A.  Okay.  I think that's correct.
22  Q.  Okay.  So -- so Think Finance SPV would
23  have been another entity within -- within Think
24  Finance that was actually purchasing shares in GPLS?
25  A.  In one of the GPLS entities, yes.

1  Q.  Okay.  And -- and then you also have the --
2  on the left side, "TC Admin Services," or TCAS, I
3  think as it's known.  And that performed the role
4  that it -- that was basically the administrator of
5  GPLS pursuant to the contract between Victory Park
6  and Think Finance?
7  A.  Correct.
8  Q.  Okay.  And the structure that -- that was
9  in place in -- in reality, not -- not in conception,
10  but just in the way it actually was, that -- what
11  TCAS did was, as in the Universal phase, it received
12  the residual slice of the waterfall at the end of
13  the month, representing all the money that's left
14  over after the payments at the higher end of the
15  waterfall were paid?
16  MR. SHELDON:  Object to form.
17  MR. SCHEFF:  Object to the form.
18  A.  So you're calling it a waterfall?  I
19  haven't heard that term.
20  BY MR. ACKELSBERG:
21  Q.  Okay.  That's all right.  We don't need to
22  use that.
23  A.  But it's the residual.
24  Q.  Yeah.  Okay.
25  And let's look at the -- the last page,

UNSEALED

1    page 8. So why don't you explain what this -- what
2    this tab is representing.
3        A.  This is -- this is Linda's view, me, okay,
4    of how things kind of should work business-wise.
5    This isn't how they necessarily are expected to run
6    their business, but this is just me looking at cash
7    and trying to give the tribe an overview of my
8    thought process of how and where the money was
9    rolling through and from and to.
10        So in this case, I said if, in the case of
11   the prior diagram, funds were provided to Plain
12   Green tribe from Haynes Trust -- and that's the
13   example in this -- in this original one.  So they --
14   they fund the loans of 2 million -- $2,000.  GPL
15   comes in and buy -- GPLS comes in and buys the
16   participation for 99.  So the Plain -- Plain Green
17   tribe now, two days later, is out their $20 for that
18   initial funding of those loans.
19        If they get collections in -- the next
20   column is -- next section is a collection example.
21   If they get collections in of $2 million on the
22   principal, and they've got collection -- and they
23   have to give that principal back to GPLS for their
24   participation that they're going to get their money
25   back for.  And then Plain Green ended -- ends up

1    with $20 of principal returned.
2        Then the next line goes into the
3    collection.  So if interest is collected on the loan
4    of 3,000, GPLS Servicing gets their 99 percent, and
5    Plain Green retains their 1 percent.  So $30 of
6    that.
7        So my thought process to them was to make
8    sure they were thinking about the fact that they had
9    a loan outstanding to -- to Haynes Capital, and that
10   realistically, they needed to look at -- I mean,
11   they needed to be looking at their business from a
12   perspective of where are the funds going to come
13   from for them to pay back their loan and what are
14   they ultimately going to have left over at the end
15   of the day.  And that's what the bottom section is
16   trying to explain to them.
17        Q.  Because -- and let me -- let me make sure I
18   understand what you're saying.  So -- so the money
19   that -- that reflects their 1 percent -- their
20   1 percent interest in the -- in the loans made, out
21   of that, they still have to somehow pay -- pay back
22   Haynes?
23        A.  Right, they have a liability on their
24   books.
25        Q.  Okay.  And -- and you're not -- you're not --

1    from the standpoint of the reporting that you're
2    doing to Plain Green, you -- that's not something
3    that -- that you would report to them, that's --
4    that's between them and Mr. Haynes, right?
5        A.  That's correct.
6        Q.  And -- and you're just trying to be helpful
7    and to -- to tell them:  Don't assume that this
8    1 percent is really all just -- is cash that can be
9    spent.  As a -- from a business standpoint, you have
10   to take account for the liability that you also
11   have?
12        MR. SCHEFF:  Object to the form.
13        A.  That -- that was my -- that was my -- what
14   I was trying to convey.
15   BY MR. ACKELSBERG:
16        Q.  And I -- I take some -- maybe I'm -- I'm
17   reading too much into your answer, but did you have
18   some degree of frustration with the business sense
19   that -- that you were seeing from the Plain Green
20   side?
21        MR. SCHEFF:  Object to the form.
22        A.  No.  I think that where I was at is that I
23   live in the weeds.  Both -- Billi Anne was the one --
24   one of the people here, and I think Bobbi was new.
25   So Billi Anne was trying to make sure Bobbi

1    understood it.  But this was me trying to give them
2    a little taste of the weeds so that they would
3    understand when we're sending them stuff, you know,
4    where our brains are coming from.  Billi Anne
5    obviously was, you know, a 50,000 view, and people
6    that do the financials are in the weeds.
7    BY MR. ACKELSBERG:
8        Q.  At this point in time, in 2012, was
9    there -- do you recall, was there anyone at -- at
10   Plain Green who was doing financials for them?
11        A.  I don't know who was doing their
12   financials.  I -- I know they were preparing
13   something, but I didn't ever see it.  I provided to
14   them their -- the program financial piece that we
15   had insight to, and they would incorporate that with
16   their own financials.
17        Q.  Did the other tribal structures -- and I'm
18   referring to Great Plains Lending and Mobiloans.
19   Did they work in a similar fashion?
20        MR. SCHEFF:  Object to the form.
21        A.  No, they did not.
22   BY MR. ACKELSBERG:
23        Q.  Okay.  So let's start with Great Plains
24   Lending, and tell me how that one differed.
25        A.  Great Plains, I -- and I'm not going to

UNSEALED

1     remember all the specific details, but both Great
2     Plains Lending and Mobiloans had built into their
3     agreements a deposit reserve concept. And I can't
4     tell you the specifics without going and looking at
5     the agreements.
6     Q. Okay. And so if we were -- if -- if you
7     had prepared a chart, the equivalent chart,
8     equivalent spreadsheet, a high level discussion and
9     a cash flow diagram for -- for Great Plains Lending
10    or Mobiloans, you would need to have taken account
11    for the reserve requirement?
12    A. Yes.
13    Q. Okay. And -- and I assume that Mr. Haynes
14    was not an intermediary for the -- the initial
15    funding capital on -- for the other two tribal
16    entities?
17        MR. SHAPIRO: Object to form.
18        MR. SCHEFF: Object to the form.
19    A. Not -- to my knowledge, he wasn't involved
20    in any of it.
21    BY MR. ACKELSBERG:
22    Q. Do you know where the initial funding
23    capital came for Great Plains Lending?
24    A. Part of the deposit reserve.
25    Q. Okay. And what about the other part?

1    A. I mean, that -- I don't know -- I don't
2    know where -- I don't know what or how they handle
3    their funding. I just saw the piece that came from
4    the deposit reserve.
5    Q. And -- and was the deposit reserve
6    something that was managed by the Think Finance
7    staff, the Think Finance finance department?
8        MR. SHELDON: Object to form.
9    A. We did analyses related to it.
10    BY MR. ACKELSBERG:
11    Q. And did the -- and did you also do fund
12    transfers -- or were you involved in the fund
13    transfers in order to maintain that reserve
14    requirement?
15    A. We would have been involved in the
16    initiation of setting up wires related to that.
17    Q. Okay. Which would then have to be approved
18    by the tribe?
19    A. Well, no. That would be -- the ones we
20    were involved in would have been approved by GPLS.
21    Q. Oh, okay. So were the -- were the reserves
22    being provided by GPLS?
23    A. As part of the document, yes.
24    Q. Okay. So -- and this is true of both Great
25    Plains Lending and Mobiloans?

1    A. Yes. Their -- and their depo- -- I
2    remember their deposit reserve sections were
3    different in the calculations, but I don't remember
4    why -- how or why they were different.
5    Q. Okay. So -- so let me make sure I got this
6    straight. With regard to Plain Green, the 1 percent
7    funding capital was coming from the money that they
8    got from Haynes, that Haynes got from Think Finance?
9    A. I would assume, yes. I mean, I don't know
10   what else Haynes had access to funds for or whether
11   he got money from other people than Think Finance,
12   cash fungibles. So -- the amounts we moved to them,
13   they moved. So I would say yes.
14    Q. Right. So just -- so to be clear, I mean,
15   you had access to the Haynes account, as well, for
16   Plain Green; am I right?
17    A. Yes.
18    Q. So -- so it was actually the Think Finance
19   finance staff that would move money, with regard to
20   Plain Green, from a Think Finance account to a
21   Haynes account to a Plain Green account?
22    A. As admin agent, yes.
23    Q. With regard to Great Plains Lending and
24   Mobiloans, some portion of that 1 percent was
25   actually a transfer from GPLS to the respective

1    tribal entity?
2    A. As a deposit reserve.
3    Q. So that's "yes," right?
4    A. Well, I mean, it's -- was transferred as a
5    deposit reserve. The overall intent of the deposit
6    reserve was due to the fact that GPLS had a right to
7    stop buying participations at any point in time, and
8    they would buy them two days out.
9    So the calculations were designed to
10   ensure that if the tribe had made loans, that they
11   would have the money to buy -- to cover the
12   participations for the two days, and then they
13   would -- they either stopped lending or find some
14   other source of participations if they needed -- if
15   hey wanted to do more loans.
16   So it was by design to make sure that
17   everybody had their rights in place.
18    Q. We were -- the -- the exhibit that -- the
19   Plain Green exhibit we were looking at with the
20   e-mail was from November 2012. At this point in
21   time, were you still reporting to Angela?
22    A. I don't know. Angela left somewhere in
23   there, and I -- I'm bad with dates.
24    Q. Okay. So when Angela left, who was your
25   direct re- -- who did you report to?

UNSEALED

1    A.  I reported to Chris Lutes for a very narrow
2  period of time, and then they brought Chad Bradford
3  on.  So I don't remember what the length of time was
4  there.
5    Q.  And -- and Bradford was as chief accounting
6  officer?
7    A.  Correct.
8    Q.  Okay.  Now, how did you learn the -- the
9  specific differences between -- for example, on --
10  we were just talking about the funding of new loans.
11  How did you learn about the different structure that
12  applied to Great Plains Lending and Mobiloans?
13    A.  From reading the documents.
14    Q.  So you would actually read the -- the
15  contracts themselves, and -- and then come up with
16  the -- cash flow that met the contracts?
17    A.  That's correct.  I would come up with
18  the -- like, these diagrams.  And then they would be
19  passed around, and people would say they agree,
20  don't agree.  Go back and talk to the lawyers, make
21  sure we were all on the same page.  It's always a
22  negotiation.
23    Q.  I see.
24    A.  And that's from past business experience.
25  That's just the way it works.

1    Q.  So --
2    MR. SHELDON:  Ms. -- Ms. Rogenski, I
3  just want to remind you that in any answer you
4  provide to Mr. Ackelsberg today, or any other lawyer
5  today, don't reveal communications with lawyers.
6  Okay?
7    THE WITNESS:  Okay.
8    MR. SHELDON:  Thank you.
9  BY MR. ACKELSBERG:
10    Q.  So -- so the process, as I understand it,
11  would be -- let me -- let -- strike that, and I'll
12  start again.
13    The contracts with regard to the tribal
14  products evolved over time; am I right?
15    A.  Yes.
16    Q.  So there were occasional amendments to the
17  participation agreements, right?
18    A.  Correct.
19    Q.  And similar amendments to the
20  administrative agency agreement?
21    A.  Correct.
22    Q.  And -- and the guarantee and security
23  agreements?
24    A.  Correct.
25    Q.  And -- and whenever that happened, you

1  would have to review them and report back to
2  somebody about your reading of that and -- and the
3  cash flow systems that you -- that based on your
4  reading, you would be putting in place?
5    A.  Correct.
6    Q.  And then they would either tell you correct
7  or not correct, and you'd make the necessary
8  adjustments?
9    A.  Correct.
10    Q.  But it required you to keep up-to-date on
11  the contracts as they were amended from time to
12  time?
13    A.  Yes, once they were complete.
14    Q.  And how did the process work to let you
15  know that the contracts were being amended?
16    A.  They would tell me they had a new contract.
17    Q.  Who's "they"?
18    A.  Either Angela or Chris.
19    Q.  Okay.  But after -- after Angela left, it
20  would have been Chris?
21    A.  It would have been Chad.
22    Q.  Okay.  All right.  I'm going to show you a
23  new document.
24    MR. ACKELSBERG:  Just a little bit of
25  housekeeping.  Are we -- should we shoot for 12:30

1  again, or what's -- would people like a --
2    MR. SCHEFF:  My guess is that they're
3  going to bring lunch in around 12:30.
4    MR. ACKELSBERG:  Okay.  And can --
5  just to take -- before I start another exhibit, do
6  you -- does anyone need a break, or --
7    MR. SCHEFF:  I could use two minutes.
8    MR. ACKELSBERG:  Okay.
9    THE VIDEOGRAPHER:  We are off the
10  record.  The time is 11:28 a.m.
11    (Break taken, 11:28 a.m. to 11:39 a.m.)
12    THE VIDEOGRAPHER:  We are back on the
13  record.  The time is 11:39 a.m.
14  BY MR. ACKELSBERG:
15    Q.  Ms. Rogenski, before I show you this next
16  exhibit, I want to ask you about a prior answer you
17  gave.
18    MR. ACKELSBERG:  If counsel can refer
19  back on -- and scroll back to page 74 and 75.  Let's
20  start with -- I've got to say, this technology is
21  amazing now.
22    MR. SCHEFF:  So we're on 87 now?
23    MR. ACKELSBERG:  I'm still from the
24  old school.  I just --
25    MR. SCHEFF:  Seventy -- I'm sorry,

UNSEALED

1    Q. Okay. So this is a document -- do you
2 remember who prepared it?
3    A. It's -- it's been prepared by many people.
4 I think you said earlier that Adam Ackerman was the
5 last author, so maybe Adam updated it last.
6    Q. And who is Adam?
7    A. He was an accountant.
8    Q. Okay. So am -- am I right, this is a
9 document that was used within the finance department
10 in its day-to-day operations?
11    A. Correct.
12    Q. Okay. And it was used to -- to reflect the
13 duties of the -- of the finance department with
14 regard to cash transactions that might need to be
15 done on a daily basis?
16    MR. SHELDON: Object to the form.
17 You can answer the question.
18    A. This was -- this is the document that's
19 designed to -- of what information to gather and
20 where to gather it from to put on a spread that
21 tracks all of the daily stuff for us then to
22 determine if the right balances are in the right
23 place.
24 BY MR. ACKELSBERG:
25    Q. Do you remember people within the finance

1 department actually using this document to guide
2 their work over the course of a day?
3    A. Treasury would usually use this document to
4 guide their work.
5    Q. Okay. All right. That's -- that's it on
6 that -- on that document.
7    I'm going to show you a document now that
8 was also used in the Callnin deposition and
9 premarked as P-31. I'm sorry for the small print,
10 but just the way it was produced.
11    A. (Reviews document.)
12 Okay.
13    Q. What is Exhibit P-31?
14    A. Appears to be an e-mail that started with
15 VPC asking Chris a question about control on bank
16 accounts for the tribes.
17    Q. And where --
18    MR. SHAPIRO: Just for the record,
19 this is marked -- this is GPL's production. This is
20 our production marked confidential, attorneys' eyes
21 only. So under the protective order in this case, I
22 think we would restrict the movement of this
23 document outside of this case to be shared with
24 anybody else.
25    MR. ACKELSBERG: Well, that's true of

1 all the confidential documents until -- until the
2 judge rules otherwise. That's -- I mean, that's
3 true of this document and any --
4    MR. SHELDON: I believe he was noting
5 the difference between just a "confidential" stamp
6 and a "confidential, attorneys' eyes only" stamp.
7    MR. ACKELSBERG: I -- I don't know
8 what the difference means.
9    MR. SHAPIRO: Is it -- is it your
10 position, the documents marked confidential in these
11 depositions cannot be shared with anybody who's not
12 a party to this case?
13    MR. ACKELSBERG: Well, it's our
14 position that --
15    MR. SHAPIRO: Because that's our
16 position.
17    MR. ACKELSBERG: Well, it's the
18 position that anyone within the confidentiality
19 agreement -- it's just governed by the -- the
20 confidentiality protective order from June of last
21 year -- or 2016. And if there are specific issues
22 that you want to talk to us about -- I mean, that
23 includes the -- the experts, the -- I mean, if
24 you're -- you're talking about outside the case?
25    MR. SHAPIRO: Yes.

1    MR. ACKELSBERG: Meaning the -- the
2 creditors' committee?
3    MR. SHAPIRO: Yes.
4    MR. ACKELSBERG: Okay. I don't know
5 what the agreement is between the creditors'
6 committee and Hunton & Williams, so I have -- I have
7 not shared any documents that are marked
8 confidential with the creditors' committee at this
9 point in time, and -- and I don't -- I am aware that
10 there are some disputes about that, and so -- so at
11 some point, I -- I assume I will be asked to share
12 some documents with the creditors' committee. If --
13 if there are special rules that are attached to
14 that, you need to let me know, because I don't --
15 I'm not party to those discussions.
16    MR. SCHEFF: I think that what can be
17 done, and I -- I think -- because I don't have a
18 protective order in front of me, so perhaps I'm
19 speaking out of -- I think there's a certain amount
20 of time --
21    MR. ACKELSBERG: Yes.
22    MR. SCHEFF: -- after the transcript
23 is prepared that any party can designate testimony
24 as being confidential and can't go anywhere. And
25 so, obviously, Mr. Ackelsberg, until that time

1　period passes, you're not sharing anything with
2　anyone.
3　　　　　MR. ACKELSBERG: Exactly.
4　　　　　MR. SCHEFF: Thank you.
5　　　　　MR. SHAPIRO: Dan, can we move on,
6　or is there anything else you need to clarify on the
7　record?
8　　　　　I would say to -- to counsel that given
9　that -- that there are these -- that there's this
10　other -- this other proceeding that's going on, and
11　if -- you should talk to me if -- if you're
12　concerned about -- I mean, I -- you know, I want to
13　make sure that I'm getting the right information
14　from creditors' committee counsel. If there's -- if
15　there's some disputes there, I certainly don't want
16　to do anything inconsistent with my obligations
17　under -- under the confidential --
18　　　　　MR. SCHEFF: We understand that.
19　　　　　MR. ACKELSBERG: Yeah.
20　　　　　MR. SHAPIRO: For the moment -- and we
21　will be in touch with you on this. For the moment,
22　please don't share this outside of this case. And
23　we'll be in touch with you on this document to let
24　you know whether that -- our position has changed on
25　that or -- or not.

1　　　　　MR. ACKELSBERG: But with regard to
2　other documents, I can tell you that just -- there
3　was a representation made to me by -- by counsel for
4　the creditors' committee that there is an
5　understanding between him and Hunton Williams
6　that -- that documents marked confidential in our
7　case could be shared.
8　　　　　Now, I have not -- I have not shared
9　anything at this point, but I -- I'm trying to
10　remember what -- what was said. There certainly was
11　nothing explained in terms of any difference between
12　"confidential" or "confidential, attorneys' eyes
13　only." And so since nothing has been exchanged, I
14　would just ask you to clarify what --
15　　　　　MR. SHAPIRO: That's fair.
16　　　　　MR. ACKELSBERG: Yeah.
17　　　　　MR. SHAPIRO: So until we've had a
18　chance to do that, though, you won't share any of
19　these documents?
20　　　　　MR. ACKELSBERG: Yes, I -- I promise
21　that.
22　　　　　MR. SHAPIRO: Okay.
23　　　　　MR. SHELDON: And let me just state
24　for the record that I -- I think at least in some
25　instances, there's been some confusion between

1　counsel for the creditors' committee as to what the
2　agreements with Hunton have been as to the sharing
3　of documents. And so before you share any
4　documents, I would just ask you to confer with
5　myself or confer with Hunton Williams to make sure
6　that everyone is on the same page.
7　　　　　MR. ACKELSBERG: I think I've already
8　said that I -- that I would do that.
9　　　　　MR. SHAPIRO: That's fine. Thank you.
10　BY MR. ACKELSBERG:
11　　Q. So -- sorry, Ms. Rogenski, for the -- for
12　the lawyer distractions, but let's go -- you know,
13　now it's back to you.
14　　　　　So this started as an inquiry from Victory
15　Park to Chris Lutes, right? Or --
16　　A. That's what it appears to be.
17　　Q. Okay. And then it -- it's an inquiry
18　where -- where an investor is -- is asking for the
19　mechanics: How is it that Think Finance has actual
20　control over the -- the tribal bank accounts, right?
21　That's what. . .
22　　A. That's what it appears to be asking.
23　　Q. Okay. And so then Chris refers that to you
24　for you to help them understand how that actually
25　works?

1　　A. Yes.
2　　Q. Okay. And as I understand, your answer is
3　that the control that -- that Think Finance finance
4　department has over the accounts titled in the name
5　of the tribal entities is not through the account
6　contract -- the account agreements themselves, but
7　rather, through some administrative -- separate
8　administrative agreement that Think has with Wells
9　Fargo at this point in time?
10　　A. Access to the administrative portal.
11　　Q. And what does that mean, "administrative
12　portal"?
13　　A. That when you do online banking with Wells
14　Fargo, you are required to use a product they call
15　CEO, which is their client electronic something.
16　And that's where all of your accounts are housed and
17　that's where you put any kind of limits, where you
18　put positive pay or you say who's authorized to --
19　to set up a wire or release a wire, all that -- all
20　that type of information, and to look at account
21　balances in detail.
22　　Q. And so the -- the criteria with regard to
23　access in -- in the various accounts that were
24　administered through the CEO portal, that was
25　determined by agreement between Think Finance and

UNSEALED

App. 0490

1 Wells Fargo?
2     MR. SHELDON: Object to form.
3     A. Yes, I would say that was an agreement with
4 Think Finance -- it was Think Finance's CEO portal,
5 yes.
6 BY MR. ACKELSBERG:
7     Q. So we previously -- well, strike that.
8     I'm going to show you one another
9 document, and then I think it will be a good time to
10 break for lunch.
11     Are we finished with this one, sir?
12     Q. Yes. For the time being, yes.
13     (Exhibit No. 158 marked.)
14     MR. SCHEFF: What number is this?
15     MR. ACKELSBERG: 158.
16 BY MR. ACKELSBERG:
17     Q. We're looking at a bank statement from
18 Wells Fargo with regard to the Plain Green
19 collection account; am I right?
20     A. Correct.
21     Q. And this is from January of 2014?
22     A. Yes.
23     Q. And the address that appears to be the
24 mailing address for the account is the office of
25 Think Finance. Am I right?

1     A. That's the address on the -- on the report.
2     Q. And is -- was that the procedure for
3 monthly bank statements, that Wells would send --
4 we're talking about Plain Green at the moment --
5 would send the bank statements to Think Finance?
6     A. I don't know if they mailed these or if we
7 went online and printed them out.
8     Q. Okay. But they were -- what we're looking
9 at here, TF-PA-454501, is an example of a bank
10 statement that -- during the period of time that
11 Wells was the bank handling the Plain Green
12 accounts, this is the way it was reported out by
13 Wells Fargo: Plain Green, LLC, collection account,
14 in care of -- well, with an address of the Think
15 Finance office?
16     A. That's correct.
17     Q. And we're looking at the collection
18 account. Am I right that the funding account would
19 have been done the same way?
20     A. Without seeing it, but I would say yes,
21 because they were all under the Think Finance CEO
22 umbrella.
23     Q. And the tribes did not have access to
24 the -- to the CEO portal at -- at Wells Fargo, did
25 they?

1     A. Yes, they did.
2     Q. And did they have -- so -- and was that
3 true for all three of the tribes?
4     A. No. Only Plain Green had accounts at Wells
5 Fargo.
6     Q. Okay. And with regard to Plain Green, they
7 had access. Did -- did the tribes themselves, as
8 far as you know, have the ability -- I'm sorry,
9 we're just talking about Plain Green. Did Plain
10 Green have the ability, itself, to go into the
11 portal and wire money without Think Finance's
12 involvement?
13     A. Without looking back at the specifics on
14 the -- the setup, I don't know the answer. It does
15 take two people, one to set up, one to release.
16     Q. Okay. But -- so --
17     A. Typically, we would set them up, and they
18 would go in and release.
19     Q. And when they release, would they be doing
20 that through the portal?
21     A. Yes.
22     Q. Okay. So it -- so in a typical wire
23 transfer, it would have required a setup on the
24 Think Finance side, and then an actual release from
25 the Plain Green side?

1     A. That would be correct.
2     Q. Okay. All done through the Wells portal?
3     A. That would be correct.
4     Q. Okay. And how did the movement of money
5 work with regard to Great Plains Lending?
6     A. It changed over time. For the most part,
7 they handled most of the their wires on their own.
8 We would do the setup, and -- or they would do the
9 setup, and then they would release. Meaning, Great
10 Plains sometimes set up their own wires and released
11 them, and sometimes we set them up, and they release
12 them.
13     Q. So there were times when Great Plains would
14 release wires that Think Finance was not -- not
15 playing a role?
16     A. Yes.
17     Q. And did that include transfers to Great --
18 to GPLS?
19     A. I wouldn't know without looking at some of
20 the transactions, but I would say no.
21     Q. Okay. So what kinds of transactions could
22 Great Plains Lending do out of their -- their
23 accounts -- and we're talking about the funding and
24 collection accounts, right?
25     A. Yes.

UNSEALED

Q. Okay. So what was the extent of Great Plains Lending's ability to move money in and out of the funding or collections account by themselves without Think Finance?

A. They were their accounts. They could move anything they wanted to move.

Q. Your previous answer said, though, that they wouldn't have -- they wouldn't have done anything on their own with regard to transfers to GPLS.

A. Not to my knowledge, because we always coordinated that with them. Gave them the amounts, and they would confirm them and then do the wires.

Q. Okay. So you were involved in some fashion at least with regard to -- "you," I mean the Think Finance finance people -- were involved in any -- in any wire transfer that involved GPLS?

A. Yes.

Q. What about with Mobiloans?

A. Mobiloans, at different points in time, it was different. The ultimate, I think, ending position was that we would set up the wires, notify them, and they would release them.

Q. Okay. And you mentioned that the other two tribal entities other than Plain Green did not --

their accounts were not in -- in Wells Fargo, right?

A. Correct.

Q. Did -- well, did the banks that the other tribes use have an administrative portal similar to Wells' CEO function?

A. I am -- I do not know.

Q. Okay. Because that was more on the treasury side?

A. No. Just because we had the -- we had the CEO portal -- being Think Finance owned the CEO portal relationship with Wells Fargo, and we brought the Plain Green tribes in under our umbrella for ease of administration. And the other two tribes had their own banks, and I don't know how they had their stuff set up. They added us to have access to view and access to set up wires.

Q. Okay.

A. "Us" meaning various people on the Think Finance team.

Q. What would -- were there ever a circumstance where -- that you know, where Think Finance set up a wire, and -- and the tribal entity did not release?

A. I can't remember a specific time. That's not to say it never happened.

Q. Were there situations where the Think Finance finance people were waiting to get the attention of the tribe to release, and it took a while for that to happen?

A. Yes.

Q. Okay. How often did that happen?

A. I can't even give you a percentage. It was just occasionally.

Q. Were there -- as between the three tribes, were -- were there -- was there a tribe that was -- I'm not sure what word to use -- delinquent or -- or difficult for the -- for the Think Finance people in terms of getting -- getting the proper release?

A. I would say Plain Green, because they had -- you know, they were in a remote location and had weather issues and things at times.

Q. So what would happen if -- let's say -- now, did you -- did you need -- let's say you want to make -- it's Plain Green, and there's money sitting in the collections account, and you want to transfer the 99 percent to GPLS. Right? And that's at Citibank, right?

A. Yes.

Q. So were there -- so I want to be clear in what -- what kind of a situation we're talking

about. Would that include situations where you and Think Finance, in its capacity as the administrative agent for VPC, is trying to get Plain Green to release a wire that you've set up for the transfer to GPLS for its 99 percent share? Would that be the kind of context that -- that you're talking about where there would be some -- some delay in getting a response back from Plain Green?

MR. SHAPIRO: Object to form.

A. That could happen.

BY MR. ACKELSBERG:

Q. Okay. And so what was the procedure for -- you know, in the situation where -- was there a way that the wire could be released without the tribe giving the okay?

A. I'm sure there were occasions where the wire was released prior to receiving okay from the tribe when the wire cutoff time was approaching or going to pass. Generally, if they couldn't release their wires, they would, in e-mail, tell us -- or in phone call, tell us, "It's okay. Go ahead and release that for us. We can't get into the office."

Q. Okay. And -- and were there times you couldn't even get the e-mail back, and that you just had to get -- had to get the wire to GPLS on your

UNSEALED

App. 0492

own?

A.  Well, typically, we were more concerned with getting the wire to Intercept for funding the loans that night than we were for --

Q.  I see.

A.  -- making the other payments.  The most critical wire was to make sure that loans that were committed to were funded.

Q.  And so what would happen in a situation where you're not getting -- you're -- no one at Plain Green is going onto the Wells portal to -- to release -- release the wire, right, and you're not getting any -- you're sending e-mails, you're not getting a response?  There was still a capacity through the portal to -- to release the wire without them, wasn't there?

A.  In Plain Green's case, yes.

Q.  Okay.

A.  They had allowed that.  They had us as their backup.

Q.  Okay.

MR. ACKELSBERG:  I think this is a good place -- good time to break for lunch.

THE VIDEOGRAPHER:  We are off the record.  The time is 12:31 p.m.

(Break taken, 12:31 p.m. to 1:11 p.m.)

(Exhibit No. 162 marked.)

THE VIDEOGRAPHER:  We are back on record.  The time is 1:11 p.m.

MR. ACKELSBERG:  All right.  While we were off the record, we identified an exhibit, and then discovered that the -- the paginations of the -- and Bates number are not in order, so we're going to try to rectify that and come back to Exhibit 162 later on.

All right.  I'm going to. . .

(Exhibit No. 164 marked.)

MR. SHAPIRO:  Is this 163?

MR. ACKELSBERG:  This is 164.  I'm sorry.  I put that on the exhibit, but I didn't -- I didn't say that out loud.  I apologize.

So what I'm -- what I'm doing is, as I've done in previous depositions, a lot of these -- these basically were pre-numbered, and I'm trying -- and I'm making some decisions on the fly to forget about documents I was going to use.  So -- so forgive the lack of -- there are going to be some spaces here the rest of the day.  So we're now looking at an exhibit that I've identified as Plaintiff's Exhibit 164.

A.  (Reviews document.)

BY MR. ACKELSBERG:

Q.  I like your sense of organization.  I can see it.

So let me ask, before -- before I ask you specifically about Exhibit 164, Ms. Rogenski, part of your responsibilities as -- in -- in the finance department was to send periodic reports to Victory Park.  Am I right?

A.  To GPLS, yeah.  And part of Victory Park.

Q.  When you say "to GPLS," what do --

A.  These were part of the -- a part of the compliance request from GPLS related to their investments in the different tribes.

Q.  But there's no --

A.  Or their participations in various tribes.

Q.  But when -- in order to comply with those reporting obligations to GPLS, you would send periodic reports to people who worked for Victory Park Capital.  Am I right?

A.  Right.  Because GPLS is one of their entities.

Q.  Okay.  And -- am I right that there was one set of reports that you would do on a weekly basis, and a different set of reports that you would

do on a monthly basis?

A.  That's correct.

Q.  And are we looking now at 164 -- Exhibit 164 as an example of the weekly reporting protocol that you had as part of your responsibility with regard to the -- the weekly reports that you sent to Victory Park?

A.  So --

MR. SHAPIRO:  Objection.  You're mischaracterizing the testimony.

BY MR. ACKELSBERG:

Q.  Okay.  Well, why don't you tell us -- and I'll withdraw the question.

Why don't you tell us what we're looking at here in -- in Exhibit 164.

A.  Part of the compliance for GPLS was for them to be able to look at the different -- all these -- all these different slides are telling different stories on different aspects.  So the number of loans, the application, the new applications, the former applications, the first paid default rates.  There's all kinds of information in here.  And it was for their financial analyst to -- GPLS's financial analyst to look at and make sure that the investment was in target with

UNSEALED

1    Q.  And what's his job at -- what was his job
2  at Think Finance?
3    A.  Compliance.
4    Q.  What did that involve?
5    A.  One, kind of ensuring a lot of our SOX
6  controls were in place and making sure that we
7  were -- that -- that the -- that everyone, the --
8  the tribes, our direct lending, all of those items
9  were in compliance with the various state rules and
10  regulations.
11    Q.  Okay.  All right.  Now, I want to refer you
12  to another exhibit.  Let me -- let me jump to --
13  well. . .  All right.  I'm going to show you a
14  document that we've labelled as Plaintiff's
15  Exhibit 175.
16        MR. SHELDON:  Irv, it looks like this
17  chain is cut off at the top, it's the end of some
18  kind of signature block or warning.  But just one
19  hanging line at the top.
20        MR. SCHEFF:  Every page is the same.
21        MR. SHAPIRO:  These were collated.
22        MR. ACKELSBERG:  Okay.  They're
23  collated.  Why don't you give them back to me, and
24  I'll -- yeah, this is a -- this is a mistake.  I'm
25  going to -- I'm going to jump exhibits, and -- and

1  we'll come back to 175.
2        Let's look at 176, and we'll come back to
3  175.
4        (Exhibit No. 176 marked.)
5  BY MR. ACKELSBERG:
6    Q.  Let me -- let me look at that one too.  Is
7  that -- are they all the same?
8    A.  No.
9    Q.  Let me -- let me take a look at that.
10  Okay.  These are two different --
11        MR. SHAPIRO:  Yeah, these are -- the
12  Bates numbers don't --
13        MR. ACKELSBERG:  Yeah, I -- I
14  understand.  I'm trying to -- I'm trying to figure
15  that out.
16        MR. SHAPIRO:  Yeah, yeah.
17        MR. ACKELSBERG:  All right.  Take off
18  the last two pages.  Just -- it's just -- the
19  exhibit will be the -- just the first two pages.
20        MR. SHAPIRO:  Bates 535853 and 535854;
21  is that right?
22        MR. ACKELSBERG:  535853 and 54, yes.
23  BY MR. ACKELSBERG:
24    Q.  All right.  Sorry for the hiccup here.
25        So we're looking at a two-page exhibit

1  identified as Plaintiff's Exhibit 176.  Now, before
2  I ask you a question, do you recall, in addition to
3  McGladrey doing some review -- or -- well, actually,
4  let me -- let me back up and ask you another
5  question about McGladrey.
6        Do you know if McGladrey ever completed
7  their audit of Plain Green?
8    A.  I wouldn't know.
9    Q.  Did you ever see any evidence of a
10  completed audit of Plain Green?
11    A.  They weren't ever required to provide that
12  to us, so I've never seen it.
13    Q.  So you don't know one way or the other
14  whether they finished their audit?
15    A.  No, I do not.
16    Q.  Okay.  In addition to getting requests from
17  McGladrey about -- about information that they
18  couldn't get directly from Plain Green, do you
19  remember also getting requests for information from
20  Charles River Associates?
21    A.  Well, yes, because it's right here in front
22  of me.
23    Q.  Well -- okay.
24    A.  I don't -- I don't recall it, but looking
25  at this, I -- I -- it looks like I provided

1  something to them.
2    Q.  Okay.  And do you remember what the role
3  was -- what role Charles River Associates was
4  playing?
5    A.  I believe that they were brought in to try
6  to help them because of some -- some turnover that
7  they had --
8    Q.  "Them" being the tribes?
9    A.  The tribe had some turnover in employees.
10  They brought Charles River in to bring some
11  temporary people in and help them get their books
12  and records caught up and organized.
13    Q.  And -- and in looking at this, do you
14  remember providing Charles River some -- some backup
15  for information that they were trying to get with
16  regard to Plain Green?
17    A.  That's clearly what is stated here, that I
18  provided financials and some bank statement
19  information.
20    Q.  Well, what you're sending them are bank
21  statements, right?
22    A.  Yes.
23    Q.  Okay.  So can we take it from -- from this
24  e-mail that -- that Think -- that Plain Green didn't
25  have bank statements?

UNSEALED

App. 0494

1      MR. SHELDON: Object to form.
2      A. If I remember correctly, as I said, they
3  were really short-staffed, and since we had access
4  to their bank accounts to pull the statements down,
5  they asked if we could help them.
6  BY MR. ACKELSBERG:
7      Q. With regard to the paper statements from
8  Wells Fargo, though, we've already established that
9  those were mailed to -- to Think Finance; am I
10 right?
11     MR. SHELDON: Object to form;
12 mischaracterizes prior testimony.
13 BY MR. ACKELSBERG:
14     Q. Am I right that with regard -- certainly
15 with regard to the funding and the collections
16 account?
17     A. I think my comment earlier -- maybe I need
18 to correct it. But I wasn't sure if they sent paper
19 forms out or if we just pulled them down from the --
20     Q. Oh, that's right.
21     A. -- from the CEO.
22     Q. That's right. So -- so --
23     A. But they were under our umbrella. That's
24 why the address was there.
25     Q. Okay. So based on what you testified to

1  this morning, I take it that Plain Green probably
2  had the capacity -- that there was a way -- if
3  someone knew how to work the -- the CEO portal,
4  there was a way for someone there to pull those bank
5  statements; am I right?
6      MR. SCHEFF: Object to the form.
7  BY MR. ACKELSBERG:
8      Q. There should have been -- that should have
9  been accessible to Plain Green, right?
10     MR. SCHEFF: Object to the form.
11     A. It -- it was accessible. I'm saying that
12 they asked if we could help.
13 BY MR. ACKELSBERG:
14     Q. And -- and do you interpret this meaning
15 that there was nobody on site at that point in time
16 that knew how to do that at the tribal level?
17     MR. SCHEFF: Object to the form. It's
18 not been the testimony.
19 BY MR. ACKELSBERG:
20     Q. Isn't that what it -- what it suggests
21 here?
22     MR. SCHEFF: Object to the form.
23 Go ahead.
24     A. I'm not suggesting that there wasn't anyone
25 there that knew how to do it, because -- I believe

1  Billi Anne was still there at this time. I'm not
2  sure. But I know they had several people that had
3  access to that portal. I just think that they were
4  so short-staffed, that they asked us to pitch in and
5  help. They were approving wires. They had access
6  to the portal.
7  BY MR. ACKELSBERG:
8      Q. And what about to the -- the invoice
9  support for the December '12 P&Ls, how -- so the
10 invoices that were prepared every month for the
11 tribes, so, for example, the -- the TailWind charges
12 and the TCDS charges, those were invoices that
13 actually were prepared by -- by Think Finance,
14 right?
15     MR. SCHEFF: Object to the form.
16 You can answer the question.
17     A. Correct.
18 BY MR. ACKELSBERG:
19     Q. I mean, Think Finance would prepare the
20 invoice for Plain Green to TailWind, and -- and also
21 the reimbursement invoice from GPLS to -- to Plain
22 Green, right?
23     A. As admin agent, yes.
24     Q. Okay. And were those invoices sent to the
25 tribes?

1      A. Yes, they were.
2      Q. Okay. In what form?
3      A. E-mail, PDF.
4      Q. Okay. Do you have any idea what the tribe
5  did with those during this period of time when you
6  were sending them every month?
7      A. No, I do not.
8      Q. Okay. Do you know, at this point in time,
9  whether there was anyone at tribal level who had any
10 understanding of the P&Ls and the invoicing and --
11 and how, basically, the program worked?
12     MR. SHELDON: Object to form.
13     A. I believe they did.
14 BY MR. ACKELSBERG:
15     Q. And -- and who would have been those
16 people?
17     A. I believe it would have been probably some
18 of the -- the tribal council members.
19     Q. Can you think of anyone by name who -- who
20 knew?
21     A. I'm bad with names. And they all had
22 really strange names. So, no.
23     Q. Okay. So you think that some people on the
24 tribal council knew how the P&Ls and the invoicing
25 worked, but you're not sure -- you can't give us a

UNSEALED

1  name of -- of who they might be?
2        MR. SHELDON: Object to form.
3     A. I mean, I can't remember their names.
4  There were so many of them.
5  BY MR. ACKELSBERG:
6     Q. Okay. And -- and is it your testimony that
7  many of them knew the details of how the -- how --
8  how the P&Ls with regard to the Plain Green product
9  worked?
10    A. My understanding is that the tribal
11  council, all those members knew how the program
12  worked.
13    Q. Well, they knew how much money was coming
14  in every month, right?
15    A. They got copies of the financials, and
16  they -- I mean, they had them for their -- for their
17  board meetings, or -- well, they didn't call them
18  board meetings, but their tribal council meetings.
19    Q. So all of the tribal -- all of those tribal
20  council members would have known that -- that the
21  tribe didn't have to pay any of the expenses, that
22  the expenses were all essentially paid by the GPLS
23  program. They would have -- they would have known
24  that, correct?
25        MR. SCHEFF: Object to the form.

1        MR. SHELDON: Object to form.
2    A. I would -- yes.
3  BY MR. ACKELSBERG:
4    Q. And they would have known that they -- they
5  have no risk for bad loans because Think Finance
6  was -- was buying out the bad loans, the more than
7  60 day delinquents, pursuant to their guarantee to
8  GPLS?
9        MR. SCHEFF: Object to the form.
10  BY MR. ACKELSBERG:
11    Q. The tribe would have known that, right?
12        MR. SCHEFF: Object to form.
13    A. I don't know if the tribe knew that,
14  because, again, I think that was the relationship
15  between Think Finance and GPLS. That was their
16  agreement, as we -- I know I said earlier, I
17  didn't -- I wasn't sure. But based on these e-mails
18  and the support you've provided me, the tribe was
19  not having their bad debts bought back. So they --
20  we were not buying -- Think Finance was not buying
21  bad loans from GPL -- from Plain Green. They were
22  only buying 99 percent of the bad participations
23  that GPLS had purchased.
24  BY MR. ACKELSBERG:
25    Q. And when Think Finance bought the

1  99 percent of the -- the bad debt out of GPLS, what
2  happened to the other 1 percent of bad debt?
3    A. So that would have stayed with the tribe if
4  it wasn't being bought back. I think that that's
5  what you're seeing on the income statement on that
6  second line for loan losses.
7    Q. So --
8    A. Revenue and loan loss, the 1 percent.
9    Q. Okay. And -- and you're aware that all of
10  the -- the bad debt was sold to a company called
11  National Credit Adjusters, right?
12        MR. SHELDON: Object to form.
13    A. I've heard that name before. I don't know
14  that it was all sold to that name, because I wasn't
15  involved in those contracts.
16  BY MR. ACKELSBERG:
17    Q. And is it your understanding that what
18  National Credit Adjusters purchased, or whoever
19  debt buyer was, that they were only purchasing
20  99 percent of -- of the bad -- of the value of the
21  bad debt?
22        MR. DAUGHERTY: Object to form.
23    A. So my understanding of it is that the loan
24  can't be bifurcated, and then 99 percent and
25  1 percent. So loans are sold. The money --

1  BY MR. ACKELSBERG:
2    Q. Sold by who?
3    A. The loans are sold by the tribe. They sign
4  off on the agreement and say, "We want to sell these
5  loans." They agree to the list of loans that are
6  being sold. They have the contract. It's sold.
7  They receive the funds from the -- from the -- I
8  guess National Credit Service, whoever. They
9  receive the funds. And then the -- we do the
10  accounting for the funds and provide the 99 percent
11  back through the chain of the entities to GPLS.
12    Q. All right. I'm going to --
13    A. And the tribe gets to keep their 1 percent
14  of the debt sales.
15    Q. All right. Well, why don't I -- why don't
16  I show you a document that I was going to show you
17  before. I think I'll show you now. Let me show you
18  another document first, and I'm going to go back to
19  the debt sales. But this -- this one, I'm going to
20  mark as Plaintiff's Exhibit 177.
21        (Exhibit No. 177 marked.)
22    A. (Reviews document.)
23  BY MR. ACKELSBERG:
24    Q. So you're looking at Plaintiff's
25  Exhibit 177?

UNSEALED

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

COMMONWEALTH OF :
PENNSYLVANIA :
   Plaintiff :
    :
    :
VS. : CIVIL ACTION NUMBER
    : 2:14-CV-07139
THINK FINANCE, INC., :
ET AL., :
   Defendants :

- - -
FEBRUARY 13, 2018
- - -

   Videotaped deposition of MARK
WILDSTEIN, was taken pursuant to notice at The
Pyramid Club, 1735 Market Street,
Philadelphia, Pennsylvania, beginning at or
about 9:25 a.m. before Jeannine Cancelliere,
Court Reporter and Notary Public and John
Vaders, Videotape Operator, there being
present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102

## Page 2

1 APPEARANCES:
2
   LANGER, GROGAN & DIVER, P C
3 BY: IRV ACKELSBERG, ESQUIRE
   BY: JOHN J GROGAN, ESQUIRE
4 1717 Arch Street, Suite 4130
   Philadelphia, Pennsylvania 19103
5 Phone: (215) 320-5701
   Representing the Plaintiff
6 iackelsberg@langergrogan com
7
8 ATTORNEY GENERAL'S OFFICE
   BY: SAVERIO MIRARCHI, ESQUIRE
9 1600 Arch Street, 3rd Floor
   Philadelphia, Pennsylvania 19103
10 Phone: (215) 560-2445
11 smirarchi@attorneygeneral gov
12
13 KIRKLAND & ELLIS LLP
   BY: PENINA MOISA, ESQUIRE
14 601 Lexington Avenue
   New York, New York 10022
15 Phone: (212) 390-4558
   Representing Victory Park and GPLS
16 Defendants
   penina moisa@kirkland com
17
18 MONTGOMERY McCRACKEN
   BY: JONATHAN P BOUGHRUM, ESQUIRE
19 123 South Broad Street
   Philadelphia, Pennsylvania 19109
20 Phone: (215) 772-7228
   Representing Ken Rees
21 jboughrum@mmwr com
22
23
24

## Page 3

1 APPEARANCES (continued)
2
   KATTEN, MUCHIN, ROSENMAN LLP
3 BY: DANIEL SHAPIRO, ESQUIRE
   BY: ALEXANDRA McNICHOLAS, ESQUIRE
4 525 W Monroe Street
   Chicago, Illinois 60661-3693
5 Phone: (312) 902-5622
   Representing Victory Park
6 daniel shapiro@kattenlaw com
7
8 EVERSHEDS SUTHERLAND LLP
   BY: MATT GATEWOOD, ESQUIRE
9 700 Sixth Street NW, Suite 700
   Washington, DC 20001-3980
10 Phone: (202) 383-0100
   MattGatewood@eversheds-sutherland com
11 Representing Think Finance
12
13 VAN NESS FELDMAN
   BY: PATRICK DAUGHERTY, ESQUIRE
14 1050 Thomas Jefferson St , NW
   Washington, DC 20007-3877
15 Phone: (202) 298-1800
   Representing National Credit
16 Adjusters LLC
   pod@vnf com
17
18
   MONTGOMERY McCRACKEN
19 BY: RICHARD L SCHEFF, ESQUIRE
   123 South Broad Street
20 Philadelphia, Pennsylvania 19109
   Phone: (215) 772-7228
21 Representing The Witness,
   Mark Wildstein
22 rscheff@mmwr com
23
24

## Page 4

- - -
INDEX
- - -

MARK WILDSTEIN      PAGE
BY MR. ACKELSBERG    6

- - -
EXHIBITS
- - -

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| P-1 | Private Placement Memo | 17 |
| P-2 | Amended Memo | 39 |
| P-3 | Documents | 83 |
| P-4 | Documents | 93 |
| P-5 | SEC Documents | 99 |
| P-6 | SEC Documents | 99 |
| P-7 | E-mails | 102 |
| P-8 | Documents | 107 |
| P-9 | Cease and Desist Document | 110 |
| P-10 | E-mails | 115 |
| P-11 | E-mails | 123 |
| P-12 | Investor Fundings | 128 |
| P-13 | List of Investors | 131 |
| P-13-A | Memo | 141 |

UNSEALED

App. 0497

```
 1              ---
 2        E X H I B I T S
 3              ---
 4  EXHIBIT NO.    DESCRIPTION         PAGE
 5    P-14        E-mails        140
 6    P-15        E-mail         147
 7    P-16        E-mail         149
 8    P-17        Pay Day vs. Installment     152
 9                Loan Document
10    P-18        E-mails        158
11    P-19        Financial Statement    167
12    P-20        Loan Agreement    172
13    P-21        Document       177
14    P-22        E-mail         179
15
16
17
18
19
20
21
22
23
24
```

```
 1          VIDEOTAPE OPERATOR:  We're now
 2  on the record.  My name is Jonathan Vaders.
 3  I'm the videographer retained by On the
 4  Record.  This is a video deposition for the
 5  Pennsylvania Eastern District Court.  Today's
 6  date is February 13th, 2018.  The video time
 7  is 9:29 a.m.
 8          This deposition is being held at
 9  1735 Market Street in the matter of
10  Commonwealth of Pennsylvania versus Think
11  Finance.  The deponent is Mark Wildstein.  All
12  counsel will be noted on the stenographic
13  record.  The court reporter is Jeannine
14  Cancelliere and will now swear in the witness.
15          - - -
16          MARK WILDSTEIN, after having
17  been first duly sworn, was examined and
18  testified as follows:
19          - - -
20          EXAMINATION
21          - - -
22  BY MR. ACKELSBERG:
23  Q.   Good morning, is it Wildstein or
24  Wildstein?
```

```
 1  A.   My brother is Wildstein and I'm
 2  Wildstein.  So take your choice, either.
 3  Q.   It's a pleasure Mr. Wildstein.  My name
 4  is Irv Ackelsberg.  This is John Grogan and
 5  Sam Mirarchi.  We're representing the
 6  Pennsylvania Attorney General, Judge Shapiro,
 7  in an action against a company named Think
 8  Finance, its former CEO, Ken Rees, and a hedge
 9  fund named Victory Park Capital.
10          Are those names you're
11  familiar with?
12  A.   Ken Rees I am; Victory Park, I've heard
13  the name.  I've never had any contact.
14  Q.   And Think Finance?
15  A.   Yes.
16  Q.   You're here pursuant to a subpoena,
17  correct?
18  A.   Yes, I am.
19  Q.   And prior to receiving the subpoena,
20  were you aware about the existence of this
21  lawsuit?
22  A.   No, I was not.
23  Q.   After you were served with the subpoena,
24  did you inform yourself, in any way, about the
```

```
 1  lawsuit?
 2  A.   Inform myself?
 3  Q.   Well, what did you do after you got the
 4  subpoena?
 5  A.   I called my brother who is involved with
 6  -- was involved with First Bank of Delaware.
 7  Q.   What's his name?
 8  A.   Harris Wildstein, Stein.
 9  Q.   And then what?
10  A.   He suggested that I call Harry Madonna.
11  Q.   Who is Harry Madonna?
12  A.   Harry was the chairman of First Bank of
13  Delaware.
14  Q.   Did you do that?
15  A.   I did.  Harry asked me to send him the
16  subpoena.  He took a look at it and then
17  suggested that I call Richard Scheff.
18  Q.   The subpoena also directed you to
19  produce some documents; isn't that correct?
20  A.   Yes.
21  Q.   And you went over that list of
22  documents?
23  A.   Yes.
24  Q.   What did you -- and you gave some
```

UNSEALED

1    documents to your attorney to get to us,
2    correct?
3    A.    The only documentation I had -- I had no
4    physical documents of any kind. I went
5    through my old e-mails and was surprised to
6    find a bunch of e-mails related to Universal
7    Finance.
8    Q.    And everything you could find, you gave
9    to Mr. Scheff for production to us?
10   A.    Yes.
11   Q.    Thank you. Before we get into the
12   substance of the deposition, I want to just
13   ask you a few standard preliminary questions.
14   First of all, have you ever been deposed
15   before?
16   A.    No, I have not.
17   Q.    Let me just, I assume your lawyer
18   explained to you some of this, but I need to
19   kind of go through it just to confirm on the
20   record that you understand what we're doing
21   here today.
22             I'm going to be asking you
23   questions requesting an answer. Everything
24   that's said, my question, your answer, will be

1    transcribed by the court reporter, who after
2    all of this is over will prepare a written
3    transcript of what was said by you, by me, by
4    the other lawyers in the room. Everything
5    that's said is put on this transcript. Do you
6    understand that?
7    A.    Yes, I do.
8    Q.    And that transcript could conceivably be
9    used by a party in this case, do you
10   understand that?
11   A.    Yes.
12   Q.    And you're under oath as if we were
13   sitting in a court of law, do you understand
14   that too?
15   A.    Yes.
16   Q.    Now because the transcript, as opposed
17   to the video, is the official record of your
18   testimony, you have to answer the questions
19   verbally. Nods or shrugs won't work, even
20   though they'll come up on the video. You need
21   to answer with words. Okay?
22   A.    Yes.
23   Q.    If you don't know the answer, then
24   that's fine. I don't know is a perfectly fine

1    answer if, in fact, that's truthful. The
2    point here is just to be truthful.
3    A.    Okay, I understand.
4    Q.    If you don't understand the question,
5    you can ask me to clarify?
6    A.    I understand.
7    Q.    Your lawyer may object to a question,
8    the other lawyers may say something too. But
9    even if there is an objection, after the
10   objection is over, unless your lawyer directs
11   you not to answer it, you still have to answer
12   the question. Okay?
13   A.    I understand, yes.
14   Q.    We will take breaks, and if you need
15   one, just ask. But you'll need to answer any
16   pending question before we take the break.
17   Okay?
18   A.    Yes.
19   Q.    Lastly, is there any reason, for
20   example, illness, hearing disorder,
21   medication, lack of sleep, anything like that
22   which would interfere with your ability to
23   give truthful testimony here today?
24   A.    No, there is not.

1    Q.    Let me just do like just a little bit of
2    background. How old are you?
3    A.    67.
4    Q.    We're the identical age. Are you
5    employed?
6    A.    Self employed.
7    Q.    In what field?
8    A.    Real estate.
9    Q.    Has that always been your employment?
10   A.    You don't want my whole history, do you?
11   Q.    No, not really, the last 10, 20 years.
12   A.    It has always been real estate.
13   Q.    Where did you grow up?
14   A.    Cheltenham Township.
15   Q.    Did you go to Cheltenham High?
16   A.    I did. Were you in my class?
17   Q.    I was not. A lot of famous people went
18   to Cheltenham High.
19   A.    Yeah.
20   Q.    Did you go to college?
21   A.    Yes, I did.
22   Q.    Where?
23   A.    Penn State.
24   Q.    Do you have any graduate degrees?

UNSEALED

App. 0499

1  A.  No, I do not.
2  Q.  When you say you're in real estate, is
3  that both -- is that residential, commercial,
4  both?
5  A.  Brokerage and then investment in
6  residential and commercial/industrial.
7  Q.  You were served at 1429 Spring Mill Road
8  in Gladwyne, correct?
9  A.  That's correct.
10  Q.  Is that your residence?
11  A.  Yes, it is.
12  Q.  Do you own that house?
13  A.  Yes, I do.
14  Q.  Who lives there with you?
15  A.  Just me.
16  Q.  We're going to be using -- I referenced
17  in the beginning the defendant company being
18  named Think Finance.  I believe when you were
19  involved, they were called Think Cash, right?
20  A.  I believe so, yes.
21  Q.  Just so that you know, when I say Think
22  Finance, it's the company that you knew as
23  Think Cash.
24  A.  I understand.

1  Q.  You're aware, are you not, that Think
2  Finance and First Bank of Delaware were at one
3  time jointly involved in an online loan
4  business?
5      MR. SCHEFF:  Objection to the
6  form.  You can answer the question.
7      THE WITNESS:  Yes.
8  BY MR. ACKELSBERG:
9  Q.  And you owned an investment fund called
10  Universal Finance II; is that correct?
11  A.  I didn't own it, I was the sole member.
12  Q.  Sole member, okay.  And that investment
13  fund that you were the sole member of, during
14  the period 2009 to 2010, purchased,
15  participation interests in loans made by that
16  business between Think Finance and First Bank
17  of Delaware, correct?
18      MR. SCHEFF:  Object to the
19  form.  You can answer the question.
20      THE WITNESS:  The dates, I
21  think by 2010 we were no longer involved, but
22  yes.
23  BY MR. ACKELSBERG:
24  Q.  In 2009 and 2010 or a portion of 2010,

1  the fund that you were the sole member of
2  would buy participation interests in the loans
3  made by that business.
4  A.  That's correct.
5      MR. SCHEFF:  Object to the
6  form.  You can answer the question.
7  BY MR. ACKELSBERG:
8  Q.  How did a real estate agent get involved
9  in the online loan business?
10  A.  My brother is on the board of the bank.
11  Q.  And that's Harris?
12  A.  That's Harris.  I had a relationship
13  with the bank.
14  Q.  In what way?
15  A.  Lending and advisory, certain advisory
16  things.  And they asked me if I would like to
17  participate in this as a trusted person who
18  they knew, and that's how it came about.
19  Q.  When you say -- first of all you
20  mentioned that you had relationship with
21  lending, were you lending money to the bank or
22  was the bank lending money to you?
23  A.  No, I was borrowing money from the bank.
24      MR. SCHEFF:  You have to wait

1  until he finishes his question and then
2  provide the answer.
3  BY MR. ACKELSBERG:
4  Q.  And you said there was some consulting,
5  as well?
6  A.  I offered and occasionally helped with
7  real estate questions.
8  Q.  Now when you say they asked you to get
9  involved in this, who is they?  Was it Harris?
10  A.  I believe it was Harris, yes.
11  Q.  Do you remember what he said?
12  A.  No, not exactly.
13  Q.  Are we talking about 2008, 2009 or are
14  we talking earlier?
15  A.  I'm not sure exactly, but 2007, I
16  believe.
17  Q.  Now there was -- this investment fund
18  that you were the sole member of, Universal
19  Finance II, there was an earlier Universal
20  fund, correct?
21  A.  Yes, there was.
22  Q.  And that also had to do with First Bank
23  of Delaware?
24  A.  It was the same type of fund, yes.

UNSEALED

App. 0500

1    Q.   When you talked about Harris coming to
2  you with a proposal to get involved in this,
3  we're talking about Universal I as opposed to
4  Universal II?
5    A.   I believe it was both, yes.  Yes.
6    Q.   Let's -- start with an exhibit.  Just
7  for the record, what we're going to do with
8  the exhibits, rather than call them Wildstein
9  Exhibits, we're going to start numbering them
10  as P-1, P-2, P-3 to try to minimize the
11  confusion of all of the paper that's going to
12  be rolling around in the case.
13        What we're going to do is
14  identify this first exhibit as P-1.
15              - - -
16        (Whereupon Exhibit P-1 was
17  marked for identification.)
18              - - -
19  BY MR. ACKELSBERG:
20    Q.   And one for your attorney.  So I brought
21  four copies.
22        MR. GATEWOOD:  Mr.
23  Ackelsberg, even though this exhibit is not
24  marked confidential, as a suggestion on

1  housekeeping, I suggest that any exhibit that
2  you use with the deponent that is marked
3  confidential, that was produced as
4  confidential, we just note that at the time
5  that you mark the exhibit.
6        MR. ACKELSBERG:  Sure.
7        MR. GATEWOOD:  So we don't
8  have to go back --
9        MR. ACKELSBERG:  That's a
10  good idea.
11  BY MR. ACKELSBERG:
12    Q.   What I did, just so you all know, there
13  are some documents that he had and that aren't
14  confidential and aren't marked confidential.
15  So where I can, I'm using those.  But there
16  will be a few that do have that marking and I
17  will note that on the record.
18        You have what has been marked
19  as P-1.
20    A.   Yes, I do.
21    Q.   What is this document, you produced
22  this.  So what is this?
23    A.   I didn't produce it, the lawyers
24  produced it.

1    Q.   Remember we talked about the documents
2  that you found --
3        MR. SCHEFF:  He doesn't
4  understand what you mean by produced.
5  BY MR. ACKELSBERG:
6    Q.   This is one of the documents that you
7  found on your e-mail that you gave to your
8  lawyer.
9    A.   Yes.
10    Q.   What is it?
11    A.   To the best of my knowledge, this is a
12  -- this is the offering memorandum, without
13  going through everything.  Quite frankly, I
14  relied on the attorneys to produce the
15  document.
16    Q.   I understand.
17    A.   I'm not an attorney and I don't
18  understand all of this.
19    Q.   Okay.  But you're familiar with some
20  parts of it though, right?
21    A.   Yes.
22    Q.   Particularly the parts that describe the
23  nature of the business that people were
24  investing in?

1    A.   Yes.
2    Q.   Let's look at a couple of the
3  statements, and we're going to refer to this
4  as the private placement memorandum or the
5  PPM.
6    A.   Right.
7    Q.   Okay.  If you go to page five and if you
8  look in the right-hand corner, it will say
9  Wildstein-29.  Do you see that?
10    A.   Yes.
11    Q.   In the first paragraph, it says that
12  your company, Universal Finance II was
13  organized on May 8th, 2008.  Do you see that?
14    A.   Yes.
15    Q.   Do you remember that, the forming of the
16  company on or about May of 2008?
17    A.   Yes, because I'm assuming that I signed
18  this document, yes.
19    Q.   And then on page 17 of the memorandum,
20  which is Wildstein-41, it also mentions the
21  formation on May 8th, 2008 at the top.
22    A.   Yes.
23    Q.   I believe it also mentions in there
24  under -- if you look to the next page, it

UNSEALED

BY MR. ACKELSBERG:
Q. Do you remember there were certain fees
that Think Finance charged for marketing and
technology? Do you remember that?
A. I don't recall specifically.
Q. You don't recall specifically the amount
or that there were --
A. I see that there are these fees.
Q. Does that refresh your recollection?
A. Again, it's ten years ago, you know.
Q. The next bullet, it looks like -- it
says in any month where the principal
charge-offs on the loans exceed 25 percent of
the stated principal amount of the loans
outstanding, the amount of principal on the
loans that exceeds 25 percent which continues
to be owned by the bank as part of its
retained interest shall be retained as a bank
fee. Do you see that?
A. Yes.
Q. This means that if the loan losses were
higher than a certain amount, the bank might
have a charge for an additional fee on that
loan loss, on their share, do you see that?

MR. SCHEFF: Object to the
form.
THE WITNESS: I see that.
BY MR. ACKELSBERG:
Q. The last bullet is that the bank also
gets monthly compensation determined, it says
in writing from time to time between the bank
and Universal, which will not exceed 15
percent times the interest and fees for the
prior month. Do you see this?
A. Yes, I do.
Q. Do you remember the term revenue share?
A. Do I remember the term?
Q. Yes.
A. No.
Q. Do you see that the bank got a fee off
of the collections on the 90 percent that the
Universal owned?
MR. SCHEFF: Object to the
form.
BY MR. ACKELSBERG:
Q. Do you see that?
A. I see, I see that.
Q. Does that refresh your recollection,

that the bank actually got paid a percentage
out of the collections for the amount that
Universal Fund got?
A. Only the fact that I see it here. I
don't recall.
Q. You don't remember?
A. No.
Q. You don't remember anyone explaining
that to you?
A. No, I don't.
Q. Now, in addition to the participation
agreement that you signed with the bank, you
signed an administrative agency agreement with
Think Finance, correct?
A. I believe so, yes.
Q. And I believe that's also an attachment
to the PPM. If you go to Wildstein-109, do
you see amended and restated administrative
agency agreement?
A. Yes, I do.
Q. If refers to Universal Finance. It uses
the term SPE. Do you see that?
A. Yes.
Q. Do you know what SPE stands for?

A. No.
Q. If you turn to the signature page,
Wildstein-131, who are the signators?
A. Ken Rees and Mark Wildstein.
Q. So Ken Rees signed as president of TC
Administrative Services and you signed as the
managing member of Universal, correct?
MR. SCHEFF: Object to the
form. It misstates the document. You can
answer the question.
THE WITNESS: Correct, yes.
BY MR. ACKELSBERG:
Q. Actually I'm looking at the wrong one.
You're very correct. I'm sorry, the signature
page of the administrative agency agreement is
Wildstein-124.
A. Okay.
Q. It's the same people that signed that
agreement though, right?
A. Yes.
Q. The agreement that we looked at, the
signature line that we looked at first was
actually the signature page, it's something
called a guarantee agreement between Universal

18 (Pages 69 to 72)

UNSEALED

App. 0502

1 and Think Cash Incorporated, correct?
2 A. I see that, yes.
3 Q. Because Think Cash or now known as Think
4 Finance was guaranteeing all of the
5 obligations and all of the promises made to
6 Universal by TC Administrative Services,
7 right?
8 MR. GATEWOOD: Objection to
9 form.
10 THE WITNESS: I see that,
11 yes.
12 BY MR. ACKELSBERG:
13 Q. Do you remember that?
14 A. To the best of my knowledge.
15 Q. In the administrative agency agreement,
16 if you look at page 98 and 99, it's a listing
17 of the lawyers that represented the various
18 parties to get notices, do you see that?
19 A. Yeah, at the bottom.
20 Q. Well, it's in the bottom --
21 A. Wildstein-98 or page 98?
22 Q. Wildstein-123.
23 A. Oh, 123.
24 Q. And 124?

1 A. Yeah, 122 and 123.
2 Q. Do you see this page lists the various
3 parties to the agreement, the two parties; and
4 then it lists the lawyers who get copies on
5 behalf of those who get notices pursuant to
6 the agreement?
7 A. Yes.
8 Q. It actually lists two law firms here for
9 you, right? It lists Pepper Hamilton and a
10 Richard Eckman?
11 A. Yes.
12 Q. And it lists Spector Gadon, Mr.
13 Fitzgerald, you mentioned before?
14 A. Yes.
15 Q. Were they both your lawyers, do you
16 remember?
17 A. I don't recall. I remember both of the
18 names, but I don't recall.
19 Q. Do you remember either of these
20 individuals, Edward Fitzgerald or Richard
21 Eckman?
22 A. I do remember Ed.
23 Q. You know him by Ed, right?
24 A. That's his name.

1 Q. Yeah, but I mean you remember him?
2 A. If I run into him today, would I
3 recognize him, probably not.
4 Q. What about Rick Eckman, is that a name
5 that --
6 A. I recall the name.
7 Q. But you don't recall ever meeting him?
8 A. I may have.
9 Q. Now you'll see that there are various
10 lawyers -- there's a law firm mentioned for
11 Think Finance and for TC Administrative
12 Services?
13 A. Uh-huh.
14 Q. It's the Coblentz Law Firm in San
15 Francisco, an attorney by the name of Paul
16 Tauber?
17 A. Yep.
18 Q. Is that a name you remember?
19 A. No.
20 Q. Okay. In administrative agency
21 agreement Wildstein-111, 111 and 112, am I
22 correct that this entity of Think Finance,
23 known as TC Administrative Services, the
24 administrative agent would manage all of the

1 bank accounts -- all of the Universal bank
2 accounts at First Bank of Delaware?
3 MR. GATEWOOD: Objection to
4 form.
5 MR. SCHEFF: Object to the
6 form.
7 BY MR. ACKELSBERG:
8 Q. That was part of what they were agreeing
9 to do here, right?
10 MR. GATEWOOD: Objection.
11 MR. SCHEFF: Object to the
12 form.
13 THE WITNESS: If that's what
14 it says, yes.
15 BY MR. ACKELSBERG:
16 Q. And it was also their job to fund that
17 reserve account that we talked about before.
18 MR. GATEWOOD: Objection.
19 MR. SCHEFF: Object to the
20 form.
21 THE WITNESS: To the best of
22 my knowledge, yes.
23 BY MR. ACKELSBERG:
24 Q. And to pay the attorneys to draft the

UNSEALED

1    investment documents like you described
2    before?
3            MR. GATEWOOD: Objection,
4    form.
5            THE WITNESS: To the best of
6    my knowledge.
7    BY MR. ACKELSBERG:
8    Q.    And to maintain all of the books and
9    records?
10           MR. GATEWOOD: Object to the
11   form.
12           THE WITNESS: Yes.
13   BY MR. ACKELSBERG:
14   Q.    And every month pay all of bank fees due
15   to First Bank of Delaware, to make the
16   principal interest payments due to the
17   investors, fund reserve account, all of these
18   things was what TC Administrative Services,
19   the Think Finance agent, those were part of
20   the obligations that they were to perform for
21   Universal fund, right?
22           MR. GATEWOOD: Objection to
23   form.
24           THE WITNESS: To the best of

1    my knowledge.
2    BY MR. ACKELSBERG:
3    Q.    And if you look at -- flip the page, you
4    will see here in terms of deposits and
5    withdrawals --
6    A.    113?
7    Q.    112.
8    A.    Wildstein-113?
9    Q.    112. So you see that in terms of
10   deposits and withdrawals, they arrange for the
11   funds received from the investors to be
12   deposited. Do you see that?
13   A.    Uh-huh.
14   Q.    Into the operating account, do you see
15   that?
16   A.    Yes.
17   Q.    And they're also -- it's also their job
18   to pay the bank the fees that the bank was
19   entitled to, that we described before?
20           MR. GATEWOOD: Objection.
21           THE WITNESS: Right, for the
22   prior month, I see. Yes.
23   BY MR. ACKELSBERG:
24   Q.    Okay. Look at the next to the last

1    paragraph.
2    A.    To the extent funds in the operating --
3    Q.    Yes. This is where the guarantee comes
4    from; is it not, where Think will actually
5    guarantee the principal and interest payable
6    to the investors. Do you see that?
7            MR. GATEWOOD: Objection,
8    form.
9            MR. SCHEFF: Objection to the
10   form.
11           THE WITNESS: I see that,
12   yes.
13   BY MR. ACKELSBERG:
14   Q.    That's what we talked about before,
15   right?
16   A.    Yes.
17   Q.    And the last paragraph, this is
18   something we haven't mentioned before. As I
19   read this, it looks like all of the money left
20   after paying all of the fees, after paying the
21   investors, after paying the administrative
22   fee, if there's anything left from the loan
23   collections, from the revenues, that Think
24   keeps that as an administrative fee for their

1    services.
2            MR. GATEWOOD: Objection,
3    form.
4    BY MR. ACKELSBERG:
5    Q.    Do you remember that?
6    A.    I see that.
7    Q.    Do you remember it?
8    A.    I do not recall.
9    Q.    You don't remember that the residual
10   cash after payment of everything was owed went
11   to Think Finance?
12           MR. SCHEFF: Object to the
13   form.
14           THE WITNESS: Again, to the
15   best of my knowledge, it would make sense,
16   after everything else is paid.
17   BY MR. ACKELSBERG:
18   Q.    Do you remember in any of your
19   agreements with Think or this Think entity,
20   TCAS, was there any requirement that you get
21   daily reports or weekly reports or monthly
22   reports, do you remember anything about that?
23           MR. SCHEFF: Object to the
24   form.

UNSEALED

App. 0504

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
    Plaintiff, *
     *
VS.      * Civil Action
     * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants. *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF
MICHELLE NYUGEN
APRIL 19, 2018
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION of MICHELLE NYUGEN,
produced as a witness at the instance of the
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 19th day of
April, 2018, from 9:04 a.m. to 5:20 p.m., before
Christy R. Sievert, CSR, RPR, in and for the State
of Texas, reported by machine shorthand, at the
offices of Hunton & Williams, LLP, 1445 Ross Avenue,
Suite 3700, Dallas, Texas 75202, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 2

```
 1              APPEARANCES
 2
 3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
 4     MR  JOHN J  GROGAN
       MR  IRV ACKELSBERG
 5     Langer, Grogan & Diver, PC
       1717 Arch Street, Suite 4130
 6     Philadelphia, Pennsylvania  19103
       Phone:   215-320-5701
 7     E-mail:  iackelsberg@langergrogan com
                jgrogan@langergrogan com
 8
       MR  SAVERIO "SAM" MIRARCHI
 9     Senior Deputy Attorney General
       Bureau of Consumer Protection
10     1600 Arch Street, Suite 300
       Philadelphia, Pennsylvania  19103
11     Phone:   215-560-2445
       E-mail:  smirarchi@attorneygeneral gov
12
13   COUNSEL FOR MICHELLE NYUGEN:
14     MR  RICHARD L  SCHEFF
       Montgomery, McCracken, Walker & Rhoads, LLP
15     123 South Broad Street
       Philadelphia, Pennsylvania  19109
16     Phone:   215-772-7502
       E-mail:  rscheff@mmwr com
17
18   COUNSEL FOR KENNETH REES:
19     MR  DAVID F  HERMAN
       Montgomery, McCracken, Walker & Rhoads, LLP
20     123 South Broad Street
       Philadelphia, Pennsylvania  19109
21     Phone:   215-772-7502
       E-mail:  dherman@mmwr com
22
23
24
25
```

## Page 3

```
 1              APPEARANCES
                (continued)
 2
 3   COUNSEL FOR THINK FINANCE, INC :
 4     MR  MATT GATEWOOD
       Eversheds Sutherland (US), LLP
 5     700 Sixth Street, NW, Suite 700
       Washington, D C  20001
 6     Phone:   202-383-0100
       E-mail:  mattgatewood@eversheds-sutherland com
 7
 8   COUNSEL FOR VICTORY PARK CAPITAL:
 9     MR  DANIEL P  SHAPIRO
       MR  MATTHEW W  HAWS
10     Katten Muchin Rosenman, LLP
       525 W  Monroe Street
11     Chicago, Illinois  60661
       Phone:   312-902-5622
12     E-mail:  daniel shapiro@kattenlaw com
                matthew haws@kattenlaw com
13
14   COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15     MR  PATRICK DAUGHERTY
       Van Ness Feldman, LLP
16     1050 Thomas Jefferson Street, NW
       Seventh Floor
17     Washington, D C  20007
       Phone:   202-298-1874
18     E-mail:  pod@vnf com
19   ALSO PRESENT:
20     GUS PHILLIPS, Videographer
       KEVIN BYERS
21     SCOTT ZEMINCK (Appearing telephonically)
22
23
24
25
```

## Page 4

```
 1              INDEX
                           PAGE
 2
```

Appearances.................................. 2-3

Exhibits.................................... 5-6

Proceedings................................. 7

MICHELLE NYUGEN:

  Examination by Mr. Grogan................... 8
  Examination by Mr. Gatewood.............. 287
Changes and Signature................... 307-308
Reporter's Certification............... 309-310

```
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

WWW.KLWREPORTERS.COM

UNSEALED

App. 0505

E X H I B I T S

| | PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|---|
| | Exhibit 178 | Key Initiatives, Growth & Profitability | 84 |
| | | TF-PA 671684 - 671695 | |
| | Exhibit 179 | E-mail correspondence 7-31-13, Re: Updated | 119 |
| | | TF-PA 521098 - 521113 | |
| | Exhibit 180 | E-mail correspondence 5-20-14, Re: MBL Council Visit 5-27-14 (2).pptx | 167 |
| | | TF-PA 300666 - 300706 | |
| | Exhibit 181 | E-mail correspondence 11-21-14, Re: Plain Green Control of Loan Underwriting Criteria and Process | 184 |
| | | TF-PA 673863 - 673864 | |
| | Exhibit 182 | E-mail correspondence 5-8-15, Re: Plain Green Agreement | 186 |
| | | TF-PA 667815 - 667817 | |
| | Exhibit 183 | E-mail correspondence 3-18-14, Re: Summer Job | 197 |
| | | TF-PA 120366 - 120369 | |
| | Exhibit 184 | E-mail correspondence 4-17-14, Re: Updated Online Consumer Lending 2014.pptx | 201 |
| | | TF-PA 276040 - 276067 | |
| | Exhibit 185 | E-mail correspondence 4-11-13, Re: Decks from qbr | 215 |
| | | TF-PA 611729 - 611756 | |
| | Exhibit 186 | E-mail correspondence 5-2-13, Re: Exec agenda | 232 |
| | | TF-PA 515479 - 515544 | |
| | Exhibit 187 | E-mail correspondence 5-7-15, Re: Board Tutorial 5-7-14.pptx | 241 |
| | | TF-PA 708090 - 708151 | |

E X H I B I T S
(continued)

| | PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|---|
| | Exhibit 188 | E-mail correspondence 3-30-12, Re: VPC Covenant - Max Lines on PGL | 246 |
| | | TF-PA 309917 - 309919 | |
| | Exhibit 189 | E-mail correspondence 10-4-13, Re: AGAIN! Decision: Tribal customer acquisition | 250 |
| | | TF-PA 244554 - 244557 | |
| | Exhibit 190 | E-mail correspondence 5-3-13, Re: Latest Consumer Loan Agreements | 261 |
| | | GPLP00006040 - 00006043 | |
| | Exhibit 191 | E-mail correspondence 1-18-13, Re: PG credit agreement | 266 |
| | | TF-PA 041391 - 041392 | |

| | DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|---|
| | Exhibit 1 | E-mail correspondence 11-21-14, Re: Privileged and Confidential: Re: Plain Green Control of Loan Underwriting Criteria and Process | 288 |
| | | TF-PA 673861 - 673862 | |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record for the videotaped deposition of Michelle Nguyen. The time is 9:04 a.m., April 19, 2018. In the matter of the Commonwealth of Pennsylvania, et al, vs. Think Finance, Incorporated, et al., Civil Action No. 14-7139-JCJ, being held in the United States Court for the Eastern District of Pennsylvania.

The court reporter is Christy Sievert, and the videographer is Gus Phillips. Both are representatives of Kaplan, Leaman & Wolfe Court Reporters.

Will counsel please state their appearances for the record.

MR. GROGAN: John Grogan for the Commonwealth of Pennsylvania.

MR. ACKELSBERG: Irv Ackelsberg, same.

MR. MIRARCHI: Saverio Mirarchi for the Commonwealth of Pennsylvania.

MR. DAUGHERTY: Patrick Daugherty on behalf of National Credit Adjusters.

MR. HAWS: Matthew Haws on behalf of the Victory Park defendants.

MR. SHAPIRO: Dan Shapiro for the

Victory Park defendants. And Scott Zeminck is on the phone with us, general counsel of Victory Park.

MR. GATEWOOD: Matthew Gatewood for the Think Finance defendants.

MR. HERMAN: David Herman on behalf of Kenneth E. Rees.

MR. SCHEFF: Richard Scheff for Michelle Nguyen.

MR. GROGAN: Could we also identify a second person on the phone, please? Is there --

MR. HERMAN: No, that's the --

MR. SCHEFF: He already did.

MR. ACKELSBERG: That was just this phone. All right.

MR. GROGAN: Swear in the witness, please.

MICHELLE NYUGEN

having been first duly sworn,

testified as follows:

EXAMINATION

BY MR. GROGAN:

Q. Good morning, Ms. Nguyen.

A. Good morning.

Q. Am I pronouncing your last name correctly?

A. Yes.

UNSEALED

App. 0506

1    Q.  Great.  Thank you.
2         Thanks for being here.  I'm sure you
3    would -- you'd rather be somewhere else.
4    A.  Yes.
5    Q.  But we do appreciate your time, and we'll
6    try to use it productively.
7         It would help me to know if you've been
8    deposed before.
9    A.  No, I have not.
10   Q.  Never.  Okay.  So let me go over some
11   ground rules that will help explain what's going on
12   here.  I'll be asking you questions throughout the
13   day.  Occasionally, I'll be showing you documents,
14   but it's mostly a question-and-answer session.
15        It's all being taken down by -- by
16   Christy, the court reporter, and she's creating the
17   official transcript.  What is written is the
18   official transcript.
19        We also have it videotaped.  So your
20   answers are being videotaped.  Because of that, it's
21   really important that you respond out loud to my
22   questions.  You and I may be able to understand
23   shrugs of the shoulders or -- or rolls of the eyes
24   or --
25   A.  Right.

1    Q.  -- head movements, but the court reporter
2    needs to hear your response.
3         Because we're trying to create a record,
4    the easiest thing to do is for us to try to
5    discipline ourselves; that I will try and state my
6    question fully and completely, and if you'll let me
7    get that out before you respond, that will be very
8    helpful.  In turn -- and this will be harder -- I
9    will try and let you finish your answer before I ask
10   the next question.
11        One wrinkle is that your counsel or one of
12   the other counsel right here may object to my
13   question.  In very limited circumstances where
14   you're instructed directly not to answer my question
15   question, you are obligated to answer my question
16   despite the objections.  So it usually works well if
17   I ask the question, and you give your counsel time
18   to object or one of the other lawyers time to object
19   before responding.  If we try to keep -- avoid
20   talking over one another, that will help make the
21   record clear.  Is that -- is that acceptable?
22   A.  Understood.
23   Q.  Good.  Good.
24        It's not a -- we will be here quite a
25   while.  I don't think we'll be here all day.  At

1    least I hope not.  I will try to move efficiently.
2    If you need a break at any time for any reason,
3    that's fine, just let us know.  We'll be taking
4    one -- we'll be taking breaks on our own initiative,
5    but if you need one, I'm happy to take it.  The only
6    thing I'd ask you to do, though, is answer any
7    pending questions before you take your break.
8    You're also free to consult with your counsel, but I
9    would ask you to answer the question before you do
10   that.
11        From my perspective, although perhaps not
12   Mr. Scheff's, this works best if this is a
13   conversation.  And for that reason, I am -- I am
14   interested in your truthful answers to the questions
15   that I've asked.  And it's my obligation to ask you
16   the questions, and for you to let me know if you
17   don't understand the questions.  It often will occur
18   that there's something about my question that you're
19   not understanding.  It may be because I don't
20   understand what I'm asking, or I don't understand
21   fully what I'm asking.  If you care to volunteer to
22   help me keep my question on track or to fill in the
23   blanks, I would appreciate it.  It helps things go
24   more smoothly.
25        Is there any reason today that you -- you

1    can't give your full attention and truthful answers?
2    Are you feeling ill, lack of sleep, or any kind of
3    medication that would impede you from giving your
4    best efforts this morning?
5    A.  No.
6    Q.  Okay.  Great.  Thank you.
7         Can I ask you who you spoke with in
8    preparation for today's deposition?
9    A.  My counsel.
10   Q.  Okay.  Have you spoken with anybody other
11   than your counsel?
12   A.  No.
13   Q.  Did you review any documents prior to
14   today's deposition?
15   A.  With my counsel.
16   Q.  Okay.  And what were those documents?
17   A.  I -- I can't recall all the specific
18   documents.
19   Q.  Did you -- do you recall reading any
20   deposition transcripts?
21   A.  No.
22   Q.  Did you read Mr. Harvison's transcript --
23   A.  No.
24   Q.  -- that was taken two days ago?
25        Okay.  Did counsel provide you those

UNSEALED          App. 0507

| Page 13 | Page 15 |
|---|---|

**Page 13**

1  documents?
2  A.  I'm sorry, which documents?
3  Q.  The documents you reviewed.
4  A.  Yes.
5  Q.  Okay.  Did you make any notes on those
6  documents?
7  A.  No.
8  Q.  Ms. Nguyen, what are you doing now for a
9  living?
10  A.  I work for a financial institution.
11  Q.  And what's the name of that company?
12  MR. SCHEFF:  She's not comfortable
13  disclosing the name.
14  BY MR. GROGAN:
15  Q.  That's fine.  And how long have you been
16  working there?
17  A.  Probably two years now.
18  Q.  Okay.  And what's your title there?
19  A.  Chief product officer.
20  Q.  Okay.  And what's the nature of that
21  company's business?
22  A.  It's a financial institution.
23  Q.  Okay.  And what kind of financial products
24  do they deal with?
25  MR. SCHEFF:  You can describe it

**Page 14**

1  generally.
2  A.  Online product loans.
3  BY MR. GROGAN:
4  Q.  Similar to the kind of work that was done
5  at Think Finance?
6  MR. SCHEFF:  You can answer generally.
7  A.  It's similar.
8  BY MR. GROGAN:
9  Q.  Okay.  And you say you've been there for
10  two years?
11  A.  That's correct.
12  Q.  And is that in the Dallas metro area,
13  generally speaking?
14  A.  That's correct.
15  Q.  Okay.  Why did you leave Think Finance?
16  A.  I left Think Finance because the -- the
17  management, specifically the -- I didn't see eye to
18  eye with the CEO.
19  Q.  Mr. Rees?
20  A.  No.  Martin Wong.
21  Q.  Mr. Wong?
22  A.  Correct.
23  Q.  I see.  Okay.  And so when did you leave
24  Think Finance?
25  A.  I believe it was November of 2014.

**Page 15**

1  Q.  Okay.
2  A.  2015?  2014?
3  MR. SCHEFF:  I think it was '15.
4  A.  2015.  Sorry.
5  BY MR. GROGAN:
6  Q.  2015?
7  A.  That's correct.  I'm sorry.
8  Q.  Okay.  And what were the nature of your
9  disagreements with Mr. Wong?
10  A.  We had personal differences.
11  Q.  I'm going to have to ask you to be a little
12  more specific about that, if you could.
13  MR. SCHEFF:  She can't.
14  MR. GROGAN:  Why can't she?
15  MR. SCHEFF:  Because she's a party to
16  an agreement which says that she can't disclose.
17  And so unless -- she just can't without a court
18  order.
19  MR. GROGAN:  Has there been litigation
20  with regard to her termination?
21  MR. SCHEFF:  No.
22  MR. GROGAN:  Or her --
23  BY MR. GROGAN:
24  Q.  Didn't say you were terminated.  Your
25  separation from the company?

**Page 16**

1  MR. SCHEFF:  No.
2  BY MR. GROGAN:
3  Q.  But you've entered into a formal agreement
4  with regard to that separation?
5  A.  That is correct.
6  Q.  Was there a period of time between leaving
7  Think Finance and your new company where you were
8  doing anything else?
9  A.  No.
10  Q.  How long was the period between leaving
11  Think Finance and starting at your present job?
12  A.  I would say about six months.
13  Q.  Okay.  And you were just home at that
14  point?
15  A.  That is correct.
16  Q.  Okay.  Where are you from?  From Texas?
17  A.  That's correct.
18  Q.  Where did you go to college?
19  A.  Local.  Southern Methodist University.
20  Q.  Have you done any post -- postgraduate
21  work?
22  A.  Yes.  I have an MBA at University of Texas
23  at Dallas.
24  Q.  When did you get that?
25  A.  Oh, my.  A while back.

UNSEALED

App. 0508

1    Q.   Okay.  When did you graduate from college?
2    A.   I graduated in '97.
3    Q.   Okay.  And what did you do after -- did you
4  go right to graduate school, or did you work?
5    A.   I worked.
6    Q.   What did you do?  Briefly --
7    A.   Sure.  I worked for a telecom company
8  called Nortel Networks.  After that, I was at a
9  startup.  And then after that, I was at Intuit.  And
10 then I ended up at Think Finance, previously called
11 PayDay One.
12   Q.   And were all of those jobs prior to PayDay
13 One, were they all in the marketing area, one way or
14 another?
15   A.   No.  Some of them were finance, as well.
16   Q.   Okay.
17   A.   Finance degree.
18   Q.   Which ones were finance?
19   A.   At Nortel Networks.
20   Q.   Okay.  What was your title there?
21   A.   When I left, I was a senior financial
22 analyst.
23   Q.   Okay.  And Nortel -- I'm sorry, was there
24 one between Nortel and PayDay One?
25   A.   There's two.

1    Q.   Okay.  Go ahead, fill me in on that again.
2    A.   There was a startup called iChoose.  And
3  then after that, there was Intuit.
4    Q.   What was the nature of business of iChoose?
5    A.   iChoose was an online software company.
6    Q.   Okay.  The next one?  I'm sorry.
7    A.   Intuit, the makers of TurboTax and
8  QuickBooks.
9    Q.   Okay.  Good.  And then you joined PayDay
10 One?
11   A.   That's correct.
12   Q.   And was that the name of the company that
13 you joined at that time?
14   A.   That's correct.
15   Q.   Okay.  How did you get there?
16   A.   At the startup, the -- the CEO of the
17 startup was actually also at PayDay One.  And so it
18 was a previous manager, if you will.
19   Q.   And who's that?
20   A.   Kevin Dahlstrom.
21   Q.   Okay.  So you knew Kevin from the previous
22 job?
23   A.   That's correct.
24   Q.   And did he recruit you to come to PayDay
25 One?

1    A.   That's correct.
2    Q.   Who did you meet with when you were
3  exploring that -- coming to work with PayDay One?
4    A.   Are you talking about the interview?
5    Q.   Uh-huh (affirmative response).
6    A.   I met with Kevin Dahlstrom, Jason Harvison,
7  Ken Rees, and probably someone in HR.
8    Q.   What was Mr. Dahlstrom's role in the
9  company at that point?
10   A.   Chief marketing officer.
11   Q.   And what was Mr. Harvison's role?
12   A.   He was SVP.  I can't recall the last part
13 of his title.
14   Q.   Okay.  And what was Mr. -- was Mr. Rees the
15 CEO at that point?
16   A.   That's correct.
17   Q.   Okay.  And was that -- what year was that?
18   A.   2006.
19   Q.   And what was the title of the job that you
20 were hired to undertake?
21   A.   Director of product.
22   Q.   Of product?
23   A.   Correct.
24   Q.   And did that have a vice presidential level
25 title, or just a directorship?

1    A.   It was director.
2    Q.   Okay.  And can you describe, generally,
3  what your duties were there at that -- in that first
4  role?
5    A.   In the first role, I was responsible for
6  the product roadmap for the internal products that
7  PayDay One had.  There were three products.
8    Q.   And what do you mean by an "internal
9  product"?
10   A.   State-by-state licensing.
11   Q.   State-by-state licensing.  Help me out.
12 What does that mean?
13   A.   They were payday products.  PayDay One is
14 one of the websites.  It was a state-by-state
15 lender.
16   Q.   Doing business in each state based on the
17 terms of that state's law?
18   A.   That is correct.
19   Q.   Okay.  And how -- you said there were three
20 products at that time.  And what were those
21 products?
22   A.   PayDay One, PayDay Okay, PayDay Select.
23   Q.   And generally speaking, if you can, what's
24 the difference between the three?
25   A.   The difference was the brand, as well as

UNSEALED

1  the marketing channel, as well as the -- the price
2  points for each of the -- the offerings.
3      Q.  How about PayDay One, what was the
4  marketing channel for PayDay One?
5      A.  At -- at which time?
6      Q.  When you started.
7      A.  When I started, it was just via search.
8      Q.  You were just out on the web, and the
9  customer had to find you?
10     A.  We would purchase paid search ads.
11     Q.  I see.  And the second product you
12  mentioned, it slips my mind already.
13     A.  PayDay Okay.
14     Q.  And what was the marketing channel for
15  PayDay Okay?
16     A.  That was also paid search ads at the time.
17     Q.  Okay.  And the last one again?  I'm sorry,
18  I won't remember.
19     A.  PayDay Select.
20     Q.  Yes.  What was the search -- or the
21  marketing channel for that?
22     A.  We refer to it as lead generation and
23  affiliate traffic.
24     Q.  Okay.  And who were you partnering with for
25  lead genera- -- or if you were partnering, who were

1  you partnering with for lead generation and
2  affiliate traffic?
3          MR. SCHEFF:  Object to the form.
4      You can answer the question.
5      A.  I -- I can't recall at that time.
6  BY MR. GROGAN:
7      Q.  And you talked about different price points
8  among these products.  What -- can you describe the
9  differences for us?
10     A.  PayDay Okay was the low price point leader,
11  was the -- the promise of that brand.
12     Q.  PayDay Okay.  And when you say "low price
13  point," from the perspective of a consumer, what
14  does that mean for the consumer?
15     A.  It would be lower than other competitors
16  with a similar offering online.
17     Q.  So a consumer with better credit might be
18  afforded an opportunity to -- to go through PayDay
19  Okay, or a consumer with worse credit?
20         MR. GATEWOOD:  Objection; form.
21  BY MR. GROGAN:
22     Q.  I'm trying to understand which part of the
23  market that product was aimed at.
24     A.  So from a marketing perspective, that was
25  the brand, in terms of PayDay Okay had a lower price

1  point versus the competitors.  From an underwriting
2  perspective, that was decided once a consumer
3  applied.
4      Q.  Okay.  And what were the criterion applied
5  to determine which of the payday products the
6  consumer eventually contracted with?
7      A.  I can't recall, because I was not
8  responsible for the underwriting at that time.
9      Q.  So here's what I'm trying to understand,
10 and maybe you can help me:  You had three products,
11 presumably addressed at slightly different consumer
12 segments.  Is that fair?  Were each of the products
13 targeted at a different consumer segment, or the
14 same consumer segment?
15         MR. SCHEFF:  Object to the form.
16     You can answer the question.
17     A.  So the -- each of the three products had a
18 different price point and a different brand message
19 for the consumers that were interested and they
20 would apply.
21 BY MR. GROGAN:
22     Q.  Okay.  And, again, I'm trying to understand
23 the characteristics of consumers who would be drawn
24 to one of the three.  How -- how would that -- how
25 did you understand that as a marketing person?  Who

1  was the typical customer of, say, PayDay Okay?
2          MR. SHELDON:  Object to the form.
3      You can answer the question.
4      A.  For PayDay Okay, a consumer may do a search
5  for a payday loan product, and the paid search ad
6  would appear.  And if they were interested in
7  identifying with that brand and looking for a lower
8  price point, then that would be the offering that
9  they would pursue.
10 BY MR. GROGAN:
11     Q.  And when you say "lower price point,"
12 meaning it would be cheaper for them to -- to obtain
13 credit from PayDay Okay than -- other products?
14     A.  That is correct.
15     Q.  Okay.  And I'm, again, trying to
16 understand -- in my admittedly superficial
17 understanding, I would think that pricing of credit
18 products depends, in part, on the creditworthiness
19 of the customer; that -- that is, a customer with
20 stronger credit would be able to get a cheaper loan.
21 Is that generally true?
22         MR. SCHEFF:  Object to form.
23         MR. GATEWOOD:  Objection; form.
24         MR. SCHEFF:  You can answer the
25 question.

UNSEALED

1  document?
2      A.  It's familiar.
3      Q.  Were you the author?
4      A.  No.
5      Q.  Okay.  In what context do you recall having
6  seen it?
7      A.  At a meeting.
8      Q.  Okay.  Again, this document doesn't bear a
9  date.  The metadata indicates that it was created in
10  November of 2010.  Do you have any -- now, you
11  notice there are similarities to the document we
12  just looked at, P-116?
13      A.  Correct.
14      Q.  It looks like page 2 is essentially the
15  same.  Do you recall whether this document came
16  after the document we saw at P-116?
17          MR. GATEWOOD:  Objection; form.
18      A.  I don't recall.
19  BY MR. GROGAN:
20      Q.  Was it -- was this a document used at a
21  subsequent meeting?
22          MR. GATEWOOD:  Objection; form.
23      A.  I would guess, yes.
24  BY MR. GROGAN:
25      Q.  Okay.  Couple of things on page 3 I want to

1  draw your attention to.  You see the term "ThinkCash
2  migration" again, and some of the other terms that
3  were used before, but a couple of new ones.  What
4  does "process stability" refer to?
5          MR. GATEWOOD:  Objection; form.
6      A.  From what I recall in reading the -- the
7  PowerPoint on page 6, it was internal process
8  improvements.
9  BY MR. GROGAN:
10      Q.  Internal to Think Finance?
11      A.  Internal to Think Finance, yeah.
12      Q.  Okay.  What is Roadrunner?
13      A.  Roadrunner, from what I recall, it was the --
14  the name of the initiative to upgrade our platform.
15      Q.  Okay.  And --
16      A.  Loan management platform.
17      Q.  Okay.  And was that initiative carried out?
18      A.  It was carried out.  It was not completed.
19      Q.  Okay.  That's the loan management platform
20  that we discussed earlier that had the PayDay One
21  products and the ThinkCash products?
22      A.  That was the -- the idea would be to
23  upgrade the platform that was currently being used.
24      Q.  Okay.  That's fine.
25          And take a look -- starting on page 4,

1  there are some initiatives that are assigned to
2  various staff persons.  I'm drawing your attention
3  to page 5, "Sovereign Nation site," which appears to
4  have been assigned to yourself and Jason Harvison.
5  Do you see that?
6      A.  I see that.
7      Q.  Do you recall being assigned responsibility
8  for an initiative referring to a sovereign nation
9  site?
10      A.  Yes.
11      Q.  Okay.  What did that mean?
12      A.  At this time, it was potentially working
13  with a sovereign nation.  And so for purposes of
14  working with a sovereign nation, let's have ideation
15  in terms of -- when I say "ideation," it's what
16  would the offering look like in order to have
17  discussions with a sovereign nation.
18      Q.  And by "sovereign nation," do you mean
19  Native American tribes?
20      A.  That's correct.
21      Q.  Okay.  You're also assigned the optimized
22  ThinkCash migration and enterprise value with
23  Mr. Harvison there.  Was the thought at this point
24  that it was -- might be possible to migrate some of
25  the ThinkCash customer base to a sovereign nation

1  site?
2          MR. GATEWOOD:  Objection; form.
3          MR. SCHEFF:  Object to the form.
4      A.  You know, from what I recall here, the idea
5  was, as I stated before, to -- for customers that
6  are paying off from a ThinkCash loan, and they
7  needed a new loan, then offer them the opportunity
8  to go to PayDay One if PayDay One was offered in
9  their state.
10  BY MR. GROGAN:
11      Q.  Okay.
12      A.  And we would present information about
13  PayDay One.
14      Q.  Okay.  And all the others?
15      A.  I'm sorry?
16      Q.  Those that couldn't go to PayDay One?
17      A.  I -- this -- as this was an initiative,
18  there was still discovery on what to do, what to
19  offer those customers.
20      Q.  And was one of the things you were
21  discovering whether or not it could be -- a
22  sovereign nation site might be an answer to that
23  problem?
24          MR. GATEWOOD:  Objection; form.
25          MR. SCHEFF:  Object to the form.

UNSEALED

App. 0511

1    A.  So at this time, we did not have any
2 discussions with sovereign nation, so I can't -- I
3 don't -- I don't see that as the tie.
4 BY MR. GROGAN:
5    Q.  Okay.  Now -- but there did come a time
6 when you had conversations with Native American
7 tribes; is that correct?
8    A.  That's correct.
9    Q.  And I think I'm done with that document.
10    When -- were you involved in any
11 conversations with -- with Native American tribes?
12    A.  Yes.
13    Q.  In this time frame?  And this would be the
14 end of 2010, the beginning of 2011.
15    A.  Yes.
16    Q.  Okay.  And you had been assigned the
17 sovereign nations responsibility along with
18 Mr. Harvison.  Did you -- did Mr. Harvison also
19 participate in those conversations with tribes?
20    A.  Some of them, correct.
21    Q.  Okay.  Who else from Think Finance
22 participated in those conversations?
23    A.  Do you mean the introductory meetings with
24 the tribes?
25    Q.  Yeah.

1    A.  It depended on everyone's availabilities.
2 So Jason sometimes.  Myself.  Chris Lutes.  Sarah
3 Cutrona.  Ken Rees.
4    Q.  Anybody else?
5    A.  I recall maybe a couple of meetings with
6 Steve Schafer.
7    Q.  Who's Steve Schafer?
8    A.  At that time -- in this time period, 2010,
9 2011, he was contracting with us from a business
10 development perspective.  We did not have a business
11 development organization, if you will.
12    Q.  Did he have any other relationship to Think
13 Finance?
14    A.  I don't recall at that exact time.  Later
15 on, he was -- I do recall him being a board member.
16 I don't recall the overlap of time.
17    Q.  But at this time, you're not aware that he
18 was a board member at the same time he was providing
19 these consultation services?
20    A.  No, I -- I didn't know.
21    Q.  And the initial context with the tribes,
22 where did you -- where did you find the tribes to
23 talk to?
24    A.  I wasn't part of -- of that discovery
25 process.  I was part of the visiting the tribe.

1    Q.  Okay.  So you just were told, "We're going
2 to go visit a tribe"?
3    A.  Yes.
4    Q.  And where did you go to visit?
5    A.  My first interaction with the individuals
6 with a tribe was in South Dakota.
7    Q.  And which tribe was that?
8    A.  You know, I'm sorry, I can't remember the
9 tribe itself.  We actually met with an individual
10 who was a tribal member.
11    Q.  Do you recall his or her name?
12    A.  Butch Webb.
13    Q.  Butch Webb.  Did anything come of those
14 conversations?
15    A.  We -- Jason Harvison was not part of that
16 conversation.  It was myself and some other
17 individuals.  We -- we met with Butch Webb, and he
18 was already also a lender with another offering
19 looking to -- looking to expand his offerings, and
20 we had conversations, but we decided not to partner
21 with Butch Webb.
22    Q.  Mr. Webb was associated with Western Sky,
23 as my colleague tells me.
24    A.  Okay.
25    Q.  Did you know that?

1    A.  I -- that does ring a bell.
2    Q.  Okay.  So that didn't pan out.  Who else
3 did you meet with?
4    A.  I met with the Chippewa tribe, I met with
5 the Otoe-Missouria tribe, and then eventually with
6 the Tunica-Biloxi tribe.
7    Q.  Right.  Those are the three tribes that did
8 eventually do business with Think Finance; is that
9 correct?
10    A.  That's correct.  I also met with other
11 tribes afterwards, as well.  So. . .
12    Q.  Okay.  Of those three, who did you meet
13 with first?
14    A.  The very first one, I said, was Butch Webb.
15    Q.  I understand.
16    A.  It wasn't a -- a tribe.  I can't recall if
17 it was Chippewa or if it was the Otoe.
18    Q.  Now, were you aware of Think Finance, in
19 addition to Mr. Schafer, using anybody else to help
20 identify tribes that might be interested in working
21 with Think Finance?
22    MR. GATEWOOD:  Objection; form.
23    A.  I was -- I was told of individuals.
24 BY MR. GROGAN:
25    Q.  Did you meet with somebody called Steven

UNSEALED

1 Haynes?
2     A. I did not meet with Steven Haynes in 2010,
3 2011.
4     Q. You didn't meet with him as part of the
5 process of interviewing tribes with?
6     A. I met with Mr. Haynes in 2014.
7     Q. Okay. Fine.
8         How about somebody called Rick Eckman? Do
9 you recognize that name?
10     A. Yes.
11     Q. Who is Rick Eckman?
12     A. He's an attorney with Pepper Hamilton.
13     Q. Was he at all involved in the process of
14 identifying tribes that you might work with?
15     A. I don't recall that specifically.
16     Q. Okay. When you traveled to -- did you
17 travel first to Oklahoma to the Otoe, or did you go
18 first to -- which tribe did you go first to?
19     A. I mean, I think as I stated earlier, I
20 can't recall if it was Chippewa or Otoe. They're so
21 far.
22     Q. Can you recall going to Box Elder, Montana?
23     A. I have been there. I can't recall the time
24 period. I only recall going to Butch Webb first
25 because it was my very first experience. That's why

1 I remember that.
2     Q. Do you recall that in -- in the process of
3 identifying tribes to work with, did you travel to
4 Montana, or was that at some later time?
5     A. I believe what I recall is a meeting and
6 traveling to Box Elder after an initial agreement
7 was -- was established.
8     Q. Did you ever travel to Las Vegas in
9 connection with meeting with tribes?
10     A. No, I did not.
11     Q. Do you know if anybody at Think Finance
12 did?
13     A. Yes.
14     Q. Who was that?
15     A. Jason Harvison.
16     Q. Okay. Was Jason spearheading this effort?
17         MR. GATEWOOD: Objection; form.
18     A. Which effort?
19 BY MR. GROGAN:
20     Q. The effort to identify tribes that you
21 might work with.
22     A. He was -- he was part of -- of that.
23     Q. Okay. And were you involved in the
24 negotiation of the terms with any of the tribes?
25     A. I was not involved in 2011.

1     Q. Okay. What was the purpose of your being
2 on these meeting -- in on these meetings?
3     A. My role was to discuss -- to have an
4 ideation discussion with that tribe about if they --
5 what their loan product would look like, talk about
6 our offering as a service provider, how we can
7 technically build something to their specifications,
8 the look, the feel, that the tribe would like that
9 would abide by that sovereign nation's essence, if
10 you will, as well as structuring the term of the
11 loan, the price point, the term, the loan amounts.
12     Q. Let's focus on your discussions with the
13 Otoe-Missouria tribe.
14     A. Okay.
15     Q. Was there any -- did they have any
16 consultants working with them?
17     A. Yes, they did.
18     Q. And who was that?
19     A. MacFarlane Group.
20     Q. And what is the MacFarlane Group?
21     A. They're a consulting company with the --
22 that managed the Otoes' other portfolio, which was
23 American Web Loan.
24     Q. I see. So the Otoe-Missouria tribe already
25 had a loan product?

1     A. That's correct.
2     Q. Okay. And was the MacFarlane -- were
3 MacFarlane people involved in -- in the discussions
4 from the beginning?
5     A. In the discussions with Otoe?
6     Q. No. With Think Finance and Otoe, yes.
7     A. They were part of that -- they were part of
8 the -- the meetings.
9     Q. Do you recall the names of the folks who
10 worked with MacFarlane?
11     A. Yes.
12     Q. And who were they?
13     A. Mark Curry. Eric -- it just escaped, the
14 name. It was our account -- Eric -- it's not --
15 Eric wasn't there, actually. John -- John Hurts.
16 Michael Page.
17     Q. Was Mr. Curry a principal at MacFarlane?
18 Are you aware?
19     A. I don't know the definition of the
20 "principal."
21     Q. Was he the owner?
22     A. My understanding, he was the owner.
23     Q. How about your trips -- or your
24 conversations with what became the Plain Green
25 group, the Chippewa tribe in Montana, did your first

UNSEALED

1  Q. Okay. Good.
2      With regard to Great Plains, was
3  MacFarlane still playing a role?
4  A. Correct.
5  Q. What was the role that they were playing
6  with Great Plains Lending?
7  A. As I mentioned, MacFarlane was already
8  working with Otoe. They had the other offering, the
9  American Web Loan product, but they also supported
10 the -- that tribe for back-end services, such as
11 hiring of the call center folks, HR, payroll,
12 their -- their books, if you will, the financials,
13 reconciling their P&L.
14 Q. Did Mobiloans or Plain Green have a similar
15 organization working with them?
16      MR. GATEWOOD: Objection; form.
17      MR. SCHEFF: Object to the form.
18 A. Plain Green did not have a back-end
19 consulting organization, that I was aware of. And
20 Mobiloans did not have one. Mobiloans would utilize
21 different vendors to assist because they were a
22 startup and they can't do everything in-house.
23 BY MR. GROGAN:
24 Q. Good.
25      Take a look at page 7, if you would.

1  These are benchmarks of what you think an industry
2  leader looked like? Is that a fair statement of
3  what this is trying to capture?
4  A. That's -- that's a fair statement.
5  Q. Okay. And, again, the same -- same drill:
6  If there's not a checkmark, that means it's missing
7  from that particular tribal product?
8      MR. SCHEFF: Object to the form.
9  A. If it was not a checkmark, then this is my
10 opinion --
11 BY MR. GROGAN:
12 Q. Okay.
13 A. -- of what was lacking and what needed to
14 be improved.
15 Q. Okay. And with regard to "stable and
16 scalable product with minimal compliance defects,"
17 that's -- Plain Green and GPL are okay, in your --
18 in your opinion, at that point?
19 A. That's correct.
20 Q. But Mobiloans was still challenged in that
21 area?
22 A. That's correct. I think -- you recall that
23 I said that we had utilized a different loan
24 management system, the CoreCard. Because it wasn't
25 built in-house, we didn't know all the ins and outs,

1  and so it caused some unacceptable defects that we
2  had to work through.
3  Q. Okay. But those defects would have been
4  caused by Think Finance difficulties, or -- or
5  deficits at Mobiloans?
6      MR. SCHEFF: Object to the form.
7  A. This line specifically was the platform
8  defects, and so it was the platform itself. You
9  know, it could be within the CoreCard build itself,
10 which is not something that was proprietary to Think
11 Finance. Or it could have been around the platform
12 itself that touched CoreCard. So it's both pieces.
13 BY MR. GROGAN:
14 Q. Right. But Mobiloans didn't have CoreCard
15 within their purview, right? That was something
16 that Think Finance had?
17      MR. GATEWOOD: Objection; form.
18 A. CoreCard is part of the platform that was
19 licensed to --
20 BY MR. GROGAN:
21 Q. Who licensed it?
22 A. Who licensed. . .
23 Q. CoreCard.
24 A. Oh, I don't -- I don't recall. I don't
25 know. I'd have to look at the contracts. I was --

1  Q. But was it Think Finance or Mobiloans?
2      MR. GATEWOOD: Objection; form.
3  BY MR. GROGAN:
4  Q. Or a Think Finance-related entity?
5      MR. GATEWOOD: Same objection.
6  A. I -- I don't know. That's a technical -- I
7  was not part of that.
8  BY MR. GROGAN:
9  Q. That's fine.
10     What was the metric that you were using in
11 determining whether there were minimal compliance
12 defects? Do you recall?
13     MR. GATEWOOD: Objection; form.
14 A. I don't -- there was not another piece of
15 paper that had 12 items. This is based on my
16 opinion from a product perspective and if there were
17 defects. Any defect as a platform provider is not
18 acceptable.
19 BY MR. GROGAN:
20 Q. And I just want to be clear. When you say
21 a "stable platform" in that -- that item, you're
22 talking about the technical loan platform, you're
23 not talking about, for instance, tribal leadership
24 or marketing --
25 A. I'm talking about the technical platform.

UNSEALED

App. 0514

1    Q.  Take a look at page 9, if you would.  And
2  here, I want to use this slide really to educate
3  myself about the way in which lead generation worked
4  across all three tribal products.  And we talked a
5  little bit about lead generation earlier.  And here
6  it says, "Today for DM" -- which I take it to be
7  "direct mail"?
8    A.  That's correct.
9    Q.  Okay.  -- "RISE takes first pass at DM
10  states, then split between the tribes."
11       And just -- can you explain what you meant
12  by that?
13    A.  So from what I recall, this is really in
14  regards to just direct mail -- a marketing channel,
15  not lead generation.  And as a marketing and risk
16  organization, we're able to identify a population of
17  customers to send a direct mail piece that was
18  both -- that will respond at a reasonable default
19  rate.  Those are our definitions.
20       And so from this statement, it indicated
21  that we would take the universe of customers that
22  would respond at a reasonable default rate, and RISE
23  would leverage those states first, and then the
24  remaining universe would be split between the three
25  tribes, from a marketing perspective.

1  offering.
2    Q.  Okay.  But why isn't it offered in all
3  states?
4    A.  RISE is offered in the states that allow
5  installment loans per legal analysis.
6    Q.  Okay.  So, for instance, RISE is not
7  offered in Pennsylvania -- or was not offered in
8  Pennsylvania?
9    A.  I mean, I'd have to go back and look at the
10  detail there --
11    Q.  You don't know that?
12    A.  -- at 2013.
13    Q.  You don't know that?
14    A.  I was working with Plain Green, Mobiloans,
15  and Great Plains.
16    Q.  Fair enough.
17       Would it be -- was RISE ever offered in a
18  state where one of the tribal products was also
19  offered?
20       MR. GATEWOOD:  Objection; form.
21    A.  Yes.
22  BY MR. GROGAN:
23    Q.  And what states would those be, if you
24  recall?
25    A.  Oh, I'm -- I can't recall all the states on

1    Q.  Okay.  First of all, let's define what RISE
2  is at this point.  This is -- this is July 2013.
3    A.  RISE is the -- at this time, was the -- the
4  direct lender installment loan offering.
5    Q.  Okay.  And that is -- is that the product
6  line that went to Elevate after the split?
7    A.  That's correct.
8    Q.  Or one of the product lines?
9    A.  That's correct.
10    Q.  Okay.  But you didn't have responsibility
11  for RISE?
12    A.  Not at this time.
13    Q.  Did you come to have responsibility for
14  RISE?
15    A.  In the early days, but not after.  I was
16  responsible for --
17    Q.  Okay.  So RISE is the installment loan
18  product that is directed at certain states.
19       MR. GATEWOOD:  Objection; form.
20  BY MR. GROGAN:
21    Q.  Is that correct?  Or is it offered in all
22  states?
23    A.  RISE is not offered in all states.
24    Q.  Why not?
25    A.  RISE is a state-by-state installment loan

1  the state list.  And I would have to compare --
2  unless you have something and we can look at it.
3    Q.  Well --
4    A.  It's all 50 states, and each state -- each
5  tribe had different states.
6    Q.  Was RISE offered in California?
7    A.  I believe so in 2013.
8    Q.  Okay.  Were any of the tribal products
9  offered in California?
10    A.  Yes.
11    Q.  Okay.  And they were competitors in that
12  context?
13    A.  Yes.
14    Q.  Okay.  All right.  You're talking about
15  direct mail here.  And who's underwriting the cost
16  of the direct mail?
17       MR. SCHEFF:  Object to the form.
18  BY MR. GROGAN:
19    Q.  Or a better -- less lawyerly way, who's
20  paying for direct mail here, the direct mail that's
21  discussed in this. . .
22    A.  What -- so there's different pieces of
23  cost?  What -- can you specify?
24    Q.  What I'm trying to get at is, the direct
25  mail -- the flow of direct mail that's being

UNSEALED

1  referenced here, this says half of it, RISE has
2  access to.  They get the first pass.  What did that
3  mean?
4         MR. SCHEFF:  Object to the form.
5     A.  You know, from what I recall, it's -- you
6  know RISE, as I said before, the -- we identify the
7  universe of consumers that are responsive and would
8  have a decent default, and then we would overlap
9  them with the RISE states, and then anything --
10  remainder, we would -- as this says, we would split
11  amongst the tribes.
12  BY MR. GROGAN:
13     Q.  Who's "we"?
14     A.  The -- as a marketing agency --
15     Q.  That's what you'd do?  You'd allocate them
16  first to RISE, and then if there were a remainder,
17  to tribal products; is that right?
18         MR. GATEWOOD:  Objection; form.
19     A.  We -- as -- you know, as I stated, we would
20  identify those for RISE, and then any of the
21  remainders, we would recommend splitting them up
22  between the other three tribes --
23  BY MR. GROGAN:
24     Q.  And how would you --
25     A.  -- or direct mail.

1     Q.  -- split them up -- how would you split
2  them up between the tribes?
3     A.  You know, it really depended on different
4  factors.
5     Q.  Like what factors?
6     A.  What the goals were for each of the tribes
7  in terms of the revenue growth, what each tribe
8  looked like in terms of their offering.  You know,
9  Great Plains had a higher APR, and so they were --
10  that product was inclined to take a riskier customer
11  base, as well as the other channels that the tribes
12  were interested in.  And so all of those came into
13  play when we talked about the direct mail pieces and
14  where they went.
15     Q.  Okay.  And who would get direct mail and
16  who wouldn't?
17     A.  Again, like, it's all of those factors that
18  I indicated.
19     Q.  Okay.  And you said one of the factors was
20  what the goals for the revenue growth of the
21  individual tribal products was.  Whose goals were
22  they?
23         MR. GATEWOOD:  Objection; form.
24     A.  In the beginning of each year, we would
25  meet with each of the tribes, because they're doing

1  their budget.  Or, actually, I would say the end of
2  the prior year for budget planning purposes.  And we
3  would talk to them about their revenue goals, and we
4  would back into:  Well, if you want X, then you need
5  Y type of customers at XZ assumption in terms of
6  revenue.
7         And so we would create a budget like any
8  organization.  We would work with them as a
9  marketing organization, and we'd say:  Okay, this is
10  your budget for X amount of customers.  We would try
11  to meet that with these different channels, whether
12  it be direct mail, or -- you know, for Great Plains,
13  it also included lead generation, paid search,
14  affiliate traffic.
15  BY MR. GROGAN:
16     Q.  Now, direct mail, by its nature, is an
17  invitation to a customer to respond to a particular
18  product offering; is that right?
19     A.  In general.
20     Q.  So there would be direct mail that would
21  say, "Please call RISE if you want a loan," right?
22  And there would be some direct mail that said,
23  "Please call Plain Green if you want a loan," right?
24         MR. GATEWOOD:  Objection; form.
25     A.  There's different versions of direct mail.

1  There could be a pre-approval.  There could be an
2  invitation to apply.  There could be another -- a
3  repeat customer direct mail piece to remind them of
4  the brand.
5  BY MR. GROGAN:
6     Q.  Right.  But they would all be
7  brand-specific, wouldn't they?
8     A.  That's correct.
9     Q.  Okay.  Okay.  So you're -- okay.  That's
10  fine.
11         It says, "No current differentiation
12  between other channels today.  Should other channels
13  follow DM volume split?"
14         And my first question is, what are the
15  other channels?
16     A.  I -- you know, the -- I -- I can't really
17  remember this -- this bullet point.  I mean. . .
18     Q.  Did you mean other marketing channels?
19     A.  Yes.  But I don't -- I can't remember why I
20  put this here.  Sorry.  I just really can't
21  remember.
22     Q.  Okay.  Well, what are -- what are the other
23  marketing channels?
24     A.  Paid search, lead generation.  Lead
25  generation was really only for Great Plains.

37 (Pages 145 to 148)

UNSEALED

 1    Affiliate traffic for all three.  And then there's
 2    repeat -- repeat customers are also considered a
 3    channel.
 4         Q.  This document was created for the executive
 5    offsite, right?
 6         A.  That's correct.
 7         Q.  Were tribal members or -- or
 8    representatives of Plain Green, Mobiloans, or Great
 9    Plains at that -- at those meetings?
10         A.  No.
11         Q.  Okay.  Now, "Items to consider," and you
12    have some characteristics of the three different
13    tribal lending organizations.  For instance,
14    Mobiloans is -- has "Strong political influence,"
15    "Lowest profit share," "Currently most profitable,
16    but will change as we lower pricing."
17           Now, what are these items to consider
18    relevant to?
19         A.  They were -- from what I'm thinking, from
20    what I recall, these items were relevant for
21    identifying the best channels for each of the
22    different portfolios.
23         Q.  I see.
24         A.  So an example would be that, you know, as
25    Mobiloans is currently the most profitable, but will

 1    change over lower pricing, I indicated that the
 2    tribe really wanted a rewards program, thus would
 3    lower the pricing.  To that end, a lead generation
 4    as a channel would not fit in terms of that
 5    Mobiloans offering, because typically lead
 6    generation has a higher default -- has a higher
 7    default with a lower price at the spread or the --
 8    and won't be profitable for that tribe.
 9         Q.  And when you're saying Mobiloans is
10    currently the most profitable, profitable to whom?
11         A.  I believe when I was writing this, it was
12    just in general, in terms of revenue minus the
13    losses.  So the interest revenue minus the losses.
14         Q.  But most profitable to Think Finance?
15           MR. GATEWOOD:  Objection; form.
16           MR. SCHEFF:  Object to the form.
17         A.  I -- I didn't say that.  I said profitable
18    as it pertains to -- I always looked at revenue
19    minus losses.  Keep it simple in terms of that.
20    BY MR. GROGAN:
21         Q.  Right.  But a profitable product -- a
22    profitable Mobiloans product is profitable for Think
23    Finance and Mobiloans, right?
24         A.  A profitable product is definitely
25    profitable for the Tunica tribe, absolutely.

 1         Q.  And for Think Finance?
 2         A.  No, we -- it all depended on, you know,
 3    each of the -- each of the contracts with each
 4    tribes were different.  But. . .
 5         Q.  I'm sorry, are you suggesting that a
 6    profitable Mobiloans product is not profitable to
 7    Think Finance?
 8         A.  No, I --
 9           MR. GATEWOOD:  Objection; form.
10           MR. SCHEFF:  Misstates the testimony.
11           MR. GROGAN:  Okay.  I'm just asking
12    for the clarity.
13           MR. SCHEFF:  Let's not play games
14    here.
15           MR. GROGAN:  Richard.
16           MR. SCHEFF:  You're just playing
17    games.  She -- you know she didn't say that.  Just
18    ask your question.
19           MR. GROGAN:  I'm just asking her to
20    clarify that.
21         A.  I -- I didn't say that.  I said --
22    BY MR. GROGAN:
23         Q.  Okay.  What did you say?
24         A.  -- profitable -- I said profitable equals
25    revenue minus the losses, and that would be

 1    profitable for the tribe.  And as a service
 2    provider, we wanted to make sure that each of our
 3    tribes were profitable and meeting their budgets.
 4         Q.  Because it was profitable to Think Finance,
 5    right?
 6           MR. SCHEFF:  Object to the form;
 7    misstates the testimony.
 8    BY MR. GROGAN:
 9         Q.  Okay.  With regard to Mobiloans, it says
10    "lowest profit share."  What does that refer to?
11         A.  I believe that refers to the -- their
12    profit share of the agreements.
13         Q.  So they -- they're receiving the lowest
14    profit share of -- relative to the other two tribal
15    products?
16         A.  That -- this is relative to the other two
17    tribal products.
18         Q.  And are we talking about the revenue share?
19         A.  This is profit share.
20         Q.  Okay.
21         A.  But it's probably misstated.
22         Q.  Okay.  It says profit share, but do you
23    think it referred to revenue share?
24           MR. SCHEFF:  Object to the form.
25           You can answer the question.

UNSEALED

1    A.  I probably misstated.
2  BY MR. GROGAN:
3    Q.  Okay.  But I'm just trying to understand
4  that -- the tribes profited -- the tribal lending
5  entities profited both from the -- the 1 percent --
6  the gain on the 1 percent of the loans that they
7  retained, right, after the sale of 99 percent to
8  GPLS, correct?
9        MR. GATEWOOD:  Objection; form.
10       MR. SCHEFF:  Object to the form.
11   A.  Each tribe was different in terms of their
12  participation and how much they held and the end
13  state.
14  BY MR. GROGAN:
15   Q.  Okay.
16   A.  And they did -- they would participate it
17  out to GPLS.
18   Q.  Okay.  And they also shared -- in addition
19  to whatever stake they retained participation in the
20  loan, they also shared through a revenue share
21  after -- from GPLS after the expenses were cleared;
22  is that correct?
23       MR. GATEWOOD:  Objection; form.
24   A.  From what I recall, the -- each of the
25  tribes would gain revenue from a revenue share

1  perspective.
2  BY MR. GROGAN:
3    Q.  Okay.  All right.  Why would the -- the
4  Mobiloans political influence be relevant to
5  consider in what kind of direct mail or marketing
6  channel flow they should get?
7    A.  You know, I can't recall why I put that in
8  here.  I apologize, I just -- I don't know why.
9    Q.  That's fine.
10   A.  It's been so long.
11   Q.  That's fine.
12       With regard to Plain Green, it says "large
13  portfolio."  Were they the largest in terms of
14  volume -- volume of loans among the three tribal
15  products?
16   A.  I think what I meant here in 2013 was that
17  they had the largest outstandings.
18   Q.  Okay.  Is that different than having the
19  largest loan volume?
20   A.  Yes.
21   Q.  How so?
22   A.  Outstandings is comprised of customers,
23  which is loans, but also in terms of the dollar
24  amount lent.
25   Q.  I see.  But they're "currently the least

1  stable tribe."  What did you mean by that?
2    A.  This is in 2013, so it was probably due to
3  the change of the -- their -- their chairman and the
4  council.  Tribal council.
5    Q.  And how is that relevant to what kind of
6  marketing channels and direct mail share they could
7  get?
8    A.  I can't recall.  I think it's the same as
9  the political influence.  I don't know why I put
10  that, other than maybe it's items to consider for
11  discussion.  I don't -- I really can't recall why I
12  put that in there as it ties to that.
13   Q.  Okay.  And "GPL's profit share is
14  negotiable."  What does that mean?
15   A.  I don't know why I put "negotiable" either.
16  Their -- their structure was different than Plain
17  Green and Mobiloans.  So I don't know why I put
18  "negotiable."  I don't believe at the time, the
19  contracts were up.  So. . .
20   Q.  Okay.  If you turn to page 10, there's a
21  "Discussion," with a question mark, "Another tribe."
22   A.  Uh-huh (affirmative response).
23   Q.  And at this particular offsite, were you
24  discussing whether another tribe was a desirable
25  partnership with -- strike that.

1        Were you discussing looking for another
2  tribal relationship?
3    A.  It would appear so.
4    Q.  Okay.  Why would you do that?
5    A.  You know, I think the -- as a service
6  provider, we were considering, you know, these other
7  two have evolved and they're not in startup mode,
8  and so do we have the bandwidth to -- you know,
9  bring up a -- start up -- have another startup with
10  another tribe, because we do realize that there
11  were -- there might be other opportunities out
12  there.
13   Q.  Okay.  I just want to be clear.  You said
14  that the two other had evolved and were no longer in
15  startup mode.  Which two are you referring to?
16   A.  No, I didn't mean to say two.  I said the
17  others over two years have evolved.
18   Q.  Okay.
19   A.  I didn't mean two, as two tribes.
20   Q.  Okay.  So you meant all three tribal
21  products?
22   A.  Correct.
23   Q.  Okay.  And they evolved to a point that
24  would allow them to do what?
25   A.  I had indicated that they had evolved, but

UNSEALED

App. 0518

1  they're not in startup mode, and so they were
2  already taking on tasks on their own. They were --
3  a lot of them were in different stages of startup,
4  meaning they were proficient in other areas. And so
5  allowed Think Finance to leverage those -- the
6  platform as a service provider.
7      Q. Fine.
8         What does it mean to say "as backup for
9  Plain Green"?
10     A. I believe at this time, there was
11 consideration that because of the tribal council --
12 as I indicated, that the chairmans -- there was
13 issues there. I think there was concern that would
14 Plain Green still be in existence due to the -- the
15 tribal council's change.
16     Q. And -- okay. So there was a concern that
17 they might -- they might exit the market for one
18 reason or another?
19     A. Correct.
20     Q. Okay. "Participate in a fund versus GPLS."
21 Do you know what -- do you know what that means?
22     A. I believe what I wrote here was: Is there
23 an opportunity to work with another entity other
24 than GPLS?
25     Q. Okay. Because at this point, GPLS is the

1  there was a concept of: Do we utilize Nortridge as
2  a different platform for the loan management system
3  to incorporate into our overall platform schema, if
4  you will.
5      Q. Okay. And did you go ahead with that and
6  create a third platform?
7      A. Not when I was there.
8      Q. Okay. So the -- the Nortridge platform was
9  never brought into -- into use in your time?
10     A. That's correct.
11     Q. Okay. Which platform had RISE on it at
12 this time?
13     A. At this time, the platform that the
14 installment loan programs were on.
15     Q. The Great Plains and Plain Green?
16     A. That's correct.
17     Q. So not CoreCard, the -- the old --
18     A. That's right.
19     Q. Okay. And it says here, "ILP," which I
20 understand to be "installment loan programs"?
21     A. Yes.
22     Q. Okay. They're on the Legacy platform, and
23 it's stable; is that --
24     A. Yes.
25     Q. Okay. And the legacy platform is the old

1  entity which is buying participations from each of
2  the three tribal products; is that correct?
3      A. From my understanding, GPLS was
4  participating with each of the tribes.
5      Q. Okay. And there's nobody else purchasing
6  participations other than GPLS; is that correct?
7      A. I'm not aware of other individuals that
8  were participating in -- in the tribe's portfolios.
9      Q. So is it fair to say that that line refers
10 to the -- the thought experiment about whether
11 another way of purchasing participations through
12 another fund, not GPLS, might be considered?
13         MR. GATEWOOD: Objection; form.
14     A. I think, like I stated before, it was in
15 consideration of a different fund other than GPLS or
16 a different tribe.
17 BY MR. GROGAN:
18     Q. Okay. I'm sorry, I know this is tedious,
19 but this is an important document to us.
20        If you look at page 11. And my question
21 is really just, what is Nortridge?
22     A. Nortridge is a different loan management
23 system. I had mentioned CoreCard. I had mentioned
24 that we had our own internal platform. We're not
25 happy with CoreCard, as I indicated earlier, and so

1  platform where PDO and ThinkCash resided way back?
2         MR. SCHEFF: Object to the form.
3      A. We would call the legacy platform as the
4  original platform. And, correct, PayDay One and
5  ThinkCash utilized that platform.
6  BY MR. GROGAN:
7      Q. What does it mean, "Do you invest minimum
8  number of enhancements and redirect resources to
9  direct products?" And let me ask a further
10 question. What is a direct product in that context?
11     A. I believe I was referring to the RISE
12 product.
13     Q. Okay. And you're -- "invest minimum number
14 of enhancements," enhancements in what?
15     A. Enhancements in the Legacy platform.
16     Q. Okay. And "redirect resources to the RISE
17 product"?
18     A. In order to build out the -- the new
19 platform with Nortridge.
20     Q. I see. So move resources from the existing
21 platform, and redirect it to the RISE products?
22     A. No.
23     Q. Okay.
24     A. That's not what I meant.
25     Q. All right. What did you mean? I'm sorry.

UNSEALED

1    A.  So technically, when you're talking about
2  an IT platform, and if it's a legacy and if it's
3  stable, and you know that you want to enhance it,
4  then you would make sure it's stable, and then
5  direct your resources to a new -- a new platform
6  while you build it up.
7       You don't want to move all of your
8  offerings, regardless of your organization, because
9  that's not -- that's not wise.  You want to solely
10  put one offering on it, make sure it's stable, and
11  then move your -- move the other offerings onto that
12  platform, because it's a new platform.
13       And so the -- this whole area is about a
14  discussion of moving off of the old platform and
15  creating a new platform and what's the best
16  mechanism to do that to make sure that it -- there's
17  no interruptions in service with our current
18  providers -- or current lenders.
19    Q.  Right.  But the only product that would
20  reside on the new platform would be RISE?
21    A.  No, that's not what I was stating here.
22    Q.  Okay.
23    A.  It was part of a -- you know, a strategy
24  to -- to optimize and make sure that there's no
25  interruption of -- of service for any of our

1  lenders.
2    Q.  Okay.  And why is it that Mobiloans still
3  needs to move?  Why did they need to move?
4    A.  I think as I indicated before, they were
5  utilizing CoreCard.  CoreCard has some issues.  It
6  wasn't built internally, and we were not happy with
7  CoreCard.  And the -- that means that we would need
8  to move them off of that platform onto the -- the
9  concept would be Nortridge.
10    Q.  And do you know whether Mobiloans was moved
11  off of CoreCard?
12    A.  I -- I didn't keep up with the technology,
13  so I don't know the ones after I left.
14    Q.  Okay.  And do you know whether enhancements
15  were made to the legacy platform?
16    A.  Since I left in 2014?
17    Q.  No.  I mean since the date of this
18  document.
19    A.  Yes, I'm sure there were.
20    Q.  Okay.  Take a look at 12.  We're now
21  talking about customer and product segmentation.
22  "Do we tailor each product to that need?"  And then
23  it gives examples that, "Great Plains is for those
24  that need a second chance.  RISE for those that want
25  to make their own comeback."  And, "Mobiloans for

1  those that do need funds more frequently."
2       And I just want to ask you, what's the
3  source for the characterization -- characterization
4  of the customer base for each of these products?
5  Where does that come from?
6    A.  You know, I think this was more of a
7  discussion item, so those were examples.  I didn't
8  utilize a source in order to come up with the
9  examples.  This is purely a brand exercise.  And
10  those were examples for discussions, and then
11  eventually got pitched to the tribes of, you know,
12  here's ideas for repositioning your brands as the
13  marketing agent.
14    Q.  Okay.  And what is it about the Great
15  Plains product that made them -- the
16  brand-of-a-second-chance sort of work, in your mind?
17    A.  I didn't say that -- that ended up coming
18  to fruition.  So. . .
19    Q.  I understand.  But why would you even think
20  it might?
21    A.  I think as I indicated before, Great Plains
22  was a higher APR offering, and they were able to
23  attract customers that might have had higher losses.
24    Q.  And is it fair to say that Mobiloans, for
25  reasons we don't need to go into, was just able to

1  make funding decisions and get cash in people's
2  pockets more quickly than the other products?
3       MR. GATEWOOD:  Objection; form.
4    A.  Mobiloans is a line of credit.  And as a
5  line of credit, it's a different -- it looks
6  different.  It's an open loan.  It's an open loan
7  credit, just like a -- we call it a card -- a credit
8  card without the card.  So you don't -- you always
9  have funds just like your own credit card --
10  BY MR. GROGAN:
11    Q.  So it gets --
12    A.  -- and you can utilize it.
13    Q.  People can get to it faster?
14    A.  It's -- it's not a closed loan --
15  installment loan.  It's different.
16    Q.  And "RISE for those who want to make their
17  own comeback."  What -- what were you thinking
18  there?
19    A.  Oh.  This is the infancy of RISE.  I think
20  it's really just tied to the brand, and concept of
21  rocky and so forth.
22    Q.  But, again, you're seeing -- or at least
23  this example makes -- seems to indicate that you're
24  thinking of these products as serving different
25  segments of the consumer market; is that correct?

UNSEALED

App. 0520

1       MR. GATEWOOD:  Objection; form.
2       A.   From what I recall, this was purposes of --
3   for discussion items, and, you know, is there an
4   opportunity to reposition the brands.
5   BY MR. GROGAN:
6       Q.   But repositioning them at different
7   segments of the -- of the market?
8       MR. GATEWOOD:  Same objection.
9       A.   Again, it's repositioning it, and then
10  discussing these items with the tribes and get their
11  feedback as a marketing agent.
12  BY MR. GROGAN:
13      Q.   But repositioning them with regard to
14  different segments of the consumer markets?
15      MR. GATEWOOD:  Objection; form.
16      MR. SCHEFF:  Object to the form.
17      A.   Again, it says "customer and product
18  discussion item."  And so this is -- these were --
19  it's an ideation session.  So it's repositioning it
20  from a brand perspective, and different customers,
21  if that makes sense to them, if it resonates to
22  them. . .
23  BY MR. GROGAN:
24      Q.   Okay.  I understand these are just
25  examples.  Is -- is there any reason why Plain Green

1   is not characterized in some way here?
2       A.   I can't recall.  I think these were just
3   examples for discussion.
4       Q.   Okay.  Thank you.  If we could turn to
5   Document D, please.
6       MR. SCHEFF:  John, we've been going
7   about an hour and ten minutes.
8       MR. GROGAN:  What time is it?
9       MR. SCHEFF:  12:35.
10      MR. GROGAN:  Are we having lunch
11  provided, or. . .
12      MR. SCHEFF:  I guess.  I don't know.
13  Did you make any arrangements?  Because I didn't.
14      MR. GROGAN:  No.  This is an okay
15  time.  If people need lunch now, that's fine.
16      MR. SCHEFF:  Okay.
17      THE VIDEOGRAPHER:  Go off the record?
18      MR. GROGAN:  Yes.
19      THE VIDEOGRAPHER:  We are off the
20  record at 12:34 p.m.
21      (Break taken, 12:34 p.m. to 1:20 p.m.)
22      THE VIDEOGRAPHER:  We're back on the
23  record.  The time is 1:20 p.m.
24  BY MR. GROGAN:
25      Q.   Welcome back, Ms. Nyugen.  Thank you,

1   again, for your patience.
2       I want to introduce a new document for our
3   discussion, and this is going to be Plaintiff's
4   Exhibit 180.  It's a very large exhibit.  You may
5   look at as much of it as you need to, but I will
6   preface my remarks by saying that I have a question
7   about what's on page 27, I think, is the only --
8   only part of this document that I'm concerned with.
9       (Exhibit No. P-180 marked.)
10      MR. SCHEFF:  I'm sorry, you said 27?
11      MR. GROGAN:  Page 27.
12      MR. SCHEFF:  What's the Bates on that?
13  Because these don't appear to be numbered.
14      MR. GROGAN:  Hold on.
15      MR. SCHEFF:  Michelle, look at as much
16  of this as you need to.
17      Oh, I'm sorry.
18      MR. GROGAN:  Yeah, it's pretty clear.
19      MR. SCHEFF:  It is -- they have --
20  they have numbers.  Never mind.  Got it.
21      A.   (Reviews document.)
22      27?  Is that right?
23  BY MR. GROGAN:
24      Q.   Page 27, yes.  The PowerPoint 27.
25      Have you studied under Dean Smith,

1   Ms. Nguyen?  Never mind.  Strike that.  I'm sorry.
2   I couldn't resist.
3       Take a look at the first page.  I'm sorry,
4   I told you 27, but if you look at the cover of the
5   document --
6       A.   This --
7       Q.   Not the e-mail transmittal, but the cover
8   of the PowerPoint.
9       A.   Okay.
10      Q.   Do you recall this document?
11      A.   I recall the document.
12      Q.   All right.  Are you the author of this
13  document?
14      A.   I am author of the majority of this
15  document.
16      Q.   Okay.  Fine.
17      And what was this document used for?  Do
18  you recall?
19      A.   I believe this was a meeting that we met
20  with the council.  I think we had indicated before
21  that I speak to different tribal members every
22  single day.  We also had an opportunity to go out
23  there, and we made it a point of at least meeting
24  with each of the councils once a quarter.  And so
25  this is an example of meeting with the council as a

UNSEALED

1    A.  That's correct.
2    Q.  And was -- from Think Finance's
3  perspective, were you noticing that ACH providers
4  were pulling away?
5    A.  Yes.
6    Q.  From working with the tribal products?
7    A.  I believe so at this time.
8    Q.  Okay.  Mr. Rees says he's having --
9  "hearing from VPC tomorrow."  Why does VPC have a
10  role to play here?
11      MR. SCHEFF:  Object to the form.
12    A.  I think we had discussed before, you know,
13  as a service provider and -- and VPC and GPLS in
14  terms of participating in the portfolios with the
15  tribes, and so if there was concern from VPC in
16  terms of participating in future portfolio, then the
17  tribes would need to be aware of that as it pertains
18  to their growth.
19  BY MR. GROGAN:
20    Q.  Did VPC take the position that they were no
21  longer going to purchase participations in the -- in
22  the tribal products at this time?
23      MR. SHAPIRO:  Object to form.
24    A.  I think when I read through this, there
25  was -- the -- loan volume continued to remain

1  on.  So from what I recall, there wasn't. . .
2  BY MR. GROGAN:
3    Q.  Well, let's look at that.  If you move
4  forward in the exchange, on October 3rd, you write,
5  "No new loans for tribal.  Former loans can remain
6  on.  Refi/draws remain on.  No marketing to formers
7  or news.  We still need to communicate to the
8  tribes, but please begin the process.  Let us know
9  if you have any questions."
10      What are you informing people of there?
11    A.  At this time, in -- on October 3rd,
12  recent -- recent decisions that, as you -- we can
13  see later have changed, but at that time, it -- it
14  looked like former loans can remain for the three
15  tribal entities.
16    Q.  Who's making these decisions?
17      MR. SHAPIRO:  Form.
18    A.  This -- from what I recall, it was
19  conversations that we were having back and forth
20  with VPC, as well as the tribes, in terms of the
21  impact and negotiations.  That's why they continued
22  to change.
23  BY MR. GROGAN:
24    Q.  And it was a fluid situation?
25    A.  Absolutely.

1    Q.  And -- and it was depending on your
2  conversations with VPC?
3      MR. SHAPIRO:  Objection to form and
4  inconsistent with her testimony.
5    A.  Yeah, as I mentioned before, it was, you
6  know, internal discussions with VPC, GPLS, as well
7  as the tribes, and ongoing negotiations of what the
8  impact is to --
9  BY MR. GROGAN:
10    Q.  Okay.  So it says -- let's skip to the
11  beginning -- I'm sorry, the first page of the
12  exhibit.  The bottom -- you're writing now, the next
13  day, October 4th, "All:  Good news for MBL.  We are
14  working with VPC to keep MBL new customer volume on,
15  in addition to formers.  As long as marketing
16  remains off, organic traffic okay.  So that means we
17  leave as is.  We still need the firm okay from VPC,
18  so hold tight, and we'll keep you posted."
19      Do you recall that?
20    A.  Yes.
21    Q.  Okay.  What is it that VPC is going to okay
22  that you're waiting for?
23    A.  From what I recall, is the ongoing intent
24  to participate in the portfolio.
25    Q.  Through purchases by GPLS?

1    A.  They were going to participate with the
2  Mobiloans portfolio via GPLS.
3    Q.  Okay.  And what would have been the effect
4  on tribal -- on the three tribal products had VPC
5  determined that GPLS was not going to participate?
6      MR. SHAPIRO:  Objection; calls for
7  speculation.
8    A.  You know, I think that would depend on the
9  tribes and what they needed to do in terms of the
10  next steps.
11  BY MR. GROGAN:
12    Q.  And yet in anticipation of that, you were
13  ready to turn off all marketing for new loans; is
14  that correct?
15    A.  You know, as a platform provider,
16  everything is -- we're always ready to make quick
17  changes, but nothing would occur until we have
18  the -- the approval of the tribe.
19    Q.  I understand that.  But it's -- on
20  October 3rd, you're believing that the position will
21  be "no new loans for tribal."  And does that mean
22  for all three tribal products?
23    A.  At this -- on October 3rd, at this time
24  period, "no new loans for tribal" would be for all
25  three tribes.

UNSEALED

1   Q.  If VPC decided that GPLS was not going to
2 participate and buy participations in tribal
3 products?
4          MR. SHAPIRO:  Object to form.
5   A.  The way -- and, again, this is all
6 shorthand.  I was trying to communicate that there's
7 a possibility of no new loans for the tribes.  If
8 GPLS didn't participate and if the -- the tribes
9 were not able to find -- or if they wanted to
10 continue on or find another funding source.
11 BY MR. GROGAN:
12   Q.  Okay.  But it was VPC that was going to
13 make that decision for GPLS?
14          MR. SHAPIRO:  Objection; form.
15   A.  Which -- sorry.
16 BY MR. GROGAN:
17   Q.  Well, it's VPC that you're waiting to hear
18 from on -- on how this is going to turn out; isn't
19 that correct?
20   A.  Only as it pertains to the participation,
21 if they were going to continue participation in the
22 portfolio, not as it pertains to whether or not the
23 tribes would continue to provide new -- more loans.
24   Q.  I see.  Are you aware that the tribes had
25 the wherewithal to provide loans without GPLS?

1   A.  In 2013?
2   Q.  Yeah.
3   A.  I was not part of each of the tribes, and I
4 don't understand their budgets.  So they possibly
5 could have.
6   Q.  Okay.  But you were prepared to order, on
7 October 3rd, that there be no new tribal loans; is
8 that correct?
9   A.  Worst case scenario, trying to line
10 everybody up in a large organization.
11   Q.  Okay.  And as it worked out, at least at
12 this particular juncture --
13   A.  I did say please -- you know, please pause --
14 start the process, but we still need to have
15 discussions with the tribes.
16   Q.  Okay.  And as it worked out, you're writing
17 on October 4th to a large group of people, "Okay.
18 We are all good to go -- we are good to go with all
19 tribal as follows:  New loan volume, leave on.  No
20 active marketing."  Is that -- did I read that
21 right?
22   A.  Yes.
23   Q.  "Former loan volume, leave on.  No active
24 marketing."
25   A.  Yes.

1   Q.  Okay.  Why are you suspending marketing?
2   A.  What I recall from the discussions with all
3 the parties was, let's continue to leave the volume
4 on as we assess what's happening with the operation
5 checkpoint and not -- not perform active marketing,
6 but allow customers to naturally find their way to
7 the -- the different portfolios.
8   Q.  Okay.  And I should have asked this
9 earlier, but earlier on the 4th, at 1:00, you are
10 reporting, "Good news for MBL."  In the other parts
11 of the e-mail, you're talking about "all tribal,"
12 but why are you singling out MBL here?
13   A.  From what I recall, this was a very fluid
14 process, and so as I got new news, I was sharing it
15 with a larger team.  And so in this example, it was
16 an update as it pertains to Mobiloans.
17   Q.  It says, "We are working with VPC to keep
18 MBL new customer volume on."
19       At that point, were you working with VPC
20 to keep Plain Green and Great Plains Lending on too,
21 or just MBL?
22   A.  Oh.  All three.
23   Q.  Okay.  Yeah, why was the ACH service so
24 critical to the model that you -- that if you had
25 lost it, you wouldn't -- you would consider not --

1 not lending anymore?
2          MR. GATEWOOD:  Objection; form.
3          MR. SCHEFF:  Object to the form.
4   A.  The services we provide is an online
5 service with -- the premise is to deposit your funds
6 the next business day via ACH.  And so if there's
7 not an ACH provider, you cannot deposit the funds
8 into the consumer's account the next business day as
9 communicated to the customers, Part 1.
10       Part 2 is, you know, we offer the ability
11 for consumers to pay back via ACH, and that would
12 not exist if there's not an ACH provider.
13 BY MR. GROGAN:
14   Q.  What percentage of consumers used ACH as
15 the means to pay back?
16   A.  What product?  What time period?  I. . .
17   Q.  Okay.  Let's -- Great Plains.
18   A.  I -- you know, ACH occurs multiple ways.
19 It's recurring ACH.  They can call in and make a
20 one-time payment via ACH.  There is also debit card
21 payments, as well as sending in paper checks, money
22 orders.
23   Q.  Right.  My question was, what percentage,
24 if you know, of consumers of, say, Plain Green used
25 the ACH process?

1      A.   For purposes of funding or payments?
2      Payments.
3      A.   You know, it's been so long, I don't have
4    the -- the numbers in each of them.  2013, I can't --
5      Q.   Okay.  But --
6      A.   -- recall.
7      Q.   -- did most of them use that, or was that a
8    fairly rare way?
9           MR. SCHEFF:  Object to the form.
10     A.   From what I recall, a number of customers
11   utilized ACH.
12          MR. GROGAN:  Okay.  All right.  Can we
13   go to document Y?
14          This will be Plaintiff's Exhibit 190.
15          (Exhibit No. P-190 marked.)
16     A.   (Reviews document.)
17   BY MR. GROGAN:
18     Q.   All set?
19     A.   Yes.
20     Q.   Good.  Do you recognize this e-mail
21   exchange?
22     A.   Yes.
23     Q.   Okay.  Let's start again at the back, if
24   you could.  As I read it, this starts with an e-mail
25   from Tom Welch to Mr. Lutes, in which he states that

1    Mr. Williams, a John Williams, "would like to take a
2    look at the latest and greatest consumer loan
3    agreements for all three tribes."
4           Do you know who John Williams was?
5      A.   I believe he was an attorney.
6      Q.   Working for whom?
7      A.   I believe he was working for VPC.
8      Q.   Okay.  And the next e-mail is from you to
9    Mr. Lutes and Mr. Welch, attaching consumer loan
10   agreements.  Did Mr. Lutes ask you to obtain those
11   for Mr. Welch?
12     A.   Yes.
13     Q.   Okay.  And then if you turn to the next
14   page going forward, there's a letter -- there's an
15   e-mail from Sarah Fagin Cutrona to Tom Welch, in
16   which you were copied.  And what she's asking, "Tom,
17   any further for us to walk through the term sheet or
18   a need for a joint call with Katten DC and Katten
19   Chicago early next week?"
20          Do you understand what that's about?
21     A.   I believe this was part of -- to
22   renegotiate with the tribes.
23     Q.   This is May 2013.  And there's a discussion
24   on which -- Katten DC and Katten Chicago.  Who's
25   Katten?

1      A.   I believe that was the -- the firm.
2      Q.   Which firm?
3      A.   Law firm for VPC.
4      Q.   For VPC?
5           MR. SHAPIRO:  Objection; form and
6    foundation.
7    BY MR. GROGAN:
8      Q.   Okay.  On the front page, there's another
9    e-mail from Mr. Lutes to Mr. Welch, and you're CC'd,
10   which includes an e-mail from Mr. Welch back to
11   Mr. -- I'm not sure who Mr. Welch is writing to.
12   But he said, "I spoke with Chris and Ken this a m.
13   We are shooting for and all-hands call next
14   Wednesday to walk through the proposed changes.  I
15   will circulate potential times tomorrow/early next
16   week."
17          My question is, if you know, what are the
18   changes that they're talking about?
19     A.   Oh, I don't -- I don't know.
20     Q.   Okay.  And then it says -- above that,
21   Mr. Lutes writes to Mr. Welch, CC'ing you, "Sarah,
22   the call will" -- and also Ms. Cutrona, "Sarah, the
23   call will exclude Rick Eckman.  Just VPC, Katten,
24   John Williams, Claudia, and us."
25          Who's Rick Eckman?

1      A.   Rick Eckman is the attorney for Plain
2    Green.
3      Q.   For Plain Green.  Is he the attorney for
4    anybody else?
5      A.   2013.  I don't think so.
6      Q.   Okay.  And we know who Mr. Williams is.  Do
7    you know who Claudia is?
8      A.   Claudia is an attorney, I believe, with
9    Katten.
10     Q.   Okay.  And who is Claudia working for?
11          MR. SHAPIRO:  Objection to the form.
12     A.   I believe Claudia was working with Katten.
13   BY MR. GROGAN:
14     Q.   Okay.  And -- for VPC?
15          MR. SHAPIRO:  Objection; form.
16   BY MR. GROGAN:
17     Q.   Or for some other party?  If you know.
18     A.   I can't recall.
19     Q.   Okay.  And do you have any idea why they
20   want to exclude Mr. Eckman from the call?
21          MR. GATEWOOD:  Objection; form.
22     A.   No.
23   BY MR. GROGAN:
24     Q.   Mr. Eckman, you said that in 2013, he was
25   representing Plain Green, to the best of your

UNSEALED

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
by Attorney General JOSH   *
SHAPIRO,     *
    Plaintiff,     *
    *
VS.     * Civil Action
    * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants.     *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
NEAL HUMPHREY
MARCH 8, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION of NEAL HUMPHREY, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and
numbered cause on the 8th day of March, 2018, from
3:27 a.m. to 6:03 p.m., before Christy R. Sievert,
CSR, RPR, in and for the State of Texas, reported by
machine shorthand, at the offices of Hunton &
Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas,
Texas 75202, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## Page 2

1         A P P E A R A N C E S
2
3 COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4   MR IRV ACKELSBERG
    MR JOHN J GROGAN
5   Langer, Grogan & Diver, PC
    1717 Arch Street, Suite 4130
6   Philadelphia, Pennsylvania 19103
    Phone: 215-320-5701
7   E-mail: iackelsberg@langergrogan com
    jgrogan@langergrogan com
8
9 COUNSEL FOR THINK FINANCE, INC :
10   MR MATTHEW S SHELDON
    Goodwin Procter, LLP
11   901 New York Avenue, NW
    Washington, D C 20001
12   Phone: 202-346-4000
    E-mail: msheldon@goodwinprocter com
13
14 COUNSEL FOR VICTORY PARK CAPITAL:
15   MR DANIEL P SHAPIRO
    Katten Muchin Rosenman, LLP
16   525 W Monroe Street
    Chicago, Illinois 60661
17   Phone: 312-902-5622
    E-mail: daniel shapiro@kattenlaw com
18
19 COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
20   MS FRANCES B MORRIS
    Van Ness Feldman, LLP
21   1050 Thomas Jefferson Street, NW
    Seventh Floor
22   Washington, D C
    Phone: 202-298-1874
23   E-mail: ftb@vnf com
24
25

## Page 3

1         A P P E A R A N C E S
          (continued)
2
3 COUNSEL FOR KENNETH REES:
4   MR. RICHARD L. SCHEFF
    Montgomery, McCracken, Walker & Rhoads, LLP
    123 South Broad Street
5   Philadelphia, Pennsylvania 19109
    Phone: 215-772-7502
6   E-mail: rscheff@mmwr.com
7
8 ALSO PRESENT:
9   GUS PHILLIPS, Videographer
    KEVIN BYERS
10   TOM GRABER
    SAVERIO "SAM" MIRARCHI, (Appearing Telephonically)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1         I N D E X
              PAGE
2

Appearances................................. 2-3

Exhibits..................................... 5

Proceedings.................................. 6

NEAL HUMPHREY:

    Examination by Mr. Ackelsberg............. 7

Changes and Signature.................. 128-129
Reporter's Certification............... 130-131

UNSEALED

App. 0525

## Page 5

E X H I B I T S

NUMBER    DESCRIPTION             PAGE

Exhibit 54  Mobiloans Business Rules    69
            TF-PA009885 - 009937

Exhibits 55 & 56 (Not identified or marked )

Exhibit 57  The Product Team Product    78
            Descriptions Measures of
            Success Department Structure
            Values in Action
            TF-PA185445 - 185471

Exhibit 58  E-mail correspondence, 11-25-14  92
            Re: MBL - No State PA
            TF-PA626072 - 626074

Exhibit 59  E-mail correspondence, 10-17-14  96
            Re: Fw: Pending SOPs
            TF-PA036495 - 036499

Exhibit 60  Mobiloans Standard Operating  99
            Procedure #200-30 Daily Review
            of Proposed Applications For
            Funding
            TF-PA011757 - 011759

Exhibit 61  E-mail correspondence, 11-5-14  106
            Re: Pending SOPs
            TF-PA021010 - 021016

Exhibit 62  E-mail correspondence, 6-25-15  120
            Re: Fw: MBL Daily Review of
            Requests for Funding SOP (d)
            TF-PA048240

Exhibit 63  E-mail disclaimers/Footers  123

Exhibit 64  2-4-17 letter to M Pierite  126
            from C  Brown, Re: Sovereign
            Regulatory Authority
            TF-PA598989 - 599006

## Page 6

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record for the video deposition of Neal Humphrey. The time is 3:27 p m., March 8, 2018, in the matter of Commonwealth of Pennsylvania, et al., vs. Think Finance, Incorporated, et al., Civil Action No. 17-7139-JCJ, being held in the United States District Court for the Eastern District of Pennsylvania.

The court reporter is Christy Sievert. The videographer is Gus Phillips.  Both are representatives of Kaplan, Leaman & Wolfe Court Reporting.

Will counsel please state their appearances for the record.

MR. ACKELSBERG:  Irv Ackelsberg, special counsel for Pennsylvania Attorney General.

MR. GROGAN:  John Grogan, special counsel for the Pennsylvania Attorney General.

MS. MORRIS:  Frances Morris for National Credit Adjusters.

MR. SHAPIRO:  Dan Shapiro for the Victory Park defendants.

MR. SCHEFF:  Richard Scheff for Kenneth Rees.

## Page 7

MR. SHELDON:  Matt Sheldon for Think Finance, LLC, joined by Tom Graber of Think Finance, LLC.

MR. ACKELSBERG:  And we also have on the phone Saverio Mirarchi, a deputy attorney general, from Pennsylvania.

THE VIDEOGRAPHER:  Would the court reporter please administer the oath.

NEAL HUMPHREY having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ACKELSBERG:

Q.  Mr. Humphrey, pleased to meet you.  My name is Irv Ackelsberg, as I just said.  And I, along with my colleague, Mr. Grogan on my -- on my left, we are representing the Commonwealth of Pennsylvania in an action against Think Finance, against Ken Rees, and against Victory Park Capital, and National Credit Adjusters concerning certain loan programs, including a program called "Mobiloans."  And that's a program you're familiar with, right?

A.  Yes.

Q.  Okay.  So first off, I need to ask you a few just preliminaries.  Have you ever been deposed

## Page 8

before?

A.  No.

Q.  Okay.  So I know that -- I'm confident that your lawyers have explained to you something about the process, but I have to do it again just to be sure that you understand what's happening here.

I'm going to ask you -- this, basically, works as a question-and-answer protocol.  I ask you a question, you -- you provide an answer.  Both the question and the answer is being transcribed by the court reporter here.  Do you understand?

A.  Yeah.

Q.  Okay.  Even though it's being videotaped, the official record is what is happening to your left, your immediate left with the court reporter. She's going to prepare that transcript.  So because it's a transcript and not a movie, we -- we can't deal with nonverbals.  So you -- a nod of the head, while it would work on the video, isn't going to work here.  So we really do need you to provide verbal answers.  You have to speak up so she can hear you.

And you understand that after this is all over, there will be a transcript of everything that happened here, everything that was said, and that it

UNSEALED

App. 0526

1  center, listen to phone calls that are coming in
2  about Mobiloans.  I mean, the whole point of is it
3  to help improve the software product.  So hearing
4  what customers are saying on the phone coming in
5  helps us do it.  It also helps to have a development
6  person there who can hear the issues directly
7  themselves.
8       Q.  And when you say -- when you use the term
9  "development person," you're talking about an IT
10  person, right?
11      A.  Correct.
12      Q.  Someone who, if an adjustment needs to be
13  made in the software, can -- can work on that?
14      A.  Yes.  He was responsible.  He wouldn't do
15  it himself.
16      Q.  Yeah, yeah, no, I understand that.
17          Now, before -- so you started in August,
18  and then in November was your first trip to
19  Louisiana, right?
20      A.  Yes.
21      Q.  Okay.  Well, let's -- let's get in all the
22  trips to Louisiana first.  Like, when was the second
23  trip to Louisiana?
24      A.  I don't recall.  I want to say it was maybe
25  a year later or so.

1       Q.  And did you bring a development director
2  again?
3       A.  No, I brought our marketing director.
4       Q.  And why did you bring the marketing
5  director?
6       A.  Similar reason, to hear -- to see the
7  operation there, to meet the client, to listen to
8  calls.  That's really where you learn most about
9  what's happening with the product and what customers
10  are saying about it and what feedback is coming back
11  and what issues we have and. . .
12      Q.  Now, my understanding is that -- well, why
13  don't you just ask -- tell me, the -- so there was a
14  call center -- or there is a call center actually on
15  tribal land, right?
16      A.  Yes.
17      Q.  Okay.  And about how many seats?  How many
18  people are answering the phones there?
19      A.  Currently or then?
20      Q.  Why don't you give me both.  We'll start
21  with -- start with now and then then.
22      A.  Now, I don't know.  But then, it was
23  probably 12 or 15.
24      Q.  Okay.  Now, my understanding is that
25  there's also call center work done -- that was done

1  for Mobiloans at vendors --
2       A.  Yes.
3       Q.  -- right?
4          Okay.  So one of those vendors was
5  MetaSource, right?
6       A.  Yes.
7       Q.  And MetaSource had some seats dedicated to
8  Mobiloans, correct?
9       A.  Yes.
10      Q.  How many?
11      A.  I don't know.
12      Q.  More than 12, right?
13      A.  I don't know.
14      Q.  You had -- did you ever go to MetaSource to
15  look?
16      A.  No.
17      Q.  Why?
18      A.  MetaSource was an overflow call center.  So
19  if the -- if the call center on the tribe -- at the
20  tribe was too busy, those calls would overflow to
21  Meta.
22      Q.  Okay.  And what kind of calls are we
23  talking about?
24      A.  Customer service calls, technical support,
25  things like that.

1       Q.  So there is -- my understanding is that
2  there is something called "verification."  Right?
3          MR. SHELDON:  Object to form.
4  BY MR. ACKELSBERG:
5       Q.  You know about verification, right?  You
6  know there is such a function?
7       A.  Yes.
8       Q.  And that's not what you're talking about,
9  right?  Or is it what you're talking about?
10      A.  No.
11      Q.  Okay.  So let's just start with
12  verification.  Verification has to do with the loan
13  application procedure, right?
14      A.  Yes.
15      Q.  So if sometimes someone -- sometimes when a
16  customer would go online and apply for Mobiloans,
17  they would be approved right away, right?
18      A.  Sometimes that would happen, yes.
19      Q.  Yeah, and it -- and if they met the -- if
20  the software determined that the risk was -- was
21  good, to -- it could make an approval almost
22  simultaneously, right?
23          MR. SHELDON:  Object to form.
24      A.  That -- that could happen, yes.
25  BY MR. ACKELSBERG:

UNSEALED

App. 0527

1   Q.   Yeah.  But sometimes, instead of an
2   approval, there would be a request for additional
3   information, right?
4   A.   Yes.
5   Q.   Okay.  And in that case, the customer would
6   be directed to call somewhere to provide
7   information, right?
8   A.   They weren't directed to call, necessarily.
9   They were directed to e-mail or fax in documents.
10  Q.   Okay.  And if they were e-mailing --
11  e-mailing or faxing documents, where would those
12  documents go to?
13  A.   The call center agents would take some of
14  those.
15  Q.   The call center agents in Louisiana?
16  A.   Yes.
17  Q.   Okay.  And the overflow go to MetaSource?
18  A.   I don't --
19  Q.   Is MetaSource involved in verification?
20  A.   I don't know.
21  Q.   Okay.  Well, you were the product manager.
22  Who would know that?
23  A.   That would be our -- I think our operations
24  people.  Or, actually, the -- in that case, the --
25  our risk folks, they manage that verification

1   process.
2   Q.   Okay.  Now, the website also had a phone
3   number, so that if a customer -- an existing
4   customer wanted to call, let's say, had an issue
5   with a payment, there was a number they could call,
6   right?
7   A.   Yes.
8   Q.   And if they called that number, would the
9   number ring at the tribe, or would it first ring,
10  like, in Texas or somewhere else and then get routed
11  to the tribe?
12  A.   No, it would ring directly to the -- to the
13  tribe.
14  Q.   To the tribe.  Okay.  And that -- and that
15  if there was overflow, it would automatically bounce
16  to MetaSource; is that how --
17  A.   That was my understanding.
18  Q.   Okay.  Now, in addition to verification,
19  there is -- there, also, are collection calls that
20  are -- like, if someone -- why don't you tell me
21  what happens when someone goes delinquent.
22      MR. SHELDON:  Object to form.
23  BY MR. ACKELSBERG:
24  Q.   In terms of contact, like, they'd get a
25  call, right?  Or an e-mail or a call or something

1   would happen, right?
2      MR. SHELDON:  Object to form.
3   A.   That's not my area of expertise, the
4   collections process.
5   BY MR. ACKELSBERG:
6   Q.   So as product manager, you didn't -- you
7   didn't --
8   A.   I wasn't responsible for the collections
9   process.
10  Q.   Who was?
11  A.   We have a collections manager that manages
12  that.
13  Q.   Who is that -- who was that in November of
14  2014?
15  A.   I believe it was Kevin Banks.
16  Q.   Okay.  And so you didn't have anything to
17  do with -- with the vendors, the collection vendors?
18  You don't --
19  A.   No.
20  Q.   No.  Okay.  Well, why don't you describe
21  who your primary responsibilities were as -- as the
22  product manager since I -- since I'm taking you into
23  areas that were not your responsibility, why don't
24  you tell me what your responsibilities, in fact,
25  were.

1   A.   Yeah, my responsibilities were to work with
2   our client.  There's a client relations aspect of
3   that job.  So working with the client on software
4   enhancements, new features to the software, fixing
5   bugs to the software, things like that.  Is that
6   enough information?
7   Q.   Yeah, I think so.  It also sort of matches
8   your background, which was in -- which is, to some
9   extent, in the software area, right?
10  A.   Yes.  Before the family business, it was,
11  yeah.
12  Q.   Yes.  In the course of your -- so you're
13  hired in August of -- of 2014.  You don't go to the
14  tribe until November.  Had you had any interactions
15  with the tribe between August and November?
16  A.   Yes.
17  Q.   Okay.  That was on the telephone?
18  A.   Yes.
19  Q.   Okay.  And who were the people that you
20  were inter-- interacting with at Mobiloans?
21  A.   Generally, it was Kim Palermo.
22  Q.   My understanding is she was -- her title
23  was compliance chief or compliance officer.  Or
24  something about compliance, right?
25  A.   That was my understanding as well.

UNSEALED

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

COMMONWEALTH OF :
PENNSYLVANIA
  Plaintiff :
             :
VS.     : CIVIL ACTION NUMBER
     : 2:14-CV-07139
THINK FINANCE, INC., :
ET AL.,    :
  Defendants :
- - -

OCTOBER 23, 2018

- - -

Videotaped deposition of SARAH
CUTRONA, was taken pursuant to notice at 1600
Arch Street, Suite 300, Philadelphia,
Pennsylvania, beginning at or about 8:00 a.m.
before Jeannine Cancelliere, Court Reporter
and Notary Public and Scott Dantzer, Videotape
Operator, there being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102
(215) 922-7112

Page 2

1
2 APPEARANCES:
3 LANGER, GROGAN & DIVER, P C
  BY: IRV ACKELSBERG, ESQUIRE
4 1717 Arch Street, Suite 4130
  Philadelphia, Pennsylvania 19103
5 Phone: (215) 320-5701
  Representing the Plaintiff
6 iackelsberg@langergrogan.com
  Also Present: David Nagdeman
7
8 ARMSTRONG TEASDALE
  BY: RICHARD SCHEFF, ESQUIRE
9 1500 Market Street, 12th Floor
  Philadelphia, Pennsylvania 19102
10 Phone: (215) 246-3478
  Representing Sarah Cutrona
11 rscheff@armstrongteasdale.com
12
13 ARMSTRONG TEASDALE
  BY: DAVID HERMAN, ESQUIRE
14 1500 Market Street, 12th Floor
  Philadelphia, Pennsylvania 19102
15 Phone: (215) 246-3478
  Representing Ken Rees
16 dherman@armstrongteasdale.com
17
18 KATTEN, MUCHIN, ROSENMAN LLP
  BY: J MATTHEW HAWS, ESQUIRE
19 525 W Monroe Street
  Chicago, Illinois 60661-3693
20 Phone: (312) 902-5319
  Representing Victory Park
21 matthew.haws@kattenlaw.com
22
23
24

Page 3

1 APPEARANCES CONTINUED
2
3 GOODWIN PROCTER
  BY: MATTHEW SHELDON, ESQUIRE
4 901 New York Avenue, NW
  Washington, D.C. 20001
5 Phone: (202) 346-4000
  Representing Think Finance
  msheldon@goodwinlaw.com
6
7
8 VAN NESS FELDMAN
  BY: KETURAH BROWN, ESQUIRE
9 1050 Thomas Jefferson Street, NW
  Washington, D.C. 20007-3877
10 Phone: (202) 298-1800
  Representing National Credit
11 Adjusters LLC
  kab@vnf.com
  (Via Telephone)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1 - - -
2 I N D E X
3 - - -
4 SARAH CUTRONA   PAGE
5 BY MR. ACKELSBERG  7
6
7
8 - - -
9 E X H I B I T S
10 - - -
11 EXHIBIT NO.  PAGE
12 P-394  24
13 P-395  42
14 P-396  54
15 P-397  64
16 P-398  64
17 P-399  66
18 P-400  68
19 P-401  126
20 P-402  129
21 P-403  133
22 P-404  134
23 P-405  136
24 P-406  145

1 (Pages 1 to 4)

UNSEALED    App. 0529

1          - - -
2      E X H I B I T S
3          - - -
4      EXHIBIT NO.   PAGE
5          P-407    185
6          P-408    192
7          P-409    200
8          P-410    200
9          P-411    202
10         P-412    205
11         P-413    218
12         P-414    219
13
14
15
16
17
18
19
20
21
22
23
24

1          VIDEOTAPE OPERATOR:  We're now
2    on the record.  My name is Scott Dantzer and
3    I'm a videographer retained by On the Record.
4    This is a video deposition for the United
5    States District Court for the Eastern District
6    of Pennsylvania.  Today is October 23rd, 2018
7    and it is 8:06 a.m. -- I'm sorry, 8:08 a.m.
8          This deposition is being held at
9    the Office of the Attorney General at 1600
10   Arch Street in Philadelphia, Pennsylvania in
11   the matter of the Commonwealth of Pennsylvania
12   v. Think Finance, et al.
13         The deponent today is Sarah
14   Cutrona.  Counsel, will you please state your
15   appearances for the record?
16         MR. ACKELSBERG:  For the
17   Commonwealth, Irv Ackelsberg.
18         MR. SCHEFF:  Richard Scheff for
19   Sarah Cutrona.
20         MR. SHELDON:  Matthew Sheldon
21   for the Think Finance defendants.
22         MR. HERMAN:  David Herman on
23   behalf of Kenneth Rees.
24         MR. HAWS:  Matthew Haws on

1    behalf of the Victory Park defendants.
2          VIDEOTAPE OPERATOR:  And the
3    court reporter today is Jeannine Cancelliere.
4    She'll now swear in the witness.  We have
5    somebody joining us on the telephone.
6          MS. BROWN:  Yes, Keturah Brown
7    for NCA.
8          - - -
9          EXAMINATION
10         - - -
11   BY MR. ACKELSBERG:
12   Q.   Good morning, Ms. Cutrona.
13   A.   Good morning.
14   Q.   Could you state your current employer
15   and position?
16   A.   Yes, I'm the chief legal officer at
17   Elevate Credit, Inc.
18   Q.   Before that you were general counsel at
19   Think Finance, before the spinoff, correct?
20   A.   That's correct.
21   Q.   I am just going to go quickly through
22   some of your background.  When did you
23   graduate law school?
24   A.   1990.

1    Q.   1990?
2    A.   Yes.
3    Q.   I would like to just go through your
4    employment history.  Between law school and
5    arriving at Think Finance -- first of all,
6    when did you arrive at Think Finance?
7    A.   Well, the entity was called Payday One
8    when I started, and that would have been in
9    July of 2006.
10   Q.   And where did you -- what was your first
11   job out of law school?
12   A.   I worked for Lynch Chappell & Alsup, a
13   law firm in Midland, Texas.
14   Q.   How long were you there?
15   A.   For two years, a little over two years.
16   Q.   At some point you went in-house on
17   various jobs?
18   A.   Correct.
19   Q.   What was your first in-house job?
20   A.   I went to work in government affairs at
21   the Associates in Irving, Texas, which would
22   have been in 1992, probably June of '92.
23   Q.   How long were you there?
24   A.   Until around October of '95, when I went

UNSEALED

App. 0530

1  that came in discovery.
2  A.   So you're saying that 714 is the second
3  page of the letter that starts on 712.
4  Q.   Yes, that's what it appears.  It appears
5  that in the copying there was an extra blank
6  page added.
7  A.   Okay.
8  Q.   If you could re-clip it, we're going to
9  have a lot of paper, just for paper management
10  purposes.
11         All right, so you see this
12  was a complaint that was initiated from the
13  State of New York from the attorney general
14  there.  Do you see that, that's how this
15  started?
16  A.   Yes.
17  Q.   And the name of the consumer was Kevin
18  Morelle, M-O-R-E-L-L-E, do you see that?
19  A.   Yes.
20  Q.   First of all, I want to just -- you
21  probably know this, but just to make sure you
22  understand, we got discovery from various
23  defendants in the case.  You'll note that the
24  lower right-hand corner of these exhibits, it

1  says GPLP and there's a number?
2  A.   Yes.
3  Q.   The GPLP indicates that we got this
4  document from Victory Park, okay.  Do you
5  understand?
6  A.   Yes, I do.
7  Q.   I guess my first question is, why would
8  Victory Park have these documents?  If you
9  could explain protocol that would end up --
10  where Victory Park would end up with this
11  complaint, I would appreciate it.
12  A.   Well, it looks like on the Tami Simpson
13  e-mail, which is the cover page, she sent this
14  to Billianne at Plain Green and Traci at Plain
15  Green.  I think Traci was probably in charge
16  of complaints at that time for Plain Green.
17  Neal Junior, Plain Green, myself, Jason,
18  Michelle, Carrie, all with Think.  And then
19  several people with VPC Advisors; Katten Law,
20  Rick Eckman which was the Plain Green outside
21  counsel; Mark Grossman at Katten.  And Katten
22  was outside counsel to VPC, as I recall.
23  David Randolph, who is a tribal law specialist
24  at Connors and Winters; Scott Zemnick at VPC

1  Advisors.  And Stephen Smith, who you
2  mentioned earlier, who worked for me.
3         Obviously they came to get
4  this because they were included in this e-mail
5  distribution.
6  Q.   Why is that, why was Victory Park
7  getting -- was this standard?  Was it standard
8  that complaints from attorneys general be
9  forwarded to Victory Park?
10         MR. SCHEFF:  Object to the
11  form.  You can answer.
12         MR. HAWS:  Objection.
13         THE WITNESS:  I think the
14  contract -- I'm not sure, but I think that
15  GPLS had asked to be notified of what we
16  called escalated complaints, which would be
17  attorney general complaints.
18  BY MR. ACKELSBERG:
19  Q.   When you say GPLS, you're referring to
20  the special purpose vehicle that was owned by
21  Victory Park and purchased the participation
22  interest; am I right?
23
24         MR. SCHEFF:  Object to the

1  form.
2         MR. HAWS:  Object to form.
3         THE WITNESS:  Yes.
4  BY MR. ACKELSBERG:
5  Q.   You mentioned this Mr. Randolph, the
6  tribal law specialist.  Who was he
7  representing?
8  A.   Either Victory Park Capital or GPLS.
9  Q.   And the complaint that initiated from
10  the attorney general looks like it had a copy
11  of a loan agreement with it, a Plain Green
12  loan agreement.  The agreement for this Mr.
13  Morelle, do you see that?
14  A.   Yes.
15  Q.   This is the form loan agreement that
16  you're familiar with, correct?
17  A.   It's been a lot of years, and as I
18  recall in this complaint, you said he had had
19  three loans.  So I'm not sure -- this was
20  probably one of the loan agreements, but there
21  were two others.  And I'm not sure if they
22  were in the same form or not.
23  Q.   Now do you remember, in terms of the
24  loan agreements was Plain Green, there was the

UNSEALED

1 original one when it started out in April of
2 2011, right?
3 A. So I would have to say the first loan
4 agreement would be the original loan
5 agreement.
6 Q. Do you remember what the occasion was or
7 the time period of any -- of the changes? You
8 said there were two changes made to the loan
9 agreement?
10 A. No, I didn't say there were two changes
11 made. I believe there were various changes
12 made by the tribes and their attorneys
13 throughout the program, but I couldn't tell
14 you when or how many.
15 Q. All right. And from the date of the
16 Morelle agreement in August of 2012, can you
17 tell if that's the original?
18 A. I have no clue.
19 Q. Okay. But in looking at it, sort of
20 generally familiar with the layout and the
21 elements of the contents of the loan
22 agreement?
23 A. It's been so long ago, I could not tell
24 you.

1 Q. The last page has a signature of
2 Billianne Raining Bird Morsette. Do you see
3 that?
4 A. Yes.
5 Q. And that's the same Billianne who you
6 mentioned got a copy of -- was copied on that
7 e-mail?
8 A. Correct, she was the CEO of Plain Green.
9 Q. Am I right that her signature appeared
10 on all of the loan agreements, as long as she
11 was the CEO?
12 A. I think that's right, yes.
13 Q. And this was pre-printed on the form,
14 right? I mean she didn't actually handwrite
15 her name on those loan agreements, did she?
16
17 MR. SCHEFF: Object to the
18 form. You can answer.
19 THE WITNESS: So it's an
20 online lender. The tribe -- after the loan
21 agreement had been executed by the borrower,
22 would then put their signature on accepting
23 the loan, yes.
24 BY MR. ACKELSBERG:

1 Q. You're saying --
2 A. It was electronically done.
3 Q. Thank you. And the loan agreement -- so
4 you'll see this is a loan agreement that was
5 in August of 2012, and this was to a New York
6 borrower named Mr. Morelle.
7 If a Pennsylvania borrower
8 had taken out a loan at the same period of
9 time with Plain Green, the loan agreement
10 would have basically looked the same, except
11 for this specific amount borrowed or things
12 like that? But I mean the form contract was
13 the same; am I right?
14 MR. SCHEFF: Object to the
15 form. You can answer.
16 THE WITNESS: Yeah, that's
17 correct. I have to add that this is dated
18 August of '12. And he had mentioned that it
19 was his third agreement, and the complaint, I
20 think was in October. So my gut tells me he
21 had taken two prior loan agreements, and this
22 was probably the third loan agreement.
23 BY MR. ACKELSBERG:
24 Q. Okay. But if a Pennsylvania borrower

1 borrowed the same amount of money that Mr.
2 Morelle borrowed at that period of time, the
3 agreement would have looked the same; am I
4 right?
5 A. Yes, that's my understanding.
6 Q. Now the second page of the -- let's
7 start with the letter from the attorney
8 general. It's from an employee in the
9 attorney general's office, correct? Someone
10 named Rachel Mills in the Internet Bureau, do
11 you see that?
12 A. Yes.
13 Q. The nature of the complaint is that the
14 New York Attorney General is characterizing
15 this as a usurious loan; am I right?
16 A. Yes.
17 Q. And the complaint letter that's February
18 5th, 2013, the complaint letter also states
19 that New York law applies to foreign entities?
20 A. Where does it state that?
21 Q. Sure. Let's look at the second --
22 A. Oh, I see, right there. That's what it
23 says.
24 Q. So in looking at this, it appears that

UNSEALED

1    New York was taking the position that the
2    interest rate on this loan was illegal, and
3    that the New York laws setting rate caps apply
4    to foreign entities, as well as New York
5    entities. That's the position the New York
6    Attorney General is taking in this letter,
7    correct?
8              MR. SHELDON: Object to form
9    and object to characterization of the letter.
10   It says earlier, it appears. And then it says
11   also, if true, this could constitute a
12   violation. But the witness can answer.
13             THE WITNESS: Can you repeat
14   the question.
15   BY MR. ACKELSBERG:
16   Q.   The attorney general is stating here
17   that in the judgement of the office, the loan
18   appears to be -- to include an illegal
19   interest rate and it's also advising Plain
20   Green that New York law applies to foreign
21   entities.
22             MR. HERMAN: Object to form.
23             MR. SHELDON: Same objection
24   as before.

1              THE WITNESS: That's what it
2    appears to say.
3    BY MR. ACKELSBERG:
4    Q.   If we look at the second page of the
5    exhibit, this is the template letter that you
6    referred to before.
7    A.   I think it would be, yes, one of the
8    template letters. There were a few that were
9    approved, yes.
10   Q.   I know -- and this is a template letter
11   that you said the tribe would have approved?
12   A.   Yes, because -- and I say generally this
13   is, and I believe it is, I can't remember
14   exactly the templates they approved. But
15   their outside counsel draft was consulted by
16   them and let us know this is the way they wish
17   to talk about their federally recognized tribe
18   making loans.
19   Q.   Now I understand that the letter would
20   have had to have gone through the outside
21   counsel, but the draft was prepared by your
22   office; isn't that right?
23   A.   So that's correct, but it was at the
24   instruction of the tribe.

1    Q.   I understand.
2    A.   In the relationship with the tribal
3    lenders, there were certain duties that they
4    asked us, once the format was approved, to
5    help them with. So I wouldn't call it an
6    agency relationship, but as someone who was
7    helping them, they asked us to draft this and
8    send back to them. But once they got it, they
9    would review it and send it out.
10   Q.   So the protocol -- the protocol as it
11   appears from this document, correct me if I'm
12   wrong, is that the complaint would come to the
13   tribe. The tribe would forward the complaint
14   to Tami Simpson. Tami Simpson would then send
15   the tribe the template that she would then
16   suggest the tribe mail on their letterhead,
17   that's the protocol, right?
18             MR. HERMAN: Object to form.
19             THE WITNESS: So in general,
20   yes. I don't know that they would always go
21   to Tami. But it was important for the tribe
22   that they keep track of complaints. And so
23   they had asked Think Finance to facilitate
24   that process. But the whole protocol was

1    approved in advance by the tribe and their
2    outside counsel.
3    BY MR. ACKELSBERG:
4    Q.   So your office then would track all of
5    the complaints that Plain Green forwarded to
6    you, correct?
7    A.   That's correct, on behalf of the tribe.
8    Q.   In tracking complaints like this, what
9    information did you capture?
10   A.   I couldn't -- I can't recall.
11   Q.   Do you recall if there were ever any
12   reports to the tribe about the number of
13   complaints or the nature of complaints?
14   A.   I don't recall specifically, but I
15   wouldn't be surprised.
16   Q.   And you also tracked that internally for
17   Think Finance purposes, correct?
18
19             MR. SCHEFF: Object to the
20   form, tracked what?
21   BY MR. ACKELSBERG:
22   Q.   The complaints from attorney generals.
23   A.   I think so, yes.
24   Q.   How did Think Finance use the

UNSEALED

1  information internally?
2  A.  We would only use it to the extent to
3  provide it to the tribe, as the tribe had
4  requested.
5  Q.  So Think Finance -- there were no --
6  Think Finance -- didn't Think Finance have an
7  interest or concern if attorneys general were
8  complaining about the Plain Green product?
9         MR. HERMAN:  Object to form.
10        THE WITNESS:  Yeah, I would
11  say that any -- because Think Finance provides
12  services to lending entities, of course from a
13  vendor management perspective, we are always
14  concerned with complaints to the lenders that
15  we work with.
16  BY MR. ACKELSBERG:
17  Q.  Why?
18  A.  Because in my role as general counsel, I
19  review -- I know that complaints often lead to
20  litigation.
21  Q.  Did the system you have described for
22  Plain Green, did you have the same system for
23  Great Plains Lending?
24

1         MR. SCHEFF:  Object to the
2  form.  You can answer.
3  BY MR. ACKELSBERG:
4  Q.  Or something like it.
5         MR. SCHEFF:  Same objection.
6        THE WITNESS:  I'm not sure
7  because there were different requests from
8  different tribes.  So I really don't recall.
9  It could have been, but I don't recall.
10  BY MR. ACKELSBERG:
11  Q.  What about Mobiloans?
12  A.  Same answer.
13  Q.  Do you remember working on template
14  responses for Great Plains Lending?
15        MR. HERMAN:  Object to form,
16  mischaracterizes the testimony.
17        THE WITNESS:  You know, I
18  don't recall because that tribe had another
19  lending product already in market.  So they
20  may have already had a format that they wanted
21  to use, but they would have sent that to us, I
22  believe, for us to use.  I really don't recall
23  if we did this for them or if they did it
24  themselves.

1  BY MR. ACKELSBERG:
2  Q.  What about Mobiloans?  You recall that
3  Mobiloans -- Mobiloans was the first lending
4  product that the Tunica tribe was involved in;
5  you recall that, correct?
6  A.  I think you asked me two questions.
7  Which one do you want me to answer first?
8  Q.  You can answer both, whatever order
9  you'd like.
10  A.  Can you repeat the question?
11        - - -
12        (Whereupon the Court Reporter
13  read back the pending question.)
14        - - -
15        THE WITNESS:  That's correct.
16  BY MR. ACKELSBERG:
17  Q.  So my question is, given Mobiloans lack
18  of experience with lending before its
19  relationship with Think Finance, did you
20  also -- did Think Finance also prepare
21  template responses for Mobiloans for
22  complaints received from state attorneys
23  general?
24        MR. HERMAN:  Object to the

1  form.
2        MR. SCHEFF:  Objection,
3  mischaracterizes testimony.
4        THE WITNESS:  First of all I
5  would have to make sure you understood that
6  Tunica Biloxi had -- I think their casino was
7  called Paragon.  They were a very
8  sophisticated tribe.  Their outside counsels
9  were Kevin Wadzinski with Drinker Biddle, some
10  guy at Steptoe Johnson, I can't remember his
11  name.  And they used Rick Eckman.
12        So I feel certain that they
13  reviewed and approved a template, as well for
14  use in responding to complaints.
15  BY MR. ACKELSBERG:
16  Q.  So probably what happened was that you
17  or someone in the legal department would have
18  drafted a template that would then have been
19  forwarded to the Mobiloans general counsel for
20  their approval?
21        MR. SCHEFF:  Object to the
22  form, calls for speculation.  You can answer
23  the question.
24        THE WITNESS:  I think you

UNSEALED

App. 0530-4

Page 61

1   with the vendors.  I'm not asking that.  I'm
2   asking, wasn't Think Finance itself concerned
3   about what states it was operating in with the
4   tribal products?
5           MR. SHELDON:  I am going to
6   lodge and objection and say, Ms. Cutrona, he
7   is now getting into -- the last question --
8   your previous questions were about what were
9   you doing in terms of tracking, right.  And
10  you were asking as a factual matter what you
11  were doing.
12          The last question you posed,
13  you phrased slightly differently.  And you
14  asked about what was Think Finance concerned
15  about, and you're asking the general counsel
16  that.  So I'm going to just instruct Ms.
17  Cutrona to be very careful in your answers.
18  And if you ever have a question about whether
19  or not your answer may require you to say
20  something that is a result of legal advice you
21  received from outside or inside counsel or
22  legal analysis that you conducted in your role
23  as general counsel to Think Finance, to not
24  give that answer.  And we can step out in the

Page 62

1   hallway and talk about it.  Do you understand?
2           THE WITNESS:  Yes.
3           MR. SHELDON:  Do you want to
4   keep that question or do you want the court
5   reporter to read it back?
6               - - -
7           (Whereupon the Court Reporter
8   read back the pending question.)
9               - - -
10          THE WITNESS:  Can you read
11  that back again.
12          MR. SHELDON:  She is finding
13  the last question.
14              - - -
15          (Whereupon the Court Reporter
16  read back the pending question.)
17              - - -
18          THE WITNESS:  I don't think I
19  can answer that question.
20  BY MR. ACKELSBERG:
21  Q.   Let's just -- I want to do this on the
22  record.  We talked I think last week or
23  previous to today, we talked about the
24  affirmative defense that I think references

Page 63

1   good faith compliance with laws and
2   regulations.  And I think that was the 9th
3   affirmative defense.
4           What I believe, Mr. Sheldon,
5   that you reiterated to us or it might have
6   been Mr. Gatewood, several times was that in
7   posing that affirmative defense, there was no
8   intent on the part of Think Finance to be
9   reliant on -- it's not a reliance on counsel
10  defense.
11          MR. SHELDON:  That's correct.
12          MR. ACKELSBERG:  I just want
13  to be clear that that includes not just
14  outside counsel but the legal department of
15  Think Finance itself?
16          MR. SHELDON:  That's correct.
17  We're not waiving any privilege as to legal
18  advice from outside counsel or inside counsel.
19          MR. ACKELSBERG:  Thank you.
20  To speed things along, I am going to show you
21  two more complaints.  These are from the
22  Minnesota Office of Attorney General.  We'll
23  call this P-397 and 398.
24              - - -

Page 64

1           (Whereupon Exhibits P-397 and
2   P-398 were marked for identification.)
3               - - -
4           MR. HERMAN:  Irv, just so I'm
5   clear, 398 is Minnesota and 397 is Mr. McHugh.
6   (Cross talk)
7           MR. ACKELSBERG:  It looks
8   like they got mixed up.  It looks like it's
9   not mixed up by me, it's mixed up in the
10  production.  It appears that there are two
11  Minnesota -- maybe they're both McHugh.
12  That's fine.
13          MR. HERMAN:  Irv, this Bates
14  number, on the second page of GPLP-501078.  It
15  goes back to 140.
16          MR. SCHEFF:  That's right.
17  BY MR. ACKELSBERG:
18  Q.   Let's forget about 398 and just use 397.
19  We're going to forget about 398.  Let's just
20  use 397.
21          I just want to just confirm
22  with the witness that this is a complaint that
23  was forwarded by Plain Green -- a complaint
24  from the Minnesota Attorney General.  Ms.

UNSEALED

App. 0531

1    Simpson again handled this and forwarded a
2    suggested response letter to the tribe, as
3    with the previous complaints we looked at.
4    A.   Yes, but I would clarify because I think
5    it's very important that the suggested
6    response was that that had been reviewed and
7    approved previously by the tribe and their
8    counsel.
9    Q.   And as with the other complaints, the
10   complaint and the proposed response was sent
11   to Victory Park Capital?
12   A.   Yes, there are certain people on here,
13   Victory Park Capital received this.
14   Q.   Also to Victory Park's lawyers at
15   Katten?
16   A.   Yes, and to David Randolph at Connor and
17   Winters, who is a tribal attorney.
18   Q.   For Victory Park, correct?
19   A.   Correct.  And to Rick Eckman who's the
20   attorney for the tribe.  And obviously it went
21   to the CEO Billianne and Jennifer at Plain
22   Green.
23   Q.   I want to shift gears for a second.
24   When you were general counsel, there would be

1    an occasional offsite meeting of the executive
2    team, do you recall that?
3    A.   Yes.
4    Q.   And that would be done on roughly a
5    quarterly basis?
6    A.   Yes, I agree with that.
7    Q.   So I want to show you a PowerPoint from
8    one of those executive team offsites.  This
9    was in the first quarter of 2013.  And we will
10   call this P-400, so the record is not
11   confused.  P-399, I'm sorry.
12        - - -
13        (Whereupon Exhibit P-399 was
14   marked for identification.)
15        - - -
16   BY MR. ACKELSBERG:
17   Q.   I will represent to you that in the
18   metadata that accompanied this production from
19   Think Finance, it has the author as Ken Rees,
20   created time of March 28th, 2013.
21        Let me ask a preliminary
22   question first:  Would it be common for Ken
23   Rees to prepare a PowerPoint for those
24   executive offsite meetings?

1    A.   Yes.
2    Q.   And if you want to go through, take your
3    time.
4        MR. HERMAN:  I am going to
5    impose an objection to form on that last
6    question.
7        MR. ACKELSBERG:  That's fine.
8        THE WITNESS:  Okay.
9    BY MR. ACKELSBERG:
10   Q.   These offsites, these executive offsite
11   meetings with Ken Rees, who would be in
12   attendance at these?
13   A.   So this would be March of 2013.
14   Generally, it varied over time.  It would be
15   the executive team and it may include some one
16   -downs from the executive team.
17        But you know, I might add
18   this, we generally, in fact, a lot of times
19   have various drafts at presentations, and I
20   have to say that I don't know that this, in
21   fact, was a presentation that was used.  It
22   could have been a draft, but it could have
23   been used in this offsite.  Because as Ken is
24   drafting or anyone else, there's various

1    iterations of PowerPoints.
2        So you haven't asked me, but
3    you might ask me, and I cannot say for sure
4    that this was reviewed -- this exact deck was
5    reviewed at the March 28th, 2013 executive
6    team offsite.
7    Q.   But you're not challenging the fact that
8    this would have been prepared by Ken Rees, if
9    the metadata says it was?
10   A.   No, I'm not at all.
11        MR. SCHEFF:  Objection to
12   form.
13   BY MR. ACKELSBERG:
14   Q.   Am I right -- just talking procedurally,
15   that after one of these offsites with the
16   executive team and maybe one down in
17   authority, that there would be PowerPoints
18   prepared for then a larger audience within the
19   company?
20   A.   I can't say that as a general rule.
21   Q.   Let me just -- I'm going to look at what
22   -- we'll call this P-400.
23        - - -
24        (Whereupon Exhibit P-400 was marked

1  for identification.)
2              - - -
3              MR. SHELDON:  Ms. Cutrona,
4  after you finish reviewing, I need to ask you
5  a quick question about this document and then
6  we will be right back in.
7              THE WITNESS:  Let's step out.
8              VIDEOTAPE OPERATOR:  Off the
9  record, we're on the record at 9:45.
10             MR. SHELDON:  After consulting
11 with Ms. Cutrona regarding this document, it
12 does appear that she was involved in providing
13 information to Mr. Rees or others that was
14 used in this, as well as potentially
15 presenting information in here.  But she can't
16 recall which specific portions.
17             So what I'm going to do Mr.
18 Ackelsberg, is allow you to proceed with your
19 questions.  We'll see where they go.  And if
20 they go into privileged information, then we
21 will address it at that time.  Okay.
22 BY MR. ACKELSBERG:
23 Q.   Thank you.  We have two PowerPoints
24 from roughly the same time period, do you see

1  that, right?
2  A.   Yes, one is March and one is April.
3  Q.   Right.  So the first one that we looked
4  at, 399 -- and I mentioned to you that the
5  metadata says it was created on March 28th,
6  and that's for an executive team offsite of
7  March 28th.  Do you see that?
8  A.   Yes.
9  Q.   The second one, according to the
10 metadata, it was created by Mr. Rees on April
11 4th, 2013.  And then it says, modified April
12 8th, 2013.  I'm just reading from the
13 metadata, just for your informational
14 purposes.
15 A.   Does it say who it was modified by?
16 Q.   It just says Ken Rees.  I have it if
17 anyone wants to see that.
18             So my question is, from --
19 now looking at the second of the two
20 PowerPoints, the one that we've identified as
21 P-400, and looking at the agenda on the second
22 page, would I be correct in saying that this
23 PowerPoint was for a larger audience within
24 the company?

1              MR. HERMAN:  I'm going to
2  impose an objection on the prefatory
3  statements, and I object to form.
4              THE WITNESS:  Yes, it appears
5  that there was a quarterly business review to
6  a larger audience after the executive team
7  offsite.
8  BY MR. ACKELSBERG:
9  Q.   Who would be at this larger --
10 generally, who would attend a larger quarterly
11 review, an example of which is we're looking
12 at P-400?
13             MR. SCHEFF:  At what time
14 period?
15             THE WITNESS:  At what time
16 period, because it would vary.
17 BY MR. ACKELSBERG:
18 Q.   You can see what time period we're
19 looking at.
20 A.   I could guess, and my guess would be --
21             MR. SCHEFF:  You shouldn't
22 guess.  If you have an educated reason for
23 your provided response, you can provide it.
24 BY MR. ACKELSBERG:

1  Q.   Based on your experience and
2  recollections of serving as the general
3  counsel?
4  A.   I believe, but I can't be certain that
5  at the quarterly business review during this
6  time period, the audience would have been
7  Think Finance employees who were at a director
8  or above title.  Sometimes there were
9  additional guests asked to attend.
10 Q.   Roughly how many people would we be
11 talking about, putting aside the guess.  20,
12 30, 40, 100, just roughly, how big a group?
13 A.   I would say between 40 and 60.
14 Q.   Would meetings of that size be conducted
15 in the Think Finance office in Fort Worth, or
16 would you need an outside space?
17 A.   It would vary, but probably for that
18 size it would have been outside of the Think
19 Finance offices.
20 Q.   Where you would use a bigger space than
21 somewhere in Fort Worth?
22 A.   Uh-huh, yes.
23 Q.   Let's go to the earlier iteration, the
24 one that's titled:  Executive Team Offsite,

UNSEALED

1  the one from March 28th.  That's P-399.  Are
2  you with me?
3  A.  Yes, I am.
4  Q.  If you look at the tables on page two
5  and page three; on page two, the title of the
6  table is Think Finance has experienced
7  explosive growth, do you see that?
8  A.  Yes.
9  Q.  And on the next page there is, however,
10  a proviso and it says, we are not adhering to
11  our diversification strategy.  Do you see
12  that?
13  A.  Yes.
14  Q.  And in 2013, I'll see if I'm reading
15  this correctly, that the company had revenues
16  north of 800 million, correct?
17  A.  Well, yeah, I would say yes.
18  Q.  And that revenue was all from tribal
19  products, except for an amount less than 100
20  million.  Is that what that table says?
21  A.  It looks like it, but I have to tell
22  you, I don't -- there's also on the -- I don't
23  know what it's called, the scale, it says also
24  direct, in the color between direct and bank

1  you can't tell because it's in black and
2  white.  But I would assume that the number
3  that's below 100 million consist of direct and
4  bank, and then the other number, the latter
5  number is tribal.
6  Q.  Actually back in 2013, there were no
7  bank products at that point; am I right?
8  A.  I don't know for sure.
9  Q.  But we can agree that of the 800 million
10  in revenue in 2013, according to this table,
11  more than 700 million was from the tribal
12  products?
13  A.  That's what this chart says, appears to
14  say.
15  Q.  So am I correct that the statement, we
16  are not adhering to our diversification
17  strategy, the meaning of that is that the
18  company has become too dependent on the tribal
19  products for its revenue?
20  A.  So I would not adopt the words that you
21  used, I would say that the company has always
22  had the idea that diversification was
23  important for the stability of the company and
24  was a good business decision.  And that means

1  different products.
2  I think during this time,
3  there may have been depressed products,
4  spendable, the UK, lending and maybe My Salary
5  Line, which was a bank product, as well.  I
6  can't recall specifically this time period.
7  Q.  But your understanding of the meaning of
8  this table is that at this point in time, Ken
9  Rees is suggesting to the executive team that
10  the company is too reliant on the tribal
11  product, as opposed to the other products?
12  MR. HERMAN:  Objection to
13  form.
14  THE WITNESS:  I would say
15  that he's suggesting what it says here, that
16  we are not adhering to our diversification
17  strategy.
18  BY MR. ACKELSBERG:
19  Q.  What do you understand that to mean,
20  with regard to this table?
21  A.  Putting all of your eggs in one basket.
22  Q.  And in this case, the one basket being
23  tribal?
24  A.  Yes.

1  Q.  Now if you turn to the fifth page of the
2  PowerPoint, TFPA-913.  Am I right that what
3  Mr. Rees is suggesting in this slide is that
4  the tribal products should be strengthened
5  against potential attacks, but that the
6  company should be paying more attention to
7  accelerating the growth of the non-tribal
8  products?
9  MR. HERMAN:  Objection to
10  form.
11  THE WITNESS:  So as far as
12  this particular slide, I am not sure if Mr.
13  Rees went over this or if he had asked me to
14  discuss this during this time.  Because when
15  we had executive offsites, we would go around
16  the room talking about our particular
17  expertise.
18  BY MR. ACKELSBERG:
19  Q.  Right.  What's your understanding of
20  this slide?  Would you say it's
21  self-explanatory?
22  A.  It says:  Restructure, make all
23  reasonable changes to improve structure of
24  tribal products against potential attacks.

UNSEALED

1   And the refocus would be accelerate growth of
2   non-tribal businesses.
3           My read of this would be that
4   it's -- this gets back to the diversification
5   discussion that you were just asking me about
6   earlier.
7   Q.   Okay.  If you flip the page, and now
8   what Mr. Rees is doing is now breaking down
9   his suggestions in the restructure area from
10  the previous slide.  Do you see that?
11          MR. HERMAN:  Objection to
12  form.
13          THE WITNESS:  Yes.  I would
14  also like to say at this point that some of
15  the content on this slide was likely from
16  discussions that he and I had prior to him
17  putting the slide together.
18  BY MR. ACKELSBERG:
19  Q.   Okay, fine.  The increasing tribal
20  management and oversight, is that something
21  that would have come out of your conversations
22  with Mr. Rees?
23  A.   Potentially, I don't recall.
24  Q.   So you don't recall specifically any

1   advice that you gave Mr. Rees with regard to
2   increasing tribal management and oversight?
3           MR. SHELDON:  Objection to
4   form.
5           MR. SCHEFF:  At this point in
6   time, March 28th, 2013?
7           MR. ACKELSBERG:  Yes.
8           MR. SHELDON:  For this
9   particular slide, Ms. Cutrona,
10  what I presume is going to happen here is he's
11  going to ask you a series of questions about
12  the bullet points on this page.
13          If you don't recall really
14  anything about the bullet points, then I'm
15  fine with you telling him that you don't
16  recall.  If you recall things about the bullet
17  points that are due to Mr. Rees talking to the
18  group at large and don't involve any legal
19  advice you provided to Mr. Rees, then I'm fine
20  with you answering the questions in that
21  respect too.
22          If for any particular bullet
23  points you recall having specific discussions
24  with Mr. Rees in which you conveyed legal

1   advice to him or answered legal questions,
2   then I need you to point that out and we can
3   step out in the hall or Mr. Ackelsberg can
4   choose to move on.
5           Do you understand how I would
6   like you to approach answering these questions
7   on these bullet points?
8           THE WITNESS:  Yes.
9           MR. SHELDON:  Mr. Ackelsberg,
10  please proceed.
11  BY MR. ACKELSBERG:
12  Q.   Why don't we do it this way.  Look at,
13  just to save time.  Look at the bullet points.
14  Are there any bullet points there that you
15  believe are there based on Ken Rees speaking
16  to you and seeking legal advice?
17  A.   Yes, I would say definitely the second
18  -- reduce contractual roles for Think Finance;
19  Mirror Mortgage Lending and improve deal
20  optics; exit high-risk states; government
21  affairs and PR.  That's probably it.
22  Q.   Without revealing specific advice that
23  you gave to Ken Rees, do you recall the nature
24  of the work that you did with regard to the

1   topic of exiting high-risk states?
2           MR. SCHEFF:  Can you clarify
3   what you mean by the nature of the work she
4   did?
5           MR. SHELDON:  Are you asking
6   her to reveal what kind of legal analysis she
7   did to look into that area?
8           MR. ACKELSBERG:  No, I'm not
9   asking for the substance of the legal
10  analysis.  I'm saying, what is it -- did you
11  conduct legal analysis in the area of exiting
12  high-risk states?
13          MR. SCHEFF:  On her own?
14  BY MR. ACKELSBERG:
15  Q.   Or did someone do it for you?  I don't
16  know.
17          MR. SHELDON:  Ms. Cutrona,
18  for that question, can you limit your response
19  right now to yes or no.
20          THE WITNESS:  Can you ask the
21  question again, please?
22          - - -
23          (Whereupon the Court Reporter
24  read back the pending question.)

UNSEALED

App. 0535

1  legislation in support of tribal ecommerce,
2  but I would -- I helped facilitate the first
3  initial meetings. And it was also important
4  to me that the tribal members of the
5  association have the sole voting authority in
6  the association.
7        And so I suggested that. And
8  I also suggested -- and I don't know if it was
9  actually adopted, but I suggested a dues
10 structure for the association.
11 Q.   Did you also make suggestions with
12 regard to Think Finance contributions to the
13 association?
14 A.   It would have been more in line with --
15 I don't know about contributions, but it would
16 be in line with the dues structure.
17 Q.   So, for example, there was some
18 litigation that was planned by NAFSA. You
19 recall that, right, with regard to the tribal
20 products that Plain Green, Great Plains
21 Lending, Mobiloans; do you recall NAFSA
22 planning some litigation?
23 A.   So what period are you talking about
24 here?

1  Q.   2013, 2014, before you left for Elevate.
2  A.   So I believe that's correct, I believe
3  that's correct.
4  Q.   So we'll talk about it in some detail
5  later on. So there was litigation that NAFSA
6  planned -- for purposes of supporting the
7  Plain Green and Great Plains lending products,
8  correct?
9  A.   No, I don't think that's correct.
10 Q.   What was wrong with what I just said?
11 A.   If you're referring to New York
12 litigation, it's my understanding that the
13 Otoe-Missouria tribe out of California, which
14 had the Great Plains product, was the
15 plaintiff in that lawsuit, and the Chippewa
16 Cree tribe was not.
17       MR. SHELDON:  Ms. Cutrona,
18 you just said the Otoe-Missouria tribe out of
19 California --
20       THE WITNESS:  Excuse me,
21 Oklahoma.
22 BY MR. ACKELSBERG:
23 Q.   That litigation, since you mentioned it,
24 that litigation was supported financially by

1  Think Finance; am I right?
2  A.   I believe that's right. However, about
3  that time Martin Wong came along and was
4  working in compliance. And before a lawsuit
5  was filed, I was asked to not participate in
6  those discussions, and Martin was the main
7  contact.
8  Q.   In fact, Martin was coordinating that
9  litigation effort, was he not?
10 A.   You know, you're using the word
11 coordinating that effort, and I don't think I
12 can adopt that, your words.
13 Q.   What was Martin's role with regard to
14 the New York litigation?
15 A.   So, as I told you, I was taken off. And
16 when I say taken off, that means I wasn't
17 copied on e-mails at all times. I don't know
18 what he did with regard to. So I cannot
19 say, and I can't adopt the language that you
20 just used.
21 Q.   Why were you taken off any involvement
22 in the New York litigation?
23       MR. SHELDON:  Ms. Cutrona,
24 you can answer that to the extent it doesn't

1  require to you involve legal advice you
2  provided to people inside Think Finance or
3  questions that they posed to you.
4        THE WITNESS:  I'm not a
5  litigator.
6  BY MR. ACKELSBERG:
7  Q.   Okay. Now the last initiative listed is
8  the exit riskiest states initiative that we
9  looked at before on the previous slide. Do
10 you see that?
11 A.   Yes.
12 Q.   With regard to that initiative, Mr. Rees
13 is saying, no one needs to do anything because
14 it's done --
15       MR. HERMAN:  Objection to
16 form.
17 BY MR. ACKELSBERG:
18 Q.   Do you see that?
19       MR. HERMAN:  Objection to
20 form.
21       THE WITNESS:  I see what it
22 says, I don't know if he was talking to this
23 slide or if I was.
24 BY MR. ACKELSBERG:

UNSEALED

1  Q.   Okay, but one of you were saying that
2  it's not something where more work needs to be
3  done, it's been completed, that's the meaning
4  of that slide, right?
5        MR. HERMAN:  Objection to
6  form.
7        THE WITNESS:  That's what it
8  appears to say.
9  BY MR. ACKELSBERG:
10 Q.   Do you recall in this very time period
11 that Think Finance adopted something called a
12 no state list for the tribal products, do you
13 remember that?
14 A.   So I think -- I know that there is
15 something called a no state list.
16 Q.   Okay.
17 A.   I don't know when it was adopted.
18 Q.   I'm going to show you a document, this
19 has already been marked.
20       MR. SHELDON:  Are we setting
21 aside 399 and 400?
22 BY MR. ACKELSBERG:
23 Q.   Yes.  We're going to look at a document
24 that has already been marked as plaintiff's

1  exhibit P-254.  I believe last week we looked
2  at another version of this that we labeled
3  P-388, just for the benefit of counsel.
4  A.   Okay.
5  Q.   Starting -- this is an e-mail thread.
6  Let's start from the first e-mail which is
7  dated March 27th.  Do you see that that's
8  actually the day before the earlier of the two
9  PowerPoints, the executive offsite.  Do you
10 see that?
11       MR. SHELDON:  If we can go
12 off the record, I just have a question for
13 you.
14       VIDEOTAPE OPERATOR:  Off the
15 record, 10:22.
16           - - -
17    (A discussion was held off the record.)
18           - - -
19       VIDEOTAPE OPERATOR:  Back on
20 the record, 10:23.
21 BY MR. ACKELSBERG:
22 Q.   You'll see that the first e-mail is from
23 Michelle Nguyen to various people in Think
24 Finance, in the Think Finance organization.

1  Do you see that?
2  A.   Yes.
3  Q.   And you'll see that the subject is final
4  no state list for Plain Green, Great Plains
5  Lending and Mobiloans.  Do you see that?
6  A.   Yes.
7  Q.   Michelle Nguyen is not a lawyer, right?
8  A.   No.
9  Q.   Are there any lawyers that Michelle is
10 sending on the transmittal list for this
11 e-mail?
12 A.   No.
13 Q.   Now Michelle Nguyen didn't come up with
14 the no state list, did she?
15 A.   No, it looks like, if you look up above,
16 that maybe there was some legal advice given
17 from Patton Boggs and Claudia Callaway.
18 Q.   That's what I want to ask you about now.
19 We're talking -- am I right that this is the
20 same subject that was described as exit high-
21 risk states in the previous documents we were
22 looking at?
23 A.   I think it might be, but this says no
24 state list; and the other one was high-risk

1  states.  And I don't know if, in Ken's mind,
2  those were the same.
3  Q.   Can you think of any other list -- was
4  there any other list of high-risk states,
5  other than the no state list that we're
6  looking at here?
7  A.   I don't remember, there could have been.
8  Q.   There could have been.  Do you remember
9  ever seeing a list of states other than the 14
10 states that are listed here on Exhibit P-254?
11       MR. SHELDON:  Ms. Cutrona,
12 I'll just give you an instruction.  If your
13 answer is, you don't remember or you don't
14 know, I'm fine with you giving him that
15 answer.  If your answer would be affirmative
16 in some sense, and it would require you to
17 reveal legal analysis that was done inside
18 Think or at the request of Think by outside
19 counsel, I'd ask you to acknowledge that and
20 we can step out in the hall and discuss how to
21 handle it.
22       THE WITNESS:  I think we need
23 to step out.
24       VIDEOTAPE OPERATOR:  Off the

UNSEALED

1  record, 10:25.  Back on the record.
2  BY MR. ACKELSBERG:
3  Q.   Without getting into, well, I will ask
4  you a different question.  The work in
5  preparing this list was done with the help of
6  outside counsel?
7  A.   Yes.
8  Q.   And the Claudia that's referenced in the
9  e-mail, that's Claudia Callaway, correct?
10  A.   Yes.
11  Q.   It also references Patton Boggs?
12  A.   That's correct.
13  Q.   Did you hire Patton Boggs and Claudia
14  Callaway to help with this effort?
15  A.   So, both Claudia -- I wouldn't phrase it
16  that way.  Claudia and Patton Boggs both
17  worked on various issues for Think Finance.
18  Q.   Specifically worked on the issue of
19  identifying high-risk states?
20  A.   Yes, they were involved.
21  Q.   Who at Patton Boggs was involved?
22  A.   I think Ed Garris was one of the
23  attorneys and there was another one whose last
24  name was Fagan, not spelled the same way my

1  maiden name is.
2  Q.   Mr. Garris is an expert in Indian law,
3  correct?
4  A.   Yes, he understands Indian law and he
5  also does many other things, corporate work.
6  Q.   But as between Patton Boggs and --
7  Claudia is a specialist -- Claudia Callaway is
8  a specialist in regulatory environment in the
9  different environment in the different states
10  with regard to high-rate lending, correct?
11  A.   My -- I don't know how to answer that.
12  I think some people would say she is, some
13  people would say she isn't.  Her engagement
14  here was actually --
15      MR. SHELDON:  Ms. Cutrona, I
16  just want to caution you.  I am okay with a
17  level of specificity of you saying, for
18  instance, that you engaged Ms. Callaway or
19  Patton Boggs on consumer regulatory matters.
20  And to the extent Mr. Ackelsberg wants to know
21  if that's within their field, I'm okay with
22  you answering that too, within your personal
23  knowledge.  I am worried that your answers are
24  about to veer into having to necessarily

1  reveal specific types of analyses that they
2  conducted for you, other than what's discussed
3  in this particular e-mail.
4      So I would instruct you just
5  to be cautious in your answers, and if there's
6  anything we need to discuss, we can.
7      THE WITNESS:  Okay.  So the
8  answer is yes.
9      MR. ACKELSBERG:  Can you read
10  back the question that the answer was yet to?
11            - - -
12      (Whereupon the Court Reporter
13  read back the question.)
14            - - -
15      THE WITNESS:  I would
16  probably re-characterize that as non-prime
17  lending.
18  BY MR. ACKELSBERG:
19  Q.   Was there a -- Ms. Cutrona, we were
20  provided last week with some retainer
21  agreements between Ms. Callaway and Think
22  Finance.  And I will represent to you that one
23  was from 2009 to help with the Payday One
24  product.  And then there was a 2012 retainer

1  dealing with the CIDs received from the CFCB.
2      So my question is, was there
3  any retainer agreement between Think Finance
4  and Ms. Callaway with regard to the work she
5  did on developing the no state list?
6      MR. SCHEFF:  Object to the
7  form, mischaracterizes the testimony.  You can
8  answer the question.
9      THE WITNESS:  So I don't know
10  the answer to that, but I have to tell you I
11  am surprised there was one regarding payday in
12  2009.  Because I started in 2006, and most of
13  the work on payday would have been done before
14  2009.
15  BY MR. ACKELSBERG:
16  Q.   I would be happy to show you -- I
17  promise to show them to you before we finish.
18      But you don't recall there
19  being anything in writing requesting any work
20  product from Ms. Callaway as to high-risk
21  states?
22      MR. SHELDON:  Are you talking
23  about specifically engagement or retainer
24  letters?

25  (Pages 97 to 100)

UNSEALED

App. 0538

1    THE WITNESS:  I appreciate
2  that.  You don't want me passing out.
3    MR. ACKELSBERG:  I don't want
4  you passing out.  I'll never hear the end of
5  it.
6    - - -
7    (Whereupon Exhibit P-403 was
8  marked for identification.)
9    - - -
10  BY MR. ACKELSBERG:
11  Q.   This one, I think, will be fairly quick.
12  So this is just a vendor list from June of
13  2012.  I will represent to you that I have not
14  produced the entire spreadsheet because it's
15  massive and I'm only interested in the entry
16  that's on the last page.
17    So you'll see that on the
18  vendor list is Tami Simpson, who had various
19  invoices that were paid and this is in the
20  2011 time period.
21    So my question is, if you
22  know, why Tami Simpson, the legal manager on
23  those early e-mails we looked at with regard
24  to the complaints from the AG's, why she is

1  being paid as a vendor, if you know?
2  A.   So what page specifically are you
3  talking about?
4  Q.   The last page of the document.
5  A.   This was in 2011?
6  Q.   Yes.
7  A.   I can speculate --
8    MR. SCHEFF:  You cannot
9  speculate.
10  BY MR. ACKELSBERG:
11  Q.   We are not interested in wild guesses,
12  we are interested in what you can surmise just
13  based on your experience.  And you can
14  condition it anyway you wish.
15    MR. SCHEFF:  Ms. Cutrona, if
16  you have a reasonable basis to answer Mr.
17  Ackelsberg's question, then you can answer it.
18    THE WITNESS:  I think I do.
19  This is probably related to either expense
20  reports that she had or it would be related to
21  maybe licensing fees for the Payday One
22  product or examination fees imposed by
23  regulatory examinations.
24  BY MR. ACKELSBERG:

1  Q.   Do you recall her laying out the money
2  and being reimbursed for license fees?
3  A.   We don't have a corporate credit card,
4  so someone pays and is reimbursed.
5  Q.   Oh, okay.  There's the answer.  Thank
6  you.  Won't anybody give you credit?
7  A.   Is that a joke?
8    - - -
9    (Whereupon Exhibit P-404 was
10  marked for identification.)
11    - - -
12    MR. SHELDON:  I'm going to need
13  to step out and talk to Ms. Cutrona about this
14  document.
15    VIDEOTAPE OPERATOR:  Off the
16  record.  Back on the record, 11:23.
17    MR. SHELDON:  Mr. Ackelsberg,
18  this document appears to have been
19  inadvertently produced and it contains
20  privileged materials, including the analysis
21  of Ms. Cutrona concerning legal issues.  We're
22  going to claw it back pursuant to the
23  protective order in this matter.
24    At this time, it's hard for me

1  to tell if there's really any substance of it
2  that could be relayed that's non-privileged.
3  So I'm not sure if it's going to be an entire
4  clawback or just a redaction.  But what I will
5  tell you, for the sake of your record, so you
6  can understand, is that my understanding is
7  the compliance department conducted interviews
8  with employees to set up compliance and audit
9  schedule.  Where those interviews were with
10  non-legal personnel, they have been produced
11  and we don't claim privilege over that.  But
12  in this case, the interview was with Ms.
13  Cutrona, in her role as general counsel.  And
14  the answers that she provided, which are
15  reflected here, include ratings and other
16  things, reflect her legal analysis and her
17  work as providing legal advice to Think
18  Finance.
19  BY MR. ACKELSBERG:
20  Q.   Ms. Cutrona, let me ask you this:  Do
21  you remember when these compliance interviews,
22  the risk analysis interviews were conducted
23  back in 2011?
24  A.   No, I don't remember, I know they

UNSEALED

1 occurred.
2 Q.  Do you remember being interviewed by
3 Kurt Tunnell?
4 A.  I don't remember being interviewed by
5 Kurt Tunnell.
6 Q.  All right, we will move on.
7         - - -
8      (Whereupon Exhibit P-405 was
9 marked for identification.)
10         - - -
11 BY MR. ACKELSBERG:
12 Q.  So this actually relates to some matters
13 that we talked about before, do you see that?
14 A.  Yes.  What matters, specifically?  Why
15 don't you -- I want to make sure I understand
16 specifically what you're referring to.
17 Q.  I am going to ask you a question.  So do
18 you remember this e-mail?
19 A.  I do remember this e-mail.
20 Q.  You're reporting to the executives,
21 that's what PDO corporate means, right?
22 A.  No.
23 Q.  What does PDO corporate mean?
24 A.  PDO corporate usually would mean

1 Q.  Specifically the Cash America decision?
2 A.  Yes, at the appellate level, yes.
3 Q.  And that's where Pennsylvania -- the
4 decision of the Pennsylvania Banking
5 Department to assert jurisdiction over
6 internet lenders was affirmed by the high
7 courts of Pennsylvania?
8 A.  So I don't think I can adopt your words,
9 because I think the actual language in the
10 opinion is much more specific about the
11 interpretation of what doing business in the
12 Commonwealth is, as it relates to state law,
13 that it did not address federal law, it did
14 not address preemption, it did not address
15 what banks do in the state, and it did not
16 address tribal lending law.
17 Q.  And for that reason, you said to the
18 employees after reading the decision that our
19 diversification strategy is indeed paying off,
20 correct?
21 A.  That's exactly what it says.
22 Q.  And what you meant by that is, we may
23 not be able to do Payday One in Pennsylvania,
24 but we can still use ThinkCash.

1 everyone at Payday One.
2 Q.  And that would be --
3 A.  -- every employee.
4 Q.  Every employee of Payday One?
5 A.  Correct.
6 Q.  And at that point in time, that was the
7 company now known as Think Finance?
8 A.  I don't know, because it says PDO --
9 yeah, it probably should, yes.  My signature
10 is at Thinkcash.com.
11 Q.  So this would just happen to be --
12 A.  I think it would be ThinkCash, not Think
13 Finance.
14 Q.  Right.  At the time the company was
15 called ThinkCash, right?
16 A.  That's correct.
17 Q.  So your -- so this was basically a
18 transmittal to a wide audience.  This wasn't
19 just the top execs?
20 A.  That's correct.
21 Q.  And you're reporting on one of the
22 Pennsylvania Appellate Court Rulings that we
23 talked about before, correct?
24 A.  Yes.

1     MR. SHELDON:  Objection.
2     MR. SCHEFF:  Object to the
3 form.  You can answer the question.
4     THE WITNESS:  What I meant by
5 that, and I'm sure you understand, there were
6 kind of two functions that we were doing at
7 this time.  One was as a direct lender, and we
8 were making Payday One loans in the State of
9 Pennsylvania.  And the other was as a service
10 provider to banks that were making loans
11 subject to federal banking law.  The First
12 Bank of Delaware and Urban Trust Bank.
13 BY MR. ACKELSBERG:
14 Q.  As a result of the ruling, Payday One
15 turned off -- the Payday One lending was
16 turned off in Pennsylvania, correct?
17 A.  That's right.
18 Q.  But you filled the gap, I think to use
19 your words?
20 A.  Where does it -- oh, we will be filling
21 the gap, okay, see it.
22 Q.  Filling the gap with the ThinkCash
23 product, correct?
24 A.  It says with these products.

UNSEALED

1   Q.   Right.  Do you know if the -- so let me
2   ask you this:  So Think Finance, after the
3   ruling, continued to market the ThinkCash
4   product in Pennsylvania for First Bank of
5   Delaware?
6   A.   So I can tell you that because that
7   ThinkCash, pursuant to its agreement with the
8   banking partner lenders, continue to provide
9   services for the banks and obviously every
10  marketing material that was sent to
11  Pennsylvania would have been reviewed and
12  approved by the lender.
13  Q.   But my question was, am I right that
14  ThinkCash continued to market in Pennsylvania
15  for First Bank of Delaware, after this
16  decision came down?
17  A.   Yes, because -- yes.
18  Q.   And it also continued to collect
19  payments from Pennsylvania borrowers on
20  account of ThinkCash loans?
21          MR. SHELDON:  Objection to
22  form.  Object to the use of the word,
23  collects.  Witness can answer if she can.
24          THE WITNESS:  Yeah, I think I

1   need to lay a little bit of ground work for
2   this.  The way these relationships were
3   established was that the bank hired, as an
4   agent for the bank, a collection group.  That
5   contract was between the collection group and
6   the bank.
7          So ThinkCash never collected
8   anything.  The bank through its vendor
9   collected payments on ThinkCash loans, that
10  the bank made.
11  Q.   So the ACH at that point, in the
12  ThinkCash period, was actually done by First
13  Bank of Delaware, correct?
14  A.   I don't remember.  I think that's
15  correct, but I couldn't swear to it.  I would
16  have to go and look it up.
17  Q.   What about the -- First Bank of Delaware
18  had contracts with regard to -- had vendor
19  contracts with collection agencies, right?
20  A.   Yes.
21  Q.   Wasn't it Think Finance's job as part of
22  its contractual relationship with First Bank
23  of Delaware, to oversee those collection
24  efforts?

1   A.   I don't think I would adopt those words,
2   oversee those collection efforts.  In fact, I
3   would probably have to look back to the
4   contract to see what it said exactly the role
5   was with Think Finance overseeing the vendors,
6   which by the way the FDIC had suggested the
7   bank hire rather than have Think Finance do it
8   ourselves.
9   Q.   Be more specific, what are you referring
10  to there?
11  A.   Well, in the first version I would call
12  it version one of ThinkCash, the First Bank of
13  Delaware was going through an examination.
14  And the examiners suggested or we understand
15  it was their suggestion from First Bank of
16  Delaware, that they were not comfortable with
17  Think Finance doing collections and customer
18  service on behalf of the bank.
19          So as a result, these duties
20  were contracted for by the bank, and that was
21  the version two of the Think Finance product,
22  which was done as a result of guidance and
23  oversight of the FDIC with First Bank of
24  Delaware.

1   Q.   Version one as you describe it, that was
2   between, as I recall the companies that -- the
3   Think Finance companies were TC Loan and TC
4   Financial.  Do you remember that?
5   A.   I don't remember.
6   Q.   Am I right that in the original version
7   shortly after the loans were made, I think on
8   a daily basis, the loans were actually
9   purchased by Think Finance from First Bank of
10  Delaware, right?
11  A.   Yeah, I think it was a whole loan sale,
12  much like you see in auto finance or credit
13  cards.
14  Q.   Right.  So on a daily basis -- again,
15  this is the original concept, on a daily basis
16  the loan was originated by First Bank of
17  Delaware, but every business day the loans
18  were then transferred to Think Finance?
19  A.   No, I don't think it was every business
20  day.  And I would actually have to refer,
21  because it has been quite some time, I think
22  there was a lag, I'm not sure how long that
23  lag was.  And I actually have to say now that
24  I don't know if there was any period of time

UNSEALED

1 that we actually operated under that version
2 one before we revised it to sell the
3 participation interest.
4 Q. Would it be helpful if you saw the
5 initial participation agreement?
6 A. No, because I would have to line it up
7 with when actually First Bank of Delaware, the
8 first loan that was made with them, and I
9 don't remember when that is. And I don't
10 know, if you have a document that says that,
11 that might help me. But I know there were
12 various versions of the agreements.
13 Q. I apologize, this one's a bear. For
14 clarity of the record, let's assign this a
15 number, P-406. But I believe it was
16 previously introduced as P-103. We will use
17 the 406 today.
18 - - -
19 (Whereupon Exhibit P-406 was
20 marked for identification.)
21 - - -
22 BY MR. ACKELSBERG:
23 Q. It will also help you in situating this,
24 the FDIC cease and desist was October 2008.

1 A. That's fine. I'm sure there were,
2 before that time, examinations. In fact, I
3 know there were. And I don't think the two
4 are related.
5 Q. Okay.
6 A. Rather than go through this entire
7 document which outside counsel produced and I
8 had minimal involvement with, do you want to
9 point me to the area that you have specific
10 questions.
11 Q. Yeah, sure. Why don't you turn to the
12 fourth page.
13 MR. SHELDON: Irv, I am
14 looking here at page 26, which is a signature
15 page. And I see this document is you know
16 executed are you making representation that
17 this is the final document.
18 MR. ACKELSBERG: Well, this
19 was what was produced. I don't think I have
20 one with signatures. I think we actually -- I
21 think this might have actually been -- I think
22 this was the Lutes deposition. This was very
23 early, or Rogenski. Any way, I think we dealt
24 with this back then. This was the version

1 that was produced and it appears to be all
2 that exists.
3 MR. SHELDON: Ms. Cutrona, I
4 know you're trying to refresh your
5 recollection on this. This document is
6 unsigned, but it appears to be a version that
7 was produced in this litigation. If you can
8 use the document to actual accurately refresh
9 your recollection, please do.
10 If you have any concerns,
11 please be clear for the record what those
12 concerns are.
13 THE WITNESS: I do have to
14 say that because I know what occurred
15 generally at this time, there were a lot of
16 different versions of the contracts. And
17 things changed quite a bit.
18 BY MR. ACKELSBERG:
19 Q. Do you remember when it started out as a
20 whole loan purchase and then it was changed to
21 buy-in participations?
22 A. I do know that contractually the
23 original document did call for that, but as I
24 said before, I'm not sure that Go Live -- I'm

1 not sure that the bank actually lent under
2 that prior version before they went through
3 one of their many consultations with the FDIC,
4 where the FDIC asked for the program to be
5 restructured.
6 Q. Okay. So you do recall though, that
7 there were restructurings that occurred at the
8 behest of FDIC?
9 A. At behest of First Bank of Delaware,
10 yes.
11 Q. And as communicated to you by First Bank
12 of Delaware, it was because of what their
13 examiners told them?
14 A. Generally, yes.
15 Q. How did the initial connection -- how
16 was the initial connection made with First
17 Bank of Delaware?
18 A. As I recall, it was a Sun Trade
19 Association meeting or a meeting, some
20 conference. And I think it might have been in
21 Las Vegas, but I can't recall for sure.
22 Q. This is an industry conference?
23 A. Yes.
24 Q. And there was some interaction -- were

UNSEALED

App. 0542

1  you there at that conference?
2  A.  Yes, I was.
3  Q.  Was it Alonzo Primus you met with?  Who
4  was the First Bank of Delaware person you met
5  with?
6  A.  I think it was Alonzo Primus.
7  Q.  If you look at the document, this master
8  participation agreement, you will see that
9  your -- it indicates you as being the -- you
10  can look at page -- if you look at page 19 and
11  20, it says who the pertinent people are to
12  get notices.
13  A.  Okay.  I was looking at page 14 of the
14  second document.  Is there more than one
15  document in here?
16          MR. SHELDON:  There's a
17  document and then there's several exhibits.
18  He's referring to -- if you start at the very
19  beginning and then start going back to the
20  page numbers at the bottom.  The first page
21  you get to is the one he's talking about.
22          THE WITNESS:  Okay.  The
23  first page, 19.
24          MR. SHELDON:  Your name is on

1  page 20.
2  BY MR. ACKELSBERG:
3  Q.  Do you see that?
4  A.  Yes.
5  Q.  You see that on page 19 the lawyer for
6  First Bank of Delaware is Richard Eckman?
7  A.  Yes.
8  Q.  Is this the first time that you met Rick
9  Eckman -- was it through the First Bank of
10  Delaware deal?
11  A.  I think that's probably right, yes.
12  Q.  And throughout the relationship that
13  Think Finance had with First Bank of Delaware
14  was Rick Eckman, counsel -- with regard to the
15  transaction, the relationship between Think
16  Finance and First Bank of Delaware?
17  A.  He was attorney to First Bank of
18  Delaware.  There may have been other attorneys
19  too, but he was one of them.
20  Q.  If you look all of the way at the back
21  of the document, it would be easier if you
22  refer to the Bates number.
23  A.  Okay.
24  Q.  It's 974.

1  A.  Okay.
2  Q.  You see there is a list of excluded
3  states that the bank will not make loans in
4  its following states, do you see that?
5  A.  Uh-huh.
6  Q.  And you might have touched on this
7  already, but can we agree that with regard to
8  the ThinkCash product, it was First Bank of
9  Delaware that made all of the decisions with
10  regard to which states that the loans would be
11  offered in?
12  A.  So I'm not sure about that.
13  Q.  Do you recall this list -- what is it
14  you're not sure about?
15  A.  I'm not sure that it was solely based on
16  First Bank of Delaware's recommendation.
17  Q.  That Think Finance might have had some
18  say in the state that they were working in?
19  A.  I think that would call for privileged
20  information.
21  Q.  I am talking about discussions with
22  First Bank of Delaware though.  I am not
23  asking your discussions with Ken Rees.  I am
24  talking about your discussions with Rick

1  Eckman.
2  A.  It would be based on my legal analysis.
3  Q.  Well, I'm not asking for the legal
4  analysis.  I'm saying, was there a time when
5  you and Rick Eckman actually discussed which
6  states that the product would be offered in?
7  A.  So as I recall, the bank had asked for
8  some legal analysis to be done, that Mr.
9  Eckman did.
10  Q.  Okay.  And he did that for First Bank of
11  Delaware?
12  A.  Yes.
13  Q.  Were you also doing independent analysis
14  or were you just relying on Mr. Eckman's
15  analysis?
16  A.  I would say that I was also doing
17  independent analysis.
18  Q.  Did you participate in the decision at
19  the outset of the program of which states to
20  market the loans in?
21          MR. SHELDON:  I'm going to
22  give you an instruction here, Ms. Cutrona.  If
23  Mr. Ackelsberg is referring to participate in
24  the decision in terms of discussions with

UNSEALED

1    First Bank of Delaware or Mr. Eckman, who was
2    First Bank of Delaware's counsel, you can
3    answer.
4            MR. ACKELSBERG:  That's all
5    I'm asking.
6            MR. SHELDON:  So with that
7    clarification, you can answer, Ms. Cutrona.
8            THE WITNESS:  Yes, I
9    participated in discussions.
10   BY MR. ACKELSBERG:
11   Q.   Was that from the beginning of the
12   program?
13   A.   That would be hard for me to say, and
14   it's because this document -- I think the
15   draft on it or the date is January 23rd of
16   2007.  I had just begun in July of 2006.  My
17   major focus was on getting those state
18   licenses for the direct Payday One lending
19   product.  And this document, as I referred
20   earlier, I could tell by this number, it was
21   not drafted by me.
22   Q.   The analysis that Mr. Eckman did for
23   First Bank of Delaware, was that used later to
24   decide which states to operate in for the

1    tribal product?
2            MR. SHELDON:  Ms. Cutrona, if
3    you can answer that question without revealing
4    legal analysis that you performed for Think
5    Finance in your role as general counsel, you
6    can.
7            THE WITNESS:  I can't answer
8    that question.
9    BY MR. ACKELSBERG:
10   Q.   You said Rick Eckman did an analysis for
11   the bank.  Was that in writing?
12   A.   I believe it was, yes.
13   Q.   And it was a state-by-state analysis?
14   A.   Yes, it was.
15   Q.   And it was shared with you?
16   A.   Yes.
17   Q.   I don't believe that was a document that
18   was produced.
19           MR. SCHEFF:  Maybe it doesn't
20   exist anymore.
21           MR. ACKELSBERG:  Do you know
22   if it exists?
23           THE WITNESS:  I don't know.
24   I've been away from Think Finance for a pretty

1    long time.
2            MR. SHELDON:  Ms. Cutrona,
3    what year would it have been shared with you,
4    do you think?
5            THE WITNESS:  2006, maybe.
6            MR. ACKELSBERG:  We're
7    looking at 2007.  If it doesn't exist, it
8    doesn't exist.
9    BY MR. ACKELSBERG:
10   Q.   Did Mr. Eckman explain in that document
11   why he was recommending that First Bank of
12   Delaware operate in Pennsylvania, but not in
13   New York?
14   A.   No, I don't think he explained that in
15   the document.
16   Q.   What did he explain in the document?
17   A.   It was more of a recitation of state law
18   and federal preemption and applicability of
19   state law.
20   Q.   At that point in time, in the 2007 time
21   period, do you remember when CashCall was sued
22   by the West Virginia Attorney General?
23   A.   I do remember that.
24   Q.   And the attorney general's position,

1    the West Virginia Attorney General's position
2    at that time was that, not withstanding
3    federal preemption, that in the judgement of
4    the West Virginia Attorney General's Office,
5    that CashCall was the true lender in that
6    arrangement; and that therefore federal
7    preemption did not apply.  That was the
8    position taken in that litigation, correct?
9    A.   So I can't adopt your exact words, but I
10   believe in general that was the position of
11   the West Virginia AG's office.
12   Q.   So at the time that you were making
13   loans --
14   A.   Remember, I didn't make loans.
15   Q.   Yes, I'm sorry.  I'm going to change
16   that.  At the time that the ThinkCash loans
17   were being offered to consumers, you were
18   aware that certain states believed that the
19   federal banking preemption would not prevent
20   the state from enforcement action, right?
21           MR. SHELDON:  Object to form.
22   I'm not sure I understand it, but the witness
23   can answer if she can and if it doesn't reveal
24   any legal analysis that she did in her role as

UNSEALED

1  in-house counsel at Think Finance.
2           MR. HERMAN: I'm also going
3  to object to form and say that it assumes
4  facts that are not of record.
5  BY MR. ACKELSBERG:
6  Q.  You can answer now.
7  A.  Can you repeat the question, please?
8           - - -
9        (Whereupon the Court Reporter
10  read back the pending question.)
11           - - -
12       THE WITNESS: I'm aware that
13  states believed that federal preemption did
14  not apply.
15  BY MR. ACKELSBERG:
16  Q.  One of those states was West Virginia,
17  correct?
18  A.  I'm aware that that was what West
19  Virginia thought, evidently, because I brought
20  the lawsuit.
21  Q.  That's why West Virginia was on Mr.
22  Eckman's list, correct?
23       MR. HERMAN: Object to form,
24  assumes facts.

1       THE WITNESS: I don't know
2  that I can answer that question, because I
3  didn't create the list, the bank did.
4       MR. SHELDON: I've been
5  presuming something, so I haven't been
6  objecting. But I presume all of your
7  questions along this line are in relation to
8  CashCall specifically, and that she's aware
9  that that is the position that they took with
10  regards to CashCall, not with regard to say
11  all lending made by preemption, right?
12       MR. ACKELSBERG: No, that's
13  not my question.
14       THE WITNESS: Well, that's
15  very important, because that's how I've been
16  answering the questions.
17  BY MR. ACKELSBERG:
18  Q.  I will be more than happy to clarify.
19  A.  Thank you.
20  Q.  Let's just start -- you understood that
21  in 2007, the West Virginia Attorney General
22  went after CashCall for its bank model
23  product, right?
24  A.  Yes.

1  Q.  Who was CashCall's bank at the time?
2  A.  I do not know.
3  Q.  You don't remember it being First Bank
4  of Delaware?
5  A.  No, I don't.
6  Q.  What I'm asking is, wasn't Mr. Eckman --
7  you said that you got this state by state
8  analysis of the law. One of the things that
9  Mr. Eckman was analyzing, was the risk of
10  operating in a particular state and the risk
11  of state enforcement, right?
12  A.  That's right. But I don't know what the
13  timing was of that versus the litigation that
14  was going on in West Virginia.
15  Q.  I'm just saying, you were aware of it;
16  he would have been aware of it, right?
17  A.  You would have to ask him --
18  Q.  I know that.
19  A.  We're both making assumptions here.
20  Q.  But in the memo, Mr. Eckman was not only
21  analyzing the substantive law in the state,
22  but also the likelihood of enforcement by the
23  state?
24  A.  Is there a memo?

1       MR. SHELDON: Ms. Cutrona,
2  he's referring to -- there was deposition
3  testimony earlier where you talked about Mr.
4  Eckman providing a memo or analysis specific
5  to the FBD program. I think he's going back
6  and talking about that memo again.
7       THE WITNESS: I'm not sure
8  it's a memo, but anyway, what's the question.
9  BY MR. ACKELSBERG:
10  Q.  So you've got a written memo and you
11  also had discussions with Mr. Eckman about
12  what states to operate in, correct?
13       MR. SHELDON: Object to form.
14       THE WITNESS: There was an
15  analysis provided and discussions occurred.
16  BY MR. ACKELSBERG:
17  Q.  And part of the analysis that he
18  provided to you was about the enforcement
19  policy of the particular state, correct?
20  A.  I would have to look at what he said
21  about West Virginia in the document.
22  Q.  But you would expect him to be looking
23  not only at the substantive law, but potential
24  enforcement problems in a particular state.

UNSEALED

1  That's part of what you would have expected
2  him to provide, right?
3          MR. SCHEFF:  Objection, calls
4  for speculation as to what someone else did.
5  You can ask her whether she knows, and she can
6  answer that question.
7          THE WITNESS:  Again, I don't
8  know the timing of that.  So if it was after
9  CashCall, I'm assuming, I don't know, it was
10  covered.  If it was before, I don't know.
11  BY MR. ACKELSBERG:
12  Q.   And if the Minnesota or let's say the
13  Massachusetts AG had issued a CID or filed a
14  lawsuit in the area of high-rate lending, it's
15  possible that that would have been part of
16  what Mr. Eckman would be looking at in
17  deciding not to be in Massachusetts, correct?
18          MR. SHELDON:  Objection,
19  calls for speculation.  Witness can testify as
20  to things within her knowledge.  Ms. Cutrona,
21  you can answer.
22          THE WITNESS:  You're asking
23  me to guess what was in a document that he
24  covered, and I cannot guess.  If I got the

1  document in front of me, that's different, but
2  I can't guess.
3  BY MR. ACKELSBERG:
4  Q.   Was Think using any outside regulatory
5  counsel of its own in 2007 with regard to the
6  states that -- where the ThinkCash product
7  would be marketed?
8  A.   Yeah, I think during that time period
9  Claudia Callaway provided regulatory guidance
10  in general to the company?
11  Q.   Before 2009?
12  A.   Yes.
13  Q.   Now the parties to the original deal
14  were TC -- the Think Finance parties were TC
15  Loan Services and TC Financial.  Do you
16  remember why those entities were used?
17  A.   No.
18  Q.   Do you know if they were created for
19  purposes of the transaction of First Bank of
20  Delaware?
21  A.   I did know that TC Loan Service, and
22  it's one, not services; was the entity that
23  employed us.  It was on the paychecks.  But I
24  don't know that it was created specifically

1  for this agreement.
2  Q.   Do you remember TC Loan registering with
3  the State of Pennsylvania as a loan broker?
4  A.   Yes, I do.
5  Q.   Why did Think Finance do that?
6  A.   So I recall very specifically that
7  when -- as I refer to version one of the way
8  the program was supposed to work, where Think
9  Finance would be marketing and before it was
10  divided up, that Think Finance needed -- he's
11  calling for my analysis.  I'm not sure I can
12  answer.
13          MR. SHELDON:  Ms. Cutrona, if
14  there is, for instance, a communication with a
15  third party, like the Commonwealth of
16  Pennsylvania that informed your decision
17  whether or not to get a license or apply for a
18  license, please do provide that information.
19          If the decision to apply for
20  a license was made and informed solely as a
21  result of your internal legal analysis, then
22  you should note that and I'll instruct you not
23  to answer.
24          THE WITNESS:  So what I can

1  say is that where perhaps the law is not
2  clear, I often times will call up a regulatory
3  agency to discuss with them whether or not
4  certain licensing was needed.  In fact, with
5  regard to -- I think it may have been in the
6  fall of 20 -- I am not sure what year it would
7  have been, but prior to the program being --
8  for ThinkCash loans being offered in
9  Pennsylvania, a letter went to the
10  Commonwealth and it described the program with
11  the parties that were involved in the program.
12  It described the services that Think would be
13  providing to the bank.  And the question was,
14  do we need this -- I think it's the loan
15  brokers services license?  I am not even sure
16  of the exact name.  So that went out.
17          I think, I don't know if it
18  was Cater Frantz or Jim Kaiser.  Jim Kaiser
19  was usually who I would talk to regarding any
20  question I had in Pennsylvania.  And I called
21  in January, after that letter was sent in the
22  fall, to follow up to see what he said.  And
23  he said the only license you need, and again
24  this is in version one, would be this loan

UNSEALED

Sarah Cutrona

1 broker license. And we have no issues with
2 the program.
3 Q. That was early on right, in 2007?
4 A. I really -- I would have to look at the
5 date. I don't know -- I know it was the fall.
6 It makes sense to me that it was either the
7 fall of '06 and January of '07; or it could
8 have been the fall of '07 and January of '08.
9 Q. That was before the Cash America
10 decision in '09 that's referenced in your
11 e-mail to PDO corporate, right?
12 A. Let me look and see when that was. I
13 don't like to guess.
14        MR. SHELDON: I think after
15 this line of questioning it would probably be
16 a good lunch time.
17 BY MR. ACKELSBERG:
18 Q. Let me finish this document.
19 A. What document was that? 405, right
20 here. Yeah, so this was in -- I have to look
21 and see when the documents were. This was in
22 July of 2009 that I sent this. So that's
23 correct.
24        Wait, let's have the

1 question. I think you asked me if this was
2 after the decision or my call with Jim Kaiser
3 was before.
4 Q. Right.
5 A. That's correct.
6 Q. So just to summarize, for clarity of the
7 record, in roughly 2006 or 2007; you remember
8 applying for a loan broker license, you
9 remember a conversation with someone in the
10 banking department, right?
11 A. Yes, either '06/'07 or '07/'08.
12 Q. But later in 2009 is when the Cash
13 America decision came down, correct?
14 A. In West Virginia.
15 Q. No, I am talking about the Pennsylvania
16 --
17 A. Oh, in Pennsylvania, yes.
18 Q. That's the -- I promise you this is the
19 last, we will give you a break. And 2009 is
20 when the Pennsylvania Supreme Court came down
21 with the Cash America decision, correct?
22        MR. SCHEFF: Object to the
23 form.
24        THE WITNESS: That's the

1 appellate decision that I reference in my July
2 2009, e-mail, yes.
3 BY MR. ACKELSBERG:
4 Q. Am I right that the Pennsylvania Banking
5 Department told ThinkCash to cease marketing
6 the product in Pennsylvania?
7 A. I don't think you're right about that.
8 I remember -- this is where it's a little
9 tricky, because ThinkCash was the corporate
10 name of the company and also the product that
11 First Bank of Delaware marketed. And I recall
12 a letter coming to the company, ThinkCash,
13 from Pennsylvania. But as I recall, it was
14 referencing the payday lending product that
15 ThinkCash made directly into the Commonwealth
16 of Pennsylvania. I could be wrong, but that's
17 what I recall.
18 Q. So I want to show you a document that
19 has been previously marked as Exhibit P-373
20 and just ask if this refreshes your
21 recollection?
22 A. Yes, it doesn't change what I said
23 though.
24 Q. Why is that?

1 A. Because this request went to ThinkCash
2 and it was regarding, in my mind, the Payday
3 One product.
4 Q. Where in this letter does it say it's
5 about the Payday One product?
6 A. Well, the reason I say that is because
7 the actual lawsuit was about a Payday One
8 product in this state, as I recall. So this
9 was interpreted -- you're asking my
10 interpretation, to be applicable to the Payday
11 One product. And that's the way I read it.
12 Q. Even though it was addressed to
13 ThinkCash and never mentions the payday loan
14 product?
15 A. ThinkCash was the name of the
16 corporation.
17 Q. It was also the name of the company that
18 had submitted a license to market the First
19 Bank of Delaware product called ThinkCash,
20 correct?
21 A. That's right.
22 Q. Your assumption was that when the
23 Pennsylvania Department of Banking wrote to
24 the company and said, stop, discontinue any

UNSEALED

1  and all advertising targeting Pennsylvania
2  residents, they were concerned about the
3  Payday One product, not the product called
4  ThinkCash?
5  A.  Yeah, let me walk you through this.
6  This letter was sent to ThinkCash in Fort
7  Worth.  ThinkCash was the parent company of
8  the entity that was lending in Pennsylvania,
9  the payday product.  And when it says that we
10  discontinue any and all advertising targeting
11  Pennsylvania residents, it's talking about
12  what ThinkCash, the corporate entity was doing
13  in Pennsylvania.  It's not saying, ThinkCash,
14  the marketing that you're doing on behalf of
15  the bank, cease and desist.  In fact, I think
16  the broker's license was probably renewed a
17  few times, as well.
18       To me this is -- you're
19  trying to conflate the two, and I don't think
20  -- that's not at all what this is regarding.
21  Q.  Earlier in 2006, or '07 or '08, whenever
22  it was, that the company submitted an
23  application to register as a loan broker --
24  A.  Right.

1  Q.  And described the ThinkCash product --
2  A.  -- version one, not version two.
3  Q.  At that time the license was in the name
4  of ThinkCash to market that product, right?
5  Is that the broker license, ThinkCash?
6  A.  I don't know, I would have to look at
7  it.  But I would like to clarify a few things,
8  because it's very important.  ThinkCash, the
9  letter that went from ThinkCash would have
10  described version one of the product, okay,
11  not the way things were divided later on,
12  where you had a marketing entity working with
13  the bank --
14  Q.  Are you talking about Tailwinds --
15  A.  A decision sciences company working with
16  the bank.  There may have been one or two
17  other agreements.  So those were two
18  completely different structures.  And so as I
19  recall, this license was really related to --
20  in fact, it was, it was related to version one
21  of that, not the second version.
22       So of course I would not
23  interpret this letter to impact a bank product
24  that was being offered by a bank in

1  Pennsylvania.  Can we have a break now?
2       MR. ACKELSBERG:  Yeah, we can
3  break.
4       VIDEOTAPE OPERATOR:  End of
5  media unit number two, we're off the record at
6  12:08.
7       This is the beginning of
8  media unit number three, we're back on the
9  record at 12:48.
10  BY MR. ACKELSBERG:
11  Q.  Ms. Cutrona, before we broke we were
12  talking about the First Bank of Delaware
13  relationship and the ThinkCash product.  What
14  I would like to do is move the timeframe a
15  little forward now to the end of 2010, the
16  beginning of 2011 when work was being done to
17  develop a tribal installment loan product to
18  take the place of ThinkCash, do you remember
19  that?
20  A.  I remember in that timeframe we did a
21  lot of research, but I wouldn't characterize
22  it as taking place at ThinkCash.
23  Q.  You were looking, among other things,
24  for a place to put the customer base of

1  ThinkCash, right?  Isn't that ultimately what
2  got transferred to Plain Green?
3  A.  Those are your words, not my words.  And
4  I do believe that the customers -- some of the
5  customers ended up taking out loans with Plain
6  Green, but I don't think all of them did.
7  Q.  You do recall the previous time when the
8  tribal product was in its development stage?
9  A.  Yes.
10  Q.  During that period of time, Think
11  Finance called the prototype that it was
12  working on --
13       MR. SCHEFF:  Did you want to
14  supplement your answer?
15       THE WITNESS:  I would like to
16  clarify something.
17  BY MR. ACKELSBERG:
18  Q.  Go ahead.
19  A.  I think early on, I don't even know when
20  it was, that maybe there was a discussion
21  between Ken and some of the board members
22  about a tribal product that would have been
23  early on at my tenure at Payday One.  So I
24  think there was an initial discussion back

UNSEALED

1  then.  But to your point, what I recall is
2  this one in late 2010.
3  Q.   So you do recall there was an earlier
4  discussion around the period that Think was
5  starting with First Bank of Delaware?
6  A.   I am told that there was one.
7  Q.   But you weren't party to those
8  discussions?
9  A.   No.
10  Q.   You're correct, we're talking about the
11  development work that went on about the tribal
12  product at the end of 2010 and the beginning
13  of 2011, okay?  That's the timeframe we're
14  focusing on?
15  A.   Yes.
16  Q.   I'm focusing on, when I say the
17  development stage, I'm talking about the work
18  that was done before there was a tribal
19  partner signed up.  Okay?
20  A.   Okay.
21  Q.   And you recall that one of the things
22  that occurred back in that development stage
23  was the creation of the GPLS fund, right?
24  A.   Yes, I think the GPLS -- yes, I am not

1  exactly sure when that was created.
2  Q.   But that was created before there
3  actually were tribes with signed participation
4  agreements, correct?
5  A.   Yes.
6  Q.   And the GPL and the GPLS acronym stood
7  for Great Plains Lending, right?  That's where
8  the GPL came from?
9  A.   I think that's right.
10  Q.   Because the prototype product that was
11  being developed inhouse was called Great
12  Plains Lending?
13  A.   I believe that was initially the ideas
14  of our marketing department.
15  Q.   During that development stage of the
16  product that was called Great Plains Lending
17  by the marketing people, what role did you
18  play in developing the product?
19  A.   I don't really recall.  Well, I don't
20  know what you're asking me specifically.  Can
21  we narrow down the timeframe maybe?
22  Q.   Sure, let's say -- first let me ask you
23  this:  Did you participate in any of the
24  meetings with potential tribal partners?

1  A.   There was one meeting before a tribe was
2  signed that I went to.
3  Q.   Was that the Butch Webb meeting?
4  A.   There was a meeting -- yes, it was with
5  Butch Webb.
6  Q.   And roughly when did that happen?
7  A.   It was either November or December of
8  that year.
9  Q.   Of 2010?
10  A.   Right.
11  Q.   What do you remember -- first of all,
12  who made the connection with Butch Webb?
13  A.   I don't recall.  The industry is pretty
14  tight, and I don't know if we knew him -- if
15  it was internally -- it came internally or if
16  it came from someone outside the company.
17  Q.   But the decision was made to go meet
18  with Butch?
19  A.   That's correct.
20  Q.   Who went with you?
21  A.   Let me see if I can remember, I know it
22  was me, obviously; I believe Ken Rees went;
23  Chris Lutes; Michelle Nguyen.  I am not sure
24  if Jason went, but I think that's probably who

1  went to that meeting.
2  Q.   What do you remember being discussed at
3  the meeting?
4  A.   Well, I remember some of it would have
5  been discussions by Cheryl Bove, which would
6  have been Butch's counsel.  So I don't think I
7  can go into those.
8  Q.   Actually you can, because we're talking
9  about conversations with a third party.
10      MR. SHELDON:  Ms. Cutrona,
11  you're allowed to tell Mr. Ackelsberg about
12  any conversations that you had with Mr. Webb
13  or with Mr. Webb's counsel.  We're not
14  claiming privilege over those communications.
15      THE WITNESS:  So there was
16  lots of discussion around really
17  operationally, around the operations.  And
18  Butch -- which were located on the
19  reservation, and Butch wanted to -- Mr. Webb
20  wanted to walk around and show us where
21  different things were done.
22      So we kind of went on a
23  little tour.  And what was discussed,
24  generally it was just at a high level, the

UNSEALED

1 document that was sent at 4:54 p.m. It talks
2 about the discussion a few weeks ago. And
3 again, what I want to be careful is that we
4 aren't conflating things here, because there
5 are lots of things that were going on.
6       MR. SHELDON: I think there
7 is a time zone issue going on too. They go
8 back and forth.
9 BY MR. ACKELSBERG:
10 Q. I think I understand what you're saying.
11 That in the communication with Mr. Lutes, on
12 the first page of 412, you're referencing a
13 conversation with Eckman that had occurred at
14 an earlier point in time a few weeks ago,
15 correct?
16 A. That's what it looks like. What it
17 looks like is that I talk about -- I did talk
18 to him a few weeks ago, and his concerns were
19 about something related to true lender.
20 Q. And you're saying that that conversation
21 that occurred several weeks in the past, in
22 that conversation he was functioning as
23 counsel for Think Finance; is that what you're
24 saying?

1 A. Yes. What I'm saying is as it relates
2 to a memo regarding true lender.
3 Q. But not with regard to removing Stephen
4 Haynes?
5 A. Well, those are your words, but I think
6 there was a comment that I'm reading that
7 says: That by removing Stephen, you weaken
8 GPLS's argument that -- then it says the -- it
9 is not considered the true lender.
10       So I believe that's all
11 related to the true lender issue.
12 Q. Was it at times hard to keep track of
13 who Rick Eckman was representing?
14 A. Not really. And the reason I say that
15 is because there were obviously occasions
16 where we had aligned interests, even when he
17 was representing the tribe. And obviously I
18 was of counsel for the service providers.
19 But, you know, I think as the documents show,
20 I'm sure you've seen them, there was quite a
21 bit of back and forth of the negotiations of
22 the documents and when the documents were
23 restructured with his representation of
24 Mobiloans, which will be Tunica Biloxi and the

1 Chippewa Cree.
2 Q. You recall that in the deal with Plain
3 Green, the loans were funded in the first
4 instance by a loan from Stephen Haynes to
5 Plain Green, right?
6 A. That's my understanding.
7 Q. But that Stephen Haynes had an agreement
8 with Think Finance, where the same money that
9 he lent to the tribe, he borrowed from Think
10 Finance, right?
11 A. That's my understanding, that there was
12 a line of credit.
13 Q. Is that what Mr. Eckman was concerned
14 about, in his capacity as counsel for the
15 tribe, when he was communicating with you in
16 June of 2012 about wanting to take Haynes out
17 of the deal?
18 A. So I don't recall that that's what it
19 was regarding.
20 Q. Now with regard to the other two tribes,
21 the way they funded the loan was through a
22 reserve account provided by GPLS, correct?
23       MR. HAWS: Object to form.
24       THE WITNESS: I think that's

1 accurate.
2 BY MR. ACKELSBERG:
3 Q. Just to summarize, at least in the early
4 days of the product --
5 A. Which product?
6 Q. I am going to make that clear. With
7 regard to the early days of Plain Green, the
8 tribe funded the loans in the first instance
9 by money that came from Think Finance, but
10 went through Mr. Haynes first?
11       MR. HERMAN: Object to form.
12       THE WITNESS: So my
13 understanding, and I wasn't involved in these
14 discussions, but my understanding is Steve
15 Haynes represented himself to us. In fact, I
16 do know this, he represented himself to us as
17 a tribal expert. He had worked with
18 specifically the Chippewa Cree Tribe in the
19 past. He had entered into financing
20 agreements within specifically related to
21 their casino operations and with equipment
22 that they use in their casino.
23       So because of his expertise
24 and working with the tribe, he was involved in

UNSEALED

1  the transaction as far as the financing for
2  the tribe to make the loans.
3      Q.  He got the money to lend to the tribe
4  via a credit agreement that he had with Think
5  Finance, correct?
6          MR. SCHEFF:  Object to the
7  form.  You can answer the question.
8          THE WITNESS:  I know he got
9  some money from an agreement that he had with
10  Think Finance.
11  BY MR. ACKELSBERG:
12      Q.  With regard to Great Plains Lending and
13  Mobiloans, in contrast to that arrangement,
14  the money to fund the loans came from GPLS,
15  correct, through that reserve account?
16          MR. HERMAN:  Objection to
17  form.
18          MR. SHELDON:  Object to form.
19  The witness can answer if she knows the
20  answer.
21          THE WITNESS:  I think that's
22  the way it is.  I need to be clear that I
23  wasn't highly involved in the structure of
24  these agreements.

1          - - -
2          (Whereupon Exhibit P-413 was
3  marked for identification.)
4          - - -
5  BY MR. ACKELSBERG:
6      Q.  I am going to show you another one of
7  these executive meeting PowerPoints.  I'm
8  really going to ask you very specific
9  questions.  You can obviously take the time
10  you need.  But I am not going to ask you
11  anything about the bulk of this document.  I
12  guess what I'd like you to focus on, the pages
13  starting 22, 22 and 23 and 24.
14      A.  The Bates number?
15      Q.  No, I'm looking at the PowerPoint page
16  numbers.
17          MR. SCHEFF:  It's 938 and
18  939.
19          MR. SHELDON:  Ms. Cutrona,
20  let me know when you're done reviewing it.  I
21  think I need to have a brief conversation with
22  you just so I can understand this document.
23          VIDEOTAPE OPERATOR:  Off the
24  record at 2:07.  Back on the record, 2:07.

1  BY MR. ACKELSBERG:
2      Q.  In looking at this, does this look
3  familiar to you as a PowerPoint that
4  accompanied an executive meeting at Think
5  Finance?
6      A.  Yes.
7      Q.  Looking at page 22, there is reference
8  to -- it says a revised Patton Boggs.  Do you
9  see that?
10      A.  Yes.
11      Q.  Is that reference to something that was
12  called the Patton Boggs white paper?
13      A.  I don't know what that's referencing.
14      Q.  Do you remember something called the
15  Patton Boggs white paper?
16      A.  Patton Boggs did a lot of work for
17  Think, and I can't recall specific names of
18  documents.
19          - - -
20          (Whereupon Exhibit P-414 was
21  marked for identification.)
22          - - -
23  BY MR. ACKELSBERG:
24      Q.  I believe this already was marked.  I

1  believe we marked it previously.  But in the
2  event we didn't, I am going to stick with 414.
3          I am going to tell you this
4  was represented to us as the Patton Boggs
5  white paper, it was produced.  Do you recall
6  this document?
7      A.  In general, yes, I do.
8      Q.  Do you remember the point in time that
9  it was -- let me ask you this -- and it was
10  done by Patton Boggs for Think Finance?
11      A.  Yes.
12      Q.  Was this done for purposes of the IPO?
13      A.  I'm not sure because I can't tell when
14  it was done.
15      Q.  Right, there is no date on it.
16      A.  Yeah, I don't know.
17      Q.  Do you recall that it was used in the
18  presentation to ███ in the ███████ trip at
19  the end of 2012; do you remember that?
20      A.  I know that there was a trip to ███
21  ███████ but I was not on the trip.  So if
22  you're representing this particular document
23  was used, then I would have to take your word
24  for it.  But that would be -- I have to say,

UNSEALED

1   that would be unusual because in all of the
2   presentations that I know Ken to do, it's
3   PowerPoint only.  He doesn't include Word
4   documents.
5   Q.   Right, unless an investor specifically
6   asked for something, right?
7   A.   Yes, but even in a presentation, I think
8   there would be reference made to it.  That's
9   just in general, my working knowledge of the
10  way Ken does things.
11  Q.   Can you turn to page 14?  In the first
12  full paragraph, right before Roman numeral
13  three, do you see that?
14  A.   Is it the paragraph that says it's
15  discussed further?
16  Q.   Yes.
17  A.   Yes.
18  Q.   And it states:  While tribal sovereign
19  immunity affords broad protection from
20  enforcement of laws, immunity from enforcement
21  should always be considered separately from
22  general applicability of laws.  Do you see
23  that?
24  A.   Yes, I do.

1   Q.   Is that a principal that you agree with?
2   A.   I'm not a subject matter expert on
3   tribal law.  So I couldn't tell you whether I
4   agreed with that or not.
5   Q.   But the idea that immunity from
6   enforcement and what law governs the
7   agreement, that's two separate legal issues,
8   right?
9        MR. SHELDON:  Ms. Cutrona, he
10  asked a legal opinion.  Ms. Cutrona, if you
11  can answer that legal opinion, you may; unless
12  that answer would require you to divulge
13  privileged legal analysis that you did during
14  your time at Think Finance?
15       THE WITNESS:  Yeah, I don't
16  think I can answer that question.
17  BY MR. ACKELSBERG:
18  Q.   Look at page 16.
19  A.   Okay.
20  Q.   Do you see Roman numeral four?
21  A.   Yes.
22  Q.   The second sentence, which reads:  It
23  would be a non-sequitur to conclude that
24  certain laws do not apply to tribes and

1   related entities simply due to the ability to
2   assert tribal sovereign immunity as a defense
3   against enforcement.  Do you see that?
4   A.   Yes.
5   Q.   Page 20.
6   A.   Did I ask this already, when this was
7   done?  Do we know when it was done?
8   Q.   We know it went to ███████.  I can't
9   tell you more than that.
10  A.   When was that?
11  Q.   I believe it was around December of
12  2012.
13       Do you see the sentence in
14  the middle of page 20, underneath the indent,
15  "Thus the Supreme Court has held that absent
16  express federal law to the contrary, Indians
17  going beyond reservation boundaries have
18  generally been held subject to
19  non-discriminatory state law otherwise
20  applicable to all citizens of the state."  You
21  see that, right?
22  A.   Yes.
23  Q.   I think you told us before that you're
24  not an expert in Indian law, right?

1   A.   That's correct.
2   Q.   So that's why you went to Patton Boggs,
3   because they are, correct?
4   A.   Ed Garris, yes.
5   Q.   If you turn to page 26, at the bottom
6   the last paragraph:  Congress is aware that
7   state laws regulating payday lenders and other
8   non-bank financial institutions may be largely
9   unenforceable against Indian tribes due to
10  their tribal sovereign immunity, and there
11  have been efforts to make state statutes
12  generally applicable through federal
13  legislation.  Do you see that?
14  A.   Yes, I see that.
15  Q.   There never was a statute passed by
16  Congress to give tribal entities any power in
17  the consumer lending area, has there been?
18       MR. SHELDON:  Objection to
19  form.
20  BY MR. ACKELSBERG:
21  Q.   Are you aware of there being any act of
22  Congress that gives tribes that power?
23       MR. HERMAN:  Object to the
24  form, to the extent that it misrepresents

UNSEALED

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

COMMONWEALTH OF :
PENNSYLVANIA :
 Plaintiff :
  :
VS. : CIVIL ACTION NUMBER
 : 2:14-CV-07139
THINK FINANCE, INC., :
ET AL., :
 Defendants :

- - -

APRIL 26, 2018

- - -

Videotaped deposition of STEPHEN
SMITH, was taken pursuant to notice at 901 New
York Avenue, NW, Washington, D.C., beginning
at or about 9:00 a.m. before Jeannine
Cancelliere, Court Reporter and Notary Public
and David Levin, Videotape Operator, there
being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102

## Page 2

1 APPEARANCES:
2
3 LANGER, GROGAN & DIVER, P.C.
 BY: IRV ACKELSBERG, ESQUIRE
4 BY: JOHN J. GROGAN, ESQUIRE
 1717 Arch Street, Suite 4130
5 Philadelphia, Pennsylvania 19103
 Phone: (215) 320-5701
6 Representing the Plaintiff
 iackelsberg@langergrogan.com
7
8
9 ATTORNEY GENERAL'S OFFICE
 BY: SAVERIO MIRARCHI, ESQUIRE
10 1600 Arch Street, 3rd Floor
 Philadelphia, Pennsylvania 19103
11 Phone: (215) 560-2445
 Representing the Defendant
12 smirarchi@attorneygeneral.gov
13
 MONTGOMERY McCRACKEN
14 BY: RICHARD SCHEFF, ESQUIRE
 123 South Broad Street
15 Philadelphia, Pennsylvania 19109
 Phone: (215) 772-7228
16 Representing Ken Rees
 rscheff@mmwr.com
17
18
 KATTEN, MUCHIN, ROSENMAN LLP
19 BY: J. MATTHEW HAWS, ESQUIRE
 BY: DANIEL SHAPIRO, ESQUIRE
20 525 W. Monroe Street
 Chicago, Illinois 60661-3693
21 Phone: (312) 902-5319
 Representing Victory Park
22 matthew.haws@kattenlaw.com
 daniel.shapiro@kattenlaw.com
23 Also Present: Scott Zemnick
24 (Via Phone)

## Page 3

1 APPEARANCES (continued)
2
3 GOODWIN PROCTER
 BY: MATTHEW S. SHELDON, ESQUIRE
 BY: THOMAS GRABER, ESQUIRE
4 BY: STEPHEN SHAW, ESQUIRE
 901 New York Avenue, NW
5 Washington, D.C. 20001
 Phone: (202) 346-4000
6 Representing Think Finance
 msheldon@goodwinprocter.com
7
8
9 VAN NESS FELDMAN
 BY: PATRICK DAUGHERTY, ESQUIRE
10 1050 Thomas Jefferson Street, NW
 Washington, D.C. 20007-3877
11 Phone: (202) 298-1800
 Representing National Credit
12 Adjusters LLC
 pod@vnf.com
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

- - -

# INDEX

- - -

STEPHEN SMITH PAGE
BY MR. ACKELSBERG 8

- - -

# EXHIBITS

- - -

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| P-216 | Metadata Document | 37 |
| P-217 | E-Mail with Attachments | 55 |
| P-218 | E-Mail Chain | 61 |
| P-219 | E-Mail with Attachments | 65 |
| P-220 | Response to Interrogatories | 86 |
| P-221 | E-Mail with Attachments | 91 |
| P-222-A | E-Mail Chain | 109 |
| P-222-B | E-Mail Chain | 110 |
| P-223 | SOP for Plain Green | 129 |
| P-224 | E-Mail Chain | 133 |
| P-225 | E-Mail Chain | 158 |
| P-226 | E-Mail with Attachments | 187 |
| P-227-A | E-Mail Chain | 207 |
| P-227-B | E-Mail Chain | 208 |
| P-228 | Draft Report | 212 |

WWW.KLWREPORTERS.COM

UNSEALED

App. 0553

```
 1            ---
 2        E X H I B I T S
 3            ---
 4   EXHIBIT NO.    DESCRIPTION        PAGE
 5   P-229      Remediation Plan      221
 6   P-230          E-Mail Chain      223
 7           P-231 was not marked
 8   P-232          E-Mail Chain      226
 9   P-233          E-Mail Chain      231
10   P-234          E-Mail Chain      236
11   P-235          Document          239
12   P-236          Document          239
13   P-237      Weekly Call Document  242
14   P-238      Production Document   245
15   P-239      Complaint Document    258
16   P-240          E-Mail Chain      268
17   P-241      Complaint Template    272
18   P-242          E-Mail            272
19       P-59 and P-60 Referenced on Page 140
20
21
22
23
24
```

```
 1       VIDEOTAPE OPERATOR:  We're now
 2   on the record.  My name is David Levin.  I'm
 3   the videographer employed by On the Record.
 4   This is a video deposition in the United
 5   States District Court for the Eastern District
 6   of Pennsylvania, Civil Action Number
 7   14-7139-JCJ.  Today's date is Thursday, April
 8   26th, 2018 and the video time is 9:00 a.m.
 9   This deposition is being held at 901 New York
10   Avenue, Northwest, Ninth Floor, Washington,
11   D.C., in the matter of the Commonwealth of
12   Pennsylvania by Attorney Josh Shapiro versus
13   Think Finance Incorporated, Et Al.
14       The deponent is Stephen E.
15   Smith.
16       Will counsel please identify
17   themselves for the record and whom they
18   represent?
19       MR. ACKELSBERG:  Irv Ackelsberg
20   for Attorney General Shapiro.
21       MR. GROGAN:  John Grogan, also
22   for the Commonwealth.
23       MR. MIRARCHI:  Sam Mirarchi for
24   the Commonwealth of Pennsylvania.
```

```
 1       MR. SHELDON:  Matthew Sheldon
 2   representing the Think Finance defendants,
 3   joined today by Thomas Graber, general counsel
 4   of Think Finance.
 5       MR. SCHEFF:  Richard Scheff for
 6   Kenneth E. Rees.
 7       MR. SHAPIRO:  Dan Shapiro for
 8   the Victory Park defendants.
 9       MR. HAWS:  Matthew Haws for the
10   Victory Park defendants.
11       MR. SHAW:  Stephen Shaw for the
12   Think Finance defendants.
13       VIDEOTAPE OPERATOR:  The court
14   reporter is Jeannine Cancelliere.  Can she now
15   swear in the witness.
16           - - -
17       STEPHEN SMITH, after having been
18   first duly sworn, was examined and testified
19   as follows:
20           - - -
21       VIDEOTAPE OPERATOR:  Please
22   proceed, counsel.
23           - - -
24           EXAMINATION
```

```
 1           - - -
 2   BY MR. ACKELSBERG:
 3   Q.   Good morning, Mr. Smith.
 4   A.   Good morning.
 5   Q.   Have you ever been deposed before?
 6   A.   Yes.
 7   Q.   Okay.  When -- can you tell me when or
 8   what the circumstances were of that
 9   deposition?
10   A.   It was approximately 15 years ago, by
11   the SEC.
12   Q.   Were you working for Think Finance then?
13   A.   No.
14   Q.   Was it a prior employment?
15   A.   Yes.
16   Q.   Okay.  That prior employer was who?
17   A.   At the time, I guess it was Citigroup.
18   Q.   Was it -- I don't understand what's -- I
19   don't understand the answer.  Was it -- did it
20   have a different name?
21   A.   Well, there were several acquisitions
22   along the way of the company that I worked for
23   that ultimately ended with Citigroup.
24   Q.   Well, the company that was acquired by
```

UNSEALED

1    Q.   And what was your first job out of
2    school after you graduated?
3    A.   I worked for a company called Security
4    Pacific Auto Finance, and it was an auto
5    collections job.
6    Q.   And were you doing the collecting --
7    collecting yourself?
8    A.   Yes.
9    Q.   Okay.  And how long did you do that?
10   A.   Four years.
11   Q.   Up until the Auto One Acceptance job?
12   A.   Yes.
13   Q.   Okay.  I take it you don't have any
14   legal training?
15   A.   No.
16   Q.   So you didn't go to law school.  Have
17   you done any kind of legal training while you
18   were working for compliance, either at
19   Accept -- Auto One Acceptance or Think
20   Finance?
21           MR. SCHEFF:  Object to form.
22           THE WITNESS:  No.
23   BY MR. ACKELSBERG:
24   Q.   Okay.  So let's start with your hiring.

1            Do you remember how you got
2    connected to Think Finance?  Where, by the
3    way, was -- where was Auto One Acceptance
4    Corporation located?
5    A.   They were located in Addison, Texas.
6    Q.   All right.  So in the same general --
7    general vicinity.  How did you -- how did you
8    end up working for -- so you took -- Think
9    Finance in Fort Worth, right?
10   A.   Yes.
11   Q.   So tell us how you found the job, how
12   you got attracted to the job.
13   A.   A former employee of mine that I worked
14   with at Citigroup knew someone at Think
15   Finance.  And I was looking for a job, and she
16   put me in touch with someone that worked in
17   the compliance department who then directed me
18   on how to submit a -- my application.
19   Q.   So you said there was a whole compliance
20   department when you applied?
21   A.   Yes.
22   Q.   Okay.  And so when you applied back
23   then, tell me what the compliance depart --
24   who constituted the -- the -- in terms of the

1    people there, who was in the compliance unit,
2    back when you started?
3    A.   Are you asking about specific names?
4    Q.   Well, let's start with, how big of a
5    department was it?
6    A.   Maybe five or six people.
7    Q.   And when you started, what were those
8    five or six people doing?  What was the job of
9    the compliance department?
10   A.   There were people involved with doing
11   compliance monitoring, compliance testing.  I
12   believe one lady worked on state licenses.  We
13   had someone that was performing user
14   acceptance testing for any technology-type
15   items.  We had someone that was responding to
16   customer complaints.  That's the majority of
17   it, I believe.
18   Q.   Among those five or six people in
19   compliance at the time, back -- and we're
20   talking roughly 2009, right?  Okay.  Were any
21   of them still there at Think Finance when you
22   started doing the tribal lending programs?
23   A.   Yes.
24   Q.   And who were they?

1    A.   Joan Verna -- you're asking about
2    specific names?
3    Q.   Yes.  Joan Verna, with a "V"?
4    A.   Yes.
5    Q.   Anyone else?
6    A.   I don't recall exactly the dates of when
7    folks left with respect to when the tribal
8    programs started.
9    Q.   But Joan Verna, you remember, is a --
10   A.   I know for sure Joan was there, yes.
11   Q.   Is she still there?
12   A.   No.
13   Q.   Where did she go?
14   A.   She's at Elevate.
15   Q.   Did you ever get an opportunity to apply
16   for a job at Elevate?
17   A.   I never applied for a job at Elevate,
18   no.
19   Q.   Did you have the option?
20   A.   I assume I did, but...
21   Q.   Any particular reason why you decided to
22   stay with Think and not go over to Elevate?
23   A.   Well my role gave me an opportunity to
24   have a little bit expanded role with Think in

UNSEALED

App. 0555

## Page 21

1  the compliance function. So it was a good
2  opportunity for me to stay at Think Finance.
3  Q.  Now at the time you started in the
4  compliance department back in 2009, my
5  recollection is that the company had the
6  direct lending products, Payday One, right?
7  A.  Yes.
8  Q.  And I think there was -- was it -- did
9  they have the other labels, Payday Select and
10  Payday OK or just Payday One?
11  A.  I know that it was Payday One.
12  Payday OK and Payday Select, I'm not that
13  familiar with. I -- I don't recall if those
14  were still operating at the time that I
15  started.
16  Q.  Okay. But you knew -- there was a
17  direct lending product called Payday One,
18  right?
19  A.  Yes.
20  Q.  And then there was another product, an
21  installment loan product, that the company was
22  working with First Bank of Delaware on, right?
23  A.  Yes.
24  Q.  Okay. And am I right, that the -- so

## Page 22

1  the Payday product operated with what is
2  referred to as the direct lender model, right?
3  You're familiar with that term, right?
4        MR. SHELDON: Objection.
5        MR. SCHEFF: Object to the
6  form.
7        THE WITNESS: Yes.
8  BY MR. ACKELSBERG:
9  Q.  Okay. Whereas the ThinkCash products,
10  the installment loan products, operated under
11  something called the service provider model;
12  am I right?
13  A.  We were a service provider to First Bank
14  of Delaware, who was the lender, yes.
15  Q.  Okay. Now I want to talk about the two
16  product lines separately. And we're still
17  back in 2009, okay?
18  A.  Okay.
19  Q.  All right. So Payday One being a -- it
20  was basically -- it was an online product,
21  right? It was offered over the Internet,
22  right?
23  A.  Yes.
24  Q.  Okay. And it was a -- what is generally

## Page 23

1  referred to as a traditional Payday loan
2  product, right?
3        MR. SCHEFF: Object to the
4  form.
5  BY MR. ACKELSBERG:
6  Q.  You know what that term means, right?
7  A.  If you could explain what you mean by
8  a --
9  Q.  A two-week loan. After two weeks, you
10  either pay it or renew it and that's --
11  something like that.
12        MR. SHELDON: Object to form.
13        THE WITNESS: My recollection
14  is that there may have been some states where
15  there was the short-term, 30-day repayment.
16  But I believe there were also some Payday
17  installment states.
18  BY MR. ACKELSBERG:
19  Q.  All right. And I appreciate the answer
20  because I think -- correct me if I'm wrong --
21  but I think what you're telling me is, with
22  regard to the Payday One product, they were
23  offered in a state-specific way to respond to
24  the different laws that existed across the

## Page 24

1  country. Would that be fair?
2        MR. SCHEFF: Object to the
3  form.
4        MR. SHELDON: Objection.
5        THE WITNESS: Yes.
6  BY MR. ACKELSBERG:
7  Q.  Okay. And so one of the jobs of
8  compliance, the compliance function at Think
9  Finance back then, was to make sure that
10  whatever Think was doing offering consumers in
11  a particular state conformed to whatever the
12  law was in that state.
13        MR. SHELDON: Object to form.
14        THE WITNESS: Correct.
15  BY MR. ACKELSBERG:
16  Q.  And in order to do that job, the
17  compliance people would have to familiarize
18  themselves with state usury law, right?
19  A.  Yes.
20  Q.  And the licensing requirements?
21  A.  Yes.
22  Q.  And if there were specific Payday
23  lending authorization legislation in that
24  state that defined the product, you would have

UNSEALED

App. 0556

1    to be really familiar with that legislation.
2    Am I right?
3            MR. SCHEFF: Object to the
4    form.
5            MR. SHELDON: Form.
6            THE WITNESS: Somewhat, yes.
7    But we also received guidance from in-house
8    counsel on -- if it was something that was
9    legislative.
10   BY MR. ACKELSBERG:
11   Q.   Well, what I mean by the legislative is
12   that some states -- I think you already said
13   that some states might say it was a 30-day
14   payback or some states might put a limit on
15   the interest rate or things like that, right?
16   A.   Yes.
17   Q.   And so I'm not asking you what specific
18   guidance you got from your counsel. I'm
19   saying that in order to do your job as a
20   compliance officer, you would need to be
21   familiar with whatever those state laws were?
22   A.   Correct.
23   Q.   Okay. Because you have to make sure
24   that the terms of the loan that you're

1    offering consumers are consistent with those
2    laws, right?
3            MR. SHELDON: Object to form.
4            THE WITNESS: Yes.
5    BY MR. ACKELSBERG:
6    Q.   And you have to make sure that the
7    information communicated to the consumers who
8    are visiting the website and thinking about
9    applying for a loan, in that case a Payday One
10   loan, you have to make sure that that
11   information is also consistent with the state
12   law governing the particular loan product?
13           MR. SCHEFF: Object to the
14   form.
15           MR. SHELDON: Object to form.
16   BY MR. ACKELSBERG:
17   Q.   Correct?
18   A.   Correct.
19   Q.   Okay. I mean, that's what compliance
20   people do, right?
21   A.   Yes.
22   Q.   Okay. Now, am I right, that if we -- if
23   we -- you started in 2009. And so I want to
24   talk generally about the period 2009 to 2010,

1    when there was a transition to tribal lending.
2    That time period. Okay?
3            So Payday -- the Payday One
4    product was offered during -- in 2009 and
5    2010, right?
6    A.   I believe that's correct, yes. It
7    didn't last very long after I started.
8    Q.   Right.
9    A.   I -- we didn't do a whole lot with
10   Payday One after I started. It was winding
11   down.
12   Q.   Okay. But at least during the period
13   that you were working on it and -- I mean, was
14   there a period where you stopped working on
15   Payday One and other people did it, or are you
16   talking collectively among the compliance
17   people?
18   A.   I mean collectively among the compliance
19   folks because the product was being
20   discontinued over the course of time, and I
21   don't think it lasted very long after I
22   started.
23   Q.   Okay. But while it was -- while it was
24   still going on and you had to familiarize

1    yourself with these different state laws that
2    we were just talking about, would I -- isn't
3    it true that some states prohibited Payday
4    lending altogether?
5            MR. SCHEFF: Object to the
6    form.
7            THE WITNESS: I don't know.
8    BY MR. ACKELSBERG:
9    Q.   You didn't know that Payday One was not
10   offered in every state?
11           MR. SCHEFF: Object to the
12   form.
13   BY MR. ACKELSBERG:
14   Q.   You knew that, though, right?
15   A.   I knew that, yes.
16   Q.   Okay. And you knew that it had
17   something to do with whatever -- I mean, if
18   the law allowed Payday One, the company would
19   have been offering Payday One in that state,
20   right?
21           MR. SCHEFF: Object to the
22   form.
23           MR. SHELDON: Object to form.
24           THE WITNESS: Not

UNSEALED

App. 0557

1           MR. SHELDON:  What exhibit
2     number was this marked?
3           MR. ACKELSBERG:  216.
4           MR. SHELDON:  Mr. Smith, are
5     you done reading it?
6           THE WITNESS:  Yes.
7           MR. SHELDON:  Okay.  You can
8     proceed.
9           MR. ACKELSBERG:  Thank you.
10    BY MR. ACKELSBERG:
11    Q.   Can you identify this document?
12    A.   I don't recall if I have seen this
13    document or not.
14    Q.   Okay.
15    A.   Before today.
16    Q.   All right.  Again, it came out -- it
17    sounds like it came out of your computer, but
18    you never -- it doesn't look familiar at all
19    to you?
20    A.   Not this specific document, no.
21    Q.   Was part of your job in the early years
22    drafting descriptions of the program?
23           MR. SHELDON:  Object to the
24    form.

1     BY MR. ACKELSBERG:
2     Q.   Do you remember ever doing descriptive
3     -- working on descriptive pieces about the
4     installment loan program?
5           MR. SHELDON:  Object to the
6     form.
7           THE WITNESS:  No.  I don't
8     recall drafting descriptions like that, no.
9     BY MR. ACKELSBERG:
10    Q.   Okay.  Do you have any idea why it would
11    have been in your folders on the server as
12    opposed to someone else's?
13           MR. SCHEFF:  Object to the
14    form.
15           THE WITNESS:  No.
16    BY MR. ACKELSBERG:
17    Q.   Ok.  Now, at the time that you began
18    work -- your work with regard to the
19    compliance work, with regard to installment
20    loan product -- well, let me ask you this:
21    You -- with regard to the document, you've
22    never seen it before, but does it accurately
23    describe the program that you worked on in
24    terms of your compliance responsibilities?

1           In other words, is this -- is
2     this an accurate description of the ThinkCash
3     program as it existed back in the 2009, 2010
4     time period?
5     A.   Some of it reflects -- based on my
6     knowledge of the product.  Some of it, I don't
7     have direct knowledge of.
8     Q.   Okay.  What is the part that you know,
9     and what's the part you don't know?
10    A.   Well, for example, where it talks about,
11    on page 2, the FICO score, the debt-to-income
12    ratio in the customer flow section there,
13    Teletrack derogatory, I don't know what
14    components were used in the underwriting
15    model, for example.
16    Q.   All right.  Okay.  So forget about --
17    forget about the customer flow section.
18    A.   Okay.
19    Q.   Let's -- what about the introductory --
20    the program overview and the product
21    specifics, does that sound -- does that --
22    take your time to reread it if you need to.
23    A.   Yeah.  Yeah.  Absolutely.
24           The product-specific section

1     as well, or just the product -- program
2     overview?
3     Q.   Well, why don't you start with the
4     program overview.  Is that an accurate
5     description -- an accurate overview of the
6     ThinkCash First Bank of Delaware product as
7     well as you can remember it?
8     A.   As well as I can remember it, it's
9     fairly accurate, yes.
10    Q.   I want to ask you about the second
11    paragraph, it says:  TC Loan Service doing
12    business as ThinkCash, the marketing and
13    servicing entity of Payday One, will provide
14    all marketing and servicing for the program
15    and the lender -- and the lender will be one
16    or more banks.  Currently we're working with
17    First Bank of Delaware.
18           Do you see that?
19    A.   Yes.
20    Q.   Okay.
21           MR. SHELDON:  That is not an
22    accurate transcription of the document.
23    BY MR. ACKELSBERG:
24    Q.   So my question is, where is -- am I right

UNSEALED

1  that there only was First Bank of Delaware
2  with regard to ThinkCash, right?
3          MR. SCHEFF: Object to the
4  form.
5          THE WITNESS: Based on my
6  tenure at Think, to my knowledge, yes.
7  BY MR. ACKELSBERG:
8  Q.   But am I also right that there was, in
9  building the systems and -- at the company, in
10 particular the installment loan products, the
11 platform, that there was a -- it was built
12 with the expectations that it could be -- it
13 could be adjusted to work for a different
14 bank? You could offer a similar product using
15 that platform to a different bank, if you so
16 choose? If that company so chose to do.
17         MR. SCHEFF: Object to the
18 form.
19         MR. SHELDON: Object to form.
20 The witness hasn't testified about building
21 anything.
22         THE WITNESS: Again, that was
23 a technical aspect of the operation. I'm not
24 a technical guy. There are other people at

1  the company that built those, so I can't speak
2  intelligently on how it was built.
3  BY MR. ACKELSBERG:
4  Q.   Okay. Now, when you started in 2009,
5  were you aware that the marketing relationship
6  with First Bank of Delaware was through an
7  affiliate called Tailwind Marketing? Do you
8  remember that?
9  A.   Yes, I do recall that.
10 Q.   And the technology services were
11 provided using the name TC Decision Sciences,
12 right?
13         MR. SCHEFF: Object to the
14 form.
15         MR. SHELDON: Object to form.
16 BY MR. ACKELSBERG:
17 Q.   You remember that, right?
18 A.   Yes.
19 Q.   Now, back then, was there any -- I'm
20 wondering what the -- was there an employee of
21 Tailwind, an employee of TC Decision Sciences,
22 or was that really more just a matter of how
23 things were set up in the contracts?
24         MR. SCHEFF: Object to the

1  form.
2          MR. SHELDON: Object to the
3  form.
4          THE WITNESS: I don't know
5  about if there were employees in those
6  entities or not.
7  BY MR. ACKELSBERG:
8  Q.   You've never heard of an employee of
9  Tailwind, or you don't know anybody who worked
10 for Tailwind, do you?
11         MR. SCHEFF: Object to the
12 form.
13         MR. SHELDON: Object to the
14 form.
15         THE WITNESS: Internally, we
16 just referred to everybody as Think.
17 BY MR. ACKELSBERG:
18 Q.   Right. Okay. Winding up with regard to
19 the bank. But during the bank period, do you
20 recall their having -- do you recall that the
21 First Bank of Delaware was operating under a
22 cease and desist order from the FDIC? Is that
23 something that you remember from your days in
24 compliance?

1          MR. SCHEFF: Object to the
2  form.
3          MR. SHELDON: Object to the
4  form.
5          THE WITNESS: No, I don't
6  recall remembering or being aware of the C&D.
7          THE COURT REPORTER: I'm
8  sorry. Being aware of?
9          THE WITNESS: C&D.
10         MR. SHELDON: That's cease
11 and desist.
12 BY MR. ACKELSBERG:
13 Q.   Do you remember First Bank of Delaware
14 pulling out of the ThinkCash product?
15         MR. SCHEFF: Object to the
16 form.
17         THE WITNESS: Yes.
18 BY MR. ACKELSBERG:
19 Q.   How did you learn about it, and what did
20 you hear?
21 A.   I don't recall specifically. But in
22 general, there was some type of -- whether it
23 was a company announcement or my boss may have
24 told me, but in general terms that the bank

UNSEALED

App. 0559

1    was terminating the ThinkCash program.
2    Q.   Now, at that point in time, who was your
3    boss?
4    A.   Sarah Cutrona.
5    Q.   Oh, okay.  Now, were -- did everybody
6    within compliance report to Sarah, or did you
7    have some supervisory responsibility over the
8    rest of the people there?
9    A.   I had supervisory responsibility over
10   some of the people.
11   Q.   And was that true from the beginning of
12   your tenure?
13   A.   As I recall, yes.
14   Q.   Okay.  So the other -- did everybody
15   within the compliance group report to you, and
16   then you reported to Sarah Cutrona?  Is that
17   how it worked?
18   A.   I believe that is correct, yes.
19   Q.   So then you would have been the most
20   senior of the non-lawyers working in the
21   compliance group?
22   A.   Could you define senior?
23   Q.   In terms of -- not in terms of your age,
24   but I mean in terms of your responsibilities.

1    A.   Ok.  Yes.  Not in terms of tenure?
2    Q.   Yes.
3    A.   Yes.
4    Q.   Okay.  Now, were you involved at all in
5    the planning -- in planning the transition
6    from ThinkCash to Plain Green?
7    MR. SCHEFF:  Object to the
8    form.
9    MR. SHELDON:  Object to the
10   form.
11   THE WITNESS:  Can you be more
12   specific about planning?
13   BY MR. ACKELSBERG:
14   Q.   Did you have any role at all in the
15   transition from -- you know what I'm talking
16   about, the transition from ThinkCash to Plain
17   Green?
18   MR. SCHEFF:  Object to the
19   form.
20   MR. SHELDON:  Object to form.
21
22   BY MR. ACKELSBERG:
23   Q.   You understand what I'm referring to
24   there?

1    MR. SCHEFF:  Same objection.
2    THE WITNESS:  Well, if you
3    could be more specific about transition.
4    BY MR. ACKELSBERG:
5    Q.   Okay.  We're talking about Plain Green
6    went online the beginning of April 2011,
7    right?
8    A.   Yes.
9    Q.   Okay.  First Bank of Delaware notified
10   Think that it was going to have to stop
11   originating loans in its name end of October
12   2010.  Does that sound about right?
13   MR. SCHEFF:  Object to the
14   form.
15   MR. SHELDON:  Same objection.
16   THE WITNESS:  Sounds about
17   right.
18   BY MR. ACKELSBERG:
19   Q.   Okay.  And that was effective the end of
20   the year in 2010, right?  The stoppage of
21   First Bank of Delaware originations.
22   A.   Yeah.  I don't recall the date that it
23   ended.
24   Q.   The specific date is not important in my

1    question, so -- okay.  So -- and then roughly
2    three months later or several months later,
3    the installment loan product was running again
4    but with a different label?
5    MR. SCHEFF:  Object to the
6    form.
7    MR. SHELDON:  Object to the
8    form.
9    BY MR. ACKELSBERG:
10   Q.   Do you understand?  Do you understand my
11   question?
12   A.   I don't know that I would characterize
13   it as a different label.
14   Q.   Okay.  How would you characterize it?
15   A.   There was an installment product that we
16   were servicing for Plain Green.
17   Q.   Okay.  Were you at all -- were you
18   involved at all in -- you had compliance
19   responsibilities with regard to the
20   installment loan product that was done with
21   First Bank of Delaware, right?
22   A.   Yes.
23   Q.   Okay.  And you ultimately had compliance
24   responsibility with regard to the

UNSEALED

1  the -- both?
2  BY MR. ACKELSBERG:
3  Q. Yeah. I think that will be easier for
4  you to see what's going on. It looks somewhat
5  similar to the last SOP we looked at.
6  A. Okay.
7  Q. Why don't we start with that? I'm
8  showing you the exhibit that was previously
9  marked Exhibit P-60, the standard operating
10  procedure for Mobiloans, that's basically the
11  same -- the equivalent policy that we were
12  looking at before for Plain Green, right?
13      MR. SCHEFF: Objection to the
14  form.
15  BY MR. ACKELSBERG:
16  Q. You can refer back to Exhibit 223. In
17  fact, you can even -- just put them side by
18  side.
19  A. Yeah. It has the same name, yes.
20  Q. And well -- and it's largely the same
21  policy; am I right?
22      MR. SCHEFF: Object to the
23  form.
24      MR. SHELDON: Object to form.

1  Irv, I think there are some material
2  differences --
3      MR. ACKELSBERG: Yeah. I
4  mean, that's fine. He can -- there are some
5  differences. Fine.
6  BY MR. ACKELSBERG:
7  Q. It's the equivalent document -- it's the
8  equivalent SOP for Mobiloans to the one we
9  were looking at before for Plain Green, right?
10      MR. SCHEFF: Object to the
11  form.
12      MR. SHELDON: Object to form.
13      THE WITNESS: Yes.
14  BY MR. ACKELSBERG:
15  Q. So I want to start this e-mail chain
16  from someone -- there is someone named LeAnna
17  Brillhart at Think Finance, who has a position
18  of senior policies analyst. Do you know
19  LeAnna or did you know who she was?
20  A. Yes.
21  Q. Who was she?
22  A. She was in the loan operations group,
23  and one of her primary roles was assisting
24  with standard operating procedures, making

1  sure that they were kept current and reviewing
2  them on a regular basis.
3  Q. Good. Okay. So is this -- and Kim
4  Palermo, you know, is an employee of
5  Mobiloans, right?
6  A. Yes.
7  Q. Okay. So -- and this is in 2014, a
8  couple of years later than the last e-mails we
9  were looking at. And the subject: Pending
10  SOPs, importance high. And LeAnna writes to
11  Kim, basically saying as you described, that
12  we're trying to get these SOPs updated and can
13  you look at these? We've updated them and if
14  they are okay, can you please send your
15  approval? That's basically what she is
16  saying, right?
17  A. Yeah. She's asking --
18      MR. SCHEFF: Object to the
19  form. Go ahead.
20      THE WITNESS: She's asking
21  Kim to review the SOP and what appears to me
22  is asking Kim if there are any updates or
23  edits that Kim needs to make to the SOP.
24  BY MR. ACKELSBERG:

1  Q. Right. And then -- so that's September
2  30th. And then October 9th, she is kind of
3  reminding Kim that she's still waiting for
4  those, right?
5  A. Yes.
6  Q. Okay. Let's look at Kim's response on
7  that same day, October 9th. And you're cc'd
8  with this one, right?
9  A. Yes.
10  Q. And this is now -- so I take it
11  Mobiloans also communicated with you at the
12  TC Decision Sciences address?
13  A. Correct.
14  Q. Was that true of Great Plains Lending
15  also?
16  A. I believe so.
17  Q. Okay. And let's see what Kim says back
18  to LeAnna. She says: This SOP is not being
19  followed by either party. My supervisor or
20  lead will approve the applications by 4 p m.,
21  the current cutoff time for funding. But this
22  is only Monday through Friday. Anything on
23  the weekend is approved by the system. I've
24  tried getting a report to see what percentage

UNSEALED

1  of loans was approved manually.  It took
2  forever to figure out how to pull it.  The
3  percentage of system-approved loans was
4  tremendously high.  I have never received a
5  report on the 10 percent threshold, as noted
6  in Item 3.2.1.  Stephen and I went through
7  this last year at the end of October and never
8  really cleared it up.  Before I can update
9  this SOP, I need to know that the system will
10  not approve on the weekend and after-hours but
11  wait until the supervisor has a chance to
12  approve.  Check with Stephen on this, please.
13          Do you see that?
14  A.   Yes.
15  Q.   And in fact, you're -- just to make sure
16  that you knew this was going on, she cc'd you,
17  right?
18  A.   Yes.
19  Q.   Okay.  Now, my first question is, do you
20  remember, either at this point in time,
21  October 2014, or as she says, a year before
22  that, like in 2013 sometime, talking to
23  Mobiloans about this particular policy not
24  being followed?

1  A.   I have a vague recollection of this
2  particular topic.  I don't recall very clearly
3  or specifically, but I do have a vague
4  recollection of it, yes.
5  Q.   All right.  And you have the policy
6  there with you.  Just so --
7          MR. SHELDON:  Are you
8  referencing to the procedure?
9          MR. ACKELSBERG:  Yeah.  The
10  procedure.  I'm sorry.  P-60.
11  BY MR. ACKELSBERG:
12  Q.   So basically this procedure is about --
13  let me step back for a minute.
14          We talked before about the --
15  when we were talking about the loan
16  underwriting policy, information goes into the
17  system.  Whatever kind of information is used,
18  the tribe would have had to approve on the
19  front end.  And then the decision engine
20  renders a decision, either approved; declined;
21  or approved, pending verification, right?
22  A.   Yes.
23  Q.   Okay.  And this procedure seems to
24  indicate that there is also -- the information

1  is sent to the tribe, in this case Mobiloans,
2  indicating the loans, among other things, the
3  loans that were approved over the course of
4  the last day.  That's basically what -- right?
5          MR. SHELDON:  Object to form.
6          THE WITNESS:  Essentially,
7  yes.
8  BY MR. ACKELSBERG:
9  Q.   And that's the system that -- as it was
10  set up, that the loan approvals, the approvals
11  rendered by the decision engine, would be
12  listed on a screen for the tribal employees to
13  review at the end of the day, right?
14  A.   That's correct.
15  Q.   And the main function of this policy was
16  to make sure that the tribe got a report
17  whenever -- let me step back.  I missed a -- I
18  think I missed a step.
19          So the screen enabled the
20  tribal employees to actually each push a
21  button or click something on the screen to
22  indicate the tribe approves funding those
23  loans that were approved, right?
24  A.   My rec --

1  Q.   Something like that?
2          MR. SHELDON:  Object to form.
3          THE WITNESS:  My recollection
4  is that they saw each individual borrower who
5  had passed Mobiloans's credit underwriting
6  criteria and as a result, had passed it to be
7  approved.  And they had the opportunity, if
8  they chose, to go in and they could review any
9  one of those.  They could select any
10  particular one if for whatever reason they
11  might want to withhold the funding of a
12  particular consumer.
13          MR. SHELDON:  Let the witness
14  finish.
15          MR. ACKELSBERG:  I'm sorry
16  for interrupting.
17          THE WITNESS:  So that was the
18  intent of the functionality.
19  BY MR. ACKELSBERG:
20  Q.   Now from the standpoint of the user of
21  -- in this case, the user -- the user end,
22  we're talking about someone at the tribe,
23  right?  If we're talking about that screen.
24  A.   Correct.

UNSEALED

App. 0562

1 Q. Okay. So it gave the user at the tribe
2 the opportunity to say, even though the system
3 has approved this person for a loan, we don't
4 want that loan funded?
5 A. The intent was to give them that
6 functionality, yes.
7 Q. Okay. And my question is, in the set-up
8 of the system, what information would the
9 tribe want to reject the loan?
10 tribe have available to it -- why would the
11 MR. SCHEFF: Object to the
12 form.
13 BY MR. ACKELSBERG:
14 Q. What information came? It's just a
15 name, right?
16 MR. SCHEFF: Object to the
17 form.
18 MR. SHELDON: Object to form.
19 BY MR. ACKELSBERG:
20 Q. Anything more than a name?
21 MR. SCHEFF: Object to the
22 form.
23 THE WITNESS: Well, they can
24 take the name, and then go into the front-end

1 system and review the application. They could
2 review any notes that might have been
3 attached. They could review documents if the
4 customer actually had to send in documents.
5 So there were pieces of the process that they
6 could review just based on the name. I don't
7 recall. It may have been where they could
8 have clicked on that name and it took them to
9 that screen.
10 BY MR. ACKELSBERG:
11 Q. But you don't know whether, in fact,
12 that --
13 A. Yeah. I don't recall. I didn't work
14 with that particular system very much.
15 Q. Okay. Now, am I right that if, let's
16 say, at the end of the day, Mobiloans did
17 nothing, they didn't review the loans, the
18 loans would get funded anyway, right?
19 A. They would get funded based on their
20 approved credit underwriting criteria. So at
21 the point that that screen was building
22 throughout the day, the loans had already
23 passed their approved underwriting criteria.
24 Q. And so just to be clear, those -- and

1 those loans would be funded, the approved
2 loans would be funded, absent some affirmative
3 rollback that was communicated from the tribe
4 to Think Finance on that functionality that
5 you're talking about, right?
6 MR. SCHEFF: Object to the
7 form.
8 MR. SHELDON: Object to form.
9 THE WITNESS: Right. They
10 had ultimate authority through that screen if
11 they wanted to remove one or all of those
12 approvals through the functionality. Again,
13 that was intent of the functionality, even
14 though, like I said, they wouldn't have been
15 put on that screen had they not already passed
16 the lender's criteria.
17 BY MR. ACKELSBERG:
18 Q. Okay. It sounds like from the e-mail
19 that Kim Palermo was actually taking that
20 responsibility seriously, that she was at the
21 end of the day, taking responsibility for
22 going over that screen and pushing that
23 approval button, right?
24 MR. SCHEFF: Object to the

1 form.
2 BY MR. ACKELSBERG:
3 Q. That's kind of what it looks like.
4 A. I don't know if she was personally --
5 Q. Someone was there was doing that?
6 A. -- responsible to review them or if she
7 had someone to do it. But clearly she was
8 reviewing the SOP against their internal
9 procedures and raising the concern that they
10 weren't following the SOP. And I don't know
11 who she had doing that review process.
12 Q. Am I right, that's she's also -- it
13 sounds like she's also complaining about
14 another aspect of it, which is that when she
15 or someone working with her would go to the
16 screen at five o'clock in the afternoon, she
17 would -- she felt like she was having some
18 involvement in the underwriting process but
19 loans were effectively getting -- but loans
20 were still being approved and funded in the
21 evenings, over the weekends, during periods
22 where there was no one in the office at
23 Mobiloans, right? That's parts of what her
24 concern is, right?

UNSEALED

1          MR. SHELDON: Object to form.
2          THE WITNESS: I think her
3   concern with the applications that came in on
4   the weekends.
5   BY MR. ACKELSBERG:
6   Q.   Okay. There's no one there to push the
7   button and that the loans would effectively
8   get approved without the review, right?
9   That's what part of what she is concerned
10  about.
11         MR. SCHEFF: Object to the
12  form.
13         MR. SHELDON: Same objection.
14         THE WITNESS: Loans didn't
15  actually fund on the weekend. So what I think
16  that she was concerned with is that those
17  screens may not have been available. I don't
18  know for sure, but in reading this, that's
19  my -- what I take from that.
20         However, on Monday, they had
21  until 4 p.m. that afternoon. Even though that
22  screen may not have shown them the
23  applications that conformed to their credit
24  policy on the weekend, they could have taken

1   action and contacted us and, you know, gotten
2   that information. I don't think the intent
3   was to not show those screens on the weekend.
4   I think that that was just a technical issue
5   that we had.
6   BY MR. ACKELSBERG:
7   Q.   And as I read the SOP, it seems like one
8   of principal functions of the SOP was to
9   generate a report so that the tribe would have
10  a sense of how -- what percentage of the loan
11  fundings were occurring without them having
12  had the opportunity to review the approvals
13  rendered by the decision engine; am I right?
14         MR. SCHEFF: Object to the
15  form.
16         MR. SHELDON: Object to form.
17  Mischaracterizes the document.
18         THE WITNESS: Item 3 in the
19  SOP does talk about reporting, correct.
20  BY MR. ACKELSBERG:
21  Q.   And so part of her concern when she says
22  neither party is following the SOP, I mean, I
23  think that she's saying on her end, they are
24  not always doing the job, as you mentioned.

1   But I think she's saying on the Think Finance
2   end, she's saying, we're not getting that
3   report. That's part of what she's complaining
4   about, right?
5          MR. SCHEFF: Object to the
6   form.
7          THE WITNESS: Yes. That's
8   what it appears to me.
9   BY MR. ACKELSBERG:
10  Q.   You -- and by the way, she said that
11  I raised this issue with Stephen a year ago,
12  right? So you do vaguely remember this having
13  come up -- periodically with Mobiloans?
14         MR. SCHEFF: Object to the
15  form.
16         THE WITNESS: I remember the
17  topic. Again, I don't recall specifically if
18  and what we may have talked about in October.
19  And again -- I remember the topic though.
20  BY MR. ACKELSBERG:
21  Q.   Okay. And so at least in 2014, we don't
22  know what happened in 2013, but in 2014, you
23  write to Neal: Please see Kim's question
24  below about the systems approvals. Will you

1   dig into this?
2          What were you asking Neal to
3   dig into?
4   A.   The -- well, I don't know. It was
5   either -- she wants to know what percentage --
6   so I believe I was asking Neal to look into
7   the reporting aspect, since that's what Kim
8   called me out for in her e-mail.
9   Q.   Did you -- do you remember -- did you
10  ever hear back from Neal or anybody about
11  what, -- whether Neal dug into this and what
12  he found out? Do you remember?
13  A.   I don't recall if Neal communicated back
14  to me specifically or not.
15  Q.   Do you remember hearing -- see if this
16  refreshes your recollection. Do you remember
17  Neal reporting back to you that the IT people
18  looked into it and concluded that there was no
19  functionality on this part of the system at
20  all?
21  A.   I don't specifically recall that.
22  Q.   You don't -- Neal didn't tell you that,
23  in fact, that there's -- that whether the
24  tribe says approve or reject, it doesn't

UNSEALED

App. 0564

1  matter because the loans are going to get
2  funded anyway?  You don't remember him finding
3  that out from the IT people?
4  A.   If he told me that, I just don't recall
5  that he told me.
6  Q.   Well, wouldn't that have been --
7  wouldn't that have been -- that sounds
8  remarkable to me as an outsider.  But you
9  don't remember that?
10           MR. SHELDON:  Object to form,
11  asked and answered.
12           THE WITNESS:  No.
13           MR. ACKELSBERG:  Okay, we can
14  break now for lunch.
15           VIDEOTAPE OPERATOR:  That
16  concludes DVD number two.  The time is 12:26.
17  We are off the record.
18             - - -
19           (Whereupon a lunch break was
20           taken at this time.)
21             - - -
22           VIDEOTAPE OPERATOR:  This
23  begins DVD number three.  It's 1:00 p.m.
24  We're on the record.

1  BY MR. ACKELSBERG:
2  Q.   Before we -- Mr. Smith, before we broke
3  for lunch, we were looking at an e-mail chain
4  between Think Finance and Kim Palermo at
5  Mobiloans regarding Mobiloans' concerns
6  expressed about a request that they approved
7  an update on an SOP entitled "Daily Review of
8  Proposed Application for Funding," right?
9  A.   Yes.
10             - - -
11           (Whereupon Exhibit P-225 was marked for
12           identification.)
13             - - -
14  BY MR. ACKELSBERG:
15  Q.   Now, I'm show you go you another that we
16  have identified as Plaintiff's Exhibit 225.
17  And it's a chain that begins Bates number
18  Think Finance 994814.  And ask you to confirm
19  that it appears the beginning of this e-mail
20  chain is in roughly the same period of time
21  the, fall of 2014, where the same person,
22  LeAnna Brillhart, is now asking a different
23  tribal lending entity, in this case Plain
24  Green, to send back the Plain Green equivalent

1  of that same policy that we were talking about
2  with Mobiloans, right?
3  A.   Yes.
4  Q.   Okay.  And so it starts out that LeAnna
5  writes to two people at Plain Green to remind
6  them that she's trying to update the SOPs and
7  she asked them to take a look at it and
8  approve or comment, what have you, right?
9  A.   Correct.
10  Q.   And then 11 days later, she is bugging
11  them, you know, you never did what I asked;
12  please look at those SOPs, right?  And then
13  she gets a reply from someone named Jim
14  Raider, who as we see from the e-mail, is at
15  that time Plain Green's call center manager.
16  Do you remember Jim?
17  A.   I do remember Jim.
18  Q.   Okay.  So he writes back to LeAnna and
19  again, the subject is this same SOP that we
20  have been looking at.  And he said:  This
21  looks good to me.  However, it would be hard
22  for me to say if there is anything missing as
23  I have not been involved in this process.
24           And you understand him to

1  refer to the process that we were talking
2  about before, where the tribe has the ability
3  to look at an approval screen and see if the
4  loans funded on a particular day should be
5  approved or rejected, right?
6  A.   Yes.
7  Q.   So basically he is saying, you know, I
8  don't have anything to do with this process.
9  Can you tell me who has this access and who
10  makes the final approval and who the five
11  logins are assigned to?
12           So I take it, from what
13  Mr. Raider is saying, is that only certain
14  people were authorized at the tribal level to
15  access that approval screen, the funding
16  screen, whatever it's called, that we were
17  talking about before; is that right?  It's not
18  open to the public.  You have to have a
19  specific person -- a person needs an actual
20  login in order to get onto that screen?
21  A.   I believe that system users had
22  permission levels.  This may have been one of
23  those where they have had to have those
24  specific permission levels to access that

UNSEALED                    App. 0565

1 screen.
2 Q. Okay. So Jim Raider is reporting back
3 to LeAnna, effectively, that he's saying, I'm
4 not one of those people and I don't know who
5 those people are, right? That's what he is
6 saying.
7 A. Yes. I believe he is saying he doesn't
8 know who it is that has access.
9 Q. And then LeAnna, she contacts Michelle
10 Peak, who was one of the people that worked on
11 Plain Green product at that time, right?
12 A. She was in our loan operation area, and
13 she did assist with Plain Green, yes.
14 Q. So LeAnna asked Michelle, who are the
15 people with access? And then Michelle writes
16 to a number of people back at Plain Green,
17 this was being done by someone in the back
18 office, but I'm not sure who is approving the
19 loan origination, right?
20 A. Yes.
21 Q. Okay. That's September 22nd. And, you
22 know, a week or two later, October 2nd, she is
23 reminding them again, I'm still waiting,
24 right?

1 A. That was her job, yes.
2 Q. And then she gets a reply from someone
3 named Paula Lamere, and I guess this is the
4 Paula that previously you weren't sure who
5 that was, right?
6 A. No. I think it was Nicole.
7 Q. Nicole. You're absolutely right.
8 Right. So this was a different person at
9 Plain Green, Paula Lamere, and she writes
10 back, and she's the compliance person -- she's
11 a compliance person there. And she says: I
12 have the same question as Jim. The SOP states
13 the lender will have five assigned employees
14 review proposed apps on a daily basis for
15 final approval. Plain Green as the lender
16 does not have employees assigned to this
17 process. So if this is an implemented SOP,
18 who is going to be completing the process on a
19 daily basis?
20 So let make sure I'm reading
21 this right.
22 Plain Green has this ability
23 to get on a screen and look at the loans
24 before they are funded. But at least

1 according to Paula at this point, not only
2 does she not know who in the system is
3 assigned but she's saying operationally,
4 nobody is doing this. That's what she's
5 saying, right?
6 MR. SCHEFF: Object to the
7 form.
8 MR. SHELDON: Object to form.
9 BY MR. ACKELSBERG:
10 Q. As far as she knows, there's nobody
11 doing that?
12 MR. SCHEFF: Object to the
13 form.
14 MR. SHELDON: Objection.
15 THE WITNESS: She states that
16 as well as stating -- asking if -- I guess, if
17 we knew who was completing the process.
18 BY MR. ACKELSBERG:
19 Q. And what we need to do to be in
20 compliance. I mean, she is learning if this
21 is something we're supposed to be doing,
22 basically tell me how to do it, right? That's
23 kind of what she's saying.
24 MR. SCHEFF: Object to the

1 form.
2 BY MR. ACKELSBERG:
3 Q. Agreed?
4 A. Agreed.
5 Q. All right.
6 A. A clarification. In compliance with
7 their own SOP.
8 Q. Yeah, sure. I understand. I
9 understand. And so then Michelle writes back:
10 Well, at some point in time, you had people
11 approving the loan at the reservation. I'm
12 not sure who passed this responsibility on to
13 the next person. Do you know if Joel has been
14 doing this or at least the access to do so? I
15 believe it was done by the back office and by
16 members who are no longer with Plain Green.
17 That's her reply, right? And
18 she sends this to the other people within the
19 tribe that have been on this e-mail, this
20 group discussing this issue and also she
21 includes Blake Richter, right? Now, Blake
22 Richter was who?
23 A. Blake oversaw the loan operations group
24 at Think and so Michelle reported to Blake.

UNSEALED

App. 0566

1    Q.   Okay.  And so now Jim apparently knows
2  that because he now is sending an e-mail to
3  the same group but addressing this to Blake,
4  right?
5    A.   Right.
6    Q.   And basically he says -- I will just
7  read it:  This is very concerning that I do
8  not believe anybody has done a final approval
9  for loans at least since I have been here and
10  who knows how much longer than that?  When I
11  first responded to the request to approve the
12  SOP, I mentioned that we did not know who had
13  this access.  I spoke to Jean Patton and she
14  informed me that someone from Think was
15  handling this aspect.
16          However, we're finding that
17  it's not only incorrect but Think would not be
18  able to handle this task.
19          In fact, that's true.  This
20  is a task that was set up for someone at Plain
21  Green to perform, right?
22    A.   Right.  And my recollection is there was
23  no one at Think that ever handled that
24  process.  So Jean Patton is saying that she

1  informed her that someone from Think was
2  handling it is not true.
3    Q.   Okay.  So before when we were talking
4  about Mobiloans, you had a little bit of a
5  recollection but not too much.  It sounds like
6  with Plain Green raising the same issue,
7  you're remembering this interchange?
8    A.   No.  We didn't talk about this issue
9  with Mobiloans.  This was specifically at --
10  was anybody at Think Finance reviewing these
11  loans on a daily basis and --
12    Q.   Think Finance or Plain Green?
13    A.   I'm referring to Jean Patton's reference
14  in here, saying she that informed Jim --
15    Q.   Oh.  That someone at Think was doing it.
16    A.   -- that someone at Think was doing it.
17    Q.   I understand.
18    A.   We didn't talk about that with
19  Mobiloans.
20    Q.   No, we certainly didn't.
21    A.   I'm telling you, no one at Think ever
22  did this.
23    Q.   No.  And we -- this was set up to be a
24  function performed by someone on tribal side.

1  That's the whole point of the function, right?
2    A.   Yes.
3    Q.   Okay.  And then -- and the reason I'm
4  showing this to you is Blake brings it to your
5  attention on October 3rd, sends it to you and
6  to Michelle Nguyen and basically saying, check
7  this out, right?
8    A.   Yep.  Well, I think Blake sent it to me
9  because on the prior chain, Greg Hilliard was
10  included.  And Greg was compliance officer.
11  So Greg probably noticed that if it wasn't
12  something that if it came up that I, you
13  know -- if my counterpart at Plain Green knew
14  about this, Greg was probably just trying to
15  keep me in the loop of something that was
16  being discussed.
17    Q.   So there's a response from you to Blake,
18  right?  And Paula -- you know, it's still
19  a question of who's got access.  I mean, it
20  looks like it continues to be unresolved about
21  who has access, right?
22          MR. SCHEFF:  Object to the
23  form.
24          MR. SHELDON:  Same objection.

1          THE WITNESS:  It appears
2  we're trying to run a report for Plain Green
3  to let them know who currently had the
4  permissions to access that screen.
5  BY MR. ACKELSBERG:
6    Q.   Yeah.  And, you know, if you move ahead,
7  it looks like October 20th, a little bit
8  later, a couple of weeks later, LeAnna, still
9  trying to do her job, goes -- comes back to
10  the tribe, well, can we get this approved or
11  not, right?
12    A.   Right.
13    Q.   And Paula says, hold on we're trying to
14  work on a few processes, right?
15    A.   Right.
16    Q.   And now it looks like roughly two months
17  later, we're now into December, there's
18  LeAnna, still bugging Plain Green, can you get
19  us this policy back, right?
20    A.   Right.
21    Q.   And then finally -- actually Greg
22  Hilliard, your counterpart, replies back on
23  December 11th.  We're now looking at
24  page 94815.  And he's now replying to LeAnna.

UNSEALED

1 He says: We have recently formed a credit
2 policy committee which has reviewed this SOP,
3 and we are currently unable to approve it at
4 this time.
5        Do you see that?
6 A. Yes.
7 Q. Now, do you remember this happening,
8 that your counter-party (sic) at Plain Green
9 was basically saying, I'm not going to sign
10 that SOP?
11 A. I don't remember that specifically. I
12 see that in the e-mail here, but I don't
13 recall.
14 Q. And it ultimately got referred to you,
15 the fact that they are refusing to sign it,
16 right?
17        MR. SCHEFF: Object to the
18 form. Misstates exhibit.
19 BY MR. ACKELSBERG:
20 Q. If you look at up at the top --
21        MR. SHELDON: Same objection.
22 BY MR. ACKELSBERG:
23 Q. Do you see that?
24 A. Yeah. I think Blake's just asking if I

1 could communicate with Greg to find out what
2 the --
3 Q. The issue --
4 A. -- problem was --
5 Q. I understand.
6 A. -- and can the SOP be -- can we get that
7 thing handled.
8 Q. And then if you look at the -- and then
9 your response was, you know, did anyone on the
10 products team call or the operations team go
11 and talk to Greg? And you say: Let's add
12 this to the next monthly meeting call and
13 discuss.
14        So does that mean that you
15 were -- were you personally involved in a
16 weekly meeting, a compliance meeting, with
17 Plain Green?
18 A. It wasn't a compliance-specific meeting.
19 It was a general meeting between Think, Plain
20 Green. Typically it was -- yes, every Monday.
21 And there were various topics, several of our
22 departments on the call.
23        So it was just a weekly touch
24 point, you know, just how are things going?

1 Any concerns? Anything you need to know?
2 Anything we need to know?
3 Q. And you would be there representing
4 compliance?
5 A. Yes.
6 Q. And would the same thing happen with
7 regard to the other two tribes?
8 A. They did. We had regular calls.
9 Q. Okay. Now, if we follow the chain, now
10 we're into January of 2015. Do you see that?
11 A. Yes.
12 Q. And Blake is trying to go figure out if
13 this ever got solved, the unsigned SOP, right?
14 A. Right.
15 Q. And then you reply -- what's your reply
16 here? I mean, you can read what's here, but I
17 would be happy to hear from you what you
18 basically -- what you remember from this, what
19 you're saying here?
20 A. So my recollection of this was that Greg
21 came back and said -- well, let's step back
22 for a minute.
23        This was a standard operating
24 procedure that Plain Green had for a function

1 that they were tasked with completing. It
2 wasn't our responsibility to make sure they
3 followed their SOPs. We didn't do reviews of
4 Plain Green to see if they were following
5 their SOPs.
6        What we did do, though, is we
7 did, as you've seen and we've talked about
8 before, helped with making sure SOPs stayed
9 current. And that involved a review process
10 back and forth between us and the lender.
11        So in this case, Plain Green
12 had some turnover in personnel. Someone was
13 doing it at one time. Through the course of
14 these personnel turnovers, it may not have
15 gotten passed down to someone. Jim Raider
16 becomes aware of it. He may have been new at
17 the time; I don't recall.
18        Then Greg steps in and says,
19 hey, we formed this committee. So, you know,
20 they are -- they have a process internally at
21 Plain Green on how they were handling this
22 situation, and we were simply trying to follow
23 up.
24 Q. As the compliance person kind of in

UNSEALED

App. 0568

1  charge on the Think end, you can't tell us
2  today that you know there was ever a time that
3  this function was actually being followed, can
4  you?
5          MR. SHELDON: Object to form.
6          THE WITNESS: No. I do
7  remember specifically in the earlier days, I
8  can't tell you exact time frame, but I
9  remember specifically Neal Rosette, Jr.,
10  performing this function.
11  BY MR. ACKELSBERG:
12  Q. Okay. But you remember that on the
13  Mobiloans, when we were talking about
14  Mobiloans before the lunch break, what turned
15  up when Neal Humphrey, the Mobiloans product
16  person -- I mean, he's like the equivalent of
17  Michelle Peak in this exchange here or?
18  A. Neal Humphrey?
19  Q. In other words, he was the equivalent
20  for Mobiloans. He was their -- he was the
21  product person for Mobiloans, right?
22  A. He was, but he was not the equivalent of
23  Michelle Peak.
24  Q. Okay. That's not important. In any

1  case, Neal, on the Mobiloans side, discovered
2  through the IT people who looked into the
3  actual mechanics, the coding and mechanics of
4  that function, Neal found that that function
5  was totally nonfunctional within the system,
6  right?
7          MR. SCHEFF: Object to the
8  form.
9          MR. SHELDON: Object to form.
10  Mischaracterizes prior testimony and exhibits.
11          MR. ACKELSBERG: Okay.
12  BY MR. ACKELSBERG:
13  Q. That's what -- you remember that, right?
14  A. I recall that that issue related to
15  Mobiloans did turn out to be a system -- some
16  functionality that was broken.
17  Q. Okay. Yeah. What about Plain Green?
18  Was it the same broken system?
19  A. No. My recollection was that it worked
20  for Plain Green.
21  Q. Okay. So on the Plain Green side -- let
22  me get it straight. On the Mobiloans side,
23  the system was just broken, and even if the
24  tribe wanted to perform that function, it

1  wasn't -- it wasn't -- what they had thought
2  was happening wasn't happening, right?
3          MR. SHELDON: Object to form.
4  BY MR. ACKELSBERG:
5  Q. In other words, from the Mobiloans side,
6  even though they thought they had some role to
7  play in the approval of the loans, whatever
8  they did didn't matter because that function
9  was broken on the Mobiloans platform, right?
10          MR. SHELDON: Object to form.
11          MR. SCHEFF: Object to the
12  form.
13          THE WITNESS: Right. The
14  difference was that the system functionality
15  for Mobiloans, there was something wrong with
16  the communications between that particular
17  page or screen and whatever processes were
18  supposed to run as a result of that. Now,
19  Mobiloans had a different loan management
20  system.
21  BY MR. ACKELSBERG:
22  Q. That's CoreCard, right?
23  A. Correct.
24  Q. Okay. Whereas Plain Green was on the

1  legacy platform?
2  A. Correct.
3  Q. So as far as you know on the legacy
4  platform, that function did work?
5  A. Yes.
6  Q. Okay. It's just that with regard to
7  Plain Green, at least for a period of time, no
8  one was doing it?
9  A. That's what it appears, yes.
10  Q. Okay. I got it. I want to show you a
11  document that we identified yesterday as
12  Plaintiff's Exhibit 210. I just have a couple
13  of questions. Richard has his copy. We have
14  the ones -- the reporter has her copy. It's
15  the change control. Richard, can you show the
16  other folks?
17          MR. SCHEFF: What's the Bates
18  numbers?
19          MR. ACKELSBERG: The Bates
20  number of the change control is 187354. And
21  there's an e-mail that I believe was attached
22  to it. Actually, here's one. So the e-mail
23  is 187345.
24          MR. SHELDON: The witness

UNSEALED

App. 0569

1  managing bigger pieces of the operations than
2  they did day one. And so this was a way to
3  try to formalize the types of things that
4  could still be transitioned and for the tribes
5  to take ownership of certain activities that
6  maybe they outsourced.
7          But it was because of the
8  growth and maturation of the tribe and the
9  product that they wanted to have a little bit
10 more of the operations to themselves.
11 Q.    And who prepared -- was this something
12 you prepared or Michelle prepared, or who did
13 this, do you remember?
14 A.    I think this was a collective -- this
15 particular document incorporated lists of
16 activities that both Think and the tribes
17 participated in -- in identifying. And then
18 I think someone at Think actually scribed most
19 of this.
20 Q.    Okay. And so what is the -- so some
21 items have a check; some items have an
22 asterisk. Do you know how this worked?
23 A.    Yeah. I don't know why there's an X or
24 an asterisk. I think in each case, the X or

1  the asterisk indicated that that function or
2  that particular item was already completed for
3  that particular tribal lending enterprise.
4  Q.    And you're not sure if there is a
5  distinction between the X and the asterisk or
6  whether it's like a degree of engagement or
7  sophistication or anything like that?
8  A.    No, I don't recall us ever having any
9  degrees. It was either done or not done.
10 Q.    But where it's blank, that means it's
11 still a work in progress, right?
12 A.    That's what that would suggest. It
13 shouldn't --
14 Q.    So under understanding credit policy,
15 where basically none of the tribes are up to
16 speed on that --
17         MR. SCHEFF: Object to the
18 form.
19         MR. SHELDON: Object to form.
20 BY MR. ACKELSBERG:
21 Q.    Isn't that what that says?
22 A.    I think this particular item was a deep
23 dive into the credit underwriting, the
24 decision engine. The tribes were aware of the

1  underwriting process. They had a credit
2  policy. But, you know, over time, we wanted,
3  I think, a little bit more. If they were
4  going to hire a chief risk officer, for
5  example, or if they needed to assess whether
6  they needed a chief risk officer, some of that
7  information is very detailed that those risk
8  analysts and statisticians do.
9          And so I believe, if I
10 recall, this was a deep dive into that risk,
11 kind of peeling back the onion a little bit
12 and letting them look a little bit deeper into
13 the credit scoring models. And that's a very
14 difficult piece to get through. It takes
15 awhile.
16 Q.    When you say they all had a credit
17 policy, are we talking about the document we
18 looked at before, the underwriting policy?
19 A.    I was referring to, like, the loan
20 underwriting policy.
21 Q.    So like the one we looked at earlier
22 from back in 2011, 2012?
23         MR. SCHEFF: Object to the
24 form.

1          MR. SHELDON: Same objection.
2          THE WITNESS: Yes.
3  BY MR. ACKELSBERG:
4  Q.    Okay. And that's the policy that
5  they're -- that according to this, they're
6  still lacking some understanding of or --
7          MR. SCHEFF: Object to the
8  form.
9          THE WITNESS: No. My
10 recollection of this particular item was a --
11 and it's probably just poorly worded. It was
12 a deep dive into the components, the workings
13 of the decision engine.
14 BY MR. ACKELSBERG:
15 Q.    Okay. And the next item, collections
16 strategy practices. Now, up until this time
17 -- and as of this time from the beginning, the
18 inception of the tribal products to this point
19 in time, September 2014, the collections were
20 all handled by some -- by an outsource, some
21 agency outside of the tribe, right?
22 A.    That's correct.
23 Q.    Whether people paying, it's done -- the
24 payments that were done by ACH, that's handled

UNSEALED

1  by an ACH provider, right?
2  A.  Think Systems would identify the
3  customers that had agreed to ACH, and then the
4  loan system -- you know, there's a system
5  built to create the daily ACH file for
6  customers whose payments were due.
7  Q.  And then for customers that aren't
8  paying, then there's contracts with collection
9  agencies to do the actual calling and whatever
10  it is that collection companies do, right?
11  A.  Correct.
12  Q.  Is collections strategies and practice,
13  does that encompass both of those pieces of
14  getting the payments into the -- getting the
15  payments in the door?
16  A.  I don't recall the specifics around this
17  particular item.  I know that one of the
18  pieces or my recollection of one of the pieces
19  that we did assist the tribes with was
20  workforce management.
21  So we would assist with
22  looking at the numbers of accounts that might
23  be in collections on a given day and how many
24  collection representatives their collection

1  vendor had staffed for that and whether or not
2  some efficiencies that could be gained.
3  So I think that part of this
4  was to help train the tribes on how this type
5  of analysis is done so that they could do that
6  for themselves.
7  Q.  Now, you knew someone at Think named --
8  I think his name was Gio Rodriguez?
9  A.  Yes.
10  Q.  And he was the one who was actually
11  doing the monitoring of collections, or his
12  group was doing the monitoring of the
13  collection agencies?
14  MR. SHELDON:  Object to the
15  form.
16  THE WITNESS:  Correct.
17  BY MR. ACKELSBERG:
18  Q.  And so this is about whether the tribes
19  could take on more of that responsibility?
20  A.  Again, I don't recall the specifics.
21  But there were aspects of the collection
22  strategies that the tribes were interested in
23  taking more involvement with.  And I think
24  that's what this item captures.

1  Q.  Well, it captures that it's aspirational
2  as of that point in time, right?
3  A.  Yeah.  This was something that they
4  weren't doing currently that they wanted to
5  do.
6  Q.  Right.  Okay.  And then down below in
7  finance, in terms of understanding the flow of
8  funds and self-service data, do you remember
9  those discussions?
10  A.  No.  This was our finance group that
11  worked with the tribes on this particular
12  item.  I didn't get involved in the flow of
13  funds discussion.
14  Q.  But it at least appears -- the results
15  of this was that this was another area that
16  was aspirational.  It's not something tribes
17  had much involvement in at that point in time.
18  MR. SCHEFF:  Object to the
19  form.
20  MR. SHELDON:  Object to form.
21  THE WITNESS:  As indicated by
22  the box not getting checked, this is something
23  that they were interested in doing that at the
24  moment -- at the time this was produced, they

1  weren't doing.
2  BY MR. ACKELSBERG:
3  Q.  Okay.  And finally, the -- do you see
4  under product, it says, deep knowledge of
5  product features?
6  A.  I see that.
7  Q.  And so none of the tribes got a check or
8  an asterisk in that item either, at that point
9  in time, right?
10  A.  I don't recall what this one was.  It
11  wasn't checked, but I don't recall what this
12  particular item was talking about.
13  Q.  And this was -- again, we're talking
14  about September 2014.  And for Plain Green,
15  this is three and a half years in, right?
16  A.  Correct.
17  Q.  And the other tribe is a little bit less
18  time but still roughly three years, right?
19  A.  Roughly, yes.
20  Q.  Now, at this point in time, September of
21  2014 -- and understanding that we're talking
22  about a service provider, not a direct lender.
23  I'm very aware of the distinction.  But at
24  that point in time, am I right that Think

UNSEALED

1  Finance was servicing three products; Plain
2  Green, Great Plains Lending, and Mobiloans and
3  that was it?
4  A.   Yes, that's my recollection at that
5  time, yes.
6        MR. ACKELSBERG:  Just bear
7  with me for a second.  I have one final area.
8  One final bunch of documents that I'm trying
9  to be selective with.
10  BY MR. ACKELSBERG:
11  Q.   Did -- Mr. Smith, did the compliance
12  group play a role with regard to responding to
13  consumer complaints that were directed to one
14  of the three tribal lenders?
15  A.   Can you clarify which compliance
16  department?
17  Q.   Yours.
18  A.   Yeah.  Early in the relationship, we
19  assisted the tribal lenders with responses to
20  customer complaints.
21  Q.   And what was the process?
22  A.   Generally, the complaint would come in.
23  Someone in my group would review the
24  complaint, would review research, investigate

1  the nature of the complaint, and provide a
2  response on behalf of the tribe to the
3  complainant.
4  Q.   And sometimes those complaints
5  originated from state regulators or attorneys
6  general?
7  A.   There were occasions when those types of
8  complaints came in, yes.
9  Q.   So let's look at an example of that.
10                - - -
11     (Whereupon Exhibit P-239 was marked for
12            identification.)
13                - - -
14  BY MR. ACKELSBERG:
15  Q.   Okay.  Now you said that you were
16  assisting the tribe in dealing with complaints
17  early on in the process.  We're looking at --
18  what we're looking at is some activity in
19  November of 2015, right?
20  A.   Yes.
21  Q.   Okay.  So -- well, why don't you explain
22  what we got here?  What happened here?
23  A.   Well, I sent an e-mail to several folks
24  within our company, just notifying them of a

1  complaint that Plain Green received directly
2  from the Department of Financial Services of
3  New York and their response and how they
4  handled that particular complaint so that our
5  folks were aware of this particular customer
6  complaint.
7  Q.   And the nature of the customer complaint
8  was that -- well, the letter actually comes
9  from the New York State Department of
10  Financial Services, right?
11  A.   Correct.
12  Q.   And they're basically advising Plain
13  Green that they at the department had received
14  a complaint from a New York citizen regarding
15  a loan originated by Plain Green, right?
16  A.   Correct.
17  Q.   And they refer to it as a Payday loan,
18  but you're familiar that there is confusion
19  between installment loan and Payday loan?
20        MR. SCHEFF:  Object to the
21  form.
22  BY MR. ACKELSBERG:
23  Q.   You're familiar with that confusion,
24  right?

1        MR. SHELDON:  Object to form.
2        THE WITNESS:  Yes, I'm
3  familiar with that.
4  BY MR. ACKELSBERG:
5  Q.   And so the examiner from New York State
6  is basically saying the kind of loan that this
7  lady got from Plain Green is illegal in New
8  York, right?  That's basically what he's
9  saying, right?
10  A.   It states Payday Loans are illegal.
11  Q.   Well -- right.  That's what it states.
12  He's referring to the -- whatever it is
13  that Plain -- whatever you call the loan that
14  Ms. Jenkins got from Plain Green that the New
15  York examiner is referring to as a Payday
16  loan, he is saying that that loan product is
17  illegal in New York.  That's the nature of the
18  complaint, right?
19        MR. SCHEFF:  Object to the
20  form.
21        MR. SHELDON:  Object to form.
22        THE WITNESS:  That's the
23  nature, yes.
24  BY MR. ACKELSBERG:

UNSEALED

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

COMMONWEALTH OF      :
PENNSYLVANIA         :
    Plaintiff    :
                 :
                 :
VS.          :   CIVIL ACTION NUMBER
                 :   2:14-CV-07139
THINK FINANCE, INC., :
ET AL.,              :
    Defendants   :
- - -

JUNE 26, 2018
- - -

Videotaped deposition of STEVEN
HAYNES, was taken pursuant to notice at 1735
Market Street, Philadelphia, Pennsylvania,
beginning at or about 8:30 a.m. before
Jeannine Cancelliere, Court Reporter and
Notary Public and David Levin, Videotape
Operator, there being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102

## Page 2

1  APPEARANCES:
2
3  LANGER, GROGAN & DIVER, P C
   BY: IRV ACKELSBERG, ESQUIRE
4  BY:  JOHN J  GROGAN, ESQUIRE
   1717 Arch Street, Suite 4130
5  Philadelphia, Pennsylvania 19103
   Phone: (215) 320-5701
6  Representing the Plaintiff
   jgrogan@langergrogan.com
7
8
9  ATTORNEY GENERAL'S OFFICE
   BY:  SAVERIO MIRARCHI, ESQUIRE
10 1600 Arch Street, 3rd Floor
   Philadelphia, Pennsylvania  19103
11 Phone: (215) 560-2445
   Representing the Defendant
12 smirarchi@attorneygeneral gov
13
14 MONTGOMERY McCRACKEN
   BY:  RICHARD SCHEFF, ESQUIRE
15 BY:  DAVID HERMAN, ESQUIRE
   123 South Broad Street
16 Philadelphia, Pennsylvania  19109
   Phone: (215) 772-7228
17 Representing Ken Rees
   rscheff@mmwr com
18
19
20 KATTEN, MUCHIN, ROSENMAN LLP
   BY: DANIEL SHAPIRO, ESQUIRE
   BY:  J  MATTHEW HAWS, ESQUIRE
21 525 W  Monroe Street
   Chicago, Illinois 60661-3693
22 Phone: (312) 902-5319
   Representing Victory Park
23 matthew haws@kattenlaw com
24

## Page 3

1  APPEARANCES (continued)
2
3  GOODWIN PROCTER
   BY:  MATTHEW SHELDON, ESQUIRE
4  901 New York Avenue, NW
   Washington, D.C.  20001
5  Phone: (202) 346-4000
   Representing Think Finance
6  msheldon@goodwinlaw.com
7
8  VAN NESS FELDMAN
   BY:  PATRICK DAUGHERTY, ESQUIRE
9  1050 Thomas Jefferson Street, NW
   Washington, D.C. 20007-3877
10 Phone: (202) 298-1800
   Representing National Credit
11 Adjusters LLC
   pod@vnf.com
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1              I N D E X
2              - - -
3  STEVEN HAYNES              PAGE
4  BY MR. ACKELSBERG            8
5  BY MR. SHELDON             302
6  BY MR. DAUGHERTY           308
7              - - -
8            E X H I B I T S
9              - - -
10 EXHIBIT NO.   PAGE
11   Haynes-1   12
12   P-337     20
13   P-338     80
14   P-339     85
15   P-340    123
16   P-341    130
17   P-342    134
18   P-343    135
19   P-344    141
20   P-345    142
21   P-346    147
22   P-347    149
23   P-348    154
24   P-349    164

UNSEALED

App. 0573

EXHIBITS (continued)

| EXHIBIT NO. | PAGE |
|---|---|
| P-350 | 168 |
| P-351 | 173 |
| P-352 | 187 |
| P-353 | 211 |
| P-354 | 217 |
| P-355 | 219 |
| P-356 | 220 |
| P-357 | 223 |
| P-358 | 233 |
| P-359 | 238 |
| P-360 | 241 |
| P-361 | 243 |
| P-362 | 253 |
| P-363 | 256 |
| P-364 | 259 |
| P-365 | 260 |
| P-366 | 261 |
| P-367 | 266 |
| P-368 | 274 |
| P-369 | 277 |
| P-370 | 281 |
| P-371 | 282 |

- - -

EXAMINATION

- - -

BY MR. ACKELSBERG:

Q. Good morning, Mr. Haynes.

A. Good morning.

Q. We just met. My name, again, is Irv Ackelsberg, and I am one of the lawyers representing the Commonwealth of Pennsylvania in this matter.

Can you state the -- what's your home address?

A. 4215 San Carlos Street, Dallas, Texas.

Q. Do you have a different business address?

A. I do.

Q. What's that?

A. 7515 Lemmon Avenue, Hangar R, Dallas, Texas.

Q. Hangar R, is that in an airport?

A. It is.

Q. Why do you have an office in an airport?

A. Very cheap space.

Q. Have you been deposed before?

VIDEOTAPE OPERATOR: We're now on the record my name is David Levin. I am the videographer employed by On the Record. This is a video deposition in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2:14-CV-07139.

Today's date is Tuesday, June 26th, 2018, and the video time is 8:38 a.m. This deposition is being held at 1735 Market Street, 21st Floor, Philadelphia, Pennsylvania, in the matter of Commonwealth of Pennsylvania versus Think Finance, Incorporated, et al.

The deponent is Steven Haynes. All counsel will be noted on the stenographic record. The court reporter is Jeannine Cancelliere. She'll now swear in the witness.

- - -

STEVEN HAYNES, after having been first duly sworn, was examined and testified as follows:

VIDEOTAPE OPERATOR: Please proceed, counsel.

A. I have.

Q. How many times?

A. Once for sure, maybe twice.

Q. The one for sure, what case was that?

A. It was a divorce case of a business partner of mine.

Q. I don't care about that divorce case. What about the other case?

A. It was an accident case.

Q. Okay. So nothing pertaining to your business activities?

A. No.

Q. I assume your lawyer has explained to you the procedures and -- but I need to go over them just to make sure that we're on the same page.

So what's going to happen is as we proceed today, I am going to be asking you questions. You're going to be answering those questions to the best of your ability. There may be some comment from the lawyers in the room. Everything that is spoken is going to be taken down by the court reporter, who's sitting at your left.

UNSEALED

App. 0574

1  by tribes, Native American tribes.
2  Q.  And when a tribe owns a bank, that's
3  really referring to the investment behind the
4  bank, right?
5         MR. SCHEFF:  Object to the
6  form.  You can answer.
7  BY MR. ACKELSBERG:
8  Q.  The ownership behind the bank, correct?
9         MR. SCHEFF:  Object to the
10  form.  You can answer the question.
11  BY MR. ACKELSBERG:
12  Q.  That's what you're referring to?
13         MR. SCHEFF:  Object to the
14  form.  Which question do you want him to
15  answer?
16  BY MR. ACKELSBERG:
17  Q.  Go ahead.
18         MR. SCHEFF:  Answer whichever
19  question you choose, Mr. Haynes.  Just tell
20  him which one you're answering.
21  BY MR. ACKELSBERG:
22  Q.  You're familiar with some Native
23  American-owned banks in the country, correct?
24  A.  Yes, sir.

1  Q.  Okay.  A Native American bank would
2  still need to be regulated by one of the
3  federal regulators, correct?
4         MR. SCHEFF:  Object to the
5  form; calls for a legal conclusion.  You can
6  answer the question.
7         THE WITNESS:  I don't know.
8  BY MR. ACKELSBERG:
9  Q.  Are you aware of any -- have you ever
10  heard of a Native American bank that was not
11  regulated by the OCC or the Federal Reserve or
12  the FDIC?
13  A.  I don't know.
14  Q.  Okay.  Did anything ever come of this
15  communication with Think Finance?  Did you get
16  a meeting with Think Finance?  I'm sorry.  I
17  said Think Finance.  I meant Victory Park.
18  A.  I have had meetings with Victory Park.
19  I'm not sure if they came as a direct result
20  of this e-mail or not.
21  Q.  We're going to be talking about -- there
22  was -- at a previous deposition, we learned
23  about there was a perspective deal that you
24  were discussing with Victory Park in the 2016,

1  2017 timeframe.  But this is back in 2013, two
2  years into the Plain Green venture.
3         Do you remember any meetings
4  with Victory Park back then?
5         MR. SHAPIRO:  Object to the
6  form.  Back when?
7  BY MR. ACKELSBERG:
8  Q.  2013.  At the time that Mr. Dunleavy was
9  introducing you to Victory Park.
10  A.  I remember meeting with Victory Park.  I
11  can't pinpoint the date.
12  Q.  Who did you meet with at Victory Park?
13  A.  It would have been -- Tom Welch was the
14  person I met with at Victory Park.
15  Q.  When's the first time you met Tom Welch?
16  A.  I don't remember.
17  Q.  What did you discuss?
18  A.  The first time I remember meeting him,
19  we discussed, you know, broad investment
20  concepts and how we each did business.
21  Q.  And were you specifically talking about
22  Native American tribes?
23  A.  It was a larger discussion than that.
24  Q.  But that included tribes?

1  A.  It would have, yes.
2  Q.  And it wasn't specifically about Think
3  Finance?
4  A.  No, sir.
5  Q.  It was about broader opportunities
6  beyond Think Finance?
7         MR. SCHEFF:  Object to the
8  form.  You can answer the question.
9         THE WITNESS:  Yes.
10  BY MR. ACKELSBERG:
11  Q.  Do you remember anyone else at the
12  meeting with Tom Welch, anyone else at Victory
13  Park, or was it just a one-on-one with you and
14  Mr. Welch?
15  A.  Terry Dunleavy would have accompanied
16  me, and I believe there was one or two other
17  people that came in and out of the meeting
18  from the Victory Park side.
19  Q.  Was this at Victory Park's offices in
20  Chicago?
21  A.  Yes, sir.
22  Q.  Can you give us a rough timeframe for
23  when this happened?
24  A.  I don't remember.

UNSEALED

1    Q.   When's the last time -- is Mr. Dunleavy
2    still representing you?
3    A.   He does.
4    Q.   Was the initial deal that you did
5    involving Think and the Rocky Boy Chippewa
6    Cree the biggest tribal lending deal you've
7    been involved in?
8           MR. SCHEFF:  Object to the
9    form.  You can answer the question.
10          THE WITNESS:  Yes.
11   BY MR. ACKELSBERG:
12   Q.   Is it the biggest in terms of the volume
13   of loans generated by the business?
14   A.   I don't know how many loans they've
15   generated.
16   Q.   Well, in terms of -- but it's the
17   biggest in terms of the most cash generated
18   for you though, correct?
19   A.   That's correct.
20   Q.   Why was that deal so lucrative?  What
21   were the aspects of that deal that made it
22   especially lucrative for you?
23   A.   Think Finance had decided that instead
24   of paying me a flat fee for making the

1    connection, they were going to pay me a
2    percent of collected revenues.
3    Q.   Good deal, huh?
4           MR. SCHEFF:  Object to the
5    form.  You can answer the question.
6          THE WITNESS:  It was a very
7    good deal for me.
8    BY MR. ACKELSBERG:
9    Q.   Why would they want to give you -- do
10   you have any sense of why they'd want to give
11   you 1 percent of their revenues?
12         MR. SHELDON:  Object to the
13   form.
14         THE WITNESS:  I believe at
15   the time in our discussions, it was not that
16   they wanted to give me 1 percent of the
17   revenues.  They just did not want to give me a
18   large flat fee for finding them a tribe.
19   BY MR. ACKELSBERG:
20   Q.   Let's move to the beginning of this
21   relationship with Think Finance and the Rocky
22   Boy Chippewa Cree.
23        How did you get connected
24   to -- did you have a -- you had a relationship

1    with the tribe before you had a relationship
2    with Think Finance, correct?
3    A.   That's correct.
4    Q.   That's why Think Finance was interested
5    in developing a relationship with you,
6    correct?
7           MR. SCHEFF:  Object to the
8    form.  You can answer the question.
9          MR. SHELDON:  Objection --
10   BY MR. ACKELSBERG:
11   Q.   As best as you understand.
12         MR. SHELDON:  Object to form.
13         MR. ACKELSBERG:  I'll
14   withdraw.  I'll restate the question.
15   BY MR. ACKELSBERG:
16   Q.   You spent time on the Rocky Boy
17   reservation in Box Elder, Montana?
18   A.   Yes, I have.
19   Q.   Okay.  How many times have you been
20   there?
21   A.   Half a dozen.
22   Q.   When was the first time?
23   A.   I'm not sure.
24   Q.   Approximately?

1    A.   Approximately 2006.
2    Q.   Okay.  And when's the most recent time?
3    A.   Probably around 2011.
4    Q.   When the deal was first set up with
5    Think Finance?
6           MR. SCHEFF:  Object to the
7    form.  You can answer the question.
8          THE WITNESS:  Correct.
9    BY MR. ACKELSBERG:
10   Q.   How would you describe -- describe the
11   reservation in Box Elder for me?
12   A.   It is poor.  It is disheveled.  It's
13   beautiful.
14   Q.   Would it be correct to say it is also
15   very remote?
16   A.   It is extremely remote.
17   Q.   Would I be correct to say that the
18   biggest population center is probably Great
19   Falls, which is roughly two hours away?
20   A.   Yeah, that's pretty safe to say.
21   Q.   Okay.  On the Canadian -- it's near the
22   Canadian border, correct?
23   A.   Correct.
24   Q.   But there's no population centers -- big

UNSEALED

1    population centers in Canada near Box Elder
2    either; am I right?
3    A.   I don't remember.  I think you're
4    correct.
5    Q.   What economic activity, if any, exists
6    at Box Elder?
7         MR. SCHEFF:  Object to the
8    form.  You can answer the question if you can.
9    BY MR. ACKELSBERG:
10   Q.   That you recall.
11   A.   They had an oil and gas industry on the
12   reservation.  They had a casino.
13   Q.   That's about it?
14   A.   That's about it.
15   Q.   Those half a dozen times that you were
16   in Box Elder, how did you get there?
17   A.   I would fly to Great Falls or someplace
18   close and rent a car and drive for a very long
19   time.
20   Q.   Now, the company that financed the
21   casino that you mentioned, that's a company
22   called BEH Gaming, correct?
23   A.   That's correct.
24   Q.   Okay.  Now, do you have any connection

1    to that company or to the principals of that
2    company?
3         MR. SCHEFF:  Object to the
4    form.  You can answer the question.
5         THE WITNESS:  I have no
6    connection to the company.  I know the
7    principals.
8    BY MR. ACKELSBERG:
9    Q.   Okay.  And who are they, the principals?
10        MR. SCHEFF:  Irv, if this has
11   something to do with the eventual relationship
12   with Think Finance, then I don't have a
13   problem with this question.  But it if
14   doesn't, then we're just not going to his
15   other business relationships.  It's just none
16   of your business.
17   BY MR. ACKELSBERG:
18   Q.   You can answer the question.
19        MR. SCHEFF:  You can't answer
20   the question.  Does it have a relationship?
21        MR. ACKELSBERG:  Yes.
22        MR. SCHEFF:  Okay.  What's
23   the relationship?
24        MR. ACKELSBERG:  I'm not here

1    to take your deposition.
2         MR. SCHEFF:  Let's go off.
3         VIDEOTAPE OPERATOR:  9:36,
4    off the record.
5              - - -
6    (Whereupon a short break was taken at this
7    time.)
8              - - -
9         VIDEOTAPE OPERATOR:  9:42,
10   we're back on the record.
11   BY MR. ACKELSBERG:
12   Q.   So the casino that's on the Rocky Boy
13   reservation, it's called the Northern Winds
14   Casino?
15   A.   I believe that's correct.
16   Q.   So your role with regard to the casino
17   was supplying the slot machines?
18        MR. SCHEFF:  Object to the
19   form.  You can answer if you can.
20        THE WITNESS:  I supplied them
21   slot machines later in the life of the casino.
22   I was not involved in the building or the
23   opening of the casino.
24   BY MR. ACKELSBERG:

1    Q.   Okay.  So the developer of the casino
2    was BEH, right?
3    A.   I believe that to be correct, yes.
4    Q.   Okay.  And at some point after it was
5    opened, you developed a contract -- you had an
6    agreement with the tribe to lease slot
7    machines, like you were talking about before?
8         MR. SCHEFF:  Object to the
9    form.  You can answer the question.
10        THE WITNESS:  I was --
11   entered into a revenue agreement to lease
12   machines to the tribe, to the casino, correct.
13   BY MR. ACKELSBERG:
14   Q.   Okay.  And through what business name
15   was your slot machine contract with the
16   Chippewa Cree?
17   A.   I believe it was AGame NV.  It may have
18   been Tribal Gaming Solutions.  I'm not sure
19   which one.  It may have been both.
20   Q.   AGame NV was a business -- who is your
21   partner in that business?
22   A.   Ray Brown.
23   Q.   And is Ray Brown connected to BEH
24   Gaming?

UNSEALED

1    MR. SCHEFF:  Object to the
2  form.
3    THE WITNESS:  I'm not sure.
4  BY MR. ACKELSBERG:
5  Q.   How did you meet Ray Brown?
6  A.   I met Ray Brown in Dallas years before.
7  He and a partner he had then came to my office
8  looking for capital at the time for Indian
9  gaming machine leasing.
10  Q.   Was Mr. Brown the one who connected you
11  to the Chippewa Cree that led to the slot
12  machine deal at the Northern Winds Casino?
13    MR. SCHEFF:  Object to the
14  form.  You can answer the question.
15    THE WITNESS:  Yes, Mr. Brown
16  introduced me to the Chippewa Cree.
17  BY MR. ACKELSBERG:
18  Q.   As a result of that, you and Mr. Brown
19  created this LLC called AGame NV?
20    MR. SCHEFF:  Object to the
21  form.  You can answer the question.
22    THE WITNESS:  I don't
23  remember it being specifically for or starting
24  with Chippewa Cree.

1  BY MR. ACKELSBERG:
2  Q.   But when you first met Mr. Brown, I
3  mean, you weren't talking specifically about
4  the Chippewa Cree, you were talking more
5  generally about providing machines to tribal
6  casinos, correct?
7    MR. SCHEFF:  Object to the
8  form.
9    THE WITNESS:  When Mr. Brown
10  came to our offices, he was looking for
11  financing for a whole host of gaming-related
12  opportunities in and off reservations.
13  BY MR. ACKELSBERG:
14  Q.   And then at some time you and Mr. Brown
15  decided to create a business together?
16  A.   That's correct.
17  Q.   Okay.  And what was the purpose of that
18  business?
19  A.   The purpose of AGame was to develop
20  and -- develop tribal casinos, commercial
21  casinos, and to lease slot machines to those
22  casinos.
23  Q.   And at some point, Mr. Brown brought to
24  your attention the possibility of AGame NV

1  getting a piece of the action at the Northern
2  Winds Casino?
3    MR. SCHEFF:  Object to the
4  form.  You can answer the question if you can.
5    THE WITNESS:  Mr. Brown, you
6  know, yes, brought it to our attention -- my
7  attention, the opportunity to lease slot
8  machines to the Northern Winds Casino.
9  BY MR. ACKELSBERG:
10  Q.   And then how does this work?  Do you and
11  Mr. Brown raise money to do this?  Do you have
12  investors?  Did you have investors in
13  AGame NV?
14    MR. SCHEFF:  Why is this --
15  how is this relevant to this case, Mr.
16  Ackelsberg?  I mean, honestly, how is this
17  relevant?
18    MR. ACKELSBERG:  We'll get
19  back to AGame NV later.  That's why.
20    MR. SCHEFF:  Okay.
21  BY MR. ACKELSBERG:
22  Q.   Now, the deal that you signed with the
23  Chippewa Cree for the slot machines, was there
24  any paperwork connected to that deal?

1    MR. SCHEFF:  Object to the
2  form.  You can answer the question.
3    THE WITNESS:  There were
4  always signed contracts with our agreements.
5  BY MR. ACKELSBERG:
6  Q.   Did you provide those signed contracts
7  either to your lawyers at Dinsmore or to your
8  lawyers here at Montgomery McCracken?
9  A.   I provided access to all of my files,
10  both on my computer and online and my file
11  cabinets.
12  Q.   And that would include the contract for
13  the slot machines with the Chippewa Cree?
14  A.   If they still exist, yes.
15  Q.   Now, at the time that -- now, is the
16  first time that you went to the Rocky Boy
17  reservation to investigate the possibility of
18  the deal for the slot machine?
19    MR. SCHEFF:  Object to the
20  form.
21    THE WITNESS:  No, sir.
22  BY MR. ACKELSBERG:
23  Q.   What was the occasion for your first
24  trip to the Rocky Boy reservation?

16  (Pages 61 to 64)

UNSEALED

App. 0578

1    A.   I believe my first trip, the casino was
2    under construction and they were looking for
3    help with their oil and gas leases.
4    Q.   And who was looking for help, the tribe?
5    A.   The tribal oil and gas corporation that
6    they owned.
7    Q.   I see.  And Mr. Brown made that
8    connection for you with the tribe?
9    A.   Yes, sir.
10   Q.   So this was after the meeting in Dallas
11   with Mr. Brown?  He connected you to the tribe
12   with regard to an oil and gas lease?
13   A.   Yes, sir.
14   Q.   Okay.  And did you have a contract with
15   the Chippewa Cree on an oil and gas deal?
16   A.   No, sir.  After investigating the
17   opportunity, there was no business to be done.
18   Q.   Okay.  And would the next time you went
19   up there, that would -- the next time you went
20   up there would have been with regard to the
21   slot machines?
22   A.   I'm not sure.  There was another
23   opportunity to build hotels and multifamily
24   housing up there.  And then after that -- or

1    previous with the slot machines, there was
2    business opportunities growing out of
3    Mr. Brown's relationship with the tribe.
4    Q.   But none of them came to fruition?
5    A.   No, sir.
6    Q.   Now, with regard to the casino, given
7    how remote that reservation is, what was the
8    business plan for getting people to come to
9    the casino?
10           MR. SCHEFF:  Object to the
11   form.  You can answer the question if you can.
12   Again, I don't know how this is on point,
13   Mr. Ackelsberg, to this case.  You can answer
14   the question if you can.
15           THE WITNESS:  That's a very
16   good question.  I wasn't invested in the
17   casino.  I don't know what their business plan
18   was.
19   BY MR. ACKELSBERG:
20   Q.   Now, was Mr. Brown also the one who
21   connected you?  Did Mr. -- well, you already
22   had a relationship -- before the Think Finance
23   deal happened, you already had this
24   pre-existing relationship with the tribe,

1    correct?
2    A.   That's correct.
3    Q.   Now, with the slot machines, for
4    example, who at the tribe were you dealing
5    with?
6    A.   I don't remember specifically.
7    Traditionally, we deal with the general
8    manager of the casino.
9    Q.   You weren't dealing with anyone in the
10   tribal council, that you remember?
11   A.   I had met members of the tribal council.
12   But the way the businesses always work is you
13   go to the general manager because they had the
14   knowledge of what they need on the
15   reservation.
16   Q.   And you don't remember who that general
17   manager was?
18   A.   I don't remember his name, no.
19   Q.   Okay.  So how did the first connection
20   with Think Finance happen?
21           MR. SCHEFF:  Object to the
22   form.  You can answer the question.
23           THE WITNESS:  My attorney,
24   Tim Anderson.

1    BY MR. ACKELSBERG:
2    Q.   At Pepper?
3    A.   At Pepper Hamilton.  Introduced me to
4    Rick Eckman, who is also an attorney there who
5    was working with Think Finance to help them
6    find a tribe to partner with.
7    Q.   So tell us what happened.
8    A.   I met with Tim, talked to Rick Eckman on
9    the phone.  He set up a conference call
10   with -- or a call between myself and Jason
11   Harvison, and Jason came over after that phone
12   call and showed me a presentation of what it
13   is they were trying to accomplish.  And I
14   thought it was interesting; I thought I could
15   help them.
16   Q.   The meeting with Tim Anderson, was that
17   at Pepper's office in Philly.
18   A.   No, it was not.
19   Q.   Where was it?
20   A.   It was either -- I'm not sure where it
21   was.  I don't know.
22   Q.   Okay.  And so you met with Mr. Anderson.
23   He got Eckman on the phone, and this was
24   basically Eckman presenting a potential

UNSEALED

App. 0579

1  business opportunity to you?
2        MR. SCHEFF: Object to the
3  form. You can answer the question. Misstates
4  the testimony. Go ahead.
5        THE WITNESS: Yeah, with Tim
6  and Rick on the phone, I was asked if I would
7  be interested in looking at opportunities with
8  tribes.
9  BY MR. ACKELSBERG:
10  Q.  Okay. So was that it? Did -- was there
11  any discussion of what kind of a relation -- I
12  mean, what do you remember Mr. Eckman telling
13  you about this business opportunity?
14  A.  I don't remember much. It was a lending
15  business, and it was installment loans. I
16  call them micro loans. I don't remember much
17  about the first call. There was not much to
18  know.
19  Q.  What, if anything, did you know about
20  online lending at the time?
21  A.  Zero.
22  Q.  Were you invested at all in the payday
23  loan industry or online loans?
24  A.  No, sir. Never heard of it before.

1  Q.  Okay. So what exactly was your interest
2  in getting involved?
3        MR. SCHEFF: Object to the
4  form; misstates the testimony. You can answer
5  the question.
6        THE WITNESS: Whenever I
7  could put a tribe together with a commercial
8  opportunity to help, one, spur economic
9  development in the tribe and, two, get
10  paycheck, I was interested.
11  BY MR. ACKELSBERG:
12  Q.  Had you heard of Think Finance before?
13  A.  No, sir.
14  Q.  Before deals were signed, did you do any
15  investigation or due diligence on Think
16  Finance?
17  A.  Aside from probably Googling them, if
18  that existed then, or doing some sort of
19  general checks, no.
20  Q.  What was your understanding about why
21  Think Finance was looking for a tribal
22  partner?
23        MR. SCHEFF: Object to the
24  form. You can answer the question. Asked and

1  answered.
2        THE WITNESS: There was no --
3  they wanted to expand their business.
4  BY MR. ACKELSBERG:
5  Q.  So all you knew was that they're in the
6  lending business; they wanted to expand their
7  business. And in order to do that, they
8  needed a tribe?
9        MR. SCHEFF: Object to the
10  form.
11  BY MR. ACKELSBERG:
12  Q.  Is that basically what you understood at
13  that point before you got into more detail?
14        MR. SCHEFF: Objection;
15  misstates the testimony. You can answer the
16  question.
17        THE WITNESS: As a person who
18  created or tried to create economic
19  development for tribes, I would get -- from
20  trade shows, phone calls, meeting people --
21  opportunities all day, everyday, of people
22  that had some conception of why they wanted to
23  move to a tribe to do business. And I was
24  a -- I helped facilitate those people meeting

1  tribes that I thought fit the bill for what
2  they needed to get the business done.
3        I honestly did not go into
4  very much depth or detail about what kind of
5  businesses, because the tribes had legal
6  representation. They had councils and
7  presidents. They had experts that ran the
8  specific businesses or if they didn't, they
9  had to find one.
10        I don't know how to drill an
11  oil well, but I could find a drilling company
12  that was interested in talking to a tribe.
13  There's just many, many examples.
14        So, no, when an opportunity
15  first showed up, I just tried to see if there
16  was a fit somewhere.
17  BY MR. ACKELSBERG:
18  Q.  I'm going to show you a document that
19  was previously marked as P-126.
20  A.  Yes, sir.
21  Q.  So do you recognize this as the
22  nondisclosure agreement between Think Finance
23  and the tribe?
24  A.  It's a nondisclosure agreement signed by

UNSEALED

1    Think Finance and the chairman of the Chippewa
2    Cree tribe, correct.
3    Q.  Okay.  And this was signed as a result
4    of the connection you made between Think
5    Finance and the tribe, right?
6           MR. SCHEFF:  Object to the
7    form.  You can answer the question.
8           THE WITNESS:  The first
9    sentence, "In connection with the ongoing
10   discussions and our negotiations produced and
11   facilitated by AGame NV and the tribe and
12   Think Finance" -- so that's correct, yes.
13   BY MR. ACKELSBERG:
14   Q.  So this is the company that -- AGame,
15   that we were talking about before that's
16   basically an LLC between you and Mr. Brown,
17   right?
18   A.  AGame is a -- AGame NV, LLC, yes, is
19   owned by Mr. Brown and myself.
20   Q.  And -- now, before this deal, had you
21   and Mr. Brown conducted any other business
22   using the name AGame NV?
23   A.  I don't know specifically.  I'm sure we
24   did.

1    Q.  Well, did -- so was Ray Brown involved
2    in making the connection to Think Finance, or
3    was that just Pepper Hamilton?
4           MR. SCHEFF:  Object to the
5    form.  You can answer the question.
6           THE WITNESS:  The
7    introduction came through Tim Anderson, to me.
8    I don't believe that Ray Brown was involved in
9    that.
10   BY MR. ACKELSBERG:
11   Q.  Do you remember discussing the idea or
12   discussing the approach that you -- from --
13   the information that you learned by talking to
14   Mr. Anderson and Mr. Eckman, did you
15   communicate that with Mr. Brown?
16   A.  Yes.
17   Q.  Okay.  And what did you discuss?
18   A.  We discussed what kind of tribe would
19   fit the parameters needed to be able to own
20   and operate an online lending business.
21   Q.  Okay.  And so you and Mr. Brown at that
22   point had dealings with a number of tribes
23   around the country, correct?
24          MR. SCHEFF:  Object to the

1    form.
2           THE WITNESS:  Yes, sir.  We
3    had --
4    BY MR. ACKELSBERG:
5    Q.  Okay.  What was it about the Rocky Boy
6    reservation that suggested to you and
7    Mr. Brown that they might be the ones to
8    approach regarding Think Finance's search for
9    a tribe?
10          MR. SCHEFF:  Object to the
11   form.  You can answer the question.  Go ahead.
12         THE WITNESS:  In any
13   opportunity, Ray and I or I by myself or I and
14   another partner, if something came up outside
15   of using AGame, we'd look at the specific
16   opportunity and decide or try to set
17   parameters that would allow a tribe to be
18   successful.  So there are roughly 562 tribes,
19   give or take one that fall off or come on
20   every year in the United States, and all of
21   them are uniquely positioned for a specific
22   business.
23        And in this case, we set some
24   parameters, and it would have been something

1    like you had to have an ongoing casino because
2    you needed to understand compliance and
3    reporting because there are rules and
4    regulations that came over lending.
5         You would need -- again, a
6    casino was helpful because you would need good
7    communication lines, T1, T3, so that you could
8    have data and servers and have access to the
9    outside world using the Internet.
10        You'd probably need -- you
11   would need some kind of education or classes
12   served to the people of the reservation that
13   would help them in some form, like accounting
14   or customer service.  And we'd just usually go
15   through a checklist and see how good the high
16   school was; was there junior college or a
17   community college on campus or nearby; was it
18   a stable government?  We always look at that
19   just for -- in general terms.
20        So we would have checklist we
21   would go through to see if something was, you
22   know, was a good fit.
23   BY MR. ACKELSBERG:
24   Q.  Did you and Mr. Brown actually go

UNSEALED

1  through a checklist for this -- with regard to
2  online lending, a checklist concerning the
3  Rocky Boy reservation?
4  A.   Yes, sir.  We would have discussed all
5  of the potential fits within the universe.
6  Q.   And was there a physical checklist, in
7  other words, you actually were working on this
8  on paper?
9  A.   Probably not.  It was a business process
10  we went through.  Whether we scribbled notes
11  down or not, I don't remember.
12  Q.   As a result of this analysis, you and
13  Ray Brown concluded that Rocky Boy would be a
14  good fit?
15       MR. SCHEFF:   Object to the
16  form.  You can answer the question.
17       THE WITNESS:   After going
18  through our due diligence of what variables
19  were important, we identified a couple of
20  tribes, and Rocky Boy was one of them.  The
21  predominant reason was they already had a
22  lending code, a lending ordinance, and were in
23  the lending business.
24  BY MR. ACKELSBERG:

1  Q.   When you say they're in the lending
2  business, they were trying to set up a
3  program, correct?
4  A.   I don't know what stages it was.  I know
5  that they had an approved lending code and
6  lending ordinances and that they told us they
7  were in the lending business.
8  Q.   Did you do any due diligence on the
9  extent of their lending business?
10  A.   No, sir.
11  Q.   Why not?
12  A.   It wasn't important to us.
13  Q.   Why?  Why wasn't that important?
14  A.   Because we had no idea whether -- what
15  we were looking at anyway, even if we saw
16  something that -- having to do with the
17  business.
18  Q.   In your conversations with Think
19  Finance, initially that was mainly Jason
20  Harvison?
21  A.   My initial contact with Think Finance
22  was Jason Harvison, correct.
23  Q.   Was there anything that Jason Harvison
24  told you, in terms of what they were looking

1  for, that led you to make any inquiries about
2  the lending experience that the Chippewa Cree
3  had?
4  A.   No, not that I remember.
5  Q.   Okay.  What do you remember about what
6  Jason told you about the qualities that they
7  were looking for?  The qualities in the tribe
8  that they were looking for.
9  A.   In my discussions with Jason, they were
10  looking for much of the same thing and -- in
11  somebody who was going to purchase their
12  services was, you know, were they good at
13  living up to contracts?  Could they pay their
14  bills?  Do they have decent employment,
15  education on the reservation?  How bad was the
16  unemployment rate?  Were they in the lending
17  business was really crucial to him.  Did they
18  already have a lending code, lending
19  ordinance?  Did they know the lending
20  business?  He was indifferent as to whether it
21  was a bank or community bank, an online
22  lending business.  They just wanted to know if
23  they were engaged in financial services.
24  Q.   Okay.  So the nondisclosure agreement,

1  you can see here, was signed on February 28th,
2  2011.  Okay?  At least that's when it was
3  signed.  That's the date --
4  A.   Yes, sir.
5  Q.   Okay.  You see that?
6  A.   Yes.
7  Q.   All right.  So this -- let's look at
8  some of the communications that occurred
9  leading up to the NDA being signed.  All
10  right?  Let's start with this.  This you --
11       MR. ACKELSBERG:   What are we
12  up to, three --
13       THE COURT REPORTER:   338.
14           - - -
15    (Whereupon Exhibit P-338 was marked for
16        identification.)
17           - - -
18  BY MR. ACKELSBERG:
19  Q.   You can see -- looking at the lower
20  right-hand corner, we're looking at a document
21  that your lawyers produced to us -- from your
22  material.  Do you see that?
23  A.   Yes, sir.
24  Q.   So that has a Haynes number.  That means

1  it came out of -- it from you. Okay.
2  A.  Yes.
3  Q.  All right. I'll give you a chance to
4  look at it, and then I'll have some questions.
5  A.  Okay.
6  Q.  Okay. All right. So it starts off,
7  there's an e-mail from Jason Harvison to you,
8  where he said: It was great talking to you
9  yesterday and discussing the tribal
10  opportunity. I look forward to meeting with
11  you Tuesday.
12       So I take it he's referring
13  to the initial phone call that you had as a
14  result of the contact with the lawyers at
15  Pepper?
16  A.  I believe that to be correct.
17  Q.  Okay. So he's saying -- "talking to you
18  yesterday," that would have been February
19  17th, probably.
20       MR. SCHEFF:  Objection to
21  form. You can answer the question.
22  BY MR. ACKELSBERG:
23  Q.  And might that have been the same day
24  that you were meeting with Tim and talking

1  with Mr. Eckman on the phone, or was there --
2  in other words, was the call with Mr. Harvison
3  the same day you were talking to Mr. Eckman?
4       MR. SCHEFF:  You can answer
5  that question.
6       THE WITNESS:  I don't believe
7  so. I believe it was -- I was contacted prior
8  by Tim and then Rick and then set up a call
9  within -- it could have been a week.
10  BY MR. ACKELSBERG:
11  Q.  Okay. All right. So it's sometime in
12  early February and probably was the initial
13  conversation you had with Rick Eckman,
14  sometime prior to February 18th?
15  A.  Prior to February 18th. I'm not sure if
16  it was January or February.
17  Q.  Okay. All right. And it looks like,
18  then, that Jason is making arrangements with
19  you for a follow-up, in-person meeting, which
20  sounds like is going to take place at your --
21  at your house or your office or?
22  A.  It was -- I had an apartment in a high
23  rise. It would have been at my home, but in
24  meeting rooms in my -- in the building I lived

1  in.
2  Q.  And you see at the top, there's an
3  e-mail from Jason to you, February 23rd,
4  "Great meeting with you yesterday." So it's
5  probably that first meeting at your residence
6  with you and Jason was probably more or less
7  the 22nd of February?
8       MR. SCHEFF:  Object to the
9  form. You can answer the question.
10       THE WITNESS:  That seems
11  reasonable, yes.
12  BY MR. ACKELSBERG:
13  Q.  Okay. And he copies Sarah Cutrona and
14  Steve Shaper. Do you see that?
15  A.  Yes, sir.
16  Q.  And were they also involved in the
17  discussions with you at some point?
18       MR. SCHEFF:  Object to the
19  form.
20       THE WITNESS:  Sarah was
21  involved in most of the discussions, if not
22  all of them. Steve Shaper, I had, I think,
23  maybe one phone call and four or five e-mails,
24  and that was it.

1  BY MR. ACKELSBERG:
2  Q.  Okay. And did you understand their
3  different roles in the company?
4  A.  I understood Sarah to be their legal
5  counsel and Steve to be one of their
6  executives.
7  Q.  And what about Jason?
8  A.  Jason was also an executive.
9  Q.  Okay. But the meeting that occurred
10  roughly around February 22nd was just you and
11  Jason on a one-on-one?
12  A.  I believe my first meeting was just
13  Jason and I, yes.
14  Q.  And do you remember him showing you,
15  like, a PowerPoint about the proposal?
16  A.  I do.
17  Q.  Okay. Would he have it on a laptop and
18  put it up on a screen, or how did you see
19  that? Or was it in paper form?
20  A.  In my meeting one-on-one, it was just in
21  paper form.
22  Q.  Okay. Let's look at another e-mail.
23  This also came from you.
24       MR. ACKELSBERG:  This will be

UNSEALED

339.

THE WITNESS: Yes, sir.

- - -

(Whereupon Exhibit P-339 was marked for identification.)

- - -

BY MR. ACKELSBERG:

Q. Okay. Ready to go?

A. I -- yes.

Q. Do you remember this e-mail?

A. Yes, sir. I do.

Q. Okay. So it starts -- at the bottom, there's an e-mail that was forwarded to you. It's an e-mail from Sarah Cutrona to Steve Shaper and Jason Harvison. Do you see that?

A. At the beginning of 5 or 6, where does it start?

Q. The initial e-mail is the last two pages there. That's how the e-mail trail starts. Okay?

A. Okay.

Q. So it looks like this was -- it started with an e-mail that you weren't -- you weren't part of that communication, but then the

e-mail was forwarded to you by someone else. Do you see that?

A. Yes, sir.

Q. Okay. So it starts with an e-mail from Sarah Cutrona to the others saying -- just referring to the documents that she needs. Do you see that? She needs the name of the tribe. She wants to verify that it's federally recognized. She wants to know if they already have a tribal lending entity and whether they have an actual lending law. Do you see that?

A. Yes, sir.

Q. And those are the things that you were talking about before?

A. Yes.

Q. And so that gets forwarded to you by Steve Shaper, and this is on February 24th. And that's the same date that the NDA was signed, the nondisclosure agreement, right?

A. I believe that's correct.

Q. Okay.

A. The nondisclosure was signed on the 28th.

Q. On the 28th. All right. So this is four days before the -- right. So you're still trying to investigate, each of you trying to figure out what this is about.

MR. SCHEFF: Object to the form.

BY MR. ACKELSBERG:

Q. You haven't approached the tribe yet at this point?

MR. SCHEFF: Object to the form. You can answer the question.

THE WITNESS: I'm not sure.

BY MR. ACKELSBERG:

Q. Okay. Let's see what Shaper writes to you. He said: Steve, to start with, our general counsel would like to have the signed NDA and the documents shown below. Right?

A. Yes, sir.

Q. He tells you how to -- he gives you Sarah's e-mail, send it to her, and then he says that Sarah is trying to get one of the tribes up within a week and this has her highest priority. Do you see that?

A. Yes.

Q. Okay. Now, was this part of what Jason talked to you about when he met you a few days earlier, that there was some rush involved?

A. Jason told me that they would like to find a tribal partner as soon as it was physically possible.

Q. Do you remember Jason explaining to you why they were in such a hurry?

A. Yes. Jason told me that they had a portfolio that was winding down and they didn't want to lose those clients.

Q. Now, you later learned that that portfolio had to do with a previous partnership between Think Finance and First Bank of Delaware, correct?

A. I don't specifically remember who their partnership was with.

Q. Okay. So -- and then Mr. Shaper says to you: As I explained before you got your call, Think Finance is losing a large amount of money each week by not being able to generate new loans. Do you see that?

A. Yes.

Q. Is that part of what Jason Harvison

UNSEALED

1  explained to you a few days earlier, in your
2  meeting?
3  A.   The general impression was that they
4  would like to get into business as soon as
5  possible, yes.
6  Q.   But it was because they had this loan
7  portfolio where they can't offer new loans to
8  those customers?
9          MR. SCHEFF:  Object to the
10  form.  You can answer the question.
11         THE WITNESS:  I --
12  BY MR. ACKELSBERG:
13  Q.   You don't remember?
14  A.   I don't remember.
15  Q.   Okay.  The next sentence:  Before our
16  meeting on Tuesday, we expected to have
17  everything signed with our Oklahoma tribe this
18  week and be processing new loans by Monday.
19         So let me ask you about that.
20  Is that something that either Jason Harvison
21  or Steve Shaper had previously explained to
22  you, that they were waiting on -- that they
23  had some other deal pending with the tribe in
24  Oklahoma?  Do you remember that?

1  A.   I was under the impression that that had
2  already been completed, and in the deck Jason
3  gave me was copies of the websites for that
4  business.
5  Q.   That was called Great Plains Lending,
6  correct?
7  A.   That's correct.
8  Q.   Okay.  And then it says -- then Shaper
9  says:  This was easy to do since our websites
10  have been up and collecting applications all
11  along.
12         Do you know which websites
13  he's referring to there, whether it's Great
14  Plains Lending or the previous?
15  A.   I don't -- I don't.
16  Q.   But then you see he says this:  We have
17  simply been turning down every applicant and
18  obviously want to stop doing that.
19         Does that refresh your
20  recollection that they were --
21  A.   I don't know what he was referring to.
22  Q.   Okay.
23  A.   I'm sorry.
24  Q.   "The significance of the" -- I'm

1  continuing to read in the e-mail from Mr.
2  Shaper to you -- "The significance of the
3  first tribe to go up is that our existing
4  websites will forward all inquiries to the
5  tribe's new website.  Plus all existing loans,
6  when/if they extend, that tribe will take over
7  the new loan."  Do you see that?
8  A.   Yes, sir.  I see that.
9  Q.   And do you remember that as part of what
10  Jason and Steve Shaper explained to you as
11  part of the rush that they were in?
12         MR. SCHEFF:  Object to the
13  form.
14  BY MR. ACKELSBERG:
15  Q.   Why were they in such a hurry to get a
16  tribal partner?
17         MR. SCHEFF:  Same objection.
18         THE WITNESS:  Except for what
19  I'm reading now, the discussion was just
20  "Steven, we need to find a tribal partner as
21  fast as we can.  Can you help us?"
22  BY MR. ACKELSBERG:
23  Q.   Okay.  In fact, in the next sentence,
24  they were talking about getting one of your

1  tribes up in under a week, right?  I mean,
2  really fast?
3  A.   Yes, that's what it says.
4  Q.   Okay.  And also suggesting that this
5  tribe that you might be able to find, might
6  take the place of the Oklahoma tribe that they
7  were already talking to.  Do you see that?
8  A.   Yes, I see that.
9  Q.   Is that what they explained to you?
10  A.   Yes.  They were hoping to get a tribe up
11  and running as fast as humanly possible.
12  Q.   And maybe to take the place of the tribe
13  that they were already talking with?
14         MR. SCHEFF:  Object to the
15  form.
16         THE WITNESS:  I believe it
17  was just to get a tribe, regardless of who it
18  was, up as fast as they possibly could.
19  BY MR. ACKELSBERG:
20  Q.   And then she says -- I'm sorry.
21  Mr. Shaper goes on, "A tremendous amount of
22  work has gone on, both legally getting
23  everything in order and designing a complete
24  website and all backup, applications,

UNSEALED

App. 0585

1    don't know. Or maybe -- I --

2          MR. SHAPIRO: It might have

3    just been printed that day and not created at

4    all but just printed out. You don't know?

5          MR. ACKELSBERG: I just know

6    what the metadata says. I have no idea, but

7    the form in which it was produced to us in

8    accordance with ESI protocol.

9          MR. SHAPIRO: I just want to

10   understand. When you said to the witness

11   "this was created on that day," I don't want

12   to --

13         MR. ACKELSBERG: Okay.

14   BY MR. ACKELSBERG:

15   Q.   This is what the metadata says. Do you

16   know what metadata is?

17   A.   No, sir.

18   Q.   It's the codes that accompany the

19   document in the electronic form when it's

20   produced to us?

21         MR. SCHEFF: Mr. Haynes, the

22   metadata is irrelevant to you. You testify

23   based on your best recollection --

24         MR. ACKELSBERG: Yeah.

1    Right.

2          MR. SCHEFF: -- about the

3    truth.

4          Mr. Ackelsberg, we produced

5    the deck that Mr. Haynes reviewed. So I don't

6    know why you're showing him this. We produced

7    it as part of Mr. Haynes' document.

8         MR. ACKELSBERG: We didn't

9    get it.

10        MR. SCHEFF: You did.

11        MR. ACKELSBERG: No, we

12   didn't.

13        MR. SCHEFF: I don't have the

14   Bates number.

15        MR. ACKELSBERG: Give me the

16   Bates number.

17        MR. SCHEFF: It's in the

18   documents that you received yesterday.

19        MR. ACKELSBERG: Yesterday?

20   Oh, the one last night that you sent that I

21   haven't had a chance to look at yet?

22        MR. SCHEFF: Well, that's

23   your problem.

24        MR. ACKELSBERG: That's my

1    problem? All right, Richard. When I -- I

2    sent a subpoena in February, and the night

3    before the deposition, you send me a document

4    and you're criticizing me for using a

5    different copy of the document because I

6    haven't had a chance to review the last-minute

7    dump that you made last night?

8         MR. SCHEFF: Mr. Ackelsberg,

9    it wasn't a last-minute dump. It was in

10   response to an inquiry that you raised by

11   e-mail that we responded to but we were under

12   no requirement to respond to because the

13   subpoena requires the documents be produced on

14   the date of the deposition, not previous. You

15   don't have a right to that. We did that as a

16   courtesy to you. You know what.

17         So we gave you documents last

18   night because you raised some questions, and

19   we then did an additional search to determine

20   whether there were documents responsive. But

21   for some reason, they've not been collected.

22   We determined that and produced them to you.

23   So don't make statements like on the record.

24   Ask your next question.

1    BY MR. ACKELSBERG:

2    Q.   Did you have a chance to look at P-122?

3    A.   Yes, I have.

4    Q.   Okay. And does this look familiar to

5    you?

6    A.   It looks familiar to me, yes.

7    Q.   Okay. So, for example, when Mr. Shaper

8    in the previous e-mail talked about a

9    portfolio size of 25 million as shown on

10   page 3 of the presentation, if you look at

11   page 3, that's what he is referring to; am I

12   right?

13         MR. SCHEFF: Object to the

14   form. You can answer the question if you can.

15         THE WITNESS: I'm not --

16   there's a 25-million-dollar line with a

17   projected tribal profit on page 3.

18   BY MR. ACKELSBERG:

19   Q.   This looks familiar to you as the

20   presentation that he gave to you, right?

21         MR. SCHEFF: Object to the

22   form. That wasn't your question. Your

23   question was whether Mr. Shaper was referring

24   to this page in his e-mail, and how he could

UNSEALED

1  he know that? But answer the question if you
2  can.
3          THE WITNESS: I'm not sure
4  what he's -- I can infer but I'm not sure what
5  he was referring to.
6  BY MR. ACKELSBERG:
7  Q.   All right. Okay. And so you can infer.
8  Let's just start -- the deck that you're
9  looking at looks like the deck that Jason gave
10 you, right?
11 A.   Yes, sir.
12 Q.   And on page 3, there are projections,
13 right? Including projections for a
14 25-million-dollar portfolio, correct?
15 A.   That's correct.
16 Q.   Okay. Now, let's start with page 2.
17 A.   Yes, sir.
18 Q.   Does page 2 look familiar to you as
19 what -- as part of what Jason presented to
20 you? You're on page 3. Look at page 2.
21         MR. SCHEFF: Look at whatever
22 page you want to look at to familiarize
23 yourself with the document and then you can
24 answer Mr. Ackelsberg's question.

1          MR. ACKELSBERG: We're
2  actually looking at page 2, but --
3          MR. SCHEFF: Look at however
4  much of the document you choose to, and then
5  you can answer Mr. Ackelsberg's question.
6          THE WITNESS: Yes, sir.
7  BY MR. ACKELSBERG:
8  Q.   All right. Then look at the middle
9  paragraph, the middle line. "Think Finance
10 has the unique turnkey solution for helping
11 tribes enter this lucrative market." Do you
12 remember that line there?
13 A.   I can read it here. I see it.
14 Q.   Do you remember it, when you were
15 talking with Mr. Harvison?
16 A.   Not particularly.
17 Q.   What about the last item on page 3?
18 "Using Think Finance technology and services,
19 tribes can generate millions of dollars in
20 cash flow with no investments in technology,
21 lending capital or marketing costs and with no
22 risk of loss." You remember that, though,
23 right?
24         MR. SCHEFF: Object to the

1  form.
2          THE WITNESS: I remember the
3  discussion of what the tribe -- what the cost
4  to the tribes would be and what was -- could
5  be provided to the tribe.
6  BY MR. ACKELSBERG:
7  Q.   And you remember that the representation
8  that Jason gave to you was that the tribe did
9  not have to invest any of their own money?
10         MR. SCHEFF: Object to the
11 form. You can answer the question.
12 BY MR. ACKELSBERG:
13 Q.   That was part of what made it appealing
14 to the tribe; am I right?
15         MR. SCHEFF: Object to the
16 form. You can answer the question.
17         THE WITNESS: Tribes find
18 those offers very attractive because many
19 tribes don't have the money to invest.
20 BY MR. ACKELSBERG:
21 Q.   Okay. And Rocky Boy Chippewa Cree did
22 not have any money to invest at the time; is
23 that right?
24         MR. SCHEFF: Object to the

1  form.
2          THE WITNESS: At the time,
3  Rocky Boy was not in a position to make any
4  investments in any of their businesses, as far
5  as I know.
6          MR. ACKELSBERG: I'm told by
7  the video recorder that we need to take a
8  short break so he can replace the tape.
9          VIDEOTAPE OPERATOR: That
10 concludes DVD number one. 10:40, off the
11 record.
12         This begins DVD number two.
13 The time is 10:52. We are on the record.
14 BY MR. ACKELSBERG:
15 Q.   Mr. Haynes, we'll go back to the
16 PowerPoint later.
17         After the nondisclosure
18 agreement was signed, did you conduct any
19 further investigation or review of what Think
20 Finance was proposing to do for the tribe? In
21 other words, did you do any due diligence
22 about Think Finance on behalf of the tribe?
23         MR. SCHEFF: Object to the
24 form.

UNSEALED

1   THE WITNESS: No, sir, I did
2   not.
3   BY MR. ACKELSBERG:
4   Q. And you weren't doing any due diligence
5   for Think Finance about the tribe, were you?
6   A. No. I would help facilitate passing of
7   documents back and forth between the parties.
8   Q. Okay. Did you know anything about the
9   tribe's existing plans to conduct an online
10  lending business through a tribal company
11  named First American Capital Resources?
12  A. No sir, I did not.
13  Q. Did you during the discussions between
14  Think Finance and Plain Green come to learn
15  about a company called Encore Services?
16  A. During the negotiations for the
17  transaction, I came to know of a company
18  called Encore, yes.
19  Q. What was the context of you coming to
20  know that?
21  A. There was a disclosure by the attorney
22  and maybe from Billi Anne Morsette that they
23  had a problem going forward with the proposed
24  Think transaction because they already had a

1   partner and that they needed to waiver in
2   order to do the transaction.
3   Q. An exclusivity waiver?
4   A. I'm not sure what it was.
5   Q. Okay. So you mentioned Billi Anne
6   Morsette. Was she the main person you were
7   interacting with on the tribal side?
8   A. On the tribal side, I had three
9   contacts. Robin Kovash was our attorney,
10  Billi Anne Morsette and Neal Rosette.
11  Q. Okay. And had you had any prior
12  business relations with either Billi Anne
13  Morsette or Neal Rosette?
14      MR. SCHEFF: Object to the
15  form. You can answer the question.
16      THE WITNESS: I had not met
17  Billi Anne before. I believe I had met Neal
18  once before, but I don't remember doing
19  business with him.
20  BY MR. ACKELSBERG:
21  Q. That was with regard to the slot
22  machines?
23  A. I'm not sure what business it was
24  between the hotel, oil and gas, and the slots.

1   I had met him once before.
2   Q. And you don't know whether FACR or any
3   other lender affiliated with Chippewa Cree had
4   ever actually launched a lending website?
5       MR. SCHEFF: Object to the
6   form. You haven't used the term FACR before.
7       MR. ACKELSBERG: First
8   American Capital Resources.
9       MR. SCHEFF: Thank you.
10      THE WITNESS: I was not aware
11  of how those businesses were operating --
12  whether they were operating or not or how
13  profitable they were.
14  BY MR. ACKELSBERG:
15  Q. And I asked you this question when we
16  were talking before the NDA was signed, but
17  I'll ask you the same question. Now that the
18  NDA is signed, so it's after February 28th,
19  did Think Finance inquire as to anything about
20  the Chippewa Cree's existing lending business
21  or experience?
22      MR. SCHEFF: Object to the
23  form. You can answer if you can.
24      THE WITNESS: They made no

1   request of me, but they had attorneys. Once
2   the NDA was signed, the attorneys jumped in
3   and my role became smaller and smaller and
4   smaller over time.
5   BY MR. ACKELSBERG:
6   Q. At some point, Rick Eckman got involved,
7   right?
8   A. Yes, sir.
9   Q. Okay. Now, when did he first get
10  involved?
11      MR. SCHEFF: Object to the
12  form. You can answer the question.
13      THE WITNESS: I had met Rick
14  prior or talked to him on the phone with Tim
15  Anderson prior to my first meeting with Jason.
16  BY MR. ACKELSBERG:
17  Q. Right. We --
18  A. He popped up again probably right after
19  the NDA was signed when -- yeah. That's about
20  the right time.
21  Q. Again, give us some context. How did he
22  pop up?
23  A. You know, he just popped up. So Tim
24  Anderson is my attorney. I'd never met Rick

UNSEALED

1 before and during our conversation, we just --
2 we had agreed, Rick and Tim and I --
3 MR. SCHEFF: Mr. Haynes,
4 don't reveal attorney-client privileged
5 conversations with Mr. Anderson.
6 BY MR. ACKELSBERG:
7 Q. At this point, there's been no testimony
8 about legal advice. We're just talking about
9 setting up, you know, so --
10 MR. SCHEFF: Then I'm going
11 to talk with my client because I don't know
12 what he's about to say and he's just testified
13 that Mr. Anderson is his lawyer.
14 MR. ACKELSBERG: Let me make
15 it clear to the witness.
16 BY MR. ACKELSBERG:
17 Q. I'm not asking you about any legal
18 advice that you got from Tim Anderson.
19 MR. SCHEFF: Let's talk about
20 it anyway. What he understands legal advice
21 to be and what legal advice might be are two
22 different things. All right? So let's talk
23 outside.
24 VIDEOTAPE OPERATOR: 10:58,

1 off the record.
2 10:59, back on the record.
3 BY MR. ACKELSBERG:
4 Q. So what can you tell us about Mr. Eckman
5 popping up?
6 MR. SCHEFF: Again, just with
7 the admonition not to reveal attorney-client
8 privileged communications that you may have
9 had with Mr. Anderson. You can answer the
10 question.
11 THE WITNESS: During our
12 conversations while the LOI was being put
13 together, there was -- Eckman suggested that
14 Tim Anderson be inserted to help with the
15 transitional documents. And then shortly
16 thereafter he appeared --
17 BY MR. ACKELSBERG:
18 Q. Let's just stop there. Eckman suggested
19 that to you or to --
20 A. To be put into the LOI with the tribe,
21 that's correct. My LOI with the tribe.
22 Q. Did Eckman explain to you why he wanted
23 Tim Anderson inserted into the deal?
24 MR. SCHEFF: Object to the

1 form. You can answer if you can.
2 BY MR. ACKELSBERG:
3 Q. This is a call you had just one-on-one,
4 you and Eckman?
5 A. No. Tim Anderson was on the phone.
6 Q. I see. Okay. So he was to be inserted
7 into the -- in what capacity would he be
8 inserted into the deal?
9 A. To facilitate or to help the tribe with
10 the transactional documents.
11 Q. I'm confused. So when you first met
12 Mr. Eckman on the phone, it was in the context
13 of Think Finance looking for a tribal partner,
14 right?
15 MR. SCHEFF: Object to the
16 form, you can answer the question.
17 THE WITNESS: It was an
18 introduction to Think Finance, yes.
19 BY MR. ACKELSBERG:
20 Q. Okay. Was it your understanding at that
21 time that Mr. Eckman was representing Think
22 Finance? Was that your understanding?
23 A. I don't remember ever having been told
24 he represented them, but he clearly was -- put

1 me in touch with them. I didn't ask them if
2 he represented them or not.
3 Q. So Mr. Eckman puts you in touch with
4 Think Finance as a lender that's looking for a
5 tribe to partner with, right?
6 MR. SCHEFF: Object to the
7 form; mischaracterizes the testimony. You can
8 answer the question.
9 BY MR. ACKELSBERG:
10 Q. I'm trying to get the sequence here.
11 That's --
12 MR. SCHEFF: That's fine.
13 You can get the sequence. Just don't
14 mischaracterize the testimony. You can answer
15 the question.
16 THE WITNESS: Tim Anderson,
17 my attorney who I'd done Indian deals with
18 before, introduced me to one of his partners
19 who was going to put me in touch with a
20 business opportunity which turned out to be
21 Think Finance.
22 BY MR. ACKELSBERG:
23 Q. Okay. And then the NDA is signed,
24 discussions are going on, and Eckman pops up

UNSEALED

1 and says that Tim Anderson should be inserted
2 into the deal, right?
3     MR. SCHEFF: Objection to the
4 form; asked and answered. You can testify
5 again.
6     THE WITNESS: It was
7 requested that Tim Anderson be loaded in as a
8 transactional attorney on the transaction.
9 BY MR. ACKELSBERG:
10 Q. But at this point, Tim Anderson is your
11 lawyer, right?
12 A. Tim Anderson is my lawyer, correct.
13 Q. Okay. So was your idea at that point
14 that he -- that Tim Anderson would be looking
15 out for your interest with regard to your role
16 in the Plain Green proposal?
17 A. I always expected Tim Anderson to look
18 after my interest in the transactions that I
19 was doing.
20 Q. Okay. Good. This is also -- I'm going
21 to show you an exhibit that was -- that has
22 appeared before in this case. It already has
23 an identification as P-279.
24 A. Yes, sir.

1 Q. Okay. So this is the signed term sheet
2 for the deal that we're talking about; am I
3 right?
4     MR. SCHEFF: Object to the
5 form. You can answer the question.
6     THE WITNESS: Yes, this
7 appears to be the signed term sheet.
8 BY MR. ACKELSBERG:
9 Q. And that's your signature on the fourth
10 page of the document?
11 A. Yes, sir. That's my signature.
12 Q. Okay. Almost as bad as mine.
13 A. As bad as it is, that's my signature.
14 Q. All right. So this is dated March 11th,
15 so basically 11 days after the nondisclosure.
16 So the nondisclosure was February 28th.
17 A. Yes, sir.
18 Q. We're now in March 11th, right?
19 A. Yes, sir.
20 Q. Okay. So we'll be referring back to
21 that, but I want to look at some of the
22 earlier iterations of the term sheet, if I
23 can.
24     MR. ACKELSBERG: This will be

1 identified as 340.
2     - - -
3 (Whereupon Exhibit P-340 was marked for
4     identification.)
5     - - -
6     THE WITNESS: Yes, sir.
7 BY MR. ACKELSBERG:
8 Q. So let me ask you something. So after
9 Mr. Eckman, as you say, popped up and said
10 that he wanted Mr. Anderson in the
11 transaction, was it your understanding that
12 Eckman was going to be in charge of the
13 documentation for the deal?
14 A. There was no understanding. He just
15 took charge. He took the reins and started
16 generating documents and being the negotiator
17 between all the parties.
18 Q. Okay. And we're looking at -- P-340 is
19 his initial draft of what became the eventual
20 term sheet; am I right?
21     MR. SCHEFF: Object to the
22 form. Answer the question if you can.
23     THE WITNESS: This is -- yes.
24 This is a draft of the term sheet, and there

1 are material differences between this and the
2 final transaction.
3 BY MR. ACKELSBERG:
4 Q. No, I understand that, but this is -- I
5 just want to be clear. This is Eckman's
6 draft, the initial draft that started the
7 discussions that ultimately produced the final
8 term sheet?
9     MR. SCHEFF: Object to the
10 form. You can answer the question if you can.
11     THE WITNESS: There were
12 multiple iterations. I'm not sure if this was
13 the first one or not. But yes, this was a
14 draft of what turned out to be the final term
15 sheet.
16 BY MR. ACKELSBERG:
17 Q. Okay. And you see that this was an
18 e-mail sent by Rick to Sarah Cutrona, you, and
19 Tim Anderson, right?
20 A. Yes, sir.
21 Q. On March 3rd of 2011?
22 A. Correct.
23 Q. Okay. So at this point, the name of the
24 tribal entity -- and if you want to compare to

UNSEALED

1  this to the final one, that's fine.  If you
2  need to refer to it, you can refer to it.  But
3  the final one, back to P-279, makes it clear
4  on page 3 that the tribe is going to establish
5  an entity called Plain Green LLC, right?
6  A.  Yes, sir.  Number 1 is the -- on page 3
7  says it will establish Plain Green, LLC.
8  Q.  Okay.  So as of March 11th, it was
9  understood that the name of the company would
10  be called Plain Green, the tribal-affiliated
11  company, right?
12  A.  That's what LOI says.
13  Q.  Well, and that's -- I'm also -- you
14  remember that, right?
15  A.  Yes.
16  Q.  Okay.  But on March the 3rd, eight days
17  earlier when Eckman first floats this draft of
18  the term sheet, there's no reference to
19  anything called Plain Green; am I right?
20        MR. SCHEFF:  Object to the
21  form.  You can answer the question.  The
22  document speaks for itself.
23        THE WITNESS:  I don't see a
24  reference to Plain Green in this document.

1  BY MR. ACKELSBERG:
2  Q.  Well, in fact, you remember from your
3  conversations with Mr. Harvison that the name
4  was probably going to be Great Plains Lending,
5  right?
6        MR. SCHEFF:  Object to the
7  form.  You can answer the question if you can.
8        THE WITNESS:  My conversation
9  with Harvison was that Great Plains Lending
10  already existed with the Oklahoma tribe.  I
11  don't know what they were going to call this
12  one.
13  BY MR. ACKELSBERG:
14  Q.  Okay.  And ultimately the funding
15  mechanism was something called GPLS, right?
16        MR. SCHEFF:  Object to the
17  form.
18  BY MR. ACKELSBERG:
19  Q.  I mean, you can look --
20  A.  Ultimately, I believe GPLS was a
21  participant in the transaction, in the loans.
22  Q.  Right.  But at this point, all that
23  Eckman -- Eckman just put on the agreement
24  was -- on his draft was that it would just be

1  a VPC entity, right?
2        MR. SCHEFF:  Object to the
3  form.
4        THE WITNESS:  That's what's
5  on here, yes.
6  BY MR. ACKELSBERG:
7  Q.  Now, was this -- when you got this from
8  Eckman, was this the first time you heard
9  about VPC or was VPC -- and by VPC, I mean
10  Victory Park.  Did Mr. Harvison or someone
11  else from Think Finance introduce you to the
12  role that Victory Park would be playing?
13        MR. SCHEFF:  Mr. Ackelsberg,
14  when you say "this" are you referring to
15  Exhibit-340?  I just want to make sure the
16  record's clear on what you're referring to.
17        MR. ACKELSBERG:  Yeah.  Yeah.
18  Thank you.
19        MR. SCHEFF:  That's all.  I
20  just want to make sure the record's clear.
21        THE WITNESS:  I don't --
22        MR. SCHEFF:  You can answer
23  the question if you can.
24        THE WITNESS:  I don't

1  remember when I knew that Victory Park was
2  going to be participating.  This may have been
3  the first one.  I don't know.
4  BY MR. ACKELSBERG:
5  Q.  Okay.  And then it says it at the
6  bottom, the last provision is that Pepper
7  Hamilton shall be counsel to the tribe.  Do
8  you see that?
9  A.  I see that.
10  Q.  Well, when you saw it back on March --
11  did you notice it back on March 3rd, that your
12  lawyer was going to be counsel to the tribe?
13        MR. SCHEFF:  Object to the
14  form.  That's not been his testimony.  You can
15  answer the question if you can.
16        THE WITNESS:  I understood in
17  the LOI that Tim Anderson would be
18  representing -- not representing but reviewing
19  the transactional documents.  This was
20  probably the first time that I saw that Pepper
21  Hamilton was going to be counsel to the tribe.
22  BY MR. ACKELSBERG:
23  Q.  Do you remember being surprised by that?
24  A.  Surprised?  Possibly.  They already had

UNSEALED

1    Q.   First time?
2    A.   First time I'd seen him.
3    Q.   Okay.  And then above it in a reply
4    e-mail from Ken Rees, he says "initial
5    comments from Samir at VPC."  Did you know who
6    Samir was?
7    A.   No, sir.  I didn't.
8    Q.   You'd heard the name Samir Patel?  Does
9    that sound familiar at all?
10   A.   I -- no.  No.
11   Q.   Okay?  So this was the first time
12   that -- so this was the first time, March 9th,
13   that you knew about -- you had any names to
14   connect to VPC or their lawyers at Katten?
15   A.   Katten for sure, yes.  This was the
16   first time I would have seen most of these
17   people.
18                      - - -
19   (Whereupon Exhibit P-347 was marked for
20           identification.)
21                      - - -
22            THE WITNESS:  Yes, sir.
23   BY MR. ACKELSBERG:
24   Q.   So this is an e-mail that you got from

1    Ken Rees describing what he calls the flow of
2    funds for Plain Green, correct?
3    A.   That's what it says, yes.
4    Q.   Do you remember receiving this?
5    A.   I recognize it.  Yes, I remember the
6    document.
7    Q.   Now, if you look at the first number --
8    paragraph number 1, it says "Haynes
9    Investments will deposit $1 million into the
10   bank account that Plain Green has at First
11   Bank of Delaware, and this amount is
12   anticipated to cover two days of loan
13   originations as well as the 1 percent
14   ownership Plain Green will retain."
15            So was it your understanding
16   that you were going to be fronting a
17   million -- a million dollars of your money?
18            MR. SCHEFF:  Object to the
19   form.  You can answer the question.
20            THE WITNESS:  As part of
21   my -- the finder's fee and the financing
22   agreement that I had, I was aware that I would
23   be loaning money to the tribe to be able to
24   make originations, yes.

1    BY MR. ACKELSBERG:
2    Q.   But at some point -- the ultimate deal
3    was that whatever money you lent to the tribe,
4    you would get the same amount back from Think
5    Finance, right?
6            MR. SCHEFF:  Object to the
7    form.  You can answer the question.
8    BY MR. ACKELSBERG:
9    Q.   That was ultimately the deal that you
10   worked out, right?
11            MR. SCHEFF:  Object to the
12   form.  You can answer the question if you can.
13            THE WITNESS:  The deal that I
14   worked out was that I was going to lend money
15   to the tribe, and I received a finder's fee
16   for it and that was it.  I had a network of
17   high-net-worth individuals, and I was able to
18   raise money.
19   BY MR. ACKELSBERG:
20   Q.   At this point in time, you thought it
21   was going to be your own money that you raised
22   that was going to be the tribe's 1 percent?
23            MR. SCHEFF:  Object to the
24   form.  You can answer the question if you can.

1            THE WITNESS:  I had worked
2    hard to be able to identify sources of funds
3    to be invested in this portfolio.
4    BY MR. ACKELSBERG:
5    Q.   Okay.  And that was your expectation,
6    that you would be lending the money and
7    earning interest on that money in a direct
8    transaction between you or your entity and the
9    tribe?
10            MR. SCHEFF:  Object to the
11   form.  You can answer the question.
12            THE WITNESS:  My expectation
13   was that I was to raise money to provide
14   financing for the origination of the loans.
15   BY MR. ACKELSBERG:
16   Q.   When did -- but ultimately what -- the
17   way it worked was that Think Finance ended up
18   giving you that money instead of you having to
19   raise the money, right?
20            MR. SCHEFF:  Object to the
21   form.
22            THE WITNESS:  Ultimately,
23   I borrowed the money from Think Finance
24   instead of my other sources, and I -- so

UNSEALED

1  that's correct.
2  BY MR. ACKELSBERG:
3  Q.   Well, why -- what happened?  Why -- what
4  happened to the money that you worked hard
5  raising that you had to go to Think Finance
6  for a loan?
7           MR. SCHEFF:  Object to the
8  form.  Mischaracterizes the testimony.
9           THE WITNESS:  Yeah.  I didn't
10 have to go to Think Finance for the loan.  I
11 had raised the money, and I'm not exactly sure
12 when it was decided that Think's investment
13 would be used as opposed to the money I
14 raised.  I do remember there being some
15 concern that my money was at 15 percent and
16 that -- it was at a high interest rate.  But
17 my investors believed that was commensurate
18 with the risk that they were taking.
19           Eventually the transaction
20 was that I borrowed the money from Think
21 Finance at 5 percent.  It was a better deal
22 for the tribe.  It made no difference to me
23 because the spread that I was to make on these
24 investments was zero.  I was -- my investors

1  invest.  I pay my investors.  My fee came out
2  of the 1 percent.
3  BY MR. ACKELSBERG:
4  Q.   Now, ultimately, the term sheet, the
5  final term sheet that we were looking at
6  before -- yeah.
7  A.   279.
8  Q.   P-279 -- that ultimately was signed by
9  everybody March 11th.  How did that signing
10 occur?  Was there an in-person meeting, or was
11 this all just by e-mail or fax or something
12 like that?
13 A.   I was not there.  I signed and either
14 scanned or e-mailed it back in.  I don't
15 remember what the rest was.  I don't remember.
16           MR. ACKELSBERG:  348.
17                  - - -
18    (Whereupon Exhibit P-348 was marked for
19             identification.)
20                  - - -
21           THE WITNESS:  Yes, sir.
22 BY MR. ACKELSBERG:
23 Q.   So this is a list; am I right?  This is
24 a list that was prepared by Pepper Hamilton

1  and all of the various people who were
2  involved in the transaction?
3           MR. SCHEFF:  Object to the
4  form --
5           THE WITNESS:  I'm not sure --
6           MR. SCHEFF:  -- lack of
7  foundation.
8           THE WITNESS:  I'm not sure
9  who prepared it, but it looks like the people
10 that were involved in the transaction.
11 BY MR. ACKELSBERG:
12 Q.   Okay.  And so first we have the Think
13 Finance people, the principals and the lawyers
14 involved.  And you see Paul Tauber here, as
15 you guessed before, was listed under Think
16 Finance.  Do you see that?
17 A.   Yes, sir.  I see his name there.
18 Q.   Okay.  And then there's the Chippewa
19 Cree.  No lawyers listed there.
20           MR. SCHEFF:  Object to the
21 form.  Misstates the document.
22 BY MR. ACKELSBERG:
23 Q.   I'm sorry, Leann Montes.  Leann Montes,
24 she's the tribal -- she the lawyer who's a

1  member of the tribe.  I think she's called the
2  attorney general or something like that.
3  A.   I don't remember.
4  Q.   You don't remember.  Okay.
5           And then there's you, Haynes
6  Investments.  There is GPL Servicing.  Do you
7  see that?  And the various people involved
8  there?
9  A.   Yes, sir.  I see that.
10 Q.   And at that point you -- then there's
11 Katten Muchin.  At that point you already were
12 aware that Katten was counsel to Victory Park,
13 right?
14           MR. SCHEFF:  Object to the
15 form.  There's no date on this document.
16           THE WITNESS:  I'm not sure
17 when.
18 BY MR. ACKELSBERG:
19 Q.   Okay.  Conner and Winters, John
20 Williams.  Do you remember that name?
21 A.   I do not remember that name.
22 Q.   Okay.  Then there's Robin Kovash, right?
23 A.   Yes, sir.  I see his name.
24 Q.   And we were talking about him before.

UNSEALED

1  And then there's Pepper Hamilton with Eckman,
2  Anderson, Wakiyama and Rees, right?
3  A.  Yes, sir.  All listed under Pepper
4  Hamilton.
5  Q.  All right.  And on this list, Pepper
6  Hamilton was the firm that was representing
7  you; am I right?
8        MR. SCHEFF:  Objection to the
9  form.  The document doesn't state that.  Why
10  don't you ask him a question?
11        MR. ACKELSBERG:  I just did
12  that.
13        MR. SCHEFF:  Yeah, but you
14  keep on misstating the record and
15  mischaracterizing this to try and put
16  testimony in his mouth.  Just ask a
17  straightforward question.  That's all.  Go
18  ahead.
19        MR. ACKELSBERG:  You enjoy
20  this, don't you?
21        MR. SCHEFF:  I just want to
22  make sure that the record is clear because you
23  just want to do the opposite.  So just ask a
24  question.

1  BY MR. ACKELSBERG:
2  Q.  So I'm not asking what the document
3  says.  I'm asking you your -- your
4  recollection during this transaction, the
5  lawyer who was looking out for your interest
6  was Tim Anderson of Pepper Hamilton, correct?
7  A.  That's correct.
8  Q.  Okay.  One question I had -- if you can
9  go back to the term sheet for a second.  It
10  says Haynes Investments.  It doesn't say
11  AGame NV.  Originally you told us this was
12  going to be -- this had to do with you and Ray
13  Brown and I think -- Haynes Investments is
14  just you, right?  That's not Ray Brown?
15  A.  Haynes Investments is owned 100 percent
16  by me, correct.
17  Q.  Okay.  So what happened that it started
18  with AGame NV and it became Haynes
19  Investments?
20  A.  At the time of this transaction when it
21  became clear that money was needed to be
22  raised and loaned to the tribe, Ray did not
23  have the wherewithal to put in any money.
24  Since I alone was going to be taking that

1  economic risk, I put the transaction in Haynes
2  Investments.  And Ray and I had an agreement
3  that he would get 50 percent of the economic
4  benefit that I got, of the 1 percent, which I
5  paid faithfully until we were terminated.
6  Q.  Is that -- is that in writing, or is
7  that just an oral deal, a handshake?
8  A.  I believe it was just an oral, just a
9  handshake.
10  Q.  Okay.  Also in the term sheet, there's
11  no reference to the -- let me go back.
12        We were talking before about
13  the reason that Think Finance was in such a
14  hurry, they had this other portfolio and in
15  some fashion, they wanted to locate that with
16  the first tribal partner that they found.  Do
17  you remember that?  We were talking about
18  that.
19        MR. SCHEFF:  Object to the
20  form.  Mischaracterizes the testimony.  You
21  can answer the question.
22        THE WITNESS:  I remember the
23  conversation that Think Finance was looking to
24  place this with a tribe as quickly as they

1  possibly could.
2  BY MR. ACKELSBERG:
3  Q.  And it had to do with the fact that they
4  had existing customers that --
5  A.  Yeah, I --
6  Q.  You're not remembering that now or --
7  A.  The specific reason of the customers
8  they had and the loans and they were -- they
9  were in a hurry to find a tribal partner, and
10  I can't tell you exactly why that was the
11  case.
12  Q.  All right.  And there's no reference in
13  the term sheet to the -- that existing loan
14  portfolio or the customers of the existing
15  loan portfolio.  There's nothing about that in
16  the term sheet, is there?  I mean, I don't see
17  any.
18        MR. SCHEFF:  Object to the
19  form.  The document speaks for itself.
20  BY MR. ACKELSBERG:
21  Q.  And I'm just wondering if you remember
22  whether there was any reason that wasn't
23  mentioned, or do you remember anything about
24  that, that aspect of the transaction?

UNSEALED

Page 173

1  guaranteed payment and not repayable, right?
2          MR. SCHEFF:  Object to the
3  form.  You can answer the question.  The
4  document speaks for itself.
5          THE WITNESS:  The $50,000
6  refers, yes, to a guaranteed payment and not a
7  loan or not a -- not to be repaid, which I
8  would consider a loan.
9          MR. ACKELSBERG:  351.
10          - - -
11  (Whereupon Exhibit P-351 was marked for
12          identification.)
13          - - -
14          THE WITNESS:  Yes, sir.
15  BY MR. ACKELSBERG:
16  Q.   Okay.  Now, the context to this is that
17  everybody is drafting the final transactional
18  documents, right, arising out of the term
19  sheet?
20  A.   That's what this appears to say, yes.
21  Q.   Yeah.  And so Scott Lyons from the
22  Katten firm said that he's updated the
23  participation agreement with various changes
24  below, but he's still waiting for Ken to

Page 174

1  decide whether, I guess, Think is going to
2  guarantee that $50,000 that the tribe wanted?
3          MR. HERMAN:  Objection to
4  form.  The document speaks for itself.
5          MR. SCHEFF:  Object to the
6  form.
7  BY MR. ACKELSBERG:
8  Q.   That's what's going on, right?
9          MR. HERMAN:  Objection to
10  form.  The document speaks for itself.
11          THE WITNESS:  Yeah.  From
12  Scott Lyons to Rick and it's -- with the
13  exception of -- it seems like they haven't
14  settled that yet.
15  BY MR. ACKELSBERG:
16  Q.   It's the $50,000 that we looked at
17  before, right?
18  A.   I'm not sure --
19          MR. SCHEFF:  Object to the
20  form.
21  BY MR. ACKELSBERG:
22  Q.   We were just looking at the -- so Rick
23  Eckman reported back from the meeting that the
24  tribe wanted a guaranteed -- wanted guaranteed

Page 175

1  revenues of 50,000, right?
2          MR. HERMAN:  Objection to
3  form.
4          THE WITNESS:  My
5  understanding is that, yes, the tribe wanted a
6  guaranteed income stream, $50,000 a month.
7  BY MR. ACKELSBERG:
8  Q.   And then what we see here is Ken Rees
9  agreeing to that provision, that Think Finance
10  would guarantee that, right?
11          MR. HERMAN:  Objection to
12  form.  The document speaks for itself.
13  BY MR. ACKELSBERG:
14  Q.   Isn't that what happened?
15          MR. HERMAN:  Objection to
16  form.  The document speaks for itself.
17          THE WITNESS:  Ken Rees's
18  reply is -- it likes looks yes, he has agreed
19  to a 50,000-dollar minimum payment.
20  BY MR. ACKELSBERG:
21  Q.   Okay.  What I'm going to show you now
22  are the deal documents that ultimately were
23  signed that pertain to you, Stephen Haynes.
24  I know there were a lot of -- you know,

Page 176

1  there's participation -- there were a lot
2  of -- participation agreement, have you ever
3  studied that?  Have you ever looked at that?
4          MR. HERMAN:  Objection to
5  form.
6          THE WITNESS:  No, I have not.
7  BY MR. ACKELSBERG:
8  Q.   Or the administrative agency agreement
9  or the guarantee treatment?  Those didn't
10  concern you, right?
11  A.   Correct.
12  Q.   I want to show you the specific
13  documents in which you were involved or
14  interested in with regard to the 1 percent and
15  with regard to the loan to the tribe.  Okay?
16  A.   Okay.
17          MR. HERMAN:  Objection to
18  form.
19  BY MR. ACKELSBERG:
20  Q.   And these have already been identified
21  in previous exhibits.  So I'm going to just
22  show you these --
23          MR. ACKELSBERG:  And I have a
24  copy for everyone else.

44 (Pages 173 to 176)

UNSEALED

App. 0595

BY MR. ACKELSBERG:
Q.   I'm going to start with the referral
agreement, which is P-132.  I think that's on
top.
A.   Yes, sir.
Q.   Just looking at it, I mean, you're
familiar with this agreement; am I right?
Actually, if you want, we'll go to the --
A.   I am familiar with this agreement.
Q.   Yeah.  And you can go to the
next-to-last page.  I believe that's your
signature?
A.   That is my signature.
Q.   Yeah.  So you signed and Ken Rees
signed, right?
A.   Correct.
Q.   Okay.  At this point, you still hadn't
met Ken Rees yet, right?
A.   Correct.
Q.   This agreement is between Haynes and --
between Haynes Investments and something
called TC Administrative Services or TCAS.  Do
you see that?
A.   Yes, I see that.

Q.   Had you ever heard of that company
before you were handed this to sign?
A.   I'm not sure if I have seen it in one of
the preliminary term sheets, but this is --
it's a recent review.
Q.   Do you know what role TCAS played in the
transaction?
A.   I do not.
Q.   One of the whereas -- the next-to-last
whereas on the first page, it says "Whereas
Haynes Investments assisted in establishing
the program as defined below and will provide
ongoing consulting services to TCAS in
connection with the program."  Do you see
that?
A.   Yes, I see that.
Q.   Okay.  My question is, did you ever
provide consulting services?
A.   I do not believe that I did.
Q.   Okay.  Now, we're going to be looking at
some e-mails later on about your
communications or your efforts on behalf of
Think Finance to perhaps locate another tribe
or other tribes that they could do business

with.  You remember doing that, right?
          MR. SCHEFF:  Object to the
form.
BY MR. ACKELSBERG:
Q.   Continuing to look for tribes for Think
Finance?
          MR. SCHEFF:  Object to the
form.  You can answer the question.
          THE WITNESS:  Think Finance
had asked us to continue looking to find them
additional tribes.  That's correct.
BY MR. ACKELSBERG:
Q.   So my question is, when you were doing
that, did that have any connection to this
language, that you're providing ongoing
consulting services?  In other words, were you
doing that pursuant -- in searching for other
tribes, were you doing that pursuant to any
obligation you had under the referral
agreement, or was that just separate business?
A.   My understanding is that the referral
agreement was specific to this one transaction
to Plain Green, and that if I was going to be
doing other things that they would retain me

or compensate me for those additional.
Q.   Okay.  Let's look at next agreement,
P-244.  This is the credit agreement between
Plain Green and Haynes Investments, and this
references a 2-million-dollar credit facility.
A.   Yes.
Q.   And in the earlier documents, we were
talking about 1 million and now it's here
2 million.  Do you see that?
A.   In the earlier document, it suggested
that I would deposit 1 million dollars into a
checking account.  This is a credit agreement
with a line of credit for 2 million dollars.
Q.   And were there -- and we're going to be
looking at the credit agreement that mirrors
this between you and Think Finance.  You can
see that's underneath.  It's 245.  You see
that?
A.   Yes, sir.  I see the document.
Q.   Okay.  And you remember that, right?
That it was -- that you were agreeing to lend
the tribe up to 2 million dollars to originate
the loans, right?
A.   That is correct.

UNSEALED

1    Q.    And you were borrowing that same --
2    whatever money that the tribe borrowed from
3    you, you would be borrowing from Think
4    Finance, that was the idea behind these
5    contracts?
6    A.    They're two standalone documents.  One
7    is I agreed to lend up to 2 million dollars to
8    Plain Green.  The second agreement was that I
9    agreed that I would borrow up to 2 million
10   dollars from Think Finance.
11           But there was no guarantees
12   that Think Finance would be able to live up to
13   their ability to loan me 2 million dollars at
14   any given time.  I still had an obligation to
15   loan the money to Plain Green.  So I just --
16   one line of credit is only as good as the
17   money you can provide on it.
18   Q.    Okay.  Now, staying with the agreement
19   between you and Plain Green, 244?
20   A.    Yes, sir.
21   Q.    Can you turn to page 10?  I want you to
22   look at pages 10 and 11.  Well, let's just
23   stick with 10.  And you can look back at page
24   9 as well, if you need to.  In this provision,

1    it's a waiver of sovereign immunity.  Page 10.
2    A.    Okay.  I'm there.
3    Q.    So on page 10, the tribe is waiving
4    sovereign immunity, right?
5    A.    That's correct.
6    Q.    And then on the previous page, on page
7    9, the parties are also agreeing that the laws
8    of Delaware will be the interpretive law
9    governing this contract, right?
10   A.    That's Section 1.12 (witness reading
11   document) -- deemed to be made in the State of
12   Delaware.  That's correct.
13   Q.    Okay.  Now, why -- well, was it
14   important to you that the tribe waive their
15   sovereign immunity?
16   A.    I will not do a financial transaction
17   with a tribe unless it waives its sovereign
18   immunity with regards to that specific loan
19   document or transaction.
20   Q.    And why is that?
21   A.    As a sovereign nation, if they don't
22   wave their sovereign immunity, it is very
23   difficult for you to collect on your debts.
24   Q.    And who drafted this for you?  Was this

1    Eckman and Anderson or?
2    A.    I'm not sure who drafted it.  Tim
3    Anderson reviewed it for me, but I'm not sure
4    who drafted the entire set of documents.
5    Q.    Okay.  And when you got the documents --
6    how did you get the documents?  Was this by
7    mail?  Were you in person?  Were you at the
8    Pepper office or how -- how did you sign --
9    how did the closing occur here?
10          MR. HERMAN:  Objection to
11   form?
12          THE WITNESS:  The closing of
13   this transaction happened in Las Vegas in a
14   conference room, and I would have gotten the
15   documents -- I'm not sure if I got them
16   e-mailed in advance, but it would be,
17   obviously, hand-delivered paper copies.
18   BY MR. ACKELSBERG:
19   Q.    And who was in the conference room?  Who
20   was there at the closing?
21   A.    I have a picture on my laptop.  I'm just
22   trying to remember all the faces.  But it was
23   Robin Kovash, Rick Eckman, Tim Anderson,
24   myself, Billi Anne, Neal, a couple other

1    attorneys that I may have met for the first
2    time.  The chairman was there.  I'm not sure
3    who else.
4    Q.    What about from Pepper, who was there?
5    A.    I remember Tim and I remember Rick
6    Eckman.
7    Q.    Is that the first time you actually met
8    Rick Eckman face-to-face?
9    A.    It may have been.
10   Q.    And when you were sitting there, you
11   were -- were you with Anderson, your lawyer?
12   A.    Yes.  Yes, Tim was with me.
13   Q.    What about Eckman, was he kind of
14   running the show?  I'm still trying to figure
15   out what he's doing there.
16          MR. SCHEFF:  Object to the
17   form.  You can answer the question if you can.
18          THE WITNESS:  I'm not sure
19   what all of the different roles were at the
20   closing of who was compiling documents, who
21   was printing them.
22   BY MR. ACKELSBERG:
23   Q.    There didn't seem to be anyone kind of
24   in charge of putting the papers around or

UNSEALED

App. 0597

1　explaining what's going on?
2　A.　I don't remember it being a meeting like
3　this.　I remember it being -- there was a room
4　full of documents; go in and sign.　I don't
5　even remember the Think Finance people that
6　were there.　It was just a convenient place
7　because nobody wanted to go to the
8　reservation, and everybody else was spread
9　out -- Chicago, Delaware, Dallas.　So we
10　assembled there and I'm actually not sure -- I
11　remember seeing a picture of all of us
12　together after the fact.
13　Q.　And you have that picture on your
14　computer?
15　A.　Someplace, yes.
16　Q.　So you could retrieve that picture --
17　A.　I should be able to.
18　Q.　-- if your lawyer asked you to?
19　A.　Yes.
20　Q.　Please ask him to.
21　　　　　MR. SCHEFF:　We'll take it
22　under advisement.
23　　　　　MR. ACKELSBERG:　Thank you.
24　BY MR. ACKELSBERG:

1　Q.　Do you remember who was there for
2　Victory Park?
3　A.　I don't.
4　Q.　Did you meet some of the Katten lawyers
5　there?　What about Scott Lyons, who was on
6　some of the e-mails?
7　A.　There were faces that I didn't know
8　there.
9　Q.　Okay.　And you just flew in, signed the
10　papers, and left?
11　A.　I'm in the gaming business.　I may have
12　stayed and visited some of my clients that
13　were out in Las Vegas.
14　　　　　MR. SCHEFF:　We've been going
15　for awhile.
16　　　　　MR. ACKELSBERG:　Mm-hmm.
17　　　　　MR. SCHEFF:　So we should
18　look for a break point.
19　　　　　MR. ACKELSBERG:　We can do it
20　now, if you'd like.
21　　　　　MR. SCHEFF:　It's totally up
22　to you.　We've been going for a while.
23　　　　　MR. ACKELSBERG:　I agree.　I
24　was thinking 12:30-ish, but --

1　　　　　MR. SCHEFF:　That's fine.
2　　　　　MR. ACKELSBERG:　This is
3　fine.
4　　　　　MR. SCHEFF:　It's 12:20
5　already.
6　　　　　VIDEOTAPE OPERATOR:　The time
7　is 12:22.　We are off the record.
8　　　　　　-  -  -
9　　　(Whereupon a lunch break was taken at this
10　　　　　time.)
11　　　　　　-  -  -
12　　　　　VIDEOTAPE OPERATOR:　This
13　begins DVD number three.　The time is 12:57.
14　We're on the record.
15　　　　　　-  -  -
16　　　(Whereupon Exhibit P-352 was marked for
17　　　　　identification.)
18　　　　　　-  -  -
19　BY MR. ACKELSBERG:
20　Q.　Mr. Haynes, earlier this morning --
21　first of all, I want to apologize.　Earlier
22　this morning, I showed you a PowerPoint, a
23　deck, that I thought might be the one that
24　Jason showed you until your attorney informed

1　me that among the documents that he sent at
2　4:30 yesterday afternoon was the actual one.
3　　　　　So in the interim, I had my
4　office prepare copies, which I believe we have
5　in front of you, marked as Plaintiff's
6　Exhibit 352.　And you will see this has a
7　Haynes marking at the bottom.　This actually
8　came -- see the number of the bottom?
9　A.　Oh, yes.　I'm sorry.　Yes.
10　Q.　Thank you.　Can we agree that 352 is the
11　actual paper deck that Jason left with you
12　back in February of 2011 when he was first
13　pitching the idea to you?
14　A.　Yes.　This is the deck that I remember.
15　Q.　And, in fact, there are some --
16　throughout, there are some handwritten notes
17　in various colored ink.　Do you see that?
18　A.　Yes, sir.
19　Q.　And these would have been your notes,
20　right?
21　A.　These are my notes, correct.
22　Q.　Okay.　So I'm going to have you -- let's
23　go through it and see what you remember about
24　Jason's presentation, just to -- so if you

UNSEALED

1   could situate this meeting, when he's showing
2   this to you, you're in your house, your
3   apartment, in your residence, right? And it's
4   just you and him, right?
5   A.   Jason and I are sitting in a conference
6   room in my -- in the building that I lived,
7   and it was just he and I across the table with
8   this deck.
9   Q.   Okay. So he's got one and you've got
10   one, and you're going through it?
11   A.   That's what I remember, yes.
12   Q.   And did you go through it page by page?
13   A.   Yes. I would have gone through it page
14   by page.
15   Q.   So on the first page, anything about the
16   information on the first page that you
17   remember that you can elaborate on in terms of
18   Jason's pitch to you?
19          MR. SCHEFF: Object to the
20   form.
21          THE WITNESS: Nothing that
22   stands out. I remember at this point, I
23   didn't know very much about anything, so I was
24   being educated.

1   BY MR. ACKELSBERG:
2   Q.   Okay. Do you remember anything in
3   particular about credit options or
4   disappearing? It's the middle item?
5   A.   This was 2011. I just remember we had
6   just come through the disaster, which was '08,
7   '09, and just from my personal standpoint,
8   credit was difficult for any business.
9   Q.   You thought that might be what this was
10   referring to?
11          MR. HERMAN: Objection to
12   form.
13          THE WITNESS: I just remember
14   the general feeling about lending and having
15   just kind of lived as a real estate guy
16   watching mortgages and credit lines just
17   disappear because of the issue with the
18   sub-prime.
19   BY MR. ACKELSBERG:
20   Q.   All right. So let's flip the page. And
21   now we're on the actual page 3 that looks a
22   little like the page 3 that we were looking at
23   before, but now this is the actual one. Okay?
24   And you see there is reference to the turnkey

1   solution like on the version I showed. You
2   see that?
3          MR. SCHEFF: Object to the
4   form.
5          THE WITNESS: I see the
6   comparison, yes.
7   BY MR. ACKELSBERG:
8   Q.   And so why don't you explain, if you
9   can, your notations and what they indicate.
10   A.   The asterisk next to the guaranteed
11   minimum revenue of 50,000 a month would be
12   something that the tribe would be very
13   interested in. At this point, I had been
14   shown or explained that the split would be,
15   you know, there's 5 percent.
16          And I believe that Jason and
17   I just talked about revenue at this point and
18   what it would look like. And I conveyed to
19   him that top-line revenue is really important
20   to tribes and not a, you know, bottom-line or
21   an equity slice. It was easier for them to
22   understand, number one.
23          Number two, they couldn't get
24   pencil-whipped by expense generation or other

1   things. It looks to me like the form 1 was
2   the proposed split for the tribe and myself.
3   Q.   Would that indicate that -- ultimately,
4   it ends up being 5 1/2 percent, right?
5   A.   Ultimately, it ended up being 4.5 to the
6   tribe and 1 to me.
7   Q.   Right. So it looks like here that maybe
8   initially Jason might have said to you 4 and 1
9   instead of 4 1/2 and 1?
10          MR. SCHEFF: Object to the
11   form. You can answer.
12          THE WITNESS: It's very
13   possible that he -- that it's maybe 5 percent
14   total compensation available.
15   BY MR. ACKELSBERG:
16   Q.   And then maybe Steve Shaper in the
17   later -- in the e-mail that we looked at a
18   couple days later was perhaps trying to make
19   the deal even more attractive?
20          MR. SCHEFF: Object to the
21   form. Calls for speculation. You can answer
22   if you can.
23          THE WITNESS: I don't
24   remember how far the negotiations or

UNSEALED

App. 0599

1  Q.  With regard to the website, that it
2  would be Think Finance's job to come up with a
3  website and manage it?
4  A.  That wasn't spoken.  They showed me an
5  example.  I don't know who made the Great
6  Plains website.  It just existed for another
7  tribe already.
8  Q.  You didn't think the Otoe-Missouria made
9  a website, did you?
10         MR. SCHEFF:  Objection to
11  form.  You can answer the question.
12         THE WITNESS:  I don't know
13  that I had an impression at all about who made
14  it.  I didn't ask the question.
15  BY MR. ACKELSBERG:
16  Q.  Did you have any expectation -- you
17  didn't tell the tribe they were going to have
18  to run a website themselves, did you?
19         MR. SCHEFF:  Object to the
20  form.
21         THE WITNESS:  I didn't relay
22  any kind of information like that to the
23  tribe.  What I did was I passed along a
24  business opportunity and I traditionally

1  turned it over to the experts to explain which
2  each of the roles were going to be.
3  BY MR. ACKELSBERG:
4  Q.  So you didn't -- it wasn't like you were
5  telling the tribe they had any particular
6  obligations if they said yes to this?
7  A.  With this document in my hand, passing
8  it over to Ray, Ray taking it to the tribe, it
9  was like, here's a business opportunity,
10  here's the deck, take a look.  If it's
11  something you're interested in, let us know.
12  Q.  Okay.  So that's the process that you --
13  that's what you actually did.  You took the
14  deck, you gave it to Ray and Ray took this
15  deck to the tribe?
16  A.  That's correct.  We also sent this deck
17  out to a couple of other tribes, as well.
18  Q.  Of potential partners if the --
19  A.  If they met our criteria of having a
20  lending business already and casino and
21  looking for economic development, yes.
22  Q.  And if it didn't work out with Rocky
23  Boy, maybe another tribe would be interested
24  in partnering with Think Finance?

1         MR. SCHEFF:  Object to the
2  form.
3         THE WITNESS:  That is the
4  belief we had, yes.
5  BY MR. ACKELSBERG:
6  Q.  This is a little out of chronological
7  sequence, but among the documents that were
8  produced last night were a couple that I
9  hadn't seen before that are sort of as the
10  deal was being negotiated, so adding to the
11  e-mails that we were looking at before.  I
12  want to show you this one.
13              - - -
14  (Whereupon Exhibit P-353 was marked for
15         identification.)
16              - - -
17  BY MR. ACKELSBERG:
18  Q.  Do you remember this e-mail?
19  A.  I remember this e-mail.
20  Q.  All right.  So this is an e-mail from
21  Neal Rosette to you.  And am I correct that he
22  is sort of going over all of the things that
23  they are doing to try to comply with the tight
24  timeline that -- but that he has some

1  concerns, right?
2  A.  He is spelling out the tasks that either
3  they completed or are completing to try to get
4  this deal done as quickly as they possibly
5  can.
6  Q.  In the paragraph, you see it says:  My
7  Team?
8  A.  Yes.
9  Q.  Me, Billi Anne and Robin have worked
10  feverishly to get our end of this deal
11  complete, and will continue through the
12  weekend, if necessary.  And then he says:  We
13  didn't do all of this work to have this deal
14  end up in a trash can.  When I asked you for a
15  portion of the development fee, I was not
16  asking for something that was not earned.  As
17  you can see from -- what's he talking about,
18  the development fee?
19         MR. SCHEFF:  Object to the
20  form.  Answer the question if you can.
21         THE WITNESS:  It's my
22  recollection that Neal and Billi Anne asked
23  for a $10,000 development fee, rather than a
24  $20,000 development fee, for them to take on

UNSEALED

1 this possibility and run it through all of
2 their different tribal business entities and
3 their attorney to get it done.
4 BY MR. ACKELSBERG:
5 Q. Was that paid?
6 A. It was paid when the deal closed. Maybe
7 it was upon signing the term sheet, one or the
8 other, but it was paid when --
9 Q. Who paid that?
10 A. It was paid by me, I wired it to Robin
11 Kovash.
12 Q. Was that your own money that you used or
13 was it reimbursed by Think Finance?
14 A. It was reimbursed by Think Finance. I
15 don't know whether I fronted it first or they
16 paid me and I used it to disburse legal fees
17 and development fees.
18 Q. I didn't see reference to that in the
19 documents, maybe it was there. But how did
20 you communicate that -- so its 10,000 for each
21 of them?
22 A. I believe it was 10,000 for each of
23 them.
24 Q. Who did you communicate that to, that

1 they wanted 10,000 each to do the deal?
2 A. I would have communicated that to Jason
3 Harvison.
4 Q. Do you remember Jason okaying that, how
5 did he okay -- eventually it was approved,
6 right?
7        MR. SCHEFF: Objection to
8 form.
9        MR. SHELDON: Objection.
10 BY MR. ACKELSBERG:
11 Q. I think you said it was approved?
12 A. The money was paid, so it must have been
13 approved.
14 Q. But you don't remember how that
15 happened?
16 A. I remember in my negotiations with Jason
17 that I got reimbursed for expenses, but as
18 typical in all my transactions, I'd have to go
19 back to the corporation and have them approve
20 them before they were spent.
21 Q. Okay. Which corporation are you
22 referring to?
23 A. Any corporation I was trying to do
24 business on a tribal land. Any customer that

1 I had, it would be made clear that at some
2 point I would be reimbursed for any expenses
3 incurred doing the deal, if the deal was
4 successful and closed, or unless they approved
5 my distributing the money, knowing it would be
6 a risk if the deal hadn't closed.
7 Q. Who -- with regard to this transaction,
8 who are you looking to for that reimbursement?
9 It would be Think, right?
10        MR. HERMAN: Objection to
11 form.
12        THE WITNESS: In this case,
13 in this transaction, Think Finance was the
14 ultimate party that would reimburse my
15 expenses, yes.
16 BY MR. ACKELSBERG:
17 Q. Because they were retaining you to find
18 a partner for them.
19        MR. SCHEFF: Object to the
20 form.
21        THE WITNESS: They contacted
22 me to find them a partner and they eventually
23 signed a finder's fee agreement with me.
24 BY MR. ACKELSBERG:

1 Q. That being the referral, the agreements
2 that we've looked at before?
3 A. Yes, sir.
4 Q. Do you know if that $10,000 to Billi
5 Anne and Neal had to get approved by the tribe
6 or was that a personal deal?
7 A. With all of my dealings with the tribes,
8 I always had any disbursements approved by
9 whatever entity needed to approve it, whether
10 it's a tribal council, the president of a
11 division or whatever -- however they were
12 structured.
13 Q. So it was clear and transparent to all
14 concerned in the transaction, including the
15 tribe, that Billi Anne and Neal were going to
16 get a development fee of 10,000 a piece.
17        MR. SCHEFF: Object to the
18 form. You can answer.
19        THE WITNESS: I don't know
20 who all in the tribe knew it. I knew that
21 Robin Kovash sent me back an e-mail saying
22 that the transaction had been approved and
23 that he was okay to disburse that money to
24 Billi Anne and Neal.

UNSEALED

1          - - -
2     (Whereupon Exhibit P-354 was marked for
3          identification.)
4          - - -
5          THE WITNESS:  Yes, sir.
6  BY MR. ACKELSBERG:
7     Q.   Mr. Haynes, do you recall in the term
8  sheet that it made reference to certain
9  advances being made either by Haynes -- I
10  think it said either by Haynes or Pepper or
11  Haynes and -- Haynes or Think, I think.  I
12  think it was to the lawyers, right, that
13  either Haynes or Think Finance would be
14  advancing certain money to the two law firms,
15  Jones Keller and Pepper Hamilton.  Do you
16  remember that?
17     A.   Yeah, the draft term sheets and the
18  final term sheets continued to move.  As you
19  know, this is a fast transaction.  I would
20  have tried to have plugged in who was getting
21  paid whenever it was available.
22          I had no authority to spend
23  anybody else's money.  So whether it was
24  verbal or put into term sheets, I would ask

1  and get permission for some kind of payment
2  before it was paid.
3     Q.   So in fact you were a conduit for
4  payments to Mr. Kovash?
5          MR. SCHEFF:  Object to the
6  form.
7          THE WITNESS:  I paid Mr.
8  Kovash the $75,000 from one of my accounts.
9  BY MR. ACKELSBERG:
10     Q.   And then you were reimbursed?
11     A.   Yes, sir, and then I was reimbursed.
12     Q.   By Think Finance?
13     A.   Correct.
14     Q.   What about payments to Pepper, did the
15  same thing happen there?
16     A.   I don't remember making any payments to
17  Pepper.  I believe they were paid at closing,
18  but I'm not sure.
19     Q.   Then it makes reference to VPCs tribal
20  review, do you see that?  It's from you to
21  Robin Kovash saying, I need some help with
22  this document.
23     A.   Yes, sir.  I see that.
24     Q.   What is that about, if you remember?

1     A.   This looks like it just pertains to all
2  of the tribes' lending codes and ordinances
3  and laws.
4     Q.   Was it your understanding that all of
5  that had to be reviewed and approved by
6  Victory Park or their counsel?
7     A.   I don't remember.  It is very typical
8  for a corporation doing business with tribes,
9  for their attorneys and for those companies
10  themselves to ask for whatever documents they
11  need to understand if they'll be able to
12  successfully build a business and get paid for
13  it.  So this would be typical of one of the
14  requests that I would have gotten.
15          - - -
16     (Whereupon Exhibit P-355 was marked for
17          identification.)
18          - - -
19          THE WITNESS:  Yes, sir.
20  BY MR. ACKELSBERG:
21     Q.   So this is also related to Victory
22  Park's review of tribal legal documents.  This
23  is sort of on the same topic to the last thing
24  we were looking at.  Victory Park needed to do

1  some additional review of tribal documents.
2          MR. SHAPIRO:  Object to the
3  form, go ahead.
4          THE WITNESS:  My
5  understanding is that this was requested by
6  VPC and there's just more documents of the
7  same.
8  BY MR. ACKELSBERG:
9     Q.   It looks like this started out with John
10  Williams?
11     A.   I don't remember John Williams.
12     Q.   But you understood it had something to
13  do with Victory Park?
14          MR. HERMAN:  Objection to
15  form.
16          THE WITNESS:  I don't
17  remember, but I clearly typed in VPCs
18  attorney's reviewing the docs and asked for
19  this.  So that would have been my
20  understanding.
21          - - -
22     (Whereupon Exhibit P-356 was marked for
23          identification.)
24          - - -

55 (Pages 217 to 220)

UNSEALED

App. 0602

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

COMMONWEALTH OF    :
PENNSYLVANIA    :
   Plaintiff    :
           :
   VS.    :  CIVIL ACTION NUMBER
        : 2:14-CV-07139
THINK FINANCE, INC., :
ET AL.,    :
   Defendants   :
- - -
MAY 15, 2018
- - -

    Videotaped deposition of TOM WELCH, was taken pursuant to notice at 525 W. Monroe Street, Chicago, Illinois, beginning at or about 9:00 a.m. before Jeannine Cancelliere, Court Reporter and Notary Public and Stephan Hoog, Videotape Operator, there being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102
(215) 922-7112

## Page 2

APPEARANCES:

LANGER, GROGAN & DIVER, P C
BY: JOHN J GROGAN, ESQUIRE
1717 Arch Street, Suite 4130
Philadelphia, Pennsylvania 19103
Phone: (215) 320-5701
Representing the Plaintiff
jgrogan@langergrogan com
Also Present: Kevin Byers and
David Nagdeman

ATTORNEY GENERAL'S OFFICE
BY: SAVERIO MIRARCHI, ESQUIRE
1600 Arch Street, 3rd Floor
Philadelphia, Pennsylvania 19103
Phone: (215) 560-2445
Representing the Defendant
smirarchi@attorneygeneral gov

MONTGOMERY McCRACKEN
BY: JONATHAN BOUGHRUM, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Phone: (215) 772-7228
Representing Ken Rees
jboughrum@mmwr com

KATTEN, MUCHIN, ROSENMAN LLP
BY: DANIEL SHAPIRO, ESQUIRE
BY: MATTHEW HAWS, ESQUIRE
525 W Monroe Street
Chicago, Illinois 60661-3693
Phone: (312) 902-5319
Representing Victory Park
matthew haws@kattenlaw com
daniel shapiro@kattenlaw com
Also Present: Scott Zemnick

## Page 3

APPEARANCES (continued)

EVERSHEDS SUTHERLAND
BY: MATTHEW GATEWOOD, ESQUIRE
700 6th Street, NW
Washington, D.C. 20001
Phone: (202) 383-0122
Representing Think Finance
matthewgatewood@eversheds-sutherland.com

VAN NESS FELDMAN
BY: PATRICK DAUGHERTY, ESQUIRE
1050 Thomas Jefferson Street, NW
Washington, D.C. 20007-3877
Phone: (202) 298-1800
Representing National Credit
Adjusters LLC
pod@vnf.com

## Page 4

- - -
I N D E X
- - -
TOM WELCH          PAGE
BY MR. GROGAN      7
- - -
E X H I B I T S
- - -

| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| P-303 | Members Register Document | 26 |
| P-304 | Intertrust Document | 29 |
| P-305 | Investment Committee Memos | 35 |
| P-306 | Investment Committee Memos | 87 |
| P-307 | Green Light Memo | 121 |
| P-308 | Deal Update Memo | 133 |
| P-309 | Metadata Document | 136 |
| P-310 | E-mails | 148 |
| P-311 | E-mails | 151 |
| P-312 | E-mails | 156 |
| P-313 | E-mails | 167 |
| P-314 | E-mails | 170 |
| P-315 | E-mails | 172 |
| P-316 | E-mails | 173 |
| P-317 | E-mails | 176 |

1 (Pages 1 to 4)

UNSEALED

App. 0603

1            - - -
2        E X H I B I T S
3            - - -
4   EXHIBIT NO.    DESCRIPTION         PAGE
5   P-318          E-mails          179
6   P-319          E-mails          182
7   P-320          E-mails          190
8   P-321          E-mails          196
9   P-322          E-mails          199
10  P-323          E-mails          203
11  P-324          E-mails          209
12  P-325          E-mails          219
13  P-326          E-mails/Article   225
14  P-327          E-mails          231
15  P-328          E-mails          233
16  P-329          E-mails          242
17  P-330          Side Letter       247
18  P-331          E-mails          255
19
20
21
22
23
24

1        VIDEOTAPE OPERATOR:  This is the
2   beginning of media one in the deposition of
3   Tom Welch in the matter of Commonwealth versus
4   Think Finance, et al., case no. 14-7139-JCJ.
5   Today's date is May 15th, 2018.  The time is
6   9:01 a.m., as indicated on the video screen.
7   My name is Stephan Hoog.  I'm the
8   videographer.  The court reporter is Jeannine
9   Cancelliere.  Will counsel please introduce
10  themselves for the record, followed by the
11  swearing in of the witness.
12       MR. GROGAN:  John Grogan for the
13  Commonwealth.
14       MR. SHAPIRO:  Dan Shapiro for
15  the Victory Park defendants.
16       MR. HAWS:  Matthew Haws with
17  Victory Park defendants.
18       MR. GATEWOOD:  Matthew Gatewood
19  for the Think Finance defendants.
20       MR. BOUGHRUM:  Jonathan
21  Boughrum for Ken Rees.
22       MR. DAUGHERTY:  Patrick
23  Daugherty on behalf of National Credit
24  Adjusters.

1        MR. MIRARCHI:  Saverio
2   Mirarchi for the Commonwealth of Pennsylvania.
3            - - -
4        TOM WELCH, after having been
5   first duly sworn, was examined and testified
6   as follows:
7            - - -
8        EXAMINATION
9            - - -
10  BY MR. GROGAN:
11  Q.   Good morning, Mr. Welch.  Thank you for
12  coming.  We're going to be spending a fair
13  amount of time today.  I apologize in advance
14  for that.  And I have a lot to cover with you,
15  but I will try do it as expeditiously as I
16  can.  Have you ever been deposed before?
17  A.   Yes.
18  Q.   In what context?
19  A.   As it related to Think Finance and their
20  bankruptcy.
21  Q.   I see.  So it was relatively recent?
22  A.   September, I believe.
23  Q.   Okay.  And so you know the ground rules
24  of a deposition.  I ask questions and you

1   answer them unless you're instructed not to by
2   your counsel.  I will ask a question.
3   Undoubtedly, counsel, either Mr. Shapiro or
4   the others will interpose objections sometimes
5   to the form of that question.  But in the
6   normal course, unless you're instructed not to
7   answer, you're going to answer the question
8   despite the objection.  Okay.
9        You're free to consult with
10  your attorneys at any time, but I would ask
11  you to answer any pending question before you
12  do that.  Similarly, with regard to breaks, it
13  is not an endurance test.  We'll be taking
14  breaks at regular times, but if you need a
15  break for any reason, please just let me know
16  and we'll stop.  Again, I would ask you to
17  answer pending questions.
18  A.   Sure.
19  Q.   If you answer my question without asking
20  for clarification, I'll assume you understood
21  it.  We're trying to keep a clean record.  The
22  official record is being kept by
23  Ms. Cancelliere here.  It's a typewritten
24  record.  It's also being videotaped, but the

UNSEALED

1          MR. SHAPIRO:  Same objection.
2          THE WITNESS:  Yes, that is my
3    understanding.
4    BY MR. GROGAN:
5    Q.    Okay.  Did anybody that you're aware of
6    at First Bank of Delaware review the 2008
7    cease and desist order before this investment
8    was made?
9          MR. SHAPIRO:  Objection,
10   form.
11   BY MR. GROGAN:
12   Q.   I mean the February 28, 2011,
13   investment.
14         MR. SHAPIRO:  Can you read
15   that -- I'm sorry.  You said the First Bank of
16   Delaware.
17         MR. GROGAN:  I'm sorry.
18   BY MR. GROGAN:
19   Q.   Did anybody at Victory Park read the
20   2008 cease and desist order issued by the FDIC
21   to the First Bank of Delaware prior to making
22   this investment?
23         MR. SHAPIRO:  Objection,
24   form.

1          THE WITNESS:  I don't know.
2    BY MR. GROGAN:
3    Q.   Were you familiar in your work at VPC
4    with a product called Cash Call?
5    A.   Yes.
6    Q.   Okay.  Do you view the statement at the
7    end of the final paragraph on page two:  The
8    proposed tribal lending structure is
9    substantially similar to the business used by
10   Cash Call for over nine months, Think
11   Finance's main competitor.
12         Do you agree with that
13   statement?
14         MR. SHAPIRO:  Objection,
15   foundation.
16         MR. GATEWOOD:  Objection.
17         MR. SHAPIRO:  And form.  Go
18   ahead.
19         THE WITNESS:  Given that it's
20   substantially similar, I would agree with
21   that.
22   BY MR. GROGAN:
23   Q.   Okay.  Do you know if VPC had any
24   relationship with Cash Call or the Cash Call

1    product?
2    A.   Not to my knowledge.
3    Q.   If you look at recommendation under --
4    on page three.  It's slightly -- the syntax is
5    odd but Think -- second sentence:  Think
6    Finance will investment 16 million into GPL
7    Servicing on the closing date to allow VPC to
8    exchange 47.7 million of ThinkCash loan
9    participations for 51 and change of ThinkCash
10   loans.
11         My question is -- and you may
12   not know -- but what is the relationship
13   between a Think Finance investment of
14   16 million and allowing VPC to exchange its
15   shares valued at 47 million for the
16   participation valued at 51 million?
17   A.   I'll be honest.  I'm not exactly sure.
18   I agree it's an oddly worded phrase.  I don't
19   know exactly what he's trying to articulate
20   from a mechanic standpoint.
21   Q.   Is it fair to say, then, that at least
22   at this point, Think Finance became, itself,
23   an investor in GPLS?
24         MR. SHAPIRO:  Objection,

1    form.
2          THE WITNESS:  Yes.  Based on
3    Think Finance will invest 16 million into
4    GPLS.
5    BY MR. GROGAN:
6    Q.   Okay.  And that was true for much of the
7    life of the GPLS investment, that Think
8    Finance itself had an investment in GPLS?
9    A.   That's correct.
10   Q.   Okay.  Prior to this deal in February
11   2011, do you know if Think Finance was
12   invested in the loan participations that were
13   purchased by -- the loan participations
14   purchased from First Bank of Delaware?
15         MR. SHAPIRO:  Objection,
16   form.
17         THE WITNESS:  I don't know.
18   BY MR. GROGAN:
19   Q.   OKAY.  Now, in the transaction overview
20   section --
21         MR. SHAPIRO:  So you're back
22   on page four?
23         MR. GROGAN:  And five.
24   BY MR. GROGAN:

UNSEALED

1    Q.   Well, maybe this answers this.  Maybe it
2    doesn't.  Who are the funds that are going to
3    invest in this iteration of funding for GPLS?
4         MR. SHAPIRO:  You're asking
5    him to interpret the document as opposed to --
6         MR. GROGAN:  If he knows, he
7    can just answer or interpret the document, if
8    you need to.
9         THE WITNESS:  Based on the
10   document and the bullet below labeled
11   investors, similar references, Victory Park
12   credit opportunities master fund and VPC Fund
13   II.
14   BY MR. GROGAN:
15   Q.   Are these the same funds that were
16   involved in the July 10th memo or different?
17   A.   I need to reference.
18   Q.   Sure.  Go ahead.
19   A.   These are the same Victory Park funds.
20   Q.   Okay.  Again, I want to draw your
21   attention to page 13, with similar language to
22   what we saw in the 2010 memo.  There are
23   currently 15 states.  Do you see that
24   language?

1    A.   Yes.
2    Q.   Okay.  Do you know, at the time that
3    this document was authored, whether Victory
4    Park -- any of the Victory Park funds was
5    buying participations in loans originated in
6    Pennsylvania?
7    A.   I do not know.
8    Q.   Okay.  Good.  We can move to the next
9    investment committee memorandum, which happily
10   you authored.
11   A.   Here we go.
12   Q.   So we can dispense with the Dean Smith
13   reading of the document for 20 minutes or so.
14   But I want you to take a look at this
15   document.  Make yourself comfortable so you
16   can answer questions about it.
17   A.   Okay.
18   Q.   Okay.  You're the author of this
19   document?
20   A.   Yes.
21   Q.   And I just want to ask sort of a
22   preparatory question.  The document strikes me
23   as very detailed.  How long does it take to
24   draft one of these, to get it ready to submit?

1    A.   It varies.  This is -- if I can put a
2    number of hours on it, I mean, it's
3    probably -- a given iteration, probably two
4    days of work to kind of proof and define and
5    term.
6    Q.   You're listed as the author.  Is there
7    somebody who vets it before it goes to the
8    investment committee, at this time?
9    A.   No.  This is -- this was just me.
10   Q.   Okay.  And this becomes the basis for a
11   discussion at the investment committee
12   meeting?
13   A.   Correct.
14   Q.   And I'll assume, but you can correct me
15   if I'm wrong, these are heavily scrutinized by
16   the investment committee members?
17   A.   Correct.
18   Q.   People ask hard questions?
19   A.   Correct.
20   Q.   Okay.  Can you take a look at the gray
21   box and tell me what's going on in this
22   particular deal?
23   A.   So Think had requested incremental
24   capital, given the growth of the tribal

1    program.  So in effect, this is going to
2    committee, requesting to increase the size of
3    the existing transaction.
4    Q.   And how much is the increase?
5    A.   An additional 150 million.
6    Q.   So doubling the size of the investment;
7    is that correct?
8    A.   That is correct.
9    Q.   And the purpose is that that business is
10   good; is that correct?
11   A.   Correct.
12   Q.   Okay.  And at this time, by October 15,
13   2012 -- strike that.
14        The previous memo had
15   referenced only one tribal lender, Plain
16   Green; is that correct?
17   A.   That's correct.
18   Q.   Okay.  How many tribal lenders were
19   involved by October 15, 2012?
20   A.   There were three tribal lenders
21   involved.
22   Q.   Okay.  Would they be the Plain Green,
23   Mobiloans and Great Plains?
24   A.   That's correct.

UNSEALED

App. 0606

1    Q.   Okay.  And in preparation of this
2  document, did you visit any of those tribal
3  lenders?
4    A.   I did not.
5    Q.   Did you speak to anybody at the tribal
6  lenders?
7    A.   Not to my recollection.
8    Q.   Okay.  So to the extent that you have
9  information in this document about tribal
10  lenders, where did you get that information?
11    A.   Think Finance.
12    Q.   This is an amendment or an expansion
13  Series I facility, which -- is it fair to say
14  the Series I facility is both the July 28th,
15  2010 investment and the 2011 investment we
16  covered?  Would they both comprise Series I?
17    A.   I would think of Series I as just the
18  second -- the non --
19    Q.   The 2011?
20    A.   The 2011, correct.
21    Q.   Okay.
22    A.   The February 2011.
23    Q.   And what was the rate of return
24  anticipated in the Series I investments?

1    A.   20 percent annualized return.
2    Q.   And what was the rate?
3        MR. SHAPIRO:  You're talking
4  about for Victory Park?
5        MR. GROGAN:  For Victory
6  Park.
7  BY MR. GROGAN:
8    Q.   And what is the rate for the Series II
9  investments?
10        MR. SHAPIRO:  Same -- let
11  me --
12  BY MR. GROGAN:
13    Q.   For Victory Park.  For Victory Park
14  funds.
15    A.   Sorry.  Can you repeat the question?
16    Q.   Well, I think the answer is the same.
17  If you look at the bottom of the gray box, VPC
18  is still expecting to earn a 20 percent
19  annualized return on the Series II money; is
20  that correct?
21    A.   Victory Park is still expecting a
22  20 percent annualized return.
23    Q.   Okay.  Is there is difference between
24  the return promised to limited investors -- or

1  limited partners in the two facilities?
2        MR. SHAPIRO:  If you know.
3  BY MR. GROGAN:
4    Q.   I'm sorry.  You can strike that.
5        You have co-investors coming
6  in at this point; is that correct?
7    A.   That's correct.
8    Q.   The rate of return the co-investors are
9  entitled to is different than the Victory Park
10  return; isn't that correct?
11    A.   To my recollection, that's correct.
12    Q.   Okay.  What is the difference?  Do you
13  recall the numbers?
14    A.   I believe at this point, any
15  co-investors were paying Victory Park a
16  management fee of two percent.  So their net
17  would be 18 percent off the 20.
18    Q.   I see.  And that's the sole reason for
19  the difference?
20    A.   Correct.
21    Q.   And that's paid to Victory Park Capital
22  Advisors?
23    A.   I don't know specifically which Victory
24  Park entity that goes to.

1    Q.   Okay.  If you look at page three,
2  current investors entitled to a 20 percent
3  fixed return.  It's seems like -- I'm looking
4  at the graph.
5    A.   Yep.
6    Q.   And then there's Class A and Class B
7  investors?
8    A.   Correct.
9    Q.   And then the Class C and Class D are
10  characterized as new investors.
11        Are they the co-investors
12  that we're talking about?
13    A.   From my recollection, there were still
14  co-investors in Class A and Class B at the 20
15  net 18 we discussed.  New investors would be
16  for Class C and D, which I believe you refer
17  to as Series II.  And that would be at the 18
18  percent return.
19    Q.   With a one percent --
20    A.   With a one percent VPC Series II fee.
21    Q.   Is that the same as a management fee?
22    A.   Correct.
23    Q.   Why the difference in return for the new
24  investors?  If you recall.

UNSEALED

1 Finance.
2 BY MR. GROGAN:
3 Q. Did VPC play a role in that decision,
4 those decisions?
5 A. No.
6 Q. Okay. Now they're also referencing on
7 the third bullet point down: October 31st,
8 the first paydown was received totaling 22.3
9 million of which 17.6 million was used to
10 retire VPC's Series I-A shares and 4.7 million
11 was returned to co-investors holding Series
12 I-A shares.
13 What's happening there?
14 A. Investors into GPLS are getting their
15 principal capital returned to them.
16 Q. People are exiting the investment?
17 A. Correct.
18 Q. And is this a period -- well, the title
19 of the section is the GPLS Partial Wind-Down.
20 Was a decision made at that point to partially
21 wind-down the investment in GPLS?
22 A. Could you be more specific?
23 Q. Not really. Well, I mean --
24 MR. SHAPIRO: Let him ask the

1 question.
2 THE WITNESS: Go ahead.
3 BY MR. GROGAN:
4 Q. I am racked into the title that was
5 chosen in the document. All right? Rise
6 Expansion and GPLS Partial Wind-Down.
7 Who decided to engage in a
8 GPLS partial wind-down?
9 A. I think, collectively, all parties
10 involved. In effect, you have Think, along
11 with the tribes, dialing down origination.
12 Therefore, there's a lot of excess cash coming
13 back in, and we agreed to -- with that excess
14 cash, started to get partially repaid.
15 Q. Okay. And that would be prepayments,
16 though, right? You're paying this back to
17 investors earlier than you had anticipated?
18 A. Correct.
19 Q. Okay. Now, who at Great Plains did you
20 discuss this decision to wind down GPLS?
21 MR. SHAPIRO: Could you read
22 that back please?
23 - - -
24 (Whereupon the court reporter

1 read back the pending question.)
2 - - -
3 MR. SHAPIRO: Objection,
4 foundation. It presumes --
5 BY MR. GROGAN:
6 Q. Did you discuss this decision to wind
7 down with anyone at Great Plains?
8 A. Most of my communications throughout
9 this time was with Think Finance. I do recall
10 having some discussions, maybe just a -- one
11 phone call or two. I can't recall exactly
12 with which tribe. I do remember speaking to
13 some individuals at either Plain Green or
14 Great Plains or Mobiloans or all of the above
15 collectively at some point around this time.
16 Q. About the partial wind-down?
17 A. Correct.
18 Q. Okay. You don't recall the name of that
19 person, and you don't recall which tribe?
20 A. Correct.
21 Q. It says at the bottom of page two, in
22 the paragraph that begins: VPC's investment
23 vehicle for the Rise facility will not
24 formally close until mid-January.

1 And my question is, does that
2 mean that no funding for the Rise facility can
3 be dispersed until mid-January?
4 MR. SHAPIRO: Well, go ahead
5 and read the rest of it.
6 BY MR. GROGAN:
7 Q. Read as much as you need to.
8 A. Okay. What's the question?
9 Q. First question is, with regards to just
10 the first sentence, does that mean that the
11 money to be raised in this new Rise facility,
12 the facility will not close until mid-January,
13 correct? That's what that says?
14 A. Correct.
15 Q. Does that mean that no money can be
16 dispersed to the Rise product for lending
17 until mid-January?
18 A. Correct. To my recollection, we didn't
19 close our Rise facility -- "we" meaning
20 Victory Park -- until January.
21 Q. And you don't give money to the borrower
22 until the facility closes?
23 A. Correct.
24 Q. Okay. And then it says: As such, VPC

25 (Pages 97 to 100)

UNSEALED

App. 0608

1    will allow Think to gross sweep, in quotes,
2    its November Administrative fee from GPLS,
3    i.e. not require the past due loans to be
4    repurchased, and use the proceeds to
5    temporarily fund Rise.
6            Did I read that correctly?
7    A.   You did.
8    Q.   What is a gross sweep?
9    A.   So as it relates to GPLS, each month,
10   when you look at the income statement for that
11   entity, in effect, what the residual was
12   pursuant to the administrative agency
13   agreement, Think Finance had a right to that
14   amount.
15   Q.   Correct.
16   A.   Now, another stipulation that Think had
17   at GPLS is that on a monthly basis, it would
18   reimburse GPLS for any loans it charged off.
19   Q.   Okay.
20   A.   So you can think about it as if the
21   administrative agency fee was ten and there
22   was five charged-off loans, they would really
23   only sweep five, in effect.  Right?
24   Q.   Right.

1    A.   So what we were saying here is that for
2    November, they can actually sweep the full ten
3    and true up that five later.
4    Q.   Later on?  Essentially, though --
5    A.   So Think Finance would have a payable to
6    GPLS.
7    Q.   So essentially, you're making a further
8    short-term loan to Think Finance?
9    A.   I don't know if I would characterize it
10   as a loan.  They would have -- there was no
11   loan document.  There was no interest rate on
12   it.  It was simply -- from an accounts payable
13   perspective, Think Finance would ultimately
14   have to reimburse the charged-off --
15   Q.   You weren't giving it to them; you
16   expected it back?
17   A.   Correct.
18   Q.   But why would you do that?
19   A.   From a cash-timing perspective, Think
20   Finance could deploy that cash into the Rise
21   product but prior to closing their facility in
22   January.
23   Q.   But that's GPLS cash?
24   A.   Correct.

1    Q.   Okay.  Do you know if Think did, in
2    fact, true up those gross sweeps?
3    A.   To my knowledge, they did.
4    Q.   Did you ever do gross sweeps in any
5    other period of time?
6    A.   We may have.  It wasn't uncommon.
7    Sometimes it would go the other way, where
8    they were actually leaving capital month to
9    month.
10   Q.   Okay.
11   A.   More of a capital management lever to
12   pull.
13   Q.   Now, I also -- I'm sorry I don't do
14   these things in order.  But if you look at the
15   paragraph or the sentences before that:
16   Management expects to rapidly grow the Rise
17   portfolio follow over the next 12 months.
18           Management there being Think
19   Finance management?
20   A.   Correct.
21   Q.   Okay.  At close, assuming January 31st,
22   Rise is expected to have approximately
23   67 million of loans outstanding.  Okay.
24   Demand for former tribal lending customers and

1    a new national marketing campaign are
2    forecasted to drive portfolio growth to over
3    160 million by year-end 2014.
4            My question is, whose
5    portfolio growth?  Would that be portfolio
6    growth of Rise?
7    A.   Yes.
8    Q.   So the anticipation would be that former
9    customers who had gotten loans from the tribal
10   lending entities would now become customers of
11   Rise; is that correct?
12           MR. SHAPIRO:  Object to form.
13           THE WITNESS:  One more time?
14   Sorry, John.
15   BY MR. GROGAN:
16   Q.   Sure.  As I read that, it seems to be
17   saying that the former customers of the tribal
18   lending entities -- that's Mobiloans, Great
19   Plain and Plain Green -- their former
20   customers would now drive the portfolio growth
21   of the Rise product.  They'd become customers
22   of Rise; is that correct?
23           MR. SHAPIRO:  Object to form.
24           THE WITNESS:  It's possible

UNSEALED

1 former tribal lending customers could become
2 Rise -- borrowers under the Rise product, yes.
3 BY MR. GROGAN:
4 Q. Well, but it's not only possible.
5 I mean, this is part of the due diligence as
6 to why the Rise investment is going to make
7 sense, right? The market's going to be 160
8 million by the end of 2014.
9 MR. GATEWOOD: Objection to
10 form.
11 BY MR. GROGAN:
12 Q. Correct? Why else would that
13 information be in this document? This is a
14 document to vet an investment in Rise.
15 MR. GATEWOOD: Objection,
16 form.
17 THE WITNESS: Again, I accept
18 that I wrote demand from former tribal lending
19 customers and a new national marketing
20 campaign are forecasted to drive portfolio
21 growth to over 160 million by year-end 2014.
22 BY MR. GROGAN:
23 Q. Yeah. And then who was going to embark
24 on the new national marketing campaign?

1 A. Think Finance.
2 Q. Yeah. To drive formal tribal customers
3 into the Rise product; isn't that correct?
4 MR. SHAPIRO: Objection to
5 form, foundation. Go ahead.
6 THE WITNESS: Presumably,
7 they would be marketing to some former tribal
8 lending customers.
9 BY MR. GROGAN:
10 Q. Okay. If you look on page five under
11 the transactional overview, at the very top,
12 it says borrower. The borrower would be the
13 Rise SBP?
14 A. SPV.
15 Q. SPV. A single-member Delaware limited
16 liability company owned by Think, but
17 controlled by VPC.
18 How does VPC control
19 Rise SPV?
20 A. So from memory, we had certain -- and
21 control was probably a poor choice on my part
22 in authoring this sentence. But we had
23 certain controls as being one of the directors
24 in that LLC, to prevent that entity from a

1 voluntary bankruptcy and certain other lender
2 protections that we held.
3 Q. On whose books would the Rise SPV show
4 up, Think Finance's or VPC's?
5 A. Think Finance's.
6 Q. And that was true with GPLS too, right?
7 A. That's correct.
8 Q. And if you look at excess cash
9 provision -- and I must confess this took me
10 awhile to get. Generally speaking, unused
11 cash is a problem for Think Finance; is that
12 correct?
13 MR. GATEWOOD: Objection to
14 form.
15 BY MR. GROGAN:
16 Q. Either in GPLS or in the Rise SPV?
17 MR. GATEWOOD: Same
18 objection.
19 BY MR. GROGAN:
20 Q. They've agreed to repay at a certain
21 rate to Victory Park, correct?
22 A. Correct.
23 Q. On the expectation that they'll put that
24 cash to use by -- in the purchase of

1 participations and loan activities?
2 MR. GATEWOOD: Same
3 objection.
4 THE WITNESS: That's correct.
5 BY MR. GROGAN:
6 Q. So if there's cash they can't deploy,
7 they're paying a fairly steep rate for that
8 cash they can't use; is that correct?
9 MR. GATEWOOD: Objection,
10 form.
11 THE WITNESS: Correct.
12 BY MR. GROGAN:
13 Q. Okay. And so this excess cash
14 provision, what is this doing? Is that
15 attempting to address that problem that Think
16 Finance would have?
17 MR. SHAPIRO: Objection,
18 form.
19 THE WITNESS: Let me just
20 give it a quick review.
21 BY MR. GROGAN:
22 Q. Sure.
23 A. Okay. So what's your question on this
24 again?

1 twelve.
2         MR. GROGAN: I have some
3 general questions about co-investors that I
4 think I can do in ten minutes or so, and then
5 we can do lunch.
6         MR. SHAPIRO: That's fine.
7 BY MR. GROGAN:
8 Q.    Generally speaking, what's the
9 relationship that exists between VPCA and the
10 co-investors who invested in GPLS?
11         MR. SHAPIRO: You're talking
12 about legal relationship or what?
13 BY MR. GROGAN:
14 Q.    Let's start with a financial
15 relationship. Do co-investors owe VPCA any
16 money for their participation in GPLS?
17 A.    Victory Park -- again, I don't know
18 specifically that exists between Victory Park. But if
19 we can look at Victory Park as an asset
20 manager, they did charge a management fee on
21 co-invest dollars.
22 Q.    Okay. But there is no general partner
23 entity with a co-investor, a VPC general
24 partner entity with a co-investor, correct?

1 A.    Are you asking if any co-investors were
2 involved with any of the GPs?
3 Q.    No. I'm asking the other way around.
4 There was no VPC general partner established
5 to interact with a co-investor?
6 A.    No.
7 Q.    The interaction is done with VPCA?
8 A.    Correct.
9 Q.    Okay. Other than ███████ and ██████ did
10 VPC solicit other co-investors for the GPLS
11 investment?
12         MR. SHAPIRO: At any point?
13 BY MR. GROGAN:
14 Q.    At any point.
15 A.    Yes.
16 Q.    Who?
17 A.    There were a host of co-investors
18 throughout the life of this deal. Some of
19 those early co-investors, we call them
20 co-investors, because there were also LPs
21 directly in some of our funds.
22 Q.    Okay.
23 A.    Or relations --
24 Q.    I'm interested in, I think, in

1 co-investors who are not LPs?
2 A.    Okay.
3 Q.    Okay. I'm sorry. We're interested in
4 both. They would all be on the share
5 register?
6 A.    Yes.
7 Q.    Okay. Were there any covenants or other
8 financial terms imposed on co-investors by
9 GPLS as a condition of entering -- becoming an
10 investor?
11 A.    I don't believe there were any covenants
12 imposed. I know there were thresholds in
13 terms of being a credit investor, et cetera.
14 And you can read it in their stock purchase
15 agreement.
16 Q.    Okay.
17 A.    But I don't believe there were any other
18 covenants that we imposed on co-investors, no.
19 Q.    And were there any terms that limited
20 the liquidity of the co-investors investment?
21         MR. SHAPIRO: Objection to
22 form. To the extent these call for legal
23 conclusions, I object to the question. But go
24 ahead. As a matter of fact, testify to what

1 you know.
2         THE WITNESS: So an investor
3 was beholden to the term of that investment.
4 There was no unilateral right for that
5 co-investor to redeem out, like a hedge fund
6 or anything.
7 Q.    Okay. All right.
8         MR. GROGAN: I think that's
9 all I have on that. I think this is a good
10 time to break.
11         THE VIDEOTAPE OPERATOR: Off
12 the record at 12:09 p.m.
13         Back on the record at 12:49
14 p.m.
15 BY MR. GROGAN:
16 Q.    Good afternoon, Mr. Welch. We are
17 beginning our second portion and we're halfway
18 there. So I appreciate your patience and your
19 attention. I want to shift gears a little
20 bit. I think you have already testified to
21 this, but I'm going to ask you again. Was VPC
22 the only entity arranging funding for GPLS at
23 any time in the period that we're discussing?
24         MR. SHAPIRO: Objection,

UNSEALED

1    form.
2         THE WITNESS: Yes, we were
3    the only institution managing kind of our
4    investment, our loan participations in
5    everything. But there were co-investors that
6    were referred in from third parties or Think
7    executives, et cetera.
8    BY MR. GROGAN:
9    Q.   Okay. Is the same true for Elevate, the
10   Rise and Elevate facilities? Was Victory Park
11   the only institution entity arranging funding
12   for those products?
13        MR. SHAPIRO: Same objection.
14        THE WITNESS: So, similar
15   answer, yes. We are their agent and provide
16   the bulk of their capital. As we sit here
17   today, there are other institutions that have
18   come into our facility.
19   BY MR. GROGAN:
20   Q.   I see. When did they come in?
21   A.   At close there were a few co-investors
22   that funded few dollars at close. And then
23   recently we amended our facility, I believe it
24   was a year ago. And there are a few other

1    institutions that participated and took pieces
2    of the up-sized commitments in the Rise
3    facility.
4    Q.   And that's solely Rise, not GPLS?
5    A.   Correct, I am just speaking to Rise.
6    Q.   Were there any co-investors in Rise --
7    strike that.
8         I think -- strike that.
9         Now what percentage of loan
10   participations were purchased by GPLS?
11   A.   It varied over time and by tribe. At
12   the outset it was a 99 percent economic
13   participation interest. Over time as the
14   tribes had more capital to devote to the
15   program, their one percent increased from
16   there. So in certain instances it was five,
17   it may have even got to ten by Plain Green.
18   Q.   I should have asked a more -- your
19   answer was the right answer to my question,
20   but I didn't mean to ask that question.
21        Of the total output of loans
22   for which participations were sold by the
23   tribal entities, what percentage of those
24   participations did GPLS buy?

1         MR. SHAPIRO: I'm confused by
2    that.
3         THE WITNESS: Are you asking
4    if they sold any other --
5    BY MR. GROGAN:
6    Q.   Yeah. Did anybody else buy
7    participations, other than GPLS?
8    A.   Not to my knowledge, no.
9         MR. SHAPIRO: Objection to
10   form.
11   BY MR. GROGAN:
12   Q.   So even to the extent that there were
13   friends and family investors, they were still
14   invested in GPLS; and GPLS was the vehicle for
15   the purchase of the participations?
16   A.   Correct.
17   Q.   Nobody else was buying participations
18   outside of GPLS?
19   A.   Not to my knowledge.
20   Q.   And GPLS was not obligated to buy
21   shares; is that correct?
22        MR. SHAPIRO: Participations?
23   BY MR. GROGAN:
24   Q.   Participations.

1    A.   GPLS was not obligated to purchase
2    participations, that's correct. It was at
3    GPLS' option.
4    Q.   And it could stop whenever it wanted to?
5    A.   That's correct.
6         MR. GROGAN: I want to show
7    you a document, document A. This will be
8    Plaintiff's --309, 310.
9              - - -
10        (Whereupon Exhibit P-310 was
11   marked for identification.)
12             - - -
13   BY MR. GROGAN:
14   Q.   Take a look at this e-mail. And my
15   question is, that this power that GPLS had to
16   stop purchasing, that was an important power
17   to some of your co-investors, including █████
18   wasn't it?
19        MR. SHAPIRO: Objection,
20   form, calls for speculation and foundation.
21   Go ahead.
22   BY MR. GROGAN:
23   Q.   Let's look at the e-mail. Who is Harsh
24   Patel?

UNSEALED

1    A.   Harsh Patel worked at █████
2    ███████████
3    Q.   Does he now work for VPC?
4    A.   He does not.
5    Q.   Did he ever work for VPC?
6    A.   He did.
7    Q.   When did he work for VPC?
8    A.   It was after -- I don't remember the
9    exact dates.  I think it was probably around
10   2014.  He was with us for maybe a year, year
11   and a half.
12   Q.   What's he doing now?
13   A.   I'm not sure.  I believe he works for a
14   venture capital fund in London.
15   Q.   Do you see where he's writing to you at
16   the top of -- the middle sort of iteration of
17   the e-mail:  Hey, I forgot to send you a note.
18   Our lawyer should be getting in touch with
19   yours to move towards closing the trade.  One
20   thing that we did want to include in the terms
21   is the ability to stop GPLS from purchasing
22   new loans should an adverse bill, such as a
23   safe lending get a positive vote in the
24   senate.  I believe that VPC have this ability

1    already through its control of GPLS --
2         MR. SHAPIRO:  Question mark.
3    BY MR. GROGAN:
4    Q.   Question mark.  And you reply:  I'll
5    double check the exact language, but yes, we
6    have the ability to turn off the program to
7    the extent there is a market MAC, such as
8    adverse legislation that ultimately turns into
9    law.  Do you recall that exchange?
10   A.   Not from memory, but...
11   Q.   Do you have any reason to doubt that
12   this is an authentic --
13   A.   No.
14   Q.   Okay.  What is a MAC?
15   A.   A MAC is a material adverse change.
16   Q.   Is it your recollection that you -- VPC
17   had the ability to turn off the program, that
18   is to stop purchasing participations and to
19   the extent -- in the event that there was a
20   market MAC?
21   A.   I may have misspoke here or there may
22   have been more context after this, but GPLS
23   has the evergreen right not the obligation to
24   purchase.  It's not so that there needs to be

1    some sort of material adverse change or
2    adverse legislation in order to effectuate
3    that ability to stop purchasing.
4    Q.   Okay, but I want to be a little more
5    specific because Mr. Patel's question is, I
6    believe that VPC have the ability -- this
7    ability already through its control of GPLS.
8    And you respond, I will double check the exact
9    language, but yes.
10        Are you saying yes to the
11   fact that VPC has the ability through its
12   control of GPLS?
13   A.   To stop purchasing participations?
14   Q.   Yes.
15   A.   Yes.
16   Q.   Thank you very much.  And there, in
17   fact, came a time when VPC did, in fact,
18   determine to stop purchasing participations;
19   isn't that correct?
20   A.   Yes.
21        MR. GROGAN:  Let's get a
22   document on that as well, it will be document
23   B.  This will be 311.
24             - - -

1         (Whereupon Exhibit P-311 was
2    marked for identification.)
3             - - -
4    BY MR. GROGAN:
5    Q.   Take a look at that e-mail.  I apologize
6    for the insanely small type.
7    A.   Okay.
8    Q.   Do you recall this e-mail?
9    A.   I do.
10   Q.   The bottom e-mail is from you to Ken
11   Rees and Chris Lutes?  Who is Ken Rees?
12   A.   Ken Rees was, at that time, the CEO of
13   Think Finance.
14   Q.   Who was Chris Lutes?
15   A.   The CFO.
16   Q.   The cc to Richard Levy, and Richard Levy
17   is a partner at Victory Park Capital?
18   A.   Correct.
19   Q.   You write:  I wanted to give you both a
20   quick heads up that we will be sending over a
21   formal letter to document our current
22   situation regarding GPLS and the halting of
23   all participation interest purchases for the
24   time being, as we have discussed.  Please let

UNSEALED

1   me know if you have any issues once you've
2   received it.  Appreciate your working with us
3   here.
4           You had a previous discussion
5   with Mr. Rees and Mr. Lutes regarding this?
6   A.   Yes.
7   Q.   What was the nature of that discussion?
8   A.   Again, given this was back in August of
9   2013, I don't recall the specific discussion.
10  This was around the time, as we discussed
11  earlier, a lot of things happening on the
12  regulatory front in particular.  As I
13  remember, Operation Choke Point, when there
14  was a perceived risk that the ability to
15  access banking relationships and the ACH
16  relationships could go away and potentially
17  cause some risk to continue on with the
18  program.
19  Q.   And things had gotten to a point where
20  you thought it prudent not to make any
21  participation purchases through GPLS?
22  A.   For that time being, yes.
23  Q.   Who did you have discussions with at VPC
24  with regard to making that decision?

1   A.   With Richard Levy.
2   Q.   Is it fair to say Mr. Levy would have
3   the final say so?
4   A.   Yes.
5   Q.   Why would that be?
6   A.   He is the -- I don't know what his
7   current title is now, founder of the firm.  He
8   owns the majority of VPCA.  And at that time
9   was the head investment.
10  Q.   It was Mr. Levy's decision to stop
11  purchasing GPLS -- for GPLS to stop purchasing
12  shares or participations at that time?
13  A.   My recollection, yes.
14  Q.   And then Mr. Lutes writes back to you a
15  day later asking you about some pre-approved
16  and direct mail campaigns.  Do you recall what
17  this was about?
18  A.   I do.
19  Q.   What is he asking here?
20  A.   In effect, they had already done some
21  marketing for the tribes.  In doing some of
22  this marketing, they pre-approve would-be
23  customers.  And given those pieces of mail
24  were already sent out, marketing had already

1   been done, there was an expectation that a
2   certain percentage of those would want to
3   ultimately take the loan that they were
4   offered.
5   Q.   And they were asking you permission to
6   have an exception to your ban on all purchases
7   for those customers?
8         MR. GATEWOOD:  Objection,
9   form.
10       THE WITNESS:  They were, in
11  effect, asking if we could continue purchasing
12  what was already pre-approved and just delay
13  the ceasing of purchasing.
14  BY MR. GROGAN:
15  Q.   Do you remember if you granted that
16  permission?
17  A.   I don't recall the specifics of the
18  exact timing or amounts.
19  Q.   Do you know if, at any point after
20  August 20th, 2013, VPC approved the resumption
21  of GPLS buying participations?
22  A.   We did.
23  Q.   I think we might see some documents
24  about that.  Can I have document D, please?

1   This will be 312.
2         MR. SHAPIRO:  Just for the
3   record, as you're referring to -- it occurs to
4   me that somebody is going to read this
5   transcript, and they're going to see
6   references to D and B.  The only thing we're
7   going by are the marked --
8         MR. GROGAN:  Correct, the
9   letters are internal to me.
10       MR. SHAPIRO:  Okay.
11       MR. GROGAN:  Sorry.  I'll do
12  it sotto voce.
13       MR. SHAPIRO:  That's okay.
14         - - -
15    (Whereupon Exhibit P-312 was
16  marked for identification.)
17         - - -
18  BY MR. GROGAN:
19  Q.   Let me know when you've taken a look at
20  that.
21  A.   Okay.
22  Q.   Okay.  So if we start, as I think we
23  have to, at the bottom of the document 9317
24  with Mr. Lutes writing to you:  I talked with

UNSEALED

App. 0614

1  budgets or just --
2  BY MR. GROGAN:
3  Q.  Their budgets, their forecast.  I assume
4  you got board material that set out yearly
5  budgets and yearly forecasts of what their
6  lending would be.  Did they ever undershoot
7  their forecast?
8         MR. GATEWOOD:  Same
9  objection.
10        THE WITNESS:  In terms of in
11  2013 when they started to -- in tantum with
12  the tribes and the -- I believe they were
13  under forecast for that year.  But I can't
14  recall the specifics.
15        MR. GROGAN:  Okay, that's
16  fine.  Let's do FF, please.  This will be 328.
17                - - -
18     (Whereupon Exhibit P-328 was
19  marked for identification.)
20                - - -
21  BY MR. GROGAN:
22  Q.  I would ask you to orient yourself, this
23  not a long document, but it is a little bit of
24  a leap in logic and in time from what we've

1  been discussing.  This is January 16th, 2014.
2  A.  Okay.
3  Q.  Let's start, for orientation purposes,
4  at the bottom with your e-mail to Mr. Levy.
5  Phil and I caught up with Lutes this afternoon
6  and feel that we have him back on "our" page,
7  related to GPLS and our 75 million.  Still not
8  entirely sure what they were missing when you
9  spoke on Tuesday, but long/short is that he
10  feels fine so long as he has access to that
11  capital for Rise (which again has always been
12  our deal) in the event of a full wind down of
13  GPLS.
14        I would ask you to comment on
15  what you understand to be going on there.
16  What were you telling Mr. Levy?
17  A.  Yeah, I don't recall specifically the
18  nuances of quote, unquote, our page or how
19  Rise related to a -- in the event of a full
20  wind down of GPLS.  From what I can recall, my
21  discussion with Lutes was just around VPC
22  providing capital full Rise, which was his --
23  that seems to be was his main focus at that
24  point in time.

1  Q.  And our 75 million, do you recall what
2  that 75 million refers to?
3  A.  It would have been VPC fund's dollars
4  that were invested in GPLS.
5  Q.  Okay.  And within context, with that
6  understood then, he feels fine so long as he,
7  this is Mr. Lutes; correct?
8  A.  Yes.
9  Q.  Has access to that capital, and that
10  capital refers to 75 million, doesn't it?
11  A.  Let me give it one more read, given all
12  of the prepositions and pronouns here.
13        I'm not -- when I say that
14  capital, I'm -- again, I'm speculating based
15  on what my intent was from four years ago.
16  But I think it all comes back to Mr. Lutes'
17  surety that there's funding available for
18  Rise.
19  Q.  Well, it's an important point because at
20  least as it occurs to me, using the definite
21  article "that", referring to 75 million, is
22  that the capital that he has access to for
23  Rise in fact GPLS capital.  And that's what I
24  want to get your opinion on.

1  A.  Yeah, even if there was any -- let me
2  try to articulate this.  There would have been
3  no way for GPLS to invest directly into Rise
4  as a lender under the facility.
5  Q.  Uh-huh.
6  A.  So again, I'm not 100 percent certain on
7  what that refers to in this context related to
8  the 75 million.
9  Q.  Let me ask another question.  Access to
10  that capital for Rise, (which again has always
11  been our deal) in the event of a full wind
12  down of GPLS.  So it seems to me, and I would
13  ask for your opinion on this, that his access
14  to that capital, the 75 million, would be for
15  Rise, in the event that GPLS wound down.  Does
16  that make any sense?
17        MR. GATEWOOD:  Objection,
18  form.
19        THE WITNESS:  The only thing
20  I can think of here, and again, I just want to
21  be clear for the record that I'm now
22  speculating on the word that in this specific
23  e-mail, is that that capital, if Rise were to
24  have wound down, going back to the funds -- in

UNSEALED

1  other words, that investments ending and being
2  redeployed as a new investment into Rise, from
3  my -- to the best of my knowledge from my
4  recollection.
5  BY MR. GROGAN:
6  Q.   Is that understanding that you just
7  articulated, do you recall that has always
8  been your deal with Think Finance, as related
9  in the parenthetical?
10        MR. GATEWOOD:  Objection,
11  form.
12        THE WITNESS:  I can't recall
13  specifically what I mean by that
14  parenthetical.
15  BY MR. GROGAN:
16  Q.   Okay.  And then you say to Mr. Levy at
17  the top -- well, Mr. Levy says, good, let's
18  see if they hide behind their board.  Do you
19  have any sense of what he meant by that?
20  A.   I don't.
21  Q.   Okay.  And you write back to him:  While
22  they might take one on the chin here, not much
23  they can do at this point.  Rise doesn't
24  happen without GPLS' cooperation.  What did

1  you mean by that?
2  A.   If you look at the collateral package
3  for GPLS, of which Think Finance and their
4  assets were a guarantor, a portion of those
5  assets were the Rise receivables.  So for GPLS
6  II, in effect, relinquish those, there would
7  need to be cooperation from GPLS II do that.
8  Q.   GPLS would have to let its interest in
9  the Rise product as security for its
10  investment go, in order for the Rise product
11  to flower?
12        MR. GATEWOOD:  Objection,
13  form.
14  BY MR. GROGAN:
15  Q.   I'm just trying to understand what you
16  said.
17  A.   So from my recollection, given the
18  collateral package and given the timing of
19  when we did the Rise facility --
20  Q.   Right, just for clarification purposes,
21  is about a month before, right?  December --
22  the investment committee memo was December
23  2013?
24  A.   I believe, if memory serves, the Rise

1  facility closed the end of January 2014.
2  Q.   Correct.  So almost contemporaneous with
3  this.
4  A.   Correct.  So GPLS would have to allow
5  that facility to have occurred.
6  Q.   I am not understanding why.
7  A.   Because at this point in time in January
8  of 2014, as part of the collateral package,
9  there was a blanket lien on all of Think's
10  assets.
11  Q.   Right.
12  A.   So as I stated earlier, part of those
13  assets were receivables based on their Rise
14  product, which was the non-tribal product.
15  Q.   Right.
16  A.   So in order to allow another lender,
17  which would have been another Victory Park
18  fund to finance the Rise product, that would
19  have needed to have been separated from GPLS
20  collateral.
21  Q.   And presumably taking its own claim on
22  the Rise receivables, as security for the Rise
23  facility, correct?
24  A.   New deal.

1  Q.   Right.
2  A.   VPC provides a credit facility to fund
3  Rise, for the Rise product, separate and
4  distinct from any investment in GPLS.
5  Q.   I see.  So, so far today we've talked
6  about I think three instances in which GPLS
7  has made a determination in connection with
8  the Rise facility.  First, we talked about the
9  gross sweeping, right?
10  A.   Yes.
11  Q.   And that was in connection with the Rise
12  facility, right?
13        MR. GATEWOOD:  Objection, I
14  think that mischaracterizes the prior
15  testimony.
16  BY MR. GROGAN:
17  Q.   Well, we'll let the record say what it
18  says about that.  We talked about the
19  amendment or the waiver of the pre-payment --
20        MR. GATEWOOD:  Same
21  objection.
22  BY MR. GROGAN:
23  Q.   And now we're talking about GPLS
24  relinquishing its interest in Rise receivables

UNSEALED

App. 0616

1  to allow the refinancing through the Rise
2  facility; is that correct?
3      MR. GATEWOOD: Same
4  objection.
5  BY MR. GROGAN:
6  Q.  There's a question pending, I think.
7  A.  Sorry, can you read -- what is the
8  pending question? -
9      MR. GROGAN: Can you read it
10 back, please.
11      THE WITNESS: There's a lot
12 of objection in the questions.
13      MR. SHAPIRO: It was a very
14 long -- are you sure you want to read this
15 whole thing.  This is the very long question,
16 right?
17      MR. GROGAN: No, I don't want
18 to read --
19      MR. SHAPIRO: Let's see if I
20 can help.  You're asking the witness if what
21 this was about was a release of the GPLS lien?
22 BY MR. GROGAN:
23 Q.  Yeah, that's fair.  Can I get a yes or
24 no to that?

1  A.  To my recollection, that's what I'm
2  referring to.
3      MR. GROGAN: Okay.  Let's go
4  to HH.  This will be 329.
5          - - -
6      (Whereupon Exhibit P-329 was
7  marked for identification.)
8          - - -
9  BY MR. GROGAN:
10 Q.  The portion of this e-mail that I'm
11 interested in is the back and forth between
12 Mr. Rees and Mr. Levy.
13 A.  Okay.
14 Q.  Let's start with Mr. Levy's e-mail to
15 Mr. Rees on January 14, 2014.  Ken, I don't
16 really know what to say about our
17 conversation.  I reread the term sheet and
18 feel it is very clear as to intent.  I also
19 reread the trail of e-mails and I don't see
20 where there could be any confusion.  We have
21 allowed the repayment of over 50 million
22 dollars plus of GPLS without pre-payment.
23      I hope you understand the
24 amount of phone calls and one-sided yelling it

1  took to achieve that.  We value the
2  relationship and have worked very hard to hold
3  up our end of the bargain.  I trust that you
4  guys will do the same.  I'm opened to
5  suggestion as to how to alleviate risk for
6  both parties.  But I do have a sense of
7  urgency to resolve this sooner, rather than
8  later.  I look forward to receiving Chris'
9  analysis and I believe the numbers may reflect
10 a smaller problem than perceived.  I am around
11 tomorrow if you'd like to discuss further.
12      First, does what I just read
13 -- do you agree that "we" meaning VPC, has
14 allowed repayment of over 50 million plus of
15 GPLS without pre-payment?
16      MR. SHAPIRO: Objection,
17 form, foundation.
18 BY MR. GROGAN:
19 Q.  Do you recall that?
20 A.  Yes.
21 Q.  That's true?
22 A.  Yes.
23 Q.  Okay.  I bet the phone calls and the
24 side yelling were to Vinny.  Okay.  I am open

1  to suggestions on how to alleviate risk for
2  both parties.  And I understand you're not a
3  participant in this conversation, but you were
4  cc'd at some point later on.  Do you
5  understand the risks that Mr. Levy is
6  articulating there?
7      MR. SHAPIRO: Objection,
8  foundation.
9      THE WITNESS: I would be
10 speculating.  The risk to -- given the context
11 of this e-mail, would be around getting
12 capital back that we could no longer invest
13 because it was past a fund investment period.
14 And the risk to -- be it GPLS or Think Finance
15 would be, as we discussed earlier, if there's
16 cash that's still owed an interest rate on,
17 however, is not being invested to generate a
18 return.
19 BY MR. GROGAN:
20 Q.  Okay.  And I think Mr. Rees explains
21 that pretty well in the second paragraph of
22 his response.  What we can't do is agree to
23 pay VPC interest on debt that we can't
24 utilize.  That's the problem we've been

UNSEALED

App. 0617

1

```
 1              UNITED STATES BANKRUPTCY COURT

 2               NORTHERN DISTRICT OF TEXAS

 3    _____

 4    IN RE:

 5       THINK FINANCE, LLC,        Case No.
         ET AL                      17-33964
 6                                  (HDH)

 7                                  Volume 3

 8    _____

 9

10    _____

11       VIDEOTAPED EXAMINATION UNDER OATH OF

12             BILLI ANNE RAINING BIRD

13    _____

14

15              BE IT REMEMBERED, the Videotaped

16    Examination Under Oath of BILLI ANNE RAINING BIRD

17    was taken by Mr. Steven Ellis, Attorney at Law,

18    for the Debtor, at the Baldwin Court Reporting

19    Offices, 306 3rd Avenue, Suite 202, Havre,

20    Montana, on Friday, October 5, 2018, beginning at

21    the hour of 10:26 AM.  Reported by Stacy M.

22    Baldwin, Registered Professional Reporter and

23    Notary Public.

24

25
```

2

```
 1    APPEARANCES:

 2    ATTORNEY APPEARING ON BEHALF OF THINK FINANCE:

 3    MR. STEVEN A. ELLIS
      Attorney at Law
 4    GOODWIN PROCTER LLP
      601 South Figueroa Street
 5    Los Angeles, California 90017
      Sellis@goodwinlaw.com
 6    (Appeared via telephone)

 7
      ATTORNEY APPEARING ON BEHALF OF THINK FINANCE:
 8
      MR. LEO WARD
 9    Attorney at Law
      BROWNING, KALECZYC, BERRY & HOVEN, P.C.
10    201 West Railroad, Suite 300
      Missoula, Montana 59802
11    Leow@bkbh.com
      (Appeared via telephone)
12
      ATTORNEY APPEARING ON BEHALF OF VIRGINIA
13    CLAIMANTS:

14    MR. ANDREW J. GUZZO
      Attorney At Law
15    KELLY & CRANDALL, PLC
      500 Ala Moana Blvd., Ste. 400
16    Honolulu, Hawaii 96813
      Aguzzo@kellyandcrandall.com
17    (Appeared via telephone)

18
      ATTORNEY APPEARING ON BEHALF OF MS. MILLER:
19
      MR. MATTHEW B. BYRNE
20    Attorney at Law
      GRAVEL & SHEA PC
21    76 St. Paul Street, 7th Floor
      P.O. Box 369
22    Burlington, Vermont 05402-0369
      Mbyrne@gravelshea.com
23    (Appeared via telephone)

24
      The videographer:  Jennifer K. Wells
25
```

3

```
 1            I N D E X                         PAGE

 2    VIDEOTAPED EXAMINATION OF BILLI ANNE RAINING BIRD
          BY MR. ELLIS                            6
 3        BY MR. GUZZO                            63
          BY MR. BYRNE                           141
 4        BY MR. ELLIS                           162
          BY MR. GUZZO                           168
 5
 6    Certificate Page                           176

 7                                             MARKED
          E X H I B I T S
 8
      Exhibit 4    Email Chain - Bates No.        28
 9                 TF-PA-319516 and Tf-PA-319517

10    Exhibit 5    Amended and Restated Loan Sale 30
                   Agreement - Bates No.
11                 TF-PA-386399 through and
                   including TF-PA-386427
12
      Exhibit 6    Email Chain                    34
13
      Exhibit 7    Email Chain                    37
14
      Exhibit 8    Email Chain                    42
15
      Exhibit 9    Email Chain                    47
16
      Exhibit 10   Audit Report Year Ended        55
17                 September 30, 2011

18    Exhibit 11   Email Chain with Attachment -  60
                   Bates No. TF-BK-VA_FOO_0027758
19                 through and including
                   TF-BK-VA_FOO_0027921
20
      Exhibit 12   Time Sheet for Think Finance - 68
21                 Chippewa Cree Transaction

22    Exhibit 13   Email - Bates No. Haynes0000446 75

23    Exhibit 14   Email Chain - Bates No. Haynes  81
                   0000447 and Haynes 0000478
24
25
```

4

```
 1
      Exhibit 15   Servicing Agreement - Bates No. 88
 2                 TF-VA013170 through and
                   including TF-VA013184
 3
      Exhibit 16   Marketing Agreement - Bates No. 99
 4                 TF-VA-001151 through and
                   including TF-PA-001166
 5
      Exhibit 17   Participation Agreement - Bates 105
 6                 No. TF-PA-000038 through and
                   including TF-PA-000068
 7
      Exhibit 18   Consumer Installment Loan       111
 8                 Agreement

 9    Exhibit 19   Email Chain - Bates No.         129
                   TF-VA025676 through and
10                 including TF-VA0256578

11    Exhibit 20   Loan Underwriting Policy -      133
                   Bates No. TF-VA0701951 through
12                 and including TF-VA0701957

13    Exhibit 21   Email Chain - Bates No.         136
                   TF-VA0701958
14
      Exhibit 22   Email Chain - Bates No.         142
15                 TF-VA0736214 through and
                   including TF-VA0736217
16
      Exhibit 23   Email Chain - Bates No.         146
17                 TF-VA0733316 and TF-VA0733317

18    Exhibit 24   Email - Bates No.               153
                   TFBK-NC-000162 and
19                 TFBK-NC-000163

20    Exhibit 25   Email Chain - Bates No.         155
                   TF-VA0734734 through and
21                 including  TF-VA0734737

22    Exhibit 26   Email Chain - Bates No.         156
                   TF-VA0734130 through and
23                 including TF-VA0734132

24    Exhibit 27   Letter - Bates No. TF-VA0412413 156
25
```

**5**

1    (The Videotaped deposition began at 10:26 AM.)
2        THE VIDEOGRAPHER:  This is an
3    audio/visual deposition taken in accordance with
4    the US bankruptcy court.  The recording equipment
5    is being operated by Jennifer K. Wells.  Her
6    principal place of business is Jeffries Court
7    Reporter Inc., which is located at 1015 Mount
8    Avenue, Missoula, Montana.  Today is Friday,
9    October 5, 2018.  The time is 10:37 AM.  The
10   deposition is being taken at the offices of
11   Baldwin Court Reporting 306 3rd Avenue, Havre,
12   Montana.
13       The caption of the case is In Re, Think
14   Financial, LLC, et al, in the US Bankruptcy Court
15   for the Northern District of Texas.  Case No.
16   17-33-964-HDH.  Will counsel present -- will
17   counsel and everyone present please introduce
18   themselves.
19       MR. ELLIS:  Yes.  Good morning, this is
20   Steven Ellis and I represent the Think Finance
21   entities.
22       MR. GUZZO:  Good morning, this is Andrew
23   Guzzo, I represent the Virginia claimants in this
24   case, and also my colleague Ms. Kelly, Kristi
25   Kelly, will be joining us at some point when her

**6**

1    other meeting finishes.
2        MR. WARD:  This is Leo Ward representing
3    the Think Finance, defendants.
4        MR. BYRNE:  Hi, this is Matt Byrne, I
5    represent Ms. Miller.
6        THE VIDEOGRAPHER:  The name of the
7    witness is Billi Anne Raining Bird and the oath
8    will now be administered by the notary.
9        <u>BILLI ANNE RAINING BIRD</u>,
10   called as a witness here, having been first duly
11   sworn, was examined and testified as follows:
12                 EXAMINATION
13   BY MR. ELLIS:
14       Q.   Good morning, Ms. Raining Bird, this is
15   Steven Ellis.  I was the one who was questioning
16   you during the first session of your deposition.
17   And I just want to ask first and importantly, can
18   you hear me okay?
19       A.   Yes, it's fine.
20       Q.   Okay.  As we talked about last time, if I
21   ask you a question and you don't understand,
22   please let me know, and if you need to take a
23   break at any time, please let me know that as
24   well.  Is that okay?
25       A.   Yeah.  That's fine.

**7**

1        Q.   Thank you.  When you were the CEO of
2    Plain Green, how many hours per week did you work
3    on matters relating to Plain Green?
4        A.   Say maybe 60, I guess.
5        Q.   And what about the earlier time when you
6    were the COO, was it the same, more or less amount
7    of work per week?
8        A.   It was the same.  It was pretty much I
9    worked whenever, like, just whenever I needed to
10   or all the time.
11       Q.   Now, in the first session of this
12   deposition we talked about a document that had
13   been marked as Exhibit 3, which is a transcript of
14   another deposition that was taken of you a few
15   months ago in Great Falls.  Do you remember that
16   deposition?
17       A.   Yes.
18       Q.   Now for that deposition, the one that was
19   in Great Falls a few months ago, did you receive a
20   subpoena requiring you to testify?
21       A.   No.
22       Q.   Do you recall who told you about the
23   deposition?
24       A.   I think I received a phone call, I can't
25   remember.  But also Bobbi Favel, who is also -- I

**8**

1    don't know if she's part of this too, but I guess
2    she told me about it as well, but that's kind of
3    how I heard about it, but I believe I received a
4    phone call at home, so.
5        Q.   And that is a phone call, did they just
6    tell you when and where to show up?
7        A.   Yes.  I'm pretty sure that's what it was,
8    yeah.
9        Q.   Do you recall who you spoke to during
10   that phone call?
11       A.   No, I don't.
12       Q.   Before you testified in that other
13   deposition did you speak to anyone about the
14   deposition?  You mentioned someone called you on
15   the phone, you mentioned Ms. Favel, anyone else?
16       A.   No.  Well, my federal probation officer
17   is all.
18       Q.   I'm sorry, could you just repeat that?  I
19   didn't hear the answer.
20       A.   I just advised my federal probation
21   officer about that I was requested to.
22       Q.   Okay.
23       A.   Yeah.
24       Q.   Did you speak to anyone, anyone who's a
25   member of the tribal council about the deposition?

97

1   A.   Yes.
2   Q.   And Plain Green really had no role in
3   that process; is that right?
4   A.   Other than I guess signing the agreement
5   to -- with that vendor, no.
6   Q.   Okay.  So, if a vendor made an error in
7   collections, that was something that Think Finance
8   would deal with, not Plain Green; is that right?
9   A.   Yes.
10   Q.   And if vendor had a question about an
11   account or a business procedure they would go to
12   Think Finance not Plain Green; is that right?
13   A.   Yes, it would go through that call center
14   that handled that.
15   Q.   Okay.  And so, Plain Green didn't have
16   any employees that handled collections from 2011
17   through 2013; is that right?
18   A.   That's correct.
19   Q.   Okay.  What about customer support, and,
20   you know, I guess that's pretty broad.  So I
21   assume what this means is the interaction between
22   a consumer and what would probably be represented
23   as Plain Green, but can you tell me what you think
24   customer support means?
25   A.   That customer support could be just in

98

1   general questions about their loan or complaints
2   about their loan or just any inbound calls
3   regarding, I guess, any area of the loan process,
4   I guess.
5   Q.   Okay.  And so, from 2011 until you left
6   Plain Green, that was not handled on the
7   reservation by Plain Green employees; is that
8   right?
9   A.   That's correct.  We did not handle that.
10   Q.   So, if someone emails complaints at
11   plaingreen.com that email actually didn't go to an
12   employee of Plain Green; is that right?
13   A.   I don't think so, no, it did not.
14   Q.   If a consumer wrote a letter to Plain
15   Green complaining about the status of their loan
16   or payment, that would not have been dealt with by
17   Plain Green either; is that right?
18   A.   Not originally, no.
19   Q.   And if a consumer called Plain Green's
20   telephone number, who would get that call?
21   A.   I guess if they called the number that
22   was on the website or on the materials that they
23   had.
24   Q.   Yeah.
25   A.   We would not get that call.  That call

99

1   would be to a call center and I believe the call
2   center was at Think Finance for that one.
3   Q.   And Think Finance managed the
4   relationship with the call center; is that right?
5   A.   Yes.
6   Q.   Okay.  Finally, was this agreement in
7   effect when you stopped working for Plain Green?
8   A.   Yes.
9   Q.   Okay.  All right.  I'm going to switch
10   now to the fifth document I sent Stacy.  That is
11   the marketing agreement.
12   (Exhibit 16 marked for identification.)
13   BY MR. GUZZO:
14   Q.   Ms. Raining Bird, do you recognize this
15   document?
16   A.   Yes.
17   Q.   Okay.  And if you turn to the back of
18   this agreement on Page 14, I'm hoping that you
19   will see your signature on the document?
20   A.   Yes.
21   Q.   Do you see that?
22   A.   Yes, I do.
23   Q.   This isn't --
24   A.   Yes.  My signature is on there, yeah.
25   Q.   All right.  And is Jason Harvison's

100

1   signature on that?
2   A.   Yes.
3   Q.   All right.  Good.  And you signed this
4   document on behalf of Plain Green in your capacity
5   as a chief operations officer; is that right?
6   A.   Yes.
7   Q.   What was the purpose of this document?
8   A.   Marketing campaigns, which included
9   website, maybe mailings, any brochures or emails,
10   advertisements basically, yeah, all of it.
11   Q.   So this is the agreement where, between
12   Plain Green and Tailwinds where Tailwinds agreed
13   to provide marketing services to Plain Green; is
14   that right?
15   A.   Yes.
16   Q.   And Tailwind was paid to perform those
17   services under that agreement; is that right?
18   A.   Yes.
19   Q.   And what services were provided by
20   Tailwind to Plain Green, to the best you can
21   recollect?
22   A.   They did bulk mail outs, they developed
23   the website, you know, just the -- you know,
24   pretty much branding the product and promoting the
25   product, sending out mass emails, buying spots,

UNSEALED

101

1 you know, when you enter a -- when you do a search
2 where Plain Green would come up at the top or
3 closer to the top. Just any promotion of the
4 product.
5     Q.   And what role did Plain Green have in the
6 marketing of the loans?
7     A.   None.
8     Q.   Okay. So you didn't personally
9 participate in the development of any marketing
10 strategies, did you?
11     A.   No.
12     Q.   Do you understand what the term pro forma
13 means?
14     A.   Yeah.
15     Q.   And what does the word pro forma mean to
16 you?
17     A.   I don't know. I guess I'm not even sure.
18     Q.   All right. I'm going to read the
19 definition of this, and I'm going to ask you to
20 say whether, what you think about this. So pro
21 forma means to be done or produced as a matter of
22 form, according to the dictionary.
23     So, essentially, it means to be done
24 without substance or contribution. And so, would
25 you say that Plain Green's review of any marketing

102

1 materials was pro forma?
2     A.   Yes.
3     Q.   So you would agree that you didn't have
4 any meaningful input on any of the marketing
5 materials; is that right?
6     A.   Yes, I agree with that.
7     Q.   And so when we talked earlier about being
8 fearful that Think Finance would terminate the
9 relationship if you didn't agree with something,
10 you would agree that one of the things would be
11 that that statement would apply to would be
12 marketing, right?
13     A.   Yes.
14     Q.   And so, if you didn't like a direct
15 mailing or a website design, you believe you
16 wouldn't really be able to put meaningful input
17 into that under this agreement; is that right?
18     A.   Yes.
19     Q.   So just a few final questions about this
20 agreement. What is your understanding of what
21 Tailwind Marketing is?
22     A.   It's just another, another branch of Think
23 Finance.
24     Q.   Okay. And in communicating with Think
25 Finance pursuant to marketing, did you ever email

103

1 with any employees of Tailwind?
2     A.   I meant, I've never seen anybody that
3 introduced themselves as working for Tailwind, no.
4     Q.   So all of your marketing communications
5 with Think Finance, were with Think Finance, not
6 Tailwind; is that correct?
7     A.   Yes.
8     MR. ELLIS: Objection to the form.
9 BY MR. GUZZO:
10     Q.   So did that ever concern you?
11     A.   Yeah.
12     Q.   And so, would it be fair to say, that you
13 were concerned that you would be paying a company
14 that you didn't even interact with?
15     A.   No. My concern was that we were paying
16 one company -- we were paying one company six,
17 seven times.
18     Q.   Yeah. So, I guess, it seemed like Think
19 Finance was double dipping, so to speak?
20     A.   It was more than double.
21     MR. ELLIS: Objection.
22     THE WITNESS: Yes, every agreement would
23 be another bit.
24     (Whereupon, the Court Reporter
25     interrupted for clarification.)

104

1     MR. ELLIS: Objection, argumentative.
2 BY MR. GUZZO:
3     Q.   And we earlier talked about how, you
4 know, this was seen has a take-it-or-leave-it deal
5 for the term sheet, do you remember that?
6     A.   Yes.
7     Q.   Would that be the same for the marketing
8 agreement?
9     A.   Yes.
10     Q.   And the same for the servicing agreement,
11 right, that was a take-it-or-leave-it agreement?
12     A.   Yes.
13     Q.   And why did they -- did Plain Green's
14 employees -- or Plain Green's attorneys have input
15 on these agreements, do you recall?
16     A.   I meant, they reviewed them, but they
17 didn't have really any input, like, I don't ever
18 recall them making any modifications or changes to
19 them.
20     Q.   And when you say that you were fearful
21 that you, know, Think Finance would move to
22 another tribe. Do you think that the attorney
23 that Plain Green shared that same sentiment?
24     MR. ELLIS: Objection, lack of
25 foundation.

UNSEALED

# In the Matter of:

## Case No. 2012-109-02

*April 7, 2016*
*Kim Palermo*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

UNSEALED

## 1

```
1           CONSUMER FINANCIAL PROTECTION BUREAU
2
3    In the matter of:              )
4    Case No. 2012-109-02           )
5    -------------------------------)
6
7                      Thursday, April 7, 2016
8
9                      Consumer Financial Protection Bureau
10                     1625 Eye Street, N.W.
11                     Washington, D.C.
12
13
14         The above-entitled matter came on for
15   investigational hearing, pursuant to notice, at
16   9:30 a.m.
17
18
19
20
21
22
23
24
25
```

## 2

```
1    APPEARANCES:
2
3    ON BEHALF OF THE CONSUMER FINANCIAL PROTECTION BUREAU:
4           BENJAMIN VAUGHN, ESQ.
5           VANESSA BUCHKO, ESQ.
6           MELANIE HIRSCH, ESQ.
7           Consumer Financial Protection Bureau
8           1625 Eye Street, N.W.
9           Washington, DC  20006
10          (202) 435-7944
11          vanessa.buchko@cfpb.gov
12
13   ON BEHALF OF MOBILOANS AND THE WITNESS:
14          CHRISTINA M. GATTUSO, ESQ.
15          ERICH M. HELLMOLD, ESQ.
16          Kilpatrick Townsend & Stockton LLP
17          607 14th Street, N.W., Suite 900
18          Washington, DC  20005
19          (202) 508-5884
20          cgattuso@kilpatricktownsend.com
21
22
23
24
25
```

## 3

```
1                  P R O C E E D I N G S
2                  -  -  -  -  -
3          MR. VAUGHN:  This is an investigational hearing
4    governed by 12 U.S.C. 5562 and its implementing
5    regulations.  Any objections that may be properly raised
6    are limited as set forth in the regulations.
7          The stenographic recording arranged by the
8    Bureau is the only recording permitted and no other
9    recording may be created.
10         This hearing is being conducted by myself,
11   Benjamin Vaughn, my colleague, Vanessa Buchko and
12   Melanie Hirsch.
13         Will you please swear in the witness.
14   Whereupon--
15                  KIM PALERMO
16   a witness, called for examination, having been first
17   duly sworn, was examined and testified as follows:
18                  EXAMINATION
19   BY MR. VAUGHN:
20      Q.  Will you please state your full name.
21      A.  Kim Palermo.
22      Q.  Ms. Palermo, are you represented by counsel here
23   today?
24      A.  Yes, I am.
25         MR. VAUGHN:  Counsel, would you please identify
```

## 4

```
1    yourself.
2          MS. GATTUSO:  Chris Gattuso, Kilpatrick
3    Townsend.
4          MR. HELLMOLD:  Eric Hellmold, Kilpatrick
5    Townsend.
6    BY MR. VAUGHN:
7       Q.  Ms. Palermo, have you ever been deposed before
8    or given testimony under oath?
9       A.  Yes, I have.
10      Q.  When were those testimonies given?
11      A.  A long time ago when I worked at the bank, more
12   than 10 years ago.
13      Q.  Were those depositions in civil litigation?
14      A.  Yes.
15      Q.  Did you ever testify in court?
16      A.  Yes.
17      Q.  Also for the bank?
18      A.  Correct.
19      Q.  So, I'll just go over some quick ground rules,
20   but it sounds like you're more of a veteran than most
21   would be.  So, it's important that you give verbal
22   answers here today so the court reporter can record
23   anything you say.  It's important that we not talk over
24   each other, so I will do my absolute best to always let
25   you finish your answer before any of us ask you another
```

1 (Pages 1 to 4)

1  Administrative Services.
2      Q.  Oh, okay.  TC, thank you.  What does the C stand
3  for?
4      A.  I believe it was like Think Cash or something
5  like that, I remember seeing somewhere, but I
6  couldn't -- I think they had a product before that.
7      Q.  What services does TC Administrative Services
8  provide to Mobiloans?
9      A.  They advise and consult regarding risk
10  management, underwriting, application processing,
11  payment processing, and vendor management.
12      Q.  Would you say that list again, please.
13      A.  I will.  Advice and consulting regarding the
14  risk management, underwriting, application processing,
15  processing of payments, and oversight and management of
16  vendors.
17      Q.  So, taking the first one, risk management, what
18  specific services does TC Administrative Services
19  provide to Mobiloans in terms of risk management?
20      A.  They may be the risk department at Think.  I
21  used to have emails that had TC Decision Sciences and TC
22  Administrative Services, but after the split with
23  Elevate, everything is Think Finance.
24      Q.  And can you name anyone who works at TC
25  Administrative Services?

1      A.  Currently, no.  I could look through some emails
2  and see if there's any current emails with that, but
3  most everything now is Think Finance.  I know at one
4  point that the Stephen Smith that I had interviewed with
5  is their compliance director, he was part of TC Decision
6  Sciences because I would get emails from both, both
7  email addresses for him, but mostly everything now is
8  just Think Finance.
9      Q.  So, what specific services do they provide in
10  terms of risk management?
11      A.  That would probably be the risk in setting up
12  the 7x7 matrix and the marketing and the default rate,
13  that type of thing.
14      Q.  Is there any other services you can think of
15  that would fall under the heading risk management?
16      A.  Part of the underwriting, when we're looking at
17  changes in the underwriting, risk is definitely in there
18  in looking at different options as to changing the
19  format of the underwriting process.
20      BY MR. VAUGHN:
21      Q.  But to be clear, there is a legal agreement that
22  spells out that TC Administrative is supposed to get $25
23  per funded loan, but as you sit here today, you're not
24  certain which services Think provides that fall under
25  that umbrella?

1      A.  Correct.  Correct.  Because we know that these
2  companies are Think companies.  We know that their
3  employees are doing those jobs.
4      Q.  What specific services do TC Administrative
5  Services or Think provide with regard to underwriting?
6      A.  They develop the underwriting.  They have a
7  proprietary risk core that we use that the initial
8  underwriting that was used was created by them.  I know
9  that there's been changes from inception in regards to
10  different types of data that is used in the
11  underwriting, but that basic criteria is maintained the
12  same.  Their risk score comes from their data that they
13  have in regards to customer activity, and they create a
14  risk core based off of that.
15      Q.  Customer activity with Think Finance or with
16  these loans, or from other --
17      A.  With I'm sure all of the products that they
18  service.  They have created a data pool from there where
19  they can determine with more precision behaviors that
20  would lead to first payment defaults, that type of
21  thing.
22      BY MR. VAUGHN:
23      Q.  So, the software generates -- based on the data
24  inputs, the software generates a risk score, and if the
25  penultimate risk score falls within --

1      A.  A certain range, correct.
2      Q.  -- the loan will be funded?
3      A.  Correct.  Or declined.
4      Q.  Or declined.  And it's your understanding that
5  the risk score that's generated is a product of Think's
6  analysis of all of the products that they service?
7      A.  Correct.  When I had gone through when I sat
8  down with him with regards to the underwriting, learning
9  that process, there, of course, is a whole flow chart
10  basically of when the loan comes in, you know, the
11  points that it hits, what's a knockout rule that would
12  immediately knock that out, it requires verifications,
13  manual verifications, that kind of thing, but when they
14  get to the risk score, it's kind of their proprietary
15  thing.  They won't give me all the details.
16      I know the items that make it up, but I don't
17  know how it's weighted to create that score, because
18  they consider that proprietary, they won't give me that
19  information.
20      Q.  So, you know what the data inputs are that go
21  into the database, the decision engine?
22      A.  Correct.
23      Q.  But you don't know how the decision engine comes
24  up with a score?
25      A.  With the risk score.  How it's weighted in order

161

1 to create the score. But I know what the inputs are
2 that they look at for that.
3    **Q. And you know certain knockout rules that will**
4 **automatically disqualify an applicant?**
5    A. Correct.
6    **Q. But if an applicant makes it past the knockout**
7 **rules, you don't know what happens between then and the**
8 **risk score to come up with a risk score?**
9    A. I know that it continues to go through the
10 underwriting process, and part of that underwriting
11 process is the risk score, and that's based on points,
12 data points, within that application. How that's
13 weighted to create the risk score and how they generated
14 what's a cut-off score, I don't have that information.
15    **Q. You don't actually have the cut-off score?**
16    A. No, I have the cut-off score, but how they
17 determine what was a cut-off score. You know, so they
18 have that information.
19    **Q. So, you know the cut-off score is 460?**
20    A. Correct, yeah.
21    **Q. But you don't know how they figure out that my**
22 **application is 520?**
23    A. Correct.
24       BY MS. BUCHKO:
25    **Q. Does anybody at Mobiloans have that information?**

162

1    A. No. Again, they consider that proprietary and
2 they won't give us that piece of it.
3       BY MR. VAUGHN:
4    **Q. And you've asked?**
5    A. Yes.
6    **Q. Who did you ask?**
7    A. I asked Martin Wong, I have asked the risk
8 people, I have asked the underwriting people, and -- but
9 they consider it proprietary and they will not give me
10 that information.
11       BY MS. BUCHKO:
12    **Q. Do they have any nicknames for that proprietary**
13 **information?**
14    A. No, it's -- unless it's RS, which is risk score,
15 11, which is the version that they are using. That's
16 what they're -- you know, when I'm looking at the
17 underwriting waterfall, and we come up to the RS score,
18 that's what they're talking about.
19    **Q. Earlier you said something about "we use the**
20 **proprietary risk score." What exactly does Mobiloans do**
21 **with the proprietary risk score?**
22    A. Our applications go through -- and I say we,
23 because I'm talking about our customers go through that
24 system. We -- that's our vendor, we're paying for that.
25 So, that's just the way I refer to it.

163

1    **Q. What services does TC Administrative Services,**
2 **or Think Finance, provide with regard to payment**
3 **processing?**
4    A. It goes through their system. I mean, when a
5 customer wants to make a payment, they can go online,
6 and they can set up to have an ACH payment from their
7 account and they can set that up online through their
8 account. So, all of that will go through the platform
9 where it's posted in that information.
10       If they want to set up where they revoke the ACH
11 and they want to just send a manual payment, then they
12 can take that part off of the system.
13       If they want to pay by a debit card, they can
14 call in and say, I want to make this payment via a debit
15 card, and that system is through the platform. So,
16 that's where they're providing the help in the
17 processing, the payment processing.
18       BY MR. VAUGHN:
19    **Q. Before the lunch break, you testified that Think**
20 **uses an out-of-date software platform that was**
21 **originally designed for credit cards that's resulted in**
22 **lots of problems. Is that the computer system that**
23 **you're talking about now that processes ACH payments and**
24 **provides those services, or are you talking about a**
25 **different system?**

164

1    A. In regards to posting them to the account, I
2 believe when you take an ACH payment, it has to go
3 through the processor. So, when the funds are actually
4 posted to the account, it goes through that platform
5 system.
6    **Q. And that's the platform that you were talking**
7 **about earlier?**
8    A. Correct. Correct.
9    **Q. And is this -- I've heard it referred to as**
10 **CoreCard, is that your understanding that the Core**
11 **system is the loan management system that handles the**
12 **servicing of the loan, the payments and those types of**
13 **issues?**
14    A. Correct. And some of the issues when we were
15 talking about the double payments has to do when the
16 system or Core or whatever creates the ACH file to send
17 to the banks, the would could be a problem where it
18 actually doubles it. That's where the processing
19 issues, where Think's issues -- now, there were some
20 issues with the processor themselves, but there were
21 some issues with the Think -- it was the platform that
22 created the issue.
23    **Q. The loan management platform?**
24    A. Correct.
25       BY MS. BUCHKO:

41 (Pages 161 to 164)

UNSEALED

App. 0635

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

COMMONWEALTH OF :
PENNSYLVANIA :
   Plaintiff :
    :
VS. : CIVIL ACTION NUMBER
    : 2:14-CV-07139
THINK FINANCE, INC., :
ET AL., :
   Defendants :
- - -

OCTOBER 16, 2018
- - -

Videotaped deposition of CLAUDIA
CALLAWAY, was taken pursuant to notice at 700
Sixth Street NW, Suite 700, Washington, D.C.,
beginning at or about 9:30 a.m. before
Jeannine Cancelliere, Court Reporter and
Notary Public and David Levin, Videotape
Operator, there being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102

## Page 2

1  APPEARANCES:
2
3  LANGER, GROGAN & DIVER, P C
   BY: IRV ACKELSBERG, ESQUIRE
4  BY: JOHN J  GROGAN, ESQUIRE
   1717 Arch Street, Suite 4130
5  Philadelphia, Pennsylvania 19103
   Phone: (215) 320-5701
6  Representing the Plaintiff
   jgrogan@langergrogan com
7
8
9  ARMSTRONG TEASDALE
   BY: RICHARD SCHEFF, ESQUIRE
10  1500 Market Street, 12th Floor
   Philadelphia, Pennsylvania  19102
11  Phone: (215) 246-3478
   Representing Ken Rees
   rscheff@armstrongteasdale com
12
13  KATTEN, MUCHIN, ROSENMAN LLP
14  BY: PATRICK SMITH, ESQUIRE
   BY:  J  MATTHEW HAWS, ESQUIRE
15  525 W  Monroe Street
   Chicago, Illinois 60661-3693
16  Phone: (312) 902-5319
   Representing Victory Park
17  patrick smith@kattenlaw com
18
19  VAN NESS FELDMAN
   BY: KETURAH BROWN, ESQUIRE
20  1050 Thomas Jefferson Street, NW
   Washington, D C  20007-3877
21  Phone: (202) 298-1800
   Representing National Credit
22  Adjusters LLC
   kab@vnf com
23
24

## Page 3

1  APPEARANCES (continued)
2
3  EVERSHEDS SUTHERLAND, LLP
   BY:  MATTHEW GATEWOOD, ESQUIRE
   700 Sixth Street NW
4  Suite 700
   Washington, D.C. 20001
5  Phone: (202) 383-0100
   Representing Think Finance Defendants
6
7
   KATTEN, MUCHIN, ROSENMAN LLP
8  BY: TED S. HELWIG, ESQUIRE
   525 W. Monroe Street
9  Chicago, Illinois 60661-3693
   Phone: (312) 902-5319
10  Representing Claudia Callaway
   ted helwig@kattenlaw.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1        I N D E X
2        - - -
3  CLAUDIA CALLAWAY     PAGE
4  BY MR. ACKELSBERG     7
5
6       - - -
7      E X H I B I T S
8       - - -
9  EXHIBIT NO.  PAGE
10  P-374   8
11  P-375   52
12  P-376   60
13  P-377   64
14  P-378   65
15  P-379   75
16  P-380   80
17  P-381   82
18  P-382   82
19  P-383   97
20  P-384   97
21  P-385   97
22  P-386   110
23  P-387   152
24  P-388   165

UNSEALED

App. 0625-01

| | EXHIBITS (continued) | |
|---|---|---|
| | EXHIBIT NO. | PAGE |
| 3 | P-389 | 172 |
| 4 | P-390 | 182 |
| 5 | P-391 | 184 |
| 6 | P-392 | 187 |
| 7 | P-393 | 190 |

1       MR. SCHEFF:  Richard Scheff for
2  Ken Rees.
3       MR. GATEWOOD:  Matthew Gatewood
4  for the Think Finance Defendants.
5       MR. HELWIG:  Ted Helwig for the
6  witness, Ms. Callaway.
7       MR. SMITH:  We have two people
8  on the line.
9       MR. HAWS:  Matt Haws for the
10  Victory Park defendants.
11       MR. SMITH:  Anyone else? (No
12  response.)
13       VIDEOTAPE OPERATOR:  The court
14  reporter is Jeannine Cancelliere, and she will
15  now swear in the witness.
16       - - -
17       CLAUDIA CALLAWAY, after having
18  been first duly sworn, was examined and
19  testified as follows:
20       - - -
21       EXAMINATION
22       - - -
23  BY MR. ACKELSBERG:
24  Q.  Good morning, Ms. Callaway, it's good to

1       VIDEOTAPE OPERATOR:  We're now
2  on the record.  My name is David Levin, I am a
3  videographer employed by On the Record.  This
4  is a video deposition in the United States
5  District Court for the Eastern District of
6  Pennsylvania, civil action number
7  23:14-CV-07139.
8       Today's date is Tuesday, October
9  16th, 2018 and the video time is 9:43 a.m.
10  This deposition is being held at 700 Sixth
11  Street Northwest, Suite 700, Washington D.C.
12  in the matter of Commonwealth of Pennsylvania
13  versus Think Finance, Incorporated, Et Al.
14  The deponent is Claudia Callaway.  Would all
15  counsel please identify themselves and say
16  whom they represent.
17       MR. ACKELSBERG:  For the
18  Commonwealth, Irv Ackelsberg.
19       MR. GROGAN:  John Grogan also
20  for the Commonwealth.
21       MR. SMITH:  Patrick Smith for
22  the Victory Park defendants
23       MS. BROWN:  Keturah Brown for
24  NCA.

1  meet you.  I have already introduced myself,
2  I'm Irv Ackelsberg.  I'm special counsel for
3  the Pennsylvania Attorney General.
4       You're here pursuant to a
5  subpoena, correct?
6  A.  Correct.
7  Q.  Okay.  Just for the record I'm going to
8  identify that subpoena.  And we'll call it
9  P-374.  Just so that you understand, I was
10  about to identify it as Callaway-1, but I
11  think what we're going to do is just continue
12  -- we've had a number of depositions, and
13  we've just been using this numerical system
14  where we're just continuing with the
15  numbering.  And I think that's what I am going
16  to do today.  I hope it's not too confusing.
17  Anyway, we're going to call this P-374.
18       - - -
19       (Whereupon Exhibit P-374 was
20  marked for identification.)
21       - - -
22  BY MR. ACKELSBERG:
23  Q.  I am going to ask you to identify that
24  as the subpoena, pursuant to which you're here

UNSEALED App. 0625-02

Page 21

1  Q.   What is FSCA?
2  A.   It was the Financial Service Centers of
3  America.
4  Q.   There's also a trade association that I
5  think is called CFSA, right?  Community
6  Financial Service Association.
7  A.   Yes.
8  Q.   Are these two separate associations or
9  CFSA a more recent name for FSCA?
10 A.   I believe they're separate.
11 Q.   Okay.  Are you a member of FSCA?
12 A.   I am not.
13 Q.   Are you a member of CFSA?
14 A.   I am not.
15 Q.   But you go to -- you go to FSCA
16 conferences regularly?
17 A.   I do not go to them regularly.
18 Q.   What about CFSA?
19 A.   I do not go to CFSA regularly.
20 Q.   But you're occasionally invited to speak
21 though, correct?
22 A.   In the past I have been, yes.
23 Q.   At both FSCA and CFSA conferences?
24 A.   Yes.

Page 22

1  Q.   Okay.  And is that -- on the occasions
2  when you are speaking to companies that are
3  members of these associations, is that one way
4  that you can develop new business for you and
5  your firm?
6  A.   It is a way I have developed business in
7  the past, yes.
8  Q.   Okay.  And what do you recall of the
9  meeting at FSCA in which you first met Mr.
10 Stinson?  Do you remember the topic that you
11 were speaking on?
12 A.   I do not.
13 Q.   Do you remember anything about the
14 conversation -- the meeting with Mr. Stinson?
15 A.   I do.
16       MR. GATEWOOD:  Objection.
17 I'll just instruct the witness not to answer,
18 to the extent that she would be divulging
19 attorney/client communications.
20       MR. ACKELSBERG:  Yeah, well,
21 we're just talking about meeting people.
22       MR. GATEWOOD:  Sure.  But the
23 instruction is necessary on the front end.
24       MR. ACKELSBERG:  I

Page 23

1  understand.
2       THE WITNESS:  I do.
3  BY MR. ACKELSBERG:
4  Q.   What do you remember?
5  A.   I had a toddler at the time who was
6  sitting behind me while I was giving my
7  presentation.  And I had handed him a set of
8  markers and a pad, with which to entertain
9  himself.  And as I was speaking, he stood up
10 and showed the audience that his hands were
11 covered in Sharpie ink.  And the audience was
12 very understanding.
13 Q.   This is while you were speaking?
14 A.   Yes, yes.
15 Q.   And then bring Mr. Stinson into the
16 scene.
17 A.   As I recall, it was either Mr. Stinson
18 or somebody else from his company and Mr.
19 Stinson, who came up and introduced himself or
20 themselves.
21 Q.   Might it have been Jason Harvison?
22 A.   That would have been who it would have
23 been, yes.
24 Q.   Jason Harvison and Mike Stinson were at

Page 24

1  the FSCA conference after this light moment
2  with your toddler.  After the presentation,
3  Mike and Jason came up to talk to you?
4  A.   As I recall, yes.
5  Q.   Without divulging any legal advice, what
6  did you talk about?
7  A.   That, I don't recall.
8  Q.   But as a result of that meeting, you
9  began a relationship with Payday One?
10 A.   I began a relationship with Payday One
11 after that.
12 Q.   Okay.  And we'll probably re-visit this
13 at some point.  I'm fairly sure we will, but
14 let's continue the history.  Actually, why
15 don't I ask you -- let's do Manatt first.
16 Let's go to Manatt.
17       Did you finish with the Paul
18 Hastings on the payday lender side, Advance
19 America, Payday OK and Payday One?  Were there
20 others?
21       MR. GATEWOOD:  Objection,
22 form.
23       THE WITNESS:  There were
24 others.

6 (Pages 21 to 24)

UNSEALED   App. 0625-03

1  BY MR. ACKELSBERG:
2  Q.  Oh, okay.  I'm sorry.  I didn't mean to
3  cut you off.
4  A.  Sitting here, I can't recall names of
5  other payday lenders that I represented at
6  Paul Hastings.
7  Q.  Do you think there were two more, four
8  more, ten more, twenty more?  Roughly how many
9  payday lenders were you representing by the
10 time you were at Paul Hastings?
11        MR. GATEWOOD:  Objection,
12 form.
13        THE WITNESS:  I would
14 estimate between five and ten.
15 BY MR. ACKELSBERG:
16 Q.  Now, one of those being Adrian Rubin?
17 A.  I don't believe I represented Mr. Rubin.
18 Q.  I mean his companies, I don't mean him
19 personally.  I mean the payday lending
20 websites.  You remember Mr. Rubin, right?
21 A.  I do remember Mr. Rubin.
22 Q.  I think -- to refresh your recollection,
23 I think one was CashNet500, one was CRA
24 Services.  There were a variety of names that

1  he used, but my understanding was that you
2  were representing Adrian Rubin or his
3  companies at some point?
4        MR. GATEWOOD:  Objection,
5  form.
6  BY MR. ACKELSBERG:
7  Q.  Is that not true?
8  A.  I don't believe I represented Mr.
9  Rubin's companies at Paul Hastings.
10 Q.  It might have been Manatt?
11 A.  I may -- I know I would have liked to
12 represent Mr. Rubin's companies.
13 Q.  Because of the volume?  Or why?
14 A.  Because they had litigation.  But I
15 can't recall whether I represented Mr. Rubin's
16 companies.
17 Q.  Okay, we'll come back to Mr. Rubin.
18 What about Charlie Hallinan?
19 A.  I did not represent Mr. Hallinan
20 personally.
21 Q.  I don't mean personally.  I mean the
22 companies associated with Charlie Hallinan,
23 the payday lending websites.
24 A.  When I was at Paul Hastings, I

1  represented TC Services.
2  Q.  What was that?
3  A.  That was not a payday lender.
4  Q.  What kind of a lender was it?
5  A.  It was a company that serviced loans for
6  a federally insured bank.
7  Q.  All right, we're going to get into the
8  bank model at some point.  And I am going --
9  you will have the chance to explain sort of
10 the difference between, you know, service
11 providers -- we'll get into all of that stuff.
12 But I'm really just -- in terms of who your
13 client contact was, did you have any client
14 relationship with Charlie Hallinan?  I guess
15 we're still talking about the Paul Hastings
16 years.  Did you have any client contact with
17 Charlie Hallinan?
18        MR. GATEWOOD:  Objection to
19 form.
20        MR. HELWIG:  I'm going to
21 object.  These long-speaking dialogues, we
22 don't care when you're going to get to what
23 you're getting to or why, just ask a question.
24 I think it will be more efficient.

1  BY MR. ACKELSBERG:
2  Q.  Did up represent Charlie Hallinan or his
3  companies?
4  A.  I represented -- I did not represent Mr.
5  Hallinan individually.  I represented TC
6  Services.
7  Q.  So that was the company you referred to
8  before.  Okay.  When you said TC -- the reason
9  I wasn't quite sure is that Think Finance had
10 something called TC Services.  I wasn't sure
11 you were talking about Mr. Hallinan or Think
12 Finance.
13        So you -- what you recall is
14 there was a company called TC Services that
15 had a business in the payday lending world,
16 and that Charlie Hallinan was somehow
17 connected to it; would that be accurate?
18        MR. GATEWOOD:  Objection to
19 form.
20        THE WITNESS:  That's not an
21 accurate description of my recollection.
22 BY MR. ACKELSBERG:
23 Q.  Then please fix it for me.
24 A.  I represented TC Services.  That was a

7 (Pages 25 to 28)

UNSEALED
App. 0625-04

Page 29

1  marketer and servicer for loans made by a
2  federally insurance insured depository
3  institution. Charlie Hallinan was my client
4  contact.
5  Q.  Okay. At TC Services?
6  A.  Yes.
7  Q.  Okay. All right, any other -- what
8  about Scott Tucker? Did you ever represent
9  Scott Tucker?
10  A.  I did not.
11  Q.  Any of his companies?
12  A.  I don't believe so, no.
13  Q.  Now let's move to Manatt Phelps, 2006 to
14  2009. Did you bring on any additional payday
15  lenders?
16  A.  I did represent -- I did bring new -- I
17  did develop new payday lender business at
18  Manatt, yes.
19  Q.  What are some of those payday lenders,
20  that you remember?
21  A.  I remember Integrity Advance. Sitting
22  here today, I don't remember new companies.
23  Q.  Okay. Now before -- you're familiar
24  with the distinction between payday loans and

Page 30

1  installment loans?
2  A.  I am familiar with people describing the
3  two differently, yes.
4  Q.  And you had some companies that -- would
5  it be correct to say over the years, you had
6  some companies that did only the payday loans
7  and only installment loans; or some that did
8  both?
9  MR. GATEWOOD: Objection,
10  form.
11  THE WITNESS: Based on my
12  understanding, and I should say a payday loan
13  would be small dollar, short-term loan that
14  can be paid in two weeks say, yes. Yes.
15  BY MR. ACKELSBERG:
16  Q.  So of the clients that you had up until
17  the time you joined Katten, were there also
18  lenders that you represent who were
19  exclusively installment lenders, as opposed to
20  payday lenders?
21  A.  Yes.
22  Q.  Can you give me those names? One would
23  be CashCall, right?
24  MR. GATEWOOD: Objection,

Page 31

1  form.
2  THE WITNESS: I don't know
3  that I can talk about CashCall.
4  BY MR. ACKELSBERG:
5  Q.  I'm just asking you names of clients.
6  MR. HELWIG: If you're asking
7  was CashCall a client, she can answer that.
8  But as you know, my position with respect to
9  --
10  MR. ACKELSBERG: We'll get to
11  that in a minute. I want to -- really I'm
12  just sort of identifying clients.
13  THE WITNESS: Yes, CashCall.
14  BY MR. ACKELSBERG:
15  Q.  Would that be an example of a lender
16  that was making what I'll call high-rate loans
17  over the internet, but did not make short-term
18  payday loans?
19  MR. HELWIG: You can answer
20  that question.
21  THE WITNESS: High rate, I
22  don't want to opine on the interest rate, but
23  that is an example of a company that made
24  installment loans rather than single payment

Page 32

1  loans.
2  BY MR. ACKELSBERG:
3  Q.  Okay. When I say high rate, just so
4  that we're clear, let's say anything over 100
5  percent APR, okay?
6  A.  Okay.
7  Q.  Does that still include CashCall?
8  A.  I don't know if it does.
9  Q.  Okay. Were there -- besides CashCall,
10  were there other clients, up until the time
11  you arrived at Katten, who you would be
12  comfortable in classifying as installment
13  lenders as opposed to payday loans? And when
14  I say installment lenders, I'm talking about
15  loans in the range above 100 percent APR.
16  MR. GATEWOOD: Objection,
17  form.
18  THE WITNESS: Sitting here I
19  can't recall who would qualify under that
20  descriptor.
21  BY MR. ACKELSBERG:
22  Q.  Now Payday One was an example of one of
23  the payday lenders that branched out into the
24  installment loan business later; am I right?

8  (Pages 29 to 32)

UNSEALED      App. 0625-05

1  CashCall. And we'll, before we break, get an
2  update from you, as to whether you will permit
3  the witness to answer questions about
4  CashCall. Okay? Does that sound accurately
5  --
6        MR. HELWIG: Correct, right.
7  BY MR. ACKELSBERG:
8  Q.  All right. Ms. Callaway, I want to ask
9  you about a different client, other than
10 CashCall. I want to show you a document and
11 ask whether you recognize it.
12              - - -
13        (Whereupon Exhibit P-378 was
14 marked for identification.)
15              - - -
16 BY MR. ACKELSBERG:
17 Q.  So my first question with regard to this
18 document, Ms. Callaway, is whether you recall
19 having a client by the name of cashnet500.com?
20 A.  Sitting here today, I don't remember
21 CashNet500. But this letter shows that I had
22 a client called CashNet500.
23 Q.  If I were to tell you that CashNet500
24 was one of Adrian Rubin's businesses, would

1  that refresh your recollection?
2  A.  The letter establishes that I
3  represented CashNet500. And if you tell me
4  that that was a company owned by Mr. Rubin, I
5  would believe you.
6  Q.  Okay. I'm going to be showing you a
7  number of documents that I will represent to
8  you that Adrian Rubin gave to me, either he
9  personally gave to me or his criminal defense
10 lawyer gave to me.
11        You're aware that Adrian
12 Rubin was a cooperating witness with the
13 federal prosecution of Charlie Hallinan and
14 Scott Tucker; are you not?
15 A.  I'm not aware of Mr. Rubin -- any
16 involvement Mr. Rubin had with Scott Tucker.
17 I am aware that Mr. Rubin was a cooperating
18 witness with Charlie Hallinan.
19 Q.  And, in fact, you were interviewed by
20 the Feds with regard to the Hallinan
21 prosecution, were you not?
22 A.  I don't believe I was.
23 Q.  You were not -- so at no point were
24 you -- you weren't interviewed by the

1  assistant U.S. attorneys or by the federal
2  agents that were investigating that case?
3  A.  No, I was not.
4  Q.  Okay. And you were never informed that
5  you were on a witness list or a potential
6  list?
7  A.  I was not informed of that.
8  Q.  But I am going to represent to you that
9  as part of Mr. Rubin's cooperation with the
10 Government, he was also cooperating with some
11 of us on the consumer protection side of the
12 world, okay. I am just making that
13 representation to you. And that Mr. Rubin
14 shared with me some documents that he
15 represented as being related to his
16 relationship with you, his attorney/client
17 relationship with you.
18        MR. HELWIG: Was that a
19 question?
20 BY MR. ACKELSBERG:
21 Q.  That's just a representation.
22        MR. SMITH: Irv, for the
23 record, you said Mr. Rubin shared this with
24 you or was it an attorney for Mr. Rubin?

1  BY MR. ACKELSBERG:
2  Q.  I don't recall -- Mr. Rubin gave me some
3  things, his lawyer gave me some things, and
4  some things were over e-mail and some things
5  were in person. But I met personally with Mr.
6  Rubin on a number of occasions.
7        So I'll just represent to you
8  that this came from Mr. Rubin, either
9  personally or through his counsel, with copies
10 -- of any e-mail that was copied to Mr. Rubin.
11 That's just a representation I'm making to you
12 here as a member of the bar.
13        I just wanted you to
14 understand the context of my having these
15 documents and asking you questions about them.
16 That's all. That's not a question, that's
17 just so that you have some understanding and
18 your counsel has some understanding, and the
19 other lawyers in the room have some
20 understanding as how I came to have possession
21 of this these documents.
22        All right. One of the things
23 that Adrian Rubin told me was that you and a
24 Wilmington lawyer named Wheeler Neff counseled

UNSEALED  App. 0625-06

1    him on setting up a bank model business with a
2    bank called County Bank of Rehoboth Beach
3    Delaware. I'm just telling you that, and I'm
4    asking, would that be a true statement?
5         MR. GATEWOOD: Objection to
6    form.
7         MR. HELWIG: I'll object and
8    instruct her not to answer, because it would
9    reveal privileged attorney/client
10   communications.
11        MR. SMITH: Irv, I'll object
12   to the relevance. I don't know where you're
13   going with any of this.
14   BY MR. ACKELSBERG:
15   Q. Mr. Neff -- I'm sorry, Mr. Rubin -- one
16   of the things Mr. Rubin said to me was that he
17   was referred to you and Mr. Neff by Charlie
18   Hallinan. Would that have been true?
19        MR. GATEWOOD: Objection,
20   form.
21        MR. ACKELSBERG: There's no
22   advice in there. It's about a referral.
23        MR. GATEWOOD: I haven't
24   directed her not to answer, but I object to

1    the form. I don't know how she would know
2    that, if she knew it from a conversation with
3    Rubin, then it would be privileged and I'd
4    direct her not to answer.
5    BY MR. ACKELSBERG:
6    Q. Understood. Did Charlie Hallinan have
7    anything to do with you beginning
8    representation of Adrian Rubin?
9    A. Sitting here, I can't recall.
10   Q. Okay.
11   A. But I don't believe I represented Mr.
12   Rubin. I recognize this name, CashNet500,
13   yes.
14   Q. Again, I'm not asking you whether you
15   represented Mr. Rubin personally. I'm asking
16   you whether you represented companies that you
17   knew were associated with Adrian Rubin, where
18   he was your client contact.
19   A. I would have to say I don't recall
20   CashNet500 -- sitting here, I don't have a
21   recollection of that representation. But I do
22   recognize this letter to me on behalf of
23   CashNet500, yes.
24   Q. Do you recall that there was a

1    relationship between one of Mr. Rubin's
2    businesses and County Bank of Rehoboth Beach
3    Delaware.
4        MR. HELWIG: I'll object and
5    direct her not to answer if that would reveal
6    privileged communications between you and
7    whatever client you were representing at the
8    time.
9        THE WITNESS: I do recall
10   that there was a -- that there was a
11   relationship, yes.
12   BY MR. ACKELSBERG:
13   Q. County Bank of Delaware had
14   relationships with a number of your clients;
15   am I right?
16   A. I did represent companies that had
17   relationships with County Bank, yes.
18   Q. And the same goes with the First Bank of
19   Delaware, correct?
20   A. I did represent companies that marketed
21   and serviced loans for First Bank of Delaware,
22   yes.
23   Q. Do you recall Adrian Rubin's
24   relationship with County Bank of Delaware

1    falling apart over his undisclosed criminal
2    record? Do you remember that happening?
3    A. That, I don't recall.
4    Q. Okay. Do you remember, I'm going to
5    mention some other businesses of his and ask
6    whether that sounds familiar. CRA Services,
7    do you remember that company?
8    A. I am familiar with that company, yes.
9    Q. What about Global PayDay Loan, LLC,
10   doing business as CashNet500?
11   A. Global -- that, I recall, Global, yes.
12   Q. So CashNet500 was doing business, that
13   was a fictitious name used by Global PayDay
14   Loan, LLC, as far as you can recall, right?
15   A. I will accept that representation from
16   you.
17   Q. All right. Now am I right that there
18   was a period of time that Mr. Rubin was making
19   loans after he lost the bank relationship,
20   which I'll represent to you is County Bank of
21   Delaware, that he continued making loans in
22   Pennsylvania and other states as a licensed
23   lender in Utah or Delaware, do you remember
24   that period?

UNSEALED

## Page 73

1     MR. GATEWOOD: Objection,
2  form.
3     MR. HELWIG: Yeah, I'm not
4  sure -- do you remember that period? Remember
5  what about that period?
6     THE WITNESS: I don't
7  remember Mr. Rubin himself making loans.
8  BY MR. ACKELSBERG:
9     Q.  Right, and when I'm talking about Adrian
10 Rubin, I understand that he never made loans
11 as Adrian Rubin. I'm really talking more
12 about Global PayDay Loan, LLC, doing business
13 as CashNet500. That's really more my
14 question.
15    Do you remember when Global
16 PayDay Loan, LLC, doing business as CashNet500
17 evolved from a bank model to making loans as
18 -- out of licenses in Utah, Delaware -- other
19 states? Do you remember that period?
20    MR. GATEWOOD: Objection to
21 form.
22    THE WITNESS: I don't recall
23 that period.
24 BY MR. ACKELSBERG:

## Page 74

1     Q.  Let me show you the next document.
2  First of all, in terms of the document that I
3  just showed you, 378, I just want to be clear.
4  You're communicating on behalf of CashNet with
5  regard to some kind of a law enforcement
6  demand that was directed to CashNet500; am I
7  right?
8     A.  Actually, this is a letter from
9  Maryland's Department of Labor, Licensing and
10 Regulation to me regarding CashNet.
11    Q.  So if you read the second sentence:
12 After reading your letter, I must reiterate
13 that Maryland law requires your client's
14 company to have a Maryland license in order to
15 make loans to Maryland residents. Do you see
16 that?
17    A.  Yes.
18    Q.  Then he says: I am referring this
19 matter to the attorney general's office,
20 right?
21    A.  That's what it says.
22    Q.  Okay. Now what I want to show you is
23 the letter that I think Mr. Prozeralik was
24 responding to. And I am going to show you the

## Page 75

1  next exhibit which was P-379.
2     - - -
3     (Whereupon Exhibit P-379 was
4  marked for identification.)
5     - - -
6  BY MR. ACKELSBERG:
7     Q.  Have you had a chance to review it?
8     A.  Yes.
9     Q.  Does -- do you remember this specific
10 letter?
11    A.  Do I remember this specific letter?
12    Q.  Yeah.
13    A.  No, I don't.
14    Q.  Do you remember writing letters like
15 this, in this period of time?
16    MR. GATEWOOD: Objection,
17 form.
18    THE WITNESS: I do not
19 remember writing -- I see this letter that I
20 wrote, but I don't have -- to answer your
21 question, generally, no.
22 BY MR. ACKELSBERG:
23    Q.  During this period of time, we're
24 looking at 2005, one of the services you

## Page 76

1  provided to your clients in this -- within
2  this industry, was that you would handle
3  regulatory inquiries that were directed to
4  them from state attorney's general or other
5  regulatory agencies; am I right?
6     A.  That is correct.
7     Q.  You will see just -- you'll see the
8  context of this is that CashNet500 -- you're
9  responding to a -- I think you can see from
10 the context that this investigator in Maryland
11 is basically saying to CashNet500 that they
12 need a Maryland license in order to be making
13 loans to Maryland citizens. Do you see that?
14    A.  Yes.
15    Q.  Okay.
16    A.  I see that from 378.
17    Q.  So -- and your response to Mr. Wink, the
18 investigator, is that in your judgement
19 CashNet500 does not need a Maryland license
20 because it's licensed in Utah and has no
21 presence in the State of Maryland. That's
22 what you said to the State of Maryland; am I
23 right?
24    A.  I did not say "in my judgement".

1   Q.   Right.  Taking out the word, "in your
2   judgement", that's what you were saying,
3   right?
4   A.   The document speaks for itself, and I
5   don't want to give any answer that would be
6   misleading about what the document says.
7   Q.   That's fine.  Is there anything about
8   this letter which suggests to you that you
9   didn't make the representations in this letter
10  to Mr. Wink?
11          MR. GATEWOOD:  Objection,
12  form.
13          THE WITNESS:  No, and I
14  didn't suggest that.  The letter, I have no
15  reason to believe that this letter is anything
16  but an accurate representation of my
17  communication.
18          MR. HELWIG:  I would note for
19  the record, and again the document speaks for
20  itself, there's no signature and no letterhead
21  on this.
22  BY MR. ACKELSBERG:
23  Q.   That's very true.
24  A.   I don't -- this is definitely a draft

1   with my name on it.
2   Q.   I see that.
3   A.   And so -- I mean I take the document for
4   what it is.
5   Q.   Right, I do too.  Okay, thank you.
6          Now at the time that you were
7   representing CashNet500, the d/b/a of Global
8   PayDay Loan, you knew that all of the
9   operations of that company were based in
10  Suburban Philadelphia, didn't you know that?
11  A.   No, I did not.
12  Q.   Would it have mattered to you in
13  communicating with the State of Maryland with
14  regarding his need for a license at this
15  period of time, whether or not he had a
16  physical presence within the State of
17  Pennsylvania, for example?
18          MR. GATEWOOD:  Objection,
19  form.  Even though you're asking about this
20  specific client, I'll instruct the witness not
21  to answer to the extent that it would disclose
22  attorney/client information that was provided
23  to my client.
24          MR. HELWIG:  And I would --

1   same objection.  And the way I hear the
2   question, it seems by definition it's asking
3   for attorney/client advice or communication.
4          So to that extent, I would
5   direct you not to answer, unless you think
6   there's a way you can answer that, that
7   doesn't implicate privileged communications.
8   BY MR. ACKELSBERG:
9   Q.   Did you ever visit or evaluate any
10  on-site operations of any of the lending
11  businesses associated Adrian Rubin?
12  A.   I don't know that I can answer that.
13          MR. HELWIG:  If you can't
14  answer that without revealing client --
15  BY MR. ACKELSBERG:
16  Q.   Whether you ever saw an operation?  I am
17  not asking anything you said, I'm asking what
18  you saw.
19          MR. GATEWOOD:  You're asking
20  her what she evaluated in order to come up
21  with the information that she's providing in
22  this letter.  I think that that's outside the
23  bounds of what is permissible for her to
24  testify about.

1          It's Ted's objection, not
2   mine.  But it seems that you're asking her to
3   opine on what she evaluated in coming up with
4   what's in this letter.
5   BY MR. ACKELSBERG:
6   Q.   Let me ask the question again.  Did you
7   ever visit Adrian Rubin's operations in
8   Suburban Philadelphia?
9          MR. HELWIG:  I will instruct
10  her not to answer.
11          MR. ACKELSBERG:  Let's go to
12  the next document.  This 380.
13          - - -
14          (Whereupon Exhibit P-380 was
15  marked for identification.)
16          - - -
17  BY MR. ACKELSBERG:
18  Q.   Have you had a chance to look at these a
19  little bit while we were offline, right?
20  A.   No.
21  Q.   You didn't, okay.  My question is, in
22  looking at P-380, does this document look
23  familiar to you?
24  A.   It does not.  It is not something I

UNSEALED

App. 0625-09

1 would say I'm familiar with.
2 Q. If I were to tell you I got this from
3 Adrian Rubin, are you suggesting there's
4 anything -- this is a counterfeit or anything
5 like that?
6 A. No, and I haven't suggested that in any
7 way.
8 Q. Okay. So this appears to be a copy, and
9 I realize it's without the letterhead and it's
10 without a signature, but this appears to be a
11 copy of a letter sent to the West Virginia
12 Office of the Attorney General on behalf of
13 Global PayDay Loan, LLC.
14 Are you -- if Mr. Rubin had
15 this -- if I have it, are you -- can we agree
16 that this letter, probably with your signature
17 and letterhead, was sent to the office of the
18 West Virginia Attorney General in conforming
19 to this copy?
20 MR. GATEWOOD: Objection to
21 form. This is clearly a draft letter.
22 THE WITNESS: I don't have
23 the exact -- I don't have a copy of the
24 transmitted letter, it appears. So I don't

1 really know how to answer your question. I
2 have no concerns that this is -- until you
3 suggested that it was doctored, it didn't
4 enter my mind. I don't even know where -- I
5 guess it's possible somebody doctored it, but
6 I don't have a copy of what was actually sent.
7 BY MR. ACKELSBERG:
8 Q. If your lawyer were to ask you to look
9 at your old files, do you still have files for
10 the Bernie Rubin companies -- Adrian Rubin
11 companies?
12 A. You know, coming into this room I
13 couldn't recall representing these companies.
14 I don't think that these -- I don't know that
15 I represented these companies after Paul
16 Hastings. I may have, but I don't believe I
17 have files. I don't believe that I have files
18 at Katten for them.
19 - - -
20 (Whereupon Exhibits P-381 and
21 P-382 were marked for identification.)
22 - - -
23 BY MR. ACKELSBERG:
24 Q. Let me show you the next exhibit, it's

1 381, Plaintiff's Exhibit 381. Have you had a
2 chance to look at Exhibit P-381?
3 A. I have skimmed through the 19 pages. I
4 wouldn't say I've had a comprehensive review
5 of it, but I'm still looking at it.
6 Q. Can you tell me what this appears to be?
7 A. This appears to be a draft opinion.
8 Q. It does. It also appears that some of
9 the -- there is that -- do you see the portion
10 in red?
11 A. On the first page?
12 Q. Yes.
13 A. Yes.
14 Q. Do you see that it says remove all
15 headers regarding CRA? Do you see that?
16 A. Yes, I do.
17 Q. If you turn the page, you will see that
18 the rest of the letter is actually an opinion
19 for a different company, CRA Services Corp,
20 right? Do you see that?
21 A. It appears that the draft -- in the
22 draft the headers say CRA Services.
23 Q. CRA Services, I think we might have
24 actually mentioned this before, but I think I

1 forgot. CRA services was another one of those
2 companies besides CashNet500 that was
3 connected in some way to Adrian Rubin; am I
4 right?
5 A. I believe that's the case, yes.
6 Q. And this appears to be Adrian Rubin
7 asking you for an opinion like you did for CRA
8 Services Corp, but he wants it for two
9 different companies. Do you see that?
10 MR. GATEWOOD: Objection,
11 form.
12 THE WITNESS: I don't know
13 that this appears to be what Mr. Rubin is
14 asking. I see the draft, and I see that there
15 are changes made. I don't know who made the
16 changes in red.
17 BY MR. ACKELSBERG:
18 Q. Do you remember producing any opinions,
19 without getting into the content of the
20 opinions, do you remember producing any
21 written opinions for any of Mr. Rubin's
22 companies?
23 MR. HELWIG: Can I ask for a
24 clarification? Do you mean to third parties?

UNSEALED App. 0625-10

BY MR. ACKELSBERG:
Q.   Thank you, Ted.  Let me just ask you this question instead.  From time to time, you prepared -- you have prepared for payday lenders or installment lenders opinion letters that are directed to the client, but where you understand the client is going to show these opinions to some third party.
        MR. GATEWOOD:  Objection to form.
BY MR. ACKELSBERG:
Q.   You have done work like that in the past; am I right?
A.   I don't know that I've prepared an opinion directed to a client with an understanding that it can be shared with a third party.
Q.   Let me ask you a different question.  Am I correct that you have, from time to time, generated letters to third parties on behalf of clients that look somewhat like that?
A.   I wouldn't say yes to that question either.
Q.   I don't mean with all of this red and

please take out -- I'm really talking more about just generically a written opinion about the legality of -- or the regulatory -- let's say legality.  Have you ever issued opinions to third parties about the state of the law regarding installment or payday lending in various states?
        MR. GATEWOOD:  Objection, form.
        THE WITNESS:  I don't know -- I will say this:  The opinion letters are specific -- specifically tailored and limited to an issue that is opined on.  I don't recall an opinion about the quote, unquote state of the law.
BY MR. ACKELSBERG:
Q.   Well, you can see what is attached here to the opinion letter or the draft opinion letter that Mr. Rubin gave to me.  There are -- there is some analysis of, in this case, of the choice of law in various of the states.  Do you see that?
A.   I see on page four in this draft it says:  Our review of choice of law principles

for the 50 states and the District of Columbia reveals as follows.
Q.   And that's something you would do from time to time for clients; am I right?  Without making any specific --
        MR. GATEWOOD:  Your prior question, Irv, was prefaced with:  Did she prepare these for third parties?  Then you went back to this document, which doesn't appear to have been prepared for a third party.  So just please clarify what you're asking.
BY MR. ACKELSBERG:
Q.   Have you ever prepared opinions for third parties that specifically review choice of law principles in the states?
        MR. GATEWOOD:  Objection to the form.
        THE WITNESS:  I believe that I have.
BY MR. ACKELSBERG:
Q.   And in looking at Exhibit P-381, does this look familiar to you, in that there -- that the analysis that state -- choice of law

analysis that's contained, you may have opined in similar fashion on behalf of other clients to third parties?
        MR. GATEWOOD:  Objection to the form.
        THE WITNESS:  Again, I don't think that I opined on choice of law in this draft.  I don't believe I opined on choice of law in this draft.
BY MR. ACKELSBERG:
Q.   Whatever it is that you did in this draft, is this the kind of review that you did on other occasions, to third parties on behalf of installment or payday lenders?
        MR. GATEWOOD:  Objection to the form.
        THE WITNESS:  In writing an opinion letter to a third party, you're not doing it on their behalf.  You, meaning the firm, you are writing the opinion letter on your client's behalf but to a third party.
BY MR. ACKELSBERG:
Q.   Right.
A.   I believe I did draft, and my firms did

UNSEALED