# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PA, by | : | CIVIL ACTION |
| Attorney General JOSH SHAPIRO, | : | |
| | : | |
| *Plaintiff,* | : | NO. 14-cv-07139-JCJ |
| | : | |
| v. | : | |
| | : | **CONFIDENTIAL** |
| THINK FINANCE, INC., et al. | : | **Filed Under Seal Pursuant to** |
| | : | **Confidentiality and Protective Order** |
| *Defendants.* | : | |

## APPENDIX TO THE COMMONWEALTH'S
## STATEMENT OF UNDISPUTED FACTS

### VOLUME 2: MARKED EXHIBITS I
### APP. 0626 – APP. 1231

UNSEALED

UNSEALED

# Contents

| | |
|---|---|
| P-1 | App. 0626 |
| P-9 | App. 0661 |
| P-21 | App. 0672 |
| P-25 | App. 0678 |
| P-26 | App. 0687 |
| P-27 | App. 0695 |
| P-32 | App. 0706 |
| P-34 | App. 0708 |
| P-35 | App. 0711 |
| P-38 | App. 0747 |
| P-60 | App. 0752 |
| P-61 | App. 0755 |
| P-65 | App. 0762 |
| P-66 | App. 0778 |
| P-67 | App. 0781 |
| P-69 | App. 0783 |
| P-72 | App. 0815 |
| P-73 | App. 0817 |
| P-78 | App. 0839 |
| P-79 | App. 0862 |
| P-80 | App. 0865 |
| P-81 | App. 0866 |
| P-83 | App. 0896 |
| P-84 | App. 0901 |
| P-85 | App. 0928 |
| P-89 | App. 0956 |
| P-97 | App. 0963 |
| P-98 | App. 0966 |
| P-101 | App. 0969 |
| P-102 | App. 0985 |
| P-104 | App. 1021 |
| P-105 | App. 1026 |
| P-106 | App. 1052 |
| P-107 | App. 1064 |
| P-111 | App. 1068-1 |
| P-116 | App. 1069 |
| P-118 | App. 1079 |
| P-119 | App. 1083 |
| P-120 | App. 1092 |
| P-122 | App. 1118 |
| P-123 | App. 1134-1 |
| P-124 | App. 1135 |
| P-126 | App. 1144 |
| P-128 | App. 1147 |
| P-129 | App. 1164 |
| P-130 | App. 1180 |
| P-131 | App. 1192 |
| P-132 | App. 1222 |

**UNSEALED**

UNSEALED

Ladies and Gentlemen:

Enclosed is an Amended and Restated Private Placement Memorandum (the "PPM") and related documents with respect to the offering of promissory notes ("Notes") issued in such amounts, with such terms and bearing such interest as provided therein.

Please follow the instructions below:

1. Please read the PPM in its entirety

2. Please read the Subscription Agreement in its entirety.

3. Please complete, date and sign the signature page to the Subscription Agreement.

4. Please read, complete, date and sign the appropriate Accredited Investor Questionnaire ("Individuals and Non-Business Trusts" or "Organizations").

5. Please forward the completed Subscription Agreement, cashier's check or money order and Accredited Investor Questionnaire to:

> Universal Finance II, LLC,
> Attention: Mark Wildstein, Managing Member
> 1429 Spring Mill Road
> Gladwyne, PA 19035

6. If wire transfer is desired, funds may be wired to the account of Universal Finance II, LLC at First Bank of Delaware: Account No. 6005918, ABA Routing Number 031101059. The Company has the right to continue to accept subscriptions for and issue additional Notes up to a maximum of $50,000,000 of Notes in the aggregate until December 31, 2009.

7. Please provide all requested information for your account where the Company may deposit any funds due to you in respect of your Notes.

8. Please complete, date and sign the appropriate W-9 Form.

If you have any questions with regard to these subscription procedures, please contact Mark Wildstein at the above address or at 215-925-7500 x212.



**UNSEALED**

App. 0626

Wildstein-000025

# AMENDED AND RESTATED PRIVATE PLACEMENT MEMORANDUM

DATED APRIL 3, 2009

# UNIVERSAL FINANCE II, LLC

---

# SALE OF PROMISSORY NOTES

## MINIMUM OFFERING: $3,000,000 in Aggregate Principal Amount of Promissory Notes

## MAXIMUM OFFERING: $50,000,000 in Aggregate Principal Amount of Promissory Notes

### MINIMUM DENOMINATION: $100,000

---

This Amended and Restated Private Placement Offering Memorandum, dated April 3, 2009 (the "Memorandum"), relates to the private placement of Notes offered by Universal Finance II, LLC (the "Company") of a minimum of $3,000,000 aggregate principal amount, up to a maximum of $50,000,000 aggregate principal amount of variable interest promissory notes (the "Notes").

**ACCREDITED INVESTORS ONLY.** The Notes are being offered pursuant to §4(2) of the Securities Act of 1933, as amended (the "Act") and Rule 506 of Regulation D thereunder solely to a limited number of "accredited investors" (each an "Accredited Investor") as defined in Regulation D. You **must** be an Accredited Investor to purchase the Notes.

**INVESTMENT IN THE NOTES OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 30 HEREOF.**

**THE NOTES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER THE APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND WILL ONLY BE OFFERED AND SOLD IN RELIANCE ON AVAILABLE EXEMPTIONS THEREFROM. THE OFFER OF THE NOTES, THE AGREEMENT TO PURCHASE THE NOTES (THE "SUBSCRIPTION AGREEMENT") AND THE OTHER OFFERING DOCUMENTS DO NOT CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY THE NOTES IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.** THE COMPANY IS RELYING ON AN EXEMPTION FROM REGISTRATION UNDER THE INVESTMENT COMPANY ACT OF 1940 THAT RESTRICTS THE NUMBER OF HOLDERS OF THE OUTSTANDING SECURITIES OF THE COMPANY TO NO MORE THAN 100 BENEFICIAL OWNERS.

**THE NOTES OFFERED HEREBY ARE "RESTRICTED SECURITIES" AS SUCH TERM IS DEFINED IN THE ACT. THE NOTES ARE BEING SOLD FOR INVESTMENT PURPOSES ONLY, WITHOUT A VIEW TO RESALE OR DISTRIBUTION THEREOF, AND MAY NOT BE OFFERED, RESOLD OR OTHERWISE DISPOSED OF WITHOUT REGISTRATION UNDER THE ACT**

UNSEALED    App. 0627    Wildstein-000026

UNLESS THE COMPANY RECEIVES (I) A WRITTEN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY STATING THAT SUCH REGISTRATION IS NOT REQUIRED AND ANY SUCH RESALES COMPLY WITH ANY APPLICABLE SECURITIES LAWS, AND (II) A WRITTEN CERTIFICATION, UNLESS WAIVED IN THE SOLE DISCRETION OF THE COMPANY, THAT ANY SUCH TRANSFER WILL NOT INCREASE THE NUMBER OF BENEFICIAL OWNERS OF THE NOTES. THE COMPANY RESERVES THE RIGHT TO REFUSE THE TRANSFER OF ANY NOTES IF THE COMPANY DETERMINES, IN ITS SOLE DISCRETION, THAT SUCH TRANSFER MAY JEOPARDIZE THE AVAILABILITY TO THE COMPANY OF AN EXEMPTION FROM REGISTRATION AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR THE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION HAS APPROVED OR DISAPPROVED OF THE NOTES OFFERED HEREBY OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE OFFER, THIS AMENDED AND RESTATED PRIVATE PLACEMENT MEMORANDUM, THE SUBSCRIPTION AGREEMENT OR ANY OF THE OTHER DOCUMENTS RELATING TO THE OFFERING OF THE NOTES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS AMENDED AND RESTATED PRIVATE PLACEMENT MEMORANDUM IS NOT TO BE SHOWN OR GIVEN TO ANY PERSON OTHER THAN THE PERSON WHOSE NAME APPEARS ABOVE AND IS NOT TO BE PRINTED OR REPRODUCED IN ANY MANNER WHATSOEVER. FAILURE TO COMPLY WITH THIS DIRECTIVE CAN RESULT IN A VIOLATION OF THE ACT. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS BY AN OFFEREE, IS UNAUTHORIZED. THE INFORMATION PRESENTED HEREIN HAS BEEN PROVIDED BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN THE NOTES IN CONNECTION WITH THE OFFER AND SALE OF THE NOTES OFFERED HEREBY.

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT ANY DISCUSSION OF TAX MATTERS SET FORTH IN THIS AMENDED AND RESTATED PRIVATE PLACEMENT MEMORANDUM WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN AND WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY PROSPECTIVE INVESTOR, FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER FEDERAL, STATE OR LOCAL TAX LAW. EACH PROSPECTIVE INVESTOR SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The date of this Amended and Restated Private Placement Memorandum is April 3, 2009.

UNSEALED                          App. 0628                          Wildstein-000027

# TABLE OF CONTENTS

SUMMARY OF TRANSACTIONS ........................................................................... 5
NOTICE TO OFFEREES .................................................................................... 9
SUITABILITY STANDARDS ............................................................................... 11
THE OFFER AND SALE OF THE NOTES ............................................................. 13
THE COMPANY ............................................................................................. 17
THE BANK .................................................................................................... 18
THE LOANS .................................................................................................. 18
FORWARD LOOKING STATEMENTS ................................................................. 30
RISK FACTORS .............................................................................................. 30
RESTRICTIONS ON RESALE ............................................................................ 33
PAYMENT OF INTEREST ................................................................................. 33
PAYMENT OF PRINCIPAL AND REDEMPTION PRIOR TO PROGRAM TERMINATION
OR MATURITY .............................................................................................. 34
USE OF PROCEEDS ........................................................................................ 34
LEGAL/TAX MATTERS ................................................................................... 34
CONDITION OF SALE OF THE NOTES .............................................................. 35
SUBSCRIPTION TO THE OFFERING OF THE NOTES ........................................... 35
Exhibits ........................................................................................................ 36

UNSEALED

App. 0629                                     Wildstein-000028

# SUMMARY OF TRANSACTIONS

**The Company.** Universal Finance II, LLC (the "Company") is a Delaware limited liability company. The Company was organized on May 8, 2008, and as such, has only a limited operating history. The Company was organized solely for the purpose of engaging in the acquisition of certain loan participations ("Participation Interests") from First Bank of Delaware (the "Bank") in certain unsecured short term consumer loans as described below in the section titled "The Loans". The Company has no officers or employees other than its Managing Member (as defined below). The equity membership interests in the Company are owned, beneficially and as of record, by the Managing Member. See the section titled "The Company – Legal Structure."

**The Offer and Sale of the Notes.** The Company is offering to sell, on a best efforts basis, a minimum of $3,000,000 (the "Minimum") and a maximum of $50,000,000 (the "Maximum") of Notes to "accredited investors" ("Accredited Investors") as that term is defined in Regulation D under the Act (the "Offering"). The Company has already sold the Minimum amount of Notes. Prospective investors in the Notes are sometimes referred to herein as "Investors." All Investors must execute and return to the Company a Subscription Agreement and an Accredited Investor Questionnaire. The Company reserves the right to reject any subscription in whole or in part or to allot to any Investor less of an amount of principal than the amount of principal for which an Investor subscribes.

**Summary Terms of the Notes—**

Interest Rate: The Notes shall accrue interest at a rate of eighteen percent (18%) per annum, subject to reduction by the amount of the Administrative Fee (as defined below).

Adminstrative Fee: As noted above, the actual interest rate on the Notes shall be reduced by an administrative fee retained by the Company (the "Administrative Fee"). The Administrative Fee shall be equal to the greater of $50,000 or one percent (1%) (annualized) of the aggregate principal amount of Notes outstanding paid on a monthly basis. The aggregate principal amount of Notes outstanding shall be calculated based on the average daily principal amount of Notes outstanding. The Administrative Fee shall be paid to the Company monthly. The Administrative Fee is intended to fund the payment by the Company of any expenses of administering the Note program that are not reimbursed by the Administrative Agent or the Bank, and the payment by the Company of an annual management fee to the Managing Member or the holders of equity interests in the Company in an amount not to exceed one-half of one percent (0.5%) per annum of the aggregate principal amount of Notes outstanding. The actual interest earned by and paid to Investors holding Notes will be reduced by the amount of such Administrative Fee and by the withholding of any applicable taxes. Accordingly, if the aggregate principal amount of outstanding Notes equals or exceeds $5 million, the maximum interest rate payable on the Notes (net of the Administrative Fee retained by the Company) will be seventeen (17%) percent per annum.

Use of Proceeds: The proceeds shall be used to purchase Participation Interests in certain unsecured short term consumer installment loans (the "Loans"). In addition, proceeds

UNSEALED

App. 0630

Wildstein-000029

will fund costs associated with the offer and sale of the Notes, the administration of the Note program and the Company's purchase of Participation Interests that are not otherwise borne by the Bank or the Administrative Agent (as defined below), including any legal, accounting and other expenses associated with the preparation of the offering documents, the Company's insurance expenses and costs relating to general fund administration. Payment of these costs and expenses by the Company is expected to be funded by the Administrative Fee.

Offering Period:                  The Offering period commenced on March 19, 2009 and will terminate on December 31, 2009 ("Closing Date"), unless the Maximum is reached.

Maximum Number of Investors:  The Company will not register as an investment company under the Investment Company Act. The Company is relying on the exception afforded by Section 3(c)(1) of the Investment Company Act and will limit the number of Investors and holders of Notes to ninety-nine (99) or fewer persons.

Transfer of Notes:               There will be no public market for the Notes and holders must comply with applicable federal and state securities laws in order to sell the Notes. Investors may not sell or otherwise transfer the Notes without an opinion of counsel acceptable to the Company that such sale or transfer will not violate federal or state securities laws, as well as a written certification, unless waived by the Company in its sole discretion, that any such transfer will not increase the number of beneficial owners of the Notes. The Company reserves the right to refuse the transfer of any Notes if the Company determines, in its sole discretion, that such transfer may jeopardize the availability to the Company of an exemption from registration as an investment company under the Investment Company Act.

Administrative Agent:            The Company has entered into an Amended and Restated Administrative Agency Agreement ("Administrative Agency Agreement") with the Administrative Agent, pursuant to which the Administrative Agent will (i) perform certain administrative services for the Company in connection with the purchase of Participation Interests and the administration of the Note program, (ii) purchase from the Company any Participation Interest acquired by the Company in respect of a Loan that is sixty (60) days' past due at a price equal to the then-current outstanding principal balance of the relevant Loan, and (iii) to the extent the Company's funds are insufficient to make any payments due to Note holders under the Notes, make such payments as necessary from the Administrative Agent's own funds without recourse to the Company. The parent company of the Administrative Agent has entered into a Guaranty with the Company whereby such parent company has agreed to guarantee the obligations of the Administrative Agent under the Administrative Agency Agreement. For more information, see the section titled "The Loans – Administrative Agency Agreement."

UNSEALED

Wildstein-000030

Risk Factors: An investment in the Notes is highly speculative and involves substantial risks. Investors should carefully review and consider the factors described under "Risk Factors".

Program Termination Date: The purchase of Participation Interests will cease and the Note program will terminate on December 31, 2013 (the "Program Termination Date") unless the Notes are earlier redeemed or paid in full. On the Program Termination Date, the Company will cease purchasing additional Participation Interests. After the Program Termination Date, the Company will use the principal repayments received in respect of the Loans in which it has purchased a Participation Interest to repay the outstanding principal amount on the Notes pro rata, as if all such Note holders had elected to redeem their Notes and the Repayment Commencement Date (as defined below) with respect to the Notes outstanding at the Program Termination Date is January 1, 2014. Such repayments will be made on a monthly basis to Investors after the Program Termination Date. The Notes will mature when the Company ceases to own any Participation Interests or the principal amount of the Notes has been earlier redeemed or paid in full such that no Notes remain outstanding.

Extension Notice: Prior to September 30, 2013, the Company may deliver a written notice (the "Extension Notice") of the Company's election to extend the Program Termination Date to a date no later than December 31, 2018; provided that the Company may deliver such an Extension Notice only if the Company and the Bank shall have extended the term of the Participation Agreement to such new Program Termination Date.

Redemption: The Notes may be redeemed commencing on the first day of the calendar quarter (the "Repayment Commencement Date") after which the Investor has provided the Company with not less than forty-five (45) days prior written notice (a "Redemption Notice") prior to the Repayment Commencement Date. Upon delivery of a Redemption Notice, the Investor will begin to receive, commencing on the Repayment Commencement Date, such Investor's pro rata share of the principal repayments on the Loans in which the Company has purchased a Participation Interest. For example, if an Investor delivers a Redemption Notice to the Company prior to February 15, 2010, the Repayment Commencement Date with respect to such Investor's Note will be April 1, 2010. Redemption Notices received after February 15, 2010, but prior to May 15, 2010, would have a Repayment Commencement Date of July 1, 2010. Upon a redemption by an Investor, the Investor's pro-rata share of principal repayments will not be reinvested by the Company in additional Participation Interests and instead would be used to repay the Investor's outstanding principal in the Note. Such repayments will be made on a monthly basis to redeeming Investors. The Company's obligation to repay any such Notes is subject to the Company having funds available for such repayment,

UNSEALED          App. 0632          Wildstein-000031

which funds are expected to be substantially provided by the principal repayments on the Loans with respect to which the Company has purchased a Participation Interest. In the event the Company does not have the necessary funds available, such Notes shall not be required to be repaid until such time as the funds are available to the Company. Pursuant to the terms of the Administrative Agency Agreement, the Administrative Agent has agreed to make such payments to the Company as are necessary to permit the Company to make the payments required on the Notes. In addition, after the Closing Date, in the event the Company does not purchase Participation Interests for a consecutive thirty (30) day period, the Company will use (a) the principal repayments received in respect of the Loans in which the Company has purchased a Participation Interest and (b) the amount of any Early Redemption Payment (as such term is defined in the Administrative Agency Agreement) actually received by the Company from the Administrative Agent pursuant to the Administrative Agency Agreement, in each case to repay the outstanding principal amount on the Notes pro rata, as if all such Note holders had elected to redeem their Notes.

Prepayment:

The Company has the right to prepay the Notes at any time and from time to time, in whole or in part, without penalty or premium. The Company shall use the proceeds of any Early Redemption Payment (as such term is defined in the Administrative Agency Agreement) actually received by the Company to prepay the Notes pro rata, as if all such Note holders had elected to redeem their Notes.

No Underwriters:

No underwriting discounts or commissions will be paid in connection with the sale of the Notes. No special compensation will be paid to the Bank, the Administrative Agent or any officers or employees of the Company or the Administrative Agent or the Bank in connection with the offering of the Notes.

Accredited Investors Only:

The Notes may only be purchased by up to ninety-nine (99) Accredited Investors as such term in defined in Regulation D under the Securities Act of 1933.

UNSEALED

Wildstein-000032

THIS MEMORANDUM CONTAINS CERTAIN ESSENTIAL INFORMATION ABOUT THE COMPANY AND THE OFFERING OF THE NOTES. INVESTORS ARE ADVISED TO READ THIS MEMORANDUM CAREFULLY PRIOR TO MAKING ANY DECISION TO PURCHASE THE NOTES. **INVESTMENT IN THE NOTES INVOLVES A HIGH DEGREE OF RISK.** INVESTORS SHOULD PARTICULARLY CONSIDER THE RISK FACTORS SET FORTH UNDER THE HEADING "RISK FACTORS."

### NOTICE TO OFFEREES

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOTES IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION WITH RESPECT TO THE COMPANY OR THE NOTES OFFERED HEREBY OTHER THAN THE INFORMATION SET FORTH IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON.

THE INFORMATION IN THIS MEMORANDUM IS CONFIDENTIAL AND PROPRIETARY TO THE COMPANY AND IS BEING SUBMITTED TO YOU SOLELY FOR YOUR CONFIDENTIAL USE AND WITH THE EXPLICIT UNDERSTANDING THAT, WITHOUT THE PRIOR WRITTEN PERMISSION OF THE COMPANY, YOU WILL NOT RELEASE THIS MEMORANDUM OR DISCUSS THIS MEMORANDUM, ITS EXISTENCE, OR ANY OF THE INFORMATION CONTAINED HEREIN, OR MAKE ANY REPRODUCTION OR USE OF THIS MEMORANDUM FOR ANY PURPOSE OTHER THAN TO EVALUATE A POTENTIAL INVESTMENT IN THE NOTES; PROVIDED, HOWEVER, THAT YOU ARE AUTHORIZED TO DISCLOSE THE INFORMATION CONTAINED HEREIN TO YOUR PERSONAL PROFESSIONAL ADVISORS. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, YOU AGREE TO PROMPTLY RETURN IT AND ANY OTHER DOCUMENTS OR INFORMATION FURNISHED TO YOU BY THE COMPANY IF YOU ELECT NOT TO PURCHASE ANY OF THE NOTES OFFERED HEREBY, OR IF THE OFFERING OF THE NOTES IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM CONTAINS SUMMARIES OR EXPLANATIONS OF CERTAIN DOCUMENTS THAT GOVERN THE TRANSACTIONS DESCRIBED HEREIN WHICH THE COMPANY BELIEVES TO BE ACCURATE, BUT REFERENCE IS MADE TO THE ACTUAL DOCUMENTS, COPIES OF WHICH EITHER ACCOMPANY THIS MEMORANDUM OR ARE AVAILABLE FOR INSPECTION (PLEASE REFER TO THE CONTACT INFORMATION IN THE SUBSCRIPTION AGREEMENT FOR SUCH REQUESTS), AND ALL STATEMENTS AND INFORMATION SET FORTH IN THIS MEMORANDUM ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH DOCUMENTS.

YOU SHOULD CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE NOTES. PRIOR TO YOUR PURCHASE OF NOTES, YOU AND YOUR REPRESENTATIVES MAY ASK QUESTIONS OF THE OFFICERS OF THE COMPANY (THROUGH THE CONTACT INFORMATION IN THE SUBSCRIPTION AGREEMENT) ABOUT ANY ASPECT OF THIS TRANSACTION AND MAY OBTAIN FROM THEM ANY ADDITIONAL INFORMATION NECESSARY TO VERIFY INFORMATION SET FORTH IN THIS MEMORANDUM TO THE EXTENT THAT THE COMPANY, OR ITS OFFICERS, POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

THE OFFERING OF THE NOTES IS MADE SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION OF THE OFFERING BY THE COMPANY WITHOUT NOTICE AND IS SPECIFICALLY SUBJECT TO THE TERMS DESCRIBED IN THIS MEMORANDUM. THE NOTES ARE OFFERED SUBJECT TO PRIOR SALE AND TO THE COMPANY'S RIGHT TO REJECT ANY

UNSEALED

App. 0634

Wildstein-000033

SUBSCRIPTION IN WHOLE OR IN PART OR TO ALLOT TO YOU LESS OF AN AMOUNT OF PRINCIPAL FOR WHICH YOU SUBSCRIBE.

YOU SHOULD CONSULT YOUR OWN INVESTMENT, LEGAL, TAX AND ACCOUNTING ADVISORS TO DETERMINE WHETHER THE NOTES ARE AN APPROPRIATE INVESTMENT FOR YOU. IN MAKING AN INVESTMENT DECISION, YOU MUST RELY ON YOUR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERINGS CONTAINED IN THIS MEMORANDUM TO ASSESS THE RISKS INVOLVED.

NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY DISTRIBUTION OF NOTES OFFERED HEREBY SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN (INCLUDING IN THE EXHIBITS HERETO) OR IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF.

NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, IS MADE AS TO THE COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY DOCUMENTS FURNISHED BY THE COMPANY UPON REQUEST, AND NOTHING CONTAINED HEREIN IS, OR SHALL BE RELIED UPON AS, A PROMISE OR REPRESENTATION AS TO FUTURE PERFORMANCE OR EVENTS.

THIS MEMORANDUM DOES NOT PURPORT TO CONTAIN ALL OF THE INFORMATION THAT MAY BE REQUIRED TO EVALUATE AN INVESTMENT IN THE NOTES AND ANY RECIPIENT HEREOF SHOULD CONDUCT ITS OWN INDEPENDENT ANALYSIS.

**THE NOTES OFFERED HEREBY ARE NOT DEPOSITS OR OBLIGATIONS OF, OR OTHERWISE GUARANTEED BY, ANY BANK, AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION OR ANY OTHER GOVERNMENTAL AGENCY.**

UNSEALED                    App. 0635                    Wildstein-000034

## SUITABILITY STANDARDS

INVESTMENT IN THE NOTES INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL RESOURCES WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT, AND WHO CAN BEAR THE RISK OF LOSS OF THEIR ENTIRE INVESTMENT.

The Company will not register as an investment company under the Investment Company Act. The Company is relying on the exception afforded by Section 3(c)(1) of the Investment Company Act and the Notes will only be offered and sold to no more than ninety-nine (99) Accredited Investors. An Accredited Investor is defined in Regulation D under the Act to include, among others, the following:

(i) individuals who are natural persons and who, together with their spouses, have a joint net worth at the time of purchase in excess of $1 million;

(ii) individuals who are natural persons whose annual individual gross income for the last two years exceeded $200,000, or joint income with that person's spouse exceeded $300,000 in those years, and who have a reasonable expectation of such an income this year;

(iii) certain organizations, such as banks, insurance companies, investment companies, retirement plans and employee benefit plans;

(iv) any corporation or partnership not formed for the specific purpose of acquiring the Notes offered hereby, with total assets in excess of $5,000,000; and

(v) certain trusts.

Each Investor will be required, as a condition to investing in the Notes, to submit a completed Accredited Investor Questionnaire affirming that the Investor, or that each of the partners, members, shareholders or grantors of the Investor, is an Accredited Investor.

BECAUSE AN INVESTMENT IN THE NOTES WILL BE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFERABILITY AND RESALE, AS DESCRIBED MORE FULLY HEREIN AND IN THE EXHIBITS ATTACHED HERETO, INVESTORS MUST EXPECT TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE NOTES FOR AN INDEFINITE PERIOD OF TIME. THE NOTES MAY NOT BE OFFERED, RESOLD OR OTHERWISE DISPOSED OF WITHOUT REGISTRATION UNDER THE ACT UNLESS THE COMPANY RECEIVES (I) A WRITTEN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY STATING THAT SUCH REGISTRATION IS NOT REQUIRED AND (II) A WRITTEN CERTIFICATION, UNLESS WAIVED IN THE SOLE DISCRETION OF THE COMPANY, THAT ANY SUCH TRANSFER WILL NOT INCREASE THE NUMBER OF BENEFICIAL OWNERS OF THE NOTES. THE COMPANY RESERVES THE RIGHT TO REFUSE THE TRANSFER OF ANY NOTES IF THE COMPANY DETERMINES, IN ITS SOLE DISCRETION, THAT SUCH TRANSFER MAY JEOPARDIZE THE AVAILABILITY TO THE COMPANY OF AN EXEMPTION FROM REGISTRATION AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT. ANY SUCH RESALES MUST ALSO COMPLY WITH ANY APPLICABLE STATE SECURITIES LAW.

INVESTORS SHOULD BE AWARE THAT INTEREST ON THE NOTES MAY VARY DUE TO MARKET CONDITIONS, GENERAL ECONOMIC CONDITIONS, FUND UTILIZATION, THE EXTENT TO WHICH THE BANK MAKES LOANS AND PARTICIPATION INTERESTS AVAILABLE TO THE COMPANY FOR PURCHASE, COMPETITION, THE PERFORMANCE BY THE ADMINISTRATIVE AGENT OF ITS OBLIGATIONS UNDER THE ADMINISTRATIVE

UNSEALED

App. 0636

Wildstein-000035

AGENCY AGREEMENT OR OTHER UNFORSEEN FACTORS BEYOND THE CONTROL OF THE COMPANY.

.

UNSEALED

Wildstein-000036

# THE OFFER AND SALE OF THE NOTES

The Company has already sold $3,000,000 of Notes to ThinkCash, Inc., the parent entity of the Administrative Agent. Accordingly, the minimum amount of the Offering (as defined below) has been satisfied. The Company will continue to offer and sell, on a best efforts basis, up to a maximum of $50,000,000 aggregate principal amount (the "Maximum") of Notes solely to a limited number of Accredited Investors (the "Offer" or "Offering"). The proceeds from the Notes will fund the Company's purchase of loan participations (the "Participation Interests") in short term unsecured consumer installment loans originated by the Bank (the "Loans"). In addition, proceeds will also fund costs associated with the offer and sale of the Notes that are not otherwise borne by the Bank or the Administrative Agent (as defined below), including any legal accounting and other expenses associated with the preparation of the offering documents and costs relating to general administration of the Participation Interests and the Notes. The actual interest rate on the Notes shall be reduced by the Administrative Fee (as defined below) which shall be equal to the greater of $50,000 or one percent (1%) (annualized) of the aggregate principal amount of Notes outstanding paid on a monthly basis. The Administrative Fee will be retained by the Company and is intended to fund the payment by the Company of any expenses of administering the Note program that are not reimbursed by the Administrative Agent or the Bank, and the payment by the Company of a management fee to the Managing Member or the holders of equity interests in the Company in an amount not to exceed one-half of one percent (0.5%) per annum of the aggregate principal amount of Notes outstanding. These costs will be paid prior to Investors receiving any interest or principal payments on the Notes.

**A.    Terms of the Notes.** The offering of the Notes will terminate on the earlier of the date the Company accepts subscriptions for the Maximum amount of Notes or until the Closing Date, at which time the offering will terminate. By subscribing to the Offering, the Investor agrees to provide to the Company the amount of funds subscribed for, in an amount of at least $100,000 (in $50,000 increments); in return, the Company will provide the Investor with a Note in that amount. An Investor may purchase, or otherwise subsequently acquire, more than one Note and may own Notes in multiple denominations provided that such Notes are denominated in $50,000 increments.

Upon receipt by the Company of acceptable subscriptions, the Company will deposit such funds into a money market account established by the Company for this purpose at the Bank. The Company will then utilize to the extent possible, on a best-efforts basis, the amounts borrowed from the Investors, to purchase Participation Interests in the Loans made available to the Company by the Bank

The Notes will accrue interest at a rate of eighteen percent (18%) per annum, subject to reduction by the amount of an administrative fee retained by the Administrative Agent ("Administrative Fee"). The Administrative Fee shall be equal to the greater of $50,000 or one percent (1%) (annualized) of the aggregate principal amount of Notes outstanding paid on a monthly basis. The aggregate principal amount of Notes outstanding shall be calculated based on the average daily principal amount of Notes outstanding. The Administrative Fee shall be paid to the Company monthly. The Administrative Fee is intended to fund the payment by the Company of any expenses of administering the Note program that are not reimbursed by the Administrative Agent or the Bank, and the payment by the Company of a management fee to the Managing Member or the holders of equity interests in the Company in an amount not to exceed one-half of one percent (0.5%) per annum of the aggregate principal amount of Notes outstanding. The actual interest earned by and paid to Investors holding Notes will be reduced by the amount of such Administrative Fee and by the withholding of any applicable taxes. Please see the section titled "Legal/Tax Matters." Accordingly, the interest rate payable on the Notes (net of the Administrative Fee and assuming at least $5 million in principal of outstanding Notes) will be seventeen (17%) percent per annum.

Within ten (10) business days after the end of each month, the Administrative Agent on behalf of the Company will distribute interest earned to the Investors. All principal repayments received in respect of the Participation Interests shall be reinvested in additional Participation Interests as and when such Participation Interests are made available to the Company by the Bank. Upon delivery of an effective

**UNSEALED**                        App. 0638                        Wildstein-000037

Redemption Notice by an Investor (or the occurrence of the Program Termination Date), such Investor's pro rata portion of the principal repayments on the Loans in which the Company has a Participation Interest shall cease to be reinvested by the Company in additional Participation Interests once the redemption of such Investor's Note has commenced pursuant to the redemption procedures described herein. Investors shall not have the right to reinvest interest payable in respect of the Notes to purchase additional Notes.

Within ten (10) business days after the end of each month (the "Payment Date"), the Administrative Agent will pay to the holders of Notes, pursuant to the terms of the Notes, after payment to the Bank of the amount of any Bank Fees payable for such month, an amount calculated according to the following formula each day:

On each calendar day the outstanding balance of the Notes multiplied by a fraction, the numerator of which is .18 (i.e., 18%) and the denominator is 365. For example, if on a given day the total principal amount of the Notes is $5,000,000, then the interest accrual on the Notes for such given day shall be:

$5,000,000 times (.18 divided by 365) = $2,465.50 daily interest accrual.

Such amount will be available pro rata to holders of the Notes as interest accruing on the Notes, subject to any reductions for administrative or other fees (the "Available Interest"). After deduction of the Administrative Fee, the remaining such amount of Available Interest will be paid to Investors by the Administrative Agent as provided in the Administrative Agency Agreement. Each Investor is required to provide and, as required, update all requested information regarding a bank account (the "Investor Account") so that any payments due to the Investor in respect of the Notes may be deposited in such account. The Administrative Agent will deposit the Available Interest distributable to a Note holder in such Note holder's Investor Account.

After the payment of the Available Interest to the Investors and the Administrative Fee to the Company, the Administrative Agent, as payment for its services under the Administrative Agency Agreement, shall be entitled to all other cash received in respect of the Participation Interests, if any, after all payments are made to Investors of interest on the Notes; provided that principal repayments received by the Company in connection with a Participation Interest shall either be used to purchase additional Participation Interests in new Loans or shall be used to repay the principal amount of the Notes with respect to Notes which have been redeemed or which have matured. The Administrative Agent is entitled under the terms of the Administrative Agency Agreement to retain all fees, interest and principal payments allocable to all Past Due Loans purchased by the Administrative Agent.

**B.    Redemption.** Investors may require repayment of their Note by the Company commencing in the first calendar quarter (the "Repayment Commencement Date") after which the Investor has provided the Company with a Redemption Notice not less than forty-five (45) days prior to the Repayment Commencement Date. Upon delivery of a Redemption Notice, the Investor will begin to receive, on the Repayment Commencement Date, such Investor's pro rata share of the principal repayments on the Loans in which the Company has purchased a Participation Interest. For example, if an Investor delivers a Redemption Notice to the Company prior to February 15, 2010, the Repayment Commencement Date shall be April 1, 2010. Redemption Notices received after February 15, 2010, but prior to May 15, 2010, would have a Repayment Commencement Date of July 1, 2010. After the Repayment Commencement Date for such Investor begins, the Investor's pro-rata share of principal repayments would not be reinvested by the Company in additional Participation Interests and instead would be used to repay an equivalent portion of the Investor's outstanding principal in the Note. Such payments in respect of a repayment will be made on the Payment Date to redeeming Investors. The Company's obligation to repay any such Notes upon delivery of a Redemption Notice is subject to the Company having funds available for such repayment, which funds are expected to be substantially provided by the principal repayments on the Loans with respect to which the Company has purchased a Participation Interest. In the event the Company does not have the necessary funds available, such Notes shall not be required to be repaid until such time as the funds are available to the Company. Pursuant to

UNSEALED                                    App. 0639                                    Wildstein-000038

the terms of the Administrative Agency Agreement, the Administrative Agent has agreed to make such payments to the Company as are necessary to permit the Company to make the payments required on the Notes. In addition, after the Closing Date, if the Company does not purchase Participation Interests for a consecutive thirty (30) day period, then the Company will use (a) the principal repayments received in respect of the Loans in which the Company has purchased a Participation Interest and (b) the amount of any Early Redemption Payment (as such term is defined in the Administrative Agency Agreement) actually received by the Company from the Administrative Agent pursuant to the Administrative Agency Agreement, in each case to repay the outstanding principal amount on the Notes pro rata, as if all such Note holders had elected to redeem their Notes.

UNSEALED

App. 0640

Wildstein-000039

**C.     Prepayment.**  The Company has the right to prepay the Notes at any time and from time to time, in whole or in part, without penalty or premium. The Company shall use the proceeds of any Early Redemption Payment (as such term is defined in the Administrative Agency Agreement) actually received by the Company to prepay the Notes pro rata, as if all such Note holders had elected to redeem their Notes.

**D.     Program Termination Date.**  The purchase of Participation Interests will cease and the Note program will terminate on December 31, 2013 (the "Program Termination Date") unless the Notes are earlier redeemed or paid in full.  On the Program Termination Date, the Company will cease purchasing additional Participation Interests.  After the Program Termination Date, the Company will use the principal repayments received in respect of the Loans in which it has purchased a Participation Interest to repay the outstanding principal amount on the Notes pro rata, as if all such Note holders had elected to redeem their Notes and the Repayment Commencement Date (as defined above) with respect to the Notes outstanding at the Program Termination Date is January 1, 2014.  Such repayments will be made on the Payment Date to Investors after the Program Termination Date.  The Notes will mature when the Company ceases to own any Participation Interests or the principal amount of the Notes has been earlier redeemed or paid in full such that no Notes remain outstanding.  Prior to September 30, 2013, the Company may deliver a written notice (the "Extension Notice") of the Company's election to extend the Program Termination Date to a date no later than December 31, 2018; provided that the Company may deliver such an Extension Notice only if the Company and the Bank shall have extended the term of the Participation Agreement to such new Program Termination Date.

**E.     No Underwriters.**  The Company intends to sell the Notes for its own account and no underwriting discounts or commissions will be paid in connection with such sale.  The Bank and the Administrative Agent, or their respective officers or employees, may also contact potential investors in the Notes.  No special compensation will be paid to the Bank, the Administrative Agent or any officers or employees of the Company or the Administrative Agent or the Bank in connection with this Offering.

**F.     Accredited Investors Only; Subscription.**  The Notes may be purchased only by qualified Investors who are Accredited Investors upon completing the Subscription Agreement and the Accredited Investor Questionnaire attached hereto as Exhibits "A" and "D," respectively, and delivering the executed Subscription Agreement, Accredited Investor Questionnaire and cashier's check  or wire transfer to the Company. The Company reserves the right to accept Subscription Agreements in whole or in part, or to reject Subscription Agreements, in its sole discretion.

**G.     Sale/Transfer of Notes.**  The Notes have not been registered under the Act or under any state securities laws.  There is no public market for the Notes, and they are only transferable in very limited circumstances.  The Notes may not be offered, resold or otherwise disposed of without registration under the Act unless the Company receives a written opinion of counsel acceptable to the Company stating that such registration is not required as well as a written certification, unless waived by the Company in its sole discretion, that any such transfer will not increase the number of beneficial owners of the Notes.   The Company reserves the right to refuse the transfer of any Notes if the Company determines, in its sole discretion, that such transfer may jeopardize the availability to the Company of an exemption from registration as an investment company under the Investment Company Act.  Any such resales must also comply with any applicable state securities law.

**INVESTORS ARE CAUTIONED THAT THE NOTES ARE NOT DEPOSITS OR OBLIGATIONS OF, OR OTHERWISE GUARANTEED BY, THE BANK OR ANY OTHER BANK, AND ARE NOT INSURED BY THE FDIC OR ANY OTHER GOVERNMENTAL AGENCY.**

UNSEALED

Wildstein-000040

# THE COMPANY

**General.** The Company was formed on May 8, 2008, for the purpose of acquiring Participation Interests in certain short term unsecured consumer installment loans originated by the Bank and offered by the Bank to the Company pursuant to a participation agreement dated March 19, 2009, by and between the Bank and the Company (the "Participation Agreement"). A copy of the Participation Agreement is attached as Exhibit "B" hereto. The short-term unsecured consumer installment loans that are the subject of the Participation Interests consist primarily of unsecured installment loans offered to customers (collectively, the "Loans"), all of which are further described under the section titled "The Loans" below. While the performance of the Notes offered hereby is directly related to and entirely dependent on the success of the Bank and the Loans, Investors should note that an investment in the Notes is a loan to the Company, and <u>not</u> an investment in the Bank or a direct ownership interest in the Loans or the Participation Interests.

**Participation Transaction.** Pursuant to the Participation Agreement, as amended, the Bank shall sell, and the Company shall purchase, ninety percent (90%) Participation Interests in the Loans, up to an aggregate of $50,000,000, such interests to be identified on a schedule to be prepared from time to time by the Bank. Pursuant to the Participation Agreement, the Bank will retain a ten percent (10%) interest (the "Retained Interest") in Loans subject to the Participation Agreement. Consequently, the maximum amount of the Retained Interest would be $5,555,500 given a maximum of $50,000,000 in Participation Interests. The amount of any such Participation Interests may vary from time to time, and even from day to day. To the extent funds derived from the offering exceed the amount of Participation Interests available for purchase at any given time, the balance of such funds shall be deposited or re-deposited in the money market account established by the Company with the Bank for such purpose and shall earn interest at the Bank Fed Funds Rate. To the extent funds are not utilized to purchase Participation Interests and are deposited in the money market account, the return to Investors in the Notes will be less than the theoretical Maximum Rate and the interest available to Investors will be less than if proceeds of the Notes were fully invested in Participation Interest(s). In addition, interest payable on the Notes may be reduced due to factors beyond the Company's control, as more fully described in the section titled "Risk Factors." The interest payable on all Notes is subject to a reduction by the amount of the Administrative Fee which, on an annualized basis, is expected to be approximately one percent (1%) per annum of the aggregate outstanding principal amount of outstanding Notes.

**Administrative Fee.** The Company will retain the annual Administrative Fee out of the amounts received by the Company in respect of funds invested in Participation Interests or in a deposit or other account with the Bank. The Administrative Fee shall be equal to the greater of $50,000 or one percent (1%) (annualized) of the aggregate principal amount of Notes outstanding paid on a monthly basis. The aggregate principal amount of Notes outstanding shall be calculated based on the average daily principal amount of Notes outstanding. The Administrative Fee shall be paid to the Company monthly. The Administrative Fee is intended to fund the payment by the Company of any expenses of administering the Note program that are not reimbursed by the Administrative Agent or the Bank, and the payment by the Company of a management fee to the Managing Member or the Company's equity holders not to exceed one-half of one percent (0.5%) per annum of the aggregate principal amount of Notes outstanding. The actual interest earned by and paid to Investors holding Notes will be reduced by the amount of such Administrative Fee. Accordingly, if all of the proceeds of the sale of Notes are fully invested by the Company in Participation Interests at all times and the aggregate principal amount of outstanding Notes equals or exceeds $5 million, the maximum interest rate payable on the Notes (net of the Administrative Fee retained by the Company) will be seventeen (17%) percent per annum, less any applicable withholding or other taxes.

**Administrative Agency Agreement.** The Company has entered into an administrative agency agreement (the "Administrative Agency Agreement") with TC Administrative Services, LLC, a Delaware limited liability company (the "Administrative Agent") and wholly owned subsidiary of ThinkCash, Inc. (the "Guarantor"). As further explained below, the Administrative Agency Agreement contains certain covenants and guarantees on the part of the Administrative Agent which provide the Company with a degree of

UNSEALED

Wildstein-000041

protection against loan losses but do not remove all risks with respect to the Notes. Pursuant to the Administrative Agency Agreement, the Administrative Agent has agreed to purchase any Participation Interest relating to a past due loan from the Company at a price equal to the then-current outstanding principal balance of the relevant Loan, which funds in respect of past due loans sold to the Administrative Agent would then become available for the purchase of additional Participation Interests from the Bank. "Past due loans" under the Administrative Agency Agreement are the Company's interest in any Loan which is more than sixty (60) days past due. For more information regarding the Administrative Agency Agreement and the rights and responsibilities of the Company and the Administrative Agent under the Administrative Agency Agreement, see "The Loans – Administrative Agency Agreement."

**Legal Structure.** The Company is a Delaware limited liability company. The legal structure of the Company and the rights of the members and its governance are described in the Company's Certificate of Formation, which is available by request, and the Company's Limited Liability Company Agreement, which is attached as Exhibit "E" hereto. The Company has been initially capitalized with $1,000. The Company is wholly owned by Mark Wildstein and Mr. Wildstein is the Managing Member (the "Managing Member") of the Company. The Company has agreed that it will not pay management fees to the Managing Member or its equity holders in excess of an amount equal to one-half of one percent (0.5%) per annum of the aggregate principal amount of Notes outstanding. Any Administrative Fees received by the Company and not used to pay management fees or other expenses of the Company will be for the benefit of the holders of equity interests in the Company and shall be available to such holders of equity interests upon a termination of the Note program and liquidation of the Company.

## THE BANK

**General.** The following overview of the Bank's history has been provided to the Company by the Bank. The Bank is a Delaware state-chartered bank headquartered in Wilmington, Delaware. The Bank has two branches, both located in Wilmington, Delaware. The Bank's primary federal regulator is the Federal Deposit Insurance Corporation ("FDIC"). It is also regulated by the Office of the State Bank Commissioner of the State of Delaware. The Bank, originally a wholly-owned subsidiary of Republic First Bancorp, Inc. ("Republic First"), was spun off from Republic First on January 31, 2005. Consequently, the Bank is now an independent company and no longer a subsidiary of Republic First. The spin-off has not had a material effect on the operations of the Bank. The Bank offers a variety of credit and depository banking services to individuals and businesses. It also offers prepaid cards and subprime credit cards. Among the services the Bank offers are the Loans.

## THE LOANS

**The Loans.** The following discussion of the Loans has been provided to the Company by the Bank. The Bank reserves the right to modify the terms and conditions of the Bank's Loan program from time to time, in its sole discretion. The amounts of the Loans range from $250 to $2,500, and are for a term of four (4) to twenty-four (24) months. The annual percentage rate ("APR") on the Loans ranges from 87% to 334%, depending on the terms of the Loan. Loans are marketed over the internet and via TV and direct mail campaigns in approximately 43 states. Customers can either fill out an application on-line or call a toll-free number. The approval process is fully automated and gives the customer a loan decision within seconds. All Loans are funded overnight into the customer's bank account by ACH transfer and repaid either by ACH transfer from the customer's account or by check or other form of payment. Loans are designed to provide a better financial option for borrowers than payday loans and other products available. Riskier borrowers are limited to lower loan amounts and higher APRs, but with successful payment history are eligible for higher loan amounts and lower interest rates. All Loans are fully amortized, meaning the principal balance is reduced proportionately over the duration of the loan term. There is no balloon payment due on maturity. Furthermore, Loans have been designed to help the customer pay off their Loans quickly, but maintain an affordable payment amount of approximately $100 every bi-weekly pay period. Currently, the range of loan amounts and APRs is as follows (which amounts and APRs are subject to modification by the Bank from time

UNSEALED                            App. 0643                          Wildstein-000042

to time in its administration of the Loan program):

UNSEALED

Wildstein-000043

| Max Loan Amount | Term Rate | Daily Rate | Bi-weekly Term | Bi-weekly Payment | Semi-Monthly Term | Semi-Monthly Payment | Monthly Term | Monthly Payment |
|---|---|---|---|---|---|---|---|---|
| 250 | 334% | 0.9151 | 8 | 51.76 | 8 | 53.18 | 4 | 111.35 |
| 500 | 334% | 0.9151 | 12 | 83.78 | 12 | 86.98 | 6 | 180.47 |
| 600 | 311% | 0.8521 | 12 | 96.55 | 12 | 100.08 | 6 | 207.49 |
| 700 | 288% | 0.7890 | 12 | 108.06 | 12 | 111.81 | 6 | 231.62 |
| 800 | 260% | 0.7123 | 24 | 88.85 | 24 | 93.74 | 12 | 191.37 |
| 900 | 240% | 0.6575 | 24 | 94.23 | 24 | 99.24 | 12 | 202.56 |
| 1000 | 220% | 0.6027 | 30 | 92.52 | 30 | 97.93 | 15 | 199.14 |
| 1100 | 200% | 0.5479 | 30 | 94.69 | 30 | 110.01 | 15 | 203.33 |
| 1200 | 180% | 0.4932 | 30 | 95.78 | 30 | 100.89 | 15 | 205.10 |
| 1300 | 170% | 0.4658 | 36 | 94.50 | 36 | 99.97 | 18 | 202.72 |
| 1400 | 160% | 0.4384 | 36 | 97.33 | 36 | 102.80 | 18 | 208.45 |
| 1500 | 149% | 0.4082 | 42 | 94.92 | 42 | 100.56 | 21 | 203.53 |
| 1600 | 139% | 0.3808 | 42 | 96.15 | 42 | 101.68 | 21 | 205.79 |
| 1700 | 129% | 0.3534 | 42 | 96.85 | 42 | 102.21 | 21 | 206.85 |
| 1800 | 119% | 0.3260 | 48 | 93.08 | 48 | 98.45 | 24 | 198.95 |
| 1900 | 109% | 0.2986 | 48 | 92.36 | 48 | 97.45 | 24 | 196.91 |
| 2000 | 99% | 0.2712 | 48 | 91.18 | 48 | 95.93 | 24 | 193.82 |
| 2100 | 98% | 0.2685 | 48 | 95.12 | 48 | 100.05 | 24 | 202.13 |
| 2200 | 97% | 0.2658 | 48 | 99.01 | 48 | 104.11 | 24 | 210.32 |
| 2300 | 96% | 0.2630 | 48 | 102.81 | 48 | 108.07 | 24 | 218.33 |
| 2400 | 90% | 0.2466 | 48 | 103.07 | 48 | 108.14 | 24 | 218.43 |
| 2500 | 87% | 0.2384 | 48 | 105.20 | 48 | 110.26 | 24 | 222.70 |

**Loan Origination.** The following summary description of the Bank's loan origination process has been provided to the Company by the Bank. The Bank reserves the right to modify the terms and conditions of the Bank's loan origination process from time to time, in its sole discretion. The Bank obtains applications from marketers soliciting borrowers through various marketing channels, including direct mail, radio or television advertising, internet websites and referrals. Prospective borrowers are placed in two primary channels: new or existing customer. New customers are eligible for a maximum loan amount of $1,000 whereas existing customers may receive up to $2,500. All customers are credit scored via use of custom risk based strategies. These strategies focus on the customer's credit history with various reporting agencies and focus on both traditional and non-traditional payment activity. If approved, the amount of the Loan granted is a function of the person's income, custom credit score, and other verification factors. Once a customer visits the website or contacts the call center and provides the requisite credit information, the Bank determines whether or not to approve or deny the Loan based on the program criteria. If the Loan is approved and all verification requirements are met, the Bank funds the Loan.

UNSEALED                           App. 0645                        Wildstein-000044

**Loan Portfolio Performance to Date**

The following summary description of the performance of the loan portfolio has been provided to the Company by the Bank.

The first unsecured consumer installment loan originated by First Bank of Delaware and marketed through ThinkCash was made in February, 2007. Since then, the Bank has originated over $100 million in new loans through this program to over 140,000 consumers with an average loan size of approximately $700 with an average term of 10.2 months.

In 2007, the portfolio generated approximately $24 million in finance charges and approximately $12 million in chargeoffs, resulting in a 50% gross margin. In 2008, the portfolio generated approximately $62 million in finance charges and approximately $32 million in chargeoffs, resulting in a gross margin of approximately 50%. Since inception, there have been several enhancements to the credit underwriting rules – first in September, and later in December of 2007. As is detailed in the following charts, the overall portfolio performance has improved since inception and remains at target levels.

**Chart A: Monthly Payment Default Rates – Inception Through December 2008**



**UNSEALED**                     App. 0646                     Wildstein-000045

**Chart B: Payment Default by Loan Amount Range and Payment Number**



Payment Default by Loan Amount & Payment Number - Loan Level
After June 2008

Legend:
- ◆ $ 250
- ■ $ 500
- $ 750
- $ 1000
- $ 1500
- $ 2000

X-axis: Payment Number (1–24)
Y-axis: 0.00% – 18.00%

Payment counts where less than 100 payments were made are excluded.
Default curves end after loans come to term, ie, $250 have a term of 6 months or 12 payments

**Bank Fees.** The Bank shall receive certain fees prior to the Company receiving any payments under the Participation Agreement and prior to Investors realizing any returns on their Notes; including (i) account fees charged to borrowers to open accounts with the Bank to receive the proceeds of the Loans, NSF charges, service and miscellaneous fees and charges, (ii) out of pocket costs incurred in connection with underwriting, credit scoring, customer service, collections, legal and due diligence and identity verification and similar fees and expenses and (iii) a percentage fee determined from time to time by agreement of the Bank and the Company by taking a specified percentage not to exceed 15% and multiplying it times the aggregate interest and fees earned for a month on the Loans. For more information on these bank fees, see "Participation Agreement – Bank Fees".

**Participation of the Loans.** On a daily basis, the Bank will sell a ninety (90%) percent Participation Interest in the prior day's Loans to the Company pursuant to the Participation Agreement. The participation percentage can only be changed by mutual agreement of the Company and the Bank. The terms of the Participation Agreement are discussed in more detail below. The Bank will be responsible for servicing, underwriting and collecting on the Loans and will either perform such services itself or will contract with third parties to provide such services. Repayments of principal and interest and other fees are deposited into an account at the Bank which shall be administered by the Administrative Agent pursuant to the Administrative Agency Agreement. The Bank Fees will be retained by the Bank and the remainder of the funds will be disbursed by the Administrative Agent to the Company in accordance with the Administrative Agency Agreement, and in turn to the holders of the Notes in respect of calculated interest payments or principal repayments due on the Notes, as the case may be. The calculation of interest on the Notes is discussed in more detail above under "The Offer and Sale of the Notes – Terms of the Notes".

UNSEALED                    App. 0647                    Wildstein-000046

**Participation Agreement.** The Company's principal asset will be the Participation Interests in the Loans pursuant to a Master Participation Agreement between the Bank and the Company (the "Participation Agreement"). The Participation Agreement is attached as Exhibit B and this discussion of the Participation Agreement is qualified by reference to such Exhibit and prospective investors should read such agreement before subscribing for Notes.

*Purchase of Participation Interests.* Each business day on which the Bank makes Loans, the Bank will sell to the Company a ninety percent (90%) Participation Interest in the Loans, up to an aggregate total purchase price of the Participation Interests not to exceed $50,000,000 outstanding at any time net of principal payments on the Loans received by the Company. The ninety percent participation percentage may only be changed upon mutual agreement of the Bank and the Company. The Bank is permitted under the Participation Agreement to offer and sell participation interests in the Loans to one or more third parties in addition to the Company. The Bank may also elect to reduce or suspend the origination of new Loans (and the subsequent sale of Participation Interests) at any time. If the Company does not purchase any Participation Interests for a consecutive thirty (30) day period, then the Company will begin repaying the Notes by applying the principal repayments received from borrowers in respect of the Loans to the outstanding principal amount on the Notes pro rata, as if all Note holders had elected to redeem their Notes.

The Company is required to maintain a reserve deposit account (the "Reserve Account") with the Bank in an amount equal to the greater of (a) two (2) times the daily average of Participation Interests purchased by Buyer for the preceding month or (b) $250,000. The Reserve Account serves as collateral for the Company's payment obligations to the Bank under the Participation Agreement and the Company has granted the Bank a security interest in the Reserve Account and all other deposit accounts it may have with the Bank (including the Operating Account described below). It will not be available to make any payments required to be made by the Company or otherwise and any remaining balance in the Reserve Account will be paid to the Company upon the termination of the Participation Agreement and all amounts due or obligations incurred by the Company to the Bank are satisfied.

The Participation Interests purchased by the Company are without recourse or representations or warranties of any kind except for the limited representations made by the Bank in the Participation Agreement and the Company. In particular, the Company is purchasing Participation Interests in the Loans on an "as-is" basis without any representation or warranty from the Bank regarding the nature, accuracy, completeness, enforceability or validity of any of the Loans or the loan documents relating thereto.

*Servicing and Administration of the Loans.* The Bank will service the Loans subject to the Participation Interests. The Bank has agreed to employ the same servicing procedures, including collection procedures, that the Bank customarily employs in servicing loans for its own account and in accordance with the servicing practices of prudent lending institutions and will service the Loans in accordance with the program guidelines established by the Bank from time to time in connection with its lending program for the solicitation, marketing and origination of short term unsecured consumer installment loans of the type subject to the Participation Agreement. The Bank will handle all collections on the Loans.

Each day, the Bank will remit into a loan repayment account with the Bank established by the Company (or the Administrative Agent on the Company's behalf) an amount equal to the Company's Participation Interest in any principal, interest and fee payments received by the Bank on such date. Within five (5) business days after the end of each calendar month, the amounts due for its Participation Interest will be transferred from the loan repayment account to the Operating Account, after payment of all Bank Fees.

The Bank retains the sole authority to establish underwriting criteria with respect to the Loans and will be identified in all loan documents as the sole lender. The Bank has the authority to underwrite each refinancing of an existing Loan and to handle and resolve all consumer complaints. The Bank may not reduce the interest rate on a Loan or the principal balance due on a Loan, except when a Loan is in default.

UNSEALED                          App. 0648                                    Wildstein-000047

*Company Obligations to the Bank.* The Company will provide annual financial statements to the Bank and has agreed to give written notice to the Bank within thirty (30) days of any material adverse change in its business, properties and assets, or financial condition and any pending or threatened litigation involving a claim against the Administrative Agent of $100,000 or more, and of all tax deficiencies and other proceedings before governmental bodies or officials affecting the Company. The Company will also deliver to the Bank, within twenty-one (21) days of receipt, any notice of actual or threatened adverse action issued by any regulatory authority or any actual or threatened litigation or arbitration with respect to any third party with respect to the Loan program. The Company agrees to submit to any regulatory audit or examination which might be required by regulators with authority over the Bank.

*Transferability of Participation Interests.* The Company may assign its rights in the Participation Interests to another entity subject to the Bank's approval, which shall not be unreasonably withheld and which assignee is subject to a due diligence review by the Bank in the Bank's sole discretion.

*Suspension or Termination of Origination of New Loans.* The Bank may elect to reduce or suspend the origination of new Loans at any time. The Bank has the right to suspend the origination of new Loans and the sale of Participation Interests in such Loans to the Company if the Company fails to purchase Participation Interests when offered to the Company for thirty (30) consecutive days or if the funds available for the Company to purchase Participation Interests fall below $3 million. The Company has the right to suspend the purchase of new Loans at any time upon five (5) business days notice to the Bank.

*Term and Termination of the Participation Agreement.* The term of the Participation Agreement is for a period commencing on the date of the Participation Agreement and ending on December 31, 2013 (the "Term"); provided that the Term may be extended by the Bank and the Company upon mutual written notice for up to an additional five (5) years thereafter. Either the Company or the Bank may terminate the Participation Agreement on thirty (30) business days' notice.

*Indemnification of the Bank by the Company.* The Company has agreed to indemnify and hold harmless the Bank against (i) the Company's breach or failure to fulfill its obligations under the Participation Agreement, (ii) any losses or penalties related to improper use or disclosure or unlawful use or disclosure of customer information by the Company, (iii) any liability of the Bank for any fees, costs, or other amounts arising out of any contract with a third party service provider retained by the Company, and (iv) the offering of the Program and any and all aspects thereof, including (without limitation) any demands or claims made in any individual, joint, representative or class action by or on behalf of borrowers and or other persons, and any inquiries, investigation or actions by federal, state, or local regulatory agencies or administrative bodies, provided, however, that the Company shall not be liable to the Bank for the foregoing to the extent the losses arise from the Bank's gross negligence or willful misconduct, and provided further that the Bank takes such action in contesting any such claim that the Company reasonably requests from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company and agreed to by the Bank.

*Bank Fees.* The Bank Fees set forth below will be paid monthly and shall be deducted from amounts otherwise due and payable to the Company in respect of Participation Interests and which fees have priority over any amounts to be realized by the Company and, by extension, Investors in the Notes:

- ■ all of the Bank's charges and fees associated with any bank accounts that the Company establishes to conduct the Loan program contemplated under the Participation Agreement, including without limitation, actual NSF charges, services fees and any miscellaneous monthly fees;

- ■ all out of pocket costs related to the Loan program incurred including all credit scoring costs, identity verification costs, underwriting and verification costs, Teletrack fees, OFAC and due diligence costs and the Bank's outside counsel fees relating to the Loan program;

UNSEALED                      App. 0649                      Wildstein-000048

- reimbursement of the Bank's direct employee costs, including salary, benefits and bonuses paid, that are incurred in underwriting the Loans;

- a Marketing Fee of $100 per funded Loan in which a Participation Interest is purchased;

- a Technology Fee of $35 per funded Loan in which a Participation Interest is purchased;

- in any month where the principal charge offs on the Loans exceed twenty-five (25%) percent of the stated principal amount of the Loans outstanding, the amount of principal on the Loans that exceeds twenty-five (25%) percent which continues to be owned by the Bank as part of its Retained Interest shall be retained by the Bank as a Bank Fee; and

- additional monthly compensation determined in writing from time to time between the Bank and the Company which will not exceed fifteen (15%) percent times the interest and fees (but not principal repayments) actually paid by borrowers ("Receipts") for the prior month with respect to the Loans and any change in the formula for calculating such additional monthly compensation may be made only with the written consent of each of the Bank, the Company and the Administrative Agent.

**Administrative Agency Agreement.** The Company has entered into an Amended and Restated Administrative Agency Agreement (the "Administrative Agency Agreement") with TC Administrative Services, LLC, a Delaware limited liability company (the "Administrative Agent") and wholly owned subsidiary of the Guarantor. The Guarantor has guaranteed the obligations of the Administrative Agent pursuant to the Guaranty (the "Guaranty"). The Administrative Agency Agreement is attached as Exhibit F and this discussion of the Administrative Agency Agreement is qualified by reference to such Exhibit and prospective investors should read such agreement before subscribing for Notes. Pursuant to the terms of the Administrative Agency Agreement, the Administrative Agent will perform various administrative services for the Company including:

- disbursing Company funds for the Company's purchase of Participation Interests in the Loans using funds received from Investors pursuant to the sale of the Notes as well as funds repaid to the Company in respect of Loans as to which the Company has purchased a Participation Interest;

- depositing in the Company's operating account the proceeds of the offering of the Notes and the proceeds received by the Administrative Agent on behalf of the Company in respect of the Company's Participation Interests in the Loans, including fees, interest and principal repayments;

- within five (5) business days of any Loan becoming more than sixty (60) calendar days past due (a "Past Due Loan"), purchasing the Participation Interest in such Past Due Loan from the Company at a price equal to the then-current outstanding principal balance of such Past Due Loan;

- guaranteeing the payment of principal and interest to Investors as provided in the Administrative Agency Agreement;

- arranging for the deposit of funds into and maintaining the Reserve Fund (as defined below);

UNSEALED

Wildstein-000049

- make any Early Redemption Payments and purchase Participation Interests from the Company with any such Early Redemption Payment in the event the Company ceases to purchase additional Participation Interests.

- maintaining (or monitoring the maintenance of) books and records for the Company and procuring, when the Administrative Agent considers in good faith that it is appropriate or necessary to do so, and coordinating the advice of, legal counsel, accounting, tax and other professional advisers to assist the Company in carrying out its obligations;

- providing certain indemnifications to the Company as discussed below;

- reimbursing the Company for the certain fees and expenses incurred in connection with the Offering of the Notes;

- reimbursing the Company for the premium paid to obtain $5 million of liability insurance covering directors, officers, managers and members or other control persons of the Company;

- establishment of the Agent Reserve Account;

- providing the Company with certain accounting services; and

- making payments out of the Company's operating account to Note holders in respect of interest and principal payments due on the Notes.

The Administrative Agent has agreed to reimburse the Bank for any portion of the Bank Fees that are payable by the Company and not paid when due by the Company.

The Administrative Agent has agreed to provide the Collateral Amount (as such term is defined in the Participation Agreement) if a Collateral Event (as such term is defined in the Participation Agreement) occurs and such Collateral Amount is not so provided by the Company

To the extent that a Loan in which the Company has purchased a Participation Interest becomes a Past Due Loan, the Administrative Agent has agreed to purchase the Participation Interest in such Loan from the Company at a price equal to the then-current outstanding principal balance of such Past Due Loan. Under the terms of the Administrative Agency Agreement, a Loan becomes a Past Due Loan if payments are more than sixty (60) calendar days past due.

The Administrative Agent has agreed that, to the extent that funds in the Operating Account are insufficient to make any payments due and payable to the Company or by the Company to the Investors in respect of their Notes from time to time, the Administrative Agent shall make such payments as necessary from its own funds without recourse to the Operating Account for any funds so advanced, including in respect of the Administrative Fee or interest on the Notes.

The Administrative Agent has agreed to establish and maintain on behalf and for the benefit of the Company a reserve account (the "Agent Reserve Account") at the Bank. Funds in the Agent Reserve Account will accrue interest. Once the Administrative Agent has been repaid all amounts paid out of its own funds pursuant to the preceding paragraphs, then fifty percent (50%) of the amounts that would otherwise be payable to the Administrative Agent shall be deposited into the Agent Reserve Account until such time that at all times the balance in the Agent Reserve Account is equal to ten percent (10%) of the amounts then owed by the Company to the Investors under the Notes.

UNSEALED                            App. 0651                            Wildstein-000050

The Administrative Agent has agreed to conduct its business in a manner separate from and independent of the Company and the Company has agreed to conduct its business in a manner separate from and independent of the Administrative Agent.

The Administrative Agent has agreed to give written notice to the Company within thirty (30) days of any material adverse change in its business, properties and assets, or financial condition and any pending or threatened litigation involving a claim against the Administrative Agent of $100,000 or more, and of all tax deficiencies and other proceedings before governmental bodies or officials affecting the Administrative Agent. The Administrative Agent will also deliver to the Company, within twenty-one (21) days of receipt, any notice of actual or threatened adverse action issued by any regulatory authority or any actual or threatened litigation or arbitration with respect to any third party with respect to the Loan program.

*Early Redemption Payment*. The Administrative Agent has agreed that in the event the Company ceases purchasing additional Participation Interests, the Administrative Agent shall also purchase from the Company an amount of Participation Interests (at a price equal to the then-current outstanding principal balance of the Loans underlying such Participation Interests so purchased) equal to one-half of the compensation payable to (or retained by) the Administrative Agent under the Administrative Agency Agreement for the period commencing on the date the Company ceases purchasing additional Participation Interests and ending on the earlier of (i) the date the Notes have been paid in full and (ii) the date on which the Company resumes purchasing Participation Interests.

*Compensation of Administrative Agent and Disbursements to Investors*. The Administrative Agent's compensation under the Administrative Agency Agreement will be determined monthly. Within ten (10) business days after the end of each month, the Administrative Agent will cause the Company to pay the following amounts in the following order of priority: (i) pay to the Bank the Bank Fees for the prior month if not retained directly by the Bank; (ii) pay the Administrative Fee to the Company; and (iii) pay to the Investors holding Notes the Available Interest (as reduced by the Administrative Fee) and principal, as the case may be, based upon their pro rata share thereof.

On each calendar day the outstanding balance of the Notes multiplied by a fraction, the numerator of which is .18 (i.e., 18%) and the denominator is 365. For example, if on a given day the total principal amount of Notes is $5,000,000, then the interest accrual on the Notes for such given day shall be:

$5,000,000 times (.18 divided by 365) = $2,465.50 daily interest accrual.

Such amount will be available to holders of the Notes as interest accruing on the Notes, subject to any reductions for the Administrative Fee.

After the payment of such amounts, the Administrative Agent, as payment for its services under the Administrative Agency Agreement, shall be entitled to the amounts, if any, representing interest and fees (but not repayments of principal) paid by borrowers under the Loans after all payments are made to Investors of interest on the Notes and in all events, shall be entitled to retain all fees, interest and principal payments allocable to all Past Due Loans purchased by the Administrative Agent; provided that the Administrative Agent may be required to use one-half of its compensation hereunder in any given period to make an Early Redemption Payment and purchase Participation Interests from the Company as described above and as provided in the Administrative Agency Agreement.

Upon receipt of a written notice by the Company that it has received a Redemption Notice, the Administrative Agent shall arrange for the repayment of such Note holder's principal amount of the Note, from the Operating Account to the extent such funds are available to fund such repayment. The Administrative Agent will bear all of its expenses in performing the services provided under the agreement.

UNSEALED                    App. 0652                    Wildstein-000051

*Indemnifications and Guarantees by Administrative Agent.*  The Administrative Agent agrees to devote the same amount of time, attention and resources to and is required to exercise the same level of skill, care and diligence in the performance of its services as it would if it were administering such services on its own behalf, but in no event less than the standard of service provided by financial institutions acting in good faith.  The Administrative Agency Agreement provides that the Administrative Agent shall indemnify and hold the Company harmless from: (i) the Administrative Agent's performance of services under the Administrative Agency Agreement or its breach of such agreement; (ii) breaches of representations and warranties by the Administrative Agent and the Guarantor; (iii) failure of the Administrative Agent or the Guarantor to comply with their obligations under the loan program and the legal requirements applicable thereto; (iv) losses related to improper use or disclosure of customer information by the Administrative Agent or the Guarantor; (v) liabilities of the Company for amounts arising out of contracts with third party service providers retained by the Company; (vi) the offering of the loan program and any and all aspects thereof, including without limitation any demands or claims made in any individual, joint, representative or class action by or on behalf of borrowers and or other persons, and any inquires, investigation or actions by federal, state, or local regulatory agencies or administrative bodies; and (vii) as a result of the Company's indemnification obligations under Section 20 of the Participation Agreement.  The Administrative Agent shall not have indemnification liability for losses arising from (i) willful misconduct, deceit or fraud of the Company, (ii) any breach by the Administrative Agent of its obligations under this Agreement to the extent such breach is a result of the servicer's failure to perform its obligations to the Company or a failure by the Company to comply with its obligations under the Administrative Agency Agreement, (iii) any action that the Company requires the Administrative Agent to take pursuant to the Company's direction or (iv) the Company's refusal to take action upon a good faith recommendation by the Administrative Agent to take such action.

*Guaranty Agreement.*  The Guaranty is attached as Exhibit G and this discussion of the Guaranty is qualified by reference to such Exhibit and prospective investors should read such agreement before subscribing for Notes.  The Guarantor, the parent company of the Administrative Agent, has agreed to guarantee the punctual payment, performance and observance by the Administrative Agent of all of its Obligations (as defined below).  "Obligations" means all amounts due and payable by the Administrative Agent to the Company pursuant to the Administrative Agency Agreement and the performance by the Administrative Agent of its obligations under the Administrative Agency Agreement.  Prospective investors are advised that any claims the Company may ever have against the Guarantor or any of its subsidiaries or affiliates may be junior to the obligations of the Guarantor and its subsidiaries and affiliates to Michael C. Stinson ("Stinson").  The Guarantor has advised the Company that Stinson is a secured lender to the Guarantor and its affiliates and subsidiaries.  Pursuant to the Guaranty, the Guarantor has provided the Company with its audited financial statements for the most recently completed fiscal year.  The Guarantor has agreed during the term of the Administrative Agent Agreement to maintain a minimum net worth of $15 million.  The Administrative Agent has advised the Company that, as of December 31, 2008, according to the audited financial statements of the Guarantor provided to the Company by Guarantor, Guarantor's net worth was approximately $30.5 million.  The Administrative Agent has agreed to deliver to the Company copies of its audited financial statements annually.

*Term of Administrative Agency Agreement.*  The Administrative Agency Agreement shall terminate upon the earliest of (i) the later of the final payment or other liquidation of the last Loan subject to a Participation Interest sold to the Company under the Participation Agreement and the remittance of all funds due under the Administrative Agency Agreement, or (ii) by mutual consent of the Administrative Agent and the Company.  In addition, the Administrative Agent may, upon five (5) business days' notice, instruct the Company to cease purchasing Participation Interests from the Bank.

The agreement may also be terminated by the Company in the event of a breach of the agreement by the Administrative Agent which remains uncured for five (5) days in the case of a payment default or thirty (30) days in the case of other defaults.  The Company may also terminate in the event of a bankruptcy, liquidation, insolvency or similar proceedings involving the Administrative Agent or the Guarantor.

UNSEALED                              App. 0653                              Wildstein-000052

With the prior written consent of the Company, which shall not be unreasonably withheld or delayed, the Administrative Agent may resign as administrative agent upon ninety (90) days prior written notice to the Company, provided that such consent is not necessary upon a determination that the Administrative Agent's duties hereunder are no longer permissible under applicable law (in which case the following sentence shall be inapplicable). In the event that the Company, despite its best reasonable efforts, is unable to obtain a replacement to fulfill the obligations and duties of the Administrative Agent, the Company may, upon not less than thirty (30) days prior written notice, obligate the Administrative Agent to delay its resignation and fulfill the obligations and duties imposed on it by the Agreement until all Loans in which a Participation Interest has been purchased have been satisfied or have been charged off by the Bank. The Company has agreed that upon such resignation and no successor having been appointed, the Company shall not acquire any additional Participation Interests in Loans.

In the event of a termination of the Administrative Agency Agreement, the Company will either need to perform itself the services previously provided by the Administrative Agent, or procure such services from a third party. In the event of such termination, any excess returns on Participation Interests that would have been compensated to the Administrative Agent would be available post-termination to (i) fund the procurement of such administrative services from a third party, and (ii) fund any indemnity obligation or other amounts due to the Bank or third parties.

UNSEALED                            App. 0654                        Wildstein-000053

# FORWARD LOOKING STATEMENTS

The information contained in this Memorandum includes certain forward-looking statements. When used in this document, words such as "intend," "expect," "could,", "should," "would," "believe," "potential", "estimates", "plans", "anticipates" and similar expressions are intended to identify forward-looking statements regarding events and financial trends which may affect the Company's future operating results and financial position. Such statements are not guarantees of future performance or a representation by the Company or any other person that the results expressed in the forward-looking statements will be achieved. Such forward-looking statements are subject to risks and uncertainties that could cause the Company's actual results and financial position to differ materially from those included within the forward-looking statements, including the Bank's ability to attract qualified borrowers and make Loans and sell Participation Interests to the Company, changes in competition and new product offerings by competitors, changes in general economic conditions or in business conditions in the financial services industry, interest rate fluctuations, the regulatory and litigation environment surrounding short-term consumer loans, changes in laws and governmental rules applicable to short term consumer installment loans including additional restrictions on such loans, the ability of the Administrative Agent to perform its obligations to the Company and the creditworthiness of the Administrative Agent and the Guarantor. Many factors, some, but not all of which, are described in detail below under the caption **"RISK FACTORS."** These risks and uncertainties are beyond the ability of the Company to control, and, in many cases, the Company cannot predict all of the risks and uncertainties that could cause its actual results to differ material from those expressed in the forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date made. The Company undertakes no obligation to disclose any revision to these forward-looking statements to reflect events or circumstances after the date made or to reflect the occurrence of unanticipated events.

## RISK FACTORS

*You should carefully consider the following risk factors and warnings before making an investment decision. The risks described below are not the only ones facing the Company. Additional risks not yet known or currently immaterial that may later become material may also impair or affect your investment. If any of the following risks actually occur, the business, financial condition or results of operations of the Company could be materially and adversely affected. In such case, you may lose all or part of your investment.*

**A.** **Controversy Surrounding the Loans.** Certain types of short term consumer installment loans are controversial because they (1) are generally taken out by low income individuals and (2) involve fees that, when annualized, amount to extremely high rates of interest. There have been, and continue to be, numerous reports in the media that have labeled these types of loans as "abusive" and "predatory." Consumer activist groups have voiced loud opposition against certain lenders and have pressured federal and state bank regulatory agencies to prohibit banks and loan retailers from making loans that such groups deem to be abusive and predatory. In response to controversy surrounding "payday" loans, the FDIC issued Revised Guidelines that curtailed such lending practices and adversely affected the market for such loans. It is possible that installment loans, which also feature extremely high rates of interest, may also be categorized as "predatory loans" by such critics. If so, they may be subject to the same tactics, pressures and adverse FDIC or other regulatory action.

**B.** **Dependence on Legal Framework.** The Bank is a Delaware state-chartered bank regulated by the FDIC and the State of Delaware. While the FDIC has issued guidelines for FDIC-regulated banks that make payday loans, such guidelines generally relate to required disclosures and the safety and soundness of the Bank and its FDIC-insured deposits. Delaware state banking laws, on the other hand, generally govern the types of loans the Bank may make. There can be no assurance that this legal/regulatory framework will not change again in a way that will make it economically unfeasible or illegal for the Bank to continue making the Loans. It is expected that there will be continued pressure by federal and state regulators to curtail or eliminate certain lending practices that may affect the ability of the Bank to continue making the Loans. Adoption of such federal or state regulations or legislation could restrict, or even eliminate, the availability of short term

UNSEALED

Wildstein-000054

consumer installment lending products in some or all of the states in which the Bank makes the Loans. If, for any reason, the Bank ceases to make or becomes unable to continue to make Loans, the Company would no longer have the ability to purchase Participation Interests from the Bank and such circumstances would adversely affect the amount of interest payable on the Notes and the value of the Notes.

       **C.**     **FDIC Guidelines and Regulation.**   Current or future guidelines issued by the FDIC may require the Bank to curtail or eliminate its short term consumer installment lending program and any such action may adversely affect your investment in the Notes. The Bank has advised the Company that on October 3, 2008, it agreed to a Stipulation and Consent to the Issuance of an Order to Cease and Desist, Order for Restitution, and Order to Pay, the "Consent Agreement," with the FDIC, pursuant to which the Bank, among other things, consented to the issuance by the FDIC of an Order to Cease and Desist, Order for Restitution and Order to Pay, the "Order." The Consent Agreement and Order represent a resolution of a June 10, 2008 notice of charges from the FDIC, as well as related litigation, regarding the Bank's consumer lending programs. The Bank has advised us that the Consent Agreement and Order are confidential and the Company and its representatives have not reviewed the terms of the Consent Agreement or the Order. The Bank has further advised us that the Consent Agreement and Order, among other things, requires the Bank to obtain the non-objection of the FDIC with respect to various aspects of the Bank's national consumer products division, including the short term consumer installment lending program. If the FDIC objects to the short term consumer installment lending program of the Bank, this could result in the early termination of the Participation Agreement and/or the inability of the Company to use its funds to purchase additional Participation Interests, which would adversely affect the amount of interest payable on the Notes and the value of the Notes. If the FDIC objects to the installment loan program or any aspect of the program, it may result in an adverse affect on the amount of interest payable on the Notes or the value of the Notes.

       **D.**     **Litigation Efforts.**   In addition to public demonstrations and pressure on regulators, consumer advocacy groups have mounted numerous class action lawsuits over the years against payday lenders in the name of borrowers. Similar efforts could be mounted in connection with the installment and emergency lending programs. These lawsuits are generally settled out of court. Although these lawsuits tend to be contained within a single state, there are enough of them to garner national attention through exposure on "investigative report" type television programs and other media. Recently, tax preparer H & R Block gained national attention defending itself against a large nation-wide class action lawsuit over tax refund anticipation loans, which operate much like payday loans and are grouped with payday loans by consumer advocate groups due to their relatively high annualized interest rates. Investors should be aware that similar litigation could directly involve the Bank and/or alter the legal framework that permits the Bank to make the Loans. Either of these developments could adversely affect your investment in the Notes.

       **E.**     **Collection Risks.**   The Bank has advised the Company that in the event that the Bank is prohibited in the future from making the Loans, banking agencies have historically given banks a significant period in which to cease making loans and to collect outstanding loans. If for any reason the Bank is prohibited from making Loans and is unable to collect outstanding Loans, the Company may not have the funds necessary for repayment of principal on the Notes. As discussed above under "FDIC Guidelines and Regulation", the Bank has advised the Company that on June 10, 2008, the FDIC filed a formal notice initiating an administrative action against the Bank and third parties related to its consumer lending programs which was resolved by the Bank's entering into the Consent Agreement and Order on October 3, 2008. The Bank has advised us that the Consent Agreement and Order are confidential and the Company and its representatives have not reviewed the terms of the Consent Agreement or the Order. The Bank has further advised us that the Consent Agreement and Order, among other things, requires the Bank to obtain the non-objection of the FDIC with respect to various aspects of the Bank's national consumer products division, including the short term consumer installment lending program. If the FDIC objects to the short term consumer installment lending program of the Bank, this could result in the early termination of the Participation Agreement and/or the inability of the Company to use its funds to purchase additional Participation Interests, which would adversely affect the amount of interest payable on the Notes and the value of the Notes. If the FDIC objects to the installment loan program or any aspect of the program, it may result in

**UNSEALED**                App. 0656               Wildstein-000055

an adverse affect on the amount of interest payable on the Notes or the value of the Notes. If the FDIC successfully pursues further administrative action in the future, any remedy sought by the FDIC including the termination or invalidation of the Participation Agreement, the invalidation of the Loans, restrictions on collecting outstanding Loans, or the cessation of the making of new Loans or the purchase and sale of Participation Interests under the Participation Agreement will materially and adversely affect the return to Investors in the Notes and may affect the solvency of the Company. There can be no assurances that the Company will have receipts sufficient to repay the principal amount of all of the Notes and all accrued interest thereon.

     **F.**    <u>**Risks Related to the Bank**</u>. The Company's earnings (and the returns to Investors on the Notes) are dependent upon the lending activity of the Bank and the resulting sale of Participation Interests in Loans to the Company. There can be no assurance that the Bank will continue underwriting new Loans or that the Bank will offer Participation Interests to the Company in any Loans. In the event Participation Interests are not offered to the Company in amounts sufficient to enable the Company to adequately utilize its funds, there will be an adverse effect on the interest rate payable on the Notes.

     **G.**    <u>**Risks Related to the Administrative Agent**</u>. The Company's operations are largely dependent upon the performance by the Administrative Agent of its duties and obligations under the Administrative Agency Agreement, including the obligation of the Administrative Agent to purchase any Past Due Loans from the Company. Failure by the Administrative Agent to perform under the Administrative Agency Agreement will materially and adversely affect the returns to Investors in the Notes and may affect the solvency of the Company. There is no assurance that the Company would be able to obtain a replacement Administrative Agent on a timely basis or on similar or more favorable economic terms. Failure of the Guarantor to perform under the Guaranty or a default by the Administrative Agent will materially and adversely affect the returns to Investors in the Notes and may affect the solvency of the Company.

     **H.**    <u>**Risks Related to the Guarantor**</u>. The Administrative Agent's obligations under the Administrative Agency Agreement are guaranteed by the Guarantor pursuant to the terms of the Guaranty. To the extent that the Guarantor is unable to meet its financial obligations under the Guaranty, Investors may experience a reduction in the interest and principal amounts received in respect of the Notes.

     **I.**    <u>**Risks related to the Stinson Loan**</u>. The Company has been advised that all of the assets of the Guarantor, as well as all of the assets of each of the Guarantor's affiliates and subsidiaries, are subject to a first priority security interest in favor of Stinson. In the event of default in the obligations to Stinson, the ability of the Company and the investors to recover amounts due from the Administrative Agent will likely be inhibited.

     **J.**    <u>**Risks Related to the Company**</u>. While the Company's agreement with the Administrative Agent provides that the Administrative Agent provide a full accounting of the transactions, the Company has no operating history, limited resources and only one employee. The Company will be paid an Administrative Fee of the greater of $50,000 per annum and one percent (1%) per annum of the aggregate principal amount of the Notes outstanding to cover its cost of operations, including a management fee of 0.5% per annum of the aggregate principal amount of the Notes outstanding. Regulatory and other pressures could increase administrative costs further beyond the Company's ability to pay such costs.

     **K.**    <u>**Risks Related to the Monthly Interest**</u>. If the Participation Interests purchased by the Company fail to generate the expected returns or if the Company fails to purchase a sufficient amount of Participation Interests, then the Company may not have the funds necessary to make payments of Available Interest. In such event, under the Administrative Agency Agreement, the Administrative Agent is required to provide funds to the Company to make such payments. If the Administrative Agent fails to fulfill this obligation, Note holders will suffer losses.

     **L.**    <u>**Risks Related to Early Termination of Participation Agreement and Early Redemption**</u>

**UNSEALED**          App. 0657          Wildstein-000056

**of Notes.** Under the Participation Agreement, each of the Company and the Bank have the right to terminate the Participation Agreement. In addition, the Administrative Agent has the right under the Administrative Agency Agreement to direct the Company to cease purchasing additional Participation Interests from the Bank. If any of these events occur, the Company would no longer reinvest principal payments received in respect of Participation Interests into new Participation Interests and would commence repaying the principal amount of the Notes. Such an occurrence would reduce the overall returns to Investors in the Notes. The Company's ability to repay the principal amount of the Notes upon such termination depends upon the Administrative Agent's performance of its obligations to make Early Redemption Payments and purchase Participation Interests from the Company with any such Early Redemption Payment.

        **M.**    **Risks Related to the Loans.** The Company is purchasing Participation Interests in the Loans on an "as-is" basis without any representation or warranty from the Bank regarding the nature, accuracy, completeness, enforceability, or validity of any of the Loans or the loan documents relating thereto. Any defects or credit or other problems with the Loans or loan documents could adversely affect the returns available to the Company and Note holders in respect of the Participation Interests and the value of the Notes.

        **N.**    **Risks Related to Loan Marketers.** The Bank offers the Loans through marketers, with which the Bank has marketing agreements. The Bank may not be able to negotiate favorable terms in these marketing agreements. In addition, the termination of one or more of these marketing agreements, due to, for example, perceived infeasibility of offering the Bank's products, could have an adverse effect on your investment in the Notes.

        **O.**    **No Registration Under Investment Company Act.** The Company will not register as an investment company under the Investment Company Act in reliance upon the exemption afforded by Section 3(c)(1) of that statute. In general, Section 3(c)(1) provides that an issuer will not be deemed to be an investment company if its outstanding securities are beneficially owned by not more than one hundred (100) persons.

        Investors should be aware that the foregoing list is not intended to be all-inclusive; rather, the list is intended to illustrate some of the risks that may be involved in purchasing the Notes offered by the Company in connection with this Memorandum.

## RESTRICTIONS ON RESALE

        The Notes offered hereby have not been registered under the Securities Act or under any state securities laws. The Notes may not be offered, resold or otherwise disposed of without registration under the Act unless the Company receives a written opinion of counsel acceptable to the Company stating that such registration is not required as well as a written certification, unless waived by the Company in its sole discretion, that any such transfer will not increase the number of beneficial owners of the Notes The Company reserves the right to refuse the transfer of any Notes if the Company determines, in its sole discretion, that such transfer may jeopardize the availability to the Company of an exemption from registration as an investment company under the Investment Company Act. Any such resales must also comply with any applicable state securities law.

## PAYMENT OF INTEREST

        The Company shall pay accrued interest payable on the Notes (less the Administrative Fee payable to the Company) in arrears on the Payment Date. Payments on the Notes shall be effected by the Administrative Agent on the Company's behalf pursuant to the terms of the Administrative Agency Agreement.

UNSEALED        App. 0658        Wildstein-000057

## PAYMENT OF PRINCIPAL AND REDEMPTION PRIOR TO PROGRAM TERMINATION OR MATURITY

Investors may require repayment of their Note by the Company by providing the Company with a Redemption Notice not less than forty-five (45) days prior to the desired Repayment Commencement Date. Upon delivery of a Redemption Notice, the Investor will begin to receive, on the Repayment Commencement Date, such Investor's pro rata share of the principal repayments on the Loans in which the Company has purchased a Participation Interest. After the Repayment Commencement Date for such Investor begins, the Investor's pro-rata share of principal repayments would not be reinvested by the Company in additional Participation Interests and instead would be used to repay an equivalent portion of the Investor's outstanding principal in the Note. Such payments in respect of a repayment will be made on a monthly basis to redeeming Investors. The Company's obligation to repay any such Notes upon delivery of a Redemption Notice is subject to the Company having funds available for such repayment, which funds are expected to be provided by the principal repayments on the Loans with respect to which the Company has purchased a Participation Interest. In the event the Company does not have the necessary funds available, such Notes shall not be required to be repaid until such time as the funds are available to the Company. Pursuant to the terms of the Administrative Agency Agreement, the Administrative Agent has agreed to make such payments to the Company as are necessary to permit the Company to make the payments required on the Notes. In addition, after the Closing Date, in the event the Company does not purchase Participation Interests for a consecutive thirty (30) day period, the Company will use (a) the principal repayments received in respect of the Loans in which the Company has purchased a Participation Interest and (b) the amount of any Early Redemption Payment (as such term is defined in the Administrative Agency Agreement) actually received by the Company from the Administrative Agent pursuant to the Administrative Agency Agreement, in each case to repay the outstanding principal amount on the Notes pro rata, as if all such Note holders had elected to redeem their Notes.

The Notes will mature when the Company ceases to own any Participation Interests or the principal amount of the Notes has been earlier redeemed or paid in full such that no Notes remain outstanding.

The Company shall have the right to prepay the Notes in whole or in part without penalty or premium. The company shall use the proceeds of any Early Redemption Payment (as such term is defined in the Administrative Agency Agreement) actually received by the Company to prepay the Notes pro rata, as if all such Note holders had elected to redeem their Notes. A Form of Note is attached hereto as Exhibit C.

## USE OF PROCEEDS

The Company intends to utilize the proceeds of this offering to purchase Participation Interests from the Bank pursuant to the Participation Agreement, as amended. The Company will also utilize the proceeds to pay all of its costs and expenses in connection with the offering of the Notes not reimbursed by the Bank or the Administrative Agent, including, but not limited to, all expenses related to the costs incurred to prepare, reproduce or print this document, the Company's insurance expenses and legal, accounting and other expenses incurred in complying with federal and state securities laws.

## LEGAL/TAX MATTERS

An investment in the Notes may involve certain material federal and state tax consequences. Prospective Investors should consult with their respective legal counsel, accountant or business adviser as to legal, tax and related matters concerning investment in the Notes offered hereby. The Company is required to withhold any applicable state and federal taxes to which Investors may be subject, including, but not limited to, the Pennsylvania Corporate Loans Tax.

UNSEALED

Wildstein-000058

## CONDITION OF SALE OF THE NOTES

The Company has sold $3,000,000 of Notes prior the date hereof and reserves the right to continue to accept subscriptions for and issue additional Notes up to the Maximum until December 31, 2009, at which time the Offering will terminate.

## SUBSCRIPTION TO THE OFFERING OF THE NOTES

Investors may purchase the Notes offered hereunder by delivering to the Company: (i) one completed and duly executed copy of the Subscription Agreement attached hereto as Exhibit A; (ii) one completed and duly executed copy of the Accredited Investor Questionnaire attached as Exhibit "D" hereto; and (iii) payment in the amount of the Purchase Price as set forth in the Subscription Agreement. Execution of the Subscription Agreement shall constitute an irrevocable subscription for the Purchase Price as set forth in the Subscription Agreement. Payment of the Purchase Price may be made by cashier's check, money order or wire transfer to the account of the Company (Acct. No.: 6005918) at:

> First Bank of Delaware
> ABA/Routing Number - 031101059

The minimum purchase that may be made is $100,000; increments in $50,000. The Company reserves the right to accept Subscription Agreements in whole or in part, or to reject Subscription Agreements. The executed Subscription Agreement, Accredited Investor Questionnaire and payment (if by cashiers check or money order) should be returned to:

> Universal Finance II, LLC
> 1429 Spring Mill Road
> Gladwyne, PA 19035
> Attention: Mark Wildstein, Managing Member

UNSEALED                    App. 0660                    Wildstein-000059

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

|  |  |
|---|---|
| In the Matter of | STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, AND ORDER TO PAY |
| FIRST BANK OF DELAWARE WILMINGTON, DELAWARE | |
| (INSURED STATE NONMEMBER BANK) | FDIC-07-256b FDIC-07-257k |

Subject to the acceptance of this STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, AND ORDER TO PAY (CONSENT AGREEMENT) by the Federal Deposit Insurance Corporation (FDIC), it is hereby stipulated and agreed by and between a representative of the Legal Division of the FDIC and First Bank of Delaware, Wilmington, Delaware (Respondent) as follows:

1. The Respondent has received a NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING (collectively, NOTICE) issued by the FDIC on June 10, 2008 detailing the violations of law and/or regulations and unsafe or unsound banking practices alleged to have been committed by the Respondent for which an ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, AND ORDER TO PAY (ORDER) may issue against the Respondent pursuant to sections 8(b) and 8(i)(2) of the Federal Deposit Insurance Act (Act), 12 U.S.C. §§ 1818(b) and 1818(i)(2).

2. Respondent has been further advised of its right to a



Confidential

UNSEALED

App. 0661

TF-PA-684341

hearing on the charges under sections 8(b) and 8(i)(2) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i)(2), and the FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308.

3.    The Respondent is represented by counsel.

4.    The Respondent admits that the FDIC is the appropriate Federal banking agency to maintain this enforcement action pursuant to section 3(q)(3) of the Act, 12 U.S.C. § 1813(q)(3), and that the FDIC has jurisdiction over it and the subject matter of this proceeding.

5.    The FDIC has reason to believe that the Respondent engaged in unsafe or unsound banking practices and violations of law and/or regulations in connection with the operation and oversight of the Respondent's National Consumer Products Division, including, but not limited to, the lending programs offered, marketed, administered, processed and/or serviced by third-parties pursuant to the agreements set forth in Exhibits "A" and "B" attached hereto. Specifically, the FDIC has reason to believe the Respondent engaged in violations of:

(a)    section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (Section 5);

(b)    section 205.10 of Regulation E of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 205.10;

(c)    the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.*;

(d)    Part 332 of the FDIC Rules and Regulations, 12 C.F.R. Part 332, implementing the consumer privacy safeguards of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*;

-2-

Confidential

**UNSEALED**

TF-PA-684342

(e) the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* and Regulation B of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 202 *et seq.*;

(f) the E-Sign Act, 15 U.S.C. §§ 7001 *et seq.*; and

(g) the CAN-SPAM Act of 2003, 15 U.S.C. §§ 7701 *et seq.*

6. In the interest of compromise and settlement, the Respondent, solely for the purpose of this proceeding pursuant to sections 8(b) and 8(i)(2) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i)(2), and without admitting or denying any of the unsafe or unsound banking practices or violations of law or regulations as set forth in paragraph 5 of this CONSENT AGREEMENT, hereby consents and agrees to the issuance of the ORDER by the FDIC, and further consents and agrees to pay a civil money penalty in the amount of $304,000 to the Treasury of the United States pursuant to the provisions of section 8(i)(2) of the Act, 12 U.S.C § 1818(i)(2).

7. The Respondent further agrees to pay the civil money penalty assessed by delivering to the FDIC a certified check payable to the Treasury of the United States in the amount of $304,000 upon execution of this CONSENT AGREEMENT. Upon issuance of the ORDER by the FDIC, the FDIC shall remit the certified check to the Treasury of the United States.

8. In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, Respondent agrees not to seek or accept indemnification for the civil money penalty assessed and paid in this matter.

-3-

Confidential
UNSEALED

TF-PA-684343

9.    Paragraph I of the ORDER provides that the Respondent shall terminate certain third-party lending programs and third-party providers that exhibit the characteristics of a "Rent-a-BIN" or "Rent-a-ICA" arrangement. Exhibit "C" attached hereto lists certain third parties that provide services directly to the Respondent. The FDIC and Respondent hereby agree that these third-parties are not subject to the termination provision set forth in paragraph I of the ORDER.

10.    The Respondent further stipulates and agrees that such ORDER will be deemed to be an order which has become final under the Act, and that such ORDER shall become effective upon its issuance by the FDIC and fully enforceable by the FDIC pursuant to the provisions of the Act subject only to the conditions of paragraphs 11 and 12 of this CONSENT AGREEMENT.

11.    In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, it is agreed that no action will be taken by the FDIC against the Respondent to enforce the ORDER in the United States District Court unless the Respondent, its affiliates, their successors or assigns, or their respective directors, officers, employees, and agents, has violated or is about to violate any provision of such ORDER.

12.    (a)    In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, and except for any claims against any of the CompuCredit Parties, as hereinafter defined, this will be a release by the FDIC of the Respondent, its affiliates, their successors and assigns, and their respective directors, officers, employees, and agents (collectively, the Bank Parties) with

-4-

UNSEALED

App. 0664

respect to the violations of Section 5 identified by the FDIC arising out of or related to the Tribute Little Rock, Imagine Little Rock, Purpose Advantage, and Embrace credit card programs or relating in any manner to the FDIC's Report of Examination dated April 25, 2007 and/or the FDIC's Compliance Report of Examination as of April 6, 2006 and related investigations, in each case to the effective date of the ORDER (Release Violations). The CompuCredit Parties shall mean CompuCredit Corporation, Atlanta, Georgia (CompuCredit), its officers, directors, employees, subsidiaries, successors and assigns, and any party having a contract with CompuCredit or providing services to or for the benefit of CompuCredit, with the exception of any of the Bank Parties. In the event the FDIC accepts this CONSENT AGREEMENT and issues the ORDER, except for any actions against any of the CompuCredit Parties, it is agreed that the FDIC shall not initiate any further legal action, except an action to enforce the terms of the ORDER, against any of the Bank Parties based on the Release Violations. Neither this CONSENT AGREEMENT nor the ORDER, if issued, shall constitute a release of any of the CompuCredit Parties.

(b) Except as provided herein, the Respondent agrees and acknowledges that the terms and provisions of this CONSENT AGREEMENT and the acceptance by the FDIC of this CONSENT AGREEMENT and the issuance of the ORDER shall not in any way bar, estop or otherwise prevent the FDIC from taking any other action against any of the Bank Parties, or any of the Respondent's current or former institution-affiliated parties.

-5-

(c)  The FDIC expressly reserves all rights against the CompuCredit Parties.  Nothing in this CONSENT AGREEMENT or the ORDER shall require the FDIC or any other party to reduce, compromise, or otherwise limit any claims against any of the CompuCredit Parties.

(d)  Nothing in this CONSENT AGREEMENT or the ORDER shall require the FDIC or any other party to reduce, compromise, or otherwise limit any claims because of any contractual or other commitments of the Bank to indemnify, defend, or hold harmless any of the CompuCredit Parties.

13.  The FDIC and the Respondent agree that entering into this CONSENT AGREEMENT shall not constitute an admission of liability by the Respondent for the transactions and practices that form the basis of the ORDER.

14.  The Respondent hereby agrees and acknowledges that the terms and provisions of this CONSENT AGREEMENT and the acceptance by the FDIC of this CONSENT AGREEMENT and the issuance of the ORDER shall not bar, estop or otherwise prevent any other federal or state agency or department from taking any action against any of the Bank Parties, or any of the Respondent's current or former institution-affiliated parties. Except as expressly provided herein, the Respondent reserves all of its rights with respect to the assertion of any claims, in any form, by any individual, or federal or state agency, department or entity.

15.  The Respondent hereby waives:

(a)  all defenses and counterclaims of any kind to the NOTICE and in this proceeding;

-6-

(b)   a public hearing for the purpose of taking evidence on such alleged charges;

(c)   the filing of proposed findings of fact and conclusions of law;

(d)   the issuance of a recommended decision by an administrative law judge;

(e)   the filing of exceptions and briefs with respect to such recommended decision; and

(f)   judicial review of the ORDER as provided by section 8(h) of the Act, 12 U.S.C. § 1818(h), or any other challenge to the validity of the ORDER.

Dated this 3d day of October, 2008.

FDIC
LEGAL DIVISION

BY:

_____
A.T. Dill, III
Assistant General Counsel

FIRST BANK OF DELAWARE
WILMINGTON, DELAWARE

BY:

_____
Harry D. Madonna, Esq.
Director

_____
William W. Batoff
Director

_____
Alonzo J. Primus, CPA
Director

_____
Lyle W. Hall Jr., CPA
Director

_____
Harris Wildstein, Esq.
Director
Comprising the Board of
   Directors of
First Bank of Delaware
Wilmington, Delaware

-7-

## EXHIBIT A

1. Amended and Restated Affinity Card Agreement dated as of March 13, 2006 between CompuCredit Corporation and First Bank of Delaware;

2. Amended and Restated Installment Loan Marketing and Servicing Agreement dated as of September 20, 2006 (made effective as of August 23, 2006) between Noble Consumer Lending Services, LLC and First Bank of Delaware;

3. Credit Card Marketing and Servicing Agreement dated as of August 31,2005 between First Bank of Delaware and CARDS Credit Services, LLC;

4. Credit Card Marketing Agreement dated as of February 28, 2006 by and among Continental Finance Company, LLC, Continental Sub-Prime Purchasing, LLC and First Bank of Delaware, and the Amended and Restated Receivables Purchase Agreement dated as of May 17, 2006 by and among First Bank of Delaware, Continental Finance Company, LLC, and Continental Sub-Prime Purchasing, LLC;

5. Credit Card Marketing Agreement dated as of January 18, 2007 between Accucredit Associates, LLC and First Bank of Delaware and the Receivables Purchase Agreement dated January 17, 2007 between Accucredit Associates, LLC and First Bank of Delaware;

6. Credit Card Marketing Agreement dated as of September 29, 2006 between E-Duction, Inc. and First Bank of Delaware and the Receivables Purchase Agreement dated September 29, 2006 between First Bank of Delaware and E-Duction Receivables Funding I, LLC;

7. Installment Loan Marketing and Servicing Agreement dated as of November 1, 2006 between Avante Teladvance, Inc. d/b/a Check 'n Go Online and First Bank of Delaware;

8. Consumer Loan Marketing, Origination, and Sale Agreement dated as of January 15, 2007 between CashCall, Inc. and First Bank of Delaware;

9. Marketing and Servicing Agreement dated as of January 23, 2007 between TC Loan Service, LLC d/b/a ThinkCash and First Bank of Delaware and the Master Participation Agreement dated as of January 23, 2007 between TC Financial, LLC and First Bank of Delaware;

Confidential

UNSEALED

TF-PA-684348

App. 0668

10. Program Administration Agreement dated as of November 1, 2006, between First Bank of Delaware and Fortris Financial, LLC and PF Participation Funding Trust; Master Participation Agreement dated as of November 1, 2006 between First Bank of Delaware and Fortris Financial, LLC and PF Participation Funding Trust; and the Sub-Servicing Agreement dated as of November 1, 2006 between Fortris Financial, LLC and First Bank of Delaware;

11. Premium Finance Program Agreement dated as of August 23, 2006 between First Delaware Services LLC and First Bank of Delaware;

12. Processor Sponsorship and Services Agreement dated as of April 17, 2006 between Card Express, Inc. and First Bank of Delaware;

13. Processor Sponsorship and Services Agreement dated as of August 26, 2005 between TSYS Prepaid, Inc. and First Bank of Delaware;

14. Processor Sponsorship and Services Agreement dated as of April 5, 2006 between ECOM Financial Corp. and First Bank of Delaware;

15. Program Management Agreement dated July 30, 2004 between Financial Services International, Inc. and First Bank of Delaware;

16. Processor Servicing Agreement dated as of October 5, 2004 between Lynk Systems, Inc. and First Bank of Delaware;

17. Bank Sponsorship and Services Agreement dated as of January 3, 2007 between Payoneer, Inc. and First Bank of Delaware.

-9-

UNSEALED                        App. 0669

EXHIBIT B

1. Amended and Restated Affinity Card Agreement dated
   as of March 13, 2006 between CompuCredit Corporation
   and First Bank of Delaware.

Confidential

**UNSEALED**

TF-PA-684350

App. 0670

EXHIBIT C

1. Marketing provider Selling Source, Inc.

2. Marketing provider Quasar Corporate Services, Inc.

3. Credit and debit card processor TSYS Inc.

4. Credit and debit card processor First Data Resources

5. Credit and debit card processor Fidelity National Information Services

6. Credit and debit card processor Ecommlink

7. Credit and debit card processor I2c Inc.

8. Customer service and collection provider First Center, LLC

9. Customer service and collection provider Cardworks Inc.

10. Credit scoring provider Transunion

11. Credit scoring provider DataX

12. Data hosting facilities provider Hosted Solutions

13. Data hosting facilities provider Rackspace

14. Scoring and credit analysis provider Austin Logistics

15. Scoring and credit analysis provider Scoring Solutions

16. Marketing provider Tailwind Marketing, LLC

17. Technology provider Protective Draft Credit, LLC

18. Software provider TC Decision Sciences, LLC

19. Marketing provider Data Processing Systems, LLC

20. Loan servicing provider Capture Resources, LLC

-11-

Confidential

UNSEALED

TF-PA-684351



th!nk

F I N A N C E

## Universal Fund Investor Update
## PPM Amendment

July 9, 2010



Confidential
UNSEALED

App. 0672


Massive growth in new loan volumes
- 27,000 new loans in June alone
- Forecast continued strong growth at June volumes through year-end

Portfolio outstandings are greater than Universal Fund limitations
- Increased fund size from $50MM to $60MM to cover anticipated July growth
- Expect to hit $60MM cap by early August

Existing investor pool unlikely to support anticipated growth volumes
- Expected growth in ThinkCash portfolio will require $85-$90MM Universal Fund by year-end
- Institutional investor required to realistically support this level of growth

CONFIDENTIAL – DO NOT COPY



Victory Park Capital is an investment fund located in Chicago
- Due to the fund structure, they must purchase participations directly rather than investing in additional notes issued by the Universal Fund

Victory Park will purchase an undivided share of the participations that Universal Fund purchased from FBD
- Exclusive right to purchase up to $90MM in participations (exclusivity terminates if VPC fails to purchase participations when required)
- Initial $15MM investment (will purchase part of Think Finance Notes in the UFund)
- Ongoing daily purchases of UFund participations as ThinkCash portfolio grows
- Program expenses will be shared pro rata between the UFund and VPC

Level of participations underlying the Universal Fund investments will be only minimally impacted by Victory Park Capital
- Universal Fund will purchase and hold participations up to the level that allows for required operating cash (~5%) and sell participation interests above that level to VPC
- In a shrinking portfolio, Universal Fund and Victory Park will reduce their ownership levels of the underlying loan pool on a pro rata basis

CONFIDENTIAL – DO NOT COPY





Think Finance Product Fund Structure

CONFIDENTIAL – DO NOT COPY


App. 0675

TF-PA-001998



New VPC Fund Structure

th!nk

**TF Admin. Services** — BUYS BACK CHARGED OFF LOANS AT FULL BV / RECEIVES FUND NET INCOME AS MONTHLY ADMIN FEE ↔ **VPC Fund** — DISTRIBUTES A RETURN → **VPC**

VPC Fund — PURCHASES PARTICIPATIONS IN 90% POOL ↓ **Universal Fund**

**TF Admin. Services** — BUYS BACK CHARGED OFF LOANS AT FULL BV / RECEIVES FUND NET INCOME AS MONTHLY ADMIN FEE ↔ **Universal Fund** — PAYS INVESTORS INTEREST → **Investors**

Universal Fund — PURCHASES 90% PARTICIPATION ↓ **First Bank of Delaware**

**TF Marketing** ← BUYS LEADS — **First Bank of Delaware** — PAYS FOR SERVICING → **Outsourced Operations**

**TF Decision Sciences** — LICENSES IT & RISK MGMT SERVICES → First Bank of Delaware

CONFIDENTIAL – DO NOT COPY

Confidential
**UNSEALED**

TF-PA-001999



The new deal structure will require amendments to the existing PPM

Investors must approve the new PPM and deal structure
- Increase in fund size to $75MM
- Increase the offering period through July 2013 (3 year VPC deal)
- Approve Universal Fund ability to sell participations to VPC under terms of new Participation Agreement between Universal Fund and VPC (attached to new PPM)

Those investors who do not sign the consent to the amended PPM or are uncomfortable with the terms of the deal will be redeemed immediately

Upon closing, the Admin Agent will fully fund the 10% investor reserve and will allow an additional $5MM in Universal Fund investments (not including Think Finance investments) on a first-come basis

CONFIDENTIAL – DO NOT COPY



**Daily Cash Instructions**

**5/21/2012**

Procedure Overview: On a daily basis, Finance monitors operating, collections, funding, and payroll cash accounts. A summary of the daily cash activity is prepared from the underlying bank records and detail for executive review. In addition, there are multiple intra- and inter- bank transfers or wires that need to be made to maintain minimum balances per the agreements in place with the tribes and ACH providers. These wires and transfers are also booked within the General Ledger - Dynamics in order to maintain accurate cash balances within each company.

A. Check Bank Balances

1. Open the daily cash monitoring worksheet (effectively a daily cash subledger) at Y:Cash/Bank Balances. This sheet tracks each of the bank accounts that Think Finance monitors, along with the wires that were posted each day.

2. Find the tab with last business day's date on it e.g. Friday May 18 tab will be labeled "05.18.12". Roll this tab forward by copying the tab into the same workbook, and re-labeling with the today's date. Change the date in cell A2 to reflect today's date.

3. Generally, Column B – "Balances" should be updated with current day balances. These balances are typically pulled from the online banking resources for each bank. However, it may also be necessary to pull the daily cash balance from Dynamics.

a. TC Loan Service Operating – 4124201062 – This account's balance is currently the only exception whose balance is pulled from Dynamics rather than from the bank's website. This is done because there are frequently large outstanding check balances that have not cleared the bank, but have been posted to the GL. Therefore the GL provides a more accurate cash balance. Keep track of any outstanding wires that have not been posted by AP, and deduct these from the balance.

1. Login to Dynamics, and select the TC Loan Service, LLC Company.

Exhibit
P-35
Christy R. Sievert, CSR, RPR

2. Once logged in, click on Inquiry>Financial>Detail to access the detail inquiry screen. Type in account 10450-800 where prompted for the account. Then click the magnifying glass icon and click 'Select' when prompted. The following screen should then pop up.



3. Take the figure in the "Account Balance" section of this screen and key this value in Column B in the "Bank Balances" spreadsheet. Any unrecorded wires should be deducted from this balance. Check with Accounts Payable for a comprehensive list of any such wires.

b. Wells Fargo Bank Accounts – Login to the Wells Fargo Bank Accounts using the Corporate Portal at: https://www.wellsfargo.com/com/. The Company ID should be "TFINANCE". Each user should have been granted a unique login and password, along with a SecurID Token. Once logged in, but before digging into each of the Wells accounts, a couple of checks should be made.

1. Check the "ACH Fraud Filter" for any activity. There should be none:



2. Check "Image Positive Pay" for any activity. Check with Accounts Payable if there is anything but zeroes.



Confidential
**UNSEALED**

3. Go to the "Reporting" section of the initial Wells screen. Click "Go" next to the "Previous Day Composite", and a PDF report will generate that will subsequently be used to support each account's balance in the daily cash calculations on the Bank Balances workbook.



4. TC Loan Service Payroll – 4124201070 – Account not used to date, should be zero.

5. TCL Loan Service Section 125 Plan – 4124201088 – Account not used to date, should be zero.

6. TC Loan Service Credit Card – 4124201096 – On the Treasury Information Report PDF generated in Step 3, find the Opening Available Balance for each Wells account, and update column B on the "Bank Balances" workbook with this figure.



7. TC Admin Services Operating – 4124201104 – Repeat procedure from Step 6.

8. Tailwind Marketing – 4124201138 - Ensure prior day's wires to or from this account were properly booked on the bank's records. To do this, sum the prior day's balance from column B and the prior day's activity in column C on the "Bank Balances" workbook, and compare that to the daily balance reported by Wells. Repeat procedure from Step 6.

9. Think Finance, Inc. – 4124201146 - Repeat procedure from Step 6.

10. TC Financial Operating – 4124201468 - Repeat procedure from Step 6.

11. Think Finance SPV Operating – 4124201476 - Ensure the prior day's wires to or from this account were properly booked on the bank's records. Repeat procedure from Step 6.

12. Think Finance SPV Fees – 4124201484 - Repeat procedure from Step 6.

Confidential

**UNSEALED**

TF-PA-318533

13. TC Financial Transfers – 4124201492 - Repeat procedure from Step 6.

14. Plain Green Funding – 4124208992 - This account typically has two wires that are made to/from this account, a wire out to Intercept and a wire in from GPLS. Ensure the prior day's wires to or from this account were properly booked on the bank's records. Repeat procedure from Step 6. In Column C, add the difference between the Debits and Credits if the sum is a credit.

15. Plain Green Collection – 4124209008 – This account frequently has a wire out to Citi GPLS Collection Account. Ensure the prior day's wires to or from this account were properly booked on the bank's records. Repeat procedure from Step 6. In addition, print the activity for this account, as we will use the Collection account later in the process.

16. Plain Green Reserve – 5621127272 – Rarely used, monitor for large variances only.

17. Haynes Investments – 6477061523 - Rarely used, monitor for large variances only.

18. Go back to the initial login screen on the Wells website. Go to the Reporting section, and select the "Intraday Composite" option. This report will be used to adjust today's balances for intra-day postings.



a. Plain Green Funding – 4124208992 – From Intraday postings, sum the debits and credits and adjust column B in "Bank Balances" workbook with this total.

b. Plain Green Collections – 4124209008 - From Intraday postings, sum the debits and credits and adjust column B in "Bank Balances" workbook with this total. Print the Intraday postings and save for later.

| Currency: USD | |
|---|---|
| **Bank:** 121000248 | **WELLS FARGO BANK, N.A.** |
| **Account:** 4124209008(TX) | **PG Collection Account** |
| **Balances** | |
| Opening Ledger Balance | 2,626,534.10 |
| Opening Available Balance | 2,626,534.10 |
| Current Ledger Balance | 3,144,016.93 |
| Current Available Balance | 3,144,016.93 |
| One Day Float | .00 |
| Two-Day Float | .00 |
| Back Value Adjustment to Opening Ledger | .00 |
| Back Value Adjustment to Opening Available | .00 |
| Change in Available Balance Since Opening | 517,482.83 |
| Today's Credits | 518,687.84 |
| Today's Debits | 1,205.01 |

c. Red River Bank Accounts – Have yet to gain access to this account

d. Plains Capital Bank Accounts - Login to the Plains Capital Banking website using the Corporate Portal at: https://www.plainscapital.com/commercial-banking/Pages/index.aspx. Each user should have been granted a unique login and password.

   1. Find the new daily bank balance from the Plains Capital website, and apply to column B on "Bank Balances". There are several accounts that will require additional research. For all the others, simply updating the balance will suffice. Use the "Available Balance" column for all non-Money Market accounts.

| ⊟ Checking | | | |
|---|---|---|---|
| Account | Updated | Available Balance | Current Balance |
| ↪ *COMMERCIAL CHECKING ACCOUNT ANALYSIS XXXXX00^2 | 06/11/12 01:24PM | $82,218.02 | $90,210.83 |
| COMMERCIAL CHECKING ACCOUNT ANALYSIS XXXXA04^7 | 06/11/12 01:24PM | $25,100.00 | $25,100.00 |
| COMMERCIAL ALL ACCESS XXXAXX1021 | 06/11/12 01:24PM | $38,500.00 | $38,500.00 |

   a. PCB - TC Loan Service Operating – Ensure that any wires or transfers from prior day have been posted.

   b. PCB –TC Loan Service Payroll - Ensure that any wires or transfers from prior day have been posted.

   c. PCB – PayDay One of Delaware – Daily wire typically sent to Intercept.

   d. PCB - PayDay Select of Delaware  - Requires a minimum balance of $150k

   e. PCT – TC Loan Service Section 125 Plan – Requires a $10k minimum balance.

   f. PCB-TC Loan Service Manual ACH – Requires a $10k minimum balance.

   g. PCB-PDO Financial - Requires a $30k minimum balance.

   h. PCB-PayDay One of Alabama - Requires a $20k minimum balance.

   i. PCB-Think Finance, Inc Operating – Used for taxes, so is crucial not to bounce any checks here.

   j. Money Market accounts – Should use "Current Balance" column, not the "Available Balance"

e. Citibank Accounts – Login to the Plains Capital Banking website using the Corporate Portal at: https://businessaccess.citibank.citigroup.com/cbusol/signon.do. Each user should have been granted a unique login and password, and a Citibank token should have been obtained. Once Logged in, click on Balance and Information Reporting>Checking Summary. Then use the "Current Available" Column for the correct balances.



| ▼Account▲ | ▼Start-of-Day Ledger▲ | ▼Start-of-Day Available▲ | ▼Current Ledger▲ | ▼Current Available▲ |
|---|---|---|---|---|
| GPL Collect | 2,704,342.64 | 2,704,342.64 | 2,704,342.64 | 2,704,342.64 |
| GPL MAINT | 1,152,715.94 | 1,152,715.94 | 6,652,715.94 | 6,652,715.94 |
| GPL Purchase | 215,408.68 | 215,408.68 | 3,715,408.68 | 3,715,408.68 |
| GPL Serv Trs | 9,851,822.42 | 9,851,822.42 | 852,384.84 | 852,384.84 |

Display Group ThinkFinance ▾

f. Missouri Bank and Trust Acccounts - Login to the Missouri Bank website using the at: https://mobank.ebanking-services.com/Auth/SignIn. Each user should have been granted a unique login and password, as well as a unique SecurID token. Add the balance for each Missouri Bank account to the "Bank Balances" sheet in column B.

## Deposit Account Balances as of 06/11/2012

To view deposit account details, click the Account Number.

**Checking Accounts**

| | | | |
|---|---|---|---|
| 101000158 | *6540 | GREAT PLAINS LENDING FUNDING ACCT | $714,761.21 |
| 101000158 | *6559 | GREAT PLAINS LENDING RECEIVABLES | $605,637.53 |

    1. For the Great Plains Lending Receivables account, click on the hyperlink under account number, and print the detail for this account. Ensure that wires in and out from prior day were posted.

    2. For the Great Plains Lending – Funding, click on the hyperlink under account number, and ensure that wires in and out from prior day were posted.

g. PNC Pinnacle Bank – Typically there is very little activity in the bank. Look under the Current Day reporting to vouch balances.

h. University National Bank (Spendable) – Login to University National Bank at http://www.universitybank.com/. Each user should have been granted a unique login and password. Add the balance for each University National Bank account to the "Bank Balances" sheet in column B.

| Account Nickname | Account Number | Account Nickname | Account Number |
|---|---|---|---|
| Checking 10329 | 32000010329 | Checking 10353 | 32000010353 |
| Checking 10337 | 32000010337 | Checking 10361 | 32000010361 |
| Checking 10345 | 32000010345 | Checking 11345 | 32000011345 |
| Account Nickname | Account Number | Account Nickname | Account Number |
| OPERATING ACCOUNT | 32000011153 | Spendable LLC Shipping Fee Rev CC | 32000009241 |
| Revenue Account | 32000011193 | SPENDABLE RESERVE | 32000010369 |
| Spendable LLC Shipping Fee Rev for ACH | 32000009249 | | |

i. Intercept – Intercept is the primary ACH provider to Think Finance. There will be a series of logins that will be required to access each of the accounts. It is important to maintain the minimum account balances in each of these accounts.

    1. Intercept-PayDay One Credit Account -- This is the first login. Each of the accounts will use the same login procedures as outlined here. Go to Reports>Settlement>Statement and Projection Reports, and click Show Report. Click on "Statement" under Payday One of Delaware CREDITS.

Confidential

UNSEALED



Click on "Statement" under Payday One of Delaware CREDITS. A PDF should pop up. Scroll down to the bottom of this PDF for the most recent day, making sure that all activity that was expected to post actually did. Take the balance at the end of the PDF and add it to the "Bank Balances" tab in column B. A decision needs to be made to determine how much cash needs to be moved into this account. For the PayDay One account, there needs to be a minimum $750k balance. The account that will make the transfer into this account is the PayDay One of Delaware from Plains Capital. Once the wire amount has been determined, update the appropriate cells in column A on Bank Balances in the Intercept subsection, and in the Plains Capital Section.

| Name | Pin | Date | Curren |
|---|---|---|---|
| ↑ ↓ | ↑ ↓ | ↑ ↓ | |
| DSI Lending Resources (PDO EXP TX) CRDTS | ZMB | 6/11/2012 | Statement |
| DSI Lending Resources (PDO EXP TX) DBTS | C9M | 6/11/2012 | Statement |
| Payday One of Delaware CREDITS | ZMC | 6/11/2012 | Statement |
| Payday One of Delaware DEBITS | C9N | 6/11/2012 | Statement |

2. Intercept-PayDay One Debit Account - Click on "Statement" under Payday One of Delaware DEBITS. A PDF should pop up. Scroll down to the bottom of this PDF for the most recent day, making sure that all activity that was expected to post actually did. Take the balance at the end of the PDF and add it to the "Bank Balances" tab in column B. This will conclude the activity for the first login. This account requires a minimum $40k balance.

3. Intercept-Friends and Family Credit Account – Second Login. This has historically been an inactive account, so we check the last activity date after successfully logging in to see if there has been any activity. This concludes the activity for the second login.

| Name | Pin | Date |
|---|---|---|
| ↑ ↓ | ↑ ↓ | ↑ ↓ |
| TC Friends & Family CREDIT | WFI | 9/30/2011 |
| TC Friends & Family DEBIT | DZF | 9/30/2011 |

4. Intercept-PayDay One Latitude Debit Account – Third Login. This account requires a minimum of $2k balance. Pull in the account balance from the end of the PDF report that is generated, and apply to Bank Balances. As this is a Debit account, there are no funding requirements for this account.

5. Intercept-Plain Green Debit Account – Fourth Login. This account requires a minimum of $100k balance.

6. Intercept-Plain Green Credit Account – Fourth Login. First, ensure that the last PG transfer was successful. This account requires a minimum of $3 million dollars, so there are usually transfers. The transferring account is the

Confidential
UNSEALED

TF-PA-318537

Wells Fargo – Plain Green account. Update wire from Wells PG to Intercept PG Account and update the wire details for each account.

7. Intercept-GPLS Debit Account (Plain Green/GPLS) – Fifth Login. This account requires a minimum of $11k balance. Pull in the account balance from the end of the PDF report that is generated, and apply to Bank Balances.

8. Intercept-GPLS Latitude Debit Account (Plain Green/GPLS/Lat) – Seventh Login - This account requires a minimum of $1k balance. Pull in the account balance from the end of the PDF report that is generated, and apply to Bank Balances.

9. Intercept-Great Plain Lending Credit Account – Eighth Login – Account not used much as a result of Billing Tree. Verify that minimum balances are maintained – $600k.

10. Intercept-Great Plain Lending Debit Account – Eighth Login – Account not used much as a result of Billing Tree. Verify that minimum balances are maintained - $125k.

11. Intercept-Mobiloans Credit Account – Ninth Login - This account requires a minimum of $300k balance. Pull in the account balance from the end of the PDF report that is generated, and apply to Bank Balances. Offset to this account is Red River Mobil Funding.

12. Intercept-Mobiloans Debit Account – Ninth Login - Pull in the account balance from the end of the PDF report that is generated, and apply to Bank Balances

## B. Vouching of Settlements

### 1. Plain Green

a. From prior day Cash Activity, the Wells Fargo IntraDay composite for the PG Collection Account that should have been retained (from step 3.b.18.b). Compare the activity from this report to the current day activity, ticking and tying each item. If there are discrepancies, sum the difference of all variances (credits are additions to the account). Insert a new line on "PG Wires-MM.YY", and add this sum to column B – "Wells Prior Day".

b. In Column C on "PG Wires – MM.YY", add today's credits from the IntraDay Composite, less any pre-authorized ACH Debits.

| Currency: USD | |
|---|---|
| **Bank:** 121000248 | **WELLS FARGO BANK, N.A.** |
| **Account:** 4124209008(TX) | **PG Collection Account** |
| **Balances** | |
| Opening Ledger Balance | 2,626,534.10 |
| Opening Available Balance | 2,626,534.10 |
| Current Ledger Balance | 2,631,943.65 |
| Current Available Balance | 2,631,943.65 |
| One Day Float | .00 |
| Two Day Float | .00 |
| Back Value Adjustment to Opening Ledger | .00 |
| Back Value Adjustment to Opening Available | .00 |
| Change in Available Balance Since Opening | 5,409.55 |
| Today's Credits | 518,687.84 |
| Today's Debits | 513,278.29 |
| Total Number Credits | 3 |
| Total Number Debits | 8 |



c. In Column D on "PG Wires – MM.YY" copy the formula in the above row, which equals 99% of the Wells IntraDay report. This is the amount that should be wired out to Citi GPLS Funding from Wells Plain Green Funding. Update both wire values on the MM.DD.YY tab in Bank Balances.

d. Open up a version of the Intranet. Go to Reporting>Plain Green Reporting>Financial Reporting>Daily Settlement Consolidated. For the date range, input the last day that wires were sent out. For Participation Entry, input GPL Servicing, Ltd. Hit view report. Add this number to column F in the "PG Wires – MM.YY" tab. In another session of Internet Explorer, run the same report for Great Plains.

e. In column H in the "PG Wires – MM.YY" tab, add the Intercept wire calculated in Intercept step 6 above. At the bottom of the "PG Wires – MM.YY" tab, there are journal entries that reference values higher in the sheet. Adjust these formulas to reflect current day activity.

| From: | Linda Rogenski [/O=PAYDAYONE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LROGENSKI] |
|---|---|
| Sent: | 11/19/2012 5:09:23 PM |
| To: | Michelle Nguyen [mnguyen@thinkfinance.com] |
| Subject: | RE: Cash Movement |
| Attachments: | High Level Cash Movement.xlsx; Accounting Flow Cash Diagram Plain Green with Cash Discussion Points.xls |

Michelle,

   This is the high level overview – just verbal descriptions. I have also attached the funds flow documentation diagram which I believe is what you are looking for.

Thanks,

Linda



Linda Rogenski
Universal Fund Controller

P/F 817-546-2676 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Michelle Nguyen
**Sent:** Monday, November 19, 2012 9:58 AM
**To:** Linda Rogenski
**Subject:** FW: Cash Movement

Linda – do you have the original version of this? I think with a flow? This is blank. Thanks.



Michelle Nguyen
VP Products

P/F 817-546-2705 |



Exhibit
P 26
Christy R. Sievert, CSR, RPR

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Bobbi Favel [mailto:bobbif@plaingreenllc.com]
**Sent:** Monday, November 19, 2012 9:56 AM
**To:** Michelle Nguyen
**Cc:** Billi Anne Raining Bird Morsette; Dan Belcourt
**Subject:** FW: Cash Movement

Michelle,

Here is the description Linda sent...I'm still locating the diagram.

Bobbi

**From:** Linda Rogenski [mailto:lrogenski@thinkfinance.com]
**Sent:** Thursday, May 24, 2012 8:18 AM
**To:** Billi Anne Morsette (Billianne@plaingreenllc.com); bobbif@plaingreenllc.com
**Subject:** Cash Movement

Billi Anne and Bobbi,

Attached is a more high level cash movement analysis. We can discuss this on the call at 9:30 as well.

Thanks,

Linda



Linda Rogenski
Universal Fund Controller

P/F:817-546-2676 | LindaR@think.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**Produced in Native Format**

Confidential

UNSEALED

**Plain Green - high level discussion of daily cash movement**

**Definitions**

Plain Green Purchasing Account — This is the account that is utilized to fund originations of customer loans

Plain Green Collections Account — This is the account that is utilized for remittance of customer payments

Intercept — This is the ACH processor for Plain Green

GPLS — This is the entity that purchases participations in the loans that Plain Green has originated

**Funding of Loans**

Cash is transferred from Plain Green Purchasing Account to an account at Intercept

Intercept processes the nightly delivered ACH file to fund approved customer loans, and

five days after origination of loans GPLS purchases a 99% participation in these loans

by transferring cash to the Plain Green Purchasing Account

**Collections on Loans**

Intercept processes the nightly delivered ACH file to collect payments from customers

Intercept holds the collected funds for x days to ensure that the majority of returns are processed

Intercept sends collected funds to the Plain Green Collections Account, and

Plain Green transfers 99% of the collections out of the Plain Green Collections Account to GPLS



High Level Discussion    Cash Flow Diagram    (+) (Discussion)

UNSEALED

Tab # 1 Ia

# Plain Green - high level discussion of daily cash movement

**Definitions**

Plain Green Purchasing Account     This is the account that is utilized to fund originations of customer loans

Plain Green Collections Account     This is the account that is utilized for remittance of customer payments

Intercept     This is the ACH processor for Plain Green

GPLS     This is the entity that purchases participations in the loans that Plain Green has originated

**Funding of Loans**     Cash is transferred from Plain Green Purchasing Account to an account at Intercept;

Intercept processes the nightly delivered ACH file to fund approved customer loans; and

Two days after origination of loans GPLS purchases a 99% participation in those loans
by transferring cash to the Plain Green Purchasing Account.

**Collections on Loans**     Intercept processes the nightly delivered ACH file to collect payments from customers;

Intercept holds the collected funds for 4 days to ensure that the majority of returns are processed;

Intercept remits collected funds to the Plain Green Collections Account; and

Plain Green transfers 99% of the collections out of the Plain Green Collections Account to GPLS.

UNSEALED



Tab #2 Ia

*ThinkFinance Systems*

Dynamics

**GPL Servicing, Trust**
GPTR (196)

**Trust Account**
Checking Acct
Citi#xxx

**GPL Servicing, LTD**
GPLS (195)

**Purchase Acct**
Checking Acct
Citi#xxx

Purchase Acct Funds
from Maint or Call Accts

**Collections Acct**
10310-195
Checking Acct
Citi#xxx

(6) UF Collections sweep
to Citi Trust Acct Daily (ACH 252)

(7) > $2?M left
to Maint. Acct

**Maintenance Acct.**
Checking Acct
Citi#xxx

**Reserve Acct**
Checking Acct
Citi#xxx

ACH

**Plain Green, LLC**
**(Tribe)**
Intercept Processes
ACH

Funding to Customer
(3) GPLS Purchase 99% participation
wire funds to Funding Acct
(2 day timing delay)

**Plain Green, LLC**
**(Tribe)**
*Funding Acct*
WF#xxx
GL 10510-180

UF Collections ACH 252

Payments from Customer

(5) 99% of collections remitted to
GPLS (sent daily, no delay)

**Plain Green, LLC**
**(Tribe)**
*Collection Acct*
WF#xxx
GL 10520-180

**Legal Reserve**
At FBD $50k
$25k Plain Green
$25k GPLS
WF#xxx

*$4,166.67 per month from each*

**ThinkFinance, Inc**
TCLS

(1) prefund up to $2M

(2) funding to Tribe

**Haynes Investment**
**Account**
WF#xxx

(4) Excess estimate swept
to Haynes Invest.

Mixed Cash
Settlement (monthly)

*Book Settlement*
Stand alone
tree on GL
(Cash Books)

**Plain Green, LLC**
On ThinkFinance
General Ledger
PLGL (180)

Monthly Financials
Monthly Volumes

(A) Calculate Marketing Fee & technology Fee
due from tribe to TF based on monthly
new loans

(B) Calculate Tribe revenue share of 4.5%
of cash revenue received

**TC Admin**
**Services, LLC**
TCAD

Invoice Plain Green
monthly

**Tailwind**
**Marketing, LLC**
TAWI

Invoice Plain Green
monthly

**TC Decision**
**Sciences, LLC**
TCDS

**Think Finance**
**SPV, LLC**
TFSPV

Mixed Cash Settlement
- Credit Card Payments
- Money Gram Payments
- Manual Customer Refunds
- The above items will need to be
wired to/from tribe collection
account monthly

UNSEALED

App. 0693

Tab #3 Jd

# Discussion for the Retained 1% of Loans

**Example of Calculations**

| | PG Funding Acct Cash (out) in | PG Collection Acct Cash (out) in | |
|---|---|---|---|
| Loans funded | (2,000) | | |
| GPL Servicing Participation | 1,980 | | |
| Plain Green 1% Retained | (20) | | Note 1 |
| | | | |
| Collections - **Principal** | | 2,000 | |
| GPL Servicing Participation | | (1,980) | |
| Plain Green 1% Retained | | 20 | Note 1 |
| | | | |
| Collections - **Fees** | | 3,000 | |
| GPL Servicing Participation | | (2,970) | |
| Plain Green 1% Retained | | 30 | Note 2 |

Note 1 - Originally Funded Loan of $2,000 results in Plain Green retaining a 1% balance in the loan of $20 which is due to Haynes Capital.

Note 2 - Collection of fees on loan of $3,000 results in Plain Green retaining a 1% balance in funds collected of $30, this amount is available to repay any Charge Off Principal with any excess available for Plain Green to keep or reinvest in future loans.

| | Inception to Date | | | May 2012 | |
|---|---|---|---|---|---|
| | 100% | 1% | | 100% | 1% |
| Total Cash Fees Collected | 157,522,337 | 1,575,223 | | 16,046,414 | 160,464 |
| Total Principal Charge offs | (35,765,616) | (357,656) | | (3,390,479) | (33,905) |
| Net Available to Plain Green | 121,756,721 | 1,217,567 | | 12,655,935 | 126,559 |

UNSEALED

| | |
|---|---|
| **From:** | Linda Rogenski [/O=PAYDAYONE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LROGENSKI] |
| **Sent:** | 9/10/2012 8:16:59 PM |
| **To:** | 'Matthew Govek' [mgovek@macfarlanegp.com]; Erin Forrester [eforrester@macfarlanegp.com] |
| **CC:** | Linda Callnin (Belisle) [lcallnin@thinkfinance.com] |
| **Subject:** | RE: Great Plains Lending Daily Settlement Reports for 09_07_2012 |
| **Attachments:** | Great Plains Invoices-August 2012.xls |

Matt,

Attached are the August invoices for Great Plains Lending. This file is just for your information as we will do all the cash transfers concerning the invoices. Please let me know if you have any questions.

Thanks,

Linda



Linda Rogenski
Universal Fund Controller

P/F:817-546-2676 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited

**From:** Matthew Govek [mailto:mgovek@macfarlanegp.com]
**Sent:** Monday, September 10, 2012 2:51 PM
**To:** Arlene Salazar; Jill Carter; Erin Forrester; Linda Callnin (Belisle); Linda Rogenski
**Subject:** RE: Great Plains Lending Daily Settlement Reports for 09_07_2012

Can you please tell me when we can expect the monthly settlement report?

Thanks,



Exhibit
P-D7
Christy R. Sievert, CSR, RPR

**UNSEALED**

App. 0695

TF-PA-325814

Matt

**From:** Arlene Salazar [mailto:asalazar@thinkfinance.com]
**Sent:** Monday, September 10, 2012 10:57 AM
**To:** Arlene Salazar; Jill Carter; Erin Forrester; Linda Callnin (Belisle); Linda Rogenski; Matthew Govek
**Subject:** Great Plains Lending Daily Settlement Reports for 09_07_2012

If you have any questions please just let me know.

Thanks,



Arlene Salazar
Accountant

P/F:817-546-2708 | thinkfinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged
and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are
hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**Produced in Native Format**

Confidential

UNSEALED

# TAILWIND MARKETING, LLC

## INVOICE

4150 International Plaza Suite 400
Fort Worth TX 76109

BILL TO:
Great Plains Lending, LLC
8155 Highway 177
Red Rock, OK 74651

DATE: August 31, 2012
INVOICE # 010

FOR: Marketing Fee

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012 New and Former Loans | 6,614 | $ 100.00 | $ 661,400.00 |
| | | TOTAL | $ 661,400.00 |

UNSEALED

# TAILWIND MARKETING, LLC

# INVOICE

4150 International Plaza, Suite 400
Fort Worth, TX  76109

**DATE:**  August 31, 2012
**INVOICE #**  810

**BILL TO:**
Great Plains Lending, LLC
8151 Highway 177
Red Rock, OK  74651

**FOR:**  Marketing Fee

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012 New and Former Loans | 6,614 | $    100.00 | $         661,400.00 |
| | | | |
| | | **TOTAL** | $         661,400.00 |

UNSEALED

App. 0699

# GREAT PLAINS LENDING, LLC

# INVOICE

8151 Highway 177
Red Rock, OK  74651

**DATE:**    August 31, 2012
**INVOICE #**  811

**BILL TO:**
GPL Servicing Ltd
227 W Monroe, Suite 3900
Chicago, IL  60606

**FOR:**    Marketing Fee

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012 New and Former Loans | 6,614 | $   100.00 | $       661,400.00 |
| | | | |
| | | **TOTAL** | $       661,400.00 |

UNSEALED

App. 0700

# TC DECISION SCIENCES, LLC

# INVOICE

4150 International Plaza, Suite 400
Fort Worth, TX 76109

**DATE:** August 31, 2012
**INVOICE #** 812

**FOR:** License and Support Fee

**BILL TO:**
Great Plains Lending, LLC
8151 Highway 177
Red Rock, OK 74651

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012 New and Former Loans | 6,614 | $ 50.00 | $ 330,700.00 |
| | | **TOTAL** | $ 330,700.00 |

UNSEALED

# GREAT PLAINS LENDING, LLC

# INVOICE

8151 Highway 177
Red Rock, OK  74651

**DATE:** August 31, 2012
**INVOICE #** 813

**FOR:** License and Support
Fees

**BILL TO:**
GPL Servicing Ltd
227 W Monroe, Suite 3900
Chicago, IL  60606

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012 New and Former Loans | 6,614 | $ 50.00 | $ 330,700.00 |
| | | **TOTAL** | $ 330,700.00 |

UNSEALED

# TC DECISION SCIENCES, LLC

# INVOICE

4150 International Plaza, Suite 400
Fort Worth, TX 76109

**DATE:** August 31, 2012
**INVOICE #** 814

**BILL TO:**
Great Plains Lending, LLC
8151 Highway 177
Red Rock, OK 74651

**FOR:** Servicing Fee

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012 Active Loans at EOM | 39,037 | $ 5.00 | $ 195,185.00 |
| | | **TOTAL** | $ 195,185.00 |

UNSEALED

App. 0703

# GREAT PLAINS LENDING, LLC

# INVOICE

8151 Highway 177
Red Rock, OK 74651

**DATE:** August 31, 2012
**INVOICE #** 815

**BILL TO:**
GPL Servicing Ltd
227 W Monroe, Suite 3900
Chicago, IL 60606

**FOR:** Servicing Fee

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012 Active Loans at EOM | 39,037 | $ 5.00 | $ 195,185.00 |
| | | **TOTAL** | $ 195,185.00 |

UNSEALED

App. 0704

# GREAT PLAINS LENDING, LLC

# INVOICE

8151 Highway 177
Red Rock, OK  74651

**DATE:** August 31, 2012
**INVOICE #** 816

**BILL TO:**
GPL Servicing Ltd
227 W Monroe, Suite 3900
Chicago, IL  60606

**FOR:** Service Fee

| DESCRIPTION | LOANS | RATE | AMOUNT |
|---|---|---|---|
| August 2012: | | | |
|   Loan Fees Collected | $  7,458,620.12 | | |
|   Return Fees Received | (2,045,765.50) | | |
|   Exception Type Return | (47,401.05) | | |
|    Net Fees Collected | 5,365,453.57 | | |
|   GPL Servicing Part (99%) | $  5,311,799.03 | 9.0% | $       478,061.91 |
| | | **TOTAL** | $       478,061.91 |

UNSEALED

App. 0705



Commercial    *Commercial Electronic Office® (CEO®) Portal*

# Commercial Electronic Office® (CEO®) Portal



## Do more and carry less

With *CEO*® Mobile Token, all you need is your smartphone

**Get started now**

## Online Banking Services

The *CEO* portal is a convenient, secure, single point of access to a broad offering of online banking services: cash management, credit, investments, foreign exchange, and more. Control user accounts and reset passwords with the Self Administration service.

## Mobile Banking Services

Get mobile versions of reports and services available on the *CEO* portal. Approve or reject wires, view account balances, see cash flow in and out of up to 20 accounts, and more. Use our mobile site, iPhone app, or Android app.

**Sign On**

Sign-On Help
*CEO* services available
Frequently asked questions
*CEO Mobile*®

## Alerts

Use our Event Messaging service to receive notifications about your accounts and transactions. Alerts are available via text, email, and fax. Fees may apply.

## Fraud Protection

Learn best practices for protecting your company from fraud. Our fraud information site includes tools and tips for fighting online and mobile fraud, payments fraud, and more.

**Contact us**

Ready to get started with the *CEO* portal? Contact your relationship manager or contact us.

Wells Fargo Bank, N.A. Member FDIC.

© 1999 - 2018 Wells Fargo. All rights reserved. NMLSR ID 399801



Exhibit

P-32

Christy R. Sievert, CSR, RPR

**UNSEALED**                    App. 0706                                3/5/2018, 10:09 AM



Commercial    *Commercial Electronic Office® (CEO®) Portal*    **CEO Frequently Asked Questions**

# CEO Frequently Asked Questions

## General

What is the Wells Fargo *Commercial Electronic Office®* (*CEO®*) portal?

The Wells Fargo *Commercial Electronic Office®* portal offers a single point of access to a variety of financial services for businesses. The CEO portal provides online access to your services from work, home, or the road. Advanced security helps protect the confidentiality of your account information.

What kinds of online services do you offer?

The *CEO* portal offers more than 60 online services, including cash management, credit, foreign exchange, trade services, health benefit services, and trust and investment services.

Who can access the *CEO* portal?

Only authorized users can access the *CEO* portal. During the enrollment process, your company selects authorized users

What is "single sign-on"?

"Single sign-on" means that you only need to sign on once to access all the financial services you use on the *CEO* portal. An additional security credential may be required for certain functions, such as wires or self-administration.

## Security

Is my information on the *CEO* portal secure?

How do I know if my banking session is encrypted?

What is encryption?

What is strong authentication?

What is an RSA SecurID® token?

## Enrollment

Who do I contact to sign up for the *CEO* portal?

Is there a cost?

## Browser & System Requirements

What kind of computer equipment and browser do I need to access the *CEO* Portal?

Does the *CEO* portal support Macintosh, Linux, or UNIX systems?

Investment and Insurance products: NOT FDIC Insured • NO Bank Guarantee • May Lose Value

Wells Fargo Bank, N.A. Member FDIC.

© 1999 - 2018 Wells Fargo. All rights reserved. NMLSR ID 399801

UNSEALED

App. 0707

**To:**  Ken Rees[krees@thinkfinance.com]; Jason Harvison[jharvison@thinkfinance.com]; Chris Lutes[CLutes@thinkfinance.com]; Badr Qureshi[bqureshi@thinkfinance.com]; Chad Bradford[cbradford@thinkfinance.com]; Oscar Garcia[OGarcia@thinkfinance.com]; Linda Callnin (Belisle)[lcallnin@thinkfinance.com]; Linda Rogenski[lrogenski@thinkfinance.com]; Adam Kramer[akramer@thinkfinance.com]; David Gentry[dgentry@thinkfinance.com]; Bob Peterson[rpeterson@thinkfinance.com]
**Cc:**  Thomas Welch (twelch@vpcadvisors.com)[twelch@vpcadvisors.com]
**From:**  Amy Nay
**Sent:**  Fri 10/4/2013 4:25:07 PM
**Importance:**  Normal
**Subject:**  Cash
**Received:**  Fri 10/4/2013 4:25:09 PM

|  | Available | Processor Collections | Required Collateral | Available Collateral | TF Total | Processor Funding |
|---|---|---|---|---|---|---|
| Corporate (Non Fund) Cash | 13,582,848 | 80,957 | 744,515 | 10,000,500 | 24,408,819 |  |
| Rise | 1,111,821 | 1,498,052 | 2,791,673 | 508,394 | 5,909,940 | 918,050 |
| GPLS | 82,989,486 | - | 12,000 | - | 83,001,486 |  |
| Plain Green | 7,657,106 | 7,454,044 | 50,046 | - | 15,161,197 | 2,682,418 |
| Great Plains Lending | 6,253,529 | 4,309,198 | - | - | 10,562,727 | 1,767,370 |
| Mobiloans | 7,051,138 | 6,678,820 | 44,209 | - | 13,774,166 | 2,317,283 |
| UK | 2,626,880 | - | - | - | 2,626,880 |  |
| Total Cash | 121,272,808 | 20,021,070 | 3,642,443 | 10,508,894 | 155,445,215 | 7,685,122 |



**Amy Nay**
Manager, Treasury Operations

P/f: 972 421 1043 | ThinkFinance.com
5080 Spectrum Drive, Suite 200W, Addison TX 75001

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden
you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or
mail and/or any attachments thereto, is strictly prohibited.



Exhibit
P-34
Christy R. Sievert, CSR, RPR

**To:** Amy Nay[anay@thinkfinance.com]
**Cc:** Badr Qureshi[bqureshi@thinkfinance.com]; Adam Kramer[akramer@thinkfinance.com]; Linda Rogenski[lrogenski@thinkfinance.com]; Chad Bradford[cbradford@thinkfinance.com]; Linda Callnin (Belisle)[lcallnin@thinkfinance.com]
**From:** Chris Lutes
**Sent:** Fri 4/11/2014 4:02:58 PM
**Importance:** Normal
**Subject:** RE: Cash
**Received:** Fri 4/11/2014 4:02:58 PM

Perfect, thx.

Badr/Adam, i want the collections account for the tribes to almost act like a clearing account – payments come in daily, we move 99% to GPLS and 1% stays. At the end of the month, the net revenue (revs less losses) from the 1% is moved to the tribe's main operating account (since they get the P&L from the 1%) and the remaining principal collections on the 1% are moved over to the funding account. So the collections accounts should never have a build up of cash. You then need to monitor the tribes funding accounts and let them and GPLS know if they have too much cash in the funding account (given expected funding volumes). If there is too much cash in these funding accounts (which is probably the case right now), the excess cash needs to be moved back to either reduce the GPLS reserve deposit for MBL and GPL or to repay PGL's loan from Haynes (for PGL).

Hope this makes sense. Thx

Can someone email all of us the summaries by tribe from yesterday's white board session? Thx



**Chris Lutes**
Chief Financial Officer

P/F:817-546-2771 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden... you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** Amy Nay
**Sent:** Friday, April 11, 2014 10:48 AM
**To:** Chris Lutes
**Cc:** Badr Qureshi; Adam Kramer
**Subject:** FW: Cash

Chris,

Based on the discussion in yesterday's meeting, Adam is working on splitting out the tribe Available cash number between Funding and Collections so future emails should reflect the change.



**Amy Nay**
Manager, Treasury Operations

P/F:972-421-1043 | ThinkFinance.com
5080 Spectrum Drive, Suite 200W, Addison TX 75001

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden... you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** Adam Kramer
**Sent:** Friday, April 11, 2014 10:33 AM

| | Available | Processor Collections | Required Collateral | Available Collateral | TF Total | Processor Funding |
|---|---|---|---|---|---|---|
| Corporate (Non Fund) Cash | 9,880,736 | - | 71,400 | 10,000,378 | 19,952,514 | |
| Rise | 13,604,414 | 2,074,516* | 3,121,673 | 2,112,118 | 20,912,720 | 1,569,39 |
| GPLS | 42,131,655 | - | 6,000 | - | 42,137,655 | |
| Plain Green | 3,577,590 | 3,440,119* | 1,750,046 | - | 8,767,756 | 947,4 |
| Great Plains Lending | 3,968,978 | 1,292,331* | 1,400,000 | - | 6,661,309 | 819,7 |
| Mobiloans | 2,764,697 | 2,881,920* | 1,120,798 | - | 6,767,416 | 1,547,7 |
| UK | 2,493,890 | - | - | - | 2,493,890 | |
| Total Cash | 78,421,960 | 9,688,887 | 7,469,917 | 12,112,496 | 107,693,260 | 4,884,3: |

**\*Money currently on hold at processors awaiting release**



Adam Kramer
Sr. Financial Analyst - Treasury

P/F:972-421-1159 | ThinkFinance.com
5080 Spectrum Drive, Suite 200W. Addison TX 75001

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited

## THIRD AMENDED AND RESTATED ADMINISTRATIVE AGENCY AGREEMENT

THIS THIRD AMENDED AND RESTATED ADMINISTRATIVE AGENCY AGREEMENT (this "Agreement"), is made as of October 4, 2011 ("Effective Date"), by and among (i) GPL Servicing Trust, a Delaware statutory trust ("GPLS Trust"), (ii) GPL Servicing Trust II, a Delaware statutory trust ("GPLS Trust II"), (iii) GPL Servicing Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands ("GPLS") and (iv) TC Administrative Services, LLC, a Delaware limited liability company ("Agent"). Each party to this Agreement may be referred to herein as a "Party" or collectively as "Parties."

*Recitals*

**WHEREAS**, on February 28, 2011, GPLS Trust purchased Loans (as defined below) from Universal Finance II, LLC, a Delaware limited liability company pursuant to that certain Loan Purchase Agreement – Initial Purchase (the "Loan Purchase Agreement").

**WHEREAS**, one or more federally recognized Indian tribes (each a "Tribe" and together the "Tribes") will originate certain Loans to Borrowers (as defined below).

**WHEREAS**, from time to time, GPLS will purchase a Participation Interest in such Loans, or in certain Receivables, and Collections therefrom, with respect to such Loans, from the applicable Tribe in accordance with the terms and conditions set forth in a Participation Agreement entered into by and between the applicable Tribe and GPLS (each, a "Participation Agreement" and, together with the Loan Purchase Agreement, the "Purchase Agreements").

**WHEREAS**, on March 18, 2011, Think Finance, Inc., a Delaware corporation ("Think Finance"), Think Finance SPV, LLC, a Delaware limited liability company ("TF SPV"), the Other Guarantors (as defined therein) and Victory Park, as Collateral Agent, executed and delivered an Amended and Restated Guaranty and Security Agreement, pursuant to which, among other things, Think Finance, TF SPV and such Other Guarantors agreed to guaranty and secure all of the Obligations of the Agent herein (as amended pursuant to that certain First Amendment to Amended and Restated Guaranty and Security Agreement dated as of June 21, 2011 and as further amended, restated, supplemented or otherwise modified from time to time, the "Guaranty and Security Agreement"), which Guaranty and Security Agreement was amended on the date hereof.

**WHEREAS**, on June 21, 2011, GPLS Trust, GPLS and Agent entered into that certain Second Amended and Restated Administrative Agency Agreement (the "Prior Agreement").

**WHEREAS**, GPLS, GPLS Trust and GPLS Trust II desire to appoint Agent, and Agent desires to accept such appointment, as a provider of certain management and administrative agent services as set forth herein.

**WHEREAS**, the Parties now desire to amend and restate the Prior Agreement as set forth herein.

Exhibit

p. 35

Christy R. Sievert, CSR, RPR

UNSEALED

App. 0711

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt of which is hereby acknowledged, Agent, GPLS Trust, GPLS Trust II and GPLS agree as follows:

*Agreement*

## ARTICLE 1
## DEFINITION

Section 1.1.    Definitions.  The following terms shall have the following meanings.

"Account" shall mean an on open-ended unsecured consumer line of credit with a credit limit of $1,000 or less.

"Additional Amount" shall have the meaning set forth in Section 8.3.

"Affiliates" shall mean with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"After-Tax Basis" means on a basis such that any payment received, deemed to have been received or receivable by any Person shall, if necessary, be supplemented by a further payment to that Person so that the sum of the two payments shall, after deduction of all U.S. federal, state and local taxes, penalties, fines, interest, additions to tax and other charges resulting from the receipt (actual or constructive) or accrual of such payments imposed by or under any U.S. federal, state or local law or Governmental Authority (after taking into account any current deduction to which such Person shall be entitled with respect to the amount that gave rise to the underlying payment) be equal to the payment received, deemed to have been received or receivable.

"Agent" shall have the meaning set forth in the introductory paragraph.

"Agent Fee" shall mean for any given month (i) the interest and fees received on account of the Purchased Securities during such month, less (ii) the Fixed Return for such month, less (iii) any and all expenses incurred by GPLS, GPLS Trust or GPLS Trust II for such month in connection with a Purchase Agreement and/or Purchased Securities, including, but not limited to, the Service Fee paid to a Tribe for such month with respect to the Participation Interests purchased pursuant to the Participation Agreements, less (iv) any and all other expenses (including a loan loss reserve on all Purchased Securities, in accordance with Generally Accepted Accounting Principles, which shall include a reserve for 95% of the outstanding principal amount of Purchased Securities with Underlying Loans that have a principal and/or interest payment greater than 60 days past due) incurred by GPLS, GPLS Trust or GPLS Trust II for such month.

"Agent Shortfall Obligation" shall have the meaning set forth in Section 2.6(b)(iii).

"Agreement" shall have the meaning set forth in the introductory paragraph.

"Borrowers" shall mean the obligors on the Loans.

2

UNSEALED

App. 0712

TF-PA-000242

"Business Day" means a day other than Saturday, Sunday or a public holiday on which banks are authorized or required to be closed under the laws of the State of Delaware.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collection Account" shall mean a segregated deposit account in the name of GPLS at a depository institution selected by Victory Park, into which all payments to GPLS, GPLS Trust or GPLS Trust II shall be deposited including, without limitation, payments from (i) the Borrowers with respect to the Loans purchased pursuant to the Loan Purchase Agreement and (ii) a Tribe with respect to Participation Interests purchased pursuant to a Participation Agreement.

"Collections" shall mean all payments received in respect of the Receivables in the form of cash, checks or any other form of payment, including Recoveries.

"Customer Information" shall have the meaning given to such term in the applicable Purchase Agreement.

"Defaulted Account" means an Account that has been charged off in accordance with applicable Program Guidelines due to a default by a Borrower.

"Default Return" shall mean the Fixed Return plus three percent (3%) per annum.

"Draft Accounts" shall have the meaning set forth in Section 2.2(e).

"Effective Date" shall have the meaning set forth in the introductory paragraph.

"Event of Default" shall have the meaning set forth in the Guaranty and Security Agreement.

"Event of Default Notice" shall have the meaning set forth in Section 3.5.

"Event of Default Redemption" shall have the meaning set forth in Section 3.5.

"Event of Default Redemption Notice" shall have the meaning set forth in Section 3.5.

"Excluded Taxes" shall mean (a) income taxes imposed on the net income of a GPLS Indemnified Party, (b) Taxes imposed upon the assignment of any Participation Interests and (c) franchise taxes imposed on the net income of a GPLS Indemnified Party, in each case by the jurisdiction under the laws of which such GPLS Indemnified Party is organized or qualified to do business or a jurisdiction or any political subdivision thereof in which a GPLS Indemnified Party engages in business activity other than activity arising solely from such GPLS Indemnified Party having executed this Agreement and having enjoyed its rights and performed its obligations under this Agreement or any Transaction Document.

"Final Determination" shall mean (a) any settlement, compromise, or other agreement with a relevant Governmental Authority, whether contained in an Internal Revenue Service ("IRS") Form 870-AD or other comparable form, or otherwise, or such procedurally later event,

3

UNSEALED

TF-PA-000243

UNSEALED

such as a closing agreement with a relevant Governmental Authority, and agreement contained in IRS Form 870-AD or other comparable form, (b) an agreement that constitutes a "determination" under Section 1313(a) of the Code, (c) a deficiency notice with respect to which the period for filing a petition with the tax court or the relevant state, local or foreign tribunal has expired or (d) a decision of any court of competent jurisdiction that is not subject to appeal or as to which the time for appeal has expired.

"Finance Charge Receivables" shall mean Receivables created in respect of (a) Periodic Finance Charges, (b) over-limit fees, (c) late charges, (d) returned check fees, (e) annual service charges, if any, (f) account processing fees, (g) program participation fees, (h) account maintenance fees, (i) transaction charges, (j) cash advance fees, (k) credit limit increase fees, and (l) other similar fees and charges.

"Fixed Return" shall mean an annual rate of return equal to twenty percent (20%) of the outstanding principal amount of GPLS Investments, calculated on a daily basis.

"Force Majeure Event" shall mean, with respect to a Program:

(a)     the enactment or operation of any United States federal, state or tribal consumer credit laws or regulations resulting in the termination of such Program; provided, that a "Force Majeure Event" shall not be deemed to have occurred under this clause (a) if, notwithstanding the foregoing, such Program is nevertheless capable of being modified in such a manner as to comply with such Requirements and, after any such modification of such Program, the Purchased Securities (or similar product) are not expected to result in a greater than sixty percent (60%) reduction in gross profit (i.e., gross revenue less charge-offs) generated by such Program compared to gross profit generated by such Program for the three (3) month period immediately preceding the date of such event; or

(b)     the termination of such Program by the applicable Tribe for any other reason and the inability of Agent, in spite of the use of its best commercial efforts, to engage a different organization to implement and manage a program substantially similar to such Program within the three (3) month period immediately following such date of termination, provided, however, that so long as another Tribe has a Program in effect, such termination shall not be deemed a Force Majeure Event, unless Agent provides evidence reasonably satisfactory to GPLS that in spite of the use of its best commercial efforts, Agent is unable to reinvest the applicable GPLS Investments from the terminated Program in such other Program within a six (6) month period immediately following such date of termination.

"GAAP" shall mean United States of America generally accepted accounting principles, consistently applied.

"GLBA" shall have the meaning set forth in Section 4.4(a)(ii).

"Governmental Authority" shall mean the government of the United States of America, the Otoe-Missouria Tribe of Indians, the Chippewa-Cree Tribe of the Rocky Boy's Indian Reservation, Montana and/or the Tunica-Biloxi Tribe of Louisiana, and any other nation or any political subdivision of any of the foregoing, whether state or local, and any agency, authority, commission, instrumentality, regulatory body, court, central bank or other entity legitimately

4

UNSEALED

TF-PA-000244

exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GPLS" shall have the meaning set forth in the introductory paragraph.

"GPLS Indemnified Parties" shall have the meaning given to such term in the applicable Purchase Agreement.

"GPLS Investment" or "GPLS Investments" shall mean equity investments in GPLS, including, without limitation, any equity investments contributed to GPLS Trust or GPLS Trust II.

"GPLS Secured Parties" shall have the meaning given to such term in the Guaranty and Security Agreement.

"GPLS Trust" shall have the meaning set forth in the introductory paragraph.

"GPLS Trust II" shall have the meaning set forth in the introductory paragraph.

"Guaranty and Security Agreement" shall have the meaning set forth in the recitals.

"Indebtedness" shall have the meaning set forth in the Guaranty and Security Agreement.

"Investment Request" shall have the meaning set forth in Section 2.5.

"Ledgers" shall have the meaning set forth in Section 2.2(a).

"Liens" shall mean any mortgage, lien, pledge, security interest, conditional sale or other title retention agreement, charge or other security interest or encumbrance of any kind, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement or any lease or license in the nature thereof, any option or other agreement to sell or give a security interest in.

"Loan Documents" shall have the meaning given to such term in the applicable Purchase Agreement.

"Loan Purchase Agreement" shall have the meaning set forth in the recitals.

"Loans" shall have the meaning given to such term in the applicable Purchase Agreements, but shall also include, without limitation, all Accounts originated by a Tribe to a Borrower.

"Losses" shall mean all out-of-pocket costs, damages, losses, fines, penalties, judgments, settlements, and expenses whatsoever, including, without limitation: (i) outside attorneys' fees and disbursements and court costs reasonably incurred; and (ii) costs (including reasonable expenses and reasonable value of time spent) attributable to the necessity that any officer or employee (other than in-house attorneys) spend more than twenty-five percent (25%) of his or

5

UNSEALED

TF-PA-000245

her normal business hours, over a period of two (2) months, in connection with any judicial, administrative, legislative, or other proceeding.

"Maintenance Account" shall mean a segregated deposit account in the name of GPLS at a depository institution selected by Victory Park, into which account shall be swept all amounts on deposit in the Collection Account and the Purchasing Account in excess of $2,000,000 in the aggregate after sweeping applicable amounts to the Trust Account and Trust Account II.

"Maintenance Fee" shall have the meaning set forth in Section 2.8.

"Material Adverse Effect" shall mean a material adverse effect on: (i) the business operations, properties, assets, condition (financial or otherwise) of Agent; (ii) the ability of Agent to fully and timely perform its obligations under this Agreement or any of the other Transaction Documents to which it is a party; (iii) the legality, validity, binding effect, or enforceability against Agent of this Agreement or any of the other Transaction Documents to which it is a party, or (iv) the rights, remedies and benefits available to GPLS, GPLS Trust and GPLS Trust II under this Agreement or under any of the other Transaction Documents to which it is a party.

"Minimum Period" shall mean a minimum period of two (2) years from the date of the applicable GPLS Investment; provided, that if an aggregate of at least $60,000,000 of GPLS Investments (other than GPLS Investments made by Think Finance or any of its Affiliates) are made into GPLS, GPLS Trust or GPLS Trust II prior to the twelve (12) month anniversary of the Effective Date, then the Minimum Period for all GPLS Investments made before or after such date shall all be reduced to eighteen (18) months; and provided, further, that if a Force Majeure Event shall occur with respect to a Program, the Minimum Period for the GPLS Investments with respect to such Program outstanding on the date of such Force Majeure Event shall extend only until the date of such Force Majeure Event; and provided, further, that upon a date of consummation of (a) a Qualified Public Offering (as defined in the Guaranty and Security Agreement) by Think Finance or (b) an acquisition of all or substantially all of the assets or outstanding equity securities of Think Finance for a purchase price of at least $250,000,000, the Minimum Period for all GPLS Investments outstanding on or after such date shall be reduced to one (1) year from the date of the applicable GPLS Investment.

"MobiLoans" shall mean MobiLoans, LLC, a limited liability company duly organized under and recognized by the laws of the Tunica-Biloxi Tribe of Louisiana.

"Month" shall have the meaning set forth in Section 2.6(b)(i).

"Non-Excluded Taxes" shall have the meaning set forth in Section 8.3(a).

"Non-Yield Maintenance Purchase Price" shall mean a purchase price equal to the aggregate outstanding principal amount of the Purchased Securities plus (i) the accrued but unpaid Fixed Return and (ii) all other amounts due and owing to GPLS, GPLS Trust, GPLS Trust II and the other GPLS Secured Parties under this Agreement and the other Transaction Documents.

"Obligations" shall have the meaning given to such term in the Guaranty and Security Agreement.

6

UNSEALED

TF-PA-000246

"Other Taxes" shall have the meaning set forth in Section 8.3(b).

"Party" shall have the meaning set forth in the introductory paragraph.

"Participated Loans" shall have the meaning given to such term in the applicable Participation Agreement, but shall also include, without limitation, all Accounts for which MobiLoans or another Person shall sell and transfer certain undivided participation interests in the Receivables, and Collections therefrom, with respect to such Accounts to a GPLS Secured Party pursuant to a Participation Agreement.

"Participation Interest" shall have the meaning given to such term in the applicable Participation Agreement, but shall also include, without limitation, all Receivables, and Collections therefrom, for which a GPLS Secured Party shall have purchased certain undivided participation interests pursuant to a Participation Agreement.

"Periodic Finance Charges" shall have, with respect to any Account, the meaning set forth in the Loan Documents applicable to such Account for finance charges, interest, fees, or any other charge that is set forth in such Loan Documents.

"Principal Receivables" shall mean all Receivables which are not Finance Charge Receivables.

"Proceeding" shall have the meaning given to such term in the applicable Purchase Agreement.

"Program" shall have the meaning given to such term in the applicable Purchase Agreement.

"Program Guidelines" shall have the meaning given to such term in the applicable Purchase Agreement.

"Purchases" shall have the meaning given to such term in the Purchase Agreements.

"Purchased Securities" shall mean (i) Loans purchased pursuant to the Loan Purchase Agreement and (ii) Participation Interests purchased pursuant to a Participation Agreement (which for purposes of clarification includes the Subject Participation Interests).

"Purchasing Account" shall mean a segregated deposit account in the name of GPLS at a depository institution selected by Victory Park, from which the Agent shall effectuate the purchase of Participation Interests by GPLS.

"Receivables" shall mean all amounts due and payable by a Borrower to MobiLoans with respect to an Account from time to time, including all Principal Receivables and all Finance Charge Receivables it being understood that a Receivable shall be deemed to have been created at the end of the Business Day on the date of processing of such Receivable.

"Records" shall have the meaning set forth in Section 9.9.

7

UNSEALED

TF-PA-000247

"Recoveries" shall mean any amounts collected or received with respect to Receivables that arose from a Defaulted Account.

"Regulatory Authority" shall mean any applicable federal, tribal or state agency having jurisdiction over the Parties.

"Requirements" shall mean all applicable federal, tribal or state laws and regulations.

"Reserve Account" shall have the meaning set forth in the applicable Participation Agreement

"Service Fee" shall have the meaning given to such term in the applicable Participation Agreement

"Services" shall have the meaning set forth in Section 2.1.

"Standard of Performance" shall have the meaning set forth in Section 3.1.

"Stinson Loan Documents" shall mean (i) that certain Loan Agreement dated as of August 11, 2011, as in effect as of October 4, 2011, by and among TC Loan Service, LLC, a Delaware limited liability company, Think Finance and Michael C. Stinson and (ii) the other "Credit Documents" (as defined therein).

"Subject Participation Interests" shall mean the Participation Interests acquired by GPLS prior to June 21, 2011, which were purchased by GPLS Trust II on June 21, 2011.

"Taxes" means all taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto (and without deduction for any of them)

"Termination Date" shall have the meaning set forth in Section 3.4(c).

"Terrorism Laws" shall mean (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States of America Treasury Department and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.

"TF SPV" shall have the meaning set forth in the recitals.

"Think Finance" shall have the meaning set forth in the recitals

"Transaction Documents" shall mean this Agreement, the Purchase Agreements, the Guaranty and Security Agreement and each of the other agreements, documents, certificates or other instruments delivered in connection with the transactions contemplated hereby and thereby.

"Trust Account" shall mean a segregated deposit account in the name of GPLS Trust at a depository institution selected by Victory Park, into which account shall be swept all amounts on deposit in the Collection Account on account of the Loans purchased pursuant to the Loan Purchase Agreement.

8

UNSEALED

TF-PA-000248

"Trust Account II" shall mean a segregated deposit account in the name of GPLS Trust II at a depository institution selected by Victory Park, into which account shall be swept all amounts on deposit in the Collection Account on account of the Subject Participation Interests.

"Underlying Loans" shall mean (i) Loans purchased pursuant to the Loan Purchase Agreement and (ii) Participated Loans with respect to Participation Interests purchased pursuant to a Participation Agreement.

"Victory Park" shall mean Victory Park Capital Advisors, LLC, a Delaware limited liability company.

"Yield Maintenance Premium" shall mean an amount equal to (i) the sum of the total Fixed Return amounts paid or payable to GPLS, GPLS Trust and GPLS Trust II for all GPLS Investments, calculated for the Minimum Period applicable to each such GPLS Investment, minus (ii) the sum of the Fixed Return amounts previously paid to GPLS, GPLS Trust and GPLS Trust II in accordance with the terms hereof.

"Yield Maintenance Purchase Price" shall mean a purchase price equal to the aggregate outstanding principal amount of the Purchased Securities purchased by GPLS, GPLS Trust and GPLS Trust II plus (i) the accrued but unpaid Fixed Return, (ii) the Yield Maintenance Premium and (iii) all other amounts due and owing to GPLS, GPLS Trust, GPLS Trust II and the other GPLS Secured Parties under this Agreement and the other Transaction Documents.

## ARTICLE 2
## APPOINTMENT; SERVICES; FEES

Section 2.1.   Appointment.   GPLS, GPLS Trust and GPLS Trust II hereby appoint Agent as the exclusive provider of the administrative services described in Sections 2.2, 2.3 and 2.4 (collectively, the "Services") to GPLS, GPLS Trust or GPLS Trust II, as applicable, on the terms and conditions set forth in this Agreement.  For purposes of clarification, any Services relating to Purchased Securities from a Tribe shall commence upon GPLS and such Tribe entering into a Participation Agreement.  Agent accepts such appointment and agrees to perform the Services on the terms and conditions set forth in this Agreement.  Notwithstanding the foregoing or anything else to the contrary in this Agreement, each of GPLS, GPLS Trust and GPLS Trust II shall retain all of its power and authority over its actions including, without limitation, at its option and in its sole discretion, its right to direct the performance of the Services delegated to and to be performed by Agent hereunder.

Section 2.2.   Services.   Agent shall perform the following services for GPLS, GPLS Trust and GPLS Trust II during the term of this Agreement:

(a)   establishing an accounting system and maintaining the accounting ledgers of and for GPLS, GPLS Trust and GPLS Trust II in accordance with GAAP, unless otherwise required by applicable law (collectively, the "Ledgers");

(b)   performing daily loan settlement reporting and accounting;

9

UNSEALED

TF-PA-000249

(c)     disbursing funds for the purchase of the Participation Interests by GPLS using funds in the Purchasing Account, provided that such funds shall only be used to purchase Participation Interests;

(d)     depositing into the Collection Account funds reflecting all principal, interest, fees and other amounts collected from (i) the Borrowers with respect to the Loans purchased pursuant to the Loan Purchase Agreement and (ii) the applicable Tribe with respect to Participation Interests purchased pursuant to a Participation Agreement;

(e)     preparing and delivering (within sixty (60) calendar days after the end of the relevant quarter or, if the end of such quarter coincides with the end of a year, within one hundred twenty (120) calendar days after the end of such year), with respect to GPLS, GPLS Trust and GPLS Trust II, a draft balance sheet and statement of changes in shareholders' equity as of the end of each quarter and year with respect to GPLS, GPLS Trust and GPLS Trust II and draft statements of income and cash flows for such quarter and year, as applicable ("Draft Accounts");

(f)     maintaining, or monitoring the maintenance of, the books, records, registers and associated filings of GPLS, GPLS Trust and GPLS Trust II required in the ordinary course of providing the Services including, without limitation, keeping accurate records of Purchases of Purchased Securities;

(g)     procuring, when Agent considers in good faith that it is appropriate or necessary to do so, and coordinating the advice of, legal counsel, accounting, tax and other professional advisers, in each case acceptable to GPLS, GPLS Trust or GPLS Trust II, as applicable, to assist GPLS, GPLS Trust and/or GPLS Trust II in carrying out its obligations, and supervising, in accordance with instructions from GPLS, GPLS Trust and/or GPLS Trust II, such legal counsel and other advisers;

(h)     paying the Service Fee with respect to the Participation Interests purchased pursuant to a Participation Agreement on behalf of GPLS to the applicable Tribe, as set forth in the applicable Participation Agreement;

(i)     managing (i) the Collection Account, Maintenance Account and Purchasing Account for and on behalf of GPLS, (ii) the Trust Account for and on behalf of GPLS Trust and (iii) Trust Account II for and on behalf of GPLS Trust II, each of which shall be a segregated deposit account;

(j)     funding and managing Reserve Accounts (or any other applicable accounts) as provided in the Participation Agreements;

(k)     facilitating the compliance by GPLS Trust of GPLS Trust's obligations under the Loan Purchase Agreement;

(l)     facilitating the compliance by GPLS Trust II of GPLS Trust II's obligations under the applicable Participation Agreements;

10

UNSEALED

TF-PA-000250

(m)     facilitating the compliance by GPLS of GPLS's obligations under the Participation Agreements;

(n)     paying the Fixed Return or Default Return, as applicable, to GPLS, GPLS Trust or GPLS Trust II;

(o)     paying the Maintenance Fee as required by Section 2.8;

(p)     pay the Past Due Amount with regard to Past Due Loans as required by Section 2.9;

(q)     paying or reimbursing GPLS, GPLS Trust, GPLS Trust II and their respective Affiliates the fees, costs and expenses required to be paid pursuant to Section 8.2 and providing the tax gross-up, payments and indemnity required pursuant to Section 8.3; and

(r)     assisting GPLS, GPLS Trust and GPLS Trust II in the preparation of their respective tax returns, if any;

provided, however, that GPLS, GPLS Trust and GPLS Trust II, as applicable, shall retain ownership for the Ledgers and Draft Accounts, including retaining all discretionary decisions and judgments relating to the preparation and maintenance thereof.

Section 2.3.    Accounting Standards.    Agent shall prepare the Draft Accounts in accordance with GAAP (without the footnotes to any financial statements) which shall be reviewed by a "Big Four" or other nationally-recognized independent certified public accountant selected by Agent and reasonably acceptable to GPLS.  GPLS hereby approves the selection of Grant Thornton LLP.

Section 2.4.    Agent Responsibility.    The obligations of Agent are limited to those matters that are expressly the responsibility of Agent in accordance with this Agreement. Notwithstanding the appointment of Agent to perform the Services and except as otherwise set forth herein, GPLS, GPLS Trust and GPLS Trust II shall remain responsible for all matters and decisions related to their respective businesses, operations, assets and liabilities.  Other than this Agreement, Agent is not authorized or empowered to enter into any agreement, contract or other legally binding arrangement, in respect of or relating to the business or affairs of GPLS, GPLS Trust or GPLS Trust II.

Section 2.5.    Funding of GPLS.    Agent may provide written requests to GPLS requesting that additional GPLS Investments be made into GPLS in accordance with this Agreement (each, an "Investment Request") as follows:  Agent shall be entitled to make such Investment Request upon no less than (a) fourteen (14) calendar days prior written notice if such proposed request is for a GPLS Investment in an amount less than $4,000,000, (b) thirty (30) calendar days prior written notice if such proposed request is for a GPLS Investment in an amount greater than or equal to $4,000,000 and less than $8,000,000; and (c) sixty (60) calendar days prior written notice if such proposed request is for a GPLS Investment in an amount greater than or equal to $8,000,000.

11

UNSEALED

TF-PA-000251

Section 2.6.   Bank Account Management and Calculation Services.   The Agent shall perform and provide the following bank account management and calculation services for GPLS, GPLS Trust and GPLS Trust II during the term of this Agreement:

(a)   The Accounts.   The Agent shall cause (i) all funds on deposit in the Collection Account on account of the Loans purchased pursuant to the Loan Purchase Agreement to be swept to the Trust Account, (ii) all funds on deposit in the Collection Account on account of the Subject Participation Interests to be swept to Trust Account II and (iii) after giving effect to the foregoing, all funds in excess of $2,000,000 in the aggregate on deposit in the Collection Account and the Purchasing Account to be swept to the Maintenance Account.

(b)   Deposits and Withdrawals.

(i)   No later than five (5) Business Days after the end of each month (each, a "Month") Agent shall pay from the Maintenance Account the Agent Fee for such Month to itself, provided, the foregoing notwithstanding, no such Agent Fee shall be paid or otherwise distributed to Agent pursuant to this Section 2.6(b) after the occurrence of an Event of Default and during the fifteen (15) day period immediately following the occurrence of such Event of Default, provided, further, that in the event Victory Park has not delivered an Event of Default Redemption Notice in accordance with the provisions of Section 3.5 hereof during such fifteen (15) day period, then Agent shall be permitted to pay itself such Agent Fee commencing on the sixteenth (16th) day immediately following the occurrence of such Event of Default and continuing until such time, if any, as another Event of Default shall have occurred (whereupon the fifteen (15) day suspension period described above shall be reinstated).

(ii)   An amount from time to time equal to (i) the balance remaining in the Maintenance Accounts after the payment of the Agent Fee for each Month in accordance with Section 2.6(b)(i), less (ii) the Fixed Return for such Month, shall be available to be transferred to the Purchasing Account to purchase additional Participation Interests as requested from time to time by Agent.

(iii)   Agent agrees that if interest received on the Purchased Securities for a Month is not sufficient to enable GPLS, GPLS Trust and GPLS Trust II to receive the Fixed Return for such Month, Agent shall be liable to GPLS, GPLS Trust and GPLS Trust II for such shortfall (the "Agent Shortfall Obligation") and, no later than five (5) Business Days after the end of the applicable Month, shall deposit into the Collection Account, for the benefit of GPLS, GPLS Trust and GPLS Trust II, such amount as is necessary for GPLS, GPLS Trust and GPLS Trust II to receive the Fixed Return for such Month.

(iv)   If any amount paid or otherwise distributed to Agent pursuant to Section 2.6(b)(i) that was not permitted to be so paid or otherwise distributed is received by Agent, such amount shall not be commingled with any asset of Agent, shall be held in trust by Agent for the benefit of GPLS, GPLS Trust and GPLS Trust II, and shall be promptly paid over to the Collection Account.

Section 2.7.   Expenses.   Except as set forth herein, Agent shall bear all of its expenses in performing the Services.

12

UNSEALED

TF-PA-000252

Section 2.8.   Maintenance Fee   Agent shall pay to Victory Park Management, LLC, a Delaware limited liability company, a fully-earned, non-refundable fee (the "Maintenance Fee") in an amount equal to $5,000 each month until the Termination Date. Such Maintenance Fee shall be due and payable in advance in cash on the Effective Date and on the fifth (5th) Business Day of each month thereafter and shall be paid by wire transfer of immediately available funds to an account specified in writing by Victory Park.

Section 2.9   Past Due Loans.   Within five (5) Business Days after the end of each calendar month, Agent shall pay GPLS, GPLS Trust or GPLS Trust II, as applicable, an amount (the "Past Due Amount") equal to the then-current outstanding principal balance plus all accrued and unpaid interest and fees with respect to all Purchased Securities with Underlying Loans that have a principal, interest and/or fee payment greater than sixty (60) calendar days past due (the "Past Due Loans"), provided that Agent shall have up to sixty (60) calendar days from the date an Underlying Loan becomes a Past Due Loan to pay the applicable Past Due Amount. The Past Due Amount shall be paid by Agent to GPLS, GPLS Trust or GPLS Trust II, as applicable, by wire transfer of immediately available funds to the Collection Account. Upon receipt by GPLS, GPLS Trust or GPLS Trust II, as applicable, of the Past Due Amount in the Collection Account, Agent shall thereafter be deemed to have a right of subrogation with respect to such Past Due Loans and shall thereafter have the right to all principal, interest, fees and other amounts received by GPLS, GPLS Trust or GPLS Trust II, as applicable, on account of such Past Due Loans. For purposes of clarification, Agent shall only be required to pay the Past Due Amount with respect to a Past Due Loan once (i.e., even though an Underlying Loan may remain a Past Due Loan for several months after the Past Due Amount is paid, the Past Due Amount with respect to such Underlying Loan is only paid one time).

# ARTICLE 3
# STANDARD OF PERFORMANCE; LIABILITY AND INDEMNITY; REDEMPTION

Section 3.1.   Standard of Performance.   Agent will devote the same amount of time, attention and resources to and will be required to exercise the same level of skill, care and diligence in the performance of the Services hereunder as it would if it were administering such Services on its own behalf (the "Standard of Performance"), but in no event less than that standard of service provided by financial institutions acting in good faith.

Section 3.2.   Liability and Indemnity

(a)   Agent shall not be liable for any losses or taxes to or of, or payable by GPLS, GPLS Trust or GPLS Trust II at any time from any cause whatsoever or any losses or taxes directly or indirectly arising out of or in connection with or related to the performance by Agent of this Agreement unless such losses or taxes are the result of Agent's own willful misconduct, gross negligence, deceit or fraud.

(b)   Agent shall indemnify and hold harmless GPLS, GPLS Trust, GPLS Trust II and the other GPLS Indemnified Parties on an After-Tax Basis for any Losses which they may incur or be subject to as a result of or arising from: (i) the performance of the Services or any breach of this Agreement by Agent, (ii) the material inaccuracy of any representation or warranty made by Agent, (iii) any failure of Agent to comply in respect of the GPLS Indemnified Parties'

13

UNSEALED

TF-PA-000253

obligations in connection with a Program or with any Requirements provided such obligations are to be satisfied by Agent in accordance with this Agreement, (iv) any improper use or disclosure or unlawful use or disclosure of Customer Information by Agent, (v) any liability of the GPLS Indemnified Parties for any fees, costs, or other amounts due including damages or liquidated damages, arising out of any contract with a third party service provider retained by Agent, (vi) the GPLS Indemnified Parties' indemnification obligations under the Purchase Agreements and (vii) the imposition of any Taxes (other than Excluded Taxes) imposed by any jurisdiction on amounts payable under the Transaction Documents paid by the GPLS Indemnified Parties and any liabilities arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted; provided, however, that this indemnity shall not apply and Agent shall have no liability in respect of Losses to the extent that they arise from (x) the willful misconduct, gross negligence, deceit or fraud of GPLS, GPLS Trust or GPLS Trust II, (y) any action that GPLS, GPLS Trust or GPLS Trust II requires Agent to take pursuant to a direction but only to the extent that Agent takes such action in accordance with such direction and in accordance with the provisions hereof, or (z) a refusal by GPLS, GPLS Trust or GPLS Trust II to take action upon a recommendation made in good faith by Agent in accordance with the terms hereof.

(c)     This Agreement contemplates that Agent shall receive the relevant information in order for Agent to make required credit and debit entries and to make the calculations and supply the information and reports required herein, and that Agent will do the foregoing to the extent such information is so provided and on the basis of such information, without undertaking any independent verification or recalculation of such information.

(d)     The indemnity obligations set forth in this Section 3.2 shall survive the termination of this Agreement until the expiration of the applicable statute of limitations period.

Section 3.3.    GPLS, GPLS Trust and GPLS Trust II Induced by Agent's Indemnity Promises.  Agent acknowledges that the indemnification and risk allocation described in this Article 3 is a material inducement to GPLS, GPLS Trust and GPLS Trust II to enter into this Agreement and the Purchase Agreements and is a material factor in GPLS's, GPLS Trust's and GPLS Trust II's determination of the compensation to be paid to Agent hereunder.   Agent expressly agrees to this risk allocation and intends that the risks allocated to Agent include any risk arising in whole or part from the alleged or actual negligence of GPLS, GPLS Trust or GPLS Trust II.

Section 3.4.    Agent's Rights and Obligations to Redeem Purchased Securities.  Agent shall have the following rights and obligations to redeem the Purchased Securities:

(a)     After July 31, 2012, Agent shall have the right, exercisable upon at least sixty (60) days' prior written notice to GPLS, to redeem all, but not less than all, of the then outstanding Purchased Securities at a price equal to the Yield Maintenance Purchase Price determined as of the date of the receipt by GPLS of such purchase price, which purchase price shall be paid by Agent to GPLS within three (3) Business Days after the expiration of such sixty (60) day (or longer, as the case may be) notice period by wire transfer of immediately available funds to one or more accounts specified in writing by GPLS.

14

UNSEALED

TF-PA-000254

(b)    If GPLS elects not to make any GPLS Investment requested by Agent in accordance with Section 2.5 and provided that all conditions of GPLS Investments set forth in Section 5.6 shall have been satisfied at the time thereof and Agent shall have made the Investment Request, if any, required to have been made at the time thereof, then Agent shall have the right, exercisable upon at least sixty (60) calendar days' prior written notice to GPLS, to redeem all, but not less than all, of the then outstanding Purchased Securities from GPLS, GPLS Trust and GPLS Trust II at a price equal to the Non-Yield Maintenance Purchase Price, which price shall be paid by Agent to GPLS, GPLS Trust and GPLS Trust II within three (3) Business Days of the expiration of such sixty (60) calendar day (or longer, as the case may be) notice period by wire transfer of immediately available funds to one or more accounts specified in writing by GPLS, GPLS Trust and GPLS Trust II; provided, that such right to redeem such outstanding Purchased Securities shall expire upon written notice from GPLS to Agent stating that GPLS is thereafter willing and able to make additional GPLS Investments requested by Agent in accordance with Section 2.5, provided that all conditions of GPLS Investments set forth in Section 5.6 shall have been satisfied at the time thereof and Agent shall have made the Investment Request, if any, required to have been made at the time thereof. For purposes of clarification, prior to the expiration of the sixty (60) calendar day notice of redemption pursuant to this Section 3.4(b), GPLS can deliver notice that it is willing and able to make GPLS Investments, whereupon such right to redeem shall expire.

(c)    On the date ("Termination Date") of the earlier to occur of (i) the termination of all Participation Agreements, or (ii) February 28, 2014, Agent shall have the obligation to redeem all, but not less than all, of the then outstanding Purchased Securities at a price equal to the Yield Maintenance Purchase Price, which price shall be paid by Agent to GPLS and, if applicable, GPLS Trust and GPLS Trust II within three (3) Business Days of the Termination Date by wire transfer of immediately available funds to one or more accounts specified in writing by GPLS, GPLS Trust and GPLS Trust II.

Section 3.5.    GPLS's, GPLS Trust's and GPLS Trust II's Redemption Right. Promptly after the occurrence of an Event of Default, Agent shall deliver written notice thereof via email, facsimile and overnight courier (an "Event of Default Notice") to GPLS. At any time after the earlier of GPLS's receipt of an Event of Default Notice and GPLS becoming aware of an Event of Default which has not been cured or waived, GPLS may require Agent to redeem all or any portion of the Purchased Securities (an "Event of Default Redemption") by delivering written notice thereof (the "Event of Default Redemption Notice") to Agent, which Event of Default Redemption Notice shall indicate the portion of the Purchased Securities that GPLS is requiring Agent to redeem; provided, that upon the occurrence of any Event of Default described in Sections 7(a)(iii) or 7(a)(iv) of the Guaranty and Security Agreement, the Purchased Securities, in whole, shall automatically, and without any action on behalf of GPLS, GPLS Trust or GPLS Trust II, be redeemed by Agent. All Purchased Securities subject to redemption by Agent pursuant to this Section 3.5 shall be redeemed by Agent at a price equal to the Yield Maintenance Purchase Price determined as of the date of the receipt by GPLS and, if applicable, GPLS Trust and GPLS Trust II of such purchase price by wire transfer of immediately available funds to one or more accounts specified in writing by GPLS, GPLS Trust and GPLS Trust II. In the case of an Event of Default Redemption, Agent shall deliver the applicable Yield Maintenance Purchase Price to GPLS and, if applicable, GPLS Trust and GPLS Trust II within three (3) Business Days after Agent's receipt of the Event of Default Redemption Notice. In the

15

UNSEALED

TF-PA-000255

case of an Event of Default, the Yield Maintenance Purchase Price shall be paid to GPLS and, if applicable, GPLS Trust and GPLS Trust II, with respect to all GPLS Investments, regardless of whether any Purchased Securities are redeemed or outstanding.

## ARTICLE 4
## AGENT UNDERTAKINGS

Section 4.1.    Agent Undertakings.  Agent shall:

(a)    if Agent receives any money which is required to be paid to or for the benefit of GPLS, GPLS Trust or GPLS Trust II, hold such money in trust for GPLS, GPLS Trust or GPLS Trust II, as applicable, and shall within three (3) Business Days thereafter remit the same into the Collection Account in accordance with the terms hereof without exercising any right of setoff;

(b)    comply with all Requirements in the performance of the Services;

(c)    make all payments required to be made by it at any time and from time to time pursuant to this Agreement, the Purchase Agreements and the other Transaction Documents on the required date for payment thereof;

(d)    observe all limited liability company formalities;

(e)    maintain proper records, books, accounts and minutes;

(f)    pay its obligations in the ordinary course of its business;

(g)    conduct its business in its own name;

(h)    not induce any third party to rely on the creditworthiness of GPLS, GPLS Trust or GPLS Trust II in order that such third party will be induced to contract with it; and

(i)    subject to Victory Park making sufficient funds available, arrange for sufficient funds from GPLS, GPLS Trust and GPLS Trust II to be maintained on deposit in the Purchasing Account to purchase Participation Interests from time to time.

Section 4.2.    Compliance Reviews and Audits.  During the term of this Agreement and at all times thereafter, GPLS, GPLS Trust and GPLS Trust II shall have reasonable access to Agent's offices, to the books and records of Agent (to the extent that such books and records pertain to the Services), to the officers, employees and accountants of Agent, and to the computer files containing copies of documents relating to the Services, all for the purposes of ensuring that Agent is complying with its obligations under this Agreement.  In addition, and not as a limitation of the foregoing, GPLS, GPLS Trust and GPLS Trust II shall have the right, from time to time during the term of this Agreement, to conduct audits and/or compliance reviews of Agent and the records generated hereunder; provided, that the exercise of such audit and review rights by GPLS, GPLS Trust or GPLS Trust II shall be conducted during normal business hours in a manner which does not unreasonably interfere with Agent's normal business operations and customer and employee relations.

16

UNSEALED

App. 0727

TF-PA-000256

Section 4.3. Representations and Warranties. Agent hereby makes the following representations and warranties to GPLS, GPLS Trust and GPLS Trust II as of the date hereof and as of the date of each GPLS Investment:

(a) Organization and Good Standing. Agent is a limited liability company duly formed under the laws of Delaware, validly existing and in good standing under the laws of Delaware and has full power, authority and the legal right to own its properties and conduct its business as now conducted, and to execute, deliver and perform its obligations under this Agreement and under each of the other Transaction Documents to which it is a party.

(b) Due Qualification. Agent (i) is duly qualified to do business and is in good standing as a foreign limited liability company in each jurisdiction where such qualification is necessary in order to perform its duties hereunder and under each of the other Transaction Documents to which it is a party, (ii) has obtained all licenses and approvals as required under federal and state law that are necessary to perform its duties hereunder and under each of the other Transaction Documents to which it is a party and (iii) is in compliance with its organizational documents.

(c) Due Authorization; Enforceability. Agent has the full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and under each of the other Transaction Documents to which it is a party including, without limitation, the performance of the Services to be performed by it hereunder. The execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party by Agent including, without limitation, the performance of the Services to be performed by it hereunder, has been duly authorized by all necessary limited liability company action on its part and do not and will not contravene any provision of its organizational documents. Each of this Agreement and the other Transaction Documents to which it is a party has been duly executed and delivered by Agent and constitutes the legal, valid and binding obligation of Agent, enforceable against Agent in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles.

(d) No Conflict. The execution, delivery and performance by Agent of this Agreement and each of the other Transaction Documents to which it is a party and the transactions contemplated hereby and thereby, including, without limitation, the performance of the Services to be performed by it hereunder, does not violate, conflict with or result in a breach or default under (i) the organizational documents of Agent, (ii) any material federal, tribal, state or local law, rule or regulation applicable to Agent or (iii) any of the Stinson Loan Documents to which Agent is a party or any or any other material agreement or other document to which Agent is a party or by which it or any of its property is bound.

(e) No Proceeding. There is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or threatened against Agent which (i) if adversely determined, could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect or (ii) questions the validity of this Agreement or any of the other Transaction Documents or any of the transactions contemplated hereby or thereby or

17

UNSEALED

TF-PA-000257

any action taken or to be taken pursuant hereto or thereto, including, without limitation, the performance of the Services to be performed by it hereunder.

        (f)    <u>Criminal Matters; Tax Liens; Proceedings and Judgments</u>. Neither Agent nor any of its officers, directors, members or managers has been subject to any of the following:

        (i)    Criminal conviction (except minor traffic offenses and other petty offenses);

        (ii)    Federal or state tax liens for amounts which are past due and which are not being contested in good faith by appropriate proceedings for which adequate reserves made in accordance with GAAP are being maintained;

        (iii)    Except as set forth on <u>Schedule 4.3(f)</u>, administrative or enforcement proceedings commenced by the Securities and Exchange Commission, any state securities regulatory authority, Federal Trade Commission, federal or state bank regulator, or any other state or federal regulatory agency; or

        (iv)    Except as set forth on <u>Schedule 4.3(f)</u>, restraining order, decree, injunction, or judgment entered in any proceeding or lawsuit alleging fraud on the part of Agent or any principal thereof.

        (g)    <u>No Consents</u>. Except as previously obtained by Agent prior to the date hereof, Agent is not required to obtain any consent, authorization, approval, order, license, franchise, permit, certificate or accreditation of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or authority or any other Person in order for it to execute, deliver or perform any of its obligations under or contemplated by this Agreement or any of the other Transaction Documents to which it is a party, including, without limitation, the performance of the Services to be performed by it hereunder, in each case in accordance with the terms hereof or thereof.

        (h)    <u>Equity Capitalization of Agent</u>. All of the outstanding limited liability company membership interests of Agent have been duly authorized, validly issued and are owned by Think Finance. Except as set forth on <u>Schedule 4.3(h)</u>, none of such limited liability company membership interests of Agent is subject to preemptive rights or any other similar rights or any Liens or encumbrances and there are no outstanding options, warrants, scrips, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any limited liability company membership interests of Agent.

        (i)    <u>Indebtedness and Contracts</u>. Except as disclosed on <u>Schedule 4.3(i)</u>, Agent (i) has no Indebtedness, (ii) is not a party to any contract, agreement or instrument, the violation of which, or default under which, by the other party(ies) to such contract, agreement or instrument could reasonably be expected to result in a Material Adverse Effect or (iii) is not in violation of any term of or in default under any contract that could reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect.

18

UNSEALED

App. 0729

(j)    No Undisclosed Events, Liabilities, Developments or Circumstances
Except for the transactions contemplated by the Transaction Documents and as set forth on
Schedule 4.3(j), no event, liability, development or circumstance has occurred or exists, or is
contemplated to occur with respect to Agent or its business, properties, prospects, operations or
financial condition, that would reasonably be expected to result, either individually or in the
aggregate, in a Material Adverse Effect.

(k)    Tax Status.   Agent (i) has made or filed all foreign, federal and state
income and all other material tax returns, reports and declarations required by any jurisdiction to
which it is subject, except where any failure to do so did not result in any material penalties to
Agent, (ii) has paid all taxes and other governmental assessments and charges shown or
determined to be due on such returns, reports and declarations, except those being contested in
good faith and for which an adequate reserve has been established on its books in accordance
with GAAP and (iii) has set aside on its books adequate reserves in accordance with GAAP for
the payment of all taxes for periods subsequent to the periods to which such returns, reports or
declarations apply.  There are no unpaid taxes in any material amount claimed to be delinquent
by the taxing authority of any jurisdiction (other than those being contested in good faith by
appropriate proceedings promptly instituted and diligently conducted and subject to adequate
reserves taken by Agent as shall be required in conformity with GAAP), and the officers of
Agent know of no basis for any such claim.

(l)    Conduct of Business; Regulatory Permits.   Agent is not in violation of any
term of or in default under its certificate of formation or operating agreement or other governing
documents.  Agent is not in violation of any judgment, decree or order or any statute, ordinance,
rule or regulation applicable to Agent (i) purporting to enjoin or restrain the execution, delivery
or performance of this Agreement or any of the other Transaction Documents, or directing that
the transactions provided for herein or therein not be consummated as herein or therein provided,
or (ii) to the extent any such violation would reasonably be expected to have, either individually
or in the aggregate, a Material Adverse Effect.   Agent possesses all material consents,
authorizations, approvals, orders, licenses, franchises, permits, certificates, accreditations and
permits and all other appropriate regulatory authorities necessary to conduct its business, and
Agent has not received any notice of proceedings relating to the revocation or modification of
any such consents, authorizations, approvals, orders, licenses, franchises, permits, certificates,
accreditations or permits.  Agent is in compliance with all laws, rules, regulations and ordinances
of all applicable Governmental Authorities.

(m)    Foreign Corrupt Practices.  Neither Agent nor any director, officer, agent,
employee or other Person acting on behalf of Agent has, in the course of its actions for, or on
behalf of, Agent (i) used any corporate funds for any unlawful contribution, gift, entertainment
or other unlawful expenses relating to political activity, (ii) made any direct or indirect unlawful
payment to any foreign or domestic government official or employee from corporate funds (iii)
violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as
amended or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other
unlawful payment to any foreign or domestic government official or employee.

(n)    Margin Stock.   Agent is not engaged in the business of extending credit
for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of

19

UNSEALED

App. 0730

the Board of Governors of the Federal Reserve System), and no part of the proceeds from the Purchases will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock, or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

       (o)    <u>Investment Company</u>. Agent is not a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

       (p)    <u>Transactions With Affiliates</u>. Except (i) as set forth on <u>Schedule 4.3(p)</u> and (ii) for transactions that have been entered into on terms, taken as a whole, no less favorable to Agent than those that might be obtained at the time from a Person who is not an officer, director or employee, none of the officers, directors or employees of Agent is presently a party to any transaction with Agent (other than for ordinary course services as employees, officers or directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such officer, director or employee or, to the knowledge of Agent, any corporation, partnership, trust or other entity in which any such officer, director, or employee has a substantial interest or is an officer, director, trustee or partner.

       (q)    <u>Insurance</u>. Agent is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are deemed prudent by Agent. Agent has not been refused any insurance coverage sought or applied for and Agent has no reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

       (r)    <u>Disclosure</u>. Notwithstanding any other provision of this Agreement or the other Transaction Documents, all disclosure provided to GPLS, GPLS Trust and GPLS Trust II regarding Agent, its business and properties, and the transactions contemplated hereby or thereby, including the Schedules to this Agreement, furnished by or on behalf of Agent, is true and correct in all material respects and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, taken as a whole and in the light of the circumstances under which they were made, not materially misleading. To its knowledge, no event or circumstance has occurred or information exists with respect to Agent or any of its business, properties, prospects, operations or condition (financial or otherwise), which, under applicable law, rule or regulation, requires public disclosure or announcement by Agent but which has not been so publicly announced or disclosed.

       (s)    <u>Terrorism Laws</u>. To the extent applicable, Agent is in compliance, in all material respects, with all Terrorism Laws.

20

UNSEALED

TF-PA-000260

Section 4.4    Covenants.

(a)    Books and Records; Inspections.

(i)    Agent will (A) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (B) permit any representatives designated by GPLS, GPLS Trust, GPLS Trust II or their respective Affiliates (including employees of GPLS, GPLS Trust, GPLS Trust II or their respective Affiliates or any consultants, accountants, lawyers and appraisers retained by GPLS, GPLS Trust, GPLS Trust II or their respective Affiliates) to visit and inspect any of the properties of Agent to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants, all upon reasonable prior written notice and at such reasonable times during normal business hours (so long as no Event of Default (or event or circumstance that, with the passage of time, the giving of notice, or both, would become an Event of Default) has occurred and is continuing) and by this provision Agent authorizes such accountants to discuss with GPLS, GPLS Trust, GPLS Trust II or their respective Affiliates and such representatives the affairs, finances and accounts of Agent; provided, that GPLS, GPLS Trust and GPLS Trust II may only exercise their rights pursuant to this Section 4.4(a)(i) once every six (6) months unless an Event of Default has occurred and is continuing (in which case no such limitations shall apply). Agent acknowledges that GPLS, GPLS Trust, GPLS Trust II and their respective Affiliates, after exercising their rights of inspection, may prepare certain reports pertaining to Agent's assets for internal use by GPLS, GPLS Trust and GPLS Trust II. After the occurrence and during the continuance of any Event of Default, subject to applicable law, Agent shall provide GPLS, GPLS Trust, GPLS Trust II and their respective Affiliates with access to its customers and suppliers.

(ii)    If GPLS, GPLS Trust or GPLS Trust II receives any Nonpublic Personal Information (as defined in the GLBA) of Account Debtors (as defined in the GLBA) that is covered by Title V of the Gramm-Leach-Bliley Act ("GLBA") (15 U.S.C. §§6801-09), GPLS, GPLS Trust and GPLS Trust II shall not disclose such information except as allowed under GLBA and shall safeguard such information as required by GLBA.

(iii)    If GPLS, GPLS Trust or GPLS Trust II receives any Nonpublic Personal Information of Account Debtors and if, to GPLS's, GPLS Trust's or GPLS Trust II's knowledge, there has been a material disclosure of such Nonpublic Personal Information in GPLS's, GPLS Trust or GPLS Trust II's possession to third parties without GPLS's, GPLS Trust's or GPLS Trust II's express or implied authorization, then GPLS, GPLS Trust or GPLS Trust II, as applicable, shall notify Agent of such event. For the avoidance of doubt, this covenant is not for the benefit of any Person other than Agent and is not intended to expand GPLS's, GPLS Trust's or GPLS Trust II's duty to safeguard Nonpublic Personal Information beyond those set forth in this Agreement or any other Transaction Document.

(iv)    Notwithstanding the foregoing, none of GPLS, GPLS Trust, GPLS Trust II, any of their respective Affiliates or any of their respective officers, partners, directors, employees or agents shall be liable to Agent or any other Person for any action taken or omitted to be taken by GPLS, GPLS Trust or GPLS Trust II under Sections 4.4(a)(ii) and (iii) (including

21

UNSEALED       TF-PA-000261

the failure to notify Agent or any other Person of any information required to be disclosed to Agent or any other Person under Sections 4.4(a)(ii) and (iii)).

(b)    Compliance with Laws.  Agent shall comply in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority.  Agent shall take all reasonable and necessary actions to ensure that no portion of the proceeds from any Purchases will be used, disbursed or distributed for any purpose, or to any Person, directly or indirectly, in violation of any of the Terrorism Laws and shall take all reasonable and necessary action to comply in all material respects with all Terrorism Laws with respect thereto.

(c)    Affiliate Transactions.  Agent shall not directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Agent, unless such transaction is on terms that are no less favorable to Agent, than those that might be obtained at the time from a Person who is not an Affiliate and are fully disclosed in writing to GPLS, GPLS Trust or GPLS Trust II prior to consummation thereof.

(d)    Existence and Maintenance of Properties.  Agent shall maintain and preserve its (i) existence and good standing in the jurisdiction of its organization and (ii) qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary (other than such jurisdictions in which the failure to be so qualified or in good standing could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect).  Agent shall maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of Agent, as applicable, and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

(e)    Modification of Organizational Documents.  Agent shall not without the prior written consent of GPLS, GPLS Trust or GPLS Trust II, permit its certificate of formation, operating agreement or other organizational documents to be amended or modified in any respect adverse to GPLS, GPLS Trust, GPLS Trust II or their respective Affiliates.

(f)    Privacy; Security of Customer Information.  Agent, on behalf of GPLS, GPLS Trust and GPLS Trust II, shall:

(i)    implement an effective security program to protect nonpublic Customer Information received with respect to any Borrower, customer or consumer;

(ii)    implement and maintain administrative, technical and physical safeguards designed to ensure the security of Customer Information pursuant to the Requirements; and

(iii)    respond promptly and thoroughly to any requests for information concerning the respective information security measures implemented by GPLS, GPLS Trust or GPLS Trust II.

22

UNSEALED

TF-PA-000262

Section 4.5.    Purchase of Participation Interests. Agent shall not use funds in the Purchasing Account to purchase Participation Interests after the occurrence of an Event of Default and during the fifteen (15) day period immediately following the occurrence of such Event of Default; provided, however, that in the event Victory Park has not delivered an Event of Default Redemption Notice in accordance with the provisions of Section 3.5 hereof during such fifteen (15) day period, Agent shall be permitted to use funds in the Purchasing Account to purchase Participation Interests commencing on the sixteenth (16th) day immediately following the occurrence of such Event of Default and continuing until such time, if any, as another Event of Default shall have occurred (whereupon the fifteen (15) day suspension period described above shall be reinstated).

## ARTICLE 5
## UNDERTAKINGS OF GPLS, GPLS TRUST AND GPLS TRUST II

Section 5.1.    Cooperation. GPLS, GPLS Trust and GPLS Trust II shall cooperate with Agent to enable Agent to provide the Services.

Section 5.2.    Information. GPLS, GPLS Trust and GPLS Trust II will provide Agent with the following information in respect of itself:

(a)    copies of all relevant documents, including its charter documents, and copies of all books and records maintained on behalf of GPLS, GPLS Trust and GPLS Trust II;

(b)    details of all bank accounts and bank mandates maintained by GPLS, GPLS Trust and GPLS Trust II;

(c)    name of and contact information of the officers, directors of GPLS, GPLS Trust and GPLS Trust II, as applicable; and

(d)    such other information as is reasonably necessary to Agent's performance of the Services.

Section 5.3.    Scope of Services. If GPLS, GPLS Trust or GPLS Trust II shall enter into any agreement, amendment or other modification or shall take any other action that has the effect of increasing in any material respect the scope, nature or level of the Services to be provided under this Agreement without Agent's express prior written consent, then such party shall so notify Agent and Agent shall not be obligated to perform the affected Service to the extent of such increase unless and until Agent and such party shall agree on the terms of such increased Service (it being understood that (i) Agent shall have no liability to such party directly or indirectly arising out of, in connection with or related to Agent's failure to perform such increased Service prior to any such agreement and (ii) such party shall not be permitted to engage another Person to perform the affected Service without the prior written consent of Agent unless Agent has indicated it is unable or unwilling to act in respect of the affected Service or Agent requires additional compensation for such additional Service that is not acceptable to such party).

Section 5.4.    Ratification. GPLS, GPLS Trust and GPLS Trust II ratify and confirm, and agree to ratify and confirm (and shall furnish written evidence thereof upon request of

23

UNSEALED

App. 0734

Agent), any act or omission by Agent in accordance with this Agreement in the exercise of any of the powers or authorities conferred upon Agent under this Agreement, it being expressly understood and agreed that GPLS, GPLS Trust and GPLS Trust II shall not have any obligation to ratify and confirm, and expressly does not ratify and confirm, any act or omission of Agent in violation of this Agreement, the Standard of Performance or for which Agent is obligated to indemnify GPLS, GPLS Trust and GPLS Trust II under Section 3.2.

Section 5.5.  Covenants.  Each of GPLS, GPLS Trust and GPLS Trust II shall conduct its respective business such that each is a separate and readily identifiable business form, and independent of, the Agent and shall also:

(a)  observe all corporate or statutory trust formalities, as applicable, necessary to remain a legal entity separate and distinct from, and independent of, Agent and any of its Affiliates;

(b)  maintain its assets and liabilities separate and distinct from those of Agent;

(c)  maintain records, books, accounts, and minutes separate from those of Agent;

(d)  pay its obligations in the ordinary course of business as a legal entity separate from Agent;

(e)  keep its funds separate and distinct from any funds of Agent, and will receive, deposit, withdraw and disburse such funds separately from any funds of Agent;

(f)  conduct its business in its own name, and not in the name of Agent;

(g)  not agree to pay or become liable for any debt of Agent, other than as may be required by this Agreement;

(h)  not hold out that it is a division of Agent, or that Agent is a division of it;

(i)  not enter into any transaction between it and Agent that are as a whole materially more favorable to either party than transactions that the parties would have been able to enter into at such time on an arm's-length basis with a non-affiliated third party;

(j)  observe all material corporate, trust or other procedures, as applicable, required under applicable law and under its constitutive documents; and

(k)  observe all material corporate or trust formalities, as applicable, necessary to keep its business separate and readily identifiable from any third party.

Section 5.6.  Conditions of Investments.  Agent hereby agrees that notwithstanding anything to the contrary set forth herein, the making of each GPLS Investment is conditioned upon the satisfaction of each of the following conditions precedent on the relevant date of such investment, unless one or more of such conditions precedent shall have been waived by GPLS:

24

UNSEALED

App. 0735

(a)     no Event of Default being in existence;

(b)     the representations and warranties of a Tribe under the applicable Participation Agreement being true and correct as of the proposed date of such GPLS Investment and the Tribe being in compliance with all of its covenants and other obligations under the applicable Participation Agreement and all applicable laws as of the proposed date of such GPLS Investment;

(c)     GPLS shall not have been requested to make GPLS Investments having an aggregate principal amount of (i) $4,000,000 or more and less than $8,000,000 without at least 30 calendar days' prior written notice for each GPLS Investment or (ii) $8,000,000 or more without at least 60 calendar days' prior written notice for each GPLS Investment; and

(d)     Agent shall have delivered to GPLS a certificate of a responsible officer, in form and substance satisfactory to GPLS, certifying that each of the foregoing conditions shall have been satisfied.

## ARTICLE 6
## TERM AND TERMINATION

Section 6.1.    Term.   This Agreement shall have a term commencing on the Effective Date and shall terminate upon the earliest of:  (i) the final payment or other liquidation of the last outstanding Purchased Security and the remittance of all funds due hereunder; or (ii) by mutual consent of Agent, GPLS, GPLS Trust and GPLS Trust II in writing.

Section 6.2.    Agent Resignation.   With the prior written consent of GPLS, GPLS Trust and GPLS Trust II, Agent may resign from the obligations and duties hereby imposed on it upon ninety (90) calendar days' prior written notice to GPLS, GPLS Trust and GPLS Trust II.   If GPLS, GPLS Trust and GPLS Trust II, despite their commercially reasonable efforts, are unable to obtain a replacement to fulfill the obligations and duties imposed on Agent by this Agreement, GPLS, GPLS Trust and GPLS Trust II may, upon not less than thirty (30) calendar days' prior written notice to Agent, obligate Agent to delay its resignation and fulfill the obligations and duties imposed on Agent by this Agreement until a replacement is obtained   Upon such resignation and no successor having been appointed, GPLS, GPLS Trust and GPLS Trust II shall not make any Purchases.  In connection with any resignation of Agent pursuant to this Section 6.2 or termination of this Agreement, the parties shall cooperate with each other in effecting the transfer of the duties of Agent hereunder, and Agent shall deliver to GPLS, GPLS Trust and GPLS Trust II, or their respective designees, any information or files in their possession relating to the Services as of the date of Agent's resignation

Section 6.3.    Survival    Notwithstanding any termination or the expiration of this Agreement, the obligations of GPLS, GPLS Trust, GPLS Trust II and Agent under Section 3.2 that have accrued prior to such date shall survive such termination or expiration.

## ARTICLE 7
## ASSIGNMENT AND DELEGATION

Section 7.1.    Assignment and Delegation.   No Party shall assign, delegate or otherwise

25

UNSEALED

TF-PA-000265

subcontract this Agreement or all or any part of its rights or obligations hereunder to any Person without the prior written consent of the other Party; provided, however, that upon the occurrence of an Event of Default that is not cured within any applicable cure periods, GPLS, GPLS Trust and GPLS Trust II shall have the right to immediately assign this Agreement and Agent's rights under this Agreement to another party acceptable to GPLS, GPLS Trust and GPLS Trust II to assume any or all of Agent's rights and duties under this Agreement, provided that such assignment shall not relieve Agent of any of its obligations hereunder. This Agreement does not confer any right or benefit on any Person other than the Parties and their successors and permitted assigns.

## ARTICLE 8
## COSTS AND EXPENSES; TAXES

Section 8.1.    General Expenses.  Except as expressly set forth in Sections 8.2 and 8.3, no Party shall be responsible for any other Party's costs, expenses, liabilities and disbursements incurred or paid in connection with this Agreement or matters relating to or arising therefrom.

Section 8.2.    Reimbursable Expenses.    Agent shall reimburse GPLS, GPLS Trust, GPLS Trust II and any of their respective Affiliates on demand for all reasonable costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees (whether for internal or outside counsel), incurred by GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates in connection with the (a) negotiation, documentation, consummation and modification of the transactions contemplated hereunder and under each of the other Transaction Documents, including, without limitation, any GPLS Investments and the exercise of any redemption rights or obligations pursuant to Article 3 of this Agreement, and any other transactions between Think Finance, TF SPV and Agent on the one hand, and GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates, on the other hand, including, without limitation, UCC and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review (including due diligence review) costs; (b) collection, protection or enforcement of any rights in or to the Purchased Securities; (c) collection of any Obligations; (d) administration and enforcement of GPLS's, GPLS Trust's, GPLS Trust II's or any of their respective Affiliates' rights under this Agreement and under each of the other Transaction Documents (including, without limitation, any costs and expenses of any third party provider engaged by GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates for such purposes); (e) costs associated with any refinancing or restructuring the terms of this Agreement or any of the other Transaction Documents whether in the nature of a "work out," in any insolvency or bankruptcy proceeding or otherwise, and whether or not consummated; (f) all reasonable out-of-pocket costs and expenses of GPLS, GPLS Trust, GPLS Trust II and any of their respective Affiliates and its assignees (including, without limitation, attorneys' fees) in connection with the assignment, transfers or syndication of the Purchased Securities; and (g) from and against all liability for any intangibles, documentary, stamp or other similar taxes, fees and excises, if any, including any interest and penalties, and any finder's or brokerage fees, commissions and expenses (other than any fees, commissions or expenses of finders or brokers engaged by GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates), that may be payable in connection with the terms of this Agreement and/or the other Transaction Documents. Agent shall also pay all normal service charges with respect to all accounts maintained and transfers made by Agent on behalf of GPLS,

26

UNSEALED

TF-PA-000266

GPLS Trust and GPLS Trust II. Notwithstanding anything to the contrary in this Agreement, so long as no Event of Default has occurred and is continuing, in no event shall Agent's liability pursuant to Sections 8.2(b)-(g) for expenses other than legal services exceed $75,000 per year.

Section 8.3. Taxes.

(a) All payments to or on behalf of GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates hereunder and under any other Transaction Document shall be made, free and clear of and without deduction for any and all current or future taxes, levies, imposts, deductions, charges or withholdings that are or would be applicable to GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates, and all liabilities with respect thereto, excluding net income taxes imposed on the net income of GPLS, GPLS Trust, GPLS Trust II or such Affiliate by the jurisdiction under the laws of which GPLS, GPLS Trust, GPLS Trust II or such Affiliate is organized (all such nonexcluded taxes, levies, imposts, deductions, charges, withholdings and liabilities, collectively or individually, being called "Non-Excluded Taxes"). If any Non-Excluded Taxes are required to be withheld from or in respect of any sum payable hereunder or under any other Transaction Document to GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates, (x) the sum payable shall be increased by the amount (an "Additional Amount") necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this Section 8.3) GPLS, GPLS Trust, GPLS Trust II or such Affiliate shall receive an amount equal to the sum it would have received had no such deductions been made, (y) Agent shall make such deductions and (z) Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) Agent will pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or under any other Transaction Document or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Transaction Document that are or would be applicable to GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates ("Other Taxes").

(c) Agent agrees to indemnify GPLS, GPLS Trust, GPLS Trust II and any of their respective Affiliates for the full amount of Non-Excluded Taxes and Other Taxes that GPLS, GPLS Trust, GPLS Trust II and/or such Affiliate and any liability (including penalties, interest and expenses (including reasonable attorney's fees and expenses)) arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared by GPLS, GPLS Trust or GPLS Trust II absent manifest error, shall be final conclusive and binding for all purposes. Such indemnification shall be made within thirty (30) calendar days after the date GPLS, GPLS Trust or GPLS Trust II makes written demand therefor.

(d) Notwithstanding Sections 8.3(a) and 8.3(c), if there is a Final Determination, other than as a result in a change of applicable law following the date of this Agreement, that any Non-Excluded Taxes apply to a payment of interest on the Purchased Securities pursuant to this Agreement, then except during the existence of an Event of Default

27

UNSEALED

TF-PA-000267

Agent shall not have any obligation to (i) pay the Additional Amount with respect to Non-Excluded Taxes pursuant to Section 8.3(a) or (ii) indemnify GPLS, GPLS Trust, GPLS Trust II or any of their respective Affiliates with respect to such Non-Excluded Taxes.

## ARTICLE 9
## MISCELLANEOUS

Section 9.1. Notices. Except as otherwise expressly provided herein, any and all notices required or agreed to be given pursuant hereto shall be in writing and shall be deemed to have been properly given, served and received (a) if delivered by messenger, when delivered, (b) if mailed, on the third (3rd) Business Day after deposit in the United States mail certified, postage prepaid, return receipt requested, (c) if by facsimile or e-mail, upon sender's transmission or (d) if delivered by reputable overnight express courier, freight prepaid, the next Business Day after delivery to such courier. Notices shall be addressed to the Parties as set forth below:

If to GPLS:

GPL Servicing Ltd.
c/o Victory Park Capital Advisors, LLC
227 W. Monroe Street, Suite 3900
Chicago, Illinois 60606
Telephone:
Facsimile:
Attention:     Scott Zemnick, Esq.
E-Mail:

With a copy (for informational purposes only) to:

Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone:     (312) 902-5297 and (312) 902-5495
Facsimile:     (312) 902-1061
Attention:     Mark R. Grossmann, Esq. and Scott E. Lyons, Esq.
E-Mail:        mg@kattenlaw.com
               scott.lyons@kattenlaw.com

If to GPLS Trust:

GPL Servicing Trust
c/o Victory Park Capital Advisors, LLC
227 W. Monroe Street, Suite 3900
Chicago, Illinois 60606
Telephone:
Facsimile:
Attention:     Scott Zemnick, Esq.

28

TF-PA-000268

UNSEALED

E-Mail: ███████████████████

With a copy (for informational purposes only) to:

Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone:     (312) 902-5297 and (312) 902-5495
Facsimile:     (312) 902-1061
Attention:     Mark R. Grossmann, Esq. and Scott E. Lyons, Esq.
E-Mail:        mg@kattenlaw.com
               scott.lyons@kattenlaw.com

If to GPLS Trust II:

GPL Servicing Trust II
c/o Victory Park Capital Advisors, LLC
227 W. Monroe Street, Suite 3900
Chicago, Illinois 60606
Telephone:     ████████████████
Facsimile:     
Attention:     Scott Zemnick, Esq.
E-Mail:        ███████████████████

With a copy (for informational purposes only) to:

Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone:     (312) 902-5297 and (312) 902-5495
Facsimile:     (312) 902-1061
Attention:     Mark R. Grossmann, Esq. and Scott E. Lyons, Esq.
E-Mail:        mg@kattenlaw.com
               scott.lyons@kattenlaw.com

If to Agent:

TC Administrative Services, LLC
4150 International Plaza, Suite 400
Fort Worth, Texas 76109
Attention:     Chief Executive Officer
Facsimile:     817-546-2700
E-Mail:        krees@thinkfinance.com

With a copy (for informational purposes only) to:

29

TF-PA-000269

UNSEALED

Coblentz, Patch, Duffy & Bass LLP
One Ferry Building, Suite 200
San Francisco, California 94111
Telephone:    (415) 391-4800
Facsimile:    (415) 989-1663
Attention:    Paul J. Tauber, Esq.
E-Mail:    pjt@cpdb.com

The Parties may change their addresses for notice by serving written notice upon all other Parties.

Section 9.2.    Execution in Counterparts.    This Agreement may be executed in any number of counterparts and by the Parties on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed an original and all of which counterparts, taken together, shall constitute but one and the same agreement. A copy of an executed signature page to this Agreement delivered by any Party via facsimile or by other electronic means shall be deemed effective on the date of such delivery.

Section 9.3.    Governing Law.    This Agreement shall be a contract made under, and governed and enforced in every respect by, the internal laws of the State of Delaware, without giving effect to its conflicts of law principles. Any dispute, controversy, or claim, whether contractual or non contractual, between the Parties arising directly or indirectly out of or connected with this Agreement, including claims for declaratory relief, or relating to the breach or alleged breach of any representation, warranty, agreement, or covenant under this Agreement, unless mutually settled by the Parties and including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Wilmington, Delaware. The arbitration shall be administered by JAMS pursuant to its (Comprehensive Arbitration Rules and Procedures). Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate, except that the Parties agree that the arbitration, the arbitrators' authority and the relief available shall be limited as follows:

(a)    The arbitrators shall be obligated to apply the rules of evidence and the substantive laws of the State of Delaware applicable to actions litigated in the courts of the State of Delaware; and

(b)    The arbitrators shall be deemed to have exceeded their powers, authority or jurisdiction if the award they render is not correct under the applicable law and properly admitted evidence, if the arbitrators grant relief not expressly permitted under this Agreement or if the arbitrators otherwise fail to comply with the terms and limitations of this paragraph. In the event of any conflict between the rules of JAMS and this Agreement, this Agreement will control. Any arbitration shall be conducted by arbitrators approved by the JAMS and mutually acceptable to the Parties. All such disputes, controversies, or claims shall be conducted by a single arbitrator, unless the dispute involves more than $50,000 in the aggregate in which case the arbitration shall be conducted by a panel of three arbitrators. If the Parties are unable to agree on the arbitrator(s), then JAMS shall select the arbitrator(s). The resolution of the dispute by the arbitrator(s) shall be final, binding, nonappealable, and fully enforceable by a court of

30

competent jurisdiction under the Federal Arbitration Act. The arbitration award shall be in writing and shall include a statement of the reasons for the award. The arbitrator(s) shall award reasonable attorneys' fees and costs to the prevailing party. Process in any such action may be served upon any Party in the manner provided for giving of notices to it herein. Notwithstanding the foregoing, the Parties hereby consent to the jurisdiction of the state and federal courts located in the City of Wilmington, Delaware with respect to any action (i) to obtain injunctive or other equitable relief and (ii) to enforce or dispute any arbitration award or to obtain, enforce or dispute any judgment relating thereto.

Section 9.4. Severability of Provisions. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 9.5. Complete Agreement. This Agreement, together with the agreements referenced herein, constitutes the complete agreement between the Parties with respect to the specific subject matter hereof and supersede all existing agreements and all oral, written, or other communications between the Parties concerning its subject matter. The Parties make no representations or warranties to each other, except as specifically set forth in or specified by this Agreement and the other Transaction Documents. All prior representations and statements made by any Party or its representatives, whether verbally or in writing, are deemed to have been merged into this Agreement.

Section 9.6. Waivers and Amendments. No delay on the part of a Party in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by such Party of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of any provision of this Agreement shall be effective unless in writing and signed by the Parties.

Section 9.7. References to Sections and Agreement; Captions. Unless otherwise indicated either expressly or by context, any reference in this Agreement to a "Section" shall be deemed to refer to a Section of this Agreement. All references herein to this Agreement shall, as of any time after the date hereof, be deemed to include all amendments hereto which have been made prior to such time in accordance with Section 9.6. Section captions, headings and titles used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.

Section 9.8. Jurisdiction, Venue and Service of Process. Subject to the provisions of Section 9.3, the Parties hereby consent to the exercise of jurisdiction over its person and its property by any court of competent jurisdiction situated in the City of Wilmington, Delaware (whether it be a court of the State of Delaware or a court of the United States of America situated in Wilmington, Delaware) for the enforcement of this Agreement or in any other controversy, dispute or question arising hereunder, and each Party hereby waives any and all personal or other rights to object to such jurisdiction for such purposes. Each Party, for itself and its successors and assigns, hereby waives any objection which it may have to the laying of venue of any such action or suit at any time, each Party agrees that service of process may be made, and personal jurisdiction over such Party obtained, by service of a copy of the summons, complaint and other

31

UNSEALED

TF-PA-000271

pleadings required to commence such litigation by personal delivery or by United States certified or registered mail, return receipt requested, addressed to such Party at its address for notices as provided in this Agreement. Each Party waives all claims of lack of effectiveness or error by reasons of any such service.

Section 9.9.    Confidentiality.  All oral and written information about each of the Parties, their respective businesses and customers, and this Agreement (collectively, the "Records"), are valuable and proprietary assets.  Each Party (and each of their respective employees and agents) shall treat the Records as strictly confidential and, except as expressly authorized hereunder, will not disclose such Records to any Person (other than its Affiliates and, in the case of GPLS, GPLS Trust or GPLS Trust II, to proposed transferees of the Purchased Securities and in connection with the exercise of any right or remedy under this Agreement) or use such Records other than in accordance therewith.  Each Party will use its best efforts to ensure that its employees and agents maintain such confidentiality.  Each Party will notify the other Parties immediately upon receiving a subpoena or other legal process about any other Party's Records and will cooperate with the other Parties to comply with or oppose the subpoena or legal process. This Section 9.9 will not apply to information, documents, and material that are in or enter the public domain other than through a wrongful act or omission of a Party.

Section 9.10.  Jury Waiver.  EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.    THE PARTIES EACH REPRESENT TO EACH OTHER THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.    IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL WITHOUT A JURY.

Section 9.11.  Compliance with Law and Regulation.  The performance of each of the Parties under this Agreement is subject to all applicable Requirements and any Regulatory Authority and each Party hereby covenants to comply with all applicable Requirements and the lawful and reasonable actions or requests of duly authorized Regulatory Authorities in connection with the matters contemplated by this Agreement.  If any Party becomes aware of any change in any Requirement affecting the performance of obligations by any Party under this Agreement, it shall promptly thereafter provide written notice of the same to the other Parties, provided that the failure to provide such notice shall not relieve any Party of its obligation to comply with all applicable Requirements as may change from time to time.  Nothing in this Agreement shall be construed as compelling any Party to act in violation of any applicable Requirements.

Section 9.12.  Survival.    Except as otherwise expressly provided herein, all the representations, warranties, terms and covenants of the Parties including, but not limited to, expense reimbursements and indemnifications, shall survive the making of each GPLS Investment and the termination of this Agreement.

32

UNSEALED

TF-PA-000272

Section 9.13. <u>Power of Attorney</u>. GPLS, GPLS Trust and GPLS Trust II shall appoint Agent as its true and lawful attorney-in-fact. All services to be performed and actions to be taken by Agent pursuant to this Agreement shall be performed to and on behalf of GPLS, GPLS Trust and GPLS Trust II. Agent shall be entitled to seek and obtain from GPLS, GPLS Trust and GPLS Trust II a power of attorney in respect of the execution of any specific action as Agent deems appropriate. Notwithstanding anything herein to the contrary, Agent shall not take any action, and shall not be authorized to take any action, that would result in GPLS, GPLS Trust, GPLS Trust II or any of their respective owners to be deemed to be engaged in the conduct of trade or business within the United States for purposes of Sections 864, 871 or 882 of the Code.

Section 9.14. <u>No Partnership</u>.

(a) It is expressly recognized and acknowledged that this Agreement is not intended to create a partnership, joint venture or other similar arrangement among GPLS, GPLS Trust, GPLS Trust II or any of their respective equity holders or trustees, on the one hand, and Agent on the other. It is also expressly understood that any actions taken on behalf of GPLS, GPLS Trust or GPLS Trust II by Agent shall be taken as agent for GPLS, GPLS Trust or GPLS Trust II, either naming GPLS, GPLS Trust or GPLS Trust II, or naming Agent as agent for an undisclosed principal. None of GPLS, GPLS Trust or GPLS Trust II shall hold itself out as a partner of Agent, and Agent will not hold itself out as a partner of GPLS, GPLS Trust or GPLS Trust II.

(b) Agent shall not have any fiduciary duty or other implied obligations to GPLS, GPLS Trust, GPLS Trust II or any other Person arising out of this Agreement.

*[Signature Page Follows]*

33

UNSEALED

TF-PA-000273

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the Effective Date.

**GPL SERVICING TRUST**

By: Victory Park Management, LLC, a Delaware limited liability company, as its trustee

By: _____
Name: Matthew D. Ray
Title: Manager

**GPL SERVICING TRUST II**

By: Victory Park Management, LLC, a Delaware limited liability company, as its trustee

By: _____
Name: Matthew D. Ray
Title: Manager

*Executed as a deed*

**GPL SERVICING LTD.**

By: Victory Park Credit Opportunities Master Fund, Ltd., its director and shareholder

By: Victory Park Capital Advisors, LLC, its investment manager

By: _____
Name: Scott R. Zemnick
Title: General Counsel

In the presence of the following witness:

By: _____
Name: Matthew Cood
Title: _____
Address: 227 W. Monroe St., Suite 3900
Chicago, IL 60606

*[Signature Page to Third Amended and Restated Administrative Agency Agreement]*

UNSEALED

App. 0745

**TC ADMINISTRATIVE SERVICES, LLC**

By: _____

Name: Kenneth E. Rees

Title: President

*[Signature Page to Third Amended and Restated Administrative Agency Agreement]*

UNSEALED

App. 0746

**To:**      LeAnna Brillhart[lbrillhart@thinkfinance.com]; Linda Callnin (Belisle)[lcallnin@thinkfinance.com]
**From:**    Adam Kramer
**Sent:**    Fri 1/30/2015 6:59:07 PM
**Importance:**      Normal
**Subject:** RE: Daily Wire Transfer SOP
**Received:**        Fri 1/30/2015 6:59:08 PM

Looks good, just copy the new 1.8 into 2.9 since it will be the same procedure for collections and funding wires.  Everything else looks good.



**Adam Kramer**
Sr. Financial Analyst

P/F:972-421-1159 | thinkFinance.com
5080 Spectrum Drive, Suite 200W, Addison TX 75001

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** LeAnna Brillhart
**Sent:** Friday, January 30, 2015 12:46 PM
**To:** Adam Kramer; Linda Callnin (Belisle)
**Subject:** RE: Daily Wire Transfer SOP

How does the attached look?



**LeAnna Brillhart**
Sr. Policies Analyst

ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** Adam Kramer
**Sent:** Friday, January 30, 2015 12:41 PM
**To:** LeAnna Brillhart; Linda Callnin (Belisle)
**Subject:** RE: Daily Wire Transfer SOP

I would delete 1.8 and change 1.9 to your verbiage.  That should be all.



**Adam Kramer**
Sr. Financial Analyst

P/F:972-421-1159 | ThinkFinance.com
5080 Spectrum Drive, Suite 200W, Addison TX 75001



Exhibit

P-38

Christy R. Sievert, CSR, RPR

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** LeAnna Brillhart

**Sent:** Friday, January 30, 2015 11:46 AM
**To:** Adam Kramer; Linda Callnin (Belisle)
**Subject:** RE: Daily Wire Transfer SOP

Is it just item 1.9 that needs to be edited?

In instances where Lender cannot access online bank account and does not provide email approval to TPSP before the applicable bank wire cut-off time, TPSP may release wire transfers so long as such wire transfers are in the ordinary course of business, and consistent with past practices and Lender's relationship with TPSP

Should it be changed to something similar to the below verbiage?

In instances where Lender cannot access online bank account and does not provide email approval to TPSP before the applicable bank wire-off time, TPSP may not release wire transfers.

 **LeAnna Brillhart**
Sr. Policies Analyst

ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** Adam Kramer
**Sent:** Friday, January 30, 2015 11:30 AM
**To:** Linda Callnin (Belisle)
**Cc:** LeAnna Brillhart
**Subject:** RE: Daily Wire Transfer SOP

LeAnna,

This SOP is fine except TPSP can't release wires, only Plain Green LLC employees are able to release wires. If PGL does not approve by a certain time(1:30), then the TPSP will follow up with PGL to remind them to release the wire.

Thanks,

 **Adam Kramer**
Sr. Financial Analyst

P/F:972-421-1159 | ThinkFinance.com
5080 Spectrum Drive, Suite 200W, Addison TX 75001

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** Linda Callnin (Belisle)
**Sent:** Thursday, January 29, 2015 2:59 PM
**To:** Adam Kramer
**Cc:** LeAnna Brillhart
**Subject:** FW: Daily Wire Transfer SOP
**Importance:** High

Adam,

This falls into your territory.☺

Confidential
**UNSEALED**

TF-PA-096708

Could you please review and let LeAnna know if it is ok.

LeAnna, this should go to the Treasury group. Just a fyi for next time.

Thanks!

Linda



**Linda Callnin (Belisle)**
Controller, Operations

P/F:817-546-2783 | ThinkFinance.con.
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** LeAnna Brillhart
**Sent:** Thursday, January 29, 2015 11:01 AM
**To:** Linda Callnin (Belisle)
**Cc:** LeAnna Brillhart
**Subject:** RE: Daily Wire Transfer SOP
**Importance:** High

Linda,

This SOP is now out of date. I am pending your review so that it may be sent to compliance. Please take a look at it immediately.



**LeAnna Brillhart**
Sr. Policies Analyst

ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confiden you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or mail and/or any attachments thereto, is strictly prohibited.

**From:** LeAnna Brillhart
**Sent:** Monday, December 01, 2014 9:12 AM
**To:** Linda Callnin (Belisle)
**Subject:** RE: Daily Wire Transfer SOP
**Importance:** High

Linda,

Have you been able to review this?



**LeAnna Brillhart**
Sr. Policies Analyst

ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109



**Plain Green, LLC**
Standard Operating Procedure # 300-40
Daily Wire Transfers

plain green

| Effective Date: 01/30/2015 | SOP Business Owner: Regulatory Compliance Officer | Links to Policy #300 |
| Last Revised Date: 01/30/2015 | Approved by: Legal/Compliance | Links to NG # |
| Last Review Date: 01/30/2015 | Scope: Daily Wire Transfers and Approvals | Other References: Knowledge Base System |
| Related SOP: | Related SOP: | Related SOP: |

| Business Context for this SOP | In order to facilitate the daily funding of loans and remittance to participants of payments collected, Lender initiates wire transfers generally on a daily basis. |
| SOP Purpose Statement | To describe the process of initiating, reviewing, approving, and recording wire transfers in the normal course of business. |
| Trigger(s) for Procedure | • Daily funding of new loans originated<br>• Collection of payments from customers |

**Core Steps (or Items) for Procedure:**

**Item 1 – Daily Wire Transfer to Replenish Funding Account with ACH Service Provider**

1.1. Third-party service provider ("TPSP") accesses internal report titled "Daily Settlement – Consolidated" and reviews prior business day principal funded amount

1.2. TPSP determines necessary amount to be wired to ACH Service Provider in order to maintain minimum balance requirements (generally, the amount necessary to meet minimum is the amount of principal dollars funded the prior day)

1.3. TPSP accesses online banking account and creates wire request for amount determined in step 1.2 above and prints confirmation of this request

1.4. TPSP sends email to Lender's designees for review of wire request

1.5. Authorized Lender designee accesses online banking account, reviews wire request and approves

1.6. Once approved, initiating bank sends email confirmation to TPSP indicating approval

1.7. If TPSP has not received bank confirmation by 1:30pm CST, TPSP accesses online bank account to determine if wire approved; if wire has not been approved, then contact is made with Lender so that Lender will perform step 1.5 above

1.8. In instances where Lender cannot access online bank account and does not provide email approval to TPSP before the applicable bank wire cut-off time, TPSP may not release any wire transfers

1.9. TPSP retains wire confirmation and backup detail of each wire transfer

**Item 2 – Daily Wire Transfer of Collected Payments to be Remitted to Participant**

2. ACH Service Provider processes amount of collected funds received that is to be remitted to Lender's Collection account

2.2. ACH Service Provider initiates bank wire to Lender's Collection account for amount determined in step 2.1 above

2.3. TPSP accesses Lender's online Collection account, reviews receipt of wire amount from ACH Service Provider and calculates amount required to be remitted to participant

2.4. TPSP creates wire request for amount determined in step 2.3 above and prints confirmation of this request

2.5. TPSP sends email to Lender's designees for review of wire request

2.6. Authorized Lender designee accesses online banking account, reviews wire request and approves

2.7. Once approved, initiating bank sends email confirmation to TPSP indicating approval

2.8. If TPSP has not received bank confirmation by 1:30pm CST, TPSP accesses online bank account to determine if wire approved; If wire has not been approved then contact is made with Lender so that Lender will perform step 2.6 above

2.9. In instances where Lender cannot access online bank account and does not provide email approval to TPSP before the applicable bank wire cut-off time, TPSP may not release any wire transfers

2.10. TPSP retains wire confirmation and backup detail of each wire transfer

UNSEALED

App. 0750

TF-PA-178669

| Steps in Event of Failure Point | DEFINITION OF FAILURE POINT: Any procedural/system step or gap that alters the normal/established business routine with an immediate negative impact to the ability to service customers or to complete the work of the company |
|---|---|
| | Step 1 – Fail Point Notification |
| | 1. Notification is received by Supervisor/Manager submitting a Help Desk ticket or Management directly notifying of the fail point issue |
| | |
| | Step 2 – Documentation |
| | 2. Alert and email notifications document the fail point issue and resolution |
| | 2.1. Alert posted in the Content Management System |
| | 2.1.1. Provide date/time of alleged failure |
| | 2.1.2. Provide account examples (when applicable) |
| | 2.1.3. List the symptoms of the problem |
| | 2.1.4. Identify and list impacted business areas |
| | 2.2. Leadership is notified via email |
| | |
| | Step 3 – Resolution Efforts |
| | 3. Help Desk tickets are monitored to validate the fail point issue is resolved |
| Contact List for Failure Events | 1. Immediate Supervisor/Manager when available; otherwise first available Supervisor/Manager |
| | 2. Operational business leader of the business unit and any third-party contact points when applicable |
| | 3. Most appropriate IT/Business resources (App Dev Ops, Network Ops, Product Team) |
| SIPOC Diagram for this SOP | |

| Document Management Information | Version | Effective Date | Revision Date | Author | Approved by | Revision |
|---|---|---|---|---|---|---|
| | 1.0 | 03/21/2012 | 03/21/2012 | B. Favel | Legal/Compliance | Initial Document |
| | 2.0 | 07/15/2013 | 08/15/2013 | Lender Representative | Legal/Compliance | Review process |
| | 2.1 | 01/30/2015 | 01/30/2015 | Lender Representative | Legal/Compliance | Edit 1.8-1.9 – TPSP will not release wire transfer |
| | | | | | | |
| | | | | | | |

UNSEALED

App. 0751

TF-PA-178670

# MOBILOANS, LLC

**Standard Operating Procedure #200-30**
**Daily Review of Proposed Applications for Funding**



| Effective Date: 04/30/2012 | SOP Business Owner: Product Manager | Links to Policy |
|---|---|---|
| Last Revised Date: 04/30/2012 | Approved by: Compliance | Links to WI # |
| Last Review Date: 04/30/2012 | Scope: For Lender Staff with App Review Authority | Other References: |
| Related SOP: | Related SOP: | Related SOP: |

| | |
|---|---|
| **Business Context for this SOP** | **After the decision rules and verification standards are applied to line of credit applications, the lender makes a final review by 7:00 pm CST on a daily basis of the proposed applications for funding. 7:00 pm CST is the end of business day time for the approved applications to be queued for funding.** |
| **SOP Purpose Statement** | To outline the process for the lender's daily review and approval process for funding of applications |
| **Trigger(s) for Procedure** | • Application is approved for funding and is listed on the Bank/Lender Application Summary Screen |
| **Core Steps (or Items) for Procedure** | Item 1 – Daily access of the Bank/Lender Application Summary<br>1. Lender personnel require access to the Application Summary in the product admin system<br>   1.1. Up to five designated persons from the lender are provided log-ins with access to this admin section<br>      1.1.1. The lender is required to take appropriate steps to maintain a current, up-to-date list of the designated persons and to notify third-party service provider of any deletions/additions required<br>      1.1.2. The number of designated persons may not exceed five persons without written approval from both the Product Director and the Compliance Director (third-party service provider personnel)<br>      1.1.3. At a minimum of every 6 months the list of designated persons is validated and provided to the Compliance Department the third-party service provider<br><br>Item 2 – Utilization of the Bank/Lender Application Summary<br>2. All approved loan applicants for the current business day are listed within the section of this summary page labeled "Suggested Approval"<br>   2.1. This section is updated throughout the day and available for review at any time<br>      2.1.1. The lender has the flexibility to review recommended approvals at intervals throughout the day or to make one final review prior to 7:00 pm Central Time<br>   2.2. Default display of Application Summary when accessed<br>      2.2.1. When the page link is selected/clicked, the page will populate with every customer application categorized in three sections with each line item defaulted to the 'No Action' radio button:<br>         2.2.1.1. Suggested Approvals<br>         2.2.1.2. Suggested Rollbacks<br>         2.2.1.3. Applications Pending Verifications<br>      2.2.2. For the purposes of this process, the lender is concerned only with the 'Suggested Approvals' section<br>      2.2.3. Methods for approving these applications<br>         2.2.3.1. Select and click on the "process" button at the bottom of the Suggested Approval Section<br>            2.2.3.1.1. All applicants listed at the time the "process" button is clicked will be approved and queued for funding<br>            2.2.3.1.2. If the lender chooses NOT to fund/approve an applicant, the lender can select the "rollback" radio on an applicant-specific basis; this will remove the applicant from the Suggested Approvals Section and then the remaining applicants will be funded when the "Process" button is used<br>         2.2.3.2. When the end of the business day for approvals is reached at 7:00 pm CST, any |

**Exhibit**

P-60

Christy R. Sievert, CSR, RPR

applicants listed on the 'Suggested Approvals' section will be "system" approved and queued for funding

2.2.3.2.1. This feature is in place as a process fail-safe mechanism

2.2.3.2.2. It is the expectation that the lender will perform the review process without reliance upon the system fail-safe feature

Item 3 - Reporting of approved applications

3. When a loan is funded, data is captured for reporting purposes
   3.1. Data Set Captured
       3.1.1. Approval source
           3.1.1.1. Agent/User ID
           3.1.1.2. System generated
       3.1.2. Application Number
       3.1.3. Loan Number
       3.1.4. Date/Time
   3.2. Reports are available on a daily basis to the lender and to the third-party service provider for monitoring purposes
       3.2.1. At any time the system approvals reach a 10% threshold within a months time, the lender is to be alerted in order to adjust and maintain a higher compliance rate with the review process
       3.2.2. The Compliance Department of the third-party service provider is the monitoring body to review these daily reports and to partner with the lender to achieve the desired compliance rate

| | |
|---|---|
| **Desired Result/Output** | Daily review of recommended funding approvals by the lender in a time frame that works within system time constraints |
| **Data/Metrics to be Captured** | Monthly System Approval Rate of <10% |
| **Steps in Event of Failure Point** | DEFINITION OF FAILURE POINT: Any procedural/system step or gap that alters the normal/established business routine with an immediate negative impact to the ability to service customers or to complete the work of the company<br>1. Complete documentation via email<br>  1.1. Enter 'FAIL POINT Report' in subject line<br>  1.2. Note the date/time of alleged failure<br>  1.3. Provide account examples (when applicable)<br>  1.4. List the symptoms of the problem<br>  1.5. Identify and list impacted business areas, including third party vendors<br>2. Submit documentation via email to first available supervisor/manager with a follow up verbal alert to same person; confirm receipt of notification<br>3. Supervisor/manager escalates as needed to director level to achieve appropriate level of attention and resolution effort |
| **Contact List for Failure Events** | 1. Immediate supervisor/manager when available; otherwise first available supervisor/manager<br>2. The Operational business leader of the business unit and any third party contact points when applicable<br>3. Most appropriate IT/business resources (App Dev Ops, Network Ops, Product Team) when applicable |
| **SIPOC Diagram for this SOP** | |

UNSEALED



| Document Management Information | Version | Effective Date | Revision Date | Author | Approved by | Revision |
|---|---|---|---|---|---|---|
| | 1.0 | 04/30/2012 | | B. Hudson | K. Malveaux | Initial Document |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| From: | Srini Vajhala [/O=PAYDAYONE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SVAJHALA] |
|---|---|
| Sent: | 11/5/2014 7:37:23 PM |
| To: | Neal Humphrey [nhumphrey@thinkfinance.com]; David Price [dprice@thinkfinance.com] |
| Subject: | RE: Pending SOPs |

Upon checking the code, the managed code is filtering out and displaying only the records from midnight today. The database returns every loan.

So as you said, loans ready to fund after the yesterday's funding process, weekend and holiday accounts are never getting displayed on the screen o get approval.

These are the ones contributing to the majority of 30-40% system approvals.

To my knowledge this has been this way for more than a year and screen has not changed recently.

We need to gather requirements to clarify current needs and prioritize the change.


Thanks,

Srini




Srini Vajhala
Manager, Application Development

P/F:817-546-2700 xt 5197 | M:816-616-2584 | thinkfinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited


**From:** Neal Humphrey
**Sent:** Tuesday, November 04, 2014 12:50 PM
**To:** Srini Vajhala; David Price
**Subject:** RE: Pending SOPs


Thank you Srini, this is great information and a nice write-up.



Exhibit

P-61

Christy R. Sievert, CSR, RPR

**UNSEALED**

App. 0755

So, one of the concerns that the tribe had was that the queue of loans that they "approve" did not include loans coming in overnight, on weekends, and over holidays. Can you research how (or if) the queue is populated during these times?



Neal Humphrey
Sr. Product Manager

ThinkFinance.com
5080 Spectrum Drive, Suite 200W, Addison TX 75001

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Srini Vajhala
**Sent:** Tuesday, November 04, 2014 12:33 PM
**To:** Neal Humphrey; David Price
**Subject:** RE: Pending SOPs

The last query might have been run incorrectly. After checking through the data and working with QA here is what we found.

1. The funding process does not look at the LenderDrawApproval table. It funds everything in ready to fund

2. The Loan Origination page (Lender approval page) shows all applications ready to fund.

3. Even if there is no approval, the funding goes on based on our testing in LLE. Also, once the loan is funded, the loan does not show up in Loan Origination page.

4. There are no records in production database where the funding date is less than lender approval.

5. There is a cancel button on the screen but there is no functionality behind this. This may be a gap as there is no way for the lender to stop funding any loan. The approval can either choose to approve or let the system approve.

      a.  It does not look like this functionality from the SOP.

          If the lender chooses NOT to fund/approve an applicant, the lender can select the "rollback" radio on an applicant-specific basis; this will remove the applicant from the Suggested Approvals Section and then the remaining applicants will be funded when the "Process" button is used

**UNSEALED**

TF-PA-021011

6. The attached document shows lender approvals by month and almost every month, the system approvals are >10%, more like 30-40%. In October 2014, 28% are system approved.

7. I am checking with EIM to see if a report already exists. If not, I can submit their request form to get the report created

8. Currently this page is not part of QA test suite. This needs to be added.


Thanks,

Srini




Srini Vajhala
Manager, Application Development

P/F:817-546-2700 xt 5197 | M:816-616-2534 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Neal Humphrey
**Sent:** Friday, October 31, 2014 2:37 PM
**To:** Srini Vajhala; David Price
**Subject:** FW: Pending SOPs




Neal Humphrey
Sr. Product Manager

ThinkFinance.com
5080 Spectrum Drive, Suite 200W, Addison TX 75001

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

UNSEALED

TF-PA-021012

**From:** Stephen.Smith-TCDecisionsciences
**Sent:** Friday, October 10, 2014 8:53 AM
**To:** Neal Humphrey
**Cc:** Michelle Nguyen; LeAnna Brillhart
**Subject:** FW: Pending SOPs

Neal, please see Kim's questions below about system approvals (basically saying approved apps can fund). Will you dig into this as we started looking at it once before but never really got her what she wanted. She definitely wants to know what % of apps fund without any manual review/approval and then she wants to make sure that approved apps over the weekend don't automatically fund.

Maybe we add this to our Monday call agenda to discuss.

Stephen E. Smith
VP, Compliance

P/F:817 546-2735 | 4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Kim Palermo [mailto:KPalermo@mobiloansllc.com]
**Sent:** Thursday, October 09, 2014 4:27 PM
**To:** LeAnna Brillhart
**Cc:** Stephen.Smith-TCDecisionsciences
**Subject:** RE: Pending SOPs

This SOP is not being followed by either party. My supervisor or lead will approve the applications by 4:00 pm the current cut-off time for funding, but this is only Monday – Friday. Anything on the weekend is approved by the system. I have tried getting a report to see what percentage of loans was approved manually and it took forever to figure out how to pull it. The percentage of system approved loans was tremendously high. I have never received a report on the 10% threshold as noted in Item 3.2.1.. Stephen and I went through this last year at the end of October and never really cleared it up. Before I can update this SOP, I need to know that the system will not approve on the weekends and after hours, but wait until the Supervisor has a chance to approve. Check with Stephen on this please.

**UNSEALED**

TF-PA-021013

Thanks!!

Kim W. Palermo, CAMS

Compliance Officer

**Mobiloans LLC**

151 Melacon

Marksville, LA  71351

318-253-7714 Phone

kpalermo@mobiloansllc.com

The information contained in this e-mail is strictly confidential and may be legally privileged and is solely intended for the use of the addressee only.  Notice is hereby given that any disclosure, use or copying of the information by anyone other than the intended recipient is prohibited and may be illegal. If you have received this message in error, please notify the sender immediately by return e-mail or at the phone number listed above.

Every reasonable precaution to ensure that any attachment to this e-mail has been swept for viruses. However, we cannot accept liability for any damage sustained as a result of software viruses and would advise that you carry out your own virus checks before opening any attachment.

**From:** LeAnna Brillhart [mailto:lbrillhart@thinkfinance.com]
**Sent:** Thursday, October 09, 2014 1:30 PM
**To:** Kim Palermo
**Subject:** FW: Pending SOPs
**Importance:** High

Kim,

Have you been able to have someone review these for updates?

**UNSEALED**

TF-PA-021014



LeAnna Brillhart
Sr. Policies Analyst

ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** LeAnna Brillhart
**Sent:** Tuesday, September 30, 2014 11:23 AM
**To:** 'Kim Palermo'
**Subject:** Pending SOPs
**Importance:** High

Kim,

The following SOPs will need to be reviewed for any updates or edits.  Once reviewed, please forward the edited document back to me and I will then submit to compliance for review.

Daily Application Review – last reviewed 4/30/12

Verifications – last reviewed 5/7/12

Thank you,



LeAnna Brillhart
Sr. Policies Analyst

ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**UNSEALED**

TF-PA-021015

UNSEALED

TF-PA-021016



# National Credit Adjusters

### National Credit Adjusters

|  |  |  |  |  |
|---|---|---|---|---|
| Collectors | 31 | 73 | 26 | 130 |
| Managers | 4 | 11 | 4 | 19 |
| Support | 1 | 48 | 1 | 50 |
| Total | 36 | 132 | 31 | 199 |

UNSEALED

App. 0762



EXHIBIT

PENGAD 800-631-6989

Confidential



# National Credit Adjusters

## NCA Board of Directors

| Bradley E. Hochstein | Richard E. Smith | Mark L. Huston | Shawn R. Gylling | Lee Tyler Rempel |

UNSEALED

Confidential

**National Credit Adjusters**

## NCA Executive Team



UNSEALED

Confidential

TF-PA-405054

# National Credit Adjusters

## NCA Operations



UNSEALED

TF-PA-405055

Confidential



★ **National Credit Adjusters**

NCA Finance

```
                    Dan Cross
                      CFO
                        |
                   Kim Wilson
                 Controller/HR
                        |
    +---------------+---------------+---------------+
    |               |               |               |
Linda Maudlin   Patty Ramos    Carol Wasinger   Carol
 Accounting       Payroll      Payment Clerk   Heironimus
  Support        Accounting                       Mail
```

UNSEALED

Confidential

**National Credit Adjusters**

NCA Compliance



TF-PA-405057

Confidential

**UNSEALED**

App. 0767



**National Credit Adjusters**

# NCA Information Technology



Dan Cross CFO

Steven Torres
Corporate
Technology
Administrator

Dave Jenkins
IT/Tellecom
Manager

Tim Layne Data
Processing

John Vineski
Help Desk

Ginnell Schrag
Help Desk

UNSEALED

App. 0768

Confidential

 **National Credit Adjusters**

NCA Legal/Quality Assurance



**Mark Fletchall General Counsel**

**Hailey Lommel QA Manager**

- Brennan Mahoney
- Tammy Hoeck
- Chassity Lindeman
- Olivia Smith

**Vickie Elsey Consumer Response Team Manager**

- Adela Gomez
- Sheri Barr
- Heather Stewart
- Holly Sutton

UNSEALED



**National Credit Adjusters**

NCA Agency Management



| Brad Hochstein<br>President & CEO |
| --- |

- Craig Dilbeck<br>Agency<br>Relationship<br>Manager
- Lisa Riner Agency<br>Relationship<br>Manager
- Katie Van Buren<br>Agency<br>Relationship<br>Manager

UNSEALED

# National Credit Adjusters

## Operations Hutchinson



**Tyler Rempel** Vice President Operations (67 Account Managers)

**Brian Elliott** Division Manager Hutchinson

**Gina Neal** Division Manager

**Ken Newberg** Dialer Manager/ Inbound

**Bill Ellington** Specialty Floor Manager GP/PG (13 Account Managers)

**Jeff Kinney** Specialty Floor Manager Cash Net (10 Account Managers)

**Charlotte Richardson** Specialty Floor Manager Cash Net (8 Account Managers)

**Nick Oser** Training Manager (9 Account Managers)

**Chris Higdon** Secondary Floor Manager (10 Account Managers)

**Paul Krznaric** Secondary Floor Manager (10 Account Managers)

**Tiffany Howard** Settlement Manager

**Juan Garcia** Inbound Floor Manager (7 Account Managers)

**Greg Davis** MIT Secondary

TF-PA-405061

Confidential

UNSEALED

App. 0771



**National Credit Adjusters**

NCA Operations Chandler

- Karl Krum Director of Operations Chandler (31 Account Managers)
  - Patrick Nunez Division Manager Chandler
    - Anthony Burrola Frontline/Legal Floor Manager (15 Account Managers)
    - Michael Ohlund Specialty Floor Manager GP/PG (16 Account Managers)

TF-PA-405062

Confidential

UNSEALED

**★ National Credit Adjusters**

## NCA Operations Ottawa



Brad Dekraai
Director of
Operations (24
Account Managers)

Charles Cramer
Specialty Floor
Manager BMG

Laura Gomez
Specialty Floor
Manager BMG (12
Account Managers)

Sherrie Cunningham
Specialty Floor
Manager BMG (12
Account Mangers)

UNSEALED

Confidential

**National Credit Adjusters**

## NCA Settlement Department



Tiffany Howard
Settlement
Manager

Mandi Sutton
Settlement
Account Manager

Sherry Johnson
Settlement
Account Manager

UNSEALED

Confidential

 **National Credit Adjusters**

# NCA Purchase/Sales Support



Kevin Emmerich
Legal/Purchase/Sales
Manager

Courtney Emmerich -
Media

Kelbe McGill - Support
(PT)

Erin Walker - Legal
Outsourcing

Kim Waybright -
Purchase & Sales
Coordinator

UNSEALED

Confidential

**National Credit Adjusters**

## NCA Administrative Support



UNSEALED

Confidential

UNSEALED

**Summary of NCA Review:**

NCA was initially reviewed by Vendor Management in late 2012/early 2013 during the inception of the TF vendor management program. TF was currently working with the vendor at the time of this review. NCA was ultimately 'Approved with exceptions' with the contingency noting that Legal would renegotiate the contract with NCA and NCA would work to implement a more comprehensive compliance program, building upon deficiencies noted in their monitoring and quality review testing.

TF vendor management initiated a re-review of NCA in October 2013. To summarize, it was determined that NCA's compliance program and other documentation reviewed appeared to address consumer protection laws and requirements. However, there is inherent risk involved in the nature of the service they are performing. Compounding this risk is the sheer size of NCA and number of sub-agencies with whom they are contracting out these collections. To mitigate this risk, contractually we required that TF has the ability to select each sub-agency with whom NCA contracts with to service our debt. Each sub-agency selected will be reviewed/approved by vendor management and subsequently agree to TF's requirements, which include evidence of completion of training, auditing and monitoring, reporting and record-keeping, complaint monitoring and tracking and overall implementation of consistent compliance controls. Additionally, after approval by vendor management, each Agency receives a 90 day preliminary approval period during which time Gio's team evaluates their performance.

While it's impossible to eliminate all risk presented by this outsourced function, by limiting the sub-agencies and imposing this monitoring process we hope to mitigate the risk to an acceptable level. Onboarded and 'Approved' sub-agencies at this time include: Kramer & Associates, LLC; Account Discovery Systems, LLC; Harbinger Processing Group, LLC; & Global Trust Management, LLC. Due to poor performance/high level of complaints during their 90 day preliminary period, two sub-agencies, Delray Capital and Streamline Recovery, were removed from the approved sub-agency list.

**Due Diligence Review:**

**Policies and Procedures:** Provided all current policies and procedures; appear to address consumer protection laws and requirements and impose sufficient executive oversight

**Training Program:** Provided copy of training program which appears to sufficiently address relevant compliance training requirements; did not provide evidence of completion

**Monitoring Program:** Provided monitoring policies but did not provide testing and results (being implemented); TF Risk team had onsite visit to review QA practices and discuss strategy for monitoring

**Complaints:** Provides complaints policy, flow chart, and training; but did not provide copy of current complaints; TF Risk team had on site visit to review complaints log and process. TF Risk team receives daily report and also requested to receive a more detailed complaint report on the 10th calendar day of every month for trend analysis purposes.

**Vendor Due Diligence Summary:** Numerous complaints and litigation found on NCA listing Fair Debt Collection Act violations as cause of action. Too many to site. Settled with Arkansas AG to cancel more than $2.7 million payday loan debts in Arkansas and paid the state $200,000 to settle a lawsuit over its collection efforts (3/2013). Business owner and company is made aware of this risk involved in working with this vendor for this outsourced function. Will attempt to mitigate risk for TF through training, QA monitoring, complaint monitoring, and implementation of compliance controls.

**Major Risk Areas:**

- **Collector Activity:**
  - ○ Training: Policy exists; Training conducted; did not provide evidence of completion
  - ○ Phone Communications: Policy exists; training conducted; QA Program in place; audits implemented
  - ○ Letter communications: Policy exists; training conducted; Letter statistics reported in place; Letters have been reviewed and approved
  - ○ Fax Communications: Policy exists; training conducted; Form has been reviewed and approved by outside counsel
- **Agency Network:** Site visits conducted (Charles River); training conducted; Testing conducted; audited process is in development; agency call monitoring process is in development; TF Vendor Management to perform due diligence of all sub-agencies selected for debt servicing
- **Complaints:** Policy in place; Training conducted (ongoing); Complaint log maintained and audited monthly; policy in place for disputes; TF Risk Dept to monitor daily and monthly to analyze trends
- **No Collect Circumstances:** Policy exists; training conducted; No testing or auditing performed
- **IT Processes:** Policy exists; training conducted; no testing auditing performed



Confidential — UNSEALED

App. 0778

TF-PA-604259

**TF IT Security Review:** IT Security conducted re-review of IT Risk Assessment and other requested IT Security protocols and policies in and provided 'green light' for this agency on 12/17/2013

**Financial Review:** NCA did not provide audited financial statements for review. Finance expressed concern over the financial impact to TF if NCA we were to lose this service and didn't have another party lined up to purchase charged-off debt. After speaking with Risk, it was clarified that obtaining another debt buyer would not be a challenge. The only challenge might be the time is takes to draft contracts, perform due diligence, and onboard the new vendor. Final outcome is that a review of audited financial statements will not be required for the 2013 annual review of NCA. Business Owner of this relationship will assume the financial viability risk of working with this vendor.

Overview of NCA:
- **Founded in 2001**
- **Privately Held**
- **Privately Capitalized**

Level Financial, LLC

- **Created as a special purpose entity of NCA in early 2014 to operate solely as the debt buying entity for current and future agreements**
- **Ownership structure mirrors NCA**

Ownership Structure:

- **International Financial Services, Inc. (Richard E. Smith): 4.7%**
- **Richard E. Smith Trust: 32.9%**
- **Huskers, Inc. (Bradley Hochstein): 37.6%**
- **4 Sum, Inc. (Mark Huston): 14.1%**
- **Erwin E. Choitz Trust: 4.7%**
- **Shawn Gylling: 6.0%**

Executive Team:

- **Brad Hochstein: President & CEO**
- **Shawn Gylling: COO**
- **Daniel Cross: CFO**
- **Tyler Rempel: VP of Operations**
- **Lori Hess: Compliance Officer**
- **Mark Fletchall: General Counsel**

Employs over 100 in Hutchison, Kansas (Corporate Headquarters)

- **74 Collectors**
- **11 Managers**
- **52 Support**

Employs 36 employees in Chandler, Arizona

- **31 Collectors**

- **4 Managers**
- **1 Support**

Employs 31 employees in Ottawa, Kansas

- **26 Collectors**
- **4 Managers**
- **1 Support**

Active Inventory

- **1.41 million accounts**
- **$1.78 billion in oustandings**
- **5.2 million active phone numbers**
- **1664 different portfolios and 10 different product types**
- **2013 Average Collections: $6.52 M**
- **2013 Monthly Cash Purchases: $77 M**
- **2013 Monthly Accounts: 90,500**

SubAgencies

- **30+ Active Agencies**
    - **Range in size from 10-70+ account managers per agency**
    - **Manage 500k+ accounts monthly**
    - **Over 4M consumer communications are generated monthly**

App. 0780

Ok

Sent on the Sprint® Now Network from my BlackBerry®

---

**From:** "Kevin Emmerich" <kevin@ncaks.com>
**Date:** Thu, 28 Oct 2010 14:32:55 -0500
**To:** <brad@ncaks.com>
**Subject:** RE: Think Finance Debt Sale / Forward Flow

done

Kevin Emmerich
National Credit Adjusters, LLC

**From:** brad@ncaks.com [mailto:brad@ncaks.com]
**Sent:** Thursday, October 28, 2010 1:58 PM
**To:** Kevin emmrich
**Subject:** Fw: Think Finance Debt Sale / Forward Flow

Sent on the Sprint® Now Network from my BlackBerry®

---

**From:** "Brett Horrocks" <brett@sourceitone.com>
**Date:** Thu, 28 Oct 2010 12:35:54 -0600
**To:** 'Brad Hochstein'<brad@ncaks.com>
**Subject:** RE: Think Finance Debt Sale / Forward Flow

As you know SourceItOne has been contracted to handle the sale and placement of Think Finance, Inc. write-offs. We have received your NDA(s) with Think Finance and First Bank of Delaware and need you to complete and sign a NDA with SourceItOne, LLC. Once we receive an executed NDA we can begin the sale process with your company. The sale will consist of approximately $80M of Payday loans and $80M of Installment loans to be completed and funded by December 1, 2010. We will also complete a forward flow on fresh charge-offs beginning in December.

If you have any questions, please contact:

Brett Horrocks 801-601-1380 ext 50, or Mark Braithwaite 801-601-1380 ext 51.

We look forward to receiving your NDA.

SourceItOne

**From:** Phil Durham [mailto:pdurham@thinkfinance.com]
**Sent:** Thursday, October 21, 2010 7:59 AM
**To:** Brad Hochstein
**Cc:** Brett Horrocks
**Subject:** Think Finance Debt Sale / Forward Flow



Dear Brad:

We recently discussed the possibility of our company selling / placing some of our debt. We appreciate the

**UNSEALED**

NCA_PA000378

time you have spent on this endeavor with signing of a NDA and some brief communications. This letter is to advise you that Think Finance has contracted with SourceItOne. LLC to handle all aspects of our debt sale and outsourcing of collections.

They are certainly interested in continuing the process with your organization however an additional Non Disclosure Agreement will need to be signed. Please contact Brett Horrocks at SourceItOne, LLC to facilitate the NDA and to obtain information to continue the process; should you continue to have an interest in purchasing and/or collecting our debt.

Once again I appreciate your time and interest in this possibility. Please feel free to contact Brett Horrocks (801) 601-1380 ext. 50 or brett@sourceitone.com should you have any questions.

Think

**Phil Durham**
Director of Account Services
P/F 817-546-2773 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**UNSEALED**

NCA_PA000379

| From: | Brad Hochstein |
|---|---|
| To: | 'Kim Wilson' |
| CC: | 'Kevin Emmerich'; 'Lori Bates'; 'Steven' |
| Sent: | 1/18/2011 6:06:34 PM |
| Subject: | FW: Emailing: Purchase Agreement NCA _ FBD 01182011 TC, PayDayOne Contract for NCA 01182011 |
| Attachments: | PayDayOne Contract for NCA 01182011.pdf; Purchase Agreement NCA _ FBD 01182011 TC.pdf |

-----Original Message-----
From: Brett Horrocks [mailto:brett@sourceitone.com]
Sent: Tuesday, January 18, 2011 11:54 AM
To: 'Brad Hochstein'
Subject: Emailing: Purchase Agreement NCA _ FBD 01182011 TC, PayDayOne Contract for NCA 01182011

Brad,

Here are the contracts for today's sales. Please sign and get them back to me and I will have the bank and TF sign. We would like to fund today. Let me know if this is going to be a problem.

Brett



EXHIBIT

Q-69

PENGAD 800-631-6989

UNSEALED

App. 0783

NCA_PA000315

UNSEALED

PURCHASE AND SALE AGREEMENT

between

First Bank of Delaware,
as Seller

and

National Credit Adjusters, LLC a Kansas LLC,
as Purchaser

Dated as of January 18, 2011

UNSEALED

NCA_PA000341

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................. 1
    Section 1.01    Definitions ................................................................................. 1
    Section 1.02    Usage of Terms ......................................................................... 4
    Section 1.03    Calculations ............................................................................. 4

ARTICLE 2 CONVEYANCE OF CONTRACTS ................................................ 4
    Section 2.01    Conveyance of Conveyed Assets ............................................ 4
    Section 2.02    Closing Date ............................................................................. 6

ARTICLE 3 THE CONTRACTS ........................................................................ 7
    Section 3.01    Representations and Warranties of the Seller ....................... 7
    Section 3.02    Warranty and Limitation of Liability .................................... 13
    Section 3.03    Conveyed Assets Not Securities ............................................ 13

ARTICLE 4 CERTAIN COVENANTS ............................................................. 13
    Section 4.01    Covenants of Purchaser .......................................................... 13
    Section 4.02    Liability Insurance .................................................................. 16

ARTICLE 5 INDEMNIFICATION ................................................................... 16
    Section 5.01    Indemnities .............................................................................. 16
    (a)      By Purchaser ........................................................................... 16

ARTICLE 6 ........................................................................................................ 19
    Section 6.01    Seller's Obligation to Repurchase Accounts ......................... 19
    Section 6.02    Seller's Option to Repurchase Contracts ............................... 19

ARTICLE 7 MISCELLANEOUS ...................................................................... 19
    Section 7.01    Survival ................................................................................... 19
    Section 7.02    Amendment ............................................................................. 19
    Section 7.03    Governing Law ....................................................................... 20
    Section 7.04    Notices .................................................................................... 20
    Section 7.05    Severability of Provisions ...................................................... 21
    Section 7.06    Assignment ............................................................................. 21
    Section 7.07    Third Party Beneficiaries ....................................................... 22
    Section 7.08    Counterparts ............................................................................ 22
    Section 7.09    Headings ................................................................................. 22
    Section 7.10    Entire Agreement .................................................................... 22
    Section 7.11    No Waiver; Cumulative Remedies .......................................... 22
    Section 7.12    Further Assurances ................................................................. 22
    Section 7.13    Expenses ................................................................................. 22

ARTICLE 8 CONFIDENTIALITY .................................................................... 22
    Section 8.01    General .................................................................................... 22
    Section 8.02    Limitation ............................................................................... 23

NCA_PA000342

NCA_PA000342

**UNSEALED**

App. 0786

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT, dated as of January 18, 2011 (this "Agreement"), is between National Credit Adjusters, LLC a Kansas LLC, as purchaser (the "Purchaser"), and First Bank of Delaware, as seller (the "Seller").

WHEREAS, Seller has originated a portfolio of unsecured installment loans some of which borrowers have not repaid the agreed upon balance due, are in default, and have been charged off by Seller; and

WHEREAS, the Seller is willing to sell such loans to the Purchaser, and the Purchaser is willing to buy such loans from the Seller, pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01    Definitions.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement.

"Agreement" means this Purchase and Sale Agreement, as amended, restated or otherwise modified from time to time.

"APR" of a Contract means annual percentage rate and is the annual rate of finance charges specified in such Contract.

"Basic Documents" means this Agreement and the Sale and Assignment.

"Borrower" means, with respect to any Contract, the related obligor and any other Person who owes payments under such Contract.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banking institutions in Wilmington, Delaware are authorized or obligated by law, executive order or government decree to remain closed.

"Closing" means the consummation of the sale of the Conveyed Assets by the Seller to the Purchaser in accordance with the terms of this Agreement.

"Closing Date" means [the date hereof][January 18, 2011]

"Consumer Credit Laws" means the United States federal Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and all other United States federal and state Laws that pertain to the extension of consumer credit and/or the collection of consumer credit obligations.

UNSEALED

NCA_PA000343

"Contract" means each unsecured consumer loan evidenced by loan agreement and transferred by the Seller to the Purchaser hereunder, as listed on the Schedule of Contracts.

"Contract Documents" means, collectively, with respect to each Contract, the following documents or instruments:

(a)    the original Contract together with all amendments and other modifications thereto; and

(b)    a true and complete copy of the credit application of the related Borrower (which may be a hard copy or in an electronic medium that may be accessed by the Purchaser); and

"Contract Files" means the Contract Documents and all other papers, documents and computerized records customarily kept by the Seller for contracts and loans comparable to the Contracts.

"Contract Number" means, with respect to any Contract, the number assigned to such Contract by Seller which number is set forth in the related Schedule of Contracts.

"Conveyed Assets" has the meaning set forth in Section 2.01.

"Customer Information" means nonpublic information relating to Borrowers including without limitation names, addresses, telephone numbers, e-mail addresses, credit information, account numbers, social security numbers, loan balances or other loan information, and lists derived there from and any other information required to be kept confidential by Regulatory Authorities or Requirements.

"Cut-Off Date" means January 18, 2011.

"Due Date" means, with respect to any Contract, the date upon which a Monthly Payment is due.

"Governmental Authority" means any nation or government, any state, county, city, municipality, or other political subdivision thereof, and any entity exercising executive, legislative, judicial, police, regulatory, or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission, or instrumentality of any of the foregoing, and any tribunal, court, or arbitrator (including any private arbitration board or panel) of competent jurisdiction.

"Interagency Guidelines" means the Interagency Guidelines Establishing Information Security Guidelines, as set forth in Appendix B to 12 CFR Part 30;

"Ineligible Contract" has the meaning set forth in Annex I.

"Lien" means, with respect to any Contract or other property, a security interest, lien, charge, pledge, equity or encumbrance of any kind.

-2-

UNSEALED

App. 0788

"Loss" or "Losses" shall mean any and all liabilities, losses, costs, claims, damages, settlement costs, penalties and expenses (including attorneys' fees and expenses and costs of investigation and litigation). In the event any of the foregoing are indemnifiable hereunder, the terms "Loss" and "Losses" shall include any and all attorneys' fees and expenses and costs of investigation and litigation incurred by the Seller Indemnified Party in enforcing such indemnity.

"Maturity Date" means, with respect to any Contract, the Due Date on which the last scheduled payment of such Contract shall be due and payable.

"Monthly Payment" means, with respect to any Contract, the amount of each monthly payment of principal and interest payable by the related Borrower in accordance with the terms thereof on the Due Date specified therein.

"Officers' Certificate" means a certificate signed by the chairman, the president or a vice president, and by the treasurer, an assistant treasurer, the controller, an assistant controller, the secretary or an assistant secretary of any Person delivering such certificate and delivered to the Person to whom such certificate is required to be delivered.

"Person" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Principal Balance" means the actual outstanding principal balance of a Contract under the terms thereof.

"Purchase Price" means $735,730.00

"Purchaser" shall have the meaning set forth in the preamble.

"Regulatory Authority" means, as the context requires, the Office of the State Bank Commissioner of the State of Delaware, the Federal Deposit Insurance Corporation, and any federal or state agency having jurisdiction over Seller or Purchaser.

"Requirements" means all applicable federal and state laws and regulations, including applicable consumer credit, disclosure and privacy laws and regulations, the USA PATRIOT Act, the Interagency Guidelines, and debt collection and debt collection practices laws and regulations.

"Sale and Assignment" means an assignment of the Conveyed Assets by the Seller to the Purchaser, dated as of the Closing Date, in substantially the form of Exhibit B attached hereto.

"Schedule of Contracts" means a schedule identifying the Contracts attached as Schedule I to the Sale and Assignment (which list may be in electronic file, microfiche, disk or other means acceptable to the Purchaser) which Contracts had an aggregate principal balance as of January 18, 2011 of $10,510,428.38

UNSEALED

App. 0789

"Seller" means First Bank of Delaware a Delaware state chartered bank.

"Taxes" shall mean all taxes, charges, fees, duties, levies or other assessments, including income, gross receipts, net proceeds, ad valorem, turnover, property (real and personal, tangible and intangible), sales, use, franchise, excise, value added, stamp, transfer, excess profits, occupational, interest equalization, windfall profits, severance, withholding, and other amounts which are imposed by any governmental authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

"UCC" means the Uniform Commercial Code as in effect in the applicable jurisdiction.

"United States" means the United States of America.

Unpaid Balance means, as to any Contract, the total outstanding unpaid balance thereon at the Cut-Off Date, as shown on Seller's books and records (including all amounts due in respect of late fees and all other applicable fees and charges).

Section 1.02   Usage of Terms.  With respect to all terms in this Agreement, unless the context otherwise requires: (i) a term has the meaning assigned to it; (ii) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time in the United States; (iii) "or" is not exclusive; (iv) "including" means including without limitation; (v) words in the singular include the plural and words in the plural include the singular; (vi) any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; (vii) references to a Person are also to its successors and permitted assigns; (viii) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (ix) Section, subsection, Schedule and Exhibit, as applicable, references contained in this Agreement are references to Sections, subsections, Schedules and Exhibits in or to this Agreement unless otherwise specified; and (x) references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form.

Section 1.03   Calculations.  Except as otherwise provided herein, all interest rate and basis point calculations hereunder shall be carried out to at least five decimal places and will be made on the basis of a 365-day year and the actual number of days elapsed from, and including, the immediately preceding date through which interest has been calculated.

ARTICLE 2
CONVEYANCE OF CONTRACTS

Section 2.01   Conveyance of Conveyed Assets. On the Closing Date, the Purchaser shall purchase from Seller all of the Conveyed Assets in the manner set forth in this Article. In

-4-

UNSEALED

NCA_PA000346

consideration of the Purchaser's delivery to the Seller of the Purchase Price, and subject to the terms and conditions hereof, the Seller hereby sells, grants, transfers, assigns and otherwise conveys to the Purchaser, without recourse (but subject to the representations, warranties and other obligations of the Seller herein) and the Purchaser hereby agrees to purchase, all of its right, title and interest in, to and under the following (collectively, the "Conveyed Assets"):

        (i)     all interest, principal and other amounts received thereunder after the Cut-Off Date;

        (ii)    the Contracts;

        (iii)   the Contract Files;

        (iv)   all proceeds in any way delivered with respect to the foregoing, all rights to payments with respect to the foregoing and all rights to enforce the foregoing; and

        (v)    all present and future claims, demands, causes of action and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, Conveyed Assets, Conveyed Assets receivable, notes, drafts, acceptances, chattel paper, checks, deposit Conveyed Assets, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property that at any time constitute all or part of or are included in the proceeds of any of the foregoing.

(b) Subject to satisfaction of the conditions in Section 2.02, on the Closing Date the Purchaser shall deliver to the Seller the Purchase Price for the Conveyed Assets. Such payment shall be made in immediately available funds in accordance with the funding instructions provided by the Seller as set forth in Schedule II.

(c) The sale of the Conveyed Assets by the Seller to the Purchaser will not constitute and is not intended to result in an assumption by the Purchaser of any obligation (other than the obligations set forth herein) of the Seller, the Borrowers or any other Person in connection with the Contracts, the Contract Files or the other Conveyed Assets or any agreement, instrument or other document related thereto.

(d) It is the intention of the Seller and the Purchaser that the sale, transfer and assignment of Conveyed Assets made pursuant to Section 2.01 (a) shall constitute a sale from the Seller to the Purchaser, conveying good title to the Conveyed Assets free and clear of Liens, and such Conveyed Assets shall not be treated as property of the Seller by the FDIC or other governmental authority acting as conservator or receiver of the Seller in a conservatorship, receivership, insolvency or other similar proceeding in respect of the Seller under the Federal Deposit Insurance Act, 12 U.S.C. Section 1811 et seq or other applicable law. However, in the event that any or all of the Conveyed Assets are held or otherwise determined to be property of the Seller or not to have been conveyed to the Purchaser in a true and absolute sale, then the Seller hereby grants, pledges and assigns to the Purchaser a

-5-

UNSEALED

App. 0791

NCA_PA000347

first priority security interest in all of the Seller's right, title and interest in, to and under such property, to secure payment of the obligation incurred by the Seller in the amount paid by the Purchaser for the Conveyed Assets and for the payment and performance of all obligations of the Seller hereunder. The Seller shall file and deliver, prior to the Closing Date, financing statements on UCC-1 in respect of such security interest, and the Seller hereby authorizes, on or after the Closing Date, the filing of any financing statements or continuation statements, and amendments to financing statements, or any similar document in any jurisdictions and with any filing offices as the Purchaser may determine, in its sole discretion, are necessary or advisable to perfect the security interest granted to the Purchaser hereunder.

(e) The Seller has determined that the Seller's disposition of the Contracts pursuant to this Agreement will be afforded sale treatment for accounting and tax purposes and shall treat the disposition of the Contracts pursuant to this Agreement in such manner. The sale of each Contract shall be reflected on the Seller's balance sheet and other financial statements and income tax returns as a sale of assets by the Seller and the Purchaser shall treat the disposition of the Contracts hereunder as a sale for accounting and tax purposes.

(f) Purchaser shall be solely responsible for any reporting requirements and/or filings required by any federal, state or local law, rule or regulation relating to the Conveyed Assets purchased after the Closing Date.

Section 2.02    Closing Date. The obligation of the Purchaser to purchase and the Seller to sell the Contracts and the other Conveyed Assets is subject to the satisfaction of the following conditions:

(a) The Seller shall have received the full Purchase Price in accordance with Annex I and Schedule II and, in each case, unless otherwise noted, dated as of the Closing Date:

(i)    signature and incumbency certificates of the officers of the Seller executing the Purchase and Sale Agreement;

(ii)    executed originals of the Purchase and Sale Agreement; and

(b) The Seller shall have delivered to the Purchaser a duly executed Sale and Assignment in the form set forth in Schedule II together with a Schedule of Contracts on the Closing Date and Annex I.

Section 2.03    Payments Received

(a)    If Seller receives any credits, payments or other consideration distributed or paid by or on behalf of any Borrower with respect to any Contract prior to or on the Cut-Off Date, Seller shall be entitled to accept such payments and (if necessary) adjust the Principal Balance of such Account reflected on the Schedule of Contracts. If Seller shall receive any credits, payments or other consideration distributed or paid by or on behalf of any Borrower with respect to any Contract after the Cut-off Date, Seller shall promptly pay over and/or deliver such payments to Purchaser. Any such remittances will be made by regular United States mail, unless otherwise requested by Purchaser (in which case Purchaser

-6-

UNSEALED

App. 0792

NCA_PA000348

will reimburse Seller for all costs incurred by Seller in connection with the transmittal of such remittance.). If Purchaser or any servicing agent shall receive any credits, payments or other consideration on any account and an Borrower which is not a Contract sold pursuant to this Agreement, Purchaser shall promptly pay over and/or deliver such payments to Seller within 10 days of receipt

ARTICLE 3
THE CONTRACTS

Section 3.01    Representations and Warranties of the Seller. As of the Closing Date, the Seller makes the following representations and warranties on which the Purchaser is deemed to have relied in acquiring the Contracts. Such representations and warranties speak as of the effective date of this Agreement and as of the Closing Date, as the case may be, but shall survive the sale, transfer and assignment of the Contracts to the Purchaser.

(i)    Organization and Good Standing. The Seller (A) has been duly organized and is validly existing as a Delaware state chartered bank, and (B) has qualified to do business and is in good standing in each jurisdiction where the character of its properties or the nature of its activities makes such qualification necessary. The Seller is an insured depository institution under the provisions of the Federal Deposit Insurance Act, 12 U.S.C. Sections 1811-1831 and the Seller's status as an insured depository institution has not been terminated under the provisions of Section 8 of the Federal Deposit Insurance Act, 12 U.S.C. Section 1818.

(ii)    Power and Authority and No Conflicts. The Seller has full power, authority and legal right to own its property, to carry on its business as presently conducted and to enter into and perform its obligations under the Basic Documents and the execution, delivery and performance of the Basic Documents have been duly authorized by all necessary action on the part of the Seller. Neither the execution, delivery or performance of the Basic Documents, nor the consummation of the transactions herein or therein contemplated, will conflict with or result in a breach of or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Seller or its properties or the organizational documents of the Seller, or any of the provisions of any indenture, mortgage, contract, agreement or other instrument to which the Seller is a party or by which it is bound or result in the creation or imposition of any Lien upon any of its property pursuant to the terms of any such indenture, mortgage, contract, agreement or other instrument.

(iii)    Binding Obligation. This Agreement is enforceable against the Seller and each Basic Document has been duly executed and delivered by the Seller and, assuming the due authorization, execution and delivery thereof by the other parties thereto, constitutes a legal, valid and binding obligation of the Seller enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights in general.

(iv)    Consents. The Seller is not required to obtain the consent of any governmental authority or any other Person or to obtain any license, approval or authorization from any governmental authority or any other Person in connection with (1) the sale of the

-7-

UNSEALED

NCA_PA000349

Conveyed Assets under this Agreement or (2) the execution, delivery, performance, validity or enforceability of any Basic Document.

(v)  No Proceedings.  There are no actions, suits or proceedings pending or, to the knowledge of the Seller, threatened against or affecting the Seller, before or by any governmental authority having jurisdiction over the Seller or its properties (1) asserting the invalidity of any Basic Document, (2) alleging that one or more of the Contracts, or the origination or servicing thereof, failed to comply with applicable law, (3) seeking to prevent the consummation of any of the transactions contemplated by the Basic Documents or (4) seeking any determination or ruling that might materially and adversely affect (a) the Seller, (b) its business, assets, operations or condition, financial or otherwise, or (c) the performance by the Seller of its obligations under, or the validity or enforceability of, the Conveyed Assets or any Basic Document.  The Seller is not in default with respect to any order of any court, administrative agency, arbitrator or governmental body so as to materially and adversely affect the transactions contemplated by or the performance by the Seller of its obligations under the Basic Documents.

(vi)  Ordinary Course of Business.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Conveyed Assets by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.  The Seller shall maintain a record of this Agreement in its official records for purposes of Sections 11(d)(9), 11(n)(4)(I) and Section 13(e) of the Federal Deposit Insurance Act, as amended.

(vii)  Solvency.  Immediately prior to and after the transfer of the Conveyed Assets by the Seller to the Purchaser, the Seller was solvent, had reasonably adequate capital to carry on its business and the Seller will not be made insolvent by the transfer of the Conveyed Assets.  The Seller is not, and, with the passage of time, does not expect to become, insolvent or bankrupt, and no liquidation of the Seller is contemplated.

(viii)  No Fraudulent Conveyance.  The transfer of the Conveyed Assets by the Seller to the Purchaser has a legitimate business purpose and was not designed to hinder, delay or defraud creditors of the Seller or impair any of their rights or interests.  The Seller received reasonably equivalent value and fair consideration for its transfer to the Purchaser of the Conveyed Assets.

(ix)  No Broker.  The Seller has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with the transactions contemplated by this Agreement other than the Purchaser.

(x)  Location.  The location of the Seller is the State of Delaware within the meaning of Section 9-307 of the UCC.

(b) As to each Contract, the following representations and warranties shall speak as of the Closing Date, unless an earlier date is otherwise specified in which case such representations and warranties shall speak as of such earlier date:

UNSEALED

App. 0794

NCA_PA000350

(i)  Title to the Contracts.  Immediately prior to the Closing Date, the Seller had good and indefeasible title to and was the sole owner of each Contract to be transferred to the Purchaser pursuant to Section 2.01 free of Liens and, other than Liens created hereunder, upon transfer of such Contract to the Purchaser pursuant to Section 2.01, the Purchaser will have good and indefeasible title to and will be the sole owner of such Contract free of Liens, other than Liens created hereunder, or Liens in favor of Purchaser; and all actions necessary under the UCC have been taken to give the Purchaser a valid and perfected first priority security interest in the Contracts.

(ii)  Compliance with Laws.  All requirements of any Applicable Law, including usury, truth in lending, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Seller and the Contract in its solicitation, origination, closing or otherwise have been complied with in all respects.

(iii)  Valid, Binding and Enforceable.  The Contract is the legal, valid and binding obligation of the Borrower thereunder and is enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally; all parties to the Contract had full legal capacity to execute and deliver the Contract and all other documents related thereto; the terms of the Contract have not been waived, amended or modified in any respect, except by instruments that are part of the Contract Documents; and no such waiver, amendment or modification has been necessary to cause the Contract to meet any of the representations, warranties and conditions set forth herein with respect thereto.

(iv)  Default.  With respect to each Contract, each one is in default and has been charged off by Seller.

(v)  One Original.  There is only one original of such Contract.  Such Contract constitutes an "instrument" as defined in the UCC.  The Contract constitutes the entire agreement between the Seller and the related Borrower.  None of the Contract Documents that constitute or evidence each Contract has any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any Person other than the Purchaser.

(vi)  No Government Entity Borrower.  The related Borrower is not a local, State or federal governmental entity.

(vii)  Priority.  Other than the security interest granted to the Purchaser pursuant to this Agreement, the Seller has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed the Contract.  There are no financing statements against the Seller that include the Contracts other than any financing statement relating to the security interest granted to the Purchaser hereunder or a financing statement that has been terminated or subordinated to the rights of the Purchaser.

(viii)  No Defenses.  The Contract is not subject to any right of rescission, set-off, counterclaim or defense, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto.

UNSEALED

NCA_PA000351

(ix)    Transfer Taxes. The sale, transfer, assignment and conveyance of such Contract by the Seller to the Purchaser is not subject to and will not result in any tax, fee or governmental charge payable by the Seller or the Purchaser to any federal, state or local government ("Transfer Taxes") other than Transfer Taxes which have been paid by Seller or will be paid by the Seller as and when due. In the event the Purchaser receives actual notice of any Transfer Taxes arising out of the transfer, assignment and conveyance of the Contracts and the other Conveyed Assets, on written demand by the Purchaser, or upon the Seller's otherwise being given notice thereof by the Purchaser, the Seller shall pay, and otherwise indemnify and hold the Purchaser harmless, on an after-tax basis, from and against any and all such Transfer Taxes (it being understood that the Purchaser shall have no obligation to pay such Transfer Taxes).

(x)    Lawful Assignment. The Seller has not entered into any agreement with the Borrower on such Contract that prohibits, restricts or conditions the assignment of all or part of such Contract.

(xi)    Full Disbursement of Proceeds. As of the date the Contract was originated, the proceeds of the loan under such Contract were fully disbursed, and there is no requirement for future advances thereunder, and all fees and expenses in connection with the origination of such Contract have been paid.

(xii)    Monthly Payments. Such Contract (1) was originated in and is due from a citizen of the United States of America and (2) is payable in United States dollars. Such Contract provides for level monthly payments that fully amortize the original principal amount by maturity and yield interest at the APR.

(xiii)    Principal Balances. The amount reflected as the Principal Balance for each Contract is the amount represented to the Purchaser at the time of the acquisition of the Contract by the Seller, less any payments received by the Seller prior to the Cut-Off Date but otherwise Seller makes no warranty as to the accuracy of the Unpaid Balance of each Contract as reflected in the Contract Documents.

(xiv)    Representations and Warranties of the Purchaser

. As of the Closing Date, the Purchaser makes the following representations and warranties on which the Seller is deemed to have relied in selling the Conveyed Assets. Such representations and warranties speak as of the effective date of this Agreement and as of the Closing Date, as the case may be, but shall survive the sale, transfer and assignment of the Conveyed Assets to the Purchaser.

(xv)    Organization and Good Standing. The Purchaser (A) has been duly organized and is validly existing as a Kansas LLC, and (B) has qualified to do business and is in good standing in each jurisdiction where the character of its properties or the nature of its activities makes such qualification necessary.

(xvi)    Power and Authority. The Purchaser has full power, authority and legal right to own its property, to carry on its business as presently conducted and to enter into and perform its obligations under the Basic Documents and the execution, delivery and

-10-

UNSEALED

NCA_PA000352

performance of the Basic Documents have been duly authorized by all necessary action on the part of the Purchaser. Neither the execution, delivery or performance of the Basic Documents, nor the consummation of the transactions herein or therein contemplated, will conflict with or result in a breach of or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Purchaser or its properties or the organizational documents of the Seller, or any of the provisions of any indenture, mortgage, contract, agreement or other instrument to which the Seller is a party or by which it is bound or result in the creation or imposition of any Lien upon any of its property pursuant to the terms of any such indenture, mortgage, contract, agreement or other instrument.

       (xvii)  <u>Binding Obligation</u>. This Agreement is enforceable against the Purchaser and each Basic Document has been duly executed and delivered by the Seller and, assuming the due authorization, execution and delivery thereof by the other parties thereto, constitutes a legal, valid and binding obligation of the Purchaser enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights in general.

       (xviii)  <u>Consents</u>. The Purchaser is not required to obtain the consent of any governmental authority or any other Person or to obtain any license, approval or authorization from any governmental authority or any other Person in connection with (1) the sale of the Conveyed Assets under this Agreement or (2) the execution, delivery, performance, validity or enforceability of any Basic Document.

       (xix)  <u>No Proceedings</u>. There are no actions, suits or proceedings pending or, to the knowledge of the Purchaser, threatened against or affecting the Purchaser, before or by any governmental authority having jurisdiction over the Purchaser or its properties (1) asserting the invalidity of any Basic Document, (2) alleging that one or more of the Contracts, or the origination or servicing thereof, failed to comply with applicable law, (3) seeking to prevent the consummation of any of the transactions contemplated by the Basic Documents or (4) seeking any determination or ruling that might materially and adversely affect (a) the Purchaser, (b) its business, assets, operations or condition, financial or otherwise, or (c) the performance by the Purchaser of its obligations under, or the validity or enforceability of, the Conveyed Assets or any Basic Document. The Purchaser is not in default with respect to any order of any court, administrative agency, arbitrator or governmental body so as to materially and adversely affect the transactions contemplated by or the performance by the Purchaser of its obligations under the Basic Documents.

       (c)  <u>Compliance with Laws</u>. Purchaser has complied with and is in compliance in all material respects with, and when performing under this Agreement will comply with each law that is applicable to Purchaser or the purchase, ownership, collection or use of the Conveyed Assets, including, but without limitation, the Gramm-Leach-Bliley Act and all applicable laws relating to consumer credit.

       (d)  <u>Suitability</u>. Purchaser has such knowledge and experience in financial, collections, and business matters as to be capable of evaluating the merits and risks of the purchase of the Conveyed Assets and is, by virtue of having made other investments of a similar nature and/or by reason of its business and financial experience or the business and

UNSEALED

NCA_PA000353

financial experience of those Persons it has retained to advise Purchaser with respect to its purchase of the Conveyed Assets, a "*sophisticated*" purchaser.

(e) Ability to Bear Risk. Purchaser is in a financial position to hold its interest in the Conveyed Assets for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of the Purchase Price of the Conveyed Assets.

(f) Investigation and Access to Information. Purchaser has been given all such access to information regarding the Conveyed Assets, including, in particular, the risks associated with the collectability (and ultimate collection) of the Conveyed Assets as it has requested from Seller, and has utilized such access to its satisfaction for the purpose of obtaining information about the Conveyed Assets. Purchaser has been solely responsible for its own due diligence investigation of the Conveyed Assets and the merits or risks of an investment in the Conveyed Assets, and is not relying on any investigation conducted or undertaken by any other Person, including Seller(and their respective directors, officers, and employees). Purchaser expressly acknowledges that, prior to executing and delivering this Agreement, Purchaser has been encouraged by Seller to review carefully the information provided to Purchaser, to consult with legal counsel and such other advisors as Purchaser believes desirable, and to ask such questions of Seller concerning the Conveyed Assets as Purchaser desires to ask.

(g) Acknowledgement of Risks. The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Purchaser shall create any inference that the transactions involve any "security" or "securities." Purchaser understands that an investment in the Conveyed Assets is speculative and involves a high degree of risk and that Purchaser must be able to withstand, and could sustain, a total loss of Purchaser's investment in the Conveyed Assets.

(h) Acknowledgement Regarding Documents. Purchaser understands that Seller will not have in its possession all account documents in respect of the Contracts that may be desired or requested by Purchaser and that the Basic Documents may not include all account documents related to any given Contract; and Purchaser acknowledges that Seller's failure to provide any account document that is not included among the Basic Documents will not constitute a breach of this Agreement on the part of Seller.

(i) Acknowledgement Regarding Fees. Purchaser warrants, represents, understands and acknowledges that no further fees or costs may be charged or assessed to the Borrower or with respect to the Contracts for the underling debt (including, but not limited to: NSF, late fees, interest, processing fees, attorney fees, collection costs, etc) and that no litigation may be commenced against any Borrower without the express written consent of Seller. Furthermore, the Contracts transferred hereunder are not subject to the provisions of Section 1719 of the California Civil Code and no Contract or Borrower may be required to pay treble damages if the check(s), ACH's or other payment mechanisms are dishonored.

UNSEALED

App. 0798

NCA_PA000354

Section 3.02    <u>Warranty and Limitation of Liability</u>

. SELLER WARRANTS TO PURCHASER THAT IT WILL SELL, ASSIGN, TRANSFER,
AND CONVEY TO PURCHASER ALL OF SELLER'S RIGHT, TITLE, AND INTEREST IN,
TO, AND UNDER THE CONVEYED ASSETS EXCEPT FOR SUCH WARRANTY AND
FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN
SECTION 3.01, THE CONVEYED ASSETS ARE BEING SOLD "AS IS" AND "WITH ALL
FAULTS," AND SELLER DOES NOT AND WILL NOT MAKE ANY REPRESENTATION
OR WARRANTY CONCERNING THE CONVEYED ASSETS, INCLUDING, BUT
WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO THE
CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR
COLLECTIBILITY OF THE CONVEYED ASSETS, OR ANY OTHER REPRESENTATION
OR WARRANTY, AND SELLER SPECIFICALLY DISCLAIMS ANY OTHER
REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, PAST OR PRESENT,
EXPRESS OR IMPLIED, CONCERNING THE CONVEYED ASSETS. PURCHASER
ACKNOWLEDGES THAT SUCH LIMITATIONS APPLY TO THE TRANSACTIONS
CONTEMPLATED BY THIS AGREEMENT, AND FURTHER ACKNOWLEDGES THAT,
EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS AGREEMENT, THE SALE,
ASSIGNMENT, TRANSFER, AND CONVEYANCE OF THE CONVEYED ASSETS WILL
BE WITHOUT RECOURSE TO SELLER AND WILL BE SUBJECT IN ALL RESPECTS TO
THE LIMITATIONS SET FORTH IN THIS SECTION 3.03.

Section 3.03    <u>Conveyed Assets Not Securities</u>. Purchaser acknowledges and agrees that
(i) the proposed sale of Conveyed Assets does not involve, nor is it intended in any way to
constitute, the sale of a "security" within the meaning of Federal securities laws, and (ii) it is not
contemplated that any filing will be made with the Securities and Exchange Commission or
pursuant to the securities laws of any jurisdiction.

ARTICLE 4
CERTAIN COVENANTS

Section 4.01    <u>Covenants of Purchaser</u>. Purchaser agrees and covenants with Seller as
follows:

(a) <u>Compliance with Law</u>. In the performance of its collection efforts with
respect to the Conveyed Assets, Purchaser agrees that it will comply with all requirements of
the Gramm-Leach-Bliley Act and all applicable federal and state Consumer Credit Laws
including but not limited to the federal Fair Debt Collections Practices Act. In the event
Purchaser receives a notice from any Governmental Authority that it is being investigated
for, or is a defendant in any administrative, civil or criminal action alleging, violations of any
federal or state Consumer Credit Law in reference to Conveyed Assets sold as covered in
this Agreement as described on Annex I, Purchaser will promptly, and in any event within 10
days after receipt of such notice, notify Seller that such investigation or action has been
initiated. Purchaser will provide Seller with details of the allegations made and of
Purchaser's intended response thereto, and will keep Seller apprised of the progress of such
investigation or action during the time it is pending. Notwithstanding any contrary provision
of this Agreement, under no circumstances whatsoever shall Purchaser institute or maintain

-13-

UNSEALED

App. 0799

NCA_PA000355

any administrative, civil or criminal action or proceeding against any Borrower, nor shall Purchaser (or any Person acting or purporting to act on behalf of Purchaser) threaten to institute any such administrative, civil or criminal action or proceeding with respect to any Contract, unless action is allowed within that states statute for loan type and approved by Seller.

(b) Use of Names. Purchaser shall use only Purchaser's own name when taking action in respect of the Conveyed Assets. Purchaser shall not state, represent or imply (and shall ensure that no permitted assignee or subsequent purchaser of the Conveyed Assets represents or implies that Purchaser is connected in any manner with, or acting for or on behalf of Seller or any Person with whom Seller has an agreement relating to the Conveyed Assets. Purchaser shall not (a) use the marks and/or names of, or otherwise refer to and shall ensure that no permitted assignee or subsequent purchaser of the Conveyed Assets uses the marks and/or names of, or otherwise refers to the Seller. The foregoing notwithstanding, however, Purchaser may use the name of Seller solely for the purpose of identifying the Conveyed Assets (a) in connection with the sale or financing of the purchase of such Contract, (b) for internal reporting purposes, (c) in bankruptcy and probate proceedings, (d) for the purpose of accurately describing the source of a Borrower's debt obligation or (e) in connection with entering into any servicing arrangement, provided, however, that neither Purchaser nor any person acting on behalf of Purchaser (or any permitted assignee, subsequent purchaser of the Conveyed Assets) shall state or represent in any way that it is taking action for or on behalf of Seller. Purchaser agrees, acknowledges, confirms and understands that there may be no adequate remedy at law for a violation of the terms, provisions, conditions and limitations set forth in this Section and Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof.

(c) Information Sharing. With respect to the sharing of any Customer Information relating to any Borrower with any affiliated or non-affiliated company, Purchaser shall comply with the requirements of all applicable federal, state and local laws, rules and regulations, including, without limitation, the requirements of Regulation P as set forth in 15 U.S.C. §6801, et seq. Additionally, Purchaser shall not sell, transfer or otherwise convey Customer Information to any other Person other than in connection with a subsequent sale of the Conveyed Assets.

(d) Encryption System. Purchaser agrees to use an encryption system for any receipt and/or transmittal of data relating to the Conveyed Assets.

(e) Compliance. In the performance of its collection efforts, if any, and in the course of owning the Conveyed Assets, Purchaser agrees at all times to conform and comply, and shall require anyone acting for or on its behalf to conform and comply, with all requirements of all applicable federal, state and local laws, and all rules and regulations applicable to the conduct of such activities and to the ownership, transfer or sale of the Conveyed Assets including, without limitation, the requirements of the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.), the Consumer Credit Protection Act, the Fair Credit Reporting Act ("FCRA"), Debt Adjusters Act, the U.S. Bankruptcy Code, and all usury laws. For any Contract for which the applicable statute of limitations has run, Purchaser will not

<div align="center">-14-</div>

UNSEALED

NCA_PA000356

falsely represent that a lawsuit will be filed if the Borrower does not pay. Purchaser represents and warrants that anyone collecting on its behalf, as well as its successors and assigns, shall be licensed to collect any amounts due in the jurisdiction in which the Borrower lives or, if appropriate, maintains a domicile, if so required by such jurisdiction's laws or regulations. If Purchaser reports to a major credit reporting agency such as Experian, Equifax and TransUnion, Purchaser will report in its name alone or as such reporting agencies or the FCRA or other applicable law requires Purchaser to report.

(f) Information Security. Purchaser shall implement and maintain administrative, technical and physical safeguards designed to ensure the security of Customer Information pursuant to the Interagency Guidelines and the Requirements, including but not limited to the following: (1) access controls on information systems, including controls to authenticate and permit access only to authorized individuals and controls to prevent its representatives from providing Customer Information to unauthorized individuals who may seek to obtain this information through fraudulent means; (2) access restrictions at physical locations containing Customer Information, such as buildings, computer facilities, and records storage facilities to permit access only to authorized individuals; (3) encryption of electronic Customer Information, including while in transit or in storage on networks or systems to which unauthorized individuals may have access; (4) procedures designed to ensure that information system modifications are consistent with the information security measures; (5) dual control procedures, segregation of duties, and employee background checks for representatives with responsibilities for or access to Customer Information; (6) monitoring systems and procedures to detect actual and attempted attacks on or intrusions into information systems; (7) response programs that specify actions to be taken when Purchaser detects unauthorized access to information systems, including immediate reports to the other parties; (8) measures to protect against destruction, loss or damage of Customer Information due to potential environmental hazards, such as fire and water damage or technological failures; (9) training staff to implement the information security measures; (10) regular testing of key controls, systems and procedures of the information security measures by independent third parties or staff independent of those that develop or maintain the security measures; and (11) appropriate measures to completely and permanently destroy "consumer information" (as defined in the Interagency Guidelines) by shredding, permanently erasing, or otherwise permanently rendering consumer information inaccessible and illegible. The Purchaser shall respond promptly and thoroughly to any requests for information concerning the respective information security measures implemented by such party.

(g) Furnishing Information to Major Credit Bureaus. Purchaser has the right to report a Borrower's delinquency on a Contract to a consumer reporting agency, including the three major credit bureaus (i.e., Experian, TransUnion, Equifax).

(h) Notification of Borrowers and Third Parties. Purchaser shall notify a Borrower in writing that the Contract has been sold to Purchaser. The written notification must include balance of the debt and the address to which the Borrower must remit payments to avoid further collection activity.

-15-

UNSEALED

NCA_PA000357

(i) Referrals of Inquiries. After the Closing Date, Purchaser will handle any and all inquiries from Borrowers directly and will not under any circumstances refer any Borrower to Seller in regard to any such inquiry.

(j) Account Information. Upon Seller's request, from time to time, Purchaser will provide Seller with information with respect to specific Conveyed Assets needed by Seller to reconcile Seller's accounting records with respect to such Contracts, provided that such information is reasonably available to Purchaser and such request is made within one year after the Closing Date.

(k) Audits. Upon Seller's request, from time to time, Seller or its agent has the right to and Purchaser will allow Seller to audit books and records and perform such oversight as required by the FDIC or to fulfill a regulatory or legal need of the Seller. Any such audit or oversight will be performed during normal business hours.

Section 4.02    Liability Insurance

Purchaser will, at all times during the term of this Agreement and at its own expense, cause to be carried and maintain in full force and effect insurance, which may be in the form of blanket insurance covering Purchaser and its subsidiaries and Affiliates, in such amounts and with such terms, with the standard deductibles, as follows: (i) comprehensive general liability with limits not less than $1 million per occurrence and $2 million annual aggregate; (ii) statutorily required worker's compensation; and (iii) professional liability/errors & omissions with limits not less than $1 million.

ANY RESPONSIBILITY FOR INDEMNITY FROM PURCHASER TO SELLER SHALL NOT BE LIMITED TO THE INSURANCE POLICIES CARRIED BY PURCHASER. ALL SUCH POLICIES CARRIED BY PURCHASER SHALL BE PRIMARY WITHOUT RIGHT OF CONTRIBUTION OF ANY INSURANCE POLICIES THAT SELLER MAY CARRY. SELLER IS NOT RESPONSIBLE FOR ANY PREMIUMS OWED BY PURCHASER, NOR ANY DEDUCTIBLES OR CONTRIBUTIONS DUE TO PURCHASER'S INSURANCE CARRIERS.

ARTICLE 5
INDEMNIFICATION

Section 5.01    Indemnities.

(a) By Purchaser. The Purchaser agrees to indemnify and hold harmless Seller and its respective officers, directors, employees and permitted assigns, as such, from and against any and all losses which in any way arise out of or relate to (i) any act, omission or failure by the Purchaser or otherwise owed to Seller by the Purchaser, (ii) the material inaccuracy of any representation or warranty made by the Purchaser, (iii) failure of the Purchaser, to comply, in respect of its obligations hereunder, (iv) any losses or penalties related to improper use or disclosure or unlawful use or disclosure of Customer Information by the Purchaser provided, however, that the Purchaser shall not be liable to Seller for the foregoing to the extent the losses arise from Seller's gross negligence or willful misconduct.

-16-

UNSEALED

App. 0802

NCA_PA000358

(b) By Seller. Seller shall indemnify and hold harmless Purchaser and any of their respective shareholders, officers, directors, agents or employees, from and against any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorney's fees and costs of suits) that arise from or relate to (a) any breach by Seller of its representations, warranties, covenants or other responsibilities set forth in this Agreement or (b) any other act or omission by Seller or any of its respective officers, directors, agents, employees, representatives or assignees with respect to the Conveyed Assets committed or occurring prior to the Closing Date. Seller shall not be liable to Purchaser for the foregoing to the extent the losses arise from Purchaser's gross negligence or willful misconduct.

(c) Limitations on Seller's Indemnification Obligations. Purchaser acknowledges that it has purchased the Conveyed Assets "AS IS," without reliance on any representations or warranties of Seller except as expressly provided herein, and that the Purchase Price reflects such fact. As a result, Purchaser agrees that in no event shall Seller be liable for any damages or claims for lost profits or consequential, incidental, indirect or punitive damages of Purchaser or any purchaser or assignee of the Contracts. Purchaser also agrees that no subsequent purchaser or assignee of the Contracts shall have a direct cause of action against, or right of indemnification from, Seller and that all purchase agreements with such Persons shall so provide.

(d) Indemnification Procedure. Whenever any claim of the type which would occasion indemnification under Article 5 hereof is asserted or threatened against any Party hereto, that Party shall promptly notify the other Party hereto. The notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of the amount of the liability arising there from. In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a Party to this Agreement, the indemnifying party shall have the right, at its option, at its expense and with its own counsel which counsel shall be reasonably satisfactory to the Party seeking indemnification to assume the defense of any such claim or any litigation resulting from such claim or to participate with its own counsel which counsel shall be reasonably satisfactory to the Party seeking indemnification in the compromise or defense thereof. If the indemnifying party undertakes to assume the defense of any such claim or litigation or participate in the compromise thereof, it shall promptly notify the indemnified party of its intention to do so, and, as a condition to the indemnifying party's indemnification obligation, the indemnified party shall cooperate reasonably with the indemnifying party and its counsel (but at the sole expense of the indemnifying party) in the defense against or compromise of any such claim or litigation. Anything in this Section 5.01 to the contrary notwithstanding, the indemnified party shall not compromise or settle any such claim or litigation without the prior written consent of the indemnifying party, which consent will not be unreasonably withheld; provided, however, that if the indemnified party shall have any potential liability with respect to, or may be adversely affected by, such claim or litigation, the indemnifying party shall not settle or compromise such claim or litigation without the prior written consent of the indemnified party.

(e) Seller Induced by Purchaser's Indemnity Promises. Purchaser acknowledges that the indemnification and risk allocation described in this Article 5.01 is a material inducement to the Seller to enter into this Agreement and is a material factor in the

-17-

UNSEALED

App. 0803

NCA_PA000359

Seller's determination of the compensation to be paid to Purchaser hereunder. Purchaser expressly agrees to this risk allocation and intends that the risks allocated to Purchaser include any risk arising in whole or part from the alleged or actual negligence of the Seller (but not the Seller's gross negligence or willful misconduct).

(f) Survival. The provisions of this Article 5.01 shall survive termination or expiration of this Agreement.

UNSEALED

NCA_PA000360

ARTICLE 6

Section 6.01    Seller's Obligation to Repurchase Accounts.

(a) Ineligible Accounts.  Seller will use reasonable efforts to determine that the Contracts do not include any Ineligible Contracts.  If, within the time frame set forth in Annex I, it is reasonably determined by Purchaser that Ineligible Contracts were included among the Contracts, or Seller determines that a Contract was sold which was an Ineligible Contract at the Closing Date, then Seller and Purchaser agree that the terms of Annex I, Paragraph 10 (Recourse Procedures) shall apply.

(b) Sole Remedy.  The remedies set forth in Annex I, Paragraph 10 (Recourse Procedures) will be Purchaser's sole remedy, and Seller's sole obligation, in the event Seller has sold Ineligible Accounts to Buyer.

Section 6.02    Seller's Option to Repurchase Contracts.  Seller shall have the right to repurchase any Contract (for an amount equal to Buyer's payment for such Contract, applying the Applicable Percentage to the Unpaid Balance of such repurchased Contract) if Seller determines that there is a pending or threatened lawsuit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to such Contract or a Borrower and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Contract, or if the Contract had been sold in error due to previous settlement or fraud.  In the event of such a repurchase, Seller shall notify Buyer of Seller's intent to repurchase such Contract, and upon receipt of such notice, Buyer shall promptly cease all activity on such Contract and execute and deliver a Bill of Sale satisfactory to Seller, assigning all right, title and interest of Buyer in such Contract, without representations or warranties or any kind or character, expressed or implied to Seller.  In addition, Buyer shall cease releasing or compromising the Contract and shall remove its credit reporting (if any) on any repurchased Contract.  Buyer shall forward to Seller all payments collected or received on the Contract after receipt of such notice.

ARTICLE 7
MISCELLANEOUS

Section 7.01    Survival Subject to the limitations and other provisions of this Agreement, (a) Articles 2,4,5 7 and 8 shall survive the Closing and (b) the representations and warranties of Seller and Buyer set forth in Article 3 shall survive for a period of two (2) years after the Closing Date.

Section 7.02    Amendment.  This Agreement may be amended by the parties hereto at any time, but only by an agreement in writing executed by the parties to this Agreement and with the prior written consent of the Servicer.

-19-

UNSEALED

App. 0805

NCA_PA000361

Section 7.03    <u>Governing Law</u>

(a) THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) In connection with any suit, claim, action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby, (i) each of the Seller and the Purchaser hereby consents to the in personam jurisdiction of any court of appropriate jurisdiction in the State of Delaware or any United States federal court located in the State of Delaware; (ii) each of the Seller and the Purchaser agrees that service by prepaid certified or registered mail, or any other form equivalent thereto (or, in the alternative, by any other means sufficient under applicable law, rules and regulations) at the addresses set forth in Section 5.05 shall be valid and sufficient for all purposes; and (iii) each the Seller and the Purchaser agrees to, and irrevocably waives any objection based on forum non conveniens or venue not to, appear in such state or United States federal court located in the State of Delaware.

(c) EACH OF THE SELLER AND THE PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE SELLER OR THE PURCHASER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PURCHASER TO ENTER INTO THIS AGREEMENT.

Section 7.04    <u>Notices</u>. All demands, notices and communications under this Agreement shall, except as otherwise provided for herein, be in writing personally delivered or mailed by certified mail, return receipt requested, and shall be deemed to have been duly given upon receipt in the case of.

if to the Seller, to:      First Bank of Delaware
                       Two Liberty Place
                       50 S. 16th Street, Suite 2400
                       Philadelphia, PA 19102

                       attention: Alonzo Primus

                       with a copy to :

UNSEALED

NCA_PA000362

Richard P. Eckman
Pepper Hamilton LLP
1313 Market Street
Suite 5100
Wilmington, DE 19810

if to the Purchaser to:

Brad Hochstein CEO
National Credit Adjusters, LLC
327 West 4th
Hutchinson, KS 67501

Copy to:

Kevin Emmerich, Legal Section
327 West 4th
Hutchinson, KS 67501

or, in each case, to such other address as any party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand-delivered to the address of such party as provided above. Any notice so mailed within the time prescribed herein shall be conclusively presumed to have been duly given, whether or not such addressee shall receive such notice.

Section 7.05   Severability of Provisions.  If one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 7.06   Assignment  This Agreement is binding upon Seller and Purchaser and their respective successors, heirs, and assigns.  The rights and obligations of Seller hereunder may be assigned by Seller to any Person at any time of Seller's discretion.  Purchaser may not assign any rights or delegate any duties to any Person, or sell, transfer, or assign any Contracts to any Person, without the prior written consent of Seller.  Any assignment or delegation by Purchaser without such prior written consent will be null and void.  If Seller consents to Purchaser's assignment of any Contract to another Person, the subsequent purchaser or assignee will be restricted from any further assignment of Contract acquired by such Person without Seller's prior written consent, and each such subsequent purchaser or assignee must execute and deliver an acknowledgment of such restrictions acceptable to Seller as a condition to the effectiveness of Seller's consent.  The foregoing notwithstanding, nothing contained in this Section 7.6 is intended to restrict or prohibit Purchaser from (a) selling, transferring, or assigning any Contract to any Affiliate of Purchaser or (b) referring any Contract for collection by third-party collectors, provided that this Agreement is complied with in all respects in any such event, including, but not limited to, obtaining Seller's consent for said transfer.

-21-

UNSEALED

NCA_PA000363

Section 7.07   Third Party Beneficiaries.  Each of the Seller Indemnified Parties is an intended beneficiary of this Agreement and each of them shall have the right to enforce all provisions of this Agreement as if they were a party hereto.  Except as otherwise specifically provided herein, the parties hereto hereby manifest their intent that no other third party shall be deemed a third party beneficiary of this Agreement, and specifically that the Originator and the Borrowers are not third party beneficiaries of this Agreement.

Section 7.08   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall together constitute but one and the same instrument.

Section 7.09   Headings.  The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 7.10   Entire Agreement.  This Agreement constitutes the entire agreement between the parties relating to the transactions contemplated herein and supersedes and extinguishes any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature whatsoever, whether or not in writing, relating thereto.

Section 7.11   No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Purchaser or the Seller, any right, remedy, power or privilege hereunder, will operate as a waiver thereof, nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges therein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 7.12   Further Assurances.  The Seller and the Purchaser agree to do and perform, from time to time, any and all acts and to execute any and all further instruments required or reasonably requested to more fully effect or evidence the purposes of this Agreement, including, without limitation, the execution of any financing statements or continuation statements relating to the Contracts for filing under the provisions of the UCC of any applicable jurisdiction or any instruments of transfer.

Section 7.13   Expenses.  Except as otherwise expressly provided herein, each party to this Agreement shall be responsible for paying their respective costs and expenses, including legal and out of pocket expenses, in connection with the negotiation, preparation and execution and delivery of this Agreement and the other Basic Documents.

ARTICLE 8
CONFIDENTIALITY

Section 8.01   General.  All oral and written information about Seller and Purchaser, their respective businesses and customers, including Borrowers, and this Agreement (including the Purchase Price) (collectively, the "Records"), are valuable and proprietary assets.  Seller and Purchaser (and each of their respective employees and agents) shall treat the Records as strictly confidential and, except as expressly authorized hereunder, will not disclose such Records to any

-22-

UNSEALED

App. 0808

NCA_PA000364

Person or use such Records other than in accordance therewith, provided that Purchaser may disclose such Records to any subsequent purchaser or potential purchaser of the Contracts if such purchaser or potential purchaser agrees to the terms of this confidentiality provision in writing, such Records directly relate to the Contracts purchased or proposed to be purchased and such Records are reasonably required by such purchaser or subsequent purchaser to collect or assess the Contracts. Each Party hereto will use its best efforts to ensure that its employees and agents maintain such confidentiality. Each party hereto will notify the other party hereto immediately upon receiving a subpoena or other legal process about the other party's Records and will cooperate with the other party thereto to comply with or oppose the subpoena or legal process.

      Section 8.02  <u>Limitation</u>.  This Article Eight will not apply to information, documents, and material that are in or enter the public domain other than through a wrongful act or omission of a party hereto

UNSEALED

NCA_PA000365

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

First Bank of Delaware,
as Seller

By:_____
        Name:  Alonzo Primus
        Title:   CEO

National Credit Adjusters, LLC as Purchaser

By:_____
        Name:  Brad Hochstein
        Title:   CEO

UNSEALED

App. 0810

NCA_PA000366

SCHEDULE I

SUMMARY OF CONTRACTS

December Charge offs.

SCHEDULE II

FORM OF SALE AND ASSIGNMENT

This Sale and Assignment, dated as of January 18, 2011(the "Closing Date"), is delivered pursuant to Section 2.01(b) of the Purchase and Sale Agreement, dated as of January 18, 2011 (the "Purchase and Sale Agreement"), between First Bank of Delaware, (the "Seller"), as Seller, and [Name of Purchaser], as Purchaser. Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed thereto in the Purchase and Sale Agreement.

1.    Attached hereto as Schedule I is a summary of Contracts to be sold by the Seller and purchased by the Purchaser on the Closing Date, which is deemed incorporated into and made a part of the Purchase and Sale Agreement. Such Contracts have an aggregate Principal Balance of $10,510,428.35 as of the Cut-Off Date.

2.    Each of the conditions set forth in Section 2.02 of the Purchase and Sale Agreement has been met as of the Closing Date and shall be true and correct as of the Closing Date.

3.    As of the Closing Date, the Seller is not insolvent, nor will it be made insolvent by the sale of such Contracts to the Purchaser, nor is it aware of any pending insolvency.

4.    The wire transfer instructions for the Seller are as follows:

Wiring Instructions:

Beneficiary:

> First Bank of Delaware
> Accounts Payable
> Two Liberty Place
> 50 S. 16th Street, Suite 2300
> Philadelphia, PA 19102

| | |
|---|---|
| ABA | 031101059 |
| Bank Acct. # | 28100 |
| $ Amount | $735,729.00 |

UNSEALED

NCA_PA000367

IN WITNESS WHEREOF, the undersigned has caused this Sale and Assignment to be executed and delivered to the Purchaser as of the date first above written.

First Bank of Delaware

By: _____
Name: Alonzo Primus
Title:   CEO

UNSEALED

NCA_PA000368

PURCHASER AND SALE AGREEMENT DATED AS OF JANUARY 18, 2011

Additional Terms and Conditions

1. Description of Contracts:

    A) See schedule I

2. Number of Contracts: 9,094

3. Aggregate Principal Balance of all Contracts: $10,510,428.35

4. [Applicable Percentage (Purchase Rate): Combined rate of: 7.0%

5. Purchase Price: $735,730.00

6. Cut-Off Date : January 18, 2011

8. Ineligible Contract. Bankrupt Contracts, Deceased Accounts, Paid/Settled In Full Accounts and Forgery/Fraud Contracts are referred to collectively herein as "Ineligible Contracts."

    (a)    Bankrupt Contracts. A "Bankrupt Contract" is an Contract that, at the Cut-Off Date, the relevant Borrower is a debtor in a case under the Bankruptcy Code or has filed a case under the Bankruptcy Code which has resulted in the discharge of such Borrwer's obligations to Seller. If there are two or more Borrowers on the same Contract all Borrowers must be debtors in bankruptcy or have filed in order for the Contract to be a Bankrupt Contract.

    (b)    Deceased Accounts. A "Deceased Account" is a Contract that, as of the Cut-Off Date, the Borrower with respect to which is deceased. If there are two or more Borrowers, or the Borrower is in a non-community property state, all Borrowers must be deceased as of the Cut-Off Date in order for the Borrower to be a Deceased Account. Verification must be provided.

    (c)    Paid in Full /Settled in Full Accounts: is a Contract that, as of the Cut-Off Date, has been paid or settled in full. Verification of payment/settlement must be provided.

    (d)    Forgery/Fraud Accounts: is a Contract that was created prior to the Cut-Off Date as a result of forgery or fraud. Verification must be provided by fraud or forgery affidavit.

Notwithstanding the foregoing, in no event shall any Contract be deemed to be an Ineligible Account unless Purchaser is able to provide the following relevant documents (the "Verification Documents") to verify the circumstances causing such Contract to be an Ineligible Contract:

    (1)    For a Bankrupt Account, Purchaser shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

UNSEALED

App. 0813

NCA_PA000369

(2)     For a Deceased Account, Purchaser shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Borrower information, a credit bureau report showing the relevant Borrower as deceased, or a copy of the relevant newspaper obituary.

(3)     For a Paid/Settled In Full Account, Purchaser shall provide written evidence that the Contract has been paid or settled in full.

(4)     For a Forgery/Fraud Account, Purchaser shall provide a copy or original of a fraud or forgery affidavit.

9.     Account Documentation: Seller shall deliver to purchaser an electronic copy of all original loan documents within 60 days of the Closing Date.

10.     Recourse Procedures: If, at any time during the period commencing on the Closing Date and ending on March 31, 2011 (the "Recourse Period Termination Date"), Purchaser identifies any Contract that Purchaser determines is an Ineligible Contract:

(a)     Purchaser shall provide to Seller (according to such instructions as Seller from time to time may give to Purchaser) a description of such Contract (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

(b)     Once Seller confirms (through its examination of the Verification Documents) that such Contract is an Ineligible Contract, Seller shall pay to Purchaser an amount equal to: (i) the Unpaid Balance of such Ineligible Contract as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage. Payments will be sent by the 5th of each month.

(c)     Seller shall promptly notify Purchaser if, based on its examination of any Verification Document, it concludes that a Contract designated by Purchaser as an Ineligible Contract does not meet the requirements of an Ineligible Contract, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Purchaser in connection with any Ineligible Contract the Verification Documents with respect to which Seller receives from Purchaser after the Recourse Period Termination Date; or (ii) shall Purchaser provide to Seller information or Verification Documents regarding Ineligible Contracts more than one (1) time in any calendar month.

Purchaser will appoint one of its employees to be the recourse liaison between Purchaser and Seller, and Seller will appoint one of its employees as recourse liaison between Purchaser and Seller for all recourse accounts.

-4-

UNSEALED

App. 0814

NCA_PA000370

| From: | Brad Hochstein |
|-------|----------------|
| To: | Shawn Gylling |
| CC: | 'Tyler Rempel'; 'Karl Krum'; 'Kevin Emmerich' |
| Sent: | 12/13/2011 10:12:55 PM |
| Subject: | FW: Think Finance |

-----Original Message-----
From: Brett Horrocks [mailto:brett@sourceitone.com]
Sent: Tuesday, December 13, 2011 3:59 PM
To: brad@ncaks.com
Subject: Re: Think Finance

We have gotten approval from all parties for the forward flow. I will be sending you the contracts for today's sale in the next few mins, if you can sign and send back. We will work on the forward flow agreements ready for January's debt.

Brett

Sent from my iPad

On Dec 12, 2011, at 11:10 PM, brad@ncaks.com wrote:

> Ok I will get back to you on time and the increase for you is ok
> -----Original Message-----
> From: Brett Horrocks
> To: Home
> Subject: Re: Think Finance
> Sent: Dec 12, 2011 4:51 PM
>
> Thanks. It is a good thing I have no hair to pull out.....and to think I don't drink....... What about an increase of 10bps for us when we get this thing done?
>
> Also, can you confirm if you will be open on the 30th.
>
>
> Brett
>
>
>
>
>
> On Dec 12, 2011, at 3:04 PM, brad@ncaks.com wrote:
>
>> Yes
>> -----Original Message-----
>> From: Brett Horrocks
>> To: Home
>> Subject: Think Finance
>> Sent: Dec 12, 2011 3:40 PM
>>
>>
>> Brad,
>>
>> I wanted to confirm with you that if I can get agreement with Think Finance we can go to .076 on both the payday and the installment products for Think Finance for the next 12 months. The sale for tomorrow will still be at .07 and .075 and the new agreement will begin with the December charge-offs. Please confirm.
>>
>> Brett
>>
>>
>>

UNSEALED

EXHIBIT
PENGAD 800-631-6989

>> Sent on the Sprint® Now Network from my BlackBerry®
>
>
>
> Sent on the Sprint® Now Network from my BlackBerry®

UNSEALED

NCA_PA014993

## LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT is entered into as of December 13, 2011, (the "Effective Date"), by and between National Credit Adjusters, LLC a Kansas LLC, ("Buyer"), and Plain Green, LLC ("Seller"), a limited liability company organized under the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation of Montana (the "Chippewa Cree").

## RECITALS:

A.     Seller originated and is the owner of certain installment consumer loans.

B.     Seller desires to sell certain Loans (defined hereafter) to Buyer as a cash transaction and Buyer desires to purchase such Loans from Seller, all in accordance with the terms and subject to the conditions contained in this Agreement.

C.     Annex I contains certain of the basic terms of the transaction contemplated by this Agreement.

## AGREEMENT

THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement and for other good and valuable consideration, the adequacy of which the parties hereby acknowledge, Seller and Buyer agree as follows:

## ARTICLE ONE

## DEFINITIONS AND TERMS

1.1     Definitions.  For purposes of this Agreement, the following terms are defined as set forth in this Section 1.1 or in the provisions of this Agreement to which reference is made in this Section 1.1.  All references to a Recital, Article, or Section are to a Recital, Article, or Section of this Agreement, unless otherwise indicated, and all references to an Annex or an Exhibit, are to an Annex or an Exhibit attached to and made a part of this Agreement, unless otherwise indicated.

Affiliate means, when used with reference to a specified Person, any other Person who directly controls, is controlled by, or is under common control with, the specified Person.  For purposes of this definition, *"control"* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person that is a corporation, limited liability company, partnership, trust, or other entity, whether through ownership of voting securities or interests, by contract, or otherwise.

Agreement means this Loan Sale Agreement, including all Annexes and Exhibits, as it may be renewed, extended, restated, amended, or supplemented from time to time.

Rev. 12.09.2011 


EXHIBIT
9-73

UNSEALED

App 0817

NCA_PA000851

Applicable Percentage has the meaning given such term in Annex I.

Assignment and Bill of Sale means an assignment and bill of sale in the form of Exhibit A, executed by Seller and delivered to Buyer evidencing the sale of the Loan Pool sold hereunder.

Bankruptcy has the meaning given such term in Annex I.

Bankruptcy Code means the Bankruptcy Code of the United States, as existing as of the Effective Date or thereafter amended.

Breach means, as to any representation, warranty, covenant, obligation, liability, or other provision made by or binding on Seller or Buyer under this Agreement, the occurrence of any inaccuracy in, breach of, or failure to comply with, such representation, warranty, covenant, obligation, liability, or other provision by Seller or Buyer, as applicable.

Business Day means every day on which commercial banks in the State of Montana are open for business.

Buyer has the meaning given such term in the initial paragraph of this Agreement.

Charged-Off Loan means a Loan receivable the Unpaid Balance of which has been charged-off by the Originating Creditor as uncollectible in accordance with the usual and customary practices of such Originating Creditor and in accordance with applicable United States federal Laws.

Closing means the consummation of the Loan purchase and sale transaction between Buyer and Seller, as contemplated by this Agreement

Closing Date means the date on which Buyer purchases the Loan Pool by completing all conditions precedent to closing, as described herein.

Consumer Credit Laws means the United States federal Fair Debt Collection Practices Act, the Fair Credit Reporting Act, all other United States federal and state laws that pertain to the collection of consumer credit obligations, and Tribal Laws that pertain to the extension of consumer credit.

Cut-Off Date means the date indicated in Annex I.

Debtor Relief Law means the Bankruptcy Code and any other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Law from time to time in effect affecting the Rights of creditors generally.

Effective Date has the meaning given such term in the initial paragraph of this Agreement.

2

UNSEALED

NCA_PA000852

**Governmental Approval** means an approval, authorization, consent, permit, license, concession, grant, waiver, or exemption of, registration, designation, declaration, or filing with, or report or notice to, any Governmental Authority.

**Governmental Authority** means any nation, tribal sovereign nation or government, any state, county, city, municipality, or other political subdivision thereof, and any entity exercising executive, legislative, judicial, police, regulatory, or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission, or instrumentality of any of the foregoing, and any tribunal, court, or arbitrator (including any private arbitration board or panel) of competent jurisdiction.

**Gramm-Leach-Bliley Act** means the United States federal Gramm-Leach-Bliley Act, as existing as of the Effective Date or thereafter amended.

**Ineligible Loan** has the meaning given such term in Annex I.

**Knowledge** of any particular fact or other matter means, (a) as to any natural Person, that such natural Person has actual knowledge of such fact or other matter, and (b) as to any Person other than a natural Person, that an individual who is serving, or who at any time has served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter. For purposes of this definition, *"actual knowledge"* of any particular fact or other matter means, as to a natural Person, that such Person is actually aware of such fact or other matter.

**Law** means any applicable statute, law, Tribal Law, treaty, ordinance, rule, regulation, order, writ, injunction, decree, judgment, or opinion of any Governmental Authority.

**Lien** means any lien, security interest, mortgage, pledge, adverse claim, title defect, title retention agreement, voting trust agreement, property settlement or marital dissolution agreement, preemptive right, right of first refusal, or other interest, equity, option, restriction, encumbrance, or charge of any kind.

**Litigation** means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party.

**Loan** means an installment loan originated by Seller that is offered for sale pursuant to the terms of this Agreement which in each case (a) has an outstanding balance as of the Cut-Off Date as set forth in Annex I, (b) is owed by one or more Borrowers, and (c) is owned by Seller as of the Cut-Off Date.

**Loan Document** means any agreement, instrument, or other document evidencing, or delivered in connection with, a Loan and in the possession or within the control of Seller, including, but without limitation, (a) any consumer credit agreement, any installment purchase or sale agreement, any loan or credit agreement, any promissory note, any guaranty, any security or pledge agreement, any invoice or request for payment, and any other document (regardless of how styled) related to the collection of a Loan, and (b) any hard copy evidencing or describing a Loan and/or the Unpaid Balance thereof, together with any renewal, extension, or restatement of,

3

UNSEALED

App. 0819

or amendment or supplement to, any of the foregoing agreements, instruments, or other documents.

Loan Listing means a listing (in a mutually agreed-upon electronic format) of the Loans in the Loan Pool, which listing shall include such basic information regarding the Loans as is customary for transactions such as the transactions contemplated by this Agreement, including, by way of example, the Loan Obligor information obtained by the lender in connection with originating each Loan, and the Unpaid Balance of each Loan as of the Cut-Off Date.

Loan Obligor means any Person who, directly or indirectly, is obligated for the payment of all or any portion of any Loan.

Loan Pool means the group of Loans sold by Seller to Buyer pursuant to the terms of this Agreement consisting of those Loans listed in the electronic Loan Listing delivered by Seller to Buyer pursuant to Section 2.3, as will be documented by an Assignment and Bill of Sale, and will be identified by a control number.

Material Litigation means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party that, according to generally accepted accounting principles, is considered significant to Buyer's or Seller's financial condition.

Order means any order, award, decision, decree, injunction, judgment, ruling, subpoena, or verdict issued, made, or rendered by any applicable Governmental Authority.

Originating Creditor means the Seller.

Person means any individual, corporation, partnership, joint venture, Limited Liability Company, trust, Governmental Authority, or other entity.

Proprietary Information means the Loan Documents and all information included therein, together with all other information concerning the Loans and/or the Loan Obligors provided to or obtained by Buyer prior to the Closing.

Purchase Price has the meaning given such term in Annex I.

Right means any legal or equitable right, remedy, power, privilege, or benefit.

Seller has the meaning given such term in the initial paragraph of this Agreement.

Tax means any tax, charge, fee, levy, or other assessment levied or charged by a Governmental Authority.

Tribal Law means mean any law or regulation duly enacted by the Chippewa Cree.

Unpaid Balance means, as to any Loan, the total outstanding unpaid balance thereon at the Cut-Off Date, as shown on Seller's books and records (including all amounts due in respect

4

UNSEALED

App. 0820

NCA_PA000854

of purchases, cash advances, late fees, return check charges, over limit fees, and all other applicable fees and charges).

1.2    Number and Gender of Words.  Whenever in this Agreement the singular number is used, the same shall include the plural where appropriate and *vice versa*, and words of any gender shall include each other gender where appropriate.

## ARTICLE TWO

## PURCHASE AND SALE OF THE LOANS

2.1    Agreement of Purchase and Sale.  Upon the terms and subject to the conditions contained in this Agreement and based upon the representations, warranties, and agreements of Buyer and Seller as contained herein, Buyer agrees to purchase the Loans from Seller, and Seller agrees to sell the Loans to Buyer, on the Closing Date.  The Loans will be sold to Buyer by Seller free and clear of any Liens created by the actions or inactions of Seller or any Affiliate of Seller; and, in conjunction with the sale of the Loans to Buyer, Seller will transfer, sell, assign, and convey to Buyer all of Seller's Rights in, to, and under the Loan Documents.

2.2    Purchase Price.  The Purchase Price to be paid by Buyer to Seller for the Loans is as set forth in Annex I.  The Purchase Price has been determined by multiplying the total Unpaid Balances of all the Loans by the Applicable Percentage, as set forth in Annex I.  Buyer will pay the Purchase Price as set forth in Annex I.  The Purchase Price is to be paid in funds available for immediate use by Seller by (i) delivery of a cashier's check or money order in the amount of the payment due or (ii) by wire transfer of the amount of the payment due in accordance with instructions provided by Seller to Buyer.

2.3    Closing.  The Closing of the purchase and sale of the Loan Pool pursuant to this Agreement will be effected on the Closing Date of December 13, 2011.  On or prior to the Closing Date, the following actions will be taken by Seller and Buyer:

       (a)    Buyer will pay the full Purchase Price, in accordance with Annex I;

       (b)    Seller will execute and deliver the Assignment and Bill of Sale to Buyer; and

       (c)    Seller will deliver to Buyer the Loan Listing.

The obligations of Buyer and Seller to complete the Closing are subject to the conditions precedent set forth in Article Six.

2.4    Payments Received.  If Seller or any servicing agent receives any credits, payments or other consideration distributed or paid by or on behalf of any Loan Obligor with respect to any Loan prior to or on the Cut-Off Date, Seller shall be entitled to accept such payments and (if necessary) adjust the Unpaid Balance of such Loan reflected on the Loan Listing.  If Seller or any servicing agent shall receive any credits, payments or other consideration distributed or paid by or on behalf of any Loan Obligor with respect to any Loan after the Cut-off Date, Seller shall promptly pay over and/or deliver such payments to Buyer.

5

UNSEALED

App. 0821

NCA_PA000855

Any such remittances will be made by regular United States mail, unless otherwise requested by Buyer (in which case Buyer will reimburse Seller for all costs incurred by Seller in connection with the transmittal of such remittance.). If Buyer or any servicing agent shall receive any credits, payments or other consideration on any account and a Loan Obligor, which is not a Loan sold pursuant to this Agreement, Buyer shall promptly pay over and/or deliver such payments to Seller within 10 days of receipt.

2.5    Warranty and Limitation of Liability.    SELLER WARRANTS TO BUYER THAT IT WILL SELL, ASSIGN, TRANSFER, AND CONVEY TO BUYER ALL OF SELLER'S RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER THE LOANS AND THE LOAN DOCUMENTS.    EXCEPT FOR SUCH WARRANTY AND FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN SECTION 3.1, THE LOANS ARE BEING SOLD "AS IS" AND "WITH ALL FAULTS," AND SELLER DOES NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY CONCERNING THE LOANS AND/OR THE LOAN DOCUMENTS, INCLUDING, BUT WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR COLLECTIBILITY OF THE LOANS, OR ANY OTHER REPRESENTATION OR WARRANTY, AND SELLER SPECIFICALLY DISCLAIMS ANY OTHER REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE LOANS OR THE LOAN DOCUMENTS. BUYER ACKNOWLEDGES THAT SUCH LIMITATIONS APPLY TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND FURTHER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS AGREEMENT, THE SALE, ASSIGNMENT, TRANSFER, AND CONVEYANCE OF THE LOANS AND THE LOAN DOCUMENTS WILL BE WITHOUT RECOURSE TO SELLER AND WILL BE SUBJECT IN ALL RESPECTS TO THE LIMITATIONS SET FORTH IN THIS SECTION 2.5.

2.6    Termination.    This Agreement and the transactions contemplated hereby may be terminated on or before the Closing Date as follows:

(a)    By the mutual written agreement of Buyer and Seller;

(b)    By Buyer if a Breach of any provision of this Agreement has been committed by Seller and such Breach has not been waived or cured on or before the Closing Date; or

(c)    By Seller if a Breach of any provision of this Agreement has been committed by Buyer and such Breach has not been waived or cured on or before the Closing Date.

2.7    Effect of Termination.    Each party's Right of termination under Section 2.6 is in addition to any other Rights it may have under this Agreement or otherwise, and the exercise of a Right of termination will not be deemed to be an election of remedies. If this Agreement is terminated pursuant to Section 2.6, all further obligations of the parties under this Agreement will terminate, except as provided in Section 8.8; provided, however, that if this Agreement is

UNSEALED

NCA_PA000856

terminated by either party because of the Breach of this Agreement by the other party, or because one or more conditions of the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's Right to pursue all legal or equitable remedies will survive such termination unimpaired.

2.8     Payment on Loans.  Subject to the limitations and conditions described in this Agreement, Seller authorizes Buyer to accept, endorse in Buyer's name for the sole purpose of depositing funds, and deposit any payments into Buyer's account that it receives on Loans for so long as Buyer retains the right to collect such Loan.

## ARTICLE THREE

## REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

(a)     Title to Loans.  Seller owns good and marketable title to the Loans, and has obtained all consents necessary to transfer title to the Loans free and clear of all Liens.

(b)     Authorization by Seller.  The execution and delivery of this Agreement by Seller and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite actions of Seller, and this Agreement has been duly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to the application of Debtor Relief Laws. Seller has full power, capacity, and authority to execute and deliver this Agreement and the Assignment and Bill of Sale.  In addition, to its knowledge, Seller has obtained all licenses and approvals, if any, as required under Tribal Law to carry on its business as now conducted insofar as Seller's business relates to Seller's ownership of the Loans or the sale thereof to Buyer, and all such licenses and approvals are in full force and effect.

(c)     Organization, Existence, and Good Standing of Seller.  Seller is an entity duly organized, validly existing, and in good standing under the laws of the Chippewa Cree with all requisite company power and authority to own, lease, and operate its properties, to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby.

(d)     No Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the organizational documents of Seller, any resolution adopted by the members or the managers of Seller, any Tribal Law, rule or regulation applicable to Seller, any agreement or other document to which Seller is a party or by which it or any of its property is bound, or any Order that affects or binds Seller.  No Governmental Approval, and no consent or approval of any other Person is required on the part

7

UNSEALED

NCA_PA000857

of Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(e)    <u>Litigation</u>. There is no actual pending Material Litigation (i) that has been commenced by or against Seller that relates to or may affect Seller's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement or the transactions contemplated hereby. To the Knowledge of Seller, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(f)    <u>Compliance with Laws</u>. To the Knowledge of Seller, (i) Seller has complied with and is in compliance in all material respects with each Law that is or was applicable to Seller in respect of the ownership or use of the Loans, and (ii) Seller has not received any notice or other communication (whether written or oral) from any applicable Governmental Authority or any other Person regarding (y) any actual, alleged, or potential violation of, or failure to comply with, any applicable Law in respect of, or affecting, Seller's ownership of the Loans or the sale thereof to Buyer, or (z) any actual, alleged, or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action in respect of, or affecting, Seller's ownership of the Loans or the sale thereof to Buyer.

(g)    <u>Loans</u>. To the Knowledge of Seller, each Loan was made for valuable consideration and represents the enforceable obligation of the Loan Obligors obligated therefore, except as limited by Debtor Relief Laws.

(h)    <u>Loan Obligors</u>. No Loan Obligor has initiated any Litigation against Seller in respect of the Loan for which such Loan Obligor is liable, and, to the Knowledge of Seller, no Loan Obligor has any enforceable Rights of set-off, counterclaim, cancellation, or claim that such Loan suffers from lack of consideration, forgery, or alteration of the Loan Obligor's signature, except as otherwise disclosed in the Loan Documents pertaining to such Loan.

(i)    <u>Unpaid Balances</u>. The amount reflected as the Unpaid Balance of each Loan in the Loan Documents is the amount of the Unpaid Balance represented to Buyer at the time of its acquisition from Seller of the Loan, less any payments received by Seller prior to Cut-Off Date; but otherwise Seller makes no warranty as to the accuracy of the Unpaid Balance of each Loan as reflected in the Loan Documents.

3.2    <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller as follows:

(a)    <u>Authorization by Buyer</u>. The execution and delivery of this Agreement by Buyer and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or other actions of Buyer, and this Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject only to the application of

8

UNSEALED

NCA_PA000858

Debtor Relief Laws. Buyer has full corporate or other power, capacity, and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Buyer as contemplated by this Agreement. In addition, Buyer possesses all Governmental Approvals, if any, required to carry on its business as now conducted insofar as Buyer's business relates to the collection of accounts receivable such as (and including) the Loans, or the purchase and collection of the Loans, and all such Governmental Approvals are in full force and effect.

(b)   <u>Organization, Existence, and Good Standing of Buyer</u>. Buyer is duly organized, validly existing, and in good standing under the Laws of the State of Kansas with all requisite power and authority to own, lease, and operate its properties and to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby. Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of business transacted by it or properties owned or leased by it requires such qualification and in which the failure to do so would have a material adverse effect on its ability to perform its obligations under this Agreement or the enforceability thereof.

(c)   <u>No Conflicts</u>. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer, any resolution adopted by the shareholders or the board of directors (or other constituent group) of Buyer, or any mortgage, indenture, lease, loan or credit agreement, or other contract, applicable Law, or Governmental Approval applicable to Buyer, or any of the properties of Buyer, or any Order which affects or binds Buyer. No Governmental Approval, and no consent or approval of any other Person, is required on the part of Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(d)   <u>Litigation</u>. There is no actual pending Material Litigation (i) that has been commenced by or against Buyer or that otherwise relates to or may affect Buyer's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with this Agreement or the transactions contemplated hereby. To the Knowledge of Buyer, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(e)   <u>Compliance with Laws</u>. Buyer has complied with and is in compliance in all material respects with, and when performing under this Agreement will comply with each Law that is applicable to Buyer or the purchase, ownership, collection or use of the Loans, including, but without limitation, the Gramm-Leach-Bliley Act and all applicable Consumer Credit Laws.

(f)   <u>Suitability</u>. Buyer has such knowledge and experience in financial, collections, and business matters as to be capable of evaluating the merits and risks of the purchase of the Loan and is, by virtue of having made other investments of a similar nature and/or by reason of its business and financial experience or the business and financial experience

9

UNSEALED

NCA_PA000859

of those Persons it has retained to advise Buyer with respect to its purchase of the Loan, a *"sophisticated"* purchaser.

(g)  Ability to Bear Risk.  Buyer is in a financial position to hold its interest in the Loan for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of the Purchase Price of the Loan.

(h)  Investigation and Access to Information.  Buyer has been given all such access to information regarding the Loan, including, in particular, the risks associated with the collectability (and ultimate collection) of the Loan as it has requested from Seller, and has utilized such access to its satisfaction for the purpose of obtaining information about the Loan. Buyer has been solely responsible for its own due diligence investigation of the Loan and the merits or risks of an investment in the Loan, and is not relying on any investigation conducted or undertaken by any other Person, including Seller or its Affiliates (and their respective directors, officers, and employees).  Buyer expressly acknowledges that, prior to executing and delivering this Agreement, Buyer has been encouraged by Seller to review carefully the information provided to Buyer, to consult with legal counsel and such other advisors as Buyer believes desirable, and to ask such questions of Seller concerning the Loan as Buyer desires to ask.

(i)  Acknowledgement of Risks.  The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities."  Buyer understands that an investment in the Loan is speculative and involves a high degree of risk and that Buyer must be able to withstand, and could sustain, a total loss of Buyer's investment in the Loan.

(j)  Acknowledgement Regarding Documents.  Buyer understands that Seller will not have in its possession all account documents in respect of the Loan that may be desired or requested by Buyer and that the Loan Documents may not include all account documents related to any given Loan; and Buyer acknowledges that Seller's failure to provide any account document that is not included among the Loan Documents will not constitute a Breach on the part of Seller.

(k)  Acknowledgement Regarding Fees.  Buyer warrants, represents, understands and acknowledges that no further fees or costs may be charged or assessed to the Loan or the Loan Obligors for the underling debt (including, but not limited to: NSF, late fees, interest, processing fees, attorney fees, collection costs, etc.).  Furthermore, the Loan transferred hereunder are not subject to the provisions of Section 1719 of the California Civil Code and no Loan or Loan Obligor may be required to pay treble damages if the check(s), ACH's or other payment mechanisms are dishonored.

## ARTICLE FOUR

## REPURCHASE OF ACCOUNTS

4.1  Seller's Obligation to Repurchase Loan.

10

UNSEALED

App. 0826

(a)    Ineligible Loan.  Seller will use reasonable efforts to determine that the Loans do not include any Ineligible Loan.  If, within the time frame set forth in Annex I, it is reasonably determined by Buyer that Ineligible Loans were included among the Loans, or Seller determines that a Loan was sold which was an Ineligible Loan at the Closing Date, then Seller and Buyer agree that the terms of Annex I, Paragraph 10 (Recourse Procedures) shall apply.

(b)    Sole Remedy.  The remedies set forth in Annex I, Paragraph 10 (Recourse Procedures) will be Buyer's sole remedy, and Seller's sole obligation, in the event Seller has sold an Ineligible Loan to Buyer.

4.2    Seller's Option to Repurchase Loan.  Seller shall have the right to repurchase any Loan (for an amount equal to Buyer's payment for such Loan, applying the Applicable Percentage to the Unpaid Balance of such repurchased Loan) if Seller determines that there is a pending or threatened lawsuit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to such Loan or a Loan Obligor, and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Loan, or if the account had been sold in error due to previous settlement or fraud.  In the event of such a repurchase, Seller shall notify Buyer of Seller's intent to repurchase such Loan, and upon receipt of such notice, Buyer shall promptly cease all activity on such Loan and execute and deliver a Bill of Sale satisfactory to Seller, assigning all right, title and interest of Buyer in such Loan, without representations or warranties or any kind or character, expressed or implied to Seller.  In addition, Buyer shall cease releasing or compromising the Loan and shall remove its credit reporting (if any) on any repurchased Loan.  Buyer shall forward to Seller all payments collected or received on the Loan after receipt of such notice.

## ARTICLE FIVE

## CERTAIN COVENANTS

5.1    Covenants of Seller.  Seller agrees and covenants with Buyer as follows:

(a)    Documentation.  Seller will comply with its obligations in respect of the retrieval and transmittal of documentation related to the Loan as set forth in Annex I.

5.2    Covenants of Buyer.  Buyer agrees and covenants with Seller as follows:

(a)    Compliance with Law.  In the performance of its collection efforts with respect to the Loans, Buyer agrees that it will comply with all requirements of the Gramm-Leach-Bliley Act and all applicable federal and state Consumer Credit Laws.  In the event Buyer receives a notice from any Governmental Authority that it is being investigated for, or is a defendant in any administrative, civil or criminal action alleging, violations of any federal or state Consumer Credit Law in reference to Loans sold as covered in this Agreement as described on Annex I, Buyer will promptly, and in any event within 10 days after receipt of such notice, notify Seller that such investigation or action has been initiated.  Buyer will provide Seller with details of the allegations made and of Buyer's intended response thereto, and will keep Seller

11

UNSEALED

App. 0827

NCA_PA000861

apprised of the progress of such investigation or action during the time it is pending. Notwithstanding any contrary provision of this Agreement, under no circumstances whatsoever shall Buyer institute or maintain any administrative, civil or criminal action or proceeding against any Loan Obligor, nor shall Buyer (or any Person acting or purporting to act on behalf of Buyer) threaten to institute any such administrative, civil or criminal action or proceeding with respect to any Loan.

(b)    Use of Seller's Name.

(i)    After the Closing, Buyer may notify the Loan Obligors on each of the Loans that Buyer has purchased such Loan and may direct such Loan Obligors to remit payments to Buyer; however, Buyer will not use the name of Seller in connection with the operation of its collection of Loans, including, but without limitation, on checks, drafts, letters, and forms, except to identify Seller as the transferor of the Loans as the Person whose extension of credit gave rise to the creation of the Loans, in the body of any correspondence with any Loan Obligor.

(ii)    Buyer will not use the name of Seller in any way in the operation of its collection of the Loans, including, but not limited to, checks, drafts, letters, and forms, except that Seller will permit Buyer to refer to a purchased Loan in the body of a collection letter as a Loan purchased from Seller.

(c)    Furnishing Information to Major Credit Bureaus.  Buyer has the right to report a Loan Obligor's delinquency on a Loan to a consumer reporting agency, including the three major credit bureaus (i.e., Experian, Trans Union, Equifax).

(d)    Use of Seller's Name.  Buyer may use the name of Seller only for the purpose of accurately describing the source of a Loan Obligor's debt obligation.

(e)    Notification of Loan Obligors and Third Parties.  Buyer shall notify a Loan Obligor in writing that the Loan Obligor's Loan has been sold to Buyer.  The written notification must include balance of the debt and the address to which the Loan Obligor must remit payments to avoid further collection activity.

(f)    Referrals of Inquiries.  After the Closing, Buyer will handle any and all inquiries from Loan Obligors directly and will not under any circumstances refer any Loan Obligor to Seller in regard to any such inquiry.

(g)    Loan Information.  Upon Seller's request, from time to time, Buyer will provide Seller with information with respect to specific Loan needed by Seller to reconcile Seller's accounting records with respect to such Loan(s), provided that such information is reasonably available to Buyer and such request is made within one year after the Closing Date.

(h)    Confidentiality of Proprietary Information.  Prior to the Closing, Buyer acknowledges that all Proprietary Information remains the property of Seller and, accordingly, Buyer agrees: (i) to hold all Proprietary Information in strict confidence; (ii) not to disclose, or permit the disclosure of, any Proprietary Information to any Person (other than to employees of Buyer who have a bona fide "need to know"); and (iii) not to use any Proprietary Information for

12

UNSEALED

App. 0828

NCA_PA000862

any purpose other than purposes related to this Agreement and the transactions contemplated by this Agreement. If the Closing does not occur, regardless of the reason, Buyer promptly (and in any event within five Business Days after the designated Closing Date) will return to Seller, at Buyer's expense, any and all tangible Proprietary Information in Buyer's possession. In the event of a Breach of this Section 5.2(h) by Buyer, Seller will be entitled to injunctive relief.

## ARTICLE SIX

## CONDITIONS PRECEDENT

6.1    Conditions Precedent to Obligations of Buyer.  The obligations of Buyer with respect to actions to be taken at the Closing are subject to the satisfaction, or waiver by Buyer, at or prior to the Closing of all the following conditions:

(a)    Representations and Warranties; Performance of Obligations.  All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Seller on or before the Closing Date, including the obligations of Seller under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)    No Litigation.  No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby, and no applicable Governmental Authority shall have taken any other action or made any request of Buyer as a result of which Buyer reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)    Compliance with Laws.  The purchase and sale of the Loans pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

6.2    Conditions Precedent to Obligations of Seller.  The obligations of Seller with respect to actions to be taken at the Closing are subject to the satisfaction, or waiver by Seller, at or prior to the Closing of the following conditions:

(a)    Representations and Warranties; Performance of Obligations.  All of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Buyer on or before the Closing Date, including the obligations of Buyer under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)    No Litigation.  No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby and no Governmental Authority shall have taken any other action or made any request of Seller as a result of which Seller reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)    Compliance with Laws.  The purchase and sale of the Loans pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

13

UNSEALED

App. 0829

NCA_PA000863

(d) <u>Consent of Sale</u>. All Parties shall consent to the sale from the Seller to Buyer of the Loans by signing below.

<h1 style="text-align:center">ARTICLE SEVEN</h1>

<h2 style="text-align:center">INDEMNIFICATION</h2>

7.1     **Buyer's Indemnification of Seller.  Buyer shall indemnify and hold Seller, and its Affiliates, and their respective predecessors, successors, owners, managers, assigns, officers, directors, employees, agents, and attorneys (collectively, the "Seller Indemnified Parties") harmless from and against any and all claims, actions, suits, or other actual or threatened proceedings (collectively "Actions"), and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel)(collectively "Losses") incurred or suffered by any Seller Indemnified Party, in either case as a result of, in connection with or arising out of: (i) any breach by Buyer of any representation, warranty or covenant made by it pursuant to the terms of this Agreement; or (ii) any action taken by or on behalf of Buyer in connection with any Loan (except to the extent any such Action or Loss arises out of a breach by Seller of any representation or warranty hereunder), including, without limitation, by reason of the gross negligence or willful misconduct of Buyer (or its Affiliates, employees or agents), or the violation of any applicable Law or any covenant made by Buyer in <u>Section 5.2</u> of this Agreement by Buyer.**

7.2     **Seller's Indemnification of Buyer.   Seller agrees to, and does hereby, (a) extend and assign to Buyer any and all Rights to indemnification that Seller has against the Originating Creditor and/or any other Person who is a prior owner of the Loans, and (b) indemnify and hold Buyer, its Affiliates, predecessors, successors, assigns, officers, directors, employees, agents, and attorneys harmless from and against any claims, actions, suits, or other actual or threatened proceedings, and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) incurred or suffered by Buyer by reason of the gross negligence, willful misconduct, or material violation of any applicable Law by Seller (or its Affiliates, employees, or agents) in connection with any Breach by Seller.**

7.3     <u>Limitation of Liability</u>.  Buyer acknowledges and agrees that neither Buyer nor any future holder of any Loan, nor their respective successors and assigns, shall have any claim, remedy, or Right to proceed (at Law or in equity) against Seller for any deficiency or other sum owing on any Loan, and Buyer hereby waives and releases any liability of Seller for and on account of such indebtedness or liability.

7.4     <u>Payable on Demand</u>.  Any amounts due to Buyer or Seller under <u>Article Seven</u> of this Agreement shall be payable on demand.

7.5     <u>Notice and Cooperation</u>.  Buyer or Seller shall notify each other within ten (10) Business Days after receiving actual knowledge of an event that triggers or may trigger indemnification obligations under this Agreement.  Notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of the

<div style="text-align:center">14</div>

UNSEALED

NCA_PA000864

amount of the liability arising there from. The party claiming indemnification will cooperate with the other party's insurance carrier, as reasonably requested by the party or the insurance carrier.

7.6 Defense. In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a party to this Agreement, the indemnifying party shall have the right, at its option, at its expense and with its own counsel, which counsel shall be reasonably satisfactory to the indemnified party, to assume the defense of any such claim or litigation or participate in the compromise thereof. If it chooses to so assume the defense of any such claim, the indemnifying party shall promptly notify the indemnified party of its intention to do so, and the indemnified party shall cooperate fully with the indemnifying party and its counsel in the defense against or compromise of any such claim or litigation. Notwithstanding anything in this Article Seven to the contrary, the indemnified party shall not compromise or settle any such claim or litigation without the prior written consent of the indemnifying party, which consent will not be unreasonably withheld.

## ARTICLE EIGHT

## MISCELLANEOUS

8.1 Governing Law. THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED UNDER THE LAWS OF THE CHIPPEWA CREE AND, TO THE EXTENT APPLICABLE, THE LAWS OF THE UNITED STATES OF AMERICA. THESE LAWS SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT.

8.2 Remedies Cumulative. No right or remedy conferred upon or reserved to Buyer or Seller under this Agreement is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to every other right or remedy granted there under or now or hereafter existing under any applicable law. Every right and remedy granted by this Agreement or by applicable Law to Buyer or Seller may be exercised from time to time and as often as may be deemed expedient by Buyer and Seller and, unless contrary to the express provisions of this Agreement, irrespective of the occurrence or continuance of any default or breach hereunder.

8.3 Entirety and Amendments. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. This Agreement may be amended or modified only in writing executed by Seller and Buyer.

8.4 Notices. Any notice or other communication hereunder must be in writing to be effective and shall be deemed to have been given when personally delivered to Buyer or Seller or, if mailed, on the third day after it is enclosed in an envelope and sent certified mail/return receipt requested in the United States mail. Either party may from time to time change its address for notification purposes by giving the other party written notice of the new address and the date upon which it will become effective. The address for each party for notices hereunder is

UNSEALED

NCA_PA000865

the address set forth. Unless otherwise specified in a notice in writing sent or delivered in accordance with the foregoing provisions of this Section 8.4, notices, demands, instructions and other communications shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective facsimile number) indicated below.

| If to Seller to: | Neil Rosette, CEO<br>Plain Green, LLC<br>P.O. Box 126<br>11275 US Highway 87, Suite 500<br>Box Elder, MT 59521 |
|---|---|
| If to Buyer: | Brad Hochstein CEO<br>National Credit Adjusters, LLC<br>327 West 4th<br>Hutchinson, KS 67501 |
| Copy to: | Kevin Emmerich, Legal Section<br>National Credit Adjusters, LLC<br>327 West 4th<br>Hutchinson, KS 67501 |

8.5    Expenses. Except as otherwise provided herein, each party hereto shall bear the expenses (including attorney's fees) it incurs in connection with the negotiation, execution, and performance of this Agreement.

8.6    Assignability; Binding Nature. This Agreement is binding upon Seller and Buyer and their respective successors, heirs, and assigns. The Rights and obligations of Seller hereunder may be assigned by Seller to any Person at any time in Seller's discretion. Buyer may not assign any Rights or delegate any duties to any Person, or sell, transfer, or assign any Loans to any Person, without the prior written consent of Seller (which shall not be unreasonably withheld) in order for Seller to confirm that Person conducts its operations in accordance with the Federal Fair Debt Collection Practices Act and/or applicable State regulations and laws. Any assignment or delegation by Buyer without such prior written consent will be null and void. If Seller consents to Buyer's assignment of any Loans to another Person, the subsequent purchaser or assignee will be restricted from any further assignment of Loans acquired by such Person without Seller's prior written consent (which shall not be unreasonably withheld), and each such subsequent purchaser or assignee must execute and deliver an acknowledgment of such restrictions acceptable to Seller as a condition to the effectiveness of Seller's consent. The foregoing notwithstanding, nothing contained in this Section 8.6 is intended to restrict or prohibit Buyer from (a) selling, transferring, or assigning any Loans to any Affiliate of Buyer or (b) referring any Loan(s) for collection by third-party collectors, provided that this Agreement is complied with in all respects in any such event, including, but not limited to, obtaining Seller's consent for said transfer.

8.7    Severability. If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable, or void, so that both Seller and Buyer would be relieved of all obligations arising under such provision, it is the agreement of Seller and Buyer

16

UNSEALED

NCA_PA000866

that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent. If such amendment is not possible, another provision that is legal and enforceable and achieves the same objective shall be substituted therefore. If the remainder of this Agreement is not affected by such declaration or finding and is capable of substantial performance by both Seller and Buyer, then the remainder shall be enforced to the extent permitted by law.

8.8    Survival of Terms.  Subject to the limitations and other provisions of this Agreement: (a) the terms and agreements set forth in Articles Two, Four, Five, Seven, and Eight shall survive the Closing and the termination of this Agreement regardless of the reason; and (b) the representations and warranties of Seller and Buyer set forth in Article Three shall survive the Closing and shall remain in effect for a period of two years after the Closing Date.

8.9    Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original for all purposes and all of which constitute, collectively, one agreement; but, in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

8.10    Waivers.  Neither the waiver by Seller or Buyer of any breach of or default under any provision of this Agreement by the other party, nor the failure of Seller or Buyer, on one or more occasions, to enforce any provision of this Agreement or to exercise any Right hereunder, shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provision or Right hereunder.

8.11    Execution by Facsimile.  The manual signature of either party hereto that is transmitted to the other party by facsimile shall be deemed for all purposes to be an original signature.  Either party that delivers a signature page by facsimile agrees to deliver an original manually signed counterpart of such party's signature page to the party who requests it promptly after receipt of such request.

8.12    No Third-Party Beneficiary.  This Agreement is for the sole benefit of the parties hereto, and nothing contained in this Agreement shall be construed to grant any Person, other than Seller and Buyer and their respective successors and permitted assigns, any Right under or in respect of this Agreement or any provision hereof.

8.13    Relationship between Seller and Buyer.  Nothing in this Agreement is intended to or shall be construed to constitute or establish, as between Seller and Buyer, a partnership, joint venture, agency, or fiduciary relationship of any kind, to create the relationship of employer-employee or principal-agent, or to otherwise create any liability for either Seller or Buyer with respect to any indebtedness, liabilities, or obligations of the other or of any other Person. Moreover, under no circumstances will either Seller or Buyer have the authority or power to bind the other party to any agreement or contract.

8.14    Right to Equitable Relief.  Buyer and Seller acknowledge that should Buyer breach the covenant of Buyer in Section 5.2(b) of this Agreement or if Seller breaches Section 3.1 of this Agreement, money damages may be an inadequate remedy to Seller or Buyer and, in

17

UNSEALED

NCA_PA000867

such event, Seller or Buyer may seek such equitable relief and Buyer and Seller agree that such relief is appropriate and warranted.

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Loan Sale Agreement to be executed by its duly authorized representative effective as of the Effective Date.

BUYER:                                              SELLER:

NATIONAL CREDIT ADJUSTERS, LLC          PLAIN GREEN, LLC

By: _____          By: _____
Brad Hochstein, Chief Executive Officer          Neal Rosette, Chief Executive Officer


THE FOLLOWING ATTACHMENTS TO THIS AGREEMENT
ARE A PART OF THIS AGREEMENT FOR ALL PURPOSES:

Annex I – Additional Terms and Conditions

Exhibit A – Assignment and Bill of Sale

18

UNSEALED

NCA_PA000868

Additional Terms and Conditions

1.  Description of Loans:

    Loans with a Charge off date of prior to November 30, 2011 - $17,977,622.32 - Loans 12,232

2.  Number of Loans: 12,232

3.  Aggregate Unpaid Balance of all Loans: $17,977,622.32

4.  Applicable Percentage (Purchase Rate): 7.0%

5.  Purchase Price: $1,258,434.00

6.  Cut-Off Date: December 13, 2011

7.  Wiring Instructions:

    | | |
    |---|---|
    | Bank Name: | Wells Fargo Bank, N.A. |
    | | 420 Montgomery Street |
    | | San Francisco, CA 94104 |
    | ABA (Routing Number): | 121000248 |
    | Credit Bank Account Name: | Plain Green, LLC Collection |
    | Credit Bank Account Number: | 4124209008 |

8.  Ineligible Loan. Bankrupt Loans, Deceased Loans, Paid/Settled In Full Loans and Forgery/Fraud Loans are referred to collectively herein as "Ineligible Loan."

    a.  Bankrupt Loans. A "Bankrupt Loan" is a Loan that, at the Cut-Off Date, the relevant Loan Obligor is a debtor in a case under the Bankruptcy Code or has filed a case under the Bankruptcy Code, which has resulted in the discharge of such Loan Obligor's obligations to Seller. If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be debtors in bankruptcy or have filed in order for the Loan to be a Bankrupt Loan.

    b.  Deceased Loans. A "Deceased Loan" is a Loan that, as of the Cut-Off Date, the Loan Debtor with respect to which is deceased.

Annex I-1

UNSEALED

App. 0835

NCA_PA000869

c.    If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be deceased as of the Cut-Off Date in order for the Loan to be a Deceased Loan. Verification must be provided.

d.    Paid in Full /Settled in Full Loans: is a Loan that, as of the Cut-Off Date, has been paid or settled in full. Verification of payment/settlement must be provided.

e.    Forgery/Fraud Loans: is a Loan that was created prior to the Cut-Off Date as a result of forgery or fraud. Verification must be provided by fraud or forgery affidavit.

Notwithstanding the foregoing, in no event shall any Loan be deemed to be an Ineligible Loan unless Buyer is able to provide the following relevant documents (the "Verification Documents") to verify the circumstances causing such Loan to be an Ineligible Loan:

i.    For a Bankrupt Loan, Buyer shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

ii.    For a Deceased Loan, Buyer shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Loan Obligor information, a credit bureau report showing the relevant Loan Obligor as deceased, or a copy of the relevant newspaper obituary.

iii.    For a Paid/Settled In Full Loan, Buyer shall provide written evidence that the Loan has been paid or settled in full.

iv.    For a Forgery/Fraud Loan, Buyer shall provide a copy or original of a fraud or forgery affidavit.

9.    <u>Loan Documentation</u>: Seller shall deliver to Buyer an electronic copy of all original loan documents within 45 days of the Closing Date.

10.    <u>Recourse Procedures</u>: If, at any time during the period commencing on the Closing Date and ending 90 days later (the "<u>Recourse Period Termination Date</u>"), Buyer identifies any Loan in the Loan Pool that Buyer determines is an Ineligible Loan:

a.    Buyer shall provide to Seller (according to such instructions as Seller from time to time may give to Buyer) a description of such Loan (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

b.    No later than ten (10) days after Seller confirms (through its examination of the Verification Documents) that such Loan is an Ineligible Loan, Seller shall pay to Buyer an amount equal to: (i) the Unpaid Balance of such Ineligible Loan as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage.

<div align="center">Annex I-2</div>

NCA_PA000870

c. Seller shall promptly notify Buyer if, based on its examination of any Verification Document, it concludes that a Loan designated by Buyer as an Ineligible Loan does not meet the requirements of an Ineligible Loan, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Buyer in connection with any Ineligible Loan the Verification Documents with respect to which Seller receives from Buyer after the Recourse Period Termination Date; or (ii) shall Buyer provide to Seller information or Verification Documents regarding Ineligible Loan more than one (1) time in any calendar month.

Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

Executed as of December 13, 2011.

BUYER:                                    SELLER:

NATIONAL CREDIT ADJUSTERS, LLC            PLAIN GREEN, LLC

By: _____              By: _____
Brad Hochstein, Chief Executive Officer      Neal Rosette, Chief Executive Officer

UNSEALED

App. 0837

NCA_PA000871

# EXHIBIT A

## ASSIGNMENT AND BILL OF SALE

Plain Green, LLC ("Seller"), a limited liability company organized under the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation of Montana, has entered into a Loan Sale Agreement, dated December 13, 2011 (the "Agreement") for the sale of certain Loans listed in the Loan Listing, to National Credit Adjusters, LLC a Kansas LLC, ("Buyer"), upon the terms and conditions set forth in the Agreement.

NOW, THEREFORE, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Loans listed in the Loan Listing, provided, however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement.

Capitalized terms not otherwise defined herein shall be as defined in the Agreement.

This instrument shall be binding upon Seller, Seller's successors and assigns, and shall inure to the benefit of Buyer and Buyer's successors and assigns.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument on the 13th day of December, 2011.

SELLER:

PLAIN GREEN, LLC

By: _____

Neal Rosette, Chief Executive Officer

Exhibit A-1

UNSEALED

App. 0838

NCA_PA000872

## LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT is entered into effective as of February 27, 2012 (the "Effective Date"), by and between National Credit Adjusters, LLC a Kansas LLC, ("Buyer"), and Great Plains Lending, LLC, a business entity duly organized under and recognized by the laws of the Otoe-Missouria Tribe of Indians ("Seller" or the "Tribe").

### RECITALS:

A.    Seller originated and is the owner of certain installment consumer loans, and Seller desires to sell to Buyer certain of such loans that are at least 120 days delinquent and that are to be more fully identified on each Sale File to be provided for each related monthly Closing indicated in the relevant Annex I.

B.    Buyer desires to purchase such loans from Seller on a monthly basis, all in accordance with the terms and subject to the conditions contained in this Agreement and the relevant Annex I.

### AGREEMENT

THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement and for other good and valuable consideration, the adequacy of which the parties hereby acknowledge, Seller and Buyer agree as follows:

### ARTICLE ONE

### DEFINITIONS AND TERMS

1.1    Definitions.  For purposes of this Agreement, the following terms are defined as set forth in this Section 1.1 or in the provisions of this Agreement to which reference is made in this Section 1.1.  All references to a Recital, Article, or Section are to a Recital, Article, or Section of this Agreement, unless otherwise indicated, and all references to an Annex or an Exhibit, are to an Annex or an Exhibit attached to and made a part of this Agreement, unless otherwise indicated.

Affiliate means, when used with reference to a specified Person, any other Person who directly controls, is controlled by, or is under common control with, the specified Person.  For purposes of this definition, *"control"* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person that is a corporation, limited liability company, partnership, trust, or other entity, whether through ownership of voting securities or interests, by contract, or otherwise.

Agreement means this Loan Sale Agreement, including all Annexes and Exhibits, as it may be renewed, extended, restated, amended, or supplemented from time to time.

Applicable Percentage has the meaning given such term in the applicable Annex I.



EXHIBIT

9-78

PENGAD 800-631-6989

NCA_PA000902

UNSEALED

App. 0839

Assignment and Bill of Sale means an assignment and bill of sale in the form of Exhibit A, executed by Seller and delivered to Buyer evidencing the sale of each Loan Pool sold hereunder.

Bankruptcy has the meaning given such term in Annex I.

Bankruptcy Code means the Bankruptcy Code of the United States, as existing as of the Effective Date or thereafter amended.

Breach means, as to any representation, warranty, covenant, obligation, liability, or other provision made by or binding on Seller or Buyer under this Agreement, the occurrence of any inaccuracy in, breach of, or failure to comply with, such representation, warranty, covenant, obligation, liability, or other provision by Seller or Buyer, as applicable.

Business Day means every day on which commercial banks in the State of Oklahoma are open for business.

Buyer has the meaning given such term in the initial paragraph of this Agreement.

Charged-Off Loan means a Loan receivable the Unpaid Balance of which has been charged-off by the Originating Creditor as uncollectible in accordance with the usual and customary practices of such Originating Creditor and in accordance with applicable United States federal Laws.

Closing means the consummation of a Loan purchase and sale transaction between Buyer and Seller, as contemplated by this Agreement

Closing Date means the date on which Buyer purchases a Loan Pool by completing all conditions precedent to closing, as described herein.

Consumer Credit Laws means the United States federal Fair Debt Collection Practices Act, the Fair Credit Reporting Act, all other United States federal and state laws that pertain to the collection of consumer credit obligations, and Tribal Laws that pertain to the extension of consumer credit.

Cut-Off Date related to the purchase of a particular Loan Pool means the date indicated in the applicable Annex I.

Debtor Relief Law means the Bankruptcy Code and any other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Law from time to time in effect affecting the Rights of creditors generally.

Effective Date has the meaning given such term in the initial paragraph of this Agreement.

NCA_PA000903

UNSEALED

Governmental Approval means an approval, authorization, consent, permit, license, concession, grant, waiver, or exemption of, registration, designation, declaration, or filing with, or report or notice to, any Governmental Authority.

Governmental Authority means any nation, tribal sovereign nation or government, any state, county, city, municipality, or other political subdivision thereof, and any entity exercising executive, legislative, judicial, police, regulatory, or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission, or instrumentality of any of the foregoing, and any tribunal, court, or arbitrator (including any private arbitration board or panel) of competent jurisdiction.

Gramm-Leach-Bliley Act means the United States federal Gramm-Leach-Bliley Act, as existing as of the Effective Date or thereafter amended.

Ineligible Loan has the meaning given such term in Annex I.

Knowledge of any particular fact or other matter means, (a) as to any natural Person, that such natural Person has actual knowledge of such fact or other matter, and (b) as to any Person other than a natural Person, that an individual who is serving, or who at any time has served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter. For purposes of this definition, *"actual knowledge"* of any particular fact or other matter means, as to a natural Person, that such Person is actually aware of such fact or other matter.

Law means any applicable statute, law, Tribal Law, treaty, ordinance, rule, regulation, order, writ, injunction, decree, judgment, or opinion of any Governmental Authority.

Lien means any lien, security interest, mortgage, pledge, adverse claim, title defect, title retention agreement, voting trust agreement, property settlement or marital dissolution agreement, preemptive right, right of first refusal, or other interest, equity, option, restriction, encumbrance, or charge of any kind.

Litigation means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party.

Loan means an installment loan originated by Seller that is offered for sale pursuant to the terms of this Agreement which in each case (a) is described on an Annex I hereto, (b) has an outstanding balance as of the Cut-Off Date as set forth in such Annex I, (c) is owed by one or more Borrowers, and (d) is owned by Seller as of the applicable Cut-Off Date.

Loan Document means any agreement, instrument, or other document evidencing, or delivered in connection with, a Loan and in the possession or within the control of Seller, including, but without limitation, (a) any consumer credit agreement, any installment purchase or sale agreement, any loan or credit agreement, any promissory note, any guaranty, any security or pledge agreement, any invoice or request for payment, and any other document (regardless of how styled) related to the collection of a Loan, and (b) any hard copy evidencing or describing a Loan and/or the Unpaid Balance thereof, together with any renewal, extension, or restatement of,

3

UNSEALED

NCA_PA000904

or amendment or supplement to, any of the foregoing agreements, instruments, or other documents.

Loan Listing means a listing (in a mutually agreed-upon electronic format) of the Loans in a particular Loan Pool, which listing shall include such basic information regarding the Loans as is customary for transactions such as the transactions contemplated by this Agreement, including, by way of example, the Loan Obligor information obtained by the lender in connection with originating each Loan, and the Unpaid Balance of each Loan as of the Cut-Off Date.

Loan Obligor means any Person who, directly or indirectly, is obligated for the payment of all or any portion of any Loan.

Loan Pool means the group of Loans sold by Seller to Buyer as part of a particular Closing pursuant to the terms of this Agreement and the applicable Annex I consisting of those Loans listed in the electronic Loan Listing delivered by Seller to Buyer pursuant to Section 2.3, as will be documented by an Assignment and Bill of Sale and will be identified by a control number.

Material Litigation means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party that, according to generally accepted accounting principles, is considered significant to Buyer's or Seller's financial condition.

Order means any order, award, decision, decree, injunction, judgment, ruling, subpoena, or verdict issued, made, or rendered by any applicable Governmental Authority.

Originating Creditor means the Seller.

Person means any individual, corporation, partnership, joint venture, Limited Liability Company, trust, Governmental Authority, or other entity.

Proprietary Information means the Loan Documents and all information included therein, together with all other information concerning the Loans and/or the Loan Obligors provided to or obtained by Buyer prior to the Closing.

Purchase Price for a particular Loan Pool has the meaning given such term in the applicable Annex I.

Right means any legal or equitable right, remedy, power, privilege, or benefit.

Seller has the meaning given such term in the initial paragraph of this Agreement.

Tax means any tax, charge, fee, levy, or other assessment levied or charged by a Governmental Authority.

NCA_PA000905

UNSEALED

App. 0842

Tribal Law means mean any law or regulation duly enacted by the Otoe-Missouria Tribe of Indians.

Unpaid Balance means, as to any Loan, the total outstanding unpaid balance thereon at the Cut-Off Date, as shown on Seller's books and records (including all amounts due in respect of purchases, cash advances, late fees, return check charges, over limit fees, and all other applicable fees and charges).

1.2    Number and Gender of Words.  Whenever in this Agreement the singular number is used, the same shall include the plural where appropriate and *vice versa*, and words of any gender shall include each other gender where appropriate.

## ARTICLE TWO

## PURCHASE AND SALE OF THE LOANS

2.1    Agreement of Purchase and Sale.  Upon the terms and subject to the conditions contained in this Agreement and based upon the representations, warranties, and agreements of Buyer and Seller as contained herein, Buyer agrees to purchase Loans from Seller in multiple Closings occurring from time to time, and Seller agrees to sell the Loans to Buyer, on the applicable Closing Date for such sale.  The Loans will be sold to Buyer by Seller free and clear of any Liens created by the actions or inactions of Seller or any Affiliate of Seller; and, in conjunction with the sale of the Loans to Buyer, on each applicable Closing Date, Seller will transfer, sell, assign, and convey to Buyer all of Seller's Rights in, to, and under the Loan Documents.  All Loan purchases and sales hereunder shall be described on an Annex I, all of which shall take the form of Annex I attached hereto.

2.2    Purchase Price.  The Purchase Price to be paid by Buyer to Seller for the Loans purchased at any Closing shall be as set forth in the applicable Annex I.  The aggregate Purchase Price shall be determined by multiplying the total Unpaid Balances of all the Loans by the Applicable Percentage, as set forth in the applicable Annex I.  Buyer will pay the Purchase Price for each Loan Pool as set forth in the applicable Annex I for such Loan Pool.  The Purchase Price is to be paid in funds available for immediate use by Seller by (i) delivery of a cashier's check or money order in the amount of the payment due or (ii) by wire transfer of the amount of the payment due in accordance with instructions provided by Seller to Buyer.

2.3    Closing.  Each Closing of the purchase and sale of a Loan Pool pursuant to this Agreement will be effected on the Closing Date described in the applicable Annex I.  On or prior to each Closing Date, the following actions will be taken by Seller and Buyer:

(a)    Buyer will pay the full Purchase Price, in accordance with the applicable Annex I;

(b)    Seller will execute and deliver the Assignment and Bill of Sale in favor of Buyer with respect to the Loan Pool that is the subject of the Annex I; and

(c)    Seller will deliver to Buyer the Loan Listing.

5

NCA_PA000906

UNSEALED

The obligations of Buyer and Seller to complete each Closing are subject to the conditions precedent set forth in Article Six.

2.4     Payments Received.     If Seller or any servicing agent receives any credits, payments or other consideration distributed or paid by or on behalf of any Loan Obligor with respect to any Loan prior to or on the Cut-Off Date, Seller shall be entitled to accept such payments and (if necessary) adjust the Unpaid Balance of such Loan reflected on the Loan Listing.     If Seller or any servicing agent shall receive any credits, payments or other consideration distributed or paid by or on behalf of any Loan Obligor with respect to any Loan after the Cut-off Date, Seller shall promptly pay over and/or deliver such payments to Buyer. Any such remittances will be made by regular United States mail, unless otherwise requested by Buyer (in which case Buyer will reimburse Seller for all costs incurred by Seller in connection with the transmittal of such remittance.).     If Buyer or any servicing agent shall receive any credits, payments or other consideration on any account and a Loan Obligor, which is not a Loan sold pursuant to this Agreement, Buyer shall promptly pay over and/or deliver such payments to Seller within 10 days of receipt.

2.5     Warranty and Limitation of Liability.     SELLER WARRANTS TO BUYER THAT IT WILL SELL, ASSIGN, TRANSFER, AND CONVEY TO BUYER ALL OF SELLER'S RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER THE LOANS AND THE LOAN DOCUMENTS.     EXCEPT FOR SUCH WARRANTY AND FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN SECTION 3.1, THE LOANS ARE BEING SOLD "AS IS" AND "WITH ALL FAULTS," AND SELLER DOES NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY CONCERNING THE LOANS AND/OR THE LOAN DOCUMENTS, INCLUDING, BUT WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR COLLECTIBILITY OF THE LOANS, OR ANY OTHER REPRESENTATION OR WARRANTY, AND SELLER SPECIFICALLY DISCLAIMS ANY OTHER REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE LOANS OR THE LOAN DOCUMENTS. BUYER ACKNOWLEDGES THAT SUCH LIMITATIONS APPLY TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND FURTHER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS AGREEMENT, THE SALE, ASSIGNMENT, TRANSFER, AND CONVEYANCE OF THE LOANS AND THE LOAN DOCUMENTS WILL BE WITHOUT RECOURSE TO SELLER AND WILL BE SUBJECT IN ALL RESPECTS TO THE LIMITATIONS SET FORTH IN THIS SECTION 2.5.

2.6     Term and Termination.     The initial term of this Agreement shall be 12 months from the Effective Date, provided that on each anniversary of the Effective Date the term of this Agreement shall automatically extend for an additional 12-month period unless a Party provides a notice of non-extension to the other Party at least 30 days prior to the end of the then applicable 12-month period.     This Agreement may be terminated by Buyer and Seller as contemplated by this Section 2.6.  This Agreement and the transactions contemplated hereby may be terminated as follows:

6

NCA_PA000907

UNSEALED

App. 0844

(a)     By the mutual written agreement of Buyer and Seller;

(b)     By Buyer if a Breach of any provision of this Agreement has been committed by Seller and such Breach has not been waived or promptly cured; or

(c)     By Seller if a Breach of any provision of this Agreement has been committed by Buyer and such Breach has not been waived or promptly cured.

2.7     Effect of Termination.  Each party's Right of termination under Section 2.6 is in addition to any other Rights it may have under this Agreement or otherwise, and the exercise of a Right of termination will not be deemed to be an election of remedies.  If this Agreement is terminated pursuant to Section 2.6, all further obligations of the parties under this Agreement will terminate, except as provided in Section 8.8; provided, however, that if this Agreement is terminated by either party because of the Breach of this Agreement by the other party, or because one or more conditions of the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's Right to pursue all legal or equitable remedies will survive such termination unimpaired.

2.8     Payment on Loans.  Subject to the limitations and conditions described in this Agreement, Seller authorizes Buyer to accept, endorse in Buyer's name for the sole purpose of depositing funds, and deposit any payments into Buyer's account that it receives on Loans for so long as Buyer retains the right to collect such Loan.

## ARTICLE THREE

## REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of Seller.  On and as of the Effective Date hereof Seller represents and warrants to Buyer, and on and as of each Closing Date hereafter Seller will represent and warrant to Buyer as follows:

(a)     Title to Loans.  Seller owns good and marketable title to the Loans, and has obtained all consents necessary to transfer title to the Loans free and clear of all Liens.

(b)     Authorization by Seller.  The execution and delivery of this Agreement by Seller and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite actions of Seller, and this Agreement has been duly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to the application of Debtor Relief Laws. Seller has full power, capacity, and authority to execute and deliver this Agreement and the Assignment and Bill of Sale.  In addition, to its knowledge, Seller has obtained all licenses and approvals, if any, as required under Tribal Law to carry on its business as now conducted insofar as Seller's business relates to Seller's ownership of the Loans or the sale thereof to Buyer, and all such licenses and approvals are in full force and effect.

(c)     Organization, Existence, and Good Standing of Seller.  Seller is an entity duly organized, validly existing, and in good standing under the laws of the Tribe with all

7

**UNSEALED**

App. 0845

NCA_PA000908

requisite company power and authority to own, lease, and operate its properties, to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby.

(d) No Conflicts. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the organizational documents of Seller, any Tribal Law, rule or regulation applicable to Seller, any agreement or other document to which Seller is a party or by which it or any of its property is bound, or any Order that affects or binds Seller. No Governmental Approval, and no consent or approval of any other Person is required on the part of Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(e) Litigation. There is no actual pending Material Litigation (i) that has been commenced by or against Seller that relates to or may affect Seller's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement or the transactions contemplated hereby. To the Knowledge of Seller, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(f) Compliance with Laws. To the Knowledge of Seller, (i) Seller has complied with and is in compliance in all material respects with each Law that is or was applicable to Seller in respect of the ownership or use of the Loans, and (ii) Seller has not received any notice or other communication (whether written or oral) from any applicable Governmental Authority or any other Person regarding (y) any actual, alleged, or potential violation of, or failure to comply with, any applicable Law in respect of, or affecting, Seller's ownership of the Loans or the sale thereof to Buyer, or (z) any actual, alleged, or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action in respect of, or affecting, Seller's ownership of the Loans or the sale thereof to Buyer.

(g) Loans. To the Knowledge of Seller, each Loan was made for valuable consideration and represents the enforceable obligation of the Loan Obligors obligated therefore, except as limited by Debtor Relief Laws.

(h) Loan Obligors. No Loan Obligor has initiated any Litigation against Seller in respect of the Loan for which such Loan Obligor is liable, and, to the Knowledge of Seller, no Loan Obligor has any enforceable Rights of set-off, counterclaim, cancellation, or claim that such Loan suffers from lack of consideration, forgery, or alteration of the Loan Obligor's signature, except as otherwise disclosed in the Loan Documents pertaining to such Loan.

(i) Unpaid Balances. The amount reflected as the Unpaid Balance of each Loan in the Loan Documents is the amount of the Unpaid Balance represented to Buyer at the time of its acquisition from Seller of the Loan, less any payments received by Seller prior to Cut-

8

NCA_PA000909

UNSEALED

Off Date; but otherwise Seller makes no warranty as to the accuracy of the Unpaid Balance of each Loan as reflected in the Loan Documents.

3.2    Representations and Warranties of Buyer. On and as of the Effective Date hereof Buyer represents and warrants to Seller, and on and as of each Closing Date hereafter Buyer will represent and warrant to Seller as follows:

(a)    Authorization by Buyer. The execution and delivery of this Agreement by Buyer and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or other actions of Buyer, and this Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject only to the application of Debtor Relief Laws. Buyer has full corporate or other power, capacity, and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Buyer as contemplated by this Agreement. In addition, Buyer possesses all Governmental Approvals, if any, required to carry on its business as now conducted insofar as Buyer's business relates to the collection of accounts receivable such as (and including) the Loans, or the purchase and collection of the Loans, and all such Governmental Approvals are in full force and effect.

(b)    Organization, Existence, and Good Standing of Buyer. Buyer is duly organized, validly existing, and in good standing under the Laws of the State of Kansas with all requisite power and authority to own, lease, and operate its properties and to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby. Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of business transacted by it or properties owned or leased by it requires such qualification and in which the failure to do so would have a material adverse effect on its ability to perform its obligations under this Agreement or the enforceability thereof.

(c)    No Conflicts. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer, any resolution adopted by the shareholders or the board of directors (or other constituent group) of Buyer, or any mortgage, indenture, lease, loan or credit agreement, or other contract, applicable Law, or Governmental Approval applicable to Buyer, or any of the properties of Buyer, or any Order which affects or binds Buyer. No Governmental Approval, and no consent or approval of any other Person, is required on the part of Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(d)    Litigation. There is no actual pending Material Litigation (i) that has been commenced by or against Buyer or that otherwise relates to or may affect Buyer's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with this Agreement or the transactions contemplated hereby. To the Knowledge of Buyer, (y) no such

9

UNSEALED

App. 0847

NCA_PA000910

Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(e)    Compliance with Laws. Buyer has complied with and is in compliance in all material respects with, and when performing under this Agreement will comply with each Law that is applicable to Buyer or the purchase, ownership, collection or use of the Loans, including, but without limitation, the Gramm-Leach-Bliley Act and all applicable Consumer Credit Laws.

(f)    Suitability. Buyer has such knowledge and experience in financial, collections, and business matters as to be capable of evaluating the merits and risks of the purchase of the Loan and is, by virtue of having made other investments of a similar nature and/or by reason of its business and financial experience or the business and financial experience of those Persons it has retained to advise Buyer with respect to its purchase of the Loan, a "*sophisticated*" purchaser.

(g)    Ability to Bear Risk. Buyer is in a financial position to hold its interest in the Loan for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of the Purchase Price of the Loan.

(h)    Investigation and Access to Information. Buyer has been given all such access to information regarding the Loans, including, in particular, the risks associated with the collectability (and ultimate collection) of the Loans as it has requested from Seller, and has utilized such access to its satisfaction for the purpose of obtaining information about the Loans. Buyer agrees and represents that the information about the Loans made available to it constitutes an adequate and sufficient basis on which to determine whether and at what price to purchase the Loans. Buyer acknowledges and agrees that (i) it has been solely responsible for its own due diligence investigation of the Loans and the merits or risks of an investment in the Loans, (ii) it is not relying on any investigation conducted or undertaken by any other Person, including Seller or its Affiliates (and their respective directors, officers, and employees) or on any representations or warranties of any other Person other than the representations expressly made by Seller herein, and (iii) it is purchasing the Loans based upon its independent examination, study, inspection and knowledge of the Loans and in reliance on its own determination of the quality, value and condition of the Loans. Buyer expressly acknowledges that, prior to executing and delivering this Agreement, Buyer has been encouraged, invited and directed by Seller (2) to conduct such due diligence review and analysis of the Loans, related information and publicly available records as Buyer deems necessary, proper or appropriate in order to make a complete informed decision with respect to its purchase of the Loans, (2) to consult with legal counsel and such other advisors as Buyer believes desirable, and (c) to ask such questions of Seller concerning the Loans as Buyer desires to ask, and Buyer has undertaken all of the foregoing tasks.

(i)    Acknowledgement of Risks. The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities." Buyer understands that an investment in the

10

UNSEALED

NCA_PA000911

Loan is speculative and involves a high degree of risk and that Buyer must be able to withstand, and could sustain, a total loss of Buyer's investment in the Loan.

(j)    Acknowledgement Regarding Documents.  Buyer understands that Seller will not have in its possession all account documents in respect of the Loan that may be desired or requested by Buyer and that the Loan Documents may not include all account documents related to any given Loan; and Buyer acknowledges that Seller's failure to provide any account document that is not included among the Loan Documents will not constitute a Breach on the part of Seller.

(k)    Acknowledgement Regarding Fees.  Buyer warrants, represents, understands and acknowledges that no further fees or costs may be charged or assessed to the Loan or the Loan Obligors for the underling debt (including, but not limited to: NSF, late fees, interest, processing fees, attorney fees, collection costs, etc.). Furthermore, the Loan transferred hereunder are not subject to the provisions of Section 1719 of the California Civil Code and no Loan or Loan Obligor may be required to pay treble damages if the check(s), ACH's or other payment mechanisms are dishonored.

## ARTICLE FOUR

### REPURCHASE OF ACCOUNTS

4.1    Seller's Obligation to Repurchase Loan.

(a)    Ineligible Loan.  Seller will use reasonable efforts to determine that the Loans do not include any Ineligible Loan. If, within the time frame set forth in the applicable Annex I, it is reasonably determined by Buyer that Ineligible Loans were included among the Loans, or Seller determines that a Loan was sold which was an Ineligible Loan at the Closing Date, then Seller and Buyer agree that the terms of the applicable Annex I, Paragraph 10 (Recourse Procedures) shall apply.

(b)    Sole Remedy.  The remedies set forth in the applicable Annex I, Paragraph 10 (Recourse Procedures) will be Buyer's sole remedy, and Seller's sole obligation, in the event Seller has sold an Ineligible Loan to Buyer.

4.2    Seller's Option to Repurchase Loan.  Seller shall have the right to repurchase any Loan (for an amount equal to Buyer's payment for such Loan, applying the Applicable Percentage to the Unpaid Balance of such repurchased Loan) if Seller determines that there is a pending or threatened lawsuit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to such Loan or a Loan Obligor, and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Loan, or if the account had been sold in error due to previous settlement or fraud.  In the event of such a repurchase, Seller shall notify Buyer of Seller's intent to repurchase such Loan, and upon receipt of such notice, Buyer shall promptly cease all activity on such Loan and execute and deliver a Bill of Sale satisfactory to Seller, assigning all right, title and interest of Buyer in such Loan, without representations or warranties

11

**UNSEALED**

App. 0849

NCA_PA000912

or any kind or character, expressed or implied to Seller. In addition, Buyer shall cease releasing or compromising the Loan and shall remove its credit reporting (if any) on any repurchased Loan. Buyer shall forward to Seller all payments collected or received on the Loan after receipt of such notice.

<div align="center">

**ARTICLE FIVE**

**CERTAIN COVENANTS**

</div>

5.1     Covenants of Seller. Seller agrees and covenants with Buyer as follows:

(a)     Documentation. Seller will comply with its obligations in respect of the retrieval and transmittal of documentation related to each Loan as set forth in the applicable Annex I.

5.2     Covenants of Buyer. Buyer agrees and covenants with Seller as follows:

(a)     Compliance with Law. In the performance of its collection efforts with respect to the Loans, Buyer agrees that it will comply with all requirements of the Gramm-Leach-Bliley Act and all applicable federal and state Consumer Credit Laws. In the event Buyer receives a notice from any Governmental Authority that it is being investigated for, or is a defendant in any administrative, civil or criminal action alleging, violations of any federal or state Consumer Credit Law in reference to Loans sold as covered in this Agreement as described on Annex I, Buyer will promptly, and in any event within 10 days after receipt of such notice, notify Seller that such investigation or action has been initiated. Buyer will provide Seller with details of the allegations made and of Buyer's intended response thereto, and will keep Seller apprised of the progress of such investigation or action during the time it is pending. Notwithstanding any contrary provision of this Agreement, under no circumstances whatsoever shall Buyer institute or maintain any administrative, civil or criminal action or proceeding against any Loan Obligor, nor shall Buyer (or any Person acting or purporting to act on behalf of Buyer) threaten to institute any such administrative, civil or criminal action or proceeding with respect to any Loan.

(b)     Use of Seller's Name.

(i)     After the Closing, Buyer may notify the Loan Obligors on each of the Loans that Buyer has purchased such Loan and may direct such Loan Obligors to remit payments to Buyer; however, Buyer will not use the name of Seller in connection with the operation of its collection of Loans, including, but without limitation, on checks, drafts, letters, and forms, except to identify Seller as the transferor of the Loans as the Person whose extension of credit gave rise to the creation of the Loans, in the body of any correspondence with any Loan Obligor.

(ii)     Buyer will not use the name of Seller in any way in the operation of its collection of the Loans, including, but not limited to, checks, drafts, letters, and forms, except that Seller will permit Buyer to refer to a purchased Loan in the body of a collection letter as a Loan purchased from Seller.

<div align="center">12</div>

NCA_PA000913

**UNSEALED**

(c)     Furnishing Information to Major Credit Bureaus.  Buyer has the right to report a Loan Obligor's delinquency on a Loan to a consumer reporting agency, including the three major credit bureaus (*i.e.*, Experian, Trans Union, Equifax).

(d)     Use of Seller's Name.  Buyer may use the name of Seller only for the purpose of accurately describing the source of a Loan Obligor's debt obligation.

(e)     Notification of Loan Obligors and Third Parties.  Buyer shall notify a Loan Obligor in writing that the Loan Obligor's Loan has been sold to Buyer.  The written notification must include balance of the debt and the address to which the Loan Obligor must remit payments to avoid further collection activity.

(f)     Referrals of Inquiries.  After the Closing, Buyer will handle any and all inquiries from Loan Obligors directly and will not under any circumstances refer any Loan Obligor to Seller in regard to any such inquiry.

(g)     Loan Information.  Upon Seller's request, from time to time, Buyer will provide Seller with information with respect to specific Loan needed by Seller to reconcile Seller's accounting records with respect to such Loan(s), provided that such information is reasonably available to Buyer and such request is made within one year after the Closing Date.

(h)     Confidentiality of Proprietary Information.  Prior to the Closing, Buyer acknowledges that all Proprietary Information remains the property of Seller and, accordingly, Buyer agrees: (i) to hold all Proprietary Information in strict confidence; (ii) not to disclose, or permit the disclosure of, any Proprietary Information to any Person (other than to employees of Buyer who have a bona fide "need to know"); and (iii) not to use any Proprietary Information for any purpose other than purposes related to this Agreement and the transactions contemplated by this Agreement.  If the Closing does not occur, regardless of the reason, Buyer promptly (and in any event within five Business Days after the designated Closing Date) will return to Seller, at Buyer's expense, any and all tangible Proprietary Information in Buyer's possession.  In the event of a Breach of this Section 5.2(h) by Buyer, Seller will be entitled to injunctive relief.

## ARTICLE SIX

## CONDITIONS PRECEDENT

6.1     Conditions Precedent to Obligations of Buyer.  The obligations of Buyer with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Buyer, at or prior to each such Closing of all the following conditions:

(a)     Representations and Warranties; Performance of Obligations.  All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the applicable Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Seller on or before the applicable Closing Date, including the obligations of Seller under Section 2.3, shall have been duly complied with and performed in all material respects.

UNSEALED

NCA_PA000914

(b)    No Litigation.  No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby, and no applicable Governmental Authority shall have taken any other action or made any request of Buyer as a result of which Buyer reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)    Compliance with Laws.  The purchase and sale of the Loans pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

6.2    Conditions Precedent to Obligations of Seller.  The obligations of Seller with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Seller, at or prior to each such Closing of the following conditions:

(a)    Representations and Warranties; Performance of Obligations.  All of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the applicable Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Buyer on or before the applicable Closing Date, including the obligations of Buyer under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)    No Litigation.  No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby and no Governmental Authority shall have taken any other action or made any request of Seller as a result of which Seller reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)    Compliance with Laws.  The purchase and sale of the Loans pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

(d)    Consent of Sale. All Parties shall consent to the sale from the Seller to Buyer of the Loans by signing below.

## ARTICLE SEVEN

## INDEMNIFICATION

7.1    **Buyer's Indemnification of Seller.  Buyer shall indemnify and hold Seller, and its Affiliates, and their respective predecessors, successors, owners, managers, assigns, officers, directors, employees, agents, and attorneys (collectively, the "Seller Indemnified Parties") harmless from and against any and all claims, actions, suits, or other actual or threatened proceedings (collectively "Actions"), and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) (collectively "Losses") incurred or suffered by any Seller Indemnified Party, in either case as a result of, in connection with or arising out of: (i) any breach by Buyer of any representation, warranty or covenant made by it pursuant to the terms of this Agreement; or (ii) any action taken by or on behalf of Buyer or any omission of Buyer or any of its Affiliates, employees, agents or representatives in connection with any Loan (except to the extent any such Action or Loss arises out of a breach by Seller of any representation or warranty hereunder), including, without limitation, by reason of the gross negligence or**

14

UNSEALED

App. 0852

willful misconduct of Buyer (or its Affiliates, employees or agents), or the violation of any applicable Law or any covenant made by Buyer in <u>Section 5.2</u> of this Agreement by Buyer.

7.2   <u>Seller's Indemnification of Buyer</u>.  Seller agrees to, and does hereby, (a) extend and assign to Buyer any and all Rights to indemnification that Seller has against the Originating Creditor and/or any other Person who is a prior owner of the Loans, and (b) indemnify and hold Buyer, its Affiliates, predecessors, successors, assigns, officers, directors, employees, agents, and attorneys harmless from and against any claims, actions, suits, or other actual or threatened proceedings, and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) incurred or suffered by Buyer by reason of the gross negligence, willful misconduct, or material violation of any applicable Law by Seller (or its Affiliates, employees, or agents) in connection with any Breach by Seller.

7.3   <u>Limitation of Liability</u>.  Buyer acknowledges and agrees that neither Buyer nor any future holder of any Loan, nor their respective successors and assigns, shall have any claim, remedy, or Right to proceed (at Law or in equity) against Seller for any deficiency or other sum owing on any Loan, and Buyer hereby waives and releases any liability of Seller for and on account of such indebtedness or liability.

7.4   <u>Payable on Demand</u>.  Any amounts due to Buyer or Seller under <u>Article Seven</u> of this Agreement shall be payable on demand.

7.5   <u>Notice and Cooperation</u>.  Buyer or Seller shall notify each other within ten (10) Business Days after receiving actual knowledge of an event that triggers or may trigger indemnification obligations under this Agreement. Notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of the amount of the liability arising there from. The party claiming indemnification will cooperate with the other party's insurance carrier, as reasonably requested by the party or the insurance carrier.

7.6   <u>Defense</u>.  In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a party to this Agreement, the indemnifying party shall have the right, at its option, at its expense and with its own counsel, which counsel shall be reasonably satisfactory to the indemnified party, to assume the defense of any such claim or litigation or participate in the compromise thereof. If it chooses to so assume the defense of any such claim, the indemnifying party shall promptly notify the indemnified party of its intention to do so, and the indemnified party shall cooperate fully with the indemnifying party and its counsel in the defense against or compromise of any such claim or litigation. Notwithstanding anything in this Article Seven to the contrary, the indemnified party shall not compromise or settle any such claim or litigation without the prior written consent of the indemnifying party, which consent will not be unreasonably withheld.

NCA_PA000916

UNSEALED

# ARTICLE EIGHT

## MISCELLANEOUS

8.1    Governing Law.   THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED UNDER THE LAWS OF THE TRIBE AND, TO THE EXTENT APPLICABLE, THE LAWS OF THE UNITED STATES OF AMERICA.   THESE LAWS SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT.

8.2    Remedies Cumulative.   No right or remedy conferred upon or reserved to Buyer or Seller under this Agreement is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to every other right or remedy granted there under or now or hereafter existing under any applicable law.   Every right and remedy granted by this Agreement or by applicable Law to Buyer or Seller may be exercised from time to time and as often as may be deemed expedient by Buyer and Seller and, unless contrary to the express provisions of this Agreement, irrespective of the occurrence or continuance of any default or breach hereunder.

8.3    Entirety and Amendments.   This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the subject matter hereof.   This Agreement may be amended or modified only in writing executed by Seller and Buyer.

8.4    Notices.   Any notice or other communication hereunder must be in writing to be effective and shall be deemed to have been given when personally delivered to Buyer or Seller or, if mailed, on the third day after it is enclosed in an envelope and sent certified mail/return receipt requested in the United States mail.   Either party may from time to time change its address for notification purposes by giving the other party written notice of the new address and the date upon which it will become effective.   The address for each party for notices hereunder is the address set forth.   Unless otherwise specified in a notice in writing sent or delivered in accordance with the foregoing provisions of this Section 8.4, notices, demands, instructions and other communications shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective facsimile number) indicated below.

<div style="margin-left: 2em;">

If to Seller to:       Charles Moncooyea, President
                       Great Plains Lending, LLC
                       8151 Highway 177
                       Red Rock, Oklahoma  74651

If to Buyer:           Brad Hochstein CEO
                       National Credit Adjusters, LLC
                       327 West 4th
                       Hutchinson, KS   67501

</div>

NCA_PA000917

UNSEALED

App. 0854

Copy to:        Kevin Emmerich, Legal Section
National Credit Adjusters, LLC
327 West 4th
Hutchinson, KS 67501

8.5    Expenses. Except as otherwise provided herein, each party hereto shall bear the expenses (including attorney's fees) it incurs in connection with the negotiation, execution, and performance of this Agreement.

8.6    Assignability; Binding Nature. This Agreement is binding upon Seller and Buyer and their respective successors, heirs, and assigns. The Rights and obligations of Seller hereunder may be assigned by Seller to any Person at any time in Seller's discretion. Buyer may not assign any Rights or delegate any duties to any Person, or sell, transfer, or assign any Loans to any Person, without the prior written consent of Seller (which shall not be unreasonably withheld) in order for Seller to confirm that Person conducts its operations in accordance with the Federal Fair Debt Collection Practices Act and/or applicable State regulations and laws. Any assignment or delegation by Buyer without such prior written consent will be null and void. If Seller consents to Buyer's assignment of any Loans to another Person, the subsequent purchaser or assignee will be restricted from any further assignment of Loans acquired by such Person without Seller's prior written consent (which shall not be unreasonably withheld), and each such subsequent purchaser or assignee must execute and deliver an acknowledgment of such restrictions acceptable to Seller as a condition to the effectiveness of Seller's consent. The foregoing notwithstanding, nothing contained in this Section 8.6 is intended to restrict or prohibit Buyer from (a) selling, transferring, or assigning any Loans to any Affiliate of Buyer or (b) referring any Loan(s) for collection by third-party collectors, provided that this Agreement is complied with in all respects in any such event, including, but not limited to, obtaining Seller's consent for said transfer.

8.7    Severability. If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable, or void, so that both Seller and Buyer would be relieved of all obligations arising under such provision, it is the agreement of Seller and Buyer that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent. If such amendment is not possible, another provision that is legal and enforceable and achieves the same objective shall be substituted therefore. If the remainder of this Agreement is not affected by such declaration or finding and is capable of substantial performance by both Seller and Buyer, then the remainder shall be enforced to the extent permitted by law.

8.8    Survival of Terms. Subject to the limitations and other provisions of this Agreement: (a) the terms and agreements set forth in Articles Two, Four, Five, Seven, and Eight shall survive each Closing and the termination of this Agreement regardless of the reason; and (b) the representations and warranties of Seller and Buyer set forth in Article Three shall survive each Closing and shall remain in effect for a period of two years after each Closing Date.

8.9    Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original for all purposes and all of which constitute,

17

NCA_PA000918

UNSEALED

App. 0855

collectively, one agreement; but, in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

8.10    Waivers. Neither the waiver by Seller or Buyer of any breach of or default under any provision of this Agreement by the other party, nor the failure of Seller or Buyer, on one or more occasions, to enforce any provision of this Agreement or to exercise any Right hereunder, shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provision or Right hereunder.

8.11    Execution by Facsimile.  The manual signature of either party hereto that is transmitted to the other party by facsimile shall be deemed for all purposes to be an original signature.  Either party that delivers a signature page by facsimile agrees to deliver an original manually signed counterpart of such party's signature page to the party who requests it promptly after receipt of such request.

8.12    No Third-Party Beneficiary.  This Agreement is for the sole benefit of the parties hereto, and nothing contained in this Agreement shall be construed to grant any Person, other than Seller and Buyer and their respective successors and permitted assigns, any Right under or in respect of this Agreement or any provision hereof.

8.13    Relationship between Seller and Buyer.  Nothing in this Agreement is intended to or shall be construed to constitute or establish, as between Seller and Buyer, a partnership, joint venture, agency, or fiduciary relationship of any kind, to create the relationship of employer-employee or principal-agent, or to otherwise create any liability for either Seller or Buyer with respect to any indebtedness, liabilities, or obligations of the other or of any other Person. Moreover, under no circumstances will either Seller or Buyer have the authority or power to bind the other party to any agreement or contract.

8.14    Right to Equitable Relief.  Buyer and Seller acknowledge that should Buyer breach the covenant of Buyer in Section 5.2(b) of this Agreement or if Seller breaches Section 3.1 of this Agreement, money damages may be an inadequate remedy to Seller or Buyer and, in such event, Seller or Buyer may seek such equitable relief and Buyer and Seller agree that such relief is appropriate and warranted.

[SIGNATURE PAGE FOLLOWS.]

18

NCA_PA000919

UNSEALED

App. 0856

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Loan Sale Agreement to be executed by its duly authorized representative effective as of the Effective Date.

BUYER:                                         SELLER:

NATIONAL CREDIT ADJUSTERS, LLC      GREAT PLAINS LENDING, LLC


By: _____      By: _____
    Brad Hochstein, Chief Executive Officer       Charles Moncooyea, President


THE FOLLOWING ATTACHMENTS TO THIS AGREEMENT
ARE A PART OF THIS AGREEMENT FOR ALL PURPOSES:

Annex I – Additional Terms and Conditions

Exhibit A – Assignment and Bill of Sale

NCA_PA000920

UNSEALED                    App. 0857

**ANNEX I**

**TO**

**LOAN SALE AGREEMENT**

**DATED AS OF FEBRUARY 27, 2012**

Additional Terms and Conditions

1.  Description of Loans:

    a.  Loans: See attached Loan Listing [TBD – determined for each monthly Closing; Loans will include 90-100% of all payday loan accounts reaching 120 days delinquent; Loan files will be scrubbed for bankruptcy and deceased Loan obligors]

    b.  Purchase Price: The aggregate Purchase Price shown below is calculated based on to $0.076 (7.6%) multiplied by the aggregate Unpaid Balance of all the Loans to be purchased under this Annex I.

    c.  Closing Date: [TBD - determined for each monthly Closing, typically will occur on or before the 15th of each month]

2.  Number of Loans: [TBD - determined for each monthly Closing]

3.  Aggregate Unpaid Balance of all Accounts: [TBD - determined for each monthly Closing]

4.  Applicable Percentage (Purchase Rate): 7.6% of Outstanding Unpaid Balance

5.  Purchase Price: [TBD - determined for each monthly Closing]

6.  Cut-Off Date: [TBD - determined for each monthly Closing]

7.  Wiring Instructions: [TBD - determined for each monthly Closing]

8.  Ineligible Loan. Bankrupt Loans, Deceased Loans, Paid/Settled In Full Loans and Forgery/Fraud Loans are referred to collectively herein as "Ineligible Loan."

    a.  Bankrupt Loans. A "Bankrupt Loan" is a Loan that, at the Cut-Off Date, the relevant Loan Obligor is a debtor in a case under the Bankruptcy Code or has filed a case under the Bankruptcy Code, which has resulted in the discharge of such Loan Obligor's obligations to Seller. If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be debtors in bankruptcy or have filed in order for the Loan to be a Bankrupt Loan.

NCA_PA000921

**UNSEALED**

App. 0858

b.  Deceased Loans. A "Deceased Loan" is a Loan that, as of the Cut-Off Date, the Loan Debtor with respect to which is deceased.

c.  If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be deceased as of the Cut-Off Date in order for the Loan to be a Deceased Loan. Verification must be provided.

d.  Paid in Full /Settled in Full Loans: is a Loan that, as of the Cut-Off Date, has been paid or settled in full. Verification of payment/settlement must be provided.

e.  Forgery/Fraud Loans: is a Loan that was created prior to the Cut-Off Date as a result of forgery or fraud. Verification must be provided by fraud or forgery affidavit.

Notwithstanding the foregoing, in no event shall any Loan be deemed to be an Ineligible Loan unless Buyer is able to provide the following relevant documents (the "Verification Documents") to verify the circumstances causing such Loan to be an Ineligible Loan:

i.  For a Bankrupt Loan, Buyer shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

ii.  For a Deceased Loan, Buyer shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Loan Obligor information, a credit bureau report showing the relevant Loan Obligor as deceased, or a copy of the relevant newspaper obituary.

iii.  For a Paid/Settled In Full Loan, Buyer shall provide written evidence that the Loan has been paid or settled in full.

iv.  For a Forgery/Fraud Loan, Buyer shall provide a copy or original of a fraud or forgery affidavit.

9.  Loan Documentation: Seller shall deliver to Buyer an electronic copy of all original loan documents within 45 days of the Closing Date.

10.  Recourse Procedures: If, at any time during the period commencing on the Closing Date and ending 90 days later (the "Recourse Period Termination Date"), Buyer identifies any Loan in the Loan Pool that Buyer determines is an Ineligible Loan:

a.  Buyer shall provide to Seller (according to such instructions as Seller from time to time may give to Buyer) a description of such Loan (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

b.  No later than ten (10) days after Seller confirms (through its examination of the Verification Documents) that such Loan is an Ineligible Loan, Seller shall pay to

UNSEALED

App. 0859

NCA_PA000922

Buyer an amount equal to: (i) the Unpaid Balance of such Ineligible Loan as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage.

c.    Seller shall promptly notify Buyer if, based on its examination of any Verification Document, it concludes that a Loan designated by Buyer as an Ineligible Loan does not meet the requirements of an Ineligible Loan, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Buyer in connection with any Ineligible Loan the Verification Documents with respect to which Seller receives from Buyer after the Recourse Period Termination Date; or (ii) shall Buyer provide to Seller information or Verification Documents regarding Ineligible Loan more than one (1) time in any calendar month.

Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

Executed as of _____, 20____

BUYER:                                          SELLER:

NATIONAL CREDIT ADJUSTERS, LLC        GREAT PLAINS LENDING, INC.


By: _____      By: _Charles J Moncooyea_____
    Brad Hochstein, Chief Executive Officer    Charles Moncooyea, President

Annex 1-3

UNSEALED

NCA_PA000923

## EXHIBIT A

### ASSIGNMENT AND BILL OF SALE

Great Plains Lending, Inc., a business entity duly organized under and recognized by the laws of the Otoe-Missouria Tribe of Indians ("Seller"), has entered into a Loan Sale Agreement, dated February 27, 2012 (the "Agreement"), with National Credit Adjusters, LLC a Kansas LLC, ("Buyer"), related to the periodic purchase and sale of Loans on the terms set forth in the Agreement. Buyer and Seller also have entered into an Annex I to Loan Sale Agreement ("Annex I") dated concurrent with this Assignment and Bill of Sale with respect to the sale of the Loan Pool described in the Loan Listing attached to such Annex I (collectively, the "Purchased Loans").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Purchased Loans, provided, however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement or in the Annex I.

Capitalized terms not otherwise defined herein shall be as defined in the Agreement.

This Assignment and Bill of Sale shall be binding upon Seller, Seller's successors and assigns, and shall inure to the benefit of Buyer and Buyer's successors and assigns.

IN WITNESS WHEREOF, Seller has signed and delivered this Assignment and Bill of Sale to be effective _____, 20__.

SELLER:

GREAT PLAINS LENDING, INC.

By: _Charles J. Moncooyea_
Charles Moncooyea, President

Exhibit A-1

UNSEALED

NCA_PA000924

**ANNEX I**

**TO**

**LOAN SALE AGREEMENT**

**DATED AS OF FEBRUARY 27, 2012**

Additional Terms and Conditions

1.  Description of Loans:

    Loans with a charge-off prior to 02-15-2015

2.  Number of Loans:  3,160

3.  Aggregate Unpaid Balance of all Accounts: $2,231,240.34

4.  Applicable Percentage (Purchase Rate): 7.6% of Outstanding Unpaid Balance

5.  Purchase Price:  $197,670

6.  Cut-Off Date: 02-28-2012

7.  Wiring Instructions:

    Bank Name:   Missouri Bank & Trust
                 1044 Main Street
                 Kansas City, MO  64105

    ABA (Routing Number):     101000158

    Credit Bank Account Name:    Great Plains Lending Collections
                                 8151 Highway 177
                                 Red Rock, OK  74651

    Credit Bank Account Number:  176559

8.  Ineligible Loan.  Bankrupt Loans, Deceased Loans, Paid/Settled In Full Loans and Forgery/Fraud Loans are referred to collectively herein as "Ineligible Loan."

    a.   Bankrupt Loans.  A "Bankrupt Loan" is a Loan that, at the Cut-Off Date, the relevant Loan Obligor is a debtor in a case under the Bankruptcy Code or has filed a case under the Bankruptcy Code, which has resulted in the discharge of such Loan Obligor's obligations to Seller.  If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be debtors in bankruptcy or have filed in order for the Loan to be a Bankrupt Loan.



EXHIBIT

**UNSEALED**

App. 0862

NCA_PA000899

b. Deceased Loans. A "Deceased Loan" is a Loan that, as of the Cut-Off Date, the Loan Debtor with respect to which is deceased.

c. If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be deceased as of the Cut-Off Date in order for the Loan to be a Deceased Loan. Verification must be provided.

d. Paid in Full /Settled in Full Loans: is a Loan that, as of the Cut-Off Date, has been paid or settled in full. Verification of payment/settlement must be provided.

e. Forgery/Fraud Loans: is a Loan that was created prior to the Cut-Off Date as a result of forgery or fraud. Verification must be provided by fraud or forgery affidavit.

Notwithstanding the foregoing, in no event shall any Loan be deemed to be an Ineligible Loan unless Buyer is able to provide the following relevant documents (the "Verification Documents") to verify the circumstances causing such Loan to be an Ineligible Loan:

i. For a Bankrupt Loan, Buyer shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

ii. For a Deceased Loan, Buyer shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Loan Obligor information, a credit bureau report showing the relevant Loan Obligor as deceased, or a copy of the relevant newspaper obituary.

iii. For a Paid/Settled In Full Loan, Buyer shall provide written evidence that the Loan has been paid or settled in full.

iv. For a Forgery/Fraud Loan, Buyer shall provide a copy or original of a fraud or forgery affidavit.

9. Loan Documentation: Seller shall deliver to Buyer an electronic copy of all original loan documents within 45 days of the Closing Date.

10. Recourse Procedures: If, at any time during the period commencing on the Closing Date and ending 90 days later (the "Recourse Period Termination Date"), Buyer identifies any Loan in the Loan Pool that Buyer determines is an Ineligible Loan:

a. Buyer shall provide to Seller (according to such instructions as Seller from time to time may give to Buyer) a description of such Loan (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

b. No later than ten (10) days after Seller confirms (through its examination of the Verification Documents) that such Loan is an Ineligible Loan, Seller shall pay to

UNSEALED

App. 0863

NCA_PA000900

Buyer an amount equal to: (i) the Unpaid Balance of such Ineligible Loan as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage.

c.   Seller shall promptly notify Buyer if, based on its examination of any Verification Document, it concludes that a Loan designated by Buyer as an Ineligible Loan does not meet the requirements of an Ineligible Loan, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Buyer in connection with any Ineligible Loan the Verification Documents with respect to which Seller receives from Buyer after the Recourse Period Termination Date; or (ii) shall Buyer provide to Seller information or Verification Documents regarding Ineligible Loan more than one (1) time in any calendar month.

Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

Executed as of February 29, 2012.

BUYER:                                          SELLER:

NATIONAL CREDIT ADJUSTERS, LLC          GREAT PLAINS LENDING, INC.


By: _____      By: _____
    Brad Hochstein, Chief Executive Officer      Charles Moncooyea, President

UNSEALED

App. 0864

NCA_PA000901

| From: | Brett Horrocks [brett@sourceitone.com] |
|---|---|
| Sent: | 2/27/2013 2:17:53 PM |
| To: | Jason Harvison [jharvison@thinkfinance.com]; Walt Ramsey [wramsey@thinkfinance.com] |
| Subject: | 2013 Debt Sale Recommendations NCA redline.ppt |
| Attachments: | 2013 Debt Sale Recommendations NCA redline.ppt |

Please let me know if there is anything else you want included in the new agreement. I have changed the delinquency to 60 days and the pricing to 8.65. I am handing this off to Carrie to incorporate the changes into the forward flow agreements. Once Carrie gets these out to the tribes and their counsel, we will need help in pushing them for approval and signoff. We will also be working on the agreement and needed changes to get Mobiloans into the process.

In addition, we are meeting with the internal Debt Sale team to discuss the changes and target April 10 as the next sale.

Brett


EXHIBIT
C-30

Confidential UNSEALED

App. 0865

TF-PA-611481

# Plaintiff's Exhibit 81

UNSEALED

## AMENDED AND RESTATED LOAN SALE AGREEMENT

THIS AMENDED AND RESTATED LOAN SALE AGREEMENT (this "Agreement") is made and entered into effective as of April 24, 2013 (the "Effective Date"), by and between National Credit Adjusters, LLC a Kansas limited liability company ("Buyer"), and Plain Green, LLC ("Seller"), a limited liability company organized under the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation of Montana (the "Chippewa Cree").

### RECITALS:

A.     Seller originated and is the owner of certain consumer installment loans, and Seller desires to sell to Buyer certain of such loans that are at least 61 days delinquent and that are to be more fully identified on each Sale File to be provided for each related monthly Closing indicated in the relevant Annex I.

B.     Buyer desires to purchase such loans from Seller on a monthly basis, all in accordance with the terms and subject to the conditions contained in this Agreement and the relevant Annex I.

C.     Seller and Buyer are party to a Loan Sale Agreement made and entered into by them effective as of February 10, 2012 (the "Original Agreement") regarding the purchase and sale of Loans, and Seller and Buyer want to update their business agreement by entering into this Agreement.

### AGREEMENT

THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement and for other good and valuable consideration, the adequacy of which the parties hereby acknowledge, Seller and Buyer agree as follows:

### ARTICLE ONE

### DEFINITIONS AND TERMS

1.1.     Definitions.  For purposes of this Agreement, the following terms are defined as set forth in this Section 1.1 or in the provisions of this Agreement to which reference is made in this Section 1.1. All references to a Recital, Article, or Section are to a Recital, Article, or Section of this Agreement, unless otherwise indicated, and all references to an Annex or an Exhibit, are to an Annex or an Exhibit attached to and made a part of this Agreement, unless otherwise indicated.

"Affiliate" means, when used with reference to a specified Person, any other Person who directly controls, is controlled by, or is under common control with, the specified Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person that is a corporation, limited liability company, partnership, trust, or other entity, whether through ownership of voting securities or interests, by contract, or otherwise.

"Agency" means any Person, including any Affiliate of Buyer, with whom Buyer places a Loan for collection or who otherwise engages in collection activities in respect of a Loan, whether in its own name or on behalf of Buyer.



"Agreement" means this Amended and Restated Loan Sale Agreement, including all Schedules, Annexes and Exhibits, as it may be renewed, extended, restated, amended, or supplemented from time to time.

"Applicable Percentage" has the meaning given such term in the applicable Annex I.

"Assignment and Bill of Sale" means an assignment and bill of sale in the form of Exhibit A, executed by Seller and delivered to Buyer evidencing the sale of each Loan Pool sold hereunder.

"Bankrupt Loan" means a Loan that, at the applicable Cut-Off Date, the relevant Loan Obligor is a debtor in a case under the Bankruptcy Code or has filed a case under the Bankruptcy Code, which has resulted in the discharge of such Loan Obligor's obligations to Seller. If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be debtors in bankruptcy or have filed in order for the Loan to be a Bankrupt Loan.

"Bankruptcy Code" means the Bankruptcy Code of the United States, as existing as of the Effective Date or thereafter amended.

"Breach" means, as to any representation, warranty, covenant, obligation, liability, or other provision made by or binding on Seller or Buyer under this Agreement, the occurrence of any inaccuracy in, breach of, or failure to comply with, such representation, warranty, covenant, obligation, liability, or other provision by Seller or Buyer, as applicable.

"Business Day" means every day on which commercial banks in the State of Montana are open for business.

"Closing" means the consummation of a Loan purchase and sale transaction between Buyer and Seller, as contemplated by this Agreement

"Closing Date" means the date on which Buyer purchases a Loan Pool by completing all conditions precedent to Closing, as described herein.

"Confidential Information" has the meaning assigned to it by the NDA and includes, without limitation, means the Loan Documents and all information included therein, together with all other information concerning the Loans and/or the Loan Obligors provided to or obtained by Buyer prior to a Closing.

"Consumer Credit Laws" means the FDCPA, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Electronic Funds Transfer Act and all other United States federal, state and Tribal Laws that pertain to the extension of consumer credit and/or the collection of consumer credit obligations.

"Cut-Off Date" related to the purchase of a particular Loan Pool means the date indicated in the applicable Annex I.

"Deceased Loan" means a Loan for which, as of the applicable Cut-Off Date, the Loan Obligor of such Loan is deceased. If there are two or more Loan Obligors on the same Loan, all Loan Obligors must be deceased as of the Cut-Off Date in order for the Loan to be a Deceased Loan.

"Debtor Relief Law" means the Bankruptcy Code and any other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Law from time to time in effect affecting the Rights of creditors generally.

2

App. 0868

"Effective Date" has the meaning given such term in the initial paragraph of this Agreement.

"FDCPA" means the Fair Debt Collection Practices, 15 U.S.C. § 1601 *et seq.*, any successor federal statute thereto and all rules and regulations promulgated thereunder, as any of the same may be amended from time to time.

"Forgery/Fraud Loan" means each Loan that is created prior to the applicable Cut-Off Date as a result of forgery or fraud.

"Governmental Approval" means an approval, authorization, consent, permit, license, concession, grant, waiver, or exemption of, registration, designation, declaration, or filing with, or report or notice to, any Governmental Authority.

"Governmental Authority" means any nation or government, tribal sovereign nation or government, any state, county, city, municipality, or other political subdivision thereof, and any entity exercising executive, legislative, judicial, police, regulatory, or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission, or instrumentality of any of the foregoing, and any tribunal, court, or arbitrator (including any private arbitration board or panel) of competent jurisdiction.

"Gramm-Leach-Bliley Act" means the Gramm-Leach-Bliley Act of 1999, any successor federal statute thereto and all rules and regulations promulgated thereunder, as any of the same may be amended from time to time.

"Ineligible Loan" means any Loan that is a Bankrupt Loan, a Deceased Loan, a Paid In Full/Settled In Full Loan or a Forgery/Fraud Loan.

"Knowledge" of any particular fact or other matter means, (a) as to any natural Person, that such natural Person has actual knowledge of such fact or other matter, and (b) as to any Person other than a natural Person, that an individual who is serving, or who at any time has served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter. For purposes of this definition, *"actual knowledge"* of any particular fact or other matter means, as to a natural Person, that such Person is actually aware of such fact or other matter.

"Law" means any applicable statute, law, Tribal Law, treaty, ordinance, rule, regulation, order, writ, injunction, decree, judgment, or opinion of any Governmental Authority.

"Lien" means any lien, security interest, mortgage, pledge, adverse claim, title defect, title retention agreement, voting trust agreement, property settlement or marital dissolution agreement, preemptive right, right of first refusal, or other interest, equity, option, restriction, encumbrance, or charge of any kind.

"Litigation" means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party.

"Loan" means a consumer installment loan receivable originated by Seller that is offered for sale by Seller pursuant to the terms of this Agreement and that in each case (a) is described on an Annex I hereto, (b) has an outstanding balance as of the Cut-Off Date as set forth in such Annex I, (c) is owed by one or more Loan Obligors, and (d) is owned by Seller as of the applicable Cut-Off Date.

3

Confidential **UNSEALED**

TF-PA-386401

"Loan Document" means any agreement, instrument, or other document evidencing, or delivered in connection with, a Loan and in the possession or within the control of Seller, including, but without limitation, (a) any consumer credit agreement, any installment purchase or sale agreement, any loan or credit agreement, any promissory note, any guaranty, any security or pledge agreement, any invoice or request for payment, and any other document (regardless of how styled) related to the collection of a Loan, and (b) any hard copy evidencing or describing a Loan and/or the Unpaid Balance thereof, together with any renewal, extension, or restatement of, or amendment or supplement to, any of the foregoing agreements, instruments, or other documents.

"Loan Listing" means a listing (in a mutually agreed-upon electronic format) of the Loans in a particular Loan Pool, which listing shall include such basic information regarding the Loans as is customary for transactions such as the transactions contemplated by this Agreement, including, by way of example, the Loan Obligor information obtained by the lender in connection with originating each Loan, and the, Unpaid Balance of each Loan as of the Cut-Off Date.

"Loan Obligor" means any Person who, directly or indirectly, is obligated for the payment of all or any portion of any Loan.

"Loan Pool" means the group of Loans sold by Seller to Buyer as part of a particular Closing pursuant to the terms of this Agreement and the applicable Annex I. The Loan Pool will consist of those Loans listed in the electronic Loan Listing delivered by Seller to Buyer pursuant to Section 2.3, will be documented by an Assignment and Bill of Sale, and will be identified by a control number.

"Material Litigation" means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party that, according to generally accepted accounting principles, is considered significant to Buyer's or Seller's financial condition.

"NDA" means the Mutual Nondisclosure Agreement entered into by Buyer and Seller, effective April 24, 2013.

"Order" means any order, award, decision, decree, injunction, judgment, ruling, subpoena, or verdict issued, made, or rendered by any applicable Governmental Authority.

"Originating Creditor" means Seller.

"Paid in Full/Settled in Full Loan" means a Loan that, as of the applicable Cut-Off Date, has been paid in full or settled in full.

"Person" means any individual, corporation, partnership, joint venture, Limited Liability Company, trust, Governmental Authority, or other entity.

"Purchase Price" for a particular Loan Pool has the meaning given such term in the applicable Annex I.

"Right" means any legal or equitable right, remedy, power, privilege, or benefit.

"Seller" has the meaning given such term in the initial paragraph of this Agreement.

"Tax" means any tax, charge, fee, levy, or other assessment levied or charged by a Governmental Authority.

4

"Tribal Law" means mean any law or regulation duly enacted by the Chippewa Cree.

"Unpaid Balance" means, as to any Loan, the total outstanding unpaid balance thereon at the applicable Cut-Off Date, as shown on Seller's books and records (including, to the extent applicable under the relevant Loan Document and applicable Law, all amounts due in respect of interest, late fees, return check charges, and all other applicable fees and charges).

1.2.   Number and Gender of Words.   Whenever in this Agreement the singular number is used, the same shall include the plural where appropriate and *vice versa*, and words of any gender shall include each other gender where appropriate.

## ARTICLE TWO

## PURCHASE AND SALE OF THE LOANS

2.1.   Agreement of Purchase and Sale.   Upon the terms and subject to the conditions contained in this Agreement and based upon the representations, warranties, and agreements of Buyer and Seller as contained herein, Buyer agrees to purchase the Loans from Seller in multiple Closings occurring from time to time, and Seller agrees to sell the Loans to Buyer, on the applicable Closing Date for each such sale. The Loans will be sold to Buyer by Seller free and clear of any Liens created by the actions or inactions of Seller or any Affiliate of Seller; and, in conjunction with the sale of the Loans to Buyer, on each applicable Closing Date, Seller will transfer, sell, assign, and convey to Buyer all of Seller's Rights in, to, and under the Loan Documents. All Loan purchases and sales hereunder shall be described on an Annex I, all of which shall take the form of Annex I attached hereto.

2.2.   Purchase Price.   The Purchase Price to be paid by Buyer to Seller for the Loans purchased at a Closing shall be as set forth in the applicable Annex I. The aggregate Purchase Price shall be determined by multiplying the total Unpaid Balances of all the Loans by the Applicable Percentage, as set forth in the applicable Annex I. Buyer will pay the Purchase Price for each Loan Pool as set forth in the applicable Annex I for such Loan Pool. The Purchase Price is to be paid in funds available for immediate use by Seller by (i) delivery of a cashier's check or money order in the amount of the payment due or (ii) by wire transfer of the amount of the payment due in accordance with instructions provided by Seller to Buyer.

2.3.   Closing.   Each Closing of the purchase and sale of a Loan Pool pursuant to this Agreement will be consummated on the Closing Date described in the applicable Annex I. On (or prior to) the Closing Date, the following actions will be taken by Seller and Buyer:

(a)   Buyer will pay the full Purchase Price, in accordance with the applicable Annex I;

(b)   Seller will execute and deliver the Assignment and Bill of Sale in favor of Buyer with respect to the Loan Pool that is the subject of the applicable Annex I; and

(c)   Seller will deliver to Buyer the Loan Listing.

The obligations of Buyer and Seller to complete each Closing are subject to the conditions precedent set forth in Article Six.

2.4.   Payments Received.   If Seller or any servicing agent receives any credits, payments or other consideration distributed or paid by or on behalf of any Loan Obligor with respect to any Loan prior to or on the Cut-Off Date, Seller shall be entitled to accept such payments and (if necessary) adjust the

5

Unpaid Balance of such Loan reflected on the Loan Listing. If Seller or any servicing agent shall receive any credits, payments or other consideration distributed or paid by or on behalf of any Loan Obligor with respect to any Loan after the Cut-off Date, Seller shall promptly pay over and/or deliver such payments to Buyer. Any such remittances will be made by regular United States mail, unless otherwise requested by Buyer (in which case Buyer will reimburse Seller for all costs incurred by Seller in connection with the transmittal of such remittance.). If Buyer or any Agency shall receive any credits, payments or other consideration on any loan of a Loan Obligor that is not a Loan sold pursuant to this Agreement, Buyer shall promptly pay over and/or deliver such payments to Seller within 10 days of receipt.

2.5. <u>Warranty and Limitation of Liability</u>. SELLER WARRANTS TO BUYER THAT IT WILL SELL, ASSIGN, TRANSFER, AND CONVEY TO BUYER ALL OF SELLER'S RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER THE LOANS AND THE LOAN DOCUMENTS. EXCEPT FOR SUCH WARRANTY AND FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN <u>SECTION 3.1</u>, THE LOANS ARE BEING SOLD "AS IS" AND "WITH ALL FAULTS," AND SELLER DOES NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY CONCERNING THE LOANS AND/OR THE LOAN DOCUMENTS, INCLUDING, BUT WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR COLLECTIBILITY OF THE LOANS, OR ANY OTHER REPRESENTATION OR WARRANTY, AND SELLER SPECIFICALLY DISCLAIMS ANY OTHER REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE LOANS OR THE LOAN DOCUMENTS. BUYER ACKNOWLEDGES THAT SUCH LIMITATIONS APPLY TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND FURTHER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS AGREEMENT, THE SALE, ASSIGNMENT, TRANSFER, AND CONVEYANCE OF THE LOANS AND THE LOAN DOCUMENTS WILL BE WITHOUT RECOURSE TO SELLER AND WILL BE SUBJECT IN ALL RESPECTS TO THE LIMITATIONS SET FORTH IN THIS <u>SECTION 2.5</u>.

2.6. <u>Payment on Loans</u>. Subject to the limitations and conditions described in this Agreement, Seller authorizes Buyer to accept, endorse in Buyer's name for the sole purpose of depositing funds, and deposit any payments into Buyer's accounts that it receives on Loans for so long as Buyer retains the right to collect such Loan.

<div align="center">

**ARTICLE THREE**

**REPRESENTATIONS AND WARRANTIES**

</div>

3.1. <u>Representations and Warranties of Seller</u>. On and as of the Effective Date hereof Seller represents and warrants to Buyer, and on and as of each Closing Date hereafter Seller will represent and warrant to Buyer as follows:

(a) <u>Title to Loans</u>. Seller owns good and marketable title to the Loans, and has obtained all consents necessary to transfer title to the Loans free and clear of all Liens.

(b) <u>Authorization by Seller</u>. The execution and delivery of this Agreement by Seller and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite actions of Seller, and this Agreement has been duly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to the application of Debtor Relief Laws. Seller has full power, capacity, and authority to execute and deliver this Agreement and the Assignment and Bill of Sale. In addition, to its knowledge, Seller has obtained all licenses and approvals, if any, as required under Tribal Law to carry on

<div align="center">6</div>

its business as now conducted insofar as Seller's business relates to Seller's ownership of the Loans or the sale thereof to Buyer, and all such licenses and approvals are in full force and effect.

(c)    Organization, Existence, and Good Standing of Seller.  Seller is an entity duly organized, validly existing, and in good standing under Tribal Law with all requisite company power and authority to own, lease, and operate its properties, to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby.

(d)    No Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the organizational documents of Seller, any resolution adopted by the members or managers of Seller, any Tribal Law, rule or regulation applicable to Seller, any agreement or other document to which Seller is a party or by which it or any of its property is bound, or any Order that affects or binds Seller.  No Governmental Approval, and no consent or approval of any other Person is required on the part of Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(e)    Litigation.  There is no actual pending Material Litigation (i) that has been commenced by or against Seller that relates to or may affect Seller's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement or the transactions contemplated hereby.  To the Knowledge of Seller, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(f)    Compliance with Laws.  To the Knowledge of Seller, (i) Seller has complied with and is in compliance in all material respects with each Law that is or was applicable to Seller in respect of the ownership or use of the Loans, and (ii) Seller has not received any notice or other communication (whether written or oral) from any applicable Governmental Authority or any other Person regarding (y) any actual, alleged, or potential violation of, or failure to comply with, any applicable Law in respect of, or affecting, Seller's ownership of the Loans or the sale thereof to Buyer, or (z) any actual, alleged, or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action in respect of, or affecting, Seller's ownership of the Loans or the sale thereof to Buyer.

(g)    Loans.  To the Knowledge of Seller, each Loan was made for valuable consideration and represents the enforceable obligation of the Loan Obligors obligated therefore, except as limited by Debtor Relief Laws.

(h)    Loan Obligors.  No Loan Obligor has initiated any Litigation against Seller in respect of the Loan for which such Loan Obligor is liable, and, to the Knowledge of Seller, no Loan Obligor has any enforceable Rights of set-off, counterclaim, cancellation, or claim that such Loan suffers from lack of consideration, forgery, or alteration of the Loan Obligor's signature, except as otherwise disclosed in the Loan Documents pertaining to such Loan.

(i)    Unpaid Balances.  The amount reflected as the Unpaid Balance of each Loan in the Loan Documents is the amount of the Unpaid Balance represented to Buyer at the time of its acquisition from Seller of the Loan, less any payments received by Seller prior to Cut-Off Date; but otherwise Seller makes no warranty as to the accuracy of the Unpaid Balance of each Loan as reflected in the Loan Documents.



7

3.2.    Representations and Warranties of Buyer.  On and as of the Effective Date hereof Buyer represents and warrants to Seller, and on and as of each Closing Date hereafter Buyer will represent and warrant to Seller as follows:

(a)    Authorization by Buyer.  The execution and delivery of this Agreement by Buyer and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or other actions of Buyer, and this Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject only to the application of Debtor Relief Laws. Buyer has full corporate or other power, capacity, and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Buyer as contemplated by this Agreement. In addition, Buyer possesses all Governmental Approvals, if any, required to carry on its business as now conducted insofar as Buyer's business relates to the collection of accounts receivable such as (and including) the Loans, or the purchase and collection of the Loans, and all such Governmental Approvals are in full force and effect.

(b)    Organization, Existence, and Good Standing of Buyer.  Buyer is duly organized, validly existing, and in good standing under the Laws of the State of Kansas with all requisite power and authority to own, lease, and operate its properties and to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby. Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of business transacted by it or properties owned or leased by it requires such qualification and in which the failure to do so would have a material adverse effect on its ability to perform its obligations under this Agreement or the enforceability thereof.

(c)    No Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer, any resolution adopted by the shareholders or the board of directors (or other constituent group) of Buyer, or any mortgage, indenture, lease, loan or credit agreement, or other contract, applicable Law, or Governmental Approval applicable to Buyer, or any of the properties of Buyer, or any Order which affects or binds Buyer. No Governmental Approval, and no consent or approval of any other Person, is required on the part of Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(d)    Litigation.  There is no actual pending Material Litigation (i) that has been commenced by or against Buyer or that otherwise relates to or may affect Buyer's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with this Agreement or the transactions contemplated hereby. To the Knowledge of Buyer, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(e)    Compliance with Laws.  Buyer has complied with and is in compliance in all material respects with, and when performing under this Agreement will comply with each Law that is applicable to Buyer or the purchase, ownership, collection or use of the Loans, including, but without limitation, the Gramm-Leach-Bliley Act and all applicable Consumer Credit Laws.

(f)    Suitability.  Buyer has such knowledge and experience in financial, collections, and business matters as to be capable of evaluating the merits and risks of the purchase of the Loans and is, by virtue of having made other investments of a similar nature and/or by reason of its business and

8

Confidential UNSEALED

TF-PA-386406

financial experience or the business and financial experience of those Persons it has retained to advise Buyer with respect to its purchase of the Loans, a "*sophisticated*" purchaser.

(g)     Ability to Bear Risk. Buyer is in a financial position to hold its interest in the Loans for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of the Purchase Price of the Loans.

(h)     Investigation and Access to Information. Buyer has been given all such access to information regarding the Loans, including, in particular, the risks associated with the collectability (and ultimate collection) of the Loans as it has requested from Seller, and has utilized such access to its satisfaction for the purpose of obtaining information about the Loans. Buyer agrees and represents that the information about the Loans made available to it constitutes an adequate and sufficient basis on which to determine whether and at what price to purchase the Loans. Buyer acknowledges and agrees that (i) it has been solely responsible for its own due diligence investigation of the Loans and the merits or risks of an investment in the Loans, (ii) it is not relying on any investigation conducted or undertaken by any other Person, including Seller or its Affiliates (and their respective directors, officers, and employees) or on any representations or warranties of any other Person other than the representations expressly made by Seller herein, and (iii) it is purchasing the Loans based upon its independent examination, study, inspection and knowledge of the Loans and in reliance on its own determination of the quality, value and condition of the Loans. Buyer expressly acknowledges that, prior to executing and delivering this Agreement, Buyer has been encouraged, invited and directed by Seller to conduct such due diligence review and analysis of the Loans, related information and publicly available records as Buyer deems necessary, proper or appropriate in order to make a complete informed decision with respect to its purchase of the Loans, to consult with legal counsel and such other advisors as Buyer believes desirable, and to ask such questions of Seller concerning the Loans as Buyer desires to ask, and Buyer has undertaken all of the foregoing tasks.

(i)     Acknowledgement of Risks. The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities." Buyer understands that an investment in the Loans is speculative and involves a high degree of risk and that Buyer must be able to withstand, and could sustain, a total loss of Buyer's investment in the Loans.

(j)     Acknowledgement Regarding Documents. Buyer understands that Seller will not have in its possession all account documents in respect of the Loans that may be desired or requested by Buyer and that the Loan Documents may not include all account documents related to any given Loan; and Buyer acknowledges that Seller's failure to provide any account document that is not included among the Loan Documents will not constitute a Breach on the part of Seller.

(k)     Acknowledgement Regarding Fees. Buyer warrants, represents, understands and acknowledges that no further fees or costs may be charged or assessed to the Loans or the Loan Obligors for the underling debt (including, but not limited to: NSF, late fees, interest, processing fees, attorney fees, collection costs, etc.). Furthermore, the Loans transferred hereunder are not subject to the provisions of Section 1719 of the California Civil Code and no Loan or Loan Obligor may be required to pay treble damages if the check(s), ACH's or other payment mechanisms are dishonored.

## ARTICLE FOUR

## REPURCHASE, CANCELLATION AND SURRENDER OF LOANS

4.1.     Seller's Obligation to Repurchase Loans.

9

(a) Ineligible Loans. Seller will use reasonable efforts to determine that the Loans do not include any Ineligible Loans. If, within the time frame set forth in the applicable Annex I, it is reasonably determined by Buyer that Ineligible Loans were included among the Loans, or Seller determines that a Loan was sold which was an Ineligible Loan at the Closing Date, then Seller and Buyer agree that the terms of the applicable Annex I, Paragraph 10 (Recourse Procedures) shall apply.

(b) Sole Remedy. The remedies set forth in the applicable Annex I, Paragraph 10 (Recourse Procedures) will be Buyer's sole remedy, and Seller's sole obligation, in the event Seller has sold an Ineligible Loan to Buyer.

4.2. Seller's Option to Repurchase Loans. Seller shall have the right to repurchase any Loan (for an amount equal to Buyer's payment for such Loan, applying the Applicable Percentage to the Unpaid Balance of such repurchased Loan) if Seller determines that there is a pending or threatened lawsuit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to such Loan or a Loan Obligor, and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Loan, or if the account had been sold in error due to previous settlement or fraud. In the event of such a repurchase, Seller shall notify Buyer of Seller's intent to repurchase such Loan, and upon receipt of such notice, Buyer shall promptly cease all activity on such Loan and execute and deliver a Bill of Sale satisfactory to Seller, assigning all right, title and interest of Buyer in such Loan, without representations or warranties or any kind or character, expressed or implied to Seller. In addition, Buyer shall cease releasing or compromising the Loan and shall remove its credit reporting (if any) on any repurchased Loan. Buyer shall forward to Seller all payments collected or received on the Loan after receipt of such notice.

4.3. Cancellation and Surrender of Purchased Loans. For each Loan purchased by Buyer hereunder that has not otherwise been paid in full, closed, cancelled, terminated by bankruptcy proceeding, repurchased by Seller as contemplated by Section 4.1 or Section 4.2 or in a repayment plan as specified in this Section 4.3, on the date that is the 30 months from the purchase date for such Loan, Buyer will (a) cease all collections activities on such Loan, (b) retrieve such Loan from any Person with whom Buyer placed the Loan for collection or sold the Loan, (c) cancel such Loan such that it no longer may be collected upon by any Person, including subsequent owners or holders of such Loan, and (d) upon the request of Seller, transfer ownership of such Loan back to Seller. With respect to Loans that are beyond the 30-month period identified above but that are in a paying status or otherwise have a payment plan in place, (x) Buyer shall be permitted to continue collecting on such Loans in accordance with the established payment arrangement, (y) Buyer shall report to Seller on the status of all such Loans every 30 days, and (z) Buyer shall comply with subsections (a) through (d) above with respect to any Loan for which payment has ceased due to a breach of the applicable payment arrangement for such Loan.

## ARTICLE FIVE

## CERTAIN COVENANTS

5.1. Confidentiality Obligations of Buyer and Seller. Buyer and each Seller acknowledge and agree that the confidentiality obligations of Buyer and each Seller are governed by the NDA, which is incorporated herein by reference. Buyer acknowledges that all Confidential Information associated with the Loans to be purchased at any Closing remains the property of Seller until the Closing is consummated and must be accorded confidential treatment in accordance with the NDA. If a Closing does not occur, regardless of the reason, Buyer promptly (and in any event within five Business Days after the designated Closing Date) will return to Seller, at Buyer's expense, any and all tangible Confidential Information in

10

Buyer's possession. In the event of a Breach of the NDA or this Section 5.1 by Buyer, Seller will be entitled to injunctive relief as set forth in this Agreement and the NDA.

5.2.    Covenants of Seller. Seller agrees and covenants with Buyer that Seller will comply with its obligations in respect of the retrieval and transmittal of documentation related to each Loan as set forth in the applicable Annex I.

5.3.    Covenants of Buyer. Buyer agrees and covenants with Seller as follows:

(a)    Compliance with Law; Reporting of Regulatory Investigations, Actions and Litigation. In the performance of its collection efforts with respect to the Loans, Buyer agrees that it will comply with all requirements of the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act and all other applicable federal and state Consumer Credit Laws. In the event Buyer (a) receives a notice from any Governmental Authority that it is being investigated for, or is a defendant in any administrative, civil or criminal related to or action alleging violations of any federal or state Consumer Credit Law in reference to Loans sold pursuant to this Agreement, or (b) receives written or oral attorney demands or notice of Litigation, Buyer will promptly, and in any event within 3 days after receipt of such notice, notify Seller thereof. Buyer will provide Seller with details of the allegations made and of Buyer's intended response thereto, and will keep Seller apprised of the progress of such investigation, action, demand or Litigation during the time it is pending. Under no circumstances whatsoever shall Buyer, any Agency or any other Person engaging in any collections activities in respect of or otherwise communicating with any Loan Obligor of any Loan, institute or maintain or threaten to institute or maintain any administrative, civil or criminal action or proceeding against any Loan Obligor.

(b)    Notification of Loan Obligors and Third Parties. Buyer shall notify a Loan Obligor in writing that the Loan Obligor's Loan has been sold to Buyer. The written notification must include (i) the name of Seller as the original creditor, (ii) the accurate balance of the debt, (iii) the address to which the Loan Obligor must remit payments to avoid further collection activity, and (iv) a statement that Buyer is collecting on its own behalf, and not on behalf of the original creditor, and that Buyer is not affiliated in any way with the original creditor. If an Agency is required by a Consumer Credit Law to provide a similar notice to Loan Obligors in respect of Loans placed with such Agency, then such Agency shall comply with this Section 5.3(b).

(c)    Use of Seller's Name. Buyer is expressly prohibited from using Seller's name in connection with Buyer's operations or its Loans, including, but without limitation, on checks, drafts, letters, and forms, provided, however, that (i) Buyer may identify Seller as the original creditor solely for the purpose of accurately describing the source of a Loan Obligor's debt obligation and (ii) must also state that Buyer is collecting on its own behalf, and not on behalf of Seller, and that Buyer is not affiliated in any way with Seller.

(d)    Referrals of Inquiries. After the Closing, Buyer will handle any and all inquiries from Loan Obligors directly and will not under any circumstances refer any Loan Obligor to Seller in regard to any such inquiry.

(e)    Loan Information. Upon Seller's request, from time to time, Buyer will provide Seller with information with respect to specific Loans needed by Seller to reconcile Seller's accounting records with respect to such Loan(s), provided that such information is reasonably available to Buyer and such request is made within one year after the Closing Date.

(f)    Audit Rights. During the term of this Agreement and for a period of nine months from the expiration or termination hereof, Buyer shall permit Seller, from time to time, upon reasonable advance notice and during Buyer's normal business hours to perform an audit of (i) all books and records

11



of Buyer as they may relate to this Agreement, the transactions contemplated hereby and the performance by Buyer of its obligations hereunder, and (ii) Buyer's operations and electronic data processing functions. Buyer shall maintain accurate, complete and correct records of all matters related to this Agreement. Buyer shall provide Seller with reasonable access to Buyer's premises and its books and records to enable Seller to exercise its audit rights hereunder. Seller shall be permitted to exercise its audit rights under this Section 5.3(f) directly or via a third party service provider, and Seller shall bear all expenses related to any audit conducted hereunder. Seller shall have the right to copy, at its own expense, any of Buyer's records related to its obligations hereunder, and Seller shall treat such records in a confidential manner in accordance with the NDA. Buyer also agrees to submit to any examination which may be required by any regulatory authority with audit and examination authority over Seller, to the fullest extent that such regulatory authority may require and to the fullest extent provided by law, and Seller shall bear Buyer's expenses incurred in relation to such audit. Each Agency with whom Buyer places any Loan as contemplated by Section 5.3(h) shall be contractually required to adhere to this Section 5.3(f).

      (g)    Adherence to Controls, Policies and Procedures; Training. Buyer, all Agencies and all employees and contractors of Buyer and each Agency (i) shall comply in all respects with the compliance controls, complaint processing, reporting, service provider oversight and other requirements set forth in Schedule A, (ii) shall adhere in all respects to Seller's policies and procedures that Seller has reasonably determined are relevant to this Agreement and the subject matter hereof and that Seller provides to Buyer in writing, (iii) shall adhere in all respects to information technology and information security standards, controls and safeguards, including, without limitation, industry standards and Seller's established information technology policies and procedures, and (iv) shall engage in all training that Seller has reasonably determined is relevant to this Agreement and the subject matter hereof and that Seller provides to Buyer in writing, electronically or otherwise.

      (h)    Approval and Onboarding of Agencies. During the time period that begins on the Effective Date and continues to the date that is 90 days from the Effective Date, Buyer may place up to 20% of purchased Loans with an Agency approved in accordance with this Section 5.3(h) and listed on Schedule A. After the initial 90-day period, Buyer may request approval from Seller to place more than the approved 20% of purchased Loans with Agencies, including Agencies other than the Agencies initially listed on Schedule A, and shall adhere to the following Agency onboarding and approval process:

      (i)    Each prospective Agency must complete the Seller-provided due diligence questionnaire and provide supporting documentation contemplated thereby;

      (ii)    Each prospective Agency must agree in writing to adhere to the terms and conditions of this Agreement, including, without limitation, the requirements of Schedule A;

      (iii)    Each prospective Agency must provide such other documentation and answer such other questions as Seller may reasonably ask to enable Seller to determine, in its discretion, whether such prospective Agency is capable of adhering to the terms and conditions of this Agreement, including, without limitation, the requirements of Schedule A.

No more than 20% of Loans purchased by Buyer at any Closing may be placed with an Agency, including an approved Agency, during the first 90 days from the Closing Date for the purchase of such Loans. Buyer may not place any purchased Loan with any Agency where the Loan Obligor has filed for protection under the Bankruptcy Code or otherwise been placed into bankruptcy. With respect to the Agencies listed on Schedule A hereto with whom Buyer placed any Loans purchased prior to the Effective Date of this Agreement, all such Agencies shall be submitted for review and approval in accordance with this Section 5.3(h) within 30 days of the Effective Date and the onboarding process for such Agencies must be fully completed within 60 days of the Effective Date. Buyer shall terminate

12

immediately any Agency not properly onboarded and approved by Seller within 60 days of the Effective Date and resume direct responsibility for all Loans placed with any such terminated Agency. In no event shall the number of Agencies exceed eight.

5.4.  Buyer's obligations under Section 5.3 apply to actions taken by Buyer and Loans purchased by Buyer before, on and after the Effective Date.

## ARTICLE SIX

## CONDITIONS PRECEDENT

6.1.  Conditions Precedent to Obligations of Buyer. The obligations of Buyer with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Buyer, at or prior to each such Closing of all the following conditions:

(a)  Representations and Warranties; Performance of Obligations. All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the applicable Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Seller on or before the applicable Closing Date, including the obligations of Seller under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)  No Litigation. No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby, and no applicable Governmental Authority shall have taken any other action or made any request of Buyer as a result of which Buyer reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)  Compliance with Laws. The purchase and sale of the Loans pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

6.2.  Conditions Precedent to Obligations of Seller. The obligations of Seller with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Seller, at or prior to each such Closing of the following conditions:

(a)  Representations and Warranties; Performance of Obligations. All of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of each Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Buyer on or before the applicable Closing Date, including the obligations of Buyer under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)  No Litigation. No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby and no Governmental Authority shall have taken any other action or made any request of Seller as a result of which Seller reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)  Compliance with Laws. The purchase and sale of the Loans pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

(d)  Consent of Sale. All Parties shall consent to the sale from the Seller to Buyer of the Loans by signing below.

13

Confidential UNSEALED

App. 0879

TF-PA-386411

**7.1.** **Buyer's Indemnification of Seller.** Buyer shall indemnify and hold Seller, and its Affiliates, and their respective predecessors, successors, owners, managers, assigns, officers, directors, employees, agents, and attorneys (collectively, the "**Seller Indemnified Parties**") harmless from and against any and all claims, actions, suits, or other actual or threatened proceedings (collectively "**Actions**"), and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) (collectively "**Losses**") incurred or suffered by any Seller Indemnified Party, in either case as a result of, in connection with or arising out of: (i) any breach by Buyer of any representation, warranty or covenant made by it pursuant to the terms of this Agreement; or (ii) any action taken by or on behalf of Buyer or any omission of Buyer or any of its Affiliates, employees, agents or representatives in connection with any Loan (except to the extent any such Action or Loss arises out of a breach by Seller of any representation or warranty hereunder), including, without limitation, by reason of the gross negligence or willful misconduct of Buyer (or its Affiliates, employees or agents), or the violation of any applicable Law or any covenant made by Buyer in <u>Section 5.3</u> of this Agreement by Buyer.

**7.2.** **Seller's Indemnification of Buyer.** Seller agrees to, and does hereby, (a) extend and assign to Buyer any and all Rights to indemnification that Seller has against the Originating Creditor and/or any other Person who is a prior owner of the Loans, and (b) indemnify and hold Buyer, its Affiliates, predecessors, successors, assigns, officers, directors, employees, agents, and attorneys harmless from and against any claims, actions, suits, or other actual or threatened proceedings, and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) incurred or suffered by Buyer by reason of the gross negligence, willful misconduct, or material violation of any applicable Law by Seller (or its Affiliates, employees, or agents) in connection with any Breach by Seller.

**7.3.** **Limitation of Liability.** Buyer acknowledges and agrees that neither Buyer nor any future holder of any Loan, nor their respective successors and assigns, shall have any claim, remedy, or Right to proceed (at Law or in equity) against Seller for any deficiency or other sum owing on any Loan, and Buyer hereby waives and releases any liability of Seller for and on account of such indebtedness or liability.

**7.4.** **Payable on Demand.** Any amounts due to Buyer or Seller under <u>Article Seven</u> of this Agreement shall be payable on demand.

**7.5.** **Notice and Cooperation.** Buyer or Seller shall notify each other within ten (10) Business Days after receiving actual knowledge of an event that triggers or may trigger indemnification obligations under this Agreement. Notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of the amount of the liability arising there from. The party claiming indemnification will cooperate with the other party's insurance carrier, as reasonably requested by the party or the insurance carrier.

**7.6.** **Defense.** In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a party to this Agreement, the indemnifying party shall have the right, at its option, at its expense and with its own counsel, which counsel shall be reasonably satisfactory to the indemnified party, to assume the defense of any such claim or litigation or participate in the compromise thereof. If it chooses to so assume the defense of any such claim, the indemnifying party shall promptly notify the indemnified party of its intention to do so, and the indemnified party shall cooperate fully with the indemnifying party and its counsel in the defense against

14

or compromise of any such claim or litigation. Notwithstanding anything in this Article Seven to the contrary, the indemnified party shall not compromise or settle any such claim or litigation without the prior written consent of the indemnifying party, which consent will not be unreasonably withheld.

## ARTICLE EIGHT

### MISCELLANEOUS

8.1.   Term and Termination.  The initial term of this Agreement shall be 24 months from the Effective Date, unless the term is extended by the mutual written agreement of Buyer and Seller.  This Agreement and the transactions contemplated hereby may be terminated as follows:

(a)      By the mutual written agreement of Buyer and Seller;

(b)      By Buyer if a Breach of any provision of this Agreement has been committed by Seller and such Breach has not been waived or promptly cured;

(c)      By Seller if a Breach of any provision of this Agreement has been committed by Buyer and such Breach has not been waived or promptly cured; or

(d)      By Buyer or Seller as permitted by Section 8.3.

On each anniversary of the Effective Date of this Agreement, for so long as this Agreement remains in place, Buyer and Seller shall review and negotiate in good faith the requirements of Schedule A and the general terms and conditions to the purchase and sale of each Loan Pool set forth in Annex I (including, without limitation, the Purchase Price).  If Buyer and Seller are unable to come to a commercially reasonable agreement about such terms and conditions after negotiating such terms and conditions in good faith, then either party may terminate this Agreement upon written notice to the non-terminating party.  Buyer and Seller also agree to negotiate in good faith the extension of this Agreement for an additional 12-month period beyond the initial term, and if Buyer and Seller are unable to come to a commercially reasonable agreement about the terms and conditions of any such extension then this Agreement shall terminate on the original expiration date.

8.2.   Effect of Termination.  Each party's Right of termination under Section 8.1 is in addition to any other Rights it may have under this Agreement or otherwise, and the exercise of a Right of termination will not be deemed to be an election of remedies.  If this Agreement is terminated pursuant to Section 8.1, all further obligations of the parties under this Agreement will terminate, except as provided in Section 8.11; provided, however, that if this Agreement is terminated by either party because of the Breach of this Agreement by the other party, or because one or more conditions of the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's Right to pursue all legal or equitable remedies will survive such termination unimpaired.

8.3.   Governing Law.  THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED UNDER THE LAWS OF THE CHIPPEWA CREE AND, TO THE EXTENT APPLICABLE, THE LAWS OF THE UNITED STATES OF AMERICA.  THESE LAWS SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT.

8.4.   Remedies Cumulative.  No right or remedy conferred upon or reserved to Buyer or Seller under this Agreement is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to every other right or remedy granted there under or now or

15

hereafter existing under any applicable law. Every right and remedy granted by this Agreement or by applicable Law to Buyer or Seller may be exercised from time to time and as often as may be deemed expedient by Buyer and Seller and, unless contrary to the express provisions of this Agreement, irrespective of the occurrence or continuance of any default or breach hereunder.

8.5.    Entirety and Amendments. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. This Agreement may be amended or modified only in writing executed by Seller and Buyer.

8.6.    Notices. Any notice or other communication hereunder must be in writing to be effective and shall be deemed to have been given when personally delivered to Buyer or Seller or, if mailed, on the third day after it is enclosed in an envelope and sent certified mail/return receipt requested in the United States mail. Either party may from time to time change its address for notification purposes by giving the other party written notice of the new address and the date upon which it will become effective. The address for each party for notices hereunder is the address set forth. Unless otherwise specified in a notice in writing sent or delivered in accordance with the foregoing provisions of this Section 8.6, notices, demands, instructions and other communications shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective facsimile number) indicated below.

<div style="margin-left:2em">

If to Seller to:          Billi Anne Raining Bird Morsette, CEO
                          Plain Green, LLC
                          93 Mack Rd, Suite 600
                          PO Box 270
                          Box Elder, MT 59521

If to Buyer:              Brad Hochstein CEO
                          National Credit Adjusters, LLC
                          327 West 4th
                          Hutchinson, KS 67501

Copy to:                  Mark Fletchall, General Counsel
                          National Credit Adjusters, LLC
                          327 West 4th
                          Hutchinson, KS 67501

</div>

8.7.    Expenses. Except as otherwise provided herein, each party hereto shall bear the expenses (including attorney's fees) it incurs in connection with the negotiation, execution, and performance of this Agreement.

8.8.    No Assignment; Binding Nature on Successors and Assigns. This Agreement is binding upon Seller and Buyer and their respective successors, heirs, and assigns. The Rights and obligations of Seller hereunder may be assigned by Seller to any Person at any time in Seller's discretion. Buyer may not assign any Rights or delegate any duties to any Person, or sell, transfer, delegate or otherwise assign any Loans to any Person. Any sale, transfer, delegation or assignment by Buyer without such prior written consent will be null and void. Buyer may place Loans with an Agency only as expressly authorized by and in accordance with Section 5.3(h).

8.9.    Headings. The headings of Articles and Sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

16

Confidential UNSEALED

TF-PA-386414

8.10.   Severability.  If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable, or void, so that both Seller and Buyer would be relieved of all obligations arising under such provision, it is the agreement of Seller and Buyer that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent.  If such amendment is not possible, another provision that is legal and enforceable and achieves the same objective shall be substituted therefore.  If the remainder of this Agreement is not affected by such declaration or finding and is capable of substantial performance by both Seller and Buyer, then the remainder shall be enforced to the extent permitted by law.

8.11.   Survival of Terms.  Subject to the limitations and other provisions of this Agreement: (a) the terms and agreements set forth in Articles Two, Four, Five, Seven, and Eight shall survive each Closing and the termination of this Agreement regardless of the reason; and (b) the representations and warranties of Seller and Buyer set forth in Article Three shall survive each Closing and shall remain in effect for a period of two years after each Closing Date.

8.12.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original for all purposes and all of which constitute, collectively, one agreement; but, in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

8.13.   Waivers.  Neither the waiver by Seller or Buyer of any breach of or default under any provision of this Agreement by the other party, nor the failure of Seller or Buyer, on one or more occasions, to enforce any provision of this Agreement or to exercise any Right hereunder, shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provision or Right hereunder.

8.14.   Execution by Facsimile.  The manual signature of either party hereto that is transmitted to the other party by facsimile shall be deemed for all purposes to be an original signature.  Either party that delivers a signature page by facsimile agrees to deliver an original manually signed counterpart of such party's signature page to the party who requests it promptly after receipt of such request.

8.15.   No Third-Party Beneficiary.  This Agreement is for the sole benefit of the parties hereto, and nothing contained in this Agreement shall be construed to grant any Person, other than Seller and Buyer and their respective successors and permitted assigns, any Right under or in respect of this Agreement or any provision hereof.

8.16.   Relationship between Seller and Buyer.  Nothing in this Agreement is intended to or shall be construed to constitute or establish, as between Seller and Buyer, a partnership, joint venture, agency, or fiduciary relationship of any kind, to create the relationship of employer-employee or principal-agent, or to otherwise create any liability for either Seller or Buyer with respect to any indebtedness, liabilities, or obligations of the other or of any other Person.  Moreover, under no circumstances will either Seller or Buyer have the authority or power to bind the other party to any agreement or contract.

8.17.   Right to Equitable Relief.  Buyer and Seller acknowledge that should Buyer breach any covenant of Buyer in Section 5.1 or Section 5.3(c) of this Agreement or if Seller breaches Section 3.1 of this Agreement, money damages may be an inadequate remedy to Seller or Buyer and, in such event, Seller or Buyer may seek such equitable relief and Buyer and Seller agree that such relief is appropriate and warranted.

8.18.   Amendment and Restatement.  This Agreement amends and restates in its entirety the Original Agreement and shall govern the past, present and future relationship of Buyer and Seller with respect to the subject matter hereof and thereof.

17

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Amended and Restated Loan Sale Agreement to be executed by its duly authorized representative effective as of the Effective Date.

BUYER:                                          SELLER:

NATIONAL CREDIT ADJUSTERS, LLC                  PLAIN GREEN, LLC

By: _____                   By: _____
Brad Hochstein, Chief Executive Officer              Billi Anne Raining Bird Morsette, Chief
                                                     Executive Officer

THE FOLLOWING ATTACHMENTS TO THIS AGREEMENT ARE A PART OF THIS
AGREEMENT FOR ALL PURPOSES:

Schedule A – Compliance Controls, Reporting Requirements, Etc.

Annex I – Additional Terms and Conditions

Exhibit A – Assignment and Bill of Sale

18

Confidential UNSEALED

TF-PA-386416

## Schedule A

### Compliance Controls, Reporting Requirements, Etc.

Agencies to be fully onboarded within 60 days of the Effective Date:

- Account Discovery Systems
- Kramer & Associates
- RJA Capital
- Zenith Financial Network, LLC

Training (applies to Buyer and all Agencies):

- All employees/contractors must complete Seller-mandated training at least semi-annually
- All new employees/contractors must complete Seller-mandated training within 15 days of hiring

Auditing and Monitoring (applies to Buyer and all Agencies):

- Weekly Call Monitoring
  - ➢ Internal and external – Internal quality control monitoring process, as well as random calls sent to Seller and Seller's servicer, on a weekly basis.
  - ➢ Seller must have on-demand access to all live and recorded calls for periodic monitoring.
- Review of adherence to contract and other legal obligations – no less than semi-annually
- Review of processes, procedures and customer-facing materials (emails, letters, phone scripts, etc.) – no less than semi-annually
- Periodic site visits – scheduled visits to occur monthly and quarterly, with additional random visits to occur not more frequently than twice per calendar month

Reporting and Recordkeeping (applies to Buyer and all Agencies):

- Weekly inventory status regarding loans and complaints received (must have remote access or updated inventory list and complaint list on a weekly basis)
- Monthly reports on debt verification, including:
  - ➢ Number of debt verification requests received per month
  - ➢ Number of days to turn around a debt verification notice (per account/per month)
  - ➢ When requested, must provide evidence of notices sent for individual customers
- Weekly Dialer Call Reporting, including:
  - ➢ Number of calls made per customer per day
  - ➢ Home
  - ➢ Cell

Confidential UNSEALED

App. 0885

TF-PA-386417

- ➢ Work
  - ➢ Other
- Monthly reporting on the status and resolution of investigations, actions, demands, Litigation described in Section 5.3(a)
- Monthly reporting on written notices of debt, including
  - ➢ Number of notices sent each month
  - ➢ When requested, must provide evidence of notices sent for individual customers

Complaint Monitoring and Tracking (applies to Buyer and all Agencies):

- Seller and Seller's servicer must be notified of all complaints within 48 hours of receipt of same (with copies of written complaints and notes of oral complaints)
- Monthly report on complaints, to be delivered no later than the 10th day of each calendar months for complaints received the prior calendar month; reports to include the following:
  - ➢ Type of complaint
  - ➢ Description of complaint
  - ➢ Source of complaint
  - ➢ Lender name
  - ➢ Resolution taken
  - ➢ Loan/customer name
  - ➢ Loan number
  - ➢ Bankruptcy number
- If Seller chooses to repurchase a Loan, Buyer must cease all collections activities on the Loan immediately and transfer ownership of the subject Loan to Seller within 1 business days of the request

Implementation of Consistent Compliance Controls (applies to Buyer and all Agencies):

- Mini Miranda violations by collector by month (trended plus action plans taken to resolve errors)
- Audit reports by collector by month
- Must evidence not deceptive, abusive, etc. to customers (for example, must not: harass customers; tell customers that you are reporting to their bureau when you are not reporting; and must not report debt so old that it has no impact on bureau, etc.)
- Must evidence not collecting illegal fees, illegal interest, or illegal expenses
- Must evidence not collecting on bankruptcy accounts (discharged, active, etc.)
- Must evidence not collecting on debt when have received a written request to stop collecting

Schedule A-2

- Must evidence not promising to "fix" consumers credit bureau report

Penalty for Failure to Comply with Schedule A Obligations:

- $1,000 per day per failure

Seller, Servicer and NCA Contact:

- *Seller Contact*: [Name, email address, phone number] Billi A.Morette, billiamne@plainprecastle.com; 406-352-3815

- *Seller's Servicer Contact*:  Gio Rodriguez, yrodriguez@thinkfinance.com, (817) 546-2781, (214) 794-8553

- *NCA Contact for matters related to Schedule A*:  [Name, email address, phone number]

Confidential  UNSEALED

TF-PA-386419

**Annex I**

**to**

**Amended and Restated Loan Sale Agreement dated April 24, 2013**

**Additional Terms and Conditions**

1. Description of Loans:

   a. <u>Loans</u>: See attached Loan Listing [TBD – determined for each monthly Closing; Loans will include 90-100% of all loan accounts reaching 61 days delinquent; Loan files will be scrubbed for bankruptcy and deceased Loan obligors]

   b. <u>Purchase Price</u>: The aggregate Purchase Price shown below is calculated based on $0.0865 (8.65%) multiplied by the aggregate Unpaid Balance of all the Loans to be purchased under this <u>Annex I</u>.

   c. <u>Closing Date</u>: [TBD - determined for each monthly Closing, typically will occur on or before the 15th of each month]

   <u>Number of Loans</u>: [TBD - determined for each monthly Closing]

   <u>Aggregate Unpaid Balance of all Loans</u>: [TBD - determined for each monthly Closing]

   <u>Applicable Percentage (Purchase Rate)</u>: 8.65% of Outstanding Unpaid Balance

   <u>Purchase Price</u>: [TBD - determined for each monthly Closing]

   <u>Cut-Off Date</u>: [TBD - determined for each monthly Closing]

7. Wiring Instructions:

   Bank Name:

   ABA (Routing Number):

   Credit Bank Account Name:

   Credit Bank Account Number:

8. <u>Ineligible Loan</u>. In respect of any Ineligible Loan, in no event shall any Loan be deemed to be an Ineligible Loan unless Buyer is able to provide the following relevant documents (the "<u>Verification Documents</u>") to verify the circumstances causing such Loan to be an Ineligible Loan:

   a. For a Bankrupt Loan, Buyer shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

   b. For a Deceased Loan, Buyer shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Loan Obligor



<div align="center">Annex I-1</div>

information, a credit bureau report showing the relevant Loan Obligor as deceased, or a copy of the relevant newspaper obituary.

c.   For a Paid In Full/Settled In Full Loan, Buyer shall provide written evidence that the Loan has been paid or settled in full.

d.   For a Forgery/Fraud Loan, Buyer shall provide a copy or original of a fraud or forgery affidavit.

9.   <u>Loan Documentation</u>: Seller shall deliver to Buyer an electronic copy of all original loan documents within 45 days of the Closing Date.

10.   <u>Recourse Procedures</u>: If, at any time during the period commencing on the Closing Date and ending 90 days later (the "<u>Recourse Period Termination Date</u>"), Buyer identifies any Loan in the Loan Pool that Buyer determines is an Ineligible Loan:

a.   Buyer shall provide to Seller (according to such instructions as Seller from time to time may give to Buyer) a description of such Loan (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

b.   No later than ten (10) days after Seller confirms (through its examination of the Verification Documents) that such Loan is an Ineligible Loan, Seller shall pay to Buyer an amount equal to: (i) the Unpaid Balance of such Ineligible Loan as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage.

c.   Seller shall promptly notify Buyer if, based on its examination of any Verification Document, it concludes that a Loan designated by Buyer as an Ineligible Loan does not meet the requirements of an Ineligible Loan, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Buyer in connection with any Ineligible Loan the Verification Documents with respect to which Seller receives from Buyer after the Recourse Period Termination Date; or (ii) shall Buyer provide to Seller information or Verification Documents regarding Ineligible Loan more than one (1) time in any calendar month.

Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

[SIGNATURE PAGE FOLLOWS.]



IN WITNESS WHEREOF, each of Buyer and Seller has caused this Annex I to Amended and Restated Loan Sale Agreement to be executed by its duly authorized representative effective as of April 25 _____, 2013.

BUYER:                                          SELLER:

NATIONAL CREDIT ADJUSTERS, LLC                  PLAIN GREEN, LLC

By: _____                   By: _____
    Brad Hochstein, Chief Executive Officer          Billi Anne Raining Bird Morsette, Chief
                                                     Executive Officer

Confidential **UNSEALED**                    App. 0890                    TF-PA-386422

## Exhibit A

### Assignment and Bill of Sale

Plain Green, LLC ("Seller"), a limited liability company organized under the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation of Montana, has entered into an Amended and Restated Loan Sale Agreement, dated April 24, 2013 (the "Agreement"), with National Credit Adjusters, LLC, a Kansas limited liability company ("Buyer"), related to the periodic purchase and sale of Loans on the terms set forth in the Agreement. Buyer and Seller also have entered into an Annex I to the Agreement ("Annex I") dated concurrent with this Assignment and Bill of Sale with respect to the sale of the Loan Pool described in the Loan Listing attached to such Annex I (collectively, the "Purchased Loans").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Purchased Loans, provided, however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement or in the Annex I.

Capitalized terms not otherwise defined herein shall be as defined in the Agreement.

This Assignment and Bill of Sale shall be binding upon Seller and Seller's successors and assigns, and shall inure to the benefit of Buyer and Buyer's successors and assigns.

IN WITNESS WHEREOF, Seller has executed and delivered this Assignment and Bill of Sale to be effective April 25ᵗʰ, 2013.

SELLER:

PLAIN GREEN, LLC

By: _____
Billi Anne Raining Bird Morsette, Chief
Executive Officer

Confidential UNSEALED

TF-PA-386423

**Amended and Restated Forward Flow Account Sale Agreement dated April 24, 2013**

**Additional Terms and Conditions**

1.  Description of Accounts:

    a.   Accounts: January 2013 – March 2013 Write-offs

    b.   Purchase Price: March – 8.65%, February – 7.6%, January 7.2%

    c.   Closing Date: April 26, 2013

    Number of Accounts: 5,440

    Aggregate Unpaid Balance of all Accounts: $5,015,516.27

    Applicable Percentage (Purchase Rate): as stated in description

    Purchase Price: $393,190

    Cut-Off Date: April 25, 2013

    Wiring Instructions:

    | | |
    |---|---|
    | Bank Name: | PlainsCapital Bank<br>777 Taylor Street Suite 102<br>Fort Worth, Texas 76102 |
    | ABA (Routing Number): | 111322994 |
    | Credit Bank Account Name: | PayDay One, LLC<br>4150 International Plaza Suite 400<br>Fort Worth, Texas 76109 |
    | Credit Bank Account Number: | 3600007458 |

8.  Ineligible Account. In respect of any Ineligible Account, in no event shall any Account be deemed to be an Ineligible Account unless Buyer is able to provide the following relevant documents (the "Verification Documents") to verify the circumstances causing such Account to be an Ineligible Account:

    a.   For a Bankrupt Account, Buyer shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

    b.   For a Deceased Account, Buyer shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Account Obligor

Confidential **UNSEALED**

TF-PA-386424

information, a credit bureau report showing the relevant Account Obligor as deceased, or a copy of the relevant newspaper obituary.

c. For a Paid In Full/Settled In Full Account, Buyer shall provide written evidence that the Account has been paid or settled in full.

d. For a Forgery/Fraud Account, Buyer shall provide a copy or original of a fraud or forgery affidavit.

9. Sale of California Accounts. In respect of Accounts sold pursuant hereto that are deferred deposit transactions originated under Section 23035 of the California Financial Code, such Accounts are not subject to the provisions of Section 1719 of the California Civil Code and no Account Obligor of any such Account may be required to pay treble damages if one or more checks remitted in payment of such Account is dishonored.

10. Account Documentation: Seller shall deliver to Buyer an electronic copy of all original loan documents within 45 days of the Closing Date.

11. Recourse Procedures: If, at any time during the period commencing on the Closing Date and ending 90 days later (the "Recourse Period Termination Date"), Buyer identifies any Account in the Account Pool that Buyer determines is an Ineligible Account:

a. Buyer shall provide to Seller (according to such instructions as Seller from time to time may give to Buyer) a description of such Account (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

b. No later than ten (10) days after Seller confirms (through its examination of the Verification Documents) that such Account is an Ineligible Account, Seller shall pay to Buyer an amount equal to: (i) the Unpaid Balance of such Ineligible Account as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage.

c. Seller shall promptly notify Buyer if, based on its examination of any Verification Document, it concludes that an Account designated by Buyer as an Ineligible Account does not meet the requirements of an Ineligible Account, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Buyer in connection with any Ineligible Account the Verification Documents with respect to which Seller receives from Buyer after the Recourse Period Termination Date; or (ii) shall Buyer provide to Seller information or Verification Documents regarding Ineligible Account more than one (1) time in any calendar month.

Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

Confidential UNSEALED

App. 0893

TF-PA-386425

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Annex I to Amended and Restated Loan Sale Agreement to be executed by its duly authorized representative effective as of April 25 , 2013.

BUYER:

NATIONAL CREDIT ADJUSTERS, LLC

By: _____
Brad Hochstein, Chief Executive Officer

SELLER:

PLAIN GREEN, LLC

By: _____
Billi Anne Raining Bird Morsette, Chief
Executive Officer

Annex I-3

Confidential **UNSEALED**

TF-PA-386426

## Assignment and Bill of Sale

Plain Green, LLC ("Seller"), a limited liability company organized under the laws of the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation of Montana, has entered into an Amended and Restated Loan Sale Agreement, dated April 24, 2013 (the "Agreement"), with National Credit Adjusters, LLC, a Kansas limited liability company ("Buyer"), related to the periodic purchase and sale of Loans on the terms set forth in the Agreement. Buyer and Seller also have entered into an Annex I to the Agreement ("Annex I") dated concurrent with this Assignment and Bill of Sale with respect to the sale of the Loan Pool described in the Loan Listing attached to such Annex I (collectively, the "Purchased Loans").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Purchased Loans, provided, however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement or in the Annex I.

Capitalized terms not otherwise defined herein shall be as defined in the Agreement.

This Assignment and Bill of Sale shall be binding upon Seller and Seller's successors and assigns, and shall inure to the benefit of Buyer and Buyer's successors and assigns.

IN WITNESS WHEREOF, Seller has executed and delivered this Assignment and Bill of Sale to be effective April 25th, 2013.

SELLER:

PLAIN GREEN, LLC

By: _____
Billi Anne Raining Bird Morsette, Chief
Executive Officer

# Plaintiff's Exhibit 83

UNSEALED

'Message

| | |
|---|---|
| **From:** | Walt Ramsey [/O=PAYDAYONE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WRAMSEY] |
| **Sent:** | 10/2/2013 2:13:16 PM |
| **To:** | Ranga Kothamasu [rkothamasu@thinkfinance.com]; Carrie E. Carbone [ccarbone@thinkfinance.com]; Jason Harvison [jharvison@thinkfinance.com] |
| **CC:** | Brett Horrocks [brett@sourceitone.com]; Michelle Nguyen [mnguyen@thinkfinance.com]; Yosvany 'Gio' Rodriguez [yrodriguez@thinkfinance.com] |
| **Subject:** | RE: MOB Debt Sale |

From my perspective – this has taken forever to get done. We are taking positions our partners can't support - they want to do things we can't support, etc... We have about $6-8MM in revenue to the P&L we can recognize when this is done – and it needs to be by November.

I'd suggest we get Brett, our attorneys, MBLs attorneys, and NCAs attorneys in the same conference room for a ½ day or this thing may never get done.



Walt Ramsey
Chief Risk Officer

P/F:817-546-2642 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Ranga Kothamasu
**Sent:** Wednesday, October 02, 2013 9:04 AM
**To:** Carrie E. Carbone; Jason Harvison
**Cc:** Brett Horrocks; Michelle Nguyen; Walt Ramsey; Yosvany 'Gio' Rodriguez
**Subject:** RE: MOB Debt Sale

Understood, the closer to ownership the better the situation is – from NCA licensing to upfront revenue recognition by MBL. If it's the tribe call on lease, the best way is to get them the new contract (lease with the recommended placement terms). We will have to run it by NCA.

Here are some additional stuff since we had the call. If it helps to have a working session on the contract with NCA on the call let me know, will help speed up the process.

Confidential **UNSEALED**

App. 0897

TF-PA-610807

Placement language is very one-sided

    Recall accounts anytime for any reason

    Recall regardless of payers after 30 month term

Indemnification provisions should mirror one another

Term for Forward Flow is 24 months with first right on 3 year.

Term of account lease is 30 months

Need to add the current agencies being on-boarded back in on Schedule A


Thanks,




Ranga Kothamasu
Sr. Director, Risk

P/F:817-546-2674 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Carrie E. Carbone
**Sent:** Tuesday, October 01, 2013 6:55 PM
**To:** Ranga Kothamasu; Jason Harvison
**Cc:** Brett Horrocks; Michelle Nguyen; Walt Ramsey; Yosvany 'Gio' Rodriguez
**Subject:** Re: MOB Debt Sale


The practical issue is that NCA can't get funding to pay MBL more than a nominal amount up front unless the agreement is a "lease."

Problem there is that a "lease" isn't a real thing in the context of collecting on consumer loan accounts. The tribe might not agree to that.

We need at least a nominal purchase price to resolve the accounting issue from the lender side.

I also think there may be state license issues on their side if they are just a collection agency as opposed to an owner.



Carrie E. Carbone
Associate General Counsel
Think Finance

Sent via BlackBerry by AT&T

---

**From:** Ranga Kothamasu <rkothamasu@thinkfinance.com>

**Date:** Tue, 1 Oct 2013 23:40:25 +0000

**To:** Jason Harvison<jharvison@thinkfinance.com>; Carrie E. Carbone<ccarbone@thinkfinance.com>

**Cc:** Brett Horrocks<brett@sourceitone.com>; Michelle Nguyen<MNguyen@thinkfinance.com>; Walt Ramsey<wramsey@thinkfinance.com>; Yosvany 'Gio' Rodriguez<yrodriguez@thinkfinance.com>

**Subject:** RE: MOB Debt Sale

We met with NCA today and came to an agreement to two potential options:

1. Revert back to lease and have the account ownership still reside with MBL (change from earlier where NCA owns the account). NCA will have the right to collect. Carrie will come back with any potential legal issues on this front. Under this model NCA is willing to pay a fee upfront.

2. Go with placement option as it states in the new contract. But NCA is not comfortable with paying anything upfront under the placement terms. They will have to work out the operational impacts as to how this will work under their tribal model.

Obviously we would prefer option 1 pending legal opinion, Carrie is looking into it.

Thanks,



Ranga Kothamasu
Sr. Director, Risk

P/F 817-548-2624 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

**From:** Jason Harvison
**Sent:** Monday, September 30, 2013 10:07 AM
**To:** Ranga Kothamasu; Yosvany 'Gio' Rodriguez
**Cc:** Brett Horrocks; Michelle Nguyen
**Subject:** MOB Debt Sale

Where are we on the MOB Debt Sale? I would like to get a proposal to the Chairman this week. Were you guys able to finalize everything with NCA and Legal?

Jason



Jason Harvison
Chief Product Officer

P/F 817-546-2755 | ThinkFinance.com
4150 International Plaza, Suite 400, Ft Worth TX 76109

Privileged and Confidential. This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain privileged and/or confidential information. If you have received this e-mail in error, please notify me immediately by a return e-mail and delete this e-mail. You are hereby notified that any dissemination, distribution or copying of this e-mail and/or any attachments thereto, is strictly prohibited.

# Plaintiff's Exhibit 84

UNSEALED

## LINE OF CREDIT ACCOUNT SALE AGREEMENT

THIS LINE OF CREDIT ACOUNT SALE AGREEMENT (this "Agreement") is made and entered into effective as of November _26__, 2013 (the "Effective Date"), by and between National Credit Adjusters, LLC a Kansas limited liability company ("Buyer"), and MobiLoans, LLC ("Seller"), a limited liability company organized under the laws of the Tunica Biloxi Tribe of Louisiana, a federally recognized Indian tribe (the "Tribe") (the Buyer and the Seller are each a "Party" and collectively, the "Parties").

### RECITALS:

A.    Seller originates and is the owner of certain consumer lines of credit, and Seller desires to sell to Buyer certain of such lines of credit accounts that are at least 61 days delinquent and that are to be more fully identified on each Sale File to be provided for each related monthly Closing indicated in the relevant Annex I.

B.    Buyer desires to purchase such line of credit accounts from Seller on a monthly basis, all in accordance with the terms and subject to the conditions contained in this Agreement and the relevant Annex I.

### AGREEMENT

THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement and for other good and valuable consideration, the adequacy of which the parties hereby acknowledge, Seller and Buyer agree as follows:

### ARTICLE ONE

### DEFINITIONS AND TERMS

1.1.    Definitions. For purposes of this Agreement, the following terms are defined as set forth in this Section 1.1 or in the provisions of this Agreement to which reference is made in this Section 1.1. All references to a Recital, Article, or Section are to a Recital, Article, or Section of this Agreement, unless otherwise indicated, and all references to an Annex or an Exhibit, are to an Annex or an Exhibit attached to and made a part of this Agreement, unless otherwise indicated.

"Account" means a consumer line of credit account receivable originated by Seller that is offered for sale by Seller pursuant to the terms of this Agreement and that in each case (a) is described on an Annex I hereto, (b) has an outstanding balance as of the Cut-Off Date as set forth in such Annex I, (c) is owed by one or more Account Obligors, and (d) is owned by Seller as of the applicable Cut-Off Date.

"Account Document" means any agreement, instrument, or other document evidencing, or delivered in connection with, an Account and in the possession or within the control of Seller, including, but without limitation, (a) any consumer credit agreement, any loan purchase or sale agreement, any loan, account or credit agreement, any promissory note, any guaranty, any security or pledge agreement, any invoice or request for payment, and any other document (regardless of how styled) related to the collection of an Account, and (b) any hard copy evidencing or describing an Account and/or the Unpaid Balance thereof, together with any renewal, extension, or restatement of, or amendment or supplement to, any of the foregoing agreements, instruments, or other documents.

"Account Listing" means a listing (in a mutually agreed-upon electronic format) of the Accounts in a particular Account Pool, which listing shall include such basic information regarding the Accounts as

Confidential **UNSEALED**

is customary for transactions such as the transactions contemplated by this Agreement, including, by way of example, the Account Obligor information obtained by the lender in connection with originating each Account, and the, Unpaid Balance of each Account as of the Cut-Off Date.

"Account Obligor" means any Person who, directly or indirectly, is obligated for the payment of all or any portion of any Account.

"Account Pool" means the group of Accounts sold by Seller to Buyer as part of a particular Closing pursuant to the terms of this Agreement and the applicable Annex I. The Account Pool will consist of those Accounts listed in the electronic Account Listing delivered by Seller to Buyer pursuant to Section 2.3, will be documented by an Assignment and Bill of Sale, and will be identified by a control number.

"Affiliate" means, when used with reference to a specified Person, any other Person who directly controls, is controlled by, or is under common control with, the specified Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person that is a corporation, limited liability company, partnership, trust, or other entity, whether through ownership of voting securities or interests, by contract, or otherwise.

"Agency" means any Person, including any Affiliate of Buyer, with whom Buyer places an Account for collection or who otherwise engages in collection activities in respect of an Account, whether in its own name or on behalf of Buyer.

"Agreement" means this Line of Credit Account Sale Agreement, including all Schedules, Annexes and Exhibits, as it may be renewed, extended, restated, amended, or supplemented from time to time.

"Applicable Percentage" has the meaning given such term in the applicable Annex I.

"Assignment and Bill of Sale" means an assignment and bill of sale in the form of Exhibit A, executed by Seller and delivered to Buyer evidencing the sale of each Account Pool sold hereunder.

"Bankrupt Account" means an Account that, at the applicable Cut-Off Date, the relevant Account Obligor is a debtor in a case under the Bankruptcy Code or has filed a case under the Bankruptcy Code, which has resulted in the discharge of such Account Obligor's obligations to Seller. If there are two or more Account Obligors on the same Account, all Account Obligors must be debtors in bankruptcy or have filed in order for the Account to be a Bankrupt Account.

"Bankruptcy Code" means the Bankruptcy Code of the United States, as existing as of the Effective Date or thereafter amended.

"Breach" means, as to any representation, warranty, covenant, obligation, liability, or other provision made by or binding on Seller or Buyer under this Agreement, the occurrence of any inaccuracy in, breach of, or failure to comply with, such representation, warranty, covenant, obligation, liability, or other provision by Seller or Buyer, as applicable.

"Business Day" means every day on which commercial banks in the State of Louisiana are open for business.

"CFPB" means the federal Consumer Financial Protection Bureau.

#22297835 v3

Confidential **UNSEALED**

App. 0903

TF-PA-565649

"Closing" means the consummation of an Account purchase and sale transaction between Buyer and Seller, as contemplated by this Agreement

"Closing Date" means the date on which Buyer purchases an Account Pool by completing all conditions precedent to Closing, as described herein.

"Confidential Information" has the meaning assigned to it by the NDA and includes, without limitation, means the Account Documents and all information included therein, together with all other information concerning the Accounts and/or the Account Obligors provided to or obtained by Buyer prior to a Closing.

"Consumer Credit Laws" means the FDCPA, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Electronic Funds Transfer Act, the Telephone Consumer Protection Act, the Servicemembers Civil Relief Act, the prohibition against unfair, deceptive, or abusive acts or practices, the guidance in the Consumer Financial Protection Bureau's Examination Procedures for Debt Collection, the guidance in the Consumer Financial Protection Bureau's Bulletin 2013-07 regarding the prohibition of unfair, deceptive, or abusive acts or practices in the collection of consumer debts, and all other United States federal, state and Tribal Laws that pertain to the extension of consumer credit and/or the collection of consumer credit obligations.

"Cut-Off Date" related to the purchase of a particular Account Pool means the date indicated in the applicable Annex I.

"Deceased Account" means an Account for which, as of the applicable Cut-Off Date, the Account Obligor of such Account is deceased. If there are two or more Account Obligors on the same Account, all Account Obligors must be deceased as of the Cut-Off Date in order for the Account to be a Deceased Account.

"Debtor Relief Law" means the Bankruptcy Code and any other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Law from time to time in effect affecting the Rights of creditors generally.

"Disaster Area Account" means an Account held by an individual who lives in a federally-declared disaster area.

"Effective Date" has the meaning given such term in the initial paragraph of this Agreement.

"FDCPA" means the Fair Debt Collection Practices, 15 U.S.C. § 1601 *et seq.*, any successor federal statute thereto and all rules and regulations promulgated thereunder, as any of the same may be amended from time to time.

"Forgery/Fraud Account" means each Account that is created prior to the applicable Cut-Off Date as a result of forgery or fraud.

"Governmental Approval" means an approval, authorization, consent, permit, license, concession, grant, waiver, or exemption of, registration, designation, declaration, or filing with, or report or notice to, any Governmental Authority.

"Governmental Authority" means the Federal government of the United States, federally recognized Indian tribe, and any tribunal, court, or arbitrator (including any private arbitration board or panel) of competent jurisdiction.

Confidential UNSEALED

App. 0904

TF-PA-565650

"Gramm-Leach-Bliley Act" means the Gramm-Leach-Bliley Act of 1999, any successor federal statute thereto and all rules and regulations promulgated thereunder, as any of the same may be amended from time to time.

"Ineligible Account" means any Account that is a Bankrupt Account, a Deceased Account, a Paid In Full/Settled In Full Account, a Forgery/Fraud Account, a Minor Account, a Servicemember Account, or a Disaster Area Account, or that is involved in Litigation.

"Knowledge" of any particular fact or other matter means, (a) as to any natural Person, that such natural Person has actual knowledge of such fact or other matter, and (b) as to any Person other than a natural Person, that an individual who is serving, or who at any time has served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter. For purposes of this definition, *"actual knowledge"* of any particular fact or other matter means, as to a natural Person, that such Person is actually aware of such fact or other matter.

Law" means (a) any applicable statute, law, treaty, ordinance, rule, regulation, order, writ, injunction, decree, judgment, or opinion of any Governmental Authority, (b) Consumer Credit Law, and (c) Tribal Law..

"Lien" means any lien, security interest, mortgage, pledge, adverse claim, title defect, title retention agreement, voting trust agreement, property settlement or marital dissolution agreement, preemptive right, right of first refusal, or other interest, equity, option, restriction, encumbrance, or charge of any kind.

"Litigation" means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation or cease and desist order commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party other than the threatened civil investigative demand attempted to be imposed on the Seller by the CFPB.

"Material Litigation" means any Litigation that, according to generally accepted accounting principles, is considered significant to Buyer's or Seller's financial condition.

"Minor Account" means any Account where the Account Obligor was a minor at the time of entering into the Account.

"NDA" means the Mutual Nondisclosure Agreement entered into by Buyer and Seller, effective May ___, 2013.

"Order" means any order, award, decision, decree, injunction, judgment, ruling, subpoena, or verdict issued, made, or rendered by any applicable Governmental Authority.

"Originating Creditor" means Seller.

"Paid in Full/Settled in Full Account" means an Account that, as of the applicable Cut-Off Date, has been paid in full or settled in full.

"Person" means any individual, corporation, partnership, joint venture, Limited Liability Company, trust, Governmental Authority, or other entity.

"Purchase Price" for a particular Account Pool has the meaning given such term in the applicable Annex I.

Confidential **UNSEALED**

TF-PA-565651

"Right" means any legal or equitable right, remedy, power, privilege, or benefit.

"Seller" has the meaning given such term in the initial paragraph of this Agreement.

"Servicemember Account" means a servicemember's Account that is subject to protection under the Servicemembers Civil Relief Act.

"Tax" means any tax, charge, fee, levy, or other assessment levied or charged by a Governmental Authority.

"Tribal Law" means mean any law or regulation duly enacted by the Tribe.

"Unpaid Balance" means, as to any Account, the total outstanding unpaid balance thereon at the applicable Cut-Off Date, as shown on Seller's books and records (including, to the extent applicable under the relevant Account Document and applicable Law, all amounts due in respect of interest, late fees, return check charges, and all other applicable fees and charges).

1.2. __Number and Gender of Words__. Whenever in this Agreement the singular number is used, the same shall include the plural where appropriate and *vice versa*, and words of any gender shall include each other gender where appropriate.

## ARTICLE TWO

## PURCHASE AND SALE OF THE ACCOUNTS

2.1. __Agreement of Purchase and Sale__. Upon the terms and subject to the conditions contained in this Agreement and based upon the representations, warranties, and agreements of Buyer and Seller as contained herein, Buyer agrees to purchase the Accounts from Seller in multiple Closings occurring from time to time, and Seller agrees to sell the Accounts to Buyer, on the applicable Closing Date for each such sale. The Accounts will be sold to Buyer by Seller free and clear of any Liens created by the actions or inactions of Seller or any Affiliate of Seller; and, in conjunction with the sale of the Accounts to Buyer, on each applicable Closing Date, Seller will transfer, sell, assign, and convey to Buyer all of Seller's Rights in, to, and under the Account Documents. All Account purchases and sales hereunder shall be described on an Annex I, all of which shall take the form of Annex I attached hereto.

2.2. __Purchase Price__. The Purchase Price to be paid by Buyer to Seller for the Accounts purchased at a Closing shall be as set forth in the applicable Annex I. The aggregate Purchase Price shall be determined by multiplying the total Unpaid Balances of all the Accounts by the Applicable Percentage, as set forth in the applicable Annex I. Buyer will pay the Purchase Price for each Account Pool as set forth in the applicable Annex I for such Account Pool. The Purchase Price is to be paid in funds available for immediate use by Seller by (i) delivery of a cashier's check or money order in the amount of the payment due or (ii) by wire transfer of the amount of the payment due in accordance with instructions provided by Seller to Buyer.

2.3. __Closing__. Each Closing of the purchase and sale of an Account Pool pursuant to this Agreement will be consummated on the Closing Date described in the applicable Annex I. On (or prior to) the Closing Date, the following actions will be taken by Seller and Buyer:

    (a) Buyer will pay the full Purchase Price, in accordance with the applicable Annex I:

#22297835 v3

Confidential UNSEALED

App. 0906

TF-PA-565652

(b)     Seller will execute and deliver the Assignment and Bill of Sale in favor of Buyer with respect to the Account Pool that is the subject of the applicable Annex I; and

(c)     Seller will deliver to Buyer the Account Listing.

The obligations of Buyer and Seller to complete each Closing are subject to the conditions precedent set forth in Article Six.

2.4.     Payments Received.  If Seller or any servicing agent receives any credits, payments or other consideration distributed or paid by or on behalf of any Account Obligor with respect to any Account prior to or on the Cut-Off Date, Seller shall be entitled to accept such payments and (if necessary) adjust the Unpaid Balance of such Account reflected on the Account Listing.  If Seller or any servicing agent shall receive any credits, payments or other consideration distributed or paid by or on behalf of any Account Obligor with respect to any Account after the Cut-off Date, Seller shall promptly pay over and/or deliver such payments to Buyer.  Any such remittances will be made by regular United States mail, unless otherwise requested by Buyer (in which case Buyer will reimburse Seller for all costs incurred by Seller in connection with the transmittal of such remittance.).  If Buyer or any Agency shall receive any credits, payments or other consideration on any Account of an Account Obligor that is not an Account sold pursuant to this Agreement, Buyer shall promptly pay over and/or deliver such payments to Seller within 10 days of receipt.

2.5.     Warranty and Limitation of Liability.  SELLER WARRANTS TO BUYER THAT IT WILL SELL, ASSIGN, TRANSFER, AND CONVEY TO BUYER ALL OF SELLER'S RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER THE ACCOUNTS AND THE ACCOUNT DOCUMENTS. EXCEPT FOR SUCH WARRANTY AND FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN SECTION 3.1, THE ACCOUNTS ARE BEING SOLD "AS IS" AND "WITH ALL FAULTS," AND SELLER DOES NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY CONCERNING THE ACCOUNTS AND/OR THE ACCOUNT DOCUMENTS, INCLUDING, BUT WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR COLLECTIBILITY OF THE ACCOUNTS, OR ANY OTHER REPRESENTATION OR WARRANTY, AND SELLER SPECIFICALLY DISCLAIMS ANY OTHER REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE ACCOUNTS OR THE ACCOUNT DOCUMENTS.  BUYER ACKNOWLEDGES THAT SUCH LIMITATIONS APPLY TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND FURTHER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS AGREEMENT, THE SALE, ASSIGNMENT, TRANSFER, AND CONVEYANCE OF THE ACCOUNTS AND THE ACCOUNT DOCUMENTS WILL BE WITHOUT RECOURSE TO SELLER AND WILL BE SUBJECT IN ALL RESPECTS TO THE LIMITATIONS SET FORTH IN THIS SECTION 2.5.

2.6.     Payment on Accounts.  Subject to the limitations and conditions described in this Agreement, Seller authorizes Buyer to accept, endorse in Buyer's name for the sole purpose of depositing funds, and deposit any payments into Buyer's accounts that it receives on Accounts for so long as Buyer retains the right to collect such Account.

#22297835 v3

Confidential UNSEALED

App. 0907

TF-PA-565653

## ARTICLE THREE

## REPRESENTATIONS AND WARRANTIES

3.1. <u>Representations and Warranties of Seller</u>. On and as of the Effective Date hereof Seller represents and warrants to Buyer, and on and as of each Closing Date hereafter Seller will represent and warrant to Buyer as follows:

(a)     <u>Title to Accounts</u>. Seller owns good and marketable title to the Accounts, and has obtained all consents necessary to transfer title to the Accounts free and clear of all Liens.

(b)     <u>Authorization by Seller</u>. The execution and delivery of this Agreement by Seller and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite actions of Seller, and this Agreement has been duly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to the application of Debtor Relief Laws. Seller has full power, capacity, and authority to execute and deliver this Agreement and the Assignment and Bill of Sale. In addition, to its knowledge, Seller has obtained all licenses and approvals, if any, as required under Tribal Law to carry on its business as now conducted insofar as Seller's business relates to Seller's ownership of the Accounts or the sale thereof to Buyer, and all such licenses and approvals are in full force and effect.

(c)     <u>Organization, Existence, and Good Standing of Seller</u>. Seller is an entity duly organized, validly existing, and in good standing under Tribal Law with all requisite company power and authority to own, lease, and operate its properties, to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby.

(d)     <u>No Conflicts</u>. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the organizational documents of Seller, any resolution adopted by the members or managers of Seller, any Tribal Law, rule or regulation applicable to Seller, any agreement or other document to which Seller is a party or by which it or any of its property is bound, or any Order that affects or binds Seller. No Governmental Approval, and no consent or approval of any other Person is required on the part of Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(e)     <u>Litigation</u>. There is no actual pending Material Litigation (i) that has been commenced by or against Seller that relates to or may affect Seller's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement or the transactions contemplated hereby. To the Knowledge of Seller, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(f)     <u>Compliance with Laws</u>. To the Knowledge of Seller, (i) Seller has complied with and is in compliance in all material respects with each applicable law of a Governmental Authority that is or was applicable to Seller in respect of the ownership or use of the Accounts, and (ii) Seller has not received any notice or other communication (whether written or oral) from any applicable Governmental Authority or any other Person regarding (y) any actual, alleged, or potential violation of, or failure to comply with, any applicable Law in respect of, or affecting, Seller's ownership of the Accounts or the sale thereof to Buyer (other than the civil investigative demand attempted to be imposed on Seller by the CFPB, or (z) any actual, alleged, or potential obligation on the part of Seller to undertake, or to

7

#2229783 v3

Confidential – UNSEALED

TF-PA-565654

bear all or any portion of the cost of, any remedial action in respect of, or affecting, Seller's ownership of the Accounts or the sale thereof to Buyer.

(g) Accounts. To the Knowledge of Seller, each Account was made for valuable consideration and represents the enforceable obligation of the Account Obligors obligated therefore, except as limited by Debtor Relief Laws.

(h) Account Obligors. No Account Obligor has initiated any Litigation against Seller in respect of the Account for which such Account Obligor is liable, and, to the Knowledge of Seller, no Account Obligor has any enforceable Rights of set-off, counterclaim, cancellation, or claim that such Account suffers from lack of consideration, forgery, or alteration of the Account Obligor's signature, except as otherwise disclosed in the Account Documents pertaining to such Account.

(i) Unpaid Balances. The amount reflected as the Unpaid Balance of each Account in the Account Documents is the amount of the Unpaid Balance represented to Buyer at the time of its acquisition from Seller of the Account, less any payments received by Seller prior to Cut-Off Date; but otherwise Seller makes no warranty as to the accuracy of the Unpaid Balance of each Account as reflected in the Account Documents.

3.2. Representations and Warranties of Buyer. On and as of the Effective Date hereof Buyer represents and warrants to Seller, and on and as of each Closing Date hereafter Buyer will represent and warrant to Seller as follows:

(a) Authorization by Buyer. The execution and delivery of this Agreement by Buyer and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or other actions of Buyer, and this Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject only to the application of Debtor Relief Laws. Buyer has full corporate or other power, capacity, and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Buyer as contemplated by this Agreement. In addition, Buyer possesses all Governmental Approvals, if any, required to carry on its business as now conducted insofar as Buyer's business relates to the collection of accounts receivable such as (and including) the Accounts, or the purchase and collection of the Accounts, and all such Governmental Approvals are in full force and effect.

(b) Organization, Existence, and Good Standing of Buyer. Buyer is duly organized, validly existing, and in good standing under the Laws of the State of Kansas with all requisite power and authority to own, lease, and operate its properties and to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby. Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of business transacted by it or properties owned or leased by it requires such qualification and in which the failure to do so would have a material adverse effect on its ability to perform its obligations under this Agreement or the enforceability thereof.

(c) No Conflicts. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer, any resolution adopted by the shareholders or the board of directors (or other constituent group) of Buyer, or any mortgage, indenture, lease, Account or credit agreement, or other contract, applicable Law, or Governmental Approval applicable to Buyer, or any of the properties of Buyer, or any Order which affects or binds Buyer. No Governmental Approval, and no consent or

Confidential **UNSEALED**

App. 0909

TF-PA-565655

approval of any other Person, is required on the part of Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(d)     Litigation.    There is no actual pending Material Litigation (i) that has been commenced by or against Buyer or that otherwise relates to or may affect Buyer's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with this Agreement or the transactions contemplated hereby. To the Knowledge of Buyer, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(e)     Compliance with Laws.    Buyer has complied with and is in compliance in all material respects with, and when performing under this Agreement will comply with each Law that is applicable to Buyer or the purchase, ownership, collection or use of the Accounts, including, but without limitation, the Gramm-Leach-Bliley Act and all applicable Consumer Credit Laws. The Buyer is licensed in all jurisdictions which require a license to collect a debt from an Account Obligor in the state where such Account Obligor resides.

(f)     Suitability.    Buyer has such knowledge and experience in financial, collections, and business matters as to be capable of evaluating the merits and risks of the purchase of the Accounts and is, by virtue of having made other investments of a similar nature and/or by reason of its business and financial experience or the business and financial experience of those Persons it has retained to advise Buyer with respect to its purchase of the Accounts, a "*sophisticated*" purchaser.

(g)     Ability to Bear Risk.    Buyer is in a financial position to hold its interest in the Accounts for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of the Purchase Price of the Accounts.

(h)     Investigation and Access to Information.    Buyer has been given all such access to information regarding the Accounts, including, in particular, the risks associated with the collectability (and ultimate collection) of the Accounts as it has requested from Seller, and has utilized such access to its satisfaction for the purpose of obtaining information about the Accounts. Buyer has received an explanation from Seller of all codes, abbreviations or shorthand terms used to indicate special characteristics or handling of the Accounts. Buyer agrees and represents that the information about the Accounts made available to it constitutes an adequate and sufficient basis on which to determine whether and at what price to purchase the Accounts. Buyer acknowledges and agrees that (i) it has been solely responsible for its own due diligence investigation of the Accounts and the merits or risks of an investment in the Accounts, (ii) it is not relying on any investigation conducted or undertaken by any other Person, including Seller or its Affiliates (and their respective directors, officers, and employees) or on any representations or warranties of any other Person other than the representations expressly made by Seller herein, and (iii) it is purchasing the Accounts based upon its independent examination, study, inspection and knowledge of the Accounts and in reliance on its own determination of the quality, value and condition of the Accounts. Buyer expressly acknowledges that, prior to executing and delivering this Agreement, Buyer has been encouraged, invited and directed by Seller to conduct such due diligence review and analysis of the Accounts, related information and publicly available records as Buyer deems necessary, proper or appropriate in order to make a complete informed decision with respect to its purchase of the Accounts, to consult with legal counsel and such other advisors as Buyer believes desirable, and to ask such questions of Seller concerning the Accounts as Buyer desires to ask, and Buyer has undertaken all of the foregoing tasks, including the risks associated with attempting to collect an Account that was originated by Seller under Tribal Law that does not comply with various state laws, including laws limiting the interest rate and other fees and charges that may be assessed under the state law where the Account Obligor resides.

#22297835 v3

9

(i)     Acknowledgement of Risks.  The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities." Buyer understands that an investment in the Accounts is speculative and involves a high degree of risk and that Buyer must be able to withstand, and could sustain, a total loss of Buyer's investment in the Accounts.

(j)     Acknowledgement Regarding Documents.  Buyer understands that Seller will not have in its possession all account documents in respect of the Accounts that may be desired or requested by Buyer and that the Account Documents may not include all account documents related to any given Account; and Buyer acknowledges that Seller's failure to provide any account document that is not included among the Account Documents will not constitute a Breach on the part of Seller.

(k)     Acknowledgement Regarding Fees.  Buyer warrants, represents, understands and acknowledges that no further fees or costs may be charged or assessed to the Accounts or the Account Obligors for the underling debt (including, but not limited to: NSF, late fees, interest, processing fees, attorney fees, collection costs, etc.).

## ARTICLE FOUR

### REPURCHASE, CANCELLATION AND SURRENDER OF ACCOUNTS

4.1.     Seller's Obligation to Repurchase Accounts.

(a)     Ineligible Accounts.  Seller will use reasonable efforts to determine that the Accounts do not include any Ineligible Accounts.  If, within the time frame set forth in the applicable Annex I, it is reasonably determined by Buyer that Ineligible Accounts were included among the Accounts, or Seller determines that an Account was sold which was an Ineligible Account at the Closing Date, then Seller and Buyer agree that the terms of the applicable Annex I, Paragraph 10 (Recourse Procedures) shall apply.

(b)     Sole Remedy.  The remedies set forth in the applicable Annex I, Paragraph 10 (Recourse Procedures) will be Buyer's sole remedy, and Seller's sole obligation, in the event Seller has sold an Ineligible Account to Buyer.

4.2.     Seller's Option to Repurchase Accounts.  Seller shall have the right to repurchase any Account (for an amount equal to Buyer's payment for such Account, applying the Applicable Percentage to the Unpaid Balance of such repurchased Account) if Seller determines that there is a pending or threatened lawsuit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to such Account or an Account Obligor, and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Account, or if the account had been sold in error due to previous settlement or fraud.  In the event of such a repurchase, Seller shall notify Buyer of Seller's intent to repurchase such Account, and upon receipt of such notice, Buyer shall promptly cease all activity on such Account and execute and deliver a Bill of Sale satisfactory to Seller, assigning all right, title and interest of Buyer in such Account, without representations or warranties or any kind or character, expressed or implied to Seller.  In addition, Buyer shall cease releasing or compromising the Account and shall remove its credit reporting (if any) on any repurchased Account.  Buyer shall forward to Seller all payments collected or received on the Account after receipt of such notice.

Confidential UNSEALED

App. 0911

4.3.    Cancellation and Surrender of Purchased Accounts.  For each Account purchased by Buyer hereunder that has not otherwise been paid in full, closed, cancelled, terminated by bankruptcy proceeding, repurchased by Seller as contemplated by Section 4.1 or Section 4.2 or in a repayment plan as specified in this Section 4.3, on the date that is the 30 months from the purchase date for such Account, Buyer will (a) cease all collections activities on such Account, (b) retrieve such Account from any Person with whom Buyer placed the Account for collection or sold the Account, (c) cancel such Account such that it no longer may be collected upon by any Person, including subsequent owners or holders of such Account, and (d) upon the request of Seller, transfer ownership of such Account back to Seller.  With respect to Accounts that are beyond the 30-month period identified above but that are in a paying status or otherwise have a payment plan in place, (x) Buyer shall be permitted to continue collecting on such Accounts in accordance with the established payment arrangement, (y) Buyer shall report to Seller on the status of all such Accounts every 30 days, and (z) Buyer shall comply with subsections (a) through (d) above with respect to any Account for which payment has ceased due to a breach of the applicable payment arrangement for such Account.

## ARTICLE FIVE

## CERTAIN COVENANTS

5.1.    Confidentiality Obligations of Parties.  Buyer and Seller acknowledge and agree that the confidentiality obligations of Buyer and Seller are governed by the NDA, which is incorporated herein by reference.  Buyer acknowledges that all Confidential Information associated with the Accounts to be purchased at any Closing remains the property of Seller until the Closing is consummated and must be accorded confidential treatment at all times in accordance with the NDA.  If a Closing does not occur, regardless of the reason, Buyer promptly (and in any event within five Business Days after the designated Closing Date) will return to Seller, at Buyer's expense, any and all tangible Confidential Information in Buyer's possession.  In the event of a Breach of the NDA or this Section 5.1 by Buyer, Seller will be entitled to injunctive relief as set forth in this Agreement and the NDA.

5.2.    Covenants of Seller.  Seller agrees and covenants with Buyer that Seller will comply with its obligations in respect of the retrieval and transmittal of documentation related to each Account as set forth in the applicable Annex I.

5.3.    Covenants of Buyer.  Buyer agrees and covenants with Seller as follows:

(a)    Compliance with Law; Reporting of Regulatory Investigations, Actions and Litigation.  In the performance of its collection efforts with respect to the Accounts, Buyer agrees that it will comply with all requirements of Tribal Law, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act and all other applicable federal and state Consumer Credit Laws.  In the event Buyer (a) receives a notice from any Governmental Authority that it is being investigated for, or is a defendant in any administrative, civil or criminal related to or action alleging violations of any federal or state Consumer Credit Law in reference to Accounts sold pursuant to this Agreement, or (b) receives written or oral attorney demands or notice of Litigation, Buyer will promptly, and in any event within 3 days after receipt of such notice, notify Seller thereof.  Buyer will provide Seller with details of the allegations made and of Buyer's intended response thereto, and will keep Seller apprised of the progress of such investigation, action, demand or Litigation during the time it is pending.  Under no circumstances whatsoever shall Buyer, any Agency or any other Person engaging in any collections activities in respect of or otherwise communicating with any Account Obligor of any Account, institute or maintain or threaten to institute or maintain any administrative, civil or criminal action or proceeding against any Account Obligor.

Confidential—UNSEALED

App. 0912

TF-PA-565658

(b)    Notification of Account Obligors and Third Parties.    Buyer shall notify an Account Obligor in writing that the Account Obligor's Account has been sold to Buyer. The written notification must include (i) the name of Seller as the original creditor, (ii) the accurate balance of the debt, (iii) the address to which the Account Obligor must remit payments to avoid further collection activity, and (iv) a statement that Buyer is collecting on its own behalf, and not on behalf of the original creditor, and that Buyer is not affiliated in any way with the original creditor. If an Agency is required by a Consumer Credit Law to provide a similar notice to Account Obligors in respect of Accounts placed with such Agency, then such Agency shall comply with this Section 5.3(b).

(c)    Use of Seller's Name.    Buyer is expressly prohibited from using Seller's name in connection with Buyer's operations or its Accounts, including, but without limitation, on checks, drafts, letters, and forms, provided, however, that (i) Buyer may identify Seller as the original creditor solely for the purpose of accurately describing the source of an Account Obligor's debt obligation and (ii) must also state that Buyer is collecting on its own behalf, and not on behalf of Seller, and that Buyer is not affiliated in any way with Seller.

(d)    Referrals of Inquiries.    After the Closing, Buyer will handle any and all inquiries from Account Obligors directly and will not under any circumstances refer any Account Obligor to Seller in regard to any such inquiry.

(e)    Account Information.    Upon Seller's request, from time to time, Buyer will provide Seller with information with respect to specific Accounts needed by Seller to reconcile Seller's accounting records with respect to such Account(s), provided that such information is reasonably available to Buyer and such request is made within three (3) years after the Closing Date.

(f)    Audit Rights.    During the term of this Agreement and for a period of nine months from the expiration or termination hereof so long as any obligation under any of the Accounts is outstanding, Buyer shall permit Seller, from time to time, upon reasonable advance notice and during Buyer's normal business hours to perform an audit of (i) all books and records of Buyer as they may relate to this Agreement, the transactions contemplated hereby and the performance by Buyer of its obligations hereunder, and (ii) Buyer's operations and electronic data processing functions. Buyer shall maintain accurate, complete and correct records of all matters related to this Agreement. Buyer shall provide Seller with reasonable access to Buyer's premises and its books and records [and those of any Agencies that it has engaged to collect amounts from Account Obligors] to enable Seller to exercise its audit rights hereunder.  Seller shall be permitted to exercise its audit rights under this Section 5.3(f) directly or via a third party service provider, and Seller shall bear all expenses related to any audit conducted hereunder. Seller shall have the right to copy, at its own expense, any of Buyer's records related to its obligations hereunder, and Seller shall treat such records in a confidential manner in accordance with the NDA. Buyer also agrees to submit to any examination which may be required by any regulatory authority with audit and examination authority over Seller, to the fullest extent that such regulatory authority may require and to the fullest extent provided by law, [and Seller shall bear Buyer's expenses incurred in relation to such audit].  Each Agency with whom Buyer places any Account as contemplated by Section 5.3(h) shall be contractually required by Buyer to adhere to this Section 5.3(f).

(g)    Adherence to Controls, Policies and Procedures; Training.    Buyer, all Agencies and all employees and contractors of Buyer and each Agency (i) shall comply in all respects with the compliance controls, complaint processing, reporting, service provider oversight and other requirements set forth in Schedule A, as required by the Consumer Laws, as set forth in Tribal Law and as set forth in any guidance, regulation or otherwise issued by the CFPB, the FTC, or any other applicable state or federal agency relating to debt collection by third parties, (ii) shall adhere in all respects to Seller's policies and procedures that Seller has reasonably determined are relevant to this Agreement and the subject matter hereof and that Seller provides to Buyer in writing, (iii) shall adhere in all respects to

#22297835 v3

Confidential   UNSEALED

TF-PA-565659

information technology and information security standards, controls and safeguards, including, without limitation, industry standards and Seller's established information technology policies and procedures, and (iv) shall engage in all training that Seller has reasonably determined is relevant to this Agreement and the subject matter hereof and that Seller provides to Buyer in writing, electronically or otherwise.

(h)     Approval and Onboarding of Agencies.  After the date that is the 90th day from the date the initial Annex I is signed hereunder, Buyer may request approval from Seller to place Accounts with Agencies, and shall adhere to the following Agency onboarding and approval process:

(i)     Each prospective Agency must complete the Seller-provided due diligence questionnaire and provide supporting documentation contemplated thereby;

(ii)     Each prospective Agency must agree in writing to adhere to the terms and conditions of this Agreement, including, without limitation, the requirements of Schedule A;

(iii)     Each prospective Agency must provide such other documentation and answer such other questions as Seller may reasonably ask to enable Seller to determine, in its discretion, whether such prospective Agency is capable of adhering to the terms and conditions of this Agreement, including, without limitation, the requirements of Schedule A.

In no event shall the number of Agencies exceed eight.  No more than 20% of Accounts purchased by Buyer at any Closing may be placed with an Agency, including an approved Agency, during the first 90 days from the Closing Date for the purchase of such Accounts.  Buyer may not place any purchased Account with any Agency where the Account Obligor has filed for protection under the Bankruptcy Code or otherwise been placed into bankruptcy or which is in Litigation.

(i)     No Sale of Accounts.  Buyer agrees that it shall not sell, transfer, or assign to any third party any Account, it being the intent of the Parties that only Buyer and approved Agencies shall have the right to engage in collection activities with respect to the Accounts.

## ARTICLE SIX

### CONDITIONS PRECEDENT

6.1.     Conditions Precedent to Obligations of Buyer.  The obligations of Buyer with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Buyer, at or prior to each such Closing of all the following conditions:

(a)     Representations and Warranties; Performance of Obligations.  All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the applicable Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Seller on or before the applicable Closing Date, including the obligations of Seller under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)     No Litigation.  No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby, and no applicable Governmental Authority shall have taken any other action or made any request of Buyer as a result of which Buyer reasonably deems it inadvisable to proceed with the transactions hereunder.

822297835 v3

Confidential **UNSEALED**     App. 0914     TF-PA-565660

(c)     Compliance with Laws. The purchase and sale of the Accounts pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

6.2.    Conditions Precedent to Obligations of Seller. The obligations of Seller with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Seller, at or prior to each such Closing of the following conditions:

(a)     Representations and Warranties; Performance of Obligations. All of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of each Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Buyer on or before the applicable Closing Date, including the obligations of Buyer under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)     No Litigation. No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby and no Governmental Authority shall have taken any other action or made any request of Seller as a result of which Seller reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)     Compliance with Laws. The purchase and sale of the Accounts pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

(d)     Consent of Sale. All Parties shall consent to the sale from the Seller to Buyer of the Accounts by signing below.

## ARTICLE SEVEN

## INDEMNIFICATION

**7.1.    Buyer's Indemnification of Seller. Buyer shall indemnify and hold Seller, and its Affiliates, and their respective predecessors, successors, owners, managers, assigns, officers, directors, employees, agents, and attorneys (collectively, the "Seller Indemnified Parties") harmless from and against any and all claims, actions, suits, or other actual or threatened proceedings (collectively "Actions"), and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) (collectively "Losses") incurred or suffered by any Seller Indemnified Party, in either case as a result of, in connection with or arising out of: (i) any breach by Buyer of any representation, warranty or covenant made by it pursuant to the terms of this Agreement; or (ii) any action taken by or on behalf of Buyer by an Agency or any omission of Buyer or any of its Affiliates, employees, agents or representatives or any Agency in connection with any Account (except to the extent any such Action or Loss arises out of a breach by Seller of any representation or warranty hereunder), including, without limitation, by reason of the gross negligence or willful misconduct of Buyer (or its Affiliates, employees or agents or any Agency), or the violation of any applicable Law or Consumer Credit Law or any covenant made by Buyer in Section 5.3 of this Agreement by Buyer.**

**7.2.    Seller's Indemnification of Buyer. Seller shall indemnify and hold Buyer, its Affiliates, predecessors, successors, assigns, officers, directors, employees, agents, and attorneys harmless from and against any claims, actions, suits, or other actual or threatened proceedings, and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) incurred or suffered by Buyer by reason of the gross negligence, willful misconduct, or material violation of any applicable Law by Seller (or its Affiliates, employees, or agents) in connection with any Breach by Seller.**

#2229783S.v3

Confidential **UNSEALED**

App. 0915

TF-PA-565661

**7.3.** __Limitation of Liability.__ Buyer acknowledges and agrees that neither Buyer nor any future holder of any Account, nor their respective successors and assigns, shall have any claim, remedy, or Right to proceed (at Law or in equity) against Seller for any deficiency or other sum owing on any Account, and Buyer hereby waives and releases any liability of Seller for and on account of such indebtedness or liability.

7.4.    __Payable on Demand.__ Any amounts due to Buyer or Seller under this Article Seven shall be payable on demand.

7.5.    __Notice and Cooperation.__ Buyer or Seller shall notify each other within ten (10) Business Days after receiving actual knowledge of an event that triggers or may trigger indemnification obligations under this Agreement. Notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of the amount of the liability arising there from. The Party claiming indemnification will cooperate with the other Party's insurance carrier, as reasonably requested by the Party or the insurance carrier.

7.6.    __Defense.__ In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a Party, the indemnifying Party shall have the right, at its option, at its expense and with its own counsel, which counsel shall be reasonably satisfactory to the indemnified Party, to assume the defense of any such claim or litigation or participate in the compromise thereof, provided, however, that an issue in a claim is one involving Tribal Law, tribal sovereignty or tribal/federal issues, Seller shall have the right to assume the defense of the matter at the expense of the indemnifying Party. Subject to the foregoing, if it chooses to so assume the defense of any such claim, the indemnifying Party shall promptly notify the indemnified Party of its intention to do so, and the indemnified Party shall cooperate fully with the indemnifying Party and its counsel in the defense against or compromise of any such claim or litigation. Notwithstanding anything in this Article Seven to the contrary, the indemnified Party shall not compromise or settle any such claim or litigation without the prior written consent of the indemnifying Party, which consent will not be unreasonably withheld.

7.7.    __Survival.__ The Parties' obligations under this Article Seven shall survive the termination of this Agreement, provided, however, no Party shall be obligated to indemnify the other Party in respect of claims for which notice is provided after the date that is three years after the termination date of this Agreement.

## ARTICLE EIGHT

## MISCELLANEOUS

8.1.    __Term and Termination.__ The initial term of this Agreement shall be 24 months from the Effective Date, unless the term is extended by the mutual written agreement of Buyer and Seller or terminated earlier in accordance with this Agreement. This Agreement and the transactions contemplated hereby may be terminated as follows:

(a)    By the mutual written agreement of Buyer and Seller;

(b)    By Buyer if a Breach of any provision of this Agreement has been committed by Seller and such Breach has not been waived or promptly cured;

(c)    By Seller if a Breach of any provision of this Agreement has been committed by Buyer and such Breach has not been waived or promptly cured; or

(d)    By Buyer or Seller as otherwise expressly permitted by this Section 8.1.

15

#22297835 v3

Confiden**UNSEALED**

TF-PA-565662

On each anniversary of the Effective Date, for so long as this Agreement remains in place, Buyer and Seller shall review and negotiate in good faith the requirements of Schedule A and the general terms and conditions to the purchase and sale of each Account Pool set forth in Annex I (including, without limitation, the Purchase Price). If Buyer and Seller are unable to come to a commercially reasonable agreement about such terms and conditions after negotiating such terms and conditions in good faith, then either Party may terminate this Agreement upon written notice to the non-terminating Party. Buyer and Seller also agree to negotiate in good faith the extension of this Agreement for an additional 12-month period beyond the initial term, and if Buyer and Seller are unable to come to a commercially reasonable agreement about the terms and conditions of any such extension then this Agreement shall terminate on the original expiration date.

8.2.     Effect of Termination. Each Party's Right of termination under Section 8.1 is in addition to any other Rights it may have under this Agreement or otherwise, and the exercise of a Right of termination will not be deemed to be an election of remedies. If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties will terminate, except as provided in Section 8.11; provided, however, that if this Agreement is terminated by either Party because of the Breach of this Agreement by the other Party, or because one or more conditions of the terminating Party's obligations under this Agreement is not satisfied as a result of the other Party's failure to comply with its obligations under this Agreement, the terminating Party's Right to pursue all legal or equitable remedies will survive such termination unimpaired.

8.3.     Governing Law.     THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED UNDER THE LAWS OF THE TRIBE AND, TO THE EXTENT APPLICABLE, THE LAWS OF THE UNITED STATES OF AMERICA.     THESE LAWS SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES     AND     THE     VALIDITY,     CONSTRUCTION,     ENFORCEMENT,     AND INTERPRETATION OF THIS AGREEMENT.

8.4.     Remedies Cumulative. No right or remedy conferred upon or reserved to Buyer or Seller under this Agreement is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to every other right or remedy granted there under or now or hereafter existing under any applicable law. Every right and remedy granted by this Agreement or by applicable Law to Buyer or Seller may be exercised from time to time and as often as may be deemed expedient by Buyer and Seller and, unless contrary to the express provisions of this Agreement, irrespective of the occurrence or continuance of any default or breach hereunder.

8.5.     Entirety and Amendments. This Agreement embodies the entire agreement between the Parties and supersedes all prior agreements and understandings relating to the subject matter hereof. This Agreement may be amended or modified only in writing executed by Seller and Buyer.

8.6.     Notices. Any notice or other communication hereunder must be in writing to be effective and shall be deemed to have been given when personally delivered to Buyer or Seller or, if mailed, on the third day after it is enclosed in an envelope and sent certified mail/return receipt requested in the United States mail. Either Party may from time to time change its address for notification purposes by giving the other Party written notice of the new address and the date upon which it will become effective. The address for each Party for notices hereunder is the address set forth. Unless otherwise specified in a notice in writing sent or delivered in accordance with the foregoing provisions of this Section 8.6, notices, demands, instructions and other communications shall be given to or made upon the respective Parties hereto at their respective addresses (or to their respective facsimile number) indicated below.

#22297835 v3

Confidential UNSEALED     App. 0917     TF-PA-565663

<table>
<tr><td>If to Seller to:</td><td>Marshall Pierite, President<br>MobiLoans, LLC<br>P.O. Box 1409<br>Marksville, Louisiana 71351</td></tr>
<tr><td>If to Buyer:</td><td>Brad Hochstein CEO<br>National Credit Adjusters, LLC<br>327 West 4th<br>Hutchinson, KS 67501</td></tr>
<tr><td>Copy to:</td><td>Mark Fletchall, General Counsel<br>National Credit Adjusters, LLC<br>327 West 4th<br>Hutchinson, KS 67501</td></tr>
</table>

8.7.    Expenses. Except as otherwise provided herein, each Party hereto shall bear the expenses (including attorney's fees) it incurs in connection with the negotiation, execution, and performance of this Agreement.

8.8.    No Assignment; Binding Nature on Successors and Assigns. This Agreement is binding upon Seller and Buyer and their respective successors, heirs, and assigns. The Rights and obligations of Seller hereunder may be assigned by Seller to any Person at any time in Seller's discretion. Buyer may not assign any Rights or delegate any duties to any Person, or sell, transfer, delegate or otherwise assign any Accounts to any Person. Any sale, transfer, delegation or assignment by Buyer without such prior written consent will be null and void. Buyer may place Accounts with an Agency only as expressly authorized by and in accordance with Section 5.3(h) provided that Buyer shall be liable for the conduct of such Agency and shall remain liable under the terms of this Agreement.

8.9.    Headings. The headings of Articles and Sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

8.10.    Severability. If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable, or void, so that both Seller and Buyer would be relieved of all obligations arising under such provision, it is the agreement of Seller and Buyer that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent. If such amendment is not possible, another provision that is legal and enforceable and achieves the same objective shall be substituted therefore. If the remainder of this Agreement is not affected by such declaration or finding and is capable of substantial performance by both Seller and Buyer, then the remainder shall be enforced to the extent permitted by law.

8.11.    Survival of Terms. Subject to the limitations and other provisions of this Agreement: (a) the terms and agreements set forth in Articles Two, Four, Five, Seven, and Eight shall survive each Closing and the termination of this Agreement regardless of the reason; and (b) the representations and warranties of Seller and Buyer set forth in Article Three shall survive each Closing and shall remain in effect for a period of two years after each Closing Date.

8.12.    Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original for all purposes and all of which constitute, collectively, one agreement; but, in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

#22297835 v3

Confidential UNSEALED

App. 0918

TF-PA-565664

8.13.   Waivers.  Neither the waiver by Seller or Buyer of any breach of or default under any provision of this Agreement by the other Party, nor the failure of Seller or Buyer, on one or more occasions, to enforce any provision of this Agreement or to exercise any Right hereunder, shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provision or Right hereunder.

8.14.   Execution by Facsimile or PDF.  The manual signature of either Party hereto that is transmitted to the other Party by facsimile or PDF shall be deemed for all purposes to be an original signature.  Either Party that delivers a signature page by facsimile or PDF agrees to deliver an original manually signed counterpart of such Party's signature page to the Party who requests it promptly after receipt of such request.

8.15.   No Third-Party Beneficiary.  This Agreement is for the sole benefit of the Parties, and nothing contained in this Agreement shall be construed to grant any Person, other than Seller and Buyer and their respective successors and permitted assigns, any Right under or in respect of this Agreement or any provision hereof.

8.16.   Relationship between Seller and Buyer.  Nothing in this Agreement is intended to or shall be construed to constitute or establish, as between Seller and Buyer, a partnership, joint venture, agency, or fiduciary relationship of any kind, to create the relationship of employer-employee or principal-agent, or to otherwise create any liability for either Seller or Buyer with respect to any indebtedness, liabilities, or obligations of the other or of any other Person.  Moreover, under no circumstances will either Seller or Buyer have the authority or power to bind the other Party to any agreement or contract.

8.17.   Right to Equitable Relief.  Buyer and Seller acknowledge that should Buyer breach any covenant of Buyer in Section 5.1 or Section 5.3(c) of this Agreement or if Seller breaches Section 3.1 of this Agreement, money damages may be an inadequate remedy to Seller or Buyer and, in such event, Seller or Buyer may seek such equitable relief and Buyer and Seller agree that such relief is appropriate and warranted.

[Signature page follows.]

#22297835 v3

Confidential UNSEALED

App. 0919

TF-PA-565665

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Line of Credit Account Sale Agreement to be executed by its duly authorized representative effective as of the Effective Date.

BUYER:                                    SELLER:

NATIONAL CREDIT ADJUSTERS, LLC            MOBILOANS, LLC

By: _____     By: _____
    Brad Hochstein, Chief Executive Officer     Marshall Pierite, President

THE FOLLOWING ATTACHMENTS TO THIS AGREEMENT ARE A PART OF THIS
AGREEMENT FOR ALL PURPOSES:

Schedule A – Compliance Controls, Reporting Requirements, Etc.

Annex I – Additional Terms and Conditions

Exhibit A – Assignment and Bill of Sale

#22297835 v3

Confidential UNSEALED

App. 0920

TF-PA-565666

**Schedule A**

**Compliance Controls, Reporting Requirements, Etc.**

Training (applies to Buyer and all Agencies):

- All employees/contractors must complete Seller-mandated training at least semi-annually

- All new employees/contractors must complete Seller-mandated training within 15 days of hiring

Auditing and Monitoring (applies to Buyer and all Agencies):

- Weekly Call Monitoring

  - Internal and external – Internal quality control monitoring process, as well as random calls sent to Seller and Seller's servicer, on a weekly basis.

  - Seller must have on-demand access to all live and recorded calls for periodic monitoring.

- Review of adherence to contract and other legal obligations – no less than semi-annually

- Review of processes, procedures and customer-facing materials (emails, letters, phone scripts, etc.) – no less than semi-annually

- Periodic site visits – scheduled visits to occur monthly and quarterly, with additional random visits to occur not more frequently than twice per calendar month

Reporting and Recordkeeping (applies to Buyer and all Agencies):

- Weekly inventory status regarding accounts and complaints received (must have remote access or updated inventory list and complaint list on a weekly basis)

- Monthly reports on debt verification, including:

  - Number of debt verification requests received per month

  - Number of days to turn around a debt verification notice (per account/per month)

  - When requested, must provide evidence of notices sent for individual customers

- Weekly Dialer Call Reporting, including:

  - Number of calls made per customer per day

  - Home

  - Cell

  - Work

  - Other

- Monthly reporting on the status and resolution of investigations, actions, demands, Litigation described in Section 5.3(a)

- Monthly reporting on written notices of debt, including

Schedule A-1

Confidential UNSEALED

> Number of notices sent each month

> When requested, must provide evidence of notices sent for individual customers

Complaint Monitoring and Tracking (applies to Buyer and all Agencies):

- Seller and Seller's servicer must be notified of all complaints within 48 hours of receipt of same (with copies of written complaints and notes of oral complaints)

- Monthly report on complaints, to be delivered no later than the 10th day of each calendar months for complaints received the prior calendar month; reports to include the following:

  > Type of complaint

  > Description of complaint

  > Source of complaint

  > Lender name

  > Resolution taken

  > Account/customer name

  > Account number

  > Bankruptcy number

- If Seller chooses to repurchase an Account, Buyer must cease all collections activities on the Account immediately and transfer ownership of the subject Account to Seller within 1 business days of the request

Implementation of Consistent Compliance Controls (applies to Buyer and all Agencies):

- Mini Miranda violations by collector by month (trended plus action plans taken to resolve errors)

- Audit reports by collector by month

- Must evidence not unfair, deceptive, abusive, etc. to customers (for example, must not: harass customers; tell customers that you are reporting to their bureau when you are not reporting; and must not report debt so old that it has no impact on bureau, etc.)

- Must evidence not collecting illegal fees, illegal interest, or illegal expenses

- Must evidence not collecting on bankruptcy accounts (discharged, active, etc.)

- Must evidence not collecting on debt when have received a written request to stop collecting

- Must evidence not promising to "fix" consumers credit bureau report

Penalty for Failure to Comply with Schedule A Obligations:

- $1,000 per day per failure

Seller, Servicer and NCA Contact:

- *Seller Contact*: [Name, email address, phone number]

Schedule A-2

- *Seller's Servicer Contact*: Gio Rodriguez, yrodriguez@thinkfinance.com, (817) 546-2781, (214) 794-8553

  - *NCA Contact for matters related to Schedule A*: Lori Hess, lori@ncaks.com, Direct Office: (620) 931-2731, Cell: (620) 708-9031

Schedule A-3

**Line of Credit Account Sale Agreement dated November 26, 2013**

**Additional Terms and Conditions**

1.  Description of Accounts:

    a.  Accounts: See attached Account Listing [TBD – determined for each monthly Closing; Accounts will include 90-100% of all Accounts reaching 61 days delinquent; Account files will be scrubbed for bankruptcy and deceased Account Obligors]

    b.  Purchase Price: The aggregate Purchase Price shown below is calculated based on [$0.0865 (8.65%)] multiplied by the aggregate Unpaid Balance of all the Accounts to be purchased under this Annex I.

    c.  Closing Date: [TBD - determined for each monthly Closing, typically will occur on or before the 15th of each month]

2.  Number of Accounts: [TBD - determined for each monthly Closing]

3.  Aggregate Unpaid Balance of all Accounts: [TBD - determined for each monthly Closing]

4.  Applicable Percentage (Purchase Rate): [8.65]% of Outstanding Unpaid Balance

5.  Purchase Price: [TBD - determined for each monthly Closing]

6.  Cut-Off Date: [TBD - determined for each monthly Closing]

7.  Wiring Instructions:

    Bank Name:

    ABA (Routing Number):

    Credit Bank Account Name:

    Credit Bank Account Number:

8.  Ineligible Account. In respect of any Ineligible Account, in no event shall any Account be deemed to be an Ineligible Account unless Buyer is able to provide the following relevant documents (the "Verification Documents") to verify the circumstances causing such Account to be an Ineligible Account:

    a.  For a Bankrupt Account, Buyer shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

    b.  For a Deceased Account, Buyer shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Account Obligor

Confidential **UNSEALED**

TF-PA-565670

information, a credit bureau report showing the relevant Account Obligor as deceased, or a copy of the relevant newspaper obituary.

c.   For a Paid In Full/Settled In Full Account, Buyer shall provide written evidence that the Account has been paid or settled in full.

d.   For a Forgery/Fraud Account, Buyer shall provide a copy or original of a fraud or forgery affidavit.

e.   For a Servicemember Account, Buyer shall provide proof that the Account Obligor is a servicemember subject to the protections of the Servicemembers Civil Relief Act.

f.   For a Minor Account, Buyer shall provide proof that the Account Obligor was a minor at the time of entering into the Account.

g.   For a Disaster Area Account, Buyer shall provide evidence that the Account Obligor lives in a federally-declared disaster area.

9.   Account Documentation: Seller shall deliver to Buyer an electronic copy of all original Account Documents within 45 days of the Closing Date.

10.   Recourse Procedures: If, at any time during the period commencing on the Closing Date and ending 90 days later (the "Recourse Period Termination Date"), Buyer identifies any Account in the Account Pool that Buyer determines is an Ineligible Account:

a.   Buyer shall provide to Seller (according to such instructions as Seller from time to time may give to Buyer) a description of such Account (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

b.   No later than ten (10) days after Seller confirms (through its examination of the Verification Documents) that such Account is an Ineligible Account, Seller shall pay to Buyer an amount equal to: (i) the Unpaid Balance of such Ineligible Account as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage.

c.   Seller shall promptly notify Buyer if, based on its examination of any Verification Document, it concludes that an Account designated by Buyer as an Ineligible Account does not meet the requirements of an Ineligible Account, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Buyer in connection with any Ineligible Account the Verification Documents with respect to which Seller receives from Buyer after the Recourse Period Termination Date; or (ii) shall Buyer provide to Seller information or Verification Documents regarding Ineligible Account more than one (1) time in any calendar month.

Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

[SIGNATURE PAGE FOLLOWS.]

Annex I-2

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Annex I to Line of Credit Account Sale Agreement to be executed by its duly authorized representative effective as of November 26, 2013.

BUYER:                                              SELLER:

NATIONAL CREDIT ADJUSTERS, LLC          MOBILOANS, LLC

By: _____          By: _____
    Brad Hochstein, Chief Executive Officer              Marshall Pierite, President

Annex I-3

## Exhibit A

### Assignment and Bill of Sale

MobiLoans, LLC ("Seller"), a business entity duly organized under and recognized by the laws of the Tunica Biloxi Tribe of Louisiana, has entered into a Line of Credit Account Sale Agreement, dated November 26, 2013 (the "Agreement"), with National Credit Adjusters, LLC, a Kansas limited liability company ("Buyer"), related to the periodic purchase and sale of Accounts on the terms set forth in the Agreement. Buyer and Seller also have entered into an Annex I to the Agreement ("Annex I") dated concurrent with this Assignment and Bill of Sale with respect to the sale of the Account Pool described in the Account Listing attached to such Annex I (collectively, the "Purchased Accounts").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Purchased Accounts, provided, however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement or in the Annex I.

Capitalized terms not otherwise defined herein shall be as defined in the Agreement.

This Assignment and Bill of Sale shall be binding upon Seller and Seller's successors and assigns, and shall inure to the benefit of Buyer and Buyer's successors and assigns.

IN WITNESS WHEREOF, Seller has executed and delivered this Assignment and Bill of Sale to be effective November 26, 2013.

SELLER:

MOBILOANS, LLC

By: _____

Marshall Pierite, President

# Plaintiff's Exhibit 85

UNSEALED

## LINE OF CREDIT ACCOUNT SALE AGREEMENT

THIS LINE OF CREDIT ACOUNT SALE AGREEMENT (this "Agreement") is made and entered into effective as of March 12, 2014 (the "Effective Date"), by and between Level Financial, L.L.C., a Delaware limited liability company ("Buyer"), and MobiLoans, LLC ("Seller"), a limited liability company organized under the laws of the Tunica Biloxi Tribe of Louisiana, a federally recognized Indian tribe (the "Tribe") (the Buyer and the Seller are each a "Party" and collectively, the "Parties").

### RECITALS:

A.    Seller originates and is the owner of certain consumer lines of credit, and Seller desires to sell to Buyer certain of such lines of credit accounts that are at least 61 days delinquent and that are to be more fully identified on each Sale File to be provided for each related monthly Closing indicated in the relevant Annex I.

B.    Buyer desires to purchase such line of credit accounts from Seller on a monthly basis, all in accordance with the terms and subject to the conditions contained in this Agreement and the relevant Annex I.

### AGREEMENT

THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement and for other good and valuable consideration, the adequacy of which the parties hereby acknowledge, Seller and Buyer agree as follows:

### ARTICLE ONE

### DEFINITIONS AND TERMS

1.1.    Definitions. For purposes of this Agreement, the following terms are defined as set forth in this Section 1.1 or in the provisions of this Agreement to which reference is made in this Section 1.1. All references to a Recital, Article, or Section are to a Recital, Article, or Section of this Agreement, unless otherwise indicated, and all references to an Annex or an Exhibit, are to an Annex or an Exhibit attached to and made a part of this Agreement, unless otherwise indicated.

"Account" means a consumer line of credit account receivable originated by Seller that is offered for sale by Seller pursuant to the terms of this Agreement and that in each case (a) is described on an Annex I hereto, (b) has an outstanding balance as of the Cut-Off Date as set forth in such Annex I, (c) is owed by one or more Account Obligors, and (d) is owned by Seller as of the applicable Cut-Off Date.

"Account Document" means any agreement, instrument, or other document evidencing, or delivered in connection with, an Account and in the possession or within the control of Seller, including, but without limitation, (a) any consumer credit agreement, any loan purchase or sale agreement, any loan, account or credit agreement, any promissory note, any guaranty, any security or pledge agreement, any invoice or request for payment, and any other document (regardless of how styled) related to the collection of an Account, and (b) any hard copy evidencing or describing an Account and/or the Unpaid Balance thereof, together with any renewal, extension, or restatement of, or amendment or supplement to, any of the foregoing agreements, instruments, or other documents.

"Account Listing" means a listing (in a mutually agreed-upon electronic format) of the Accounts in a particular Account Pool, which listing shall include such basic information regarding the Accounts as

#222#7835-v3
4238503.3

Confidential **UNSEALED**    App. 0929    TF-PA-272605

is customary for transactions such as the transactions contemplated by this Agreement, including, by way of example, the Account Obligor information obtained by the lender in connection with originating each Account, and the, Unpaid Balance of each Account as of the Cut-Off Date.

"Account Obligor" means any Person who, directly or indirectly, is obligated for the payment of all or any portion of any Account.

"Account Pool" means the group of Accounts sold by Seller to Buyer as part of a particular Closing pursuant to the terms of this Agreement and the applicable Annex I. The Account Pool will consist of those Accounts listed in the electronic Account Listing delivered by Seller to Buyer pursuant to Section 2.3, will be documented by an Assignment and Bill of Sale, and will be identified by a control number.

"Affiliate" means, when used with reference to a specified Person, any other Person who directly controls, is controlled by, or is under common control with, the specified Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person that is a corporation, limited liability company, partnership, trust, or other entity, whether through ownership of voting securities or interests, by contract, or otherwise.

"Agency" means any Person, including any Affiliate of Buyer, with whom Buyer places an Account for collection or who otherwise engages in collection activities in respect of an Account, whether in its own name or on behalf of Buyer.

"Agreement" means this Line of Credit Account Sale Agreement, including all Schedules, Annexes and Exhibits, as it may be renewed, extended, restated, amended, or supplemented from time to time.

"Applicable Percentage" has the meaning given such term in the applicable Annex I.

"Assignment and Bill of Sale" means an assignment and bill of sale in the form of Exhibit A, executed by Seller and delivered to Buyer evidencing the sale of each Account Pool sold hereunder.

"Bankrupt Account" means an Account that, at the applicable Cut-Off Date, the relevant Account Obligor is a debtor in a case under the Bankruptcy Code or has filed a case under the Bankruptcy Code, which has resulted in the discharge of such Account Obligor's obligations to Seller. If there are two or more Account Obligors on the same Account, all Account Obligors must be debtors in bankruptcy or have filed in order for the Account to be a Bankrupt Account.

"Bankruptcy Code" means the Bankruptcy Code of the United States, as existing as of the Effective Date or thereafter amended.

"Breach" means, as to any representation, warranty, covenant, obligation, liability, or other provision made by or binding on Seller or Buyer under this Agreement, the occurrence of any inaccuracy in, breach of, or failure to comply with, such representation, warranty, covenant, obligation, liability, or other provision by Seller or Buyer, as applicable.

"Business Day" means every day on which commercial banks in the State of Louisiana are open for business.

"CFPB" means the federal Consumer Financial Protection Bureau.

4238503.3

Confidential UNSEALED

App. 0930

TF-PA-272606

"Closing" means the consummation of an Account purchase and sale transaction between Buyer and Seller, as contemplated by this Agreement

"Closing Date" means the date on which Buyer purchases an Account Pool by completing all conditions precedent to Closing, as described herein.

"Confidential Information" has the meaning assigned to it by the NDA and includes, without limitation, means the Account Documents and all information included therein, together with all other information concerning the Accounts and/or the Account Obligors provided to or obtained by Buyer prior to a Closing.

"Consumer Credit Laws" means the FDCPA, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Electronic Funds Transfer Act, the Telephone Consumer Protection Act, the Servicemembers Civil Relief Act, the prohibition against unfair, deceptive, or abusive acts or practices, the guidance in the Consumer Financial Protection Bureau's Examination Procedures for Debt Collection, the guidance in the Consumer Financial Protection Bureau's Bulletin 2013-07 regarding the prohibition of unfair, deceptive, or abusive acts or practices in the collection of consumer debts, and all other United States federal, state and Tribal Laws that pertain to the extension of consumer credit and/or the collection of consumer credit obligations.

"Cut-Off Date" related to the purchase of a particular Account Pool means the date indicated in the applicable Annex 1.

"Deceased Account" means an Account for which, as of the applicable Cut-Off Date, the Account Obligor of such Account is deceased. If there are two or more Account Obligors on the same Account, all Account Obligors must be deceased as of the Cut-Off Date in order for the Account to be a Deceased Account.

"Debtor Relief Law" means the Bankruptcy Code and any other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, fraudulent transfer or conveyance, suspension of payments, or similar Law from time to time in effect affecting the Rights of creditors generally.

"Disaster Area Account" means an Account held by an individual who lives in a federally-declared disaster area.

"Effective Date" has the meaning given such term in the initial paragraph of this Agreement.

"FDCPA" means the Fair Debt Collection Practices, 15 U.S.C. § 1601 *et seq.*, any successor federal statute thereto and all rules and regulations promulgated thereunder, as any of the same may be amended from time to time.

"Forgery/Fraud Account" means each Account that is created prior to the applicable Cut-Off Date as a result of forgery or fraud.

"Governmental Approval" means an approval, authorization, consent, permit, license, concession, grant, waiver, or exemption of, registration, designation, declaration, or filing with, or report or notice to, any Governmental Authority.

"Governmental Authority" means the Federal government of the United States, federally recognized Indian tribe, and any tribunal, court, or arbitrator (including any private arbitration board or panel) of competent jurisdiction.

4238503.3

"Gramm-Leach-Bliley Act" means the Gramm-Leach-Bliley Act of 1999, any successor federal statute thereto and all rules and regulations promulgated thereunder, as any of the same may be amended from time to time.

"Ineligible Account" means any Account that is a Bankrupt Account, a Deceased Account, a Paid In Full/Settled In Full Account, a Forgery/Fraud Account, a Minor Account, a Servicemember Account, or a Disaster Area Account, or that is involved in Litigation.

"Knowledge" of any particular fact or other matter means, (a) as to any natural Person, that such natural Person has actual knowledge of such fact or other matter, and (b) as to any Person other than a natural Person, that an individual who is serving, or who at any time has served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter. For purposes of this definition, *"actual knowledge"* of any particular fact or other matter means, as to a natural Person, that such Person is actually aware of such fact or other matter.

Law" means (a) any applicable statute, law, treaty, ordinance, rule, regulation, order, writ, injunction, decree, judgment, or opinion of any Governmental Authority, (b) Consumer Credit Law, and (c) Tribal Law..

"Lien" means any lien, security interest, mortgage, pledge, adverse claim, title defect, title retention agreement, voting trust agreement, property settlement or marital dissolution agreement, preemptive right, right of first refusal, or other interest, equity, option, restriction, encumbrance, or charge of any kind.

"Litigation" means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation or cease and desist order commenced, brought, conducted, or threatened by or before, or otherwise involving, any Governmental Authority or any third party other than the threatened civil investigative demand attempted to be imposed on the Seller by the CFPB.

"Material Litigation" means any Litigation that, according to generally accepted accounting principles, is considered significant to Buyer's or Seller's financial condition.

"Minor Account" means any Account where the Account Obligor was a minor at the time of entering into the Account.

"NCA" means National Credit Adjusters, L.L.C., a Kansas limited liability company.

"NDA" means the Mutual Nondisclosure Agreement entered into by Buyer and Seller, effective March 12, 2014.

"Order" means any order, award, decision, decree, injunction, judgment, ruling, subpoena, or verdict issued, made, or rendered by any applicable Governmental Authority.

"Originating Creditor" means Seller.

"Paid in Full/Settled in Full Account" means an Account that, as of the applicable Cut-Off Date, has been paid in full or settled in full.

"Person" means any individual, corporation, partnership, joint venture, Limited Liability Company, trust, Governmental Authority, or other entity.

4238503.3

Confidential UNSEALED

App. 0932

TF-PA-272608

"Purchase Price" for a particular Account Pool has the meaning given such term in the applicable Annex I.

"Right" means any legal or equitable right, remedy, power, privilege, or benefit.

"Seller" has the meaning given such term in the initial paragraph of this Agreement.

"Servicemember Account" means a servicemember's Account that is subject to protection under the Servicemembers Civil Relief Act.

"Tax" means any tax, charge, fee, levy, or other assessment levied or charged by a Governmental Authority.

"Tribal Law" means mean any law or regulation duly enacted by the Tribe.

"Unpaid Balance" means, as to any Account, the total outstanding unpaid balance thereon at the applicable Cut-Off Date, as shown on Seller's books and records (including, to the extent applicable under the relevant Account Document and applicable Law, all amounts due in respect of interest, late fees, return check charges, and all other applicable fees and charges).

1.2.    Number and Gender of Words.  Whenever in this Agreement the singular number is used, the same shall include the plural where appropriate and *vice versa*, and words of any gender shall include each other gender where appropriate.

## ARTICLE TWO

### PURCHASE AND SALE OF THE ACCOUNTS

2.1.    Agreement of Purchase and Sale.  Upon the terms and subject to the conditions contained in this Agreement and based upon the representations, warranties, and agreements of Buyer and Seller as contained herein, Buyer agrees to purchase the Accounts from Seller in multiple Closings occurring from time to time, and Seller agrees to sell the Accounts to Buyer, on the applicable Closing Date for each such sale. The Accounts will be sold to Buyer by Seller free and clear of any Liens created by the actions or inactions of Seller or any Affiliate of Seller; and, in conjunction with the sale of the Accounts to Buyer, on each applicable Closing Date, Seller will transfer, sell, assign, and convey to Buyer all of Seller's Rights in, to, and under the Account Documents. All Account purchases and sales hereunder shall be described on an Annex I, all of which shall take the form of Annex I attached hereto.

2.2.    Purchase Price.  The Purchase Price to be paid by Buyer to Seller for the Accounts purchased at a Closing shall be as set forth in the applicable Annex I. The aggregate Purchase Price shall be determined by multiplying the total Unpaid Balances of all the Accounts by the Applicable Percentage, as set forth in the applicable Annex I. Buyer will pay the Purchase Price for each Account Pool as set forth in the applicable Annex I for such Account Pool. The Purchase Price is to be paid in funds available for immediate use by Seller by (i) delivery of a cashier's check or money order in the amount of the payment due or (ii) by wire transfer of the amount of the payment due in accordance with instructions provided by Seller to Buyer.

2.3.    Closing.  Each Closing of the purchase and sale of an Account Pool pursuant to this Agreement will be consummated on the Closing Date described in the applicable Annex I. On (or prior to) the Closing Date, the following actions will be taken by Seller and Buyer:

4238503.3

ConfidentialUNSEALED

TF-PA-272609

(a)     Buyer will pay the full Purchase Price, in accordance with the applicable Annex I;

(b)     Seller will execute and deliver the Assignment and Bill of Sale in favor of Buyer with respect to the Account Pool that is the subject of the applicable Annex I; and

(c)     Seller will deliver to Buyer the Account Listing.

The obligations of Buyer and Seller to complete each Closing are subject to the conditions precedent set forth in Article Six.

2.4.     Payments Received.  If Seller or any servicing agent receives any credits, payments or other consideration distributed or paid by or on behalf of any Account Obligor with respect to any Account prior to or on the Cut-Off Date, Seller shall be entitled to accept such payments and (if necessary) adjust the Unpaid Balance of such Account reflected on the Account Listing.  If Seller or any servicing agent shall receive any credits, payments or other consideration distributed or paid by or on behalf of any Account Obligor with respect to any Account after the Cut-off Date, Seller shall promptly pay over and/or deliver such payments to Buyer.  Any such remittances will be made by regular United States mail, unless otherwise requested by Buyer (in which case Buyer will reimburse Seller for all costs incurred by Seller in connection with the transmittal of such remittance.).  If Buyer or any Agency shall receive any credits, payments or other consideration on any Account of an Account Obligor that is not an Account sold pursuant to this Agreement, Buyer shall promptly pay over and/or deliver such payments to Seller within 10 days of receipt.

2.5.     Warranty and Limitation of Liability.  SELLER WARRANTS TO BUYER THAT IT WILL SELL, ASSIGN, TRANSFER, AND CONVEY TO BUYER ALL OF SELLER'S RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER THE ACCOUNTS AND THE ACCOUNT DOCUMENTS. EXCEPT FOR SUCH WARRANTY AND FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN SECTION 3.1, THE ACCOUNTS ARE BEING SOLD "AS IS" AND "WITH ALL FAULTS," AND SELLER DOES NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY CONCERNING THE ACCOUNTS AND/OR THE ACCOUNT DOCUMENTS, INCLUDING, BUT WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR COLLECTIBILITY OF THE ACCOUNTS, OR ANY OTHER REPRESENTATION OR WARRANTY, AND SELLER SPECIFICALLY DISCLAIMS ANY OTHER REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE ACCOUNTS OR THE ACCOUNT DOCUMENTS.   BUYER ACKNOWLEDGES THAT SUCH LIMITATIONS APPLY TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND FURTHER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS AGREEMENT, THE SALE, ASSIGNMENT, TRANSFER, AND CONVEYANCE OF THE ACCOUNTS AND THE ACCOUNT DOCUMENTS WILL BE WITHOUT RECOURSE TO SELLER AND WILL BE SUBJECT IN ALL RESPECTS TO THE LIMITATIONS SET FORTH IN THIS SECTION 2.5.

2.6.     Payment on Accounts.  Subject to the limitations and conditions described in this Agreement, Seller authorizes Buyer to accept, endorse in Buyer's name for the sole purpose of depositing funds, and deposit any payments into Buyer's accounts that it receives on Accounts for so long as Buyer retains the right to collect such Account.

4238503.3

Confidential UNSEALED

App. 0934

TF-PA-272610

# ARTICLE THREE

## REPRESENTATIONS AND WARRANTIES

3.1.    Representations and Warranties of Seller. On and as of the Effective Date hereof Seller represents and warrants to Buyer, and on and as of each Closing Date hereafter Seller will represent and warrant to Buyer as follows:

(a)    Title to Accounts. Seller owns good and marketable title to the Accounts, and has obtained all consents necessary to transfer title to the Accounts free and clear of all Liens.

(b)    Authorization by Seller. The execution and delivery of this Agreement by Seller and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite actions of Seller, and this Agreement has been duly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to the application of Debtor Relief Laws. Seller has full power, capacity, and authority to execute and deliver this Agreement and the Assignment and Bill of Sale. In addition, to its knowledge, Seller has obtained all licenses and approvals, if any, as required under Tribal Law to carry on its business as now conducted insofar as Seller's business relates to Seller's ownership of the Accounts or the sale thereof to Buyer, and all such licenses and approvals are in full force and effect.

(c)    Organization, Existence, and Good Standing of Seller. Seller is an entity duly organized, validly existing, and in good standing under Tribal Law with all requisite company power and authority to own, lease, and operate its properties, to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby.

(d)    No Conflicts. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the organizational documents of Seller, any resolution adopted by the members or managers of Seller, any Tribal Law, rule or regulation applicable to Seller, any agreement or other document to which Seller is a party or by which it or any of its property is bound, or any Order that affects or binds Seller. No Governmental Approval, and no consent or approval of any other Person is required on the part of Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(e)    Litigation. There is no actual pending Material Litigation (i) that has been commenced by or against Seller that relates to or may affect Seller's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement or the transactions contemplated hereby. To the Knowledge of Seller, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(f)    Compliance with Laws. To the Knowledge of Seller, (i) Seller has complied with and is in compliance in all material respects with each applicable law of a Governmental Authority that is or was applicable to Seller in respect of the ownership or use of the Accounts, and (ii) Seller has not received any notice or other communication (whether written or oral) from any applicable Governmental Authority or any other Person regarding (y) any actual, alleged, or potential violation of, or failure to comply with, any applicable Law in respect of, or affecting, Seller's ownership of the Accounts or the sale thereof to Buyer (other than the civil investigative demand attempted to be imposed on Seller

4238503.3

Confidential **UNSEALED**

TF-PA-272611

by the CFPB, or (z) any actual, alleged, or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action in respect of, or affecting, Seller's ownership of the Accounts or the sale thereof to Buyer.

(g)     Accounts.  To the Knowledge of Seller, each Account was made for valuable consideration and represents the enforceable obligation of the Account Obligors obligated therefore, except as limited by Debtor Relief Laws.

(h)     Account Obligors.  No Account Obligor has initiated any Litigation against Seller in respect of the Account for which such Account Obligor is liable, and, to the Knowledge of Seller, no Account Obligor has any enforceable Rights of set-off, counterclaim, cancellation, or claim that such Account suffers from lack of consideration, forgery, or alteration of the Account Obligor's signature, except as otherwise disclosed in the Account Documents pertaining to such Account.

(i)     Unpaid Balances.  The amount reflected as the Unpaid Balance of each Account in the Account Documents is the amount of the Unpaid Balance represented to Buyer at the time of its acquisition from Seller of the Account, less any payments received by Seller prior to Cut-Off Date; but otherwise Seller makes no warranty as to the accuracy of the Unpaid Balance of each Account as reflected in the Account Documents.

3.2.     Representations and Warranties of Buyer.  On and as of the Effective Date hereof Buyer represents and warrants to Seller, and on and as of each Closing Date hereafter Buyer will represent and warrant to Seller as follows:

(a)     Authorization by Buyer.  The execution and delivery of this Agreement by Buyer and the performance by it of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or other actions of Buyer, and this Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject only to the application of Debtor Relief Laws. Buyer has full corporate or other power, capacity, and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Buyer as contemplated by this Agreement.  In addition, Buyer possesses all Governmental Approvals, if any, required to carry on its business as now conducted insofar as Buyer's business relates to the collection of accounts receivable such as (and including) the Accounts, or the purchase and collection of the Accounts, and all such Governmental Approvals are in full force and effect.

(b)     Organization, Existence, and Good Standing of Buyer.  Buyer is duly organized, validly existing, and in good standing under the Laws of the State of Delaware with all requisite power and authority to own, lease, and operate its properties and to carry on its business as now being conducted, and to execute, deliver, and perform its obligations under this Agreement and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby. Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of business transacted by it or properties owned or leased by it requires such qualification and in which the failure to do so would have a material adverse effect on its ability to perform its obligations under this Agreement or the enforceability thereof.

(c)     No Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not contravene, conflict with, or result in any violation of or default under any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer, any resolution adopted by the shareholders or the board of directors (or other constituent group) of Buyer, or any mortgage, indenture, lease, Account or credit agreement, or

4238503.3

Confidential **UNSEALED**

TF-PA-272612

other contract, applicable Law, or Governmental Approval applicable to Buyer, or any of the properties of Buyer, or any Order which affects or binds Buyer. No Governmental Approval, and no consent or approval of any other Person, is required on the part of Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(d)     Litigation.  There is no actual pending Material Litigation (i) that has been commenced by or against Buyer or that otherwise relates to or may affect Buyer's Right to consummate the transactions contemplated by this Agreement, or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with this Agreement or the transactions contemplated hereby.  To the Knowledge of Buyer, (y) no such Material Litigation has been threatened and (z) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Material Litigation.

(e)     Compliance with Laws.  Buyer has complied with and is in compliance in all material respects with, and when performing under this Agreement will comply with each Law that is applicable to Buyer or the purchase, ownership, collection or use of the Accounts, including, but without limitation, the Gramm-Leach-Bliley Act and all applicable Consumer Credit Laws. The Buyer is licensed in all jurisdictions which require a license to collect a debt from an Account Obligor in the state where such Account Obligor resides.

(f)     Suitability.  Buyer has such knowledge and experience in financial, collections, and business matters as to be capable of evaluating the merits and risks of the purchase of the Accounts and is, by virtue of having made other investments of a similar nature and/or by reason of its business and financial experience or the business and financial experience of those Persons it has retained to advise Buyer with respect to its purchase of the Accounts, a "*sophisticated*" purchaser.

(g)     Ability to Bear Risk.  Buyer is in a financial position to hold its interest in the Accounts for an indefinite period of time and is able to bear the economic risk and withstand a complete loss of the Purchase Price of the Accounts.

(h)     Investigation and Access to Information.  Buyer has been given all such access to information regarding the Accounts, including, in particular, the risks associated with the collectability (and ultimate collection) of the Accounts as it has requested from Seller, and has utilized such access to its satisfaction for the purpose of obtaining information about the Accounts.  Buyer has received an explanation from Seller of all codes, abbreviations or shorthand terms used to indicate special characteristics or handling of the Accounts.  Buyer agrees and represents that the information about the Accounts made available to it constitutes an adequate and sufficient basis on which to determine whether and at what price to purchase the Accounts.  Buyer acknowledges and agrees that (i) it has been solely responsible for its own due diligence investigation of the Accounts and the merits or risks of an investment in the Accounts, (ii) it is not relying on any investigation conducted or undertaken by any other Person, including Seller or its Affiliates (and their respective directors, officers, and employees) or on any representations or warranties of any other Person other than the representations expressly made by Seller herein, and (iii) it is purchasing the Accounts based upon its independent examination, study, inspection and knowledge of the Accounts and in reliance on its own determination of the quality, value and condition of the Accounts.  Buyer expressly acknowledges that, prior to executing and delivering this Agreement, Buyer has been encouraged, invited and directed by Seller to conduct such due diligence review and analysis of the Accounts, related information and publicly available records as Buyer deems necessary, proper or appropriate in order to make a complete informed decision with respect to its purchase of the Accounts, to consult with legal counsel and such other advisors as Buyer believes desirable, and to ask such questions of Seller concerning the Accounts as Buyer desires to ask, and Buyer has undertaken all of the foregoing tasks, including the risks associated with attempting to collect an

4238503.3

9

Account that was originated by Seller under Tribal Law that does not comply with various state laws, including laws limiting the interest rate and other fees and charges that may be assessed under the state law where the Account Obligor resides.

(i)     Acknowledgement of Risks. The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities." Buyer understands that an investment in the Accounts is speculative and involves a high degree of risk and that Buyer must be able to withstand, and could sustain, a total loss of Buyer's investment in the Accounts.

(j)     Acknowledgement Regarding Documents. Buyer understands that Seller will not have in its possession all account documents in respect of the Accounts that may be desired or requested by Buyer and that the Account Documents may not include all account documents related to any given Account; and Buyer acknowledges that Seller's failure to provide any account document that is not included among the Account Documents will not constitute a Breach on the part of Seller.

(k)     Acknowledgement Regarding Fees. Buyer warrants, represents, understands and acknowledges that no further fees or costs may be charged or assessed to the Accounts or the Account Obligors for the underling debt (including, but not limited to: NSF, late fees, interest, processing fees, attorney fees, collection costs, etc.).

## ARTICLE FOUR

## REPURCHASE, CANCELLATION AND SURRENDER OF ACCOUNTS

4.1.    Seller's Obligation to Repurchase Accounts.

(a)     Ineligible Accounts. Seller will use reasonable efforts to determine that the Accounts do not include any Ineligible Accounts. If, within the time frame set forth in the applicable Annex I, it is reasonably determined by Buyer that Ineligible Accounts were included among the Accounts, or Seller determines that an Account was sold which was an Ineligible Account at the Closing Date, then Seller and Buyer agree that the terms of the applicable Annex I, Paragraph 10 (Recourse Procedures) shall apply.

(b)     Sole Remedy. The remedies set forth in the applicable Annex I, Paragraph 10 (Recourse Procedures) will be Buyer's sole remedy, and Seller's sole obligation, in the event Seller has sold an Ineligible Account to Buyer.

4.2.    Seller's Option to Repurchase Accounts. Seller shall have the right to repurchase any Account (for an amount equal to Buyer's payment for such Account, applying the Applicable Percentage to the Unpaid Balance of such repurchased Account) if Seller determines that there is a pending or threatened lawsuit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to such Account or an Account Obligor, and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Account, or if the account had been sold in error due to previous settlement or fraud. In the event of such a repurchase, Seller shall notify Buyer of Seller's intent to repurchase such Account, and upon receipt of such notice, Buyer shall promptly cease all activity on such Account and execute and deliver a Bill of Sale satisfactory to Seller, assigning all right, title and interest of Buyer in such Account,

4238503.3

Confidential UNSEALED

TF-PA-272614

without representations or warranties or any kind or character, expressed or implied to Seller. In addition, Buyer shall cease releasing or compromising the Account and shall remove its credit reporting (if any) on any repurchased Account. Buyer shall forward to Seller all payments collected or received on the Account after receipt of such notice.

4.3. Cancellation and Surrender of Purchased Accounts. For each Account purchased by Buyer hereunder that has not otherwise been paid in full, closed, cancelled, terminated by bankruptcy proceeding, repurchased by Seller as contemplated by Section 4.1 or Section 4.2 or in a repayment plan as specified in this Section 4.3, on the date that is the 30 months from the purchase date for such Account, Buyer will (a) cease all collections activities on such Account, (b) retrieve such Account from any Person with whom Buyer placed the Account for collection or sold the Account, (c) cancel such Account such that it no longer may be collected upon by any Person, including subsequent owners or holders of such Account, and (d) upon the request of Seller, transfer ownership of such Account back to Seller. With respect to Accounts that are beyond the 30-month period identified above but that are in a paying status or otherwise have a payment plan in place, (x) Buyer shall be permitted to continue collecting on such Accounts in accordance with the established payment arrangement, (y) Buyer shall report to Seller on the status of all such Accounts every 30 days, and (z) Buyer shall comply with subsections (a) through (d) above with respect to any Account for which payment has ceased due to a breach of the applicable payment arrangement for such Account.

## ARTICLE FIVE

## CERTAIN COVENANTS

5.1. Confidentiality Obligations of Parties. Buyer and Seller acknowledge and agree that the confidentiality obligations of Buyer and Seller are governed by the NDA, which is incorporated herein by reference. Buyer acknowledges that all Confidential Information associated with the Accounts to be purchased at any Closing remains the property of Seller until the Closing is consummated and must be accorded confidential treatment at all times in accordance with the NDA. If a Closing does not occur, regardless of the reason, Buyer promptly (and in any event within five Business Days after the designated Closing Date) will return to Seller, at Buyer's expense, any and all tangible Confidential Information in Buyer's possession. In the event of a Breach of the NDA or this Section 5.1 by Buyer, Seller will be entitled to injunctive relief as set forth in this Agreement and the NDA.

5.2. Covenants of Seller. Seller agrees and covenants with Buyer that Seller will comply with its obligations in respect of the retrieval and transmittal of documentation related to each Account as set forth in the applicable Annex 1.

5.3. Covenants of Buyer. Buyer agrees and covenants with Seller as follows:

(a) Compliance with Law; Reporting of Regulatory Investigations, Actions and Litigation. In the performance of its collection efforts with respect to the Accounts, Buyer agrees that it will comply with all requirements of Tribal Law, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act and all other applicable federal and state Consumer Credit Laws. In the event Buyer (a) receives a notice from any Governmental Authority that it is being investigated for, or is a defendant in any administrative, civil or criminal related to or action alleging violations of any federal or state Consumer Credit Law in reference to Accounts sold pursuant to this Agreement, or (b) receives written or oral attorney demands or notice of Litigation, Buyer will promptly, and in any event within 3 days after receipt of such notice, notify Seller thereof. Buyer will provide Seller with details of the allegations made and of Buyer's intended response thereto, and will keep Seller apprised of the progress of such investigation, action, demand or Litigation during the time it is pending. Under no circumstances whatsoever shall Buyer, any Agency or any other Person engaging in any collections activities in respect

4238503.3

11

of or otherwise communicating with any Account Obligor of any Account, institute or maintain or threaten to institute or maintain any administrative, civil or criminal action or proceeding against any Account Obligor.

(b)  Notification of Account Obligors and Third Parties.  Buyer shall notify an Account Obligor in writing that the Account Obligor's Account has been sold to Buyer. The written notification must include (i) the name of Seller as the original creditor, (ii) the accurate balance of the debt, (iii) the address to which the Account Obligor must remit payments to avoid further collection activity, and (iv) a statement that Buyer is collecting on its own behalf, and not on behalf of the original creditor, and that Buyer is not affiliated in any way with the original creditor. If an Agency is required by a Consumer Credit Law to provide a similar notice to Account Obligors in respect of Accounts placed with such Agency, then such Agency shall comply with this Section 5.3(b).

(c)  Use of Seller's Name.  Buyer is expressly prohibited from using Seller's name in connection with Buyer's operations or its Accounts, including, but without limitation, on checks, drafts, letters, and forms, provided, however, that (i) Buyer may identify Seller as the original creditor solely for the purpose of accurately describing the source of an Account Obligor's debt obligation and (ii) must also state that Buyer is collecting on its own behalf, and not on behalf of Seller, and that Buyer is not affiliated in any way with Seller.

(d)  Referrals of Inquiries.  After the Closing, Buyer will handle any and all inquiries from Account Obligors directly and will not under any circumstances refer any Account Obligor to Seller in regard to any such inquiry.

(e)  Account Information.  Upon Seller's request, from time to time, Buyer will provide Seller with information with respect to specific Accounts needed by Seller to reconcile Seller's accounting records with respect to such Account(s), provided that such information is reasonably available to Buyer and such request is made within three (3) years after the Closing Date.

(f)  Audit Rights.  During the term of this Agreement and for a period of nine months from the expiration or termination hereof so long as any obligation under any of the Accounts is outstanding, Buyer shall permit Seller, from time to time, upon reasonable advance notice and during Buyer's normal business hours to perform an audit of (i) all books and records of Buyer as they may relate to this Agreement, the transactions contemplated hereby and the performance by Buyer of its obligations hereunder, and (ii) Buyer's operations and electronic data processing functions. Buyer shall maintain accurate, complete and correct records of all matters related to this Agreement. Buyer shall provide Seller with reasonable access to Buyer's premises and its books and records [and those of any Agencies that it has engaged to collect amounts from Account Obligors] to enable Seller to exercise its audit rights hereunder. Seller shall be permitted to exercise its audit rights under this Section 5.3(f) directly or via a third party service provider, and Seller shall bear all expenses related to any audit conducted hereunder. Seller shall have the right to copy, at its own expense, any of Buyer's records related to its obligations hereunder, and Seller shall treat such records in a confidential manner in accordance with the NDA. Buyer also agrees to submit to any examination which may be required by any regulatory authority with audit and examination authority over Seller, to the fullest extent that such regulatory authority may require and to the fullest extent provided by law, [and Seller shall bear Buyer's expenses incurred in relation to such audit]. Each Agency with whom Buyer places any Account as contemplated by Section 5.3(h) shall be contractually required by Buyer to adhere to this Section 5.3(f).

(g)  Adherence to Controls, Policies and Procedures; Training.  Buyer, all Agencies and all employees and contractors of Buyer and each Agency (i) shall comply in all respects with the compliance controls, complaint processing, reporting, service provider oversight and other requirements

4238503.3

Confidential **UNSEALED**     App. 0940     TF-PA-272616

set forth in Schedule A, as required by the Consumer Laws, as set forth in Tribal Law and as set forth in any guidance, regulation or otherwise issued by the CFPB, the FTC, or any other applicable state or federal agency relating to debt collection by third parties and any best practices issued now or in the future by the American Collection Assocation ("ACA") or any other nationally recognized trade association of collection agencies in the United States, (ii) shall adhere in all respects to Seller's policies and procedures that Seller has reasonably determined are relevant to this Agreement and the subject matter hereof and that Seller provides to Buyer in writing, (iii) shall adhere in all respects to information technology and information security standards, controls and safeguards, including, without limitation, industry standards and Seller's established information technology policies and procedures, and (iv) shall engage in all training that Seller has reasonably determined is relevant to this Agreement and the subject matter hereof and that Seller provides to Buyer in writing, electronically or otherwise.

(h) Approval and Onboarding of Agencies. After the date that is the 90th day from the date the initial Annex I is signed hereunder, Buyer may request approval from Seller to place Accounts with Agencies, and shall adhere to the following Agency onboarding and approval process:

(i) Each prospective Agency must complete the Seller-provided due diligence questionnaire and provide supporting documentation contemplated thereby;

(ii) Each prospective Agency must agree in writing to adhere to the terms and conditions of this Agreement, including, without limitation, the requirements of Schedule A;

(iii) Each prospective Agency must provide such other documentation and answer such other questions as Seller may reasonably ask to enable Seller to determine, in its discretion, whether such prospective Agency is capable of adhering to the terms and conditions of this Agreement, including, without limitation, the requirements of Schedule A.

In no event shall the number of Agencies exceed eight. No more than 20% of Accounts purchased by Buyer at any Closing may be placed with an Agency, including an approved Agency, during the first 90 days from the Closing Date for the purchase of such Accounts. Buyer may not place any purchased Account with any Agency where the Account Obligor has filed for protection under the Bankruptcy Code or otherwise been placed into bankruptcy or which is in Litigation

(i) No Sale of Accounts. Buyer agrees that it shall not sell, transfer, or assign to any third party any Account, it being the intent of the Parties that only Buyer, NCA, and approved Agencies or Permitted Agencies shall have the right to engage in collection activities with respect to the Accounts.

## ARTICLE SIX

### CONDITIONS PRECEDENT

6.1. Conditions Precedent to Obligations of Buyer. The obligations of Buyer with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Buyer, at or prior to each such Closing of all the following conditions:

(a) Representations and Warranties; Performance of Obligations. All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the applicable Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Seller on or before the applicable

4238503.3

Confidential UNSEALED

TF-PA-272617

Closing Date, including the obligations of Seller under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)    No Litigation.  No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby, and no applicable Governmental Authority shall have taken any other action or made any request of Buyer as a result of which Buyer reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)    Compliance with Laws.  The purchase and sale of the Accounts pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

6.2.    Conditions Precedent to Obligations of Seller.  The obligations of Seller with respect to actions to be taken at each Closing are subject to the satisfaction, or waiver by Seller, at or prior to each such Closing of the following conditions:

(a)    Representations and Warranties; Performance of Obligations.    All of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of each Closing Date; and each and all of the terms, covenants, and conditions of this Agreement to be complied with and performed by Buyer on or before the applicable Closing Date, including the obligations of Buyer under Section 2.3, shall have been duly complied with and performed in all material respects.

(b)    No Litigation.  No Litigation shall have been instituted or threatened to restrain or prohibit the transactions contemplated hereby and no Governmental Authority shall have taken any other action or made any request of Seller as a result of which Seller reasonably deems it inadvisable to proceed with the transactions hereunder.

(c)    Compliance with Laws.  The purchase and sale of the Accounts pursuant to this Agreement shall be consummated in such manner as complies with all applicable Laws.

(d)    Consent of Sale. All Parties shall consent to the sale from the Seller to Buyer of the Accounts by signing below.

## ARTICLE SEVEN

## INDEMNIFICATION

7.1.    **Buyer's Indemnification of Seller.  Buyer shall indemnify and hold Seller, and its Affiliates, and their respective predecessors, successors, owners, managers, assigns, officers, directors, employees, agents, and attorneys (collectively, the "Seller Indemnified Parties") harmless from and against any and all claims, actions, suits, or other actual or threatened proceedings (collectively "Actions"), and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) (collectively "Losses") incurred or suffered by any Seller Indemnified Party, in either case as a result of, in connection with or arising out of: (i) any breach by Buyer of any representation, warranty or covenant made by it pursuant to the terms of this Agreement; or (ii) any action taken by or on behalf of Buyer by an Agency or any omission of Buyer or any of its Affiliates, employees, agents or representatives or any Agency in connection with any Account (except to the extent any such Action or Loss arises out of a breach by Seller of any representation or warranty hereunder), including, without limitation, by reason of the gross negligence or willful misconduct of Buyer (or its Affiliates, employees or agents or any Agency), or**

4238503.3

14

Confidential **UNSEALED**

TF-PA-272618

the violation of any applicable Law or Consumer Credit Law or any covenant made by Buyer in **Section 5.3** of this Agreement by Buyer.

7.2.    **Seller's Indemnification of Buyer.**  Seller shall indemnify and hold Buyer, its Affiliates, predecessors, successors, assigns, officers, directors, employees, agents, and attorneys harmless from and against any claims, actions, suits, or other actual or threatened proceedings, and all losses, judgments, damages, expenses, or other costs (including reasonable counsel fees and disbursements of counsel) incurred or suffered by Buyer by reason of the gross negligence, willful misconduct, or material violation of any applicable Law by Seller (or its Affiliates, employees, or agents) in connection with any Breach by Seller.

7.3.    **Limitation of Liability.**  Buyer acknowledges and agrees that neither Buyer nor any future holder of any Account, nor their respective successors and assigns, shall have any claim, remedy, or Right to proceed (at Law or in equity) against Seller for any deficiency or other sum owing on any Account, and Buyer hereby waives and releases any liability of Seller for and on account of such indebtedness or liability.

7.4.    **Payable on Demand.**  Any amounts due to Buyer or Seller under this Article Seven shall be payable on demand.

7.5.    **Notice and Cooperation.**  Buyer or Seller shall notify each other within ten (10) Business Days after receiving actual knowledge of an event that triggers or may trigger indemnification obligations under this Agreement. Notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of the amount of the liability arising there from. The Party claiming indemnification will cooperate with the other Party's insurance carrier, as reasonably requested by the Party or the insurance carrier.

7.6.    **Defense.**  In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a Party, the indemnifying Party shall have the right, at its option, at its expense and with its own counsel, which counsel shall be reasonably satisfactory to the indemnified Party, to assume the defense of any such claim or litigation or participate in the compromise thereof, provided, however, that an issue in a claim is one involving Tribal Law, tribal sovereignty or tribal/federal issues, Seller shall have the right to assume the defense of the matter at the expense of the indemnifying Party. Subject to the foregoing, if it chooses to so assume the defense of any such claim, the indemnifying Party shall promptly notify the indemnified Party of its intention to do so, and the indemnified Party shall cooperate fully with the indemnifying Party and its counsel in the defense against or compromise of any such claim or litigation. Notwithstanding anything in this Article Seven to the contrary, the indemnified Party shall not compromise or settle any such claim or litigation without the prior written consent of the indemnifying Party, which consent will not be unreasonably withheld.

7.7.    **Survival.**  The Parties' obligations under this Article Seven shall survive the termination of this Agreement, provided, however, no Party shall be obligated to indemnify the other Party in respect of claims for which notice is provided after the date that is three years after the termination date of this Agreement.

## ARTICLE EIGHT

## MISCELLANEOUS

8.1.    **Term and Termination.**  The initial term of this Agreement shall be 24 months from the Effective Date, unless the term is extended by the mutual written agreement of Buyer and Seller or

4238503.3

Confidential **UNSEALED**                              App. 0943                              TF-PA-272619

terminated earlier in accordance with this Agreement. This Agreement and the transactions contemplated hereby may be terminated as follows:

        (a)    By the mutual written agreement of Buyer and Seller;

        (b)    By Buyer if a Breach of any provision of this Agreement has been committed by Seller and such Breach has not been waived or promptly cured;

        (c)    By Seller if a Breach of any provision of this Agreement has been committed by Buyer and such Breach has not been waived or promptly cured; or

        (d)    By Buyer or Seller as otherwise expressly permitted by this Section 8.1.

On each anniversary of the Effective Date, for so long as this Agreement remains in place, Buyer and Seller shall review and negotiate in good faith the requirements of Schedule A and the general terms and conditions to the purchase and sale of each Account Pool set forth in Annex I (including, without limitation, the Purchase Price). If Buyer and Seller are unable to come to a commercially reasonable agreement about such terms and conditions after negotiating such terms and conditions in good faith, then either Party may terminate this Agreement upon written notice to the non-terminating Party. Buyer and Seller also agree to negotiate in good faith the extension of this Agreement for an additional 12-month period beyond the initial term, and if Buyer and Seller are unable to come to a commercially reasonable agreement about the terms and conditions of any such extension then this Agreement shall terminate on the original expiration date.

        8.2.    Effect of Termination. Each Party's Right of termination under Section 8.1 is in addition to any other Rights it may have under this Agreement or otherwise, and the exercise of a Right of termination will not be deemed to be an election of remedies. If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties will terminate, except as provided in Section 8.11; provided, however, that if this Agreement is terminated by either Party because of the Breach of this Agreement by the other Party, or because one or more conditions of the terminating Party's obligations under this Agreement is not satisfied as a result of the other Party's failure to comply with its obligations under this Agreement, the terminating Party's Right to pursue all legal or equitable remedies will survive such termination unimpaired.

        8.3.    Governing Law. THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED UNDER THE LAWS OF THE TRIBE AND, TO THE EXTENT APPLICABLE, THE LAWS OF THE UNITED STATES OF AMERICA. THESE LAWS SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT.

        8.4.    Remedies Cumulative. No right or remedy conferred upon or reserved to Buyer or Seller under this Agreement is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to every other right or remedy granted there under or now or hereafter existing under any applicable law. Every right and remedy granted by this Agreement or by applicable Law to Buyer or Seller may be exercised from time to time and as often as may be deemed expedient by Buyer and Seller and, unless contrary to the express provisions of this Agreement, irrespective of the occurrence or continuance of any default or breach hereunder.

4238503.3

Confidential UNSEALED    App. 0944    TF-PA-272620

8.5.    Entirety and Amendments. This Agreement embodies the entire agreement between the Parties and supersedes all prior agreements and understandings relating to the subject matter hereof. This Agreement may be amended or modified only in writing executed by Seller and Buyer.

8.6.    Notices. Any notice or other communication hereunder must be in writing to be effective and shall be deemed to have been given when personally delivered to Buyer or Seller or, if mailed, on the third day after it is enclosed in an envelope and sent certified mail/return receipt requested in the United States mail. Either Party may from time to time change its address for notification purposes by giving the other Party written notice of the new address and the date upon which it will become effective. The address for each Party for notices hereunder is the address set forth. Unless otherwise specified in a notice in writing sent or delivered in accordance with the foregoing provisions of this Section 8.6, notices, demands, instructions and other communications shall be given to or made upon the respective Parties hereto at their respective addresses (or to their respective facsimile number) indicated below.

        If to Seller to:        Marshall Pierite, President
                                MobiLoans, LLC
                                P.O. Box 1409
                                Marksville, Louisiana 71351

        If to Buyer:            Brad Hochstein, President
                                c/o Level Financial, L.L.C.
                                P.O. Box 2876
                                Hutchinson, KS  67504-2876

        Copy to:                Mark Fletchall, General Counsel
                                c/o Level Financial, L.L.C.
                                P.O. Box 2876
                                Hutchinson, KS  67504-2876

8.7.    Expenses. Except as otherwise provided herein, each Party hereto shall bear the expenses (including attorney's fees) it incurs in connection with the negotiation, execution, and performance of this Agreement.

8.8.    No Assignment; Binding Nature on Successors and Assigns. This Agreement is binding upon Seller and Buyer and their respective successors, heirs, and assigns. The Rights and obligations of Seller hereunder may be assigned by Seller to any Person at any time in Seller's discretion. Buyer may not assign any Rights or delegate any duties to any Person, or sell, transfer, delegate or otherwise assign any Accounts to any Person. Any sale, transfer, delegation or assignment by Buyer without such prior written consent will be null and void. Buyer may place Accounts with an Agency only as expressly authorized by and in accordance with Section 5.3(h), and Section 8.18, provided that Buyer shall be liable for the conduct of such Agency and shall remain liable under the terms of this Agreement .

8.9.    Headings. The headings of Articles and Sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

8.10.   Severability. If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable, or void, so that both Seller and Buyer would be relieved of all obligations arising under such provision, it is the agreement of Seller and Buyer that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent. If such amendment is not possible, another provision that is legal and enforceable and achieves the same objective shall be substituted therefore. If the remainder of this

4238503.3

Confidential UNSEALED                App. 0945                TF-PA-272621

Agreement is not affected by such declaration or finding and is capable of substantial performance by both Seller and Buyer, then the remainder shall be enforced to the extent permitted by law.

8.11.   Survival of Terms. Subject to the limitations and other provisions of this Agreement: (a) the terms and agreements set forth in Articles Two, Four, Five, Seven, and Eight shall survive each Closing and the termination of this Agreement regardless of the reason; and (b) the representations and warranties of Seller and Buyer set forth in Article Three shall survive each Closing and shall remain in effect for a period of two years after each Closing Date.

8.12.   Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original for all purposes and all of which constitute, collectively, one agreement; but, in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

8.13.   Waivers. Neither the waiver by Seller or Buyer of any breach of or default under any provision of this Agreement by the other Party, nor the failure of Seller or Buyer, on one or more occasions, to enforce any provision of this Agreement or to exercise any Right hereunder, shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provision or Right hereunder.

8.14.   Execution by Facsimile or PDF. The manual signature of either Party hereto that is transmitted to the other Party by facsimile or PDF shall be deemed for all purposes to be an original signature. Either Party that delivers a signature page by facsimile or PDF agrees to deliver an original manually signed counterpart of such Party's signature page to the Party who requests it promptly after receipt of such request.

8.15.   No Third-Party Beneficiary. This Agreement is for the sole benefit of the Parties, and nothing contained in this Agreement shall be construed to grant any Person, other than Seller and Buyer and their respective successors and permitted assigns, any Right under or in respect of this Agreement or any provision hereof.

8.16.   Relationship between Seller and Buyer. Nothing in this Agreement is intended to or shall be construed to constitute or establish, as between Seller and Buyer, a partnership, joint venture, agency, or fiduciary relationship of any kind, to create the relationship of employer-employee or principal-agent, or to otherwise create any liability for either Seller or Buyer with respect to any indebtedness, liabilities, or obligations of the other or of any other Person. Moreover, under no circumstances will either Seller or Buyer have the authority or power to bind the other Party to any agreement or contract.

8.17.   Right to Equitable Relief. Buyer and Seller acknowledge that should Buyer breach any covenant of Buyer in Section 5.1 or Section 5.3(c) of this Agreement or if Seller breaches Section 3.1 of this Agreement, money damages may be an inadequate remedy to Seller or Buyer and, in such event, Seller or Buyer may seek such equitable relief and Buyer and Seller agree that such relief is appropriate and warranted.

8.18.   Servicing. Seller hereby agrees that all servicing obligations of Buyer under this Agreement (other than the purchase of the Accounts hereunder) may be performed by NCA, the Permitted Agencies defined herein, or any other Agency onboarded hereunder, on Buyer's behalf, but shall be in the name of NCA.

[Signature page follows.]

4238503.3

Confidential **UNSEALED**

App. 0946

TF-PA-272622

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Line of Credit Account Sale Agreement to be executed by its duly authorized representative effective as of the Effective Date.

BUYER:                                          SELLER:

LEVEL FINANCIAL, L.L.C.                          MOBILOANS, LLC

By: _____                    By: _____
Kevin Emmerich, Operations Manager                Marshall Pierite, President

THE FOLLOWING ATTACHMENTS TO THIS AGREEMENT ARE A PART OF THIS
AGREEMENT FOR ALL PURPOSES:

Schedule A – Compliance Controls, Reporting Requirements, Etc.

Annex I – Additional Terms and Conditions

Exhibit A – Assignment and Bill of Sale

4238503.3

Confidential UNSEALED

App. 0947

TF-PA-272623

<u>Schedule A</u>

**Compliance Controls, Reporting Requirements, Etc.**

<u>At least Four (4) of the listed agencies to to onboarded and fully approved for placements prior to funding the first sale, all others will be reviewed for onboarding and approval within 60 days following the close of the first sale:</u>

- Kramer & Associates

- Delray Capital, L.L.C.

- Global Trust Management, L.L.C.

- Harbinger Processing Group, L.L.C.

- Account Discovery Systems

<u>Training (applies to Buyer and all Agencies):</u>

- All employees/contractors must complete Seller-mandated training at least semi-annually

- All new employees/contractors must complete Seller-mandated training within 15 days of hiring

<u>Auditing and Monitoring (applies to Buyer and all Agencies):</u>

- Weekly Call Monitoring

  - ➤ Internal and external – Internal quality control monitoring process, as well as random calls sent to Seller and Seller's servicer, on a weekly basis.

  - ➤ Seller must have on-demand access to all live and recorded calls for periodic monitoring.

- Review of adherence to contract and other legal obligations – no less than semi-annually

- Review of processes, procedures and customer-facing materials (emails, letters, phone scripts, etc.) – no less than semi-annually

- Periodic site visits – scheduled visits to occur monthly and quarterly, with additional random visits to occur not more frequently than twice per calendar month

<u>Reporting and Recordkeeping (applies to Buyer and all Agencies):</u>

- Weekly inventory status regarding accounts and complaints received (must have remote access or updated inventory list and complaint list on a weekly basis)

- Monthly reports on debt verification, including:

  - ➤ Number of debt verification requests received per month

Schedule A-1

> Number of days to turn around a debt verification notice (per account/per month)

> When requested, must provide evidence of notices sent for individual customers

• Weekly Dialer Call Reporting, including:

> Number of calls made per customer per day

> Home

> Cell

> Work

> Other

• Monthly reporting on the status and resolution of investigations, actions, demands, Litigation described in Section 5.3(a)

• Monthly reporting on written notices of debt, including

> Number of notices sent each month

> When requested, must provide evidence of notices sent for individual customers

Complaint Monitoring and Tracking (applies to Buyer and all Agencies):

• Seller and Seller's servicer must be notified of all complaints within 48 hours of receipt of same (with copies of written complaints and notes of oral complaints)

• Monthly report on complaints, to be delivered no later than the10th day of each calendar months for complaints received the prior calendar month; reports to include the following:

> Type of complaint

> Description of complaint

> Source of complaint

> Lender name

> Resolution taken

> Account/customer name

> Account number

> Bankruptcy number

• If Seller chooses to repurchase an Account, Buyer must cease all collections activities on the Account immediately and transfer ownership of the subject Account to Seller within 1 business days of the request

Implementation of Consistent Compliance Controls (applies to Buyer and all Agencies):

• Mini Miranda violations by collector by month (trended plus action plans taken to resolve errors)

Schedule A-2

Confidential **UNSEALED**                    App. 0949                                TF-PA-272625

- Audit reports by collector by month

- Must evidence not unfair, deceptive, abusive, etc. to customers (for example, must not: harass customers; tell customers that you are reporting to their bureau when you are not reporting; and must not report debt so old that it has no impact on bureau, etc.)

- Must evidence not collecting illegal fees, illegal interest, or illegal expenses

- Must evidence not collecting on bankruptcy accounts (discharged, active, etc.)

- Must evidence not collecting on debt when have received a written request to stop collecting

- Must evidence not promising to "fix" consumers credit bureau report

Penalty for Failure to Comply with Schedule A Obligations:

- $1,000 per day per failure

Seller, Servicer and NCA Contact:

- *Seller Contact*: [Name, email address, phone number]

- *Seller's Servicer Contact*: Kevin Banks Kbanks@Think Finance.com, (972) 421-1164

  - *NCA Contact for matters related to Schedule A*: Lori Hess, , Direct Office: (620) 931-2731, Cell: (620) 708-9031

Schedule A-3

Confidential UNSEALED

App. 0950

TF-PA-272626

## Annex I

### to

### Line of Credit Account Sale Agreement dated March 12, 2014

#### Additional Terms and Conditions

1.  Description of Accounts:

    a.  Accounts: See attached Account Listing [TBD – determined for each monthly Closing; Accounts will include 90-100% of all Accounts reaching 61 days delinquent; Account files will be scrubbed for bankruptcy and deceased Account Obligors]

    b.  Purchase Price: The aggregate Purchase Price shown below is calculated based on [$0.0865 (8.65%)] multiplied by the aggregate Unpaid Balance of all the Accounts to be purchased under this Annex I.

    c.  Closing Date: [TBD - determined for each monthly Closing, typically will occur on or before the 15th of each month]

2.  Number of Accounts: [TBD - determined for each monthly Closing]

3.  Aggregate Unpaid Balance of all Accounts: [TBD - determined for each monthly Closing]

4.  Applicable Percentage (Purchase Rate): [8.65]% of Outstanding Unpaid Balance

5.  Purchase Price: [TBD - determined for each monthly Closing]

6.  Cut-Off Date: [TBD - determined for each monthly Closing]

7.  Wiring Instructions:

    Bank Name:

    ABA (Routing Number):

    Credit Bank Account Name:

    Credit Bank Account Number:

8.  Ineligible Account. In respect of any Ineligible Account, in no event shall any Account be deemed to be an Ineligible Account unless Buyer is able to provide the following relevant documents (the "Verification Documents") to verify the circumstances causing such Account to be an Ineligible Account:

    a.  For a Bankrupt Account, Buyer shall provide a copy of the bankruptcy filing or the following information necessary to verify the bankruptcy filing: attorney name; attorney phone number; case number; and filing date.

Confidential **UNSEALED** App. 0951 TF-PA-272627

b.  For a Deceased Account, Buyer shall provide a copy of the relevant death certificate, a screen print from Social Security Death Index containing the relevant Account Obligor information, a credit bureau report showing the relevant Account Obligor as deceased, or a copy of the relevant newspaper obituary.

c.  For a Paid In Full/Settled In Full Account, Buyer shall provide written evidence that the Account has been paid or settled in full.

d.  For a Forgery/Fraud Account, Buyer shall provide a copy or original of a fraud or forgery affidavit.

e.  For a Servicemember Account, Buyer shall provide proof that the Account Obligor is a servicemember subject to the protections of the Servicemembers Civil Relief Act.

f.  For a Minor Account, Buyer shall provide proof that the Account Obligor was a minor at the time of entering into the Account.

g.  For a Disaster Area Account, Buyer shall provide evidence that the Account Obligor lives in a federally-declared disaster area.

9.  <u>Account Documentation</u>: Seller shall deliver to Buyer an electronic copy of all original Account Documents within 45 days of the Closing Date.

10. <u>Recourse Procedures</u>: If, at any time during the period commencing on the Closing Date and ending 90 days later (the "<u>Recourse Period Termination Date</u>"), Buyer identifies any Account in the Account Pool that Buyer determines is an Ineligible Account:

a.  Buyer shall provide to Seller (according to such instructions as Seller from time to time may give to Buyer) a description of such Account (in such reasonable detail as Seller may request), together with the relevant Verification Documents in such format as Seller may reasonably request.

b.  No later than ten (10) days after Seller confirms (through its examination of the Verification Documents) that such Account is an Ineligible Account, Seller shall pay to Buyer an amount equal to: (i) the Unpaid Balance of such Ineligible Account as of the Cut-Off Date; multiplied by (ii) the Applicable Percentage.

c.  Seller shall promptly notify Buyer if, based on its examination of any Verification Document, it concludes that an Account designated by Buyer as an Ineligible Account does not meet the requirements of an Ineligible Account, as set forth above.

In no event: (i) shall Seller be obligated to make any payment to Buyer in connection with any Ineligible Account the Verification Documents with respect to which Seller receives from Buyer after the Recourse Period Termination Date; or (ii) shall Buyer provide to Seller information or Verification Documents regarding Ineligible Account more than one (1) time in any calendar month.

Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

Annex 1-2

Confidential **UNSEALED**

TF-PA-272628

[SIGNATURE PAGE FOLLOWS.]

Annex I-3

Confidential UNSEALED

App. 0953

TF-PA-272629

IN WITNESS WHEREOF, each of Buyer and Seller has caused this Annex I to Line of Credit Account Sale Agreement to be executed by its duly authorized representative effective as of March 12, 2014.

BUYER:

LEVEL FINANCIAL, L.L.C.

By: _____

Kevin Emmerich, Operatons Manager

SELLER:

MOBILOANS, LLC

By: _____

Marshall Pierite, President

Annex I-4

## Exhibit A

### Assignment and Bill of Sale

MobiLoans, LLC ("Seller"), a business entity duly organized under and recognized by the laws of the Tunica Biloxi Tribe of Louisiana, has entered into a Line of Credit Account Sale Agreement, dated March 12, 2014 (the "Agreement"), with Level Financial, L.L.C., a Delaware limited liability company ("Buyer"), related to the periodic purchase and sale of Accounts on the terms set forth in the Agreement. Buyer and Seller also have entered into an Annex I to the Agreement ("Annex I") dated concurrent with this Assignment and Bill of Sale with respect to the sale of the Account Pool described in the Account Listing attached to such Annex I (collectively, the "Purchased Accounts").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Purchased Accounts, provided, however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement or in the Annex I.

Capitalized terms not otherwise defined herein shall be as defined in the Agreement.

This Assignment and Bill of Sale shall be binding upon Seller and Seller's successors and assigns, and shall inure to the benefit of Buyer and Buyer's successors and assigns.

IN WITNESS WHEREOF, Seller has executed and delivered this Assignment and Bill of Sale to be effective ___March 14___, 20_17_

SELLER:

MOBILOANS, LLC

By: _____

Marshall Pierite, President

Confidential UNSEALED

TF-PA-272631

# Plaintiff's Exhibit 89

UNSEALED

Message

| | |
|---|---|
| From: | Lori Hess [Lori@ncaks.com] |
| Sent: | 5/13/2014 4:06:07 AM |
| To: | Kevin Banks [kbanks@thinkfinance.com]; Kori Townsend [ktownsend@thinkfinance.com]; Stephen.Smith-TCDecisionsciences [sesmith@tcdecisionsciences.com] |
| CC: | Mark Fletchall [MFletchall@ncaks.com]; Sara Woggerman [Sara@ncaks.com]; Shawn Gylling [Shawn@ncaks.com]; Tyler Rempel [Tyler@ncaks.com]; Brad Hochstein [brad@ncaks.com] |
| Subject: | Monthly Summary Reports - Think Finance |
| Attachments: | TF_Memo_April_2014.docx; Great Plains Report Group.xlsx; MobiLoans Report Group.xlsx; Plain Green Report Group.xlsx |

All,

Please find attached the monthly summary report for the Think products. You may still find the compliance logs on the SFTP for additional detail if necessary.

Please advise if this meets your requirements going forward. We will discuss at Wednesday's meeting.

Thank you

Lori



**National Credit Adjusters**

Lori Hess
Compliance Officer          lori@ncaks.com



National Credit Adjusters, LLC   Phone: 620-931-7731
327 W 4th Ave                     Fax: 620-665-3115
Hutchinson, Kansas 67504          ncaks.com

**UNSEALED**

TF-PA-392165



Dialer Fails Per 1000 Attempts

■ Max Attempts
■ Time Zone

UNSEALED

Produced in Native Format

Confidential

UNSEALED



Dialer Fails Per 1000 Attempts

■ Max Attempts
■ Time Zone

UNSEALED

App. 0960



## Complaints Per 1000 Accounts

■ NCA

| 2013-05 | 2013-06 | 2013-07 | 2013-08 | 2013-10 | 2013-11 | 2013-12 | 2014-01 | 2014-02 | 2014-03 | 2014-04 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| 0.23 | 0.18 | 0.00 | 0.21 | 0.07 | 0.02 | 0.07 | 0.16 | 0.21 | 0.21 | 0.13 |

## Account Discovery Systems, LLC

■

| 2013-05 | 2013-06 | 2013-07 | 2013-08 | 2013-12 | 2014-01 | 2014-02 | 2014-03 | 2014-04 | 2014-05 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| 0.24 | 0.00 | 0.00 | 1.18 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 |

UNSEALED

UNSEALED



Total Number of Accounts Graded by QA

# Plaintiff's Exhibit 97

UNSEALED

Brett give me a call when you have time to go over product type

**From:** Jack Mahoney
**Sent:** Monday, August 31, 2015 2:44 PM
**To:** Brad Hochstein
**Cc:** Craig Dilbeck; Lisa Riner; Katie VanBuren; Michael Swanson; Tiffany Howard; Kami Rangeloff; Tyler Rempel; Brian Elliott; Karl Krum; Patrick Nunez; Jodi Crady; Gene Gurley; Shawn Gylling; Mark Fletchall; Lori Patnode; Doug Honeysett; Steven Torres; Ken Newberg
**Subject:** RE: Think Product Close and Recall - PA

For all Think product which is currently active (BHLD included) with State Placed OR Current Res = PA.
I can run this again after the MobiLoans are recalled so the BHLD (closed) count is updated.
The ACOL, ANSL & ATBR are the paying accounts.
The ones in ABKP & APOC were moved from BHLD after I did the initial move (not sure if we should be doing that, account numbers below for review).
The FFW* accounts will mostly become BHLD after the MobiLoans are recalled.
BHLD would be the closed accounts.

| Status | # Accts | Crnt Balance |
| --- | --- | --- |
| ABKP | 3 | $4,724 |
| ACOL | 327 | $223,597 |
| AFLR | 13 | $10,427 |
| ANSL | 26 | $30,670 |
| APOC | 3 | $2,719 |
| ATBR | 1 | $603 |
| BHLD | 20,230 | $21,476,376 |
| FFWD | 3,476 | $2,728,823 |
| FFWS | 9 | $8,246 |
| FFWT | 2 | $790 |
| **Grand Total** | **24,090** | **$24,486,976** |

| Status | # Accts | Crnt Balance |
| --- | --- | --- |
| ELASTIC | 413 | $186,950 |
| GREAT PLAINS | 2,825 | $3,468,556 |
| JC - PAYDAYONE | 1,883 | $1,280,775 |
| JC - PLAIN GREEN | 120 | $159,812 |
| JC - THINKCASH | 216 | $194,727 |
| MOBILOANS | 6,069 | $4,987,372 |
| PAYDAYONE | 3,529 | $2,403,191 |
| PLAIN GREEN | 6,941 | $9,577,499 |
| RISE | 50 | $61,784 |
| THINKCASH | 1,957 | $2,067,906 |
| THINKCASH / PAYDAYONE | 87 | $98,403 |
| **Grand Total** | **24,090** | **$24,486,976** |

Accounts that are internal payers.

| Status | # Accts | Crnt Balance |
| --- | --- | --- |
| GREAT PLAINS | 45 | $32,527 |
| JC - PAYDAYONE | 4 | $1,832 |
| JC - THINKCASH | 1 | $854 |
| MOBILOANS | 119 | $62,364 |
| PAYDAYONE | 13 | $5,158 |
| PLAIN GREEN | 121 | $103,435 |
| RISE | 1 | $1,130 |
| THINKCASH | 10 | $9,553 |
| **Grand Total** | **314** | **$216,852** |

| Status | |
| --- | --- |
| **ABKP** | |
| 10034306 | |
| 10149034 | |
| 10466241 | |
| **APOC** | |
| 9425755 | |
| 9435693 | |
| 11256979 | |

**From:** Brad Hochstein
**Sent:** Monday, August 31, 2015 1:29 PM
**To:** Jack Mahoney
**Cc:** Craig Dilbeck; Lisa Riner; Katie VanBuren; Michael Swanson; Tiffany Howard; Kami Rangeloff; Tyler Rempel; Brian Elliott; Karl Krum; Patrick Nunez; Jodi Crady; Gene Gurley; Shawn Gylling; Mark Fletchall; Lori Patnode; Doug Honeysett; Steven Torres; Ken Newberg
**Subject:** Re: Think Product Close and Recall - PA
I need a report to send Brett for each client amount closed face amount paying and all other accounts face

On Aug 31, 2015, at 12:43 PM, Jack Mahoney <Jack@ncaks.com> wrote:

MobiLoans was not included in the previous report. The same process as below needs to be applied to the attached list.
Summary:

| Status | Count of Account ID | Sum of Account Balance | | Client | Count of Account ID | Sum of Account Balance |
| --- | --- | --- | --- | --- | --- | --- |
| Move to BHLD | 85 | $71,236.36 | | MOBILOANS | 5945 | $4,922,943.82 |

**UNSEALED**

App. 0964

| Status | Count | Sum | | | |
|---|---|---|---|---|---|
| SIF Review | 17 | $17,345.69 | **Grand Total** | 5945 | $4,922,943.82 |
| APOC | 1 | $770.00 | | | |
| Need To Recall | 3334 | $2,588,032.17 | | | |
| Already in BHLD | 2508 | $2,245,559.60 | | | |
| **Grand Total** | 5945 | $4,922,943.82 | | | |

**From:** Jack Mahoney
**Sent:** Monday, August 10, 2015 4:10 PM
**To:** Craig Dilbeck; Lisa Riner; Katie Van Buren; Michael Swanson; tiffany@ncaks.com
**Cc:** Kami Rangeloff; Tyler Rempel; Brian Elliott; Karl Krum; Patrick Nunez; Jodi Crady; Gene Gurley; Shawn Gylling; Brad Hochstein; Mark Fletchall; Lori Patnode; Doug Honeysett; Steven Torres; Ken Newberg
**Subject:** Think Product Close and Recall - PA
**Importance:** High

All active Think Product accounts with a State Placed or Current Res = PA are being moved to BHLD.

Going forward, the nightly BHLD scrub will evaluate Think accounts for both State Placed and Current Res = PA and move non-collector owned accounts. The attached workbook has these sheets:

· Moved to BHLD – These are all active accounts, not forwarded and with *no active promise on file.* All are being moved to BHLD
· Need Recalled – These are all FFW* accounts. Allow agencies to keep current payers, but recall all others and move to BHLD on return.
· APOC – These need to be closed and moved to BHLD
· SIF Review – Need DSC Department to review and identify accounts with active arrangements which can be left

Please complete your part ASAP.
Summary:

| Status | Count of Account ID | Sum of Account Balance |
|---|---|---|
| Move to BHLD | 12823 | $12,602,084.26 |
| SIF Review | 101 | $139,270.88 |
| APOC | 13 | $17,032.03 |
| Already in BHLD | 492 | $532,148.83 |
| Need To Recall | 4387 | $6,047,600.50 |
| **Grand Total** | 17816 | $19,338,136.50 |

| Client | Count of Account ID | Sum of Account Balance |
|---|---|---|
| ELASTIC | 413 | $186,589.91 |
| GREAT PLAINS | 2779 | $3,435,780.66 |
| JC - PAYDAYONE | 1879 | $1,278,942.38 |
| JC - PLAIN GREEN | 121 | $160,783.90 |
| JC - THINKCASH | 215 | $193,872.95 |
| PAYDAYONE | 3515 | $2,397,729.66 |
| PLAIN GREEN | 6818 | $9,474,404.52 |
| RISE | 48 | $80,136.98 |
| THINKCASH | 1941 | $2,051,492.21 |
| THINKCASH / PAYDAYONE | 87 | $98,403.33 |
| **Grand Total** | 17816 | $19,338,136.50 |

Jack Mahoney
Director of Analytics
National Credit Adjusters – Chandler, AZ
Ext: 5218
Direct: 620-931-2702
Cell: 620-802-3311



**National Credit Adjusters**



Jack Mahoney      Cell: 620-802-3311
Director of Analytics    jmk@ncaks.com

National Credit Adjusters, LLC   Phone: 620-931-2702
855 W Chandler Blvd. Ste 100   Fax: 866-773-7511
Chandler, Arizona 85225   ncaks.com

**UNSEALED**
NCA_PA002604

# Plaintiff's Exhibit 98

UNSEALED

Brett see below

**From:** Jack Mahoney
**Sent:** Thursday, December 3, 2015 2:56 PM
**To:** Brad Hochstein ; Shawn Gylling ; Mark Fletchall
**Subject:** PG-GP-ML All Accts PA - 2015-12-03.XLSX

This is all accounts for Plain Green, Great Plains and MobiLoans that were loaded from 4/1/13 to today which have either state placed PA or current residence PA.
It has filters built in to exclude the certain status codes that were mentioned.
I think it has everything, but let me know if something more is needed.
Summary:

| Age (DP to 12/3/15) | # Accts | Placed | Crnt Balance | Futures |
|---------------------|---------|--------|--------------|---------|
| **GREAT PLAINS** | **2731** | **$3,530,561.93** | **$3,390,414.40** | **$17,049.36** |
| 1-90 | 3 | $3,485.70 | $3,485.70 | $0.00 |
| 91-180 | 2 | $2,649.68 | $2,476.13 | $0.00 |
| 181-270 | 3 | $2,468.95 | $2,468.95 | $0.00 |
| 271-360 | 2 | $2,347.81 | $2,347.81 | $0.00 |
| 361-450 | 98 | $118,258.77 | $113,092.07 | $1,968.00 |
| 451-540 | 147 | $176,895.83 | $168,915.31 | $1,282.57 |
| 541-630 | 163 | $192,959.34 | $184,172.97 | $452.00 |
| 631-720 | 444 | $583,035.66 | $556,968.30 | $2,320.64 |
| 721-810 | 627 | $796,231.58 | $757,940.73 | $3,277.75 |
| 811-900 | 290 | $349,837.59 | $336,458.17 | $1,083.70 |
| 901-990 | 952 | $1,302,391.02 | $1,262,088.26 | $6,664.70 |
| **JC - PLAIN GREEN** | **120** | **$159,812.45** | **$159,812.45** | **$0.00** |
| 901-990 | 120 | $159,812.45 | $159,812.45 | $0.00 |
| **MOBILOANS** | **6155** | **$5,224,798.35** | **$5,078,453.05** | **$33,185.38** |
| 91-180 | 7 | $6,412.66 | $6,132.06 | $392.78 |
| 181-270 | 3 | $2,596.09 | $2,596.09 | $0.00 |
| 271-360 | 5 | $5,575.38 | $5,253.96 | $0.00 |
| 361-450 | 213 | $180,888.23 | $173,858.79 | $212.02 |
| 451-540 | 442 | $388,202.26 | $370,243.15 | $4,438.29 |
| 541-630 | 5485 | $4,641,123.73 | $4,520,369.00 | $28,142.29 |
| **PLAIN GREEN** | **6695** | **$9,738,221.03** | **$9,335,712.33** | **$53,789.35** |
| 1-90 | 3 | $3,577.21 | $3,577.21 | $0.00 |
| 91-180 | 7 | $13,276.80 | $13,276.80 | $0.00 |
| 181-270 | 13 | $19,936.42 | $19,936.42 | $0.00 |
| 271-360 | 8 | $8,680.86 | $8,006.46 | $0.00 |
| 361-450 | 310 | $430,633.26 | $412,221.07 | $4,377.45 |
| 451-540 | 401 | $562,008.19 | $543,654.64 | $2,135.82 |
| 541-630 | 251 | $360,011.98 | $341,090.25 | $6,975.85 |
| 631-720 | 928 | $1,325,327.42 | $1,259,203.27 | $6,762.08 |
| 721-810 | 1382 | $1,953,368.57 | $1,859,097.55 | $11,248.78 |
| 811-900 | 733 | $1,016,006.69 | $971,956.32 | $4,634.10 |
| 901-990 | 2659 | $4,045,393.63 | $3,903,692.34 | $17,655.27 |

NCA_PA007264

**UNSEALED**        App. 0967

| Grand Total | 15701 | $18,653,393.76 | $17,964,392.23 | $104,024.09 |

NCA_PA007265

**UNSEALED**



## pennsylvania
**DEPARTMENT OF BANKING**

MARKET SQUARE PLAZA | 17 N SECOND STREET, SUITE 1300 | HARRISBURG, PA 17101-2290
☎ 717.787.2665 , · 717.787.8773 // www.banking.state.pa.us

# LOAN BROKER REGISTRATION APPLICATION

| For Official Use Only<br>Registration No. _____ | **PART 2** |
|---|---|

---

**1. Please indicate name of business and how it is structured.**

Name of corporation: **TC Loan Service, LLC**

D/B/A (if applicable): **Think Cash**

Federal ID Number: **56-2513103**

Attach Articles of Incorporation, if a foreign corporation, Certificate of Authority to do business in Pennsylvania, and a copy of the fictitious name registration, if applicable. **see attachment '1'**

If business is not a corporation

How is business organized? **n/a**

Name of entity: _____

D/B/A (if applicable): _____

Federal ID Number If Partnership or Association: _____

Attach a copy of the Operating Agreement, By-laws, etc., and evidence of registry with the Pennsylvania Department of State, if required. If registry not required, state reason below. Please provide legal opinion if claiming exemption.

---

$300.
#011920

Credit Services Loan Broker Registration Page 3



Exhibit

P101

Christy R. Sievert, CSR, RPR

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**UNSEALED**

PAOAG-0000207

App. 0969

| 2. | List complete address where loan broker business will be conducted. Attach additional sheets if there are additional locations where loan broker business will be conducted. |
|----|----|

($300 registration fee must accompany application):

4150 International Plaza, Suite 400     (817) 546-2700
Street Address and Suite or Room Number     Office Telephone

Fort Worth     Texas   76109     (817) 546-2600
City     State    Zip Code     FAX Number

Tarrant     Jason Harvison     1-866-420-7157
County     Full-time W-2 Employee/Mgr.     Toll-Free Number at location
        *(Did you complete all Criminal History Requests?)*

n/a
Mailing Address if Different [If Not Different, indicate N/A]

Company's e-mail address: __srule @thinkcash.com__

Company's web address: __thinkcash.com__

**(Web address must be registered with the Department of State if it is significantly different from the company name or not prominently displayed in the opening page.)

List all types of business offered on your website: __see attachment '2'__

Attach additional sheets if necessary.

Explain how loan broker business will be conducted via the internet: __see attachment '2'__

Attach additional sheets if necessary.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER        PAOAG-0000208

UNSEALED

App. 0970

| 3. | Identify officers, directors, owners, and all designated office managers of entity. |
|----|---------------------------------------------------------------------------------------|

**If business is a corporation:**
List full name, corporate title, date of birth, social security number, residence address, residence telephone number and cell phone number of each officer, director and office manager of the proposed licensed corporation.

**If business is not a corporation:**
List full name, official title in the business, date of birth, social security number, residence address, residence telephone number and cell phone number of each owner and office manager of the proposed licensed business.

FULL NAME: Kenneth E. Rees ___ TITLE: President and CEO

DATE OF BIRTH: 12/16/62 ___ SOCIAL SECURITY NO. 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

HOME ADDRESS: 401 ~~State~~ Hazelwood Dr., FortWorth, Tx 76107

~~HOME~~ work PHONE NO.: 817-546-2788 ___ CELL PHONE NO.: ___

EMAIL ADDRESS: Krees@thinkcash.com

Did you complete all Criminal History Requests? ✓Yes __ No

FULL NAME: Jason D. Harvison ___ TITLE: Sr. Vice President - Secretary

DATE OF BIRTH: 04/24/76 ___ SOCIAL SECURITY NO.: 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

HOME ADDRESS: 821 Thomas Crossing, Burleson, TX, 76028

~~HOME~~ work PHONE NO.: 817-546-2755 ___ CELL PHONE NO.: ___

EMAIL ADDRESS: Jharvison@thinkcash.com

Did you complete all Criminal History Requests? ✓Yes __ No

NOTE: Attach additional sheets as needed.

Credit Services Loan Broker Registration Page 5

**4.** Please complete all of the following information in order to identify the person the Department should contact to address registration matters and compliance issues.

Contact Person: __Scott D. Rule, Associate General Counsel__
                    Name and Title

__4150 International Plaza, Suite 400__          __(817) 546 - 2759__
Street Address and Suite or Room Number          Office Telephone

__Fort Worth__          __Texas__     __76109__     __(817) 509-2584__
City                    State    Zip Code   FAX Number

**5.** Identify names and addresses of all agents and employees of the loan broker who act or will act as a loan broker on behalf of the loan broker and indicate whether each agent or employee identified is a W-2 employee or 1099 agent. Attach additional sheets if necessary.

Full Name: __NONE__          W-2 or 1099? _____

Home Address: _____

_____

Home Telephone No.: _____

Social Security No.: _____ Date of Birth: _____

see attachment '2' — automated decision engine

**6.** Indicate business (es) other than the loan broker business that will be conducted from the premises of the loan broker business.

Are there any additional businesses, not regulated under the Credit Services Act, that will be operating from the location of the proposed loan broker business?

__✓__ Yes                              _____ No

If YES, please indicate the name of the business(es), a brief description of the service(s) or product(s) offered, and whether there is or will be any relationship (other than the same location) between the loan broker business and other business(es). Attach additional sheets if necessary. See attachment '4'

| Name of business | Description | Describe relationship between businesses |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

Credit Services Loan Broker Registration Page 6

UNSEALED

App. 0972

| 7. | List types of loan broker services offered to consumers by the loan broker. Attach additional sheets if necessary. |

1. _____ see attachment '2' _____

2. _____

| 8. | List the types of other services offered to consumers by the loan broker. Attach additional sheets if necessary. |

1. _____ NONE _____

2. _____

| 9. | List the name, address and telephone number of all loan brokers or lenders on whose behalf the applicant acts or will act. Attach additional sheets if necessary. |

1. First Bank of Delaware, 50 S 16TH St, Philadelphia, PA 19102

2. _____

| 10. | List the name, address and telephone number of the lender(s) who fund the loans of the loan broker and, if applicable, show types of credit provided (credit cards, unsecured loans, etc.). Attach additional sheets if necessary. |

1. First Bank of Delaware, 50 S16TH St., Philadelphia, PA 19102

_____

2. _____

Credit Services Loan Broker Registration Page 7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNSEALED

| 11. | Provide a list of any fees the consumer must pay or any services or products the consumer must purchase prior to the granting of the loan or credit. Attach additional sheets if necessary. |

1. _____ see attachment '2' _____

2. _____

3. _____

| 12. | List the fees the loan broker will receive from either the borrower or the lender and when those fees will be due. Attach additional sheets if necessary. |

1. _____ see attachment '2' _____ due: _____

2. _____ due: _____

3. _____ due: _____

4. _____ due: _____

| 13. | Has any director, officer, office manager or owner etc. identified on this application ever been arrested for, charged with, convicted of, pled guilty to, or pled nolo contendere (no contest) or given a diversionary sentence in lieu of conviction to any criminal offense in this Commonwealth or anywhere else (including courts martial or disciplinary proceedings under the Uniform Code of Military Justice)? |

_____ Yes

_✓_ No

If yes, explain in detail the circumstances:

_____ n/a _____

_____

_____

_____

Attach additional sheets if necessary.

Credit Services Loan Broker Registration Page 8

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**UNSEALED**

| 14. | Has any principal or employee identified in this registration been a party to a financial service business whose application, license, or authorization has been refused, denied, suspended, or revoked in Pennsylvania or any other state? |
|---|---|

_____ Yes                      ✓ No

If yes, provide complete details below:

_____ n/a _____

_____

_____

_____

_____

Attach additional sheets if necessary.

| 15. | Please answer the following questions by placing an X on the appropriate response line. |
|---|---|

**YES  NO**

a. ✓ ___ Did you receive a copy of the Credit Services Act and the Regulations as part of this application package?

b. ✓ ___ Have you reviewed the Credit Services Act and the Regulations? (Regardless of whether you review the Credit Services Act and the Regulations, please be aware that as a registered loan broker, you shall be bound by all provisions of the Credit Services Act and the Regulations applicable to a registered loan broker.)

c. ✓ ___ Do you understand that the Credit Services Act and the Regulations describes requirements related to conducting a loan broker business?

d. ✓ ___ If you become registered, will you convey the requirements of the Credit Services Act and the Regulations to any person(s) who engage(s) in the loan brokering business as your employee?

e. ✓ ___ Do you understand that the Pennsylvania Department of Banking requires that persons whose income you report on an IRS For 1099 or individuals that you treat as non-employees for any other governmental reporting purpose must obtain their own loan broker registration?

f. ✓ ___ Do you understand that as a registered loan broker the office manager must either be a full-time, W-2 employee or officer/owner of the company and must staff the registered business location during normal business hours?

g. ✓ ___ Do you understand that a loan broker's registration expires each year on January 31?

Credit Services Loan Broker Registration Page 9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNSEALED

|   | Yes | NO |   |
|---|-----|----|---|
| h. | ✓ | ___ | Do you understand that the loan broker's renewal application must be received by the Department no later than December 1? |
| i. | ✓ | ___ | Do you understand that a loan broker is subject to a $100 late fee if the renewal registration application and fee is not received by the Department by December 1? |
| j. | ✓ | ___ | Do you understand that the Department of Banking has the authority to issue rules, regulations, and orders as may be necessary to insure proper registration of a loan broker? |
| k. | ✓ | ___ | Do you understand that the Department may refuse to register or renew the registration of a loan broker applicant? |
| l. | ✓ | ___ | Do you understand that upon receipt of your application, the Department of Banking will forward all required documents and instructions needed to obtain National Criminal History Record Information. |
| m. | ___ | ✓ | Do you have any questions about the Credit Services Act or the registration process? [If yes, attach separate sheet with the question(s).] |

---

**16.    Designate Pennsylvania agent for service of process (For Foreign Corporations Only):**

---

The applicant corporation, in pursuance of action taken at a regular meeting of the Board of Directors of said corporation does hereby appoint:

FULL NAME: _Corporation Service Company_

RESIDENCE ADDRESS: _2704 Commerce, Herrisburg, PA 17110_

POST OFFICE: _____

its true and lawful attorney and authorized agent upon whom all lawful process in any proceeding against it may be served and agrees that service of process on its attorney or agent herein named shall be of the same legal force and validity as if served upon it, the said corporation, and the authority for such service of process shall continue in force as long as any liability remains outstanding against it in the Commonwealth of Pennsylvania.

In the case of death, removal from the Commonwealth of Pennsylvania, or any legal disability or disqualification of its attorney or agent herein named, the said corporation does hereby appoint the Secretary of Banking of the Commonwealth of Pennsylvania, and successor in office, to be its true and lawful attorney and authorized agent upon whom all lawful process in any proceeding against it may be served and agrees that service of process on the Secretary of Banking shall be of the same legal force and validity as if served upon it, the said corporation, and the authority for such service of process shall continue in force as long as any liability remains outstanding against it in the Commonwealth of Pennsylvania.

Credit Services Loan Broker Registration Page 10

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNSEALED

PAOAG-0000214

App. 0976

**17.** **Affidavit for Sole Proprietorship, Partnership, etc.:**

State of:

County of:

N / A

The following individuals personally appeared before me:

who, being duly sworn according to law, depose and say that the statements contained in the above application are true and correct.

(All owners, partners or managing partners are required by law to sign this application.)

Sworn and subscribed before me this

_____day of_____AD 20_____          **NOTARY SEAL**

_____
(Signature of Notary Public)

Credit Services Loan Broker Registration Page 11

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

**UNSEALED**

**18.  Affidavit for Corporation:**

State of: Texas

County of: Tarrant

The following individuals personally appeared before me:

Scott D. Rule, Associate General Counsel

( Print or type names and official titles of persons signing on behalf of the Corporation.)

who, being duly sworn according to law, depose and say that the statements contained in the above application are true and correct and that this application is duly executed, and the seal of the corporation is affixed by the authority of the Board of Directors of the said Corporation.

_____
(Signature of Official)

**CORPORATE SEAL**

_____
(Signature of Official)

Sworn and subscribed before me this

6 day of Sept AD 2007

_____
(Signature of Notary Public)

**NOTARY SEAL**

CHARLA WALDEN
Notary Public, State of Texas
My Commission Expires
October 27, 2008

Credit Services Loan Broker Registration Page 12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNSEALED

**19.** Please review before mailing this application.

Have you...
- Answered all questions or indicated N/A?
- Checked answers for accuracy?
- Signed the application?
- Had your signature(s) notarized?
- Attached a copy of the Articles of Incorporation, if a foreign corporation, a Certificate of Authority to do Business, and, if applicable, a copy of the Fictitious Name Registration?
- Made and retained a copy of the entire application for your records?
- Enclosed a check for the appropriate amount?

**20.** Please mail completed original application to:

Pennsylvania Department of Banking
Licensing Division
17 North Second St, Suite 1300
Harrisburg, Pennsylvania 17101-2290

Credit Services Loan Broker Registration Page 13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNSEALED

# Th**i**nkCash

September 7, 2007

**VIA FEDERAL EXPRESS**
Pennsylvania Department of Banking
Licensing Division
17 North Second Street, Suite 1300
Harrisburg, Pennsylvania 17101-2290

*Re: Loan Broker Registration Application*

To whom it may concern:

Enclosed is the referenced application for TC Loan Service, LLC, along with check number 011920 in the amount of $300.00 payable to the Pennsylvania Department of Banking for the required fees.

If you have any questions, please do not hesitate to contact me at (817) 546-2759.

Best regards,

Scott D. Rule
Associate General Counsel

Enclosures

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNSEALED



2



## ThinkCash
### Program Overview

*Program Overview*

ThinkCash is a new program being offered by TC Loan Service, LLC dba ThinkCash. It will provide short-term installment loans to consumers in need of cash using the Internet as a delivery channel. It is far more convenient for consumers and will help consumers identify a lower-cost credit product and provide consumers a "road to credit" without the alleged more abusive characteristics of payday loans. Our goal is to increase competition in the short term loan industry by teaming with a bank lender to become the low-cost leader, offering the most consumer-conscious product in the market.

TC Loan Service, LLC dba ThinkCash (the marketing and servicing entity of PayDay One) will provide all marketing and servicing for the program and the lender will be one or more state banks. Currently, we are working with First Bank of Delaware, a Delaware state bank, regulated by the FDIC (the "Lender").

*Product Specifics*

Although the ultimate pricing and product specifications will be determined by the Lender, we anticipate that the loans offered in the program will be relatively short-term, relatively high-interest loans designed specifically for the needs of the "sub-sub-prime" consumer who currently only has access to products like payday loans and potentially providers like CashCall.

The loans will range in size from $250 to $2,500 and vary in term from 3 months to 2 years. Also, the interest rate will vary depending on the size of the loan and the creditworthiness of the borrower.

The allowable term of the loan will vary based on the size of the loan and the interest rate. The Lender will offer the customer three options for loan term to help them minimize the number of payments while lowering the payment amounts to manageable levels. Lower dollar loans with higher interest will have three fairly short term options while higher dollar, lower interest loans will have longer term options. The payment due dates on the loans will be tied to the customer's pay dates (e.g. monthly, bi-weekly, etc) to help the customer effectively budget for the loans.

The Lender does not anticipate an origination fee charge to the consumer. Other than interest, the only fees the consumer will potentially pay are a returned payment (NSF) fee. There will be no prepayment penalty and we will encourage customers to pay some or all of the loan back early.

ThinkCash
Confidential and Proprietary to PayDay One Holdings, Inc. and affiliates.
Copyright © 2007, PayDay One Holdings, Inc. All rights reserved.

*Consumer Marketing*

We plan to use numerous marketing channels for this program:

- Search marketing (e.g. Google, Yahoo)
- Affiliate programs (with other websites)
- Lead generators (who sell us completed customer application)
- Emails and banner ads
- TV
- Direct mail
- Other "Offline" marketing channels (billboard, etc)

The primary marketing message will be related to the ease and convenience of the loans for "emergency cash" needs.

The banks will review all advertising copy before being released.

*Customer Flow*

Once the customer accesses the website, they will be able to learn about the product (including pricing, terms and conditions, and other FAQs). The customer will then be able to fill out an application for the loan on-line, which will be scored according to rules established by the bank providing the loan in the customer's state. The decision will be based on data the customer provided (salary, time at residence, etc) as well as commercially available credit information (FICO score, debt to income ratio, Teletrack derogatory information). Prior to submitting the application for approval, the customer must sign the terms and conditions of the program, including privacy policy and an arbitration agreement.

After the application has been scored, the customer will be prompted to check their email for the results (for electronic notification compliance). The email will contain a link back to the site where either the adverse action notification will be presented, or the customer will be notified of the application approval. If approved, the customer will select the loan amount desired (up to the maximum amount authorized by the bank), the term of the loan (one of three options), and the first payment date (not more than 45 days in the future).

Based on the loan specifics (e.g. amount, term, interest rate, etc), the loan agreement will be displayed to the customer and signed via E-Sign compliant with state and Federal law.

After the loan is signed by the customer, but prior to funding, the application information is verified for accuracy. If the application information is found to be incomplete or incorrect, the lender may decide not to fund the loan. In this case, the customer is notified via email of the situation and may be asked to fax in additional information to be "re-scored". Note that the loan agreement clearly states that loan funding is subject to verification of application information.

ThinkCash
Confidential and Proprietary to PayDay One Holdings, Inc. and affiliates.
Copyright !! 2007, PayDay One Holdings, Inc. All rights reserved.

After funding, the customer will have the option to make payments by a variety of means (ACH, check, money order, etc), however if their payment is not received by the due date and we do not hear from the customer otherwise, we will process an ACH from the customer's bank account for the payment amount. The customer can come on-line at any time to schedule an early payment or to make additional principal payments without penalty.

The customer will have access to view all of their loan agreements on-line and the loan agreement will be clearly marked "paid in full" with a "watermark" when the loan has been paid off.

*Bank/ThinkCash Relationship*

Although ThinkCash is the marketer/servicer for the program, the bank is the lender. As such, the Lender defines the application required and sets the underwriting criteria for all loans. As well, they define the product pricing and terms. This is fully disclosed to customers and all communications either list the name of the Lender or mention that loans are provided by an FDIC regulated state bank.



Contractually, ThinkCash has a marketing and servicing agreement with the Lender. Under this agreement ThinkCash provides certain services (marketing, technology support, customer service, collections, reporting, etc) for the Lender and is paid a one-time fee for each new loan made by a customer.

ThinkCash
Confidential and Proprietary to PayDay One Holdings, Inc. and affiliates.
Copyright © 2007, PayDay One Holdings, Inc. All rights reserved.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNSEALED

## MARKETING AND SERVICING AGREEMENT

This Marketing and Servicing Agreement (this "Agreement") is dated as of January 23, 2007, between First Bank of Delaware, a Delaware state-chartered bank ("Bank"), and TC Loan Service, LLC d/b/a ThinkCash, a Delaware limited liability company ("ThinkCash"). All capitalized terms used herein shall have the meanings ascribed thereto in the "Glossary of Defined Terms," attached hereto as Exhibit A.

WHEREAS, Bank is a Delaware state-chartered bank insured by the Federal Deposit Insurance Corporation (the "FDIC"), and as such, is authorized to make loans to its customers, subject to the federal and Delaware laws in effect and as applicable;

WHEREAS, ThinkCash, in performing duties under this Agreement, is a duly authorized and validly existing Delaware limited liability company, authorized to do business in the State of Texas; and

WHEREAS, commencing on or about February 19, 2007, and in accordance with its established lending criteria as may be amended by Bank from time to time, Bank desires to originate loans in amounts not to exceed $2,500 ("Loans") to consumers ("Borrowers"), and further desires to secure each Loan with the Borrower's automated clearinghouse ("ACH") debit authorization or the Borrower's remotely created check authorization ("RCC") and ThinkCash, in performing duties under this Agreement, desires to market and service the Loans on Bank's behalf upon the terms and conditions stated herein (the "Program");

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises contained in this Agreement, and other valuable consideration, the sufficiency of which is hereby acknowledged, and intending to be legally bound, Bank and ThinkCash (each a "Party" and together, the "Parties") agree as follows:

### 1. Bank's Responsibilities and Rights.

(a) Bank in its sole discretion shall determine all of the conditions, terms and features of the Loans, including, without limitation, loan amounts, fees and charges, interest rates, credit limits, credit standards and all other terms and conditions of the Loans, and shall be responsible for the form of all Loan Documents as that term is defined in Section 2(e)(iii). Bank may make Loans to Applicants (as that term is defined in Section 2(a) below) who apply at one or more approved websites or storefront locations or call centers or other marketing channels operated by ThinkCash for Loans and who, in the sole discretion of Bank, meet such credit standards and other qualifications. In no circumstance shall Bank be required to make any Loan, and Bank may, in its discretion, decline to make any Loan, including without limitation if it has reason to believe that the making of the Loan or its solicitation will violate or has violated any applicable federal or state statutes, regulations, interpretations, orders, court decisions or other applicable rules (collectively, "Laws") or if Bank is unable to fund the Loan. Neither ThinkCash, nor Bank, nor their respective employees shall state or suggest to Applicants that Loans are made or approved by ThinkCash or that ThinkCash (or any employee of ThinkCash) can have any effect on an Applicant's prospect of obtaining a Loan. Bank shall maintain at its offices in Delaware computer terminals that connect to ThinkCash from which Bank may approve or reject any Loan or Loans at any time in its sole discretion. The Bank will select the states in which the loans are granted. The Bank will not make loans in the states listed in Exhibit D.



Exhibit

P 102

Christy R. Sievert, CSR RPR

UNSEALED
CONFIDENTIAL

TF-PA-000845

(b)     ThinkCash acknowledges that all rights of ownership in the Loans and Loan Documents, including, without limitation, any payments on the Loans or collateral or security for the Loans, are and remain the sole property of Bank, and ThinkCash shall have no ownership or other rights to or interests in, whether legal or equitable, such Loans, Loan Documents, payments on the Loans or collateral or security for the Loans during the term of this Agreement, and all such Loans, Loan Documents, payments on the Loans or other collateral or security for the Loans shall not be considered property of ThinkCash's estate if a bankruptcy petition is filed by or against ThinkCash.

(c)     In its sole discretion, Bank may sell, transfer, grant an interest in, or otherwise assign any Loan, or any portion of any Loan, to a third-party or parties. Any sale, transfer or assignment by Bank of any such Loan shall comply with applicable Laws.

(d)     Bank shall forward to ThinkCash via facsimile, with a copy by first-class mail, within five (5) Business Days ("Business Day" is defined as any day upon which Delaware state banks are open for business, but excluding Saturdays and Sundays) of receipt any written notices it receives indicating that bankruptcy proceedings have been initiated with respect to any Borrower.

(e)     Bank shall, within forty-five (45) days of the last day of any calendar quarter, provide ThinkCash with Bank's quarterly 10-Q financial statements prepared in accordance with generally accepted accounting principles.

(f)     Within a reasonable time after the execution of this Agreement and as permitted by applicable Law, and from time to time during the term as reasonably necessary to enable ThinkCash to perform its obligations under this Agreement and as permitted by applicable Law, Bank shall provide ThinkCash with copies of all policies, notices and disclosures required to be maintained by ThinkCash or provided to customers of Bank under applicable law (including, but not limited to, policies, notices and disclosures required under the Bank Secrecy Act, the PATRIOT Act, the Truth in Lending Act, the Equal Credit Opportunity Act and FinCEN 314a searches).

2.     **ThinkCash's Responsibilities and Services**.

(a)     General Duties of ThinkCash; Standards of Performance.  ThinkCash shall perform all services reasonably required to market and service, via one or more approved websites, storefront locations, call centers, or other marketing channels ("Access Channels") operated by ThinkCash, the Loans made by Bank, through which Loan applicants ("Applicants") may submit Loan applications ("Applications") and receive disclosures required by applicable Laws and where Borrowers may execute and deliver Loan documentation and payments on the Loans for deposit by ThinkCash on Bank's behalf to the Bank Deposit Account.  In marketing the Loans and performing its services hereunder, ThinkCash shall at all times and in all material respects comply with applicable Laws.  ThinkCash shall use all of the reasonable documentation provided by Bank and shall follow the reasonable and lawful practices, policies and procedures established by Bank and communicated in writing to ThinkCash from time to time with respect to the Loans, which Bank's practices, policies and procedures shall incorporate without limitation the guidelines and recommendations governing the Loans and sub-prime lending and loan classification promulgated or adopted by the FDIC, the Office of the State Bank Commissioner of the State of Delaware, the Federal Reserve Board, the Office of the Comptroller of the Currency, or the Office of Thrift Supervision, as such best practices, guidelines, and recommendations may from time to time be amended and as communicated to ThinkCash by Bank (the "Bank Policies").  The current Bank Policies are attached as Exhibit E. ThinkCash shall train and supervise its employees to act in conformity with the Bank Policies and the requirements of applicable Laws pertaining to their duties.  ThinkCash will not accept

2

any consideration from any Applicant and will not agree or promise to procure a Loan for any Applicant from Bank. ThinkCash shall comply with all policies, notices and disclosures provided to ThinkCash by Bank from time to time under this Agreement.

(b)     Marketing of Loans.

(i)     Bank hereby authorizes ThinkCash, during the term of this Agreement, to market Loans to Borrowers via one or more Access Channels operated by ThinkCash in compliance with all applicable Laws and Bank Policies; *provided, however*, that ThinkCash shall not market Loans in any location for which it has not received the written prior approval of Bank. Bank hereby grants to ThinkCash a non-exclusive license to reproduce the name, trade name, trademarks and logos of Bank (collectively, the "Bank Properties") during the term of this Agreement in connection with this Agreement on letters, print advertisements, the internet, television and radio communications and other advertising and promotional materials (all such letters, advertising and promotional materials incorporating Bank Properties and all related designs, artwork, logos, slogans, copy and other similar materials shall be referred to collectively herein as the "Promotional Materials"); *provided, however*, ThinkCash shall submit all Promotional Materials to Bank for its written approval prior to any use thereof and Bank shall not unreasonably withhold such approval. All rights not expressly granted to ThinkCash herein are reserved by Bank. Regardless of whether they incorporate the Bank Properties, advertising and promotional materials for the Loans (A) shall prominently identify the maker of the Loans as either (i) Bank or (ii) a federally-regulated state bank, (B) shall be accurate, (C) shall not be misleading, (D) shall comply with all applicable Laws and governmental requirements, and (E) shall be submitted to Bank for prior approval, which approval shall not be unreasonably withheld or delayed; *provided, however*, that Bank's approval shall not constitute any representation or warranty that the advertising and promotional materials are accurate, not misleading or comply with all applicable laws. Bank shall be identified to Applicants and to Borrowers as lender and the creditor for all credit extended on the Loans. ThinkCash shall promote, advertise and market Loans to prospective Applicants. Except as may be agreed by the Parties from time to time during the term of this Agreement, ThinkCash shall be responsible for all costs and expenses associated with advertising and developing and implementing any Promotional Materials under this Agreement, including but not limited to (a) lead list acquisition, scrubbing and management of lead lists, (b) preparation and distribution of product offerings and associated marketing materials, (c) development and placement of internet, print media, radio and television advertising, (d) website design and development, and (e) payment of all compensation owed to Third-Party Service Providers.

(ii)     In connection with ThinkCash's performance of its obligations under this Agreement, it is expressly agreed that (A) Bank shall not hold any ownership in ThinkCash or possess a leasehold interest in ThinkCash's offices or any personal property located therein, except that Bank shall be the exclusive owner of all Loan Agreements (as such term is defined in Section 2(c) below), Loan Documents, and funds reflecting Loan repayments as may be stored in ThinkCash's computer servers and/or files from time to time, (B) no Bank employees shall work in the ThinkCash offices (except for Bank auditors or other Bank personnel who may examine ThinkCash's practices from time to time for compliance with the terms of this Agreement and Bank Policies), and (C) other than as may be necessary to effectuate the terms of this Agreement or with respect to any requirements or requests of Regulatory Authorities, Bank shall exercise no authority or control over ThinkCash's employees or methods of operation. Neither ThinkCash nor any of its employees, officers, directors, representatives or agents will hold themselves out as an agent or employee of Bank.

(iii)     There shall be no restriction on Bank's right to do business with any other organization that markets and services loans similar to the Loans.

3

CONFIDENTIAL   **UNSEALED**

TF-PA-000847

(iv)     ThinkCash will make any reasonable change to its business operations that the Bank or any Regulatory Authority either recommends or, through audits and compliance reviews, determines is necessary to comply with the Bank Policies or the Laws governing the Loans. ThinkCash agrees to comply with the Bank's current minimum information technology ("IT") standards and any updates. Bank's current IT standards are included as Exhibit F. Bank shall notify ThinkCash in writing at least forty-five (45) days prior to adoption of any update to Bank's IT standards, unless such update is required to be adopted by applicable Laws and governmental requirements. To the extent that any Third-Party Service Providers used by ThinkCash retain any Customer Information, ThinkCash shall ensure that such Third-Party Service Providers comply with the Bank's IT Standards.

(c)     Servicing of Applications.

(i)     Bank hereby authorizes ThinkCash to assist Bank in obtaining Applications by allowing ThinkCash employees to take Applications from Applicants who apply at one or more approved Access Channels operated by ThinkCash using an Application form approved by Bank. ThinkCash shall not discourage any prospective Applicant from submitting an Application and shall provide reasonable assistance to each prospective Applicant in completing an Application. Without limiting the generality of the foregoing, ThinkCash shall not discriminate against or discourage any Applicant in any aspect of the credit process on any "prohibited basis," as such term is defined in the federal Equal Credit Opportunity Act ("ECOA") and Federal Reserve Board's Regulation B ("Regulation B"). ThinkCash shall make all completed Applications available to Bank (or Bank's designated loan processing agent) electronically, by facsimile, by telephone, or by other appropriate means agreeable to both Parties. A copy of the Application is attached as Exhibit G.

(ii)     Based upon the information provided by Applicants to Bank in the Applications and such other credit-related information as obtained by ThinkCash at the direction of Bank, or by Bank directly, and pursuant to the credit granting standards adopted by Bank in its sole discretion, Bank shall be solely responsible for determining whether to extend credit to Applicants. Bank shall communicate to ThinkCash its credit decision on any Application, together with the reason for any negative credit decision, electronically, by telephone or by other means acceptable to both Parties. ThinkCash shall prepare and deliver an appropriately completed adverse action notice from Bank in compliance with Regulation B and applicable state law ("Adverse Action Notice") to any Applicant whose Application is rejected by Bank or for which the Applicant is not approved by Bank on the terms requested, which Adverse Action Notice shall also contain, in addition to the information required by the ECOA, any adverse action information required by the federal Fair Credit Reporting Act ("FCRA"), and any applicable state credit reporting law.

(iii)     Each of Bank's Loans hereunder shall be governed by a written loan agreement ("Loan Agreement") containing the disclosures required by the federal Truth-in-Lending Act, Federal Reserve Board's Regulation Z ("Regulation Z") and applicable state law (the "Disclosures"). The Loan Agreement shall be issued for the amount shown as the "Total of Payments" on the Loan Agreement (which shall be the sum of the amount shown as the "Amount Financed" plus the amount shown as the "Finance Charge"). The amount of the Finance Charge shall be pre-computed. In the case where Bank's credit granting standards indicate that an Applicant qualifies for a Loan, the Borrower shall be provided the proceeds of the Loan via an ACH credit to the Borrowers bank account or a credit to a Borrower's debit card. None of the Bank's Loans shall be evidenced by a promissory note.

(iii)     After the Loan is approved by Bank, ThinkCash shall (A) electronically or otherwise deliver a copy of the Loan Agreement to the Borrower; (B) obtain

4

UNSEALED
CONFIDENTIAL

TF-PA-000848

from the Borrower the executed Loan Agreement; (C) deliver a copy of the Bank's privacy policy to the Borrower and (D) obtain electronically or otherwise from Borrower information relating to collecting the amount due under the Loan Agreement and from the Borrower's checking or other asset accounts as described in Section 2(d) below, which may include his or her authorization for ACH debit transfers. Borrowers shall execute the Loan Agreement with either a manual signature (transmitted by facsimile to ThinkCash) or an electronic signature (given in accordance with the federal E-Sign law or other applicable Laws).

        (d)    Collection of Loans.

            (i)    Bank hereby authorizes ThinkCash, and ThinkCash agrees, to service the Loans by, among other things, (1) using its commercially reasonable efforts to collect payments on the Loans at and after maturity thereof on behalf of Bank; (2) accurately recording and reporting the payments of funds received from Borrowers; and (3) making prompt remittance to and settlement with Bank. Collection efforts will include, but shall not be limited to, the presentment of ACH or RCC debit entries to the Borrower's bank account identified in the ACH debit or RCC debit authorization. ThinkCash shall ensure that for each Borrower who repays the entire principal amount of the Loan prior to maturity date, that interest is accurately rebated to the Borrower using the actuarial method. In collecting payments owed under the Loan Agreements, ThinkCash shall comply with all applicable Laws, including, without limitation, the federal Fair Debt Collection Practices Act (the "FDCPA"), if applicable, the Operating Rules of the National Automated Clearing House Association (the "NACHA Rules"), any debt collection regulations and consumer protection laws applicable to the Bank or ThinkCash and any other applicable Laws. Without limiting the generality of the foregoing, ThinkCash shall not, explicitly or implicitly, make any threats of criminal prosecution in connection with debt collection, or otherwise engage in any practices that violate any applicable Law, nor shall it impose a charge for cashing a check presented for payment of the amount due under a Loan.

            (ii)    ThinkCash shall use commercially reasonable efforts to service the Loans at all times in accordance with the terms of the Loan Agreement, the Disclosures and the Bank Policies. Bank shall notify ThinkCash in writing at least ten (10) days prior to any change in the Bank Policies, unless applicable Law requires such changes sooner.

            (iii)    On each Business Day, ThinkCash shall assure that any amounts obtained by ThinkCash representing each individual payment on each individual Loan due on such day are deposited (or, if received by ThinkCash from Borrowers in the mail, sent to be deposited) to a deposit account designated and owned by Bank ("Bank Deposit Account"), unless such Loan is refinanced by Borrower; provided, however, if Bank has an Insolvency Event (as defined in Section 4(b)(ii), below) or is in default of any participation agreement, upon the written request of any participant, ThinkCash is authorized and directed to distribute to such participant its pro rata share of each such payment until such time as such Insolvency Event or default is resolved. Bank shall have no liability in connection with such direct distributions by ThinkCash.

        (e)    Reports; Access to Stores, Books and Records and Employees:

            (i)    During the term of this Agreement, ThinkCash shall provide to Bank data submissions and reports reasonably required by Bank in order to maintain effective internal controls and to monitor results under this Agreement, including without limitation the performance of the Loans and ThinkCash's obligations hereunder. Such reports shall include a daily report showing those Loans originated through ThinkCash, outstanding and repaid each day, as agreed upon by Bank and ThinkCash, as well as ThinkCash's monthly compliance review checklists and periodic internal audit reports.

5

(ii)     For each calendar year ThinkCash shall, within thirty (30) days of the last day of any calendar quarter, provide Bank with ThinkCash's quarterly financial statements. For each calendar year after 2006, on or before April 15, ThinkCash shall provide Bank with ThinkCash's audited annual financial report. Both the quarterly financial statements and the annual financial report shall be prepared in accordance with generally accepted accounting principles.

(iii)     Unless otherwise directed by Bank to ThinkCash, Bank agrees to allow ThinkCash, as its bailee, to maintain and retain possession in trust for Bank for the term of the Agreement and any additional record retentions period required by applicable Law of (x) all computer files representing Applications and Adverse Action Notices and other documents relating to rejected Applications and (y) all computer files of all Applications, Loan Agreements (including Disclosures), and other documents provided to or received from Borrowers (all such documents referenced in clauses (x) and (y) above collectively, the "Loan Documents"). ThinkCash agrees to use such Loan Documents solely to service the Loans. Such Loan Documents shall be held by ThinkCash in trust and as bailee for Bank, which has and shall continue to have constructive possession and legal title to such documents, files and records. At such time or times as Bank may reasonably request, ThinkCash shall deliver a copy of all Loan Documents to Bank at its headquarters or such other location or locations as Bank shall direct. All such Loan Documents shall be maintained in such a manner as to facilitate their inspection by and delivery to Bank, if so requested.

(iv)     During the term of this Agreement and at all times thereafter, Bank and banking agencies with regulatory authority over Bank, ThinkCash, or any third-party service providers ("Regulatory Authorities") shall have reasonable access to ThinkCash's and any Third-Party Service Provider's offices, to the books and records of ThinkCash and any Third-Party Service Provider (to the extent that such books and records pertain to the Loans), to the officers, employees and accountants of ThinkCash and Third-Party Service Providers, and to the computer files containing the Loan Documents, all for the same purposes of ensuring that ThinkCash and any Third-Party Service Provider is carrying out the Bank Policies and is otherwise complying fully with its obligations under this Agreement. Such access shall include permission to maintain employees or agents of Bank, at Bank's expense, and any Regulatory Authority, at ThinkCash's expense, on the premises of ThinkCash or any Third-Party Service Provider during regular business hours to audit ThinkCash's or any Third-Party Service Provider's services contemplated by this Agreement. In addition, and not as a limitation of the foregoing, Bank and any Regulatory Authority shall have the right, from time to time during the term of this Agreement, to conduct audits and/or compliance reviews of ThinkCash and any Third-Party Service Provider, the services provided by ThinkCash and any Third-Party Service Provider hereunder, and the records generated thereunder; provided, that the exercise of such audit and review rights by Bank or any Regulatory Authorities shall be conducted during normal business hours in a manner which does not unreasonably interfere with ThinkCash's or any Third-Party Service Provider's normal business operations and customer and employee relations. In its contracts with its Third- Party Service Providers, ThinkCash shall ensure that Bank and Regulatory Authorities have identical access to such Third-Party Service Providers as set forth herein with respect to ThinkCash.

(v)     Each Party warrants to the other that each Party and any Third-Party Service Provider has in place and employs appropriate measures designed to meet the objectives of the security and confidentiality guidelines of the federal banking agencies' Interagency Guidelines Establishing Standards for Safeguarding Consumer Information and 12 C.F.R. Part 332, *et seq*., adopted in connection with the federal Gramm-Leach-Bliley Act of 1999 ("GLBA"). Each Party shall immediately disclose to the other Party any breaches in security with respect to its or any Third-Party Service Provider's operations, the identity or information regarding any Borrower or Applicant, or any breach relating to databases or

6

UNSEALED
CONFIDENTIAL                                                                                   TF-PA-000850

information maintained by either Party or any Third-Party Service Provider with respect to Loans, Borrowers, or Applicants. Each Party shall immediately report to the other Party when any such material intrusion has occurred, the estimated effect of the intrusion on the other Party and the Borrowers and Applicants, and the specific corrective actions taken or planned to be taken. In addition, each Party agrees that no Party or Third-Party Service Provider will make any material changes to its security procedures and requirements affecting the performance of its obligations hereunder which would materially lessen the security of its operations or materially reduce the confidentiality of any databases and information maintained with respect to the other Party, Borrowers, and Applicants without the prior written consent of the other Party. ThinkCash must ensure that any Third-Party Service Provider to whom ThinkCash transfers or provides access to Customer Information (i) signs a written contract restricting its use of Customer Information to the use specified in the agreement between ThinkCash and the third-party, which must be consistent with the terms of this Agreement; (ii) agrees to comply with all governmental requirements and the privacy policies for the Program; (iii) agrees to implement and maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of all Customer Information as provided herein and (iv) complies with the requirements of this subsection (v). The Bank shall be provided a copy of all such agreements.

(vi)     ThinkCash will comply, as determined by Bank in Bank's sole and absolute discretion, with the loan underwriting system as administered by Bank.

(vii)    ThinkCash shall track and notify Bank, within five (5) Business Days of receipt by ThinkCash, of any complaints it receives from Borrowers and Applicants and the complaint resolution, which shall be the sole responsibility of ThinkCash.

(viii)   ThinkCash shall cooperate and shall require each Third-Party Service Provider to cooperate with any examination which may be required by any Regulatory Authority to the fullest extent requested by such Regulatory Authority. ThinkCash shall use and shall require each Third-Party Service Provider to use commercially reasonable efforts to provide to Bank any information which may be requested by any Regulatory Authority in connection with their audit or review of Bank or the Program, and ThinkCash shall and shall require each Third-Party Service Provider to fully cooperate with such Regulatory Authority in connection with any audit or review of Bank. ThinkCash shall also use commercially reasonable efforts to provide such other information as Bank, any Regulatory Authority may from time to time request with respect to the financial condition of ThinkCash and such other information as any of the foregoing may from time to time request with respect to Third-Party Service Providers.

(f)      Fees and Costs. In consideration for ThinkCash's performance of its obligations under this Agreement, Bank shall pay ThinkCash the sum of one hundred dollars ($100.00) per Loan funded by Bank payable monthly and due 14 days after the end of each calendar month..

(g)      Opinion of Counsel. ThinkCash shall deliver to Bank, simultaneously with the execution of this Agreement, an opinion of ThinkCash's counsel, in form and substance reasonably satisfactory to Bank, confirming the legality of the activities of ThinkCash contemplated by this Agreement under state and federal law.

(h)      ThinkCash shall maintain at all times a disaster recovery/business resumption plan, allowing ThinkCash to recover and continue to perform the services required under this Agreement in the event of an act of God or other disaster. ThinkCash shall test such plan at least annually. A summary of the plan and the results of testing will be made available to Bank upon request and the results of the testing shall be satisfactory to the Bank in its sole reasonable judgment.

7

(i)        ThinkCash shall maintain at its expense employee dishonesty coverage and a general comprehensive liability policy, each with a financially sound and reputable insurer reasonably acceptable to Bank. Such employee dishonesty and general comprehensive liability policy shall provide coverage limits of not less than $500,000 and $1 million, respectively, together with commercial umbrella coverage with a general aggregate limit of not less than $2 million. ThinkCash shall provide copies of such insurance policies to Bank and provide to Bank such evidence as it may reasonably request concerning the continued existence of such coverages during the term of this Agreement.

(j)        In the event of any failure by ThinkCash to perform any of its obligations under this Agreement, the Bank shall have all rights and remedies available under this Agreement at law and in equity. Without limiting the generality of the foregoing, ThinkCash grants to Bank a security interest in, and acknowledges that Bank shall have a contractual and statutory right of setoff against, any and all accounts, funds, monies, and other properties of ThinkCash at Bank or which come into the possession of Bank for the purpose of satisfying the obligations of ThinkCash hereunder, including, but not limited to, the Bank Deposit Account. ThinkCash agrees that none of its deposits at Bank shall be considered "special" deposits unavailable for setoff by Bank unless Bank has specifically so agreed in a separate writing. ThinkCash agrees that the rights and remedies of Bank described herein are in addition to all other rights which Bank may have by law or equity.

(k)        ThinkCash will obtain from each state in which it markets and services Loans any necessary loan brokering or collection agency licenses required by applicable Laws. Upon the Bank's request, ThinkCash shall provide a copy of any necessary license or certificate of authority. Finally, throughout the term of this Agreement, ThinkCash will obtain and maintain all other licenses, permits, and registrations necessary under applicable Laws to perform its obligations under this Agreement or as otherwise required by applicable Laws.

(l)        Each Party shall provide the other Party with written notice promptly (but not later than 5 Business Days) after becoming aware of any threatened or actual investigation, regulatory action, arbitration, lawsuit, fees, or penalties pertaining to the Loans, this Agreement, or any similar marketing and servicing agreements of third-parties that may materially impact the obligations or rights of the Parties under this Agreement.

3.    **Representations and Warranties.**

(a)        Bank hereby represents and warrants to ThinkCash as of the date hereof that:

(i)        Bank is a duly organized Delaware state-chartered bank, validly existing under the laws of the State of Delaware, and is authorized, as a matter of Delaware law, to conduct its business as described in this Agreement. The deposits of Bank are insured by the FDIC up to applicable limits. Bank has the corporate power and authority and all requisite licenses, permits and authorizations under Delaware and federal law to execute and deliver this Agreement and perform its obligations contemplated hereunder.

(ii)        Bank is authorized under Delaware and federal law to make Loans which comply with Delaware law regarding such Loans to Borrowers residing outside of Delaware and is not prohibited by Delaware or federal law to contract with a third-party to provide the services which ThinkCash will provide under this Agreement.

(iii)        Bank is authorized under Delaware and federal law to contract with a third-party to provide loan processing services not covered by this Agreement, and

8

UNSEALED
CONFIDENTIAL                                                                                            TF-PA-000852

transmission by and between ThinkCash and such third party of information required for and provided solely for the purpose of processing the Loans does not violate Delaware or federal law.

(iv) This Agreement has been duly authorized by Bank's Board of Directors, executed and delivered by Bank and constitutes its legal, valid and binding agreement, enforceable against Bank in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship, and the rights and obligations of receivers and conservators under 12 U.S.C. §§1821 (d) and (e), and any other laws affecting creditors' rights and remedies generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(v) The execution, delivery and performance of this Agreement by Bank does not violate or conflict with (A) any provision of the articles of incorporation or other governance documents of Bank or (B) any Delaware or federal law, or any order, arbitration award, judgment or decree to which Bank is a party or by which Bank or any of its assets may be bound.

(vi) Except as may be set forth on Exhibit B hereto, there are no claims, actions, suits, orders or investigations, either at law or in equity, or any proceedings by or before any court or governmental authority or arbitrator pending, or to the knowledge of Bank threatened, against Bank or any of its affiliates that (i) if asserted and decided adversely to Bank or any affiliate, could materially and adversely affect Bank or its affiliate or the Program contemplated by this Agreement, or (ii) questions the validity of this Agreement, the Program contemplated herein or the Loans, or (iii) seeks to delay, prohibit or restrict the activities of ThinkCash or Bank contemplated by this Agreement.

(vii) The Bank has delivered to ThinkCash true and correct copies of the Bank's audited financial statements as of and for the year ended December 31, 2005. Such financial statements and notes fairly present the financial condition and the results of operations, stockholders' equity, and cash flow of the Bank as of December 31, 2005 and for the year then ended, all in accordance with generally accepted accounting principles. The Bank has also delivered to ThinkCash true and correct copies of the Bank's unaudited financial statements as of and for the 9-month period ended September 30, 2006. Such financial statements fairly present the financial condition and the results of operations, stockholders' equity, and cash flow of the Bank as of September 30, 2006 and for the 9-month period then ended, all in accordance with generally accepted accounting principles (other than the omission of notes).

(b) ThinkCash hereby represents and warrants to Bank, as of the date hereof and as of each date on which a Loan is made that:

(i) ThinkCash is duly organized and validly existing under the laws of the State of Delaware, and, prior to performing duties under this Agreement, shall be duly qualified to do business in all necessary jurisdictions as contemplated under this Agreement, and shall have all requisite consents, approvals, licenses, permits and authorizations under applicable Law to execute and deliver this Agreement and perform its obligations contemplated hereunder.

(ii) ThinkCash has the corporate power and authority, and ThinkCash shall have all requisite licenses, permits and authorizations to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly authorized by ThinkCash's Board of Directors, executed and delivered by ThinkCash and constitutes its legal, valid and binding agreement, enforceable against ThinkCash in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights and remedies generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

9

UNSEALED
CONFIDENTIAL
TF-PA-000853

(iii)     The execution, delivery and performance of this Agreement by ThinkCash does not violate or conflict with (A) any provision of the governance documents of ThinkCash or (B) any applicable Law, or any order, arbitration award, judgment or decree to which ThinkCash is a party or by which ThinkCash or any of its assets may be bound.

(iv)     Except as may be set forth on Exhibit C hereto, there are no claims, actions, suits, orders or investigations, either at law or in equity, or any proceedings by or before any court or governmental authority or arbitrator pending, or to the knowledge of ThinkCash threatened, against ThinkCash or any of its affiliates that (i) if asserted and decided adversely to ThinkCash or any affiliate, could materially and adversely affect ThinkCash or its affiliate or the Program contemplated by this Agreement, or (ii) questions the validity of this Agreement, the Program contemplated herein or the Loans, or (iii) seeks to delay, prohibit or restrict the activities of ThinkCash or Bank contemplated by this Agreement.

(v)     ThinkCash has delivered to Bank true and correct copies of ThinkCash's financial statements as of and for the year ended December 31, 2005. Such financial statements and notes fairly present the financial condition and the results of operations, members' equity, and cash flow of ThinkCash as at December 31, 2005, and for the year then ended, all in accordance with generally accepted accounting principles. ThinkCash has also delivered to the Bank true and correct copies of ThinkCash's unaudited financial statements as of and for the 9-month period ended September 30, 2006. Such financial statements fairly present the financial condition and the results of operations, stockholders' equity, and cash flow of ThinkCash as of September 30, 2006 and for the 9-month period then ended, all in accordance with generally accepted accounting principles (other than the omission of notes in ThinkCash's unaudited financial statements).

(vi)     The execution, delivery, and performance of this Agreement does not violate, conflict with, permit the cancellation of, or constitute a default under any agreement to which ThinkCash is a party or by which ThinkCash is bound.

(vii)     ThinkCash maintains, in accordance with commercially reasonable standards customarily in place in the loan servicing industry, offsite back-up storage for all electronic data and other information pertaining to the performance of its services hereunder and each Loan serviced by ThinkCash for Bank pursuant to the Agreement.

(viii)     ThinkCash shall ensure that ThinkCash and all Third-Party Service Providers with which it contracts comply with all aspects of the Confidential Information clause in Section 6 of this Agreement. ThinkCash shall and shall require each Third-Party Service Provider to immediately notify Bank of any situation which may result in the loss or unauthorized disclosure of Customer Information and shall immediately provide Bank with (i) a list of the names of persons whose Customer Information has been disclosed or that may be disclosed, (ii) a description of the type and categories of the Customer Information that has been or may be disclosed, and (iii) the circumstances underlying the unauthorized or potentially unauthorized disclosure. ThinkCash shall and shall require each Third-Party Service Provider to cooperate with Bank and, at the direction of Bank, shall assist in notifying such customer or customers and shall take any other remedial action recommended by Bank and/ or required by applicable Law. ThinkCash shall bear the expense of this notification, any out of pocket costs incurred by Bank including outside counsel fees, and other any other costs related thereto.

(ix)     All actions taken by ThinkCash, its employees, its agents and contractors, and ThinkCash shall require and ensure that all Third-Party Service Providers, shall comply with:

10

UNSEALED

(a) the terms and conditions set forth in the Loan Agreement (including, without limitation, the interest rates, fees and charges);

(b) the forms of the written application, the telemarketing scripts and all other Promotional Materials, including any notices and disclosures required or permitted under applicable Laws, rules or regulations to be included thereon or therewith;

(c) the credit criteria and procedures;

(d) all laws and regulations applicable to all other solicitation, marketing, advertisement, acquisition and collection activities (but only where such collection activities are performed by ThinkCash or Third-Party Service Providers unaffiliated with Bank) relating in any way to the Loans, including, without limitation, all internet advertising, websites and links (whether or not operated by ThinkCash) which make any reference to the Loans or to and all activities involving disclosure to, or use or disclosure by, ThinkCash or any third-party under arrangement with ThinkCash, of any information relating to any Bank "consumer" or "customer" (as those terms are defined in the GLBA and regulations thereunder).

(x) Neither ThinkCash nor any principal thereof has been or is the subject of any of the following:

(a) Criminal conviction;

(b) IRS lien;

(c) Enforcement agreement, memorandum of understanding, cease and desist order, administrative penalty, or similar agreement concerning lending matters, or participation in the affairs of a financial institution;

(d) Administrative or enforcement proceeding or investigation commenced by the Securities Exchange Commission, state securities regulatory authority, Federal Trade Commission, any banking regulator, or any other state or federal Regulatory Authority, with the exception of routine communications from a Regulatory Authority concerning a consumer complaint and routine examinations of ThinkCash conducted by a Regulatory Authority in the ordinary course of ThinkCash's business; or

(e) Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practices or illegal activity on the part of ThinkCash or any principal thereof.

(f) For purposes of this subsection the word "principal" of ThinkCash shall include (i) any person exercising Control over ThinkCash, (ii) any officer or director of ThinkCash, and (iii) any person actively participating in the control of ThinkCash's business. For purposes of this subsection the word "Control" shall mean the ownership or power to vote ten percent (10%) or more of the outstanding ownership or voting interests of a person.

11

4. **Term and Termination.**

(a)     The term of this Agreement shall commence as of the date of the first Loan that is approved, and shall continue for a period of five (5) years (the "Initial Term"). This Agreement will automatically renew for subsequent one (1) year periods (each a "Renewal Term") unless Bank or ThinkCash provides written notice to the other at least 180 days prior to the expiration of the Agreement's Initial Term or any Renewal Term.

(b)     This Agreement also may be terminated upon the occurrence of one or more of the following events, within the time periods set forth below:

(i)     Upon the occurrence and during the continuation of an Event of Default (as defined below in this Section 4(b)(i)) by either Party, the nondefaulting Party may terminate this Agreement by giving written notice at least fifteen (15) Business Days in advance of termination and an opportunity for the defaulting Party to cure the event of default ("Event of Defaut") during such notice period (the "Cure Period"). It shall constitute an Event of Default by Bank hereunder if Bank shall be in material breach of any representation or warranty or covenant. It shall constitute an Event of Default by ThinkCash hereunder if ThinkCash shall be in material breach of any representation or warranty or covenant hereunder. Any nondefaulting Party, by giving written notice to the other Party, may suspend its obligations under this Agreement during any Cure Period until such time as the default is cured or this Agreement is terminated.

(ii)     Upon the occurrence of an Insolvency Event (as defined below in this Section 4(b)(ii)) by either Party, this Agreement shall automatically and immediately terminate. It shall constitute an insolvency event ("Insolvency Event") by Bank hereunder if Bank shall file for protection under any state or federal liquidation provision, or Bank is placed into conservatorship or receivership with the FDIC or any other duly appointed person or entity. It shall constitute an Insolvency Event by ThinkCash hereunder if ThinkCash shall file for protection under any chapter of the federal Bankruptcy Code, an involuntary petition is filed against ThinkCash under any such chapter and is not dismissed within thirty (30) days of such filing, or a receiver or any regulatory authority takes control of ThinkCash.

(iii)     Either Party may, by giving written notice to the other Party, suspend its obligations under this Agreement during any period that any representation or warranty made by the other Party pursuant to Section 3 hereof would have been inaccurate in any material respect if it had been made by the other Party during such period.

(iv)     Subject to Section 1(a), and provided that ThinkCash is not in material breach of this Agreement, ThinkCash may terminate this Agreement by giving written notice at least ten (10) Business Days in advance of termination if (a) Bank ceases generally to fund Loans marketed by ThinkCash pursuant to this Agreement, and Bank does not resume funding within such ten Business Day notice period; (b) if the Bank Policies violate any Laws or guidelines and recommendations governing loans and subprime lending and loan classification promulgated by the FDIC, Delaware Division of Banking or any other Regulatory Authorities and Bank fails to cure such violation within such ten-day notice period; or (c) if Bank amends the Bank Policies or the Loan credit underwriting criteria in a way that causes a material adverse effect on ThinkCash or its affiliates' business and Bank fails to take steps reasonably requested by

12

UNSEALED
CONFIDENTIAL

ThinkCash to minimize the material adverse effect on ThinkCash within such ten Business Day notice period.

(v)　　In the event of an act of God or other natural disaster which makes the carrying out of this Agreement impossible, or if a Party's performance hereunder is rendered illegal or materially adversely affected by reason of changes in Law (either federal or state) applicable to the Loans or to either Party hereto, or if a Party is advised in writing by any regulatory agency having or asserting jurisdiction over such Party or the Loans that the performance of its obligations under this Agreement is or may be unlawful or constitutes or may constitute an unsafe or unsound banking practice or that such activity may jeopardize such Party's standing with or applicable rating from such Regulatory Authority, then the Party unable to perform, or whose performance has been rendered illegal or who has been so advised by a Regulatory Authority, may terminate this Agreement by giving written notice at least ninety (90) days in advance of termination to the other Party, unless such changes in the Laws or communication from such Regulatory Authority require earlier termination, in which case termination shall be effective upon such earlier required date.

(vi)　　Either Party may terminate this Agreement on ninety (90) days' (or less, if so required by any Regulatory Authority) written notice to the other Party (a) in the event that they become aware of any adverse legal, regulatory or other developments related to the type of program contemplated by this Agreement and which could have a material adverse impact on either Party, its rate of return for the Loans or its litigation or risk exposure or (b) the Bank is not able to participate 100% of the Loans to participants.

(c)　　Upon termination or expiration of this Agreement, Bank shall pay ThinkCash any fees that are then due and payable under this Agreement. In order to preserve the goodwill of each Party with its customers, both Parties shall act in good faith and cooperate in order to ensure a smooth and orderly termination of their relationship and the termination of the Loan origination and the Program contemplated hereunder. Unless prohibited by applicable Laws, or as otherwise provided in this Agreement, upon Bank's written request ThinkCash shall continue to service outstanding Loans following termination or expiration of this Agreement until all Loans are repaid or charged off in accordance with Bank Policies. Upon the termination or expiration of this Agreement, all rights herein granted to ThinkCash shall revert to Bank, and ThinkCash (except any rights it may have under Section 6(a)) shall immediately cease using the Bank Properties. Upon the termination or expiration of this Agreement (other than a termination due to an Event of Default by ThinkCash or in the event that ThinkCash gives Bank notice of its intent not to renew this Agreement pursuant to Section 4(a)), Bank shall deliver, without charge, the list of all present and former Borrowers acquired under this Agreement, provided, however, that such list shall not include those Borrowers who have opted-out of such disclosure.

(d)　　Upon the termination or expiration of this Agreement, this Agreement shall become null and void and neither Party shall have any further liability with respect thereto, except for the provisions of <u>Sections 2(d)</u>, <u>2(e)(iii)</u>, <u>4 (c)-(g)</u>, <u>5</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u>, and <u>12</u> hereof, which shall survive the termination of this Agreement.

(e)　　If an Event of Default has occurred and is continuing, the non-defaulting Party shall be entitled to pursue, either before or after termination, such rights and remedies as may be available at law and in equity, in addition to those rights and remedies specifically provided for under the terms of this Agreement.

13

(f)     Upon termination of this Agreement for any reason, Bank shall have the immediate right to obtain possession from ThinkCash, at ThinkCash's sole expense, of the Loan Documents, including any computer files representing Loan Documents or information relating to them.

**5.     Notices.**

Any notice hereunder by a Party shall be given to the other Party at its address set forth below or at such other address designated by notice in the manner provided in this Section 5, by personal delivery, certified mail or private courier service, or by facsimile with a confirmation copy by first class mail, postage prepaid. Any written notice or demand to be given under this Agreement shall be duly and properly given if delivered as described in this Section 5. Such notice shall be deemed to have been given (a) when received if by personal delivery or private courier service, (b) when faxed if by facsimile, and (c) three days after mailing, if sent by certified mail; provided, however, that any notice given by a Party changing its address for notice shall be deemed given only upon actual receipt by the other Party. Unless otherwise agreed, notice shall be sent to the contact persons at the addresses or facsimile numbers, as the case may be, set forth below:

If to ThinkCash:

TC Loan Service, LLC d/b/a ThinkCash
Attn: Ken Rees
President
3880 Hulen Street
Suite 500
Fort Worth, TX 76107
Telephone: (817) 546-2788
Facsimile: (817) 546-2688

with a copy to (which shall not constitute notice):

Sarah L. Cutrona
TC Loan Service, LLC d/b/a ThinkCash
General Counsel
3880 Hulen Street
Suite 500
Fort Worth, TX 76107
Telephone: (817) 546-2788
Facsimile: (817) 546-2688

If to Bank:

First Bank of Delaware
Attn: Alonzo J. Primus
President
1000 Rocky Run Parkway
Wilmington, Delaware
Telephone: 215-735-4422 X5260
Facsimile: 215-735-0212

with a copy to (which shall not constitute notice):

14

First Bank of Delaware
Attn: CFO
1000 Rocky Run Parkway
Wilmington, Delaware
Telephone: 215-735-4422
Facsimile: 215-735-0212

Richard P. Eckman

Pepper Hamilton LLP
1313 Market Street ·

Suite 5100

Wilmington, Delaware 19801

Telephone (302) 777-6560

Facsimile (302) 397-2707

## 6. Confidentiality and Use of Customer Information.

(a)     Bank shall be and remain the owner of all information collected on the Application regarding all Applicants ("Applicant Information"), including, without limitation, names, addresses, demographic information and financial information. Notwithstanding the foregoing, ThinkCash shall be free to use Applicant Information for any lawful purpose with the prior written consent of Bank, and Bank agrees that such consent shall not be unreasonably withheld, provided that in all cases, such use by ThinkCash shall be consistent with the limitations imposed by the GLBA, FDIC, Federal Reserve Board regulations and Federal Trade Commission regulations implementing the GLBA, and other applicable privacy Laws; provided, further, that ThinkCash may not disclose or otherwise use any Applicant Information regarding any Applicant for any purpose other than performance of its obligations hereunder if such Applicant has opted-out of such sharing. Subject to Section 4(c) herein, ThinkCash shall not disclose or otherwise use information concerning an Applicant, other than Applicant Information, that is received by ThinkCash as a result of the Applicant's receipt of a Loan from the Bank pursuant to this Agreement for any purpose other than to perform ThinkCash's services as set forth in Section 2 of this Agreement. ThinkCash agrees that it will ensure that any Third-Party Service Provider that it uses who has access to the Applicant Information follows GLBA and other applicable Laws relating to Applicant Information and Customer Information. Consistent with the limitations imposed by the GLBA, FDIC, Federal Reserve Board regulations and Federal Trade Commission regulations implementing the GLBA, and other applicable privacy Laws, the Bank may use the Applicant Information for any Applicant to whom it extends a Loan, or considers extending a Loan, only for the purposes authorized by, and subject to the provisions of, this Agreement.

(b)     Bank agrees not to target the Borrowers for any solicitation of any product or service (other than general solicitations for products or services directed to the public at large), and not to provide any Applicant Information and any other information regarding any Borrower (collectively, "Customer Information") to any person or entity not a party to this Agreement, except (i) in connection with the collection and repayment of the Loans should the services of ThinkCash be terminated under this Agreement, or (ii) to the extent required to do so under applicable Law or judicial, administrative or regulatory process, without the prior written consent of ThinkCash, which consent shall not be unreasonably withheld, conditioned or delayed. Bank shall use reasonable care to ensure that its agents do not violate this provision; provided,

15

UNSEALED
CONFIDENTIAL                                             TF-PA-000859

however, that the Bank shall not be deemed to have violated this provision as a result of any advertising or solicitation that may be initiated by other marketers and servicers of the Bank's short-term loans, so long as the Bank does not provide any Customer Information to those other marketers and servicers.

(c)     Bank and ThinkCash agree to treat in confidence the provisions of this Agreement and all documents, materials, and other information related to this Agreement, including but not limited to, all proprietary information, data, trade secrets, business information and other information of any kind whatsoever which (a) a Party ("Discloser") discloses, in in writing to the other Party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement, and which (b) relates to (i) the Discloser, (ii) in the case of ThinkCash or a Third-Party Service Provider, Bank and its customers and or affiliates, or (iii) consumers who have made confidential or proprietary information available to ThinkCash or a Third-Party Service Provider, that were obtained during the course of negotiations leading to, and during the performance of, this Agreement (collectively "Confidential Information"), including without limitation the reports referenced in Section 2(e), and not to communicate Confidential Information to any third-party, except that Confidential Information may be provided to a Regulatory Authority having or asserting jurisdiction over a Party or the Loans, a Party's affiliates, as such term is defined in the Securities Exchange Act of 1934, counsel, accountants, financial or tax advisors without the consent of the other Party; *provided* that such parties agree to hold such Confidential Information in confidence. As used herein, and for the avoidance of doubt, the term "Confidential Information" does not include information which (i) becomes generally available to the public other than as a result of a disclosure by a Party receiving such information (a "Restricted Party"), (ii) is independently developed by a Restricted Party without violating this Agreement, (iii) was available to the Restricted Party on a non-confidential basis prior to its disclosure to the Restricted Party, (iv) becomes available to the Restricted Party on a non-confidential basis from a source other than the other Party; provided that such source is not bound by a confidentiality agreement with the other Party or otherwise prohibited from transmitting the information to the Restricted Party by a contractual, legal or fiduciary obligation or (v) is required by Law to be disclosed.

(d)     In the event that a Restricted Party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, the Restricted Party will provide the other Party with prompt notice of such request(s) so that the other Party may seek an appropriate protective order or other appropriate remedy and/or waive the Restricted Party's compliance with the provisions of this Agreement. In the event that the other Party does not seek such a protective order or other remedy, or such protective order or other remedy is not obtained, or the other Party grants a waiver hereunder, the Restricted Party may furnish that portion (and only that portion) of the Confidential Information which the Restricted Party is legally compelled to disclose and will exercise such efforts to obtain reasonable assurance that confidential treatment will be accorded any Confidential Information so furnished as a Restricted Party would reasonably exercise in assuring the confidentiality of any of its own Confidential Information.

(e)     ThinkCash acknowledges that Bank has a responsibility to keep information about its customers and their accounts, including "nonpublic personal information" as defined under the GLBA, strictly confidential and Bank acknowledges that ThinkCash has a responsibility to the Applicants and Borrowers to keep such Customer Information strictly confidential. In addition to the other requirements set forth in this Section 6 regarding Confidential Information, Customer Information shall also be subject to the additional restrictions set forth in this Section 6. The Parties shall disclose and use all Customer Information in strict compliance with the GLBA, all regulations which are or may be promulgated thereunder, and which may be promulgated by Regulatory Authorities, and any other applicable Laws. The Recipient of Customer Information shall not disclose or use such

CONFIDENTIAL  **UNSEALED**     App. 1000                    TF-PA-000860

Customer Information other than to carry out the purposes for which the Discloser has provided the Customer Information, or for which one of its affiliates or agents disclosed such Customer Information to Recipient.

(f)     Recipient shall not disclose any Customer Information other than on a "need to know" basis and then only, to the extent permitted by applicable Law, to: (1) affiliates of Discloser, provided that such affiliates shall be restricted in use and redisclosure of the Customer Information to the same extent as Discloser; (2) its employees, officers, auditors and attorneys; (3) affiliates of Recipient provided that such affiliates shall be restricted in use and redisclosure of the Customer Information to the same extent as Recipient; (4) to carefully selected subcontractors provided that such subcontractors shall have entered into a confidentiality agreement no less restrictive than the provisions of this Section 6; (5) to independent contractors, agents, and consultants hired or engaged by Recipient, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section 6; or (6) pursuant to the exceptions set forth in 15 U.S.C. § 6802(e) and accompanying regulations which disclosures are made in the ordinary course of business. The restrictions set forth herein shall apply during the Term, any Renewal Terms, and after the termination of this Agreement. For the purposes of this Section 6, all Borrowers shall be considered customers of Bank.

(g)     ThinkCash and Bank shall comply with the requirements of GLBA and the applicable regulations promulgated thereunder including, without limitation, 12 CFR Part 364, Appendix B. ThinkCash and Bank consider their relationship under the Agreement to be a "joint marketing relationship" as defined in Section 216.13 of Federal Reserve Board Regulation P. ThinkCash and Bank shall describe the existence of the joint marketing agreement, as required by Section 216.6(a)(5) of Regulation P, in their initial, annual and revised privacy notices, as applicable. Consistent with Section 216.13 of Regulation P, ThinkCash, its affiliates, agents, Third-Party Service Providers, marketers, or respective assigns shall not disclose or use any nonpublic personal information provided by Bank other than to carry out the purposes of designing, developing and administering the Program or as otherwise permitted pursuant to Federal Reserve Board's Regulation P.

(h)     Upon receiving personal information either directly or through an affiliate, ThinkCash and Bank shall not disclose such information to any other person that is a nonaffiliated third-party of both Bank and ThinkCash, unless such disclosure would be lawful if made directly to such other person by either Party.

## 7.     Specific Performance in the Event of Breach.

The Parties agree that monetary damages would not be adequate compensation in the event of a breach by a Restricted Party of its obligations under Section 6 of this Agreement and, therefore, the Parties agree that in the event of any such breach the Restricted Party, in addition to its other remedies at law or in equity, shall be entitled to an order requiring the Restricted Party to specifically perform its obligations under Section 6 of this Agreement or enjoining the Restricted Party from breaching Section 6 of this Agreement, and the Restricted Party shall not plead in defense thereto that there would be an adequate remedy at law.

## 8.     Indemnification.

(a)     ThinkCash and PayDay One Holdings, Inc., jointly and severally each hereby indemnifies and agrees to hold harmless Bank, its affiliates and the officers, directors, members, employees, representatives, shareholders, agents and attorneys of such entities (the "Bank Indemnified Parties") against any and all claims, losses, liabilities, damages, penalties, demands, judgments, settlements, costs and expenses ("Losses") suffered or incurred by such

17

UNSEALED
CONFIDENTIAL                     App. 1001                                TF-PA-000861

Bank Indemnified Parties as a result of, or with respect to, or arising from (i) any breach by ThinkCash of its obligations under this Agreement or the inaccuracy of any warranty or representation of ThinkCash set forth herein; (ii) the act or omission of ThinkCash or its employees, agents, or representatives (including, but not limited to, any such act or omission concerning the completion of an Application, Loan Agreement, or other Loan Documents by or with the assistance of any employee, agent, or representative of ThinkCash or any such act or omission in contravention of Bank Policies that is the material cause of a claim or determination that the Loans or the Loan Documents are illegal under or prohibited by any of the Laws and any other claim asserted by or on behalf of Borrowers or a Regulatory Authority with respect to the Loans); (iii) any act or omission of any Third-Party Service Provider retained by ThinkCash (including, but not limited to, any such act or omission in contravention of Bank Policies that is the material cause of a claim or determination that the Loans or the Program is illegal under or prohibited by any Law and any other claim asserted by or on behalf of Borrowers or a Regulatory Authority with respect to the Loans), the material inaccuracy of any warranty or representation made for the benefit of Bank by any Third-Party Service Provider retained by ThinkCash, or the breach of any obligation owed to Bank by any Third-Party Service Provider retained by ThinkCash; (iv) any Loss of Bank excluding credit losses on Loans and the negligence or intentional misconduct of Bank under this Agreement; (v) any separate proceeding or litigation initiated by Bank if Bank and ThinkCash mutually and reasonably agree that the commencement of such separate proceeding or litigation shall assist in establishing the legality or validity of the Loans or the Program and is directly related to the lending program established pursuant to this Agreement; (vi) any Losses resulting from the theft of Borrower personal identifying information or (vii) any separate proceeding or litigation commenced by Bank, with the written approval of ThinkCash (not to be reasonably withheld or denied), seeking to compel arbitration of any claim or dispute relating to the Loans and Loan Documents. Nothing herein, however, shall be construed to require ThinkCash to indemnify the Bank Indemnified Parties for any liability, claim, damage, loss, or expense directly arising out of any breach by Bank of its obligations under this Agreement or any gross negligence or wrongful act of Bank or any Third-Party Service Provider retained by it. Notwithstanding the foregoing, there shall be no indemnification due from ThinkCash under this Agreement for: (A) Losses caused by Bank's breach of this Agreement (including but not limited to the breach by Bank of any representation or warranty contained herein); (B) Losses caused by the burglary, fraud, theft, gross negligence or willful misconduct of Bank or its employees; (C) the loss of Bank's state charter, or the loss of any license or permit required by Bank to transact business as a state bank or as a federally insured financial institution; (D) claims that any Bank Indemnified Party is in violation of federal or state securities or corporate laws; (E) claims brought by employees or sharcholders of any Bank Indemnified Party; (F) a decline in the value of the stock of any Bank Indemnified Party; (G) adverse publicity or customer relations problems encountered by any Bank Indemnified Party; (H) loss of any non-Loan related business or profits of any Bank Indemnified Party; or (I) management time relating to attending hearings and meetings with respect to indemnified matters.

(b)        Bank hereby indemnifies and agrees to hold harmless ThinkCash, its affiliates, and the officers, directors, members, employees, representatives, shareholders, agents and attorneys of ThinkCash and its affiliates (the "ThinkCash Indemnified Parties") against any and all Losses suffered or incurred by such ThinkCash Indemnified Parties as a result of, or with respect to, or arising from (i) any breach of this Agreement by Bank (including, but not limited to the breach by Bank of any representation or warranty contained herein), or (ii) any burglary, fraud, theft, gross negligence or willful misconduct by Bank or its employees. Notwithstanding the foregoing, there shall be no indemnification due from Bank under this Agreement for: (i) Losses caused by ThinkCash's breach of this Agreement (including but not limited to the breach by ThinkCash of any representation or warranty contained herein); (ii) Losses caused by the burglary, fraud, theft, gross negligence or willful misconduct of ThinkCash or its employees; (iii) Losses resulting from any claim, investigation or allegation made by any regulatory or

18

governmental authority or agency arising from or relating to the Loans; (iv) Losses arising from the settlement of any claim, or a judgment or ruling by a court, arbitrator or regulatory authority on such claim, that ThinkCash has violated state or federal usury laws, state or federal consumer protection laws, state or federal racketeering laws (including the federal Racketeering Influenced and Corrupt Organizations Act), or federal Truth-in-Lending laws, or is liable for fraud or unconscionability; (v) claims that any ThinkCash Indemnified Party is in violation of federal or state securities or corporate laws; (vi) claims brought by employees or shareholders of any ThinkCash Indemnified Party; (vii) a decline in the value of the stock of any ThinkCash Indemnified Party; (viii) adverse publicity or customer relations problems encountered by any ThinkCash Indemnified Party; (ix) non-monetary sanctions by any court or Regulatory Authority; (x) loss of non-Loan related business or profits of any ThinkCash Indemnified Party; or (xi) management time relating to attending hearings and meetings with respect to indemnified matters.

(c)     The Bank Indemnified Parties and the ThinkCash Indemnified Parties are sometimes referred to herein as the "Indemnified Parties" and ThinkCash and PayDay One Holdings Inc. or Bank, as indemnitor hereunder, is sometimes referred to herein as the "Indemnifying Party".

(d)     An Indemnified Party shall not be entitled to indemnity from an Indemnifying Party for its own costs and expenses incurred in defending itself against a claim brought against it by an Indemnifying Party.

(e)     Any Indemnified Party seeking indemnification hereunder shall promptly notify the Indemnifying Party, in writing, of any indemnified Loss hereunder, specifying in reasonable detail the nature of the Loss, and, if known, the amount, or an estimate of the amount, of the Loss, provided that failure to promptly give such notice shall only limit the liability of the Indemnifying Party to the extent of the actual prejudice, if any, suffered by such Indemnifying Party as a result of such failure. The Indemnified Party shall provide to the Indemnifying Party as promptly as practicable thereafter information and documentation reasonably requested by such Indemnifying Party to support and verify the claim asserted.

(f)     The Indemnifying Party may assume the defense of a claim which it is indemnifying, or prosecute a claim resulting from such indemnified claim, and may employ counsel chosen by the Indemnifying Party (which counsel shall be reasonably acceptable to the Indemnified Party), at the Indemnifying Party's sole cost and expense. The Indemnified Party shall have the right, at its own expense, to reasonably employ counsel separate from counsel employed by the Indemnifying Party in any such action and to participate therein; provided, however, that the Indemnifying Party shall be responsible for reasonable attorneys' fees and legal expenses relating to separate counsel retained by the Indemnified Party if the Indemnified Party reasonably concludes that the ability of the parties to prevail in the defense of any claim is materially improved if separate counsel represents the Indemnified Party. The Indemnified Party shall not be liable for any settlement of any claim effected without its prior written consent, which shall not be unreasonably withheld, it being understood that the Indemnifying Party shall have no right to object to any equitable relief the Indemnified Party may agree to provide. However, if the Indemnifying Party does not assume the defense or prosecution of a claim within thirty (30) days after notice thereof, the Indemnified Party may settle such claim without the Indemnifying Party's consent. The Indemnifying Party shall not agree to a settlement of any claim which provides for any relief other than the payment of monetary damages by the Indemnifying Party without the Indemnified Party's prior written consent, which shall not be unreasonably withheld. Whether or not the Indemnifying Party chooses to so defend or prosecute such claim, the parties hereto shall cooperate in the defense or prosecution thereof and shall furnish such records, information and testimony, and attend such conferences, discovery

19

proceedings, hearings, trials and appeals, as may be reasonably requested in connection therewith, all at the Indemnifying Party's sole cost and expense.

(g)     The Parties agree that, if both Parties are named as defendants in the same lawsuit, the Parties will enter into a joint defense agreement reasonably acceptable to the Parties, but subject to the obligations of an Indemnifying Party hereunder.

(h)     This Section 8 shall survive any termination or expiration of this Agreement.

(i)     Bank and ThinkCash knowingly, voluntarily and intentionally waive any right to claim for punitive damages in connection with any claim or dispute, action or proceeding against Bank arising under or in connection with this Agreement, in tort, at law or in equity, or by virtue of any statute or otherwise.

### 9.     Expenses.

Except as expressly provided to the contrary in this Agreement, each Party shall be responsible for all expenses incurred by it in the performance of its obligations under this Agreement, including any expenses incurred by it in performing its duties set forth in Sections 1 or 2 above, as the case may be; *provided, however,* that ThinkCash shall reimburse Bank for all legal fees and incremental consultant costs including, without limitation, reasonable travel and lodging expenses, directly incurred by Bank in connection with the Loans, the Bank's initial and ongoing review of any third-parties used by ThinkCash and this Agreement.

If the Parties agree to Bank's use of the services of a third-party, such as Teletrack, Inc., for credit verification or check services, ThinkCash shall be responsible for 100 percent of any fees or expenses related thereto, which shall be deducted from the fee provided in Section 2(g) herein.

### 10.     Guaranty.

ThinkCash acknowledges that its obligations hereunder are to be guaranteed by PAYDAY ONE HOLDINGS, INC. ("Guarantor") and that the obligations of Bank hereunder are contingent upon Bank obtaining written guaranty in a form and substance satisfactory to Bank from the Guarantor. ThinkCash further agrees that Bank is entitled to information concerning the financial condition and stability of the Guarantor and its ability to meet all other financial commitments under such guaranty. ThinkCash agrees to cause the Guarantor to provide Bank with such information concerning the financial condition of the Guarantor as Bank may from time to time reasonably request.

### 11.     Miscellaneous.

(a)     Neither the existence of this Agreement or any related agreements, nor their execution, is intended to be, nor shall it be construed to be, the formation of a partnership, joint venture or agency relationship between Bank and ThinkCash. No employee of ThinkCash shall be deemed to be an employee of Bank, nor shall any employee of Bank be deemed an employee of ThinkCash.

(b)     This Agreement and any related agreements supersede any negotiations, discussions or communications between Bank and ThinkCash and constitute the entire agreement of Bank and ThinkCash with respect to the subject matter hereof.

**UNSEALED**
CONFIDENTIAL                    App. 1004                                    TF-PA-000864

(c)     Failure of any Party to insist, in one or more instances, on performance by any other Party in accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted hereunder or of the future performance of any such term or condition or of any other term or condition of this Agreement unless and to the extent that such waiver is in a writing signed by or on behalf of the Party alleged to have granted such waiver.

(d)     (i)     ThinkCash shall not assign any of its rights or delegate any of its obligations hereunder without Bank's prior written consent, which shall not be unreasonably withheld, in which event ThinkCash shall remain directly liable to Bank for all of ThinkCash's obligations hereunder.

(ii)     In seeking the approval of Bank to retain a Third-Party Service Provider, ThinkCash shall provide to Bank such information concerning the proposed Third-Party Service Provider as Bank may reasonably request. Bank may condition its willingness to approve a proposed Third-Party Service Provider upon obtaining a written commitment from such Third-Party Service Provider to comply with the terms of this Agreement, the Bank Policies and the Program guidelines, submit to audits and inspections by Bank and any Regulatory Authority, and indemnify Bank upon such terms and conditions as Bank may reasonably require. ThinkCash shall be responsible for supervising any Third-Party Service Providers retained by it and ensuring their compliance with this Agreement, the Bank Policies, and the Laws. Bank shall not assign any of its rights or delegate any of its obligations hereunder without ThinkCash's prior written consent, which shall not be unreasonably withheld.

(iii)     Any such approved assignee is referred to herein as a "Third-Party Service Provider". This Section 11(d) shall not be deemed to apply to Section 1(c).

(e)     This Agreement is for the sole and exclusive benefit of the Parties and shall not be deemed to be for the benefit of any third-party, including any Borrower.

(f)     Notice. Each party shall provide the other with written notice promptly (but not later than five (5) Business Days) after becoming aware of any threatened or actual investigation, regulatory action, arbitration, lawsuit, fees or penalties pertaining to the Loans, this Agreement or any similar marketing and servicing agreements of third-parties, the effect of which may materially impact the obligations or rights of the Parties under this Agreement.

(g)     The headings and captions of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

(h)     This Agreement may be executed by the Parties in separate counterparts, each of which is an original but all of which together shall constitute one and the same document. Facsimile signatures and photocopies shall be deemed as valid as though they were originals.

(i) ThinkCash agrees that it shall use its best efforts to enable the Bank to issue on a monthly basis at least 25% of Loans contemplated under this Agreement on substantially the same terms as the Program contemplated by this agreement pursuant to solicitations mailed or distributed by ThinkCash, its parent company, its affiliates, or related parties under any similar agreements with other banks or financial institutions. Bank shall be the exclusive provider of Loans in the states listed in Exhibit H. It is agreed that this exclusivity provision will be effective beginning on the date that is up to 60 days after the first Loan is made. However, if the Bank is unable or unwilling to make Loans in any of the states listed in Exhibit H, the exclusivity provision for that state will be waived.

21

## 12. Choice of Law; Forum Selection; Attorneys Fees; Waiver of Jury Trial.

(a)    **Choice of Law**.  This Agreement and the rights and duties described herein shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, without reference to Delaware choice of law or conflict of law rules.

(b)    **Forum Selection**.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the Parties in the courts of the State of Delaware, New Castle County, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, and each of the Parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

(c)    **Attorneys Fees**.  Any person who is the successful Party in any proceeding brought to enforce such Party's rights under this Agreement shall be entitled to recover attorneys' fees and costs from the other Party.

(d)    **WAIVER OF RIGHTS TO TRIAL BY JURY**.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANYWAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

*[Signature Page Follows]*

22

IN WITNESS WHEREOF, Bank and ThinkCash, intending to be legally bound hereby, have caused this Agreement to be executed by their duly authorized officers as of the day and year first set forth above.

FIRST BANK OF DELAWARE      TC LOAN SERVICE, LLC d/b/a THINKCASH
("Bank")                                         ("ThinkCash")

By: _____      By: _____

Its: __President__                           Its: President + CEO

Date: __1/23/07__                       Date: __1/25/07__

Sections 8 and 10 Acknowledged and Agreed:

PAYDAY ONE HOLDINGS, INC.

By: _____

Its: __President + CEO__

Date: __1/25/07__

23

EXHIBITS

Exhibit A:          Glossary of Defined Terms
Exhibit B:          Proceedings Against Bank
Exhibit C:          Proceedings Against ThinkCash
Exhibit D:          Excluded States
Exhibit E:          Bank Policies
Exhibit F:          IT Standards
Exhibit G:          Copy of Application
Exhibit H:          List of States where Bank is the Exclusive provider of Loans

UNSEALED
CONFIDENTIAL

TF-PA-000868

**EXHIBIT A**
**GLOSSARY OF DEFINED TERMS**

"Access Channels" has the meaning ascribed to it in Section 2(a).

"ACH" has the meaning ascribed to it in the Preamble.

"Adverse Action Notice" has the meaning ascribed to it in Section 2(c)(ii).

"Agreement" has the meaning ascribed to it in the Preamble.

"Applicants" has the meaning ascribed to it in Section 2(a).

"Applicant Information" has the meaning ascribed to it in Section 6(a).

"Applications" has the meaning ascribed to it in Section 2(a).

"Bank" has the meaning ascribed to it in the Preamble.

"Bank Deposit Account" has the meaning ascribed to it in Section 2(d)(iii).

"Bank Indemnified Parties" has the meaning ascribed to it in Section 8(a).

"Bank Policies" has the meaning ascribed to it in Section 2(a).

"Bank Properties" has the meaning ascribed to it in Section 2(b)(i).

"Borrowers" has the meaning ascribed to it in the Preamble.

"Business Day" has the meaning ascribed to it in Section 1(d).

"Confidential Information" has the meaning ascribed to it in Section 6(c).

"Cure Period" has the meaning ascribed to it in Section 4(b)(i).

"Customer Information" has the meaning ascribed to it in Section 6(b).

"Discloser" has the meaning ascribed to it in Section 6(c).

"Disclosures" has the meaning ascribed to it in Section 2(c)(ii).

"ECOA" has the meaning ascribed to it in Section 2(c)(i).

"Event of Defaut" has the meaning ascribed to it in Section 4(b)(i).

"FCRA" has the meaning ascribed to it in Section 2(c)(ii).

"FDCPA" has the meaning ascribed to it in Section 2(d)(i).

"FDIC" has the meaning ascribed to it in the Preamble.

"GLBA" has the meaning ascribed to it in Section 2(e)(v).

"Guarantor" has the meaning ascribed to it in Section 10.

"Indemnified Parties" has the meaning ascribed to it in Section 8(c).

"Indemnifying Party" has the meaning ascribed to it in Section 8(c).

"Initial Term" has the meaning ascribed to it in Section 4(a).

"Insolvency Event" has the meaning ascribed to it Section 4(b)(ii).

"IT" has the meaning ascribed to it in Section 2(b)(iv).

"Laws" has the meaning ascribed to it in Section 1(a).

"Loans" has the meaning ascribed to it in the Preamble.

"Loan Documents" has the meaning ascribed to it in Section 2(e)(iii).

"Losses" has the meaning ascribed to it in Section 8(a).

"NACHA Rules" has the meaning ascribed to it in Section 2(d)(i).

"Loan Agreement" has the meaning ascribed to it in Section 2(c)(iii).

"Party" and "Parties" have the meaning ascribed to them in the Preamble.

"Program" has the meaning ascribed to it in the Preamble.

"Promotional Materials" has the meaning ascribed to it in Section 2(b)(i).

"RCC" has the meaning ascribed to it in the Preamble.

"Recipient" has the meaning ascribed to it in Section 6(c).

"Regulation B" has the meaning ascribed to it in Section 2(c)(i).

"Regulation Z" has the meaning ascribed to in Section 2(c)(ii).

"Regulatory Authorities" has the meaning ascribed to it in Section 2(e)(iv).

"Renewal Term" has the meaning ascribed to it in Section 4(a).

"Restricted Party" has the meaning ascribed to it in Section 6(c).

"ThinkCash" has the meaning ascribed to it in the Preamble.

"ThinkCash Indemnified Parties" has the meaning ascribed to it in Section 8(b).

"Third-Party Service Provider" has the meaning ascribed to it in Section 11(d)(iii).


CONFIDENTIAL UNSEALED

TF-PA-000870

# EXHIBIT B
## PROCEEDINGS AGAINST BANK

**None.**

CONFIDENTIAL **UNSEALED**

App. 1011

TF-PA-000871

## EXHIBIT C
## PROCEEDINGS AGAINST THINKCASH


CONFIDENTIAL

TF-PA-000872

## EXHIBIT D
## EXCLUDED STATES

**The Bank will not make Loans in the following states**

**New York**

**New Jersey**

**Maryland**

**Kansas**

**Massachusetts**

**West Virginia**

**Georgia**

**Puerto Rico**

**U.S Virgin Islands**

# EXHIBIT E
## BANK POLICIES

CONFIDENTIAL UNSEALED

TF-PA-000874



# GUARANTY

THIS GUARANTY is made as of the 23rd day of January, 2007, by PAYDAY ONE HOLDINGS, INC, a Delaware corporation (hereinafter referred to as "Guarantor"), to and for the benefit of First Bank of Delaware (hereinafter referred to as "Bank").

## RECITALS -

TC Loan Service, LLC d/b/a ThinkCash ("TC Loan Service"), an affiliate of Guarantor, proposes to enter into a Marketing and Servicing Agreement (the "Marketing and Servicing Agreement"), dated as of January 23, 2007, with Bank. Bank is unwilling to enter into the Marketing and Servicing Agreement unless it has received this Guaranty from Guarantor of the obligations of TC Loan Service under the Marketing and Servicing Agreement.

NOW, THEREFORE, in consideration of the premises recited above and of One Dollar ($1.00) in hand paid by TC Loan Service to the Guarantor, and of other good and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged by the Guarantor; and for the purpose of inducing Bank to enter into the Marketing and Servicing Agreement; and as long as TC Loan Service continues to be obligated to Bank in any manner whatsoever, the Guarantor:

1.    Unconditionally and absolutely guarantees: (a) the due and punctual payment of all amounts due and payable from TC Loan Service to Bank under the Marketing and Servicing Agreement, and any interest thereon and any other moneys due or which may become due thereon; and (b) the due and punctual performance and observance by TC Loan Service of all other obligations, warranties, covenants, and duties of TC Loan Service set forth in the Marketing and Servicing Agreement and any other instruments or documents executed in connection therewith, whether according to the present terms thereof or pursuant to any extension of time or to any change or changes in the terms, warranties, covenants, agreements and conditions thereof now or at any time hereafter made or granted (all of which amounts, interest, other moneys due, and the terms, warranties, agreements, covenants and conditions being herein called the "Obligations").

To this end the Guarantor covenants and agrees to take all such actions necessary to enable TC Loan Service to observe and perform and to refrain from taking any action which would prevent TC Loan Service from observing and performing each and every such Obligations.

2.    Agrees that this Guaranty shall be a continuing guaranty, shall be binding upon the Guarantor, and upon its successors and assigns, and shall remain in full force and effect, and shall not be discharged, impaired or affected by (a) the existence or continuance of any of the Obligations; (b) the validity or invalidity of any document or agreement evidencing the Obligations or any of them; (c) the existence or continuance of TC Loan Service as a legal entity; (d) any waiver, indulgence, alteration, substitution, exchange, change in, modification or other

**UNSEALED**

TF-PA-000840

disposition of any of the Obligations, all of which TC Loan Service is hereby expressly authorized to make from time to time without notice to the Guarantor; (e) the acceptance by Bank of any security for, or other guarantors upon, all or any part of the Obligations; or (f) any defense (other than the payment or performance of the Obligations in accordance with their terms) that the Guarantor may or might have to its undertakings, liabilities and obligations hereunder, each and every such defense being hereby waived by the Guarantor.

In order to hold the Guarantor liable hereunder, there shall be no obligation on the part of Bank, or anyone, at any time, to proceed against TC Loan Service, or its properties or estates, or to proceed against any other guarantor, or to resort to any collateral, security, property, liens or other rights or remedies whatsoever.

3. Agrees that Bank shall have the right to enforce this Guaranty against the Guarantor for and to the full amount of the Obligations, with or without enforcing or attempting to enforce this Guaranty against any other guarantor, and whether or not other proceedings or steps are pending or have been taken or have been concluded to enforce or otherwise realize upon the obligation or security of TC Loan Service or any other guarantor. The payment of any amount or amounts by the Guarantor, pursuant to his obligation hereunder, shall not entitle the Guarantor, either at law or otherwise, to any right, title or interest (whether by way of subrogation or otherwise) in and to any of the Obligations, unless and until the full amount of the Obligations has been fully paid.

4. (a) As of the date of this Guaranty, Guarantor shall have delivered to the Bank true and correct copies of Guarantor's audited financial statements as of and for the year ended December 31, 2005. Such financial statements and notes fairly present the financial condition and the results of operations, stockholders' equity, and cash flow of Guarantor as at December 31, 2005 and for the year then ended, all in accordance with generally accepted accounting principles. On or before April 30 of every year that the Participant Agreement is in effect, Guarantor shall deliver to the Bank true and correct copies of Guarantor's audited financial statements as of the last day of the immediately preceding calendar year and such financial statements shall accurately present the financial condition and the results of operations, stockholders' equity, and cash flow of Guarantor as at the end of such calendar year, all in accordance with generally accepted accounting principles.

(b) As of the date hereof and throughout the term of the Marketing and Servicing Agreement, (i) Guarantor does and shall continue to directly own 100% of the capital stock of TC Loan Service and (ii) no other entity is or shall be considered the parent corporation of TC Loan Service.

(c) As of the date of this Guaranty and during the length of the Marketing and Servicing Agreement, Guarantor agrees to retain a minimum net worth of $ 15 million which is the ending net worth as of December 31, 2006.

5. Guarantor hereby represents, warrants and covenants to Bank, as of the date hereof and on a continuing basis throughout the term of this Guaranty, that:

-2-

UNSEALED   TF-PA-000841

(a)     Guarantor is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.

(b)     Guarantor has the corporate power and authority, and all necessary licenses, permits and authorizations, to execute and deliver this Guaranty and to perform its duties hereunder. This Guaranty has been duly authorized by Guarantor's Board of Directors, duly executed and delivered by Guarantor and constitutes Guarantor's legal, valid and binding agreements enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights and remedies generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     The execution, delivery and performance of this Guarantor will not (A) violate or conflict with any provision of the articles of incorporation, the bylaws or other governance documents of Guarantor; or (B) violate or conflict with, constitute a breach of or default under, result in the loss of any material benefit under, or permit the acceleration of or entitle any party to accelerate any obligation under or pursuant to, any material mortgage, lien, lease, agreement, instrument, order, law, arbitration award, judgment or decree to which Guarantor is a party or by which Parent assets may be bound, except as disclosed on Schedule A hereof.

(d)     There are no undisclosed actions, investigations (formal or informal), lawsuits, or claims pending or threatened against Guarantor which may impact upon the ability of Guarantor to perform under this Guaranty in any respect.

(e)     All written and financial information provided to Bank by Guarantor as of the date hereof are accurate and, to the best of Parent's knowledge, contains no material misrepresentations of fact or material omissions.

6.     Waives diligence, presentment, protest, notice of dishonor, demand for payment, extension of time of payment, notice of acceptance of this Guaranty, nonpayment at maturity and indulgences and notices of every kind, and consent to any and all forbearance and extensions of the time of payment of the Obligations, and further consents to any and all changes in the terms, covenants and conditions thereof hereafter made or granted; it being the intention that the Guarantor shall remain liable under this Guaranty until the Obligations shall have been fully repaid to Bank and the terms, covenants and conditions thereof shall have been fully performed and observed by TC Loan Service, notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of the Guarantor.

7.     Agrees that this Guaranty shall inure to the benefit of and may be enforced by Bank and its successors and assigns.

8.     Agrees, as does Bank, that this Guaranty shall be governed by the laws of the State of Delaware and that any dispute or controversy whatsoever arising hereunder shall be resolved pursuant to the provisions set forth in the Marketing and Servicing Agreement, or any other dispute resolution procedures which TC Loan Service and Bank may agree upon in writing, all of which are hereby consented and agreed to by Guarantor and Bank.

-3-

**UNSEALED**

TF-PA-000842

9.     Any notice hereunder shall be given by notice in the manner provided in this Section 4 by hand delivery, certified mail or private courier service, or by facsimile with a confirmation copy by first class mail, postage prepaid. Any written notice or demand to be given under this Guaranty shall be duly and properly given if delivered as described in this Section 3. Such notice shall be deemed to have been given (a) when received, if by personal delivery or private courier service, (b) when faxed, if by facsimile, and (c) three days after mailing, if sent by certified mail; provided, however, that any notice given by a party changing its address for notice shall be deemed given only upon actual receipt by the other party. Unless otherwise agreed, notice shall be sent to the contact persons at the addresses or facsimile numbers, as the case may be, set forth below:

If to Guarantor:

Ken Rees, President
PayDay One Holdings, LLC
3880 Hulen Street, Suite 500
Fort Worth, Texas 76107
Facsimile (817) 546-2688

With a copy to:

Sarah Cutrona, Esquire
PayDay One Holdings, LLC
3880 Hulen Street, Suite 500
Fort Worth, Texas 76107
Facsimile (817) 546-2688

If to Bank:

Alonzo J. Primus, President
First Bank of Delaware
1000 Rocky Run Parkway
Wilmington, Delaware 19803
Facsimile (215) 735-0212

With a copy to:

Harry D. Madonna, CEO
First Bank of Delaware
1000 Rocky Run Parkway
Wilmington, Delaware 19803
Facsimile (215) 735-0212

*[Signature Page Follows]*

-4-

UNSEALED

App. 1019

TF-PA-000843

The Guarantor has executed this instrument as of the day and year first above written.

PAYDAY ONE HOLDINGS, INC

By: _____

Its _Pres. at t CEO_

GUARANTOR

STATE OF _Texas_ )

                   : SS

COUNTY OF _Tarrant_ )

On this, the _23rd_ day of _January_ , 2008, before me, the undersigned officer, personally appeared _KENNETH G Rees_ who acknowledged himself to be the _PRES. & CEO_ of PAYDAY ONE HOLDINGS, INC, a corporation, and that he, as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as _PRESIDENT & CEO_ .

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Charmie S Le Zew_

Notary Public, _Texas_

My Commission expires: _10/01/08_

CHARMIE S LE HEW
NOTARY PUBLIC
State of Texas
Comm. Exp.10-01-2008

-5-

UNSEALED

App. 1020

TF-PA-000844

**First Bank of Delaware**
Two Liberty Place
60 S. 16th Street, Suite 2400
PHILADELPHIA, PENNSYLVANIA 19102
215-735-4422
FAX: 215-735-0212
www.fbdel.com



**FIRST BANK OF DELAWARE**
INNOVATIVE FINANCIAL SOLUTIONS

ALONZO J. PRIMUS
PHONE: (215) 735-4422 EXT. 5260
FAX: (215) 735-0212
E-MAIL: APRIMUS@FBDEL.COM

September 27, 2007

**CONFIDENTIAL**

**BY E-MAIL AND FEDERAL EXPRESS**

ThinkCash
Attn: Ken Rees
4150 International Plaza Suite 400
Fort Worth TX 76109
krees@thinkcash.com

Re: Amendment to Master Participation Agreement

Dear Mr. Ken Rees:

Reference is made hereby to the Marketing and Servicing Agreement between us dated January 23rd, 2007 (the "Agreement") and the Addendum dated May 22nd, 2007. As used herein, unless the context otherwise requires, all capitalized terms have the meanings ascribed to them in the Agreement.

Section 20.1 of the agreement speaks to maintaining a RESERVE account that is an amount not less than the Purchase Price for the next Business Day. It also mentions the Reserve Account Balance Requirement being calculated each Business Day. Operationally, we have found this practice to be impractical and unmanageable from an accounting perspective.

Section 20.1 of the Agreement shall be superseded with the following section:



Exhibit
P104
Christy R. Sievert, CSR, RPR

CONFIDENTIAL **UNSEALED**

TF-PA-000989

TC Financial agrees to maintain a deposit account ("Reserve Account") at the Lender, which Reserve Account shall contain a balance (the "Reserve Account Balance Requirement"), that is an amount equal to the (a) one (1) times the daily average of the total sum of Loans funded in a given day divided by the actual number of business days or (b) $50,000. The reserve account calculation will be within five (5) business days immediately preceding the prior calendar month. The failure to meet and maintain the Reserve Account Balance Requirement after three (3) Business Days prior notice to TC Financial from the Lender constitutes grounds for termination of this Agreement pursuant to Section 15, above. To the extent the Reserve Account balance exceeds the Reserve Account Balance Requirement, the Lender shall pay to TC Financial by ACH payment or wire transfer an amount equal to the excess balance held in the Reserve Account provided that the Lender shall not be required to transfer such excess balances more frequently then the end of each calendar quarter. TC Financial acknowledges that the purpose for the TC Financial owned, Lender controlled Reserve Account is to serve as collateral for TC Financial's payment obligations to the Lender hereunder. If any shortfall should occur within the Reserve Account, FBD shall have the right of set off by use of the Customer Repayment Account. Upon termination of this Agreement, and repayment in full of all obligations of TC Financial owed to the Lender, and the full performance of all obligations of TC Financial hereunder, the Lender shall return any remaining amounts held in the Reserve Account to TC Financial.

Section 2.2 – (Sale of Participating Interest) of the Agreement shall be superseded with the following section:

(a)    On each Business Day on which Lender makes the Offering Schedule available, the Lender shall sell to TC Financial, and TC Financial shall purchase from the Lender without recourse, subject to the terms of this Agreement, a ninety percent (90%) Participating Interest in the Consumer Loans on the Offering Schedule. The Consumer Loans on the Offering Schedule shall constitute the Loan Schedule. The ninety percent (90%) Participating Interest in the Consumer Loans listed on the Loan Schedule shall be sold by Lender to TC Financial, at a purchase price equal to ninety percent (90%) of the aggregate Amount Financed of the Consumer Loans identified on the Offering Schedule (each, a "Purchase Price") on the day on which the Loan Schedule is received. Such Loan Schedule shall also reflect the Lender's retained ten percent (10%) interest in the Consumer Loans identified on such Loan Schedule (the "Retained Interest"). As payment for the TC Financial's ninety percent (90%) Participating Interest in the Loans, Lender may process an ACH transfer on or after 5:30 p.m. Central Time on the current Business Day from the Transfer Account in an amount equal to the Purchase Price in payment for the Participating Interest in the Consumer Loans identified on the Loan Schedule. TC Financial shall ensure that adequate funds for such settlement are in the Transfer Account at all times during the term of this Agreement. Notwithstanding the foregoing, the Lender shall be permitted to offer and sell a participating interest in the Consumer Loans to one or more third parties if TC Financial is unable or unwilling to purchase that Participating Interest.

(b)    In the event that the Lender, by oral, written or other formal or informal communication or investigation, becomes aware of any adverse legal, regulatory or other developments related to the type of program contemplated by this Agreement and the Marketing and Servicing Agreement, and which could have a material adverse impact on the

2

UNSEALED
CONFIDENTIAL

TF-PA-000990

Lender, its rate of return for the Loans or its litigation or risk exposure, and provided that the Marketing and Servicing Agreement has not been terminated, the Lender may give TC Financial written notice of such developments and require TC Financial to immediately purchase the Lender's then-outstanding Retained Interest in the Loans. On such day as such notice is given, and on each Business Day thereafter, subsections 2.2(a) and 2.2(b) hereof shall cease to have any effect, and on each Business Day on which Lender makes the Offering Schedule available, the Lender shall sell to TC Financial, and TC Financial shall purchase from the Lender, subject to the terms of this Agreement, all of Bank's Retained Interest in Consumer Loans and a one hundred percent (100%) Participating Interest in the Consumer Loans on the Offering Schedule. The Consumer Loans on the Offering Schedule shall constitute the Loan Schedule. The Retained Interest in the Consumer Loans shall be sold by Lender to TC Financial, at a purchase price equal to ten percent (10%) of the remaining principal value owed under the Loan Agreements. The one hundred percent (100%) Participating Interest in the Consumer Loans listed on the Loan Schedule shall be sold by Lender to TC Financial, at a purchase price equal to one hundred percent (100%) of the aggregate Amount Financed of the Consumer Loans identified on the Offering Schedule on the day on which the Loan Schedule is received. As payment for the Loans, Lender may process an ACH transfer on or after 5:30 p.m. Central Time on the current business day from the Transfer Account in an amount equal to the purchase price as calculated above. TC Financial shall ensure that adequate funds for such settlement are in the Transfer Account at all times during the term of this Agreement. Notwithstanding the foregoing, the Lender shall be permitted to offer and sell a participating interest in the Consumer Loans to one or more third parties if TC Financial is unable or unwilling to purchase that participating interest.

Exhibit E is amended and replaced with the Exhibit E listed below.

## **EXHIBIT E**

## **COMPUTATION OF PROGRAM REVENUES**

1. TC Financial shall pay the Lender a percentage of Program Revenues as follows:
   a) When Consumer Loans outstanding on the last day of any month are less than or equal to $5 million, the Lender shall retain 9% of Program Revenues for the next month;
   b) When Consumer Loans outstanding on the last day of any month are greater than $5 million but less than or equal to $10 million, the Lender shall retain 8% of Program Revenues for the next month;
   c) When Consumer Loans outstanding on the last day of any month are greater than $10 million but less than or equal to $15 million, the Lender shall retain 7% of Program Revenues for the next month;
   d) When Consumer Loans outstanding on the last day of any month are greater than $15 million but less than or equal to $20 million, the Lender shall retain 6% of Program Revenues for the next month;

3

UNSEALED
CONFIDENTIAL

TF-PA-000991

e) When Consumer Loans outstanding on the last day of any month are greater than $20 million but less than or equal to $25 million, the Lender shall retain 5% of Program Revenue for the next month s;

f) When Consumer Loans outstanding on the last day of any month are greater than $25 million but less than or equal to $30 million, the Lender shall retain 4% of Program Revenues for the next month;

g) When Consumer Loans outstanding on the last day of any month are greater than $30 million but less than or equal to $35 million, the Lender shall retain 4% of Program Revenues for the next month;

h) When Consumer Loans outstanding on the last day of any month are greater than $35 million, the Lender shall retain 3% of Program Revenues for the next month.

2. TC Financial shall reimburse the Lender on a monthly basis for all the Lender's charges and actual costs associated with any bank accounts that the Lender establishes to conduct the Program contemplated under this Agreement, including, without limitation, actual NSF charges, services fees, and any miscellaneous monthly fees. The Lender will submit an invoice to TC Financial for these charges on a monthly basis.

3. TC Financial shall ensure that the Lender earns the following amount of Program Revenue ("Minimum Program Revenue") of:

a) For the first 12 months of the Agreement, $15,000 per month, however this minimum will be waived for the first month of the Agreement and will be effective starting with April activity.

b) For the next 24 months of the Agreement, $25,000 per month

c) For the final two years of the Agreement, $50,000 per month.

4. TC Financial shall reimburse the Lender for all Lender costs related to the Program including all credit scoring costs, identity verification costs, Teletrack fees, OFAC and due diligence costs and outside counsel fees relating to the Program.

5. In any month, where the principal charge offs on loans exceed 25% of the Bank's Retained Interest, TC Financial shall reimburse the Bank for the amount of principal losses that exceed 25% of the Bank's Retained Interest in that month.

Except as amended hereby, the Agreement is unmodified and shall remain in full force and effect.

Best Regards,

FIRST BANK OF DELAWARE

4

UNSEALED
CONFIDENTIAL

App. 1024

By: _____

Alonzo J. Primus
President

Accepted and agreed to as of
the 28th day of September, 2007:

TC FINANCIAL, LLC

By: _____

Ken Rees
President

5

**UNSEALED**
CONFIDENTIAL

App. 1025

TF-PA-000993

By: _____

Alonzo J. Primus
President

Accepted and agreed to as of
the 28th day of September, 2007:

TC FINANCIAL, LLC

By: _____

Ken Rees
President

5

**UNSEALED**
CONFIDENTIAL

App. 1025

TF-PA-000993